agents as to how this amount, which does not match any of the foregoing scenarios[12], was arrived at; in any event, after taking into account the fees paid to the Defendants and the other participants, Plaintiffs still lost hundreds of thousands of dollars on the transaction.[13]

6. **Camferdam and Adams Contribute Securities**

184. On or about December 15, 1999, Plaintiffs Camferdam and Adams contributed bonds (the "Bonds"), which they had held for more than one year, to Carmel Partners as a contribution to capital, in reasonable reliance on the instructions of the Defendants, Ernst & Young and Jenkens, the promised formal opinion letters of Jenkens & Gilchrist and Brown & Wood confirming the propriety of the COBRA Strategy, and the representations of Hoeing, Upchurch and Rhodes at the November 5, 1999 presentation and thereafter. The Bonds contributed had a market value of approximately $1,250,000.00 ($1,005,000 from Camferdam and $245,000 from Adams).

7. **The Individual Plaintiffs Contribute Their Interests in Carmel Partners to BAMC, Inc.**

185. On or about December 23, 1999, Plaintiffs each contributed their interest in Carmel Partners to BAMC, Inc. as a contribution to its capital. These transfers were made pursuant to the instructions and with the assistance of the Defendants, Jenkens and Ernst & Young for the purpose of carrying out the COBRA Strategy.

[12] Moreover, the median price of the Euro on that date was U.S. $1.00400 per 1.0 Euro and the median price of the Yen was 103.58 Japanese Yen per U.S. Dollar. Thus, both trades on all contracts were beneath the strike prices and Plaintiffs should have received $7,775,000. Plaintiffs' acceptance of a smaller amount indicates their total lack of understanding of the FX Contracts.

[13] Indeed, the digital options were designed by the Deutsche Defendants to expire out of the money, thus allowing Deutsche to retain the premiums. The Camferdam, Adams, Michener and Trigilio Plaintiffs are more an anomaly than the norm; most other Plaintiffs expired out of



GOVERNMENT EXHIBIT 1 (2/2)
PENGAD 800-631-6989

186. Contemporaneously with this contribution, Carmel Partners was dissolved and liquidated. As a distribution in liquidation of Carmel Partners, all of the Bonds were distributed to BAMC, Inc.

### 8. BAMC, Inc. Sells Investments

187. On or about December 28, 1999, BAMC, Inc. sold the Bonds it received upon liquidation of Carmel Partners. These transactions were made based on the advice and instruction of and with assistance by the Defendants, Jenkens and Ernst & Young for the purpose of carrying out the COBRA Strategy.

## F. THE OTHER PLAINTIFFS ENGAGE IN THE COBRA STRATEGY

188. In late November and December of 1999, the Parmer, Laurenzo, Rice and Arnold Plaintiffs engaged in the COBRA Strategy. The transaction these Plaintiffs entered into was identical in form to the one entered into by the Camferdam, Adams, Michener and Trigilio Plaintiffs and differed only in the names of the entities, the *size* of the various "trades" and the type of currency involved.

## G. IRS NOTICE 1999-59: TRANSACTIONS LACKING IN "ECONOMIC SUBSTANCE" ARE ILLEGAL

189. On December 27, 1999, the IRS issued IRS Notice 1999-59, entitled "Tax Avoidance Using Distribution of Encumbered Property." In this Notice, the IRS stated that "[t]he Internal Revenue Service and Treasury Department have become aware of certain types of transactions as described below, that are being marketed to taxpayers for the purpose of generating tax losses. This notice is being issued to alert taxpayers and their representatives that the purported losses arising from such transactions are not properly allowable for Federal income

---

the money and, accordingly, lost their premiums on top of all the other fees they paid to the Defendants, Jenkens and Ernst & Young.

tax purposes. . . . Through a contrived series of steps, taxpayers claimed tax losses for capital outlays that they have in fact recovered. Such artificial losses are not allowable for Federal income tax purposes." The clear message from the IRS to the Defendants was that purported losses arising from transactions wholly lacking in "economic substance" (e.g., the COBRA Strategy) are not properly allowable for Federal income tax purposes. The Defendants failed to discuss and analyze the effect and significance of this IRS Notice on the COBRA Strategy with Plaintiffs. Indeed, the Defendants simply ignored this Notice.

190. As a result of Notice 1999-59, the Defendants knew or certainly should have known that the IRS would assert that the purported losses arising from the COBRA Strategy were improper and not allowable for tax purposes; however, based on the information and belief, the Defendants intentionally did not disclose this information to Plaintiffs and, indeed, told them the exact opposite.

191. Shortly after the IRS issued Notice 1999-59, Jerrod Blanchard, an Ernst & Young partner, wrote a memorandum dated January 5, 2000, that was highly critical of COBRA. In this memorandum, Blanchard notified Ernst & Young of his belief that: (a) COBRA lacked economic substance and business purpose; (b) the short option is a liability; and (c) the Jenkens opinion letter has glaring deficiencies. As a result of Blanchard's memorandum, on January 6, 2000, Ernst & Young got "out of the COBRA business." Unfortunately, Ernst & Young failed to disclose this critical information to the Plaintiffs. Certainly, the Brown & Wood Defendants should have come to the same conclusions as Blanchard if they were truly interested in providing Plaintiffs with an objective, accurate legal opinion. Unfortunately, the Brown & Wood Defendants ignored the true significance of the Notice. Likewise, the Deutsche and Scheef &

Stone Defendants should have come to the same conclusions and disclosed this crucial information to the Plaintiffs but they didn't.

## II. IRS NOTICE 2000-44: THE IRS CONTENDS THAT THE COBRA STRATEGY IS ILLEGAL

192. In August 2000, the IRS once again clearly and unequivocally informed accountants and tax attorneys across the country that they believed the COBRA Strategy was illegal. Specifically, on August 11, 2000, the IRS published Notice 2000-44, entitled "Tax Avoidance Using Artificially High Basis." This Notice concerned "similar transactions [to those described in Notice 1999-59] that purport to generate tax losses for taxpayers," thus indicating the IRS believed it had also addressed transactions like the COBRA Strategy in Notice 1999-59 (issued before Jenkens and Brown & Wood had issued their opinion letters and Plaintiffs had, in reliance on those letters and the other advice received from Ernst & Young, filed their tax returns).

193. Most importantly, Notice 2000-44 specified the precise transactions marketed by Ernst & Young to the Plaintiffs, under which the taxpayer purchases call options and simultaneously writes offsetting call options, transfers the option positions to a partnership, and ultimately claims that the basis in his partnership interest "is increased by the cost of the purchased call options but is not reduced under [Internal Revenue Code] §752 as a result of the partnership's assumption of the taxpayer's obligation." The IRS stated that "[t]he purported losses from these transactions (and from any similar arrangements designed to produce non-economic tax losses by artificially overstating basis in partnership interest) are not allowable as deductions for Federal income tax purposes." The clear message from the IRS to the Defendants, Jenkens and Ernst & Young was that the purported losses arising from the COBRA

Strategy are not properly allowable for Federal income tax purposes. The Defendants, Jenkens and Ernst & Young simply ignored the IRS and this Notice to the detriment of Plaintiffs.

194. Thus, there is no doubt that the Defendants knew or should have known as a result of IRS Notices 1999-59 and 2000-44 issued on August 11, 2000, if not earlier, that the purported losses arising from the Plaintiffs' participation in COBRA were not properly allowable for Federal or State income tax purposes; however, based on information and belief, the Defendants intentionally failed to inform the Plaintiffs of this fact to their detriment. More importantly, the Defendants failed to retract, modify, or qualify in any way their advice to Plaintiffs, the opinions expressed in the Jenkens' and the Brown & Wood Defendants' opinion letters, or their advice in connection with the preparation of the Plaintiffs' tax returns confirming the propriety of claiming as an increase in basis the cost of the Long Options on Plaintiffs' tax returns. Unbelievably, after Notice 2000-44 was issued, the Defendants continued to assure the Plaintiffs that was a sound tax strategy.

195. The Defendants represented that the COBRA Strategy was a legal tax shelter despite the fact that IRS Notices 1999-59 and 2000-44 expressly and unequivocally stated that the type of transaction the Plaintiffs undertook, based on the advice and recommendation of Defendants, was illegal. The Defendants either ignored the clearly stated implications of IRS Notices 1999-59 and 2000-44 or made representations contrary to the Notices and, therefore, knowingly deceived and misled the Plaintiffs to their detriment.

196. The Defendants represented that the COBRA Strategy was not required to be disclosed on the Plaintiffs' respective federal tax returns pursuant to Treas. Reg. § 1.6011-4(a). Further, the Defendants failed to register the COBRA Strategy as a tax shelter with the Internal

Revenue Service pursuant to Treas. Reg. § 301.6111-2 and did not advise the Plaintiffs that registration of the COBRA Strategy was required.

197. Shortly after the IRS issued Notice 2000-44 in August 2000, Deutsche Bank issued an internal memorandum attaching Notice 2000-44 and instructing the Deutsche Bank employees not to promote tax shelters identified in Notice 2000-44. However, Deutsche Bank failed to advise the Plaintiffs of this internal memorandum and the effect Notice 2000-44 had on Deutsche Bank's marketing and promotional efforts of COBRA. More importantly, Deutsche Bank failed to advise Plaintiffs to amend their return to prevent penalties.

## I. THE DEFENDANTS' REPEATED FAILURE TO GIVE FULL DISCLOSURE TO PLAINTIFFS

198. As a result of IRS Notice 2000-44 issued on August 11, 2000, if not earlier, the Defendants knew or should have known that the Defendants, Ernst & Young and Jenkens were illegally promoting an unregistered tax shelter by marketing the COBRA Strategy to the Plaintiffs, and that the purported losses arising from the Strategy were not properly allowable for Federal and State income tax purposes; however, the Defendants intentionally failed to inform Plaintiffs of this and, in fact, advised them to the contrary. Simply stated, the Defendants repeatedly deceived and knowingly misled the Plaintiffs and placed their greed over the best interest of their clients.

## J. THE OPINION LETTERS FOR THE PLAINTIFFS' 1999 TAXES

199. Jenkens and Brown & Wood sent each of the Plaintiffs virtually identical opinion letters regarding the propriety of the COBRA Strategy (the "Opinion Letters") in 2000. The Plaintiffs were all still under the mistaken belief that each of the Opinion Letters set forth "independent" opinions of a law firm on the propriety of the COBRA Strategy.

200. The Opinion Letters were authored and prepared based, in part, on representations made by Defendants. The Opinion Letters advised these Plaintiffs that, among other things:

(1) Entering into the Options will not be taxable and the Options will be treated as separate instruments for Federal income tax purposes;

(2) The various COBRA partnerships will be classified as partnerships for Federal income tax purposes;

(3) The Plaintiffs' contributions of their interests in their respective Options to their respective COBRA partnerships will not result in a taxable gain or loss;

(4) The Short Options will not be a liability within the meaning of § 752 of the Internal Revenue Code of 1986, as amended (the "Code");

(5) The Plaintiffs' bases in their interests in their respective COBRA partnerships, after the contribution of Plaintiffs' interests in their respective Options, will include the cost of the Long Options contributed, without adjustment for the Short Options;

(6) The Plaintiffs' contributions of their interests in their respective COBRA partnerships to their respective corporations will not be a taxable transaction, and the corporations' bases in the respective partnership's interests contributed by the Plaintiffs will be equal to their bases in such interest as of the date of such contribution;

(7) The Plaintiffs' bases in their interest in their respective corporations will be increased by an amount equal to the adjusted bases of their interest in their respective COBRA partnership as of the date of contribution;

(8) The liquidation of the partnerships will not result in gain or loss recognition;

(9) The liquidation of the partnerships will result in an allocation of the partnerships' "outside" bases to the properties distributed by each respective partnership in liquidation;

(10) The disposition by the corporations of any capital assets received in liquidation of the partnerships will result in a capital loss, while the disposition of any foreign currency will result in ordinary loss;

(11) The step transaction, sham transaction, and economic substance doctrines will not apply to disallow the results of the transactions described herein;

(12) Code section 707(a)(2)(B), 165(c), 465, 469 and 1092 will not apply to the transactions described herein; and

(17) Treasury Regulation section 1.701-2 will not apply to the transactions described herein.

201. Based on information and belief, the Defendants were aware of the existence and effect of Notice 1999-59 but intentionally failed to fully discuss or analyze the effect of the Notice on the COBRA Strategy – either in the opinion letters or thereafter.

202. Most importantly, Ernst & Young had already decided to "get out of the COBRA business" based, at least in part, on Blanchard's internal memorandum on January 5, 2000, which was highly critical of COBRA and the Jenkens opinion letter. Yet, Ernst & Young failed to inform Plaintiffs of these facts and allowed Plaintiffs to use these opinion letters as support for the validity of COBRA.

## K. Ernst & Young Gives Tax Advice and Prepares the Plaintiffs' Tax Returns

203. Ernst & Young prepared the 1999 tax returns for the Plaintiffs and their related entities. Ernst & Young advised these Plaintiffs that their returns were properly prepared in

accordance with professional standards. Ernst & Young utilized the losses generated by the COBRA Strategy in these tax returns. Ernst & Young also insisted on reviewing the returns prepared for Plaintiffs Trigilio and Michener by other accountants and strongly insisted or recommended certain changes on those returns. Importantly, the Plaintiffs signed and filed their returns after Ernst & Young made the decision to "get out of the COBRA business" based on Blanchard's highly critical internal memorandum.

