**CAUSE NO. 017-212033-05**

| | | |
|---|---|---|
| **HENRY N. CAMFERDAM, JR., HNC DITCH INVESMENTS LLC, JEFFREY M. ADAMS, JMA SEDGEMOUR INVESTMENTS LLC, JAY MICHENER, JM WALNUT INVESTMENTS LLC, CAROL TRIGILIO, CT OAK INVESTMENTS LLC, BAMC, INC., CARMEL PARTNERS, WALTER P. PARMER, ARGENIA IDA PARMER, WPP FARRAHS CALVARY INVESTMENTS LLC, WSWP VIRGINIA INVESTORS INC., WSWP PARTNERS, NEIL D. ARNOLD, H. JANE ARNOLD, NDA DAUPHIN INVESTMENTS LLC, VINCENT D. LAURENZO, SHERRILL S. LAURENZO, VDL GULFSHORE BLVD. INVESTMENTS LLC, VICTOR A. RICE, CORRINE F. RICE, VAR TUDOR PLACE INVESTMENTS LLC, VAR PARTNERS, and VAR INVESTORS INC.** | § | **IN THE DISTRICT COURT OF** |
| **PLAINTIFFS** | § | |
| v. | § | **TARRANT COUNTY** |
| **DEUTSCHE BANK AG; DEUTSCHE BANK SECURITIES, INC., d/b/a DEUTSCHE BANK ALEX BROWN, a division of DEUTSCHE BANK SECURITIES, INC.; DAVID PARSE; SIDLEY AUSTIN BROWN & WOOD, LLP; R.J. RUBLE; SCHEEF & STONE, LLP; and GRADY DICKENS,** | § | FILED 2005 JUN -1 PM 3:20 |
| **DEFENDANTS.** | § | **17th JUDICIAL DISTRICT** |

## PLAINTIFFS' FIRST AMENDED PETITION

Plaintiffs Henry N. Camferdam, Jr. and HNC Ditch Investments LLC (collectively, the "Camferdam Plaintiffs"); Jeffrey M. Adams and JMA Sedgemour Investments LLC (collectively, the "Adams Plaintiffs"); Jay Michener and JM Walnut Investments LLC (collectively, the



GOVERNMENT EXHIBIT A(1)(2)

"Michener Plaintiffs"); Carol Trigilio and CT Oak Tree Investments LLC (collectively, the "Trigilio Plaintiffs"); BAMC, Inc.; Carmel Partners; Walter P. Parmer, Argenia Ida Parmer, WPP Farrahs Calvary Investments LLC, WSWP Virginia Investors Inc., and WSWP Partners (collectively, the "Parmer Plaintiffs"); Neil D. Arnold, H. Jane Arnold, and NDA Dauphin Investments LLC (collectively, the "Arnold Plaintiffs"); Victor A. Rice, Corrine F. Rice, and VAR Tudor Place Investments LLC (collectively, the "Rice Plaintiffs"); Vincent D. Laurenzo, Sherrill S. Laurenzo, and VDL Gulfshore Blvd. Investments LLC (collectively, the "Laurenzo Plaintiffs"); VAR Partners; and VAR Investors, Inc. (the Camferdam Plaintiffs, Adams Plaintiffs, Michener Plaintiffs, Trigilio Plaintiffs, the Parmer Plaintiffs, the Arnold Plaintiffs, the Rice Plaintiffs and the Laurenzo Plaintiffs are sometimes collectively referred to herein as the "Individual Plaintiffs", and all of the plaintiffs are hereinafter sometimes collectively referred to as the "Plaintiffs") bring this action against Defendants Deutsche Bank AG; Deutsche Bank Securities, Inc., d/b/a Deutsche Bank Alex Brown, a division of Deutsche Bank Securities, Inc.; David Parse; Sidley Austin Brown & Wood LLP; R.J. Ruble; Scheef & Stone, LLP; and Grady Dickens (all defendants are sometimes collectively referred to as the "Defendants"), seeking damages for claims arising out of tax strategies of the type further described herein, and state:

## I.

## PARTIES

1. Plaintiffs Henry N. Camferdam, Jr., Jeffrey M. Adams, Jay Michener and Carol Trigilio are individuals and citizens of Indiana.

2. Plaintiffs Walter P. Parmer and Argenia Ida Parmer are individuals and citizens of Florida.

3. Plaintiffs Neil D. Arnold, H. Jane Arnold, Victor A. Rice and Corrine F. Rice are individuals and citizens of New York.

4. Plaintiffs Vincent D. Laurenzo and Sherrill S. Laurenzo are individuals and citizens of Florida.

5. Plaintiffs HNC Ditch Investments LLC, JMA Sedgemour Investments LLC, JM Walnut Investments LLC, CT Oak Tree Investments LLC, WPP Farrahs Calvary Investments LLC, NDA Dauphin Investments LLC, VAR Tudor Place Investments LLC, and VDL Gulfshore Blvd. Investments LLC are single member limited liability companies formed under the laws of the State of Delaware.

6. Plaintiff Carmel Partners is an Indiana general partnership with offices in Indiana.

7. Plaintiff WSWP Partners is a Virginia general partnership with offices in Virginia.

8. Plaintiff VAR Partners is a New York general partnership with offices in New York.

9. Plaintiffs BAMC Inc., WSWP Virginia Investors Inc., and VAR Investors Inc. are "Subchapter S corporations" formed under the laws of the State of Delaware.

10. Defendant Deutsche Bank AG ("Deutsche Bank") is a German corporation with its principal place of business at Taunusanlage 12, 60325 Frankfurt am Main, Germany. This Defendant is continuously and systematically engaged in business in the State of Texas as further described herein, and has agents doing business in the State of Texas. This Defendant does not maintain a regular place of business in the State of Texas, does not have a designated agent for service of process, and this lawsuit arises out of this Defendant's business in the State of Texas.

Accordingly, the Secretary of State is the agent for service of process on this Defendant pursuant to TEX. CIV. PRAC. & REM. CODE §17.044.

11. Defendant Deutsche Bank Securities, Inc. d/b/a Deutsche Bank Alex Brown ("DB Alex Brown") is a Delaware corporation with its principal place of business at 31 West 52nd Street, New York, New York, 10019. Deutsche Bank Securities, Inc. is a member of the New York Stock Exchange. This Defendant is continuously and systematically engaged in business in the State of Texas, and holds a certificate of authority to transact business in the State of Texas. It may be served with process by serving its registered agent, CT Corporation System, CT Corporation, 350 North St. Paul Street, Dallas, Texas 75201.

12. Defendant David Parse is an individual and citizen of Illinois. This Defendant is or was, during the relevant period, an employee of Deutsche Bank and/or DB Alex Brown. This Defendant does not maintain a regular place of business in the State of Texas, does not have a designated agent for service of process, and this lawsuit arises out of this Defendant's business in the State of Texas. Accordingly, the Secretary of State is the agent for service of process on this Defendant pursuant to TEX. CIV. PRAC. & REM. CODE §17.044. Deutsche Bank, DB Alex Brown, and Parse are collectively referred to herein as the "Deutsche Defendants."

13. Defendant Sidley Austin Brown & Wood, L.L.P. ("Brown & Wood") is a professional limited liability partnership organized and existing under the laws of the State of Delaware with its principal place of business in Chicago, Illinois. This law firm is the successor in interest to Brown & Wood, the law firm that advised Plaintiffs. This Defendant is continuously and systematically engaged in business in the State of Texas, and holds a certificate of authority to

transact business in the State of Texas. It may be served with process at 717 N. Harwood, Suite 3400, Dallas, Texas 75201.

14. Defendant R.J. Ruble ("Ruble") is a citizen and individual of the State of New York. Ruble is or was, during the relevant period, an employee of Brown & Wood. Ruble was, at all times relevant to the events in question, continuously and systematically engaged in business in the State of Texas, as further described herein. This Defendant does not maintain a regular place of business in the State of Texas, does not have a designated agent for service of process, and this lawsuit arises out of this Defendant's business in the State of Texas. Accordingly, the Secretary of State is the agent for service of process on this Defendant pursuant to TEX. CIV. PRAC. & REM. CODE §17.044. Brown & Wood and Ruble are sometimes collectively referred to herein as the "Brown & Wood Defendants."

15. Defendant Scheef & Stone, LLP ("Scheef & Stone") is a professional limited liability partnership organized and existing under the laws of the State of Texas. Scheef & Stone may be served with process at its principal place of business located at 5956 Sherry Lane, Suite 1400, Dallas, Texas 75225.

16. Defendant Grady Dickens ("Dickens") is a citizen and individual of the State of Texas. Dickens is or was, during the relevant time period, an employee or partner of Scheef & Stone, LLP. Dickens may be served with process at his business located at 502 N. Carroll Ave., Suite 150, Southlake, Texas 76092. Dickens and Scheef & Stone, LLP are sometimes collectively referred to herein as the "Scheef & Stone Defendants."

## II.

## REQUEST FOR DISCLOSURE AND PRIVILEGE LOG

17. Pursuant to Rule 194, you are hereby requested to disclose, within fifty (50) days of service of this request, the information or material described in Rule 194.2 (a)-(k). Also, pursuant to Rule 193.3, you are hereby requested to produce, within fifty (50) days of service of this request, a privilege log setting forth all documents you are withholding from production based upon privilege.

## III.

## DISCOVERY CONTROL LEVEL

18. Plaintiffs request that discovery be conducted in accordance with a scheduling order pursuant to discovery control Level 3, as provided by TEX. R. CIV. P. 190.4.

## IV.

## JURISDICTION AND VENUE

19. Venue is proper in Tarrant County, Texas pursuant to TEX. CIV. PRAC. & REM. CODE § 15.002 because Grady Dickens is a resident of Tarrant County.

20. Jurisdiction is proper because the damages sought are within the jurisdictional limits of this Court. Additionally, Defendants have submitted to the jurisdiction of this State as they are duly authorized to and do conduct business in the State of Texas.

## V.

## BACKGROUND FACTS

### A. THE DEVELOPMENT OF THE SCHEME TO SELL DIGITAL OPTIONS

1. **<u>About Deutsche Bank, Jenkens & Gilchrist[1], Brown & Wood[2], Ernst & Young[3] and Scheef & Stone</u>**

21. Deutsche Bank, founded in 1870, is a joint stock company principally dedicated to financing foreign trade.[4] Deutsche Bank does business in major financial and banking markets in Germany, Europe and the rest of the world; and, as of December 31, 2003, had total assets of approximately $1.06 trillion and revenues and net income in 2003 of approximately $29 billion and $1.85 billion, respectively. Deutsche Bank offers various investment, financial and related products and services to consumer and corporate clients worldwide. Deutsche Bank has roughly 67,700 employees and more than 13 million customers in 76 countries worldwide; more than half of Deutsche Bank's staff works outside of Germany.

22. Deutsche Bank claims to provide its private clients with all-round service extending from account-keeping and cash and securities investment advice to asset management. In addition, Deutsche Bank claims to have a leading position in international foreign exchange, fixed-income and equities trading.

---

[1] Jenkens & Gilchrist and its current or former employees are not named as defendants herein due to the pendency of an $81.55 million class settlement approved in the Southern District of New York and currently on appeal to the Second Circuit Court of Appeals.

[2] The Camferdam, Adams, Michener and Trigilio Plaintiffs do not allege any claims against the Brown & Wood Defendants due to pending arbitration against those defendants.

[3] Ernst & Young is not named as a defendant in this lawsuit; all Plaintiffs have either filed or are in the process of filing for arbitration against Ernst & Young.

[4] All of the information set forth in this section is taken from the websites of Deutsche Bank, Jenkens & Gilchrist, Ernst & Young, and Sidley Austin Brown & Wood. *See* <http://www.db.com/>*Welcome to Deutsche Bank* (last visited March 1, 2005); <http://www.bdo-international.com/> (last visited March 1, 2005); http:\www.jenkens.com\ jenkens\aboutjenkens.asp>*About Jenkens* (last visited March 1, 2005); www.ey.com/global(last visited May 1, 2005); www.sidleyaustin.com (last visited May 1, 2005); and www.scheefandstone.com (last visited May 1, 2005).

