(Page 138, line 21)

Q. Would you give any advice to clients as to timing of exiting?
(t) A. I think that was – well, only from an investment standpoint. Obviously, if they were making money, stay in. If they were losing money, let's look at alternatives.
Q. In terms of tax benefits, though?
(u) A. No. I mean, this was an investment for the client. So our advice was centered around if you're going to – if you believe this is a good investment and it makes sense, stay in. Continue to do, you know, to do the digital trading, do the foreign currency trading. If it doesn't make sense, let's think about exiting and how should we exit.

* * * *

(Page 139, line 22)

Q. Do you know if clients withdrew from [the Add-On LLC]?
A. Yes. I do know clients withdrew from it.
Q. Do you know what the basis would have been for withdrawing from it?
(v) A. Lack of profit.

* * * *

(Page 142, line 9)

Q. When you were determining the entrance, . . . [h]ow would you calculate what their contribution would be?
A. I think a lot was dictated on how much percentage profits that they wanted in the fund, and how much they felt comfortable with contributing.
Q. What are the types of assets that they were contributing?
A. If I remember the fund, the fund was a digital, foreign currency digital program. . . .

Q. Where did they get the options from?
(w) A. Well, the digital options were purchased as part of their, from the investment standpoint, as part of their alternative investment, you know, that was just part of their investing.

* * * *

(Page 165, line 6)

Q. Are you aware of any of the listed transactions that your clients engaged in prior to them being listed?
A. [Looking at Notice 2001-51] Yes.
Q. Do you know which ones?
A. CDS, I think, just got listed, if I remember right, is a listed transaction, the swap transaction. . . .
Q. Are you familiar with any of the other ones? . . . What about No. 11, the Notice 2000-44?
(x) A. Inflating the basis of partnership interests? I don't think we did any inflation of partnership interest.

* * * *

(Page 169, line 8)

Q, I'm going to get off the list of transactions and ask whether at any time did you ever consult an E&Y database for strategy?
A. An E&Y database for strategy. Trying to think. Database. We have – if the client asked for a – trying to think what an example would be – an engagement letter, then we would have – there is a repository for engagement letters so that we wouldn't have to duplicate that effort. . . .
Q. Where would that be?
A. That is in a just – I think it's a general PFC database. And you're talking to someone that's administratively, again, very weak in this. . . . So, yeah, I do think there's a PFC database that would have engagement letters there.
Q. Would there be a database where after you review, say, the currency, the fund, where you could let everyone out there in the country know that hey, this is a good vehicle for your clients if you have someone that wants it?
(y) A. Other than email? I don't know. I mean, if a client – see, everything was driven from the client's perspective. So if the client came to the client service professional and said, you know, we've got this that's – you know, got this fact pattern, or whatever, and then they call the subject matter expert, the subject matter expert said send them an email, look, this has been done for another client and, you know, the fact pattern sounds similar, you may want to investigate this particular deal[.]

* * * *

(Page176, line 4)

Q. [T]ake just a digital currency option trade as an example, would that fit into the definition of a solution?

**(z)** A. That would be a one off tax strategy. So, in other words, there would be no database or this thing formed for digital option, because it was a one off investment fund that was produced by a third party that came to us. Most of our solutions, I think almost all the solutions are internally developed. So a solution is just a way that Ernst & Young has been doing a service, it needs to be standardized. If it was a tax strategy that was brought to us by a third-party vendor, that's not a solution per se. We used to call it just, you know, a tax strategy.

Q. Did Ernst & Young create its own tax strategies?

**(aa)** A. Unfortunately, no. We – the only, I guess, strategies, per se, a [Mr. X] would have brought to us.

* * * *

Page 186, line 22)

Q. Would – back to the fund, the [Company X] fund . . . – the eight to ten that you actually were involved in . . . did each client approach E&Y to engage in the fund?

**(bb)** A. For financial planning assistance. They would have come to their relationship person and said, you know, for whatever reason I've got this fact pattern. And then the relationship person would say, "Hey, Brian, you know, this is the fact pattern." Well, if I was aware this fund was being offered, I'd say, "Well, look, you need to probably check with [Mr. X], see if the facts of this make sense for you." If it was an investment planning professional that had done an asset allocation, said we need to look at a hedge fund, you know, [Mr. X]'s hedge fund at that time would have been one that they probably would have considered. So it really just, you know, it really depended upon the risk tolerance of the client from an investment perspective and whether a hedge fund fit in their asset allocation.

(Title 18, United States Code, Section 1001).

