IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-231 T
(Chief Judge Damich)

---

JZ Buckingham Investments LLC as Tax Matters Partner
of JBJZ Partners, a South Carolina general partnership,

Plaintiff,

v.

United States of America,

Defendant.

---

# APPENDIX

| | | |
|---|---|---|
| **Exhibit A1** | Criminal indictment against Robert Coplan, Martin Nissenbaum, Richard Shapiro and Brian Vaughn, dated May 22, 2007. | Pages 1-18 |
| **Exhibit A2** | Criminal indictment against Robert Coplan, Martin Nissenbaum, Richard Shapiro and Brian Vaughn, dated May 22, 2007. | Pages 19-44 |
| **Exhibit A3** | Criminal indictment against Robert Coplan, Martin Nissenbaum, Richard Shapiro and Brian Vaughn, dated May 22, 2007. | Pages 45-62 |
| **Exhibit A4** | Criminal indictment against Robert Coplan, Martin Nissenbaum, Richard Shapiro and Brian Vaughn, dated May 22, 2007. | Pages 63-72 |
| **Appendix A** | A summary list of IRS information document requests and taxpayer responses. | Pages 73-74 |

| | | |
|---|---|---|
| **Appendix B** | A summary list of material documents withheld by the taxpayers from the IRS in violation of the taxpayers agreement according to Announcement 2002-2. | Pages 75-76 |
| **Exhibit 562** | An Ernst & Young e-mail forwarding a template engagement letter. | Pages 77-82 |
| **Exhibit 541** | An Ernst & Young COBRA Action Workplan. | Pages 83-84 |
| **Exhibit 2252** | Two page fax dated November 22, 1999, from Ray Knight of Ernst & Young to Jerry Zucker and Jim Boyd which Zucker and Boyd failed to produce to the IRS. | Pages 85-88 |
| **Exhibit 2257** | Five page fax dated November 12, 1999, from Zucker to Knight. | Pages 89-94 |
| **Exhibit 2260** | Retained copy of a response of Zucker and Boyd to a Jenkens & Gilchrist letter dated December 14, 1999. | Pages 95-111 |
| **Exhibit 1104** | Fax dated November 15, 1999, disclosing that E&Y's fee on the transaction was a fixed percentage (1.5%) and that the law firm's fee was also a fixed percentage (3%). | Pages 112-120 |
| **Exhibit 1029A** | Retained copies of engagement letters dated November 15, 1999, executed with E&Y. | Pages 121-124 |
| **Exhibit 1109** | E-mail dated April 3, 2002, from Robert Coplan of Ernst & Young to Paul Daugerdas of Jenkens & Gilchrist. | Pages 125 |
| **Exhibit 169** | Letter dated April 17, 2002, reportedly postmarked April 19, 2002, from Boyd to Revenue Agent Gadsen electing to disclose the transaction reported on the 1999 Form 1040, Form 1065 and Form 1120S. | Pages 126-129 |

| | | |
|---|---|---|
| **Exhibit 170** | Letter dated April 20, 2002, from Zucker to Revenue Agent Simmons electing to disclose the transaction reported on the 1999 Form 1040, Form 1065 and Form 1120S. | Pages 130-133 |
| **Exhibit 2259** | Form SS-4 for JBJZ Investors, Inc. | Pages 134-146 |
| **Exhibit 171** | Letter dated April 30, 2002, from Revenue Agent Alan E. Moss to Zucker requesting information pursuant to the agreement to furnish information in accordance with Announcement 2002-2, attaching IDRS ##1 and 2. | Pages 147-149 |
| **Exhibit B** | Relevant pages of the deposition of James Boyd. | Pages 150-151 |
| **Exhibit C** | Relevant pages of the deposition of Jerry Zucker. | Pages 152-153 |
| **Appendix C** | Relevant pages from the Expert Report of David Wayne LaRue, Ph.D., in this matter. | Pages 154-176 |

JUDGE STEIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

07 CRIM. 453

UNITED STATES OF AMERICA

- v. -

ROBERT COPLAN,
MARTIN NISSENBAUM,
RICHARD SHAPIRO, and
BRIAN VAUGHN,

Defendants.

