IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NO. 05-231-T

---

JZ BUCKINGHAM INVESTMENTS, LLC, as TAX MATTERS PARTNERS of JBJZ PARTNERS, a SOUTH CAROLINA GENERAL PARTNERSHIP,

Plaintiff,

VS.

UNITED STATES OF AMERICA,

Defendant.

VIDEO DEPOSITION OF

JAMES BOYD

Thursday, June 7, 2007

9 AM to 2:30 PM

North Charleston, South Carolina

Reported by: Jane G. LaPorte

EXHIBIT

2

Page 2

APPEARANCES

FOR THE PLAINTIFF

JADE BUCKINGHAM et al
BY: JOHN M. CROUCH
-and- TARA C. CAMPBELL
MEADOWS, COLLIER, REED, COUSINS & BLAU, LLP
901 Main Street
Suite 3700
Dallas, TX 75202
214 744 3700 - telephone
214 747 3732 - fax
jcrouch@meadowscollier.com

FOR THE DEFENDANT

UNITED STATES OF AMERICA
BY: JOHN A. LINDQUIST, III
Senior Trial Attorney
Tax Division
PO Box 55
Washington, DC 20044-0055
202 307 6561 - telephone
202 514 5238 - fax
JOHN.A.LINDQUIST@USDOJ.GOV

Page 3

EXHIBIT INDEX

| EXHIBIT | | |
|---|---|---|
| 155 | PREVIOUSLY MARKED - COBRA ACTION WORK PLAN | 81 |
| 156 | PREVIOUSLY MARKED - E-MAIL | 82 |
| 159 | PREVIOUSLY MARKED - E-MAIL | 75 |
| 164 | PREVIOUSLY MARKED - IRS LETTER OCTOBER 22, 2003 | 175 |
| 166 | PREVIOUSLY MARKED - ERNST & YOUNG JANUARY 3, 2003 | 178 |
| 169 | PREVIOUSLY MARKED LETTER FROM JAMES S AND HAZEL BOYD, APRIL 11, 2002 | 177 |
| 175 | PREVIOUSLY MARKED DEPARTMENT OF THE TREASURY LETTER, 03.25.2003 | 180 |
| 177 | PREVIOUSLY MARKED - ENGAGEMENT LETTER | 34 |
| 178 | PREVIOUSLY MARKED - LETTER | 59 |
| 180 | PREVIOUSLY MARKED - LETTER | 63 |
| 1000 | PREVIOUSLY MARKED 1040 1999 | 152 |
| 1001 | PREVIOUSLY MARKED 1120S 1999 | 149 |
| 1002 | PREVIOUSLY MARKED - 1040 1999 | 158 |
| 1004 | PREVIOUSLY MARKED - 1040 1997 | 164 |
| 1006 | PREVIOUSLY MARKED - E&Y ENGAGEMENT | 64 |
| 1008 | PREVIOUSLY MARKED - LETTER ENTITLED "RE: REPRESENTATIONS" | 124 |
| 1009 | PREVIOUSLY MARKED - FAX | 70 |
| 1010 | PHONE CALL MESSAGE | 88 |
| 1011 | PART OF A CLOSING BINDER | 88 |

(Exhibits Continued)

Page 4

| | | |
|---|---|---|
| 1012 | LETTER TO DEUTSCHE BANK | 114 |
| 1013 | LETTER TO DEUTSCHE BANK | 117 |
| 1014 | JENKENS & GILCHRIST LETTER TO JAMES BOYD | 118 |
| 1015 | JENKENS AND GILCHRIST OPINION | 118 |
| 1016 | PETITION FROM BROWN AND WOOD | 122 |
| 1017 | MAY 30, 2000 LETTER TO DB ALEX BROWN | 138 |
| 1018 | JENKENS & GILCHRIST LETTER NOVEMBER 16, 1999 | 141 |
| 1019 | HANDWRITTEN PAGE - MEMO TO FILE | 146 |
| 1020 | 1040 1999 | 154 |

Page 5

VIDEOGRAPHER: Stand by, please. We are now on the record. Today's date is June 7th, 2007. The time is approximately 9:11 a.m.

This is the videotape deposition of Mr. Jim Boyd taken in the matter in the US Court of Federal Claims, No. 05-231-T, JB Buckingham Investments, et al. versus the United States of America.

Counsel, please introduce yourselves for the video.

MR. CROUCH: John Crouch and Tara Campbell on behalf of the witness and the plaintiffs in this matter.

MR. LINDQUIST: John Lindquist on behalf of the United States of America.

VIDEOGRAPHER: Madam court reporter, please swear in the witness.

JAMES BOYD,

having been first duly sworn, on his oath, testified as follows:

EXAMINATION

BY MR. LINDQUIST:

Q Good morning, Mr. Boyd. My name is John Lindquist.

I'm a trial attorney at the Department of

[illegible] Tax Division.
I'm going to be asking you some questions in what's called a deposition.
Have you ever had your deposition taken before?
A Many times, sir.
Q How long ago was the last time you had your deposition?
A Well, my accident was over four years ago. So it was before four years ago.
So it was probably within the last 20 or 30 years; that's all I could say.
Q Have you ever had your deposition taken with respect to any tax matters?
A No, sir.
But I think I took depositions, because I used to try cases in tax court --
Q Okay.
A -- 35 or 40 years ago.
Q Well, let me start off then. Are you an attorney?
A Yes, sir.
Q And where are you licensed?
A Just in South Carolina.
Q And when did you first become an



attorney?
A I graduated from law school in '65, and I think that the swearing in was probably in September or something of '65.
And -- excuse me -- and then I went on to other graduate schools.
Q And prior to graduating from law school, where did you -- did you do undergraduate?
A Yes, sir.
Q Where was that?
A I actually went to play football at the Citadel in Charleston, South Carolina, and that's where I met my wife. That was the best thing.
Q And where did you graduate from law school in '65?
A The first law school was USC, and I graduated with honors there.
Q And did you go on to get some sort of a Masters after that?
A Yes, sir. I was going to work for an M.A. that's a Doctor of Juridical Science, because I thought I wanted to teach.
And, unfortunately, Uncle Sam wanted me more in Vietnam.
And so I only got to go to NYU for two



years.
And -- but when I finished my tour of duty in Vietnam, the government asked me [illegible] anyplace I wanted to go.
And I said, "Yes, sir. I want to go to New York City, if you have a post there, because I wanted to go to NYU."
Q And did you?
A Yes, sir.
Q And did you then complete your Masters?
A I got my LLM in less than two years; I did it in one-and-a-half years.
Q Was that a Masters of Laws in any particular area?
A It was in taxation.
Q And what was the year that you got your LLM in taxation?
A I think I got my LLM in taxation in August of 1971.
Because I had returned from Vietnam in '69 -- I think it was either '71 or '72 -- and then I went through school very quickly -- NYU.
I had to go through, because I had to get back to Charleston.
Q Uh-huh.



A Because I had been recruited by some lawyers in Charleston.
Q And this was after graduating from NYU?
A I had actually been recruited before I graduated from NYU, and --
THE WITNESS: Can I deviate for a second?
MR. CROUCH: Why don't you just answer his questions.
THE WITNESS: Okay.
Q Answer my questions. Because before we get back to getting back to Charleston, I want to first ask you about your tour of duty in Vietnam. It was a two-year tour?
A No, sir.
Q How long was it?
A It was not quite a full year.
Q And --
A I think it was 11 and a half months.
Q Did you have any combat experience there?
A I was in DaNang, NaTrang and Cam Ranh Bay, but I was not assigned to a fighting unit.
I was assigned to the Engineer Corps, and I used to fly around in little tiny airplanes mainly with generals and stuff like that.

Page 10

Q Did you have some sort of specialty in engineering?
A No. I had a specialty in procurement law.
Q Now, what was the name of the law firm that was recruiting you when you were at NYU?
A It was Austin and Henry Smythe, and they were at [illegible] Moore Smythe and McGee.
And I do remember that was at Five Exchange Street in Charleston.
Q And once you had your LLM in taxation did you then start employment with them?
A Yes. Because my military duty was over in August of '73.
That was why I had to go through in a year and a half. [illegible] two years and --
THE WITNESS: I don't say any more.
Q Did you graduate with any type of distinction from NYU?
A I know I got a lot of As and Bs. But I think I also got some other things, but I don't know.
Q And for how long were you with this first firm, Henry Smythe?
A Excuse me for pausing. I -- just -- I

Page 11

became a managing partner in -- oh, I know it was unusual -- but I became a managing partner in like '76 or '77.
And then I left to form a tax and securities law firm with a couple of friends.
They were partners in another law firm and that was in -- maybe in -- I think 1979.
Q What was the name of that entity that you formed with your friends?
A Evans, Boyd & Carter.
Q Now, did that -- when you had been with Henry Smythe, did you specialize in tax issues?
A Yes, sir.
Q Were you involved in tax litigation at that time?
A They were trying to build a tax practice and I was the first tax lawyer there.
Q Uh-huh.
A And I worked in a number of international and corporate tax transactions, including -- we represented the owners of Kiawah -- excuse me -- we represented the owners of Kiawah, and eventually the Kingdom [illegible] retained me as their tax counsel after the transaction had closed, because they got my -- not just my approvals -- they asked for the

Page 12

approval from all the people involved.
Q My question, though, was a little bit -- and I didn't want to trip you up. But were you involved in any tax litigation at that time when you were with the firm of Henry Smythe?
A I went to the Tax Court, but I think I mainly went to the District Court, US District Court. I never had to go above the District Court.
Q And when you went to the District Court was that with respect to the litigation of tax issues?
A Both tax, as well as, there was some criminal tax involved, too.
Q How long was the firm Evans, Boyd -- and was it Carter -- how long was that -- did that exist --
A (No response.)
Q -- after you formed it around 1979?
A It's still exists, but it's under a different name now.
Q How long did you stay with that partnership?
A (No response.)
Q From about what year?
A Early- to mid-eighties.

Page 13

Q And you indicated that that firm had -- was involved with securities. Was it also involved with taxation?
A Mainly international -- me, mainly -- I did mainly international tax.
I didn't represent many local people. I represented international, multi-national firms that were headquartered in other countries, as well as some in -- headquartered in New York and Chicago and places like that.
Q And during the time that you were associated with Evans, Boyd & Carter, did any of those multi-national tax firms get into tax litigation where they, in fact, needed you to represent them in court?
MR. [illegible]: Clarification. You said multi-national tax firms.
Q Multi-national clients. Did any of the multi-national clients need representation in court by you?
A Not in court, but most of them I did corporate and tax transactions and securities transactions for.
THE WITNESS: Can I say the name of the client?

Page 14

MR. CROUCH: [illegible] probably [illegible] say a
view of the client.
THE WITNESS: Okay.
Q. So you were more involved in -- would it
be fair to say -- structuring transactions at that
time?
A. That was a significant percentage, but I
can't say that that is more than regular [illegible] or
corporate work.
Q. How would you characterize the breakdown
of your practice at that time with Evans, Boyd &
Carter when you represented multi-nationals with
respect to tax matters, part of it was structuring
of the transactions, what would be?
MR. CROUCH: I object to the word
"structuring" as being ambiguous.
Q. Then you can put your words. How would you
break down the basic components of your major
components of your practice at that time?
A. Mergers and acquisitions, [illegible]
things like that.
THE WITNESS: Excuse me.
Q. And after your association with the
partnership with Evans, Boyd & Carter, in the
mid eighties, when you indicated that you then left

Page 15

that firm, where did you go from there?
A. With three other people, I bought a
place called Wild Dunes, which was a resort.
And I did several other acquisitions
and eventually I [illegible] doing work for Mr. Jerry
Zucker.
Q. So were you -- when you left that
firm -- did you set up a private practice? Or a
solo practice?
A. I don't remember. I [illegible] but I know
I continued practice [illegible]
[illegible] like some big international clients, and
then, of course, Mr. Zucker and his companies and
stuff like that.
Q. Did you ever become a corporate counsel
for Mr. -- for any of the entities owned or
controlled by Mr. Zucker?
A. I started being counsel with my former
partner, [illegible], who is now deceased. We did
general work, and I did mergers, acquisitions,
divestitures.
Q. And at that time, were you employed by
Mr. Zucker?
[illegible] for the entities owned or controlled by
Mr. Zucker?

Page 16

MR. CROUCH: You mean employed directly
or a W-2 employee?
MR. [illegible]: Yes.
A. I [illegible] I don't think I
was [illegible]
THE WITNESS: Excuse me.
A. -- I don't think I was an employee
until -- I think it was 1988, when Jerry asked me to
join him, and I became -- I still am a partner -- but
I became an owner of the Intertech Group with
Mr. Zucker.
Q. And that was 1988, that was the year that
you became a partner with Mr. Zucker?
A. (No response.)
Q. Did I get that right, correctly, 1988?
A. I think it was either in 1988 or later
1988. I can't remember which.
Q. And you were a [illegible] with Mr. Zucker of
what?
A. The Intertech Group. It was a holding
company.
And then Mr. Zucker and I made -- I hate
to use the word "many" -- but that was it. It was
many acquisitions, many international acquisitions.
And we also formed [illegible] many

Page 17

companies.
I think we had something like 60 or 70
companies. I don't recall.
Q. What was the nature of your ownership in
terms of stock and percentage when you first joined
with Mr. Zucker in 1988 or --
A. (No response.)
Q. -- as a partner?
A. He was always the controlling owner, as
far as ownership percentage.
Many -- Intertech, we owned 75/25. And
then we would own other holding companies.
But Intertech would own 100 percent or 50
some percent or something like that.
Q. Did the 75/25 percent split with respect
to Intertech ever change after 1988?
A. Not as to Intertech, but we did other
transactions.
I can't tell you how many [illegible] different
percentages.
And -- but Intertech itself, the parent
company, that was always 75/25.
Q. And do you still own 25 percent of
Intertech?
A. No, sir.

Page 18

Q Okay.
A I'm retired.
THE WITNESS: Excuse me.
A I'm retired.
Q I just want to have a brief question in there.
I had asked whether the percentage ever changed.
And so at some point in time, did you sell your 35 percent interest?
A I retained counsel, and they handled the transaction. And Mr. Tucker had counsel.
And I have to be honest with you. I don't remember when the actual sale took place.
But since my accident was in May 2003, I think after I came home from the different hospitals -- brain hospitals -- and everything, I think the neurosurgeons wanted me to withdraw from business with Mr. Tucker.
They said my brain wouldn't probably get -- I couldn't stand the pressure or something. I laughed about that, but --
MR. CROUCH: I think you answered the question.
Q Basically, if I understand what you're

Page 19

saying is that you had an accident in around May of 2003.
And now -- thereafter, your 35 percent interest in Intertech was sold?
A Well, we had many other holdings.
Q First as to Intertech?
MR. CROUCH: Just as to Intertech he's asking you about.
I think he's saying it correctly. He needs the answer from you, not from me.
A When I came back from the brain hospital in Atlanta, which was in 2004 --
MR. CROUCH: I'm sorry. If you don't mind.
THE WITNESS: Okay.
MR. LINDQUIST: I'll ask the question.
Q I want to talk to you about the accident next. But first, just --
MR. CROUCH: It's a simple question.
Q Generally, is it correct, am I correct in understanding that it was around 2003 after your accident that your 35 percent interest in the Intertech Group was sold?
A No, sir.
Q Around what year was it, if you know, that your interest in the Intertech Group was sold?

Page 20

A It was either 2004 or early 2005.
THE WITNESS: Sorry.
MR. CROUCH: That's okay.
Q Now, you referenced an accident in May 2003.
And it sounds like it was a very serious accident.
What happened at that time, briefly?
THE WITNESS: Do I have to talk about it?
MR. LINDQUIST: Well, then if it's upsetting to you, can you tell me --
Q You mentioned that you had a neurosurgeon telling you to stop work?
A Many.
Q Did you -- did the accident require you to have any surgeries? Operations?
A Twenty or 30.
Q Okay.
A I don't remember how many.
Q And I take it, it was a severe accident?
A I was in a coma.
Q As a result of that accident, are you still today taking any medication?
A Yes, sir.

Page 21

Q And what medications are you taking today?
A The only medication that I take today is Celexa -- [illegible] -- it's an anti-depressant. And I take that 40 milligrams or more a day. I don't know.
Q And I assume that's upon the advice of your physician?
A Psychiatrists and physicians -- well, psychiatrists are physicians, excuse me.
Q To your knowledge, has your accident -- has this accident impaired your memory in any way?
A (No response.)
Q I'm not asking like --
MR. CROUCH: He's just trying to get something on the record here.
Q -- like a judicious question, but I need to have you tell me. I can't guess.
A Yes.
Q Has it severely impaired your memory?
A Short term more than long term.
Q So, for instance, what type of short-term items would you have difficulty with --
A (No response.)
Q -- remembering? For instance, what's

Page 22

you go back that does it that the type of short
term?
A Forgive me for being long. I think your
first name is Judd?
Q Yes, sir.
A Is it Hungerford? Longford?
Q It's a name alone. But is it that type of a
short-term memory?
A Yes, sir.
Q And has it in any way impaired your long-
term memory --
A (No response.)
Q -- to your knowledge?
A In my way of thinking, yes. But in some
people's way of thinking, I still have a reasonable
memory.
Q I'm trying to get your perception. Have
you, in the course of your practice of law, ever had
any disciplinary action against you?
A No, sir. I was an AB rated lawyer, even
after I came with Jerry. I retained that AB rating.
In fact, I think I was the youngest
person ever to be an AV rated lawyer.
Q You indicated you still have your license
to practice law; are you still practicing law?

Page 23

A I had it reinstated -- I was retired
medically retired, and then in either March or
April I asked the bar to reinstate it, so I could
do consulting and occasionally accounting and tax
work.
Q And are you currently reinstated?
A Yes, sir.
Q And are you currently consulting --
A (No response.)
Q -- and doing accounting and tax work?
A To a modest degree.
Q Are you doing any work for Mr. Sucher?
A No, sir.
Q Do you recall in 1999 --
MR. CROUCH: 1999?
MR. LINDQUIST: Excuse me.
Q 1999 --
MR. CROUCH: Thank you.
MR. LINDQUIST: My own short-term memory.
Q Do you recall in 1999 knowing a
Mr. Calendar of Ernst & Young?
A Tony Calendar, yes, sir.
Q And can you tell me who is Tony Calendar?
A A good friend, and he also was the lead
accountant on multiple audits that we had for

Page 24

various companies and other activities.
Q Was he an accountant with Ernst & Young?
A He's a regional partner.
Q And was Ernst & Young the accountant for
Intertech in 1999?
A And its holdings, yes, sir.
Q And is it still today?
A Including international holdings.
Q And is it still today?
A I don't know.
Q Do you know whether Ernst & Young was
ever terminated as the accountant for the Intertech
Group?
MR. CROUCH: If you know.
A I don't know.
Q Do you recall from 1999 a Mr. Ken
Knight?
A I recall the name, and I met with him, I
think, once.
Q Do you recall about when it was that you
met with him that once?
A I think 1999.
Q Do you recall what the subject matter of
your meeting with Mr. Knight was?
A Yes, sir.

