ERNST & YOUNG

Ernst & Young LLP
Suite 2800
600 Peachtree Street
Atlanta, Georgia 30308-2215

Phone [illegible]
www.ey.com

November 19, 2002

Internal Revenue Service
Small Business/Self-Employed Division
4995 Lacross Road, Suite 1400-A
N. Charleston, SC 29406

ATTN: Mr. Alan E. Moss
Internal Revenue Agent

**Re: Jerry & Anita G. Zucker**
**SSN 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**
**Form 1040 - December 31, 1999**
**IDR #3**

**VIA FEDEX**

Dear Mr. Moss:

This letter is in response to information requested in your Information Document Request #3, dated September 19, 2002. I apologize for the delay in responding. It is my understanding that separate, but identical IDRs have been issued to Mr. Zucker, Mrs. Zucker, Mr. Boyd, Mrs. Boyd, JBJZ Partners and JBJZ Investors. This response is intended to cover each of the IDRs.

**Item 1** – Please find enclosed a copy of the Ernst & Young LLP engagement letter to Mr. Zucker dated November 11, 1999. As we understand it, there are no other documents not previously disclosed to the Internal Revenue Service. A similar engagement letter was sent to Mr. Boyd.

**Item 2** -- In discussing this question with Ray Knight, Shawn Smith, Kenny Hughes and Mr. Zucker, we have determined that no promotional materials were either presented or provided to, or left with Mr. Zucker during consideration of the transactions. The same is true for Mr. Boyd.

**Item 3** - All available documentation has been previously provided. That documentation includes agreements, the legal opinions discussing the tax consequences of the transactions, the account statements, etc.

**Item 4** – Both Mr. Zucker and Mr. Boyd are extremely sophisticated investors and have extensive experience with "financial products," including currency transactions and options trading. Both taxpayers well-recognized that the investments carried substantial risk as well as opportunity for generating a significant profit in a short period of time.



A Member Practice of Ernst & Young Global

EXHIBIT
tabbies
7

3254

Both knew that the profit potential exceeded all costs and fees associated with the transactions. In addition, Mr. Zucker and Mr. Boyd understood that potential existed that if the final strike price was in a very narrow range, any specific long option would be "won," while the short option in the same currency would not have to be fulfilled. This provided a unique opportunity to generate a very large profit on the transactions. For Mr. Zucker, you might recall that, among other transactions, his LLC bought Euro/U.S. Dollar digital options at U.S. $1.0123 per 1.0 Euro with a payoff amount if in the money totaling $40,000,000. In addition, the LLC sold Euro/U.S. Dollar digital options at U.S. $1.0121 per 1.0 Euro with profit potential of $37,500,000. If the strike price at the moment of termination of the positions (December 22, 1999 at 10:00 A.M., EST) had been either U.S. $1.0122 or $1.0123, Mr. Zucker would have "won" on the long option position and would not have had to cover the short options, resulting in a taxable profit on the separate transactions of $77,500,000. Similar opportunities for large profit existed on the Japanese/U.S. Dollar options as well as for Mr. Boyd. While the nature of the options made daily prices somewhat unimportant until the moment of expiration, it was not unusual to be "in the money" and "out of the money" periodically on the same day and this could be tracked. I am aware of at least one situation where the daily closing price was, in fact, at an exact strike price needed to win both sides of the transactions.

Thus, while both Mr. Zucker and Mr. Boyd understood the inherent and significant risks in investments as sophisticated as these, their prior experience led them to conclude that the opportunity to make a significant return on their individual LLC's investments over a 30-day period, as well as the possibility of hitting a "home run" on one or more of the option pairs, made the investment strategy a worthwhile undertaking, even without regard to the tax attributes of the transactions. Indeed, the transactions resulted in significant income over a short period of time, e.g. $625,000 gain for JBJZ Partners over approximately 30 days, as several transactions finished "in the money."

I would like to briefly address two similar Service concerns, one of which you mentioned in your IDR – that the taxpayers were not substantially at risk under §465 of the I.R.C., or that the flow through losses were not considered passive activity losses under §469.

