ERNST & YOUNG

Ernst & Young LLP
Suite 2800
600 Peachtree Street
Atlanta, Georgia 30308-2215

Phone: (404) 874-8300
www.ey.com

April 23, 2003

Internal Revenue Service
Small Business/Self-Employed Division
4995 Lacross Road, Suite 1400-A
N. Charleston, SC 29406

ATTN: Mr. Alan E. Moss
Internal Revenue Agent

**Re: JBJZ Partners**
**EIN 57-1088089**
**Form 1065 - December 31, 1999**
**Information Document Request #4**

Dear Mr. Moss:

Please accept my apology for not providing this response as soon as requested. On April 1st I reduced my work schedule to two days per work. Unfortunately, my workload has not quite followed suit as I scale back my activity. I will continue to represent the JBJZ group for the foreseeable future. In addition, it was important that both Mr. Boyd and Mr. Zucker have an opportunity to contribute to this response. As I think you know, Mr. Boyd was involved in a severe automobile accident and is completely incapacitated.

On another note, Mr. & Mrs Boyd received a letter directly from LMSB, Financial Services, Territory 8, requesting numerous items of information related to Brown & Woods, one of the law firms that issued a more likely than not opinion regarding the transactions entered into by the entities. I am concerned that the existing powers of attorney were bypassed by the FPS Group, and suspect that you may have been as well. A copy of the inquiry letter is attached, and we will respond to it shortly, given Mr. Boyd's physical condition.

Item #1 – Engagement letter question re "implementation of the COBRA strategy." The acronym COBRA means "Currency Options Bring Reward Alternatives." As discussed previously the investment in foreign currency was designed to secure a short-term economic profit (not without significant risk) as well as important tax advantages to the investors. The actual implementation of the strategy involved the investment in the long and short options in one or more foreign currencies against the U.S. dollar. The strategy was implemented as described in my letter of November 19, 2002, under item #4. There were many choices available to Mr. Boyd and Mr. Zucker, including which currencies against the dollar they believed had the best chance for being "in the money" at the time of expiration, the spread available to them, as well as other investment vehicles and

ZEY 001140



EXHIBIT
tabbies
9

opportunities. It is my understanding that probability models available at the time reflected the potential to secure a return of around 35% over a thirty-day period with attendant risk. Mr. Boyd and Mr. Zucker were left to their own analysis as to the attractiveness of the various investments and achieved excellent results with their investments.

Along with the economic gain came the legal position that the tax benefits of the technical interpretation of the partnership provisions were also significant, assuming they reflected the correct legal interpretation of the statute, a position strongly supported by the two legal opinions previously provided. In general, sophisticated investors like our taxpayers find this kind of play in the digital options market intriguing, and a worthwhile investment. Keep in mind that late 1999 reflected the Y2K concern and a general feeling that the United States was better prepared than Europe or Asia for the millennium date change. For some this made the U.S dollar an attractive play against the foreign currencies of Europe and Asia. Each investor formulated his own strategy within the overall "COBRA strategy."

The mechanics and the actual transactions are fully described in the legal opinions as what transpired did, indeed, follow the strategy.

The engagement letter used the phrase "desired loss." The taxpayers and their advisors recognized that along with the potential for significant economic gain came some favorable tax rules that would enable them to offset personal income with loss incurred by the flow through entity. Thus, the investment, the risk, and the success could potentially be tailored within the strategy to offset other sources of income. The amount of the offset or loss was subject to numerous factors but would lie within a reasonably definable range, leading to the potential to realize the technical losses in varying amounts. This led to the use of the term "desired loss" in the engagement letter.

Item #4 – The establishment of the ranges between the long and short options was a function that had a direct relationship to the premiums charged by the unrelated third party. Because of the "sweet spot," a widening of the range between the options would have resulted in an accelerating premium cost, as the third party would have to cover its own risk. As in any business transaction, both sides analyze their risk tolerance and decide the parameters of their investment. A very narrow range in option prices kept the premiums at an affordable level, while leaving a strong possibility of significant economic success and at least some likelihood, albeit very small, of hitting the "sweet spot," for a massive gain.

Increasing the prospects of securing the exact same economic gain, but with a higher likelihood, would have meant widening the spread and paying escalating premiums. Thus, the analysis undertaken by the taxpayers convinced them to keep the options in a narrow range and manage the risk with a lesser premium. This is a normal risk analysis process, although one undertaken here in a very sophisticated investment arena. I do not know if a specific range was recommended, but do not believe it would significantly

affect the outcome of the transactions other than for economic purposes, i.e. added costs for a higher likelihood of securing the economic gain.

Item #6 – Because of the basis shifting interpretation of the IRC and related material discussed in my earlier letter, the S Corporation had cash and basis attached to the cash The Canadian currency was purchased as an investment with full recognition that the purchase of the currency followed by its sale before the close of the tax year would result in a comparison of the sales price of the currency with the adjusted basis of the currency, here well in excess of the cost. On the Form 1120-S for December 31, 1999, the currency transaction is reflected as an ordinary loss on Form 4797 and is carried to line 4 on page 1 of the return. Schedule D transactions flow through directly to the two shareholders as shown on the Schedule K-1s. This final transaction for 1999 is a part of the COBRA strategy.

Mr. Moss, I hope the above information is of assistance to you. If you have any questions please call me at 404-817-4834. Again, my apology for the tardy response.

Thanks.

Very truly yours,

Al Brooke

Nelson A. Brooke
Principal