IN THE UNITED STATES COURT OF FEDERAL CLAIMS

JZ BUCKINGHAM INVESTMENTS LLC, )
Plaintiff ) Case No
vs. ) 05-231 T
THE UNITED STATES, )
Defendant. )

Courtroom 4
National Courts Building
717 Madison Place
Washington, D C.

10:07 a.m.
Thursday, July 19, 2007

DEPOSITION OF JERRY ZUCKER

BEFORE THE HONORABLE EDWARD J DAMICH



APPEARANCES:

ON BEHALF OF THE PLAINTIFF:
JOEL N. CROUCH, ESQ.
M. TODD WELTY, ESQ.
Meadows, Collier, Reed,
Cousins & Blau, LLP
901 Main Street, Suite 3700
Dallas, Texas 75202
(214) 744-3700

ON BEHALF OF THE DEFENDANT:
DENNIS M. DONOHUE, ESQ
JOHN A. LINDQUIST, ESQ.
DAVID M. STEINER, ESQ.
Tax Division
U.S Department of Justice
P O Box 55
Washington, D.C. 20044
(202) 307-6492

***Index appears at end of transcript***



P R O C E E D I N G S

\- - - - - - -

THE COURT: This is the case of JZ Buckingham Investments versus the United States, Docket Number 05-231T. And representing the plaintiff is, let me see, Mr. Joel Crouch

MR CROUCH: Yes, and Mr. Todd Welty is here this morning also, Your Honor

THE COURT: Okay Mr. Welty and Mr. Crouch. And representing the United States is Mr Dennis Donohue.

MR DONOHUE: Yes, Your Honor. And with me this morning is Mr. David Steiner, S-T-E-I-N-E-R.

And also Mr. Lindquist from yesterday will be joining us.

THE COURT: Okay Great. Thanks.

Okay. Welcome to all of you. And I understand that we have Mr. Zucker standing by

MR. CROUCH: We do. We have Mr Zucker right there.

THE COURT: Great.

MR CROUCH: He's ready to go, Your Honor.

THE COURT: Super. Okay Let me first



see if I can remember what the ground rules were. I believe the government has already deposed Mr. Zucker; is that correct?

MR DONOHUE: Yes, Your Honor. That is correct

THE COURT: Okay. So it's going to be as if it was direct testimony

MR. CROUCH: Yes I'm going to take direct testimony today, Your Honor. I assume the government is going to ask questions probably, as follow-up to my questions.

THE COURT: Okay

MR CROUCH: Presumably if the Court would like to ask questions, we would also be happy if the Court would like to ask questions.

THE COURT: Is it in the nature of a cross-examination then for Mr Donohue?

MR. CROUCH: That's my understanding, Your Honor.

MR DONOHUE: Yes, Your Honor. We are prepared to do cross-examination.

THE COURT: Great. And we talked a little bit yesterday about admissibility, objections, et cetera. What is the -- what is the view?

EXHIBIT
tabbies
1

MR CROUCH: I believe --

THE COURT: Go ahead.

MR CROUCH: My understanding is we're treating this like a deposition, Your Honor. And we will -- objections will be lodged and ruled on by the Court at a subsequent time.

THE COURT: Okay Is that correct. Mr. Donohue?

MR DONOHUE: Yes, sir. That's our understanding.

THE COURT: Do we have any documents to be admitted?

MR. CROUCH: No, we don't.

THE COURT: Not admitted, but to be shown?

MR CROUCH: We have documents to be shown, Your Honor. We have placed up there for the Court a copy of the notebook we're providing, a copy for the witness also, of some documents, and we've given a copy to the government also.

THE COURT: And you're agreeing there's not an admission then of these documents at this time?

MR. CROUCH: At this time that's correct, Your Honor.



THE COURT: Mr. Donohue.

MR. DONOHUE: Yes, that's correct. Your Honor.

THE COURT: Okay. Great. Thanks very much. Welcome again, Mr. Zucker. Would you please stand so I can -- can you stand? Do you feel all right?

THE WITNESS: Yes, I can.

THE COURT: I'll administer the oath.

Whereupon,

JERRY ZUCKER

was called as a witness, and, having first been duly sworn, was examined and testified as follows:

THE COURT: You may be seated.

THE WITNESS: Thank you.

THE COURT: And state your name for the record. You are?

THE WITNESS: Jerry Zucker. Z-U-C-K-E-R.

THE COURT: Mr. Crouch, your witness.

MR. CROUCH: Your Honor, thank you.

DIRECT EXAMINATION

BY MR. CROUCH:

Q Mr. Zucker, you understand you're here today for purposes of the deposition for purposes



of preserving your testimony, and that it may be used at trial if you're not available at that time?

A Yes, I do.

THE COURT: Excuse me just a minute, Mr. Crouch. If you would like to remove your jacket, Mr Zucker, you can do that.

THE WITNESS: Thank you very much.

THE COURT: Just tell me whenever you want to, if you want to take a break. I'll probably do a break once every hour, if that's okay But if you need it more often than that, just let me know

MR. CROUCH: Your Honor, we do know that we have -- the tapes we understand are an hour and 20 minutes long I will get a signal from the videographer as to when we're getting close to the end.

THE COURT: Okay.

MR. CROUCH: We'll try to keep the Court informed of that also.

THE COURT: Super. Great. Thanks.

BY MR. CROUCH:

Q You understand, Mr Zucker, that I will be asking you questions today, as will probably --



likely the government and possibly even the Court. Do you understand that?

A I do.

Q Can you tell me where you currently reside?

A Charleston, South Carolina.

Q And how is it that you came to reside in Charleston, South Carolina?

A I immigrated to the United States My father is the only survivor of a family of 11 from the Holocaust from Lowicz, Poland, and he immigrated to what was Palestine at the time I was born in Tel Aviv. And my mother and brother and father and I, we all came over in 1952.

Back in those years, the only way you could legally get in the United States was through sponsorship. And my father had an uncle who had come to the United States before World War II. And he sponsored us. He happened to live in Charleston.

So they first put us up at the Benjamin Franklin Hotel in New York, where we had a mandatory course in English, concepts of American democracy and American history. Very brief course, about four weeks And then they put us on

a bus to Charleston, which is where our sponsor lived. That's how I came to be originally in Charleston. But I ended up moving back to Charleston again at a later date. After the end of 1977.

Q Okay. Can you give a little bit of your educational background?

A Yeah. I have a triple major, Bachelor of Science in mathematics, physics, chemistry. And I have a Master's in electrical engineering. It was a 5-year Bachelor's/Master's program at the University of Florida. Graduating in 1972.

THE COURT: Do you have water?

THE WITNESS: I do. And I actually have some hot tea that the Court's provided. Thank you very much.

BY MR. CROUCH:

Q Did you pursue any degree after 1972 at the University of Florida?

A No. I did pursue additional education, but just auditing courses that were of interest to me, in science and business and bioelectronics and other subjects that were of interest.

Q Can you give me some examples of courses --



A MUSC, College of Charleston, Citadel. Proteonics, bioelectronics, bioengineering. Courses in business that were part of their MBA program that I thought would -- would enhance my knowledge.

Q Did you get any degrees beyond the --

A No.

Q You have to let me ask the questions --

A I'm sorry.

Q -- so the court reporter can get it down.

Did you get any degrees beyond the degrees you obtained in 1972 from the University of Florida?

A I've got three honorary doctor degrees, from MUSC -- Medical University of South Carolina -- College of Charleston, and from Johnson & Wales.

Q I should have reminded you, Mr. Zucker. The court reporter is trying to take down what you say. So if you could slow down a little bit.

A Okay. I'm sorry.

Q And if you could also, when I'm asking a question, let me finish the question, so that the court reporter can get down the question, and that



you can then answer the question. I'll try not to run over you at the same time. That's okay?

A My apologies.

Q Why don't you give me a little bit of your work history, starting in -- tell me a little bit about your work history.

A I had my first job when I was 10 years old washing dishes in a restaurant for 35 cents an hour. And when I was age 12, my father ran into an individual who had been laid off from St. Regis paper mills and he was starting a radio/TV repair business. And my father arranged for me to get a job as an apprentice in the radio/TV repair shop. And as it turned out, Mr. Grauer, the proprietor, was actually an excellent teacher. He taught me very well. So that was my first.

Then I ended up entering a science competition. And I ended up doing very well in the science competition. I had a science project that was called "A revolutionary method for determining distance and direction utilizing the distance phase factor for co-linear electromagnetic waves." It's a fancy title for, I came up with a means of eliminating the need for triangulation when you want to find something



electronically in three dimensions, by measuring the phase differential of two energy waveforms, you ended up being able to measure its distance. It ended up being used as the guidance telemeter for the lunar lander in the Apollo program.

And as a result of that, I ended up with a variety of job offers, which led to my going to the University of Florida. There was a company in Gainesville, Vital Industries. And they hired me, even though I had not yet started college, to be an engineer for -- designing video matrices and special effects equipment for the broadcast industry.

Q And did you work for Vital Industries when you graduated from the University of Florida?

A I did.

Q Okay.

A I worked for them before and after. But simultaneous with that, I already had an entrepreneurial bent and I had started several businesses during the same course of time, including manufacturing linear amplifiers for CB radios.

Since then I maintained a relationship -- my wife of some -- she's been my

wife for 37 years. but I started dating her almost 41 years ago We had an understanding that was prenuptial that anything I made in salary with others we would spend on ourselves and family. and that anything I made in business I would keep reinvesting. which I in fact did for some 22 years.

Q You've kind of given us some background there. Can you tell me around 1999 what type of businesses you were in?

A 1999. I was -- lots of businesses. We had. at that time. about 147 operations in 27 countries around the world. I was the chairman. president. CEO of a public company called Polymer Group, and -- which was a company. I took a portion of the InterTech Group. which I took public in 1996.

And I was also the founder. chairman. president and CEO of the InterTech Group and numerous of its subsidiaries.

Q Can you tell me a little bit about the InterTech Group What does it do?

A If it relates to polymers. fibers. resins and composites. we probably do it We make everything from flexible printed circuit boards to



cryogenic thermal seals --

Q You have to talk a little bit slower because you're using some technical terms.

