Q Just a second. Let me ask the question. Your sweet spot is 106.19 and 106.20; is that correct?
A And -- all the way up to 21.
Q Well, if I'm reading the second page, it says you have to pay -- you have to pay Deutsche Bank if it's 106 21?
A You're talking about for the bank.
Q Yeah.
A You're right. That's correct.
Q I'm talking about just for the sweet spot.
A That's correct. Yes.
Q I just want to make sure I'm clear on that.
A That's correct.
Q Okay. If you could now turn the page to the -- to the next document, if you could, please.
A Just tell me where I'm going.
Q Tab number 7. I'm sorry. I'm sorry.
A Okay.
(Plaintiff's Exhibit Number 2 was marked for identification.)
BY MR. CROUCH:
Q And do you recognize this document?



A I do, yeah. It's the two other digital options, confirmation from Deutsche Bank.
Q And I think you -- and if you look on the third page, is that your signature?
A Yes.
Q And did you review these documents before you signed it?
A Yeah, I did.
Q And does this reflect your negotiations with Mr. Parse?
A Yes, it does.
Q Okay. And, again, I -- I want to walk through this briefly to make sure I understand. If I'm understanding this correctly -- you tell me, what does this document reflect?
A The big difference, the chief difference here is this, first of all, you can see the currency is different. Where it says the currency pair is the euro versus US dollar.
Q Uh-huh.
A Okay. The parties are the same designations as on the last document, except in this, case, if you look at the -- at that next to the bottom paragraph, where it says less than or equal to, and then it calls for the first range



again, which is the strike price. Except in this case, it's less than and equal to rather than greater than or equal to.
Q What did you pay Deutsche Bank for this?
A Well, if you look up at where it says, first of all, the notional amount was 40 million. But in this case, party A -- I paid $20 million. I'm party B. I paid $20 million for the right to gain $40 million if I called it correctly.
Q Okay.
A And I happened that I did.
Q Okay.
A And in this case, though, it was -- I said, it was less than or equal to 1.0123 per euro.
Q Okay.
A If you see that at the very bottom.
Q Yes.
A Okay. And I called that one right, so I actually made that 20 million.
Q 20 million or 40 million?
A Well, they paid me the 40. But I had a $20 million premium.
Q Okay.
A So, you know, you have to deduct your



premium. So they paid me the 40.
Q Okay. And if you would, if you would look on the second page of this document.
A Yes.
Q And can you explain to me --
A This is the second digital option related to the same currency. And, again, it's the euro, US dollar. And this is my selling position to the bank. The -- the bank paid me $19 million for the right to earn, if they were correct in their determination, $37.5 million if the exchange rate was at or below 1.0121 per euro, which is reflected in that second paragraph, that kind of bullet point paragraph.
Q If I'm reading this correctly --
A Yes.
Q -- it looks like there's a two -- I think what you refer to as a pip differential between the first contract and the second contract.
A Yeah. It's two pips. It's the same kind of a spread. And 1.0123 versus 1.0121.
Q So the sweet spot here would be the --
A It's really --
Q 1.0123 and 1.0122; is that correct?

A That's correct. The -- you know, the government -- I say the government. My apologies to the government.

When Deutsche Bank -- Deutsche Bank, other than hitting -- if they had hit exactly on the goalpost, then I would not be able to count their end. I would still have had to pay them for an offset. So I have really three pips that would make me a winner.

Q I think you referenced earlier to six contracts that you all had with respect to Deutsche Bank.

A That's correct.

Q We've looked at -- we've looked at two on the first -- first document, number 6, and two on the second document, number 7. Did you have other contracts with --

A Jim Boyd.

Q Say again? I'm sorry.

A Jim Boyd.

Q Jim Boyd.

A Jim Boyd, his LLC.

Q Yes.

A Had contracts as well in the euro which he called correctly. Actually I called it for



him.

Q Okay. Why did you call it for him?

A He trusted in me to make currency decisions in terms of directionality and the investments.

Q Okay. What ultimately happened on each one of these --

THE COURT: Do I understand you correctly, then, you had four contracts; and Jim Boyd had two contracts?

THE WITNESS: Had two contracts. A total of six contracts. In the end --

BY MR. CROUCH:

Q Would you repeat -- Mr. Boyd had his -- I'm sorry. Mr. Boyd had his contracts in what?

A He had his in the euro.

Q In the euro also, okay.

A He paralleled exactly what I -- I used the exact same strike prices in his contract except for lesser dollar sums.

Q Ultimately what happened with respect to these contracts that you had with Deutsche Bank?

A Well, on the euro we netted -- I hit -- I called the direction correctly, and we made $1,875,000 of profit. And he made 375,000. I



made 1-1/2 million. And unfortunately, I wish I'd called the direction right on the yen, but I didn't. The market moved against me. So we didn't make anything on that. So effectively I lost my net premium on that, which is about $1-1/4 million between the two of us.

Q Okay. So ultimately where did you end up?

A We ended up netting $625,000.

Q Okay. Thank you. The reference -- you had referenced on these that the trade date for each one of these is November 23rd, 1999; is that correct?

A Yes.

Q Do you remember when you received these contracts to sign?

A Obviously -- obviously at some point thereafter, because they wouldn't even have had what the strike price was until the actual date of the occurrence. So it was sometime thereafter. I would have to look to see what the dates were. But it had to be at some subsequent period of time.

Generally when I -- when I do derivative contracts, total return swaps, options, you know,



it's -- it's quite far after. Sometimes I don't get my information confirming the transaction for, you know, well over a month.

Q Is that -- does that concern you if you don't have your contracts all signed up as of the date the transaction is supposed to take place?

A Oh, no. No. That's -- that's more the norm than an exception.

Q Okay.

MR. CROUCH: Your Honor, if we want to take a break now for lunch or --

THE COURT: Yeah. Do you want to have lunch now?

MR. CROUCH: That would be fine, Your Honor.

THE COURT: Okay. How much time do you think you'll be? An hour?

MR. CROUCH: That's fine.

THE COURT: Because you have to either go down to our horrible cafeteria or go outside. There's always a rush.

So 10 after 1:00 then would be a good time to resume?

MR. CROUCH: That's fine.

THE COURT: Okay. The court is recessed

until 10 after 1:00.

(Whereupon, at 12:13 p.m., the deposition was recessed, to be reconvened at 1:10 p.m. this same day.)



AFTERNOON SESSION (1:15 p.m.)

Whereupon,

JERRY ZUCKER

having been previously duly sworn, was examined and testified further as follows:

THE COURT: Mr. Crouch, you may resume.

MR. CROUCH: Thank you, Your Honor.

DIRECT EXAMINATION (Continued)

BY MR. CROUCH:

Q Mr. Zucker, when we left the proceedings we talked about the contracts you had with Deutsche Bank and how those ultimately had resolved. I'm going to ask you now to look at what's under tab number 8, if you would, please.

A Tab 8?

Q Tab 8.

A Okay.

THE COURT: Actually, before you do that, Mr. Crouch, can I ask Mr. Zucker what's the difference between a long option and a short option?

THE WITNESS: It's the position as to whether or not you're buying the option or you're selling. Selling is short and long is buying.

THE COURT: Does that mean with the



short, you're betting that the security or whatever it is is going to go down in price?

THE WITNESS: No. Actually it's not the typical expression like you'd see in an equities market, if you're trading you say you're going long or going short in selling. It's simply to designate the difference in the position as to who is selling the position to whom. In this case, the bank buying the position to me is going short.

THE COURT: Oh, I see.

MR. CROUCH: In other words, if you look at the document --

THE WITNESS: But it's unique to the option.

THE COURT: Mr. Crouch says you can illustrate by looking in tab 7.

BY MR. CROUCH:

Q Yeah. Tab 6 or 7, one of those, which is the options contracts. You might point out to the Judge which one is the long and which one is the short on those.

A Where I'm taking the position to buy an option with the anticipation of a payout, that's the long. And vice versa, where I'm selling my position to the bank and then saying that, you



know, if certain conditions are met, I will pay you, that's the short.

THE COURT: I see. Okay. Great.

THE WITNESS: It's unique to the currency trading. Typically when you think in terms of equities buying and selling, if you're buying it's long, if you're selling -- planning on holding the position it's long. If you plan on selling the position, it's short.

THE COURT: Okay. Great. Thanks. Mr. Crouch, you may resume.

(Government's Exhibit Number 1053 was marked for identification.)

BY MR. CROUCH:

Q Mr. Zucker, if you could look under tab number 8.

A Yes.

Q Under tab number 8 we have a document that's been designated in a previous deposition as Government Exhibit 1053. Do you recognize this document?

A You're wanting to look behind tab 8, the one that's entitled Jenkens & Gilchrist?

Q Yes.

A Yes, I do.

Q Do you recognize that this is a faxed document to you from Donna Guerin at Jenkens & Gilchrist?

A Yeah. I'm trying to see where the date is on it. But it's in the bottom. Yes. I see it.

Q Okay. What's the date on this?

A It says November 26th, 1999.

Q And can you tell the Court where you're looking at that date?

A At the very bottom next -- next to the little margin line at the bottom of the page.

Q If you take a second to look at these documents.

A Yes.

