don't know that it's the first time.
Q I can represent to you, Mr. Zucker, that the government did not receive this document or the --
A The government as the IRS.
Q -- including the IRS, until last week.
A Okay. That's entirely possible.
Q Now, take a look, again, at your binder.
A Yes.
Q At tab number 14.
A Yes. Uh-huh.
Q And you'll notice Exhibit P-6.
A Yes.
Q And look at the handwriting at the top of that page. Do you see that?
A Yes.
Q And that's your handwriting, correct?
A That's correct.
Q And in note 2 you'll notice that it says, Charlotte, please retain this original in our files.
A Right.
Q Who is Charlotte?
A Charlotte is the administrative assistant, Charlotte Crosby.



Q That's the same Ms. Crosby whose deposition was taken last week, correct?
A That's correct.
Q And you're referring, in telling Ms. Crosby to retain this original in our files. What did you mean by the term, our files?
A Files in the office. That's how I generally refer to anything we do together, as our.
Q Your files of this transaction, correct?
A I mean, obviously in order to keep it organized, it would be related to the organizational topic. So -- I don't do the filing. But, you know, she would file it in such a way that it could be found again.
Q Turn to your memo, which is the second page of Exhibit 2257.
A I'm sorry. Are we still in the tab or --
Q We are --
A Just so I know where to look.
Q -- on Government Exhibit 2257. And we're on the second page of it.
A Where is 2257? I don't know where to look for it.



MR. DONOHUE: Your Honor, may I approach the witness --
THE COURT: Sure.
MR. DONOHUE: -- and see if I can help him.
THE WITNESS: Please.
BY MR. DONOHUE:
Q It's this document right here.
A Oh, okay. All right.
Q Now, take a look at the second page of Exhibit 2257.
A Yes.
Q In the first paragraph you state:
Attached is an executed copy of the engagement letter.
A Right.
Q I have signed the letter and return it subject to you clarifying what information from me and/or the partnership you are relying upon and also confirming to me that I will in fact receive two legal opinion letters from your reputable firms.
So am I correct, number one, that some information had been given to you as to the fact that you would receive opinion letters from law



firms in connection with this transaction?
A The answer is yes, apparently. In the -- if you remember in the direct, I was asked that question. And, although I don't recall that ever having come up in our meeting, it apparently, between the meeting and the time of this, the subject did come up. And it would have been something that Jim Boyd would have been right on top of.
Q Could you read for us the second paragraph of this letter.
A Yes. Under additionally?
Q Under additionally.
A Additionally, I want you to confirm my understanding of paragraph 3. Reading of the paragraph suggests that my maximum exposure for $100 million loss is 8-1/2 million. If the actual cost is different from this amount, I would appreciate you informing me immediately.
Q What did you mean by a $100 million loss?
A That this was the offset transaction for the magnitude of the $100 million versus the range I had suggested to him of revenue that I would need to offset might be 50 to 100 million. And as

you know, in the final agreement, it was not 100 million. It was actually reduced, you know, down to 50 on a 90/10 basis.

Q So you --

A So this was affirming what my understanding was at that time.

Q So you're referring to a tax loss, correct?

A I'm referring to the offset, yes.

Q And the last paragraph reads: Further, the document does not refer specifically to the $100 million loss.

A Yeah.

Q I assume this is in fact the number to be allocated 98/2 as per our discussion.

A Right.

Q Do you see that?

A That refers to the meeting, yes.

Q Now, did that make any difference to you that the engagement letter did not specifically refer to your $100 million loss?

A I just wanted to make sure that, you know, it had a bunch of percentages, and I wanted to make sure that I was only exposing $8-1/2 million as a leveraged transaction. And it was --



it only referred to percentages so I couldn't really -- it was not something that was the subject of our meeting. So I wanted to understand what it was being applied to, and did it coincide with my understanding.

Q Do you have any explanation as to how that memo did not get turned over to the Internal Revenue Service back in 2002?

A I have none other than to say that, you know, apparently there was some sort of a snafu. But I have no idea why not.

Q You are signing an engagement letter for a transaction that you were first presented with two days earlier. Am I correct?

A I'm sorry?

Q Well, this is dated November 12th, correct? Your memo? I'm on --

A Just so I'm on the same page, I don't -- what are you referring to now?

Q I'm referring to Government Exhibit 2257.

A Okay.

Q And I'm specifically referring to the last page of the document. And it says -- I'm sorry. It's not Bates stamped. I'll refer to it



as page 2 of your engagement letter, which is the third -- the fourth page of the document.

A One, two, three, four. It's the one that I signed and Ray signed?

Q Correct.

A I'm on that page.

Q You'll notice it's dated 11/12, correct?

A Yeah. It was received the day before, yeah.

Q So am I correct that you are signing an engagement letter for this transaction two days after Mr. Knight's presentation?

A Yeah.

THE COURT: I notice, though, that it says 1998.

THE WITNESS: That's a good catch. I didn't even catch that.

MR. DONOHUE: Your Honor, only a judge would notice that.

THE WITNESS: Obviously it's not the year -- obviously it's not the year before.

THE COURT: Okay.

THE WITNESS: I didn't catch that.

(Government's Exhibit Number 1029 was marked for identification.)



BY MR. DONOHUE:

Q Now, I'm going to ask that you be handed what's been marked as Exhibit 1029.

THE COURT: Caffeine and sugar. That's what does it.

THE WITNESS: Okay.

BY MR. DONOHUE:

Q Now, you'll notice that this is a letter dated November 15th, 1999.

A Uh-huh.

Q And it's unsigned. Do you see it on the second page? This is unsigned?

A Yes.

Q Did you ultimately sign an engagement letter which was dated November 15th, 1999?

A Well, I can't tell you that it was dated that date. But I definitely signed an engagement letter that was to pay Ernst & Young $675,000.

(Government's Exhibit Number 2338 was marked for identification.)

BY MR. DONOHUE:

Q I'm going to ask that you be handed what's been marked as 2338.

A Okay.

THE WITNESS: Your Honor, can I stand

just for a moment?

THE COURT: Please. Do you need to take a break?

THE WITNESS: No. I'm actually -- are we off the record? I'm doing better than I expected.

MR. DONOHUE: Did I say 22? 23.

Let the record reflect I've asked for Exhibit 2338.

BY MR. DONOHUE:

Q I'm going to ask that you look at your own notebook --

A Yes.

Q -- under your tab 3. And we so happen to have the same exhibit.

A Okay.

Q It's also Government Exhibit 1104.

A Yes.

Q Now, I have the same question. You -- in your direct examination, you identified this document.

A Yes.

Q The same question I've asked with respect to other documents. This document was also not turned over to the Internal Revenue



Service. Do you have a different explanation as to why this document wasn't turned over?

A I don't know. Were they in the same file? I don't know. Maybe the file got overlooked. I have no idea. You know, just all I can say is everybody got directed. So if it didn't get turned over until now, it got somehow overlooked. I don't know how.

Q Now, take a look at Bates stamp number 13 -- I'm sorry, 1284.

A Where would I -- oh, 1284. The same document. Okay.

Q You'll notice this is not signed. Do you see that? 1284 is not signed?

A Right.

Q Now, turn back to the first page of the document.

A Yes.

Q Now, there is a memo from Mr. Knight to you. Do you see that memo?

A You're saying the one that's marked 1282? Government Exhibit 1104?

Q Correct.

A Okay.

Q Now, in the second paragraph of this



memo to you, it states: The equitable contribution and fee structure are as follows.

Now, was it your understanding that Mr. Knight was replying to you in response to your letter or your memo respecting or regarding what was in fact the fee structure of this transaction? Was this a response to your earlier memo to him?

A I would presume so, because it says attached is a copy of the modified engagement letter. And he says two legal opinions from a reputable firm, the firms will be provided. So I'm presuming that that's the case.

Q Now, you'll notice here that it refers to the cost of the long option, 5 percent?

A Right.

Q Do you see that?

A Right.

Q If you turn to the next page, there is once again in the third paragraph, third line, a reference to the cost of the long option equal to 5 percent of the desired loss. Do you see that?

A I see where it says that, yes.

Q So you were aware at least on November 15th as to the fact that your net cost for the option transaction would be 5 percent of



your desired loss; am I correct?

A I wouldn't couch it the way you said. But yes, the letter speaks for itself. That information was there. Although I told you that was the reason I asked him to confirm about the $8-1/2 million because, you know, that -- it was never couched in percentages until that first communication that I had after the meeting. But, yes.

Q Now, take a look at the next item in this memo. It says cash injection to partnership 2 percent not at risk.

A Right. Which I didn't know that anything was not at risk. But --

Q I haven't asked you a question.

A I know. But yes, I see where it says that.

Q And my question is did Mr. Knight at the meeting point out to you that 2 percent of your desired loss would be -- had to be injected into the partnership but would not be at risk? Did he point that out to you?

A No. He never pointed out percentages. And he didn't point out risk versus not risk.

I presumed for a 100 million transaction

that the entire 8-1/2 would be at risk So, no. he didn't point that out at the --
Q If you turn the page, once again, to Bates stamp number 1312, the third paragraph.
A One -- I'm sorry 1312?
Q Right. In the third paragraph
A Okay. I'm on the second page. All right. 1312.
Q The second page.
A The second page But that document is marked. I see it. It starts with, in this engagement
Q Well, in the third paragraph, third paragraph, it says our fee. Do you see that? It refers to in the second sentence, investment in the partnership equals cost of long option contract equal to 5 percent of desired loss plus cash equal to 2 percent of the desired loss.
And did Mr. Knight or anyone else explain to you what this 2 percent was for?
A No The communications at the meeting. I didn't have any clarification or need for clarification. I assumed Ernst & Young was fully competent to understand the structure they were proposing.



