Q This is something that you saw in your direct examination.
A Yes.
Q Do you recall in your direct examination you mentioned that this is a handwritten note by Mr. Boyd.
A Yeah.
Q Am I correct?
A Yeah. This is his writing, yes.
Q And do you see the date of this note?
A It says -- this appears to be the 7th of 1999 -- December 7th of 1999.
Q And you'll notice that he's referring to some bank stocks. Do you see that?
A I do.
Q Did you advise Mr. Boyd to invest in these bank stocks?
A He -- he asked me about the -- where we should invest. So we did have these discussions, yes.
Q And turn back to Exhibit 2361, the table.
A Turn back to 2361? Okay. All right.
Q And you'll notice, as I said before, that the purchase dates for the three bank stocks



was 12/7. Do you know what the settlement date would be for those purchases?
A They're generally five days, you know. It's normally five days differences in settlement dates and in general for trading. I don't know what -- the particulars as it relates to Alex Brown. But, you know, that's typically five days settlement.
And the date that they -- the sale date that's reflected here is the 14th and the 23rd of December for the four different securities.
Q Wasn't the purchase of these bank stocks -- wasn't the purchase of these bank stocks for purposes of providing you with a business purpose for the partnership?
A For the purpose of providing -- not for the purpose of. I mean, it was one of the structural attributes for the proprietary structure that they had come up with. But it's true for, you know, all businesses. You look for diversification. And you look for distribution of risks. All the fundamentals apply to any -- any -- any corporate or partnership structures and sharing common interests and so forth.
There's a lot of standard business



purposes for any structure. So if you're trying to narrow it down to that being a sole purpose, it certainly wasn't a sole purpose.
MR. DONOHUE: Your Honor, we are at the end of the tape.
THE COURT: Okay. Thankfully. We can take a break. We don't have the stamina that you have, Mr. Zucker.
THE WITNESS: Thank you.
THE COURT: Let's take a break. We'll be back at quarter to 6:00. The court is in recess.
(Whereupon, a recess was taken between 5:39 p.m. and 5:52 p.m.)
THE COURT: Mr. Donohue, please continue.
BY MR. DONOHUE:
Q Thank you, Your Honor.
Mr. Zucker, let's go back to 2361. That is a table of the investment activity within the partnership.
A Yes.
Q And going to the fourth item -- we've discussed the first three, which are the bank stocks. Go to the fourth item. Notice that it



refers to the purchase of a Gateway Fund on December 22nd.
A Yes.
Q And then the sale the following day of that fund on December 23rd. Do you know why that fund was purchased on the 22nd of December?
A I can't tell you why specifically that day. It was just general investment activity which was part of the overall, you know, strategy that was laid out by EY in terms of the diversification of the funds. And it was another trade, and they locked in on, you know, $500 profit on it.
Q What is the Gateway Fund?
A It's -- I can't tell you specifically what they were investing in at the time. But it's a -- a compendium fund where they make multiple investments in various securities themselves. So by investing in them, you're actually investing in multiple securities.
Q I'm a little confused. You said I can't tell you specifically what they were investing --
A Right. Well, the Gateway Fund is fund of funds, yes. I'm sorry.
Q You have to wait until I finish my

question.

A I'm sorry

Q My question is: When you say they, are you referring -- my understanding --

A Gateway.

Q -- is that the partnership was making this investment, correct?

A Right. But I'm talking about Gateway

Q Okay

A It was an investment in Gateway, which is an equity security. And the Gateway Fund is a fund in itself It has -- makes multiple investments in a variety of other securities.

So by making an investment in them, it's like a mutual. You make an investment in a mutual, it's not just the mutual company that you're investing in. You're investing in all the portfolio -- items they have in their own portfolio.

Q I'm going to ask that you be handed what's been marked as Government Exhibit 2367.

A Yes

(Government's Exhibit Number 2367 was marked for identification.)

THE WITNESS: Yes.



BY MR. DONOHUE:

Q Now, on the -- 2367 is another E-mail by Mr Coplan that's dated 12/22/1999 at 1:05 p.m And if you turn to the next page, it's sent to a list of E&Y people including Mr. Knight.

And if you'll notice, he points out in the subject line: Matters related to windup of COBRA transactions.

And he points out that, in the third paragraph: By tomorrow, David Parse will have completed the process of liquidating all of the trading accounts in the partnerships and use the proceeds to acquire foreign currency (Canadian dollars because of its volatility and ability to be converted within one day) except in those partnerships that are oriented toward capital loss

Now, am I correct that your partnership did purchase Canadian currency, correct?

A We did.

Q Now, turn to the next page and take a look at the second full paragraph on that page. And it points out that Melinda Merk has left an urgent EYComm for those of you who are the primary representatives for clients with a COBRA



transaction in order to obtain one final verification of the transactions for Deutsche Bank.

In a voice mail -- in the voice mail, Melinda will indicate our understanding as to whether your clients is/are in an ordinary or capital loss partnership or both

If capital, she will indicate which asset is expected to be distributed out of the S Corporation and sold. In a few instances, the Gateway Fund will be purchased as a capital asset because it can be cash settled in one day.

Do you see that?

A I do.

Q Now, let me ask you, do you recall if the reason that your partnership purchased the Gateway Fund is because it was considering to use the Gateway Fund as the capital asset for purposes of triggering the capital loss. Do you recall if that's true?

A I -- I don't recall it. And, you know, you were showing me a lot of, you know, commonalities and things that were apparently shared internally in EY.

But, no, that wasn't a subject of



specific discussion. But it was certainly part of an overall, you know, proprietary structure that EY had. And, you know, perhaps they had shared some communications on that subject.

But I -- I'm not -- I wasn't privy of it other than the fact that I was aware of the fact that, you know, Gateway Fund is a fund of funds. The fact that they had a -- you know, a one-day settlement period, I wouldn't have been aware of that, frankly.

Q Now, your partnership, JBJZ Partners, it had both purchased Canadian currency and, if you recall, ultimately, there was distributed into the partnership 5,000 shares of Cisco stock. Do you recall that?

A That's correct.

Q Now, that was, am I correct, the capital asset that was supposed to trigger both the long-term and the short-term capital losses, correct?

A I don't know if that was in the structure. I knew that part of the structure involved, you know, having a variety of diversified funds in -- in the company and the fact that we made investments and trades to -- to,

you know, conduct an ordinary business purpose for the structure.

But there was, in addition, you know, direction provided by EY as to -- as to what the necessary sequence was to fit within their proprietary structure to -- to beyond just business purpose to have structural purpose to maximize my retention of capital.

So this was obviously part of their directed structure.

Q Mr. Zucker, do you recall that, in fact, that 5,000 shares of Cisco stock, even though it was supposed to have been contributed to the partnership, had been mistakenly contributed to the Subchapter S Corporation?

A Yeah.

Q Do you recall that?

A I recall that and then it being transferred back to the partnership and then being effectively recontributed to correct that error.

That's correct.

Q And I'm going to ask that you be provided with Government Exhibit 1073.

(Government's Exhibit Number 1073 was marked for identification.)



THE WITNESS: Yes.

EVENING SESSION (6:00 p.m.)

BY MR. DONOHUE:

Q Now, this is -- Government Exhibit 1073 is a document which is entitled JBJZ Investors, Inc. Now, am I correct, that was your Subchapter S Corporation, correct?

A That's correct.

Q And if you'll notice here, you're pointing out that this letter constitutes your authorization to address to Mr. Parse to transfer both the 500 shares of Cisco stock and, in the second paragraph, the 4,500 shares of Cisco stock to the account of --

A Well, back to the partners, yes.

Q The account of JBJZ Partners, correct?

A That's correct.

Q So it should have been initially transferred to JBJZ Partners, but, through a mistake, it got transferred to the Subchapter S Corporation. And now on the 22nd you were transferring it back, am I correct?

A Right. We were correcting the error. That's correct.

Q Now, did anyone discuss with you the



potential tax consequences of that error?

A No.

Q Well, the reason I'm asking is because was there any discussion that there could be a trigger of tax as a result of the transfer back to the partnership; and, in order to avoid that, we could purchase and use the Gateway Fund as our capital asset to trigger our capital losses? Was there any discussion of that?

A None with me.

Q Do you have any other explanation as to why the Gateway Fund was purchased on December 22nd but the very next day sold on December 23rd?

A Other than locking in a $500 gain, not -- no.

Q You had mentioned, Mr. Zucker, that one of the business purposes of the partnership was diversification. What do you mean by that?

A The partnership itself?

Q The partnership.

A Combining the interests of independent units. You get individuals to focus on common interests. It provided an ability of forum to consolidate a variety of elements of investment



from -- from -- including, of course, the options being contributed. And it was part of the overall structure that EY had recommended to us as being the most tax efficient.

So, frankly, I routinely rely on professional advice as to what I do and how it should be structured. I wish I were consistently so brilliant as to not need advice.

Q But getting back to this concept of diversification, you had a dollar/yen option and a euro/dollar option -- set of options, correct?

A Right. Yes.

Q And Mr. Boyd had also euro/dollar options, correct?

A Right. But it diversified Jim Boyd's -- he was my partner. It helped diversify Jim Boyd as well, not just me. I would be rather selfish to only look for myself.

Q So you had 90 percent of the transaction. How were you going to be diversified by picking up the same euro/dollar options that you already had in your partnership?

A Well, as to that particular element of the partnership, it didn't do anything for me. It did for Jim. It helped diversify him in terms of

the partnership element.

But the fact is that I was already aware of the fact that we were going to contribute, you know, other assets to the overall diversification including the, you know, Cisco stock, as well as, you know, additional capital. And we were going to do other trades.

So there was -- you know, overall directionally, you know, all of the corporate entities have, you know, you can easily go through all of the standard business reasons that you set up a corporation. This was going to be all the standard reasons but also the opportunity to end up in a proprietary structure that allowed me to have some tax benefit as well. So I looked at it, you know, based on best advice.

Q And you knew that the life of this partnership was approximately a little over 30 days, correct?

A Well, at this point in time, yes.

Q So this is a partnership which you were investing in sometime near the end of November. And the partnership was going to go out of existence near the end of December, correct?

A That's correct.



Q What was the business purpose for the Subchapter S entity?

A There's always the underlying business purpose of keeping as much money as you can. When you're making money, you want to certainly hold as much so. Obviously retention of capital, maximizing retention. You know, I'm always getting advice as to how to best structure to be within compliance of all the regulations, but minimize tax costs. So.

And, of course, I'd already known as part of the overall structure that -- and I understood that there would be a liquidation of the partnership when it hit the Sub S, that I would be able to lock in the basis.

Because I had already been explained -- and I don't want to keep being redundant, but the real estate example that if there was an unmatured -- it was a liability to not get matured, that it wouldn't be included in the basis. And that was part of the means of creating the revenue offset. So it was, you know, part of their proprietary structure.

Q So is what you're saying --

A Over and above the business



Q So -- well, you're saying over and above the business. But is what you're saying is that the reason that you formed the Subchapter S entity was you were taking the advice of E&Y in terms --

A That's certainly --

Q You have to wait until I finish my question.

You were -- now, see, you've made me lose my train of thought.

A Do you want me to give you the other business purposes?

Q No. Not yet.

