IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NO. 05-231-T

---

JZ BUCKINGHAM INVESTMENTS, LLC, as TAX MATTERS PARTNERS of JBJZ PARTNERS, a SOUTH CAROLINA GENERAL PARTNERSHIP,

Plaintiff,

vs.

UNITED STATES OF AMERICA,

Defendant.

VIDEO DEPOSITION OF

JAMES BOYD

Thursday, June 7, 2007

9 AM to 2:30 PM

North Charleston, South Carolina

Reported by: Jane G. LaPorte

EXHIBIT

tabbles

2

APPEARANCES:

FOR THE PLAINTIFF:

JBJZ BUCKINGHAM, et al.
BY: JOEL N. CROUCH
-and- TARA C. CAMPBELL
MEADOWS, COLLIER, REED, COUSINS & BLAU, LLP
901 Main Street
Suite 3700
Dallas, TX 75202
214.744.3700 - telephone
214.747.3732 - fax
jcrouch@meadowscollier.com

FOR THE DEFENDANT:

UNITED STATES OF AMERICA
BY: JOHN A. LINDQUIST, III
Senior Trial Attorney
Tax Division
PO Box 55
Washington, DC 20044-0055
202.307.6561 - telephone
202.514.5238 - fax
JOHN.A.LINDQUIST@USDOJ.GOV



EXHIBIT INDEX


| EXHIBIT | | |
|---|---|---|
| 155 | PREVIOUSLY MARKED - COBRA ACTION WORK PLAN | 83 |
| 156 | PREVIOUSLY MARKED - E&Y EMAIL | 82 |
| 159 | PREVIOUSLY MARKED - E&Y EMAIL | 75 |
| 164 | PREVIOUSLY MARKED - IRS LETTER, OCTOBER 22, 2001 | 175 |
| 166 | PREVIOUSLY MARKED - ERNST & YOUNG, JANUARY 7, 2002 | 178 |
| 169 | PREVIOUSLY MARKED LETTER FROM JAMES G. AND HAZEL BOYD, APRIL 17, 2002 | 179 |
| 175 | PREVIOUSLY MARKED DEPARTMENT OF THE TREASURY LETTER, 03.25.2003 | 180 |
| 177 | PREVIOUSLY MARKED - ENGAGEMENT LETTER | 54 |
| 178 | PREVIOUSLY MARKED - LETTER | 59 |
| 180 | PREVIOUSLY MARKED - LETTER | 63 |
| 1000 | PREVIOUSLY MARKED 1065, 1999 | 152 |
| 1001 | PREVIOUSLY MARKED 1120S, 1999 | 149 |
| 1002 | PREVIOUSLY MARKED - 1040, 1999 | 159 |
| 1004 | PREVIOUSLY MARKED - 1040, 1997 | 164 |
| 1006 | PREVIOUSLY MARKED - E&Y ENGAGEMENT | 69 |
| 1008 | PREVIOUSLY MARKED - LETTER ENTITLED "RE: REPRESENTATIONS" | 126 |
| 1009 | PREVIOUSLY MARKED - FAX | 70 |
| 1010 | PHONE CALL MESSAGE | 84 |
| 1011 | PART OF A CLOSING BINDER | 88 |


(Exhibits Continued:)




| | | |
|---|---|---|
| 1012 | LETTER TO DEUTSCHE BANK | 116 |
| 1013 | LETTER TO DEUTSCHE BANK | 117 |
| 1014 | JENKENS & GILCHRIST LETTER TO JAMES BOYD | 118 |
| 1015 | JENKENS AND GILCHRIST OPINION | 114 |
| 1016 | OPINION FROM BROWN AND WOOD | 120 |
| 1017 | MAY 18, 2000 LETTER TO DB ALEX BROWN | 138 |
| 1018 | JENKENS & GILCHRIST LETTER NOVEMBER 16, 1999 | 141 |
| 1019 | HANDWRITTEN PAGE: MEMO TO FILE | 146 |
| 1020 | 1040, 1999 | 159 |




VIDEOGRAPHER: Stand by, please. We are now on the record. Today's date is June 7th, 2007. The time is approximately 9:11 AM.

This is the videotape deposition of Mr. Jim Boyd, taken in the matter in the US Court of Federal Claims, No. 05-231-T; JZ Buckingham Investments, et al -versus- the United States of America.

Counsel, please introduce yourselves for the video.

MR. CROUCH: Joel Crouch and Tara Campbell on behalf of the witness and the plaintiffs in this matter.

MR. LINDQUIST: John Lindquist on behalf of the United States of America.

VIDEOGRAPHER: Madam court reporter, please swear in the witness.

JAMES BOYD,

having been first duly sworn, on his oath, testified as follows:

EXAMINATION

BY MR. LINDQUIST:

Q. Good morning, Mr. Boyd. My name is John Lindquist.

I'm a trial attorney at the Department of

Page 6

Justice Tax Division.

I'm going to be asking you some questions in what's called a deposition.

Have you ever had your deposition taken before?

A. Many times, sir.

Q. How long ago was the last time you had your deposition?

A. Well, my accident was over four years ago. So, it was before four years ago.

So, it was probably within the last 20 or 30 years; that's all I could say.

Q. Have you ever had your deposition taken with respect to any tax matters?

A. No, sir.

But I think I took depositions, because I used to try cases in tax court --

Q. Okay.

A. -- 35 or 40 years ago.

Q. Well, let me start off then, are you an attorney?

A. Yes, sir.

Q. And where are you licensed?

A. Just in South Carolina.

Q. And when did you first become an

Page 7

attorney?

A. I graduated from law school in '69, and I think that the swearing in was probably in September, or something, of '69.

And -- excuse me -- and then I went on to other graduate schools.

Q. And prior to graduating from law school, where did you -- did you do undergraduate?

A. Yes, sir.

Q. Where was that?

A. I actually went to play football at the Citadel in Charleston, South Carolina, and that's where I met my wife; that was the best thing.

Q. And where did you graduate from law school in '69?

A. The first law school was USC, and I graduated with honors there.

Q. And did you go on to get some sort of a Masters after that?

A. Yes, sir. I was going to UVA for an SJD, that's a Doctor of Juridical Science, because I thought I wanted to teach.

And, unfortunately, Uncle Sam wanted me more in Vietnam.

And so I only got to go to UVA for two

Page 8

years.

And -- but when I finished my tour of duty in Vietnam, the government asked me was there anyplace I wanted to go?

And I said: Yes, sir. I want to go to New York City, if you have a post there, because I wanted to go to NYU.

Q. And did you?

A. Yes, sir.

Q. And did you then complete your Masters?

A. I got an LLM in less than two years; I did it in one-and-a-half years.

Q. And was that a Masters of Laws in any particular area?

A. It was an LLM/Taxation.

Q. And what was the year that you got your LLM in taxation?

A. I think I got my LLM in taxation in August of 1973.

Because I had returned from Vietnam in 19 -- I think it was either '71 or '72 -- and then I went through school very quickly -- LLM.

I had to go through, because I had to get back to Charleston.

Q. Uh-huh.

Page 9

A. Because I had been recruited by some lawyers in Charleston.

Q. And this was after graduating from NYU?

A. I had actually been recruited before I graduated from NYU, and --

THE WITNESS: Can I deviate for a second?

MR. CROUCH: Why don't you just answer his questions.

THE WITNESS: Okay.

Q. Answer my questions. Because before we get back to getting back to Charleston, I want to first ask you about your tour of duty in Vietnam; it was a two-year tour?

A. No, sir.

Q. How long was it?

A. It was not quite a full year.

Q. And --

A. I think it was 11 and a half months.

Q. Did you have any combat experience there?

A. I was in DaNang, NaTrang and Cam Ranh Bay, but I was not assigned to a fighting unit.

I was assigned to the Engineer Corps, and I used to fly around in little tiny airplanes, mainly with generals and stuff like that.

Page 10

Q. Did you have some sort of specialty in engineering?
A. No. I had a specialty in procurement law.
Q. Now, what was the name of the law firm that was recruiting you when you were at NYU?
A. It was Austin and Henry Smythe, and they were at Buist Moore Smythe and Mc Gee.
And I do remember that was at Five Exchange Street in Charleston.
Q. And once you had your LLM in taxation, did you then start employment with them?
A. Yes. Because my military duty was over in August of '73.
That was why I had to go through in a year and a half, less than two years and --
THE WITNESS: I won't say any more.
Q. Did you graduate with any type of distinction from NYU?
A. I know I got a lot of As and Bs, but I think I also got some other things, but I don't know.
Q. And for how long were you with this first firm, Henry Smythe?
A. Excuse me for pausing. I'm just -- I

Page 11

became a managing partner in -- oh, I know it was unusual -- but I became a managing partner in like '76 or '77.
And then I left to form a tax and securities law firm with a couple of friends.
They were partners in another law firm, and that was in -- excuse me -- I think 1979.
Q. What was the name of that entity that you formed with your friends?
A. Evans, Boyd & Carter.
Q. Now, did that -- when you had been with Henry Smythe, did you specialize in tax issues?
A. Yes, sir.
Q. Were you involved in tax litigation at that time?
A. They were trying to build a tax practice, and I was the first tax lawyer there.
Q. Uh-huh.
A. And I worked on a number of international and corporate tax transactions, including -- we represented the owners of Kiawah -- excuse me -- we represented the owners of Kiawah, and eventually the Kingdom Kuwait retained me as their tax counsel after the transaction had closed, because they got my -- not just my approvals -- they asked for the

Page 12

approval from all the people involved.
Q. My question, though, was a little bit -- and I didn't mean to trip you up, but were you involved in any tax litigation at that time when you were with the firm of Henry Smythe?
A. I went to the tax court, but I think I mainly went to the District Court, US District Court. I never had to go above the District Court.
Q. And when you went to the District Court, was that with respect to the litigation of tax issues?
A. Both tax, as well as, there was some criminal tax involved, too.
Q. How long was the firm Evans, Boyd -- and was it Carter -- how long was that -- did that exist --
A. (No response.)
Q. -- after you formed it around 1979?
A. It's still exists, but it's under a different name now.
Q. How long did you stay with that partnership?
A. (No response.)
Q. From about what year?
A. Early- to mid-eighties.

Page 13

Q. And you indicated that that firm had -- was involved with securities. Was it also involved with taxation?
A. Mainly international -- me, mainly -- I did mainly international tax.
I didn't represent many local people. I represented international, multi-national firms that were headquartered in other countries, as well as some in -- headquartered in New York and Chicago and places like that.
Q. And during the time that you were associated with Evans, Boyd & Carter, did any of those multi-national tax firms get into tax litigation where they, in fact, needed you to represent them in court?
MR. CROUCH: Clarification. You said multi-national tax firms.
Q. Multi-national clients. Did any of the multi-national clients need representation in court by you?
A. Not in court, but most of them I did corporate and tax transactions and securities transactions for.
THE WITNESS: Can I say the name of the client?

Page 14

MR. CROUCH: You probably shouldn't say a name of the client.

