Page 110

Millbank Tweed many. many times

And I would be there sometimes for three or four days -- literally. three or four days -- signing documents from early morning until sometimes ten or 11 o'clock at night.

And then we would usually have to sign them in front of a notary. If they had to do a notarization by lawyers; oftentimes. would say: Don't fill that in. we will fill the date in.

I just would follow what was considered procedure in business transactions

Q. So, you considered this to just be normal business procedure?

A. Yes. sir; not unusual.

Q. Did you undertake any analysis of this transaction, the transaction that has now became known as COBRA. to determine whether there was any economic substance to the transaction?

A (No response )

Q. You are familiar with that term as a tax attorney, correct?

A. There's actually E&A portfolio on the Economic Substance Doctrine

Q. Did you help to write it?

A No. It is E&A Portfolio 508.

Page 111

THE WITNESS: Isn't that odd that I remember that

MR LINDQUIST: Uh-huh.

A. But I can tell you a lot of other numbers too.

But I looked at issues for basis and whether we could -- whether certain liabilities were in basis or not in basis under Section 752 and under the regs under 1 752-E something

But I did a lot of that. and I did a lot of work under 988 and other things.

But. specifically. if you asked me to outline what I did. or did I have notes on it? I will be honest with you I don't recall

Q. Did you do any type of an analysis of whether or not there was economic substance with respect to this transaction?

A Yes. Because we -- under the Black-Scholes model. which is what we did for European digital options. we set the -- well. I say Jerry did the final setting of it -- but. yes. it had economic substance

And we expected. in all honesty. to make a profit.

And we actually made a profit on -- I

Page 112

think it was four of the six options that we went into.

Q. Was that with or without accounting for the fees that you paid with respect to the transaction?

A. (No response.)

Q. Did you account for the fees when you did your analysis of the economic substance?

A. Well. I don't think that I took into account. specifically. that I'm paying X dollars or Y dollars on that.

But I took into account the reality of the transaction itself. And --

Q. Did you take into account the fact that you were paying a 1.5 percent fee to E&Y and a three percent fee to the law firms. for a total of 4.5 percent in fees in the transaction being paid to E&Y and the law firms?

MR CROUCH: Objection; assumes facts not in evidence.

A. I never talked in terms of percentage. I just knew that there was a flat fee that we were taking, and --

Q. Did you take into account that flat fee when you did your economic -- your analysis of the

Page 113

economic substance doctrine?

A. In all honesty. I don't think I did. But I looked at the transaction and the possibility that we could make $40 plus million.

And we actually made over $600.000 as a result of being in the sweet spot on four of the six options.

Q. If you would turn to the last page. DOJ 041562.

A Yes. sir.

Q. This is a document that purports to be signed by Jerry Zucker.

And it discusses -- discussing authorization with respect to Cisco stock.

Do you recall transferring Cisco stock or authorizing Jerry to transfer Cisco stock on your behalf into -- into JBJZ Investors. Inc.?

A. I transferred something like 500 shares of Cisco

And I remember being instructed by Jerry -- or Charlotte was -- to authorize. I think it was 4.500 shares or something to go in -- to be contributed.

MR LINDQUIST: Would this be a good time to take a lunch break? Is that okay with you?

Page 114

THE WITNESS: If that's what you want.
VIDEOGRAPHER: We will now go off the video record.
The time is approximately 12:32 PM.
(OFF THE RECORD.)
VIDEOGRAPHER: Stand by, please. We are now back on the record.
The time is approximately 1:16.
Q. (BY MR. LINDQUIST:) Yes, sir, allow me to show you what I have marked as Exhibit 1015.
(EXHIBIT 1015 MARKED.)
Q. This is a copy of an opinion by Jenkens and Gilchrist -- at least it purports to be an opinion by Jenkens and Gilchrist -- addressed to you dated January 31, 2000.
It goes right through to O-20, at least that's the page number at the end.
You previously referenced an opinion that you received from Jenkens and Gilchrist in 2004.
Is this the opinion that you were talking about?
A. Yes, sir. June of 2004; yes, sir.
Q. And you don't believe that you received this prior to that date?
A. No. In fact, I have an envelope which

Page 115

would demonstrate -- I actually saved the envelope, so if someone would believe me --
Q. Do you have a copy of that envelope?
MR. CROUCH: I don't know if I have a copy of the envelope.
I don't recall if I have a copy of the envelope.
THE WITNESS: Excuse me, could I fax something to you tomorrow?
MR. CROUCH: Sure.
MR. LINDQUIST: Okay.
Q. How is it that the envelope proves that you didn't receive --
A. Because it has a date stamp on it.
Q. Usually on an envelope, a date of mailing is postmarked; is that the postmark on the envelope?
A. It has a circle up on the upper right-hand side, and that was June, 2004.
Q. And does it -- is this an original opinion that was sent to you in June, 2004, so it has an original signature on it?
A. I can't tell that it had an original signature, but I think it did, but I can't tell you.
Q. How do you know that it wasn't just a duplicate copy of what was sent to you at an earlier

Page 116

date?
A. I never received it.
Q. So, you did not rely upon the Jenkens and Gilchrist opinion in preparing your return for 1999, personal income tax return?
A. No.
Q. You hadn't received it?
A. No.
Q. Do you know if Mr. Zucker received an opinion from Jenkens and Gilchrist?
A. I only found out because of this litigation, that he -- yes, he did receive an opinion.
And -- but I'll be honest with you, I don't recall him ever telling me that he received an opinion, because maybe he thought I received one, but I just don't recall.
Q. Did Mr. Zucker tell you when he received his opinion?
A. Not that I recall, sir.
Q. I want to show you what I have marked as Exhibit 1012.
(EXHIBIT 1012 MARKED.)
Q. This is a fax dated December 29 of 1999, page one of one, purports to be signed by Jerry

Page 117

Zucker, and it is addressed to Deutsche Bank; his authorization to prepare a check for $1.4 million to be paid to Jenkens and Gilchrist and charged to JBJZ Investors, Inc.
Have you ever seen this document before?
A. I think maybe in the last day or so, but that's because I know his signature, because I was his partner for 18 years --
Well, I was together with him for 18 years, I know that's Jerry's signature.
Q. Do you recall whether $1.4 million was, in fact, paid to the law firm of Jenkens and Gilchrist on or about December 29 of 1999 as instructed here?
A. If that's what it says, then I would just take it logically that it would be.
Q. I'm going to show you what I marked as Exhibit 1013.
(EXHIBIT 1013 MARKED.)
Q. Now, this is another fax dated February 29 of 2000 at the top, handwritten in February "27," 2000.
It also has: Signature by Jerry Zucker, and it's an authorization to prepare another check to Jenkens and Gilchrist, and this time for

Page 118

$40,000.
Do you -- have you ever seen this document before?
A In all honesty, I don't recall it. And I don't even recall the $40,000, what it would have been for.
Q. Well, you anticipated my question.
A. Excuse me.
Q. No; no problem there.
Have you had any discussions with Mr. Zucker as to the $40,000 that was paid?
A. I haven't.
Q. I show you what I'm going to mark as 1014.
(EXHIBIT 1014 MARKED.)
Q. This is a letter dated March 10 of 2000, addressed to you with a copy to Ray Knight.
And it purports to be a letter forwarding you Jenkens and Gilchrist's legal opinion.
When you received the legal opinion in 2004, did it come with a letter like this?
A. I have to look back at it, sir, but I don't remember it.
MR. LINDQUIST: I would ask you, counsel, to produce a copy of the envelope and also its

Page 119

contents.
And I would like to have the original; I want to be able to inspect it.
And we can do it either at the next deposition -- but I would like to have an opportunity to inspect the original.
MR. CROUCH: We will try to have it by -- when will you be leaving to go out of town?
THE WITNESS: I believe Friday at 11:05.
MR. CROUCH: Okay.
Q. Did you, in the course of your practice of tax law, ever have occasion to confront what's called the Step Transaction Doctrine?
A. Corporate transactions, I sure did.
Q. Did you analyze the -- what we have referred to here as the COBRA transaction, your COBRA transaction, did you evaluate whether the Step Transaction Doctrine would apply to your own transaction?
MR. CROUCH: Objection; as to ambiguous as to "analyze" or "evaluate."
A. I specifically didn't undertake an evaluation as to step transaction.
My purpose was to evaluate: Did it have economic substance? And it had economic substance

