# GOVERNMENT EXHIBIT D

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NO. 05-231 T

(CHIEF JUDGE DAMICH)

JZ BUCKINGHAM INVESTMENTS, LLC
AS TAX MATTERS PARTNER OF JBJZ PARTNERS,
A SOUTH CAROLINA GENERAL PARTNERSHIP,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

DEPOSITION OF: CHARLOTTE CROSBY

DATE: July 13, 2007

TIME: 9:22 AM

LOCATION: The Intertech Group, Inc.
4838 Jenkens Avenue
North Charleston, SC

TAKEN BY: Counsel for the Defendant

REPORTED BY: TERRI L. BRUSSEAU,
Registered Professional
Reporter, CP, CRR

PENGAD 800-631-6989
GOVERNMENT EXHIBIT
D



9eb6a822-13fa-4e1f-a26a-5d4409a532b9

APPEARANCES OF COUNSEL:

ATTORNEYS FOR THE PLAINTIFF
JZ BUCKINGHAM INVESTMENTS LLC AS TAX MATTERS PARTNER OF JBJZ PARTNERS, A SOUTH CAROLINA GENERAL PARTNERSHIP:

MEADOWS, COLLIER, REED,
COUSINS & BLAU, LLP
BY: JOEL N. CROUCH
901 Main Street, Suite 3700
Dallas, TX 75202
(214) 744-3700
(214) 749-2456 Direct
jcrouch@meadowscollier.com

ATTORNEYS FOR THE DEFENDANT
UNITED STATES OF AMERICA:

U.S. DEPARTMENT OF JUSTICE
BY: JOHN A. LINDQUIST, III
Tax Division
P.O. Box 55
Washington DC 20044-0055
(202) 307-6561
JOHN.A.LINDQUIST@USDOJ.GOV

ALSO PRESENT:

Joe Schmitt, Video Technician

(INDEX AT REAR OF TRANSCRIPT)



VIDEO TECHNICIAN: We are now going on the video record. Today -- today is Friday, July 13th, 2007. The time is approximately 9:22. We are at the office of Intertech Group at 4838 Jenkins Avenue, North Charleston, South Carolina. Civil Action Number is 05-231 T. The deponent is Charlotte Crosby. The video deposition is requested by the Defense counsel, U.S. Department of Justice.

Will counsel please identify themselves for the record.

MR. CROUCH: Joel Crouch on behalf of Plaintiffs Jerry Zucker, Jim Boyd and the related entities.

MR. LINDQUIST: John Lindquist appearing as counsel for the Defendant United States.

VIDEO TECHNICIAN: My name is Joe Schmitt, video specialist, representing Henjum Goucher Litigation Services. The deponent may now be sworn in.

CHARLOTTE A. CROSBY
being first duly sworn, testified as follows:

EXAMINATION

BY MR. LINDQUIST:



Q. Miss Crosby, my name is John Lindquist. I'm a trial attorney with the Department of Justice, Tax Division.

Have you ever had your deposition taken before, Miss Crosby?

A. Yes, I have.

Q. And was that recently?

A. No, it was in 1990.

Q. Was that related to a personal injury matter?

A. No.

Q. What was that related to?

A. It had to do with a -- some corporate records of one of our subsidiaries.

Q. And were you a witness in that?

A. Yes.

Q. And what was the name of the subsidiary that was at issue in that?

A. RemGrit Corporation.

Q. How do you spell that?

A. R-E-M-G-R-I-T.

Q. And since that time, have you had your deposition taken in any other matters?

A. No.

Q. In case a reminder is needed, you may



recall the procedure, but when your deposition is being taken, I'm going to be asking you questions. It's important that you understand questions before you answer them because it's assumed that you're understanding the question, you're under oath.

A. Right.

Q. And as a corollary, I take no offense if you tell me you don't understand the question and I'll try and restate the question so that it's clear. It's also important that your responses be verbal so that the Court Reporter can take it down.

If you need to take a break as I mentioned before, please let me know that you need to take a break. I prefer to have you finish answering a question before we take any breaks.

Miss Crosby, do you currently work for Intertech?

A. Yes, I do.

Q. And for how long have you worked for Intertech?

A. Since March the 15th, 1986.

Q. And how old are you today, Miss Crosby?

A. 61.

Q. And prior to March 15, 1986, were you working with Mr. Boyd or Mr. Zucker?







9eb55822-13fa-4e16-a2da-5d440ea632b9

A. I was working with Mr. Boyd.
Q. And when did you first begin working with Mr. Boyd?
A. In September of 1972.
Q. Do you have any professional degrees, Miss Crosby?
A. I have a paralegal degree from The Paralegal Institute.
Q. When did you obtain that?
A. 1993.
Q. And did you go to college as well?
A. No, I did not.
Q. From 1986 until today, what positions have you held in Intertech?
A. I was Jim Boyd's secretary -- do you mean official?
Q. Official or unofficial, whatever your understanding was of your position --
A. Okay.
Q. -- or function.
A. Okay. I worked for Jim Boyd as his assistant and when he came out here from his law practice, I worked for he and on a limited basis with Mr. Zucker.
Q. And were you their assistants?



A. Yes.
Q. Were you their personal assistants?
A. Yes. And I kept some legal records still for Mr. Boyd for some of his clients that he had.
Q. Were you in the nature of a paralegal function or in the nature of a secretarial function or something different? I'm trying to understand the nature of what would go into the type of duties that you're performing as a personal assistant.
A. Well, I took shorthand, I did minutes of corporate meetings and I did whatever they wanted me to do.
Q. Okay.
A. And that was until Mr. Zucker's assistant left who was handling the cash transactions in the company and I don't remember what year that was, but I was trained to do that job also.
Q. You were also trained to do what you're referring to, the cash transactions?
A. Handling cash transactions for the company, moving cash between companies when they needed, making wires for the companies when they requested it to various vendors.



Q. In the fall of 1999, Mr. Zucker and Mr. Boyd had both described a meeting that they attended with Mr. -- a person by the name of Ray Knight. Were you aware of that meeting or did you participate in that meeting?
A. No, I did not.
Q. Did you keep any records related to the -- what I'll call the COBRA transaction which was subsequently entered into after that meeting?
A. I do not know what a COBRA transaction is, but I do know that when they gave me documents to put in a file, I would do that so...
Q. Let me show you a copy of an exhibit that I'm marking 1006.
MR. LINDQUIST: You may already have a copy.
BY MR. LINDQUIST:
Q. This is a letter dated November 15 of 1999 that was faxed to Mr. Boyd and Mr. Zucker around November 15 of 1999. And you'll see in the first line this refers to an engagement concerning the implementation of something called the COBRA strategy and that's where I'm getting the word COBRA.
A. Okay.



Q. Have you ever seen a document like this before?
A. If -- if Mr. Boyd or Mr. Zucker gave it to me to put in the file, it was in the file.
Q. Okay.
A. So...
Q. But the reason why I'm asking is I'm trying to understand into which file you would have put it. In other words, if you didn't call it the COBRA strategy, what would you have called it and where would it have been filed?
A. It was filed in my office in a drawer in my office and I just called it JBJZ Investors.
Q. And in that file did you keep any records relating to this transaction that Mr. Boyd might have had or provided to you?
A. If he gave it to me, it was in that file, yes.
Q. And was Mr. Zucker also providing you documents related to this transaction that you were also putting in that same file?
A. He may not have provided me with everything, but he -- what he gave me to go in that file went in that file.
Q. My question is: Did Mr. Zucker give

you anything relating to the JBJZ Investors --
A. He probably did, yes.
Q. Do you recall that he, in fact, did?
A. Yes.
Q. At that time, November 15 of 1999, were you -- did Mr. Zucker have a separate personal assistant other than you who would -- who might have been keeping a separate file that you're aware of on the JBJZ Investors transaction?
A. Yes, he had -- Elaine Peterson was his secretary at that time.
Q. And do you recall whether Elaine Peterson kept a JBJZ Investors file for Mr. Zucker?
A. I have no idea.
Q. Did you ever have any discussion with Elaine Peterson regarding the JBJZ Investors --
A. I did not.
Q. What role, if any, did you play in -- other than keeping the records in a file that you were given by Mr. Boyd or Mr. Zucker, what role, if any, did you play in terms of overseeing the implementation of this transaction, this JBJZ Investors transaction?
A. I don't understand the -- overseeing the implementation.



Q. Did you have any other -- were you given any other responsibilities or duties by Mr. Zucker or Mr. Boyd with respect to this transaction?
A. No. The only thing I did was what they told me to do. If they asked me to fax something, if they asked me to obtain information from anyone, make a phone call or they -- the wiring of money, I would fill out the forms and send them off to -- to have that done.
Q. And were you aware of whether Mr. Boyd or Mr. Zucker kept separate files from the file that you had in the office for JBJZ Investors, Inc.?
A. I do not know.
Q. So you were not aware?
A. No, I am not aware.
Q. This particular document which was addressed to Mr. Boyd, do you know whether Mr. Boyd ever signed this letter? You'll see on the second page of this exhibit --
A. Um-hum.
Q. -- there's an agreed to by and there's a place for a name. Do you know if Mr. Boyd ever signed off on this?



A. I do not.
Q. Were you ever -- when you drafted a letter or if you ever -- did you ever write any letters on behalf of Mr. Boyd or Mr. Zucker with respect to this transaction?
A. I wrote letters to the people at the bank sending them whatever documents Mr. Boyd and Mr. Zucker gave to me to send them, but they had dictated those letters and told me to send them.
Q. And was there some sort of an abbreviation that you would put on the bottom of the letter indicating that you were the author --
A. Yes.
Q. -- or you were the preparer of the letter?
A. Yes.
Q. And what would that be, CC?
A. Um-hum.
Q. And did you have any conversations with a person by the name of David Parse?
A. No.
Q. Did you have any conversations with a woman by the name of Donna Guerin?
A. The name sounds familiar, but I cannot remember.



