# GOVERNMENT EXHIBIT F (PART 1/2)

**JZ Buckingham Investments v. U.S No. 05-231T July 19, 2007**

# DEPOSITION OF JERRY ZUCKER

**Page 1 to Page 427**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

PENGAD 800-631-6989
GOVERNMENT EXHIBIT
F 1/2

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

JZ BUCKINGHAM INVESTMENTS LLC. )
Plaintiff ) Case No. 05-231T
vs. )
THE UNITED STATES. )
Defendant. )

Courtroom 4
National Courts Building
717 Madison Place NW
Washington, D.C.

10:07 a.m.
Thursday, July 19, 2007

DEPOSITION OF JERRY ZUCKER

BEFORE THE HONORABLE EDWARD J. DAMICH



APPEARANCES

ON BEHALF OF THE PLAINTIFF:
JOEL N. CROUCH, ESQ.
M. TODD WELTY, ESQ.
Meadows, Collier, Reed,
Cousins & Blau, LLP
901 Main Street, Suite 3700
Dallas, Texas 75202
(214) 744-3700

ON BEHALF OF THE DEFENDANT:
DENNIS M. DONOHUE, ESQ.
JOHN A. LINDQUIST, ESQ.
DAVID M. STEINER, ESQ.
Tax Division
U.S. Department of Justice
P. O. Box 55
Washington, D.C. 20044
(202) 307-6492

(Index appears at end of transcript)



PROCEEDINGS
(10:07 a.m.)

THE COURT: This is the case of JZ Buckingham Investments versus the United States. Docket Number 05-231T. And representing the plaintiff is, let me see, Mr. Joel Crouch.

MR. CROUCH: Yes, and Mr. Todd Welty is here this morning also, Your Honor.

THE COURT: Okay. Mr. Welty and Mr. Crouch. And representing the United States is Mr. Dennis Donohue.

MR. DONOHUE: Yes, Your Honor. And with me this morning is Mr. David Steiner, S-T-E-I-N-E-R.

And also Mr. Lindquist from yesterday will be joining us.

THE COURT: Okay. Great. Thanks.

Okay. Welcome to all of you. And I understand that we have Mr. Zucker standing by.

MR. CROUCH: We do. We have Mr. Zucker right there.

THE COURT: Great.

MR. CROUCH: He's ready to go, Your Honor.

THE COURT: Super. Okay. Let me first



see if I can remember what the ground rules were. I believe the government has already deposed Mr. Zucker; is that correct?

MR. DONOHUE: Yes, Your Honor. That is correct.

THE COURT: Okay. So it's going to be as if it was direct testimony.

MR. CROUCH: Yes. I'm going to take direct testimony today, Your Honor. I assume the government is going to ask questions probably, as follow-up to my questions.

THE COURT: Okay.

MR. CROUCH: Presumably if the Court would like to ask questions, we would also be happy if the Court would like to ask questions.

THE COURT: Is it in the nature of a cross-examination then for Mr. Donohue?

MR. CROUCH: That's my understanding, Your Honor.

MR. DONOHUE: Yes, Your Honor. We are prepared to do cross-examination.

THE COURT: Great. And we talked a little bit yesterday about admissibility, objections, et cetera. What is the -- what is the view?

Page 5

MR. CROUCH: I believe –

THE COURT: Go ahead.

MR. CROUCH: My understanding is we're treating this like a deposition, Your Honor. And we will – objections will be lodged and ruled on by the Court at a subsequent time.

THE COURT: Okay. Is that correct, Mr. Donohue?

MR. DONOHUE: Yes, sir. That's our understanding.

THE COURT: Do we have any documents to be admitted?

MR. CROUCH: No, we don't.

THE COURT: Not admitted, but to be shown?

MR. CROUCH: We have documents to be shown, Your Honor. We have placed up there for the Court a copy of the notebook we're providing, a copy for the witness also, of some documents, and we've given a copy to the government also.

THE COURT: And you're agreeing there's not an admission then of these documents at this time?

MR. CROUCH: At this time that's correct, Your Honor.

Page 6

THE COURT: Mr. Donohue.

MR. DONOHUE: Yes, that's correct, Your Honor.

THE COURT: Okay. Great. Thanks very much. Welcome again, Mr. Zucker. Would you please stand so I can – can you stand? Do you feel all right?

THE WITNESS: Yes, I can.

THE COURT: I'll administer the oath.

Whereupon,

JERRY ZUCKER

was called as a witness, and, having first been duly sworn, was examined and testified as follows:

THE COURT: You may be seated.

THE WITNESS: Thank you.

THE COURT: And state your name for the record. You are?

THE WITNESS: Jerry Zucker. Z-U-C-K-E-R.

THE COURT: Mr. Crouch, your witness.

MR. CROUCH: Your Honor, thank you.

DIRECT EXAMINATION

BY MR. CROUCH:

Q Mr. Zucker, you understand you're here today for purposes of the deposition for purposes of preserving your testimony, and that it may be used at trial if you're not available at that time?

Page 7

A Yes, I do.

THE COURT: Excuse me just a minute, Mr. Crouch. If you would like to remove your jacket, Mr. Zucker, you can do that.

THE WITNESS: Thank you very much.

THE COURT: Just tell me whenever you want to, if you want to take a break. I'll probably do a break once every hour, if that's okay. But if you need it more often than that, just let me know.

MR. CROUCH: Your Honor, we do know that we have – the tapes we understand are an hour and 20 minutes long. I will get a signal from the videographer as to when we're getting close to the end.

THE COURT: Okay.

MR. CROUCH: We'll try to keep the Court informed of that also.

THE COURT: Super. Great. Thanks.

BY MR. CROUCH:

Q You understand, Mr. Zucker, that I will be asking you questions today, as will probably – likely the government and possibly even the Court. Do you understand that?

Page 8

A I do.

Q Can you tell me where you currently reside?

A Charleston, South Carolina.

Q And how is it that you came to reside in Charleston, South Carolina?

A I immigrated to the United States. My father is the only survivor of a family of 11 from the Holocaust from Lowicz, Poland, and he immigrated to what was Palestine at the time. I was born in Tel Aviv. And my mother and brother and father and I, we all came over in 1952. Back in those years, the only way you could legally get in the United States was through sponsorship. And my father had an uncle who had come to the United States before World War II. And he sponsored us. He happened to live in Charleston. So they first put us up at the Benjamin Franklin Hotel in New York, where we had a mandatory course in English, concepts of American democracy and American history. Very brief course, about four weeks. And then they put us on

Page 9

a bus to Charleston, which is where our sponsor lived. That's how I came to be originally in Charleston. But I ended up moving back to Charleston again at a later date. After the end of 1977.

Q Okay. Can you give a little bit of your educational background?

A Yeah. I have a triple major, Bachelor of Science in mathematics, physics, chemistry. And I have a Master's in electrical engineering. It was a 5-year Bachelor's/Master's program at the University of Florida. Graduating in 1972.

THE COURT: Do you have water?

THE WITNESS: I do. And I actually have some hot tea that the Court's provided. Thank you very much.

BY MR. CROUCH:

Q Did you pursue any degree after 1972 at the University of Florida?

A No. I did pursue additional education, but just auditing courses that were of interest to me, in science and business and bioelectronics and other subjects that were of interest.

Q Can you give me some examples of courses –

Page 10

A MUSC, College of Charleston, Citadel. Proteomics, bioelectronics, bioengineering. Courses in business that were part of their MBA program that I thought would – would enhance my knowledge.

Q Did you get any degrees beyond the –

A No.

Q You have to let me ask the questions –

A I'm sorry.

Q – so the court reporter can get it down. Did you get any degrees beyond the degrees you obtained in 1972 from the University of Florida?

A I've got three honorary doctor degrees. from MUSC – Medical University of South Carolina – College of Charleston, and from Johnson & Wales.

Q I should have reminded you, Mr. Zucker. The court reporter is trying to take down what you say. So if you could slow down a little bit.

A Okay. I'm sorry.

Q And if you could also, when I'm asking a question, let me finish the question, so that the court reporter can get down the question, and that

Page 11

you can then answer the question. I'll try not to run over you at the same time. That's okay?

A My apologies.

Q Why don't you give me a little bit of your work history, starting in – tell me a little bit about your work history.

A I had my first job when I was 10 years old washing dishes in a restaurant for 35 cents an hour. And when I was age 12, my father ran into an individual who had been laid off from St. Regis paper mills and he was starting a radio/TV repair business. And my father arranged for me to get a job as an apprentice in the radio/TV repair shop. And as it turned out, Mr. Grauer, the proprietor, was actually an excellent teacher. He taught me very well. So that was my first.

Then I ended up entering a science competition. And I ended up doing very well in the science competition. I had a science project that was called "A revolutionary method for determining distance and direction utilizing the distance phase factor for co-linear electromagnetic waves." It's a fancy title for, I came up with a means of eliminating the need for triangulation when you want to find something

Page 12

electronically in three dimensions, by measuring the phase differential of two energy waveforms, you ended up being able to measure its distance. It ended up being used as the guidance telemeter for the lunar lander in the Apollo program.

And as a result of that, I ended up with a variety of job offers, which led to my going to the University of Florida. There was a company in Gainesville, Vital Industries. And they hired me, even though I had not yet started college, to be an engineer for – designing video matrices and special effects equipment for the broadcast industry.

Q And did you work for Vital Industries when you graduated from the University of Florida?

A I did.

Q Okay.

A I worked for them before and after. But simultaneous with that, I already had an entrepreneurial bent and I had started several businesses during the same course of time, including manufacturing linear amplifiers for CB radios.

Since then I maintained a relationship – my wife of some – she's been my

Page 13

wife for 37 years, but I started dating her almost 41 years ago. We had an understanding that was prenuptial that anything I made in salary with others we would spend on ourselves and family, and that anything I made in business I would keep reinvesting, which I in fact did for some 22 years.

Q You've kind of given us some background there. Can you tell me around 1999 what type of businesses you were in?

A 1999, I was – lots of businesses. We had, at that time, about 147 operations in 27 countries around the world. I was the chairman, president, CEO of a public company called Polymer Group, and – which was a company, I took a portion of the InterTech Group, which I took public in 1996.

And I was also the founder, chairman, president and CEO of the InterTech Group and numerous of its subsidiaries.

Q Can you tell me a little bit about the InterTech Group. What does it do?

A If it relates to polymers, fibers, resins and composites, we probably do it. We make everything from flexible printed circuit boards to

Page 14

cryogenic thermal seals –

Q You have to talk a little bit slower because you're using some technical terms.

A Cryogenic thermal seals and insulations, and a variety of other, generally polymer based products. We also have various electronics services and a variety of other businesses that are under the holding company.

Q Are you the – who are the owners of InterTech?

A Today I'm the sole owner.

Q Have you always been the sole owner of InterTech?

A No.

Q Who are the previous owners of InterTech?

A Jim Boyd had a 25 percent interest. He was my partner.

Q Can you tell the Court who Jim Boyd is?

A Jim Boyd, he started off being a tax consultant, corporate structuring attorney. He worked for a firm called Evans, Boyd & Carter in Charleston. And I started using him in the, I think it was the late – late '70s. And eventually brought him in. He was – essentially

Page 15

all of his practice became me. So I asked him to join my firm. And he became my –

Q And when was it you asked him to join your firm?

A I believe it was 1985.

Q Okay. What did Mr. Boyd do when he joined your firm?

A He became my chief financial officer and became my partner in the truest sense. He was a brilliant, brilliant man.

Q When you say he became your partner in the truest sense, did he become your business partner?

A Yeah. He was my business partner, my confidant, my – in every – in every way. We entered into real estate partnerships. We ended up doing corporate deals together. We – he became much more than just a CFO.

Q I think you indicated Mr. Boyd at one point was an owner – partial owner in InterTech; is that correct?

A That's correct.

Q How much interest did he own in InterTech?

A 25 percent.

Page 16

Q He no longer owns that interest in InterTech?

A No. After he had a tragic accident in May of 2003, he was in a coma. When he did eventually come out of the coma, his family and he asked that I buy him out, which I did in the fall of 2004.

Q Can you explain kind of what was the relationship you had with Jim Boyd? In other words, he was your business partner. What did he bring to the table to assist you in your business practices?

A He was just an extraordinarily brilliant man. He brought depth of understanding, financial acumen, legal understanding. He was a corporate attorney. He was – when I brought him over, he was General Electric's corporate attorney for the state of South Carolina, for all their structure, just to give you an example of his capabilities. He was also just a fine human being in all respects.

Q You mentioned I think earlier, Polymer Group. Is that also known as PGI?

A That is PGI, yes.

(Plaintiff's Exhibit Number 14 was

Page 17

marked for identification.)

BY MR. CROUCH:

Q Would you take a look at what we've marked as Exhibit P-14 that's sitting next to you there.

A Yes.

Q Do you recognize this document –

MR. CROUCH: I have to warn everybody, when you open this all the way up, it's actually a talking document. It talks to you. So I apologize. That's the only one we had.

BY MR. CROUCH:

Q But can you tell –

THE COURT: Are we supposed to mark these exhibits?

MR. CROUCH: We're marking for purposes – you should have a marked copy on the front, Your Honor.

THE COURT: Yeah. It says P-14.

MR. CROUCH: And I'm going to be giving copies of these to the court reporter, these copies that are up here.

THE COURT: All right. Thanks. Excuse me. Mr. Donohue?

MR. DONOHUE: Your Honor, I must be slow

Page 18

because I turned to my notebook.

MR. CROUCH: I'm sorry. It's right here.

MR DONOHUE: Oh.

THE COURT: It's far more dramatic than your notebook.

MR. DONOHUE: I'm afraid to open it.

MR. CROUCH: Your Honor, I'll show you –

THE COURT: Has the voice been sworn?

MR. CROUCH: The voice has not been sworn. Your Honor, if you open the front cover and open this last part –

THE COURT. Oh, I see.

THE WITNESS: If you just don't open that last flap.

MR. CROUCH: One of them, I don't know which one it is, doesn't actually talk. I probably gave that one to the government actually.

THE COURT: I see what you mean.

MR. CROUCH: I was just warning everybody because I sure didn't want to get on the record there.

BY MR. CROUCH:

Q First of all, do you recognize this

Page 19

document, Mr. Zucker?

A Yes. It's the 1999 annual report for the Polymer Group.

Q Okay. Can you tell me, is this something that was produced in your business?

A Yes, it was. I – as you can see on the fourth and fifth page, that I was the chairman, president and CEO. And there's a photograph of me standing next to Jim Boyd, who was the chief financial officer.

Q I assume those are your signatures on the next page, also?

A They are.

Q Would you also turn, if you would, look at, I guess it's page 3. Excuse me. Not page 3. Page 23. I'm sorry.

A 23.

Q And would you look there, it appears – who is your independent auditor –

A I'm sorry. I'm not on the page. 23. Okay. I'm on 23.

Q Okay. And who does it say your independent auditors are?

A Ernst & Young.

Q Can you tell me a little bit about what

Page 20

the Polymer Group is?

A Well, it's the second nonwovens company that I founded, but today it's the third largest nonwovens company in the world.

Q Can you tell the Court what a nonwovens company is?

A If you think in terms of the materials that you see in a diaper or feminine hygiene product, the materials are polymers that have been spun. Instead of being woven together they're placed together. It almost looks like tissue paper, but it's made out of polymers. They're made in various forms, both by thermal melt as well as, there are various spun mill processes and water injection methods. There are a variety of methods of making these products that appear to be textiles but they're not made with the traditional process of making textiles.

Q Would you look on the inside flap, if you would, please, of this document. Try not to open up the talking part.

A Yes.

Q And can you tell me what this map is showing on the inside here?

A It shows many of the international

Page 21

locations. You actually have to partially move that left side up to appreciate it. But it shows - that we're basically on almost all the continents of the world in terms of locations.

Q Is - is PGI the only company you had that had facilities -

A No.

Q That are - facilities all over the world?

A No. I, both at that time as well as today, have operations all over the world. And I had - I was also at the same time the chairman, president and CEO of a company called Polypore, which is now also a public company, which I also founded. It went public in the New York Stock Exchange this year.

And after I - I had sold it a few years ago to Warburg Pincus.

Q You indicated that PGI had facilities all over the world. I think you indicated earlier InterTech was also a multinational company?

A That's correct.

Q In your role in working for these companies did you have some experience in working with foreign currency?

Page 22

A Routinely.

Q Okay. What kind of things would you work with in foreign currency?

A We were doing trade in various currencies around the world. I have to try to match as close as I could expected revenues in one currency with protecting my balance sheet and earnings in US dollars here in the States where everything was consolidated.

Q Did you -

A So I -

Q Did you do any kind of hedging?

A I did. I did both natural hedging as well as synthetic hedging, derivatives, currency, option trades, a variety of means of protecting myself.

Q Tell me what a natural hedge is.

A A natural hedge is when you try to anticipate when receivables will be paid and what currency they're in versus the purchases that you're making for inventory of raw materials, to anticipate matching the two together so that you're not short a particular currency. That you don't have to worry about the variation in the currency value.

Page 23

Q What is - I guess in contrast what's a synthetic hedge?

A Synthetic hedge is where you go to generally a third-party institution and you ask to lay off the risk by either buying currencies or anticipating the purchase of a currency through buying an option, so that you can lock in the values so that you don't expose yourself to a potential variance in the exchange value.

Q Okay. And you may have explained this, but make sure I understand this. When would you be using, you know, some sort of hedging in your business?

A When?

Q Yes, when?

A Routinely. If I got a large contract, for example, from one of our Japanese customers, and if it was yen denominated, but yet I wanted to make sure I was locking in my margin in US dollars, I would have to either lock in a synthetic hedge by buying an option, actually trading in the currency, or purchasing inventory in the same currency to anticipate the offset, so I can maintain my margin.

Q What foreign currencies did you have

Page 24

experience in?

A Numerous. But the ones that were most active were, at the time - and I'm going pre-1999 because the euro was only actively traded for about that one year. It started actively trading in about January of '99, although it had already been fixed in terms of the deutsche mark, in relationship to the French franc and to the other major European currencies. So all of the European currencies I was actively involved in, particularly deutsche marks, British pounds sterling, French francs, occasionally Swiss francs, and in Asia, primarily yen. But I'd also in the Middle East done shekels from Israel. And once - very rarely but on a couple of occasions I did Canadian dollars as well.

MR. CROUCH: I'm sorry, Your Honor. I want to turn around and make sure we don't have somebody in the gallery that -

THE COURT: Excuse me. Ma'am, could you identify yourself.

MR. LINDQUIST: I'm with the Department of Justice.

MR. CROUCH: I know who you are.

MR. DONOHUE: Your Honor, this woman who

Page 25

is right behind me is my paralegal, that is Prudence Black.

THE COURT: Okay. Great. Thanks. That's okay?

MR. CROUCH: That's fine, Your Honor.

THE COURT: I want to note for the record Mr. Lindquist has arrived as well.

MR. CROUCH: Thank you.

BY MR. CROUCH:

Q I'm sorry. You also made reference to derivatives. What are derivatives?

A Derivatives are just indirect means of hedging – hedging your bets as well as trading in currencies. For example, I've done total return swaps. And that would be considered a derivative transaction, without having to go through all the complexities.

Q That's fine.

A It's just means of contracting for values that were not otherwise naturally available by buying and selling product.

Q Okay. With reference in Exhibit P-14, there was a reference to Ernst & Young?

A Yes.

Q Who is Ernst & Young?

Page 26

A Ernst & Young is one of the auditing firms that we use. They are the consolidating audit firm and advisor that we've used for about two and a half decades.

Q Okay. And what – you said auditing. Did they do anything other – did Ernst & Young –

A They provide tax –

Q Let me finish my question for the court reporter. Do they do more than just auditing work for you?

A They do.

Q What else do they do for you?

A They provide tax advice. Often they'll even coordinate introducing us to some of their other clients so that we can form, you know, mutual partnerships, joint ventures, and business relationships that they introduce us to, among, you know, providing structural concepts to us, which, you know, they do as a routine.

Q Do you currently use Ernst & Young now?

A I do.

Q Okay. Looking at and focusing on 1999, can you tell me who you interacted with at Ernst & Young in 1999?

A Oh, back in those days, it would have

Page 27

been Tony Callendar, Kenny Hughes, Shawn Smith, Ray Knight, Steve Balzer, David Green, Jimmy Wilson. There were a variety of people back in that period of time for various purposes.

Q Let's take each one separately here. I think you mentioned a Tony Callendar at E&Y. What did he do for you?

A He was our point person. He was the partner that oversaw the account relationship. And he – he served to get me to wherever I needed to get an answer, as well as provided oversight for the other partners.

But Ernst & Young had a practice of rotating these partners so that – as an internal requirement. Although frankly I liked him. I didn't really want to have him rotated away. But they rotated him.

Q You also mentioned I think a David Green. Who is David Green?

A Right. David Green also was a rotation partner. But at the time he was coordinating subsidiary consolidations.

Q Okay. And I think you mentioned a Mr. Wilson?

A Jimmy Wilson I think was the person that

Page 28

was charged with – he was one of the coordinating people for the tax department.

Q All right. And then I think you mentioned a Kenny Hughes?

A Kenny Hughes, I didn't work with him that much. Jim Boyd did. But he – he and a fellow named Shawn Smith would often provide structural input and tax advice and, you know, means of maximizing capital retention when you're dealing with overseas transactions and repatriation of capital from foreign entities into the US and so forth.

Q Okay. And I can't – I didn't get them all down here. Is there anybody else that you mentioned?

A Yeah. Ray Knight.

Q Okay. Okay. What did Mr. Knight do for you?

A The only involvement that I had with Ray Knight was related to this transaction. The transaction that's in question.

Q You also mentioned a second ago that Mr. Boyd was the person that interacted with Kenny Hughes a lot. I guess I need to go back and ask this question. When you and Mr. Boyd were working

Page 29

together, were there specified areas in which each of you would concentrate?
A He was the chief financial officer, so in general those matters that related to finance, international tax, tax law, those sort of things, those were his primary domain.
Q What about yours? What were you concentrating on?
A I concentrated on making money.
Q Okay.
A Primarily, the manufacturing side of the business, the management, operations. And I became, you know, pretty good in terms of cash management when it came to capital account coordination for the various subsidiaries around the world.
Q Okay. I want to focus you on the period November, December of 1999. First I want to ask you, what was your opinion of Ernst & Young around that time period?
A Very professional, very dependable, very capable.
Q Okay. I want to ask you, do you recall sometime during –
A Could you give me just one moment.

