# GOVERNMENT EXHIBIT F (PART 2/2)

Page 245

$20 million. You received a premium of 19 million.
A That's correct.
Q So you owed $1 million, correct?
A So, yeah. If you – on that basis, yes.
Q And your share of this $50 million loss transaction was 90 percent, correct?
A Including Jim's, yes.
Q Well, Jim's was 10 percent, right?
A No, no, but I'm saying of the total, of the total, yes, that's correct, we had a 90/10 split.
Q So 90 percent of 50 million is 45 million, correct?
A That's correct.
Q So if you recall, your engagement letter said that your investment for the options was 5 percent of your desired loss. Do you recall that?
A I recall the letter, yes.
Q And 5 percent of $45 million, am I correct, is $2,250,000?
A If you've calculated it, that would be correct.
Q And in Mr. Boyd's case, his share of the

Page 246

loss transaction was 5 million, correct?
A Right, the 45/5 for the 90/10.
Q And 5 percent of $5 million is $250,000, correct?
A That's a correct calculation.
Q Now, you had a fair amount of testimony regarding the confirmations. Did you read the confirmations when you received them?
A I did review the confirmations.
Q But not in any detail; am I correct?
A Well, I don't know if you're correct or not. I just – you know, I just – I just know my normal practice. My tendency is to skim things. I've never had issues in terms of fiduciary integrity. So I probably did these as well. But I can't tell you the extent of the detail that I looked over them.
Q You mentioned in your direct testimony the Black-Scholes model.
A Yes.
Q Is the Black-Scholes model a mathematical model that allows you to calculate what the value of an option is?
A You can if you have – if you have data that's reasonable and appropriate. There's the

Page 247

Garmen model, which is more generally appropriate for use in currency trading. But – but, yeah, you can – the Black-Scholes will work. And it gives you a good indication of, you can use – use it for calculating both probability as well as value.
Q Okay. That was my next question. You can also use the Black-Scholes mathematical model, or a variant of it, to calculate what your probability of payoff is; am I correct?
A Yes, you can.
Q You need certain information, however, to make these calculations; am I correct?
A Right.
Q Among the information you need is the volatility of the currency, correct?
A That's correct.
Q Now, did you make any attempt, once you made a decision to purchase this transaction, to calculate what your probabilities of payoff were for either your Japanese yen/dollar or your euro – dollar/euro currency transactions?
A I did.
Q And did you make an attempt to determine what were the various information that you would

Page 248

need in order to make that calculation?
A I'm fairly knowledgeable of that, and the answer is yes.
Q And what did you calculate to be the probability of payoff for the long and the short options, both being in the money or paying off?
A Actually, I addressed that earlier, but if you want me to go through it again, I will. As I had mentioned, the data is so scattered there isn't really a good correlation in the data. So depending on the data set you use, if you use the most recent trading activity versus longer base, you – you come up with a slightly different answer. The actual probability on – the euro ironically produced a higher probability of positive outcome, only because it was based on a more limited set of data. It's ironic because we only had under a year's trading activity to refer to. It ended up with a higher probability of outcome.
But if you – depending on which data set you got, you got anywhere from high teens to as much as 60 percent. But you know, I figured it was pretty much about a toss of a coin on each of the outcomes. And the probability of hitting the

GOVERNMENT EXHIBIT F 2/2
PENGAD 800-631-6989

Page 249

sweet spot, as I've mentioned earlier, is pretty much the product of the probabilities. So depending on which set of assumptions you want to use, if you used 50 percent, then it would be 50 percent times 50 percent times 50 percent, the number of occurrences that have to occur at the same time.

And if you used the lower end of the spectrum and you said it was in the 20-some-odd percent, then it would be, again depending on what values you want to use, it's just multiply them times each other. And that gives you the effective probability.

But, you know, it becomes a, you know, a single digit to small double digit kind of a number, depending on base case versus most optimistic case for finding the sweet spot.

THE COURT: Mr. Donohue, if you've finished your line of questioning, I would like to take a break.

MR. DONOHUE: Your Honor, this would be a perfect time.

THE COURT: All right. Let's take a 10-minute break. 10 minutes after.

(Whereupon, a recess was taken between

Page 250

4:05 p.m. and 4:16 p.m.)

THE COURT: Mr. Donohue, will you give us an idea of how long this will take.

MR. DONOHUE: Your Honor, I would say 2-1/2 to 3 hours.

THE COURT: Oh, wow.

Mr. Zucker, is it possible for you to come back tomorrow?

THE WITNESS: I would have to make special arrangements to do so. I guess it's possible. I - you know, I'll do whatever it takes. My preference would be to continue being here. My daughter and new grandchild are, ironically, in Charleston right now. I would like to at least see them for a day. She's only going to be there until tomorrow evening. But, you know, I'll do whatever is necessary.

THE COURT: You can last for 2-1/2 to 3 hours?

THE WITNESS. If I have to, I will. I'll need to just make some changes in flight arrangements at our next break say after an hour or so. I'll make a few calls to make changes in the flight arrangements.

THE COURT: Mr. Donohue, what do you

Page 251

prefer to do? Do you want to go tomorrow?

MR. DONOHUE: Your Honor, I think, given our situation, whatever Mr. Zucker wants to do, that would be our preference.

THE COURT: Okay. Mr. – well, Mr. Crouch?

MR. CROUCH: Whatever Mr. Zucker wants to do, Your Honor.

THE COURT: Okay.

THE WITNESS: I'll just do what – I'll try to stick – I'm – the fact that I'm doing as well as I am right now, I take this as a blessed day, and I'll go ahead and continue.

THE COURT: It is remarkable I have to say. I think I'm more tired than you are. So let's continue then.

MR. DONOHUE: Thank you, Your Honor.

BY MR. DONOHUE:

Q Mr. Zucker, I am not clear as to what range of probabilities you calculated for both options paying off, the option you bought and the Deutsche Bank's option that you sold to them. What was the range of probabilities?

A Depending on the dataset that we used, they ranged anywhere from high teens, 18 to 20-ish

Page 252

percent, to as high as 60 percent. But it just depended on the particular dataset whether you looked at more proximate or you looked at more outreaching.

So at the end of the day, they're pretty much calling in the money. It was about a 50 percent shot just based on statistical methodologies. And the balance was more intuitive based on the sense of the market and directionality.

And although, as you know, we made 1,875,000 on the euro, we didn't make our premium break on the yen. I wished I'd called that properly, but I didn't.

Q Let's go back to Exhibit 2360. Do you have that? That's the table in front of you.

A 2360, yes.

Q And you previously mentioned that the premiums that you owed to the Deutsche Bank would, in fact, be offset by the premium that the Deutsche Bank owed you. Do you recall that testimony?

A Well, I wouldn't couch it in those particular words, but those were your words, yes. They were netted at the same institution. So that

Page 253

would be an internal offset.
Q And am I correct, again, looking at, for example, table 1, column 1, that if, in fact, both your long option and the Deutsche Bank short option were both in the money, that, in fact, that the payout that you would receive would be offset by the payout that, in fact, the Deutsche Bank would receive? Am I correct?
A That is correct.
Q So that you would ultimately out of that receive a net payout, correct?
A In fact, that's what happened. I got 1-1/2 million and Jim got $375,000 which were the net payments from each of those euro transactions.
Q So, for example, if we look at the payout for the first column for the Japanese yen, that payout is 50 million, correct?
A That's 50 million, right.
Q And if you look at for the short option, which is the option you sold to the Deutsche Bank, that payout is 46,875,000, correct?
A That's correct.
Q So if both options are in the money, that would mean that you would receive the difference between the 50 million and the

Page 254

$46,875,000, correct?
A That's correct.
Q Now, the – I mentioned if both options are in the money.
A That's correct.
Q Did – did you – and you mentioned that you can use this mathematical model of either the Black-Scholes or a variant of it to calculate probabilities. But you can also use it to calculate what is the value of the option, correct?
A Right.
Q Did you make any attempt to calculate what the value of this option was?
A Well, the relative value is really the payout ratio. And I felt that, you know, anything in the order of 50 percent was reasonable. So I didn't really go through, you know, detailed calculations because the currency markets and the volatility is such that it doesn't – you know, the Black-Scholes works much better on equities than it does on currency. And the Garmen really wasn't a very relevant structure for this use. So I had a choice of, you know,

Page 255

developing a – a lot of empirical data. And I didn't want to go through the trouble of doing that.
Q So is the answer to my question you did not make an attempt to value the option?
A No. That's not correct. I just told you I did my estimates. I just didn't use the Black-Scholes methodology that purpose because I felt that it – it was inherently, not terribly meaningful. You know, but the ratio in terms of what my payout was and what the Deutsche Bank's payout was was relevant. And I felt that being able to make what came out to be $3,750,000 on calling the currencies directly, and that was the net payout was in premiums, was adequate, that was, you know, well in excess of all I had at risk plus including my fees.
Q Well, for example, am I correct, if we look at the Japanese yen in column 1 for $25 million, one would expect, if you did a calculation of the value of that option on the date you purchased it, that the value would be somewhere around $25 million? Am I correct?
A You can – you can approximate it at

Page 256

that. And I say that, assuming the – the equity of the exchange rates, that was a fair deal, yes.
Q Did you at any point in time learn that, in fact, these options by the Deutsche Bank had been overvalued? Did that – at any point in time, did you learn that?
A No. I never learned that they were overvalued, no.
Q Did you learn that they were undervalued?
A No. I didn't learn either.
Q What attempt did you make to determine if the net premium you were paying on the transaction was, in fact, a fair net premium?
A I used my own experience and acumen. The – you know, nothing other than that.
Q Did you do any competitive price shopping to determine if this net premium that you were paying on these options was a fair price?
A I felt it was in the right ballpark for the – for the net value of what I could earn by calling it in the money. And I felt confident in being able to call it in the money.
Q How ordinarily are options priced? In other words, how does the dealer, in fact, make a

Page 257

profit on options ordinarily?
A He takes a risk spread differential. Or he often will have an offsetting customer, you know, a customer out there where he'll distribute his risk so that he minimizes his own internal risk.
Q Are you referring to, essentially, the difference in the bid and ask prices?
A Often it's bid and ask. And other times, it can be within the same institution. It doesn't have to be in the market itself. It can be within the market within the institution.
Q And the -- am I correct the -- if you recall your earlier testimony, what you were paying for net premium on the options was based on 5 percent of your desired loss, correct?
A If you want to couch it in those terms. I did not -- I did not consider it nor go through the calculations that were relevant to percentages.
Q Have you ever paid, for any other option/transaction that you engaged in, a premium on the transaction based on a percent of a desired tax loss?
A No. I mean, you know, I do plenty of

Page 258

currency trading. It's based on the particulars of the transaction. It happened that those mirrored, you know, the valuations associated with the options. But, you know, that's -- it wasn't -- it wasn't relevant that I was negotiating with him separately. You know, we -- I'm sorry.
Q Did you assume -- when you became aware of what the Deutsche Bank's net premium was, did you assume that they were building into this net premium a fee on the transaction for their participation in the transaction?
A No. I wouldn't have assumed that. I would have assumed that they would have priced the options to make a profit. But I -- you know, that's normal for anyone in the business.
Q You mentioned the sweet spot. Could you define for us what the sweet spot is?
A Yeah. The sweet spot is where I'm in the money, and the bank isn't.
Q All right.
A That's very simply. And since we're both calling the same direction, it was the difference in the strike points for the -- for them going in the money since they were

Page 259

directionally the same as my own going into the money. So just that -- that spread in the strikes between us, that would be the sweet spot.
Q Okay. So if we -- if we go back to the table, which is Government Exhibit 2360, and, for example, if you look at the Japanese yen in column 1, do you see the strike prices --
A Yes. That would --
Q -- for the long option and the short option?
A I do. So the sweet spot would be the couple bibs -- couple pips in between the 106.19 and the 106.21. And in the case of the euro between the 101.23 and the 101.21.
Q Now, what is one pip? You mentioned this before in your direct testimony.
A Yes. It's -- it's 1/10,000 of a spot rate, which is, generally speaking, the lowest common unit of currency pair exchange. And it's kind of -- I'll give you an analogy. It would be analogous to a basis point when you're talking about interest rate or yields which would be one-hundredth of 1 percent.
Q I'm going to ask that you be provided with Government Exhibit 2370.

Page 260

A 2370. Where is --
Q You don't have it yet.
A To be provided. I'm sorry. Will you allow me one --
Q Certainly.
A Okay.
(Government's Exhibit Number 2370 was marked for identification.)
BY MR. DONOHUE:
Q Now, you'll notice there are some calculations of what the two pip spread is for both your dollar/euro and your Japanese yen/dollar option pairs.
A Right.
Q Notice that it refers to a pip is point -- I'm looking first at the dollar/euro, is .002.
A Yeah.
Q Am I correct that that would be either 2/10,000 of a dollar or 2/100 of 1 cent; is that correct?
A That's exactly what I told you a moment ago. It was 1/10,000 of the spot rate and/or analogous to 1/100 of a percent of a basis point. So if you're doing it on the dollar side

Page 261

as opposed to as doing it on the euro side, that's – that is correct.

Q Now, did you make – now, I believe you said you did in your direct testimony – a calculation of what your probability would be to hit this two-pip spread? Did you make a calculation of that?

A I answered that before. It's the – it's the multiplication, depending on a set of data you choose, as to how low do you want to get it.

If you assume the likelihood of each event for, you know, for a total of six, you know, you have six different events, three different discreet events, it's the product of each of those assumed probabilities happening at the same time. It's just the product.

So if you assume it to be, you know, 50 percent, then you multiply it times 50 times 50 times 50. If you assume it to be 20 percent, then it's 20 percent times 20 percent times 20 percent or other – you know, other components. It becomes a small percentage as I had said earlier.

Q What I believe you said at the deposition the probability of hitting the sweet

Page 262

spot was 16 percent. Do you recall that testimony?

A No. I said, if you made the assumption that the 40 percent was the – was the probability of an event occurring, then you wanted to know – of two events occurring, then it would be 40 percent times 40 percent, which is 16 percent. I was using it as a – as an analogy as to how you do the calculation just as I am now.

Q Okay. But what did you calculate the probability was of your hitting the sweet spot on either of your option pairs?

A I didn't need to hit the sweet spot. I would love to hit it. But if I were to hit it, it was a very small percentage. It wasn't necessary for me to go through the intellectual effort knowing that I only had a – a nominal spread range so that it would be a small percentage hitting the sweet spot.

But my likelihood of making a great return on my investment was very good just by just simply calling the direction of the currency and not hitting the sweet spot. If I hit, it was a home run. It was like entering a lottery. If I hit the sweet spot, I made, you know, 90 plus

Page 263

million dollars.

Q And what do you call small percentage?

A You know, I can go through the intellectual calculation with you, but it's a small percentage. It's – you know, it's a single digit percentage that would likely occur for such a narrow band.

Q Am I correct that, to calculate the sweet spot, you would simply take the probability of hitting the long option and subtract that probability from the probability of hitting the short option? On the Deutsche Bank –

A It doesn't work that way because – especially with currency. Simply because, when you're dealing with currency, there is no normal curves as you would expect. And even if you use the Black-Scholes model, it assumes normality. It assumes a normal bell-shaped distribution. And currency just simply don't work that way.

If you're using a normalized distribution, that would approximate it. But, in this case, that's not the case because the potential for either of us hitting approximately the same, whatever calculations I did for myself would be of the same calculations as for the bank

Page 264

save and except a very, very tiny differential, and if you use that differential, simply because we had a different strike price for each of them. So if we calculated and used your approach, and if we said that the probability of my hitting it was 51 percent and the probability of them hitting it was 50 percent – and I'm being arbitrary – then, based on your theory, it would be 1 percent using that basis of calculation.

And I'm saying that, if I take the probability of both occurrences at the same time, that I can take the product of those probabilities, and it's actually a lesser number. So, you know, which set of data do you want to use? It's up to you. It's a low number to hit the sweet spot. But then it would be like hitting a, you know, lottery jackpot, but still being able to take a free lottery ticket because, you know, I already had a good investment that could make me, you know, a substantial return, you know, almost two point – $3.8 million. It was $3,750,000 if I just called the currency directions right. And I did call the currency directions right for the euro. I mean, I made 1,875,000. I wished I had done exactly the

Page 265

same on the yen. Shame on me. I mean, I - I thought I called it right. And the vagaries of the market moved it in the wrong direction.

Q Mr. Zucker, are you aware that you retained expert witnesses in this case who have calculated what is the probability of hitting the sweet spot? Are you aware of that?

A I'm not aware of the particulars. I know that we will have experts in this case.

Q But you're not aware that they calculated the probability of hitting the sweet spot?

A I have not -

Q Let me ask that you be given exhibits 2371 and 2372.

(Government's Exhibit Numbers 2371 and 2372 were marked for identification.)

THE WITNESS: Who is Don Chance?

BY MR. DONOHUE:

Q That is your - one of your options experts in this case. Are you aware of that?

A No. I mean, I knew that experts would be brought in from, you know, your side and ours. But no.

Q I just have the relevant pages of his

Page 266

report. But if you turn to page - the second page of the exhibit. And you'll notice -

A That's the one marked page 32?

Q Yes. The one marked page 32.

A Uh-huh.

Q And he points out in the last paragraph, he says: Recall from material included earlier in this report that options are at and out of the money - that are at and out of the money have relatively low probabilities of profit, but any such profits that do occur tend to be large. Each of these transactions would return a profit of 50 percent if the low profit is achieved. The high profit (or sweet spot profit) is related to the initial premium by a constant factor. This profit is 30 times - 39 times the premium. I estimated the probabilities of achieving this high profit. The figures slightly vary from contract to contract but are all less than .3 percent. Now, is that what you meant when you said a very small percentage?

