# GOVERNMENT EXHIBIT O

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Nos. 06-245T, 06-246T, and 06-247T
(Consolidated)

| | |
|---|---|
| MURFAM FARMS, LLC,<br>By and Through Wendell H. Murphy, Jr.,<br>a Partner Other Than Tax Matters Partner,<br><br>PSM FARMS, LLC,<br>By and Through Stratton K. Murphy,<br>a Partner Other Than Tax Matters Partner,<br><br>MURPHY PORK PARTNERS, LLC,<br>By and Through Wendell H. Murphy, Jr.,<br>a Partner Other Than Tax Matters Partner,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | ) |

and

IN THE UNITED STATES DISTRICT COURT
IN THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| GARY V. WOODS, as Tax Matters Partner<br>of TESORO DRIVE PARTNERS, a<br>Texas General Partnership,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | ) | Case No.<br>SA-05-CA-0216-XR |

Consolidated with

GARY V. WOODS, as Tax Matters Partner )
of SA TESORO INVESTMENT PARTNERS, )
a Texas General Partnership, )
)
Plaintiff, )
)
v. ) Case No.
) SA-05-CA-0217-XR
UNITED STATES OF AMERICA, )
)
Defendant. )

********************************************

VIDEOTAPED ORAL DEPOSITION OF
STUART A. SMITH
AUGUST 30, 2007
VOLUME I

********************************************

ORAL DEPOSITION OF STUART A. SMITH, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on the 30th day of August, 2007, from 9:59 a.m. to 4:08 p.m., before Dana Taylor, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Mr. Anthony Daddino, Meadows Collier, 901 Main Street, Suite 3700, Dallas, Texas 75202, pursuant to the Federal Rules of Civil Procedure.



A P P E A R A N C E S

FOR THE PLAINTIFFS:

MR. ANTHONY DADDINO
MEADOWS COLLIER
901 Main Street
Suite 3700
Dallas, Texas 75202
(214)744-3700

FOR THE DEFENDANT:
MR. DENNIS M. DONOHUE
U.S. DEPARTMENT OF JUSTICE
TAX DIVISION
P.O. Box 403
Washington, DC 20044
(202)307-6492



INDEX

Appearances 2
Stipulations 6

STUART A. SMITH
Examination by Mr. Donohue 6

Signature and Changes 195
Reporter's Certificate 196



EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 2408 | Plaintiffs' Expert Report of Stuart A. Smith | 7 |
| 2409 | Plaintiff's Expert Report of Stuart A. Smith | 7 |
| 2836 | Expert Report of Stuart A. Smith | 20 |
| 2351 | Correspondence dated 9/16/99 | 41 |
| 2325 | Agreement | 43 |
| 2353 | Correspondence dated 10/25/99 | 46 |
| 155 | COBRA Action Work Plan | 50 |
| 2846 | Memorandum dated 10/1999 | 55 |
| 2868 | Correspondence dated 2/17/00 | 56 |
| 159 | Correspondence dated 11/1999 | 68 |
| 2837 | Petitioners'/Plaintiffs' Expert Report of Stuart A. Smith | 73 |
| 2867 | Correspondence dated 3/9/00 | 91 |
| 2847 | Correspondence dated 11/12/99 | 95 |
| 2834 | 152 Federal Reporter, 3d Series | 106 |
| 2833 | Chamberlain v. C.I.R. | 108 |
| 2827 | Definitions and Special Rules | 138 |
| 2850 | Correspondence dated 1/17/00 | 166 |
| 2843 | Correspondence dated 10/8/99 | 176 |
| 2864 | Declaration of Robert B. Coplan | 177 |
| 2656 | Memorandum dated 11/17/99 | 178 |
| 2859 | Correspondence dated 12/5/99 | 182 |

PROCEEDINGS

MR. DONOHUE: Let me state that this deposition is being taken pursuant to an agreement of the parties as to the time, place, and date, and also being taken pursuant to the Federal Rules of Civil Procedure.

STUART A. SMITH,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. DONOHUE:

Q Mr. Smith, would you state your full name and spell your last name for the court reporter?

A Stuart A. Smith, S-m-i-t-h.

Q And where do you reside?

A In New York City.

Q And I know you had a deposition taken of yourself at least once. How many times has your deposition been taken in the past?

A Just that once.

