IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-231 T
(Chief Judge Damich)

---

JZ Buckingham Investments LLC as Tax Matters Partner
of JBJZ Partners, a South Carolina general partnership,

Plaintiff,

v.

United States of America,

Defendant.

---

**CORRECTED UNITED STATES' REPLY BRIEF IN FURTHER SUPPORT OF ITS MOTION FOR LEAVE TO AMEND ANSWER**

DENNIS M. DONOHUE
Chief Senior Litigation Counsel
U.S. Department of Justice, Tax Division
Post Office Box 403
Ben Franklin Station
Washington, D.C. 20044
(202) 307-6492

## TABLE OF CONTENTS

**Page(s)**

STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A. Exhibit 2257, 2252 And 2260 Are Newly Discovered Evidence.. . . . . . . . . . . . . . .3

B. False And Fraudulent Statements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

JUSTICE REQUIRES GRANTING THE
UNITED STATES' MOTION TO AMEND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

A. The United States Promptly Filed This Motion . . . . . . . . . . . . . . . . . . . . . . . . . . 14

B. Plaintiff's Claims Of Bad Faith Are Absurd . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

C. There Is No Prejudice To Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

D. Plaintiff's Futility Argument Is Meritless. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Principal Life Ins. Co. v. Untied States,*
75 Fed. Cl. 32, 33 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

*Santa Monica Pictures v. Commissioner*,
T.C. Memo. 2005-104 at 810 n.187 (May 11, 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

*Domulewicz v. Commissioner*,
129 T.C. No. 3 (Aug. 8, 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. .19

*MURFAM Farms, et al.*, (CFC, 06-245, 06-246, and 06-247)
and *Gary Woods v. United States*, 06-8000 (S.D. Ind.). . . . . . . . . . . . . . . . . . . . . . . . . . . . .19, 20

*In re COBRA Tax Shelters Litigation*, 05-9727 (S.D. Ind.). . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**Federal Statutes**

26 U.S.C. (“IRC”) § 6226(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19
I.R.C. § 6230(c)(1)(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**Federal Regulations**

Temp. Treas. Reg. § 301.6221-1T. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19
Temp. Treas. Reg. § 301.6221-1T(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
Treas. Reg. § 1.6664-4(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20
§ 10.33 of Treasury Circular 230. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

**Federal Rules of Civil Procedures And**
**Rules of the Court of Federal Claims**

Rule 26(a)(1)(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11
RCFC 15. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-231 T
(Chief Judge Damich)

JZ Buckingham Investments LLC as Tax Matters Partner
of JBJZ Partners, a South Carolina general partnership,

Plaintiff,

v.

United States of America,

Defendant.

**APPENDIX A**

| **Govt. Ex. No.** | **Description** | **Pages** |
|---|---|---|
| 138 | Internal E&Y email with respect to the procession of the B&W legal opinions, requiring 1) A BW engagement letter for each partner; 2) a letter of factual representations for each partner to support the BW opinion; and 3) a draft opinion letter (that the client is supposed to review in order to agree to representation #8). | 1-2 |
| 159 | COBRA Powerpoint Presentation, revised 11/11/99, detailing the COBRA implementation steps | 3-21 |
| 164 | IRS Information Document Request ("IDR") dated November 27, 2001 ("IDR #1"), requesting Boyd, inter alia, to provide basis computations for JBJZ Investors, Inc. | 22-24 |

| **Govt. Ex. No.** | **Description** | **Pages** |
|---|---|---|
| 165 | Letter dated January 2, 2002, responding IDR#1, advising that the requested basis computation will follow. | 25-27 |
| 166 | Letter dated January 7, 2002, further responding to IDR #1 on behalf of James and Hazel T. Boyd | 28-43 |
| 167 | IRS notes of a conference call on February 7, 2002, with respect to a similar request that Zucker, inter alia, to provide basis computations for JBJZ Investors, Inc. | 44-45 |
| 168 | letter to the IRS dated April 9, 2002, providing additional information on behalf of Zucker attached | 46-51 |
| 174A | Response to IDR #3, with enclosures | 52-85 |
| 177A | E&Y's transmittal of the November 11, 1999 COBRA engagement letter to Jerry Zucker by Federal Express for delivery on 11/12/99. | 86-89 |
| 177 | Executed copy of the $100 million COBRA engagement letter endorsed by Zucker, with his hand written note next to his endorsement, stating "100 million loss to be allocated @98/2 between the parties" and that his endorsement is "Subject to clarification of second paragraph on first page." | 90-93 |
| 568 | COBRA Action Work Plan (Revised 11/12/99) | 94-99 |
| 1008 | Unendorsed Boyd Representation Letter to B&W | 100-102 |
| 1028 | Unendorsed Zucker Representation Letter to B&W | 103-105 |
| 1029 | Unendorsed EY engagement letter to Zucker dated 11/15/99 "implementation of the COBRA strategy" stating EY is to be paid a fee of "$675,00 on a total investment in the Partnership by you and other indvidual(s) in the amount of $3.5 million. Investment in the partnership equals Cost of long option contract equal to 5% of the desired loss, plus cash equal to 2% of the desired loss." | 106-110 |

| Govt. Ex. No. | Description | Pages |
|---|---|---|
| 1101 | Fax to Zucker with IDR No. 1 | 111-113 |
| 2255 | Handwritten note from Boyd to Zucker with respect to a discussion that day with Ray Knight stating "I again raised the issue with Ray about the "margin earning" on the Euro. He said he will call you tomorrow. He said the reason we only picked upon the margin gain of $625K (plus the original $2.5M) was because we capped our exposure." | 114-115 |
| 2260A | Copy from Closing Binder of filled-in assignment dated December 27, 1999 assigning James Boyd's partnership interest in JBJZ Partners to JBJZ Investors, Inc. | 116 - 117 |
| 2260B | Copy from Closing Binder of filled-in letter dated December 27, 1999 informing the Deutsche Bank (DB) that all interests in JBJZ Partners have been transferred to JBJZ Investors, Inc. and, accordingly, such partnership has liquidated this date as a matter of law. | 118 - 119 |

