**IN THE UNITED STATES DISTRICT COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **JZ Buckingham Investments, LLC, as Tax Matters Partner of JBJZ Partners, A South Carolina general partnership,** | § § § § | |
| **Plaintiff,** | § | **Case No. 05-231 T** |
| | § | **Chief Judge Edward Damich** |
| **v.** | § § | |
| **United States of America,** | § § | |
| **Defendant.** | § | |

**APPENDIX**

| Exhibit | Description | Pages |
|---|---|---|
| 1 | Rule 30(b)(6) Notice of Deposition and Subpoena | 1-29 |
| 2 | Objections of the United States to Plaintiff's 30(b)(6) Deposition Notice | 30-55 |
| 3 | Plaintiff's Memorandum in Support of Cross-Motion to Compel J&G to Comply with Subpoena for Rule 30(b)(6) Deposition and Production of documents and in Opposition to J&G's Motion to Quash | 56-78 |
| 4 | Opinion and Order of August 9, 2007 | 19-93 |
| 5 | Affidavit of M. Todd Welty | 94 |
| 6 | United States' Response to Plaintiff's First Set of Requests for Admissions | 94-181 |
| 7 | United States' Second Amended Answers to First Set of Interrogatories | 182-189 |
| 8 | United States' Amended Answers to Second Set of Interrogatories | 190-206 |
| 9 | Untied States' Answers to Plaintiff's Third Set of Interrogatories | 207-232 |
| 10 | Treas. Reg. § 1.752-6T | 233-237 |
| 11 | Chief Counsel's Notice CC-2003-020 | 238-249 |
| 12 | Assumption of Partner Liabilities | 250-251 |
| 13 | Notice 2000-44 | 252-254 |
| 14 | Final Partnership Administrative Adjustment | 255-265 |
| 15 | De Rosa Expert Opinion | 266 |
| 16 | I.R.C. § 6707 | 267-268 |
| 17 | I.R.C. § 6111 | 269-273 |
| 18 | Deposition Testimony of De Rosa | 274-280 |
| 19 | Jenkins & Gilchrist's Brief in Support of Motion to Quash and Motion for Protection from Plaintiff's Subpoena for a rule 30(b)(6) Deposition and for Production of Documents | 281-289 |
| 20 | IR-2007-103 | 290 |
| 21 | 2007 ABA Tax Section | 291-307 |
| 22 | Plaintiff's Cross-Motion to Compel J&G to Comply with Subpoena for Rule 30(b)(6) Deposition and Production of Documents | 308-311 |
| 23 | Deposition Testimony of John Gilliam | 312-319 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JZ Buckingham Investments LLC as Tax Matters Partner of JBJZ Partners, a South Carolina general partnership, | § | |
| | § | |
| | § | |
| | § | CASE NO. 05-231 T |
| Plaintiff, | § | Chief Judge Edward J. Damich |
| v. | § | |
| | § | |
| United States of America, | § | |
| | § | |
| Defendant. | § | |

NOTICE OF DEPOSITION

PLEASE TAKE NOTICE that Plaintiffs JZ Buckingham Investments, LLC as Tax Matters Partner of JBJZ Partners, a South Carolina general partnership, will take the deposition of Jenkens & Gilchrist, P.C., pursuant to RCFC 30(b)(6) and 45 The deposition will be conducted on May 18, 2007 at 9:00 a.m., at the offices of Meadows, Collier, Reed, Cousins & Blau, L.L.P., 901 Main Street, Suite 3700, Dallas, Texas 75202, or at another location determined by the parties

The deposition will be recorded by stenographic means and will continue from day to day until completed, subject to such adjournments as may be agreed upon by counsel

The witness is being commanded to testify to the matters set forth in and to produce the materials listed on Exhibit A to the Subpoena attached hereto

351262



EXHIBIT
tabbies
1

Respectfully submitted,

By: [signature]

Joel N Crouch
Texas State Bar No 05144220
M Todd Welty
Texas State Bar No 00788642
Michael E. McCue
Texas State Bar No. 13494150
Anthony P Daddino
Texas State Bar No 24036434

MEADOWS, COLLIER, REED
COUSINS & BLAU, L.L.P
901 Main Street, Suite 3700
Dallas, TX 75202
(214) 744-3700 Telephone
(214) 747-3732 Facsimile
jcrouch@meadowscollier com
twelty@meadowscollier com
mmccue@meadowscollier com
adaddino@meadowscollier.com

ATTORNEYS FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

I hereby certify that on April 25, 2007, I served the foregoing Notice of Deposition on the below-listed counsel:

David M. Steiner, Esq. *(via Certified Mail)*
United States Department of Justice
Tax Division
P.O. Box 55 Ben Franklin Station
Washington, D.C. 20044

Joseph Pitzinger, Esq. *(via Certified Mail)*
Jonathan Blacker, Esq.
United States Department of Justice
Tax Division
717 North Harwood
Suite 400
Dallas, Texas 75201

***Attorneys for the United States***

F. Anthony Paganelli, Esq. *(via FedEx)*
Sommer Barnard, P.C.
One Indiana Square
Suite 3500
Indianapolis, Indiana 46204

***Attorney for Carmel Partners***

JOEL N. CROUCH

351262

OAO88 (Rev. 1/94) SUBPOENA

Issued by the

# UNITED STATES COURT OF FEDERAL CLAIMS

JZ Buckingham Investments LLC as Tax Matters Partner of JBJZ Partners, a South Carolina general partnership

**SUBPOENA**

V

United States of America

Case Number:[1] **05-231 T**

TO: **JENKENS & GILCHRIST (as more fully defined in Exhibit A attached hereto)**

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

X YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above referenced case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| **Meadows, Collier, Reed, Cousins & Blau, 901 Main Street #3700, Dallas, TX 75202** | **May 18, 2007 at 9:00 a.m.** |

X YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date and time specified below

**See Attached.**

| PLACE | DATE AND TIME |
|---|---|
| | |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify Federal Rules of Civil Procedure, 30(b)(6)

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | | DATE |
|---|---|---|
| [signature] | Attorney for Plaintiffs | 4-25-07 |

ISSUING OFFICER'S NAME. ADDRESS AND PHONE NUMBER
Joel N Crouch, Esq
901 Main Street, Suite 3700, Dallas, TX 75248
(214) 744-3700

[1] If action is pending in district other than district of issuance. state district under case number

AO88 (Rev 1/94) SUBPOENA

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

SERVED ON (PRINT NAME) MANNER OF SERVICE

SERVED BY (PRINT NAME) TITLE

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on ______________________ ______________________
DATE SIGNATURE OF SERVER

______________________
ADDRESS OF SERVER

______________________

RCFC 45

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include but is not limited to lost earnings and reasonable attorney's fee

(2) (A) A person commanded to produce and permit inspection and copying of designated books papers documents or tangible things or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition hearing or trial

(B) Subject to paragraph (d) (2) of this rule a person commanded to produce and permit inspection and copying may within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises If objection is made the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued If objection has been made the party serving the subpoena may upon notice to the person commanded to produce move at any time for an order to compel the production Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded

(3) (A) On timely motion the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides is employed or regularly transacts business in person except that subject to the provisions of clause (c) (3) (B) (iii) of this rule such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies or

(iv) subjects a person to undue burden

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research development or commercial information or

(ii) requires disclosure of an unretained expert=s opinion or information not describing specific events or occurrences in dispute and resulting from the expert=s study made not at the request of any party or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial the court may to protect a person subject to or affected by the subpoena quash or modify the subpoena or if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated the court may order appearance or production only upon specified conditions

(d) DUTIES IN RESPONDING TO SUBPOENA

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials the claim shall be made expressly and shall be supported by a description of the nature of the documents communications or things not produced that is sufficient to enable the demanding party to contest the claim

**Exhibit A**

THIS SUBPOENA NAMES A CORPORATION, JENKENS & GILCHRIST, P C ("JENKENS & GILCHRIST"), AS THE DEPONENT

1 Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, JENKENS & GILCHRIST is directed to designate a person or persons to testify on its behalf regarding any or all transactions that were known as COBRA, offered by Ernst & Young LLP, and opined to by JENKENS & GILCHRIST Specifically, the designated person or persons is directed to testify as to matters, which include, but may not be limited to:

a JENKENS & GILCHRIST's relationship before, during, and after the period of November-December 1999 (the "Period") with any or all of the following entities and individuals: GW Tesoro Investments LLC, BJM Tesoro Drive Investments LLC, SA Tesoro Investment Partners, Tesoro Drive Partners, SA Tesoro Investors, Inc, Tesoro Drive Investors, Inc., Billy J McCombs, Gary Woods;

b JENKENS & GILCHRIST's role in transactions (the "Transactions") entered into during the Period by any or all of the above-referenced entities and individuals, including, but not limited to, its tax opinions dated on or about January 31, 2000 that are related to the above-styled litigation;

c JENKENS & GILCHRIST's fees paid by or on behalf of any or all of the above-referenced entities and individuals in connection with the Transactions, which would include how those fees were calculated, agreed to, and paid;

d JENKENS & GILCHRIST's relationship with Deutsche Bank AG and Deutsche Bank Securities, Inc D/B/A Deutsche Bank Alex.Brown; and

e JENKENS & GILCHRIST's relationship with Ernst & Young LLP

349314v 1

Plaintiffs request that JENKENS & GILCHRIST provide to Plaintiffs at least seven (7) days before the date of the deposition (1) the names and titles of the persons it will designate to give testimony and (2) summaries of the areas in which each designated person will give testimony

2 Pursuant to Rule 45 of the Federal Rules of Civil Procedure, JENKENS & GILCHRIST is commanded to produce and to permit inspection and copying of all documents, communications, or both relating to the matters listed in paragraph 1

a Please produce the documents in accordance with the following instructions:

i The documents sought by this Subpoena shall include all documents (as defined herein) within your possession, custody, control or access, or within the possession, custody, control or access of any of your representatives (as defined herein)

ii. This Subpoena is continuing in nature, and if you or your agents or representatives acquire additional documents regarding this Subpoena, all such subsequently acquired documents should be made available to Plaintiffs' counsel

iii If you at any time had possession or control of a document called for under this Subpoena, and if such document has been lost, destroyed or is not presently in your possession or control, you shall describe in writing, the document, the date of its loss, destruction, purge or separation from possession or control, and the circumstances surrounding its loss, destruction, purge or separation from possession or control.

iv. The documents shall be produced as they are kept in the usual course of business or shall be organized and labeled to correspond with the categories in this Subpoena.

v The selection of documents and files and other sources shall be performed in such a manner as to insure that the file or other source from which a document is obtained

may be identified

vi In the event that you contend that any document is privileged or otherwise not subject to production or inspection, you are requested to identify each such document, in writing, by date, author, addressee, and general subject matter, and to identify all persons who received any copy thereof or otherwise obtained access thereto. Also, you are requested to state the basis for your assertion of privilege or other grounds for exclusion with respect to each document claimed to be privileged or otherwise not subject to production.

vii Whenever appropriate, the singular form of a word shall be interpreted as plural, and the masculine gender shall be deemed to include the feminine

b The requested documents should be construed using the following definitions:

i "Documents" as used herein shall mean all writings and recordings, including the original and non-identical copies, whether different from the original by reason of any notation made on such copies or otherwise (including but without limitation to, email and attachments, correspondence, memoranda, notes, diaries, minutes, statistics, letters, telegrams, minutes, contracts, reports, studies, checks, statements, tags, labels, invoices, brochures, periodicals, telegrams, receipts, returns, summaries, pamphlets, books, interoffice and intraoffice communications, offers, notations of any sort of conversations, working papers, applications, permits, file wrappers, indices, telephone calls, meetings or printouts, teletypes, telefax, invoices, worksheets, and all drafts, alterations, modifications, changes and amendments of any of the foregoing), graphic or aural representations of any kind (including without limitation, photographs,

charts, microfiche, microfilm, videotape, recordings, motion pictures, plans, drawings, surveys), and electronic, mechanical, magnetic, optical, or electric records or representations of any kind (including without limitation, computer files and programs, tapes, cassettes, discs, recordings), including metadata, drafts, alterations, modifications, changes of memoranda, etc., to any of the foregoing

ii "You," "your," and "yours," as used herein shall refer to JENKENS & GILCHRIST, and its representatives and all other past and present representatives of such in their representative capacity

iii "Communication" as used herein shall mean any contact between or among JENKENS & GILCHRIST, its employees, agents or representatives regarding the matters listed in paragraph 1. Further, Communication shall include but not be limited to, all documents (as defined above), telephone or personal conversations, meetings, conferences and discussions, at any time or place, and under any circumstances whatsoever, whereby information of any nature was stated or in any manner transmitted or transferred

iv "Entity" as used herein shall mean a corporation, partnership, association, agency, governmental body (or any division, department or unit thereof), or any other legal entity other than a natural person.

v "Representative" as used herein shall mean any and all present or former agents, employees, servants, officers, directors, attorneys, accountants, consultants and other persons or entities acting or purporting to act on behalf of the person or entity referred to.

vii. "Person" as used herein shall mean a natural person other than an entity and shall

be construed to include groups of natural persons.

viii "Relate to," "relates to," and "relating to" mean, consist of, refer to, pertain to, reflect, evidence, or be in any way logically or factually connected with the matter discussed.

