01/11/06

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-231 T
(Chief Judge Damich)

---

JZ Buckingham Investments LLC as Tax Matters Partner
of JBJZ Partners, a South Carolina general partnership,

Plaintiff,

v.

United States of America,

Defendant.

---

**UNITED STATES' SECOND AMENDED ANSWERS TO FIRST SET OF INTERROGATORIES**

In accordance with Rule of Civil Procedure 33, Respondent, the United States of America, responds to Plaintiff's First Set of Interrogatories as follows:

1. Do you contest that the transactions described in IRS Notice 2000-44 generally, and this case specifically, do not involve the acceleration or duplication of losses as contemplated by Section 309 of the Community Renewal Tax Relief Act of 2000 (Public Law 106-554, 114 Stat 2763)? If you contest this fact, explain how a loss is accelerated or duplicated in any of the transactions described in IRS Notice 2000-44 generally and in this case specifically

Answer: Respondent objects to this interrogatory on the ground that it involves "inquiries into 'issues of pure law'" to the extent that it seeks information with respect to transactions described in IRS Notice 2000-44 generally. IRS Notice 2000-44 refers to a number of different transactions not at issue in this case Accordingly, to that extent, this interrogatory involves a



EXHIBIT 7

pure question of law and is improper. *Kendrick v Sullivan*, 125 F.R.D 1,2 (D C 1989) citing Notes of Advisory Comm. On Rules, 1970 Amend. to Rule 33; *Steil v Humana Kansas City, Inc* , 197 F.R.D. 445, 447 (D. Kan. 2000); *Langer v. Presbyterian-University of Pennsylvania Medical Center*, 1988 W.L. 56972 (E.D Penn. 1988). Court of Fed. Cl. Rule 33(c) requires that contention interrogatories be posed in a manner that inquire into the application of law to the facts at issue. *See e g Kendrick v Sullivan*, 125 F.R.D. at 3. Interrogatories that seek abstract opinions of the law or pure legal contentions fall outside the bounds of Rule 33(b) and are therefore impermissible. *See, e g , Abbott v United States*, 177 F.R.D 92, 93-94 (N.D.N Y. 1997). *Ransom v United States*, 8 Cl Ct 646, 647-48 (1985); Notes of Advisory Comm on Rules, 1970 Amend to Rule 33.

With respect to the transactions at issue in this case, Respondent is not taking the position that these transactions involve the acceleration or duplication of losses. Rather, it is our position that the purpose of the issuance of Temporary Treasury Regulation §1.752-6T was reflected in the preamble to these regulations. The preamble expressly noted that prior to the enactment of IRC Section 358(h) and Section 309(c) and (d)(2) of the Community Renewal Tax Relief Act of 2000 ("Act"), there was a lack of specific rules addressing the treatment of liabilities upon the transfer of property to a corporation or a partnership, which, in turn, led to interpretations of then existing law that failed to reflect the true economics of certain transactions. In some cases, taxpayers continued to assert these interpretations even after the enactment of the Section 358(h) and Section 309(c) and (d)(2) of the Act. For example, in a transaction addressed in Notice 2000-44 (2000-2 C B 255), a taxpayer, as in the instant case, purchases and writes economically offsetting options and then purports to create substantial positive basis by transferring those

option positions to a partnership. On the disposition of the partnership interest, the liquidation of the partner's interest in the partnership, or the taxpayer's sale or depreciation of distributed partnership assets, the taxpayer claims a tax loss, even though the taxpayer has incurred no corresponding economic loss. See, Proposed Rules Department of the Treasury Internal Revenue Service 26 CFR Part 1, Assumption of Partner Liabilities, Tuesday, June 24, 2003, 68 FR 37414-01 (June 24, 2003). The regulations were designed to prevent such abuse of a taxpayer claiming a tax loss where it has incurred no real economic loss.

2. The preamble to Temporary Treasury Regulation §1.752-6T states that the regulation is necessary to prevent abuse. Please explain how Treas. Reg. §1.752-6 or §1.752-6T is necessary to prevent the type of abuse perceived by the IRS in the transactions described in IRS Notice 2000-44 generally and in the transactions at issue in this case specifically.

<u>Answer</u>: Respondent objects to this interrogatory on the ground that it involves "inquiries into 'issues of pure law" to the extent that it seeks information with respect to transactions described in IRS Notice 2000-44 generally. IRS Notice 2000-44 refers to a number of different transactions not at issue in this case. Accordingly, to that extent, this interrogatory involves a pure question of law and is improper. *Kendrick v. Sullivan*, 125 F.R.D. 1,2 (D.C. 1989) citing Notes of Advisory Comm. On Rules, 1970 Amend. to Rule 33; *Steil v. Hunana Kansas City, Inc.*, 197 F.R.D. 445, 447 (D. Kan. 2000); *Langer v. Presbyterian-University of Pennsylvania Medical Center*, 1988 W.L. 56972 (E.D. Penn. 1988). Court of Fed. Cl. Rule 33(c) requires that contention interrogatories be posed in a manner that inquire into the application of law to the facts at issue. *See e.g. Kendrick v. Sullivan*, 125 F.R.D. at 3. Interrogatories that seek abstract opinions of the law or pure legal contentions fall outside the bounds of Rule 33(b) and are therefore impermissible. *See, e.g.*, *Abbott v. United States*, 177 F.R.D. 92, 93-94 (N.D.N.Y.

1997). *Ransom v United States*, 8 Cl.Ct. 646, 647-48 (1985); Notes of Advisory Comm on Rules, 1970 Amend. to Rule 33. With respect to the transactions at issue in this case, see answer to interrogatory 1, above, which explains the type of abuse that Temporary Treasury Regulation §1.752-6T was directed to prevent and why it was necessary to issue this regulation ro prevent such abuse.

3 Do you contest that the Options contributed to JBJZ Partners would constitute "liabilities within the meaning of 26 U S.C. § 752 in the absence of Treas Reg. §§ 1.752-6T and 1.752-6? If you do contest this fact, fully describe your position and provide a complete explanation of its legal and factual basis.

Answer: Respondent objects to this interrogatory on the ground that it poses a hypothetical legal scenario unrelated to the law and facts of the case. *Abbott v. United States*, 177 F.R.D. 92, 93-94 (N.D.N.Y. 1997); *Kendrick v Sullivan*, 125 F.R.D. at 3; *Mobil Oil Corporation v Department of Energy*, 1982 W.L 1135 (N.D. N.Y. 1982). Respondent has not, in this litigation, made the subject of dispute, contention or litigation, that options contributed to JBJZ Partners constitute "liabilities" within the meaning of 26 U.S.C § 752 in the absence of Treas. Reg. §§ 1 752-6T and 1 752-6. This is because the purported assumption of liabilities by JBJZ partners occurred on November 24, 1999, after the effective date for Treas. Reg. § 1.752-6. See FPAA, Exhibit A, Item 4. Interrogatories calling for an opinion or contention based on hypothetical scenario are always improper. *See, e g*, *Mobil Oil Corporation v Department of Energy*, 1982 W.L 1135 (and cases cited therein.); *Kendrick v Sullivan*, 125 F.R.D. at 3; *Abbott v United States*, 177 F.R.D. 92, 93-94. Without waiving these objections, the United States states that even absent Treas. Regs. §§ 1.752-6T and 1.752-6, the options offset each other and you can't just disregard

one leg and claim a phony loss that does not reflect reality. As such, there was no liability in fact.

Secondly, IRC § 752 in no way limits the meaning of the term "liability." The term "liability" in Section 752 encompasses all liabilities, including contingent liabilities. *See*, *Coltec Industries v United States*, 2006 WL 1897077 (Fed Cir, July 12, 2006). Section 752 must be read *in pari materia* with Section 358. Both of these statutes use the term "liability" in the same manner and context. In 2000, Congress specifically stated that "the term 'liability' in Section 358 shall include any fixed or contingent obligation to make payment, without regard to whether the obligation is otherwise taken into account for purposes of this title." IRC § 358(h)(3). Congress made clear that this amendment, and rules to prevent abuses under subchapter K, would be effective as of October 18, 1999, before the transactions in this case took place. *See* Community Renewal Tax Relief Act of 2000, P.L. 106-554, § 309(c) and (d).

Moreover, even if the transactions in this matter had occurred prior to October 18, 1999, the short options would still have been liabilities for purposes of Section 752. It is clear that the Community Renewal Tax Relief Act was a clarification, and not a change, in the law. Section 358 does not limit the meaning of the term liability or the type of liabilities that are included within its scope. Indeed, when Congress enacted Section 358(d)(1)'s predecessor, Section 113(s)(6) of the Internal Revenue Code of 1939, it intended that in determining basis under that section, "*any liabilities* of the taxpayer assumed by the transferee . . . shall be considered as money received by the taxpayer upon the exchange." 84 Cong. Rec. 7481 (1939)(emphasis added), reprinted in *Seidman's Legislative History of Federal Income Tax Laws* 1953-1939 at 1634 (1954). Whether a liability is fixed or contingent, it is still a "liability," as Congress made

clear when it enacted Section 358(h) in order to definitively shut down the contingent liability shelters. *See Illinois Tool Works, Inc v Commissioner*, 355 F 3d 997, 1002 (7th Cir. 2004)(refusing to treat contingent liabilities differently than fixed liabilities and holding that both types of liabilities must be capitalized by an entity which purchased a business because "that contingent liability formed part of the purchase price); *Holdcroft Transp Co v Commissioner*, 153 F 2d 323, 324 (8th Cir. 1946) (applying same rule for tax free exchange).

The enactment of Section 358(h) in no way indicates that, prior to October 18, 1999, contingent liabilities were excluded from the scope of Section 358(d). Instead, Section 358(h) provides that if "any" liability (whether fixed or contingent) somehow escapes the basis-reduction rule set out in Section 358(d), then Section 358(h) will apply to "reduc[e] the transferor's basis in potentially abusive situations." Burke, 106 Tax Notes at 588. It is *a fortiori* clear that Section 752 always included contingent liabilities as liabilities because the Community Renewal Tax Relief Act directed the Commissioner to prevent any such abuses without making any changes in the language of Sections 752 whatsoever.

I, Dennis M. Donohue, pursuant to the provisions of 28 U.S.C. Section 1746 declare under penalty of perjury that the foregoing responses to the plaintiff's interrogatories are true and correct to the best of my knowledge, information, and belief.

Dated this August 11, 2006, in Washington, D.C.

Respectfully submitted,

Dennis M. Donohue DMD

DENNIS M. DONOHUE
SENIOR LITIGATION COUNSEL
OFFICE OF CIVIL LITIGATION
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 403
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-5892
E-mail: dennis.donohue@usdoj.gov

EILEEN J. O'CONNOR
Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section

**CERTIFICATE OF SERVICE**

I hereby certify that on August 11, 2006, a copy of the foregoing UNITED STATES' SECOND AMENDED ANSWERS TO FIRST SET OF INTERROGATORIES was mailed by Federal Express, pre-paid, and properly addressed to the following:

Joel N. Crouch, Esq.
Meadows, Owens, Collier, Reed
Cousins & Blau, L.L.P.
901 Main Street, Suite 3700
Dallas, Texas 75202

F. Anthony Paganelli, Esq.
Sommer Barnard, P.C.
One Indiana Square, Suite 3500
Indianapolis, IN 46204

DAVID M. STEINER
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 55
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-5892
Facsimile: (202) 514-5238
E-mail: David.M.Steiner2@USDOJ.GOV

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-231 T
(Chief Judge Damich)

---

JZ Buckingham Investments LLC as Tax Matters Partner
of JBJZ Partners, a South Carolina general partnership,

Plaintiff,

v.

United States of America,

Defendant.

---

**UNITED STATES' AMENDED ANSWERS TO SECOND SET OF INTERROGATORIES**

Respondent, the United States of America, hereby responds to Plaintiff's Second Set of Interrogatories as follows:

**GENERAL OBJECTIONS**

The United States objects to each of these interrogatories on the ground that they, and the instructions thereto, fail to recognize that this proceeding requires a trial *de novo* and not a review of an administrative record. The United States is not bound by or limited to any position taken by the Internal Revenue Service at the administrative stage of this case, including any position taken by the Internal Revenue Service in the FPAA.

The United States also objects to each of these interrogatories because they are, in substance, contention interrogatories and thus premature. Contention interrogatories are not



EXHIBIT 8

appropriate at the initial stages of discovery *Northland Ins. Co v Shell Oil Co*, 930 F Supp 1069 (D.N.J.,1996.); *In Re Domestic Air Transport Antitrust Litigation*, 1992 WL 120351 (N. D. GA. 1992); *Leksi Inc v Federal Insurance Co*, 129 F.R.D. 99, 107 (D.N.J. 1989). In addition, the Manual of Complex Litigation Second also discourages the use of contention interrogatories at the beginning of discovery, stating "other productive means for clarifying and narrowing the issues and the contentions of the parties" are available, particularly when served before substantial completion of discovery. Manual at § 21.463. "Without such controls, substantial time, money, and energy may be wasted on contention interrogatories that are either premature or overinclusive." *Id.*

The United States further objects to these interrogatories to the extent they request all (or *each and every*) fact and all (or *each and every*) document supporting our legal contentions. Contention interrogatories should ask only for the principal facts and principal materials supporting a party's contentions. *See e g*, *IBP, Inc*, *v Mercantile Bank of Topeka*, 179 F.R.D. 316, 321 (D.Kan.1998); *Bradley v Val-Mejias*, 2001 WL 1249339 (D.Kan. 2001). *See also*, . *SJ Berwin & Co v Evergreen Entertainment Group, Inc*, 1994 WL 185687, at *2 (S.D N.Y. , 1994) (contention interrogatories should not be a vehicle for requiring a party to regurgitate all factual information learned in discovery).

Without waving these objections or requesting the Court pursuant to Ct of Fed. Cl. R. 33(b) to defer our response to these contention interrogatories until the completion of discovery, the United States is providing a preliminary response to each of these interrogatories. Where necessary, however, we will supplement or revise our responses as to our legal contentions as well as to the principal facts and principal materials supporting our legal positions once we have

had the opportunity to review the documents produced to us and depose the necessary parties and third-parties having information relevant to our legal positions. We also anticipate that the reports and testimony of expert witnesses will support some of the factual positions set forth below.

4. Describe all legal theories and factual support for your contention set forth in Exhibit A, paragraph 1 to the FPAA and identify all documents that support your contention.

ANSWER: In paragraph 1 of Exhibit A of the FPAA the Internal Revenue Service "determined that neither JBJZ Partners partnership nor its purported partners have established the existence of JBJZ Partners as a partnership as a matter of fact." The United States contends that the Internal Revenue Service correctly determined that the plaintiff has failed to establish that the JBJZ Partners partnership is not a factual sham. At this early stage of discovery, the principal factual basis of this position is that this entity was organized for the sole purpose of illegally avoiding federal and state income taxes. As such, it was not formed for a legal purpose as is required by state law. Consequently, this entity would not be recognized to exist as a partnership under state law.

