PROPOSED RULES

DEPARTMENT OF THE TREASURY

Internal Revenue Service

26 CFR Part 1

[REG-106736-00]

RIN 1545-AX93

Assumption of Partner Liabilities

Tuesday, June 24, 2003

*37434 AGENCY: Internal Revenue Service (IRS), Treasury

ACTION: Notice of proposed rulemaking; notice of proposed rulemaking by cross-reference to temporary regulations; and notice of public hearing.

SUMMARY: This document contains proposed regulations relating to the definition of liabilities under section 752 of the Internal Revenue Code These regulations provide rules regarding a partnership's assumption of certain fixed and contingent obligations in exchange for a partnership interest and provide conforming changes to certain regulations. These regulations also provide rules under section 358(h) for assumptions of liabilities by corporations from partners and partnerships In addition, this document provides notice that the IRS and Treasury intend to issue supplemental guidance that may apply certain of the rules outlined in these proposed regulations to transactions involving corporations This document also provides notice of public hearing on the proposed regulations.

DATES: Written or electronic comments and requests to speak at the public hearing scheduled for Tuesday, October 14, 2003, must be received by September 22, 2003.

ADDRESSES: Send submissions to: CC:PA:RU (REG-106736-00), room 5226, Internal Revenue Service, POB 7604, Ben Franklin Station, Washington, DC 20044 Submissions may be hand-delivered between the hours of 8 a m. and 4 p.m to CC:PA:RU (REG-106736-00), Courier's Desk, Internal Revenue Service, 1111 Constitution Avenue, NW , Washington, DC or sent electronically, via the IRS Internet site at: www irs.gov/regs The public hearing will be held in the auditorium, Internal *37435 Revenue Building, 1111 Constitution Avenue, NW , Washington, DC

© 2007 Thomson/West. No Claim to Orig U S Govt Works



EXHIBIT 12

250

Rev Rul 95-26 (1995-1 C.B. 131)

Because these proposed regulations define a § 1.752-7 liability as a fixed or contingent obligation to make payment to which section 752 does not apply, Treasury and the IRS believe that it is appropriate to describe in these regulations the liabilities to which section 752 does apply. Therefore, following the principles set forth in § 1.752-1T(g) and Rev. Rul 88-77, the proposed regulations provide that an obligation is a liability if and to the extent that incurring the obligation: (A) Creates or increases the basis of any of the obligor's assets (including cash); (B) gives rise to an immediate deduction to the obligor; or (C) gives rise to an expense that is not deductible in computing the obligor's taxable income and is not properly chargeable to capital An obligation for this purpose is any fixed or contingent obligation to make payment without regard to whether the obligation is otherwise taken into account for purposes of the Code Obligations include, but are not limited to, debt obligations, environmental obligations, tort obligations, contract obligations, pension obligations, obligations under a short sale, and obligations under derivative financial instruments such as options, forward contracts, and futures contracts The definition of a liability contained in these proposed regulations does not follow Helmer v Commissioner, T.C Memo 1975-160 (The Tax Court, in Helmer, held that a partnership's issuance of an option to acquire property did not create a partnership liability for purposes of section 752.)

Treasury and the IRS are considering adopting the definition of liability proposed in these regulations as an appropriate interpretation of the term liability for purposes of subchapter C of chapter 1 of the Code Treasury and the IRS request comments on the scope and substance of such regulations, which will be retroactive to the extent necessary to prevent abuse

2 § 1 752-7--Partnership Assumption of Partner's § 1 752-7 Liability

In the corporate context, section 358(h) prevents the duplication and acceleration of loss with respect to obligations not encompassed by section 358(d) by reducing the transferor shareholder's basis in corporate stock received in the exchange Treasury and the IRS do not believe that this is the best approach for partnerships given their passthrough nature. Ultimately, the partners' shares of a partnership's deductions are limited by the partners' bases in their partnership interests (their outside bases) If, at the time of an assumption of a§ 1.752-7 liability by a partnership from a partner (the § 1 752-7 liability partner), the partner's outside basis were reduced by the amount of the § 1 752-7 liability, then the partner would not have sufficient outside basis *37437 to absorb any deduction with respect to the § 1.752-7 liability that passed through the partnership.

For this reason, these proposed regulations do not reduce the outside basis of the § 1 752-7 liability partner upon the partnership's assumption of the§ 1 752-7 liability. If the partnership satisfies the § 1.752-7 liability while the§ 1.752-7 liability partner is a partner in the partnership, then the deduction with

© 2007 Thomson/West No Claim to Orig U.S Govt Works

Internal Revenue
bulletin

Bulletin No. 2000–36
September 5, 2000

# HIGHLIGHTS OF THIS ISSUE

These synopses are intended only as aids to the reader in identifying the subject matter covered. They may not be relied upon as authoritative interpretations.

## INCOME TAX

**Rev. Rul. 2000–41, page 248.**
**Federal rates; adjusted federal rates; adjusted federal long-term rate, and the long-term exempt rate.** For purposes of sections 1274, 1288, 382, and other sections of the Code, tables set forth the rates for September 2000.

**T.D. 8896, page 249.**
**REG–103735–00; REG–110311–98;**
**REG–103736–00, page 258.**
Proposed and temporary regulations modify the disclosure, registration, and list maintenance requirements relating to tax shelters under sections 6011, 6111, and 6112 of the Code

**T.D. 8897, page 234.**
Final regulations under section 263A of the Code provide guidance relating to the application of the uniform capitalization rules to property produced in the trade or business of farming Notices 87–76, 88–24, and 88–86 (section V) obsolete

**Notice 2000–44, page 255.**
**Tax avoidance using artificially high basis.** Taxpayers and their representatives are alerted that the purported losses arising from certain types of transactions are not properly allowable for federal income tax purposes. Also, the Service may impose penalties on participants in these transactions or, as applicable, on persons who participate in promoting or reporting these transactions

**Notice 2000–45, page 256.**
**Capitalization; business expenses; farmers.** This notice provides guidance to taxpayers engaged in the trade or business of farming in determining whether a plant has a preproductive period in excess of 2 years for purposes of section 263A(d) of the Code.

**Rev. Proc. 2000–33, page 257.**
**Acquisition of corporate debt.** This procedure provides guidance on whether an acquisition of corporate debt by a beneficiary of the decedent creditor's estate or by a beneficiary of a revocable trust that became irrevocable upon the creditor's death is a direct acquisition within the meaning of section 1.108–2(b) of the regulations.

## EMPLOYEE PLANS

**Announcement 2000–77, page 260.**
This announcement provides guidance on the types of plan amendments that may be needed to obtain a favorable determination letter for volume submitter plan applications.

## ADMINISTRATIVE

**T.D. 8896, page 249.**
**REG–103735–00; REG–110311–98;**
**REG–103736–00, page 258.**
Proposed and temporary regulations modify the disclosure, registration, and list maintenance requirements relating to tax shelters under sections 6011, 6111, and 6112 of the Code.

**Announcement 2000–76, page 260.**
The Service expects to post planned changes to the 2001 Forms W-2 and W-3 on the IRS web site by mid-October 2000. Earlier drafts are being modified in response to public comments.

Finding Lists begin on page ii.
Announcement of Disbarments and Suspensions begins on page 262.
Index for August begins on page iv.

Department of the Treasury
Internal Revenue Service

EXHIBIT
tabbies
13

# Part III. Administrative, Procedural, and Miscellaneous

## Tax Avoidance Using Artificially High Basis

## Notice 2000-44

In Notice 99-59, 1999-52 I.R.B. 761, the Internal Revenue Service and the Treasury Department described certain transactions that were being marketed to taxpayers for the purpose of generating artificial tax losses. This notice concerns other similar transactions that purport to generate tax losses for taxpayers.

As stated in Notice 99-59, a loss is allowable as a deduction for federal income tax purposes only if it is bona fide and reflects actual economic consequences. An artificial loss lacking economic substance is not allowable. See *ACM Partnership v. Commissioner*, 157 F.3d 231, 252 (3d Cir. 1998), *cert. denied*, 526 U.S. 1017 (1999) ("Tax losses such as these ... which do not correspond to any actual economic losses, do not constitute the type of 'bona fide' losses that are deductible under the Internal Revenue Code and regulations."); *Scully v. United States*, 840 F.2d 478, 486 (7th Cir. 1988) (to be deductible, a loss must be a "genuine economic loss"); *Shoenberg v. Commissioner*, 77 F.2d 446, 448 (8th Cir. 1935) (to be deductible, a loss must be "actual and real"); § 1.165-1(b) of the Income Tax Regulations ("Only a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss.")

Notice 99-59 describes an arrangement that purported to give rise to deductible losses on disposition of stock by applying the rules relating to distributions of encumbered property to shareholders in order to create artificially high basis in the stock. The Service and the Treasury have become aware of similar arrangements that have been designed to produce noneconomic tax losses on the disposition of partnership interests. These arrangements purport to give taxpayers artificially high basis in partnership interests and thereby give rise to deductible losses on disposition of those partnership interests.

