ABA Civil & Criminal Tax Penalties Committee

2007 Mid-Year Meeting

# Penalty Computation Disputes

## The Devil's In The Details

January 20, 2007

EXHIBIT 21

43

# Introduction

January 20, 2007

## Introduction

- The Tax Shelter Problem and Other Line Drawing in a Vast and Complex Code
- Sunlight is said to be the best of disinfectants; electric light the most effective policeman
  - Appropriate in case of taxpayer strategies
  - Worthwhile to shine light on government as well
- 2006 developments and Computational Case Study

January 20, 2007

# Selected 2006 developments

January 20, 2007

## Selected 2006 developments

- Courts admonishing government for instances of overreach

January 20, 2007

## Selected 2006 Developments

- Caracci v. Comm'r, 456 F.3d 444 (5th Cir. 2006) citing Dunn v. Comm'r, 301 F.3d 339 (5th Cir. 2002).
  - Commissioner's position so "incongruous as to call his motivation into question, . . . '[i]t can only be seen as one aimed at achieving maximum revenue at any cost, . . . seeking to gain leverage against the taxpayer in the hope of garnering a split-the-difference settlement--or, failing that, then a compromise judgment--somewhere between the value returned by the taxpayer. . . and the unsupportedly excessive value eventually proposed by the Commissioner.'"
  - "Reversed and Rendered."

January 20, 2007

## Selected 2006 Developments

- McCord v. Comm'r, 461 F.3d 614 (5th Cir. 2006)
  - Service's assertion of value in excess of that supported by its expert "exemplifies a practice of the IRS that we see with disturbingly increased frequency, e.g., a grossly exaggerated amount asserted in a notice of deficiency."
  - "Undaunted by the facts, well-established legal precedent, and respondent's failure to present sufficient evidence to establish his determinations, the [Tax Court] majority allow their olfaction to displace sound legal reasoning and adherence to the rule of law."

January 20, 2007

## Selected 2006 Developments

- Kohler Company v. United States, 468 F.3d 1032 (7th Cir. 2006)
  - Reversed District Court ruling favorable to government despite untenable taxpayer position.
  - Government failed to present a number that was "prima facie plausible."
  - "Government played all or nothing, lost all, so gets nothing."

January 20, 2007

## Selected 2006 Developments

- United States v. Stein, 435 F. Supp. 2d 330 (S.D.N.Y.):
  - Court finds that "KPMG's decision to cut off all payments of legal fees and expenses . . . was the direct consequence of the pressure applied" by the government's prosecutorial policy violating Fifth and Sixth Amendments.
  - This ruling has been appealed.

January 20, 2007

## Selected 2006 developments

- These cases may not be representative.
  - Government's limited resources
  - Frustration with level of compliance
- They do demonstrate potential for government fallibility, an important fact to keep in mind.

January 20, 2007

# Computational Case Study

January 20, 2007

## Computations

- Example
  - TP enters into simultaneous trades with counterparty
    - Selling foreign currency call option for $14.85 million
    - Buying foreign currency call option for $15 million
    - Net cash outlay of $150k plus fees
  - TP transfers both positions to partnership
  - Claims basis equal to purchased option, without reduction for exposure on sold call. See Helmer v. Comm'r, 34 T.C.M. 727 (1975).
  - Basis in partnership interest exceeds value by $14.85 million.

January 20, 2007

## Computations

- Government's litigating position as expressed in Notice 2000-44
  - Because the loss does not reflect "net economic outlay" and reflects "artificially overstating basis," it is not allowable.
- Government's position in Jade Trading, LLC v. United States (Fed. Cl. No. 03-2164T is that as a matter of fact:
  - The pair of options cannot be separated and should be treated as the acquisition of a "single spread option" for $150k; they are a "single investment with a cost of" $150k
  - Expert: two options "constituted a single transaction"
  - Expert: spread option was a "single security, not two identical securities"

January 20, 2007

## Computations

### Service's proposed penalty computation . . .

- Tax shelter ratio under Section 6111(pre-2004 changes)
  - Tax shelter is any investment reasonably leading to the inference that the "tax shelter ratio" may be greater than 2-to-1
  - Tax shelter ratio:

$$\frac{\text{aggregate amount of deductions potentially allowable}}{\text{"Investment base"}}$$

  - Implicit Service position: tax shelter ratio is \$14.85 million divided by an investment base of \$150K. This is consistent with government position in <u>Jade Trading.</u>

January 20, 2007

## Computations

Service's proposed penalty computation . . .

