IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE COBRA TAX SHELTER LITIGATION, | § | |
| | § | |
| | § | |
| | § | |
| THIS DOCUMENT RELATES TO: | § | 1:05-ml-09727-JDT-WTL |
| | § | |
| 1:06-CV-8000 | § | |
| 1:06-CV-8002 | § | |
| | § | |
| | § | |

**CASE MANAGEMENT PLAN**

**I. Parties and Representatives.**

**A. Petitioners - Carmel Partners Case No. 1:06-cv-8002.**

Carmel Partners
HNC Ditch Investments LLC
Henry N. Camferdam, Jr.
JMA Sedgemoor Investments LLC
Jeffrey M. Adams
JM Walnut Investments LLC
Jay S. Michener
CT Oak Tree Investments LLC
Carol A. Bockelman-Trigilio

**B. Petitioners' Counsel - Carmel Case No. 1:06-cv-8000.**

Jackie M. Bennett, Jr.
F. Anthony Paganelli
SOMMER BARNARD PC
One Indiana Square
Suite 3500
Indianapolis, IN 46204
(317) 713-3444 Telephone
(317) 713-3699 Facsimile
jbennett@sommerbarnard.com
paganelli@sommerbarnard.com

GOVERNMENT EXHIBIT
C

C. **Petitioners- Tesoro Case No. 1:06-cv-8000.**

Gary Woods, as Tax Matters Partner of
SA Tesoro Investment Partners

Gary Woods, as Tax Matters Partner of
Tesoro Drive Partners

D. **Petitioners' Counsel - Tesoro Case No. 1:06-cv-8000.**

Joel N. Crouch
M. Todd Welty
Michael E. McCue
Anthony P. Daddino
MEADOWS, OWENS, COLLIER, REED
COUSINS & BLAU, LLP
901 Main Street
Suite 3700
Dallas, TX 75202
(214) 744-3700 Telephone
(214) 747-3732 Facsimile
jcrouch@meadowsowens.com
twelty@meadowsowens.com
mmccue@meadowsowens.com
adaddino@meadowsowens.com

E. **Respondent.**

United States of America

F. **Respondent's Counsel - Carmel Case No. 1:06-cv-8002**
**- Tesoro Case No. 1:06-cv-8000**

Dennis M. Donohue
John A. Lindquist
David M. Steiner
U.S. DEPARTMENT OF JUSTICE - TAX DIVISION
555 4th Street NW
Room 7104
Washington, DC 20001
(202) 307-6492 Telephone
(202) 307-2504 Facsimile
dennis.donohue@usdoj.gov
john.a.lindquist@usdoj.gov
david.m.steiner@usdoj.gov

Joseph A. Pitzinger, III
Jonathan L. Blacker
U.S. DEPARTMENT OF JUSTICE-TAX DIVISION
717 N. Harwood, Suite 400
Dallas, Texas 75201
(214) 880-9728 Telephone
(214) 880-9742 Facsimile
Joseph.A.Pitzinger@usdoj.gov
Jonathan.blacker2@usdoj.gov

Jeffrey L. Hunter
Assistant U.S. Attorney
U.S. Department of Justice
10 West Market Street
Suite 2100
Indianapolis, IN 46204
(317)226-6333 Telephone
(317)226-6125 Facsimile
jeff.hunter@usdoj.gov

Counsel shall promptly file a notice with the Clerk if there is any change in this information.

## II. Synopsis of Case.

### A. Petitioner Carmel Partners' Statement.

Petitioners bring this case under 26 U.S.C. § 6226 for redetermination of partnership items. On July 16, 2004, the Commissioner of Internal Revenue (the "Commissioner") issued a Notice of Final Partnership Administrative Adjustment (the "FPAA") against Carmel Partners for tax year ending December 23, 1999, disallowing all tax benefits arising from certain transactions and applying negligence and accuracy-related penalties under 26 U.S.C. § 6662. Petitioners believe these adjustments are improper and that the Court should reverse the adjustments in the FPAA and refund Petitioners' deposits.

The two primary factual and legal issues in this case are: (1) whether Henry N. Camferdam, Jeffrey M. Adams, Jay S. Michener, and Carol A. Bockelman-Trigilio (collectively "Taxpayers") correctly reported the tax consequences of certain transactions (the "Transactions") on their federal income tax returns, and (2) whether the Taxpayers should be penalized under 26 U.S.C. § 6662 for engaging in the Transactions. This Court has jurisdiction to entertain this controversy under 26 U.S.C. §§ 6226(a), (c) and 28 U.S.C. § 1346(e).

#### 1. Transaction Details.

On November 16, 1999, the Taxpayers, through their wholly-owned limited liability companies, entered into certain over-the-counter, non-publicly traded European-style foreign currency option positions on the Euro and Yen (collectively the "Options") with Deutsche Bank AG New York Branch (the "Bank"). Each Taxpayer bought an option and sold a second option.

On November 17, 1999, the Taxpayers each contributed their Options to Carmel Partners as contributions to capital. On December 15, 1999, Carmel Partners' option positions were terminated pursuant to a termination agreement for a profit in excess of the net amounts paid to the Bank for such positions. On the same day, Camferdam and Adams contributed bonds they had held for investment for more than one year (the "Bonds") to Carmel Partners.

On December 23, 1999, the Taxpayers each contributed their interests in Carmel Partners to BAMC, Inc., a Delaware corporation. As a result of those contributions, Carmel Partners was dissolved and liquidated. Upon liquidation, all of the Bonds were distributed to BAMC, Inc., who sold the Bonds on December 28, 1999.

2. **Tax Treatment of Transactions.**

Various tax professionals opined that BAMC, Inc.'s sale of its investment in the Bonds triggered a loss that was reported on BAMC, Inc.'s IRS Form 1120S and the corresponding Schedules K-1 for the 1999 tax year. This aggregate loss was in the amount of $68,734,215. Generally speaking, this loss arose from the opinions that the options sold were not treated as liabilities under 26 U.S.C. § 752, and consequently, did not reduce the Taxpayers' basis in the partnership interests.

Carmel Partners and BAMC, Inc. timely filed their federal income tax returns. The Taxpayers also timely filed their respective federal income tax returns for the 1999 tax year, which included their respective share of income, losses, and deductions from BAMC, Inc. In accordance with the opinions received from various tax professionals and the returns prepared by tax professionals at Ernst & Young, LLP, in reliance thereon, the loss generated by BAMC Inc.'s sale of the Bonds was allocated to the Taxpayers for the 1999 tax year as follows: (a) $48,825,463 was allocated to Camferdam; (b) $11,713,479 was allocated to Adams; (c) $6,829,165 was allocated to Michener; and (d) $1,366,108 was allocated to Trigilio.

3. **IRS Adjustments Are Improper and Should be Reversed.**

The Commissioner disallowed all the tax benefits associated with the Transactions described above and applied penalties against the Taxpayers on a number of theories when it issued the FPAA. Each of these theories is erroneous and cannot form the basis of the adjustments proposed.

4. **Penalties Should Not Apply.**

Taxpayers should not be penalized because they relied on the advice, counsel, and guidance of competent tax professionals, including, but not limited to, professionals at Jenkens & Gilchrist P.C., Brown & Wood LLP, and Ernst & Young, LLP in determining the federal income tax consequences and proper reporting obligations relative to the Transactions described above.

The Taxpayers each obtained a separate written legal opinion from Jenkens & Gilchrist P.C. dated January 31, 2000. Jenkens & Gilchrist P.C. provided an opinion on a more likely than not basis regarding the federal tax consequences of the Transactions. Brown & Wood LLP also issued opinions which provided legal analysis and conclusions consistent with those of Jenkens & Gilchrist P.C. Other tax professionals confirmed this advice to the Taxpayers, including Ernst & Young, LLP, who prepared and filed the various entity returns and two of the four Taxpayers' returns. The conclusions set forth in the legal opinions, as ratified and confirmed by the other professionals, provided reasonable bases for the manner in which the Transactions were reported for federal tax purposes. Consequently, Petitioners have a complete defense to the application of penalties.

