$$d_2 = \frac{\ln(Se^{-r_f T} / X) + (r_d - (\sigma^2 / 2))T}{\sigma\sqrt{T}}$$

$$= \frac{\ln(\$0.90e^{-0.04(1)} / \$0.95) + (0.03 - ((0.10)^2 / 2))(1)}{0.10\sqrt{1}} = -0.6907$$

$$Normsdist(-0.6907) = 0.2449$$

$$c_D = Pe^{-r_D T} N(d_2)$$

$$= \$5e^{-0.03(1)}(0.2449)$$

$$= \$1.1882$$

Now, let us create another option that has been constructed in a different currency, a digital put on the British pound. The spot exchange rate is £0.57, the exercise rate is £0.55, the volatility is 8%, the U. S. interest rate is 3%, the British interest rate is 5%, the option expires in one year, and it pays $3. Note that the strike is expressed in pounds but the payoff is in dollars. Thus, we find the probability from the perspective of the British investor and multiply it by the present value of the payoff from the perspective of the U. S. investor. The process is as follows:

$$d_2 = \frac{\ln(Se^{-r_f T} / X) + (r_d - (\sigma^2 / 2))T}{\sigma\sqrt{T}}$$

$$= \frac{\ln(0.57e^{-0.03(1)} / 0.55) + (0.05 - ((0.08)^2 / 2))(1)}{0.08\sqrt{1}} = 0.6565$$

$$Normsdist(-0.6565) = 0.2558$$

$$p_D = Pe^{-r_D T} N(-d_2)$$

$$= \$3e^{-0.03(1)}(0.2558)$$

$$= \$0.7446$$

Note that in the formula for $d_2$, the US rate plays the role of the foreign rate and the British rate plays the role of the domestic rate. This interchange is required because we are entering the exchange rate and exercise price in foreign terms. $N(-d_2)$ gives us the risk-neutral probability of the put expiring in-the-money. Note, though, that this probability is multiplied by the present value of $3 in one year, where the discounting is done using the U. S. rate. The U. S. rate is used because the investor receives $3 in one year if the option expires in-the-money. We need to know what that $3 is worth now in dollars to complete the valuation of the option. Thus, the $3 in one year is worth $\$3e^{-.03(1)}$ = $2.91. Multiplying by the probability $N(-d_2)$, we get the option value of $0.7446.

Thus, to summarize, for options in which the strike is denominated in dollars, use the standard approach where the U. S. rate is the domestic rate and the foreign rate is the foreign rate. The result will be the option value in dollars. For options in which the strike is denominated in the foreign currency, do the following:

Step 1:

Use the U. S. interest rate as the foreign rate and the foreign interest rate as the domestic rate, express the current spot rate in terms of foreign currency per dollar, and the exercise rate in terms of foreign currency per dollar. Then calculate $d_2$.

Step 2:

Given $d_2$ from Step 1, use Excel to calculate $N(d_2)$ for calls and $N(-d_2)$ for puts using Excel.

Step 3:

Calculate the present value of $P$ by multiplying by $e^{-r_d T}$ where the U. S. rate is now the domestic rate.

Step 4:

Multiply the present value of $P$ from Step 3 by $N(d_2)$ for calls and $N(-d_2)$ for puts.

To use an interest rate in an option pricing model, we require that the rate be input in continuously compounded form. The interest rates obtained are in LIBOR format, as discussed in the main body of this report. The conversion of LIBOR rates to continuously compounded equivalents is done in the following manner:

$$r = \ln(1 + L(m/360))\left(\frac{365}{m}\right)$$

where $L$ is LIBOR, $m$ is the number of days of the option's life, and $ln(.)$ is the natural logarithm function.

**Supporting Appendix A: Curriculum Vita**

**Don M. Chance**
**William H. Wright, Jr. Endowed Chair for Financial Services**

**Office Address**
Department of Finance
2163 CEBA
E. J. Ourso College of Business
Louisiana State University
Baton Rouge, LA 70803-6308
225-578-0372, 225-578-6366 (fax)

**Home Address**
833 Grand Lakes Drive
Baton Rouge, LA 70810
225-763-6343 (home)
225-803-6904 (cell)

dchance@lsu.edu
http://www.bus.lsu.edu/academics/finance/faculty/dchance

**Education and Certification**

| | |
|---|---|
| CFA, 1986 | Institute of Chartered Financial Analysts, Charlottesville, Virginia |
| Ph.D., 1980 | Louisiana State University, Baton Rouge, Louisiana<br>Major: Finance; Minor: Quantitative Methods |
| M.B.A., 1973 | University of Mississippi, Oxford, Mississippi |
| B.S., 1972 | University of Montevallo, Montevallo, Alabama<br>Major: Business Administration; Minor: Economics |

**Professional Experience**

| | |
|---|---|
| 2003- | Louisiana State University<br>Professor and William H. Wright, Jr. Endowed Chair for Financial Services, 2003- |
| 1980-2003 | Virginia Tech, Blacksburg, Virginia<br>First Union Professor of Financial Risk Management, 1996-2003.<br>Professor of Finance, 1989-1996<br>Associate Professor of Finance, 1983-1989<br>Assistant Professor of Finance, 1980-1983 |
| 1999 (fall) | Virginia Tech Northern Virginia Graduate Center, Falls Church, Virginia |
| 1994 (fall) | University of North Carolina, Chapel Hill, North Carolina<br>Visiting Scholar |
| 1978-1980 | Louisiana State University, Baton Rouge, Louisiana<br>Graduate Teaching Assistant |
| 1973-1977 | First National Bank of Birmingham, Birmingham, Alabama.<br>Last position: Assistant Cashier and Corporate Services Manager. |
| 1975 | Jefferson State Junior College, Birmingham, Alabama<br>Part-time Instructor |

**- Professional Activities during Previous 10 Years -**

**Published and Forthcoming Articles**

*Scholarly Articles*

"Taxation without Replication: A Look at a Problem in Synthetic Indexing." **The Journal of Portfolio Management** (forthcoming, 2007).

"Black-Scholes-Merton, Liquidity, and the Valuation of Executive Stock Options." **Advances in Financial Economics** (forthcoming, 2007). Co-author: T.-H. Yang.

"Reply to 'A Hedging Deficiency in Eurodollar Futures." **The Journal of Futures Markets** 27 (2007), 195-201.

"A Hedging Deficiency in Eurodollar Futures." **The Journal of Futures Markets** 26 (February, 2006), 189-207.

"The Utility-Based Valuation and Cost of Executive Stock Options in a Binomial Framework: Issues and Methodologies." **Journal of Derivatives Accounting** 9 (September, 2005), 165-188. Co-author: T.-H. Yang.

"Mathematical Probability Theory and Finance: Connecting the Dots." **Journal of Financial Education** 31 (Summer 2005), 1-14.

"Two Extensions for Fitting Discrete Time Term Structure Models with Normally Distributed Factors," **Applied Mathematical Finance** 18 (September, 2004), 187-205. Co-author: S. Agca.

"Speed and Accuracy Comparison of Bivariate Normal Distribution Approximations for Option Pricing." **The Journal of Computational Finance** 6 (Summer, 2003), 61-96. Co-author: S. Agca.

"Swaptions and Options." **The Journal of Risk** 5 (Spring, 2003), 67-90.

"The (In)Stabilty of the Relationship Between Stocks, Bonds and Managed Futures." **Journal of Applied Business Research** 19 (2003), 75-93.

"A Simple Proof of European Option Pricing with Discrete Stochastic Dividends." **The Journal of Derivatives** 9 (Spring, 2002), 39-45. Co-authors: R. Kumar and D. Rich.

"The Performance of Professional Market Timers: Daily Evidence from Executed Strategies." **Journal of Financial Economics** 62 (November, 2001), 377-411. Co-author: M. L. Hemler.

"The False Teachings of the Unbiased Expectations Hypothesis." **The Journal of Portfolio Management** 27 (Summer, 2001), 83-95. Co-author: D. Rich.

"Dividend Forecast Biases in Index Option Valuation." **Review of Derivatives Research** 4 (2001), 285-303. Co-authors: R. Kumar and D. Rich.

"The 'Repricing' of Executive Stock Options." **Journal of Financial Economics** 57 (July, 2000), 129-154. Co-authors: R. Kumar and R. B. Todd. Abstracted in **Economic Intuition** (Fall, 2000), 2-3.

"Research Trends in Derivatives and Risk Management Since Black-Scholes." **The Journal of Portfolio Management Special 25th Anniversary Issue** (May, 1999), 35-46. Abstracted in **The CFA Digest** 29 (Fall, 1999), 89-91.

"Implied Standard Deviations and Put-Call Parity Relations Around Primary Security Offerings." **The Journal of Applied Business Research** 15 (Winter, 1998-99), 1-12. Co-authors: J. B. Broughton and D. M. Smith.

"Some Computational Problems in the Pedagogy of the Black-Scholes Model." **The Journal of Financial Education** 24 (Fall, 1998), 61-70. Co-author: H. E. Fredericks.

"The Pricing of Equity Swaps and Swaptions." **The Journal of Derivatives** 5 (Summer, 1998), 19-31. Co-author: D. Rich.

"A Theory of the Value of Active Investment Management and Its Implications for Closed-End Funds and Investment Management Contracts." **Advances in Financial Economics** 3 (1997), 81-115.

*Practitioner Articles*
"Discretionary Trading and the Search for Alpha." **The Journal of Asset Management** 6 (August, 2005), 117-135.

"Equity Swaps and Equity Investing," **Journal of Alternative Investments** 7 (Summer, 2004), 75-97.

"Rethinking Implied Volatility." **Financial Engineering News** (January-February, 2003), 7, 20.

"The New Science of Finance." **American Scientist** 87 (May-June, 1999), 256-263. Co-author: P. P. Peterson. Reprinted in **Academic Communities/Disciplinary Conventions** by B. Beedles and M Petracca. Prentice-Hall: Upper Saddle River, New Jersey (2001).

"What Are Derivatives? A Comparison of Instrument Structures and Their Risks for the Internal Audit Team." Chapter 2 in **Derivatives and the Internal Auditor**. London: Risk Publications (1999).

"Price the Average." **Energy and Power Risk Management** 1 (December, 1996-January, 1997), 22-25. Co-author: D. Rich.

"Guest Speaker: A Derivative Alternative as Executive Compensation." **Financial Analysts Journal** 53 (March-April, 1997), 6-8.

**Books**
**An Introduction to Derivatives and Risk Management,** 7th ed. Mason, Ohio: Thomson South-Western (2007), 653 pp., co-authored with Robert Brooks; 6th ed., Mason, Ohio: Thomson South-Western (2004), 675 pp.; 5th ed., Fort Worth: Harcourt, Inc. (2001), 822 pp. [Previously published as **An Introduction to Derivatives,** 3rd ed., Fort Worth: The Dryden Press (1995), 625 pp.; 4th ed., (1998), 785 pp. Previously published as **An Introduction to Options and Futures,** Hinsdale, Illinois: The Dryden Press (1989), 560 pp; 2nd edition (1992), 605 pp.]

**Solutions Review Manual: An Introduction to Derivatives and Risk Management,** 7th ed. Mason, Ohio: Thomson South-Western (2007), 126 pp., co-authored with Robert Brooks; **Test Bank: An Introduction to Derivatives and Risk Management,** 7th ed. (2007), 94 pp, co-authored with Robert Brooks; Previously published as **Instructor's Manual: An Introduction to Derivatives and Risk Management,** 6th ed., Mason, Ohio: Thomson South-Western (2004), 229 pp.; 5th ed., Fort Worth: Harcourt, Inc. (2001), 242 pp; Previously published as **Instructor's Manual: An Introduction to Derivatives,** 3rd ed., Fort Worth: The Dryden Press (1995), 252 pp. 4th ed. (1998), 208 pp. [Previously published as **Instructor's Manual: An Introduction to**

**Options and Futures**, Hinsdale, Illinois: The Dryden Press (1989), 200 pp; 2nd ed. (1992), 259 pp.]

**Analysis of Derivatives for the CFA Program**. Charlottesville, Virginia: Association for Investment Management and Research (September, 2003), 656 pp.

**Essays in Derivatives**. New York: John Wiley (1998), 323 pp. Collection of 70 essays on various topics in derivatives; various chapters reprinted in **Financial Engineering News**, (January/February 2005), pp. 21-22. See "Other Publications and Writings." 2nd edition, forthcoming, 2007.

## Articles Contributed to Books and Collections

Chapter 9, "Risk Management" (with Kenneth Grant and John R. Marsland). **Managing Investment Portfolios: A Dynamic Process**, 3rd. ed., edited by John Maginn and Donald L. Tuttle, Charlottesville: CFA Institute (forthcoming, 2007).

"Valuing Forward Contracts." **The Professional Risk Manager's Handbook: A Comprehensive Guide to Current Theory and Best Practices**, ed. Carol Alexander and Elizabeth Sheedy. Professional Risk Managers International Association (PRIMA) (2004). http://www.prmia.org/PRM_Handbook/handbook_intro.php

## Other Publications and Writings

Regular Columnist, *Financial Engineering News*, Teaching Notes. "Option Prices and State Prices," March/April, 2003, pp. 8-10; "Convergence of the Binomial to the Black-Scholes Model," May/June, 2003, pp. 8-9, 12; "Linear Homogeneity, Euler's Rule, The Black-Scholes Model, and an Application to Forward Start Options," September/October, 2003, pp. 10-11; "Concepts of Discrete and Continuous Time Models," November/December, 2003, pp. 15-16, 22; "Default Risk as an Option," January/February, 2004, pp. 15, 22; "The Local Expectations Hypothesis," March/April, 2004, pp. 13, 17; "The Volatility Smile," May/June, 2004, pp. 13, 16-17, 19; "A Nontechnical Introduction to Brownian Motion," March/April, 2005, pp. 21-22; "No Arbitrage Models of the Term Structure: Ho-Lee and Heath-Jarrow-Morton," May/June, 2005,. pp. 21-22; "The Strange Relationship Between Academics and Practitioners in Derivatives and Risk Management," July/August 2005, pp. 19, 22; "Risk Neutral Pricing of Derivatives," September/October 2005, pp. 25-26;

Regular Columnist, *Financial Engineering News*, Technical Notes. "A Generalization of the Cost of Carry Forward/Futures Pricing Model. Part One." March/April 2006, pp. 33-34; "A Generalization of the Cost of Carry Forward/Futures Pricing Model. Part Two." May/June 2006, pp. 23-24, 26; "The Pricing and Interest Rate Sensitivity of Floating-Rate Securities," September/October, 2006, pp. 17, 35-36, 38; "The Bivariate Normal Probability Density," November/December, pp. 31, 42.

## Current Research

*Working Papers*

"Microsoft's Employee Option Buyback."

"A Synthesis of Binomial Option Pricing Models for Lognormally Distributed Assets."

"Pricing an Option on a Non-Decreasing Asset Value: An Application to Movie Revenue," with J. Hilliard and E. Hillebrand.

"Private Information and the Exercise of Executive Stock Options," with R. Brooks and B. Cline.

"Stock Options, Incentives, and Shareholder Wealth: Problems and a Solution," with T.-H. Yang.

"Executive Stock Option Exercise, Insider Trading, and Abnormal Returns: Firm Characteristics," with R. Brooks and B. Cline.

*Research in Progress*
"Dividend Rights."

"Dividend-Protected Options."

## Monographs

**Expensing Executive Stock Options: Sorting Out the Issues**. Charlottesville: CFA Institute Centre for Financial Market Integrity (forthcoming, 2007). Co-author: R. T. McEnally.

**Real Options and Investment Valuation**. Charlottesville: Association for Investment Management and Research (2002), 114 pp. Co-author: P. Peterson. Abstracted in **The CFA Digest** 32 (August, 2002), pp. 40-43.

## Instructional Cases

**State of Wisconsin Investment Board**. International Thomson Publishing CaseNet (1998); http://casenet.thomson.com/casenet/abstracts/swib.html

## Presentations and Participation in Conferences and Programs

*Presentations at faculty seminars*

Korea Advanced Institute for Science and Technology (September 2006), George Washington University (April 2006), Virginia Tech (April 2006), University of Laval (October 2005), University of Massachusetts-Amherst (September 2005), Auburn University (March 2005), University of Southern Mississippi (April 2004), Rutgers University-Camden (February 2004), University of Mississippi (November 2002), Louisiana State University (May 2002, April 2005), University of Georgia (December 2001), Oklahoma State University (February 2000), University of Strathclyde (May 1999), University of Utah (May 1998), University of Vienna (April 1998), Virginia Tech Department of Mathematics (November 1997), University of New Mexico (May 1997)

*Presentations at Regulatory Agencies*

Commodity Futures Trading Commission (Washington, October 1999)

*Presentations at Academic Conferences*

Hofstra University Conference on Managing Risk in Financial Institutions (Hempstead, NY, April 2006), FDIC/Cornell/Houston Derivatives Securities Conference (Arlington, VA, April 2006), Northern Finance Association (Vancouver, October 2005), Portuguese Finance Network (Lisbon, July 2004), Washington Area Finance Association (Washington, November, 2002; April 1999), Western Finance Association (Santa Monica, June 1999), International Association of Financial Engineers (September 1998), Financial Management Association (Copenhagen, June 2002)

*Other Academic Conference Participation*

Advances in Econometrics: The Econometrics of Risk Management Conference, panelist, Baton Rouge, Louisiana (November 2006), Portuguese Finance Network,

discussant (Lisbon, July 2004), Financial Management Association, panel moderator and organizer (San Antonio, October 2002), Washington Area Finance Association, discussant (December 1999), Financial Management Association, session chair (San Antonio, October 2002; Toronto, October 2001; Seattle, October 2000), Eastern Finance Association, discussant (Charleston, April 2001), Financial Management Association, discussant (Toronto, October 2001; Copenhagen, June 2002; San Antonio, October 2002); Denver, October 2003; New Orleans, October 2004; Chicago, October 2005; Salt Lake City, October 2006)

*Presentations at Practitioner Conferences and Programs*

Super Bowl of Indexing (Phoenix, AZ, December, 2006), The Art of Indexing (Washington, DC, September, 2006), Newport Cup of Indexing (Newport, RI, July, 2006), Risk-Management and Governance Conference, World Bank and Central Bank of Brazil (Sao Paulo, Brazil, April 2006), CFA Society of New Orleans (New Orleans, February, 2006), Derivatives-Based Investments, (New York, December, 2005), The Seoul International Derivatives Securities Conference (Seoul, South Korea, August 2004; August 2005; August 2006), Society of Financial Examiners, New Orleans (August 2003), Asset Allocation Summit (Williamsburg, Virginia, April 2002), Canada Cup of Indexing and Related Products (Montreal, April 2002), Aquila/University of Missouri at Kansas City (Kansas City, March 2002), Society of Asset Allocators and Fund Timers (Atlanta, February 2002), Pro Bowl of Investment Risk Management (Lake Tahoe, April 2001), ICBI Risk Management Forum (Geneva, December 2000), Financial Analysts Seminar (Evanston, July 2000), Pro Bowl of Derivatives Risk Management (Vail, March 2000), Association for Investment Management and Research (Chicago, March 2000), Scottish Institute for Research in Investment and Finance (May 1999), Association for Investment Management and Research (Chicago, November 1997)

*Participation in Practitioner Conferences*

Super Bowl of Indexing, panel moderator (Phoenix, AZ, December, 2006), Super Bowl of Indexing, panel moderator (Scottsdale, AZ, December, 2005), Derivatives-Based Investments, panelist (New York, December, 2005), Pro Bowl of Investment Risk Management, panelist (Lake Tahoe, April 2001), Pro Bowl of Investment Risk Management, panel moderator (Lake Tahoe, April 2001), Pro Bowl of Derivatives Risk Management, panel moderator (Vail, March 2000), Association for Investment Management and Research conference on Derivatives in Equity Portfolio Management, conference moderator (Chicago, March 2000), Virginia Tech Luncheon program on the Chicago Board of Trade vs. the SEC, panel moderator (Washington, September 1999), Scottish Institute for Research in Investment and Finance, panel moderator (Edinburgh, May 1999)

*Presentations before Local and Community Groups*

Southwest Virginia Chapter of the Institute of Management Accountants, Roanoke (April 2002), First National Student Portfolio Conference (Blacksburg, March 1998)

*Other Conferences Attended*

The ABCs of Exchange-Traded and Over-the-Counter Derivatives (New York, December, 2005), American Finance Association (San Diego, January 2004), Finance 2000, Boston University (April 2000), Chicago Board of Trade Research Seminar (December 1997)

## Awards and Honors

MBA Distinguished Lecturer, Korea Advanced Institute for Science and Technology, Seoul, 2006
Aquila/University of Missouri at Kansas City Visiting Lecturer, 2002
University Certificate of Teaching Excellence, Virginia Tech, 1999
Distinguished Alumnus of the Year, University of Montevallo, 1999

Pamplin College of Business Teaching Excellence Award, Spring, 1999

**Research Grants, Financial Support, and Related**
Chancellor's Distinguished Lectureship Series, 2004
Research Foundation of the Association for Investment Management and Research, 2000
Virginia Tech Center for the Study of Futures and Options Markets, 1997

**Consulting**
Meadows, Collier, Attorneys, 2005-
Catanzarite Law Corporation, 2000-2002, 2006-
Bank of America & Davis, Polk, Wardwell, Attorneys, 2005-2006
CFA Institute, 2005
Council of Institutional Investors, 2005
Dickinson, Wright, Attorneys, 2004
Strobl, Cunningham, Sharp, Attorneys, 2004
Patpatia Associates, 2002
Epstein, Cole, Attorneys, 1999
DSTCatalyst, 1998
Association for Investment Management and Research, 2000

**Executive and Professional Development Instruction**
PRMIA and the World Bank, PRM Exam Review Course, May and October, 2006, Washington, D.C.
Institute de Formation Bancaire de Luxembourg (IFBL), 1999-2005. Derivatives Valuation and Analysis
EATEL, 2004. Interest Rate Risk Management, Gonzalez, Louisiana
Association for Investment Management and Research, "Valuing Executive Stock Options," webcast presentation with CD-ROM. Consultant to overall project entitled "Derivatives Analysis: Executive Stock Options and Short Sales Alternatives." 2004
Aquila/University of Missouri at Kansas City, 2002
Thomson Financial Corporation, 2000. Swaps: Applications and Pricing, Boston
Frank J. Fabozzi Associates, 1999. Swaps: Applications and Pricing: Washington, D.C
Frank J. Fabozzi Associates, 1998. Introduction to Swaps, New York
ICM Conferences, 1998, Equity Derivatives I, New York
German Society of Financial Analysts, 1998-99. CFA review course in derivatives, Vienna, Austria
Financial Analysts Review of the United States, 1997-2000. CFA review course taught in Raleigh, North Carolina, Bangkok, Thailand and Zurich, Switzerland (for Union Bank of Switzerland). Instruction in fixed-income securities, derivative securities and quantitative techniques

**Book Reviews and Abstracts**
Abstract of "An Empirical Comparison of Forward-Rate and Spot-Rate Models for Valuing Interest-Rate Options." (W. Bühler, M. U. Walter, T. Weber) **Contemporary Finance Digest** (Winter 1999)
Review of *Black-Scholes and Beyond: Option Pricing Models* (N. Chriss), **Risk** (March 1997)

**Academic Committees and Service**
Director of Graduate Programs, Department of Finance, Virginia Tech, 1999-2003.

Founder and Faculty Advisor, SEED (Student-managed Endowment for Educational Development), $3.5 million student-managed portfolio, 1997-2002

Doctoral Dissertation Research Committees Chaired

T.-H. Yang (Louisiana State University). "Managerial Ability and the Valuation of Executive Stock Options." 2007.

S. Agca (Virginia Tech). "The Performance of Alternative Interest Rate Risk Measures and Immunization Strategies Under Heath-Jarrow-Morton Framework." 2002. Article published in **Journal of Financial and Quantitative Analysis**. Placed at George Washington University

D. R. Rich (Virginia Tech). "Incorporating Default Risk into the Black-Scholes Model Using Stochastic Barrier Option Pricing Theory." 1993. Article published in **Review of Derivatives Research**. Placed at Northeastern University

## Professional Service

Journal of Indexes/Super Bowl of Indexing, 2005-2006. Judge for William F. Sharpe Indexing Achievement Awards.

Charlotte Chapter, PRMIA (Professional Risk Managers' International Association), Steering Committee, 2002-2003

Georgia State University Department of Finance External Review Committee (chair), 2002

New York Mercantile Exchange Institutional Money Management Advisory Committee, 1996-2000.

Associate Editor, **The Journal of Alternative Investments**, 1998-2002, 2005-; **Journal of Derivatives Accounting**, 2004-2006; **The Financial Review**, 1998-; **The Journal of Derivatives**, 1993-; **Journal of Financial Engineering**, 1997-1999.

Editorial Advisory Board, **Chicago Board of Trade Research Seminar Series**, 1997-1998.

## Media Items

*Newspaper and other periodicals opinion/editorial articles*

"Research and Teaching Go Hand in Hand," **The Roanoke Times and World News**, June 15, 2003, p. Horizon 3; "Lessons from the Corporate Confidence Crisis," **The Virginian Pilot**, August 20, 2002, p. B9

*Radio/Television Interviews and Appearances*

**WSLS Television**, March 22, 2003; **WFNR Radio**, March 20, 2003; "At Issue," **WBRA Public Television**, November 24, 2002; **WPSK/WFNR Radio**, September 9-13, 2002; "At Issue," **WBRA Public Television**, July 28, 2002; **Metro Radio Network**, June 29, 2002; "The Money Club," **CNBC**, September 18, 1997

*Miscellaneous Commentaries, Interviews, Presentations, Speeches and References*

**Chicago Business**, December 14, 2006; **The 2006 Indexing Almanac and Directory**, December 2006; **Hedge World**, December 4, 2006; **Greater Baton Rouge Business Report**, November 21-December 4, 2006; **Bloomberg News**, October 17, 2006; **Greater Baton Rouge Business Report**, September 26-October 9, 2006; **Financial News** (Seoul, Korea), August 31, 2006; **Bloomberg News**, July 31, 2006; **The Daily Reveille**, January 30, 2006; **Risk**, November, 2005; **Financial News** (Seoul, Republic of Korea), September 1, 2005; **Bloomberg News**, August 30, 2005; **Salon.com**, October 11, 2004; **Financial News** (Seoul, Korea), August 24-25, 2004; **Fortune**, May 31, 2004; **Financial Engineering News**, March/April 2004; **CFA Magazine**, March/April 2004; **Greater Baton Rouge Business Report**, January 22, 2004; **Clearing Quarterly and Directory**, Fall 2003; **Roanoke Times and World News**, May 25, 2003; **Treasury and Risk Management Express**, November 4, 2002; **Kiplinger's Personal Finance**, November,

2002; **The Virginian Pilot**, September 1, 2002; **Fredericksburg Free Lance-Star**, August 8, 2002; **The Daily Record**, February 21, 2002; **CBS Radio**, February 7, 2002; **Forbes.com**, February 7, 2002; **SmartMoney.com**, September 18, 2001; **Best's Insurance News**, May 25, 2001; **Scrap Magazine**, March/April, 2001; **San Francisco Chronicle**, February 23, 2001; **Office.com**, February 2, 2001; **Pensions and Investments**, November 13, 2000; **CBS MarketWatch.com**, September 18, 2000; **Derivatives Strategy**, September, 2000; **Office.com**, March 16, 2000; **Interactive-Week.com**, March 10, 2000; **KnowledgeSpace.com**, February 14, 2000; **Bloomberg News Wire**, September 1/2, 1999; **Virginia Tech Arts & Sciences**, Fall 1999; **SmartMoney.com**, July 7, 1999; **SmartMoney.com**, June 8, 1999; **Montreal Gazette**, April 3, 1999; **Virginian Pilot and Ledger-Star**, March 17, 1999; **SmartMoney.com**, February 3, 1999; **SmartMoney.com**, January 20, 1999; **SmartMoney Interactive**, October 5, 1998; **CBS MarketWatch.com**, July 16, 1998; **New York Times**, July 15, 1998; **Richmond Times-Dispatch**, June 29, 1998; **Bloomberg News Wire**, March 11, 1998; **Andrews Derivatives Litigation Reporter**, February 5, 1998; **Dow Jones News Wire**, December 11, 1997; **ABC News Online**, October 14, 1997; **Virginia Business**, October, 1997; **Institutional Investor**, June, 1997; **Barrons'**, May 26, 1997; **AsiaTimes**, April 17, 1997

*Media Citations of Work*

**Futures**, May, 2002, p. 36; **Dow Jones Asset Management**, May/June, 1997, p. 52; **Minerva**, May, 1997, p. 2; **USA Today**, April 29, 1997, p. 12A; **Managed Accounts Report**, February, 1997, p. 6; **Pensions and Investments**, January 6, 1997, p. 29

## Memberships in Professional Societies

American Finance Association
CFA Institute
Global Association of Risk Professionals
International Association of Financial Engineers
Professional Risk Managers' International Association
Financial Management Association
Society for Financial Studies
Southern Finance Association
Eastern Finance Association
Financial Education Association

**Supporting Appendix B: Sworn Testimony in Previous Four Years**

The Rogers Revocable Trust vs. Bank of America, N.A., Supreme Court of New York, New York, New York, 2006

**Supporting Appendix C: Documents Reviewed**

| Beginning Doc # | Ending Doc # | Description |
|---|---|---|
| BOGOV2896 | BOGOV2897 | Pages of Brown & Wood Opinion to Zucker |
| Z000000 | Z000000 | certification of Certificate of Incorporation |
| Z000001 | Z000004 | Certificate of Incorporation |
| Z000033 | Z000034 | Jerry Zucker's 90 Shares of JBJZ Investors |
| Z000035 | Z000036 | James Boyd's 10 shares of JBJZ Investors |
| Z000230 | Z000238 | Foreign Exchange Digital Option Transaction Ref. No. ex 27921A for JGB Bochicket Investments LLC |
| Z000254 | Z000257 | Letter to David Parse from Jerry Zucker authorizing wire transfer of $2,250,000 from acct. no. 222-10153-12 to DB acct. no. 100450210032 re: FX Options |
| Z000258 | Z000259 | assigning of partnership interest |
| Z000419 | Z000423 | account no. 222-10153 |
| Z000517 | Z000517 | Fax confirmation for fax to the IRS from L. Lightholder re: FEIN's for Zucker/Boyd entities |
| Z000658 | Z000659 | Certificate of Formation of JGB Bohicket Investments |
| Z000670 | Z000681 | JBJZ Partners |
| Z000683 | Z000684 | JBJZ Partners |
| Z000754 | Z000756 | Letter to D. Parse from J. Zucker authorizing wire transfer of $2,250,000 from JZ Buckingham Investments LLC acct. no. 222-10153-12 to DB acct no. 100450210032 re: FX Options |
| Z000766 | Z000766 | enclosing EIN |
| Z000778 | Z000779 | JGB Bohicket Investments LLC |
| Z001311 | Z001311 | Letter Requesting Transfer of Funds |
| Z001339 | Z001339 | outgoing wire confirmation for $350,000.00 |
| Z001342 | Z001342 | authorization to wire $350,000.00 from AllFirst Bank account to DB account 222-10154-11 |
| Z001350 | Z001350 | EIN 57-1088055 |
| Z001365 | Z001365 | authorization to transfer remaining cash to JBJZ Partners account |
| Z001386 | Z001386 | requesting wire of 4,500 shares of Cisco to DB Alex Brown account 222-10156-19 |
| Z001389 | Z001389 | requesting wire of 500 shares of Cisco to DB Alex Brown account 222-10156-19 |
| Z001392 | Z001392 | authorization to journal transfer 500 shares of Cisco to First Union account of James and Hazel Boyd |
| ZEY000255 | ZEY000259 | account no. 222-10155 |
| ZEY000275 | ZEY000279 | Pages of E & Y Opinion to Boyd |
| ZEY000485 | ZEY000486 | Pages of Brown & Wood Opinion to Zucker |
| ZEY000689 | ZEY000692 | Pages of E&Y Opinion to Zucker |
| ZEY001211 | ZEY001211 | advising all interests have been transferred to JBJZ Investors, Inc. and authorizing transfer of all assets to Investors' account |
| ZEY001214 | ZEY001214 | informing of assignment of options positions to JBJZ Partners |
| ZEY001221 | ZEY001223 | assigning financial positions to JBJZ Partners |
| ZJG000005 | ZJG000005 | Form SS-4 |
| ZJG000030 | ZJG000032 | Consent of JBJZ Investors to resolutions |
| ZJG000127 | ZJG000127 | Fax Confirmation Sheet |
| ZJG000128 | ZJG000130 | assigning financial positions to JBJZ Partners |
| ZJG000144 | ZJG000144 | Fax Cover Sheet |
| ZJG000145 | ZJG000145 | Authorization to transfer 500 shares of Cisco Systems to JBJZ Partners |
| ZJG000146 | ZJG000146 | Transfer Letter |

| | | |
|---|---|---|
| ZJG000174 | ZJG000176 | Trade Confirmation |
| ZJG000180 | ZJG000182 | Trade Confirmation |
| ZJG000367 | ZJG000368 | account no. 222-10156 |
| ZJG000453 | ZJG000455 | assigning financial positions to JBJZ Partners |
| ZJG000456 | ZJG000458 | assigning financial positions to JBJZ Partners |
| ZJG001277 | ZJG001277 | Delaware |
| ZJG001278 | ZJG001278 | Certificate of Formation of JZ Buckingham Investments |
| ZJG001279 | ZJG001279 | JBZ Buckingham Investments |
| ZUDB00005 | ZUDB00008 | Account Agreement |
| ZUDB00011 | ZUDB00014 | Account Agreement |
| ZUDB00015 | ZUDB00018 | Account Agreement |
| ZUDB00118 | ZUDB00118 | Non-Corporate Resolution |
| ZUDB00198 | ZUDB00206 | Account no. 222-10155 |
| ZUDB00286 | ZUDB00286 | Non-Corporate Resolution |
| ZUDB00287 | ZUDB00290 | Account Agreement |
| ZUDB00292 | ZUDB00292 | transferring all remaining cash from account 222-10154-11 to JBJZ Partners account 222-10155-10 |
| ZUDB00293 | ZUDB00293 | authorizing wire of $250,000 from account 222-10154-11 to DB re: FX Options |
| ZUDB00308 | ZUDB00309 | account number 222-10155-10 |
| ZUDB00315 | ZUDB00319 | account no. 222-10154 |
| ZUZU00009 | ZUZU00013 | account no. 222-10453 |

**Supporting Appendix D: Compensation Arrangement**

My services for the client of Meadows Collier are provided through the firm of RoundTable Group, Inc. I bill RoundTable Group $300 an hour.

Any results I present or conclusions I draw are not affected by my compensation.

## Revised Appendix C in Zucker Report

| | Document Description | Document Numbers From | Through |
|---|---|---|---|
| 1. | Deutsche Bank Foreign Exchange Digital Option Transaction (confirmation) 27919A, 11/24/99 | Z000233 | Z000235 |
| 2. | Deutsche Bank Foreign Exchange Digital Option Transaction (confirmation) 27921A, 11/24/99 | Z000230 | Z000232 |
| 3. | Deutsche Bank Foreign Exchange Digital Option Transaction (confirmation) 27920A, 11/24/99 | Z000236 | Z000238 |
| 4. | Opinion letter from Jenkins & Gilchrist to Jerry Zucker, 1/31/00 | ZEY000689 | ZEY000692 |
| 5. | Opinion letter from Jenkins & Gilchrist to James G. Boyd, 1/31/00 | ZEY~~000275~~<br>ZEY000063 | ZEY~~000279~~<br>ZEY000065 |
| 6. | Opinion letter from Brown & Wood to Jerry Zucker, 3/9/00 | ZEY000485 | ZEY000486 |
| 7. | Opinion letter from Brown & Wood to James G. Boyd, 3/9/00 | EY14088 | EY14089 |
| 8. | State of Delaware Certificate of Incorporation of JBJZ Investors Inc., 11/16/99 | Z000000 | Z000004 |
| 9. | Certificate for 90 shares of JBJZ stock for Jerry Zucker, 11/16/99 | Z000033 | Z000034 |
| 10. | Certificate for 10 shares of JBJZ stock for James G. Boyd, 11/16/99 | Z000035 | Z000036 |
| 11. | Assignment letter from Jerry Zucker to David Parse, Deutsche Bank Alex Brown, 11/24/99 | Z000255 | Z000255 |
| 12. | Assignment of Partnership Interest in JBJZ Partners by James G. Boyd to Jerry Zucker, 12/27/99 | Z000258 | Z000258 |
| 13. | Assignment of Partnership Interest in JBJZ Partners by Jerry Zucker to James G. Boyd, 12/27/99 | Z000259 | Z000259 |
| 14. | Client Statement from BT Alex Brown for JZ Buckingham Investments, LLC, 11/30/99 | Z000419 | Z000423 |
| 15. | State of Delaware Certificate of Incorporation of JGB Bohicket Investments LLC, 11/16/99 | Z000658 | Z000659 |
| 16. | Agreement of General Partnership for JGB Partners, 11/16/99 | Z000670 | Z000681 |
| 17. | Application for Employer Identification Number by JBJZ Partners, 11/18/99 | Z000683 | Z000683 |
| 18. | Wire transfer authorization from Jerry Zucker to Deutsche Bank for JZ Buckingham Account, 11/30/99 | Z000754<br>ZUDB00127 | Z000754<br>ZUDB00128 |
| 19. | IRS fax of employer identification number to JBJZ Investors, Inc., 11/26/99 | Z000766 | Z000766 |
| 20. | Application for Employer Identification Number by James G. Boyd, 11/19/99 | Z000778 | Z000778 |

GOVERNMENT EXHIBIT 1 -B

| | Revised Appendix C in Zucker Report | | |
|---|---|---|---|
| 21. | Transfer authorization from Jerry Zucker to Wachovia Bank, 11/22/99 | Z001311 | Z001314 |
| 22. | Anchor Bank Wire transfer confirmation to James G. Boyd, 11/23/99 | Z001339 | Z001339 |
| 23. | Wire transfer instructions from James G. Boyd to Allfirst Bank for JGB Bohicket, 11/23/99 | Z001342 | Z001342 |
| 24. | IRS Employer identification number assignment for JGB Bohicket Investments, 11/29/99 | Z001350 | Z001350 |
| 25. | Transfer authorization from Jerry Zucker to David Parse, Deutsche Bank Alex Brown, 11/24/99 | Z001365 | Z001365 |
| 26. | Instructions to First Union Bank to wire transfer 4,500 Cisco shares by Jerry Zucker, 12/7/99 | Z001386 | Z001386 |
| 27. | Instructions to First Union Bank to wire transfer 500 Cisco shares by James G. Boyd, 12/7/99 | Z001389 | Z001389 |
| 28. | Instructions to First Union Brokerage to journal 500 CISCO shares by James and Hazel T. Boyd, 12/7/99 | Z001392 | Z001392 |
| 29. | Client Statement from BT Alex Brown for JGB Bohicket Investments LLC, 11/30/99 | ZEY000255 | ZEY000259 |
| 30. | Partnership liquidation and transfer letter from Jerry Zucker to Deutsche Bank Alex Brown, 12/27/99 | ZEY001211 | ZEY001211 |
| 31. | Letter of option assignment from James G. Boyd to Deutsche Bank Alex Brown, 11/24/99 | ZEY001214 | ZEY001214 |
| 32. | Assignment agreement, 11/24/99 | ZEY001221 | ZEY001223 |
| 33. | Application for Employer Identification Number by Jerry Zucker | ZJG000005 | ZJG000005 |
| 34. | Consent of sole director of JBJZ Investors, Inc., 11/16/99 | ZJG000030 | ZJG000032 |
| 35. | Letter from Jenkins & Gilchrist with assignment agreement | ZJG000127 | ZJG000130 |
| 36. | Letter from Jenkins & Gilchrist with transfer letters | ZJG000144 | ZJG000146 |
| 37. | Deutsche Bank Foreign Exchange Digital Option Transaction (confirmation) 27920A, 11/24/99 (duplicate) | ZJG000174 | ZJG000176 |
| 38. | Deutsche Bank Foreign Exchange Digital Option Transaction (confirmation) 27919A, 11/24/99 (duplicate) | ZJG000180 | ZJG000182 |
| 39. | Deutsche Bank Foreign Exchange Digital Option Transaction (confirmation) 27921A, 11/24/99 (repeat) | Z000230 | Z000232 |
| 40. | DB Alex Brown CISCO transfer confirmation, 12/31/99 | ZJG000367 | ZJG000368 |
| 41. | Assignment agreement for JZ Buckingham Investments LLC, 11/24/99 | ZJG000453 | ZJG000458 |

| | **Revised Appendix C in Zucker Report** | | |
|---|---|---|---|
| 42. | State of Delaware Certificate of Formation of JZ Buckingham Investments LLC, 11/16/99 | ZJG001277<br>Z001277 | ZJG001279<br>Z001278 |
| 43. | BT Alex Brown Account Agreement for JZ Buckingham Investments, LLC | ZUDB00005 | ZUDB00008 |
| 44. | BT Alex Brown Account Agreement for JBJZ Partners | ZUDB00011 | ZUDB00018 |
| 45. | Alex Brown Non-Corporate Resolution for JZ Buckingham Investments LLC, 11/16/99 | ZUDB00118 | ZUDB00118 |
| 46. | Alex Brown Non-Corporate Resolution for JGB Bohicket Investments LLC, 11/16/99 | ZUDB00286 | ZUDB00286 |
| 47. | BT Alex Brown Account Agreement fro JGB Bohicket Investments LLC | ZUDB00287 | ZUDB00290 |
| 48. | Client Statement from Deutsche Bank Alex Brown for JBJZ Partners, 12/31/99 | ZUDB00198 | ZUDB00206 |
| 49. | Authorization to transfer cash from James G. Boyd to Deutsche Bank Alex Brown, 11/24/99 | ZUDB00292 | ZUDB00292 |
| 50. | Authorization to transfer cash from James G. Boyd to Deutsche Bank Alex Brown, 1124/99 | ZUDB00293 | ZUDB00293 |
| 51. | BT Alex Brown Partnership Account Authorization & Indemnity for JBJZ Partners | ZUDB00308 | ZUDB00309 |
| 52. | Client Statement from Deutsche Bank Alex Brown to JGB Bohicket Investments, 12/31/99 | ZUDB00315 | ZUDB00319 |
| 53. | Client Statement from Deutsche Bank Alex Brown to JZ Buckingham Investments, 11/30/99 | ZUZU00009 | ZUZU00013 |
| 54. | Client Statement from Deutsche Bank Alex Brown to JBJZ Partners, 12/31/99 | ZUDB00198 | ZUDB00198 |
| 55. | Complaint for Readjustment of Partnership Items | (no number) | |
| 56. | Deutsche Bank Option Deal Entry 27919 (& duplicate) | DB-DOJ-COBRA-00026161 | DB-DOJ-COBRA-00026162 |
| 57. | Deutsche Bank Option Deal Entry 27919 (& duplicate) | ~~DB-DOJ-COBRA-00026163~~<br>DB COBRA 04211 | ~~DB-DOJ-COBRA-00026164~~<br>DB COBRA 04212 |
| 58. | Deutsche Bank Option Deal Entry 27919 (& duplicate) | ~~DB-DOJ-COBRA-00026165~~<br>DB COBRA 04213 | ~~DB-DOJ-COBRA-00026166~~<br>DB COBRA 04216 |
| 59. | Deutsche Bank Option Deal Entry 27920 (& duplicate) | DB-DOJ-COBRA-00026167 | DB-DOJ-COBRA-00026168 |
| 60. | Deutsche Bank Option Deal Entry 27920 (& duplicate) | DB-DOJ-COBRA-00026169 | DB-DOJ-COBRA-00026170 |
| 61. | Deutsche Bank Option Deal Entry 27920 (& duplicate) | DB-DOJ-COBRA-00026171 | DB-DOJ-COBRA-00026172 |
| 62. | Deutsche Bank Option Deal Entry 27921 (& duplicate) | DB-DOJ-COBRA-00026173 | DB-DOJ-COBRA-00026174 |
| 63. | Deutsche Bank Option Deal Entry 27921 (& duplicate) | DB-DOJ-COBRA-00026175 | DB-DOJ-COBRA-00026176 |
| 64. | Deutsche Bank Option Deal Entry 27921 (& duplicate) | DB-DOJ-COBRA-00026177 | DB-DOJ-COBRA-00026178 |

0001

IN THE UNITED STATES DISTRICT COURT

```
IN RE:                          *
COBRA TAX SHELTERS              *
LITIGATION                      *
                                *
------------------------        *
                                *
CARMEL PARTNERS, et al,         *
                                *
   Plaintiffs,                  *
                                *
VS.                             * NO.:  1:06 cv 8001
                                * (S.D. Ind.)
UNITED STATES,                  *
                                *
   Defendant.                   *
-------------------------       *
                                *
JS BUCKINGHAM                   *
INVESTMENTS, LLC, et al,        *
                                *
   Plaintiffs,                  *
                                *
Vs.                             * NO:  05-231 (Ct. Fed
                                * Claims)
UNITED STATES,                  *
                                *
   Defendant.                   *
------------------------        *
                                *
MURFAM FARMS, LLC,              *
                                *
   Plaintiff,                   *
                                *
Vs.                             * NO: 06-245T through
                                * 06-247T (Ct. Fed
USA, NO,                        * Claims.)
                                *
   DEFENDANT.                   *
```

0002

********************************************************

ORAL DEPOSITION OF
DON CHANCE
SEPTEMBER 6TH, 2007

********************************************************

ORAL DEPOSITION OF DON CHANCE, produced as a witness at the instance of the DEFENDANT, and duly sworn, was taken in the above-styled and numbered cause on the 2nd of August, 2007, from 9:49 a.m. to 5:13 p.m., before Tammy Staggs, CSR in and for the State of Texas, reported by machine shorthand, at the law offices of Meadows Collier, LLP, 901 Main Street, Suite 3700, Dallas, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

GOVERNMENT EXHIBIT 2

0003

A P P E A R A N C E S

FOR THE PLAINTIFFS:
Sarah Q. Wirskye, Esq.
MEADOWS COLLIER, LLP
901 Main Street
Suite 3700
Dallas, Texas 75202
214.744.3700
214.747.3732 - Fax

FOR THE DEFENDANT, UNITED STATES GOVERNMENT:
Dennis M. Donohue, Esq.
UNITED STATES DEPARTMENT OF JUSTICE
Tax Division
PO Box 403
Washington, D.C. 20044
202.307.6492
202.307.2504 - Fax
Joe Pitzinger, III, Esq.
UNITED STATES DEPARTMENT OF JUSTICE
Tax Division
717 North Harwood
Suite 400
Dallas, Texas 75201
214.880.9728
214.880.5741 - Fax

ALSO PRESENT:
Devin Brosseau, CFA

0004

INDEX


| | PAGE |
|---|---|
| Appearances...................................... | 2 |
| Exhibit List..................................... | 5 |
| Stipulations..................................... | 6 |
| DON CHANCE: | |
| EXAMINATION BY MR. DONOHUE................. | 6 |
| Signature and Changes........................... | 274 |
| Reporter's Certificate.......................... | 276 |


REQUESTED DOCUMENTS/INFORMATION
(None)

CERTIFIED QUESTIONS
(None)

0005

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 2369 | E-mail cited in one of the Government's expert's report, subject: RGI Investments, LLC ........................ | 219 |
| 2400 | Don Chance's Expert Report in the JBJZ case..................................... | 8 |
| 2402 | Don Chance's Report in the Murphy Case... | 32 |
| 2404 | Don Chance's Report in the Tesoro Case... | 32 |
| 2405 | Don Chance's rebuttal report in the JBJZ case dated June 20, 2007................. | 192 |
| 2406 | Don Chance's rebuttal report in the Murfam Farms case........................ | 42 |
| 2415 | Dr. DeRosa's original report............ | 30 |
| 2428 | Dr. DeRosa's rebuttal report to Dr. Chance and Dr. Hess..................... | -- |
| 2429 | Dr. Kolbe's rebuttal report to Dr. Chance and Dr. Hess............................ | 92 |
| 2434 | Dr. Kolbe's expert report in the JBJZ case..................................... | 30 |
| 2806 | Bates stamped DB COBRA 04211, Option Deal Entry.................................... | 24 |
| 2807 | Document labeled Details for Trade 27919A-RMSRPT............................ | 20 |

0006

P R O C E E D I N G S

(All exhibits were pre-marked.)

MR. DONOHUE: Let me state that this deposition is being taken pursuant to an agreement of the parties as to time, place, and date and also is being taken pursuant to the Federal Rules of Civil Procedure.

DON CHANCE,

Having been first duly sworn, testified as follows:

EXAMINATION

BY MR. DONOHUE:

Q. Good morning, Dr. Chance.

A. Good morning.
Q. Would you prefer that I refer to you as Dr. Chance or Professor Chance or do you have a choice on that?
A. Everybody asks me that, and I just say it doesn't really matter. It's up to you.
Q. All right. Well, if it's okay with you, I'll refer to you as doctor.
A. That's fine.
Q. Anyone who gets a PhD in my view should have the privilege of being referred to by their title.
A. Well, attorneys have JD as I understand, so I think we can call you doctor as well.

0007

Q. But it's not a convention we be called doctors.
All right. Could you tell us where you reside?
A. I reside in Baton Rouge, Louisiana.
Q. And have you ever had your deposition taken before?
A. Yes.
Q. And approximately how many times?
A. A deposition I think I've done once.
Q. And when you say that, have you testified in court before?
A. Yeah. I was -- I'm separating that from a deposition.
Q. Okay. And approximately how many times have you testified in court?
A. Two times.
Q. Well, since you had your deposition taken once before, you know what the procedure is.
A. Yes.
Q. The procedure -- and just to refresh your recollection -- I will ask questions and the court reporter is here to take down my questions and your answers. If my questions are unclear to you, just let me know and I'll do the best I can to rephrase the

0008

question. Do you understand that?
A. Yes, I do.
Q. Okay. Another sort of ground rule is is that we can't be speaking at the same time.
A. Right.
Q. So you have to wait until I complete my question.
A. Right.
Q. And sometimes that's going to be a problem because I --
A. Sure.
Q. -- have a tendency to be thinking. And so you have to wait until I'm totally finished with my question.
A. All right.
Q. Is that clear?
A. Yes, I understand.
Q. And this is just a formality, but is there any reason this morning and today that you cannot give a full, accurate, and complete testimony? For example, is there any reason why your judgment may be impaired for any reason?
A. No.

Q. Okay. All right. With that in mind, why don't we first start with your report in the JBJZ case,
0009
which is Exhibit 2400. I'm going to ask that you be given a copy of that.
(Counsel hands document to witness.)
Q. (BY MR. DONOHUE) All right. Dr. Chance, is this the report you prepared in the JBJZ case?
A. Well --
Q. Exhibit 2400?
A. It looks like it.
Q. Okay. And am I correct that for that report and your other reports you have prepared, you have attached your curriculum vitae, what is known as your CV, as an --
A. That is correct.
Q. -- appendix to your report, correct?
A. That's correct. I thought you had stopped.
Q. I told you we would have problems with this.
A. You're trying to trick me up.
Q. Okay. Could you turn to your appendix? I believe it's on -- your CV rather, which is on page 58. And am I correct that your CV lists essentially what is your employment-related background after your education?
A. Yes.
Q. Am I correct?
A. As well as before.
Q. And looking at it, I did not see any
0010
indication that you had a background in foreign exchange, either as a trader or any other aspect of foreign exchange. Is -- do you have any experience in that area?
A. I'm not a practitioner in that area. I am an academic. I do have banking experience. But you're correct, I'm not a trader or practitioner in the area of foreign exchange.
Q. Okay. You mentioned you have banking experience. What was that experience?
A. Well, it's on my vitae. It says 1973 to '77, First National Bank of Birmingham, which is currently known as AmSouth, and my position was called assistant cashier and corporate services manager. And I was involved in providing services -- certain banking services to corporations.
Q. But that experience in no way involved anything dealing with the foreign exchange market?
A. That's correct.
Q. Okay. Have you ever personally traded, yourself, options on -- foreign exchange options?
A. I've not done a foreign exchange option.
Q. I'm sorry. The answer --
A. I've not done a foreign exchange option. I have done an option before.
0011
Q. Okay. But not a foreign exchange option?
A. That's correct.
Q. Are you familiar with the term "calculation agent"? Have you ever heard that term before?
A. Yes.
Q. And what is your understanding of the meaning of that term?
A. Well, calculation agent is an institution or

it's a party to an over-the-counter contract, and that party has the responsibility of making certain calculations, I guess. I'm trying not to use the same word, but...

They're supposed to make the calculations that determine things like the market-to-market value of the contract or what the contract pays off at. On the ISDUB (phonetic) template that's used to fill out these contracts, there's a line that says calculation agent and it's blank and parties have to fill in a name for that and that becomes -- in some sense, I view it, it's a little bit like a referee. It's -- it may be one of the parties of the contract, it usually is, but it's someone who determines a number that is necessary to be used in the contract.

Q. Did you see that term "calculation agent" used in any documents in this case?

0012

A. I believe it was.

Q. Do you recall where?

A. It probably would have been the confirmation, but I'm not absolutely sure. It is my understanding that Deutsche Bank is the calculation agent in this -- in these cases.

Q. What gave you that understanding?

A. Well, I probably saw it. It's possible I heard it. To the best of my knowledge, you know, I probably saw it on a form, but...

Q. Turn to Appendix C of your report, which is Exhibit 2400. And in your Appendix C you have a list of documents reviewed. Am I correct that this is the same set of documents you reviewed not only for your JBJZ report, but also for your Tesoro report in your -- I'll refer to it as your Murphy report?

A. I'm not sure I can actually say that because I don't believe the list are identical, and I don't think there's a one-for-one mapping from one list to the other. I had certain responsibilities in this case and I needed certain things and I was given certain documents, but I know that some of these documents were not relevant to what I had to do. I'm not sure why I had them, but they weren't relevant to what I had to do. I needed the terms and conditions of the contracts, and

0013

I know I got that off of the confirmation.

So the confirmation is primarily what I looked at. And I did look at a confirmation for each of the three. Now, you asked me -- I'm not trying to drift away from your question. You asked me if this is the same list. I believe if you look in all three Appendixes C, you would find that there may not be a one-to-one mapping on each of these documents. This document here matches up with a document in the other report that matches up to a document in another report. But I do have the confirmations in each of the three cases, and that's the principal information that I used.

Q. How did you come to acquire the documents that are on Appendix C?

A. Well, the law firm gave me the documents.

Q. And how -- how did you come to get those specific documents? Did you request them or did they provide them to you?

A. No, they provided me -- I did not request any

specific documents.
Q. And what did you do -- were all these -- strike that question.
Were these documents provided to you initially all at one time or did they come over a period of time?

0014

A. I'm not sure I remember exactly. I honestly don't know, but I know that I could not have gotten started on the case without the confirmations. I believe the confirmations came early, but, you know, I can't be certain. I just know that I wouldn't have gotten very far without the confirmations because that gave me the terms and conditions of the contract.
I don't remember on each of these other documents exactly -- I know some of them came in later, but I know, as I said, that I did not use a lot of this information. My -- the scope of my responsibility, I think, was fairly limited. I know this is a big case and goes far beyond me. I know some of these documents, which are things like letters involving this transfer or that transfer, really didn't have any relevance to me. I'm not sure how I got them -- I mean, I know how I got them, but I'm not sure why I got them.
Q. What did you feel the scope of your assignment was?
A. The principal scope -- or the principal responsibility I had was coming up with probabilities for these options. There were several, I guess, secondary questions that are addressed in the report, such as: What was the value of the short option on the transfer day? Were the options in or out of the money

0015

on the day of the transaction, the transfer day, the termination day, and so forth?
But my focus was really mostly on the probabilities of these options.
Q. And when you say "probabilities," what do you mean?
A. Probabilities that the options would be profitable.
Q. Would be in the money, so to speak?
A. Well, in the money -- you know, in the money for these options does translate into profitability, but for an ordinary option -- I'm hesitant to say that so generally because for an ordinary option in the money does not necessarily translate into profitability. It does in this particular case here.
Q. Well, when I use the term "in the money," do you use that term also to mean the probability that the options would pay off? Is that what you're referring to?
A. I'm assuming we're talking about this case?
Q. Yes.
A. And I want to be real careful because ordinarily when you're talking about a standard option, if you say in the money that does not equate necessarily to being profitable. It turns out in this case there

0016

are -- each of these options or these transactions, I should say, they have three outcomes and -- because there are two options and these three outcomes.
In one of the outcomes both options

expire out of the money, and you lose what you paid for the options. And then you have one where one is in the money and the other is out of money and -- I know this term "sweet spot" has popped up in this case, and that's what I'm talking about there. And then there's a third case where the Exchange rate is beyond both options and they -- and you end up having your long one short the other, you have a profit on one, you have a loss on the other, but you have a net profit overall.
Q. And when you call that as having a net profit overall, how are you defining the term "profit"?
A. Well, it would be that the payoff you receive when you exercise the option exceeds the cost you pay for the option.
Q. And that's how you're defining it to be a profitable --
A. Right.
Q. -- transaction --
A. Right.
Q. -- am I correct?
A. Right.

0017

Q. Okay.
A. I interrupted.
Q. Do you take into account in your analysis of profit other transaction costs?
A. Are we talking about my original report or my rebuttal report?
Q. Well, first let's talk about the original report.
A. Okay. That's not taken into account in the original report.
Q. Well, we'll come back to that entire area in more detail. But before we do, could you describe to us, first of all, when you were contacted by counsel to -- when was your first contact, approximately?
A. I'm not sure I could put a date on that. I think we've been on this case -- I think I've been on this case about two years. I honestly couldn't tell you exactly.
Q. And who was your first contact with?
A. It was either Mr. Welty or Mark Thomas, and Mark is not with the firm anymore, and Joel Crouch who is still with the firm. I honestly couldn't tell you. I think Mr. Welty was the first person to contact me, but I know that I came and we had a meeting and I met all three of them. Ms. Wirskye was not involved at that

0018

time.
Q. And at the point of the meeting were you told as to exactly what the scope of your assignment would be or did that come later?
A. Yes, it was a -- kind of a general overview. In fact, we may have had some discussions on the phone. I know that he contacted me and said can you come to Dallas, and I said that would be easy to do. I'm only a one-hour plane ride from here. And we may have had some discussions on the phone to give me a little bit of light overview of it. But I know we had a meeting here in a room very similar to this, and he told me that, you know, there were these digital currency options. And that the issue that I would be involved in had to do with the probabilities of these options being

profitable. And he would need me to opine or to analyze, I should say maybe first -- analyze these options, come up with some numbers, and opine about their probabilities of being profitable.
Q. Other than that particular question, did he ask you to opine on other questions?
A. Not at that time. I'm not sure what you mean necessarily by other questions.
Q. Well --
A. And he may have said at that time that there

0019

may be some other things that we'll need you to do, but, you know, that was kind of a minor detail. I don't really recall. I do know later he did subsequently ask me to do a few other things.
Q. Did he explain to you at all any of the documents that the parties had obtained from third parties, including the Deutsche Bank in this litigation?
A. Well, I'm not sure if I would remember that, but I know I've done a few of these cases and I know that it would -- I would have expected that there would have been documents. There wouldn't be any way I could analyze this without some documents. And whether we had a discussion about the documents or not, I don't recall. But it would have been obvious to me that they would have had to have documents, in particular the confirmation.
I would need to see the terms of the contract. And, you know, I may well have said to him I'll need to see the terms of the contract. You know, he probably said well, yeah, we can get that.
Q. What about any internal documents from the Deutsche Bank, did -- were you aware as to whether or not any of those documents had been obtained?
A. I honestly don't know. I mean, you're asking me to remember a conversation a couple of years ago. I

0020

just have to say I don't know.
Q. After you had a chance to review the documents you did receive, did you make a request, for example, for additional documents that would assist you in connection with your work?
A. I don't think I did because I think that the confirmations were the primary documents that I used. In order to calculate probability I felt like I would need to know the terms of the contract. I did eventually see some other documents. As you see, there's a list there with a lot of documents and all. And I read over them, but I don't recall if I requested anything else. I know that the -- I just don't recall using anything else much except for the confirmations.
Q. Did you ask counsel if, for example, the Deutsche Bank's pricing data was available?
A. I probably did, but I don't recall for sure. I mean, I just can't say for sure.
Q. As you review the documents on your list, do you see any documents that reflect what the Deutsche Bank's pricing data was?
A. Well, there's some Deutsche Bank documents here. I don't know if any of these reflect their pricing data.
Q. I'm going to hand you what's been marked as

0021

Exhibits 2806, 2807, and 2808. Do any of these documents look familiar?
A. The first one does. The second one looks strange -- strangely unfamiliar because of the typeset is so large. I just -- I don't remember seeing the second one. And the third one -- I'm not sure about the third one. I know the first one does look familiar.
Q. And do you know why? Is that on your list?
A. I'm not sure. They keep track of the documents that are sent. If it's on the list, it's on the list, but I don't remember.
Q. Do you know --
A. I just remember it looks like something I saw.
Q. Do you know what that document is?
A. Well, it looks like a bank document. It's called an owe debt -- option deal entry ticket or whatever the "T" stands for. And it's some sort of a document that the bank takes when it does a transaction and it goes through the bank's accounting system and, you know, it's in effect something that's in the bank's internal system.
Q. But are you just speak- -- guessing now or do you know as a fact what this document is?
A. Well, I can look at the document and I can see things that I can interpret and say -- first of all, I

0022

see the word "option deal entry," and so I think, well, that's probably the bank's document. I'm pretty sure that's the bank's document.
Q. But you're now guessing, right? See, I want your personal knowledge. You believe you've seen this document before, and what I want now is your personal knowledge of what this document is. And your personal knowledge could have been acquired from your review of other documents. But do you have any personal knowledge of what this document is?
A. I'm still unclear about your question. Now, if you hand me a document like this and I can look at the words that are down the left column and I can look at the words down the right column, this looks to me like a bank document that says that a transaction was done on a certain day, and there were certain terms in that transaction. It has a certain expiration day. And there's entries here that sort of refer to things that the bank may have done. Currency premium is paid in U.S. dollars, et cetera, et cetera. So I'm giving you an interpretation of what I see in this document based on my experience.
Q. As you sit here today, correct?
MS. WIRSKYE: Objection. Form.
A. As opposed to what?

0023

Q. (BY MR. DONOHUE) Well, as opposed to a document, for example, that you had used in connection with your work?
A. Well, I did not use the bank documents to make my calculations. As I said, this does look like something that I remember seeing.
Q. If you, for example, had this document at the time you were doing your analysis, do you know whether or not you would have used it?
A. Not necessarily.
Q. And why not?

A. Well, a couple of reasons. One, I felt it was fairly important that I try to work as independently of the bank as I could. If I just mimic what the bank does and come up with the exact same thing the bank does, I'm not sure that you need an expert witness to do that. And I tried to work independently. And I took the information off the confirmations and I tried to make the most independent and unbiased assessment as I possibly could. Now, I vaguely recall -- I know that's a rather murky term -- but I vaguely recall in looking over these numbers and wondering about some of them like -- and, again, I can't remember exactly what this was, but some of the numbers like the amount -- it seems to me that the amount they were doing in the form of a

0024

hedge, they didn't look right.

And I started having questions about some of these numbers. How could they have come up with some of the numbers they did. I said, well, I'm actually going to try to work independent of the bank anyway. So basically I didn't use their sheets.

Q. See, I'm a little confused. Take a look at -- on Exhibit 2806 what is known as a Bates --

A. Wait a minute. Where's the number? Oh, I see.

Q. Take a look at the Bates Stamp number at the very bottom. Do you see that number DB COBRA 04211, do you see that?

A. Yes.

Q. Now, take a look at your Appendix C of the documents that you reviewed. I don't see any Bates Stamped numbers with a DB COBRA on it. Am I correct?

A. I guess. I haven't looked over it, but...

Q. Well, if you just take a look at --

A. Well, I mean, I believe you.

Q. Wait until I finish.

Take a look at the beginning and ending documents. The documents you were supplied -- and I notice all have a Z zero on it, and they -- on the second page, you have a page and a half of documents. I

0025

don't see any DB COBRA documents. Am I correct?

A. That's the way it looks.

Q. So is it fair to say that this is not a document that you have at least included in the documents that you reviewed in Appendix C?

MS. WIRSKYE: Objection. Form.

THE WITNESS: I answer, right?

MS. WIRSKYE: Yes.

A. The list of documents that is on here was provided to me by the law firm, and I made the assumption that the list was correct. As I said, I only really used the confirmations. But it's my understanding they keep track of the list of documents that are sent to me, and all I can tell you right now is this looks familiar.

Q. (BY MR. DONOHUE) But you can't --

A. If it's not on the list, it's because it was not on the list that was sent to me.

Q. Okay. But if it looks familiar and it's not on the list, is it because the list is wrong or because you were shown this at some point after you did your report?

MS. WIRSKYE: Objection. Form.
A. Oh, no, I definitely -- if I did see it -- and as I said, it looked familiar -- it was definitely

0026

before the report because the report was only done a few months ago.
Q. (BY MR. DONOHUE) Okay. All right. So even though it looks familiar, it's not a document that appears to be on your list. So is it fair to say that even though it looks familiar, you did not even use this document in connection with your report --
MS. WIRSKYE: Objection.
Q. (BY MR. DONOHUE) -- in preparation of your report?
MS. WIRSKYE: Objection. Form.
A. As I said, I did not use this document in preparing my report.
Q. (BY MR. DONOHUE) Okay. All right. Now take a look on Exhibit 2806 at the second to last row, do you see that term on the first page --
A. Are you on the --
Q. The first page.
A. Yeah.
Q. Do you see that term "Volatility to Expiry"?
A. Yes.
Q. Do you see that?
Do you know what that means?
A. Well, that's their opinion. Whoever entered this, that's this person's opinion of the bid and the

0027

ask volatility over the horizon of the transaction.
Q. And when you say "this person," are you referring to, for example, that's the Deutsche Bank's?
A. Well, some human being had to put --
Q. Right.
A. -- these numbers in here, so...
Q. So --
A. Now, when I said this -- excuse me. When I said this was Deutsche Bank's before -- and I don't see Deutsche Bank's name on it -- I'm drawing the conclusion that it's Deutsche Bank because it says option deal entry.
Q. Well, isn't it there right up at the top?
A. Oh, that's right. It's very small.
Q. Now, if -- you're saying this is a reference to a bid and ask volatility, am I correct?
A. Yes.
Q. Had you had that information at the time you did your report, is there something you may have used that information for in doing your analysis?
A. I'm not sure I follow that question. You said is there something -- might I have used that information when I did my analysis?
Q. Right.
A. I don't think so. As I said, I tried to -- I

0028

tried to be as independent of the bank as I possibly could, and I don't believe that if I had just taken the numbers off of the bank's numbers, I would have been acting independent.
I know where you're actually heading with this on volatility. And I'm sure we'll have an extensive discussion about that before this is over.

But first of all, to sort of back things up, whenever it was that I saw this was indeed before the report, so I did have the option -- no pun intended -- to use this.

Q. I'm sorry? Say -- I missed what you just said.

A. As I indicated, I did the report a few months ago. And as I said, I believe I recall seeing this and it was definitely more -- or earlier than that point in time. So I suppose I would have had the option to do this. So if I would have done it -- I'm just not quite sure of the wording of your question. You're saying would you have used it. But I did have the option to use it, and I chose not to use it.

Q. Well, I'm totally confused. Because we've just established that this document is not a document that is on your Appendix C of documents you considered, correct?

A. It's not on Appendix C, but I'm telling you

0029

that I have seen the document, at least it looks familiar. Now, what -- how it got left off of Appendix C, I don't know.

Q. Well, is that the only document that -- in other words, you understand that you have an obligation as part of the Federal Rules of Civil Procedure to list the documents in which you reviewed and considered in connection with this assignment, do you understand that?

MS. WIRSKYE: Objection. Form.

A. I asked them for the list of documents they have sent me, and this is the list they sent me. Now, I did make the assumption -- I didn't check each individual document. I made the assumption that these lined up with the documents that I received.

Q. (BY MR. DONOHUE) What I --

A. I did feel confident that the documents I used were on the list.

Q. Well, since you are saying that you may have seen this document and yet it's not on your list, I'm going to make a request that after the deposition is over that you review the documents that you have to make sure that your list, Appendix C, is complete and accurate. And if you have documents that you reviewed that are not on this list, then I'm going to ask that you revise Appendix C to provide us what is an accurate

0030

list of the documents you've seen.

A. Sure.

Q. Do you understand that?

A. Yes, that's fine.

Q. Because the obligation to provide the list is not counsel's obligation. It's the witness's obligation.

A. That's correct, yes.

Q. All right. Now, let me hand you what's been marked as Exhibit 2415 and 2422.

A. Do I hand these back?

Q. No, you keep them. We'll come back to those.

MS. WIRSKYE: And Dennis, are you giving him the court reporter's copy? Is that...

MR. DONOHUE: That's the procedure.

MS. WIRSKYE: Okay. I just wanted to make sure.

Q. (BY MR. DONOHUE) Twenty-four -- Exhibits 2415

and 2422 they should be Dr. DeRosa's, who is the Government's expert witness in this case, opening and rebuttal reports. Have you had an occasion to read those reports?
A. Yes, I have.
Q. And I'm going to also give you what's been marked as Exhibits 2429 and 2434.

0031

MR. DONOHUE: I have the wrong number here, okay. Let me for the record point out that 2422 is not Dr. DeRosa's rebuttal report, so I'll get that in a second.
MS. WIRSKYE: Dennis, can we stop for just a second here. I think we've got some reports from some other cases that you've given me.
THE WITNESS: This says Ira Shepard.
MR. DONOHUE: Okay. Let's see, then -- okay. Let's see what we have here. Yeah, it's the wrong exhibit numbers, sorry.
Q. (BY MR. DONOHUE) Well, let me ask you without actually giving you reports because I don't think necessarily you need the reports. Did you read the reports of Dr. DeRosa and Dr. Kolbe, both their opening and rebuttal reports?
A. I did, but let me qualify I didn't read each of the three cases word for word.
Q. You read, what, just one report in each case?
A. I read one and then I sort of skimmed over the others and looked for, sort of, where they diverged.
Q. Now, as a result of reading their reports, did you see any reason to change any of your opinions or modify any of your opinions?
A. No.

0032

Q. Let's take a look at your reports, and go to Exhibit 2400. And I'm going to give you what's been marked as 2402 and 2404. Now, first let's go to 2402. Is that your report in the Murphy case?
A. Yes.
Q. And go to Exhibit 2404, is that your report in the Tesoro case?
A. Yes.
Q. And am I right that the analysis and the ultimate conclusions in your reports in these cases are essentially the same?
A. Well, you know, the numbers are a little different, but I think --
Q. The numbers are different, but the analysis is --
A. -- generally, yes.
Q. And ultimately your conclusions are the same, are they not, in all three reports?
A. Yes.
Q. And with that in mind, even though I'm entitled to ask you questions on each separate report, we can speed this along. What I plan to do is take two of your reports, the JBJZ report and the Murphy report and go through some in-depth questions with respect to those reports. But to the extent that you would feel

0033

that there would be some difference in your answers with respect to my questions, I'm going to ask you to alert me. If I don't feel on your part that -- or hear on

your part that there is a reason to be different, I'm going to assume that your answers would be the same for the Tesoro or for the other report -- the other report that I'm not immediately referring to. Is that clear?
A. I understand, yes.
Q. All right. Now, prior to -- and let's start with Exhibit 2400. Do you know approximately when you finished writing the report?
A. It was sometime in the spring. I don't know if I could tell you exactly. The report has a date of May the 8th. I seem to recall it was due the 31st or something like that, but I went on vacation for the last two and a half weeks of May. So I finished it a little bit early, that's why the date doesn't line up with the deadline. I would have to say it was probably early May, possibly April.
But when I write something -- I mean, I've written many articles in books and I can say I've finished, but finishing means sometimes putting it aside -- I like to put things aside for maybe sometimes a few weeks and let my brain sort of clear out and go back to it. And I probably did that. So I may have

0034

actually had the draft done a while back, before May the 8th.
Q. And did you submit the draft to counsel for counsel's review?
A. What do you mean by "submit"?
Q. Give it.
A. I mean, we had discussions. No, I don't think I did that.
Q. You didn't --
A. We had discussions about it certainly.
Q. Well, but you gave a draft to counsel in order for counsel to read it, am I correct?
A. It depends what you mean by draft. I don't think they read anything until the final report, but I don't recall. I mean, I know we had discussions about it.
Q. As a result of those discussions, did you change any portion of your report?
A. Well, I may have, but I don't know. If what you're getting at did counsel tell me to say something, no, it's not what happened.
Q. Sir --
A. We had discussion about it and I'm sure I made changes. Even if we hadn't had discussions, I would have made changes.

0035

Q. All right. Let me go to your comment "getting at." Whatever I'm getting at is the basis -- is my question. So that's the sum and substance of what I'm getting at is whatever question I ask you. Is that clear?
A. I'm not sure if it's clear, but I think you can proceed.
Q. Okay. Now, that's why I'm a little confused. If you gave to counsel the report and then there were changes, why wouldn't that -- why wouldn't you consider that to be a draft report? Isn't your final report at the point that all changes were finished? Isn't that what you consider your final report?
MS. WIRSKYE: Objection. Form.

A. I'm still confused. I did not E-mail or Fed Ex counsel a -- this until the very end. And we had discussions about this. And as I recall we had meetings that were online where they saw my words, were able to see the words that I had, but I did not send them a report.
Q. (BY MR. DONOHUE) Oh, I see.
A. I didn't E-mail them or Fed Ex, or whatever you call it, until -- I don't want to say May the 8th, but somewhere around May the 8th, I suppose.
Q. And when you say online, did you have, for

0036

example, or did they have, for example, a site you could go to or did you have a site --
A. They had the -- there's the ability to see things online, to look at what's on the screen.
Q. And whose -- when you say there is this service. Whose service is it?
A. I'm not sure. It's just the Internet. I mean...
Q. Right. But did they inform you or did you tell them, I'm going to put my report on -- online?
A. By the way, let me not say online. It's not like anybody could get it --
Q. Right, I understand.
A. -- you know, so let's be careful about that. But they have -- there is the ability to look at the report. I think it's called Net Meeting or something like that. We can actually look at something on someone else's computer, and we had discussions about it.
Q. Okay. And how many times did this occur where you put your report online and there were discussions?
A. I don't remember. I don't remember. It wasn't very many.
Q. More than five?
A. Oh, I'm pretty sure it wasn't that many.
Q. So it was less than five?

0037

A. You know, I'm pretty sure, but I can't swear.
Q. And then you -- then you had discussions, what, by telephone regarding the report?
A. Yes.
Q. And do you recall as you sit here today as to what some of those discussions were about?
A. Well, you know, we discussed a lot of things. Any attorney is going to have discussions with their expert witnesses. I'm not sure I can remember exactly what we discussed. But I know that under no circumstances did they ever tell me what to say.
Q. Sir, you understand you're under oath.
A. I know, yeah.
Q. And if you do remember something but you say you don't, you understand that is a violation of your oath. Do you understand that?
A. I know, but I don't --
Q. Did you understand that?
A. I can't remember the details. I do understand --
Q. Did you understand the question?
A. -- your question -- your point, I mean...
Q. Now my questions is, you mentioned you had a number of meetings, and all I'm asking you is do you recall anything from those meetings as to what was

0038
discussed?
MS. WIRSKYE: Objection. Form.
A. Well, they read -- you know, they read parts of the document, and they might ask me or make a comment about it or say something is unclear as if someone is trying to read something that you've written and trying to understand it. And I honestly can't recall. I mean, I've written books and articles and gone over them and over them many times, and I couldn't recall what I -- you know, what preliminary thoughts I might have had when I re-read something. So I don't know exactly what it was that we might have discussed because it's a, what is it, a 60-page report or so.
Q. (BY MR. DONOHUE) So it's your testimony under oath that in all the meetings that you had nothing comes back to you as to any specific discussion about what you had? Is that your testimony under oath?
MS. WIRSKYE: Objection. Form.
A. If you're -- you're asking me to -- are you asking me to point out a specific paragraph or something like that, I mean...
Q. (BY MR. DONOHUE) I'm asking you whatever you remember. Not necessarily with respect to a change, but the discussion. I'm asking you --
A. It's just -- it's just a pretty hard --
0039
Q. Let me finish my question.
A. Okay. I'm sorry. You're right.
Q. Let me finish my question.
A. I thought you were through.
Q. Do you recall anything about any of the specific discussions you had when you were discussing your report with counsel?
A. I don't recall at the moment. If I had some time and thought really, really deeply and went through the report line by line, it's possible something might come back to me. But I don't recall at the moment any specifics.
Q. As a result of those discussions, did you change your report in any way?
A. I made editorial changes to the report certainly.
Q. And what do you mean by "editorial changes"?
A. A certain sentence might be worded a certain way, I might word it a different way. I'm always open to someone telling me that something isn't clear.
Q. Look at Exhibit 2400, that's your JBJZ report, page 18. Am I correct that you use the Black-Scholes model to calculate the values of the short option?
A. That is correct.
Q. Take a look at page 39 of your report,
0040
Exhibit 2400. Am I correct that you determined the theoretical values of the options on the date of their contribution to the partnerships?
A. Yes.
Q. And take a look at page 17 of your report.
A. Yes.
Q. Am I correct that you point out that volatility is probably the most important factor in valuing options?
A. That's correct.

Q. How do dealers determine volatility?
A. Well, that's the universal question in options and is the one piece of information at which people would have a great deal of disagreement about. No one really knows exactly how they determine volatility. I'm pretty familiar with the 30-year literature on research on volatility. There are a couple of methods, implied volatilities is one and historical volatilities is the other. One could even blend them for that matter and one could even make an opinion -- a wild guess is what I'm trying to say.
One should also keep in mind that whatever volatility number you put into a model, is a number that picks up a lot of factors that the model might not be picking up. For example, one of those

0041

pages you had me look at, there was a bid and an ask volatility. Well, the stock only has one volatility, or an option, a currency, I'm sorry. It has only one volatility, and yet on one of those pages there's two volatilities. Well, that's because one of those numbers has been used to quote a bid price and one is being quoted -- or one is being used to quote an ask price.
So the volatility number subsumes a lot of information. And dealers have to think about what they think is a good guess as to what the volatility is.
Q. So if I understand your answer, you don't know how a dealer determines volatility?
A. Well, what I'm trying to say is that there is no universal method of determining volatility. It is an opinion, and dealers don't tell you how they determine volatility. In fact, determining volatility is the whole -- it's kind of the whole nature of the options game. Whoever is coming up with the best number will do the best. If I knew how to determine volatility with absolute certainty, I would make a lot of money and I wouldn't tell anybody.
Q. Well, did you understand the question I asked you?
A. You asked me how dealers determine volatility.
Q. Yeah, but I asked you do you know how dealers

0042

determine volatility. What is the answer to my question?
A. I have an idea and I've given you the idea. They -- as I said, I think they look at historical volatility. They look elsewhere in the market. And they also pad those numbers with all these other effects that are not being captured by the model.
Q. And what's the basis of your opinion?
A. Twenty-five years of observing these markets, doing research, reading articles. I talk a lot to practitioners. I attend practitioner conferences. I read a lot of practitioner publications. I can only say that I've obtained that since -- from my experience as an observer of this market.
Q. Do you know how Deutsche Bank arrived at their volatility numbers?
A. Well, I wouldn't know in a specific case. The previous question I interpreted as being sort of a general question, and I wouldn't know in a specific case. Although I would think it would have something to do with what I previously said.

Q. And I showed you Exhibit 2406 which had the -- do you want to take a look at that again? It looks like this (indicating).
A. Right.

0043

Q. I showed you this Exhibit 2406. Do you happen to know, for example, what this transaction, which is Exhibit 2806, refers to?
A. Well, it's a transaction involving Euro. It looks like it was started on the 23rd of November to terminate on the 22nd of December. Someone named Brooks sold it. There's some other numbers here. With a little more time if I were to read every single number, I might be able to nail it down.
Q. Take a look on the second page of the document, the second to last row, confirmation details.
A. Yeah.
Q. Do you see a name there that may be familiar?
A. Yeah, JZ Buckingham looks familiar, sure.
Q. Now, if you turn to the third page of the document -- which is something that says leg one -- you'll see, for example, information about three-quarters of the way down regarding the customer premium amount. Do you see $20 million?
A. I'm still looking for leg one, I'm sorry.
Q. It's on the third page of the document. It's Bates Stamp No. 04213. It's the third page --
A. I see that, but I still don't see your leg one.
Q. Oh, leg one is the second --

0044

A. Oh, I see, the second line.
Q. -- the second line.
A. The second line, all right. I'm with you. And go back to what your question was.
Q. If you go to -- for example, three-quarters of the way down you'll see something called customer premium amount, $20 million. Do you see that?
A. Yes.
Q. And, for example, if you go over to leg 2 which is that Bates Stamp No. 04215.
A. Yes.
Q. Do you see a customer premium amount there of $19 million?
A. Yes.
Q. Does that look at all familiar or sound familiar with respect to one of the pairs of option for the JBJZ?
A. Well, I can only say it looks familiar, but I don't have the numbers memorized of all these options.
Q. All right. But am I correct that even if you -- even if you had seen this information at the time you were doing your analysis, you would not have used that document in any way in doing your own analysis?
MS. WIRSKYE: Objection. Form.
A. Well, the operative word is "would." I felt

0045

comfortable doing my own independent analysis. I think if I had seen a number on here that may be contradicted. I would have felt probably even more right about not using this. And as I said, I tried to do my analysis as independently of the bank as I possibly could. And so I didn't use these numbers, no.

Q. (BY MR. DONOHUE) When you --
A. I did an independent analysis.
Q. When you say that if you had seen a number on here that may have contradicted, I would have felt probably more right about not using this.
I'm not clear as to what you mean by that. What do you mean by that?
A. Well, like a mistake. I mean, this is -- this is 24 -- 2806. This 2806 is a sheet that some human being obviously has to enter this information into the system. I think we talked about that earlier. And if I had seen some number like maybe the date wrong or the strike rate wrong or the strike rate didn't line up with the premium and it looked like something was mixed up in some way, then I definitely would not have wanted to use it.
Q. You used, am I correct, historical volatilities?
A. That's correct.

0046

Q. And your historical volatilities, am I correct, were based on time periods of 30, 60, and 90 days?
A. That's correct.
Q. You mentioned the term "implied volatility." What is implied volatility?
A. Well, let's back up just a little bit. An option model has either five or six variables in it. In the case of currency options, you're going to have six. You will see by the way -- if you look in a book, you'll often see a set of five. But oftentimes they leave the payout out of the initial explanation.
But it has six variables, and the volatility is one of those variables. And that volatility is a number that represents someone's opinion about what the underlying volatility or variation, or whatever you might want to call it for an alternative word, will be. It is a number where there could be potentially a great deal of disagreement. We could disagree somewhat on interest rates. We could disagree a little bit on what the value of the underlying is depending on the timing. We wouldn't disagree on the expirations of the exercise prices.
So volatility is the number where there is potentially the most disagreement. And it's an

0047

important number, as you pointed out in one of my statements there, it's a very important number because it is a number that doesn't reveal itself to us very easily.
Q. Okay. But my question is: What is implied volatility?
A. I did get -- I got distracted I'm sorry. I felt like I needed to cast it into an appropriate setting, what are the numbers.
Implied volatility is to go to the options market, take the price of the option, and to back out the volatility that the person who traded that option put into the model to get that price. So it is a number that is -- you can infer from the price of the option.
There's a procedure for solving the option formula to get the volatility out of it, and that gives you an idea of what that person's opinion is of

the volatility at the time he said I will do this transaction at this price.
Q. Now, in order to make that determination, am I correct that you would need to know the price of the option?
A. You would, yes.
Q. Okay.
A. You also have to know a model. I mean, you

0048

would have to agree on a model.
Q. Did you make any attempt to determine implied volatilities based on the prices of the options that you saw in the confirmations?
A. In other words, if this option traded at this price, this was the implied volatility?
Q. Yes.
A. No, I didn't do that.
Q. Is there some reason you did not do that?
A. Well, first of all, I decided for a number of reasons -- and we can get into that now or later if you want -- that I wanted to use the historical volatility. I know that there is no right or wrong answer for what volatility is. There's no magic number that some one of us is going to be able to stand up and say, I have the number. I know what is the correct volatility.
And I also wanted to give a range of numbers because I know that, as I said, there's margin of error on what everybody does. We don't know what the volatility is. I wanted to give a range of numbers, and so I felt it was important to look at the recent history of the market. One of the problems you have with using implied volatility is that in the Exchange listed market, option trading is very transparent and the extensive studies that have looked at implied volatility

0049

have all looked at the Exchange listed market. To my knowledge there are no studies that look at the over-the-counter market where there's considerably less transparency.
If I might elaborate a little bit, I don't know if everybody understands the word "transparency." Would you like to elaborate a little bit on what that means?
Q. Sure.
A. It's an esoteric term that's used a lot in this profession. If you and I were option traders on the floor of the Chicago Board Options Exchange -- and by the way, you can trade electronically when you're not on the floor -- but if we were on the floor and I were facing you and I called out a bid for an option and you hit the bid -- just another term they use to say you agreed with me and we just did a transaction -- well, that transaction goes through a system. We do some paperwork and so forth. It goes through a system. It goes into the Exchange, and it gets recorded. And tomorrow when the Exchange reports the volume of trading, that transaction will say we've made a mistake. It's going to be in there.
And that transaction goes into a database. And those databases are accumulated over

0050

periods of many years and they end up in the hands of academics oftentimes, like me, who do studies about

implied volatility. And there have been 30 years or so of studies of implied volatility. But to my knowledge they've all been on the Exchange listed market.
Now, every study on implied volatility have not supported implied volatility as a very good predictor, future volatility. One study in particular said it was a pretty bad predictor. But most of the studies say that it's a pretty good predictor. But the problem is it's in a very transparent market, like the Exchange listed market, where all the transactions are collected and recorded and they go into a big database. In the over-the-counter market if you and I did an over-the-counter transaction -- we could do one right now I suppose if we weren't in the middle of a deposition -- I could say I'm going to buy an option from you and you're going to sell that option to me. There's no one out there collecting this information and recording it and also recording the transactions that maybe you guys did at the same time.
And to my knowledge there's never been any studies that have looked at a fairly nontransparent market like the OTC market. That implied volatility is a better predictor. Now, I'm not saying -- I'm not here

0051

to actually say that it's a worse predictor. I'm saying we really don't know. And for that reason I felt it best to try to come up with multiple estimates and to use recent historical data, and that's basically my justification for doing it. I don't want to just copy what Deutsche Bank has or to try to figure out the implied volatility because Deutsche Bank built into the price of these options a profit margin. And I'm not sure that profit margin would be a very good number for me to stick into the model and come up with implied volatility and that would buy us the forecast.
Q. Dr. Chance, if you did do a determination of the implied volatility, these options, based on their option price and you arrived at volatilities that were or at least seemed suspect, what would that tell you about the price?
MS. WIRSKYE: Objection. Form.
A. Let me see if I've got your question right. If I calculated some implied volatilities and maybe they looked really out of line or something --
Q. (BY MR. DONOHUE) Correct.
A. -- or they were too big or something like that, are you -- is that a general question or are you referring specifically to these options?
Q. I'm referring specifically to these options.

0052

A. Well, I think that's probably almost surely what would happen because of the prices of these options. They had a profit margin built into them. And so yeah, I mean, I would be suspicious of these numbers.
Q. You say because they had a profit margin built into them?
A. Sure. The banks -- banks build profit margins into them. And also -- they also build bid and ask. Somewhere on one of these exhibits you previously showed me was a bid volatility and an ask volatility.
Q. Do --
A. That's something of a profit margin right there.

Q. Well, let me just take that statement. You're aware that there was not only a long option that was purchased by one of the entities, but there was also a short option that was purchased by the Deutsche Bank?
A. Right.
Q. You're aware of that?
A. Sorry, yes.
Q. And you're aware, I assume also, that banks normally do not overpay for their options?
MS. WIRSKYE: Objection. Form.
A. I suppose they don't.
Q. (BY MR. DONOHUE) So what if on the short

0053

option you made a determination as to what the implied volatility was and you determined that, in fact, you have a number, which is out of line, totally inconsistent with what you would think would be a normal range for volatilities, what would that tell you?
A. Well, I'm not sure what it would tell me other than there was something wrong with the numbers or that the implied volatility contains something in there that's not really the volatility. I think if you go back up a few pages or whatever, you'll note that I pointed out that volatilities -- I didn't use this word -- but the word is subsumes. It subsumes within it a lot that the model is not capturing.
So it wouldn't necessarily surprise me if I calculated implied volatility and it looked like it was somewhat off from what I thought the volatility was. It wouldn't surprise me at all because that number subsumes within it a lot of other information.
Q. Do you recall, for example, in the Murphy case there were options that were based on the Euro dollar conversion rate?
A. It's not Euro dollar.
Q. I'm sorry, the Euro.
A. Euro. Euro dollar is something totally different.

0054

Q. Yes, yes. I understand what Euro dollar is. I did a case on it. Euro --
A. Yes, there were Euros I believe in that case.
Q. What if, for example, you found that the implied volatility for those options was over 100 percent, does that sound like a reasonable volatility?
MS. WIRSKYE: Objection. Form.
A. Well, not necessarily and let me explain. If you consider that the implied volatility assumes within it a lot of other information, 100 percent would certainly strike one as being big, but it depends on what you mean. If it subsumes within it the bank's cost and the bank's profit margins, I don't know whether it would be big or not. But if I'm supposed to take that number, 100 percent, and say that is the bank's prediction of the future volatility of something like a currency, contrast to maybe some Internet company or something, then yeah. But I wouldn't take that number for that purpose. I wouldn't use that number for that purpose.
Q. (BY MR. DONOHUE) Could it possibly also indicate that the price of the option, in fact, is considerably overstated? Could it indicate that?

MS. WIRSKYE: Objection. Form.

0055

A. Well, anytime you have an over-the-counter market your option price is not going to precisely equal the model price. And I sort of object to your word "considerably" because that's such a -- what one might call considerably, another one might not. If you say it -- if you just said overstated, I think I could go along with that. But I don't know exactly what considerably means in that context.

Q. (BY MR. DONOHUE) All right. You don't believe that market volatility is a more accurate gauge of volatility than historical volatility, am I correct?

MS. WIRSKYE: Objection. Form.

A. I believe you may have said the question wrong. I'm not sure why I should be helping you, but I think you meant to say implied volatility. You said market volatility.

Q. (BY MR. DONOHUE) Well, what do you consider market volatility to mean?

A. Well, that word could mean a lot of things. What is -- what is market -- if someone said what is market volatility, I would interpret that to mean that -- are you talking about what's the standard deviation as of today? I mean, it could really mean a lot of things. I think you would have to be a little clearer on that.

0056

Q. When dealers, for example, determine volatility, does their determinations change day by day?

MS. WIRSKYE: Objection. Form.

A. Well, it certainly could. Volatility changes a lot. We've all seen a huge amount of volatility in the stock market, and then we saw it calm down. So it could very easily change not only on a day-to-day basis, it could change within a day very easily.

Q. (BY MR. DONOHUE) Do you --

A. Can I finish here? I'm sorry.

Q. No, go ahead.

A. I know I sounded like I'm finished. But what I wanted to add was: Information is constantly hitting the market, and that information makes people assess where markets are going and how much volatility is in it. So for that volatility number not to change consistently over a long period of time, I mean, that would be really unusual.

Q. Are there outside services that have information on volatility, for example, Bloomberg?

A. Yes.

Q. What does Bloomberg have in turn -- what information does Bloomberg have on volatility?

A. Well, I've never looked at Bloomberg's volatilities, but I'm assuming that they have some

0057

numbers that represent either their opinions or somebody's opinion of what volatility is. You can also calculate a stark of volatility off of Bloomberg as well.

Q. You say you assumed. Have you ever used Bloomberg's volatility in connection with --

A. I've used Bloom- -- I'm sorry.

Q. -- in connection with valuing an option -- a foreign currency option?

A. No. I have used Bloomberg. I want to make that clear.
Q. How many times have you valued the foreign currency option in the past?
A. Well, that's difficult to say because I've been an option's academic for 25 or so years. I've done a lot of research. I've written books. I've given, you know -- I honestly couldn't say how many times I've plugged numbers -- currency option numbers into the currency option model. I really couldn't say. I mean, I've certainly done it.
Q. More than five times?
A. I'm sure. I've got currency option examples all in my book. The book is in seven editions and I've done --
Q. And how do you --

0058

A. -- problems. I've given students problems on exams and things like that, so yes.
Q. How did you determine volatility in these other exercises?
A. Well, it depends. It depends on the context. If I'm working up a problem to use in a presentation or on an exam or something like that, all I need is a realistic number. So I can make up a number. I'm not trying to trade on that basis. I'm trying to use the model to make a point. So all I really need is a realistic number. Now, at one time --
Q. Well, how do you --
A. Let me finish here.
Q. Okay.
A. At one time the currency options market on the Philadelphia Stock Exchange was a fairly liquid market. I'm not sure what happened, but it's -- over the years it's really deteriorated and it's not anymore. Now, at one time you could actually go to their quotes and find an option that had a fair amount of liquidity, and you could calculate the implied volatility and feel with some confidence that that was a pretty good number. But you really can't do that much anymore. We just don't have enough trading volume.
Q. Is there some reason why you didn't use

0059

Bloomberg's volatility for purposes of a volatility number for your Black-Scholes analysis?
A. Well, like I said, I didn't want to just mimic somebody else. You know, if everybody is looking at Bloomberg, then we all end up having the same opinion of volatility. And I want to point out something that's very important here when you talk about volatility. You seem to be trying to get everybody to converge on volatility, a sort of let's all try to do it the same way and reach the same number.
And I want to point out that there's a growing market for options and swaps -- that's another type of derivative instrument -- where volatility is the underlying, where people actually buy options and swaps and they pay off based on what the volatility of something is. And if everybody had the same opinion about volatility, there wouldn't be that kind of market. So people have to have different opinions. I mean, you can infer that from observing that there's a market for volatility options and swaps.

And I just don't think in this situation it's appropriate for me to just go grab a number that someone else used. I would love to have been able to go to the currency options market at the Philadelphia Exchange, see that there was plenty of trading volume

0060

and currency options that are close to the ones in this case and use their numbers, but there really wasn't.
Q. Do you know if dealers use historical volatilities?
A. Well, like I said, we don't know really what dealers use. If they've got a good model, they're not going to tell everybody about it. But I have a feeling they probably at least look at the number, but they may well look at somebody else's opinion of implied volatility. There may be people out there who give volatility forecasts and they may blend it all together. And as I said, they will pad these numbers to pick up all the other, sort of, junk that doesn't get reflected in the model, so...
Q. What are you referring to as "junk"?
A. Well, as I said, it's things like their profit margin, their trading costs, and this -- like the bid and the ask we saw in this other exhibit that reflects their market-making activities that we try to buy at this price, we try to sell at this price, we try to cover that cost.
Q. Did you have an opportunity to read Dr. DeRosa's deposition that was taken by the plaintiffs in this case?
A. No, I have not seen that. I thought you meant

0061

his report.
Q. Had anyone discussed with you his deposition?
A. Very lightly.
Q. And who was that?
A. Mr. Welty did.
Q. And what did he say?
A. There were a few specific questions that he asked him. And he told me, sort of, how he answered the questions, and...
Q. Do you remember specifics?
A. Well, I can remember one. Like I said, I may remember more if I had more time to think about it, but I'll give you -- I'll give you an example to show you I'm not going to say I can't remember.

Dr. DeRosa made a comment that I used the Google and S&P 500 data inputs, or whatever, into my currency option calculations. And he asked him a question about that and told me -- I think he said Dr. DeRosa really couldn't explain how he got it or what basis he made that statement. So that's an example.
Q. Are you aware -- you used historical volatility again, am I correct?
A. That's correct, yes.
Q. And where did you get your historical information from?

0062

A. I downloaded the data from the Fed's database, and I believe one of the currencies -- I think it was the Deutschemark -- we had to get from a different database. It's mentioned in one of the footnotes.
Q. Are you aware that Federal Reserve data goes

back to 1971?
A. That sounds familiar, but...
Q. Are you aware of that?
A. I mean, it's -- I can only say it sounds familiar. I mean, you know, I've scrolled through their database before, but I did not go back to 1971.
Q. Is there some reason you didn't use all the way to 1971?
A. Well, I think in calculating a volatility that I'm going to use to make a current estimate, I would want to use fairly current pieces of information.
Q. Would it be wrong to go back to 1971?
MS. WIRSKYE: Objection. Form.
A. It depends on the context.
Q. (BY MR. DONOHUE) And what do you mean by that?
A. I personally would not do it for the purposes that I had in what I was supposed to do for this case, but I'm not sure it would necessarily always be wrong. It depends on the context. I mean, you would have to

0063

give me an example of some other context and I might...
Q. Yeah, but in this case you didn't think it would be appropriate?
MS. WIRSKYE: Objection. Form.
A. Not for what I had to do.
Q. (BY MR. DONOHUE) And why not?
A. Well, I wanted as current information as I could possibly get, and I didn't think it was necessary to go any further than maybe about 90 days. It's all a judgment call. If I had gone 180 days, it wouldn't necessarily had been wrong. But the further back you go, then you start -- if you're trying to get a current piece of information, as you go further back then you start having to, you know, wonder whether that's current enough.
Q. So from your point of view if you're going to use historical data, it's best not to go back too far?
MS. WIRSKYE: Objection. Form.
A. Well, that's what I would do.
Q. (BY MR. DONOHUE) Okay. What is -- are you -- have you ever heard the term "foreign points to expiration"?
A. I think you said foreign. I think you meant forward.
Q. I mean forward -- forward points. You're

0064

absolutely right. Have you heard of that term before?
A. Yes.
Q. And what does that mean?
A. Basically that's an adjustment to the Exchange rate that's supposed to take into account the difference in the -- one of the interest rates -- the interest rate in one of the countries, the interest rate in the other country. It's a type of an adjustment that -- what it really does is it converts a spot rate into a forward rate, which is why they use the term "forward points." But it's really just kind of -- quotes around that word -- an adjustment for the difference in the interest rates in the two countries.
Q. Does Black-Scholes formula take into account forward points?
A. Well, it does take into account. It just

doesn't do it the way that your person did it, although what your person did was equivalent to the Black-Scholes in that sense.
     Q.   You lost me with the reference --
     A.   Dr. Kolbe.
     Q.   -- with "your person."  Who are you --
     A.   Dr. Kolbe.
     Q.   Dr. Kolbe?
     A.   Yes.  Is that how you pronounce it?

0065

     Q.   Yes, Dr. Kolbe.  Now, give me your answer again now that I understand what you're referring to by "your person."
     A.   You said does the Black-Scholes take into account forward points.
     Q.   Yes.
     A.   And the Black-Scholes takes into account the two interest rates.  Now, the forward point concept subsumes that into one number.  And so to do it that way -- and that's when I made that allusion to the way Dr. Kolbe did it -- is nothing more than to algebraically manipulate a formula so that it looks in such a way that you can use the forward points number, yes.
     Q.   All right.  Take a look at page 54 of your report, Exhibit 2400.  Do you see on page 54 a reference to actually the equivalent of taking into account in the formula forward points to expiration?
     A.   Yes.
     Q.   And where would that be?
     A.   Well, as I said, forward points shows up when you mathematically manipulate this formula.  And if you look in the -- roughly the middle of the page under the formula for D-2, and that little -- it looks like an NL, it's natural log.  And you see an S and then you see

0066

that -- this is called -- the next thing is called an expediential.  And in the exponent you see a minus R sub F times a T note.  Just the R sub F is what's important.  And if you go further down that -- or across you see an R sub D.  Now, this is the more general statement of the formula.
          If you take the R sub D and the R sub F and if you manipulate the formula, you subsume that information into a forward points number.  And there is -- you know, there is an equation in which you could say the forward points equals -- and I can't remember exactly what it is, but it's got natural log and it's got RD and it's got RF and it's got T in it.  So yes, it's implicitly in there is what I am saying, yes.
     Q.   All right.  And what is the purpose as to why the formula takes into account forward points to expiration?
     A.   Well, the purpose of the formula is to provide a value for the option.  That's -- if you notice the title, valuation of digital currency options.  I should point out it's not a formula in this form to give you the probability, but I'm not getting away from your question here.
          Black-Scholes and Merten back in 1972 developed this option pricing model by using a

0067

methodology that took what people knew prior to that

time and said, hey, there's something we can do different here. In order to value an option, let's assume you could trade the option along with the underlying and former risk-free hedge. And if you do that, that transaction ought to earn what is called the risk-free rate, the Government or securities or LIBOR or something like that.

And when you do that and you go through some really horrendous mathematics, you end up with this formula. And you end up with something that some other people came along later and said this is what you call risk-neutral pricing. The interest rates that you see there really reflect the opportunity cost of your money, and what they reflect is sort of the return you would get if you engaged in a risk-free hedge. Now, we're not saying people actually engage in risk-free hedges, but what we're saying is that if these options, or whatever you're trying to value, didn't conform to this formula -- assuming all the assumptions, you know, are met -- then people could earn a profit, which is called an arbitrage profit, which basically means you could pick up money without any risk. It's like -- some people call it like finding money on the street.

And these two terms, the domestic

0068

interest rate and the foreign interest rate, are just two of the terms that have to go into that formula. So, you know, that's sort of how it works. It's kind of an opportunity cost on your money.

I'm sort of at the end of the discussion here, so you can sort of take it from there.

Q. Okay. If a foreign and domestic risk-free rates were different, weren't the same -- if you assume that -- if you ignore the forward points to expiration would you arrive at an incorrect value for the option?

MS. WIRSKYE: Objection. Form.

A. If you're valuing the option, you should not ignore these terms. Valuation is the purpose. So as to how far incorrect, that's hard to say. I mean, it could vary, like, by the problem, you know.

Q. (BY MR. DONOHUE) You previously mentioned that you determined the price of the option -- the price of the short option on the contribution date, am I correct?

A. Yes, the contribution date.

Q. And if you take a look at pages 39 and 40 of your report where you have a discussion of the value of the short options on the date of contribution. Do you see that?

A. Yes.

0069

Q. And then over on pages 40 and 41 you have estimated values of the short option on the transfer date --

A. Yes.

Q. -- am I correct? Did your calculations there reflect forward points?

A. Yes, but they reflected it in a way that the formula shows there, which is I did not subsume these two figures into a single forward points figure. But, you know, that's the long answer. But, yes, that information is taken into account.

Q. Take a look at page 30 of your report. You

see in the third paragraph where you say (as read): There is no a priori reason why the Exchange rate would be expected to increase at this net rate.
A. Is that a question?
Q. Yes. Do you see that?
A. Yes.
Q. Now, you're saying that the Exchange rate -- there's no a priori reason why the Exchange rate would be expected to increase at the net rate reflected by the forward points, correct?
A. Yes, that's correct.
Q. If you ignore forward points in your probability calculation, isn't it correct that you're
0070
assuming that your foreign exchange rate will be the same at expiration as the spot rate at the date of -- that the option is written?
A. No. Although I think -- I think you may have worded that question a little -- maybe not the way you intended. You said I'm assuming that the Exchange rate would be the same at expiration, I think that's what you said. And no one is making that assumption. The only way you can make that assumption is if you put a zero volatility in the model, which, you know, obviously we didn't do that.
Q. No, I said by ignoring forward points. If you --
A. Right.
Q. -- ignore forward points, aren't you making an assumption that, in fact, your exchange rate at the expiration is the same as a --
A. No. I'm sorry.
Q. Okay. You have to wait and let me finish.
A. I mean, that's what -- I'm sorry.
Q. Isn't that the assumption you're making?
A. When you restated the question, that sounded exactly like the original question. And what I said was that is not true, that the Exchange rate -- you're not assuming the Exchange rate would be the same if you
0071
ignore the forward points.
Q. The forward exchange rate?
MS. WIRSKYE: Objection. Form.
A. I'm not sure I heard that last time, so I have to think about that. If the spot rate -- let me back up. I'm going to do some thinking here aloud, but that's fine.
Q. (BY MR. DONOHUE) Okay.
A. If the spot rate is the same at expiration, the only way for you to be assuming the spot rate is the same at expiration is to assume a zero volatility, and that's definitely not being assumed. Now, the forward rate will always converge to the spot rate at expiration. You know, assuming our forward period corresponds to our option life.
So it sounds like the forward would be assumed to be the same as the spot. Now, I'll agree with that statement, but that is not the same as assuming that the spot will be where it was at the beginning of the transaction.
Q. What in your opinion is the effect of ignoring forward points?
A. Well, I'm calculating the probability. And

the forward points, which again reflect the interest rates -- I feel a lot more comfortable answering that

0072

question if I emphasis the interest rate part of it. So if we said ignoring interest rates, what effect would that be? First of all, I want to point out that the option pricing model that has the forward points in it does not give you probabilities of outcomes. It gives you what's called risk-neutral probabilities, and those are not the true probabilities. They might be close, they might not.

Now, in order to get the true probability you need to plug into this formula for this D2 value. You need to plug in the expected rate of return on the currencies. Now, to do what I did was to make the assumption that over this very short period of time I'm not going to try to predict that one currency is expected to increase over the other currency because if I do, I'm in effect seeing one set of investors is expected to gain over the other. And that information is something I don't think anybody really knows frankly. I mean, if you're a foreign exchange trader, you make a living trying to guess what things like that are going to happen.

But I felt like the most neutral thing to do was to assume that it was indeed neutral, that there is no expected rate of return on either of the currencies so that it wouldn't give one currency an

0073

unfair advantage over the other.

Q. I understand what you did, and you just explained what you did. What I'm trying to ask you, unsuccessfully thus far, is what is the effect of ignoring forward points to expiration which you're pointing out, am I correct, in the formula are reflected by the risk-neutral domestic and foreign interest rates? Am I right on that?

A. Well, I'm not sure because I don't like the part, what is the effect of ignoring points in this probability calculation. That's like saying what is the effect of ignoring a wrong piece of information. And...

Q. What --

A. I'm not sure I can answer that. The forward points don't go into the calculation of probability of profit. Now, I don't know if the effect would be large or small, but you're asking me to tell you what's the effect of -- of ignoring a number that's not right. And I just don't know how to answer the question.

Q. I showed you the Black-Scholes formula, and I thought you said that the formula itself takes into account this feature, forward points to expiration. Didn't you say that before?

MS. WIRSKYE: Objection. Form.

A. That is correct, but the formula is designed

0074

for valuation, not determining the probability of an outcome.

Q. (BY MR. DONOHUE) But doesn't the formula also provide for in a different -- in a different way probabilities?

A. If you use --

MS. WIRSKYE: Objection. Form.

A. -- the right inputs, if you use good inputs.

The formula itself -- if I can turn to the page -- can I do that?
     Q.   (BY MR. DONOHUE)  Sure.
     A.   Can we turn to page 54?  The formula, C sub D, P sub D, and D sub 2, what that does is that gives you the value of the call, the value of the put, and D sub 2 is one of the numbers that goes into calculating that value, but it does not directly in that manner give you the probability.  The actual probability you have to take this formula, D sub 2, and do something to it.
     Q.   I understand that.
     A.   And if you just make the assumption that the expected returns on the currencies are equal to the risk-free rate, well, that assumption is really not correct.  It's impossible to say exactly what the numbers would be, but I'm very uncomfortable making that assumption because it would contradict everything that I

0075

know and everything that has been written about what the Black-Scholes model is and what it isn't.  It does not give true probabilities.  It gives risk-neutral probabilities.  Would the numbers be that different?  I don't know.
     Q.   Well, getting back -- hopefully, finally to the question I initially asked.  And that is, by ignoring forward points, isn't it true that you therefore make an assumption that your forward exchange rate is equal to your spot rate at the trade day?
               MS. WIRSKYE:  Objection.  Form.
     A.   Well, the foreign exchange rate will always equal the spot --
     Q.   (BY MR. DONOHUE)  Forward, forward.
     A.   I said that.  Didn't you say forward?
     Q.   Yeah, forward.
     A.   The forward exchange rate will also equal the spot rate at expiration, but if what you're saying is the spot rate at expiration will equal the spot rate at the time you take the transaction, that's only going to happen with zero volatility.  Nobody's making that assumption.
     Q.   All right.  Turn to page 39 of your report in JBJZ, Exhibit 2400.  On the last paragraph you make reference to the fact that the theoretical value is the

0076

starting point from which one can determine the options of actual price.  Am I correct?
     A.   Yes.
     Q.   Now, you -- on the next page you refer to the theoretical value as value for market value, and you say those various related terms are somewhat interchangeable, correct?
     A.   Yes.
     Q.   Do you know for digital options, like the digital options we have in this case, what a dealer would ordinarily charge as a premium for a digital option?
               MS. WIRSKYE:  Objection.  Form.
     A.   I don't think I would know what he would charge, no.
     Q.   (BY MR. DONOHUE)  Okay.  Just so my question is clear.  The theoretical value in an option does not necessarily reflect what the dealer is going to charge for the premium; is that correct?

A. That's correct. That's why I used the word "starting point."
Q. Yeah. So there may be a difference between theoretical value and the premium that the dealer charges, correct?
A. Yes.

0077

Q. And my question is: Do you know as to ordinarily what dealers charge for their premium and how it differs from theoretical values?
MS. WIRSKYE: Objection. Form.
A. No, I don't.
Q. (BY MR. DONOHUE) Okay. Would you think it would be reasonable or unreasonable for a dealer, in fact, to charge a premium such that the difference between the premium and the theoretical value was, let's say, 10 percent?
MS. WIRSKYE: Objection. Form.
Q. (BY MR. DONOHUE) Ten percent of the premium.
A. I'm not sure. It's kind of like -- it's kind of like saying a 10 percent markup or something like that. I don't know what's the customary markup. I think you used the word "reasonable," would that be reasonable. I'm not sure I could determine that. I do know this. When dealers trade what's called plain vanilla options -- which these are not, but it's kind of a standard option. It's an option on Euro -- it's a more competitive market than when they get into more complicated option transactions.
In my understanding of economics -- I think most people would agree -- is once the instruments get a little bit more complicated, then the margins are

0078

likely to go up. So I don't really know. I mean, it's a long answer to a short question, I understand that. But I don't really know what they would charge or whether that would be a reasonable markup or not.
Q. Take a look on page 25 of Exhibit 2400. This is Table 2, and it has information on that page for the digital option strategies. Do you see, for example, one of the options there is an option in the second column for an initial premium of $25 million. Do you see that one?
A. Yes.
Q. And if, for example, I indicated to you the difference between theoretical value and the premium was 2 million -- 2.5 million, which is 10 percent of the premium, do you know as to whether that would seem to be a reasonable premium or not?
MS. WIRSKYE: Objection. Form.
A. I think that's the same question you just asked me.
Q. (BY MR. DONOHUE) It is indeed.
A. Clever, huh?
Q. Well, clever by half.
A. So I guess I have to give the same answer, that it's about 10 percent and I'm not sure that I would know if that's reasonable or not.

0079

Q. Do you know, for purposes of the options that you value, as to what the difference, if any, they were between the premium charge and their theoretical values?
A. Offhand I don't. I mean, I have -- the

premiums are in one part of the report and the values and the transfer dates are on another part of the report, so in a matter of seconds one could determine what those numbers were.

Q. But you -- as of now you have not made that correlation?

MS. WIRSKYE: Objection. Form.

A. Well, I know what they charged was more.

Q. (BY MR. DONOHUE) Okay. You might have said this previously. You determined the theoretical value of the options as of their contribution -- of a short option as of their contribution date, correct?

A. That's correct.

Q. Is there some reason that you did not determine their theoretical value of the short option as of their trade date?

A. Well, they asked me to determine the transfer date, and they -- counsel said that that's the issue in this case, and I had to take it that that was the issue. I mean, I don't have any legal authority to say what an issue is. They said this is the number we need, and

0080

that's very common in expert witness work. Here's a number we need, get it for us.

Q. And you only determined the theoretical value of the short option on the transfer date. Is there some reason you didn't determine the theoretical value of the long option on the transfer date?

A. The same reason really. That's what they said they needed. They said the long option was not an issue.

Q. Did you -- nevertheless even though you weren't asked, did you as part of your own calculations and analysis, did you make any determination as to what was the theoretical value of the long options on the transfer date?

A. Well, when I was originally writing the programs to come up with these numbers, again, I can only say -- this goes back a ways -- I may have, but it's just -- it's basically a spreadsheet, and you put the numbers in there. And if you need more than one number to show up at one time, you copy the formula. And at a point they said, you know, we only need the short option. So it would be very easy to come up with the long option if they said I want the long option and I would. But somewhere along the line early in the process I probably did have it, but I don't still.

0081

Q. Did you keep your work papers with respect to those values?

A. Well, it's a spreadsheet, the same spreadsheet that produced these numbers. And I don't think I still -- I'm pretty sure I don't still have the long options because I think I just put different -- you just put different numbers in and --

Q. Yeah, I'm going to make a request. If you did retain your work papers with respect to your determination of the value of a long options on the trade date, I'm going to ask that in the errata sheet that you make a note of that and I'm going to make a request for those documents.

A. Okay. I'm pretty sure I don't have it.

Q. Okay. Now I have the same question with

respect to both the long and short options as of the trade date. Did you as part of your analysis do any determinations as to what the values of the long and short options were as of the trade date?
A. Well, again, I think they did at one point, but then I learned we didn't really need those numbers, so I don't still have them.
Q. Then I'm going to have the same request.
A. Right.
Q. For the -- for Table 2, which is on page 25 of
0082
Exhibit 2400, am I correct that the ratio of the premiums -- of the long premiums to the payout was two to one?
A. It looks like it, yes.
Q. And given that payoff probability, what in your opinion would be a fair probability of a bet -- two-to-one bet?
MS. WIRSKYE: Objection. Form.
A. I'm not sure what you mean by that. Because I mean if you said -- are you asking me if something pays off two for one, what would you pay for it?
Q. (BY MR. DONOHUE) I'm asking you for a probability. My question deals with probability.
A. I'm not sure you could say. It all depends on what you would pay for it. You pay $1, you get $2. But again, this is an option. Options -- what you pay for options -- the value of an option, as I said, you know, in the appendix, is not determined by probability of a payoff. It's determined by risk-neutral probability, which can certainly deviate from my gut feeling for what the outcome might be. So I don't think I could put a number on that.
Q. I'm a little lost. You said you would have to know what you paid for it. Your premium -- I just told you --
0083
A. Yeah, and I --
Q. Let me finish my question.
Remember, I said we would have problems with this. I know there's -- you have to let me finish my question.
A. All right.
Q. The premium I just told you is $20 million. That's what you paid for it. Do you understand that?
A. Yeah.
Q. And you understand the payout is $40 million?
A. Right.
Q. And I asked you isn't that a two-to-one ratio of a payout?
A. That is a two to one.
Q. Well, let me ask you. Wouldn't a fair probability for a bet, a two-to-one bet be a 50 percent probability?
A. No.
MS. WIRSKYE: Objection. Form.
A. No. You're trying to value an option -- and, again, the 20 million is the so-called value of an option. It's what someone said I'll pay 20 million for a chance at 40 million. And you're saying, well, that ought to be a half and I'm saying, well, not necessarily because that's not how you value options. Again, you're
0084

taking option valuation back to the pre-Black-Scholes error, and Black-Scholes showed that's not how you value options. You value them by using risk-neutral probabilities. You can't just look at two to one and say, hey, I'll be 50 percent. That's not the way it works.
Q. (BY MR. DONOHUE) Well, what you're saying is there's a time value factor.
A. It's more than that. I'm sorry.
Q. First you're saying that, correct? There's a time value factor, correct?
A. There is a time -- that is one factor.
Q. Okay. Let's ignore time value for the moment. Okay. Well, for a 30-day option is a time value -- excuse me -- is a -- for a 30-day option --
MS. WIRSKYE: Just wait.
Q. (BY MR. DONOHUE) -- is a time value going to have a significant ultimate effect on your probability?
A. Absolutely.
MS. WIRSKYE: Objection. Form.
Q. (BY MR. DONOHUE) Okay. And why is that?
A. Well, first of all, time value is a very important factor. It is the uncertainty effect in an option value. It comes from two things. So what you're thinking is it comes from time, you know, thinking that

0085

30 days is really not all that much. But it really is a function of time and volatility. How much you pay for an option is intrinsic value and it's time value. And time value is a function of both time and volatility. Now, a 30-day option that's actually to professional option traders out there trading options in Chicago and New York, that's a fairly common expiration. In fact, you'll find most of the volume will be in fairly short term options. And if time value wasn't a factor, then there wouldn't be that much trading. Because it is -- that is the big uncertainty. That's where we'd all disagree when we trade options. So time value on a 30-day option --
Q. Okay. Ignore --
A. I refuse to let you --
Q. Ignore --
A. Let me finish.
Q. Okay. Ignore --
A. Can I finish?
Q. But --
MS. WIRSKYE: Let him finish his answer.
A. I absolutely refuse --
Q. (BY MR. DONOHUE) I understand.
A. -- to proceed with can you ignore time value on a 30-day option.

0086

Q. Okay. Okay. I understand what you're saying. But I'm asking you to ignore that for purposes of my question. Okay?
Now, if we ignore time value, is there anything else that you think would be significant that would require you to have a probability other than 50 percent?
A. Well, the moneyness of the option is a factor, whether it's in the money or out of the money. If you said we're going to have a, you know, two-for-one bet based on something that happens in some market over

there, well, the moneyness of the option, which is kind of a good way of saying -- it's kind of like a race where you start off ahead or you start off behind. And if you're starting off ahead, that would give you some advantage and that might make this look somehow better. If you were starting off behind, you would have something of a disadvantage.
So if you ignored the time effect, the time value -- and I'm having a real hard time doing -- that moneyness of the option would kind of be the main thing.
Q. And by "moneyness of the option" you're referring to what?
A. The underlying value relative to the exercise

0087

price and, of course, is it a put or a call because whether one is above the other, you know, it matters whether it's a foot or a call.
Q. Are you referring to, by the moneyness, for example, how close is the spot rate to the strike price at the date of the trade? Is that what you're referring to when you --
A. That's moneyness. I mean, that's...
Q. Is there some reason you didn't just say that's what you mean by moneyness?
A. It's a term that's widely used, and I probably made the assumption that that term had made its way into this discussion. Because it's -- to subsume it within the word "moneyness" is a lot more compact than to say strike price reluctant to the underlying price. So I will use that term "moneyness" a lot, and I -- you know, if anybody...
Q. But doesn't the ratio two to one take into account what you've been referring to as the moneyness of the option?
A. Well, that depends.
Q. Can you answer that yes or no?
A. I can only answer that depends. Because I don't know where the two-to-one numbers necessarily came from.

0088

Q. So when you say you don't know, ordinarily when you have a payout which is a two-to-one payout, would that payout ordinarily take into account the, quote, moneyness of the option?
A. When someone determines what they're going to charge, like 20 million or whatever, $1 for $2, I would think they would take into account where they are right now. If something is above or below, if you're starting off the race ahead or you're starting off the race behind, so I would think that would somehow get taken into account. But I don't necessarily know whether it was in that $25 million. Plus again, I go back to the old ignore the time value, you really can't ignore the time value. If you start off way ahead --
Q. Well, if you --
A. Let me finish.
If you start off way ahead and the time value is low, then you might not win the race.
Q. Sir, you're asking a -- you're making a comment on a question I didn't ask. I asked for the moment to assume that -- I asked to assume or ignore the time value for the moment. So you're saying I can't

assume it. And I said please assume it.
So with that in mind, do you think that the Deutsche Bank in taking into account probabilities

0089

would not take into account the quote, unquote moneyness of the option in setting what their payout ratios were?
MS. WIRSKYE: Objection. Form.
A. Well, I would think they would take that into account.
Q. (BY MR. DONOHUE) So if that is the case and if we ignore what you're considering to be the time value of the option, would in that event a 50 percent probability be a fair probability for a two-to-one payout on an option?
A. Well, I know you're not going to like this answer, but I'm still stuck on this ignore time value business because -- and I -- there's no way I can answer your question without saying why I'm stuck on that. Because if there was no time value on the option, one of two things would have to have happened. The option would have to be so far in or out of the money or it would have to be at expiration, clearly not the case, or there would have to be zero volatility. And at that point all the uncertainty would be -- would go away and there would be no -- no -- how could you have odds on a payoff if you've taken the uncertainty away. I'm sorry if I keep going back to this, but I can't conceive of trading an option with no time value. There would be no certainty in the option, and it wouldn't be -- I mean,

0090

it wouldn't exist. I mean...
Q. For -- for a present value basis, would you expect on a 30-day option the present value of the option to be not materially different from its value on the trade date?
MS. WIRSKYE: Objection. Form.
A. Say that again, I didn't quite follow all of that. On a present value basis...
Q. (BY MR. DONOHUE) On a present value basis, I'm asking for a 30-day option would you expect much of a difference in terms of present value? That's all I'm asking.
A. Well, it would be some, but it wouldn't be all that much.
Q. Let's take a look at your Table 5, which is on page 32. Again, I write that -- in Table 5 you determine the probabilities of the -- of the individual -- what you call the individual option transactions, correct?
A. That's correct.
Q. Are these -- you don't have a reference here. Are these probabilities, probabilities of just the long option?
A. These are probabilities of profit, and that means passing what I'm going to call the low exercise

0091

price or passing what I'm going to put the high one.
Q. I'm a little unclear as to what you mean by that. Let's go back to --
A. It's probably a profit, I'm sorry.
Q. Let's go back to basics. We have a pair of options, correct, in this case?
MS. WIRSKYE: Objection. Form.

Q. (BY MR. DONOHUE) Correct?
A. Yes.
Q. One is a long -- in the pair one is long and one is short, correct?
A. Yes.
Q. I'm specifically asking you for your Table 5 as to whether these probabilities are for just the long options. Do you understand my question?
A. No, no. I mean --
Q. Do you understand my question?
A. I understand your question.
Q. And can you answer my question?
A. And the answer to that question is no.
Q. And what are they the probability of?
A. This is the probability of profit which does takes into account the possibility of one option gets exercised and the other does not.
Q. Did you have a chance to read Dr. Kolbe's

0092

rebuttal report?
A. Yes, I did.
Q. Let's --
A. I don't think I have it here.
Q. -- take a look at it. It's Exhibit 2429.
A. There it is. Yeah, I do have it.
Q. Take a look at the appendixes in his report, E-R-3A to 3C. And the appendixes are not numbered.
A. Hold on. Hold on. I only see work papers, so can you help me?
Q. Well, the work papers is what I'm referring to.
A. Oh, all right. And say the numbers again.
Q. It would be E-R-3A to 3C.
A. E-R-3A to 3C, okay.
Q. Now, have you had a chance to review those work papers?
A. I looked over them a little bit.
Q. Do you know what they show?
A. He looks like he's trying to replicate my numbers. It says: Replication of Chance report probabilities for long options at trade date. I could only assume that's what it is.
Q. Using your probabilities and using your methodology, the only -- I'm sorry. Using your

0093

methodology, the only way that he could replicate your probabilities was for the long options that are shown in your Table 5.
MS. WIRSKYE: Objection. Form.
A. Is that a question?
Q. (BY MR. DONOHUE) Yes. That's --
A. I'm not sure I see what it is though.
Q. The question is: That was the only way that he could replicate your probabilities in your Table 5, so he concluded that your Table 5 must be probabilities for the long options only.
A. That's not correct.
Q. Do you have your calculations for your Table 5?
A. Yes. The sweet spot or -- to use that term -- has a very, very low probability, which I indicated in one of the reports, was less than .4 percent, and one was less than .3 and I think one was less than

.2 percent.
Q. And Murphy was .2 percent, correct?
A. Actually, there were -- I mean, there were less than that actually. So they really were immaterial, and I didn't throw them out.
Q. I missed your last comment.
A. I said they were immaterial and I did not

0094

throw them out. Because they were immaterial I wasn't showing them out and saying, hey, this is so insignificant I'm not going to use it. So they're in there. But they're very, very difficult to detect because they're so small.
Q. And I did not throw them out because they were immaterial and I was showing them and saying -- it seems to me what you're saying is, is that the reason you included the probability for the sweet spot is, in your view, it would not have any effect on the ultimate probability. Is that what you're saying?
A. That's not exactly what I'm saying here. And I know in order to answer this question we probably have to introduce something of another issue, and that is: Was there zero probability of hitting the sweet spot? And I know that's something your people have talked about and all, and I did not make that assumption that there was zero probability in these calculations. And it's in there, but it's very small. But I didn't see any reason to actually throw the number out. Because if I threw the number out, I would be assuming at this point that it was zero. But I knew it wasn't having a material effect, so it didn't really matter whether I left it in or threw it out.
MR. DONOHUE: Why don't we do this, why

0095

don't we take a short break. Off the record.
(Recess held, 11:43 a.m. to 12:00 p.m.)
Q. (BY MR. DONOHUE) Dr. Chance, let's turn to your report in the Murphy cases, Exhibit 2402, and let's go to page 25. And I'm going to direct you specifically to this second table on that page, and specifically the first column that deals with the Option No. 24629. Do you see that?
A. Yes.
Q. And am I correct that in this table here you're showing that the initial premium for this particular dollar Euro option was $26,400,000?
A. That's the purchased option premium, yes.
Q. Right. And it shows, am I correct, the payout to be for the purchased option $52,800,000?
A. Correct.
Q. And that, again, is a two-to-one payout, am I correct?
A. Yes.
Q. Did you notice that that two-to-one payout was true with all of the options that you valued?
A. In the Murphy case?
Q. In the Murphy and the other cases.
A. I don't recall exactly what the numbers were. As I recall, there was consistency whatever the numbers

0096

were, but I don't recall if it was two for one in all the other cases.
Q. If I told you, in fact, that each of these

options had a payout ratio of two -- for the long options -- had a payout ratio of two to one, would you have any reason to doubt my statement?
A. I think you would be honest with me. If I looked at the table, I would probably verify it. So I think I could go with that.
Q. Take a look at Table 5 on page 33. Am I correct that in Table 5 for that same option that I -- or that you show what your probabilities are on a 30-, 60- and 90-day basis?
A. I do, but it's unclear because on the previous table you're trying -- I'm sort of linking this to what we just said -- you referred only to the long option and this is long and short, so...
Q. When you say "this is long and short" --
A. This table that we're on right now, this Table 5. This is the entire position of long and short options. And on the previous table I think you were just pointing to the long option.
Q. Well, again, when you say this takes into account long and short, were your -- did you make a separate calculation of probabilities for the short

0097

option?
A. The two calculations -- or two options are subsume within the same calculation. So it's hard to say whether it's a separate calculation. You know, I didn't separate the two of them, but I did calculate the short option separately. I calculated the sweet spot separately that's actually a better way of saying it. I calculated the overall probability and then I calculated the probability of the sweet spot, and one could work from those numbers and separate them, I suppose.
Q. Well, just so I'm clear, are -- are you saying that you did not calculate separately the probability for the long option? Is that what you're saying?
A. Well, in order to answer that I really need to kind of use an example. Okay. So let's say we have a call struck at whatever and then we've got a long call and then we've got a short putt, and it has a slightly higher exercise price. Now, the probability for the overall position does take into account the sweet spot. And so that would reflect the probability of the long option being exercised. I don't label it as such, but it does reflect the probability. Because of that overlapping situation, that sweet spot area, it does account for both, but you could get the long option probability. And I calculated the short option -- I

0098

mean the sweet spot probability separately. And, you know...
Q. In Murphy do you recall your sweet spot probability was .2 percent?
A. Well, it wasn't. I said it was less than .2, so -- I think I said it was less than .2.
Q. Let's see, I'm going to page 34, the last sentence of -- in the second paragraph.
A. Yes, it says less than .2.
Q. Less than .2 percent?
A. Right.
Q. So is what you're saying is that subsumed in the probability of long option is your sweet spot probability? Is that what you're saying?

A. Subsumed in the overall probability is the sweet spot probability.
Q. For example, if -- well, the long option is the only option in which taxpayers would receive a payout, correct?
A. Correct.
Q. And the sweet spot or the possibility of a one option payout -- can I use that term also? Do you understand that? A one op-
A. The long -- I'm sorry. The long paying off, the short not paying off, is that what you're saying?

0099

Q. Right. A one option payout that would reflect also simply the long option being in the money, correct?
A. Right, that's correct, yes.
Q. Without the short option being in the money?
A. Right.
Q. So when one determines a probability for the long option, subsumed within that probability, based on your calculations, would be a probability that just the long option would payout, correct?
MS. WIRSKYE: Objection. Form.
A. I think you just said when I calculate the long option, it contains the probability that the long option would pay out. I mean, that's sort of the way I heard the question.
Q. (BY MR. DONOHUE) The long option and the short option would pay out. But if you have, for example, a less than 2 percent probability of just the long option paying out, then your calculation of the long option would take into account just that -- that possibility of just the long option paying out, correct?
MS. WIRSKYE: Objection. Form.
A. I can only answer that question by saying this: I calculated the overall probability, counting for both options. I calculated the probability of the sweet spot, which is that area right in the middle

0100

there. I did not separate them out into the long and the short option.
Q. (BY MR. DONOHUE) Well, for example, if one wanted to on the Deutsche Bank side know what its probability was of its short option paying out, wouldn't they simply take the long option, subtract the sweet spot probability, and then that would be the probability for the short option?
A. It should be, yeah.
Q. Okay. So essentially that's -- I'm trying to understand what your probability numbers reflect. And, for example, now going back to the figures that are in 24629 -- well, on page 33 in Table 5. I'm referring to option 24629. Do those numbers reflect the probability of the long option paying out including that point -- less than 2 percent --
A. Yes.
Q. -- for the sweet spot?
A. Yes, they do.
Q. Okay. So, again, if I wanted to now determine what would be the probability for the short spot -- not the short -- the short options paying out, I could then take a figure of something less than .2 percent and arrive at what would be the probabilities for the short options?

0101

A. That's correct.
Q. Okay.
A. Because the strikes are so close, the numbers are obviously going to be very close.
Q. All right. Okay. Thank you.
Now, looking at your probabilities of -- for Option No. 24629, am I right that they range from roughly 12 percent to 19 percent?
A. Yes.
Q. And this is, again, in connection with an option that has a payout ratio of two to one, correct?
A. Yes.
Q. Did something strike you as unusual about this option which had a payout ratio of two to one which has a probability of the long option paying out of somewhere between 12 and 19 percent, did that strike you as unusual?
MS. WIRSKYE: Objection. Form.
A. Well, when I was looking at these numbers -- when I calculated these numbers, I'm not really thinking about the payout. Although those numbers -- you know, they do go into the calculation. These numbers don't strike me as particularly small, but I don't think in terms of what the payout is because I know -- going back to what we talked about a little earlier -- because I

0102

know options are not priced according to probabilities of pay off. And I also know that the one in the two-to-one number -- I put up $1, I get back $2 -- that number subsumes within it what they believe the value of the option is along with their cost, their profit margin, any uncertainty they have about this process. They can put whatever they want to in there.
So my -- I don't know what goes into their thought process when they come up with a number, and I'm not -- I don't think my job is to really question -- you know, the customer had the right to pay whatever he wanted to pay or walk away. So to me these are just the numbers. They're not -- they don't strike me as unusual. And I think what you're asking is the payoff is unusual, and I don't know. You know, the customer had a right to walk away if he didn't want to do it.
Q. (BY MR. DONOHUE) Let's take, for example, your highest volatility, roughly about 19 percent for this option.
A. Sure, yes.
Q. And am I correct that if I wanted, for example, to determine what the value of my option was, I would simply take that volatility number, roughly about 19 percent, and multiply it times the payout and I would

0103

get --
A. I'm confused.
Q. And get an approx- -- for me I would get an approximate value for my option. Would that be appropriate?
MS. WIRSKYE: Objection. Form.
A. Are you talking about this 19 percent here?
Q. (BY MR. DONOHUE) Yes.
A. Because you said the volatility of 19 percent.
Q. Oh, I'm sorry. I meant probability.

A. Probability.
Q. Volatility, probability... So sorry.
A. Being a professor, you cannot get away with this.
Q. Yes, that's true.
A. Try the question again.
Q. I meant -- let me rephrase my question.
Am I correct that with this probability, you know, taking your highest probability of 19 percent, if I wanted to get a rough gauge as to what the value of my option would be, I would simply take that probability, multiply it times the payout, and I would get a rough approximation as to what the value of my option is?
A. I don't know about that. Once again, you're
0104
sort of reverting to the pre-Black-Scholes error of crossing options. That's sort of how people priced options before these guys, Black-Scholes and Merton came along. And I don't think we know and I don't think we can just take it back to that era because that's not how you price options.
Q. So your 19 percent probability I thought you said was determined by using Black-Scholes, correct?
A. Yes, but it's not a risk-neutral probability.
Q. What is the significance that it's not a risk-neutral probability?
A. Well, I attempted to use what I thought was a reasonable expected rate of return. We did talk about this a little earlier of course --
Q. Right. We did?
A. -- to come up with a range of numbers and -- I've sort of forgotten the question, but I mean, you know, that's my calculation, my estimate based on what I thought was a reasonable assumption about the expected rate of return, not to make the automatic assumption that the expected return is equal to the, you know, the forward points, that issue we were talking about.
Q. Right.
A. And so this number -- these numbers I think are reasonably good numbers, but absolutely no expert
0105
witness can attest that he's absolutely 100 percent sure these are correct.
Q. Okay. And I -- so you feel your 19 percent probability for a -- on this 60-day historical basis that that is a reasonable determination of probability for this particular option, correct?
A. Yes.
Q. So all I'm saying is, if you make that assumption that 19 percent is a reasonable calculation of probability and you look at the payout -- which is as I said before, 52.8 million -- and you notice that if you take your probability as calculated with respect to Black-Scholes with the, I'll call, missing factor, which you've explained, wouldn't you then arrive at a number that would be an approximate amount as to what you would expect to pay for that option?
A. Not necessarily. I mean, I've said this repeatedly. I know you're, you know -- that's not how you price options. And what you pay for an option, especially a customized option in the over-the-counter market, is going to have some padding into the price.

And I don't know how much has been padded here. I can't take that and -- take that two-for-one payoff odds and say something looks odd.
Q. Do you know what you get when you multiply,

0106

let's say, 19.33 percent times 52.8 million?
A. 52 times 20 percent would be about 10.4 -- so let's say ten.
Q. Roughly about 10.2 million. And do you recall what the premium here was for this option?
A. Well, if it was 52-something -- 52.8, it was two for one, we talked about a few minutes earlier -- it must be 26.4.
Q. Correct. So here we have a premium for an option which is 26.4. You have now determined a probability for that option. One possible probability would be 19 percent, which would indicate a possible premium would be roughly about 10.2 million. Do you agree with the math? Do you agree -- first of all, do you --
A. I can agree with the math but not with the words that you used.
Q. All right. Now, do you see any possible, let's say, cause for further questioning with respect to that premium of 26.4 million based on your probabilities? Do you see that there could be something amiss with respect to these premiums if my probabilities range from 12 to 19 percent?
MS. WIRSKYE: Objection. Form.
A. Well, first of all, there's a short option

0107

too. There's a net premium, a short option, right? I mean the two transac- -- wasn't the 52.8 the long option?
Q. (BY MR. DONOHUE) Correct.
A. And the premium was 26.4, and I don't have the table, but there was a short option. So there's some net premium which is not 26 million. I don't remember what it was. And I would have to go back and do the math and all, but I don't know how much this bank may have padded into the price and how much they may have been able to get from the customer. It's a free market, and the customer has every right to say whatever he wants to say. I've been known to pay, you know, a premium before to buy something, so I don't know that I could say. But I know that you can't just look at the long option because there is a short option there as well.
Q. Okay. All right. But remember what you said is that we could determine the probabilities for the short option by simply taking the probabilities from the long option and subtract out the sweet spot probability?
A. Right.
Q. -- correct?
So if we did that, which is minor, and simply looked at making the same type of calculation

0108

with respect to the probabilities for the short option, we're using roughly the same probabilities, are we not?
A. Yes, that would be very close.
Q. And we would multiply those times the payout of the short option, correct?
A. That's correct.

Q. And am I right that we would also wind up with numbers in which the Deutsche Bank is paying itself -- paying for its premiums which are significantly different than what your probability numbers would -- I mean, what your numbers would be if you multiplied your probabilities times the payout for the short option, correct?
MS. WIRSKYE: Objection. Form.
A. Well, I would want to look at the short option number to -- because of the word "significantly," but I mean, we could do that.
Q. (BY MR. DONOHUE) Well, for example, yeah, why don't you turn back to Table 2, which is on page 24, and -- I'm sorry -- 25, and take a look at the ratio of the short option premium to its payout.
A. I see it.
Q. So it's in the same range -- it's not exact -- but it's in the same range of two to one, am I correct?
A. Yes.

0109

Q. So, for example, for the short option payout, we have -- for Option No. 24629 we have a payout of $51,018,000, correct?
A. That's correct.
Q. So I'm just asking now, if you made the same type of calculation using your probabilities as applied to the short options, wouldn't you also wind up with an indication that the Deutsche Bank is, in fact, having -- paying a premium that was significantly greater than what was the figures that you would arrive at by multiplying the short option probabilities times their payout? It would be significantly greater. The premiums are paid.
MS. WIRSKYE: Objection. Form.
A. Let me do some mental calculations. It looks like you would get around 10 million in one number and you would get around -- well, 25 million is the premium, so you want to call that significantly, okay. I mean, I'll answer that affirmatively. What matters is the net that they pay. That's -- that difference is it was big.
Q. (BY MR. DONOHUE) Well, I agree with that, but that's not what we're discussing right now. I'm trying to get a feel from you if you think that these probabilities that you're arriving at may indicate to you that for the individual options they are -- both of

0110

them, the premiums, are seriously -- I'll use the word "materially" -- greater than what figures you would arrive at if you took the probabilities times the payout.
MS. WIRSKYE: Objection. Form.
A. I have a qualified agreement with that statement. I want to emphasis that the benchmark should be the value of the option. It shouldn't be my probability times the payoff because of what I said many times before. That's not how you arrive at the value of the option. So I suppose -- it's sort of a qualified yes. I just want to make sure that statement is sort of attached to what I said, yeah.
Q. (BY MR. DONOHUE) Well, for example, if you were advising a client, a client walks into you and says here I have this option -- well, first do the long option. The client says it's calculated -- or at least

I'm told that the probability is 19 percent and my payout on this option is two to one. My payout is 52.4 million. What would you advise that client in terms of what you would consider to be an appropriate premium?
MS. WIRSKYE: Objection. Form.
A. Well, I would do a -- I would do a Black-Scholes calculation, first of all, because I wouldn't calculate the probability. I assume what

0111

you're saying is the client is asking me if I think he should do that. And I would do a Black-Scholes calculation. And I would compare that to what the bank is asking. And I suppose based on what those numbers are, that's what I would do. But I wouldn't calculate the probability of the payoff because I wouldn't see that as being -- that's not a number that goes into the value of the option. The client is really just wanting to know, hey, I have this chance to buy this option and the bank says it costs this and is that a good deal. I would do some calculations using Black-Scholes or whatever model is appropriate. But I probably wouldn't even calculate the probability of pay off.
Q. (BY MR. DONOHUE) Well, I mean probability of pay off -- I mean, isn't that almost for a mathematician an instantaneous calculation, the ratio?
A. What do you mean an instantaneous calculation?
Q. Well, maybe we're talking about two different things. When I -- I'm talking about the payoff ratio. Isn't that almost -- looking at the premium, looking at the payout, isn't that almost instantaneous --
A. You mean that the two for one?
Q. Yeah.
A. Oh, yes. But I thought you said the probability. I thought you said that if a client came

0112

to me and said I've got this option. It has this two-to-one pay off and I think you said -- because the client wouldn't know this. He wouldn't know that it's 19 percent. I think you said if you -- what would you tell him if you knew the probability was 19 percent. Well, I wouldn't calculate the probability. Because I would want to know whether the premium that he's paying for the option, how does that compare with the Black-Scholes value? And I know it's not going to be the same number and I know the client is going to pay a mark up. But I would do that calculation. I would probably not even know or do the 19 percent calculation.
Q. If you --
A. So I don't know if I could tell you. I don't think I could speak in hypotheticals. I wouldn't even calculate that.
Q. All right. But if you had that 19 percent, that's what I'm saying, if you had that 19 -- what you're saying is -- and I believe you did this in your report, you did determine the value of the short option on the transfer date, correct?
A. That's correct, yes.
Q. And we're coming ultimately to what you did to determine those values?
A. Right.

0113

Q. We'll get there. We're not there yet. But right now I'm trying to get a feel for whether you saw

something that was amiss when you saw that your probabilities -- for example, for this particular option we're discussing -- was in the range of 12 to 19 percent and you saw what the payout was for this option. If you saw there was something amiss in terms of whether or not the -- for both the long and short options -- whether or not these premiums, in fact, are really -- whether or not they're materially overstated?

MS. WIRSKYE: Objection. Form.

A. Well, again, I would have to look at the value of the option, but if -- I know we're scrolling ahead to that and all, but I would look at the value of the option. And it's quite possible I might say, yeah, this is going to be pretty expensive. Are you sure you want to do this? I don't know. It's just like anything else, a person can say no.

Q. (BY MR. DONOHUE) He might also say let's shop around to see what we can get the same option for from a different dealer, might you say that?

MS. WIRSKYE: Objection. Form.

A. Yes, that's quite possible.

Q. (BY MR. DONOHUE) Okay. Let's take a look at the short option in Table 5 for the same -- or Table 2

0114

rather -- for the same option, and we've discussed this a bit. But am I right that the premium for the short option is 25,608,000 and the payout is 51,018,000?

A. That's correct.

Q. Okay. Now, take a look at your Table 12 on page 44. And am I correct that your values for the short option on the transfer date for Option No. 24629 range from roughly about 5.2 million to 8.7 million?

A. That's correct.

Q. Now go back to the Table 2 and look at what the premium was for the short option. It was roughly about 25.6 million. Do you see that?

A. Yes.

Q. Do you recall what the difference in time was between the trade date and the transfer date?

A. I think it's two business days.

Q. Wasn't it one business day?

MS. WIRSKYE: Objection. Form.

A. Well, again, I don't remember exactly. I was just given the day --

Q. (BY MR. DONOHUE) Okay.

A. -- and I put the day in. Maybe it was two calendar days or something like that, in some cases.

Q. What do you think the likelihood is that the value of the short option dropped from roughly 25.6

0115

million to anywhere from 5.2 to 8.2 million in one business day?

A. You're comparing apples with oranges. One is the Black-Scholes value of the option. The other is the premium that was paid for the option.

Q. And didn't you -- I thought you said that the starting point for determining market value of an option is its theoretical value, correct?

A. That is correct.

Q. And the difference between theoretical value and the actual market value -- am I correct, the difference is going to be what would be what the particular dealer is going to charge for that option,

correct?
MS. WIRSKYE: Objection. Form.
A. That is correct. And I'm actually now thinking that you asked me just then the difference between 25 million and 5 -- 5 or 8 million.
Q. (BY MR. DONOHUE) Right.
A. And I realize now that I missed -- the mistake in your question is that you don't compare the 25 million to the -- let's pick a number -- 5 million.
Q. Right.
A. You compare the difference between the long and the short value to the 5 million. Because what's on

0116

page 44 is the value of the -- that's right, oh, okay. I'm looking at the wrong number. That is the value of the short option. So that's correct. That's the value of the short option. Initial premium is 25 million. So go back and ask -- rephrase your question. I got mixed up on myself.
Q. Okay. I'm just asking you if you make a comparison between the value of the short options that you determine on the transfer date, which was one day later than the trade date, if you compare those theoretical values to the premium for the short option on the trade date, which is roughly about 25 million, if that might not indicate to you that the short option, the option which the Deutsche Bank is, in fact, paying a premium for, was materially overstated?
MS. WIRSKYE: Objection. Form.
A. Well, there was a markup in this option and one might say it was large, if that's what you mean by materially overstated. Now, what I don't know is how much it could have moved in those two days or how much it did move. And to really answer that question, one ought to figure out how much it did move. What was the Black-Scholes value on the day of the short option on the transaction date? How much was it a business day or so later? It would be a lot easier to answer that

0117

question if you had that knowledge.
Q. (BY MR. DONOHUE) Is there information in your report that we could make that determination?
A. I don't know whether you could make that determination or not. I mean, I could make that determination. Let's see, you would need the spot rate. You would need the risk-free rates. I think there's probably enough information to do it, but you're asking if you-all could do it. I don't know. I mean, I know I could.
Q. Let's just roughly say that all else being equal if the option is out of the money on the trade date but it moves closer to being in the money on the following day, if it does that, will its value increase as opposed to decrease?
A. Yes, it will increase.
Q. Okay. Look at Table 2 of your report. Do you have information in Table 2 on page 25 as to what the spot rate was?
A. It's not in Table 2, but I believe it is elsewhere in the report.
Q. Let's take a look at page 28.
A. When you say -- excuse me. When you say the spot rate, do you mean the transfer date or the

transaction?

0118

Q. I'm talking about for this the trade date. Take a look on page 28. Do you see on that page information as to what the spot rate was?
MS. WIRSKYE: Objection. Form.
A. No.
Q. (BY MR. DONOHUE) Well, let's go back first of all to Table 2, and let's start at the beginning. Does Table 2 provide us information as to what the strike prices were?
A. Yes.
Q. Okay. For example, you'll see the strike price in the short option, am I right, is .9205?
A. Right.
Q. And the long option it was .9207?
A. That's correct.
Q. And on Table 10 if we -- we can see, am I right -- that's on page 42 -- that on the transaction date that these options 24629, they were out of the money, correct?
A. Yes, I think all of the options in all the cases were out when I started.
Q. Okay. Now take a look at Table 4 on page 32. Do you see information in Table 4 that would provide you with what the spot rate was for the Euro on the trade date?

0119

A. It's the 9564 number.
Q. Okay. And then if you look at your Table 11 on page 43, do you have information in Table 11 as to what the spot rate was for the Euro on the transfer date?
A. It's 9550.
Q. And am I correct that for the option -- the option that we've been discussing, that based on those spot rates it moved closer to in the money the following day?
A. Yeah, it's put so it's moving closer to the money.
Q. Okay. Now, given that, let's go back to your value of the options, which is in Table 12 on page 44. Now these -- again, this is the value of the short option on the transfer date, correct?
A. Correct.
Q. So isn't it fair to say that rather than decreasing, the values that are reflected in this table actually, if anything, reflect a slight increase, if at all, from what they were on the trade date?
MS. WIRSKYE: Objection. Form.
A. Well, we're backing into the trade date number, but I would say that makes sense. But I haven't seen -- I don't know what the trade day number is, but

0120

the direction seems to be correct.
Q. (BY MR. DONOHUE) All right. See, now what I'm -- by going through this little exercise what I'm pointing out to you is, is that there is no basis to say that there's some precipitous fall in the value of the options in this one day. So now excluding that as a possibility, my question comes back to whether or not that premium that the Deutsche Bank is paying for the short option, roughly $26 million, whether that premium

is, in fact -- or indicates that there is some type of material overstatement of that premium from what the theoretical value of that option is?
MS. WIRSKYE: Objection. Form.
Q. (BY MR. DONOHUE) Based on your determinations.
A. Well, we're kind of backing into it, but -- and I don't know what the actual number for the value would be, but it looks like it did have a significant premium to it, so yes.
Q. All right. Take a look at the -- and you said this before, let's take a look at your calculation of the value of the sweet spot, which is on page 34, which you said was less than .2 percent.
A. All right.
Q. And previously you made some reference to what

0121

ultimately mattered was not the premiums of the long and short, but what was the net positions --
A. That's correct.
Q. -- do you recall that?
A. Yes.
Q. Of course, are you aware for tax purposes the value of the long option -- the premium paid to the long option was used as a basis, were you aware of that?
MS. WIRSKYE: Objection. Form.
A. For what?
Q. (BY MR. DONOHUE) The basis of ultimately when they were transferred to a partnership, the basis of the partner's partnership interest. Were you aware of that?
A. That's kind of out of my area. I mean, I know there's some transfer. I mean, obviously, they asked me to do a transfer date. So obviously there had to be some transfer. I know that there were partnerships and some L.L.C.s and there was some tax issues, but that was really out of my area, so...
Q. All right. But let's go to the net. Would -- would you essentially be saying that if one wanted to determine what would be the value of this sweet spot in terms of one would ultimately pay for the option, would it be appropriate to take that .2 percent and multiply it times the long option? Say if I was going to really

0122

pay for something, this would be a ballpark figure as to what I would pay for it for the possibility of me being able to have a one option payout. Would that be a fair way to calculate it?
A. That's an awfully long question.
Q. Well, do you want me to repeat it?
A. Well, I know you were trying -- let me see if I sort of got it. You asked me --
Q. I'll repeat it.
A. -- to calculate the value of the sweet spot.
Q. Correct.
A. And I'm not sure what that means by the value of the sweet spot.
Q. I'm asking you as to what you would think this would be worth to you if you had a .2 percent -- less than a .2 percent probability of actually having a one option payout as to what it would be worth to you, it's value. And I'm saying -- first of all, do you understand that, that portion of my question?
A. I do understand that part.

Q. Okay. Then I'm asking you would it be appropriate then to calculate that, to simply take that .2 percent or point, is it 002 and multiply that times the payout and you would arrive at a rough estimate as to what it's worth to you?

0123

A. Well, I wouldn't do that. It goes back to something that I said earlier. These probabilities are not the probabilities that are used in determining option value. I could have figured out the risk-neutral probability of the sweet spot, and I could have made a calculation. But I just don't think I can say because you sort of go against my -- sort of my expertise all these years of studying options is that you don't take actual probabilities and multiply them by payoffs. If you had the risk-neutral probability, what would it be? Would it be much different? If you told me if I had the risk-neutral probability and I multiplied by that, discount it 30 days, you know, I would say I would be okay with that. But I don't know what that risk-neutral probability is.

Q. Well, is the reason you don't have the risk-neutral probability is because you didn't make that calculation?

A. That's correct. It's implicitly done within the option valuation process, but you don't really pull the number out.

Q. But I thought you said the reason you didn't do it is because it would not have a material effect on your overall calculation?

A. Well --

0124

Q. I thought that was the reason you said you wouldn't do it?

A. What do you mean by "do it"?

Q. By making that calculation.

A. I think that's incorrect.

Q. Okay.

A. I think what I said I wouldn't do was that -- when I gave you a probability number -- be careful about mixing up calculating probabilities versus valuing an option. When I gave you a probability number, I did not bother to take that sweet spot number out because it was immaterial to the calculation of the probability. Now, when I valued the short option, obviously, there's not a sweet spot there. I mean, you've only got one option and all.

So I never really valued the sweet spot by itself, and I wouldn't value it by taking the actual probability and multiplying it by whatever the payoff was. I mean, I wouldn't do it. Yeah, I mean, it could be done, but I -- you know, if someone asked me to do it, I could do it, but...

Q. Well, I'm lost and it's probably my fault, but let me go back over something you said. I thought you said if you had calculated risk-neutral probabilities, then yes if I made such a calculation of the probability

0125

or risk-neutral probability times the payout I would feel more comfortable in terms of arriving at what I would consider to be a value of the sweet spot. I thought that's what you said.

A. Yeah.

Q. Am I correct?
A. That's correct. We're okay.
Q. Now, I thought the reason -- and you did not calculate risk-neutral probabilities, correct?
A. Well, let's qualify that answer in the sense that when I valued the short option, the risk-neutral probability for the short option is calculated. But if what you meant was the risk-neutral probability of the sweet spot, no, that doesn't. No, that's not there.
Q. When you say the risk-neutral probability for the short option is calculated, what -- if you recall our prior discussion on your calculation of probabilities where I mentioned that they did not reflect forward points to expiration -- do you recall our discussion on that?
A. Yes.
Q. And I thought you said another -- I'll use the word gauge of forward points to expiration was the difference in the respective domestic and foreign risk-neutral interest rates. Didn't you say that?

0126

A. Sort of. First of all, we don't want to imply that -- because you just said the difference, I think that's what you said. It's not strictly the difference between the two, but the two interest rates -- by the way you just said risk-neutral interest rates, and that's not correct terminology. Just the difference in the two interest rates.
I think what we're saying here if I'm interpreting this correctly is -- actually, I'm not sure. So maybe you need to rephrase the question.
Q. Well, let me just -- since time is of the essence. I don't know if we have time to go back to this. Just taking -- you said I'm not correct when I use the term "risk neutral." Isn't the -- what term would you use for the reference of interest rates that are used in the formula? What term would you use?
MS. WIRSKYE: Objection. Form.
A. They're just interest rates. They're not risk-neutral interest rates. They're just interest rates.
Q. (BY MR. DONOHUE) Well --
A. The term risk neutral -- hang on. Let me finish here. See, two can play this, you know.
Q. Except I ask the questions.
A. I'm not going to ask you the questions, but I

0127

need to finish my answer.
Q. All right. Go ahead.
A. The term "risk neutral" is used to describe probabilities. It's not used to describe interest rates. If interest rates are plugged into the model, as they should be in the Black-Scholes model, the probabilities you get are the risk-neutral probabilities. We don't use the term "risk-neutral interest rates." They don't need a modifier. They're just interest rates. They don't have some property of being risk neutral or not.
Q. Okay. What about risk free?
A. Well, free and neutral are not the same word. So risk free is -- usually that means it is a default-free interest rate or most of the time you use a LIBOR rate, which is not strictly a default-free rate,

but it is a very high quality borrower rate. But that's a common term, risk-free rate. You'll see it used a lot in academia and in the real world. If you leave it off, it doesn't really change anything particularly in this context.
Q. Well, in Exhibit 2400, page 54, in your technical description of the valuation of the digital currency options, don't you refer to risk-free rates in the domestic and foreign currency?

0128

A. You need to show me where.
Q. Are you on page 54?
A. Right, yeah.
MS. WIRSKYE: I think we're on different exhibits here.
MR. DONOHUE: I'm on Exhibit 2400.
THE WITNESS: Oh, I was still on Murphy. I'm sorry.
MR. DONOHUE: It's in Murphy I'm sure too, but I...
THE WITNESS: Okay. Ask the question again.
Q. (BY MR. DONOHUE) Yeah. My question is don't you see the term "risk-free rates" in your formula?
A. That's correct, yes.
Q. So you have used that term, correct?
A. Yes.
Q. And this is -- in determining -- in determining forward points to expiration, I thought you said that one can make that determination by using risk-free domestic informed interest rates.
A. That's correct. I want to emphasis that if you leave the word "risk free" off it doesn't change it all that much.
Q. Well, I'm a little confused because -- I mean,

0129

isn't there a big difference between a risk-free interest rate and any interest rate?
A. That's correct. But I'm assuming we're sort of setting it in the context that these interest rates are -- you know, whether you want to call them the risk-free rate for clarity -- I'm assuming we don't have to say risk free every time. That once we set that in the context, you know...
Q. Actually, I was using the term "risk neutral" --
A. You were.
Q. -- to be synonymous with risk free. And when you corrected me before saying I was using an incorrect term, I wanted to get a feel for what term you feel more comfortable with. So if I creep back into risk neutral, do you understand I mean risk-free rate?
A. All right. But I'll probably still call you on it.
Q. Okay. That's your prerogative.
Now, with that in mind -- we got off on a diversion here. With that in mind, getting back to your point that you made that you would feel more comfortable in determining what would be a value for the sweet spot if, in fact, you had determined a risk-free probability for the sweet spot. Do you recall that?

0130

MS. WIRSKYE: Objection. Form.

A. I've also got to -- you mixed up another pair of words here.
Q. (BY MR. DONOHUE) Okay.
A. There's no such thing as a risk-free probability.
Q. Well, probability --
A. I think you meant risk-free neutral.
Q. Well, probability that takes into account. You're probably right. Probability that did take into account a risk-free interest rate.
A. That would be a risk-neutral probability.
Q. Okay.
A. So the answer is yes, I would be more comfortable calculating a value for the sweet spot if I had that information.
Q. All right. So with that in mind -- and now I can see where the confusion is. You're using the term "risk neutral" for a probability that takes into account risk-free interest rates. That's the way you're using that term, correct?
A. It is. I don't like the term "takes into account." I would say that it requires that information --
Q. Okay.

0131

A. -- the risk-free interest rates.
Q. All right. Now, I thought that the reason that you did not use or take into account -- I'll use that term for the moment -- take into account in your calculation of probabilities the risk-free domestic and foreign interest rates is because you ultimately concluded that it would not have a material difference on your ultimate outcome in terms of the probability. Didn't -- wasn't that your conclusion?
A. Well, I did not use the interest rates because I would be -- what I would be doing is reporting to you what I believe were the risk-neutral probabilities. And I felt like I needed to make a distinction. I needed to give some thought to what would be a reasonable expected return on the currency and not to just blindly assume that it was -- that it would be the risk-free rate. If I did something like that and just pulled an actual probability out of the Black-Scholes model and just said, you know, here it is -- I mean, this is the risk-neutral probability, frankly I think it would be -- it would be inconsistent with what's written about the model, what I've written about the model, what I know about the model. I would just feel uneasy about it.
And when I talked about in, I think, one of the appendixes about it, I said you don't just assume

0132

that the interest rates give you the expected -- that they are the expected returns. You need to think about it. Think about what assumptions that you're making. And I came up with what I thought was the most palatable assumption, which was that I'm going to assume that no currency has any advantage over any other currency. I mean, that no set of investors in one country is expected to gain over a set of investors in the other country, which seemed to me to be a reasonable enough assumption over a short period of time. If these were ten-year options, I might think about that a little more.

So for that reason I just couldn't have made that calculation by just -- I couldn't have just pulled the risk-neutral probability. I think that academics and practitioners would say he doesn't understand the Black-Scholes model.
Q. But --
A. And I just felt very uncomfortable about doing it that way.
Q. But this is a feature of the Black-Scholes model, correct?
A. It gives you risk-neutral probabilities, but you guys want to know the true probabilities. That's my understanding. I mean, you want to know what are the

0133

odds, and I interpret that to mean what are the odds, the actual probabilities, not the risk-neutral probabilities.
Q. Do you know how dealers do it? Do they use risk-free interest rates in calculating what the probabilities are?
A. I'm not sure they necessarily calculate the probabilities. What dealers do is they figure out what they're going to buy and sell these options for, and they need to use a model like Black-Scholes or whatever to come up with a number. And those risk-neutral probabilities are -- you know, when you get a final number, they're in there somewhere. They may or may not pull those numbers out and actually look at them.
But what they need to know, the way a dealer works is he quotes a bid and an ask. He says I'll take either side of the transaction. He needs to know a handful of things. He needs to know what is the fundamental value of the option, that's the number that's coming out of Black-Scholes. He needs to know -- I know I'm going to introduce a term you may not have heard before -- he needs to know the delta. He needs to know the gamma. And those are figures that tell him something about the risk that is in this option, how the option may move when the underlying moves. He does not

0134

necessarily need to know the probability. I couldn't tell you whether he calculates it or not.
Q. But isn't the probability, in fact, simply a product of your value of the option?
A. Well, you need to tell me what you mean -- what word are you going to put in front of probability? True probability or risk-neutral probability?
Q. Well, I'm asking you -- the question as to if you know what the dealer -- when the dealer calculates a value of the option, if, in fact, based on the value of the option you were then to back out, what would be the probability? Would the dealer -- if the dealer decided to back out what the probability was, would that be a what you've been using the term a risk-neutral probability?
A. If the dealer backed that directly out of Black-Scholes without making any statements or assumptions about the expected return on the underlying currency, then he would be backing out the risk-neutral probability.
Q. Okay. But you felt that -- or for your purposes it would be better not to, for the reasons you've stated, not the determine a risk-neutral

probability, correct?
A. Well, I've been advised by counsel that the question is: What is the probability? And I -- you know, I didn't specifically say, do you mean the real probability? Because I would take that to mean the real probability, not the risk-neutral probability. The risk-neutral probability is implicitly embedded in the valuation done on the short option, but I had every reason to interpret that as that you guys want to know the actual real probability.
Q. All right.
MR. DONOHUE: Well, it's 1 o'clock and let's go off the record.
(Recess held, 12:58 p.m. to 1:49 p.m.)
THE WITNESS: One question you had asked about reports, had I sent them a report, there was an earlier deadline that I completely forgot about, you might remember, a November or something or another deadline. And I was thinking I may have sent a report then. And we checked it out and we did. So I had sent a report back in November. So I just wanted to clarify that.
MR. DONOHUE: All right.
Q. (BY MR. DONOHUE) Now, you mentioned a few times that from the parties' viewpoint, what really counted to them was their net position. Am I right that you referred to the parties' net position as what -- for their purposes really mattered in terms of their -- in terms of the partners, their out-of-pocket costs?
A. Whoa, I'm not following that at all. I thought I was following it until you got to the cost part. My cost -- let's be real careful. Are you talking about what you paid for the option or --
Q. Sure.
A. Some people use cost and fees interchangeably. So you didn't mean to introduce that at this point?
Q. No, I wasn't introducing fees.
A. All right. So what does matter to someone who's buying the option is the net cost, and it also matters to someone on the other side of the transaction.
Q. And the net payoff too, that's really what they take into account with the possible exception of a one option payout, correct?
MS. WIRSKYE: Objection. Form.
A. Are you -- if you're saying does the payoff of an option matter to the parties, the net payoff of an option, yeah, I mean, it matters.
Q. (BY MR. DONOHUE) Let's go back to the option that we've been dealing with so far. That is in Exhibit 2402, the option in Table 2, which is 24629. And for that particular option there is -- am I right, we can calculate what the net cost of that option to the partners were -- to the partner was, correct?
A. Yes.
Q. And can you give me just a rough estimate of what the net premium was?
A. Well, I would take 26 million 4 and I would subcontract 25 million 608, so it looks like 792,000. I'm trying to do the arithmetic in my head, but...
Q. That's correct. Very good. A plus.

Now, for the net payout, what approximately would that be?
A. That would be 52 million 8 minus 51 million 018, that's about -- it's a little under 2 million it looks like.
Q. How about 1.782 million?
A. That sounds good.
Q. All right. Now, if one wanted to do a rough estimate as to what would be the value of that net position, how in your view would you go about calculating what would be the value of the net position?
MS. WIRSKYE: Objection. Form.
A. Well, I would probably use the Black-Scholes model to value the two options. If that's a question I want to know the answer to, that's what I would do.
Q. (BY MR. DONOHUE) If, for example, you recall your estimate for the long option, your probability

0138

estimate, was roughly 19.33 percent --
A. Yes, I think that's right.
Q. -- and -- and if, for example, we -- and I believe you mentioned this, your -- your probability for the sweet spot pending a one option payoff was less than .2 percent, correct?
A. That's correct.
Q. Could you get a rough estimate as to the value of your sweet spot by taking that 2 percent -- and let me make sure I have the calculation right -- and multiplying it times the payout of $52,800,000?
MS. WIRSKYE: Objection. Form.
A. Well, a couple of things. Let me clarify for the record. You said 2 percent. It was less than .2 percent.
Q. (BY MR. DONOHUE) Less than .2 percent, correct.
A. And I think what you're asking me is could I have taken that number, whatever it was, less than .2 percent and multiply it by the sweet spot pay off and some up with some value. And what I'm saying is -- and I've said this many times, I believe so far -- that I would not do that because that is how you would value an option. The 19 percent probability is not the risk-neutral probability, and I would simply not do it

0139

that way.
Q. And I know you said that many times, but am I correct that you didn't feel that there was a material difference between the probability you determined and a risk-neutral probability, am I correct that you felt that was the case?
MS. WIRSKYE: Objection. Form.
A. I didn't make that assessment. The comment that I said that wasn't material was that when I quoted that 19 percent rate in probability, it included the sweet spot. And the comment was that the sweet spot was not having a material sweet spot probability. It was not having a material effect on the figure that I gave, the 19 percent. That's not quite the same as what you just said. So I'm going to have to turn it back over to you to tell me what it is that you're actually asking me.
Q. (BY MR. DONOHUE) Well, I was under the impression that you felt as if there was no material

difference in a determination from your perspective of a risk-neutral probability and the probability that you determined.
     A.   That's not correct.  I didn't make that determination.  I'm not saying that there is material or not a material difference, but I didn't make the
0140
determination of a risk-neutral probability, so I couldn't really say.
     Q.   So as you sit here today, what is your view as to whether or not essentially had you used instead of not including in your calculation a determination of forward points to expiration, if, in fact, you had done that, in your view would there be a material difference?
     A.   Well, I don't know that, but I can make some inferences based on the information I've read in this case.  Having looked at Dr. Kolbe's report -- and I compared his probabilities with mine.  There were a couple of cases where there's a fairly large difference. In most cases the differences are not very large.  And one of the things that one could do is just say what is the average difference between the two, and it was only about one percent.  And I realize averages are -- you know, they subsume a lot of information and all.
               But in many of these cases I reported probabilities just a few percent different from what they reported.  And, you know, I can go back and check and make sure they did everything right.  But, you know, I would say maybe it would have an effect of a few percent in some cases.  That would, of course, presume that we agreed on all the other numbers that go in there.
0141
     Q.   If you took, for example, your .2 percent and multiplied that times the payout on the option we're referring to, the $52,800,000, do you agree with me you get a figure of roughly $105,600?
     A.   I'm going to have to take your word for it on that.  I mean, it sounds right.
     Q.   All right.  Am I correct that your assumption is, is that some portion of the net premium should include a value for the possibility of hitting the sweet spot, am I correct on that?
     A.   I made the assumption that the sweet spot has whatever probability -- risk-neutral probability that I purported, and so that would be a portion of the value of the option.  But, of course, you know I only calculated the value of the short option.
     Q.   But that would be a portion -- when you said the option, you mean the net position?
     A.   The net.  I mean the net, yes.
     Q.   And if one then wanted to determine what was the remaining portion of the value and one wanted to do a rough calculation of that, if you simply took your probability for the long option, subtracted out your sweet spot probability and then multiplied that times the payout, could you arrive at a rough estimate there? And when you multiply it, you would multiply it by the
0142
net payout, and you would get a rough estimate as to what would be the remaining value of the option?
     A.   Well, once again, I would be breaking the rules.  Those are not the true probabilities, and I

would need to know what the risk-neutral probabilities were. That's -- that's subsume within the Black-Scholes model.

Q. But I thought you just said a minute ago that if you compared, for example, Dr. Kolbe's probabilities with yours, except in a few cases where there's a large difference, for the most part there is no significance difference in the probabilities, didn't you just say that?

A. I'm not sure I would say that there's no significant difference. I mean, it does vary from option to option. The way I interpreted looking at a number like -- I don't remember this particular option, but I know there was one case where I had a number around 26 and your -- Dr. Kolbe had a number around 30 or so.

And when I say there's not a significant difference in that number, what I'm saying is that I believe the issue in this case as I interpreted hinges on whether there is a reasonable probability of profit. And I don't think it's likely that anyone's going to

0143

draw a line between 26 and 30 and say 26 is unreasonable and 30 is reasonable. No one's going to -- I don't think that's large in that context. I don't know whether the values of the options would be significantly different. That's just something one would have to put numbers into a model and see.

Q. Well, if we subtracted out that .2 percent from your 19.33 percent, which is what you report in Table 5 at page 33 -- I assume you recall that figure?

A. Yes.

Q. That was for your 60-day option. You've got a number of 19.13 percent. And you multiplied that times the net position, would you have any reason to dispute -- I've done that. You'd wind up with a number of approximately $340,897.

A. I'll take your word for it that you did the math.

Q. All right. And if you added those two figures together, the 340,897 and the figure of 105,600, which was the value for the sweet spot, you would wind up with a total amount of 446,497, would you at least agree with my math on this?

A. I'm not doing the math in my head.

Q. Okay.

A. So let me sort of answer it conditionally. If

0144

you did your math right, then I would agree with it, I suppose.

Q. One thing that you did previously do the math right on is what the net premium was for this option, which was $792,000. Do you remember that?

A. Yes, I remember that number.

Q. Now, if you compare the figures I just arrived at, the total figure of roughly 446,000 and compare it to the figure of 792,000, assuming that this is a rough estimate calculation of what the value of the option is, do you at least foresee the possibility that not only the long and the short options were materially overstated, but there was even at least the possibility that the net position, the net cost of the option was overstated?

MS. WIRSKYE: Objection. Form.
A. Well, first of all -- first of all, I think the number you came up with, which was 446 or something like that?
Q. (BY MR. DONOHUE) Yes, 446?
A. And, again, you know, I didn't do the arithmetic on this. I took your word for it on that.
Q. I understand.
A. But I believe that number was obtained by taking my probabilities and multiplying them by payoffs.
0145
Q. Right.
A. And as I've said -- and I've repeatedly -- my probabilities should not be multiplied by payoffs in order to figure out values of options. And you're not going to get me to say that it would be. You used the term "rough estimate," I remember that as a word. I'm not sure I'm comfortable saying rough estimate. If one wanted to know what it was actually worth, one could have done the calculation. And I'm uncomfortable with, you know, accepting your definition as a rough estimate. So it's hard for me to answer that question when I'm uncomfortable with that notion because it goes against what I know, what I've been taught and what I've taught for years that that's not how you value options.
Q. Well, do you recall when we started this exercise I had you take the 19.33 percent times -- for purposes of determining the value of the long option, I had you take that times the payout of the long option. Do you recall that exercise?
MS. WIRSKYE: Objection. Form.
A. I don't think I would have consented to that being an estimate of the value of the long option.
Q. (BY MR. DONOHUE) I didn't ask you if you consented to it. I asked you if you recall that we went through that exercise?
0146
A. It depends on what you mean. If I said yes to that, does that mean that I agreed that that would be an appropriate calculation of the value --
Q. No, that doesn't mean that at all. I'm asking you --
A. If you're just asking me, do I remember having a discussion, if that's what you're --
Q. Yeah, right. Do you remember having the discussion.
A. That I'm okay with, yeah.
Q. And do you recall that if you did do the multiplication there and you took the 19.33 percent times the payout, which is roughly about 52 million, you would wind up with -- do you recall the figure -- which was about 10.2 million, do you recall that?
A. You're asking me if we multiplied the 19.33 times the 52.8 that we would get whatever that number was?
Q. Right.
A. So you're just asking me a math problem.
Q. Right.
A. And I'm saying yeah, I think I remember we had that discussion, yes.
Q. Right. I'm not asking you to do anything more than recall my former exercise or discussion on this.
0147

A. Right.
Q. And do you recall then the -- that figure of roughly 10.2 million in the ultimate values you determined for the short option, do you recall what the difference was there?
MS. WIRSKYE: Objection. Form.
A. I would have to look at my table for the values I've got for the short options. If you could tell me which page that was on.
Q. (BY MR. DONOHUE) Yeah. Your tables are on page 44 of Exhibit 2402.
A. That was the 5.2 million, the 8.7 million.
Q. Right. So that range from about 5 to 8 million, correct?
A. That's correct.
Q. And if you recall what the premium was for that option -- do you recall what the premium was for that option?
A. No. And I will have to look in the table.
Q. It's Table 2.
A. 25,608 -- 25 million 608.
Q. All right. So there is a considerable difference between both the value of the option -- a possible value of the option by taking probability times payout, your calculated values of the option, and what

0148

would be the premium of the option, am I correct?
MS. WIRSKYE: Objection. Form.
A. We've got to qualify that a little bit. I know we discussed that earlier.
Q. (BY MR. DONOHUE) Right.
A. But one of those numbers is taken on one day, and one is taken -- and two of them are taken on other days. So if you allow for that, I would say there's differences in those numbers, yes.
Q. But even with the fact that one's taken on another day if you recall, it would -- what we went through was that these options would not have dropped in value but, if anything, increased in value. Do you --
A. That's correct.
Q. Okay. So I understand you, yourself, was not asked to determine if the net position was over value, am I correct?
A. That's correct.
Q. Based on your calculation of the value of the short options, am I right -- and I showed you you could use your same methodology to calculate the value of the long options, correct?
A. Yes, you could.
Q. And I showed you that Dr. Kolbe, in fact, had done that, do you recall that?

0149

A. Yes.
Q. I didn't show you precisely where he calculated in his report, but -- I didn't show you the exact values of them, but if you recall -- or do you recall that the values of the short options that -- of the long options that he determined were, in fact, not terribly different than the value of the short options? You don't recall that?
A. You know, I read the report and, of course, you don't read a table. You look over a table and all. I would have to only say that -- you know, I'm not sure

I could answer that question. If I saw the numbers, I could probably answer the question.
Q. All right. Well, why don't we go to his report and take a look at what is Exhibit 2429. And I believe it's in E-R-5 A through C. We're looking here at his calculation of implied values for the long options to trade date using your methodology. Do you see that?
A. Yes.
Q. And if you go down, for example, to the first Murfam Farm, L.L.C., Dwindle, do you notice that's the option we were talking about which is a dollar Euro option with the same strike price?
A. Yes.

0150

Q. Okay. So if you go all the way over to the end, you'll see that he determined on a 30-day basis a value for the long option of roughly $5 million. Do you see that?
A. Yes.
Q. And if you turn the page, he's done that on a 60-day basis, and it's roughly 8.8 million?
A. Yes.
Q. And if you turn the page for a 90 day, he makes the same determination. And again it's there 8.3 million?
A. Yes.
Q. So if one then, using your methodology, wanted to determine whether the value of the net position was, in fact -- or what was the value of the net position, how would you go about doing that? Would you, for example, simply take the value of the long position, the value of the short position, and subtract the two?
A. I would.
Q. Okay. So if you did that and you arrived at a number that was significantly less than the 792,000 net premium payment, what conclusion would you derive from that? By significantly less, I'm talking about in the neighborhood of anywhere from 50 to 80 percent or so. What --

0151

A. Well, I would say that it's probably a deep out-of-the-money option. Because a deep out-of-the-money option has a huge leverage, relatively low value, and it has potentially a rather large pay off. That's what comes from a high degree of leverage. So I would infer from that it's probably a somewhat deep out-of-the-money option.
Q. What if you went to another bank and got a price very close to -- for the option -- as to what you were determining to be the difference between the values of your long and short option, then what would you conclude?
A. So let me make sure I've got this clear. So you've done some sort of internal calculation, and you have some Black-Scholes value for these options, the net position.
Q. The net position.
A. And you went to a bank and you asked them could you do these options? And they say -- they're naturally going to say, yeah, I'm pretty sure we can do this.
Q. And what --

A. And you'd say what would you charge me?
Q. Well, before you get that, you have one bank, the Deutsche Bank saying my cost -- my premium -- net
0152
premium for this pair of options is 792,000. You've determined separately that, in fact, a cost for these options is closer to $446,000. So you're looking at that 446,000 and trying to make a determination as to why the Deutsche Bank is charging 792,000 for options which you have determined have a theoretical value of 446,000. And you're trying to make a determination of what that difference is attributable to. You've given me one explanation.
And then I said to you, all right, now, you take the same pair of options, you go to another bank, and this other bank tells you that I would for the same option pair, having the same terms, I would charge you something closer to what you have determined to be the theoretical value. Then what would you conclude?
MS. WIRSKYE: Objection. Form.
A. Okay. That was an awfully long statement, but I wanted to stop you.
Q. (BY MR. DONOHUE) Okay.
A. And be glad that I didn't. Because when you mentioned the 446,000, I think I remember -- going back so many minutes -- that you got that number not by subtracting the long and short values. I thought you got that number by multiplying the payoffs by my probabilities. So I would be uncomfortable, as I've
0153
said repeatedly, taking actual probabilities times payoffs.
Q. I changed -- if you recall, I've now changed. I'm off of that. I understand what your position is on that. I'm saying if, in fact, you got the 446,000, not by that, but by simply subtracting the values of the long and short -- and that's why I went to Dr. Kolbe's report. And I'm saying if, in fact, you made that type of determination as to using the Black-Scholes as to what your net position is -- do you understand that?
A. I understand that.
Q. Because you're reverting back to a prior --
A. But the problem is you were using a number that was obtained some other way and in a way that I object to and then throwing it into this question. I was very uncomfortable with that. If you just made up another number, I think I would have been more comfortable with it.
Q. Well, I can make up any number. The point of my question, however, deals with there's a significant difference between the 792,000 and that number. So I'll just throw out if you don't like 446,000, I'll through out 440,000. So the point is that what would you conclude if you went to another bank and you wound up getting a price closer to what you determined to be the
0154
theoretical values of the net position?
A. I understand your question now.
Q. Okay.
A. We're clear on that.
Q. All right.
A. When you buy options, understand something. We all buy things all the time. You bought lunch, you

know. You buy a car, you buy this, or buy that. You are free to shop around. If you find another bank that gives you a better price, you are free to take that price. You may or may not take that price, I don't know. I can't get in the mind of someone.

But it's the same principal as if I go -- let's say I'm shopping for something, and I go to Macy's and Macy's sells it for this price. And I find the exact same thing at Wal-Mart, and it sells it for some other price. Now, does everybody just rush to Wal-Mart and buy it? No, not necessarily because those same items couldn't be sold by two different companies, the exact same item for different prices if somebody wasn't paying the higher price.

So if you saw a price somewhere that was lower, the client might well be tempted to say, yeah, this is a better deal. I have a good -- you know, I'm perfectly willing to do business with this bank, but not

0155

necessarily, for the same reason that we don't buy everything from Wal-Mart that we could buy from Wal-Mart.

Q. Do you -- have you ever price shopped a foreign exchange option?

A. No.

Q. You've never done that?

A. Right.

Q. Do you have any -- in any of your writings -- you mentioned you've written textbooks. What portion of any of your textbooks is devoted to the subject of foreign currency options?

A. We have -- previously had an entire chapter on foreign currency derivatives of which options are a major component. And over time we've consolidated the foreign currency treatment into the same chapters that deal with other options. We had to make some changes to keep the book from exploding, it was getting so big. So at one time I had an entire chapter devoted to foreign currency options. You know, I've written some pieces on foreign currency option, so yes.

Q. Well, you just a minute ago said you, yourself, have never priced shop foreign currency options, correct?

A. Well, that would mean have I ever actually

0156

bought one, and I think that was the first question you asked me this morning or something.

Q. Well, it doesn't necessarily mean that because you could have price shopped without buying, correct?

A. That's true. I assumed that -- I sort of took the question to mean have you ever been a buyer, someone who's looked around for a foreign currency option and I would say no, I'm not.

Q. Well, you could have done it in a professional sense of trying to yourself for purposes of, let's say, your writings, your teachings, try to get a feel for whether or not different dealers have varying prices for the same foreign currency options. So there's a couple -- am I correct, you could have done it for that reason?

A. Well, in theory I could have done it, but I don't know if anybody would have given me the time of day if I just called them up and they said who are you, and I said well, you know, I just need something for my

book here. I'm not sure they would have given me the time of day. So in, sort of, theory I could have done it, but as a practical matter it couldn't have been done.

Q. So is it fair to say that you don't know then if you had the very same terms of an option, you don't know what to expect if you went and price shopped that

0157

option at different banks? You just don't know what type of difference, if any, there would be?

MS. WIRSKYE: Objection. Form.

A. Well, not precisely, but it would depend on the competitive nature of the market. And I do know from what I have read and what I've heard about these markets that you're dealing with what's called plain vanilla instruments. It's a very competitive market. You probably wouldn't find very large differences in the price. When you get into more complex instruments, you will start to find some differences in the price. I couldn't put a number on the magnitude of the differences.

Q. (BY MR. DONOHUE) I see. And am I correct the options here are known as digital options?

A. That's correct.

Q. And with digital options, based on your reading, would you expect -- would you also expect the pricing in digital options are quite competitive among the different banks?

MS. WIRSKYE: Objection. Form.

A. Well, the funny thing about digital options is on the one hand, they're classified as exotics. Usually you see them in chapters on exotic options. But on the other hand, a digital option is really just a piece of a

0158

standard option. There's two kinds of digitals, and I talked about that in the report, and this happens to be one of the two kinds of digitals. I always like to give the example that it's -- a digital is kind of looking at the Black-Scholes under a microscope. So it's hard to say whether it would be competitive or not. They're somewhat different, but at the same time they are a much more fundamental component of a standard option. So it's really hard to say what you would get with digital options as far as the competitiveness of the market. I do know that, you know, there are a lot of articles out there about digitals. I would assume most major banks -- I can't imagine why they wouldn't make markets in digital options.

Q. (BY MR. DONOHUE) Well, I'm not sure I understand your response. Are you saying you don't know if there is a market by banks in digital options?

A. No, I know there is a market.

Q. There is a market?

A. I don't know how competitive it is. I suspect it's fairly competitive. Nobody really knows how much training goes on in these things because as I said, they're customized transactions. The only data we have on the OTC market -- which I cite in my report and I think your experts do too -- comes from the Bank for

0159

International Settlements and doesn't break it down fine enough -- or doesn't break it down at least into digitals.

So we don't know really how big it is. We only know -- I know what I read, what I hear, and I read a lot of what the industry says. And I think most banks -- I can't imagine most banks that are seriously in this business wouldn't make a market in digital options.
Q. And, again, would you expect the prices that the different banks would charge would be competitive, they wouldn't vary significantly?
A. Well, I don't know. I mean, if it is a very competitive market, a lot of banks are willing to make markets in these, the prices quite possible would be close.
Q. And when you say close, would you refer to close being, let's say, a few pips apart?
A. Pips are usually differences in foreign currency denominations, like the .9205 and the .9207, and I'm sort of thinking of this in terms of what I, as an American, would pay for this. So I don't know how I could translate that into pips. If you give me a percentage or something, I'm still not sure I could answer the question, but I don't know how close they

0160

would be and I can't exactly say what, you know, is close. I do know that in a competitive market a dealer will find out pretty quickly if his prices are out of line.
Q. And the reason for that is, is that you always have a feel for what is the price of their instruments in the market?
MS. WIRSKYE: Objection. Form.
A. They -- they have an idea of what these instruments are worth. They have an idea of what their costs are, how difficult it might be to hedge their position, and they have to do some padding in there. And they all face very similar pieces of information in that regard. So yeah, I mean, they have a lot of information. They're almost overloaded with it.
Q. (BY MR. DONOHUE) And they also have a feel for what their competitors are charging for the same instruments?
A. Well, they should.
Q. Let me go on to a different subject. Take a look at your Exhibit 2400, page 3, that's your JBJZ report.
MS. WIRSKYE: What page did you say?
MR. DONOHUE: Three.
Q. (BY MR. DONOHUE) At the bottom of the page

0161

under Summary of Findings, you state (as read): I found the transactions did have a reasonable possibility of profit.
Am I correct?
A. It says probability of profit.
Q. Probability, I'm sorry. Am I correct?
A. Yes.
Q. All right. How are you defining profit?
A. Well, it's pay off minus what you pay.
Q. Pay off minus of the cost of the option?
A. What you -- yeah, you just have to be real careful about cost because we use a term a lot it's called transaction cost, and that would equate to the fees and things in this case. So you just need to be a

little careful, around me at least, when you use the term "cost," that's the price of the option. It's what you pay. It's the option premium.
Q. Okay. When you say what you pay, are you referring to specifically the cost of the option? Is that what you're call --
A. Yes, if that's the way you want to define cost as opposed to the cost that you might have to do the transaction, such as fees or if I bought a stock and I pay a broker and stuff like that. I just want to keep that out.

0162

Q. Okay. So in other words, in your view profit means -- does not take into account any other possible transaction cost or fees except for the cost of the option?
MS. WIRSKYE: Objection. Form.
A. In the report I was asked to determine the probability of profit without taking into account any fees. And in the rebuttal I incorporated the fees. So at this point I'm not incorporating the fees. You can define the profit that way because you will see it in just about every options textbook. They will show you profit graphs. It's a very common picture you'll see. It looks like a hockey stick. And you can define profit that way. At some later point you might wish to incorporate cost into it, but it's a perfectly reasonable way to define profit.
Q. (BY MR. DONOHUE) Well, of course, normally, am I correct, that when one considers profit, one considers -- in fact, one walks away with a -- from the transaction with money from the transaction?
A. Right.
Q. Is it possible that even though on these transactions one had a profit on an option that one nevertheless would still have an overall loss on the transaction when one took into account all of the fees

0163

and other transaction costs on the transaction?
MS. WIRSKYE: Objection. Form.
A. I think you said is it possible --
Q. (BY MR. DONOHUE) Yes.
A. -- that if you took these other fees into account that a profit could turn into a loss; is that --
Q. Right.
A. It is possible, yes.
Q. How do you define reasonable probability of profit? How do you define that term?
A. This is why I decided that you needed a benchmark, something to give you an idea of what investors expect when they buy options. And what I did was I collected data on options that traded on Google and the S&P 500, and that's in one of the tables in there. And I'm trying to answer the question. I'm trying to help the Court understand, what do people expect when they buy options in terms of the odds, the odds that it will pay off. Again, this is not the values of options. What are the odds that options will pay off?
And what I did is went to the options market and said what are these numbers. What would they look like? And that's how I define reasonable because I look at these numbers and I look at those numbers, and I

0164

think, well, you know, they look pretty reasonable.
Q. So is what you're saying your standard for what you consider to be a reasonable probability of profit is to compare the probabilities of the options in this case to probabilities for Google and S&P 500 options. And to the extent that the probabilities that you have determined for these options are, in fact, in line with or even greater than the probabilities for the Google and S&P options, then you conclude that that is a reasonable probability for a profit; is that --
A. That's correct, yes.
Q. All right. Why did you choose Google and S&P options? Am I correct, those are equity options, right?
A. Well, you have to be careful about the term "equity" actually. Some people would say that they're both equity options, and some would say that Google is an equity option and others would say but S&P 500 is an index option. So -- but it's an index that consists of equity. So I tend to call them one is an equity and one is an index option.
Q. All right.
A. So I think your question is why did you pick them?
Q. Yeah, why did you pick them as opposed to -- well, why did you pick them?

0165

A. Well, it would have been nice to have been able to pick currency options off of the Philadelphia Exchange, but as I said there's not much volume of trading there. So what I wanted to do was pick some actively traded options that everybody was familiar with. I picked some obscure company that would probably look a little strange.
The S&P 500 is a very good representative of the market as a whole, and it's a very visible number at least -- maybe not to your layperson -- but at least to people in the financial world. And I picked Google because it's a pretty actively traded option. Anybody who goes on the Internet knows who Google is. So, you know, out of the thousands of options I could have picked, I picked those.
Q. Could you, by any chance, have used your calculation of probabilities for Google and/or the S&P 500 in connection with some other matter and you just had those handy?
A. No.
Q. So you actually made a deliberate decision in this case to determine probability -- reasonable probabilities in this case by making a determination as to what the probabilities were for Google and S&P 500 options?

0166

A. That is correct.
Q. Okay. Is it possible, for example, to have a probability of being in the money on an option of, say, 99 percent and yet the investment itself in your view be still unreasonable?
MS. WIRSKYE: Objection. Form.
A. Yeah, I don't know what you mean by unreasonable, but I'm trying to define -- when I made the statement unreasonable, it's my understanding the wording of the law says there must be some reasonable

possibility of profit. So I tried to work with that word "reasonable possibility," which I interpret to be reasonable probability. You're telling me is it possible for something to have a 99 percent chance and that to be unreasonable it would be pretty hard, but I don't know. I haven't really thought about it. But if you've got a 99 percent chance of winning, that sounds like a pretty good chance of winning but that doesn't mean it's a good investment though.
Q. (BY MR. DONOHUE) Because...
A. Because it could be unfavorably priced. You could have a 99 percent chance that it would be unfavorably priced.
Q. So there is another factor in determining reasonable possibility of profit, it's your cost?

0167

A. No, that's not what I said.
Q. Well, is this not another factor?
A. That's not what I said. You said if something had a 99 percent chance of a probability -- or 99 percent probability of profit, you said would you interpret that to be reasonable probability of profit. And I said, it seems like that would be. But I said, it didn't necessarily mean that it was a good investment because of the cost. And that's -- I think that's a slight difference from what you said. You sort of paraphrased what I said.
Q. Well, but if you ultimately conclude that it's not a good investment because of the cost, in your view then wouldn't it be fair to say that that investment doesn't have a reasonable possibility of profit?
MS. WIRSKYE: Objection. Form.
A. No, I don't think so.
Q. (BY MR. DONOHUE) Then I'm confused. How -- how are you defining -- let me go back to profit. How are you defining profit for purposes of your determination of reasonable possibility of profit?
MS. WIRSKYE: Objection. Form.
A. Pay off minus what you pay for it. What you get in the end minus what you pay. I didn't know whether you wanted to bring cost in at this point, but

0168

I'm assuming not. But profitability of profit, let's say it's 99 percent. Now, if someone wants to know is that a high number -- I don't know how the Court necessarily defines reasonable -- but if someone wants to define or ask whether that's a high number, I'm going to say yeah, that's a high number. It really couldn't get too much higher, you know. But should a person automatically buy something that has a 99 percent chance of making money, not necessarily. It depends on what you have to pay for it.
Q. (BY MR. DONOHUE) And, for example, if, in fact, what you had to pay for was such that even in the -- even in the 99 percent probability of your bet paying off, you would still lose money, I assume you would agree that's not a good investment, correct?
MS. WIRSKYE: Objection. Form.
A. I think you'll have to restate that.
Q. (BY MR. DONOHUE) Well --
A. There's a 99 percent chance of making money --
Q. No.
A. -- and there's some chance of losing money, is

that what you said?
Q. That's not what I said. I said you have a 99 percent probability of being in the money.
A. Are we talking about an option here or just
0169
some generic investment?
Q. We're talking about an option. You have an option with a 99 percent chance of being in the money. Now, if you --
A. What about it?
Q. -- have an option with a 99 percent chance of being in the money, I think you've just said that may or may not be a good investment. You would have to know what the price is. Didn't you just say that?
A. Well, I would determine the value of the option using the Black-Scholes model. And, again, that 99 percent figure is not in the Black-Scholes model. Black-Scholes uses risk-neutral probabilities. So I would determine the value of the option and I would determine what I'm paying for the option and I would make some sort of a value judgment or decision sort of based on that.
Q. Well --
MR. DONOHUE: Let's take a short break.
(Discussion held off the record.)
Q. (BY MR. DONOHUE) So is it fair to say that in your view, to determine reasonable probability of profit all one needs to do is make a comparison of probabilities? Is that a fair statement of your reading?
0170
A. Well, I think if you just calculate a probability, you need some kind of a benchmark to go against. So assuming that you have some kind of a benchmark, and I would calculate the probability of profit and I would compare that to the benchmark.
Q. And in your case your benchmark is Google and the S&P 500 options, correct?
A. That's correct.
Q. Well, what if the price of the option was significantly greater than the value of the option?
MS. WIRSKYE: Objection. Form.
Q. (BY MR. DONOHUE) First of all, do you understand what I just said?
A. Sure.
Q. Okay. In other words, you're paying for the option, an amount which is significantly greater than the actual value of the option. Can you make that assumption?
A. Sure.
Q. Now, how would you take into account that if you simply made a comparison of the probability of your option being in the money versus the probability of the S&P and Google options being in the money?
A. Well, I think you're mixing things up here a little bit.
0171
Q. Okay. Go ahead.
A. The question deals with probability, is something a reasonable probability, that's one thing. I would compare the probability with some benchmark. However, that number does not -- is not a basis for deciding whether to buy the option or whether the option

is overpriced or underpriced. The probability of the pay off is a number that was produced for this report only because I was asked to produce it. And I made the assumption because, on advice of counsel, that that was an issue in this case, and so I produced that number.
Now, if the question -- if this case were just totally different and the question was, did they pay a reasonable price for the option, then I would have approached it differently and I wouldn't have calculated the profitability of profit. So, you know, you're sort of mixing things. I'm only answering the questions I've been asked by counsel, and you're kind of mixing things up.
Q. How would you approach it in that event?
A. Well, if "that event" is -- what you mean is let's say the issue were, did they pay a fair price for the option -- is that sort of the question?
Q. Well, no. That wasn't my question. My question really comes back to terminology that you're
0172
using. Terms like "profit" and terms like "reasonable probability" or "reasonable possibility."
MS. WIRSKYE: Objection.
Q. (BY MR. DONOHUE) Those are terms you're using. Do you understand that?
A. Yes.
MS. WIRSKYE: Objection. Form.
Q. (BY MR. DONOHUE) And I'm trying to myself gauge what you mean by those. And I think what you mean by those is, is that you are making -- by virtue of making a comparison between the probabilities of these options being in the money -- and by these I mean the options in this case -- versus the probability of Google and S&P 500 options being in the money, it seems to me what you're concluding is, is that since there is a consistency in terms of these probabilities, that you are concluding that there is a reasonable probability of profit for these options, correct?
A. That is correct. From my point of view reasonable seems like numbers that are in line with other numbers that investors expect. Now, I do -- let me finish one thing.
I do understand and I respect the fact that in the legal system you have debates about what a word means, and within this process you may decide that
0173
reasonable means something else, I don't know. But I'm trying to help the process out a little bit by saying what probabilities do people face when they buy options. And if that's -- that in my mind is a decent definition of what reasonable means. The legal system may define it something else.
Q. Well, I mean going to something more basic in terms of profit. It seems to me that your concept of profit is whether the option is in the money.
A. No. It's whether you make money off of the option.
Q. Well, if you make money off of the option, then I don't understand how you can say that you may know -- for your purposes you weren't asked to make a determination as to whether the option was fairly priced. Am I correct, you weren't asked to make that determination as to whether the options were fairly

priced?
A. That's all you're asking me?
Q. Yes.
A. Was I asked to make --
Q. Yes.
A. I was asked only to determine that on the short -- the short option on the day of the transfer.
Q. But yet, in fact, you were asked to determine

0174

the value but you weren't asked that second question, were you? Is this option fairly priced? You weren't asked that question.
A. Oh, right. That's correct, yes.
Q. Okay. But am I right that in order for you to determine if there's a reasonable possibility or probability of profit, don't you have to know as to whether or not the option is fairly priced?
A. No.
MS. WIRSKYE: Objection. Form.
Q. (BY MR. DONOHUE) Well, what if I told you to assume the options were not fairly priced, if you had to make that assumption, would that affect your determination as to whether there was a reasonable possibility of profit?
MS. WIRSKYE: Objection. Form.
A. Let me explain. What you pay for an option is a determinant of the profit, and it certainly was incorporated into my determination of the profits. Now, each one of these transactions that has three pay offs, as we all know. There's the one where you lose the money and then there's one where you make the big money and then there's the other one. And I calculated the profit in each one of those three outcomes, and that was determined by what you actually did pay or what they

0175

actually did pay for the options. And they could have paid less, they could have paid somewhat more. It wouldn't have actually affected the probabilities.
So it got incorporated into the calculations. The fact that they paid some number that you're claiming was, you know, really high, that's embedded in the calculations.
Q. (BY MR. DONOHUE) So if I understand what you're saying, you're saying that the probability calculations that you determined were, in fact, embedded -- that the -- let me strike that.
The value -- okay. Let me take that back. The probability calculations take into account whatever the cost was for those options. Is that what you're saying?
A. That's correct. But they do so only to the extent that the payoffs -- the two positive payoffs that the -- two out of the three were positive payoffs -- were more than enough to cover the actual cost. Now, once you determine that these three outcomes, two of them are more than enough to cover the cost, then the cost itself doesn't really matter. All you have to do is then calculate the probability of these two out of three outcomes.
Q. Well, let me see if I can understand what

0176

you're saying. In other words, let me make an assumption here that I can -- I purchase an option that

is materially overpriced. Can you assume that?
A. Yes.
Q. There's still a possibility -- if I am in the money, there's still a possibility that I will make a profit. Do you understand that point?
A. Yes, but I would like to ask are we talking digital or standards? Because that does make a difference.
Q. Yes, digitals. I'm talking digitals.
A. Okay. All right.
Q. All right. So here I'm paying for an option. It's materially overstated, but there is still a possibility of making money on this option. Are you saying that the fact that it's -- and I -- on this option I wind up with a probability which is somewhere close to one of your Google options. Do you understand that?
A. You lost me on maybe the second half of that.
Q. Well --
A. You're saying if I incorporate the cost, I would wind up with a probability that I can compare to these Google options; is that correct?
Q. Yeah, you're still in the range of -- you have

0177

a -- am I right, you have a range for the Google options of somewhere -- of probabilities to somewhere between 1 point -- what is it, 1.167 percent and they go up from there, don't they?
A. I'm not looking at the numbers, but it sounds right.
Q. I mean, for example, if we do look at the numbers, it would be on --
A. Page 34.
Q. Yeah, I think it's --
A. Table 6, page 34. Actually page 35 is what it's on.
Q. Page 35?
A. It's split pages.
Q. Yeah, 34 and 35. If you take a look at, for example, for your Google option it has a strike price of 490. I mean, you have a probability there of 1.56 percent, right?
A. Yes.
Q. So I mean, you have a range of 1.56 percent all the way up to 41 percent, correct?
A. That is correct. And that is because the exercise prices have a pretty wide range too, 490 to 380.
Q. So in other words, am I correct, from your

0178

point of view if the COBRA -- I'll call it the COBRA options. Do you understand what I mean by that, the options in this case?
A. Yes.
Q. If they had themselves a range of probabilities that went from -- anywhere from a little over 1 percent to 41 percent, in your view they would be a reasonable probability of profit for these option?
MS. WIRSKYE: Objection. Form.
A. See, that's not how I would interpret that.
Q. (BY MR. DONOHUE) How would you interpret it?
A. The purpose of these Google options and S&P options is to show that when people buy options,

actively traded options, options of which the underlying is something that we've all heard of, that they face probabilities ranging from for out of the monies, you know, all the way down to one and a half percent and -- a fair amount of volume traded at those levels.

And that's the purpose of using this as some kind of a benchmark for these currency options is to be able to say well, the probabilities that all of the experts have calculated in this case, you know, are numbers that, you know, if I were the Judge, I would feel drowning in probability numbers. And what I want to do is I want to give the Judge some kind of benchmark

0179

to say: are they high? are they low? And what I'm showing here is when people buy options, out-of-the-money options in particular, it gets lower the more out of the money you go that the odds look very, very stacked against them. And that is because that is the way options work.

When you are dealing with out-of-the-money options, you have a great deal of leverage in them. You don't pay that much for them. They don't pay off very often. And when they do pay off, your rate of return is going to be really good. And that's something -- I'm sure the average person has heard of options, you know, your stock options and all that kind of stuff. But I don't really think, with all due respect, that attorneys and judges, let's say who have happened to have traded them, would have some kind of a feel for what numbers do people expect when they trade options. And that's the purpose of this. Calculate these currency option probabilities. Are they big, are they small. Well, look compare them to out-of-the-money options that trade on the Exchange, and then you have some perspective to say whether they're large or they're small.

Q. And what I'm saying is if one of the options in this case had a probability of one and a half

0180

percent, in your view would that have a reasonable probability of profit?

A. Well, in comparison to other options, it wouldn't be out of line.

Q. Okay. So it would?

MS. WIRSKYE: Objection. Form.

A. I think you said would have a reasonable probability?

Q. (BY MR. DONOHUE) Yeah, would have a reasonable possibility.

MS. WIRSKYE: Objection. Form.

A. If the Court will accept these as benchmarks -- reasonable benchmarks, then I would say yes. But it wouldn't -- you know, any numbers that are in line with these numbers wouldn't surprise me at all because these options have very high leverage.

Q. (BY MR. DONOHUE) How is the cost of these options determined? And by these I mean the Google and S&P 500. How are they determined?

A. They're determined by buyers and sellers of options.

Q. Fair to say it's determined by a market price?

A. Did you say a market price?

Q. Yeah.

A. I think I would have said a market process,

0181

you know, supply and demand and what the pieces of information are that each of the participants bring to the market and also whatever the options market maker decide he needs to build into the price in order to cover his cost and make a profit.

Q. Do you know how the prices of the options in this case were determined?

MS. WIRSKYE: Objection. Form.

A. You're talking about the currency options, right?

Q. (BY MR. DONOHUE) The currency option, yes.

A. I don't know.

Q. Do you know if it was a so-called market process?

A. Well, any over-the-counter options contract is privately negotiated between parties. If you decided you wanted to do one of these transactions and you could come up with, you know, a few hundred thousand or a million or whatever, you could call up a dealer and ask to do it, and the dealer would give you a number. Just like, you know, going down to your car dealer and saying what does this car cost? And you could, just like with a car dealer, you could negotiate.

I always use -- I like to use cars as examples for this because when we go to shop for cars if

0182

we're -- you know, if we shop intelligently, we sort of have some idea of, you know, what we're buying and what information might go into that price. And we're perfectly free to accept it and walk away with the car or the option or we can go somewhere else.

Q. But I didn't ask you generally how you arrive at a price for a foreign currency option. I asked you specifically with respect to the options in this case. And my question was: Do you know how the price of the options in this case were determined?

A. And I answered that I did. I believe I said I did. I know I elaborated a little bit, but...

Q. Do you know whether there are any documents in the record in this case which, in fact, explain how the price of these options were determined?

A. I don't know. They're -- documents like that usually exist. I don't know whether I saw them or not. I don't recall seeing any. But usually they have things called pricing sheets, and although that can usually mean nothing more than a spreadsheet. And doesn't necessarily mean someone wrote an opinion about why I used those numbers.

Q. Okay. Let me get back to the question because I'm not sure I fully understand your answer. And that is: If you assume that the price of the options in this

0183

case were materially overstated -- do you understand what I just said? Can you make that assumption?

A. All right.

Q. Would that affect your determination as to whether or not for these options there was a reasonable probability of profit?

MS. WIRSKYE: Objection. Form.

A. Well, all I have to do to get probability of profit is to determine how many outcomes are profitable.

And in order to do that, I have to use the price that they actually pay regardless whether it's overstated or not. I have to use that price. And I determine that there are two outcomes out of three in which there was a profit. I have to determine the probabilities of those two outcomes.

So you said to make the assumption if they were overpriced. If they were overpriced, that was used in the determination of whether they made a profit. In fact, they could have been priced somewhat higher and still produced a profit that would not have affected my probability calculations. Now, there is a point where it would have wiped out the profit when both options get exercised, there is a point where the premium would have wiped that out completely, but it didn't happen in this case.

0184

Q. So in other words, as long as, from your point of view, there is some possibility of having a profit on -- or I should say a payoff on the options when they're in the money that exceed what their cost is from your point of view, then there is a reasonable possibility in profit?

MS. WIRSKYE: Objection. Form.

A. No. All that does is identifies whether a particular outcome produces a profit. In order to say whether something is reasonable, you need a benchmark or a pretty good definition of what the word "reasonable" means.

Q. (BY MR. DONOHUE) But I --

A. So there's another part to that equation, you know.

Q. All right. But I thought with your options when you make these comparisons, you have a Google option that has a one and a half percent possibility of a profit, am I correct?

A. Yes.

Q. So from your view point, there's almost any probability, going down to one and a half percent, that would in your view be considered a reasonable probability of profit?

MS. WIRSKYE: Objection. Form.

0185

A. Well, that is actually correct because that is the nature of options. That's how options are. So almost any numbers would be appropriate because that's what happens in the options market. Because of the fact that out-of-the-money options have a huge amount of leverage -- which I actually think a lot people don't really -- here may not understand what that means -- but because they have a huge amount of leverage, that one and a half percent option -- one and a half percent probability option, very little chance of paying off; but if it does pay off, it will pay off a very, very nice return.

And I think people don't appreciate that. Your average layperson doesn't appreciate that. That is the way it has to be. If it has that much leverage in it, it has to have a very low probability of profit or frankly we ought to all just quit our jobs and go trade options. We could make a lot of money rather easily if that were not the case.

So it is true that almost any numbers

would be reasonable. And that's the thing that sort of perplexed me about this case, is that options can have very, very low probabilities of profit. And I actually considered at one time simply testifying that any numbers would be reasonable, but I decided that, you

0186

know, maybe people wouldn't believe me. So I gave you some numbers to, sort of, back it up.

Q. (BY MR. DONOHUE) But do you actually believe that any probability for these options, no matter what it was, would be reasonable, do you believe that?

MS. WIRSKYE: Objection. Form.

A. I can't see any reason why not because the Google and S&P numbers, they don't go all the way to zero. They go pretty low, and that's what people face when they buy options.

Q. (BY MR. DONOHUE) Well, that's what people face when they buy Google options and S&P options, correct?

A. Well, this is a general characteristic of options. It is a general characteristic. We would not have to calculate this for every option in the market. It has to be because of the fact that options offer -- out-of-the-money options offer a great deal of leverage.

Q. So to get back to my question then, you feel as though that as long as the options in this case have a payout probability which is in the same range as a Google and S&P 500 options that in your view there's a reasonable probability of profit?

MS. WIRSKYE: Objection. Form.

A. Well, that is a characteristic of options, and

0187

I don't see why it wouldn't be considered reasonable.

Q. (BY MR. DONOHUE) So in your view, I suppose, almost any option, if you purchase the option from a dealer, should have a reasonable possibility or probability of profit?

MS. WIRSKYE: Objection. Form.

A. Well, I would have some problems if it went completely to zero. For example, if the premium on this option were more than the sweet spot pay off, that would run it completely to zero. I probably would wander in that case, but it would have to be a whole lot higher than it is now in order for that to happen.

Q. (BY MR. DONOHUE) So if -- for example, if the premium on this option were more than the sweet spot pay off --

A. Right. That would wipe out all possibility of profit. We would be looking at a situation of zero possibility of profit. Well, no one is going to pay anything for something where there's absolutely zero chance of making money. And the value -- you know, the value of the option would truly be zero at that point.

Q. Well, your value of the sweet spot, I thought you said, was less than .2 percent, correct?

A. Yes. But what I did just a second ago was to say what you paid for this option was large enough to

0188

completely eliminate any possibility of a payoff, and we would be looking at something that was completely valueless. And the model would tell us -- if you were valuing it, it would tell you that you were -- that you had no value, and that would completely eliminate any

possibility of profit.
Q. Right. But if, in fact, it did not, even if you had that .2 percent chance of -- of having one option pay off -- if I understand what you're saying is -- in that situation, in your view, there would be a reasonable possibility of profit?
MS. WIRSKYE: Objection. Form.
A. Well, that might be difficult to say. If we were looking at -- I mean, I've got some benchmark numbers here. They run to 1.56 in one and four on the other. If something ran down to where it was -- you know, it took six digits to the right of the decimal place to see it, then I might start wondering about it. That would be really unusual. That would be much harder to -- really, it would be a lot harder to opine in that situation about whether that was reasonable.
But that didn't really happen in this situation. The numbers seem to be fairly reasonable in comparison to these numbers.
Q. (BY MR. DONOHUE) Let me ask you to turn to
0189
your rebuttal report in JBJZ, and that's Exhibit 2405.
A. Actually, I don't think I have that.
Q. Am I correct in your rebuttal report you were asked to take into account the total fees that were incurred on the transaction?
MS. WIRSKYE: Objection. Form.
A. I was given a fee number for the maximum possible fees and was asked to consider different levels of fees because I was told the fees are in dispute in this case. And so that's sort of what you asked. I took the fees into account, but I'm not making any statement about whether any particular fee is correct or not.
Q. (BY MR. DONOHUE) All right. So what then did you do with this maximum number of fees?
A. Right. Well, what you do is these options were put together into -- I just call it a pool or a portfolio or combination or something. And what you do is when you combine them together, you look at all the possible outcomes. Each option has three outcomes. If you were to put two options together, you would have nine outcomes. There's a formula three to the number, you know, options.
And basically you identify each of the nine outcomes, and then you use either a bivariant or
0190
tri-variant normal probability method and it calculates the probabilities of each of the outcomes. And in some cases some outcomes will offset. Some they won't. You just run the numbers through there. You come up with a table that produces a number of which, without fees, is in my regular report. Then what you do is you go back -- when they give me the fees, I go back and I look at different levels of the fees and I determine which of the profitable outcomes do those fees slice off or -- I can't remember a number, but if a payoff was 200,000, the fee was 300,000. Then that particular outcome would be sliced off and in effect the probability that it be -- that it would occur would be removed from the probability of profit.
And as a result of that, I produced a table. The reason you see these numbers, such as on top

of page 2, less than 625,000 and it's 625 to two million three, these are profits that were combinations of just the way you combined the options that anything less than 625,000 wouldn't be -- the number wouldn't be any different.
Q. So in other words, am I correct that -- from your explanation, this didn't affect your overall probability determinations by including fees?
A. Well, you have tables there of the

0191

profitabilities of profits after the fees, so I would just qualify it and say these are -- that's what they are. They're probabilities of profits after taking into account the fees.
Q. All right. Let's take a look, for example, under profitability of profit given the volatility and correlation estimates. And in terms of your fees, could you tell us, for example, for the 60 day, what is your probability?
A. What fee do you want me to assume?
Q. Well, for both sets of fees.
A. Well, you read that as anything less than 625,000 in fees, the probability is about .4863. Anything between 625 and 2.3 million is .1376.
Q. So is that less than 1 percent in both cases?
A. Well, when you read -- well, .1376 is 13.76 percent, yeah.
Q. Right. I didn't know where -- your decimal placement.
A. I know what you mean, yeah, sorry.
Q. You don't have a percent sign there, so I wasn't sure exactly what you were referring to since your other table --
(Cell phone interruption.)
MR. DONOHUE: Can we take just one short

0192

break and see if I can -- hold on one second.
(Recess held, 3:05 p.m. to 3:16 p.m.)
Q. (BY MR. DONOHUE) Dr. Chance, I believe before the break we were talking about your probabilities in your rebuttal report, Government Exhibit 2405. And since you were showing your probability different on this than you were in your original report, could you tell us what your probabilities mean for both these that are less than and greater than $625,000?
A. I assume that what you meant by different was I didn't put the percent sign.
Q. Right.
A. The way I did it for less than 625, that number 0.4863 means 48.63 percent. That's a perfectly acceptable way to show a decimal. And sometimes you show the percent number and sometimes you don't. And it's hard to be completely consistent everywhere -- or every time you do it.
Q. So in other words, what you're finding is that for fees less than $625,000 the probability is 48 percent for -- you say the probability of profit for what? You don't take specific options here. So are you taking all three options?
A. These are a combination, whichever ones were combined in this particular case. I think it was three

0193

options although two of them were equivalent, and they

were combined together. I think I explained that a little bit earlier. You take all the possible outcomes and you sort of line them up and there would be nine outcomes. And you figure out what are the probabilities of the outcomes that are profitable.
Q. So in looking at all possible outcome and combing all three options, for fees less than $625,000 as you're finding the probability is 48 percent and for greater than 625,000 and less than 2,300,000 you're finding the percent to range -- well, roughly about 13 percent, correct?
A. That's correct.
Q. Now, I don't see any opinion in this report as to whether considering the fees these options still have a reasonable possibility of profit. I don't see that language in your rebuttal report. Am I correct, I didn't see that in your report?
MS. WIRSKYE: Objection. Form.
A. That's correct. Counsel asked me for the profitabilities after caring for the fees, and I produced a table and didn't specifically make a qualitative statement about the table.
Q. (BY MR. DONOHUE) All right. Now, are you familiar with a concept of expected return?

0194

A. Yes.
Q. What in your view is expected return?
A. Well, I always like to give an example when I define things, if you'll indulge me for a moment. We play a coin tossing game, fair coin, and toss it. You get a head or a head comes up. You -- I pay you $10. If tails comes up, I pay you $5. And you would say, well, what is my expected pay off from this coin tossing game? And you could do the mental arithmetic and you come up with 7.50. We can toss the coin one time. You're not going to get 7.50. You'll get ten or you'll get five.
But what that means is over a long period of time or having done this many times that would be the payoff you would get on average. That's what -- that's the expected payoff you would -- to get the actual return, you would have to divide that by what you pay because, of course, I'm not going to play this game with you unless you pay me some money.
Q. Would it be fair to say that expected return in terms of your expected return would be the meaning of all possible payouts?
A. It is the mean -- I always want to qualify that a little bit because most of the time when someone says mean they mean average. And most of the time if

0195

you don't qualify that, they think of it as an equally-weighted average. Coin tossing is okay for that, but most events in the financial world don't have equally-weighted averages, so...
I know I'm taking this probably further than you wanted, but it's a probability weighted average.
Q. All right. And that's what I meant by mean. Isn't that normally the meaning of the word "mean"?
A. It is, but so many people use a mean -- use the word "mean" --
Q. To be average?

A. -- average.
Q. Right.
A. And most of the time when you say an average, like what's your average cholesterol or something, you know, you just add them up and divide by the number and that's really not the way it is in the financial world.
Q. But I was using the word "mean" in its technical sense.
All right. So you agree with me then that expected return is the mean of all possible outcomes?
A. Yes.
Q. Okay. I did see a calculation in your report

0196

of expected returns. Did I miss anything in your reports or was it in there and I did miss it?
A. You're asking me if you missed something?
Q. Yes, sir.
A. I mean, what are you asking me exactly?
Q. I'm asking you was there any determination on your part of expected returns in your report?
A. For Google and S&P.
Q. For Google and S&P there was --
A. In order to get those probabilities I had to come up with an expected return for Google and S&P. I'm assuming that's what you think you might have missed.
Q. So you're saying in your report in order to arrive at the probabilities, you determined expected return for the Google and the S&P options?
A. That's correct.
Q. And where are those calculations?
A. You want to see the section?
Q. Yes.
A. Sure. Give me a moment. It looks like page 34, 35. If you would, take the last full paragraph on 34 (as read): It is necessary to estimate the expected return on the stock or index.
And they go on to explain how they do it.
Q. And when you -- you're using the term

0197

"expected return" there, how are you using it? In what sense?
A. Well, it is an estimate -- it's an indirect estimate of the mean of the expected outcomes, but how it's estimated is using a model called the capital asset pricing model. And basically what you do is you get some pieces of information about the stock, some pieces of information about the market, the risk-free rate, and it goes into the formula and, you know, you come up with a number.
Q. Did you, in turn, do an expected return analysis of the options in these cases?
A. Well, this goes back to the question we discussed earlier. I made the assumption that the expected return on the currencies was zero. Now again, just a moment ago I think you said expected returns on the options. This is not the expected return on the Google or the S&P options. It's the expected return on the stock, Google, S&P. So I'm not sure -- if you might have been confused about that.
Q. Until you said that I was confused because you're saying you first determined an expected return on the underlying stock?

A. That's correct, yes.
Q. Okay. But you didn't determine an expected

0198

return on the options, am I correct?
A. That is correct, yes.
Q. Okay. That's -- that's what I thought, and I now thank you for clarifying that.
Did you -- did you for the options in this case, the foreign currency options, did you make a determination of expected return?
A. No.
Q. And is there some reason why you did not?
A. Well, I don't think the issue is relevant at all in this case because I was asked to determine whether there was this reasonable probability of profit and expected return on the option. It's a number that comes from probability. Expected return comes from probability. Probability doesn't come from expected return. So I had no reason to have to do that.
Q. Well, how can you make a determination if, in fact, there's a reasonable possibility of profit if you don't know if you're expected profit is positive or negative?
A. Well, if you asked me -- you or someone asked me I want this piece of information, and I give you that piece of information and I don't want -- I don't need some other piece of information to give you this piece of information, then I'm not going to get that other

0199

piece of information for you. They asked for probabilities of profit and that's what I produced. It's not necessary to produce the expected return on the option. It's that simple.
Q. But am I right you said you were equating the term "reasonable probability of profit" with the term "reasonable possibility of profit"?
MS. WIRSKYE: Objection. Form.
Q. (BY MR. DONOHUE) Didn't you say that?
A. That's the way I interpret that.
Q. So you were asked to determine reasonable possibility of profit, correct?
A. I'm not really sure. Let me clarify that because I interpret the word "possibility" in this context to mean probability. I think counsel made it clear to me that's what it means. Counsel did not request an expected return on the options. Now, I provided you probabilities of profit. Now, the Court can have discussions about whether the word "probability" and the word "possibility" mean the same thing in this context. You know, that's sort of out of my purview. But that's the best interpretation I can make with the advice of counsel that that's what that means.
And I can't -- I don't think there's any

0200

way I can go from the word "possibility" to the word "expected return." It just doesn't make sense. You know, if a judge were to say, well, it is what that means and you should calculate it, well, certainly I'll be glad to do it. I'll let the legal system figure that out. But there's just no way I can do that because it does not seem -- I hate to use a pun -- it doesn't seem reasonable to do that.

Q. So in other words, from your point of view a determination of expected return on investment has no relationship to whether or not the investment has a reasonable profitability of profit?
MS. WIRSKYE: Objection. Form.
A. Not necessarily. If all you want to know is is there a reasonable possibility of profit expected return, it can be all over the place.
Q. (BY MR. DONOHUE) What do you mean by that?
A. Well, it's very easy to create examples where you have negative expected returns and relatively high possibilities of profit. And it's possible to have a very low possibility of profit and have a rather significant positive expected return. I mean, those examples are quite easy to construct.
Q. (BY MR. DONOHUE) All right. So I come back to if that's the case, is there -- in your view is there
0201
a relationship between having a reasonable possibility of profit and expected return?
MS. WIRSKYE: Objection. Form.
A. It depends on what you mean by relationship. If you mean there is a -- let me back up. There is a mapping -- that's a technical term used -- but there's a mapping between probability and expected return that you can go from one number to the other number. But whether something is a reasonable probability of profit -- or whatever it is, whether it's reasonable or not reasonable, you can have expected return pretty much all over the place because it depends on the payoffs.
Expected return would take into account the payoffs and the probabilities. And all you have to do is change the payoffs, you can leave the probabilities what they are, and you can get all sorts of results that are simply inconsistent with the position I sense that you-all are taking on this. And I don't think -- there's no linkage there between reasonable probability of profit and positive or high expected return. It's just too easy to construct counter examples.
Q. (BY MR. DONOHUE) Well, in your view, can an investment which has a material negative expected return have a reasonable possibility of profit?
0202
MS. WIRSKYE: Objection. Form.
A. Yes.
Q. (BY MR. DONOHUE) And could you explain how?
A. Well, you can easily construct an example. You can construct an example with a 50 percent chance of -- a payoff of 50 percent and a 50 percent chance of losing, and that is a 50 percent chance of making money and yet in that example there you have a 25 percent negative expected return. If you invested, say, 100,000 and returned 150,000, you would have a negative expected return. I don't know whether 50 percent is reasonable. I mean, it would be reasonable to me and I think it would be reasonable to most people, but it strikes me that there's a case where there's a relatively high probability of making money and yet the expected return is negative.
Q. Well, you just said a minute ago that one factor that takes -- that is taken into account with the expected return is, in fact, the payout. Didn't you

just say that?
A. That is correct.
Q. And your probability does not take into account the payout, correct?
A. That is correct.
Q. For purposes of determining whether one has a

0203

reasonable possibility of profit, do you feel it's necessary to take into account what the payout is of the investment?
MS. WIRSKYE: Objection. Form.
A. No. Let me give you an example. I'll go back to our little coin tossing game. Assuming you have a fair coin, we can make those payoffs anything. I can make them reasonable or unreasonable. In other words, I can make them high or low or I can say, you know, the old heads I win, tails you lose. We could put all sorts of payoffs there. We don't affect the probabilities of that coin toss. And just as in this case, these probabilities that these exchange rates will hit certain levels that participants in this market don't have control over. So I think I'm answering your question. I'm not sure. You can feel free to rephrase it or restate it. But, you know, the probabilities are what they are. They reflect the relatively likelihood of certain events taking place. And you could make the payoffs whatever you want to make them.
Q. (BY MR. DONOHUE) Well, I understand you can make the payoffs whatever you want to make them. But if you do make the payoffs such that you would arrive at a material negative expected return, I'm having a hard time understanding why, in your view, that would not

0204

affect your view as to whether or not this was a good investment?
A. That's not what you asked me earlier. I think you said whether it would affect my view of a reasonable possibility of pay off, whether it's a good --
Q. No, I said profit, not pay off.
A. Profit. Well, whatever. I mean, it's really not -- I mean, we're okay on this. And I said it wouldn't affect that. Now, whether you should make the investment or not depends on a lot of things. It depends on possibly your assessments of the profitabilities. You may have different opinions than others. That wouldn't happen in our coin tossing game, of course, but you may have different opinions. Of course, it may be optimistic. And whether you're -- you know, whether you're willing to make the investment. Am I willing to spend this money given what I think will happen? You know, I don't know whether that's necessarily a reasonable investment or not.
Q. Do financial analysts use expected returns in making a determination as to whether an investment is a good investment?
A. Well, they're supposed to.
Q. Do you?
A. Well, I'm not a financial analyst and I'm sort

0205

of a boring investor. I sort of buy things and hold them.
Q. Are you a financial economist?
A. I think we, yes, we can be called financial

economists. But financial economists don't specifically make recommendations on individual investments.
Q. You might make recommendations for your own investments, right?
A. Right.
Q. Well, am I right that expected return is a common tool that financial economists and analysts use in making a determination as to whether the investment is a good investment? Am I correct?
MS. WIRSKYE: Objection. Form.
A. Yes, it is a number. It's a piece of information.
Q. (BY MR. DONOHUE) What in your view is, if anything, the relationship between a good investment and the reasonable possibility of profit? Are those, in your view, terms that are synonymous?
MS. WIRSKYE: Objection. Form.
A. No.
Q. (BY MR. DONOHUE) And how are they different?
A. Well, as I said, you could have a situation where there's a very small possibility of a very large

0206

profit, a very large possibility of perhaps losing all your money. And you could have a positive expected return. And that expected return is a number that goes into what this thing costs. And you may believe that it's a pretty good bet. You may believe those are good terms and conditions. Even though the odds of paying off are very low. You may have a different opinion about what those odds are. You may have a certain amount of personal confidence that you know where something is going. You can even illegally have inside information. There all sorts of reasons why someone might, with a very low pay off, take the plunge. And entrepreneurship is a classic example of it. People start businesses, and oftentimes the odds are stacked heavy against them but yet they're optimistic because they have confidence and --
Q. We're not talking about --
A. -- could very well have -- you know, they could be so optimistic they have a positive expected return and the odds are stacked against them. And of course, some make it and they become famous and -- most of them, you know, you don't hear from.
Q. Well, I'm not talking right now about entrepreneurship. I'm talking about investment and --
A. Hold on. Entrepreneurship is an investment,

0207

and you can't say that that's not relevant.
Q. Well, I'm not talking about entrepreneurship. I'm talking about something other than entrepreneurship. So with that in mind, at least in your view, you don't feel that your -- that an investment that has a materially expected negative return has any effect whatsoever on your view as to whether there's a reasonable possibility of profit on an investment --
MS. WIRSKYE: Objection.
Q. (BY MR. DONOHUE) -- am I right on that?
MS. WIRSKYE: Objection. Form.
A. Let me just say, you could have a high probability -- possibility, whatever word you want to settle on, of profit and you could have a negative expected return. And all I'm being asked in this case

to do is to determine if there's reasonable possibility of profit. And that is my understanding of what the legal issue is. I realize you-all are going to fight that out in court and all, but it's my understanding that that's the issue.
And I've calculated that number and your experts have said these things have negative expected returns. My response to that is that so what. You know, maybe these investors had different opinions about these probabilities. Maybe they were more optimistic.

0208

Maybe they were willing to take that risk. I mean, I'm not inside their heads. I don't know what their thinking was on this. But if all have I to do is say is there a reasonable possibility of profit, I look at these numbers and, you know, it looks like that they are.
Q. (BY MR. DONOHUE) But your definition, if I understand you correctly, of a reasonable possibility of profit is simply looking at probabilities and comparing those probabilities to what you have determined to be the probabilities for S&P and Google options, correct?
MS. WIRSKYE: Objection. Form.
Q. (BY MR. DONOHUE) That's how -- that's your view of the definition of reasonable possibility of profit, correct?
MS. WIRSKYE: Objection. Form.
A. Reasonable possibility of profit is in my view what kinds of odds -- what kind of odds do option investors normally face. And Google and S&P are not used to specifically say, hey, I'm comparing them to Google and S&P. I'm using them as representatives of options. There are thousand of options. I couldn't pick them all.
Q. (BY MR. DONOHUE) But in your view it makes no difference. For example, if one materially over pays

0209

for the particular option one acquires, in your view that doesn't affect whether or not there's a reasonable possibility of profit?
MS. WIRSKYE: Objection. Form.
A. Well, it didn't in this case. But as I explained a little bit earlier, if they had paid more than they paid, there is a threshold point that it would have changed things.
Q. (BY MR. DONOHUE) Yeah. If, in fact, they ultimately as a result of what they paid don't make money on the options, I believe you said before then in your view that would affect it. But short of that, it doesn't make any difference if they materially overpay, correct?
MS. WIRSKYE: Objection. Form.
A. That's correct. That's taken into account.
Q. (BY MR. DONOHUE) Okay. Let's return to the sweet spot. A sweet spot, am I correct, was two pips wide?
A. That's correct.
Q. In your experience have you ever heard of an option spread that had a difference in strike prices of two pips?
A. No, I have not.
Q. Did you consider that to be unusual?

0210

A. Well, it's important to point out that these are over-the-counter options. I know that I explained this morning there's a great deal of -- or great lack of transparency, and that means that when these things get done, you know, nobody is going to broadcast them on the Internet. They're not going to be collected and put in some database. And I don't know whether I can say that's unusual or not in comparison to what else is out there because there's just not enough transparency in digital option spreads. So it's a small spread, that's about all I can say. But to say it's unusual, you have to have something to compare it to.
Q. All right. We discussed before the term "calculation agent," and I believe you mentioned that you believe that Deutsche Bank was the calculation agent on these options. Am I right?
A. Yes.
Q. As part of their role as calculation agent, was it their determination as to determine what was the spot price of the option at expiration?
A. That's correct.
Q. Do you know how --
A. Hold on. It's not spot price of the option. It's the spot price of the currency.
Q. Spot price of the currency.

0211

A. I realize that's what you meant.
Q. Do you know how dealers proceed to determine what is the spot price of the currency at expiration?
A. Well, it's interesting that you can write into a contract -- you've certainly heard this -- a specific procedure for determining what that is. You can -- you could say that, you know, at a certain time on a certain day you're going to call certain dealers and you're going to -- oftentimes they'll take the quotes and they'll average them and come up with some number. And that's what I've always heard they do things along those lines. But I won't say that's true in every case because as it is there's only -- I mean, there's transparency -- or lack of transparency here. So we don't know exactly what they do, what would be the sort of standard way of doing it.
Q. So if I understand your answer, you have a guess as to what they may do, but you really don't know. Is that a fair statement?
A. That's correct, yeah.
Q. Did you see any reference in any of the confirmations or supporting documents to how the spot price of the options at issue in this litigation was supposed to have been determined at expiration?
A. Well, I don't recall how -- seeing anything of

0212

how they were supposed to have been done. I don't think that was written into the contract. I do know that your experts presented some discussions about E-mails and things like that about that, but I don't recall an official Deutsche Bank statement in that confirmation letter.
Q. So given that there was nothing in the contract that required the Deutsche Bank to choose some specific methodology or use some specific methodology in selecting a spot price of the currency at expiration, what in your opinion was the latitude that the Deutsche

Bank had in selecting a spot price of the currency at expiration?
A. Well, they had some latitude in it. I would like to think that someone would do it in a fair and honest method. If it were me, what I would do is I would do probably what I said a moment ago, I would probably have some procedure for calling other dealers and I would probably throw out some of the extreme values and average what's left.
It would also be important to take into account the bid and the ask, so I would probably ask for a dealer midpoint quote and average them and as I said probably throw out the extremes. Again, they didn't have to do it that way, but that's probably what I would
0213
do if I were trying to, you know, do it in a fair and honest method -- manner, I should say.
Q. But could the Deutsche Bank in effect in their role as calculation agent and given the two pip wide spread, could they have, in fact, determined spot price in a way reasonable to have totally excluded the possibility of any sweet spot occurring?
A. Yes, I think they could.
Q. Well, if that is the case, why would you have -- if they could have reasonably selected a spot price such that the sweet spot would not be hit, why did you take into account in your own work the possibility that the sweet spot could be hit? If you recall, you took it into account in your profitability calculation.
A. Yes. I don't operate from the assumption that they're engaging in fraud manipulative behavior. I think that's a pretty heavy charge to level against them. I would like to think they're reasonably honest people and they are, you know, an honest bank and they've been given a lot of awards for being, you know, an outstanding derivativus bank. And somehow I just get the feeling that if you did that on a fairly routine basis, eventually it would catch up with you.
And I refuse to make the assumption that they would engage in that kind of behavior. It's a very
0214
heavy charge all for the purpose of knocking .2 percent or whatever the number is, you know, off of my number.
Q. Well, but I just -- maybe I'm wrong. I just thought that the Deutsche bank in your opinion could reasonably had selected a spot price at expiration so as to exclude the possibility of the sweet spot being hit. Didn't you just say that a minute ago?
MS. WIRSKYE: Objection. Form.
A. The word "reasonably" is very important here.
Q. (BY MR. DONOHUE) Yes, and that's why I used it.
A. Right. And what you're saying is they have some latitude in order to have chosen one or the other. And could they have done this and gotten away with it, yes it's quite possible. But I sort of liken it to this. Suppose we had a little lottery in this room here and we all put our name on a piece of paper and we put it in a hat. Let's decide by the end of the day I'm tired of you, no offense, and I don't want you to win. So I kept an eye on your little piece of paper. In fact, your little piece of paper has got a little mark on it. So I stick my hand in the hat and I make sure I

don't draw your piece of paper.
And that strikes me that as that you are manipulating the outcome so that something that you
0215
don't want to happen would occur. Now, could I do that reasonably and get away with it? Yes, quite possible I could get away with it. I refuse to make the assumption that Deutsche Bank would do that. And even the fact that there were E-mails you-all have presented discussing it, doesn't necessarily mean they would do it. It's just a pretty heavy charge or assumption to make in order to eliminate .2 percent off of a number like 19 percent or something.
Q. Well, it seems in one case you're saying they could within their discretion reasonably do this, but then you seem to be implying that if they did it, it wouldn't be reasonable. It would be manipulating the end result. So which is it? Can they do it reasonably or if the only way they can do it is to manipulate the end result? Which is it?
A. Well, I assume when you said reasonably a moment or so ago what you meant was could they do this and get away with it. Now, if you're asking me whether if reasonable means ethical -- I don't think it does, but... -- then I would disagree with you. But I think what you were saying was could they do this, could they possibly do it and get away with it. And I'm thinking I don't see why that couldn't happen. I couldn't say they would get caught.
0216
Q. Well --
A. But what I'm telling you is, is that it would certainly not be ethical and would probably be fraudulent and --
Q. Well, if it's not ethical and fraudulent, it's not reasonable, correct?
MS. WIRSKYE: Objection. Form.
Q. (BY MR. DONOHUE) Right?
A. Again, it depends on the word "reasonable." I thought you meant could they get away with it.
Q. I excluded fraud and I excluded manipulation. Do you want to go back on what you said before, there's no -- you said before, I thought, that the Deutsche Bank could reasonably had selected a spot price to exclude the possibility of sweet spot being hit. Do you recall that prior response?
A. I recall it, but I --
Q. Okay. Now, if you want to qualify it, that's fine.
A. Sure.
Q. When I say reasonable, I'm excluding fraud. I'm excluding manipulation. I'm excluding anything unethical. Do you -- given how I've now defined reasonable, would you like to change your answer?
A. Yeah, I think it's a different thing.
0217
Q. Okay.
A. I think if it hits -- if the ask hits inside the sweet spot and they choose the bid, the bid hits in the sweet spot and they chose the ask, then I would say that that's fraudulent and I would say, yeah, I mean, that's not unreasonable. Would they get away with it? You know, it's quite possible they would certainly get

away with it.
     Q.   But whose bid and whose ask?
     A.   Well, that's another issue is where does the number come from. I mean, they could potentially ask themselves -- in fact, call one of their foreign exchange traders and ask for a number or they could get it from another bank or they could average it. I mean, there's all sorts of places they could get it from. So they have some latitude there. There's no question about it. But in doing so they were trying to make it such that the sweet spot could never be hit, then I would say that -- I mean, again, I can't say it's anything but fraudulent.
     Q.   But do you think there was any connection between this 2 percent -- this two pip difference in the strike price and the Deutsche Bank's ability to control the sweet spot never being hit? Do you think there was any connection between that two pips and the Deutsche
0218
Bank never being able to pay out on the sweet spot?
     A.   Well, I don't know because I don't know where you came up with the two pips. I mean, in these options you come up with the terms, but you're saying is there a connection between the two pips and their ability to avoid having to pay off. I mean, I don't know. I mean, you know, a minute earlier it gave them some latitude. You know, it wouldn't have worked if it was really far apart, but I don't know, you know. And, again, I'm just not going to accuse them of manipulating the outcome.
     Q.   But there's a difference between manipulating the outcome -- I assume you'll agree with me -- and their having the flexibility to chose a spot price of the currency to expiration which, in fact, would exclude the possibility of the sweet spot being hit?
               MS. WIRSKYE: Objection. Form.
     A.   Well, I use manipulating as a slightly more generic term to mean engaging in some sort of fraudulent result. I don't -- some people may think manipulation means they go in and they trade and they try to make the price move. And I agree, that would be a form of manipulation.
               But I'm just saying their ability to choose either side with the full intention of choosing the side that absolutely would not pay off the sweet
0219
side, then to me that would be fraudulent. And I think that would be manipulating the outcome so that the outcome serves their purpose instead of is the outcome of a fair process.
     Q.   (BY MR. DONOHUE) I'm going to hand you what's been marked as Exhibit 2369. Have you seen this document before? It was cited in one of the Government's expert's report?
     A.   Well, I read the Government's expert reports. So I would have to say I probably did see it.
     Q.   You notice that in the body of the E-mail the author of the E-mail is responding to the fact that (as read): In the event of any question you might have as to the rate that the Deutsche Bank set, the practice we follow is (which is industry standard) is as follows: We pulled five interbank FX participants at 10 a.m. on determination date for their spot FX dealing rate. Deutsche Bank chooses one of these rates and a specific

price on or within that quote. The counterparties we currently use are...
And then it lists five counterparties. Do you see that?
A. Yes, I see that.
Q. And did you notice that for those rates he gives example of both the bid and ask price?
0220
A. Yes.
Q. Do you see the differences there of the various bid and ask prices?
A. Yes.
Q. And are those differences greater than two pips?
A. It looks like they're about three. You're talking about the bid and the ask difference, not the difference between the bids?
Q. I'm referring to actually both, the bid and the ask difference as well as the difference between the various bank bid and asks?
A. Well, we have to sort of look at these numbers along two dimensions. If you look at the bid and the ask it looks like there's three pip difference in each case. If you look sort of vertically in one of the dealers, there's two pips -- a couple of them are identical. There's a three pip difference and -- well, actually three of them are identical on the bid. Have I answered your question.
Q. Well, take a look, for example, at CitiBank. Do you see 109.3?
A. Yes.
Q. And then if you go to Morgan Stanley for their ask price, it goes -- do you see that, the 109.09?
0221
A. I see 109.06.
Q. But that's a bid. Take a look at what the ask is.
A. You said 109.09. I don't see a 109.09 anywhere actually.
Q. Take a look at Morgan Stanley.
A. Oh, okay. All right. I do see -- yeah, there's a typo in here and --
Q. Right, there's a typo with a period missing. But I assume you, being the scholar that you are, thought --
A. Yeah, I just didn't pick up on it.
Q. But I mean, there between that .03 and the .09 there's actually a range of six bids, right?
A. There is.
Q. Could the Deutsche Bank given what you you've seen as their practice in terms of selecting a spot price and expiration, could they have reasonably chosen a spot price that would, in fact, have eliminated the possibility of a sweet spot?
A. Well, I continue to be bothered by what you mean by the word "reasonably." Could they have chosen any one of these and gotten away with it, the answer to that is yes. Would it have been fraudulent and manipulative? If they intentionally chose one that was
0222
out the sweet spot and perhaps one of the others was inside the sweet spot, then I would say they probably could get away with it, but I would say that would be

fraudulent.
Q. And why would it be fraudulent?
A. Well, they're taking the outcome -- they're taking a handful of outcomes and they're intentionally making sure that the option of the sweet spot does not pay off, and I would strike that as -- I would assume or I would consider that to be fraudulent.
Q. Then why?
A. Because basically they have eliminated any possibility that -- their intention is to eliminate any possibility that that sweet spot pays off. Just as if we put, you know, our paper in the hat or something and I've got my eyes on yours and I make absolutely sure I don't draw yours. Could I get away with that? I probably could.
Q. Well, but you're calling it fraudulent. To me fraudulent is either a civil or criminal issue here, and I would like to know what your basis is for calling it fraudulent.
A. Well, I was --
Q. You're just within your ability as a calculation agent making a determination. It so happens

0223

to favor you, but you have that ability. What's fraudulent about that?
MS. WIRSKYE: Objection. Form.
A. Well, I think if you make sure that the outcome never -- let's say, the outcome that hurts you a lot never occurs, I would say that's fraudulent. Now, I'm not denying that you could do it and get away with it. Yes, certainly. But I would consider it fraudulent.
Q. (BY MR. DONOHUE) Do you think the investor could sue on the basis -- on that basis that it -- that somehow the Deutsche Bank is selecting a spot price in a situation which comes within the two pips, mind you, but that doesn't favor the investor but favors the Deutsche Bank? Do you think it could sue and prevail on that?
MS. WIRSKYE: Objection. Form.
A. Well, anybody can always sue.
Q. (BY MR. DONOHUE) Sue and not prevail. I'm familiar with they can sue.
A. Well, I'm not sure whether they could prevail or not. Nobody --
Q. All right.
A. I mean, nobody really knows that. But could they make a reasonable argument that if they could show a pattern that this is being done -- and I would think

0224

that they could. If you could actually show, say, a handful of quotes like this, some of them were within the sweet spot area and that there was a pattern in which you were always choosing one that was outside of the sweet spot area, I would think they would have a pretty good argument.
Q. Well, the Deutsche Bank and the investor, do you know whether given the overall terms of these transactions, whether the investors actually even considered the possibility of their having a one option payoff?
MS. WIRSKYE: Objection. Form.
A. I wouldn't know what the investors considered.
Q. (BY MR. DONOHUE) All right.

A. I mean, that would be something going on inside their heads. I wouldn't know.
Q. Do you know as to whether the Deutsche Bank hedged the possibility of the sweet spot being hit?
A. Well, I remember reading in your expert's report a claim that they did not hedge. And while I didn't, you know, go through and verify that, I suppose I could accept that as probably being true.
Q. If they did not hedge the sweet spot, would the Deutsche Bank have an incentive on their part within the confines of their role as calculation agents to

0225

ensure that the sweet spot did not occur?
MS. WIRSKYE: Objection. Form.
A. You said -- let me make sure I got the question right. You said if they didn't hedge, so they had some exposure to the sweet --
Q. (BY MR. DONOHUE) Yeah, they had exposure on these options.
A. -- to the sweet spot, would they have an incentive to make sure it didn't happen, is that what you're asking me?
Q. Right.
A. I suppose they wouldn't want it to happen, but if you're asking me if that incentive was powerful enough to make them somehow manipulate the outcome, I don't know.
Q. Would you consider this if this -- which I showed you in Exhibit 2369 -- is their practice and if using their practice they deliberately chose a spot rate that would exclude the possibility of the sweet spot being hit, would you consider that manipulative?
MS. WIRSKYE: Objection. Form.
A. Yes.
Q. (BY MR. DONOHUE) And would you consider that fraudulent?
A. I would, yeah.

0226

Q. You note that -- take a look at your JBJZ report, Exhibit 2400.
A. What page?
Q. Page 10. Do you notice there where you point out in the second paragraph the dealers almost always hedge these positions?
A. Yes.
Q. And if you look right below that, you'll notice it states that some dealers are required to hedge their exposure. Do you see that?
A. I'm looking for required. I guess it's obligated is what it's -- yeah, it means the same thing, but I was looking for the word "required," so...
Q. Well, it's the next sentence.
All right. Do you know if the Deutsche Bank is one of those dealers that would be obligated or required to hedge their exposure?
A. It's my understanding that the dealers that I'm talking about are banks that, you know, our government regulates. And they don't allow the banks to gamble with people's money. No bank can ever remain perfectly hedged at all times. It's a dynamic process and all, but I do know that the bank regulators are looking at the bank's positions. And they're not allowing them to gamble with depositor's money.

0227

Now, I'm not exactly sure where Deutsche Bank falls in on this because I know it's a German bank. But I also know that Deutsche Bank acquired Banker's Trust a number of years ago, which would have certainly been a U.S. bank. So I don't know exactly where they fall in this process. So the answer is that I'm not sure, but I needed to qualify why I'm not sure.

Q. All right. If the Deutsche Bank did not hedge their exposure on the sweet spot, what in your opinion was -- what affect would that have in terms of their exercising their discretion as calculation agent to ensure that the sweet spot did not occur?

MS. WIRSKYE: Objection. Form.

A. Well, would they have been tempted to have manipulated the outcome? Possibly. Would they have actually done it? I don't know. Since it didn't actually occur, it's difficult to say would they have actually done it. But you're saying would they have had some incentive to do so, that's sort of like saying, you know, would they be tempted or have some reason to engage in this kind of behavior, which would be inappropriate, and, you know, I guess there might be some reason they might think about that, but I'm not sure it means they would necessarily do it.

Q. (BY MR. DONOHUE) What is the reason you

0228

think -- what do you think the reason is as to why the Deutsche Bank did not hedge their exposure on the sweet spot?

MS. WIRSKYE: Objection. Form.

A. Well, a couple of things. It's quite possible that they didn't put a hedge in at the start. They may have been -- one of the things they could have done is they could have put the hedge on later. I don't think there were any documents that actually said what they did later on. These positions that we call hedge -- let me finish this.

These positions that we call hedge -- hedging or hedged or dynamic and that means they have to make changes to it. They can't just -- it's not like it's a boat you put on the water and all because it will drift in the wrong directions. They have to make adjustments to them. When you put the transaction on at the very start, you're not looking at necessarily much chance of the sweet spot being hit. And you also don't have to worry for -- in Murphy's case, two months; in the other case one month -- you don't have to worry about what happens for a period of time.

But you can monitor this position, and it is quite possible that they might be able to put the hedge on later. But honestly I couldn't answer for

0229

Deutsche Bank as to why they didn't hedge it. It strikes me that they just considered the odds of it happening not to be all that great.

Q. (BY MR. DONOHUE) But even if the odds weren't that great in the event that there was an option in which had -- an option pair that had a one option payout, their exposure could be significant?

A. Oh, it definitely would be.

Q. I mean, wouldn't it be absolutely irresponsible and possibly a violation of their legal

obligations not to have hedged if, in fact, there was any possibility of the sweet spot occurring?
A. Well, I don't know what their legal obligations are. We talked about that a moment ago. They may be able to get away with some risks that, say, CitiBank, Bank of America might not be able to get away with. I'm not a banking regulation expert.
But I think what you're saying is did they run some risk of this happening. And, you know, the answer to that is -- I mean, there was some risk. It was not a very large risk. I couldn't tell you why they didn't choose to hedge it. I do know that any time a hedge is put in place, there's no such thing as a perfect hedge. There's always some risk. And they have risk managers -- in fact, they're one of the best --

0230

probably one of the best companies at doing this. They have people who monitor their positions, you know, to keep an eye on it. It's kind of like, you know, if you see the boat drifting close to the iceberg, I mean, you have some opportunity to do something about it.
I can't speculate about, you know, what their risk manager's thinking is on this, but all I can say -- I mean, there's -- you know, there's no question they have some exposure. If they choose not to hedge it, then they choose not to hedge it. You pretty much have to ask --
Q. Isn't it --
A. Let me finish. Just one thing.
You pretty much need to ask them as to why they didn't hedge it.
Q. But isn't one possibility as to why they didn't hedge it is because from their point of view the sweet spot was an illusion, it wasn't going to happen? Isn't that a possibility as to why they didn't hedge it?
MS. WIRSKYE: Objection. Form.
A. If you're saying that they were going to manipulate this outcome so that it never occurred -- I think that's what you're saying -- so that --
Q. (BY MR. DONOHUE) No, that's not what I'm saying.

0231

A. Actually, I think it is.
Q. Well, you and I differ in terms of what they can reasonably do. You're saying what they -- your view of what they would do in order to exclude the sweet spot is manipulation. I'm not saying that. That's your view.
All I am saying is, isn't it a possibility that, in fact, they did not hedge the sweet spot, isn't the reason -- one possible reason why they didn't because they considered the sweet spot an illusion that wasn't going to happen?
A. That's a little bit different from saying what they would do if this thing were about to expire and it was right in between the sweet spot, you know, what would they do or how would they use these different quotes and all to help them.
You know, what I'm saying is -- and I said this earlier, I made this real clear earlier -- could they have used that flexibility and gotten away with it? Well, of course they could have. If that's what you want me to say, I mean, I'll state it, yeah, they could

have gotten away with it.
Q. You mentioned before that the effect, from your point of view, of this sweet spot was simply almost a -- it had an insignificant, almost totally negligible effect on the terms of your overall probabilities.
A. That's correct.
Q. So you're saying from your point of view you really didn't think this would make a difference one way or the other, correct?
A. Right.
Q. But would it have a -- would it make a difference in terms of the net premium ultimately paid by the investor or the taxpayer in this case?
A. Well, this actually goes back to something you asked me earlier which had to do with what is the value of the sweet spot. And because I was not asked to calculate that value, I don't think I can answer that question.
You know, if one calculated that value of the overall position, incorporated the sweet spot into it, I mean, I don't know that I could say exactly whether it would have a large or a small effect. These are the kinds of questions where, you know, I would rather crunch a number and answer it, you know, if I had to than to just to try to speculate on what effect it would have.
Q. Well --
A. I mean, it would have some effect, but it might be small, it might be large. I just don't know.
Q. Did you see in reading the Government's reports that they, in fact, did make those calculations?
A. That they did make the calculations?
Q. Yes, of what the effect would be in terms of the sweet spot -- eliminating that value of the sweet spot in terms of the overall net premium. Did you see their discussion of that issue?
A. I'm a little bit confused about this. When you say in "terms of the overall net premium" --
Q. Yes.
A. -- I did read the Government's report. I didn't study it in great detail. I don't remember anything specific about that, but if it's in there then I would have read it. But I don't know what you mean when you say the overall net premium. You know, they paid 25 million for one and 26 million or whatever for the other.
Q. So in your example the net premium there was $1 million, correct? And isn't some portion of that net premium, $1 million, doesn't that represent a value for the possibility of hitting the sweet spot?
MS. WIRSKYE: Objection. Form.
A. Well, I'm not sure I can really answer that question because I don't know how they came up with the numbers that they -- the 25 and the 26 million. I don't know how they came up with the numbers.
Q. (BY MR. DONOHUE) Well --
A. I do -- let me finish one thing.
I do know that if counsel had said to me I want you to calculate the values of these options, you know, on the transaction day I want you to, you know,

put a table in your report with these numbers, then the value of the sweet spot would have been embedded in those numbers. I don't know if I would have separated it if they asked for it and all.
But I don't know given what the prices -- what they actually paid for the options, I don't really know how much of that reflects the value of the sweet spot, whether it's zero or some big number. I don't know because, you know, I haven't -- it's just not something that I studied.
Q. But I thought we discussed this issue before where if, in fact, you determine the value of the long option, you determine the value of the short option, and you take the differences in those values, that that difference would include some value attributable to hitting the sweet spot, didn't you say that?
A. Now, I just want to be careful about one thing. I did not do that.
Q. I understand.

0235

A. But I'm thinking you're speaking in hypotheticals.
Q. Right.
A. If someone did that, that should reflect the value of the sweet spot. Somewhere embedded in that number is that value.
Q. And if, in fact, that value of the sweet spot represented some of the net premium, some material -- some, say, anywhere from 25 percent to 35 or 40 percent of the overall net premium, in that event wouldn't there be some significant impact as to whether or not the sweet spot was or was not a real possibility?
MS. WIRSKYE: Objection. Form.
Q. (BY MR. DONOHUE) Do you understand my question?
A. Well, let me restate it and you tell me if I've got it right.
Q. Okay.
A. You're saying if we had a number that was calculated on the day of the transaction and it was the overall value of the loan, you know, minus short, and some part of that number would reflect the value of the sweet spot. And I think what you were saying was if that number was in there -- we don't know what that number is -- and the sweet spot couldn't be hit, then --

0236

maybe you need to fill in the rest of it. I've forgotten it.
Q. I think you missed a significant portion. I told you whatever that number was it was material in terms of anywhere from 25 to 35 percent --
A. If it were material.
Q. -- of the net premium. In that event wouldn't it make a difference as to whether or not the sweet spot was a real possibility?
A. If the value of the sweet spot were material, would it make a difference as to whether the sweet spot was -- could be hit? And I would say yeah, I think so.
Q. I mean, isn't -- the point I'm getting at here. For example, if there was no real possibility of the sweet spot being hit and yet the investor, taxpayers were paying for that possibility, weren't they essentially overpaying on a net premium basis?

A. Well, that's an outcome -- if you're telling me the outcome has a zero probability of occurring and if they're paying some significant amount of money. Then yeah, they would be overpaying. They would be paying for something they have no chance of getting.
Q. Let me turn to a different subject. And we discussed this subject a bit before, so we'll try to expedite it . The options in the COBRA cases we said
0237
are over-the-counter options, correct?
A. Yes.
Q. And am I right what that means is there's no centralized exchange where we're going to, in fact, be able to go to and find these options, am I right?
A. That's correct. They're privately negotiated between two parties.
Q. If one wanted to determine the price of an over-the-counter option, how would one do it?
A. Well, you want to get the terms and conditions of the contract, exercise price expiration, and so forth and you need to come up with a volatility number, the value of the underlying and so forth. And you plug it into the Black-Scholes model, if that's an appropriate model for that kind of option. And you would have a number, at least it would be a starting point, you know, a term that I used earlier. So I think you would start with that.
Q. Do you know what the net premiums were -- the range net premiums that were in these cases and all of your reports, what did they generally range from?
A. I'm not sure I could say. I mean, there's a lot of numbers. If I were looking at the table, you know, I could figure it out, but they vary. I think some were less than 100,000 and some were I think more
0238
than a million.
Q. So with net premiums that were in that range, would you advise the investor to shop around to make sure you get the best price of the option?
A. Well, it kind of depends on the investor. I mean, I might mention, you know, you may want to shop around. But I know these particular investors are worth a lot of money, and it's kind of like -- it's like I tell my wife sometimes who wants to find the cheapest place to buy something, and I say just go to the most convenient place. You know, I remember one of these options had a $60,000 premium. Well, that's pocket change to these people. Maybe that's not a significant amount of money to them.
I would certainly tell them that they have alternatives. It's just like, you know, Macy's or Wal-Mart. But maybe it's not worth their shopping around. You know, there are some costs to spending some time shopping around here and maybe it wouldn't be worth it to them. But I certainly would make them aware that there are alternatives.
Q. You mentioned that particular taxpayers are taxpayers that have significant means in these cases, correct?
A. Yes.
0239
Q. And don't, for example, they have people who can very expeditiously and quickly make such

determinations as to what prices like this of options were going to be. Is that something difficult for them to do, to have the people on their staff make such a determination?

MS. WIRSKYE: Objection. Form.

A. I would think they could do that, but, you know, I don't know who they have on their staff. And some of these people may like to make their own decisions on things like this. They may like to be the person out front on this. I don't know. I would think they could though.

Q. (BY MR. DONOHUE) Do you know as to whether any of the taxpayers in these cases made any attempt to quote, unquote shop around and determine as to what the best price for these options would have been?

A. I'm not aware that they did.

Q. Do you know why they did not?

MS. WIRSKYE: Objection. Form.

A. I wouldn't have any idea.

Q. (BY MR. DONOHUE) Are you aware of the tax benefits that are related to these transactions?

A. I know that there are tax issues in this case. I don't know what they are. That's all I can say. I

0240

mean, you know, it's something beyond my area of expertise.

Q. All right. Take a look on page 43 of Exhibit 2400, in the last paragraph on that page -- the second last paragraph, you state that (as read): These transactions can benefit from diversification.

Do you see that?

A. Yes.

Q. Are you saying there when you say "these transactions can benefit from diversification" that the participants in, for example, the JBJZ partnership did benefit from diversification?

A. Well, can benefit says that there can be a benefit from diversification. As to whether there's a benefit from diversification depends on the individual case. And let's define benefit as being probability of payoff or of profit. I'm defining it that way because I think that's the way that you-all sort of want that defined. You might disagree, but it's my understanding that benefit to their argument is probability of payoff.

Now, whether these things benefit depends on which one you start with. Now, if I have an option or stock or anything, I'm sort of saying I've got an option here on my left hand. I'm going to call it A. And I've got one on my right hand and I'm going to call

0241

it B. When I pull them together and I calculate the profitability of profit -- of these two pulled together, it could be higher than the one for A, lower than the one for A, or higher or lower than the one for B. So it could be. And that's all I'm really saying. They can benefit from diversification. And it depends really on which one you're looking at, and in some of these cases there were benefits and some of them there were not.

Q. Did you make a specific determination as to JBJZ as to whether or not the options in that case benefitted from diversification?

A. Well, it's kind of a determination that in the course of looking back at the tables we could say

whether they benefited. We could look at the profitability of profit of the options combined and compare that with the individual options. And my recollection is I believe the options combined at higher probabilities, but I don't want to swear to that until I'm actually looking at the numbers in the tables.

Q. Would it make any difference of your determination if you took into account these?

A. It could potentially, yes. Now, there's one big problem you're going to have if you take into account fees. Now, as I've had -- the way I've had this fee issue explained to me is these fees -- I took the

0242

fees together in my rebuttal report and I looked at the fees compared to -- or the effect of the fees on the combined position. Now, one thing I did not do is look at them on the individual positions. I was not asked to do that. And I believe if I were asked to do that -- you know, if you wanted that information -- you would have to tell me exactly how many -- how much of a fee figure was -- or should be attributed to any one individual options.

It's my understanding it would be a little bit easier to do that at the combined level than it would be at the individual level. So it would be very hard to say. And I didn't do it on an individual level the effect of the fees. Unless you could give me or they could give me a number and say deduct this fee from this option and this fee from that option and so forth.

Q. Take a look on page 37 and the bottom of the page 38 of Exhibit 2400. You notice you state there that (as read): An improvement in diversification will increase the probability of profit.

Do you see that?

A. Yes.

Q. Do you know whether there was an increase in the probability of profit from the contribution of the

0243

options to the partnership?

A. Are you asking me whether there was an increase?

Q. Yes.

A. Well, again, I would have to be looking at all the numbers in order to say. And it also depends on which option you actually start with. If I had option A and option B and I pulled them together, does it actually increase? And, you know, if you indulge me to look at the tables, I could comment on that.

Q. Well --

A. I mean, if you want me to.

Q. Let's look at a look at your rebuttal report in the Murphy case. It's Exhibit 2406.

A. I don't have a copy.

Q. I think you'll need a copy of that.

A. All right.

Q. Did you notice -- for example, let's just look at Murphy Pork Farms.

A. You mean Murphy Pork?

Q. Yes, Murphy Pork.

I notice that you have there that the effective fees for amounts greater than $120,000 has the effect of reducing your probabilities to -- is that --

is that .2 percent?
0244
A. That's correct.
Q. Do you consider that to be -- to begin with, still a reasonable possibility of profit?
A. Well, it's pretty low. It's getting pretty close to zero. I don't want to say there's never been an option traded with a probability that low, but it's very, very low. I mean, it's certainly, you know, almost as low as you can get. Of course, we don't know whether those are the actual fees. I'm just giving you a table. You guys have to work out this fee thing.
Q. My only question is the way you determine reasonable possibility of profit if in your view at .2 percent is a reasonable possibility of profit?
MS. WIRSKYE: Objection. Form.
A. Well, I'm not sure I could say. I would just say it's certainly extremely low. That's all I'm willing to say on this. And -- I mean, you see a number like that you say well, it's very, very close to zero. And that's about as far I can say on that.
Q. (BY MR. DONOHUE) So you don't have an opinion one way or the other if --
A. It's in the gray area. I'm sorry.
Q. Let me finish.
You don't have an opinion one way or the other as to whether that 2 percent represents a
0245
reasonable possibility of profit?
A. .2 percent, but it's --
Q. .2 percent.
A. It's in the gray area. It's starting to look like maybe not.
Q. Would it be fair to say that that, at least as to that partnership, the contributions of the options to the partnership and assuming costs are greater than $120,000, that that was -- contribution of the options was economically harmful to the partners?
MS. WIRSKYE: Objection. Form.
A. On an after-cost basis it looks like it would be.
Q. (BY MR. DONOHUE) In gambling -- I don't know if you do that or not.
A. My students do.
Q. What would be your advice as a financial economist? Would you advise someone to essentially take their pool of money for gambling and diversify it into a number of different bets or just to make one bet?
A. I wouldn't even attempt to advise someone on gambling.
Q. But I'm asking you as a professional. I'm sure that even though my example deals with gambling, I'm asking you as a professional based on your
0246
background as a financial economist and your knowledge of probabilities, and I'm saying based on that what would you advise a person who has an amount set aside for gambling? Would you advise that person to make a number of smaller bets or one large bet?
MS. WIRSKYE: Objection. Form.
A. I don't have knowledge of gambling. I wouldn't do it. I mean, I don't think I could make any such advice about it. If I were forced to -- if someone

said look, you know, you need to help me out on this, maybe I would study the matter, but I've not really done that.
Q. (BY MR. DONOHUE) But do you know as to whether in gambling the odds favor the casino?
A. I think so.
Q. Now given that knowledge, that the odds favor the casino, what seems to be -- based on your knowledge of probabilities and statistics -- what seems to be the more prudent way to gamble? To take a sum of money and make a series of bets or just to make one bet?
MS. WIRSKYE: Objection. Form.
A. I honestly don't know.
Q. (BY MR. DONOHUE) Take a look at Table 8 of your JBJZ report at page 37, which is Exhibit 2400.
A. All right.

0247

Q. Am I correct that in that table you determined the conditions under which each partnership is profitable?
MS. WIRSKYE: Objection.
A. I don't think that's the exact wording. Each partnership?
Q. (BY MR. DONOHUE) I thought that's the title of your -- your table. Conditions under which each partnership is profitable. Right?
A. Yeah, that might actually not be the right wording myself on that.
Q. Okay. What is the right wording?
A. I think the conditions under which -- I was supposed to actually have said each option is profitable. I don't know why I came up with partnership. There's one column there for the Euro option. The other column is the Japanese yen option. I belive there's only one actual partnership in this situation. So yeah, that's probably mislabeled on the title. I'm not sure if that was your point anyway, but...
Q. Well, you're in this table making reference to the conditions under which -- for the -- the options of the JBJZ partnership, the conditions under which the options would be profitable?

0248

A. That's a correct statement.
Q. Did Table 8 take into account fees?
A. It's in the original report, so it doesn't take into account fees.
Q. At the time you did the original report, were you aware that there were significant fees that were incurred by the investor taxpayers on these transactions?
MS. WIRSKYE: Objection. Form.
A. I was aware there were fees. I don't know whether they're significant or not, but I knew there were fees.
Q. (BY MR. DONOHUE) And how did you come by that information?
A. They told me.
Q. When you say they told you --
A. Oh, counsel.
Q. Did they tell you how the fees were calculated?
A. No. In fact, I don't even to this day know

how fees were calculated.
Q. Did you, for example, know that the fees were calculated based on the percent of the taxpayer's desired loss on the transaction? Were you aware of that?

0249

A. Well, I think I became aware of that on reading your expert's reports. That sounds somewhat familiar, but I don't recall their telling me that. In fact, I'm pretty sure they didn't tell me that. I do know I saw it in your report.
Q. Well, nevertheless, you did know that there were fees at the time you did your original report, correct?
A. Yes, that's correct.
Q. Is there some reason knowing this that you didn't say, I've been asked as to whether there's a reasonable possibility of profit. I better find out all fees that were connected with this transaction. Is there some reason that you didn't inquire further and get that information?
A. Well, I asked them if they would like me to calculate the profits and fees, and they said not at this point in the report -- I mean not at this point in the process for this report. And we can introduce that information at a later point.
Q. Who did you ask?
A. Mr. Welty -- there was another attorney who's actually not -- you know, he's left the firm now. I can't remember specifically which one -- and we may have -- me and Ms. Wirskye may have had that discussion too

0250

at some point.
Q. Did you feel it was necessary in order to determine reasonable possibility of profit to take into account all transaction costs?
A. Well, let me say this. I know you -- it's going to sound like I'm diverting, but I'm coming back to this, so bear with me.
Q. Let me get my stopwatch. Okay. Go ahead.
A. Don't insult me now, come on.
If you were to pick up an options book and you were to read some of the chapters on option strategies, they would show you the familiar hockey stick graphs. And they would not have the fees -- the fees being sort of what you pay your broker and things like that -- they wouldn't have them in there. That's done for a purpose in order to sort of get a prospective without introducing this other outside effect. That's all I'm going to say about that. I'm coming back to your statement right now.
And the impression I got was that we needed to see these numbers without the effect of fees because the fees themselves were in considerable dispute. Now, as I said, they told me that we would introduce the fees at a later point. So I was comfortable that before this process was all over, that

0251

the numbers would show the fees. So all they wanted to know at this point was what are the profitabilities without the fees, and that's what I gave them.
Q. But you gave them something which you're calling a reasonable possibility or probability of

profit, right?
MS. WIRSKYE: Objection. Form.
A. That is, yes.
Q. (BY MR. DONOHUE) But you're aware that there are fees that are connected with the transaction?
A. There are, but I don't know -- I don't know how large they are, and they could potentially be small enough that they don't effect these outcomes.
Q. But one way or the other, I mean, as a professional wasn't it incumbent upon you to say in order to do my job, you want me to determine the reasonable possibility of profit, I have to know all the transaction costs. Wasn't it incumbent upon you to say that?
A. Well, I don't necessarily think so. And the reason being, if the attorney says the Court needs a number, we need a number, whatever -- we need a number that says what are the probability of profit and we need -- without the fees -- and we need you to give an opinion just on these numbers without this outside

0252

effect of these fee numbers and we'll bring the fee numbers in at some other point, now if they had said to me we're not going to bring the fee numbers in at all, then I would have put my foot down and said, well, it's important enough it needs to get in there at some point.
But knowing that we were going to bring this in, I didn't have a problem drawing some inferences as this sort of first pass, first report. And I don't see necessarily what is the problem because I have stated explicitly that -- you know, or made it clear that the fees are not in there. So I'm not trying to deceive in any way.
Q. Well, you made it clear in your rebuttal report, correct?
A. Well, I mean, there's no discussion of fees in here and had there been fees in these numbers, then the fees would have been in there.
Q. See, I asked you -- if you recall when I started out this discussion in Table 8, I asked you the question, do you take into account the fees into Table 8? Because I didn't know if that table did or did not take into account fees.
MS. WIRSKYE: Objection. Form.
A. Well, I think what you're saying is I didn't explicitly make a statement about fees, and that is

0253

correct. I guess I would have thought that, you know, I gave you enough information to produce my numbers and that if, you know, the fees had been used, there would have been an inconsistency there.
Q. (BY MR. DONOHUE) You said you felt comfortable giving an initial set of numbers without the fees because you were informed that at some point the fees would be taken into account. Is that a fair statement?
A. That's correct.
Q. But aren't you doing more than simply giving a number with respect to the fees? Aren't you basing a conclusion on that number that there was a reasonable possibility of profit? Aren't you doing that?
A. Yes, but it's conditional on the information that -- that's used in this analysis at this point.

Q. If you put information in Table 8, taking into account fees, would you be able to then assess as to whether or not the investment of these options in the partnership provided a reasonable possibility of profit?
A. Well, that's the purpose of the rebuttal report which is constructed from this table.
Q. But --
A. And -- hang on.
Q. Okay.
0254
A. I think your question was could I make such an assessment. And I could make that assessment, but I can't make it at this point because you haven't told me -- y'all have not worked it out what are the actual fees that should be allocated here. So that's why at this point all I could do is give you a table and then if you-all settle that issue as to what the number is, then, you know, I can make some sort of comment.
Q. But as of right now you have made no comment; is that fair?
A. Because I don't have all the information I need to know. I don't know what the fees are, so I can't make a comment on an after-fee basis what the actual number is. And if I don't know what the number is, then I can't make a comment about whether it's a good number or a bad number.
Q. And for purposes you mentioned before that you said that counsel told you the fees are in dispute, did you take from that that -- any dispute as to whether or not these fees had been paid, is that what you understood it to be?
A. My understanding the actual amounts of the fees and how much is actually allocated to these options, that's in dispute. And so when I said earlier I'm aware of fees, yeah, I was aware that there were
0255
fees. What I'm not aware of is exactly how much of the fees, if any, you-all could reach some conclusion that it was zero, that none of it should be allocated to the options. Or you could have reached a conclusion that it's some amount that wouldn't actually affect the probability. So that's just something I don't know, and it's just out of my area of expertise.
Q. I want to turn to a different subject. Am I right you were also asked to evaluate the actual profits on the transactions?
A. That's correct.
Q. And, for example, for JBJZ at page 42, Exhibit 2400, you concluded that the overall transaction produced an estimated profit of $625,000. Do you see that?
A. That's correct.
Q. In calculating that profit, am I correct you didn't take into account the actual fees that were paid on that transaction?
MS. WIRSKYE: Objection. Form.
A. That's correct because the fees are not incorporated into the original report.
Q. (BY MR. DONOHUE) Do you know if you had taken into account all of the fees that were paid by the investor on the transaction as to what it would do in
0256
terms of the profit of the transaction?

A. It would depend on the number. If somehow you-all worked this out and decided that none of these fees should be allocated to the option transactions, it wouldn't change the number. If you told me some other number, then I would deduct it from the profit.
Q. And if the Court said, for example, that the fees on the transaction are, in fact, what the taxpayers paid for this transaction and they included an amount that were significantly greater than $625,000, what effect would that have to your determination of actual profit?
A. It would wipe it out.
Q. It would turn an actual profit into a loss?
A. Sure.
Q. Are you aware that there's a standard convention in quoting currency?
A. Depends on what you mean by standard convention. You're just going to have to elaborate on what that means.
Q. Well, let's take the yen dollar exchange rate. How is -- how -- do you know how that is ordinarily quoted on a dealer's floor?
A. Well, it's my understanding it's quoted yen per dollar. I'm not absolutely sure. I do know on the futures exchange it's -- you know, the currency future it's actually quoted dollars per yen. You get this number with a bunch of zeros to the right of the decimal.
Q. Do you know if in your expert report that you properly took into account the conventions for quoting currency?
MS. WIRSKYE: Objection. Form.
A. First of all, that's not actually important and I'll be glad to explain why.
Q. (BY MR. DONOHUE) But that's not the question I asked you. Do you understand my question? Whether it's important or not is not my question. My question is: In your expert report do you know if you properly took into account the conventions for quoting currencies?
MS. WIRSKYE: Objection. Form.
A. I don't know what the conventions are, so I'm not sure I can say that. What I do know is that I collected data in the form in which a contract specifies, yen per dollar, dollars per Euro, dollars per Australian, dollar various, you know, other contracts. That's the way the contract is actually stated and that is the manner in which I collected the data and that is the manner in which I processed the data.
Now, whether that's the actual convention that occurs on a trading floor, I couldn't answer that question. I mean, I have some idea, but, you know, I'm not a trader so I don't really know. I just know I collected the data in the form in which it was cited or quoted in the contracts and processed it properly.
Q. (BY MR. DONOHUE) I'm going to be asked that you be given Exhibit 2429. That's Dr. DeRosa's [sic] rebuttal report.
Did you have a chance to read Dr. DeRosa's rebuttal report?
A. I did.

Q. Turn to page 12 of his rebuttal report. Do you recall specifically reading this section of his rebuttal report?
A. I do.
Q. He points out that you committed a serious error in calculating correlations between the Euro and Japanese yen. Do you see that?
A. I do.
Q. At the bottom he points out that apparently you confused the currency quotation conventions. He points out when the analysis is done correctly, meaning the Euro beats the dollar and the Japan yen beats the dollar, the correlation signs are correctly reversed.
0259
The following table illustrated Dr. Chance's error.
And he shows for your correlation, for example, that what was a negative for the relationship between those cited currencies actually changes to a positive. Do you see that?
A. I see that. Is there a question?
Q. Well, I haven't gotten to the question yet.
A. All right.
Q. Were you -- well, let me first ask before I ask this specific question, what's your reaction to that?
A. This is a good example actually of something you mentioned this morning when you said if I refer to one particular report and you would like to sort of bring it into another report or bring in another report, I'd kind of like to do that here because I think I can create a much-easier-to-understand explanation for this.
Let's talk about the report that had the Swiss Franc and the Euro. I think that may have been Murphy. And this contract -- one of the contracts is quoted in Swiss Francs per dollar and the other is quoted in dollars per Euro. Now, I don't really know what traders on the floor of the Exchange say when they holler out prices at each other or whatever. It doesn't really matter.
0260
But I collected a database of information. And if you can picture one column of numbers, it has dollars per Euro; one column of numbers, that has Swiss Francs per dollar. Now, most people think -- institution is fairly consistent with this -- that the dollar will tend to move against both of those currencies in a pretty consistent matter. If it strengthens against one currency, it tends to strength against the other currency. If it weakens against one, it tends to weaken against the other. In fact, I went through the database. It was about 16 months of data. And the dollar strengthened or weakened against those two currencies 92 percent of the time.
Now, institution tells people that that means that those are highly correlated currencies. But the problem is one of them is quoted in Swiss Francs per dollar and one of them is quoted in dollars per Euro. So if the dollars strengths against both or weakens against both, those numbers are going to move in opposite directions. You have to get them in the same -- quoted in the same manner in order to get the positive correlation.
He stated in that report that I should

get a positive correlation, and I got a negative correlation . And the actual number that we got -- if

0261

you ignore the sign, was actually pretty close. And it wouldn't be all that far apart. It would differ only by the database that we use. So what happens with the correlation, that correlation number will be -- if you invert all of the numbers, it will be exactly the opposite if you do the inversion. Now, you can do it any way you want to do it. You really can honestly process your number any way you want to process it, either the straight method or the indirect method. As long as the formulas you use -- as long as the numbers that go into other formulas are consistent. They make that assumption that that's the way in which you're quoting.

And that's what I did, and that's why I made the statement -- and I know it jumped out that the Euro and the Swiss Franc had a negative correlation -- maybe I didn't make the statement, but it was in a table. And he made a very similar statement and he recalculated and he said well, you know, they ought to have a positive correlation, but...

Q. Do you agree that they should have a positive correlation?

A. Well, it depends on how their quoted. This is the problem you get with currencies because you can quote them either way.

0262

Q. Well, that's what you say that you can quote them either way, correct?

A. Exactly.

Q. But do you know --

A. But correlation -- hold on a minute.

MS. WIRSKYE: Let him finish.

A. Hold on a minute.

Q. (BY MR. DONOHUE) Okay.

A. Because you can quote them either way, you can process the numbers either way. And if you don't believe that they're quoted both ways, I can tell you that you can pick up a Wall Street Journal and see the quotes and there's the dollar quote in one column and there's the foreign currency quote in the other.

Q. Did you read what Dr. DeRosa said?

A. I read what he said.

Q. Let me read you what he said. He said (as read): Although an American newspaper, for example, might quote foreign currencies in relation to the U.S. dollar, foreign exchange dealers have a universal protocol for quoting currencies.

Are you aware of that?

A. Assuming that what he says is correct, but that's not the same thing as processing data. To calculate a correlation and to process data, you can put

0263

those numbers any way you want to. You can put the direct method or the inverse method, and all it's going to do is it's just going to reverse the correlation issue and technically it's not what you call reverse. It changes the sign on the correlation.

And you can quote them any way you want to. And as long as you process that number, as those numbers go into the formulas and that formula is

assuming that it's coming in that form, then there's absolutely nothing wrong with that.

Q. So --

A. I don't care -- hang on just a minute. I don't care what the traders on the floor say. And I would agree that if I processed it in a certain way, you know, it might jump out and some trader might say, oh, wait a minute. I think it's the other way. It depends on how it's processed and it depends on how the contract is quoted. And what I'm telling you is that if the dollar moves with the Euro -- I'm sorry -- with the Swiss -- if the Euro moves with the Swiss Franc as it does 92 percent of the time and the Swiss Franc is quoted in Swiss Francs per dollar and the Euro is quoted in dollars per Euro, you're going to get a negative correlation. One's going to move up and the other is going to move down. And that's what happened, and

0264

that's the same explanation you get all the way through this process.

Q. Well --

A. That's a very lame attempt to try to criticize my work. I could have done it with his correlations, but I would have had to have made adjustments elsewhere in the formula.

Q. But when you put a table in your report that shows that there is a negative correlation between the Swiss Franc and the Euro, when you do that, isn't that misleading?

MS. WIRSKYE: Objection. Form.

A. That was only put in there for the purpose of you or someone else, probably another expert or whatever, being able to actually put the numbers into the formula and come up with, you know, the values. The actual magnitude of that correlation or the sign isn't particularly important for this case. Those numbers actually go into the calculation of these multi-vary probabilities.

Now, it's not even absolutely imperative that I put the number there. Now, if I say the number is negatively correlated and it jumps out and some trader or practitioner says, whoa, that doesn't make sense. Well, you know, it's unfortunate that maybe

0265

there's a little bit of confusion. But what really matters is the bottom line number. And as long as you put the right -- you know, if I use the number in that form and I put it in the formula and the formula is expecting it to be in that form, there's absolutely nothing wrong with that.

I could have taken his number, given the numbers themselves were slightly different, I could have taken his number and put it into my formula and gotten the same result, but there would have had to have been adjustments to my formula. My formula was expecting it in that form and it produces the right result.

Q. (BY MR. DONOHUE) Well, what you're -- if I understand what you're saying is, even though you do agree that there's a positive correlation between the Euro and the Swiss Franc, even though you do agree with that, the ultimate -- by using a negative correlation, the way you process those figures it made no difference?

A. No, that's not even close to what I said.

First of all --
Q. All right.
A. I'm not sure I would say that I necessarily agree. I would -- the first part of your statement. I would agree with the first part of your statement if the two currencies were quoted the same way, either the
0266
dollar on the bottom or the dollar on the top.
Q. Well, don't -- are you -- as I understand it, you're not familiar with how dealers quote currencies.
MS. WIRSKYE: Objection. Form.
A. Well, I don't know what goes on on the trading floor, but I do know the way the transaction is quoted. I mean, there is the confirmation letter. And in the confirmation letter it says that it's Swiss Francs per dollar. That strikes are in Swiss Francs. And the other contract is in Euros. And it says dollars per Euros.
And on that basis -- I don't remember if there were -- those calls or puts, but on that basis whether the Euro contract pays off -- let's assume it's a call -- depends on whether the dollar price of the Euro goes up. And the Swiss Franc contract -- I'm going to assume it's a call, I don't remember -- but if it is a call, then it's going to pay off if the number of Swiss Francs per dollar goes up.
So I'm unwilling to just say this unless, you know, there's a positive correlation -- unless we make an agreement about how these are being quoted for the purpose of this statement. I don't have a problem if traders on the floor of the Exchange have a certain convention, but what they say on the floor of the
0267
Exchange does not determine the actual numbers that are produced or the numbers that are expected by a formula, the manner in which this formula expects to see these numbers.
And that formula has -- in one part of the formula it has Swiss Francs per dollar because that's what the confirmation says. And elsewhere in that formula it has dollars per Euro. And that's the way it's expecting that data to be processed and I don't --
Q. (BY MR. DONOHUE) Well --
A. Just one more thing and I'll let you have it back.
I said this several times, and I want to emphasize that I could have inverted it. I could have done it the other way. I could have gotten a positive correlation. You-all would have been happy, but I would have had to have done some other things to my formula and I would have gotten the same answer.
Q. Do you recall what my question was? Because you've now repeated yourselves about four different times with the same thing. Do you recall what my question was?
A. I believe your question, first of all, started off with something like, would you agree that had a
0268
positive correlation, and I believe the second part was that --
Q. Okay. Let's just take the first part.
A. Sure.

Q. Do you agree that, in fact, there's a positive correlation between the Swiss Franc and the Euro?
A. Tell me how you're quoting them.
Q. So in other --
A. The dollar on the denominator or the dollar in the numerator? Are you doing it the same way for both?
Q. I am referring to how Dr. DeRosa refers to it in the inviolate convention in quoting the currencies.
MS. WIRSKYE: Objection. Form.
A. I don't know or care about inviolate convention in quoting them. I care about how it's processed. We are producing numbers that are going into -- these numbers are coming out of formulas, numbers are going into formulas. I don't know and I don't care what the trading floor convention is. I mean, there's no way I'm going to agree that the trading floor convention has anything to do with how I process these numbers.
Q. (BY MR. DONOHUE) So -- so in your view the -- it had no consequence that, in fact, you ultimately determined there was a negative correlation between the

0269

Euro and the Swiss Franc, that had no impact or consequence on your ultimate calculations. Is that what you're saying?
A. I think that's a statement somewhat taken out of context. The negative correlation between the Euro and Swiss Franc that was used in my calculation is a result of the data being processed in the form of Euros per dollar and Swiss Francs -- I'm sorry -- dollars per Euro and Swiss Francs per dollar. That produces a negative correlation. That negative correlation goes into the formula. Assuming that all the numbers are right in the formula, it produces a correct result.
Q. All right. So I think you've answered my question. From your point of view, it did not have any consequence or effect on my ultimate result?
A. What I'm saying is that the criticism is incorrect. It's either misinterpretation or misunderstanding or something along those lines. It's simply not a correct criticism.
Q. Would you -- if you were speaking, let's say, to a group of practitioners in this field, would you get up before a room and say there is a negative correlation between the Euro -- let me finish my question -- between the Euro and the Swiss Franc? Would you make such a statement?

0270

MS. WIRSKYE: Objection. Form.
A. Well, I wouldn't make an unqualified statement. I would make sure that I made it real clear -- as I did just a moment ago -- how the currency is being quoted.
MR. DONOHUE: Okay. Why don't we do this, let's take a two- or three-minute break.
(Recess held, 5:04 p.m. to 5:10 p.m.)
MR. DONOHUE: All right. I have no further questions.
Dr. Chance, what's going to happen next is a transcript of your deposition will be prepared. And if you recall, during the course of the deposition I mentioned that I want you specifically to put information in the errata sheets of the deposition. Now

a part -- do you recall that?

THE WITNESS: Yes, yes.

MR. DONOHUE: And apart from that, I want you to read carefully the questions and answers. If there are any transcription errors, I'm going to ask you to make a note of the line and page of the error.

THE WITNESS: Yes.

MR. DONOHUE: And in addition you are permitted -- a lot of people think you can't do this, but you can do it -- you are permitted to change the

0271

substance of your answer. But if you do that, you have to put the reason for the change. Do you understand that?

THE WITNESS: Yes.

MR. DONOHUE: And if you do that, I am permitted to reopen your deposition to inquire about that change.

THE WITNESS: Yes.

MR. DONOHUE: Or those changes. So I'm going to ask that you take that into account before you would make any changes in your substance of the testimony. But if there are no changes, I'm going to assume that based on your signature that you're confident that, in fact, the transcript represents a full, complete, and accurate transcription of your testimony.

THE WITNESS: Now, would changes like in spelling or stuff like that, if I change that I mean...

MR. DONOHUE: No, that's what I call --

THE WITNESS: That's immaterial?

MR. DONOHUE: That's what I call purely an errata sheet type of correction.

THE WITNESS: All right.

MR. DONOHUE: It's not a substantive change.

0272

MS. WIRSKYE: Basically, if you think that you said this or this is misspelled and she -- and it was mistaken the way it's transcribed, that's a transcription error. Now, if you read it and say, well, I didn't mean to say this, that --

THE WITNESS: Right.

MR. DONOHUE: Not only you didn't mean to say it. If, in fact, you decide what you said is something that I wish I hadn't said. My god, I said this, I wish I hadn't said this. Let me change that. And you diametrically now have a new answer. Now, I can assure you if you say that, we'll be back here.

MS. WIRSKYE: I think we're saying the same thing.

MR. DONOHUE: All right.

THE WITNESS: These instructions you've given me here, somebody will write them down at some point or...

MR. DONOHUE: Well, your counsel can certainly re-explain them, but this is my last time to explain to you what the instructions are. So this is all -- this is the reason I had this put on the record. Once you receive your deposition, you will have an opportunity to read this portion of the transcript.

So once you have finished, reviewed, and

0273

put the errata sheets in, then -- the information in your errata sheets, I'm going to ask that you sign the deposition and you'll be given instructions as to what to do with it.

THE WITNESS: I realize now since she's taking this down what you just told me is going to be in the deposition, so...

MR. DONOHUE: Okay. Thank you very much, Dr. Chance. It's been a pleasure.

THE WITNESS: Thank you.

(The deposition concluded at 5:13 p.m.)

0274

CHANGES AND SIGNATURE

PAGE LINE CHANGE REASON

________________________________________________________
________________________________________________________
________________________________________________________
________________________________________________________
________________________________________________________
________________________________________________________
________________________________________________________
________________________________________________________
________________________________________________________
________________________________________________________
________________________________________________________
________________________________________________________
________________________________________________________
________________________________________________________
________________________________________________________
________________________________________________________
________________________________________________________
________________________________________________________
________________________________________________________
________________________________________________________
________________________________________________________
________________________________________________________
________________________________________________________

0275

I, DON CHANCE, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

___________________________________
DON CHANCE

THE STATE OF ___________)
COUNTY OF _______________)

Before me, ___________________________, on

this day personally appeared DON CHANCE, known to me (or proved to me under oath or through ___________________________) (description of identity card or other document)) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this __________ day of ________________________, __________.

___________________________________
NOTARY PUBLIC IN AND FOR
THE STATE OF ______________________
COMMISSION EXPIRES: _______________

0276

0277

IN THE UNITED STATES DISTRICT COURT

```
IN RE:                       *
COBRA TAX SHELTERS           *
LITIGATION                   *
                             *
------------------------     *
                             *
CARMEL PARTNERS, et al,      *
                             *
   Plaintiffs,               *
                             *
VS.                          * NO.:  1:06 cv 8001
                             * (S.D. Ind.)
UNITED STATES,               *
                             *
   Defendant.                *
-------------------------    *
                             *
JS BUCKINGHAM                *
INVESTMENTS, LLC, et al,     *
                             *
   Plaintiffs,               *
```

| | |
|---|---|
| Vs. | NO: 05-231 (Ct. Fed Claims) |
| UNITED STATES, | |
| Defendant. | |
| ------------------------ | |
| MURFAM FARMS, LLC, | |
| Plaintiff, | |
| Vs. | NO: 06-245T through 06-247T (Ct. Fed Claims.) |
| USA, NO, | |
| DEFENDANT. | |

0278

REPORTER'S CERTIFICATION
DEPOSITION OF DON CHANCE
SEPTEMBER 6TH, 2007

I, TAMMY LEA STAGGS, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, DON CHANCE, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on ____________________ to the witness or to the attorney for the witness for examination, signature and return to me by ____________________;

That the amount of time used by each party at the deposition is as follows:

Ms. Sarah Q. Wirskye - (0:00)
Mr. Dennis M. Donohue - (5:59)
Mr. Joe Pitzinger, III - (0:00)

0279

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

FOR THE PLAINTIFFS:
Sarah Q. Wirskye, Esq.

FOR THE DEFENDANT, UNITED STATES GOVERNMENT:
Dennis M. Donohue, Esq.
Joe Pitzinger, III, Esq.

That $__________ is the deposition officer's charges to the Plaintiff for preparing the original deposition transcript and any copies of exhibits;

0280

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 14th of September, 2007.

___________________________________
Tammy Lea Staggs, CSR 7496
Expiration Date: 12/31/2007
Firm No. Dallas: 69 Houston: 373
Henjum Goucher Reporting Services
2501 Oak Lawn Avenue
Suite 435
Dallas, Texas 75219
214.521.1188 Fax 214.521.1034
1.888.656.DEPO

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-231 T
(Chief Judge Damich)

JZ Buckingham Investments, LLC as Tax Matter Partner
of JBJZ Partners, a South Carolina general partnership,

Plaintiff,

v.

United States of America,

Defendant.

---

# DECLARATION OF
# A. LAWRENCE KOLBE

ON

ECONOMIC METHODOLOGY USED IN THE
EXPERT REPORT OF DON M. CHANCE, PH.D., CFA, TO ASSESS
WHETHER A REASONABLE PROBABILITY OF PROFIT EXISTED

Prepared for the
U.S. Department of Justice

*The Brattle Group*
44 Brattle Street
Cambridge, MA 02138-3736
617.864.7900 voice
617.864.1576 fax

March 7, 2008

GOVERNMENT EXHIBIT
3

## Table of Contents

INTRODUCTION AND SUMMARY . . . . . 1
Purpose of Declaration . . . . . 1
Summary of Findings . . . . . 2

CHANCE REPORT'S METHODOLOGY FOR DETERMINATION OF WHETHER A REASONABLE PROBABILITY OF PROFIT EXISTED . . . . . 3

BASIC ECONOMIC PRINCIPLES THAT DETERMINE THE PROFIT PROBABILITY FOR PUBLICLY TRADED OPTIONS . . . . . 4

APPLICABILITY OF THE ABOVE ECONOMIC PRINCIPLES TO THE PRESENT SITUATION . . . . . 6

COMMENTS ON THE SEVEN ADDITIONAL FACTORS . . . . . 8

APPENDIX: QUALIFICATIONS OF A. LAWRENCE KOLBE . . . . . 12

ATTACHMENT: LETTER FROM U.S. DEPARTMENT OF JUSTICE, TAX DIVISION, DATED MARCH 3, 2008 . . . . . 16

# I. INTRODUCTION AND SUMMARY

My name is A. Lawrence Kolbe. My business address is The Brattle Group, 44 Brattle Street, Cambridge, Massachusetts 02138. I hold a B.S. in from the U.S. Air Force Academy (1968) and a Ph.D. from the Massachusetts Institute of Technology (1979), both in economics. I am a financial economist with three decades of experience in the field. I am co-author of three books and author or co-author of a number of articles. I have testified on financial and regulatory issues in many forums in the U.S. and other countries, including U.S. District Courts and the U.S. Court of Federal Claims. The appendix to this declaration provides more detail on my professional qualifications. My Expert Report in this matter was submitted on June 1, 2007, and my Rebuttal Report on July 2, 2007. My deposition in this matter was taken on August 23, 2007.

## A. Purpose of Declaration

I have been asked in a March 3, 2008 letter to me from the Tax Division of the U.S. Department of Justice ("DOJ"), which is attached to this declaration, to provide my comments

> on the methodology used in the Expert Reports of Don M. Chance, Ph.D. CFA ("Chance Reports") [in this and related cases] to support their conclusions that the foreign exchange digital option "transactions" did have a *reasonable* probability of profit in each case. Specifically, whether the methodology used in the Chance Reports to determine *reasonableness* is scientifically valid and properly can be applied to the facts at issue in [the various cases].

Additionally the letter states:

> If possible the United States requests your comments on the applicability and relevance of the following factors with regards to the methodology used in Chance Reports: (1) whether the method used is susceptible to testing; (2) whether the method has been published or is otherwise susceptible to peer review; (3) the potential error rate of the method; (4) whether the method has gained general acceptance in the scientific community; (5) the existence of standards controlling the method's operation; (6) the relationship of the method used to other methods which have been established to be reliable; and, (7) any uses to which the method has been put.

The purpose of this declaration is to respond to these requests. Hereafter, a reference to the "Chance Report," in the singular, refers to the version filed in the present case.

**B. Summary of Findings**

The methodology used in the Chance Report to determine whether the options had a reasonable probability of profit involves: (1) calculating profit probabilities on a selection of publicly traded options, (2) calculating profit probabilities for the options at issue in this dispute, and (3) concluding that a probability of profit for an option in this dispute is reasonable if it lies within the range observed for publicly traded options.

This method is grounded in basic principles of financial economics in the context of publicly traded securities in well-functioning capital markets. However, it cannot properly be applied to the facts at issue in this dispute in the way done in the Chance Report, because the options in this dispute were not priced and traded at their market values. This breaks the essential link between an option's profit probability and the price paid for the right to receive its potential profit.

Factors 2, 4, 5 and 7 above are not applicable to the Chance Report's method because they shed no additional light on that method. Factor 6 is applicable in the way just stated, i.e., that the Chance Report's method relies on standard principles but does not take account of the present options' break in the essential link between profit probability and the price paid for the option.

The Chance Report's method embodies a test of reasonableness that is effectively impossible to fail: it accepts a profit probability as "reasonable" if it is within the range observed in financial markets, regardless of anything else, and those markets are so extensive that a traded option with almost any probability of profit can be found. Therefore, Factor 1 is applicable because it is meaningless to speak of testing a method that embodies a test that cannot be failed.

The potential error rate of a method addresses how often the method will reach an erroneous conclusion. An error is possible in the Chance Report only if the relevant standard for "reasonable probability of profit" can in fact be failed, since the Chance Report's method effectively cannot be

failed. If there do in fact exist options without a "reasonably probability of profit" according to the relevant standard, Factor 3 is applicable because the Chance Report's method, which effectively always reports no failures, will have an error rate equal to the percentage of failures in the sample of options whose profit probabilities are being tested. This error rate could reach 100 percent.

This declaration first discusses the Chance Report's methodology, next the principles that underlie it, then their applicability to the facts at issue here, and lastly the seven additional factors.

## II. CHANCE REPORT'S METHODOLOGY FOR DETERMINATION OF WHETHER A REASONABLE PROBABILITY OF PROFIT EXISTED

The Chance Report states at p. 3 that one of its purposes is to discover "whether the foreign exchange digital option spread strategies include a reasonable probability of profit". The Chance Report describes its methodology for addressing this question as follows:

> I found that the transactions did have a reasonable probability of profit. I drew this conclusion on the basis of a comparison of the probability of earning a profit on the transactions in this case to the probability of earning a profit on standard option transactions that are conducted on U. S. options exchanges. For example, I estimated the probabilities of profit of a large number of options on Google and the S&P 500 and found those probabilities to be comparable if not much lower than those of the transactions in this case.[1] ...
>
> The results [of analyses of the profit probabilities on exchange-traded options on Google and the S&P 500 stock index] are shown in Table 6. Note how the probabilities of profit are inversely related to the exercise price. All probabilities are less than 50%. Note that the probabilities for the three deepest out-of-the-money Google options are less than 3%. For the three deepest out-of-the-money S&P 500 options, the probabilities are less than 6% and yet over 100,000 of those contracts traded.
>
> These comparative results using the options of two widely known underlying stocks, Google and the S&P 500, show that the probabilities of the digital currency options in this case are not at all out of line with commonly traded options and what option investors expect when buying and selling options.[2]

---

1 Chance Report, pp. 3-4.

2 Chance Report, p. 34.

Thus the methodology is (1) to calculate profit probabilities on a selection of publicly traded options, (2) to compare those calculated probabilities of profit with those the Chance Report calculates for the options at issue in this dispute, and (3) to conclude that the probability of profit is reasonable if the calculated profit probabilities for the options in this dispute lie within the range of the probabilities of profit determined for publicly traded options.[3]

## III. Basic Economic Principles that Determine the Profit Probability for Publicly Traded Options

A central task of finance is the valuation of risky investments, such as common stocks, corporate bonds, or corporate investment projects.[4] In well-functioning capital markets, securities trade at prices that offer an expected rate of return that compensates investors for the risk they bear.[5] All else equal, the higher an investment's risk, the lower the price investors will be willing to pay in

[3] This interpretation of the Chance Report's methodology is consistent with statements in Dr. Chance's deposition in this matter, taken September 6, 2007 ("Chance Deposition"). See, for example, the Chance Deposition at pp. 163, 164, and 172-75. Note that the Chance Report's definition of "probability of profit" is the probability that the payoff will be greater than the cost of the option (see, for example, the Chance Deposition, pp. 15-16, 167-68). The "probability of profit" on a vanilla option will be lower than the probability the option will finish "in the money" and so be worth exercising. This is because it is worth exercising an in-the-money vanilla option even if that exercise returns only part of the cost of buying the option and hence does not generate a "profit." Section III of this declaration, regarding economic principles, sometimes needs to refer to the probability that the option will simply finish in the money; for convenience, this is identified in this declaration as the "probability of *payoff*." The two probabilities will be closely related, and for the digital options in the present dispute they will be identical (since the value of the fixed dollar payout on the digital option is always greater than the price paid for the option). The basic conclusions in this report would hold equally true if the Chance Report's focus were the probability of payoff instead of the probability of profit, as these terms have just been defined.

[4] For example, the leading graduate textbook in the field, Richard A. Brealey, Stewart C. Myers, and Franklin A. Allen, *Principles of Corporate Finance*, 8th ed., New York: McGraw-Hill/Irwin (2006) ("Brealey, Myers and Allen"), devotes the first six of its 35 chapters to a section called "Value" and the next three to a section called "Risk."

[5] The expected rate of return in capital markets on a particular investment is called its "opportunity cost of capital," or "cost of capital" for short, where "expected" is used in the statistical sense and signifies the mean outcome. (See, for example, Brealey, Myers and Allen, pp. 17-20 and 514-15, or more generally, Part Two, "Risk," Chapters 7-9.)

capital markets for that investment. The market price of capital assets, such as stocks and bonds, therefore equilibrates to reflect the risk associated with a particular asset.[6]

The Chance Report calculates and reports the profit probabilities of various publicly traded options.[7] For purposes of this declaration, I assume that the Chance Report's calculations produced the true profit probabilities associated with the publicly traded options it analyzes.[8]

The above quotation from the Chance Report notes that the higher the exercise price, the lower the calculated probability of profit.[9] This follows directly from the fact that the higher the exercise price on a call option (all else equal), the greater the risk that the option will finish "out of the money," i.e., that the investor will have to let the option expire unexercised and lose the money used to purchase the option.

In well-functioning capital markets, the higher risk of loss associated with a higher exercise price, which produces a lower expected payoff, will be reflected in the market prices at which the options in question trade. Thus, the market price equilibrates so that investors are compensated for bearing the higher risk by paying less for the asset. The resulting market value for the option embodies the risk-return tradeoff that the market requires.

---

6 For example, "[i]n well-functioning capital markets investors capitalize the dividends of all securities in [a particular stock's] risk class at exactly the same rate." Brealey, Myers and Allen, p. 67. The original theory of how this happens, the "Capital Asset Pricing Model"("CAPM"), is used in the Chance Report as part of its calculation of the profit probabilities of the publicly traded options. Chance Report, p. 33. See Brealey, Myers and Allen, pp. 188-97, for discussion of the CAPM and pp. 197-204 for discussion of alternative theories of capital asset pricing.

7 Chance Report, pp. 33-35.

8 That is, the precise mechanics of the Chance Report's probability calculations are not a subject of this declaration. Here, I also ignore both the fees paid to Ernst & Young and to attorneys and also the differences between the traded options analyzed in the Chance Report and the present options (e.g., vanilla calls versus digital options), to focus solely on the economic logic of the methodology itself.

9 This corresponds to the payoff on call options. With put options, it is lower exercise prices that correspond to lower probabilities of profit, all else equal.

Put differently, the profit probability associated with any given option is economically reasonable for that particular option in well-functioning capital markets *because* the option's price itself reflects that probability. That is, suppose two options were identical in every respect, including the expected payoff *if* a payoff occurs, except that one had a lower probability of getting that payoff. No economically rational investor would buy the one with a lower payoff probability unless it were offered at a lower price. If the two instead were initially offered at the same price, the expected profit on the option with the higher payoff probability would be higher and no one would buy the one with the lower payoff probability.[10] In a well-functioning capital market, this would drive up the price of the higher-probability option and/or drive down the price of the lower-probability option until both were priced to offer the risk-return tradeoff the market required. Thus, the profit probabilities and the market prices of publicly traded options are inexorably linked.[11]

## IV. Applicability of the Above Economic Principles to the Present Situation

The options in the present dispute did not trade at market values.[12] The Chance Report nonetheless concludes that their calculated profit probabilities were reasonable *because* those probabilities were

---

[10] Expected profit is expected revenue minus the (known) price paid. If the price were the same and the expected revenue higher because the probability of getting the same average payoff were higher, the expected profit necessarily would be higher, too.

[11] This is just a specific application of the basic principle that the price of a risky asset in well-functioning capital markets reflects its risks, whether those risks affect the level of its expected cash flows or the rate at which those cash flows can be discounted to present value (or both). Again, see generally Brealey, Myers and Allen, Chapters 7-9.

[12] Note that one does not need an option pricing model, such as used by Deutsche Bank or in the Chance Report and in my own report, to verify this conclusion. The stated premiums for the options all end in a number of zeros (see DB COBRA 04213, 04215, 04219, 04221, 04225, 04227). There is nothing in option pricing theory (see, for example, Brealey, Myers and Allen, Chapter 21, "Valuing Options") that calls for options' values to end in zeros. The odds of having the value of any one option by chance end in, for example, six zeros are literally one in a million. The odds of having two options do so are one in one million squared, i.e., one in a trillion. Since the odds of observing by chance all the ending zeros in the options in this case are far worse than that, it is immediately evident that the options cannot have traded at market values.

within the wide range of profit probabilities observed in the market.[13] This conclusion misapplies the basic economic principles reviewed in the previous section.

It is standard practice in investment project valuation and selection to trust market prices if they are available, unless there is a specific reason not to.[14] Thus, the premise that underlies the Chance Report's methodology, that it is reasonable to trust that the profit probabilities observed in the market are economically reasonable for options traded in the market, is in accord with standard practice in finance. But the *reason* that it is consistent with standard practice to trust market-derived profit probabilities is that those probabilities affect not merely the expected payoff, but also the price observed in the market and paid for the right to receive that expected payoff.

Here, that essential link is broken. The logic that would lead someone schooled in finance to accept a probability from well-functioning capital markets as economically "reasonable" (e.g., one at which unrelated, informed parties would voluntarily trade when acting in their own economic self-interest, focusing only on the transaction at hand) does not apply if the price at which that trade takes place is not the market value. For the options in this dispute, the requisite correspondence between profit probability and price at which the trade takes place does not exist, so the economic principles that lead one to accept market-based profit probabilities as economically reasonable do not apply to the profit probabilities for the present option trades. The fact that a particular probability of profit is reasonable for an option trading at market value says nothing about whether it would be reasonable for an option trading at some other value.

---

[13] For completeness, I would note that the market probabilities of profit cannot be "observed" directly, only calculated, but here I assume that the Chance Report has calculated them perfectly.

[14] For example, Brealey, Myers and Allen starts Chapter 11, "Strategy and the Capital Investment Decision," with a section entitled, "Look First to Market Values." Brealey, Myers and Allen, pp. 275-80.

In short, the Chance Report's methodology to assess whether the profit probabilities were reasonable relies on standard economic principles in the context of options that trade at market value, but these principles cannot properly be applied to the present set of facts in the way done in the Chance Report because the present options did not trade at market value.

## V. COMMENTS ON THE SEVEN ADDITIONAL FACTORS

The seven factors I was asked to address are: (1) whether the method used is susceptible to testing; (2) whether the method has been published or is otherwise susceptible to peer review; (3) the potential error rate of the method; (4) whether the method has gained general acceptance in the scientific community; (5) the existence of standards controlling the method's operation; (6) the relationship of the method used to other methods which have been established to be reliable; and, (7) any uses to which the method has been put. This section first discusses Factors 2, 4-5 and 7, then returns to Factors 6, 1 and 3.

**Factors 2, 4-5 and 7:** Economics generally and financial economics specifically have developed a body of principles and tools. These principles and tools sometimes are applied to problems that arise frequently and other times to problems that arise only rarely or in specific settings. The fact that a standard principle or tool is being applied to a novel situation does not, by itself, in any way impair the economic validity of the analysis. There are always more problems to solve than tools needed to solve them. Principles and tools evolve precisely because they have general applicability to classes of problems, including those not before encountered.

The method in the Chance Report starts from standard principles, discussed in Section III above. The Chance Report's particular application of these principles to the facts at issue has not been published or peer reviewed, to my knowledge, and for reasons stated in Section IV above, it would not pass peer review, in my opinion. But an application of standard principles to a new or

rare situation that would readily pass peer review and be readily accepted as an appropriate approach if a similar situation were to arise again, equally might not have been published or otherwise peer reviewed as of the time it was performed. Thus, Factors 2, 4-5 and 7 logically do not shed light on the merits of the Chance Report's approach, and so have no applicability here.

**Factor 6:** The sixth factor, how the method relates to other methods, is applicable for reasons discussed in sections III and IV above: the Chance Report's approach is grounded in standard principles, but it does not take account of the fact that the essential link between profit probability and the price paid for the right to receive the potential profit is broken for the options in this dispute, since they did not trade at market value. Thus, these principles have not been shown to be reliable in the way the Chance Report's method applies them.

**Factor 1:** The Chance Report's method embodies a test for whether a "reasonable probability of a profit" exists that is effectively impossible to fail. That is, under the Chance Report's method, a probability of profit is "reasonable" if it falls within the range of profit probabilities observed in the market, regardless of anything else. But financial markets are immense, so some option, somewhere, can be found with almost any probability of profit.[15] Therefore, under the Chance Report's method for determining if a profit probability is "reasonable," Factor 1 is applicable because it is meaningless to speak of testing a method that embodies a standard that is impossible to fail.

---

[15] For example, in two of the three Chance Reports in the set of cases the DOJ asked me to analyze, the lowest calculated probability of profit for an exchange-traded option was 1.56 percent. (See the Chance Reports in the present dispute and in the "*Gary Woods et. al*" dispute mentioned in the attached letter from DOJ, at p. 35 in both reports.) Also, the Chance Deposition states that a profit probability of 0.2 percent is in a "gray area," apparently because of the possibility that there might not ever have been an option traded with a profit probability that low. (Chance Deposition, pp. 243-45.) For comparison, the probability of making a profit if betting on a single number in roulette is 2.63 percent (one in 38).

**Factor 3:** Factor 3, the potential error rate of the method, addresses how often the method will reach an erroneous conclusion. As just discussed, the Chance Report's method will essentially never find an option not to have a "reasonable probability of profit." Therefore, an error can arise under the Chance Report's method if and only if a "probability of profit" can be classified as "unreasonable" while still being higher than the lowest probability of profit observed in the market. That is, for the Chance Report's method to produce an error, the relevant standard must admit of the possibility that an option could have an "unreasonable" probability of profit even when that probability was more than *de minimis*.[16]

When such an outcome is possible, Factor 3 is applicable because the Chance Report's method, which will report zero failures effectively all of the time, will have an error rate equal to the percentage of failures in any given sample of options whose profit probabilities are being tested for "reasonableness." For example, in a sample of options that all fail to meet the relevant standard for a "reasonable probability of profit," the error rate of the Chance Report's method will be 100 percent.

---

16 To illustrate, the Chance Deposition at p. 120 indicates acceptance of the view that at least some of the options in the present disputes traded at a price that was materially in excess of their theoretical value (which is the best estimate of the market value that would be observed if they were publicly traded). If the trade price of an option is materially above-market, its expected profit is materially below-market, i.e., materially lower than it would be if the option instead were priced and traded at market value. (For example, suppose a digital option with a 25 percent chance of a $10 payoff -- and hence a $2.50 expected payoff -- had a market price of $2.00, producing an expected profit of $0.50. If the same option were instead sold for $3.00, its expected profit would be a *negative* $0.50, even though it would have the same 25 percent chance of earning a (reduced) profit if the digital option paid off.) If a probability of profit were held to be "unreasonable" if the associated expected profit was materially below-market, even if the probability itself were well above the lowest "probability of profit" observed in the market for publicly traded options, then it at least would be *possible* for the Chance Report's method to reach an erroneous conclusion.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. This declaration was executed in Cambridge, Massachusetts on March 6, 2008.

A. Lawrence Kolbe

## APPENDIX: QUALIFICATIONS OF A. LAWRENCE KOLBE

**EDUCATION**

B.S. in International Affairs (Economics), U.S. Air Force Academy, 1968.
Ph.D. in Economics, Massachusetts Institute of Technology, 1979.

**EMPLOYMENT**

U.S. Air Force, 1963-1977
Charles River Associates, 1978-1985
Putnam, Hayes and Bartlett, 1985-1990
The Brattle Group, 1990-

**HONORS AND AWARDS**

Sears Foundation National Merit Scholarship, 1963 (declined).
Fairchild Award, U.S. Air Force Academy, 1968 (for standing first in his class, academically).
National Science Foundation Graduate Fellowship in economics, MIT, 1968-1971.
Joint Service Commendation Medal, 1975.

**PROFESSIONAL AFFILIATIONS**

American Economic Association
American Finance Association
The Econometric Society
Served as Referee for *The Rand Journal of Economics, Land Economics*, *The Journal of Industrial Economics*

**PAPERS AND PUBLICATIONS IN THE LAST TEN YEARS**

"How to Value a Lost Opportunity: Defining and Measuring Damages from Market Foreclosure," (with William B. Tye and Stephen H. Kalos), *The Economics of Antitrust Injury and Firm-Specific Damages*, Kevin S. Marshall, ed., Tucson, Arizona: Lawyers & Judges Publishing Company, Inc. (2008). (Republication of a 1995 article.)

"Measuring Return on Equity Correctly: Why current estimation models set allowed ROE too low," *Public Utilities Fortnightly* (with Michael J. Vilbert and Bente Villadsen), August 2005.

"The Effect of Debt on the Cost of Equity in a Regulatory Setting," (with Michael J. Vilbert and Bente Villadsen, and with "The Brattle Group" listed as author), published by the Edison Electric Institute (dated January 2005, issued April 2005)

*Capital Investment and Valuation*, (with Richard A. Brealey and Stewart C. Myers, with "The Brattle Group" listed as third author), New York: McGraw-Hill/Irwin (2003).

"The True Hourly Rate for Private Counsel in the State of Louisiana Tobacco Lawsuit," (with August J. Baker and Bin Zhou), Brattle report prepared for private counsel to the Louisiana Attorney General in the state's lawsuit to recover health care costs from the tobacco industry (July 2000).

"The Cost of Capital for the Dampier to Bunbury Natural Gas Pipeline," (with M. Alexis Maniatis and Boaz Moselle) Brattle report submitted to the Office of Gas Access Regulation, Western Australia (October 1999).

"Compensation for Asymmetric Risks," (with others) Brattle report prepared for GPU PowerNet, Melbourne, Australia (October 1999).

"A Non-Practitioner's Guide to the State of the Art in Cost of Capital Estimation," (with others) Brattle report prepared for GPU PowerNet, Melbourne, Australia (June 1999).

"A Note on the Pre-tax Weighted Average Cost of Capital in a Regulatory Context with Australian Dividend Tax Credits and Alternative Debt Refinancing Policies" (with M. Alexis Maniatis), Working Paper in Progress.

"The Impact of Stranded-Cost Risk on Required Rates of Return for Electric Utilities: Theory and An Example" (with Lynda S. Borucki). *Journal of Regulatory Economics* Vol. 13 (1998), 255-275.

## TRIAL TESTIMONY AND DEPOSITIONS IN LAST FOUR YEARS

**2004**

Case: Coltec Industries, Inc. v. The United States of America, Fed. Cl. No. 01-72T
Party: The United States of America
Forum: The United States Court of Federal Claims

Case: Liberty Digital, Inc. v. AT&T Broadband, LLC and Comcast Corporation, Civil Action No. 03-CV-95
Party: AT&T Broadband, LLC and Comcast Corporation
Forum: Colorado District Court, County of Arapahoe, 18th Judicial District

Case: West Virginia-American Water Company, Case No. 04-0373-W-42T
Party: West Virginia-American Water Company
Forum: Public Service Commission of West Virginia

Case: Koch Industries, Inc., and Subsidiaries v. The United States, Fed. Cl. No. 02-8T
Party: The United States
Forum: The United States Court of Federal Claims

Case: United States of America v. Anne (Sandy) Batchelor-Robjohns, a/k/a/ Anne O'Neill Batchelor; Daniel J. Ferraresi; Marvin C. Gutter; and Father Patrick O'Neill, Co-Personal Representatives of the Estate of George E. Batchelor, Case No. 03-20164-CIV-Ungaro-Benages/Brown
Party: United States of America
Forum: United States District Court for the Southern District of Florida, Miami Division

**2005**

Case: TransCanada PipeLines Limited 2004 Mainline Tolls and Tariff (Phase 2), RH-2-2004
Party: TransCanada PipeLines Limited
Forum: [Canadian] National Energy Board

Case: Polymer Dynamics, Inc. v. Bayer Corporation
Party: Polymer Dynamics, Inc.
Forum: U.S. District Court for the Eastern District of Pennsylvania

Case: Jade Trading, LLC, by and through Robert W. Ervin and Laura Kavanaugh Ervin on Behalf of Ervin Capital, LLC, Partners Other than the Tax Matters Partner, v. The United States, Case No. 03-2164T
Party: The United States
Forum: The United States Court of Federal Claims

**2006**

Case: Arizona-American Water Company, Inc., for Utility Service by its Paradise Valley Water District, Docket No. WS-01303A-05-0405
Party: Arizona-American Water Company, Inc.
Forum: Arizona Corporation Commission

Case: K2 Trading Ventures, LLC, New Vista, LLC, Tax Matters Partner, v. The United States of America, by and through the Internal Revenue Service, Case No. 04-1419T
Party: The United States of America
Forum: The United States Court of Federal Claims

Case: Garco Investments LLP, et al. v. Sprint Corporation, Case No. 04 CV 01714
Party: Garco Investments LLP, et al.
Forum: District Court of Johnson County, Kansas, Civil Court Department

**2007**

| | |
|---|---|
| Case: | JZ Buckingham Investments, LLC as Tax Matters Partner of JBJZ Partners, a South Carolina general partnership, v. United States of America, Case No. 05-231 T |
| Party: | United States of America |
| Forum: | The United States Court of Federal Claims |
| Case: | Gary Woods, as Tax Matters Partner of Tesoro Drive Partners, a Texas general partnership, and Gary Woods, as Tax Matters Partner of SA Tesoro Investment Partners, a Texas general partnership, v. United States of America, Case Nos. SA-05-CA-0216-XR. |
| Party: | United States of America |
| Forum: | United States District Court for the Western District of Texas, San Antonio Division |
| Case: | MURFAM FARMS, LLC, By and Through Wendell H. Murphy Jr., a Partner Other Than the Tax Matters Partner; PSM FARMS, LLC, By and Through Stratton K. Murphy, a Partner Other Than the Tax Matters Partner; MURPHY PORK PARTNERS, LLC, By and Through Wendell H. Murphy, Jr., a Partner Other Than the Tax Matters Partner, v. United States of America, Case Nos. 06-245 T, 06-246 T, and 06-247 T (Consolidated). |
| Party: | United States of America |
| Forum: | The United States Court of Federal Claims |
| Case: | Fidelity International Currency Advisor A Fund, L.L.C., by the Tax Matters Partner, v. United States of America, Case No. 05-40151-FDS. |
| Party: | United States of America |
| Forum: | United States District Court for the District of Massachusetts |

**ATTACHMENT: LETTER FROM U.S. DEPARTMENT OF JUSTICE, TAX DIVISION, DATED MARCH 3, 2008**

U.S. Department Of Justice

*Tax Division*

EJO'C:LPH:JAPitzinger
DJ: 5-76-28980
CMN: 2005103871

*717 N. Harwood*
*Suite 400*
*Dallas, Texas 75201*

*Main Line: (214) 880-9721*
*Attorney's Direct Line:*
*(214) 880-9728*
*Fax: (214) 880-9741/9774*

March 3, 2008

Dr. Larry Kolbe
The Brattle Group
44 Brattle Street
Cambridge, MA 02138-3736

Re: *In Re COBRA Tax Shelters Litigation*, 1:05-ml-09727-JDT-WTL (S.D. Ind.)
*Gary Woods, et al. v. United States*, 1:06 cv 8000 and 1:06 cv 8001 (S.D. Ind.);
*MurFam Farms, et al v. United States*, Case No. 06-245, 06-247 & 06-247 (Consolidated) (Fed. Cl.); and *JZ Buckingham, as Tax Matter Partner of JBJZ Partners*, Case. No. 05-231T (Fed Cl.)

Dear Dr. Kolbe:

The United States requests your comments on the methodology used in the Expert Reports of Don M. Chance, Ph.D. CFA ("Chance Reports") to support their conclusions that the foreign exchange digital option "transactions" did have a *reasonable* probability of profit in each case. Specifically, whether the methodology used in the Chance Reports to determine *reasonableness* is scientifically valid and properly can be applied to the facts at issue in the above referenced COBRA cases.

If possible the United States requests your comments on the applicability and relevance of the following factors with regards to the methodology used in the Chance Reports: (1) whether the method used is susceptible to testing; (2) whether the method has been published or is otherwise susceptible to peer review; (3) the potential error rate of the method; (4) whether the method has gained general acceptance in the scientific community; (5) the existence of standards controlling the method's operation; (6) the relationship of the method used to other methods which have been established to be reliable; and, (7) any uses to which the method has been put.

If you have any questions, please do not hesitate to contact me.

Sincerely yours,

JOSEPH A. PITZINGER, III
Trial Attorney
Civil Trial Section
Southwestern Region

cc: Dennis M. Donohue, Esc.
David Steiner, Esq.
John Lindquist, Esq.
Jonathan Blacker, Esq.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JZ Buckingham Investments LLC as Tax Matters Partner of JBJZ Partners, a South Carolina general partnership, Plaintiff, | § | CASE NO. 05-231 T |
| v. | § | Chief Judge Edward J. Damich |
| United States of America, Defendant. | § | |

REBUTTAL

Don M. Chance, Ph.D., CFA

June 20, 2007

**The Effect of Fees on the Probabilities of Combinations of Transactions**

I have been given fees and asked to determine the effect that the fees have on the probability of profit. To determine this effect, I refer to Table 8 in my original report (dated May 8, 2007). This table shows all possible outcomes for the partnership.

There are nine possible outcomes, resulting from there being two currencies (JPY and EUR). Each outcome of each currency is paired with each outcome of the other currency. The outcomes range from a loss of $2,500,000 to a profit of $97,500,000, with one outcome negative and eight positive. By deducting fees, some of the positive outcomes will then become negative and therefore, those outcomes would no longer contribute to the probability of profit.

I was told to consider fees up to $2.3 million. I arranged the nine outcomes in ascending order. The smallest positive outcome is $625,000. This result occurs in two of the eight positive outcomes. (The next smallest is more than the fees.) The table below indicates the probabilities of profit for each of the three volatility estimates for varying levels of fees up to $2.3 million.

| The Effect of Fees for JBJZ | | | |
|---|---|---|---|
| | Probability of Profit given Volatility and Correlation Estimates | | |
| Fees | 30-day | 60-day | 90-day |



gov.app.210

GOVERNMENT EXHIBIT 4

| | | | |
|---|---|---|---|
| < $625,000 | 0.4470 | 0.4863 | 0.4858 |
| ≥ $625,000 & ≤ $2,300,000 | 0.1323 | 0.1376 | 0.1349 |

From this table one can determine how fee levels up to the maximum affect the probability of profit.

**On the Issue of the Number of Transactions**

I have been asked to opine on whether a digital option spread should be considered one transaction or two. It is not possible to make a definitive statement one way or the other. It depends on the point of view one takes. I offer some analogies that are commonly encountered in investing.

Consider an investor looking at certain stocks for potential investment. The investor already owns $100,000 of Apple stock and is considering whether to sell it and replace it with a competitor of Apple, such as Dell. After doing his homework, the investor is convinced that Dell will make great strides in its hardware and will virtually destroy the market share of Apple computers. Therefore, the investor believes that an appropriate trade would be to sell his $100,000 of Apple and buy $100,000 of Dell. He goes to his online account and places an order to sell $100,000 of Apple. Immediately after placing that order, he places an order to buy $100,000 of Dell. Is this one transaction or two?

The online broker will consider it two transactions. Simultaneous orders are not permitted, so two distinct transactions, although separated in time by less than a minute, are executed. The customer will pay two distinct commissions and receive two confirmations. Yet the transactions are part of a single strategy.

One transaction or two? It depends on how you look at it. Consider another example, similar to the digital option spreads. Many option traders use covered calls, which involve the sale of a call option on a stock that the investor owns. Suppose the investor owns 1,000 shares of AT&T, which is currently selling for about $40. She sells call options on 1,000 shares. These options have an exercise price of $45. She collects the premium and holds her position, mindfully watching to see if the stock price rises above $45. If that happens when the options expires, she will have to sell the stock at $45. Not wanting to incur the cost of selling the stock and wanting to hold on to the

stock, she plans to watch the stock closely. If it rises to near $45, she will buy back the options struck at $45 and sell new options struck at $50. So let us say the stock is at $44.75 and expiration is approaching. She places an order to buy 1,000 calls struck at $45. As soon as she places that order, she places another order to sell 1,000 calls struck at $50. Her options broker will consider it two transactions. As with the Apple-Dell example, simultaneous orders are not permitted. She will incur two commissions and receive two confirmations. Yet the transactions are part of a single strategy. The similarity with the digital spreads should be apparent. With the digital spread strategy, an option with one exercise price is purchased and one with another exercise price is sold. With the covered call strategy, an option with one exercise price is purchased and one with another exercise price is sold.

One investment or two? It depends on how you look at it. Yet another way of thinking about this problem is to consider an investor with an IRA that contains a stock mutual fund and a bond mutual fund. Is that one investment or two? It is one IRA, but it has two components. Looking further, we might find that the mutual fund owns 100 individual stocks and the bond fund owns 50 individual bonds. Now, do we have one investment, two investments, or 150 investments? It depends on how you look at it. Mutual funds in particular illustrate the difficulty of asserting whether what appears to be one investment is really more than one. As we teach students of investments, when you buy a mutual fund you are purchasing shares in the fund but receiving a claim on the performance of all of the securities held by the fund. One investment or two? It depends on how you look at it.

In conclusion, it is not possible to definitively say that a digital option spread is a single transaction or two transactions. The argument that the two transactions are done jointly no more establishes that it is a single transaction than do any of the above examples establish that they are a single transaction.

Don M. Chance

Don M. Chance

6/20/07

Date