204. Ernst & Young reiterated to the Individual Plaintiffs that the COBRA Strategy was a legal tax shelter (despite the import of IRS Notice 1999-59). Indeed, Ernst & Young never discussed Notice 1999-59 with the Individual Plaintiffs. They simply ignored this Notice to Plaintiffs' detriment.

205. In accordance with the representations the Defendants, Ernst & Young and Jenkens made to the Plaintiffs, Ernst &Young prepared tax returns for the Plaintiffs that included the premiums *Plaintiffs paid* for the Long Options, but not the premiums *they received* for the Short Options, in their tax bases for computing their respective capital losses and ordinary income in their 1999 tax returns.

206. Incredibly, before Ernst & Young prepared the Plaintiffs' 1999 tax returns and had Plaintiffs sign and file them: (a) one of Ernst & Young's partners, Jerrod Blanchard, had put Ernst & Young on notice through his highly critical internal memorandum that COBRA did not have economic substance or a business purpose, was invalid, and the short option should be a liability, and the Jenkens' opinion letter has glaring deficiencies; (b) Ernst & Young decided to "get out of the COBRA business" in January 2000 because of Blanchard's concerns; and (c) Ernst & Young believed the Jenkens opinion letter did not provide penalty protection. Ernst &

Young did not inform the Plaintiffs of any of these facts. Had Ernst & Young been forthright with Plaintiffs. Plaintiffs would not have signed and filed their tax returns using COBRA.

207. In reasonable reliance on the tax advice, legal advice, and professional services rendered by the Defendants, the Plaintiffs signed and filed their 1999 income tax returns.

## L. Plaintiffs Did Not Receive Full Disclosure

208. At no time prior to or subsequent to their implementation of the COBRA Strategy did the Defendants, Ernst & Young or Jenkens inform the Plaintiffs that the IRS contended that such transactions constituted tax shelters within the meaning of Code § 6111 or otherwise, and that the Defendants, Ernst & Young and Jenkens were therefore illegally promoting an unregistered tax shelter by marketing the Strategy to the Plaintiffs. The Defendants failed to inform the Plaintiffs of these facts and, in fact, advised them to the contrary.

209. Between the time the Defendants, Ernst & Young and Jenkens advised, recommended, and pressured the Plaintiffs to enter into the COBRA Strategy and the time the Plaintiffs' respective tax returns were prepared, signed and filed, the Defendants, Ernst & Young and Jenkens never disclosed to Plaintiffs the significance of IRS Notice 1999-59. The Defendants, Ernst & Young and Jenkens failed to advise Plaintiffs that the Strategy lacked a business purpose and economic substance and, in fact, advised Plaintiffs to the contrary. Based on information and belief, the Defendants, Ernst & Young and Jenkens intentionally failed to disclose this material information to the Plaintiffs.

210. As a result of IRS Notice 1999-59 issued on December 27, 1999, and IRS Notice 2000-44 issued on August 11, 2000, and otherwise, the Defendants knew or should have known, before or within months after (depending on the Notice) (i) Jenkens and Brown & Wood issued the opinion letters, and (ii) Ernst & Young prepared the Plaintiffs' tax returns, that the IRS would

contend that the purported losses arising from the Strategy were not properly allowable for Federal or State income tax purposes. However, the Defendants intentionally failed to inform Plaintiffs of this and, indeed, informed them to the contrary.

211. Finally, the Defendants failed to disclose to Plaintiffs critical information regarding Defendants' internal communications and beliefs, which would have caused Plaintiffs not to file a return using COBRA in 1999 and/or to amend their 1999 returns. Specifically, the Defendants failed to disclose to Plaintiffs that:

a. Ernst & Young believed the Jenkens opinion letter did not provide penalty protection;
b. A partner at Ernst & Young put Ernst & Young on notice on January 5, 2000, of his belief that COBRA lacked economic substance and business purpose; the short option is a liability; and the Jenkens opinion letter had glaring deficiencies; and
c. As of January 6, 2000, Ernst & Young had decided to get "out of the COBRA business."

Likewise, the Deutsche Defendants failed to disclose to Plaintiffs that, after the IRS issued Notice 2000-44, the Deutsche Defendants instructed its employees not to promote COBRA. Finally, the Deutsche Defendants failed to disclose to Plaintiffs that they should amend their returns – although, based on information and belief, some of the Deutsche Bank employees who also did the tax shelter did.

212. The Defendants failed to retract or modify in any way their advice and opinions expressed to the Plaintiffs confirming the propriety of the COBRA Strategy.

## M. THE CONSPIRACY

213. On information and belief, the Defendants (along with Ernst & Young and Jenkens) conspired to design, promote, and implement the COBRA Strategy for the purpose of receiving and splitting millions of dollars in fees (the "Defendants' Arrangement"). The receipt

of those fees was the primary, if not sole, motive in the development and execution of the transaction. Further, the amount of fees earned by the Defendants, Ernst & Young and Jenkens was not tied to or reflective of the amount of time and effort they expended in providing tax or accounting services, but rather was tied to the amount of capital and/or ordinary losses each client would claim on its tax returns. Indeed, the Defendants, Ernst & Young and Jenkens designed the transaction and agreed to provide a veneer of legitimacy to each other's opinion as to the lawfulness and tax consequences of the COBRA Strategy by agreeing to the representations that would be made and to issue the allegedly "independent" opinions before potential clients were solicited. These "independent" opinions were prefabricated and canned opinions used for each and every client across the United States with basic factual information inserted depending upon the client.

214. The Defendants, Ernst & Young and Jenkens aggressively put their scheme into action. Ernst & Young solicited their own trusting clients to enter into the COBRA Strategy. Ernst & Young identified the Plaintiffs as potential COBRA participants based on their intimate knowledge of the Plaintiffs' finances. Ernst & Young's clients, including the Plaintiffs, became "targets".

215. Based on information and belief, before meeting with the Plaintiffs, the Defendants, Ernst & Young and Jenkens devised a game plan that included Ernst & Young identifying their own clients for the COBRA Strategy. The game plan also included a scheme wherein Ernst & Young and Deutsche Bank solicited potential clients and made the aggressive presentation. Ernst & Young would contact their clients and make one or more presentations to them. Ernst & Young would assure the "target" that two major law firms, Jenkens and Brown & Wood, would prepare "independent" opinion letters confirming the propriety and legality of the

COBRA Strategy. Ernst & Young would then bring in the Defendants and Jenkens to further promote COBRA. The Defendants, Ernst & Young and Jenkens would tout the reputations of Jenkens, Brown & Wood, Deutsche Bank, and others as a means to assure the "target" that the COBRA Strategy was completely legal. Ernst & Young would not disclose the fact that Jenkens would be providing a legal opinion as to the propriety and legality of a tax transaction in part created, designed, and implemented by Jenkens itself or that Jenkens' large percentage fee would undoubtedly lead the IRS to question the indulgence of Jenkens' opinion letter. This scheme was carried out with the Plaintiffs.

216. By agreeing before clients were found that Ernst & Young would solicit clients on behalf of Jenkens and the other Defendants, and inform the clients that Jenkens and the Brown & Wood Defendants would opine that the COBRA Strategy was not illegal or an unregistered tax shelter, and by authorizing Ernst & Young to present the Scheef & Stone and the Brown & Wood Defendants' legal advice to clients, the Scheef & Stone and the Brown & Wood Defendants allowed Ernst & Young to direct and regulate the Scheef & Stone and the Brown & Wood Defendants' professional judgment.

217. The receipt of fees and pecuniary gain from those fees was the primary motive for the Defendants' conduct; the provision of professional services to clients was merely an incidental byproduct of, not a motivating factor for, Defendants' conduct alleged herein. Further, the Defendants' Arrangement gave each of the participating Defendants a significant pecuniary interest in the advice and professional services they would render, allowed Ernst & Young to direct and regulate the professional judgment of the Scheef and Stone and Brown & Wood Defendants, and impaired the exercise of that judgment and the duty of care, loyalty and honesty each of the aforementioned Defendants owed to the Plaintiffs and their other clients.

218. Further, the ability of Ernst & Young to solicit clients for the Brown & Wood Defendants, something the law firms and individual lawyers could not do themselves, as more particularly alleged below, impaired the judgment of the lawyers and their exercise of the duty of care, honesty and loyalty they owed their clients, including Plaintiffs.

219. The Brown & Wood Defendants had a significant pecuniary interest in inducing Plaintiffs, as well as other clients, to enter into the COBRA transactions, and to do so, promised, opined, and assured that the transactions would enable Plaintiffs and others to avoid taxes. The Brown & Wood Defendants never disclosed to Plaintiffs that their representation of them would be materially limited and impaired by their own interests in the transactions in violation of any and all applicable rules of professional conduct (*e.g.*, New York Rules of Professional Conduct and Professional Responsibility, including § 1200.21 (DR 5-101) of the Lawyer's Code of Professional Responsibility of the New York State Bar [the "New York Rules"]). The Brown & Wood Defendants' undertaking the representation of Plaintiffs violated their duty of care, honesty, and loyalty owed by attorneys to their clients and impaired the exercise of their professional judgment in violation of the New York Rules, including violation of the specific rules indicated above.

220. Ernst & Young had a financial, business and property interest in inducing Plaintiffs, as well as other clients, to enter into the COBRA transaction, and to do so, promised, opined and assured that the transactions would enable Plaintiffs and others to avoid taxes. Ernst & Young never disclosed to Plaintiffs that their representation of them and their objectivity, integrity and professional care would be materially impaired by their own interest in the transactions in violation of the American Institute of Certified Public Accountants (AICPA) Code of Professional Conduct, including Sections 53, 54 and 55.

221. Based on information and belief, the Defendants entered into the Defendants' Arrangement, whereby they agreed they would solicit each other's clients. In this instance, Ernst & Young solicited clients for Jenkens and the Deutsche, Brown & Wood, and Scheef & Stone Defendants.

Such solicitations violated the rules of conduct for attorneys and accountants in that:

a) Jenkens and the Scheef & Stone and Brown & Wood Defendants, through Ernst & Young, solicited professional employment from Plaintiffs, and others, in violation of § 1200.8 (DR 2-103) of the New York Rules and Rule 7.03(a) of the Texas Rules; and

b) Ernst & Young conspired with and assisted Jenkens and the Brown & Wood and Scheef & Stone Defendants in violating the applicable codes of professional conduct. In so acting, Ernst & Young violated Section 53 of the AICPA Code of Professional Conduct.

222. Based on information and belief, pursuant to the Defendants' Arrangement, Jenkens and the Brown & Wood, Scheef & Stone, and Ernst & Young split the fee to be charged clients that implemented the COBRA Strategy, including Plaintiffs. Such conduct violated the applicable rules of conduct for attorneys and accountants as follows:

a) By this fee splitting arrangement, the Brown & Wood and Scheef & Stone Defendants shared legal fees with non-lawyers, Ernst & Young, in violation of § 1200.17 (DR 3-102) of the New York Rules and 5.04 of the Texas Rules; and

b) By the fee splitting arrangement, as well as by agreeing in advance to provide legal opinions to clients solicited by Ernst & Young, and by allowing Ernst & Young to use the name of the Brown and Wood Defendants to solicit clients, and to promise that the Brown & Wood Defendants would endorse the COBRA

transaction described by Ernst & Young, the Brown & Wood and Scheef & Stone Defendants allowed the Ernst & Young Defendants to receive millions of dollars in fees, thereby giving Ernst & Young something of value for recommending Jenkens and the Brown & Wood Defendants' services in violation of Rule 7.03(b) of the Texas Rules and § 1200.8(B) (DR 2-103(B)) of the New York Rules, which states that a "lawyer shall not compensate or give anything of value to a person or organization to recommend or obtain employment by a client, or as a reward for having made a recommendation resulting in employment by a client"; and

c) Ernst & Young violated Section 53 of the AICPA Code of Professional Conduct.

223. The Defendants' Arrangement described above constituted a partnership and association of lawyers and non-lawyers that included the practice of law for a profit and aided non-lawyers in the unauthorized practice of law. The Defendants' Arrangement violated the New York Rules and the Texas Rules, including § 1200.16 (DR 3-101) of the New York Rules and 5.04 of the Texas Rules.

## N. PLAINTIFFS DISCOVER THE FRAUDULENT SCHEME

224. The Plaintiffs did not discover the fraudulent scheme until long after they began to receive letters from the Defendants and Jenkens informing them the IRS was requesting information on their COBRA clients and after they retained new tax and legal advisors.