23. Deutsche Bank holds itself out to be a pre-eminent provider of liquidity in the world's foreign exchange markets and a recognized leader in all aspects of foreign exchange. According to its website, it is consistently ranked as one of the top three global foreign exchange providers by *Euromoney* Magazine's industry standard annual Foreign Exchange Poll, both in terms of client perception and market share.

24. Deutsche Bank's Foreign Exchange claims to be committed to the core values of client focus and innovation that allegedly characterize all its wholesale client businesses. It emphasizes its ability to find the most creative solution available to *individual* client problems.

25. Deutsche Bank claims that its foreign exchange options franchise is unsurpassed among major players. It further states that its options desk is fully integrated with all parts of its global foreign exchange operations, giving clients 24-hour access to a world of *speculative and hedging* opportunities.

26. At the time of the events in question, Jenkens & Gilchrist, P.C. ("Jenkens") was a large law firm with over six hundred (600) attorneys and offices in nine (9) major cities throughout the United States. It claims expertise in a variety of industries and market segments, including Anti-Trust, Bankruptcy, Construction, Securities, Financial Institutions, Financial Services, Environmental, Franchise and Distribution, Health, Immigration, Intellectual Property, International Tax, Litigation, Technology, and Real Estate Law.

27. Brown & Wood consists of more than fourteen hundred (1400) attorneys in fourteen (14) offices, six (6) of which are in major cities across the United States, including New York and Chicago. Brown & Wood was established in New York in 1914, and offers services in a variety of areas, including Business and Financial Transactions, Litigation and Dispute Resolution,

Tax, Employment, and Intellectual Property. According to Brown & Wood's website, "[c]lient success is foremost at Sidley Austin Brown & Wood."

28. Ernst & Young is an international professional services firm providing tax, financial advisory and consulting services to private and publicly traded businesses. According to its website, Ernst & Young helps its clients "engage in effective tax planning to manage your [the client] company's overall liability. Our [Ernst & Young] experienced Tax professionals can assist you in recognizing the tax consequences of business moves, and support and advocate your [the client] tax position." Ernst & Young contends that it stays "ahead of pending change-so we [Ernst & Young] can analyze how *new tax laws and regulations will affect your company.*" Ernst & Young maintains approximately 110,000 employees in 670 locations in 135 countries, including nearly 90 cities in the United States.

29. Scheef & Stone is a law firm in Dallas, Texas. Scheef & Stone claims to be a full-service business law firm that provides legal representation in a wide spectrum of sophisticated transactions and complex litigation, including business transactions, business litigation, commercial litigation, securities, and corporate law. According to its website, Scheef & Stone provides "legal counsel based on solid principles." In addition, Scheef & Stone's website indicates that Scheef & Stone is "committed" to:

- "listen to you and provide solutions to your needs in a timely and cost effective manner."
- "learn your business to enable us to better understand and anticipate the nature of the legal issues that may arise."
- "respond to your needs and make ourselves available at your convenience."

- "tell you when a legal matter does not justify the expenditure of legal fees."

2. **About Digital Options**

30. An option gives a buyer the right to buy or sell something at a definite price for a definite period of time, regardless of that something's then market price on the open market. That "something" may be stock, bonds, commodities (such as coffee or pork bellies), or intangible market valuations such as the Standard & Poors composite value. Options are said to be "in the money" if the price of the underlying "something" makes exercising the option profitable. Similarly, options are said to be "out of the money" when exercising the option would result in no gain or a loss. While options were originally primarily developed as a "hedge" against declines in other investments, "plain vanilla" options have spawned a host of derivatives which sometimes hang by only a slender thread from any underlying investment or in some cases —like here— not at all.

31. Options may be either "American-style" or "European-style," depending upon whether the option purchaser has the right to exercise the option at any time before expiration or *only upon* the designated expiration date. For example, assume an investor buys a "call" option on 1000 shares of ABC stock with a "strike price" of $100 and an expiration date of July 16, 2003. This option gives the investor the right to purchase 1000 shares of ABC for $100. Under an American-style option, the option holder can exercise the option by purchasing the shares at any time he chooses prior to July 16, 2003. Under a European-style option, the option holder can only elect to exercise the option on July 16, 2003, and perhaps, as was true in this case, only at a certain time on that date.

32. Digital Options are "digital" in the sense that the investor wins or loses a pre-determined amount in full, *but only* if the strike price is met—thus, the option is either on or off, like a digital (binary) 1 or 0. As a result, Digital Options provide an investor with the same payout no matter how far above the strike price the underlying price goes. For example, a Digital Option may look as follows: an investor will receive $1,000 if ABC Corp. closes at or above $12 per share on June 24, 2003. If the price of ABC Corp. is at or above $12 per share on the closing date, the investor is paid $1,000. If ABC does not close at or above $12 per share, the investor gets nothing and loses what he originally paid for the option. No matter the outcome, however, stock in ABC Corp. never changes hands. Digital Options are, in reality, nothing more than wagers that a certain commodity or equity price will be at or beyond (or beneath) a given price on a certain date.

33. Digital Options are ordinarily less expensive to purchase than standard options. A Digital Option price is influenced by many of the same factors as any other option, such as the price of the underlying commodity, the exercise price, the time to maturity, the volatility of the underlying commodity, and short-term interest rates. A key disadvantage of Digital Options is a limited profit potential.

**3. <u>Development of the Plan to Market the FX Contracts</u>**

34. Prior to 1994, Paul Daugerdas was employed by Arthur Andersen as *inter alia* the Partner in charge of the Futures and Options Tax Practice. From 1994 to December 28, 1998, he was a partner at the law firm of Altheimer & Gray in Chicago, Illinois, where he was Chairman of its Tax Department. Since December 29, 1998, Daugerdas has been a Shareholder in Jenkens' Chicago office, where he is now "of counsel" to the firm. Parse and Daugerdas had a professional and social relationship for many years before the COBRA Strategy was designed and marketed.

Parse was actually Daugerdas' personal stockbroker. In addition, Craig Brubaker was employed by Arthur Andersen (prior to his employment with Deutsche Bank) during the same time period that Daugerdas was employed with Arthur Andersen.

35. A plan to market a tax strategy involving foreign exchange digital options contracts (the "FX Contracts") as part of a tax strategy was developed by Jenkens & Gilchrist, Ernst & Young, and the Deutsche and the Scheef & Stone Defendants in 1999. Upon information and belief, the participants included Paul Daugerdas ("Daugerdas"), a partner at Jenkens; David Parse ("Parse"), Dan Brooks, Craig Brubaker ("Brubaker") and certain other unknown individuals with the Deutsche Defendants; Brian Vaughn ("Vaughn"); Richard Shapiro ("Shapiro"); Robert Coplan ("Coplan") and certain other unknown individuals with Ernst & Young; and Grady Dickens and certain other unknown individuals with the Scheef & Stone Defendants.

36. The result was a tax strategy where a taxpayer purchases and sells options and transfers these option positions to a partnership. As a result, the taxpayer claims that the basis of the taxpayer's partnership interest is increased by the cost of the purchased options, but is not reduced by the taxpayer's obligation with regard to the options sold.

37. To hold the risk and the resulting profit potential to a minimum, all of the FX Contracts were structured as follows: Each client entered into two opposing transactions[5] - one

[5] The two transactions, although purportedly independent, were actually neither independent nor even transactions. Each client and Deutsche Bank entered into one form contract memorializing both what was bought and what was sold, and without providing further collateral the client could not transfer the positions separately. Further, the FX Contracts were not something traded on any recognized exchange but were simply a matter of private contract between the participants. Finally, neither party had any rights to take possession of the "underlying currency." As a result, the FX Contracts amounted, in actuality, to a contractual wager (*i.e.*, a "bet") based on movements in foreign currency prices, without any real possibility of foreign

where the client would be PAID if the spot rate on a particular foreign currency[6] was at or below a certain rate, and one where the client would have to PAY OUT if the spot rate was at or below a certain rate. The two rates that were set (one where the client would be PAID and one where the client would PAY OUT) were different by only *fractions of a penny*. On all of the FX Contracts, the trigger[7] occurred when the spot rate on the underlying currency pair (Japanese Yen vs. U.S. Dollar, Euro vs. U.S. Dollar, or Canadian Dollar vs. U.S. Dollar) was at or below a specific spot rate *on a certain date at a certain time*. Thus, there was almost no chance of only one position being acted upon. Either the spot rate would be above both, so neither were acted upon, or the spot rate would be below both, so both were acted upon.

38. To further ensure control of the transaction (that either both or neither one was acted upon), the ability to determine when and if the event was triggered was retained by the Deutsche Defendants, with the stipulation that Deutsche Bank, as the "calculation agent", could choose to accept or disregard any spot rate. When you combine these two elements - the incredibly close proximity of the trigger spot rates (hundredths of a penny apart) and the ability to choose the spot rate that determines if the trigger occurred - the transactions had virtually no risk of just one of the paired transactions being exercised. Buried in a footnote in some, but not all, of Jenkens' opinion letters issued after the transaction was completed, Jenkens referred to the small chance of this occurring as "lottery-type" winnings. Of course, the Defendants never informed the

---

currency ever changing hands between the parties. Of course, the Plaintiffs were unaware of these aspects of the FX Contracts.

[6] Foreign currency was used so that the loss claimed could be either capital or ordinary, depending on the need, under § 988 of the Internal Revenue Code.

[7] The "trigger" is an event that causes a payoff with respect to digital options.

Plaintiffs that they had as good of a chance of winning the lottery as they had of earning a profit on the FX Contracts.

39. The Defendants, Ernst & Young and Jenkens structured the tax strategy so that the total of fees to them and Jenkens was between five and one-half percent (5.5%) and nine and one-half percent (9.5%) of the tax savings the client desired to achieve. Of this amount, between one percent (1%) and five percent (5%) went to the Deutsche Defendants as the "spread" between the two positions in the FX Contract (*i.e.*, the difference between what was paid for buying one position and what was received for selling the other), three percent (3%) went to Jenkens for having "developed" the FX Contract as a tax strategy and writing an opinion letter on the transaction, and one and one-half percent (1.5%) went to Ernst & Young who assisted in designing and implementing the tax strategy and introducing and recommending the FX Contracts, as part of various tax strategies, to long-time clients who trusted them. Jenkens paid twenty percent (20%) of the fee it received to the Scheef & Stone Defendants as a "brokerage" fee for bringing Ernst & Young and Jenkens together and for participating in the development of the Strategy. In addition to the fees set forth above, the Plaintiffs and other clients of Ernst & Young paid a fee to the Brown & Wood Defendants for a second opinion letter. The tax strategy was marketed by Ernst & Young under the name "COBRA" (*i.e.*, Currency Options Bring Reward Alternatives).

40. Each of the Plaintiffs entered into the FX Contracts. All the options expired out of the money (except for the Camferdam, Michener, Adams, Trigilio and Rice Plaintiffs), thus allowing the Deutsche Defendants to retain the premiums it had received on the FX Contracts. The Plaintiffs also paid substantial fees to Jenkens, the Brown & Wood Defendants, Ernst & Young and indirectly to Scheef & Stone.

41. The Defendants, singly and in concert, directly or indirectly, engaged in a common plan, transaction and course of conduct described herein pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and a course of business which operated as a fraud upon Plaintiffs. Further, the Defendants made various false statements of material fact, and omitted to state material facts, which made statements misleading, to the Plaintiffs.

42. The purpose and effect of the Defendants' plan, transaction, and course of conduct was to generate huge fees by promoting the alleged tax-savings strategy named COBRA.

43. As a result of and in reliance on the various false statements of material fact and omissions of material fact, which made statements misleading, to the Plaintiffs, the Plaintiffs engaged in the COBRA Strategy.

44. Had the Plaintiffs known of the material adverse information which the Defendants did not disclose, they would not have engaged in the COBRA Strategy.

45. The Defendants owed duties to the Plaintiffs. These duties included the duty to:

- Exercise prudence, caution and care in recommending and entering into the COBRA Strategy for and with the Plaintiffs; and
- Exercise their responsibility to deal fairly and in good faith and their fiduciary responsibilities of care and loyalty to the Plaintiffs.