**COUNT FOUR**

**(False Statements To The IRS)**

The Grand Jury further charges:

77. The allegations set forth in paragraphs 1 through 65 and 71 are repeated and realleged as if fully set forth herein.

78. On or about June 20, 2002, in the Southern District of New York and elsewhere, ROBERT COPLAN, the defendant, in a matter within the jurisdiction of the executive branch of the Government of the United States, unlawfully, wilfully, and knowingly made materially false, fictitious and fraudulent statements and representations, to wit, in connection with an examination by the IRS of tax shelters marketed by Ernst & Young, COPLAN gave the false testimony underlined below:

(Page 24, line 10)

Q. Who produced the materials [to be distributed to clients] for the [Company X Add-On] transaction. . . . a description of the transaction that you would give to investors before they invest --

A Yeah. On the [Company X] transaction, there were no materials given. That was just explained. . . . I believe 1 office did produce something, and it was on their own and without national involvement. .

Q. What office was it?

A. Seattle.

Q. Did you review any of those materials?

A. I did after I became aware of them, but not for distribution. In other words, I basically said, these are not to be distributed.

Q. And why did you say they were not to be distributed?

(a) A. We didn't see the need to, and anything – or even show it to clients. We didn't think the transaction was that complicated, to be honest with you, so we only really had it for internal purposes.

* * * *

(Page 34, line 9)

Q. And who was the counterparty in most of these [CDS Add-On transactions]?
A. I believe it was [Financial Institution] in both transactions.
Q. And [Financial Institution] is a U.S. entity?
A. Again, I've become aware there was some confusion about that . . . . On the [Company X] transaction, it was really being – all the investments aspects of it were being done in connection with the existing partnerships. And those existing partnerships had trading accounts that were doing exotic option trading and other trading, and so – and Ernst & Young had nothing really to do with the operation of that partnership.
Q. M-hm.
A. So [Company X] was the asset manager. [Company X] was not necessarily at the time, but they became the general partner also of those accounts during the period in question.
And so they were leading the investment decisions of who to use, and they were using a trader who specialized in these type of currency options. And so we really didn't – we, Ernst & Young, really didn't have involvement in the decisions that the general partner made as to who to use to do the trading, how to structure those trades. It was really their investment decision and their decision as general partner. They didn't have to ask us anything.

* * * *

(Page 38, line 11)

Q. What were the risks on the tax transaction?
A. That the IRS would disagree, that you had basis in the partnership.
Q. What did you think the IRS would – just on the basis issue alone, that's what you thought the issue would be?
A. Yeah. But I think in the explanations that have been put forth of the facts and amnesty disclosures, et cetera, on this transaction, the surrounding facts were such
**(d)** that when we analyzed it, we looked at the fact that the partnerships were existing partnerships, they had been doing some of this trading, and that there was going to be a transfer of a portion of the trading accounts to this [Financial Advisor] outfit for management, and he said, I'm not going to manage a whole bunch of these little accounts, I'm going to put all of these things into an LLC so I can do 1 account

trading for these options. And it was 1 of those circumstances where his tax planner – as we say, we're aware of this idea that's out there. We hear about the concept of transferring a long and a short option that aren't matched and getting basis and not having to reduce it for the liability, and so here was kind of a fortuitous circumstance where if these accounts are going to be transferred into an entity anyway, that it's a matter of taking the tax position, because along with that transfer, if someone felt appropriate to do it.

* * * *

(Page 62, line 7)

Q. So how did [Company X] get involved in the option transaction?
A. [Company X] got involved – this was later on after [name of co-conspirator] brought the idea to us. So in other words, we had the idea. That's why I said at some point, we kind of married an idea with facts in the [Company X] transaction, so that it was what we did with [Company X]. But we had the idea at some previous time from [name of co-conspirator].
Q. Okay. So maybe I asked this: How did [Company X] actually come to do the transaction? Did you have – is this based on a preexisting relationship with [Company X]?
A. Yeah. I mean, I said we – [Company X] was involved in the swap partnerships.
Q. Okay.
A. And so they were involved as the asset allocators and the investment folks. And they were dealing with these trading-type people like [Financial Advisor] is the 1 involved.
And so we're the tax advisors, and we said, hey, if you are happening to be forming these – transferring these trading accounts over to [Financial Advisor] and he's going to put them in an LLC, we know this tax idea. That's kind of what I said before.