INDICTMENT

07 Cr.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: MAY 22 2007

**COUNT ONE**

**(Conspiracy)**

The Grand Jury charges:

**Background**

1. At all times relevant to this Indictment, Ernst & Young ("E&Y") was one of the largest accounting firms in the world. E&Y provided audit services to many of the world's largest corporate clients, and provided tax services to corporate and individual clients, including some of the wealthiest individuals in the United States. Those tax services included preparing tax returns, providing tax advice and tax planning advice, and representing clients in audits by the Internal Revenue Service ("IRS") and litigation with the IRS in Tax Court.

2. At all times relevant to this Indictment, as part of its tax practice, E&Y had a business unit that was responsible for providing tax advice, as well as financial planning advice, to individuals. That business unit was known as Personal Financial Counseling, or "PFC." E&Y had partners and other professionals throughout the country who were members of



GOVERNMENT EXHIBIT A

the PFC practice.

3. At all times relevant to this Indictment, E&Y also had a department within its tax practice known as the National Tax Department ("National Tax"). The individuals assigned to National Tax were generally experts in particular areas of taxation, and they provided expert tax advice to E&Y professionals in the field. Within National Tax was a sub-group of experts whose particular areas of expertise related to E&Y's PFC practice.

4. In or about early 1998, the national leader of PFC formed a group that would devote itself to designing, marketing, and implementing high-fee tax strategies for individual clients. These strategies included tax shelters that could be used by high-net-worth clients to eliminate, reduce or defer taxes on significant income or gains. The group initially called itself the "VIPER Group" (an acronym for "Value Ideas Produce Extraordinary Results"), but changed its name to the "Strategic Individual Solutions Group," or "SISG," in or about early 2000.

5. Members of the VIPER/SISG group worked together with banks, other financial institutions, law firms and tax shelter promoters to design, market and implement tax strategies. Each of the defendants was a member of the VIPER/SISG group for all or a significant part of the period relevant to this Indictment.

6. The tax strategies developed by the VIPER/SISG group were marketed to clients and prospective clients by members of the group, as well as by PFC professionals located throughout the country, who had primary responsibility for client contact. In or about mid-1999, certain PFC professionals around the country were designated to be members of the "Quickstrike Team," a nationwide area-based network created to provide greater efficiency in the marketing

and execution of the VIPER/SISG strategies.

## The Defendants

7. At all times relevant to this Indictment, defendant ROBERT COPLAN, a lawyer with a Master's Degree in tax law, was a partner located in E&Y's Washington, D.C. office. COPLAN worked within the PFC section of National Tax, and was one of E&Y's "subject matter experts," or "SMEs," in the areas of personal income taxes, estate and gift taxes, and excise taxes. COPLAN, who was the National Director of E&Y's Center For Family Wealth Planning, was a member of the VIPER/SISG group from its inception in or about early 1998. For most of the next several years, COPLAN supervised the activities of the group. Among his other activities, COPLAN approved promotional materials, and ensured that essential information about the design and implementation of E&Y's tax shelters was shared throughout the PFC practice. He consulted regularly with defendants MARTIN NISSENBAUM, RICHARD SHAPIRO and BRIAN VAUGHN, and also participated in sales presentations to clients. Before his employment at E&Y, COPLAN had worked for the IRS as a Branch Chief in the Legislation and Regulations Division.

8. At all times relevant to this Indictment, defendant MARTIN NISSENBAUM, a lawyer with a Master's Degree in tax law, was a partner at E&Y. Located in E&Y's New York office, NISSENBAUM was a member of the PFC group within National Tax, and was a subject matter expert in the areas of individual income taxation, retirement benefits and compensation. NISSENBAUM was the National Director of E&Y's Personal Income Tax and Retirement Planning practice, and was a member of the VIPER/SISG group from its

inception. Among other things, NISSENBAUM worked closely with defendants ROBERT COPLAN and RICHARD SHAPIRO in evaluating and developing the various tax shelters marketed by the group, and participated in sales presentations to clients and prospective clients.