Page 25

Q What was it?
A He was a salesman -- He was like a
salesman, and he was a -- he prepared and
suggested to --
THE WITNESS: Can I call Mr. Sucher
Jerry?
MR. LINDQUIST: You call him whatever you
want.
A Jerry and I attempt to make some money in
a -- it was a straddle. Maybe it was a hedge. It
an investment transaction.
Q And who else was at that meeting with you
and Mr. Knight, --
A (No response.)
Q -- with respect to this marketing or sale
by --
A With respect to what?
Q This marketing or sale by Mr. Knight?
A I think Mr. Kenney Hughes who was an
associate at E&Y.
Q Was Mr. Sucher there?
A I believe so.
Q Other than the people that you've
mentioned, anybody else?
A I don't believe so.

Page 26

Q Who is Dave Smith?
A A good friend. He is also a regional partner, and he's responsible for five states for Ernst & Young.
He was an international [illegible] expert and he has remained a good friend.
Q Was he at that meeting with Mr. Knight --
A (No response.)
Q -- and Mr. Hughes and Mr. Tucker?
MR. CROUCH: Objection; asked and answered.
A I don't believe so. But I remember talking or having him on the phone one time when -- I think when I was talking to Mr. Knight, I think Mr. Smith was on the phone. But to be honest, I can't swear to it.
Q Now, what was the transaction that Mr. Knight was proposing at that time?
A He suggested or proposed currency hedges or something with options.
Q Now, did he -- he was personally present at that meeting, Mr. Knight was?
A The meeting that was independent of Mr. Smith. He was on a phone call with us.
Q Okay.

Page 27

A But, yes, he was personally present. And I don't think the meeting lasted very long.
Q About how long? Ten minutes? A half hour? An hour? I don't know what you think of --
A Probably a half hour, something like that. He just talked, and we talked.
Q Did he -- did Mr. Knight, at that time, provide you with or show you any papers or documents with respect to the proposed transaction?
A No. He just talked.
Q Did he tell you anything about whether there were any law firms that would be involved with the transaction?
A You have to forgive me. I get [illegible] and things jumbled in my head.
But at some point, he said there were two large prominent law firms that would be involved, but he never said the names.
Q You indicated that you had one meeting with Mr. Knight.
Is it possible that you had more than one meeting with Mr. Knight?
A Anything is possible, but I don't remember.
Q The reason why I ask is, that you said at

Page 28

some point, he said that there were two large prominent law firms.
And you previously had indicated to me that you had one meeting with Mr. Knight.
And I'm trying to understand whether that is an indication that, at some point during this meeting that you are referencing, he said it, or possibly you had more than one meeting or conversation.
A Or telephone conversation I may have had.
I think I learned about the two prominent law firms. I thought they were going to be in New York or Chicago or something, and I probably learned that a couple of months later. I don't know.
Q At the time that you were first approached by Mr. Knight, do you know whether they already had, in fact, developed the proposed transaction, all the details of the proposed transaction, or was this something that was still in process?
A When Mr. Knight met with [illegible] and myself --
MR. CROUCH: Think about what his question was.

Page 29

I want you to answer his question that he's asking you.
THE WITNESS: What was the question again?
MR. CROUCH: Make sure you answer his question.
Q At the time that you were first approached by Mr. Knight, do you know whether Ernst & Young had, in fact, developed the proposed transaction, or was this proposed transaction something that Ernst & Young was still in the process of developing?
MR. CROUCH: The question is: Do you know that?
A I don't know.
Q You indicated the meeting you had in person with Mr. Knight. Was that meeting here at Intertech?
A If my recollection is correct, yes. But --
Q Would Intertech have kept a record of that meeting?
For instance, when I came in the door, I saw that they were writing down names and badges for all the visitors.
In 1999, did Intertech have a practice of

writing down the names of the firms?
A He may have. I don't know.
Q Okay.
A I guess he did.
THE WITNESS: Do you know?
Q Do you know when it was that you first learned about the names of two law firms that were going to be involved in the transaction that you had been discussing with Mr. Knight?
A In recent months, I have learned that I received an opinion from Brown and Wood in mid-March, 2000.
And I think I communicated with a lady at a Jenkens and Gilchrist law firm.
But I didn't receive a formal opinion from Jenkens and Gilchrist until 2004, even though it was dated before 2004.
Q You don't believe you received the J&G opinion until 2004?
A I know for a fact that I didn't receive it until 2004 because I retained the envelope.
Q Do you have that with you here today?
A No, sir, but I can get it for you.
THE WITNESS: Excuse me. Is that -- okay.



Q You indicate that you have recently learned as to the Brown and Wood opinion, that you received that in mid-March of 2000?
A Yes, sir.
Q On what do you base that knowledge? How are you reconstructing that?
A I -- excuse me --
MR. CROUCH: As long as it doesn't violate the attorney/client privilege.
THE WITNESS: I'm trying not to violate the attorney/client privilege.
A I think I got a copy of it from Mr. Crouch.
THE WITNESS: Is that right?
Q And it was dated in March of 2000?
A It was dated in March of 2000, and I must have received it in 2000 because the letter, I think was dated March 15th, or something like that, in 2000.
Q Do you have any memory -- actual memory -- of receiving it in March of 2000?
A I would like to say yes, but I would just be speculating.
Q Is it possible you didn't receive it until later, May of 2000, after the filing of your



tax return?
MR. CROUCH: Objection. Calls for speculation.
A I just don't know, sir.
Q Do you recall what the fee was paid to the firm of Brown and Wood for their opinion?
A A specific date.
Q Yes.
MR. CROUCH: It might help him, counsel, if you showed him documents.
MR. [illegible]: I'm just asking.
Q If you have any recollection -- if you don't, I'll go to the documents -- but I'm asking if you have any recollection.
A I recall Mr. [illegible] and I either wired or [illegible] to be wired some money to the two law firms.
Q And did you pay the two law firms before or after you had received the opinion?
A Well, I didn't receive the Jenkens opinion until June of 2004, so I obviously paid Jenkens before then. But as to Brown and Wood, I don't know.
Q Have you -- do you recall whether the transaction that you discussed with Mr. Knight, whether that was ever called COBRA?



A As of today, I know now it's called COBRA.
But at the time that Mr. Knight appeared on our door step, or whatever, I had never heard of COBRA.
Q What sort of due diligence did you do in 1999 before deciding to purchase the COBRA product?
A Jerry was an expert on Black-Scholes and some other thing called Garman something -- I'm sorry, as I don't remember Garman something -- and so but I did a lot of the -- not a lot -- I did some research on trades related to Section 752, which was basis.
I did preliminary research. I believe, I can't say for certain, but I think I would have on the Section 752 about basis and stuff like that.
Q Did you write any memos?
A Did I?
Q Yes. At that time, all this research that you did, did you keep a folder of research with respect to this transaction?
A Without sounding vain or anything, I used to have a pretty good memory, and you would call it photographic.
And I just would read stuff, and I could

Page 34

remember it?
A I don't believe I wrote anything down. I may have written something -- or something to Jerry about amounts to spend -- for me to put him because he's doing these -- on hedges and stuff like that options.
Q Uh-huh.
A But I don't specifically recall.
Q So you had a photographic memory in 1999 that you could see --
A People used to say that.
Q Was that your understanding, that you could see your memory -- you could see something once and you could recall it?
A Not quite as good as my grandfather, who taught at Harvard, or my uncle, because they had classic photographic memories. But I had a very good memory.
Q And before you did this research, what was -- how did you understand -- how did you learn about how the transaction was, in fact, going to be implemented, the details of the transaction; how did you understand the transaction?
A My main discussions were with Jerry. And we talked, to the best of my recollection, about

Page 35

different currencies.
Q Okay.
A Because we used to do a lot of hedging. I can't tell you specifically. But Jerry would do hedging in the hundreds of millions of dollars.
And I think I was a participant in some of those.
For corporate purposes, we used to do hedging for Europe, England, Italy, Canada; we did a lot of Canada -- hedging in Canada.
THE WITNESS: Excuse me.
Q My question for you is: How did you -- did you, at any time, learn the details of how this proposed COBRA transaction was to be implemented?
A Can I answer it in two parts?
Q Answer it any way you want.
A I kind of was riding Jerry's coattails on a lot of things.
But I wanted to -- as he did, very much so, we wanted to make money.
And we talked a lot about different currencies. Jerry and I did. I never talked about them with -- that I can remember -- with a lot of other people. But Jerry and I used to talk about currencies all the time.

Page 36

And I seem to recall -- please don't hold me to this -- but Jerry came to me and said we could make something like 45 or 50 million dollars.
And then he talked about -- that he might want to do something larger to make more money.
And, of course, my percentage was only ten percent in this transaction.
Q Why was that, that your percentage in this transaction was ten percent?
A We had differing percentages on many investments that we did.
And it all basically, because I was reasonably wealthy, but Jerry was very wealthy.
And Jerry had the ability to do more and put more at risk than I could -- or at least he was willing to put more at risk than I could.
Q What was the transaction in which you had a 90/10 split, at that time, that you are referencing?
A Or -- You're asking 90/10?
Q Yes.
A Jerry and I had a 90/10 split in an investment involving -- I specifically recall Euro dollar hedges.
And I think Jerry did yen and dollars.

Page 37

And I wanted to know -- could we do Canadian dollars and US dollars. But I remember specifically Euro and dollars.
Q Other than the COBRA transaction, which I believe involved -- ultimately, there was a Euro -- you purchased Euros, and I think Jerry purchased Euros and Yen options.
You indicated that when you went into the COBRA transaction, you only had a 10 percent split and Jerry had a 90 percent split of that transaction, which I believed involved $50 million in terms of the longs.
A I thought, at one time, he talked about -- excuse me -- you didn't ask a question. I'm sorry.
Q You think I'm incorrect? You indicated sometimes he talked about $150 million?
A I think at one time $100 million came up.
Q Yes.
A And I said, "That is too much risk for me."
And I only wanted to be at risk for a couple million dollars, which I could handle.
Q So, when you first discussed the COBRA transaction, you were discussing a 10 percent/90

Page 38

percent entity something like that?

MR. CROUCH: Objection; assumes facts not in evidence.

A I didn't know what it was called COBRA but what we were discussing was hedging.

Q Uh-huh.

A And Jerry talked to me about the possibility of taking hedging positions at larger amounts than what we actually did.

MR. CROUCH: Sir, I think you need to listen to what the question is and answer exactly what he's asking.

THE WITNESS: I apologize. Could I go to the bathroom?

MR. CROUCH: Can we take a break?

MR. LINDQUIST: Absolutely.

VIDEOGRAPHER: We will now go off the record. The time is approximately 10:[illegible].

(OFF THE RECORD.)

VIDEOGRAPHER: Is everybody ready?

MR. LINDQUIST: Yes.

VIDEOGRAPHER: Okay. Mr. Lindquist, you all set?

MR. LINDQUIST: Yes, I am. [illegible]

VIDEOGRAPHER: Stand by, please.

Page 39

We are now back on the record. The time is approximately 10:[illegible].

MR. LINDQUIST: Thank you.

Q Mr. Boyd, do you know if you ever signed an engagement letter with Ernst & Young with respect to the COBRA transaction?

A To be honest, I don't recall.

Q Do you know whether there was ever any discussion of doing a COBRA transaction for $100 million desired loss?

A Loss?

Q Yes.

A Between me -- no -- I remember talking with Jerry, but he was on with real big numbers about profit. But I don't ever recall a talk about a loss.

Q You don't recall talking about a desired loss?

A No, sir.

Q You referenced earlier the fact that you only had a 10 percent participation in the COBRA transaction, because in other deals you also had a 10 percent participation with Mr. Tucker.

Was there some other transaction that you are specifically referencing where you only had a ten percent participation with Mr. Tucker, other

Page 40

than the COBRA transaction, which you then had a ten percent participation in?

A I don't recall. But I know that in some transactions I had more interest than what Mr. Tucker did.

Q But --

THE WITNESS: -- excuse me -- I shouldn't answer more than that.

A I don't know.

Q What sort of discussions did you have with Mr. Tucker in the fall of 1999 as to the amount of risk that you wanted to take in the COBRA transaction?

A I can only remember one discussion, and that was like maybe two and a half or $3 million at risk or actual cash or something.

Q You're paraphrasing, and I don't quite understand.

A I'm sorry.

Q You said it was like maybe two and a half or $3 million at risk or actual cash or something.

Can you put that into -- explain what you mean by that statement.

A I'm sorry. I can't.

Q So am I to understand that you did not

Page 41

want to risk more than two and a half or $3 million in actual cash, as your loss?

A I think, at that time, I was concerned my exposure would be what I felt relatively in certain and would not be more than well [illegible] -- nothing big like Jerry would do.

Q At that time, were you providing any type of legal advice to Mr. Tucker with respect to the transaction being proposed by Mr. Wright?

A We were partners, and I thought it was my obligation to check out things, like taxes, and would we get taxes and was that appropriate, and we were doing the right thing.

And Jerry used to ask me a lot of tax questions, but I can't tell you exactly what he asked me.

Q Did you rely upon Mr. Tucker as to the financial side of the transaction?

A Jerry is a financial genius, but I thought that I was reasonably -- about [illegible] and that kind of profit -- but I really relied on Mr. Tucker, because he was an expert.

Q Did Mr. Tucker ever discuss with you whether or not the fee being charged by Deutsche Bank for the options transactions that you engaged

Page 42

with it Mr. Tucker whether or not that fee was a reasonable fee?

A I don't recall.

Q Did you or Mr. Tucker ever discuss what the fee was that was being paid to Deutsche Bank in that transaction as part of the premium you were paying?

A In all honesty, I don't recall.

Q I previously asked you what sort of due diligence you did with respect to the transaction.

And specifically, I want to focus you on what type of documentation you obtained from Ernst & Young prior to engaging in the transaction.

MR. CROUCH: Is there a question?

MR. [illegible]: Yes.

A Documentation, you said?

Q Yes. Did you receive any documentation from Ernst & Young as to what the product was that you were purchasing from them?

A No, sir.

Q Was that a normal practice for you to have a proposed transaction without any written description as to what the proposed transaction was going to be?

MR. CROUCH: Object to the word "normal practice"; it's vague and ambiguous.

Page 43

A Jerry and I used to do a lot of hedging and other things like that.

And I don't think -- I don't recall ever getting something formal or anything like that.

Q You keep using the word "hedging" with respect to the COBRA transactions.

Was there any particular type of -- was there any particular type of risks that you were -- you and Jerry were planning to hedge with respect to the COBRA transactions?

A You keep referring to "COBRA." I didn't know the name COBRA at this time.

Q Then for convenience sake I'm using the word COBRA.

A Okay.

Q But this proposed transaction that you were going to purchase from Ernst & Young, was there any particular type of risk that you and Jerry needed to hedge at that time?

A Not formal in the word hedge, but we did long and short positions.

But I don't think we used the word ourselves "hedging" like we would do for corporate purposes.

Page 44

Q As part of this transaction being proposed by Ernst & Young, you recall that there were offsetting positions, long and short?

A Yes, sir.

Q And why were there offsetting positions?

MR. CROUCH: Objection to the word "offsetting"; vague and ambiguous.

A I don't recall the word "offsetting," but I remember that we did a long -- we did a long option and we did a short option.

But I don't recall specifically similar to what Mr. Ostrow said, that they were offsetting or anything. They were independent transactions.

I just -- I remember doing two independent transactions.

Q And how much was the long option that you purchased from Deutsche Bank?

MR. CROUCH: Are you talking about him personally?

Or as part of the whole transaction?

Q No. You personally.

A I seem to recall something like two and a half million or something like that, but I can't be specific.

Q There was an LLC that was formed. Do you recall the name JCB Holdings -- or I think was the name. I may have the wrong name.

Page 45

A I had had that as an entity before.

Q Why was the LLC formed in the fall of 1999 by that name?

MR. CROUCH: Objection; assumes facts not in evidence.

A I can only assume I formed an LLC because it had -- they have limited liability -- or it was for investment purposes.

Q Do you know why the options that you purchased were purchased purportedly through this LLC?

A I don't recall.

Q Do you know why the options -- the purchase through this LLC -- were then contributed to a partnership?

A I seem to have a recollection that Jerry and I talked about spreading or diversifying our portfolios, or doing things. But I just don't recall.

Q Do you know why it was that you did not just purchase the options through the partnership -- you and Jerry?

A I don't recall. I'm sorry.

Page 46

Q Do you know -- do you have any recollection as to whether there was any type of a timeline with respect to the transaction -- this thing that was called -- has since been called COBRA?

A Well, I do remember under Black Scholes you used to look at different timelines or things -- different kinds of timelines.

But I remember that Cathy and I wanted to make money for -- I think at the 1999 -- because we -- 1999, and but I don't recall specific reasons to do timelines other than the Black-Scholes that we -- because you have to look at timelines for Black-Scholes.

Q Why did you do a 30-day option?

A Greed. I don't know. Greed. I don't know.

Q I mean, did you ever discuss why not do a 60-day or 90-option?

A What things under Black-Scholes were computed -- from -- that I recall.

But I don't recall specifically discussing 30 days, 60 days, 90 days. I don't recall.

Q Do you ever recall having any discussion

Page 47

regarding the fact the transaction had to be closed out before the end of the tax year of 1999?

A (No response.)

Q Which would have meant you couldn't have gone beyond 30 days?

MR. CROUCH: If you recall.

A I don't recall.

THE WITNESS: I'm sorry.

A I don't recall.

MR. CROUCH: That's okay.

Q Do you recall whether there was any type of a non-disclosure agreement that you were required to sign by Ernst & Young with respect to this transaction that they were discussing with you?

A No, sir.

Q Do you recall whether you were required to sign a document prepared by the law firm of Jenkens and Gilchrist?

A You mean non-disclosure?

Q No. Documents to implement the transaction.

A Yes, sir. And that was when I first knew about Jenkens and Gilchrist.

But I never knew about Brown and Wood because they weren't involved.

Page 48

Some lady named Guerin -- Donna Guerin was somebody from Jenkens and Gilchrist.

Q Uh-huh.

A Donna Guerin used to send stuff to us by fax -- or something -- to us.

Q Did you ever call up Donna Guerin?

A I probably did, but I don't recall.

Q Did you ever call up R. J. Ruble?

A Who?

Q Mr. Ruble of Brown and Wood?

A I have never heard that name before.

Q Did you ever call up Susan Sadosa, his assistant?

A I never heard that name before.

Q Did you ever speak with Paul Daugerdas at Jenkens and Gilchrist?

A No.

Q Did you ever speak to any other attorneys at Jenkens and Gilchrist?

A Can I ask a question?

Q Sure.

A Was Donna Guerin an attorney?

Q Yes, she was.

A I don't recall.