I.R.C. §465(a)(1) restricts an individual's ability to recognize tax losses from an activity to the taxpayer's aggregate at-risk investment as defined in §465(b). Sec. 465(b) provides that a taxpayer's at-risk investment is the sum of cash and property contributed to the activity, plus borrowed amounts for which the taxpayer is personally liable. A complicated series of rules applies to the definition of what constitutes a borrowed amount that may be taken into account for purposes of Sec. 465. By definition, all liabilities of a limited liability company, whether specifically recourse or nonrecourse to the entity, are nonrecourse to its members. However, recall that the long and short option positions were contributed by the separate LLCs to the JBJZ partnership. Thus, obligations that may have been nonrecourse in the LLC entity structure were not nonrecourse at the partnership level.

Under §465, the statutory language is worded exclusively in terms of the at-risk investment of the taxpayer. Unlike in the context of partnership basis under Reg. Sec.

1.752-2, where a taxpayer may receive basis in its partnership interest for loans provided by related parties (and may even be allocated the entire amount of such liability), §465 contains no such benefit for a taxpayer for potential at-risk amounts that may be supplied by parties related to the taxpayer.

My earlier letter regarding the technical determination of the basis of each partner's share in his partnership interest and each shareholder's share in the S Corporation indicated that the long options clearly qualified as property contributed to a partnership with attendant increase to basis, and further, that the contribution of the short option position to the partnership was not a contribution of property and did not have the effect of reducing either partner's basis in his partnership interest.

The long option position was property with adjusted basis attributable to each partner The partnership basis position being correct, the expiration of various option positions negates the question of "at risk" under §465 and the reported losses may flow through to the returns of the two partners/shareholders.

I.R.C. §469 provides the legislative basis for the so-called passive activity loss rules. The passive activity loss ("PAL") rules under I.R.C. §469 limit the ability of a taxpayer to deduct passive activity losses. A passive activity is generally defined as an activity involving the conduct of a trade or business in which the taxpayer does not materially participate. Generally, passive losses may be claimed only to the extent of passive income. If an activity generates passive losses that cannot currently be offset by passive income, the passive losses are suspended and carried over to future tax years. The suspended losses can be deducted either (1) against passive income generated in future periods, or (2) against gains generated upon the taxpayer's disposition of his interest in the passive loss activity. Normal tax strategy would dictate that taxpayers that have no passive activity income should avoid PALs because they may not deduct their disallowed PALs until they dispose of their interest in the passive activity. Further, taxpayers holding interests in passive activities that generate losses should attempt to generate legitimate passive income so that they may utilize the passive losses arising from their loss activities.

## Trading of Personal Property Not a Passive Activity

Under Treas. Reg. §1.469-1T(e)(6), "[a]n activity of trading personal property for the account of owners of interests in the activity is not a passive activity . . . " This is true regardless of whether or not the activity is deemed to be a trade or business. See Treas. Reg. §1.469-1T(e)(6)(i). For purposes of this regulation, the term personal property is generally defined as "any personal property of a type which is actively traded." See Treas. Reg. §1.469-1T(e)(6) and IRC §1092(d). The regulations provide an example to illustrate the regulation (see Reg. Sec. 1.469-1T(e)(6)(iii)):

> A partnership is a *trader* of stocks, bonds, and other securities (within the meaning of section 1236(c)). The capital employed by the partnership in the trading activity consists of amounts contributed by the partners in exchange for their partnership

> interests, and funds borrowed by the partnership. The partnership derives gross income from the activity in the form of interest, dividends, and capital gains. Under these facts, the partnership is treated as conducting an activity of trading personal property for the account of its partners. Accordingly, under this paragraph (c)(6), **the activity is not a passive activity** [emphasis added].

In *Moller v. Commissioner*, 721 F2d 810 (Fed. Cir. 1983), the Federal Circuit Court, citing *Purvis v. Commissioner*, 530 F2d 1332 (9th Cir. 1976), stated the test to be used in order to distinguish between an "investor" and a "trader." According to the court, if the taxpayer is an investor the "securities are purchased to be held for capital appreciation and income, usually without regard to short-term development that would influence the price of securities on the daily market." If the taxpayer is a trader, according to the court, the "securities are bought and sold with reasonable frequency in an endeavor to catch the swings in the daily market movements and profit thereby on a short term basis." The court went on to state, "in order to be a trader, a taxpayer's activities must be directed to short-term trading, not the long-term holding of investments, and income must be principally derived from the sale of securities rather than from dividends and interest paid on those securities. In determining whether a taxpayer who manages his own investments is a trader, and thus engaged in a trade or business, relevant considerations are the taxpayer's investment intent, the nature of the income to be derived from the activity, and the frequency, extent, and regularity of the taxpayer's securities transactions."