A Cryogenic thermal seals and insulations. and a variety of other. generally polymer based products We also have various electronics services and a variety of other businesses that are under the holding company

Q Are you the -- who are the owners of InterTech?

A Today I'm the sole owner.

Q Have you always been the sole owner of InterTech?

A No

Q Who are the previous owners of InterTech?

A Jim Boyd had a 25 percent interest. He was my partner.

Q Can you tell the Court who Jim Boyd is?

A Jim Boyd. he started off being a tax consultant. corporate structuring attorney. He worked for a firm called Evans, Boyd & Carter in Charleston And I started using him in the. I think it was the late -- late '70s. And eventually brought him in. He was -- essentially



all of his practice became me So I asked him to join my firm. And he became my --

Q And when was it you asked him to join your firm?

A I believe it was 1985.

Q Okay. What did Mr. Boyd do when he joined your firm?

A He became my chief financial officer and became my partner in the truest sense. He was a brilliant. brilliant man.

Q When you say he became your partner in the truest sense. did he become your business partner?

A Yeah. He was my business partner. my confidant. my -- in every -- in every way. We entered into real estate partnerships We ended up doing corporate deals together. We -- he became much more than just a CFO.

Q I think you indicated Mr. Boyd at one point was an owner -- partial owner in InterTech; is that correct?

A That's correct.

Q How much interest did he own in InterTech?

A 25 percent



Q He no longer owns that interest in InterTech?

A No. After he had a tragic accident in May of 2003. he was in a coma. When he did eventually come out of the coma. his family and he asked that I buy him out. which I did in the fall of 2004.

Q Can you explain kind of what was the relationship you had with Jim Boyd? In other words. he was your business partner. What did he bring to the table to assist you in your business practices?

A He was just an extraordinarily brilliant man. He brought depth of understanding. financial acumen. legal understanding. He was a corporate attorney He was -- when I brought him over. he was General Electric's corporate attorney for the state of South Carolina. for all their structure. just to give you an example of his capabilities. He was also just a fine human being in all respects.

Q You mentioned I think earlier. Polymer Group. Is that also known as PGI?

A That is PGI. yes.

(Plaintiff's Exhibit Number 14 was

marked for identification )
BY MR CROUCH:
Q Would you take a look at what we've marked as Exhibit P-14 that's sitting next to you there.
A Yes.
Q Do you recognize this document --
MR CROUCH: I have to warn everybody, when you open this all the way up, it's actually a talking document. It talks to you So I apologize. That's the only one we had.
BY MR. CROUCH:
Q But can you tell --
THE COURT: Are we supposed to mark these exhibits?
MR. CROUCH: We're marking for purposes -- you should have a marked copy on the front, Your Honor.
THE COURT: Yeah. It says P-14.
MR. CROUCH: And I'm going to be giving copies of these to the court reporter, these copies that are up here.
THE COURT: All right. Thanks. Excuse me Mr Donohue?
MR DONOHUE: Your Honor, I must be slow



because I turned to my notebook
MR CROUCH: I'm sorry. It's right here.
MR. DONOHUE: Oh
THE COURT: It's far more dramatic than your notebook
MR. DONOHUE: I'm afraid to open it.
MR. CROUCH: Your Honor, I'll show you --
THE COURT: Has the voice been sworn?
MR. CROUCH: The voice has not been sworn Your Honor, if you open the front cover and open this last part --
THE COURT: Oh, I see
THE WITNESS: If you just don't open that last flap.
MR. CROUCH: One of them. I don't know which one it is, doesn't actually talk. I probably gave that one to the government actually.
THE COURT: I see what you mean.
MR CROUCH: I was just warning everybody because I sure didn't want to get on the record there.
BY MR. CROUCH:
Q First of all, do you recognize this



document, Mr. Zucker?
A Yes It's the 1999 annual report for the Polymer Group.
Q Okay. Can you tell me, is this something that was produced in your business?
A Yes, it was. I -- as you can see on the fourth and fifth page, that I was the chairman, president and CEO. And there's a photograph of me standing next to Jim Boyd, who was the chief financial officer.
Q I assume those are your signatures on the next page, also?
A They are.
Q Would you also turn, if you would, look at, I guess it's page 3 Excuse me Not page 3. Page 23. I'm sorry.
A 23.
Q And would you look there, it appears -- who is your independent auditor --
A I'm sorry I'm not on the page. 23. Okay. I'm on 23
Q Okay And who does it say your independent auditors are?
A Ernst & Young.
Q Can you tell me a little bit about what



the Polymer Group is?
A Well, it's the second nonwovens company that I founded, but today it's the third largest nonwovens company in the world.
Q Can you tell the Court what a nonwovens company is?
A If you think in terms of the materials that you see in a diaper or feminine hygiene product, the materials are polymers that have been spun. Instead of being woven together they're placed together. It almost looks like tissue paper, but it's made out of polymers. They're made in various forms, both by thermal melt as well as, there are various spun mill processes and water injection methods. There are a variety of methods of making these products that appear to be textiles but they're not made with the traditional process of making textiles.
Q Would you look on the inside flap, if you would, please, of this document. Try not to open up the talking part.
A Yes.
Q And can you tell me what this map is showing on the inside here?
A It shows many of the international

locations You actually have to partially move that left side up to appreciate it But it shows that we're basically on almost all the continents of the world in terms of locations.

Q Is -- is PGI the only company you had that had facilities --

A No

Q That are -- facilities all over the world?

A No I, both at that time as well as today, have operations all over the world. And I had -- I was also at the same time the chairman, president and CEO of a company called Polypore, which is now also a public company, which I also founded. It went public in the New York Stock Exchange this year.

And after I -- I had sold it a few years ago to Warburg Pincus.

Q You indicated that PGI had facilities all over the world. I think you indicated earlier InterTech was also a multinational company?

A That's correct.

Q In your role in working for these companies did you have some experience in working with foreign currency?



A Routinely.

Q Okay. What kind of things would you work with in foreign currency?

A We were doing trade in various currencies around the world. I have to try to match as close as I could expected revenues in one currency with protecting my balance sheet and earnings in US dollars here in the States where everything was consolidated.

Q Did you --

A So I --

Q Did you do any kind of hedging?

A I did. I did both natural hedging as well as synthetic hedging, derivatives, currency, option trades, a variety of means of protecting myself.

Q Tell me what a natural hedge is.

A A natural hedge is when you try to anticipate when receivables will be paid and what currency they're in versus the purchases that you're making for inventory of raw materials, to anticipate matching the two together so that you're not short a particular currency. That you don't have to worry about the variation in the currency value



Q What is -- I guess in contrast what's a synthetic hedge?

A Synthetic hedge is where you go to generally a third-party institution and you ask to lay off the risk by either buying currencies or anticipating the purchase of a currency through buying an option, so that you can lock in the values so that you don't expose yourself to a potential variance in the exchange value

Q Okay And you may have explained this, but make sure I understand this. When would you be using, you know, some sort of hedging in your business?

A When?

Q Yes, when?

A Routinely If I got a large contract, for example, from one of our Japanese customers, and if it was yen denominated, but yet I wanted to make sure I was locking in my margin in US dollars, I would have to either lock in a synthetic hedge by buying an option, actually trading in the currency, or purchasing inventory in the same currency to anticipate the offset, so I can maintain my margin.

Q What foreign currencies did you have



experience in?

A Numerous. But the ones that were most active were, at the time -- and I'm going pre-1999 because the euro was only actively traded for about that one year. It started actively trading in about January of '99, although it had already been fixed in terms of the deutsche mark, in relationship to the French franc and to the other major European currencies. So all of the European currencies I was actively involved in, particularly deutsche marks, British pounds sterling, French francs, occasionally Swiss francs, and in Asia, primarily yen But I'd also in the Middle East done shekels from Israel And once -- very rarely but on a couple of occasions I did Canadian dollars as well.

MR. CROUCH: I'm sorry, Your Honor. I want to turn around and make sure we don't have somebody in the gallery that --

THE COURT: Excuse me. Ma'am, could you identify yourself.

MR. LINDQUIST: I'm with the Department of Justice.

MR CROUCH: I know who you are.

MR. DONOHUE: Your Honor, this woman who

is right behind me is my paralegal, that is Prudence Black

THE COURT: Okay Great. Thanks. That's okay?

MR. CROUCH: That's fine. Your Honor

THE COURT: I want to note for the record Mr. Lindquist has arrived as well.

MR. CROUCH: Thank you.

BY MR. CROUCH:

Q I'm sorry You also made reference to derivatives. What are derivatives?

A Derivatives are just indirect means of hedging -- hedging your bets as well as trading in currencies. For example, I've done total return swaps. And that would be considered a derivative transaction, without having to go through all the complexities

Q That's fine.

A It's just means of contracting for values that were not otherwise naturally available by buying and selling product.

Q Okay. With reference in Exhibit P-14, there was a reference to Ernst & Young?

A Yes.

Q Who is Ernst & Young?



A Ernst & Young is one of the auditing firms that we use. They are the consolidating audit firm and advisor that we've used for about two and a half decades

Q Okay. And what -- you said auditing Did they do anything other -- did Ernst & Young --

A They provide tax --

Q Let me finish my question for the court reporter. Do they do more than just auditing work for you?

A They do.

Q What else do they do for you?

A They provide tax advice Often they'll even coordinate introducing us to some of their other clients so that we can form, you know, mutual partnerships, joint ventures, and business relationships that they introduce us to, among, you know, providing structural concepts to us, which, you know, they do as a routine

Q Do you currently use Ernst & Young now?

A I do.

Q Okay looking at and focusing on 1999, can you tell me who you interacted with at Ernst & Young in 1999?

A Oh, back in those days, it would have



been Tony Callendar, Kenny Hughes, Shawn Smith, Ray Knight, Steve Balzer, David Green, Jimmy Wilson. There were a variety of people back in that period of time for various purposes.

Q Let's take each one separately here. I think you mentioned a Tony Callendar at E&Y. What did he do for you?

A He was our point person He was the partner that oversaw the account relationship And he -- he served to get me to wherever I needed to get an answer, as well as provided oversight for the other partners

But Ernst & Young had a practice of rotating these partners so that -- as an internal requirement. Although frankly I liked him. I didn't really want to have him rotated away. But they rotated him.

Q You also mentioned I think a David Green. Who is David Green?