Q Can you tell me what the documents are that are attached to this fax?

A Sequentially it's authorization to wire money from the Deutsche Bank account to the JZ Buckingham LLC account number. Second sequentially is the assignment of the option positions to JBJZ Partners and the account number designation. And similarly, the direction to David Parse giving him authorization to transfer the remaining cash to the LLC and to JBJZ Partners and the account number



And then the very tail end is an assignment agreement. It's between the LLC to JBJZ Partners

Q Do you actually recall receiving this document?

A Recollection is a funny thing. I just -- you know, you want to be able to instantaneously say that you remember receiving it. I receive things, so many things during the course of the day I can't specifically say that I recall. But obviously I received it.

Q Just a couple of things I want --

A I know I'm splitting hairs. But I think --

Q On the third document or the third page on that.

A Yes.

Q There's a document, JZ Buckingham Investments LLC at the top. Do you see the third document in?

A I want to make -- third page in

Q Third page in.

A Okay.

Q It has the --

A My third page is addressed to David



Parse

Q No. I'm looking at the very top of that page. I'm sorry. Very top of the page where it says JZ Buckingham Investments LLC?

A I see that. Yes.

THE COURT: Excuse me. Mr. Donohue.

MR. DONOHUE: Your Honor, since there's more than one page of the document that has that heading at the top, I think if counsel would refer to the document by Bates stamp.

MR. CROUCH: Yeah. That's what I was about to say

MR. DONOHUE: That would be clearer.

MR. CROUCH: The Bates stamp number at the bottom is JG hyphen --

THE COURT: Thank you, Mr. Donohue.

THE WITNESS: This is the one ending 8787

BY MR. CROUCH:

Q Yeah. Let me make sure I get it on the record JG-CL 0147878.

I think you previously said that this fax was sent to you on November 26th, 1999

A Yeah That's what's noted on the base, yes



Q And this document has already filled in November 24th, 1999. And it's asking you to sign this in two different places where it says November 24th. Do you see that?

A Yes.

Q Did you in fact execute this document as far as you know?

A I believe that I did, yes.

Q Did it bother you that you were executing a document that had a date on it that was prior to the actual date of the fax being sent to you?

A No. Just they're conforming it to the fax. I have no problem with that.

Q Do you know why you were executing all these documents with respect to -- that Jenkens & Gilchrist was sending you?

A This is basically following the format that Ernst & Young had recommended as the most appropriate structure.

(Government's Exhibit Number 1019 was marked for identification.)

BY MR. CROUCH:

Q Okay. Thank you. Would you look under tab number 9 now, please

A Tab number 9 Okay.
Q This is a document that has been marked in a previous deposition as Government Exhibit 1019.
A Yes. I see that.
Q Okay Do you recognize the handwriting on this document?
A I do
Q Whose handwriting is that?
A Jim Boyd's.
Q Have you ever seen these notes before?
A I saw them as a result of my own deposition.
Q Okay. Do you recall seeing these back in 1999?
A I don't.
Q The notes seem to reflect that Mr. Boyd was having a conversation with Ray Knight and with David Parse.
A Right.
Q Also a Shawn Smith was on the line. Ray Knight, who is he with?
A Ray Knight was with Ernst & Young.
Q And David Parse with who?
A Deutsche Bank Alex. Brown



Q How about Shawn Smith?
A Shawn Smith was with Ernst & Young
Q He references here first of all previous -- it looks like to be previous wires. 3 10 and 350. Do you see that?
A Yes. This would have been funding amounts that each of us had made to the transactions.
Q Okay. And he says 1 million for investment. And then he references, it looks like some bank stocks down there. Do you see that?
A Right. Yeah. Bank of New York, Bank of America and First Union.
Q Do you recognize why he was talking to Mr. Parse possibly about --
A Yeah, that was part of the --
Q Let me finish my question.
A I'm sorry.
Q Do you recognize why Mr Boyd may have been talking to these gentlemen about investments in bank stocks?
A Yes.
Q Okay. What was the reason?
A We were going to be making diversification of our accounts And it included



the investment as part of the proposed structure, investments into capital equities in the market. And the bank stocks were selected as being, in my opinion, they were solid in terms of likely trending upward. I had done very well in banks in general. And I had a comfort that they were going to appreciate in value.
And I felt those were going to be a good place to park. And Jim was just reconfirming, I assume, in this, although I don't recall seeing this, that he was going to be investing respectively, it says $500,000 in each of the Bank of New York, Bank of America and First Union.
(Plaintiff's Exhibit Number 3 was marked for identification.)
BY MR CROUCH:
Q Okay. If you would turn over to the document that's under tab number 10, please.
A Yes.
Q And do you recall receiving this document from Jenkens & Gilchrist? This is a document marked with Exhibit P-3.
A I recall the document.
Q Okay. In here, Ms. Guerin is writing on behalf of Jenkens & Gilchrist It says: Please



do not fill in any of the blanks which appear in these documents.
A Yes.
Q As to the dates. Were you bothered by the fact that she was telling you not to fill in the dates on this?
A No, not at all As a matter of fact, most of the -- as a matter of fact, normally as to all the mergers and acquisitions and other things that I do, almost all of them are left blank and conformed by the attorneys after the fact, where I just simply sign the documents. So, no, I'm not at all surprised by that.
Q Do you have any recollection of actually signing these documents?
A Yeah. I recall signing a lot of documents. And I see my signature on a number of the documents that are attached.
Q And do you know what you did with these documents once you executed them?
A What I would ordinarily do with these sorts of documents is give it to one of our administrative assistants and ask them to forward it to the proper party.
Q Do you know why you were executing these

documents in particular?

A Yeah. These were all the various transfer and assignment documents related to the various transactions we were doing in the corporate partnership entities that we created in the cross-contribution.

(Government's Exhibit Number 2255 was marked for identification.)

BY MR. CROUCH:

Q Okay. If you would look under tab 11, please, Mr. Zucker.

A Yes.

Q And first of all, is that your handwriting on that page?

A No. That's Jim Boyd's.

Q Okay. Do you recall ever seeing this document?

A Not contemporaneous with this date. But I recall seeing it since.

Q Since as in when?

A As in related to the last few weeks.

Q Okay. Thank you.

This seems to reference something, some discussions that Mr. Boyd had with Ray Knight. Do you recall around December 28th, 1999 you having



any discussions with Mr. Boyd about his discussions with Mr. Knight?

A I don't recall the specific content, nor do I fully understand what he's writing in this note, but we have lots of discussions during that period of time, and hallway exchanges and so forth. So --

Q He seems to be referencing something about margin earnings on the euro. And Mr. Knight had told him something about just picking up the margin gain on $625,000. Do you recognize --

A Well, the 625,000 I would recognize as a number --

Q Let me ask you a question first.

A Yes. I'm sorry.

Q Do you understand what Mr. Boyd may be discussing in this letter?

A Not fully. I recognize some numbers. But I don't really know -- I don't know what a margin gain is. I know what the capital gain would be related to the transaction. And I'm not really sure exactly what the references are.

Q Mr. Zucker, I can tell you that this document was recently found in a file in the office of one of your assistants, that being



Charlotte Crosby.

A Uh-huh.

Q Did you have an understanding that Ms. Crosby had files in her office with respect to this transaction?

A I would assume that she keeps copies of various files on an ongoing basis. Often I'll actually direct her to put the things in the file. As to whether it's in her office or not, I don't know.

Q Do you understand that this document had not been turned over to the government in response to their request for production?

A You've told me that. But I wasn't aware of it.

Q Okay. Do you know why the files in Ms. Crosby were not produced -- not produced to the government when they requested it?

A A screw-up, because I instructed everybody in the office to go through their files and get everything that was related to this transaction.

Q Okay. Who did you ask to do that?

A I asked Charlotte Crosby. I asked Donna Hartin.



Q Okay. Who is Donna Hartin?

A Carmen Wigfall. I'm sorry?

Q Let's go back. Who is Donna Hartin?

A Donna Hartin is more directly my administrative assistant. And Charlotte is -- years ago she was almost -- very heavily weighted toward Jim Boyd's administrative assistant. But then after Jim's car accident and all, I kept her as a general administrative assistant for many people, including myself.

Q Okay. Who else did you ask in your office?

A I may have, because it was done at the same time, it was at a staff meeting that I made the mention, so there were a whole bunch of other people present in the meeting. But, you know, Carmen Wigfall, but she didn't have any files of any, you know, that --

Q As far as you knew had all the records been produced?

A To the best of my knowledge and certainly to my instructions, you know, all the records had been produced.