Q But you're being told now that you're going to have to come up with cash equal to 2 percent of the desired loss, and it's not going to be at risk. Did you have any idea as to what this amount was for?
A No. Not other than that I was going to have an $8-1/2 million, which I thought was all at risk, for a $100 million transaction.
So, no. This -- you know, having money that would not otherwise be at risk, that sounds positive to me.
Q Now, notice in the next line it says E&Y fee, 1-1/2 percent. Do you see that?
A Yes.
Q So the fee that you were paying to E&Y on this transaction was equal to 1-1/2 percent of your desired loss, correct?
A That's what the letter says.
Q And then it says in the last line: Law firms and bank bill separately from E&Y 3 percent. So were you -- by receiving this, you became aware that the law firms wanted for their fee on the transaction 3 percent of the desired loss, correct?
A That that's -- that would be the basis



of their fee structure, yes.
Q So when you received this, what was your reaction to the fact that you're now receiving a memo from Mr. Knight which has fees that are in addition to the $8-1/2 million that he mentioned at the meeting? What was your reaction?
A They're not in addition to They're all inclusive.
Q What --
A In other words, if you add up all the sums of the monies, and if you exclude the, what he's calling it, not at risk, it's $8-1/2 million.
Q The 8-1/2 million --
A For the -- for the 100 million. And it's scaled back by 50 percent.
Q We haven't got there yet
A Okay.
Q But the $8-1/2 million, that is -- was for a $100 million loss transaction, correct?
A Right.
Q So $8-1/2 million is 8-1/2 percent, correct?
A That's correct. If you're doing it as a percent
Q So now, if you add up these amounts



here, am I correct there is, instead of 8-1/2 percent, 11-1/2 percent, if you add up those amounts, am I correct?
A You may be. But 2 percent is not at risk. So it might be a variance of a percentage point.
Q 1 percent.
A Right.
Q So by the time you got this document which has been marked as Government Exhibit 1104, you had learned that you would have, instead of 8-1/2 percent at risk, you would have 9-1/2 percent at risk. Am I correct?
A Yeah. But on a -- on a sum half as much, yes.
Q Now, that is referred to in the last paragraph of the memo, Government Exhibit 1104. Do you see that?
A I don't yet. 1104.
Q The last paragraph First page.
A Back to the first page?
Q Yes.
A Okay.
Q It says the amount of the loss --
A Okay Yeah. It's $50 million

Q The amount of the loss is $50 million. 60 percent ordinary loss and 40 percent long-term capital loss.

A Yes.

Q Do you see that?

A I do.

Q And he, am I correct, is now referring, instead of a $100 million loss transaction, to a $50 million loss transaction?

A That's correct.

Q So you had made a decision between the time you signed the first engagement letter, which was on the 12th of November, you had made a decision to, instead of a $100 million loss transaction, to engage in a $50 million loss transaction, correct?

A You keep using the term, but, yes, that's fine.

Q And where did Mr. Knight come up with this notion that the loss was going to be allocated 60 percent to ordinary and 40 percent to long-term capital loss? How did he come up with that?

A It would have been based on a communication during that period of time. I can't



tell you that I specifically recall having discussed it. You know, it's possible that either I or Jim. I'm not really sure.

Q So between the 12th of November and the 15th of November, did you do any type of calculation or rough estimate as to what portion of an offset of ordinary income versus what portion of an offset of capital gain you would need?

A Not really as a percentage. But I knew that either in 1999 or 2000 or in that period of time, I felt very comfortable, in terms of the relative exposure of, you know, leveraging, it's a leverage transaction, so whether I, you know, put up, as you said, 9-1/2 million relative as a percent, 9-1/2 percent versus 8-1/2 million -- but this was a 50 percent sizing. We had sized it down. Jim and I had some discussions with regard to the amount of capital that he had available versus myself. And although he ultimately ended up with a slightly higher dollar amount, that he became more relevant in the 90/10 split as opposed to 98/2.

So sometime in those intervening days, you know, based on the discussions that I had with



Jim, we decided to size it down and to change the split between us.

Q Turn to the second page of Government Exhibit 1104, Bates stamp number 1312.

A I'm sorry. I'm not following where we are.

Q We are in the second page of the exhibit. We're at tab 3.

A I'm on tab 3. Okay.

Q Government Exhibit 1104. Second page.

A Okay.

Q Back to the third paragraph.

A Okay.

Q You'll notice that now --

A That's the paragraph beginning our fee.

Q Our fee. Correct. You'll notice now in the first sentence it refers to E&Y's fee not as a percent of the desired loss, but as $675,000. Do you see that?

A I do.

Q Did Mr. Knight at any time, or anyone else at E&Y, tell you that in fact we are not going to refer to our fee as a percent of the desired loss, but we would refer to it only as a fixed amount?



A No. He never told me -- we never had such a discussion.

(Government's Exhibit Number 2350 was marked for identification.)

BY MR. DONOHUE:

Q Take a look at -- and I'll ask that you be handed Government Exhibit 2350.

Mr. Zucker, Government Exhibit 2350 is a template engagement letter of E&Y. And I'm going to refer you to the very same third paragraph that we have been referring to in Government Exhibit 1104. Do you see the third paragraph?

A I see the third paragraph.

Q It starts our fee.

A I see what you've handed me, yes.

Q And it notes in -- that -- it states: Our fee for providing the professional services referred to above will be [insert amount equal to 1.5 percent of the desired loss to be generated. If the size of the transaction is not certain at the time this letter is signed, add "based on total investment in the partnership by you and other individuals, in the amount of blank million."

And my question is at any point in time,

did any E&Y representative inform you that in fact it was a mistake to have provided you with a memo indicating that E&Y's fee was based on 1 5 percent of the desired loss? Did anyone ever point that out to you?
A No. It never came up. And we had no discussions on the percentage other than what I've already related to you today.
Q And that was not -- and didn't have anything to do with the fact that this memo was not turned over to the Internal Revenue Service?
A I don't believe I ever had a memo like this. This doesn't look like something that I would have received.
Q No. I'm not referring to Government Exhibit 2350. I'm referring to Government Exhibit 1104, the first page, which has all those percentages --
A I would never have known --
Q Let me finish my question
-- that has all those percentages, including the percentage referring to E&Y's fees as being 1 5 percent?
A No
Q My question was, did anyone ever explain



to you that, in fact, it was a mistake to have provided you with a memo showing that E&Y's fee was based on 1.5 percent of your desired loss?
A I don't know why it would be a mistake. But, no, nobody had such a discussion or any discussion of the sort. I -- you know, I have many transactions that are based on percentages. I can't tell you how many times I've been hit with a Lehman formula doing business on Wall Street. You know, if you're familiar with the Lehman, 5, 4, 3, 2, 1 percent. Percentages are very common. Frankly I've been charged by the legal firms in New York on transactions not based on hours but based on size of transactions.
So whether it's percentage or absolute dollars, it's the same money.
Q Have you ever had another tax transaction in which your fee was based on a percentage of the tax benefits?
A I've never had a transaction which I'm -- knowingly would have been even viewed possibly as what you're now defining as a shelter So I've not had similar transactions. All of the structural work that I've had done previously has always been paid for services based on the number



of hours put into it by the accounting firms.
Q So this particular transaction was the first time in which you paid a fee based on a percent of your desired tax benefits?
A I never based anything based on the percentage of tax benefit that are -- in these letters. I based it on what my risk/reward exposure was and the proprietary nature of what I was paying them money for. So whether it was a percentage or whether it was absolute dollars, it was the same dollars out of my pocket So I never thought in terms of percentage.
Q You already have in front of you Exhibit 155. It's one of the early documents that I provided you
A 177, 173, 171, 170, 174 177A. What was it? 155?
Q 155.
A I found 155. Okay.
Q Keep that one out. We might come back to that.
A Okay.
Q Turn to paragraph 2.
A This was the internal document you were telling me about?



Q Yes. And it says: Have client and client's attorney advisor, if any, sign E&Y nondisclosure agreement as well as separate J&G nondisclosure agreement
Did you ever sign any nondisclosure agreement with E&Y?
A No. And I was never asked to do so.
(Government's Exhibit Number 2342 was marked for identification.)
BY MR DONOHUE:
Q I'm going to ask that you be given what's been marked as 2342.
A Okay. All right.
Q This is a template, a nondisclosure agreement for E&Y. Read this and tell me if you've ever seen this document before.
A I --
Q Or one like it?
A I've not. As I've said earlier, they've never asked me to sign anything. And they never discussed -- they just, you know, they told me the transaction was proprietary to them. And I respect intellectual property, just as I expect those to respect my own intellectual property. So, no, I was never asked, and never seen this.

(Government's Exhibit Numbers 2378 and 2379 was marked for identification.)

BY MR. DONOHUE:

Q And I ask that you be provided with Exhibits 2378 and 2379.

I'm going to first direct your attention to Exhibit 2378.

A Yes.

Q This is a E-mail by Robert Coplan dated 7/17/2001.

A Uh-huh.

Q It's sent to a variety of E&Y professionals, including Mr. Knight. And if you'll notice the subject line, it refers to important, purge of all key COBRA documents. And then turn to the next --

A I'm sorry, where should I be looking?

Q The last -- on the last page -- I'm sorry, on the first page, the last line. Do you see where it says subject, important?

A Yeah.

Q Purge of all key COBRA documents.

It states: In an effort to eliminate unnecessary material from files, both paper and electronic, you are hereby instructed to



immediately delete and dispose of any and all materials in your drawers and on your computers related to the COBRA transaction, other than documents related to the currency trades made by the client, and research done to assist in deciding on those trades, document -- two, documents supporting the economic purpose and bona fide nature of the investment and the transaction, and, three, your copies of the opinion letters issued to the client.

A Uh-huh.

Q We have already removed such unnecessary items from the SISG tool kit such as slides, work plans, engagement letters, NDAs, et cetera.

A Yeah.

Q I assume NDAs is nondisclosure agreements?

A Yeah.

Q Mr. Zucker, my question to you is: Did anyone from E&Y ever inform you that they had received an instruction to delete and destroy all COBRA files --

A No.

Q -- in connection -- in connection with the transaction other than those that are listed



here?

A I can't imagine -- I can't -- no. No. They wouldn't have shared such -- if they did such things, they certainly wouldn't have shared them with me. I can't imagine why in my case that they would do anything, because I think everything we did was exactly as per the regulations.

Q Now, take a look at Government Exhibit 2379.

A 2379. I see it.

Q And if you'll turn to the second page, you'll notice that Mr. Coplan on 7/17/2001 points out, on the second page, he states at the top: Based on some information I just received from our general counsel's office, I must ask you all not to purge any COBRA documents to the extent you have not already done so already. If you need further information about this, I can provide it. In the meantime, please maintain those files as they are.