I believe I was asking you, Mr. Zucker, that, am I correct that the reason you formed the Subchapter S entity was because you were taking the advice of E&Y in terms of how to maximize actually the tax benefits on the transaction?

A Well, it's certainly one of the range of things. But any time you go from a partnership to any kind of a corporate entity, in contributing to the S Corp, you create a liability shield from going from the partnership forum to the -- to the Sub S forum.

So, clearly, by going to a corporate forum, I was providing additional liability



protection as it related to me personally. I was -- outside of the partnership.

So, you know, you can -- you can kind of go through and show the various business purposes. But as well, you know, clearly, the fact that it was part of the proprietary structure that would provide the -- the revenue offset. And that certainly was a -- a factor.

Q Let me explore this liability shield purpose. Now, am I correct that, once the partnership was terminated, the Cisco stock in the Canadian currency was distributed to the S Corporation. Am I correct?

A That's correct.

Q And am I also correct that, prior to the end of the year, that is, prior to December 31st, 1999, both of those assets were sold by the Subchapter S Corporation; is that correct?

A I believe so. They were all liquidated.

Q And those were the assets of the Subchapter S Corporation, correct?

A That's correct.

Q Where do you see a need for holding for a few days Canadian currency in Cisco stock of a need for a liability shield?

A Well. you don't. I'm just saying. in general -- you know. if you -- limited to those specific facts only. then. you know. there wouldn't be a need for any corporate entities ever

But I'm saying. in general. my business purpose in having corporate entities is to preclude me from having personal liability in any relationship. you know. whether it's the simplest. you know. personal liability issues of trip and falls to whether it is a corporate misunderstanding that you don't anticipate and it -- and it arises that -- where you would not plan on it. Having the corporate form in general is very protective and provides a shielding

The fact that it also has. you know. substantial positive purpose in terms of structuring. you could ask the same question of every major corporation in the United States why they set up the various overseas structures to minimize their taxes

There's certainly no regulation that says that you should structure it in such a way as to maximize your taxes. Could I have set it up to. you know -- certainly. you know. tax



considerations and retention of capital is always a business consideration.

Q Mr. Zucker. let's turn to a different subject. I'm going to ask that you be handed what's been marked as Exhibit 1022.

(Government's Exhibit Number 1022 was marked for identification.)

BY MR DONOHUE:

Q Mr Zucker, Exhibit 1022 is an opinion from Jenkens & Gilchrist addressed to you. and it's dated January 31st. 2000. Did you receive this opinion on or about January 31st?

A I can't tell you that particular date. I know I got it in the first quarter because we -- we had both opinions before we filed our taxes.

Q Did you read this opinion before you filed your personal tax return and before the partnership in Subchapter S tax returns were filed for the transaction?

A I do as I would normally do documents. I skimmed through it And I preponderantly rely on the professionals to make sure that all of the legalese and preciseness is appropriate. But. yes. I did skim through it and read through it

Q And when you say skim through it. how



much time did you take in reading this opinion. approximately?

A I can't tell you. I mean. I would just be guessing. You know. various documents -- I get so many documents through my office. I can't tell you specifically how much time I spent on it.

But. in general, if you're in my office. you'll see that I'm very reliant on professionals to fill it in. I guess no different than you. I'm sure. when you file your own personal taxes. that you rely on all the experts to fill in all the blanks.

THE COURT: Do you want to answer that question?

MR DONOHUE: Don't turn the tables.

THE WITNESS: I mean. that's just -- that's just the nature of how we all are. It's just the nature of how we all operate. We're not experts in all fields.

BY MR DONOHUE:

Q Did you consider Jenkens & Gilchrist to be an independent law firm rendering an independent legal opinion on the transaction?

A I didn't really form an opinion one way or another So we had two opinions and then Barry



had told me that. really. only one was necessary. So the fact that there was a Brown & Wood opinion that clearly was independent I -- I had no -- it didn't -- didn't cross my mind to think about any potentials for conflict.

I wasn't aware of all the things that you had subsequently alleged to me that they were involved with. I wasn't -- other than the fact that they had processed a bunch of documents. I wasn't aware that. as you've indicated. that they were somehow involved in forming the concept and structure with Ernst & Young. I didn't have any knowledge of that.

Q But you were aware. were you not. that their fee for the transaction was based on a percentage of your tax loss?

A Yeah I mean. most of the transactions I deal with on a large scale with Wall Street. including the legal firms up there. are based on percentages. I wished they were based purely on time I would be generally much better off.

They frequently size transactions based on percentages: In general Lehman formulas. if I'm dealing with investment firms. or some similar index when I'm dealing with a large attorney --

legal firms that are up in New York.
It's almost irrelevant. They have pretty much standard cut-and-paste agreements for closings; but, yet, they charge me based on the percentage of the size of the transaction. That's just something I've lived to accept, not that I like it.
Q Are you talking about investment firms like Lehman Brothers?
A Well, not specifically. I'm saying Lehman formula. But in terms of, for example, Goldman Sachs or any of the large investment firms. It just happened that Lehman historically had been -- the banks, if I did a deal with JP Morgan or did one with Bank of America Securities or their investment banking arm, almost invariably, the charges would be based as percentages.
And the legal fees, much to my chagrin, don't relate to specifically hours even though they try to sometimes after the fact rationalize it based on all the time and effort they put into it.
But they're cut-and-paste documents that they've used for many other transactions; but,



yet, I get charged these astronomic fees based on the size the transaction I've done, whether it's a merger or acquisition. It's just --
Q And did you -- did you consider that analogous to Jenkens & Gilchrist charging you a fee based on a percentage of your desired tax loss?
A I did not think in the terms that you're currently framing right now. But the magnitude of the fees, you know, was all contemplated by how much I was going to be investing from the getgo.
So certainly I'm not surprised by the magnitude. The fact that they're tied to percentages and all really wasn't relevant to me.
Q You mentioned that you received two legal opinions. Is the second legal opinion received from the law firm of what was then known as Brown & Wood?
A Right.
Q I'm going to ask that you be given what's been marked as Exhibit 1028.
(Government's Exhibit Number 1028 was marked for identification.)
BY MR. DONOHUE:
Q Mr. Zucker, did you want to stop to --



A It will just take a moment here. I just wanted to heat this up. I'm sorry for the noise.
Okay.
Q Exhibit 1028, you'll notice, is a document which is from Brown & Wood.
A Yes.
Q At least it has their name and address at the top left. It refers to representations. And if you look at the second page, there is a place for a signature space and under it your name. Do you see that?
A I see it.
Q This appears to be a document in which there are a number of representations, eight paragraphs of them, that appear to have -- to be sent to Brown & Wood. Did you ever sign a representation letter to Brown & Wood making these representations?
A I don't believe I signed representation letters to anybody, no. And, also, if representations were made, it was done by Ernst & Young on our behalf, but not by us.
Q Let's --
A And not by me.
Q I'm sorry. Let's look at what's been



marked as Government Exhibit 2377.
A Is this a different document?
Q A different document which you will be handed.
(Government's Exhibit Number 2377 was marked for identification.)
BY MR. DONOHUE:
Q Mr. Zucker, this is an E-mail by Mr. Coplan to a number of E&Y people. And it refers to, subject: Brown & Wood items missing for COBRA opinions.
And it states: As of 3/22/2000, the following clients had not executed and sent in to Susan Sodano at Brown & Wood either rep letters or engagement letters and will not be receiving opinion letters until they do. See what you can do to get both of these items signed and returned by the clients so we can wrap this up.
And I notice that you and Mr. Boyd's names are not on that list. Can this possibly refresh your recollection that you did, in fact, sign these representation letters to and sent them off to Brown & Wood?
A No. I have absolutely no recollection of any representation letters other than the

reference to -- in the original thing that I
received on the 11th, if you remember, the
November 11th communication where I asked the
question mark, what information are they asking of
us? Do you remember that question?
Other than that coming up on that
occasion and being -- being told that it was
nothing more than telling -- saying that, you
know, that the securities were -- had been held
for over, you know, a year and -- and the
formation of the corporations which was being
handled for me, that I had no concern.
And, no, I don't recall ever signing any
kind of a representation document.
Q So you're saying you have absolutely no
recollection. But is it possible that you signed
it and just don't recall now?
A It's highly unlikely. You know,
although my mental capacity is diminishing, I
still have a reasonably good mental acumen and
recall. I have no recollection, and I do not
believe that that ever happened.
Q I'm going to ask that you be given
what's been marked as Government Exhibit 1023.
(Government's Exhibit Number 1023 was



marked for identification.)
BY MR. DONOHUE:
Q Mr. Zucker, this is a Brown & Wood legal
opinion addressed to you dated March 9th, 2000.
A Yes.
Q Is this the Brown & Wood legal opinion
that you received?
A I have to make certain presumptions. It
appears to be. I would have to read every word
and make potential comparisons. But I believe
it's the same, yes.
Q Well, if you read every word, would you
still be able to make such a comparison?
A It appears to be describing all the
details of the transaction. And if -- it appears
to be a form in substance for what they sent us.
You know, we did, in fact, have both opinions
prior to filing our taxes so it would have been,
you know, before the end of the first quarter.
Q That opinion is dated March 9th, 2000.
A Right.
Q Is it your testimony here that you
received that testimony sometime in March of --
A My original recollection was that I had
gotten it actually in May. But I know that that's



for sure not because I know that Barry had -- had
made a comment to me just in reflecting about the
fact that we couldn't file until we had the
opinions.
So, you know, so to the extent that my
original recollection was that it was later, it
was first quarter or later, it is my clear
recollection that Barry had made a comment about
us having to have the opinions in form prior to
filing our taxes. And since the taxes were filed
timely, it had to be in that period that preceded.
Q And when did Mr. Emerson make this
comment to you?
A It was at or around the -- the -- that
period of time. I can't tell you exactly the
date. But it was -- it was sometime in the end of
the first quarter.
Q When Mr. Emerson made this comment to
you?
A I can't recall the specifics of the
timing. But I'm saying it was in or around that
period of time in the first quarter. I can't tell
you exactly what day or, you know, relative to,
you know, the end of the month what it was.
Q Then I'm a little confused. I think --



A I know it says March 9th, and you're
trying to tie it back to March 9th. But I can't
tell you from actual memory. You know, if you
want me just to simply say what is obvious from
the numbers, you know, I can do that. But I want
to speak with integrity. I can't specifically
remember the date. Now, I can --
Q That's not what I'm confused about,
Mr. Zucker.
A Yes.
Q What I'm confused about, I thought you
said your original recollection was that you
received the opinion sometime in May of 2000.
However, you also said that Mr. Emerson refreshed
your recollection that you received the opinion
before you filed the tax return.
And I asked you: When did Mr. Emerson
refresh your recollection? And you said sometime
in the first quarter.
A No no. Then I answered incorrectly.
Just on -- I'm apparently losing it.
If you recall in the original
deposition -- I know that Your Honor was this the
there -- but the original deposition, you asked me
my best recollections. And I said it was either

the first quarter or it may have been as late as May. I couldn't lock into it.

And, you know, since, you know, that period of time, I've now reflected on, you know, when was it that -- that the note to Barry took place. And it gave me kind of a refreshment as to, you know, what was the time zone.

I remember that, as I answered to you previously in the prior deposition, that I recalled writing a note to Barry, and it was sometime in January.