THE WITNESS: Okay.

Q. So, you were more involved in -- would it be fair to say -- structuring transactions, at that time?

A. That was a significant percentage, but I can't say that that is more than regular tax or corporate work.

Q. How would you characterize the breakdown of your practice at that time with Evans, Boyd & Carter when you represented multi-nationals with respect to tax matters, part of it was structuring of the transaction; what would be?

MR. CROUCH: I object to the word "structuring" as being ambiguous.

Q. Then you use your words. How would you break down the basic components of your major components of your practice at that time?

A. Mergers and acquisitions, spin-offs; things like that.

THE WITNESS: Excuse me.

Q. And after your association with the partnership with Evans, Boyd & Carter, in the mid-eighties, when you indicated that you then left

Page 15

that firm, where did you go from there?

A. With three other people, I bought a place called Wild Dunes, which was a resort.

And I did several other acquisitions.

And eventually I was doing work for Mr. Jerry Zucker.

Q. So, were you -- when you left that firm -- did you set up a private practice? Or a solo practice?

A. I don't remember. I'm sorry. But I know I continued practice on tax and corporate matters to represent like some big international clients; and then, of course, Mr. Zucker and his companies and stuff like that.

Q. Did you ever become a corporate counsel for Mr -- for any of the entities owned or controlled by Mr. Zucker?

A. I shared being counsel with my former partner, Austin Smythe, who is now deceased. He did general work, and I did mergers, acquisitions, divestitures.

Q. And at that time, were you employed by Mr. Zucker?

Or any entities owned or controlled by Mr. Zucker?

Page 16

MR. CROUCH: You mean employed directly as a W-2 employee?

MR. LINDQUIST: Yes.

A. I used to bill him, but I don't think I was a --

THE WITNESS: Excuse me.

A. -- I don't think I was an employee until -- I think it was 1986, when Jerry asked me to join him, and I became -- I call it a partner -- but I became an owner of the Intertech Group with Mr. Zucker.

Q. And that was 1986, that was the year that you became a co-owner with Mr. Zucker?

A. (No response.)

Q. Did I get that year correctly, 1986?

A. I think it was either in mid- or late-1986; I can't remember which.

Q. And you were a owner with Mr. Zucker of what?

A. The Intertech Group. It was a holding company.

And then Mr. Zucker and I made -- I hate to use the word "many" -- but that was it, it was many acquisitions, many international acquisitions.

And we also screen fielded many

Page 17

companies.

I think we had something like 60 or 70 companies; I don't recall.

Q. What was the nature of your ownership in terms of stock and percentage when you first joined with Mr. Zucker in 1986 --

A. (No response.)

Q. -- as a partner?

A. He was always the controlling owner, as far as ownership percentage.

Many -- Intertech, we owned 75/25. And then we would own other holding companies.

But Intertech would own 100 percent or 90 some percent or something like that.

Q. Did the 75/25 percent split with respect to Intertech ever change after 1986?

A. Not as to Intertech, but we did other transactions.

I can't tell you how many in different percentages.

And -- but Intertech itself, the parent company, that was always 75/25.

Q. And do you still own 25 percent of Intertech?

A. No, sir.

Page 18

Q. Okay.
A. I'm retired.
THE WITNESS: Excuse me
A. I'm retired.
Q. I didn't want to have a trick question in there.
I had asked whether the percentage ever changed.
And so at some point in time, did you sell your 25 percent interest?
A. I retained counsel, and they handled the transaction. And Mr. Zucker had counsel.
And I have to be honest with you, I don't remember when the actual sale took place.
But since my accident was in May, 2003, I think after I came home from the different hospitals -- brain hospitals -- and everything, I think the neurosurgeons wanted me to withdraw from business with Mr. Zucker.
They said my brain wouldn't probably get -- I couldn't stand the pressure or something. I laughed about that, but --
MR. CROUCH: I think you answered his question.
Q. Basically, if I understand what you're

Page 19

saying is, that you had an accident in around May of 2003;
And you -- thereafter, your 25 percent interest in Intertech was sold?
A. Well, we had many other holdings.
Q. First as to Intertech?
MR. CROUCH: Just as to Intertech, he's asking you about.
I think he's saying it correctly. He needs the answer from you, not from me.
A. When I came back from the brain hospital in Atlanta, which was in 2004 --
MR. CROUCH: Jim, Jim, if you don't mind.
THE WITNESS: Sir?
MR. LINDQUIST: I'll ask the question.
Q. I want to talk to you about the accident next. But first, just --
MR. CROUCH: It's a simple question.
Q. Summarily, is it correct, am I correct in understanding, that it was around 2003 after your accident, that your 25 percent interest in the Intertech Group was sold?
A. No, sir.
Q. Around what year was it, if you know, that your interest in the Intertech Group was sold?

Page 20

A. It was either 2004 or early 2005.
THE WITNESS: Sorry.
MR. CROUCH: That's okay.
Q. Now, you referenced an accident in May, 2003.
And it sounds like it was a very serious accident.
What happened at that time, briefly?
THE WITNESS: Do I have to talk about it?
MR. LINDQUIST: Well, then if it's upsetting to you, can you tell me --
Q. You mentioned that you had a neurosurgeon telling you to stop work?
A. Many.
Q. Did you -- did the accident require you to have any surgeries? Operations?
A. Twenty or 30.
Q. Okay.
A. I don't remember how many.
Q. And I take it, it was a severe accident?
A. I was in a coma.
Q. As a result of that accident, are you still today taking any medication?
A. Yes, sir.

Page 21

Q. And what medications are you taking today?
A. The only medication that I take today is Celexa -- C-e-l-e-x-a; it's an anti-depressant. And I take that 40 milligrams or more a day; I don't know.
Q. And I assume that's upon the advice of your physician?
A. Psychiatrists and physicians -- well, psychiatrists are physicians, excuse me
Q. To your knowledge, has your accident -- has this accident impaired your memory in any way?
A (No response.)
Q. It may sound like --
MR. CROUCH: He's just trying to get something on the record here
Q. -- like a ludicrous question, but I need to have you tell me. I can't guess.
A. Yes
Q. Has it severely impaired your memory?
A. Short term more than long term
Q. So, for instance, what type of short-term items would you have difficulty with --
A (No response.)
Q. -- remembering? For instance, where

Page 22

you've been that day; is that the type of short term?

A Excuse me for being smug. I think your first name is John?

Q. Yes, sir.

A. Is it Homquist? Lunquist?

Q. It's very close. But it's that type of a short-term memory?

A. Yes. sir.

Q. And has it in any way impaired your long-term memory --

A. (No response )

Q. -- to your knowledge?

A. To my way of thinking, yes. But to some peoples' way of thinking. I still have a reasonable memory.

Q. I'm trying to get your perception. Have you, in the course of your practice of law. ever had any disciplinary action against you?

A. No. sir, I was an AB rated lawyer. even after I came with Jerry. I retained that AB rating.

In fact. I think I was the youngest person ever to be an AB rated lawyer.

Q. You indicated you still have your license to practice law; are you still practicing law?

Page 23

A. I had it reinstated -- I was retired. medically retired. and then in either March or April. I asked the bar to reinstate it. so I could do consulting and occasionally accounting and tax work.

Q. And are you currently reinstated?

A. Yes. sir.

Q. And are you currently consulting --

A. (No response.)

Q. -- and doing accounting and tax work?

A To a modest degree.

Q. Are you doing any work for Mr. Zucker?

A. No. sir.

Q. Do you recall in 1989 --

MR CROUCH: 1989?

MR LINDQUIST: Excuse me.

Q. 1999 --

MR. CROUCH: Thank you.

MR LINDQUIST: My own short-term memory

Q. Do you recall in 1999, knowing a Mr. Calendar at Ernst & Young?

A Tony Calendar; yes. sir

Q. And can you tell me who is Tony Calendar?

A A good friend and he also was the lead accountant on multiple audits that we had for

Page 24

various corporate and other activities.

Q. Was he an accountant with Ernst & Young?

A He's a regional partner.

Q. And was Ernst & Young the accountant for Intertech in 1999?

A. And its holdings; yes. sir.

Q. And is it still today?

A. Including international holdings

Q. And is it still today?

A. I don't know.

Q. Do you know whether Ernst & Young was ever terminated as the accountant for the Intertech Group?

MR. CROUCH: If you know.

A. I don't know.

Q. Do you recall from 1999, a Mr. Ray Knight?

A. I recall the name. and I met with him. I think. once.

Q. Do you recall about when it was that you met with him that once?

A. I think 1999.

Q. Do you recall what the subject matter of your meeting with Mr. Knight was?

A. Yes. sir.

Page 25

Q. What was it?

A. He was a salesman -- he was like a salesman. and he was a -- he's proposed and suggested to --

THE WITNESS: Can I call Mr Zucker Jerry?

MR. LINDQUIST: You call him whatever you want.

A. Jerry and I invest to make some money in a -- it wasn't a straddle. maybe it was a hedge. in an investment transaction.

Q. And who else was at that meeting with you and Mr. Knight --

A (No response.)

Q. -- with respect to this marketing or sale by --

A. With respect to what?

Q. This marketing or sale by Mr. Knight?

A. I think Mr. Kenney Hughes who was an associate at E&Y.

Q. Was Mr. Zucker there?

A. I believe so.

Q. Other than the people that you've mentioned. anybody else?

A. I don't believe so

Page 26

Q. Who's Sean Smith?
A. A good friend. He's also a regional partner, and he's responsible for five states for Ernst & Young.
He was an international taxes expert, and he has remained a good friend.
Q. Was he at that meeting with Mr. Knight --
A. (No response.)
Q. -- and Mr. Hughes and Mr. Zucker?
MR. CROUCH: Objection; asked and answered.
A. I don't believe, sir. But I remember talking or having him on the phone one time, when -- I think when I was talking to Mr. Knight, I think Mr. Smith was on the phone. But to be honest, I can't swear to it.
Q. Now, what was the transaction that Mr. Knight was proposing at that time?
A. He suggested or proposed currency hedges or something with options.
Q. Now, did he -- he was personally present at that meeting, Mr. Knight was?
A. The meeting that was independent of Mr. Smith's was on a phone call with us.
Q. Okay.

Page 27

A. But, yes, he was personally present. And I don't think the meeting lasted very long.
Q. About how long? Ten minutes? A half hour? An hour? I don't know what you think of --
A. Probably a half hour, something like that. He just talked, and we talked.
Q. Did he -- did Mr. Knight, at that time, provide you with or show you any papers or documents with respect to the proposed transaction?
A. No, sir; he just talked.
Q. Did he tell you anything about whether there were any law firms that would be involved with the transaction?
A. You have to forgive me. I get time and things jumbled in my head.
But at some point, he said there were two large prominent law firms that would be involved, but he never said the names.
Q. You indicated that you had one meeting with Mr. Knight.
Is it possible that you had more than one meeting with Mr. Knight?
A. Anything is possible, but I don't remember.
Q. The reason why I ask is, that you said at

Page 28

some point, he said that there were two large prominent law firms.
And you previously had indicated to me that you had one meeting with Mr. Knight.
And I'm trying to understand whether that is an indication that, at some point during this meeting, that you are referencing he said it; or possibly you had more than one meeting or conversation.
A. Or telephone conversation. I may have had.
I think I learned about the two prominent law firms. I thought they were going to be in New York or Chicago or something, and I probably learned that a couple of months later. I don't know.
Q. At the time that you were first approached by Mr. Knight, do you know whether they already had, in fact, developed the proposed transaction, all the details of the proposed transaction, or was this something that was still in process?
A. When Mr. Knight met with Jerry and myself --
MR. CROUCH: Think about what his question was.