Page 120

and profit motive, but I can't attest that I did anything on step transaction or anything like that, but I'm very familiar with it.
Q. Allow me to show you what I've marked as Exhibit 1016.
(EXHIBIT 1016 MARKED.)
Q. This is an opinion from Brown and Wood addressed to you, dated March 9 of 2000; have you ever seen this document before?
A. Yes, sir, I have.
Q. About when did you receive it?
A. I think I received it sometime in 2000, but I can't swear to the exact date, but I think it was in 2000.
Q. Do you know whether you received it prior to the filing of your 1999 Form 1040?
A. In all honesty, I just don't know.
Q. Do you know whether you relied upon this document for purposes of preparing your 1999 Form 1040?
MR. CROUCH: Objection; assumes facts not in evidence.
A I personally didn't rely on this, and I didn't give this to my CPAs or anything like that.
Q. So, you didn't give a copy of this -- or

Page 121

the Jenkens and Gilchrist opinion -- to your return preparer for purposes of preparing your return?
A I didn't have a Jenkens and Gilchrist document.
And if I had thought it was material or reasonable to do so, and somebody had said: Did you have basis or did you not have basis, did you have this or that or something like that, then I probably would have.
But I don't want to sound arrogant, but I just didn't put much stock in any of this.
Q. In any of what?
A. This opinion.
Q. And why didn't you put much stock in the Brown and Wood opinion?
A I'm certain I read it, but they didn't consult with me. They didn't talk to me.
And usually when I would rely on opinions, was -- I was purposely -- I would talk to the lawyers, the tax lawyers, or whomever involved, because I would have questions, but I never did that in this one.
So, in all honesty, I don't think that I purposely did something to rely on this.
Q. Did you talk -- you know, whether your

Page 122

partner, Mr. Zucker, talked to any of the lawyers at Brown and Wood?

A. To be honest with you, I don't know, but you could ask him.

Q. Did you ever have any discussions with your return preparer, Ms. Pace, about this transaction that we have been referring to as COBRA?

A. I told Sheila, Ms. Pace, about the time that we entered into the transaction, and that I was hopeful that I would make some money.

But I didn't really -- I didn't go into any discussions with her -- real discussions about what it was.

Q. When you say when you entered into the transaction, would that have been prior to the end of the year, back in November of 1999 that you are referring to?

A. I think we bought the options and -- the different options in either November or December of 1999.

Q. So, was it before you even purchased the options that you discussed it with Ms. Pace?

A. In all honesty, I don't remember, but I would imagine it would have been either contemporaneous with or after.

Page 123

Q. Once you had completed the options at the end of the year, of 1999, did you then go to Ms. Pace and provide her with documents for purposes of preparing your 1999 Form 1040?

A. I think, as I would normally do, by the time I would gather all K-1s and stuff like that from partnerships and different things, and I had gotten W-2s and various, you know, 1040s and things like that, then I would have turned it over to Ms. Pace, but that would have probably been in either March or April.

Q. Did you provide Ms. Pace any type of a description of the COBRA -- what we have called the COBRA transaction?

Or did you just give her this K-1 that you have been referring to?

A. Please don't hold me to this, but I think I told Sheila, in either -- probably in December, that Jerry and I -- because I would talk to her about different things -- that we stood a chance to make a potful of money, but I don't recall.

Q. Did you ever have any discussions with Amy Keating at Ernst & Young?

A. Who?

Q. Amy Keating at Ernst & Young.

Page 124

A. (No response.)

Q. Do you know Amy Keating?

A. I don't even know who she is.

MR. LINDQUIST: That may be an asked-and-answered.

Q. Did you talk to anybody at Ernst & Young about the preparation of the partnership return for JBJZ Partners for 1999?

A. I think I probably talked with Kenney Hughes, H-u-g-h-e-s, who was an associate there, maybe he's a partner now, but he was an associate then, but it was more of kind of information stuff.

Q. Why did Ernst & Young prepare the partnership return for JBJZ Partners?

MR. CROUCH: Objection; assumes facts not in evidence.

A. My recollection is, I think that they said that they would do -- that they would prepare the returns and coordinate with our accountants and stuff like that, but I just can't tell you exactly what happened.

Q. Do you know who prepared the 1999 Form 1120-S for JBJZ, Investors, Inc.?

A. I would have assumed that it would have been either Kenney or somebody in his office up in

Page 125

either Greenville or some other place, Greenville, South Carolina, excuse me.

Q. Why was Ernst & Young asked to prepare the Form 1120-S for JBJZ, Investors, Inc.?

A. They did a lot of -- they did all of our tax work and audit work -- for not just Intertech, but for the multiple holdings we had all over the world; not the Greenville office, but Greenville plus Germany plus England and stuff like that.

But I thought -- my recollection is, is that you would have to ask Mr. Zucker.

But I think that we were told that E&Y would prepare all the returns and information stuff and coordinate stuff with our accountants.

Q. Was that part of the fee that was paid?

A. I can't tell you, but they just told us that, I think.

Q. The name of the LLC that you used, JGB Bohicket, did you come up with that name?

Or did somebody else call up with the name?

A. I came up with the name because I lived on Bohicket Road then.

Q. Who came up with the name JBJZ Investors, Inc.?

Page 126

A. Well. Jerry is JZ. and I'm JB. And I assume that it wasn't -- I don't remember. but I think maybe Jerry or somebody said let's just use initials.

Q. Who came up with the name JBJZ Partners?

A. I'm certain Jerry and I talked about it. but I just don't recall.

Q. I'm going to show you what I marked as Exhibit 1008.

(PREVIOUSLY MARKED EXHIBIT 1008.)

MR. CROUCH: We have a copy of that already.

MR. LINDQUIST: You may. but I'm not sure.

MR. CROUCH: I believe I did.

MR. LINDQUIST: Yes. you should.

Q. Have you ever seen this document before entitled: Representations?

That's a draft letter from you to Brown and Wood dated March 3 of 2000.

A. Well. I didn't sign it. but I have seen it in the last couple of days.

But it's kind of a catch-all thing. Just represent A. B. C. and stuff you always do.

MR. CROUCH: I want you to answer his

Page 127

question.

A. What was your question?

Q. My question was: Have you ever seen --

MR. LINDQUIST: Let's see.

Q. Have you ever seen this document before entitled: Representations?

That is a draft letter from you to Brown and Wood dated March 3 of 2000.

And, obviously. you have seen it before.

Did you ever see it back in March of 2000?

A. I can't tell you whether I did or not.

Q. Did you ever -- well, I would like you to take a look through each of the paragraphs.

And I'm going to take you through each one of them one at a time.

A. Yes. sir.

Q. And ask you whether or not -- whether you have seen it before and whether you've -- whether you ever agreed with that representation and/or would have today.

So, I'm going to take it through in parts with you.

Item number one: Investor entered into foreign currency options, the option for substantial

Page 128

non-tax business reasons including to produce an overall economic profit from the movement of foreign currency against the US dollar.

MR. CROUCH: Objection; foundation.

Q. Does that refresh your recollection as to whether or not you have ever seen it?

A. Within the last two to three days?

Q. No. Back in 2000.

A. No. But I would have eliminated the word "including." because --

MR. CROUCH: Jim. I need to you answer his question.

THE WITNESS: Okay.

MR. CROUCH: Just answer his question.

THE WITNESS: Okay.

Q. You indicated that you would have eliminated the word "including" because -- why would you have eliminated the word "including"?

A. I would have said "and" instead of "including."

Q. Item number -- as to that representation -- other than that edit. would it be a true or false representation?

MR. CROUCH: Objection; foundation.

Q. Do you agree with it? Or you disagree

Page 129

with it?

MR. CROUCH: Objection as to foundation.

A. I agree with the bulk of it.

MR. CROUCH: Also objection as to foundation; calls for speculation.

Q. You said you agree with the bulk of it. What part of it do you not agree with?

A. Jerry and I did these things to make money. and that was the purpose.

Q. You indicated that there was a fallback position.

A. Yes.

Q. And what was that fallback position?

A. The fallback position. we were told was that if we didn't hit the sweet spot. and didn't make money -- but we did make money on a couple of the trades -- that that was why I looked at basis and things like that. whether I had substantial basis.

And that a fallback position was that we would get some economic benefit at the end -- at the end of whatever it was. if we didn't hit the sweet spots.

Q. What you mean is, that in any event, you would be able to claim a tax loss; is that what you

Page 130

mean?

A. In summary. yes.

Q. Did you and Jerry, in evaluating a potential benefits of a claim of a tax loss, evaluate the potential risks that the IRS would find this transaction and challenge it?