Q. Did you -- are there any conversations that you recall at this time that you, in fact, had regarding the COBRA transaction?
A. No.
Q. Have you -- are there any documents that you're aware of that might refresh your recollection concerning what you, in fact, did in the fall of 1999 through the spring of 2000 with respect to the COBRA -- what I'm calling the COBRA transaction such as notes that you might have kept regarding your activities and assignments?
A. Sure. Sure.
Q. Did you keep a log of your activities?
A. No. If there were notes -- if -- anything that I did, if I made phone calls to anybody or there were notes that I made to obtain information, I would write them and there would be copies of them in the file.
Q. And this would be in the JBJZ Investors file?
A. That's correct.
Q. And was that the name on the front of this file, it would say JBJZ Investors file?
A. It was -- there was a -- an expandable folder and that folder had JBJZ Investors on a file







9eb5a822-13fa-4e1f-a26a-5d4409a532b9

folder which was inside of the expandable, yes, and all the documents that I had were in there.
Q. And do you know whether you provided a complete copy of that file to your counsel?
A. I did.
Q. Let me show you what was previously marked as Government Exhibit 159. This is an internal Ernst & Young e-mail attached to which is something that's called a PowerPoint presentation. I'd like to ask you whether you've ever seen anything such as the second page of this document --
A. No, I have not.
Q. -- which is the front page of the PowerPoint.
A. No, I have not.
Q. I'm going to show you what's been previously marked as Exhibit 177. This is a handwritten -- or a slightly marked-up copy of a fax that was addressed to Mr. Zucker dated November 11 of 1999. Do you recognize this as having been a document that was in the file of JBJZ Investors, Inc.?
A. Yes, I do.
Q. And on the back of this is Mr. Zucker's



signature which he's previously identified and at this time Mr. Zucker wrote in on that second page, a hundred million dollar loss to be allocated at 98-2 between the parties. Were you privy to any discussions regarding this hundred million dollar loss?
A. No, I was not.
Q. Were you privy to any discussions regarding the allocation of a loss between Mr. Zucker and Mr. Boyd?
A. No, I was not.
Q. Now, Mr. Zucker, I believe, had this faxed or sent back to Mr. Knight at Ernst & Young. Were you the one who sent this back to -- faxed this back to Mr. Knight or Fed Ex'd it back to Mr. Knight?
A. I could have been. I do not -- I do not know unless I look at the fax sheet or see a fax sheet. I do not -- I do not recall.
Q. What was your practice if you had been asked to send a fax back to Mr. Zucker -- excuse me, to Mr. Knight by Mr. Zucker and Mr. Boyd, would you keep a complete copy of the cover sheet and the confirmation in your file with the fax?
A. Yes, I would.



Q. And would that have been -- if it was related to this particular transaction, would it have been found in the JBJZ Investors file?
A. Yes, it would, usually attached to the document that was sent.
Q. Were you ever asked by Mr. Zucker or Mr. Boyd to remove any materials from your JBJZ Investors file?
A. Absolutely not.
Q. Were you ever asked by Mr. Zucker or Mr. Boyd to destroy any materials within your JBJZ Investors file?
A. Absolutely not.
Q. I'm going to show you what's been previously marked as Government Exhibit 180. This is a copy of a fax from Mr. Ray Knight to Jenkens & Gilchrist with respect to the JBJZ Investors transaction as well as some others and so you would not have seen a complete copy of this fax.
A. I am not familiar with this document.
Q. But it includes two pages which do relate to the JBJZ Investors file -- JBJZ Investors transaction I should say. And I'd like to direct your attention to those and ask you if you've ever seen these before and that would be Bates Number



JGCL014038 and 37. They are the fax -- have fax page numbers of 6 and 7 at the top right side. Do you see the first one for Mr. Boyd?
A. Yes, I do.
Q. Have you ever seen this document before?
A. No, I have not.
Q. And the second page or the following page from Mr. Zucker, have you ever seen that page?
A. No, sir.
Q. There is a reference here to a Mr. David Bradley at Chase Manhattan. Do you recall Mr. David Bradley as having been a person with whom Mr. Zucker worked for financial -- as a bank reference?
A. Yes.
Q. Did you have any discussions with Mr. Bradley?
A. No.
Q. On the page from Mr. Zucker there's some Social Security numbers. Do you recognize the Social Security number of Mr. Zucker there, 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?
A. No, I do not.
Q. Were you privy to his Social Security







9eb5a822-13fa-4e1f-a28a-5d4409a532b9

information?
A. I have his Social Security number in the personnel file.
Q. And so if you needed --
A. If I needed it, I could go and find it.
Q. And if you turn back to the page from Mr. Boyd, were you privy to -- were you aware that that was Mr. Boyd's Social Security number, 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?
A. I am.
Q. Did you ever have any involvement in the review of tax returns?
A. No.
Q. Were you ever asked to review any tax returns related to the COBRA transaction such as the tax returns prepared for the partnership of JBJZ Investors?
A. No.
Q. Excuse me, JBJZ Partners?
A. No.
Q. And what about the S Corp., JBJZ Investors, Inc.?
A. No.
Q. Were you ever involved in reviewing any of the personal returns filed by Mr. Zucker or



Mr. Boyd for federal income tax purposes, their Forms 1040?
A. No.
Q. Did you -- were you ever asked to forward information on behalf of Mr. Zucker and/or Mr. Boyd to their return preparers, for instance, Mr. Emerson, who is Mr. Zucker's return preparer?
A. If he gave it to me and asked me to send it to Barry, yes.
Q. And did you also send materials to Miss -- I think it's Pace, Sheila Pace, on behalf of Mr. Boyd?
A. Again, if Mr. Boyd gave it to me and asked me to send it, I sent it.
Q. Now, if you are sending those materials related to those -- their personal tax matters, would you have kept a -- and suppose you were faxing it, would you have kept a copy of that fax in your personal -- in your file?
A. Only probably the notes, not the actual document if it was a tax document. I never kept their personal tax documents.
Q. And why was that?
A. Well, because they are very private with their tax returns.



Q. Even though it was in your -- even though you were their personal secretary or personal assistant?
A. Yes.
Q. I'm going to show you a copy of what I've marked previously as 179. This is a copy of a nondisclosure agreement that was used by Mr. Ray Knight about that same time of November 15 of 1999. Do you recall any nondisclosure agreements with regard to the COBRA strategy? The second line references the COBRA strategy. Do you recall a nondisclosure agreement being in your file for JBJZ Investors?
A. No, I do not.
Q. I'm going to show you what's been previously marked as Exhibit 178. This is a copy of a memo that was sent to Mr. Zucker from Ray Knight. Do you recall this being a document that was in the file for JBJZ Investors?
A. No, I do not.
Q. Do you -- have you retained the original of the JBJZ Investors file?
A. I have what's in my file, the -- some original -- well, they're not even original, they're books that were sent to us with the opinion



letters and the LLC documents and the incorporation documents.
Q. Where do you have those?
A. In my office.
Q. And so there were additional materials that you used to have in your JBJZ Investors file that you no longer have in your office?
A. No, I still have copies of what we've sent.
Q. Okay. So you have copies of everything that you used to have -- you have a complete Investor file?
A. I have a complete file that I maintained in my office, yes.
Q. In the subpoena that was sent to you you were asked to produce a copy of all documents within your possession.
A. Right.
Q. And have you -- and you have not brought that with you today. Do you have a copy with you today?
A. A copy of?
Q. Of that complete JBJZ Investors file that was in your office?
MR. CROUCH: We don't have it with us







9eb5a822-13fa-4e1f-a26a-5d4409a532b9

Page 22

today. We can get it if you want it. I think all that information was already turned over to you though.
MR. LINDQUIST: Well, it would help me with this witness to be able to make sure that I'm --
MR. CROUCH: Sure.
MR. LINDQUIST: -- as opposed to hunting and pecking. If you wouldn't mind when we take a break and perhaps just --
MR. CROUCH: Do you want to take a break now or you want to --
MR. LINDQUIST: Let's take a break now and that way I'm not going to have to take Miss Crosby through things if she doesn't have to.
MR. CROUCH: Okay.
VIDEO TECHNICIAN: We are now going off the record. The time is approximately 9:49.
(A recess transpired.)
VIDEO TECHNICIAN: We are now going back on the record. The time is approximately 10:46, Case Number 05-231 T.
BY MR. LINDQUIST:
Q. Miss Crosby, we've taken a short break while you and your counsel have secured two files

Page 23

and brought them here and we have -- I've requested a complete copy of those files. Your attorney's advised me that he's in the process of copying those with the exception of certain materials which he considers to be protected communications and I expect I'll see a privileged log for anything that's been pulled out of those files. Thank you for expediting that and getting those files for us.
In the interim, so that we can move on with your deposition, I have also identified certain items in those files that were -- appeared to be new to me so that we could address those immediately. And I'm not saying that I've reviewed these files completely since I've only had a short time to look at them.
Allow me to show you first something that was in the file, I've marked it as Exhibit 2252.
(DFT. EXH. 2252, Ernst & Young, LLP Confidential Fax dated 11/22/99 to Charlotte from Ray Knight, with attachments, was marked for identification.)
BY MR. LINDQUIST:
Q. And this is a document that appears to be attention Charlotte from Ray Knight. Is this a