Page 30

Q Certainly.
A I want to add a little bit of hot tea. If you don't mind, Your Honor
THE COURT Yes, please.
THE WITNESS I'm just going to kind of warm up what I've got in front of me. Thank you very much. Please.
BY MR CROUCH:
Q Okay Anytime you want to do something like that, just tell me.
A Thank you very much.
Q And I'm happy to take that kind of break
I want to concentrate again on November, December of 1999. Do you recall sometime in November of '99 being contacted by Ernst & Young about possibly setting up a meeting with you and Mr. Boyd?
A I wasn't directly contacted, but yes.
Q Can you tell me a little bit about that contact?
A I believe Elaine Peterson, that's my best recollection, but one of my administrative assistants, told me that we had received a call from Ernst & Young and that they wanted to arrange

Page 31

a meeting for Jim Boyd and myself, to present a concept to us.
Q Do you know who it was that contacted you from – Elaine Peterson from Ernst & Young?
A No. Elaine Peterson worked for me.
Q I'm sorry.
A So I don't know who had called her originally, but had asked about setting aside time for a meeting. And I agreed to doing it.
THE COURT: Excuse me. What time frame was this approximately?
THE WITNESS: Well, actually this particular case I know very precisely. It was the week of – the week prior to November 10th. The reason I can in particular remember that is because Jim Boyd was on a climbing trip. He happened to also do mountain climbing. He was very physically active.
He was going to be returning – he was in the process of returning from a trip so that if they wanted to speak to both of us, we told him the only date that would work for me and him, to speak to both of us, was the 10th. November 10th.
THE COURT: Thank you very much.
THE WITNESS: I'm sorry.

Page 32

BY MR. CROUCH:
Q Did you – was it unusual for Ernst & Young to be contacting you to ask for a meeting?
A No. No. We had meetings with them, you know, with frequency during the course of a year.
Q Did you understand what the meeting was to be about?
A No. I did not.
Q And I think you've already said – told the Court that you agreed to a meeting on November 10th; is that correct?
A That's correct.
Q Okay. So did this meeting take place on November 10th?
A It did.
Q Okay. And who attended that meeting?
A In addition to Jim Boyd and myself, Kenny Hughes and Ray Knight.
Q And where did this meeting take place?
A In the conference room adjoining my office, which is shared with Jim Boyd's office.
Q Prior to this meeting, had you ever met Ray Knight?
A I had not.
Q Prior to this meeting, had you ever met

Page 33

Kenny Hughes?
A Yes.
Q How did you know Mr. Hughes?
A He was part of the tax department for Ernst & Young and had provided us with advice in the past, as well as was involved in dealing with international tax.
Q Did anyone other than the four of you attend that meeting?
A No. We were the four in the meeting.
Q Okay. About how long did the meeting last?
A I estimate an hour and a half, something like that.
Q Okay. How did the meeting start?
A It started off with Kenny introducing Ray. And then pretty much turning it over to Ray Knight. Kenny didn't really participate much in the meeting.
Q What did Mr. Knight – what did he explain to you?
A Well, he first asked me if I – what I knew about – or how I felt about, you know, currency trading and transactions. And I told him I was very comfortable. I knew quite a bit about

Page 34

it.
Q Was this based on your experience with InterTech and PGI?
A InterTech, PGI, Polypore and the various affiliated entities
Q Did Mr. Knight explain to you he had a transaction he was asking you to look at?
A He did.
Q What was your understanding of that transaction?
A He went through the concepts of a structure. He said he had a proprietary – Ernst & Young had a proprietary structure. He said how would you like the ability to, if you call the currency right, make a lot of money and on a worst-case basis still get a tax benefit.
Q When you say call the currency right, what do you mean?
A He had gone through and explained, taking positions in currency so that if I could directionally decide correctly as to whether one of the currencies that I'd chosen at the time, it wasn't particular examples, the yen, euro, British pound sterling or other currencies, if I could call the direction, I could sell the call as well

Page 35

as buy, excuse me, an option.
If you'll give me just a moment again.
Q Did Mr. Knight explain what kind of options these were?
A Yeah. He explained they were going to be European digital options, as was his preferred style.
Q Do you know what European digital options are?
A Certainly. Yeah.
Q Okay. Can you explain to the Court what European digital options are?
THE COURT: Slowly.
THE WITNESS: First – well, let me just in general say a digital option, it's either you're in the money or you're out of the money. And it's like a binary situation. Either you're – you either meet the terms of the contract and you get a payment, or you don't. And in American style, there are various values that are – that can be had based on the value during the period of time, and you can exercise throughout the entire range of time. In the European digital option, you know, basically it's a date certain. And it's either on or off.

Page 36

You're either in the money or you're not in the money.
BY MR. CROUCH:
Q Okay.
THE COURT: That's the digital aspect of it?
THE WITNESS: The digital is binary. You're either in or out. And the European defines the particular date certain as opposed to a range of transaction times that can be up through a date of expiry, which would be the American.
BY MR. CROUCH:
Q As of November 1999 had you had any experience in digital options, first of all?
A I'd done digital options, but primarily my preference was American. American style.
Q Had you ever done European digital options?
A I have, yeah.
Q Had you at that time?
A For currency?
Q Yes.
A I – that was not my preferred method, no.
Q Okay. But you said you had done some

Page 37

sort of European digital options at the time?

A I had done – primarily equities based, total return swaps. And some other things that I used to protect the valuation of assets in foreign markets.

Q Can you explain to the Court why you would use a European digital option versus maybe an American digital option?

A Well –

Q In business circumstances?

A Aside from the fact that you can get different price points, the American options, although not always, are a little bit more expensive, because you're paying for the ability to transact over a period of time. Not always. It just depends on the underlying security. And you know, I personally like the fact that I could transact when I saw a trend. I could anticipate there might be a change of an event toward the end and transact sooner rather than later. Whereas with digital, it's a date certain. So I like the flexibility. There were occasions where I wanted to get the lowest cost I could, which the digital option provided. And if I wasn't really looking

Page 38

at it as – I was using it as a method of protecting an event, then I could go to the digital.

Q Okay. Did you have an understanding from Mr. Knight as to how you could make money in this transaction?

A Oh, yeah.

Q And what was your understanding of that?

A Of how to make money?

Q Yeah.

A Well, if I called the direction, it was obvious I could – the transactions – make millions of dollars just calling the direction.

Q What do you mean by calling the direction?

A If I said, for example, that on a date certain that the euro was going to be at or below, you know, by way of example, and it happened to be the case in this case 1.0123, you know, dollars per euro, just as an example, and it ended up being directionally correct and if it ended up being less than that, then I would have a preagreed payment for that sum. And if I called that – in our case there was a total of six contracts, six options

Page 39

contracts. And if I called – called them right, you know, where I was in the money and the banks were not in the money, I could make huge. I could make over $90 million.

Q Okay.

A – I'm sorry.

Q Let me back up a little bit. I want to make sure I understand this. At the time you had the meeting with Mr. Knight in November of 1999, had you made any kind of determination at that point whether you could or could not make money on what he was proposing as far as these transactions?

A Well, as to the concepts, but not the precise economics. The concepts I could easily range what the potentials were, but not of a particular magnitude, because that had not yet been defined. Until I finally did the structuring with the – with David Parse, I couldn't be absolutely certain of that.

Q We'll get to that in a second.

A I'm sorry.

Q Did you have any understanding at the time as to how long – first of all, how long can these options contracts be?

Page 40

A They can be almost any length of time. But generally speaking from 30 days to 365 days.

Q Why would you have one that's 365 days?

A You're tying it to a year. And you may want it to overlap into the close of another year. Or it may be associated with a particular transaction that I've got with a customer, or buying from a vendor, and I want to cover the – there are all kinds of reasons. But you time it to coincide with whatever your particular needs and desires are.

Q Well, is it – likewise, why would you have a 30-day window on a contract like this?

A It's not unusual. I mean, I've done that for plenty of other, you know, both – you know, derivative transactions as well as for equities transactions and currency transactions. But it just – it needed to just simply coincide with, you know, what your objectives were.

Q Okay. I think you also referenced that Mr. Knight said that you could make a lot of money, but there was also some tax benefits associated with this.

A That's correct.

Q Did he explain what those tax benefits

Page 41

were?
A He did.
Q What was your understanding of what the tax benefits were associated with the transaction?
A Well, he – if I can – if I may – bear with me. This won't be an exact answer to your question. But he did it by analogy. He explained that there was a real estate transaction and a ruling that had been made by a court that some taxpayer had – had tried to take his basis in a property that he had purchased, a contingent liability that had not yet matured. And that the courts ruled that it could not be included as part of his basis.
And he said that that was an opportunity where the proprietary nature of this structure came up. That if you could contribute – if you could contribute, under his structure, options that had not yet matured, that only the portion that had been paid in cash would be part of your basis. And that that part of the liability that had not yet matured would not be included in the basis.
And as a result of that, that there was the potential for creating offset to income. And

Page 42

in this case, frankly, I was intending to make a pretty good profit. So I would like to shelter it.
Q Did he explain how this transaction would be put together?
A He went through the general description of forming, you know, the various corporate entities.
Q Did he tell you what kind of entities would be formed?
A Yeah. Yeah.
Q Do you recall what any of them were?
A Yeah. I mean, I do them routinely. Limited liability, you know, companies. We'd buy the options through limited liability companies, which, in general, I do anyway because I set up any kind of corporate entity to provide a personal shield from any unexpected liabilities that might arise.
So, in general, I try not to do things personally. I try to do them through corporate entities, either C Corps, S Corps or LLCs.
Q Did he describe any other entities that would be used?
A He did. Partnership.

Page 43

Q Okay.
A And said that we would contribute our interest into a partnership. And – which made sense anyway because we were going to be diversifying the overall portfolio of what we had. And he –
Q When you say you were going to be diversifying portfolio, what do you mean by that?
A He had indicated that as part of the structure, the proprietary structure, that we would need to have a diversified portfolio and that it would include investment and capital stocks as well as currency trades, which – and he had specifically asked me whether, you know, what I thought was a very stable currency. And I told him the Canadian dollar relative to the US dollar I thought was very stable. It was, you know, in the – about 68 cents at the time. And I felt it was going to be hanging around that for a while.
Q Did the – other than the LLCs and partnerships, did he describe any other entities that might be involved in the transaction?
A Yeah. Just setting up an S Corp.
Q Did he explain why you would need the S Corp?

Page 44

A Well, it had a variety of benefits. But, you know, you could get out – if you get out of the partnership, you – by itself, it provides liability protection which, for fundamental business reasons, you would want to do anyway. But in this particular case, under his structure, since we would be contributing indirectly through the partnership, we would be liquidating the partnership by having contributed it to the S – to the S Corp. And the contracts were separate. And the liabilities associated with the – with the unmatured liabilities under the option would not yet have matured and would not be part of my basis, whereas the cash component for the options that I paid in cash were fully matured and were basis. And so they would be separated by having contributed.
So I have a double benefit and have the – have the protection for business purposes of being in a corporate entity. And I'd get the benefit of reducing my – my basis.
Q I think you said in your business you used lots of different entities?
A I'm sorry.
Q I think you said, in your business, you

Page 45

use lots of different entities, LLCs?
A We do.
Q Do you use partnerships in your business?
A We do.
Q How about S Corps, do you use that in your business?
A Yes.
Q C Corps?
A Yes.
Q How do you decide which entity you're going to use in your business?
A In all cases I rely on my expert counsel, my counsel at Ernst & Young and outside opinions. I don't hold myself out to be an expert.
Q Is there anything in particular you found very interesting about Mr. Knight's presentation?
A Yeah. I found it to be win-win. I thought I could make a bunch of money, because I really knew my currencies. At the same time, I thought I could get a nice offset in my revenue.
Q Did you ever talk to Mr. Boyd about it?
A Well, he was there. He was very

Page 46

excited, Jim. He saw the – he thought the merits were very good. And when he got excited about it, it made me feel even more positive.
Q Did you have any discussion with Mr. Knight or anybody else at the meeting about the size of the transaction?
A Ray Knight had asked me how much revenue I thought I would have to offset. And I told him that I thought it would be between 50 and $100 million.
Q Okay. And how did you come up with this amount?
A I had a number of transactions that were – I had the ability to cause to happen. As a private company, it gives me a lot of leeway as to when I sell assets and whether I take W-2 income or not. And taking W-2 income is not very tax efficient. So I try as much as possible to take things as dividends or as capital gains, to – to maximize my capital retention.
Q Did you have any kind of understanding about how much a transaction of that size might involve? How much investment you would have to make?
A Yeah. Ray had specifically said it was

Page 47

going to be a leverage transaction. That for $100 million of potential offset, that I could – I would spend $8-1/2 million.
Q I think you said the meeting lasted about an hour and a half?
A Somewhere around an hour and a half.
Q How did the meeting end?
A I felt pretty positive about going forward, and as did Jim. You know, we – we –
Q Did you –
A My expectation was that we would receive some definitive details from EY.
Q Did you commit to doing the transaction at that time?
A No. Not a commitment. But it was certainly implicit in our tone.
Q You said you were going to – you thought you were going to get some information from EY. Do you know what you were supposed to be getting from them?
A I was expecting to get a proposal that was definitive.
Q Was there anything you needed to do on your side, moving forward?
A To anticipate the transaction, I started

Page 48

looking at currencies and to get an idea of which currencies I would be most comfortable in.
Q Was it your understanding that what Mr. Knight was proposing was some transaction which you yourself could make a significant amount of money on?
A Oh, absolutely.
Q And was it your understanding that you were going to get some sort of favorable tax benefit from it?
A That I had that as a win-win, yes. That I could get that as well, yes.
Q Would you have done this transaction if you had – were only going to get the tax benefit from it?
A No.
Q Okay. Why not?
A Well, frankly, I could – if all I was going to do was just a currency trade, I could do it – I could do it efficiently in other ways, to direct money. I was looking strictly – I saw this as an opportunity to make a significant amount of money and do it in such a structured way that I would be able to shield the earnings as well.

Page 49

Q Okay. We left this meeting, I think you said November 10th. And you said I think you needed to do some of your own due diligence. What did you do as far as due diligence?

A Well, I - I basically looked at the available currencies, what their volatility was in the market, so I could do some estimation on valuation.

Do you want - are you asking me immediately following? Because it wasn't until the next day that I actually got the proposal.

Q I'm talking about the next couple of days. You're talking about doing due diligence of some kind. What kind of due diligence did you do?

A I got the FRED data.

Q Tell me what the FRED data is.

A Federal Reserve Economics Data. It's generally referred to as the FRED. Nowadays the FRED data is consolidated through services like Bloomberg. In fact even then I didn't have Bloomberg available. But Bloomberg was available to professionals. I also went to one of our - I asked one of our, my outside advisors and brokers, Brooks Johnson, to also get me information specific to several currencies.

Page 50

Q What kind of currencies did you ask him to get information for?

A Well, I can't tell you if his included the British pound sterling. But I'm certain it included both the euro, which had only been out for less than a year in terms of the actual trading, and the yen. Of course the yen, you know, there was lots of data on the yen.

Q When did you do this due diligence?

A In the period of time post our meeting, but preponderantly in discussions the following week.

Q Tell me - so you got the information from Mr. Johnson. Well, I guess Mr. Johnson pulled the stuff off the FRED data is what you called it?

A Yeah, the FRED, which he may have - I frankly - you'd have to check with him. But he may have had access to other financial services -

Q Okay.

A - in addition to it. But the FRED was the primary purpose that would have been pooled from.

Q Anything other than that and looking at the FRED data?

Page 51

A I looked at the - at the pit - the type of typical closings and the trends for the euro and for the yen and the British pound sterling. And I looked at the Canadian dollar but I was very familiar with it anyway because, you know, all the various trading.

Q Why were you looking at this information?

A Well, it enters into pricing. The volatility is one of the factors in the Black-Scholes model for both predicting the probability of outcome as well as the pricing models.

Q What - I mean, what is volatility?

A Volatility is just the natural variance in the - in the valuations that the market ascribes to it.

Q Was there something in particular you're looking for from this data to help you determine - about the transaction?

A I wanted to get an idea how much does it vary per unit day typically, without some really abnormal news. There's all kinds of potential for unusual news that moves the currency, and you don't really have any control over it. At least

Page 52

it gives you an idea of the typical movements, the typical variances you have in the currency, from day to day and from week to week.

Q In looking at this data, did you come to any conclusion about the currencies you were looking at, about the ability to make a profit on those?

A Yeah. I had - I had a, I felt, a very good probability of at least calling the directions of the currencies, you know, dead on. I felt really good about it. Although we ended up making $1,875,000 on the euro, I didn't call the direction properly on the yen, which is shame on me.

But we still ended up netting another 625,000.

Q Did -

A I wish I'd called it right. Had I hit the sweet spot, I could have made a ton.

Q Okay. How did you come to the determination you could make money on the transaction?

A How did I come to the determination?

Q Yeah. In reviewing this information, what led into you believing you could make money

Page 53

on the transaction?
A Calling the direction, I felt at the time, frankly, that I would call it right. And I really feel ashamed that I didn't call the yen property, because at the very least we would have made almost $3.8 million just if I just called the direction of the currencies properly, even not having hit the sweet spot.
But, you know, I felt the probability was, you know, about the flip of a coin as to hitting the – hitting the direction question.
And the sweet spot is really the product of probabilities. If you can – I know I'm going beyond your question.
THE COURT: That's okay. I'm intrigued by the sweet spot.
MR. CROUCH: That means yes, talk about the sweet spot.
THE WITNESS: I did some calculations in terms of probability. Unfortunately, currency data is not very consistent data. And there isn't really a lot of good co-relationships. So depending on which set of data you use, whether it's most proximate, or if you look out for 6 months or 9 months, you end up with different

Page 54

answers. But the probability ranged from high teens to as high as 60 percent probability of hitting the individual transactions out of six events
And in our case, we were in the money for four out of the six, and had we been in the money for all six events – this is not hitting the sweet spot, just in the money – we would have made just shy of $3.8 million. But if I hit the sweet spot, meaning if the banks' position was out of the money and mine was in the money, then I could have made north of $90 million, which, you say what's the probability of doing that. That's the product.
If I take the probability, again it depends on whether you use the 50 percent mark or the 60 or the 20, but it ends up with a range of probabilities. If you use, by way of example, the 50 percent mark, we'll use – make an easier calculation for us 40 percent mark.
If I say each event the probability is 40 percent, then the likelihood of two events happening would be 40 percent times 40 percent, or 16 percent. Subsequently, the likelihood of three events happening.

Page 55

In our case it was the product of two events for the bank and for ourselves. But to have all the – you know, basically double sets happening, it would be the product of those probabilities.
So it was a narrow range. But nevertheless, you know, a positive probability.
You know, it's not anywhere near the flip of a coin; it would have been the product of those probabilities. So some – some single digit percent of hitting the all-time home run.
But still very positive events. And the more of those events that occurred, the higher my profits.
BY MR. CROUCH:
Q What – unless the Court has another question for you?
THE COURT: No. That's okay.
THE WITNESS: I'm sorry if I rambled on, Your Honor.
THE COURT: No, no. It's very interesting.
BY MR. CROUCH:
Q Did you – you made this conclusion about the possibility or the probability of making

Page 56

money on the transaction. Did you discuss this with Jim Boyd?
A I did.
Q And what did you and Mr. Boyd discuss?
A Well, he asked me what I thought the probability was. And I used the expression it was about the flip of a coin as to each of the option contracts, you know, on our account being in the money.
So, you know, that's what I shared with him.
Q Did you at that point, had you made any determination as to what currency you wanted to invest in?
A Yes.
Q What had you decided at that point?
A Well, as far as the options were concerned, the euro and the yen.
Q Okay. You had said earlier you were considering the British pound.
A I had considered the British pound sterling but ended up with the euro and the yen.
Q Okay. You also referenced earlier, you referenced the Black-Scholes. Can you tell the Court what the Black-Scholes model is?

Page 57

A Well, it's frankly –
Q In simple terms if you can, please?
A I'm a bit of a user. We had an Excel spreadsheet program. And basically you put in the volatility. You put in the various range numbers. It's a plug-in formula. And it calculates for you what the value model would be as well as the probability.
The problem with Black-Scholes, and this is a – it's a fundamental problem with currencies, is Black-Scholes assumes normality, that it has a normal distribution, Your Honor, such as a bell curve. Unfortunately, currencies don't do bell curves.
So you can – if you want to do it with greater discipline, you can look at it empirically. But I didn't want to go to the trouble. So I just did my own estimations.
Q Okay. Did you have some sort of formula that you used? Or how did you do that?
A We plugged in the Black-Scholes, you know, the spreadsheet. And then I looked at my own experience. There's a little bit of natural intuition that comes into understanding whether the market is strong. You have to kind of expect.

Page 58

as the interest rate – I don't have any control over the central banks. But if they increase the interest rate, for example, on the US dollar, then I'm going to – I'm going to end up ending up with a stronger dollar relative to all of the currencies. If the Fed, for example, did here. If the central bank in Japan did vice versa, it would move the currency in the other direction, because people want to go to the currency where they can make the greatest return. Certainly there are things that you can't factor in that are, you know, beyond control. But you can look at what your estimates are. I did a lot of business in these countries and I had a sense of were the business conditions good? Were my customers happy? Were their sales projections good or not good? It gave me an indication, indirect indication of the softness or strength of the markets. So I used a little bit of intuitive thinking as well.
MR. CROUCH: Your Honor, I notice we're now an hour into it. Do you want to take a break now?
THE COURT: Is this a good time?
MR. CROUCH: This would be fine, to take

Page 59

a break now.
THE COURT: Okay. Great. We all need a break, and you especially, Mr. Zucker.
THE WITNESS: That's wonderful. I appreciate it, Your Honor.
THE COURT: The court will be in recess until 10 after.
(Whereupon, a recess was taken between 11:03 a.m. and 11:16 a.m.)
THE COURT: Mr. Crouch.
MR. CROUCH: Thank you, Your Honor.
BY MR. CROUCH:
Q Mr. Zucker, I think when we took a break we were talking about the fact that you had done due diligence in determining – or looking at the possibility of making money on this transaction. I think the other side you said to this, at the breakup of your meeting with Mr. Knight and Mr. Hughes, was you were expecting some sort of documentation from them of some kind.
A Yes.
Q Do you know what in particular you were looking for from them?
A Yeah. I was expecting a definitive proposal. And, you know, what the fees were going

Page 60

to be associated with the transaction.
Q Okay. If you would, take a look if you've got that notebook in front of you, please.
A Yeah. Let me just put my glasses on. Okay.
Q If you look at the document you have under tab number 1, please.
A Yes.
Q This has been marked in a previous exhibit as Government Exhibit 177. We'll leave it at that for right now.
A You've got a problem with your binder here. It's all messed up.
MR. WELTY: May I approach, Your Honor?
THE COURT: Yes, please. What is the government exhibit number again?
MR. CROUCH: It's at the bottom of the page. Government Exhibit 177, Your Honor. Your Honor, we tried to have all these marked one way or another for the Court and for marking purposes today.
THE WITNESS: All right. I now have what's behind tab 1.
(Government's Exhibit Number 177 was marked for identification.)