A I wouldn't have put it that low. But, you know, depending on the set of data that you use, that's a very - you know, I say single

Page 267

digits is what I thought is a combination of probabilities. But he's speaking for just the sweet spot.

Q Yes.

A Right.

Q And that's what we're talking about.

A This is the product of - product of those probabilities. I would not have put the sweet spot. But, you know, that's making 90 to $100 million is a big number. When I, you know, fundamentally got into the transaction, I'd love to hit the sweet spot. But even if I didn't, I'm still making an enormous return on my investment.

Q Take a look at Government Exhibit 2372.

A Yeah.

Q This is relevant pages of an expert report by Alan Hess. Are you aware that he's another one of your options expert?

A No. As I already answered, no.

Q Take a look at the next page, page 19?

A Yes.

Q Now, for example, do you see -

A He ended up with percentages similar to the calculations that I had given you for myself. If you recall, I said high 18s to - for me over

Page 268

60 percent. And I told you that the - ironically, the Japanese yen/US dollar showed a higher probability than - simply because there was less data ironically. Yeah.

Q One second. Let me direct your attention to page 19. And do you see where he refers to empirical probability that payout will occur in column F?

A Yes.

Q And do you notice it refers to first option 22.5 percent by 7 percent?

A Yeah. Ironically, the ones he predicted the lowest percentage on is the ones that I succeeded in.

Q And do you notice in the second option he - that's - the second option, am I correct, that's referring to the Deutsche Bank's option? It shows the probability -

A Right.

Q - of 22.34 percent. Do you see that?

A I see what it says. And it's consistent with what I told you; that to calculate the difference in the probability of my happening and their happening was relatively close because we were both going directionally the same.

Page 269

Q So if you subtract the probability of – your probability of being in the money for your option from the Deutsche Bank's probability of being in the money for their option –
A Yeah.
Q – wouldn't that difference provide you with the probability of hitting the sweet spot?
A If you recall in my prior answer to you, that is one way to approach it. And if you're using the normalized distribution, as he's tried to do – as he's trying to do, you could end up with that being one answer.
You know, it happens that currency correlations are not good. And that can't be used as an absolute. But it's a low number. You know, I'm not suggesting – he's suggesting by doing that it's about .3 of 1 percent. But let me ask you, who wouldn't ask for $100 million or $50 million, in my case, 90 to $100 million jackpot with – that's great odds.
I mean, if you look at the statistics on getting involved in the lottery, that's a wonderful opportunity to buy – get a free lottery ticket considering that I've already got a great potential to make a profit completely independent

Page 270

of hitting the sweet spot.
So it's a low number. Whether you use that approach or you use the approach of the probability – multiplication of the probabilities of each event happening, it's a low number.
Q And if you recall, Mr. Chance's probability was .3 percent. And now I believe it's Dr. Hess' – yes, it Dr. Hess' –
A .3 percent essentially.
Q – is also essentially 3 percent.
A Using your subtractive approach.
Q You have to wait –
A I'm sorry.
Q – until I finish my question.
A I'm sorry.
Q So if, in fact, you take his probability also of hitting the sweet spot by subtracting the probabilities, you would also get approximately the same type of percentage number as Dr. Chance, correct?
A Based on using that approach, that's correct.
Q Now, at the time that you were making a purchase of these options, did you seriously consider that you had any real chance of the sweet

Page 271

spot being hit by you by any of your options?
A Did I seriously have a chance?
Q Yeah.
A Sure. Sure I had a serious chance. But more important to me was just calling the direction of the currency right. And if I had done both of them right, you know, I would have made almost $3.8 million. I only called one of them right, which made the 1,875,000.
Q Let me –
A That was the primary focus. The rest of it was going to be a bit of a chance.
Q But we're – let me ask that you be given what's been marked as Government Exhibit 2375. It's simply the confirmations that you've already testified to previously, but I have it marked as a different Exhibit Number.
A Okay. Yes.
(Government's Exhibit Number 2375 was marked for identification.)
BY MR. DONOHUE:
Q Now, am I right that there is a difference between a bid and ask price? Am I correct on that?
A Do they exist in the market? Sure.

Page 272

Q So a spot price for a currency will have a bid price and an ask price, correct?
A There'll generally be thousands of them that are factored in, but yes.
Q And the difference between these spot prices may be – between the bid and ask may be greater than two pips. Isn't that possible?
A It's possible, yes.
Q And, in fact, isn't that normally the difference? Isn't it normally a difference of greater than two pips?
A During the course of the day, it's wildly different, yes.
Q Did you make any attempt to determine for purposes of a Deutsche Bank at the expiration of your options, determining what the spot price was if your – if their determination was going to be a bid price or an ask price?
A No. The – well, the ones that I was clearly in the money, I was so far in the money on, there really wasn't any point to argue it.
And I had, in fact, gone back and looked at, you know, what were the trading prices, where did it open. And I was so far out of the money with regard to the yen, there really wasn't much

Page 273

point. It wasn't a matter of arguing about a few pips, you know. I really had called that one way wrong.
Q But my question is not directed to whether you're in the money for both options or out of the money for both options. It's whether you made a determination for purposes of hitting the sweet spot if the Deutsche Bank spot price was based on a bid or ask price.
Did you make any attempt to determine whether the spot price for the Deutsche Bank, when it – at the expiration of your options was going to terminate, if you would be hitting the sweet spot, if their spot price was a bid or ask price?
Did you make such a determination?
A If you allow me in context, because it will lead to the wrong conclusion, the answer is there was no need because we were so far out of the range.
I did, in fact, check to see, you know, what the opening bids were in various markets for that day. So I did have those. Because we were so far out of the range, there wasn't a need – if we had come in within a few pips of where we had called it, then, believe me, I would have been

Page 274

down them, you know, very quickly to say, you know, I want to see the open book, you know, as to what transacted that day so we see whether or not we had a reason to quibble.
But we weren't close to the point of where it was, you know, it was a quibbling because we were so far – I was so far removed from that sweet spot that there wasn't a point.
Q Mr. Zucker, my question doesn't involve what you did after the expiration of the options.
My question –
A I'm talking about for determination of that option on that date.
Q Mr. Zucker –
A I'm sorry.
Q – you have to wait until I finish my question.
A Okay. I'm sorry.
THE COURT: We'll go faster that way.
THE WITNESS: I'm sorry.
BY MR. DONOHUE:
Q Much faster.
A I'm sorry. Your Honor.
Q My question has to do with, at the time you entered into the transaction, you purchased

Page 275

the options.
My question is: Did you make any determination at that point in time on purchase as to how the Deutsche Bank was going to determine the spot price for purposes of whether or not you would hit the sweet spot?
A As I think I testified in my direct earlier, we had agreed that whatever is the opening bid was, that they were going to mark it down for the – as it relates to the euro by 10 pips and 12 pips respectively for the strike prices for us and for – for me speaking for myself and Jim Boyd, and 12 pips down as it related to Deutsche Bank against the opening bid.
And that's how we set the strike.
Because we didn't know if we were going to close on the November 22nd or the 23rd. So we pre-agreed that. And I did ultimately verify, you know, where the openings were for that day.
There was no way that he would make any difference what he functionally locked into because, you know, there was – there was no way for him to predict whether we were going to be in or out of the market to such a fine degree.
Q Mr. Zucker, it's getting late in the

Page 276

day.
A I'm sorry.
Q I don't think you understand my question.
I'm not asking you how you determined the strike price on the date or prior to the date you entered into the options.
Take a look at –
A We said opening bid.
Q Take a look at Government Exhibit 2375.
Take a look at that.
A I'm looking at it.
Q Now, take a look at, under, for example, section 2. It's the second to last paragraph. Do you see where it says: If the spot rate is? Do you see that language?
A You're on the second page?
Q On the first page.
A On the first page. Okay.
Q I am on the second –
A If the spot rate is on the first rate determination.
Q Yes.
A Okay.
Q Now, my question has to do with did you

Page 277

make any determination as to how the Deutsche Bank was going to determine the spot rate on the expiration of the options?
A We said the opening bid at precisely 10:00 a.m. So whatever they had on their book that was entered at 10:00 a.m. So it would be the opening bid for that time.
Q Do you see any reference to that language in the confirmation?
A Yeah. It says 10:00 a.m. First determination date of 10:00 a.m. local time New York. Yeah.
Q But it says "of the spot rate". How was the Deutsche Bank going to determine the spot rate?
A I can tell you that my agreement with David Parse was that it would be the -- the opening bid at 10:00 a.m.
Q But --
A So --
Q -- was that incorporated in the confirmation?
A Well, apparently not if -- I'm reading it right now and it doesn't -- it only refers to the spot rate. But, you know, that -- we didn't

Page 278

get close to having to argue over it.
Q If you take a look at -- take a look at the second page.
A Yes. Yes.
Q Do you see in paragraph A, at the bottom, a reference to the calculation agent?
A That's correct.
Q And it says that the calculation agent --
A Acting in good faith.
Q -- acting in good faith -- I'm having a hard time reading it -- considers that it would not be commercially reasonable to take into account.
Who was the calculation agent?
A Alex Brown Deutsche Bank.
Q I'm going to ask that you be given what's been marked as Government Exhibit 2369.
A Okay.
(Exhibit Number 2369 was marked for identification.)
BY MR. DONOHUE:
Q This is an internal Deutsche Bank E-mail from Tom Tahl to Craig Brubaker. In the course of any of your conversations with anyone at the

Page 279

Deutsche Bank, did you speak to Craig Brubaker?
A No.
Q Notice what the E-mail says. It says the calculation agent is the Deutsche Bank.
A Right.
Q The calculation agent is clearly specified in the trade confirmation documents. In the event of any question you might have as to the rate that the Deutsche Bank set, the practice we follow, which is industry standard, is as follows: We poll five interbank FX participants at 10:00 a.m. on determination date for this -- their spot FX dealing rate. Deutsche Bank chooses one of those rates in a specific price on or within that quote. The counterparties we use are: Chase, Citibank, Union Bank of Switzerland, Morgan Stanley, Barclays. For example, this morning, Wednesday, August 2nd, 10:00 a.m., their respective dealing quotes in dollar Japanese yen were. And it gives a list of those institutions. And you'll notice that it gives -- for each one, it gives both a -- it gives two quotes. Do you know what those two quotes are? Am I correct those are the bid and ask price?

Page 280

A They're probably bid and ask, yeah.
Q And you'll notice what it says there is Deutsche Bank chose to use the Barclays quote and our determination rate today was 109.06. Were you aware at the time that you entered into this transaction that this was the procedure used by the Deutsche Bank for determining what the spot rate would be at the expiration of an option transaction?
A Well, it's inconsistent with the discussion I had with Davis Parse. So, no.
Q And did you -- when you received the confirmation, did you review that confirmation and notice that it was inconsistent with your conversation with Mr. Parse and say, Mr. Parse, this is not what we agreed to? Did you do that?
A No, I didn't. You know, frankly, I've never had any reason to question the fiduciary integrity of any of these large institutions. I had no reason at the time to look at it in such miniscule detail as you've now done. But, no, I did not question it.
Q Am I correct that banks like the Deutsche Bank that, after they enter into a option transaction, they enter into a hedge to protect

Page 281

themselves? Do you know whether that's true or not?
A As I discussed with you earlier, it can be both internal offset, as you say, hedges, or it can be laying off a risk. They would like to distribute their exposure. So depending on concentrations of position, they may or may not.
Q Am I correct that, normally, at least on the bank's part, where they try to make their money is in the difference between the bid and ask prices? Isn't that normally where they try to make their money on these transactions?
A Not necessarily. They can have numerous customers. And they can make, you know, money off the spread of customers laying off effectively the risk by selling positions to customers that are offsetting. So it's one of the ways they can.
Q And in order to actually simply limit their exposure on the transaction, once the bank entered it into one of these off – these option transaction, they would enter into a hedging transaction to essentially mirror with offsetting terms the transaction they entered into. Isn't that normally how it's done?
A That's one of the many ways that it can

Page 282

be done. That is one of the many.
Q Did you ever inquire as to whether the Deutsche Bank, in fact, entered into a hedging transaction to protect themselves in the event that there was going to be this huge lottery payout? Did you ever make an inquiry as to –
A No. I –
Q Let me finish my question.
A I made no inquiry.
Q You have to wait until I finish my question.
A Okay. I'm terribly sorry.
Q Did you ever inquire of the Deutsche Bank as to whether they entered into any type of hedging transaction that would have protected themselves in the event that there was a lottery payout? Did you make any inquiry about that?
A I did not. Deutsche Bank is a big bank. I wouldn't be worried about whether they hedged or not.
Q I'm going to ask that you be given what's been marked as Exhibit 2362.
(Government's Exhibit Number 2362 was marked for identification.)
BY MR. DONOHUE:

Page 283

Q Now, do you recognize this table of the – to reflect what were the payouts on your and Mr. Boyd's options?
A Well, somebody's put together a table that shows the transactions as if they're all been pre-netted, you know. So the – if I looked at each of the combinations as being pre-netted, this table looks right.
Q Okay. And I'm going to ask that you be given what's been marked as Exhibit 2363.
(Government's Exhibit Number 2363 was marked for identification.)
THE WITNESS: Let me just say it would have been better if this table had been shown as each of the discreet options rather than netting everything out. It kind of obscures the money. It only shows a net of having made 625,000 when, in fact, we did much – much better in terms of the individual transactions.
BY MR. DONOHUE:
Q We're getting to that.
A Okay.
Q But if you look at 2363, this is a summary of the fees that were paid on the transaction. And if you look under your name, it

Page 284

has a list of – for your LLC fees of – that were paid to Ernst & Young, two amounts to Jenkens & Gilchrist and one to Brown & Wood. Does that appear correct that your fees totaled approximately $2,025,000?
A I don't know that that number is right, but it's the right order of magnitude.
Q And on your option positions, you'll notice in row 6 and 7 it has what the net premiums were. And does that appear correct to you that your net premiums were approximately $2,250,000?
A Again, in magnitude, that all seems correct.
Q Because if you, for example, multiply 4.5 percent, which represents E&Y's 1-1/2 percent, and the legal fees of 3 percent, if you multiply 4.5 percent times 45 million, you would get the total of $2,250,000 plus $2,025,000. Am I correct?
A If you've calculated it correctly, then you're correct.
Q Okay. Now, I'm going to ask that you be given what's been marked as Exhibit Number 2364.
(Government's Exhibit Number 2364 was marked for identification.)

Page 285

BY MR. DONOHUE:
Q Now, this takes into account, Mr. Zucker, this table, not only your net premium amount, which is in row 2, of $2,250,000, if you subtract simply that amount from your payout of your options, which is $2,812,500, does that give us the number that you previously testified to as to what you said was your profit on the transaction?
A Well, you've kind of co-blended so many things in here. In terms of the actual transaction we made on the euro 1,875,000, I had an offset of premiums of 1,250,000 using your offset concept, which left a net of 625,000. So you then have to look at, you know, in terms of what I paid in fees.
So if you've presented them in list form here correctly, then it would be correct.
Q And after you take into account your fees on the transaction, am I correct that you lost roughly about $1.4 million on the transaction?
A If that's what it – if what the calculation comes out to, then that's – that would be correct. However, had I called both –

Page 286

just the directions of my options correctly, I would have, you know, well more than doubled the cost of all the fees and all the premiums and everything combined completely apart from hitting the sweet spot.
Q Now, when you make a calculation –
A Yeah.
Q Let me strike that question. When you make a determination as to whether a financial investment is or is not for you a suitable investment, do you do a calculation of expected return?
A I do at times. It depends on the nature of the investment and if it's – if it's something that's akin to this, I probably wouldn't. But, you know, I felt highly likely it was a win-win for me in terms of the approaches that I said earlier. I had a terrific opportunity to make a good profit and, as well, to provide a material offset to my revenue.
Q How would you calculate expected return for the options transaction?
A In this case?
Q Yes.
A Well, you know, I would have to look at

Page 287

it separately as I did. You know, I looked at what did I feel my likelihood of calling the options correctly. I felt it was very good that, you know, I would be able to, you know, better than double all of my exposure, including all fees, you know, in terms of just calling the directions right. And shame on me I only got half the equation. I didn't get both halfs. But –
Q But would you simply take the probability times the present value of the payout, and that would give you essentially your dollar amount of expected return?
A Could I use that as one method for general investments? Yeah.
Q And if you wanted to actually get a rate of return, you would simply then take that dollar figure and divide it by your cost, correct?
A That would give you a rate that's over a very limited life in this case. But, yeah, that would be – that would be one approach.
Q So did you make any attempt at the time you entered into this transaction to determine whether your expected rate of return on this transaction was positive or negative?
A I didn't need to. I mean, it was

Page 288

intuitive. I felt highly confident that I would at least call the directions of the currencies correctly and that I would more than – more than double all of my risk exposures including fees. And that if, God willing, I would hit the sweet spot, I would have a jackpot.
Q But is the reason that you didn't need to is because you had a $50 million tax write-off on the transaction and so you didn't have to worry about whether or not you, in fact, had a positive or negative expected return? Isn't that the reason you did it?
A I certainly factored in the ability to preserve additional capital. But it was secondary. I – I went after making a profit and really doing well.
Q Let me ask that you be given what's been marked as government Exhibit 1032.
(Government's Exhibit Number 1032 was marked for identification.)
THE WITNESS: Yes.
BY MR. DONOHUE:
Q Mr. Zucker, Government Exhibit 1032 is a draft. It appears to be part of a legal opinion. And there is handwriting on the first page. Do