Q Okay. And just in case sort of the ground rules were not explained to you, I'm going to take the time to explain that there is, as you know, right here a court reporter. She will take down my questions and your answers.

You need to wait obviously until I finish my question before you give your answer. And if for any reason my questions are not clear, please let me know, and I'll do



my best within my abilities to restate the question.

Is that clear?

A Yes.

(Exhibit Nos. 2408 and 2409 were marked.)

BY MR. DONOHUE:

Q Okay. Now, as I mentioned, the goal here is to finish today. And so what I'm going to do is pursue certain efficiencies. What we'll start off with is your Tesoro report, and that's been put right in front of you. It's been marked as an exhibit. It is deposition Exhibit 2409.

Do You see that exhibit in front of you?

A I do.

Q And is that the report you wrote in connection with the Tesoro report?

A It is.

Q And what you'll notice is is that right underneath that there is another report you wrote, which is the report in the Murphy case. That is Exhibit 2408. Do you see that report?

A I do.

Q And is that the report that you wrote in connection with the Murphy case?

A It is.

Q Now, what I'm going to do is start off with



questions on the Tesoro report. And even though there's a different legal opinion that you're opining on in connection with the Murphy case, unless you feel that the questions I ask somehow would be answered differently with respect to your Murphy report, then let me know, and I'll take the time to specifically inquire about any differences between the two reports.

Do you understand that?

A I do.

Q Okay. So if there are no differences, then we can then simply ultimately finish with the Tesoro report, and then I can end the deposition.

A Uh-huh.

Q Is that clear?

A I do.

Q Okay.

A I am.

Q You understand?

A I do.

Q All right. Now, this is just a formality. You're not under any type of drugs or anything else that would impair your ability to give full and complete answers today, are you?

A No.

Q All right. Let's begin. Could you tell me,



for purposes of your reports, what do you consider your field of expertise?

A Well, my field -- I consider my field of expertise to be taxation. That's what I've focused my entire career on that area of law with an emphasis in federal tax matters. I had government service that -- and a law clerkship on the tax court that focused me in that direction, and my government work involved federal tax matters.

I have also some state tax expertise because I have taught state taxation at Georgetown Law School, and I have represented people in state tax matters after I left the government that were not only focused on the law of the particular state involved but also involved what I would call broader constitutional objections to the imposition of a particular state tax.

I've done a lot of tax litigation, both on the government side and on the private side, so I -- and I've also reviewed, over the course of my private career, many tax opinions for clients who want to inquire as to whether the opinion warrants reliance for purposes of making an investment.

Q Would it be fair to sort of summarize what you just said is your field of expertise would be federal tax law?

A Correct. The only part of federal tax law







38894b34-4be0-477a-ae15-baf72ef5502b

Page 10

that I don't consider myself an expert or involved in is employee benefits because that -- that field has become so technical and so collateral that -- and so detailed that I don't really involve myself in the employee benefits work.
Q And more specifically with respect to this case -- and when I say this case, I'm really referring collectively to the COBRA litigation. Do you understand that?
A Uh-huh.
Q With respect to this litigation, what part of the federal tax law would you say lends itself to your particular field of expertise for purposes of testifying?
A Well -- well, I suppose this transaction precedes with an analysis of the provisions of Subchapter K, the partnership provisions, and I've had experience in dealing with that and giving advice and navigating the various provisions of Subchapter K.
And generally they -- I've also had experience in just appraising the quality of tax opinions of the sort that I have addressed in my reports.
Q And do you -- for purposes of your -- your expertise as a federal tax lawyer, do you also consider your ability to understand and interpret the case law, federal tax case law --
A Yes.

Page 11

Q -- is -- you have to wait.
A Oh, sorry.
Q -- is relevant to your experience?
A Yes.
Q Okay. You mentioned that you have tried some cases. Were these tax cases that you tried?
A Yes.
Q Could you tell us approximately how many cases you tried?
A I've tried a lot of cases in the tax court. It's hard to recall how many. I've tried some cases in the -- what is now called the court of federal claims, which used to be called the claims court, and I've tried some cases in the federal district courts.
I've also argued tax cases in the courts of appeals, both on the government side and on the private side, and I've also argued cases in the United States Supreme Court on the government side.
Q Have you ever retained expert witnesses yourself in connection with cases that you have tried?
A No.
Q Is there some reason for that?
A Well, actually, let me think about that. Let me revise my question -- my answer. I -- I did retain an expert witness once, I believe, in connection with some