| Govt. Ex. No. | Description | Pages |
|---|---|---|
| 2260C | Copy from Closing Binder of filled-in authorization dated December 28, 1999 to sell the positions of JBJZ Investors, Inc. (to be received from JBJZ Partnership on its liquidation) in its DB Alex Brown account, Account No. 222-10156-19. | 120 - 122 |
| D | Crosby Deposition dated July 13, 2007 | 122 - 146 |
| E | Crosby Deposition and Document Subpoena | 147 - 150 |
| F (1/2) | Zucker Deposition dated July 19, 2007 | 151- 213 |
| F (2/2) | Zucker Deposition dated July 19, 2007 | 214 - 260 |
| G | Plaintiff's Initial Disclosures dated August 10, 2005 | 261 - 266 |
| H | US First Set of Discovery served December 12, 2006 | 267 - 300 |
| I | Plaintiff's Objections and Responses to the United States' First Set of Interrogatories and Plaintiff's Objections and Responses to the United States' First Requests for Production of Documents served February 28, 2006. | 301 - 340 |
| J | United States Second Set of Interrogatories | 341 - 358 |
| K | Plaintiff's Objections and Responses to the United States' Second Set of Interrogatories. | 359 - 378 |
| L | United States Third Set of Interrogatories | 379 - 395 |
| M | Plaintiff's Objections and Responses to the United States' Third Set of Interrogatories. | 396 - 417 |
| N | Smith Report | 418 - 454 |
| O | Smith Deposition, pp. 22-26 | 455 - 464 |
| 113 | E&Y COBRA template engagement letter | 465 - 469 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-231 T
(Chief Judge Damich)

JZ Buckingham Investments LLC as Tax Matters Partner
of JBJZ Partners, a South Carolina general partnership,

Plaintiff,

v.

United States of America,

Defendant.

**CORRECTED UNITED STATES' REPLY BRIEF IN FURTHER SUPPORT OF ITS MOTION FOR LEAVE TO AMEND ANSWER**

Plaintiff's opposition to our Motion for Leave to Amend is, *inter alia*, a potpourri of histrionics, mischaracterization, *ad hominem* attack and deceit. At bottom, however, plaintiff does not dispute that it and its partners failed to honor their sworn document-disclosure obligations to the IRS and their sworn discovery obligations in this litigation. It seeks, however, to trivialize these serious violations, claiming that the information within the withheld documents was either available in the documents that were produced or could easily have been deduced. Alternatively, plaintiff alleges that its failure to produce any material documents was simply an innocent oversight. As explained below, these assertions are patently untrue.

**STATEMENT**

Contrary to plaintiff's assertion, plaintiff's partners Jerry Zucker ("Zucker") and James Boyd ("Boyd") did not voluntarily choose "to notify the IRS of their investment in the COBRA

transaction" in April, 2002. Pltf. Br. 2. In fact, the IRS discovered the transaction the prior year, had requested Zucker and Boyd to produce documents relating to their claimed tax benefits on the transaction, and was in the midst of a full-scale audit of the transaction by the time they elected to participate in the penalty amnesty program in Announcement 2002-2.[1] It is therefore unsurprising that Zucker viewed his election to participate in the penalty waiver initiative as a "free lottery ticket."[2]

However, Zucker's election to participate under IRS Announcement 2002-2 was manifestly not a "free ticket." Both Zucker and Boyd were obligated under penalties of perjury to fully disclose all information concerning their COBRA transactions.[3] To enforce the terms of those elections, the IRS issued a series of Information Document Requests ("IDR") to them for COBRA documents, including all marketing materials, engagement letters, and *internal documents* used in their decision making process.[4]

During over two years of our discovery in this litigation, plaintiff repeatedly claimed that it had already provided all COBRA documents to the IRS and/or had produced these documents

---

[1] *See*, Govt. Exs. 164, 165, 166, 167, 1101 and 168. All new exhibits referenced herein are attached to the Declaration of John Lindquist, Appendix A *infra*..

[2] *See*, Govt. Ex. F, Zucker II Dep. 151:16-152:2 All new deposition transcript references are attached the Declaration of John Lindquist, Appendix A *infra*.

[3] *See*, Govt. Exs 169 and 170 (also Plaintiff's Ex.3), Elections by Zucker and Boyd under IRS Announcement 2002-2.

[4] *See*, Govt. Ex. 171 (also Pltf's Ex. 4), IDR No. 2 dated 4/30/02, Items 1 and 2 (asking for all information received by the promoters and all internal documents); Pltf's Ex. 6, IDR No. 3 dated 9/19/02, Item 3 (asking for all documentation relating directly or indirectly to the tax and financial consequences of participating in the transaction); Pltf's Ex. 8, IDR No. 4 dated 3/25/03, Item 6; and Pltf's Ex. 8, IDR No. 4 (asking taxpayer to fully explain the mechanics of the transaction).

to us in its initial disclosures. Lindquist Dec. ¶¶ 26-39. It therefore asserted that the United States had all relevant COBRA documents in its possession. *Id.* The United States did not learn until the deposition of Zucker's administrative assistant, Charlotte Crosby, on July 13, 2007, that plaintiff's repeated representations were completely untrue. It was only at that time that we discovered that plaintiff had withheld an entire file of documents directly related to the COBRA transaction. Lindquist Dec. ¶ ¶ 6-12. In our initial memorandum, we highlighted three of the highly-sensitive documents in this file. Govt. Br. 3-7. In its response, plaintiff attempts to minimize the devastating significance of these documents, claiming that material parts of these documents were not newly discovered evidence because the information in these documents had either already been produced in other documents or could be derived by simple mathematical calculation. Pltf. Br. 6, 13. These allegations are demonstrably false.