3 The deposition will be recorded stenographically and on audio tape The deposition will be taken before an officer authorized to administer oaths and take testimony pursuant to Rule 28 of the Federal Rules of Civil Procedure and will continue from day to day during regular business hours until completed

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **JZ Buckingham Investments LLC as Tax Matters Partner of JBJZ Partners, a South Carolina general partnership,** | § § § | |
| **Plaintiff,** | § § | **CASE NO. 05-231 T** **Chief Judge Edward J. Damich** |
| v. | § § | |
| **United States of America,** | § § | |
| **Defendant.** | § | |

**NOTICE OF DEPOSITION**

PLEASE TAKE NOTICE that Plaintiffs JZ Buckingham Investments, LLC as Tax Matters Partner of JBJZ Partners, a South Carolina general partnership, will take the deposition of the Internal Revenue Service, pursuant to RCFC 30(b)(6) and 45. The deposition will be conducted on April 26, 2007 at 9:00 a.m., at the offices of U.S. Department of Justice, Tax Division, 555 4th Street NW, Washington, D.C., or at another location determined by the parties.

The deposition will be recorded by stenographic means and will continue from day to day until completed, subject to such adjournments as may be agreed upon by counsel.

The witness is being commanded to testify to the matters set forth in and to produce the materials listed on Exhibit A to the Subpoena attached hereto.

351698

Respectfully submitted,

By: ______________________

Joel N. Crouch
Texas State Bar No.05144220
M. Todd Welty
Texas State Bar No. 00788642
Michael E. McCue
Texas State Bar No. 13494150
Tara C. Campbell
Texas State Bar No. 24043452

MEADOWS, COLLIER, REED
COUSINS & BLAU, L.L.P.
901 Main Street, Suite 3700
Dallas, TX 75202
(214) 744-3700 Telephone
(214) 747-3732 Facsimile
jcrouch@meadowscollier.com
twelty@meadowscollier.com
mmccue@meadowscollier.com
tcampbell@meadowscollier.com

ATTORNEYS FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

I hereby certify that on April 23, 2007, I served the foregoing Notice of Deposition on the below-listed counsel by certified mail, return receipt requested.

David M. Steiner, Esq.
United States Department of Justice
Tax Division
P.O. Box 55 Ben Franklin Station
Washington, D.C. 20044

Joseph Pitzinger, Esq.
Jonathan Blacker, Esq.
United States Department of Justice
Tax Division
717 North Harwood
Suite 400
Dallas, Texas 75201

*Attorneys for the United States*

F. Anthony Paganelli, Esq.
Sommer Barnard, P.C.
One Indiana Square
Suite 3500
Indianapolis, Indiana 46204

*Attorney for Carmel Partners*

JOEL N. CROUCH

351698

OAO88 (Rev. 1/94) SUBPOENA

Issued by the

# UNITED STATES COURT OF FEDERAL CLAIMS

JZ Buckingham Investments LLC as Tax Matters Partner of JBJZ Partners, a South Carolina general partnership

**SUBPOENA**

V.

United States of America

Case Number:[1] **05-231 T**

TO: **Internal Revenue Service, 1111 Constitution Avenue NW, Washington, D.C. 20224**

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

X YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above referenced case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| **U.S. Department of Justice-Tax Division, 555 4th Street NW, Washington, D.C. 20001** | **April 26, 2007, 9:00 a.m.** |

X YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date and time specified below.

**See Attached.**

| PLACE | DATE AND TIME |
|---|---|
| | |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| [signature] Attorney for Plaintiffs | 4.23.07 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Joel N. Crouch, Esq.
901 Main Street, Suite 3700, Dallas, TX 75248
(214) 744-3700

[1] If action is pending in district other than district of issuance, state district under case number.

AO88 (Rev 1/94) SUBPOENA

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

SERVED ON (PRINT NAME) MANNER OF SERVICE

SERVED BY (PRINT NAME) TITLE

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on ____________________
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

RCFC 45

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include but is not limited to, lost earnings and reasonable attorney's fee

(2) (A) A person commanded to produce and permit inspection and copying of designated books. papers documents or tangible things. or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial

(B) Subject to paragraph (d) (2) of this rule. a person commanded to produce and permit inspection and copying may. within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service. serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made. the party serving the subpoena may. upon notice to the person commanded to produce. move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion. the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides is employed or regularly transacts business in person. except that. subject to the provisions of clause (c) (3) (B) (iii) of this rule. such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies. or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information. or

(ii) requires disclosure of an unretained expert=s opinion or information not describing specific events or occurrences in dispute and resulting from the expert=s study made not at the request of any party or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial. the court may, to protect a person subject to or affected by the subpoena. quash or modify the subpoena. or. if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated. the court may order appearance or production only upon specified conditions

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents. communications. or things not produced that is sufficient to enable the demanding party to contest the claim

**Exhibit A**

THIS SUBPOENA NAMES THE INTERNAL REVENUE SERVICE AS THE DEPONENT.

1. Pursuant to Rule 30(b)(6) of the Rules of the Court of Federal Claims, the INTERNAL REVENUE SERVICE is directed to designate a person or persons to testify to Defendant's legal and factual positions regarding the transactions at issue in this matter and that more generally known as COBRA. Specifically, the designated person or persons is directed to testify as to matters, which include, but may not be limited to:

   a. Defendant's legal and factual position with regard to the issuance of Treas. Reg. §1.752-6T on June 23, 2003, and the promulgation of Treas. Reg. §1.752-6 on May 23, 2004; the specific application of Treas. Regs. §§1.752-6T and 1.752-6 to the above-styled litigation; whether prior to the issuance of these regulations there was substantial authority for the reporting position that a contingent obligation did not constitute a liability within the meaning of I.R.C. §752; and separately, whether these regulations were issued to enhance Defendant's litigation position with respect to transactions described in Notice 2000-44;

   b. Defendant's legal and factual position with regard to Treas. Reg. §1.701-2 and its specific application to the above-styled litigation;

   c. Defendant's legal and factual position regarding whether each of the sold and purchased digital options contracts at issue in this case (Attachments 1 through 5) are a single option or investment; and separately, whether for purposes of determining the "aggregate amount invested" under I.R.C. §6707, Defendant is taking the position that each digital option contract, such as those involved in this case, are separate options or investments rather than a single option or investment;

350385v1 MU

d. The names of tax advisors and firms that issued tax opinions regarding transactions that are the same as, or substantially similar to, those set forth in I.R.S. Notice 2000-44, 2000-2 C.B. 255 (August 14, 2000) and whose opinions concluded that there was substantial authority for, or that taxpayers would more-likely-than-not prevail on the merits if challenged by the Internal Revenue Service on, the position that contingent obligations are not liabilities within the meaning of I.R.C. § 752. This request is limited to those tax advisors or firms whose opinions Defendant has rejected as a basis for the reasonable cause defense to I.R.C. §6662 penalties;

e. The determination to impose I.R.C. §6662 penalties in this case;

f. Defendant's discovery responses in the above-styled litigation.

Plaintiff requests that the INTERNAL REVENUE SERVICE provide to Plaintiff at least seven (7) days before the date of the deposition (1) the names and titles of the persons it will designate to give testimony and (2) summaries of the areas in which each designated person will give testimony.

2. The deposition will be recorded stenographically and on audio tape. The deposition will be taken before an officer authorized to administer oaths and take testimony pursuant to Rule 28 of the Rules of the Court of Federal Claims and will continue from day to day during regular business hours until completed.

# ATTACHMENT 1

# Deutsche Bank AG New York Branch

24 November, 1999

**Foreign Exchange Digital Option Transaction**
Our ref: ex27921A

JGB BOHICKET INVESTMENTS LLC
Care of David Parse
DB Alex Brown
222 West Adams Suite 1900
Chicago, IL 60606
312-424-6020

Deutsche Bank AG New York Branch
31 West 52nd Street
New York NY 10019

Telephone: 212-474-8000
Fax: 212-474-8580
Swift: DEUT US 33

Ladies and Gentlemen:

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Foreign Exchange Digital Option Transaction entered into between us ("Party A") and you ("Party B") on the Trade Date referred to below (the "Transaction"). The parties acknowledge and agree that B.T. Alex Brown has acted as introducing broker to Party A with respect to this Transaction.The Transaction consists of a number of elements as detailed below in Sections 1, 2(i) and (ii), 3(i) and (ii) and Section 4. Certain definitions and provisions which are applicable to more than one element of the Transaction are detailed in Section 1. The terms of the Transaction to which this Confirmation relates are as follows:

**1. Section 1 – General Terms**

| | |
|---|---|
| Notional Amount: | USD 10,000,000 |
| Trade Date: | 23 November 1999 |
| Termination Date: | 22 December 1999, subject to modification in accordance with the Following Business Day Convention. |
| Business Days: | In New York |
| Calculation Agent: | Party A |
| Currency Pair: | EUR/USD |

**2. Section 1 – First Digital Option Transaction**

(i) Initial Exchange Provisions:

| | |
|---|---|
| Party A Initial Exchange Amount: | Zero |
| Party B Initial Exchange Amount: | USD 5,000,000 |
| Initial Exchange Date: | 26 November 1999, subject to adjustment in accordance with the Following Business Day Convention. |

(ii) Final Exchange Provisions:

| | |
|---|---|
| Party A Final Exchange Amount: | USD 10,000,000 |
| Party B Final Exchange Amount: | Zero |
| First Range Level: | USD 1.0123 per EUR 1.00 |
| First Rate Determination Date: | Means the Termination Date |
| Final Exchange Date: | 27 December 1999, subject to adjustment in accordance with the Following Business Day Convention. |

(A) If the Spot Rate is, on the First Rate Determination Date at 10:00 a.m. local time in New York, less than or equal to the First Range Level (such event being a "First Digital Option Trigger Event"), then upon the occurrence of such First Digital Option Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a First Digital OptionTrigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of the First Digital Option Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the First Digital Option Trigger Event and provide details of the occurrence of such First Digital Option Trigger Event. A failure to give such notice shall not, however, prejudice the occurrence of the First Digital OptionTrigger Event.

ex27921a

3. Section 1 – Second Di... Option Transaction

(i) Initial Exchange Provisions:

| | |
|---|---|
| Party A Initial Exchange Amount: | USD 4,750,000 |
| Party B Initial Exchange Amount: | Zero |
| Initial Exchange Date: | 26 November 1999, subject to adjustment in accordance with the Following Business Day Convention |

(ii) Final Exchange Provisions:

| | |
|---|---|
| Party A Final Exchange Amount: | Zero |
| Party B Final Exchange Amount: | USD 9,375,000 |
| Second Range Level: | USD 1.0121 per EUR 1.00 |
| Second Rate Determination Date: | Means the Termination Date |
| Final Exchange Date: | 27 December 1999, subject to adjustment in accordance with the Following Business Day Convention |

(A) If the Spot Rate is, on the Second Rate Determination Date at 10:00 a.m. local time in New York, less than or equal to the Second Range Level (such event being a "Second Digital Option Trigger Event"), then upon the occurrence of such Second Digital Option Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a Second Digital Option Trigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of a Second Digital Option Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the Second Digital Option Trigger Event and provide details of the occurrence of such Second Digital Option Trigger Event. A failure to give such notice shall not however prejudice the occurrence of the Second Digital Option Trigger Event.