5. Describe all legal theories and factual support for your contention set forth in Exhibit A, paragraph 2 to the FPAA and identify all documents that support your contention.

ANSWER: In paragraph 2 of Exhibit A of the FPAA the Internal Revenue Service determined:

> Even if JBJZ Partners partnership existed as a partnership, the purported partnership was formed and availed of solely for purposes of tax avoidance by artificially overstating basis in the partnership interests of its purported partners. The formation of JBJZ Partners partnership, the acquisition of any interest in the purported partnership by the purported partner, the purchase of offsetting options, the transfer of offsetting options to a partnership, and the distribution of those assets to JBJZ investors, Inc., a corporation controlled by the purported partners in complete liquidation of the partnership interests, and the subsequent sale of those assets to generate at a loss, all within a period of less than 2 Months, had no

> business purpose other than tax avoidance, lacked economic substance, and, in fact and substance, constitutes an economic sham for federal income tax purposes. Accordingly, the partnership and the transaction described above shall be disregarded in full and: (1) any purported losses resulting from these transactions are not allowable as deductions; (2) increases in basis of assets are not allowed to eliminate gain for federal income tax purposes.

The United States contends that the Internal Revenue Service correctly determined that even if JBJZ Partners existed as a partnership under state law, this entity was a sham for federal income tax purposes. That is, the LLCs did not "join together as partners to conduct business activity for a purpose other than tax avoidance." *ASA Investerings P'ship v. Comm'r*, 201 F.3d 505, 513 (D.C.Cir.2000). " '[T]he absence of a nontax business purpose is fatal' to the argument that the Commissioner should respect an entity for federal tax purposes." *Saba P'ship v. Comm'r*, 273 F.3d 1135, 1141 (D.C.Cir. 2001), *quoting ASA Investerings P'ship v. Comm'r*, 201 F.3d at 512. At this early stage of discovery and apart from the facts set forth in paragraph 2 of Exhibit A of the FPAA, the fundamental factual basis of this position is that this purported entity was not formed or availed of for a valid business purpose. Rather, it was organized and availed of solely for purposes of tax avoidance which was to be accomplished by artificially inflating the basis of the partners' partnership interests.

The United States also contends that the Internal Revenue Service correctly determined that the purchase of the offsetting option transactions and their contribution to JBJZ Partners was an economic sham. First, these offsetting option transactions did not have objective economic substance. At this early stage of discovery, the principal factual basis of that position is that absent the tax benefits, there was no reasonable possibility that the LLCs or the purported partnership would realize a profit in excess of the enormous fees and transaction costs on these

transactions. Apart from the individual taxpayers personal fees on these transactions, they and their purported entities had to incur fees to the promoters amounting to 9½ % in order to generate the desired tax losses. Given these enormous fees, combined with the marginal chances of the options being "in the money" at the end of their terms, viewing the transactions objectively, neither the purported partners (the LLCs) nor the purported partnership (JBJZ Partners) had a realistic possibility of realizing an economic profit on these transactions. Moreover, with the spread between the two offsetting positions being just a fraction of a cent, there was virtually no chance that just one of the offsetting positions would be acted upon. Indeed, because the Deutsche Bank, as the calculating agent, could choose to accept or disregard any spot rate, when combined with the incredibly close proximity of the trigger spot rates (hundredths of a penny apart), the chances of just one of the paired position being exercised, was virtually nil. As a result, these offsetting option positions amounted to, in reality, a contractual wager, with the chances of winning the wager being no different than that of winning the lottery – it was not going to happen. It is expected that expert testimony will also address this issue.

Secondly, these offsetting option transactions had no purpose (business or otherwise) other than the creation of income tax losses. At this early stage of discovery and apart from the facts set forth in paragraph 2 of Exhibit A of the FPAA, the principal factual basis of this position is that the sole purpose of these transactions was to generate a huge paper tax loss on the sale of former partnership property which was not economically inherent in these transactions, but created artificially "by machinations whose only purpose and effect was to give rise to the desired tax consequences." *ACM Partnership et al v. Commissioner*, 157 F.3d 231, 245 (3rd Cir. 1998).

Accordingly, the Internal Revenue Service correctly determined that the purported partnership and the offsetting option transactions described above should be disregarded in full and: (1) any purported losses resulting from these transactions are not allowable as deductions; and (2) increases in basis in partnership interests and increases in basis of assets are not allowed to eliminate gain for federal income tax purposes.

6. Describe all legal theories and factual support for your contention set forth in Exhibit A, paragraph 3 to the FPAA and identify all documents that support your contention.

ANSWER: In paragraph 3 of Exhibit A of the FPAA the Internal Revenue Service determined:

> [T]hat JBJZ Partners partnership was a sham, lacked economic substance and, under §1.701-2 of Income Tax Regulations, was formed and availed of in connection with a transaction or transactions in taxable year 1999, a principal purpose of which was to reduce substantially the present value of its partners' aggregate federal tax liability in a manner that is inconsistent with the intent of Subchapter K of the Internal Revenue Code. It is consequently determined that:
>
> a. the JBJZ Partners partnership is disregarded and that all transactions engaged in by the purported partnership are treated as engaged in directly by its purported partners. This includes the determination that assets purportedly acquired by JBJZ Partners partnership, including but not limited to foreign currency options, were acquired directly by the purported partners.
>
> b. the foreign currency option(s), purportedly contributed to or assumed by JBJZ Partners partnership, are treated as never having been contributed to or assumed by said partnership and any gains or losses purportedly realized by JBJZ Partner partnership on the option(s) are treated as having been realized by its partners.
>
> c the purported partners of JBJZ Partners partnership should be treated as not being partners in JBJZ Partners partnership.
>
> d. contributions of JBJZ Partners partnership will be adjusted to reflect clearly the partnership's or purported partners' income

Apart from the legal contentions set forth in our response to Interrogatory 5, the United States contends that Internal Revenue Service correctly determined that the formation of JBJZ Partners

and the contribution of the offsetting option transactions to JBJZ Partners violated the Anti Abuse regulations of Subchapter K of the Internal Revenue Code – i.e., Treas. Reg. §1.701-2. At this early stage of discovery and apart from the facts set forth in paragraph 3 of Exhibit A of the FPAA, the principal facts that support the application of the Anti Abuse provisions of Treas. Reg. § 1.701-2 are the same facts as listed in our Response to Interrogatory 5.

7. Describe all legal theories and factual support for your contention set forth in Exhibit A, paragraph 4 to the FPAA and identify all documents that support your contention.

ANSWER: In paragraph 4 of Exhibit A of the FPAA the Internal Revenue Service determined "[t]hat the obligations under the short positions (written call options) transferred to JBJZ Partners partnership constitute liabilities for purposes of Treasury Regulation §1.752-6T, the assumption of which by JBJZ Partners partnership shall reduce the purported partners' bases in JBJZ Partners partnership in the amounts of $42,750,000.00 and $4,750,000.00, respectively, but not below the fair market value of the purported partnership interest." The United States contends that the Internal Revenue Service correctly determined that the obligations inherent in the short positions (written call options) transferred to JBJZ Partners partnership constitute liabilities for purposes of Section 752 and Treas. Reg. §1.752-6T. The term "liability" in Section 752 encompasses all liabilities, including contingent liabilities. *See*, *Coltec Industries v United States*, 2006 WL 1897077 (Fed Cir, July 12, 2006). Thus, JBJZ Partners's assumption of the obligations under the short positions constituted a distribution of money to the purported partners under Section 752(b), thereby decreasing their basis in the purported partnership. Moreover, *Helmer v. Commissioner*, 34 T.C.M. (CCH) 727, T.C.M (1975) is inapposite to these facts because it did not involve simultaneously executed long and short options of the same underlying

property with virtually identical terms, which offsetting options eliminated all financial risk to the purported partners in excess of the net premiums paid by them. Also, *Helmer* did not involve offsetting option transactions which were entered into as part of an elaborate and prearranged scheme to avoid federal income taxes. Finally, *Helmer* is also inapplicable for the same reasons set forth in the Confidential Memorandum of Jared Blanchard dated January 5, 2000. *See,* 2003EY004049-4062, and particularly 2003 EY 4056-4061.

8. Describe all legal theories and factual support for your contention set forth in Exhibit A, paragraph 5 to the FPAA and identify all documents that support your contention.

ANSWER: In paragraph 5 of Exhibit A of the FPAA the Internal Revenue Service determined "that neither JBJZ Partners partnership nor its purported partners entered into the option(s) positions or purchase the foreign currency or stock with a profit motive for purposes of §165(c)(2)." The United States contends that the Internal Revenue Service correctly determined that the purported partners of JBJZ Partners partnership did not acquire the option(s) positions or contribute them to the purported partnership for the principal purpose of realizing a profit. At this early stage of discovery, the principal facts that support that position are the same facts as set forth in our response to Interrogatory 5. It is also expected that expert testimony will address this issue.

9 Describe all legal theories and factual support for your contention set forth in Exhibit A, paragraph 6 to the FPAA and identify all documents that support your contention.

ANSWER: In paragraph 6 of Exhibit A of the FPAA the Internal Revenue Service determined:

> Even if the foreign currency option(s) are treated as having been contributed to JBJZ Partners partnership, the amount treated as contributed by the partners under section 722 of the Internal Revenue Code is reduced by the amounts received by the contributing partners from the contemporaneous sales of the call option(s) to the same counter-party. Thus, the basis of the contributed option(s) is reduced,

both in the hands of the contributing partners and JBJZ Partners partnership. Consequently, any corresponding claimed increases in the outside basis in JBJZ Partners partnership resulting from the contributions of the foreign currency option(s) are disallowed.

The United States contends that the Internal Revenue Service correctly determined that even if JBJZ Partners partnership is treated as a partnership for federal income tax purposes and even if the foreign currency option(s) are therefore treated as having been contributed to this partnership, these nominally separate offsetting (long and short) options were in substance a "single" position. It a foundational principle of the tax law that the substance of a transaction controls for federal income tax purposes. At this early stage of the discovery, the principal facts supporting this position are that in form, these nominally separate options required huge gross premiums (totaling many millions of dollars) and exposed the option writers to massive potential losses. In substance, however, these nominally separate private trades economically nearly totally offset each other, thereby only requiring a relatively small net premium. Moreover, because of their incredibly close strike prices, as discussed in our response to Interrogatory 5, there was virtually no risk that only one position would be exercised. Thus, assuming these alleged trades were not "factual shams," these nominally separate positions constituted, in substance and in reality, a single position. As such, the basis of these offsetting option positions would be limited to the net premium paid on their acquisition – with the corresponding result that the contributing partners' basis of their partnership interests would also be limited to this net premium amount. It is expected that expert testimony will also address this issue.

10. Describe all legal theories and factual support for your contention set forth in Exhibit A, paragraph 7 to the FPAA and identify all documents that support your contention.

ANSWER: In paragraph 7 of Exhibit A of the FPAA the Internal Revenue Service determined that:

> [T]he adjusted bases of the long call positions (purchased call options), zero coupon notes, and other contributions purportedly contributed by the partners to JBJZ Partners partnership has not been established under I.R.C. § 723. It is consequently determined that the partners of JBJZ Partners partnership have not established adjusted bases in their respective partnership interests in an amount greater than zero (-0-).

The United States contends that the Internal Revenue Service correctly determined that the adjusted basis of the offsetting options and other property contributed to JBJZ Partners is zero. As noted in our response to Interrogatory 9, even though the offsetting options must be viewed as a "single position" with the result that the basis of these offsetting options would be equal to the net premium paid for these positions, the burden is on the plaintiff to establish that they made a net "out of pocket" payment for these options and also to establish the amount of this net cash payment. Also, the burden is on the plaintiff to establish what was the adjusted basis in the hands of the purported partners of the other property contributed to the purported partnership. However, even assuming that plaintiff sustains its burden of showing what net amounts were paid for the offsetting options, the basis of these option positions would still be zero if these transactions were determined to be factual or economic shams.

11. Describe all legal theories and factual support for your contention set forth in Exhibit A, paragraph 8 to the FPAA and identify all documents that support your contention.

ANSWER: In paragraph 8 of Exhibit A of the FPAA the Internal Revenue Service determined "that, in the cases of a sale, exchange, or liquidation of JBJZ Partners [or] the partners' partnership interests, neither the purported partnership nor its purported partners have established that the bases of the partners' partnership interests were greater than zero for purposes of

determining gain or loss to such partners from the sale, exchange, or liquidation of such partnership interest. The United States contends that the Internal Revenue Service correctly determined that in the case of the purported partners' nominal transfer of their partnership interests to JBJZ Investors Inc, a purported Subchapter S corporation, the basis of their purported partnership interests (both before and after the transfer) is zero. This position is based on the same facts and contentions discussed in our response to Interrogatory 10. *See* 26 U.S.C. §§ 705 and 722, which provide, in relevant part, that the basis of a contributing partner's partnership interest is equal to the adjusted basis of the contributed property at the time of contribution. Since plaintiff has not established what was the net (out of pocket) amount of the premium payments for the offsetting positions, the adjusted basis of such options is zero – with the result that the basis of the contributing partners' purported partnership interests must also be zero.

12. Describe all additional adjustments *not* described in the FPAA that you intend to assert relating to JBJZ Partners' short tax year ending December 27, 1999 and describe all legal theories and factual support for these additional adjustments and identify all documents that support your contentions.

ANSWER: Apart from our general objection to disclosing our legal positions at the beginning of discovery as set forth above, the United States specifically objects to this interrogatory seeking our additional legal positions (apart from those advanced in the FPAA) before we have had the opportunity to obtain all of the relevant documents and conduct any fact or expert depositions. Without waiving this objection, the United States provides the following preliminary response to this interrogatory.

First, the United States contends that the step transaction doctrine is applicable in this case, requiring that the individual steps of the COBRA transaction be collapsed. The purported

partnership in this scheme was simply used as a conduit to create an artificially inflated basis in the purported partners' partnership interests, which inflated basis could, in turn, then be allocated to property distributed to the purported Subchapter S corporation upon the prearranged dissolution of the purported partnership. The purported Subchapter S corporation was also simply used as a conduit to generate a paper tax loss on the sale of this property whose basis had been artificially inflated, which loss could then be passed through the individual taxpayers. Under the step transaction doctrine, the steps of the transfer of the offsetting options to the purported partnership and the distribution of the partnership property on the liquidation of the partnership to the purported subchapter S corporation are disregarded. With these steps disregarded, the basis of property distributed to the Subchapter S corporation would therefore be required to equal the actual cost of this property – and not the artificially inflated basis of the disregarded partnership interests. Thus, the disposition of such property would not give not rise to an artificially-generated tax loss. At this stage of discovery, the principal facts supporting this position are the marketing materials of the promoters which make it crystal clear that each of the steps of this COBRA transaction was meticulously prearranged with the ultimate end result in mind to achieve an artificially-generated tax loss for the individual investors.