One variation involves a taxpayer's borrowing at a premium and a partnership's subsequent assumption of that indebtedness. As an example of this variation, a taxpayer may receive $3,000X in cash from a lender under a loan agreement that provides for an inflated stated rate of interest and a stated principal amount of only $2,000X. The taxpayer contributes the $3,000X to a partnership, and the partnership assumes the indebtedness. The partnership thereafter engages in investment activities. At a later time, the taxpayer sells the partnership interest.

Under the position advanced by the promoters of this arrangement, the taxpayer claims that only the stated principal amount of the indebtedness, $2,000X in this example, is considered a liability assumed by the partnership that is treated as a distribution of money to the taxpayer that reduces the basis of the taxpayer's partnership interest under § 752 of the Internal Revenue Code. Therefore, disregarding any additional amounts the taxpayer may contribute to the partnership, transaction costs, and any income realized or expenses incurred at the partnership level, the taxpayer purports to have a basis in the partnership interest equal to the excess of the cash contributed over the stated principal amount of the indebtedness, even though the taxpayer's net economic outlay to acquire the partnership interest and the value of the partnership interest are nominal or zero. In this example, the taxpayer purports to have a basis in the partnership interest of $1,000X (the excess of the cash contributed ($3,000X) over the stated principal amount of the indebtedness ($2,000X)). On disposition of the partnership interest, the taxpayer claims a tax loss with respect to that basis amount, even though the taxpayer has incurred no corresponding economic loss.

In another variation, a taxpayer purchases and writes options and purports to create substantial positive basis in a partnership interest by transferring those option positions to a partnership. For example, a taxpayer might purchase call options for a cost of $1,000X and simultaneously write offsetting call options, with a slightly higher strike price but the same expiration date, for a premium of slightly less than $1,000X. Those option positions are then transferred to a partnership which, using additional amounts contributed to the partnership, may engage in investment activities.

Under the position advanced by the promoters of this arrangement, the taxpayer claims that the basis in the taxpayer's partnership interest is increased by the cost of the purchased call options but is not reduced under § 752 as a result of the partnership's assumption of the taxpayer's obligation with respect to the written call options. Therefore, disregarding additional amounts contributed to the partnership, transaction costs, and any income realized and expenses incurred at the partnership level, the taxpayer purports to have a basis in the partnership interest equal to the cost of the purchased call options ($1,000X in this example), even though the taxpayer's net economic outlay to acquire the partnership interest and the value of the partnership interest are nominal or zero. On the disposition of the partnership interest, the taxpayer claims a tax loss ($1,000X in this example), even though the taxpayer has incurred no corresponding economic loss.

The purported losses resulting from the transactions described above do not represent bona fide losses reflecting actual economic consequences as required for purposes of § 165. The purported losses from these transactions (and from any similar arrangements designed to produce noneconomic tax losses by artificially overstating basis in partnership interests) are not allowable as deductions for federal income tax purposes. The purported tax benefits from these transactions may also be subject to disallowance under other provisions of the Code and regulations. In particular, the transactions may be subject to challenge under § 752, or under § 1.701-2 or other anti-abuse rules. In addition, in the case of individuals, these transactions may be subject to challenge under § 165(c)(2). See *Fox v. Commissioner*, 82 T.C. 1001 (1984). Furthermore, tax losses from similar transactions designed to produce noneconomic tax losses by artificially overstating basis in corporate stock or other property are not allowable as deductions for federal income tax purposes.

Appropriate penalties may be imposed on participants in these transactions or, as applicable, on persons who participate in the promotion or reporting of these transactions, including the accuracy-related

penalty under § 6662, the return preparer penalty under § 6694, the promoter penalty under § 6700, and the aiding and abetting penalty under § 6701

Transactions that are the same as or substantially similar to the transactions described in this Notice 2000–44 are identified as "listed transactions" for the purposes of § 1.6011–4T(b)(2) of the Temporary Income Tax Regulations and § 301 6111– 2T(b)(2) of the Temporary Procedure and Administration Regulations See also § 301.6112–1T, A-4 It should be noted that, independent of their classification as "listed transactions" for purposes of §§ 1 6011–4T(b)(2) and 301.6111–2T(b)(2), the transactions described in this Notice 2000–44 may already be subject to the tax shelter registration and list maintenance requirements of §§ 6111 and 6112 under the regulations issued in February 2000 (§§ 301 6111–2T and 301.6112–1T, A-4), as well as the regulations issued in 1984 and amended in 1986 (§§ 301 6111–1T and 301 6112–1T, A-3) Persons required to register these tax shelters who have failed to register the shelters may be subject to the penalty under § 6707(a) and to the penalty under § 6708(a) if the requirements of § 6112 are not satisfied.

In addition, the Service and the Treasury have learned that certain persons who have promoted participation in transactions described in this notice have encouraged individual taxpayers to participate in such transactions in a manner designed to avoid the reporting of large capital gains from unrelated transactions on their individual income tax returns (Form 1040) Certain promoters have recommended that taxpayers participate in these transactions through grantor trusts and use the same grantor trusts as vehicles to realize the capital gains. Further, although each separate capital gain and loss attributable to a portion of a trust that is treated as owned by a grantor under the grantor trust provisions of the Code (§ 671 and following) is properly reported as a separate item on the grantor's individual income tax return (see § 1 671–2(c) and the Instructions to Form 1041, U S. Income Tax Return for Estates and Trusts), the Service and the Treasury understand that these promoters have advised that the capital gains and losses from these transactions may be netted, so that only a small net capital gain or loss is reported on the taxpayer's individual income tax return. In addition to other penalties, any person who willfully conceals the amount of capital gains and losses in this manner, or who willfully counsels or advises such concealment, may be guilty of a criminal offense under §§ 7201, 7203, 7206, or 7212(a) or other provisions of federal law.

The principal authors of this notice are David A. Shulman of the Office of Associate Chief Counsel (Passthroughs and Special Industries) and Victoria S Balacek of the Office of Associate Chief Counsel (Financial Instruments and Products). For further information regarding this notice, contact Mr Shulman at (202) 622-3080 or Ms. Balacek at (202) 622-3930 (not toll free calls)

---

## List of Plants, Grown in Commercial Quantities in the United States, Having a Preproductive Period in Excess of Two Years Based on the Nationwide Weighted Average Preproductive Period for Such Plant

## Notice 2000–45

### PURPOSE

This notice provides guidance to taxpayers engaged in the trade or business of farming in determining whether a plant has a preproductive period in excess of 2 years for purposes of § 263A(d) of the Internal Revenue Code This guidance is derived from the nationwide weighted average preproductive period for various plants grown in commercial quantities in the United States

### BACKGROUND

Section 263A requires generally that the direct costs and an allocable share of indirect costs of real or tangible personal property produced by a taxpayer be capitalized. Under § 263A, taxpayers generally are required to capitalize the costs of producing property in a farming business (including animals and plants without regard to the length of their preproductive period)

Sections 263A(d) and (e) set forth special rules for property produced in the trade or business of farming Under § 263A(d)(1) and § 1 263A–4(a)(2) of the Income Tax Regulations, taxpayers neither required by § 447 to use an accrual method nor prohibited by § 448(a)(3) from using the cash method ("qualified taxpayers") are not required to capitalize the costs of producing plants that have a preproductive period of 2 years or less or animals In addition, under § 263A(d)(3) and § 1 263A–4(d), a qualified taxpayer may elect to have § 263A not apply to the cost of producing plants in a farming business Thus, unless an election is made to have § 263A not apply in accordance with § 263A(d)(3), qualified taxpayers generally are required to capitalize the costs of producing plants that have a preproductive period in excess of 2 years

Section 263A(e)(3)(B) and § 1.263A–4(b)(2)(i)(B) provide that, for purposes of determining whether a plant has a preproductive period in excess of 2 years, the preproductive period of plants grown in commercial quantities in the United States must be based on the nationwide weighted average preproductive period for such plants The legislative history of § 263A explains that Congress expected the Treasury Department to periodically publish a list of the preproductive periods of various plants based on the nationwide weighted averages for such plants *See* H.R. Rep. No. 426, 99th Cong., 1st Sess. 628 (1985), 1986–3 (Vol. 2) C.B 628 A proposed list was included in the preamble of the proposed § 1 263A–4 regulations (62 FR 44542) The Internal Revenue Service and Treasury Department received and considered comment letters relating to this proposed list.