- Penalty for failure to register under section 6707
- 1% of "aggregate amount invested" in tax shelter
- Aggregate amount invested based Service factual position in 2000-44 and Jade Trading:

  $150k

- Aggregated amount invested in Service's proposed penalty computation:

  $14.85 million

January 20, 2007

## Computations

Service's proposed penalty computation . . .

- Government's intention to assess, collect and enforce penalty prior to administrative or judicial review.
- At least one bankruptcy so far
- Application to firms, not just individuals
- Potential for field nullification
- Cost to system?

January 20, 2007

## Final Note

- 2004 Amendments
  - No tax shelter ratio
  - Penalty based upon fees rather than investment
  - Reasonable cause exception eliminated
- Secretary's power to rescind penalty
  - Not in case of listed transactions
  - *Not subject to judicial review*

January 20, 2007

IN THE UNITED STATES DISTRICT COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JZ Buckingham Investments, LLC, as Tax Matters Partner of JBJZ Partners, A South Carolina general partnership, | § | |
| Plaintiff, | § | Case No. 05-231 T<br>Chief Judge Edward Damich |
| v. | § | |
| United States of America, | § | |
| Defendant. | § | |

PLAINTIFF'S CROSS-MOTION TO COMPEL J&G TO COMPLY WITH SUBPOENA FOR RULE 30(b)(6) DEPOSITION AND PRODUCTION OF DOCUMENTS

Plaintiff, JZ Buckingham Investments, LLC, as Tax Matters Partner of JBJZ Partners, a South Carolina general partnership, by its undersigned attorneys, and pursuant to the Rules of the United States Court of Federal Claims 26(b)(1) and 45(c)(2)(B), move to compel Jenkens & Gilchrist ("J&G") to comply with Plaintiff's subpoena for a Rule 30(b)(6) deposition and production of documents. Plaintiff believes the issues implicated by this Motion are central to the substantive issues before the Court. Thus, Plaintiff requests oral argument if the Court is inclined to deny discovery on the subjects of this Motion. In support of its motion, Plaintiff states the following:

1. Plaintiff served a Rule 30(b)(6) subpoena on J&G on April 25, 2007, seeking information regarding how the IRS calculated the $76 million civil penalty it assessed in connection with J&G's role in COBRA and other transactions.

2. The subpoena consists of five requests that are narrowly confined to that issue, which is directly relevant to whether the IRS treats the foreign currency digital options in



EXHIBIT 22

tabbies

308

dispute in this litigation as a single net option or as separate options in different contexts, depending on which position produces the maximum revenue for the Treasury.

3. Plaintiffs have also served Rule 30(b)(6) notices on the IRS seeking similar information, and the IRS has uniformly refused to produce that information. See the Appendix at 35, attached to the Memorandum in Support of this Motion, filed simultaneously herewith.

4. On May 16, 2007, J&G responded to Plaintiff's subpoena by filing a Motion to Quash and Motion For Protective Order, asserting that the information sought was irrelevant, that J&G was precluded by a confidentiality agreement with the IRS from complying with the subpoena and that complying with the subpoena would be unduly burdensome.

5. To the contrary, as is fully set out in Plaintiff's Memorandum, the subpoena seeks information that is directly relevant to the ultimate issues in this litigation and is necessary to prepare Plaintiff's case. The information is not protected by any rule of privilege or confidentiality. The scope of the information sought is narrow and not readily available elsewhere. Moreover, despite its protestations to the contrary, J&G clearly has the resources to comply with the subpoena.