## B. Petitioner SA Tesoro Investment Partners and Tesoro Drive Partners' Statement.

Petitioner, SA Tesoro Investment Partners ("SATI Partners") and Tesoro Drive Partners ("TD Partners") bring this case under 26 U.S.C. § 6226 for redetermination of partnership items. On December 27, 2004, the Commissioner of Internal Revenue (the "Commissioner") issued a Notice of Final Partnership Administrative Adjustment (the "FPAA") against SATI Partners for tax year ending December 31, 1999, disallowing all tax benefits arising from certain transactions and applying negligence and accuracy-related penalties under 26 U.S.C. § 6662. On December 21, 2004, the Commissioner issued a Notice of Final Partnership Adjustment against TD Partners for the tax year ended December 31, 1999, disallowing all tax benefits arising from certain transactions and apply negligence and accuracy-related penalties under 26 U.S.C. § 6662. Petitioners SATI Partners and TD Partners believe these adjustments are improper and that the Court should reverse the adjustments in the FPAAs and refund Petitioners' deposits.

The three primary factual and legal issues in these cases are: (1) whether Gary V. Woods and Billy J. McCombs (collectively "Taxpayers") correctly reported the tax consequences of certain transactions (the "Transactions") on their federal income tax returns, (2) whether the Taxpayers should be penalized under 26 U.S.C. § 6662 for engaging in the Transactions, and (3) whether the Government properly promulgated Treas. Reg. §§ 1.752-6 and 1.752-6T retroactively changing the definition of "liability" for the purposes of IRC § 752.

### 1. SATI Partners Transaction.

On November 18, 1999, the Taxpayers, through their wholly-owned limited liability companies, entered into certain over-the-counter, non-publicly traded European-style foreign currency option positions on the Japanese Yen, Swiss Franc and Australian Dollar

(collectively the "Options") with Deutsche Bank AG New York Branch (the "Bank"). The Taxpayers bought options and sold options.

On November 19, 1999, the Taxpayers contributed each contributed their Options to SATI as contributions to capital. On December 17, 1999, SATI option positions were terminated pursuant to a termination agreement for a profit in excess of the net amounts paid to the Bank for such positions. On December 3, 1999, SA Tesoro Investment Partners purchased shares of Sun Microsystems Inc., ("Shares") as an investment.

On December 27, 1999, the Taxpayers contributed their interests in SATI to a Delaware corporation, SA Tesoro Investors, Inc. As a result of those contributions, Tesoro Investment Partners was dissolved and liquidated. Upon liquidation, all of the Shares were distributed to SA Tesoro Investors, Inc., which sold the Shares on December 29, 1999.

2. **TD Partners Transaction.**

On November 18, 1999, the Taxpayers, through their wholly-owned limited liability companies, entered into certain over-the-counter, non-publicly traded European-style foreign currency option positions on the German Deutschmark and Swiss Franc (collectively the "Options") with Deutsche Bank AG New York Branch (the "Bank"). The Taxpayers bought options and sold options.

On November 19, 1999, the Taxpayers each contributed their Options to TD Partners as contributions to capital. On December 17, 1999, TD Partners' option positions terminated. The date of termination was established after careful monitoring of the applicable exchange rates in order to maximize the overall return on investment. On December 22, 1999, TD Partners purchased Canadian Dollars ("Foreign Currency") as an investment.

On December 27, 1999, the Taxpayers contributed their interests in TD Partners to a Delaware corporation, Tesoro Drive Investors, Inc. As a result of those contributions, TD Partners was dissolved and liquidated. Upon liquidation, all of the Foreign Currency was distributed to Tesoro Drive Investors, Inc., which sold the Foreign Currency on December 29, 1999.

3. **Tax Treatment of Transactions.**

Various tax professionals opined that SA Tesoro Investors Inc.'s sale of its investment in the Shares triggered a loss that was reported on SA Tesoro Investment Inc.'s IRS Form 1120S and the corresponding Schedules K-1 for the 1999 tax year. This aggregate loss was in the amount of $32,297,786. This loss arose from the opinions that the options sold were not treated as liabilities under 26 U.S.C. § 752, and consequently, did not reduce the Taxpayers' basis in the partnership interests.

Various tax professionals opined that Tesoro Drive Investors Inc.'s sale of its investment in the Foreign Currency triggered a loss that was reported on Tesoro Drive Investors, Inc.'s IRS Form 1120S and the corresponding Schedules K-1 for the 1999 tax year.

This aggregate loss was in the amount of $13,353,162. This loss arose from the opinions that options sold were not treated as liabilities under 26 U.S.C. § 752, and consequently did not reduce the Taxpayers' basis in the partnership interests.

SATI Partners, SA Tesoro Investors, Inc. and TD Partners and Tesoro Drive Investors, Inc. timely filed their federal income tax returns. The Taxpayers also timely filed their respective federal income tax returns for the 1999 tax year, which included their respective share of income, losses, and deductions from SATI Partners, SA Tesoro Investors, Inc., TD Partners and Tesoro Drive Investors, Inc. In accordance with the opinions received from various tax professionals and the returns prepared by tax professionals at Ernst & Young, LLP, in reliance thereon, the loss generated by SA Tesoro Investors Inc.'s sale of the Shares was allocated to the Taxpayers for the 1999 tax year as follows: (a) $3,229,779 was allocated to Gary Woods and; (b) $29,068,077 was allocated to Billy J. McCombs.

Likewise, in accordance with the opinions obtained from tax professionals and the returns prepared by Ernst & Young, LLP, in reliance thereon, the loss generated by Tesoro Drive Investors, Inc.'s sale of the Foreign Currency was allocated to the Taxpayers for the 1999 tax year as follows: (a) $8,217,536 was allocated to Gary Woods, and (b) $5,135,626 was allocated to Billy J. McCombs.

4. **IRS Adjustments Are Improper and Should be Reversed.**

The Commissioner disallowed all the tax benefits associated with the Transactions described above and applied penalties against the Taxpayers on a number of theories when it issued the FPAA. Each of these theories is erroneous and cannot form the basis of the adjustments proposed.

5. **Penalties Should Not Apply.**

Taxpayers should not be penalized because they relied on the advice, counsel, and guidance of competent tax professionals, including, but not limited to, professionals at Jenkens & Gilchrist P.C., Brown & Wood LLP, and Ernst & Young, LLP in determining the federal income tax consequences and proper reporting obligations relative to the Transactions described above.

The Taxpayers each obtained a separate written legal opinion from Jenkens & Gilchrist P.C. dated January 31, 2000. Jenkens & Gilchrist P.C. provided an opinion on a more likely than not basis regarding the federal tax consequences of the Transactions. Brown & Wood LLP also issued opinions which provided legal analysis and conclusions consistent with those of Jenkens & Gilchrist P.C. Other tax professionals confirmed this advice to the Taxpayers, including Ernst & Young, LLP, who prepared and filed the various entity returns and two of the four Taxpayers' returns. The conclusions set forth in the legal opinions, as ratified and confirmed by the other professionals, provided reasonable bases for the manner in which the Transactions were reported for federal tax purposes. Consequently, Petitioners have a complete defense to the application of penalties.

6. **Miscellaneous Matter.**

In its statement below, Respondent makes repeated references to *Camferdam, et al. v. Ernst & Young et al.*, Case No. 02 Civ. 10100 (USDC SDNY), and implies that the *Tesoro* petitioners are parties in that case. The *Tesoro* petitioners are not and have never been parties in that case.

C. **Respondent's Statement.**

This case arises out of a complex abusive tax shelter strategy developed in the mid 1990's by the Chicago law firm of Jenkens & Gilchrist, a Professional Corporation ("J&G") and others. The purpose of this generic tax shelter product was to eliminate gains realized by the taxpayers from the recent sale of their businesses and other income. The strategy was essentially based on the purchase by wealthy taxpayers of what were characterized as option contracts, but which in reality were nothing more than private wagering arrangements. The contracts were not sold on any exchange. Nor was there any real possibility of foreign currency ever exchanging hands on the transactions. The strategy called for the purchase of purported offsetting currency positions, but which had no reasonable possibility of a profit in excess of the enormous fees on the transactions.