### 1. <u>The Defendants Fail to Advise the Plaintiffs to Enter the IRS Amnesty Program.</u>

225. In late 2001, the IRS offered the "Tax Amnesty Program", a voluntary disclosure program for individuals and entities that participated in tax strategies like the COBRA Strategy. Under the Amnesty Program, taxpayers who disclosed their involvement in such strategies would avoid any liability for penalties for underpayment of taxes without conceding liability for back-taxes or interest. Each Defendant had knowledge of the Amnesty Program and its

applicability to the Plaintiffs. With respect to several of the Plaintiffs, the Defendants wholly failed to inform them of the Amnesty Program and these Plaintiffs were completely deprived of any opportunity to join the Amnesty Program and avoid the assessment of penalties. With respect to the Plaintiffs that were informed of the Amnesty Program, these Plaintiffs were advised by the Defendants unequivocally to "lay low" and **not** take advantage of the Amnesty Program. Accordingly, to their detriment, none of the Plaintiffs participated in the Amnesty Program. This failure on the part of the Defendants to advise the Plaintiffs to enter into the Amnesty Program has resulted in the Plaintiffs being subject to penalties, which would have been waived had the Plaintiffs participated in the Amnesty Program. In connection with such advice, Defendants again failed to inform Plaintiffs of the existence and/or significance of Notices 1999-59 and 2000-44.

**2. Plaintiffs Receive Notice of IRS Inquiries**

226. On or about June 6, 2002, Hoeing wrote to the Individual Plaintiffs informing them that the IRS "recently began examinations of several professional services firms, including Ernst & Young LLP" and had demanded "the production of broad categories of documents and other information with regard to the **[COBRA]** transaction in which you were involved" (brackets and emphasis in original). In response to a follow-up request, an attorney for Ernst & Young provided Plaintiffs with what they represented was "excerpted language from the IRS summons issued to E&Y covering the COBRA transaction." This document made reference to IRS Notice 2000-44.

**3. The Illinois Litigation and the Disclosure of Plaintiffs' Identities**

227. Jenkens and the Brown & Wood Defendants acted as Plaintiffs' attorneys, and exchanged information and communications with the Plaintiffs in confidence.

228. The State of Indiana has created a privilege for accountants and their clients that protects communications with accountants. That privilege is embodied in Section 25-2.1-14-1 of the Indiana Code, which provides that "A certified public accountant, a public accountant, an accounting practitioner, or any employee is not required to divulge information relative to and in connection with any professional service as a certified public accountant, a public accountant, or an accounting practitioner, " and Section 25-2.1-14-2 of the Indiana Code, which provides that "The information derived from or as the result of professional services is confidential and privileged." This privilege belongs to the client, not the accountant. It protects communications with accountants to the same extent as the attorney-client privilege. The Internal Revenue Code also establishes a tax practitioner privilege that is embodied in Section 7525 of the Internal Revenue Code, 26 U.S.C. § 7525, which provides, "With respect to tax advice, the same common law protections of confidentiality which apply to a communication between a taxpayer and an attorney shall also apply to a communication between a taxpayer and any federally authorized tax practitioner to the extent that the communication would be considered a privileged communication if it were between a taxpayer and an attorney." This privilege also belongs to the client, not the tax practitioner. It protects communications with accountants to the same extent as the attorney-client privilege. Elsewhere (in 26 U.S.C. § 6103(b)(2)(A)), the Code also provides that a taxpayer's identity is confidential and privileged.

230. Disclosure of the names and identity of the Plaintiffs as COBRA participants amounts to disclosure of their entire relationship and confidential communications with Ernst & Young.

231. Disclosure of the names and identity of the Plaintiffs as COBRA participants amounts to disclosure of their entire relationship and confidential communications with the Plaintiffs' attorneys, Jenkens and the Brown & Wood Defendants.

232. Disclosure of any papers in the custody or possession of Ernst & Young would likewise amount to disclosure of the Plaintiffs' entire relationship and confidential communications with Ernst & Young and with the Plaintiffs' attorneys.

233. The Code of Professional Conduct of the American Institute of Certified Public Accountants, which applies to Ernst & Young and to their provision of professional services to the Plaintiffs, provides, "A member in public practice shall not discuss any confidential client information without the specific consent of the client." AICPA Code of Professional Conduct ET § 301. ET Section 301 prohibits the disclosure of a client's name when that constitutes the release of confidential information.

234. In June 2002, the Plaintiffs were informed by Ernst & Young that Ernst & Young LLP had received administrative *summonses* from the IRS and that in the opinion of Ernst & Young, documents and information in their files pertaining to the professional services they had rendered to the Plaintiffs and the COBRA Strategy were responsive to the summonses. Ernst & Young, in a June 6, 2002, letter signed by Hoeing, stated that Ernst & Young would produce the Plaintiffs' documents and information if no objection was received. In a letter sent by their attorneys the same day, the Plaintiffs informed Ernst & Young that they objected to the disclosure of any information about the Plaintiffs, including their names and their documents.

235. Thereafter, the Plaintiffs informed Ernst & Young that if they produced the Plaintiffs' information or documents, the Plaintiffs would hold Ernst & Young liable. In response, on September 4, 2002, Ernst & Young informed the Plaintiffs that on the advice of their outside counsel they planned to identify the Plaintiffs' names to the IRS but promised that no documents would be produced and that Ernst & Young would notify the Plaintiffs if the IRS required production of the Plaintiffs' documents.

236. The next day, Jenkens informed Ernst & Young that they could not disclose information or documents concerning persons who participated in the COBRA Strategy. On or about September 5, 2002, Jenner & Block, acting on behalf of John Does, sued Ernst & Young LLP in the Northern District of Illinois and sought a temporary restraining order ("TRO") to prevent such disclosures on behalf of certain John Doe clients and all similarly situated persons. This suit and the application for a TRO (hereinafter "the Illinois Litigation") were commenced on behalf of all similarly situated John Does, and thus included the Plaintiffs.

237. On or about September 18, 2002, the Illinois District Court refused to issue either a TRO or a preliminary injunction, although the parties agreed to not disclose client names to the IRS pending a motion for a stay pending appeal of the order refusing the injunction. Originally that stay was to expire at the close of business on September 20, 2002.

238. On September 20, 2002, the John Doe Plaintiffs sought an extension of time to file their appeal in the Seventh Circuit and an extension of the ban on disclosure of their names until September 30, 2002. They obtained those extensions. Ernst & Young contends that, at this hearing, the court lifted the ban on disclosing the names of absent class members. Neither the Plaintiffs nor their counsel attended or participated in the September 20, 2002 hearing.

239. At no time prior to 2003 did Ernst & Young inform the Plaintiffs of what happened at the September 20, 2002 hearing, that they believed they were now free to disclose the Plaintiffs' names to the IRS, or that they intended to do so immediately. Such disclosures would have allowed the Plaintiffs to determine whether they no longer were protected by the stay issued by the Illinois district court or by the Seventh Circuit's subsequent orders.

240. On or about September 26, 2002, the John Doe Plaintiffs filed an appeal in the Seventh Circuit. Documents filed at that time indicated the appeal was filed on behalf of the John Does and "all John Does Similarly Situated."

241. On September 27, 2002, the Seventh Circuit issued an order precluding Ernst & Young from disclosing appellants' names pending resolution of the motion for a stay. That order remained in effect after October 23, 2002, when the Seventh Circuit remanded the case for more detailed findings as to whether privileges existed.

242. On September 24, 2002, Ernst & Young confirmed that none of the Plaintiffs' documents had been produced to the IRS. The letter did not disclose that Ernst & Young had turned over or was about to turn over the Plaintiffs' names to the IRS.

243. On information and belief, Ernst & Young voluntarily[14] disclosed the names of the Plaintiffs to the IRS on September 24, 2002.

244. Ernst & Young's disclosure of the Plaintiffs' names to the IRS was made in violation of the express instructions the Plaintiffs had given to Ernst & Young; those instructions were not to disclose their identity, documents, information or communications to the IRS without the Plaintiffs' consent, which was never given. The disclosure of the Plaintiffs' names was made at a time when the Plaintiffs believed they were included in a class action to prevent such disclosures and a court had barred such disclosures. The disclosure was also in violation of the terms of the Engagement Agreement.

### 4. Plaintiffs are Notified of Audits

245. The Camferdam, Adams, Michener and Trigilio Plaintiffs received notice of audit from the IRS in December 2002. Likewise, the Laurenzo, Arnold, Rice, and Parmer Plaintiffs were informed in 2002 that Ernst & Young had given their names to the IRS; they were shortly thereafter notified by the IRS of the beginning of auditing procedures.

### 5. Plaintiffs Retain New Counsel and Learn of Fraud and Illegality

14 No court ever ordered Ernst & Young to do so.

246. After retaining new tax and legal advisors and at substantial expense, the Plaintiffs discovered for the first time that the Defendants had, among other things:

a) Fraudulently induced them to participate in a bogus tax transaction that could succeed only if the IRS and state tax authorities neglected to audit their tax returns or otherwise failed to discover that they had engaged in the COBRA Strategy;

b) Abused their fiduciary relationship with the Plaintiffs and committed professional malpractice by providing advice that they knew or should have known was wrong and directly contradicted by published authority IRS positions;

c) Exposed the Plaintiffs to substantial additional tax liability including interest and penalties due to the filing of inaccurate returns based on the COBRA Strategy, their failure to advise the Plaintiffs to amend their tax returns, and their recommendation not to enter the Amnesty Program, as described below;

d) Caused the Plaintiffs to pay a substantial amount of money in fees to the Defendants for their false and fraudulent advice and to incur substantial additional costs and expenses for engaging in unnecessary currency options transactions, and for retaining new tax and legal advisors to investigate and rectify the situation; and

e) Caused the Plaintiffs to forego other legitimate tax saving opportunities.

## O. Recent Pronouncements of the IRS Regarding the COBRA Strategy

247. In June of 2003, the IRS formalized its position regarding the COBRA Strategy and other 2000-44 transactions by issuing new regulations (the "Regulations") retroactive to October 18, 1999, and through Office of Chief Counsel Notice CC-2003-020 (the "OCC Notice"). The Regulations invalidate the COBRA Strategy and the OCC Notice explains the IRS' position why. For example, in the OCC Notice, the IRS stated that it is their position that:

> (1) For written options assumed by partnerships after October 18, 1999, but before June 24, 2003, the Service will apply § 1.752-6T of the Income Tax Regulations to reduce the outside basis in the partnership of the taxpayer from whom the written call option was assumed.
>
> . . .
>
> (3) For an individual partner, the loss that a partner claims resulting from the artificial inflation of the partner's outside basis in a partnership used in a Son of Boss transaction may be disallowed under § 165(c)(2) because the partner lacked the requisite economic profit objective.
>
> (4) Under § 465(c)(4), taxpayers are not considered at risk for amounts invested in the economically offsetting option positions contributed to and assumed by a partnerships [sic] formed or availed of in connection with a Son of Boss transaction as such amounts are protected against loss.

As was true with Notice 2000-44, although the IRS names these transactions as "Son of Boss" in reference to a name given by another promoter, the description of the transaction makes it clear that the COBRA Strategy implemented by the Plaintiffs is included.

248. The Regulations, retroactive to before the date of the Plaintiffs' transactions, thus totally invalidate the Strategy implemented by the Plaintiffs. Specifically, the Regulations provide that both option positions are taken into account in determining the basis and thus little, if any, "extra" basis is created.

249. In the OCC Notice, the IRS has also indicated it will not be relying only upon the Regulations to invalidate the Plaintiffs' transactions, but will also be taking the position that the losses generated by such transactions may be disallowed under §§ 165(c)(2) and 465(c)(4) of the Code. The opinion letters opined that § 165(c)(2) was inapplicable to the COBRA Strategy.

Such argument presumes the possibility of hitting the "sweet spot". In the OCC Notice, the IRS cautioned that:

> Losses claimed by individuals, other than casualty losses, are limited by § 165(c) to (1) losses incurred in a trade or business and (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business. The application of § 165(c) does not require a finding that the transaction lacks economic substance.
>
> If an individual invests in a Son of Boss transaction, any loss generated either through the disposition of the partnership interest or through the disposition of assets distributed to the individual in complete liquidation of the individual's partnership interest may be limited or denied under § 165(c)(2) because of the lack of an economic profit objective.

250. The opinion letters construed § 465(c)(4) in a manner totally at odds with the IRS in the OCC Notice.

251. Finally, the IRS also takes the position in the OCC Notice, again contrary to what Plaintiffs were told in the opinion letters provided by the Defendants, that the COBRA Strategy may be set aside as violative of the partnership "anti-abuse" rules:

> Section 1.701-2(a), the partnership anti-abuse rule, provides in pertinent part that subchapter K is intended to permit taxpayers to conduct joint business (including investment) activities through a flexible economic arrangement without incurring an entity-level tax.
>
> . . .
>
> ...Accordingly, if a partnership is formed or availed of in connection with a transaction a principal purpose of which is to reduce substantially the present

value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K, the Service can recast the transaction for federal tax purposes, as appropriate to achieve tax results that are consistent with the intent of subchapter K in light of the applicable statutory and regulatory provisions and the pertinent facts and circumstances. Thus, even though the transaction may fall within the literal words of a particular statutory or regulatory provision, the Service can determine, based on the particular facts and circumstances, that to achieve tax results that are consistent with the intent of subchapter K:

(1) the purported partnership should be disregarded in whole or in part, and the partnership's assets and activities should be considered, in whole or in part, to be owned and conducted, respectively, by one or more of its purported partners; (2) one or more of the purported partners of the partnership should not be treated as a partner; (3) the methods of accounting used by the partnership or a partner should be adjusted to reflect clearly the partnership's or the partner's income; (4) the partnership's items of income, gain, loss, deduction or credit should be reallocated; or (5) the claimed tax treatment should otherwise be adjusted or modified.