46. The Defendants intended to deceive the Plaintiffs, as evidenced by the aggressive push they took, directly and through Ernst & Young, to convince the Plaintiffs to engage in the COBRA Strategy. In combination with the relatively short time the Plaintiffs were given to consider the transactions and the transactions' complete failure to achieve their intended purpose, there is no possible explanation for the Defendants' behavior other than intentional deceit.

47. An examination of the movement, according to Bloomberg, of one of the underlying currencies -the Euro- related to the FX Options illustrates their highly speculative nature:



48. As shown, from December 31, 1998, to December 31, 1999, the Euro traded between 1.1899 (on January 4, 1999) and 0.999 (on December 3, 1999)—a spread of almost 20%.

49. In addition, under the Trade Confirmation, Deutsche Bank, as the Calculating Party, was authorized to use discretion in selecting the spot rate on expiration. The range of currency rates available to the Calculating Party makes the selection of the Defining Event subject to the pleasure of the Calculating Party. As can be seen by the quotes for the Euro in May 2003, the Calculating Party can pick from a range of spot rates larger than and including the narrow range of "winning" spot rates defined in the FX Contract. Thus, it is exclusively the Calculating Party who determines whether the FX Contract pays out.[8]

50. For example, there are approximately twelve (12) bid spot rates listed as of 8:21 A.M. on May 8, 2003. According to Bloomberg, the spot rates range from $1.1463/Euro (Den Norske Bank) to $1.1468/ Euro (RBS, London):

[8] The fact that the FX Contract does not specify whether it is the "bid" or the "ask" rate to be used also allows Deutsche Bank to decide who "wins" and who "loses", since the spread between the "bid" and the "ask" is almost always larger than this "sweet spot".




51. As an example, the strike price for the Camferdam contract involving options purchased on the Euro was \$1.0187/Euro and the strike price for the option sold was \$1.0186/Euro—a spread of 1/100th of a penny. Given that, as shown above, the spread of spot rates at any given time exceed the decimal specificity of the strike price, the pay out of the FX Contract was clearly wholly up to Deutsche Bank.

52. It is evident that the Defendants chose to defraud the Plaintiffs for personal gain in the form of outrageous fees from unsuspecting "clients." These transactions to defraud were perpetrated through the Defendants' discrete acts of misrepresentations, representatives of which are previously alleged.

**B. THE COBRA TEAM IS FORMED AND THE SCHEME IS PUT IN ACTION**

53. Based on information and belief, Jenkens, Ernst & Young and the Defendants developed a marketing plan wherein Ernst & Young, with the assistance of Jenkens and the other Defendants, would market the COBRA Strategy to wealthy individuals and, in particular, the wealthy clients of Ernst & Young.

54. Why was the marketing plan so successful? Simply stated, people trust their attorneys, accountants and advisors. Wealthy clients place a tremendous amount of trust and faith in the advice and recommendations of their attorneys, accountants and advisors. Attorneys, accountants and advisors know their clients' finances better than just about anyone else. As a result, Jenkens, Ernst & Young and the Defendants knew that law, accounting firms and investment firms had an established market for the COBRA Strategy. Jenkens, Ernst & Young and the Defendants knew that if Ernst & Young recommended the tax shelter to their wealthy clients, the clients would more than likely do the deal without questioning the details of the strategy.

55. Why were Jenkens, Ernst & Young and the Defendants eager to participate in selling the COBRA Strategy? The answer is money. The fee to each of the participants in these tax strategies was not based on an hourly rate or time spent working on the deal; rather, the fee was based solely on "the size" of the transaction. In other words, the bigger the deal, the larger

the fee shared by Jenkens and the Defendants. Thus, Jenkens, Ernst & Young and the Defendants had a motive to sell as many tax shelters as possible, as large as possible.

56. Ernst & Young identified potential wealthy clients and set up meetings to discuss the COBRA Strategy. Ernst & Young, capitalizing on the close-relationship they had with their clients, gave the initial sales presentation. The crux of the sales pitch was always that two major law firms (*i.e.*, Jenkens and Brown & Wood) would prepare "independent" opinion letters confirming the propriety of the COBRA Strategy, which would supposedly provide absolute insurance in the event of an audit, and a major investment firm (*i.e.*, Deutsche Bank) would provide advice on the FX Contracts and handle the FX Contracts. In addition, Ernst & Young represented to their clients that they had a 38% chance of a 31% return on the FX Contracts – which they represented to be sufficient economic substance to substantiate the claimed tax results. Ernst & Young identified their existing clients, who Ernst & Young knew had significant income and/or large capital gains, and then Ernst & Young, Jenkens and the Defendants worked together to aggressively market and implement COBRA, each "touting" COBRA and thereby providing legitimacy to the sales pitch made by the others.

57. The opinion letter actually used by Jenkens in connection with COBRA was a "canned," "prefabricated" form that was utilized, with minor changes based on the particular client, for each and every Strategy deal sold across the country. Indeed, "macros" or "templates" of such opinion letters were actually used, requiring only that the entries to certain pre-determined "fields" be made to then generate a "customized" opinion letter *for that particular client*. Brown & Wood's "second" opinion letters were similarly "boilerplate."

58. Based on information and belief, the COBRA team devised and implemented a well-planned sales strategy that focused on leveraging trust and confidence, coupled with pressure as needed, to sell the COBRA Strategy to trusting clients. Ernst & Young identified the potential wealthy clients and set up meetings to discuss the COBRA Strategy. Ernst & Young, capitalizing on the close-relationship they had with the Plaintiffs, gave the initial sales presentations and then brought in the Defendants and Jenkens to further promote COBRA. At no point in time did Ernst & Young, Jenkens or Defendants disclose to the Plaintiffs that the Defendants, Ernst & Young and Defendants controlled virtually every aspect of the COBRA Strategy; rather, Ernst & Young represented to the Plaintiffs that the sole role of Jenkens and the Brown & Wood Defendants was to provide an "independent" legal opinion as to the propriety of the COBRA Strategy, which Ernst & Young represented was an Ernst & Young tax strategy.

**Deutsche Bank Approaches Jenkens**

59. In the Fall of 1999, Dan Brooks ("Brooks") of Deutsche Bank made a "marketing" visit to Daugerdas in Chicago to "pitch" Jenkens on using Deutsche Bank to implement a tax shelter using foreign currency digital options. Brooks explained to Daugerdas that Deutsche Bank had significant experience designing and implementing foreign currency digital options for tax shelters with Bricolage Capital Management and Gramercy Advisors, LLC. Brooks informed Daugerdas that Deutsche Bank had a strong desire to design and implement a tax shelter with Jenkens using foreign currency digital options. Brooks also explained to Daugerdas the types of options that Deutsche Bank would design and implement, the structure of the FX Contract, and the pricing of the options. Brooks supplied Daugerdas with a sample FX Contract for his review.

60. At about the same time as Daugerdas and Brooks met, Craig Brubaker of Deutsche Bank and Erwin Mayer of Jenkens were also discussing the use of FX Contracts as part of a tax shelter, and Deutsche Bank's role in working with Jenkens to design and implement such tax shelters. To help get Brubaker up to speed, Mayer provided Brubaker with a technical memorandum on "contingent liabilities" under §752 of the Internal Revenue Code and a copy of an opinion letter previously issued by Jenkens on a similar but different tax shelter.

**Scheef & Stone Brokers A Deal**

61. Grady Dickens ("Dickens"), a Scheef & Stone tax partner, and Brian Vaughan ("Vaughan"), an Ernst & Young partner, are close friends. In September 1999, Vaughan informed Dickens that Ernst & Young had designed a tax shelter using digital options, and that he had a large number of clients he wanted to market the tax shelter to before the end of the year. Vaughan told Dickens that Ernst & Young needed a large law firm to write an opinion letter on the tax shelter and asked Dickens to help him find such a law firm. At that time, Dickens began the "hunt" for the law firm.

62. In September 1999, Dickens and Charles Helms ("Helms"), a Scheef & Stone associate, began calling large law firms in Dallas, Texas to find a law firm to write an opinion letter for Ernst & Young. As part of these calls, Helms called his former law school classmate, Patrick O'Daniel ("O'Daniel"), a Jenkens associate in Austin, Texas, to determine if Jenkens could and would write an opinion letter for an undisclosed accounting firm that had designed a tax shelter.

63. After talking to Helms, O'Daniel called Daugerdas in Chicago and informed Daugerdas about his conversation with Helms. Daugerdas told O'Daniel that he could and

would write an opinion letter for the undisclosed accounting firm and how the fee would be structured. O'Daniel passed this information on to Helms, who then informed Dickens that Jenkens was willing to write the opinion letter.

64. On September 23, 1999, Dickens left a telephone message for Daugerdas stating, "Must speak to you today regarding potential large deal…need an opinion." When Daugerdas called Dickens back, Dickens explained to Daugerdas that he had an opportunity for Jenkens to issue legal opinions for an accounting firm that had designed a tax shelter. Dickens and Daugerdas began a series of conversations regarding this opportunity; however, Dickens would not identify the accounting firm until Dickens and Daugerdas first negotiated a "fee" for Scheef & Stone. The sole purpose of Dickens' calls to Daugerdas in Chicago was to "broker" a deal between Jenkens and the undisclosed accounting firm, and in the process secure a fee for Scheef & Stone.

65. After many discussions, Daugerdas (from Illinois) and Dickens hammered out a fee for Scheef & Stone's role in "brokering" the relationship between Jenkens and the undisclosed accounting firm. In the end, Jenkens agreed to pay Scheef & Stone twenty percent (20%) of the fee Jenkens received for each opinion letter it issued. Daugerdas explained to Dickens that Jenkens would ordinarily have to disclose this fee agreement to the client as a "referral arrangement," but that this could be avoided if Scheef & Stone merely agreed to provide legal services *to Jenkens* on each tax shelter. As expected, Dickens informed Daugerdas that Scheef & Stone would provide "some" legal services on each tax shelter so Jenkens would not have to disclose the fee agreement to the client. As a result, neither Jenkens nor Scheef & Stone ever disclosed this "secret" fee agreement to the clients. In fact, the COBRA clients were

never even aware of Scheef & Stone's existence. After Dickens took care of protecting Scheef & Stone's fee, Dickens told Daugerdas that the accounting firm he had just "brokered" the deal for was Ernst & Young. Dickens reduced the agreement to writing and sent it to Daugerdas at Jenkens' Chicago office.

66. Upon request, Scheef & Stone signed and returned a confidentiality agreement sent to them from Jenkens' Chicago offices. In addition, Scheef & Stone subsequently sent an invoice to Jenkens on each Ernst & Young tax strategy Jenkens issued an opinion on for twenty percent (20%) of Jenkens' fee. Each invoice set forth a fee (20% of Jenkens' fee) but did not identify the amount of hours billed. Each invoice also set forth as a description of services the following (and <u>only</u> the following): "For legal services rendered, including without limitation, consultation regarding the design, structure, and implementation of transaction." Dickens was identified on each invoice as the only Scheef & Stone attorney that allegedly performed "work" on each client's COBRA. Scheef & Stone, and specifically Grady Dickens, primarily performed research on various issues that arose during the development of COBRA and provided legal analysis and opinion on various issues and aspects of the design and validity of COBRA. Although Scheef & Stone was involved in some meetings and conversations with the COBRA Team about the creation and design of the COBRA tax shelter (and provided legal and tax input), Scheef & Stone provided absolutely <u>no</u> direct legal services for any specific client, unless invoicing Jenkens and receiving a fee for "brokering" the relationship between Jenkens and Ernst & Young is, without more, considered providing legal services for the client. No doubt, the clients never spoke to a Scheef & Stone lawyer; never saw a Scheef & Stone lawyer; and never even knew of Scheef & Stone's existence. In essence, Scheef & Stone collected a "royalty" on

each and every tax shelter Ernst & Young sold for its role in brokering the deal between Ernst & Young and Jenkens and then assisting in the design and creation of COBRA.