* * * *

(Page 98, line 6)

Q. Were clients concerned about the large capital gain at the end of the [CDS] transaction in that they would have a large amount to pick up in income that year?
(f) A. That was – well, they weren't sure that that would happen, because they had to

make a decision on the economic side to – they would have to decide to early-terminate the swap, because the swap was scheduled to run for 18 months. And so a decision was required on their part or the counterparties' part to terminate the swap prior to the majority. Otherwise, you'd have ordinary income on the back end.

Q. Did – do you know, did all the partnerships terminate early?

A. I believe they did.

* * * *

(Page 118, line 116)

Q. Was there a reason why [the Add-On transaction] was done through an LLC and not for the Jenkens partnerships for lack of a better description?

(g) A. Well, as I think I explained, the – well, the Jenkens came first. They were done with individual folks forming a partnership. And they did their ... currency contracts and contributed them to partnerships. The [Add-On] transaction wasn't really done that way. It was done based on the fact that the partnerships were transferring their trade – I mean, it really was a fact that existed prior to the tax idea. In other words, the LLC was formed as an LLC because of Mr. [K's] interest in forming an LLC for all those trading accounts. . . . For the – for all those partnerships that were doing this type of trading that [Company X] said, we can't use [Financial Institution] anymore to do this kind of trading, we've got to move the trading account to [Financial Advisor]. And so they moved it and he said, if I'm going to do this trading for you, I'm going to have all these accounts in 1 entity.

* * * *

(Page 139, line 12)

Q. Who would pay E and Y fees [for PICO], the individual or the S Corp?

A. We had an engagement letter with the individual.

Q. The individual was responsible for paying the fees?

**(h)** A. We were paid by the individual. We also received a fee from [Company Z] for consulting with them on the transaction. . . . We were advising them on the tax aspects of the results of investors investing in these types of S corporations.

(Title 18, United States Code, Section 1001).

## COUNTS FIVE THROUGH SEVEN

**(Tax Evasion)**

The Grand Jury further charges:

79. The allegations set forth in paragraphs 51 through 65 are repeated and realleged as if fully set forth herein.

80. From in or about 2000, through at least in or about 2003, in the Southern District of New York and elsewhere, ROBERT COPLAN, MARTIN NISSENBAUM, and RICHARD SHAPIRO, the defendants, unlawfully, wilfully and knowingly did attempt to evade and defeat a substantial part of the income tax due and owing by each of them to the United States of America for calendar year 2000, by various means, including among others:

a) structuring and then implementing a tax shelter transaction which they knew had no reasonable possibility of generating a profit;

b) using that tax shelter to generate tax losses they knew could not properly be deducted on their respective tax returns;

c) creating entities that served no legitimate business purpose, but were used merely to obtain tax benefits;

d) preparing and executing false and fraudulent documents intended to deceive the IRS, including but not limited to transactional documents and a Certificate of Facts;

e) preparing and causing to be prepared, signing and causing to be signed, and filing and causing to be filed a false and fraudulent U.S. Individual Income Tax Return, Form 1040, which substantially understated each defendant's taxable income and tax due and owing; and

f) taking various steps to conceal from the IRS the true facts relating to the tax shelter, including providing false information in response to IDRs sent by the IRS.

| **Count** | **Defendant** | **Return** | **Approx. Amount of Fraudulent Underpayment** | **Approx. Filing Date** |
|---|---|---|---|---|
| 5 | ROBERT COPLAN | 2000 Form 1040 | $ 291,913 | April 15, 2001 |
| 6 | MARTIN NISSENBAUM | 2000 Form 1040 | $ 340,262 | April 16, 2001 |
| 7 | RICHARD SHAPIRO | 2000 Form 1040 | $ 201,565 | August 16, 2001 |

(Title 26, United States Code, Section 7201)

**COUNT EIGHT**

**(Obstruction of the IRS)**

The Grand Jury further charges:

81. The allegations set forth in paragraphs 51 through 65 are repeated and realleged as if fully set forth herein.

82. On or about September 25, 2003, in the Southern District of New York and elsewhere, MARTIN NISSENBAUM, the defendant, unlawfully, wilfully, and knowingly did corruptly obstruct and impede, and did endeavor to obstruct and impede, the due administration of the Internal Revenue Code; to wit, in response to IDR #2, NISSENBAUM caused the false and

misleading statements set forth in paragraph 65, above, to be submitted to the IRS on behalf of himself and ten other E&Y partners.

(Title 26, United States Code, Section 7212).

Madeline Coutin
FOREPERSON

Michael J. Garcia
MICHAEL J. GARCIA
United States Attorney