9. At all times relevant to this Indictment, defendant RICHARD SHAPIRO, a lawyer with a Master's Degree in tax law, was a partner located in E&Y's New York office. SHAPIRO was a subject matter expert in the taxation and structuring of financial products and instruments. Although he was not a formal member of National Tax or the VIPER/SISG group until 2000, SHAPIRO worked regularly with the group from its inception in or about early 1998. SHAPIRO worked closely with defendants ROBERT COPLAN and MARTIN NISSENBAUM in evaluating the strategies marketed by the group. Because of his background and expertise in financial instruments, he played an essential role in the approval process of several of the group's shelters. He also participated in sales presentations to clients and prospective clients. Before his employment at E&Y, SHAPIRO had been the Director of Tax for the Financial Services Industry Practice at another large accounting firm.

10. At all times relevant to this Indictment, defendant BRIAN VAUGHN – who had a college degree in accounting – was a certified public accountant (CPA) and a certified financial planner (CFP). After working at three other major accounting firms, VAUGHN joined E&Y as a senior manager in 1998. As a member of the VIPER/SISG group from its inception through at least 2001, VAUGHN led sales efforts for most of the SISG strategies, and also played a development role. VAUGHN was promoted to partner in or about 2002, in large part based upon his role in successfully developing and marketing E&Y's tax shelters.

**Tax Shelter Fraud**

11. During the period from at least in or about 1998 through at least in or about 2004, the defendants, ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO and BRIAN VAUGHN, and others known and unknown to the Grand Jury (hereinafter "the co-conspirators"), participated in a scheme to defraud the IRS by designing, marketing, implementing and defending tax shelters using means and methods intended to deceive the IRS about the bona fides of those shelters, and about the circumstances under which the shelters were marketed and sold to clients.

12. The defendants and the co-conspirators designed and marketed the tax shelters as a means for wealthy individuals with taxable income generally in excess of $10 or $20 million to eliminate or reduce the individual income taxes they would have to pay to the IRS. As marketed and implemented, instead of wealthy clients paying U.S. individual income taxes that were legally owed (generally, between 20% and 40% of their taxable income), the clients could pay total costs calculated largely as a percentage of the desired tax loss or deduction generated by the tax shelter. These costs included the fees payable to E&Y and to E&Y's co-promoters, which included the various law firms that supplied opinion letters to the clients, and the banks and other financial institutions that executed the transactions. The costs also included an amount that would be used to execute purported "investments," which were designed, in part, to disguise and conceal the true nature and purpose of the tax shelters.

13. The defendants and their co-conspirators understood that if the IRS were to detect their clients' use of these tax shelters, and learn the true facts and circumstances surrounding the design, marketing and implementation of these shelters, the IRS would

aggressively challenge the claimed tax benefits. In that event, the IRS would seek to collect the unpaid taxes plus interest, and might also seek to impose substantial penalties upon the clients. Accordingly, the defendants and their co-conspirators undertook to prevent the IRS from: a) detecting their clients' use of these shelters; b) understanding how the steps of the transactions operated to produce the tax results reported by the clients; c) learning that these shelters were marketed as cookie-cutter products that would eliminate, reduce or defer large tax liabilities; d) learning that the clients were not seeking profit-making investment opportunities, but were instead seeking huge tax benefits; and e) learning that, from the outset, all the clients intended to complete a pre-planned series of steps that had been designed by the conspirators to lead to the specific tax benefits sought by the clients.

14. In order to maximize the appearance that the tax shelters were investments undertaken to generate profits, and to minimize the likelihood that the IRS would learn the transactions were actually designed to create tax losses and deductions, the defendants and their co-conspirators created, assisted in creating, and reviewed transactional documents and other materials containing false and fraudulent descriptions of the clients' motivations for entering into the transactions, and for taking the various steps that would yield the tax benefits. They also carefully protected internal documents and promotional materials that set forth the tax benefits and pricing schedules of the various shelters against disclosure to the IRS. The conspirators' goal of deceiving the IRS into believing that E&Y's tax shelters were driven by investment objectives rather than tax savings objectives was demonstrated in an email sent by defendant ROBERT COPLAN to a PFC professional in 2001. That individual had prepared a proposed client solicitation letter, in which he provided short descriptions of various SISG

strategies and their accompanying tax benefits. COPLAN expressed reservations about sending such a letter to clients, as the IRS would inevitably ask the clients for marketing and promotional materials in the course of any audit. COPLAN explained, "Since our ultimate goal is to make our strategies appear to be investment techniques that have advantageous tax consequences, letters like this are not helpful to the client's case[.]"