Q Other than Donna Guerin, who you indicate

Page 49

that you communicated with in writing, did you speak with any attorneys at Jenkens and Gilchrist?

A I didn't speak with, but I received letters from -- who was that guy you mentioned?

Q Paul Daugerdas.

A I remember his name or something, but I don't remember him. I don't remember talking to him.

Q Were you ever asked to sign a certification of facts in support of a Brown and Wood opinion?

A Well, I didn't know who Brown and Wood was until I received their opinion.

So, maybe I did. I don't know. I may have, but I don't know.

Q So, is it your recollection today that when you received the Brown and Wood opinion, it was a surprise?

A In all honesty, I think yes.

Q Okay.

A Because I didn't know that they were involved -- as far as -- I used to deal with Brown and Wood on bond deals, tax deals many, many years before.

They were an expert underwriters counsel.

Page 50

a bond deal?

But I didn't know that they were involved in anything until Ernst & Young.

Q You indicated that earlier on in the transaction when you were talking to Mr. Knight, he had referenced there were two law firms involved.

Who did you understand the second law firm to be?

A I had no idea, but I just surmised that it may have been a firm that represented Ernst & Young, or something like that.

And would have probably been in either like New York or Chicago or something like that. But I didn't -- I don't know.

Q Did you ever -- did you think that it was appropriate to inquire as to who the law firm would be?

A It probably would have been, but I don't recall ever doing it.

Q Were you planning, at any time after you decided to engage in this transaction that's been called COBRA -- did you -- did you plan at any time to rely upon opinions to be issued by these two law firms that were referenced by Mr. Knight?

MR. CROUCH: Do you understand the

Page 51

question?

THE WITNESS: I think I do.

MR. CROUCH: Okay.

A The best as I can recall, is that at some point in time, either Jerry or I was told that there would be one or two law firms that would render an opinion or something -- that should be it.

Q Did Jerry at any time ask you to write an opinion to support him on this transaction?

A We used to do hedges all the time and currency swaps and things like that, and he never asked me for an opinion before.

He just would ask my advice on different currencies, like lira or pound, because the Euro hadn't -- I don't know if they had come into existence by then.

I don't know if it came into existence by then, but the main one pound and lira and Deutschmark and Canadian dollars.

But he never asked me for an opinion, but he would sometimes ask me: Do you think this is a wise thing to do on currency or hedging -- because we used to do hundreds of millions of dollars of hedges of debt and stuff like that.

Q When you did these hundreds of millions

Page 52

of hedges on debt and currencies, did you deal directly with the financial institution to get that trade through for you?

A Jerry and I used to deal with --

MR. CROUCH: You need to answer the question.

A I don't know. I can't remember.

Q Did you have any type of relationship with -- you and/or Jerry -- have any relationship with any financial institutions that did hedges?

A Yes, sir.

Q And which institutions were those?

A Morgan Stanley, Dean Witter, but they were acquired by Morgan Stanley.

Q Was there any particular individual that you recall that you had financial contact with at Morgan Stanley?

A About hedges?

Q Yeah. If you had wanted to get a hedge through, who would you have contacted?

A We also used to deal with J.P. Morgan Chase.

Q Uh-huh.

A And Bank of America, First Union and CitiBank, but I don't recall names.

Page 53

Q At Morgan Stanley, do you recall any specific names?

A At Morgan Stanley?

Q Yes.

MR. CROUCH: If you can remember.

A I don't remember specifically.

Q If you had wanted to purchase Euros, a long or a short on Euros in 1999, do you think you could have done that directly through Morgan Stanley?

A We used to deal in pounds and lira. And I think even Deutschmarks.

But I think we dealt in many currencies in '99. Euro was a new currency, new currency around that time.

Q Uh-huh.

A I think they came into existence in either '98 or '99.

Q Could you have purchased it directly through Morgan Stanley with whom you had a relationship?

A And also banks.

Q Yes.

A Yes, sir.

Q Is the answer yes?

Page 54

A Yes, sir, I think so.

Q Allow me to show you what's been previously marked as Government Exhibit 17?

MR. CROUCH: Is this one of those from yesterday.

MR. LINDQUIST: Yes, it is.

THE WITNESS: Can I show this to Mr. Crouch?

MR. LINDQUIST: I believe he has a copy right there.

MR. CROUCH: I have one right here.

(PREVIOUSLY MARKED EXHIBIT 17.)

Q This is a copy of an engagement letter signed by Mr. Fisher dated November 11 of 1999. First off, have you ever seen this document before?

A Probably, but I can't specifically say yes, but I probably have. There's a note here above Jerry's signature, says $100 million.

MR. CROUCH: He didn't ask you that question.

THE WITNESS: Excuse me.

Q Well, let's go to the back, the second page, I should say, of this.

Page 55

And is -- can you read Jerry's handwriting there, that note that you are referencing?

A Is this where you are reading from, "$100 million"?

Q "$100 million losses to be allocated at 50/50 between the parties" --

A Subject to clarification.

Q -- of second paragraph on first page.

A Second paragraph. What is that?

Q The second paragraph on the first page states: "In this engagement, we will be using information provided by you and the partnership and will not be relying upon --"

MR. CROUCH: I think you misstated what that says. It says it will be relied on.

Q I'm sorry. "In this engagement, we will be using information provided by you and the partnership will be relying upon you and the partnership for the accuracy and completeness of this information."

That's the first sentence. And there is some handwriting next to that with a question mark which amounts to any

Page 56

something like, "What information?"

A Yes, sir, I see that.

Q Do you recall any discussion with Mr. Fisher about this paragraph?

MR. CROUCH: Objection, foundation.

THE WITNESS: Can I answer it?

MR. CROUCH: Yes, you may.

A I don't recall it.

THE WITNESS: Can I clear up something.

MR. CROUCH: No.

THE WITNESS: Okay.

Q If you take a look at the third paragraph down --

A Yes, sir.

Q -- that first sentence -- sorry, I think I'm reading it correctly, the second sentence that states: "Investment in partnership equals cost of loss-portion treatment equal to five percent of desired loss plus cash equal to two percent of the desired loss."

I previously used the phrase "desired loss," and you didn't appear to recall that phrase. Does this refresh your recollection?

A I don't ever recall this letter. No, sir.

Page 57

Q Just whether that reading that refreshes your recollection of any discussion with respect to the phrase "desired loss"?

A No. I remember talking about profit of $150 million, $100 million once and $50 million once, but I don't recall any discussion about loss or anything.

Q You previously indicated that you had some recollection that you and Jerry had originally talked about a larger transaction of around -- I think you said $100 million?

A Jerry did; I didn't.

Q Okay.

A Basically.

Q And this handwriting on the second page references the phrase -- references the fact that this is a $100 million loss at 50/50 between the parties.

Were you supposed to be the other party with the two percent loss?

A He talked to me about --

MR. CROUCH: Objection, foundation.

THE WITNESS: Excuse me.

MR. CROUCH: Go ahead.

A He talked to me about a profit of $100

Page 58

million.

And I said: How much risk does that involve?

And I think it was much more than I personally wanted to be at risk.

Q Did you ever try [illegible] any $[illegible] million in profit, as opposed to $100 million in loss?

A Yes, sir.

Q That isn't a misstatement?

A I remember talking, and I remember Mr. Crocker and I discussed -- it was either $100 million, or what he finally talked about was maybe $50 million.

But that was always profit. It was never -- never a loss.

THE WITNESS: Do you want this back?

MR. LINDQUIST: Just put it right down there.

Q Allow me to show you what's been previously marked as Exhibit 178.

MR. LINDQUIST: And counsel, you should have a copy of that from the other day.

MR. CROUCH: I do. I have a copy right here.

(PREVIOUSLY MARKED EXHIBIT 178.)

Page 59

THE WITNESS: Okay.

Q This is a letter dated November 15 of 1999, a few days later, from Mr. Knight to Mr. Crocker.

And with this, he's saying that he's forwarding a modified engagement letter -- and states two legal opinions from reputable law firms will be provided.

Do you recall ever seeing this document?

A Where does it say -- oh, yes. Two legal opinions -- or --

But I remember Jerry talked to me about a fallback position: that if we didn't hit the numbers, that the worst case was that we could take a loss. But it was always a fallback.

THE WITNESS: You want this?

MR. CROUCH: He's probably not done asking you questions yet.

THE WITNESS: Excuse me.

Q Did you ever understand that the amount of the fee to be paid to Ernst & Young on this transaction was one-and-a-half percent of the desired loss, as reflected on this Exhibit 178?

MR. CROUCH: Objection; foundation.

A No, sir.

Page 60

Q If you take a look at the -- at the front page of Exhibit 178, below the E&Y fee at one-and-a-half percent, it states that: The law firms and bank (billed separately from E&Y) three percent.

Did you ever have any understanding as to how the amount to be paid to the law firms was supposed to be computed?

MR. CROUCH: Objection; foundation.

A No. I just thought they were billing on a fixed flat fee. I never saw that.

Q Do you recall what that fixed flat fee -- excuse me.

A It was fat.

Q Fixed fat flat fee -- I won't do that -- how that fixed flat fee was -- how much it was?

A I don't recall specifically, but I think it was in seven figures.

Q How the disparity between the fee to be paid to Jenkens and Gilchrist, and the fee to be paid to Brown and Wood?

A I didn't even know about Brown and Wood, so I can't answer that.

Q Here it indicates that the -- on this -- that the fee to be paid to the law firms to be

Page 61

billed separately is going to aggregate a flat three percent of the desired loss.

Does that refresh your recollection?

A No, sir. I have never seen this before.

And no percentage was ever mentioned to me.

Q Below the bottom line of this letter recites that the amount of the loss is $57 million, of which 40 percent is to be ordinary loss and 60 percent is the long-term capital loss.

Do you recall having any discussion with Jerry as to the breakdown of the loss: 40 percent and 60 percent?

MR. CROUCH: Objection; foundation.

A Not that I recall. I was aware of Section 988, which talked about gain, how you treated gain between ordinary and capital under the Code Section 988. But I don't recall any of this.

Q So you do not recall that it was -- that the prior agreement was to generate a loss of $57 million?

A Agreement with whom?

Q With Ernst & Young.

A No, sir. I don't recall anything.

Q And you don't recall that the prior

Page 62

agreement as of November 15 of 1999 you [illegible] 60 percent [illegible] and 40 percent long-term loans?
MR. [illegible]: If you know.
A No, sir.
Q And then the last line here says that: The allocation of the partnership interests is [illegible] 10 percent is allocated to Jim.
Are you the Jim being referred to here?
A I would assume so. Because I had -- my interest in the currency hedge was ten percent.
Q Well, at this point in time, November 15 of 1999, the hedge had not yet been made -- or not yet been done.
A Okay.
Q And the fee had not yet been paid.
MR. [illegible]: Objection; assumes facts not in evidence.
Q Do you recall some sort of discussion that you had with Mr. Tucker or somebody else to let Mr. Knight know that you were going to be participating ten percent in this transaction?
A I don't know. I'm sorry. I don't know.
Q Allow me to show you what I believe has been previously marked as Exhibit 180.

Page 63

THE WITNESS: Do you have this?
MR. [illegible]: I do.
(PREVIOUSLY MARKED EXHIBIT 180.)
Q This is a fax from Mr. Knight to Jenkens and Gilchrist dated November 13 of 1999.
And this fax was sent two days before Exhibit 179 that we just looked at.
So at this point in time Mr. Knight is sending a fax to Jenkens Gilchrist with respect to your proposed transaction.
Mr. Boyd, if you look on the front page it's referenced as partnership number three. Mr. Boyd and Mr. Tucker are listed.
And if you turn to the last two pages of this document, you will find what is entitled a COBRA Client Information Questionnaire that had been completed for both you and Mr. Tucker.
A That's not my writing.
Q I didn't say that it was.
A Excuse me.
Q I said it had been completed. And my first question, after directing your attention to it is, have you ever seen this COBRA Client Information Questionnaire before?
A I don't recall, sir, but I would say no

Page 64

Q How did Mr. Knight obtain this information to fill in on this sheet?
For instance, he fills in your name at the top.
And then the name, I believe, of your -- is that Carol Ann Boyd your wife?
A She's named after [illegible].
Q Did you provide that information to Mr. Knight?
MR. [illegible]: Objection; assumes facts not in evidence; foundation.
Another objection -- I can't remember what it is now.
A I didn't, sir. But maybe Jerry might have. I don't know.
Q Is that, in fact -- was that, in fact, your address in 1999, 3510 [illegible] Road, Johns Island?
A Johns Island. I had a house there, yes.
Q And were those your phone numbers at -- those numbers and fax numbers at that time?
A I can answer about the phone numbers, but I can't recall the fax numbers.
Q As to the phone numbers, were those your

Page 65

phone numbers at that time?
A Both here at the Interteck Group and my house, yes, sir.
Q And were those your Social Security numbers?
A Yes, sir. And I have to say -- that's my wife's Social Security number, but I don't recall it.
Q And there's a bank reference here that is about four lines up from the bottom. Chase Manhattan; was that your bank?
A I used to do business with Chase Manhattan before they merged with J.P. Morgan.
Q And it lists your approximate annual household income and approximate net worth. Are these accurate, $[illegible] million plus for annual household income and $10 million plus for net worth?
A I think the net worth was understated but the annual household income -- that was right if I got a plus after it, yes. That would have been correct.
Q How do you recall whether you provided the information about your annual income and net worth to Mr. Knight?
MR. [illegible]: Objection; foundation. Calls

Page 66

for speculation.

A I don't recall.

THE WITNESS: Can I say one thing?

MR. LINDQUIST: Yes, sir.

MR. CROUCH: You need to answer his questions when he asks his questions.

A I don't recall ever saying that.

MR. LINDQUIST: Okay.

Q Do you recall ever providing that information to Mr. Wright in any way?

A No, sir. I don't recall.

Q Do you recall authorizing anyone to provide that information to Mr. Wright on your behalf?

A Jerry and I had a relationship where he could provide information about me, or I could provide information about him.

But I don't recall a specific written document.

Q And then the amount of the transaction is written down on here.

And it appears that the amount has been -- the original amount has been crossed out and in lieu of it, the number that looks like it used to be something like $3 million. It looks like it's

Page 67

been increased to $5 million.

Do you recall any discussion about the fact that you were going to participate in a $5 million transaction?

MR. CROUCH: Objection; asked and answered.

THE WITNESS: Excuse me. Where is that?

Q Amount of transaction. It's on the one, two, three, four, five, six -- seventh line up from the bottom.

A I don't recall.

Q And the amount of the ordinary income, you'll see that there's an amount that has been crossed out, and the number 60 percent appears.

Is any of that handwriting your handwriting?

A No, sir.

Q Now, there are lots -- it appears that there are different handwritings on here, but --

So, I would ask you to take a careful look to make sure none of that's yours.

A None of it's mine.

Q Did you have any particular need for a loss -- an ordinary income loss -- of $3 million in 1999?

Page 68

MR. CROUCH: Objection; vague and ambiguous.

A No. But a profit of many millions of dollars is what Jerry and I talked about, and that would have been nice.

Q Understood; a profit would always be nice, but it appears this document is planning for a $3 million ordinary loss back in November of 1999?

MR. CROUCH: Objection; calls for speculation, no foundation.

A No, no, sir. I don't know, sir.

Q And it appears that from this document that there's also a plan for a capital loss.

Were you planning for a capital loss at that time?

MR. CROUCH: Objection; assumes facts not in evidence.

A Not to my recollection.

THE WITNESS: Excuse me.

MR. CROUCH: Can we take a break?

MR. LINDQUIST: Absolutely, sir.

VIDEOGRAPHER: Going off the record; the time is approximately 10:57.

(OFF THE RECORD.)

VIDEOGRAPHER: Everybody set? Stand by,

Page 69

please.

We are now back on the record. The time is approximately 11:13.

Q (BY MR. LINDQUIST:) Mr. Boyd, allow me to show you what has been previously marked as Exhibit 1006.

MR. CROUCH: I have a copy of that.

MR. LINDQUIST: You should have a copy of that one as well, counsel.

MR. CROUCH: I do.

(PREVIOUSLY MARKED EXHIBIT 1006.)

Q This is an E&Y engagement letter addressed to you of November 15, 1999.

I'm going to ask you whether you recall receiving this?

A To be honest, I don't recall.

Q Okay.

A I don't think I did, but I don't recall.

Q It references in the third paragraph down a fee of $75,000 to be paid to Ernst & Young by you.

Do you recall paying Ernst & Young $75,000 with respect to the COBRA strategy referenced in this letter?

A I must have paid them. I don't remember.

Page 70

[illegible] the amount [illegible]
Q. It talks about in that third paragraph -- it also says -- in the second sentence in reference that the amount of the -- the amounts to be paid are in reference to the desired loan.
Do you see that phrase "desired loan" in that sentence?
A. I see that. But I don't recall this letter.
And I don't recall -- I didn't sign it. So I don't recall it.
Q. Do you recall not ever -- you indicated that, you -- this is not initialed by you on the second page -- this particular copy.
Do you, in fact, have an independent recollection, now, that you received something like this and refused to sign it?
A. I don't recall receiving this, sir.
Q. Allow me to show you what's been previously marked as Exhibit 1009.
(Previously marked Exhibit 1009.)
Q. This is a fax. It appears to be from you to Susan Gentile. Is that your handwriting?
A. Yes, sir. It's my handwriting.
Q. It appears to me -- and correct me if

Page 71

I'm wrong -- "Dear [illegible]. After receiving clarification from Ray Knight of the [illegible] the $140,000 referenced in attached letter and instructions authorizing $150,000 to be wired. Please note I have approved the -- and what is that -- incremental amounts also have left a voice mail message for you confirming the approval. Thanks, Jim Boyd."
A. That's me writing, sir.
Q. Did I accurately read your handwriting?
A. Yes, sir. I don't see -- I don't understand what that word -- I think it looks like something like [illegible] something [illegible] -- maybe it is incremental. I don't know. But that's my handwriting.
Q. If you take a look at the next page, this is a letter addressed to you from Jenkens and Gilchrist.
And it appears that it has been initialed by you on December 20th of 1999.
That's on the third page of this document. Is that your initials?
A. That's my signature.
Q. Okay.
A. But it's a very [illegible] -- [illegible]

Page 72

signature.
Q. Do you recall why a $140,000 fee was being [illegible] a $150,000 fee?
A. In all honesty, no.
Q. Do you recall leaving this voice mail message for Susan Gentile?
A. In all honesty, no. But that's my handwriting.
Q. Do you recall a discussion with Ray Knight on or about this date of December 20 of 1999 that is referenced in your handwritten note?
A. Well, if it says it, I must have done it. But I don't recall it.
Q. If you turn to the last page, where is this money being wired from and to?
A. It says: Wiring instructions [illegible] to Deutsche Bank, Alex Brown.
Q. Which?
A. So that's where it must have gone to.
Q. Okay.
A. I don't know. But that's my [illegible]
Q. Was it your understanding that this was your payment to Jenkens and Gilchrist for its opinion letter to be issued to you?
A. I don't know. I just know my signature

Page 73

is about wiring money. But I don't know what it was for.
Q. Well, then, let's turn to the second page of this fax, the last paragraph on that page.
MR. CROUCH: Are you talking about page one of the letter, counsel?
Make sure [illegible] I got the right page here.
MR. [illegible]: Page two of the letter, the second page of the document.
MR. CROUCH: Okay.
Q. At the Bates No. [illegible]
A. Right.
Q. It says: "The amount charged for the legal opinions we provide to you will be based on a fixed fee of $140,000 for our advice and assistance in the facilitation and execution of European digital foreign currency option investment transactions in the amount of approximately $5 million.
The documentation of the transaction and our research and the rendering of a 'more likely than not' tax opinion setting forth our conclusions and rationale."
Having read through that paragraph, does that refresh your recollection as to whether your

Page 74

for [illegible] you for those services?