Based on the above, the transactions entered into by the partnership and S Corporation were those of a "trader," as defined in the regulations, the activity therefore not being considered a passive activity, and not subject to the limitations of I.R.C. §469.

Based on the above discussion, there are no issues to be raised by the Service regarding the "sham" transaction doctrine, the "economic purpose" doctrine, or the profit motive of the taxpayers. Additionally, §§465 and 469 do not operate to deny the claimed tax treatment of the transactions.

**Item 5** – To the best of my knowledge and understanding, there exist no documents regarding the LLCs, the Partnership and the S Corporation that have not been disclosed, either in conjunction with the disclosure initiative under Announcement 2002-02, or in response to Information Document Requests.

**Item 6** – I believe this question relates to the Canadian Currency transactions. On December 22nd and 23rd of 1999 JBJZ Partners purchased Canadian Dollars at .6800. These transactions are reflected in the Deutsche Bank Alex.Brown December statements (copies enclosed). The Canadian Dollars were among the assets transferred to JBJZ Investors, Inc. on December 28, 1999 arising from the liquidation of JBJZ Partners. The partnership basis attached to the Canadian Currency holdings as discussed in our prior letter, and these holdings were liquidated by the corporation on December 29, 1999 at .6852. The sale of the currency is reflected on the Deutsche Bank Alex.Brown December

1999 statements for the corporation (copies enclosed). The actual trade tickets are not available, but the monthly statements confirm the transactions.

I believe we are in receipt of requests to extend the statute of limitations for the December 31, 1999 tax years of the two partners/shareholders. I would like to discuss with you limiting the extension requests to the issues raised thus far during the examination of the tax returns of the Zuckers and the Boyds. I believe the Service has been amenable to using restricted consent procedures to ameliorate the concern of lengthy extensions expressed in other similarly situated examinations of taxpayers.

Mr. Moss, I enjoyed our meeting a few months ago in Greenville and found the discussions of that day to be very interesting. If you have any questions regarding any of the information, please call me at 404-817-4834.

Very truly yours,

Nelson A. Brooke
Principal

Enclosures

cc: Jerry Zucker

Jim Boyd

Ray Knight, Ernst & Young LLP

Kenny Hughes, Ernst & Young LLP

From. NELSON A. BROOKE (404)617-4634
ERNST & YOUNG LLP
600 PEACHTREE STREET. NW

ATLANTA, GA, 30308

REVENUE BARCODE

FedEx.

To: Debra L. Simmons -- Int. Rev. Agent (843)566-0207
Internal Revenue Service
SB/SE Division
4995 LaCross Road, Suite 1400-A
N. Charleston, SC, 29406

SHIP DATE: 12APR02
WEIGHT 1 LBS

Ref: 150 001 10216 003

RELEASE# 3785346

DELIVERY ADDRESS BARCODE(FEDEX-EDR)

TRK # 7918 1495 7830 FORM 0201

FedEx STANDARD OVERNIGHT

CHS

MON
A1

29406-SC-US XH CHSA

Deliver by:
15APR02

Please fold this document in half and place it in the waybill pouch affixed to your shipment so that the barcode portion of the label can be read and scanned. *** WARNING: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.

## Shipping Label

Schedule Courier | Find a Dropoff Location | Shipping History

Shipment Complete | Cancel Shipment | Edit Shipment Information

1. Use the "Print" feature from your browser to send this page to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping label pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

### Shipment Details

To print a copy of the shipment information for your records. please click "Shipment Details" Shipment Details

**Ship a New Package**

Ship Inside U.S. | Ship Outside U.S. | Ship to Same Recipient

Use of this system constitutes your agreement to the service conditions in the current FedEx service Guide available upon request.
FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery or misinformation unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.