A Right. David Green also was a rotation partner. But at the time he was coordinating subsidiary consolidations.

Q Okay. And I think you mentioned a Mr Wilson?

A Jimmy Wilson I think was the person that



was charged with -- he was one of the coordinating people for the tax department.

Q All right. And then I think you mentioned a Kenny Hughes?

A Kenny Hughes, I didn't work with him that much. Jim Boyd did. But he -- he and a fellow named Shawn Smith would often provide structural input and tax advice and, you know, means of maximizing capital retention when you're dealing with overseas transactions and repatriation of capital from foreign entities into the US and so forth.

Q Okay. And I can't -- I didn't get them all down here. Is there anybody else that you mentioned?

A Yeah. Ray Knight.

Q Okay. Okay. What did Mr. Knight do for you?

A The only involvement that I had with Ray Knight was related to this transaction. The transaction that's in question.

Q You also mentioned a second ago that Mr. Boyd was the person that interacted with Kenny Hughes a lot. I guess I need to go back and ask this question When you and Mr Boyd were working

together, were there specified areas in which each of you would concentrate?

A He was the chief financial officer. So in general those matters that related to finance, international tax, tax law, those sort of things, those were his primary domain.

Q What about yours? What were you concentrating on?

A I concentrated on making money.

Q Okay.

A Primarily, the manufacturing side of the business, the management, operations. And I became, you know, pretty good in terms of cash management when it came to capital account coordination for the various subsidiaries around the world.

Q Okay. I want to focus you on the period November, December of 1999. First I want to ask you, what was your opinion of Ernst & Young around that time period?

A Very professional, very dependable, very capable.

Q Okay. I want to ask you, do you recall sometime during --

A Could you give me just one moment.



Q Certainly.

A I want to add a little bit of hot tea, if you don't mind, Your Honor.

THE COURT: Yes, please.

THE WITNESS: I'm just going to kind of warm up what I've got in front of me. Thank you very much. Please.

BY MR. CROUCH:

Q Okay. Anytime you want to do something like that, just tell me.

A Thank you very much.

Q And I'm happy to take that kind of break.

I want to concentrate again on November, December of 1999. Do you recall sometime in November of '99 being contacted by Ernst & Young about possibly setting up a meeting with you and Mr. Boyd?

A I wasn't directly contacted, but yes.

Q Can you tell me a little bit about that contact?

A I believe Elaine Peterson, that's my best recollection, but one of my administrative assistants, told me that we had received a call from Ernst & Young and that they wanted to arrange



a meeting for Jim Boyd and myself, to present a concept to us.

Q Do you know who it was that contacted you from -- Elaine Peterson from Ernst & Young?

A No. Elaine Peterson worked for me.

Q I'm sorry.

A So I don't know who had called her originally, but had asked about setting aside time for a meeting. And I agreed to doing it.

THE COURT: Excuse me. What time frame was this approximately?

THE WITNESS: Well, actually this particular case I know very precisely. It was the week of -- the week prior to November 10th. The reason I can in particular remember that is because Jim Boyd was on a climbing trip. He happened to also do mountain climbing. He was very physically active.

He was going to be returning -- he was in the process of returning from a trip so that if they wanted to speak to both of us, we told him the only date that would work for me and him, to speak to both of us, was the 10th. November 10th.

THE COURT: Thank you very much.

THE WITNESS: I'm sorry.



BY MR. CROUCH:

Q Did you -- was it unusual for Ernst & Young to be contacting you to ask for a meeting?

A No. No. We had meetings with them, you know, with frequency during the course of a year.

Q Did you understand what the meeting was to be about?

A No. I did not.

Q And I think you've already said -- told the Court that you agreed to a meeting on November 10th; is that correct?

A That's correct.

Q Okay. So did this meeting take place on November 10th?

A It did.

Q Okay. And who attended that meeting?

A In addition to Jim Boyd and myself, Kenny Hughes and Ray Knight.

Q And where did this meeting take place?

A In the conference room adjoining my office, which is shared with Jim Boyd's office.

Q Prior to this meeting, had you ever met Ray Knight?

A I had not.

Q Prior to this meeting, had you ever met

Kenny Hughes?
A Yes
Q How did you know Mr. Hughes?
A He was part of the tax department for Ernst & Young and had provided us with advice in the past, as well as was involved in dealing with international tax.
Q Did anyone other than the four of you attend that meeting?
A No. We were the four in the meeting.
Q Okay. About how long did the meeting last?
A I estimate an hour and a half, something like that
Q Okay How did the meeting start?
A It started off with Kenny introducing Ray And then pretty much turning it over to Ray Knight Kenny didn't really participate much in the meeting
Q What did Mr. Knight -- what did he explain to you?
A Well, he first asked me if I -- what I knew about -- or how I felt about, you know, currency trading and transactions And I told him I was very comfortable I knew quite a bit about



it.
Q Was this based on your experience with InterTech and PGI?
A InterTech, PGI, Polypore and the various affiliated entities.
Q Did Mr. Knight explain to you he had a transaction he was asking you to look at?
A He did.
Q What was your understanding of that transaction?
A He went through the concepts of a structure. He said he had a proprietary -- Ernst & Young had a proprietary structure. He said how would you like the ability to, if you call the currency right, make a lot of money and on a worst-case basis still get a tax benefit.
Q When you say call the currency right, what do you mean?
A He had gone through and explained, taking positions in currency so that if I could directionally decide correctly as to whether one of the currencies that I'd chosen at the time, it wasn't particular examples, the yen, euro, British pound sterling or other currencies, if I could call the direction, I could sell the call as well



as buy, excuse me, an option.
If you'll give me just a moment again.
Q Did Mr. Knight explain what kind of options these were?
A Yeah He explained they were going to be European digital options, as was his preferred style.
Q Do you know what European digital options are?
A Certainly. Yeah
Q Okay Can you explain to the Court what European digital options are?
THE COURT: Slowly.
THE WITNESS: First -- well, let me just in general say a digital option, it's either you're in the money or you're out of the money And it's like a binary situation. Either you're -- you either meet the terms of the contract and you get a payment, or you don't.
And in American style, there are various values that are -- that can be had based on the value during the period of time, and you can exercise throughout the entire range of time In the European digital option, you know, basically it's a date certain And it's either on or off



You're either in the money or you're not in the money
BY MR CROUCH:
Q Okay.
THE COURT: That's the digital aspect of it?
THE WITNESS: The digital is binary You're either in or out. And the European defines the particular date certain as opposed to a range of transaction times that can be up through a date of expiry, which would be the American.
BY MR. CROUCH:
Q As of November 1999 had you had any experience in digital options, first of all?
A I'd done digital options, but primarily my preference was American. American style.
Q Had you ever done European digital options?
A I have, yeah.
Q Had you at that time?
A For currency?
Q Yes.
A I -- that was not my preferred method, no.
Q Okay. But you said you had done some

sort of European digital options at the time?

A I had done -- primarily equities based total return swaps. And some other things that I used to protect the valuation of assets in foreign markets.

Q Can you explain to the Court why you would use a European digital option versus maybe an American digital option?

A Well --

Q In business circumstances?

A Aside from the fact that you can get different price points, the American options, although not always, are a little bit more expensive, because you're paying for the ability to transact over a period of time. Not always. It just depends on the underlying security.

And you know, I personally like the fact that I could transact when I saw a trend. I could anticipate there might be a change of an event toward the end and transact sooner rather than later. Whereas with digital, it's a date certain. So I like the flexibility.

There were occasions where I wanted to get the lowest cost I could, which the digital option provided And if I wasn't really looking



at it as -- I was using it as a method of protecting an event, then I could go to the digital

Q Okay. Did you have an understanding from Mr. Knight as to how you could make money in this transaction?

A Oh, yeah.

Q And what was your understanding of that?

A Of how to make money?

Q Yeah.

A Well, if I called the direction, it was obvious I could -- the transactions -- make millions of dollars just calling the direction

Q What do you mean by calling the direction?

A If I said, for example, that on a date certain that the euro was going to be at or below, you know, by way of example, and it happened to be the case in this case, 1 0123, you know, dollars per euro, just as an example, and it ended up being directionally correct and if it ended up being less than that, then I would have a preagreed payment for that sum.

And if I called that -- in our case there was a total of six contracts, six options



contracts And if I called -- called them right, you know, where I was in the money and the banks were not in the money, I could make huge. I could make over $90 million.

Q Okay.

A I'm sorry

Q Let me back up a little bit. I want to make sure I understand this. At the time you had the meeting with Mr Knight in November of 1999, had you made any kind of determination at that point whether you could or could not make money on what he was proposing as far as these transactions?

A Well, as to the concepts, but not the precise economics. The concepts I could easily range what the potentials were, but not of a particular magnitude, because that had not yet been defined. Until I finally did the structuring with the -- with David Parse, I couldn't be absolutely certain of that.

Q We'll get to that in a second.

A I'm sorry.

Q Did you have any understanding at the time as to how long -- first of all, how long can these options contracts be?



A They can be almost any length of time. But generally speaking from 30 days to 365 days.

Q Why would you have one that's 365 days?

A You're tying it to a year. And you may want it to overlap into the close of another year. Or it may be associated with a particular transaction that I've got with a customer, or buying from a vendor, and I want to cover the -- there are all kinds of reasons. But you time it to coincide with whatever your particular needs and desires are.

Q Well, is it -- likewise, why would you have a 30-day window on a contract like this?

A It's not unusual. I mean, I've done that for plenty of other, you know, both -- you know, derivative transactions as well as for equities transactions and currency transactions. But it just -- it needed to just simply coincide with, you know, what your objectives were.

Q Okay I think you also referenced that Mr. Knight said that you could make a lot of money, but there was also some tax benefits associated with this.

A That's correct.

Q Did he explain what those tax benefits

were?

A He did

Q What was your understanding of what the tax benefits were associated with the transaction?

A Well, he -- if I can -- if I may -- bear with me. This won't be an exact answer to your question. But he did it by analogy He explained that there was a real estate transaction and a ruling that had been made by a court that some taxpayer had -- had tried to take his basis in a property that he had purchased, a contingent liability that had not yet matured. And that the courts ruled that it could not be included as part of his basis.