Q Okay. Mr. Zucker, I'm asking you to flip back in your notebook right now to --

actually, no. Let me ask you something else.
Actually I want you to look under Exhibit Number -- tab number 13 if you would, please.
A Yes.
(Plaintiff's Exhibit Number 5 was marked for identification.)
BY MR. CROUCH:
Q Can you recognize this document?
A Yes. It's the Brown & Wood opinion letter.
Q When you say the Brown & Wood opinion letter, what are you referring to?
A It -- I mean it's from Brown & Wood. And we were told that we were going to get two reputable firms to provide us with opinions of the appropriateness and properness, that we were compliant with IRS code and regulation.
Q Do you recall when you received this opinion letter from Brown & Wood?
A Well, I'm looking at the date now. But if you asked me of my own recollection I would have said first quarter of 2000.
Q Why do you say the first quarter of 2000?
A Well, there was no way that our taxes



were going to get filed without the opinion letters in our file that, you know -- Barry Emerson and through his discussion with Roy Knight made that very clear that, you know, we couldn't file our taxes without the opinions.
Q Who is Barry Emerson?
A He's my regular CPA for filing my 1040s.
Q Okay. And you said Barry Emerson told you that you could not file your tax return without having the opinion letters?
A No. Barry told me it was necessary for me to have the opinion letters in hand before we filed our taxes.
Q Did he tell you why?
A He said that that way that we could -- we could demonstrate that we were diligent in making sure that we followed all the rules.
Q Do you recall the first time you heard the name Brown & Wood associated with this transaction?
A I'll be frank with you. Until all of my, you know, proceeding against the government for a refund and all, I didn't really think or remember Brown & Wood. I didn't think in terms of the names of the firms. I knew that we had, you



know, reputable opinions in the file.
On reflection of the documents, I now remember Jenkens & Gilchrist and Brown & Wood and so forth. But those were not names that were familiar to me. They were instantly familiar to Jim Boyd. But, you know, upon reflection, I would say during that same period of time.
Q Did you review this opinion? Do you recall reviewing this opinion when it came in?
A Only as I normally do, just skimming things.
Q Okay. Do you -- what would you have done with this opinion when you received it?
A I would have, you know, put a note on it, if it was exclusively to me. I would have put a note on it, circulated it, given it to Charlotte and ask that copies be sent to Barry Emerson, since it was ultimately related to something he would have to file.
Q Did you -- do you know if you did share this with Mr. Emerson?
A Oh, I know that Barry had both opinions in his file. As to whether it came directly in this form or whether it came through Charlotte or other, I can't absolutely confirm that. But I



know that he got a copy.
Q Well, was Barry Emerson involved in the transaction with Ernst & Young?
A Not at all.
Q So why would he need this opinion?
A He's my CPA. He's the one that does all my own 1040s, for myself and for my wife.
Q Did you rely on this opinion for the purposes of filing the 1999 tax return?
A Well, clearly I wasn't going to be able to file them without it. So, yes, I relied on this opinion and the Jenkens & Gilchrist opinions. But I'll be frank with you as well, I felt totally reliant on Ernst & Young and the fact that they told me that everything was kosher, was being done properly and structured properly, as well as Jim Boyd. Jim was an excellent tax attorney.
Q Why would you rely on Mr. Boyd?
A Oh, he started off being my, you know, corporate structuring attorney and tax attorney. He was unbelievably bright. He can run circles around almost anybody that I knew in terms of his brilliance.
So he felt very comfortable with the nature of the transaction and kind of the

reference in terms of the real estate precedent that had been set in terms of it being -- and as I mentioned earlier. I don't want to be redundant. but the fact that an unmatured liability would not be included in the basis So he felt comfortable with regard to the -- all of it as well.

So I had almost like a triple endorsement. I had the two opinions plus Jim Boyd's opinion. which I valued equally

(Plaintiff's Exhibit Number 6 was marked for identification.)

BY MR. CROUCH:

Q If you would turn to page -- turn to the next document. under tab number 14. if you would.

A Yes.

Q Because you had just referenced -- you just referenced an opinion received from Jenkens & Gilchrist And on -- and an exhibit that's marked on 14. Exhibit P-6.

A Yes.

Q And for the court reporter I forgot to mention. I think. the exhibit number for number 13. which was P-4.

(Plaintiff's Exhibit Number 4 was marked for identification.)



BY MR. CROUCH:

Q Under 14 is P-6. Do you recognize this document?

A Yes.

Q Can you tell me what this is?

A Yeah It's -- first. the cover note is from Ray Knight to me sending -- saying that attached is the opinion issued by Jenkens & Gilchrist.

Q Do you remember when you received this letter from Mr. Knight -- did you receive this letter from Mr Knight?

A I did. And it was in the. again. the first quarter. But a bit earlier than the -- than the one I had gotten from Brown & Wood's. Brown & Wood's was later

Q Is that your writing on there?

A It is.

Q Can you tell me what your notes say?

A That says: Please copy Barry Emerson. For your files. Jerry. Charlotte. please retain this original in our files.

Q So were you again sending a copy of this off to Mr. Emerson?

A Yes.



Q Because he was preparing your 1999 tax return?

A That's correct.

Q If you turn the page. is the document behind that the opinion you received from Jenkens & Gilchrist?

A Yes

Q And when you received this document. did you review it?

A I skimmed through it to just see how it described our transaction.

Q Did you -- did you have confidence in it?

A Oh. absolutely.

Q Okay. Did you rely on this opinion for purposes of your filing your 1999 tax return?

A Yes.

(Government's Exhibit Number 1000 was marked for identification.)

BY MR. CROUCH:

Q Mr. Zucker. if you could now turn to the documents under tab number 15. please.

A Yes.

Q Do you recognize this document?

A It's a -- yeah It's a partnership



return for JBJZ Partners.

Q Again. what is JBJZ Partners?

A That was the partnership between -- where we had contributed our LLC interests. our single member LLC interests.

Q Why had you contributed your single member LLC interests?

A Among the usual rationalizations of diversification and so forth. I'm not going to go through all the business -- normal rationales that you would have for any business. But it was part of the structure EY had indicated was part of the opportunity to make money. and at the same time create a benefit for me in terms of an offset in earnings.

Q I'm looking down the page. And this was previously marked in the previous deposition as Government Exhibit 1000.

A Yes.

Q Is that your signature on the -- on that document?

A It is

Q And is that your date that you put on there?

A Yes.

Q Okay. Do you recall -- I mean, first of all, obviously you did sign this document. Do you recall when you signed it? Was it March 22nd, 2000?
A Generally speaking, when I'm signing something directly, and I'm not asked to leave it blank or anything like that, I normally mark the exact date that I'm actually signing it. So that would have been the date.
Q Okay. Do you recall reviewing this document before it was filed?
A It's kind of like almost all of the dozens and dozens of tax filings I do every year. I -- you know, I'll glance at it. I depend on the professionals to make sure every line entry is filled out properly. I just don't have the time or the patience to go through every single line entry.
Q You said dozens and dozens. Approximately how many tax returns do you have to file every year?
A Counting international, I don't know, many dozens.
Q Okay.
A But stateside, several dozen



(Government's Exhibit Number 1001 was marked for identification.)
BY MR. CROUCH:
Q Okay. If you now turn the tab to tab 16.
A Yes.
Q And do you recognize this document?
A Yeah. It's the S Corp that we had formed.
Q And what S Corp was that?
A JBJZ Investors, Inc.
Q And that was for purposes of the transaction Ernst & Young had proposed to you?
A That was for purposes of the transaction. But also just from a business perspective, it made sense, yeah.
Q Okay. Do you recognize that signature on there as the taxpayer?
A Yeah. That's Jim Boyd's.
Q And who prepared this tax return?
A I would presume, because it was part of the understanding, that Ernst & Young prepared it.
Q Does it indicate down at the bottom who prepared this tax return?
A Yeah. It says Ernst & Young.



Q And again for the court reporter this is Government Exhibit, previous Government Exhibit 1001.
And looking back at the prior document -- and I meant to ask you this, this is under tab 15.
A Yes.
Q This is the partnership return for JBJZ Partners?
A Yes.
Q Do you know who prepared that tax return?
A Yeah. It says Ernst & Young.
Q Okay. How many tax returns do you think Ernst & Young prepared for you in 1999?
A I'd have to actually look to see, you know, who is doing the individual consolidating entities, but it would have been a large number.
Q Okay. Large number, more than 10?
A Yes.
Q Okay. More than 20?
A You know, I don't recall each of the details because I had, you know, I had Membrana and Celgard and all these other companies. It depends on how -- what the holding company



structure was as to, you know, some of the individual statements get consolidated into one. So I can't remember how -- if they were individually filed or if they were filed in consolidated units.
(Government's Exhibit Number 1005 was marked for identification.)
BY MR. CROUCH:
Q Okay. Would you turn to tab 17, please.
A Can I ask you just to hold for a minute.
Q Sure.
A My apologies.
THE COURT: No problem.
THE WITNESS: Okay. Please, again.
BY MR. CROUCH:
Q Turn under tab 17. Do you recognize this document?
A Tab 17.
Q This is a --
A Yes.
Q -- marked previously in a deposition as Government Exhibit 1005.
A Yes. I recognize it as my wife and my own personal return
Q Did you -- and I will tell you that this

is actually part of the administrative file within the IRS. So it's not -- everything in here is not actually -- would be part of your tax return. But I will say, and I think the government agrees, that your tax return is part of this document here. Does the government agree?

MR. DONOHUE: Yes. Your Honor.

THE WITNESS: It's just -- a few pages, you're right. There are subsets

BY MR. CROUCH:

Q Yes

A But the top page --

Q But I want you to look in on the page that's marked, the Bates number at the bottom corner says, ADMIN 001295

A 1295. Okay. Okay. I'm on the one that says 1295

Q Is that your signature?