So my question here is: Did you ever receive any information from anyone from E&Y saying that Mr. Coplan's purge order had been rescinded or revoked?

A I never heard anything about either



No. I had no knowledge of any of this sort of stuff.

Q Let me turn to a different subject. Let me ask that you be handed Exhibit 1053.

A Yes.

Q Now, this Exhibit 1053, Mr. Zucker, you testified in your direct testimony on. Am I correct that you received this fax from Jenkens & Gilchrist on November 26, 1999?

A You know, if I could see the ones that I actually signed I could verify they're the one and the same.

THE COURT: The very bottom here.

THE WITNESS: I'm sorry.

THE COURT: The date is at the very bottom on the left.

THE WITNESS: Right. That coincides with -- that's correct.

BY MR. DONOHUE:

Q If you recall, you did say that in your direct testimony?

A No, no, I recognize the basic contents. But yes.

Q And you point out -- I'm sorry. It's pointed out in the fax, it says: Please execute

the attached documents and send me a copy by fax.

And then if you'll turn the page, there is a place for your signature, but there's a blank in terms of the amount.

A Yeah

Q Did you ultimately sign your name and leave the amount blank?

A I would presume that I probably did because, I'll be frank with you, most of the transactions I do, I sign and they're filled in after the fact. And I've never had any, you know, questions of integrity with any of the firms. But I can't specifically recall without actually looking at a document. But I probably did

Q Take a look at the next page. And in the next page, it points out: Please note from the attached assignment that the option positions in the above-referenced account have been assigned to JBJZ Partners, account number 2221015-10, effective as of November 24th, 1999.

Do you see that?

A I do see it.

Q Am I correct you were being asked to sign that document referring to an assignment that took place on November 24th, correct?



A Yes

(Government's Exhibit Number 1061 was marked for identification.)

BY MR. DONOHUE:

Q Take a look at -- and I ask that you be handed what's been marked as Government Exhibit 1061.

A Yes

Q And you'll notice that the first page of Government Exhibit 1061 is a fax page. And it bears the InterTech Group fax symbol. Do you see that?

A I don't see a fax symbol.

Q Do you see --

A I see where it says from Charlotte Crosby, who works in the InterTech office, to Donna Guerin at Jenkens & Gilchrist. That's not a fax -- you're talking about just our logo, the InterTech?

Q Your logo. I stand corrected. Your logo.

Take a look at the from. You mentioned it's from Charlotte Crosby. Am I correct your prior testimony is Ms. Crosby worked for you at InterTech, correct?



A For me and others, yes.

Q And you previously referred to the fact that she, in fact, had files in connection with the transaction, correct?

A You know, she was -- she -- I can't tell you if she personally had files. But apparently with her, you know, deposition she had some other files that, you know, that did not -- you know, based on the information you provided, were not provided.

But she apparently had other files. I know we had central files and other files that individuals kept. And she certainly was keeper of files

Q Now, turn to the second page. And there is a letter by Ms. Crosby to Ms. Guerin of Jenkens & Gilchrist. Did you know who Donna Guerin of Jenkens & Gilchrist was?

A No.

Q It says, dear Ms. Guerin: Enclosed please find the executed documents which were faxed to Mr. Zucker and Mr. Boyd on November 26th, 1999 regarding the above-referenced matter

Do you see that?

A I do.



Q Now, turn the page and go to Bates stamp number 919.

A They apparently aren't sequential. Let's see, 910.

THE COURT: I can't find it either.

THE WITNESS: 912.

BY MR. DONOHUE:

Q It would be -- take a look at the top right. And it will say page 02/16. Does that help?

A 02 --

Q No, that won't help.

A I'm just looking at the bottom. It's the Bates number, you said?

Q It is 919.

A So just give me a second to flip through the stack

MR. CROUCH: It looks like it's the 12th page in.

THE COURT: Is it? I found it. Yeah.

THE WITNESS: I have to tell you, as I say, my acuity is going down here. I don't see 919. I'm sure it's here. Count 12 pages in?

BY MR. DONOHUE:

Q Yeah. In fact, if you go up at the top,

it is the 12th page because there's a fax symbol for the 12th -- at the very top. Do you see that?

A I'm now going -- I see page 10.

THE COURT: Top right, you'll see number 12.

THE WITNESS: All right.

THE COURT: It's the fax. Overlay.

THE WITNESS: Okay. I see page 12.

MR. DONOHUE: That was a lot of work to get to this one letter here.

THE WITNESS: I'm sorry.

THE COURT: That's quite all right. Do you see at the bottom it's 919?

THE WITNESS: I see at the bottom it says 919, yes, sir.

BY MR. DONOHUE:

Q Now, am I correct that this is the signed version of the letter that was sent to you earlier by Ms. Guerin, and which you have now signed the document. Am I correct?

A Yes.

Q And Ms. Crosby is now sending this and other documents back to Ms. Guerin, correct?

A Yes.

Q And once again, if you look at this, you



have left blank what the amount should be, correct?

A Yes. It's very common for me, yes.

Q Now, turn the page. And you'll notice on the next page, I'll refer to this as Bates stamp number 903, that here you have signed the assignment of the option position document. Do you see that?

A I do.

Q And that's your signature, correct?

A It is.

Q Now, you mentioned that one of the steps of this transaction was is that the options would be transferred from your individual LLCs to the partnership, correct?

A That's correct.

Q And the name of the partnership I believe was JBJZ Partners? Am I correct?

A Yes.

Q And did Mr. Knight explain to you that that contribution of the options to the partnership was essential for your tax basis position? Did he explain that to you?

A There are all kinds of reasons for forming it, including the diversification and



consolidation. But among the reasons is it was going to be a tax efficient structure. So it was necessary, as he had explained to us at the meeting, to contribute the partnership itself into the S Corp.

Q And did he explain to you that your basis in your partnership would be based on simply the premium for the long options without regard to the premiums that you received on the short options which offset the amount that you would owe? Did he explain that to you?

A Not that it offsets. But that it would not be included in the basis, because the -- it had a maturity date that's beyond the date of contribution. And he annualized -- he basically provided in the meeting an example of real estate in terms of the ruling that a contingent liability or a liability that had not yet matured couldn't be included in the basis.

And, you know, accordingly since it had already been made in the ruling. So the answer is, yes, I understood that -- I understood how fundamentally conceptually the structure worked to be compliant with the regulations.

Q What I was referring to when I said



offset, for your options, you had to pay a premium on the long option, correct?

A Yes, I did.

Q And you received a premium on the short option, correct?

A I sold an option, yes.

Q You received a premium on the short option, correct?

A That's correct, yes.

Q And so when it came time to pay an amount to the Deutsche Bank, you paid the net amount between the two, correct?

A The answer is effectively yes. But there were separate transactions. But it's typical in terms of limiting credit exposure.

Q I understand. But my question is in terms of the amount you paid to Deutsche Bank, it was based on the net of the premium that you owed to the Deutsche Bank and the premium that you received from the Deutsche Bank; am I correct?

A Right. That's in pretty much all derivatives. If I do derivatives that are even offset or not offset, but where one is being sold and one is being bought, it would be -- the banks won't let the money go until they've taken their

cut and vice versa. But, yes, effectively it gets netted.
Q So did Mr. Knight explain to you that for purposes of your being able to get a tax basis in your partnership interest, you needed to make a contribution of the options to the partnership? Did he explain that to you?
A I think I've said that several times, yes.
(Government's Exhibit Number 2360 was marked for identification.)
BY MR. DONOHUE:
Q Now, I'm going to ask that you look at what's been marked as Government Exhibit 2360.
A Is this in this same package?
Q No. It's coming.
A Okay.
Q Mr. Zucker, if you want to take a break, let me know.
THE COURT: Do you want to take a break, Mr. Zucker?
THE WITNESS: I'd just as soon continue.
BY MR. DONOHUE:
Q Mr. Zucker, this is a table of both your and Mr. Boyd's options. And am I correct that



the -- all of the options that you and Mr. Boyd purchased all had a 30-day term?
A These aren't correct. What you've got shown here. But they're somebody's.
Q I'm sorry?
A You know, I don't recognize these -- the numbers in here as being my own, other than the 1.0121 at the bottom, and the 1.0123. You've got call and puts at 102.65 and 104.40, and I don't know whose those are. But I see some components in here that may be relevant. The bottom on this is relevant.
Q We can check the confirmations if you think they're wrong. I can assure you, though, they are right.
A I think you're wrong.
Q Well, let's first start with the premium.
A The option pairs at the top are not mine.
Q When you say the top, are you referring to --
A I'm talking about when you look at underlying currencies, it shows the Japanese dollar and US. But the spot rates are not correct



spot rates.
Q When you say spot rates, are you saying 104.40?
A 104.40 and 102.65.
Q Well, ignore those for the moment.
A Oh, okay. You're talking about -- you just want me to look at the -- what the strike prices were for each?
Q Right.
A Those appear to be correct.
Q Look at where it says long options and short options. Do you see that?
A I see the long and the short, yeah.
Q Look under columns 1 and 2. Your premium for your long option, am I correct, was $25 million, correct?
A Yes. That's correct.
Q And the payout on your long option was $50 million, correct?
A Payout would have been 50. I can pull out the individual contracts, but that's correct.
Q At some point --
A Although I don't see -- you don't have those shown here. Oh, I see where you've got the payout. I'm sorry. Go ahead.



Q And take a look at the short option. The premium for that is $23,750,000, correct?
A That is correct, yes.
Q And so am I correct that the premium for the short option offset the amount you owed on the long option?
A You know, if I need to keep couching it in your terms, it was done by the same bank. It is the practice of the bank to not let cash out until such time as they received their compensation. So, yes, to the extent that at the end of the day it's the net amount that counts, that's the amount you net have at risk and net premium, yes.
Q So the net amount for your Japanese yen/dollar options was $1,250,000, correct?
A You're combining it with Jim Boyd's as well?
Q No, I'm referring to simply the net option premium at the bottom of column 1. Do you see that?
A I see. And if you've done the calculations, that would be the case. I -- okay.
Q And then if you look for your dollar/euro options, you owed a premium of

$20 million. You received a premium of 19 million

A That's correct.

Q So you owed $1 million, correct?