Well, then, when I actually saw, you know, what it was written on and the draft form of it all, it -- it brought back, you know, recollections.

So, you know, I'm letting you know I also had conversation, which I today can specifically recall, where Barry had raised the point that, you know, you don't want to file until you actually have the -- you have to have the opinions in hand.

Q And --

A So it just -- these things happen when you -- all these subjects get brought up. And you do -- even though you've been throwing a lot of



documents that I've never seen, you know, previously, these things at EY and all, the fact that you show me some documents refreshes memories as it relates to the events of the time.

Q So just so I understand what you're saying, are you saying that the note that was on the document that you -- that you wrote to Mr. Emerson, that when you read that note, that refreshed your recollection regarding the fact that you must have received this opinion sometime prior to filing the tax returns?

A I'm not saying. I'm saying that all these things in the aggregate. I can't tell you which singular event, but all these things in the aggregate as to when did the opinions come in and when did you write the note to -- that I recall as a result of all those questions and all the various documents that have been placed in front of me that -- and I can't tell you which specific document triggers what in my mind, but that I recall, as a result of these things, that Barry had asked that -- you know, had made the comment about the need for the opinions to be in hand. And that it was post -- that comment was post my having sent him that note which was sometime in



January

Q So getting back to your original recollection, you mentioned at the deposition your original recollection was that you may have received this opinion actually as late as May.

And then you're saying, since your deposition, if I understand your testimony, you're saying your memory has been now refreshed by an aggregate of matters. And you are saying that, with your memory refreshed, you know you must have received this opinion sometime prior to the filing of the tax returns.

A No. I'm certain of the fact that it was prior to the tax return filing because I do specifically recall a comment from Barry, which was not a question you had asked me before. And all of these things have, in combination, refreshed my memory.

Q I'm going to ask that you be given what's been marked as Exhibit 1090.

A Yes.

(Government's Exhibit Number 1090 was marked for identification.)

BY MR. DONOHUE:

Q Mr. Zucker, Exhibit 1090 is an Ernst &



Young fax. It's dated 5/17, May 17th, 2000. And it's to Charlotte Crosby.

Now, am I correct Ms. Crosby worked for you, correct?

A Yes.

Q And it's from Ken Hughes. And who was Mr. Hughes?

A Kenny Hughes worked for the tax department in Ernst & Young.

Q I notice it's dated May 17. But if you turn the page, it refers to a letter dated March 31st from Mr. Knight. And it states: Enclosed is a copy of the Brown & Wood tax opinion along with copies of all documents executed.

A Right.

Q Do you know why Ernst & Young was sending you in May a document --

A Sending to Charlotte, not to me.

Q Well, sending to Charlotte, a -- a document which is a cover letter for a Brown & Wood tax opinion dated March 31st. Do you know why they were doing that?

A Other than, perhaps, just completing Charlotte's file. But, you know, I know that prior to the filing on the -- on the, you know,

15th or approximate date. that date. because we filed it timely. that Barry had both opinions in hand

Q Take a look at the next page of the fax There is -- at the bottom of that page. there is what appears to be a signature It appears to be your signature. Is that your signature?

A Bottom of which page?

Q The next page.

A Are you talking about on the authorization to --

Q Yes.

A -- to transfer 60.000?

Q Yes.

A That is my signature.

Q And is that your initials over the 60.000?

A It is.

Q And you'll notice this is dated March 28th.

A Yes.

Q Do you see that?

A I do.

Q Do you know when that transfer of funds of $60.000 took place?



A It would have been some date subsequent to the date. But. no. I don't know.

Q You'll notice that it's being transferred to a bank on behalf of Brown & Wood. Citibank. Do you see that?

A Yes

Q And was that your fee. that $60.000. for the Brown & Wood legal opinion?

A I have to presume that it was. There is a fee letter that's attached. you know, one page further. So yes.

Q Now I'm going ask that you be handed what's been marked as Exhibit 2382.

(Government's Exhibit Number 2382 was marked for identification )

THE WITNESS: Yes.

BY MR. DONOHUE:

Q I'll be with you in one second. Mr. Zucker.

Turn to -- turn to Bates stamp number --

A You don't want to ask me about all the trading activity?

Q No. Bates stamp number. it's on the top left. 4970.

A 4970. Okay.



Q Refers to a wire of funds on that page under debits to your account Do you see that?

A Wired funds sent. yes.

Q And you notice that's the account of JBJZ Investors. Inc. Do you see that?

A Yes

Q And notice the date that funds were wired in the amount of $60.000 to the Brown & Wood account.

A I see it.

Q Do you notice what date that is?

A Yeah. It says 05/24.

Q 5/24. That's May 24th. correct. of 2000?

A Assuming that that's the correct date. yes

Q Now. let's go back to Exhibit 1017.

A Okay Can I ask you -- okay. I'm sorry. 1017. I'm sorry.

Q Yes.

A 1017 is -- is this something you're going to hand me or something that I have?

Q You have in front of you.

MR LINDQUIST: No. no It hasn't been used.



BY MR. DONOHUE:

Q Now I'm going to hand it to you.

(Government's Exhibit Number 1017 was marked for identification.)

BY MR DONOHUE:

Q Do you notice that this letter is dated May 18th?

A Right.

Q And it's signed by Ms. Crosby as an assistant to you. Do you recognize Ms. Crosby's signature?

A I do.

Q And you'll notice that she points out that she's enclosing a letter authorizing the wire transfer from the escrow account to Brown & Wood in the amount of $60.000 --

A Right.

Q -- which has been executed by Mr. Zucker. Do you see that?

A I do see it.

Q So if you turn the page. what you see is that same authorization for a wire transfer to Brown & Wood in the amount of $60.000. Do you see that?

A I do.

Q Now, Mr. Zucker, I'm going to ask you: Does this refresh your recollection that, in fact, you didn't pay the fee to Brown & Wood until May of 2000; and, as a consequence, you didn't receive that opinion -- even though it has an earlier date, you didn't receive that opinion until May of 2000?

A Absolutely not. You know, as you know from looking at the other records as well, there were many payments that were made, you know, later than the transaction.

And I, frankly, even if it relates to -- if I was doing business with Kirkland Ellis or other attorneys, it's frequent that I don't pay them, you know, immediately coincident with the work effort.

You know, I -- even the current situation, the current case, you know, I don't pay it instantaneously and currently. You know, he gets paid in time. I can't tell you why it's getting paid at a later date, but that had nothing to do with the work product.

Q And it's your testimony that Brown & Wood was going to release this legal opinion to you without first being paid?



A Oh, I can tell you for sure that I had it received and that Barry had it before we filed our taxes. So as to whether -- what date they got paid, you know, it's -- it's -- I guess I got the use of the earnings for a few extra days. But there was no relationship between their work and the payment date.

Q You say you can tell me for sure. But I believe you also said that your recollection two weeks ago was that you could have received it in May. Am I correct?

A No. Well, we talked about it being either first quarter or it could have been as late as May that I had read through it. You're asking me about when I read the deposition. And my -- clearly, with all these other factors in my mind, I have specific recollection of Barry making a comment as to the fact that we need to have the opinions in hand.

Q Did anyone speak to you between your deposition and now saying you certainly can't rely on a Brown & Wood legal opinion if you did not receive it prior to the filing of the tax return?

A No. No one has suggested that to me.

Q Let me ask that you look to what's been



marked as Exhibit 180.

A This is something that I will be receiving?

Q You will be receiving.

(Government's Exhibit Number 180 was marked for identification.)

BY MR. DONOHUE:

Q Mr. Zucker, Exhibit 180, if you recall, it was also shown to you at your deposition. It is a fax by Mr. Knight to Jenkens & Gilchrist. And it refers to -- it's dated 11/13/99. And it refers to information regarding three different sets of partners. And if you'll turn to the last page of the document.

A Yes.

Q You'll notice that it's entitled COBRA Client Information Questionnaire. And it refers to both you and your wife. And it has various information on it, including at the -- near the middle of the page the amount of the transaction. Do you see that? Do you see where it says amount of the transaction?

A Amount of transaction. I see a bunch of scratches and substitutions. But, yeah, I see those numbers, yeah.



Q And it refers there to the amount of this transaction is 45 million, which was your share of the $50 million loss transaction, correct?

A That's correct.

Q And notice that it also has a division between ordinary income and ST capital gain.

A Right.

Q Do you see that?

A Yeah. I -- no, I don't see the ST capital gain. But this is -- yeah, I do. I do now.

Q Now, take a look at the Social Security numbers. Is that your correct Social Security number?

A Where is the --

Q It's right above -- or right below E-mail address.

A You know, for the life of me I just can't -- I guess I can't focus.

Q Your Honor, may I approach?

A This is on this page right here?

Q Yes.

THE COURT: You see the amount in transaction?

THE WITNESS: I do

THE COURT: Right above that are the two social securities numbers

THE WITNESS: Oh, okay Yeah That's my 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, yes.

BY MR DONOHUE:

Q And that's your Social Security number, correct?

A That is.

Q And you provided --

A And that's my wife's beneath it.

Q Did you provide that personally to Mr. Knight or did you have someone provide it to him?

A I can't tell you specifically because they've done so many other K-1 forms and things. They could very well have had it on file already from just prior relationships. Although, they don't do my 1040. Barry does Certainly K-1s and things they would have processed.

But I do specifically have a recollection that I was asked during -- I know I can't tell you -- place the exact period of time. But I think it was Elaine Peterson that asked would it be okay for Ernst & Young to release



my -- and Jim Boyd's Social Security numbers

And it may have been released, meaning that they were planning on letting it go to somebody else rather than them needing it. I can't recall which.

Q I'm going to ask that you be given Exhibits 1018 and 2259.

(Government's Exhibit Number 2259 was marked for identification.)

THE WITNESS: Is this 1018?

BY MR. DONOHUE:

Q Yes.

A Okay

Q And you testified regarding this document in your direct examination.

A Yes.

Q And that is, am I correct, your handwriting on it?

A Yeah. It's the scroll along the top and the side, yeah.

Q And could you read us what that says.

A It says, Charlotte, several places for Jim, Jim Boyd to sign. I inadvertently signed as a guarantor on one of the forms for Jim. I already signed one of the guarantees. Please make



a copy set and retain. Please call Ray Knight at EY to find out where to send the executed agreements after the corrections and execution by Jim. And then it has a phone number. If you can't reach Ray, call Kenny Hughes. And it has a number.

And then on the left-hand side, it says: Jim also has a copy set with him in New York.

Q And you'll notice that, in this letter to you, there is enclosed, you'll notice, various forms. Do you see that?

A Yes, I do.

Q Now, I've asked that you be handed Exhibit 2259.

A I have it.

Q And one of the forms you'll notice is a SS-4 form for the partnership. Do you see that?

A I do. I've got it in front of me.

Q It's item 3 on 10/18

A Right.

Q And take a look at 2259

A I'm on 2259.

Q Do you see that?

A You're asking me to look at which item on this?



Q Look at row 7 --

A Line 7.

Q -- name of principal officer. Do you see that?

A I do. You had pointed this out in my prior deposition that the --

THE COURT: Let Mr. Donohue ask the question.

THE WITNESS: I'm sorry.

BY MR DONOHUE:

Q Take a look at the Social Security number next to your name. Is that the correct Social Security number?