Page 29

I want you to answer his question that he's asking you.
THE WITNESS: What was the question again?
MR. CROUCH: Make sure you answer his question.
Q. At the time that you were first approached by Mr. Knight, do you know whether Ernst & Young had, in fact, developed the proposed transaction; or was this proposed transaction something that Ernst & Young was still in the process of developing?
MR. CROUCH: The question is: Do you know that?
A. I don't know.
Q. You indicated the meeting you met in person with Mr. Knight, was that meeting here at Intertech?
A. If my recollection is correct; yes, sir.
Q. Would Intertech have kept a record of that meeting?
For instance, when I came in the door, I saw that they were writing down names and badges for all the visitors.
In 1999, did Intertech have a practice of

Page 30

writing down the names of the visitors?
A We may have; I don't know.
Q. Okay.
A. I guess we did.
THE WITNESS: Do you know?
Q. Do you know when it was that you first learned about the names of two law firms that were going to be involved in the transaction that you had in discussing with Mr. Knight?
A. In recent months. I have learned that I received an opinion from Brown and Wood in mid-March, 2000.
And I think I communicated with a lady at a Jenkens and Gilchrist law firm.
But I didn't receive a formal opinion from Jenkens and Gilchrist until 2004, even though it was dated before 2004.
Q. You don't believe you received the J&G opinion until 2004?
A. I know for a fact that I didn't receive it until 2004, because I retained the envelope.
Q. Do you have that with you here today?
A. No, sir; but I can get it for you.
THE WITNESS: Excuse me. Is that -- okay.

Page 31

Q. You indicate that you have recently learned as to the Brown and Wood opinion, that you received that in mid-March of 2000?
A. Yes, sir.
Q. On what do you base that knowledge? How are you reconstructing that?
A I -- excuse me --
MR. CROUCH: As long as it doesn't violate the attorney/client privilege.
THE WITNESS: I'm trying not to violate the attorney/client privilege.
A I think I got a copy of it from Mr. Crouch.
THE WITNESS: Is that right?
Q. And it was dated in March of 2000?
A It was dated in March of 2000. And I must have received it in 2000, because the letter, I think was dated March 15th, or something like that, in 2000.
Q. Do you have any memory -- actual memory -- of receiving it in March of 2000?
A I would like to say yes, but I would just be speculating.
Q. Is it possible you didn't receive it until later, May of 2000, after the filing of your

Page 32

tax return?
MR. CROUCH: Objection; calls for speculation.
A. I just don't know, sir.
Q. Do you recall when the fee was paid to the firm of Brown and Wood for their opinion?
A. A specific date?
Q. Yes.
MR. CROUCH: It might help him, counsel, if you showed him documents.
MR. LINDQUIST: I'm just asking.
Q. If you have any recollection -- if you don't, I'll go to the documents -- but I'm asking if you have any recollection.
A. I recall Mr. Zucker and I either wired or caused to be wired some money to the two law firms.
Q. And did you pay the two law firms before or after you had received the opinion?
A. Well, I didn't yet receive the Jenkens opinion until June of 2004; so, I obviously paid Jenkens before then. But as to Brown and Wood, I don't know.
Q. Have you -- do you recall whether the transaction that you discussed with Mr. Knight, whether that was ever called COBRA?

Page 33

A As of today, I know now it's called COBRA.
But at the time that Mr. Knight appeared on our door step, or whatever, I had never heard of COBRA.
Q. What sort of due diligence did you do in 1999 before deciding to purchase the COBRA product?
A. Jerry was an expert on Black-Scholes and some other thing called Garman something -- I'm sorry -- I can't remember Garman something -- and -- but I did a lot of tax -- not a lot -- I did tax research on issues related to Section 752, which was basis.
I did confirmatory research, I believe. I can't say for certain, but I think I would have as to Section 351 about basis and stuff like that.
Q. Did you write any memos?
A. Did I?
Q. Yes. At that time, all this research that you did, did you keep a folder of research with respect to this transaction?
A. Without sounding cute or anything, I used to have a pretty good memory, and you would call it photographic.
And I just would read stuff, and I would

Page 34

remember it.

I don't believe I wrote anything down. I may have written something -- or something to Jerry about amounts to spend -- for me -- not him because he's big time -- on hedges and stuff like that. options.

Q. Uh-huh.

A. But I don't specifically recall.

Q. So, you had a photographic memory in 1999 that you could use --

A. People used to say that.

Q. Was that your understanding, that you could use your memory -- you could see something once, and you could recall it?

A. Not quite as good as my grandfather, who taught at Harvard, or my uncle, because they had classic photographic memories. But I had a darn good memory.

Q. And before you did this research, what was -- how did you understand -- how did you learn about how the transaction was, in fact, going to be implemented the details of the transaction; how did you understand the transaction?

A. My main discussions were with Jerry. And we talked, to the best of my recollection, about

Page 35

different currencies.

Q. Okay.

A. Because we used to do a lot of hedging. I can't tell you specifically, but Jerry would do hedging in the hundreds of millions of dollars.

And I think I was a participant in some of those.

For corporate purposes, we used to do hedging for Europe, England, Italy, Canada; we did a lot of Canada -- hedging in Canada.

THE WITNESS: Excuse me.

Q. My question for you is: How did you -- did you, at any time, learn the details of how this proposed COBRA transaction was to be implemented?

A. Can I answer it in two parts?

Q. Answer it any way you want.

A. I kind of was riding Jerry's coattails on a lot of things.

But I wanted to, as he did, very much so, we wanted to make money.

And we talked a lot about different currencies, Jerry and I did. I never talked about them with -- that I can remember -- with a lot of other people; but Jerry and I used to talk about currencies all the time.

Page 36

And I seem to recall -- please don't hold me to this -- but Jerry came to me and said we could make something like 45 or 50 million dollars.

And then he talked about -- that he might want to do something larger to make more money.

And, of course, my percentage was only ten percent in this transaction.

Q. Why was that, that your percentage in this transaction was ten percent?

A. We had differing percentages on some investments that we do.

And in all honestly, because I was reasonably wealthy, but Jerry was very wealthy.

And Jerry had the ability to do more and put more at risk than I could -- or at least he was willing to put more at risk than I could.

Q. What was the transaction in which you had a 90/10 split, at that time, that you are referencing?

A. Oh. You're asking 90/10?

Q. Yes.

A. Jerry and I had a 90/10 split in an investment involving -- I principally recall Euro dollar hedges.

And I think Jerry did yen and dollars.

Page 37

and I wanted to know -- could we do Canadian dollars and US dollars; but I remember specifically Euro and dollars.

Q. Other than the COBRA transaction, which I believe involved -- ultimately, there was a Euro -- you purchased Euros, and I think Jerry purchased Euro and yen hedges.

You indicated that when you went into the COBRA transaction, you only had a 10 percent split, and Jerry had a 90 percent split of that transaction, which, I believed, totaled $50 million in terms of the longs.

A. I thought, at one time, he talked about -- excuse me -- you didn't ask a question. I'm sorry.

Q. You think I'm incorrect? You indicated sometimes he talked about $100 million?

A. I think at one time $100 million came up.

Q. Yes.

A. And I said: That is too much risk for me.

And I only wanted to be at risk for a couple million dollars; which I could handle.

Q. So, when you first discussed the COBRA transaction, you were discussing a 98 percent/two

Page 38

percent split; something like that?

MR CROUCH: Objection; assumes facts not in evidence.

A. I didn't know what it was called COBRA, but what we were discussing was hedging

Q. Uh-huh.

A. And Jerry talked to me about the possibility of taking hedging positions at larger amounts than what we actually did

MR. CROUCH: Jim. I think you need to listen to what his question is and answer exactly what he's asking.

THE WITNESS: I apologize Could I go to the bathroom?

MR. CROUCH: Can we take a break?

MR. LINDQUIST: Absolutely

VIDEOGRAPHER: We will now go off the record. The time is approximately 10:04.

(OFF THE RECORD)

VIDEOGRAPHER: Is everybody ready?

MR. LINDQUIST: Yes.

VIDEOGRAPHER: Okay. Mr. Lindquist. you all set?

MR. LINDQUIST: Yes. I am. sir

VIDEOGRAPHER: Stand by. please.

Page 39

We are now back on the record The time is approximately 10:14

MR. LINDQUIST: Thank you.

Q. Mr. Boyd, do you know if you ever signed an engagement letter with Ernst & Young with respect to the COBRA transaction?

A. To be honest. I don't recall.

Q. Do you know whether there was ever any discussion of doing a COBRA transaction for $100 million desired loss?

A. Loss?

Q. Yes.

A. Excuse me No. I remember talking with Jerry. but he was up with real big numbers about profit. but I don't ever recall a talk about a loss

Q. You don't recall talking about a desired loss?

A No. sir

Q. You referenced earlier. the fact that you only had a 10 percent participation in the COBRA transaction. because in other deals you also had a 10 percent participation with Mr. Zucker.

Was there some other transaction that you are specifically referencing where you only had a ten percent participation with Mr. Zucker, other

Page 40

than the COBRA transaction. which you then had a ten percent participation in?

A I don't recall. but I know that in some transactions. I had more interest than even Mr. Zucker did.

But --

THE WITNESS: -- excuse me -- I shouldn't answer more than that.

A. I don t know.

Q. What sort of discussions did you have with Mr. Zucker in the fall of 1999, as to the amount of risk that you wanted to take in the COBRA transaction?

A. I can only remember one discussion. and that was like maybe two and a half or $3 million at risk -- actual cash in something

Q. You're paraphrasing, and I don't quite understand.

A. I'm sorry.

Q. You said it was like maybe two and a half or $3 million of risk -- actual cash in something.

Can you put that into -- explain what you mean by that statement.

A. I'm sorry I can't.

Q. So. am I to understand that you did not

Page 41

want to risk more than two and a half or $3 million in actual cash, as your loss?

A I think. at that time. I was concerned my exposure would be what I call relatively de minimis. and would not be more than well X plus Y dollars; nothing big like Jerry would do.

Q. At that time. were you providing any type of legal advice to Mr. Zucker with respect to the transaction being proposed by Mr. Knight?