A. Did I. sir?

Q. Did you.

A. (No response.)

Q. You are a tax litigator.

A. I didn't.

Q. So. you never discussed the potential audit risks of engaging in this transaction?

A. A couple of years later. I was asked by E&Y to consent to waive some things and allow my name to be released or something.

But that was the first time that I was aware that the Service was even questioning --

Q. And at that time when you were asked by the IRS to waive and to release your name, did you agree to the release of your name?

A. Yes.

MR. CROUCH: Objection; I think it mischaracterizes what he said.

MR. LINDQUIST: Excuse me.

Page 131

Q. He stated: A couple of years later I was asked by E&Y to consent to waive some things and allow my name to be released or something.

But the first time I was aware that the Service was even questioning -- but that was the first time.

With respect to that request for your consent, did you consent?

A. E&Y said that there was a client -- some kind of. you know. not attorney/client -- but a client privilege.

And I told them -- and I think Jerry also told them: Go ahead and release whatever you need to release or whatever would be appropriate.

Q. Let's go through this -- the rest of this letter.

Item number two states: Investor believed that investor had a reasonable opportunity to earn a reasonable profit in excess of all fees and transaction costs from the transactions described herein without regard to tax benefits.

Did you have such a belief?

MR. CROUCH: Objection; foundation.

A. Could I again parse the paragraph?

Q. Certainly.

Page 132

A. And I would put a period after the word "profit."

Because I didn't even think about. in all honesty -- the rest of the stuff about transaction fees and everything.

I just believed that we had a fairly reasonable -- not just probability -- but possibility of heightening the sweet spot. which we did on four of the six options.

Q. You previously indicated that you did not even consider fees; is that -- I want to understand the period that you are adding in here.

What would you do with the rest of this sentence which talks about: In excess of all fees and transaction costs?

A. I would eliminate it. And I would say that after the word "profit." I would put a period.

And the rest of the thing I would just parse and scratch out.

Q. And is that -- why is it that you would not consider any of the fees associated with the transaction in your calculation of profit?

A. Because I was dealing with professionals. and I figured they would charge reasonable fees or whatever they would. and -- and I never totaled up

Page 133

the fees or did anything like that.

Q. So. was it normal for you to engage in options transactions where you would pay fees of this magnitude. in this case $1.4 million to Jenkens and Gilchrist; total of $750.000 to Ernst & Young, as between you and Mr. Zucker; was that normal?

A. I don't recall. I think they were substantial. but I don't recall.

Q. Item number three of this letter states:

Investor believed that investor had an opportunity to make an aggregate gross return in excess of the sum of investor's net investment in the options and the investment advisory fee paid by investor.

You don't agree with that?

A (No response.)

Q. Or do you?

A. I wouldn't have included that.

MR. CROUCH: Objection as to form.

A. I told you that I believed that after looking through the Black-Scholes formula and all the discussions with Jerry. that we had a -- I would say a 50/50 chance to hit the sweet spot.

Q. Would you take -- turn back and take a look at the second page of Exhibit 1016.

Page 134

MR CROUCH: This one right here
A. Which one?
Q. 1016, the second page. Look at the bottom of that page at ZEY. The second page of Exhibit 1016.
MR. CROUCH: There
Q. Under: Representations and Assumption. And it states: For purposes of rendering our opinion, investor is represented as follows: And then item one through item nine appears to track what is set forth in Exhibit 1008 as to representations.
Is it true or false -- is it true or false that you represented as detailed in this opinion, what is set forth on pages -- on the second and third page items one through nine; did you make those representations to Brown and Wood? Or didn't you?
A. I don't recall. I don't recall -- I don't think I ever signed this letter. And that I got it, so I just don't recall.
Q. Other than signing the letter, did you ever make the representations to Brown and Wood, either in writing or otherwise, that as described in this opinion that you received, it states: For

Page 135

purposes of rendering our opinion, investor is represented as follows -- and then it recites one through nine -- nine items that you supposedly represented to Brown and Wood; are they telling the truth? Or are they not?
A I just can't recall. But I would tell you that I considered a lot of the stuff they had in here was traditional tax lawyer stuff
And to be honest with you, I just didn't really give it a second or third glance
Q. Brown and Wood said that they were relying upon these representations for purposes of rendering their opinion.
So, you may have considered it just lawyer stuff, but they considered it, obviously, important.
And I'm going to ask you to take a look at these.
A. Nobody told me.
Q. Turn back, now that we have the focus on this, and tell me -- are all these representations that Brown and Wood supposedly thought were material, whether you agreed with them?
MR CROUCH: Are you talking about a document?

Page 136

MR LINDQUIST: And I'm going to --
Q. Let's go there. Let's turn -- we will go to one particular paragraph.
MR. CROUCH: Which document? Make sure he's not confused with which document you're looking at
You are looking at the Brown and Wood opinion.
MR LINDQUIST: Brown and Wood opinion. 1016
MR CROUCH: Make sure he's looking at the right document.
Q. Let's turn to the -- let's turn to the third page.
It says "page three" at the top. And let's look at paragraph number eight, there is an eight by it.
And it says: There existed no understanding, agreement, obligation or arrangement -- read through that language. Take your time.
And then I would like to ask you whether you believe that is a true or a false statement.
A I can't say conclusively, but I would agree that I had no understanding agreement or

Page 137

arrangement.
Q. Person to which any of the parties described committed to undertake all or any of the transactions described.
A. I know I did things in response to when E&Y instructed us to do things, but I never got instructions from Brown and Wood to do something.
Q. This is not limited to Brown and Wood. It says: To which any of the parties described herein; and I think that Brown and Wood is certainly a promoter in this transaction, or at least a participant in this transaction.
The question is: Did you do any of these things according to E&Y's plan or its dictates as to what --
MR. CROUCH: Objection; form and objection to foundation
A. When E&Y asked us to do a certain thing. Jerry and I would say: Is this a reasonable request?
Or is this out in left field or something?
And I think we just agreed, and we did what we were told to do.
Q. Allow me to show you what I marked as

Page 138

1017.

A. Okay.

(EXHIBIT 1017 MARKED.)

Q. This is a wire from -- or a letter from a person named Charlotte Crosby, who is reflected to be the assistant of Jerry Zucker, to Deutsche Bank on May 18 of 2000.

Have you ever seen this document before?

A. I think in the last two days -- one or two days -- I have seen it.

But I don't recall ever seeing it before.

Q. Do you recall discussing with Mr. Zucker that $60,000 was going to be paid to Brown and Wood?

MR. CROUCH: Objection; foundation.

A. I don't recall that discussion.

Q. Did you have any understanding that Brown and Wood would be, or any -- or a second law firm, would be billing separately for an opinion on this -- what's been known as the COBRA transaction?

A. Well, I had been told by Mr. Knight back in 1999, that there were two reputable law firms that would render opinions, but I never thought any more about it.

Q. So, you never thought about how much they would have to be paid?

Page 139

A. Not as far as a dollar amount. I just assumed that they would legitimately bill us for what they were doing.

Q. Did you ever discuss with anyone at Ernst & Young, as to whether or not they had expensed or incorporated the professional fees being paid on this transaction, into the returns that they had prepared for JBJZ Investors, Inc., and JBJZ Partners?

MR. CROUCH: Objection; vague and ambiguous.

A. In expensing? Or capitalization?

Q. Correct.

A. I personally don't remember specifically.

Q. Now, did you ever tell your return preparer to claim a deduction for professional fees paid to Ernst & Young on your 1999 Form 1040?

A. I'm certain if I paid a fee to Ernst & Young, I would consider it a professional fee or professional services.

And -- but I didn't instruct Sheila, I would say: I paid this, or I didn't pay this or something like that, and that she would treat it appropriately.

Q. And did you ever make an attempt to

Page 140

determine whether or not that fee had already been capitalized into the basis of either JBJZ Partners or JBJZ Investors, Inc.?

A. Did I make an independent determination?

Q. Did you make any inquiry?

A. No, sir.

Q. So, would it be possible that you effectively claimed a double deduction for the $75,000 that was paid to Ernst & Young?

MR. CROUCH: Objection; vague and ambiguous.

A. I wouldn't claim a double deduction myself for anything.

Q. Well, if the $75,000 had already been capitalized into the basis of one of those entities -- and you are also claiming it as a miscellaneous expense on your personal income tax return?

A. I will be honest with you --

MR. CROUCH: Objection; calls for speculation, assumes facts not in evidence.