Page 24

fax that you received on or about November 22 from Mr. Knight?
A. Yes.
Q. It appears that this is -- that I have two copies of this from your file. Is that what this is, are they the same document?
A. It is the same document, but it was addressed to Jim and to Jerry and I made two copies so -- to show that each one of them got a copy.
Q. Okay. Now, these files that you've turned over to us for copying, are these materials that you kept in the files in the ordinary course of your duties?
A. That's correct.
Q. And are these documents that you've included contemporaneously to the time that you received them? In other words, at the same time that you received them, you put them in the file?
A. Either I did or Mr. Zucker's assistant would come in and say, Charlotte, I have a document that needs to go in this file and that's -- they would put it in there.
Q. Now, this particular document dated November 22 of 1999, this attachment from Ray Knight to Zucker and Boyd -- and I'm directing you

Page 25

to the second page of the document, of 2252. It doesn't have a Bates number. And this has a little table on there describing an equity contribution or fee and some percentages and risk/non-risk and then timing is the header on the table. Did you have any discussion of this -- of the content of this fax with Mr. Zucker or Mr. Boyd?
A. I did not.
Q. I have not seen this document before. Do you know why this document was not turned over to the United States before?
A. I do not.
Q. I also did not see it in the production that had been turned over to the IRS when they previously asked for some information. Do you know why it wouldn't -- might not have been turned over to the IRS?
A. I do not.
(DFT. EXH. 2253, Handwritten memo on Charlotte Crosby letterhead, was marked for identification.)
BY MR. LINDQUIST:
Q. I'm going to show you now a document that's marked -- I've marked as 2253. This is -- appears to be a memo entitled Charlotte Crosby. Is

this your handwriting?
A. Yes, it is.
Q. And what does this say?
A. It says Ray Knight and a telephone number which I'm assuming is his since I wrote it under his name and it's Wachovia LC or Dean Witter, which means Wachovia line of credit or Wachovia and then Donna Guerin and a telephone number which, again, I assume is hers, JZ, 3,150,000, JB, 350,000.
Q. Do you recall why it was you wrote this note at that -- here?
A. Somebody gave me those instructions and that's where I wrote it.
Q. Do you recall whether you were calling Mr. Knight or Miss Guerin at that time?
A. No, I was -- I did -- I don't recall.
Q. This document is not one that I've seen previously turned over to the United States in this litigation. Do you know why it might not have been turned over to the United States?
A. I do not unless it was just something that since it's on a notepad, it could have slipped in the bottom of the file or something. I have no idea.



Q. And the original of this is indeed a little bit smaller than this page. It's about the size of the width of the marked note here that outlines this writing, correct?
A. Yes, it's a legal -- I mean it's a letter -- memo pad.
Q. I'll show you here -- I'm putting a staple through it for you and I've marked this as 2250.
(DFT. EXH. 2250, Jenkins & Gilchrist document entitled Second Notice dated 2/25/00, with attachments, was marked for identification.)
BY MR. LINDQUIST:
Q. This document appears to be written to you. Is this something that was in your file?
A. Yes. This is an invoice.
Q. And this appears to be from Mr. Zucker stating, I thought we had already authorized release of those funds a long time ago, please -- what does that say?
A. Reconfirm.
Q. Do you recall what this related to?
A. If -- he sent it to me to check and see if this payment had been made. That was for -- that was the reason for the note.



Q. And how would you have gone about confirming that payment had been made?
A. Most of the accounts for JBJZ Investors were at Scott Stringfellow so I would have done a -- an LOA is what they call it, letter of authorization, to make this payment to Jenkens & Gilchrist.
Q. What's this entity that you're referring to, Scott Stringfellow, what is that?
A. That is their -- where the accounts are for this company. They're an investment broker.
Q. Now, this cover page is associated with a few other pages. I was not sure whether it was related to the other pages. If you take a look at the next page, do you know what that has to do with?
MR. CROUCH: Counsel, I think it may be easier if you turn to the third page. I think the second page is related to it.
THE WITNESS: I think it's just a carryover, isn't it?
MR. CROUCH: Yeah.
THE WITNESS: Yeah, it's just inverted. The pages -- Page 3 is Page 1, Page 2 is Page...
BY MR. LINDQUIST:



Q. All right. If you turn to the third page then.
A. Okay.
Q. What does -- do you know whose handwriting the third page is?
A. Jerry's. Well, it looks like Anita's maybe because that's not -- that's not Jerry's signature and since it was addressed to him at his house.
Q. And you're looking at the last page now?
A. No. You said Page 3.
Q. Yes, I did.
A. Okay. That is --
Q. Well, I see a signature of Jerry here. You don't think that that's --
A. That's Anita -- that -- Anita wrote that for Jerry.
Q. And what is -- and would Anita have been dictating or did she --
A. Jerry would have dictated this to her to write.
Q. And what is he dictating, what does it say?
A. Wasn't Ernst & Young supposed to make







9eb5a822-13fa-4e1f-a26a-5d4409a532b9

these tax filings for Jim and myself? If so, please contact Tony Calendar to express my dismay.
Q. Do you recall whether you were involved in any way in these communications?
A. No, I was not. And Anita spelled Tony's last name wrong anyway.
Q. Who's Tony Calendar?
A. He's with Ernst -- he was with Ernst & Young.
Q. And what did Tony Calendar do for -- what role did he play with respect to the JBJZ Investors COBRA transaction?
A. I have no idea. He just worked at Ernst & Young and Jerry and Jim talked to him about everything. I mean, I can't say it was specifically about this because they were -- they are tax people.
Q. Let me show you what I've marked as Exhibit 2251.
(DFT. EXH. 2251, Handwritten document to Charlotte Crosby dated 3/4/02, with attachments, was marked for identification.)
BY MR. LINDQUIST:
Q. This appears to be -- have some handwriting on the front and then I've attached --



have attached to it two pages that appear to have been associated with it and along with a complete copy of the opinion that was in the file from Jenkens & Gilchrist. What does this handwriting have to do with on the front page?
A. Jerry -- this is from Ellen that --
Q. Who is Ellen first?
A. Ellen used to be Mr. and Miss Zucker's assistant -- or Miss Zucker's assistant, personal.
Q. What was Ellen's last name again?
A. I don't remember. She's -- she's been gone for a couple of years now. I don't remember. I didn't deal with her very much.
Q. Okay. And is Ellen telling you to do something here?
A. She's asking me if we need to still keep JZ Buckingham Investments, LLC open.
Q. And then how do you know that?
A. Because she called me and said that that's what Jerry wanted to know and then she had faxed -- excuse me, she -- she had faxed this to me.
Q. Okay. And the handwriting -- there appears to be some handwriting from Jerry to Ellen that's pointed the other way. Is that Jerry's



signature?
A. No.
Q. Whose handwriting is that?
A. That looks like Anita's again.
Q. And Anita -- do you understand that Anita would have been dictating -- taking this as dictation from Jerry?
A. Yes.
Q. So what does this handwriting say?
A. Copy to Charlotte, Charlotte will disburse to Jim Boyd and Sean Smith, and Barry Emerson, Jim Boyd and Sean Smith. Do I or we still need to maintain JZ Buckingham Investments, LLC? Please advise, Jerry.
Q. And on the second page, is the second page or the third page properly associated with this fax in the front?
A. I would assume so if they were attached.
Q. They were not attached.
A. Oh.
Q. I found them in the file and they may have been inadvertently associated with each other.
A. Yeah.
Q. The front has a two-page -- indicates



that it was part of a two-page fax. Do you know where the second page of the fax is? Would that be in the file somewhere?
A. I have no idea.
Q. The second page of this document has some handwriting that says -- appears to say in the upper left-hand corner, please copy Barry Emerson. Whose handwriting is that?
A. That's Jerry's handwriting.
Q. And do you recall whether this was something that Jerry gave to you?
A. I do not. If there's not a -- a copy of a fax cover or confirmation, then I did not send it.
Q. Is it possible that either of the other two individuals that you've referenced, Anita or Ellen -- is it Anita?
A. Anita is Jerry's wife, yes.
Q. Or Ellen here, were they -- could they have been the ones who would have been doing the fax?
A. They could have since it was addressed to his home.
Q. And on the second page, the reference to Mr. Emerson, do you recall Mr. Emerson being






9eb5a822-13fa-4e1f-a26a-5d4409a532b9

sent copies of the opinions?
A. Of?
Q. From Jenkens Gilchrist?
A. I do not know.
Q. If you take a look at the third page, there's some handwriting. Do you know whose handwriting that is?
A. The handwriting's Jerry's except for the word copied.
Q. Okay. And was this something that Jerry addressed to you here?
A. The please copy Barry Emerson?
Q. Yeah.
A. No. I -- he just addressed the please retain this original in our files and that's the only part that came to me.
Q. Okay. Now I show you what I've marked as 2254.
(DFT. EXH. 2254, Handwritten document to Charlotte from Jerry, was marked for identification.)
BY MR. LINDQUIST:
Q. This appears to be part of a three-page fax from 2003 addressed to you from Jerry. Is that Jerry's handwriting?



A. It's his signature, but it's not his handwriting.
Q. Do you recall -- can you read the handwriting?
A. I can read part of it what's -- please have E&Y respond on my behalf and send me a copy of the response. Please note -- and I can't read, is time --
Q. It looks like the word sensitive.
A. Could be. I have no idea.
Q. Do you recall what this was about?
A. I think -- well, yes. There was a question about whether or not they could name us in something. There's -- there's a letter in the file that says whether or not they could give our name out.
Q. Who's the they you're talking about?
A. Ernst & Young could give our name out to, I think, the IRS or somebody with regard to a letter that they had sent to Jerry.
Q. And do you recall what the resolution of that question was?
A. No, I do not.
Q. Do you know if the name of Mr. Zucker was given out to the IRS?