Page 61

BY MR. CROUCH:
Q Okay. Thank you. First of all, do you recognize this document?
A I do. It's the – it's the letter that I received the day after our meeting.
Q And who is the letter from?
A It's signed by Ray Knight.
Q And it's directed to you; is that correct?
A It is.
Q If you'd look on the second page?
A Yes.
Q Is that your signature on that page?
A It is.
Q Okay. And do you recall signing that document?
A I do.
Q Okay. Also on this document, there are some notes on the first page. Is that your writing on the first page?
A It is. It says what information and the maximum dollar amount, $8.5 million.
Q Okay. First of all, let's talk about your first note on there, where it says, what information. What were you asking them at that

Page 62

time?
A Well, basically this document didn't really line up with the discussions we had had the day before. So I wasn't really sure what he was referring to in here. So I wanted clarification of what he's expecting from us. And at the time of our meeting, he had simply said $8-1/2 million for $100 million size investment. But, yet, this was shown as percentages. And we hadn't discussed percentages at our meeting.
Q You had just discussed $8-1/2 million?
A 8-1/2 million on a hundred million transaction.
Q Based on this letter, what was your understanding of what Ernst & Young was going to do for you in this transaction?
A Well, they were going to provide the proprietary structure, which they said was going to be – provide me with a preservation of the largest amount of capital possible. And that they would take care of all the – all the paperwork associated with it, and give me proper advice and kind of effectively stand by me with regard to the overall transaction.
Q On the bottom of the second page,

Page 63

there's a – there's some handwritten notes. Are those your notes also?
A It is.
Q And what do those notes say?
A It says $100 million – and someone pointed out to me they think the word is loss. $100 million loss to be allocated 98/2 between the parties, subject to clarification of second paragraph on first page.
Q And what were you – first of all, what does the 98/2 mean?
A It was to be the allocation of investments between Jim Boyd and myself. Myself being the 98 and Jim being the 2.
(Government's Exhibit Number 2269 was marked for identification.)
BY MR. CROUCH:
Q Okay. If you would now look – if you would turn the page to page – the next – the next tab in that, tab 2.
A Yes.
Q And do you recognize this document? This – for identification purposes, this is Government Exhibit – I believe it's Government Exhibit 2269.

Page 64

A Okay. Yes.
Q Can you tell me what this document is?
A Well, at the face of it, it appears to be my handwriting to Charlotte saying to put it in the file. And it appears to be a fax from Ray Knight at Ernst & Young. And –
Q I'm sorry, is that a fax from Ray Knight or to Ray Knight?
A It's to Ray Knight. Excuse me.
Q From you?
A Right.
Q Can you look at the next page and tell me what that document is?
A It – it references that I've attached an executed copy of the engagement letter that I've signed, but requesting clarification on various issues, including in it, though, that I receive two legal opinions, letters from reputable firms, which –
Q Let me ask you a couple questions. First of all, is that your signature on that page?
A It is.
Q Do you remember drafting this document?
A I do now.
Q You just referenced the two opinions

Page 65

from two reputable law firms. Do you recall that you gave your deposition in this case on June 8th, 2007?

A I do.

Q Do you recall at that time that you were asked by counsel for the defendant whether you recalled – whether you recall the discussion of two law firms and opinions coming up in your meeting, initial meeting with Mr. Knight –

A Right.

Q – and Mr. Hughes. Do you recall being asked that question?

A I do recall being asked that question.

Q Do you recall what your answer was at that time?

A I told them that I did not recall that coming up. But –

Q Let me ask you the question. On reviewing this, does this refresh your recollection as to whether the subject of two law firms and the opinions from two law firms came up during that meeting?

A I don't recall it coming up at the meeting. But obviously between the meeting and the next day it must have come up, because I've

Page 66

referenced it here.

Q Okay. Do you know – I mean, this memo, can you tell me what this memo is?

A Well, you know, obviously it's not final because it doesn't reflect the terms of what we had agreed. But it – the memo says that, you know, I've signed the letter subject to, you know, these – clarification of these points. And that it was $100 million size. $8-1/2 million would be the actual investment.

Q Let me ask you, what were you trying to do with this memo?

A I'm sorry?

Q What were you trying to do with this memo?

A I was trying to get him to give me the additional clarification so that we could move on.

Q Okay. And do you see attached to this is a copy of your fee agreement? The one that we looked at that was under tab 1 also?

A Yeah. This is the same that you referenced earlier.

Q Okay. So you were just returning this to Mr. Knight; is that correct?

A That's correct, yes.

Page 67

Q Do you recall what happened after you returned this to Mr. Knight? Did he call you? Did he contact you?

A You know, I honestly do not remember what the specifics of the communication were. But –

Q Well, would you please look under tab number 3, please.

A Yes.

(Government's Exhibit Number 1104 was marked for identification.)

BY MR. CROUCH:

Q And this is an exhibit that had been previously marked in the deposition as Government Exhibit 1104.

A Right.

Q And do you recognize this document?

A I do.

Q Can you tell the Court what this document is.

A Yeah. It basically shows a summary page that I'm forwarding to Jim Boyd and asking him, I said in view of the fact that I'm –

Q Ignoring your handwriting on here.

A Oh.

Page 68

Q Not looking at your handwriting, do you understand – do you recognize the document itself?

A I do.

Q Okay. Can you tell me what the document – without talking about the handwriting, first of all.

A The document outlines the fee structure and costs for the transaction.

Q Okay. And who is this from?

A The document itself?

Q Yes.

A It's from Ray Knight.

Q And who is it directed to?

A To me.

Q And do you know why Mr. Knight was sending this to you?

A It was – first of all, it represented ultimately revisions that we were making in the terms of the agreement. And it expressed things in definitive percentage terms which, again, were not the terms that were discussed at the day of the meeting.

Q Did you have a discussion with Mr. Knight about this, this memo, that you can

Page 69

recall?
A I can't recall having done so, no.
Q In the last paragraph it references the transaction is now a $50 million transaction. Do you have any understanding as to why it's referencing a 50 million transaction instead of the 100 million you were discussing with Mr. Knight?
A Yeah. I recall talking with Jim. And I can't remember all the nuances of the discussion. But that we agreed that we would go after a $50 million transaction in terms of size. And we would do 90/10, instead of the 98/2 in the $100 million transaction.
Q Do you know why –
A I remember some of the discussion –
Q Let me ask my question so the court reporter can get it down.
A I'm sorry.
Q Do you know why you had reduced your transaction from 100 million to 50 million?
A I can't tell you the specifics. I remember that there was an amount of capital investment, that Jim had some concerns. Although, ironically in this case, his investment was bumped

Page 70

up just slightly by going to the 90/10 on 50 as opposed to 2 percent on 100.
But that it was just, you know, he was more relevant to the transaction. And I just reduced the total combined investment.
Q Do you know how Mr. Knight would have come about the information that you were now reducing your transaction from 100 million to 50 and the split with Mr. Knight was – with Mr. Boyd was now going to be 98 –
A There –
Q Excuse me. 90/10?
A There obviously had to have been some discussion during that period of time. But I don't really recall any discussion having taken place. So it's possible that it – it came through Jim Boyd. That's all I can guess.
Q Attached to this document is a second page of this fax. It appears – does this appear that it was faxed to you? This is the first page.
A Which page?
Q The first page
A We're still on tab 3?
Q Tab 3, the first page. I apologize.
A Okay.

Page 71

Q Does it appear this was faxed to you?
A It appears to have been faxed to me. It's addressed to me.
Q Okay. Let me ask you something else before we get off this page. There's some handwritten notes on this page. Are those your handwritten notes?
A Those are my handwritten notes to Jim.
Q And this is to Jim Boyd?
A Yes, it is.
Q Okay. And what were you trying to tell Mr. Boyd here?
A I was trying to tell him, since we had changed the nature of the transaction and he was now going to be a 90/10, I wanted him to authorize approval and make comments before we returned.
Q Okay. And do you know if you ever discussed this with Mr. Boyd?
A I discussed the – the transaction. I can't recall specifically, you know, what the comeback was. Because Jim and I often talked just kind of a quick hallway discussion. We were physically next-door. So it probably would have been just a hallway interaction.
Q Do you recall if – okay. Let's go on

Page 72

to the next page of this document if we could.
A Okay.
Q You see the next page, it appears to be – can you tell me what that appears to be.
A It appears to be Ernst & Young's engagement letter.
Q And would you look at the third paragraph down if you would, please.
A Yes.
Q And does that appear to be a change from the original fee agreement they sent you, which is under – if you would like to look at it, it's under tab 1.
A Yeah. Let me look at that.
THE COURT: You're asking a question about paragraph 3?
MR. CROUCH: Yes.
THE COURT: Okay.
THE WITNESS: You're asking me to compare their fees?
BY MR. CROUCH:
Q No. What I'm asking you to do, is that a change from the original fee agreement?
A Yes.
Q Okay. And how was it changed?

Lindquist Dec Appendix Page 170

Page 73

A Well, it's – it's less in terms of the amount. It's $675,000 as opposed to reference to a higher sum in the former agreement.

Q Okay. Did the – do you know why it was reduced?

A I would assume that it was proportionate to the transaction.

Q Okay. Did the fee of $675,000 seem high to you?

A No. Not at all. You know, frankly, with my patents, I charged plenty for my proprietary – when I let people have proprietary value in my patents. This was a proprietary structure for them. Plus they were going to be providing support services and going to do all the legwork associated with it. No, I thought that was reasonable.

Q Do you – I think you testified before you do a lot of work with Ernst & Young. Do they do –

A They do for me.

Q How much do they charge you per year, possibly? I mean, round figures.

A It's millions. I don't know what the number is, but a lot of money. It's in the

Page 74

millions.

THE COURT: We're all in the wrong profession.

BY MR. CROUCH:

Q Do you know what ultimately you did with this fee agreement?

A It was sent back.

Q Okay. Thank you. So at the time that you had sent – that you signed this fee agreement and sent it back, had you committed to the transaction at that time?

A No. Not to the transaction itself.

Q Well, what had you committed to at that point? You signed the fee agreement, obviously?

A Yeah. But the fee agreement has language in there that basically says if I should not go forward with the investment, that I would just pay them for their time and some administrative costs. It was like 8-1/2 percent or something. It didn't commit me to the transaction.

Q What were you waiting on at that point to commit to the transaction?

A I had to work out the terms of the deal with, you know, David Parse and Deutsche Bank.

Page 75

Q First of all, tell me who David Parse is.

A David Parse was the person that I was to have all the discussions with regard to the currency options at Deutsche Bank.

Q Okay. And when did you learn the name David Parse, or Deutsche Bank? When did you first learn that Deutsche Bank was going to be part of this transaction?

A We'd have to actually go to the actual letters and dates. I can't tell you the date. But it was pretty fast, because I was dealing with – I was dealing with David Parse the very next week. So that it was – it was pretty fast.

(Government's Exhibit Number 1018 was marked for identification.)

BY MR. CROUCH:

Q Well, if you would turn to tab 4 in our notebook there. And this is a document we previously marked in a deposition as Government Exhibit 1018. And first off, without looking at the handwriting on there, I want you to note – I want you to tell the Court if you recognize the actual document there.

A Yes.

Page 76

Q Okay. Can you tell me what this document is.

A That was Jenkens & Gilchrist was – were conveying the various documents to be filed with the IRS for forming the federal tax ID numbers and other account, you know, openings.

Q Okay. Well, let's back up a little bit. Did you know the name Jenkens & Gilchrist prior to getting this letter?

A I'll be frank with you, I don't think that I recognized it at the time of the letter. I kind of looked past it. I didn't know the name Jenkens & Gilchrist in general.

Q The other thing you said is you just – you had not committed to the transaction at this time. What is the date on this letter?

A November 16th.

Q Okay. And Jenkens & Gilchrist was sending you documentation at that time for the transaction?

A Apparently, yes.

Q So why would you be signing documents that you received from Jenkens & Gilchrist at that time?

A I assumed everything was go. I just had

Page 77

to work out the economic terms on the actual investment. But the investment was not yet to be triggered until sometime in the future.

Q Okay. The document references down here on number 1, Internal Revenue Service forms SS-4, 8821, Deutsche Bank/Alex. Brown account form for JZ Buckingham Investments LLC. What is JZ Buckingham Investments LLC?

A That was a single member LLC that we set up for buying the currency options.

Q Who is the single member of JZ Buckingham LLC?

A Yours truly.

Q And where did the name JZ Buckingham come from?

A Buckingham is the street that I live on, and JZ are my initials.

Q What about the second one? It says the same information for JGB Bohicket Investments LLC?

A Those are Jim Boyd's initials and the street that he lives on.

Q And the third one down is – and, again, who came up with that name?

A Well, my recollection is that I actually suggested the name Buckingham, because in fact I

Page 78

used Buckingham Sports as one of my companies. I use the name Buckingham just, you know ordinarily Buckingham Investments, Buckingham Sports. It's easy for me to remember.

So I believe it was me. But I'm not certain.

Q And then under number 3, it references the same information for a JBJZ Partners.

A Uh-huh

Q Does – what is JBJZ Partners?

A Those are Jim Boyd's and Jerry Zucker initials.

Q Okay. It was a partnership?

A Yeah. It was a partnership. It was part of the structure that Ernst & Young had indicated that we would – as part of the process and structure that was needed.

Q Okay. The last one, on number 5, it references a JBJZ Investors Incorporated. What was JBJZ Investors Incorporated?

A That was the S. Corp we had set up to contribute the partnership assets.

Q Again, I guess I'm asking this question again. Were you surprised to be receiving a document like this from Jenkens & Gilchrist

Page 79

although you had not committed to the transaction?

A No. I mean, we were on the way. We were planning on doing it. But we still had to work out the economics on the actual purchase of the options.

Q Had – did you have a fee agreement with Jenkens & Gilchrist at that time?

A Not that I can recall.

Q Okay. You have a note on here – well, let me back up. There's writing on this document. Is this your writing?

A Yes, it is.

Q Okay. Can you tell me what that says.

A Yes. It has several places for Jim Boyd to sign. I inadvertently signed as a guarantor in one of the forms for Jim. I already signed one of the guarantees, parentheses closed, please make a copy set and retain. Please call Ray Knight at EY to find out where to send the executed agreements after the corrections and executions by Jim. And then gives the phone number.

If you can't reach Ray call Kenny Hughes, and it gives a phone number.

Q Okay.

A It's a note to Charlotte Crosby.

Page 80

Q Who is Charlotte Crosby?

A One of the administrative assistants.

Q Okay. And the Kenny Hughes you're referencing here is the Kenny Hughes at E&Y?

A Yes.

Q Likewise the Ray Knight is the Ray Knight at E&Y, correct?

A Yes, yes.

Q There's a note off to the left of the numbers. Is that also your handwriting?

A Yes.

Q What does that say?

A It says Jim also has a copy set with him in New York.

Q Okay. And what were you – what were you telling – is this a note to this Charlotte Crosby?

A Yes, it is.

Q Okay. You were telling her that Mr. Boyd also has a set of these documents; is that correct?

A Right. The following week we had arbitration with Dominion Nonwovens Sudamerica in New York.

Q You're going to need to spell that for

Page 81

the court reporter.
A We'll get it later. DNS.
Q Let's go with DNS. How about that?
A We'll go with DNS.
Q I'm sorry. You were saying.
A We had arbitrations going on. And I asked Phillip Bryson to handle it and then Jim Boyd followed. So we were kind of taking turns at the arbitration in New York.
Q Okay. Do you know what you did with these documents ultimately that you received from Jenkens & Gilchrist?
A I would assume at this point that, you know, they were signed and returned.
Q Do you know – do you have an understanding as to why you were executing these documents at this time?
A We were setting up all the organizational requirements to be able to go forward with the transaction.
(Government's Exhibit Number 1029A was marked for identification.)
BY MR. CROUCH:
Q Okay I guess you – let's go ahead and we'll flip to, just to identify for the Court, the

Page 82

next document under tab number 5. If you would look on the second page of that document. This has previously been marked as Government Exhibit 1029A.
A Uh-huh
Q And you look at the second page of that document. Is that your signature on that page?
A It is.
Q Is that your date that you put on there?
A Yeah. That's correct.
Q Okay. Is this the fee agreement – the second fee agreement you received from Ernst & Young for your transaction; is that correct?
A It is.
Q And this is you returning it to them?
A This is my return to them, yes.
Q Okay. You also referenced that you had not committed to this transaction as of the date of November 15th because you had to go talk to somebody at Deutsche Bank?
A I didn't physically go to talk to them, but I did by phone, yes.
Q Okay. Who did you talk to?
A David Parse.
Q Okay. And who is Mr. Parse? Do you

Page 83

know what his title is?
A I don't know what his title is. But he was the individual that – with which I did all my negotiations at Deutsche Bank.
Q How do you know he was – how did you know he was the person to contact at Deutsche Bank?
A You and other counsel asked me that before. And I can't recall if it was from a conversation I had with Jim Boyd or – it was – I had somehow during that period of time, this is a number of years ago, someone had said that was the person I needed to talk to. And whether Jim had received the call and was told that, or Jim told me, or, I don't remember what the form of the communication was. But that was the name that was given.
Q Did you have any kind of prior relationship with Deutsche Bank?
A Well, Deutsche Bank in Germany, we had, in Neunkirchen, Germany and Nordenstadt, Germany, we had simply payroll accounts and local accounts for some of our facilities. But we had no relationship at all with Deutsche Bank in the United States. And he was in Chicago.

Page 84

Q Okay. What were you calling – what were you going to negotiate with Mr. Parse?
A Well, we were negotiating what the exchange rate was. I wanted to make sure that it was going to be fair to the parties. Also, most importantly, was to be able to define the sweet spot, so to be able to maximize the opportunity to really make a killing on it.
Not – I felt very confident that I could make good money on the calling the direction. But I really wanted to hit that sweet spot. I wanted to get it where I was in the money and the bank wasn't. So I wanted the, kind of the goalposts, we'll call it the strike prices for the bank, to be as wide as possible so I could, you know, improve my probability of hitting the sweet spot.
Q When did you talk to Mr. Parse?
A I started talking to him, you know, almost immediately after. So it would be heavily the week of the 16th.
Q Okay. How many – did you talk to him just one time?
A No, no. I talked to him multiple times.
Q Was this both before or after you had

Page 85

done your due diligence on the currencies?
A It was – it was during the same period of time because I was – I was running both at the time. I had already had a lot of data that I had already reflected on. And then, you know, subsequently, I had more data when I got with him on the phone successively.
Q And you talked about negotiating the goalposts, what you call the goalposts. What are the goalposts?
A Those are the strike prices. The X – if we talk, Your Honor, when we talked about the digital options, it was the point at which you were either in the money or out of the money. And I wanted to make the – the distance between my being in the money – I felt I was going to call the direction right, but I wanted the distance between where I was saying we were going to be in the money and where the government – where the Deutsche Bank was going to be – I wanted to make that a few more pips wider, so that I had a greater opportunity to really make a huge profit.
Q What did Mr. Parse want on the goalpost?
A He wanted it really skinny. One pip.
Q Can you tell the Court what a pip is?

Page 86

A Pip is the smallest denomination of a currency pair trading. It represents 1/10,000 of the spot price. It's akin to a basis point when you talk interest, in 1/100 of a percentage point.
Q And what was Mr. Parse wanting the distance to be?
A He wanted it to be one pip. And I – and, you know –
Q So what would one pip equal to then?
A Too little. I wanted it to be minimum, you know, four, five pips is what I wanted.
Q You wanted four, five pips because why?
A Well, it's – it created a greater spread. It created a greater opportunity for me to make – well, Jim and I could have made well in excess of $90 million if I hit it just right. Now, the wider apart it was, the higher the possibilities were of being – kind of like football. If you get the goalposts a little bit further apart, it's more likely the kicker is going to get the kick through.
Q Did you and Mr. Parse negotiate the goalposts?
A Well, it wasn't to my favor. But I ended – he ended up going to two pips. And I

Page 87

ended up settling for much less than I wanted. I wanted four.
Q What else – did you know what currencies you wanted to invest in at that time for purposes of this transaction?
A The initial discussion that I had with him focused on three currencies, the British pound sterling, the yen and the euro. And we ultimately ended up doing the yen and euro.
Q Why did you do the euro?
A Well, certainly, as far as the European currencies were concerned, I had a lot of experience. I had a good sense of the market in terms of what I felt the directionality was going to be. Even though now it was a fixed exchange rate between the currencies, the euro was going to track the overall economic conditions. The pound sterling, we had operations in Manchester, UK, and I felt comfortable that I would have a good take on it. We had a lot of customers that were dealing in British pounds sterling. But he felt as well more comfortable – he said he would work in the British pound sterling if I insisted on it. But his personal preference was to – for me to go into the yen and

Page 88

the euro as well. So I ended up going. I didn't feel strongly.
Q You addressed the euro. But why the yen? Just because Mr. Parse –
A The yen for me or for him?
Q No, well, you said Mr. Parse had a preference for the euro and the yen.
A Well, we were discussing three different currencies.
Q Okay. But why did you want the yen?
A I'm very – you know, have a lot of customers, a lot of business, a lot of trade in yen. I had both facilities as well as customers that were yen denominated. It was an area that I felt comfort in. You know, so just, you know, I'm – I regret that I ended up calling the direction of the yen wrong, because I would have made a great sum of money.
Q Did you discuss –
A I made less.
Q Did you discuss volatility with Mr. Parse?
A Not specifically the term volatility. I already looked up, you know, what I felt the relative volatility. But we did talk about

Page 89

typical opens and closes and variations that had been taking place in the market, although we didn't specifically talk in terms of a volatility factor.

Q Did you negotiate anything else with Mr. Parse?

A Yeah. What the exchange positions were going to be. The –

Q What do you mean, the exchange positions?

A Well, you know, if – generally speaking, you have a kind of a notional or indicative expression of probability. If you take the amount of the – the notion amount, the gross amount that has the potential payout and you look at the premium, the relationship between the premium and the payout generally is roughly indicative of probability.

So if you have a $50 million payout for a $25 million, you know, fee, then you would have something that would be less margins that are retained somewhere around 50 percent, if you're just kind of using a rule of thumb without getting technical about the details. It would represent that he felt it was less than a 50 percent

Page 90

probability. Keeping the difference for his own account.

And so we ended up with, in one case he had a little over 46 million on one side, with a payment of 23-1/2. So it wasn't a perfect two for one. But it was in that order of magnitude. It was fair. And if I called it right, it provided me with a very handsome profit.

Q Did you negotiate the price of these various options?

A Well, we talked about the exchange rates so that – but the exchange rates were reflective of part of the overall EY strategy of, you know, what the amount of unmatured liability was going to be. So to some extent you had to work a little bit backwards. You had to say how much was your contribution going to be, because you could back into that being, you know, calculated unmatured liability.

So that was a factor. And we did adjust the ratio.

Q Do you remember what the exchange rate was that you ultimately –

A Yeah.

Q – negotiated with Mr. Parse was?

Page 91

A Yeah. $1.0123 to the – to the euro. And that was – and then they were two pips further, 1.0121, so I only had two pips in between the two of us.

Q And that was on the euro?

A That was on the euro.

Q What about the yen?

A The yen was 1.06 and change. But the way we had agreed, and although you haven't asked the question, the way we had agreed, since we were going to enter into the transaction as of November 22nd or 23rd, and at the time we weren't sure if it was going to be the 22nd or the 23rd, we said that we would agree that, as of that morning, whatever the opening was, that we would gap 10 and 12 pips respectively for the strike price for Deutsche Bank and the strike – my strike price. So that we wouldn't have to necessarily speak that morning.

And then for the yen, I sadly called the direction wrong. I wish I called it the other way. But it ended up the – I was expecting the yen not to strengthen against the dollar. I was expecting it to be, you know, 106 – yen were trading, around, you know, 103, 104.

Page 92

So what we had agreed was we were going to open up two yen to the dollar, plus two yen and two pips for the morning – that morning, to create the spreads. So that's where the 106 and change and – respectively the 106 and change plus two pips came from on the Deutsche Bank side.