Page 289

you recognize that handwriting?
A I do. That's mine.
Q Could you read us what that says.
A It's addressed to Barry Emerson. Barry, attached is a draft of the opinion letter re the year-end activity resulting in $45 million tax loss. Please accelerate your understanding my discussing with Ray Knight of EY, et al. I would like to proceed on an accelerated basis for a tax refund.
Q Mr. Zucker, this was another document that was not turned over to the Internal Revenue Service. Do you have a different explanation or the same explanation as to why this document wasn't turned over?
A Well, this would not have been in my files. This was a – you know, given to Barry. And I probably just noted it on and he – he had it in his file. I frankly never even thought to call Barry to ask Barry to go through his file. So if EY or somebody else did that, I frankly never even thought to call Barry because, you know, Barry just was doing the filing of the 1040.
Q Well, maybe I'm mistaken, but I thought Mr. Emerson was the point person in terms of

Page 290

making sure all the documents were turned over to E&Y.
A No, he – he coordinated on my behalf and did all my filing of my 1040. But we relied pretty much on Ernst & Young to actually do as they had committed in their fee level, and that was to take us through all of the necessary actions and so forth to provide – so, you know, Barry certainly, you know, was in contact with Ray Knight or indirectly involved. But I don't specifically recall – I can't – I can only speak for myself. I don't specifically recall calling Barry to say, if you have anything in your file that's not contained in other people's file, you know, directly. That just didn't cross my mind. Maybe it should have, but it didn't.
Q Well, just so I understand, was Mr. Emerson the point person for turning over documents from your staff to E&Y –
A Barry is not on my staff.
Q Was – let me start again. Was Mr. Emerson the point person for contacting people on your staff – I know he's not on your staff, but was he the point person for

Page 291

contacting people on your staff to make sure that the documents got to E&Y that – so that they could be turned over to the Internal Revenue Service? Was that his function?
A No. If I ever created that impression, it's a misimpression. But no. I mean, Barry was my CPA that did the filing of my 1040s. But I directed my staff to do so and to accumulate the information. I didn't direct Barry. And maybe I failed to think to call him at the time, but I – I didn't.
Q Mr. Zucker, this note refers to the fact that your – there's a draft of an opinion. Do you know who gave you this opinion?
A Well, I know I got it after the close of the year. So it would have been in the beginning of, you know, the first quarter of 2000. It probably would have – probably – I can't tell you. I don't know. But it probably would have come from Ernst & Young or something like that. I'm not – I'm guessing. I don't know.
Q Well, if you're guessing, are you also guessing in terms of when you received it? You said –
A No, no. Of that I'm certain because

Page 292

even my language in here refers to the past, not that we will be receiving. It's would or will be. It doesn't speak in terms of something that's going to happen but something that has happened.
Q Barry, attached is a draft of the opinion.
A Yeah.
Q Other – is that other?
A Letter. Opinion letter.
Q Letter.
A Re.
Q Opinion letter re.
A The year-end activities resulting in, which to me is in the past participle. It's resulting in a 45 – not that it will result or that it will result in or whatever. It's not – it's not couched in a future.
Q Were you aware –
A It's also my recollection as well.
Q – that –
A If you recall in my other deposition, you had asked me if I remember writing a note to Barry. And I remember I even told you that I didn't know this document was around. And I said I remember writing a note to Barry, but there was

Page 293

a – in the first part of the year. This is the note that I was referring to although not knowing what it had been written on.
Q Were you aware as to whether E&Y was using draft legal opinions in marketing the COBRA transaction?
A No. I had never seen that note. I certainly wouldn't have had any of their internal knowledge of what they did or didn't do.
Q So the only basis – let me make sure I understand. You don't remember when you received it exactly, but the only basis you have of saying that you received it sometime in the following year. I assume you're referring – I assume you're referring to the year 2000 is the way you are reading right now this note?
A No. No. You remember you asked me in my prior deposition if – and I told you that I remember writing a note to Barry, and I believed that it would be January. Completely independent of you – of having seen this because I didn't know that it was around.
And I brought it up actually several times in the deposition. I remember writing a note to Barry in sometime in January about, you

Page 294

know, checking over the details and accelerating my refund. And this was the note.
Now you've given me the context so that I can further, you know, refresh my memory. And this was the note that I was referring to at the time of my deposition; although, I had not seen this at the time.
Q You don't know who you received this opinion from, correct?
A I am – I am pretty sure that it ended up coming from, you know, Ernst & Young, but I'm not certain of that.
Q Let me give you what's been marked as Government Exhibit 520.
(Government's Exhibit Number 520 was marked for identification.)
THE WITNESS: Yes.
BY MR. DONOHUE.
Q If you'll notice, Government Exhibit 520 is a Jenkens & Gilchrist fax with an attachment. And among the recipients is Mr. Knight. Do you see that?
A Recipients. He's on – it's shown as number 3 on the front page. Yeah, I see it.
Q And if you'll notice on the second page

Page 295

of this document, there's a memorandum regarding the tax consequences of contribution of the options spread to partnership or corporation. Do you see that?
A Yeah. You know, I'm not familiar with this document, nor would I have seen such a document. But I see what you're putting before me.
Q And did you read any portion of the draft opinion, which is Government Exhibit 1032, before you gave it to Mr. Emerson?
A 1032. Just the one that you've shown me previously?
Q Yes.
A I can't say that I – that I specifically did. But it outlines the – it underlines the general concept of the transaction. And that's why I forwarded it to Barry so he could start understanding the transactions so that I could move forward with getting my refund.
Q Let me ask that you be given what's been marked as Exhibit 1079.
(Government's Exhibit Number 1079 was marked for identification.)
THE COURT: Do you want to take a break,

Page 296

Mr. Zucker?
THE WITNESS: I wouldn't mind just stretching. But I would really, you know, like to continue.
THE COURT: Okay. Let me just, while you're stretching, point out that the air-conditioning normally goes off at 5 o'clock. I forgot about this. And I've tried to get the Clerk of Court to extend it to 8 o'clock. But it seems to me as if it's gone off. I don't know. It seems like it's warming up in here from what it was before.
Yeah, go check with them, would you. We're trying to save those tax dollars, Mr. Donohue.
MR. DONOHUE: This would be a good time to splurge, Your Honor.
THE COURT: While we're waiting, also, Mr. Crouch, do you anticipate a redirect?
MR. CROUCH: We may have some redirect, Your Honor. I just can't tell you at this point how long it might be.
THE COURT: Mr. Zucker, do you still want to stay?
THE WITNESS: You know, I – I think the

Page 297

answer is yes because I don't know what the circumstances will be by any delay. I'm actually impressed with my – the fact that I've managed to this point of the day. And I – if this is one of those odd days, then I would sure like to take advantage of it.

THE COURT: Okay. All right. I'll keep asking you.

THE WITNESS: I appreciate, Your Honor, your consideration. Thank you.

Am I supposed to be doing something in the mean time or –

THE COURT: Yeah. Mr. Donohue, please.

MR. DONOHUE: Oh, Your Honor, are we waiting?

THE COURT: Yeah. I was waiting for – it was just a stretch.

MR. DONOHUE: Oh, okay.

THE COURT: And then I was sort of filling in the silence with my comments.

MR. DONOHUE: I'm confused, Your Honor.

THE COURT: That's all right. We're all tired. Go ahead, Mr. Donohue.

MR. DONOHUE: Okay.

BY MR. DONOHUE:

Page 298

Q Mr. Zucker, turn to Exhibit 1079.

A I have it.

Q This – and the first page of it is a handwritten – appears to be fax from Donna Guerin to yourself.

A No. From me to Donna.

Q I'm sorry. From you to Donna.

A Yes.

Q And it has six pages. And if you'll turn to the third page of the document, in the third page of the document, it is Bates stamped number 266. And you'll notice a signature under accepted and agreed to. Is that your signature?

A It is.

Q Okay. Now, turn to the first page of the document. This appears to be your engagement letter with Jenkens & Gilchrist dated December 1st, 1999. Am I correct?

A It appears to be, yes.

Q And take a look at the last paragraph on the first page. It states: The amount charged for the legal services we provided to you would be based on a fixed fee of 1,260,000 for our advice and assistance in the facilitation and execution of the European digital foreign currency option

Page 299

investment transactions in the amount of approximately $45 million, the documentation of the transaction, and our research and the rendering of a more-likely-than-not tax opinion setting forth our conclusions and rationale.

Am I correct that, even though it refers to this amount of $1,260,000, you previously have been informed that the legal opinions that you would receive, your fee for that would be 3 percent of the desired loss, correct?

A It was in the other documents that you showed me, yes.

Q Were you, at this point in time, which is in December, were you aware of what Jenkens & Gilchrist's role in this transaction was?

A To the extent that they were – they were taking care of all the paperwork and the – and the – you know, the basic preparation of documents, to that extent, I certainly was.

Q And were you aware that they also had a hand in the development of the transaction?

A No.

Q I'm going to ask that you be given what's been marked as Exhibit 2325.

(Government's Exhibit Number 2325 was

Page 300

marked for identification.)

BY MR. DONOHUE:

Q Mr. Zucker, Exhibit 2325 is a template confidentiality agreement between Jenkens & Gilchrist and the client.

Were you asked by Jenkens & Gilchrist to execute a confidentiality agreement?

A Not to my recollection at any time. No.

Q Go back to Exhibit 155. Do you remember I told you to keep that one out?

A I probably didn't.

THE COURT: Mr. Zucker, it's this one.

THE WITNESS: I'll look for it. I kept them all out.

Yes. Okay. I've got it. All right.

BY MR. DONOHUE:

Q Keep it out, Mr. Zucker.

A Okay.

Q Take a look at paragraph 2. You notice it says: Have client and client's attorney advisor, if any, sign E&Y nondisclosure agreement as well as separate J&G nondisclosure agreement.

Does that refresh your recollection that –

A It absolutely did not occur. And, you know, I keep referring to these things about what

Page 301

they might have done with other people, but not with me.
Q You have to wait until I finish the question.
A No. It did not happen.
Q Let me – once again, you have to wait until I finish my question.
A I'm sorry.
Q My question is: Does that refresh your recollection that you were asked to execute a Jenkens & Gilchrist nondisclosure agreement?
A No.
Q Okay. Now, take a look at Government Exhibit 2325.
A Okay.
Q Their template nondisclosure agreement in the first paragraph, second sentence, states: The confidential proprietary information (Confidential Information) involves certain financing structures be (the Structures) developed by J&G and/or its clients, consultants or co-counsel that provide economic, financial, business and tax advantages for individuals and companies through the use of the structures. Is it your testimony that you were not

Page 302

aware that J&G was, in fact, involved in the development of this transaction?
A Absolutely I had no knowledge of it.
Q But you were aware that they were involved in implementing the transaction, correct?
A I was aware of the fact that they were – they were creating much of the documentation associated with the transaction.
Q And you were aware that a fee that you were paying was based on a percent of your desired tax loss to both Jenkens & Gilchrist and Brown & Wood. You're aware of that?
A You've shown me the documents that refer to those, yes
Q Let me ask that you take a look at what's been marked as Government Exhibit 1010.
A This is not one I have before me, right?
Q You will be given that exhibit.
A Okay.
(Government's Exhibit Number 1010 was marked for identification.)
BY MR. DONOHUE:
Q Mr. Zucker, this happens to be a phone call receipt or tab. And it indicates that, on 12/6 at 10:15, that Mr. Knight called. And it

Page 303

refers to JB or CC.
A Right.
Q Do you know who those initials are?
A Yeah. Jim Boyd or Charlotte Crosby.
Q Were you ever informed that, on December 6th, Mr. Knight called Mr. Boyd –
A No.
Q – or Ms. Crosby?
A No. I have no recollection. I mean, you know, it's years ago, but I have no recollection of that.
Q Let's – let me ask that you be given what has been marked as Government Exhibit 2358A.
(Government's Exhibit Number 2358A was marked for identification.)
BY MR. DONOHUE:
Q Now, you'll notice that, at the bottom of this exhibit, that there is an E-mail from Mr. Coplan that's dated 12/6/1999. Do you see that?
A Where should I look to see that? Oh, yes. I see. It says, next to Bob Coplan's name, Robert B. Coplan.
Q Now, take a look at the second page.
A Okay.

Page 304

Q And Mr. Coplan's E-mail is being sent by a number of people – or sent – is being sent to a number of people, including Mr. Ray Knight, which his name is about the fifth one up.
A I do see it.
Q And notice what it says. It says: COBRA Matters – Urgent. This E-mail discusses three items of importance to the COBRA transaction, two relating to completed transactions and one related to COBRA 2000. One, trading activity in the partnership. As you know, in addition to the transfer of the options spread to the partnerships, the client's transferred cash equal to 2 percent of the loss amount to the partnership. There has been some confusion as to what – as to what type of trading is expected to be done with this cash during the life of the partnership. The trading activity is important to the maintenance of the business purpose of the partnership i.e., investment activity. We have not developed precise rules for the investment of the funds, but here are some guidelines. The money should not sit in a money

Page 305

market account. The more trading activity the better, and preferably in an investment that can reasonably be expected to provide a potential for a good return. Although, speculative investments are not encouraged.

If one wanted to move in and out of different market indexes, that would be acceptable. Because there are only about three weeks left to the liquidation of the partnerships, it is essential that, if no activity has yet commenced, that it begun – that it be begun immediately through David Parse at Alex Brown. Investment in foreign currencies is not necessary at this time even in the ordinary loss partnerships. That will be done just prior to the termination of the partnerships after the assets remaining in the trading account had been liquidated.

Mr. Zucker, does that refresh your recollection that, on or about December 6 of 1999, Mr. Knight called, spoke to Mr. Boyd about the need to invest the 2 percent of your loss transaction, the $1 million, to begin to invest that in various securities?

A No, it doesn't. It doesn't add to any

Page 306

of my knowledge or recollection that the call was made.

Q But you do recall that, in the earlier engagement letter, that you were required to pay upfront an amount of 2 percent of a desired loss. Do you recall that?

A You showed me a list that had everything allocated as percentage. And I looked to how many dollars I was going to be putting into the transaction. And it was on that list. So the answer would be, yes, it referenced it on the list.

Q And remember it said not at risk. Do you recall that?

A I do recall that. Yes.

Q And 2 percent of a $50 million loss transaction is $1 million, correct?

A That's correct.

Q So you had already made a contribution of the – you and Mr. Boyd, of the $1 million. But to your knowledge, had – up to 12/6, had that money been invested in any securities?

A You would have to look at the dates and timing for when that happened. But, you know, if you look at that note as to, you know, the Bank of

Page 307

New York and Bank of America and First Union activity that will give you a better indication as to what the timing was for investments. I don't have specific recollection. Sorry.

Q You did discuss, however, with Mr. Boyd, making conservative investments, did you not?

A I suggested the bank stocks in particular. It wasn't just a matter of being conservative. But that they were probably a very good investment because they were appreciating very rapidly. And I felt that the banks would do well.

Q If you recall at your deposition, you –

A Yeah.

Q – I believe said that Mr. Boyd asked you what would be some conservative securities. And you suggested bank stocks, correct?

A I did. I did, yeah. I thought they would be positive investments and would be conservative. We certainly wouldn't be losing money on it.

Q Let me ask that you be provided what's been marked as Exhibit 2361.

(Government's Exhibit Number 2361 was marked for identification.)

Page 308

BY MR. DONOHUE:

Q Mr. Zucker, Exhibit 2361 is a table of the partnership's, JBJZ Partners, purchase of four securities, three bank stocks and a Gateway Fund. It contains information regarding the number of shares, the purchase and the purchase date.

A Yeah.

Q Do you notice that the securities were purchased on December 7th? Do you notice that?

A I see December 7th and the 22nd, yes.

Q Do you know that the securities were sold on December 14th?

A For three of the securities. And the 23rd for the fourth, yes.

Q So, in other words, your investment in securities for the 2 percent that you required to contribute, that was made in respect to three bank stocks as well as something called the Gateway Fund. Do you see that?

A I don't know that the percentage calculation is precisely correct, but it shows the investment activity in those securities.

Q Take a look at Exhibit 1019. And I'll ask that you be handed that.

A Okay.

Page 309

Q This is something that you saw in your direct examination.
A Yes.
Q Do you recall in your direct examination you mentioned that this is a handwritten note by Mr. Boyd.
A Yeah.
Q Am I correct?
A Yeah. This is his writing, yes.
Q And do you see the date of this note?
A It says – this appears to be the 7th of 1999 – December 7th of 1999.
Q And you'll notice that he's referring to some bank stocks. Do you see that?
A I do.
Q Did you advise Mr. Boyd to invest in these bank stocks?
A He – he asked me about the – where we should invest. So we did have these discussions, yes.
Q And turn back to Exhibit 2361, the table.
A Turn back to 2361? Okay. All right.
Q And you'll notice, as I said before, that the purchase dates for the three bank stocks

Page 310

was 12/7. Do you know what the settlement date would be for those purchases?
A They're generally five days, you know. It's normally five days differences in settlement dates and in general for trading. I don't know what – the particulars as it relates to Alex Brown. But, you know, that's typically five days settlement. And the date that they – the sale date that's reflected here is the 14th and the 23rd of December for the four different securities.
Q Wasn't the purchase of these bank stocks – wasn't the purchase of these bank stocks for purposes of providing you with a business purpose for the partnership?
A For the purpose of providing – not for the purpose of. I mean, it was one of the structural attributes for the proprietary structure that they had come up with. But it's true for, you know, all businesses. You look for diversification. And you look for distribution of risks. All the fundamentals apply to any – any – any corporate or partnership structures and sharing common interests and so forth. There's a lot of standard business

Page 311

purposes for any structure. So if you're trying to narrow it down to that being a sole purpose, it certainly wasn't a sole purpose.
MR. DONOHUE: Your Honor, we are at the end of the tape.
THE COURT: Okay. Thankfully. We can take a break. We don't have the stamina that you have, Mr. Zucker.
THE WITNESS: Thank you.
THE COURT: Let's take a break. We'll be back at quarter to 6:00. The court is in recess.
(Whereupon, a recess was taken between 5:39 p.m. and 5:52 p.m.)
THE COURT: Mr. Donohue, please continue.
BY MR. DONOHUE:
Q Thank you, Your Honor.
Mr. Zucker, let's go back to 2361. That is a table of the investment activity within the partnership.
A Yes.
Q And going to the fourth item – we've discussed the first three, which are the bank stocks. Go to the fourth item. Notice that it

Page 312

refers to the purchase of a Gateway Fund on December 22nd.
A Yes.
Q And then the sale the following day of that fund on December 23rd. Do you know why that fund was purchased on the 22nd of December?
A I can't tell you why specifically that day. It was just general investment activity which was part of the overall, you know, strategy that was laid out by EY in terms of the diversification of the funds. And it was another trade, and they locked in on, you know, $500 profit on it.
Q What is the Gateway Fund?
A It's – I can't tell you specifically what they were investing in at the time. But it's a – a compendium fund where they make multiple investments in various securities themselves. So by investing in them, you're actually investing in multiple securities.
Q I'm a little confused. You said I can't tell you specifically what they were investing –
A Right. Well, the Gateway Fund is fund of funds, yes. I'm sorry.
Q You have to wait until I finish my

Page 313

question.