Page 12

litigation over the tax benefits of a -- of a recycling machine.
I'm hard pressed to remember exactly what his -- he must have been an engineer. That's just my recollection. This was a long time ago. This was probably 20 years ago. So I -- so the answer to that is -- is yes.
Q And did this witness ultimately testify at trial?
A Yes, or he had a report and testified at trial, I believe. It's going back a long ways, so...
Q Of the cases that you tried, how many ultimately went to trial?
MR. DADDINO: Objection, form.
Go ahead; you can answer.
A I can't answer that question. I just know that in the '80s and '90s, I had a whole bunch of cases in the United States tax court that dealt with the litigating over the application of penalties in connection with this plastics recycling investment because a lot of people who ultimately paid the taxes and the interest litigated the applicability of what was then the negligence penalty under Section 6653(b), (a) or (b). The old penalties provision.
BY MR. DONOHUE:
Q Before the accuracy-related penalty provision?

Page 13

A Right, long before that, when it was just a five percent penalty.
Q But my question was --
A It may have been -- you want to -- you want to know the number?
Q Well, an approximation.
A It's got to be in the nature of 15 to 20, something like that, I think.
Q Are you familiar with Daubert motion?
A Yes.
Q What to your understanding is a Daubert motion?
A Well, the Daubert -- the Daubert motion is a -- it's, I think, named after a supreme court case. And what it basically says -- holds is that an expert witness can't -- is -- is not permitted to provide the court with his understanding of the law; that that is for the court to decide. But that he can give his expert opinion with respect to certain facts.
Let me revise my -- going back, I think you once asked -- I think you earlier asked me whether I ever was an expert witness, and I think I said no. Well, now that I think about it, I was an expert witness in a tax case that was tried in the United States bankruptcy court. No. I take that back.

Page 14

I was not an expert witness. I hired an expert witness in that case. I was the lawyer. And I had -- I had -- the reason -- the reason your question about Daubert stimulated this recollection was that I remember that I had Daubert opposition to an accountant that I had hired as an expert witness.

The government -- the government was represented by the United States attorney in the Southern District of New York, and they objected to the testimony that my expert witness gave in connection with the taxpayer's treatment of something. The court said that he had taken tax cases in law school, and he could, you know, figure out the tax consequences. He would not, you know, admit that -- you know, that testimony.

Q He would admit that testimony?

A He would not; he would not.

Q He would not admit that testimony?

A Would not.

Q Do you recall the name of that case?

A Yeah, it's called Becker versus -- it went through the United States bankruptcy court, then I appealed the -- the adverse decision to the United States district court. If the district court affirmed the bankruptcy court, then I appealed it to the second circuit, and I lost two to one.

Page 15

MR. DADDINO: I think you answered his question.

THE WITNESS: Okay.

BY MR. DONOHUE:

Q Now, you mentioned that you had your deposition taken in the Klamath case; am I correct?

A Correct.

Q Okay. And you prepared an expert witness report in the Klamath case; correct?

A I did.

Q And you prepared two expert witness reports in connection with the COBRA litigation; am I correct?

A Yes, the -- the ones that are sitting on the table here, 2408 and 2409.

Q Okay. Have you prepared any other expert witness reports in your career?

A Yes, I have. I prepared an expert witness report in an -- in a private arbitration proceeding that was -- I mean the proceeding was confidential. Although the proceeding did not involve taxation as such, it raised certain tax questions. And as a result, the lawyer for one of the parties engaged me to render a report in that case, which I did do.

Q Any other reports?

A I also prepared an expert witness report in

Page 16

another arbitration proceeding that did involve -- it was a confidential arbitration proceeding that did involve a transaction like this.

Q That did involve?

A That did involve.

And then I have prepared an expert witness report in another pending litigation, which I think -- I think all in total -- just to -- just to be succinct, I think probably four or five to date.

Q Well, let's go back to that confidential arbitration proceeding that you said involved a transaction like this. When you say involved a transaction like this, what are you referring to?

A I'm referring to this COBRA transaction.

Q Okay.

A I don't remember the -- I -- it may have -- I don't remember the details of it because it was many months ago. But it was a transaction that I would just say, you know, without elaborating, that it was comparable to a transaction like this.