**A. Exhibits 2257, 2252 and 2260 are newly discovered evidence** .

Govt. Ex. 2257 is a six-page document containing a cover memorandum from Zucker to Ray Knight at Ernst & Young (E&Y) dated November 12, 1999, and attaching a copy of a COBRA E&Y engagement letter dated November 11, 1999 ("the $100 million engagement letter"). The highly-damning cover memorandum, which, despite repeated discovery requests plaintiff never turned over, expressly shows that Zucker's singular focus at the inception of the COBRA transaction was obtaining a $100 million tax loss and what his cost would be for such an immense tax benefit. As his memorandum candidly states: "[my] maximum exposure for a $100 million loss is $8 1/2 million." And to doubly ensure that this was the precise amount of his entitled non-economic tax loss from the COBRA transaction, his memorandum even goes so far to state –

> Further, the document does not refer specifically to the $100 million loss. I assume this is, in fact, the number to be allocated 98/2, *as per our discussion*.

Govt. Ex. 2257 (Emphasis added.). What is more, the attached engagement letter bears Zucker's own handwritten notes and also confirms what was his true motivation for the transaction, stating that the "$100 million dollar loss to be allocated @ 98/2 between the parties."[5]

The cover memorandum, cc'd to Boyd, unqualifiedly proves that Zucker and Boyd were well aware that the *raison d' etre* of COBRA was to generate a massive tax loss, not an economic profit. Notwithstanding Zucker's and Boyd's agreement under Announcement 2002-2, and despite numerous documentary requests, plaintiff never turned this document over. Nor did it ever claim the document as privileged. This one contemporaneous long-withheld document flatly and totally contradicts Zucker's repeated testimonial assertions that he entered the transaction with the hope of realizing speculative foreign currency option profits.[6]

In an effort to defuse the devastating significance of this document, plaintiff asserts that the $100 million engagement letter was produced by E&Y to the IRS on November 19, 2002. Pltf.Br. 8. As plaintiff well knows, this is simply not true. What Zucker produced to the IRS was an unsigned copy of the $100 million engagement letter. Critically, the unsigned version did not have Zucker's handwritten notes emphasizing that the $100 million loss was to be

---

[5] Pointedly, despite also being in its withheld file, plaintiff at no time produced a copy of the *signed* $100 million engagement letter with Zucker's handwritten notes to the IRS or the Government in this litigation. Instead, the United States had to obtain a copy of this critical document from E&Y, which it produced on April 21, 2006, but E&Y also failed to produce Zucker's devastating cover memo. Lindquist Dec. at ¶43. Govt. Ex. 177.

[6] *See* Pltf' Ex. 1, Zucker I Dep. Dated 6/8/07, 83:15-83:25 (Zucker testifying that he did not participate in the transaction to hedge a particular risk, but because he saw it as a chance to make profit on the sweet spot); 106:3-103:13 ("I was actually excited about getting involved with the option side of the equation to try to make a buck").

allocated 98% to him. It is thus quite obvious why the signed version was not given to the IRS. The signed version containing Zucker's incriminating hand-written notes would have revealed his true motivation for the transaction. But to produce a materially incomplete engagement letter to the IRS without a highly-revealing personal note is not measurably different from physically altering the document itself, *i.e.*, the spoilation of evidence.

Incredibly, plaintiff suggests that the critical cover memorandum was previously produced to the IRS and that the United States' failure to attach a copy of Govt. Ex. 174A to our motion evidences a willful attempt on our part to mislead the Court.[7] Pltf.Br. 8. Plaintiff's irresponsible allegation not only defies logic but is absurd. Plaintiff has a copy of Govt. Ex. 174A and knows full well that a copy of Zucker's memorandum of November 12, 1999 is not among the materials given to the IRS.[8] Plaintiff not only failed to produce the devastating cover memorandum to the IRS, Govt. Ex. 2257, but withheld this document during over two years of ongoing discovery in this case and in the face of a series of comprehensive and detailed document requests requiring its production. Lindquist Declaration ¶¶9, 10, 25, 31, 34, 35 and 38. Plaintiff's knowingly false assertion that it may have produced this document to the IRS can only be viewed as a deliberate attempt to deceive the Court.

Plaintiff also admits that it did not produce a copy of Govt. Ex. 2252, which was also not obtained until the June 13, 2007 deposition of Charlotte Crosby. Pltf. Br. 8. This critical exhibit

---

[7] Govt. Ex. 174A is Zucker's response to IDR No. 3, with a copy of the documents produced therewith.

[8] The United States offered for identification a copy of Govt. Ex. 174A during the trial testimony of Jerry Zucker on July 19, 2000. See Govt. Ex E, Zucker II 7/19/07, 201:2-203:19. A copy of Zucker's cover memorandum of November 12, 1999, Govt. Ex. 2257, was not produced therewith. Lindquist Declaration at ¶25.

contains a memorandum from Ray Knight to Zucker dated November 22, 1999, postdating the executed COBRA engagement letters, detailing that the promoters' fees were based on a fixed percent of the long option (which was equal to the desired tax loss), the due dates of the payment of the respective fees, that the 2% cash injection by the taxpayers was *not at risk*, and that their stock contributions (which was to generate the capital tax loss) were "due to be made within two weeks of inception." This exhibit reveals the true nature of the tax-driven compensation scheme of the COBRA's promoters, that any business purpose arising out of the taxpayers's 2% cash injection was pure fiction, and that the capital tax loss derived from the stock contribution was preplanned at the outset.

To downplay the significance of this highly-revealing withheld document, plaintiff argues that the information in the Knight memorandum of November 22, 1999, Govt. Ex. 2252, is virtually identical to that contained in the Knight memorandum to Zucker of November 11, 1999, Govt. Ex. 1104, which plaintiff disclosed to the United States on August 31, 2005 in its initial disclosures. Pltf. Br. at 7. Plaintiff's assertions are once again unavailing.