Section 2 - Other Provisions

(i) For the purposes of this Transaction only, the following provision shall apply:

"Subparagraph (ii) of Section 2 (c) of the ISDA Form shall not apply to the First Digital Option Transaction and the Second Digital Option Transaction.

(ii) Offices:

(a) The Office of Party A for the Transaction is New York; and
(b) The Office of Party B for the Transaction is Delaware.

3. Representations:

Each party represents to the other party as of the date that it enters into this Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for this Transaction):

(i) Non-Reliance. It is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party including any affiliate or subsidiary thereof as investment advice or as a recommendation to enter into this Transaction, it being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered to be investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(ii) **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms and conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of the Transaction.

(iii) **Status of Parties.** The other party is not acting as a fiduciary for or adviser to it in respect of this Transaction.

**4. ISDA Agreement:**

If you and we are parties to either an ISDA Interest Rate and Currency Exchange Agreement (for which purposes this Transaction shall constitute a "Swap Transaction") or an ISDA Master Agreement (in each case an "Agreement") then this Confirmation supplements forms part of and is subject to such Agreement. If you and we are not yet parties to an Agreement then this Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition Party A and Party B agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form") with such modifications as you and we will in good faith agree. Upon execution by Party A and Party B of such an agreement, this Confirmation will supplement, form part of, and be subject to that agreement. All provisions contained or incorporated by reference in that agreement upon its execution will govern this Confirmation. Until we execute and deliver that agreement, this Confirmation, together with all other documents referring to the ISDA Form (each a "Confirmation") confirming transactions (each a "Transaction") entered into between us (notwithstanding anything to the contrary in a Confirmation) shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement on the Trade Date of the first such Transaction between us in such form with the Schedule thereto (i) specifying only that (a) the governing law is New York law and (b) the Termination Currency is U.S., Dollars, (ii) incorporating the addition to the definition of "Indemnifiable Tax" contained in (page 48 of) the ISDA "Users Guide to the 1992 ISDA Master Agreements" and (iii) incorporating any other modifications to the ISDA form specified below.

**5. Definitions:**

The definitions and provisions contained in the 1991 ISDA Definitions (as amended by the 1997 Supplement) as published by the International Swaps and Derivatives Association, Inc (the "Swap Definitions") and in the 1998 FX and Currency Option Definitions (the "FX Definitions") as published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee (the "1998 Definitions", and together with the Swap Definitions, the "Definitions"), are incorporated into this Confirmation. In the event of any inconsistency between the Swap Definitions and the 1998 Definitions, the 1998 Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us or by sending to us a letter or telex substantially similar to this letter, which letter or telex sets forth the material terms of the Transaction to which this Confirmation relates and indicates your agreement to those terms.

Yours faithfully,
for and on behalf of
Deutsche Bank AG, New York

By: [signature]
Name: Jennifer Andrews
Title: AVP

By: [signature] Penny Parker
Name: PENNY PARKER
Title: DIRECTOR

Confirmed as of the date first above written:
JGB BOHICKET INVESTMENTS LLC

By: [signature]
Name:
Authorised Signatory

By:
Name:
Authorised Signatory

For any query relating to this Confirmation please contact: 212-469-4033

TOTAL P.10

# ATTACHMENT 2

# Deutsche Bank AG New York Branch

24 November, 1999

**Foreign Exchange Digital Option Transaction**
Our ref: ex27919A

JZ BUCKINGHAM INVESTMENTS LLC
Care of David Parse
DB Alex Brown
222 West Adams Suite 1900
Chicago, IL 60606
312-424-6020

Deutsche Bank AG New York Branch
31 West 52nd Street
New York NY 10019

Telephone: 212-474-8000
Fax: 212-474-8560
Swift: DEUT US 33

Ladies and Gentlemen:

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Foreign Exchange Digital Option Transaction entered into between us ("Party A") and you ("Party B") on the Trade Date referred to below (the "Transaction"). The parties acknowledge and agree that B.T. Alex Brown has acted as introducing broker to Party A with respect to this Transaction. The Transaction consists of a number of elements as detailed below in Sections 1, 2(i) and (ii), 3(i) and (ii) and Section 4. Certain definitions and provisions which are applicable to more than one element of the Transaction are detailed in Section 1. The terms of the Transaction to which this Confirmation relates are as follows:

**1. Section 1 – General Terms**

| | |
|---|---|
| Notional Amount: | USD 40,000,000 |
| Trade Date: | 23 November 1999 |
| Termination Date: | 22 December 1999, subject to modification in accordance with the Following Business Day Convention. |
| Business Days: | In New York |
| Calculation Agent: | Party A |
| Currency Pair: | EUR/USD |

**2. Section 1 – First Digital Option Transaction**

(i) Initial Exchange Provisions:

| | |
|---|---|
| Party A Initial Exchange Amount: | Zero |
| Party B Initial Exchange Amount: | USD 20,000,000 |
| Initial Exchange Date: | 26 November 1999, subject to adjustment in accordance with the Following Business Day Convention. |

(ii) Final Exchange Provisions:

| | |
|---|---|
| Party A Final Exchange Amount: | USD 40,000,000 |
| Party B Final Exchange Amount: | Zero |
| First Range Level: | USD 1.0123 per EUR 1.00 |
| First Rate Determination Date: | Means the Termination Date |
| Final Exchange Date: | 27 December 1999, subject to adjustment in accordance with the Following Business Day Convention. |

(A) If the Spot Rate is, on the First Rate Determination Date at 10:00 a.m. local time in New York, less than or equal to the First Range Level (such event being a "First Digital Option Trigger Event"), then upon the occurrence of such First Digital Option Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a First Digital OptionTrigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of the First Digital Option Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the First Digital Option Trigger Event and provide details of the occurrence of such First Digital Option Trigger Event. A failure to give such notice shall not, however, prejudice the occurrence of the First Digital OptionTrigger Event.

3. Section 1 -- Second Digital Option Transaction

(i) Initial Exchange Provisions:

| | |
|---|---|
| Party A Initial Exchange Amount: | USD 19,000,000 |
| Party B Initial Exchange Amount: | Zero |
| Initial Exchange Date: | 26 November 1999, subject to adjustment in accordance with the Following Business Day Convention |

(ii) Final Exchange Provisions:

| | |
|---|---|
| Party A Final Exchange Amount: | Zero |
| Party B Final Exchange Amount: | USD 37,500,000 |
| Second Range Level: | USD 1.0121 per EUR 1.00 |
| Second Rate Determination Date: | Means the Termination Date |
| Final Exchange Date: | 27 December 1999, subject to adjustment in accordance with the Following Business Day Convention |

(A) If the Spot Rate is, on the Second Rate Determination Date at 10:00 a.m. local time in New York, less than or equal to the Second Range Level (such event being a "Second Digital Option Trigger Event"), then upon the occurrence of such Second Digital Option Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a Second Digital Option Trigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of a Second Digital Option Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the Second Digital Option Trigger Event and provide details of the occurrence of such Second Digital Option Trigger Event. A failure to give such notice shall not however prejudice the occurrence of the Second Digital Option Trigger Event.

Section 2 - Other Provisions

(i) For the purposes of this Transaction only, the following provision shall apply:

"Subparagraph (ii) of Section 2 (c) of the ISDA Form shall not apply to the First Digital Option Transaction and the Second Digital Option Transaction.

(ii) Offices:

(a) The Office of Party A for the Transaction is New York; and
(b) The Office of Party B for the Transaction is Delaware.

3. Representations:

Each party represents to the other party as of the date that it enters into this Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for this Transaction):

(i) **Non-Reliance.** It is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party including any affiliate or subsidiary thereof as investment advice or as a recommendation to enter into this Transaction, it being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered to be investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(ii) **Assessment and Un[illegible]anding**. It is capable of assessing the merits of [illegible] understanding (on its own behalf or through independent professional advice), and understands and accepts the terms and conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of the Transaction.

(iii) **Status of Parties**. The other party is not acting as a fiduciary for or adviser to it in respect of this Transaction.

4. **ISDA Agreement:**

If you and we are parties to either an ISDA Interest Rate and Currency Exchange Agreement (for which purposes this Transaction shall constitute a "Swap Transaction") or an ISDA Master Agreement (in each case an "Agreement") then this Confirmation supplements forms part of and is subject to such Agreement. If you and we are not yet parties to an Agreement then this Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition Party A and Party B agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form") with such modifications as you and we will in good faith agree. Upon execution by Party A and Party B of such an agreement, this Confirmation will supplement, form part of, and be subject to that agreement. All provisions contained or incorporated by reference in that agreement upon its execution will govern this Confirmation. Until we execute and deliver that agreement, this Confirmation, together with all other documents referring to the ISDA Form (each a "Confirmation") confirming transactions (each a "Transaction") entered into between us (notwithstanding anything to the contrary in a Confirmation) shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement on the Trade Date of the first such Transaction between us in such form with the Schedule thereto (i) specifying only that (a) the governing law is New York law and (b) the Termination Currency is U.S., Dollars, (ii) incorporating the addition to the definition of "Indemnifiable Tax" contained in (page 48 of) the ISDA "Users Guide to the 1992 ISDA Master Agreements" and (iii) incorporating any other modifications to the ISDA form specified below.

5. **Definitions:**

The definitions and provisions contained in the 1991 ISDA Definitions (as amended by the 1997 Supplement) as published by the International Swaps and Derivatives Association, Inc (the "Swap Definitions") and in the 1998 FX and Currency Option Definitions (the "FX Definitions") as published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee (the "1998 Definitions", and together with the Swap Definitions, the "Definitions"), are incorporated into this Confirmation. In the event of any inconsistency between the Swap Definitions and the 1998 Definitions, the 1998 Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us or by sending to us a letter or telex substantially similar to this letter, which letter or telex sets forth the material terms of the Transaction to which this Confirmation relates and indicates your agreement to those terms.