Second, the United States contends that the offsetting option transactions may be factual shams. That is, it appears that while these transactions are, at least to some extent, documented on paper, this documentation may not reflect the reality of these transactions. Based on the allegations in the investors' suits against the promoters, these option contracts may ultimately be determined to be illusory. The principal facts to support this position will only be known after full discovery (documentary and depositions) has been conducted upon the Deutsche Bank.

Third, the United States contends that the "at risk" rules of I.R.C. § 465 apply here to preclude the allowance of the claimed losses. Section 465(a)(1) provides that individuals may claim losses and deductions only to the extent of the aggregate amount to which the taxpayer is at risk. Section 465(b) provides that a taxpayer is not considered at risk with respect to amounts protected against loss through some related agreement. At this early stage of discovery, the principal facts supporting this legal position are that the COBRA transactions were carefully designed to limit the financial risk of the investors, their LLCs and their purported partnership. As discussed in our response to Interrogatory 5, the offsetting options were expressly designed to ensure that the investors, through their LLCs and their partnership, were exposed to risk only to the extent of the net premium paid to the Deutsche Bank. Moreover, the operation of the offsetting options limited their risk because the values of the options moved in opposite directions in economically offsetting amounts. The amount that could be gained or lost was therefore fixed at the time the offsetting options came into existence. As neither the LLCs nor JBJZ Partners were "at risk" for more than the amount of the net premium, §465 precludes JBJZ Partners from claiming a basis in the offsetting option positions in excess of the net premium.

13. Describe all legal theories and factual support for any penalty or addition to tax you intend to assert should be applied and identify all documents that support your contentions.

ANSWER: The United States objects to this interrogatory to the extent that it seeks information that is protected under the attorney-client and deliberative process privileges. Without waiving these objections, the United States states that no determination has yet been made as to whether penalties should be asserted.

As noted in the FPAA, no penalties were asserted in the FPAA as to JBJZ Partners partnership because the partners along with JBJZ Investors, Inc. (corporation controlled by the partners) filed a disclosure with the Internal Revenue Service and represented that they provided all information required by Announcement 2002-2. To disclose an item under Announcement 2002-2, a taxpayer was required to provide the following:

a. A statement describing the material facts of the item;

b. A statement describing the taxpayer's tax treatment of the item;

c. The taxable years affected by the item;

d. If the taxpayer is a Coordinated Industry Case (CIC) taxpayer, a statement that the taxpayer will agree to address the disclosed item under the Accelerated Issue Resolution process described in Rev. Proc. 94-67, 1994-2 C.B. 800, if requested to do so by the IRS;

e. The names and addresses of (a) any parties who promoted, solicited, or recommended the taxpayer's participation in the transaction underlying the item and who had a financial interest, including the receipt of fees, in the taxpayer's decision to participate, and (b) if known to the taxpayer, any parties who advised the promoter, solicitor or recommender with respect to that transaction;

f. A statement agreeing to provide, if requested, copies of all of the following:

   i. All transactional documents, including agreements, contracts, instruments, schedules, and, if the taxpayer's participation in the transaction was promoted, solicited or recommended by any other party, all material received from that other party or that party's advisor(s);

   ii. All internal documents or memoranda used by the taxpayer in its decision-making process, including, if applicable, information presented to the taxpayer's board of directors;

   iii. All opinions and memoranda that provide a legal analysis of the item, whether prepared by the taxpayer or a tax professional on behalf of the taxpayer; and

iv. A penalty of perjury statement that the person signing the disclosure has examined the disclosure and that to the best of that person's knowledge and belief, the information provided as part of the disclosure contains all relevant facts and is true, correct, and complete. In the case of an individual taxpayer, the declaration must be signed and dated by the taxpayer, and not the taxpayer's representative. In the case of a corporate taxpayer, the declaration must be signed and dated by an officer of the corporate taxpayer who has personal knowledge of the facts. If the corporate taxpayer is a member of an affiliated group filing consolidated returns, a penalties of perjury statement also must be signed, dated, and submitted by an officer of the common parent of the group. The person signing for a trust, a state law partnership, or a limited liability company must be, respectively, a trustee, general partner, or member-manager who has personal knowledge of the facts. A stamped signature is not permitted.

Announcement 2002-2, further provides that "[i]t should not be inferred by the determination of the Accuracy Related Penalty in this notice that fraud penalties will not be sought on any portion of an underpayment subsequently determined to be attributable to fraud or that prosecution for criminal offenses will not be sought under IRC § 7201, 7206 or other provisions of federal law if determined to be appropriate.

The United States contends that accuracy-related penalties may also be asserted if it is determined, through the course of discovery, that the individual participants, following their election to disclose, failed to fully disclose the transaction and/or made false or fraudulent statements to the Internal Revenue Service about the transactions.

I, Dennis M. Donohue, pursuant to the provisions of 28 U.S.C. Section 1746 declare under penalty of perjury that the foregoing responses to the plaintiff's interrogatories are true and correct to the best of my knowledge, information, and belief.

Dated this August 11, 2006, in Washington, D.C.

Respectfully submitted,

DENNIS M. DONOHUE
SENIOR LITIGATION COUNSEL
OFFICE OF CIVIL LITIGATION
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 403
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-5892
E-mail: dennis.donohue@usdoj.gov

EILEEN J. O'CONNOR
Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section

**CERTIFICATE OF SERVICE**

I hereby certify that on August 11, 2006, a copy of the foregoing UNITED STATES' AMENDED ANSWERS TO SECOND SET OF INTERROGATORIES was mailed by Federal Express, pre-paid, and properly addressed to the following:

Joel N. Crouch
Texas State Bar No. 05144220
Meadows, Owens, Collier, Reed
Cousins & Blau, L.L.P.
901 Main Street, Suite 3700
Dallas, Texas 75202

F. Anthony Paganelli, Esq.
Sommer Barnard, P.C.
One Indiana Square, Suite 3500
Indianapolis, IN 46204

DAVID M. STEINER
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 55
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-5892
Facsimile: (202) 514-5238
E-mail: David.M.Steiner2@usdoj.gov

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-231 T
(Chief Judge Damich)

JZ Buckingham Investments LLC as Tax Matters Partner
of JBJZ Partners, a South Carolina general partnership,

Plaintiff,

v.

United States of America,

Defendant.

**UNITED STATES' ANSWERS TO
PLAINTIFF'S THIRD SET OF INTERROGATORIES**

Respondent, the United States of America, hereby responds to Plaintiff's Third Set of Interrogatories as follows:

**GENERAL OBJECTIONS**

The United States objects to each of these interrogatories on the ground that they, and the instructions thereto, fail to recognize that this proceeding requires a trial *de novo* and not a review of an administrative record. The United States is not bound by or limited to any position taken by the Internal Revenue Service at the administrative stage of this case, including any position taken by the Internal Revenue Service in the FPAA.



EXHIBIT 9

tabbles

The United States also objects to many of these interrogatories because they are, in substance, contention interrogatories and thus premature. Contention interrogatories are not appropriate at the initial stages of discovery. *Northland Ins. Co. v. Shell Oil Co.*, 930 F.Supp. 1069 (D.N.J.,1996.); *In Re Domestic Air Transport Antitrust Litigation*, 1992 WL 120351 (N. D GA. 1992); *Leksi Inc. v. Federal Insurance Co.*, 129 F.R.D. 99, 107 (D.N.J. 1989). In addition, the Manual of Complex Litigation Second also discourages the use of contention interrogatories at the beginning of discovery, stating "other productive means for clarifying and narrowing the issues and the contentions of the parties" are available, particularly when served before substantial completion of discovery. Manual at § 21.463. "Without such controls, substantial time, money, and energy may be wasted on contention interrogatories that are either premature or overinclusive." *Id.*

The United States further objects to these interrogatories to the extent they request all (or *each and every*) fact and all (or *each and every*) document supporting our legal contentions. Contention interrogatories should ask only for the principal facts and principal materials supporting a party's contentions. *See e.g.*, *IBP, Inc., v. Mercantile Bank of Topeka* 179 F.R.D. 316, 321 (D.Kan.1998); *Bradley v. Val-Mejias*, 2001 WL 1249339 (D.Kan. 2001). *See also*, . *SJ Berwin & Co. v. Evergreen Entertainment Group, Inc.*, 1994 WL 185687, at *2 (S.D.N.Y., 1994) (contention interrogatories should not be a vehicle for requiring a party to regurgitate all factual information learned in discovery).

Without waving these objections or requesting the Court pursuant to Ct of Fed. Cl. R. 33(b) to defer our response to these contention interrogatories until the completion of discovery, the United States is providing a preliminary response to each of these interrogatories. Where

necessary, however, we will supplement or revise our responses as to our legal contentions as well as to the principal facts and principal materials supporting our legal positions once we have had the opportunity to review the documents produced to us and depose the necessary parties and third-parties having information relevant to our legal positions. We also anticipate that the reports and testimony of expert witnesses will support some of the factual positions set forth below.

## INTERROGATORIES

INTERROGATORY NO. 14: Identify and list the name, address and telephone number for each and any law firm, financial institution, accounting firm, tax services or investment advisory firm that provided any written advice (whether or not constituting a formal written opinion, and whether or not the advice indicated that the taxpayer could rely upon it) to any taxpayer relating to any transaction described in Notice 2000-44.

ANSWER: Defendant objects to the Interrogatory on the grounds that it seeks information that is, in part, irrelevant, overbroad, and also places a burden or expense on Defendant that outweighs its likely benefit.

To the extent the information requested may be relevant to issues in this case, the United States further objects to the Interrogatory on the ground that Plaintiff has equal access to all the third party materials from which such information can be obtained. The United States is not required to search voluminous materials to provide it with the requested information.

In fact, even if the United States has – or were to – perform a search of these third-party materials, any information obtained from such a review would be protected by the Attorney Work-Product Doctrine. Fed.R.Civ.Pro. 26(b)(3) partially codifies this doctrine, which gives a virtually absolute protection to work product which would disclose an attorney's mental impressions, conclusions, opinions, or legal theories. See, e.g. *Sporck v. Peil*, 759 F.2d 312, 31: (3d Cir.), *cert. denied*, 474 U.S. 903 (1985), in ("the selection and compilation of documents by counsel . . . in preparation for pre-trial discovery falls within the highly-protected category of opinion work product.") *Id.* At 316. As the Courts have noted, "[i]n cases that involve reams of documents and extensive document discovery, the selection and compilation of documents is often more crucial than legal research." *Shelton v. American Motors Corp., et al.*, 805 F.2d 1323, 1329 (8th Cir. 1986).

Moreover, even if any information obtained from our review of these materials could be viewed as fact – and not opinion – work product, such information would still be protected by the work product doctrine. A requesting party is not entitled to the fruits of Fact Work Product unless "the party seeking discovery demonstrates a 'substantial need for the material and an inability to obtain the substantial equivalent of the information without undue hardship.'" *Portis, et al. v. City of Chicago*, 2004 U.S. Dist. LEXIS 12640 (N.D.Ill. July 7, 2004)(quoting *Eagle Compressors, Inc. v. HEC Liquidating Corp.*, 206 F.R.D. 474, 478 (N.D.Ill. 2002)). Defendant has turned over all tax shelter materials obtained in this case–whether obtained from third parties or the Internal Revenue Service-- to Plaintiff, which has the same ability to search it as does Defendant. Therefore, Plaintiff can make no such showing that it is unable to obtain the substantial equivalent of the information requested without undue hardship.

**INTERROGATORY NO. 15:** List all pending or completed litigation in which Defendant is a party and in which the issues directly or indirectly involve, or in any way pertain to, a Notice 2000-44 Transaction or other disputes which concern substantially the same issues as are involved in this case. Include in your answer the complete posture of such case(s), the names of the taxpayer(s), the court, the docket number, and the name, address, and telephone number of each attorney representing the taxpayer(s) in each of such cases.

**ANSWER:** Defendant objects to the Interrogatory on the grounds that it seeks information that is, in part, irrelevant, overbroad, and also places a burden or expense on Defendant that outweighs its likely benefit. Specifically, Notice 2000-44 covers transactions other than the COBRA product here at issue or similar European-style offsetting digital option transactions. Notice 2000-44 covers transactions used to produce noneconomic tax losses on the disposition of partnership interests Therefore, Notice 2000-44 covers more than just transactions involving offsetting options. For example, Notice 2000-44 covers transactions involving a partnerships' assumption of purported loans with a purported loan premium. Such transactions have nothing to do with the case at bar. Therefore, Defendant objects to the Interrogatory to the extent that it requests information regarding transactions other than those involving offsetting European-style digital options.

Defendant also objects to the Interrogatory to the extent that it requests information that the Government may not disclose according to 26 U.S.C. § 6103. Subject to and without waiving said objections, the following is a partial list of offsetting option cases, which includes

all COBRA cases and two cases pending in the Court of Federal Claims involving offsetting–but not digital–options:

| | Case | T/P Attorney | Posture |
|---|---|---|---|
| | *MURFAM Farms, LLC, et al. v. United States*, Fed. Cl. No. 06-245T | Meadows, Owens, Collier, Reed, Cousins & Blau, L.L.P.<br>901 Main Street, Suite 3700<br>Dallas, TX 75202<br>(214)744-3700 | Discovery |
| | *PSM Farms, LLC, et al. v. United States*, Fed. Cl. No. 06-246 T | Meadows, Owens, Collier, Reed, Cousins & Blau, L.L.P.<br>901 Main Street, Suite 3700<br>Dallas, TX 75202<br>(214)744-3700 | Discovery |
| | *Murphy Pork Partners, LLC, et al. v. United States*, Fed. Cl. No. 06-247T | Meadows, Owens, Collier, Reed, Cousins & Blau, L.L.P.<br>901 Main Street, Suite 3700<br>Dallas, TX 75202<br>(214)744-3700 | Discovery |
| | *Carmel Partners, et al. v. United States*, 06-8002 (S.D.Ind.) | Anthony Paganelli<br>Sommer Barnard, P.C.<br>One Indiana Square, Suite 3500<br>Indianapolis, IN 46204<br>Anthony Paganelli<br>(317)713-3444 | Discovery as part of *In re COBRA Tax Shelters Litigation*, 05-9727(S.D.Ind.) |

| | | | |
|---|---|---|---|
| | *Gary Woods v. United States*, 06-8000 (S.D.Ind.) | Meadows, Owens, Collier, Reed, Cousins & Blau, L.L.P.<br>901 Main Street, Suite 3700<br>Dallas, TX 75202<br>(214)744-3700 | Discovery as part of *In re COBRA Tax Shelters Litigation*, 05-9727(S.D.Ind.) |
| | *K2 Trading Ventures, LLC, New Vista, LLC, TMP v. United States*, Fed.Cl. 04-1419T-MCW | Felix Benjamin Laughlin<br>Dewey Ballantine<br>Suite 500<br>Washington, DC 20006-4605<br>(202)862-1000 | Discovery |
| | *Jade Trading, LLC et al. v. United States*, Fed.Cl. 03-2164-MCW | David DeCoursey Aughtrey<br>Chamberlain, Hrdlicka, et al.<br>191 Peachtree St., NE<br>Ninth Floor<br>Atlanta, GA 30303<br>(404)659-1852 | Awaiting decision |
| | *Mellow Partners, Myer Berlow, A Partner other than TMP v. Commissioner*, Tax Court Docket No. 11453-05 | N. Jerold Cohen<br>Sutherland Asbill & Brennan LLP<br>999 Peach Tree St., N.E.<br>Atlanta, GA 30309<br>(404) 853-8000 | Discovery |
| | *Fairfield Investment Partners, DHP Fiesta Investments LLC, TMP v. Commissioner*, Tax Court Docket No. 5484-06 | David DeCoursey Aughtrey<br>Chamberlain, Hrdlicka, et al.<br>191 Peachtree St., NE<br>Ninth Floor<br>Atlanta, GA 30303<br>(404)659-1852 | Discovery |

**INTERROGATORY NO. 16:** For all cases listed in Interrogatory 15, list the names, contact information, and employment information for all experts witnesses used, hired and retained by a parties.