Based upon information provided by the United States Department of Agriculture, the Service Treasury Department have determined that plants producing the following crops or yields have a nationwide weighted average preproductive period in excess of 2 years:

almonds, apples, apricots, avocados, blackberries, blueberries, cherries, chestnuts, coffee beans, currants, dates, figs, grapefruit, grapes, guavas, kiwifruit, kumquats, lemons, limes, macadamia nuts, mangoes, nectarines, olives, oranges, papayas, peaches, pears, pecans, persimmons, pistachio nuts, plums, pomegranates, prunes, raspberries, tangelos, tangerines, tangors, and walnuts

**Internal Revenue Service**
**JFK P.O. Box 9112, Stop 41100, Boston, MA 02203**

**Department of the Treasury**

Refer To:
SE:S:E:TS:NAA:1:JH
Taxpayer Identifying Number:

Name of Partnership:
JBJZ Partners
Partnership Identifying Number:
57-1088089
Tax Year Ended:
December 27, 2000
Date FPAA Mailed to Tax Matters Partner:
December 9, 2004
Person to Contact:
Mr. J Heinlin
Employee Identification Number: 04-03576
Contact Hours:
8:00 AM - 4:30 PM (Monday - Friday)
Contact Telephone Number:
(617) 316-2421

Date: December 9, 2004

Tax Matters Partner
JBJZ Partners
16 Buckingham Drive
Charleston, SC 29407

## NOTICE OF FINAL PARTNERSHIP ADMINISTRATIVE ADJUSTMENT

The law requires us to send a Notice of Final Partnership Administrative Adjustment (FPAA) to the partnership named above, for the tax year shown above, and to each partner who is entitled to receive this notice.

We are proposing adjustments to the partnership items of the partnership and tax year shown above. We will send the examination report outlining these adjustments to the Tax Matters Partner (TMP) of the partnership. (The TMP is the partner designated by the partnership to deal with the IRS.) He/she is also authorized to act for the partners who are not entitled to receive this notice. Any partner who wants a copy of the examination report should request it from the TMP. If the TMP is unable to provide you with a copy of the examination report, please contact the person named in the heading of this letter.

Taxable Years Ending Before August 6, 1997:

The adjustments to the partnership items reported on the partnership tax return may cause an increase or decrease to the tax liability on your individual return Form 870-P, *Agreement to Assessment and Collection of Deficiency in Tax for Partnership Adjustments*, is a summary of the proposed adjustments to the partnership return. You can compute your share of the proposed adjustments by multiplying each adjusted partnership item by your percentage interest for that partnership item.

Taxable Years Ending After August 5, 1997:

The adjustments to the partnership items reported on the partnership tax return may cause an increase or decrease in the tax liability on your individual return. The adjustments may include partnership level determinations regarding penalties and additions to tax that relate to adjustments to partnership items Form 870-PT, *Agreement for Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts*, is a summary of the proposed adjustments to the partnership return. You can compute your share of the proposed adjustments by multiplying each adjusted partnership item by your percentage interest for that partnership item.



EXHIBIT
tabbies
14

You have three options available to you:

**1. If you agree with the adjustments:**

Sign and return the enclosed Form 870-P/Form 870-PT When you sign Form 870-P/Form 870-PT, you are agreeing to pay any additional tax and interest resulting from the adjustments to the partnership return. For tax years ending after August 5, 1997, you are also agreeing to any partnership level determination as to penalties, additions to tax and additional amounts that relate to adjustments to partnership items, if any. In addition, you are waiving your rights to participate in any administrative or judicial proceeding affecting partnership items and in partnership level determinations as to penalties, additions to tax and additional amounts that relate to adjustments to partnership items for the tax year in question. This is a binding settlement only if you sign and return Form 870-P/Form 870-PT and we sign on behalf of the Commissioner of Internal Revenue Service. When we sign the agreement form, the one-year extension of the period of limitations on assessments will begin under Internal Revenue Code section 6229(f) Once the agreement is signed by both parties, you may not file a claim to change the items in question or claim a refund/credit based on a readjustment.

Note: If you are the TMP of the partnership, see the section of this letter entitled, *"For the Tax Matters Partner of the Partnership"*.

**2. If you do not agree with the adjustments:**

If you are the TMP of the partnership and want to contest the adjustments in court, you must file a petition within 90 days from the date of this letter. During this 90-day period, no other partner may file a petition for judicial review. You can file your petition for readjustment of partnership items with:

1. the United States Tax Court;
2. the United States Court of Federal Claims; or
3. the District Court of the United States, in the district of the partnership's principal place of business.

A petition filed by the TMP precludes all other actions. If the TMP doesn't file a petition by the 90th day from the date the FPAA was mailed, any partner or any 5 percent group entitled to receive this notice may petition one of these courts A "5 percent group" includes any group of partners who together have an interest of five percent or more in profits of the partnership. The petition must be filed after the 90th day, but on or before the 150th day from the date the FPAA was mailed to the TMP If more than one petition is filed in Tax Court, the first petition filed will go forward. All other petitions (even those filed earlier in one of the other courts) will be dismissed. If no one files a petition in Tax Court, the first petition filed in one of the other courts will go forward and subsequent petitions will be dismissed.

Petitions filed with the United States Tax Court must be mailed to:

**United States Tax Court**
**400 Second Street, NW**
**Washington, DC 20217**

Attach a copy of this letter to the petition. The time in which you must file a petition with the court is fixed by law and the court cannot consider your case if your petition is filed late. If this letter is addressed to both a husband and wife and both want to petition the Tax Court, both must sign the petition or each must file a separate signed petition.

When a partner (including each member of a 5 percent group that files a petition) files a petition in either the appropriate District Court or the Court of Federal Claims, the partner filing the petition must deposit the amount that the partner's tax liability would be increased if the treatment of the partnership items on the partner's return were made consistent with the treatment of partnership items under the FPAA. If you reported the partnership items the way the partnership reported them on its return, you can generally determine the amount to deposit by taking your pro rata share of the partnership adjustments into account in recomputing your tax. You must deposit the appropriate amount with the IRS on or before the day you file your petition

**3. If you do nothing:**

If a petition for readjustment is not filed in any of the courts listed in this letter, the FPAA becomes final, and we will bill you for any additional tax plus interest that you may owe under the FPAA. You will not be permitted to contest the treatment of the partnership items of the partnership under the FPAA in any refund claim or suit. The law allows the Service to bill you after 150 days from the mailing date of the FPAA to the TMP.

However, if a petition is filed in the Tax Court, and the Tax Court upholds the adjustments in whole or in part, we will not bill you until the Tax Court decision is final.

You may wish to contact the TMP of the partnership or your tax advisor to discuss this matter

If you have any questions, please write to the person whose name and address are shown in the heading of this letter. If you write, attach a copy of this letter to help identify your account. Also, include your telephone number and the most convenient time for us to call you in case we need additional information.

If you prefer, you may call the IRS contact person at the telephone number shown in the heading of this letter. If this number is outside your local calling area, there will be a long distance charge to you.

Thank you for your cooperation.

Sincerely,

Technical Services Territory Manager -
North Atlantic

Enclosures:
Form 870-P/Form 870-PT
Copy of this letter

**FOR THE TAX MATTERS PARTNER OF THE PARTNERSHIP**

If you are the Tax Matters Partner (TMP), you are entitled to make an agreement to bind non-notice partners to the treatment of the partnership items as shown on the enclosed schedule of adjustments. You must add the following statement above the signature blocks on the Form 870-P or Form 870-PT:

"The undersigned Tax Matters Partner is signing this offer on behalf of himself (herself) and all other partners whom he (she) has the authority to bind; a final agreement resulting from the co-signature of the Commissioner of Internal Revenue will be binding on all such other partners."

As the TMP, you may submit a petition, as described above for the partnership on behalf of all partners

If you have any questions, you can call the IRS contact person at the telephone number shown in the heading of this letter. Thank you for your cooperation

| Form 870-PT (08/2001) | DEPARTMENT OF THE TREASURY - INTERNAL REVENUE SERVICE **Agreement for Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts** | IN REPLY REFER TO: SE:S:E:TS: NAA:1:JH |
|---|---|---|

| Taxpayer(s) name(s), address and ZIP code: | Name of Partnership: | Tax Year(s) Ended: |
|---|---|---|
| Tax Matters Partner<br>JBJZ Partners<br>16 Buckingham Drive<br>Charleston, SC 29407 | JBJZ Partners<br><br>Taxpayer Identifying Number:<br><br>57-1088089 | December 27, 1999 |
| Taxpayer Identifying Number: | Name of Tax Matters Partner: | |

**Offer of Agreement to Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts**

**&**

**Waiver of Restrictions on Assessment for Partnership Items, Penalties, Additions to Tax, and Additional Amounts**

Under sections 6224(c) and 7121 of the Internal Revenue Code of 1986, the Commissioner of the Internal Revenue Service and the undersigned taxpayer(s) agree to the determination of partnership items and partnership level determinations as to penalties, additions to tax and additional amounts that relate to adjustments to partnership items as shown on the attached schedule of adjustments.