6. Thus, the factors relevant to determining a motion to compel weigh heavily in Plaintiff's favor.

For all the foregoing reasons, as well as those set forth in Plaintiff's Memorandum in Support of this Motion, Plaintiff respectfully requests that the Court grant its Motion to Compel.

Respectfully submitted,

By: /s/ Joel N. Crouch
Joel N. Crouch
State Bar No. 05144220
M. Todd Welty
State Bar No. 00788642

MEADOWS, OWENS, COLLIER, REED,
COUSINS & BLAU, L.L.P.
901 Main Street, Suite 3700
Dallas, TX 75202
(214) 744-3700 Telephone
(214) 747-3732 Facsimile

jcrouch@meadowsowens.com
twelty@meadowsowens.com

ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

I hereby certify that on June 6, 2007, I served the above and foregoing on the below-listed counsel:

David M. Steiner, Esq. *(via ECF Notification)*
United States Department of Justice
Tax Division
P.O. Box 55 Ben Franklin Station
Washington, D.C. 20044

Joseph Pitzinger, Esq. *(via ECF Notification)*
Jonathan Blacker, Esq.
United States Department of Justice
Tax Division
717 North Harwood
Suite 400
Dallas, Texas 75201

***Attorneys for the United States***

F. Anthony Paganelli, Esq. *(via FedEx)*
Sommer Barnard, P.C.
One Indiana Square
Suite 3500
Indianapolis, Indiana 46204

***Attorney for Carmel Partners***

Robert J. Wagman, Jr. *(Via Certified Mail)*
Baker Botts, L.L.P.
The Warner
1299 Pennsylvania Avenue
Washington, D.C. 20004-2400

***Attorney for Jenkens & Gilchrist***

/s/ Joel N. Crouch
JOEL N. CROUCH

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JZ BUCKINGHAM INVESTMENTS LLC as Tax Matters Partner of JBJZ Partners, a South Carolina general partnership, | ) | CASE NO. 05-231 T |
| Plaintiffs, | ) | Chief Judge Edward J. Damich |
| v. | ) | |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

************************************************

ORAL DEPOSITION OF

JOHN GILLIAM

OCTOBER 4, 2007

VOLUME 1

**************************************************

ORAL DEPOSITION OF JOHN GILLIAM, produced as a witness at the instance of the Plaintiffs, JZ Buckingham Investments, LLC as Tax Matters Partner of JBJZ Partners, a South Carolina general partnership, and duly sworn, was taken in the above-styled and numbered cause on the 4th day of October, 2007, from 2:02 p.m. to 2:38 p.m., before Dana Taylor, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Baker Botts LLP, 2001 Ross Avenue, Dallas, Texas 75201, 901 Main Street, Suite 3700, Dallas, Texas 75202, pursuant to the Federal Rules of Civil Procedure.



Electronically signed by Dana Taylor (401-213-825-2798)

EXHIBIT 23

APPEARANCES

FOR THE PLAINTIFFS:

MR. M. TODD WELTY
MEADOWS COLLIER
901 Main Street
Suite 3700
Dallas, Texas 75202
(214)744-3700

FOR THE DEFENDANT:
MR. JOE PITZINGER
U.S. DEPARTMENT OF JUSTICE
TAX DIVISION
717 North Harwood
Suite 400
Dallas, Texas 75201
(214)880-9721

FOR THE WITNESS:
MS. MARY L. SCOTT
BAKER BOTTS LLP
2001 Ross Avenue
Dallas, Texas 75201-2980
(214)953-6628



INDEX


| | |
|---|---|
| Appearances | 2 |
| JOHN GILLIAM | |
| Examination by Mr. Welty | 4 |
| Examination by Mr. Pitzinger | 18 |
| Examination by Ms. Scott | 21 |
| Further Examination by Mr. Welty | 21 |
| Signature and Changes | 24 |
| Reporter's Certificate | 25 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Notice of Deposition | 4 |
| 2 | Supplement to Notice of Deposition | 4 |
| 3 | Protective Order ** | 6 |
| 4 | Correspondence dated September 21, 2007 with documents | 6 |
| 5 | Correspondence dated September 26, 2007 with documents | 6 |
| 6 | Form 8821 | 13 |