The fees for these transactions were a fixed percentage of the taxpayers' desired tax loss. The only question for the taxpayers was how much of the gains to eliminate. The scheme, sometimes with minor variations, was marketed under various names, including the version refined by Ernst and Young, LLP ("E&Y"), which was marketed to its wealthy clients under the acronym of "COBRA, or Currency Options Bring Reward Alternatives. The DeutscheBank A.G. ("DB") was recruited to serve as the financial counter party to the private wagering contracts. J&G was recruited to assist in the development and implementation of the strategy. There were a total of 16 COBRA transactions through which taxpayers attempted to generate nearly $1 billion worth of artificial losses.

1. **Summary of Facts as to The Marketing of the Strategy.**

According to allegations in a class action suit against the promoters of this strategy, as discussed infra, E&Y presented the tax strategy to petitioners by the use of power point displays and represented that it devised the tax strategy, when in fact it was merely the marketing agent of J&G. At the beginning of the presentation, potential investors were required to sign confidentiality agreements with both J&G and E&Y. Under these confidentiality agreements, which expressly disclosed J&G's role as a promoter, participants agreed that they would not disclose any of the marketing materials used by E&Y to explain the steps of the transaction.

After agreeing to the marketing terms, participants then met with E&Y for a document signing ceremony at which they pre-signed documents necessary to effectuate the COBRA transaction. The Carmel participants have testified that they did not in fact read the documents they signed. It is unclear at this time where and when in November the documents were signed in Tesoro. E&Y appears to have recommended that participants eliminate only part

of their gains, so as to avoid flagging the transaction to the IRS. J&G and E&Y also appear to have decided that the fees paid to J&G should not be claimed by participants as itemized deductions, again to avoid flagging the transaction to the IRS.

. E&Y apparently represented to participants that the IRS would never be able to find the transaction on the multiple tax returns used to report the transaction. J&G and another law firm, Brown & Wood, ("B&W") furnished "canned" and "prefabricated" legal opinion to participants in an attempt to insulate the COBRA transactions from penalties, should they ever be discovered by the IRS. However, both of these law firms were co-promoters of COBRA.

The fees to purchase the COBRA product were pre-set by the promoters as a fixed percentage of the investors' desired tax loss. Total transaction costs and fees were set at 9 1/2 % of the desired loss. E&Y allegedly recommended that participants not eliminate their entire income, so as to avoid flagging the transaction to the IRS. E&Y thereafter "picked" the loss petitioners needed to generate and the participants signed the form documents which were then generated to effectuate the transaction. The investors' partnerships were created as an integral part of this transaction for purposes of generating the losses that had been "picked."

These tax shelter transactions are but one of a host of abusive tax shelter transactions recently unearthed by the Internal Revenue Service which were marketed to wealthy individuals. Apart from E&Y and J&G, at least three other professional firms were also involved in the design, marketing, and implementation of COBRA. These firms were the DeutscheBank ("DB"), and the law firms of Brown & Wood ("B&W") and Scheef & Stone ("S&S"). J&G and B&W prepared the boilerplate opinions to "bless" the transactions.

Counsel for the *Tesoro* petitioners have filed one other case involving the same COBRA tax strategy that was purchased by petitioners in the Federal Court of Claims. *JZ Buckingham v. United States*, No. 05-231 T (Fed. Cl.). *JZ Buckingham* also involves that same five third parties that are involved in this MDL litigation. *Tesoro* counsel has represented that they are also about to file three more cases involving the COBRA tax strategy in the Court of Federal Claims. According to *Tesoro* counsel, these three new cases also involve E&Y and DB and a new law firm, Proskauer & Rose, which prepared the legal opinions for the participants in these cases. These new cases will therefore involve much of the same third party discovery. Accordingly, while 28 USC § 1407 does not cover cases before the Federal Court of Claims, we will seek, by stipulation or court order, to allow the third party discovery taken in the MDL litigation to apply to the Court of Federal Claims cases. Coordinating identical third party discovery will be beneficial to all parties, as well as the courts in these different cases, since it will obviate the need for duplicative discovery.

It is anticipated by the United States that the scope of its third party discovery will be substantial. The United States anticipates that it will require at least 100 depositions in these three MDL cases and the one Court of Federal Claims case and 150 interrogatories in each case, and has filed a motion to enlarge discovery limits. The need for such discovery is amply illustrated by petitioners' own allegations in their class action against these same third parties in which they have alleged that E&Y, DB, J&G, B&W conspired:

> . . . to devise the scheme and agreed to provide a veneer of legitimacy to each other's opinion as to the lawfulness and tax consequences of the COBRA transaction by agreeing to the representations that would be made and to issue allegedly "independent" opinions before potential clients were solicited. These "independent" opinions were prefabricated and canned opinions used for each and every client across the United States with basic factual information inserted depending upon the client.

Second Amended Complaint, ¶181, *Camferdam, et al. v. Ernst & Young, et al.*, Case No. 02 Civ. 10100 (USDC SDNY). The underlying options transactions were allegedly also rigged. *See*, Second Amended Complaint, ¶ 59, Camferdam, et al. v. Ernst & Young, et al., Case No. 02 Civ. 10100 (USDC SDNY). A preliminary order certifying the class, dated May 14, 2004, reflects that discovery against J&G was stayed during settlement negotiations. J&G settled the claims against it for about $85 million. Under the terms of this settlement, J&G produced to class counsel over 200,000 pages of documents and allowed extensive interviews of its key witnesses, including Paul Daugerdas, Edwin Mayer, Donna Guerin and Patrick O'Daniel. Class counsel have represented that they spent 18,799 hours of attorney and paralegal time. Petitioners' remaining claims against E&Y, DB and B&W are still pending. B&W also has settled many of the participants' claims against it with respect to these transactions.

The Office of the United States Attorney for the Southern District of New York has a pending criminal investigation with respect to these transactions. That office has asked that it be kept apprised of any discovery in this action in order to ensure that this action does not adversely effect its pending criminal investigations. In the event that it does, the United States anticipates that it will seek either a protective order, or other such relief, including a stay if necessary, to protect the important interests of law enforcement. Counsel for the United States has notified petitioners that, in addition to Rule 6(e) of the Federal Rules of Criminal Procedure which protects grand jury information, the IRS criminal files are also privileged and not subject to discovery at this time.

## III. Contentions/Issues.

The Magistrate Judge has asked the parties to identify and describe the parties' contentions and the issues at this stage of the litigation. The following is a summary table listing the contentions and issues of the parties which is offered for the benefit of the Court, but is not intended to waive any contentions or issues not listed:

### A. Petitioner Carmel Partners' Contentions/Issues.

1. Petitioners properly determined all items of income, losses, deductions, and credits for the 1999 tax year.

2. Petitioners properly calculated and reported the loss generated by BAMC Inc.'s sale of bonds, which was allocated to the Taxpayers for the 1999 tax year as follows: (a) $48,825,463 was allocated to Camferdam; (b)

$11,713,479 was allocated to Adams; (c) $6,829,165 was allocated to Michener; and (d) $1,366,108 was allocated to Trigilio.

3. Petitioners properly calculated and caused to be reported a loss on BAMC, Inc.'s IRS Form 1120S and the corresponding Schedules K-1 for tax year 1999 in the amount of $68,734,215.

4. All basis calculations and determinations made by the Petitioners with respect to tax year 1999 were valid and proper.

5. All of the petitioner entities were validly created, existing, and recognized for all state and federal law purposes, including federal income tax purposes for tax year 1999.

6. Neither the petitioners that are entities, nor the entities that were formed by or on behalf of any of the petitioners with respect to the COBRA transaction (collectively, the "Petitioner Entities") were shams for federal income tax purposes for tax year 1999.