. . .

. . . the requirement that each partnership transaction or series of related transactions be entered into with a substantial business purposes is not met . . . . Although establishment of substantial business purpose is a fact specific inquiry, the reasonably expected pre-tax profit from both the economically offsetting

option positions and the investment transactions is minimal when compared to the purported reduction in tax liability achieved through the Son of Boss transaction.

252. In sum, the IRS has taken multiple positions in the OCC Notice, any one of which would thoroughly invalidate the Strategy and cause disallowance of all losses created thereby. Ernst & Young (and presumably the Brown & Wood Defendants) were aware in the Fall of 1999 of the possibility that the IRS would sponsor legislation or regulations retroactive to October 1999, but in conversations with Jenkens, determined to ignore this possibility and not disclose it to their clients, including the Plaintiffs, except to "bury" it in the massive opinion letters sent by Jenkens to the clients.

253. On or about May 5, 2004, in Notice 2004-46, the IRS, in furtherance of its previous pronouncements, offered to "settle" with the Plaintiffs and other like-situated taxpayers by those parties paying to the IRS (a) all of the taxes avoided by use of these transactions, (b) all interest due, (c) a 10% penalty, and (d) a loss of 50% of the fees and other "out of pocket" costs deducted. If taxpayers did not accept this offer, then the IRS indicated they would be assessed all tax and interest, lose all deductions, and be assessed a 40% penalty. Faced with this "choice", the Laurenzo, Arnold, Rice and Parmer Plaintiffs were essentially forced to accept the "settlement". Likewise, the Camferdam, Adams, Michener and Trigilio Plaintiffs also attempted to accept the settlement offer. However, the IRS would not allow it. As a result, they were assessed and have paid all back taxes, interest and a 40% penalty.

## P. THE COST OF THE COBRA STRATEGY

254. The Plaintiffs lost a significant amount of money in carrying out the COBRA Strategy. For the COBRA Strategy and tax returns in connection therewith:

- the Camferdam, Adams, Michener and Trigilio Plaintiffs collectively paid fees to the Defendants and others of at least $6,688,000;

- the Camferdam Plaintiffs paid $2,055,083 in interest and $3,966,840 in penalties to the IRS;
- the Adams Plaintiffs paid $470,072 in interest and $907,187 in penalties to the IRS;
- the Michener Plaintiffs paid $278,228 in interest and $547,084 in penalties to the IRS;
- the Trigilio Plaintiffs paid $56,557 in interest and $111,012 in penalties to the IRS;
- the Parmer Plaintiffs paid fees to the Defendants and others of at least $1,126,175 as well as $687, 827 in interest and $191, 783 in penalties; and
- the Rice, Laurenzo and Arnold Plaintiffs collectively paid the Defendants and others of at least $4,770,000; they also collectively paid $3,596,692 in interest and $2,120,567 in penalties to the IRS.

255. The Plaintiffs also incurred significant legal, accounting, and other advisory fees in connection with rectifying the wrongs that have been perpetrated against them. To date, the Parmer Plaintiffs have paid at least $24,000 in accounting and legal fees and the Rice, Laurenzo and Arnold Plaintiffs have paid at least $125,013 in accounting and legal fees.

256. The Camferdam, Adams, Michener and Trigilio Plaintiffs have paid and will continue to pay attorneys, tax attorneys and accountants significant fees and incur substantial expenses in connection with rectifying the wrongs that have been perpetrated against them and addressing the IRS audit. The fees incurred in this regard will be determined in the future but are substantially in excess of $1,000,000 through the present date.

VI.

## FIRST CLAIM

### DECLARATORY JUDGMENT AND UNJUST ENRICHMENT

### BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS

257. Plaintiffs reallege each and every allegation set forth in Paragraphs 1-256, inclusive, and incorporate them by reference herein as if fully set forth.

258. An actual, justiciable controversy exists between the Plaintiffs on the one hand and the Defendants on the other with regard to the FX Contracts.

259. Accordingly, Plaintiffs seek a declaration that the FX Contracts entered into with Plaintiffs are unenforceable due to a lack of consideration, or in the alternative, a failure of consideration, in that Deutsche Bank retained virtually unlimited discretion to determine whether the FX Contracts would pay out and therefore, could ensure, if they so chose, that the Digital Options would *not* pay out or limit the amount of any payout. As a result, all promises of Deutsche Bank under those contracts are merely "illusory" and, without those promises, the FX Contracts fail due to a lack of consideration.

260. Had the Plaintiffs not been enticed to enter into the FX Contracts, they would not have paid fees to the other Defendants, Ernst & Young and Jenkens either. Thus, Plaintiffs seek a declaration that, due to the foregoing lack of consideration, the Defendants have been unjustly enriched and all fees paid to Defendants should be returned to the Plaintiffs.

261. Finally, Plaintiffs seek an award of costs and reasonable and necessary attorneys' fees as are equitable and just.

VII.

## SECOND CLAIM

### BREACH OF CONTRACT AND BREACH OF THE DUTY OF GOOD FAITH

**AND FAIR DEALING (In the Alternative)**

**BY ALL PLAINTIFFS AGAINST THE DEUTSCHE DEFENDANTS**

262. Plaintiffs reallege each and every allegation set forth in Paragraphs 1-261 and incorporate them by reference herein as if fully set forth.

263. If not void *ab initio* or otherwise invalidated pursuant to Count One herein, Plaintiffs' agreements with the Deutsche Defendants with respect to the FX Contracts constituted valid and existing agreements with those Defendants. As a result, the Deutsche Defendants owed the Plaintiffs a duty of good faith and fair dealing.

264. The Deutsche Defendants breached their agreements with Plaintiffs (including but not limited to, the FX Contracts), and their duty of good faith and fair dealing, by, among other things,

- Failing to disclose the true likelihood that the FX Contracts would not pay out;
- Failing to disclose that the Defendants retained virtually unlimited discretion to determine whether the Digital Options would pay out and therefore, could ensure, if they so choose, that the Digital Options would *not* pay out;
- Failing to apprise the Plaintiffs that the Digital Options they were purchasing and selling had no reasonable possibility of a profit, net of all fees, and that their net effect was nothing more than a wager, like buying a lottery ticket, on where the price of the underlying currency would be at exactly 10 a.m. on a given date thirty days hence;
- Failing to disclose the true relationship between the Deutsche Defendants, Jenkens, and the other Defendants with respect to the COBRA Strategy;
- Failing to disclose the existence and significance of the IRS Notices (as discussed previously in this Complaint);

- Failing to terminate the Plaintiffs' FX Contracts early when the FX Contracts were "in the money," despite dong so in numerous other instances where it was in the Deutsche Defendants' best interests; and
- Terminating the Camferdam Plaintiffs' FX Contracts early where it was in the Deutsche Defendants' best interests but those Plaintiffs would have made approximately $1.5 million had the Contracts been left open *for one more day*!

265. As a result of Defendants' conduct set forth herein, Plaintiffs have suffered injury in that (1) they paid Defendants, Ernst & Young and Jenkens substantial fees, (2) they unnecessarily purchased the FX Contracts to effectuate the COBRA Strategy, (3) they have incurred tax penalties and interest and disallowance of certain deductions, (4) they lost the opportunity to avail themselves of other legitimate tax-savings strategies, and (5) they have incurred substantial additional costs in hiring new tax and legal advisors to rectify the situation.

266. By reason of the foregoing acts and conduct, Plaintiffs are entitled to recover from the Deutsche Defendants all actual damages sustained by them as a result of the Deutsche Defendants' acts as alleged above, to be proven at trial, plus consequential damages, punitive damages in accordance with the evidence, interest, costs, and a reasonable attorneys' fee.

## VIII.

## THIRD CLAIM

## BREACH OF FIDUCIARY DUTY

### BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS

267. Plaintiffs repeat and reallege each and every prior allegation in Paragraphs 1-266, as if fully set forth herein.

268. The Defendants, as the Plaintiffs' investment advisors, tax advisors and attorneys, were Plaintiffs' fiduciaries, and thus owed the Plaintiffs the duties of honesty, loyalty, care and compliance with the applicable codes of professional responsibility.

269. These Defendants breached their fiduciary duties to the Plaintiffs by advising Plaintiffs to engage in the COBRA Strategy and to sign and file the tax returns prepared by Ernst & Young in reliance on the Defendants' advice, representations, recommendations, instructions, and opinions, which the Defendants knew or should have known to be improper and illegal, for the sole purpose of generating huge fees for the Defendants.

270. These Defendants breached their fiduciary duties to the Plaintiffs by, among others, the following acts and/or omissions:

(1) Taking advantage of a relationship of trust and confidence and using their knowledge of Plaintiffs' finances to solicit Plaintiffs for the Strategy;

(2) Taking advantage of a relationship of trust and confidence in recommending the Strategy;

(3) Pressuring Plaintiffs to engage in the Strategy by *inter alia* informing Plaintiffs that engaging in the Strategy was time-sensitive;

(4) Advising and recommending that Plaintiffs engage in the Strategy;

(5) Charging and collecting unreasonable, excessive, and unethical fees;

(6) Failing to disclose the actual roles and relationships of each Defendant in the Strategy;

(7) Failing to disclose that the Defendants were splitting and/or sharing fees;

(8) Failing to advise the Plaintiffs that the Strategy was created, designed, and implemented by Jenkens, Ernst & Young, Scheef & Stone and Deutsche Bank;

(9) Advising the Plaintiffs that the Strategy was created, designed, and implemented by Ernst & Young;

(10) Soliciting Plaintiffs on behalf of Jenkens, Brown & Wood, Deutsche Bank and/or Scheef & Stone;

(11) Failing to fully explain the details of the Strategy and assure Plaintiffs understood the Strategy before inducing Plaintiffs to enter into the Strategy;

(12) Representing to Plaintiffs that the tax savings of the Strategy to Plaintiffs would be significant and far outweigh the amount of fees and costs incurred by Plaintiffs;

(13) Representing to Plaintiffs that the tax benefits of the Strategy far outweighed any potential loss that might be incurred on the FX Contracts;

(14) Advising Plaintiffs that the Jenkens and Brown & Wood opinion letters were "independent" legal opinions from "independent" law firms;

(15) Failing to advise Plaintiffs that the Jenkens and Brown and Wood opinion letters were not "independent" legal opinions from "independent" law firms;

(16) Advising Plaintiffs that the Jenkens and Brown & Wood opinion letters could be relied upon to protect the Plaintiffs from incurring penalties if audited;

(17) Advising Plaintiffs that the Jenkens and Brown & Wood opinion letters could be relied upon to satisfy the IRS as to the propriety of the Strategy if audited;

(18) Creating, designing, implementing, promoting, advising, recommending, and/or selling an illegal, improper, and invalid tax shelter that is disallowed and/or prohibited by the IRS;

(19) Failing to advise Plaintiffs that Jenkens and Brown & Wood had already prepared a "form" opinion letter approving the Strategy and needed to only fill in several blanks for each of the many clients to which they rendered such opinion letters across the country;

(20) Illegally promoting an unregistered tax shelter by marketing the Strategy to Plaintiffs;

(21) Failing to disclose to Plaintiffs that if they filed tax returns claiming losses based on the Strategy they could be liable for penalties and interest;

(22) Advising Plaintiffs that the losses created by the Strategy were legitimate, proper, and in accordance with all applicable tax laws, rules, and regulations;

(23) Representing and advising Plaintiffs that the various entities formed to carry out the Strategy had business purpose and economic substance;

(24) Making and endorsing the statements and representations in the opinion letters authored and signed by Jenkens and Brown & Wood;

(25) Making and endorsing the statements and representations contained in the Defendants' oral advice, instructions, recommendations, and the tax returns prepared by the Defendants;

(26) Failing to advise Plaintiffs of Deutsche Bank's role in COBRA and the fee Deutsche Bank received for assisting and carrying out COBRA through the FX Contracts;

(27) Failing to advise Plaintiffs of Scheef & Stone's role and the fee Scheef & Stone received;

(28) Recommending, advising, instructing, and assisting Plaintiffs in carrying out each of the steps of the Strategy;

(29) Recommending that Plaintiffs purchase the FX Contracts;

(30) Recommending, advising, instructing, and assisting Plaintiffs in the FX Contracts;

(31) Failing to accurately and fully explain the FX Contracts to Plaintiffs and ensure they understood the Options before Plaintiffs engaged in the transaction;

(32) Failing to accurately and fully advise Plaintiffs that the Options were a private bet with Deutsche Bank, that Deutsche Bank controlled the outcome of the bet by picking the spot rate and ignoring other spot rates, that Deutsche Bank could manipulate the results to ensure Plaintiffs did not make money, that the Options were designed to expire out of the money and result in a loss for Plaintiffs, and that the chance of winning on the investment was analogous to the chance of winning the lottery;

(33) Failing to advise Plaintiffs that the design of the COBRA Strategy and the FX Contracts made no economic or investment sense and had no business purpose or economic substance;

(34) Advising Plaintiffs that the design of the COBRA Strategy and the FX Contracts had economic and investment sense and had business purpose and economic substance;