**COBRA is Developed**

67. After Dickens took care of Scheef & Stone's fee, Dickens continued his role of "broker" by setting up and participating in planning meetings between Jenkens, Scheef & Stone, Ernst & Young and Deutsche Bank. These initial meetings usually included, among others, Robert Coplan ("Coplan"), Richard Shapiro ("Shapiro"), Brian Vaughn ("Vaughan") and Martin Nessenbaum ("Nessenbaum") of Ernst & Young; Daugerdas and O'Daniels of Jenkens; and Dickens of Scheef & Stone. Subsequent meetings included Parse and Brubaker of Deutsche Bank. Before the first meeting, Coplan signed, on behalf of Ernst & Young, a nondisclosure agreement with Jenkens. After signing this agreement, Coplan asked Daugerdas to fax a copy of an opinion letter and marketing materials to him. Daugerdas faxed marketing materials to Coplan and sent by Fed Ex a redacted opinion letter on a somewhat different tax shelter to Coplan.

68. The first "joint conference call" was held on approximately September 29, 1999, and included O'Daniel, Daugerdas and Mayer of Jenkens; Grady and Helms of Scheef & Stone; and Vaughan, Coplan, Shapiro, and Nessenbaum of Ernst & Young. Coplan and Nessenbaum were introduced to the group as the head of VIPER – "Value Ideas Produce Extraordinary Results" – the Ernst & Young group that aggressively marketed tax shelters to individuals.

69. During this first conference call, the first agenda item discussed, naturally, was the fee to charge the clients and how the fee would be split among Jenkens and the Defendants. Once the fee structure was discussed, the remainder of the conference call (and all future

discussions) did not focus on "technical issues"; rather, the discussions centered on "soft issues", including economic substance, business purpose, and the mechanics of the tax shelter (entities used, etc.). Shapiro and Vaughan informed the group that Ernst & Young already understood the technical issues and therefore only wanted to discuss the "soft issues."

70. During this initial conference call, the group discussed how the tax shelter worked and the resulting losses. After this issue was discussed, Shapiro stated: "I hear what you are saying, but it sounds too good to be true." In addition to discussing briefly the basic mechanics of the shelter, the group also discussed:

- Using a partnership to execute the tax shelter;
- Whether the short option is a liability and the economic implications of the short option terminating inside the partnership;
- Issuing a "more likely than not" opinion letter vs. a "should" opinion letter. Vaughan wanted a "should" opinion letter for marketing purposes;
- Daugerdas' experience with tax shelters using short sale of options;
- Ernst & Young's desire for Jenkens to charge a fixed fee for the opinion letter in order to get around the "reasonable reliance" issue. This did not happen and ultimately led to Ernst & Young retaining the Brown & Wood Defendants to issue a second opinion letter;
- Ernst & Young asked Daugerdas to talk to Ernst & Young's Quality Control Group to get Ernst & Young comfortable with the transaction;
- Coplan's concern about the client's ability to rely upon Jenkens' opinion letter, noting that the opinion letter must be independent, that is, from a law firm without a financial interest in the transaction. Daugerdas emphasized that a law firm always has an interest in being paid for work it does;
- Coplan was "afraid" that the clients would realize that because the fee was so large Jenkens and the Scheef & Stone Defendants would give the client a favorable opinion just so they could get paid; and

- Vaughan's main concern of getting the tax shelter finalized as soon as possible so he could present it to the VIPER group members that report to him and then they could start marketing it to Ernst & Young clients.

Importantly, from the first conference call, Ernst & Young was very concerned that the short option could not and would not be validly treated as a "contingent" liability, which was necessary for COBRA to work as designed. Indeed, Ernst & Young's technical experts were of the opinion that the short option was not a "contingent" liability. They were correct. COBRA was doomed from the beginning and the Defendants, Jenkens and Ernst & Young knew it but simply ignored this basic and obvious flaw.

71. During this initial "joint conference call", Jenkens learned that Ernst & Young's VIPER Group had designed a tax shelter using digital options; had already identified Locke Liddell & Sapp as a law firm to issue a second opinion letter; and had already identified Private Capital Management Group, led by Ralph Lovejoy and David Smith (a close personal friend of Shapiro), to execute the digital options. After listening to Coplan, it was clear to Daugerdas that Ernst & Young had not yet, however, finalized either the design of the FX Contracts of the tax shelter or the digital options. Nonetheless, COBRA appealed to Daugerdas because of his increasing concern in the late Summer and early Fall of 1999 that tax shelters using short sales of treasury notes, which Jenkens had been previously marketing with the Deutsche Defendants, were coming under intense scrutiny from the House Ways and Means Committee and their use might be legislatively prohibited in the very near future.

72. Shortly after the initial "joint conference call" on approximately September 29, 1999, Dickens called O'Daniel to discuss the Ernst & Young tax shelter. Dickens informed

O'Daniels that Shapiro, a "technical expert" at Ernst & Young, was "on-board" with the tax shelter but other "technical experts" at Ernst & Young had not yet given approval for Ernst & Young to market the digital options tax strategy. Dickens also told O'Daniel that Ernst & Young needed Jenkens to charge a "flat fee" for each opinion letter in order for Ernst & Young to be comfortable with the tax shelter. Finally, Dickens told O'Daniel that Vaughan wanted Jenkens to provide him with marketing materials, including examples of the options trades, so Vaughan could prepare a PowerPoint presentation to give to VIPER. Vaughan also wanted Jenkens to provide him with a non-redacted opinion letter for use in marketing the shelter to Ernst & Young's clients. O'Daniel informed Dickens that Jenkens would provide Ernst & Young with a technical memorandum and would agree to discuss the transaction with Vaughan and others at Ernst &Young, but Jenkens did not have an unredacted opinion letter on this specific tax shelter to provide to Ernst & Young.

73. In October 1999, during one of the many meetings between Ernst & Young, Scheef & Stone, and Jenkens, Coplan informed Daugerdas that Ernst & Young did not want to use Private Capital Management to design and implement the digital options and asked Daugerdas to recommend an investment firm. Naturally, Daugerdas recommended Deutsche Bank. On approximately November 5, 1999, Coplan also informed Daugerdas that Ernst & Young needed another law firm to write the second opinion because Ernst & Young had decided not to use Locke Liddell & Sapp. Coplan, after receiving approval from Jenkens & Gilchrist, retained R.J. Ruble of Brown & Wood to issue a second opinion letter.

74. Coplan contacted Dan Brooks at Deutsche Bank in October 1999 and R.J. Ruble at Brown & Wood in October 1999 to discuss their interest in working with Ernst & Young on

COBRA. Naturally, the Deutsche Defendants and the Brown & Wood Defendants jumped at the opportunity.

75. On approximately October 1, 1999, Dickens once again called O'Daniel to discuss the tax strategy. Dickens told O'Daniel that Ernst & Young was troubled by the fact that the spread between the long and short option was so small. Ernst & Young wanted a larger spread so the client would have more money at risk and therefore strengthen the economic substance of the tax shelter. In addition, Dickens once again told O'Daniel that Ernst & Young wanted Jenkens to provide Ernst & Young with an opinion letter to use for marketing purposes.

76. On approximately October 5, 1999, Vaughan and/or Dickens called O'Daniel. During this call, O'Daniel was told that Ernst & Young's VIPER Group was having a strategic meeting in the next few days and that the tax shelter needed to be finalized so Ernst & Young could sell and implement the tax shelter for their clients before the end of the year. Vaughn's main concern was to unleash VIPER to sell as many COBRAs as possible to their unsuspecting clients before the end of the year. For every day that passed without COBRA, Ernst & Young lost money.

77. On approximately October 11, 1999, Dickens informed O'Daniel that Ernst & Young was in the process of determining whether Ernst & Young would market the BLIPS shelter (with KPMG) or the short options shelter Ernst & Young had designed. Dickens informed O'Daniel that Shapiro was responsible for making the final decision on which shelter Ernst & Young would market. As a result, Shapiro's job was to ask a lot of questions and then "bless" the tax shelter Ernst & Young would ultimately market. Helms, of Scheef & Stone, also called O'Daniel later that day, and once again told O'Daniel that Ernst & Young was considering

whether to market BLIPS or the Ernst & Young short options strategy. Helms emphasized that "there is competition between Jenkens and others to get Ernst & Young's business." It was clear to O'Daniel that Ernst & Young was looking only at these two strategies, and Ernst & Young was going to pick one to market.

78. Coplan informed O'Daniel on approximately October 11, 1999, that Ernst & Young had 24 clients "to pitch" the tax shelter to in the immediate future. Coplan also told O'Daniel that Shapiro wanted to see a model of the trades because he was having trouble with the facts and wanted to see the actual transaction to understand the economics. Despite this, at the end of his conversation with Coplan, O'Daniel understood that Ernst & Young wanted to "roll out" the tax shelter *the next week*.

79. On approximately October 12, 1999, Shapiro spoke with Daugerdas and O'Daniel about the tax shelter. Shapiro informed Daugerdas and O'Daniel that Ernst & Young's national internal procedure had been changed in October 1999. The newly-revised national internal procedure now required only one "technical expert" to approve the tax shelter in order for Ernst & Young to market it, as long as the opinions of the rest of the "technical experts" was that the tax strategy was "above frivolous." Shapiro informed Daugerdas and O'Daniel that this new internal procedure replaced a much tougher standard, which had required all of these "technical experts" to opine that the strategy in question was more likely than not. This change in internal procedure allowed Ernst & Young to market COBRA with only Shapiro approving the strategy, even though other "technical experts" at Ernst & Young (*e.g.*, Jerred Blanchard) had significant issues with the tax shelter. During this conversation, Shapiro nonetheless continued to express concerns about the economics of the tax shelter. Daugerdas attempted to ease Shapiro's

concerns by telling him that Ernst & Young needed to stress to the client that the client's #1 goal needed to be to make money on the transaction. Shapiro once again emphasized that he wanted a larger spread between the long and short options because he was concerned that the small spread did not give the transaction sufficient economic substance. Shapiro stated his belief that he did not think a "court would be impressed" by a small spread. Finally, Shapiro asked Daugerdas what percentage of clients would wind up in and out of "the money". Daugerdas told Shapiro that Deutsche Bank would design the options so that 70% will lose and 30% would win on the options bet.

80. Prior to the conference call on approximately October 14, 1999, Ernst & Young sent Daugerdas and O'Daniel a copy of VIPER's PowerPoint presentation on their options strategy, which at that time was named "BEST". During the conference call on approximately October 14, 1999, the group went through each slide and Jenkens recommended changes, where needed. Jenkens suggested the following changes to the PowerPoint:

- Slide 1: Ernst & Young needed to change the name of the shelter ("BEST") because "BEST" was already being used on another product;

- Slide 3:
  a. Fees are not negotiable
  b. Do not provide the client with an opinion letter to review. Typically, only provide a technical memorandum or a short seven page draft of opinion.

- Slide 6:
  a. VIPER stands for "Value Ideas Produce Extraordinary Results"
  b. Ernst & Young's engagement letter covers just Ernst & Young services
  c. Jenkens can't issue an opinion letter in 30 days. Jenkens probably won't be able to issue an opinion letter until January or February of 2000. The opinion letter will be dated prior to the date of the client's return
- Slide 9:

c. Add to Step 3: Inject the possibility of using an S-Corp at the end of the transaction – contribution from a partnership to an S-Corp
d. Add step 4: liquidation of the S-Corp

- Slide 10: Add in new name of tax shelter (ultimately changed from "BEST" to "COBRA").

81. On approximately October 19, 1999, Vaughan informed O'Daniel that Ernst & Young intended to "roll out" the shelter to 12 clients who each had a $50 million minimum in long term capital gains by the following Tuesday. Vaughan asked Jenkens to provide Ernst & Young with a sensitivity analysis, cash-in and cash-out, upside/downside, economics, and fees/costs for the tax shelter. This information would be used in Ernst & Young's marketing efforts.