15. The law in effect at all times relevant to this Indictment provided that if a taxpayer claimed a tax benefit by using a tax shelter, and that benefit was later disallowed, the IRS could impose substantial penalties -- ranging from 20% to 40% of the underpayment attributable to the shelter -- unless the claimed tax benefit was supported by an independent opinion, reasonably relied upon by the taxpayer in good faith, that the tax benefit "more likely than not" would survive IRS challenge. In order to encourage clients to participate in the shelters, and to shield the clients from possible penalties, the defendants worked with law firms to provide E&Y's clients with opinion letters that claimed the tax shelter losses or deductions would "more likely than not" survive IRS challenge, or "should" survive IRS challenge. However, the defendants knew those opinions were based upon false and fraudulent statements, and omitted material facts. By helping their clients obtain false and fraudulent opinion letters, with the understanding and intent that those opinion letters would be presented to the IRS if and when the clients were audited, the defendants not only sought to undermine the ability of the IRS to ascertain the clients' tax liabilities, but also sought to undermine the ability of the IRS to determine whether penalties should be imposed.

16. The defendants and their co-conspirators undertook these actions so that E&Y could participate in the highly lucrative tax shelter market in which other accounting firms

were already participating; so that E&Y could prevent its high-net-worth clients from taking their business (including, potentially, the highly-prized audit business associated with some of these individuals) to its competitors; so that PFC – a business unit that was not a substantial contributor to the firm's revenues – could grow and prosper within the firm; and so the individual defendants could enhance their own opportunities for professional recognition, advancement, job security, and remuneration.

17. Among the fraudulent tax shelter transactions designed, marketed, implemented and defended by the defendants, ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO and BRIAN VAUGHN, and their co-conspirators, were CDS ("Contingent Deferred Swap"); COBRA ("Currency Options Bring Reward Alternatives"); CDS Add-On; and PICO ("Personal Investment Corporation").

18. In addition to implementing fraudulent tax shelters for E&Y's clients, in 2000, defendants ROBERT COPLAN, MARTIN NISSENBAUM and RICHARD SHAPIRO implemented a tax shelter to evade their own taxes, and arranged for eight of their E&Y partners to participate in the transaction with them. Use of that tax shelter enabled the group of eleven E&Y partners to eliminate a total of approximately $3.7 million in taxes.

**The Fraudulent CDS Shelters**

19. CDS (an abbreviation for "Contingent Deferred Swap") was marketed and sold from mid-1999 through in or about 2001. During that period, approximately 69 CDS transactions were implemented for approximately 140 wealthy individuals. As designed and marketed, the fee for CDS was approximately 1.25% of the tax deductions to be generated for

each client. Various clients paid greater or lesser amounts, but ultimately the transaction generated more than $27 million in fees for E&Y. Clients who implemented CDS also paid fees to other participants in the transaction, including a fee to Law Firm A for an opinion stating that if the IRS were to disallow the CDS tax benefits, the client "should" ultimately prevail (a "should opinion"). Typically, Law Firm A's fee was $50,000.

20. The objective of CDS was to convert a client's ordinary income into capital gains, and defer the client's tax liability from the year in which the income was earned ("Year 1") to the following year ("Year 2"). During the period when CDS was sold, ordinary income for very wealthy individuals was typically taxed at a rate of approximately 40%, while long-term capital gains were taxed at approximately 20%. Accordingly, the conversion of a client's income from ordinary to capital resulted in tax savings to the client of approximately 20% of their income. CDS was marketed to individuals who had at least $20 million in ordinary income to shelter.