A I'm just reading it now. I don't know. I don't know what it was for.

Q So, other than reading it now, you don't have any recollection?

A No, sir.

Q Did you, as an attorney, form any opinion as to whether or not you could rely upon an opinion being issued by the same firm that had designed and was going to implement the transaction --

MR. CROUCH: Objection; assumes facts not in evidence.

Q -- for you.

A You said designed?

Q Yes.

A I had no idea that somebody designed [illegible], other than Ernst & Young.

Q Did you have any opinion as to whether or not you could rely upon an opinion from the same law firm that was implementing the transaction for you?

MR. CROUCH: Same objection; assumes facts not in evidence.

A To be honest, I don't recall that, but I -- between I talked to Ernst & Young, I --

Q Were you going to get an opinion from

Page 75

Ernst & Young?

A I don't recall.

Q Did you ask for an opinion from Ernst & Young?

A I don't think so.

Q I'll show you what's been previously marked as Government Exhibit 159.

(Government Exhibit Number 159.)

Q This is an internal Ernst & Young e-mail dated November 11 of 1999 by which is distributed to various people within Ernst & Young, including Mr. Knight, who is listed on the addressee list here, a copy of what is attached, and that is a COBRA PowerPoint.

You can see the names of the attachment on the front page here, and then the attachment follows.

A I have never seen this, sir.

Q That's my question for you. If you take a look at the second page, this is the first page of the PowerPoint, and then it has the number of pages that follow.

And so I want to first ask you to take a look at that attachment and tell me whether or not you have ever seen this or have ever shown this.

Page 76

MR. CROUCH: Objection; vague and outside the attorney/client privilege.

MR. LINDQUIST: I'm sorry.

Q Whether you were ever shown this in 1999 or 2000.

A No, sir. Never saw it. This is the first time I have ever heard it.

Q The PowerPoint goes through and describes a number of steps.

Did Mr. Knight ever discuss with you what the steps of the proposed transaction would be that you were going to be purchasing from Ernst & Young?

A What page, sir?

Q If you turn to, for instance, page three of the PowerPoint, has the title: Step One, Option Contracts.

A Got it.

Q And it has Bates No. [illegible].

MR. CROUCH: That's it. The Bates numbers there.

Q That's where step one is.

The next page is step two.

The next page is step three.

The next page is step four.

And then it has step five.

Page 77

And the question is: Did Mr. Knight ever discuss with you what the planned steps of the transaction that you were going to undertake were to be?

A I don't recall, but he must have. I don't know.

Q If you turn to page eight of the PowerPoint, and that's at 7033 EY 7758 --

A Okay, sir.

Q -- there is an executive summary.

A Yes, sir.

Q And the first bullet there is: "Taxpayer and other non-related individual" is referenced there.

Do you recall discussing with Mr. Knight as to who would participate in the transaction?

MR. CROUCH: Objection; foundation.

A I don't recall, sir.

Q Do you ever recall discussing with Mr. Knight how the strike price of the options were to be determined after 30 days?

A Strike price --

MR. CROUCH: Objection; assumes facts not in evidence.

A I'm certain, because strike price is part

Page 78

of all of it.

But I don't know if I did discuss it with him, or if Jerry discussed it with him. I don't know.

Q. Do you know if you -- prior to this, you had ever engaged in a European digital option transaction?

MR. CROUCH: Objection. Vague and ambiguous as to before this.

Q. Before -- before November of 1999.

A. I may have, but they are different from American digital options.

Q. How -- do you know what the difference is?

A. Yes. A European digital option, you can only exercise on the expiry date, the date that it expires.

And the American option, you can actually exercise at any time up to and including date of the expire.

Q. Did you know at the time of November of 1999?

A. It's strange. That's something I do remember because I used to know that.

Q. Okay.

A. Because I used to deal in [illegible] Black-

Page 79

Scholes and German -- it's a German something. I can't remember his last name. I can't remember. By last name of it, German-something, [illegible] -- maybe he.

MR. CROUCH: Never mind.

Q. So you used to deal with this in your business?

A. Yes, sir.

Q. Do you know if Jerry Sucher had previously engaged in European digital option transactions prior to November of 1999?

A. I understood and believed he was an expert in both American and European digital options.

And I was just kind of a run of-the-mill person on it, but he was an expert.

Q. My question is: You both may have known that they existed.

Did you personally, prior to November of 1999, ever personally invest in a European digital option?

A. I can't recall a European, but I think -- I think I did in American options, but I can't recall. I just don't know.

Q. Why have --

Page 80

MR. [illegible]: Can I get clarification before you ask your next question.

Are you talking about him personally? Not within their business.

A. In the business, it was in the business, not me personally, in the business.

Q. So, did you within your business investments, ever prior to November of 1999 purchase a European digital option?

MR. CROUCH: If you know.

A. I just don't recall.

Q. And I believe -- and I want to make sure I understand your testimony -- that prior to that time, you in your business had invested in American digital options.

A. To the best of my recollection, I think so.

And we did hedges and swaps and currency hedges and that kind of stuff.

But that's just to the best of my recollection.

Q. Why, in this transaction, did you decide to do a European digital option transaction?

A. I don't recall. I just don't know.

Q. Did you have any type of an understanding

Page 81

when you started this transaction with Ernst & Young, that you would follow through the sequence of steps that Ernst & Young had planned?

MR. CROUCH: Objection. Assumes facts not in evidence.

A. I remember Jerry and I took some steps and we did something between an LLC and a partnership and an S corporation.

But I don't recall exactly the timing of everything that we did.

Q. Do you recall that those steps were choreographed -- I'll use that word -- do you understand the word "choreographed"?

A. Yes, sir.

Q. Did you understand the steps that you and Jerry took between November and December of 1999 that those were choreographed?

MR. CROUCH: Objection. Vague and ambiguous and assumes facts not in evidence.

A. They must have been. Because I don't recall preparing any documents about every time that I would do something. I think somebody else prepared them. I don't recall.

Q. And who was that, somebody else that was preparing them, if not you?

Page 82

A I know this is wrong, but I'm probably guessing either Ray or somebody at Jenkens and Gilchrist.
But I knew at that time Jenkens and Gilchrist was involved because of Donna Guerin.
VIDEOGRAPHER: Counsel, five minutes on tape.
MR. LINDQUIST: Thank you.
Q I'll show what's been previously marked as Exhibit 154.
THE WITNESS: [illegible]
MR. LINDQUIST: Certainly. Counsel, you should have a copy of this document.
MR. CROUCH: I do.
(PREVIOUSLY MARKED EXHIBIT 154.)
Q This is an e-mail from Ernst & Young, an internal one, where they were distributing on November 5th of 1999 something called a spreadsheet on COBRA.
And the distribution list included Mr. Knight.
And I'm going to ask you if you recall seeing a copy of the spreadsheet in this form, or any other form.
This one is in the amount of $30 million

Page 83

capital and $30 million ordinary loss. Those are the last two pages.
A I don't think I have ever seen this.
In fact, I don't even know who this person is. [illegible]
Q Yes. That's the internal distribution list within Ernst & Young.
MR. CROUCH: All right.
Q Allow me to show you what's been previously marked as Government's Exhibit 155.
A Yes, sir.
(PREVIOUSLY MARKED EXHIBIT 155.)
Q And this is something called a COBRA Action Work Plan.
Have you ever seen a document like this before?
A I have never seen this, sir.
Q At the top, the first action team, it says: Qualify client as under item one -- and the first bullet point says: Aggressive, willing to assume tax risk.
Would you characterize yourself as an aggressive taxpayer willing to assume tax risk?
MR. CROUCH: Objection; foundation.
A. If you drop the word aggressive, I would

Page 84

be willing to assume tax risk.
Jerry was aggressive, but I was not aggressive, but I was willing to assume tax risk.
MR. LINDQUIST: Let us take a break while we switch the tape.
VIDEOGRAPHER: This concludes tape number one in the deposition of Mr. Jim Boyd.
The time is approximately 11:15. We are now off the record.
(OFF THE RECORD.)
VIDEOGRAPHER: Stand by, please. We are now back on the record.
This is tape number two in the videotape deposition of Jim Boyd.
The time is approximately 11:45.
Q (BY MR. LINDQUIST:) Mr. Boyd, allow me to show you what I'm marking as Exhibit 1510.
MR. LINDQUIST: Here is a copy.
(EXHIBIT 1510 MARKED.)
A Yes, sir.
Q Counsel provided this to me yesterday.
It looks like it's a fax to or from CC. Is CB you?
A Yes, sir.
Q Who is CC?

Page 85

A Christine Crosby. She was my secretary for 10 plus years.
Well, I should say my assistant.
Q And this appears to be -- would be a message from Ray Knight.
Does that mean that Ray Knight has called you? Or what does the M stand for?
A That's what it appears to be, yes, sir.
Q Do you have any recollection as to what Mr. Knight was calling you about on December 6th?
A I don't specifically recall. But I remember sometime in early December that I got on the phone with Mr. Knight, and I think Sean Smith was also on -- I think -- maybe -- I don't know whether I was on the phone, or he actually was here.
And then Sean Smith was on a telephone call, but I can't remember.
Q Do you recall in early December -- and this would have been 1999 -- that you recall having this -- you recall a meeting or a discussion with Mr. Knight and Mr. Sean Smith?
A I think Mr. Smith was on a phone. And maybe Mr. Knight was actually here. But I don't recall exactly.

Page 86

Q Do you recall whether it was around December 4th of 1998 that this occurred?
A I just have to go by the date here, and I would assume that's when the date was.
Q And do you recall what the position or discussion was at that time?
A I remember it's a call or e-mail, I think Dean and Mr. -- we talked about doing something with First Union Stock, Bank of America stock, and something else for investing like a million and a half dollars or something. I can't remember, like in $500,000 increments.
But you would have to show me some other documents or I could refresh my memory.
Q Did this discussion relate to the TODRA transaction that we had been discussing?
A Of course, I didn't know the name TODRA up then.
But I think, obviously, it might have related to it.
Because I didn't talk to Mr. Knight about anything other than this transaction.
Q Was this discussion a discussion about what to do with the two percent of -- the portion of the loan of funds that were sitting in the bank

Page 87

account at Deutsche Bank?
MR. CROUCH: Objection, assumes facts not in evidence.
A I just don't know.
Q Was it a discussion about what to do with money that you had to invest?
A I remember when Dean was on a phone call with me and I think Mr. Knight was present. We were talking about doing something with like a million and a half dollars.
But they were in three different increments, like $500,000 each.
But, I will be honest with you, I can't specifically remember. Do you have something to show me?
Q No. I'm trying to understand what's going on at this time.
A Okay.
Q I have but this paper.
MR. CROUCH: Counsel, can we go off the record just a second.
VIDEOGRAPHER: Off the record. The time is approximately 11:30.
(OFF THE RECORD.)
MR. LINDQUIST: Let's go back on the

Page 88

record.
VIDEOGRAPHER: All right. Stand by, please. Back on the record.
The time is approximately 11:32.
Q (BY MR. LINDQUIST) Mr. Boyd, allow me to provide you with what I have marked as Government Exhibit 1011.
(EXHIBIT 1011 MARKED.)
A Okay, sir.
Q This is a copy of part of the closing binder that Jenkens and Gilchrist prepared.
First off, I would like to ask you whether you have ever seen this document before?
A Not in this format, but I may have seen some of the things in the document.
Q Okay.
A Because my signature is here.
Q The table of contents kind of summarizes what's in there. Okay.
Let me then take you through a few of the documents here.
Let me first turn your attention to the item at -- in the table of contents, number two, which is the application for employer identification number for JBB Holdings Investors.

Page 89

A Yes.
Q You did?
A Yes, sir.
Q And first off, is that your signature on that page on November 18 of 1998?
A That's my signature, sir.
Q It appears that some of the documents in here were signed by Mr. [illegible] at a different time, a day earlier.
Do you know where you were when you signed this document that you are looking at here for your part for JBB Holdings?
A Where I was?
Q Yes. Did someone come here to Charlotte or to your house, and present a whole bunch of documents to you to sign?
A No one came to my house, sir.
Q Did someone come to Charlotte and present you with a whole bunch of documents to sign around November 18th of 1998?
A I don't recall anyone coming here. So they must have sent them by mail. I don't know.
Q Do you have any recollection of receiving a package of documents from Jenkens and Gilchrist to sign for the transaction?

Page 90

A. [illegible] package, [illegible] different times --
[illegible] Mr. -- Mr. [illegible].
Q. [illegible] -- yes.
A. She sent different things at different
times, but I never got what you call a package.
Q. Here it appears that you're signing on
this page to form an LLC as a single member
one-person LLC to be a disregarded entity.
And I previously asked you about why you
formed this entity, and you said that it was to
insulate you from risk.
A. I would have thought forming an LLC would
have been to -- would be for this purpose, yes, sir.
Q. What was the risk that you had, that you
were trying to -- or that you were trying to insulate
yourself from?
A. I can't specifically identify one risk,
but I would imagine the only reason I formed an LLC
was because -- or that I was involved in an LLC to
insulate myself.
Q. What activities did you plan to engage in
through this LLC at that time?
[illegible] Investments. So
my question would be, first, is that correct?
MR. [illegible]: You're on the wrong page

Page 91

there.
A. Yes, sir. Because I think I also
invested in stock through the JGB [illegible]
Investments with both Dean Witter and with First
Union, but I can't specifically recall.
Q. And what would be the -- what would be
your exposure in investing in those stocks --
A. (No response.)
Q. -- that you are trying to insulate
yourself from?
Any particular risk? Because --
A. I can't think of a specific risk right
now.
Q. If you turn to [illegible] 041467, that's the
SS-4 application that is signed by Mr. Tucker.
And you can see that that's signed on
November 16 of 1999, the day earlier than you signed
yours.
Do you know whether you and Mr. Tucker
discussed with each other why he was going to form
an LLC as well?
A. I can only surmise that it was something
that Ernst & Young suggested that we do.
Q. Were you the one that filled out the
information on this SS-4?

Page 92

Or did somebody else fill this out for
you?
A. (No response.)
Q. And "there," I'm referring to your SS-4
and what --
A. That's not my handwriting up there where
it says "Single member [illegible]."
And that's not the employer
identification number -- my handwriting. So
somebody else must have done it.
Q. Well, you wouldn't have the employer
identification number at the time the information
was typed in here, that would be something you would
get -- you're applying.
A. This is an application for it, yes, sir.
Q. So my question is: Was it your office
that -- first off, I might ask: Have you ever
prepared an SS-4 before?
A. Yes -- I'm sure I -- yes.
Q. Okay.
A. And Charlotte used to do it all the time.
Q. And your Social Security number is listed
here as [illegible]. Is that your Social Security
number?
A. Yes, sir.

Page 93

Q. Did you have any problems remembering
your Social Security number --
A. (No response.)
Q. -- at any time?
A. After my accident, I didn't even remember
my wife.
Q. Before your accident, you indicated you
had a pretty good memory.
A. Yes, sir.
Q. Did Mr. Tucker, to your knowledge, have
any particular problems remembering his Social
Security number?
A. I doubt it, no, sir.
Q. Let me turn to what is item number five
in this package.
It's the agreement of general
partnership dated November 16 of 1999.
It begins at DOJ 041469 and it goes on
through to 041479.
And if you take a look at the signature,
the last page of that document, is that your
signature?
A. Yes, sir.
Q. Were you forming a partnership on
November 16 of 1999?

Page 94

A I remember going to -- but I don't remember any -- other than that Ernst & Young may have said the need to form a partnership because you and Jerry were doing -- [illegible] -- or something. I don't know.

Q Was it part of the plan for the implementation of this transaction with Ernst & Young that you would form the LLC and a partnership and an S Corp?

A I remember we were going to form an LLC.

And then I remember we were going to form a partnership.

And I think because of liability issues and other things, we did an S Corporation, too.

Q And did you do them all about the same time --

A (No response.)

Q -- as part of a plan?

MR. [illegible]: Objection --

A There was no plan.

MR. CROUCH: -- vague and ambiguous -- objection, vague and ambiguous as to the plan. You can go ahead and answer.

A Characterization as a "plan" -- I have no recollection of a "plan."

Page 95

But I recall that we were instructed to do things by Ernst & Young at different times.

And the only thing I remember was that we did something so we could diversify our portfolio and we could also insulate ourselves from any potential liabilities.

But that would have been a natural thing to do in an investment, instead of having -- you know, like in a general partnership, you have -- general partners have unlimited liability.

Q What were the liabilities you were insulating yourself from?

A I thought that Jerry and I were going to do other investments in the partnership.

And maybe we would have done some swaps and some hedges.

But I will be honest with you, John -- [illegible] -- I just don't recall.

Q You indicated that you were planning to diversify -- you were planning to diversify the portfolio.

What was the portfolio you were planning to diversify?

A I think we had Bank of America first, Union, and maybe other bank stocks.

Page 96

Jerry had a big position in bank stocks, but I can't recall.

Q Were you planning to diversify before you formed the partnership or after you formed the partnership?

A I don't recall. I'm sorry.

Q If you would turn to BOJ [illegible] through [illegible].

And there we have a cover letter from Laura Lightholder at Jackson and Gilchrist.

And behind it we have a Form 2553 that appears to have been signed by you and Mr. Fisher.

And you appear to have signed it on November 18 of 1999.

Did you, in fact, sign this application?

A That's my signature, sir.

Q And as of that date, November 18 of 1999, you were electing to treat JBJF Investors, Inc., as a small business corporation?

A (No response.)

Q Is that -- is that correct?

A That's what it appears, sir.

Q Turn to Tab item number 11.

MR. CROUCH: You have the Bates number.

MR. LINDQUIST: I'm going to get that.

Page 97

Q That starts at BOJ [illegible]?

A Yes.

Q And it goes through 041500. And it's entitled, "Consent of Sole Director of JBJF Investors, Inc."

A Yes, sir.

Q And it has a resolution in there for the issuance of stock to you and Mr. Fisher: 90 shares to Mr. Fisher and ten shares to you.

Do you recall, in fact, receiving ten shares of stock in JBJF Investors, Inc.?