And he said that that was an opportunity where the proprietary nature of this structure came up. That if you could contribute -- if you could contribute, under his structure, options that had not yet matured, that only the portion that had been paid in cash would be part of your basis And that that part of the liability that had not yet matured would not be included in the basis

And as a result of that, that there was the potential for creating offset to income. And



in this case, frankly, I was intending to make a pretty good profit. So I would like to shelter it

Q Did he explain how this transaction would be put together?

A He went through the general description of forming, you know, the various corporate entities.

Q Did he tell you what kind of entities would be formed?

A Yeah. Yeah.

Q Do you recall what any of them were?

A Yeah. I mean, I do them routinely. limited liability, you know, companies We'd buy the options through limited liability companies, which, in general, I do anyway because I set up any kind of corporate entity to provide a personal shield from any unexpected liabilities that might arise.

So, in general, I try not to do things personally. I try to do them through corporate entities, either C Corps, S Corps or LLCs.

Q Did he describe any other entities that would be used?

A He did. Partnership.



Q Okay.

A And said that we would contribute our interest into a partnership. And -- which made sense anyway because we were going to be diversifying the overall portfolio of what we had. And he --

Q When you say you were going to be diversifying portfolio, what do you mean by that?

A He had indicated that as part of the structure, the proprietary structure, that we would need to have a diversified portfolio and that it would include investment and capital stocks as well as currency trades, which -- and he had specifically asked me whether, you know, what I thought was a very stable currency. And I told him the Canadian dollar relative to the US dollar I thought was very stable. It was, you know, in the -- about 68 cents at the time. And I felt it was going to be hanging around that for a while.

Q Did the -- other than the LLCs and partnerships, did he describe any other entities that might be involved in the transaction?

A Yeah. Just setting up an S Corp

Q Did he explain why you would need the S Corp?



A Well, it had a variety of benefits. But, you know, you could get out -- if you get out of the partnership, you -- by itself, it provides liability protection which, for fundamental business reasons, you would want to do anyway. But in this particular case, under his structure, since we would be contributing indirectly through the partnership, we would be liquidating the partnership by having contributed it to the S -- to the S Corp. And the contracts were separate. And the liabilities associated with the -- with the unmatured liabilities under the option would not yet have matured and would not be part of my basis, whereas the cash component for the options that I paid in cash were fully matured and were basis. And so they would be separated by having contributed.

So I have a double benefit and have the -- have the protection for business purposes of being in a corporate entity. And I'd get the benefit of reducing my -- my basis.

Q I think you said in your business you used lots of different entities?

A I'm sorry.

Q I think you said, in your business, you

use lots of different entities. LLCs?
A We do
Q Do you use partnerships in your business?
A We do
Q How about S Corps. do you use that in your business?
A Yes
Q C Corps?
A Yes
Q How do you decide which entity you're going to use in your business?
A In all cases I rely on my expert counsel. my counsel at Ernst & Young and outside opinions. I don't hold myself out to be an expert
Q Is there anything in particular you found very interesting about Mr Knight's presentation?
A Yeah. I found it to be win-win. I thought I could make a bunch of money. because I really knew my currencies. At the same time. I thought I could get a nice offset in my revenue.
Q Did you ever talk to Mr. Boyd about it?
A Well. he was there. He was very



excited. Jim. He saw the -- he thought the merits were very good. And when he got excited about it. it made me feel even more positive.
Q Did you have any discussion with Mr. Knight or anybody else at the meeting about the size of the transaction?
A Ray Knight had asked me how much revenue I thought I would have to offset. And I told him that I thought it would be between 50 and $100 million.
Q Okay. And how did you come up with this amount?
A I had a number of transactions that were -- I had the ability to cause to happen. As a private company. it gives me a lot of leeway as to when I sell assets and whether I take W-2 income or not. And taking W-2 income is not very tax efficient. So I try as much as possible to take things as dividends or as capital gains. to -- to maximize my capital retention.
Q Did you have any kind of understanding about how much a transaction of that size might involve? How much investment you would have to make?
A Yeah. Ray had specifically said it was



going to be a leverage transaction. That for $100 million of potential offset. that I could -- I would spend $8-1/2 million.
Q I think you said the meeting lasted about an hour and a half?
A Somewhere around an hour and a half.
Q How did the meeting end?
A I felt pretty positive about going forward. and as did Jim. You know. we -- we --
Q Did you --
A My expectation was that we would receive some definitive details from EY.
Q Did you commit to doing the transaction at that time?
A No. Not a commitment. But it was certainly implicit in our tone.
Q You said you were going to -- you thought you were going to get some information from EY. Do you know what you were supposed to be getting from them?
A I was expecting to get a proposal that was definitive.
Q Was there anything you needed to do on your side. moving forward?
A To anticipate the transaction. I started



looking at currencies and to get an idea of which currencies I would be most comfortable in.
Q Was it your understanding that what Mr. Knight was proposing was some transaction which you yourself could make a significant amount of money on?
A Oh. absolutely
Q And was it your understanding that you were going to get some sort of favorable tax benefit from it?
A That I had that as a win-win. yes That I could get that as well. yes.
Q Would you have done this transaction if you had -- were only going to get the tax benefit from it?
A No.
Q Okay. Why not?
A Well. frankly. I could -- if all I was going to do was just a currency trade. I could do it -- I could do it efficiently in other ways. to direct money. I was looking strictly -- I saw this as a win-win. I saw this as an opportunity to make a significant amount of money and do it in such a structured way that I would be able to shield the earnings as well.

Q Okay. We left this meeting. I think you said November 10th. And you said I think you needed to do some of your own due diligence What did you do as far as due diligence?

A Well. I -- I basically looked at the available currencies. what their volatility was in the market, so I could do some estimation on valuation

Do you want -- are you asking me immediately following? Because it wasn't until the next day that I actually got the proposal.

Q I'm talking about the next couple of days You're talking about doing due diligence of some kind. What kind of due diligence did you do?

A I got the FRED data.

Q Tell me what the FRED data is.

A Federal Reserve Economics Data. It's generally referred to as the FRED. Nowadays the FRED data is consolidated through services like Bloomberg. In fact even then I didn't have Bloomberg available. But Bloomberg was available to professionals. I also went to one of our -- I asked one of our. my outside advisors and brokers. Brooks Johnson. to also get me information specific to several currencies.



Q What kind of currencies did you ask him to get information for?

A Well. I can't tell you if his included the British pound sterling. But I'm certain it included both the euro. which had only been out for less than a year in terms of the actual trading. and the yen Of course the yen. you know. there was lots of data on the yen.

Q When did you do this due diligence?

A In the period of time post our meeting. but preponderantly in discussions the following week.

Q Tell me -- so you got the information from Mr. Johnson. Well. I guess Mr. Johnson pulled the stuff off the FRED data is what you called it?

A Yeah. the FRED. which he may have -- I frankly -- you'd have to check with him. But he may have had access to other financial services --

Q Okay.

A -- in addition to it But the FRED was the primary purpose that would have been pooled from

Q Anything other than that and looking at the FRED data?



A I looked at the -- at the pit -- the type of typical closings and the trends for the euro and for the yen and the British pound sterling. And I looked at the Canadian dollar but I was very familiar with it anyway because. you know. all the various trading.

Q Why were you looking at this information?

A Well. it enters into pricing. The volatility is one of the factors in the Black-Scholes model for both predicting the probability of outcome as well as the pricing models.

Q What -- I mean. what is volatility?

A Volatility is just the natural variance in the -- in the valuations that the market ascribes to it.

Q Was there something in particular you're looking for from this data to help you determine -- about the transaction?

A I wanted to get an idea how much does it vary per unit day typically. without some really abnormal news. There's all kinds of potential for unusual news that moves the currency. and you don't really have any control over it At least



it gives you an idea of the typical movements. the typical variances you have in the currency. from day to day and from week to week.

Q In looking at this data. did you come to any conclusion about the currencies you were looking at. about the ability to make a profit on those?

A Yeah. I had -- I had a. I felt. a very good probability of at least calling the directions of the currencies. you know. dead on I felt really good about it. Although we ended up making $1.875.000 on the euro. I didn't call the direction properly on the yen. which is shame on me.

But we still ended up netting another 625.000.

Q Did --

A I wish I'd called it right. Had I hit the sweet spot, I could have made a ton.

Q Okay. How did you come to the determination you could make money on the transaction?

A How did I come to the determination?

Q Yeah. In reviewing this information. what led into you believing you could make money

on the transaction?

A Calling the direction. I felt at the time, frankly, that I would call it right. And I really feel ashamed that I didn't call the yen properly, because at the very least we would have made almost $3 8 million just if I just called the direction of the currencies properly, even not having hit the sweet spot.

But, you know, I felt the probability was, you know, about the flip of a coin as to hitting the -- hitting the direction question. And the sweet spot is really the product of probabilities. If you can -- I know I'm going beyond your question.

THE COURT: That's okay. I'm intrigued by the sweet spot.

MR. CROUCH: That means yes, talk about the sweet spot.

THE WITNESS: I did some calculations in terms of probability. Unfortunately, currency data is not very consistent data. And there isn't really a lot of good co-relationships. So depending on which set of data you use, whether it's most proximate, or if you look out for 6 months or 9 months, you end up with different



answers. But the probability ranged from high teens to as high as 60 percent probability of hitting the individual transactions out of six events.

And in our case, we were in the money for four out of the six, and had we been in the money for all six events -- this is not hitting the sweet spot, just in the money -- we would have made just shy of $3 8 million. But if I hit the sweet spot, meaning if the banks' position was out of the money and mine was in the money, then I could have made north of $90 million, which, you say what's the probability of doing that. That's the product.

If I take the probability, again it depends on whether you use the 50 percent mark or the 60 or the 20, but it ends up with a range of probabilities. If you use, by way of example, the 50 percent mark, we'll use -- make an easier calculation for us, 40 percent mark.

If I say each event the probability is 40 percent, then the likelihood of two events happening would be 40 percent times 40 percent, or 16 percent. Subsequently, the likelihood of three events happening.



In our case it was the product of two events for the bank and for ourselves. But to have all the -- you know, basically double sets happening, it would be the product of those probabilities.

So it was a narrow range. But nevertheless, you know, a positive probability. You know, it's not anywhere near the flip of a coin; it would have been the product of those probabilities. So some -- some single digit percent of hitting the all-time home run.