A It is.

Q Is that the signature of your wife?

A It is.

Q Okay. Do you recall -- and who prepared this tax return?

A Well, the 1040 would clearly have been prepared by Barry Emerson



Q And again Barry Emerson --

A And signed here.

Q And Barry Emerson is who?

A Barry Emerson is my CPA.

Q Do you recall having any discussions with Mr. Emerson about how the transaction that you had done at the behest of Ernst & Young was being reported on this tax return?

A How it's being reported?

Q Yeah. Did he have any concerns about the transaction at all?

A No.

Q Okay. Did he ever --

A Well, he told me that my taking the position for sure would generate an audit. And I said fine.

Q You weren't bothered by the fact that he was telling you it was going to generate an audit?

A No. I thought everything I had done was perfectly fine.

Q Okay If I could, Mr. Zucker, could I direct your attention to the first quarter of -- first quarter of 2002.

A Just -- you mean reference -- mean --

Q I'm off that document now.



A Okay.

Q First quarter of 2002.

A Yes.

Q Do you recall ever hearing about in the first quarter of 2002 an amnesty program from the IRS that is called IRS Announcement 2002-2?

A Yes.

Q What do you recall about what you heard about that?

A I think it was published in the first part of the year, maybe January 2002. And it basically said if anyone had participated in any currency options, and they had various names for various shelters or structures that were similar described, that if you volunteered your name, that, even if it was found to be improper, that you would be not penalized for -- if penalties were ever attributable, that it wouldn't be attributable to you, that you had volunteered your name and information.

Q Did you have any conversations with anyone at Ernst & Young about that program?

A I can't recall to whom I spoke, but, yeah, there were some discussions right at the the very beginning.



Q Do you recall what you talked about?

A Yeah I said I wanted to participate. Why take any chances Go ahead and participate in the program. And subsequently I had discussions telling them to, you know, to be totally open with everything I had. I'd rather, you know, rather have an open dialogue.

Q Did you have any discussion with Mr Emerson about that program?

A I did.

Q Okay. And what were your discussions with Mr. Emerson?

A Similar. That, you know, I felt it was a good idea. He said that he didn't think there was any down side to it as well. Even though I personally didn't think there was any reason in terms of we had done anything structurally improper. I thought everything we did was fine, as I do now.

(Plaintiff's Exhibit Number 7 was marked for identification.)

BY MR. CROUCH:

Q Would you look under tab 19, please

A Yes.

Q Under tab number 19 is a document we

have designated as Exhibit P-7

A If you hold just for a minute. This binder is --

THE COURT: Are we skipping tab 18?

MR. CROUCH: Yes, we are, for right now.

THE WITNESS: Okay. All right. I'm on tab 19, Exhibit P-7

BY MR. CROUCH:

Q Yes. Do you recognize this document?

A Yeah. This is -- this is what I sent to Deborah Sims at the IRS informing her of the transaction and our names and contacts.

Q Okay. If you look on the fourth page of that document.

A Yes.

Q Are those your three signatures?

THE COURT: Bates number?

MR. CROUCH: I'm sorry. Bates number, I think it's 3172

THE WITNESS: Uh-huh

BY MR. CROUCH:

Q Are those your signatures?

A They are mine and my wife's.

Q Okay. Thank you. And do you recall -- did you -- did you draft this document?



A No. The --

Q Who drafted this document?

A Ernst & Young.

Q And why did they draft this document?

A Frankly, I could not have been as -- as eloquent in describing the transaction as they were, and had a lot of the technicalese in it. They had sent it to me for me to review and submit.

Q It says, again, on the fourth page, which is Bates number 3172, do you see the second paragraph from the end?

A Yes

Q And can you tell me what that says

A Second paragraph -- under penalties of perjury?

Q Yes. Thank you.

A Yeah. Under penalties of perjury we agree that we have examined this disclosure and to the best of our knowledge and belief, information --

Q You're reading too fast.

A I'm sorry. We examined this disclosure and to the best of our knowledge and belief, the information provided as part of the disclosure



contains all relevant facts and is true and correct and complete. Yes

Q Okay. Did you in fact review this?

A Yeah. And I -- I went over it and it seemed to outline, you know, all the essential facts.

Q Do you -- as far as you knew when you signed this document, did it appear to be true and correct to you?

A Yeah. Yeah I mean, you know, I -- I didn't -- even today I don't really see anything that's not right.

Q Okay. Again, why did you -- why did you file this document?

A Why did I file it?

Q Yeah. Why did you send this to the IRS?

A Well, it's kind of like, you know, a free lottery ticket. Why would you not accept a free lottery ticket? You know, it's -- this was, in the event that the -- anything that we had done was not proper, that I would be protected from any potential for penalties.

So I'd much rather -- I thought we had not done anything wrong at all, and I still don't. That's why I'm seeking a refund. But why not at



least cover the bases. So I thought we should go ahead and take advantage.

Q Okay. Do you recall -- is there anything else you want to add?

A Not to that answer. But --

Q Okay. Okay.

A There's something that's relevant that I see that I've scratched out and I want to tell you why.

Q Don't worry -- let me ask you about that. Let me ask you about that.

A Okay.

Q I see on the first page of this document, Mr. Zucker, that you have -- that the date has been scratched out. And it's -- then it's got some -- a new date put in there and some initials on there.

A Yes.

Q Can you tell me what those are?

A Yes. Her office is very close to my office. So I wanted to have it delivered --

Q When you're saying her office?

A Deborah Sims of the IRS office. It's on LaCross Road in North Charleston, which is just a very short distance from my office So this had

been predated by Ernst & Young. And it was a Friday. The 20th was a Friday. And I wanted to have it delivered directly to her office. So since I was signing it that day and having it delivered. I wanted it to coincide with the date that it was being delivered.

Q Okay. Okay. Do you recall ever being contacted by any of the other professionals associated with this transaction, either Jenkens & Gilchrist or Brown & Wood --

A Yes.

Q -- about IRS inquiries regarding your transaction?

A Yes.

Q Okay. What do you recall being contacted about?

A They said that they had gotten like a John Doe summons. I think that's what it was called. They were saying that under their rules that they weren't allowed to give my name out unless I specifically said to the contrary. And I responded to them, please freely give them my name and give them all information and records.

(Plaintiff's Exhibit Number 8 was marked for identification.)



BY MR. CROUCH:

Q Okay. Would you look under tab number 20, please?

A I'm sorry?

Q Would you look under tab number 20, please.

A Yes. Yes.

Q And is this a letter you received from the law firm of Jenkens & Gilchrist?

A Yes.

Q And what was your understanding of this letter?

A That they were basically telling me that under their -- that they had been getting a John Doe summons and requested to be given all the information about their various clients. And that under the commitments of their ethics and confidentiality of attorney/client privilege, that they would refuse to produce or give information unless, you know, I directed them to the contrary.

And I did in fact direct them to the contrary.

(Plaintiff's Exhibit Number 9 was marked for identification.)

BY MR. CROUCH:



Q Will you look under tab number 21.

A Yes. Yes.

Q And an exhibit that we had marked as Exhibit P-9.

A Yes.

Q And for the court reporter, the previous document was Exhibit P-8.

P-9.

A Yes.

Q And is this your letter to Jenkens & Gilchrist?

A It is.

Q Is that your signature on that document?

A It is my signature.

Q What are you telling Jenkens & Gilchrist at that time?

A I said I received your letter regarding the John Doe summons. And that I understand the obligations that they have to assert attorney/client privilege and confidentiality. And that I told them that some time ago I had already told Ernst & Young to give them authority to release my name and cooperate with the IRS.

And I said that I don't believe -- you know, I believe that the best thing to do



basically is to be fully cooperative. It was -- that I had a -- that it was consistent with all the regulations, that I had an opportunity to make a profit or a loss, a reasonable business risk. And I felt that it had followed all the existing regulations and to go ahead and be fully compliant and give them everything they needed.

Q Did you have the same conversation with Ernst & Young?

A I did.

Q What did you tell Ernst & Young?

A I told them to cooperate in every respect and give them whatever they needed. Just whatever they were asked for, to give it, because I had nothing to hide.

Q To give it to who?

A To anyone that asked under the government from the IRS.

Q Okay. Do you recall being contacted a second time by Jenkens & Gilchrist about producing your information?

A I -- I -- yeah. I received a subsequent letter. It was essentially the same.

(Plaintiff's Exhibit Number 10 was marked for identification.)