A So, yeah. If you -- on that basis, yes.

Q And your share of this $50 million loss transaction was 90 percent, correct?

A Including Jim's, yes.

Q Well, Jim's was 10 percent, right?

A No, no, but I'm saying of the total, of the total, yes, that's correct, we had a 90/10 split.

Q So 90 percent of 50 million is 45 million, correct?

A That's correct.

Q So if you recall, your engagement letter said that your investment for the options was 5 percent of your desired loss. Do you recall that?

A I recall the letter, yes.

Q And 5 percent of $45 million, am I correct, is $2,250,000?

A If you've calculated it, that would be correct.

Q And in Mr Boyd's case, his share of the



loss transaction was 5 million, correct?

A Right, the 45/5 for the 90/10

Q And 5 percent of $5 million is $250,000, correct?

A That's a correct calculation.

Q Now, you had a fair amount of testimony regarding the confirmations. Did you read the confirmations when you received them?

A I did review the confirmations.

Q But not in any detail; am I correct?

A Well, I don't know if you're correct or not. I just -- you know, I just -- I just know my normal practice. My tendency is to skim things I've never had issues in terms of fiduciary integrity. So I probably did these as well. But I can't tell you the extent of the detail that I looked over them.

Q You mentioned in your direct testimony the Black-Scholes model.

A Yes.

Q Is the Black-Scholes model a mathematical model that allows you to calculate what the value of an option is?

A You can if you have -- if you have data that's reasonable and appropriate. There's the



Garmen model, which is more generally appropriate for use in currency trading. But -- but, yeah, you can -- the Black-Scholes will work. And it gives you a good indication of, you can use -- use it for calculating both probability as well as value.

Q Okay That was my next question. You can also use the Black-Scholes mathematical model, or a variant of it, to calculate what your probability of payoff is; am I correct?

A Yes, you can.

Q You need certain information, however, to make these calculations; am I correct?

A Right.

Q Among the information you need is the volatility of the currency, correct?

A That's correct.

Q Now, did you make any attempt, once you made a decision to purchase this transaction, to calculate what your probabilities of payoff were for either your Japanese yen/dollar or your euro -- dollar/euro currency transactions?

A I did.

Q And did you make an attempt to determine what were the various information that you would



need in order to make that calculation?

A I'm fairly knowledgeable of that, and the answer is yes.

Q And what did you calculate to be the probability of payoff for the long and the short options, both being in the money or paying off?

A Actually, I addressed that earlier, but if you want me to go through it again, I will. As I had mentioned, the data is so scattered there isn't really a good correlation in the data.

So depending on the data set you use, if you use the most recent trading activity versus longer base, you -- you come up with a slightly different answer. The actual probability on -- the euro ironically produced a higher probability of positive outcome, only because it was based on a more limited set of data. It's ironic because we only had under a year's trading activity to refer to. It ended up with a higher probability of outcome.

But if you -- depending on which data set you got, you got anywhere from high teens to as much as 60 percent. But you know, I figured it was pretty much about a toss of a coin on each of the outcomes. And the probability of hitting the

sweet spot, as I've mentioned earlier, is pretty much the product of the probabilities. So depending on which set of assumptions you want to use, if you used 50 percent, then it would be 50 percent times 50 percent times 50 percent, the number of occurrences that have to occur at the same time.

And if you used the lower end of the spectrum and you said it was in the 20-some-odd percent, then it would be, again depending on what values you want to use, it's just multiply them times each other. And that gives you the effective probability.

But, you know, it becomes a, you know, a single digit to small double digit kind of a number, depending on base case versus most optimistic case for finding the sweet spot.

THE COURT: Mr. Donohue, if you've finished your line of questioning, I would like to take a break.

MR. DONOHUE: Your Honor, this would be a perfect time.

THE COURT: All right. Let's take a 10-minute break. 10 minutes after.

(Whereupon, a recess was taken between



4:05 p.m. and 4:16 p.m.)

THE COURT: Mr. Donohue, will you give us an idea of how long this will take.

MR. DONOHUE: Your Honor, I would say 2-1/2 to 3 hours.

THE COURT: Oh, wow.

Mr. Zucker, is it possible for you to come back tomorrow?

THE WITNESS: I would have to make special arrangements to do so. I guess it's possible. I -- you know, I'll do whatever it takes. My preference would be to continue being here. My daughter and new grandchild are, ironically, in Charleston right now. I would like to at least see them for a day. She's only going to be there until tomorrow evening. But, you know, I'll do whatever is necessary.

THE COURT: You can last for 2-1/2 to 3 hours?

THE WITNESS: If I have to, I will. I'll need to just make some changes in flight arrangements at our next break say after an hour or so. I'll make a few calls to make changes in the flight arrangements.

THE COURT: Mr. Donohue, what do you



prefer to do? Do you want to go tomorrow?

MR. DONOHUE: Your Honor, I think, given our situation, whatever Mr. Zucker wants to do, that would be our preference.

THE COURT: Okay. Mr. -- well, Mr. Crouch?

MR. CROUCH: Whatever Mr. Zucker wants to do, Your Honor.

THE COURT: Okay.

THE WITNESS: I'll just do what -- I'll try to stick -- I'm -- the fact that I'm doing as well as I am right now, I take this as a blessed day, and I'll go ahead and continue.

THE COURT: It is remarkable I have to say. I think I'm more tired than you are.

So let's continue then.

MR. DONOHUE: Thank you, Your Honor.

BY MR. DONOHUE:

Q Mr. Zucker, I am not clear as to what range of probabilities you calculated for both options paying off, the option you bought and the Deutsche Bank's option that you sold to them.

What was the range of probabilities?

A Depending on the dataset that we used, they ranged anywhere from high teens, 18 to 20-ish



percent, to as high as 60 percent. But it just depended on the particular dataset whether you looked at more proximate or you looked at more outreaching.

So at the end of the day, they're pretty much calling in the money. It was about a 50 percent shot just based on statistical methodologies. And the balance was more intuitive based on the sense of the market and directionality.

And although, as you know, we made 1,075,000 on the euro, we didn't make our premium break on the yen. I wished I'd called that properly, but I didn't.

Q Let's go back to Exhibit 2360. Do you have that? That's the table in front of you.

A 2360, yes.

Q And you previously mentioned that the premiums that you owed to the Deutsche Bank would, in fact, be offset by the premium that the Deutsche Bank owed you. Do you recall that testimony?

A Well, I wouldn't couch it in those particular words, but those were your words, yes. They were netted at the same institution. So that

would be an internal offset

Q And am I correct, again, looking at, for example, table 1, column 1, that if, in fact, both your long option and the Deutsche Bank short option were both in the money, that, in fact, that the payout that you would receive would be offset by the payout that, in fact, the Deutsche Bank would receive? Am I correct?

A That is correct.

Q So that you would ultimately out of that receive a net payout, correct?

A In fact, that's what happened. I got 1-1/2 million and Jim got $375,000 which were the net payments from each of those euro transactions.

Q So, for example, if we look at the payout for the first column for the Japanese yen, that payout is 50 million, correct?

A That's 50 million, right.

Q And if you look at for the short option, which is the option you sold to the Deutsche Bank, that payout is 46,875,000, correct?

A That's correct.

Q So if both options are in the money, that would mean that you would receive the difference between the 50 million and the



$46,875,000, correct?

A That's correct.

Q Now, the -- I mentioned if both options are in the money.

A That's correct.

Q Did -- did you -- and you mentioned that you can use this mathematical model of either the Black-Scholes or a variant of it to calculate probabilities. But you can also use it to calculate what is the value of the option, correct?

A Right.

Q Did you make any attempt to calculate what the value of this option was?

A Well, the relative value is really the payout ratio. And I felt that, you know, anything in the order of 50 percent was reasonable.

So I didn't really go through, you know, detailed calculations because the currency markets and the volatility is such that it doesn't -- you know, the Black-Scholes works much better on equities than it does on currency. And the Garmen really wasn't a very relevant structure for this use.

So I had a choice of, you know,



developing a -- a lot of empirical data. And I didn't want to go through the trouble of doing that.

Q So is the answer to my question you did not make an attempt to value the option?

A No. That's not correct. I just told you I did my estimates. I just didn't use the Black-Scholes methodology that purpose because I felt that it -- it was inherently, not terribly meaningful.

You know, but the ratio in terms of what my payout was and what the Deutsche Bank's payout was was relevant. And I felt that being able to make what came out to be $3,750,000 on calling the currencies directly, and that was the net payout was in premiums, was adequate, that was, you know, well in excess of all I had at risk plus including my fees.

Q Well, for example, am I correct, if we look at the Japanese yen in column 1 for $25 million, one would expect, if you did a calculation of the value of that option on the date you purchased it, that the value would be somewhere around $25 million? Am I correct?

A You can -- you can approximate it at



that. And I say that, assuming the -- the equity of the exchange rates, that was a fair deal, yes.

Q Did you at any point in time learn that, in fact, these options by the Deutsche Bank had been overvalued? Did that -- at any point in time, did you learn that?

A No. I never learned that they were overvalued, no.

Q Did you learn that they were undervalued?

A No. I didn't learn either.

Q What attempt did you make to determine if the net premium you were paying on the transaction was, in fact, a fair net premium?

A I used my own experience and acumen. The -- you know, nothing other than that.

Q Did you do any competitive price shopping to determine if this net premium that you were paying on these options was a fair price?

A I felt it was in the right ballpark for the -- for the net value of what I could earn by calling it in the money. And I felt confident in being able to call it in the money.

Q How ordinarily are options priced? In other words, how does the dealer, in fact, make a

profit on options ordinarily?

A He takes a risk spread differential. Or he often will have an offsetting customer, you know, a customer out there where he'll distribute his risk so that he minimizes his own internal risk.

Q Are you referring to, essentially, the difference in the bid and ask prices?

A Often it's bid and ask. And other times, it can be within the same institution. It doesn't have to be in the market itself. It can be within the market within the institution.

Q And the -- am I correct the -- if you recall your earlier testimony, what you were paying for net premium on the options was based on 5 percent of your desired loss, correct?

A If you want to couch it in those terms. I did not -- I did not consider it nor go through the calculations that were relevant to percentages.