A No. You had, at the other deposition, pointed out to me that the 3 and the 8 were reversed.

Q Trans- --

A I wouldn't -- I would never have noticed that.

Q Transposed?

A They're transposed, right. That the 8 and the 3 are transposed.

Q So your -- your Social Security number was sent correctly in the questionnaire to J&G, but the document that ultimately was filed with

the Internal Revenue Service, SS-4, did not have the correct Social Security number, correct?
A That's correct. The two numbers are transposed.
Q I'm going to ask that you be handed what's been marked as Exhibit 1011.
A Have you already handed this, or are you intending to?
Q No. It's going to be given to you.
A Yes.
(Government's Exhibit Number 1011 was marked for identification.)
Q Now, would you turn to Bates stamp Number 467. It's the last three letters -- or numbers.
A Yes. Uh-huh. 469. Let me get to 467.
Q Now, notice that this is an SS-4 for an application for an Employer Identification Number for JC Buckingham Investments, LLC. And Mr. Tucker, JC Buckingham Investments, LLC, am I correct, that was the subchapter -- I'm sorry, that was your single-member LLC, correct?
A That's correct.
Q And take a look at line 7 there.
A It has the same transposition.



Q And so your Social Security number on this document that was filed with the Internal Revenue Service is also wrong, correct?
A Yes. I mean it's transposed.
THE COURT: I see an 8A. It says disregarded entity. Sometimes I feel like I'm a disregarded entity myself.
THE WITNESS: Your Honor, thank you for your consideration today.
THE COURT: No. No problem.
THE WITNESS: Definitely not disregarded by me. Thank you.
THE COURT: I hope you made the right decision.
THE WITNESS: That's who I am. Well --
THE COURT: I'm sorry. Mr. Donohue.
THE WITNESS: I'm sorry. Go ahead.
BY MR. DONOHUE:
Q Turn to Bates stamp 490.
A This is within the same group?
Q Yes.
A I'm closely getting there. I'm closely getting there. 491. 490. Okay.
Q Now, this is an application for an Employer Identification Number for JBJZ Investors,



Inc. And that was your Subchapter S entity, correct?
A That's correct.
Q And if you'll turn to line 7, you'll notice once again that there is a Social Security number next to your name.
A It's the same transposition.
Q You can't cut me off, sir.
A I'm sorry.
Q Am I correct that that is also an incorrect Social Security number for you?
A The 3 an the 8 are transposed.
Q And you signed all of these forms; am I correct?
A I did. If you had not pointed it out to me previously, I would have never noticed these forms in front of me, no. Yes, you -- I'm aware of it, and I clearly see it.
Q Can you -- I'm going to ask that you be handed what's been marked as Exhibit 1001.
Now, you testified regarding this tax return in your direct examination. And this, am I correct, is the tax return which was filed for the year or for the period, rather, ending 12/31/1999 by your Subchapter S entity JBJZ Investors, Inc.;



am I correct?
A Yes.
Q Now, turn to Bates stamp number 1079.
A Yes.
Q Now, that is a Schedule K for the Subchapter S return. And you'll notice that there's a Social Security number which is above your name. Do you see that?
A That's certainly being very consistent transposed.
Q So that also is an incorrect Social Security number; am I correct?
A The 8 and the 3 are transposed.
Q Now, turn the page -- I'm sorry. Go back two pages to Bates stamp number 1077.
A Yes.
Q And that's the Schedule K for Mr. Boyd; am I correct?
A It is.
Q Now, notice the Social Security number for Mr. Boyd. Do you see that?
A Right.
Q Do you know if that's a correct Social Security number?
A I don't think it will be a correct

Social Security number for any human being. It doesn't have enough decimals in it -- enough places in it unless they have some odd code somewhere, you know, that's -- it's three followed by two followed by four.

Q So Mr. Boyd's Social Security number is missing a digit, correct?

A Yeah. Yeah. I don't know what his number is, but that definitely has a digit missing.

Q So your Social Security number had a transposition, and Mr. Boyd's Social Security number was missing a digit. Do you have any explanation as to how that happened on the same return?

A Not at all. I have no idea.

If you want me to complete the answer, I mean, other than the fact that human beings make mistakes. Just like I put 1998, and it clearly wasn't 1998.

Q Mr. Zucker, I'm going to ask that you be handed what's been marked as Exhibit 1100.

(Government's Exhibit Number 1100 was marked for identification.)

THE COURT: Do you want a break.



Mr. Zucker?

THE WITNESS: Well, I'm out of hot water. I still have a little bit in the cup here.

THE COURT: We can break for 10 minutes.

THE WITNESS: I don't want to -- it's already late. I don't want to get somebody else -- I appreciate the consideration. Thank you, Your Honor.

THE COURT REPORTER: Your Honor, may I have a restroom break in a little bit?

THE COURT: Let's take a break, then, and we'll come back at 5 minutes after. The Court is in recess.

(Whereupon, a recess was taken between 6:57 p.m. and 7:09 p.m.)

THE COURT: Mr. Donohue.

MR. DONOHUE: Thank you, Your Honor.

BY MR. DONOHUE:

Q We left off, Mr. Zucker, at Government Exhibit 1100. This is a handwritten note from Mr. Emerson. Have you seen this document before?

A No.

Q Do you -- it is -- I'm sorry, and I apologize for the poor copy. But can you read what it says?



A If you can help me through some of the words.

Q Do you know who --

A It's somebody's -- somebody's name.

Q Okay.

A If it is what you just said.

Q Okay.

A If it's a Sheila. Jim Boyd has a CPA whose name is Sheila. Jerry -- I don't know what it says. Jerry -- something -- can you read it to me.

Q Well, I can't read it either.

A Oh.

Q So isn't the next word after that near the end: To forward these to you?

A I -- I'm -- I can speculate a guess like you, but I can't read it.

Q It is my current understanding that these returns with --

A I would agree with those words, yeah.

Q Can you see: Will be prepared by E&Y's Charlotte's office. Ray Knight.

A That sounds likely, yes.

Q I'll let you know the minute I hear anything.



A Yeah. I would agree with those.

Q Was that your understanding that the returns for your transaction entities was to be prepared by Ernst & Young?

A Yes, it was.

Q Now, take a look at what's been marked as Government Exhibit 1001. And if you would, go to your binder, which is tab 16, which has it.

A Yes. Somebody has actually turned it to that, yes.

Q And take a look again at the first page of this. Am I correct that this is the return for JBJZ Investors, Inc., which was your Subchapter S entity, correct?

A Yes, it is.

Q And take a look at the bottom. That shows a preparer's signature of Ray Knight, correct?

A Yes.

Q Now, turn to Bates stamp number 1070, which is a Schedule D of the return.

A Yes.

Q And you'll notice that, in part 1, it makes reference to: See statement 2. Do you see that?

A See statement 2. Yes.

Q And then if you turn to Bates stamp Number 1074, you'll see statement 2. Do you see that at the bottom right-hand corner?

A I do. Yeah.

Q Now, am I correct that the references to the property that is on that page, the Cisco stock, is referring to both a short-term capital gain and losses and long-term capital gains and losses refer to the Cisco stock that you ultimately sold to generate the long and short-term capital losses? Am I correct?

A I would presume that's the case, yes.

Q Now, notice what, for both, it states under the column costs. Do you see that in?

A Yes.

Q Did -- in your case, am I correct that the bottom Cisco stock refers to -- referring to long-term capital gains and losses, that refers to your Cisco stock that you contributed. Am I correct?

A Well, let me see -- do you know what the number of shares are? I can't really look into any of these numbers. But, you know, I had 4500 shares of Cisco stock. So if that's the reference



to it, then that would be the case.

Q And notice the date acquired, 2/15/96.

A Yeah.

Q Do you see that?

A I owned the stock a long time. But I -- I can't confirm that particular date. But, yes.

Q Do you notice what it shows is the cost of that stock? Do you see that number?

A I can't -- is that an 18 or a 10?

Q That's an 518,654,451. Is that what it cost you to purchase that stock?

A Well, I don't know what the cost basis was that they calculated or allocated out of the -- out of the Sub S. But I can't tell you specifically what it cost without actually going back to my records to see what it costs. I have no idea.

Q Let's take a look at what has been marked as 1082.

A 1082.

Q Yes. And I'm going to ask that that be given to you.

A I actually have 1082 I believe. Is that the one that's ADMIN 001082? It's just a few pages further before my formal tab 17.



Q I'm referring to Government Exhibit 1082.

A Oh. Then apparently I don't have it then.

Q It's a separate document altogether.

A Okay. So I'll just wait for you to give it to me.

(Government's Exhibit Number 1082 was marked for identification.)

BY MR. DONOHUE:

Q Yes. You'll notice that Exhibit 1082 is a fax from Ms. Crosby to Amy Keating. Do you know who Amy Keating is?

A I don't.

Q But Ms. Crosby again worked for you, correct?

A She did.

Q And you'll notice, if you turn the page, that there is a typed memo from Ms. Crosby to Ms. Keating. And it has information regarding what was the cost for you and Mr. Boyd regarding the Cisco stock. Do you see that?

A Yeah. In the bottom -- kind of the bottom paragraph before a signature.

Q Right.



A Yes.

Q And do you notice that she has there that your cost for the Cisco stock was $57,000?  Do you see that?

A I do.

Q Does that sound about correct as to what your cost was for the Cisco stock?

A I honestly have no recollection. You know, if you looked at my normal trading accounts, I literally -- hundreds of trades generally a day. So I can't tell you if that's right or not.

Q But you have no reason at this point in time to believe --

A No.

Q -- that that --

A I have --

Q Let me finish my question. To believe that that number is incorrect?

A I have no reason to believe that it's incorrect.

Q Okay. Now, I'm going to ask that you be given the Government Exhibit 2037.

A Are you going to tell me who Amy Keating is just so I know?

Q Well, normally the process is that I ask

the questions

A Okay.

(Government's Exhibit Number 2037 was marked for identification.)

BY MR DONOHUE:

Q Mr Zucker, this is the document which is the instructions in 1999 for completing Schedule D And if you take a look on page 3 under specific instructions part 1 and 2 Do you see that?

A Yes. Instruction Schedule D First page?

Q No. On page 3.

THE COURT: Page 3.

THE WITNESS: Page 3. Okay I'm now to page 3

BY MR. DONOHUE:

Q Do you see under parts 1 and 2 where it refers to column E. Do you see that?

A Column E, yes.

Q And notice the first sentence. It says: Cost or other basis. In determining gain or loss, the basis of property is generally its costs And then I'm going to skip to the last --

A But it also says special rules for



determining basis are provided in sections of Subchapters K, CK, D and P, whatever those are.

Q Right.

A And that, basically, that the other rules apply.

Q And you can read as much of that as you want. But get down to the last sentence of that paragraph. And it says: Attach an explanation if you use a basis other than actual cash cost of the property

Do you see that?

A I see that that says that in the instructions, yes.

Q Now, take a look at -- go back to the return, which is marked as Government Exhibit 1001.

A Yes.

Q Do you know if anywhere in that return there is information regarding what your actual cost basis of the Cisco stock was?

A I have no idea. I mean, if you expect me to actually -- I didn't sign this return. I have no idea. I didn't review it up until the prior deposition where you showed me. But, you know, I would have to read every line item to see



what's in here and what's not. It's got a lot of papers attached. I don't know what that is.