A. We were partners. and I thought it was my obligation to check out things. like basis. and would we get basis and was that appropriate: and we were doing the right thing

And Jerry used to ask me a lot of tax questions. but I can't tell you exactly what he asked me

Q. Did you rely upon Mr. Zucker to do the financial side of the transaction?

A. Jerry is a financial genius. but I thought that I was reasonably -- about Black-Scholes and that kind of stuff -- but I really relied on Mr Zucker. because he was an expert

Q. Did Mr. Zucker ever discuss with you whether or not the fee being charged by Deutsche Bank for the options transactions that you engaged

Page 42

with in Mr. Zucker, whether or not that fee was a reasonable fee?

A. I don't recall.

Q. Did you or Mr. Zucker ever discuss what the fee was that was being paid to Deutsche Bank in that transaction as part of the premium you were paying?

A. In all honesty, I don't recall.

Q. I previously asked you what sort of due diligence you did with respect to the transaction.

And, specifically, I want to focus you on what type of documentation you obtained from Ernst & Young prior to engaging in the transaction.

MR. CROUCH: Is there a question.

MR. LINDQUIST: Yes?

A. Documentation, you said?

Q. Yes. Did you receive any documentation from Ernst & Young, as to what the product was that you were purchasing from them?

A. No, sir.

Q. Was that a normal practice for you to have a proposed transaction without any written description as to what the proposed transaction was going to be?

MR. CROUCH: Object to the word "normal

Page 43

practice;" it's vague and ambiguous.

A. Jerry and I used to do a lot of hedging and other things like that.

And I don't think -- I don't recall ever getting something formal or anything like that.

Q. You keep using the word "hedging" with respect to the COBRA transactions.

Was there any particular type of -- was there any particular type of risks that you were -- you and Jerry were planning to hedge with respect to the COBRA transactions?

A. You keep referring to "COBRA." I didn't know the name COBRA at this time.

Q. Then for convenience sake, I'm using the word COBRA.

A. Okay.

Q. But this proposed transaction that you were going to purchase from Ernst & Young, was there any particular type of risk that you and Jerry needed to hedge at that time?

A. Not formal in the word hedge, but we did long and short positions.

But I don t think we used the word ourselves, "hedging," like we would do for corporate purposes

Page 44

Q. So, here in this transaction being proposed by Ernst & Young, you recall that there were offsetting positions, long and short?

A Yes, sir.

Q. And why were there offsetting positions?

MR. CROUCH: Objection to the word "offsetting," vague and ambiguous

A. I don't recall the word "offsetting," but I remember that we did a long -- we did a long option, and we did a short option

But I don't recall, specifically, similar to what Mr. Crouch said, that they were offsetting or anything, they were independent transactions

I just -- I remember doing two independent transactions.

Q. And how much was the long option that you purchased from Deutsche Bank?

MR. CROUCH: Are you talking about him personally?

Or as part of the whole transaction?

Q. No. You personally.

A. I seem to recall something like two and a half million, or something like that; but I can't be specific.

Q. There was an LLC that was formed. Do you

Page 45

recall the name JGB Bohicket -- I think was the name. I may have the wrong name.

A I had had that as an entity before

Q. Why was the LLC formed in the fall of 1999 by that name?

MR. CROUCH: Objection; assumes facts not in evidence

A. I can only assume I formed an LLC because it had -- LLCs have limited liability, or it was for investment purposes.

Q. Do you know why the options that you purchased were purchased purportedly through this LLC?

A. I don't recall.

Q. Do you know why the options -- the purchase through this LLC -- were then contributed to a partnership?

A. I seem to have a recollection that Jerry and I talked about spreading or diversifying our portfolios, or doing things; but I just don't recall.

Q. Do you know why it was that you did not just purchase the options through the partnership -- you and Jerry?

A. I don't recall. I'm sorry.

Page 46

Q. Do you know -- do you have any recollection as to whether there was any type of a timeline with respect to the transaction -- this thing that was called -- has since been called COBRA?

A. Well. I do remember under Black-Scholes. you used to have to do timelines or things -- different kinds of timelines.

But I remember that Jerry and I wanted to make money for -- I think it was 1999 -- excuse me -- 1999. and but I don't recall specific reasons to do timelines. other than the Black-Scholes that we -- because you have to look at timelines for Black-Scholes.

Q. Why did you do a 30-day option?

A. Greed. I don't know. Greed I don't know.

Q. I mean, did you ever discuss: Why not do a 60-day or 90-option?

A. Most things under Black-Scholes were compressed in time. that I recall

But I don't recall specifically discussing 20 days. 30 days. 40 days; I don't recall

Q. Do you ever recall having any discussion

Page 47

regarding the fact the transaction had to be closed out before the end of the tax year of 1999?

A. (No response.)

Q. Which would have meant you couldn't have gone beyond 30 days?

MR. CROUCH: If you recall

A. I don't recall.

THE WITNESS: I'm sorry

A. I don't recall.

MR. CROUCH: That's okay.

Q. Do you recall whether there was any type of a non-disclosure agreement that you were required to sign by Ernst & Young with respect to this transaction that they were discussing with you?

A. No. sir.

Q. Do you recall whether you were required to sign a document prepared by the law firm of Jenkens and Gilchrist?

A. You mean non-disclosure?

Q. No. Documents to implement the transaction.

A. Yes. sir. And that was when I first knew about Jenkens and Gilchrist.

But I never knew about Brown and Wood. because they weren't involved

Page 48

Some lady named Guerin -- Donna Guerin was someone from Jenkens and Gilchrist.

Q. Uh-huh.

A. Donna Guerin used to send stuff to us by fax -- or something -- to us.

Q. Did you ever call up Donna Guerin?

A. I probably did. but I don't recall.

Q. Did you ever call up R. J. Ruble?

A. Who.

Q. Mr. Ruble of Brown and Wood?

A. I have never heard that name before.

Q. Did you ever call up Susan Sadona, his secretary?

A. I never heard that name before.

Q. Did you ever speak with Paul Daugerdas at Jenkens and Gilchrist?

A. No.

Q. Did you ever speak to any other attorneys at Jenkens and Gilchrist?

A. Can I ask a question?

Q. Sure.

A. Was Donna Guerin an attorney?

Q. Yes. she was.

A. I don't recall

Q. Other than Donna Guerin, who you indicate

Page 49

that you communicated with in writing, did you speak with any attorneys at Jenkens and Gilchrist?

A. I didn t speak with. but I received letters from -- who was that guy you mentioned?

Q. Paul Daugerdas.

A. I remember his name on something. but I don't remember him I don't remember talking to him.

Q. Were you ever asked to sign a certification of facts in support of a Brown and Wood opinion?

A. Well. I didn t know who Brown and Wood was until I received their opinion

So. maybe I did; I don't know. I may have. but I don't know.

Q. So, it's your recollection today. that when you received the Brown and Wood opinion. it was a surprise?

A. In all honesty. I think yes.

Q. Okay.

A. Because I didn't know that they were involved -- excuse me -- I used to deal with Brown and Wood on bond deals. tax deals many. many years before.

They were an expert underwriters counsel

Page 50

in bond deals.
But I didn't know that they were involved in anything with Ernst & Young.
Q. You indicated that early on in the transaction when you were talking to Mr. Knight, he had referenced there were two law firms involved.
Who did you understand the second law firm to be?
A. I had no idea, but I just surmised that it may have been a firm that represented Ernst & Young, or something like that.
And would have probably been in either like New York or Chicago or something like that, but I didn't -- I don't know.
Q. Did you ever -- did you think that it was appropriate to inquire as to who the law firm would be?
A. It probably would have been, but I don't recall ever doing it.
Q. Were you planning, at any time after you decided to engage in this transaction that's been called COBRA -- did you -- did you plan at any time to rely upon opinions to be issued by these two law firms that were referenced by Mr. Knight?
MR. CROUCH: Do you understand the

Page 51

question?
THE WITNESS: I think I do.
MR. CROUCH: Okay.
A. The best as I can recall, is that at some point in time, either Jerry or I was told that there would be one or two law firms that would render an opinion or something -- that should be it.
Q. Did Jerry at any time ask you to write an opinion to support him on this transaction?
A. We used to do hedges all the time and currency swaps and things like that, and he never asked me for an opinion before.
He just would ask my advice on different currencies, like lira or pound, because the Euro hadn't -- I don't know if they had come into existence by then.
I don't know if it came into existence by then, but the main was pound and lira and Deutschmark and Canadian dollars.
But he never asked me for an opinion.
But he would sometimes ask me: Do you think this is a wise thing to do on currency or hedging -- because we used to do hundreds of millions of dollars of hedges on debt and stuff like that.
Q. When you did these hundreds of millions

Page 52

of hedges on debt and currencies, did you deal directly with the financial institution to put that trade through for you?
A. Jerry and I used to deal with --
MR. CROUCH: You need to answer his question.
A. I don't know. I can't remember.
Q. Did you have any type of relationship with -- you and/or Jerry -- have any relationship with any financial institutions that did hedges?
A. Yes, sir.
Q. And which institutions were those?
A. Morgan Stanley, Dean Witter, but they were acquired by Morgan Stanley.
Q. Was there any particular individual that you recall, that you had financial contact with at Morgan Stanley?
A. About hedges?
Q. Yeah. If you had wanted to put a hedge through, who would you have contacted?
A. We also used to deal with J.P. Morgan Chase.
Q. Uh-huh.
A. And Bank of America, First Union and CitiBank; but I don't recall names.

Page 53

Q. At Morgan Stanley, do you recall any specific name?
A. At Morgan Stanley?
Q. Yes.
MR. CROUCH: If you can remember.
A. I don't remember specifically.
Q. If you had wanted to purchase Euros, a long or a short on Euros in 1999, do you think you could have done that directly through Morgan Stanley?
A. We used to deal in pounds and lira. And I think even Deutschmarks.
But I think we dealt in many currencies, but Euro was a new currency, new currency around that time.
Q. Uh-huh.
A. I think they came into existence in either '98 or '99.
Q. Could you have purchased it directly through Morgan Stanley with whom you had a relationship?
A. And also banks.
Q. Yes.
A. Yes, sir.
Q. Is the answer yes?

Page 54

A. Yes, sir; I think so.

Q. Allow me to show you what's been previously marked as Government Exhibit 177.

MR. CROUCH: Is this one of these from yesterday?

MR. LINDQUIST: Yes, it is.

THE WITNESS: Can I show this to Mr. Crouch?

MR. LINDQUIST: I believe he has a copy right there.

MR. CROUCH: I have one right here.

(PREVIOUSLY MARKED EXHIBIT 177.)

Q. This is a copy of an engagement letter signed by Mr. Zucker dated November 11 of 1999.

First off, have you ever seen this document before?

A. Probably, but I can't specifically say yes, but I probably have.

There's a note here above Jerry's signature, says $100 million.

MR. CROUCH: He didn't ask you that question.

THE WITNESS: Excuse me.

Q. Well, let's go to the back, the second page, I should say, of this.

Page 55

And it -- can you read Jerry's handwriting there, that note that you are referencing?