A. I don't know what was done.

MR. LINDQUIST: I think I'm up to 1018.

MR. CROUCH: Yes. That's correct, counsel.

Page 141

(EXHIBIT 1018 MARKED.)

Q. Allow me to show you what I'm going to mark as 1018.

This is a letter dated November 16 of 1999, from Donna Guerin addressed to you and Mr. Zucker. And it has some handwriting on it. Whose handwriting is this?

A. The handwriting, except for the signatory for the letter, is all Mr. Zucker's -- is all Mr. Zucker's writing.

Q. It appears to be read -- and correct me if I misstate: Charlotte, several places for Jim B. to sign. I inadvertently signed as guarantor on one of the forms for Jim (I already signed one of the guarantees.) Please make a copy set and retain -- please call Ray Knight at E&Y to find out where to send the executed agreements after the corrections and executions by Jim, phone -- and there is a number 704-618-5842. If you can't reach Ray, call Kenney Hughes.

Is that a fair reading of Mr. Zucker's handwriting?

A. Yes, sir. But the -- Mr. Knight is misspelled as Mr. Kite.

So, maybe he just didn't know who -- I

Page 142

mean. he didn't really know much about who he was.
So. it's obvious. Mr Knight was a kind of -- just a casual person.
Q. And then it also says on the left side: Jim also has a copy set with him in New York; is that Zucker's writing, as well?
A. Yes. sir.
Q. Who is Jim? Is that you?
A That's me
Q. Does that say: Jim also has a copy set with him in New York?
A That's what it says; yes. sir.
Q. So, had you already received a copy set of this?
MR. CROUCH: Objection; foundation
A. I don't know. I don't recall.
Q. Do you recall being in New York around November 16th of 1999?
A. I used to go to New York usually once a week or once every two weeks. but --
Q. Did --
A. I don't know.
Q. Did you keep a personal calendar at that time that would have -- would reflect where you were and what you were doing?

Page 143

A. Do I personally have a personal calendar?
Q. Did you, at that time. keep a personal calendar that would -- to keep track of your events --
A I had.
Q. -- and travels?
A. I had a day timer.
Q. Day timer? And do you still have a copy of your day timer from November of 1999?
A. No. sir
Q. Did you submit any travel receipts to Intertech in 1999?
A. I used to submit a lot of travel receipts. because I used to travel probably 30. 40 percent of the year
Q. And you would submit those travel receipts to Intertech to get reimbursed?
A. Charlotte would submit them. No. they were usually to substantiate where I went. so we could bill something or bill a company or something like that
Q. And when you say "Charlotte," you are referring to Charlotte Crosby?
A Yes. sir.

Page 144

Q. And Charlotte Crosby was Jerry Zucker's personal assistant?
A. I would rather say she was my personal assistant.
But she may have been also. at times. been Jerry's personal assistant.
Q. She was your personal assistant at that time?
A. (No response.)
Q. Or she was both of yours?
A. For 30 some years she was.
Q. Is Charlotte Crosby still working at Intertech today?
A. I think for medical reasons. she works like two days a week. but I --
Q. Does she have some sort of medical problems?
A. She has had a history of operations and everything. and so she's considered uninsurable.
Q. All right. It indicates that -- let's get down do the substance of this.
Do you know whether Charlotte Crosby, your assistant, had conversations with Ray Knight as reflected in this letter?
MR. CROUCH: Objection.

Page 145

Q. In handwriting. it say: please call Ray Knight.
MR. CROUCH: Objection; foundation.
A Charlotte was very diligent. So. I assume if she had an instruction to call Mr. Knight. she probably did.
Q. If she had called Ray Knight, would she have kept a record of those -- of that call?
MR. CROUCH: Objection; calls for speculation.
Q. Did she have a habit of keeping a record of her phone calls?
A She had a day timer herself. but I don't think. other than for a contemporaneous period. she would still have it
Q. Did you and Mr. Zucker treat your investment in this transaction that we are calling -- has been called COBRA -- did you treat that as a personal investment? Or a business investment on behalf of Intertech Group?
A It was not on behalf of Intertech. but Jerry and I did so many things together for 18 years. we just did things together It wasn't Intertech.
Q. You indicated that Mr. Zucker misspelled

Page 146

Knight.

But then also in the sentence he refers to Knight by his first name "Ray."

Did you and Mr. Zucker have a first-name basis with Mr. Knight where you called him Ray?

MR. CROUCH: Objection; calls for speculation, lack of foundation.

A. I personally don't recall, no.

Q. I'll show you what I'm marking as 1019.

(EXHIBIT 1019 MARKED.)

Q. -- a document that's been presented to me by your counsel. Whose handwriting is this?

A. That's mine, sir.

Q. And can you read that for me.

A. Memo to file. JZ/JB 12/7 -- that's how I used to write 7s.

Q. Okay.

A. 12/7/99, spoke with Ray Knight and David Parse (Sean Smith also online), previous wires 3,150 350, 3,500, 7 percent of $50 million, 1 million for investment instructions to David Parse (DB/I -- that's either AR or AB) - $1.5 million with 12 and a half head room -- bank of BONY is Bank of New York, $500,000, that's 500 K. BOA, Bank of America - 500K, again $500,000. FU is First Union - again

Page 147

500K, $500,000. Discretionary authority to David (he acknowledged), will transfer something systems.

Q. Could it be Cisco?

A. Cisco -- oh, yeah -- Cisco systems stock for trading - 12/7/99. Ray Knight will coordinate with Charlotte (spoke with Charlotte)

Q. What does the phrase "head room" mean?

A. (No response.)

Q. You used it in the context of $1.5 million with 12 and a half head room.

A. I will be honest with you, it's so long ago, I don't remember.

Q. Is that a term that you use in business?

A. Head room was terms that Jerry and I used as to how much -- either profit we could make, or how much cash we needed to do something, or how much of this or that.

But it was -- head room was always the -- if you had -- you thought you might have one million, but you had a guarantee of ten million, you say: Well, I have got head room of 11 million, something like that.

Q. Why were you transferring in Cisco stock for trading?

What was the trading going to be with

Page 148

respect to the Cisco stock?

A. My recollection was that pursuant to -- I don't want to use the word "instructions", but pursuant to advice from Ernst & Young, we needed to transfer 5,000 shares of something; and my ten percent would have been the 500 shares, and Jerry would have transferred 4,500 shares.

Q. I'm trying to understand that in the context for trading.

What does it mean to transfer it in for trading?

A. I'm sorry. I don't recall.

THE WITNESS: Can we take a break?

MR. CROUCH: Take a break.

VIDEOGRAPHER: We will now go off the record.

The time is approximately 2:06.

(OFF THE RECORD.)

VIDEOGRAPHER: Stand by, please. We are now back on the record.

The time is approximately 2:15 PM.

Q. (BY MR. LINDQUIST:) Allow me to show you what's been previously marked as Exhibit 1001.

(PREVIOUSLY MARKED EXHIBIT 1001.)

Q. This is a copy of the Form 1120S, JBJZ

Page 149

Investors, Inc., with a file stamped date on it and signature; is that your signature?

A. Yes, sir.

Q. And are you signing as secretary?

A. Yes, sir.

MR. CROUCH: I'm going to raise the same objection that I raised yesterday, this has other attachments, other than the actual tax return, additional documents in there.

So, I'm not sure this was the actual tax return that was filed.

Q. If you take a look at Bates -- the second page through -- I think it is 1062 through 1066; 1066 is a copy of an application for an automatic extension of time to file corporate income tax return.

Do you know if an application for automatic extension of time was filed with respect to JBJZ Investors, Inc.?

A. If it's here, I just have to assume it was, but I couldn't tell you whether it was or not.

Q. Well, the other items, 1062 through 1065, were not filed with this return.

They appear to have been put in associated with the file with respect to powers of

Page 150

representation that were filed with respect to this return and so were included in the IRS file.
A. Okay
Q. So, I didn't want to mislead you that it was filed with those powers.
A I trust you.
Q. I would like to ask you first off. before you signed this return, did you review this return?
A. I will be honest with you. I would like to say yes. but I can't say yes; I don't know
Q. Was it your practice, at that time, to review any tax return?
A I didn't formally. as a professional. liken to professional like accounting and stuff like that. as a CFO. I was a CFO of Intertech. but I probably thumbed through it; I don't know
Q. And do you recall whether you asked anybody to review it for you?
A I see Mr. Hughes' name here on the document. and maybe I -- excuse me
Q. Were you -- do you see Mr. Hughes' name?
MR CROUCH: On page two
Q. Page two? That is part of -- part of the power of attorney that appears to have been filed at a later date.