A. It was supposed to have been, yes.
Q. How do you know that?
A. Because Jerry had me follow up with Kenny and Sean to say that it was okay to make sure that they approved that and they told me yes, it was.
Q. I can't tell exactly what date this is at the top. I see a 26 --
A. March 26.
Q. That's March 26?
A. Yes.
Q. Okay. Of 2003?
A. Yes. No. I don't know what the year is.
Q. Okay. So the 3 there refers to the March?
A. March.
Q. And so the year would be in front of it?
A. Yes. And it was sent from their home.
Q. And you can tell that because of the fax --
A. The fax number.
Q. The fax number. What about this block, checkered block, is that something that was on



their home faxes?
A. It must have been.
Q. I'm going to show you a copy of a document that I'm marking as Exhibit 1104.
MR. LINDQUIST: This may be one that you don't have, Counsel, previously.
BY MR. LINDQUIST:
Q. This is a nine-page fax which I did not see in your file at the office. Have you ever seen this document before?
A. No, sir.
Q. Do you recognize that handwriting as the handwriting of Mr. Zucker?
A. Yes, I do.
Q. It indicates here that he is asking Mr. Boyd to please review and approve or comment before asking Charlotte to return one copy and retain one original in the file and he's asking you to please initial originals. Do you recall any such instruction?
A. No, I do not.
Q. And that would have been a request from Mr. Boyd --
A. From Mr. Boyd, yes.
Q. -- to you to return one copy and retain






9eb5a822-13fa-4a1f-a26a-5d4409a532b9

one original in the file?
A. That's correct.
Q. Now, attached to this fax which is a nine-page fax are engagement letters addressed to Mr. Zucker and Mr. Boyd dated November 15 of 1999. Do you know if Mr. Zucker, in fact, signed a copy of this engagement letter?
A. No, I do not.
Q. If he had, you'd have retained a copy in your file?
A. That's correct.
MR. LINDQUIST: Let's take a five-minute break and I'll grab that.
MR. CROUCH: Okay.
VIDEO TECHNICIAN: We are now going off the record. The time is approximately 11:07.
(A recess transpired.)
VIDEO TECHNICIAN: We're going back on the record, Case Number 05-231, approximately 11:24.
BY MR. LINDQUIST:
Q. Miss Crosby, we're back on the record and I wanted to put on the record my understanding of an agreement with your counsel that the records that you have produced today from your file that



you had kept, JBJZ Investors, Inc. files from your office, that those were records that were kept by you in the ordinary course of business for purposes of determining admissibility of those records in this proceeding and that those -- there's going to be no need to come back and authenticate those documents as business records and --
MR. CROUCH: I agree with that, that stipulation.
MR. LINDQUIST: All right.
BY MR. LINDQUIST:
Q. Then let us proceed and I'll show you a few documents that appear to be new to me and perhaps you can tell us something about them.
(DFT. EXH. 2255, Handwritten note dated 12/18/99 to Jerry from Jim, was marked for identification.)
BY MR. LINDQUIST:
Q. I'm going to first show you a document I've marked as 2255. This is a handwritten note dated December 28 of 1999. It appears to be addressed to Jerry Zucker from Jim Boyd. Do you recognize this as the handwriting of Jim Boyd?
A. Yes, I do.
Q. Do you know why this document would not



have been turned over to the IRS or United States prior to this?
A. I have -- no, I do not.
Q. I'll try reading it because I think I can read the handwriting. It states: I spoke with Ray Knight at 3:00 PM today. The funds for the fees at Jenkens & Gilchrist and the second law firm, Brown & Wood, are on deposit at Deutsche Bank and they need authorization for the release as per letter in your file. I again raised the issue with Ray about the, quote, unquote, margin earnings on the Euro. He said he will call you tomorrow. He said the reason we only picked up the margin gain of 625,000, where a thousand is in K, paren, plus the original 2.5 million, close paren, was because we capped our exposure. And then it provides his number and his first name.
Do you recall having any discussion with respect to this 625,000 dollars that's referenced here?
A. No, I did not.
Q. Were you aware of any early termination of the options with respect to this transaction?
A. No, I was not.
Q. Were you aware of any discussion with



respect to the profitability of these transactions?
A. No, I was not.
Q. Are you aware of any type of analysis by Mr. Zucker or anyone else at Intertech with respect to the potential profitability of the options that were part of this JBJZ Investors transaction?
A. No, I'm not.
(DFT. EXH. 2256, Transmission Report dated 12/28/99 to Donna Guerin from Jerry Zucker, was marked for identification.)
BY MR. LINDQUIST:
Q. I'm going to show you what I've marked as Exhibit 2256. This is a -- appears to be a fax cover sheet. Do you know whose handwriting this is?
A. Looks like Jerry's.
Q. And did he sometimes do the faxing himself?
A. Yes, he did, especially during this time of year because in December our office is usually closed the week of Christmas.
Q. I couldn't tell exactly what this page was associated with, but it appears to be dated December 28, 1999 and a six-page fax. Is that what

this is?
A. That's what it looks like, yes.
Q. And is that the type of stamp that would have appeared on the Intertech transmission report?
A. Yes.
Q. So this is from Intertech, not from Jerry's home?
A. That's correct.
Q. I assume that since this has found its way into your file that Mr. Zucker also had access to your JBJZ Investor file?
A. His assistant did.
Q. Okay. And by his assistant, who are you referring to?
A. Elaine Peterson.
Q. Did anybody else have -- I'm sorry, I cut you off.
A. Elaine Peterson.
Q. Did anybody else at Intertech have access to your files?
A. Well, this particular file?
Q. Yes.
A. No.
Q. Was it kept in a locked drawer?



A. The drawers do lock, yes.
Q. And the only other person with a key to that lock was Elaine Peterson?
A. No, Elaine did not have any keys.
Q. Sorry. Who else had a key to that locked drawer?
A. No one except for me and it was kept in my desk drawer.
Q. And did you keep those files locked?
A. Not at all times when I'm here.
Q. When you're not here do you keep them locked?
A. Not always, no.
(DFT. EXH. 2257, Transmission Report dated 11/12/99 to Ray Knight from Jerry Zucker, with attachments, was marked for identification.)
BY MR. LINDQUIST:
Q. I'm going to show you what I've marked as Exhibit 2257. This appears to be a fax cover sheet from Intertech for a five-page fax on November 12 of 1999. Is this a document that you faxed?
A. No, it is not.
Q. Can you tell who faxed this?
A. Elaine. That's Elaine's handwriting.



Q. And there's a -- there's some handwriting at the top. It appears to say Charlotte something. What's --
A. The F means file.
Q. Is that your handwriting?
A. That's Jerry's.
Q. So this is the way that Jerry would give it to you --
A. Yes.
Q. -- to make sure you put it in the file?
A. Right.
Q. The second page of this document is a -- is a memo that I've not previously seen. Do you know why this memo was not previously turned over to the United States in this litigation?
A. No, I do not.
Q. Do you know why this memo would not have previously been turned over to the IRS in this litigation?
A. No, I do not.
Q. At some point around November 12 of 1999, the amount of the loss to be generated on this transaction was reduced from an aggregate of a hundred million to an aggregate of 50 million. Do you know anything about that change?



A. No, I do not.
Q. Were you privy to any discussions regarding Mr. Zucker's possible need for a hundred million dollar loss or a 98 million dollar loss?
A. No, I am not.
Q. I appear -- this appears to be -- attached to this memo appears to be a four-page fax. Let me see if I've got it all. I've got Page 1, I've got Page 3 of 4, 4 of 4, but I appear to be missing 2 of 4. Would you be able to take a look through your files and see if you can find Page 2 of 4? Let me see if I can take a look, if I can find it in any documents I have. I have a -- I have a copy of your -- of what you produced today, one of the files, and perhaps you can find it in there.
A. I'm not sure I understand what it is you're looking for because I do not see where you're --
MR. CROUCH: Her copy doesn't show it.
MR. LINDQUIST: Oh, it doesn't?
BY MR. LINDQUIST:
Q. At the top of the page --
MR. CROUCH: For some reason her copy doesn't show it.






9eb5a822-13fa-4e1f-a26a-5d4408a532b9

BY MR. LINDQUIST:
Q. Let me give you my copy. Take a look at the upper top.
A. Page 3 of 4. Page 1 of 4. Page 4 of 4.
Q. Perhaps we should substitute my copy for the original.
A. I don't think there was another page because it looks like Ray Knight sent four pages, which is cover page plus these three pages, and then Jerry sent back this memo which would have been Page 4, 1, 2, 3, 4, and then the cover page would have been 5.
Q. Okay. Well, let me put a new sticker on that one that has the -- that has the -- where you can see it at the top that there is a number on November 12 of 1999 at 4:28 PM.
MR. LINDQUIST: Do you have a new sticker we could use? And I'll write the number on there. I'll just make this a new one and we can make another copy so -- Joel, so that you'll have a complete copy too. We'll make sure we make extra copies of this. I'm going to mark this one as 2269.
MR. CROUCH: A new exhibit number?