Q You talked about the fact that –

A I wish I called it the other way.

Q I was asking you – you talked about the fact that you had decided which way to go on currency, essentially –

A Yeah.

Q – above or below.

A Yeah.

Q How did you decide which way to go?

A There's a little bit of intuition. The overall trend, the – the yen, if you remember in general, you know, it was trading at several hundred yen to the dollar. And over a period of a couple decades, it trended down. And now – but the yen had a pattern. The yen had a pattern, if you looked at the charts, where it would occasionally dip up and it would kind of recover, kind of like our Dow Jones Industrial does. It tends to run up and then it seems to fall back.

Page 93

People take a little bit of profit and then it runs up again.

The yen was following a similar pattern, it was running downhill for a while, but each time it would have a burst up. And my expectation was it was just in that little up-burst, so I figured the yen was going to weaken against the dollar, which means instead of it being 103 or 104 or 101, it ended up going to the wrong side. I called it going up to the 106.

Q What about the euro? How did you decide which way to go on the euro?

A The euro, I – it had had – I wanted it to be, you know, 101.21 or 23 relative, but less than or equal to. So I was expecting it to, you know, the – the dollar effectively to strengthen against the euro.

Q Did you – did you ultimately reach an agreement with Mr. Parse? Did you ultimately reach an agreement with Mr. Parse?

A Yeah. Yes. I did.

Q And Deutsche Bank?

A I did.

Q Did you ever talk to Jim Boyd about what you had agreed to with Deutsche Bank?

Page 94

A Yes.

Q And Mr. Parse?

A Yes

Q Okay If you would look with me, please, at what is – the document –

A Would you allow me just for a moment just to warm this up

Q Sure, sure

A I'm sorry. Please.

(Plaintiff's Exhibit Number 1 was marked for identification.)

BY MR. CROUCH:

Q If you will look under what – under tab 6, a document which we have marked as Exhibit P-1.

A Yes.

Q And do you recognize this document?

A Yes. I do.

Q Okay. And would you look on the third page of this document, please?

A Yes.

Q And is that your signature?

A It is.

Q Under JZ Buckingham Investments, LLC?

A It is

Q Again, what is JZ Buckingham

Page 95

Investments, LLC?

A It was a single member limited liability company. That was me.

Q Okay. It was you. Okay. Can you tell the Court what this document is?

A It's a confirmation of our transaction for the – in this particular case, it's two digital options that are reflected.

Q Okay. Can you tell me what digital options we're talking about here? First of all, I think there's a reference number at the top. Do you see that reference number?

A Yeah.

Q Okay. What is that reference number?

A 27320. 27 – it's hard to read this particular copy. 920.

Q It looks like 920A to me.

A 920A.

Q 920, capital A. Can you tell me, you said this is our digital option contract or confirmation –

A This is –

Q Let me finish my question.

A This is two of the options, yeah.

Q Tell me what options these are.

Page 96

A This relates to the US dollar versus Japanese yen is the currency pair.

Q Where are you seeing that?

A Under currency pair under the section 1, general terms.

Q Oh, I see. Down here about – under section 1, the last line under section 1, currency pair?

A Right.

Q US dollar – USD/JPY. Is that what I'm looking at? US dollar?

A Yes. JPY is the Japanese yen and USD is the US dollar.

Q Can you tell me – this is one of the deals you negotiated with Mr. Parse; is that correct?

A Well, it's two of the deals. But yeah. It's two pages. First page is one of the options. The second page is the – is another option.

Q Okay. What's the option on the second page?

A Well, they – they are relating both to the – to the Japanese yen. But they're – one is a – one is a buy and one is a sell.

Q Okay. Well, did – I mean they're both

Page 97

on the same document. Is this considered one – one option contract? Or is this considered one option?
A No. It's just – it's both contracts for the particular currency.
Q Have you ever seen – you do a number of currency options, I think you said?
A Yeah.
Q Have you ever seen two currency options on one contract like this?
A Generally, I – generally I don't end up going doing both buy and sell. So ordinarily I would see, you know, one, one deal on a page. But these were all relevant to each other, in the same currency. So I guess for convenience they put both agreements in the same document.
Q Did – as far as you know, I mean, in reviewing this document before you signed it, I assume – well, did you review this document before you signed it?
A Sure.
Q Okay. Did this document correctly reflect the agreement you had reached with Mr. Parse with respect to your investment in the Japanese yen?

Page 98

A Yeah. They did.
Q Okay. And can you tell the Court, in simple terms, essentially what you had negotiated with Mr. Parse as far as the Japanese yen on the first contract on the front?
A Yeah. Well, first you have to look to the definition of party A and party B. Party A is Deutsche Bank and party B represents the single member LLC, which is – for our purposes I'll just say me.
Q And that's for – and that's under the second line, party A and party B, is that correct?
A Right. Yeah.
Q Okay.
A So if you look to the notional amount, the notional amount just simply refers to the calculation overview value that will be used as a referential point for all points of discussion that are beneath it.
So initially you see the initial exchange amount. It says that party B will – that me, I'll pay a premium of $25 million in exchange for getting $50 million if at or a time, the date, where it says final – you can see where it says termination date.

Page 99

Q Where are you looking at the termination date? I'm sorry.
A Further down in the document, you'll see where it says first range level, which is just another way of saying strike price, or if you want to use the goalpost example.
Q When you're talking about first range level, you're looking under section – it's number 2, section 1?
A It –
Q Roman –
A Small ii?
Q Let me go through this. Let me ask this. Small ii, final exchange provisions, first range level, under that; is that correct? Is that where you're pointing at?
A That's correct.
Q I just want to make sure it's clear on the record.
A That's correct. And this one happens to be for the Japanese yen/dollar. And if you look very much further down, just the top of the next paragraph, it says, at 10:00 a.m. local time New York, greater than or equal to the first range level.

Page 100

So it's basically saying that if it's greater than or equal to 106.19.
Q Yes.
A Okay.
Q What will happen if it is greater than or equal to?
A If it's greater than, I would receive a payment of $50 million for the $25 million premium.
Q Okay. And $25 million premium is what?
A That's what I paid Deutsche Bank for the position.
Q Okay. So in other words, you paid Deutsche Bank $25 million to essentially say, look, if the Japanese yen is worth 106.19 or higher on this day at this time, Deutsche Bank will pay you $50 million?
A Will owe me $50 million; that's correct.
Q Okay.
A And –
Q And there's a reference here on – to final exchange date. Do you know what that –
A Yeah. That's just – that's the settlement date. That's the date – you know, money would change hands typically five to seven

Page 101

days.
Q I'm looking further up the page here. under section 1, it says: Trade date. Can you tell me what that date is.
A Yeah. That's the date in which the currency option was entered into.
Q What's that date?
A It says November 23rd, 1999.
Q And then it says, the next line, says something about a termination date. What is the termination date?
A It's a defined term. That's the termination date, you'll see further down, which was December 22nd, was the termination date. That was the date that the terms of maturation, you determine whether or not you're in or out.
Q Okay.
A If you're in the money or not.
THE COURT: So in other words, the strike price, you're looking for the strike price to be on December 22nd, 1999?
THE WITNESS: That's correct.
THE COURT: And the closing, the money changes hands on the 27th of December?
THE WITNESS The actual cash exchange.

Page 102

yes.
BY MR CROUCH
Q And then you were referencing before this paragraph A down here. If the spot rate on the first rate determination date at 10 o'clock a.m. local time in New York, greater than or equal to the first range level
A Right. Which was the strike price. Just another way of saying it.
Q So greater than or equal to 106.19. Then upon the occurrence of such first optional trigger event, one, party A shall pay to party B – shall pay to party B the party A final exchange amount, which I think you said is $50 million?
A Yes
Q And, two, party B shall pay to party A the party B final exchange amount.
Am I reading that correctly?
A I'm sure you read as well as I, yes.
Q And it appears to me that – if I'm reading this correctly up here, did party B have a final exchange amount, party B being you?
A Well, party B is – I had already paid my premium.

Page 103

Q Okay.
A So it shows zero. See – if I could help you out.
Q Thank you. Thank you. I appreciate all the help I can get.
A Okay. So – I mean, it says zero. They're defined. So I paid my money up front. I had to pay a $25 million premium for the right to possibly get $50 million if I called the currency direction right.
Q Okay. Thank you.
Can you read the last sentence of that paragraph there, that same paragraph. It starts with in determining.
A The last paragraph?
Q The last line of paragraph A.
A Okay. Paragraph A. Okay.
Q Do you see where it says, the last sentence, it says: In determining?
A Let me just get my glasses to focus. In determining whether the first digital option trigger event has occurred, a particular spot rate shall be disregarded of the calculation agent acting in good faith if he considers that it would not be commercially reasonable to take account of

Page 104

it.
Q First of all, what is the calculation agent?
A Well, in this case, it's Deutsche Bank.
Q What is this allowing Deutsche Bank to do?
A If they get an aberrant offer, which happens all the time in the market, if somebody has a small lot, they want to get rid of, in this case it can be yen, and they'll just say I'll take what I can get for it, I'm not really interested in trying to work the market, you can get an aberrant price, which would be well above or well below the market. He has the right to ignore that aberrant rate as long as the overall commercial market indications are that it's aberrant.
Q Okay. In reviewing this contract, did that portion concern you?
A No.
Q Why not?
A I've never had any problem with the integrity of any of the large institutions I've dealt with. They've all been, you know, above board. I've never had a problem.
Q You referenced on the second page, this

Page 105

is the second digital option transaction.
A Yes.
Q And because you're better at explaining this apparently better than I am at understanding it, could you explain to the Court what this transaction essentially says?
A Yeah. If you – if you look at the top, it now has the parties – for initial party B it's zero for the amount being paid. Remember, party B is me.
Q Okay.
A So I'll use that as – instead of speaking of myself as the single member, you know, LLC.
And party A in this case is the bank.
So in this case, the bank is paying me $23,750,000 for the right on an option for them to receive $46,675,000 if, on the termination – the termination date, they are – and if you look at the bottom here it tells you, again, at or below – it happens in this particular case it is exactly the same conditions, except in their case, it's equal to – excuse me, equal to or above 106.21, which is the two additional pips that I had mentioned to you.

Page 106

Q Uh-huh.
A So the spread between them being in the money and me being in the money, it was highly likely that both of us would be in the money. But it was less likely for them to be – for me to be in the money and for them to be out of the money. I only had, you know, two pips, where I was looking for four to five pips of separation between us.
Q Okay. Let me go back. Let's talk about it a little bit to make sure I understand that.
A Yeah.
Q If I'm understanding this correctly, what the document seems to be saying is –
A Excuse me, pips, I'm sorry.
Q They were going to pay you, Deutsche Bank, you paid $25 million for the right to possibly get $50 million if the Japanese yen is equal to or greater than 106.19, right?
A That's correct.
Q And you agreed to pay Deutsche Bank $46 million – $46,875,000 if the Japanese yen was greater than or equal to 106.21?
A That's correct.
Q So what would the sweet spot be for

Page 107

these purposes then?
A It would be the two pips in between.
Q Okay. Which is – where would the Japanese yen have to end up?
A It would end up at 106.20 or –
Q If I could help you here, it says greater than or equal to?
A Excuse me. I'm on the wrong side of the curve. Just – well, greater than or equal to is fine. I'm just saying that I am – I am –
Q Well, tell me –
A Let's put it this way. If I called it right I would have put it the other direction instead, because it ended up being, you know, the Japanese yen ended up strengthening against the dollar instead of weakening.
Q Tell me what the sweet spot is here.
A The sweet spot is that spread, if you're putting it on a chart, if you're putting it on a chart and you put the strike price for the bank and the strike price for me, the two – the distance between the two, which is, if you – and if I'm just going to mark it down here, 106.21 and 106.19, any number in between 106.21 and 106.19 is the sweet spot.

Page 108

Q Let me ask you a couple questions about that?
A The sweet spot means I would collect my premiums, but would have no payout.
Q Let me ask you –
A Plus I would get a payout from the bank.
Q If the Japanese yen ends up at 106.19 –
A Right.
Q – what would happen then?
A I would get paid.
Q And would –
A It's equal to or greater than this.
Q Okay. Would you have to pay Deutsche Bank then?
A No. My only – my point was twofold. It has to be – it's anything equal to or greater than. So it would include those goalposts. You know, it's one of those cases, not like football, where if you hit the goalpost it still counts here. So the 106.21 would count and the 106.19 would count. But it's equal to or greater than.
Q Okay. So in other words, if I'm understanding this correctly, your sweet spot was 106.19 and 106.21 – or 106.19 –
A Or any number –

Page 109

Q Just a second. Let me ask the question.
Your sweet spot is 106.19 and 106.20; is that
correct?
A And – all the way up to 21.
Q Well, if I'm reading the second page, it
says you have to pay – you have to pay Deutsche
Bank if it's 106.21?
A You're talking about for the bank.
Q Yeah.
A You're right. That's correct.
Q I'm talking about just for the sweet
spot.
A That's correct. Yes.
Q I just want to make sure I'm clear on
that.
A That's correct.
Q Okay. If you could now turn the page to
the – to the next document, if you could, please.
A Just tell me where I'm going.
Q Tab number 7. I'm sorry. I'm sorry.
A Okay.
(Plaintiff's Exhibit Number 2 was marked
for identification.)
BY MR. CROUCH:
Q And do you recognize this document?

Page 110

A I do, yeah. It's the two other digital
options, confirmation from Deutsche Bank.
Q And I think you – and if you look on
the third page, is that your signature?
A Yes
Q And did you review these documents
before you signed it?
A Yeah, I did.
Q And does this reflect your negotiations
with Mr. Parse?
A Yes, it does.
Q Okay. And, again, I – I want to walk
through this briefly to make sure I understand.
If I'm understanding this correctly – you tell
me, what does this document reflect?
A The big difference, the chief difference
here is this, first of all, you can see the
currency is different. Where it says the currency
pair is the euro versus US dollar.
Q Uh-huh.
A Okay. The parties are the same
designations as on the last document, except in
this, case, if you look at the – at that next to
the bottom paragraph, where it says less than or
equal to, and then it calls for the first range

Page 111

again, which is the strike price. Except in this
case, it's less than and equal to rather than
greater than or equal to.
Q What did you pay Deutsche Bank for this?
A Well, if you look up at where it says,
first of all, the notional amount was 40 million.
But in this case, party A – I paid $20 million.
I'm party B. I paid $20 million for the right to
gain $40 million if I called it correctly.
Q Okay.
A And I happened that I did.
Q Okay.
A And in this case, though, it was – I
said, it was less than or equal to 1.0123 per
euro.
Q Okay.
A If you see that at the very bottom.
Q Yes.
A Okay. And I called that one right, so I
actually made that 20 million.
Q 20 million or 40 million?
A Well, they paid me the 40. But I had a
$20 million premium.
Q Okay.
A So, you know, you have to deduct your

Page 112

premium. So they paid me the 40.
Q Okay. And if you would, if you would
look on the second page of this document.
A Yes.
Q And can you explain to me –
A This is the second digital option
related to the same currency. And, again, it's
the euro, US dollar. And this is my selling
position to the bank. The – the bank paid me
$19 million for the right to earn, if they were
correct in their determination, $37.5 million if
the exchange rate was at or below 1.0121 per euro,
which is reflected in that second paragraph, that
kind of bullet point paragraph.
Q If I'm reading this correctly –
A Yes.
Q – it looks like there's a two – I
think what you refer to as a pip differential
between the first contract and the second
contract.
A Yeah. It's two pips. It's the same
kind of a spread. And 1.0123 versus 1.0121.
Q So the sweet spot here would be the –
A It's really –
Q 1.0123 and 1.0122; is that correct?

Page 113

A That's correct. The – you know, the government – I say the government. My apologies to the government.
When Deutsche Bank – Deutsche Bank, other than hitting – if they had hit exactly on the goalpost, then I would not be able to count their end. I would still have had to pay them for an offset. So I have really three pips that would make me a winner.
Q I think you referenced earlier to six contracts that you all had with respect to Deutsche Bank.
A That's correct.
Q We've looked at – we've looked at two on the first – first document, number 6, and two on the second document, number 7. Did you have other contracts with –
A Jim Boyd.
Q Say again? I'm sorry.
A Jim Boyd.
Q Jim Boyd.
A Jim Boyd, his LLC.
Q Yes.
A Had contracts as well in the euro which he called correctly. Actually I called it for

Page 114

him
Q Okay. Why did you call it for him?
A He trusted in me to make currency decisions in terms of directionality and the investments
Q Okay. What ultimately happened on each one of these –
THE COURT: Do I understand you correctly, then, you had four contracts; and Jim Boyd had two contracts?
THE WITNESS: Had two contracts. A total of six contracts. In the end –
BY MR. CROUCH:
Q Would you repeat – Mr. Boyd had his – I'm sorry. Mr. Boyd had his contracts in what?
A He had his in the euro.
Q In the euro also, okay.
A He paralleled exactly what I – I used the exact same strike prices in his contract except for lesser dollar sums.
Q Ultimately what happened with respect to these contracts that you had with Deutsche Bank?
A Well, on the euro we netted – I hit – I called the direction correctly, and we made $1,875,000 of profit. And he made 375,000. I

Page 115

made 1-1/2 million. And unfortunately, I wish I'd called the direction right on the yen, but I didn't. The market moved against me. So we didn't make anything on that. So effectively I lost my net premium on that, which is about $1-1/4 million between the two of us.
Q Okay. So ultimately where did you end up?
A We ended up netting $625,000.
Q Okay. Thank you. The reference – you had referenced on these that the trade date for each one of these is November 23rd, 1999; is that correct?
A Yes.
Q Do you remember when you received these contracts to sign?
A Obviously – obviously at some point thereafter, because they wouldn't even have had what the strike price was until the actual date of the occurrence. So it was sometime thereafter. I would have to look to see what the dates were. But it had to be at some subsequent period of time.
Generally when I – when I do derivative contracts, total return swaps, options, you know,

Page 116

it's – it's quite far after. Sometimes I don't get my information confirming the transaction for, you know, well over a month.
Q Is that – does that concern you if you don't have your contracts all signed up as of the date the transaction is supposed to take place?
A Oh, no. No. That's – that's more the norm than an exception.
Q Okay.
MR. CROUCH: Your Honor, if we want to take a break now for lunch or –
THE COURT: Yeah. Do you want to have lunch now?
MR. CROUCH: That would be fine, Your Honor.
THE COURT: Okay. How much time do you think you'll be? An hour?
MR. CROUCH: That's fine.
THE COURT: Because you have to either go down to our horrible cafeteria or go outside. There's always a rush. So 10 after 1:00 then would be a good time to resume?
MR. CROUCH: That's fine.
THE COURT: Okay. The court is recessed

Page 117

until 10 after 1:00.

(Whereupon, at 12:13 p.m., the deposition was recessed, to be reconvened at 1:10 p.m. this same day.)

Page 118

AFTERNOON SESSION (1:15 p.m.)

Whereupon,

JERRY ZUCKER

having been previously duly sworn, was examined and testified further as follows:

THE COURT: Mr. Crouch, you may resume.

MR. CROUCH: Thank you, Your Honor.

DIRECT EXAMINATION (Continued)

BY MR. CROUCH:

Q Mr. Zucker, when we left the proceedings we talked about the contracts you had with Deutsche Bank and how those ultimately had resolved. I'm going to ask you now to look at what's under tab number 8, if you would, please.

A Tab 8?

Q Tab 8.

A Okay.

THE COURT: Actually, before you do that, Mr. Crouch, can I ask Mr. Zucker what's the difference between a long option and a short option?

THE WITNESS: It's the position as to whether or not you're buying the option or you're selling. Selling is short and long is buying.

THE COURT: Does that mean with the

Page 119

short, you're betting that the security or whatever it is is going to go down in price?

THE WITNESS: No. Actually it's not the typical expression like you'd see in an equities market, if you're trading you say you're going long or going short in selling. It's simply to designate the difference in the position as to who is selling the position to whom. In this case, the bank buying the position to me is going short.

THE COURT: Oh, I see.

MR. CROUCH: In other words, if you look at the document –

THE WITNESS: But it's unique to the option.

THE COURT: Mr. Crouch says you can illustrate by looking in tab 7.

BY MR. CROUCH:

Q Yeah. Tab 6 or 7, one of those, which is the options contracts. You might point out to the Judge which one is the long and which one is the short on those.

A Where I'm taking the position to buy an option with the anticipation of a payout, that's the long. And vice versa, where I'm selling my position to the bank and then saying that, you

Page 120

know, if certain conditions are met, I will pay you, that's the short.

THE COURT: I see. Okay. Great.

THE WITNESS: It's unique to the currency trading. Typically when you think in terms of equities buying and selling, if you're buying it's long, if you're selling – planning on holding the position it's long. If you plan on selling the position, it's short.

THE COURT: Okay. Great. Thanks. Mr. Crouch, you may resume.

(Government's Exhibit Number 1053 was marked for identification.)

BY MR. CROUCH:

Q Mr. Zucker, if you could look under tab number 8.

A Yes.

Q Under tab number 8 we have a document that's been designated in a previous deposition as Government Exhibit 1053. Do you recognize this document?

A You're wanting to look behind tab 8, the one that's entitled Jenkens & Gilchrist?

Q Yes.

A Yes, I do.

Page 121

Q Do you recognize that this is a faxed document to you from Donna Guerin at Jenkens & Gilchrist?
A Yeah. I'm trying to see where the date is on it. But it's in the bottom. Yes, I see it.
Q Okay. What's the date on this?
A It says November 26th, 1999.
Q And can you tell the Court where you're looking at that date?
A At the very bottom next – next to the little margin line at the bottom of the page.
Q If you take a second to look at these documents.
A Yes.
Q Can you tell me what the documents are that are attached to this fax?
A Sequentially it's authorization to wire money from the Deutsche Bank account to the JZ Buckingham LLC account number. Second sequentially is the assignment of the option positions to JBJZ Partners and the account number designation. And similarly, the direction to David Parse giving him authorization to transfer the remaining cash to the LLC and to JBJZ Partners and the account number.

Page 122

And then the very tail end is an assignment agreement. It's between the LLC to JBJZ Partners.
Q Do you actually recall receiving this document?
A Recollection is a funny thing. I just – you know, you want to be able to instantaneously say that you remember receiving it. I receive things, so many things during the course of the day I can't specifically say that I recall. But obviously I received it.
Q Just a couple of things I want –
A I know I'm splitting hairs. But I think –
Q On the third document or the third page on that.
A Yes.
Q There's a document. JZ Buckingham Investments LLC at the top. Do you see the third document in?
A I want to make – third page in.
Q Third page in.
A Okay.
Q It has the –
A My third page is addressed to David

Page 123

Parse.
Q No. I'm looking at the very top of that page, I'm sorry. Very top of the page where it says JZ Buckingham Investments LLC?
A I see that. Yes.
THE COURT: Excuse me. Mr. Donohue.
MR. DONOHUE: Your Honor, since there's more than one page of the document that has that heading at the top, I think if counsel would refer to the document by Bates stamp.
MR. CROUCH: Yeah. That's what I was about to say.
MR. DONOHUE: That would be clearer.
MR. CROUCH: The Bates stamp number at the bottom is JG hyphen –
THE COURT: Thank you, Mr. Donohue.
THE WITNESS: This is the one ending 878?
BY MR. CROUCH:
Q Yeah. Let me make sure I get it on the record. JG-CL 0147878.
I think you previously said that this fax was sent to you on November 26th, 1999.
A Yeah. That's what's noted on the base, yes.