A I'm sorry.

Q My question is: When you say they, are you referring – my understanding –

A Gateway.

Q – is that the partnership was making this investment, correct?

A Right. But I'm talking about Gateway.

Q Okay.

A It was an investment in Gateway, which is an equity security. And the Gateway Fund is a fund in itself. It has – makes multiple investments in a variety of other securities. So by making an investment in them, it's like a mutual. You make an investment in a mutual, it's not just the mutual company that you're investing in. You're investing in all the portfolio – items they have in their own portfolio.

Q I'm going to ask that you be handed what's been marked as Government Exhibit 2367.

A Yes.

(Government's Exhibit Number 2367 was marked for identification.)

THE WITNESS: Yes.

Page 314

BY MR. DONOHUE:

Q Now, on the – 2367 is another E-mail by Mr. Coplan that's dated 12/22/1999 at 1:05 p.m. And if you turn to the next page, it's sent to a list of E&Y people including Mr. Knight. And if you'll notice, he points out in the subject line: Matters related to windup of COBRA transactions. And he points out that, in the third paragraph: By tomorrow, David Parse will have completed the process of liquidating all of the trading accounts in the partnerships and use the proceeds to acquire foreign currency (Canadian dollars because of its volatility and ability to be converted within one day) except in those partnerships that are oriented toward capital loss. Now, am I correct that your partnership did purchase Canadian currency, correct?

A We did.

Q Now, turn to the next page and take a look at the second full paragraph on that page. And it points out that Melinda Merk has left an urgent EYComm for those of you who are the primary representatives for clients with a COBRA

Page 315

transaction in order to obtain one final verification of the transactions for Deutsche Bank. In a voice mail – in the voice mail, Melinda will indicate our understanding as to whether your clients is/are in an ordinary or capital loss partnership or both. If capital, she will indicate which asset is expected to be distributed out of the S Corporation and sold. In a few instances, the Gateway Fund will be purchased as a capital asset because it can be cash settled in one day. Do you see that?

A I do.

Q Now, let me ask you, do you recall if the reason that your partnership purchased the Gateway Fund is because it was considering to use the Gateway Fund as the capital asset for purposes of triggering the capital loss. Do you recall if that's true?

A I – I don't recall it. And, you know, you were showing me a lot of, you know, commonalities and things that were apparently shared internally in EY. But, no, that wasn't a subject of

Page 316

specific discussion. But it was certainly part of an overall, you know, proprietary structure that EY had. And, you know, perhaps they had shared some communications on that subject. But I – I'm not – I wasn't privy of it other than the fact that I was aware of the fact that, you know, Gateway Fund is a fund of funds. The fact that they had a – you know, a one-day settlement period, I wouldn't have been aware of that, frankly.

Q Now, your partnership, JBJZ Partners, it had both purchased Canadian currency and, if you recall, ultimately, there was distributed into the partnership 5,000 shares of Cisco stock. Do you recall that?

A That's correct.

Q Now, that was, am I correct, the capital asset that was supposed to trigger both the long-term and the short-term capital losses, correct?

A I don't know if that was in the structure. I knew that part of the structure involved, you know, having a variety of diversified funds in – in the company and the fact that we made investments and trades to – to,

Page 317

you know, conduct an ordinary business purpose for the structure.

But there was, in addition, you know, direction provided by EY as to – as to what the necessary sequence was to fit within their proprietary structure to – to beyond just business purpose to have structural purpose to maximize my retention of capital. So this was obviously part of their directed structure.

Q Mr. Zucker, do you recall that, in fact, that 5,000 shares of Cisco stock, even though it was supposed to have been contributed to the partnership, had been mistakenly contributed to the Subchapter S Corporation?

A Yeah.

Q Do you recall that?

A I recall that and then it being transferred back to the partnership and then being effectively recontributed to correct that error. That's correct.

Q And I'm going to ask that you be provided with Government Exhibit 1073.

(Government's Exhibit Number 1073 was marked for identification.)

Page 318

THE WITNESS: Yes.

EVENING SESSION (6:00 p.m.)

BY MR DONOHUE

Q Now, this is – Government Exhibit 1073 is a document which is entitled JBJZ Investors, Inc. Now, am I correct, that was your Subchapter S Corporation, correct?

A That's correct.

Q And if you'll notice here, you're pointing out that this letter constitutes your authorization to address to Mr. Parse to transfer both the 500 shares of Cisco stock and, in the second paragraph, the 4,500 shares of Cisco stock to the account of –

A Well, back to the partners, yes.

Q The account of JBJZ Partners, correct?

A That's correct.

Q So it should have been initially transferred to JBJZ Partners, but, through a mistake, it got transferred to the Subchapter S Corporation. And now on the 22nd you were transferring it back, am I correct?

A Right. We were correcting the error. That's correct.

Q Now, did anyone discuss with you the

Page 319

potential tax consequences of that error?

A No.

Q Well, the reason I'm asking is because was there any discussion that there could be a trigger of tax as a result of the transfer back to the partnership; and, in order to avoid that, we could purchase and use the Gateway Fund as our capital asset to trigger our capital losses? Was there any discussion of that?

A None with me.

Q Do you have any other explanation as to why the Gateway Fund was purchased on December 22nd but the very next day sold on December 23rd?

A Other than locking in a $500 gain, not – no.

Q You had mentioned, Mr. Zucker, that one of the business purposes of the partnership was diversification. What do you mean by that?

A The partnership itself?

Q The partnership.

A Combining the interests of independent units. You get individuals to focus on common interests. It provided an ability of forum to consolidate a variety of elements of investment

Page 320

from – from – including, of course, the options being contributed. And it was part of the overall structure that EY had recommended to us as being the most tax efficient.

So, frankly, I routinely rely on professional advice as to what I do and how it should be structured. I wish I were consistently so brilliant as to not need advice.

Q But getting back to this concept of diversification, you had a dollar/yen option and a euro/dollar option – set of options, correct?

A Right. Yes.

Q And Mr. Boyd had also euro/dollar options, correct?

A Right. But it diversified Jim Boyd's – he was my partner. It helped diversify Jim Boyd as well, not just me. I would be rather selfish to only look for myself.

Q So you had 90 percent of the transaction. How were you going to be diversified by picking up the same euro/dollar options that you already had in your partnership?

A Well, as to that particular element of the partnership, it didn't do anything for me. It did for Jim. It helped diversify him in terms of

Page 321

the partnership element.
But the fact is that I was already aware
of the fact that we were going to contribute, you know, other assets to the overall diversification including the, you know, Cisco stock, as well as, you know, additional capital. And we were going to do other trades.
So there was – you know, overall directionally, you know, all of the corporate entities have, you know, you can easily go through all of the standard business reasons that you set up a corporation. This was going to be all the standard reasons but also the opportunity to end up in a proprietary structure that allowed me to have some tax benefit as well. So I looked at it, you know, based on best advice.

Q And you knew that the life of this partnership was approximately a little over 30 days, correct?

A Well, at this point in time, yes.

Q So this is a partnership which you were investing in sometime near the end of November. And the partnership was going to go out of existence near the end of December, correct?

A That's correct.

Page 322

Q What was the business purpose for the Subchapter S entity?

A There's always the underlying business purpose of keeping as much money as you can. When you're making money, you want to certainly hold as much so. Obviously retention of capital, maximizing retention. You know, I'm always getting advice as to how to best structure to be within compliance of all the regulations, but minimize tax costs. So....
And, of course, I'd already known as part of the overall structure that – and I understood that there would be a liquidation of the partnership when it hit the Sub S, that I would be able to lock in the basis
Because I had already been explained – and I don't want to keep being redundant, but the real estate example that if there was an unmatured – it was a liability to not get matured, that it wouldn't be included in the basis And that was part of the means of creating the revenue offset. So it was, you know, part of their proprietary structure.

Q So is what you're saying –

A Over and above the business

Page 323

Q So – well, you're saying over and above the business. But is what you're saying is that the reason that you formed the Subchapter S entity was you were taking the advice of E&Y in terms –

A That's certainly –

Q You have to wait until I finish my question.
You were – now, see, you've made me lose my train of thought.

A Do you want me to give you the other business purposes?

Q No. Not yet.
I believe I was asking you, Mr. Zucker, that, am I correct that the reason you formed the Subchapter S entity was because you were taking the advice of E&Y in terms of how to maximize actually the tax benefits on the transaction?

A Well, it's certainly one of the range of things. But any time you go from a partnership to any kind of a corporate entity, in contributing to the S Corp, you create a liability shield from going from the partnership forum to the – to the Sub S forum.
So, clearly, by going to a corporate forum, I was providing additional liability

Page 324

protection as it related to me personally. I was – outside of the partnership.
So, you know, you can – you can kind of go through and show the various business purposes.
But as well, you know, clearly, the fact that it was part of the proprietary structure that would provide the – the revenue offset. And that certainly was a – a factor.

Q Let me explore this liability shield purpose. Now, am I correct that, once the partnership was terminated, the Cisco stock in the Canadian currency was distributed to the S Corporation. Am I correct?

A That's correct.

Q And am I also correct that, prior to the end of the year, that is, prior to December 31st, 1999, both of those assets were sold by the Subchapter S Corporation; is that correct?

A I believe so. They were all liquidated.

Q And those were the assets of the Subchapter S Corporation, correct?

A That's correct.

Q Where do you see a need for holding for a few days Canadian currency in Cisco stock of a need for a liability shield?

Page 325

A Well, you don't. I'm just saying, in general -- you know, if you -- limited to those specific facts only, then, you know, there wouldn't be a need for any corporate entities ever.
But I'm saying, in general, my business purpose in having corporate entities is to preclude me from having personal liability in any relationship, you know, whether it's the simplest, you know, personal liability issues of trip and falls to whether it is a corporate misunderstanding that you don't anticipate and it -- and it arises that -- where you would not plan on it. Having the corporate form in general is very protective and provides a shielding.
The fact that it also has, you know, substantial positive purpose in terms of structuring, you could ask the same question of every major corporation in the United States why they set up the various overseas structures to minimize their taxes.
There's certainly no regulation that says that you should structure it in such a way as to maximize your taxes. Could I have set it up to, you know -- certainly, you know, tax

Page 326

considerations and retention of capital is always a business consideration.
Q Mr. Zucker, let's turn to a different subject. I'm going to ask that you be handed what's been marked as Exhibit 1022.
(Government's Exhibit Number 1022 was marked for identification.)
BY MR. DONOHUE:
Q Mr. Zucker, Exhibit 1022 is an opinion from Jenkens & Gilchrist addressed to you, and it's dated January 31st, 2000. Did you receive this opinion on or about January 31st?
A I can't tell you that particular date. I know I got it in the first quarter because we -- we had both opinions before we filed our taxes.
Q Did you read this opinion before you filed your personal tax return and before the partnership in Subchapter S tax returns were filed for the transaction?
A I do as I would normally do documents. I skimmed through it. And I preponderantly rely on the professionals to make sure that all of the legalese and preciseness is appropriate. But, yes, I did skim through it and read through it.
Q And when you say skim through it, how

Page 327

much time did you take in reading this opinion, approximately?
A I can't tell you. I mean, I would just be guessing. You know, various documents -- I get so many documents through my office. I can't tell you specifically how much time I spent on it.
But, in general, if you're in my office, you'll see that I'm very reliant on professionals to fill it in. I guess no different than you, I'm sure, when you file your own personal taxes, that you rely on all the experts to fill in all the blanks.
THE COURT: Do you want to answer that question?
MR. DONOHUE: Don't turn the tables.
THE WITNESS: I mean, that's just -- that's just the nature of how we all are. It's just the nature of how we all operate. We're not experts in all fields.
BY MR. DONOHUE:
Q Did you consider Jenkens & Gilchrist to be an independent law firm rendering an independent legal opinion on the transaction?
A I didn't really form an opinion one way or another. So we had two opinions and then Barry

Page 328

had told me that, really, only one was necessary. So the fact that there was a Brown & Wood opinion that clearly was independent I -- I had no -- it didn't -- didn't cross my mind to think about any potentials for conflict.
I wasn't aware of all the things that you had subsequently alleged to me that they were involved with. I wasn't -- other than the fact that they had processed a bunch of documents, I wasn't aware that, as you've indicated, that they were somehow involved in forming the concept and structure with Ernst & Young. I didn't have any knowledge of that.
Q But you were aware, were you not, that their fee for the transaction was based on a percentage of your tax loss?
A Yeah. I mean, most of the transactions I deal with on a large scale with Wall Street, including the legal firms up there, are based on percentages. I wished they were based purely on time. I would be generally much better off. They frequently size transactions based on percentages: In general Lehman formulas, if I'm dealing with investment firms, or some similar index when I'm dealing with a large attorney --

Page 329

legal firms that are up in New York. It's almost irrelevant. They have pretty much standard cut-and-paste agreements for closings; but, yet, they charge me based on the percentage of the size of the transaction. That's just something I've lived to accept, not that I like it.

Q Are you talking about investment firms like Lehman Brothers?

A Well, not specifically. I'm saying Lehman formula. But in terms of, for example, Goldman Sachs or any of the large investment firms. It just happened that Lehman historically had been – the banks, if I did a deal with JP Morgan or did one with Bank of America Securities or their investment banking arm, almost invariably, the charges would be based as percentages.

And the legal fees, much to my chagrin, don't relate to specifically hours even though they try to sometimes after the fact rationalize it based on all the time and effort they put into it.

But they're cut-and-paste documents that they've used for many other transactions; but,

Page 330

yet, I get charged these astronomic fees based on the size the transaction I've done, whether it's a merger or acquisition. It's just –

Q And did you – did you consider that analogous to Jenkens & Gilchrist charging you a fee based on a percentage of your desired tax loss?

A I did not think in the terms that you're currently framing right now. But the magnitude of the fees, you know, was all contemplated by how much I was going to be investing from the getgo.

So certainly I'm not surprised by the magnitude. The fact that they're tied to percentages and all really wasn't relevant to me.

Q You mentioned that you received two legal opinions. Is the second legal opinion received from the law firm of what was then known as Brown & Wood?

A Right.

Q I'm going to ask that you be given what's been marked as Exhibit 1028.

(Government's Exhibit Number 1028 was marked for identification.)

BY MR. DONOHUE:

Q Mr. Zucker, did you want to stop to –

Page 331

A It will just take a moment here. I just wanted to heat this up. I'm sorry for the noise. Okay.

Q Exhibit 1028, you'll notice, is a document which is from Brown & Wood.

A Yes.

Q At least it has their name and address at the top left. It refers to representations. And if you look at the second page, there is a place for a signature space and under it your name. Do you see that?

A I see it.

Q This appears to be a document in which there are a number of representations, eight paragraphs of them, that appear to have – to be sent to Brown & Wood. Did you ever sign a representation letter to Brown & Wood making these representations?

A I don't believe I signed representation letters to anybody, no. And, also, if representations were made, it was done by Ernst & Young on our behalf, but not by us.

Q Let's –

A And not by me.

Q I'm sorry. Let's look at what's been

Page 332

marked as Government Exhibit 2377.

A Is this a different document?

Q A different document which you will be handed.

(Government's Exhibit Number 2377 was marked for identification.)

BY MR. DONOHUE:

Q Mr. Zucker, this is an E-mail by Mr. Coplan to a number of E&Y people. And it refers to, subject: Brown & Wood items missing for COBRA opinions.

And it states: As of 3/22/2000, the following clients had not executed and sent in to Susan Sodano at Brown & Wood either rep letters or engagement letters and will not be receiving opinion letters until they do. See what you can do to get both of these items signed and returned by the clients so we can wrap this up.

And I notice that you and Mr. Boyd's names are not on that list. Can this possibly refresh your recollection that you did, in fact, sign these representation letters to and sent them off to Brown & Wood?

A No. I have absolutely no recollection of any representation letters other than the

Page 333

reference to – in the original thing that I received on the 11th, if you remember, the November 11th communication where I asked the question mark, what information are they asking of us? Do you remember that question?

Other than that coming up on that occasion and being – being told that it was nothing more than telling – saying that, you know, that the securities were – had been held for over, you know, a year and – and the formation of the corporations which was being handled for me, that I had no concern. And, no, I don't recall ever signing any kind of a representation document.

Q So you're saying you have absolutely no recollection. But is it possible that you signed it and just don't recall now?

A It's highly unlikely. You know, although my mental capacity is diminishing, I still have a reasonably good mental acumen and recall. I have no recollection, and I do not believe that that ever happened.