The -- the taxpayer had brought an action against the -- the advisor. So I -- I prepared an expert witness report about the advisor's conduct.

Q And, more specifically, are you referring to a transaction involving options?

Page 17

A It was -- I think it was an options transaction.

Q And is that -- is your report that was submitted in that proceeding, is it still confidential?

A Yes, I think so. I think the whole proceeding is confidential.

Q Are you permitted to provide information regarding who the counsel was that retained you in connection with that?

A You know, I tell you, quite frankly, I would be happy to tell you, but I think before I did, I would have to ask permission because the whole thing -- these -- these arbitration proceedings are by their very nature sort of confidential. And I think before I gave you any information about it, I would want to ask him.

Q All right. Why don't we do this. Ultimately when we complete the deposition, you'll have an opportunity to read the transcript. And if at that point in time that you're able to speak to counsel and he does permit you to provide his name or her name, then if you would, just put that information in the errata sheet of the deposition?

A Fine; fine.

Q Now, you mentioned about four or five reports. Any reports other than in -- other than Klamath in confidential arbitration proceedings?

Page 18

A I'm working on one now, which is also a confidential arbitration proceeding, but it -- but I haven't completed it yet.
Q Any others?
A I have some -- I have some other -- when I said four or five, they included the ones that -- I have some others that have been -- that are in -- that are in court cases that I believe -- I think one of them has been filed or maybe -- but some of them are just prepared, but they're not filed yet because the deadline for filing them hasn't arrived.
Q How many are these?
A Well, I think that's part of the four or five that I -- number that I gave you. I think that's -- that's a good faith estimate.
Q Well, let's -- let's separate out the Klamath and the confidential arbitration proceedings. Now, with respect to those that you either have completed your report or in the process of preparing a report, how many -- how many reports have you prepared?
A I think five.
Q Now, of those five reports, how many of them involve a transaction like the COBRA transaction in the sense that they involved options, pairs with option transactions?
A I think one or two.

Page 19

Q And could you give me the names of those?
A Well, since they haven't been filed yet, I'm -- you know, I would have to consult with counsel about whether I could give you those names.
Q Who is the -- I assume in these cases that the government is a party?
A Yes.
Q And of the two, when you say it has not been filed, what specifically are you referring to?
A My report.
Q But when you say filed, are you talking about filed with the court or exchanged with --
A Exchanged with the -- with the other side.
Q The other side?
A Right. I think -- and then I have -- and then I have another one, but I think it's part of the five I mentioned, which is one I did in a tax court case, but -- but there's not even a trial date. So that -- that one hasn't been filed either.
Q But when you say filed, even though there has been no trial date set, you're aware that the parties usually have a date for the exchanging of the --
A Yeah, I know, and I don't think that date has come yet.
Q Okay. Now, to your knowledge, the reports

Page 20

that you have prepared in connection with court cases, to your knowledge, none of them -- as of yet none of your reports have been exchanged with the other side?
A I think one -- I think one of them has, but I would just want to check because, you know, I prepare these things, and then since I'm not the lawyer in charge of the litigation, I don't really pay close attention to, you know, when and if they get filed.
But if -- if -- I assume that if they're exchanged with the government -- I don't mean to run on like this -- that -- that it's something that -- that you're entitled to see.
Q And so, again, what I'm going to ask you to do is to consult with counsel for these other cases, and to the extent, find out if the report has been exchanged. And if it has been exchanged, to make an indication in the errata sheet as to what the name of the report is and who your -- what counsel --
A In fact, let me just revise my -- I just thought of another one that I hadn't thought of in my mental, you know, senses. So -- so probably the answer is six and not five.
Q Six. All right.
(Exhibit No. 2836 was marked.)
BY MR. DONOHUE:

Page 21

Q Let me show you what's been marked as Exhibit 2836. Does this report look familiar?
A Yeah, that was the one that I just thought of because -- and that's one that I -- that I worked on. And I believe that that has been exchanged -- obviously, it's been exchanged with the government because -- yes, I prepared this report.
Q Okay. And in connection with that report, that, am I correct, also does have a feature of that report, or at least a feature of the transaction offsetting options?
A Yes.
Q Can you estimate as to -- since I'm going to receive your bills later, about approximately how much time you spent in connection with the preparation of your reports?
A Well, I think it's easy to figure out by dividing my hourly rate by the amount of the bill. I mean I --
Q Would you have any rough estimate before we receive the bills as to --
A I haven't actually -- it's --
MR. DADDINO: Just to clarify, counselor, I presume you mean across both the Tesoro cases and the Murphy cases collectively?