Apart from the irrefutable fact that neither of these documents (Govt. Exs. 1104 and 2252) were produced to the IRS, the Knight memorandum in Govt. Ex. 2252 contains additional material information that is not in the Knight memorandum in Govt. Ex. 1104. Critically, the table in Govt. Ex. 2252 adds a new column entitled "Timing," detailing when the promoter's fees were to be paid. Moreover, Govt. Ex. 2252 also adds a seemingly innocuous note stating when the stock contributions were required to be made by the taxpayers.[9] Only by combining Govt.

---

[9] As described in E&Y's COBRA Powerpoint, the contribution of stock was one of the critical steps to the implementation of the COBRA tax shelter product. Lindquist Dec. ¶40, Govt. Ex. 159.

Exs. 1104 and 2252, does it become clear, as detailed below, as to the true picture of the timing of the taxpayers' cash payments and stock contributions for the COBRA tax shelter product:

- The cost of the long option was 5% of the planned $50 million loss.[10] This amount was to be paid at inception;
- An additional 2% of the planned $50 million loss was also to be paid at inception .
- Ernst & Young was to be paid its fee within 30 days, equal to 1 ½% of the planned $50 million loss;
- The law firms were to be paid their fee within 90 days, equal to 3% of the planned $50 million loss.
- The stock contributions (to generate the ultimate capital tax loss) was to be made within two weeks of inception.

Critically, knowledge of the timing of the payments of the various taxpayer cash payments, fees and stock contribution is essential to a full understanding of this complex multi-step transaction.

Govt. Ex. 2260 is a copy of plaintiff's retained copy of a letter dated December 14, 1999 returned to Jenkens & Gilchrist, (J&G), enclosing a number of critical COBRA implementation documents which had been executed by Zucker and Boyd. J&G's letter expressly asked that Zucker only sign where indicated and that he "not fill in any blanks which appear in those documents at this time *(i.e., dates*)." (Emphasis added.) Attached to plaintiff's retained copy of this letter are the attachments which, precisely as instructed, were signed by Zucker and Boyd, but with the dates of the documents left blank.

Govt. Ex. 2260 reflects that COBRA implementation documents were both pre-executed and post-executed.[11] Proof of the fact that Zucker and Boyd pre-executed and post executed

---

[10] In a second E&Y engagement letter dated November 15, 1999, Zucker and Boyd changed the amount of their desired loss to $50 million. Govt Exs. 1104 and 1029.

[11] Govt. Ex. 2260 reflects that the following documents were received by Zucker via Federal Express on December 14, 1999 and returned by James Boyd via overnight mail:

- On or about December 15, 1999, Boyd and Zucker signed the assignment of Boyd's partnership interests in JBJZ Partners to JBJZ Investors, Inc., leaving the dates of this assignment and acceptance to be filled-in by J&G. The filled-in copy of this document

documents is highly relevant because it evidences the steps of the COBRA transaction were meticulously preplanned. The fact that the steps of the COBRA transaction were preplanned flies in the face of subsequent representations by Zucker and Boyd that "[t]here existed no understanding, agreement, obligation, or arrangement pursuant to which any of the parties ... committed to undertake all or any of the transactions . . . upon the happening of any other transaction . . . ."[12]

To refute its failure to turn over this document, plaintiff argues that virtually the same

---

which appears in the Closing Binder prepared by J&G reflects that this step of the COBRA transaction allegedly occurred on December 27, 1999. *See* Lindquist Dec. ¶44, Govt. Ex. 2260A.

- On or about December 15, 1999, Zucker signed a letter informing the Deutsche Bank (DB) that all interests in JBJZ Partners have been transferred to JBJZ Investors, Inc. and, accordingly, such partnership has liquidated this date as a matter of law. Therefore, this constitutes your authorization to transfer from the above-captioned account all assets held therein to the account of JBJZ Investors, Inc., Account No. 222-10156-19 in liquidation of JBJZ Partners. The filled-in copy of this document which appears in the Closing Binder prepared by J&G reflects that this step of the COBRA transaction allegedly occurred on December 27, 1999. *See* Lindquist Dec. ¶45, Govt. Ex. 2260B.
- On or about December 15, 1999, Zucker signed as President of JBJZ Investors, Inc., an authorization to sell the positions of JBJZ Investors, Inc.(to be received from JBJZ Partnership on its liquidation) in its DB Alex Brown account, Account No. 222-10156-19. *Critically, this authorization was signed by Zucker even before JBJZ Partnership had been liquidated and had distributed its assets to JBJZ Investors*. Lindquist Dec ¶46. The filled-in copy of this document which appears in the Closing Binder prepared by J&G reflects that the this step of the COBRA transaction allegedly occurred on December 28, 1998 (after the liquidation of JBJZ Partnership.) *See* Govt. Ex. 2260C.
- On or about December 15, 1999, Zucker signed a Consent of Sole Director of JBJZ Investors, Inc., electing himself President of the corporation, authorizing the issuance of corporate stock to himself and Boyd for $100 of consideration, and electing S Corp. status. The consent is backdated with the date of November 16, 1999. See Govt. Ex.2260.

[12] This factual representation is recited in representation letters from Zucker and Boyd to Brown & Wood and is also recited in the legal opinions issued to Zucker and Boyd as one of the material factual representations upon which Brown & Wood relied in rendering its opinion on their COBRA transaction. Lindquist Dec. ¶40-42.

cover letter and attachments was produced by it on August 31, 2005. Pltf. Br. 8. This is also palpably not true. What plaintiff earlier produced was the copy of the letter and attachments that J&G sent to Zucker, not the version of the letter with the highly-sensitive executed attachments which had been signed by Zucker and Boyd but with the dates left blank. This was the version of the document that had been returned to J&G. In short, plaintiffs once again withheld documents that *directly linked* Zucker and Boyd to the tax-driven and highly-scripted steps of the COBRA transaction.