Yours faithfully,
for and on behalf of
**Deutsche Bank AG, New York**

By: [signature]
Name: [signature]
Title: AVP

By: Perry Parker
Name: Perry Parker
Title: Director

Confirmed as of the date first above written:
**JZ BUCKINGHAM INVESTMENTS LLC**

By: [signature]
Name:
Authorised Signatory

By:
Name:
Authorised Signatory

For any query relating to this Confirmation please contact: 212-469-4033

# ATTACHMENT 3

Deutsche Bank AG New York Branch

24 November, 1999

**Foreign Exchange Digital Option Transaction**
Our ref: ex27820A

JZ BUCKINGHAM INVESTMENTS LLC
Care of David Parse
DB Alex Brown
222 West Adams Suite 1900
Chicago, IL 60606
312-424-6020

Deutsche Bank AG New York Branch
31 West 52nd Street
New York NY 10019

Telephone: 212-474-8000
Fax: 212-474-8550
Swift: DEUT US 33

Ladies and Gentlemen:

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Foreign Exchange Digital Option Transaction entered into between us ("Party A") and you ("Party B") on the Trade Date referred to below (the "Transaction"). The parties acknowledge and agree that B.T. Alex Brown has acted as introducing broker to Party A with respect to this Transaction.The Transaction consists of a number of elements as detailed below in Sections 1, 2(i) and (ii), 3(i) and (ii) and Section 4. Certain definitions and provisions which are applicable to more than one element of the Transaction are detailed in Section 1. The terms of the Transaction to which this Confirmation relates are as follows:

**1. Section 1 – General Terms**

| | |
|---|---|
| Notional Amount: | USD 50,000,000 |
| Trade Date: | 23 November 1999 |
| Termination Date: | 22 December 1999, subject to modification in accordance with the Following Business Day Convention. |
| Business Days: | In New York |
| Calculation Agent: | Party A |
| Currency Pair: | USD/JPY |

**2. Section 1 – First Digital Option Transaction**

(i) Initial Exchange Provisions:

| | |
|---|---|
| Party A Initial Exchange Amount: | Zero |
| Party B Initial Exchange Amount: | USD 25,000,000 |
| Initial Exchange Date: | 26 November 1999, subject to adjustment in accordance with the Following Business Day Convention. |

(ii) Final Exchange Provisions:

| | |
|---|---|
| Party A Final Exchange Amount: | USD 50,000,000 |
| Party B Final Exchange Amount: | Zero |
| First Range Level: | JPY 108.19 per USD 1.00 |
| First Rate Determination Date: | Means the Termination Date |
| Final Exchange Date: | 27 December 1999, subject to adjustment in accordance with the Following Business Day Convention. |

(A) If the Spot Rate is, on the First Rate Determination Date at 10:00 a.m. local time in New York, greater than or equal to the First Range Level (such event being a "First Digital Option Trigger Event"), then upon the occurrence of such First Digital Option Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a First Digital OptionTrigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of the First Digital Option Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the First Digital Option Trigger Event and provide details of the occurrence of such First Digital Option Trigger Event. A failure to give such notice shall not, however, prejudice the occurrence of the First Digital OptionTrigger Event.

-77070-

3. Section 1 – Second Digital ( n Transaction

(i) Initial Exchange Provisions:

| | |
|---|---|
| Party A Initial Exchange Amount: | USD 23,750,000 |
| Party B Initial Exchange Amount: | Zero |
| Initial Exchange Date: | 26 November 1999, subject to adjustment in accordance with the Following Business Day Convention |

(ii) Final Exchange Provisions:

| | |
|---|---|
| Party A Final Exchange Amount: | Zero |
| Party B Final Exchange Amount: | USD 46,875,000 |
| Second Range Level: | JPY 108.21 per USD 1.00 |
| Second Rate Determination Date: | Means the Termination Date |
| Final Exchange Date: | 27 December 1999, subject to adjustment in accordance with the Following Business Day Convention |

(A) If the Spot Rate is, on the Second Rate Determination Date at 10:00 a.m. local time in New York, greater than or equal to the Second Range Level (such event being a "Second Digital Option Trigger Event"), then upon the occurrence of such Second Digital Option Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a Second Digital Option Trigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of a Second Digital Option Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the Second Digital Option Trigger Event and provide details of the occurrence of such Second Digital Option Trigger Event. A failure to give such notice shall not however prejudice the occurrence of the Second Digital Option Trigger Event.

Section 2 - Other Provisions

(i) For the purposes of this Transaction only, the following provision shall apply:

"Subparagraph (ii) of Section 2 (c) of the ISDA Form shall not apply to the First Digital Option Transaction and the Second Digital Option Transaction.

(ii) Offices:

(a) The Office of Party A for the Transaction is New York; and
(b) The Office of Party B for the Transaction is Delaware.

3. Representations:

Each party represents to the other party as of the date that it enters into this Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for this Transaction):

(i) **Non-Reliance.** It is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party including any affiliate or subsidiary thereof as investment advice or as a recommendation to enter into this Transaction, it being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered to be investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

**Wood, Linda**

---

**From:** Thur, LaDonna
**Sent:** Friday, November 02, 2007 1:38 PM
**To:** Wood, Linda
**Subject:** FW: Does WRC know what we are going to do on Soaring Society of America? (bill w/off hold)

Does CWB have this one?

---

**From:** Mangini, Julia
**Sent:** Friday, November 02, 2007 1:30 PM
**To:** Thur, LaDonna
**Subject:** RE: Does WRC know what we are going to do on Soaring Society of America? (bill w/off hold)

CWB has charge of this bill.

---

**From:** Thur, LaDonna
**Sent:** Friday, November 02, 2007 1:18 PM
**To:** Mangini, Julia
**Subject:** Does WRC know what we are going to do on Soaring Society of America? (bill w/off hold)

(ii) **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms and conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of the Transaction.

(iii) **Status of Parties.** The other party is not acting as a fiduciary for or adviser to it in respect of this Transaction.

4. **ISDA Agreement:**

If you and we are parties to either an ISDA Interest Rate and Currency Exchange Agreement (for which purposes this Transaction shall constitute a "Swap Transaction") or an ISDA Master Agreement (in each case an "Agreement") then this Confirmation supplements forms part of and is subject to such Agreement. If you and we are not yet parties to an Agreement then this Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition Party A and Party B agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form") with such modifications as you and we will in good faith agree. Upon execution by Party A and Party B of such an agreement, this Confirmation will supplement, form part of, and be subject to that agreement. All provisions contained or incorporated by reference in that agreement upon its execution will govern this Confirmation. Until we execute and deliver that agreement, this Confirmation, together with all other documents referring to the ISDA Form (each a "Confirmation") confirming transactions (each a "Transaction") entered into between us (notwithstanding anything to the contrary in a Confirmation) shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement on the Trade Date of the first such Transaction between us in such form with the Schedule thereto (i) specifying only that (a) the governing law is New York law and (b) the Termination Currency is U.S., Dollars, (ii) incorporating the addition to the definition of "Indemnifiable Tax" contained in (page 49 of) the ISDA "User's Guide to the 1992 ISDA Master Agreements" and (iii) incorporating any other modifications to the ISDA form specified below.

5. **Definitions:**

~~The definitions and provisions contained in the 1991 ISDA Definitions (as amended by the 1997 Supplement) as published by~~ the International Swaps and Derivatives Association, Inc (the "Swap Definitions") and in the 1998 FX and Currency Option Definitions (the "FX Definitions") as published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee (the "1998 Definitions", and together with the Swap Definitions, the "Definitions"), are incorporated into this Confirmation. In the event of any inconsistency between the Swap Definitions and the 1998 Definitions, the 1998 Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us or by sending to us a letter or telex substantially similar to this letter, which letter or telex sets forth the material terms of the Transaction to which this Confirmation relates and indicates your agreement to those terms.

Yours faithfully,
for and on behalf of
Deutsche Bank AG, New York

By: [signature]
Name: [signature]
Title:

By: Perry Parker
Name: PERRY PARKER
Title: DIRECTOR

Confirmed as of the date first above written:
JZ BUCKINGHAM INVESTMENTS LLC

By: [signature]
Name:
Authorised Signatory

By:
Name:
Authorised Signatory

For any query relating to this Confirmation please contact: 212-469-4033

TOTAL P.16

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-231 T
(Chief Judge Damich)

---

JZ Buckingham Investments LLC as Tax Matters Partner
of JBJZ Partners, a South Carolina general partnership,

Plaintiff,

v.

United States of America,

Defendant.

---

**OBJECTIONS OF THE UNITED STATES TO PLAINTIFF'S 30(b)(6) DEPOSITION NOTICE**

The defendant, the United States of America, by its undersigned counsel, hereby objects to Plaintiff's subpoena commanding that the United States produce a witness or witnesses pursuant to Rule 30(b)(6) of the United States Court of Federal Claims on the grounds that each and every matter listed on Exhibit A of the Subpoena is an improper subject for such testimony.

At the outset, the United States points out that, when a Rule 30(b)(6) subpoena is procedurally deficient in its entirety, as is Plaintiff's, it is procedurally preferable for the requested party to serve objections which the parties may then discuss, rather than immediately requesting judicial intervention by means of a protective order. If the parties cannot come to an accommodation and judicial intervention becomes the only alternative, the requesting party may then move to compel and the requested party may cross-move for a protective order. *See, e.g., Boston Edison Co. v. United States*, 2007 U.S. Claims LEXIS 54 at 28 (Feb. 26, 2007).

2410909.1

EXHIBIT
tabbies
2

**General Objection**

The United States objects to the subpoena on the grounds that it improperly names the United States of America as the deponent. It is, of course, true that the United States, as a party litigant, is subject to the rules of discovery. *United States v. Proctor & Gamble Co.*, 356 U.S. 677, 681 (1958). The rules, however, clearly state that "[u]nder RCFC 30(6)(b), a party may serve a deposition notice on a 'governmental agency . . . describ[ing] with reasonable particularity the matters on which examination is requested. . . .'" *Boston Edison Co. v. United States*, 2007 U.S. Claims LEXIS 54, 31-32 (February 26, 2007). In violation of Rule 30(b)(6), Plaintiff did not designate any government agency. Moreover, as described in the Specific Objections, Plaintiff did not describe the matters with any particularity at all.

Prior to the adoption of Rule 30(b)(6) of the Federal Rules of Civil Procedure in 1970, it was an open question whether the Federal Government was subject to Rule 30 subpoenas. Open questions also existed as to who could testify on behalf of a corporation. The admiralty case of *Fay v. United States*, 22 F.R.D. 28 (E.D.N.Y. 1958) is instructive. In that case, a libelant served the United States with a Rule 30 subpoena. The United States argued that it was not subject to Rule 30 depositions. The court discussed cases regarding who could testify for corporations and found that, as a general proposition, the United States was subject to Rule 30 subpoenas. *Id.* at 32. The court stated, nevertheless, that "had the instant notices specified that the deposition of the United States would be taken 'by its officer or managing agent . . . having knowledge or information with reference to the matters set forth in the complaint', they would have been defective. . . ." *Id.* at 32-33. As, however, the notices specified "the captain or chief officer" of the vessel in question, the notice was sufficient. *Id.* at 33. This is because the court found that

such a person would have the characteristics of what today one would expect of a Rule 30(b)(6) witness. Specifically the court stated:

> The captain or chief officer in charge of a United States naval vessel possesses broad and general powers to exercise his judgment and discretion in dealing with official matters. He may be depended upon to carry out orders to give testimony at the demand of the libelants and he may be expected to identify himself with the interests of the United States rather than with the interests of the libelants.

*Id.* at 32

The adoption of Rule 30(b)(6) resolved the issues addressed in *Fay*. The rule specifies that the subpoena must be addressed to a specific agency and must specify the matters with reasonable particularity. The Rule 30(b)(6) subpoena in this matter suffers from the same defects that would have made such a subpoena insufficient in *Fay* had it merely requested that the United States testify.

Oddly, the subpoena does not specify the Internal Revenue Service. Rather, it specifies the United States of America. Not only is this improper for the reasons stated above, but it is simply unclear what kind of testimony Plaintiff is seeking. It may be that Plaintiff is in fact seeking testimony from the Justice Department, i.e., Defendant's counsel. Such a subpoena would be improper because, while counsel is not absolutely immune from such subpoenas, they are proper only "where the party seeking to take the deposition has shown that (1) no other means exist to obtain the information than to depose opposing counsel . . .; (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case." *Shelton v. American Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir. 1986). Plaintiff has made no such showing. A Rule 30(b)(6) subpoena is improper if it would necessarily lead to the

deposition of opposing counsel, even if the subpoena does not specifically request this. *S.E.C. v. Buntrock, et al.*, 217 F.R.D. 441 (N.D. Ill. 2003). It appears that the subpoena at bar fails the *Shelton* test, and seeks testimony on material which is irrelevant, protected from disclosure by 26 U.S.C. § 6103, and is protected by attorney client and deliberative process privilege.