**ANSWER:** The United States objects to the Interrogatory because the information requested is irrelevant, overbroad, places a burden on Defendant that outweighs its likely benefit, and may be protected from disclosure by the work product doctrine. The United States further objects to the Interrogatory on the ground that it is not required to conduct research of court dockets or trial records on behalf of the Plaintiff that it is equally capable of conducting on its own behalf. Without waiving such objections, and to the extent not privileged, the Government provides the following information:

| Case | Government Experts | Taxpayer Experts |
|---|---|---|
| *K2* | David DeRosa, Ph.D.<br>DeRosa Research and Trading, Inc.<br>495 White Oak Shade Road<br>New Canaan, CT 06840<br>(203)801-4340<br><br>A. Lawrence Kolbe, Ph.D.<br>The Brattle Group<br>44 Brattle Street<br>Cambridge, MA 02138<br>(617)864-7900 | Nassim Taleb, Ph.D.<br>gamma@fooledbyrandomness.com |

| | | |
|---|---|---|
| *Jade Trading* | David DeRosa, Ph.D.<br>DeRosa Research and Trading, Inc.<br>495 White Oak Shade Road<br>New Canaan, CT 06840<br>(203)801-4340<br><br>A. Lawrence Kolbe, Ph.D.<br>The Brattle Group<br>44 Brattle Street<br>Cambridge, MA 02138<br>(617)864-7900<br><br>Merle Erickson, Ph.D.<br>Graduate School of Business<br>University of Chicago<br>Chicago, IL 60637<br>(773)834-0716 | Jeffrey Frankel Ph.D.<br>10 Humboldt Street<br>Cambridge, MA 02140<br><br>Robert Kolb, Ph.D.<br>9638 Mountain Ridge Place<br>Boulder, CO 80302<br>(303)786-9501<br><br>Kenichi Shoji, Ph.D.<br>29 East 22nd Street<br>New York, NY 10010 |
| | | |

The United States is not required to furnish such expert witness information regarding COBRA litigation except pursuant to the scheduling orders of the courts in this litigation. Accordingly, at this time such information in protected by the work product doctrine.

**INTERROGATORY NO. 17:** For all cases listed in Interrogatory 15, list all theories and support set forth by the Government expert witnesses listed in Interrogatory 16.

**ANSWER:** Defendant objects to the Interrogatory on the grounds that it seeks information that is irrelevant, overbroad, and also places a burden or expense on Defendant that outweighs its likely benefit. Defendant also objects to the Interrogatory to the extent that it requests information that the Government may not disclose according to 26 U.S.C. § 6103 . Defendant further objects

to the extent the requested information relates to the COBRA litigation because such information is at this time protected by the work product doctrine.

Finally, to the extent the analysis of expert witnesses in the non-COBRA litigation may ultimately become relevant to the COBRA litigation because the same expert witnesses in that litigation are identified by the United States to be expert witnesses in the COBRA litigation, the proper way to obtain the analysis of such expert witnesses in that prior litigation – as the parties discussed in their teleconference on October 13, 2006 – is to request the reports prepared by the experts in these other cases. Interrogatories are too clumsy a way to seek information regarding the substance of expert testimony which is why "[i]n 1993, [Fed.R.Civ.Pro.] 26(b) was amended to eliminate the need for interrogatories to determine the substance of an expert's testimony." *Krisa v The Equitable Life Assurance Society*, 196 F.R.D. 254, 258 (M.D.Pa. 2000)(internal quotation marks omitted).

__INTERROGATORY NO. 18:__ Identify all written and oral communications made by Plaintiff or any of Plaintiff's representatives to you that you contend are admissions within the meaning of Rule 801(d)(2) of the Federal Rules of Evidence.

__ANSWER:__ The United States is still in the process of reviewing the materials that may contain possible admissions by the Plaintiffs or their representatives. At this stage of discovery, the United States had indemnified the following such communications. The United States reserves the right to supplement this list.

1. Letter dated November 18, 2002, to IRS Revenue Agent Alan E. Moss from Nelson A. Brooke.

2. Letter dated April 23, 2003, to IRS Revenue Agent Alan E. Moss from Nelson A. Brooke.

3. Form 13586 signed by Jerry and Anita Zucker on September 4, 2004.

4. Form 13586 signed by James and Hazel Boyd on September 16, 2004.

5. Facsimile dated April 12, 2002, to IRS Revenue Agent Debra Simmons from Nelson A. Brooke.

6. Letter dated April 17, 2002, from James and Hazel Boyd to IRS Revenue Agent Neva A. Gadsden.

7. Letter dated April 20, 2002, from Jerry and Anita Zucker to IRS Revenue Agent Debra Simmons.

8. All factual allegations in Plaintiff's Second Amended Complaint and Original Class Action Complaint in *Camferdam, et al. v. Ernst & Young International, Inc., et al.*, No. 02 Civ. 10100 (S.D.N.Y.)(BSJ).

**INTERROGATORY NO. 19:** Identify the name(s), operator identification number(s) and contact information of the employee (s), agent(s), or other representative(s) of the IRS, who made (or will make) the determination to apply to this case the anti-abuse regulations as promulgated by the Secretary of the Treasury in Treas. Reg. §1.701-2.

**ANSWER:** The United States objects to this interrogatory on the ground that the information requested is not relevant to this action and is also not reasonably calculated to lead to the discovery of admissible evidence in this suit for adjustment of a final partnership administrative adjustment (FPAA). In a federal tax case, any challenge by a taxpayer to the Commissioner's

determination that taxes are owing must be resolved in a trial de novo, rather than by review of an existing administrative record. *See e g., Revell, Inc. v. Riddell*, 273 F.2d 649, 658-59 (9th Cir. 1959); *Greenberg's Express, Inc v. Commissioner*, 62 T.C. 324, 327-28 (1974). An FPAA is the equivalent of a notice of deficiency in a refund action. *In re G-1 Holdings, Inc.*, Civ. No. 02-03082 (WGB) (D.N.J. July 16, 2004). In an FPAA action, the partner must establish that the FPAA is incorrect, which, in turn, requires the court to apply the law to the facts of the case. The reasons for the Commissioner's determination are not relevant because the court does not review the administrative reasons, policy or procedure of that determination. *Greenberg's Express, Inc. v. Commissioner*, 62 T.C. 324, 327-28. Notwithstanding and without waiving this objection, the United States notes that the Revenue Agent who was assigned this case at the administrative level was Alan E. Moss, who is now retired. The FPAA was signed by Technical Services Territory Manager Sheila Savino, who is now deceased.

__INTERROGATORY NO. 20:__ Please identify each document and each fact you relied or reply upon in denying any of Plaintiff's First Set of Requests for Admissions

__ANSWER:__ Defendant objects to the Interrogatory on the grounds that, to the extent that it is proper, it is an attempt to circumvent the limitation on interrogatories ordered by the Court. Defendant denied over 60 of Plaintiff's Requests for Admissions. This is an attempt to compress 60-odd interrogatories into a single interrogatory.

Defendant further objects to the Interrogatory on the grounds that it seeks information that is, in part, irrelevant, overbroad, and places a burden or expense on Defendant that outweighs its likely benefit.

**INTERROGATORY NO. 21:** Do you contest that prior to promulgation of Treas. Reg. §1.752-6 and Treas. Reg. §1.752-7 and the changes to Treas. Reg. §1.752-1 in June 2003, it was well-settled law that "contingent obligations" were not treated as liabilities for purposes of Section 752 of the Code? If so, identify each document and state each fact you rely upon for this position. If not, identify each document and state each fact you rely upon for this position.

**ANSWER:** Defendant objects to the Interrogatory on the ground that it involves "inquiries into 'issues of pure law." *Kendrick v. Sullivan*, 125 F.R.D. 1,2 (D.C. 1989) citing Notes of Advisory Comm. On Rules, 1970 Amend. to Rule 33; *Steil v. Hunana Kansas City Inc.*, 197 F.R.D. 445, 447 (D. Kan. 2000); *Langer v. Presbyterian-University of Pennsylvania Medical Center*, 1988 W.L. 56972 (E.D. Penn. 1988). Court of Fed. Cl. Rule 33(c) requires that contention interrogatories be posed in a manner that inquire into the application of law to the facts at issue *See e g , Kendrick v Sullivan*, 125 F.R.D. at 3. Interrogatories that seek abstract opinions of the law or pure legal contentions fall outside the bounds of Rule 33(b) and are therefore impermissible. *See, e.g., Abbott v. United States*, 177 F.R.D. 93-94. This interrogatory seeks "pure legal conclusions which are related not to the facts, but to the law of the case." *Ransom v. United States*, 8 Cl.Ct. 646, 647-48 (1985); Notes of Advisory Comm. on Rules, 1970 Amend. to Rule 33. The United States further objects to the Interrogatory upon the ground of the governmental deliberative process privilege and upon the ground of relevancy. Notwithstanding and without waiving these objections, Defendant refers Plaintiff to its response to Interrogatory 7 of Plaintiff's Second Set of Interrogatories.

**INTERROGATORY NO. 22:** Further, do you contest that the definition of the term "liability"

in Treas. Reg. §1.752-6 includes "contingent obligations?" If so, identify each document and state each fact you rely upon for this position. If not, identify each document and state each fact you rely upon for this position.

**ANSWER:** Defendant objects to the Interrogatory on the ground that it involves "inquiries into 'issues of pure law." *Kendrick v. Sullivan*, 125 F.R.D. 1,2 (D.C. 1989) citing Notes of Advisory Comm. On Rules, 1970 Amend. to Rule 33; *Steil v. Hunana Kansas City, Inc.*, 197 F.R.D. 445, 447 (D. Kan. 2000); *Langer v. Presbyterian-University of Pennsylvania Medical Center*, 1988 W.L. 56972 (E.D. Penn. 1988). Court of Fed. Cl. Rule 33(c) requires that contention interrogatories be posed in a manner that inquire into the application of law to the facts at issue. *See e.g., Kendrick v. Sullivan*, 125 F.R.D. at 3. Interrogatories that seek abstract opinions of the law or pure legal contentions fall outside the bounds of Rule 33(b) and are therefore impermissible. *See, e.g., Abbott v. United States*, 177 F.R.D. 93-94. This interrogatory seeks "pure legal conclusions which are related not to the facts, but to the law of the case." *Ransom v United States*, 8 Cl.Ct. 646, 647-48 (1985); Notes of Advisory Comm. on Rules, 1970 Amend. to Rule 33. The United States further objects to the Interrogatory upon the ground of the governmental deliberative process privilege and upon the ground of relevancy. Notwithstanding and without waiving these objections, Defendant refers Plaintiff to its response to Interrogatory 7 of Plaintiff's Second Set of Interrogatories.

**INTERROGATORY NO. 23:** Do you contest that Treas. Reg. §1.752-6 purports to overrule the 1975 case of *Helmer v. Comm'r*, T.C. Memo 1975-160, which held that an option to purchase certain real property did not constitute a liability for purposes of Section 752? If so, identify each

document and state each fact you rely upon for this position. If not, identify each document and state each fact you rely upon for this position.

**ANSWER:** Defendant objects to the Interrogatory on the ground that it involves "inquiries into 'issues of pure law." *Kendrick v. Sullivan*, 125 F.R.D. 1,2 (D.C. 1989) citing Notes of Advisory Comm. On Rules, 1970 Amend. to Rule 33; *Steil v. Hunana Kansas City Inc.*, 197 F.R.D. 445, 447 (D. Kan. 2000); *Langer v. Presbyterian-University of Pennsylvania Medical Center*, 1988 W.L. 56972 (E.D. Penn. 1988). Court of Fed. Cl. Rule 33(c) requires that contention interrogatories be posed in a manner that inquire into the application of law to the facts at issue. *See e.g.*, *Kendrick v. Sullivan*, 125 F.R.D. at 3. Interrogatories that seek abstract opinions of the law or pure legal contentions fall outside the bounds of Rule 33(b) and are therefore impermissible. *See, e.g., Abbott v. United States*, 177 F.R.D. 93-94. This interrogatory seeks "pure legal conclusions which are related not to the facts, but to the law of the case." *Ransom v. United States*, 8 Cl.Ct. 646, 647-48 (1985); Notes of Advisory Comm. on Rules, 1970 Amend. to Rule 33. The United States further objects to the Interrogatory upon the ground of the governmental deliberative process privilege and upon the ground of relevancy. Notwithstanding and without waiving these objections, Defendant refers Plaintiff to its response to Interrogatory 1 of Plaintiff's First Set of Interrogatories and Interrogatory 7 of Plaintiff's Second Set of Interrogatories.

**INTERROGATORY NO. 24:** Do you contest that Section 309(c) of the Community Renewal Tax Relief Act of 2000, Pub. L. No. 106-554, 114 Stat. 2763 (2000) only authorized the Secretary of the Department of the Treasury to prescribe rules to provide "appropriate adjustments . . . to

prevent the acceleration or duplication of losses through the assumption of (or transfer of assets subject to) liabilities described in section 358(h)(3) . . . in transactions involving partnership"? If so, identify each documents and state each fact you rely upon for this position. If not, identify each document and state each fact you rely upon for this position.