The undersigned taxpayer(s), in accordance with section 6224(b) and 6213(d), also waives the restrictions provided by sections 6225(a) and 6213(a) and consents to the assessment and collection of any deficiency attributable to adjustments to partnership items, penalties, additions to tax and additional amounts that relate to adjustments to partnership items, as set forth in the attached schedule of adjustments; plus any interest provided by law.

This agreement is conditional and will not become effective or final until this agreement form is returned to the Commissioner and is signed on his or her behalf. The one-year extension of the period of limitations on assessment under section 6229(f) will not begin to run until the date the Commissioner's representative signs this form on the Commissioner's behalf.

If this part of this agreement form is signed for the Commissioner, the treatment of partnership items and partnership level determinations as to penalties, additions to tax and additional amounts that relate to adjustments to partnership items under this agreement will not be reopened in absence of fraud, malfeasance, or misrepresentation of fact. In addition, no claim for an adjustment of partnership items, refund or credit based on any change in the treatment of partnership items or partnership level determinations as to penalties, additions to tax and additional amounts may be filed or prosecuted.

| Signature of taxpayer | Date Signed |
|---|---|
| Signature of taxpayer | Date Signed |
| By (Signature and title) | Date Signed |

| FOR INTERNAL REVENUE USE ONLY | Date accepted for Commissioner | Signature |
|---|---|---|
| | Office | Title |

(See Instructions For Signing Agreement) Form 870-PT (08/2001)

DEPARTMENT OF THE TREASURY - INTERNAL REVENUE SERVICE

## Agreement for Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts

### SCHEDULE OF ADJUSTMENTS

| NAME OF PARTNERSHIP: JBJZ Partners | TAX YEAR(S) ENDED | | |
|---|---|---|---|
| TAXPAYER IDENTIFYING NUMBER: 57-1088089 | 12/27/1999 | | |
| DETAIL OF ADJUSTMENTS TO ORDINARY INCOME<br>Ordinary Income – Digital Options Currency Contracts | $(625,000.00) | | |
| TOTAL ADJUSTMENTS TO ORDINARY INCOME | $(625,000.00) | | |
| OTHER ADJUSTMENTS | | | |
| A. CAPITAL CONTRIBUTIONS (SCH. M-2 LINE 2) | | | |
| (1) ADJUSTMENT | $(51,529,750.00) | | |
| (2) AS REPORTED | $51,529,750.00 | | |
| (3) CORRECTED | $0.00 | | |
| B. Net Sjprt-Term Capital Gain (Schedule D Form 1065) (K-1 Line 4d) | | | |
| (1) ADJUSTMENT | $(2,305.00) | | |
| (2) AS REPORTED | $2,305.00 | | |
| (3) CORRECTED | $0.00 | | |

REMARKS

* Reference Exhibit A attached.

Accuracy Penalties under IRC Section 6662 are included as a partnership level determination. See Exhibit A, paragraph 9 for a description of the penalties.

## INSTRUCTIONS FOR SIGNING THIS AGREEMENT

1. If a JOINT RETURN OF A HUSBAND AND WIFE was filed, and both spouses intend to agree, both spouses must sign Form 870-PT. One spouse may sign as agent for the other, if acting under a power of attorney.

2. If the taxpayer is a corporation, the agreement must be signed with the corporate name followed by the signature and title of the officer authorized to sign Form 870-PT.

3. Your attorney or agent may sign for you if this action is specifically authorized by a power of attorney, which if not previously filed, must accompany this form.

4. If this offer is signed by a Tax Matters Partner, please include the title with the signature.

DEPARTMENT OF THE TREASURY – INTERNAL REVENUE SERVICE

Agreement for Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax and Additional Amounts

SCHEDULE OF ADJUSTMENTS

| NAME OF PARTNERSHIP: JBJZ Partners<br>TAXPAYER IDENTIFYING NUMBER: 57-1088089 | TAX YEAR(S) ENDED<br>12/27/1999 | | |
|---|---|---|---|
| C. OUTSIDE PARTNERSHIP BASIS | * | | |
| (1) ADJUSTMENT | * | | |
| (2) AS REPORTED | * | | |
| (3) AS CORRECTED | * | | |
| D. Tax Exempt Interest Income (K-1 LINE 22) | | | |
| (1) ADJUSTMENT | $(670.00) | | |
| (2) AS REPORTED | $670.00 | | |
| (3) AS CORRECTED | $0.00 | | |
| E. | | | |
| (1) ADJUSTMENT | | | |
| (2) AS REPORTED | | | |
| (3) AS CORRECTED | | | |
| F. | | | |
| (1) ADJUSTMENT | | | |
| (2) AS REPORTED | | | |
| (3) AS CORRECTED | | | |

* Reference Exhibit A attached.

Accuracy Penalties under IRC Section 6662 are included as a partnership level determination. See Exhibit A paragraph 9 for a description of the penalties.

**<u>JBJZ Partners FPAA</u>**
EXHIBIT A

1. It is determined that neither JBJZ Partners partnership nor its purported partners have established the existence of JBJZ Partners as a partnership as a matter of fact.
2. Even if JBJZ Partners partnership existed as a partnership, the purported partnership was formed and availed of solely for purposes of tax avoidance by artificially overstating basis in the partnership interests of its purported partners. The formation of JBJZ Partners partnership, the acquisition of any interest in the purported partnership by the purported partner, the purchase of offsetting options, the transfer of offsetting options to a partnership in return for a partnership interest, the purchase of assets by the partnership, and the distribution of those assets to JBJZ Investors, Inc., a corporation controlled by the purported partners in complete liquidation of the partnership interests, and the subsequent sale of those assets to generate at a loss, all within a period of less than 2 Months, had no business purpose other than tax avoidance, lacked economic substance, and, in fact and substance, constitutes an economic sham for federal income tax purposes. Accordingly, the partnership and the transactions described above shall be disregarded in full and: (1) any purported losses resulting from these transactions are not allowable as deductions; (2) increases in basis of assets are not allowed to eliminate gain for federal income tax purposes.
3. It is determined that JBJZ Partners partnership was a sham, lacked economic substance and, under § 1.701-2 of the Income Tax Regulations, was formed and availed of in connection with a transaction or transactions in taxable year 1999, a principal purpose of which was to reduce substantially the present value of its partners' aggregate federal tax liability in a manner that is inconsistent with the intent of Subchapter K of the Internal Revenue Code. It is consequently determined that:
    a. the JBJZ Partners partnership is disregarded and that all transactions engaged in by the purported partnership are treated as engaged in directly by its purported partners. This includes the determination that the assets purportedly acquired by JBJZ Partners partnership, including but not limited to foreign currency options, were acquired directly by the purported partners.
    b. the foreign currency option(s), purportedly contributed to or assumed by JBJZ Partners partnership, are treated as never having been contributed to or assumed by said partnership and any gains or losses purportedly realized by JBJZ Partners partnership on the option(s) are treated as having been realized by its partners.
    c. the purported partners of JBJZ Partners partnership should be treated as not being partners in JBJZ Partners partnership.
    d. contributions to JBJZ Partners partnership will be adjusted to reflect clearly the partnership's or purported partners' income.
4. It is determined that the obligations under the short positions (written call options) transferred to JBJZ Partners partnership constitute liabilities for purposes of Treasury Regulation §1.752-6T, the assumption of which by JBJZ Partners partnership shall reduce the purported partners' bases in JBJZ

Partners partnership in the amounts of $42,750,000.00 and $4,750,000.00, respectively, but not below the fair market value of the purported partnership interest.

5. It is determined that neither JBJZ Partners partnership nor its purported partners entered into the option(s) positions or purchase the foreign currency or stock with a profit motive for purposes of § 165(c)(2).
6. It is determined that, even if the foreign currency option(s) are treated as having been contributed to JBJZ Partners partnership, the amount treated as contributed by the partners under section 722 of the Internal Revenue Code is reduced by the amounts received by the contributing partners from the contemporaneous sales of the call option(s) to the same counter-party. Thus, the basis of the contributed option(s) is reduced, both in the hands of the contributing partners and JBJZ Partners partnership. Consequently, any corresponding claimed increases in the outside basis in JBJZ Partners partnership resulting from the contributions of the foreign currency option(s) are disallowed.
7. It is determined that the adjusted bases of the long call positions (purchased call options), zero coupon notes, and other contributions purportedly contributed by the partners to JBJZ Partners partnership has not been established under I.R.C. § 723. It is consequently determined that the partners of JBJZ Partners partnership have not established adjusted bases in their respective partnership interests in an amount greater than zero (-0-).
8. It is further determined that, in the case of a sale, exchange, or liquidation of JBJZ Partners, the partners' partnership interests, neither the purported partnership nor its purported partners have established that the bases of the partners' partnership interests were greater than zero for purposes of determining gain or loss to such partners from the sale, exchange, or liquidation of such partnership interest.