** Subject to a protective order dated September 7th, 2007.



PROCEEDINGS

JOHN GILLIAM,
having been first duly sworn, testified as follows:

EXAMINATION

BY MR. WELTY:
Q Would you please state your name for the record?
A John Gilliam.
Q Do you mind spelling that for the record?
A G-i-l-l-i-a-m.
Q Mr. Gilliam, my name is Todd Welty. I am an attorney representing a number of taxpayers, including those in the JZ Buckingham Investments, MurFam Farms, LLC, and other consolidated cases before the court of federal claims, as well as some taxpayers involved in the In Re: COBRA Tax Shelter Litigation currently pending before the Southern District of Illinois.
(Exhibit Nos. 1 and 2 were marked.)
BY MR. WELTY:
Would you please take a look at Exhibit No. 1 for me, please.
A Okay. I am.
Q And also Exhibit No. 2.
A Okay. And I have looked at it as well.
Q Do you recognize those documents?



A Yes, they appear to be the original Notice of Deposition in this case, which is Exhibit No. 1, and the Supplement to Notice of Deposition, which is Exhibit No. 2.
Q And, Mr. Gilliam, are you the representative of Jenkens & Gilchrist designated by the entities in those subpoenas here to testify today?
A I am.
Q All right. And before we get into the substance of your testimony, Mr. Gilliam, are you familiar with the deposition process?
A I am.
Q Are you a former -- or current or former litigator?
A I'm a former litigator.
Q Okay.
A Recovering litigator.
Q Recovering litigator. Okay. So I am not going to spend any time going through the deposition rules because you're probably at least as familiar as I am with them.
But just for matters of form, advise that you're under oath here today and that your testimony can be used in addition to or in lieu of live testimony before a court under certain circumstances. You understand that?
A Yes, I do.





Electronically signed by Dana Taylor (401-213-825-2798) 25812b08-c0e6-4e8d-895c-ca6258be21da

Q Okay. In response to the Notice of Deposition, which is Exhibit No. 1, and the supplemental notice of deposition, which is Exhibit No. 2, did Jenkens & Gilchrist or its attorneys Baker and Botts make any production of documents in response to those subpoenas?
A We did.
(Exhibit Nos. 4 and 5 were marked.)
BY MR. WELTY:
Q Are those responses set forth in Exhibits No. 4 and No. 5?
A Yes, I believe so.
Q And just for the record, I want to note that Exhibit 3 is the protective order issued by the United States Court of Federal Claims, Chief Judge Damich, limiting the disclosure of this information beyond that provided in the order.
And I just want to make Exhibit No. 3 a part of the record here and would appreciate you noting on the deposition as well that it's subject to a protective order dated September 7th, 2007.
(Exhibit No. 3 was marked.)
BY MR. WELTY:
Q Mr. Gilliam, before we get into the documents that were produced, which are Exhibits No. 4 and 5, can you tell me what you did to gather responsive documents?



A In response to the original notice, Exhibit No. 1, I reviewed what remaining file I had relating to the issues that were described in the notice, the topics that were being asked to be included in our search.
I contacted Tom Cantrell, Pat Mitchell, and Roger Hayse. Pat and Tom, formally being chairmen at various times of the firm, were involved in discussions with the Department of Justice, the IRS. And Roger Hayse, who's currently with Jenkens & Gilchrist, who is not a lawyer but a business advisor who also attended meetings with the Department of Justice, the IRS, obtained their files, their hard copy files; I reviewed those.
I reviewed the electronic files that they had looking for communications with the Department of Justice and the Internal Revenue Service that related to the calculation of the $6 million penalty. And that material was produced, and what I found was produced in connection with the first production that we made.
Q You're comfortable that Jenkens made a diligent search for responsive documents?
A Yes.
Q With respect to the supplemental notice of deposition related to the DGI suit, can you tell me what you did to locate responsive documents?
A I went through, I believe, 29 boxes of