7. None of the Petitioner Entities lacked economic substance for federal income tax purposes for tax year 1999.

8. No part of the Petitioner Entities or the Transactions may be disregarded, ignored or recharacterized on the basis that they lacked economic substance, business purpose or otherwise constituted a sham for federal income tax purposes.

9. The losses and other benefits claimed by the Petitioners on their federal tax returns cannot be disallowed on the basis that either the Transactions or any of the entities involved constituted shams or lacked business purpose or economic substance because none of these doctrines is incorporated into or otherwise a part of the Code.

10. Disallowance of the losses or other benefits claimed by the Petitioners in this case on the basis of either the sham transaction, business purpose or economic substance theories asserted by the Commissioner would violate the separation of powers provisions of the United States Constitution.

11. The Petitioner Entities were not formed or availed of in connection with a transaction or transactions in a manner inconsistent with the intent of Subchapter K of the Code and may not otherwise be disregarded, nor may any of their transactions be recharacterized, in whole or in part, under the authority of Treas. Reg. § 1.701-2 for tax year ending December 27, 1999.

12. Treas. Reg. § 1.701-2 is invalid and inapplicable to the facts of this case.

13. The obligations under the Short Options sold do not constitute liabilities under Code Section 752. Consequently, neither the petitioners' nor any of the Petitioner Entities' assumption of any or all of those obligations should be regarded as a distribution of money under the Code for tax year 1999.

14. Even if the Options do constitute liabilities under Code Section 752 and the applicable regulations, the amount of the "liability" transferred under the Options is $0. As such, the bases in the Petitioner Entities cannot be reduced by any part of the Options transferred to the Petitioner Entities.

15. The amounts treated as contributed under Section 722 of the Internal Revenue Code are not reduced by the amounts received from the sale of the Short Options.

16. Temporary Treas. Reg. 1.752-6T is invalid and inapplicable to the facts of this case.

17. Code Section 165(c)(2) does not operate to disallow the losses or other tax benefits claimed in this case for tax year 1999.

18. Petitioners properly determined and reported the basis of the Foreign Currency transferred in tax year 1999.

19. Petitioners properly computed and reported the basis of all transactions in tax year 1999.

20. In every other respect, the federal tax consequences of the transactions at issue in this case are as set forth in the legal opinions discussed above and as reported by Petitioners on their federal tax returns.

21. Petitioners are not subject to penalties under Code Section 6662 because any tax liability ultimately determined by this Court against them is not attributable to: (a) negligence or disregard or rules or regulations; (b) any substantial understatement of income tax; or (c) any substantial or gross valuation misstatement under Chapter 1.

22. Petitioners are not subject to penalties under Code Section 6662 because any understatement ultimately determined by the Court is attributable to items for which the relevant facts were adequately disclosed in Petitioners' returns or in a statement attached to the returns; and there is a reasonable basis for the tax treatment of such item by the taxpayer.

23. The Transactions at issue in this case do not constitute a tax shelter.

24. In the alternative, even if the Transactions do constitute a tax shelter, Petitioners are not subject to penalties under Code Section 6662 because

any understatement ultimately determined by the Court is, based on the foregoing, attributable to the tax treatment of items for which there is or was substantial authority for such treatment, and, furthermore, Petitioners reasonably believed that the tax treatment of such item by Petitioners was more likely than not the proper treatment.

25. Petitioners are not subject to penalties under Code Section 6662(b)(1) because they were not negligent nor did they disregard any rules or regulations as contemplated by Code Section 6662.

26. Petitioners are not subject to penalties under Code Section 6662(b)(2) because there is no substantial understatement of income tax as contemplated by Section 6662.

27. Petitioners are not subject to penalties under Code Section 6662(b)(3) because there is no substantial or gross valuation misstatement as contemplated by Code Section 6662.

28. Petitioners are not subject to penalties under Code Section 6662 on any underpayment ultimately determined because there was, based on the foregoing, reasonable cause for such underpayment and Petitioners acted in good faith as contemplated by Code Section 6664(c)(1).

29. Petitioners relied on the advice provided by tax professionals including, but not limited to, Jenkens & Gilchrist, P.C., Brown & Wood, LLP and Ernst & Young, LLP. In addition, the reliance on such advice was reasonable and in good faith. Thus, under the authority of Code Section 6664(c)(1) and Treasury Regulation § 1.6664-4, Petitioners are not subject to the penalties imposed by the IRS under Code Section 6662.

30. Petitioners are not subject to penalties because the Government retroactively changed the definition of "liability" under IRC § 752.

B. **<u>Petitioners SA Tesoro Investment Partners' and Tesoro Drive Partners' Contentions/Issues.</u>**

1. Petitioners properly determined all items of income, losses, deductions, and credits of SATI Partners and TD Partners for the tax year ending December 27, 1999.

2. Petitioners properly calculated and reported the net short term capital gain of TD Partners in the amount of $5,037 for tax year ending December 27, 1999.

3. Petitioners properly calculated and reported the tax exempt interest of SATI Partners in the amount of $958 for the tax year ended December 27, 1999.

4. Petitioners properly calculated and reported ordinary income of TD Partners in the amount of $650,000 for tax year ending December 27, 1999. Petitioners properly computed and reported ordinary income of SATI Partner in the amount of $50,000 for the tax year ending December 27, 1999.

5. Taxpayers properly determined the Partners' outside basis in TD Partners and SATI Partners for tax year ending December 27, 1999.

6. TD Partners and SATI Partners are partnerships validly created, existing, and recognized for all state and federal law purposes, including federal income tax purposes for tax year ending December 27, 1999.

7. TD Partners and SATI Partners were not shams for federal income tax purposes for tax year ending December 27, 1999.

8. TD Partners and SATI Partners did not lack economic substance for federal income tax purposes for tax year ending December 27, 1999.

9. No part of the Partnerships or the Transactions may be disregarded, ignored or recharacterized on the basis that they lacked economic substance, business purpose or otherwise constituted a sham for federal income tax purposes.

10. The losses and other benefits claimed by the Petitioners on their federal tax returns cannot be disallowed on the basis that either the Transactions or any of the entities involved constituted shams or lacked business purpose or economic substance because none of these doctrines is incorporated into or otherwise a part of the Code.

11. Disallowance of the losses or other benefits claimed by the Petitioners in this case on the basis of either the sham transaction, business purpose or economic substance theories asserted by the Commissioner would violate the separation of powers provisions of the United States Constitution.

12. TD Partners and SATI Partners were not formed or availed of in connection with a transaction or transactions in a manner inconsistent with the intent of Subchapter K of the Code and may not otherwise be disregarded, nor may any of their transactions be recharacterized, in whole or in part, under the authority of Treas. Reg. § 1.701-2 for tax year ending December 27, 1999.

13. Treas. Reg. § 1.701-2 is invalid and inapplicable to the facts of this case.

14. The obligations under the Short Options sold do not constitute liabilities under Code Section 752. Consequently, both TD Partners' and SATI Partners' assumption of those obligations is not regarded as a distribution of money to the Partners under the Code for tax year ending December 27, 1999.

15. Even if the Options do constitute liabilities under Code Section 752 and the applicable regulations, the amount of the "liability" transferred to the Partnerships under the Options is $0. As such, the Partners' bases in the Partnerships cannot be reduced by any part of the Options transferred to the Partnerships.

16. The amounts treated as contributed by the Partners under Section 722 of the Internal Revenue Code are not reduced by the amounts received by the Partners from the sale of the Short Options.

17. Temporary Treas. Reg. 1.752-6T is invalid and inapplicable to the facts of this case.

18. Code Section 165(c)(2) does not operate to disallow the losses or other tax benefits claimed by the Partners in this case for tax year ending December 27, 1999.

19. Petitioners properly determined and reported the basis of the Foreign Currency transferred from TD Partners to Tesoro Drive Investors, Inc. for tax year ending December 27, 1999.

20. Petitioners properly computed and reported the basis of the Shares transferred form SATI Partners to SA Tesoro Investors, Inc. for the tax year ending December 27, 1999.