(35) Informing Plaintiffs that they had an opportunity of making a profit on the FX Contracts when, in fact, it was virtually impossible to make a profit taking into account the fees and costs of the Strategy, the fact that the Options were designed to result in a loss, and that Deutsche Bank controlled the outcome and could manipulate the results to ensure Plaintiffs did not make money;

(36) Failing to learn the facts as to whether the FX Contracts were appropriate for the Plaintiffs, either as an investment or as part of a tax strategy;

(37) Failing to fully and properly inform and advise Plaintiffs of IRS Notice 1999-59 and its implications on the Strategy;

(38) Failing to advise Plaintiffs that IRS Notice 1999-59 identified transactions lacking in "economic substance" (like the Strategy) as improper and illegal and purported to disallow any losses generated through such transactions;

(39) Advising Plaintiffs that IRS Notice 1999-59 did not apply to the Strategy and/or did not impact the propriety of the Strategy;

(40) Failing to revise, alter, amend, or modify the advice, recommendations, instructions, opinions, and representations made to Plaintiffs, orally or in opinion letters, regarding the propriety of the Strategy in light of IRS Notice 1999-59;

(41) Advising, instructing, and assisting in the preparation of filing of Plaintiffs' tax returns, utilizing the capital and/or ordinary losses generated by the Strategy;

(42) Advising, confirming, and/or ratifying that the Jenkens and Brown & Wood opinion letters were accurate and correct;

(43) Advising Plaintiffs that their tax returns, which utilized the losses generated by the Strategy, were prepared in accordance with professional standards and pursuant to IRS guidelines and established legal authorities;

(44) Failing to fully and properly inform and advise the Plaintiffs of IRS Notice 2000-44 and its implications on the Strategy;

(45) Failing to advise Plaintiffs that in IRS Notice 2000-44, the IRS had identified the Strategy as improper and illegal and planned to disallow the losses generated by the Strategy;

(46) Failing to advise Plaintiffs that IRS Notice 2000-44 precisely described and identified the Strategy as being improper and illegal;

(47) Advising Plaintiffs that IRS Notice 2000-44 did not apply to the Strategy and/or impact the propriety of the Strategy;

(48) Failing to revise, alter, amend, or modify the advice, recommendations, instructions, representations, and opinions made to Plaintiffs, orally or in opinion letters, regarding the propriety of the Strategy in light of IRS Notice 2000-44;

(49) Advising Plaintiffs that the Strategy was valid and proper in spite of IRS Notice 1999-59 and IRS Notice 2000-44;

(50) Failing to recommend and/or advise Plaintiffs to amend their returns to prevent the IRS from assessing penalties against Plaintiffs;

(51) Failing to disclose existing published authority that purported losses for transactions such as the Strategy were improper and not allowable for Federal and/or State income tax purposes;

(52) Failing to ensure that the transactions into which Defendants advised Plaintiffs to enter complied with the applicable State and Federal Rules and regulations;

(53) Failing to comply with their ethical obligations to Plaintiffs;

(54) Violating their respective professional rules of conduct;

(55) Providing erroneous tax, legal, investment, and accounting opinions and advice;

(56) Engaging in professional relationships that violated their respective professional and ethical rules of conduct;

(57) Advising the Plaintiffs that the step transaction, sham transaction, and economic substance doctrines would not apply to disallow the results of the Strategy;

(58) Advising the Plaintiffs that Treasury Regulation Section 1.701-2 would not apply to the Strategy;

(59) Advising Plaintiffs that the Short Options will not be liabilities within the

meaning of Section 752 of the Internal Revenue Code of 1986;

(60) Advising, recommending, instructing, and assisting Plaintiffs in entering into a transaction in which they were advised that the step transaction, sham transaction, and/or economic substance doctrines did not apply to disallow the results of the Strategy;

(61) Advising Plaintiffs that each of the various steps of the Strategy were meaningful and imbued with non-tax considerations;

(62) Informing the Plaintiffs that the Strategy was not a "sham transaction" that would be ignored or disallowed for tax purposes;

(63) Informing the Plaintiffs that the Opinion Letters would confirm that the Strategy was not a "sham transaction" that would be ignored or disallowed for tax purposes;

(64) Advising, recommending, instructing, and assisting Plaintiffs in engaging into a transaction which they were advised had business purpose and economic substance and made investment sense;

(65) Failing to advise Plaintiffs that the transactions had no business purpose and no economic substance and made no business sense;

(66) Recommending, instructing, and advising Plaintiffs to enter into the FX Contracts as an investment and/or part of a tax strategy;

(67) Advising, recommending, instructing, and assisting Plaintiffs in entering into transactions that, unbeknownst to the Plaintiffs, were illegal and improper and would be disallowed and held invalid by the IRS on the grounds the transactions lacked economic substance, had no business purpose, were "sham transactions", and violated the step transaction, sham transaction, and economic substance

doctrines;

(68) Failing to advise certain Plaintiffs of other legitimate tax-savings and investments opportunities available to them:

(69) Failing to advise Plaintiffs that an Ernst & Young partner had notified Ernst & Young that COBRA lacked economic substance and business purpose; that the short option is not a "contingent liability"; that Ernst & Young got "out of the COBRA business on January 6, 2000"; that the Jenkens opinion letter has glaring deficiencies; and that the Jenkens opinion letter does not provide penalty protection;

(70) Failing to advise Plaintiffs that Deutsche Bank instructed the Deutsche Bank employees to stop promoting COBRA after the IRS issued Notice 2000-44; and

(71) Failing to advise Plaintiffs to amend their returns – just like, based on information and belief, certain Deutsche Bank employees that did the tax shelter did.

271. As a result of the Defendants' conduct set forth herein, Plaintiffs have suffered injury in that (1) they paid the Defendants, Ernst & Young and Jenkens millions of dollars, (2) they have incurred tax penalties and interest, and (3) they have and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation.

272. As a proximate cause of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial, and should be awarded punitive damages in accordance with the evidence, plus attorneys' fees and costs.

## IX.

## FOURTH CLAIM

## FRAUD

### BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS

273. Plaintiffs repeat and reallege each and every prior allegation of Paragraphs 1-272, as if fully set forth herein.

274. In order to induce the Plaintiffs to pay them millions of dollars in fees, the Defendants made numerous knowingly false affirmative representations and intentional omissions of material facts to Plaintiffs, including but not limited to:

(1) Taking advantage of a relationship of trust and confidence and using their knowledge of Plaintiffs' finances to solicit Plaintiffs for the Strategy;

(2) Taking advantage of a relationship of trust and confidence in recommending the Strategy;

(3) Pressuring Plaintiffs to engage in the Strategy by *inter alia* informing Plaintiffs that engaging in the Strategy was time-sensitive;

(4) Advising and recommending that Plaintiffs engage in the Strategy;

(5) Charging and collecting unreasonable, excessive, and unethical fees;

(6) Failing to disclose the actual roles and relationships of each Defendant in the Strategy;

(7) Failing to disclose that the Defendants were splitting and/or sharing fees;

(8) Failing to advise the Plaintiffs that the Strategy was created, designed, and implemented by Jenkens, Ernst & Young, Scheef & Stone and Deutsche Bank;

(9) Advising the Plaintiffs that the Strategy was created, designed, and implemented by Ernst & Young;

(10) Soliciting Plaintiffs on behalf of Jenkens, Brown & Wood, Deutsche Bank and/or Scheef & Stone;

(11) Failing to fully explain the details of the Strategy and assure Plaintiffs understood the Strategy before inducing Plaintiffs to enter into the Strategy;

(12) Representing to Plaintiffs that the tax savings of the Strategy to Plaintiffs would be significant and far outweigh the amount of fees and costs incurred by Plaintiffs;

(13) Representing to Plaintiffs that the tax benefits of the Strategy far outweighed any potential loss that might be incurred on the FX Contracts;

(14) Advising Plaintiffs that the Jenkens and Brown & Wood opinion letters were "independent" legal opinions from "independent" law firms;

(15) Failing to advise Plaintiffs that the Jenkens and Brown and Wood opinion letters were not "independent" legal opinions from "independent" law firms;

(16) Advising Plaintiffs that the Jenkens and Brown & Wood opinion letters could be relied upon to protect the Plaintiffs from incurring penalties if audited;

(17) Advising Plaintiffs that the Jenkens and Brown & Wood opinion letters could be relied upon to satisfy the IRS as to the propriety of the Strategy if audited;

(18) Creating, designing, implementing, promoting, advising, recommending, and/or selling an illegal, improper, and invalid tax shelter that is disallowed and/or prohibited by the IRS;

(19) Failing to advise Plaintiffs that Jenkens and Brown & Wood had already prepared a "form" opinion letter approving the Strategy and needed to only fill in several

blanks for each of the many clients to which they rendered such opinion letters across the country;

(20) Illegally promoting an unregistered tax shelter by marketing the Strategy to Plaintiffs;

(21) Failing to disclose to Plaintiffs that if they filed tax returns claiming losses based on the Strategy they could be liable for penalties and interest;

(22) Advising Plaintiffs that the losses created by the Strategy were legitimate, proper, and in accordance with all applicable tax laws, rules, and regulations;

(23) Representing and advising Plaintiffs that the various entities formed to carry out the Strategy had business purpose and economic substance;

(24) Making and endorsing the statements and representations in the opinion letters authored and signed by Jenkens and Brown & Wood;

(25) Making and endorsing the statements and representations contained in the Defendants' oral advice, instructions, recommendations, and the tax returns prepared by the Defendants;

(26) Failing to advise Plaintiffs of Deutsche Bank's role in COBRA and the fee Deutsche Bank received for assisting and carrying out COBRA through the FX Contracts;

(27) Failing to advise Plaintiffs of Scheef & Stone's role and the fee Scheef & Stone received;

(28) Recommending, advising, instructing, and assisting Plaintiffs in carrying out each of the steps of the Strategy;

(29) Recommending that Plaintiffs purchase the FX Contracts;

(30) Recommending, advising, instructing, and assisting Plaintiffs in the FX Contracts;

(31) Failing to accurately and fully explain the FX Contracts to Plaintiffs and ensure they understood the Options before Plaintiffs engaged in the transaction;

(32) Failing to accurately and fully advise Plaintiffs that the Options were a private bet with Deutsche Bank, that Deutsche Bank controlled the outcome of the bet by picking the spot rate and ignoring other spot rates, that Deutsche Bank could manipulate the results to ensure Plaintiffs did not make money, that the Options were designed to expire out of the money and result in a loss for Plaintiffs, and that the chance of winning on the investment was analogous to the chance of winning the lottery;

(33) Failing to advise Plaintiffs that the design of the COBRA Strategy and the FX Contracts made no economic or investment sense and had no business purpose or economic substance;

(34) Advising Plaintiffs that the design of the COBRA Strategy and the FX Contracts had economic and investment sense and had business purpose and economic substance;

(35) Informing Plaintiffs that they had an opportunity of making a profit on the FX Contracts when, in fact, it was virtually impossible to make a profit taking into account the fees and costs of the Strategy, the fact that the Options were designed to result in a loss, and that Deutsche Bank controlled the outcome and could manipulate the results to ensure Plaintiffs did not make money;

(36) Failing to learn the facts as to whether the FX Contracts were appropriate for the Plaintiffs, either as an investment or as part of a tax strategy;

(37) Failing to fully and properly inform and advise Plaintiffs of IRS Notice 1999-59 and its implications on the Strategy;

(38) Failing to advise Plaintiffs that IRS Notice 1999-59 identified transactions lacking in "economic substance" (like the Strategy) as improper and illegal and purported to disallow any losses generated through such transactions;

(39) Advising Plaintiffs that IRS Notice 1999-59 did not apply to the Strategy and/or did not impact the propriety of the Strategy;

(40) Failing to revise, alter, amend, or modify the advice, recommendations, instructions, opinions, and representations made to Plaintiffs, orally or in opinion letters, regarding the propriety of the Strategy in light of IRS Notice 1999-59;

(41) Advising, instructing, and assisting in the preparation of filing of Plaintiffs' tax returns, utilizing the capital and/or ordinary losses generated by the Strategy;

(42) Advising, confirming, and/or ratifying that the Jenkens and Brown & Wood opinion letters were accurate and correct;

(43) Advising Plaintiffs that their tax returns, which utilized the losses generated by the Strategy, were prepared in accordance with professional standards and pursuant to IRS guidelines and established legal authorities;

(44) Failing to fully and properly inform and advise the Plaintiffs of IRS Notice 2000-44 and its implications on the Strategy;

(45) Failing to advise Plaintiffs that in IRS Notice 2000-44, the IRS had identified the Strategy as improper and illegal and planned to disallow the losses generated by the Strategy;

(46) Failing to advise Plaintiffs that IRS Notice 2000-44 precisely described and identified the Strategy as being improper and illegal;

(47) Advising Plaintiffs that IRS Notice 2000-44 did not apply to the Strategy and/or impact the propriety of the Strategy;

(48) Failing to revise, alter, amend, or modify the advice, recommendations, instructions, representations, and opinions made to Plaintiffs, orally or in opinion letters, regarding the propriety of the Strategy in light of IRS Notice 2000-44;

(49) Advising Plaintiffs that the Strategy was valid and proper in spite of IRS Notice 1999-59 and IRS Notice 2000-44;