82. As of October 19, 1999, Ernst & Young was still considering using Private Capital Management Group as the managing general partner of the partnership that each client would use in the tax shelter. Apparently, Shapiro and David Smith of Private Capital Management Group were good friends. Shapiro wanted Private Capital Management Group to work with Deutsche Bank on the investment part of the transaction. Shapiro wanted Private Capital Management Group to receive an investment advisory fee. Most importantly, on approximately October 19, 1999, Vaughan informed O'Daniel that Ernst & Young would only market the tax shelter to clients "*that would only look to Ernst & Young for decision making and would not go to a lawyer for advice.*" Vaughan emphasized that Ernst & Young needed to "*act quick*" and be "*aggressive*".

83. As of approximately October 20, 1999, at least the following 3 issues remained for resolution: 1) the law firm that would issue a second opinion; 2) how to present the shelter

on the tax return; and 3) Ernst & Young needed a complete set of documents to review. As of October 20, 1999, Ernst & Young was still planning on Locke Liddell & Sapp issuing the second opinion letter. However, Ernst &Young had already begun aggressively marketing and selling COBRA.

84. The Defendants, Ernst & Young and Jenkens spent a substantial amount of time negotiating the fee to charge each client and how the fee would be split among Jenkens, Ernst & Young and the Defendants. On approximately October 22, 1999, Jenkens, Ernst & Young and the Defendants decided on a total fee of nine and a half percent (9 ½%) of the loss generated by COBRA: 3% to Jenkens; 1 ½% to Ernst & Young; and 5% to Deutsche Bank. Deutsche Bank's fee came from the "net premium" the client paid for the options. As a result, Deutsche Bank had a strong, over-riding incentive to make sure each client lost the "bet" on the FX Contracts (and, in the rare case this couldn't be achieved, to hold down the amount of "profit"); otherwise, Deutsche Bank would not receive a fee directly from the clients. Scheef & Stone received twenty percent (20%) of the fee Jenkens was paid. Once Brown & Wood agreed to issue the second opinion in October 1999, it was determined that Brown & Wood's fee would be paid out of Scheef & Stone's fee. Deutsche Bank's fee of five percent (5%) (*i.e.,* the net premium) was derived from Ernst & Young's belief that in order for COBRA to have economic substance, the amount of money at risk to the client -- the premium paid on the FX Contracts -- had to be greater than the four and a half percent (4 ½%) fee paid to Jenkens and Ernst & Young. The only differences between COBRA and the shelter marketed by others were that (i) rather than a five percent (5%) premium spread, Jenkens only required a one percent (1%) spread, and (ii) Ernst & Young required at least two individuals to participate in a given transaction.

objections alone would have prevented Ernst & Young from ever marketing COBRA. Instead of pulling the plug on COBRA, Ernst & Young simply instructed Deutsche Bank to change the name of the FX trade confirmation from "Foreign Exchange SWAP" to "Foreign Exchange Digital Option", hoping to escape Blanchard's devastating opinion that a "SWAP" was not a "contingent liability" and that COBRA was doomed to invalidity.

**Ernst & Young Abruptly and "Quietly" Get Out of the COBRA Business**

113. The IRS issued Notice 1999-59 in December 1999. Shortly thereafter, Ernst & Young abruptly and quietly changed their position on the validity of COBRA. Specifically, on January 5, 2000, Jerrod Blanchard, an Ernst & Young partner, prepared an internal memorandum regarding the "VIPER/COBRA tax opinion." Blanchard wrote this memorandum "to summarize my concern regarding the VIPER/COBRA transaction and the law firm tax opinion that is being used to market the transaction." In this memorandum, Blanchard expressed grave concerns about the validity of COBRA and the opinions expressed by Jenkens in the opinion letter. Importantly, Blanchard's opinions regarding COBRA were consistent with his opinions regarding SWAP short sale tax shelters, which were circulated to the group developing COBRA in October 1999.

114. Specifically, Blanchard expressed concern with the Ernst & Young marketing materials that indicated there was a thirty-eight percent (38%) probability that the taxpayer would make a profit. The pre-tax economics of COBRA was a concern to Blanchard, who emphasized that the value of the downside risk (62% of the money invested) greatly exceeded the value of the upside opportunity. Blanchard concluded:

> While there does appear to be some opportunity to earning a pre-tax profit, the transaction does not seem to be one that a reasonable investor would entertain in the absence of the anticipated generation of a ... federal income tax benefit. Looking solely at the pre-tax economics of the proposed transaction and ignoring any potential return on the additional ... cash to be invested by taxpayer in the Fund (which likely will be ignored for this purpose under *ACM*) it would appear that the value of the downside risk...exceeds the value of the upside opportunity... . In other words, it is more likely than not that the Taxpayer will incur a pre-tax loss as a result of entering into the proposed transaction. Query whether a court would therefore hold, based on the clear evidence set forth in the marketing materials, that Taxpayer, acting as a reasonable investor desiring a reasonable opportunity to earn a pre-tax profit on his investment, would not have entered into the proposed transaction for any reason other than the generation of...tax benefits. Furthermore, it is my judgment that Taxpayer would likely lose the argument that his investment in the proposed transaction is motivated, in whole or in part, by desire to earn a pre-tax profit and, hence, the Taxpayer's anticipated loss would be disallowed under Section 165(a).

Blanchard also was highly critical of the alleged "business" purpose:

> It appears Taxpayer's investment in Fund [*i.e.*, the partnership] will be relatively short-lived (about 30 to 60 days). The avowed business purpose for the Fund investment is to diversify Taxpayer's foreign currency exposure and expand the pool of capital from which Taxpayer may derive its pre-tax return. Query whether the brevity of Taxpayer's investment in Fund belies this avowed business purpose.

115. Blanchard also expressed concerns regarding the Jenkens' opinion: "My main concern is that two or three rather key opinions are missing, without which the federal income tax benefits Taxpayer expects to derive from the proposed transaction clearly will not be realized."

116. Second, Blanchard was highly critical of the failure of Jenkens' opinion to offer legal authority to support a position that the loss from the disposition of the foreign currency is allowable. Blanchard stated, "First and foremost, there is no opinion that any loss recognized. . .in connection with a subsequent sale of the Euros will be allowed pursuant to section 165(a). I would think the government would argue tooth and nail that any loss recognized. . .in connection with the disposition of the Euros is not allowable."

117. Third, Blanchard opined that the analysis of whether the short option is a liability

is wrong, and the opinion's reliance on the cited authority is unreasonable. According to Blanchard, the legal authority clearly establishes that the short option is a liability. Blanchard stated:

> On a more pragmatic note, a very troubling aspect of the tax opinion is that it assumes the Short Option is respected as a liability, susceptible of valuation on the date of the contribution to the Fund, for the purpose of section 1001. . ..Clearly, the tax opinion author's view that the Short Option liability is fixed in amount for section 1001 purposes is quite surprising in view of his argument that it is not fixed in amount for purposes of section 752. Even more surprising is the tax opinion author's view that the Short Option is a "seller liability" for purposes of section 1001, since that view is tantamount to saying the fact of the liability is created prior to its assumption by Fund. Clearly, this is contrary to the opinion's argument that no liability for section 752 purposes can arise unless and until the Short Option is executed. If the opinion's position regarding the application in section 1001 were consistent with this argument then clearly the liability would not be included in Taxpayer's amount realized under section 1001. . ..It is this line of analysis - the realization that section 1001 simply must take into account the Short Option as a "seller liability" in computing Taxpayer's amount (and gain or loss) realized in the exchange - that indicates to me that the proper view of the Short Option for federal income tax purposes is that it consists of two liabilities.

118. After Blanchard prepared this memorandum, Coplan sent the memorandum to Donna Guerin of Jenkens. Upon receiving this memorandum, Donna Guerin called Coplan for an explanation. Coplan told Guerin that Blanchard's views were not Ernst & Young's views, but Jenkens needed to address the issues raised by Blanchard in the Jenkens' opinion letter. Donna Guerin told Coplan that the Jenkens' opinion letter already addressed these opinions, and Jenkens simply had a different opinion than Blanchard. With that, the discussion ended.

119. On approximately January 6, 2000, Daugerdas called Coplan to discuss business. During this call, Coplan told Daugerdas that Ernst & Young "was out of the COBRA business." No doubt, Blanchard's views on COBRA were shared by Ernst & Young. Blanchard's scathing memorandum apparently caused Ernst & Young to abruptly stop marketing COBRA. Unfortunately, Ernst & Young never contacted the trusting clients Ernst & Young had convinced

to purchase COBRA to tell them about Blanchard's concerns or that Ernst & Young was no longer marketing COBRA because of the concerns identified by Blanchard. Had Ernst & Young been forthright with their trusting clients, their clients would not have prepared and filed tax returns using COBRA -- and would have never been assessed a penalty. Unfortunately, Ernst & Young decided to leave their trusting clients in the dark. With one simple phone call by Ernst & Young, the misery the Ernst & Young's clients have endured for the last several years would have been avoided.

**<u>Deutsche Bank's Instructions to Stop Promoting COBRA Are Ignored</u>**

120. As time progressed, other promoters of COBRA abruptly and quietly got out of the COBRA business. For example, when the IRS issued Notice 2000-44 in August 2000, Deutsche Bank sent a copy of the Notice and an internal memorandum to its employees. The internal memorandum, dated September 15, 2000, instructed all Deutsche Bank employees to not promote the tax shelters identified in Notice 2000-44 (*e.g.*, COBRA). Despite Deutsche Bank's issuance of this memorandum, Deutsche Bank continued to aggressively promote, market, and implement tax shelters using digital options to new clients. To illustrate, between mid-October and November of 2000, Brubaker sent Mayer numerous emails regarding individuals Brubaker had promoted digital options tax shelters to and the amount of capital and/or ordinary loss each individual needed to shelter. Deutsche Bank's aggressive drive to make as much money as possible – regardless of their client's best interest – was the only thing that mattered to Deutsche Bank.

**<u>Deutsche Bank Survey Shows Deutsche Bank Rigged The FX Contracts</u>**

121. At some point in 2000, Erwin Mayer of Jenkens asked Craig Brubaker to show

him proof that the FX Contracts were, in actuality, designed and structured by Deutsche Bank to give clients a thirty-six percent (36%) probability of making a profit. In response, Craig Brubaker prepared spreadsheets to show Deutsche Bank clients who made a profit in 1999 and 2000 on the FX Contracts (the "Deutsche Bank Survey").

122. The Deutsche Bank Survey showed that a substantial number of individuals at Deutsche Bank and Jenkens and other promoters (the "insiders") did the tax shelter themselves. Jenkens charged the "insiders" a "steeply discounted" fee for the tax shelter. Actually, the fee charged was a "pittance" of the normal fee Jenkens charged to other clients. Based on information and belief, the insiders were actually sheltering profits they made from selling the tax shelters to their unsuspecting and trusting clients.

123. The specific results of the Deutsche Bank Survey were even more disturbing. In 2000, only 44 individuals (15%) made a total of $1.5 million dollars (8%), excluding fifteen insiders and the transactions Brubaker included in the Deutsche Bank Survey that were wholly unrelated to tax shelters and undoubtedly included in order to skew the results. Most importantly, almost all of these were "early unwinds" (*i.e.*, terminated before the termination date). Why did this happen if the European style options could not be terminated before the termination date? And to whose benefit was this? The answer to these two questions is obvious: Deutsche Bank manipulated the FX Contracts to benefit only Deutsche Bank.

124. The "early unwinds" fell into two categories. First, Deutsche Bank chose to "early unwind" all of the "insiders" so the insiders could make a profit. The second group consisted of ordinary, trusting clients. In this case, Deutsche Bank identified clients who might make more money if the FX Contracts were closed on the termination date than if the FX

Contracts were terminated early. With respect to those unfortunate clients, Deutsche Bank chose to terminate the FX Contracts early so the client would make less money than if the FX Contracts were allowed to terminate in accordance with the terms. By manipulating the FX Contracts, Deutsche Bank could actually decrease the profit the client would have otherwise made – benefiting only Deutsche Bank (and those brokers who were to receive bonuses based on the profits made by Deutsche Bank). Deutsche Bank also identified clients who had executed "smaller" FX Contracts to unwind early. This was done to give Deutsche Bank ammunition to say that clients were in fact making money.