21. Although there were variations, in a typical CDS transaction, the client sought to convert $20 million in ordinary income into capital gains. CDS was designed and implemented as a series of pre-determined steps intended to deceive the IRS by making it appear that the client was engaged in the business of currency trading for profit, and that the various component parts of the transaction were routine financial activities comprising a coherent business philosophy. The conspirators concealed the fact that CDS was mass-marketed to clients who had no genuine interest in putting their money at risk by engaging in the business of currency trading, but were instead merely carrying out steps they were told to carry out in order to achieve CDS's tax benefits. These steps, and the manner in which these steps were

manipulated to deceive the IRS, included the following:

a) The CDS strategy was implemented through the creation of a limited partnership in which an entity characterized as an investment advisor was the general partner and the client was the limited partner. Although the main purpose of the limited partnership was for the client to obtain tax benefits, the documents created to execute the transaction described the entity as a "trading partnership," and made no mention of the tax benefits, but instead stated that the partnership was "organized to generate capital appreciation."

b) After determining how much ordinary income the client wished to shelter from taxes in Year 1, the co-conspirators would typically arrange for the client to contribute approximately one-third of that amount ($6.6 million in the typical example) to the purported "trading partnership."

c) The success of the client's tax position with the IRS required that the partnership be characterized for tax purposes as a "trade or business," so that "business deductions" could be generated, and then used by the clients to offset their taxable income. Accordingly, the conspirators arranged for approximately $1 million of the client's $5.6 million contribution to be placed in a trading account. In order to make it appear that the "trading partnership" was genuinely engaged in the business of trading for profit, the funds in that trading account were used to carry out a high volume of short-term trades. However, in reality, the activity in that account consisted of trades designed to preserve the client's capital, so the funds in the account could be returned to the client once the tax benefits of CDS had been obtained. As described by an employee of Company X, one of the entities that served as the GP of the CDS partnerships, "Our true investment objective in the various trading accounts was

minimal gains and losses." The conspirators affirmatively sought to conceal the fact that no trading profits were expected, as reflected in an email sent by a conspirator in February 2000, asking that certain references be removed from CDS documents, and explaining, "We don't want to highlight that we don't anticipate trading profits."

d) A portion of the client's cash contribution to the "trading partnership" (approximately $5 million in the example) was put toward a $20 million swap contract, which was entered into between the partnership and a bank or financial institution ("the bank"). The swap contract called for the "trading partnership" to make periodic payments totaling approximately $20 million to the bank over the life of the swap. Because the payments made to the bank in Year 1 were made by an entity purportedly engaged in the "business" of trading, those payments were claimed by the partnership as "business expenses." The purported "business expenses" – which flowed through the "trading partnership" to the client -- would be used to offset the $20 million in ordinary income earned by the client in Year 1, and thus would eliminate the client's tax liability that year.

e) In order for a CDS client to shelter $20 million in income, it was also necessary, under the tax code, for that client to have $20 million "at risk" in the CDS transaction. Only $5 million of the client's money was put toward the swap; the additional $15 million was obtained by the partnership as a loan from the bank. However, the $15 million loan proceeds were deposited in a collateral account at the bank, and at all times, the bank was fully collateralized on the loan. In addition, there was no possibility of a default by the partnership because the transaction was carefully designed to ensure that the bank would never need to seek repayment of the loan from the individual client. Although prospective CDS clients were assured

that they would not have to contribute any additional money to the transaction, the defendants and their co-conspirators caused the clients to execute documents by which they agreed to accept personal liability on the loan. In causing the clients to execute such documents, the conspirators sought to deceive the IRS into believing that the clients were actually "at risk" for the loan amounts, when in truth and in fact, they knew no such risk existed.

f) The swap contract also provided for a "termination payment" to be paid by the bank to the "trading partnership" in Year 2, at the end of the swap. For a $20 million swap, the termination payment was approximately $20 million, with some variation based on market fluctuation. In order for the termination payment made to the "trading partnership" to qualify for long-term capital gains treatment, the swap termination in Year 2 had to occur more than a year after the swap was executed, and had to be characterized as an "early termination" of the swap contract. Although prospective CDS clients were told by E&Y that the swaps would last for just over one year, the conspirators arranged for swap contracts to be drawn up with 18-month maturity dates. This was done to mislead the IRS into believing that the parties actually contemplated an 18-month swap, and that "early termination" was an option, but not a foregone conclusion. The conspirators sought to conceal this plan from the IRS, as reflected in an email sent by defendant BRIAN VAUGHN to a co-conspirator in June 2001. In that email, VAUGHN suggested removing reference to "early termination" from a CDS economic model, explaining, "This could adversely affect our tax situation given the level of audits that are currently in progress. . . . Remember our goal is to convince the agents the client did not have a predisposition of early termination." For a similar reason, defendant RICHARD SHAPIRO recommended against use of an internal E&Y document called a "CDS Action Plan," which set

forth all the steps of the transaction in advance, including early termination of the swap. In an email SHAPIRO sent to defendants ROBERT COPLAN, MARTIN NISSENBAUM and BRIAN VAUGHN, he explained:

> "[O]ne of the problems with tax advantaged transactions when they are viewed is that they are perceived (correctly I might add) as too scripted. While having a plan is important, should we have in writing 'before the fact' such things as the fact that our swap will be terminated early? Clearly, that is necessary for the flow of the transaction. But should there be a document in existence (such as this) that has all the chapters and verses laid out? I question that seriously."

Thus, by manipulating the terms of the swap and by concealing the genuine intentions of all the parties, the conspirators concocted a scenario that enabled them fraudulently to characterize the termination payments received by the CDS "trading partnerships" from the bank as long-term capital gains. Those capital gains flowed through the partnerships to the clients, so they could be taxed at the lower, capital gains rate.

22. As part of the scheme to defraud the IRS, the conspirators created additional documents that purported to provide non-tax business motivations for steps that were actually tax-motivated. For example, defendant ROBERT COPLAN drafted a letter to be signed by clients who had decided to terminate their CDS partnerships after the tax benefits had been obtained. In that letter, the clients falsely attributed their decision to discontinue their trading activities to the September 11, 2001 terrorist attacks, and to "possible economic repercussions resulting from such attacks." COPLAN explained that the letter could be used "as a means of establishing a logical reason for winding down the trading account in the partnership. . . . This could document for the file a logical non-tax rationale for ending the trading account – if that is otherwise what the client wants to do."

23. As part of executing the fraudulent CDS tax shelter, the conspirators arranged for CDS clients to sign false factual representations that could be, and were, incorporated into the CDS opinion letters prepared by Law Firm A. For example, although the real purpose of CDS trading activity was to achieve a particular volume and frequency of trading so the conspirators could plausibly characterize the CDS partnership as a "trade or business," and could thereby assert that the swap payments made in Year 1 were "business deductions," the CDS clients were directed to sign, and did sign, a document stating, "I regard the various investments of the partnership -- including the swaps and the trading activities -- as comprising one coherent business philosophy, and this diversity of investments was an important element in my decision to invest in the partnership." In truth, as the conspirators well knew, the diversity of investments was not an important element in the clients' decisions, and the only "coherent philosophy" reflected in the various components of the CDS transaction was a philosophy to reduce taxes.

24. In addition to incorporating the false factual representations described in paragraph 23 above, the defendants and their co-conspirators caused Law Firm A to issue opinion letters which they knew contained false and fraudulent statements and omitted material facts, including but not limited to the following:

a) The opinions stated that the objective of the partnership's trading activities was to "profit from short term market movements," when in reality, the objective of the trading activity was to achieve a particular volume and frequency of trades, while preserving the client's capital by minimizing trading losses.

b) The opinions stated that because either party to the swap contract

could elect to terminate the swap early, the partnership was "not in control of that decision, should it occur," and therefore the partnership should not be viewed as "being able to manipulate the timing of income," when in reality, both parties to the swap contract planned to terminate the swap early from the outset, and the sole purpose of that plan was to manipulate the timing of income.

c) The opinions stated that the limited partner (the client) was "at risk" for an amount greater than the amount invested because the client had agreed to be personally liable for the debts of the partnership, when in reality, the clients had been assured that they would not be liable for any amount over their initial cash contribution, and the transaction was arranged so there would be no such liability.

d) The opinions stated that "[n]one of the business conducted by the Partnership [had] a predetermined outcome," when in reality, E&Y had marketed to its clients, and the clients had paid fees to obtain, a strategy consisting of a pre-planned series of steps leading to a predetermined tax benefit.

e) The opinions did not disclose that the client's primary purpose for implementing the CDS transaction was to obtain the tax benefits, or that the fees associated with the transaction were calculated on the basis of the intended tax deduction to be generated.

f) The opinions did not disclose that they were rendered by an attorney who had assisted the defendants in structuring, marketing, and implementing the CDS transaction, and had been offered to the clients as part of a promotional package.