A You mean formal shares?

Q Yes.

A I don't recall getting physical -- having physical presence of shares in my hand.

Q This consent is dated November 18 of 1999.

Subsequent to that date, were there any additional shares issued by JBJF Investors, Inc.?

A Not that I'm aware of.

Q And if you turn to Tab [illegible] BOJ [illegible] -- and this is a certificate of ten shares of JBJF Investors, Inc.

MR. CROUCH: Can he get to it first.

MR. LINDQUIST: Sure.

Page 98

MR. CROUCH: That's correct. You have it there. One more -- one more. I'm sorry. That's it.

A Okay.

Q And it appears that this is dated November 16th of 1999, 10 shares of [illegible] Investors Inc. had been issued to you.

Does -- does that refresh your recollection as to whether you have ever seen this document before, and whether you received it?

A It doesn't refresh my recollection. But if it says I have ten shares -- I know I had ten shares, but I don't recall this.

Q Now, I would like to take you to item number 14, which begins at [illegible].

A Yes, sir.

Q And that goes through [illegible]. And this is part of a fax -- there is a fax legend at the top -- but drawing your attention to the third page of this sequence of pages.

First off, is that your signature down there on behalf of [illegible] Holdings Investments, [illegible]?

A Yes, sir, that's my signature.

Q Do you know on what date you signed this?

Page 99

A I see it's dated November 24. So it must have been something around that time.

But I don't, as a matter of recollection, recall.

Q Now, have you ever seen documents like this before?

This appears to be something called a foreign exchange digital option transaction -- at the top.

And it's got a reference number. Do you recall receiving this and reading it and understanding it back in 1999?

A I think I remember documents similar to this, but the exact words of it --

I can't tell you they had the exact words, but I think the general content of it were something similar to what I had seen or signed before.

Q Did you pick the currencies -- the [illegible] dollar? Was that your pick?

A (No response.)

Q It's referenced in section one of this document in general terms.

A Can I make a comment?

MR. CROUCH: Why don't you answer his

Page 100

question.

A I specifically talked with Jerry about pounds, about Canadian dollars, and I remember pounds and Canadian dollars. And I think the Euro was kind of new then.

And so, I may have talked to him about the Euro, but Euro didn't have a lot of history.

Pounds had a lot of history. And the Canadian dollar had a lot of history.

But I can't say honestly specifically that I said you know, a Euro or a Yen, or something like that.

Q Who picked the Euros for this transaction? Was that you picking it?

A No, sir.

Q Who picked it?

A Um, I think Jerry told me that -- well, I think it would have been Jerry, I think.

Q Okay.

A But we discussed it.

Q Did you -- did Jerry tell you why he was picking Euros?

A He had done a lot of work on the different spreads and stuff like that.

And I guess we discussed it at that time,

Page 101

but I can't recall specifically.

Q On this particular document that we are looking at, there is a spread between the first range level -- which you'll see on the first exchange provisions under one -- sorry -- let me read that again -- under section two, the number two section two, first digital option transaction.

And then it says, [illegible] first exchange provision.

And under that it has the first range level of 1.0121 per Euro. Do you see that number?

A [illegible] recall that number, yes, sir.

Q And then if you compare that number to -- on the second page -- to the second range level, which is about two inches down from the top, and that is in US dollars 1.0311 -- why the difference between those two numbers of 1.021 and 1.031? Did you pick those?

A No. My best recollection is Jerry did an analysis, and he figured where the -- what was called the "sweet spot," and where it could hit and what would be a good range and what it would do.

And I think that, in all honesty, I think Jerry was the final determiner of exactly what those ranges were.

Page 102

But we had to hit this, or above to be in the sweet spot.
And I think Jerry was the one who had done most of the work on that.
Q When you say "he had done an analysis," did Jerry also have a photographic memory? Did he keep any written records of this analysis?
A Jerry had an unbelievable memory. But I wouldn't know whether you could legitimately call it photographic, but he has an unbelievable memory.
Q Did he show you any type of an analysis in writing for you to take a look at so that you could understand?
A No. He talked to me about it. And he talked to me, and he said -- he said what kind of area where we could make between 40 and 150 million or something.
And he said, "If we hit this or above or something like that, then we've got it." And we actually made money.
Q You don't recall actually seeing anything in writing?
A (No response.)
Q Do you recall seeing anything in writing prepared by Jerry with respect to his analysis of

Page 103

what you called the sweet spot?
A I may have, but I don't recall.
Q Do you recall any discussion with anyone at Ernst & Young about what you called the sweet spot?
A I don't think so, sir.
Q Do you recall any discussion with anyone at Deutsche Bank with respect to what you call the sweet spot?
A I think I talked with one guy whose name is Parse or something. [illegible], maybe once or twice.
But Jerry did most of the conversations about what the sweet spot and everything was.
Q And when you spoke with Mr. Parse, was it a call where Jerry Zucker was also on the line with David Parse?
A I don't recall.
Q Do you recall whether your conversation with Mr. Parse in fact involved a discussion of the sweet spot?
A To be honest, I just don't recall.
Q If you recall -- do you recall how the spot rate was to be determined at the end of the 30 days for purposes of determining whether or not you

Page 104

were within the sweet spot?
A Jerry talked about strike price, volatility, interest rates, and a bunch of other things.
But I just don't specifically recall exactly what we discussed.
Q If you turn to the page DBJ 041538 --
A Yes, sir.
Q -- which is the second page of this particular portion of the document.
And if you take a look at about -- it's under section three of Large Cap 1 and Large Cap 2 and it has the language, "If the spot rate is on the second rate determination date at 10 AM local time in New York less than or equal to the second range level," et cetera.
Do you recall any discussion of that language with anyone?
A Not the specific language, but I do recall that you had to exercise on the expire date by -- I think it was 10 in the morning, or around that time.
And -- but on American options, I don't think you had to give a specific time date. But you did for European digital options.

Page 105

Q You say you would have to exercise. What did you understand by saying you would have to exercise?
Did you think you would have to take some sort of action?
A I just don't recall. I don't know.
Q Do you understand how the spot rate was in fact to be determined on that time, whether or not it was to be determined by you, or whether it was to be determined by Deutsche Bank?
A I used to know that. How you used to do spot rates and interest rates and, you know, all that stuff, but I don't recall now.
Q If you would now turn to Item number 13 and that is at -- it's hard to see the Bates number because they have the page upside down.
So, if you turn to DBJ 041538, that's the second page of the assignment, and the print page, the Bates numbers is at the top instead of the bottom.
So it starts at DBJ 041537. And that's an assignment agreement dated December 14 of 1999 between JSB Holdings Investments and Deutsche Bank and JBG Partners. Are you with me? Three-page document?

Page 106

A. Yes, sir. [illegible] date.
Q. On the second page, is that your signature?
A. Both of those are my signature, at the top and at the bottom.
Q. At the top, are you signing both on behalf of JG Schickert and JBJS Partners?
A. Yes, sir.
Q. Why are you assigning the -- why are you entering into this assignment agreement on this date, November 24, 1999?
A. I should know, but I don't recall.
Q. Do you recall whether, as of this date, you had already paid for these options?
A. As of November 24th?
Q. Yes.
A. As of that specific date, I don't recall.
Q. If you turn to JBJS 041547.
MR. CROUCH: 147?
MR. LINDQUIST: Yes, sir.
Q. 041547.
And I would ask you to take a look at 47, 48 and 49.
They all appear to be under this item number 16.

Page 107

First off, is your -- is that your signature on all three of these pages?
A. Yes, sir.
Q. If you take a look at the last of those pages, JBJS 041549, this is an authorization to wire $250,000 from JGS Schickert. Do you know why you're making this transfer?
A. Well, I initialed the $250,000. So I must have -- I don't recall why I did it.
But that's definitely my signature and my initials.
Q. As of November 30th, 1999, you're making a wire payment of $250,000; was that to purchase the options?
A. I just don't know. I don't recall.
Q. But if you look at the prior -- the first page that I referenced you to, JBJS 041547, as of November 24th, you were authorizing a transfer of all remaining cash from JGS Schickert to JBJS Partners.
Why were you transferring all the cash from JGS Schickert to JBJS Partners as of November 24, 1999?
A. I don't know, but I could only say I was following instructions.

Page 108

Q. Is that your handwriting on the top that -- is the number -- there is a November 24th and the 24th is handwritten. Did you put that number on there?
A. That's not my -- .
Q. When you signed this document, was the number already in there?
Or did you leave that part blank?
A. I don't recall. And I see it's filled in on a couple of later documents, but that's not my handwriting.
Q. On the next part, it states, "Please note from the attached assignment that the option positions in the above-referenced account had been assigned to JBJS Partners."
So, that's the assignment we referenced.
So, as of the 24th of November, you were assigning the options to the partnership; is that what is going on here?
A. That's what it appears to be, but that's not my handwriting, where it says November 24th.
But I just have to reference that I might have done something on the 24th. I don't know.
Q. Do you recall any direction from Jenkens and Gilchrist to sign documents that they sent to

Page 109

you and to leave -- to not fill in the blanks, so that they could fill them in?
MR. CROUCH: Objection; assumes facts not in evidence.
Q. Those packages of documents that you described earlier receiving from [illegible] for your signature, do you recall any direction from the law firm of Jenkens and Gilchrist that when signing those documents, you were not to fill in the blanks?
MR. CROUCH: Objection. I think that mischaracterizes -- I don't think he ever said he received a package of documents from them.
A. I may have, but I just don't recall. But we tend to -- in business matters and negotiations -- always direct people don't fill the dates in, because we will fill the dates in -- the lawyers or the notary publics or whatever. And that was very common, very traditional in big international transactions where you had to sign hundreds and sometimes thousands of documents. That was truly common.
Q. And do you -- why is that done in big transactions, that you don't fill in that information; you let the lawyers do it?
A. I can only say that I remember going to

Page 110

millions [illegible] many, many times.
And I would go there sometimes for three or four days -- literally three or four days -- signing documents from early morning until sometimes ten or 11 o'clock at night.
And then we would usually have to sign them in front of a notary. If they had to do a notarization by lawyers' standards, would say Don't fill that in, we will fill the date in.
I just would follow what was considered procedure in business transactions.
Q. So you considered this to just be normal business procedure?
A. Yes, with our counsel.
Q. Did you undertake any analysis of this transaction, the transaction that has now become known as COBRA, to determine whether there was any economic substance to the transaction?
A. (No response.)
Q. You are familiar with that term as a tax attorney, correct?
A. There's actually IRS portions on the Economic Substance Doctrine.
Q. Did you help to write it?
A. No. It is the doctrine, but

Page 111

THE WITNESS: For -- that had that I remember that.
MR. [illegible]: Okay.
A. But I can tell you a lot of other numbers for.
But I looked at reasons for basis and whether we could -- whether certain liabilities were in basis or not in basis under Section 752 and under the regs under § 752-6 something.
But I did a lot of that, and I did a lot of work under 465 and other things.
But, specifically, if you asked me to outline what I did, or did I have notes on it? I will be honest with you. I don't recall.
Q. Did you do any type of an analysis of whether or not there was economic substance with respect to this transaction?
A. Yes. Required we -- under the Black-Scholes model, which is what we did for European digital options, we ran the -- well, I and Jerry did the final pricing of it -- but, yes, it had economic substance.
And we expected, in all honesty, to make a profit.
And we actually made a profit on it. I

Page 112

think I was four of the six options that we went with.
Q. Was that with or without accounting for the fees that you paid with respect to the transaction?
A. (No response.)
Q. Did you account for the fees when you did your analysis of the economic substance?
A. Well, I don't think that I took into account specifically that I'm paying X dollars or Y dollars on that.
But I took into account the reality of the transaction itself. And --
Q. Did you take into account the fact that you were paying a 1.5 percent fee to E&Y and a three percent fee to the law firm, for a total of 4.5 percent in fees in the transaction being paid to E&Y and the law firm?
MR. [illegible]: Objection. Assumes facts not in evidence.
A. I never talked in terms of percentage. I just knew that there was a flat fee that we were paying, and --
Q. Did you take into account that flat fee when you did your economic -- your analysis of the

Page 113

economic substance doctrine?
A. In all honesty, I don't think I did. But I looked at the transaction and the possibility that we could make $10 plus million.
And we actually made over $100,000 as a result of being in the right spot on four of the six options.
Q. If you would turn to the last page, DOJ 047542.
A. Yes, sir.
Q. This is a document that purports to be signed by Jerry [illegible].
And it discusses -- discussing authorization with respect to Cisco stock.
Do you recall transferring Cisco stock or authorizing Jerry to transfer Cisco stock on your behalf into -- into JMJ Investors, Inc.?
A. I transferred something like 110 shares of Cisco.
And I remember being instructed by Jerry -- or Charlotte was -- to authorize, I think it was 4,500 shares or something to go in -- to be transferred.
MR. [illegible]: Would this be a good time to take a lunch break? Is that okay with you?

Page 114

THE WITNESS: If that's what you want.
VIDEOGRAPHER: We will now go off the video record.
The time is approximately 12:32 PM.
(OFF THE RECORD.)
VIDEOGRAPHER: Stand by, please. We are now back on the record.
The time is approximately 1:16.
Q (BY MR. LINDQUIST:) Yes, sir. Allow me to show you what I have marked as Exhibit 1012.
(EXHIBIT 1012 MARKED.)
Q This is a copy of an opinion by Jenkens and Gilchrist -- at least it purports to be an opinion by Jenkens and Gilchrist -- addressed to you dated January 31, 2000.
It goes right through to D-50, at least that's the page number at the end.
You previously referenced an opinion that you received from Jenkens and Gilchrist in 2004.
Is this the opinion that you were talking about?
A Yes, sir. June of 2004, yes, sir.
Q And you don't believe that you received this prior to that date?
A No. In fact, I have an envelope which

Page 115

would demonstrate -- I actually saved the envelope -- if someone would believe me.
Q Do you have a copy of that envelope?
MR. CROUCH: I don't know if I have a copy of the envelope.
I don't recall if I have a copy of the envelope.
THE WITNESS: Maybe we could fax something to you tomorrow.
MR. CROUCH: Sure.
MR. LINDQUIST: Okay.
Q How is it that the envelope proves that you didn't receive --
A Because it has a date stamp on it.
Q Usually on an envelope, a date of mailing is presented. Is that the postmark on the envelope?
A It has a circle up on the upper right-hand side, and that was June, 2004.
Q And does it -- is this an original opinion that was sent to you in June, 2004, or it has an original signature on it?
A I can't tell that it had an original signature, but I think it did, but I can't tell you.
Q How do you know that it wasn't just a duplicate copy of what was sent to you at an earlier

Page 116

date?
A I never received it.
Q So you did not rely upon the Jenkens and Gilchrist opinion in preparing your return for 1999 personal income tax return?
A No.
Q You didn't receive it?
A No.
Q Do you know if Mr. Tucker received an opinion from Jenkens and Gilchrist?
A I only found out because of this litigation that he -- yes, he did receive an opinion.
And -- but I'll be honest with you. I don't recall him ever telling me that he received an opinion, because maybe he thought I received the -- but I just don't recall.
Q Did Mr. Tucker tell you when he received his opinion?
A Not that I recall, sir.
Q I want to show you what I have marked as Exhibit 1013.
(EXHIBIT 1013 MARKED.)
Q This is a fax dated December 29 of 1999, page one of two, purports to be signed by Jerry

Page 117

Tucker, and it is addressed to Deutsche Bank, his authorization to prepare a check for $1.4 million to be paid to Jenkens and Gilchrist and charged to [illegible] Investors, Inc.
Have you ever seen this document before?
A I think maybe in the last day or so, but that's -- because I know his signature, because I was his partner for 18 years --
Well, I was together with him for 18 years. I know that's Jerry's signature.
Q Do you recall whether $1.4 million was in fact paid to the law firm of Jenkens and Gilchrist on or about December 29 of '99 as instructed here?
A If that's what it says, then I would just take it logically that it would be.
Q I'm going to show you what I marked as Exhibit 1014.
(EXHIBIT 1014 MARKED.)
Q Now, this is another fax dated February 23 of 2000 -- the top, handwritten is February 23, 2000.
It also has a signature by Jerry Tucker and it's an authorization to prepare another check to Jenkens and Gilchrist, and this time for

Page 118

$40,000?
Q Do you -- have you ever seen this document before?
A In all honesty, I don't recall it. And I don't even recall the $40,000, what it would have been for.
Q Well, you anticipated my question.
A Excuse me.
Q No, no problem there.
Have you had any discussions with Mr. Zucker as to the $40,000 that was paid?
A I haven't.
Q I show you what I'm going to mark as 1014.
(EXHIBIT 1014 MARKED.)
Q This is a letter dated March 16 of 2000 addressed to you with a copy to Ray Knight.
And it purports to be a letter forwarding you Jenkens and Gilchrist's legal opinion.
When you received the legal opinion in 2000, did it come with a letter like that?
A I have to look back at it, sir, but I don't remember it.
MR. LINDQUIST: I would ask you, counsel, to produce a copy of the envelope and also its

Page 119

contents.
And I would like to have the original; I want to be able to inspect it.
And we can do it either at the next deposition -- but I would like to have an opportunity to inspect the original.
MR. CROUCH: We will try to have it be -- when will you be leaving to go out of town?
THE WITNESS: I believe Friday at 11:05.
MR. CROUCH: Okay.
Q Did you, in the course of your practice of the law, ever have occasion to confront what's called the Step Transaction Doctrine?
A Corporate transactions, I sure did.
Q Did you analyze the -- what we have referred to here as the COBRA transaction, your COBRA transaction, did you evaluate whether the Step Transaction Doctrine would apply to your own transaction?
MR. CROUCH: Objection as to ambiguous, as to "analyze" or "evaluate."
A I specifically didn't undertake an evaluation as to step transaction.
My purpose was to evaluate: Did it have economic substance? And it had economic substance

Page 120

and profit motive, but I can't attest that I did anything on step transaction or anything like that, but I'm very familiar with it.
Q Allow me to show you what I've marked as Exhibit 1016.
(EXHIBIT 1016 MARKED.)
Q This is an opinion from Brown and Wood addressed to you, dated March [illegible] of 2000. Have you ever seen this document before?
A Yes, sir, I have.
Q About when did you receive it?
A I think I received it sometime in 2000, but I can't swear to the exact date, but I think it was in 2000.
Q Do you know whether you obtained it prior to the filing of your 1999 Form 1040?
A In all honesty, I just don't know.
Q Do you know whether you relied upon this document for purposes of preparing your 1999 Form 1040?
MR. CROUCH: Objection; assumes facts not in evidence.
A I certainly didn't rely on this, and I didn't give this to my CPA or anything like that.
Q So you didn't give a copy of this -- or

Page 121

the Jenkens and Gilchrist opinion -- to your return preparer for purposes of preparing your return?
A I didn't have a Jenkens and Gilchrist document.
And if I had thought it was material or reasonable to do so, and somebody had said, did you have Brown or did you not have Jenkens, did you have this or that or something like that, then I probably would have.
But I don't want to sound arrogant, but I just didn't put much stock in any of this.
Q In any of what?
A These opinions.
Q And why didn't you put much stock in the Brown and Wood opinions?
A I'm certain I read it, but they didn't consult with me. They didn't talk to me.
And usually what I would rely on opinions, and -- I was primarily -- I would talk to the lawyers, the tax lawyers, or whoever involved, because I would have questions. But I never did that in this one.
So, in all honesty, I don't think that I primarily did something to rely on this.
Q Did you talk -- do you know whether your

Page 122

partner, Mr. Sucher, talked to any of the lawyers at Brown and Wood?