But still very positive events. And the more of those events that occurred, the higher my profits.

BY MR. CROUCH:

Q What -- unless the Court has another question for you?

THE COURT: No. That's okay.

THE WITNESS: I'm sorry if I rambled on, Your Honor.

THE COURT: No, no. It's very interesting.

BY MR. CROUCH:

Q Did you -- you made this conclusion about the possibility or the probability of making



money on the transaction. Did you discuss this with Jim Boyd?

A I did.

Q And what did you and Mr. Boyd discuss?

A Well, he asked me what I thought the probability was. And I used the expression it was about the flip of a coin as to each of the option contracts, you know, on our account being in the money.

So, you know, that's what I shared with him.

Q Did you at that point, had you made any determination as to what currency you wanted to invest in?

A Yes

Q What had you decided at that point?

A Well, as far as the options were concerned, the euro and the yen.

Q Okay. You had said earlier you were considering the British pound.

A I had considered the British pound sterling but ended up with the euro and the yen.

Q Okay. You also referenced earlier, you referenced the Black-Scholes. Can you tell the Court what the Black-Scholes model is?

A Well, it's frankly --

Q In simple terms if you can, please?

A I'm a bit of a user. We had an Excel spreadsheet program. And basically you put in the volatility. You put in the various range numbers. It's a plug-in formula. And it calculates for you what the value model would be as well as the probability.

The problem with Black-Scholes, and this is a -- it's a fundamental problem with currencies, is Black-Scholes assumes normality, that it has a normal distribution, Your Honor, such as a bell curve. Unfortunately, currencies don't do bell curves.

So you can -- if you want to do it with greater discipline, you can look at it empirically. But I didn't want to go to the trouble. So I just did my own estimations.

Q Okay. Did you have some sort of formula that you used? Or how did you do that?

A We plugged in the Black-Scholes, you know, the spreadsheet. And then I looked at my own experience. There's a little bit of natural intuition that comes into understanding whether the market is strong. You have to kind of expect,



as the interest rate -- I don't have any control over the central banks. But if they increase the interest rate, for example, on the US dollar, then I'm going to -- I'm going to end up ending up with a stronger dollar relative to all of the currencies. If the Fed, for example, did here.

If the central bank in Japan did vice versa, it would move the currency in the other direction, because people want to go to the currency where they can make the greatest return.

Certainly there are things that you can't factor in that are, you know, beyond control. But you can look at what your estimates are. I did a lot of business in these countries and I had a sense of were the business conditions good? Were my customers happy? Were their sales projections good or not good? It gave me an indication, indirect indication of the softness or strength of the markets. So I used a little bit of intuitive thinking as well.

MR. CROUCH: Your Honor, I notice we're now an hour into it. Do you want to take a break now?

THE COURT: Is this a good time?

MR. CROUCH: This would be fine, to take



a break now.

THE COURT: Okay. Great. We all need a break, and you especially, Mr. Zucker.

THE WITNESS: That's wonderful. I appreciate it, Your Honor.

THE COURT: The court will be in recess until 10 after.

(Whereupon, a recess was taken between 11:03 a.m. and 11:16 a.m.)

THE COURT: Mr. Crouch.

MR. CROUCH: Thank you, Your Honor.

BY MR. CROUCH:

Q Mr. Zucker, I think when we took a break we were talking about the fact that you had done due diligence in determining -- or looking at the possibility of making money on this transaction.

I think the other side you said to this, at the breakup of your meeting with Mr. Knight and Mr. Hughes, was you were expecting some sort of documentation from them of some kind.

A Yes.

Q Do you know what in particular you were looking for from them?

A Yeah. I was expecting a definitive proposal. And, you know, what the fees were going



to be associated with the transaction.

Q Okay. If you would, take a look if you've got that notebook in front of you, please.

A Yeah. Let me just put my glasses on. Okay.

Q If you look at the document you have under tab number 1, please.

A Yes.

Q This has been marked in a previous exhibit as Government Exhibit 177. We'll leave it at that for right now.

A You've got a problem with your binder here. It's all messed up.

MR. WELTY: May I approach, Your Honor?

THE COURT: Yes, please. What is the government exhibit number again?

MR. CROUCH: It's at the bottom of the page. Government Exhibit 177, Your Honor. Your Honor, we tried to have all these marked one way or another for the Court and for marking purposes today.

THE WITNESS: All right. I now have what's behind tab 1.

(Government's Exhibit Number 177 was marked for identification.)

BY MR CROUCH:

Q Okay. Thank you. First of all, do you recognize this document?

A I do. It's the -- it's the letter that I received the day after our meeting.

Q And who is the letter from?

A It's signed by Ray Knight.

Q And it's directed to you; is that correct?

A It is.

Q If you'd look on the second page?

A Yes.

Q Is that your signature on that page?

A It is.

Q Okay And do you recall signing that document?

A I do

Q Okay. Also on this document, there are some notes on the first page Is that your writing on the first page?

A It is. It says what information and the maximum dollar amount, $8.5 million.

Q Okay First of all, let's talk about your first note on there, where it says, what information. What were you asking them at that



time?

A Well, basically this document didn't really line up with the discussions we had had the day before. So I wasn't really sure what he was referring to in here. So I wanted clarification of what he's expecting from us. And at the time of our meeting, he had simply said $8-1/2 million for $100 million size investment. But, yet, this was shown as percentages. And we hadn't discussed percentages at our meeting

Q You had just discussed $8-1/2 million?

A 8-1/2 million on a hundred million transaction.

Q Based on this letter, what was your understanding of what Ernst & Young was going to do for you in this transaction?

A Well, they were going to provide the proprietary structure, which they said was going to be -- provide me with a preservation of the largest amount of capital possible. And that they would take care of all the -- all the paperwork associated with it, and give me proper advice and kind of effectively stand by me with regard to the overall transaction

Q On the bottom of the second page,



there's a -- there's some handwritten notes Are those your notes also?

A It is.

Q And what do those notes say?

A It says $100 million -- and someone pointed out to me they think the word is loss. $100 million loss to be allocated 98/2 between the parties, subject to clarification of second paragraph on first page.

Q And what were you -- first of all, what does the 98/2 mean?

A It was to be the allocation of investments between Jim Boyd and myself. Myself being the 98 and Jim being the 2.

(Government's Exhibit Number 2269 was marked for identification.)

BY MR CROUCH:

Q Okay If you would now look -- if you would turn the page to page -- the next -- the next tab in that, tab 2

A Yes.

Q And do you recognize this document? This -- for identification purposes, this is Government Exhibit -- I believe it's Government Exhibit 2269.



A Okay. Yes.

Q Can you tell me what this document is?

A Well, at the face of it, it appears to be my handwriting to Charlotte saying to put it in the file. And it appears to be a fax from Ray Knight at Ernst & Young. And --

Q I'm sorry, is that a fax from Ray Knight or to Ray Knight?

A It's to Ray Knight. Excuse me.

Q From you?

A Right.

Q Can you look at the next page and tell me what that document is?

A It -- it references that I've attached an executed copy of the engagement letter that I've signed, but requesting clarification on various issues, including in it, though, that I receive two legal opinions, letters from reputable firms, which --

Q Let me ask you a couple questions First of all, is that your signature on that page?

A It is.

Q Do you remember drafting this document?

A I do now

Q You just referenced the two opinions

from two reputable law firms. Do you recall that you gave your deposition in this case on June 8th, 2007?

A I do.

Q Do you recall at that time that you were asked by counsel for the defendant whether you recalled -- whether you recall the discussion of two law firms and opinions coming up in your meeting, initial meeting with Mr. Knight --

A Right

Q -- and Mr. Hughes. Do you recall being asked that question?

A I do recall being asked that question.

Q Do you recall what your answer was at that time?

A I told them that I did not recall that coming up. But --

Q Let me ask you the question. On reviewing this, does this refresh your recollection as to whether the subject of two law firms and the opinions from two law firms came up during that meeting?

A I don't recall it coming up at the meeting. But obviously between the meeting and the next day it must have come up, because I've



referenced it here

Q Okay. Do you know -- I mean, this memo, can you tell me what this memo is?

A Well, you know, obviously it's not final because it doesn't reflect the terms of what we had agreed. But it -- the memo says that, you know, I've signed the letter subject to, you know, these -- clarification of these points. And that it was $100 million size. $8-1/2 million would be the actual investment.

Q Let me ask you, what were you trying to do with this memo?

A I'm sorry?

Q What were you trying to do with this memo?

A I was trying to get him to give me the additional clarification so that we could move on

Q Okay. And do you see attached to this is a copy of your fee agreement? The one that we looked at that was under tab 1 also?

A Yeah. This is the same that you referenced earlier.

Q Okay. So you were just returning this to Mr. Knight; is that correct?

A That's correct, yes.



Q Do you recall what happened after you returned this to Mr. Knight? Did he call you? Did he contact you?

A You know, I honestly do not remember what the specifics of the communication were. But --

Q Well, would you please look under tab number 3, please

A Yes.

(Government's Exhibit Number 1104 was marked for identification.)

BY MR. CROUCH:

Q And this is an exhibit that had been previously marked in the deposition as Government Exhibit 1104.

A Right.

Q And do you recognize this document?

A I do.

Q Can you tell the Court what this document is.

A Yeah. It basically shows a summary page that I'm forwarding to Jim Boyd and asking him. I said in view of the fact that I'm --

Q Ignoring your handwriting on here

A Oh



Q Not looking at your handwriting, do you understand -- do you recognize the document itself?

A I do

Q Okay. Can you tell me what the document -- without talking about the handwriting, first of all.

A The document outlines the fee structure and costs for the transaction.

Q Okay. And who is this from?

A The document itself?

Q Yes.

A It's from Ray Knight.

Q And who is it directed to?

A To me.

Q And do you know why Mr. Knight was sending this to you?

A It was -- first of all, it represented ultimately revisions that we were making in the terms of the agreement. And it expressed things in definitive percentage terms which, again, were not the terms that were discussed at the day of the meeting

Q Did you have a discussion with Mr. Knight about this, this memo, that you can

recall?

A I can't recall having done so, no.

Q In the last paragraph it references the transaction is now a $50 million transaction. Do you have any understanding as to why it's referencing a 50 million transaction instead of the 100 million you were discussing with Mr. Knight?