BY MR. CROUCH:
Q And how did you -- if you look under tab number 22, an exhibit marked as P-10, is this the subsequent letter you received from the IRS -- from Jenkins & Gilchrist?
A It is.
Q How did you respond to this letter?
A I responded that, you know, almost in disbelief, didn't you get my other letter. And I actually attached the letter and said that, you know, for them to fully cooperate and provide the information and so forth
(Plaintiff's Exhibit Number 11 was marked for identification.)
BY MR. CROUCH:
Q And if you'll look under tab 23. Is this a copy of -- an exhibit we have marked as P-11, is this a copy of the letter that you sent to Jenkens & Gilchrist, the second letter?
A It is. It's the one that basically reminded them of the letter I had previously sent them And to go ahead and give them everything they wanted, and attached a copy of my prior letter to this letter as well, just to show them that I'd directed them to do that before



Q Again, why were you telling Jenkens & Gilchrist to do this?
A I told them I felt it was structured in every respect correctly and by the regulations. I had nothing to hide and that I -- I freely had no problem with being audited.
Q So you --
A Just to go ahead and give whatever needed.
Q So you had no problem with turning over any kind of records to the IRS?
A No. Everything. That's fine. I'm perfectly fine with that.
Q And you had made the same statement to Ernst & Young also, correct?
A I did.
Q Do you recall being contacted by the law firm of Sidley Austin Brown & Wood?
A Yes.
Q What were they contacting you about?
A Similar. You know, it was a John Doe summons.
(Plaintiff's Exhibit Number 12 was marked for identification )
BY MR CROUCH:



Q Would you look under tab 24?
A Yes.
Q And do you recognize this document?
A Yes
Q What is this document?
A You know, just -- it says the Department of Justice, sensitive proceeding. It's basically providing the reasons for why they're sending it. And similar, as to the attorney/client privilege, that they could protect it. And I provided them notice that it was not needed.
(Plaintiff's Exhibit Number 13 was marked for identification.)
BY MR. CROUCH:
Q Okay. Would you turn to tab 25, which is a document -- excuse me, the last document is P-12. I don't know if I told the court reporter that The next document we've marked as P-13.
A Yes.
Q On tab 25. Is that your letter to Sidley Austin Brown & Wood?
A It is
Q Okay. Is that your signature?
A It is my signature.
Q What are you telling them?



A I'm telling them basically what I told the others, that, you know, I had given my name and information a long time ago. That they had all the rights to withdraw attorney/client privilege. That they could give anything and everything that was asked of them.
Q Again, explain. You're saying you're telling these professionals all to turn over their records; is that correct?
A That's correct.
Q And why were you doing this again?
A I wanted to be fully cooperative. I've always believed that openness -- if you're trying to do everything that's right and proper, that you have nothing to hide, just go ahead and give them everything you have.
Q As far as you knew, had Ernst & Young turned over all your records to the IRS?
A As far as I knew, yeah.
Q How about Jenkens & Gilchrist, had they turned over all the records as far as you knew?
A Well, I directed them to I can't tell you specifically if they had or hadn't, but I directed all of them to do it.
MR CROUCH: Okay. I pass the witness

THE COURT: Okay. Thanks. Mr. Crouch.

MR. DONOHUE: Your Honor, may we take a few-minute break so that we can set up the realtime at the podium.

THE COURT: Sure. I think we can all use a break anyway Is 10 minutes enough?

MR DONOHUE: Yes. Your Honor.

THE COURT: The court will be in recess for 10 minutes.

(Whereupon, a recess was taken between 1:55 p.m and 2:06 p.m )

THE COURT: Mr. Donohue

MR. DONOHUE: Thank you. Your Honor.

CROSS-EXAMINATION

BY MR. DONOHUE:

Q Good afternoon. It is Mr. Zucker. am I correct?

A That's correct.

Q So if I ultimately refer to you as Mr. Zucker, please forgive me.

THE COURT: Forgive me the many times. Mr. Zucker.

THE WITNESS: I'm sure I've been called worse.

BY MR DONOHUE:



Q Mr. Zucker. your direct testimony indicated that a Mr. Knight. a Ray Knight of Ernst & Young --

A Yes.

Q -- made a presentation to you on November 10th. Am I correct?

A That's correct.

Q And did you ever learn as to why Mr. Knight made this presentation to you?

A Why he made the presentation?

Q Yes.

A As opposed to?

Q Yes.

A No. I would assume that he was the one that was the most knowledgeable of the proprietary structure that was being proposed.

(Government's Exhibit Number 155 was marked for identification.)

BY MR. DONOHUE:

Q I'm going to ask that you be handed what's been marked as Government Exhibit 155.

A Okay.

MR. CROUCH: Do you have a copy for us?

MR. DONOHUE: It's coming.

THE COURT: Do I have a copy.



Mr. Donohue?

MR. DONOHUE: Yes. Your Honor -- no. Your Honor. You'll be getting a copy right now.

THE COURT: Okay. Great. Thanks.

THE WITNESS: Yes.

BY MR. DONOHUE:

Q Mr. Zucker. Government Exhibit 155 is an internal E&Y document entitled COBRA Action Work Plan

A Right.

Q And you'll notice at the top. under paragraph 1. it refers to qualified client. Do you see that?

A I see it. yes

Q It refers to number 1. the -- referring again to qualifying client. that the -- that the client must be aggressive. willing to assume tax risk.

Did Mr. Knight in his presentation to you indicate or ask you if you're willing to assume tax risk?

A No.

Q Take a look at 2 50 million minimum income to be sheltered. Ordinary preferable to capital



You mentioned. am I correct. before that you told Mr. Knight that you had approximately 50 to 100 million of income to be sheltered. correct?

A No. I didn't say that. He asked me how much revenue would I -- would I have that I might offset. And my answer was probably 50 to 100 million.

Q Well. I think what you're -- we're saying the same thing. You're saying that he asked you --

A Well. it might be semantics. but that's what actually was said.

Q Now. Mr. Knight. did he point out to you that in order to qualify for the transaction you needed 50 million in income to offset?

A No.

Q Take a look at 3. Business associates willing to participate. Did Mr. Knight indicate to you that in order to participate in this transaction you needed a business associate?

A No. Other than the fact that he was speaking to two people. But no.

Q But you were told. if I recall your direct testimony. that they wanted to make the presentation to both you and to Mr. Boyd. correct?

A Right. Which would be normally the way EY would present to us, yes.

Q And Mr Boyd was, as you pointed out in your direct testimony, your business partner, correct?

A That's correct

Q Take a look at the next item there. Can make quick decision. Do you see that?

A Where should I look on that? I'm just --

THE COURT: Under number 1. Bullet point, the bullet points

THE WITNESS: Okay. I see it

BY MR. DONOHUE:

Q Did Mr. Knight explain to you that there was a time factor to making a decision regarding this transaction? You had to make a quick decision?

A No. The -- the -- at the time of my presentation and all, I viewed it as being either available for 1999 or for 2000, depending on when we concluded the transactions. But that didn't come up as a subject.

(Government's Exhibit Number 2353 was marked for identification.)



BY MR. CROUCH:

Q I'm going to ask that you be handed what's been marked as Government Exhibit 2353.

A It's not in here?

Q You don't have it yet.

A Okay.

Q Mr. Zucker, Government Exhibit 2353 is an E-mail dated October 25th, 1999 by Mr Robert Coplan to a number of different E&Y individuals, including Mr. Knight. If you'll see, his name is approximately about the third from the bottom. Do you see his name, Knight Carolinas?

A If that's him. I see Knight Carolinas

Q Now, turn to the second page of the document. It says: Remember, we must sell and implement by November 15th. That leaves us only 15 business days after today. This will place a good deal of pressure on all of us to make this work well. So constant communication will be critical.

Now, in light of that statement by Mr. Coplan, does this refresh your recollection that, in fact, Mr. Knight told you that you're going to have to make a decision regarding this transaction by November 15th?



A No. He never said any such thing to me.

Q Mr. Zucker, did it come up in your meeting with Mr. Knight as to whether the income that you were seeking to offset, whether it would be allocated to ordinary income versus capital gain?

A It didn't come up at the meeting. But that was a question as to they had the flexibility in the structure to allocate between ordinary and capital. And I think we chose 60/40.

Q But you're saying it ultimately came up but not at the meeting, correct? Is that your testimony?

A I have no recollection of it ever coming up in our meeting.

Q Mr Knight, you mentioned, explained to you the sequence of steps. Do you recall that?

A Yeah. That's correct.

Q Take a look again at Government Exhibit 2353, the first page

A 2353. Okay.

Q This again is Mr. Coplan's E-mail. And in the first paragraph, he states: We have decided to allow each area the opportunity to make two presentations of the COBRA strategy to



eligible targets. Therefore, you should determine for each of your areas who are your two most likely purchasers of the strategy among your eligibles within the short time allowed, taking into account factors such as the need to have lawyers or other advisors sign off, the client's risk profile, et cetera.

Did Mr. Knight mention to you that there was limited to each geographical area of E&Y only two targets?

A No. He never mentioned anyone else. As far as I was concerned, he was just talking to us about a strategy that Jim and I could be involved with. I had no idea of anything else.

Q You mentioned in your direct testimony that he did explain the steps of the transaction, correct?

A He did.

Q Take a look again at Government Exhibit 155, paragraph 4.

A 155, 4. Okay

Q Notice it says: Present idea to client using client version of PowerPoint slides posted to toolkit.

A Uh-huh.