Q Have you ever paid, for any other option/transaction that you engaged in, a premium on the transaction based on a percent of a desired tax loss?

A No. I mean, you know, I do plenty of



currency trading. It's based on the particulars of the transaction. It happened that those mirrored, you know, the valuations associated with the options. But, you know, that's -- it wasn't -- it wasn't relevant that I was negotiating with him separately. You know, we -- I'm sorry.

Q Did you assume -- when you became aware of what the Deutsche Bank's net premium was, did you assume that they were building into this net premium a fee on the transaction for their participation in the transaction?

A No. I wouldn't have assumed that. I would have assumed that they would have priced the options to make a profit. But I -- you know, that's normal for anyone in the business.

Q You mentioned the sweet spot. Could you define for us what the sweet spot is?

A Yeah. The sweet spot is where I'm in the money, and the bank isn't.

Q All right.

A That's very simply. And since we're both calling the same direction, it was the difference in the strike points for the -- for them going in the money since they were



directionally the same as my own going into the money. So just that -- that spread in the strikes between us, that would be the sweet spot.

Q Okay. So if we -- if we go back to the table, which is Government Exhibit 2360, and, for example, if you look at the Japanese yen in column 1, do you see the strike prices --

A Yes. That would --

Q -- for the long option and the short option?

A I do. So the sweet spot would be the couple bibs -- couple pips in between the 106.19 and the 106.21. And in the case of the euro between the 101.23 and the 101.21.

Q Now, what is one pip? You mentioned this before in your direct testimony.

A Yes. It's -- it's 1/10,000 of a spot rate, which is, generally speaking, the lowest common unit of currency pair exchange. And it's kind of -- I'll give you an analogy. It would be analogous to a basis point when you're talking about interest rate or yields which would be one-hundredth of 1 percent.

Q I'm going to ask that you be provided with Government Exhibit 2370.



A 2370. Where is --

Q You don't have it yet.

A To be provided. I'm sorry.

Will you allow me one --

Q Certainly.

A Okay.

(Government's Exhibit Number 2370 was marked for identification.)

BY MR. DONOHUE:

Q Now, you'll notice there are some calculations of what the two pip spread is for both your dollar/euro and your Japanese yen/dollar option pairs.

A Right.

Q Notice that it refers to a pip is point -- I'm looking first at the dollar/euro, is 002.

A Yeah.

Q Am I correct that that would be either 2/10,000 of a dollar or 2/100 of 1 cent; is that correct?

A That's exactly what I told you a moment ago. It was 1/10,000 of the spot rate and/or analogous to 1/100 of a percent of a basis point.

So if you're doing it on the dollar side

as opposed to as doing it on the euro side.
that's -- that is correct.

Q Now, did you make -- now, I believe you said you did in your direct testimony -- a calculation of what your probability would be to hit this two-pip spread? Did you make a calculation of that?

A I answered that before. It's the -- it's the multiplication, depending on a set of data you choose, as to how low do you want to get it.

If you assume the likelihood of each event for, you know, for a total of six, you know, you have six different events, three different discreet events, it's the product of each of those assumed probabilities happening at the same time. It's just the product.

So if you assume it to be, you know, 50 percent, then you multiply it times 50 times 50 times 50. If you assume it to be 20 percent, then it's 20 percent times 20 percent times 20 percent or other -- you know, other components. It becomes a small percentage as I had said earlier.

Q What I believe you said at the deposition the probability of hitting the sweet



spot was 16 percent. Do you recall that testimony?

A No. I said, if you made the assumption that the 40 percent was the -- was the probability of an event occurring, then you wanted to know -- of two events occurring, then it would be 40 percent times 40 percent, which is 16 percent. I was using it as a -- as an analogy as to how you do the calculation just as I am now.

Q Okay. But what did you calculate the probability was of your hitting the sweet spot on either of your option pairs?

A I didn't need to hit the sweet spot. I would love to hit it. But if I were to hit it, it was a very small percentage. It wasn't necessary for me to go through the intellectual effort knowing that I only had a -- a nominal spread range so that it would be a small percentage hitting the sweet spot.

But my likelihood of making a great return on my investment was very good just by just simply calling the direction of the currency and not hitting the sweet spot. If I hit, it was a home run. It was like entering a lottery. If I hit the sweet spot, I made, you know, 90 plus



million dollars.

Q And what do you call small percentage?

A You know, I can go through the intellectual calculation with you, but it's a small percentage. It's -- you know, it's a single digit percentage that would likely occur for such a narrow band.

Q Am I correct that, to calculate the sweet spot, you would simply take the probability of hitting the long option and subtract that probability from the probability of hitting the short option? On the Deutsche Bank --

A It doesn't work that way because -- especially with currency. Simply because, when you're dealing with currency, there is no normal curves as you would expect. And even if you use the Black-Scholes model, it assumes normality. It assumes a normal bell-shaped distribution. And currency just simply don't work that way.

If you're using a normalized distribution, that would approximate it. But, in this case, that's not the case because the potential for either of us hitting approximately the same, whatever calculations I did for myself would be of the same calculations as for the bank



save and except a very, very tiny differential, and if you use that differential, simply because we had a different strike price for each of them.

So if we calculated and used your approach, and if we said that the probability of my hitting it was 51 percent and the probability of them hitting it was 50 percent -- and I'm being arbitrary -- then, based on your theory, it would be 1 percent using that basis of calculation.

And I'm saying that, if I take the probability of both occurrences at the same time, that I can take the product of those probabilities, and it's actually a lesser number.

So, you know, which set of data do you want to use? It's up to you. It's a low number to hit the sweet spot. But then it would be like hitting a, you know, lottery jackpot, but still being able to take a free lottery ticket because, you know, I already had a good investment that could make me, you know, a substantial return, you know, almost two point -- $3.8 million.

It was $3,750,000 if I just called the currency directions right. And I did call the currency directions right for the euro. I mean, I made 1,875,000. I wished I had done exactly the

same on the yen Shame on me. I mean, I -- I thought I called it right And the vagaries of the market moved it in the wrong direction.

Q Mr. Zucker, are you aware that you retained expert witnesses in this case who have calculated what is the probability of hitting the sweet spot? Are you aware of that?

A I'm not aware of the particulars I know that we will have experts in this case.

Q But you're not aware that they calculated the probability of hitting the sweet spot?

A I have not --

Q Let me ask that you be given exhibits 2371 and 2372.

(Government's Exhibit Numbers 2371 and 2372 were marked for identification.)

THE WITNESS: Who is Don Chance?

BY MR. DONOHUE:

Q That is your -- one of your options experts in this case. Are you aware of that?

A No I mean, I knew that experts would be brought in from, you know, your side and ours. But no

Q I just have the relevant pages of his



report. But if you turn to page -- the second page of the exhibit. And you'll notice --

A That's the one marked page 32?

Q Yes The one marked page 32.

A Uh-huh.

Q And he points out in the last paragraph, he says: Recall from material included earlier in this report that options are at and out of the money -- that are at and out of the money have relatively low probabilities of profit, but any such profits that do occur tend to be large.

Each of these transactions would return a profit of 50 percent if the low profit is achieved. The high profit (or sweet spot profit) is related to the initial premium by a constant factor. This profit is 30 times -- 39 times the premium. I estimated the probabilities of achieving this high profit. The figures slightly vary from contract to contract but are all less than .3 percent.

Now, is that what you meant when you said a very small percentage?

A I wouldn't have put it that low. But, you know, depending on the set of data that you use, that's a very -- you know, I say single



digits is what I thought is a combination of probabilities. But he's speaking for just the sweet spot

Q Yes.

A Right.

Q And that's what we're talking about.

A This is the product of -- product of those probabilities. I would not have put the sweet spot But, you know, that's making 90 to $100 million is a big number. When I, you know, fundamentally got into the transaction, I'd love to hit the sweet spot. But even if I didn't, I'm still making an enormous return on my investment.

Q Take a look at Government Exhibit 2372.

A Yeah.

Q This is relevant pages of an expert report by Alan Hess. Are you aware that he's another one of your options expert?

A No. As I already answered, no.

Q Take a look at the next page, page 19?

A Yes.

Q Now, for example, do you see --

A He ended up with percentages similar to the calculations that I had given you for myself. If you recall, I said high 10s to -- for me over



60 percent And I told you that the -- ironically, the Japanese yen/US dollar showed a higher probability than -- simply because there was less data ironically Yeah.

Q One second.

Let me direct your attention to page 19. And do you see where he refers to empirical probability that payout will occur in column F?

A Yes.

Q And do you notice it refers to first option 22.5 percent by 7 percent?

A Yeah. Ironically, the ones he predicted the lowest percentage on is the ones that I succeeded in.

Q And do you notice in the second option he -- that's -- the second option, am I correct, that's referring to the Deutsche Bank's option? It shows the probability --

A Right.

Q -- of 22.34 percent. Do you see that?

A I see what it says. And it's consistent with what I told you; that to calculate the difference in the probability of my happening and their happening was relatively close because we were both going directionally the same.