Q Well --

A Fifty, 100 pages I'm not sure. More.

Q So your answer is you don't know if there's anything in this return that would disclose what your actual cost basis is. Am I correct?

A Am I looking at the wrong documents? But, no, I don't know

Q Okay. All right. Now, let me turn to another portion of this return.

A You know, I just realize that this -- another exhibit was attached to the 1001 that you gave me. And it's actually -- it appeared much thicker to me. But it's still -- it's a lesser amount than I thought I was referencing. But I still don't know without, you know, reading through it.

Q Now, turn to, in this return, Bates stamp number 1077

A 1077 Okay.

Q Do you notice that on the schedule K-1 for Mr. Boyd, he is being allocated the short -- the net short-term capital loss of -- loss of



$2,019,744. Do you see that?

A I do see the numbers.

Q And if you turn to Bates stamp number 1079

A Yes.

Q You'll notice in line E-2 --

A Yes.

Q -- that you're being allocated a net long-term capital loss. Do you see that?

A I do.

Q So Mr. Boyd was being allocated all of the net short-term capital loss. And you were being allocated all the net long-term loss; am I correct?

A That's what it appears on the schedule Yes.

Q And your ownership of JBJZ Investors, Inc., your Subchapter S entity, was 90 percent, correct?

A Yeah. We had a -- I have a 90 percent interest

Q And Mr. Boyd's was 10 percent?

A That's correct.

Q And yet he's being not allocated any portion of the long-term capital loss, and you're

not being allocated any portion of the net short-term capital loss. Do you know why that happened?

A No. I mean, I -- I rely on the professionals to actually make out the forms and all. And I assume that they know how to do it properly. So, no, I don't know. And I don't know what -- you know what special -- if I were to look back at all those special regulations and all that apply, I suspect that they applied what -- I have no idea.

Q Now, you, if you recall, paid a fee to Ernst & Young of $675,000. Do you recall that?

A Yes.

Q And that was in connection with this transaction, correct?

A That's correct.

Q Did you ever learn that that fee was included in your partnership basis which, in turn, carried over to the basis of your assets, the Cisco stock in the currency? Did you ever learn that that fee was capitalized?

A Not other than you telling me that that was the case at my prior deposition. But, no, I was not aware of that. And the only thing I do



specifically know is that I paid that out of my personal account directly to EY. And it wasn't paid through any of my -- any of those corporate entities. So it was -- it expected to be charged as an expense, personal expense to me for that year.

Q I'm going to ask that you be given what's been marked as Exhibit 10 -- 1005.

A It's not part of what I have?

Q No. You don't have it yet.

A Okay.

Q Now, Mr. Zucker, this is your joint 1999 1040 return?

A Yes.

Q And am I correct that it was on this return that you reported the losses from the COBRA transaction?

A Well, Barry, you know, basically consolidated the report for the year. So I would assume that the entire -- the transaction would have been reflected in this return.

Q Now, take a look at Bates stamp Number 1295.

A Yes.

Q And do you notice there is a



signature --

MR. CROUCH: Sorry, counsel, what page?

I'm sorry.

MR. DONOHUE: Bates stamp number 1295.

MR. CROUCH: 1295. Thank you.

BY MR. DONOHUE:

Q You'll notice that there is a signature at the bottom of that page. Is that your signature?

A It's mine as well as my wife.

Q Now, turn the next page to 1296.

A Yes.

Q And you'll notice under Schedule A where there is, at the bottom, a reference to in -- on line 22, other expenses. Do you see that?

A Yeah. Where it's -- it references see statement 9.

Q See statement 9. Do you see that?

A I do.

Q And if you turn to Bates stamp number 1335, there is a reference to the miscellaneous deduction subject to floor on that page. Do you see that under Schedule A?

A I'm on 1335. And where should I look?

Q Take a look in the middle of the page



under Schedule A, miscellaneous deductions subject to floor. Do you see that?

A Yes.

Q And you'll notice that one of the deductions -- the fourth one down in the amount of $675,000 is your fee to Ernst & Young.

A Right.

Q Do you see that?

A Correct. And that's the one I mentioned to you that I personally funded out of my account from the house to pay them directly.

Q And that refers to your fee for the COBRA transaction, correct?

A Well, for all of the various tax advice which was -- and the services that they were to provide in a future basis. But, yes, that was the same 675,000 we've spoken of during the course of the day.

Q And did you ever become aware that you took a deduction for this $675,000 fee and that it was, in addition, it was capitalized into the basis of your Cisco stock and Canadian currency --

A Other than --

Q Let me finish my question. Did you ever become aware of that?

A Other than you informing me of that, and I believe it was an inadvertent error, no, I was not informed otherwise.

Q And the inadvertent error being the double deduction, correct?

A Well, I don't know. You are the one that reported it to me. I was not aware of it from any other source.

Q Can we go back to, for the moment, Exhibit 1001, which is your Subchapter S return.

A Okay.

Q Now, I notice that the Jenkens & Gilchrist fee, which was significantly larger than the Ernst & Young fee, you did not take a deduction for that fee on your personal 1040 return. Do you know where that fee is reflected on the transaction?

A I don't. I would presume that it would be capitalized as part of the basis. But I don't know

Q I'm going to ask that you be given what's been marked as Government Exhibit 2366.

(Government's Exhibit Number 2366 was marked for identification.)

BY MR. DONOHUE:



Q Mr. Zucker, Government Exhibit 2366 is a chain E-mail. And I'm going to ask that you turn to the last page of the E-mail.

A You said a chain E-mail?

Q Chain E-mail.

A Okay. I'm on the last page.

Q And turn to the last page.

A Yeah.

Q And, first of all, before you turn to that page, turn to the prior page at the bottom and note that the E-mail that I'm referring to is from Robert Coplan dated March 14th, 2000. Do you see that?

A I see the time indications and date indications. It says Jim Cox. And at the bottom it's got the Robert Coplan, yes.

Q Now, turn to the next page. And what you'll notice is the subject says further and close to final update on COBRA returns. And then take a look at the third paragraph where it says J&G fees capitalized. Do you see that? Mr. Zucker, do you see where I'm referring?

A I'm looking at the key services. J&G.

Q Fees capitalized. Do you see that paragraph?



THE COURT: It's in bold.

THE WITNESS: Therefore J&G fees will --

BY MR DONOHUE:

Q My only question is --

A I see the paragraph. It's got.

Q Okay.

A I just can't -- my eyes just aren't focusing on particular words. How many lines down where it says J&G fees capitalizes --

Q Your Honor, may I?

A I see the heading.

THE COURT: Please.

THE WITNESS: I do see the heading.

THE COURT: You have the bold?

THE WITNESS: That's the heading.

BY MR. DONOHUE:

Q Yeah.

A I was reading the paragraph trying to find out what you're doing.

Q No

A But it's actually the heading.

Q The heading.

A Okay.

Q What that says is this. It says: This is to further advise you that the returns reflect



a decision made late last week to capitalize the Jenkens & Gilchrist legal fees into the basis of the partnership interest which, in turn, gets included in the basis of the S Corporation out of which the payments were ultimately made.

We concluded there was reasonable support for taking this position in that the key services J&G rendered were the structuring of the partnership, the document preparation, and the formation of the entities.

The legal opinion was not the main reason for the payment of the fee since a separate tax opinion was being obtained from Brown & Wood.

Therefore, the J&G fees will produce an additional K-1 loss in the same manner as the E&Y fees.

The final S Corp returns and K-1s reflect this position. The significance of this is that the returns will not force the individuals to show the large payment to J&G is a miscellaneous itemized deduction which could be a flag on the 1040.

Do you see that?

A I see what you've read to me.

Q Did you ever have any discussions with

either Mr. Emerson or anyone at E&Y regarding the fact that the fees to pay to J&G would not be reflected on your personal return as an itemized deduction, but, rather would be capitalized in the basis?

A No. I had no discussion of that type at all with either.

Q Mr. Zucker, do you know when the fees that were paid to J&G were made?

A I mean, I can look to the documents and tell you I can't -- I can't specifically recall the dates. The one that I specifically do recall is Ernst & Young because I had paid that out of our home accounts and transferred -- cross-transferred our funding to pay that directly so that -- my view was so that it would be properly deductible in 1999. So I don't recall specifically when the others were funded.

Q Well, do you recall that the fee was paid by your Subchapter S Corporation?

A Yeah No, I remember signing the -- the wiring information But I just can't place the date as to when it was wired.

Q Well, were you aware that the fee was paid on December 29th of 1999?



A I don't have a specific in my own mind recollection of it being paid that particular day But I do know, you know, that it was paid and that I had authorized it.

Q And do you recall that your partnership was terminated on December 27th with the assets being distributed to the Subchapter S on that date? Do you recall that?

A I recall that it was at the very end of the year, yes. I just can't tell you that it was specifically that particular day. But, yes.

Q Were you aware that, in order to capitalize the Jenkens & Gilchrist fee into the partnership interest, it would have required a retroactive allocation back to a partnership which, in fact, had been terminated? Were you aware of that?

A No.

(Government's Exhibit Number 1005A was marked for identification.)

BY MR. DONOHUE:

Q Let me ask that you look at what's been marked as Exhibit 1005A.

A Something that I will be receiving or something I have.



Q You will be receiving. And so will I. No I won't.

MR. CROUCH: Counsel, if you want to make it easy, there's a copy of the same document under tab 18 of the notebook.

THE WITNESS: Okay. Okay

THE COURT: You wanted 1005A, though, right?

MR. DONOHUE: 1005A.

THE COURT: This is 1005.

MR. CROUCH: On tab 18, Your Honor

THE COURT: Oh, 18.

THE WITNESS: It's 1005A Okay.

BY MR DONOHUE:

Q Now, Mr. Zucker, this, am I correct, is a filed copy of a return for an application for a tentative refund of -- for you and your wife for 1999 Am I correct?

A Yeah That's -- that appears to be, yes

Q And it refers to, if you look at a -- the line 28, the decrease in tax of $5.6 million. Do you see that?

A I do

Q And if you'll look at line 11, you'll



notice that there is a reference to a $24 million net operating loss deduction. Do you see that?

A This -- on the same page?

Q Yes. Same page --

A Just tell me the line number again

Q -- of line 11.

A Yes

Q And are you aware that you are taking this deduction of $24 million? And do you know where it came from in carrying it back to 1997?

A Yeah. I can't tell you the specific calculations. I rely on the professionals to actually fill out the forms and to review them and depend on their competency. So I can't tell you the specifics as to how many dollars are appropriate for each slot.

Q Well, I -- do you recall that -- if we can go back to it -- we can -- that note you wrote to Mr. Emerson.

A Yes.

Q Do you recall in that note you said, Barry, familiarize yourself with this transaction. We will be preparing. Do you recall that note?

A Not will be. That we're -- you're talking about that we had had $45 million in

losses that had been created And I wanted to accelerate my refunds That's the note you're referring to?

Q Right. And by accelerating your refunds, you're referring to actually taking a part of your losses from the transaction and, in fact, carrying them back to an earlier tax year. That's what you're referring to, correct --

A No.

Q -- by refund?

A Earlier or prospective. I pay quarterly payments as well. So it would be generally applicable to my -- you know, I literally paid hundreds of millions of dollars in taxes to the government. So as to how we applied it and what year, you know, I left it to his discretion.