A. Is this where you are reading from. $$100 million.

Q. $100 million losses to be allocated at 98/2 between the parties --

A. Subject to clarification.

Q. -- of second paragraph on first page.

A. Second paragraph. What is that?

Q. The second paragraph on the first page states:

In this engage, we will be using information provided by you and the partnership and will not be relying upon --

MR. CROUCH: I think you misstated what that says. It says it will be relied on.

Q. I'm sorry. In this engagement, we will be using information provided by you and the partnership will be relying upon you and the partnership for the accuracy and completeness of this information.

That's the first sentence.

And there is some handwriting next to that with a question mark which appears to say

Page 56

something like: What information?

A. Yes, sir; I see that.

Q. Do you recall any discussion with Mr. Zucker about this paragraph?

MR. CROUCH: Objection; foundation.

THE WITNESS: Can I answer it?

MR. CROUCH: Yes, you may.

A. I don't recall it.

THE WITNESS: Can I clear up something?

MR. CROUCH: No.

THE WITNESS: Okay.

Q. If you take a look at the third paragraph down --

A. Yes, sir.

Q. -- that first sentence -- sorry, I think I'm reading it correctly, the second sentence that starts: Investment in partnership, equals cost of long-option contract equal to five percent of desired loss, plus cash equal to two percent of the desired loss.

I previously used the phrase "desired loss," and you didn't appear to recall that phrase.

Does this refresh your recollection?

A. I don't even recall this letter. No, sir.

Page 57

Q. Just whether that reading that refreshes your recollection of any discussion with respect to the phrase "desired loss"?

A. No. I remember talking about profit of $150 million. $100 million once and $50 million once, but I don't recall any discussion about loss or anything.

Q. You previously indicated that you had some recollection that you and Jerry had originally talked about a larger transaction of around -- I think you said $100 million?

A. Jerry did; I didn't.

Q. Okay.

A. Ha-ha-ha

Q. And this handwriting on the second page references the phrase -- references the fact that this is a $100 million loss at 98/2 between the parties.

Were you supposed to be the other party with the two percent loss?

A. He talked to me about --

MR. CROUCH: Objection; foundation.

THE WITNESS: Excuse me.

MR. CROUCH: Go ahead.

A. He talked to me about a profit of $100

Page 58

million.

And I said: How much risk does that involve?

And I think it was much more than I personally wanted to be at risk.

Q. Did you mean to say $100 million in profit, as opposed to $100 million in loss?

A. Yes. sir.

Q. That isn't misspeaking?

A. I remember talking. and I remember Mr. Zucker and I discussed -- it was either $100 million. or what he finally talked about was maybe $50 million.

But that was always profit. it was never -- never a loss.

THE WITNESS: Do you want this back?

MR. LINDQUIST: Just put it right down there.

Q. Allow me to show you what's been previously marked as Exhibit 178.

MR. LINDQUIST: And. counsel. you should have a copy of this from the other day.

MR. CROUCH: I do. I have a copy right here.

(PREVIOUSLY MARKED EXHIBIT 178.)

Page 59

THE WITNESS: Okay.

Q. This is a letter dated November 15 of 1999. a few days later, from Mr. Knight to Mr. Zucker.

And with this, he's saying that he's forwarding a modified engagement letter -- and states two legal opinions from reputable law firms will be provided.

Do you recall ever seeing this document?

A. Where does it say -- oh. yes. Two legal opinions -- no.

But I remember Jerry talked to me about a fallback position; that if we didn't hit the numbers. that the worst case was that we could have a loss. but it was always a fallback.

THE WITNESS: You want this?

MR. CROUCH: He's probably not done asking you questions yet.

THE WITNESS: Excuse me.

Q. Did you ever understand that the amount of the fee to be paid to Ernst & Young on this transaction was one-and-a-half percent of the desired loss, as reflected on this Exhibit 178?

MR. CROUCH: Objection; foundation.

A. No. sir.

Page 60

Q. If you take a look at the -- at the front page of Exhibit 178. below the E&Y fee at one-and-a-half percent, it states that: The law firms and bank (billed separately from E&Y) three percent.

Did you ever have any understanding as to how the amount to be paid to the law firm was supposed to be computed?

MR. CROUCH: Objection: foundation.

A. No. I just thought they were billing us a fixed flat fee. I never saw that.

Q. Do you recall what that fixed flat fat -- excuse me.

A. It was fat.

Q. Fixed fat flat fee -- I won't do that -- how that fixed flat fee was -- how much it was?

A. I don't recall. specifically. But I think it was in seven figures.

Q. Why the disparity between the fee to be paid to Jenkens and Gilchrist, and the fee to be paid to Brown and Wood?

A. I didn t even know about Brown and Wood. so I can't answer that.

Q. Here it reflects that the -- on this -- that the fee to be paid to the law firms to be

Page 61

billed separately is going to aggregate a flat three percent of the desired loss.

Does that refresh your recollection?

A. No. sir. I have never seen this before.

And no percentage was ever mentioned to me.

Q. Below the bottom line of this letter, recites that the amount of the loss is $50 million of which 60 percent is to be ordinary loss and 40 percent is the long-term capital loss.

Do you recall having any discussion with Jerry as to the breakdown of the loss; 60 percent and 40 percent?

MR. CROUCH: Objection; foundation.

A. Not that I recall. I was aware of Section 988. which talked about gain. how you treated gain between ordinary and capital under the Code Section 988. But I don't recall any of this.

Q. So, you do not recall that it was -- that the prior agreement was to generate a loss of $50 million?

A. Agreement with whom?

Q. With Ernst & Young.

A. No. sir. I don't recall anything.

Q. And you don't recall that the prior

Page 62

agreement as of November 15 of 1999, was to generate 60 percent ordinary loss and 40 percent long-term loss?

MR CROUCH: If you know.

A. No. sir.

Q. And then the last line here says that: The allocation of the partnership interests is 90/10' i.e.. 10 percent is allocated to Jim.

Are you the Jim being referred to here?

A. I would assume so. Because I had -- my interest in the currency hedges was ten percent.

Q. Well, at this point in time. November 15 of 1999, the hedges had not yet made -- not yet been done.

A. Okay.

Q. And the fee had not yet been paid.

MR. CROUCH: Objection; assumes facts not in evidence.

Q. So, was there some sort of discussion that you had with Mr. Zucker, or somebody else, to let Mr. Knight know that you were going to be participating ten percent in this transaction?

A. I don't know. I'm sorry. I don't know.

Q. Allow me to show you what I believe has been previously marked as Exhibit 180.

Page 63

THE WITNESS: Do you have this?

MR. CROUCH: I do.

(PREVIOUSLY MARKED EXHIBIT 180.)

Q. This is a fax from Mr. Knight to Jenkens and Gilchrist, dated November 13 of 1999.

And this fax was sent two days before Exhibit 178 that we just looked at.

So, at this point in time, Mr. Knight is sending a fax to Jenkens Gilchrist with respect to your proposed transaction.

Mr. Boyd, if you look on the front page, it's referenced as partnership number three: Mr. Boyd and Mr. Zucker are listed.

And if you turn to the last two pages of this document, you will find what is entitled a: COBRA Client Information Questionnaire that has been completed for both you and Mr. Zucker.

A. That's not my writing.

Q. I didn't say that it was.

A. Excuse me.

Q. I said it had been completed. And my first question, after directing your attention to it is: Have you ever seen this COBRA Client Information Questionnaire before?

A. I don't recall. sir. but I would say no.

Page 64

Q. How did Mr. Knight obtain this information to fill in on this sheet?

For instance, he fills in your name at the top.

And then the name, I believe, of your -- is Hazel Sam Boyd your wife?

A. She's named after Sam huff.

Q. Did you provide that information to Mr. Knight?

MR. CROUCH: Objection; assumes facts not in evidence. foundation.

Another objection -- I can't remember what it is now.

A. I didn't. sir. But maybe Jerry might have; I don't know.

Q. Is that, in fact -- was that, in fact, your address in 1999, 3520 Bohicket Road, Johns Island?

A. Johns Island. I had a horse farm there. yes.

Q. And were those your phone numbers at -- phone numbers and fax numbers at that time?

A. I can answer about the phone numbers, but I can't recall the fax numbers.

Q. As to the phone numbers, were those your

Page 65

phone numbers at that time?

A. Both here at the Intertech Group and my house; yes, sir.

Q. And were those your Social Security numbers?

A. Yes. sir. And I have to get -- that's my wife's Social Security number. but I don't recall it.

Q. And there's a bank reference here that is about four lines up from the bottom: Chase Manhattan; was that your bank?

A. I used to do much with Chase Manhattan before they merged with J.P. Morgan.

Q. And it lists your approximate annual household income and approximate net worth; are those accurate $1 million plus for annual household income and $50 million plus for net worth?

A. I think the net worth was understated. but the annual household income -- that was since it's got a plus after it. yes. that would have been correct.

Q. How do you recall whether you provided the information about your annual income and net worth to Mr. Knight?

MR. CROUCH: Objection; foundation. calls

Page 66

for speculation

A. I don't recall.

THE WITNESS: Can I say one thing?

MR. LINDQUIST: Yes, sir.

MR. CROUCH: You need to answer his questions when he asks his questions.

A. I don't recall ever saying that.

MR. LINDQUIST: Okay.

Q. Do you recall ever providing that information to Mr. Knight in any way?

A. No, sir; I don't recall.

Q. Do you recall authorizing anyone to provide that information to Mr. Knight on your behalf?

A. Jerry and I had a relationship where he could provide information about me, or I could provide information about him.

But I don't recall a specific written document.

Q. And then the amount of the transaction is written down on here.

And it appears that the amount has been -- the original amount has been crossed out and in lieu of it, the number five looks like it used to be something like $2 million. It looks like it's

Page 67

been increased to $5 million.

Do you recall any discussion about the fact that you were going to participate in a $5 million transaction?

MR. CROUCH: Objection; asked and answered.

THE WITNESS: Excuse me. Where is that?

Q. Amount of transaction, it's on the one, two, three, four, five, six -- seventh line up from the bottom.

A. I don't recall.

Q. And the amount of the ordinary income, you'll see that there's an amount that has been crossed out, and the number 60 percent appears.

Is any of that handwriting your handwriting?

A. No, sir.

Q. Now, there are lots -- it appears that there are different handwritings on here, but --

So, I would ask you to take a careful look to make sure none of that's yours.

A. None of it's mine.

Q. Did you have any particular need for a loss -- an ordinary income loss -- of $3 million in 1999?

Page 68

MR. CROUCH: Objection; vague and ambiguous.

A. No. But a profit of many millions of dollars is what Jerry and I talked about, and that would have been nice.

Q. Understood a profit would always be nice, but it appears this document is planning for a $3 million ordinary loss back in November of 1999.

MR. CROUCH: Objection; calls for speculation, no foundation.

A. No. No, sir. I don't know, sir.

Q. And it appears that from this document, that there's also a plan for a capital loss.

Were you planning for a capital loss at that time?