Page 151

You will see a fax date at the top of April 23, 2002. on that second page.
So. that was a power of attorney that appears to have been submitted to the IRS around April 23, '02 and would have been associated with the return so that the person would be authorized to speak with Mr. Hughes or any other power of attorney.
A. Okay.
Q. So, my question to you is: Do you recall whether you asked anybody, in March of 2000, to assist you in reviewing this return prepared by Ernst & Young?
A. I don't recall. sir.
Q. Did you have any discussion with Mr. Zucker as to whether you would take the responsibility of signing one return. the partnership return; and he would sign the other return. the S Corporation return?
Or how did it come about that you were the one who signed this return?
MR. CROUCH: Objection; form.
A. Maybe I was here. and he wasn't here. Or vice versa. But I just don't know. I just don't recall.

Page 152

Q. Let me provide you with what's been previously marked as Government Exhibit 1000.
MR. LINDQUIST Keep that one with you.
THE WITNESS: Okay. sir
MR LINDQUIST: Because I want to have you look at them at the same time
MR. CROUCH: What's the document number?
MR. LINDQUIST: I believe it's 1000.
THE WITNESS: Yes.
(PREVIOUSLY MARKED EXHIBIT 1000.)
Q. And this is the Form 1065, 1999 for JBJZ Partners.
And you will notice that both returns -- the front page, it's signed by Ray Knight as preparer.
They both bear the same date as being signed by Ray Knight.
So, it appears that they would have been prepared about the same time.
Do you recall whether or not Mr. Knight came to your office to review these returns with you?
A. I don't recall. sir; but I doubt it
MR. CROUCH: Objection; also it assumes facts not in evidence.

Page 153

Q. If you compare the two returns. Mr. Zucker appears to be signing the partnership return; is that Mr. Zucker's signature?
A Yes. it is. sir.
Q. Do you know -- do you have any recollection as to whether Mr. Zucker also asked you to review the partnership return?
A. I have no recollection
Q. Was Mr. Zucker as qualified as you to review a tax return?
MR. CROUCH: Objection; calls for speculation
Objection; asked and mischaracterizes.
A. As I told you earlier. he's brilliant. And I would assume that he would be qualified. even if he's not licensed as an attorney or enrolled as a CPA.
Q. Are you also a CPA?
A. I didn't take enough courses to do it. I wanted to go back to do it. my wife said: No You have been to school too much
Q. Directing you back to Exhibit 1001, the return that you signed. if you would take a look, please. at --
MR LINDQUIST: Let's see which page is

Page 154

it --

Q. -- at page Admin 1077. And that's a K-1 with your name at the top, Jim Boyd?

A. Yes, sir.

Q. The Social Security number listed on there for you is incorrect, isn't it?

A. Yes, sir, it is.

Q. And if you take a look at the next K-1, the one for Jerry Zucker, do you have any knowledge of Jerry Zucker's Social Security number?

A. I probably used to, but I can't remember it now.

Q. Do you know whether that's Mr. Zucker's Social Security number?

A. I can't tell you straightforwardly, no.

Q. Do you recall any discussion with Mr. Zucker in March of 2000, concerning whether you were going to file the Form 1120S with incorrect Social Security numbers for yourself and Mr. Zucker?

MR. CROUCH: Objection; assumes facts not in evidence, calls for speculation.

A. I have to tell you that that must be a typing error, or an error that was done on whoever made the preparation, because I wouldn't do it.

Q. So, you don't recall any such discussion

Page 155

or any knowledge of the fact that there was an incorrect Social Security number?

A. I have no knowledge of that.

Q. Turning to the partnership return, did you ever have any discussion with anyone at Ernst & Young concerning the manner in which the COBRA transaction was to be reported to the IRS --

MR. CROUCH: Objection; vague.

Q. -- on the Form 1065?

MR. CROUCH: Excuse me, objection; vague and ambiguous.

A. I don't recall. But if I talked to anybody, it would have been to Mr. Hughes.

Q. Were you aware that E&Y was using a template Form 1065 for purposes of preparing the partnership returns for the COBRA transactions?

A. A template?

MR. CROUCH: Objection to form.

Q. A template.

MR. CROUCH: Objection; assumes facts not in evidence.

A. I have no -- I can't believe that they would have used a template.

Q. Did you ever ask -- you or Mr. Zucker -- to your knowledge, ever ask anyone at Ernst & Young

Page 156

as to how many other -- what is it you have learned to be called COBRA -- COBRA-like transactions to have been implemented by Ernst & Young in 1999?

A. To be honest, I didn't care.

Q. Were you ever told?

A. No. And I never asked.

Q. Were you ever told that there was only a limited number of COBRA transactions that were available?

MR. CROUCH: Objection; assumes facts not in evidence.

A. You say a limited number of COBRA transactions in -- I don't know what you are referring to.

Q. The transaction that you purchased from Ernst & Young --

MR. CROUCH: Objection.

Q. -- were you aware that the Southeast of the United States was only allocated a limited number of COBRA transactions by Ernst & Young?

MR. CROUCH: Objection; vague and ambiguous and also assumes facts not in evidence.

Q. Were you ever told by Mr. Knight that this was a -- that you had a limited amount of time within which to decide to sign up for the COBRA

Page 157

transaction?

MR. CROUCH: Vague and ambiguous.

A. The only thing I remember was -- and I think Mr. Knight asked us, maybe he didn't -- was -- were we qualified, and were we sophisticated investors, or anything like that.

But I can't swear to it that he asked me that or he asked Jerry that and Jerry told me that; but I don't know.

Q. I previously asked you whether Mr. Zucker was an aggressive taxpayer, and you said that he was.

Was Mr. Zucker in 19 -- in the fall of 1999 -- in the market to purchase a tax shelter?

MR. CROUCH: Objection; vague and ambiguous, calls for speculation.

THE WITNESS: Excuse me.

A. Can I recharacterize what you have just said?

Mr. Zucker was very aggressive. I didn't mean to infer that he was an aggressive taxpayer, but he was a very aggressive investor.

And, yes, he was a very aggressive investor.

And he brought me along as an aggressive

Page 158

investor.

Q. And at that time in November of 1999, was Mr. Zucker shopping for tax shelters?

MR. CROUCH: Objection; vague and ambiguous. also calls for speculation.

A. The best I know.

Q. Do you understand my question?

A. Jerry was always shopping to make money.

He -- I hate to says this. because Jerry will probably read it -- he was somewhat rapacious about making money

We never talked about shelters or anything like that; we just talked about making money

Q. Did you or Jerry ever contact anyone at Diversified Group, Inc.?

A. I'm sorry Who are they? I don't know.

Q. Did you ever contact anyone at KPMG about any of their tax shelter products?

MR. CROUCH: Objection; assumes facts not in evidence.

A. KPMG always solicited us for accounting purposes. but never talked to them about tax shelters or investments or anything.

And PriceWaterhouse was another one that

Page 159

solicited us all the time. but I never talked -- I used to deal with PriceWaterhouse. but I never talked to them about tax shelters or investments or anything.

Q. I'll show you what I'm going to mark as 1020.

(EXHIBIT 1020 MARKED.)

Q. This is a copy of your 1999 Form 1040. an unsigned copy, that has been provided to us by your counsel --

MR. LINDQUIST: I'm also going to show you a copy of -- here is Exhibit 1002 that you already have a copy. counsel --

(PREVIOUSLY MARKED EXHIBIT 1002)

Q. -- of the IRS' record of your filed return.

And it has. with the prior tax return -- the IRS' copy includes some documents which were associated with your return after the fact.

In particular, the 2848 powers of attorney are at the front.

A That's the one you handed to me as 1002?

Q. Yes. sir.

A Okay.

Q. And your -- the filed copy reflects that

Page 160

you signed this return.

MR CROUCH: Are you talking about 1002? Just make sure.

MR LINDQUIST: 1002 --

MR. CROUCH: Right

Q. -- reflects that you signed this return on April 5th. 2000. And is that your signature on page 2237 of 1002?

A That's my signature. And that's my wife's signature. And that's Sheila's signature.

Q. Did you discuss with your wife your participation in this transaction that we have been referring to as COBRA?

A. Are you talking about prior to filing the tax return?

Q. Prior to the filing of the tax return?

A. No. I told Sam. as I did on many occasions. because I share everything with her. that I invested to make money in something.