MR. LINDQUIST: Yes, a new exhibit number because it has the --
(DFT. EXH. 2269, Transmission Report dated 11/12/99 to Ray Knight from Jerry Zucker, with attachments, was marked for identification.)
BY MR. LINDQUIST:
Q. And I'm going to come over here and point out to you and perhaps you can explain it to me if you don't mind -- at the top here I see a time stamp of fax and I see 1 of 1 here.
A. Right.
Q. Now, is this something coming -- is that a stamp for something coming in or going out of your office?
A. It's something coming into our office.
Q. Okay. Now, there is Page 1. Here's Number 3 of 4. Here's Number 4 of 4 and then this is 1 of 4. So the question is perhaps -- I have the 1, the 3 and the 4 and I would have expected to see a 2 of 4.
A. Okay. This was the cover page that came in. I don't want to take that off, but this originally came in like that --
Q. Um-hum.
A. -- with 1 and then three pages behind



it would have been four.
Q. All right.
A. Okay. There could have been a problem with the fax machine, a jam or something that it just picked up Page 3 or another page could have fed in there, but this letter just -- I mean, it says Page 2 and then when Jerry sent it back, it was his memo, the four pages -- the three pages of Ray Knight's letter and this cover page which would have been five pages.
Q. Okay. So when Jerry sent it back, it would have included this memo?
A. That's correct.
Q. And that would have been sent to Ernst & Young?
A. No, it would -- well, to Ray Knight, yes.
Q. Thank you for pointing that out and clarifying that for me.
A. Okay. Do you want this back?
Q. Put it right there.
A. Okay.
Q. And we'll make sure we make an extra copy of -- what's the number on that, 2257?
MR. CROUCH: 2269.



THE WITNESS: 2269.
BY MR. LINDQUIST:
Q. 2269, excuse me. Allow me to show you what I've now marked as -- it is a similar piece, but it had on the original two stickies on the front of the document and I'm going -- I'm marking this 2258.
(DFT. EXH. 2258, Handwritten document, with attachments, was marked for identification.)
BY MR. LINDQUIST:
Q. And I'm not sure if you will need to look at the original stickies to figure out what this means. First off, whose handwriting is this that we see on the front?
A. It's my handwriting.
Q. And can you -- can you read this or do you need to look at the original?
A. No, I can read this.
Q. Okay. What does it say?
A. Okay. It says, transfer 20 million from BB&T to Wachovia, 12.5 Canadian, pay down Wachovia, return, Sean Smith, liquidate stock, wire JBJZ into Intertech. Well, it's cut off there. I don't know what the --
Q. Could you take a look at the original

and perhaps you can understand it. I think it's right in there. There they are.
A. Into Intertech. Liquidate stock, wire JBJZ into Intertech.
Q. And about what time were you -- can you tell about what time you were doing this?
A. No.
Q. And was this your practice to put stickies on things sometimes like this?
A. Whenever I'm standing there and they walk in and say, Charlotte, would you do this, I write notes and stick it somewhere.
Q. So you would have made this note basically dictating down the instruction that you were receiving so you'd know what to do?
A. That's correct.
Q. And the sticky to the right, was that created about the same time or was that a different time?
A. I -- I couldn't tell you.
Q. What's the sticky on the right say?
A. All JB -- or JZJB IN -- that means investors -- but 100,000, Brooks 3,200,000 to 3.1 million, 90 percent to JZ Charleston, 10 percent to JB Dean Witter, one million to TIG --



Q. What's TIG mean?
A. Intertech Group. 100,000 to TIG.
Q. Is this money that's going to the Intertech Group? The one million to TIG, is that money being wired back to the Intertech Group?
A. Yes.
Q. Do you recall what you did according to these instructions?
A. It's been too long ago. The only -- when Jerry wanted money to go into TIG from any of his accounts, I would write down how much he wanted to go into his account, into the TIG account. So that could have been anything because we needed money for funding for the other company so he would put money into TIG.
Q. All right. And do you know what percentage interest Mr. Boyd held in the Intertech Group?
A. 25 percent.
(DFT. EXH. 2259, Application for Employer Identification Number, with attachments, was marked for identification.)
BY MR. LINDQUIST:
Q. I want to show you what I've marked as Exhibit 2259. This is another document from the



files produced today. And it appears that at least some of these documents have been previously produced, but these were associated together so I wanted to get a complete copy of what was associated together.
And were you involved in sending a copy of this bundle of documents to Jenkens Gilchrist after they've been signed by Mr. Zucker?
A. I could have been, I -- I just don't recall. I mean, I could look in the file and see if there's correspondence, but I -- I do not know.
Q. I think that there's some other documents that reflect that fact.
A. Okay.
Q. But you would have retained that complete copy of this in the file when you received it from Mr. Zucker?
A. Yes.
(DFT. EXH. 2260, Letter dated 12/14/99 to Mr. Jerry Zucker from Donna M. Guerin, with attachments, was marked for identification.)
BY MR. LINDQUIST:
Q. Allow me to show you what I've marked as 2260. Thank you, Miss Crosby. There's some handwriting on here on this letter dated December



14 of 1999. Whose handwriting is that?
A. Jim Boyd.
Q. And do you recall what this related to?
A. What it related to?
Q. Yes.
A. His handwriting or this letter?
Q. This letter and his -- his statement done.
A. I do not know what the letter refers to other than looking at it and seeing what it is and --
Q. Can you read his handwriting?
A. Yes. Done, returned to J&G via overnight, JGB. That means that he returned it to them.
Q. Okay. And would you have been the one who was returning it to him or was -- did he sometimes do things himself?
A. He did it himself sometimes.
Q. And do you know why a copy of this document wasn't previous -- this cover page wasn't previously produced?
A. I do not.
(DFT. EXH. 2261, Letter dated 2/27/00 to Deutsche Bank from Jerry Zucker, with






9eb5a822-13fa-4e1f-a26a-5d4409a532b9

attachments, was marked for identification.)
BY MR. LINDQUIST:
Q. I want to show you a copy of what I've marked as 2261. Now, this is a copy of a document that I found that had some handwriting on it that appears -- appears to have been handwriting. The Number 27 appears as original penmanship on the -- on a fax copy making it clear that the 27 was not on the fax when it was received. If you could take a look at the original and confirm that fact. I think it's just below that.
A. Just below.
Q. There it is.
A. That's not much better. Yes, it's --
Q. So the 27 has been written on in blue pen on the front of this Exhibit 2261?
A. Yes.
Q. As has the handwritten -- handwriting at the top left corner that says faxed 2/27/00?
A. Correct.
Q. Whose handwriting is that?
A. Jerry's.
Q. I located the four pages -- or this appears to be part of a four-page fax that Mr. Zucker had or someone had received from whoever



was sending it. Do you know where the first cover page is?
A. I do not.
Q. I didn't find it in the file. Could you take a look and see if you can find it. As you've been looking through there, I just noticed the second page and third page is a little clearer. It appears that the fax was addressed to the Zuckers. And would that have been Mr. Zucker's home?
A. That is his home address.
Q. So it may well be that the reason why we don't see it is because it was never associated with the office file?
A. That's their -- that is their home fax number.
Q. And would this be something that Mr. Zucker would have given to you to put in the file and that's how it found its way into the file, Exhibit 2261?
A. He either gave it to me or had his -- had somebody else put it in the file, yes.
Q. Okay. I'd like to show you now -- and this may be part of a -- part of a group of documents, I'm not clear -- 2262.



(DFT. EXH. 2262, Letter to Jerry Zucker from Department of the Treasury Internal Revenue Service, was marked for identification.)
BY MR. LINDQUIST:
Q. Thank you, Miss Crosby. This has some handwriting on it. Whose handwriting is that?
A. Jerry's.
Q. And do you recall this document?
A. I do not recall the document, but I -- he gave it to me to do something and evidently I did.
Q. And can you tell what date this is?
A. January 6th of '03. That was the date that I faxed it to Kenny.
Q. How -- how do you -- how can you tell on --
A. Right here.
Q. Oh. Thank you. And what is that on the second to last page, is that an office printout from Intertech, a fax that was sent and received?
A. Yes.
Q. And do we see that as --
A. It was confirmation that six pages was received by that fax number, which is Kenny Hughes' number.



Q. Okay. Thank you.
(DFT. EXH. 2263, Handwritten document, with attachments, was marked for identification.)
BY MR. LINDQUIST:
Q. Let me show you what I've marked as 2263. This has some handwriting at the top. Is this Mr. Zucker's handwriting?
A. Yes, it is.
Q. And he's saying, please copy E&Y, and then paren, Sean, et al. and Barry Emerson. Who's Sean, et al.?
A. Sean Smith at EY.
Q. And who would the other people be? Who else is he referring to?
A. Kenny Hughes.
Q. And is this the -- there's a fax cover page here that appears to be in your handwriting to Barry Emerson. Is that where you are sending him something on December --
A. Right, I'm sending him a copy of -- because the front page says, EY Sean, et al. and Barry Emerson.
(DFT. EXH. 2264, Document entitled 1999 for Jerry Zucker, with attachments, was marked for identification.)







9eb5a822-13fa-4e1f-a26a-5d4409a532b9

Page 58

BY MR. LINDQUIST:
Q. All right. Let me show you what I've marked as Exhibit 2264. This is a document I'm not previously familiar with.
MR. LINDQUIST: You'll have to write that number on there, Mr. Crouch.
MR. CROUCH: 2264?
MR. LINDQUIST: Yes, sir.
BY MR. LINDQUIST:
Q. Can you tell me first what this -- I'm not sure these are all properly associated together. It appears at the back that there is a fax sheet dated January 24, 2002 in your handwriting to Barry Emerson where you're faxing him two pages. Do you know if these are the two pages that you were faxing him, the front two pages?
A. If they were attached to this, they were the two pages that I was faxing to Jerry -- I mean to Barry, yes.
Q. And do you know what -- whose handwriting this is on the front of this Exhibit 2264? The handwriting on the top right says, these funds were deposited into Morgan Stanley Dean Witter account and it provides a number.