Page 124

Q And this document has already filled in November 24th, 1999. And it's asking you to sign this in two different places where it says November 24th. Do you see that?
A Yes.
Q Did you in fact execute this document as far as you know?
A I believe that I did, yes.
Q Did it bother you that you were executing a document that had a date on it that was prior to the actual date of the fax being sent to you?
A No. Just they're conforming it to the fax. I have no problem with that.
Q Do you know why you were executing all these documents with respect to – that Jenkens & Gilchrist was sending you?
A This is basically following the format that Ernst & Young had recommended as the most appropriate structure.
(Government's Exhibit Number 1019 was marked for identification.)
BY MR. CROUCH:
Q Okay. Thank you. Would you look under tab number 9 now, please.

Page 125

A Tab number 9. Okay.
Q This is a document that has been marked in a previous deposition as Government Exhibit 1019.
A Yes, I see that.
Q Okay. Do you recognize the handwriting on this document?
A I do.
Q Whose handwriting is that?
A Jim Boyd's.
Q Have you ever seen these notes before?
A I saw them as a result of my own deposition.
Q Okay. Do you recall seeing these back in 1999?
A I don't.
Q The notes seem to reflect that Mr. Boyd was having a conversation with Ray Knight and with David Parse.
A Right.
Q Also a Shawn Smith was on the line. Ray Knight, who is he with?
A Ray Knight was with Ernst & Young.
Q And David Parse with who?
A Deutsche Bank Alex. Brown.

Page 126

Q How about Shawn Smith?
A Shawn Smith was with Ernst & Young.
Q He references here first of all previous -- it looks like to me previous wires. 3.10 and 350. Do you see that?
A Yes. This would have been funding amounts that each of us had made to the transactions.
Q Okay. And he says 1 million for investment. And then he references, it looks like some bank stocks down there. Do you see that?
A Right. Yeah. Bank of New York, Bank of America and First Union.
Q Do you recognize why he was talking to Mr. Parse possibly about --
A Yeah, that was part of the --
Q Let me finish my question.
A I'm sorry.
Q Do you recognize why Mr. Boyd may have been talking to these gentlemen about investments in bank stocks?
A Yes.
Q Okay. What was the reason?
A We were going to be making diversification of our accounts. And it included

Page 127

the investment as part of the proposed structure, investments into capital equities in the market. And the bank stocks were selected as being, in my opinion, they were solid in terms of likely trending upward. I had done very well in banks in general. And I had a comfort that they were going to appreciate in value.
And I felt those were going to be a good place to park. And Jim was just reconfirming, I assume, in this, although I don't recall seeing this, that he was going to be investing respectively, it says $500,000 in each of the Bank of New York, Bank of America and First Union.
(Plaintiff's Exhibit Number 3 was marked for identification.)
BY MR. CROUCH:
Q Okay. If you would turn over to the document that's under tab number 10, please.
A Yes.
Q And do you recall receiving this document from Jenkens & Gilchrist? This is a document marked with Exhibit P-3.
A I recall the document.
Q Okay. In here, Ms. Guerin is writing on behalf of Jenkens & Gilchrist. It says: Please

Page 128

do not fill in any of the blanks which appear in these documents.
A Yes.
Q As to the dates. Were you bothered by the fact that she was telling you not to fill in the dates on this?
A No, not at all. As a matter of fact, most of the -- as a matter of fact, normally as to all the mergers and acquisitions and other things that I do, almost all of them are left blank and conformed by the attorneys after the fact, where I just simply sign the documents. So, no, I'm not at all surprised by that.
Q Do you have any recollection of actually signing these documents?
A Yeah. I recall signing a lot of documents. And I see my signature on a number of the documents that are attached.
Q And do you know what you did with these documents once you executed them?
A What I would ordinarily do with these sorts of documents is give it to one of our administrative assistants and ask them to forward it to the proper party.
Q Do you know why you were executing these

Page 129

documents in particular?
A Yeah. These were all the various transfer and assignment documents related to the various transactions we were doing in the corporate partnership entities that we created in the cross-contribution.
(Government's Exhibit Number 2255 was marked for identification.)
BY MR. CROUCH:
Q Okay. If you would look under tab 11, please, Mr. Zucker.
A Yes.
Q And first of all, is that your handwriting on that page?
A No. That's Jim Boyd's.
Q Okay. Do you recall ever seeing this document?
A Not contemporaneous with this date. But I recall seeing it since.
Q Since as in when?
A As in related to the last few weeks.
Q Okay. Thank you.
This seems to reference something, some discussions that Mr. Boyd had with Ray Knight. Do you recall around December 28th, 1999 you having

Page 130

any discussions with Mr. Boyd about his discussions with Mr. Knight?
A I don't recall the specific content, nor do I fully understand what he's writing in this note, but we have lots of discussions during that period of time, and hallway exchanges and so forth. So –
Q He seems to be referencing something about margin earnings on the euro. And Mr. Knight had told him something about just picking up the margin gain on $625,000. Do you recognize –
A Well, the 625,000 I would recognize as a number –
Q Let me ask you a question first.
A Yes. I'm sorry.
Q Do you understand what Mr. Boyd may be discussing in this letter?
A Not fully. I recognize some numbers. But I don't really know – I don't know what a margin gain is. I know what the capital gain would be related to the transaction. And I'm not really sure exactly what the references are.
Q Mr. Zucker, I can tell you that this document was recently found in a file in the office of one of your assistants, that being

Page 131

Charlotte Crosby.
A Uh-huh.
Q Did you have an understanding that Ms. Crosby had files in her office with respect to this transaction?
A I would assume that she keeps copies of various files on an ongoing basis. Often I'll actually direct her to put the things in the file. As to whether it's in her office or not, I don't know.
Q Do you understand that this document had not been turned over to the government in response to their request for production?
A You've told me that. But I wasn't aware of it.
Q Okay. Do you know why the files in Ms. Crosby were not produced – not produced to the government when they requested it?
A A screw-up, because I instructed everybody in the office to go through their files and get everything that was related to this transaction.
Q Okay. Who did you ask to do that?
A I asked Charlotte Crosby. I asked Donna Hartin.

Page 132

Q Okay. Who is Donna Hartin?
A Carmen Wigfall. I'm sorry?
Q Let's go back. Who is Donna Hartin?
A Donna Hartin is more directly my administrative assistant. And Charlotte is – years ago she was almost – very heavily weighted toward Jim Boyd's administrative assistant. But then after Jim's car accident and all, I kept her as a general administrative assistant for many people, including myself.
Q Okay. Who else did you ask in your office?
A I may have, because it was done at the same time, it was at a staff meeting that I made the mention, so there were a whole bunch of other people present in the meeting. But, you know, Carmen Wigfall, but she didn't have any files of any, you know, that –
Q As far as you knew had all the records been produced?
A To the best of my knowledge and certainly to my instructions, you know, all the records had been produced.
Q Okay. Mr. Zucker, I'm asking you to flip back in your notebook right now to –

Page 133

actually, no. Let me ask you something else.
Actually I want you to look under Exhibit Number – tab number 13 if you would, please.
A Yes.
(Plaintiff's Exhibit Number 5 was marked for identification.)
BY MR. CROUCH:
Q Can you recognize this document?
A Yes. It's the Brown & Wood opinion letter.
Q When you say the Brown & Wood opinion letter, what are you referring to?
A It – I mean it's from Brown & Wood. And we were told that we were going to get two reputable firms to provide us with opinions of the appropriateness and properness, that we were compliant with IRS code and regulation.
Q Do you recall when you received this opinion letter from Brown & Wood?
A Well, I'm looking at the date now. But if you asked me of my own recollection I would have said first quarter of 2000.
Q Why do you say the first quarter of 2000?
A Well there was no way that our taxes

Page 134

were going to get filed without the opinion letters in our file that, you know – Barry Emerson and through his discussion with Ray Knight made that very clear that, you know, we couldn't file our taxes without the opinions.
Q Who is Barry Emerson?
A He's my regular CPA for filing my 1040s.
Q Okay. And you said Barry Emerson told you that you could not file your tax return without having the opinion letters?
A No. Barry told me it was necessary for me to have the opinion letters in hand before we filed our taxes.
Q Did he tell you why?
A He said that that way that we could – we could demonstrate that we were diligent in making sure that we followed all the rules.
Q Do you recall the first time you heard the name Brown & Wood associated with this transaction?
A I'll be frank with you. Until all of my, you know, proceeding against the government for a refund and all, I didn't really think or remember Brown & Wood. I didn't think in terms of the names of the firms. I knew that we had, you

Page 135

know, reputable opinions in the file.
On reflection of the documents, I now remember Jenkens & Gilchrist and Brown & Wood and so forth. But those were not names that were familiar to me. They were instantly familiar to Jim Boyd. But, you know, upon reflection, I would say during that same period of time.
Q Did you review this opinion? Do you recall reviewing this opinion when it came in?
A Only as I normally do, just skimming things.
Q Okay. Do you – what would you have done with this opinion when you received it?
A I would have, you know, put a note on it, if it was exclusively to me, I would have put a note on it, circulated it, given it to Charlotte and ask that copies be sent to Barry Emerson, since it was ultimately related to something he would have to file.
Q Did you – do you know if you did share this with Mr. Emerson?
A Oh, I know that Barry had both opinions in his file. As to whether it came directly in this form or whether it came through Charlotte or other, I can't absolutely confirm that. But I

Page 136

know that he got a copy.
Q Well, was Barry Emerson involved in the transaction with Ernst & Young?
A Not at all.
Q So why would he need this opinion?
A He's my CPA. He's the one that does all my own 1040s, for myself and for my wife.
Q Did you rely on this opinion for the purposes of filing the 1999 tax return?
A Well, clearly I wasn't going to be able to file them without it. So, yes, I relied on this opinion and the Jenkens & Gilchrist opinions. But I'll be frank with you as well, I felt totally reliant on Ernst & Young and the fact that they told me that everything was kosher, was being done properly and structured properly, as well as Jim Boyd. Jim was an excellent tax attorney.
Q Why would you rely on Mr. Boyd?
A Oh, he started off being my, you know, corporate structuring attorney and tax attorney. He was unbelievably bright. He can run circles around almost anybody that I knew in terms of his brilliance.
So he felt very comfortable with the nature of the transaction and kind of the

Page 137

reference in terms of the real estate precedent that had been set in terms of it being – and as I mentioned earlier, I don't want to be redundant, but the fact that an unmatured liability would not be included in the basis. So he felt comfortable with regard to the – all of it as well.

So I had almost like a triple endorsement. I had the two opinions plus Jim Boyd's opinion, which I valued equally.

(Plaintiff's Exhibit Number 6 was marked for identification.)

BY MR. CROUCH:

Q If you would turn to page – turn to the next document, under tab number 14, if you would.

A Yes.

Q Because you had just referenced – you just referenced an opinion received from Jenkens & Gilchrist. And on – and an exhibit that's marked on 14, Exhibit P-6.

A Yes.

Q And for the court reporter I forgot to mention, I think, the exhibit number for number 13, which was P-4.

(Plaintiff's Exhibit Number 4 was marked for identification.)

Page 138

BY MR. CROUCH:

Q Under 14 is P-6. Do you recognize this document?

A Yes

Q Can you tell me what this is?

A Yeah. It's – first, the cover note is from Ray Knight to me sending – saying that attached is the opinion issued by Jenkens & Gilchrist

Q Do you remember when you received this letter from Mr. Knight – did you receive this letter from Mr. Knight?

A I did. And it was in the, again, the first quarter. But a bit earlier than the – than the one I had gotten from Brown & Wood's. Brown & Wood's was later.

Q Is that your writing on there?

A It is.

Q Can you tell me what your notes say?

A That says. Please copy Barry Emerson. For your files. Jerry. Charlotte, please retain this original in our files.

Q So were you again sending a copy of this off to Mr. Emerson?

A Yes

Page 139

Q Because he was preparing your 1999 tax return?

A That's correct.

Q If you turn the page, is the document behind that the opinion you received from Jenkens & Gilchrist?

A Yes.

Q And when you received this document, did you review it?

A I skimmed through it to just see how it described our transaction.

Q Did you – did you have confidence in it?

A Oh, absolutely.

Q Okay. Did you rely on this opinion for purposes of your filing your 1999 tax return?

A Yes.

(Government's Exhibit Number 1000 was marked for identification.)

BY MR. CROUCH:

Q Mr. Zucker, if you could now turn to the documents under tab number 15, please.

A Yes.

Q Do you recognize this document?

A It's a – yeah. It's a partnership

Page 140

return for JBJZ Partners.

Q Again, what is JBJZ Partners?

A That was the partnership between – where we had contributed our LLC interests, our single member LLC interests.

Q Why had you contributed your single member LLC interests?

A Among the usual rationalizations of diversification and so forth, I'm not going to go through all the business – normal rationales that you would have for any business. But it was part of the structure EY had indicated was part of the opportunity to make money, and at the same time create a benefit for me in terms of an offset in earnings.

Q I'm looking down the page. And this was previously marked in the previous deposition as Government Exhibit 1000.

A Yes.

Q Is that your signature on the – on that document?

A It is.

Q And is that your date that you put on there?

A Yes.

Page 141

Q Okay. Do you recall – I mean, first of all, obviously you did sign this document. Do you recall when you signed it? Was it March 22nd, 2000?

A Generally speaking, when I'm signing something directly, and I'm not asked to leave it blank or anything like that, I normally mark the exact date that I'm actually signing it. So that would have been the date.

Q Okay. Do you recall reviewing this document before it was filed?

A It's kind of like almost all of the dozens and dozens of tax filings I do every year. I – you know, I'll glance at it. I depend on the professionals to make sure every line entry is filled out properly. I just don't have the time or the patience to go through every single line entry.

Q You said dozens and dozens. Approximately how many tax returns do you have to file every year?

A Counting international, I don't know, many dozens.

Q Okay.

A But stateside, several dozen.

Page 142

(Government's Exhibit Number 1001 was marked for identification.)

BY MR. CROUCH:

Q Okay. If you now turn the tab to tab 16.

A Yes.

Q And do you recognize this document?

A Yeah. It's the S Corp that we had formed.

Q And what S Corp was that?

A JBJZ Investors, Inc.

Q And that was for purposes of the transaction Ernst & Young had proposed to you?

A That was for purposes of the transaction. But also just from a business perspective, it made sense, yeah.

Q Okay. Do you recognize that signature on there as the taxpayer?

A Yeah. That's Jim Boyd's.

Q And who prepared this tax return?

A I would presume, because it was part of the understanding, that Ernst & Young prepared it.

Q Does it indicate down at the bottom who prepared this tax return?

A Yeah. It says Ernst & Young.

Page 143

Q And again for the court reporter this is Government Exhibit; previous Government Exhibit 1001.

And looking back at the prior document – and I meant to ask you this, this is under tab 15.

A Yes.

Q This is the partnership return for JBJZ Partners?

A Yes.

Q Do you know who prepared that tax return?

A Yeah. It says Ernst & Young.

Q Okay. How many tax returns do you think Ernst & Young prepared for you in 1999?

A I'd have to actually look to see, you know, who is doing the individual consolidating entities, but it would have been a large number.

Q Okay. Large number, more than 10?

A Yes.

Q Okay. More than 20?

A You know, I don't recall each of the details because I had, you know, I had Membrana and Celgard and all these other companies. It depends on how – what the holding company structure was as to, you know, some of the individual statements get consolidated into one. So I can't remember how – if they were individually filed or if they were filed in consolidated units.

Page 144

(Government's Exhibit Number 1005 was marked for identification.)

BY MR. CROUCH:

Q Okay. Would you turn to tab 17, please.

A Can I ask you just to hold for a minute.

Q Sure.

A My apologies.

THE COURT: No problem.

THE WITNESS: Okay. Please, again.

BY MR. CROUCH:

Q Turn under tab 17. Do you recognize this document?

A Tab 17.

Q This is a –

A Yes.

Q – marked previously in a deposition as Government Exhibit 1005.

A Yes. I recognize it as my wife and my own personal return.

Q Did you – and I will tell you that this

Page 145

is actually part of the administrative file within the IRS. So it's not – everything in here is not actually – would be part of your tax return. But I will say, and I think the government agrees, that your tax return is part of this document here. Does the government agree?

MR. DONOHUE: Yes, Your Honor.

THE WITNESS: It's just – a few pages, you're right. There are subsets.

BY MR. CROUCH:

Q Yes.

A But the top page –

Q But I want you to look in on the page that's marked, the Bates number at the bottom corner says, ADMIN 001295.

A 1295. Okay. Okay. I'm on the one that says 1295.

Q Is that your signature?

A It is.

Q Is that the signature of your wife?

A It is.

Q Okay. Do you recall – and who prepared this tax return?

A Well, the 1040 would clearly have been prepared by Barry Emerson.

Page 146

Q And again Barry Emerson –

A And signed here.

Q And Barry Emerson is who?

A Barry Emerson is my CPA.

Q Do you recall having any discussions with Mr. Emerson about how the transaction that you had done at the behest of Ernst & Young was being reported on this tax return?

A How it's being reported?

Q Yeah. Did he have any concerns about the transaction at all?

A No.

Q Okay. Did he ever –

A Well, he told me that my taking the position for sure would generate an audit. And I said fine.

Q You weren't bothered by the fact that he was telling you it was going to generate an audit?

A No. I thought everything I had done was perfectly fine.

Q Okay. If I could, Mr. Zucker, could I direct your attention to the first quarter of – first quarter of 2002.

A Just – you mean reference – mean –

Q I'm off that document now.

Page 147

A Okay.

Q First quarter of 2002.

A Yes.

Q Do you recall ever hearing about in the first quarter of 2002 an amnesty program from the IRS that is called IRS Announcement 2002-2?

A Yes.

Q What do you recall about what you heard about that?

A I think it was published in the first part of the year, maybe January 2002. And it basically said if anyone had participated in any currency options, and they had various names for various shelters or structures that were similar described, that if you volunteered your name, that, even if it was found to be improper, that you would be not penalized for – if penalties were ever attributable, that it wouldn't be attributable to you, that you had volunteered your name and information.

Q Did you have any conversations with anyone at Ernst & Young about that program?

A I can't recall to whom I spoke, but, yeah, there were some discussions right at the very beginning.

Page 148

Q Do you recall what you talked about?

A Yeah. I said I wanted to participate. Why take any chances. Go ahead and participate in the program. And subsequently I had discussions telling them to, you know, to be totally open with everything I had. I'd rather, you know, rather have an open dialogue.

Q Did you have any discussion with Mr. Emerson about that program?

A I did.

Q Okay. And what were your discussions with Mr. Emerson?

A Similar. That, you know, I felt it was a good idea. He said that he didn't think there was any down side to it as well. Even though I personally didn't think there was any reason in terms of we had done anything structurally improper. I thought everything we did was fine, as I do now.

(Plaintiff's Exhibit Number 7 was marked for identification.)

BY MR. CROUCH:

Q Would you look under tab 19, please.

A Yes.

Q Under tab number 19 is a document we

Page 149

have designated as Exhibit P-7.
A If you hold just for a minute. This binder is –
THE COURT: Are we skipping tab 18?
MR. CROUCH: Yes, we are, for right now.
THE WITNESS: Okay. All right. I'm on tab 19, Exhibit P-7.
BY MR. CROUCH:
Q Yes. Do you recognize this document?
A Yeah. This is – this is what I sent to Deborah Sims at the IRS informing her of the transaction and our names and contacts.
Q Okay. If you look on the fourth page of that document.
A Yes.
Q Are those your three signatures?
THE COURT: Bates number?
MR. CROUCH: I'm sorry. Bates number, I think it's 3172.
THE WITNESS: Uh-huh.
BY MR. CROUCH:
Q Are those your signatures?
A They are mine and my wife's.
Q Okay. Thank you. And do you recall – did you – did you draft this document?

Page 150

A No. The –
Q Who drafted this document?
A Ernst & Young.
Q And why did they draft this document?
A Frankly, I could not have been as – as eloquent in describing the transaction as they were, and had a lot of the technicalese in it. They had sent it to me for me to review and submit.
Q It says, again, on the fourth page, which is Bates number 3172, do you see the second paragraph from the end?
A Yes.
Q And can you tell me what that says.
A Second paragraph – under penalties of perjury?
Q Yes. Thank you
A Yeah. Under penalties of perjury we agree that we have examined this disclosure and to the best of our knowledge and belief, information –
Q You're reading too fast.
A I'm sorry. We examined this disclosure and to the best of our knowledge and belief, the information provided as part of the disclosure

Page 151

contains all relevant facts and is true and correct and complete. Yes.
Q Okay. Did you in fact review this?
A Yeah. And I – I went over it and it seemed to outline, you know, all the essential facts.
Q Do you – as far as you knew when you signed this document, did it appear to be true and correct to you?
A Yeah. Yeah. I mean, you know, I – I didn't – even today I don't really see anything that's not right.
Q Okay. Again, why did you – why did you file this document?
A Why did I file it?
Q Yeah. Why did you send this to the IRS?
A Well, it's kind of like, you know, a free lottery ticket. Why would you not accept a free lottery ticket? You know, it's – this was, in the event that the – anything that we had done was not proper, that I would be protected from any potential for penalties.
So I'd much rather – I thought we had not done anything wrong at all, and I still don't. That's why I'm seeking a refund. But why not at

Page 152

least cover the bases. So I thought we should go ahead and take advantage.
Q Okay. Do you recall – is there anything else you want to add?
A Not to that answer. But –
Q Okay. Okay.
A There's something that's relevant that I see that I've scratched out and I want to tell you why.
Q Don't worry – let me ask you about that. Let me ask you about that.
A Okay.
Q I see on the first page of this document, Mr. Zucker, that you have – that the date has been scratched out. And it's – then it's got some – a new date put in there and some initials on there.
A Yes.
Q Can you tell me what those are?
A Yes. Her office is very close to my office. So I wanted to have it delivered –
Q When you're saying her office?
A Deborah Sims of the IRS office. It's on LaCross Road in North Charleston, which is just a very short distance from my office. So this had

Page 153

been predated by Ernst & Young. And it was a Friday. The 20th was a Friday. And I wanted to have it delivered directly to her office. So since I was signing it that day and having it delivered, I wanted it to coincide with the date that it was being delivered.

Q Okay. Okay. Do you recall ever being contacted by any of the other professionals associated with this transaction, either Jenkens & Gilchrist or Brown & Wood –

A Yes.

Q – about IRS inquiries regarding your transaction?

A Yes.

Q Okay. What do you recall being contacted about?

A They said that they had gotten like a John Doe summons. I think that's what it was called. They were saying that under their rules that they weren't allowed to give my name out unless I specifically said to the contrary. And I responded to them, please freely give them my name and give them all information and records.

(Plaintiff's Exhibit Number 8 was marked for identification.)

Page 154

BY MR. CROUCH:

Q Okay. Would you look under tab number 20, please?

A I'm sorry?

Q Would you look under tab number 20, please.