Q I'm going to ask that you be given what's been marked as Government Exhibit 1023.

(Government's Exhibit Number 1023 was marked for identification.)

Page 334

BY MR. DONOHUE

Q Mr. Zucker, this is a Brown & Wood legal opinion addressed to you dated March 9th, 2000.

A Yes.

Q Is this the Brown & Wood legal opinion that you received?

A I have to make certain presumptions. It appears to be. I would have to read every word and make potential comparisons. But I believe it's the same, yes.

Q Well, if you read every word, would you still be able to make such a comparison?

A It appears to be describing all the details of the transaction. And it – it appears to be a form in substance for what they sent us. You know, we did, in fact, have both opinions prior to filing our taxes so it would have been, you know, before the end of the first quarter.

Q That opinion is dated March 9th, 2000.

A Right.

Q Is it your testimony here that you received that testimony sometime in March of –

A My original recollection was that I had gotten it actually in May. But I know that that's for sure not because I know that Barry had – had made a comment to me just in reflecting about the fact that we couldn't file until we had the opinions.

Page 335

So, you know, so to the extent that my original recollection was that it was later, it was first quarter or later, it is my clear recollection that Barry had made a comment about us having to have the opinions in form prior to filing our taxes. And since the taxes were filed timely, it had to be in that period that preceded.

Q And when did Mr. Emerson make this comment to you?

A It was at or around the – the – that period of time. I can't tell you exactly the date. But it was – it was sometime in the end of the first quarter.

Q When Mr. Emerson made this comment to you?

A I can't recall the specifics of the timing. But I'm saying it was in or around that period of time in the first quarter. I can't tell you exactly what day or, you know, relative to, you know, the end of the month what it was.

Q Then I'm a little confused. I think –

Page 336

A I know it says March 9th, and you're trying to tie it back to March 9th. But I can't tell you from actual memory. You know, if you want me just to simply say what is obvious from the numbers, you know, I can do that. But I want to speak with integrity. I can't specifically remember the date. Now, I can –

Q That's not what I'm confused about, Mr. Zucker.

A Yes.

Q What I'm confused about, I thought you said your original recollection was that you received the opinion sometime in May of 2000. However, you also said that Mr. Emerson refreshed your recollection that you received the opinion before you filed the tax return. And I asked you: When did Mr. Emerson refresh your recollection? And you said sometime in the first quarter.

A No no. Then I answered incorrectly. Just on – I'm apparently losing it. If you recall in the original deposition – I know that Your Honor was this the there – but the original deposition, you asked me my best recollections. And I said it was either

Page 337

the first quarter or it may have been as late as May. I couldn't lock into it. And, you know, since, you know, that period of time, I've now reflected on, you know, when was it that – that the note to Barry took place. And it gave me kind of a refreshment as to, you know, what was the time zone. I remember that, as I answered to you previously in the prior deposition, that I recalled writing a note to Barry, and it was sometime in January. Well, then, when I actually saw, you know, what it was written on and the draft form of it all, it – it brought back, you know, recollections. So, you know, I'm letting you know I also had conversation, which I today can specifically recall, where Barry had raised the point that, you know, you don't want to file until you actually have the – you have to have the opinions in hand.

Q And –

A So it just – these things happen when you – all these subjects get brought up. And you do – even though you've been throwing a lot of

Page 338

documents that I've never seen, you know, previously, these things at EY and all, the fact that you show me some documents refreshes memories as it relates to the events of the time.

Q So just so I understand what you're saying, are you saying that the note that was on the document that you – that you wrote to Mr. Emerson, that when you read that note, that refreshed your recollection regarding the fact that you must have received this opinion sometime prior to filing the tax returns?

A I'm not saying. I'm saying that all these things in the aggregate. I can't tell you which singular event, but all these things in the aggregate as to when did the opinions come in and when did you write the note to – that I recall as a result of all those questions and all the various documents that have been placed in front of me that – and I can't tell you which specific document triggers what in my mind, but that I recall, as a result of these things, that Barry had asked that – you know, had made the comment about the need for the opinions to be in hand. And that it was post – that comment was post my having sent him that note which was sometime in

Page 339

January.

Q So getting back to your original recollection, you mentioned at the deposition your original recollection was that you may have received this opinion actually as late as May. And then you're saying, since your deposition, if I understand your testimony, you're saying your memory has been now refreshed by an aggregate of matters. And you are saying that, with your memory refreshed, you know you must have received this opinion sometime prior to the filing of the tax returns.

A No. I'm certain of the fact that it was prior to the tax return filing because I do specifically recall a comment from Barry, which was not a question you had asked me before. And all of these things have, in combination, refreshed my memory.

Q I'm going to ask that you be given what's been marked as Exhibit 1090.

A Yes.

(Government's Exhibit Number 1090 was marked for identification.)

BY MR. DONOHUE:

Q Mr. Zucker, Exhibit 1090 is an Ernst &

Page 340

Young fax. It's dated 5/17, May 17th, 2000. And it's to Charlotte Crosby. Now, am I correct Ms. Crosby worked for you, correct?

A Yes.

Q And it's from Ken Hughes. And who was Mr. Hughes?

A Kenny Hughes worked for the tax department in Ernst & Young.

Q I notice it's dated May 17. But if you turn the page, it refers to a letter dated March 31st from Mr. Knight. And it states: Enclosed is a copy of the Brown & Wood tax opinion along with copies of all documents executed.

A Right.

Q Do you know why Ernst & Young was sending you in May a document –

A Sending to Charlotte, not to me.

Q Well, sending to Charlotte, a – a document which is a cover letter for a Brown & Wood tax opinion dated March 31st. Do you know why they were doing that?

A Other than, perhaps, just completing Charlotte's file. But, you know, I know that prior to the filing on the – on the, you know,

Page 341

15th or approximate date, that date, because we filed it timely, that Barry had both opinions in hand.
Q Take a look at the next page of the fax. There is – at the bottom of that page, there is what appears to be a signature. It appears to be your signature. Is that your signature?
A Bottom of which page?
Q The next page.
A Are you talking about on the authorization to –
Q Yes.
A – to transfer 60,000?
Q Yes.
A That is my signature.
Q And is that your initials over the 60,000?
A It is.
Q And you'll notice this is dated March 28th.
A Yes.
Q Do you see that?
A I do.
Q Do you know when that transfer of funds of $60,000 took place?

Page 342

A It would have been some date subsequent to the date. But, no, I don't know.
Q You'll notice that it's being transferred to a bank on behalf of Brown & Wood, Citibank. Do you see that?
A Yes.
Q And was that your fee, that $60,000, for the Brown & Wood legal opinion?
A I have to presume that it was. There is a fee letter that's attached, you know, one page further. So yes.
Q Now I'm going ask that you be handed what's been marked as Exhibit 2382.
(Government's Exhibit Number 2382 was marked for identification.)
THE WITNESS: Yes.
BY MR. DONOHUE:
Q I'll be with you in one second. Mr. Zucker. Turn to – turn to Bates stamp number –
A You don't want to ask me about all the trading activity?
Q No. Bates stamp number, it's on the top left. 4970.
A 4970. Okay.

Page 343

Q Refers to a wire of funds on that page under debits to your account. Do you see that?
A Wired funds sent, yes.
Q And you notice that's the account of JBJZ Investors, Inc. Do you see that?
A Yes.
Q And notice the date that funds were wired in the amount of $60,000 to the Brown & Wood account.
A I see it.
Q Do you notice what date that is?
A Yeah. It says 05/24.
Q 5/24. That's May 24th, correct, of 2000?
A Assuming that that's the correct date, yes.
Q Now, let's go back to Exhibit 1017.
A Okay. Can I ask you – okay. I'm sorry. 1017. I'm sorry.
Q Yes.
A 1017 is – is this something you're going to hand me or something that I have?
Q You have in front of you.
MR. LINDQUIST: No, no. It hasn't been used.

Page 344

BY MR. DONOHUE:
Q Now I'm going to hand it to you.
(Government's Exhibit Number 1017 was marked for identification.)
BY MR. DONOHUE:
Q Do you notice that this letter is dated May 18th?
A Right.
Q And it's signed by Ms. Crosby as an assistant to you. Do you recognize Ms. Crosby's signature?
A I do.
Q And you'll notice that she points out that she's enclosing a letter authorizing the wire transfer from the escrow account to Brown & Wood in the amount of $60,000 –
A Right.
Q – which has been executed by Mr. Zucker. Do you see that?
A I do see it.
Q So if you turn the page, what you see is that same authorization for a wire transfer to Brown & Wood in the amount of $60,000. Do you see that?
A I do.

Page 345

Q Now, Mr. Zucker, I'm going to ask you: Does this refresh your recollection that, in fact, you didn't pay the fee to Brown & Wood until May of 2000; and, as a consequence, you didn't receive that opinion – even though it has an earlier date, you didn't receive that opinion until May of 2000?

A Absolutely not. You know, as you know from looking at the other records as well, there were many payments that were made, you know, later than the transaction.

And I, frankly, even if it relates to – if I was doing business with Kirkland Ellis or other attorneys, it's frequent that I don't pay them, you know, immediately coincident with the work effort.

You know, I – even the current situation, the current case, you know, I don't pay it instantaneously and currently. You know, he gets paid in time. I can't tell you why it's getting paid at a later date, but that had nothing to do with the work product.

Q And it's your testimony that Brown & Wood was going to release this legal opinion to you without first being paid?

Page 346

A Oh, I can tell you for sure that I had it received and that Barry had it before we filed our taxes. So as to whether – what date they got paid, you know, it's – it's – I guess I got the use of the earnings for a few extra days. But there was no relationship between their work and the payment date.

Q You say you can tell me for sure. But I believe you also said that your recollection two weeks ago was that you could have received it in May. Am I correct?

A No. Well, we talked about it being either first quarter or it could have been as late as May that I had read through it. You're asking me about when I read the deposition. And my – clearly, with all these other factors in my mind, I have specific recollection of Barry making a comment as to the fact that we need to have the opinions in hand.

Q Did anyone speak to you between your deposition and now saying you certainly can't rely on a Brown & Wood legal opinion if you did not receive it prior to the filing of the tax return?

A No. No one has suggested that to me.

Q Let me ask that you look to what's been

Page 347

marked as Exhibit 180.

A This is something that I will be receiving?

Q You will be receiving.

(Government's Exhibit Number 180 was marked for identification.)

BY MR. DONOHUE:

Q Mr. Zucker, Exhibit 180, if you recall, it was also shown to you at your deposition. It is a fax by Mr. Knight to Jenkens & Gilchrist. And it refers to – it's dated 11/13/99. And it refers to information regarding three different sets of partners. And if you'll turn to the last page of the document.

A Yes.

Q You'll notice that it's entitled COBRA Client Information Questionnaire. And it refers to both you and your wife. And it has various information on it, including at the – near the middle of the page the amount of the transaction. Do you see that? Do you see where it says amount of the transaction?

A Amount of transaction. I see a bunch of scratches and substitutions. But, yeah, I see those numbers, yeah.

Page 348

Q And it refers there to the amount of this transaction is 45 million, which was your share of the $50 million loss transaction, correct?

A That's correct.

Q And notice that it also has a division between ordinary income and ST capital gain.

A Right.

Q Do you see that?

A Yeah. I – no, I don't see the ST capital gain. But this is – yeah, I do. I do now.

Q Now, take a look at the Social Security numbers. Is that your correct Social Security number?

A Where is the –

Q It's right above – or right below E-mail address.

A You know, for the life of me I just can't – I guess I can't focus.

Q Your Honor, may I approach?

A This is on this page right here?

Q Yes.

THE COURT: You see the amount in transaction?

Page 349

THE WITNESS: I do.
THE COURT: Right above that are the two social securities numbers.
THE WITNESS: Oh, okay. Yeah. That's my 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, yes.
BY MR. DONOHUE:
Q And that's your Social Security number, correct?
A That is.
Q And you provided --
A And that's my wife's beneath it.
Q Did you provide that personally to Mr. Knight or did you have someone provide it to him?
A I can't tell you specifically because they've done so many other K-1 forms and things. They could very well have had it on file already from just prior relationships. Although, they don't do my 1040. Barry does. Certainly K-1s and things they would have processed.
But I do specifically have a recollection that I was asked during -- I know I can't tell you -- place the exact period of time. But I think it was Elaine Peterson that asked would it be okay for Ernst & Young to release

Page 350

my -- and Jim Boyd's Social Security numbers. And it may have been released, meaning that they were planning on letting it go to somebody else rather than them needing it. I can't recall which.
Q I'm going to ask that you be given Exhibits 1018 and 2259.
(Government's Exhibit Number 2259 was marked for identification.)
THE WITNESS: Is this 1018?
BY MR. DONOHUE:
Q Yes.
A Okay.
Q And you testified regarding this document in your direct examination.
A Yes.
Q And that is, am I correct, your handwriting on it?
A Yeah. It's the scroll along the top and the side, yeah.
Q And could you read us what that says.
A It says, Charlotte, several places for Jim, Jim Boyd to sign. I inadvertently signed as a guarantor on one of the forms for Jim. I already signed one of the guarantees. Please make

Page 351

a copy set and retain. Please call Ray Knight at EY to find out where to send the executed agreements after the corrections and execution by Jim. And then it has a phone number. If you can't reach Ray, call Kenny Hughes. And it has a number.
And then on the left-hand side, it says: Jim also has a copy set with him in New York.
Q And you'll notice that, in this letter to you, there is enclosed, you'll notice, various forms. Do you see that?
A Yes, I do.
Q Now, I've asked that you be handed Exhibit 2259.
A I have it.
Q And one of the forms you'll notice is a SS-4 form for the partnership. Do you see that?
A I do. I've got it in front of me.
Q It's item 3 on 10/18.
A Right.
Q And take a look at 2259.
A I'm on 2259.
Q Do you see that?
A You're asking me to look at which item on this?

Page 352

Q Look at row 7 --
A Line 7.
Q -- name of principal officer. Do you see that?
A I do. You had pointed this out in my prior deposition that the --
THE COURT: Let Mr. Donohue ask the question.
THE WITNESS: I'm sorry.
BY MR. DONOHUE:
Q Take a look at the Social Security number next to your name. Is that the correct Social Security number?
A No. You had, at the other deposition, pointed out to me that the 3 and the 8 were reversed.
Q Trans- -
A I wouldn't -- I would never have noticed that.
Q Transposed?
A They're transposed, right. That the 8 and the 3 are transposed.
Q So your -- your Social Security number was sent correctly in the questionnaire to J&G, but the document that ultimately was filed with

Page 353

the Internal Revenue Service, SS-4, did not have
the correct Social Security number, correct?
A That's correct. The two numbers are
transposed.
Q I'm going to ask that you be handed
what's been marked as Exhibit 1011.
A Have you already handed this, or are you
intending to?
Q No. It's going to be given to you.
A Yes.
(Government's Exhibit Number 1011 was
marked for identification.)
Q Now, would you turn to Bates stamp
Number 467. It's the last three letters – or
numbers.
A Yes. Uh-huh. 469. Let me get to 467.
Q Now, notice that this is an SS-4 for an
application for an Employer Identification Number
for JC Buckingham Investments, LLC. And
Mr. Zucker, JC Buckingham Investments, LLC, am I
correct, that was the subchapter – I'm sorry,
that was your single-member LLC, correct?
A That's correct.
Q And take a look at line 7 there.
A It has the same transposition.

Page 354

Q And so your Social Security number on
this document that was filed with the Internal
Revenue Service is also wrong, correct?
A Yes. I mean it's transposed.
THE COURT: I see an 8A. It says
disregarded entity. Sometimes I feel like I'm a
disregarded entity myself.
THE WITNESS: Your Honor, thank you for
your consideration today.
THE COURT: No. No problem.
THE WITNESS: Definitely not disregarded
by me. Thank you.
THE COURT: I hope you made the right
decision.
THE WITNESS: That's who I am. Well –
THE COURT: I'm sorry. Mr. Donohue.
THE WITNESS: I'm sorry. Go ahead.
BY MR. DONOHUE:
Q Turn to Bates stamp 490.
A This is within the same group?
Q Yes.
A I'm closely getting there. I'm closely
getting there. 491. 490. Okay.
Q Now, this is an application for an
Employer Identification Number for JBJZ Investors,

Page 355

Inc. And that was your Subchapter S entity,
correct?
A That's correct.
Q And if you'll turn to line 7, you'll
notice once again that there is a Social Security
number next to your name.
A It's the same transposition.
Q You can't cut me off, sir.
A I'm sorry.
Q Am I correct that that is also an
incorrect Social Security number for you?
A The 3 an the 8 are transposed.
Q And you signed all of these forms; am I
correct?
A I did. If you had not pointed it out to
me previously, I would have never noticed these
forms in front of me, no. Yes, you – I'm aware
of it, and I clearly see it.
Q Can you – I'm going to ask that you be
handed what's been marked as Exhibit 1001.
Now, you testified regarding this tax
return in your direct examination. And this, am I
correct, is the tax return which was filed for the
year or for the period, rather, ending 12/31/1999
by your Subchapter S entity JBJZ Investors, Inc.;

Page 356

am I correct?
A Yes.
Q Now, turn to Bates stamp number 1079.
A Yes.
Q Now, that is a Schedule K for the
Subchapter S return. And you'll notice that
there's a Social Security number which is above
your name. Do you see that?
A That's certainly being very consistent
transposed.
Q So that also is an incorrect Social
Security number; am I correct?
A The 8 and the 3 are transposed.
Q Now, turn the page – I'm sorry. Go
back two pages to Bates stamp number 1077.
A Yes.
Q And that's the Schedule K for Mr. Boyd;
am I correct?
A It is.
Q Now, notice the Social Security number
for Mr. Boyd. Do you see that?
A Right.
Q Do you know if that's a correct Social
Security number?
A I don't think it will be a correct

Page 357

Social Security number for any human being. It doesn't have enough decimals in it – enough places in it unless they have some odd code somewhere, you know, that's – it's three followed by two followed by four.