Page 22

MR. DONOHUE: That's correct.
MR. DADDINO: Thank you.
A This Tesoro case -- I'm just rounding because I don't do long division all that well in my head. This looks like it took me -- the Tesoro case looks like it took me about 40 hours to do.
BY MR. DONOHUE:
Q 40?
A 40.
Q Okay.
A And the MurFam one, 32, thereabouts.
Q Turn to Page 3 of your Tesoro report. You make reference there to the materials that you considered and relied upon in preparing your report. Could you just briefly summarize for me what materials that you considered and relied upon for purposes of preparing your report?
A Well, as -- as Page 3 -- as I say on Page 3, I -- there were two -- there were two opinions in this case. One issued by Jenkens & Gilchrist, and one issued by Brown & Wood. So I read all of those -- I read those.
I read the -- the authorities -- I reviewed the authorities that were cited in those opinions. I read the expert reports just for background of Dr. Hess and Dr. Chance. And then I read the expert reports of Dr. Hess in a related case in which I have filed another report in a

Page 23

case called JZ Buckingham just to enhance my understanding of the economist prospective.
And then I -- I -- I reviewed the Treasury Circular 230, particularly Section Paragraph 1033 which establishes the Treasury's standards for issuing tax opinions, you know, for people who are enrolled as -- you know, to be able to practice before the Treasury.
Q You mentioned you read the authorities. Did you read each of the authorities --
A Yes.
Q -- and the legal opinions?
A Yes.
Q Or had you already read some of them, and you read the ones that you --
A Well --
Q You have to wait until I finish my question.
A Oh, sorry.
Q -- had already read some of them, and you read the authorities only that you had not previously read?
A No. It's my practice when I -- you know, because it's my practice when I approach an assignment like this is to re-read things because -- and not to rely on my recollections of -- of what the authorities say because they're so -- they involve such detail that it's better to have a fresh, you know, prospective.

Page 24

Q Are you aware that there is a huge separate record in this case involving documents that were obtained either formally or informally from a variety of different third parties? Are you aware of that?
A Well, I was not aware of it until I saw the expert report of Dr. -- of Professor LaRue. I mean he filed a rebuttal to my report, which counsel gave me, and so I read that report. And then as a result of -- none of this is listed here because it was after my -- my filing -- my giving of my report.
And then in order to satisfy myself about some of the points Professor LaRue made in his rebuttal report because he had some cross references to his original report, so I read his original report to -- or at least I remember reading the references that he made because he made them succinctly in footnotes.
So that's how I became aware that there is another record -- I don't mean another record, but that the record has other things in it that -- that I was not aware about -- aware of when I rendered my report.
Q Do you recall as to what the size of that record is?
MR. DADDINO: Objection to the use of the word record.
MR. DONOHUE: Objection as to form.

Page 25

BY MR. DONOHUE:
Q Are you aware of the size of that record?
A No.
Q You're not aware that that record comprises a multi-million page database of documents?
MR. DADDINO: Objection, form.
A I'm not -- I'm not aware of the size of the record, as I said.
BY MR. DONOHUE:
Q You mentioned that you read Dr. LaRue's rebuttal report, and then you read his opening report. As a result of that, did you at that point in time have occasion to review any of the documents in the record of this case?
MR. DADDINO: Objection, form; vague and ambiguous.
A No. What I did was simply -- I mean Dr. -- Dr. LaRue from -- his report would every once in a while quote from something that was in the record with an appropriate Bates stamp, I assumed, just the way I would, that those references were accurate. And I just -- I didn't feel the need to actually read, you know, an e-mail to see whether he was quoting it accurately. I just -- I took it as -- I accepted it on its face.
BY MR. DONOHUE:
Q Do you recall when you were retained in this

case?
A The answer is -- to that is no. Although, I would -- the answer is no. I mean I could -- I could -- I must -- I am sure I signed a retention agreement, but I don't have it with me. And I don't remember -- I don't like to speculate on -- and tell -- and make a guess.
Q All right. Who did you meet with, if anyone, in connection with your retention in this case?
A I met with Mr. Welty of the Meadows firm.
Q And was anyone else present at your meeting besides Mr. Welty?
A No.
Q And what at that meeting happened?
A Well, we discussed, you know -- you know, my background and what I might be able to -- to -- what kind of report I might be able to render. He may have -- but I don't remember for sure.
But he may have sent me the opinions that I would be asked to review so that I could review them -- review them in advance of the meeting. I don't remember whether he did or not. If he did, I reviewed them. If he didn't do it before, he certainly did it immediately thereafter and I read them.
Q And when you refer to opinions, I assume you're referring to --