In our opening memorandum, we also pointed out that plaintiff failed to produce Exhibits 1104 and 1029A to the IRS. Govt. Br. at 6-7. Exhibit 1104 consists, *inter alia*, of the Knight memorandum dated November 15, 1999 to Zucker detailing the promoters' fee structure and the taxpayers' required cash contributions discussed above and Exhibit 1029A is the second E&Y engagement letter (the $50 million engagement letter) dated November 15, 1999 signed by Zucker. While plaintiff admits it failed to produce Exhibit 1029A to the IRS, it asserts that it had on November 19, 1999 provided the IRS with an identical copy addressed to Boyd. Pltf. Br. 5. *See* Ex. 174A. But the November 15, 1999 Boyd engagement letter produced to the IRS was unsigned, leaving the mis-impression that the COBRA engagement letters had not been signed. As discussed above, the signed version of Zucker's November 11, 1999 engagement letter contains highly-incriminating handwritten notes by Zucker.

Equally false is plaintiff's assertion that the information in Knight's sensitive promoter-fee memorandums not turned over to the IRS can be gleamed by a simple mathematical calculation from the information in the E&Y unsigned engagement letters. Pltf. Br. 7. Critically, the E&Y engagement letters describe the fees as flat amounts, not percentages, as was revealed in Ray Knight's memorandums. Indeed, E&Y's template engagement letter reflected

its heightened sensitivity to disclosing how its fee was derived, warning its sales force to insert in the engagement letter an "amount equal to 1.50 % of the desired loss to be generated." Lindquist Dec. ¶41, Govt. Ex 113. E&Y's COBRA Action Workplan also instructed its sales force not to reference the amount of the loss in the engagement letter.[13] In short, E&Y exhibited a compelling desire not to disclose this damming information to the IRS. Indeed, see Vaughn's false testimony cited in our opening memorandum denying that E&Y's fees were calculated based on tax savings. Pltf. Br. 4, n.2.

Plaintiff also argues that Exhibits 1104 and 1029A are not newly discovered evidence because they were produced on August 31, 2005. Pltf's. Brf. 5. But the United States included those exhibits in its motion to demonstrate that plaintiff's partners have demonstrated a continuous pattern of abjectly failing to turn over highly-sensitive documents to the IRS regarding their COBRA transaction, in violation of their sworn obligations which were the consideration for the IRS's agreement to waive their penalties. Although the United States was aware upon receipt of these two documents that Zucker and Boyd had appeared to have violated their sworn disclosure agreements with the IRS, we nevertheless pursued discovery in good faith. It was our expectation that plaintiff and its partners would now redouble their efforts to honor their discovery obligations in this case, as well as the obligations of their partners under IRS Announcement 2002-2, and provide us with all relevant COBRA information in their files.[14]

---

[13] *See*, COBRA Action Action Workplan, Item No. 7, Govt. Ex 568.

[14] Consequently, on December 12, 2005, the United States served interrogatories and requests to produce on plaintiff requesting that it "[i]dentify all documents that were provided to you or that you generated or were generated by other individuals during the course of the discussions [of the COBRA transaction]" and requested "all documents relating to the implementation of the COBRA transactions and/or the Transactions." Lindquist Dec. at ¶30, Govt. Ex. H, Interrogatories Nos. 2-3 and Request to Produce No.1. In response to these

This it has woefully failed to do. Contrary to its false assertion that we are seeking to "punish" plaintiff for its bringing this suit, if that were our real intent, we would have filed our motion to amend immediately after receiving Knight's first promoter fee-structure memorandum and Zucker's signed November 15, 1999 engagement letter. Instead we took plaintiff at its word that it had reviewed its files and records and had provided us with "any and all responsive documents." See n.14, *supra*.

Moreover, plaintiff's attempt to characterize the relevant documents in the withheld file as limited to three in number is irrelevant. It is not the number of documents that plaintiff withheld but rather their significance to the issues in the litigation. As extensively discussed,, the three documents withheld by plaintiff here totally undermine its positions on the merits in this litigation. Moreover, there appear to be numerous other documents in the Crosby files which are equally damning. For example, that file also contains Exhibit 2255, which plaintiff failed to produce to both the IRS and the United States in this litigation. Lindquist Decl. at ¶11. This exhibit is a handwritten note from Jim Boyd to Jerry Zucker dated December 28, 1999. Zucker Dep. II at 129, Govt. Ex. E. The note states, *inter alia*:

> I again raised the issue with Ray about the "margin earnings" on the Euro. He said he will call you tomorrow. He said the reason we only picked up the margin gain of $625K [plaintiff's payoff on one of its currency options] (plus the original $2.5M) was because we capped our exposure.

This note is highly material in that it reveals that Zucker and Boyd did not understand the

---

discovery requests, on March 13, 2006, plaintiff represented that:

> *Any and all responsive documents have been previously provided* to the Internal Revenue Service during the examination and to the United States pursuant to Plaintiff's Initial Disclosures under Rule 26(a)(1)(b) of the Federal Rues of Civil Procedure and the Rules of the Court of Federal Claims.

(Emphasis added.) Lindquist Dec. ¶¶31-32, Govt. Ex. I.

transaction quite as well as Zucker claimed he did in his deposition. Govt. Ex. F, Zucker Dep.II at 129-131. The note indicates that Zucker and Boyd did not realize that they were investing in "digital" options, which would only pay out a sum certain should the option wind up in the money. Rather, the note shows that Zucker and Boyd thought that the payoff would depend upon how far in the money their position was, *i.e.*, that they thought they had invested in "vanilla" as opposed to "digital" options. This note flatly contradicts Zucker's claim that he carefully researched the option investment. Zucker Dep. I 6/8/07 112:25-113:3, Pltf's. Ex. 1.

In sum, it was not until the deposition of Charlotte Crosby on July 13, 1999 that the Government fully realized the extent of plaintiff's calculated attempt to withhold critical documents. It was at that deposition that we found verifiable "smoking gun"evidence never before produced by plaintiff. These contemporaneous documents, specifically, Exhibits 2252, 2257, and 2260, proved conclusively that Zucker and Boyd were focused exclusively on obtaining a massive tax loss, not speculative currency option profits, through a series of highly-scripted steps carefully pre-arranged by the COBRA promoters. What is more, Exhibit 2255, which was also in the withheld file, shows that Zucker and Boyd had a fundamental and utter lack of understanding as to even what was their alleged economic investment.