**<u>Specific Objections</u>**

**<u>Matters 1.a. and 1.b.</u>**

Matter 1.a. requests:

> Defendant's legal and factual position with regard to the issuance of Treas. Reg. § 1.752-6T on June 23, 2003, and the promulgation of Treas. Reg. § 1.752-6 on May 23, 2004; the specific application of Treas. Regs §§ 1.752-6T and 1.752-6 to the above-styled litigation; whether prior to the issuance of these regulations there was substantial authority for the reporting position that a contingent obligation did not constitute a liability within the meaning of I.R.C. § 752; and separately, whether these regulations were issued to enhance Defendant's litigation position with respect to transactions described in Notice 2000-44.

Matter 1.b. requests "Defendant's legal and factual position with regard to Treas. Reg. § 1.701-2 and its specific application to the above-styled litigation."

Plaintiff's requests in these matters are improper as they are pure issues of law for the Court to decide in its analysis and application of the governing legal authorities. *See Neptune v. United States*, 38 Fed. Cl. 510, 513 (1997), *aff'd* 178 f.3d 1306 (Fed. Cir. 1998). Moreover, the thoughts of those responsible for the promulgation of regulations has, as this Circuit has ruled, no probative value. *Honeywell, Inc. v. United States*, 661 F.2d 182, 185 (Ct. Cl. 1982). The meaning and reasons for promulgation of regulations are not a proper subject for deposition

because "the IRS must speak with a single voice, that is, through formal statements of policy such as regulations and revenue rulings. . . . Accordingly, statements by individual IRS employees cannot bind the Secretary." *Sidell v. Commissioner*, 225 F.3d 103, 111 (1st Cir. 2000); *See also Connecticut General Life Insurance Co. v. Commissioner*, 177 F.3d 136, 145 (3d Cir), *cert. denied*, 528 U.S. 1003 (1999); *Armco Corp. v. Commissioner*, 87 T.C. 865, 867-68. The testimony of individual officials does not represent agency interpretations. *Vons Cos. v. United States*, 51 Fed. Cl. 1, 21 (2001). Consequently, the views of IRS employees are irrelevant in construing Treasury Regulations; and, as a consequence, the depositions of the IRS employees on such subjects can not lead to the discovery of relevant information.

Nor can a party somehow elide these basic principles of law by requiring a party to designate a witness pursuant to Rule 30(b)(6) to testify on such irrelevant subject matter. In a case involving a tax shelter similar to this one, the Court of Federal Claims recently granted a protective order barring the deposition of three IRS officials involved in the drafting of certain IRS Treasury Regulations and Notices on subjects very similar to those set forth here, holding that testimony on such subject matter is not probative and therefore was irrelevant. *See* Order of the Court of March 19, 2007, in *Evergreen Trading v. United States*, No. 06-123 T A copy of this order is attached.

Even if such testimony were relevant, deliberative process privilege would bar testimony regarding the promulgation and application of regulations because "[h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances . . . to the detriment of the decisionmaking process." *United States v. Nixon*, 418 U.S. 683, 705 (1974). Therefore, privilege protects the details of such decision

making from disclosure. *See generally Marriott International Resorts, LP v. United States*, 437 F.3d 1302 (Fed. Cir. 2006).

**Matter 1.c.**

> Defendant's legal and factual position regarding whether each of the sold and purchased digital options contracts at issue in this case (Attachments 1, 2, and 3) are a single option or investment; and separately, whether for purposes of determining the "aggregate amount invested" under I.R.C. § 6707, Defendant is taking the position that each digital option contract, such as those involved in this case, are separate options or investments rather than a single option or investment.

The United States objects to this matter because it is premature. Whether or not the United States will be taking the position that the options were a single option or investment for purposes of any legal issue presented in this case will be the subject of expert testimony, and initial expert reports are not due until May 15. Moreover, to the extent the subject matter of this request seeks to inquire into the legal contentions of the United States, it is equally improper since discovery into the contentions of parties are properly examined through contention interrogatories, not Rule 30(b)(6) depositions. *See Exxon Research Engineering Co. v. United States*, 44 Fed. Cl. 597 (August 27, 1999).

**Matter 1.d.**

> The names of tax advisors and firms that issued tax opinions regarding transactions that are the same as, or substantially similar to, those set forth in I.R.S. Notice 2000-44, 2000-2 C.B. 255 (August 14, 2000) and whose opinions concluded that there was substantial authority for, or that taxpayers would more-likely-than-not prevail on the merits if challenged by the Internal Revenue Service

on, the position that contingent obligations are not liabilities within the meaning of I.R.C. § 752. This request is limited to those advisors or firms whose opinions Defendant has rejected as a basis for the reasonable cause defense to I.R.C. § 6662 penalties.

The United States objects to this matter on the grounds that it is not a proper subject for inquiry, is irrelevant to any issue in this litigation, is protected from disclosure by 26 U.S.C. § 6103(a) and also is protected from disclosure by one or more privileges, including the attorney client and the deliberative process privilege.

The legal opinions that are the subject matter of this request were not prepared, reviewed, or signed by the United States. We have already provided you with any legal opinions involving COBRA transactions obtained by us through discovery. To the extent that there may be legal opinions involving non COBRA transactions in the possession, custody, or control of the United States or any of its various agencies, including the IRS, the names and firms that issued such non COBRA tax opinions cannot possibly lead to any relevant evidence. Moreover, to the extent that such information would be in the possession of the IRS, this information would be protected from disclosure by 26 U.S.C. § 6103(a). Finally, to the extent this subject matter seeks testimony as to the names and firms which issued legal opinions that the United States, and specifically the IRS, have determined not to have constituted a basis for a reasonable cause defense for accuracy related penalties under Section 6662, it is equally improper. This is because it would be seeking testimony that is irrelevant, protected from disclosure under 26 U.S.C. § 6103(a), and also subject to one or more privileges, including the attorney client and the deliberative process privilege.

**Matter 1.e.**

The determination to impose I.R.C. § 6662 penalties in this case.

The United States objects to this matter on the grounds that whether the IRS properly imposed penalties according to I.R.C. § 6662 requires a trial *de novo*. *See Estate of Kluener v. Commissioner*, 154 F.3d 630, 637 (6th Cir. 1998). A review of audit determinations has no relevance. In *Nordberg v. United States*, 1996 U.S. Dist. LEXIS 5259; 96-1 U.S. Tax Cas. (CCH) P50,295; 77 A.F.T.R.2d (RIA) 2158 (D.Mass. 1996) (copy attached), the court articulated in some detail why inquiry into the reasoning of the IRS for its determinations is not at all relevant in any ensuing tax litigation:

> The discovery does not relate to the facts existing during 1987, upon which the IRS determinations were based. In light of the principle that a challenge to a tax determination results in a trial de novo rather than a review by this Court of an existing administrative record, the defendants' discovery requests fail to satisfy the mandate of *Fed.R.Civ.P. 26(b)* that information sought to be discovered be relevant or "reasonably calculated to lead to the discovery of admissible evidence." See, e.g., *Lewis v. Reynolds, 284 U.S. 281, 283, 76 L. Ed. 293, 52 S. Ct. 145 (1932); Ruth v. United States, 823 F.2d 1091, 1094 (7th Cir. 1987)* ("courts conduct a de novo review of the... assessment"); *Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 328 (1974)* (a court's determination as to a taxpayer's liability "must be based on the merits of the case and not any previous record developed at the administrative level").
>
> The information sought by defendants which forms the basis for the motion to compel is, therefore, evidence which would not be relevant to determining their 1987 tax liability. Information about people who participated in the audit is not relevant, nor are notes made by IRS employees during the audit. Indeed, the audit of the Nordbergs' 1987 tax return took place well after the tax year at issue. In short, the information requested by defendants has no bearing on the sole issue in the case at bar because the Nordbergs' ultimate tax liability is not influenced by the IRS' conduct or findings during the audit. In rejecting a similar argument, one District Court denied a motion to compel upon observing that:
>
> > the opinions, impressions, conclusions and reasoning of IRS agents are irrelevant to the validity of the assessment against [the taxpayer] ....Resolution of the[] issues depends solely on

> application of the pertinent law to the facts of [the] case... The opinions of individual IRS agents regarding their propriety are immaterial.

*Garity v. United States, 81-2 U.S. Tax Cas. (CCH) P 9599, 1980 WL 1765,* at *2 (E.D. Mich. May 20, 1980).

**Matter 1.f.**

Defendant's discovery responses in the above-styled litigation.

The United States objects to this matter because RCFC requires that the requestor "describe with reasonable particularity the matters on which examination is requested." Plaintiff has not given any indication what it wants to ask in respect to Defendant's discovery responses.

## CONCLUSIONS

As the subpoena is completely improper, the United States objects to it in its totality and will not provide a witness or witnesses as all matters listed by Plaintiffs are improper as a subject of a RCFC 30(b)(6) deposition.

Dennis M. Donohue
DENNIS M. DONOHUE
Attorney of Record

Chief Senior Litigation Counsel
U.S. Department of Justice - Tax Division
Post Office Box 403
Ben Franklin Station
Washington, D.C. 20044
(202) 307-6492

2410909.1

# In The United States Court of Federal Claims

No. 06-123 T

(Filed: March 19, 2007)

| | | |
|---|---|---|
| EVERGREEN TRADING, LLC, by and through GLEN NUSSDORF AND CLAUDINE STRUM on behalf of GN INVESTMENTS, LLC, A Partner Other than the Tax Matters Partner, Plaintiffs, | * | Depositions; Motion for Protective Order; Depositions of IRS employees regarding drafting of regulation; Personal views of IRS employees irrelevant in determining the validity of the regulations; Motion granted. |
| v. | * | |
| THE UNITED STATES, Defendant. | * | |

**ORDER**

*David D. Aughtry*, Chamberlain, Hrdlicka, White, Williams & Martin, Atlanta, Georgia, for plaintiffs.

*Stuart J. Bassin*, Tax Division, U.S. Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Eileen J. O'Connor*, for defendant.

**ALLEGRA, Judge:**

On March 13, 2007, defendant filed a motion for a protective order under RCFC 26(c) to bar plaintiffs from taking the depositions of three individuals who were involved in the drafting of certain Treasury regulations at issue in this case, including Treas. Reg. §§ 1.752-6 and 1.752-6T. Earlier this day, plaintiffs filed their response to this motion.

Having reviewed these documents, the court concludes that the requested depositions will not lead to the discovery of information relevant to the claim or defense of any party in this litigation. While plaintiffs cite various cases that might provide grounds for challenging certain of the Treasury regulations at issue in this case, none of these cases remotely suggest that the personal views, intentions, etc. of the drafters of such regulations are relevant to those arguments. *See, e.g.*, *Bankers Trust N.Y. Corp. v. United States*, 225 F.3d 1368 (Fed. Cir. 2000). Other cases, indeed, explicitly make clear that the views expressed by individual Internal Revenue

Service employees are irrelevant in construing regulations or determining the validity thereof. *See Sidell v. Comm'r of Internal Revenue*, 225 F.3d 103, 111 (1st Cir. 2000) (rejecting the taxpayer's reliance on a number of internal IRS memoranda to show that a proposed regulation was not meant to cover a particular situation); *Conn. Gen. Life Ins. Co. v. Comm'r of Internal Revenue*, 177 F.3d 136, 145 (3d Cir. 1999), *cert. denied*, 528 U.S. 1003 (1999) ("reliance upon remembered details from officials who lacked the ultimate authority to issue any proposed regulation has little support in the law"); *Schwalbach v. Comm'r of Internal Revenue*, 111 T.C. 215, 228 n.4 (1998) (giving "no weight" to oral statements made by "agents of the Commissioner" describing the content of final regulations); *Armco Inc. v. Comm'r of Internal Revenue*, 87 T.C. 865, 867-68 (1986) (affidavit of IRS employee explaining his intent in drafting a regulation irrelevant to interpreting the regulation); *see also Vons Cos. v. United States*, 51 Fed. Cl. 1, 21 (2001) ("this court [should be] extraordinarily hesitant to attribute to the IRS or the Treasury Department interpretations of a revenue ruling made by individual IRS employees that represent their personal views, rather than the official position of the agency"). Accordingly, in the court's view, the requested depositions fall well outside the scope of appropriate discovery under RCFC 26(b)(1).