**ANSWER:** Defendant objects to the Interrogatory on the ground that it involves "inquiries into 'issues of pure law." *Kendrick v. Sullivan*, 125 F.R.D. 1,2 (D.C. 1989) citing Notes of Advisory Comm. On Rules, 1970 Amend. to Rule 33; *Steil v. Hunana Kansas City, Inc.*, 197 F.R.D. 445, 447 (D. Kan. 2000); *Langer v. Presbyterian-University of Pennsylvania Medical Center*, 1988 W.L. 56972 (E.D. Penn. 1988). Court of Fed. Cl. Rule 33(c) requires that contention interrogatories be posed in a manner that inquire into the application of law to the facts at issue. *See e.g.*, *Kendrick v. Sullivan*, 125 F.R.D. at 3. Interrogatories that seek abstract opinions of the law or pure legal contentions fall outside the bounds of Rule 33(b) and are therefore impermissible. *See, e.g.*, *Abbott v. United States*, 177 F.R.D. 93-94. This interrogatory seeks "pure legal conclusions which are related not to the facts, but to the law of the case." *Ransom v. United States*, 8 Cl.Ct. 646, 647-48 (1985); Notes of Advisory Comm. on Rules, 1970 Amend. to Rule 33. The United States further objects to the Interrogatory upon the ground of the governmental deliberative process privilege and upon the ground of relevancy. Notwithstanding and without waiving these objections, Defendant refers Plaintiff to its responses to Interrogatories 1 and 2 of Plaintiff's First Set of Interrogatories.

**INTERROGATORY NO. 25:** Do you contest that, to be valid, Treas. Reg. § 1.752-6 must be limited to preventing the acceleration to duplication of losses? If so, identify each document and

state each fact you rely upon for this position. If not, identify each document and state each fact you rely upon for this position.

**ANSWER:** Defendant objects to the Interrogatory on the ground that it involves "inquiries into 'issues of pure law." *Kendrick v. Sullivan*, 125 F.R.D. 1,2 (D.C. 1989) citing Notes of Advisory Comm. On Rules, 1970 Amend. to Rule 33; *Steil v. Hunana Kansas City Inc.*, 197 F.R.D. 445, 447 (D. Kan. 2000); *Langer v. Presbyterian-University of Pennsylvania Medical Center*, 1988 W.L. 56972 (E.D. Penn. 1988). Court of Fed. Cl. Rule 33(c) requires that contention interrogatories be posed in a manner that inquire into the application of law to the facts at issue. *See e.g.*, *Kendrick v. Sullivan*, 125 F.R.D. at 3. Interrogatories that seek abstract opinions of the law or pure legal contentions fall outside the bounds of Rule 33(b) and are therefore impermissible. *See, e.g.*, *Abbott v. United States*, 177 F.R.D. 93-94. This interrogatory seeks "pure legal conclusions which are related not to the facts, but to the law of the case." *Ransom v. United States*, 8 Cl.Ct. 646, 647-48 (1985); Notes of Advisory Comm. on Rules, 1970 Amend. to Rule 33. The United States further objects to the Interrogatory upon the ground of the governmental deliberative process privilege and upon the ground of relevancy. Notwithstanding and without waiving these objections, Defendant refers Plaintiff to its responses to Interrogatories 1 and 2 of Plaintiff's First Set of Interrogatories.

**INTERROGATORY NO. 26:** Do you contest that, in drafting Treas. Reg. § 1.752-6, the Internal Revenue Service (the "Service") denied the exceptions of Section 358(h) to the transactions described in Notice 2000-44 in order to provide the Service with an additional basis for challenging the transactions described in Notice 2000-44? It so, identify each document and

state each fact and legal position that you rely upon for this position. If not, identify each document and state each fact and legal position you rely upon for this position.

**ANSWER:** Defendant objects to the Interrogatory on the ground that it involves "inquiries into 'issues of pure law." *Kendrick v. Sullivan*, 125 F.R.D. 1,2 (D.C. 1989) citing Notes of Advisory Comm. On Rules, 1970 Amend. to Rule 33; *Steil v. Hunana Kansas City, Inc.*, 197 F.R.D. 445, 447 (D. Kan. 2000); *Langer v. Presbyterian-University of Pennsylvania Medical Center*, 1988 W.L. 56972 (E.D. Penn. 1988). Court of Fed. Cl. Rule 33(c) requires that contention interrogatories be posed in a manner that inquire into the application of law to the facts at issue *See e.g.*, *Kendrick v. Sullivan*, 125 F.R.D. at 3. Interrogatories that seek abstract opinions of the law or pure legal contentions fall outside the bounds of Rule 33(b) and are therefore impermissible. *See, e.g.*, *Abbott v. United States*, 177 F.R.D. 93-94. This interrogatory seeks "pure legal conclusions which are related not to the facts, but to the law of the case." *Ransom v. United States*, 8 Cl.Ct. 646, 647-48 (1985); Notes of Advisory Comm. on Rules, 1970 Amend. to Rule 33. The United States further objects to the Interrogatory upon the ground of the governmental deliberative process privilege and upon the ground of relevancy. Notwithstanding and without waiving these objections, Defendant refers Plaintiff to its responses to Interrogatories 1 -3 of Plaintiff's First Set of Interrogatories.

**INTERROGATORY NO. 27:** The Preamble to Treas. Reg. § 1.752-7 provides: 'In the corporate context, section 358(h) prevents the duplication and acceleration of loss with respect to obligations not encompassed by section 358(d) by reducing the transferor shareholder's basis in corporate stock received in the exchange. Treasury and the IRS do not believe that this is the best

approach for partnership given their passthrough nature." Explain how Treas. Reg. § 1.752-6, which applies to partnerships a rule like the rule in Section 358(h), provides for the "appropriate adjustments" contemplated in Section 309(c) of the Community Renewal Tax Relief Act of 2000 when Preamble to Treas. Reg. § 1.752-7 indicates that this is not "the best approach."

**ANSWER:** Defendant objects to the Interrogatory on the ground that it involves "inquiries into 'issues of pure law." *Kendrick v Sullivan*, 125 F.R.D. 1,2 (D.C. 1989) citing Notes of Advisory Comm. On Rules, 1970 Amend. to Rule 33; *Steil v. Hunana Kansas City Inc.*, 197 F.R.D. 445, 447 (D. Kan. 2000); *Langer v. Presbyterian-University of Pennsylvania Medical Center*, 1988 W.L. 56972 (E.D. Penn. 1988). Court of Fed. Cl. Rule 33(c) requires that contention interrogatories be posed in a manner that inquire into the application of law to the facts at issue. *See e.g., Kendrick v. Sullivan*, 125 F.R.D. at 3. Interrogatories that seek abstract opinions of the law or pure legal contentions fall outside the bounds of Rule 33(b) and are therefore impermissible. *See, e.g., Abbott v. United States*, 177 F.R.D. 93-94. This interrogatory seeks "pure legal conclusions which are related not to the facts, but to the law of the case." *Ransom v. United States*, 8 Cl.Ct. 646, 647-48 (1985); Notes of Advisory Comm. on Rules, 1970 Amend. to Rule 33. The United States further objects to the Interrogatory upon the ground of the governmental deliberative process privilege and upon the ground of relevancy. Notwithstanding and without waiving these objections, Defendant refers Plaintiff to its responses to Interrogatories 1-3 of Plaintiff's First Set of Interrogatories.

**INTERROGATORY NO. 28:** Do you contest that Treas. Reg. § 1.752-6 does not apply to "liabilities described in section 358(h)(3)"? If so, state what your position is on this matter and

provide an explanation of the legal and factual basis for that position.

**ANSWER:** Defendant objects to the Interrogatory on the ground that it involves "inquiries into 'issues of pure law." *Kendrick v. Sullivan*, 125 F.R.D. 1,2 (D.C. 1989) citing Notes of Advisory Comm. On Rules, 1970 Amend. to Rule 33; *Steil v. Hunana Kansas City Inc*, 197 F.R.D. 445, 447 (D. Kan. 2000); *Langer v. Presbyterian-University of Pennsylvania Medical Center*, 1988 W.L. 56972 (E.D. Penn. 1988). Court of Fed. Cl. Rule 33(c) requires that contention interrogatories be posed in a manner that inquire into the application of law to the facts at issue. *See e.g.*, *Kendrick v. Sullivan*, 125 F.R.D. at 3. Interrogatories that seek abstract opinions of the law or pure legal contentions fall outside the bounds of Rule 33(b) and are therefore impermissible. *See, e g., Abbott v. United States*, 177 F.R.D. 93-94. This interrogatory seeks "pure legal conclusions which are related not to the facts, but to the law of the case." *Ransom v. United States*, 8 Cl.Ct. 646, 647-48 (1985); Notes of Advisory Comm. on Rules, 1970 Amend. to Rule 33. The United States further objects to the Interrogatory upon the ground of the governmental deliberative process privilege and upon the ground of relevancy. Notwithstanding and without waiving these objections, Defendant refers Plaintiff to its responses to Interrogatories 1 -3 of Plaintiff's First Set of Interrogatories.

**INTERROGATORY NO. 29:** Do you contest that Treas. Reg. § 1.752-6 was issued for the purpose of providing the Service with an additional basis for challenging the transactions described in IRS Notice 2000-44? If so, state what your position is on this matter and provide an explanation of the legal and factual basis for that position.

**ANSWER:** Defendant objects to the Interrogatory on the ground that it involves "inquiries into 'issues of pure law." *Kendrick v. Sullivan*, 125 F.R.D. 1,2 (D.C. 1989) citing Notes of Advisory Comm. On Rules, 1970 Amend. to Rule 33; *Steil v. Hunana Kansas City. Inc.*, 197 F.R.D. 445, 447 (D. Kan. 2000); *Langer v. Presbyterian-University of Pennsylvania Medical Center*, 1988 W.L. 56972 (E.D. Penn. 1988). Court of Fed. Cl. Rule 33(c) requires that contention interrogatories be posed in a manner that inquire into the application of law to the facts at issue. *See e.g.*, *Kendrick v. Sullivan*, 125 F.R.D. at 3. Interrogatories that seek abstract opinions of the law or pure legal contentions fall outside the bounds of Rule 33(b) and are therefore impermissible. *See, e.g., Abbott v. United States*, 177 F.R.D. 93-94. This interrogatory seeks "pure legal conclusions which are related not to the facts, but to the law of the case." *Ransom v. United States*, 8 Cl.Ct. 646, 647-48 (1985); Notes of Advisory Comm. on Rules, 1970 Amend. to Rule 33. The United States further objects to the Interrogatory upon the ground of the governmental deliberative process privilege and upon the ground of relevancy. Notwithstanding and without waiving these objections, Defendant refers Plaintiff to its responses to Interrogatories 1-3 of Plaintiff's First Set of Interrogatories.

**INTERROGATORY NO. 30:** Explain why the Service issued Treas. Reg. § 1.752-6 to apply retroactively and Teas. Reg. § 1.752-7 to apply prospectively to address the same issues? Explain why Treas Reg. § 1.752-7 was not made effective on a retroactive basis, rather than issuing Treas Reg. § 1.752-6.

**ANSWER:** Defendant objects to the Interrogatory on the ground that it involves "inquiries

into 'issues of pure law." *Kendrick v. Sullivan*, 125 F.R.D. 1,2 (D.C. 1989) citing Notes of Advisory Comm. On Rules, 1970 Amend. to Rule 33; *Steil v. Hunana Kansas City, Inc.*, 197 F.R.D. 445, 447 (D. Kan. 2000); *Langer v. Presbyterian-University of Pennsylvania Medical Center,* 1988 W.L. 56972 (E.D. Penn. 1988). Court of Fed. Cl. Rule 33(c) requires that contention interrogatories be posed in a manner that inquire into the application of law to the facts at issue. *See e.g., Kendrick v. Sullivan*, 125 F.R.D. at 3. Interrogatories that seek abstract opinions of the law or pure legal contentions fall outside the bounds of Rule 33(b) and are therefore impermissible. *See, e.g., Abbott v. United States*, 177 F.R.D. 93-94. This interrogatory seeks "pure legal conclusions which are related not to the facts, but to the law of the case." *Ransom v. United States*, 8 Cl.Ct. 646, 647-48 (1985); Notes of Advisory Comm. on Rules, 1970 Amend. to Rule 33. The United States further objects to the Interrogatory upon the ground of the governmental deliberative process privilege and upon the ground of relevancy. Notwithstanding and without waiving these objections, Defendant refers Plaintiff to its responses to Interrogatories 1 -3 of Plaintiff's First Set of Interrogatories.

**INTERROGATORY NO. 31:** Explain why the government waited approximately two and one-half years after the enactment of the Community Renewal Tax Relief Act of 2000 to first issue what is now Treas. Reg. § 1.752-6 as a temporary regulation.

**ANSWER:** Defendant objects to the Interrogatory on the ground that it involves "inquiries into 'issues of pure law." *Kendrick v. Sullivan*, 125 F.R.D. 1,2 (D.C. 1989) citing Notes of Advisory Comm. On Rules, 1970 Amend. to Rule 33; *Steil v. Hunana Kansas City, Inc.*, 197

F.R.D. 445, 447 (D. Kan. 2000); *Langer v. Presbyterian-University of Pennsylvania Medical Center*, 1988 W.L. 56972 (E.D. Penn. 1988). Court of Fed. Cl. Rule 33(c) requires that contention interrogatories be posed in a manner that inquire into the application of law to the facts at issue. *See e.g.*, *Kendrick v. Sullivan*, 125 F.R.D. at 3. Interrogatories that seek abstract opinions of the law or pure legal contentions fall outside the bounds of Rule 33(b) and are therefore impermissible. *See, e.g.*, *Abbott v. United States*, 177 F.R.D. 93-94. This interrogatory seeks "pure legal conclusions which are related not to the facts, but to the law of the case." *Ransom v. United States*, 8 Cl.Ct. 646, 647-48 (1985); Notes of Advisory Comm. on Rules, 1970 Amend. to Rule 33. The United States further objects to the Interrogatory upon the ground of the governmental deliberative process privilege and upon the ground of relevancy. Notwithstanding and without waiving these objections, Defendant refers Plaintiff to its responses to Interrogatories 1-3 of Plaintiff's First Set of Interrogatories.

**INTERROGATORY NO. 33:** State your position as to whether the reliance by the Individual Participants on the legal opinions issued by Jenkens & Gilchrist and Brown & Wood represents "reasonable cause" for purposes of Section 6664 of the Internal Revenue Code. Provide a detailed explanation of the legal and factual basis for your position.

**ANSWER:** Defendant objects to the Interrogatory on the ground that it is vague and ambiguous. The meaning of the term "Individual Participants" is not clear. If the reference is to the Individual Participants in the instant litigation ( Zucker and Boyd) , the defendant further objects on the ground of relevancy. As of now, no penalties have been asserted in the FPAA that is the subject of this litigation. If the reference is to the Individual Participants in other COBRA litigation in which penalties were asserted in the FPAAs which are the subject of that litigation, the defendant

also objects on the ground of relevancy.

**INTERROGATORY NO. 34:** Do you contest that Jenkens & Gilchrist and Brown & Wood were qualified to issue the opinions to the Individual Participants? If so, state what your position is on this matter and provide and explanation of the legal factual basis for that position.