9. Accuracy-Related Penalties:

No penalties are asserted as JBJZ Partners partnership and partners along with JBJZ Investors, Inc. (corporation controlled by partners) filed a disclosure with the IRS pursuant to Announcement 2002-2 and provided all information requested by the service.

It should not be inferred by the determination of the Accuracy Related Penalty in this notice that fraud penalties will not be sought on any portion of an underpayment subsequently determined to be attributable to fraud or that prosecution for criminal offenses will not be sought under IRC § 7201, 7206 or other provisions of federal law if determined to be appropriate.

<u>Information Regarding Additions to Tax (Penalties) and Affected Items</u>

The Internal Revenue Code provides, in appropriate cases, for the application of accuracy related penalties under Internal Revenue Code Section 6662,

which include, in part, penalties for negligence or disregard of rules or regulations, substantial understatement of income tax, and substantial valuation misstatements.

For partnership taxable years ending *after* August 5, 1997, penalties are determined at the partnership level and may be agreed to as part of the partnership proceeding. A court will have jurisdiction over partnership level penalties raised in a Final Partnership Administrative Adjustment petition for a partnership taxable year ending *after* August 5, 1997. Any partner level defense to partnership level penalty determinations, however, may only be raised through refund claims following the assessment and collection of such penalties.

For all partnership taxable years, other items affected by partnership adjustments, "affected items," may also be separately determined and assessed after the outcome of the partnership proceeding. Upon the completion of the partnership proceeding or the execution of a Form 870-PT, you may be sent an examination report and/or a statutory notice of deficiency asserting affected items.

Please note: This is an information item only, and is not part of the notice of Final Partnership Administrative Adjustment.

The following items are affected items or other partner level determinations that may arise as a result of the final determinations made in the partnership proceeding regarding the proposed adjustments to the partnership items as outlined in the primary position or alternative positions. This list may not include all of the other items that require partner level determinations.

1. Capital Loss Carryovers are affected items. To the extent the determination made in the partnership proceeding reduces the capital losses of a partner, such that the capital loss carryover is reduced or eliminated, a consequential adjustment will be made.

### *I.D. Summary of Conclusions*

Based on the analysis described below, I conclude that:

- The offsetting options reflected irregular pricing;
- The offsetting options held long by each Participant, or Partnership, would never be exercised without the offsetting options held short by the Participants, or Partnership, also being exercised;
- An objective analysis of the transactions reveals that the offsetting options did not provide the Participants, or the Partnerships, with a reasonable possibility of achieving a non-tax profit;
- Each offsetting option the Participants purchased, sold, or contributed to the Partnerships represented a component element of a single transaction structure;
- An analysis of the hedging transactions done by DEUTSCHE BANK supports my single transaction opinion;
- The Participants had no non-tax business purpose in contributing their offsetting options to the Partnerships, and therefore the Partnerships had no non-tax business purpose.



EXHIBIT 15

Westlaw.



26 U.S.C.A. § 6707

I.R.C. § 6707

**Effective: [See Notes] to October 22, 2004**

United States Code Annotated
Title 26. Internal Revenue Code
Subtitle F. Procedure and Administration
Chapter 68. Additions to the Tax, Additional Amounts, and Assessable Penalties
Subchapter B. Assessable Penalties
Part I General Provisions.

**→§ 6707. Failure to furnish information regarding tax shelters**

**(a) Failure to register tax shelter.**—

**(1) Imposition of penalty.**—If a person who is required to register a tax shelter under section 6111(a)—

(A) fails to register such tax shelter on or before the date described in section 6111(a)(1), or

(B) files false or incomplete information with the Secretary with respect to such registration,

such person shall pay a penalty with respect to such registration in the amount determined under paragraph (2) or (3), as the case may be. No penalty shall be imposed under the preceding sentence with respect to any failure which is due to reasonable cause.

**(2) Amount of penalty.**—Except as provided in paragraph (3), the penalty imposed under paragraph (1) with respect to any tax shelter shall be an amount equal to the greater of—

(A) 1 percent of the aggregate amount invested in such tax shelter, or

(B) $500.

**(3) Confidential arrangements.**—

**(A) In general.**—In the case of a tax shelter (as defined in section 6111(d)), the penalty imposed under paragraph (1) shall be an amount equal to the greater of—

(i) 50 percent of the fees paid to all promoters of the tax shelter with respect to offerings made before the date such shelter is registered under section 6111, or

(ii) $10,000.

Clause (i) shall be applied by substituting "75 percent" for "50 percent" in the case of an intentional failure or act described in paragraph (1).

**(B) Special rule for participants required to register shelter.**—In the case of a person required to register

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



EXHIBIT 16

tabbies

such a tax shelter by reason of section 6111(d)(3)--

(i) such person shall be required to pay the penalty under paragraph (1) only if such person actually participated in such shelter,

(ii) the amount of such penalty shall be determined by taking into account under subparagraph (A)(i) only the fees paid by such person, and

(iii) such penalty shall be in addition to the penalty imposed on any other person for failing to register such shelter.

**(b) Failure to furnish tax shelter identification number.--**

**(1) Sellers, etc.**--Any person who fails to furnish the identification number of a tax shelter which such person is required to furnish under section 6111(b)(1) shall pay a penalty of $100 for each such failure.

**(2) Failure to include number on return.**--Any person who fails to include an identification number on a return on which such number is required to be included under section 6111(b)(2) shall pay a penalty of $250 for each such failure, unless such failure is due to reasonable cause.

CREDIT(S)

(Added Pub.L. 98-369, Div. A, Title I, § 141(b), July 18, 1984, 98 Stat. 680, and amended Pub.L. 99-514, Title XV, §§ 1532(a), 1533(a), Oct. 22, 1986, 100 Stat. 2750; Pub.L. 105-34, Title X, § 1028(b), (d), Aug. 5, 1997, 111 Stat. 927, 928.)

1997 Acts. Amendments by section 1028 of Pub.L. 105-34 to apply to any tax shelter (as defined in section 6111(d) of this title) interests in which are offered to potential participants after the Secretary of the Treasury prescribes guidance with respect to meeting requirements added by such amendments see section 1028(e) of Pub.L. 105-34, set out as a note under section 6111 of this title.

26 U.S.C.A. § 6707, 26 USCA § 6707

Copr. © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.



26 U.S.C.A. § 6111

I.R.C. § 6111

**Effective: August 05, 1997 to October 22, 2004**

United States Code Annotated
Title 26. Internal Revenue Code
Subtitle F. Procedure and Administration
Chapter 61. Information and Returns
Subchapter B. Miscellaneous Provisions

→§ 6111. **Registration of tax shelters**

(a) **Registration.**--

(1) **In general.**--Any tax shelter organizer shall register the tax shelter with the Secretary (in such form and in such manner as the Secretary may prescribe) not later than the day on which the first offering for sale of interests in such tax shelter occurs.

(2) **Information included in registration.**--Any registration under paragraph (1) shall include--

(A) information identifying and describing the tax shelter,

(B) information describing the tax benefits of the tax shelter represented (or to be represented) to investors, and

(C) such other information as the Secretary may prescribe.

(b) **Furnishing of tax shelter identification number; inclusion on return.**--

(1) **Sellers, etc.**--Any person who sells (or otherwise transfers) an interest in a tax shelter shall (at such times and in such manner as the Secretary shall prescribe) furnish to each investor who purchases (or otherwise acquires) an interest in such tax shelter from such person the identification number assigned by the Secretary to such tax shelter.

(2) **Inclusion of number on return.**--Any person claiming any deduction, credit, or other tax benefit by reason of a tax shelter shall include (in such manner as the Secretary may prescribe) on the return of tax on which such deduction, credit, or other benefit is claimed the identification number assigned by the Secretary to such tax shelter.

(c) **Tax shelter.**--For purposes of this section--

(1) **In general.**--The term "tax shelter" means any investment--

(A) with respect to which any person could reasonably infer from the representations made, or to be made, in connection with the offering for sale of interests in the investment that the tax shelter ratio for any investor as of the close of any of the first 5 years ending after the date on which such investment is offered for sale may be greater than 2 to 1, and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



tabbies' EXHIBIT 17

(B) which is--

(i) required to be registered under a Federal or State law regulating securities,

(ii) sold pursuant to an exemption from registration requiring the filing of a notice with a Federal or State agency regulating the offering or sale of securities, or

(iii) a substantial investment.

(2) **Tax shelter ratio defined.**--For purposes of this subsection, the term "tax shelter ratio" means, with respect to any year, the ratio which--

(A) the aggregate amount of the deductions and 350 percent of the credits which are represented to be potentially allowable to any investor under subtitle A for all periods up to (and including) the close of such year, bears to

(B) the investment base as of the close of such year

(3) **Investment base.**--

(A) **In general.**--Except as provided in this paragraph, the term "investment base" means, with respect to any year, the amount of money and the adjusted basis of other property (reduced by any liability to which such other property is subject) contributed by the investor as of the close of such year.