material, DGI material to find documents that related to the settlement, that litigation, and the -- and the payment of the settlement obligations in that litigation.
Documents -- those files included files that had been made available to me by Marshall Simmons who was formally a manager of the firm and who was involved in that litigation, and collected that material, the documents relating to the settlement and payment of settlement, and made that available.
I also talked to Wayne Parnell (phonetic), who's in our accounting area of the firm currently, to see if he could find anything electronically that would help me trace payments that were made in settlement of that litigation, and I got, I think, two or three sheets of paper from him that are also part of the production.
Q Are you comfortable that Jenkens & Gilchrist made a diligent search for documents responsive to the supplemental deposition subpoena?
MS. SCOTT: I'm going to object to that. And if you want an explanation, I'll give it to you. But really for form only because I think our conversations modified that subpoena a little bit.
MR. WELTY: Okay. Fair enough; fair enough. That wasn't intended to be a trick question.
BY MR. WELTY:



Q Are you comfortable that you made a diligent search for the settlement agreement and documents related to the funding of that settlement agreement?
A Yes, I am.
Q In terms of documents not within the direct physical custody of Jenkens & Gilchrist, did you attempt to obtain documents from outside counsel related to either the initial or supplemental deposition subpoenas?
A I did.
Q Can you tell me what you did in that regard?
A I contacted the Davis Polk Wardwell lawyers in New York who represented us in connection with the grand jury investigation and discussions with the IRS to see if they -- made inquiries as to whether or not they had any documents relating to the calculation of the penalty. It was -- it was advised by them they did not.
Q Okay. Did you have any discussions with -- without telling me any privileged information, did you have discussions with the attorneys at Davis Polk regarding their discussions with the IRS over the penalty?
A I did.
Q Okay. Can you tell me what your understanding is that the discussions between Davis and Polk and the IRS were related to the penalty?
MR. PITZINGER: Objection to form.

Page 10

A Well, let me, first of all, say I -- I asked all of the attorneys that were involved in discussions with the Department of Justice and the IRS about any discussions they had with the IRS people regarding the calculation of the penalty and understood initially that there had been none.
I then learned recently, the last two or three weeks, that one of the lawyers there, Mario Verdolini, had a very brief conversation with an IRS representative at the -- at the last meeting -- face-to-face meeting we had with them on I think January the 19th of 2007.
MR. PITZINGER: Objection to the responsiveness of the witness to the question.
BY MR. WELTY:
Q Can you tell me, to the extent you know, the substance of that conversation between the attorney at Davis Polk and the IRS?
MR. PITZINGER: Objection as to form.
A Mario Verdolini asked the IRS representative whether the calculation would be done on a gross or a net basis and was told by this representative that it would be done on a gross basis.
BY MR. WELTY:
Q What do you understand the difference between gross and net to mean?
MR. PITZINGER: Objection as to form,

Page 11

speculation, and relevance what he understands it to be.
MS. SCOTT: Objection to the extent it calls for privileged communications.
A Well, I asked -- inquired of Mario as to what that meant. And my understanding from what he -- he told me is that in -- it meant that in doing calculation, the -- the IRS would -- would take into consideration the long option but not the offsetting short option in doing the calculation.
MR. PITZINGER: Objection to the responsiveness to the question.
BY MR. WELTY:
Q So in calculating the one percent penalty, is it your understanding the IRS simply did one percent times the long premium without offsetting it for the short premium? Is that -- is that essentially what we're --
MS. SCOTT: Objection.
A I reiterate what he --
MR. PITZINGER: Objection to form before -- excuse me.
Go ahead, Mr. Gilliam.
THE WITNESS: That's okay.
MR. PITZINGER: I just wanted to make my objection before you responded.
MS. SCOTT: I'm objecting to the extent it