21. In every other respect, the federal tax consequences of the transactions at issue in this case are as set forth in the Legal Opinions discussed above and as reported by Petitioners on their federal tax returns.

22. Petitioners are not subject to penalties under Code Section 6662 because any tax liability ultimately determined by this Court against them is not attributable to: (a) negligence or disregard or rules or regulations; (b) any substantial understatement of income tax; or (c) any substantial or gross valuation misstatement under Chapter 1.

23. Petitioners are not subject to penalties under Code Section 6662 because any understatement ultimately determined by the Court is attributable to items for which the relevant facts were adequately disclosed in Petitioners'

returns or in a statement attached to the returns; and there is a reasonable basis for the tax treatment of such item by the taxpayer.

24. The Transactions at issue in this case do not constitute a tax shelter.

25. In the alternative, even if the Transactions do constitute a tax shelter, Petitioners are not subject to penalties under Code Section 6662 because any understatement ultimately determined by the Court is, based on the foregoing, attributable to the tax treatment of items for which there is or was substantial authority for such treatment, and, furthermore, Petitioners reasonably believed that the tax treatment of such item by Petitioners was more likely than not the proper treatment.

26. Petitioners are not subject to penalties under Code Section 6662(b)(1) because they were not negligent nor did they disregard any rules or regulations as contemplated by Code Section 6662.

27. Petitioners are not subject to penalties under Code Section 6662(b)(2) because there is no substantial understatement of income tax as contemplated by Section 6662.

28. Petitioners are not subject to penalties under Code Section 6662(b)(3) because there is no substantial or gross valuation misstatement as contemplated by Code Section 6662.

29. Petitioners are not subject to penalties under Code Section 6662 on any underpayment ultimately determined because there was, based on the foregoing, reasonable cause for such underpayment and Petitioners acted in good faith as contemplated by Code Section 6664(c)(1).

30. Petitioners relied on the advice provided by tax professionals including, but not limited to, Jenkens & Gilchrist, P.C., Brown & Wood, LLP and Ernst & Young, LLP. In addition, the reliance on such advice was reasonable and in good faith. Thus, under the authority of Code Section 6664(c)(1) and Treasury Regulation § 1.6664-4, Petitioners are not subject to the penalties imposed by the IRS under Code Section 6662.

31. Petitioners are not subject to penalties because the Government retroactively changed the definition of "liability" under IRC § 752.

C. **<u>The United States' Contentions/Issues.</u>**

1. The United States contends that the Internal Revenue Service correctly determined that even if Carmel Partners, SA Tesoro Investment Partners and Tesoro Drive Partners existed as partnerships under state law, the entities were shams for federal income tax purposes. That is, the LLCs did not "join together

as partners to conduct business activity for a purpose other than tax avoidance." *ASA Investerings P'ship v. Comm'r*, 201 F.3d 505, 513 (D.C.Cir.2000). " '[T]he absence of a nontax business purpose is fatal' to the argument that the Commissioner should respect an entity for federal tax purposes." *Saba P'ship v. Comm'r*, 273 F.3d 1135, 1141 (D.C.Cir. 2001), *quoting ASA Investerings P'ship v. Comm'r*, 201 F.3d at 512. At this early stage of discovery, the fundamental factual basis of this position is that this purported entity was not formed or availed of for a valid business purpose. Rather, it was organized and availed of solely for purposes of tax avoidance which was to be accomplished by artificially inflating the basis of the partners' partnership interests.

2. The United States also contends that the Internal Revenue Service correctly determined that the purchase of the offsetting option transactions and their contribution to Carmel Partners, SA Tesoro Investment Partners and Tesoro Drive Partners, respectively, was an economic sham. First, these offsetting option transactions did not have objective economic substance. At this early stage of discovery, the principal factual basis of that position is that absent the tax benefits, there was no reasonable possibility that the LLCs or the purported partnership would realize a profit in excess of the enormous fees and transaction costs on these transactions. Apart from the individual taxpayers personal fees on these transactions, they and their purported entities had to incur fees to the promoters amounting to 9½ % of their desired tax losses. Given these enormous fees, combined with the marginal chances of the options being "in the money" at the end of their terms, neither the purported partners (the LLCs) nor the purported partnership had a realistic possibility of realizing an economic profit on these transactions. Moreover, with the spread between the two offsetting positions being just a fraction of a cent, there was virtually no chance that just one of the offsetting positions would be acted upon. Indeed, because the Deutsche Bank, as the calculating agent, could choose to accept or disregard any spot rate, when combined with the incredibly close proximity of the trigger spot rates (hundredths of a penny apart), the chances of just one of the paired position being exercised, was virtually nil. As a result, these offsetting option positions amounted to, in reality, a contractual wager, with the chances of winning the wager being no different than that of winning the lottery – it was not going to happen. It is expected that expert testimony will also address this issue.

3. The United States contends that these offsetting option transactions had no purpose (business or otherwise) other than the creation of income tax losses. At this early stage of discovery, the principal factual basis of this position is that the sole purpose of these transactions was to generate a huge paper tax loss on the sale of former partnership property which was not economically inherent in these transactions, but created artificially "by machinations whose only purpose and effect was to give rise to the desired tax consequences." *ACM Partnership et al v. Commissioner*, 157 F.3d 231, 245 (3rd Cir. 1998). Accordingly, the Internal Revenue Service correctly determined that the purported partnership and the

offsetting option transactions described above should be disregarded in full and: (1) any purported losses resulting from these transactions are not allowable as deductions; and (2) increases in basis in partnership interests and increases in basis of assets are not allowed to eliminate gain for federal income tax purposes.

4. The United States contends that the Internal Revenue Service correctly determined that Carmel Partners, SA Tesoro Investment Partners and Tesoro Drive Partners were each shams, lacked economic substance and, under §1.701-2 of Income Tax Regulations, were formed and availed of in connection with a transaction or transactions in taxable year 1999, a principal purpose of which was to reduce substantially the present value of its partners' aggregate federal tax liability in a manner that is inconsistent with the intent of Subchapter K of the Internal Revenue Code.

5. The United States contends that the Internal Revenue Service correctly determined that the Carmel Partners, SA Tesoro Investment Partners and Tesoro Drive Partners should be disregarded and that all transactions engaged in by the purported partnerships should be treated as engaged in directly by its purported partners. This includes the determination that assets purportedly acquired by Carmel Partners, SA Tesoro Investment Partners and Tesoro Drive Partners, including but not limited to foreign currency options, were acquired directly by the purported partners.

6. The United States contends that the Internal Revenue Service correctly determined that the foreign currency option(s), purportedly contributed to or assumed by Carmel Partners, SA Tesoro Investment Partners and Tesoro Drive Partners, should be treated as never having been contributed to or assumed by said partnerships and any gains or losses purportedly realized by Carmel Partners, SA Tesoro Investment Partners and Tesoro Drive Partners on the option(s) should be treated as having been realized by its partners.

7. The United States contends that the Internal Revenue Service correctly determined that the purported partners of Carmel Partners, SA Tesoro Investment Partners and Tesoro Drive Partners should be treated as not being partners in Carmel Partners, SA Tesoro Investment Partners and Tesoro Drive Partners.

8. The United States contends that the Internal Revenue Service correctly determined that contributions of Carmel Partners, SA Tesoro Investment Partners and Tesoro Drive Partners should be adjusted to reflect clearly the partnership's or purported partners' income.

9. The United States contends that Internal Revenue Service correctly determined that the formation of Carmel Partners, SA Tesoro Investment Partners and Tesoro Drive Partners and the contribution of the offsetting option transactions to Carmel Partners, SA Tesoro Investment Partners and Tesoro Drive

Partners violated the Anti-Abuse regulations of Subchapter K of the Internal Revenue Code – i.e., Treas. Reg. §1.701-2.