(50) Failing to recommend and/or advise Plaintiffs to amend their returns to prevent the IRS from assessing penalties against Plaintiffs;

(51) Failing to disclose existing published authority that purported losses for transactions such as the Strategy were improper and not allowable for Federal and/or State income tax purposes;

(52) Failing to ensure that the transactions into which the Defendants advised Plaintiffs to enter complied with the applicable State and Federal Rules and regulations;

(53) Failing to comply with their ethical obligations to Plaintiffs;

(54) Violating their respective professional rules of conduct;

(55) Providing erroneous tax, legal, investment, and accounting opinions and advice;

(56) Engaging in professional relationships that violated their respective professional and ethical rules of conduct;

(57) Advising the Plaintiffs that the step transaction, sham transaction, and economic substance doctrines would not apply to disallow the results of the Strategy;

(58) Advising the Plaintiffs that Treasury Regulation Section 1.701-2 would not apply to the Strategy;

(59) Advising Plaintiffs that the Short Options will not be liabilities within the meaning of Section 752 of the Internal Revenue Code of 1986;

(60) Advising, recommending, instructing, and assisting Plaintiffs in entering into a

transaction in which they were advised that the step transaction, sham transaction, and/or economic substance doctrines did not apply to disallow the results of the Strategy;

(61) Advising Plaintiffs that each of the various steps of the Strategy were meaningful and imbued with non-tax considerations;

(62) Informing the Plaintiffs that the Strategy was not a "sham transaction" that would be ignored or disallowed for tax purposes;

(63) Informing the Plaintiffs that the Opinion Letters would confirm that the Strategy was not a "sham transaction" that would be ignored or disallowed for tax purposes;

(64) Advising, recommending, instructing, and assisting Plaintiffs in engaging into a transaction which they were advised had business purpose and economic substance and made investment sense;

(65) Failing to advise Plaintiffs that the transactions had no business purpose and no economic substance and made no business sense;

(66) Recommending, instructing, and advising Plaintiffs to enter into the FX Contracts as an investment and/or part of a tax strategy;

(67) Advising, recommending, instructing, and assisting Plaintiffs in entering into transactions that, unbeknownst to the Plaintiffs, were illegal and improper and would be disallowed and held invalid by the IRS on the grounds the transactions lacked economic substance, had no business purpose, were "sham transactions", and violated the step transaction, sham transaction, and economic substance doctrines;

(68) Failing to advise certain Plaintiffs of other legitimate tax-savings and investments

opportunities available to them;

(69) Failing to advise Plaintiffs that an Ernst & Young partner had notified Ernst & Young that COBRA lacked economic substance and business purpose; that the short option is not a "contingent liability"; that Ernst & Young got "out of the COBRA business on January 6, 2000"; that the Jenkens opinion letter has glaring deficiencies; and that the Jenkens opinion letter does not provide penalty protection;

(70) Failing to advise Plaintiffs that Deutsche Bank instructed the Deutsche Bank employees to stop promoting COBRA after the IRS issued Notice 2000-44; and

(71) Failing to advise Plaintiffs to amend their returns - just like, based on information and belief, certain Deutsche Bank employees that did the tax shelter did.

275. The above intentional omissions of material fact and/or affirmative representations made by each Defendant were false when made and the Defendants knew these representations to be false when made with the intention that Plaintiffs rely upon them in entering into the COBRA Strategy and pay them millions of dollars in fees. In addition, the above affirmative misrepresentations and/or intentional omissions of material fact were made knowingly by the Defendants, also with the intent to induce Plaintiffs to enter into the COBRA Strategy and pay them millions of dollars in fees.

276. In reasonable reliance on the Defendants' false affirmative representations and intentional omissions of material facts regarding the COBRA Strategy, Plaintiffs paid millions of dollars to the Defendants and Jenkens for tax and legal advice, paid millions of dollars to Deutsche Bank to execute the COBRA Strategy, did not enter the Amnesty Program, filed federal and state tax returns that reflected improper deductions for capital losses resulting from the COBRA Strategy, and did not amend their tax returns.

277. But for the Defendants' intentional misrepresentations and material omissions described above, Plaintiffs would never have hired Defendants for advice on the COBRA Strategy, engaged in the COBRA Strategy, claimed the purportedly resulting capital losses on their income tax returns, filed and signed their tax returns as prepared by Ernst & Young or in reliance on the Defendants' advice, failed to amend their tax returns, failed to enter the Amnesty Program, and/or failed to avail themselves of legitimate tax savings opportunities. After discovering the Defendants' fraud, Plaintiffs incurred and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation.

278. As a result of the Defendants' conduct set forth herein, Plaintiffs have suffered injury in that (1) they paid Defendants, Ernst & Young and Jenkens millions of dollars, (2) they have incurred tax penalties and interest, and (3) they have and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation.

279. As a proximate cause of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial, and should be awarded punitive damages in accordance with the evidence, plus attorneys' fee and costs.

## X.

## FIFTH CLAIM

## NEGLIGENCE

### BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS

280. Plaintiffs repeat and reallege each and every prior allegation in Paragraphs 1-279 as if fully set forth herein.

281. As Plaintiffs' investment advisors, tax advisors and attorneys, the Defendants owed Plaintiffs duties of care, loyalty and honesty, a duty to comply with the applicable

standards of care, and a duty to comply with the applicable provisions of their codes of professional responsibility.

282.. These Defendants also had a duty to Plaintiffs to meet the applicable standard of care for attorneys and investment advisors. These Defendants failed to meet those applicable standards of care. The Defendants' failure to meet the standard of care caused damages to the Plaintiffs as set forth elsewhere in this Complaint.

283. These Defendants breached the applicable standard of care in, among others, the following manner:

(1) Taking advantage of a relationship of trust and confidence and using their knowledge of Plaintiffs' finances to solicit Plaintiffs for the Strategy;

(2) Taking advantage of a relationship of trust and confidence in recommending the Strategy;

(3) Pressuring Plaintiffs to engage in the Strategy by *inter alia* informing Plaintiffs that engaging in the Strategy was time-sensitive;

(4) Advising and recommending that Plaintiffs engage in the Strategy;

(5) Charging and collecting unreasonable, excessive, and unethical fees;

(6) Failing to disclose the actual roles and relationships of each Defendant in the Strategy;

(7) Failing to disclose that the Defendants were splitting and/or sharing fees;

(8) Failing to advise the Plaintiffs that the Strategy was created, designed, and implemented by Jenkens, Ernst & Young, Scheef & Stone and Deutsche Bank;

(9) Advising the Plaintiffs that the Strategy was created, designed, and implemented by Ernst & Young;

(10) Soliciting Plaintiffs on behalf of Jenkens, Brown & Wood, Deutsche Bank and/or Scheef & Stone;

(11) Failing to fully explain the details of the Strategy and assure Plaintiffs understood the Strategy before inducing Plaintiffs to enter into the Strategy;

(12) Representing to Plaintiffs that the tax savings of the Strategy to Plaintiffs would be significant and far outweigh the amount of fees and costs incurred by Plaintiffs;

(13) Representing to Plaintiffs that the tax benefits of the Strategy far outweighed any potential loss that might be incurred on the FX Contracts;

(14) Advising Plaintiffs that the Jenkens and Brown & Wood opinion letters were "independent" legal opinions from "independent" law firms;

(15) Failing to advise Plaintiffs that the Jenkens and Brown and Wood opinion letters were not "independent" legal opinions from "independent" law firms;

(16) Advising Plaintiffs that the Jenkens and Brown & Wood opinion letters could be relied upon to protect the Plaintiffs from incurring penalties if audited;

(17) Advising Plaintiffs that the Jenkens and Brown & Wood opinion letters could be relied upon to satisfy the IRS as to the propriety of the Strategy if audited;

(18) Creating, designing, implementing, promoting, advising, recommending, and/or selling an illegal, improper, and invalid tax shelter that is disallowed and/or prohibited by the IRS;

(19) Failing to advise Plaintiffs that Jenkens and Brown & Wood had already prepared a "form" opinion letter approving the Strategy and needed to only fill in several

blanks for each of the many clients to which they rendered such opinion letters across the country;

(20) Illegally promoting an unregistered tax shelter by marketing the Strategy to Plaintiffs;

(21) Failing to disclose to Plaintiffs that if they filed tax returns claiming losses based on the Strategy they could be liable for penalties and interest;

(22) Advising Plaintiffs that the losses created by the Strategy were legitimate, proper, and in accordance with all applicable tax laws, rules, and regulations;

(23) Representing and advising Plaintiffs that the various entities formed to carry out the Strategy had business purpose and economic substance;

(24) Making and endorsing the statements and representations in the opinion letters authored and signed by Jenkens and Brown & Wood;

(25) Making and endorsing the statements and representations contained in the Defendants' oral advice, instructions, recommendations, and the tax returns prepared by the Defendants;

(26) Failing to advise Plaintiffs of Deutsche Bank's role in COBRA and the fee Deutsche Bank received for assisting and carrying out COBRA through the FX Contracts;

(27) Failing to advise Plaintiffs of Scheef & Stone's role and the fee Scheef & Stone received;

(28) Recommending, advising, instructing, and assisting Plaintiffs in carrying out each of the steps of the Strategy;

(29) Recommending that Plaintiffs purchase the FX Contracts;

(30) Recommending, advising, instructing, and assisting Plaintiffs in the FX Contracts;

(31) Failing to accurately and fully explain the FX Contracts to Plaintiffs and ensure they understood the Options before Plaintiffs engaged in the transaction;

(32) Failing to accurately and fully advise Plaintiffs that the Options were a private bet with Deutsche Bank, that Deutsche Bank controlled the outcome of the bet by picking the spot rate and ignoring other spot rates, that Deutsche Bank could manipulate the results to ensure Plaintiffs did not make money, that the Options were designed to expire out of the money and result in a loss for Plaintiffs, and that the chance of winning on the investment was analogous to the chance of winning the lottery;

(33) Failing to advise Plaintiffs that the design of the COBRA Strategy and the FX Contracts made no economic or investment sense and had no business purpose or economic substance;

(34) Advising Plaintiffs that the design of the COBRA Strategy and the FX Contracts had economic and investment sense and had business purpose and economic substance;

(35) Informing Plaintiffs that they had an opportunity of making a profit on the FX Contracts when, in fact, it was virtually impossible to make a profit taking into account the fees and costs of the Strategy, the fact that the Options were designed to result in a loss, and that Deutsche Bank controlled the outcome and could manipulate the results to ensure Plaintiffs did not make money;

(36) Failing to learn the facts as to whether the FX Contracts were appropriate for the Plaintiffs, either as an investment or as part of a tax strategy;

(37) Failing to fully and properly inform and advise Plaintiffs of IRS Notice 1999-59 and its implications on the Strategy;

(38) Failing to advise Plaintiffs that IRS Notice 1999-59 identified transactions lacking in "economic substance" (like the Strategy) as improper and illegal and purported to disallow any losses generated through such transactions;

(39) Advising Plaintiffs that IRS Notice 1999-59 did not apply to the Strategy and/or did not impact the propriety of the Strategy;

(40) Failing to revise, alter, amend, or modify the advice, recommendations, instructions, opinions, and representations made to Plaintiffs, orally or in opinion letters, regarding the propriety of the Strategy in light of IRS Notice 1999-59;

(41) Advising, instructing, and assisting in the preparation of filing of Plaintiffs' tax returns, utilizing the capital and/or ordinary losses generated by the Strategy;

(42) Advising, confirming, and/or ratifying that the Jenkens and Brown & Wood opinion letters were accurate and correct;

(43) Advising Plaintiffs that their tax returns, which utilized the losses generated by the Strategy, were prepared in accordance with professional standards and pursuant to IRS guidelines and established legal authorities;

(44) Failing to fully and properly inform and advise the Plaintiffs of IRS Notice 2000-44 and its implications on the Strategy;

(45) Failing to advise Plaintiffs that in IRS Notice 2000-44, the IRS had identified the Strategy as improper and illegal and planned to disallow the losses generated by the Strategy;

(46) Failing to advise Plaintiffs that IRS Notice 2000-44 precisely described and identified the Strategy as being improper and illegal;

(47) Advising Plaintiffs that IRS Notice 2000-44 did not apply to the Strategy and/or impact the propriety of the Strategy;

(48) Failing to revise, alter, amend, or modify the advice, recommendations, instructions, representations, and opinions made to Plaintiffs, orally or in opinion letters, regarding the propriety of the Strategy in light of IRS Notice 2000-44;

(49) Advising Plaintiffs that the Strategy was valid and proper in spite of IRS Notice 1999-59 and IRS Notice 2000-44;

(50) Failing to recommend and/or advise Plaintiffs to amend their returns to prevent the IRS from assessing penalties against Plaintiffs;

(51) Failing to disclose existing published authority that purported losses for transactions such as the Strategy were improper and not allowable for Federal and/or State income tax purposes;

(52) Failing to ensure that the transactions into which Defendants advised Plaintiffs to enter complied with the applicable State and Federal Rules and regulations;

(53) Failing to comply with their ethical obligations to Plaintiffs;

(54) Violating their respective professional rules of conduct;

(55) Providing erroneous tax, legal, investment, and accounting opinions and advice;

(56) Engaging in professional relationships that violated their respective professional and ethical rules of conduct;