125. Craig Brubaker and others at Deutsche Bank determined and selected the individuals for whom Deutsche Bank would terminate the FX Contracts early. As a result, Deutsche Bank made sure the "insiders" made money and that any pay out to a client was minimized (if it could not be prevented altogether). Simply stated, Deutsche Bank made the decision to terminate FX Contracts early only if it benefited Deutsche Bank or the "insiders." Clearly, Deutsche Bank had three sets of rules – one for the insiders; one to limit a client's profit; and one to prevent clients from making a profit. The Deutsche Bank Survey confirms that Deutsche Bank rigged and manipulated the FX Contracts.

**<u>Deutsche Bank and Jenkens Promoters Amend Their Returns</u>**

126. Based on information and belief, after the IRS issued Notice 2000-44, some or all of the individuals at Jenkens and Deutsche Bank who personally executed a tax shelter quietly amended their returns to prevent the IRS from assessing a penalty. Unfortunately, neither Jenkens nor Deutsche Bank contacted their trusting clients to recommend that the clients also amend their returns (although Jenkens and Deutsche Bank talked to each other about it).

Obviously, Deutsche Bank placed their interest over the best interests of their clients.

## C. THE COBRA TEAM SOLICITS THE PLAINTIFFS

### 1. THE CAMFERDAM, ADAMS, MICHENER, AND TRIGILIO PLAINTIFFS

127. Plaintiffs Camferdam, Adams, Michener and Trigilio (collectively, the "Camferdam Individuals") were the founders and principals of Support Net, Inc. ("Support Net"), a mid-range distributor of mainframe computer systems and peripherals, headed by Camferdam. After building their distributorship into a phenomenal success, the Camferdam Individuals sold the entity in the late 1990's. As a result of the transaction, the Camferdam Individuals received a substantial cash payment in August 1999 and realized a combined capital gain in excess of $70 million.

128. Throughout the negotiation and execution of the transactions resulting in the sale of their business and for several years prior to these transactions (from 1995 on), Ernst & Young provided accounting, auditing and consulting services to both Support Net and two of the Camferdam Individuals through its Indianapolis, Indiana office, primarily through its partner Jay Heck in earlier years, and in later years through senior manager (now partner) Defendant Wayne T. Hoeing. Led by Hoeing and partner David Hegeman from its Cleveland, Ohio office, Ernst & Young prepared the offering memorandum for the sale of Support Net and assisted in soliciting offers that ultimately led to its sale. Ernst & Young then advised the Camferdam Individuals in the sale transaction itself and were paid in excess of $900,000 in fees for their services. Ernst & Young had also prepared the individual tax returns for Camferdam and Adams for the past six years.

129. As a result of this relationship, Ernst & Young, including Hoeing, were trusted advisors and fiduciaries of the Camferdam Individuals, all of whom are successful business people, but none of whom were knowledgeable about complex tax and legal matters. As a result of this close fiduciary relationship with the Camferdam Individuals and its participation in the sale of their business, Ernst & Young and Hoeing were aware of the substantial capital gains realized by the Camferdam Individuals in 1999.[9]

130. Shortly after the Camferdam Individuals received the final payment for their business in August 1999, Ernst & Young exploited their knowledge of the Camferdam Individuals' finances and their position as a trusted fiduciary by approaching the Camferdam Individuals and making an aggressive sales pitch to them regarding the COBRA Strategy.

131. In late October 1999, Hoeing contacted Trigilio about a potential tax saving strategy to benefit Camferdam due to his large capital gain on the sale of Support Net. Hoeing briefly presented the idea to Trigilio: for gains over $50 million in 1999, worked whether the gains were ordinary or capital, involved foreign currency options, and took advantage of a "tax loophole" that he did not specifically describe. According to Hoeing, the strategy would legally eliminate all capital gains taxes, thus saving Camferdam millions. Trigilio suggested that Hoeing call Camferdam directly. After Camferdam spoke with Trigilio about her conversation with Hoeing, he also told Michener and Adams generally about the conversation.

---

[9]The capital gain to the Camferdam Individuals from the sale of Support Net actually occurred over a period of years. In prior years, the Camferdam Individuals had paid the taxes due; indeed, the Camferdam Individuals had already worked with Hoeing on calculating the amounts that would be due for 1999 when they were approached about the COBRA Strategy.

132. As suggested by Trigilio, Hoeing called Camferdam about the potential tax saving strategy. During their discussion, Camferdam suggested to Hoeing that all of the Camferdam Individuals meet to see Ernst & Young's presentation of the idea, since all of them had gains on the sale. Hoeing told Camferdam then of the urgency: that they needed to start the transaction within the next week to ten days because the transaction took about 6-8 weeks to complete and it needed to be completed prior to the end of 1999. As a result, they agreed to meet on November 5, 1999, to hear the details of the strategy.

133. On November 5, 1999, the Camferdam Individuals met with Hoeing, Upchurch and Rhodes at Ernst & Young's Indianapolis office. There was no one else present (*i.e.*, no one from Jenkens & Gilchrist or Brown & Wood). With the exception of having to sign a confidentiality agreement as soon as they arrived (before anything else took place), it was a typical casual meeting for the Camferdam Individuals with Hoeing. Rhodes was there at the suggestion of the Camferdam Individuals' broker, Dave Knall. Upchurch actually conducted the meeting and seemed to be the most knowledgeable about what was being discussed; it appeared that Hoeing and Rhodes were really present more for client relations, than for any substantive knowledge they might have.

134. The meeting on November 5, 1999, lasted one to two hours. Primarily, it was a PowerPoint presentation presented by Upchurch. Upchurch appeared to the Camferdam Individuals to be the lead contact in Indianapolis for the COBRA Strategy. In response to the Camferdam Individuals' questions about the COBRA Strategy, Hoeing and Rhodes stated, "That's why you have us." The Camferdam Individuals depended on Ernst & Young to tell them if the COBRA Strategy was valid and appropriate for them. Hoeing advised the Camferdam

Individuals that they could make this transaction work for them. Hoeing also told them that the COBRA Strategy was a valid tax shelter; that the tax shelter would be upheld if they were audited; and that Ernst & Young would defend the Camferdam Individuals up to Court. They also showed the Camferdam Individuals an "opinion letter" from Jenkens & Gilchrist during the presentation, which the Camferdam Individuals were told was "insurance" in the event of an audit. They also suggested the Camferdam Individuals obtain a second legal opinion "just to make sure." They informed the Camferdam Individuals they had a firm, Brown & Wood, which could provide them with a second legal opinion. During this meeting, Hoeing discussed the need for the Camferdam Individuals to have a "business purpose" for the transaction. Since the Camferdam Individuals had no understanding of the transaction, they told Hoeing to figure out a business purpose, which he agreed to do.

135. Following the meeting on November 5, 1999, Hoeing picked the "loss" Camferdam and the other Camferdam Individuals needed to generate. The loss was almost in alignment with the prior ownership of BAMC, LLC (which had held the shares of Support Net and was owned by the Camferdam Individuals).

136. Hoeing told the Camferdam Individuals that Ernst & Young was in a hurry to get the deal done. As a result, a few days later, the Camferdam Individuals met Hoeing and several other individuals at Twin Lakes Golf Course before Camferdam, Adams, and Michener were to play golf. Because of the urgency, Hoeing wanted to squeeze the meeting in before the Plaintiffs' tee time. The purpose of the meeting was to sign all the paperwork to start the implementation of the tax strategy, including transactional documents and an engagement agreement (the "Engagement Agreement"). The meeting only lasted 30 minutes or so. No

copies of the documents were given to the Camferdam Individuals at that time – Hoeing said they would be mailed to the Camferdam Individuals later. Although the transactional documents were later sent to the Camferdam Individuals in a binder, the Engagement Agreement and the promotional materials used during the meeting were never sent to the Camferdam Individuals. During this meeting, Michener asked Hoeing, "What is this strategy?" Hoeing responded by saying, "It is already done, don't worry about it."

137. During the meeting on November 8, 1999, Hoeing did not go through the Engagement Agreement at all. In fact, Hoeing did not go over any of the documents with the Camferdam Individuals. It was simply a signing meeting.

138. During the meetings, Ernst & Young informed the Camferdam Individuals that by forming a partnership to engage in foreign currency option transactions, they could legally create large capital losses for tax purposes that would largely eliminate or offset their expected substantial capital gain in 1999. Ernst & Young informed the Camferdam Individuals that the COBRA Strategy would result in either a far smaller loss or profit in real dollars than the tax loss that was being created.

139. The Camferdam Individuals are all successful business people; however, they do not have knowledge about complex tax and legal matters. An example of this lack of knowledge occurred on December 15, 1999 when the Deutsche Defendants (specifically, Parse) mysteriously proposed they terminate the FX Contracts one day early[10] and Plaintiffs be paid the sum of $6,000,000.00, resulting in a total gain to them of $2,312,000.00 over and above the

[10] Of course, Parse also refused twice in the following week to close out another client's FX Contracts early since that client was "in the money."

premiums paid for the Long Options. No explanation was given to Plaintiffs or their agents as to how this amount[11] was arrived at. In any event, after taking into account the fees paid to the Defendants, Jenkens and Ernst & Young, Plaintiffs still lost hundreds of thousands of dollars on the transaction.

140. Additionally, the Camferdam Individuals relied on the Defendants for their "expertise." If the Defendants had ever mentioned the possibility of penalties or that the IRS might even question the legality of the transaction, the Camferdam Individuals would have never agreed to do the Strategy. The Defendants, Jenkens and Ernst & Young discussed all aspects of the COBRA Strategy with the Camferdam Individuals, including the alleged tax benefits of the Strategy. For instance, Ernst & Young informed the Camferdam Individuals that by forming a partnership to engage in the COBRA Strategy, it was possible to create large capital losses for tax purposes that would largely eliminate or offset their expected substantial capital gain and income. Ernst & Young informed the Camferdam Individuals that the COBRA Strategy would result in either a large profit or a small loss in real dollars but that any small "real" loss would be more than offset by the tax savings from the large capital loss generated by the Strategy.

**2. The Parmer Plaintiffs**

141. In March of 1999, Walter Parmer ended his employment with America Online ("AOL") and cashed in his stock options, netting a $5.8 million dollar gain. Because he had worked for such a long time to obtain this financial goal, Parmer wanted the best tax advice on

11 Moreover, the median price of the Euro on that date was U.S. $1.00400 per 1.0 Euro and the median price of the Yen was 103.58 Japanese Yen per U.S. Dollar. Thus, both trades on all contracts were beneath the strike prices and Plaintiffs should have received $7,775,000. Plaintiffs' acceptance of a smaller amount indicates their total lack of understanding of the FX

how to save on his taxes. After looking in the 1998 Washington Business Journal Book of Lists and seeing Ernst & Young's name close to the top of the list for top accounting firms, Parmer decided to contact Ernst & Young. After explaining to the receptionist that he had cashed in AOL stock, the receptionist promptly connected Parmer directly to Michael Bearer, an Ernst & Young partner.

142. Parmer explained to Bearer that he was an engineer and did not understand taxes very well. Bearer reassured Parmer that Ernst & Young could help him and that Ernst & Young had an investment strategy that could make Parmer ten million dollars or potentially lose a small amount which would have the effect of reducing Parmer's tax bill by two million dollars. Parmer asked Bearer about the legality of the Strategy and told Bearer that he did not want to be involved in anything that was not accepted by the IRS. Bearer assured Parmer that there was no question as to the legality of the Strategy, that "this is the law", and that "the same law applies to everyone and you should take advantage of it as others had." Bearer also emphasized that Parmer would have not one but two tax opinions from "the best law firms" which would support the Strategy and ensure that the IRS would have no problem with the Strategy.

143. After speaking with Bearer on several additional occasions on the phone, wherein Bearer stated that the last partners to engage in the Strategy made more than ten million dollars, Bearer took Walter and Argenia's names and information (collectively, the "Parmer Individuals"). Shortly thereafter, the Parmer Individuals received nondisclosure agreements from Ernst & Young, Brown & Wood and Jenkens. The Parmer Individuals signed the

---

Contracts.

agreements and faxed them back without ever speaking to anyone from Brown & Wood and Jenkens.