**The Fraudulent COBRA Shelters**

25. COBRA (an acronym for "Currency Options Bring Reward Alternatives"), was marketed and sold by E&Y during the last few months of 1999 to 51 wealthy taxpayers. Of the 16 COBRA transactions, all but one were implemented in late 1999; the other was implemented in 2000. As designed and marketed, the fee charged by E&Y was approximately 1.5% of the tax losses to be generated using the strategy. Although some clients paid greater or lesser amounts, COBRA generated approximately $14.7 million in fees for E&Y. The fees paid by COBRA clients amounted to approximately 4.5% of the losses to be generated, including a fee of just under 3% charged by the law firm of Jenkens & Gilchrist ("J&G"). J&G prepared most of the transaction documents for the COBRA shelters, and implemented the COBRA transactions for the clients. J&G also issued "more likely than not" opinion letters to the COBRA clients. The defendants, ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO and BRIAN VAUGHN, realized that because J&G was involved in structuring and implementing the transaction, its clients would not be able to obtain penalty protection on the basis of J&G's opinion letter. Therefore, the defendants arranged for another attorney, a partner at Law Firm B, to issue each of the COBRA clients a second "more-likely-than-not" opinion for a fee of up to $150,000.

26. The objective of COBRA was the complete and permanent elimination of all tax liability on whatever amount of ordinary income or capital gain a client might choose. COBRA, which involved the manipulation of basis in foreign currency options, was E&Y's brand of a strategy also known as the "short option strategy."

27. COBRA was designed, marketed and implemented as a series of pre-planned steps which, within a period of 30 to 45 days, would generate artificial losses sufficient to offset a client's income or gains completely. COBRA was intended to deceive the IRS by making it appear that the client – together with other like-minded individuals – was "investing" in foreign currency options in order to make a profit, and that non-tax business reasons existed for the various steps of the transaction. In reality, in exchange for substantial fees that were calculated as a percentage of the tax loss to be generated for E&Y's clients, the defendants and their co-conspirators provided the clients with a cookie-cutter transaction that utilized almost completely offsetting foreign currency options to generate huge artificial tax losses. The options had little chance of earning the clients any significant profit after the fees were paid. Indeed, although the conspirators repeatedly characterized COBRA as an "investment," the strategy was not offered through E&Y's Investment Advisory Service, but was marketed to clients with more than $20 million in income or gains to offset.

28. COBRA included the following key steps:

a) The client would identify an amount of ordinary income or capital gains on which the client wished to eliminate taxes. The client or E&Y would then identify other individuals who also wished to eliminate their taxes, with whom the client could participate in the transaction.

b) Using J&G, each client would create a wholly-owned limited liability company ("LLC"). That LLC would purchase a digital foreign currency option (the "long option") from a bank, and would sell an almost completely off-setting digital foreign currency option ("the short option") to the same bank. The LLC paid a net amount to the bank

for the pair of options; that amount equaled 5% of the tax loss the client wished to generate (that is, 5% of the income the client wished to eliminate).

c) The two offsetting options constituted a single financial bet between the client and the bank that, at the end of 30 days, a particular foreign currency would have gone up or down in value against another currency by a specific amount. The off-setting option position was priced and structured by arrangement between E&Y and the bank so that if the client won the bet (or, was "in the money") at the end of the 30-day period, the bank would pay the client an amount sufficient to yield a small profit over and above the client's initial 5% contribution, plus the fees associated with the transaction. E&Y told its clients that the odds of that happening were approximately 38%. If the client's option pair was "out of the money" after 30 days, then the client would lose his 5% contribution and his fees. E&Y told its clients that the likelihood of that outcome was approximately 62%. Thus, the defendants and the clients knew from the outset that the clients would probably lose their 5% contribution and their fees.

d) Almost immediately after purchasing the option pair from the bank, each client – acting through his newly created LLC – would contribute the option position to a newly created partnership, also formed by J&G, in which one or more other COBRA clients were also partners. After approximately 30 days, the options would expire. Each client would also contribute a low-value asset to the partnership – an ordinary asset or a capital asset depending on whether the client desired ordinary or capital losses.

e) Each client would then transfer his partnership interest to a new S-Corporation, also formed by J&G. When this occurred, the partnership would automatically terminate. According to the defendants and their co-conspirators, each client could then claim –