A. To be honest with you, I don't know. But you would ask him.

Q. Did you ever have any discussion with your return preparer, Ms. Pace, about this transaction that we have been referring to as COBRA?

A. I told Sheila, Ms. Pace, about the time that we entered into the transaction, and that I was hopeful that I would make some money.

But I didn't really -- I didn't go into any discussions with her -- real discussions about what it was.

Q. When you say that you entered into the transaction, would that have been prior to the end of the year, back in November of 1999 that you are referring to?

A. I think we bought the options and -- the different options in either November or December of 1999.

Q. So was it before you even purchased the options that you discussed it with Ms. Pace?

A. In all honesty, I don't remember. But I would imagine it would have been either contemporaneous with or after.

Page 123

Q. Once you had completed the options at the end of the year of 1999, did you then go to Ms. Pace and provide her with documents for purposes of preparing your 1999 Form 1040?

A. I think, as I would normally do, by the time I would gather all K-1s and stuff like that from partnerships and different things, and I had gotten W-2s and whatever, you know, 1099s and things like that, then I would have turned it over to Ms. Pace. But that would have probably been in either March or April.

Q. Did you provide Ms. Pace any type of a description of the COBRA -- what we have called the COBRA transaction?

Or did you just give her this K-1 that you have been referring to?

A. Please don't hold me to this, but I think I told Sheila, in either -- probably in December that Jerry and I -- because I would talk to her about different things -- that we stood a chance to make a pile of money. But I don't recall.

Q. Did you ever have any discussions with Amy [illegible] at Ernst & Young?

A. Who?

Q. Amy [illegible] at Ernst & Young.

Page 124

A. Who [illegible]?

Q. Do you know Amy [illegible]?

A. I don't even know who she is.

MR. [illegible]: That may be asked and answered.

Q. Did you talk to anybody at Ernst & Young about the preparation of the partnership return for [illegible] for 1999?

A. I think I probably talked with Andrew Hughes, H-u-g-h-e-s, who was an associate there. Maybe he's a partner now, but he was an associate then. But it was more of kind of information stuff.

Q. Why did Ernst & Young prepare the partnership return for [illegible]?

MR. CROUCH: Objection; assumes facts not in evidence.

A. My recollection is, I think that they said that they would do -- that they would prepare the returns and coordinate with our accountants and stuff like that. But I just can't tell you exactly what happened.

Q. Do you know who prepared the 1999 Form 1120-S for [illegible] Investors, Inc.?

A. I would have assumed that it would have been either Andrew or somebody in his office up in

Page 125

either Greenville or some other place. Greenville, South Carolina, excuse me.

Q. Why was Ernst & Young asked to prepare the Form 1120-S for [illegible] Investors, Inc.?

A. They did a lot of -- they did all of our tax work and audit work -- for not just [illegible] but for the multiple holdings we had all over the world; not the Greenville office, but Greenville plus Germany plus England and stuff like that.

But I thought -- my recollection is, is that you would have to ask Mr. Sucher.

But I think that we were told that E&Y would prepare all the returns and information stuff and coordinate stuff with our accountants.

Q. Was that part of the fee that was paid?

A. I can't tell you. But they just told us that, I think.

Q. The name of the LLC that you used, [illegible], did you come up with that name?

Or did somebody else come up with the name?

A. I came up with the name because I lived on [illegible] Road then.

Q. You came up with the same [illegible] Investors, Inc.?

Page 126

A Well, Jerry is [illegible] and I'm [illegible]. And I
assume that it wasn't -- I don't remember. But I
think maybe Jerry or somebody would let me just [illegible]
[illegible]
Q Who came up with the name JBJS [illegible]?
A I'm certain Jerry and I talked about it.
But I don't recall.
Q I'm going to show you what I marked as
Exhibit 1004.
(Deposition Exhibit 1004 [illegible].)
MR. CROUCH: We have a copy of that
already.
MR. LINDQUIST: You may, but I'm not
sure.
MR. CROUCH: I believe I did.
MR. LINDQUIST: Yes, you should.
Q Have you ever seen this document before
entitled: Representations?
That's a draft letter from you to Brown
and Wood dated March 3 of 2000.
A Well, I didn't sign it. But I have seen
it in the last couple of days.
But it's kind of a catch all thing. Just
represent A, B, C, and stuff you always do.
MR. CROUCH: I want you to answer his

Page 127

question.
A What was your question?
Q My question was: Have you ever seen --
MR. LINDQUIST: Let me see.
Q Have you ever seen this document before
entitled: Representations?
That is a draft letter from you to Brown
and Wood dated March 3 of 2000.
And obviously you have seen it before.
Did you ever see it back in March of
2000?
A I can't tell you whether I did or not.
Q Did you ever -- well, I would like you to
take a look through each of the paragraphs.
And I'm going to take you through each
one of them one at a time.
A Yes, sir.
Q And ask you whether or not -- whether you
have seen it before and whether you're -- whether
you ever agreed with that representation and/or
would have today.
So I'm going to take it through in parts
with you.
Item number one: "Investor entered into
foreign currency options, the option for substantial

Page 128

[illegible] business reasons including to produce an
overall economic profit from the movement of foreign
currency against the US dollar."
MR. CROUCH: Objection: foundation.
Q Does that refresh your recollection as to
whether or not you have ever seen it?
A Within the last two to three days?
Q No. Back in 2000.
A No. But I would have eliminated the word
"including" because --
MR. CROUCH: Jim, I need you to answer
his question.
THE WITNESS: Okay.
MR. CROUCH: Just answer his question.
THE WITNESS: Okay.
Q You indicated that you would have
eliminated the word "including" because -- why would
you have eliminated the word "including"?
A I would have said "and" instead of
"including."
Q Item number -- as to that
representation -- other than that edit, would it be
a true or false representation?
MR. CROUCH: Objection: foundation.
Q Do you agree with it? Or you disagree

Page 129

with it?
MR. CROUCH: Objection as to foundation.
A I agree with the bulk of it.
MR. CROUCH: Also objection as to
foundation; calls for speculation.
Q You said you agree with the bulk of it.
What part of it do you not agree with?
A Jerry and I did these things to make
money. And that was the purpose.
Q You indicated that there was a fallback
position.
A Yes.
Q And what was that fallback position?
A The fallback position, we were told was
that if we didn't hit the sweet spot, and didn't
make money -- but we did make money on a couple of
the trades -- that that was when I looked at basis
and things like that, whether I had substantial
basis.
And that a fallback position was that we
would get some economic benefit at the end -- at the
end of whatever it was, if we didn't hit the sweet
spot.
Q What you mean is, that in any event, you
would be able to claim a tax loss in that what you

Page 130

mean?

A In summary, yes.

Q Did you and Jerry, in evaluating a potential benefits of a claim of a tax loss evaluate the potential risks that the IRS would find this transaction and challenge it?

A Did I -- sir?

Q Did you.

A (No response.)

Q You are a tax litigator.

A I didn't.

Q So, you never discussed the potential audit risks of engaging in this transaction?

A A couple of years later, I was asked by E&Y to consent to waive some things and allow my name to be released or something.

But that was the first time that I was aware that the Service was even questioning --

Q And at that time that you were asked by the E&Y to waive and to release your name, did you agree to the release of your name?

A Yes.

MR. CROUCH: Objection. I think it mischaracterizes what he said.

MR. [illegible]: Excuse me.

Page 131

Q He stated: A couple of years later I was asked by E&Y to consent to waive some things and allow my name to be released or something.

But the first time I was aware that the Service was even questioning -- but that was the first time.

With respect to that request for your consent, did you consent?

A E&Y said that there was a client -- some kind of, you know, not attorney/client -- but a client privilege.

And I told them -- and I think Jerry also told them: Go ahead and release whatever you need to release or whatever would be appropriate.

Q Let's go through this -- the rest of this letter.

Item number two states: Investor believed that Investor had a reasonable opportunity to earn a reasonable profit in excess of all fees and transaction costs from the transactions described herein without regard to tax benefits.

Did you have such a belief?

MR. CROUCH: Objection; foundation.

A Could I parse the paragraph?

Q Certainly.

Page 132

A And I would put a period after the word "profit."

Because I didn't even think about -- in all honesty -- the rest of the stuff about transaction fees and everything.

I just believed that we had a fairly reasonable -- not that probability -- but possibility of hitting the sweet spot, which we did on four of the six options.

Q You previously indicated that you did not even consider fees. So that -- I want to understand the period that you are adding in here.

What would you do with the rest of this sentence which talks about: In excess of all fees and transaction costs?

A I would eliminate it. And I would say that after the word "profit," I would put a period.

And the rest of the thing I would just parse and scratch out.

Q And is that -- why is it that you would not consider any of the fees associated with the transaction in your calculation of profit?

A Because I was dealing with professionals and I figured they would charge reasonable fees or whatever they would. And -- and I never totaled up

Page 133

the fees or did anything like that.

Q So, was it normal for you to engage in options transactions where you would pay fees of this magnitude, in this case $3.4 million to Jenkens and Gilchrist, total of $[illegible] to Ernst & Young, as between you and Mr. Tucker? Was that normal?

A I don't recall. I think they were substantial, but I don't recall.

Q Item number three of this letter states:

"Investor believed that Investor had an opportunity to make an aggregate gross return in excess of the sum of Investor's net investment in the options and the investment advisory fee paid by Investor."

You don't agree with that?

A (No response.)

Q Or do you?

A I wouldn't have included that.

MR. CROUCH: Objection as to form.

A I told you that I believed that, after looking through the Black-Scholes formula and all the discussions with Jerry, that we had a -- I would say a 50/50 chance to hit the sweet spot.

Q Would you take -- turn back and take a look at the second page of Exhibit [illegible].

Page 134

MR. CROUCH: This one right here.
A. Right one.
Q. 1016, the second page. Look at the bottom of that page is ZKY. The second page of Exhibit 1016.
MR. CROUCH: There.
Q. Under "Representations and Assumptions," and it states: "For purposes of rendering our opinion, Investor is represented as follows:" And then item one through item nine appears to track what is set forth in Exhibit 1007 as to representations.
Is it true or false -- is it true or false that you represented as detailed in this opinion, what is set forth on pages -- on the second and third page items one through nine; did you make those representations to Brown and Wood? Or didn't you?
A. I don't recall. I don't recall -- I don't think I ever signed this letter. And that I got it, so I just don't recall.
Q. Other than signing the letter, did you ever make the representations to Brown and Wood either in writing or otherwise that are described in this opinion that you received? It states: "For

Page 135

purposes of rendering our opinion, Investor is represented as follows" -- and then it, number one through nine -- nine items that are purportedly represented to Brown and Wood; are they telling the truth? Or are they not?
A. I just don't recall. But I would tell you that I considered a lot of the stuff they did to be here was traditional tax lawyer stuff.
And to be honest with you, I just didn't really give it a second or third glance.
Q. Brown and Wood said that they were relying upon these representations for purposes of rendering their opinion.
So, you may have considered it just lawyer stuff, but they considered it, obviously, important.
And I'm going to ask you to take a look at these.
A. Nobody told me.
Q. Turn back, now that we have the [illegible] on this, and tell me -- are all these representations that Brown and Wood purportedly thought were material, whether you agreed with them?
MR. CROUCH: Are you talking about a document?

Page 136

MR. LINDQUIST: And I'm going to --
Q. Let me go there. Let me turn -- go with me to the particular paragraph.
MR. CROUCH: Which document? Make sure he's not confused with which document you're looking at.
You are looking at the Brown and Wood opinion.
MR. LINDQUIST: Brown and Wood opinion 1016.
MR. CROUCH: Make sure he's looking at the right document.
Q. Let me turn to the -- let me turn to the third page.
It says "page three" at the top. And let me look at paragraph number eight. There it is, it might be it.
And it says: "There existed no understanding, agreement, obligation or arrangement" -- read through that language. Take your time.
And then I would like to ask you whether you believe that is a true or a false statement.
A. I can't say definitively, but I would agree that I had no understanding, agreement or

Page 137

arrangement.
Q. "Known to which any of the parties described committed to undertake all or any of the transactions described."
A. I know I did things in response to what DGI instructed me to do things, but I never got instructions from Brown and Wood to do something.
Q. This is not limited to Brown and Wood. It says: "To which any of the parties described herein," and I think that Brown and Wood is certainly a promoter in this transaction, or at least a participant in this transaction.
The question is: Did you do any of these things according to DGI's plan or its dictates as to what --
MR. CROUCH: Objection; form and objection to foundation.
A. When DGI asked me to do a certain thing, Jerry and I would say, "Is this a reasonable request?"
Or is this out in left field or something?
And I think we just agreed, and we did what we were told to do.
Q. Allow me to show you what I marked as

Page 138

1017"

A Okay.

(Exhibit 1017 marked.)

Q This is a fax from -- or a letter from a person named Charlotte Crosby, who is reflected to be the assistant of Jerry Sucher, to Deutsche Bank on Nov. 19 of 1999.

Have you ever seen this document before?

A I think in the last two days -- one or two days -- I have seen it.

But I don't recall ever seeing it before.

Q Do you recall discussing with Mr. Sucher that $40,000 was going to be paid to Brown and Wood?

MR. CROUCH: Objection; foundation.

A I don't recall that discussion.

Q Did you have any understanding that Brown and Wood would be -- or any -- or a second law firm would be billing separately for an opinion on this -- what's been known as the COBRA transaction?

A Well, I had been told by Mr. Knight back in 1999 that there were two reputable law firms that would render opinions, but I never thought any more about it.

Q So you never thought about how much they would have to be paid?

Page 139

A Not as far as a dollar amount. I just assumed that they would (Sucher/Ernst's) bill or for what they were doing.

Q Did you ever discuss with anyone at Ernst & Young as to whether or not they had expensed or incorporated the professional fees being paid on this transaction into the returns that they had prepared for JBJL Investors, Inc. and JBJL Partners?

MR. CROUCH: Objection; vague and ambiguous.

A In expensing. Or capitalization?

Q Correct.

A I personally don't remember specifically.

Q Now, did you ever tell your return preparer to claim a deduction for professional fees paid to Ernst & Young on your 1999 Form 1040?

A I'm certain if I paid a fee to Ernst & Young, I would consider it a professional fee or professional services.

And -- but I didn't instruct Sheila. I would say, I paid this, or I didn't pay this, or something like that, and then she would treat it appropriately.

Q And did you ever make an attempt to

Page 140

determine whether or not that fee had already been capitalized into the basis of either JBJL Partners or JBJL Investors, Inc.?

A Did I make an independent determination?

Q Did you make any inquiry?

A No, sir.

Q So, would it be possible that you effectively claimed a double deduction for the $75,000 that was paid to Ernst & Young?

MR. CROUCH: Objection; vague and ambiguous.

A I wouldn't claim a double deduction myself for anything.

Q Well, if the $75,000 had already been capitalized into the basis of one of those entities -- and you are also claiming it as a miscellaneous expense on your personal income tax return?

A I will be honest with you, I --

MR. CROUCH: Objection; calls for speculation; assumes facts not in evidence.

A I don't know what was done.

MR. FALCIGNO: I think I'm up to 1018.

MR. CROUCH: Yes. That's correct --

correct.

Page 141

(EXHIBIT 1018 MARKED.)

Q Allow me to show you what I'm going to mark as 1018.

This is a letter dated November 16 of 1999 from Donna Guerin addressed to you and Mr. Sucher. And it has some handwriting on it.

Whose handwriting is this?

A The handwriting, except for the signature for the letter, is all Mr. Sucher's -- is all Mr. Sucher's writing.

Q It appears to be read -- and correct me if I misstate: Charlotte, overall pages for Jim B to sign. I inadvertently signed as guarantor on the of the forms for Jim (I already signed one of the guarantees). Please make a copy all and return -- please call Ray Knight at B&W to find out where to send the executed agreements after the corrections and executions by Jim. phone -- and there is a number [illegible]. If you can't reach him, call Rainey Hughes.

Is that a fair reading of Mr. Sucher's handwriting?

A Yes, sir. But the -- Mr. Knight is misspelled as Mr. Nite.

So, maybe he just didn't know who -- I

Page 142

[illegible] he didn't really know much about who is [illegible] it's obvious Mr. Knight was a kind of -- a [illegible] person.

Q. And then it also says on the left side Jim also has a copy set with him in New York. Is that Tucker's writing, as well?

A. Yes, sir.

Q. Who is Jim, in that year?

A. That's me.

Q. When that says, Jim also has a copy set with him in New York?

A. That's what it says, yes, sir.

Q. So, had you already received a copy set of this?

MR. CROUCH: Objection; foundation.

A. I don't know. I don't recall.

Q. Do you recall being in New York around November 14th of 1999?

A. I used to go to New York usually once a week or once every two weeks. But --

Q. Did --

A. I don't know.

Q. Did you keep a personal calendar at that time that would have -- would reflect where you were and what you were doing?

Page 143

A. Oh, I personally have a personal calendar.

Q. Did you, at that time, keep a personal calendar that would -- to keep track of your events --

A. I had.

Q. -- and travels?

A. I had a day timer.

Q. Day timer? And do you still have a copy of your day timer from November of 1999?

A. No, sir.

Q. Did you submit any travel receipts to Intertech in 1999?

A. I used to submit a lot of travel receipts, because I used to travel probably 35, 40 percent of the year.

Q. And you would submit those travel receipts to Intertech to get reimbursed?

A. Charlotte would submit them. So, they were usually in [illegible] where I went, so we could tell something or tell a company or something like that.

Q. And when you say, Charlotte, you are referring to Charlotte Crosby?

A. Yes, sir.

Page 144

Q. And Charlotte Crosby was Jerry Tucker's personal assistant?

A. I would rather say she was my personal assistant.

But she may have been also, at times, been Jerry's personal assistant.

Q. She was your personal assistant at that time?

A. (No response.)

Q. Or she was both of yours?

A. For 10 some years, yes, sir.

Q. Is Charlotte Crosby still working at Intertech today?

A. I think for medical reasons, she works like two days a week. But I --

Q. Does she have some sort of medical problems?

A. She has had a history of operations and everything, and so she's considered vulnerable.

Q. All right. It indicates that -- let's get down to the substance of this.

Do you know whether Charlotte Crosby, your assistant, had conversations with Mr. Knight as reflected in this letter?