A Yeah. I recall talking with Jim. And I can't remember all the nuances of the discussion. But that we agreed that we would go after a $50 million transaction in terms of size. And we would do 90/10, instead of the 98/2 in the $100 million transaction.

Q Do you know why --

A I remember some of the discussion --

Q Let me ask my question so the court reporter can get it down.

A I'm sorry.

Q Do you know why you had reduced your transaction from 100 million to 50 million?

A I can't tell you the specifics. I remember that there was an amount of capital investment, that Jim had some concerns. Although, ironically in this case, his investment was bumped



up just slightly by going to the 90/10 on 50 as opposed to 2 percent on 100.

But that it was just, you know, he was more relevant to the transaction. And I just reduced the total combined investment.

Q Do you know how Mr. Knight would have come about the information that you were now reducing your transaction from 100 million to 50 and the split with Mr. Knight was -- with Mr. Boyd was now going to be 98 --

A There --

Q Excuse me, 90/10?

A There obviously had to have been some discussion during that period of time. But I don't really recall any discussion having taken place. So it's possible that it -- it came through Jim Boyd. That's all I can guess.

Q Attached to this document is a second page of this fax. It appears -- does this appear that it was faxed to you? This is the first page.

A Which page?

Q The first page.

A We're still on tab 3?

Q Tab 3, the first page. I apologize.

A Okay.



Q Does it appear this was faxed to you?

A It appears to have been faxed to me. It's addressed to me.

Q Okay. Let me ask you something else before we get off this page. There's some handwritten notes on this page. Are those your handwritten notes?

A Those are my handwritten notes to Jim.

Q And this is to Jim Boyd?

A Yes, it is.

Q Okay. And what were you trying to tell Mr. Boyd here?

A I was trying to tell him, since we had changed the nature of the transaction and he was now going to be a 90/10, I wanted him to authorize approval and make comments before we returned.

Q Okay. And do you know if you ever discussed this with Mr. Boyd?

A I discussed the -- the transaction. I can't recall specifically, you know, what the comeback was. Because Jim and I often talked just kind of a quick hallway discussion. We were physically next-door. So it probably would have been just a hallway interaction.

Q Do you recall if -- okay. Let's go on



to the next page of this document if we could.

A Okay.

Q You see the next page, it appears to be -- can you tell me what that appears to be.

A It appears to be Ernst & Young's engagement letter.

Q And would you look at the third paragraph down if you would, please.

A Yes.

Q And does that appear to be a change from the original fee agreement they sent you, which is under -- if you would like to look at it, it's under tab 1.

A Yeah. Let me look at that.

THE COURT: You're asking a question about paragraph 3?

MR. CROUCH: Yes.

THE COURT: Okay.

THE WITNESS: You're asking me to compare their fees?

BY MR. CROUCH:

Q No. What I'm asking you to do, is that a change from the original fee agreement?

A Yes.

Q Okay. And how was it changed?

A Well, it's -- it's less in terms of the amount. It's $675,000 as opposed to reference to a higher sum in the former agreement.
Q Okay. Did the -- do you know why it was reduced?
A I would assume that it was proportionate to the transaction.
Q Okay. Did the fee of $675,000 seem high to you?
A No. Not at all. You know, frankly, with my patents, I charged plenty for my proprietary -- when I let people have proprietary value in my patents. This was a proprietary structure for them. Plus they were going to be providing support services and going to do all the legwork associated with it. No. I thought that was reasonable.
Q Do you -- I think you testified before you do a lot of work with Ernst & Young. Do they do --
A They do for me.
Q How much do they charge you per year, possibly? I mean, round figures.
A It's millions. I don't know what the number is, but a lot of money. It's in the



millions.
THE COURT: We're all in the wrong profession.
BY MR. CROUCH:
Q Do you know what ultimately you did with this fee agreement?
A It was sent back.
Q Okay. Thank you. So at the time that you had sent -- that you signed this fee agreement and sent it back, had you committed to the transaction at that time?
A No. Not to the transaction itself.
Q Well, what had you committed to at that point? You signed the fee agreement, obviously?
A Yeah. But the fee agreement has language in there that basically says if I should not go forward with the investment, that I would just pay them for their time and some administrative costs. It was like 8-1/2 percent or something. It didn't commit me to the transaction.
Q What were you waiting on at that point to commit to the transaction?
A I had to work out the terms of the deal with, you know, David Parse and Deutsche Bank.



Q First of all, tell me who David Parse is.
A David Parse was the person that I was to have all the discussions with regard to the currency options at Deutsche Bank.
Q Okay. And when did you learn the name David Parse, or Deutsche Bank? When did you first learn that Deutsche Bank was going to be part of this transaction?
A We'd have to actually go to the actual letters and dates. I can't tell you the date. But it was pretty fast, because I was dealing with -- I was dealing with David Parse the very next week. So that it was -- it was pretty fast.
(Government's Exhibit Number 1018 was marked for identification.)
BY MR. CROUCH:
Q Well, if you would turn to tab 4 in our notebook there. And this is a document we previously marked in a deposition as Government Exhibit 1018. And first off, without looking at the handwriting on there, I want you to note -- I want you to tell the Court if you recognize the actual document there.
A Yes.



Q Okay. Can you tell me what this document is.
A That was Jenkens & Gilchrist was -- were conveying the various documents to be filed with the IRS for forming the federal tax ID numbers and other account, you know, openings.
Q Okay. Well, let's back up a little bit. Did you know the name Jenkens & Gilchrist prior to getting this letter?
A I'll be frank with you. I don't think that I recognized it at the time of the letter. I kind of looked past it. I didn't know the name Jenkens & Gilchrist in general.
Q The other thing you said is you just -- you had not committed to the transaction at this time. What is the date on this letter?
A November 16th.
Q Okay. And Jenkens & Gilchrist was sending you documentation at that time for the transaction?
A Apparently, yes.
Q So why would you be signing documents that you received from Jenkens & Gilchrist at that time?
A I assumed everything was go. I just had

to work out the economic terms on the actual investment. But the investment was not yet to be triggered until sometime in the future.
Q Okay. The document references down here on number 1. Internal Revenue Service forms SS-4. 8821, Deutsche Bank/Alex. Brown account form for JZ Buckingham Investments LLC. What is JZ Buckingham Investments LLC?
A That was a single member LLC that we set up for buying the currency options.
Q Who is the single member of JZ Buckingham LLC?
A Yours truly.
Q And where did the name JZ Buckingham come from?
A Buckingham is the street that I live on. and JZ are my initials.
Q What about the second one? It says the same information for JGB Bohicket Investments LLC?
A Those are Jim Boyd's initials and the street that he lives on.
Q And the third one down is -- and, again, who came up with that name?
A Well, my recollection is that I actually suggested the name Buckingham, because in fact I



used Buckingham Sports as one of my companies I use the name Buckingham just, you know ordinarily Buckingham Investments, Buckingham Sports It's easy for me to remember.
So I believe it was me. But I'm not certain.
Q And then under number 3, it references the same information for a JBJZ Partners.
A Uh-huh.
Q Does -- what is JBJZ Partners?
A Those are Jim Boyd's and Jerry Zucker initials.
Q Okay. It was a partnership?
A Yeah. It was a partnership It was part of the structure that Ernst & Young had indicated that we would -- as part of the process and structure that was needed.
Q Okay. The last one, on number 5, it references a JBJZ Investors Incorporated. What was JBJZ Investors Incorporated?
A That was the S. Corp we had set up to contribute the partnership assets.
Q Again, I guess I'm asking this question again. Were you surprised to be receiving a document like this from Jenkens & Gilchrist



although you had not committed to the transaction?
A No. I mean, we were on the way. We were planning on doing it. But we still had to work out the economics on the actual purchase of the options
Q Had -- did you have a fee agreement with Jenkens & Gilchrist at that time?
A Not that I can recall.
Q Okay. You have a note on here -- well, let me back up. There's writing on this document Is this your writing?
A Yes, it is.
Q Okay. Can you tell me what that says.
A Yes. It has several places for Jim Boyd to sign. I inadvertently signed as a guarantor in one of the forms for Jim. I already signed one of the guarantees, parentheses closed, please make a copy set and retain Please call Ray Knight at EY to find out where to send the executed agreements after the corrections and executions by Jim. And then gives the phone number.
If you can't reach Ray call Kenny Hughes, and it gives a phone number.
Q Okay.
A It's a note to Charlotte Crosby



Q Who is Charlotte Crosby?
A One of the administrative assistants.
Q Okay. And the Kenny Hughes you're referencing here is the Kenny Hughes at E&Y?
A Yes.
Q likewise the Ray Knight is the Ray Knight at E&Y, correct?
A Yes, yes.
Q There's a note off to the left of the numbers Is that also your handwriting?
A Yes.
Q What does that say?
A It says Jim also has a copy set with him in New York.
Q Okay. And what were you -- what were you telling -- is this a note to this Charlotte Crosby?
A Yes, it is.
Q Okay. You were telling her that Mr. Boyd also has a set of these documents; is that correct?
A Right. The following week we had arbitration with Dominion Nonwovens Sudamerica in New York.
Q You're going to need to spell that for

the court reporter.
A We'll get it later. DNS
Q Let's go with DNS How about that?
A We'll go with DNS.
Q I'm sorry. You were saying.
A We had arbitrations going on. And I asked Phillip Bryson to handle it and then Jim Boyd followed. So we were kind of taking turns at the arbitration in New York.
Q Okay. Do you know what you did with these documents ultimately that you received from Jenkens & Gilchrist?
A I would assume at this point that, you know, they were signed and returned.
Q Do you know -- do you have an understanding as to why you were executing these documents at this time?
A We were setting up all the organizational requirements to be able to go forward with the transaction.
(Government's Exhibit Number 1029A was marked for identification.)
BY MR. CROUCH:
Q Okay. I guess you -- let's go ahead and we'll flip to, just to identify for the Court, the



next document under tab number 5. If you would look on the second page of that document. This has previously been marked as Government Exhibit 1029A
A Uh-huh.
Q And you look at the second page of that document. Is that your signature on that page?
A It is.
Q Is that your date that you put on there?
A Yeah That's correct.
Q Okay. Is this the fee agreement -- the second fee agreement you received from Ernst & Young for your transaction; is that correct?
A It is.
Q And this is you returning it to them?
A This is my return to them, yes.
Q Okay. You also referenced that you had not committed to this transaction as of the date of November 15th because you had to go talk to somebody at Deutsche Bank?
A I didn't physically go to talk to them, but I did by phone, yes.
Q Okay. Who did you talk to?
A David Parse.
Q Okay. And who is Mr. Parse? Do you



know what his title is?
A I don't know what his title is. But he was the individual that -- with which I did all my negotiations at Deutsche Bank.
Q How do you know he was -- how did you know he was the person to contact at Deutsche Bank?
A You and other counsel asked me that before. And I can't recall if it was from a conversation I had with Jim Boyd or -- it was -- I had somehow during that period of time, this is a number of years ago, someone had said that was the person I needed to talk to. And whether Jim had received the call and was told that, or Jim told me, or, I don't remember what the form of the communication was But that was the name that was given.
Q Did you have any kind of prior relationship with Deutsche Bank?
A Well, Deutsche Bank in Germany, we had, in Neunkirchen, Germany and Nordenstadt, Germany, we had simply payroll accounts and local accounts for some of our facilities. But we had no relationship at all with Deutsche Bank in the United States And he was in Chicago