Q Do not leave marketing materials with client under any circumstances.
A Right.
Q Did Mr. Knight, in making his presentation to you, use any type of visual aids?
A He did not.
(Government's Exhibit Number 2352 was marked for identification.)
BY MR. DONOHUE:
Q Let me ask that you see what's been marked as Government Exhibit 2352.
A Is this one you're going to give me?
Q Yes. This is one I'm asking be handed to you. And if this works seamlessly, it shortly will be.
A Okay.
Q Mr. Zucker, you've been handed now what's been marked for identification as Government Exhibit 2352. The first page of this document has the word C-O-B-R-A, Currency Options Bring Reward Alternatives.
Have you ever heard of that name before, COBRA?
A I -- the first time I heard it was not the day of the presentation but in the follow-up



communication that same week. And they used it as a reference term. But I did not know until this litigation that it was an acronym that stood for something. And it was not used at our meeting.
Q At your meeting that --
A The presentation, the word -- the acronym or its -- this other information underneath it, for which it stands, was not used at the meeting.
Q Mr. Zucker, just like your counsel, I'm going to ask you to let me finish my question.
A I'm sorry.
Q I started off with at your meeting and you cut me off.
A I'm sorry.
Q So --
A I'm sorry.
Q Just so the record is clear, at your meeting, is it your testimony that Mr. Knight did not mention the term COBRA?
A To my recollection, it was not brought up until I saw it in written form subsequently. Not -- not at the meeting.
Q Now, take a look at this document. This is a PowerPoint slide presentation of the COBRA



transaction.
A Right.
Q Have you ever seen this document before?
A Not other than you having shown it to me before, no.
Q Take a look at what's on Bates stamp number -- and I'm referring to the right-hand corner -- 1561.
A 1560. 1561. Yes.
Q Okay. Now you'll notice there, first is step 1, option contracts. Even though you didn't see this particular visual aid, am I correct that Mr. Knight did explain to you that, in fact, this transaction involved the buying and selling of options?
A No, no. For sure he did, yes.
Q And he indicated to you, am I correct, that the purchase of these options would be done through an entity which you referred to earlier in your direct testimony as an LLC? Am I correct?
A Yes.
Q Now, take a look at the next page of the document.
A Uh-huh.
Q Which is Bates stamp number 1562.



A Yes.
Q Did he also indicate that upon the single-member LLC, your single-member LLC, purchasing the option transactions, that they would, in turn, be transferred at a short time later to a partnership?
A Yes.
Q And so he did refer to the fact that, in connection with this transaction, there would be a need to form a partnership, correct?
A Yes.
Q Okay. Now, turn to the next page of the document, step 3, investment.
A Step 3. Okay. The pages are stuck. All right.
Q Did -- am I correct that Mr. Knight did explain to you that the term of these options was 30 days?
A No. No.
Q Well, did he explain to you that, if you wanted tax benefits in the current tax year, you would need to, in fact, execute and have the term of the options close before the current tax year? Did he explain that to you?
A He didn't actually bring it up in the

meeting But it was clear from his overall
presentation that the timing of when the tax
benefit, as you call it, that would take place and
the conclusion of the transaction in terms of my
making an earning would depend on the timing of
the conclusion of the options contract and when
they were ultimately contributed, yes.
Q You were aware, were you not, that in
order for you to receive any tax benefits in the
current year, 1999, you would need to in fact have
the options closed out before the end of the year.
You're aware of that?
A Right If I had wanted it to be in '99
versus 2000, it would have to have been concluded
in '99.
Q Now, were you aware and did he explain
to you that if you wanted ordinary -- an offset
against ordinary income, you would have to
purchase -- your partnership would have to
purchase currency? Did he explain that to you?
A I don't -- I think he specifically
asked, if you're asking for my recollection, he
specifically asked about what currency I thought
would be stable, because we were going to have a
diversified portfolio which would include



currency And that was the comment I had made
earlier, in the earlier testimony about suggesting
the Canadian currency
Q If I recall correctly, you ultimately
did purchase through the partnership --
A I did.
Q -- Canadian currency, correct?
A That's correct.
Q And did he mention to you, if you wanted
a capital loss, you would either have to make a
contribution of securities to the partnership or
have the partnership purchase securities? Did he
mention that?
A Not in the form of your question. He
said that as part of the overall strategy that we
would end up with a diversified portfolio that
would include buying the foreign currency and the
purchase of capital securities.
Q But did he make it clear that, if you
wanted a capital loss, that is a loss that you
could offset against capital gains, you would need
to have a capital asset and either purchase it or
contribute it to the partnership?
A Not the way you've asked the question.
Only what I said previously He said that we



would have a diversified portfolio which would
include the contribution. And he asked if we had
some long-held assets. And I told him I had
plenty of positions that were long that could be
contributed. And --
Q And by long, you mean a position that,
in fact, had a -- a holding period on your part of
something longer than one year, correct?
A That's correct
Q And ultimately, am I correct, that you
did transfer to -- ultimately to your partnership,
you did transfer Cisco stock, am I correct?
A That's correct, yes.
Q And I believe you ultimately transferred
4,500 shares of the stock; am I correct?
A I believe that's correct, yes.
Q And Mr. Boyd ultimately transferred 500
shares of the stock, correct?
A That's correct. But his was short-term
Q And you read my next question Your
holding period for your stock was greater than one
year, correct?
A Yes
Q And his was in fact less than one year,
correct?



A Yes.
Q Now turn to the next page of this
document, which is Bates stamped number 1564.
Now, did he explain to you that as part of this
transaction, it would be necessary for you and
Mr. Boyd to transfer your partnership interest to
a Subchapter S corporation? Did he explain that
to you?
A He described the structure of the
transaction that included that, yes.
Q And did he explain to you that the
effect of your transferring your partnership
interest to a Subchapter S corporation would cause
a termination of the partnership? Did he explain
that to you?
A Yes. That's something I recognized
anyway. But yes.
Q And did he also explain to you that, in
addition to the partnership being terminated, that
the partnership would be liquidated with assets in
the partnership being distributed to your
Subchapter S corporation?
A That's what would ordinarily happen with
a contribution of partnership. He -- he probably
mentioned it. I can't specifically remember that.

But he went through the structure verbally, yes.

Q And if you turn to what's been marked as -- on Bates stamp number 1565, you'll see step 5. You'll see a reference to the distribution where the partnership liquidates and distributes its investments to the S Corp.

Then did he explain to you that the next step of the transaction was is that the S Corp would sell the assets that were distributed to it as part of the liquidation of the partnership, and by virtue of the sale, would realize either a capital or an ordinary loss? Did he explain that to you?

A He generally described the contribution of the assets. Jim Boyd fully understood because he had used previous -- you haven't asked the question -- a real estate analogy where he talked about the precedent that had been established previously in the court. Jim Boyd lit up, he said, you know, that's -- you can't have it both ways. You can't have it as part of the basis and/or not part of the basis. And since they'd already ruled that an unmatured liability would not be included as basis, Jim understood it clearly. And I frankly felt very comfortable with



what had been presented.

He went through -- did not go through these pictures at all. None of this stuff was present. But he verbally went through the concepts of the structure.

Q And did he also make clear that the loss, whether it be capital or ordinary, would have to be -- in order for you to take some benefit from the current tax year, all of this would have to be done, including the sale of the assets, in the current tax year?

A No. He -- he didn't -- he basically described the fact that we were going to have this diverse portfolio, that it would involve -- he talked about what it would involve. And he said that under the proprietary structure that they had in mind, that they would be able to allocate between ordinary and capital. But he didn't go through precisely what you're asking. But --

Q Maybe my question wasn't clear. And I apologize if it wasn't. But my question is did he also explain to you, once the assets of the partnership were in the S Corp, that -- and those assets were sold, they would have to be sold in the current tax year, 1999, in order for you to



realize tax benefits from the transaction? Did he explain that to you?

A He didn't explain it. But I understood it myself. And certainly Jim Boyd, who is much more expert than I ever would dream to be, you know, understood.

Q Mr. Knight, am I correct, he is a tax professional at E&Y? Is that correct?

A I can't really tell you. I don't -- I don't know. He presented himself as representing Ernst & Young at that meeting. It's the first time I had ever met him. So -- I hadn't subsequently met him other than that occasion. I can't really tell you as to his -- I knew he was employed by Ernst & Young.

Q Is it fair to say you knew he wasn't an investment analyst for --

A No, he was representing Ernst & Young.

Q Right, but do you understand what I mean by investing analyst? He wasn't a person that you would necessarily go to for investment advice. He wasn't in the investment analysis --

A I can't tell you what his credentials are.

Q You have to wait until I finish the



question.

A I'm sorry.

Q He wasn't in the investment analysis side of E&Y; am I correct?

A As I told you, I don't know. I just know that he was representing Ernst & Young at this meeting. And he was apparently part of their tax, you know, department. That was the only -- you know, I had not met him before that day of the meeting.

Q How --

A So I don't know about his credentials.

Q At that meeting, am I correct that he did not provide you, other than the fact that there would be the opportunity to invest in option transactions, he did not give you any further details regarding these option transactions?

A He went through the concepts of -- and I certainly had done enough currency trading to know, you know, I could make a buck at it. I'd certainly done that previously.

So I understood exactly, you know, how I could make money in calling it directionally. I understood the sweet spot. I still had not defined, you know, how wide it would be.

So the basic concepts, you know, I fully understood in terms of the opportunity to make a buck. And he understood and Jim Boyd was right on top of his understanding of tax structure based on the precedent.

And I was -- I was comfortable with Jim And Jim, you know -- I was comfortable with the additional opinions we got. And you know, I -- you know, I didn't -- I didn't really need any further advice on the options.