Q So if you subtract the probability of -- your probability of being in the money for your option from the Deutsche Bank's probability of being in the money for their option --
A Yeah.
Q -- wouldn't that difference provide you with the probability of hitting the sweet spot?
A If you recall in my prior answer to you, that is one way to approach it. And if you're using the normalized distribution, as he's tried to do -- as he's trying to do, you could end up with that being one answer.
You know, it happens that currency correlations are not good. And that can't be used as an absolute. But it's a low number. You know, I'm not suggesting -- he's suggesting by doing that it's about .3 of 1 percent. But let me ask you, who wouldn't ask for $100 million or $50 million, in my case, 90 to $100 million jackpot with -- that's great odds.
I mean, if you look at the statistics on getting involved in the lottery, that's a wonderful opportunity to buy -- get a free lottery ticket considering that I've already got a great potential to make a profit completely independent



of hitting the sweet spot.
So it's a low number. Whether you use that approach or you use the approach of the probability -- multiplication of the probabilities of each event happening, it's a low number.
Q And if you recall, Mr. Chance's probability was .3 percent. And now I believe it's Dr. Hess' -- yes, it Dr. Hess' --
A .3 percent essentially.
Q -- is also essentially 3 percent.
A Using your subtractive approach
Q You have to wait --
A I'm sorry.
Q -- until I finish my question.
A I'm sorry.
Q So if, in fact, you take his probability also of hitting the sweet spot by subtracting the probabilities, you would also get approximately the same type of percentage number as Dr. Chance, correct?
A Based on using that approach, that's correct.
Q Now, at the time that you were making a purchase of these options, did you seriously consider that you had any real chance of the sweet



spot being hit by you by any of your options?
A Did I seriously have a chance?
Q Yeah.
A Sure. Sure I had a serious chance. But more important to me was just calling the direction of the currency right. And if I had done both of them right, you know, I would have made almost $3.8 million. I only called one of them right, which made the 1,875,000.
Q Let me --
A That was the primary focus. The rest of it was going to be a bit of a chance.
Q But we're -- let me ask that you be given what's been marked as Government Exhibit 2375. It's simply the confirmations that you've already testified to previously, but I have it marked as a different Exhibit Number.
A Okay. Yes.
(Government's Exhibit Number 2375 was marked for identification.)
BY MR. DONOHUE:
Q Now, am I right that there is a difference between a bid and ask price? Am I correct on that?
A Do they exist in the market? Sure



Q So a spot price for a currency will have a bid price and an ask price, correct?
A There'll generally be thousands of them that are factored in, but yes.
Q And the difference between these spot prices may be -- between the bid and ask may be greater than two pips. Isn't that possible?
A It's possible, yes.
Q And, in fact, isn't that normally the difference? Isn't it normally a difference of greater than two pips?
A During the course of the day, it's wildly different, yes.
Q Did you make any attempt to determine for purposes of a Deutsche Bank at the expiration of your options, determining what the spot price was if your -- if their determination was going to be a bid price or an ask price?
A No. The -- well, the ones that I was clearly in the money, I was so far in the money on, there really wasn't any point to argue it.
And I had, in fact, gone back and looked at, you know, what were the trading prices, where did it open. And I was so far out of the money with regard to the yen, there really wasn't much

point. It wasn't a matter of arguing about a few pips. you know. I really had called that one way wrong.

Q But my question is not directed to whether you're in the money for both options or out of the money for both options It's whether you made a determination for purposes of hitting the sweet spot if the Deutsche Bank spot price was based on a bid or ask price.

Did you make any attempt to determine whether the spot price for the Deutsche Bank. when it -- at the expiration of your options was going to terminate. if you would be hitting the sweet spot, if their spot price was a bid or ask price? Did you make such a determination?

A If you allow me in context. because it will lead to the wrong conclusion. the answer is there was no need because we were so far out of the range.

I did. in fact. check to see. you know. what the opening bids were in various markets for that day So I did have those. Because we were so far out of the range. there wasn't a need -- if we had come in within a few pips of where we had called it. then. believe me. I would have been



down them. you know, very quickly to say. you know. I want to see the open book. you know, as to what transacted that day so we see whether or not we had a reason to quibble.

But we weren't close to the point of where it was. you know. it was a quibbling because we were so far -- I was so far removed from that sweet spot that there wasn't a point.

Q Mr. Zucker. my question doesn't involve what you did after the expiration of the options My question --

A I'm talking about for determination of that option on that date.

Q Mr Zucker --

A I'm sorry.

Q -- you have to wait until I finish my question.

A Okay. I'm sorry

THE COURT: We'll go faster that way.

THE WITNESS: I'm sorry.

BY MR. DONOHUE:

Q Much faster.

A I'm sorry. Your Honor.

Q My question has to do with. at the time you entered into the transaction. you purchased



the options.

My question is: Did you make any determination at that point in time on purchase as to how the Deutsche Bank was going to determine the spot price for purposes of whether or not you would hit the sweet spot?

A As I think I testified in my direct earlier. we had agreed that whatever is the opening bid was. that they were going to mark it down for the -- as it relates to the euro by 10 pips and 12 pips respectively for the strike prices for us and for -- for me speaking for myself and Jim Boyd. and 12 pips down as it related to Deutsche Bank against the opening bid.

And that's how we set the strike. Because we didn't know if we were going to close on the November 22nd or the 23rd So we pre-agreed that. And I did ultimately verify. you know. where the openings were for that day.

There was no way that he would make any difference what he functionally locked into because. you know. there was -- there was no way for him to predict whether we were going to be in or out of the market to such a fine degree.

Q Mr Zucker. it's getting late in the



day.

A I'm sorry.

Q I don't think you understand my question.

I'm not asking you how you determined the strike price on the date or prior to the date you entered into the options.

Take a look at --

A We said opening bid.

Q Take a look at Government Exhibit 2375 Take a look at that.

A I'm looking at it.

Q Now, take a look at. under. for example. section 2. It's the second to last paragraph. Do you see where it says: If the spot rate is? Do you see that language?

A You're on the second page?

Q On the first page

A On the first page Okay.

Q I am on the second --

A If the spot rate is on the first rate determination.

Q Yes.

A Okay.

Q Now, my question has to do with did you

make any determination as to how the Deutsche Bank was going to determine the spot rate on the expiration of the options?

A We said the opening bid at precisely 10:00 a m. So whatever they had on their book that was entered at 10:00 a m So it would be the opening bid for that time.

Q Do you see any reference to that language in the confirmation?

A Yeah. It says 10:00 a.m. First determination date of 10:00 a.m. local time New York. Yeah.

Q But it says "if the spot rate". How was the Deutsche Bank going to determine the spot rate?

A I can tell you that my agreement with David Parse was that it would be the -- the opening bid at 10:00 a.m.

Q But --

A So --

Q -- was that incorporated in the confirmation?

A Well, apparently not if -- I'm reading it right now and it doesn't -- it only refers to the spot rate. But, you know, that -- we didn't



get close to having to argue over it.

Q If you take a look at -- take a look at the second page

A Yes. Yes.

Q Do you see in paragraph A, at the bottom, a reference to the calculation agent?

A That's correct.

Q And it says that the calculation agent --

A Acting in good faith.

Q -- acting in good faith -- I'm having a hard time reading it -- considers that it would not be commercially reasonable to take into account.

Who was the calculation agent?

A Alex Brown Deutsche Bank.

Q I'm going to ask that you be given what's been marked as Government Exhibit 2369.

A Okay.

(Exhibit Number 2369 was marked for identification.)

BY MR. DONOHUE:

Q This is an internal Deutsche Bank E-mail from Tom Tahl to Craig Brubaker. In the course of any of your conversations with anyone at the



Deutsche Bank, did you speak to Craig Brubaker?

A No.

Q Notice what the E-mail says. It says the calculation agent is the Deutsche Bank.

A Right.

Q The calculation agent is clearly specified in the trade confirmation documents. In the event of any question you might have as to the rate that the Deutsche Bank set, the practice we follow, which is industry standard, is as follows: We poll five interbank FX participants at 10:00 a m on determination date for this -- their spot FX dealing rate.

Deutsche Bank chooses one of those rates in a specific price on or within that quote. The counterparties we use are: Chase, Citibank, Union Bank of Switzerland, Morgan Stanley, Barclays.

For example, this morning, Wednesday, August 2nd, 10:00 a.m., their respective dealing quotes in dollar Japanese yen were.

And it gives a list of those institutions. And you'll notice that it gives -- for each one, it gives both a -- it gives two quotes Do you know what those two quotes are? Am I correct those are the bid and ask price?



A They're probably bid and ask, yeah.

Q And you'll notice what it says there is Deutsche Bank chose to use the Barclays quote and our determination rate today was 109.06

Were you aware at the time that you entered into this transaction that this was the procedure used by the Deutsche Bank for determining what the spot rate would be at the expiration of an option transaction?

A Well, it's inconsistent with the discussion I had with Davis Parse. So, no

Q And did you -- when you received the confirmation, did you review that confirmation and notice that it was inconsistent with your conversation with Mr Parse and say, Mr. Parse, this is not what we agreed to? Did you do that?

A No, I didn't. You know, frankly, I've never had any reason to question the fiduciary integrity of any of these large institutions. I had no reason at the time to look at it in such miniscule detail as you've now done.

But, no, I did not question it.

Q Am I correct that banks like the Deutsche Bank that, after they enter into a option transaction, they enter into a hedge to protect

themselves? Do you know whether that's true or not?

A As I discussed with you earlier, it can be both internal offset, as you say, hedges, or it can be laying off a risk. They would like to distribute their exposure. So depending on concentrations of position, they may or may not.

Q Am I correct that, normally, at least on the bank's part, where they try to make their money is in the difference between the bid and ask prices? Isn't that normally where they try to make their money on these transactions?

A Not necessarily. They can have numerous customers. And they can make, you know, money off the spread of customers laying off effectively the risk by selling positions to customers that are offsetting. So it's one of the ways they can

Q And in order to actually simply limit their exposure on the transaction, once the bank entered it into one of these off -- these option transaction, they would enter into a hedging transaction to essentially mirror with offsetting terms the transaction they entered into. Isn't that normally how it's done?

A That's one of the many ways that it can



be done. That is one of the many

Q Did you ever inquire as to whether the Deutsche Bank, in fact, entered into a hedging transaction to protect themselves in the event that there was going to be this huge lottery payout? Did you ever make an inquiry as to --

A No. I --

Q Let me finish my question

A I made no inquiry.

Q You have to wait until I finish my question.

A Okay. I'm terribly sorry.

Q Did you ever inquire of the Deutsche Bank as to whether they entered into any type of hedging transaction that would have protected themselves in the event that there was a lottery payout? Did you make any inquiry about that?

A I did not. Deutsche Bank is a big bank. I wouldn't be worried about whether they hedged or not.

Q I'm going to ask that you be given what's been marked as Exhibit 2362

(Government's Exhibit Number 2362 was marked for identification.)

BY MR. DONOHUE:



Q Now, do you recognize this table of the -- to reflect what were the payouts on your and Mr Boyd's options?

A Well, somebody's put together a table that shows the transactions as if they're all been pre-netted, you know. So the -- if I looked at each of the combinations as being pre-netted, this table looks right.

Q Okay. And I'm going to ask that you be given what's been marked as Exhibit 2363.

(Government's Exhibit Number 2363 was marked for identification.)