Q Take a look at -- and I'll ask that you be handed Exhibit 2355.

A 2355 Do I have it?

Q You don't have it yet.

A Oh, okay.

(Government's Exhibit Number 2355 was marked for identification.)

BY MR. DONOHUE:

Q Now, Exhibit 2355 is an E-mail by



Mr. Coplan on 11/4/1999. And he states: We've had this question before. And definitive answers are hard to come by from the procedural group. The best guess is that a large refund on an original return may well attract more scrutiny. But it is by no means clear that it triggers an audit.

Now, Mr. Zucker, you testified that you were certain that your returns would be audited. Do you recall that testimony?

A Barry had expressed that opinion to me. I felt that was fine. I've been audited before. You know, no issues. I always try to comply with regulations. And I, you know, have the professionals handle it for me. So I didn't have any problem with an audit. I had no reason to be concerned.

Q Well, that wasn't my question. My question was: Do you recall that you received this information that a large refund could trigger an audit? Do you recall that?

A Only the discussion that I had with Barry saying that, because of the magnitude of the deduction, that I could be pretty much certain that I would be audited. And I felt fine with



that

Q Now, this Exhibit 1005A, that is an application for a tentative refund. Am I correct that that's not your original 1999 return? Am I correct on that?

A I just -- I'm sorry Just get me back to the right document.

Q I went back to Exhibit 1005A. Do you see that?

A I see 1005 Is that the same --

THE COURT: Tab 18.

BY MR. DONOHUE:

Q Tab 18

A Oh, this is back to the tab. Okay. 1005A I see it

Q That's an application for tentative refund. But that's not your original return; am I correct?

A I can read it as well as you. It says Tentative Refund.

Q All right. Let me turn to a different subject, Mr. Zucker. You have mentioned a few times that, for you, this was a, I believe you used the word, win-win situation.

A That's correct



Q Where did you come up with these terms? And I've noticed in your deposition you used that, too Win-win, is that just something that came --

A I used that for --

Q Let me finish my question. Just ultimately something you yourself out of, I suppose, your diction or memory came up with?

A No. It's conventional. If you are talking about, especially in customer relationships and general sales, you want the customer to have a win. And the same thing with a vendor relationship, you want it to be win-win. Both parties need to make a profit, for example.

So you generally refer to that as a win-win when all concerned and for all reasons and purposes you -- you have success. We generally refer to it as, you know, between parties win-win that you reach a contract or an agreement.

As you know, I'm the -- also the governor and CEO of the Hudson's Bay Company. And we recently reached an agreement with General Electric. And I described it in that agreement that it was a win-win agreement. They would make more money. We would make more money So it's a term that I conventionally use

Q But -- okay. In -- with its reference to this transaction, when you say win-win, are you referring to win on the economics of the transaction --
A That's correct.
Q -- plus win on the tax side of the transaction?
A That's correct. That I could -- I could both make a profit and as well have a tax benefit.
Q And at the time you entered into this transaction, what was your predominant purpose for entering into it? Was it predominantly for the economics of the transaction or predominantly for the tax benefits of the transaction?
A When you're looking at hindsight, it's great. It was economic. But I had a wonderful tag-along that came with it. And I was, at the time of the discussion, I was convinced that I would call the currencies at least directionally correct and make a good chunk of money. And then have a real opportunity to potentially, more of a lottery, hit the sweet spot.
Q I ask that you be given what's been marked for identification as Government Exhibit 2368.



(Government's Exhibit Number 2368 was marked for identification.)
THE WITNESS: Is it something I have or --
BY MR. DONOHUE:
Q No.
A Okay.
Q You're going to be provided this exhibit.
Mr. Zucker, Government Exhibit 2368 is an E-mail from Melinda Merk of Ernst & Young, attaching a spreadsheet. And if you turn the page, you'll see a PowerPoint presentation. And what I'm going to ask you to do is turn to the very last two pages. Do you see that?
A I'm getting there.
Q It would be Bates stamp number 3766 and 3767.
A Okay. All right. I'm on 3766.
Q All right. Do you see that?
A What should I focus my attention to?
Q Okay. Now take a look at the top where it says ordinary loss. And it refers to a $50 million ordinary loss transaction. Do you see that?



A Yeah. I mean, the economic -- those are not my transactions. But --
Q Well, you had a $50 million transaction, correct?
A Oh, you're saying you think this relates to me or just --
Q No.
A -- an example that they use?
Q My question simply is did you have a $50 million transaction, a loss transaction?
A In terms of the magnitude for Jim and myself, yes.
Q And --
A It's 50 million in the aggregate.
Q Right. Your transaction, 60 percent was allocated to ordinary loss and 40 percent was allocated to capital gain, correct?
A That's correct.
Q Well, let's first look at this ordinary loss for a $50 million transaction. And you notice on the economics, under the column which is the second column, it says: Win bet, win tax. Do you see that?
A Win bet.
Q Do you see where it says economics?



A I see win bet, win tax.
Q Do you see that?
A I do.
Q Now take a look at the fees for this transaction. Those fees of -- which are total of $4,750,000. Do you see that?
A Yes, I do.
Q And that was the total of your fees on the transaction, too, wasn't it?
A I'd have to go back and calculate it. But if you tell me it is, I'll take your representation that that's correct.
Q Now, notice what the economic --
A Is that actually -- did we put 4,750,000 in it. You don't mean fees? But total capital, that would be right.
Q Yes. Total capital and your net premium paid to the Deutsche Bank. Remember --
A Using your form of calculation, then I would agree that that's the -- originally we said 8-1/2 million, and you were commenting about the percentages. So that seems right in terms of total, including the capital that we put at risk, yes.
Q Don't you remember --

A No. no. no. I agree
Q -- your fee for the net premium was 5 percent. Your total fees for the legal opinions and to E&Y is 4-1/2 percent. for a total of 9-1/2 percent. And if you multiply 9-1/2 percent by 50 million. you get $4.750.000
A Okay.
Q Now, take a look at what the return is for an ordinary loss on the economics only. Do you see that return of 31.56 percent?
A Is that 56 or 58?
THE COURT: 58.
MR. DONOHUE: 58 percent.
THE WITNESS: I see it.
BY MR. DONOHUE:
Q Now, did you make. at the time that you entered into this transaction. any type of calculation as to what -- if both of your options. as well as Mr. Boyd's options. were in the money. and you received favorable payoffs on all three. did you receive or did you make any calculation as to what your rate of return would be?
A No. You mean on all six. not all three?
Q Well, all three pairs.
A Oh. well. for the six transactions. I --



I've already gone through all this before. But. no. I didn't do a rate of return. I just did probability and my expectation of it. But no.
Q Now take a look under -- on an after tax basis. as to what the net after tax percentage return is on an ordinary loss. Do you see the bottom line number there of 513 -- I'm sorry. 512?
A 512.37 percent. I do see the number. yes.
Q Now. at the time that Mr. Knight and you were discussing changing the transaction from a $100 million loss transaction to a $50 million loss transaction. did you do some rough calculations as to what your rate of return would be based on the assumption that you would be able to claim either a capital loss or an ordinary loss in the transaction? Did you make any calculation of that?
A No. You had asked me that a number of different ways and times before. No. I did not.
Q Take a look at the next column. where it says lose bet. but win tax. Do you see that column?
A Yes. I see the column. I mean. are you



showing me an internal document? I've not -- I see the column. I can read it.
Q Okay. You notice at the bottom of this page it says lose bet. win tax And there what it shows is is that the rate of return is 418.68 percent. Do you see that number?
A I see what's -- what you're reading. yes.
Q Well. even though you didn't do any specific calculation. were you aware that. even if you lost the bet on your options, nevertheless. your rate of return on this transaction was going to be quite significant? Did you make any type of. shall we say. rough calculation of that?
A No. I did not
Q I'm having a hard time understanding when you say the economics were the predominant purpose of the transaction Can you. given these rates of return here. can you explain to me as to how the economics would be the predominant purpose of this transaction?
A You can base -- using this sheet. you can assess what you want after the fact. But at the time of the transaction. I was very excited about making a good buck on the currency option.



and the overall structure was very exciting and fully understandable by Jim Boyd. And between the two of them. I just saw it as just a great opportunity.
So. you know. my interest was focused on the making money. And the fact that I would. for a change. be able to get some deduction. that would have been nice. So -- you all don't seem to complain. I've given you all in corporate earnings and personal hundreds of millions of dollars in taxes. Nobody seems to complain then.
Now I've tried everything to apply the regulations as appropriate and do everything by the book. And I'm looking for my refund. And now. you know, you're trying to make it look like I'm somehow involved with these other documents that you're presenting before me.
But I had no knowledge of it. And that was not my intent.
Q But you could make the calculations. couldn't you? You didn't need these documents to make the rough calculations as to what your rate of return would be?
A I didn't even consider rate of return. I considered all those aspects that I've already

reviewed today. And that was my probability of outcome. And I had an extraordinarily high set of confidence of being able to call the right direction on the currencies.

Q I ask that you be given Exhibit 2380.

(Government's Exhibit Number 2380 was marked for identification.)

BY MR. DONOHUE:

Q Did you ultimately take part in a suit --

A Is 2380 something I'm supposed to have?

Q You'll be getting that in a second. 2380. My question is did you ultimately take part in any type of either litigation or any type of proceeding against any of the promoters of this transaction?

A Not against anyone. But as I told you at the last deposition, we got a call from an attorney in Texas that asked me if I wanted a free lottery ticket, that they were going to pursue a group settlement that could, if I -- I didn't have to make any claims of any kind, that I would get a shared participation. And he -- he indicated to me that there was no down side to my doing so. So I said fine.



Q So your testimony is you did participate in either a litigation or other proceeding against the promoters of the transaction?

A I don't believe that it was any litigation. But I do believe that I got a participation in a -- in a group settlement of some sort.

Q Take a look at what's been marked as Government Exhibit 2380.

A Is this something in front of me?

Q Do you have it in front of you?

A I'm asking, is 2380 something that should be before me? Oh, I see. 2380 to the left. Okay. I've got it. I've got so many documents. I'm sorry.

Q Now, this is a settlement agreement between Sidley Austin Brown & Wood and yourself, your wife, JZ Buckingham Investments LLC, JBJZ Partners and JBJZ Investors, Inc. Do you see that at the top?

A I see the form you've given me.

Q And if you turn to Bates stamp number 835.

A Yes.

Q Do you notice there's some signatures on



that page?

A Right.

Q Are those your signatures?

A Right. You had asked me if I had entered into such an agreement. And I had said yes.

Q And did you receive any monies pursuant to your settlement agreement from this firm?

A I can't specifically tell you if I did from this firm. But the attorney that was representing us, I know that there were payments made. And I just don't know the amounts of what the payment was.

Q Did -- let me ask that you be given Exhibit 2374.

(Government's Exhibit Number 2374 was marked for identification.)

THE WITNESS: 2374. Oh, to be given. Okay.

BY MR. DONOHUE:

Q You mentioned, Mr. Zucker, that an attorney from Texas called you.

A Yeah.

Q Do you recall the name of the attorney?

A I don't specifically. Is this a --



Q Take a look at page 131 of what's been marked as Government Exhibit 2374.