MR. CROUCH: Objection; assumes facts not in evidence.

A. Not to my recollection.

THE WITNESS: Excuse me.

MR. CROUCH: Can we take a break?

MR. LINDQUIST: Absolutely, sir.

VIDEOGRAPHER: Going off the record; the time is approximately 10:57.

(OFF THE RECORD.)

VIDEOGRAPHER: Everybody set? Stand by, please.

Page 69

We are now back on the record. The time is approximately 11:13.

Q. (BY MR. LINDQUIST:) Mr. Boyd, allow me to show you what has been previously marked as Exhibit 1006.

MR. CROUCH: I have a copy of that.

MR. LINDQUIST: You should have a copy of that one, as well, counsel.

MR. CROUCH: I do.

(PREVIOIUSLY MARKED EXHIBIT 1006.)

Q. This is an E&Y engagement letter addressed to you, of November 15, 1999.

I'm going to ask you whether you recall receiving this?

A. To be honest, I don't recall.

Q. Okay.

A. I don't think I did, but I don't recall.

Q. It references, in the third paragraph down, a fee of $75,000 to be paid to Ernst & Young by you.

Do you recall paying Ernst & Young $75,000 with respect to the COBRA strategy referenced in this letter?

A. I must have paid them. I don't remember.

Page 70

though. what the amount was.
Q. It talks about, in that third paragraph -- it also uses -- in the second sentence, it references that the amount of the -- the amounts to be paid are in reference to the desired loss.
Do you see that phrase "desired loss" in that sentence?
A I see that. but I don't recall this letter.
And I don't recall -- I didn't sign it. So. I don't recall it.
Q. Do you recall not ever -- you indicated that, yes, this is not initialed by you on the second page -- this particular copy.
Do you, in fact. have an expressed recollection, now that you received something like this and refused to sign it?
A. I don't recall receiving this. sir.
Q. Allow me to show you what's been previously marked as Exhibit 1009.
(PREVIOUSLY MARKED EXHIBIT 1009.)
Q. This is a fax. It appears to be from you to Donna Guerin; is that your handwriting?
A. Yes. sir. It's my handwriting.
Q. It appears to say -- and correct me if

Page 71

I'm wrong -- Dear Donna: After receiving clarification from Ray Knight at E&Y RE: the $140,000 referenced in attached letter and instructions authorizing $150.000 to be wired. please note I have approved the -- and what is that -- incremental amount; also have left a voice mail message for you confirming the approval. Thanks. Jim Boyd.
A That's my writing. sir.
Q. Did I accurately read your handwriting?
A Yes. sir I don't see -- I don't understand what that word is. that it looks like something line "i-n" something m-e-n-t-a-l. maybe it is incremental. I don't know. but that's my handwriting
Q. If you take a look at the next page. This is a letter addressed to you from Jenkens and Gilchrist.
And it appears that it has been initialed by you on December 20th of 1999.
That's on the third page of this document; is that your initials?
A That's my signature
Q. Okay.
A But it's very hurried -- hurried

Page 72

signature.
Q. Do you recall why a $140,000 fee was going to a $150,000 fee?
A. In all honesty. no.
Q. Do you recall leaving this voice mail message for Donna Guerin?
A. In all honesty. no; but that's my handwriting.
Q. Do you recall a discussion with Ray Knight on or about this date of December 29 of 1999. that is referenced in your handwritten note?
A. Well. if it says it. I must have done it. But I don't recall it.
Q. If you turn to the last page, where is this money being wired from and to?
A. It says: Herein instructions to wire to Deutsche Bank. Alex Brown.
Q. Uh-huh.
A. So. that's where it must have gone to.
Q. Okay.
A. I don't know. But that's my initials.
Q. Was it your understanding that this was your payment to Jenkens and Gilchrist for its opinion letter to be issued to you?
A. I don't know I just know my signature

Page 73

is about wiring money. but I don't know what it was for.
Q. Well. then. let's turn to the second page of this fax. the last paragraph on that page.
MR. CROUCH: Are you talking about page one of the letter. counsel?
Make sure he's got the right page here
MR. LINDQUIST: Page one of the letter. the second page of the document.
MR. CROUCH: Okay.
Q. At the Bates No. JGCI 1048032.
A. Right.
Q. It says: The amount charged for the legal services we provide to you will be based on a fixed fee of $140,000 for our advice and assistance in the facilitation and execution of European digital foreign currency option investment transactions in the amount of approximately $5 million.
The documentation of the transaction and our research and the rendering of a "more likely than not" tax opinion setting forth our conclusions and rationale.
Having read through that paragraph. does that refresh your recollection as to whether your

Page 74

fee here was for these services?
A. I'm just reading it now. I don't know. I don't know what it was for.
Q. So, other than reading it now, you don't have any recollection?
A. No, sir.
Q. Did you, as an attorney, have any opinion as to whether or not you could rely upon an opinion being issued by the same firm that had designed and was going to implement the transaction --
MR. CROUCH: Objection; assumes facts not in evidence.
Q. -- for you.
A. You said designed?
Q. Yes.
A. I had no idea that somebody designed something, other than Ernst & Young.
Q. Did you have any opinion as to whether or not you could rely upon an opinion from the same law firm that was implementing the transaction for you?
MR. CROUCH: Same objection; assumes facts not in evidence.
A. To be honest, I don't recall that, but I -- because I relied on Ernst & Young. I --
Q. Were you going to get an opinion from

Page 75

Ernst & Young?
A. I don't recall.
Q. Did you ask for an opinion from Ernst & Young?
A. I don't think so.
Q. I'll show you what's been previously marked as Government Exhibit 159.
(PREVIOUSLY MARKED EXHIBIT 159.)
Q. This is an internal Ernst & Young e-mail dated November 11 of 1999 by which it distributed to various people within Ernst & Young, including Mr. Knight, who is listed on the addressee list here, a copy of what is attached, and that is a COBRA PowerPoint.
You can see the names of the attachment on the front page here, and then the attachment follows.
A. I have never seen this, sir.
Q. That's my question for you. If you take a look at the second page, this is the first page of the PowerPoint, and then it has the number of pages that follow.
And so I want to first ask you to take a look at that attachment, and tell me whether or not you have ever seen this or were ever shown this.

Page 76

MR. CROUCH: Objection; vague and outside the attorney/client privilege.
MR. LINDQUIST: I'm sorry.
Q. Whether you were ever shown this in 1999 or 2000.
A. No, sir. Never saw it. This is the first time I have ever seen it.
Q. The PowerPoint goes through and describes a number of steps.
Did Mr. Knight ever discuss with you what the steps of the proposed transaction would be that you were going to be purchasing from Ernst & Young?
A. What page, sir?
Q. If you turn to, for instance, page three of the PowerPoint, has the title: Step One, Option Contracts.
A. Got it.
Q. And it has Bates No. 2003 EY 3753.
MR. CROUCH: That's it. The Bates numbers there.
Q. That's where step one is;
The next page is step two;
The next page is step three;
The next page is step four;
And then it has step five.

Page 77

And the question is: Did Mr. Knight ever discuss with you what the planned steps of the transaction that you were going to undertake were to be?
A. I don't recall, but he must have. I don't know.
Q. If you turn to page eight of the PowerPoint, and that's at 2003 EY 3758 --
A. Okay, sir.
Q. -- there is an executive summary.
A. Yes, sir.
Q. And the first bullet there is: Taxpayer and other non-related individual, is referenced there.
Do you recall discussing with Mr. Knight as to who could participate in the transaction?
MR. CROUCH: Objection; foundation.
A. I don't recall, sir.
Q. Do you ever recall discussing with Mr. Knight how the strike price of the options were to be determined after 30 days?
A. Strike price --
MR. CROUCH: Objection; assumes facts not in evidence.
A. I'm certain, because strike price is part

Page 78

of all of it.

But I don't know if I did discuss it with him. or if Jerry discussed it with him; I don't know.

Q. Do you know if you -- prior to this, you had ever engaged in a European digital option transaction?

MR. CROUCH: Objection; vague and ambiguous as to 'before this."

Q. Before -- before November of 1999.

A I may have. but they are different from American digital options.

Q. Yes. Do you know what the difference is?

A Yes A European digital option. you can only exercise on the expire date. the date that it expires.

And the American option. you can actually exercise at any time up to and including date of the expire

Q. Did you know at the time of November of 1999?

A It's strange That's something I do remember, because I used to know that

Q Okay.

A Because I used to deal in both Black-

Page 79

Scholes and Garman -- it's Garman something. I can't remember his last name. I can't remember the last name of it. Garman-something. Heckleberg -- excuse me.

MR. CROUCH: Never mind.

Q. So, you used to deal with this in your business?

A. Yes. sir

Q. Do you know if Jerry Zucker had previously engaged in European digital option transactions prior to November of 1999?

A. I understood and believed he was an expert in both American and European digital options.

And I was just kind of a run-of-the-mill person in it. but he was an expert.

Q. My question is: You both may have known that they existed.

Did you personally, prior to November of 1999. ever personally invest in a European digital option?

A. I can't recall a European. but I think -- I think I did in American options, but I can't recall I just don't know.

Q. Why here --

Page 80

MR. CROUCH: Can I get clarification before you ask your next question.

Are you talking about him personally? Not within their business.

A In the business. it was in the business. not me personally. in the business.

Q. So, did you within your business investments. ever prior to November of 1999, purchase a European digital option?

MR. CROUCH: If you know.

A. I just don't recall.

Q. And I believe -- and I want to make sure I understand your testimony -- that prior to that time, you in your business had invested in American digital options.

A. To the best of my recollection. I think so.

And we did hedges and swaps and currency hedges and that kind of stuff

But that's just to the best of my recollection.

Q. Why. in this transaction, did you decide to do a European digital option transaction?

A. I don't recall. I just don't know.

Q. Did you have any type of an understanding

Page 81

when you started this transaction with Ernst & Young, that you would follow through the sequence of steps that Ernst & Young had planned?

MR. CROUCH: Objection; assumes facts not in evidence.

A I remember Jerry and I took some steps. and we did something between an LLC and a partnership and an S corporation

But I don't recall exactly the timing of everything that we did.

Q. Do you recall that those steps were choreographed -- I'll use that word -- do you understand the word choreographed?

A Yes. sir

Q. Did you understand the steps that you and Jerry took between November and December of 1999, that those were choreographed?

MR. CROUCH: Objection; vague and ambiguous. and assumes facts not in evidence.

A They must have been Because I don't recall preparing any documents about every time that I would do something. I think somebody else prepared them; I don't recall

Q. And who was that somebody else that was preparing them, if not you?

Page 82

A. I know this is wrong. but I'm probably guessing. either E&Y or somebody at Jenkens and Gilchrist.

But I knew at that time. Jenkens and Gilchrist was involved because of Donna Guerin.

VIDEOGRAPHER: Counsel. five minutes on tape.

MR. LINDQUIST: Thank you.

Q. I'll show what's been previously marked as Exhibit 156.

THE WITNESS: Excuse me.