But she was always nervous. because I used to sign guarantees and stuff like that.

And I had signed over a billion dollars of guarantees by then.

And so. quite logically. she was always: What are you guaranteeing now? Or what are you

Page 161

doing now?

Q. Did you sign any guarantees with respect to the COBRA transaction?

A. I don't recall.

Q. Other than letting her know that you had participated in a transaction, did you describe the nature of the transaction to her?

MR. CROUCH: Objection; I think it mischaracterizes what he said previously. I just want to make sure.

MR. LINDQUIST: Okay

Q. You told her: I invested to make money in something.

Did you tell her what the "something" was?

A. In all honesty, I don't remember. I don't think so.

MR. LINDQUIST: Okay. We have five minutes left on the tape. Let's change the tape. take a break.

VIDEOGRAPHER: This concludes videotape number two in the video deposition of James Boyd. We will now go off the record. The time is approximately 2:34 PM.

(OFF THE RECORD.)

Page 162

VIDEOGRAPHER: Ready? Stand by, please.
This is the beginning of videotape number three in the video deposition of James Boyd.
Today's date is June 7th, 2007. The time is approximately 2:39 PM. We are now on the record.
Q. Did you ever discuss with anyone at Ernst & Young or at Deutsche Bank about the possibility of an early termination of your European digital options?
A. I thought you couldn't -- you had to do -- you could only do it on expire. I'm sorry. I didn't.
Q. Did you ever have any discussion with anyone at Ernst & Young concerning the optics of the transaction that you were purchasing from Ernst & Young?
MR. CROUCH: Objection; vague and ambiguous as to "optics."
Q. Do you know what the term means?
A. Appearance?
Q. Yes.
A. No.
Q. Prior to deciding to limit your participation in the -- what -- in the product that you were purchasing from Ernst & Young to $5

Page 163

million, did you make any type of calculation as to the amount of the ordinary loss that you could use on your personal income tax return for 1999?
A. No. I actually calculated the gain, between ordinary income and capital gain, and I figured what that would be.
Q. Prior to deciding to participate in a $5 million product from Ernst & Young, that had the name COBRA attached to it, did you calculate what your capital gains were going to be for 1999?
A. I had a hope and an expectation, but I don't know if I did a calculation on paper.
I may have talked about it, but I never did anything, you know, like: I'm going to get nine million or eight million or something like that; and what's my basis in it --
I just would --
Q. How about with respect to your other investments.
Did you -- had you done some sort of proforma in November as to what your taxable income was going to be for 1999?
A. In all honesty, no.
Q. Did you have -- you, in fact, carried back a loss from your 1999 tax return to your 1997

Page 164

tax return; is that correct?
A. If you say so; I don't know.
MR. LINDQUIST: Well, we will go to it.
Q. Showing you what's been marked as Exhibit 1004 -- previously marked in the deposition of your return preparer, Ms. Pace, and she testified that this was the amended 1997 that was attached to a 1040-X that was filed for 1997 claiming carry back of loss from 1999.
(PREVIOUSLY MARKED EXHIBIT 1004.)
Q. Do you recall this? Does this refresh your recollection that you claimed a carry back loss to 1997?
A. Now that you put this in front of me, this refreshes me as of now.
But Sheila had a power of attorney and could -- she would tell me what she was doing, and I would either approve it or not approve it, but I trusted Sheila explicitly.
Q. When you decided to participate in the Ernst & Young's product and to pay the fees for that product in November of 1999 to Ernst & Young and to the other fees associated with it, did you anticipate, at that time, that you would be able to carry back a loss to 1997?

Page 165

MR. CROUCH: Objection; vague and ambiguous.
A. I anticipated a profit. I anticipated that I was going to make a profit and that we were going to be in the money; but I can't say anything more than that.
Q. And how much profit did you anticipate?
A. I think I anticipated -- I think it was between eight and $10 million. I can't remember the --
Q. Eight and ten million --
A. Yes.
Q. -- is your expected profit?
A. That was the maximum, the gross profit, but that's not what the net profit would have been after taxes or anything.
Q. So, in other words, if you invested and purchased $5 million -- $5 million product, you anticipated making eight to $10 million?
MR. CROUCH: If you can recall.
A. I don't recall. But I know it was more than $5 million. I don't recall, but I know it was more than $5 million.
Q. For this $5 million product, you were going to make an investment of how much? Five

Page 166

percent. I believe. was the amount of the options; is that correct?

MR. CROUCH: Objection; form. also vague and ambiguous.

A. Jerry asked me if I would be willing to invest more?

And I think it was going to be up to a potential of 90 to $100 million of profit. but he would have gotten the lion's share of it. but I can t recall

Q. You ended up only purchasing ten percent of the $50 million, or participating in ten percent of the $50 million, and that would be a $5 million product.

And your -- the amount -- the net premium that you paid to Deutsche Bank for that transaction was $250,000 right?

MR CROUCH: Objection.

A I don't recall. but if you say so

MR CROUCH: Objection; assumes facts not in evidence.

Q. And did you expect that $250.000 to grow to eight to $10 million?

A. I expected whatever I invested to grow to in excess of $5 million.

Page 167

Q. Okay.

A And Jerry was talking about actually investing more

And I told Jerry. I said: Jerry. I don't want to assume the monetary risk of investing more.

And I think that's why I only ended up investing ten percent. rather than a usual. like. 15 or 20 or 25 percent.

Q. If you put $250.000 in as your net premium to purchase the options from Deutsche Bank. and you're telling me you expected a return of eight to $10 million?

A. No I expected -- excuse me -- that was --

MR. CROUCH: Let him ask his question

THE WITNESS: Excuse me.

Q. What was the return that you expected off of your net $250 million dollar investment for the terms of the cost of the premium that you paid to Deutsche Bank?

MR. CROUCH: Objection; I think that mischaracterizes the testimony. also misstates the facts of the case

A I think it was when Jerry was talking more about doubling what we were going to invest.

Page 168

which I didn't want to do. that was potentially a six. seven. eight, $9 million profit.

But at the end. I think the best I can recollect is that I anticipated a profit of probably three to $5 million; I can't recall

Q. And this is based upon what you actually did. not what you originally considered doing when Jerry thought about doing $100 million with you participating on a two percent basis on that transaction?

A. (No response.)

Q. Remember that -- we had a mark above the COBRA Client Information Questionnaire. that originally said it was 98/2 on $100 million.

It was marked down and changed to $50 million of which you had $5 million, Jerry had $45 million?

A That sounds logical. but I don't recall.

MR. CROUCH: Let him ask his question

THE WITNESS: Excuse me.

Q. So, on that $5 million product, Deutsche Bank was charging a five percent net premium for the investment. and five percent of $5 million is $250,000, that's the actual money you put into Deutsche Bank on the options.

Page 169

And are you telling me that you expected that $250.000 to grow to three to $5 million?

MR CROUCH: Objection; assumes facts.

A. I don't know exactly what I assume. but I expected to make a reasonable profit. just like Jerry and I. we invested in Polycore. we put in less than 20 or $30 million. we made over a billion dollars.

Q. Okay. This wasn't Polycore, this was something else.

So my question is: As to this transaction. on what did you base your belief that you would make three to $5 million?

MR CROUCH: Objection; asked and answered

A I think it was probably my hanging onto Jerry's coattails and knowing that he was so bright. and that he was so good at investing. that I would stand a chance to make an investment

I didn t do anything independently on my own to verify. other than working with Black-Scholes and some other stuff. that whether I invested $10.000 or I invested $100.000. it didn't make any difference to me

Q. Was the primary purpose of your

Page 170

participation in the transaction that you purchased from Deutsche Bank at Ernst & Young and Jenkens Gilchrist to make a tax loss?

MR. CROUCH: Objection; assumes facts not in evidence.

A. Can you repeat that, sir.

Q. Was the primary purpose of the product that you purchased from Deutsche Bank, Jenkens and Gilchrist and Ernst & Young, to make a tax loss?

A. No, sir. That was a fallback. We wanted to make money. Jerry and I always went into everything to make money.

Q. How much time did you take to evaluate the proposed transaction being offered by Ernst & Young when Mr. Knight came and made his pitch to you?

MR. CROUCH: Objection; vague and ambiguous.

A. I will be honest; I don't recall.

Q. Did you take more than a day?

MR. CROUCH: Objection; asked and answered.

A. I don't recall.

Q. Do you know if you or Mr. Zucker sought the advice of any counsel on the proposed

Page 171

transaction?