Page 59

A. That's my handwriting.
Q. And do you know why on August 25, 1999, 12 million was deposited into that account?
A. No, I do not.
Q. The -- below the reference to Chase is a reference to a Wachovia and it has some dates, debits, credits and balances and then some handwriting below that. Is that your handwriting below that?
A. Yes.
Q. And that appears to say -- well, let me ask you, what does it say?
A. 2,800,000 for Arc shares purchase, 350,000 for Versent-related matters. This document may not refer to anything in this file. It may be in -- misplaced in this file.
Q. Okay. Before moving on, can you tell me there at the -- right at the balance there are some abbreviations, CIP and there's another one that says GIP and there's another one that says Arc Versent?
A. Yes, that's Carolina Ice Palace, Greenville Ice Palace and Arc Versent, which refers to Ice Palace.
Q. Now, was this a matter where you were

Page 60

tracking the cash flows?
A. No, this is not my document. I just wrote notes on it. That's why I'm saying this document should not have been in that file.
Q. Okay. The second page of this appears to have some handwriting. Is any of that your handwriting?
A. Yes.
Q. On the left side if you're looking at it, there's Charlotte Crosby in the upper left. Do you see what I mean? Stand it up that way. Yes.
A. Okay.
Q. The handwriting -- is all -- first off, is all the handwriting your handwriting?
A. Yes, it is.
Q. Okay. What is -- what is it that you're writing down on the left and what does that relate to?
A. The telephone numbers for somebody.
Q. And on the right side, what does that relate to?
A. I have -- I do not know.
Q. It has some reference in there that -- I can read that there's a statement, Gary, Barry Emerson, Chase and Wachovia, funds used for -- I

Page 61

don't know whether it says 1999 or what.
A. That's the year. That's -- I like to doodle whenever I'm writing -- whenever I'm talking so this all -- since Chase's telephone number is on here and Barry's number's on here, I'm assuming that these were notes with regard to this attachment.
Q. Okay. So the fax cover sheet probably just means that you faxed the front page to Barry Emerson, not that you faxed your doodles?
A. That's correct. And again, it does not belong in this file.
Q. All right. Why would you have been sending it to Barry Emerson?
A. Because Barry handles all of Jerry's personal tax matters.
Q. Okay.
(DFT. EXH. 2265, Transaction documents from DB Alex. Brown LLC, was marked for identification.)
BY MR. LINDQUIST:
Q. I'm going to show you what I've marked as 2265. Is that your handwriting in the upper left?
A. No, it is not.






9eb5a822-13fa-4e1f-a26a-5d4409a532b9

Page 62

Q. Whose handwriting is that?
A. I have no idea.
Q. And on all three pages there is some handwriting. It appears to be the same handwriting spelling out your name.
A. It could possibly be Ellen's because it was addressed to them at their home and she was just giving me a copy of it.
Q. Okay. And because it references JBJZ Investors, you would have put it in the JBJZ file?
A. That's correct.
(DFT. EXH. 2266, Transaction documents from DB Alex. Brown LLC, was marked for identification.)
BY MR. LINDQUIST:
Q. I'm going to show you what I've marked as 2266. Thank you, Miss Crosby. This appears to be a three-page fax that was sent either to or from the Zuckers. Can you tell whether it's to or from the Zuckers?
A. It is from the Zuckers. That's their home fax in the bottom right-hand corner.
Q. Okay. And so it would have been received by?
A. Me.

Page 63

Q. By you. And whose handwriting is on here?
A. Jerry's.
Q. And it appears that he's asking you to -- he's asking somebody to copy both Barry Emerson and Charlotte Crosby?
A. Right.
Q. Do you know who he would have been asking you to fax this to?
A. He probably would have sent -- told Ellen or somebody to fax it to Barry and to me.
Q. And again, you would have associated this with the JBJZ Investors file because it references JBJZ?
A. That's correct.
Q. I'm going to show you a copy of a document that I've marked as Exhibit 1018.
MR. LINDQUIST: Counsel, you should have a copy of that.
MR. CROUCH: Is that in here?
MR. LINDQUIST: Yes, sir.
BY MR. LINDQUIST:
Q. This appears to be in the handwriting -- handwriting addressed to you. Is that Jerry's handwriting?

Page 64

A. Yes, it is.
Q. And I didn't see this particular item in that file. Do you know if -- could you take a look in the file and see if you have it right there?
MR. CROUCH: Do you want to look in that file --
MR. LINDQUIST: Yes.
MR. CROUCH: -- or do you want us to look at the other file?
THE WITNESS: There's the other file she's copying.
MR. LINDQUIST: Perhaps we can come back to that then. Okay.
BY MR. LINDQUIST:
Q. Do you recall this document?
A. I don't recall it, but, I mean, it's -- obviously I did something with it.
Q. There was -- according to Mr. Zucker and Mr. Boyd, there was some sort of a meeting that they had with a Ray Knight who we've previously seen is referenced in some of your communications prior to this date of November 16 of 1999, possibly November 10th, 11th of 1999.
Are you aware of any type of

Page 65

recordkeeping system at Intertech around that time, November of 1999, which would reflect the date -- the actual date that that meeting occurred? The most obvious thing to me would be that -- this check-in list that they now have at the front door.
A. Well, we didn't implement that until after 9/11. We keep calendars, daily calendars -- well, they're not daily, they're monthly calendars of meetings and things like that. I don't know whether they were kept back that far for Jerry or not.
Q. Did Jerry keep his own personal calendar?
A. His assistant did.
Q. And what about Mr. Boyd?
A. Jim had a diary that he used to keep or he would put it on the company calendar, yes.
Q. All right. Do you know what's happened to those company calendars?
A. Not -- no, I do not, not that far back.
Q. Is there any place that you could look to see if you could find them?
A. I -- well, since Mr. Boyd has been gone, all of his stuff that was -- that I used to keep is gone and the -- I don't know that the






9eb5a822-18fa-4e1f-a26a-5d4409a532b9

calendars -- how far back they were kept. I do -- I don't know.

Q. Have you previously been asked to look for any such calendars?

A. I know that Donna mentioned to me if I had any calendars that went back beyond 2003 and I told her no.

Q. And who is Donna?

A. Donna is Mr. Zucker's secretary now.

Q. Okay. Did you have any contact with -- were you aware of any prior contact by Ray Knight prior to November of 1999?

MR. CROUCH: Objection, vague.

BY MR. LINDQUIST:

Q. Did you know -- when did you first become aware of a person by the name of Ray Knight?

A. When they first asked me to do something.

Q. Okay. Were you aware in November of 1999 or prior to that of whether or not Mr. Boyd and Mr. Zucker were looking for tax shelters?

A. No, I do not.

Q. I'm going to show you a copy of what I've marked as Exhibit 1047.

MR. LINDQUIST: And you probably have a



copy there. If you don't, I can give you a copy.

MR. CROUCH: Thank you.

BY MR. LINDQUIST:

Q. Is this your signature?

A. Yes, it is.

Q. And attached to this I have a handwritten note for your records. Is that your handwriting as well?

A. That's my handwriting.

Q. And is this something which you would have been providing to Mr. Boyd or Mr. Zucker, providing them a copy for their records, or is this something that you would be sending out with -- as a cover to Donna Guerin so that she would have a copy for her records?

A. That's what it would have been.

Q. And is there anything on this letter that indicates other than your signature here -- I don't see any type of initial here that you're the one who typed this, but I assume you're the one who also typed this letter.

A. That's correct.

Q. Now, the attached -- there's an attached Fed Ex label here that indicates that there was a Fed Ex that was addressed from Donna



Guerin to Jerry Zucker around September 19, 2000 and I'm not sure if that's a misstate or if it's not properly associated with this document -- excuse me, September 19, 2000. Is that -- is that Fed Ex properly associated with this document?

A. Probably not. I mean, that's too far away, almost a year away difference.

Q. Okay.

MR. CROUCH: Counsel, the Bates numbers on the bottom don't even match up.

MR. LINDQUIST: I'm detecting an error.

MR. CROUCH: Okay.

THE WITNESS: And can I just let you know the initials at the bottom, my initials, CC --

BY MR. LINDQUIST:

Q. Oh, that's -- those are your initials?

A. Yes. And the DBM is done by me.

Q. Oh. Thank you. Allow me to show you what I've marked previously as 1027. Thank you. I have initials here of JZ/CC. Does that mean that you wrote this letter for Jerry Zucker?

A. That's correct, he dictated this letter.

Q. And is that his handwriting?

A. Yes, it is.



Q. And on the second page of this which appears to be a -- have a fax print at the top, whose handwriting is that?

A. Which one?

Q. The second page.

A. Okay. Which handwriting, though? There's two different --

Q. Oh, there are two different --

A. The 3,150,000 is mine. Wire 11/23/99 is mine. Okay, J. -- J. Zucker 11/23/99 is his and Christy to wire is mine.

Q. And who's Christy?

A. She works at the -- I guess the bank. I have no idea.

Q. Let me show you what I've marked as Exhibit 1052. This is a fax from Jenkens & Gilchrist to Jim Boyd at a fax number of 843-768-9430. Is that the Intertech fax number or Mr. Boyd's personal fax?