A Yes. Yes.

Q And is this a letter you received from the law firm of Jenkens & Gilchrist?

A Yes.

Q And what was your understanding of this letter?

A That they were basically telling me that under their – that they had been getting a John Doe summons and requested to be given all the information about their various clients. And that under the commitments of their ethics and confidentiality of attorney/client privilege, that they would refuse to produce or give information unless, you know, I directed them to the contrary. And I did in fact direct them to the contrary.

(Plaintiff's Exhibit Number 9 was marked for identification.)

BY MR. CROUCH:

Page 155

Q Will you look under tab number 21.

A Yes. Yes.

Q And an exhibit that we had marked as Exhibit P-9.

A Yes.

Q And for the court reporter, the previous document was Exhibit P-8. P-9.

A Yes.

Q And is this your letter to Jenkens & Gilchrist?

A It is.

Q Is that your signature on that document?

A It is my signature.

Q What are you telling Jenkens & Gilchrist at that time?

A I said I received your letter regarding the John Doe summons. And that I understand the obligations that they have to assert attorney/client privilege and confidentiality. And that I told them that some time ago I had already told Ernst & Young to give them authority to release my name and cooperate with the IRS. And I said that I don't believe – you know, I believe that the best thing to do

Page 156

basically is to be fully cooperative. It was – that I had a – that it was consistent with all the regulations, that I had an opportunity to make a profit or a loss, a reasonable business risk. And I felt that it had followed all the existing regulations and to go ahead and be fully compliant and give them everything they needed.

Q Did you have the same conversation with Ernst & Young?

A I did.

Q What did you tell Ernst & Young?

A I told them to cooperate in every respect and give them whatever they needed. Just whatever they were asked for, to give it, because I had nothing to hide.

Q To give it to who?

A To anyone that asked under the government from the IRS.

Q Okay. Do you recall being contacted a second time by Jenkens & Gilchrist about producing your information?

A I – I – yeah. I received a subsequent letter. It was essentially the same.

(Plaintiff's Exhibit Number 10 was marked for identification.)

Page 157

BY MR. CROUCH:
Q And how did you – if you look under tab number 22, an exhibit marked as P-10, is this the subsequent letter you received from the IRS – from Jenkins & Gilchrist?
A It is.
Q How did you respond to this letter?
A I responded that, you know, almost in disbelief, didn't you get my other letter. And I actually attached the letter and said that, you know, for them to fully cooperate and provide the information and so forth.
(Plaintiff's Exhibit Number 11 was marked for identification.)
BY MR. CROUCH:
Q And if you'll look under tab 23. Is this a copy of – an exhibit we have marked as P-11, is this a copy of the letter that you sent to Jenkens & Gilchrist, the second letter?
A It is. It's the one that basically reminded them of the letter I had previously sent them. And to go ahead and give them everything they wanted, and attached a copy of my prior letter to this letter as well, just to show them that I'd directed them to do that before.

Page 158

Q Again, why were you telling Jenkens & Gilchrist to do this?
A I told them I felt it was structured in every respect correctly and by the regulations. I had nothing to hide and that I – I freely had no problem with being audited.
Q So you –
A Just to go ahead and give whatever needed.
Q So you had no problem with turning over any kind of records to the IRS?
A No. Everything. That's fine. I'm perfectly fine with that.
Q And you had made the same statement to Ernst & Young also, correct?
A I did.
Q Do you recall being contacted by the law firm of Sidley Austin Brown & Wood?
A Yes.
Q What were they contacting you about?
A Similar. You know, it was a John Doe summons.
(Plaintiff's Exhibit Number 12 was marked for identification.)
BY MR. CROUCH:

Page 159

Q Would you look under tab 24?
A Yes.
Q And do you recognize this document?
A Yes.
Q What is this document?
A You know, just – it says the Department of Justice, sensitive proceeding. It's basically providing the reasons for why they're sending it. And similar, as to the attorney/client privilege, that they could protect it. And I provided them notice that it was not needed.
(Plaintiff's Exhibit Number 13 was marked for identification.)
BY MR. CROUCH:
Q Okay. Would you turn to tab 25, which is a document – excuse me, the last document is P-12. I don't know if I told the court reporter that. The next document we've marked as P-13.
A Yes.
Q On tab 25. Is that your letter to Sidley Austin Brown & Wood?
A It is.
Q Okay. Is that your signature?
A It is my signature.
Q What are you telling them?

Page 160

A I'm telling them basically what I told the others, that, you know, I had given my name and information a long time ago. That they had all the rights to withdraw attorney/client privilege. That they could give anything and everything that was asked of them.
Q Again, explain. You're saying you're telling these professionals all to turn over their records; is that correct?
A That's correct.
Q And why were you doing this again?
A I wanted to be fully cooperative. I've always believed that openness – if you're trying to do everything that's right and proper, that you have nothing to hide, just go ahead and give them everything you have.
Q As far as you knew, had Ernst & Young turned over all your records to the IRS?
A As far as I knew, yeah.
Q How about Jenkens & Gilchrist, had they turned over all the records as far as you knew?
A Well, I directed them to. I can't tell you specifically if they had or hadn't, but I directed all of them to do it.
MR. CROUCH: Okay. I pass the witness.

Page 161

THE COURT: Okay. Thanks, Mr. Crouch.
MR. DONOHUE: Your Honor, may we take a few-minute break so that we can set up the realtime at the podium.
THE COURT: Sure. I think we can all use a break anyway. Is 10 minutes enough?
MR. DONOHUE: Yes, Your Honor.
THE COURT: The court will be in recess for 10 minutes.
(Whereupon, a recess was taken between 1:55 p.m. and 2:06 p.m.)
THE COURT: Mr. Donohue.
MR. DONOHUE: Thank you, Your Honor.
CROSS-EXAMINATION
BY MR. DONOHUE:
Q Good afternoon. It is Mr. Zucker, am I correct?
A That's correct.
Q So if I ultimately refer to you as Mr. Zucker, please forgive me.
THE COURT: Forgive me the many times, Mr. Zucker.
THE WITNESS: I'm sure I've been called worse.
BY MR. DONOHUE:

Page 162

Q Mr. Zucker, your direct testimony indicated that a Mr. Knight, a Ray Knight of Ernst & Young –
A Yes.
Q – made a presentation to you on November 10th. Am I correct?
A That's correct
Q And did you ever learn as to why Mr. Knight made this presentation to you?
A Why he made the presentation?
Q Yes.
A As opposed to?
Q Yes.
A No. I would assume that he was the one that was the most knowledgeable of the proprietary structure that was being proposed.
(Government's Exhibit Number 155 was marked for identification.)
BY MR. DONOHUE:
Q I'm going to ask that you be handed what's been marked as Government Exhibit 155.
A Okay.
MR. CROUCH: Do you have a copy for us?
MR. DONOHUE: It's coming.
THE COURT: Do I have a copy,

Page 163

Mr. Donohue?
MR. DONOHUE: Yes, Your Honor – no, Your Honor. You'll be getting a copy right now.
THE COURT: Okay. Great. Thanks.
THE WITNESS: Yes.
BY MR. DONOHUE:
Q Mr. Zucker, Government Exhibit 155 is an internal E&Y document entitled COBRA Action Work Plan.
A Right.
Q And you'll notice at the top, under paragraph 1, it refers to qualified client. Do you see that?
A I see it, yes.
Q It refers to number 1, the – referring again to qualifying client, that the – that the client must be aggressive, willing to assume tax risk.
Did Mr. Knight in his presentation to you indicate or ask you if you're willing to assume tax risk?
A No.
Q Take a look at 2. 50 million minimum income to be sheltered. Ordinary preferable to capital.

Page 164

You mentioned, am I correct, before that you told Mr. Knight that you had approximately 50 to 100 million of income to be sheltered, correct?
A No, I didn't say that. He asked me how much revenue would I – would I have that I might offset. And my answer was probably 50 to 100 million.
Q Well, I think what you're – we're saying the same thing. You're saying that he asked you –
A Well, it might be semantics, but that's what actually was said.
Q Now, Mr. Knight, did he point out to you that in order to qualify for the transaction you needed 50 million in income to offset?
A No.
Q Take a look at 3. Business associates willing to participate. Did Mr. Knight indicate to you that in order to participate in this transaction you needed a business associate?
A No. Other than the fact that he was speaking to two people. But no.
Q But you were told, if I recall your direct testimony, that they wanted to make the presentation to both you and to Mr. Boyd, correct?

Page 165

A Right. Which would be normally the way EY would present to us, yes.
Q And Mr. Boyd was, as you pointed out in your direct testimony, your business partner, correct?
A That's correct.
Q Take a look at the next item there. Can make quick decision. Do you see that?
A Where should I look on that? I'm just –
THE COURT: Under number 1. Bullet point, the bullet points.
THE WITNESS: Okay. I see it.
BY MR. DONOHUE:
Q Did Mr. Knight explain to you that there was a time factor to making a decision regarding this transaction? You had to make a quick decision?
A No. The – the – at the time of my presentation and all, I viewed it as being either available for 1999 or for 2000, depending on when we concluded the transactions. But that didn't come up as a subject.
(Government's Exhibit Number 2353 was marked for identification.)

Page 166

BY MR. CROUCH:
Q I'm going to ask that you be handed what's been marked as Government Exhibit 2353.
A It's not in here?
Q You don't have it yet.
A Okay.
Q Mr. Zucker, Government Exhibit 2353 is an E-mail dated October 25th, 1999 by Mr. Robert Coplan to a number of different E&Y individuals, including Mr. Knight. If you'll see, his name is approximately about the third from the bottom. Do you see his name, Knight Carolinas?
A If that's him. I see Knight Carolinas.
Q Now, turn to the second page of the document. It says: Remember, we must sell and implement by November 15th. That leaves us only 15 business days after today. This will place a good deal of pressure on all of us to make this work well. So constant communication will be critical.
Now, in light of that statement by Mr. Coplan, does this refresh your recollection that, in fact, Mr. Knight told you that you're going to have to make a decision regarding this transaction by November 15th?

Page 167

A No. He never said any such thing to me.
Q Mr. Zucker, did it come up in your meeting with Mr. Knight as to whether the income that you were seeking to offset, whether it would be allocated to ordinary income versus capital gain?
A It didn't come up at the meeting. But that was a question as to they had the flexibility in the structure to allocate between ordinary and capital. And I think we chose 60/40.
Q But you're saying it ultimately came up but not at the meeting, correct? Is that your testimony?
A I have no recollection of it ever coming up in our meeting.
Q Mr. Knight, you mentioned, explained to you the sequence of steps. Do you recall that?
A Yeah. That's correct.
Q Take a look again at Government Exhibit 2353, the first page.
A 2353. Okay.
Q This again is Mr. Coplan's E-mail. And in the first paragraph, he states: We have decided to allow each area the opportunity to make two presentations of the COBRA strategy to

Page 168

eligible targets. Therefore, you should determine for each of your areas who are your two most likely purchasers of the strategy among your eligibles within the short time allowed, taking into account factors such as the need to have lawyers or other advisors sign off, the client's risk profile, et cetera.
Did Mr. Knight mention to you that there was limited to each geographical area of E&Y only two targets?
A No. He never mentioned anyone else. As far as I was concerned, he was just talking to us about a strategy that Jim and I could be involved with. I had no idea of anything else.
Q You mentioned in your direct testimony that he did explain the steps of the transaction, correct?
A He did.
Q Take a look again at Government Exhibit 155, paragraph 4.
A 155, 4. Okay.
Q Notice it says: Present idea to client using client version of PowerPoint slides posted to toolkit.
A Uh-huh.

Page 169

Q Do not leave marketing materials with client under any circumstances.
A Right.
Q Did Mr. Knight, in making his presentation to you, use any type of visual aids?
A He did not.
(Government's Exhibit Number 2352 was marked for identification.)
BY MR. DONOHUE:
Q Let me ask that you see what's been marked as Government Exhibit 2352.
A Is this one you're going to give me?
Q Yes. This is one I'm asking be handed to you. And if this works seamlessly, it shortly will be.
A Okay.
Q Mr. Zucker, you've been handed now what's been marked for identification as Government Exhibit 2352. The first page of this document has the word C-O-B-R-A. Currency Options Bring Reward Alternatives. Have you ever heard of that name before. COBRA?
A I – the first time I heard it was not the day of the presentation but in the follow-up

Page 170

communication that same week. And they used it as a reference term. But I did not know until this litigation that it was an acronym that stood for something. And it was not used at our meeting.
Q At your meeting that –
A The presentation, the word – the acronym or its – this other information underneath it, for which it stands, was not used at the meeting.
Q Mr. Zucker, just like your counsel, I'm going to ask you to let me finish my question.
A I'm sorry.
Q I started off with at your meeting and you cut me off.
A I'm sorry.
Q So –
A I'm sorry.
Q Just so the record is clear, at your meeting, is it your testimony that Mr. Knight did not mention the term COBRA?
A To my recollection, it was not brought up until I saw it in written form subsequently. Not – not at the meeting.
Q Now, take a look at this document. This is a PowerPoint slide presentation of the COBRA

Page 171

transaction.
A Right.
Q Have you ever seen this document before?
A Not other than you having shown it to me before, no.
Q Take a look at what's on Bates stamp number – and I'm referring to the right-hand corner – 1561.
A 1560. 1561. Yes.
Q Okay. Now you'll notice there, first is step 1, option contracts. Even though you didn't see this particular visual aid, am I correct that Mr. Knight did explain to you that, in fact, this transaction involved the buying and selling of options?
A No, no. For sure he did, yes.
Q And he indicated to you, am I correct, that the purchase of these options would be done through an entity which you referred to earlier in your direct testimony as an LLC? Am I correct?
A Yes.
Q Now, take a look at the next page of the document.
A Uh-huh.
Q Which is Bates stamp number 1562.

Page 172

A Yes.
Q Did he also indicate that upon the single-member LLC, your single-member LLC, purchasing the option transactions, that they would, in turn, be transferred at a short time later to a partnership?
A Yes.
Q And so he did refer to the fact that, in connection with this transaction, there would be a need to form a partnership, correct?
A Yes.
Q Okay. Now, turn to the next page of the document, step 3, investment.
A Step 3. Okay. The pages are stuck. All right.
Q Did – am I correct that Mr. Knight did explain to you that the term of these options was 30 days?
A No. No.
Q Well, did he explain to you that, if you wanted tax benefits in the current tax year, you would need to, in fact, execute and have the term of the options close before the current tax year? Did he explain that to you?
A He didn't actually bring it up in the

Page 173

meeting. But it was clear from his overall presentation that the timing of when the tax benefit, as you call it, that would take place and the conclusion of the transaction in terms of my making an earning would depend on the timing of the conclusion of the options contract and when they were ultimately contributed, yes.

Q You were aware, were you not, that in order for you to receive any tax benefits in the current year, 1999, you would need to in fact have the options closed out before the end of the year. You're aware of that?

A Right. If I had wanted it to be in '99 versus 2000, it would have to have been concluded in '99.

Q Now, were you aware and did he explain to you that if you wanted ordinary – an offset against ordinary income, you would have to purchase – your partnership would have to purchase currency? Did he explain that to you?

A I don't – I think he specifically asked, if you're asking for my recollection, he specifically asked about what currency I thought would be stable, because we were going to have a diversified portfolio which would include

Page 174

currency. And that was the comment I had made earlier, in the earlier testimony about suggesting the Canadian currency.

Q If I recall correctly, you ultimately did purchase through the partnership –

A I did.

Q – Canadian currency, correct?

A That's correct.

Q And did he mention to you, if you wanted a capital loss, you would either have to make a contribution of securities to the partnership or have the partnership purchase securities? Did he mention that?

A Not in the form of your question. He said that as part of the overall strategy that we would end up with a diversified portfolio that would include buying the foreign currency and the purchase of capital securities.

Q But did he make it clear that, if you wanted a capital loss, that is a loss that you could offset against capital gains, you would need to have a capital asset and either purchase it or contribute it to the partnership?

A Not the way you've asked the question. Only what I said previously. He said that we

Page 175

would have a diversified portfolio which would include the contribution. And he asked if we had some long-held assets. And I told him I had plenty of positions that were long that could be contributed. And –

Q And by long, you mean a position that, in fact, had a – a holding period on your part of something longer than one year, correct?

A That's correct.

Q And ultimately, am I correct, that you did transfer to – ultimately to your partnership, you did transfer Cisco stock, am I correct?

A That's correct, yes.

Q And I believe you ultimately transferred 4,500 shares of the stock; am I correct?

A I believe that's correct, yes.

Q And Mr. Boyd ultimately transferred 500 shares of the stock, correct?

A That's correct. But his was short-term.

Q And you read my next question. Your holding period for your stock was greater than one year, correct?

A Yes.

Q And his was in fact less than one year, correct?

Page 176

A Yes.

Q Now turn to the next page of this document, which is Bates stamped number 1564. Now, did he explain to you that as part of this transaction, it would be necessary for you and Mr. Boyd to transfer your partnership interest to a Subchapter S corporation? Did he explain that to you?

A He described the structure of the transaction that included that, yes.

Q And did he explain to you that the effect of your transferring your partnership interest to a Subchapter S corporation would cause a termination of the partnership? Did he explain that to you?

A Yes. That's something I recognized anyway. But yes.

Q And did he also explain to you that, in addition to the partnership being terminated, that the partnership would be liquidated with assets in the partnership being distributed to your Subchapter S corporation?

A That's what would ordinarily happen with a contribution of partnership. He – he probably mentioned it. I can't specifically remember that.

Page 177

But he went through the structure verbally, yes.
Q And if you turn to what's been marked as – on Bates stamp number 1565, you'll see step 5. You'll see a reference to the distribution where the partnership liquidates and distributes its investments to the S Corp. Then did he explain to you that the next step of the transaction was is that the S Corp would sell the assets that were distributed to it as part of the liquidation of the partnership, and by virtue of the sale, would realize either a capital or an ordinary loss? Did he explain that to you?
A He generally described the contribution of the assets. Jim Boyd fully understood because he had used previous – you haven't asked the question – a real estate analogy where he talked about the precedent that had been established previously in the court. Jim Boyd lit up, he said, you know, that's – you can't have it both ways. You can't have it as part of the basis and/or not part of the basis. And since they'd already ruled that an unmatured liability would not be included as basis, Jim understood it clearly. And I frankly felt very comfortable with

Page 178

what had been presented.
He went through – did not go through these pictures at all. None of this stuff was present. But he verbally went through the concepts of the structure.
Q And did he also make clear that the loss, whether it be capital or ordinary, would have to be – in order for you to take some benefit from the current tax year, all of this would have to be done, including the sale of the assets, in the current tax year?
A No. He – he didn't – he basically described the fact that we were going to have this diverse portfolio, that it would involve – he talked about what it would involve. And he said that under the proprietary structure that they had in mind, that they would be able to allocate between ordinary and capital. But he didn't go through precisely what you're asking. But –
Q Maybe my question wasn't clear. And I apologize if it wasn't. But my question is did he also explain to you, once the assets of the partnership were in the S Corp, that – and those assets were sold, they would have to be sold in the current tax year, 1999, in order for you to

Page 179

realize tax benefits from the transaction? Did he explain that to you?
A He didn't explain it. But I understood it myself. And certainly Jim Boyd, who is much more expert than I ever would dream to be, you know, understood.
Q Mr. Knight, am I correct, he is a tax professional at E&Y? Is that correct?
A I can't really tell you. I don't – I don't know. He presented himself as representing Ernst & Young at that meeting. It's the first time I had ever met him. So – I hadn't subsequently met him other than that occasion. I can't really tell you as to his – I knew he was employed by Ernst & Young.
Q Is it fair to say you knew he wasn't an investment analyst for –
A No, he was representing Ernst & Young.
Q Right, but do you understand what I mean by investing analyst? He wasn't a person that you would necessarily go to for investment advice. He wasn't in the investment analysis –
A I can't tell you what his credentials are.
Q You have to wait until I finish the

Page 180

question.
A I'm sorry.
Q He wasn't in the investment analysis side of E&Y; am I correct?
A As I told you, I don't know. I just know that he was representing Ernst & Young at this meeting. And he was apparently part of their tax, you know, department. That was the only – you know, I had not met him before that day of the meeting.
Q Now –
A So I don't know about his credentials.
Q At that meeting, am I correct that he did not provide you, other than the fact that there would be the opportunity to invest in option transactions, he did not give you any further details regarding these option transactions?
A He went through the concepts of – and I certainly had done enough currency trading to know, you know, I could make a buck at it. I'd certainly done that previously.
So I understood exactly, you know, how I could make money in calling it directionally. I understood the sweet spot. I still had not defined, you know, how wide it would be.

Page 181

So the basic concepts, you know, I fully understood in terms of the opportunity to make a buck. And he understood and Jim Boyd was right on top of his understanding of tax structure based on the precedent.

And I was – I was comfortable with Jim.

And Jim, you know – I was comfortable with the additional opinions we got. And you know, I – you know, I didn't – I didn't really need any further advice on the options.

Q Well, he didn't provide to you at that meeting what would be the premiums on the options, did he?

A No. But the magnitude of both the premiums on both the collection, the sale and the purchase were relevant to the magnitude of what I was willing to expose. And that hadn't been determined.

Q So as of the meeting, there had not been any decision as to what your risk exposure would be on the transaction?

A No. Not quite. You know, we had talked about 50 to $100 million being the amount of revenue that I – that I might have for offset. And the total of $8-1/2 million of capital. So

Page 182

that there would be a leveraged transaction. So I kind of zoned in that for $100 million size transaction, I would have 8-1/2 million.

Q And when you say 100 million – excuse me. I didn't mean to cut you off. Were you finished with your answer?

A Only to the extent that I understood the overall relationship and structure, so I knew that the relationship on my – the exposure on my options was going to be relevant to the amount of offset that I would be able to create. So if I was more willing to go to a higher amount of exposure, that I would have the higher opportunity both to make a profit as well as to create a tax offset.

Q And when you refer to a $100 million transaction, you're referring to a $100 million loss transaction, am I correct?

A Well, no. This is the total amount of exposure in terms of the – the capital. If you look at the notional amounts of the exposure on the options, and based on the structure they had explained to us in terms of the fact that each option contract would be – stand on its own, and that something that had an unmatured liability

Page 183

would not be included in the basis, I fully understood that a loss post the date of contribution would be an independent loss and not part of capital basis.

Q That – that was not, however, my question. My question is, when you refer to a $100 million transaction, when you use that term, you're referring to a $100 million loss transaction, am I correct?

A Not that I would generate $100 million in personal out-of-pocket cash loss; but, rather, I would be able to create an offset to revenue of $100 million.

Q Thank you. I was not clear. When I refer to loss, you're referring to a $100 million tax loss transaction, correct?

A An offset to my revenue, yes.

Q Okay. So Mr. Knight explained at that first meeting that your out-of-pocket cost for a $100 million tax loss transaction was $8-1/2 million; is that correct?

A You keep referring to tax loss. But, you know, kind of putting words in my mouth. But that for $100 million of revenue to be offset, that I would have an exposure of $8-1/2 million.

Page 184

Q All right.

A It's a leverage transaction.

(Government's Exhibit Number 177A was marked for identification.)