Q So Mr. Boyd's Social Security number is missing a digit, correct?

A Yeah. Yeah. I don't know what his number is, but that definitely has a digit missing.

Q So your Social Security number had a transposition, and Mr. Boyd's Social Security number was missing a digit. Do you have any explanation as to how that happened on the same return?

A Not at all. I have no idea. If you want me to complete the answer, I mean, other than the fact that human beings make mistakes. Just like I put 1998, and it clearly wasn't 1998.

Q Mr. Zucker, I'm going to ask that you be handed what's been marked as Exhibit 1100.

(Government's Exhibit Number 1100 was marked for identification.)

THE COURT: Do you want a break,

Page 358

Mr. Zucker?

THE WITNESS: Well, I'm out of hot water. I still have a little bit in the cup here.

THE COURT: We can break for 10 minutes.

THE WITNESS: I don't want to – it's already late. I don't want to get somebody else – I appreciate the consideration. Thank you, Your Honor.

THE COURT REPORTER: Your Honor, may I have a restroom break in a little bit?

THE COURT: Let's take a break, then, and we'll come back at 5 minutes after. The Court is in recess.

(Whereupon, a recess was taken between 6:57 p.m. and 7:09 p.m.)

THE COURT: Mr. Donohue.

MR. DONOHUE: Thank you, Your Honor.

BY MR. DONOHUE:

Q We left off, Mr. Zucker, at Government Exhibit 1100. This is a handwritten note from Mr. Emerson. Have you seen this document before?

A No.

Q Do you – it is – I'm sorry, and I apologize for the poor copy. But can you read what it says?

Page 359

A If you can help me through some of the words.

Q Do you know who –

A It's somebody's – somebody's name.

Q Okay.

A If it is what you just said.

Q Okay.

A If it's a Sheila. Jim Boyd has a CPA whose name is Sheila. Jerry – I don't know what it says. Jerry – something – can you read it to me.

Q Well, I can't read it either.

A Oh.

Q So isn't the next word after that near the end: To forward these to you?

A I – I'm – I can speculate a guess like you, but I can't read it.

Q It is my current understanding that these returns with –

A I would agree with those words, yeah.

Q Can you see: Will be prepared by E&Y's Charlotte's office. Ray Knight.

A That sounds likely, yes.

Q I'll let you know the minute I hear anything.

Page 360

A Yeah. I would agree with those.

Q Was that your understanding that the returns for your transaction entities was to be prepared by Ernst & Young?

A Yes, it was.

Q Now, take a look at what's been marked as Government Exhibit 1001. And if you would, go to your binder, which is tab 16, which has it.

A Yes. Somebody has actually turned it to that, yes.

Q And take a look again at the first page of this. Am I correct that this is the return for JBJZ Investors, Inc., which was your Subchapter S entity, correct?

A Yes, it is.

Q And take a look at the bottom. That shows a preparer's signature of Ray Knight, correct?

A Yes.

Q Now, turn to Bates stamp number 1070, which is a Schedule D of the return.

A Yes.

Q And you'll notice that, in part 1, it makes reference to: See statement 2. Do you see that?

Page 361

A See statement 2. Yes.
Q And then if you turn to Bates stamp Number 1074, you'll see statement 2. Do you see that at the bottom right-hand corner?
A I do. Yeah.
Q Now, am I correct that the references to the property that is on that page, the Cisco stock, is referring to both a short-term capital gain and losses and long-term capital gains and losses refer to the Cisco stock that you ultimately sold to generate the long and short-term capital losses? Am I correct?
A I would presume that's the case, yes.
Q Now, notice what, for both, it states under the column costs. Do you see that in?
A Yes.
Q Did – in your case, am I correct that the bottom Cisco stock refers to – referring to long-term capital gains and losses, that refers to your Cisco stock that you contributed. Am I correct?
A Well, let me see – do you know what the number of shares are? I can't really look into any of these numbers. But, you know, I had 4500 shares of Cisco stock. So if that's the reference

Page 362

to it, then that would be the case.
Q And notice the date acquired, 2/15/96.
A Yeah.
Q Do you see that?
A I owned the stock a long time. But I – I can't confirm that particular date. But, yes.
Q Do you notice what it shows is the cost of that stock? Do you see that number?
A I can't – is that an 18 or a 10?
Q That's an $18,654,451. Is that what it cost you to purchase that stock?
A Well, I don't know what the cost basis was that they calculated or allocated out of the – out of the Sub S. But I can't tell you specifically what it cost without actually going back to my records to see what it costs. I have no idea.
Q Let's take a look at what has been marked as 1082.
A 1082.
Q Yes. And I'm going to ask that that be given to you.
A I actually have 1082 I believe. Is that the one that's ADMIN 001082? It's just a few pages further before my formal tab 17.

Page 363

Q I'm referring to Government Exhibit 1082.
A Oh. Then apparently I don't have it then.
Q It's a separate document altogether.
A Okay. So I'll just wait for you to give it to me.
(Government's Exhibit Number 1082 was marked for identification.)
BY MR. DONOHUE:
Q Yes. You'll notice that Exhibit 1082 is a fax from Ms. Crosby to Amy Keating. Do you know who Amy Keating is?
A I don't.
Q But Ms. Crosby again worked for you, correct?
A She did.
Q And you'll notice, if you turn the page, that there is a typed memo from Ms. Crosby to Ms. Keating. And it has information regarding what was the cost for you and Mr. Boyd regarding the Cisco stock. Do you see that?
A Yeah. In the bottom – kind of the bottom paragraph before a signature.
Q Right.

Page 364

A Yes.
Q And do you notice that she has there that your cost for the Cisco stock was $57,000? Do you see that?
A I do.
Q Does that sound about correct as to what your cost was for the Cisco stock?
A I honestly have no recollection. You know, if you looked at my normal trading accounts, I literally – hundreds of trades generally a day. So I can't tell you if that's right or not.
Q But you have no reason at this point in time to believe –
A No.
Q – that that –
A I have –
Q Let me finish my question. To believe that that number is incorrect?
A I have no reason to believe that it's incorrect.
Q Okay. Now, I'm going to ask that you be given the Government Exhibit 2037.
A Are you going to tell me who Amy Keating is just so I know?
Q Well, normally the process is that I ask

Page 365

the questions.
A Okay.
(Government's Exhibit Number 2037 was marked for identification.)
BY MR. DONOHUE:
Q Mr. Zucker, this is the document which is the instructions in 1999 for completing Schedule D. And if you take a look on page 3 under specific instructions part 1 and 2. Do you see that?
A Yes. Instruction Schedule D. First page?
Q No. On page 3.
THE COURT: Page 3.
THE WITNESS: Page 3. Okay. I'm now to page 3.
BY MR. DONOHUE:
Q Do you see under parts 1 and 2 where it refers to column E. Do you see that?
A Column E, yes.
Q And notice the first sentence. It says: Cost or other basis. In determining gain or loss, the basis of property is generally its costs. And then I'm going to skip to the last –
A But it also says special rules for

Page 366

determining basis are provided in sections of Subchapters K, CK, O and P, whatever those are.
Q Right.
A And that, basically, that the other rules apply.
Q And you can read as much of that as you want. But get down to the last sentence of that paragraph. And it says: Attach an explanation if you use a basis other than actual cash cost of the property.
Do you see that?
A I see that that says that in the instructions, yes.
Q Now, take a look at – go back to the return, which is marked as Government Exhibit 1001.
A Yes.
Q Do you know if anywhere in that return there is information regarding what your actual cost basis of the Cisco stock was?
A I have no idea. I mean, if you expect me to actually – I didn't sign this return. I have no idea. I didn't review it up until the prior deposition where you showed me. But, you know, I would have to read every line item to see

Page 367

what's in here and what's not. It's got a lot of papers attached. I don't know what that is.
Q Well –
A Fifty, 100 pages. I'm not sure. More.
Q So your answer is you don't know if there's anything in this return that would disclose what your actual cost basis is. Am I correct?
A Am I looking at the wrong documents? But, no, I don't know.
Q Okay. All right. Now, let me turn to another portion of this return.
A You know, I just realize that this – another exhibit was attached to the 1001 that you gave me. And it's actually – it appeared much thicker to me. But it's still – it's a lesser amount than I thought I was referencing. But I still don't know without, you know, reading through it.
Q Now, turn to, in this return, Bates stamp number 1077.
A 1077. Okay.
Q Do you notice that on the schedule K-1 for Mr. Boyd, he is being allocated the short – the net short-term capital loss of – loss of

Page 368

$2,019,744. Do you see that?
A I do see the numbers.
Q And if you turn to Bates stamp number 1079.
A Yes.
Q You'll notice in line E-2 –
A Yes.
Q – that you're being allocated a net long-term capital loss. Do you see that?
A I do.
Q So Mr. Boyd was being allocated all of the net short-term capital loss. And you were being allocated all the net long-term loss; am I correct?
A That's what it appears on the schedule. Yes.
Q And your ownership of JBJZ Investors, Inc., your Subchapter S entity, was 90 percent, correct?
A Yeah. We had a – I have a 90 percent interest.
Q And Mr. Boyd's was 10 percent?
A That's correct.
Q And yet he's being not allocated any portion of the long-term capital loss, and you're

Page 369

not being allocated any portion of the net
short-term capital loss. Do you know why that
happened?
A No. I mean, I – I rely on the
professionals to actually make out the forms and
all. And I assume that they know how to do it
properly. So, no, I don't know. And I don't know
what – you know what special – if I were to look
back at all those special regulations and all that
apply, I suspect that they applied what – I have
no idea.
Q Now, you, if you recall, paid a fee to
Ernst & Young of $675,000. Do you recall that?
A Yes.
Q And that was in connection with this
transaction, correct?
A That's correct.
Q Did you ever learn that that fee was
included in your partnership basis which, in turn,
carried over to the basis of your assets, the
Cisco stock in the currency? Did you ever learn
that that fee was capitalized?
A Not other than you telling me that that
was the case at my prior deposition. But, no, I
was not aware of that. And the only thing I do

Page 370

specifically know is that I paid that out of my
personal account directly to EY. And it wasn't
paid through any of my – any of those corporate
entities. So it was – it expected to be charged
as an expense, personal expense to me for that
year.
Q I'm going to ask that you be given
what's been marked as Exhibit 10 – 1005.
A It's not part of what I have?
Q No. You don't have it yet.
A Okay.
Q Now, Mr. Zucker, this is your joint 1999
1040 return?
A Yes.
Q And am I correct that it was on this
return that you reported the losses from the COBRA
transaction?
A Well, Barry, you know, basically
consolidated the report for the year. So I would
assume that the entire – the transaction would
have been reflected in this return.
Q Now, take a look at Bates stamp
Number 1295.
A Yes.
Q And do you notice there is a

Page 371

signature –
MR. CROUCH: Sorry, counsel, what page?
I'm sorry.
MR. DONOHUE: Bates stamp number 1295.
MR. CROUCH: 1295. Thank you.
BY MR. DONOHUE:
Q You'll notice that there is a signature
at the bottom of that page. Is that your
signature?
A It's mine as well as my wife.
Q Now, turn the next page to 1296.
A Yes.
Q And you'll notice under Schedule A where
there is, at the bottom, a reference to in – on
line 22, other expenses. Do you see that?
A Yeah. Where it's – it references see
statement 9.
Q See statement 9. Do you see that?
A I do.
Q And if you turn to Bates stamp
number 1335, there is a reference to the
miscellaneous deduction subject to floor on that
page. Do you see that under Schedule A?
A I'm on 1335. And where should I look?
Q Take a look in the middle of the page

Page 372

under Schedule A, miscellaneous deductions subject
to floor. Do you see that?
A Yes.
Q And you'll notice that one of the
deductions – the fourth one down in the amount of
$675,000 is your fee to Ernst & Young.
A Right.
Q Do you see that?
A Correct. And that's the one I mentioned
to you that I personally funded out of my account
from the house to pay them directly.
Q And that refers to your fee for the
COBRA transaction, correct?
A Well, for all of the various tax advice
which was – and the services that they were to
provide in a future basis. But, yes, that was the
same 675,000 we've spoken of during the course of
the day.
Q And did you ever become aware that you
took a deduction for this $675,000 fee and that it
was, in addition, it was capitalized into the
basis of your Cisco stock and Canadian currency –
A Other than –
Q Let me finish my question. Did you ever
become aware of that?

Page 373

A Other than you informing me of that, and I believe it was an inadvertent error, no, I was not informed otherwise.
Q And the inadvertent error being the double deduction, correct?
A Well, I don't know. You are the one that reported it to me. I was not aware of it from any other source.
Q Can we go back to, for the moment, Exhibit 1001, which is your Subchapter S return.
A Okay.
Q Now, I notice that the Jenkens & Gilchrist fee, which was significantly larger than the Ernst & Young fee, you did not take a deduction for that fee on your personal 1040 return. Do you know where that fee is reflected on the transaction?
A I don't. I would presume that it would be capitalized as part of the basis. But I don't know.
Q I'm going to ask that you be given what's been marked as Government Exhibit 2366.
(Government's Exhibit Number 2366 was marked for identification.)
BY MR. DONOHUE:

Page 374

Q Mr. Zucker, Government Exhibit 2366 is a chain E-mail. And I'm going to ask that you turn to the last page of the E-mail.
A You said a chain E-mail?
Q Chain E-mail.
A Okay. I'm on the last page.
Q And turn to the last page.
A Yeah.
Q And, first of all, before you turn to that page, turn to the prior page at the bottom. And note that the E-mail that I'm referring to is from Robert Coplan dated March 14th, 2000. Do you see that?
A I see the time indications and date indications. It says Jim Cox. And at the bottom, it's got the Robert Coplan, yes.
Q Now, turn to the next page. And what you'll notice is the subject says further and close to final update on COBRA returns. And then take a look at the third paragraph where it says J&G fees capitalized. Do you see that? Mr. Zucker, do you see where I'm referring?
A I'm looking at the key services. J&G.
Q Fees capitalized. Do you see that paragraph?

Page 375

THE COURT: It's in bold.
THE WITNESS: Therefore J&G fees will –
BY MR. DONOHUE:
Q My only question is –
A I see the paragraph. It's got.
Q Okay.
A I just can't – my eyes just aren't focusing on particular words. How many lines down where it says J&G fees capitalizes –
Q Your Honor, may I?
A I see the heading.
THE COURT: Please.
THE WITNESS: I do see the heading.
THE COURT: You have the bold?
THE WITNESS: That's the heading.
BY MR. DONOHUE:
Q Yeah.
A I was reading the paragraph trying to find out what you're doing.
Q No.
A But it's actually the heading.
Q The heading.
A Okay.
Q What that says is this. It says: This is to further advise you that the returns reflect

Page 376

a decision made late last week to capitalize the Jenkens & Gilchrist legal fees into the basis of the partnership interest which, in turn, gets included in the basis of the S Corporation out of which the payments were ultimately made. We concluded there was reasonable support for taking this position in that the key services J&G rendered were the structuring of the partnership, the document preparation, and the formation of the entities. The legal opinion was not the main reason for the payment of the fee since a separate tax opinion was being obtained from Brown & Wood. Therefore, the J&G fees will produce an additional K-1 loss in the same manner as the E&Y fees. The final S Corp returns and K-1s reflect this position. The significance of this is that the returns will not force the individuals to show the large payment to J&G is a miscellaneous itemized deduction which could be a flag on the 1040. Do you see that?
A I see what you've read to me.
Q Did you ever have any discussions with

Page 377

either Mr. Emerson or anyone at E&Y regarding the fact that the fees to pay to J&G would not be reflected on your personal return as an itemized deduction, but, rather would be capitalized in the basis?

A No. I had no discussion of that type at all with either.

Q Mr. Zucker, do you know when the fees that were paid to J&G were made?

A I mean, I can look to the documents and tell you. I can't – I can't specifically recall the dates. The one that I specifically do recall is Ernst & Young because I had paid that out of our home accounts and transferred – cross-transferred our funding to pay that directly so that – my view was so that it would be properly deductible in 1999. So I don't recall specifically when the others were funded.

Q Well, do you recall that the fee was paid by your Subchapter S Corporation?

A Yeah. No. I remember signing the – the wiring information. But I just can't place the date as to when it was wired.

Q Well, were you aware that the fee was paid on December 29th of 1999?

Page 378

A I don't have a specific in my own mind recollection of it being paid that particular day. But I do know, you know, that it was paid and that I had authorized it.

Q And do you recall that your partnership was terminated on December 27th with the assets being distributed to the Subchapter S on that date? Do you recall that?

A I recall that it was at the very end of the year, yes. I just can't tell you that it was specifically that particular day. But, yes.

Q Were you aware that, in order to capitalize the Jenkens & Gilchrist fee into the partnership interest, it would have required a retroactive allocation back to a partnership which, in fact, had been terminated? Were you aware of that?

A No

(Government's Exhibit Number 1005A was marked for identification.)

BY MR DONOHUE:

Q Let me ask that you look at what's been marked as Exhibit 1005A.

A Something that I will be receiving or something I have

Page 379

Q You will be receiving. And so will I.

No I won't.

MR. CROUCH: Counsel, if you want to make it easy, there's a copy of the same document under tab 18 of the notebook.

THE WITNESS: Okay. Okay.

THE COURT: You wanted 1005A, though, right?

MR. DONOHUE: 1005A.

THE COURT: This is 1005.

MR. CROUCH: On tab 18, Your Honor.

THE COURT: Oh, 18.