A The -- the law firm --
MR. DADDINO: Let him finish.
THE WITNESS: Oh, sorry.
BY MR. DONOHUE:
Q -- the opinions of Jenkens & Gilchrist, Brown & Wood, and Proskauer & Rose?
A Correct.
Q At that meeting did Mr. Welty indicate to you as to what he wanted you to do?
A Well, what -- I don't remember specifically that he said what I want you to do is this. But I think what he was interested in -- my recollection was that he was interested in determining -- finding out from me whether I could prepare a report about these opinions in the same manner as my report that I prepared in the Klamath case.
Q And in Klamath you prepared, am I correct, a very similar report to the reports that you prepared in this case?
A When you say similar, in the Klamath case, it was -- it was a slightly different transaction. But when you say similar, it was similar to the extent that it preceded with an examination of an opinion of counsel that reached certain conclusions, and I -- and I prepared a report that addressed the question as to whether the -- whether the opinion was objectively reasonable and it was one that the



tax grant -- return preparer could reasonably rely on.
Q But you ultimately -- am I correct you rendered opinions in these cases that are very similar to the opinions you rendered in Klamath?
A Well, when you say similar, that's sort of -- I mean that's kind of a vague word. I mean -- I mean it's similar to the extent that they involve this intellectual process that I described.
They're similar insofar as they involve the examination of a -- of opinions of counsel and -- and measured them for adequacy and quality and character in accordance with professional standards and the Treasury standards.
And I suppose they're similar insofar as they reached the -- a similar conclusion that they were, like the opinions in the Klamath case, opinions that were of the character and quality that -- and were objectively reasonable so that the taxpayer and his preparer could -- return preparer could reasonably rely upon.
Q Getting back to Mr. -- your conversations with Mr. Welty at this first meeting, at that meeting did you indicate to Mr. Welty that you could provide an analysis that's similar to your analysis that you did in the Klamath case?
A Well, let me say this. That at that -- at



that meeting with Mr. Welty, to the extent that I looked at the opinions, I may have given him some preliminary observations about what I thought of them. But until I actually dug into them, I would not have told him that I could reach the same conclusion that I reached in the Klamath case because the Klamath case involved different opinions.
Q Did you have -- subsequent to that first meeting, did you have any other meetings with Mr. Welty?
A We talked on the phone. But the answer to that is I don't think I met him physically -- maybe I met him once more. I -- I really don't remember.
Q Where was your first meeting? Was that here in Dallas?
A No, it was in -- in my office.
Q In New York?
A Yes.
Q After this first meeting, at what point in time did you communicate to Mr. Welty that you could provide an opinion that's ultimately the opinions in your report?
A I don't remember when that was. I mean all I can do is -- you know, this -- this opinion -- my report is dated May 30th I think in both of these cases, yes. And so it took some time to -- to -- to write this report.
I can't tell you -- it had to be in advance -- it had to be before May 30th. When before May 30th I told

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

FOR THE PLAINTIFFS:
MR. ANTHONY DADDINO
MEADOWS COLLIER, 901 Main Street
Suite 3700
Dallas, Texas 75202
(214)744-3700
Taxable Cost: $____________

FOR THE DEFENDANT:
MR. DENNIS M. DONOHUE
U.S. DEPARTMENT OF JUSTICE
TAX DIVISION
P.O. Box 403
Washington, DC 20044
(202)307-6492
Taxable Cost: $____________

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to me by this 10th day of September, 2007.

Dana Taylor
______________________
DANA TAYLOR, Texas CSR 6048
Expiration Date: 12/31/08
Henjum Goucher Reporting Services, P.C.
Firm No. Dallas: 69 Houston: 373
2501 Oak Lawn Avenue, Suite 435
Dallas, Texas 75219
(888)656-DEPO







38894b34-4be0-477a-ae15-baf72ef5502b