Plaintiff's answer to this deception is to impliedly lay the onus on Ms. Crosby, pointing out that she does not know why these documents were not produced, asserting it must have been due to an "oversight." Pltf. Br. 6, 8. But this failure to produce – both to the IRS and the Government in this litigation – does not lie with Ms. Crosby. She never testified that this file was not produced because of some "oversight" and plaintiff cites no such testimony. Pltf. Br. at 5, 8. In fact, she unabashedly testified that she provided a complete copy of this file to counsel. Lindquist Dec. ¶20, Crosby Dep. at 14:3-5, Govt. Ex. D. In short, this blatant and inexcusable

failure of production lies directly where it should -- on the shoulders of plaintiff and its counsel.

**B. False and Fraudulent Statements:**

Plaintiff cavalierly dismisses our position that Zucker and Boyd made false and fraudulent statements in their sworn statements to the IRS by stating that their COBRA transaction was properly reported on their COBRA and personal returns. Pltf. Brf. at 9-10; Govt. Exs 169 and 170. Its response to a virtual laundry list of gross errors, including the deducting of E&Y's fees of $675,000 twice, is that Dr LaRue, who catalogued these flagrant errors in his expert witness report, is a biased Government witness. Pltf. Br. at 9-10. Rather than flatly denying the existence of the errors, however, plaintiff instead places the responsibility for the correctness of its returns on E&Y.[15] It blithely says that "E&Y advised Plaintiff's partners that the disclosure was accurate" and that the partners believed and still believe the returns were accurate.[16] Pltf. Br. at 9. But E&Y did not sign the disclosure initiative statements to the IRS under penalties of perjury. It was plaintiff's partners who undertook that unassignable

---

[15] Plaintiff admits that Zucker's and Boyd's social security numbers ("SSNs") were erroneously reported on JBJZ Investors, Inc 1999 Form 1120S but contends any suggestion that this was intentional is "silly." Pltf's Br. 10. Plaintiff alleges that the return preparers have testified that these were their own errors, not the errors of Zucker or Boyd, and that the errors were unintentional. This is a mischaracterization of their testimony. What the return preparers said was that they did not catch these errors on their review of the returns or the furnished return information, not that they were responsible for the errors. Pltf. Ex. 20, Keating Dep. 178:2-178:7 (a change to SSNs could have been made after draft of 1120S had been prepared in her office); Pltf. Ex. 19, Emerson Dep. 22:20-23:3 (Emerson prepared 2000 1120S based on K-1 from the 1999 1120S); Pltf. Ex. 21, Pace Dep. 95:5-8 (Pace did not prepare or review 1999 1120S). In fact, Boyd's return preparer, Pace, confirmed that the presence of more than one incorrect SSN on a single return is highly unusual. Pltf's Ex. 21, Pace Dep. 95:16-96:5.

[16] In recent responses to our Interrogatories inquiring about these erroneous return positions, plaintiff also placed the responsibility squarely on E&Y, repeatedly responding that it relied on advice from E&Y as to its various improper return positions, again not challenging the correctness of Dr. LaRue's findings. See, Govt. Ex. M, Plaintiff's Objections and Responses to United States' Third Set of Interrogatories, Nos. 57, 58, 59, 63, 64, 65, 66, 67, 68.

obligation. And it was their responsibility to retain competent and independent advisors to assist them with their disclosure obligations. Incredibly, to fulfill that fundamental responsibility, plaintiff observes that its partners relied upon the very same tax shelter promoter who sold them the COBRA tax shelter and to whom they paid a huge fee based on their desired tax loss. Given these circumstances, it defies understanding as to how Zucker and Boyd can tell this Court that they could confidently rely upon this same promoter in its Notice 2002-2 elections, Govt. Exs. 169 and 170, to ensure that their COBRA "transaction was properly reported."

## ARGUMENT

## JUSTICE REQUIRES GRANTING THE UNITED STATES' MOTION TO AMEND

The law is clear that justice requires the granting of a motion for leave to amend a pleading under RCFC 15 absent, *inter alia*, undue delay, bad faith, undue prejudice, or the futility of the amendment. *Principal Life Ins. Co. v. Untied States*, 75 Fed. Cl. 32, 33 (2007) and cases cited therein (motion to amend denied where Government waited without explanation for four years until even after the trial and issuance of opinion.) The facts of this motion, however, are markedly different than those of *Principal Life*. While plaintiff claims all of the above factors for denying a motion to amend are present, its positions fly in the face of the record.

### A. The United States Promptly Filed this Motion

Throughout this litigation, plaintiff repeatedly responded to our discovery requests with the refrain that the United States already possessed all requested COBRA materials either from Zucker's and Boyd's disclosures to the IRS pursuant to their Announcement 2002-2 elections, or from plaintiffs' initial disclosures in this ligation. Lindquist Declaration at ¶¶26, 32, 37(b) and (c). As discussed above, that response was patently not true. Plaintiff had an entire file of

COBRA materials containing highly relevant documents which it withheld not only from the IRS in violation of its sworn disclosure obligation, but also from the United States in violation of its sworn discovery responses. It was only at the deposition of Charlotte Crosby on July 13, 2007, six days before the Court deposition of Zucker, that the United States obtained this file.[17] It was only at that belated hour, some four years after the Zucker's and Boyd's disclosure agreements with the IRS and after some two years of extensive discovery in this case that United States obtained this file. This file, which contains over 900 pages of documents, includes documents which totally undermined Zucker's and Boyd's professed motivation that they entered the COBRA transaction to obtain speculative foreign currency trading profits and vividly show them arranging with the promoters to engineer a series of minutely preplanned steps to implement a transaction designed to generate massive non-economic tax losses.