Finding plaintiffs' other claims in support of the requested depositions also misplaced, the court concludes that the requested protective order shall issue and that the requested depositions shall be barred. *See Vons Cos., Inc.*, 51 Fed. Cl. at 24-25 ("While . . . some degree of fishing is anticipated by the Federal discovery rules, those rules do not sanction a party to employ essentially a purse seine that indiscriminately sweeps in not only relevant catch, but hosts of irrelevant and protected species of information.").*

**IT IS SO ORDERED.**

s/ Francis M. Allegra
Francis M. Allegra
Judge

---

* Based on the foregoing, the court need not reach defendant's argument that the information sought by plaintiff is protected by the deliberative process privilege.

LEXSEE 1996 U.S. DIST. LEXIS 5259

Positive
As of: Apr 19, 2007

**UNITED STATES OF AMERICA, Plaintiff v. PAUL C. NORDBERG and DEBRA L. NORDBERG, Defendants**

**Civil Action No. 93-12681-NMG**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS**

***1996 U.S. Dist. LEXIS 5259; 96-1 U.S. Tax Cas. (CCH) P50,295; 77 A.F.T.R.2d (RIA) 2158***

**April 8, 1996, DATED**

**COUNSEL:** [*1] For UNITED STATES OF AMERICA, Plaintiff: Beth A. Westerman, Trial Attorney, Tax Division, U.S. Department of Justice, Washington, DC. Richard J. Gagnon, Jr., U.S. Department of Justice, Tax Division, Washington, DC.

For PAUL C. NORDBERG, Defendant: Paul C. Nordberg, [PRO SE], Auburn, MA.

For DEBRA L. NORDBERG, Defendant: Debra L. Nordberg, [PRO SE], Auburn, MA.

For UNITED STATES OF AMERICA, Counter-Defendant: Richard J. Gagnon, Jr., U.S. Department of Justice, Tax Division, Washington, DC.

**JUDGES:** Nathaniel M. Gorton, United States District Judge

**OPINION BY:** NATHANIEL M. GORTON

**OPINION:**

**MEMORANDUM AND ORDER**

GORTON, J.

There are five motions currently pending before this Court in the above-entitled civil action: 1) defendants' motion for judgment on the pleadings [Docket #11], 2) plaintiff's motion for partial summary judgment on defendants' counterclaim [#12], 3) defendants' motion to compel [#17], 4) plaintiff's motion for a protective order [#18], and 5) plaintiff's motion for partial summary judgment [#20]. For the reasons that follow, the defendants' motion to compel will be denied and plaintiff's motion for summary judgment will be [*2] allowed; the remaining motions will, therefore, be denied as moot.

**I. Introduction**

On December 9, 1993, the United States government filed this civil action, pursuant to *26 U.S.C. § 7405*, to collect what it asserts was an erroneous refund paid to defendants. Section 7405 provides that "any portion of a tax imposed by this title, refund of which is erroneously made, ... may be recovered by civil action brought in the name of the United States." The dispute arises out of defendants' 1987 tax return, which was the subject of a lengthy IRS audit that lasted until May, 1990. The issue in the case is whether the defendants' treatment of their 1987 securities trading losses on their 1987 tax return was erroneous as a matter of law.

Although an initial "Audit Report" issued by the IRS to the Nordbergs in May, 1990, indicated no deficiency, the agency later alleged a deficiency of $ 30,665, plus interest. By December 10, 1991, defendants paid, under protest, the entire amount of the alleged deficiency.

In late December, 1991, the IRS issued a check payable to defendants for $ 45,188.25 as a refund for overpayment of their 1987 taxes. In May, 1992, however, the IRS informed [*3] defendants that the refund was erroneous and requested repayment. Defendants, claiming that the refund was owed to them, refused to return the

money. Subsequently, the IRS refused to refund the defendants' claimed overpayments on their 1991 and 1992 tax returns but instead applied those amounts ($ 2,430 and $ 5,317, respectively) to the claimed outstanding liability. n1

n1 The IRS withheld the later refunds pursuant to *26 U.S.C. § 6402*(a), which provides that "in the case of any overpayment, the Secretary, within the applicable period of limitations, may credit the amount of such overpayment, including any interest allowed thereon, against any liability in respect of an internal revenue tax on the part of the person who made the overpayment...."

On December 9, 1993, the United States filed the instant suit to recover the amount of the erroneous refund plus statutory interest. The defendants filed an answer and counterclaim on December 29, 1993, seeking return of the money held by the IRS as credits toward repayment [*4] of the alleged deficiency.

**II. Defendants' Motion to Compel [Docket #17]:**

Defendants' motion to compel asserts that the government has repeatedly objected to and declined to answer requests for admissions and interrogatories concerning various aspects of the IRS' audit of their 1987 tax return. The importance of the audit, at least to the defendants, is further evidenced by their expressed desire to depose IRS employees involved during the process, which has led the government to file a motion for a protective order. The government responds that, in light of the sole issue at stake in the underlying action, the defendants' requests for admissions and production of documents fail to satisfy the requirements of *Fed.R.Civ.P. 26(b)*. This Court agrees.

Resolution of the case at bar turns solely on the specific issue of whether the Nordbergs' treatment of their 1987 trading losses was erroneous as a matter of law. Their discovery requests seek to obtain information about the reasoning and processes by which IRS employees involved with the audit of the taxpayers' return decided to assess the tax liabilities with respect to their trading transactions. The discovery does [*5] not relate to the facts existing during 1987, upon which the IRS determinations were based. In light of the principle that a challenge to a tax determination results in a trial de novo rather than a review by this Court of an existing administrative record, the defendants' discovery requests fail to satisfy the mandate of *Fed.R.Civ.P. 26(b)* that information sought to be discovered be relevant or "reasonably calculated to lead to the discovery of admissible evidence." See, e.g., *Lewis v. Reynolds, 284 U.S. 281, 283, 76 L. Ed. 293, 52 S. Ct. 145 (1932); Ruth v. United States, 823 F.2d 1091, 1094 (7th Cir. 1987)* ("courts conduct a de novo review of the... assessment"); *Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 328 (1974)* (a court's determination as to a taxpayer's liability "must be based on the merits of the case and not any previous record developed at the administrative level").

The information sought by defendants which forms the basis for the motion to compel is, therefore, evidence which would not be relevant to determining their 1987 tax liability. Information about people who participated in the audit is not relevant, nor are notes made by IRS employees [*6] during the audit. Indeed, the audit of the Nordbergs' 1987 tax return took place well after the tax year at issue. In short, the information requested by defendants has no bearing on the sole issue in the case at bar because the Nordbergs' ultimate tax liability is not influenced by the IRS' conduct or findings during the audit. In rejecting a similar argument, one District Court denied a motion to compel upon observing that:

> the opinions, impressions, conclusions and reasoning of IRS agents are irrelevant to the validity of the assessment against [the taxpayer] ....Resolution of the[] issues depends solely on application of the pertinent law to the facts of [the] case.... The opinions of individual IRS agents regarding their propriety are immaterial.

*Garity v. United States, 81-2 U.S. Tax Cas. (CCH) P 9599, 1980 WL 1765*, at *2 (E.D. Mich. May 20, 1980). Similarly, the Southern District of New York has recognized that:

> the subjective analysis of the agent and technical advisor based upon the information derived from [taxpayer's] records and their respective opinions as to the proper method to be applied in determining whether taxes are due form [*7] no part of the [taxpayer's] case. While no doubt disclosure of such information would be of interest to [taxpayer], it is not essential nor required for proper preparation.

*Detroit Screwmatic Co. v. United States, 49 F.R.D. 77, 79 (S.D.N.Y. 1970).*

Furthermore, if the Nordbergs' treatment of the trading losses on their 1987 tax return was erroneous as a matter of law, they are liable regardless of what an IRS agent, at any time, might have thought. See *United States v. Tuthill, 55 F.2d 415, 416 (7th Cir. 1931); United States v. Ellis, 154 F. Supp. 32, 38 (S.D.N.Y. 1957)*, aff'd, *264 F.2d 325 (2d Cir. 1959)*; see also *Flamingo Fishing Corp. v. United States, 31 Fed. Cl. 655, 658 (1994)* (where the Court of Claims allowed the government's motion for protective order precluding taxpayer from deposing IRS agents because agents' opinions and conclusions regarding the applicable Code provisions were irrelevant to the determination of the case). Accordingly, defendants' motion to compel will be DENIED.

**III. Plaintiff's Motion for Partial Summary Judgment [Docket #20]:**

The government has also filed a motion for "partial summary [*8] judgment on the issue of the nature of the defendants' losses from trading in 1987." In the memorandum in support of its motion, the government enumerates the "questions presented" to the Court as: 1) whether Paul Nordberg was a trader or a dealer with respect to the options he traded in 1987, and, accordingly, 2) whether the losses from the trading activity are properly capital or ordinary. The Nordbergs vigorously contest the government's assertion that there is no genuine issue of any material fact with respect to the nature of the losses, and, therefore, it is important for this Court to identify precisely the material facts upon which plaintiff bases its motion.

A. The Summary Judgment Standard

Summary judgment shall be rendered where the pleadings, discovery on file and affidavits, if any, show "there is no genuine issue of material fact and...the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(c)*. The Court must view the entire record in the light most favorable to the plaintiffs and indulge all reasonable inferences in their favor. *O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993)*.

With respect to a motion for summary judgment, [*9] the burden is on the moving party to show that "there is an absence of evidence to support the nonmoving party's case." *FDIC v. Municipality of Ponce, 904 F.2d 740, 742 (1st Cir. 1990)* (quoting *Celotex Corp. v. Catrett, 477 U.S. 317, 325, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*). If the movant satisfies that burden, it shifts to the non-moving party to establish the existence of a genuine material issue. Id. In deciding whether a factual dispute is genuine, this Court must determine whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. The nonmovant's assertion of mere allegation or denial of the pleadings is insufficient on its own to establish a genuine issue of material fact. *Fed.R.Civ.P. 56(e)*.

B. Material Facts

On their joint income tax return for 1987, the Nordbergs reported, on Schedule C (entitled "Profit or (Loss) From Business or Profession"), losses of $ 86,821.76. According to a letter written by Paul Nordberg to the Internal Revenue Service, those losses resulted from his trading of securities called "OEX options," which are "puts" and "calls" indexed to a [*10] basket of stocks in the Standard & Poors 100. In response to the United States' Requests for Admissions, Paul Nordberg admitted that his trading of securities in 1987 was done "exclusively for an account" in the Nordbergs' name at Shearson, Lehman Brothers. Government Exhibit 9 at p.4.

Moreover, Mr. Nordberg admitted that he was aware of no facts or evidence that in 1987 he ever traded securities except through a "securities exchange," assuming that that term encompasses the Chicago Board of Exchange. Id. at pp. 5-6. By reporting the losses on a Schedule C form, the Nordbergs claimed the entire trading loss as an ordinary business loss. An audit by the IRS followed, with which the defendants cooperated fully.