**ANSWER:** Defendant objects to the Interrogatory on the ground that it is vague and ambiguous The meaning of the term "Individual Participants" is not clear. If the reference is to the Individual Participants in the instant litigation ( Zucker and Boyd) , the defendant further objects on the ground of relevancy. As of now, no penalties have been asserted in the FPAA that is the subject of this litigation. If the reference is to the Individual Participants in other COBRA litigation in which penalties were asserted in the FPAAs which are the subject of that litigation, the defendant also objects on the ground of relevancy.

**INTERROGATORY NO. 35:** Do you contend that Jenkens & Gilchrist and Brown & Wood had conflicts of interest in rendering the tax opinions to the Individual Participants? If so, state what your position is on this matter and provide an explanation of the legal and factual basis for that position.

**ANSWER:** Defendant objects to the Interrogatory on the ground that it is vague and ambiguous The meaning of the term "Individual Participants" is not clear. If the reference is to the Individual Participants in the instant litigation ( Zucker and Boyd) , the defendant further objects on the ground of relevancy. As of now, no penalties have been asserted in the FPAA that is the subject of this litigation. If the reference is to the Individual Participants in other COBRA litigation in

which penalties were asserted in the FPAAs which are the subject of that litigation the defendant also objects on the ground of relevancy.

I, Dennis M. Donohue, pursuant to the provisions of 28 U.S.C. Section 1746 declare under penalty of perjury that the foregoing responses to the plaintiff's interrogatories are true and correct to the best of my knowledge, information, and belief.

Dated this October 24, 2006, in Washington, D.C.

Respectfully submitted,

Dennis M. Donohue DMD

DENNIS M. DONOHUE
SENIOR LITIGATION COUNSEL
OFFICE OF CIVIL LITIGATION
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 403
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-5892
E-mail: dennis.donohue@usdoj.gov

EILEEN J. O'CONNOR
Assistant Attorney General
DAVID GUSTAFSON

## CERTIFICATE OF SERVICE

I hereby certify that on October 24, 2006, a copy of the foregoing UNITED STATES' ANSWERS TO PLAINTIFF'S THIRD SET OF INTERROGATORIES was mailed by First Class U.S. mail postage paid, and properly addressed to the following:

Joel N. Crouch
Texas State Bar No. 05144220
Meadows, Owens, Collier, Reed
Cousins & Blau, L.L.P.
901 Main Street, Suite 3700
Dallas, Texas 75202

DAVID M. STEINER
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 55
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-5892
Facsimile: (202) 514-5238
E-mail: David.M.Steiner2@usdoj.gov

---

**Treasury Decisions**

# TD 9062, Treatment of certain liabilities—assumption of §358(h)(3) liability., Code Sec. 752 , 06/23/2003

## HEADNOTE:

Temporary regs were issued concerning partnership's assumption of partner's Code Sec. 358(h)(3) liability in transactions that occurred after 10/18/1999 and before 6/24/2003. Regs were issued under congressional directive in Community Renewal Tax Relief Act of 2000 (P.L. 106-554; 12/21/2000) to prevent acceleration and duplication of loss through assumption in nonrecognition transaction. Text of regs also serves as text of proposed regs.

*Reference(s):* Code Sec(s). Code Sec. 752

## FULL TEXT:

### RIN 1545-BB83

Assumption of Partner Liabilities

**AGENCY:** Internal Revenue Service (IRS), Treasury.

**ACTION:** Temporary regulations.

**SUMMARY:** This document contains temporary regulations regarding a partnership's assumption of a partner's liabilities in a transaction occurring after October 18, 1999, and before June 24, 2003. These temporary regulations affect partners and partnerships and clarify the tax treatment of an assumption by a partnership of a partner's liability. The text of these temporary regulations also serves as the text of the proposed regulations set forth in a notice of proposed rulemaking on this subject in the Proposed Rules section of this issue of the Federal Register.

DATES: Effective Date: These regulations are effective June 24, 2003.

Applicability Date: For date of applicability, see 1.752-6T(d).

**FOR FURTHER INFORMATION CONTACT:** Horace Howells (202) 622-3050 (not a toll-free number).

## Supplementary Information:

*Background*

EXHIBIT
tabbies
10

With certain exceptions, no gain or loss is recognized if property is transferred to a corporation solely in exchange for stock of the corporation, and, immediately after the exchange, the transferors control the corporation. If, however, the transferee corporation assumes a liability of the transferor, then, under section 358(d), the transferor's basis in the stock received in the exchange is reduced by the amount of that liability. If the amount of the liability exceeds the transferor's basis in the property transferred to the corporation, then the transferor recognizes gain under section 357(c)(1). Under section 357(c)(3), a liability the payment of which would give rise to a deduction or that would be described in section 736(a) (regarding payments to a retiring partner) is not taken into account in applying section 357(c)(1), unless the incurrence of the liability resulted in the creation of, or an increase in, the basis of any property.

Under section 752(a) and (b), similar rules apply where a partnership assumes a liability from a partner or a partner contributes property to a partnership subject to a liability. The difference between the amount of the liability and the partner's share of that liability after the partnership's assumption is treated as a distribution of money, which reduces the partner's basis in the partnership interest and may cause the partner to recognize gain. There is no statutory or regulatory definition of liabilities for purposes of section 752. Case law and revenue rulings, however, have established that, as under section 357(c)(3), the term liabilities for this purpose does not include liabilities the payment of which would give rise to a deduction, unless the incurrence of the liability resulted in the creation of, or an increase in, the basis of property. Rev. Rul. 88-77 (1988-2 C.B. 128); Salina Partnership LP, FPL Group, Inc. v. Commissioner, T.C Memo 2000-352.

On December 21, 2000, as part of the Community Renewal Tax Relief Act of 2000 (Appendix G of H R. 4577, Consolidated Appropriations Act, 2001) Public Law 106-554, 114 Stat. 2763, 2763A-638 (2001) (the Act), Congress enacted section 358(h) to address certain situations where property was transferred to a corporation in exchange for both stock and the corporation's assumption of certain obligations of the transferor. In these situations, transferors took the position that the obligations were not liabilities within the meaning of section 357(c) or that they were described in section 357(c)(3), and, therefore, the obligations did not reduce the basis of the transferor's stock. These assumed obligations, however, did reduce the value of the stock. The transferors then sold the stock and claimed a loss. In this way, taxpayers attempted to duplicate a loss in corporate stock and to accelerate deductions that typically are allowed only on the economic performance of these types of obligations.

Section 358(h) addresses these transactions by requiring that, after application of section 358(d), the basis in stock received in an exchange to which section 351, 354, 355, 356, or 361 applies be reduced (but not below the fair market value of the stock) by the amount of any liability assumed in the exchange Exceptions to section 358(h) are provided where: (1) the trade or business with which the liability is associated is transferred to the person assuming the liability as part of the exchange; or (2) substantially all of the assets with which the liability is associated are transferred to the person assuming the liability as part of the exchange. The term liability for purposes of section 358(h) includes any fixed or contingent obligation to make payment without regard to whether the obligation is otherwise taken into account for purposes of the Internal Revenue Code (Code).

Congress recognized that taxpayers were attempting to use partnerships to carry out the same types of abuses that section 358(h) was designed to deter. Therefore, in section 309(c) and (d)(2) of the Act, Congress directed the Secretary to prescribe rules to provide "appropriate adjustments under subchapter K of chapter 1 of the Code to prevent the acceleration or duplication of losses through the assumption of (or transfer of assets subject to) liabilities described in section 358(h)(3) .. in transactions involving partnerships." This statutory provision does not specify whether the exceptions in section 358(h)(2) should apply. The only cross-reference to section 358(h) in this statutory provision is to section 358(h)(3), which defines the term liability. Under the statute, these rules are to "apply to assumptions of liability after October 18, 1999, or such later date as may be prescribed in such rules"

In response to this directive, these temporary regulations provide rules to prevent the duplication and acceleration of loss through the assumption by a partnership of a liability of a partner in a nonrecognition transaction. Section 1.752-6T adopts the approach of section 358(h), with some modifications, for transactions involving partnership assumptions of partners' liabilities occurring after

October 18, 1999, and before June 24, 2003. The modifications made to the approach of section 358 (h) were to provide rules to conform the application of section 358(h) to partnerships and, as discussed below, to prevent abuse.

Prior to the enactment of Code section 358(h) and section 309(c) and (d)(2) of the Act, the lack of specific rules addressing the treatment of liabilities upon the transfer of property to a corporation or a partnership led to interpretations of then existing law that failed to reflect the true economics of certain transactions. In some cases, taxpayers continued to assert these interpretations even after the enactment of these statutory provisions. For example, in a transaction addressed in Notice 2000-44 (2000-2 C.B. 255), a taxpayer purchases and writes economically offsetting options and then purports to create substantial positive basis by transferring those option positions to a partnership. On the disposition of the partnership interest, the liquidation of the partner's interest in the partnership, or the taxpayer's sale or depreciation of distributed partnership assets, the taxpayer claims a tax loss, even though the taxpayer has incurred no corresponding economic loss.

Treasury and the IRS believe that it is appropriate to prohibit partners and partnerships engaging in transactions described in, or transactions that are substantially similar to the transactions described in, Notice 2000-44 from relying on the exception in section 358(h)(2)(B). The exceptions to section 358(h) were intended to exclude from the application of section 358(h) ordinary business transactions. They were not intended to allow taxpayers to engage in transactions that create noneconomic tax losses.

The text of the temporary regulations also serves as the text of the proposed regulations set forth in the notice of proposed rulemaking on this subject in the Proposed Rules section of this issue of the Federal Register (_1.752-6 of the proposed Income Tax Regulations). As part of that notice of proposed rulemaking, §1.752-7 of the proposed Income Tax Regulations is being issued to carry out the directive of section 309(c) of the Act with respect to assumptions of liabilities occurring on or after June 24, 2003. The proposed regulations conform the application of section 358(h) to partnerships by providing a basis reduction upon an event that separates the partner from the liability rather than on assumption of the liability by the partnership and by adopting certain exceptions. Section 1.752-7(j) of the proposed Income Tax Regulations allows a partnership to elect to apply _1.752-7 of the proposed Income Tax Regulations and related proposed provisions to assumptions of liabilities occurring after October 18, 1999, and before June 24, 2003, in lieu of applying _1.752-6T of the temporary Income Tax Regulations to this period.

## Explanation of Provisions

Under these temporary regulations, if a partnership assumes a liability of a partner (other than a liability to which section 752(a) and (b) apply) in a transaction described in section 721(a), then, after application of section 752(a) and (b), the partner's basis in the partnership is reduced (but not below the adjusted value of such interest) by the amount (determined as of the date of the exchange) of the liability. For this purpose, the term liability includes any fixed or contingent obligation to make payment, without regard to whether the obligation is otherwise taken into account for federal tax purposes. The adjusted value of a partner's interest in a partnership is the fair market value of that interest increased by the partner's share of partnership liabilities under 1.752-1 through 1.752-5.

The exceptions under section 358(h) applicable to corporate assumptions of shareholder liabilities generally apply for purposes of these temporary regulations. Therefore, a reduction in a partner's basis generally is not required, under these regulations, after an assumption of a liability by a partnership from that partner if: (1) the trade or business with which the liability is associated is transferred to the partnership assuming the liability as part of the transaction, or (2) substantially all of the assets with which the liability is associated are contributed to the partnership assuming the liability.

However, in the case of a partnership transaction described in, or a partnership transaction that is substantially similar to the transactions described in, Notice 2000-44, the exception for contributions of "substantially all of the assets with which the liability is associated" does not apply.

## Effective Date

In accordance with the directive in section 309(c) and (d)(2) of the Act, these temporary regulations apply to assumptions of liabilities occurring after October 18, 1999, and before June 24, 2003. Under section 7805(b)(6), the Secretary may provide that any regulation may take effect in accordance with a legislative grant from Congress authorizing the Secretary to prescribe the effective date for such regulation. In addition, under section 7805(b)(3), the Secretary may provide that any regulation may take effect or apply retroactively to prevent abuse. The Secretary has determined that a later effective date is inappropriate. Therefore, these regulations are being applied retroactively in accordance with the directive from Congress in section 309(d)(2) of the Act and to prevent abuse.

## Special Analyses

These temporary regulations are necessary to prevent abusive transactions of the type described in the Notice 2000-44. Accordingly, good cause is found for dispensing with notice and public procedure pursuant to 5 U.S.C. 553(b)(B) and for dispensing with a delayed effective date pursuant to 5 U.S.C. 553(d)(1) and (3).

It has been determined that this Treasury decision is not a significant regulatory action as defined in Executive Order 12866. Therefore, a regulatory assessment is not required For the applicability of the Regulatory Flexibility Act (5 U.S.C chapter 6), refer to the Special Analyses section of the preamble to the notice of proposed rulemaking on this subject published in the Proposed Rules section of this issue of the Federal Register Pursuant to section 7805(f) of the Code, these temporary regulations will be submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on their impact on small business.

## Drafting Information

The principal author of these temporary regulations is Horace Howells, Office of the Associate Chief Counsel (Passthroughs and Special Industries), IRS. However, other personnel from the IRS and Treasury Department participated in their development

## List of Subjects in 26 CFR Part 1

Income taxes, Reporting and recordkeeping requirements.

## Adoption of Amendments to the Regulations

Accordingly, 26 CFR part 1 is amended as follows:

## Part 1—Income Taxes

Paragraph 1. The authority citation for part 1 continues to read in part as follows:

Authority: 26 U.S.C. 7805

## Section 1.752-6T also issued under Public Law 106-554, 114 Stat. 2763, 2763A-638 (2001) * * *

Par. 2. Section 1.752-6T is added to read as follows:

1.752-6T Partnership assumption of partner's section 358(h)(3) liability after October 18, 1999, and before June 24, 2003.

((a)) In general. If, in a transaction described in section 721(a), a partnership assumes a liability (defined in section 358(h)(3)) of a partner (other than a liability to which section 752(a) and (b) apply), then, after application of section 752(a) and (b), the partner's basis in the partnership is reduced (but not below the adjusted value of such interest) by the amount (determined as of the date of the exchange) of the liability For purposes of this section, the adjusted value of a partner's interest in a partnership is the fair market value of that interest increased by the partner's share of partnership liabilities under __1.752-1 through 1.752-5

((b)) Exceptions—

((1)) In general. Except as provided in paragraph (b)(2) of this section, the exceptions contained in section 358(h)(2)(A) and (B) apply to this section.

((2)) Transactions described in Notice 2000-44. The exception contained in section 358(h)(2)(B) does not apply to an assumption of a liability (defined in section 358(h)(3)) by a partnership as part of a transaction described in, or a transaction that is substantially similar to the transactions described in, Notice 2000-44 (2000-2 C.B. 255). See §601.601(d)(2) of this chapter.