(B) **Certain borrowed amounts excluded.**--For purposes of subparagraph (A), there shall not be taken into account any amount borrowed from any person--

(i) who participated in the organization, sale, or management of the investment, or

(ii) who is a related person (as defined in section 465(b)(3)(C)) to any person described in clause (i),

unless such amount is unconditionally required to be repaid by the investor before the close of the year for which the determination is being made.

(C) **Certain other amounts included or excluded.**--

(i) **Amounts held in cash equivalents, etc.**--No amount shall be taken into account under subparagraph (A) which is to be held in cash equivalent or marketable securities.

(ii) **Amounts included or excluded by Secretary.**--The Secretary may by regulation--

(I) exclude from the investment base any amount described in subparagraph (A), or

(II) include in the investment base any amount not described in subparagraph (A),

if the Secretary determines that such exclusion or inclusion is necessary to carry out the purposes of this section.

(4) **Substantial investment.**--An investment is a substantial investment if--

(A) the aggregate amount which may be offered for sale exceeds $250,000, and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(B) there are expected to be 5 or more investors

**(d) Certain confidential arrangements treated as tax shelters.**—

**(1) In general.**—For purposes of this section, the term "tax shelter" includes any entity, plan, arrangement, or transaction—

(A) a significant purpose of the structure of which is the avoidance or evasion of Federal income tax for a direct or indirect participant which is a corporation,

(B) which is offered to any potential participant under conditions of confidentiality, and

(C) for which the tax shelter promoters may receive fees in excess of $100,000 in the aggregate.

**(2) Conditions of confidentiality.**—For purposes of paragraph (1)(B), an offer is under conditions of confidentiality if—

(A) the potential participant to whom the offer is made (or any other person acting on behalf of such participant) has an understanding or agreement with or for the benefit of any promoter of the tax shelter that such participant (or such other person) will limit disclosure of the tax shelter or any significant tax features of the tax shelter, or

(B) any promoter of the tax shelter—

(i) claims, knows, or has reason to know,

(ii) knows or has reason to know that any other person (other than the potential participant) claims, or

(iii) causes another person to claim,

that the tax shelter (or any aspect thereof) is proprietary to any person other than the potential participant or is otherwise protected from disclosure to or use by others.

For purposes of this subsection, the term "promoter" means any person or any related person (within the meaning of section 267 or 707) who participates in the organization, management, or sale of the tax shelter.

**(3) Persons other than promoter required to register in certain cases.**—

**(A) In general.**—If—

(i) the requirements of subsection (a) are not met with respect to any tax shelter (as defined in paragraph (1)) by any tax shelter promoter, and

(ii) no tax shelter promoter is a United States person,

then each United States person who discussed participation in such shelter shall register such shelter under subsection (a).

**(B) Exception.**—Subparagraph (A) shall not apply to a United States person who discussed participation in a tax shelter if—

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(i) such person notified the promoter in writing (not later than the close of the 90th day after the day on which such discussions began) that such person would not participate in such shelter, and

(ii) such person does not participate in such shelter.

(4) **Offer to participate treated as offer for sale.**--For purposes of subsections (a) and (b), an offer to participate in a tax shelter (as defined in paragraph (1)) shall be treated as an offer for sale.

(e) **Other definitions.**--For purposes of this section--

(1) **Tax shelter organizer.**--The term "tax shelter organizer" means--

(A) the person principally responsible for organizing the tax shelter,

(B) if the requirements of subsection (a) are not met by a person described in subparagraph (A) at the time prescribed therefor, any other person who participated in the organization of the tax shelter, and

(C) if the requirements of subsection (a) are not met by a person described in subparagraph (A) or (B) at the time prescribed therefor, any person participating in the sale or management of the investment at a time when the tax shelter was not registered under subsection (a).

(2) **Year.**--The term "year" means--

(A) the taxable year of the tax shelter, or

(B) if the tax shelter has no taxable year, the calendar year.

(f) **Regulations.**--The Secretary may prescribe regulations which provide--

(1) rules for the aggregation of similar investments offered by the same person or persons for purposes of applying subsection (c)(4),

(2) that only 1 person shall be required to meet the requirements of subsection (a) in cases in which 2 or more persons would otherwise be required to meet such requirements,

(3) exemptions from the requirements of this section, and

(4) such rules as may be necessary or appropriate to carry out the purposes of this section in the case of foreign tax shelters.

CREDIT(S)

(Added Pub.L. 98-369, Div. A, Title I, § 141(a), July 18, 1984, 98 Stat. 677, and amended Pub.L. 99-514, Title II, § 201(d)(13), Title XV, § 1531(a), Title XVIII, § 1899A(54), Oct. 22, 1986, 100 Stat. 2142, 2749, 2961; Pub.L. 105-34, Title X, § 1028(a), Aug. 5, 1997, 111 Stat. 926.)

1997 Acts. Section 1028(e) of Pub.L. 105-34 provided that:

"(1) **In general.**--Except as provided in paragraph (2), the amendments made by this section [amending this section and sections 6707 and 6662 of this title] shall apply to any tax shelter (as defined in section 6111(d) of the Internal Revenue Code of 1986, as amended by this section) [subsec. (d) of this section] interests in which are

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

offered to potential participants after the Secretary of the Treasury prescribes guidance with respect to meeting requirements added by such amendments.

"(2) **Modifications to substantial understatement penalty.**--The amendments made by subsection (c) [amending sections 6707 and 6662 of this title] shall apply to items with respect to transactions entered into after the date of the enactment of this Act [Aug. 5, 1997]."

26 U.S.C.A. § 6111, 26 USCA § 6111

Copr. © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

00172

transactions, but include the fees associated with those tax benefits, that being EY and attorney fees, when calculating whether there was a reasonable possibility of profit?
A. Well, the answer to your question is that that is not what I was assigned to do.
Q. You were not assigned to do that?
A. I was not assigned to do that and I didn't do it. And you have it in these six bullet points of what the assignment was, and that's what the report is. There is nothing else to learn from this.
Q. Let's move to another topic, the question of whether the long option and the short option are a single integrated transaction. The Government told you going in that that's what they wanted, isn't it?
A. No, actually not.
Q. You came up with that on your own?
A. Actually, I did.
Q. Why is it in the engagement letters which are Exhibit Number 11, it asks you to opine on this requirement?
A. Well, I had done other cases before which I had a very similar opinion.

EXHIBIT 18

00173

Q. What other cases?
A. You have them here. You have Sala and you have Jade. In particular, Jade.
Q. In Jade you came up with that theory?
A. Yes.
Q. And they just ducktailed it in?
A. It was well known. It was well known that I had come up with that.
Q. It was well known?
A. Yeah, I would say it was well known that I had come up with that explanation for the transaction. In fact, it's quite remarkable. Just looking at them, you see it right away.
Q. Is it reasonable for somebody to take a contrary position?
A. I'm not sure I understand your question.
Q. Is it reasonable for somebody to take the position that the long option and the short option are just that, two options rather than a single met option?
A. I don't think so. I think I summed it fairly conclusively.
Q. So if the IRS is taking the position that the long and the short option are not a single

00174

net option in other contexts is unreasonable?
A. But what other contexts? Aren't those very different options you're talking about?
Q. These exact options involved in this case.
A. Well, I'd say if that's the case and that is the first time I've heard that, I would say that that's wrong.
Q. Is it wrong for the IRS to assess tens of millions of dollars of penalties calculated on the basis that those options are not a single net option, but instead are separate long options and a separate short option?
MR. WELTY: You can object if you want to, but let he's to answer the question.
MR. DONOHUE: Counsel, please let me make my objection. I object, it calls for a conclusion, but you may answer.
MR. WELTY: You can answer.
THE WITNESS: You know, you're talking about something, I don't know where you're getting this from, and it is a question of tax and law. My only opinion --
BY MR. WELTY:
Q. No, it's a question of fact.

00175

A. No, it's not a question of fact. I don't know what your facts are. What I'm telling you is they're one transaction. I don't know anything about this other case, or these other things you're talking about.

Q. I'm talking about the specific option contracts in this case. And this case being JBJZ, the Murphy Family cases and the Tesoro cases.

A. And what I am saying to you is, all I know is my opinion, which I've given to you. I don't know anything about taxes or the IRS.

Q. But it would be unreasonable for the IRS to do that?

MR. DONOHUE: Objection.

THE WITNESS: I have no idea.

BY MR. WELTY:

Q. They didn't inform you that they were taking a position 180 degrees contrary to yours?

MR. DONOHUE: Objection.

THE WITNESS: I don't know anything about it.