Page 12

calls for privileged communications.
A I can only tell you what he told me, Todd, and that was that it -- they -- the calculation would take in consideration the long option but not the short option.
BY MR. WELTY:
Q Okay. Did Jenkens & Gilchrist, or you on behalf of Jenkens & Gilchrist, inquire of the IRS as to the penalty calculation methodology they used in arriving at the penalty agreed to by Jenkens?
MS. SCOTT: Jenkens themselves?
MR. WELTY: Yes.
A No.
BY MR. WELTY:
Q Either at the time of the settlement with the IRS or at the time you were gathering information responsive to the subpoenas in Exhibit 1 and 2?
A Not at either.
Q Is there some reason that Jenkens did not request the information from the IRS?
A I -- I think to answer to that question would call for me to reveal the terms or part of the terms of the closing agreement that we had with the IRS, which I'm not permitted to do.
Q Okay. Without doing anything that you think violates the terms of the closing agreement with the IRS, can

Page 13

you tell me whether it's your understanding that the closing agreement itself prevents you from requesting the information from the IRS or disclosing the information provided by the IRS to a third party?
MR. PITZINGER: Objection to form.
A I think it gets into the terms of the closing agreement, which I am prohibited from disclosing.
(Exhibit No. 6 was marked.)
BY MR. WELTY:
Q Would you take a look at Exhibit No. 6 for me, please?
A Got it.
Q This is a Tax Information Authorization Form 8821, and I know you have not had the chance to discuss this with your counsel.
A Right.
Q But let me give you what I believe to be an accurate portrayal of what this form does. This form would allow Jenkens & Gilchrist to authorize -- would allow Jenkens & Gilchrist -- strike that.
This form would allow the IRS to provide information related to Jenkens & Gilchrist confidential tax information to the designated appointee. In other words, if Jenkens & Gilchrist authorized the IRS to provide information to the appointee herein, the IRS would be obligated to do so

Page 14

to the extent that it would have to provide the information directly to Jenkens.
I understand, I think -- and correct me if I'm wrong -- you did not request the penalty calculation methodology from the IRS in response to the subpoenas; is that correct?
A That's correct.
Q And you did that because you think that such a request would violate the terms of the closing agreement; is that correct?
MR. PITZINGER: Objection as to form.
A No.
MS. SCOTT: Can we -- we didn't get a chance to talk about this actually because we were making copies.
MR. WELTY: Sure. Do you want to take a --
MS. SCOTT: Can we take five minutes?
MR. WELTY: Sure, you can take a five-minute break. Sure.
(Break from 2:18 to 2:22.)
BY MR. WELTY:
Q Mr. Gilliam, since we've taken a break, let me just start fresh.
A Okay.
Q And I apologize in advance if I've already asked this and you've answered.

Page 15

A No problem.
Q Isn't it true, Mr. Gilliam, that in response to the subpoena and Exhibit No. 1, you did not request information from the IRS regarding how they calculated the penalty to which Jenkens & Gilchrist agreed?
MR. PITZINGER: Objection to form.
A Yes.
BY MR. WELTY:
Q You did not request that information?
A Did not request that.
Q And it's my understanding, I think based on your previous answer, that Jenkens & Gilchrist did not request that information from the IRS because of concerns over the closing agreement with the IRS; is that correct?
A Not exactly. I didn't request it because I didn't believe I had any obligation to request it, first.
Presented with the issue now as to whether or not I'm willing to do it, I have to tell you that I can't do that, and -- and if it -- if it -- without consulting with the IRS because of my concern that I may be breaching the closing agreement -- the terms of the closing agreement. And if I did that, consequences could be disastrous for the firm.
Q Absent an objection from the IRS, would Jenkens & Gilchrist have a problem providing -- requesting and providing to us, subject to the Court's confidentiality