10. The United States contends that the Internal Revenue Service correctly determined that the obligations inherent in the short positions (written call options) transferred to Carmel Partners, SA Tesoro Investment Partners and Tesoro Drive Partners constitute liabilities for purposes of Section 752 and Treas. Reg. §1.752-6T. The term "liability" in Section 752 encompasses all liabilities, including contingent liabilities. Thus, assumption of the obligations under the short positions constituted a distribution of money to the purported partners under Section 752(b), thereby decreasing their basis in the purported partnership. Moreover, *Helmer v. Commissioner,* 34 T.C.M. (CCH) 727, T.C.M (1975) is inapposite to these facts because it did not involve simultaneously executed long and short options of the same underlying property with virtually identical terms, which offsetting options eliminated all financial risk to the purported partners in excess of the net premiums paid by them. Also, *Helmer* did not involve offsetting option transactions which were entered into as part of an elaborate and prearranged scheme to avoid federal income taxes.

11. The United States further contends that the Internal Revenue Service correctly determined that the purported partners of Carmel Partners, SA Tesoro Investment Partners and Tesoro Drive Partners did not acquire the option(s) positions or contribute them to the purported partnerships for the principal purpose of realizing a profit for purposes of 26 U.S.C. Section 165(c)(2).

12. The United States contends that the Internal Revenue Service correctly determined that the purported partners of Carmel Partners, SA Tesoro Investment Partners and Tesoro Drive Partners did not acquire the option(s) positions or contribute them to the purported partnership for the principal purpose of realizing a profit.

13. The United States contends that the Internal Revenue Service correctly determined that even if Carmel Partners, SA Tesoro Investment Partners and Tesoro Drive Partners are treated as partnerships for federal income tax purposes and even if the foreign currency option(s) are therefore treated as having been contributed to this partnership, these nominally separate offsetting (long and short) options were in substance a "single" position. It a foundational principle of the tax law that the substance of a transaction controls for federal income tax purposes. At this early stage of the discovery, the principal facts supporting this position are that in form, these nominally separate options required huge gross premiums (totaling many millions of dollars) and exposed the option writers to massive potential losses. In substance, however, these nominally separate private trades economically nearly totally offset each other, thereby only requiring a relatively small net premium. Moreover, because of their incredibly close strike prices, there was virtually no risk that only one position would be exercised. Thus, assuming these alleged trades were not "factual shams," these nominally

separate positions constituted, in substance and in reality, a single position. As such, the basis of these offsetting option positions would be limited to the net premium paid on their acquisition – with the corresponding result that the contributing partners' basis of their partnership interests would also be limited to this net premium amount. It is expected that expert testimony will also address this issue.

14. The United States contends that the Internal Revenue Service correctly determined that the adjusted basis of the offsetting options and other property contributed to Carmel Partners, SA Tesoro Investment Partners and Tesoro Drive Partners is zero. Even though the offsetting options must be viewed as a "single position" with the result that the basis of these offsetting options would be equal to the net premium paid for these positions, the burden is on the plaintiff to establish that they made a net "out of pocket" payment for these options and also to establish the amount of this net cash payment.

15. The United States contends that the burden is on the petitioners to establish what was the adjusted basis in the hands of the purported partners of the other property contributed to the purported partnership. However, even assuming that plaintiff sustains its burden of showing what net amounts were paid for the offsetting options, the basis of these option positions would still be zero if these transactions were determined to be factual or economic shams.

16. The United States contends that the Internal Revenue Service correctly determined that in the case of the purported partners' nominal transfer of their partnership interests to the purported Subchapter S corporations (BAMC, Inc., Tesoro Drive Investors, Inc. and SA Tesoro Investors, Inc.), the basis of their purported partnership interests (both before and after the transfer) is zero. *See* 26 U.S.C. §§ 705 and 722, which provide, in relevant part, that the basis of a contributing partner's partnership interest is equal to the adjusted basis of the contributed property at the time of contribution. Since petitioners have not established what was the net (out of pocket) amount of the premium payments for the offsetting positions, the adjusted basis of such options is zero – with the result that the basis of the contributing partners' purported partnership interests must also be zero.

17. The United States contends that the step transaction doctrine is applicable in this case, requiring that the individual steps of the COBRA transaction be collapsed. The purported partnership in this scheme was simply used as a conduit to create an artificially inflated basis in the purported partners' partnership interests, which inflated basis could, in turn, then be allocated to property distributed to the purported Subchapter S corporation upon the prearranged dissolution of the purported partnership. The purported Subchapter S corporation was also simply used as a conduit to generate a paper tax loss on the sale of this property whose basis had been artificially inflated, which loss could then be passed through the individual taxpayers. Under the step transaction doctrine, the

steps of the transfer of the offsetting options to the purported partnership and the distribution of the partnership property on the liquidation of the partnership to the purported subchapter S corporation are disregarded. With these steps disregarded, the basis of property distributed to the Subchapter S corporation would therefore be required to equal the actual cost of this property – and not the artificially inflated basis of the disregarded partnership interests. Thus, the disposition of such property would not give not rise to an artificially-generated tax loss. At this stage of discovery, the principal facts supporting this position are the marketing materials of the promoters which make it crystal clear that each of the steps of this COBRA transaction was meticulously prearranged with the ultimate end result in mind to achieve an artificially-generated tax loss for the individual investors.

18. The United States contends that the offsetting option transactions may be factual shams. That is, it appears that while these transactions are, at least to some extent, documented on paper, this documentation may not reflect the reality of these transactions. Based on the allegations in the investors' suits against the promoters, these option contracts may ultimately be determined to be illusory. The principal facts to support this position will only be known after full discovery (documentary and depositions) has been conducted upon the Deutsche Bank.

19. The United States contends that the "at risk" rules of I.R.C. § 465 apply here to preclude the allowance of the claimed losses. Section 465(a)(1) provides that individuals may claim losses and deductions only to the extent of the aggregate amount to which the taxpayer is at risk. Section 465(b) provides that a taxpayer is not considered at risk with respect to amounts protected against loss through some related agreement. At this early stage of discovery, the principal facts supporting this legal position are that the COBRA transactions were carefully designed to limit the financial risk of the investors, their LLCs and their purported partnership. The offsetting options were expressly designed to ensure that the investors, through their LLCs and their partnership, were exposed to risk only to the extent of the net premium paid to the Deutsche Bank. Moreover, the operation of the offsetting options limited their risk because the values of the options moved in opposite directions in economically offsetting amounts. The amount that could be gained or lost was therefore fixed at the time the offsetting options came into existence. As neither the LLCs nor Carmel Partners, SA Tesoro Investment Partners and Tesoro Drive Partners were "at risk" for more than the amount of the net premium, §465 precludes Carmel Partners, SA Tesoro Investment Partners and Tesoro Drive Partners from claiming a basis in the offsetting option positions in excess of the net premium.

20. The United States further contends that the FPAA correctly determined that the partners are liable for four accuracy-related penalties: a 20-percent penalty for negligence, a 20-percent penalty for a substantial underpayment of tax, a 20-percent penalty for a substantial valuation misstatement, and a 40-percent penalty for a gross valuation misstatement.

21. Section 6662(a) imposes an accuracy-related penalty on certain underpayments of tax. The accuracy-related penalty is equal to 20 percent of that portion of an underpayment that is attributable to, among other things: (1) negligence, (2) any substantial understatement of income tax, and (3) any substantial valuation misstatement. *See,* § 6662(b)(1) - (b)(3), Appendix A, *infra.* The penalty increases to 40 percent of the underpayment if the underpayment is due to a gross valuation misstatement. *See,* § 6662(h). Two recent cases have confirmed that the statutory term "valuation misstatement" includes inflated basis of property. *See, Long Term Capital Holdings, Ltd, v. United States,* 330 F. Supp. 2d 122, 199 (D. Conn. 2004), aff'd (unpublished order) (2nd Cir. Sept. 27, 2005); *Santa Monica Pictures, LLC v. Commissioner,* 89 T.C.M. (CCH) 1157 ( May 11, 2005) (on appeal C.A. 2). The United States contends that the gross valuation misstatement penalty is applicable as a matter of law with respect to the overstatements of basis in the COBRA transactions. There is no stacking of the accuracy-related penalty components, Treas. Reg. § 1.6662-2 (c). In other words, the maximum accuracy related penalty imposed on any portion of an underpayment is 20 percent, or 40 percent in the case of gross valuation misstatement, even if that portion of the underpayment is attributable to more than one type of misconduct.