(57) Advising the Plaintiffs that the step transaction, sham transaction, and economic substance doctrines would not apply to disallow the results of the Strategy;

(58) Advising the Plaintiffs that Treasury Regulation Section 1.701-2 would not apply to the Strategy;

(59) Advising Plaintiffs that the Short Options will not be liabilities within the meaning of Section 752 of the Internal Revenue Code of 1986;

(60) Advising, recommending, instructing, and assisting Plaintiffs in entering into a

transaction in which they were advised that the step transaction, sham transaction, and/or economic substance doctrines did not apply to disallow the results of the Strategy;

(61) Advising Plaintiffs that each of the various steps of the Strategy were meaningful and imbued with non-tax considerations;

(62) Informing the Plaintiffs that the Strategy was not a "sham transaction" that would be ignored or disallowed for tax purposes;

(63) Informing the Plaintiffs that the Opinion Letters would confirm that the Strategy was not a "sham transaction" that would be ignored or disallowed for tax purposes;

(64) Advising, recommending, instructing, and assisting Plaintiffs in engaging into a transaction which they were advised had business purpose and economic substance and made investment sense;

(65) Failing to advise Plaintiffs that the transactions had no business purpose and no economic substance and made no business sense;

(66) Recommending, instructing, and advising Plaintiffs to enter into the FX Contracts as an investment and/or part of a tax strategy;

(67) Advising, recommending, instructing, and assisting Plaintiffs in entering into transactions that, unbeknownst to the Plaintiffs, were illegal and improper and would be disallowed and held invalid by the IRS on the grounds the transactions lacked economic substance, had no business purpose, were "sham transactions", and violated the step transaction, sham transaction, and economic substance doctrines;

(68) Failing to advise certain Plaintiffs of other legitimate tax-savings and investments

opportunities available to them;

(69) Failing to advise Plaintiffs that an Ernst & Young partner had notified Ernst & Young that COBRA lacked economic substance and business purpose; that the short option is not a "contingent liability"; that Ernst & Young got "out of the COBRA business on January 6, 2000"; that the Jenkens opinion letter has glaring deficiencies; and that the Jenkens opinion letter does not provide penalty protection;

(70) Failing to advise Plaintiffs that Deutsche Bank instructed the Deutsche Bank employees to stop promoting COBRA after the IRS issued Notice 2000-44; and

(71) Failing to advise Plaintiffs to amend their returns – just like, based on information and belief, certain Deutsche Bank employees that did the tax shelter did.

284. The Defendants' negligence rises to the level of gross negligence and/or malice. The Defendants' negligence proximately caused Plaintiffs' damages.

285. As a result of Defendants' negligence, Plaintiffs paid millions of dollars to the Defendants, Ernst & Young and Jenkens for tax and legal advice, paid millions of dollars to Deutsche Bank to execute the COBRA Strategy, did not enter the Amnesty Program, filed federal and state tax returns that reflected improper deductions for capital losses resulting from the COBRA Strategy, and did not amend their tax returns.

286. But for the Defendants' negligence, Plaintiffs would never have hired the Defendants, Ernst & Young or Jenkens for advice on the COBRA Strategy, engaged in the COBRA Strategy, claimed the purportedly resulting capital losses on their income tax returns, filed and signed their tax returns as prepared by Ernst & Young or in reliance on the Defendants' advice, failed to amend their tax returns, failed to enter the Amnesty Program, and/or failed to avail themselves of legitimate tax savings opportunities. After discovering the Defendants'

negligence, Plaintiffs incurred and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation.

287. After discovering the Defendants' negligence, Plaintiffs incurred and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation.

288. As a result of the Defendants' conduct set forth herein, Plaintiffs have suffered injury in that (1) they paid the Defendants, Ernst & Young and Jenkens millions of dollars, (2) they have incurred tax penalties and interest, and (3) they have and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation.

289. As a proximate cause of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial, and should be awarded punitive damages in accordance with the evidence, plus attorneys' fee and costs.

## XI.

## SIXTH CLAIM

## NEGLIGENT MISREPRESENTATION

### BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS

290. Plaintiffs repeat and reallege each and every prior allegation in Paragraphs 1-289 as if fully set forth herein.

291. As Plaintiffs' investment advisors, tax advisors and attorneys, the Defendants owed Plaintiffs duties of care, loyalty and honesty, a duty to comply with the applicable standards of care, and a duty to comply with the applicable provisions of their codes of professional responsibility.

292. During the course of their representation of Plaintiffs, these Defendants each made numerous knowingly or negligently false affirmative representations, and intentional or negligently misleading omissions of material fact, including but not limited to:

(1) Taking advantage of a relationship of trust and confidence and using their knowledge of Plaintiffs' finances to solicit Plaintiffs for the Strategy;

(2) Taking advantage of a relationship of trust and confidence in recommending the Strategy;

(3) Pressuring Plaintiffs to engage in the Strategy by *inter alia* informing Plaintiffs that engaging in the Strategy was time-sensitive;

(4) Advising and recommending that Plaintiffs engage in the Strategy;

(5) Charging and collecting unreasonable, excessive, and unethical fees;

(6) Failing to disclose the actual roles and relationships of each Defendant in the Strategy;

(7) Failing to disclose that the Defendants were splitting and/or sharing fees;

(8) Failing to advise the Plaintiffs that the Strategy was created, designed, and implemented by Jenkens, Ernst & Young, Scheef & Stone and Deutsche Bank;

(9) Advising the Plaintiffs that the Strategy was created, designed, and implemented by Ernst & Young;

(10) Soliciting Plaintiffs on behalf of Jenkens, Brown & Wood, Deutsche Bank and/or Scheef & Stone;

(11) Failing to fully explain the details of the Strategy and assure Plaintiffs understood the Strategy before inducing Plaintiffs to enter into the Strategy;

(12) Representing to Plaintiffs that the tax savings of the Strategy to Plaintiffs would be significant and far outweigh the amount of fees and costs incurred by Plaintiffs;

(13) Representing to Plaintiffs that the tax benefits of the Strategy far outweighed any potential loss that might be incurred on the FX Contracts;

(14) Advising Plaintiffs that the Jenkens and Brown & Wood opinion letters were "independent" legal opinions from "independent" law firms;

(15) Failing to advise Plaintiffs that the Jenkens and Brown and Wood opinion letters were not "independent" legal opinions from "independent" law firms;

(16) Advising Plaintiffs that the Jenkens and Brown & Wood opinion letters could be relied upon to protect the Plaintiffs from incurring penalties if audited;

(17) Advising Plaintiffs that the Jenkens and Brown & Wood opinion letters could be relied upon to satisfy the IRS as to the propriety of the Strategy if audited;

(18) Creating, designing, implementing, promoting, advising, recommending, and/or selling an illegal, improper, and invalid tax shelter that is disallowed and/or prohibited by the IRS;

(19) Failing to advise Plaintiffs that Jenkens and Brown & Wood had already prepared a "form" opinion letter approving the Strategy and needed to only fill in several blanks for each of the many clients to which they rendered such opinion letters across the country;

(20) Illegally promoting an unregistered tax shelter by marketing the Strategy to Plaintiffs;

(21) Failing to disclose to Plaintiffs that if they filed tax returns claiming losses based on the Strategy they could be liable for penalties and interest;

(22) Advising Plaintiffs that the losses created by the Strategy were legitimate, proper, and in accordance with all applicable tax laws, rules, and regulations;

(23) Representing and advising Plaintiffs that the various entities formed to carry out the Strategy had business purpose and economic substance;

(24) Making and endorsing the statements and representations in the opinion letters authored and signed by Jenkens and Brown & Wood;

(25) Making and endorsing the statements and representations contained in the Defendants' oral advice, instructions, recommendations, and the tax returns prepared by the Defendants;

(26) Failing to advise Plaintiffs of Deutsche Bank's role in COBRA and the fee Deutsche Bank received for assisting and carrying out COBRA through the FX Contracts;

(27) Failing to advise Plaintiffs of Scheef & Stone's role and the fee Scheef & Stone received;

(28) Recommending, advising, instructing, and assisting Plaintiffs in carrying out each of the steps of the Strategy;

(29) Recommending that Plaintiffs purchase the FX Contracts;

(30) Recommending, advising, instructing, and assisting Plaintiffs in the FX Contracts;

(31) Failing to accurately and fully explain the FX Contracts to Plaintiffs and ensure they understood the Options before Plaintiffs engaged in the transaction;

(32) Failing to accurately and fully advise Plaintiffs that the Options were a private bet with Deutsche Bank, that Deutsche Bank controlled the outcome of the bet by picking the spot rate and ignoring other spot rates, that Deutsche Bank could manipulate the results to ensure Plaintiffs did not make money, that the Options were designed to expire out of the money and result in a loss for Plaintiffs, and that the chance of winning on the investment was analogous to the chance of winning the lottery;

(33) Failing to advise Plaintiffs that the design of the COBRA Strategy and the FX Contracts made no economic or investment sense and had no business purpose or economic substance;

(34) Advising Plaintiffs that the design of the COBRA Strategy and the FX Contracts had economic and investment sense and had business purpose and economic substance;

(35) Informing Plaintiffs that they had an opportunity of making a profit on the FX Contracts when, in fact, it was virtually impossible to make a profit taking into account the fees and costs of the Strategy, the fact that the Options were designed to result in a loss, and that Deutsche Bank controlled the outcome and could manipulate the results to ensure Plaintiffs did not make money;

(36) Failing to learn the facts as to whether the FX Contracts were appropriate for the Plaintiffs, either as an investment or as part of a tax strategy;

(37) Failing to fully and properly inform and advise Plaintiffs of IRS Notice 1999-59 and its implications on the Strategy;

(38) Failing to advise Plaintiffs that IRS Notice 1999-59 identified transactions lacking in "economic substance" (like the Strategy) as improper and illegal and purported to disallow any losses generated through such transactions;

(39) Advising Plaintiffs that IRS Notice 1999-59 did not apply to the Strategy and/or did not impact the propriety of the Strategy;

(40) Failing to revise, alter, amend, or modify the advice, recommendations, instructions, opinions, and representations made to Plaintiffs, orally or in opinion letters, regarding the propriety of the Strategy in light of IRS Notice 1999-59;

(41) Advising, instructing, and assisting in the preparation of filing of Plaintiffs' tax returns, utilizing the capital and/or ordinary losses generated by the Strategy;

(42) Advising, confirming, and/or ratifying that the Jenkens and Brown & Wood opinion letters were accurate and correct;

(43) Advising Plaintiffs that their tax returns, which utilized the losses generated by the Strategy, were prepared in accordance with professional standards and pursuant to IRS guidelines and established legal authorities;

(44) Failing to fully and properly inform and advise the Plaintiffs of IRS Notice 2000-44 and its implications on the Strategy;

(45) Failing to advise Plaintiffs that in IRS Notice 2000-44, the IRS had identified the Strategy as improper and illegal and planned to disallow the losses generated by the Strategy;

(46) Failing to advise Plaintiffs that IRS Notice 2000-44 precisely described and identified the Strategy as being improper and illegal;

(47) Advising Plaintiffs that IRS Notice 2000-44 did not apply to the Strategy and/or impact the propriety of the Strategy;

(48) Failing to revise, alter, amend, or modify the advice, recommendations, instructions, representations, and opinions made to Plaintiffs, orally or in opinion letters, regarding the propriety of the Strategy in light of IRS Notice 2000-44;

(49) Advising Plaintiffs that the Strategy was valid and proper in spite of IRS Notice 1999-59 and IRS Notice 2000-44;

(50) Failing to recommend and/or advise Plaintiffs to amend their returns to prevent the IRS from assessing penalties against Plaintiffs;

(51) Failing to disclose existing published authority that purported losses for transactions such as the Strategy were improper and not allowable for Federal and/or State income tax purposes;

(52) Failing to ensure that the transactions into which Defendants advised Plaintiffs to enter complied with the applicable State and Federal Rules and regulations;

(53) Failing to comply with their ethical obligations to Plaintiffs;

(54) Violating their respective professional rules of conduct;

(55) Providing erroneous tax, legal, investment, and accounting opinions and advice;

(56) Engaging in professional relationships that violated their respective professional and ethical rules of conduct;

(57) Advising the Plaintiffs that the step transaction, sham transaction, and economic substance doctrines would not apply to disallow the results of the Strategy;

(58) Advising the Plaintiffs that Treasury Regulation Section 1.701-2 would not apply

to the Strategy;

(59) Advising Plaintiffs that the Short Options will not be liabilities within the meaning of Section 752 of the Internal Revenue Code of 1986;

(60) Advising, recommending, instructing, and assisting Plaintiffs in entering into a transaction in which they were advised that the step transaction, sham transaction, and/or economic substance doctrines did not apply to disallow the results of the Strategy;

(61) Advising Plaintiffs that each of the various steps of the Strategy were meaningful and imbued with non-tax considerations;

(62) Informing the Plaintiffs that the Strategy was not a "sham transaction" that would be ignored or disallowed for tax purposes;

(63) Informing the Plaintiffs that the Opinion Letters would confirm that the Strategy was not a "sham transaction" that would be ignored or disallowed for tax purposes;

(64) Advising, recommending, instructing, and assisting Plaintiffs in engaging into a transaction which they were advised had business purpose and economic substance and made investment sense;

(65) Failing to advise Plaintiffs that the transactions had no business purpose and no economic substance and made no business sense;

(66) Recommending, instructing, and advising Plaintiffs to enter into the FX Contracts as an investment and/or part of a tax strategy;

(67) Advising, recommending, instructing, and assisting Plaintiffs in entering into

transactions that, unbeknownst to the Plaintiffs, were illegal and improper and would be disallowed and held invalid by the IRS on the grounds the transactions lacked economic substance, had no business purpose, were "sham transactions", and violated the step transaction, sham transaction, and economic substance doctrines;

(68) Failing to advise certain Plaintiffs of other legitimate tax-savings and investments opportunities available to them;

(69) Failing to advise Plaintiffs that an Ernst & Young partner had notified Ernst & Young that COBRA lacked economic substance and business purpose; that the short option is not a "contingent liability"; that Ernst & Young got "out of the COBRA business on January 6, 2000"; that the Jenkens opinion letter has glaring deficiencies; and that the Jenkens opinion letter does not provide penalty protection;

(70) Failing to advise Plaintiffs that Deutsche Bank instructed the Deutsche Bank employees to stop promoting COBRA after the IRS issued Notice 2000-44; and

(71) Failing to advise Plaintiffs to amend their returns – just like, based on information and belief, certain Deutsche Bank employees that did the tax shelter did.