144. Ernst & Young also sent the Parmer Individuals an article from the September 23, 1996 issue of Tax Notes entitled, "Short-Sale Oligations and Basis in Partnership Interests." The Parmer Individuals did not understand the article but took it as validating the Ernst & Young statements on the law regarding the Strategy. The Parmer Individuals were still unsure about the Strategy and were contemplating just paying the taxes on the entire capital gain. After a couple of months of pondering the decision, Walter Parmer called Bearer who again reassured him that it was the law and that other people were doing it. Based on these reassurances and representations, the Parmer Individuals agreed to partake in the Strategy.

145. In December 1999, the Parmer Individuals were partnered with another individual, William Seippel, to engage in the Strategy. The Parmer Individuals gave Ernst & Young the investment capital to forward to Deutsche Bank. Shortly thereafter, Ernst & Young placed a conference call to the Parmer Individuals, Seippel, David Parse of Deutsche Bank and Charles Paul, a tax attorney from Ernst & Young. Parse instructed the Parmer Individuals and Seippel which currencies to buy, which they did relying on the expertise and reputation of Deutsche Bank. As was true in most instances, the Parmer Individuals lost money on the Strategy.

146. The Parmer Individuals are successful business people; however, they do not have knowledge about complex tax and legal matters. The Parmer Individuals relied on the Defendants for their "expertise." If the Defendants had ever mentioned the possibility of

penalties or that the IRS might even question the legality of the transaction, the Parmer Individuals would have never agreed to do the Strategy.

### 3. The Laurenzo, Rice and Arnold Plaintiffs

147. Since 1995, initially in connection with an international merger, Ernst & Young has provided financial and tax advisory services to certain current and retired executives of the company of which they were officers. Acting in this role, Ernst & Young provided services to Rice and Laurenzo in connection with executive compensation, federal tax planning and other services. Because they had knowledge of Rice and Laurenzo's personal finances, David Johnson and Chuck Kowal of Ernst & Young approached Rice and Laurenzo in 1998 with a tax shelter idea. After discussing the idea, Rice and Laurenzo declined because Ernst & Young failed to persuade them that the strategy would "more likely than not" pass IRS scrutiny and the offering of only one legal opinion.

148. In May 1999, Ernst & Young became aware that the Plaintiffs were expecting to receive very large sums of money in connection with the imminent sale of the company. On October 29, 1999, Ernst & Young again exploited their knowledge of the Plaintiffs' personal finances when Johnson and Kowal approached Rice, Laurenzo, and Arnold (collectively, the "Rice Individuals"). Kowal and Johnson told the Plaintiffs that they had a different but much better tax shelter called "COBRA", which had significant economic substance and the backing of not one but two legal opinions. Kowal and Johnson told Rice, Laurenzo and Arnold that they had a very short time to decide to participate in the COBRA Strategy and that they must complete the Strategy by December 31, 1999.

149. Kowal and Johnson set up numerous subsequent conference calls to push the idea on the Rice Individuals, even going so far as to set up a conference call with Robert Shapiro, the "national head of Ernst & Young's tax group in Washington, D.C." Shapiro spent a great deal of time on the call explaining the mechanics of COBRA and why it was valid. Shapiro told the Rice Individuals that COBRA had significant business purpose and economic substance and two law firms would issue opinion letters supporting the validity of COBRA.

150. After that meeting, Kowal and Johnson told the Rice Individuals that Ernst & Young had changed part of the Strategy. Instead of initially requiring a client to put up 1% to be at risk, Ernst & Young was now requiring clients to put up 5%. Kowal told them that this change would provide the Rice Individuals with a 38% chance of making a 31% return on their money in 30 days. In a subsequent meeting, Johnson and Kowal told the Rice Individuals that the COBRA Strategy was only being offered to a small group of individuals, specifically clients that had a minimum of $50,000,000 to participate in COBRA.

151. On yet another conference call, Johnson and Bill Murphy (also an Ernst & Young employee) introduced the Rice Individuals to David Parse of Deutsche Bank. Parse explained to the Rice Individuals how the FX Contracts worked and that the Rice Individuals had the opportunity to make "considerable money" on the transaction and that Deutsche Bank would "help them." Parse emphasized repeatedly that Deutsche Bank had significant experience in completing the FX Contracts for clients that participated in tax strategies and that Deutsche Bank would be extremely helpful to them during the process. Parse told the Rice Individuals about the "sweet spot" and that they had a chance of making a substantial amount of money if they were to hit it.

152. On yet another conference call with the Rice Individuals, Johnson and Kowal showed the Plaintiffs a "matrix" which set forth the various scenarios that could occur. Kowal and Johnson explained that even if the Rice Individuals lost money on the FX Contracts, the tax savings would be substantial. More importantly, the matrix never showed a situation where the Plaintiffs would be assessed a penalty. Kowal and Johnson instructed the Rice Individuals that they could not discuss the COBRA Strategy with any other advisors. Based on these representations and the reputation of Deutsche Bank, Jenkens, Brown & Wood and Ernst & Young, the Rice Individuals agreed to participate in the Strategy.

153. Approximately two days before the FX Contracts were to be terminated under the terms of the Contracts, the Rice Individuals were "in the money." The Rice Individuals contacted David Parse and asked that he terminate the FX Contracts so that they could make a profit. Parse refused.

154. The Rice Individuals are all successful business people; however, they do not have knowledge about the complex tax and legal matters relating to the COBRA Strategy. The Rice Individuals relied on the Defendants for their "expertise." If the Defendants had ever mentioned the possibility of penalties or that the IRS might even question the legality of the transaction, the Rice Individuals would have never agreed to do the Strategy.

## D. THE FEATURES OF THE STRATEGY

155. The steps of the COBRA Strategy were as follows:

a. First, the Individual Plaintiffs would sell a short digital option and purchase a long digital option in almost identical amounts on a foreign currency with different (but narrow) strike prices, each to expire in thirty

(30) days. The cost of the long digital option, though large, would be largely (although not entirely) offset by the premium earned on the sale of the short digital option. The Individual Plaintiffs would form a single-member limited liability company ("LLC") for the purpose of purchasing the options;

b. Second, the Individual Plaintiffs (through the LLCs) would contribute these options to a general partnership formed for the purpose of conducting the COBRA Strategy. After 30 days, the long and short options would expire either "in or out of the money," resulting in a gain or loss, depending upon the exchange rate between the U.S. dollar and the relevant foreign currency at that time;

c. Third, the Individual Plaintiffs would make a capital contribution consisting of cash or other capital assets to the partnership; if cash was contributed, it was sometimes used to purchase capital or ordinary assets (depending on whether a capital or ordinary loss was being "created");

d. Fourth, the Individual Plaintiffs would contribute their interests in the partnership to an S Corporation, causing the termination of the partnership as a matter of law; and

e. Fifth, the S Corporation would sell the capital or ordinary assets contributed by the Individual Plaintiffs. These assets would have an artificially inflated basis and their sale would thus lead to a substantial unrealized short-term capital loss and/or ordinary loss.

156. Each of the steps proposed by the Defendants, Ernst & Young and Jenkens to the Plaintiffs, acting pursuant to an undisclosed arrangement between them, were fully planned in advance to reduce or eliminate tax liability for the Plaintiffs' substantial capital gains and/or ordinary income.

157. The Defendants, Ernst & Young and Jenkens advised the Individual Plaintiffs that the basis of their interest in the partnership would be increased for tax purposes by the purchase cost of the Long Options, but not decreased by the premium received by the Plaintiffs on the sale of the Short Options. They further advised that, as a result, upon the contribution of the partnership interest to the S Corporation and the sale by the S Corporation of its assets, the S Corporation would realize large capital or ordinary losses that could be applied to substantially reduce or eliminate the gains realized by the Individual Plaintiffs in 1999, thus substantially reducing or even eliminating the Individual Plaintiffs' tax liability.

158. The Defendants, Ernst & Young and Jenkens acting pursuant to an undisclosed arrangement between them, further advised the Individual Plaintiffs that the precise amount of loss to be generated by the COBRA Strategy would be chosen beforehand, but should not be a loss so large that it would offset the capital gains or ordinary income entirely.

159. The Defendants, Ernst & Young and Jenkens informed the Individual Plaintiffs that depending on the exchange rate between the U.S. dollar and the foreign currencies involved in the digital options transactions, there was sufficient chance of realizing a pre-tax gain on the FX Contracts, although a pre-tax loss might also occur, for the economic substance necessary to support the tax result. Indeed, certain of the Plaintiffs were lead to believe the FX Contracts had

been highly profitable for others in the past and they had a substantial chance of similar large returns.

160. In any event, the Defendants, Ernst & Young and Jenkens assured the Individual Plaintiffs that the tax benefits of the COBRA Strategy as a whole, resulting from the creation of capital and/or ordinary losses to offset capital gains and income, far outweighed any losses that might be incurred as a result of the FX Contracts.

161. The Defendants, Ernst & Young and Jenkens further advised the Individual Plaintiffs that if the Internal Revenue Service ("the IRS") audited their tax returns as a result of the COBRA Strategy, the "independent" opinion letters of Jenkens and the Brown & Wood Defendants would confirm the propriety of the COBRA Strategy and of claiming the resulting losses on their tax returns. These "independent" opinion letters would enable the Plaintiffs to satisfy the IRS auditors as to the propriety of the tax returns and provide absolute penalty protection. As noted, Jenkens and the Brown & Wood Defendants had already prepared the "canned" and "prefabricated" opinion letters approving the COBRA Strategy, and needed only to fill in several blanks for each of the many clients to which they rendered such opinion letters.

162. The Defendants, Ernst & Young and Jenkens advised the Individual Plaintiffs that the capital and ordinary losses created by the COBRA Strategy were legitimate and in accordance with all applicable tax laws, rules, and regulations. In particular, the Defendants, Jenkens and Ernst & Young advised the Individual Plaintiffs that the COBRA Strategy was not a "sham transaction" that would be ignored or disallowed for tax purposes and that the "independent" opinion letters from Jenkens and the Brown & Wood Defendants would confirm this. They also advised the Plaintiffs that the regional office of Ernst & Young had implemented

five of these transactions and that the transactions were only being offered to taxpayers with income and/or capital gains in excess of $50 million.

## E. THE CAMFERDAM, ADAMS, MICHENER AND TRIGILIO PLAINTIFFS ENGAGE IN THE COBRA STRATEGY IN 1999

163. In approximately November 1999, the Camferdam, Adams, Michener and Trigilio Plaintiffs agreed to engage in the COBRA Strategy. Their decision was based in large measure upon their relationship with Hoeing, the Defendants' advice, the promised "independent" opinion letters of the Brown & Wood Defendants and Jenkens confirming the propriety of the COBRA Strategy, and the representations and recommendations of the Defendants, Ernst & Young and Jenkens during the initial COBRA Strategy presentation and thereafter.

### 1. The Camferdam, Adams, Michener, and Trigilio Plaintiffs Form the COBRA Strategy Entities

164. On or about November 9, 1999, the Camferdam Plaintiffs formed HNC Ditch Investments, LLC, the Trigilio Plaintiffs formed CT Oak Tree Investments, LLC, the Michener Plaintiffs formed JM Walnut Investments LLC, and the Adams Plaintiffs formed JMA Sedgemour Investments, LLC. On or about the same date, the Plaintiffs formed BAMC, Inc. and Carmel Partners. Each of these entities was formed for the purpose of carrying out the COBRA Strategy. The Defendants, Ernst & Young and Jenkens instructed, advised and orchestrated the formation of these entities.

### 2. The Camferdam, Adams, Michener and Trigilio Plaintiffs Make Cash Contributions to the LLCs

165. On or about November 9, 1999, the Camferdam Plaintiffs, on the advice and instruction of the Defendants, Ernst & Young and Jenkens made a cash contribution of

approximately $2,500,000.00 to HNC Ditch Investments, LLC, through Deutsche Bank. These funds were subsequently used to pay the premium on the Long Option.