MR. CROUCH: Objection.

Page 145

Q. In handwriting, it says, please call Ray Knight.

MR. CROUCH: Objection; foundation.

A. Charlotte was very diligent. So, I assume if she had an instruction to call Mr. Knight, she probably did.

Q. If she had called Mr. Knight, would she have kept a record of those -- of that call?

MR. CROUCH: Objection; calls for speculation.

Q. Did she have a habit of keeping a record of her phone calls?

A. She had a day timer herself. But I don't think, other than for a contemporaneous record, she would still have it.

Q. Did you and Mr. Tucker treat your investment in this transaction that we are talking -- has been called CONRA -- did you treat that as a personal investment? Or a business investment on behalf of Intertech Group?

A. It was not on behalf of Intertech. But Jerry and I did so many things together for 40 years, we just did things together. It wasn't Intertech.

Q. You indicated that Mr. Tucker misspelled

Page 146

Knight.

But then also in the sentence he refers to Knight by his first name "Ray."

Did you and Mr. Becker have a first-name basis with Mr. Knight where you called him Ray?

MR. CROUCH: Objection; calls for speculation, lack of foundation.

A I personally don't recall. No.

Q I'll show you what I'm marking as 1019.

(EXHIBIT 1019 MARKED.)

Q -- a document that's been presented to me by your counsel. Whose handwriting is this?

A That's mine, sir.

Q And can you read that for me?

A Some of this stuff [illegible] -- that I [illegible] used to write in.

Q Okay.

A 12/7/99, spoke with Ray Knight and David Kerns (Dean Witter) also [illegible] previous [illegible] 1,150 -- 350 -- 1,500 -- 7 percent of $50 million -- $ million for investment. Instructions to David Kerns (DW) -- that's either AR or AAS -- $1.5 million with 12 and a half head room -- Bank of NY[illegible] Bank of New York -- $100,000 -- that's 500 -- BOA, Bank of America -- 500K, again $100,000 -- [illegible] -- [illegible]

Page 147

500K, $100,000. Discretionary authority to David (for acknowledgment). Will transfer something systems.

Q Could it be Cisco?

A Cisco -- oh, yeah -- Cisco systems stock for trading. 12/7/99. Ray Knight will coordinate with Charlotte (spoke with Charlotte).

Q What does the phrase "head room" mean?

A (No response.)

Q You used it in the context of $1.5 million with 12 and a half head room.

A I will be honest with you. It's a so long ago. I don't remember.

Q Is that a term that you use in business?

A Head room was terms that Jerry and I used as to how much -- either profit we could make, or how much cash we needed to do something, or how much of this or that.

But it was -- head room was always the -- if you had -- you thought you might have one million, but you had a guarantee of two million, you say, "Well, I have got head room of $1 million," something like that.

Q Why were you transferring in Cisco stock for trading?

What was the trading going to be with

Page 148

respect to the Cisco stock?

A My recollection was that pursuant to -- I don't want to use the word "instructions," but pursuant to advice from Ernst & Young, we needed to transfer 5,000 shares of something; and my ten percent would have been the 500 shares, and Jerry would have transferred 4,500 shares.

Q I'm trying to understand that in the context for trading.

What does it mean to transfer it in for trading?

A I'm sorry. I don't recall.

THE WITNESS: Can we take a break?

MR. CROUCH: Take a break.

VIDEOGRAPHER: We will now go off the record.

The time is approximately 2:06.

(OFF THE RECORD.)

VIDEOGRAPHER: Stand by, please. We are now back on the record.

The time is approximately 2:15 PM.

Q (BY MR. [illegible]) Allow me to show you what's been previously marked as Exhibit 1061.

(PREVIOUSLY MARKED EXHIBIT 1061.)

Q This is a copy of the Form 1120S, JMJZ

Page 149

Investors, Inc., with a file stamped date on it and signature. Is that your signature?

A Yes, sir.

Q And are you signing as secretary?

A Yes, sir.

MR. CROUCH: I'm going to raise the same objection that I raised yesterday: this has other attachments, other than the actual tax return, additional documents to it.

So I'm not sure this was the actual tax return that was filed.

Q If you take a look at Bates -- the record page through -- I think it is 1062 through 1064; 1064 is a type of an application for an automatic extension of time to file corporate income tax return.

Do you know if an application for automatic extension of time was filed with respect to JMJZ Investors, Inc.?

A If it's here, I just have to assume it was, but I couldn't tell you whether it was or not.

Q Well, the other items, 1062 through 1065, were not filed with this return.

They appear to have been put in, associated with the file with respect to powers of

Page 150

representatives that were filed with respect to this return and so were included in the IRS file.
A Okay.
Q So, I didn't want to mislead you that it was filed with those powers.
A I trust you.
Q I would like to ask you, first off, before you signed this return, did you review this return?
A I will be honest with you. I would like to say yes, but I can't say yes. I don't know.
Q Was it your practice, at that time, to review any tax return?
A I didn't formally, or a professional (taken to professional) like accounting and stuff like that, as a CPA. I was a CPA of interest, but I probably thumbed through it. I don't know.
Q And do you recall whether you asked anybody to review it for you?
A I see Mr. Hughes' name here on the document, and maybe I -- excuse me.
Q Where you -- do you see Mr. Hughes' name?
MR. CROUCH: On page two.
Q Page two? That is part of -- part of the power of attorney that appears to have been filed at a later date.

Page 151

You will see a fax date at the top of April 23, 2003 on that second page.
So, that was a power of attorney that appears to have been submitted to the IRS around April 23, '03 and would have been associated with the return so that the IRS would be authorized to speak with Mr. Hughes or any other power of attorney.
A Okay.
Q So my question to you is: Do you recall whether you asked anybody, in March of 2003, to assist you in reviewing this return prepared by Ernst & Young?
A I don't recall, no.
Q Did you have any discussion with Mr. Tucker as to whether you would take the responsibility of signing one return, the partnership return, and he would sign the other return, the S corporation return?
Or how did it come about that you were the one who signed this return?
MR. CROUCH: Objection; form.
A Maybe I was here, and he wasn't here. Or vice versa. But I just don't know. I just don't recall.

Page 152

Q Let me provide you with what's been previously marked as Government Exhibit 1009.
MR. LINDQUIST: Keep that one with you.
THE WITNESS: Okay, sir.
MR. LINDQUIST: Because I want to have you look at them at the same time.
MR. CROUCH: What's the document number?
MR. LINDQUIST: I believe it's 1010.
THE WITNESS: Yes.
(PREVIOUSLY MARKED EXHIBIT 1010.)
Q And this is the Form 1065, 1999 for JDJT Partners.
And you will notice that both returns on the front page, it's signed by Ray Knight as preparer.
They both bear the same date as being signed by Ray Knight.
So, it appears that they would have been prepared about the same time.
Do you recall whether or not Mr. Knight came to your office to review these returns with you?
A I don't recall. I'm not -- I doubt it.
MR. CROUCH: Objection; also to assumes facts not in evidence.

Page 153

Q If the records, the two returns, Mr. Tucker appears to be signing the partnership return; is that Mr. Tucker's signature?
A Yes, it is, sir.
Q Do you know -- do you have any recollection as to whether Mr. Tucker also asked you to review the partnership return?
A I have no recollection.
Q. Was Mr. Tucker as qualified as you to review a tax return?
MR. CROUCH: Objection; calls for speculation.
Objection; asked and mischaracterizes.
A As I told you earlier, he's brilliant. And I would assume that he would be qualified, even (he's not licensed) as an attorney or enrolled as a CPA.
Q Are you also a CPA?
A I didn't take enough courses to do it. I wanted to go back to do it. My wife said: No, you have been to school too much.
Q Directing you back to Exhibit 1009, the return that you signed, if you would take a look please, at --
MR. LINDQUIST: That's the which page in.

Page 154

it --

Q -- at page Adair 1077. And that's a K-1 with your name at the top, Jim Boyd?

A Yes, sir.

Q The Social Security number listed on there for you is incorrect, isn't it?

A Yes, sir, it is.

Q And if you take a look at the next K-1, the one for Jerry Zucker, do you have any knowledge of Jerry Zucker's Social Security number?

A I probably used to, but I don't remember it now.

Q Do you know whether that's Mr. Zucker's Social Security number?

A I can't tell you straightforwardly, no.

Q Do you recall any discussion with Mr. Zucker in March of 2000 concerning whether you were going to file the Form 1120S with incorrect Social Security numbers for yourself and Mr. Zucker?

MR. CROUCH: Objection; assumes facts not in evidence, calls for speculation.

A I have to tell you that that must be a typing error, or an error that was done by whoever made the preparation, because I wouldn't do it.

Q So you don't recall any such discussion

Page 155

or any knowledge of the fact that there was an incorrect Social Security number?

A I have no knowledge of that.

Q Turning to the partnership returns, did you ever have any discussion with anyone at Ernst & Young concerning the manner in which the COBRA transaction was to be reported to the IRS --

MR. CROUCH: Objection; vague.

Q -- on the Form 1065?

MR. CROUCH: Same -- objection; vague and ambiguous.

A I don't recall. But if I talked to anybody, it would have been to Mr. Zucker.

Q Were you aware that E&Y was using a template Form 1065 for purposes of preparing the partnership returns for the COBRA transactions?

A A template?

MR. CROUCH: Objection to form.

Q A template.

MR. CROUCH: Objection; assumes facts not in evidence.

A I have no -- I can't believe that they would have used a template.

Q Did you ever ask -- you or Mr. Zucker -- to your knowledge, ever ask anyone at Ernst & Young

Page 156

as to how many other -- what is it you have learned to be called COBRA -- COBRA-like transactions to have been implemented by Ernst & Young in 1999?

A To be honest, I didn't care.

Q Were you ever told?

A No. And I never asked.

Q Were you ever told that there was only a limited number of COBRA transactions that were available?

MR. CROUCH: Objection; assumes facts not in evidence.

A That there's a limited number of COBRA transactions to -- I don't know what you are referring to.

Q The transaction that you purchased from Ernst & Young --

MR. CROUCH: Objection.

Q -- were you aware that the continent of the United States was only allocated a limited number of COBRA transactions by Ernst & Young?

MR. CROUCH: Objection; vague and ambiguous and also assumes facts not in evidence.

Q Were you ever told by Mr. Knight that this was a -- that you had a limited amount of time within which to decide to sign up for the COBRA

Page 157

transaction?

MR. CROUCH: Vague and ambiguous.

A The only thing I remember was -- and I think Mr. Knight asked us, maybe he didn't -- who we were, so qualified, and were we sophisticated investors, or anything like that.

But I can't swear to it that he asked me that, or he asked Jerry that and Jerry told me that. But I don't know.

Q I previously asked you whether Mr. Zucker was an aggressive taxpayer, and you said that he was.

Was Mr. Zucker in 19 -- in the fall of 1999 -- in the market to purchase a tax shelter?

MR. CROUCH: Objection; vague and ambiguous, calls for speculation.

THE WITNESS: Excuse me.

A Can I recharacterize what you have just said?

Mr. Zucker was very aggressive. I didn't mean to infer that he was an aggressive taxpayer, but he was a very aggressive investor.

And, yes, he was a very aggressive investor.

And he brought me along as an aggressive

Page 158

[illegible]
Q. And at that time in November of 1999, was Mr. Becker shopping for tax shelters?
MR. CROUCH: Objection; vague and ambiguous. Also calls for speculation.
A. Not that I know.
Q. Do you understand my question?
A. Jerry was always shopping to make money.
Now -- I have to say this, because Jerry will probably read it -- he was somewhat suspicious about making money.
We never talked about shelters or anything like that. We just talked about making money.
Q. Did you or Jerry ever contact anyone at Diversified Group, Inc.?
A. I'm sorry. Who are they? I don't know.
Q. Did you ever contact anyone at KPMG about any of their tax shelter products?
MR. CROUCH: Objection; assumes facts not in evidence.
A. KPMG always solicited us for something purposes, but never talked to them about tax shelters or investments or anything.
And PricewaterhouseCoopers was another one that

Page 159

solicited us all the time. But I never asked -- I used to deal with PricewaterhouseCoopers. But I never talked to them about tax shelters or investments or anything.
Q. I'll show you what I'm going to mark as 1020.
(EXHIBIT 1020 MARKED.)
Q. This is a copy of your 1999 Form 1040, an unsigned copy, that has been provided to us by your counsel --
MR. LINDQUIST: I'm also going to show you a copy of -- here is Exhibit 1022 that you already have a copy, counsel --
(DEPOSITION EXHIBIT 1022 MARKED.)
Q. -- of the IRS' record of your filed return.
And it has, with the prior tax return -- the IRS' copy includes some documents which were associated with your return after the fact.
In particular, the form power of attorney are at the front.
A. That's the one you handed to me as 1022?
Q. Yes, sir.
A. Okay.
Q. And your -- the filed copy reflects that

Page 160

you signed this return.
MR. CROUCH: Are you talking about 1022? Just make sure.
MR. LINDQUIST: 1022 --
MR. CROUCH: Right.
Q. -- reflects that you signed this return on April 5th, 2000. And is that your signature on page [illegible] of that?
A. That's my signature. And that's my wife's signature. And that's Sheila's signature.
Q. Did you discuss with your wife your participation in this transaction that we have been referring to as COBRA?
A. Are you talking about prior to filing the tax return?
Q. Prior to the filing of the tax return.
A. No. I told her, as I did on many occasions, because I share everything with her, that I invested to make money in something.
But she was always nervous, because I used to sign guarantees and stuff like that.
And I had signed over a million dollars of guarantees by then.
And so, quite frankly, she was always, What are you guaranteeing now? Or what are you

Page 161

doing now?
Q. Did you sign any statement with respect to the COBRA transaction?
A. I don't recall.
Q. Other than letting her know that you had participated in a transaction, did you describe the nature of the transaction to her?
MR. CROUCH: Objection. I think it mischaracterizes what he said previously. I just want to make sure.
MR. LINDQUIST: Okay.
Q. You told her, I invested to make money in something.
Did you tell her what the "something" was?
A. In all honesty, I don't remember. I don't think so.
MR. LINDQUIST: Okay. We have five minutes left on the tape. Let's change the tape and take a break.
VIDEOGRAPHER: This concludes videotape number two in the video deposition of James Boyd.
We will now go off the record. The time is approximately 2:14 PM.
(OFF THE RECORD.)

Page 162

VIDEOGRAPHER: Ready? Stand by, please.
This is the beginning of videotape number three in the video deposition of James Boyd.
Today's date is June 7th, 2007. The time is approximately 2:?? PM. We are now on the record.
Q. Did you ever discuss with anyone at Ernst & Young or at Deutsche Bank about the possibility of an early termination of your European digital options?
A. I thought you couldn't -- you had to -- or -- you could only do it at expire. I'm sorry, I didn't.
Q. Did you ever have any discussion with anyone at Ernst & Young concerning the profits of the transaction that you were purchasing from Ernst & Young?
MR. CHURCH: Objection; vague and ambiguous as to "profits."
Q. Do you know what the term means?
A. Appreciated?
Q. Yes.
A. No.
Q. Prior to deciding to limit your participation in the -- what -- in the product that you were purchasing from Ernst & Young to $5

Page 163

million, did you make any type of calculation as to the amount of the ordinary loss that you could use on your personal income tax return for 1999?
A. No. I actually calculated the gain between ordinary income and capital gain, and I figured what that would be.
Q. Prior to deciding to participate in a $5 million product from Ernst & Young, that had the [illegible] attached to it, did you calculate what your capital gains were going to be for 1999?
A. I had a hope and an expectation, but I don't know if I did a calculation on paper.
I may have talked about it, but I never did anything, you know, like, I'm going to get nine million or eight million or something like that; and what's my basis in it.
I just would --
Q. How about with respect to your other investments?
Did you -- had you done some sort of projection in November as to what your taxable income was going to be for 1999?
A. In all honesty, no.
Q. Did you have -- you, in fact, carried back a loss from your 1999 tax return to your 1997

Page 164

tax returns; is that correct?
A. If you say so. I don't know.
MR. [illegible]: Well, we will go to it.
Q. Showing you what's been marked as Exhibit 1004 -- previously marked in the deposition of your return preparer, Ms. Pace, and she testified that this was the amended 1997 that was attached to a 1040-X that was filed for 1997 claiming carry back of loss from 1999.
(PREVIOUSLY MARKED EXHIBIT 1004.)
Q. Do you recall that? Does this refresh your recollection that you claimed a carry back loss to 1997?
A. Now that you put this in front of me, this refreshes some of the --
But Sheila had a power of attorney and could -- she would tell me what she was doing, and I would either sign it or approve it. But I trusted Sheila explicitly.
Q. When you decided to participate in the Ernst & Young product and to pay the fees for that product in November of 1999 to Ernst & Young and to the other fees associated with it, did you anticipate, at that time, that you would be able to carry back a loss to 1997?

Page 165

MR. CHURCH: Objection; vague and ambiguous.
A. I anticipated a profit. I anticipated that I was going to make a profit and that we were going to be in the money. But I can't say anything more than that.
Q. And how much profit did you anticipate?
A. I think I anticipated -- I think it was between eight and $10 million. I don't remember the --
Q. Eight and ten million --
A. Ten.
Q. -- is your expected profit?
A. That was the maximum, the gross profit, but that's not what the net profit would have been after taxes or anything.
Q. So, in other words, if you invested and purchased $5 million -- $5 million product, you anticipated making eight to $10 million?
MR. CHURCH: If you can recall.
A. I don't recall. But I know it was more than $5 million. I don't recall, but I know it was more than $5 million.
Q. For this $5 million product, you were going to make an investment of how much? Five

percent. I believe was the amount of the options. Is that correct?

MR. CROUCH: Objection; form. Also vague and ambiguous.

A. Jerry asked me if I would be willing to invest more.

And I think it was going to be up to a potential of 40 to $100 million of profit, but he would have gotten the lion's share of it. But I can't recall.

Q. You ended up only purchasing ten percent of the $50 million, or participating in ten percent of the $50 million, and that would be a $5 million product.

And your -- the amount -- the net premium that you paid to Deutsche Bank for that transaction was $250,000, right?

MR. CROUCH: Objection.

A. I don't recall, but if you say so.

MR. CROUCH: Objection; assumes facts not in evidence.

Q. And did you expect that $250,000 to grow to eight to $10 million?

A. I expected whatever I invested to grow to in excess of $5 million.



Q. Okay.

A. And Jerry was talking about actually investing more.

And I told Jerry, I said, "Jerry, I don't want to reduce the monetary risk of investing more."

And I think that's why I only ended up investing ten percent, rather than a usual, like, 15 or 20 or 25 percent.

Q. If you put $250,000 in as your net premium to purchase the options from Deutsche Bank and you're telling me you expected a return of eight to $10 million?

A. No. I expected -- maybe I -- that was --

MR. CROUCH: Let him ask the question.

THE WITNESS: Excuse me.

Q. What was the return that you expected out of your net $250 million dollar investment for the terms of the cost of the premium that you paid to Deutsche Bank?