Q Okay. What were you calling -- what were you going to negotiate with Mr. Parse?
A Well, we were negotiating what the exchange rate was. I wanted to make sure that it was going to be fair to the parties. Also, most importantly, was to be able to define the sweet spot, so to be able to maximize the opportunity to really make a killing on it.
Not -- I felt very confident that I could make good money on the calling the direction. But I really wanted to hit that sweet spot. I wanted to get it where I was in the money and the bank wasn't. So I wanted the, kind of the goalposts, we'll call it the strike prices for the bank, to be as wide as possible so I could, you know, improve my probability of hitting the sweet spot.
Q When did you talk to Mr. Parse?
A I started talking to him, you know, almost immediately after. So it would be heavily the week of the 16th.
Q Okay. How many -- did you talk to him just one time?
A No, no. I talked to him multiple times.
Q Was this both before or after you had

done your due diligence on the currencies?
A It was -- it was during the same period of time because I was -- I was running both at the time. I had already had a lot of data that I had already reflected on. And then, you know, subsequently, I had more data when I got with him on the phone successively.
Q And you talked about negotiating the goalposts, what you call the goalposts. What are the goalposts?
A Those are the strike prices. The X -- if we talk, Your Honor, when we talked about the digital options, it was the point at which you were either in the money or out of the money. And I wanted to make the -- the distance between my being in the money -- I felt I was going to call the direction right, but I wanted the distance between where I was saying we were going to be in the money and where the government -- where the Deutsche Bank was going to be -- I wanted to make that a few more pips wider, so that I had a greater opportunity to really make a huge profit.
Q What did Mr. Parse want on the goalpost?
A He wanted it really skinny. One pip.
Q Can you tell the Court what a pip is?



A Pip is the smallest denomination of a currency pair trading. It represents 1/10,000 of the spot price. It's akin to a basis point when you talk interest, in 1/100 of a percentage point.
Q And what was Mr. Parse wanting the distance to be?
A He wanted it to be one pip. And I -- and, you know --
Q So what would one pip equal to then?
A Too little. I wanted it to be minimum, you know, four, five pips is what I wanted.
Q You wanted four, five pips because why?
A Well, it's -- it created a greater spread. It created a greater opportunity for me to make -- well, Jim and I could have made well in excess of $90 million if I hit it just right. Now, the wider apart it was, the higher the possibilities were of being -- kind of like football. If you get the goalposts a little bit further apart, it's more likely the kicker is going to get the kick through.
Q Did you and Mr. Parse negotiate the goalposts?
A Well, it wasn't to my favor. But I ended -- he ended up going to two pips. And I



ended up settling for much less than I wanted. I wanted four.
Q What else -- did you know what currencies you wanted to invest in at that time for purposes of this transaction?
A The initial discussion that I had with him focused on three currencies, the British pound sterling, the yen and the euro. And we ultimately ended up doing the yen and euro.
Q Why did you do the euro?
A Well, certainly, as far as the European currencies were concerned, I had a lot of experience. I had a good sense of the market in terms of what I felt the directionality was going to be. Even though now it was a fixed exchange rate between the currencies, the euro was going to track the overall economic conditions.
The pound sterling, we had operations in Manchester, UK, and I felt comfortable that I would have a good take on it. We had a lot of customers that were dealing in British pounds sterling. But he felt as well more comfortable -- he said he would work in the British pound sterling if I insisted on it. But his personal preference was to -- for me to go into the yen and



the euro as well. So I ended up going. I didn't feel strongly.
Q You addressed the euro. But why the yen? Just because Mr. Parse --
A The yen for me or for him?
Q No, well, you said Mr. Parse had a preference for the euro and the yen.
A Well, we were discussing three different currencies.
Q Okay. But why did you want the yen?
A I'm very -- you know, have a lot of customers, a lot of business, a lot of trade in yen. I had both facilities as well as customers that were yen denominated. It was an area that I felt comfort in. You know, so just, you know, I'm -- I regret that I ended up calling the direction of the yen wrong, because I would have made a great sum of money.
Q Did you discuss --
A I made less.
Q Did you discuss volatility with Mr. Parse?
A Not specifically the term volatility. I already looked up, you know, what I felt the relative volatility. But we did talk about

typical opens and closes and variations that had been taking place in the market, although we didn't specifically talk in terms of a volatility factor.

Q Did you negotiate anything else with Mr. Parse?

A Yeah. What the exchange positions were going to be. The --

Q What do you mean, the exchange positions?

A Well, you know, if -- generally speaking, you have a kind of a notional or indicative expression of probability. If you take the amount of the -- the notion amount, the gross amount that has the potential payout and you look at the premium, the relationship between the premium and the payout generally is roughly indicative of probability.

So if you have a $50 million payout for a $25 million, you know, fee, then you would have something that would be less margins that are retained somewhere around 50 percent, if you're just kind of using a rule of thumb without getting technical about the details. It would represent that he felt it was less than a 50 percent



probability. Keeping the difference for his own account.

And so we ended up with, in one case he had a little over 46 million on one side, with a payment of 23-1/2. So it wasn't a perfect two for one. But it was in that order of magnitude. It was fair. And if I called it right, it provided me with a very handsome profit.

Q Did you negotiate the price of these various options?

A Well, we talked about the exchange rates so that -- but the exchange rates were reflective of part of the overall CY strategy of, you know, what the amount of unmatured liability was going to be. So to some extent you had to work a little bit backwards. You had to say how much was your contribution going to be, because you could back into that being, you know, calculated unmatured liability.

So that was a factor. And we did adjust the ratio.

Q Do you remember what the exchange rate was that you ultimately --

A Yeah.

Q -- negotiated with Mr. Parse was?



A Yeah. 51.0123 to the -- to the euro. And that was -- and then they were two pips further, 1.0121, so I only had two pips in between the two of us.

Q And that was on the euro?

A That was on the euro.

Q What about the yen?

A The yen was 1.06 and change. But the way we had agreed, and although you haven't asked the question, the way we had agreed, since we were going to enter into the transaction as of November 22nd or 23rd, and at the time we weren't sure if it was going to be the 22nd or the 23rd, we said that we would agree that, as of that morning, whatever the opening was, that we would gap 10 and 12 pips respectively for the strike price for Deutsche Bank and the strike -- my strike price. So that we wouldn't have to necessarily speak that morning.

And then for the yen, I sadly called the direction wrong. I wish I called it the other way. But it ended up the -- I was expecting the yen not to strengthen against the dollar. I was expecting it to be, you know, 106 -- yen were trading, around, you know, 103, 104



So what we had agreed was we were going to open up two yen to the dollar, plus two yen and two pips for the morning -- that morning, to create the spreads. So that's where the 106 and change and -- respectively the 106 and change plus two pips came from on the Deutsche Bank side.

Q You talked about the fact that --

A I wish I called it the other way.

Q I was asking you -- you talked about the fact that you had decided which way to go on currency, essentially --

A Yeah.

Q -- above or below.

A Yeah.

Q How did you decide which way to go?

A There's a little bit of intuition. The overall trend, the -- the yen, if you remember in general, you know, it was trading at several hundred yen to the dollar. And over a period of a couple decades, it trended down. And now -- but the yen had a pattern. The yen had a pattern, if you looked at the charts, where it would occasionally dip up and it would kind of recover, kind of like our Dow Jones Industrial does. It tends to run up and then it seems to fall back.

People take a little bit of profit and then it runs up again.
The yen was following a similar pattern. it was running downhill for a while. but each time it would have a burst up. And my expectation was it was just in that little up-burst. so I figured the yen was going to weaken against the dollar. which means instead of it being 103 or 104 or 101. it ended up going to the wrong side. I called it going up to the 106.
Q What about the euro? How did you decide which way to go on the euro?
A The euro. I -- it had had -- I wanted it to be. you know. 101 21 or 23 relative. but less than or equal to. So I was expecting it to. you know. the -- the dollar effectively to strengthen against the euro.
Q Did you -- did you ultimately reach an agreement with Mr. Parse? Did you ultimately reach an agreement with Mr. Parse?
A Yeah Yes. I did
Q And Deutsche Bank?
A I did.
Q Did you ever talk to Jim Boyd about what you had agreed to with Deutsche Bank?