Q Well, he didn't provide to you at that meeting what would be the premiums on the options, did he?

A No. But the magnitude of both the premiums on both the collection, the sale and the purchase were relevant to the magnitude of what I was willing to expose. And that hadn't been determined.

Q So as of the meeting, there had not been any decision as to what your risk exposure would be on the transaction?

A No. Not quite. You know, we had talked about 50 to $100 million being the amount of revenue that I -- that I might have for offset. And the total of $8-1/2 million of capital. So



that there would be a leveraged transaction. So I kind of zoned in that for $100 million size transaction, I would have 8-1/2 million.

Q And when you say 100 million -- excuse me. I didn't mean to cut you off. Were you finished with your answer?

A Only to the extent that I understood the overall relationship and structure, so I knew that the relationship on my -- the exposure on my options was going to be relevant to the amount of offset that I would be able to create. So if I was more willing to go to a higher amount of exposure, that I would have the higher opportunity both to make a profit as well as to create a tax offset.

Q And when you refer to a $100 million transaction, you're referring to a $100 million loss transaction, am I correct?

A Well, no. This is the total amount of exposure in terms of the -- the capital. If you look at the notional amounts of the exposure on the options, and based on the structure they had explained to us in terms of the fact that each option contract would be -- stand on its own, and that something that had an unmatured liability



would not be included in the basis. I fully understood that a loss post the date of contribution would be an independent loss and not part of capital basis.

Q That -- that was not, however, my question. My question is, when you refer to a $100 million transaction, when you use that term, you're referring to a $100 million loss transaction, am I correct?

A Not that I would generate $100 million in personal out-of-pocket cash loss; but, rather, I would be able to create an offset to revenue of $100 million.

Q Thank you. I was not clear. When I refer to loss, you're referring to a $100 million tax loss transaction, correct?

A An offset to my revenue, yes.

Q Okay. So Mr. Knight explained at that first meeting that your out-of-pocket cost for a $100 million tax loss transaction was $8-1/2 million; is that correct?

A You keep referring to tax loss. But, you know, kind of putting words in my mouth. But that for $100 million of revenue to be offset, that I would have an exposure of $8-1/2 million



Q All right.

A It's a leverage transaction.

(Government's Exhibit Number 177A was marked for identification.)

BY MR. DONOHUE:

Q Let me ask that you be handed Government Exhibit or Deposition Exhibit 177A.

Now, Mr. Zucker, you've seen this exhibit before in your direct examination. But I'm not versed enough to know where -- under what tab it is in your book. So I'm giving you a new one. But it's the same document you saw on direct examination.

And am I correct that --

A Would you mind for my benefit giving me the reference number of the tab here.

MR. CROUCH: I think it's tab 1.

THE WITNESS: Okay.

MR. CROUCH: And, Your Honor, I'm not sure it's the exact same document, because there's writing -- there's different writing on those two documents.

THE WITNESS: Okay.

BY MR. DONOHUE:

Q All right. Now, take a look -- I notice

just for the record that there appears to be a fax by line at the top. And your version of the same document. I don't see -- at least on the top page -- I do see it. So I'm not 100 percent sure where the difference is. But we'll use our version of 177 since they are marked identical.

Take a look at the handwriting which is on the second page. Now, you've identified your signature, correct?

A On the second page I don't have a signature on this. So I -- you know --

Q Isn't your signature on the second page of the document?

MR. CROUCH: There's no --

THE WITNESS: There's no signature

BY MR. DONOHUE:

Q On --

A The document that we used had my signature.

Q Okay

A But this document -- it's not the same.

Q I am so sorry. Take a look at the second page. There is no signature, correct?

A That's correct.

Q But there is handwriting which is on the



top of the document. Please take a look at that.

THE COURT: I think I've lost you here. Mr. Donohue What document are you looking at?

MR DONOHUE: I'm on Exhibit 177A. The confusion was that I was referring to 177 instead of 177A.

THE COURT: Okay.

THE WITNESS: The documents are not the same. And I don't recognize this handwriting either.

BY MR DONOHUE:

Q Okay. You do recognize Mr. Knight's signature, correct?

A Not by -- not unless I match it up with something. I wouldn't recognize it, no.

Q And you are correct, on the second page you have not signed it, correct?

A No.

Q Okay. Now, take a look. I'm going to ask you to be handed what has been marked as Exhibit 177.

A Is it different from 177A?

Q That one is --

A Okay The original 177. That was the one with my notes on it.



Q Correct.

A Okay Okay

Q Now, if you turn to the second page of this document, you'll notice, I believe, you've identified your signature, correct?

A That's correct.

Q And could you read the handwriting right above your signature.

A Yeah. It says: $100 million -- and then you had suggested to me the word is loss, and I can accept that -- to be allocated 98/2 between the parties subject to clarification of second paragraph on first page. And then my initials.

Q So take a look on the first page. The date of this document is November 11th, correct?

A Right. The day after our meeting, yes.

Q And take a look, now, at the third paragraph on the first page.

A Yes.

Q You notice it says our fee for providing the professional services referred to above will be 1.5 million on the total investment in the partnership by you and the other individual or -- with an S, in the amount of $7 million.

Do you see that?



A Yeah. I see it.

Q And in the next sentence it says: Investment in partnership equals cost of long option contract equal to 5 percent of desired loss.

A Right.

Q Plus cash equal to 2 percent of the desired loss Do you see that?

A I do.

Q Is that the first time that you had seen the term, desired loss?

A Yeah. I have not seen any of these percentages or -- none of that came up in our meeting.

Q And what, am I correct, you're being told is that the amount that you would need on a $100 million loss transaction, tax loss transaction, is $7 million, correct?

A Well, the document speaks for itself. I would have to read through it But what I noted, to coincide with our meeting, it would be a maximum for a $100 million transaction of $8-1/2 million. Which is what I noted in the margin.

Q Did Mr Knight at the meeting explain to you that your out-of-pocket costs for the options

would be based on 5 percent of your desired loss?

A No.

Q Did he explain that?

A Not at our meeting, no.

Q So this was the following day, November 11th. And did you -- I notice the fax line up at the top is November 12th. Do you know when you received this document?

A It would have been -- it was -- it was the day after the meeting is when I got the communication. So it would have been the 11th.

Q So the day after the meeting, you became aware that your out-of-pocket cost for the options would be based on 5 percent of the desired loss. You became aware of that?

A It was the way it was drafted in here. But it didn't coincide with what was presented at the meeting. That's one of the reasons I noted and asked the question.

Q Then you'll notice it says plus cash equal to 2 percent of the desired loss.

Did Mr. Knight at the meeting explain to you anything about cash that was required in an amount of 2 percent of the desired loss?

A No. These percentages, the first time



they appeared was the day that I received the communication.

Q And so that is, am I correct, your note on the side. Could you read that note to us?

A It says maximum $8-1/2 million, 8 5 million.

Q And what does that mean?

A I just wanted to -- to make it conform to what he had told me. I didn't actually add up the sums or calculate the percentages. But I wanted to make sure that for the $100 million transaction, that that represented $8-1/2 million of exposure, which is what he'd said at the meeting.

Q Now let me take a slight detour here.

A Okay.

Q Did you turn over this document to the Internal Revenue Service as part of your agreement to disclose all documents regarding the transaction?

A I frankly don't know. I mean, I directed that all files and information be submitted. And so I had no idea what was actually in the file folders. But I assumed that everybody, you know, followed my instructions



But I -- I can't tell you.

Q Let's take a -- I'm sorry. Go ahead.

A I mean, I directed everyone to do it. And they're competent people. So I assumed they all did.

(Government's Exhibit Number 170 was marked for identification.)

BY MR. DONOHUE:

Q Take a look at -- and I'm going to ask that you be handed Exhibit 170. That's another document that you had -- that were shown on your direct examination.

A Okay.

Q 170.

A Yes.

Q Now, am I correct that this document was the document that was prepared on your behalf by Ernst & Young?

A Yes.

Q And am I correct that this was your election to qualify for the Internal Revenue Service's penalty amnesty program?

A That's correct.

Q And if you take a look on the last page, I believe you've identified your signature



That's your signature, correct?

A It is.

Q Now take a look in the page before it. The last sentence on that page, it says we agree to provide, if requested, copies of the following. And you'll notice there are three paragraphs --

A Just so I'm following with you. Please refer me to where.

Q Yes. I am on Bates stamp number 2117.

A Okay.

Q And I'm reading the last sentence.

A Yes. I see it.

Q It says: We agree to provide if requested copies of the following.

A Yes.

Q Do you notice it says in A, B and C -- and I won't read there, but essentially am I correct that, if requested, you were essentially agreeing to provide all transactional documents, all internal documents --

A Right.

Q -- relating to the transaction, correct?

A That's correct. Yes.

(Government's Exhibit Number 171 was marked for identification.)

BY MR. DONOHUE:

Q Now I'm going to ask that you be handed what's been marked as Government Exhibit 171.

Now, this is a letter dated 4/30/2002, which is 10 days later from what's been marked as Government Exhibit 170 --

A Uh-huh.