THE WITNESS: Let me just say it would have been better if this table had shown as each of the discreet options rather than netting everything out. It kind of obscures the money. It only shows a net of having made 625,000 when, in fact, we did much -- much better in terms of the individual transactions.

BY MR. DONOHUE:

Q We're getting to that.

A Okay

Q But if you look at 2363, this is a summary of the fees that were paid on the transaction And if you look under your name, it



has a list of -- for your LLC fees of -- that were paid to Ernst & Young, two amounts to Jenkens & Gilchrist and one to Brown & Wood. Does that appear correct that your fees totaled approximately $2,025,000?

A I don't know that that number is right, but it's the right order of magnitude

Q And on your option positions, you'll notice in row 6 and 7 it has what the net premiums were. And does that appear correct to you that your net premiums were approximately $2,250,000?

A Again, in magnitude, that all seems correct.

Q Because if you, for example, multiply 4.5 percent, which represents E&Y's 1-1/2 percent, and the legal fees of 3 percent, if you multiply 4.5 percent times 45 million, you would get the total of $2,250,000 plus $2,025,000. Am I correct?

A If you've calculated it correctly, then you're correct.

Q Okay. Now, I'm going to ask that you be given what's been marked as Exhibit Number 2364.

(Government's Exhibit Number 2364 was marked for identification.)

BY MR. DONOHUE:

Q Now, this takes into account, Mr. Zucker, this table, not only your net premium amount, which is in row 2, of $2,250,000, if you subtract simply that amount from your payout of your options, which is $2,812,500, does that give us the number that you previously testified to as to what you said was your profit on the transaction?

A Well, you've kind of co-blended so many things in here. In terms of the actual transaction we made on the euro 1,875,000. I had an offset of premiums of 1,250,000 using your offset concept, which left a net of 625,000. So you then have to look at, you know, in terms of what I paid in fees.

So if you've presented them in list form here correctly, then it would be correct.

Q And after you take into account your fees on the transaction, am I correct that you lost roughly about $1.4 million on the transaction?

A If that's what it -- if what the calculation comes out to, then that's -- that would be correct. However, had I called both --



just the directions of my options correctly, I would have, you know, well more than doubled the cost of all the fees and all the premiums and everything combined completely apart from hitting the sweet spot.

Q Now, when you make a calculation --

A Yeah.

Q Let me strike that question. When you make a determination as to whether a financial investment is or is not for you a suitable investment, do you do a calculation of expected return?

A I do at times. It depends on the nature of the investment and if it's -- if it's something that's akin to this, I probably wouldn't. But, you know, I felt highly likely it was a win-win for me in terms of the approaches that I said earlier. I had a terrific opportunity to make a good profit and, as well, to provide a material offset to my revenue.

Q How would you calculate expected return for the options transaction?

A In this case?

Q Yes.

A Well, you know, I would have to look at



it separately as I did. You know, I looked at what did I feel my likelihood of calling the options correctly. I felt it was very good that, you know, I would be able to, you know, better than double all of my exposure, including all fees, you know, in terms of just calling the directions right. And shame on me I only got half the equation. I didn't get both halfs. But --

Q But would you simply take the probability times the present value of the payout, and that would give you essentially your dollar amount of expected return?

A Could I use that as one method for general investments? Yeah.

Q And if you wanted to actually get a rate of return, you would simply then take that dollar figure and divide it by your cost, correct?

A That would give you a rate that's over a very limited life in this case. But, yeah, that would be -- that would be one approach.

Q So did you make any attempt at the time you entered into this transaction to determine whether your expected rate of return on this transaction was positive or negative?

A I didn't need to. I mean, it was



intuitive. I felt highly confident that I would at least call the directions of the currencies correctly and that I would more than -- more than double all of my risk exposures including fees. And that if, God willing, I would hit the sweet spot, I would have a jackpot.

Q But is the reason that you didn't need to is because you had a $50 million tax write-off on the transaction and so you didn't have to worry about whether or not you, in fact, had a positive or negative expected return? Isn't that the reason you did it?

A I certainly factored in the ability to preserve additional capital. But it was secondary. I -- I went after making a profit and really doing well.

Q Let me ask that you be given what's been marked as government Exhibit 1032.

(Government's Exhibit Number 1032 was marked for identification.)

THE WITNESS: Yes.

BY MR. DONOHUE:

Q Mr. Zucker, Government Exhibit 1032 is a draft. It appears to be part of a legal opinion. And there is handwriting on the first page. Do

you recognize that handwriting?
A I do. That's mine.
Q Could you read us what that says.
A It's addressed to Barry Emerson. Barry, attached is a draft of the opinion letter re the year-end activity resulting in $45 million tax loss. Please accelerate your understanding my discussing with Ray Knight of EY, et al. I would like to proceed on an accelerated basis for a tax refund.
Q Mr. Zucker, this was another document that was not turned over to the Internal Revenue Service Do you have a different explanation or the same explanation as to why this document wasn't turned over?
A Well, this would not have been in my files. This was a -- you know, given to Barry. And I probably just noted it on and he -- he had it in his file. I frankly never even thought to call Barry to ask Barry to go through his file. So if EY or somebody else did that, I frankly never even thought to call Barry because, you know. Barry just was doing the filing of the 1040.
Q Well, maybe I'm mistaken, but I thought Mr. Emerson was the point person in terms of



making sure all the documents were turned over to E&Y
A No, he -- he coordinated on my behalf and did all my filing of my 1040. But we relied pretty much on Ernst & Young to actually do as they had committed in their fee level, and that was to take us through all of the necessary actions and so forth to provide -- so, you know, Barry certainly, you know, was in contact with Ray Knight or indirectly involved.
But I don't specifically recall -- I can't -- I can only speak for myself. I don't specifically recall calling Barry to say, if you have anything in your file that's not contained in other people's file, you know, directly. That just didn't cross my mind. Maybe it should have, but it didn't.
Q Well, just so I understand, was Mr. Emerson the point person for turning over documents from your staff to E&Y --
A Barry is not on my staff.
Q Was -- let me start again
Was Mr. Emerson the point person for contacting people on your staff -- I know he's not on your staff, but was he the point person for



contacting people on your staff to make sure that the documents got to E&Y that -- so that they could be turned over to the Internal Revenue Service? Was that his function?
A No. If I ever created that impression, it's a misimpression. But no. I mean, Barry was my CPA that did the filing of my 1040s. But I directed my staff to do so and to accumulate the information I didn't direct Barry. And maybe I failed to think to call him at the time, but I -- I didn't.
Q Mr. Zucker, this note refers to the fact that your -- there's a draft of an opinion Do you know who gave you this opinion?
A Well, I know I got it after the close of the year. So it would have been in the beginning of, you know, the first quarter of 2000. It probably would have -- probably -- I can't tell you. I don't know. But it probably would have come from Ernst & Young or something like that. I'm not -- I'm guessing. I don't know.
Q Well, if you're guessing, are you also guessing in terms of when you received it? You said --
A No, no. Of that I'm certain because



even my language in here refers to the past, not that we will be receiving. It's would or will be. It doesn't speak in terms of something that's going to happen but something that has happened
Q Barry, attached is a draft of the opinion.
A Yeah.
Q Other -- is that other?
A Letter. Opinion letter
Q Letter.
A Re.
Q Opinion letter re.
A The year-end activities resulting in, which to me is in the past participle. It's resulting in a 45 -- not that it will result or that it will result in or whatever. It's not -- it's not couched in a future.
Q Were you aware --
A It's also my recollection as well.
Q -- that --
A If you recall in my other deposition, you had asked me if I remember writing a note to Barry. And I remember I even told you that I didn't know this document was around. And I said I remember writing a note to Barry, but there was

a -- in the first part of the year. This is the note that I was referring to although not knowing what it had been written on.

Q Were you aware as to whether E&Y was using draft legal opinions in marketing the COBRA transaction?

A No. I had never seen that note. I certainly wouldn't have had any of their internal knowledge of what they did or didn't do.

Q So the only basis -- let me make sure I understand. You don't remember when you received it exactly, but the only basis you have of saying that you received it sometime in the following year, I assume you're referring -- I assume you're referring to the year 2000 is the way you are reading right now this note?

A No. No. You remember you asked me in my prior deposition if -- and I told you that I remember writing a note to Barry, and I believed that it would be January. Completely independent of you -- of having seen this because I didn't know that it was around.

And I brought it up actually several times in the deposition. I remember writing a note to Barry in sometime in January about, you



know, checking over the details and accelerating my refund. And this was the note.

Now you've given me the context so that I can further, you know, refresh my memory. And this was the note that I was referring to at the time of my deposition; although, I had not seen this at the time.

Q You don't know who you received this opinion from, correct?

A I am -- I am pretty sure that it ended up coming from, you know, Ernst & Young, but I'm not certain of that.

Q Let me give you what's been marked as Government Exhibit 520.

(Government's Exhibit Number 520 was marked for identification.)

THE WITNESS: Yes.

BY MR. DONOHUE:

Q If you'll notice, Government Exhibit 520 is a Jenkens & Gilchrist fax with an attachment. And among the recipients is Mr. Knight. Do you see that?

A Recipients. He's on -- it's shown as number 3 on the front page. Yeah, I see it.

Q And if you'll notice on the second page



of this document, there's a memorandum regarding the tax consequences of contribution of the options spread to partnership or corporation. Do you see that?

A Yeah. You know, I'm not familiar with this document, nor would I have seen such a document. But I see what you're putting before me.

Q And did you read any portion of the draft opinion, which is Government Exhibit 1032, before you gave it to Mr. Emerson?

A 1032. Just the one that you've shown me previously?

Q Yes.

A I can't say that I -- that I specifically did. But it outlines the -- it underlines the general concept of the transaction. And that's why I forwarded it to Barry so he could start understanding the transactions so that I could move forward with getting my refund.

Q Let me ask that you be given what's been marked as Exhibit 1079.

(Government's Exhibit Number 1079 was marked for identification.)

THE COURT: Do you want to take a break,



Mr. Zucker?

THE WITNESS: I wouldn't mind just stretching. But I would really, you know, like to continue.

THE COURT: Okay. Let me just, while you're stretching, point out that the air-conditioning normally goes off at 5 o'clock. I forgot about this. And I've tried to get the Clerk of Court to extend it to 8 o'clock. But it seems to me as if it's gone off. I don't know. It seems like it's warming up in here from what it was before.