A 131. Okay.

Q And look under the law firm of Shore & Deary LLP. Do you see -- do you see that's a Texas law firm?

A It's a Texas law firm, yes.

Q Now, do you recognize any of those names?

A The name Deary sounds very familiar.

Q So it was Mr. Deary who called you in connection with asking you if you wanted to participate -- I believe what you said, a lottery ride?

A Yeah. He said he'd won a free lottery ticket. He says they're going to be doing a group settlement. Would I allow my name to be included. So the answer was yes. But I don't think he's the person that actually called me. I remember his name, but I think it was somebody else that was involved with his firm.

Q Exhibit 2374 is a second amended complaint, an original class action complaint. Have you ever seen this document before?

A I don't think so. I don't think so.

Q Mr. -- or whoever called you from this Texas law firm --
A Yes
Q -- they asked you if you wanted to take a lottery ticket but they didn't provide you with any information as to what the nature of the action was?
A Ultimately they told me it was to settle this, that -- I told you this in the last deposition. But for the Judge's benefit, that he said that they thought the government, you know, the government has got endless pockets, that they're going to keep putting pressure on these firms. And eventually they're going to cave just simply because they don't want to be exposed to the possibility.
And that if I wanted a free ride, that they would want -- they believed that they would be interested in a settlement, if I wanted to get a participation, that it was a free ride, and I said fine.
Q Take a look at, in this document, at page 21 The top of the page.
A Page 21, yes.
Q And the top of the page is in reference



to paragraph 34. And it says: Throughout the class period, defendants --
A Am I looking at --
Q Yes.
A I want to be looking at the same place.
Q Paragraph 64 is on the prior page.
A Okay. All right.
Q Take a look at the prior page.
A All right. Yes.
Q It says throughout the class period, defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose the true facts, even though such facts were available to this -- to them. In this regard defendants' acts and omissions included, inter alia, and then go over to the top of page 21.
A Uh-huh.
Q It says failing to apprise the plaintiffs and the class members that the FX contracts had no reasonable possibility of a profit, certainly not in excess of the fees paid. And that, in reality, the net effect of the digital options they were purchasing and selling



was nothing more than a wager, like buying a lottery ticket on where the price of the underlying currency would be exactly at 10:00 a.m. on a date -- on a given date 30 days hence.
When this attorney called you, did he mention to you either that allegation or any of the allegations that in fact the investors were making against the promoters?
A No. He very specifically said I wouldn't have to make any claims. He just, if he included me in the listing, it would increase the overall settlement. And I would get a participation in the settlement if they were successful. No
Q I ask that you be given Exhibit 2255
THE WITNESS: Can I add one thing, Your Honor, just to clarify?
THE COURT: Sure.
THE WITNESS: I specifically told them that I didn't think they had done anything wrong. And he told me that it didn't really make any difference. That, you know, would I turn down a free lottery ticket that could amount to participation in some money. I just wanted to complete that. I'm sorry.



THE COURT: That's okay.
THE WITNESS: Were you in the middle of a question? Or are you about to give me something?
BY MR. DONOHUE:
Q What I said is I'm asking that you be handed what's been marked as Government Exhibit 2255.
A 2355.
Q 2255.
A Okay.
Q Now, you testified regarding this note on 12 -- regarding 12/28/99 on direct examination. Do you recall that?
A I do.
Q Now, this is another document that was not produced either to the Internal Revenue Service or to the government pursuant to our request to produce until Ms. Charlotte Crosby's deposition last week Do you have any other explanation besides those that you've offered as to why this document was not turned over?
A No. Not other than what I've already offered You know, probably missed the file.
Q You'll notice that Mr -- this is

Mr. Boyd's handwritten note to you. correct?
A Right.
Q It's dated 12/28/99. correct?
A It is.
Q Now, you -- take a look at the -- in the middle of the page. where he says: I. again. raised the issue with Ray. Do you see where I'm reading?
A I do.
Q About the. quote, margin earnings on the euro. Now. the euro. am I correct. is the currency. am I correct. that you in fact were in the money on? Am I correct?
A Right. We made $1.875.000 on the euro.
Q And it says. he said he will call you tomorrow. He said the reason we only picked up the margin gain of 625,000 -- and am I correct, the 625.000 represents the net gain on the transaction?
A I don't know. I'm not familiar with margin gain. as I said earlier. So I'm presuming -- the only 625 I know of is when you take the $1-1/4 million that was the net premium loss on the -- on the yen. And if you then charge that against the 1.875.000. you end up with the



625.000. So I'm presuming that's what he -- you know. that's what he's saying.
Q In other words. what he's saying there is he's taking your total payout on the transaction and he's subtracting your total costs. And he's referring to a net amount. Am I correct?
A I'm not sure.
Q All right.
A I'm presuming that to be the case because that's the only reference to 625 that comes to mind.
Q But that's not my question. My question is is he's saying he said the reason we only picked up the margin gain of 625.000 plus the original 2.5 million was because we capped our exposure. Do you see that?
A I see what it says.
Q Now. it seems to me that there was some confusion as to what you thought would be your payout when your euro options were in the money. Was there some confusion as to what your payout would be if your euro currency options were in the money?
A There was no confusion about it. I was just very excited. I had tracked them and I knew



that we had gotten in the money. so I'd gotten $1.875.000. And it didn't apparently dawn on me at the time in my comments to Jim that we were out of the money on the yen. I frankly thought we had -- we were going to hit both. I just ended up calling the yen wrong.
Q Well --
A So I suspect that that's what he's referring to here.
Q It seems that his note's referring to the fact that he's had some conversation regarding this subject with you previously. Did you instruct him to find out from Mr. Knight as to why it was you were only receiving. in fact. the amount you did on this transaction?
A No. I -- to be quite frank with you. I don't actually recall the note until you put it before me. But I'm presuming that I saw it and I don't know any more than what I'm testifying to right now. that those are the things that I can attribute to it.
But I don't know what he means by because we capped our exposure. I don't know what that means. other than the fact that it was a leverage transaction. And. you know. we had



committed. you know. what the maximum amount of money that would be invested.
Q Do you remember your prior testimony when you said that. for the euro. you were. in fact. well in the money --
A Yes.
Q -- on that transaction?
A Right.
Q Now, for a nondigital transaction where you in fact are well in the money. your payout is related to how high in fact your spot price is; am I correct. at the closing of the transaction or at its expiration; am I right?
A Not on a digital option.
Q Correct?
A On a digital option. it's either yes or no based on the contract terms.
Q Correct. But my question is. for a nondigital option. am I correct --
A For an American stock?
Q -- that your payout is. in fact. based on how much in the money or how high or low. depending on if it's call or put. your spot price is? Am I correct?
A If I had had a currency option that

would result in actual currency payment as an exchange, then you would be right. But as a digital option, it's a contracted yes or no. It's binary. So. . .

Q You correct me if I'm wrong. But the way I read it, it appears as if you initially thought that you had not purchased a digital option but you had initially purchased in fact a normal option, not digital, since you were way in the money, you were wondering, and asked Mr. Boyd to find out why it was that you weren't getting a larger payout.

A I do not believe that what you're defining had anything to do with my thinking. Because I clearly understood that it was a digital option. So I don't believe that your suggested reasons for it coming up are that, but rather that I was very excited about having known that we were in the money and that we made $1,875,000. And I failed to probably recognize at the time that we were not in the money on the yen.

So I don't think it had anything to do with that because I was clearly -- understood digital.

Q Well, you understood digital but is the



question whether or not you had any real understanding of the type of option transaction that you entered into at the time you did.

A Yeah. I understood it was a digital option, that it was either yes or no. It was binary. Either we were in the money or we weren't in the money. There were no shades of gray in that the amount that had been contracted for would be the actual exchange. It's clearly noted in all of our discussions and clearly noted in the confirmation.

Q Did you direct or ask Mr. Boyd to find out why it was that your payout on the euro options wasn't greater than it was? Did you make any direction to him regarding that?

A No. I -- I don't -- I do not recall having any discussions on that subject with him. It's unlikely that I would have, simply because I knew the transaction well.

Q Mr. Zucker, did -- on the initial entering into this transaction, did it ever occur to you to say these people, Ernst & Young, are telling me I can take a tax loss for a fraction of the cash amount that I am putting into this transaction; I better have a set of independent



lawyers and advisors look at this? Did that ever occur to you?

A No. I had ultimate trust in Ernst & Young. I had done business with them for 2-1/2 decades, since the time they changed from Ernst & Ernst to Ernst & Whinney in, I think that was like 1979 or so. So right around that time period, maybe 1980 if not '79.

No. And I continue to have the ultimate respect for them as professionals.

Q Your Honor --

A That never even crossed my mind.

MR. DONOHUE: Your Honor, I pass the witness.

THE COURT: Thanks very much.

MR. CROUCH: Can we have a five-minute break, Your Honor?

THE COURT: Yes. How long do you think your redirect will be?

MR. CROUCH: I don't want to make any promises to the Court, but I'm hoping it will go quickly.

THE COURT: Okay. Because we've lost our air-conditioning.

MR. CROUCH: It will go more quickly



that way.

THE COURT: Okay. That will wonderfully concentrate the mind. Okay. Recess for -- when do you want to come back? Quarter after?

MR. CROUCH: Quarter after will be fine.

(Whereupon, a recess was taken between 8:12 p.m. and 8:22 p.m.)

THE COURT: Mr. Crouch.

MR. CROUCH: Your Honor, in order to kind of facilitate this a little quickly, we're trying to pull out the particular documents I want to talk to Mr. Zucker about very quickly here.

THE COURT: Okay. May I borrow a pen from someone?

Power is such a wonderful thing.

MR. CROUCH: If I could, while we're getting the documents, Your Honor, I do have a couple questions for Mr. Zucker, if it's okay to start.

THE COURT: Sure. Please start.

REDIRECT EXAMINATION

BY MR. CROUCH:

Q Mr. Zucker, you were asked right before the break about obtaining some sort of independent legal advice with respect -- legal or accounting

advice with respect to this transaction

I'm talking too fast, aren't I? Okay. Let me try it again. I'll slow down. It's sort of late in the day. I think I speed up when we get late, but I'll slow down.

Right before the break, you were asked about whether you had obtained independent -- or considered obtaining independent legal or accounting advice with respect to this transaction. Do you recall that question?

A I do.

Q And Mr. Zucker, other than Ernst & Young and Jenkens & Gilchrist and Brown & Wood, did you rely on anybody else with respect to this transaction?

A Sure. Jim Boyd. Brilliant tax attorney and corporate structuring attorney, yes. He felt -- felt very good about the facts and what the regulations were, based on what had been presented and his follow-up.

Q Also, Mr. Zucker, you have continually had questions about how the transaction has been stated by the government. One of the questions -- one of the issues you had is you have continually referred to the term revenue offset instead of tax



loss. Why is it that you are referring to revenue offset instead of tax loss?

A I fully expected to make a good profit on this thing. It just offsets the profits I have and so, you know, I went into this to make money.

Q Could I ask you to look at what has been previously marked as Government Exhibit 1029.

A Yes.

Q Do you have that in front of you?

A I do.

Q Very good.

MR. CROUCH: Your Honor, if you would like to you can look at our --

THE COURT: I have it, thanks.