MR. LINDQUIST: Certainly. Counsel you should have a copy of this document.

MR. CROUCH: I do.

(PREVIOUSLY MARKED EXHIBIT 156.)

Q. This is an e-mail from Ernst & Young, an internal one, where they were distributing on November 5th of 1999, something called a spreadsheet on COBRA.

And the distribution list included Mr. Knight.

And I'm going to ask you if you recall seeing a copy of the spreadsheet in this form, or any other form.

This one is in the amount of $50 million

Page 83

capital and $50 million ordinary loss. Those are the last two pages.

A. I don't think I have ever seen this.

In fact. I don't even know who this person is. Haynie?

Q. Yes. That's the internal distribution list within Ernst & Young.

MR. CROUCH: All right.

Q. Allow me to show you what's been previously marked as Government's Exhibit 155.

A. Yes. sir.

(PREVIOUSLY MARKED EXHIBIT 155.)

Q. And this is something called a COBRA Action Work Plan.

Have you ever seen a document like this before?

A. I have never seen this, sir.

Q. At the top, the first action team, it says: Qualify client as under item one -- and the first bullet point says: Aggressive, willing to assume tax risk.

Would you characterize yourself as an aggressive taxpayer willing to assume tax risk?

MR. CROUCH: Objection; foundation.

A. If you drop the word aggressive. I would

Page 84

be willing to assume tax risk.

Jerry was aggressive. but I was not aggressive. but I was willing to assume tax risk.

MR. LINDQUIST: Let us take a break while we switch the type.

VIDEOGRAPHER: This concludes tape number one in the deposition of Mr. Jim Boyd.

The time is approximately 11:35. We are now off the record.

(OFF THE RECORD.)

VIDEOGRAPHER: Stand by. please. We are now back on the record.

This is tape number two in the videotape deposition of Jim Boyd.

The time is approximately 11:45.

Q. (BY MR. LINDQUIST:) Mr. Boyd. allow me to show you what I'm marking as Exhibit 1010.

MR. LINDQUIST: Here is a copy.

(EXHIBIT 1010 MARKED.)

A. Yes. sir.

Q. Counsel provided this to me yesterday.

It looks like it's for JB or CC; is JB you?

A. Yes. sir.

Q. Who is CC?

Page 85

A. Charlotte Crosby. She was my secretary for 30 some years.

Well. I should say my assistant.

Q. And this appears to be "M" would be a message from Ray Knight.

Does that mean that Ray Knight has called you? Or what does the M stand for?

A. That's who it appears to be; yes. sir.

Q. Do you have any recollection as to what Mr. Knight was calling you about on December 6th?

A. I don't specifically recall. But I remember sometime in early December that I got on the phone with Mr. Knight. and I think Sean Smith was also on -- I think -- maybe -- I don't know whether I was on the phone. or he actually was here.

And then Sean Smith was on a telephone call. but I can't remember.

Q. So, you recall in early December -- and this would have been 1999 -- that you recall having this -- you recall a meeting or a discussion with Mr. Knight and Mr. Sean Smith?

A. I think Mr. Smith was on a phone. And maybe Mr. Knight was actually here. But I don't recall exactly.

Page 86

Q. Do you recall whether it was around December 6th of 1999 that this occurred?

A I just have to go by the mark here. and I would assume that s when the date was.

Q. And do you recall what the meeting or discussion was at that time?

A I remember in a call on which I think Sean was on. we talked about doing something with First Union stock. Bank of America stock. and something else for something like a million and a half dollars or something. I can't remember. like in $500 000 increments

But you would have to show me some other documents so I could refresh my memory

Q. Did this discussion relate to the COBRA transaction that we had been discussing?

A Of course. I didn't know the name COBRA by then.

But I think. obviously. it must have related to it

Because I didn't talk to Mr Knight about anything other than this transaction

Q. Was this discussion a discussion about what to do with the two percent of -- two percent of the loss of funds that were sitting in the bank

Page 87

account at Deutsche Bank?

MR CROUCH: Objection; assumes facts not in evidence

A I just don't know.

Q. Was it a discussion about what to do with money that you had to invest?

A I remember when Sean was on a phone call with me. and I think Mr. Knight was present. we were talking about doing something with like a million and a half dollars

But they were in three different increments. like $500.000 each.

But I will be honest with you. I can't specifically remember. Do you have something to show me?

Q. No. I'm trying to understand what's going on at this time.

A. Okay.

Q. I have got this paper.

MR CROUCH: Counsel. can we go off the record just a second?

VIDEOGRAPHER: Off the record The time is approximately 11:50

(OFF THE RECORD )

MR. LINDQUIST: Let's go back on the

Page 88

record.

VIDEOGRAPHER: All right. Stand by. please Back on the record.

The time is approximately 11:52.

Q. (BY MR. LINDQUIST:) Mr. Boyd, allow me to provide you with what I have marked as Government Exhibit 1011.

(EXHIBIT 1011 MARKED.)

A Okay. sir.

Q. This is a copy of part of the closing binder that Jenkens and Gilchrist prepared.

First off, I would like to ask you whether you have ever seen this document before?

A. Not in this format. but I may have seen some of the things in the document.

Q. Okay.

A. Because my signature is here.

Q. The table of contents kind of summarizes what's in there. Okay.

Let me then take you through a few of the documents here.

Let me first turn your attention to the item at -- in the table of contents, number two, which is the application for employer identification number for JGB Bohicket invoice.

Page 89

A. Yes.

Q. DOJ 041460.

A. Yes. sir.

Q. And first off. is that your signature on that page on November 19 of 1999?

A. That's my signature. sir.

Q. It appears that some of the documents in here were signed by Mr. Zucker at a different time, a day earlier.

Do you know where you were when you signed this document that we are looking at here, your SS-4 for JGB Bohicket?

A. Where I was?

Q. Yes. Did someone come here to Intertech, or to your house, and present a whole bunch of documents to you to sign?

A. No one came to my house. sir.

Q. Did someone come to Intertech and present you with a whole bunch of documents to sign around November of 19th of 1999?

A. I don't recall anyone coming here. but they must have sent them by mail; I don't know.

Q. Do you have any recollection of receiving a package of documents from Jenkens and Gilchrist to sign for the transaction?

Page 90

A Not a package. but at different times -- is it Ms. or Mrs Guerin?
Q. Guerin -- yes.
A. She sent different things at different times. but I never got what you call a package.
Q. Here it appears that you're signing on this page to form an LLC as a single member one-person LLC to be a disregarded entity.
And I previously asked you about why you formed this entity; and you said that it was to insulate you from risk.
A. I would have thought forming an LLC would have been to -- would be for risk purpose; yes. sir.
Q. What was the risk that you had, that you were trying to, or that you were trying to insulate yourself from?
A. I can't specifically identify one sir. but I would imagine the only reason I formed an LLC was because -- or that I was involved in an LLC to insulate myself.
Q. What activities did you plan to engage in through this LLC, at that time.
It says here No. 14: Investments. So, my question would be. first. is that correct?
MR. CROUCH: You're on the wrong page

Page 91

there.
A. Yes. sir. Because I think I also invested in stock through the JGB Bohicket Investments with both Dean Witter and with First Union. but I can't specifically recall
Q. And what would be the -- what would be your exposure on investing in those stocks --
A. (No response.)
Q. -- that you are trying to insulate yourself from?
Any particular risk? Because --
A. I can't think of a specific risk right now.
Q. If you turn to DOJ 041467, that's the SS-4 application that is signed by Mr. Zucker.
And you can see that that's signed on November 18 of 1999, one day earlier than you signed yours.
Do you know whether you and Mr. Zucker discussed with each other why he was going to form an LLC, as well?
A. I can only surmise that it was something that Ernst & Young suggested that we do.
Q. Were you the one that filled out the information on this SS-4?

Page 92

Or did somebody else fill this out for you?
A (No response.)
Q. And "there," I'm referring to your SS-4 and what --
A. That's not my handwriting up there where it says: Single member one-person.
And that's not the employer identification number -- my handwriting. So. somebody else must have done it.
Q. Well, you wouldn't have the employer identification number at the time the information was typed in here, that would be something you would get -- you're applying.
A. This is an application for it; yes, sir.
Q. So my question is: Was it your office that -- first off. I might ask: Have you ever prepared an SS-4 before?
A. Yes -- excuse me -- yes.
Q. Okay.
A. And Charlotte used to do it all the time.
Q. And your Social Security number is listed here as 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; is that your Social Security number?
A. Yes. sir.

Page 93

Q. Did you have any problems remembering your Social Security number --
A. (No response.)
Q. -- at any time?
A. After my accident. I didn't even remember my wife.
Q. Before your accident, you indicated you had a pretty good memory.
A. Yes. sir.
Q. Did Mr. Zucker, to your knowledge. have any particular problems remembering his Social Security number?
A. I doubt it; no. sir.
Q. Let me turn to what is item number five in this package.
It's the agreement of general partnership, dated November 16 of 1999.
It begins at DOJ 041469 and it goes on through to 041479.
And if you take a look at the second-to-the-last page of that document. is that your signature?
A. Yes. sir.
Q. Why were you forming a partnership on November 16 of 1999?

Page 94

A I remember doing it but I don't remember why, other than that Ernst & Young may have said: You need to form a partnership, because you and Jerry were doing it through two LLCs -- or something; I don't know.
Q. Was it part of the plan for the implementation of this transaction with Ernst & Young, that you would form the LLCs and a partnership and an S Corp?
A. I remember we were going to form an LLC.
And then I remember we were going to form a partnership.
And I think because of liability issues and other things, we did an S Corporation, too.
Q. And did you do them all about the same time --
A. (No response.)
Q. -- as part of a plan?
MR. CROUCH: Objection --
A There was no plan.
MR. CROUCH: -- vague and ambiguous -- objection is vague and ambiguous "as to the plan."
You can go ahead and answer.
A. Characterization as a "plan". I have no recollection of a "plan."

Page 95

But I recall that we were instructed to do things by Ernst & Young at different times.
And the only thing I remember was that we did something so we could diversify our portfolio, and we could also insulate ourselves from any potential liabilities.
But that would have been a natural thing to do in an investment, instead of having, you know, like in a general partnership, you have -- general partners have unlimited liability.
Q. What were the liabilities you were insulating yourself from?
A. I thought that Jerry and I were going to do other investments in the partnership.
And maybe we would have done some swaps and some hedges.
But I will be honest with you, John -- excuse me -- I just don't recall.
Q. And you indicated that you were planning to diversify -- you were planning to diversify the portfolio.
What was the portfolio you were planning to diversify?
A I think we had Bank of America, First Union, and maybe other bank stocks.