MR. CROUCH: Objection; vague and ambiguous.

A. I can only speculate I talked to Sean Smith, but I don't recall.

Q. Did Sean Smith indicate to you that he was familiar with the COBRA product?

A. I don't recall.

Q. Did you ask for a copy of any documents from Ernst & Young with respect to the proposed transaction so that you would be able to have as much detail of the transaction as possible?

MR. CROUCH: Objection; vague and ambiguous.

A. No. I thought Jerry and I were astute enough to figure out the different spreads or, you know, what we would be doing. And so I don't recall us ever asking.

Q. Prior to the time that you signed the confirmation statements with Deutsche Bank with respect to the options that you purchased, had you ever seen the confirmation sheet?

MR. CROUCH: Vague and ambiguous.

Q. Do you understand what I'm talking about "the confirmation sheet"?

Page 172

A. I just don't recall.

Q. Take a look back at Exhibit 1011.

MR. CROUCH: 1011, counsel.

Q. 1011 and turn to page DOJ 041527.

A. What page, sir?

Q. DOJ 041527.

A. Okay, sir.

Q. Do you know, have you ever seen a confirmation statement before --

A. Yes.

Q. -- for an option transaction?

A. Yes, sir.

Q. Does this look like a confirmation statement for an option transaction?

A. I know the paragraphs A and B are fairly traditional.

But I can't speak as to the other stuff.

Q. Had you ever seen a draft of the language in this confirmation statement before you received it in around November 24, 1999?

A. Not from Deutsche Bank, but I had seen similar language in prior transactions which Jerry and I had done, I think, but I can't be certain.

Q. You indicated that you had not previously done a European digital option transaction.

Page 173

A. We used to do -- I think we did some American options but not European digital options. Because that --

MR. CROUCH: I think you answered the question.

THE WITNESS: Excuse me.

Q. So, you testified you had not seen this language from Deutsche Bank, particularly if -- let me ask you:

Had you seen a draft of this document with the name Foreign Exchange Digital Option Transaction at the top, from anybody?

MR. CROUCH: Objection; form.

A. As I told you, I think I have seen paragraphs A and maybe B, but I can't tell you about the rest of it, no.

Q. Have you ever seen -- have you ever seen before the time that you signed this document, a document with the name -- a confirmation document -- with the name Foreign Exchange Digital Option Transaction at the top?

A. I don't believe so, but I can't recall.

Q. Did you have any discussions with Mr. Knight concerning the appropriate time to terminate JBJZ Investors, Inc.?

Page 174

MR CROUCH: Objection; vague and ambiguous
A. I only had two conversations that I can recall with Mr. Knight.
And I don't recall anything about termination or calling or doing anything like that.
In fact. I think I told somebody from E&Y I really didn't like Mr Knight that much. and I didn't want him to call me.
Q. When did you tell someone at E&Y that?
A. I think it was probably in 1999. but I don't recall
Q. And what was it that triggered this phone call?
A. I talked to Tony Calendar and Sean Smith.
And I just said that Mr. Knight is not very substantive.
I say substantive. he was not what I was used to. you know. somebody who was extraordinarily confident. knowledgeable in everything
Q. Did you make this call to Calendar and Smith after you had already decided to purchase a product from Ernst & Young?
MR. CROUCH: Objection; vague

Page 175

A. I believe it was after. but I don't recall.
Q. Did you -- did Ernst & Young provide somebody else for you to contact instead of Ray Knight with respect to the product that you purchased from Ernst & Young?
MR. CROUCH: Objection; vague
A. Not that I'm aware of. But Mr. Calendar and Mr. Smith knew that I was not enamored of Mr. Knight.
Q. Did --
A Or enamored with. excuse me.
Q. Did you know whether there was any substitution for Mr. Knight by anyone else at Ernst & Young to play his role?
MR. CROUCH: Objection; vague and ambiguous
A. Not that I m aware of.
Q. I'll show what's been marked as Exhibit 164.
(PREVIOUSLY MARKED EXHIBIT 164.)
MR. CROUCH: Is it something from yesterday. counsel?
MR LINDQUIST: I'm going to give you -- I believe it is. but if you don't have a copy. I'll

Page 176

give you another copy
MR. CROUCH: Let me look here real quick.
I'm sure we have copies. just to speed things along here Thank you.
Q. This is a letter that was addressed to you by the IRS with respect to the audit of your 1999 Form 1040.
Do you recall getting this around October of 2001?
A. If it says it was addressed to myself and Sam. I would say yes. I got it.
And I think I turned this over to either Sheila or contacted Kenney Hughes.
Q. Did you have any discussions with your wife concerning this examination?
A No. Because I had been under audit before. and --
Q. Which years had you already been under audit for?
A. A number of years. I don't know I can't remember
Q. Had you been under audit in 1998?
MR. CROUCH: Objection; asked and answered.

Page 177

A You need to check with Ms. Pace. I don't recall.
Q. Did you have any discussions with Mr. Hughes at Ernst & Young concerning whether to disclose your participation in the E&Y product known as COBRA?
MR. CROUCH: We are going to object to that on the basis of any discussions with Mr Hughes regarding a disclosure after October. 22nd. 2001 is protected by privilege.
You -- he may answer your question as to whether he had discussions with him but not the substance of those discussions.
MR LINDQUIST: I will be opposing that with a motion to the court on fraud
MR CROUCH: On fraud?
MR LINDQUIST: On fraud.
MR CROUCH: On what basis of fraud?
MR. LINDQUIST: I'll bring that up with you afterwards.
Q. Did you have discussions with Mr. Hughes with regard to the examination of your 1999 federal income tax return by the IRS?
MR. CROUCH: You may answer whether you had discussions. not the substance of those

Page 178

discussions.
A. I may have, but I don't recall.
Q. Are you asserting a claim of privilege with respect to your discussions with the IRS -- I mean with Mr. Hughes?
MR. CROUCH: Yes, he is.
THE WITNESS: Okay.
Q. Did you agree to fully disclose the COBRA transaction to the IRS in 2002?
A. I remember discussing with Mr. Smith, and I said: We have nothing to hide. And whatever you need to disclose or whatever, go ahead and do it.
Q. I show what's been marked as Exhibit 166.
MR. LINDQUIST: I'll give you another copy.
MR. CROUCH: Thank you.
(PREVIOUSLY MARKED EXHIBIT 166.)
Q. This is a letter dated January 7th, 2002, signed by Ken Hughes with a copy to you and to Mr. Brooke.
Do you remember receiving this?
A. I probably did, but I don't recall it. I know Mr. Hughes did a lot of stuff for me.
Q. I show what's been marked as Exhibit 169

Page 179

in the deposition of Mr. Hughes --
(PREVIOUSLY MARKED EXHIBIT 169.)
Q. -- this is the letter to the IRS dated April 17 of 2002.
And is that your signature and your wife's signature on the back?
A. Yes, sir.
Q. Did you and your wife discuss the details set forth in this letter?
A. I don't recall, but I told Sam, like I did on most things, that E&Y would handle whatever was required.
Q. Did your wife have any knowledge when she signed this letter, as to the facts set forth in this letter?
A. (No response.)
Q. And if you would please take a look at the description of material facts that is described beginning on the first page through, I believe, to the end of the second page.
A. No. She didn't have any facts, other than what I told her.
Q. I asked if she had any knowledge of those facts set forth when she signed the letter?
A. No, sir

Page 180

Q. Did you have knowledge of the facts being represented here?
A. I think these were representative of the various things that we did; so, yes, I had knowledge.
Q. So, you reviewed this letter before you signed it, to make sure that it was accurate?
A. I believe I did.
Q. I show you what's been marked as Exhibit 175 in the deposition of Mr. Hughes.
(PREVIOUSLY MARKED EXHIBIT 175.)
Q. This is a letter addressed to you with respect to JBJZ Partners, March 25 of 2003, with respect to a document request; do you recall getting this document request?
A. I would like to say yes, I recall it, because I'm addressed here; but I gave a copy of it to Mr. Hughes. I was in a brain hospital by this time.
Q. Okay.
A. So, I'm certain Mr. Hughes did everything.
MR. CROUCH: Clarify that I'm not sure if this is March 25, 2003.
THE WITNESS: No. It was May. I'm

Page 181

sorry, it was in May.
Q. Were you -- you were asked before whether there was any promotional or marketing materials that you received with respect to the product that's been referred to here as the COBRA transaction.
And I would ask you, again, did you ever receive any promotional or marketing materials describing the COBRA transaction?
A. As I told you earlier; no, sir.
Q. Was there any type of a white board used for purposes of writing down anything by -- about the COBRA transaction by anyone from Ernst & Young?
MR. CROUCH: Objection; vague and ambiguous.
Q. White board, blackboard, piece of paper?
A. That's what I was going to ask you when you refer to white board, do you mean blackboard, because we have blackboards here -- no.
Q. Was there any type of a visual presentation of the -- outlining the planned transaction being proposed by Ernst & Young?
A. No, sir.
Q. Was there any type of a verbal presentation by anyone at Ernst & Young describing the planned transaction?