A. That's his home fax or it was his home fax number.

Q. Did you have any understanding as to why Mr. Zucker and Mr. Boyd were receiving faxes with respect to this transaction, the COBRA transaction or the JBJZ Investors transaction, at







9eb5a822-13fa-4e1f-a264-5d4409a532b9

Page 70

their personal residences as opposed to at the office?
A. No, I do not.
Q. Let me show you a copy of Exhibit 1053A. This is part of a 16-page fax that appears to have been sent around November 26, 1999 to Mr. Zucker from Jenkens & Gilchrist. Do you recognize any of the handwriting on the first page as the -- for instance, the first number at the top, the 2,250,000, is that Mr. Zucker's handwriting?
A. No, it is not.
Q. Do you know whose handwriting it is?
A. It's mine.
Q. And do you know why you would have been filling in the numbers there?
A. Because that's what he told me to put in there.
Q. Allow me to show you a copy of Exhibit 1053. This is a copy of a fax to Mr. Zucker from Jenkens Gilchrist, a 16-page fax. Is that number for Mr. Zucker, is that the Intertech number or Mr. Zucker's home fax number?
A. I don't know what that number is.
Q. You don't recognize it as --

Page 71

A. I do not.
Q. Okay. Allow me to show you what I've marked as Exhibit 1061. This is a 26-page fax to Donna Guerin from Charlotte Crosby. Is that your handwriting on the front?
A. Yes, it is.
Q. And it says, per instructions of Ray Knight. Did you receive instructions from Ray Knight?
A. I assume I did since I wrote that on there.
Q. Do you recall what his instructions were?
A. It must have been just to send it to Donna Guerin. I have no -- I don't remember.
Q. And the second page of this, that appears to be your handwriting on the signature and this is another CC, done by me?
A. Right.
Q. If you turn to Page 4 of the -- of the fax, there's Mr. Boyd's signature. Do you know whether that's his handwriting on the 24 --
A. Yes, it is.
MR. CROUCH: Let him finish his question.

Page 72

THE WITNESS: Okay.
BY MR. LINDQUIST:
Q. On the 24 above there's a number -- a date that's been dated as November 24th. Do you know if that's his handwriting?
A. Yes, it is.
Q. And on the next page, there's another -- another -- Page 5, there's handwriting, November 24 and James Boyd. Is that again his handwriting?
A. Looks like it.
Q. Now, on the next page, Page 6, the -- there's Mr. Boyd's handwriting and there's a wire transfer amount, but it's been left blank and it's not been dated. Do you know why that dollar amount has not been filled in and why it's not been dated?
A. I do not.
Q. If you would be so kind as to turn to Page 12 of the fax. There is -- appears to be the signature of Mr. Zucker. Do you recognize that?
A. Yes, I do.
Q. Now, here again, the date and the dollar amount of the transfer have been left blank. Do you know why?
A. No, I do not.

Page 73

Q. On the -- Page 13, the following page, there is a date that's been filled in of November 24th. Do you know whose handwriting that is?
A. No, I don't.
Q. And on the following page, Page 14, do you know whose handwriting that is?
A. It sort of looks like Jim's, but I --
Q. That's -- the date part sort of looks like Jim's?
A. Yes.
Q. But the signature, does that appear to be Jim's --
A. No.
Q. -- handwriting or Mr. Zucker's handwriting?
A. It's Mr. Zucker's.
Q. Are you okay to proceed?
A. (Witness moved head up and down.)
Q. Allow me to show you what I've previously marked as Exhibit 1060. This is a letter dated November 30th, 1999 and I'm not sure if this is a duplicate of what we had previously had. Is that the same letter?
A. Yes, it is.
Q. Okay. I'll move on to 1010. This

Page 74

is -- appears to be some sort of a phone call message note. Whose handwriting is that?
A. I have no idea. It's probably one of the receptionists that we had. It could have been a -- a -- we've been through three or four receptionists since 1999 so...
Q. What do you understand that -- so this is an Intertech note?
A. Yes, it is.
Q. And the reference to JB or CC, is that to James Boyd or yourself?
A. Yes, it is.
MR. CROUCH: Objection, foundation.
BY MR. LINDQUIST:
Q. Well, on what basis do you believe that to be a reference to you as the CC?
A. Because those are my initials and that's what I sign everything with.
Q. Okay. And do you recall a phone call discussion with Mr. Ray Knight around December 6 of 1999?
A. I could have, I just don't recall.
Q. Is there anything that would refresh your recollection?
A. If I knew what happened on that day.

Page 75

Q. Okay. Allow me to show you what's been previously marked as Exhibit 1019. This is a handwritten note memo to file for J -- JBJZ. Mr. Boyd previously testified that this was his handwriting. Do you -- have you seen this memo before?
A. No, I have not.
Q. Do you know whether this was included in the files that you maintained?
A. No.
Q. And why do you say that?
A. Because if -- if it's not in there, you would have seen it or whatever.
Q. This appears to be dated and, if I recall correctly, Mr. Boyd's testimony was December 7, 1999 and he's referencing that he spoke with Ray Knight and David Parse. Do you -- does that refresh your recollection whether you had any discussion with Ray Knight and David Parse about that time?
A. If he wrote this on the 7th, right -- 7th, he probably --
Q. He indicated that his handwriting was the 7th.
A. It is 7th because he makes his little

Page 76

line through the seven. If it was done on 12/7, then he probably spoke to Ray Knight, not me.
Q. At the bottom of this -- his note there is a reference to you and Mr. Boyd wrote, will transfer Cisco Systems stock for trading 12/7/99. Ray Knight will coordinate with Charlotte. Spoke with Charlotte, which would appear to be a reference to you.
Do you know if Mr. Boyd or Mr. Knight spoke with you and/or coordinated with you as indicated here?
A. Yes, Mr. Boyd asked me to check on the Cisco's stock that he had at Dean Witter and that's what I did and that was what that was in reference to.
Q. And why were you checking on the Cisco stock at Dean Witter?
A. Because he asked me to.
Q. And were you involved in the transfer of that Cisco stock?
MR. CROUCH: Objection, assumes facts.
THE WITNESS: I --
BY MR. LINDQUIST:
Q. To your knowledge, were you involved -- then involved in the transfer of the Cisco stock

Page 77

from Dean Witter?
A. I think it wasn't Dean Witter, it was First Union --
Q. Okay.
A. -- that had those shares and yes, I talked to Robert Vengey (ph) at First Union.
Q. And did you have some discussions with Ray Knight about the transfer of that stock for use in the JBJZ transaction?
A. I do not recall other than maybe getting some instructions from him on what to do, where to -- where to send the shares or the information on them.
Q. The Cisco stock was first sent to JBJZ Investors, Inc. and then was apparently transferred to JBJZ partners. Does that refresh your recollection as to any role you played in the transfer of those -- of that stock?
A. No. All I did was get it from First Union to wherever it went.
Q. I have for you here what I have attempted to reconstruct from files of Jenkens & Gilchrist Exhibit 1079. This appears to be a fax to Donna Guerin from Jerry Zucker and I believe you previously identified the front page of this as






9eb5a822-13fa-4e1f-a26a-5d4409a532b9

something in your file. Do you -- is that your handwriting?
A. No, it is not.
Q. Do you know whose handwriting it is?
A. It's -- it looks like Mr. Zucker's.
Q. Can you tell whether this is being sent from Intertech or from Mr. Zucker's home?
A. Well, this is the Intertech fax number here so I'm assuming it's Intertech.
Q. Now, if you turn to the second page, the -- there's a copy of an engagement letter I'll call it between Mr. Zucker and Jenkens & Gilchrist. Were you aware of the fact that Jenkens & Gilchrist was involved or being engaged by Mr. Zucker as part of this transaction?
A. No, I was not.
Q. Did you ever overhear any discussions between Mr. Zucker and/or Mr. Boyd regarding the retention of Jenkens & Gilchrist in this transaction?
A. No, sir.
Q. Let me show you a copy of what I've marked as -- I believe previously as 1009. Mr. -- Mr. Boyd previously identified this as his handwriting. Is this a document that you would



have had in your file?
A. If he gave it to me it would be in there.
Q. Mr. Boyd in here states that he has received clarification from Ray Knight on or about the date of this, which is December 29 of 1999. Do you recall any discussions with Ray Knight on or about that time?
A. No, I do not and again, it's because during the Christmas holidays our offices are closed so that's the reason he probably did it himself.
Q. On the Page 3 of 4, do you recognize that all as James Boyd's handwriting?
A. Yes, I do.
Q. And this fax is of course being sent from the Intertech Group. Do you know if you assisted in sending this fax?
A. No, I did not.
Q. I show you a copy of what I've marked as Exhibit 1008. This is a copy of a representation letter from Mr. Boyd to the law firm of Brown & Wood. Do you recall ever seeing a document like this?
A. No, sir.



Q. Do you ever recall any discussion regarding representations in the JBJZ Investors matter?
A. No, sir.
Q. I show you what's marked as 1028. This is a copy of a representation letter to Brown & Wood from Mr. Zucker. Have you ever seen this letter before?
A. No, I have not.
Q. Are you aware of whether or not Mr. Zucker or Mr. Boyd kept separate files on the JBJZ transaction at home, at their homes?
A. No, I do not know.
Q. Were you involved in copying any documents for production to the IRS or the United States in this -- with respect to the JBJZ Investors transactions?
A. Yes, some.
Q. And at that time were you copying -- can you tell me what some is and describe what you're referencing.
A. If Donna asked me to help her run some copies or something, that's what I would do, but I was not getting things from Jim or Jerry from any place other than this office.



Q. Were you ever asked to copy any documents that -- for production to the United States that you understood to have come from either Jerry Zucker or James Boyd that were not from your file?
A. No.
Q. I show you a copy of a fax, a two-page exhibit, 1082. This is a fax that appears to be in your handwriting to Amy Keating on about March 7, 2000. Is this your handwriting?
A. Yes, it is.
Q. And did you send this to Miss Keating on or about that time?
A. Yes.
Q. The fax date at the top is March 8th.
A. Yes, yes.
Q. And do you recall why you were sending this?
A. Because they told me to.
Q. Did you write this letter that's attached?
A. Yes.
Q. Did you -- was that dictated to you by somebody?
A. Yes.