BY MR. DONOHUE:

Q Let me ask that you be handed Government Exhibit or Deposition Exhibit 177A. Now, Mr. Zucker, you've seen this exhibit before in your direct examination. But I'm not versed enough to know where – under what tab it is in your book. So I'm giving you a new one. But it's the same document you saw on direct examination. And am I correct that –

A Would you mind for my benefit giving me the reference number of the tab here.

MR. CROUCH: I think it's tab 1.

THE WITNESS: Okay.

MR. CROUCH: And, Your Honor, I'm not sure it's the exact same document, because there's writing – there's different writing on those two documents.

THE WITNESS: Okay.

BY MR. DONOHUE:

Q All right. Now, take a look – I notice

Page 185

just for the record that there appears to be a fax by line at the top. And your version of the same document. I don't see – at least on the top page – I do see it. So I'm not 100 percent sure where the difference is. But we'll use our version of 177 since they are marked identical. Take a look at the handwriting which is on the second page. Now, you've identified your signature, correct?

A On the second page. I don't have a signature on this. So I – you know –

Q Isn't your signature on the second page of the document?

MR. CROUCH: There's no –

THE WITNESS: There's no signature.

BY MR. DONOHUE:

Q On –

A The document that we used had my signature.

Q Okay.

A But this document – it's not the same.

Q I am so sorry. Take a look at the second page. There is no signature, correct?

A That's correct.

Q But there is handwriting which is on the

Page 186

top of the document. Please take a look at that.

THE COURT: I think I've lost you here. Mr. Donohue. What document are you looking at?

MR. DONOHUE: I'm on Exhibit 177A. The confusion was that I was referring to 177 instead of 177A.

THE COURT: Okay.

THE WITNESS: The documents are not the same. And I don't recognize this handwriting either.

BY MR. DONOHUE:

Q Okay. You do recognize Mr. Knight's signature, correct?

A Not by – not unless I match it up with something. I wouldn't recognize it, no.

Q And you are correct, on the second page you have not signed it, correct?

A No.

Q Okay. Now, take a look. I'm going to ask you to be handed what has been marked as Exhibit 177.

A Is it different from 177A?

Q That one is –

A Okay. The original 177. That was the one with my notes on it.

Page 187

Q Correct.

A Okay. Okay.

Q Now, if you turn to the second page of this document, you'll notice, I believe, you've identified your signature, correct?

A That's correct.

Q And could you read the handwriting right above your signature.

A Yeah. It says: $100 million – and then you had suggested to me the word is loss, and I can accept that – to be allocated 98/2 between the parties subject to clarification of second paragraph on first page. And then my initials.

Q So take a look on the first page. The date of this document is November 11th, correct?

A Right. The day after our meeting, yes.

Q And take a look, now, at the third paragraph on the first page.

A Yes.

Q You notice it says our fee for providing the professional services referred to above will be 1.5 million on the total investment in the partnership by you and the other individual or – with an S, in the amount of $7 million.

Do you see that?

Page 188

A Yeah. I see it.

Q And in the next sentence it says: *Investment in partnership equals cost of long option contract equal to 5 percent of desired loss.*

A Right.

Q Plus cash equal to 2 percent of the desired loss. Do you see that?

A I do.

Q Is that the first time that you had seen the term, desired loss?

A Yeah. I have not seen any of these percentages or – none of that came up in our meeting.

Q And what, am I correct, you're being told is that the amount that you would need on a $100 million loss transaction, tax loss transaction, is $7 million, correct?

A Well, the document speaks for itself. I would have to read through it. But what I noted, to coincide with our meeting, it would be a maximum for a $100 million transaction of $8-1/2 million. Which is what I noted in the margin.

Q Did Mr. Knight at the meeting explain to you that your out-of-pocket costs for the options

Page 189

would be based on 5 percent of your desired loss?
A No.
Q Did he explain that?
A Not at our meeting, no.
Q So this was the following day, November 11th. And did you – I notice the fax line up at the top is November 12th. Do you know when you received this document?
A It would have been – it was – it was the day after the meeting is when I got the communication. So it would have been the 11th.
Q So the day after the meeting, you became aware that your out-of-pocket cost for the options would be based on 5 percent of the desired loss. You became aware of that?
A It was the way it was drafted in here. But it didn't coincide with what was presented at the meeting. That's one of the reasons I noted and asked the question.
Q Then you'll notice it says plus cash equal to 2 percent of the desired loss. Did Mr. Knight at the meeting explain to you anything about cash that was required in an amount of 2 percent of the desired loss?
A No. These percentages, the first time

Page 190

they appeared was the day that I received the communication.
Q And so that is, am I correct, your note on the side. Could you read that note to us?
A It says maximum $8-1/2 million. 8.5 million.
Q And what does that mean?
A I just wanted to – to make it conform to what he had told me. I didn't actually add up the sums or calculate the percentages. But I wanted to make sure that for the $100 million transaction, that that represented $8-1/2 million of exposure, which is what he'd said at the meeting.
Q Now let me take a slight detour here.
A Okay.
Q Did you turn over this document to the Internal Revenue Service as part of your agreement to disclose all documents regarding the transaction?
A I frankly don't know. I mean, I directed that all files and information be submitted. And so I had no idea what was actually in the file folders. But I assumed that everybody, you know, followed my instructions.

Page 191

But I – I can't tell you.
Q Let's take a – I'm sorry. Go ahead.
A I mean, I directed everyone to do it. And they're competent people. So I assumed they all did.
(Government's Exhibit Number 170 was marked for identification.)
BY MR. DONOHUE:
Q Take a look at – and I'm going to ask that you be handed Exhibit 170. That's another document that you had – that were shown on your direct examination.
A Okay.
Q 170.
A Yes.
Q Now, am I correct that this document was the document that was prepared on your behalf by Ernst & Young?
A Yes.
Q And am I correct that this was your election to qualify for the Internal Revenue Service's penalty amnesty program?
A That's correct.
Q And if you take a look on the last page, I believe you've identified your signature.

Page 192

That's your signature, correct?
A It is.
Q Now take a look in the page before it. The last sentence on that page, it says we agree to provide, if requested, copies of the following. And you'll notice there are three paragraphs –
A Just so I'm following with you. Please refer me to where.
Q Yes. I am on Bates stamp number 2117.
A Okay.
Q And I'm reading the last sentence.
A Yes. I see it.
Q It says: We agree to provide if requested copies of the following.
A Yes.
Q Do you notice it says in A, B and C – and I won't read there, but essentially am I correct that, if requested, you were essentially agreeing to provide all transactional documents, all internal documents –
A Right.
Q – relating to the transaction, correct?
A That's correct. Yes.
(Government's Exhibit Number 171 was marked for identification.)

Page 193

BY MR. DONOHUE:
Q Now I'm going to ask that you be handed what's been marked as Government Exhibit 171. Now, this is a letter dated 4/30/2002, which is 10 days later from what's been marked as Government Exhibit 170 –
A Uh-huh.
Q – by Mr. Alan Moss, in which he's directing you and requesting you to provide documents. Do you see that in the first paragraph?
A Yes.
Q If you turn the page to Bates stamp number 1132, what you'll notice is is that he has simply quoted the paragraphs from your election letter of April 20th?
A Right.
Q Do you see that?
A I do.
Q Now, once you received – and did you receive this document?
A Yes.
Q Once you received it, what direction did you give to either E&Y or anyone on your staff to make available all the files and transactional

Page 194

documents with respect to this transaction?
A Well, at the staff meeting I said that anyone that had any files relevant to this, and gave them the topics and all, to please be sure to forward them, and it happened to be to accumulate them in the administrative assistants, and then to send it to my counsel.
And I certainly, and I had instructed similarly for Ernst & Young, just basically to empty our files.
(Government's Exhibit Number 173 was marked for identification.)
BY MR. DONOHUE:
Q Take a look, and I'm going to ask that you be handed what's been marked as Government Exhibit 173.
A I'm sorry. Oh, you're going to hand it to me. Okay.
MR. DONOHUE: Your Honor, we have been given the one-minute warning for the tape change.
THE COURT: Do you want to take a break?
MR. DONOHUE: Can we take a short break?
THE COURT: Yes. Right now?
MR. DONOHUE: Yes.
THE COURT: Okay. We'll take a break.

Page 195

10 minutes, so that would be 10 minutes to 3:00. So the court is recessed for 10 minutes.
(Whereupon, a recess was taken between 2:46 p.m. and 2:56 p.m.)
THE COURT: Mr. Donohue.
MR. DONOHUE: Thank you, Your Honor.
BY MR. DONOHUE:
Q Mr. Zucker, just before the break –
A Yes.
Q – you provided this answer: Well, at the staff meeting, I said that anyone that had any files relevant to this, and gave them the topics and all, to please be sure to forward them, it happened to be accumulated to administrative assistants, and to send it to my counsel. Do you recall that answer?
A Yeah. That was not correct. What I said is I wanted to get all of our stuff pulled together. And that I had already instructed Ernst & Young to provide all the information. And I assumed frankly that EY had copies of everything because they were the ones that were handling it.
Q I'm a little unclear.
A Counsel had not yet been involved at the time. So it was just a miss – I just misspoke.

Page 196

Q So is it your testimony that you directed your staff to accumulate all your files with respect to the transaction?
A I did. I asked that it be all put together in a file that would be available.
Q Well, did you direct them to provide it to anyone, that file?
A I had directed Ernst & Young to provide all the information that had been requested with the assumption that they had a copy of everything. And –
Q I'm a little unclear. Are you saying you directed your staff to accumulate all documents but not to turn those over to Ernst & Young to provide –
A No, no, no. I just – you know, this is – just to kind of put it in context, this is a number of years ago. So I had instructed everyone during this period of time, and some of it took place in, as you know, 2002. Some of it was relevant where we had questions like on the John Doe summons from Jenkens & Gilchrist, I told everyone just to be totally open with anything and everything that was requested.
And I had directed Ernst & Young to

Page 197

provide all the information that they had. And they should have had a copy of literally everything. And I'm not aware, you know, of any – anything that was being requested that in fact had not already been provided.

Q Well, are you – just so I understand your testimony, are you saying you assumed that Ernst & Young already had copies of all the documents in your files? Is that what you're saying?

A No. I'm saying that – if you look at the specific list, it says please provide us with. And it's got all the details of contracts and agreements and liabilities and so forth. And Kenny Hughes and Shawn Smith had indicated that they would handle all of the submission of the documents. I asked to get all of our documents together.

And, ultimately, when we ended up with the prosecution for this litigation against the government to try to get my refund, that's when I directed that everything in my office be turned over to my counsel so that they could in turn provide it to you as – in the case.

And I was just, you know, kind of

Page 198

confusing the point in time when I answered it earlier.

Q If you go back to, for example, the documents requested, am I correct, it also requested internal documents and memoranda. Am I correct?

A Yes.

Q And are you saying that you directed your staff to accumulate all the documents – let's first – that's your testimony, number 1, am I correct?

A That I told the people that anyone that had anything in this file, to go ahead and turn it over to – put it into a central file with Donna Hartin.

Q And then do what with it?

A It was with the ultimate purpose of being sent to the government, to the, in this case, the IRS. But with Ernst & Young, I'd also separately directed them to send and be fully cooperative in sending all of the information.

Q But you said, if I understand your testimony, it was for the ultimate purpose of having your files be sent to the government. Did you specifically direct anyone to send your files

Page 199

to the government?

A You know, I can't specifically say I remember those particular words, but – you know, frankly, I don't remember whether I specifically said directed to the government or not. I'd asked for it to be accumulated. And I had directed EY to send anything and everything in terms of being cooperative. And I asked that the – whatever we had that they wouldn't have be – be forwarded to – I can't tell you for sure. I can't tell you if I said EY or if I said the government. I just can't remember which specific words I used.

Q Mr. Zucker, I'm going to ask that you be handed what's been marked as Government Exhibit Number 173.

A Yes.

MR. CROUCH: I think we already have a copy of that. I think it's what she just handed out, wasn't it?

BY MR. DONOHUE:

Q Mr. Zucker, did you receive another document request from the Internal Revenue Service in connection with your agreement to disclose all documents?

A Do you have a document you can refer to?

Page 200

Q Yes. Government Exhibit 173. Do you see –

A Furnish in accordance with your – okay.

Q And am I correct that you did receive this document? Am I correct in that?

A That is correct.

Q Now, turn to the next page. There's a description of documents requested.

A Yes.

Q And it points out in the paragraphs, it provides, among other things, in paragraph 2, please provide a copy of all additional promotional materials presented either/or provided to the taxpayers concerning this transaction that have not been submitted previously.

Do you see that?

A I can. I do.

Q What did you do to ensure compliance with that document request?

A Just a communication at the staff meeting directing people to accumulate, to provide kind of a central repository. And then I know that we had – and you have to understand the way my office works. I know that we had two subsequent packages of information that we

Page 201

provided to the IRS.
(Government's Exhibit Number 174A was marked for identification.)
BY MR. CROUCH:
Q Okay. Let me ask that you be handed what's been marked as Government Exhibit 174.
A Yes.
Q 174A. I apologize.
A Okay. I also apologize for my decline in mental acuity.
THE COURT: It happens to me, too.
THE WITNESS: I'm sorry, sir.
THE COURT: It happens to me, too, in the afternoon. Perhaps if I had a nice big mocha frappuccino with a sugar buzz and a caffeine one.
THE WITNESS: Yes.
BY MR. DONOHUE:
Q Government Exhibit 174A is a letter from Ernst & Young dated November 19, 2002 to the Internal Revenue Service in response to document request number 3. Do you see that in the first paragraph?
A Yes.
Q Now, turn to Bates stamp number 1858. And you'll notice that this document – this

Page 202

letter, rather, is signed by Nelson A. Brooke. Do you see that?
A I do
Q And was Mr. Brooke acting on your behalf in connection with the disclosure of documents?
A Although I don't know Mr. Brooke, but he appears to be, yes.
Q And you'll notice that there's a cc of various individuals. And you're cc'd on this letter. Do you see that?
A That's correct. Yes.
Q Take a look at Bates stamp number 1874. Do you see that?
A Hang on a minute. Yes.
Q Now, this, among other documents that's being provided by Mr. Brooks, this is an unsigned copy of the November 11th, 1999 engagement letter. Do you see the second page of this?
A Yes. I see the unsigned page, 18 – marked 1875.
Q Now, if you go back to what's been marked as Government Exhibit 177A.
A 177A. 174A.
Q I'm sorry. Yes – I'm sorry. 177. Not 177A.

Page 203

A Okay. 177. Yeah.
Q Now, 177 is the same document that's signed and has your notes on it. Do you see that?
A You say it's the same as 1874?
Q Well, it's the same as pages 1874 and 1875.
A Except for the amendments and notes on it.
Q Correct.
A Yes. Or it appears to be.
Q Do you have any explanation as to why Mr. Brooke, acting on your behalf, is sending to the Internal Revenue Service an unsigned copy of the engagement letter without your notes? Do you have any explanation for that?
A I don't. I do know that we had a couple of packages that went from our office to the IRS office. But I don't know about this particular letter or why it's the unsigned edition.
(Government's Exhibit Number 2257 was marked for identification.)
BY MR. DONOHUE:
Q I'm going to ask that you be handed what's been marked as 2257.
A 2257. Okay.

Page 204

Q Now, Mr. Zucker, Government Exhibit 2257 was an exhibit that was shown to you in your direct examination. Do you recall that?
A I do.
Q And if you'll turn to the second page of that exhibit, there is a memo from you to Mr. Knight. Do you see that?
A Yes. The one that starts with the words, attached is an executed copy.
Q And then the next two pages is the same November 11th engagement letter with your personal notes. Do you see that?
A I do.
Q Now, Mr. Zucker, this exhibit was first turned over to the government last week at the deposition of Ms. Crosby. Can you tell us who Ms. Crosby is?
A Yeah. She's an administrative assistant in our office.
Q And –
A Although I don't know, by the way, that that's the first time that the government got it. Because we had a couple packages of bundles of information from our office that went to the IRS that – you know, separately. So, you know, I

Page 205

don't know that it's the first time.
Q I can represent to you, Mr. Zucker, that the government did not receive this document or the –
A The government as the IRS.
Q – including the IRS, until last week.
A Okay. That's entirely possible.
Q Now, take a look, again, at your binder.
A Yes.
Q At tab number 14.
A Yes. Uh-huh.
Q And you'll notice Exhibit P-6.
A Yes.
Q And look at the handwriting at the top of that page. Do you see that?
A Yes.
Q And that's your handwriting, correct?
A That's correct.
Q And in note 2 you'll notice that it says, Charlotte, please retain this original in our files.
A Right.
Q Who is Charlotte?
A Charlotte is the administrative assistant, Charlotte Crosby.

Page 206

Q That's the same Ms. Crosby whose deposition was taken last week, correct?
A That's correct.
Q And you're referring, in telling Ms. Crosby to retain this original in our files. What did you mean by the term, our files?
A Files in the office. That's how I generally refer to anything we do together, as our.
Q Your files of this transaction, correct?
A I mean, obviously in order to keep it organized, it would be related to the organizational topic. So – I don't do the filing. But, you know, she would file it in such a way that it could be found again.
Q Turn to your memo, which is the second page of Exhibit 2257.
A I'm sorry. Are we still in the tab or –
Q We are –
A Just so I know where to look.
Q – on Government Exhibit 2257. And we're on the second page of it.
A Where is 2257? I don't know where to look for it.

Page 207

MR. DONOHUE: Your Honor, may I approach the witness –
THE COURT: Sure.
MR. DONOHUE: – and see if I can help him.
THE WITNESS: Please.
BY MR. DONOHUE:
Q It's this document right here.
A Oh, okay. All right.
Q Now, take a look at the second page of Exhibit 2257.
A Yes.
Q In the first paragraph you state: Attached is an executed copy of the engagement letter.
A Right.
Q I have signed the letter and return it subject to you clarifying what information from me and/or the partnership you are relying upon and also confirming to me that I will in fact receive two legal opinion letters from your reputable firms.
So am I correct, number one, that some information had been given to you as to the fact that you would receive opinion letters from law

Page 208

firms in connection with this transaction?
A The answer is yes, apparently. In the – if you remember in the direct, I was asked that question. And, although I don't recall that ever having come up in our meeting, it apparently, between the meeting and the time of this, the subject did come up. And it would have been something that Jim Boyd would have been right on top of.
Q Could you read for us the second paragraph of this letter.
A Yes. Under additionally?
Q Under additionally.
A Additionally, I want you to confirm my understanding of paragraph 3. Reading of the paragraph suggests that my maximum exposure for $100 million loss is 8-1/2 million. If the actual cost is different from this amount, I would appreciate you informing me immediately.
Q What did you mean by a $100 million loss?
A That this was the offset transaction for the magnitude of the $100 million versus the range I had suggested to him of revenue that I would need to offset might be 50 to 100 million. And as

Page 209

you know, in the final agreement, it was not 100 million. It was actually reduced, you know, down to 50 on a 90/10 basis.
Q So you –
A So this was affirming what my understanding was at that time.
Q So you're referring to a tax loss, correct?
A I'm referring to the offset, yes.
Q And the last paragraph reads: Further, the document does not refer specifically to the $100 million loss.
A Yeah.
Q I assume this is in fact the number to be allocated 98/2 as per our discussion.
A Right.
Q Do you see that?
A That refers to the meeting, yes.
Q Now, did that make any difference to you that the engagement letter did not specifically refer to your $100 million loss?
A I just wanted to make sure that, you know, it had a bunch of percentages, and I wanted to make sure that I was only exposing $8-1/2 million as a leveraged transaction. And it was –

Page 210

it only referred to percentages so I couldn't really – it was not something that was the subject of our meeting. So I wanted to understand what it was being applied to, and did it coincide with my understanding.
Q Do you have any explanation as to how that memo did not get turned over to the Internal Revenue Service back in 2002?
A I have none other than to say that, you know, apparently there was some sort of a snafu. But I have no idea why not.
Q You are signing an engagement letter for a transaction that you were first presented with two days earlier. Am I correct?
A I'm sorry?
Q Well, this is dated November 12th, correct? Your memo? I'm on –
A Just so I'm on the same page, I don't – what are you referring to now?
Q I'm referring to Government Exhibit 2257.
A Okay.
Q And I'm specifically referring to the last page of the document. And it says – I'm sorry. It's not Bates stamped. I'll refer to it

Page 211

as page 2 of your engagement letter, which is the third – the fourth page of the document.
A One, two, three, four. It's the one that I signed and Ray signed?
Q Correct.
A I'm on that page.
Q You'll notice it's dated 11/12, correct?
A Yeah. It was received the day before, yeah.
Q So am I correct that you are signing an engagement letter for this transaction two days after Mr. Knight's presentation?
A Yeah.
THE COURT: I notice, though, that it says 1998.
THE WITNESS: That's a good catch. I didn't even catch that.
MR. DONOHUE: Your Honor, only a judge would notice that.
THE WITNESS: Obviously it's not the year – obviously it's not the year before.
THE COURT: Okay.
THE WITNESS: I didn't catch that.
(Government's Exhibit Number 1029 was marked for identification.)

Page 212

BY MR. DONOHUE:
Q Now, I'm going to ask that you be handed what's been marked as Exhibit 1029.
THE COURT: Caffeine and sugar. That's what does it.
THE WITNESS: Okay.
BY MR. DONOHUE:
Q Now, you'll notice that this is a letter dated November 15th, 1999.
A Uh-huh.
Q And it's unsigned. Do you see it on the second page? This is unsigned?
A Yes.
Q Did you ultimately sign an engagement letter which was dated November 15th, 1999?
A Well, I can't tell you that it was dated that date. But I definitely signed an engagement letter that was to pay Ernst & Young $675,000.
(Government's Exhibit Number 2338 was marked for identification.)
BY MR. DONOHUE:
Q I'm going to ask that you be handed what's been marked as 2338.
A Okay.
THE WITNESS: Your Honor, can I stand

Page 213

just for a moment?
THE COURT: Please. Do you need to take a break?
THE WITNESS: No. I'm actually – are we off the record? I'm doing better than I expected.
MR. DONOHUE: Did I say 22? 23. Let the record reflect I've asked for Exhibit 2338.
BY MR. DONOHUE:
Q I'm going to ask that you look at your own notebook –
A Yes.
Q – under your tab 3. And we so happen to have the same exhibit.
A Okay.
Q It's also Government Exhibit 1104.
A Yes.
Q Now, I have the same question. You – in your direct examination, you identified this document.
A Yes.
Q The same question I've asked with respect to other documents. This document was also not turned over to the Internal Revenue

Page 214

Service. Do you have a different explanation as to why this document wasn't turned over?
A I don't know. Were they in the same file? I don't know. Maybe the file got overlooked. I have no idea. You know, just all I can say is everybody got directed. So if it didn't get turned over until now, it got somehow overlooked. I don't know how.
Q Now, take a look at Bates stamp number 13 – I'm sorry, 1284.
A Where would I – oh, 1284. The same document. Okay.
Q You'll notice this is not signed. Do you see that? 1284 is not signed?
A Right.
Q Now, turn back to the first page of the document.
A Yes.
Q Now, there is a memo from Mr. Knight to you. Do you see that memo?
A You're saying the one that's marked 1282? Government Exhibit 1104?
Q Correct.
A Okay.
Q Now, in the second paragraph of this

Page 215

memo to you, it states: The equitable contribution and fee structure are as follows. Now, was it your understanding that Mr. Knight was replying to you in response to your letter or your memo respecting or regarding what was in fact the fee structure of this transaction? Was this a response to your earlier memo to him?
A I would presume so, because it says attached is a copy of the modified engagement letter. And he says two legal opinions from a reputable firm, the firms will be provided. So I'm presuming that that's the case.
Q Now, you'll notice here that it refers to the cost of the long option, 5 percent?
A Right.
Q Do you see that?
A Right.
Q If you turn to the next page, there is once again in the third paragraph, third line, a reference to the cost of the long option equal to 5 percent of the desired loss. Do you see that?
A I see where it says that, yes.
Q So you were aware at least on November 15th as to the fact that your net cost for the option transaction would be 5 percent of

Page 216

your desired loss; am I correct?
A I wouldn't couch it the way you said. But yes, the letter speaks for itself. That information was there. Although I told you that was the reason I asked him to confirm about the $8-1/2 million because, you know, that – it was never couched in percentages until that first communication that I had after the meeting. But, yes.
Q Now, take a look at the next item in this memo. It says cash injection to partnership 2 percent not at risk.
A Right. Which I didn't know that anything was not at risk. But –
Q I haven't asked you a question.
A I know. But yes, I see where it says that.
Q And my question is did Mr. Knight at the meeting point out to you that 2 percent of your desired loss would be – had to be injected into the partnership but would not be at risk? Did he point that out to you?
A No. He never pointed out percentages. And he didn't point out risk versus not risk. I presumed for a 100 million transaction

Page 217

that the entire 8-1/2 would be at risk. So, no, he didn't point that out at the –

Q If you turn the page, once again, to Bates stamp number 1312, the third paragraph.