THE WITNESS: It's 1005A. Okay.

BY MR. DONOHUE:

Q Now, Mr. Zucker, this, am I correct, is a filed copy of a return for an application for a tentative refund of – for you and your wife for 1999. Am I correct?

A Yeah. That's – that appears to be, yes.

Q And it refers to, if you look at a – the line 28, the decrease in tax of $5.6 million. Do you see that?

A I do.

Q And if you'll look at line 11, you'll

Page 380

notice that there is a reference to a $24 million net operating loss deduction. Do you see that?

A This – on the same page?

Q Yes. Same page –

A Just tell me the line number again.

Q – of line 11.

A Yes.

Q And are you aware that you are taking this deduction of $24 million? And do you know where it came from in carrying it back to 1997?

A Yeah. I can't tell you the specific calculations. I rely on the professionals to actually fill out the forms and to review them and depend on their competency. So I can't tell you the specifics as to how many dollars are appropriate for each slot.

Q Well, I – do you recall that – if we can go back to it – we can – that note you wrote to Mr. Emerson.

A Yes.

Q Do you recall in that note you said, Barry, familiarize yourself with this transaction. We will be preparing. Do you recall that note?

A Not will be. That we're – you're talking about that we had had $45 million in

Page 381

losses that had been created. And I wanted to accelerate my refunds. That's the note you're referring to?

Q Right. And by accelerating your refunds, you're referring to actually taking a part of your losses from the transaction and, in fact, carrying them back to an earlier tax year. That's what you're referring to, correct –

A No.

Q – by refund?

A Earlier or prospective. I pay quarterly payments as well. So it would be generally applicable to my – you know, I literally paid hundreds of millions of dollars in taxes to the government. So as to how we applied it and what year, you know, I left it to his discretion.

Q Take a look at – and I'll ask that you be handed Exhibit 2355.

A 2355. Do I have it?

Q You don't have it yet.

A Oh, okay.

(Government's Exhibit Number 2355 was marked for identification.)

BY MR. DONOHUE:

Q Now, Exhibit 2355 is an E-mail by

Page 382

Mr. Coplan on 11/4/1999. And he states: We've had this question before. And definitive answers are hard to come by from the procedural group. The best guess is that a large refund on an original return may well attract more scrutiny. But it is by no means clear that it triggers an audit.

Now, Mr. Zucker, you testified that you were certain that your returns would be audited. Do you recall that testimony?

A Barry had expressed that opinion to me. I felt that was fine. I've been audited before. You know, no issues. I always try to comply with regulations. And I, you know, have the professionals handle it for me. So I didn't have any problem with an audit. I had no reason to be concerned.

Q Well, that wasn't my question. My question was: Do you recall that you received this information that a large refund could trigger an audit? Do you recall that?

A Only the discussion that I had with Barry saying that, because of the magnitude of the deduction, that I could be pretty much certain that I would be audited. And I felt fine with

Page 383

that.

Q Now, this Exhibit 1005A, that is an application for a tentative refund. Am I correct that that's not your original 1999 return? Am I correct on that?

A I just – I'm sorry. Just get me back to the right document.

Q I went back to Exhibit 1005A. Do you see that?

A I see 1005. Is that the same –

THE COURT: Tab 18.

BY MR. DONOHUE:

Q Tab 18.

A Oh, this is back to the tab. Okay. 1005A. I see it.

Q That's an application for tentative refund. But that's not your original return; am I correct?

A I can read it as well as you. It says Tentative Refund.

Q All right. Let me turn to a different subject, Mr. Zucker. You have mentioned a few times that, for you, this was a, I believe you used the word, win-win situation.

A That's correct.

Page 384

Q Where did you come up with these terms? And I've noticed in your deposition you used that, too. Win-win, is that just something that came –

A I used that for –

Q Let me finish my question. Just ultimately something you yourself out of, I suppose, your diction or memory came up with?

A No. It's conventional. If you are talking about, especially in customer relationships and general sales, you want the customer to have a win. And the same thing with a vendor relationship, you want it to be win-win. Both parties need to make a profit, for example. So you generally refer to that as a win-win when all concerned and for all reasons and purposes you – you have success. We generally refer to it as, you know, between parties win-win that you reach a contract or an agreement. As you know, I'm the – also the governor and CEO of the Hudson's Bay Company. And we recently reached an agreement with General Electric. And I described it in that agreement that it was a win-win agreement. They would make more money. We would make more money. So it's a term that I conventionally use.

Page 385

Q But – okay. In – with its reference to this transaction, when you say win-win, are you referring to win on the economics of the transaction –

A That's correct.

Q – plus win on the tax side of the transaction?

A That's correct. That I could – I could both make a profit and as well have a tax benefit.

Q And at the time you entered into this transaction, what was your predominant purpose for entering into it? Was it predominantly for the economics of the transaction or predominantly for the tax benefits of the transaction?

A When you're looking at hindsight, it's great. It was economic. But I had a wonderful tag-along that came with it. And I was, at the time of the discussion, I was convinced that I would call the currencies at least directionally correct and make a good chunk of money. And then have a real opportunity to potentially, more of a lottery, hit the sweet spot.

Q I ask that you be given what's been marked for identification as Government Exhibit 2368

Page 386

(Government's Exhibit Number 2368 was marked for identification.)

THE WITNESS: Is it something I have or –

BY MR. DONOHUE:

Q No.

A Okay.

Q You're going to be provided this exhibit.

Mr. Zucker, Government Exhibit 2368 is an E-mail from Melinda Merk of Ernst & Young, attaching a spreadsheet. And if you turn the page, you'll see a PowerPoint presentation. And what I'm going to ask you to do is turn to the very last two pages. Do you see that?

A I'm getting there.

Q It would be Bates stamp number 3766 and 3767.

A Okay. All right. I'm on 3766.

Q All right. Do you see that?

A What should I focus my attention to?

Q Okay. Now take a look at the top where it says ordinary loss. And it refers to a $50 million ordinary loss transaction. Do you see that?

Page 387

A Yeah. I mean, the economic – those are not my transactions. But –

Q Well, you had a $50 million transaction, correct?

A Oh, you're saying you think this relates to me or just –

Q No.

A – an example that they use?

Q My question simply is did you have a $50 million transaction, a loss transaction?

A In terms of the magnitude for Jim and myself, yes.

Q And –

A It's 50 million in the aggregate.

Q Right. Your transaction, 60 percent was allocated to ordinary loss and 40 percent was allocated to capital gain, correct?

A That's correct.

Q Well, let's first look at this ordinary loss for a $50 million transaction. And you notice on the economics, under the column which is the second column, it says: Win bet, win tax. Do you see that?

A Win bet.

Q Do you see where it says economics?

Page 388

A I see win bet, win tax.

Q Do you see that?

A I do.

Q Now take a look at the fees for this transaction. Those fees of – which are total of $4,750,000. Do you see that?

A Yes, I do.

Q And that was the total of your fees on the transaction, too, wasn't it?

A I'd have to go back and calculate it. But if you tell me it is, I'll take your representation that that's correct.

Q Now, notice what the economic –

A Is that actually – did we put 4,750,000 in it. You don't mean fees? But total capital, that would be right.

Q Yes. Total capital and your net premium paid to the Deutsche Bank. Remember –

A Using your form of calculation, then I would agree that that's the – originally we said 8-1/2 million, and you were commenting about the percentages. So that seems right in terms of total, including the capital that we put at risk, yes.

Q Don't you remember –

Page 389

A No, no, no, I agree.
Q -- your fee for the net premium was 5 percent. Your total fees for the legal opinions and to E&Y is 4-1/2 percent, for a total of 9-1/2 percent. And if you multiply 9-1/2 percent by 50 million, you get $4,750,000.
A Okay.
Q Now, take a look at what the return is for an ordinary loss on the economics only. Do you see that return of 31.56 percent?
A Is that 56 or 58?
THE COURT: 58.
MR. DONOHUE: 58 percent.
THE WITNESS: I see it.
BY MR. DONOHUE:
Q Now, did you make, at the time that you entered into this transaction, any type of calculation as to what -- if both of your options, as well as Mr. Boyd's options, were in the money, and you received favorable payoffs on all three, did you receive or did you make any calculation as to what your rate of return would be?
A No. You mean on all six, not all three?
Q Well, all three pairs
A Oh, well, for the six transactions, I --

Page 390

I've already gone through all this before. But, no, I didn't do a rate of return. I just did probability and my expectation of it. But no.
Q Now take a look under -- on an after tax basis, as to what the net after tax percentage return is on an ordinary loss. Do you see the bottom line number there of 513 -- I'm sorry. 512?
A 512.37 percent. I do see the number, yes.
Q Now, at the time that Mr. Knight and you were discussing changing the transaction from a $100 million loss transaction to a $50 million loss transaction, did you do some rough calculations as to what your rate of return would be based on the assumption that you would be able to claim either a capital loss or an ordinary loss in the transaction? Did you make any calculation of that?
A No. You had asked me that a number of different ways and times before. No, I did not.
Q Take a look at the next column, where it says lose bet, but win tax. Do you see that column?
A Yes. I see the column. I mean, are you

Page 391

showing me an internal document? I've not -- I see the column. I can read it.
Q Okay. You notice at the bottom of this page it says lose bet, win tax. And there what it shows is is that the rate of return is 418.68 percent. Do you see that number?
A I see what's -- what you're reading, yes.
Q Well, even though you didn't do any specific calculation, were you aware that, even if you lost the bet on your options, nevertheless, your rate of return on this transaction was going to be quite significant? Did you make any type of, shall we say, rough calculation of that?
A No, I did not.
Q I'm having a hard time understanding when you say the economics were the predominant purpose of the transaction. Can you, given these rates of return here, can you explain to me as to how the economics would be the predominant purpose of this transaction?
A You can base -- using this sheet, you can assess what you want after the fact. But at the time of the transaction, I was very excited about making a good buck on the currency option,

Page 392

and the overall structure was very exciting and fully understandable by Jim Boyd. And between the two of them, I just saw it as just a great opportunity.
So, you know, my interest was focused on the making money. And the fact that I would, for a change, be able to get some deduction, that would have been nice. So -- you all don't seem to complain. I've given you all in corporate earnings and personal hundreds of millions of dollars in taxes. Nobody seems to complain then.
Now I've tried everything to apply the regulations as appropriate and do everything by the book. And I'm looking for my refund. And now, you know, you're trying to make it look like I'm somehow involved with these other documents that you're presenting before me.
But I had no knowledge of it. And that was not my intent.
Q But you could make the calculations, couldn't you? You didn't need these documents to make the rough calculations as to what your rate of return would be?
A I didn't even consider rate of return. I considered all those aspects that I've already

Page 393

reviewed today. And that was my probability of outcome. And I had an extraordinarily high set of confidence of being able to call the right direction on the currencies.

Q I ask that you be given Exhibit 2380.

(Government's Exhibit Number 2380 was marked for identification.)

BY MR. DONOHUE:

Q Did you ultimately take part in a suit --

A Is 2380 something I'm supposed to have?

Q You'll be getting that in a second. 2380. My question is did you ultimately take part in any type of either litigation or any type of proceeding against any of the promoters of this transaction?

A Not against anyone. But as I told you at the last deposition, we got a call from an attorney in Texas that asked me if I wanted a free lottery ticket, that they were going to pursue a group settlement that could, if I -- I didn't have to make any claims of any kind, that I would get a shared participation. And he -- he indicated to me that there was no down side to my doing so. So I said fine

Page 394

Q So your testimony is you did participate in either a litigation or other proceeding against the promoters of the transaction?

A I don't believe that it was any litigation. But I do believe that I got a participation in a -- in a group settlement of some sort.

Q Take a look at what's been marked as Government Exhibit 2380.

A Is this something in front of me?

Q Do you have it in front of you?

A I'm asking, is 2380 something that should be before me? Oh, I see. 2380 to the left. Okay. I've got it. I've got so many documents. I'm sorry.

Q Now, this is a settlement agreement between Sidley Austin Brown & Wood and yourself, your wife, JZ Buckingham Investments LLC, JBJZ Partners and JBJZ Investors, Inc. Do you see that at the top?

A I see the form you've given me.

Q And if you turn to Bates stamp number 835.

A Yes.

Q Do you notice there's some signatures on

Page 395

that page?

A Right.

Q Are those your signatures?

A Right. You had asked me if I had entered into such an agreement. And I had said yes.

Q And did you receive any monies pursuant to your settlement agreement from this firm?

A I can't specifically tell you if I did from this firm. But the attorney that was representing us, I know that there were payments made. And I just don't know the amounts of what the payment was.

Q Did -- let me ask that you be given Exhibit 2374.

(Government's Exhibit Number 2374 was marked for identification.)

THE WITNESS: 2374. Oh, to be given. Okay.

BY MR. DONOHUE:

Q You mentioned, Mr. Zucker, that an attorney from Texas called you.

A Yeah.

Q Do you recall the name of the attorney?

A I don't specifically. Is this a --

Page 396

Q Take a look at page 131 of what's been marked as Government Exhibit 2374.

A 131. Okay.

Q And look under the law firm of Shore & Deary LLP. Do you see -- do you see that's a Texas law firm?

A It's a Texas law firm, yes.

Q Now, do you recognize any of those names?

A The name Deary sounds very familiar.

Q So it was Mr. Deary who called you in connection with asking you if you wanted to participate -- I believe what you said, a lottery ride?

A Yeah. He said he'd won a free lottery ticket. He says they're going to be doing a group settlement. Would I allow my name to be included. So the answer was yes. But I don't think he's the person that actually called me. I remember his name, but I think it was somebody else that was involved with his firm.

Q Exhibit 2374 is a second amended complaint, an original class action complaint. Have you ever seen this document before?

A I don't think so. I don't think so.

Page 397

Q Mr. – or whoever called you from this Texas law firm –
A Yes.
Q – they asked you if you wanted to take a lottery ticket but they didn't provide you with any information as to what the nature of the action was?
A Ultimately they told me it was to settle this, that – I told you this in the last deposition. But for the Judge's benefit, that he said that they thought the government, you know, the government has got endless pockets, that they're going to keep putting pressure on these firms. And eventually they're going to cave just simply because they don't want to be exposed to the possibility.
And that if I wanted a free ride, that they would want – they believed that they would be interested in a settlement, if I wanted to get a participation, that it was a free ride, and I said fine.
Q Take a look at, in this document, at page 21. The top of the page.
A Page 21, yes.
Q And the top of the page is in reference

Page 398

to paragraph 34. And it says: Throughout the class period, defendants –
A Am I looking at –
Q Yes.
A I want to be looking at the same place.
Q Paragraph 64 is on the prior page.
A Okay. All right.
Q Take a look at the prior page.
A All right. Yes.
Q It says throughout the class period, defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose the true facts, even though such facts were available to this – to them. In this regard defendants' acts and omissions included, inter alia, and then go over to the top of page 21.
A Uh-huh.
Q It says failing to apprise the plaintiffs and the class members that the FX contracts had no reasonable possibility of a profit, certainly not in excess of the fees paid. And that, in reality, the net effect of the digital options they were purchasing and selling

Page 399

was nothing more than a wager, like buying a lottery ticket on where the price of the underlying currency would be exactly at 10:00 a.m. on a date – on a given date 30 days hence. When this attorney called you, did he mention to you either that allegation or any of the allegations that in fact the investors were making against the promoters?
A No. He very specifically said I wouldn't have to make any claims. He just, if he included me in the listing, it would increase the overall settlement. And I would get a participation in the settlement if they were successful. No.
Q I ask that you be given Exhibit 2255.
THE WITNESS: Can I add one thing, Your Honor, just to clarify?
THE COURT: Sure.
THE WITNESS: I specifically told them that I didn't think they had done anything wrong. And he told me that it didn't really make any difference. That, you know, would I turn down a free lottery ticket that could amount to participation in some money. I just wanted to complete that. I'm sorry.