Upon reviewing that file and while still at the deposition, Government counsel informed plaintiff's counsel that we would recommend to the IRS that penalties be asserted in this case. Lindquist Dec. at ¶12. On July 14, 2007, the IRS authorized the assertion of this counterclaim

[17] Ms. Crosby was the personal assistant to both Mr. Zucker and Mr. Boyd at their company. Govt. Ex. D, Crosby Dep. at 6:13-7:19. Accordingly, prior to her deposition, she was served with a deposition subpoena requiring her to produce all documents in her possession or control relating to the COBRA transactions. At the beginning of her deposition, Ms Crosby failed to produce any documents as required by the Government's deposition subpoena. During the course of her deposition, Ms. Crosby admitted that she maintained a file of Zucker's and Boyd's COBRA transactions, which she called "JBJZ Investors, which she kept at their direction in her office. Govt. Ex. D, Crosby Dep. at 9:7- 10:4; 11:1-11:10. Ms. Crosby testified that she still had the JBJZ Investors file in her office. Govt. Ex. D, Crosby Dep. at 21:10 - 21:14. Upon learning this, Government counsel John Lindquist requested the file and then immediately recessed the deposition to review the file. It was only at that time that the United States first saw Govt. Exs 2252, 2255, 2257, and 2260. Lindquist. Decl. ¶¶8-10. Moreover, it was not until August 14, 2007, when plaintiff produced a CD containing the 961 pages of the file, that the United States had the opportunity to review and thoroughly and analyze all the documents in that withheld file. Lindquist Decl. at ¶ 19.

for penalties and the United States filed its motion on July 18, 2007. Lindquist Decl. ¶12. This record makes eminently clear that there was no delay whatsoever in bringing this motion. Moreover, contrary to plaintiff's utterly false assertions, the information in the critical documents it withheld was not obtainable from materials it produced previously.

**B. Plaintiff's Claims of Bad Faith are Absurd**.

Plaintiff accuses the Government of bad faith. Among other specious, unsupported, and irresponsible allegations, it states that "Defendant's counsel has periodically stated that they had not reconciled themselves to the lack of penalties in the FPAA. . . ." Pltf. Br. at 11. In the first place, this allegation is flatly contradicted by plaintiff's own admission that "Defendant has litigated this case before this Court for two-and-a-half years and never suggested that it had a claim for penalties." Pltf. Br. 15. What is even more significant is that plaintiff attaches no declaration or other evidence to support such a personal accusation. Making a personal allegation against opposing counsel without a shred of support is, in itself, an indicia of bad faith. If anything, this reckless allegation shows the lengths to which plaintiff will go to refocus the Court's attention from its own wrong doing.

Plaintiff also asserts that the United States tried to "poison this litigation with unproven allegations" by quoting from the recently unsealed indictment of four E&Y partners. Pltf. Br. 1. This allegation is equally specious. Throughout this litigation, including Zucker's court deposition testimony, plaintiff's partners have steadfastly attempted to foist onto E&Y their obligations of producing all COBRA information. *See* Linduist Declaration ¶¶ 16-18, Govt. Ex. F., Zucker Dep. II 190:17-191:1; 193:23-194:10; 195:8-199:12. *See*, *also* footnote 16, *supra*. Even in its response to our motion, plaintiff continues to echo this stance, asserting that it relied upon E&Y to support its numerous erroneous return positions (i.e., "E&Y advised plaintiff's

partners that the disclosure was accurate."). Pltf. Br. at 9.

In our opening memorandum, we cited the E&Y indictment to demonstrate that E&Y had no intention whatsoever of fulfilling its clients' obligations to provide the IRS with sensitive COBRA information. Unlike plaintiff's unsupported assertions, however, we supported the allegation in the indictment with direct evidence. We cited and attached an E&Y e-mail showing that E&Y had requested J&G to furnish it with it an electronic copy of J&G's boilerplate legal opinion so that E&Y could "create a template for COBRA amnesty disclosures." Pltf. Br. at 8, Govt. Ex. 1109. We also cited the E&Y incitement to show to what lengths E&Y would go to deny that its fee was based on"a percentage of tax saving." Govt. Br. at 4, n. 2. This evidence showed that plaintiff could not in good faith have reasonably relied upon E&Y to fulfil its disclosure obligations. And plaintiff's professed reliance on E&Y to carry out its partners' sworn obligations was either knowingly false or blindly reckless.

Plaintiff also asserts that our motion is designed to punish it for desiring to litigate the merits of its tax adjustments. Pltf. Br. at 1. Nothing could be further from the truth. In fact, despite repeated indications that plaintiff may not been have completely forthcoming in its disclosure obligations with the IRS and with the United States in this litigation, we nevertheless still failed to take any action regarding these apparent document-production "lapses." It was only after it become glaringly and undeniably obvious that plaintiff's partners had totally and unconscionably reneged on their sworn commitments to produce all COBRA documents that the United States was compelled to request authorization to file this counterclaim. Contrary to his court deposition testimony, Zucker's election to participate in the penalty waiver disclosure initiative was not a "free lottery ticket." Govt. Ex. F, Zucker II Dep at.151:16-152:2. It came with certain basic and fundamental obligations. Both Zucker and Boyd were obligated, under

the terms of their penalty waiver elections, to fully disclose any and all information concerning their COBRA transactions. This record makes crystal clear that they failed to honor those obligations. This motion is in no way calculated to punish the plaintiff but is the logical and inevitable consequence of plaintiff's and its partners' own willful or negligent violations of their sworn obligations.

**C. There Is No Prejudice to Plaintiff.**

Plaintiff argues that this motion raises new factual and legal issues that would require additional fact and expert witness discovery if it were granted, which discovery would result in undue prejudice to it. Pltf. Br. 17. Its claim of required additional discovery falls into two categories. First, it argues that it would be required to conduct discovery to show Zucker's and Boyd's good faith compliance with the requirements of Announcement 2002-2 and their reliance on their agreements with the IRS. *Id*. It further asserts that it would thereafter need to file one or more dispositive motions including a motion for declaratory judgment as to the enforceability of Zucker's and Boyd's Announcement 2002-2 agreements. *Id*. This argument is meritless.