At the conclusion of the exhaustive audit, the only unresolved substantive issue was whether Paul Nordberg's trading losses for the 1987 tax year were capital or ordinary. Indeed, in a letter to the IRS dated May 8, 1989, Mr. Nordberg wrote that:

> The only material, unresolved matter is the proper treatment...of Nordberg's trading of securities... The issue to be determined is whether Nordberg is limited to a maximum "Capital Loss" deduction of $ 3,000 (for 1987) [*11] or is entitled to treat the entire net trading loss in 1987 as the loss incurred in a "business" or "trade", and therefor [sic] deductible in its entirety in 1987.

Government Exhibit 2, p. 2.

According to an "Income Tax Examination Changes" form dated July 11, 1990, the IRS changed the characterization of the Nordbergs' 1987 loss to a capital loss. Government Exhibit 3. Consequently, the IRS proposed a deficiency of $ 30,665, plus interest, for a total of $ 44,015.70. In November and December of 1991, the

defendants made payments by check in the amount equal to the total amount of the assessment, plus interest.

By what the IRS admits was mistake, it issued a refund check to the Nordbergs on December 20, 1991, for $ 45,188.25, representing the payments made by defendants plus $ 388.25 in interest. Government Exhibits 4, 6. In early 1992, the IRS sent the defendants a notice that 1) informed them that the refund check had been issued erroneously, and 2) requested repayment. Government Exhibit 7. By letter dated February 14, 1992 to the IRS Center Director, the Nordbergs informed the Service that they would not return the money. The government then commenced the pending [*12] lawsuit.

C. Legal Analysis

Sections 165(a) and (c) of the Internal Revenue Code permit individuals to deduct losses incurred in a trade or business or in a transaction entered into for profit. *26 U.S.C. § 165*(a), (c). Section 165(f) provides, however, that capital losses are deductible only to the extent allowed by sections 1211 and 1212. Under section 1211, an individual's capital losses are deductible only to the extent of capital gains, plus $ 3,000 of ordinary income.

Section 1221 of the Code broadly defines the term "capital asset" as "property held by the taxpayer (whether or not connected with his trade or business)," and then narrows that definition by enumerating various exceptions. The relevant provision in the case at bar is section 1221(1), which excludes from the definition of capital assets:

> stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business[.]

*26 U.S.C. § 1221*(1).

In the case at bar, the government maintains [*13] that 1) Paul Nordberg was a trader in securities (as opposed to a dealer) who engaged in securities transactions entirely on his own account and lacked "customers," and 2) he cannot, therefore, invoke the exception to the definition of capital asset provided by § 1221(1). The government asserts that the Nordbergs' 1987 losses were therefore capital in nature and, accordingly, they must repay to the United States "the portion of the refund attributable to the disallowance of the Nordbergs' ordinary loss claim." Government Memorandum at 14.

To determine whether securities constitute "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business," see § 1221(1), courts have identified three classifications of purchasers of securities: dealers, traders and investors. E.g., *United States v. Wood, 943 F.2d 1048, 1051 (9th Cir. 1991); King v. Commissioner, 89 T.C. 445, 457-58 (1987)*. Of those three classifications, only the first two are relevant to the case at bar. "The tax liability of a seller of securities depends upon which classification best identifies the seller; dealers may qualify for [the § 1221(1) exception], [*14] while traders and investors do not." *Wood, 943 F.2d at 1051*.

The critical issue in distinguishing between dealers and traders is whether the taxpayer has "customers." *Wood, 943 F.2d at 1050-53*. The United States Tax Court explained that a "dealer" is a person who purchases securities or commodities with the expectation of realizing a profit,

> not because of a rise in value during the interval of time between purchase and resale, but merely because they have or hope to find a market of buyers who will purchase from them at a price in excess of their cost. This excess or mark-up represents remuneration for their labors as a middle man bringing together buyer and seller, and performing the usual services of retailer or wholesaler of goods.

*Kemon v. Commissioner, 16 T.C. 1026, 1032-33 (1951)*. The Kemon Court thus employed a "merchant" analogy to determine whether a seller of securities is a dealer who sells to "customers" for purposes of section 1221. See id.; see also *Wood, 943 F.2d at 1051; United States v. Diamond, 788 F.2d 1025, 1029 (4th Cir. 1986)*.

"Traders," on the other hand, are sellers of securities or commodities who [*15] "depend upon such circumstances as a rise in value or an advantageous purchase to enable them to sell at a price in excess of cost." *Kemon, 16 T.C. at 1033*. In contrast to dealers traders "perform[] no merchandising functions nor any other service which warrants compensation by a price mark-up of the securities he or she sells." *Id. at 1032-33; Diamond, 788 F.2d at 1029*. A trader will be deemed to be engaged in a "trade or business" if his or her trading is frequent and substantial. *King, 89 T.C. at 458*. As the Wood Court observed, however, although "generally both dealers and

traders will be engaged in a trade or business[,] only a dealer...has customers." *943 F.2d at 1052.* In short, unlike a trader, a dealer in securities or commodity futures can take advantage of the section 1221(1) exception to capital asset tax treatment because the latter deals in property held "primarily for sale to customers in the ordinary course" of business. Id.; see also *26 U.S.C. § 1221*(1).

The foregoing cases illustrate that, even when a taxpayer is engaged in the trade or business of selling securities, the gains or losses derived from that activity are nonetheless [*16] capital in nature if the taxpayer has no customers. See *Diamond, 788 F.2d at 1028; King, 89 T.C. at 458.* In Diamond, for example, the Court of Appeals observed that the taxpayer's emphasis upon the significant financial and hourly commitment to securities trading "misses the crucial point that, whether or not his 1980 transactions amounted to a trade or business, he was not selling 'to customers' for purposes of § 1221(1)." n2 *788 F.2d at 1028.* In the case at bar, then, even assuming that Paul Nordberg was engaged in the "trade or business" of trading securities, this Court's focus properly turns to the issue of whether or not he had "customers" within the meaning of § 1221(1).

> n2 It is worth noting that the phrase "to customers" was added to the predecessor of § 1221(1) to exclude from the definition of capital assets only those securities bought and sold by dealers, and not those traded by investors on their own account. See *Mirro-Dynamics Corp. v. United States, 374 F.2d 14, 16 (9th Cir. 1967)* (citing legislative history); see also *MacAdam v. Commissioner, T.C.Memo. 1991-410, 1991 WL 157917 (1991).*

[*17]

Numerous cases demonstrate that a taxpayer who trades solely on his own account through a broker has no customers with respect to the securities so traded. *Diamond, 788 F.2d at 1028* ("courts have clearly and consistently held that a taxpayer who trades securities for his own account does not sell 'to customers' within the meaning of § 1221(1)"); *Van Suetendael v. Commissioner, 152 F.2d 654 (2d Cir. 1945)* (per curiam). In the instant case, the Nordbergs admit both that their trading of securities in 1987 was exclusively for an account in their name at Shearson, Lehman Brothers and that they are aware of no facts or evidence that in 1987 they ever traded securities other than through a securities exchange. Government Exhibit 9 at p.4.

Defendants attempt to avert summary judgment merely by reciting that "a significant factual issue in dispute in this case is whether [defendants] had 'customers,'" and citing a dictionary definition of the term "customer" (i.e., "one that purchases a commodity or service"). Opposition at 9. Defendants further reason that

> by that straightforward meaning of the term, there could not have been sales (which there undisputedly were) [*18] in the absence of the "seller" (Paul Nordberg) having "customers." A "customer" is always needed for a sale to occur.

Id.

Several courts have, however, considered and rejected the argument that securities sold by taxpayers through a broker eventually reach customers. See, e.g., *George E. Warren Co. v. United States, 53 F. Supp. 578, 581 (D. Mass. 1944)* ("while it may be contended that each time [the taxpayer corporation which was not a dealer in securities] sold the securities it dealt with a customer, such is not true within a fair reading of the taxing statute"); *Mirro-Dynamics, 374 F.2d at 16* (rejecting taxpayer's argument that securities it sold eventually reached customers); *Seeley v. Helvering, 77 F.2d 323, 324 (2d Cir. 1935)*("So far as [the taxpayer] traded in securities on his own account, his sales were on the exchange to persons whom he did not even know; these were not his customers....").

In Swartz v. Commissioner, for example, the Tax Court dismissed the taxpayer's argument that his commodity contract trades, all of which were made through Merrill Lynch or Prudential-Bache, were made to "customers." Rather, [*19] the Court observed that those brokerage houses "were not [taxpayer's] customers, but...[he] was one of their customers," and the court declined to regard as taxpayer's customers "the nameless members of the commodity markets who ultimately purchased the commodity contracts [taxpayer] sold and sold the commodity contracts [he] purchased."*T.C. Memo. 1987-582*, aff'd, *876 F.2d 657 (8th Cir. 1989)*, cert. denied, *494 U.S. 1006 (1990).*

In short, if a taxpayer transacting in securities has no customers, then that taxpayer cannot, within the meaning of the second clause of § 1221(1), hold securities "primarily for sale to customers in the ordinary course of his trade or business." As the Fourth Circuit Court of Appeals noted in Diamond,

> the government's position...merely reflects the well-settled rule that a trader buying and selling securities exclusively for his

> own account does not sell 'to customers,' whatever the character of his transactions.

*788 F.2d at 1030.*

A taxpayer without customers likewise cannot satisfy the first clause of § 1221(1), to wit, hold the securities as "stock in trade...which would properly be included in the inventory [*20] of the taxpayer if on hand at the close of the taxable year." The general rules governing inventories are enumerated in *section 471 of the Internal Revenue Code.* See *26 U.S.C. § 471.* Tellingly, regulation 1.471-5, promulgated under that Code section, applies to taxpayers who are "dealers" in securities, and states that:

> For the purposes of this section, a dealer in securities is a merchant of securities..., with an established place of business, regularly engaged in the purchase of securities and their resale to customers; that is, one who as a merchant buys securities and sells them to customers with a view to the gains and profits that may be derived therefrom... Taxpayers who buy and sell or hold securities for investment or speculation, irrespective of whether such buying or selling constitutes the carrying on of a trade or business,...are not dealers in securities within the meaning of this section.

*Treas. Reg. 1.471-5* (emphasis added); see also *Micro-Dynamics, 374 F.2d at 16; Swartz v. Commissioner, 876 F.2d 657, 659 (8th Cir. 1989)*(rejecting taxpayer's argument that his commodity futures contracts were property he included in inventory [*21] at the end of each tax year, explaining that "commodity futures contracts are capital assets in the hands of a trader"), cert. denied, *494 U.S. 1006, 108 L. Ed. 2d 478, 110 S. Ct. 1301 (1990).*

This Court concludes, therefore that the securities that Mr. Nordberg purchased and sold for his own account at Shearson, Lehman Brothers were capital assets in his hands, and the losses from such trading were capital in nature.

**ORDER**

For the foregoing reasons:

1) The defendants' motion to compel [Docket #17] is **DENIED;**

2) The plaintiff's motion for summary judgment [Docket #20] is **ALLOWED;** and

3) The defendants' motion for judgment on the pleadings [Docket #11], the plaintiff's motion for partial summary judgment on defendants' counterclaim [Docket #12] and the plaintiff's motion for a protective order [Docket #18] are **DENIED AS MOOT.**

So ordered.