((c)) Example. The following example illustrates the principles of paragraph (a) of this section:

Example. In 1999, A and B form partnership PRS. A contributes property with a value and basis of $200, subject to a nonrecourse debt obligation of $50 and a fixed or contingent obligation of $100 that is not a liability to which section 752(a) and (b) applies, in exchange for a 50% interest in PRS. Assume that, after the contribution, A's share of partnership liabilities under __1.752-1 through 1.752-5 is $25. Also assume that the $100 liability is not associated with a trade or business contributed by A to PRS or with assets contributed by A to PRS After the contribution, A's basis in PRS is $175 (A's basis in the contributed land ($200) reduced by the nonrecourse debt assumed by PRS ($50), increased by A's share of partnership liabilities under __1 752-1 through 1.752-5 ($25)). Because A's basis in the PRS interest is greater than the adjusted value of A's interest, $75 (the fair market value of A's interest ($50) increased by A's share of partnership liabilities ($25)), paragraph (a) of this section operates to reduce A's basis in the PRS interest (but not below the adjusted value of that interest) by the amount of liabilities described in section 358(h)(3) (other than liabilities to which section 752(a) and (b) apply) assumed by PRS. Therefore, A's basis in PRS is reduced to $75.

((d)) Effective dates—

((1)) In general. This section applies to assumptions of liabilities occurring after October 18, 1999, and before June 24, 2003.

((2)) Election to apply §1.752-7. The partnership may elect, under the provisions of REG-106736-00 (2003-28 IRB) (see §601.601(d)(2) of this chapter) to apply those provisions and related proposed Income Tax Regulations to all assumptions of liabilities by the partnership occurring after October 18, 1999, and before June 24, 2003. The provisions of REG-106736-00 (2003-28 IRB) (see §601.601(d)(2) of this chapter) describes the manner in which the election is made.

David A. Mader

Assistant Deputy Commissioner of Internal Revenue.

Approved: 5/07/03

Gregory Jenner

Deputy Assistant Secretary of the Treasury.

END OF DOCUMENT -

© 2007 Thomson/RIA All rights reserved

Department of the Treasury
Internal Revenue Service
Office of Chief Counsel

# Notice

CC-2003-020

June 25, 2003

Notice 2000-44
Subject:: Son of Boss Tax Shelter

Cancellation Date: Upon Incorporation Into CCDM

## Purpose

The purpose of this Notice is to assist Chief Counsel attorneys in advising field personnel in the development of cases involving the type of transaction described in the second fact pattern of Notice 2000-44, 2000-2 C.B. 255, and substantially similar transactions (referred to herein as Son of Boss transactions).

## Summary

The Son of Boss transaction involves the contribution of a purchased option to a partnership and the assumption by the partnership of a separate written option which the taxpayer incurred. A taxpayer engaged in a Son of Boss transaction claims that the basis in the taxpayer's partnership interest is increased by the cost of the purchased call option but is not reduced under Internal Revenue Code § 752 for the assumption of the obligation under the written call option. Subsequently, taxpayer claims a loss on the disposition of the partnership interest even though taxpayer has incurred no corresponding economic loss. It is the position of Counsel that:

(1) For written options assumed by partnerships after October 18, 1999, but before June 24, 2003, the Service will apply § 1.752-6T of the Income Tax Regulations to reduce the

Filing Instructions: Binders______ Master Sets: NO X RO___
NO: Circulate___ Distribute X to: All Personnel___ Attorneys X In: all divisions
RO: Circulate___ Distribute X to: All Personnel___ Attorneys X In: all divisions
Other National FOIA Reading Room
Electronic Filename: son of boss .pdf Original signed copy in: CC:FM:PM:P

EXHIBIT 11

outside basis in the partnership of the taxpayer from whom the written call option was assumed.[1]

In a Son of Boss transaction that involves the assumption of a short sale obligation by a partnership, the Service will continue to follow Rev. Rul. 95-26, 1995-1 C.B. 131. Revenue Ruling 95-26 provides that a short sale of securities creates an obligation on the part of the partnership to deliver identical securities to close out the short sale and concludes that the short sale described in the ruling creates a partnership liability under § 752. Further, for Son of Boss transactions in which the short sale obligation was assumed by a partnership after October 18, 1999, but before June 24, 2003, the Service will apply § 1.752-6T to reduce the outside basis in the partnership of the taxpayer from whom the short sale was assumed.

(2) The Service may apply § 1.701-2 to a partnership formed or availed of in connection with a Son of Boss transaction as the principal purpose of the transaction is to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K. The Service may determine, based on the facts and circumstances, that to achieve results that are consistent with the intent of subchapter K the purported partnership should be disregarded in whole or in part, one or more of the purported partners of the partnership should not be treated as a partner, the methods of accounting used by the partnership or a partner should be adjusted to reflect clearly the partnership's or the partner's income, the partnership's items of income, gain, loss, deduction, or credit should be reallocated, or the claimed tax treatment should otherwise be adjusted or modified. In the case of a partnership formed in connection with a Son of Boss transaction, disregarding the partnership is also consistent with existing case law. ASA Investerings P'ship v. Commissioner, 201 F.3d 505 (D.C. Cir. 2000).

(3) For an individual partner, the loss that a partner claims resulting from the artificial inflation of the partner's outside basis in a partnership used in a Son of Boss transaction may be disallowed under § 165(c)(2) because the partner lacked the requisite economic profit objective.

(4) Under § 465(b)(4), taxpayers are not considered at risk for amounts invested in the economically offsetting option positions contributed to and assumed by a partnerships formed or availed of in connection with a Son of Boss transaction as such amounts are protected against loss.

Background

---

[1] The Temporary regulations are effective for this period. § 1.752-6T(d). Proposed regulations also have been issued that apply to assumptions of liabilities by partnerships on or after June 24, 2003. As described in the preamble to § 1.752-1 of the proposed regulations, the definition of liability contained in the proposed regulations does not follow Helmer v. Commissioner, T.C. Memo 1975-160.

On September 5, 2000, the Service issued Notice 2000-44, 2000-2 C.B. 255, listing the Son of Boss transaction as an abusive tax shelter. In the second fact pattern in Notice 2000-44, a taxpayer purchases call options for a cost of $1,000X and simultaneously writes call options which virtually economically offset the purchased call options in exchange for a premium of slightly less than $1,000X. The written call options have a slightly higher strike price but the same expiration date as the purchased options. The purchased and written option positions are then transferred to a partnership that, using additional amounts contributed to the partnership, engages in investment activities.

Under the position advanced by the promoters of this arrangement, the taxpayer claims that the basis in the taxpayer's partnership interest is increased by the cost of the purchased call options but is not reduced under § 752(b) as a result of the partnership's assumption of the taxpayer's obligation with respect to the written call options. Therefore, disregarding additional amounts contributed to the partnership, transaction costs, and any income realized and expenses incurred at the partnership level, the taxpayer purports to have a basis in the partnership interest equal to the cost of the purchased call options ($1,000X in these facts), even though the taxpayer's net economic outlay to acquire the partnership interest and the value of the partnership interest is nominal or zero. On the disposition of the taxpayer's partnership interest, the taxpayer claims a tax loss ($1,000X in these facts), even though neither the taxpayer nor the partnership has incurred a corresponding economic loss. In a variation of this transaction, the partnership distributes an asset to a partner in complete liquidation of his interest in the partnership. Under § 732(b) the distributed asset picks up the artificially increased outside basis. On the subsequent sale of the distributed asset, the partner claims a loss.[2]

Discussion

1. Section 752 applies to the Son of Boss transaction to reduce the partner's basis in the partnership.

A. For Son of Boss transactions involving the contribution of offsetting option positions after October 18, 1999, but before June 24, 2003, the Service will apply § 1.752-6T to reduce the outside basis in the partnership of the taxpayer who contributed the options.

---

[2] The facts presented in this memo describe the loss generation type Son of Boss transaction. Some Son of Boss transactions are structured as gain elimination transactions rather than as loss generation transactions. In a gain elimination transaction, the partner contributes an asset with significant built in gain to the partnership and, following the closing of the option positions, the partnership distributes the asset to the partner in a liquidating transaction. Under § 732(b), the contributed asset picks up the artificially increased outside basis. The effect of this is that the gain in the contributed asset is eliminated. In gain elimination Son of Boss transactions, the Service will assert the same arguments as will be presented in the loss generation Son of Boss transaction except that the § 165 and § 465 arguments can not be asserted in those transactions in which no loss is generated.

Section 1.752-6T(a) provides that if, in a transaction described in § 721(a), a partnership assumes a liability (defined in § 358(h)(3)) of a partner (other than a liability to which § 752(a) and (b) apply), then, after application of § 752(a) and (b), the partner's basis in the partnership is reduced (but not below the adjusted value of such interest) by the amount (determined as of the date of the exchange) of the liability For purposes of § 1.752-6T, the adjusted value of a partner's interest in a partnership is the fair market value of that interest increased by the partner's share of partnership liabilities under § 1.752-1 through § 1.752-5. Section 358(h)(3) defines liability to include any fixed or contingent obligation to make a payment, without regard to whether the obligation is otherwise taken into account for federal tax purposes. Under § 1.752-6T, the reduction in a partner's basis is not required after an assumption of a liability to which § 752(a) and (b) do not apply, if the trade or business with which the liability is associated is transferred to the partnership assuming the liability as part of the transaction However, the Son of Boss transaction described above does not involve the transfer of a trade or business and therefore, does not meet the exception.

In addition, § 1.752-6T(b)(1) includes another exception contained in § 358(h)(2)(B), which provides that the reduction in basis is not required after an assumption of a liability (described in § 358(h)(3)) if substantially all of the assets with which the liability is associated are transferred to the person assuming the liability as part of the exchange. This exception does not apply to Son of Boss transactions. § 1 752-6T(b)(2)

In a Son of Boss transaction involving the purchase and sale of economically offsetting option positions, each contribution of a written call option to the partnership after October 18, 1999, but before June 24, 2003, is an assumption of liability that reduces the basis in the partnership of the partner who contributed the liability, to the extent of the amount of the liability but not below the adjusted value of the partner's interest. § 1.752-6T(a).

B. <u>For Son of Boss transactions involving the contribution of a short sale to a partnership, § 752 and the regulations thereunder apply to adjust the partner's basis in a manner that eliminates the artificial loss.</u>

In Son of Boss transactions involving short sales, § 752 applies to treat the short sale obligation as a § 752 liability. Revenue Ruling 95-26, 1995-1 C.B. 131, provides that a short sale of securities creates an obligation on the part of the partnership to deliver identical securities to close out the short sale and concludes that the short sale described in the ruling creates a partnership liability under § 752. In <u>Salina Partnership v. Commissioner</u>, T.C. Memo 2000-352, the Tax Court held that the partnership's obligation to close its short sale by replacing the Treasury bills that it borrowed represented a partnership liability within the meaning of § 752. The effect of treating the short sale obligation as a § 752 liability will be that on the satisfaction of the obligation, the partners will be deemed to have received a distribution equal to the amount received for selling short. The deemed distribution will cause a reduction in the partner's basis in the partnership under § 705(a)(2). This reduction in basis will eliminate the artificial loss

Alternatively, under § 1 752-6T, in a Son of Boss transaction involving the contribution of a partner's short sale obligation by the partnership, each short sale obligation contributed after October 18, 1999, but before June 24, 2003, is a liability that reduces the basis in the partnership of the partner who contributed the liability, to the extent of the amount of the liability but not below the adjusted value of the partner's interest. § 1.752-6T(a). As discussed above, the exception to the application of § 1 752-6T that applies in the event of the transfer of a trade or business to a partnership that assumes a liability associated with the trade or business as part of the transaction does not apply to the facts presented. Similarly, the substantially all the assets exception in § 358(h)(2)(B) does not apply to the contribution of a short sale obligation to the partnership in a Son of Boss transaction.

2. The Service may recast a Son of Boss transaction involving a partnership formed or availed of in connection with such transaction to achieve results that are consistent with the intent of subchapter K.

Section 1.701-2(a), the partnership anti-abuse rule, provides in pertinent part that subchapter K is intended to permit taxpayers to conduct joint business (including investment) activities through a flexible economic arrangement without incurring an entity-level tax. Implicit in the intent of subchapter K are the following requirements:

> (1) the partnership must be bona fide and each partnership transaction or series of related transactions (individually or collectively, the transaction) must be entered into for a substantial business purpose;
>
> (2) the form of each partnership transaction must be respected under substance over form principles; and
>
> (3) except as otherwise provided, the tax consequences under subchapter K to each partner of the partnership operations and of transactions between the partnership and the partner must accurately reflect the partners' economic agreement and clearly reflect the partner's income.

Section 1.701-2(b) provides that the provisions of subchapter K and the regulations thereunder must be applied in a manner that is consistent with the intent of subchapter K as set forth in § 1 701-2(a). Accordingly, if a partnership is formed or availed of in connection with a transaction a principal purpose of which is to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K, the Service can recast the transaction for federal tax purposes, as appropriate to achieve tax results that are consistent with the intent of subchapter K in light of the applicable statutory and regulatory provisions and the pertinent facts and circumstances. Thus, even though the transaction may fall within the literal words of a particular statutory or regulatory provision, the Service can determine, based on the particular facts and circumstances, that to achieve tax results that are consistent with the intent of subchapter K:

(1) the purported partnership should be disregarded in whole or in part, and the partnership's assets and activities should be considered, in whole or in part, to be owned and conducted, respectively, by one or more of its purported partners; (2) one or more of the purported partners of the partnership should not be treated as a partner; (3) the methods of accounting used by the partnership or a partner should be adjusted to reflect clearly the partnership's or the partner's income; (4) the partnership's items of income, gain, loss, deduction or credit should be reallocated; or (5) the claimed tax treatment should otherwise be adjusted or modified.

Section 1.701-2(c) provides that whether a partnership was formed or availed of with a principal purpose to reduce substantially the present value of the partners' aggregate federal tax liability in a manner inconsistent with the intent of subchapter K is determined based on all of the facts and circumstances, including a comparison of the purported business purpose for a transaction and the claimed tax benefits resulting from the transaction. Section 1.701-2(c) lists factors that may be considered in making the determination but those factors do not create a presumption that a partnership was or was not used in a manner inconsistent with subchapter K.

One of the factors on the list indicative of a principal purpose to reduce substantially the present value of the partners' aggregate federal tax liability in a manner inconsistent with the intent of subchapter K is that the present value of the partners' aggregate federal tax liability is substantially less than had the partners owned the partnership assets and conducted the partnership's activities directly. The loss generated (or the gain eliminated) in a Son of Boss transaction is achieved through the inflated outside basis in the partnership This inflated basis is not supported by the underlying economics of the transaction. Thus, if the investors in a Son of Boss transaction held the options and engaged in the minor investment activities outside the partnership, the tax loss would not have been generated. This is true whether the partnership was formed to engage in a Son of Boss transaction or an existing partnership was used to engage in the Son of Boss transaction

A partnership formed or availed of in connection with a Son of Boss transaction does not operate in a manner consistent with the intent of subchapter K. First, the requirement that each partnership transaction or series of related transactions be entered into with a substantial business purpose is not met. A partnership formed or availed of in connection with a Son of Boss transaction engages in minor investment activities The partnership engages in the investment transactions to generate the appearance of a business purpose in the event the transaction is challenged The real purpose of the partnership is the generation of the loss or elimination of gain through the Son of Boss transaction. Although establishment of substantial business purpose is a fact specific inquiry, the reasonably expected pre-tax profit from both the economically offsetting option positions and the investment transactions is minimal when compared to the purported reduction in tax liability achieved through the Son of Boss transaction.