BY MR. WELTY:

Q. So that would be another thing they didn't tell you?

A. I don't know anything about it. All I

00176

know, this is I've got -- this is the single transaction hypothesis. I think I've proved it conclusively, that's all I know. I don't know anything about what the IRS is doing. All I know is the single transaction hypothesis.
Q. When did you come up with this hypothesis?
A. Long time ago.
Q. How long ago?
A. Oh, maybe three years ago.
Q. What year?
A. I don't remember exactly, but it may have been 2004. It was before I started working on this case.
Q. Would it be reasonable for the taxpayers here to take the position that the long option and the short option are two separate options, and not a single net option?
A. No.
Q. Then I ask you again, would it be reasonable for the IRS to take the position that the long option and the short option are two separate options, and not a separate net option -- a single net option?
MR. DONOHUE: Objection.

00177

Misstates the facts. You may answer.
THE WITNESS: See, again I don't know what you're -- you're talking so hypothetically that I don't know what you're talking about, so I can't answer your question.
BY MR. WELTY:
Q. Well, I asked you the exact parallel. You said it would not be reasonable for tax payers to take that position, but you won't answer would it be reasonable for the IRS to take the same exact position.
A. Because the IRS is giving judgment and rulings -- not judgments and rulings, but the IRS is administering the tax law, which I do not understand. They run taxation.
Now, what you asked me earlier was whether the taxpayers should have seen it as one transaction, and that answer I can tell you. What the IRS does in its wisdom, I don't know.
Q. Was it unreasonable for the taxpayers to treat them as two separate positions for tax purposes?
A. I don't know. I don't know about taxes. I'm not a tax guy.
Q. Would you look at Exhibit Number 3?

00178

MR. DONOHUE: What is that?
MR. WELTY: It is Don Chance's rebuttal report in JBJZ Investments.
MR. DONOHUE: Do you have a copy of that?
THE WITNESS: Somewhere I think.
MR. DONOHUE: I'm talking about for me.
THE WITNESS: Yes. Oh, I'm sorry, you weren't speaking to me. I only have one copy of each. I'm sure you could look on. Here it is.
BY MR. WELTY:
Q. Have you reviewed this?
A. Yes, I did.
Q. And looking at Page 2 under the heading, on the issue of the number of transactions, starting with the second paragraph regarding the Apple and Dell stock.
MR. DONOHUE: We may have to stop this. Let's go off the record for a second. If you don't have exhibits for us, I'm going to have to stop every time you use an exhibit and get it.
MR. WELTY: Off the record.

IN THE UNITED STATES DISTRICT COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JZ Buckingham Investments LLC as Tax Matters Partner of JBJZ Partners, a South Carolina general partnership, Plaintiff, | § | CASE NO. 05-231 T<br>Chief Judge Edward J. Damich |
| v. | § | |
| United States of America, Defendant. | § | |

**NON-PARTY JENKENS & GILCHRIST'S BRIEF IN SUPPORT OF MOTION TO QUASH AND MOTION FOR PROTECTION FROM PLAINTIFF'S SUBPOENA FOR A RULE 30(b)(6) DEPOSITION AND FOR PRODUCTION OF DOCUMENTS**

Non-party Jenkens & Gilchrist, a Professional Corporation (Texas) ("J&G"), moves pursuant to Rules of the Court of Federal Claims 26(b)(2) and 45(c)(3)(A) to quash the subpoena served by Plaintiff JZ Buckingham Investments LLC as Tax Matters Partner of JBJZ Partners, a South Carolina general partnership and for a protective order under Rules 26(c) and 45(c)(3)(A). The subpoena, *see Attachment 1* (App. 2-11), should be quashed and protection should be granted because responding to the subpoena would be unduly burdensome and would require J&G to disclose the terms of a confidential settlement agreement with the Internal Revenue Service ("Closing Agreement") along with confidential documents and information relating to the Closing Agreement, all of which are irrelevant to Plaintiff's claims

**I. Introduction**

Amid the reports of office closings and lawyers leaving, it became common knowledge in recent months that J&G was close to dissolution. In March 2007, J&G stopped offering legal services. *See* Declaration of John Gilliam ¶ 2 (attached as Attachment 2) ("Gilliam Decl.")



EXHIBIT 19 tabbles

(App. 12-45). John Gilliam, J&G's in-house counsel since 2004, is the only remaining lawyer employed by J&G. *Id.*

The firm now continues to operate solely for the purpose of collecting assets, addressing payment of obligations, and finalizing all business matters. Gilliam Decl. at ¶ 3 (App. 13-14). J&G has limited financial resources and is attempting to conserve them for the benefit of its creditors. To that end, J&G has kept only enough staff to quickly and efficiently wind down the affairs of the Firm. In addition to Gilliam, J&G has a President, Roger Hayse, who is not a lawyer, and about 15 administrative employees, who are assisting in the process of liquidating the firm. *Id.*

At the end of March 2007, J&G entered into settlement agreements with the Department of Justice through the United States Attorney's Office for the Southern District of New York ("DOJ") and the Internal Revenue Service ("IRS"). The settlements resolved government investigations into J&G's involvement in certain tax shelters. *See* Gilliam Decl. ¶ 7 (App. 14-15) and Exhibits 1 - 3. These settlements were announced by the DOJ and IRS on March 29, 2007. Gilliam Decl. at Exhibits 1 and 3 (App. 20-23 and App. 44-45).

Shortly after the announcement, Plaintiff served the subpoena, which requires the production of the settlement agreement with the IRS ("Closing Agreement") and information relating to that settlement. Gilliam Decl. ¶ 11 (App. 16-17). Specifically, the subpoena seeks:

- testimony about and a copy of the Closing Agreement and other documents relating to the Closing Agreement (Subpoena No. 1(a)) (App. 7);
- testimony and documents about the IRS's legal and factual positions on the calculation of penalties under certain sections of the Internal Revenue Code (Subpoena No. 1(b)) (App. 7);
- testimony and documents on whether the IRS assessed, threatened to assess or provided computations of a potential penalty under I.R.C. § 6707 prior to J&G's agreement to settle (Subpoena No. 1(c)) (App. 8);

- testimony and documents on the IRS's position as to whether a penalty under I.R.C. § 6707 could be challenged administratively or in court prior to its payment (Subpoena No. 1(d)) (App. 8); and

- testimony and documents on whether J&G concluded it had to pay a penalty under I.R.C. § 6707 prior to challenging it in court (Subpoena No. 1(d)) (App. 8).

*See* Attachment 1 at ¶¶ 1 and 2 (App. 7-8).

The Court should quash the subpoena and grant J&G protection because responding to the subpoena would require the disclosure of irrelevant, protected information and would subject J&G to undue burden.

## II. ARGUMENT

J&G's motion to quash or for a protective order must be considered in light of the overarching policy that "'non-party status' is a significant factor . . in determining whether the burden imposed by a subpoena is undue." *United States v. Amerigroup Illinois, Inc.*, 2005 WL 3111972, *4-5 (N.D. Ill., Oct. 21, 2005); *North Carolina Right to Life, Inc. v. Leake*, 231 F.R.D. 49, 51 (D.D.C. 2005). "[C]oncern for the unwanted burden thrust upon non-parties is a factor [given] *special weight*" by courts in balancing the needs of the competing interests. *See Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998) (emphasis added); *Gray v. Cottrell, Inc.*, 2006 WL 1663242, *1 (E.D. Mo. June 12, 2006). Limiting discovery is appropriate when the burden of providing the discovery outweighs the need for it. *Leake*, 231 F.R.D. at 51.

### A. The Closing Agreement with the IRS and negotiations of its terms are protected by confidentiality provisions.

J&G cannot give testimony about or produce the Closing Agreement or other documents relating to it because the agreement and its terms are confidential. Gilliam Decl. ¶¶ 8-9, 13 (App. 15, 17). J&G is prohibited from disclosing the agreement or any information relating to

the terms of the agreement. *Id.* Violating this prohibition could lead to an event of default under both the Closing Agreement and the settlement agreement with the DOJ and result in the termination of those agreements. The loss of these settlements would have serious adverse consequences to J&G. *Id.*

As demonstrated by the IRS's announcement, the Closing Agreement is not even relevant to Plaintiff's claim:

> The Internal Revenue Service today announced that it has reached a settlement with the law firm of Jenkens & Gilchrist, which agreed that they are subject to a penalty of $76 million. The penalty stems from the firm's promotion of abusive and fraudulent tax shelters and violations of the tax law concerning tax shelter registration and maintenance and turnover to the IRS of tax shelter investor lists.