Page 16

order, the information on how the penalty was calculated and to which Jenkens agreed?
MR. PITZINGER: Objection as to form.
A If the IRS has no objection to it and would not consider it to be a breach of our -- of the confidentiality provisions in the closing agreement, then I would have no objection.
BY MR. WELTY:
Q So Jenkens would directly request that and provide it to us pursuant to the protective order entered by the Court as long as the IRS does not object?
A Yes.
Q Would the same hold true, in other words, would Jenkens execute a Form 8821 authorizing the IRS to provide us that information directly as long as it was subject to the Court's protective order and the IRS did not consider it a breach of the closing agreement?
A Yes.
MR. PITZINGER: Objection as to form.
BY MR. WELTY:
Q And just so I have it for the record, what was the name of the attorney at Davis Polk that discussed the penalty calculation with the IRS?
A Mario Verdolini.
Q Do you know how to spell that?

Page 17

A V-e-r- -- V-e-r-d-o-l-i-n-i.
Q V-e-r- -- V-e-r-d-o --
A No. Excuse me. It's V-e-r-d-o-l-i-n-i.
Q Okay.
A Verdolini.
Q I was pretty sure I wasn't going to be able to spell that on my own.
A That sounds like a bottle of fine Italian wine to me.
Q Moving on to the supplemental notice of deposition.
A Right.
Q Mr. Gilliam, regarding the DGI lawsuit and the settlement and funding of that settlement, I believe you indicated that you searched for documents evidencing the funding of the settlement agreement?
A Correct.
Q Were you able to locate all the funding documents?
A I don't think so. I mean I -- I was able to locate all the ones we currently have. But I -- it certainly raised some questions in my mind about exactly how it got funded.
Q Was it, in fact, funded though?
A Yes, it's my understanding it was.

Page 18

Q So it was fully paid?
A Yes.
MR. WELTY: Can we go off the record for just a second.
(Discussion off the record.)
(Break from 2:27 to 2:33.)
MR. WELTY: I appreciate you being here, Mr. Gilliam.
I pass the witness.
EXAMINATION
BY MR. PITZINGER:
Q Hi.
A Hi.
Q Mr. Gilliam, I have just a few questions.
Does -- you said -- excuse me.
Mr. Welty insinuated, I thought, that the only reason you had not provided the tax calculation was due to the terms of the IRS settlement. Is there any other reasons you haven't provided that information?
MS. SCOTT: The tax --
A I don't have the tax calculation.
BY MR. PITZINGER:
Q The tax calculations.
A I don't --
Q Did Jenkens & Gilchrist ever have possession

Page 19

or control of the tax calculations?
A I don't -- the only thing I know about the tax calculation is what I related, the conversation Mario Verdolini had with the IRS representative. I've never seen the calculation. I've never seen the form.
Q Okay. There was some earlier discussion on your production to the supplemental subpoena --
A Right.
Q -- about that it had been modified a little bit. Do you know what that modification was from the subpoena?
A I think the original -- the subpoena, I think, as worded, calls for a document describing the role of Jenkens & Gilchrist in the DGI litigation. And I think based upon discussions between Mr. Welty and Ms. Scott, the -- it was -- it was limited to the settlement paper -- documents relating to the settlement of the DGI case and the funding of that settlement.
Q Okay. When there was a discussion right at the beginning of the deposition regarding the production as to the original subpoena, which is Exhibit 1 --
A Right.
Q -- you said that you had produced the documents in connection with the first production, but you did not identify what documents you meant that you had

Page 20

produced in response to the first production.
Is that one of the exhibits that were -- that has been introduced in this deposition today or discussed?
MS. SCOTT: Responsive to the production or to the subpoena?
BY MR. PITZINGER:
Q Well, that was my question because the response of the witness at the time was that he had produced the response to the first subpoena in connection with the first -- he had -- the response was produced in connection with the first production.
And I was not too sure if he meant one of the two productions that were identified in Exhibits 4 and 5, or has there been another production other than the ones --
A Just four and five.
MS. SCOTT: I'm going to object as to form on that.
A Maybe I misspoke. I'm not sure I...
MR. WELTY: Just for the record, the only documents we've received in response to the subpoenas are Exhibit -- in Exhibits No. 4 and 5.
MS. SCOTT: That's all we --
THE WITNESS: Yeah, that's all we've produced.
BY MR. PITZINGER:

Page 21

Q So if you think -- if there was a reference related to the first production, it was to the earlier of these Exhibits 4 and 5?
A Yes.
Q Okay.
MR. PITZINGER: Pass the witness.
MR. WELTY: Thank you. No further questions.
MS. SCOTT: Actually, I do have a question.
MR. PITZINGER: On the record?
MS. SCOTT: Yes.
EXAMINATION
BY MS. SCOTT:
Q Mr. Gilliam, Exhibit No. 6.
A Yes.
Q Were you even aware of this form when you were originally preparing a response to the subpoena, the first subpoena, Exhibit 1?
A I don't believe so.
MS. SCOTT: That's all I have.
FURTHER EXAMINATION
BY MR. WELTY:
Q Well, let me just ask one more question. Sorry. The last question always leads to one more question, doesn't it?

Page 22

A Yeah.

Q If ordered to do so, Mr. Gilliam, would you have a problem executing the Form 8821 authorizing the IRS to provide directly to us its penalty calculation methodology for the penalty that Jenkens & Gilchrist agreed to?

A I'm going to comply with whatever the Court orders me to do.

MR. WELTY: No further questions.

MR. PITZINGER: No questions.

MS. SCOTT: No questions.

(End of proceedings at 2:38.)

Page 23

CHANGES ANDSIGNATURE

PAGE/LINE CHANGE REASON

Page 24

I, JOHN GILLIAM, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

______________________
JOHN GILLIAM

STATE OF ________ )
COUNTY OF ________ )

Before me, ____________________, on this day personally appeared JOHN GILLIAM known to me (or proved to me under oath or through ____________________) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _____________, 2007.

______________________
NOTARY PUBLIC IN AND FOR
THE STATE OF __________

Page 25

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

JZ BUCKINGHAM INVESTMENTS LLC as Tax )
Matters Partner of JBJZ Partners, a )
South Carolina general partnership, )
) CASE NO. 05-231 T
Plaintiffs, ) Chief Judge Edward
) J. Damich
v. )
)
UNITED STATES OF AMERICA, )
)
Defendant. )

REPORTER'S CERTIFICATION
DEPOSITION OF JOHN GILLIAM
OCTOBER 4, 2007

I, Dana Taylor, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, JOHN GILLIAM, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition was submitted on ________________, 2007 to the witness or to the attorney for the witness for examination, signature and return to me by ________________, 2007;

That the amount of time used by each party at the deposition is as follows:

Mr. Welty - (0:22)
Mr. Pitzinger - (0:03)
Ms. Scott - (0:01)

Page 26

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

FOR THE PLAINTIFFS:
MR. M. TODD WELTY
MEADOWS COLLIER
901 Main Street
Suite 3700
Dallas, Texas 75202
(214)744-3700
Taxable Cost: $____________

FOR THE DEFENDANT:
MR. JOE PITZINGER
U.S. DEPARTMENT OF JUSTICE
TAX DIVISION
717 North Harwood
Suite 400
Dallas, Texas 75201
(214)880-9721
Taxable Cost: $____________

FOR THE WITNESS:
MS. MARY L. SCOTT
BAKER BOTTS LLP
2001 Ross Avenue
Dallas, Texas 75201-2980
(214)953-6628
Taxable Cost: $____________

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Page 27

Certified to me by this ____ day of October, 2007.

Dana Taylor
DANA TAYLOR, Texas CSR 4048
Expiration Date: 12/31/08
Henjum Goucher Reporting Services, P.C.
Firm No. Dallas: 69 Houston: 373
2501 Oak Lawn Avenue
Suite 435
Dallas, Texas 75219
(888)656-DEPO