22. The United States further contends that the adjustment of partnership items of Carmel Partners, SA Tesoro Investments Partners and Tesoro Drive Partners are attributable to a tax shelter for which no substantial authority has been established for the position taken and no showing of reasonable belief by the partnership or its partners that the position taken was more likely than not the correct treatment of the tax shelter and related transaction.

23. The United States contends that the substance of the foreign currency transactions, not the form of the transactions should control the tax treatment of the foreign currency transactions. *See,* 26 U.S.C. § 988 and the regulations thereunder.

24. Accordingly, the Internal Revenue Service correctly determined that the purported partnership and the offsetting option transactions described above should be disregarded in full and: (1) any purported losses resulting from these transactions are not allowable as deductions; and (2) increases in basis in partnership interests and increases in basis of assets are not allowed to eliminate gain for federal income tax purposes.

25. Whether the various partnerships meet the criteria for a partnership under applicable state and federal laws.

26. Whether the partnerships have a legitimate business purpose and therefore should be respected for federal income tax purposes.

27. Whether the partnership exists as a matter of fact or whether it is a factual sham.

28. Whether the offsetting option transactions have economic substance, and therefore should be respected for federal income purposes?

29. Whether the individual petitioners and the partnership petitioners could reasonably expect to realize a pre-tax profit on the offsetting option transactions.

30. Whether there was a legitimate business purpose for the contribution of the offsetting option transactions to the partnership.

31. Whether the transaction should be disregarded or recast, in whole or in part due, to the violation of Treas. Reg. § 1.701-2 (the partnership anti-abuse rules) which regulation list various factors to be considered, including consideration of the purported business purpose and claimed tax benefits resulting from the transaction.

32. Whether the offsetting options constitute a single position for federal income purposes.

33. Whether the step transaction doctrine applies to require the steps of the COBRA transactions to be collapsed because they were preplanned with the single objective in mind of generating massive paper tax losses, which could then be passed through to the individual investors.

34. Whether Treas. Reg. § 1.752-6T applies to reduce the outside basis in the partnership of the petitioners who contributed the options in the amount of the nominal premium received for the short option.

35. Whether the legal and promoter fees and other "out-of-pocket expenses" paid by the individual investors or the partnership with respect to the COBRA transactions were fees paid in connection with tax shelter activities and are therefore not deductible?

36. Whether the economically offsetting option positions contributed to the partnership constitute an arrangement under I.R.C. § 465(b)(4) to limit exposure to risk of loss.

37. Whether, under all the facts and circumstances, the transaction was conducted in such a manner as to warrant application of the accuracy-related penalties?

38. Whether the notice partners qualify for relief from the accuracy-related penalties under the reasonable cause provisions of I.R.C. § 6664(c).

## IV. Pretrial Pleadings and Disclosures

The parties propose the following dates for the Case Management Plan:

A. **Initial Disclosures.** The parties have served their Fed. R. Civ. P. 26 initial disclosures.

B. **Petitioners' Preliminary Witness and Exhibit Lists.** Petitioners shall file preliminary witness and exhibit lists on or before **March 21, 2006.**

C. **Respondent's Preliminary Witness and Exhibit Lists.** Respondent shall file preliminary witness and exhibit lists on or before **March 21, 2006.**

D. **Deadline for Amending Pleadings or Adding Parties.** All motions for leave to amend the pleadings and/or to join additional parties shall be filed on or before **June 1, 2006.** The United States reserves the right to seek a further enlargement of the agreed upon scheduling deadlines to the extent such amendment or addition of parties adds additional issues that have not already been pled.

E. **Settlement Demand Deadline.** Petitioners shall serve on Respondent (but not file with the Court) a statement of special damages, if any, and make a settlement demand, on or before **March 21, 2006.** Respondent shall serve on Petitioners (but not file with the Court) a response thereto within 30 days after receipt.

F. **Expert Disclosures.** The parties shall disclose the name, address, and vita of all expert witnesses, and shall serve the report required by Fed. R. Civ. P. 26(a)(2)(B) on or before November 15, 2006. However, if a party uses expert witness testimony at the summary judgment stage, that party shall make such disclosures no later than 60 days prior to the summary judgment deadline. The parties shall all disclose the name, address, and vita of all rebuttal expert witnesses, and shall serve the report required by Fed. R. Civ. P. 26(a)(2)(B) for such expert rebuttal witnesses on or before **December 15, 2006.**

G. **Deadline for Motion to Exclude or Limit Expert Testimony.** Any party who wishes to limit or preclude expert testimony at trial shall file any such objections no later than **February 1, 2007**. Any party who wishes to preclude expert witness testimony at the summary judgment stage shall file any such objections with their responsive brief within the briefing schedule established by Local Rule 56.1.

H. **Final Witness and Exhibit Lists.** All parties shall file and serve their final witness and exhibit lists on or before **February 1, 2007.**

I. **Bifurcation.** Any party who believes that bifurcation of discovery and/or trial is appropriate with respect to any issue or claim shall notify the Court as soon as practicable.

J. **Medical Experts.** The parties do not anticipate that medical experts will be utilized in this case.

## V. Discovery and Dispositive Motions.

A. **Dispositive Motions.** Petitioners believe that certain issues may be ripe for summary judgment and anticipate filing motions for summary judgment, challenging the validity of certain regulations upon which Respondent based its determinations in the FPAA. Respondent does not concur.

B. **Track 4.** The Parties recommend a custom plan under Track 4 where dispositive motions are expected and shall be filed no later than **April 1, 2007**; non-expert and expert witness discovery shall be completed[1] by **February 1, 2007**.

C. **Results of Conference Under FED.R.CIV.P. 26(f).** The Parties have conferred as required under FED.R.CIV.P. 26(f). While the Parties agree that they should coordinate third-party factual discovery in the MDL litigation with other similar cases, the Parties appear to have a broad disagreement regarding the scope and extent of permissible discovery.

## VI. Pre-Trial/Settlement Conferences.

A. **Settlement Conference.**

Petitioners believe that certain issues may be ripe for Petitioners believe that a settlement conference with the Magistrate Judge would likely be appropriate as soon as possible. The United States does not concur.

B. **Proposed Trial Dates.**

1. **Petitioners.** Both the Carmel and the Tesoro Investment Partners Petitioners request a trial date of **June 2007**. The trials are bench trials and both the Carmel and the Tesoro Petitioners expect the presentation of their case to last no more than seven days.

2. **Respondent.** Given the amount of trial preparation and coordination that will be required for all of these actions, the United States requests that the first trial in these cases be scheduled no earlier than September 2007, with trial dates to be scheduled sequentially thereafter for the remaining actions in three month intervals.

---

[1] The term "completed," as used in Section IV.B, means that counsel must serve their discovery requests in sufficient time to receive responses before this deadline. Counsel may not serve discovery requests within the 30-day period before this deadline unless they seek leave of Court to serve a belated request and show good cause for the same. In such event, the proposed belated discovery request shall be filed with the motion, and the opposing party will receive it with service of the motion but need not respond to the same until such time as the Court grants the motion.

The United States requests that the Carmel and Tesoro cases not be scheduled for trial at or about the same time due to potential conflicts in both counsel and witness schedules. Until Respondent completes discovery, it will not be able to make an accurate estimate as to the length of these trials. At this stage, it is believed that these trials could be anywhere from two to four weeks, but this is only a rough estimate.

## VII. Referral to Magistrate Judge.

At this time, all parties do not consent to refer this matter to the Magistrate Judge pursuant to 28 U.S.C. § 636(b) and Federal Rule of Civil Procedure 73 for all further proceedings including trial.