293. The Defendants either knew or reasonably should have known their representations, recommendations, advice, instructions, and opinions to be false.

294. In reasonable reliance on the Defendants' negligently false affirmative representations and intentional or negligently misleading omissions of material facts regarding the COBRA Strategy, Plaintiffs paid millions of dollars to the Defendants, Ernst & Young and

Jenkens for tax and legal advice and other professional services, paid millions of dollars to Deutsche Bank to execute the COBRA Strategy, did not enter the Amnesty Program, filed federal and state tax returns that reflected improper deductions for capital losses resulting from the COBRA Strategy, and did not amend their tax returns.

295. But for the Defendants' negligent misrepresentations and material omissions described above, Plaintiffs would never have hired the Defendants, Ernst & Young or Jenkens for advice on the COBRA Strategy, engaged in the COBRA Strategy, claimed the purportedly resulting capital losses on their income tax returns, filed and signed their tax returns as prepared by Ernst & Young or in reliance on the Defendants' advice, failed to amend their tax returns, failed to enter the Amnesty Program, and/or failed to avail themselves of legitimate tax savings opportunities.

296. After discovering the Defendants' negligent misrepresentations, Plaintiffs incurred and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation.

297. As a result of the Defendants' conduct set forth herein, Plaintiffs have suffered injury in that (1) they paid the Defendants, Ernst & Young and Jenkens millions of dollars, (2) they have incurred tax penalties and interest, and (3) they have and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation.

298. As a proximate cause of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial, and should be awarded punitive damages in accordance with the evidence, plus attorneys' fee and costs.

## XII.

## SEVENTH CLAIM

## BREACH OF CONTRACT

### BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS

299. Plaintiffs repeat and reallege each and every prior allegation in Paragraphs 1-298, as if fully set forth herein.

300. Plaintiffs entered into oral and written contracts with the Defendants to provide Plaintiffs with professionally competent investment advice and services, tax advice and services, legal advice and services, accounting services and tax return preparation services. In connection therewith, the Defendants were required and expected to meet all applicable standards of care, to meet the fiduciary duties of loyalty and honesty, and to comply with all applicable rules of professional conduct. The Defendants breached their oral and/or written contracts with the Plaintiffs.

301. Plaintiffs fully performed their obligations to the Defendants under these contracts and thus did not contribute to the Defendants' breaches in any way.

302. The Defendants ignored their obligations and instead provided Plaintiffs with advice, opinions, recommendations, representations and instructions that the Defendants either knew or reasonably should have known to be wrong. In addition, the rendering of such representations, recommendations, advice, instructions and opinions, as well as the failure to advise the Plaintiffs of the omissions set forth above, was negligent, grossly negligent, and reckless. Accordingly, the Defendants failed to exercise the standard of care required of them as accountants and attorneys and breached their contracts with Plaintiffs.

303. As a result of the Defendants' conduct set forth herein, Plaintiffs have suffered injury in that (1) they paid the Defendants, Ernst & Young and Jenkens millions of dollars, (2) they have incurred tax penalties and interest, (3) they have incurred consequential damages; and (4) they have and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation.

304. As a proximate cause thereof, Plaintiffs have been injured in an actual amount to be proven at trial, and should be awarded punitive, consequential and incidental damages in accordance with the evidence, plus attorneys' fee and costs.

## XIII.

## EIGHTH CLAIM

## DECLARATORY JUDGMENT

### BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS

305. Plaintiffs repeat and reallege each and every prior allegation in Paragraphs 1-310, inclusive, as if fully set forth herein.

306. The IRS has commenced audits of Plaintiffs' tax returns. The Plaintiffs have incurred interest and penalties assessed by the IRS and state tax authorities, as well as disallowance of other deductions, as a consequence of Plaintiffs engaging in the COBRA Strategy as advised by the Defendants. They are continuing to incur additional professional fees and expenses to rectify the Defendants' wrongdoing.

307. The Defendants are legally responsible for: (1) interest and/or penalties assessed by the IRS and/or state tax authorities, as well as the disallowance of other certain deductions; (2) professional fees and costs incurred by Plaintiffs in connection with the State and/or Federal

investigations and audits; and (3) professional fees and expenses incurred by on account of the Defendants' breaches of fiduciary duty, fraud, negligent misrepresentations, acts of malpractice, breaches of contract, and all other claims asserted herein.

308. Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Defendants are liable to Plaintiffs for such penalties, interest, loss of certain other deductions, costs, professional fees, expenses and damages. There exists an actual, justiciable controversy between the parties as Defendants have denied such liability.

## XIV.

## NINTH CLAIM

## UNETHICAL, EXCESSIVE AND ILLEGAL FEES

### BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS

309. Plaintiffs repeat and reallege each and every prior allegation in Paragraphs 1-308, as if fully set forth herein.

310. Regardless of the merits of the legal advice and the opinion letters the Brown & Wood and Scheef & Stone Defendants rendered to Plaintiffs, the fees the Brown & Wood and Scheef & Stone Defendants charged Plaintiffs, which they paid, is unethically excessive and in violation of all applicable Rules of Professional Conduct and/or Code of Professional Responsibility, such as §1200.11 (DR 2-106) of the New York Code of Professional Responsibility. On information and belief, the Brown & Wood and Scheef & Stone Defendants issued a virtually identical opinion letter for a significant number of other clients and charged these clients the same fee for the same work and expended little, if any, additional time or effort in providing an opinion letter and advice to Plaintiffs.

311. Further, since the Brown & Wood and Scheef & Stone Defendants did not disclose information that they were required to disclose - *i.e.*, their opinion letter was not "independent", they had a significant pecuniary interest in the COBRA Strategy, and their representation of Plaintiffs and their arrangement with the other Defendants violated the applicable rules of professional conduct and standard of care - their fee agreement with Plaintiffs is not enforceable.

312. Accordingly, the Brown & Wood and Scheef & Stone Defendants must disgorge their fees to Plaintiffs.

## XV.

## TENTH CLAIM

## CIVIL CONSPIRACY

### BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS

313. Plaintiffs repeat and reallege each and every allegation in Paragraphs 1-312, inclusive, as if fully set forth herein.

314. As described more fully above, the Defendants, Ernst & Young and Jenkens knowingly acted in concert, with each other and with others, to market and implement the fraudulent and illegal COBRA Strategy. In doing so, the Defendants acted with full knowledge and awareness that the COBRA Strategy was designed to give the false impression that a complex series of financial transactions were legitimate business transactions which had economic substance from an investment standpoint, when they in fact lacked those features (which were necessary for a successful tax strategy).

315. The Defendants acted in the respective roles as described above according to a predetermined and commonly understood and accepted plan of action (*i.e.*, the Arrangement), all for the purposes of obtaining professional fees from consumers, including the Plaintiffs.

316. The acts of the Defendants were contrary to numerous provisions of law, as stated above.

317. There was a meeting of the minds between and among the Defendants, and other individuals and entities, both known and unknown, to commit the unlawful acts alleged herein. This conspiracy to commit these unlawful, overt acts, proximately caused and continues to cause Plaintiffs' damages as previously set forth herein.

318. As a result of the Defendants' conduct set forth herein, the Plaintiffs have suffered injury to their business and property in that Plaintiffs have paid Defendants, Ernst & Young and Jenkens millions of dollars in fees and have incurred actual damages and losses in an amount to be proven at trial; have incurred tax penalties and interest; and have incurred and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation.

319. Plaintiffs have been injured in an actual amount to be proven at trial, and should be awarded punitive damages in accordance with the evidence, plus attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, demand judgment against the Defendants as follows:

A. **As to the First Claim (Declaratory Judgment and Unjust Enrichment):** An order on behalf of Plaintiffs entering the declaratory relief prayed for herein, together with the return to the Plaintiffs of all amounts by which Defendants have been unjustly enriched;

B. **In the alternative, as to the Second Claim (Breach of Contract/Breach of the Duty of Good Faith and Fair Dealing):** A judgment in favor of Plaintiffs against the Deutsche Defendants jointly and severally, for actual damages in an amount to be proven at trial, plus punitive damages in accordance with the evidence, attorneys' fees, interest, and costs;

C. **As to the Third Claim (Breach of Fiduciary Duty):** A judgment in favor of the Plaintiffs against each Defendant jointly and severally, for actual damages in an amount to be proven at trial, plus punitive damages in accordance with the evidence, attorneys' fees, interest, and costs;

D. **As to the Fourth Claim (Fraud):** A judgment in favor of the Plaintiffs against each Defendant jointly and severally, actual damages in an amount to be proven at trial, plus punitive damages in accordance with the evidence, attorneys' fees and costs, rescission of the FX Contracts and return of all monies paid by them in connection therewith;

E. **As to the Fifth Claim (Negligence):** A judgment in favor of the Plaintiffs against each Defendant jointly and severally, actual damages in an amount to be proven at trial, plus punitive damages in accordance with the evidence, attorneys' fees and costs;

F. **As to the Sixth Claim (Negligent Misrepresentation):** A judgment in favor of the Plaintiffs against each Defendant jointly and severally, actual damages in an amount to be proven at trial plus punitive damages in accordance with the evidence, attorneys' fees and costs;

G. **As to the Seventh Claim (Breach of Contract):** A judgment in favor of the Plaintiffs against each Defendant jointly and severally, actual damages in an amount to be proven at trial, plus punitive, consequential and incidental damages in accordance with the

evidence, attorneys' fees and costs;

H. **As to the Eighth Claim (Declaratory Judgment):** A declaration in favor of the Plaintiffs for all relief prayed for herein and that Defendants are liable to Plaintiffs for any and all interest and penalties assessed against them by the IRS and/or State tax authorities resulting from Plaintiffs' participation in the COBRA Strategy, for all additional professional fees, costs, and expenses incurred by Plaintiffs to engage in the COBRA Strategy and to rectify Defendants' wrongdoing, for tax savings and investment opportunities lost as a result of Defendants' conduct, for the disallowance/loss of certain deductions, and for the cost of the unnecessary investments purchased to effectuate the COBRA Strategy, plus punitive damages, attorneys' fees and costs.

I. **As to the Ninth Claim (Unethical, Excessive and Illegal Fees):** A judgment in favor of the Plaintiffs against the Scheef & Stone and Brown & Wood Defendants, and disgorgement by those Defendants to Plaintiffs of their fees;

J. **As to the Tenth Claim (Civil Conspiracy):** A judgment in favor of the Plaintiffs against each Defendant jointly and severally, actual damages in an amount to be proven at trial, plus punitive damages in accordance with the evidence, attorneys' fees, interest, and costs;

K. Against each Defendant, actual, punitive, exemplary damages, attorneys' fees, costs, interest, and such other and further relief as the Court may deem just and proper; and

L. That the Court grant such other, further, and different relief as the Court deems just and proper under the circumstances.

Respectfully submitted,

DEARY MONTGOMERY DEFEO & CANADA, LLP

DAVID R. DEARY
State Bar No. 05624900
W. RALPH CANADA, JR.
State Bar No. 03733800
STEWART CLANCY
State Bar No. 24027926
JEVEN R. SLOAN
State Bar No. 24039177
ALYSSA M. BARRENECHE
State Bar No. 24040607
Chateau Plaza, Suite 1565
2515 McKinney Avenue
Dallas, Texas 75201
(214) 292-2600
(215) 739-3879 (fax)

LEAD ATTORNEYS FOR PLAINTIFFS

CORY WATSON CROWDER & DEGARIS
ERNEST CORY
2131 Magnolia Avenue
Birmingham, Alabama 35205
(205) 328-2200
(205) 324-7896 (fax)

ATTORNEYS FOR PLAINTIFFS

WHATLEY DRAKE, LLC
JOE R. WHATLEY, JR.
OTHNI LATHRAM
2323 2nd Avenue North
Birmingham, Alabama 35203
(205) 328-9576
(205) 328-9669 (fax)

ATTORNEYS FOR PLAINTIFFS