166. On or about November 9, 1999, the Adams, Michener and Trigilio Plaintiffs, on the advice and instructions of the Defendants, Jenkens and Ernst & Young, made cash contributions of approximately $490,000.00, $600,000.00, and $98,000.00, respectively, to their respective LLCs, through Deutsche Bank. These funds were subsequently used to pay the premiums on the Long Options, as well as fees to the Defendants.

### 3. The Camferdam, Adams, Michener and Trigilio Plaintiffs Enter into FX Contracts with the Deutsche Defendants

167. Once these Plaintiffs committed to the transactions, directions as to implementation of the FX Contracts came from Jenkens and/or Ernst & Young. After these Plaintiffs were referred to the Deutsche Defendants, the Plaintiffs were directed to complete new account forms for Deutsche Bank, which had already been completed by Ernst & Young and/or Jenkens to indicate that the Plaintiffs had experience with options, *without regard to whether they actually did,* and that the Plaintiffs had an investment objective of aggressive growth, *also without regard to whether they actually did.* In any event, these forms were to open accounts at DB Alex Brown and not specifically with respect to the FX Contracts, for which no due diligence in accordance with NYSE Rule 405 was done whatsoever.

168. David Parse and others at Deutsche Bank advised and instructed Camferdam to pick the Euro and the remaining Plaintiffs to pick the Japanese Yen as their foreign currencies and, in each case, the exact amounts to be invested in each option. The Defendants, Jenkens and Ernst & Young had calculated the capital and ordinary losses these Plaintiffs needed and the

foreign currency option positions (including the "strike prices" to be used) necessary to achieve the loss before the options were purchased. The Plaintiffs did as they were told.

### a. *Camferdam Enters Into One of the FX Contracts*

169. On or about November 16, 1999, in accordance with the COBRA Strategy, the Camferdam Plaintiffs, through HNC Ditch Investments, LLC, entered into a private contract with Deutsche Bank involving foreign currency digital option positions on the Euro. This private contract with Deutsche Bank required the Camferdam Plaintiffs, through HNC Ditch Investments, LLC, to purchase a digital option on the Euro at a strike price of U.S. $1.0187 per 1.0 Euro with an expiration date of December 16, 1999, a settlement date of December 20, 1999, a pay off amount of $100,000,0000.00 and paid a premium of $50,000,000.00 (the "Long Option"). In addition, the private contract with Deutsche Bank required the Camferdam Plaintiffs, through HNC Ditch Investments, LLC, to sell a digital option on the Euro at a strike price of U.S. $1.0186 per 1.0 Euro with an expiration date of December 16, 1999, a settlement date of December 20, 1999, a pay off amount of $93,750,0000.00 and paid a premium of $47,500,000.00 (the "Short Option"). The Long and Short Options are referred to collectively as the "Camferdam Options."

170. According to the private contract with Deutsche Bank, if the Euro was trading at less than or equal to U.S. $1.0187 per 1.0 Euro (the "spot rate") at exactly 10:00 a.m. New York time on December 16, 1999, Deutsche Bank paid the Camferdam Plaintiffs $100,000,000.00 on the Long Option. If the Euro was trading at less than or equal to the spot rate of U.S. $1.0186 per 1.0 Euro at 10:00 New York time, the Camferdam Plaintiffs paid Deutsche Bank $93,750,000.00 on the Short Option. Unbeknownst to the Camferdam Plaintiffs, Deutsche Bank

was able to control the outcome of the Camferdam Options since the private contract gave Deutsche Bank the power to pick, among numerous spot rates, the particular spot rate it wished to use at exactly 10:00 a.m. New York time on December 16, 1999. As a result, unbeknownst to the Camferdam Plaintiffs, Deutsche Bank could disregard any spot rate that resulted in the Camferdam Plaintiffs winning on the Camferdam Options. The Camferdam Options were designed so that they would both expire "out of the money" and worthless. Indeed, the chances of the Camferdam Plaintiffs hitting the "sweet spot" (*i.e.* the spot rate between 1.0187 and 1.0186) was like winning the lottery - it was not going to happen.

171. In the purchase of the Camferdam Options, the Camferdam Plaintiffs actually paid a net premium to Deutsche Bank of $2,500,000.00, consisting of the difference between the $50,000,000.00 paid for the Long Option and the $47,500,000.00 received for the Short Option.

**b. *Trigilio Enters Into One of the FX Contracts***

172. On or about November 16, 1999, in accordance with the COBRA Strategy, the Trigilio Plaintiffs, through CT Oak Tree Investments, LLC, entered into a private contract with Deutsche Bank AG New York Branch ("Deutsche Bank") involving foreign currency digital option positions on the Japanese Yen. This private contract with Deutsche Bank required the Trigilio Plaintiffs, through CT Oak Tree Investments, LLC, to purchase a digital option on the Japanese Yen at a strike price of 103.83 Japanese Yen per U.S. $1.00 with an expiration date of December 16, 1999, a settlement date of December 20, 1999, a pay off amount of $ 2,800,000.00 and paid a premium of $1,400,000.00. (the "Long Option"). In addition, the private contract with Deutsche Bank required the Trigilio Plaintiffs, through CT Oak Tree Investments, LLC, to sell a digital option on the Japanese Yen at a strike price of 103.81Japanese Yen/U.S. $1.00 and

receive a premium of $1,330,000.00, with an expiration date of December 16, 1999, a settlement date of December 20, 1999, and a pay off amount of $2,625,000.00 (the "Short Option"). The Long and Short Options are referred collectively as the "Trigilio Options."

173. According to the private contract with Deutsche Bank, if the Japanese Yen was trading at less than or equal to 103.83 Japanese Yen/U.S. $1.00 (the "spot rate") at exactly 10:00 a.m. New York time on December 16, 1999, Deutsche Bank paid the Trigilio Plaintiffs $2,800,000.00 on the Long Option. If the Japanese Yen was trading at less than or equal to the spot rate of 103.81 Japanese Yen/U.S.$1.00 at exactly 10:00 New York time, the Trigilio Plaintiffs paid Deutsche Bank $2,625,000.00 on the Short Option. Unbeknownst to the Trigilio Plaintiffs, Deutsche Bank was able to control the outcome of the Trigilio Options since the private contract gave Deutsche Bank the power to pick, among numerous spot rates, the particular spot rate it wished to use at exactly 10:00 a.m. New York time on December 16, 1999. As a result, unbeknownst to the Trigilio Plaintiffs, Deutsche Bank could disregard any spot rate that resulted in the Trigilio Plaintiffs winning on the Trigilio Options. The Trigilio Options were designed so that they would both expire "out of the money" and worthless. Indeed, the chances of the Trigilio Plaintiffs hitting the "sweet spot" (*i.e.*, the spot rate between 1.0187 and 1.0186) was like winning the lottery - it was not going to happen.

174. In the purchase of the Trigilio Options, the Trigilio Plaintiffs paid a net premium to Deutsche Bank of approximately $70,000.00 consisting of the difference between the $1,400,000.00 paid for the Long Option and the $1,330,000.00 premium received for the Short Option.

c. *Adams Enters Into One of the FX Contracts*

175. On or about November 16, 1999, in accordance with the COBRA Strategy, the Adams Plaintiffs, through JMA Sedgemour Investments, LLC, entered into a private contract with Deutsche Bank AG New York Branch ("Deutsche Bank") involving foreign currency digital option positions on the Japanese Yen. This private contract with Deutsche Bank required the Adams Plaintiffs, through JMA Sedgemour Investments, LLC, to purchase a digital option on the Japanese Yen at a strike price of 103.83 Japanese Yen per U.S. $1.00 with an expiration date of December 16, 1999, a settlement date of December 20, 1999, a pay off amount of $24,000,000.00 and paid a premium of $12,000,000.00. (the "Long Option"). In addition, the private contract with Deutsche Bank required the Adams Plaintiffs, through JMA Sedgemour Investments, LLC, to sell a digital option on the Japanese Yen at a strike price of 103.81 Japanese Yen per U.S. $1.00 with an expiration date of December 16, 1999, a settlement date of December 20, 1999, a pay off amount of $22,500,000.00 and paid a premium of $11,400,000.00. (the "Short Option"). The Long and Short Options are collectively referred to as the "Adams Options."

176. According to the private contract with Deutsche Bank, if the Japanese Yen was trading at less than or equal to 103.83 Japanese Yen/U.S. $1.00 (the "spot rate") at exactly 10:00 a.m. New York time on December 16, 1999, Deutsche Bank paid the Adams Plaintiffs $24,000,000.00 on the Long Option. If the Japanese Yen was trading at less than or equal to the spot rate of 103.81 Japanese Yen/U.S.$1.00 at 10:00 New York time, the Adams Plaintiffs paid Deutsche Bank $22,500,000.00 on the Short Option. Unbeknownst to the Adams Plaintiffs, Deutsche Bank was able to control the outcome of the Adams Options since the private contract

gave Deutsche Bank the power to pick, among numerous spot rates, the particular spot rate it wished to use at exactly 10:00 a.m. New York time on December 16, 1999. As result, unbeknownst to the Adams Plaintiffs, Deutsche Bank could disregard any spot rate that resulted in the Adams Plaintiffs winning on the Adams Options. The Adams Options were designed so that they would both expire "out of the money" and worthless. Indeed, the chances of the Adams Plaintiffs hitting the "sweet spot" (*i.e.* the spot rate between 103.83 and 103.81) was like winning the lottery - it was not going to happen.

177. In the purchase of the Adams Options, the Adams Plaintiffs paid a net premium to Deutsche Bank of approximately $600,000.00, consisting of the difference between the $12,000,000.00 paid for the Long Option and the $11,400,000.00 premium received for the Short Option.

**d.** ***Michener Enters Into One of the FX Contracts***

178. On or about November 16, 1999, in accordance with the COBRA Strategy, the Michener Plaintiffs, through JM Walnut Investments, LLC, entered into a private contract with Deutsche Bank AG New York Branch ("Deutsche Bank") involving foreign currency digital option positions on the Japanese Yen. This private contract with Deutsche Bank required the Michener Plaintiffs, through JM Walnut Investments, LLC, to purchase a digital option on the Japanese Yen at a strike price of 103.83 Japanese Yen per U.S. $1.00 with an expiration date of December 16, 1999, a settlement date of December 20, 1999, a pay off amount of $14,000,000.00 and paid a premium of $7,000,000.00. (the "Long Option"). In addition, the private contract with Deutsche Bank required the Michener Plaintiffs, through JM Walnut Investments, LLC, to sell a digital option on the Japanese Yen at a strike price of 103.81

Japanese Yen per U.S. $1.00 with an expiration date of December 16, 1999, a settlement date of December 20, 1999, a pay off amount of $6,650,000.00 and paid a premium of $13,250,000.00. (the "Short Option"). The Long and Short Options are referred to collectively as the "Michener Options."

179. According to the private contract with Deutsche Bank, if the Japanese Yen was trading at less than or equal to 103.83 Japanese Yen/U.S. $1.00 (the "spot rate") at exactly 10:00 a.m. New York time on December 16, 1999, Deutsche Bank paid the Michener Plaintiffs $14,000,000.00 on the Long Option. If the Japanese Yen was trading at less than or equal to the spot rate of 103.81 Japanese Yen/U.S.$1.00 at exactly 10:00 New York time, the Michener Plaintiffs paid Deutsche Bank $13,250,000.00. on the Short Option. Unbeknownst to the Michener Plaintiffs, Deutsche Bank was able to control the outcome of the Michener Options since the private contract gave Deutsche Bank the power to pick, among numerous spot rates, the particular spot rate it wished to use at exactly 10:00 a.m. New York time on December 16, 1999. As a result, Deutsche Bank could disregard any spot rate that resulted in the Michener Plaintiffs winning on the Michener Options. The Michener Options were designed so that they would both expire "out of the money" and worthless. Indeed, the chances of the Michener Plaintiffs hitting the "sweet spot" (*i.e.* the spot rate between 103.83 and 103.81) was like winning the lottery - it was not going to happen.

180. In the purchase of the Michener Options, the Michener Plaintiffs actually paid a net premium to Deutsche Bank of approximately $350,000.00, consisting of the difference between the $7,000,000.00 premium paid for the Long Option and the $6,650,000.00 premium received for the Short Option.