MR. CROUCH: Objection. I think that mischaracterizes the testimony. Also misstates the facts of the case.

A. I think it was when Jerry was talking more about doubling what we were going to invest,



which I didn't want to do. That was potentially a six, seven, eight, $9 million profit.

But at the end, I think the best I can recollect is that I anticipated a profit of probably three to $5 million. I can't recall.

Q. And this is based upon what you actually did, not what you originally considered doing when Jerry thought about doing $100 million with you participating on a ten percent basis on that transaction?

A. (No response.)

Q. Remember that -- we had a talk about the TDWAS Client Information Questionnaire that originally said it was 90/10 on $100 million.

It was carved down and changed to $50 million of which you had $5 million, Jerry had $45 million?

A. That sounds logical, but I don't recall.

MR. CROUCH: Let him ask the question.

THE WITNESS: Excuse me.

Q. So, on that $5 million product, Deutsche Bank was charging a five percent net premium for the investment, and five percent of $5 million is $250,000; that's the actual money you put into Deutsche Bank on the options.



And are you telling me that you expected that $250,000 to grow to three to $5 million?

MR. CROUCH: Objection; assumes facts.

A. I don't know exactly what I expected, but I expected to make a reasonable profit. Just like Jerry and I, we invested in Tollycraft, we put in less than 10 to $12 million, we made over a billion dollars.

Q. Okay. This wasn't Tollycraft. This was something else.

So we mention [illegible]. As to this transaction, or what did you base your belief that you would make three to $5 million?

MR. CROUCH: Objection; asked and answered.

A. I think it was probably my trusting with Jerry's expertise and knowing that he was so bright and that he was so good at investing, that I would stand a chance to make an investment.

I didn't do anything independently on my own to verify, other than working with [illegible] and some other stuff, that whether I invested $10,000 or I invested $100,000, it didn't make any difference to me.

Q. Was the primary purpose of your

Page 170

anticipation in the transaction that you purchased from Deutsche Bank at Ernst & Young and Jenkens & Gilchrist to make a tax loss?

MR. CROUCH: Objection; assumes facts not in evidence.

A Can you repeat that, sir?

Q Was the primary purpose of the product that you purchased from Deutsche Bank, Jenkens and Gilchrist and Ernst & Young, to make a tax loss?

A No, sir. That was a fallback. We wanted to make money. Jerry and I always went into everything to make money.

Q How much time did you take to evaluate the proposed transaction being offered by Ernst & Young when Mr. Wright came and made his pitch to you?

MR. CROUCH: Objection; vague and ambiguous.

A I will be honest. I don't recall.

Q Did you take more than a day?

MR. CROUCH: Objection; asked and answered.

A I don't recall.

Q Do you know if you or Mr. [illegible] sought the advice of any counsel on the proposed

Page 171

transaction?

MR. CROUCH: Objection; vague and ambiguous.

A I can only speculate. I talked to Sean Smith, but I don't recall.

Q Did Sean Smith indicate to you that he was familiar with the COBRA product?

A I don't recall.

Q Did you ask for a copy of any documents from Ernst & Young with respect to the proposed transaction so that you would be able to have as much detail of the transaction as possible?

MR. CROUCH: Objection; vague and ambiguous.

A No. I thought Jerry and I were astute enough to figure out the different threads of -- you know, what we would be doing. And so I don't recall us ever asking.

Q Prior to the time that you signed the confirmation statements with Deutsche Bank with respect to the options that you purchased, had you ever seen the confirmation sheet?

MR. CROUCH: Vague and ambiguous.

Q Do you understand what I'm talking about, "the confirmation sheet"?

Page 172

A I just don't recall.

Q Take a look back at Exhibit 1011.

MR. CROUCH: 1011, counsel.

Q 1011 and turn to page DBJ 041537.

A What page, sir?

Q DBJ 041537.

A Okay, sir.

Q Do you know, have you ever seen a confirmation statement before --

A Yes.

Q -- for an option transaction?

A Yes, sir.

Q Does this look like a confirmation statement for an option transaction?

A I know the paragraphs A and B are fairly traditional.

But I can't speak as to the other stuff.

Q Had you ever seen a draft of the language in this confirmation statement before you received it in around November 24, 1999?

A Not from Deutsche Bank, but I had seen similar language in other transactions which Jerry and I had done, I think. But I can't be certain.

Q You indicated that you had not previously done a European digital option transaction.

Page 173

A We used to do -- I think we did some American options but not European digital options because that --

MR. CROUCH: I think you answered the question.

THE WITNESS: [illegible]

Q So, you testified you had not seen this language from Deutsche Bank, particularly if -- let me ask you:

Had you seen a draft of this document with the same Foreign Exchange Digital Option Transaction at the top, from anybody?

MR. CROUCH: Objection; form.

A As I told you, I think I have seen paragraphs A and maybe B, but I can't tell you about the rest of it, no.

Q Have you ever seen -- have you ever seen before the time that you signed this document, a document with the same -- a confirmation document -- with the same Foreign Exchange Digital Option Transaction at the top?

A I don't believe so, but I can't recall.

Q Did you have any discussions with Mr. Wright concerning the appropriate time to terminate [illegible] Investors, Inc.?

Page 174

MR. CROUCH: Objection, vague and ambiguous.

A I only had two conversations that I can recall with Mr. Knight.

And I don't recall anything about termination or calling or doing anything like that.

In fact, I think I told somebody from E&Y I really didn't like Mr. Knight that much, and I didn't want him to tell me.

Q When did you tell someone at E&Y that?

A I think it was probably in 1999, but I don't recall.

Q And what was it that triggered this phone call?

A I talked to Tony Calendar and Sean Smith.

And I just said that Mr. Knight is not very substantive.

In my estimation, he was not what I was used to, you know, somebody who was extraordinarily confident, knowledgeable in everything.

Q Did you make this call to Calendar and Smith after you had already decided to purchase a product from Ernst & Young?

MR. CROUCH: Objection, vague.

Page 175

A I believe it was after, but I don't recall.

Q Did you -- did Ernst & Young provide somebody else for you to contact instead of Ray Knight with respect to the product that you purchased from Ernst & Young?

MR. CROUCH: Objection, vague.

A Not that I'm aware of. But Mr. Calendar and Mr. Smith knew that I was not enamored of Mr. Knight.

Q Did --

A Or enamored with -- [illegible] me.

Q Did you know whether there was any substitution for Mr. Knight by anyone else at Ernst & Young to play his role?

MR. CROUCH: Objection, vague and ambiguous.

A Not that I'm aware of.

Q I'll show what's been marked as Exhibit 164.

(Whereupon, marked Exhibit 164.)

MR. CROUCH: Is it something from yesterday, counsel?

MR. LINDQUIST: I'm going to give you -- I believe it is, but if you don't have a copy, I'll

Page 176

give you another copy.

MR. CROUCH: Let me look into real quick.

I'm sure we have copies, just to speed things along here. Thank you.

Q This is a letter that was addressed to you by the IRS with respect to the audit of your 1999 Form 1040.

Do you recall getting this around October of 2001?

A It says it was addressed to myself and Sam. I would say yes, I got it.

And I think I turned this over to either Sheila or contacted Kenny Hughes.

Q Did you have any discussions with your wife concerning this examination?

A No. Because I had been under audit before, and --

Q Which years had you already been under audit for?

A A number of years. I don't know. I don't remember.

Q Had you been under audit in 1998?

MR. CROUCH: Objection, asked and answered.

Page 177

A You need to check with my -- Pete. I don't recall.

Q Did you have any discussions with Mr. Hughes at Ernst & Young concerning whether to disclose your participation in the E&Y product known as COBRA?

MR. CROUCH: We are going to object to that on the basis of any discussions with Mr. Hughes regarding a disclosure after October 22nd, 2001 is protected by privilege.

You can in any way answer your question as to whether he had discussions with him but not the substance of those discussions.

MR. LINDQUIST: I will be pursuing that with a motion to the court on fraud.

MR. CROUCH: On fraud?

MR. LINDQUIST: On fraud.

MR. CROUCH: On what basis of fraud.

MR. LINDQUIST: I'll bring that up with you afterwards.

Q Did you have discussions with Mr. Hughes with regard to the examination of your 1999 Federal income tax return by the IRS?

MR. CROUCH: You may answer whether you had discussions, not the substance of those.

Page 178

discussions.
A I may have, but I don't recall.
Q Are you asserting a claim of privilege with respect to your discussions with the IRS -- I mean with Mr. Hughes?
MR. CROUCH: Yes, he is.
THE WITNESS: Okay.
Q Did you agree to fully disclose the COBRA transaction to the IRS in 2003?
A I remember discussing with Mr. Baird, and I said: We have nothing to hide. And whatever you need to disclose or whatever, go ahead and do it.
Q I show what's been marked as Exhibit 166.
MR. LINDQUIST: I'll give you another copy.
MR. CROUCH: Thank you.
(PREVIOUSLY MARKED EXHIBIT 166.)
Q This is a letter dated January 7th, 2003 signed by Mr. Hughes with a copy to you and to Mr. Brooks.
Do you remember receiving this?
A I probably did, but I don't recall it. I know Mr. Hughes did a lot of stuff for me.
Q I show what's been marked as Exhibit 169

Page 179

in the deposition of Mr. Hughes --
(PREVIOUSLY MARKED EXHIBIT 169.)
Q -- this is the letter to the IRS dated April 17 of 2003.
And is that your signature and your wife's signature on the back?
A Yes, sir.
Q Did you and your wife discuss the details set forth in this letter?
A I don't recall, but I told her, like I did on most things, that E&Y would handle whatever was required.
Q Did your wife have any knowledge when she signed this letter as to the facts set forth in this letter?
A (No response.)
Q And if you would please take a look at the description of material facts that is described beginning on the first page through, I believe, to the end of the second page.
A No. She didn't have any facts other than what I told her.
Q I asked if she had any knowledge of those facts set forth when she signed the letter?
A No, sir.

Page 180

Q Did you have knowledge of the facts being represented here?
A I think these were representations of the various things that we did, to, yes, my knowledge.
Q So, you reviewed this letter before you signed it, to make sure that it was accurate?
A I believe I did.
Q I show you what's been marked as Exhibit 175 in the deposition of Mr. Hughes.
(PREVIOUSLY MARKED EXHIBIT 175.)
Q This is a letter addressed to you with respect to JACK Northern, March 25 of 2003, with respect to a document request. Do you recall getting this document request?
A I would like to say yes. I recall it because I'm addressed here, but I gave a copy of it to Mr. Hughes. I was in a brain hospital by this time.
Q Okay.
A So, I'm certain Mr. Hughes did everything.
MR. CROUCH: Clarify that I'm not sure if this is March 21, 2003.
THE WITNESS: No. It was May, I'm

Page 181

sorry. It was in May.
Q Were you -- you were asked before whether there was any promotional or marketing materials that you received with respect to the product that's been referred to here as the COBRA transaction.
And I would ask you again, did you ever receive any promotional or marketing materials describing the COBRA transaction?
A As I told you earlier, no, sir.
Q Was there any type of a white board used for purposes of writing down anything by -- about the COBRA transaction by anyone from Ernst & Young?
MR. CROUCH: Objection; vague and ambiguous.
Q White board, blackboard, piece of paper?
A That's what I was going to ask you. When you refer to white board, do you mean blackboard because we have blackboards here -- or --
Q Was there any type of a visual presentation of the -- outlining the planned transaction being proposed by Ernst & Young?
A No, sir.
Q Was there any type of a verbal presentation by anyone at Ernst & Young describing the planned transaction?

Page 182

A No, sir, not that I recall.

Q How is it that you had any understanding of the planned transaction being proposed by [illegible] Knight?

A To the best of my recollection, Mr. Knight talked about an investment strategy.

And since we were qualified investors under SEC rules, would we be interested in talking or hearing more about it?

And I think Jerry and I later agreed yes, we would be interested in hearing more about it.

Q And from whom did you hear more about it?

A I think it was Mr. Knight.

Q And was that at a subsequent time you rescheduled a meeting or scheduled a meeting?

A I think he was here more than once. In fact, I think he was here twice.

So, yes, I think that's when it was.

Q And was Mr. Hughes with him at the time of that second meeting?

A I don't recall, and I don't think so, sir.

MR. CROUCH: I want to make sure you agree he was here twice.

Page 183

Are you sure -- do you remember two meetings?

THE WITNESS: In all honesty, I'm just speculating on my own mind.

Q The first time when you were asked by Mr. Knight whether you wanted to hear more about it, was that -- was Mr. Knight here? Or was it possible that he was speaking with you all by phone?

A Mr. Calendar called us, I believe, and told us that somebody named Knight would be calling or contacting us. And would we be interested in talking with him, and I think we indicated, yes, we would be willing to talk with him. But he didn't say anything more than that.

Q And was that when you then set up a meeting or a meeting was set up for Mr. Knight to come to meet with you?

A I would guess so, yes, sir.

Q And do you recall whether Mr. Hughes attended that meeting with Mr. Knight?

A I don't recall.

Q Was that meeting here at these offices?

A Yes. When Mr. Knight came, he came here to the [illegible] offices, yes, sir.

Q And do you know in which conference room

Page 184

you all met with Mr. Knight?

A (No response.)

Q Was it this same conference room that we are in today?

A This conference room didn't exist at the time, sir.

Q Was it on the other side of the building?

A It was on the other side of the building.

There was a conference room between Jerry's office and my office.

And I'm probably 90 percent certain it was in that conference room.

Q So it was in the conference room between your two offices?

A Yes, sir.

Q And how many chairs -- how many people can that room accommodate?

A Comfortably, I think nine.

Q Did you all record that meeting?

A No, sir.

Q Was there any transcription of that meeting?

A No, sir.

Q Were there any notes taken during that

Page 185

meeting?

A I didn't take any, sir. Maybe Mr. Tucker did, but I don't recall.

Q Did Mr. Tucker have a habit of taking notes?

A He used to have little what he called stickies and little things that he would sometimes jot a note down or something. But I just don't recall, sir.

Q And at that meeting, did Mr. Knight have anything with him other than his own person?

A Not that I'm aware, sir.

Q Is it possible that he had something and you don't recall?

A He didn't leave anything at the meeting. He may have had something out in his car. I don't know, sir.

Q Do you recall whether Mr. Knight ever dropped off anything at your offices after a meeting?

MR. CROUCH: Objection; vague and ambiguous as to when.

Q After the meeting?

MR. CROUCH: At any time?

MR. LINDQUIST: At any time.

Page 186

MR. CROUCH: The relevant. Anything you're talking about?
A. I think he exchanged e-mails with Charlotte, my assistant.
And he may have exchanged e-mails with either Jerry and me, but I don't recall.
Q. You indicated that he may have had something in the car at the time of the meeting.
MR. CROUCH: Objection, mischaracterizes the testimony.
A. I'm speculating.
MR. [illegible]: Okay.
Q. I'm trying to focus in to the time of your initial meeting with Mr. Knight.
And you indicated that other than his person, he did not have anything with him to the best of your recollection.
But that he might have had something in the car.
Is that just sheer speculation on your part that he may have had something in the car?
A. Yes. He might have had his wife in the car. I don't know.
Q. Did anyone from Ernst & Young attend that meeting with Mr. Knight by phone?

Page 187

MR. CROUCH: Objection, asked and answered.
A. I think at a later meeting, Mr. Smith was on the phone and a Mr. Fahey or somebody from Deutsche Bank. And that was -- but that was, I think, in December.
Q. In the meeting -- the earlier meeting that you had with Mr. Knight when he was having a discussion with you and Mr. Tucker about the [illegible] transaction, did Mr. Brian Vaughn from Ernst & Young -- have you ever heard of the name Brian Vaughn?
A. No, sir.
Q. Have you ever heard of the name Richard Shapiro?
A. No, sir.
Q. Have you ever heard of the name Robert Coplan?
A. I think so, but it was spelled differently than what it was in a newspaper article.
Q. Okay.
A. I thought it was spelled differently.
Q. Can you describe for me any discussion that you may have had with a Robert Coplan?
A. I never had a discussion with him.

Page 188

Q. Did you ever know anyone named Robert Coplan from Ernst & Young?
A. I didn't know somebody, no, sir. And I never met him.
Q. Did you ever have any discussions with a person by the name of Rosenbaum, [illegible]?
A. What is the first name, sir?
Q. I think it's Richard -- or -- that's Richard Shapiro.
THE WITNESS: Richard Shapiro has now been indicted.
A. Excuse me. Sometimes if you give me a first name, it will trigger a memory, but I don't recall the name.
Q. Well, I don't recall the first name. I just don't remember the first name.
A. I don't remember anyone named Rosenbaum.
Q. And you have no recollection of anyone participating in that first -- that first meeting at your offices in between yours and Mr. Tucker's office by phone?
A. No, sir.
Q. Does that office -- does that conference room -- did that conference room in 1999 have

Page 189

conference ability?
A. It had conference call ability, yes, sir.
Q. Subsequent to that meeting in the conference room, did you have any type of a phone conference with anyone at Ernst & Young?
MR. CROUCH: Objection; subsequent to?
Q. Subsequent to the meeting with Mr. Knight in your offices, did you have any type of a phone conference with anyone -- I would say between that time, and the time of December 6 and December 7 of 1999, did you have any phone conferences with anyone from Ernst & Young?
MR. CROUCH: Regarding the COBRA transaction?
Q. On anything.
A. I'm certain I talked to either Dean Smith or Andrew Hughes or Tony Calendar, because they were our auditors.
And I used to talk with them almost on a daily or every-other-day basis.
Q. Did Kenney Hughes ever provide you with any materials related to the transaction that had been -- that you had discussed with Mr. Knight?
A. No, sir.
Q. Did Mr. Dean Smith ever provide you with

Page 190

any materials related to the transaction that you had discussed with Mr. [illegible]?

A. No, sir.

Q. Did Mr. [illegible] ever provide you with any materials related to the transaction that you discussed?

A. No, sir.

MR. LINDQUIST: No further questions.

MR. CROUCH: No questions at this time.

VIDEOGRAPHER: This completes the videotape deposition of James Boyd. The time is approximately [illegible] p.m. We are now off the record.

Page 191

WITNESS SIGNATURE

I, the undersigned witness, do hereby swear under penalty of perjury that I have read the foregoing transcription and made the following corrections, and signed my signature before a Notary Public as follows:

PAGE LINE CORRECTION

______________________________

WITNESS' SIGNATURE

SWORN BEFORE ME, ______________________

THIS THE ________ DAY OF ________ ______, [illegible]

COMMISSION EXPIRES ______________________

Page 192

REPORTER'S CERTIFICATE

I, Jane G. LaPorte, Court Reporter and Notary Public in and for the States of North Carolina and South Carolina, do hereby certify that the above and foregoing is a true and complete transcription of my stenographic notes, taken and transcribed by me.

Dated this [illegible] day of June, 2007.

______________________________

JANE G. LAPORTE