A Yes.
Q And Mr. Parse?
A Yes
Q Okay. If you would look with me. please. at what is -- the document --
A Would you allow me just for a moment just to warm this up
Q Sure. sure.
A I'm sorry Please
(Plaintiff's Exhibit Number 1 was marked for identification.)
BY MR. CROUCH:
Q If you will look under what -- under tab 6. a document which we have marked as Exhibit P-1.
A Yes.
Q And do you recognize this document?
A Yes. I do
Q Okay. And would you look on the third page of this document. please?
A Yes.
Q And is that your signature?
A It is.
Q Under JZ Buckingham Investments. LLC?
A It is.
Q Again. what is JZ Buckingham



Investments. LLC?
A It was a single member limited liability company. That was me
Q Okay It was you Okay. Can you tell the Court what this document is?
A It's a confirmation of our transaction for the -- in this particular case. it's two digital options that are reflected.
Q Okay. Can you tell me what digital options we're talking about here? First of all. I think there's a reference number at the top. Do you see that reference number?
A Yeah
Q Okay What is that reference number?
A 27320 27 -- it's hard to read this particular copy. 920.
Q It looks like 920A to me
A 920A
Q 920. capital A. Can you tell me. you said this is our digital option contract or confirmation --
A This is --
Q Let me finish my question.
A This is two of the options. yeah
Q Tell me what options these are



A This relates to the US dollar versus Japanese yen is the currency pair.
Q Where are you seeing that?
A Under currency pair under the section 1. general terms
Q Oh. I see. Down here about -- under section 1. the last line under section 1. currency pair?
A Right.
Q US dollar -- USD/JPY Is that what I'm looking at? US dollar?
A Yes. JPY is the Japanese yen and USD is the US dollar.
Q Can you tell me -- this is one of the deals you negotiated with Mr. Parse; is that correct?
A Well. it's two of the deals. But yeah It's two pages. First page is one of the options. The second page is the -- is another option.
Q Okay. What's the option on the second page?
A Well. they -- they are relating both to the -- to the Japanese yen But they're -- one is a -- one is a buy and one is a sell.
Q Okay Well. did -- I mean they're both

on the same document. Is this considered one -- one option contract? Or is this considered one option?

A No. It's just -- it's both contracts for the particular currency.

Q Have you ever seen -- you do a number of currency options. I think you said?

A Yeah.

Q Have you ever seen two currency options on one contract like this?

A Generally. I -- generally I don't end up going doing both buy and sell. So ordinarily I would see, you know, one, one deal on a page. But these were all relevant to each other, in the same currency. So I guess for convenience they put both agreements in the same document.

Q Did -- as far as you know. I mean, in reviewing this document before you signed it, I assume -- well, did you review this document before you signed it?

A Sure.

Q Okay. Did this document correctly reflect the agreement you had reached with Mr. Parse with respect to your investment in the Japanese yen?



A Yeah. They did.

Q Okay. And can you tell the Court, in simple terms, essentially what you had negotiated with Mr. Parse as far as the Japanese yen on the first contract on the front?

A Yeah. Well, first you have to look to the definition of party A and party B. Party A is Deutsche Bank and party B represents the single member LLC, which is -- for our purposes I'll just say me.

Q And that's for -- and that's under the second line, party A and party B, is that correct?

A Right. Yeah.

Q Okay.

A So if you look to the notional amount, the notional amount just simply refers to the calculation overview value that will be used as a referential point for all points of discussion that are beneath it.

So initially you see the initial exchange amount. It says that party B will -- that me, I'll pay a premium of $25 million in exchange for getting $50 million if at or a time, the date, where it says final -- you can see where it says termination date.



Q Where are you looking at the termination date? I'm sorry.

A Further down in the document, you'll see where it says first range level, which is just another way of saying strike price, or if you want to use the goalpost example.

Q When you're talking about first range level, you're looking under section -- it's number 2, section 1?

A It --

Q Roman --

A Small ii?

Q Let me go through this. Let me ask this. Small ii, final exchange provisions, first range level, under that; is that correct? Is that where you're pointing at?

A That's correct.

Q I just want to make sure it's clear on the record.

A That's correct. And this one happens to be for the Japanese yen/dollar. And if you look very much further down, just the top of the next paragraph, it says, at 10:00 a.m. local time New York, greater than or equal to the first range level



So it's basically saying that if it's greater than or equal to 106.19.

Q Yes.

A Okay.

Q What will happen if it is greater than or equal to?

A If it's greater than, I would receive a payment of $50 million for the $25 million premium.

Q Okay. And $25 million premium is what?

A That's what I paid Deutsche Bank for the position.

Q Okay. So in other words, you paid Deutsche Bank $25 million to essentially say, look, if the Japanese yen is worth 106.19 or higher on this day at this time, Deutsche Bank will pay you $50 million?

A Will owe me $50 million; that's correct.

Q Okay.

A And --

Q And there's a reference here on -- to final exchange date. Do you know what that --

A Yeah. That's just -- that's the settlement date. That's the date -- you know, money would change hands typically five to seven

days.

Q I'm looking further up the page here, under section 1, it says: Trade date. Can you tell me what that date is

A Yeah. That's the date in which the currency option was entered into

Q What's that date?

A It says November 23rd, 1999

Q And then it says, the next line, says something about a termination date What is the termination date?

A It's a defined term That's the termination date, you'll see further down, which was December 22nd, was the termination date That was the date that the terms of maturation, you determine whether or not you're in or out

Q Okay.

A If you're in the money or not.

THE COURT: So in other words, the strike price, you're looking for the strike price to be on December 22nd, 1999?

THE WITNESS: That's correct

THE COURT: And the closing, the money changes hands on the 27th of December?

THE WITNESS: The actual cash exchange.



yes.

BY MR. CROUCH:

Q And then you were referencing before this paragraph A down here If the spot rate on the first rate determination date at 10 o'clock a.m. local time in New York, greater than or equal to the first range level.

A Right. Which was the strike price. Just another way of saying it.

Q So greater than or equal to 106.19. Then upon the occurrence of such first optional trigger event, one, party A shall pay to party B -- shall pay to party B the party A final exchange amount, which I think you said is $50 million?

A Yes

Q And, two, party B shall pay to party A the party B final exchange amount.

Am I reading that correctly?

A I'm sure you read as well as I, yes

Q And it appears to me that -- if I'm reading this correctly up here, did party B have a final exchange amount, party B being you?

A Well, party B is -- I had already paid my premium.



Q Okay.

A So it shows zero. See -- if I could help you out.

Q Thank you. Thank you I appreciate all the help I can get.

A Okay. So -- I mean, it says zero. They're defined. So I paid my money up front. I had to pay a $25 million premium for the right to possibly get $50 million if I called the currency direction right.

Q Okay. Thank you.

Can you read the last sentence of that paragraph there, that same paragraph It starts with in determining.

A The last paragraph?

Q The last line of paragraph A.

A Okay. Paragraph A. Okay.

Q Do you see where it says, the last sentence, it says: In determining?

A Let me just get my glasses to focus. In determining whether the first digital option trigger event has occurred, a particular spot rate shall be disregarded of the calculation agent acting in good faith if he considers that it would not be commercially reasonable to take account of



it.

Q First of all, what is the calculation agent?

A Well, in this case, it's Deutsche Bank.

Q What is this allowing Deutsche Bank to do?

A If they get an aberrant offer, which happens all the time in the market, if somebody has a small lot, they want to get rid of, in this case it can be yen, and they'll just say I'll take what I can get for it, I'm not really interested in trying to work the market, you can get an aberrant price, which would be well above or well below the market. He has the right to ignore that aberrant rate as long as the overall commercial market indications are that it's aberrant.

Q Okay. In reviewing this contract, did that portion concern you?

A No.

Q Why not?

A I've never had any problem with the integrity of any of the large institutions I've dealt with. They've all been, you know, above board I've never had a problem.

Q You referenced on the second page, this

is the second digital option transaction.
A Yes
Q And because you're better at explaining this apparently better than I am at understanding it, could you explain to the Court what this transaction essentially says?
A Yeah. If you -- if you look at the top, it now has the parties -- for initial party B it's zero for the amount being paid. Remember, party B is me.
Q Okay
A So I'll use that as -- instead of speaking of myself as the single member, you know, LLC.
And party A in this case is the bank. So in this case, the bank is paying me $23,750,000 for the right on an option for them to receive $46,675,000 if, on the termination -- the termination date, they are -- and if you look at the bottom here it tells you, again, at or below -- it happens in this particular case it is exactly the same conditions, except in their case, it's equal to -- excuse me, equal to or above 106.21, which is the two additional pips that I had mentioned to you.



Q Uh-huh.
A So the spread between them being in the money and me being in the money, it was highly likely that both of us would be in the money. But it was less likely for them to be -- for me to be in the money and for them to be out of the money. I only had, you know, two pips, where I was looking for four to five pips of separation between us.
Q Okay. Let me go back. Let's talk about it a little bit to make sure I understand that.
A Yeah.
Q If I'm understanding this correctly, what the document seems to be saying is --
A Excuse me, pips, I'm sorry.
Q They were going to pay you, Deutsche Bank, you paid $25 million for the right to possibly get $50 million if the Japanese yen is equal to or greater than 106.19, right?
A That's correct
Q And you agreed to pay Deutsche Bank $46 million -- $46,875,000 if the Japanese yen was greater than or equal to 106.21?
A That's correct.
Q So what would the sweet spot be for



these purposes then?
A It would be the two pips in between.
Q Okay. Which is -- where would the Japanese yen have to end up?
A It would end up at 106.20 or --
Q If I could help you here, it says greater than or equal to?
A Excuse me I'm on the wrong side of the curve Just -- well, greater than or equal to is fine. I'm just saying that I am -- I am --
Q Well, tell me --
A Let's put it this way. If I called it right I would have put it the other direction instead, because it ended up being, you know, the Japanese yen ended up strengthening against the dollar instead of weakening.
Q Tell me what the sweet spot is here.
A The sweet spot is that spread, if you're putting it on a chart, if you're putting it on a chart and you put the strike price for the bank and the strike price for me, the two -- the distance between the two, which is, if you -- and if I'm just going to mark it down here, 106.21 and 106.19, any number in between 106.21 and 106.19 is the sweet spot



Q Let me ask you a couple questions about that?
A The sweet spot means I would collect my premiums, but would have no payout.
Q Let me ask you --
A Plus I would get a payout from the bank.
Q If the Japanese yen ends up at 106.19 --
A Right.
Q -- what would happen then?
A I would get paid.
Q And would --
A It's equal to or greater than this.
Q Okay Would you have to pay Deutsche Bank then?
A No. My only -- my point was twofold. It has to be -- it's anything equal to or greater than So it would include those goalposts. You know, it's one of those cases, not like football, where if you hit the goalpost it still counts here. So the 106.21 would count and the 106.19 would count. But it's equal to or greater than.
Q Okay So in other words, if I'm understanding this correctly, your sweet spot was 106.19 and 106.21 -- or 106.19 --
A Or any number --