Q -- by Mr. Alan Moss, in which he's directing you and requesting you to provide documents. Do you see that in the first paragraph?

A Yes.

Q If you turn the page to Bates stamp number 1132, what you'll notice is is that he has simply quoted the paragraphs from your election letter of April 20th?

A Right.

Q Do you see that?

A I do.

Q Now, once you received -- and did you receive this document?

A Yes.

Q Once you received it, what direction did you give to either E&Y or anyone on your staff to make available all the files and transactional



documents with respect to this transaction?

A Well, at the staff meeting I said that anyone that had any files relevant to this, and gave them the topics and all, to please be sure to forward them, and it happened to be to accumulate them in the administrative assistants, and then to send it to my counsel.

And I certainly, and I had instructed similarly for Ernst & Young, just basically to empty our files.

(Government's Exhibit Number 173 was marked for identification.)

BY MR. DONOHUE:

Q Take a look, and I'm going to ask that you be handed what's been marked as Government Exhibit 173.

A I'm sorry. Oh, you're going to hand it to me. Okay.

MR. DONOHUE: Your Honor, we have been given the one-minute warning for the tape change.

THE COURT: Do you want to take a break?

MR. DONOHUE: Can we take a short break?

THE COURT: Yes. Right now?

MR. DONOHUE: Yes.

THE COURT: Okay. We'll take a break.



10 minutes, so that would be 10 minutes to 3:00. So the court is recessed for 10 minutes.

(Whereupon, a recess was taken between 2:46 p.m. and 2:56 p.m.)

THE COURT: Mr. Donohue.

MR. DONOHUE: Thank you, Your Honor.

BY MR. DONOHUE:

Q Mr. Zucker, just before the break --

A Yes.

Q -- you provided this answer: Well, at the staff meeting, I said that anyone that had any files relevant to this, and gave them the topics and all, to please be sure to forward them, it happened to be accumulated to administrative assistants, and to send it to my counsel. Do you recall that answer?

A Yeah. That was not correct. What I said is I wanted to get all of our stuff pulled together. And that I had already instructed Ernst & Young to provide all the information. And I assumed frankly that EY had copies of everything because they were the ones that were handling it.

Q I'm a little unclear.

A Counsel had not yet been involved at the time. So it was just a miss -- I just misspoke.



Q So is it your testimony that you directed your staff to accumulate all your files with respect to the transaction?

A I did. I asked that it be all put together in a file that would be available.

Q Well, did you direct them to provide it to anyone, that file?

A I had directed Ernst & Young to provide all the information that had been requested with the assumption that they had a copy of everything. And --

Q I'm a little unclear. Are you saying you directed your staff to accumulate all documents but not to turn those over to Ernst & Young to provide --

A No, no, no. I just -- you know, this is -- just to kind of put it in context, this is a number of years ago. So I had instructed everyone during this period of time, and some of it took place in, as you know, 2002. Some of it was relevant where we had questions like on the John Doe summons from Jenkens & Gilchrist. I told everyone just to be totally open with anything and everything that was requested.

And I had directed Ernst & Young to

provide all the information that they had. And they should have had a copy of literally everything. And I'm not aware, you know, of any -- anything that was being requested that in fact had not already been provided.

Q Well, are you -- just so I understand your testimony, are you saying you assumed that Ernst & Young already had copies of all the documents in your files? Is that what you're saying?

A No. I'm saying that -- if you look at the specific list, it says please provide us with And it's got all the details of contracts and agreements and liabilities and so forth. And Kenny Hughes and Shawn Smith had indicated that they would handle all of the submission of the documents. I asked to get all of our documents together.

And, ultimately, when we ended up with the prosecution for this litigation against the government to try to get my refund, that's when I directed that everything in my office be turned over to my counsel so that they could in turn provide it to you as -- in the case.

And I was just, you know, kind of



confusing the point in time when I answered it earlier.

Q If you go back to, for example, the documents requested, am I correct, it also requested internal documents and memoranda. Am I correct?

A Yes.

Q And are you saying that you directed your staff to accumulate all the documents -- let's first -- that's your testimony, number 1, am I correct?

A That I told the people that anyone that had anything in this file, to go ahead and turn it over to -- put it into a central file with Donna Martin.

Q And then do what with it?

A It was with the ultimate purpose of being sent to the government, to the, in this case, the IRS. But with Ernst & Young, I'd also separately directed them to send and be fully cooperative in sending all of the information.

Q But you said, if I understand your testimony, it was for the ultimate purpose of having your files be sent to the government. Did you specifically direct anyone to send your files



to the government?

A You know, I can't specifically say I remember those particular words, but -- you know, frankly, I don't remember whether I specifically said directed to the government or not. I'd asked for it to be accumulated. And I had directed EY to send anything and everything in terms of being cooperative. And I asked that the -- whatever we had that they wouldn't have be -- be forwarded to -- I can't tell you for sure. I can't tell you if I said EY or if I said the government. I just can't remember which specific words I used.

Q Mr. Zucker, I'm going to ask that you be handed what's been marked as Government Exhibit Number 173.

A Yes.

MR. CROUCH: I think we already have a copy of that. I think it's what she just handed out, wasn't it?

BY MR. DONOHUE:

Q Mr. Zucker, did you receive another document request from the Internal Revenue Service in connection with your agreement to disclose all documents?

A Do you have a document you can refer to?



Q Yes. Government Exhibit 173. Do you see --

A Furnish in accordance with your -- okay.

Q And am I correct that you did receive this document? Am I correct in that?

A That is correct.

Q Now, turn to the next page. There's a description of documents requested.

A Yes.

Q And it points out in the paragraphs, it provides, among other things, in paragraph 2, please provide a copy of all additional promotional materials presented either/or provided to the taxpayers concerning this transaction that have not been submitted previously.

Do you see that?

A I can. I do.

Q What did you do to ensure compliance with that document request?

A Just a communication at the staff meeting directing people to accumulate, to provide kind of a central repository. And then I know that we had -- and you have to understand the way my office works. I know that we had two subsequent packages of information that we

provided to the IRS.

(Government's Exhibit Number 174A was marked for identification.)

BY MR. CROUCH:

Q Okay. Let me ask that you be handed what's been marked as Government Exhibit 174.

A Yes.

Q 174A. I apologize.

A Okay. I also apologize for my decline in mental acuity.

THE COURT: It happens to me, too.

THE WITNESS: I'm sorry, sir.

THE COURT: It happens to me, too, in the afternoon. Perhaps if I had a nice big mocha frappuccino with a sugar buzz and a caffeine one.

THE WITNESS: Yes.

BY MR. DONOHUE:

Q Government Exhibit 174A is a letter from Ernst & Young dated November 19, 2002 to the Internal Revenue Service in response to document request number 3. Do you see that in the first paragraph?

A Yes.

Q Now, turn to Bates stamp number 1858. And you'll notice that this document -- this



letter, rather, is signed by Nelson A. Brooke. Do you see that?

A I do.

Q And was Mr. Brooke acting on your behalf in connection with the disclosure of documents?

A Although I don't know Mr. Brooke, but he appears to be, yes.

Q And you'll notice that there's a cc of various individuals. And you're cc'd on this letter. Do you see that?

A That's correct. Yes.

Q Take a look at Bates stamp number 1874. Do you see that?

A Hang on a minute. Yes.

Q Now, this, among other documents that's being provided by Mr. Brooke, this is an unsigned copy of the November 11th, 1999 engagement letter. Do you see the second page of this?

A Yes. I see the unsigned page. 18 -- marked 1875.

Q Now, if you go back to what's been marked as Government Exhibit 177A.

A 177A. 174A.

Q I'm sorry. Yes -- I'm sorry. 177. Not 177A.



A Okay. 177. Yeah.

Q Now, 177 is the same document that's signed and has your notes on it. Do you see that?

A You say it's the same as 1874?

Q Well, it's the same as pages 1874 and 1875.

A Except for the amendments and notes on it.

Q Correct.

A Yes. Or it appears to be.

Q Do you have any explanation as to why Mr. Brooke, acting on your behalf, is sending to the Internal Revenue Service an unsigned copy of the engagement letter without your notes? Do you have any explanation for that?

A I don't. I do know that we had a couple of packages that went from our office to the IRS office. But I don't know about this particular letter or why it's the unsigned edition.

(Government's Exhibit Number 2257 was marked for identification.)

BY MR. DONOHUE:

Q I'm going to ask that you be handed what's been marked as 2257.

A 2257. Okay.



Q Now, Mr. Zucker, Government Exhibit 2257 was an exhibit that was shown to you in your direct examination. Do you recall that?

A I do.

Q And if you'll turn to the second page of that exhibit, there is a memo from you to Mr. Knight. Do you see that?

A Yes. The one that starts with the words, attached is an executed copy.

Q And then the next two pages is the same November 11th engagement letter with your personal notes. Do you see that?

A I do.

Q Now, Mr. Zucker, this exhibit was first turned over to the government last week at the deposition of Ms. Crosby. Can you tell us who Ms. Crosby is?

A Yeah. She's an administrative assistant in our office.

Q And --

A Although I don't know, by the way, that that's the first time that the government got it. Because we had a couple packages of bundles of information from our office that went to the IRS that -- you know, separately. So, you know, I