Yeah, go check with them, would you.

We're trying to save those tax dollars, Mr. Donohue.

MR. DONOHUE: This would be a good time to splurge, Your Honor.

THE COURT: While we're waiting, also, Mr. Crouch, do you anticipate a redirect?

MR. CROUCH: We may have some redirect, Your Honor. I just can't tell you at this point how long it might be.

THE COURT: Mr. Zucker, do you still want to stay?

THE WITNESS: You know, I -- I think the

answer is yes because I don't know what the circumstances will be by any delay. I'm actually impressed with my -- the fact that I've managed to this point of the day. And I -- if this is one of those odd days, then I would sure like to take advantage of it.

THE COURT: Okay. All right. I'll keep asking you.

THE WITNESS: I appreciate, Your Honor, your consideration. Thank you.

Am I supposed to be doing something in the mean time or --

THE COURT: Yeah. Mr. Donohue, please.

MR. DONOHUE: Oh. Your Honor, are we waiting?

THE COURT: Yeah. I was waiting for -- it was just a stretch.

MR. DONOHUE: Oh, okay.

THE COURT: And then I was sort of filling in the silence with my comments.

MR. DONOHUE: I'm confused, Your Honor.

THE COURT: That's all right. We're all tired. Go ahead, Mr. Donohue.

MR. DONOHUE: Okay.

BY MR. DONOHUE:



Q Mr. Zucker, turn to Exhibit 1079.

A I have it.

Q This -- and the first page of it is a handwritten -- appears to be fax from Donna Guerin to yourself.

A No. From me to Donna.

Q I'm sorry. From you to Donna.

A Yes.

Q And it has six pages. And if you'll turn to the third page of the document, in the third page of the document, it is Bates stamped number 266. And you'll notice a signature under accepted and agreed to. Is that your signature?

A It is.

Q Okay. Now, turn to the first page of the document. This appears to be your engagement letter with Jenkens & Gilchrist dated December 1st, 1999. Am I correct?

A It appears to be, yes.

Q And take a look at the last paragraph on the first page. It states: The amount charged for the legal services we provided to you would be based on a fixed fee of 1,260,000 for our advice and assistance in the facilitation and execution of the European digital foreign currency option



investment transactions in the amount of approximately $45 million, the documentation of the transaction, and our research and the rendering of a more-likely-than-not tax opinion setting forth our conclusions and rationale.

Am I correct that, even though it refers to this amount of $1,260,000, you previously have been informed that the legal opinions that you would receive, your fee for that would be 3 percent of the desired loss, correct?

A It was in the other documents that you showed me, yes.

Q Were you, at this point in time, which is in December, were you aware of what Jenkens & Gilchrist's role in this transaction was?

A To the extent that they were -- they were taking care of all the paperwork and the -- and the -- you know, the basic preparation of documents, to that extent, I certainly was.

Q And were you aware that they also had a hand in the development of the transaction?

A No.

Q I'm going to ask that you be given what's been marked as Exhibit 2325.

(Government's Exhibit Number 2325 was



marked for identification.)

BY MR. DONOHUE:

Q Mr. Zucker, Exhibit 2325 is a template confidentiality agreement between Jenkens & Gilchrist and the client.

Were you asked by Jenkens & Gilchrist to execute a confidentiality agreement?

A Not to my recollection at any time. No.

Q Go back to Exhibit 155. Do you remember I told you to keep that one out?

A I probably didn't.

THE COURT: Mr. Zucker, it's this one.

THE WITNESS: I'll look for it. I kept them all out.

Yes. Okay. I've got it. All right.

BY MR. DONOHUE:

Q Keep it out, Mr. Zucker.

A Okay.

Q Take a look at paragraph 2. You notice it says: Have client and client's attorney advisor, if any, sign E&Y nondisclosure agreement as well as separate J&G nondisclosure agreement. Does that refresh your recollection that --

A It absolutely did not occur. And, you know, I keep referring to these things about what

they might have done with other people, but not with me.
Q You have to wait until I finish the question.
A No. It did not happen.
Q Let me -- once again, you have to wait until I finish my question.
A I'm sorry.
Q My question is: Does that refresh your recollection that you were asked to execute a Jenkens & Gilchrist nondisclosure agreement?
A No.
Q Okay. Now, take a look at Government Exhibit 2325.
A Okay.
Q Their template nondisclosure agreement in the first paragraph, second sentence, states: The confidential proprietary information (Confidential Information) involves certain financing structures be (the Structures) developed by J&G and/or its clients, consultants or co-counsel that provide economic, financial, business and tax advantages for individuals and companies through the use of the structures.
Is it your testimony that you were not



aware that J&G was, in fact, involved in the development of this transaction?
A Absolutely I had no knowledge of it.
Q But you were aware that they were involved in implementing the transaction, correct?
A I was aware of the fact that they were -- they were creating much of the documentation associated with the transaction.
Q And you were aware that a fee that you were paying was based on a percent of your desired tax loss to both Jenkens & Gilchrist and Brown & Wood. You're aware of that?
A You've shown me the documents that refer to those, yes.
Q Let me ask that you take a look at what's been marked as Government Exhibit 1010.
A This is not one I have before me, right?
Q You will be given that exhibit.
A Okay.
(Government's Exhibit Number 1010 was marked for identification.)
BY MR. DONOHUE:
Q Mr. Zucker, this happens to be a phone call receipt or tab. And it indicates that, on 12/6 at 10:15, that Mr. Knight called. And it



refers to JB or CC.
A Right.
Q Do you know who those initials are?
A Yeah. Jim Boyd or Charlotte Crosby.
Q Were you ever informed that, on December 6th, Mr Knight called Mr. Boyd --
A No.
Q -- or Ms. Crosby?
A No. I have no recollection. I mean, you know, it's years ago, but I have no recollection of that.
Q Let's -- let me ask that you be given what has been marked as Government Exhibit 2358A.
(Government's Exhibit Number 2358A was marked for identification.)
BY MR DONOHUE:
Q Now, you'll notice that, at the bottom of this exhibit, that there is an E-mail from Mr. Coplan that's dated 12/6/1999. Do you see that?
A Where should I look to see that? Oh, yes. I see. It says, next to Bob Coplan's name, Robert B. Coplan.
Q Now, take a look at the second page.
A Okay.



Q And Mr. Coplan's E-mail is being sent by a number of people -- or sent -- is being sent to a number of people, including Mr. Ray Knight, which his name is about the fifth one up.
A I do see it.
Q And notice what it says. It says: COBRA Matters -- Urgent. This E-mail discusses three items of importance to the COBRA transaction, two relating to completed transactions and one related to COBRA 2000.
One, trading activity in the partnership. As you know, in addition to the transfer of the options spread to the partnerships, the client's transferred cash equal to 2 percent of the loss amount to the partnership.
There has been some confusion as to what -- as to what type of trading is expected to be done with this cash during the life of the partnership. The trading activity is important to the maintenance of the business purpose of the partnership i.e., investment activity. We have not developed precise rules for the investment of the funds, but here are some guidelines.
The money should not sit in a money

market account. The more trading activity the better, and preferably in an investment that can reasonably be expected to provide a potential for a good return. Although, speculative investments are not encouraged.

If one wanted to move in and out of different market indexes, that would be acceptable. Because there are only about three weeks left to the liquidation of the partnerships, it is essential that, if no activity has yet commenced, that it begun -- that it be begun immediately through David Parse at Alex Brown.

Investment in foreign currencies is not necessary at this time even in the ordinary loss partnerships. That will be done just prior to the termination of the partnerships after the assets remaining in the trading account had been liquidated.

Mr. Zucker, does that refresh your recollection that, on or about December 6 of 1999, Mr. Knight called, spoke to Mr. Boyd about the need to invest the 2 percent of your loss transaction, the $1 million, to begin to invest that in various securities?

A No, it doesn't. It doesn't add to any



of my knowledge or recollection that the call was made.

Q But you do recall that, in the earlier engagement letter, that you were required to pay upfront an amount of 2 percent of a desired loss. Do you recall that?

A You showed me a list that had everything allocated as percentage. And I looked to how many dollars I was going to be putting into the transaction. And it was on that list. So the answer would be, yes, it referenced it on the list.

Q And remember it said not at risk. Do you recall that?

A I do recall that. Yes.

Q And 2 percent of a $50 million loss transaction is $1 million, correct?

A That's correct.

Q So you had already made a contribution of the -- you and Mr. Boyd, of the $1 million. But to your knowledge, had -- up to 12/6, had that money been invested in any securities?

A You would have to look at the dates and timing for when that happened. But, you know, if you look at that note as to, you know, the Bank of



New York and Bank of America and First Union activity that will give you a better indication as to what the timing was for investments. I don't have specific recollection. Sorry.

Q You did discuss, however, with Mr. Boyd, making conservative investments, did you not?

A I suggested the bank stocks in particular. It wasn't just a matter of being conservative. But that they were probably a very good investment because they were appreciating very rapidly. And I felt that the banks would do well.

Q If you recall at your deposition, you --

A Yeah.

Q -- I believe said that Mr. Boyd asked you what would be some conservative securities. And you suggested bank stocks, correct?

A I did. I did, yeah. I thought they would be positive investments and would be conservative. We certainly wouldn't be losing money on it.

Q Let me ask that you be provided what's been marked as Exhibit 2361.

(Government's Exhibit Number 2361 was marked for identification.)



BY MR. DONOHUE:

Q Mr. Zucker, Exhibit 2361 is a table of the partnership's, JBJZ Partners, purchase of four securities, three bank stocks and a Gateway Fund. It contains information regarding the number of shares, the purchase and the purchase date.

A Yeah.

Q Do you notice that the securities were purchased on December 7th? Do you notice that?

A I see December 7th and the 22nd, yes.

Q Do you know that the securities were sold on December 14th?

A For three of the securities. And the 23rd for the fourth, yes.

Q So, in other words, your investment in securities for the 2 percent that you required to contribute, that was made in respect to three bank stocks as well as something called the Gateway Fund. Do you see that?

A I don't know that the percentage calculation is precisely correct, but it shows the investment activity in those securities.

Q Take a look at Exhibit 1019. And I'll ask that you be handed that.

A Okay.