BY MR. CROUCH:

Q And you recognize this as a copy of your letter that -- your fee agreement with Ernst & Young?

A That's correct.

Q I think you previously testified that you did not enter into any kind of nondisclosure agreement with respect to Ernst & Young; is that right?

A Well, specifically I was shown a nondisclosure agreement. I said I had never seen



anything like it before.

Q Let me ask the question. Let me ask the question.

A Okay.

Q If you -- if you would look at the last paragraph on that document, it seemed -- if I could read that to you, it says all advice and other services we provide pursuant to this arrangement are intended to be solely for your benefit and that of the partnership and are not for the benefit of anyone else. Accordingly, our advice may not be relied upon by any other person or persons, used in connection with any other transaction or used for any other purpose without our prior written consent.

Furthermore, the content of any oral or written communication made by us in connection with this engagement shall not be communicated to the public or otherwise publicized in any manner without our prior written consent.

Can you tell me what your understanding of that paragraph was?

A That it was proprietary. That was their intellectual property. And they didn't want me sharing it around. So I didn't have any problem



with it. I mean, I -- I've got, you know, numerous patents of which I collect, you know -- and the corporation collects royalties on. And I understand respect for proprietary knowledge.

Q Okay. Thank you. You were also shown during the cross-examination a number of internal E-mail correspondence, primarily E-mail correspondence within Ernst & Young.

A Yes.

Q Did you ever see any of those E-mail correspondence?

A Not other than from counsel here.

Q Were you ever made aware of any of those E-mail correspondence?

A No. Never.

Q By anybody from Ernst & Young?

A Never.

Q Would you look at Government Exhibit 2382.

A Somebody is going to have to hand it to me. Yes.

Q I'm waiting for the Court to get it, to see if he has a copy of it.

And can you tell me what this document is?

A It's a copy of a trading statement from Morgan Stanley Dean Witter, just reflecting the fact that we have done many, many trades in JBJZ.
Q Okay. Tell me a little bit -- who is it a trading statement for?
A It's for JBJZ Investors, Inc.
Q Okay. And what is JBJZ -- is that the S Corporation in this transaction?
A It's the S Corp, yes.
Q Okay. Did you continue using JBJZ --
A I did
Q -- after this transaction?
A Yes.
Q Do you know how long you continued using JBJZ Investors, Incorporated?
A I think the account relationship is continuing and being -- is maintained open now.
Q So in other words, JBJZ Investors, Incorporated was not just used for the transaction at issue in this case; is that correct?
A That's correct.
Q Mr. Zucker, you were also shown a number of times the tax returns related to this transaction, that being your personal tax return, tax returns for the S Corporation and the tax



return for the partnership
A Yes
Q And counsel for the defendant pointed out a number of discrepancy -- what they claim to be discrepancies in those tax returns.
A Yeah.
Q First of all, did you prepare these tax returns?
A No.
Q Who prepared the tax returns?
A Ernst & Young.
Q Okay What about your personal tax return?
A Personal tax return is, you know, for years been Barry Emerson
Q Okay. Ernst & Young prepared the other tax returns, though?
A Yes.
Q Do you have the capability of preparing tax returns?
A Me personally?
Q Yes, you personally?
A Not unless I gained an awful lot more patience than I have No, I don't think so
Q When is the last time you prepared a tax



return?
A Many, many years ago.
Q Okay And why is it you don't prepare tax returns?
A That's not an area of my expertise, and I certainly don't have the patience for it.
Q Do you rely on professionals to prepare the tax returns?
A I do.
Q Okay. I'm going to ask you to look at what is two different documents. That is what's been marked as Government's Exhibit 2259 and Government Exhibit 1011.
A 2259. Yes And 1011. Okay.
Q 1011.
A Okay. Is that the one I'm to look at first?
Q Let's make sure the Court gets a copy of it
Do you recall that you went through some of these documents with the government where they pointed out some discrepancies on some of these documents with respect to your Social Security number?
A Yes



Q Okay. Would you look with me at, within 1011, Bates number DOJ 041490.
THE COURT: Which one is that again?
MR. CROUCH: Zero --
THE COURT: 1011.
MR. CROUCH: 1011.
THE COURT: And the Bates number?
MR. CROUCH: 041490.
THE WITNESS: Okay. Okay.
BY MR. CROUCH:
Q Will you note with me, if you would -- are you aware is that the correct employer identification number in the top right-hand corner, as far as you know?
A As far as I know, it is correct.
Q Would you then look at document 2259 with me, please?
A Yes.
Q And keep 1011 with you.
A Okay.
Q And would you turn to the third page of this document.
A Yes.
Q Form 2553.
A Yes

Q And do you see where you have signed that document?

A I do see it

Q Do you see where you have signed it in the box marked. I guess it's under K. you signed it two different places; is that correct?

A I did.

Q Okay. Do you see under the line M where your Social Security number is on there?

A Yes.

Q Is that a correct number?

A Correctly stated.

Q Okay. And this document was filed with the Internal Revenue Service?

A It was.

Q But do you also see at the top of that, in the name of the entity. what's the name of the entity there, does it say?

A It says JBJZ Investors. Investors Inc.

Q Do you know why that was placed there?

A I would think typographic error

Q Okay Would you go back to document number 1011.

A Okay.

Q Would you look at Bates stamp



number 494. the last three digits.

A Okay.

Q Do you see -- you see this is the form 2553 that we previously reviewed?

A Yes.

Q And you see again that your Social Security number is correct on that?

A It's correctly stated. yes.

Q You see also that the employer identification number is the same number as was shown on the previous SS-4?

A Right. And Jim Boyd's complete Social Security number is there. It's the same filing that the government was referring to earlier.

Q All right. Do you also see -- what is the name now that is listed on line 1?

A It says JBJZ Investors. Inc

Q Does it appear to you. would you agree with me that it appears that somebody tried to correct that and did it correctly?

A I believe that it was correctly submitted. resubmitted. yes.

Q Mr. Zucker. was it your understanding from this transaction that you had an opportunity to make money on the transaction?



A Absolutely.

Q Was it also your understanding that there were some tax benefits associated with this transaction?

A Yes.

Q And was -- would you have done this transaction if the only thing that was available was the tax benefits and there was no way for you to make a profit on the transaction?

A No.

MR. CROUCH: Pass the witness.

THE COURT: Thanks very much.

MR DONOHUE: Nothing. Your Honor

THE COURT: Thank God. Okay. Mr. Zucker. you are excused. Thank you so much

THE WITNESS: Are we off the record now?

THE COURT: We're still on the record. yes.

THE WITNESS: We're on the record. I was going to make some comments to you.

THE COURT: I can go off if you like.

THE WITNESS: Could we do that?

THE COURT: Yes. go off the record. please.

(Discussion off the record.)



(Whereupon. the proceeding continued on the stenograph record only as follows:)

THE COURT: Let's go back on the record. I just want to point out that we have all this electronic equipment. you know, so if you could have just simply slid the exhibit right on the ELMO here and it would have gone to everything. that would have saved us a lot of time. I don't know if you were aware of that before.

MR. CROUCH: I was not until we walked in yesterday. Your Honor.

THE COURT: I see. Okay. So just in the future. if we get to the stage of the trial. now you're aware of it. right?

MR. CROUCH: Yes.

THE COURT: So we can move things along more quickly. Great. I want to thank everybody for their patience. And good job from all the lawyers. as usual. as I expect.

Again. thank you very much. Mr. Zucker. And I wish you all the best.

THE WITNESS: Thank you very much.

THE COURT: We finally are adjourned. Thank you.

(Whereupon. signature having not been

waived. at 8:35 p m . the deposition was concluded )



C O N T E N T S


| WITNESS | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| JERRY ZUCKER | 118 | 161 | 408 |

AFTERNOON SESSION: 118

EVENING SESSION: 318


E X H I B I T S


| PLAINTIFF'S EXHIBIT NO. | MARKED |
|---|---|
| 1 | 94 |
| 2 | 109 |
| 3 | 127 |
| 4 | 137 |
| 5 | 133 |
| 6 | 137 |
| 7 | 148 |
| 8 | 153 |
| 9 | 154 |
| 10 | 156 |
| 11 | 157 |
| 12 | 158 |
| 13 | 159 |
| 14 | 16 |

| GOVERNMENT'S EXHIBIT NO. | MARKED |
|---|---|
| 155 | 162 |




E X H I B I T S


| GOVERNMENT'S EXHIBIT NO. | MARKED |
|---|---|
| 170 | 191 |
| 171 | 192 |
| 173 | 194 |
| 174A | 201 |
| 177 | 60 |
| 177A | 184 |
| 180 | 347 |
| 520 | 294 |
| 1000 | 139 |
| 1001 | 142 |
| 1005 | 144 |
| 1005A | 378 |
| 1010 | 302 |
| 1011 | 353 |
| 1017 | 344 |
| 1018 | 75 |
| 1019 | 124 |
| 1022 | 326 |
| 1023 | 333 |
| 1028 | 330 |
| 1029 | 211 |
| 1029A | 81 |
| 1032 | 288 |




E X H I B I T S


| GOVERNMENT'S EXHIBIT NO. | MARKED |
|---|---|
| 1053 | 120 |
| 1061 | 234 |
| 1073 | 317 |
| 1079 | 295 |
| 1082 | 363 |
| 1090 | 339 |
| 1100 | 367 |
| 1104 | 67 |
| 2037 | 365 |
| 2255 | 129 |
| 2257 | 203 |
| 2259 | 350 |
| 2269 | 63 |
| 2325 | 299 |
| 2338 | 212 |
| 2342 | 228 |
| 2350 | 224 |
| 2352 | 169 |
| 2353 | 165 |
| 2355 | 381 |
| 2358A | 303 |
| 2360 | 241 |
| 2361 | 307 |

E X H I B I T S

| GOVERNMENT'S EXHIBIT NO. | MARKED |
|---|---|
| 2362 | 282 |
| 2363 | 283 |
| 2364 | 284 |
| 2366 | 373 |
| 2367 | 313 |
| 2368 | 386 |
| 2369 | 278 |
| 2370 | 260 |
| 2371 | 265 |
| 2372 | 265 |
| 2374 | 395 |
| 2375 | 271 |
| 2377 | 332 |
| 2378 | 229 |
| 2379 | 229 |
| 2380 | 393 |
| 2382 | 342 |



ACKNOWLEDGMENT OF DEPONENT

UNITED STATES COURT OF FEDERAL CLAIMS

JE BUCKINGHAM INVESTMENTS LLC
vs.
THE UNITED STATES

DEPOSITION OF JERRY ZUCKER

July 19. 2007

I do hereby acknowledge that I have read and examined the foregoing pages 1 through 427, inclusive. of the transcript of my deposition and that:

(Check appropriate box):

[ ] The same is a true. correct and complete transcription of the answers given by me to the questions therein recorded.

[ ] Except for the changes noted in the attached errata sheet, the same is a true. correct and complete transcription of the answers given by me to the questions therein recorded.

__________ __________________

DATE SIGNATURE



CERTIFICATE OF REPORTER

DOCKET NO :

CASE TITLE:

HEARING DATE:

LOCATION:

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims

Date:__________________

__________________

Vicky Reiner. RMR. CRR
Official Reporter
Heritage Corporation
Suite 600
1220 L Street. N.W
Washington. D.C. 20005-4019