Page 96

Jerry was a big investor in bank stocks, but I can't recall.
Q. Were you planning to diversify before you formed the partnership? Or after you formed the partnership?
A I don't recall. I'm sorry.
Q. If you would turn to DOJ 041492 through 041494.
And there we have a cover letter from Laura Lightholder at Jenkens and Gilchrist.
And behind it we have a Form 2553 that appears to have been signed by you and Mr. Zucker.
And you appear to have signed it on November 18 of 1999.
Did you, in fact, sign this application?
A. That's my signature, sir.
Q. And as of that date, November 18 of 1999, you were electing to treat JBJZ Investors, Inc., as a small business corporation?
A. (No response.)
Q. Is that -- is that correct?
A. That's what it appears, sir.
Q. Turn to now item number 11.
MR CROUCH: You have the Bates number?
MR. LINDQUIST: I'm going to get that.

Page 97

Q. That starts at DOJ 041497.
A. Yes.
Q. And it goes through 041500. And it's entitled: A Consent of Sole Director of JBJZ Investors, Inc.
A. Yes, sir.
Q. And it has a resolution in there for the issuance of stock to you and Mr. Zucker; 90 shares to Mr. Zucker and ten shares to you.
Do you recall, in fact, receiving ten shares of stock in JBJZ Investors, Inc.?
A. You mean formal shares?
Q. Yes.
A. I don't recall getting physical -- having physical presence of shares in my hand.
Q. This consent is dated November 16 of 1999.
Subsequent to that date, were there any additional shares issues by JBJZ Investors, Inc.?
A. Not that I'm aware of.
Q. And if you turn to, now, DOJ 041524 -- and this is a certificate of ten shares of JBJZ Investors, Inc.
MR. CROUCH: Can he get to it first
MR. LINDQUIST: Sure

Page 98

MR. CROUCH: That's correct. You have it there. One more -- one more. I'm sorry. That's it.

A. Okay.

Q. And it appears that this is dated November 16th of 1999, 10 shares of JBJZ Investors, Inc., had been issued to you.

Does -- does that refresh your recollection as to whether you have ever seen this document before, and whether you received it?

A. It doesn't refresh my recollection. But if it says I have ten shares -- I knew I had ten percent, but I don't recall this.

Q. Now, I would like to take you to item number 14, which begins at DOJ 041527.

A. Yes, sir.

Q. And that goes through DOJ 1529. And this is part of a fax -- there is a fax legend at the top -- but drawing your attention to the third page of this sequence of pages:

First off, is that your signature down there on behalf of JGB Bohicket Investments, DOJ 140529?

A. Yes, sir; that's my signature.

Q. Do you know on what date you signed this?

Page 99

A. I see it's dated November 24. So, it must have been something around that time.

But I don't, as a matter of recollection, recall.

Q. Now, have you ever seen documents like this before?

This appears to be something called a foreign exchange digital option transaction -- at the top.

And it's got a reference number. Do you recall receiving this and reading it and understanding it back in 1999?

A. I think I remember documents similar to this, but the exact words of it --

I can't tell you they had the exact words, but I think the general context of it were something similar to what I had seen or signed before.

Q. Did you pick the currencies -- the Euro, US dollar; was that your pick?

A. (No response.)

Q. It's referenced in section one of this document in general terms.

A. Can I make a comment?

MR. CROUCH: Why don't you answer his

Page 100

question.

A. I specifically talked with Jerry about pounds, about Canadian dollars, and I remember pounds and Canadian dollars. And I think the Euro was kind of new then.

And so, I may have talked to him about the Euro, but Euro didn't have a lot of history.

Pounds had a lot of history. And the Canadian dollar had a lot of history.

But I can't say, honestly, specifically, that I said you know: X Euro or Y Euro, or something like that.

Q. Who picked the Euros for this transaction? Was that you picking it?

A. No, sir.

Q. Who picked it?

A. Um, I think Jerry told me that -- well, I think it would have been Jerry, I think.

Q. Okay.

A. But we discussed it.

Q. Did you -- did Jerry tell you why he was picking Euros?

A. He had done a lot of work on the different spreads and stuff like that.

And I guess we discussed it at that time,

Page 101

but I can't recall specifically.

Q. On this particular document that we are looking at, there is a spread between the first range level -- which you'll see on the final exchange provisions under one -- sorry -- let me read that again -- under section two, the number two section one, first digital option transaction.

And then it says: 2 ii, final exchange provision.

And under that it has the first range level of 1.0123 per Euro; do you see that number?

A I seem to recall that number; yes, sir.

Q. And then if you compare that number to -- on the second page -- to the second range level, which is about two inches down from the top, and that is in US dollars, 1.0121; why the difference between these two numbers of 1.021 and 1.023? Did you pick those?

A. No My best recollection is Jerry did an analysis, and we figured where the -- what was called the "sweet spot," and where it could hit and what would be a good range and what it could do.

And I think that, in all honesty, I think Jerry was the final determiner of exactly what those ranges were

Page 102

But we had to hit that or above to be in the sweet spot.

And I think Jerry was the one who had done most of the work on that.

Q. When you say "he had done an analysis," did Jerry also have a photographic memory? Did he keep any written records of this analysis?

A. Jerry has an unbelievable memory, but I wouldn't know whether you could legitimately call it photographic, but he has an unbelievable memory.

Q. Did he show you any type of an analysis in writing for you to take a look at so that you could understand?

A. No. He talked to me about it. And he talked to me, and he said -- he said what kind of area where we could make between 40 and $50 million or something.

And he said: If we hit this or above or something like that, 'bam' we've got it. And we actually made money.

Q. You don't recall actually seeing anything in writing.

A (No response.)

Q. Do you recall seeing anything in writing prepared by Jerry with respect to his analysis of

Page 103

what you called the sweet spot?

A. I may have, but I don't recall.

Q. Do you recall any discussion with anyone at Ernst & Young about what you called the sweet spot?

A. I don't think so, sir.

Q. Do you recall any discussion with anyone at Deutsche Bank with respect to what you call the sweet spot?

A. I think I talked with one guy whose name is Parse or something, P-a-r-s-e, maybe once or twice.

But Jerry did most of the conversations about what the sweet spot and everything was.

Q. And when you spoke with Mr. Parse, was it a call where Jerry Zucker was also on the line with David Parse?

A I don't recall.

Q. Do you recall whether your conversation with Mr. Parse, in fact, involved a discussion of the sweet spot?

A To be honest, I just don't recall.

Q. If you recall -- do you recall how the spot rate was to be determined at the end of the 30 days for purposes of determining whether or not you

Page 104

were within the sweet spot?

A. Jerry talked about strike price, volatility, interest rates, and a bunch of other things.

But I just don't specifically recall exactly what we discussed.

Q. If you turn to the page DOJ 041528 --

A. Yes, sir.

Q. -- which is the second page of this particular portion of the document.

And if you take a look at about -- it's under section three of large cap A, and large cap B, and it has the language: If the spot rate is on the second rate determination date at 10 AM local time in New York less than or equal to the second range level, etcetera.

Do you recall any discussion of that language with anyone?

A. Not the specific language, but I do recall that you had to exercise on the expire date by -- I think it was ten in the morning, or around that time.

And -- but on American options, I don't think you had to give a specific time date, but you did for European digital options.

Page 105

Q. You say you would have to exercise; what did you understand by saying you would have to exercise?

Did you think you would have to take some sort of action?

A. I just don't recall. I don't know.

Q. Do you understand how the spot rate was, in fact, to be determined on that time; whether or not it was to be determined by you, or whether it was to be determined by Deutsche Bank?

A. I used to know that, how you used to do spot rates and interest rates and, you know, all that stuff; but I don't recall now.

Q. If you would now turn to item number 15, and that is at -- it's hard to see the Bates number because they have the page upside down.

So, if you turn to DOJ 041538, that's the second page of the assignment. And the prior page, the Bates numbers is at the top instead of the bottom.

So, it starts at DOJ 041537. And that's an assignment agreement dated November 24 of 1999 between JGB Bohicket Investments and Deutsche Bank and JBG Partners. Are you with me? Three-page document?

Page 106

A. Yes, sir. I'm here.

Q. On the second page, is that your signature?

A. Both of those are my signature, at the top and at the bottom.

Q. At the top, so you are signing both on behalf of JG Bohicket and JBJZ Partners?

A. Yes, sir.

Q. Why are you assigning the -- why are you entering into this assignment agreement on this date, November 24, 1999?

A. I should know, but I don't recall.

Q. Do you recall whether, as of this date, you had already paid for these options?

A. As of November 24th?

Q. Yes.

A. As of that specific date, I don't recall.

Q. If you turn to DOJ 041547.

MR. CROUCH: 547?

MR. LINDQUIST: Yes, sir.

Q. 041547.

And I would ask you to take a look at 47, 48 and 49.

They all appear to be under this item number 16.

Page 107

First off, is your -- is that your signature on all three of these pages?

A. Yes, sir.

Q. If you take a look at the last of these pages, DOJ 041549, this is an authorization to wire $250,000 from JGB Bohicket; do you know why you're making this transfer?

A. Well, I initialed the $250,000. So, I must have -- I don't recall why I did it.

But that's obviously my signature and my initials.

Q. As of November 30th, 1999, you're making a wire payment of $250,000; was that to purchase the options?

A. I just don't know. I don't recall.

Q. But if you look at the prior -- the first page that I referenced you to, DOJ 041547, as of November 24th, you were authorizing a transfer of all remaining cash from JGB Bohicket to JBJZ Partners.

Why were you transferring all the cash from JGB Bohicket to JBJZ Partners as of November 24, 1999?

A. I don't know, but I could only say I was following instructions.

Page 108

Q. Is that your handwriting on the top, that -- in the number -- there is a November 24th, and the 24th is handwritten in; did you put that number on there?

A. That's not my --

Q. When you signed this document, was the number already in there?

Or did you leave that part blank?

A. I don't recall. And I see it's filled in on a couple of later documents, but that's not my handwriting.

Q. On the DOJ 041548, it states: Please note from the attached assignment that the option positions in the above-referenced account had been assigned to JBJZ Partners.

So, that's the assignment we referenced.

So, as of the 24th of November, you were assigning the options to the partnership; is that what is going on here?

A. That's what it appears to be, but that's not my handwriting, where it says November 24th.

But I just have to reference that I must have done something on the 24th. I don't know.

Q. Do you recall any direction from Jenkens and Gilchrist to sign documents that they sent to

Page 109

you, and to leave -- to not fill in the blanks, so that they could fill them in?

MR. CROUCH: Objection; assumes facts not in evidence.

Q. Those packages of documents that you described earlier receiving from Donna Guerin for your signature, do you recall any direction from the law firm of Jenkens and Gilchrist that when signing those documents, you were not to fill in the blanks?

MR. CROUCH: Objection; I think that mischaracterizes -- I don't think he ever said he received a package of documents from them.

A. I may have, but I just don't recall. But we used to -- in business mergers and acquisitions -- always direct: People don't fill the dates in, because we will fill the dates in, the lawyers or the notary publics or whatever. And that was very common, very traditional in big international transactions where you had to sign hundreds and sometimes thousands of documents, that was truly common.

Q. And do you -- why is that done in big, big transactions, that you don't fill in that information; you let the lawyers do it?

A. I can only say that I remember going to