Page 182

A. No. sir; not that I recall

Q. How is it that you had any understanding of the planned transaction being proposed by Ernst & Young?

A. To the best of my recollection. Mr. Knight talked about an investment strategy.

And since we were qualified investors under SEC rules. would we be interested in talking or hearing more about it?

And I think Jerry and I later agreed. yes. we would be interested in hearing more about it

Q. And from whom did you hear more about it?

A. I think it was Mr. Knight

Q. And was that at a subsequent time you rescheduled a meeting or scheduled a meeting?

A. I think he was here more than once. In fact. I think he was here twice.

So. yes. I think that's when it was.

Q. And was Mr. Hughes with him at the time of that second meeting?

A. I don't recall. and I don't think so. sir.

MR. CROUCH: I want to make sure you agree he was here twice.

Page 183

Are you sure -- do you remember two meetings?

THE WITNESS: In all honesty. I'm just speculating in my own mind.

Q. The first time when you were asked by Mr. Knight whether you wished to hear more about it, was that -- was Mr. Knight here? Or was it possible that he was speaking with you all by phone?

A. Mr. Calendar called us, I believe. and told us that somebody named Knight would be calling -- contacting us. and would we be interested in talking with him; and I think we indicated. yes. we would be willing to talk with him But he didn't say anything more than that.

Q. And was that when you then set up a meeting or a meeting was set up for Mr. Knight to come to meet with you?

A I would guess so; yes. sir

Q. And do you recall whether Mr. Hughes attended that meeting with Mr. Knight?

A. I don't recall

Q. Was that meeting here at these offices?

A Yes When Mr Knight came. he came here to the Intertech offices; yes. sir.

Q. And do you know in which conference room

Page 184

you all met with Mr. Knight?

A. (No response.)

Q. Was it this very conference room that we are in today?

A. This conference room didn't exist at the time. sir.

Q. Was it on the other side of the building?

A. It was on the other side of the building.

There was a conference room between Jerry's office and my office.

And I'm probably 90 percent certain it was in that conference room.

Q. So. it was in the conference room between your two offices?

A. Yes. sir.

Q. And how many chairs -- how many people can that room accommodate?

A Comfortably. I think nine.

Q. Did you all record that meeting?

A No. sir.

Q. Was there any transcription of that meeting?

A. No. sir.

Q. Were there any notes taken during that

Page 185

meeting?

A. I didn't take any. sir. maybe Mr. Zucker did. but I don't recall

Q. Did Mr. Zucker have a habit of taking notes?

A. He used to have little what we called stickies and little things that he would sometime jot a note down on something; but I just don't recall. sir.

Q. And at that meeting. did Mr. Knight have anything with him other than his own person?

A. Not that I'm aware. sir.

Q. Is it possible that he had something, and you don't recall?

A. He didn't have anything in the meeting. He may have had something out in his car. I don't know. sir.

Q. Do you recall whether Mr. Knight ever dropped off anything at your offices after a meeting?

MR. CROUCH: Objection; vague and ambiguous as to when.

Q. After the meeting?

MR. CROUCH: At any time?

MR. LINDQUIST: At any time.

Page 186

MR. CROUCH: Tax returns? Anything you're talking about?
A. I think he exchanged e-mails with Charlotte, my assistant.
And he may have exchanged e-mails with either Jerry and me, but I don't recall.
Q. You indicated that he may have had something in the car at the time of the meeting.
MR. CROUCH: Objection; mischaracterizes the testimony.
A. I'm speculating.
MR. LINDQUIST: Okay.
Q. I'm trying to focus in on the time of your initial meeting with Mr. Knight.
And you indicated that other than his person, he did not have anything with him to the best of your recollection.
But that he might have had something in the car.
Is that just shear speculation on your part that he may have had something in the car?
A. Yes. He might have had his wife in the car; I don't know.
Q. Did anyone from Ernst & Young attend that meeting with Mr. Knight by phone?

Page 187

MR. CROUCH: Objection; asked and answered.
A. I think at a later meeting, Mr. Smith was on the phone and a Mr. Parse or somebody from Deutsche Bank, and that was -- but that was, I think, in December.
Q. In the meeting -- the earlier meeting that you had with Mr. Knight when he was having a discussion with you and Mr. Zucker about the E&Y transaction, did Mr. Brian Vaughan from Ernst & Young -- have you ever heard of the name Brain Vaughan?
A. No, sir.
Q. Have you ever heard of the name Richard Shapiro?
A. No, sir.
Q. Have you ever heard of the name Robert Copeland?
A. I think so, but it was spelled differently than what it was in a newspaper article.
Q. Okay.
A. I thought it was spelled differently.
Q. Can you describe for me any discussion that you may have had with a Robert Copeland.
A. I never had a discussion with him.

Page 188

Q. Did you ever know anyone named Robert Copeland from Ernst & Young?
A. I didn't know somebody; no, sir. And I never met him.
Q. Did you ever have any discussions with a person by the name of Nissenbaum, N-i-s-s-e-n-b-a-u-m?
A. What is the first name, sir?
Q. I think it's Richard -- no, that's Richard Shapior.
THE WITNESS: Richard Schapiro has just been indicted.
A. Excuse me. Sometimes if you give me a first name, it will trigger a memory, but I don't recall the name.
Q. Well, I can't recall the first names. I can't remember the first name.
A. I don't remember anyone named Nissenbaum.
Q. And you have no recollection of anyone participating in that first -- that first meeting at your offices in between yours and Mr. Zucker's office by phone?
A. No, sir.
Q. Does that office -- does that conference room -- did that conference room in 1999, have conference ability?

Page 189

A. It had conference call ability; yes, sir.
Q. Subsequent to that meeting in the conference room, did you have any type of a phone conference with anyone at Ernst & Young?
MR. CROUCH: Objection; subsequent to
Q. Subsequent to the meeting with Mr. Knight in your offices, did you have any type of a phone conference with anyone -- I would say between that time, and the time of December 6 and December 7 of 1999, did you have any phone conferences with anyone from Ernst & Young?
MR. CROUCH: Regarding the COBRA transaction?
Q. On anything.
A. I'm certain I talked to either Sean Smith or Kenney Hughes or Tony Calendar, because they were our auditors.
And I used to talk with them almost on a daily or every-other-day basis.
Q. Did Kenney Hughes ever provide you with any materials related to the transaction that had been -- that you had discussed with Mr. Knight?
A. No, sir.
Q. Did Mr. Sean Smith ever provide you with

Page 190

any materials related to the transaction that you had discussed with Mr. Knight?

A. No. sir.

Q. Did Mr. Calendar ever provide you with any materials related to the transaction that you discussed?

A. No. sir.

MR. LINDQUIST: No further questions.

MR. CROUCH: No questions at this time.

VIDEOGRAPHER: This completes the videotape deposition of James Boyd.

The time is approximately 3:24 PM.

We are now off the record.

Page 191

WITNESS SIGNATURE

I. the undersigned witness. do hereby swear under penalty of perjury that I have read the foregoing transcription and made the following corrections. and signed my signature before a Notary Public as follows:

PAGE LINE CORRECTION

________________________________________

________________________________________

________________________________________

________________________________________

________________________________________

________________________________________

________________________________________

________________________________________

________________________________________

________________________________________

________________________________________

________________________________________

________________________________________

________________________________________

WITNESS' SIGNATURE

SIGNED BEFORE ME______________________________

ON THIS________DAY OF ________. _____. MY

COMMISSION EXPIRES:__________________________

Page 192

REPORTER'S CERTIFICATE

I. Jane G. LaPorte. Court Reporter and Notary Public in and for the States of North Carolina and South Carolina. do hereby certify that the above and foregoing is a true and complete transcription of my stenographic notes. taken and transcribed by me.

Dated this 18th day of June. 2007.

__________________________

JANE G. LaPORTE