9eb5a822-12fa-4e1f-a26a-5d4909a532b9

Q. Who dictated it to you?
A. Probably Mr. Boyd.
Q. How can you tell that?
A. Well, this is his kind of format. Either he wrote it out or he dictated it to me, yes.
Q. There's some handwriting on the second page that says, 69.81 times 500 equals 34,905. Is that your handwriting?
A. No, it is not.
Q. Do you know whose handwriting it is?
A. I do not.
Q. Did you have any discussions with Amy Keating?
A. No, I did not.
Q. Do you know who Amy Keating is?
A. No, I do not.
Q. I'm going to show you what I've marked as Exhibit 1090. I believe it's been previously marked in the deposition of Mr. Hughes. Is this a fax that you received from Mr. Hughes -- I mean, sorry -- yes.
A. I assume I did.
Q. Do you recall Mr. Hughes sending you a fax for -- regarding payment for -- of the Brown &



Wood fee? As indicated on here, there is a reference to a -- for authorization to wire transfer 60,000 dollars from the account.
A. Yes.
Q. Now, this fax is a four-page fax and it states, enclosed is a copy of the Brown & Wood tax opinion. Do you know whether or not at that time you had received a copy of the Brown & Wood tax opinion?
A. I do not know.
Q. Do you recall ever having any discussions with Mr. Boyd or Mr. Zucker regarding the Brown & Wood tax opinion?
A. No, sir.
Q. I'm showing you a copy of Government Exhibit 1100.
A. I'm sorry.
MR. CROUCH: Sorry.
BY MR. LINDQUIST:
Q. This appears to be a handwritten note from Barry Emerson to Sheila Pace dated January 31, 2000 and he's stating, Jerry asked me to forward these to you. It is my current understanding that these returns will be prepared by E&Y's Charlotte office, Ray Knight. I will let you know the minute



I hear anything.
Do you -- were you -- have you ever seen this document before?
A. No, I have not.
Q. Do you know what Mr. Emerson would have been forwarding to Sheila Pace at that time?
A. No, I do not.
Q. I'm going to show you 1017. I believe this has previously been marked. It appears to be a letter signed by you, is that correct?
A. That's correct.
Q. And here you're forwarding it appears a signed authorization to pay Brown & Wood. Do you recall that?
A. Yes, I do.
Q. Are you okay to still press forward?
A. I'm fine.
Q. I'd like to show you what I've marked as Exhibit 1032. This is a -- appears to be in handwriting signed by Jerry at the top left. Is that Mr. Zucker's handwriting?
A. Yes, it is.
Q. Have you ever seen this document before?
A. No, I have not.



Q. Were you involved in forwarding this -- forwarding this document or any documents like this to Mr. Emerson?
A. No, I was not.
Q. Were you aware that Mr. Zucker and/or Mr. Boyd had received a draft of Jenkens Gilchrist's opinion?
A. No, I was not.
MR. CROUCH: Objection, assumes facts.
BY MR. LINDQUIST:
Q. The handwriting here to Mr. Emerson, can you read Mr. Zucker's handwriting?
A. Yes.
Q. What does it say?
A. Barry, attached is a draft of the opinion letter re: the yearend activity resulting in a 45 million dollar tax loss. Please accelerate your understanding by discussing with Ray Knight of EY, et al. I'd like to proceed on an accelerated basis for a tax refund, thanks, Jerry.
Q. Were you aware of the fact that Mr. Zucker was attempting to proceed on an accelerated basis for a tax refund related to a tax loss of 45 million?
A. No, I was not.





9eb5a822-13fa-4e1f-a26a-5d4409a532b9

Q. Can you tell from this document on about what date this was provided to Mr. Emerson?
A. No, sir.
Q. When you started reading this, you started with the name Barry. Can you read what it says above that?
A. Well, it's cut off on the copy. That is Barry Emerson.
Q. Okay. I couldn't read that. Are there any other files in the offices of Intertech that you're aware of that relate to the JBJZ Investors COBRA transaction other than the ones that you've brought here today to this -- from your office?
A. No, sir.
MR. LINDQUIST: No further questions.
MR. CROUCH: Let me ask you one question, I want to clarify this.

EXAMINATION

BY MR. CROUCH:
Q. Miss Crosby, are you aware that Mr. Zucker's secretary also maintains a file on JBJZ?
A. Yes.
MR. CROUCH: Okay. I just want to make sure you understand there is another file. No more



questions.
MR. LINDQUIST: Thank you for clarifying that.
BY MR. LINDQUIST:
Q. Do you know whether or not a complete copy of the file in the possession of Mr. Zucker's secretary has been produced to the United States?
MR. CROUCH: He's asking you, he's not asking me.
THE WITNESS: Oh.
BY MR. CROUCH:
Q. Do you know, Miss Crosby, whether a complete copy of the file in the possession of Mr. Zucker's secretary has been produced to the United States?
A. I believe it has been, yes.
Q. And how do you know that?
A. I'm going by what Donna tells me, that those documents have been supplied. Everything in there has been supplied.
Q. I have some concern insofar as I've -- taking a look at your files today, I see documents that had not previously been produced. Would it be possible for you to obtain the file of Mr. Zucker's secretary so that we can verify that fact with you



here and have you go through it?
MR. CROUCH: Would you like to do that during a break?
MR. LINDQUIST: I'd like to do that during a break.
THE WITNESS: Okay.
MR. LINDQUIST: All right.
VIDEO TECHNICIAN: We'll go off the record at 12:41.
(A luncheon recess transpired.)
VIDEO TECHNICIAN: We're going back on the record now. The time is approximately two o'clock. This concludes the video deposition of Charlotte --
MR. CROUCH: We need to go back on -- we need to go on the record before you actually close it.
VIDEO TECHNICIAN: I beg your pardon, sir, go ahead.
MR. LINDQUIST: This is John Lindquist, counsel for the United States. Miss Crosby has been excused, no further questions from counsel for the United States and we are closing the record.
MR. CROUCH: No further questions from Plaintiffs.



VIDEO TECHNICIAN: This concludes the video deposition of Charlotte Crosby consisting of one tape. The time is approximately two o'clock.
MR. LINDQUIST: Thank you.
(WHEREUPON, the proceedings concluded at 2:03 PM.)

SIGNATURE OF DEPONENT

I, the undersigned, CHARLOTTE CROSBY, do hereby certify that I have read the foregoing deposition and find it to be a true and accurate transcription of my testimony, with the following corrections, if any:

PAGE LINE CHANGE REASON

______________________________
CHARLOTTE CROSBY Date



CERTIFICATE OF REPORTER

I, Terri L. Brusseau, Registered Professional Reporter and Notary Public for the State of South Carolina at Large, do hereby certify that the foregoing transcript, Pages 1 through 93, is a true, accurate, and complete record.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof.

Witness my hand, I have hereunto affixed my official seal this 16th day of July, 2007 at Charleston, Charleston County, South Carolina.

______________________________
Terri L. Brusseau,
Registered Professional Reporter,
Certified Realtime Reporter
My Commission expires
March 24, 2016.



INDEX


| | Page | Line |
|---|---|---|
| CHARLOTTE A. CROSBY | 3 | 22 |
| EXAMINATION BY MR. LINDQUIST | 3 | 24 |
| EXAMINATION BY MR. CROUCH | 86 | 18 |
| CERTIFICATE OF REPORTER | 91 | 1 |


EXHIBITS


| | Page | Line |
|---|---|---|
| DFT. EXH. 2252, Ernst & Young, LLP Confidential Fax dated 11/22/99 to Charlotte from Ray Knight, with attachments | 23 | 19 |
| DFT. EXH. 2253, Handwritten memo on Charlotte Crosby letterhead | 25 | 19 |
| DFT. EXH. 2250, Jenkins & Gilchrist document entitled Second Notice dated 2/25/00, with attachments | 27 | 10 |
| DFT. EXH. 2251, Handwritten document to Charlotte Crosby dated 3/4/02, with attachments | 30 | 20 |
| DFT. EXH. 2254, Handwritten document to Charlotte from Jerry | 34 | 19 |
| DFT. EXH. 2255, Handwritten note dated 12/18/99 to Jerry from Jim | 39 | 15 |
| DFT. EXH. 2256, Transmission Report dated 12/28/99 to Donna Guerin from Jerry Zucker | 41 | 9 |
| DFT. EXH. 2257, Transmission Report dated 11/12/99 to Ray Knight from Jerry Zucker, with attachments | 43 | 14 |
| DFT. EXH. 2269, Transmission Report dated 11/12/99 to Ray Knight from Jerry Zucker, with attachments | 47 | 3 |
| DFT. EXH. 2258, Handwritten document, with attachments | 49 | 8 |
| DFT. EXH. 2259, Application for Employer Identification Number, with attachments | 51 | 20 |
| DFT. EXH. 2260, Letter dated 12/14/99 to Mr. Jerry Zucker from Donna M. Guerin, with attachments | 52 | 19 |





| | Page | Line |
|---|---|---|
| DFT. EXH. 2261, Letter dated 2/27/00 to Deutsche Bank from Jerry Zucker, with attachments | 53 | 24 |
| DFT. EXH. 2262, Letter to Jerry Zucker from Department of the Treasury Internal Revenue Service | 56 | 1 |
| DFT. EXH. 2263, Handwritten document, with attachments (retained by Mr. Lindquist) | 57 | 2 |
| DFT. EXH. 2264, Document entitled 1999 for Jerry Zucker, with attachments | 57 | 23 |
| DFT. EXH. 2265, Transaction documents from DB Alex. Brown LLC | 61 | 18 |
| DFT. EXH. 2266, Transaction documents from DB Alex. Brown LLC | 62 | 12 |








9eb5a822-13fa-4e1f-a26a-5d4489a532b9