A One – I'm sorry. 1312?

Q Right. In the third paragraph.

A Okay. I'm on the second page. All right. 1312.

Q The second page.

A The second page. But that document is marked. I see it. It starts with, in this engagement.

Q Well, in the third paragraph, third paragraph, it says our fee. Do you see that? It refers to in the second sentence, investment in the partnership equals cost of long option contract equal to 5 percent of desired loss plus cash equal to 2 percent of the desired loss. And did Mr. Knight or anyone else explain to you what this 2 percent was for?

A No. The communications at the meeting. I didn't have any clarification or need for clarification. I assumed Ernst & Young was fully competent to understand the structure they were proposing.

Page 218

Q But you're being told now that you're going to have to come up with cash equal to 2 percent of the desired loss; and it's not going to be at risk. Did you have any idea as to what this amount was for?

A No. Not other than that I was going to have an $8-1/2 million, which I thought was all at risk, for a $100 million transaction. So, no. This – you know, having money that would not otherwise be at risk, that sounds positive to me.

Q Now, notice in the next line it says E&Y fee, 1-1/2 percent. Do you see that?

A Yes.

Q So the fee that you were paying to E&Y on this transaction was equal to 1-1/2 percent of your desired loss, correct?

A That's what the letter says.

Q And then it says in the last line: Law firms and bank bill separately from E&Y 3 percent. So were you – by receiving this, you became aware that the law firms wanted for their fee on the transaction 3 percent of the desired loss, correct?

A That that's – that would be the basis

Page 219

of their fee structure, yes.

Q So when you received this, what was your reaction to the fact that you're now receiving a memo from Mr. Knight which has fees that are in addition to the $8-1/2 million that he mentioned at the meeting? What was your reaction?

A They're not in addition to. They're all inclusive.

Q What –

A In other words, if you add up all the sums of the monies, and if you exclude the, what he's calling it, not at risk, it's $8-1/2 million.

Q The 8-1/2 million –

A For the – for the 100 million. And it's scaled back by 50 percent.

Q We haven't got there yet.

A Okay.

Q But the $8-1/2 million, that is – was for a $100 million loss transaction, correct?

A Right.

Q So $8-1/2 million is 8-1/2 percent, correct?

A That's correct. If you're doing it as a percent.

Q So now, if you add up these amounts

Page 220

here, am I correct there is, instead of 8-1/2 percent, 11-1/2 percent, if you add up those amounts, am I correct?

A You may be. But 2 percent is not at risk. So it might be a variance of a percentage point.

Q 1 percent.

A Right.

Q So by the time you got this document which has been marked as Government Exhibit 1104, you had learned that you would have, instead of 8-1/2 percent at risk, you would have 9-1/2 percent at risk. Am I correct?

A Yeah. But on a – on a sum half as much, yes.

Q Now, that is referred to in the last paragraph of the memo, Government Exhibit 1104. Do you see that?

A I don't yet. 1104.

Q The last paragraph. First page.

A Back to the first page?

Q Yes.

A Okay.

Q It says the amount of the loss –

A Okay. Yeah. It's $50 million.

Page 221

Q The amount of the loss is $50 million.
60 percent ordinary loss and 40 percent long-term capital loss.
A Yes.
Q Do you see that?
A I do.
Q And he, am I correct, is now referring, instead of a $100 million loss transaction, to a $50 million loss transaction?
A That's correct.
Q So you had made a decision between the time you signed the first engagement letter, which was on the 12th of November, you had made a decision to, instead of a $100 million loss transaction, to engage in a $50 million loss transaction, correct?
A You keep using the term, but, yes, that's fine.
Q And where did Mr. Knight come up with this notion that the loss was going to be allocated 60 percent to ordinary and 40 percent to long-term capital loss? How did he come up with that?
A It would have been based on a communication during that period of time. I can't

Page 222

tell you that I specifically recall having discussed it. You know, it's possible that either I or Jim. I'm not really sure.
Q So between the 12th of November and the 15th of November, did you do any type of calculation or rough estimate as to what portion of an offset of ordinary income versus what portion of an offset of capital gain you would need?
A Not really as a percentage. But I knew that either in 1999 or 2000 or in that period of time, I felt very comfortable, in terms of the relative exposure of, you know, leveraging, it's a leverage transaction, so whether I, you know, put up, as you said, 9-1/2 million relative as a percent, 9-1/2 percent versus 8-1/2 million – but this was a 50 percent sizing. We had sized it down. Jim and I had some discussions with regard to the amount of capital that he had available versus myself. And although he ultimately ended up with a slightly higher dollar amount, that he became more relevant in the 90/10 split as opposed to 98/2.
So sometime in those intervening days, you know, based on the discussions that I had with

Page 223

Jim, we decided to size it down and to change the split between us.
Q Turn to the second page of Government Exhibit 1104, Bates stamp number 1312.
A I'm sorry. I'm not following where we are.
Q We are in the second page of the exhibit. We're at tab 3.
A I'm on tab 3. Okay.
Q Government Exhibit 1104. Second page.
A Okay.
Q Back to the third paragraph.
A Okay.
Q You'll notice that now –
A That's the paragraph beginning our fee.
Q Our fee. Correct. You'll notice now in the first sentence it refers to E&Y's fee not as a percent of the desired loss, but as $675,000. Do you see that?
A I do.
Q Did Mr. Knight at any time, or anyone else at E&Y, tell you that in fact we are not going to refer to our fee as a percent of the desired loss, but we would refer to it only as a fixed amount?

Page 224

A No. He never told me – we never had such a discussion.
(Government's Exhibit Number 2350 was marked for identification.)
BY MR. DONOHUE:
Q Take a look at – and I'll ask that you be handed Government Exhibit 2350.
Mr. Zucker, Government Exhibit 2350 is a template engagement letter of E&Y. And I'm going to refer you to the very same third paragraph that we have been referring to in Government Exhibit 1104. Do you see the third paragraph?
A I see the third paragraph.
Q It starts our fee.
A I see what you've handed me, yes.
Q And it notes in – that – it states:
Our fee for providing the professional services referred to above will be (insert amount equal to 1.5 percent of the desired loss to be generated. If the size of the transaction is not certain at the time this letter is signed, add "based on total investment in the partnership by you and other individuals, in the amount of blank million."
And my question is at any point in time,

Page 225

did any E&Y representative inform you that in fact it was a mistake to have provided you with a memo indicating that E&Y's fee was based on 1.5 percent of the desired loss? Did anyone ever point that out to you?

A No. It never came up. And we had no discussions on the percentage other than what I've already related to you today.

Q And that was not – and didn't have anything to do with the fact that this memo was not turned over to the Internal Revenue Service?

A I don't believe I ever had a memo like this. This doesn't look like something that I would have received.

Q No, I'm not referring to Government Exhibit 2350. I'm referring to Government Exhibit 1104, the first page, which has all those percentages –

A I would never have known –

Q Let me finish my question.

– that has all those percentages, including the percentage referring to E&Y's fees as being 1.5 percent?

A No

Q My question was, did anyone ever explain

Page 226

to you that, in fact, it was a mistake to have provided you with a memo showing that E&Y's fee was based on 1.5 percent of your desired loss?

A I don't know why it would be a mistake. But, no, nobody had such a discussion or any discussion of the sort. I – you know, I have many transactions that are based on percentages. I can't tell you how many times I've been hit with a Lehman formula doing business on Wall Street. You know, if you're familiar with the Lehman, 5, 4, 3, 2, 1 percent. Percentages are very common. Frankly I've been charged by the legal firms in New York on transactions not based on hours but based on size of transactions. So whether it's percentage or absolute dollars, it's the same money.

Q Have you ever had another tax transaction in which your fee was based on a percentage of the tax benefits?

A I've never had a transaction which I'm – knowingly would have been even viewed possibly as what you're now defining as a shelter. So I've not had similar transactions. All of the structural work that I've had done previously has always been paid for services based on the number

Page 227

of hours put into it by the accounting firms.

Q So this particular transaction was the first time in which you paid a fee based on a percent of your desired tax benefits?

A I never based anything based on the percentage of tax benefit that are – in these letters. I based it on what my risk/reward exposure was and the proprietary nature of what I was paying them money for. So whether it was a percentage or whether it was absolute dollars, it was the same dollars out of my pocket. So I never thought in terms of percentage.

Q You already have in front of you Exhibit 155. It's one of the early documents that I provided you.

A 177. 173. 171. 170. 174. 177A. What was it? 155?

Q 155.

A I found 155. Okay.

Q Keep that one out. We might come back to that.

A Okay.

Q Turn to paragraph 2.

A This was the internal document you were telling me about?

Page 228

Q Yes. And it says: Have client and client's attorney advisor, if any, sign E&Y nondisclosure agreement as well as separate J&G nondisclosure agreement. Did you ever sign any nondisclosure agreement with E&Y?

A No. And I was never asked to do so.

(Government's Exhibit Number 2342 was marked for identification.)

BY MR. DONOHUE:

Q I'm going to ask that you be given what's been marked as 2342.

A Okay. All right.

Q This is a template, a nondisclosure agreement for E&Y. Read this and tell me if you've ever seen this document before.

A I –

Q Or one like it?

A I've not. As I've said earlier, they've never asked me to sign anything. And they never discussed – they just, you know, they told me the transaction was proprietary to them. And I respect intellectual property, just as I expect those to respect my own intellectual property. So, no, I was never asked, and never seen this.

Page 229

(Government's Exhibit Numbers 2378 and 2379 was marked for identification.)

BY MR. DONOHUE:

Q And I ask that you be provided with Exhibits 2378 and 2379. I'm going to first direct your attention to Exhibit 2378.

A Yes.

Q This is a E-mail by Robert Coplan dated 7/17/2001.

A Uh-huh.

Q It's sent to a variety of E&Y professionals, including Mr. Knight. And if you'll notice the subject line, it refers to important, purge of all key COBRA documents. And then turn to the next –

A I'm sorry, where should I be looking?

Q The last – on the last page – I'm sorry, on the first page, the last line. Do you see where it says subject, important?

A Yeah

Q Purge of all key COBRA documents. It states, In an effort to eliminate unnecessary material from files, both paper and electronic, you are hereby instructed to

Page 230

immediately delete and dispose of any and all materials in your drawers and on your computers related to the COBRA transaction, other than documents related to the currency trades made by the client, and research done to assist in deciding on those trades, document – two, documents supporting the economic purpose and bona fide nature of the investment and the transaction, and, three, your copies of the opinion letters issued to the client

A Uh-huh

Q We have already removed such unnecessary items from the SISG tool kit such as slides, work plans, engagement letters, NDAs, et cetera.

A Yeah

Q I assume NDAs is nondisclosure agreements?

A Yeah

Q Mr. Zucker, my question to you is: Did anyone from E&Y ever inform you that they had received an instruction to delete and destroy all COBRA files –

A No.

Q – in connection – in connection with the transaction other than those that are listed

Page 231

here?

A I can't imagine – I can't – no. No. They wouldn't have shared such – if they did such things, they certainly wouldn't have shared them with me. I can't imagine why in my case that they would do anything, because I think everything we did was exactly as per the regulations.

Q Now, take a look at Government Exhibit 2379.

A 2379. I see it.

Q And if you'll turn to the second page, you'll notice that Mr. Coplan on 7/17/2001 points out, on the second page, he states at the top: Based on some information I just received from our general counsel's office, I must ask you all not to purge any COBRA documents to the extent you have not already done so already. If you need further information about this, I can provide it. In the meantime, please maintain those files as they are. So my question here is: Did you ever receive any information from anyone from E&Y saying that Mr. Coplan's purge order had been rescinded or revoked?

A I never heard anything about either.

Page 232

No. I had no knowledge of any of this sort of stuff.

Q Let me turn to a different subject. Let me ask that you be handed Exhibit 1053.

A Yes.

Q Now, this Exhibit 1053, Mr. Zucker, you testified in your direct testimony on. Am I correct that you received this fax from Jenkens & Gilchrist on November 26, 1999?

A You know, if I could see the ones that I actually signed I could verify they're the one and the same.

THE COURT: The very bottom here.

THE WITNESS: I'm sorry.

THE COURT: The date is at the very bottom on the left.

THE WITNESS: Right. That coincides with – that's correct.

BY MR. DONOHUE:

Q If you recall, you did say that in your direct testimony?

A No, no, I recognize the basic contents. But yes.

Q And you point out – I'm sorry. It's pointed out in the fax, it says: Please execute

Page 233

the attached documents and send me a copy by fax. And then if you'll turn the page, there is a place for your signature, but there's a blank in terms of the amount.

A Yeah.

Q Did you ultimately sign your name and leave the amount blank?

A I would presume that I probably did because, I'll be frank with you, most of the transactions I do, I sign and they're filled in after the fact. And I've never had any, you know, questions of integrity with any of the firms. But I can't specifically recall without actually looking at a document. But I probably did.

Q Take a look at the next page. And in the next page, it points out: Please note from the attached assignment that the option positions in the above-referenced account have been assigned to JBJZ Partners, account number 2221015-10, effective as of November 24th, 1999. Do you see that?

A I do see it.

Q Am I correct you were being asked to sign that document referring to an assignment that took place on November 24th, correct?

Page 234

A Yes

(Government's Exhibit Number 1061 was marked for identification.)

BY MR. DONOHUE:

Q Take a look at – and I ask that you be handed what's been marked as Government Exhibit 1061

A Yes

Q And you'll notice that the first page of Government Exhibit 1061 is a fax page. And it bears the InterTech Group fax symbol. Do you see that?

A I don't see a fax symbol.

Q Do you see –

A I see where it says from Charlotte Crosby, who works in the InterTech office, to Donna Guerin at Jenkens & Gilchrist. That's not a fax – you're talking about just our logo, the InterTech?

Q Your logo. I stand corrected. Your logo

Take a look at the from. You mentioned it's from Charlotte Crosby. Am I correct your prior testimony is Ms. Crosby worked for you at InterTech, correct?

Page 235

A For me and others, yes.

Q And you previously referred to the fact that she, in fact, had files in connection with the transaction, correct?

A You know, she was – she – I can't tell you if she personally had files. But apparently with her, you know, deposition she had some other files that, you know, that did not – you know, based on the information you provided, were not provided.

But she apparently had other files. I know we had central files and other files that individuals kept. And she certainly was keeper of files.

Q Now, turn to the second page. And there is a letter by Ms. Crosby to Ms. Guerin of Jenkens & Gilchrist. Did you know who Donna Guerin of Jenkens & Gilchrist was?

A No.

Q It says, dear Ms. Guerin: Enclosed please find the executed documents which were faxed to Mr. Zucker and Mr. Boyd on November 26th, 1999 regarding the above-referenced matter. Do you see that?

A I do.

Page 236

Q Now, turn the page and go to Bates stamp number 919.

A They apparently aren't sequential. Let's see, 910.

THE COURT: I can't find it either.

THE WITNESS: 912.

BY MR. DONOHUE:

Q It would be – take a look at the top right. And it will say page 02/16. Does that help?

A 02 –

Q No, that won't help.

A I'm just looking at the bottom. It's the Bates number, you said?

Q It is 919.

A So just give me a second to flip through the stack.

MR. CROUCH: It looks like it's the 12th page in.

THE COURT: Is it? I found it. Yeah.

THE WITNESS: I have to tell you, as I say, my acuity is going down here. I don't see 919. I'm sure it's here. Count 12 pages in?

BY MR. DONOHUE:

Q Yeah. In fact, if you go up at the top,

Page 237

it is the 12th page because there's a fax symbol for the 12th – at the very top. Do you see that?
A I'm now going – I see page 10.
THE COURT: Top right, you'll see number 12.
THE WITNESS: All right.
THE COURT: It's the fax. Overlay.
THE WITNESS: Okay. I see page 12.
MR. DONOHUE: That was a lot of work to get to this one letter here.
THE WITNESS: I'm sorry.
THE COURT: That's quite all right. Do you see at the bottom it's 919?
THE WITNESS: I see at the bottom it says 919, yes, sir.
BY MR. DONOHUE:
Q Now, am I correct that this is the signed version of the letter that was sent to you earlier by Ms. Guerin, and which you have now signed the document. Am I correct?
A Yes.
Q And Ms. Crosby is now sending this and other documents back to Ms. Guerin, correct?
A Yes.
Q And once again, if you look at this, you

Page 238

have left blank what the amount should be, correct?
A Yes. It's very common for me, yes.
Q Now, turn the page. And you'll notice on the next page, I'll refer to this as Bates stamp number 903, that here you have signed the assignment of the option position document. Do you see that?
A I do.
Q And that's your signature, correct?
A It is.
Q Now, you mentioned that one of the steps of this transaction was is that the options would be transferred from your individual LLCs to the partnership, correct?
A That's correct.
Q And the name of the partnership I believe was JBJZ Partners? Am I correct?
A Yes
Q And did Mr. Knight explain to you that that contribution of the options to the partnership was essential for your tax basis position? Did he explain that to you?
A There are all kinds of reasons for forming it, including the diversification and

Page 239

consolidation. But among the reasons is it was going to be a tax efficient structure. So it was necessary, as he had explained to us at the meeting, to contribute the partnership itself into the S Corp.
Q And did he explain to you that your basis in your partnership would be based on simply the premium for the long options without regard to the premiums that you received on the short options which offset the amount that you would owe? Did he explain that to you?
A Not that it offsets. But that it would not be included in the basis, because the – it had a maturity date that's beyond the date of contribution. And he annualized – he basically provided in the meeting an example of real estate in terms of the ruling that a contingent liability or a liability that had not yet matured couldn't be included in the basis.
And, you know, accordingly since it had already been made in the ruling. So the answer is, yes, I understood that – I understood how fundamentally conceptually the structure worked to be compliant with the regulations.
Q What I was referring to when I said

Page 240

offset, for your options, you had to pay a premium on the long option, correct?
A Yes, I did.
Q And you received a premium on the short option, correct?
A I sold an option, yes.
Q You received a premium on the short option, correct?
A That's correct, yes.
Q And so when it came time to pay an amount to the Deutsche Bank, you paid the net amount between the two, correct?
A The answer is effectively yes. But there were separate transactions. But it's typical in terms of limiting credit exposure.
Q I understand. But my question is in terms of the amount you paid to Deutsche Bank, it was based on the net of the premium that you owed to the Deutsche Bank and the premium that you received from the Deutsche Bank; am I correct?
A Right. That's in pretty much all derivatives. If I do derivatives that are even offset or not offset, but where one is being sold and one is being bought, it would be – the banks won't let the money go until they've taken their

Page 241

cut and vice versa. But, yes, effectively it gets netted.
Q So did Mr. Knight explain to you that for purposes of your being able to get a tax basis in your partnership interest, you needed to make a contribution of the options to the partnership? Did he explain that to you?
A I think I've said that several times, yes.
(Government's Exhibit Number 2360 was marked for identification.)
BY MR. DONOHUE:
Q Now, I'm going to ask that you look at what's been marked as Government Exhibit 2360.
A Is this in this same package?
Q No. It's coming.
A Okay.
Q Mr. Zucker, if you want to take a break, let me know.
THE COURT: Do you want to take a break, Mr. Zucker?
THE WITNESS: I'd just as soon continue.
BY MR. DONOHUE:
Q Mr. Zucker, this is a table of both your and Mr. Boyd's options. And am I correct that

Page 242

the – all of the options that you and Mr. Boyd purchased all had a 30-day term?
A These aren't correct, what you've got shown here. But they're somebody's.
Q I'm sorry?
A You know, I don't recognize these – the numbers in here as being my own, other than the 1.0121 at the bottom, and the 1.0123. You've got call and puts at 102.65 and 104.40, and I don't know whose those are. But I see some components in here that may be relevant. The bottom on this is relevant.
Q We can check the confirmations if you think they're wrong. I can assure you, though, they are right.
A I think you're wrong.
Q Well, let's first start with the premium
A The option pairs at the top are not mine.
Q When you say the top, are you referring to –
A I'm talking about when you look at underlying currencies, it shows the Japanese dollar and US. But the spot rates are not correct

Page 243

spot rates.
Q When you say spot rates, are you saying 104.40?
A 104.40 and 102.65.
Q Well, ignore those for the moment.
A Oh, okay. You're talking about – you just want me to look at the – what the strike prices were for each?
Q Right.
A Those appear to be correct.
Q Look at where it says long options and short options. Do you see that?
A I see the long and the short, yeah.
Q Look under columns 1 and 2. Your premium for your long option, am I correct, was $25 million, correct?
A Yes. That's correct.
Q And the payout on your long option was $50 million, correct?
A Payout would have been 50. I can pull out the individual contracts, but that's correct.
Q At some point –
A Although I don't see – you don't have those shown here. Oh, I see where you've got the payout. I'm sorry. Go ahead.

Page 244

Q And take a look at the short option. The premium for that is $23,750,000, correct?
A That is correct, yes.
Q And so am I correct that the premium for the short option offset the amount you owed on the long option?
A You know, if I need to keep couching it in your terms, it was done by the same bank. It is the practice of the bank to not let cash out until such time as they received their compensation. So, yes, to the extent that at the end of the day it's the net amount that counts, that's the amount you net have at risk and net premium, yes.
Q So the net amount for your Japanese yen/dollar options was $1,250,000, correct?
A You're combining it with Jim Boyd's as well?
Q No, I'm referring to simply the net option premium at the bottom of column 1. Do you see that?
A I see. And if you've done the calculations, that would be the case. I – okay.
Q And then if you look for your dollar/euro options, you owed a premium of