Page 400

THE COURT: That's okay.
THE WITNESS: Were you in the middle of a question? Or are you about to give me something?
BY MR. DONOHUE:
Q What I said is I'm asking that you be handed what's been marked as Government Exhibit 2255.
A 2355.
Q 2255.
A Okay.
Q Now, you testified regarding this note on 12 – regarding 12/28/99 on direct examination. Do you recall that?
A I do.
Q Now, this is another document that was not produced either to the Internal Revenue Service or to the government pursuant to our request to produce until Ms. Charlotte Crosby's deposition last week. Do you have any other explanation besides those that you've offered as to why this document was not turned over?
A No. Not other than what I've already offered. You know, probably missed the file.
Q You'll notice that Mr. – this is

Page 401

Mr. Boyd's handwritten note to you, correct?
A Right.
Q It's dated 12/28/99, correct?
A It is.
Q Now, you – take a look at the – in the middle of the page, where he says: I, again, raised the issue with Ray. Do you see where I'm reading?
A I do.
Q About the, quote, margin earnings on the euro. Now, the euro, am I correct, is the currency, am I correct, that you in fact were in the money on? Am I correct?
A Right. We made $1,875,000 on the euro.
Q And it says, he said he will call you tomorrow. He said the reason we only picked up the margin gain of 625,000 – and am I correct, the 625,000 represents the net gain on the transaction?
A I don't know. I'm not familiar with margin gain, as I said earlier. So I'm presuming – the only 625 I know of is when you take the $1-1/4 million that was the net premium loss on the – on the yen. And if you then charge that against the 1,875,000, you end up with the

Page 402

625,000. So I'm presuming that's what he – you know, that's what he's saying.
Q In other words, what he's saying there is he's taking your total payout on the transaction and he's subtracting your total costs. And he's referring to a net amount. Am I correct?
A I'm not sure.
Q All right.
A I'm presuming that to be the case because that's the only reference to 625 that comes to mind.
Q But that's not my question. My question is is he's saying he said the reason we only picked up the margin gain of 625,000 plus the original 2.5 million was because we capped our exposure. Do you see that?
A I see what it says.
Q Now, it seems to me that there was some confusion as to what you thought would be your payout when your euro options were in the money. Was there some confusion as to what your payout would be if your euro currency options were in the money?
A There was no confusion about it. I was just very excited. I had tracked them and I knew

Page 403

that we had gotten in the money, so I'd gotten $1,875,000. And it didn't apparently dawn on me at the time in my comments to Jim that we were out of the money on the yen. I frankly thought we had – we were going to hit both. I just ended up calling the yen wrong.
Q Well –
A So I suspect that that's what he's referring to here.
Q It seems that his note's referring to the fact that he's had some conversation regarding this subject with you previously. Did you instruct him to find out from Mr. Knight as to why it was you were only receiving, in fact, the amount you did on this transaction?
A No. I – to be quite frank with you, I don't actually recall the note until you put it before me. But I'm presuming that I saw it and I don't know any more than what I'm testifying to right now, that those are the things that I can attribute to it.
But I don't know what he means by because we capped our exposure. I don't know what that means, other than the fact that it was a leverage transaction. And, you know, we had

Page 404

committed, you know, what the maximum amount of money that would be invested.
Q Do you remember your prior testimony when you said that, for the euro, you were, in fact, well in the money –
A Yes.
Q – on that transaction?
A Right.
Q Now, for a nondigital transaction where you in fact are well in the money, your payout is related to how high in fact your spot price is; am I correct, at the closing of the transaction or at its expiration; am I right?
A Not on a digital option.
Q Correct?
A On a digital option, it's either yes or no based on the contract terms.
Q Correct. But my question is, for a nondigital option, am I correct –
A For an American stock?
Q – that your payout is, in fact, based on how much in the money or how high or low, depending on if it's call or put, your spot price is? Am I correct?
A If I had had a currency option that

Page 405

would result in actual currency payment as an exchange, then you would be right. But as a digital option, it's a contracted yes or no. It's binary. So....

Q You correct me if I'm wrong. But the way I read it, it appears as if you initially thought that you had not purchased a digital option but you had initially purchased in fact a normal option, not digital, since you were way in the money, you were wondering, and asked Mr. Boyd to find out why it was that you weren't getting a larger payout.

A I do not believe that what you're defining had anything to do with my thinking. Because I clearly understood that it was a digital option. So I don't believe that your suggested reasons for it coming up are that, but rather that I was very excited about having known that we were in the money and that we made $1,875,000. And I failed to probably recognize at the time that we were not in the money on the yen. So I don't think it had anything to do with that because I was clearly -- understood digital.

Q Well, you understood digital but is the

Page 406

question whether or not you had any real understanding of the type of option transaction that you entered into at the time you did.

A Yeah. I understood it was a digital option, that it was either yes or no. It was binary. Either we were in the money or we weren't in the money. There were no shades of gray in that the amount that had been contracted for would be the actual exchange. It's clearly noted in all of our discussions and clearly noted in the confirmation.

Q Did you direct or ask Mr. Boyd to find out why it was that your payout on the euro options wasn't greater than it was? Did you make any direction to him regarding that?

A No. I -- I don't -- I do not recall having any discussions on that subject with him. It's unlikely that I would have, simply because I knew the transaction well.

Q Mr. Zucker, did -- on the initial entering into this transaction, did it ever occur to you to say these people, Ernst & Young, are telling me I can take a tax loss for a fraction of the cash amount that I am putting into this transaction; I better have a set of independent

Page 407

lawyers and advisors look at this? Did that ever occur to you?

A No. I had ultimate trust in Ernst & Young. I had done business with them for 2-1/2 decades, since the time they changed from Ernst & Ernst to Ernst & Whinney in, I think that was like 1979 or so. So right around that time period, maybe 1980 if not '79. No. And I continue to have the ultimate respect for them as professionals.

Q Your Honor --

A That never even crossed my mind.

MR. DONOHUE: Your Honor, I pass the witness.

THE COURT: Thanks very much.

MR. CROUCH: Can we have a five-minute break, Your Honor?

THE COURT: Yes. How long do you think your redirect will be?

MR. CROUCH: I don't want to make any promises to the Court, but I'm hoping it will go quickly.

THE COURT: Okay. Because we've lost our air-conditioning.

MR. CROUCH: It will go more quickly

Page 408

that way.

THE COURT: Okay. That will wonderfully concentrate the mind. Okay. Recess for -- when do you want to come back? Quarter after?

MR. CROUCH: Quarter after will be fine.

(Whereupon, a recess was taken between 8:12 p.m. and 8:22 p.m.)

THE COURT: Mr. Crouch.

MR. CROUCH: Your Honor, in order to kind of facilitate this a little quickly, we're trying to pull out the particular documents I want to talk to Mr. Zucker about very quickly here.

THE COURT: Okay. May I borrow a pen from someone? Power is such a wonderful thing.

MR. CROUCH: If I could, while we're getting the documents, Your Honor, I do have a couple questions for Mr. Zucker, if it's okay to start.

THE COURT: Sure. Please start.

REDIRECT EXAMINATION

BY MR. CROUCH:

Q Mr. Zucker, you were asked right before the break about obtaining some sort of independent legal advice with respect -- legal or accounting

Page 409

advice with respect to this transaction.
I'm talking too fast, aren't I? Okay.
Let me try it again. I'll slow down. It's sort of late in the day. I think I speed up when we get late, but I'll slow down.
Right before the break, you were asked about whether you had obtained independent – or considered obtaining independent legal or accounting advice with respect to this transaction. Do you recall that question?
A I do.
Q And Mr. Zucker, other than Ernst & Young and Jenkens & Gilchrist and Brown & Wood, did you rely on anybody else with respect to this transaction?
A Sure. Jim Boyd. Brilliant tax attorney and corporate structuring attorney, yes. He felt – felt very good about the facts and what the regulations were, based on what had been presented and his follow-up.
Q Also, Mr. Zucker, you have continually had questions about how the transaction has been stated by the government. One of the questions – one of the issues you had is you have continually referred to the term revenue offset instead of tax

Page 410

loss. Why is it that you are referring to revenue offset instead of tax loss?
A I fully expected to make a good profit on this thing. It just offsets the profits I have and so, you know, I went into this to make money.
Q Could I ask you to look at what has been previously marked as Government Exhibit 1029.
A Yes.
Q Do you have that in front of you?
A I do.
Q Very good.
MR. CROUCH: Your Honor, if you would like to you can look at our –
THE COURT: I have it, thanks.
BY MR. CROUCH:
Q And you recognize this as a copy of your letter that – your fee agreement with Ernst & Young?
A That's correct.
Q I think you previously testified that you did not enter into any kind of nondisclosure agreement with respect to Ernst & Young; is that right?
A Well, specifically I was shown a nondisclosure agreement. I said I had never seen

Page 411

anything like it before.
Q Let me ask the question. Let me ask the question.
A Okay.
Q If you – if you would look at the last paragraph on that document, it seemed – if I could read that to you, it says all advice and other services we provide pursuant to this arrangement are intended to be solely for your benefit and that of the partnership and are not for the benefit of anyone else. Accordingly, our advice may not be relied upon by any other person or persons, used in connection with any other transaction or used for any other purpose without our prior written consent. Furthermore, the content of any oral or written communication made by us in connection with this engagement shall not be communicated to the public or otherwise publicized in any manner without our prior written consent.
Can you tell me what your understanding of that paragraph was?
A That it was proprietary. That was their intellectual property. And they didn't want me sharing it around. So I didn't have any problem

Page 412

with it. I mean, I – I've got, you know, numerous patents of which I collect, you know – and the corporation collects royalties on. And I understand respect for proprietary knowledge.
Q Okay. Thank you. You were also shown during the cross-examination a number of internal E-mail correspondence, primarily E-mail correspondence within Ernst & Young.
A Yes.
Q Did you ever see any of those E-mail correspondence?
A Not other than from counsel here.
Q Were you ever made aware of any of those E-mail correspondence?
A No. Never.
Q By anybody from Ernst & Young?
A Never.
Q Would you look at Government Exhibit 2382.
A Somebody is going to have to hand it to me. Yes.
Q I'm waiting for the Court to get it, to see if he has a copy of it.
And can you tell me what this document is?

Page 413

A It's a copy of a trading statement from Morgan Stanley Dean Witter, just reflecting the fact that we have done many, many trades in JBJZ.

Q Okay. Tell me a little bit – who is it a trading statement for?

A It's for JBJZ Investors, Inc.

Q Okay. And what is JBJZ – is that the S Corporation in this transaction?

A It's the S Corp, yes.

Q Okay. Did you continue using JBJZ –

A I did.

Q – after this transaction?

A Yes.

Q Do you know how long you continued using JBJZ Investors, Incorporated?

A I think the account relationship is continuing and being – is maintained open now.

Q So in other words, JBJZ Investors, Incorporated was not just used for the transaction at issue in this case; is that correct?

A That's correct.

Q Mr. Zucker, you were also shown a number of times the tax returns related to this transaction, that being your personal tax return, tax returns for the S Corporation and the tax

Page 414

return for the partnership.

A Yes.

Q And counsel for the defendant pointed out a number of discrepancy – what they claim to be discrepancies in those tax returns.

A Yeah.

Q First of all, did you prepare these tax returns?

A No.

Q Who prepared the tax returns?

A Ernst & Young.

Q Okay. What about your personal tax return?

A Personal tax return is, you know, for years been Barry Emerson.

Q Okay. Ernst & Young prepared the other tax returns, though?

A Yes

Q Do you have the capability of preparing tax returns?

A Me personally?

Q Yes, you personally?

A Not unless I gained an awful lot more patience than I have. No, I don't think so.

Q When is the last time you prepared a tax

Page 415

return?

A Many, many years ago.

Q Okay. And why is it you don't prepare tax returns?

A That's not an area of my expertise, and I certainly don't have the patience for it.

Q Do you rely on professionals to prepare the tax returns?

A I do.

Q Okay. I'm going to ask you to look at what is two different documents. That is what's been marked as Government's Exhibit 2259 and Government Exhibit 1011.

A 2259. Yes. And 1011. Okay.

Q 1011.

A Okay. Is that the one I'm to look at first?

Q Let's make sure the Court gets a copy of it.

Do you recall that you went through some of these documents with the government where they pointed out some discrepancies on some of these documents with respect to your Social Security number?

A Yes.

Page 416

Q Okay. Would you look with me at, within 1011, Bates number DOJ 041490.

THE COURT: Which one is that again?

MR. CROUCH: Zero –

THE COURT: 1011.

MR. CROUCH: 1011.

THE COURT: And the Bates number?

MR. CROUCH: 041490.

THE WITNESS: Okay. Okay.

BY MR. CROUCH:

Q Will you note with me, if you would – are you aware is that the correct employer identification number in the top right-hand corner, as far as you know?

A As far as I know, it is correct.

Q Would you then look at document 2259 with me, please?

A Yes.

Q And keep 1011 with you.

A Okay.

Q And would you turn to the third page of this document.

A Yes.

Q Form 2553.

A Yes.

Page 417

Q And do you see where you have signed that document?
A I do see it.
Q Do you see where you have signed it in the box marked, I guess it's under K, you signed it two different places; is that correct?
A I did.
Q Okay. Do you see under the line M where your Social Security number is on there?
A Yes.
Q Is that a correct number?
A Correctly stated.
Q Okay. And this document was filed with the Internal Revenue Service?
A It was.
Q But do you also see at the top of that, in the name of the entity, what's the name of the entity there, does it say?
A It says JBJZ Investors, Investors Inc.
Q Do you know why that was placed there?
A I would think typographic error.
Q Okay. Would you go back to document number 1011.
A Okay.
Q Would you look at Bates stamp

Page 418

number 494, the last three digits.
A Okay.
Q Do you see – you see this is the form 2553 that we previously reviewed?
A Yes.
Q And you see again that your Social Security number is correct on that?
A It's correctly stated, yes.
Q You see also that the employer identification number is the same number as was shown on the previous SS-4?
A Right. And Jim Boyd's complete Social Security number is there. It's the same filing that the government was referring to earlier.
Q All right. Do you also see – what is the name now that is listed on line 1?
A It says JBJZ Investors, Inc.
Q Does it appear to you, would you agree with me that it appears that somebody tried to correct that and did it correctly?
A I believe that it was correctly submitted, resubmitted, yes.
Q Mr. Zucker, was it your understanding from this transaction that you had an opportunity to make money on the transaction?

Page 419

A Absolutely.
Q Was it also your understanding that there were some tax benefits associated with this transaction?
A Yes.
Q And was – would you have done this transaction if the only thing that was available was the tax benefits and there was no way for you to make a profit on the transaction?
A No.
MR. CROUCH: Pass the witness.
THE COURT: Thanks very much.
MR. DONOHUE: Nothing, Your Honor.
THE COURT: Thank God. Okay. Mr. Zucker, you are excused. Thank you so much.
THE WITNESS: Are we off the record now?
THE COURT: We're still on the record, yes.
THE WITNESS: We're on the record. I was going to make some comments to you.
THE COURT: I can go off if you like.
THE WITNESS: Could we do that?
THE COURT: Yes, go off the record, please.
(Discussion off the record.)

Page 420

(Whereupon, the proceeding continued on the stenograph record only as follows:)
THE COURT: Let's go back on the record. I just want to point out that we have all this electronic equipment, you know, so if you could have just simply slid the exhibit right on the ELMO here and it would have gone to everything, that would have saved us a lot of time. I don't know if you were aware of that before.
MR. CROUCH: I was not until we walked in yesterday, Your Honor.
THE COURT: I see. Okay. So just in the future, if we get to the stage of the trial, now you're aware of it, right?
MR. CROUCH: Yes.
THE COURT: So we can move things along more quickly. Great. I want to thank everybody for their patience. And good job from all the lawyers, as usual, as I expect. Again, thank you very much, Mr. Zucker. And I wish you all the best.
THE WITNESS: Thank you very much.
THE COURT: We finally are adjourned. Thank you.

(Whereupon, signature having not been waived, at 8:35 p.m., the deposition was concluded.)



CONTENTS

| WITNESS | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| JERRY ZUCKER | 6 | 161 | 406 |

AFTERNOON SESSION: 118

EVENING SESSION: 318

EXHIBITS

| PLAINTIFF'S EXHIBIT NO. | MARKED |
|---|---|
| 1 | 94 |
| 2 | 109 |
| 3 | 127 |
| 4 | 137 |
| 5 | 133 |
| 6 | 137 |
| 7 | 148 |
| 8 | 153 |
| 9 | 154 |
| 10 | 156 |
| 11 | 157 |
| 12 | 158 |
| 13 | 159 |
| 14 | 16 |

| GOVERNMENT'S EXHIBIT NO. | MARKED |
|---|---|
| 155 | 162 |



EXHIBITS

| GOVERNMENT'S EXHIBIT NO. | MARKED |
|---|---|
| 170 | 191 |
| 171 | 192 |
| 173 | 194 |
| 174A | 201 |
| 177 | 60 |
| 177A | 184 |
| 180 | 347 |
| 520 | 294 |
| 1000 | 139 |
| 1001 | 142 |
| 1005 | 144 |
| 1005A | 378 |
| 1010 | 302 |
| 1011 | 353 |
| 1017 | 344 |
| 1018 | 75 |
| 1019 | 124 |
| 1022 | 326 |
| 1023 | 333 |
| 1028 | 330 |
| 1029 | 211 |
| 1029A | 81 |
| 1032 | 288 |



EXHIBITS

| GOVERNMENT'S EXHIBIT NO. | MARKED |
|---|---|
| 1053 | 120 |
| 1061 | 234 |
| 1073 | 317 |
| 1079 | 295 |
| 1082 | 363 |
| 1090 | 339 |
| 1100 | 357 |
| 1104 | 67 |
| 2037 | 365 |
| 2255 | 129 |
| 2257 | 203 |
| 2259 | 350 |
| 2269 | 63 |
| 2325 | 299 |
| 2338 | 212 |
| 2342 | 228 |
| 2350 | 224 |
| 2352 | 169 |
| 2353 | 165 |
| 2355 | 381 |
| 2358A | 303 |
| 2360 | 241 |
| 2361 | 307 |

Page 425

EXHIBITS

GOVERNMENT'S EXHIBIT NO. MARKED

| | |
|---|---|
| 2362 | 282 |
| 2363 | 283 |
| 2364 | 284 |
| 2366 | 373 |
| 2367 | 313 |
| 2368 | 386 |
| 2369 | 278 |
| 2370 | 260 |
| 2371 | 265 |
| 2372 | 265 |
| 2374 | 395 |
| 2375 | 271 |
| 2377 | 332 |
| 2378 | 229 |
| 2379 | 229 |
| 2380 | 393 |
| 2382 | 342 |

Page 426

ACKNOWLEDGMENT OF DEPONENT

UNITED STATES COURT OF FEDERAL CLAIMS

JZ BUCKINGHAM INVESTMENTS LLC

vs

THE UNITED STATES

DEPOSITION OF JERRY ZUCKER

July 19, 2007

I do hereby acknowledge that I have read and examined the foregoing pages 1 through 427, inclusive, of the transcript of my deposition and that:

(Check appropriate box):

( ) The same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

( ) Except for the changes noted in the attached errata sheet, the same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

DATE SIGNATURE

Page 427

CERTIFICATE OF REPORTER

DOCKET NO.: 05-231T

CASE TITLE: JZ Buckingham Investments v. U.S

HEARING DATE: July 19, 2007

LOCATION: Washington, DC

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: July 19, 2007

Vicky Reiner, RMR, CRR
Official Reporter
Heritage Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4019