The Court would lack subject-matter jurisdiction over such a claim to enforce Zucker's and Boyd's personal agreements with the IRS because such a claim belongs to the partners who participated in the Announcement, and not to the partnership. It is settled law that "[p]artner level defenses . . . must be asserted in a separate refund action following assessment and payment." *Santa Monica Pictures v. Commissioner*, T.C. Memo. 2005-104 at 810 n.187 (May 11, 2005). A court has jurisdiction in a partnership-level proceeding to consider "the applicability of any penalty" that relates to an adjustment to a partnership item, but the court does not have jurisdiction to consider partner-level defenses to penalties. 26 U.S.C. ("IRC") § 6226(f); Temp. Treas. Reg. § 301.6221-1T. *See also*, IRC § 6230 (c)(1)(C) (providing for the

right of partner to file refund claim to raise partner-level defenses). Partner-level defenses are those that are (1) personal to the partner or are dependent upon the partner's separate return and (2) cannot be determined at the partnership level. Temp. Treas. Reg. § 301.6221-1T(d). An alleged agreement with the Service with respect to penalties is personal to the partner and cannot be determined at the partnership level. The partnership-level determination of penalties would be unaffected by such an alleged agreement. Therefore, any agreement regarding Announcement 2002-2 is a partner-level defense to the penalties over which this Court has no subject-matter jurisdiction in a TEFRA proceeding. Accord, *Domulewicz v. Commissioner*, 129 T.C. No. 3 (Aug. 8 2007). Accordingly, this alleged claim would necessitate no additional discovery in this action.

Secondly, plaintiff argues it would need to conduct additional discovery and retain expert witnesses to prepare to litigate the merits of the penalty issues and its defenses. Pltf. Br. 17. Other than conclusory allegations, however, plaintiff has not specified what additional discovery it would be required to conduct. Pointedly, the same accuracy-related penalties were asserted against the partnerships in the other COBRA cases, including the consolidated cases of *MURFAM Farms, et al.*, (CFC, 06-245, 06-246, and 06-247) and *Gary Woods v. United States*, 06-8000 (S.D. Ind.), one of the MDL cases in *In re COBRA Tax Shelters Litigation*, 05-9727 (S.D. Ind.). Plaintiff's counsel also represents the *Murfam* and *Gary Woods* plaintiffs and have fully explored discovery on the very same penalty issues in that litigation. Lindquist Dec. at ¶51. Indeed plaintiff has retained the very same expert witness, Gerald J. Songy, in this litigation to rebut the Government's expert witness on the penalty issue, Dr. LaRue, that plaintiff's counsel retained as a rebuttal witness in the *Murfam* and *Tesoro* cases. Lindquist Dec. at ¶52. Significantly, Mr. Songy's expert witness report is nearly identical in all three cases. Lindquist

Dec. at ¶53. In other words, plaintiff's counsel has conducted complete discovery against the Government on all the penalty issues in this litigation and is fully prepared to litigate these issues on the merits.[18]

**D. Plaintiff's Futility Argument Is Meritless.**

Plaintiff argues that this motion to amend is futile because plaintiff may prevail on a motion for declaratory judgment to enforce "*its* Announcement 2002-2 *agreement* with the Service." (Emphasis added.) Pltf. Br. 18. These agreements, however, were not with plaintiff, but with Zucker and Boyd as individuals. *See,* Govt. Exs. 169 and 170. As noted, the Court lacks subject-matter jurisdiction over a claim to enforce personal agreements with the IRS. Moreover, given this record, even if the Court had jurisdiction plaintiff would have little chance of prevailing on such a claim.

**CONCLUSION**

The fundamental issue on this motion is whether the plaintiff and its partners can blatantly violate their sworn document-production obligations to the IRS and to the Government in this litigation without suffering any consequence. Plaintiff argues that the violations were due

---

[18] Plaintiff's counsel has retained an additional penalty expert, Stuart Smith, in the *MURFAM* and *Gary Woods* matters. However, Smith's proffered testimony is on legal and not factual issues. Specifically, he is opining whether the promoters' legal opinions met the requirements of § 10.33 of Treasury Circular 230. *See* Govt. Ex. J, Smith Report, at 7. Apart from the fact that this issue is purely one of law, equally important this particular directive has absolutely no applicability in this case. *See* Treas. Reg.§1.6664-4(c) (which sets forth the requirements that must be complied with for reliance upon the advice of others). Accordingly, at an appropriate time we will be moving to exclude Smith's testimony at trial. In any event, Smith's reports in the *MURFAM* and *Gary Woods* matters are virtually identical and it took him no more than 40 hours to prepare his report. Govt. Ex. K, Smith Dep at 22. This is not surprising since he did little more than read the promoters' legal opinions. Govt. Ex. K, Smith Dep at 22 -26. Thus, if plaintiff so decided, it would take Smith little time and effort to submit a virtually identical report in this matter.

to an oversight and unintentional. This explanation is not supported by the record and in any event strains credulity. We respectfully submit that justice requires the granting of this motion to amend our answer to assert accuracy related penalties.

Respectfully submitted,

s/ Dennis M. Donohue
DENNIS M. DONOHUE
Attorney of Record

Chief Senior Litigation Counsel
U.S. Department of Justice - Tax Division
Post Office Box 403
Ben Franklin Station
Washington, D.C. 20044
(202) 307-6492

**CERTIFICATE OF SERVICE**

I hereby certify that on September 19th, 2007, I electronically filed the foregoing Corrected Reply Brief in Support of United States' Motion for Leave to Amend Answer to Assert Counterclaim for Penalties with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

Joel N. Crouch
Texas State Bar No. 05144220
Meadows, Collier, Reed
Cousins & Blau, L.L.P.
901 Main Street, Suite 3700
Dallas, Texas 75202

s/ David M. Steiner
David M. Steiner
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 55
Ben Franklin Station
Washington, D.C. 20044
(202) 307-5892