Nathaniel M. Gorton

United States District Judge

DATED: April 8, 1996

**CERTIFICATE OF SERVICE**

I hereby certify that on April 19, 2007, a copy of the foregoing OBJECTIONS OF THE UNITEI STATES TO PLAINTIFF'S 30(b)(6) DEPOSITION NOTICE was mailed by First Class U.S. mail postage paid, and properly addressed to the following:

F. Anthony Paganelli, Esq.
SOMMER BARNARD, P.C.
One Indiana Square, Suite 3500
Indianapolis, IN 46204

Joseph Pitzinger, Esq.
United States Department of Justice
717 N. Hardwood St., Suite 400
Dallas, TX 75201

Jonathan Blacker, Esq.
United States Department of Justice
717 N. Hardwood St., Suite 400
Dallas, TX 75201

Joel N. Crouch, Esq.
Meadows, Collier, Reed
Cousins & Blau, L.L.P.
901 Main Street, Suite 3700
Dallas, Texas 75202

DAVID M. STEINER
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 55
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-5892

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-231 T
(Chief Judge Damich)

---

JZ Buckingham Investments LLC as Tax Matters Partner
of JBJZ Partners, a South Carolina general partnership,

Plaintiff,

v.

United States of America,

Defendant.

---

**OBJECTIONS OF THE UNITED STATES TO PLAINTIFF'S 30(b)(6) DEPOSITION NOTICE**

The defendant, the United States of America, by its undersigned counsel, hereby objects to Plaintiff's subpoena commanding that the United States produce a witness or witnesses pursuant to Rule 30(b)(6) of the United States Court of Federal Claims on the grounds that each and every matter listed on Exhibit A of the Subpoena is an improper subject for such testimony.

At the outset, the United States points out that, when a Rule 30(b)(6) subpoena is procedurally deficient in its entirety, as is Plaintiff's, it is procedurally preferable for the requested party to serve objections which the parties may then discuss, rather than immediately requesting judicial intervention by means of a protective order. If the parties cannot come to an accommodation and judicial intervention becomes the only alternative, the requesting party may then move to compel and the requested party may cross-move for a protective order. *See, e.g.*, *Boston Edison Co. v. United States*, 2007 U.S. Claims LEXIS 54 at 28 (Feb. 26, 2007).

2452757.1

**Specific Objections**

**Matters 1.a. and 1.b.**

Matter 1.a. requests:

> Defendant's legal and factual position with regard to the issuance of Treas. Reg. § 1.752-6T on June 23, 2003, and the promulgation of Treas. Reg. § 1.752-6 on May 23, 2004; the specific application of Treas. Regs §§ 1.752-6T and 1.752-6 to the above-styled litigation; whether prior to the issuance of these regulations there was substantial authority for the reporting position that a contingent obligation did not constitute a liability within the meaning of I.R.C. § 752; and separately, whether these regulations were issued to enhance Defendant's litigation position with respect to transactions described in Notice 2000-44.

Matter 1.b. requests "Defendant's legal and factual position with regard to Treas. Reg. § 1.701-2 and its specific application to the above-styled litigation."

Plaintiff's requests in these matters are improper as they are pure issues of law for the Court to decide in its analysis and application of the governing legal authorities. *See Neptune v. United States*, 38 Fed. Cl. 510, 513 (1997), *aff'd* 178 f.3d 1306 (Fed. Cir. 1998). Moreover, the thoughts of those responsible for the promulgation of regulations has, as this Circuit has ruled, no probative value. *Honeywell, Inc. v. United States*, 661 F.2d 182, 185 (Ct. Cl. 1982). The meaning and reasons for promulgation of regulations are not a proper subject for deposition because "the IRS must speak with a single voice, that is, through formal statements of policy such as regulations and revenue rulings. . . . Accordingly, statements by individual IRS

employees cannot bind the Secretary." *Sidell v. Commissioner*, 225 F.3d 103, 111 (1[st] Cir. 2000). *See also Connecticut General Life Insurance Co. v. Commissioner*, 177 F.3d 136, 145 (3d Cir), *cert. denied*, 528 U.S. 1003 (1999); *Armco Corp. v. Commissioner*, 87 T.C. 865, 867-68. The testimony of individual officials does not represent agency interpretations. *Vons Cos. v. United States*, 51 Fed. Cl. 1, 21 (2001). Consequently, the views of IRS employees are irrelevant in construing Treasury Regulations; and, as a consequence, the depositions of the IRS employees on such subjects can not lead to the discovery of relevant information.

Nor can a party somehow elide these basic principles of law by requiring a party to designate a witness pursuant to Rule 30(b)(6) to testify on such irrelevant subject matter. In a case involving a tax shelter similar to this one, the Court of Federal Claims recently granted a protective order barring the deposition of three IRS officials involved in the drafting of certain IRS Treasury Regulations and Notices on subjects very similar to those set forth here, holding that testimony on such subject matter is not probative and therefore was irrelevant. *See* Order of the Court of March 19, 2007, in *Evergreen Trading v. United States*, No. 06-123 T. A copy of this order is attached.

Even if such testimony were relevant, deliberative process privilege would bar testimony regarding the promulgation and application of regulations because "[h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances . . . to the detriment of the decisionmaking process." *United States v. Nixon*, 418 U.S. 683, 705 (1974). Therefore, privilege protects the details of such decision making from disclosure. *See generally Marriott International Resorts, LP v. United States*, 437 F.3d 1302 (Fed. Cir. 2006).

**Matter 1.c.**

> Defendant's legal and factual position regarding whether each of the sold and purchased digital options contracts at issue in this case (Attachments 1, 2, and 3) are a single option or investment; and separately, whether for purposes of determining the "aggregate amount invested" under I.R.C. § 6707, Defendant is taking the position that each digital option contract, such as those involved in this case, are separate options or investments rather than a single option or investment.

The United States objects to this matter because it is premature. Whether or not the United States will be taking the position that the options were a single option or investment for purposes of any legal issue presented in this case will be the subject of expert testimony, and initial expert reports are not due until May 15. Moreover, to the extent the subject matter of this request seeks to inquire into the legal contentions of the United States, it is equally improper since discovery into the contentions of parties are properly examined through contention interrogatories, not Rule 30(b)(6) depositions. *See Exxon Research Engineering Co. v. United States*, 44 Fed. Cl. 597 (August 27, 1999).

**Matter 1.d.**

> The names of tax advisors and firms that issued tax opinions regarding transactions that are the same as, or substantially similar to, those set forth in I.R.S. Notice 2000-44, 2000-2 C.B. 255 (August 14, 2000) and whose opinions concluded that there was substantial authority for, or that taxpayers would more-likely-than-not prevail on the merits if challenged by the Internal Revenue Service on, the position that contingent obligations are not liabilities within the meaning of I.R.C. § 752. This request is limited to those advisors or firms whose opinions Defendant has rejected as a basis for the reasonable cause defense to I.R.C. § 6662 penalties.

The United States objects to this matter on the grounds that it is not a proper subject for inquiry, is irrelevant to any issue in this litigation, is protected from disclosure by 26 U.S.C. § 6103(a) and also is protected from disclosure by one or more privileges, including the attorney client and the deliberative process privilege.

The legal opinions that are the subject matter of this request were not prepared, reviewed, or signed by the United States. We have already provided you with any legal opinions involving COBRA transactions obtained by us through discovery. To the extent that there may be legal opinions involving non COBRA transactions in the possession, custody, or control of the United States or any of its various agencies, including the IRS, the names and firms that issued such non COBRA tax opinions cannot possibly lead to any relevant evidence. Moreover, to the extent that such information would be in the possession of the IRS, this information would be protected from disclosure by 26 U.S.C. § 6103(a). Finally, to the extent this subject matter seeks testimony as to the names and firms which issued legal opinions that the United States, and specifically the IRS, have determined not to have constituted a basis for a reasonable cause defense for accuracy related penalties under Section 6662, it is equally improper. This is because it would be seeking testimony that is irrelevant, protected from disclosure under 26 U.S.C. § 6103(a), and also subject to one or more privileges, including the attorney client and the deliberative process privilege.

**Matter 1.e.**

The determination to impose I.R.C. § 6662 penalties in this case.

The United States objects to this matter on the grounds that whether the IRS properly imposed penalties according to I.R.C. § 6662 requires a trial *de novo*. *See Estate of Kluener v. Commissioner*, 154 F.3d 630, 637 (6th Cir. 1998). A review of audit determinations has no relevance. In *Nordberg v. United States*, 1996 U.S. Dist. LEXIS 5259; 96-1 U.S. Tax Cas. (CCH) P50,295; 77 A.F.T.R.2d (RIA) 2158 (D.Mass. 1996) (copy attached), the court articulated in some detail why inquiry into the reasoning of the IRS for its determinations is not at all relevant in any ensuing tax litigation:

> The discovery does not relate to the facts existing during 1987, upon which the IRS determinations were based. In light of the principle that a challenge to a tax determination results in a trial de novo rather than a review by this Court of an existing administrative record, the defendants' discovery requests fail to satisfy the mandate of *Fed.R.Civ.P. 26(b)* that information sought to be discovered be relevant or "reasonably calculated to lead to the discovery of admissible evidence." See, e.g., *Lewis v. Reynolds, 284 U.S. 281, 283, 76 L. Ed. 293, 52 S. Ct. 145 (1932); Ruth v. United States, 823 F.2d 1091, 1094 (7th Cir. 1987)* ("courts conduct a de novo review of the... assessment"); *Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 328 (1974)* (a court's determination as to a taxpayer's liability "must be based on the merits of the case and not any previous record developed at the administrative level").
>
> The information sought by defendants which forms the basis for the motion to compel is, therefore, evidence which would not be relevant to determining their 1987 tax liability. Information about people who participated in the audit is not relevant, nor are notes made by IRS employees during the audit. Indeed, the audit of the Nordbergs' 1987 tax return took place well after the tax year at issue. In short, the information requested by defendants has no bearing on the sole issue in the case at bar because the Nordbergs' ultimate tax liability is not influenced by the IRS' conduct or findings during the audit. In rejecting a similar argument, one District Court denied a motion to compel upon observing that:
>
> > the opinions, impressions, conclusions and reasoning of IRS agents are irrelevant to the validity of the assessment against [the taxpayer] ....Resolution of the[] issues depends solely on application of the pertinent law to the facts of [the] case... The opinions of individual IRS agents regarding their propriety are immaterial.

*Garity v. United States, 81-2 U.S. Tax Cas. (CCH) P 9599, 1980 WL 1765*, at *2 (E.D. Mich. May 20, 1980).

**Matter 1.f.**

Defendant's discovery responses in the above-styled litigation.

The United States objects to this matter because RCFC requires that the requestor "describe with reasonable particularity the matters on which examination is requested." Plaintiff has not given any indication what it wants to ask in respect to Defendant's discovery responses.

**CONCLUSIONS**

As the subpoena is completely improper, the United States objects to it in its totality and will not provide a witness or witnesses as all matters listed by Plaintiffs are improper as a subject of a RCFC 30(b)(6) deposition.

DENNIS M. DONOHUE
Attorney of Record

Chief Senior Litigation Counsel
U.S. Department of Justice - Tax Division
Post Office Box 403
Ben Franklin Station
Washington, D.C. 20044
(202) 307-6492

2452757.1

**CERTIFICATE OF SERVICE**

I hereby certify that on May 23, 2007, a copy of the foregoing OBJECTIONS OF THE UNITED STATES TO PLAINTIFF'S 30(b)(6) DEPOSITION NOTICE was mailed by First Class U.S. mail postage paid, and properly addressed to the following:

F. Anthony Paganelli, Esq.
SOMMER BARNARD, P.C.
One Indiana Square, Suite 3500
Indianapolis, IN 46204

Joseph Pitzinger, Esq.
United States Department of Justice
717 N. Hardwood St., Suite 400
Dallas, TX 75201

Jonathan Blacker, Esq.
United States Department of Justice
717 N. Hardwood St., Suite 400
Dallas, TX 75201

Joel N. Crouch, Esq.
Meadows, Collier, Reed
Cousins & Blau, L.L.P.
901 Main Street, Suite 3700
Dallas, Texas 75202

DAVID M. STEINER
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 55
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-5892