Second, the requirement that the tax consequences to each partner of the partnership operations and of transactions between the partnership and the partner must accurately reflect the partner's income is not met. In a Son of Boss transaction, a large tax loss is generated through an inflated basis in the partnership interests received by the contribution of offsetting option positions to a partnership. The interest is later sold for a loss, or the property that is distributed and acquires the artificially high outside basis is later sold for a loss. For the tax consequences of a Son of Boss transaction to clearly reflect the partners' income, the partners or the partnership would have to have experienced a net economic loss at least equal to the claimed tax loss or the tax loss would need to be clearly contemplated by a provision in the Code or regulations. The tax loss generated in the transaction does not accurately reflect an underlying economic loss experienced by either the partners or the partnership. Further, no provision in subchapter K contemplates the creation of the large non-economic losses generated in the Son of Boss transaction.

Section 1.701-2(b) gives the Service broad authority to recast a transaction or series of transactions in the event that a partnership is formed or availed of in connection with a transaction a principal purpose of which is to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K. In light of this, the partnership anti-abuse rule should be applied either to disregard the partnership or some of the partners, to disregard the contributions of the options to the partnership, or to reduce the partners' bases in the partnership to the net amount invested in the options, depending on the particular facts of the transaction.

If a partnership is formed in connection with a Son of Boss transaction, the Service may disregard the partnership and recast the transaction in a manner that is consistent with the partners engaging in the activities directly. This approach will eliminate the discrepancy between outside basis and inside basis, and eliminate the purported loss (or restore the purportedly eliminated gain).

Other authorities support the Service's disregarding of the purported partnership. Under § 761 a partnership includes a syndicate, group, pool, joint venture or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a corporation or a trust or estate. See also, § 7701(a)(2). The Supreme Court in Commissioner v. Culbertson, 337 U.S. 733, 742 (1949), stated that a partnership is created for federal income tax purposes if:

> [C]onsidering all the facts -- the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent -- the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise.

The Tax Court in Luna v. Commissioner, 42 T C. 1067, 1077-78 (1964) set forth the following nonexclusive list of factors relevant to the consideration of whether a partnership is created:

> The agreement of the parties and their conduct in executing its terms; the contributions, if any, which each party had made to the venture; the parties' control over income and capital and the right of each to make withdrawals; whether each party was a principal and co-proprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a percentage of income; whether business was conducted in the joint names of the parties; whether the parties filed federal partnership returns or otherwise represented to respondent or to persons with whom they dealt that they were joint venturers; whether separate books of account were maintained for the venture; and whether the parties exercised mutual control over the assumed mutual responsibilities for the enterprise

In ASA Investerings P'ship v. Commissioner, the Court of Appeals for the D.C. Circuit found that a partnership formed for a tax purpose and which engages in de minimis business activity in furtherance of that tax purpose is not a valid partnership. ASA at 512; See also Boca Investerings P'ship v. United States, 2003 U.S. App LEXIS 429 Moreover, the ASA Court stated that whether "the 'sham' be in the entity or the transaction . . . the absence of a nontax business purpose is fatal." Id.

Applying this analysis to the facts before it, the court of appeals in ASA found that even though the "investment in LIBOR Notes might have had a business purpose, the prior three-week investment in and subsequent sale of the private placement notes (PPNs) was . . . a business activity merely conducted for tax purposes." Id. at 513. The court of appeals realized that the taxpayer may have had an interest in potential gain from its investments, but those interests were "dwarfed by its interest in the tax benefit." Id. at 513. In concluding that ASA Investerings was not a legitimate partnership, the court further clarified that "[a]lthough a taxpayer may structure a transaction so that it satisfies the formal requirements of the Internal Revenue Code, the Commissioner may deny legal effect to a transaction if its sole purpose is to evade taxation" Id. (quoting, Zamuda v. Commissioner, 731 F.2d 1417, 1421 (9th Cir. 1984)). Hence, the standard in the D.C Circuit is that a de minimis business purpose will not validate a partnership whose true purpose is the pursuit of tax benefits. Rather, the relevant legal inquiry, as found by the Court of Appeals for the D.C. Circuit, is a comparison of the purported business purpose to the expected tax benefit. Id. at 513. The weight placed upon this legal factor led the D.C. Circuit to disregard the partnership entity. Id. at 516.

On the issue of risk, the court of appeals in ASA allowed for the existence of de minimis risk in the transaction noting that "no investment is entirely without risk." Id. at 514. The court of appeals further concluded that a carve out of de minimis risk is consistent with the Supreme Court's view that "a transaction will be disregarded if it did 'not appreciably affect [taxpayer's]

beneficial interest except to reduce his tax.'" Id. (quoting Knetsch v. United States, 364 U.S. 361, 366 (1960))

As with the transactions in ASA and Boca, de minimis risk exists in the Son of Boss transactions. The Son of Boss transactions are structured specifically to generate a tax benefit while limiting each partner's risk of loss to the difference between the premium received for writing the option and the premium paid for the long option. The minor investment activities engaged in by the partnerships are de minimis compared to the amount of the claimed tax savings. Further, the modicum of business purpose asserted by the promoters for the formation of the partnership in a Son of Boss transaction does not alter the fact that the true purpose for the partnership is the reduction of tax liability. Thus, the partnership entity should be disregarded.

In cases in which an operating partnership engages in a Son of Boss transaction it may not be appropriate to disregard the partnership. In these cases, § 1.701-2 applies to permit the Service to recast the transaction in a manner consistent with the intent of subchapter K.

A Son of Boss transaction, whether engaged in through a partnership formed primarily for use in the transaction or through a previously operating partnership, reduces substantially the present value of the partners' aggregate federal tax liability in a manner inconsistent with the intent of subchapter K. The fact that such reduction was a principal purpose of engaging in the transaction is apparent from the lack of legitimate economic purpose for the transaction. As noted above, a comparison of the tax gain generated by the transaction to the economic benefit that the transaction could be reasonably expected to generate, as well as the fact that the exposure to risk is limited in a Son of Boss transaction, are significant factors indicating that the principal, if not sole, purpose for engaging in a Son of Boss transaction is the tax reduction generated by the transaction

It follows from this that the Service may recast either by, among other things, treating the offsetting option positions as though they were not contributed to the partnership or reducing the partners' bases in their partnership interests to reflect the net investment in the offsetting option positions. In either case, the purported tax loss generated by the Son of Boss transaction will be eliminated.

3. Individual taxpayers may not claim losses from investments in partnerships unless such investments are made with an economic profit objective.

Section 165(a) allows as a deduction any loss sustained during the year and not compensated by insurance or otherwise.

Losses claimed by individuals, other than casualty losses, are limited by § 165(c) to (1) losses incurred in a trade or business and (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business. The requirements of § 165(c)(2) were applied

to certain straddle transactions in Fox v. Commissioner, 82 T.C. 1001 (1984). The Tax Court there found that § 165(c)(2) required that the taxpayer enter into the transaction "primarily for profit." 82 T.C. at 1019-21 See also Dewees v. Commissioner, 870 F.2d 21, 33 (1st Cir. 1989), and the cases cited therein This "primarily profit" motive test has its origins in the Supreme Court decision, Helvering v. National Grocery Co., 304 U.S. 282 (1938), which interpreted a predecessor of § 165(c)

The application of § 165(c) does not require a finding that the transaction lacks economic substance. For example, the Tax Court in Fox found that because the taxpayer did not meet the requirements of § 165(c)(2), it did not have to find that the transaction was a sham. See also Smith v. Commissioner, 78 T.C. 350 (1982), aff'd without published opinion, 820 F.2d 1220 (4th Cir. 1987), where the Tax Court found certain straddles not to be shams, but at the same time disallowed the resulting losses because the taxpayers lacked the requisite economic profit objective under § 165(c)(2). In applying § 165(c), we may look to the individual taxpayer's motivation for entering the partnership, see Howell v. Commissioner, 41 T.C. 13 (1963), aff'd, 332 F.2d 428 (3d Cir. 1964), or we may look at the motivation for entering the specific transactions See Andros v. Commissioner, T.C. Memo 1996-133

If an individual invests in a Son of Boss transaction, any loss generated either through the disposition of the partnership interest or through the disposition of assets distributed to the individual in complete liquidation of the individual's partnership interest may be limited or denied under § 165(c)(2) because of the lack of an economic profit objective.

4. The losses that a taxpayer sustains and deducts are limited by § 465 to the amount for which the taxpayer is at risk.

Section 465(a)(1) provides that in the case of an individual engaged in an activity identified in § 465(c), any loss from the activity for the taxable year is allowed only to the extent of the aggregate amount with respect to which the taxpayer is at-risk for such activity at the close of the taxable year. Section 465(c)(3) provides that § 465 applies to each activity engaged in by the taxpayer in carrying on a trade or business or for the production of income.

Section 465(b)(1) provides that a taxpayer is considered at-risk for an activity with respect to amounts including the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity and amounts borrowed with respect to such activity. Under § 465(b)(2), a taxpayer is considered at risk for an activity with respect to amounts including amounts borrowed for use in an activity to the extent that the taxpayer either is personally liable for the repayment of such amounts, or has pledged property, other than property used in such activity, as security for such borrowed amount.

Section 465(b)(4) provides that notwithstanding the other provisions of § 465, a taxpayer is not considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements. Under

§ 465(b)(4), the legislative history provides that in evaluating the amount at-risk, it should be assumed that a loss-protection guarantee, repurchase agreement or other loss limiting mechanism will be fully paid to the taxpayer Id (citing S.Rep. No. 938, 94th Cong., 2d Sess. 50 n.6 (1976)); see also, Moser v. Commissioner, 914 F.2d 1040 (8th Cir. 1990) (A theoretical possibility that the taxpayer will suffer economic loss is insufficient to avoid the applicability of [465(b)(4)].; Levien v. Commissioner, 103 T.C. 120 (1994)).

The case law is not in complete accord on this issue. In Emershaw v. Commissioner, 949 F.2d 841, 845 (6th Cir 1991), the court adopted a worst-case scenario approach and determined that the issue of whether a taxpayer is "at risk" for purposes of § 465(b)(4) "must be resolved on the basis of who realistically will be the payor of last resort if the transaction goes sour and the secured property associated with the transaction is not adequate to pay off the debt." quoting Levy v. Commissioner, 91 T.C. 838, 869 (1988)

In contrast, the Second, Eighth, Ninth, and Eleventh Circuits look to the underlying economic substance of the arrangements under § 465(b)(4). Waters v. Commissioner, 978 F.2d 1310, 1316 (2nd Cir 1992) (citing American Principals, 904 F.2d at 483; Young v. Commissioner, 926 F.2d 1083, 1089 (11th Cir. 1991); Moser, 914 F.2d at 1048-49.) The view, as adopted by the Second, Eighth, Ninth, and Eleventh Circuits is that, in determining who has the ultimate liability for an obligation, the economic substance and the commercial realities of the transaction control See Waters, 978 F.2d at 1316; Levien, 103 T.C. 120; Thornock v. Commissioner, 94 T.C. 439, 448 (1990), Bussing v. Commissioner, 89 T.C. 1050, 1057 (1987). To determine whether a taxpayer is protected from ultimate liability, a transaction should be examined to see if it "is structured - by whatever method - to remove any realistic possibility that the taxpayer will suffer an economic loss if the transaction turns out to be unprofitable." American Principals, 904 F.2d at 483, see Young, 926 F.2d at 1088, Thornock, 94 T.C. at 448-49, Owens v. United States, 818 F. Supp 1089, 1097 (E.D. Tenn. 1993), Bussing, 89 T.C. at 1057-58. "[A] binding contract is not necessary for [465(b)(4)] to apply." American Principals, 904 F.2d at 482-83. In addition, "the substance and commercial realities of the financing arrangements presented . . . by each transaction" should be taken into account under § 465(b)(4). Thornock, 94 T.C at 449. To avoid the application of § 465(b)(4), there must be more than "a theoretical possibility that the taxpayer will suffer economic loss" American Principals, 904 F 2d at 483

In presenting a § 465 argument, it is important that the Service address Laureys v. Commissioner, 92 T.C. 101 (1989), nonacq. 1990-2 C.B. 1. Laureys dealt with an individual who traded straddles rather than options The Laureys Court limited the application of § 465(b)(4) in cases involving straddles on the basis that a separate regime exists for the regulation of straddle transactions and that it is unlikely that Congress intended to include straddles in the term "similar arrangement" given the other provisions of the Code regulating straddles.

For three reasons, the Service may assert § 465(b)(4) in Son of Boss cases even in light of Laureys. First, depending on the facts of the case, the virtually offsetting option positions may not constitute a straddle. Section 1092 provides that the term straddle means offsetting option positions with respect to actively traded personal property. In some cases, the economically offsetting option positions may not meet the definition provided in § 1092(c) or may qualify for an exception provided in § 1092(d) or the regulations.

Second, even if the option positions do constitute a straddle, the loss which the Son of Boss transaction generates is not the type of loss to which § 1092 is directed. Section 1092 addresses the timing of recognition of the loss generated on one leg of a straddle. The loss generated in a Son of Boss transaction is related to the artificial increase in a partner's outside basis. In this way, Laureys is not applicable to the Son of Boss transaction.

Third, the Service has a longstanding position that the decision in Laureys with regard to § 465(b)(4) is erroneous. See nonacq. at 1990-2 C.B. 1. Thus, even in cases in which the virtually offsetting option positions constitute a straddle, the Service will challenge the Laureys Court's holding that § 465(b)(4) does not apply to straddle transactions.

In a Son of Boss transaction, the investor purchases and writes economically offsetting option positions and contributes the option positions to a partnership. The effect of this structure is that through the partnership, the investor in a Son of Boss transaction is exposed to risk only to the extent of the cash contributed and the difference between the premium paid for the purchased option and the premium received for the written option. Because the values of the options move in opposite directions in economically offsetting amounts, the amount that can be lost by an investor in a Son of Boss transaction is fixed at the time the options are written and purchased. Which one of the offsetting options finishes in the money is irrelevant to determining the maximum amount that the investor can lose. As a result, in Son of Boss cases, the Service will treat the economically offsetting option positions as an arrangement under § 465(b)(4) to limit the taxpayers' exposure to risk of loss.

This notice may be updated in accordance with future published guidance.

If you have any questions concerning this notice, please contact James M. Gergurich, Passthroughs and Special Industries, at (202) 622-3070.

/s/

HEATHER MALOY
Associate Chief Counsel
(Passthroughs & Special Industries)