Attachment 2 at Exhibit 3 (App. 45). According to this IRS announcement, the Closing Agreement relates to penalties for violations of tax laws in promoting tax shelters and failing to provide certain information to the IRS. Plaintiff seeks to overturn the IRS's disallowance of the benefit of Plaintiff's tax shelter, which has nothing to do with penalties assessable against J&G. J&G's settlement with the IRS, then, cannot possibly affect Plaintiff's claims. *See Gray*, 2006 WL 1663242, *1 (E.D. Mo. June 12, 2006) (quashing subpoena in part because discovery sought was irrelevant to plaintiffs' claims).

The only testimony Gilliam can provide about the Closing Agreement that is not privileged or confidential is testimony about Gilliam's discussions with the IRS, all of which were limited to J&G's need for a global settlement and J&G's financial situation, its continued viability, and its cooperation with the Government. Gilliam Decl. ¶ 8, 12 (App. 15, 17). Discovery of these matters will not further any claims or defenses in the case and are, thus, also irrelevant to Plaintiff's claim.

Several courts have held that negotiations leading up to a settlement with the Government are not discoverable. *See, e.g., United States v. Bleznak*, 153 F.3d 16, 20 (2d Cir. 1998) (settlement memorandum provided by DOJ to company under investigation not discoverable); *Clark v. Experian Info. Solutions, Inc.*, No. 03, 7882, 2006 WL 626820, *6 (N.D. Ill. Mar 8, 2006) (documents reflecting negotiations with FTC, including offers, counteroffers, acceptances, drafts of proposed agreed order, not discoverable because they "may contain the type of candid 'give and take discussion' that courts have protected from discovery"); *see also Allen County v. Reilly Indus.*, 197 F.R.D. 352, 354 (N.D. Ohio 2000) (settlement negotiation letters with civil defendant not discoverable). The rationale behind these decisions is straightforward – requiring disclosure of negotiations with the government in later civil cases may chill settlement negotiations and settlements themselves. *Clark*, 2006 WL 626820, *3.

Accordingly, J&G should not be required to testify about or produce documents responsive to Numbers 1(a) and 1(c) of the subpoena.

**B. J&G does not have discoverable information on the remaining subject matters identified in the subpoena.**

Plaintiff seeks information about the method by which the IRS computed the penalty announced in the News Release, the IRS's position on challenges to the penalty, and J&G's conclusions about challenges to the penalty. *See* Attachment 1 at 1(b) - (e) (App. 7-8). None of the information J&G possesses about these matters is discoverable because it is protected by the attorney-client privilege and the work product exemption.

With respect to the information about the IRS's legal and factual positions on the calculation of the penalty – as described in Numbers 1(b) and (c) – the only knowledge J&G has about these matters is based on legal advice from its outside counsel, Davis Polk & Wardwell. Gilliam Decl. ¶ 13 (App. 17). The IRS never discussed the computation of the penalty or any of

the other matters described in Number 1(b) with J&G. *Id.* Likewise, the IRS never shared any documents with J&G on those subject matters. *Id.* The only documents responsive to Number 1(b) are protected from disclosure by the attorney-client privilege and work product exemption.

With respect to the information sought in Number 1(d) of the subpoena – the IRS's legal and factual position on whether a penalty under § 6707 could be challenged administratively or in court prior to its payment – the IRS never disclosed to J&G its position on this subject matter either orally or in writing. Gilliam Decl. ¶ 15 (App. 18). Any documents relating to the information in Number 1(d) would be protected from disclosure by the attorney-client privilege and work product exemption. *Id.* This information also is irrelevant to whether the IRS properly or lawfully disallowed Plaintiff's tax shelter.

With respect to the information sought in Number 1(e) of the subpoena – J&G's conclusions on challenges of penalties under § 6707 – the only information that J&G has is based upon discussions among Gilliam, as in-house counsel for J&G, members of J&G's Board of Directors, and J&G's outside counsel. Gilliam Decl. ¶ 16 (App. 18). Any documents relating to the matters described in Number 1(e) would be protected from disclosure by the attorney-client privilege and work product exemption. *Id.* Further, this information like the other information sought is irrelevant to Plaintiff's claims.

### C. J&G does not have the financial or staffing resources to respond to Plaintiff's subpoena.

J&G's staff has been reduced to a skeleton crew who are focused on liquidating the firm's assets, satisfying obligations to creditors, and closing out all outstanding business matters. Gilliam Decl. ¶ 3 (App. 13-14). J&G's financial resources are limited and are being conserved for the benefit of creditors. *Id.* Preparing for a deposition and producing documents will tax J&G's staff and finances and hinder its ability to expeditiously wind up J&G's affairs. *Id.* The

effort to respond to the subpoena will be unduly burdensome to J&G and should not be required given the lack of relevance of the discovery sought. *See e.g., Gray*, 2006 WL 1663242, at *1.

## III. CONCLUSION

Requiring J&G to respond to the subpoena would inflict undue burden on J&G contrary to Rules 26 and 45. None of the information is relevant to Plaintiff's case and the non-privileged information in J&G's possession is confidential pursuant to the Closing Agreement with the IRS. For the foregoing reasons, the Court should grant J&G's motion to quash and motion for protection.

Respectfully submitted,

By: S/ Robert J. Wagman, Jr.

Robert J. Wagman, Jr.
Baker Botts L.L.P.
The Warner
1299 Pennsylvania Avenue
Washington, D.C. 20004-2400
robert.wagman@bakerbotts.com
202.639.7700
202.639.7890 (telecopy)

COUNSEL FOR JENKENS & GILCHRIST, A PROFESSIONAL CORPORATION (TEXAS)

Dated: May 16, 2007

**NON-PARTY JENKENS & GILCHRIST'S**
**CERTIFICATE OF CONFERENCE**

The undersigned counsel certifies that a reasonable effort was made to reach agreement with counsel for Plaintiff on the matters set forth in Non-Party Jenkens & Gilchrist's Motion to Quash and Motion for Protection From Plaintiff's Subpoena for a Rule 30(b)(6) Deposition and for Production of Documents. An agreement could not be reached. In particular, several conversations have occurred between Jenkens & Gilchrist's counsel, Mary Scott and Rod Phelan, and Plaintiff's counsel, Todd Welty and Joel Crouch between April 11 and May 10, 2007. The last conversations occurred on Thursday, May 10, 2007 between Jenkens & Gilchrist's counsel, Mary Scott, and Joel Crouch, counsel for Plaintiff.

Respectfully submitted,

By: S/ Robert J. Wagman, Jr.
Robert J. Wagman, Jr.
Baker Botts L.L.P.
The Warner
1299 Pennsylvania Avenue
Washington, D.C. 20004-2400
robert.wagman@bakerbotts.com
202.639.7700
202.639.7890 (telecopy)

COUNSEL FOR JENKENS & GILCHRIST, A PROFESSIONAL CORPORATION (TEXAS)

Dated: May 16, 2007

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing documents were served through the Court of Federal Claims ECF System, on all counsel of record on May 16, 2007.

S/ Robert J. Wagman, Jr.
Robert J. Wagman, Jr.

Internal Revenue Service (I.R S )

News Release

SIDLEY & AUSTIN LLP PAYS IRS $39.4 MILLION PENALTY

For Release: May 23, 2007

WASHINGTON -- The Internal Revenue Service today announced that it has reached a settlement with the law firm of Sidley Austin LLP, the successor firm of the merger in 2001 between Sidley & Austin and Brown & Wood LLP, which has paid a civil tax shelter promoter penalty of $39.4 million. The penalty stems from the firm's promotion of abusive tax shelters and a failure to comply with tax shelter registration requirements.

"Sidley Austin has paid a significant penalty for its role in promoting abusive tax shelters," said IRS Acting Commissioner Kevin M Brown "The firm has also taken concrete steps to prevent a recurrence of this behavior in the future, which they have agreed to maintain going forward We appreciate their actions and their cooperation in our ongoing investigations "

The firm issued opinions in connection with potentially abusive tax shelters to over 700 high-net worth individuals and corporations. Some of the packages marketed to these individuals included listed transactions such as BOSS (Bond & Option Sale Strategy), variants of the so-called "Son of BOSS" shelter that went by names of COBRA (Currency Options Bring Reward Alternatives), BLIPS (Bond Linked Issue Premium Structure) and COINS (Currency Option Investment Strategy), and others that went by the names of FLIP (Foreign Leveraged Investment Program), OPIS (Offshore Portfolio Investment Strategy) and POPS (Partnership Option Portfolio Securities)

The firm also issued tax opinions in connection with certain potentially abusive non-listed transactions involving distressed assets, bond and equity strips and lease strips.

Sidley Austin LLP has offices in Beijing, Brussels, Chicago, Dallas, Frankfurt, Geneva, Hong Kong, London, Los Angeles, New York, San Francisco, Shanghai, Singapore, Tokyo and Washington, D C.

Media Contact: Tel (202) 622-4000

Copies: Tel. (202) 622-4040

IR-2007-103, 2007 WL 1491285 (I R S.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT
tabbles
20