## VIII. Miscellaneous Matters.

### A. Procedures for the Resolution of Discovery Disputes.

Please refer to T.R. 37 and Local Rule 37.1 for the prerequisites of a motion to compel. The magistrate judge requires a conference with the attorneys prior to the filing of any discovery motions. Most disputes can be handled informally which will obviate the need for motion practice.

### B. Procedures for Coordinating Third Party Discovery and Any Identical Discovery Requests Upon the United States.

The Court will require similarly situated parties to confer and develop a single or master set of discovery requests to be served upon a third party or any discovery to be served on the United States. If there has been discovery upon the United States or third parties (whether formal or informal) that has been responded to in these cases, all parties are entitled to receive these responses regardless of who propounded the discovery request. A party who responded to any discovery request shall, within ten (10) business days from receipt of a written request for any discovery response shall provide that party with copy of such responses and a set of all documents produced.

### C. Adoption of Other Party Responses.

Any party may adopt the response of any other party in this MDL proceeding, whether the response is to discovery requests or motions filed with the court. The Party adopting a response must specifically reference both the request or motion (or part of the request or motion) for which the party is making an adoption and the response (or part of a response) being adopted.

### D. Procedures of Assertion of Privilege.

1. A claim for protection against disclosure based upon privilege shall be based upon a privilege log. Documents contained therein should be

identified by date and by the names of the author(s) and recipient(s) and describing their general subject matter. Unresolved claims of privilege shall be presented to the Magistrate Judge.

2. The United States, if asserting a claim of governmental deliberative process privilege, must furnish a privilege log but need not support the claim with a signed declaration unless the claim is challenged in a motion to compel.

3. Inadvertent disclosures of otherwise privileged documents shall not be considered a waiver of privilege if a party is notified of the inadvertent production no later than three months after the inadvertent production or two months before the discovery deadline, whichever is earlier. If a party is timely notified of the inadvertent disclosure of privileged documents, such document shall be returned promptly, along with all copies of such document. Alternatively, a party may move the Court to allow it to file all copies of said document in its possession or control under seal with the court and move for the court to determine whether it is covered by a valid claim of privilege. When a claim of inadvertent disclosure is made three months after a document is produced or two months before the discovery deadline, whichever is earlier, the party claiming the privilege has the burden of asking the court to determine whether the document is privileged and showing that it was inadvertently disclosed.

**E. <u>Joinder of Other Cobra Tax Shelter Litigation.</u>**

Any request to transfer as a tag along case any other tax shelter litigation involving the tax shelter product known as COBRA should comply with Rules 1.1, 7.4 and 7.5 of the Rules of Procedure of the Judicial Panel on MultiDistrict Litigation.

**F. <u>Coordination with Other Cobra Tax Shelter Litigation.</u>**

The parties have agreed in principal to coordinate discovery in this action with *JZ Buckingham v. United States*, Case. No. 05-231 (Ct. Fed. Claims), a Cobra Litigation Tax Shelter case involving Ernst & Young, LLP ("E&Y"), DeutscheBank ("DB"), and the law firms of Jenkens & Gilchrist, a Professional Corporation ("J&G"), Brown & Wood ("B&W"), and Scheef & Stone ("S&S"). Counsel for Tesoro has also informed the Court that they expect three other cases to be filed shortly in the Court of Federal Claims and they desire to coordinate discovery in those cases with this MDL Case.

The parties shall keep the court informed of any new Cobra Tax Shelter Litigation, in which the parties intend to coordinate discovery. The notice should include the name of the Court, Judge, case number and any orders entered by the other court and or any agreement between the parties on how to proceed in coordination with this court.

**G. Exhibits.**

The parties shall coordinate the numbering of exhibits. The same exhibit numbers shall be used in depositions and the trial of the cases, if possible. No two exhibits should have the same exhibit number. The exhibit number can consist of a prefix and a number, for example "P-1."

**H. Party Designations.**

Unless otherwise agreed by the parties, the United States may use the designation U.S. or Government (G)(Gov) on documents and Petitioners may jointly use the designation of Petitioners or Plaintiff or P. The appropriate party may use the designation of Tesoro (T)(Tes), Carmel (C)(Car) or Buckingham (B)(Buc). Regardless of how an exhibit is designated any party may use it at trial, if otherwise admissible.

Respectfully submitted,

FOR PETITIONERS, CARMEL PARTNERS, ET AL.

s/ F. Anthony Paganelli
Jackie M. Bennett, Jr.
F. Anthony Paganelli
SOMMER BARNARD ATTORNEYS, PC
One Indiana Square
Suite 3500
Indianapolis, IN 46204
(317) 713-3444 Telephone
(317) 713-3699 Facsimile
jbennett@sommerbarnard.com
paganelli@sommerbarnard.com

FOR PETITIONERS, TESORO PARTNERS, ET AL.

s/ Joel N. Crouch
Joel N. Crouch
M. Todd Welty
Michael E. McCue
Anthony P. Daddino
MEADOWS, OWENS, COLLIER, REED
COUSINS & BLAU, LLP
901 Main Street
Suite 3700
Dallas, TX 75202
(214) 744-3700 Telephone
(214) 747-3732 Facsimile
jcrouch@meadowsowens.com
twelty@meadowsowens.com
mmccue@meadowsowens.com
adaddino@meadowsowens.com

FOR RESPONDENT, UNITED STATES OF AMERICA

s/ Dennis M. Donohue
Dennis M. Donohue
John A. Lindquist
David M. Steiner
U.S. DEPARTMENT OF JUSTICE
TAX DIVISION
555 4th Street NW
Room 7104
Washington, DC 20001
(202) 307-6492 Telephone
(202) 307-2504 Facsimile
dennis.donohue@usdoj.gov
john.a.lindquist@usdoj.gov
david.m.steiner@usdoj.gov

Joseph A. Pitzinger, III
Jonathan L. Blacker
U.S. DEPARTMENT OF JUSTICE
TAX DIVISION
717 N. Harwood, Suite 400
Dallas, Texas 75201
(214) 880-9728 Telephone
(214) 880-9742 Facsimile
Joseph.A.Pitzinger@usdoj.gov
Jonathan.blacker2@usdoj.gov

Jeffrey L. Hunter
Assistant U.S. Attorney
U.S. Department of Justice
10 West Market Street
Suite 2100
Indianapolis, IN 46204
(317)226-6333 Telephone
(317)226-6125 Facsimile
jeff.hunter@usdoj.gov

**************************************************************************

__________ PARTIES APPEARED IN PERSON/BY COUNSEL ON __________ FOR A PRETRIAL/STATUS CONFERENCE.

__X__ APPROVED AS SUBMITTED.

__________ APPROVED AS AMENDED.

__________ APPROVED AS AMENDED PER SEPARATE ORDER.

__________ APPROVED, BUT ALL OF THE FOREGOING DEADLINES ARE SHORTENED/LENGTHENED BY __________ MONTHS.

__________ APPROVED, BUT THE DEADLINES SET IN SECTION(S) __________ OF THE PLAN IS/ARE SHORTENED/LENGTHENED BY __________ MONTHS.

__________ THIS MATTER IS SET FOR TRIAL BY __________ ON __________ __________. FINAL PRETRIAL CONFERENCE IS SCHEDULED FOR __________ AT __________ .M., ROOM __________.

__________ A SETTLEMENT/STATUS CONFERENCE IS SET IN THIS CASE FOR __________ AT __________ .M. COUNSEL SHALL APPEAR:

________ IN PERSON IN ROOM __________; OR

________ BY TELEPHONE, WITH COUNSEL FOR __________ INITIATING THE CALL TO ALL OTHER PARTIES AND ADDING THE COURT JUDGE AT (____) __________.

________ BY TELEPHONE, WITH COUNSEL CALLING THE JUDGE'S STAFF AT (____) __________.

__X__ DISPOSITIVE MOTIONS SHALL BE FILED NO LATER THAN April 1, 2007.

03/13/2006

Date

William T Lawrence

Hon. William T. Lawrence, Magistrate Judge
United States District Court
Southern District of Indiana