I would normally do.
Q. (BY MR. DONAHUE) And how so?
A. Well, if -- and I was careful to state it that I'm -- you know, in the abstract whether this is a trade secret or not, as the Court may determine to be a legally protectable trade secret, is different than and could be different -- may not be different, but could be different from, does it have the characteristics of intellectual property or this form of intellectual property called trade secrets? So then I could go to the next step and say that a fee based on a percentage of the value, so to speak, was it a reasonable approach to making it a fee?
If it's ultimately determined that -- if I was talking about patentability, and it's ultimately not patentable, that still would mean that my analysis about the appropriateness of the fee structure would still be valid. So I was careful to say the characteristics of a trade secret because, you know, I did not and I didn't have the time and I didn't charge for the time to send letters and investigate throughout the whole accounting industry about this subject matter. I relied upon the documents that I had and came to the conclusion that it had the characteristics of a trade secret.



Q. Did you ask counsel to provide you with any documents that may elucidate as to what enhancements Ernst & Young provided to this strategy?
A. No, I don't recall doing that because I wasn't specifically concerned about the exact detail of the enhancements. I was -- I was impressed with the fact that they said they made enhancements and that therefore that would be part and parcel of the idea that -- well, you know, they're appropriately charging a fee for the use of these services which includes tax representation before the IRS, tax strategy, business strategy, and on top of anything else they made enhancements to this strategy. I didn't particularly feel like I had to know exactly what the enhancements were.
Q. If I told you to assume that one difference between this COBRA strategy and other tax strategies on the market was the fact that in the COBRA strategy the client would pay a greater amount of money for the offsetting options than in the other strategies, would you view that as an enhancement?
A. Pay a greater amount of money to whom? I mean, pay a greater fee? I guess the word -- I don't think we should place too much emphasis on the word "enhancement" because it wasn't a major part of my understanding of the analysis. We have a tax



strategy -- an Investment and Tax Strategy as I have defined it in my report, and my approach was to determine whether it has the characteristics of a trade secret, and I said it does. It's a plus that it has enhancements. I did not dig into exactly what the enhancements might be.
Q. I understand that, but now I'm saying if you knew -- I understand you didn't know, but if I told you that -- that a difference between the COBRA tax strategy and other similar strategies on the market was that for the COBRA strategy they charge more money for the offsetting options, would you view that as a type of enhancement that would differentiate the COBRA strategy from these other strategies?
MS. GAVIOLI: Objection. Form.
A. I don't know enough about the economics of the -- or the tax aspects of it to say whether that's an enhancement or not. I'm sorry.
Q. (BY MR. DONAHUE) Okay. Are you aware of any other firms that were offering similar strategies as the COBRA strategy?
A. Well, Jenkins & Gilchrist was involved in aspects of this, that's another -- other than E&Y? That's another firm that was involved. There were firms that rendered legal opinions on these strategies, so I



guess they were involved.
Q. Are you finished?
A. Yes.
Q. Okay. Take a look at page 10, second bullet at the top. You state (as read): Ernst & Young was the only company providing the COBRA Investment and Tax Strategy. I am not aware of any other primary service providers other than E&Y who were offering this specific COBRA investment tax strategy.
Do you see that?
A. Yeah.
Q. And what is your basis for your conclusion that E&Y was the only, what you call, service provider that was offering a COBRA strategy?
A. Well, I -- in the documents that I reviewed and the conversations I had with counsel, I was not aware of any other party that was giving the COBRA strategy --
Q. And you --
A. -- as a strategy.
Q. And you point out in the last sentence that (as read): This belief is based on my review of the available documentation and my discussions with counsel.
A. Right.
Q. What portion of your conclusion -- of this





33536769-e7b1-4f38-a24d-ef5ac1ee2103

Page 122

conclusion is based on your discussions with counsel?
A. What portion? Well, they all -- they went hand in hand. I discussed it with counsel and reviewed the documents, I can't say...
Q. What counsel did counsel say?
A. I don't recall specifically except that I've been -- I was provided with everything that -- that I needed to come to that conclusion or that I -- that would permit me to come to that conclusion.
Q. Yeah, well, but did counsel say that there are no other promoters of tax strategies offering similar COBRA-like strategies?
MS. GAVIOLI: Objection. Form.
A. I really can't tell you what exactly counsel said at this stage. But when we had those discussions, this was the opinion and conclusion I formed as I stated here in this report.
Q. (BY MR. DONAHUE) I'll hand you what's been marked as Exhibit 2437. I'll hand you this one because it has a clip on it.
Have you seen this document before?
A. I do not believe so, no.
Q. This is the indictment of various individuals in connection with their design, marketing, and implementation of tax strategies. And most of these

Page 123

individuals were former employees of KPMG. Are you familiar with the accounting firm KPMG?
A. I've heard that term. That's a -- what does that stand for.
Q. It's just the name of the firm.
A. KPMG, they represent names I assume, but I've heard that name, yes.
Q. Were you aware that roughly about 22 individuals either at KPMG or other entities were indicted in connection with their involvement in fraudulent tax shelters?
A. No, I was not.
Q. Turn to page 26 of Exhibit 2437.
A. Page 26.
Q. Do you see at the bottom there's a reference to fraudulent SOS shelters?
A. I see the reference, yes.
Q. And do you see it states under paragraph 47 (as read): These shelters were designed to generate substantial capital and ordinary tax losses through a series of pre-arranged transactions that involved the clients entering into virtually offsetting foreign currency option positions with the bank, including but not limited to Bank A, sometimes transferring the offsetting option positions to a partnership or other

Page 124

entities.
Do you see that?
A. I see that reference.
MS. GAVIOLI: Objection. Form.
Q. (BY MR. DONAHUE) Now, do you know -- do you know whether or not the COBRA tax strategy had that element to it?
A. That element? What element is that?
Q. The element I just read.
MS. GAVIOLI: Objection. Form. I don't believe the question was clearly stated.
A. No, I do not is the answer.
Q. (BY MR. DONAHUE) Okay. Take a look at the next sentence. It says (as read): These shelters were referred to by various names including Short Option Strategy, Spread Option Strategy, Split Option Strategy, SOS, Binary Options, Digital Options, Gain Mitigator, Loss Generator, COINS, BEST, FX Transaction (hereinafter SOS).
Do you have any knowledge as to what are the characteristics of the various tax strategies that are referred to in which I just read?
A. As SOS?
Q. Any of them.
A. No, I do not.

Page 125

Q. Do you know to what extent that the COBRA tax strategy has the same elements or many of the same elements as these tax strategies?
A. I do not know.
Q. Do you recall that in the indictment that I read to you for E&Y individuals there was a reference to the SOS Strategy?
A. I don't recall that, no.
Q. Okay.
A. But I'll take your word for it.
Q. Well, let's see here. It's Exhibit 2439. Do you still have that in front of you?
MS. WIRSKYE: What is it?
MR. DONOHUE: 2439.
MS. WIRSKYE: But what is it?
MR. DONOHUE: It's the E&Y indictment.
Q. (BY MR. DONAHUE) Do you have it in front of you?
A. Yes, I do now.
Q. Okay. Turn to page 16. I read to you before paragraph 26, which is at the bottom. You'll notice paragraph 26 states (as read): The objective of COBRA was the complete and permanent elimination of all tax liability on whatever amount of ordinary income or capital gain a client might choose. COBRA, which

involved the manipulation of basis in foreign currency options, was E&Y's brand of a strategy also known as the Short Option Strategy.
Do you see that?
A. I see that.
Q. And do you recall that I read you in the list of strategies in the KPMG indictment the same term, the Short Option Strategy?
A. Is that what SOS stands for?
Q. And that's -- if you recall, if you want to go back to the KPMG indictment -- do you want to go back to that one?
A. Let me check just to be sure. What page was that, please?
Q. One second.
MS. WIRSKYE: 26.
THE WITNESS: 26?
Q. (BY MR. DONAHUE) It's on page 27.
A. The Short Option Strategy is included on page 27 of Exhibit 2437.
Q. So were you aware that, in fact, there were a whole series of offsetting option transactions that were being marketed during the same time period that the COBRA strategy was being marketed?
MS. GAVIOLI: Objection. Form.



A. No, I was not.
Q. (BY MR. DONAHUE) Do you -- as you sit here today, do you have any knowledge as to what the differences, if any, are between these various strategies?
A. That are listed in these documents here --
Q. Yes.
A. -- or these indictments?
No, I could not speak to the difference between these strategies.
Q. If --
A. If there are any. I assume they are, but they're different names. I guess that's the difference.
Q. If you were going to provide an opinion to a client that its tax strategy met the characteristic that it was not generally known in the industry and that it was at least somewhat different than other tax strategies already being marketed in the industry, what would you do now that you have this information before you?
A. What would I do?
Q. Yes. In other words, you now know, as I've pointed out to you, that there are a -- at this point in time there are a variety of other tax strategies involving offsetting options. And my question to you



is: Now that you know this, what would you want yourself to do in order to be able to tell a client that their particular COBRA strategy is, in fact, meets this first requirement of yours, that it's novel, it's not generally known in the industry, and has some type of difference between the other strategies on the market, what would you want to do?
MS. GAVIOLI: Objection. Form.
A. Well, in general terms each one of these strategies could be a trade secret or have the characteristics of a trade secret. The parties kept them confidential, treated them as such, and they could be ten trade secrets on -- related or somewhat similar strategies. And that's one of the difficulties in the trade secret business is to go out and investigate other strategies that are trade secret that are kept -- they're kept secret, so you don't know what they are.
But what you would do as best you could is determine the characteristics of that particular business method or strategy and does it have the characteristics of a trade secret. You can have, for example, a trade secret on a whole series of components, each of which are known generally, but the combination of those components has sufficiently this uniqueness or monochrome of unknowness that I referred to earlier that



permits it to be categorized or characterized as a trade secret.
In the trade secret business there's an awful lot of that where people defend against trade secrets saying, well, each one of these components is known and therefore the entire process, for example, is known. We know a step A, step B, step C, and D. But in totality, the process together, the combination can be and is in the law many times found to be or have the characteristics of a trade secret.
Q. (BY MR. DONAHUE) You started off your answer by saying: Well, in general terms each one of these strategies could be a trade secret or have the characteristics of a trade secret. The parties kept them confidential, treated them as such.
How do you know that to be true?
A. Well, how do I know that to be true?
Q. Yes.
A. In my understanding of the trade secret law -- you -- for example, you and I could both have a trade secret on exactly the same thing, conceptually. You keep it secret. I keep it secret. Vis-a-vis each other, we may not be able to have any cause of action, but you still have a trade secret. It's different from other intellectual property subject matter because of





33536769-e7b1-4f38-a24d-ef5ac1ee2103

Page 130

that characteristic. Now, can you enforce it? Yeah, you tell your client of your secret and keep it secret. I tell my client my secret and keep it secret.
Q. But --
A. But we don't know of each other's secrecy.
Q. But you --
A. Because they're secret.
Q. Were you speaking theoretically or were you saying with respect to the various firms that were offering the different tax strategies that I mentioned -- I should say the tax strategies that I mentioned. Do you have any ideas as to whether those firms knew that other firms were offering the same tax strategy?
A. I'm speaking theoretically. I do not know, but you asked me -- in fact, I thought to speak theoretically so I spoke theoretically.
Q. Okay. Well, but my question is: If you wanted to determine if the COBRA tax strategy was not generally known in the industry and had some slight enhancement over other similar tax strategies and you knew that there were all these other tax strategies out there, what would you want to do to confirm to yourself that the COBRA tax strategy was and had the characteristics of a trade secret?

Page 131

MS. GAVIOLI: Objection. Form.
A. Well, see, that speaks to the dilemma of this trade secret business compared to patent business. In the patent game I could go out and look in the library or a patent office and see if it's, quote, novel, end quote. But if I had a secret process or a secret business strategy and I want to know what your -- whether you have the same strategy -- if your strategy is secret, even if I called you up and said tell me your strategy, you would say no, it's secret. So in that respect there's difficulty in doing this investigation you're suggesting.
But what you do is you do the best you can. You investigate the facts. You look at the circumstances. You see -- a strong indicia is how did the people treat it that were dealing with it. Were there confidentiality agreements? Were there understandings that this secret would be -- not disclosed to others? And you do the best you can to come to that conclusion that it has the characteristic of a trade secret. Just like any other areas of the law, you may, in fact, be wrong, but you've come to that ascertainment that based on what I know, it has the characteristics of a trade secret.
Q. (BY MR. DONAHUE) Well, now that you do know

Page 132

that there are other tax strategies going by different names that, at least in the indictment, have been characterized as essentially the same strategy, would you want to do something more, now that you know this, either asking counsel to provide you with whatever documents you -- they could regarding this issue or on your own do something more, now that you know this?
MS. GAVIOLI: Objection. Form.
A. Well, I was not asked to investigate the detailed characteristics of the strategy, and therefore it wouldn't have done an awful lot of good for me to know the detailed specific difference between the strategies because my -- my -- my assignment or intent was to determine whether the strategy has the characteristics of a trade secret, not did it, in fact, legally be an enforceable trade secret that might be upheld eventually in court.
So would it affect me? I would like to know the difference between the various processes, but if they're all secret, I don't think that I could find that out. But if there's -- if there's a sufficient enhancement or difference, that alone could speak to the fact that they have a trade secret and I have a trade secret. ABCD Prime could be a trade secret compared to ABC and D. I just don't know what the details are.

Page 133

Q. (BY MR. DONAHUE) If you knew that the various firms that were offering these tax strategies knew that other firms were offering the same or a similar strategy, would that make any difference in your opinion?
MS. GAVIOLI: Objection. Form.
A. Please repeat your question.
Q. (BY MR. DONAHUE) Yeah, my question is -- and I may be wrong on this. It appears you're making an assumption that these firms do not know that other firms are offering the same or a similar tax strategy. And I -- my question is: If you knew that these firms, in fact, were aware that other firms were offering the same or a very similar tax strategy, would that make any difference to your opinion?
MS. GAVIOLI: Objection. Form.
A. If I knew they were offering similar tax strategies? I would like to consider that fact. It would be part of the totality of circumstances, but, again, I keep coming to the fact that I viewed my assignment not quite that way. I was trying to determine whether as treated in this environment, in this case, between these parties did this subject matter have the characteristics of intellectual property and specifically characteristics of a trade secret such that





33536769-e7b1-4f38-a24d-ef5ac1ee2103

Page 134

it was reasonable to ask for a percentage fee for the use of that intellectual property.
And the important element or the most important element, I guess, is the way the parties treated it, not whether in the abstract it was -- you have to rely upon the common sense and what you know and what the parties themselves did. In a nutshell, based upon what I looked at, this subject matter -- this business strategy had the characteristics of a trade secret and that permitted me to go to the next step and say, all right, it would be reasonable under the normal valuation of intellectual property laws and techniques to apply a percentage fee to the use of that information.
Q. (BY MR. DONAHUE) See, I'm confused. Because you had -- you stated that one of your requirements is novel in the sense of not generally being known in the industry. Am I right on that?
A. Right, of a trade secret, yeah.
Q. Of a trade secret. And I have pointed out to you that you may -- there may be other -- a lot of other tax strategies just like COBRA. That's the reason I showed you those indictments. Of course, indictments are allegations. But now that I've pointed this out to you, you seem to be saying to me well, that really is

Page 135

not relevant because I looked at the totality of circumstances.
But I'm specifically saying to you, now that you know this, that there's allegations, that there's this same product being offered by other firms, what would you want to do to confirm, yourself, that in fact the COBRA tax strategy was not generally known in the industry?
MS. GAVIOLI: Objection. Form. I believe we've covered this already several times.
A. You said same product. You see the -- this gets a little confusing. But in this intellectual property area information has value. Even non-secret information has value. There's a section of the restatement, Section 759 for example, that talks about the misuse of non-trade secret information. So the fact that something -- a body of knowledge can support a fee or a reasonable royalty, for example, for the use of -- which I viewed my assignment to be -- isn't necessarily totally dependent upon it being totally in view of all circumstances in the abstract and in realty a, quote, trade secret or a patentable invention.
Does this have the characteristics of a trade secret? Is it a valuable body of information? And is it, therefore, something that would be reasonable

Page 136

under the circumstances to pay a fee for? I was not -- I did not intend to and I did not have the assignment to go out and determine as a matter of absolute proof that this business strategy was a trade secret. Now, if that was my assignment, it would take me a lot more time than what I have invested here. That wasn't my assignment.
Q. (BY MR. DONAHUE) So am I right in saying that you didn't conclude that as a factual matter this COBRA tax strategy had the characteristics of a trade secret?
MS. GAVIOLI: Objection. Form.
Q. (BY MR. DONAHUE) Am I right in that's what you're saying?
MS. GAVIOLI: Objection. Form.
A. No. No, that's not what I'm saying.
Q. (BY MR. DONAHUE) Okay. What are you saying?
A. I'm saying what I said in my report. I'm trying to say it accurately.
Q. What did you mean when you said: I did not go out and determine as a matter of absolute proof that this business strategy was a trade secret.
What did you mean by that?
A. Well, like I say in my summary of opinion on page 4 of my report, it has the characteristics of a trade secret. For me to ascertain whether any particular thing in the absolute might have never been

Page 137

known by anybody would take me an awful lot of time. And I did not say, for example, is in fact a specific trade secret. I say it has the characteristics of a trade secret, which for my purposes was what I needed to know because then my primary assignment was the next step. Was it reasonable under the circumstances for the parties to treat this as a body of information that would justify the charge of a fee for use of the information?
Now, it's just like if I were -- if I had a patent and I licensed you the patent and you pay me a million dollars for the patent, it has value. It has the characteristics of a patentable invention. But after a lawsuit is finished three years later, that may be rendered an invalid patent but still it had the characteristics of a patentable invention. I know it sounds abstract, but this is what we're dealing with.
Q. But when a client -- if you told the client we're going to allow you to -- with our product not pay any taxes at all, wouldn't a client pay money for that regardless of whether or not it was and had the characteristics of a trade secret?
MS. GAVIOLI: Objection. Form.
A. I really can't speak to that.
Q. (BY MR. DONAHUE) But to me it appears to be





33636769-e7b1-4f38-a24d-ef5ac1ee2103

Page 138

that you're saying because the client ultimately paid money for this product, somehow that relates to the initial issue as to whether or not the tax strategy had a -- had the characteristics of a trade secret.
MS. GAVIOLI: Objection. Form. I believe you're mischaracterizing --
MR. DONOHUE: Counsel, let me finish my question before you object.
MS. GAVIOLI: I don't hear a question at this point.
MR. DONOHUE: I'm sorry? I apologize.
Q. (BY MR. DONAHUE) It appears from what I'm hearing that what you're saying is, is that the primary focus or purpose of your assignment was to determine if this tax strategy was something in which a client would, in fact, pay money for. Is that what you've been saying?
MS. GAVIOLI: Objection. Form. I think the question is very unclear.
MR. DONOHUE: You may answer.
A. Well, as I said in my report and as I've been trying to say here, my assignment was to determine whether in my opinion the information I was provided for permitted me to conclude that this business strategy -- this business method, what we called Investment and Tax

Page 139

Strategy, had the characteristics of intellectual property, which would support a charge of a reasonable royalty-type fee for the use of it. And that was my assignment.
And I came to two conclusions. One, it had the characteristics of the intellectual property. And two, therefore I looked at the -- at the fee structure and said well, that's not unreasonable. Those were my two steps in my assignment.
Q. (BY MR. DONAHUE) Okay. Let me show you what's been marked as Government Exhibit 2440. You mentioned previously you read some testimony of a Mr. Daugerdas. Have you seen this decision before? 2440 is a decision in a lawsuit by the Diversified Group against Paul Daugerdas and Jenkins & Gilchrist.
THE WITNESS: Before we get to this, could we take a five-minute break?
MR. DONOHUE: Sure. Sure. Any time you want a break.
THE WITNESS: Thank you.
(Recess held, 2:21 p.m. to 2:27 p.m.)
Q. (BY MR. DONAHUE) Back on the record. Mr. Jager, you've been handed what's been marked as Government Exhibit 2440. As I mentioned previously, that is a decision in a lawsuit by the Diversified Group

Page 140

against Paul Daugerdas, D-A-U-G-D-A-R-D-A-S, and Jenkins & Gilchrist. Are you aware of this decision?
A. I think this is part of the material I referred to earlier that I had seen within the last couple of days. It's a decision on summary judgment, is that what this is? I believe so.
Q. So you believe you've seen it before?
A. I think I've seen it, yes. I haven't seen it in this form, printed form.
Q. And who provided you with that material?
A. Counsel did.
Q. And do you know why you were provided that material?
A. Just as background for this deposition.
Q. Were you provided any other material besides this decision?
A. I saw the complaint, the pleadings. I went through -- there were three or four documents. I forget exactly what they were. There was some -- somebody who tried to -- well, I saw some deposition testimony. That was pretty substantially redacted, so I couldn't really follow all of it. And then I saw a motion by somebody to open the record and then the matter ended. I assume it was settled.
Q. Do you know why you were shown these

Page 141

materials?
A. Because counsel wanted me to have them in front of me so that if you asked me questions about them, I would be familiar with them, as you are doing now.
Q. How do you know?
A. Well, then if we have no questions, let's move on.
Q. Not so fast.
So did you have a chance to review the opinion?
A. In general terms, yes.
Q. Okay. Turn to page 7 of the opinion under the heading OPS, do you see in the first paragraph it states (as read): A tax strategy is defined as a technique used in a business or investment transaction designed to achieve a particular tax result predicated on particular economic and tax principals.
Is that how you would define a tax strategy for purposes of you rendering an opinion?
A. Well, that's not the definition I used, as you know. I had investment tax because there was an investment component, and I understand some of these parties actually made a profit, so to speak, from the investment, but I'm certainly not going to argue with





33536769-e7b1-4f38-a24d-ef5ac1ee2103

the Court about their definition of a tax strategy.
Q. What is your basis for saying some of the clients made a profit, so to speak. What's your basis for that?
A. I think that the material that I studied and that counsel advised me that they did.
Q. Could you point to where in the material that you saw anything that any of these people made a profit on these transactions?
A. No. I'm relying on the representations of counsel.
Q. And to what extent did that representation play any part in your opinion?
A. Well, that's why -- it really is an Investment and Tax Strategy.
Q. If none of the clients made a profit on the transaction, would that affect how you referred to this strategy?
MS. GAVIOLI: Objection. Form.
A. No, it wouldn't.
Q. (BY MR. DONAHUE) Even though they didn't make a profit, would you still refer to it as a, quote, Investment and Tax Strategy?
A. Yes, I would because they had the potential of making a profit. If they, in fact, did not, they still



would have the potential.
Q. Do you know the difference between a positive and negative expected return?
A. I have not heard that term.
Q. Go back to Exhibit 2440, page 7, and I'm in the middle of that paragraph where -- the first paragraph, where it states (as read): The option partnership strategy is a tax saving strategy wherein the taxpayer purchases and writes options and transfers these option positions to a partnership so as to create substantial increase basis in the partnership interest.
Do you see where I just read?
A. Yes, I do.
Q. To your knowledge, do you know if the COBRA strategy had that same feature?
A. To my knowledge the COBRA strategy, as I opined on, had like I said in my opinion two aspects: the potential for profit on the investment and the potential for tax savings. This speaks to one part of that, the tax saving strategy. If this -- this is OPS, right? I can't tell you what the difference is between OPS and COBRA.
Q. Well, since you didn't precisely answer the question I asked, let me ask it once again.
I read you that sentence and my question



was: Do you know whether the COBRA tax strategy had this element as a feature of it?
MS. GAVIOLI: Objection. Form.
A. Specifically, no, I don't.
Q. (BY MR. DONAHUE) All right. The next sentence says (as read): As a result of these trades and transfers, the taxpayer claims that the basis of the taxpayers' partnership interest is increased by the cost of the purchase call options, but is not reduced as a result of the partnership's assumption of the taxpayers obligation with respect to the written call options.
And my question is: Do you know whether the COBRA strategy had that as an element of its -- its strategy?
A. No, I do not. As I said in my report, I made some assumptions and I didn't get into those details.
Q. Would it make any difference now, as you sit here today, if you knew that the COBRA strategy had both of those as elements to your ultimate opinion?
MS. GAVIOLI: Objection. Form.
A. Both of -- what both?
Q. (BY MR. DONAHUE) Well, I read you two sentences. I'm referring to those two sentences. And my question is: If you knew the COBRA tax strategy had both of those elements, would that make any difference



to your opinion?
A. Well, my opinion was assumed on the -- was based on the assumption that this business strategy had both investment characteristics and tax strategy characteristics. This paragraph you just read to me out of this opinion talks about some techniques used to obtain a tax benefit. So to the extent that's a part of the tax strategy, it would be within my assumption, but I can't tell you whether it is exactly what COBRA is or not. I did not study that.
Q. But wasn't also one of the characteristics you looked at when determining whether COBRA was a -- entitled to trade secret protections is whether or not COBRA was generally known in the industry? Wasn't that one of the elements you looked at?
MS. GAVIOLI: Objection. Form.
A. That's what I -- that's one of the characteristics of a trade secret, yes.
Q. (BY MR. DONAHUE) And what this is saying is that another strategy called OPS or the Option Partner Strategy has these characteristics. And I'm saying if you knew that COBRA had the same characteristics, would that affect your opinion as to whether or not COBRA was generally known in the industry?





33536769-e7b1-4f38-a24d-ef5ac1ee2103

Page 146

MS. GAVIOLI: Objection. Form. I believe he's already answered this question.
MR. DONOHUE: You may answer it.
A. Not necessarily because I have based my opinion on the assumptions that I stated. There, obviously, are other tax-saving strategies out there, and that would not have changed my opinion.
Q. (BY MR. DONAHUE) Even if those tax-savings strategies had essentially the identical features, that wouldn't change your opinion?
MS. GAVIOLI: Objection. Form.
A. Well, that might change the conclusion as to whether or not it's an absolute trade secret, but it wouldn't change the conclusion -- and this is a fine point -- that the strategy, as interpreted by these parties and as I have studied, have the characteristics of a trade secret.
Q. (BY MR. DONAHUE) Do you know what the nature of the lawsuit was between the Diversified Group and Paul Daugerdas?
A. Well, as stated here, I think there was some contentions that Mr. Daugerdas breached agreements that he had with the Diversified Group and with his attorney and breached his attorney-client relationship. I think that's what this speaks to.

Page 147

Q. Take a look back on page 7, the last paragraph.
A. Yes.
Q. On the first column, it says (as read): DGI asserts that OPS originated sometime in 1988 in a conversation between Oren Tilevitz, T-I-L-E-V-I-T-Z, an attorney, who at the time was an employee of PriceWaterHouse, engaged by DGI to review and develop tax strategies and R. J. Ruble, a lawyer with the firm Brown & Wood.
Do you see that?
A. Yes, I do.
Q. And next it says (as read): According to Haber, DGI spent hundreds of hours of professional time developing the OPS into a functional tax strategy.
Do you see that?
A. Yes, I do.
Q. And my questions is -- and it's really getting back to your prior response. You stated: That might change the conclusion as to believe it were not an absolute trade secret, but it wouldn't change the conclusion and at that -- in this -- and that is a fine point. But the strategy is interpreted by these parties, and as I have studied have the characteristics of a trade secret.

Page 148

It's that response that I'm having a hard time understanding. Is a trade secret something that is purely referred to between -- in your view between the parties or is a trade secret something that you have to meet legal characteristics; and if you meet these legal characteristics, it provides you with protection throughout the country?
MS. GAVIOLI: Objection. Form.
A. I don't quite understand the question.
Q. (BY MR. DONAHUE) All right. Let me -- let me go back then. If you recall, I said if you knew that other tax strategies on the market at the same time as COBRA had the same features as COBRA, if you knew that, I asked would that affect your opinion. What is your answer to that question?
MS. GAVIOLI: Objection. Form. You've asked this question several times now.
MR. DONOHUE: You may answer.
A. I think I did answer that question before and you can read back my question if you can.
THE WITNESS: Can you find the answer to that?
Q. (BY MR. DONAHUE) But I read you back your answer and I didn't understand your answer. So that's the reason I'm asking it again.

Page 149

A. Well, your question wasn't -- the answer you read back wasn't quite the question you just asked me, so please restate your question and I'll try to answer it.
Q. All right. My question is: If you knew that there were other tax strategies on the market that offered the same features as COBRA -- I'm asking you if you knew that -- how would that affect your opinion?
MS. GAVIOLI: Objection. Form.
A. Well, I tried to answer that before. My assignment was not to determine in the absolute sense that this was -- this business strategy was something that was a trade secret in the ultimate or abstract sense. My assignment was to -- my assignment, as I understood it, was to determine if it had the characteristics of intellectual property, in this case a trade secret, or proprietary information that the next step would justify the application of a reasonable fee to use it.
Q. (BY MR. DONAHUE) Well, in your report on page 10, Exhibit 2398, the second bullet, you say (as read): Ernst & Young was the only company providing the COBRA Investment and Tax Strategy.
Do you see that?
A. Yes, I see that.





33536769-e7b1-4f38-a24d-ef5ac1ee2103

Page 150

Q. And you say (as read): This belief is based on my review of the available documentation and my discussion with counsel.
Do you see that?
A. I see that.
Q. Okay. So you do render an opinion that COBRA was the only company providing the COBRA Investment and Tax Strategy, am I correct?
A. As I understand COBRA, that's correct.
Q. And you made -- based on your discussions with counsel and your review of what you call available documentation, you concluded that you had a reasonable basis for that conclusion, correct?
MS. GAVIOLI: Objection. Form.
A. Well, see, this -- this was one of the factors that I considered in determining in my opinion as an intellectual property lawyer that this subject matter had the characteristics of a trade secret, and therefore would justify the charging of a fee -- a reasonable fee for its use. Now, I don't know if you -- I don't know how else to state it. I've said that two or three times now.
Q. (BY MR. DONAHUE) But you haven't answered the question that I just asked you.
MS. GAVIOLI: Counsel, I believe he has

Page 151

answered the question. I think it's time to move on from this area.
MR. DONOHUE: Please don't make statements on the record.
MS. GAVIOLI: Objection. Asked and answered.
MR. DONOHUE: Okay.
Q. (BY MR. DONAHUE) What my question was -- is you have made a statement here that Ernst & Young was the only company providing the COBRA Investment and Tax Strategy. And you say your belief is based on my review of available documentation and my discussions with counsel. And what my question is: If you knew that other firms out there were offering this same tax strategy, how would that affect your opinion?
MS. GAVIOLI: Objection. Form. Asked and answered.
A. I think I'll depend upon my previous answers to that question that's been asked several times, so...
Q. (BY MR. DONAHUE) Am I right then, it wouldn't affect your opinion at all?
MS. GAVIOLI: Objection. Form. Mischaracterize the expert's opinion.
A. I stand on my previous answers.
Q. (BY MR. DONAHUE) Well, the reason I'm asking

Page 152

the question again is because I don't understand your previous answers. If you could just say it doesn't affect it or it does affect it, you know, that to me -- I could move on. But I need an answer to my questions.
MS. GAVIOLI: There's not a question before the witness.
Q. (BY MR. DONAHUE) So I ask the question again. If you knew that there were other tax strategies on the market that had the same features as the COBRA tax strategy, how would that affect your opinion that the COBRA tax strategy met the characteristic that it was not generally known in the industry?
MS. GAVIOLI: Objection. Form. Asked and answered.
A. I stand on my previous answer to that same question.
Q. (BY MR. DONAHUE) So you refuse to answer the question?
MS. GAVIOLI: Objection.
A. I've already answered it, sir. I'm sorry. I don't mean to be arguing, but I'll try to restate it as best I can, the answer, but I would rather refer to the previous answer that I gave.
Q. (BY MR. DONAHUE) Well, your previous answer dealt with I wasn't given the assignment to make a

Page 153

determination in the absolute sense as to whether or not the COBRA tax strategy met the characteristics or had the characteristics of the trade secret. You said that, am I correct?
MS. GAVIOLI: Objection. Form.
A. That was part of what I said, yes.
Q. (BY MR. DONAHUE) But then I pointed out to you you did render an opinion that the COBRA strategy, Ernst & Young was the only company providing the COBRA investment. I pointed that out to you. To me that's a pretty dogmatic, absolute statement. And alls I was doing was pointing out that if you knew that there were other companies out there that were, in fact, offering a strategy that had the same features as COBRA, would that affect your opinion?
MS. GAVIOLI: Objection.
Q. (BY MR. DONAHUE) And you come back to telling me that you weren't asked to make a determination in the absolute sense.
MS. GAVIOLI: Is there a question before the witness, Counsel?
Q. (BY MR. DONAHUE) Do you understand where my problem lies?
A. Do I understand where your problem lies? No, I don't.





33536769-e7b1-4f38-a24d-ef5ac1ee2103

Page 154

Q. Okay. Let me specifically go back to your conclusion that Ernst & Young was the only company providing the COBRA investment tax strategy. If you knew that wasn't true, would that affect your opinion?
MS. GAVIOLI: Objection. Form.
A. If I knew that wasn't true, would that affect my opinion? You're pulling out one sentence of a several-page report, and I looked at that fact as well as many other facts, as I've stated. And as I've said many times before, you and I can both, for example, have the same trade secret. So I would have to say based on what I know, that may or may not affect it, but I don't think it would.
I didn't look into the exact COBRA strategy, so I can't answer those detailed questions you've been trying to ask me. I don't know the COBRA strategy that well.
Q. (BY MR. DONAHUE) Well, to answer my question do you need to know what the details of the strategy are? Alls I'm saying is assume with me. You're an expert witness. I'm saying assume there are other strategies that have the same features.
MS. GAVIOLI: Objection. Form. Asked and answered.
MR. DONOHUE: Counsel, let me finish my

Page 155

question.
MS. GAVIOLI: It seems to be the same question you've been --
MR. DONOHUE: Counsel, please do not interrupt me until --
MS. GAVIOLI: -- asking for the last hour. We need to move on.
MR. DONOHUE: Please do not interrupt me -- it's improper, it's impolite -- at least until I finish my question.
A. Please state your question.
Q. (BY MR. DONAHUE) Yes, my question. I lost my train of thought.
I can't -- in response to my last question you seem to be saying, I didn't look into the details of the COBRA strategy. And what I pointed out to you is, forget about the details. Just assume that there are other strategies on the market that have the same features. And I asked you, would that affect your opinion. And I think what you're saying is no, it would not affect my opinion. If that's your answer, fine we can move on. Is that your answer?
MS. GAVIOLI: Objection. Form.
A. Well, I would stand on what I have said previously, but there are several features that I looked

Page 156

at, the totality of circumstances, and my assignment was not as COBRA strategy that's trade secret to the abstract, is it -- does it have the characteristics of a trade secret. And as I've said to you many times, you and I both might have COBRA. And you might charge your clients a fee to use COBRA. I might charge my clients a fee to use COBRA. The fact that we both know it or the fact that other people knew it besides Ernst & Young and was charging a fee for it, alone does not make it not have the characteristics of a trade secret. That's what I'm speaking to.
Q. (BY MR. DONAHUE) So in other words, for purposes of having the characteristic of a trade secret, you are one -- let me phrase it this way.
It makes, in your opinion, no difference if someone else is offering the identical product?
MS. GAVIOLI: Objection. Form. I don't believe that's what the expert spoke to.
A. No, that's not what I said. That's not -- I thought I was making myself clear. I'll try to restate it.
I was trying to determine whether this had the characteristics of intellectual property that would reasonably support the charging of a fee. And my conclusion was yes. And whether you are charging a fee

Page 157

for a similar service or not wouldn't ultimately affect that opinion, if that's what you are driving at.
Q. (BY MR. DONAHUE) Well, if that's the case, why was it necessary then in your second bullet for your conclusion that Ernst & Young was the only company providing the COBRA Investment and Tax Strategy, why was that necessary?
A. Well, because basically --
MS. GAVIOLI: Objection. Form.
A. Why was it necessary? It was one element of my analysis, and I just stated what one element of my analysis was at the time I made my analysis.
Q. (BY MR. DONAHUE) If there were other firms out there in the market that were offering this same tax strategy and charging a fee and these firms are aware that there are other firms out there charge -- offering the same product and charging a fee for their tax strategy, which had the same features as the COBRA strategy, would this make a difference in terms of whether in your opinion these strategies had the characteristics of a trade secret?
MS. GAVIOLI: Objection. Form. Asked and answered.
A. It would not affect my ultimate opinion, no. My ultimate opinion was that this body of intellectual

property or of this body of information had the characteristics of intellectual property was sufficient to reasonably support a fee and whether other people were doing it or not in my judgment would not change that ultimate opinion.
Q. (BY MR. DONAHUE) Is it conceivable to you that the -- the fee that clients were paying that that was -- could have been directly related to the fact that they were being told that they would save -- be able to -- not save but eliminate their tax liability?
MS. GAVIOLI: Objection. Form.
A. I'm sorry. Would you restate the question?
Q. (BY MR. DONAHUE) Yeah. Did you conceive of the possibility that the reason that clients were paying a fee for the tax strategy was because they were being told that the tax strategy could eliminate their tax liability, did you consider that possibility?
MS. GAVIOLI: Objection. Form.
A. Well, I stated the assumptions upon which my opinion was based, and the assumption was that it had business and tax aspects, and that's -- what you just described was a tax aspect of the strategy. But I started out with that assumption.
Q. (BY MR. DONAHUE) If you recall, you mentioned that there were other strategies, tax strategies that



had been patented. Do you recall that?
A. Yes.
Q. Do you know whether any of these other tax strategies that had been patented had as a feature of their strategy paying a fee to a firm based on a percentage of their tax savings?
A. No, I do not know.
Q. Okay. Let me turn to your secrecy requirement. And if you would, turn to page 10 of Exhibit 2398, the second paragraph, the last sentence you state (as read): Establishing that something is not generally known and that it is been guarded -- and it has been guarded aides in convincing a trier of fact that the trade secret is valuable.
And my question is: What is your basis for that statement?
A. Well, that's a paraphrasing of a comment I think made by Jim Pooley in his book is what that is -- James Pooley, I'm sorry.
Q. So it's -- in other words, it's your opinion that in order to meet this requirement, it would be helpful to establish that the item is not generally known and that it is guard -- and it has been guarded?
MS. GAVIOLI: Objection. Form.
Q. (BY MR. DONAHUE) Am I right?



A. That's what -- that's what Mr. Pooley has said and I was generally referring to what Mr. Pooley said, yes.
Q. Now, did you make any attempt to determine whether or not the COBRA strategy was generally known and had been guarded?
A. I believe I did, yes. We looked at the documents that are cited just below that statement you're reading and looked at the other documents that are cited on page 11 and looked at the facts, as I could ascertain them, and yes, we have looked into that.
Q. And by the documents, are you referring to the confidentiality agreements?
A. Well, the one, two -- those four bullet points on the bottom of page 10 and the top of page 11 is what I'm referring to, for example. The parties guarded this information by confidentiality agreements and by understandings between them. That's what I meant by guarding.
Q. So in that you were attempting to determine -- you were using the confidentiality agreements as what, sort of, circumstantial evidence to the fact that the strategy was not generally known?
MS. GAVIOLI: Objection. Form.
Q. (BY MR. DONAHUE) Is that what you were doing?



A. It's one factor you consider, yes.
Q. In your second bullet on page 11 you state (as read): The Investment and Tax Strategy is not publically available.
You say (as read): Based on the information reviewed, the specific Investment and Tax Strategy was not publically accessible or well-known in the financial and the tax services industry.
What is your basis for that conclusion?
A. Well, to the extent that I reviewed the record and had discussions with counsel, that was my understanding at the time I wrote this.
Q. Would you -- given the morning and the afternoon, would you -- now that other information has been provided to you, do you see any reason that you would change the wording of that sentence?
A. Well, I have not -- I did not look into whether any of these SOS's or whatever they are are similar or different or to what extent they're different from the Investment and Tax Strategies I am looking at, so as I sit here today I wouldn't change that statement knowing what I know now.
Q. Would you possibly have a footnote and point out that there are other strategies on the market and I haven't looked into as to what extent they have the same





33536769-e7b1-4f38-a24d-ef5ac1ee2103

Page 162

features as the COBRA tax strategy?
MS. GAVIOLI: Objection. Form.
A. I couldn't tell whether I would put it in a footnote or not.
Q. (BY MR. DONAHUE) Would you put it in the text?
MS. GAVIOLI: Objection. Form.
Q. (BY MR. DONAHUE) That was a real question. I mean, would you add something now that you have other information?
A. Well, the other information I have is only that there are other tax strategies out there. And I don't know whether they're identical to or different from or to what extent they're different from what I have been told the COBRA strategy was. And as I keep saying over and over again, my assumption was that this strategy had investment and tax benefits and that it had the characteristics of a trade secret. If it may not be absolutely a trade secret, it had the characteristics of a trade secret such that my next conclusion is reasonable, that it is reasonable to prepare a fee for charging it. I've said that as clear as I could.
Q. I understand that. But you've also concluded that the COBRA tax and investment strategy, as you call it, was -- met the secrecy requirement, correct?

Page 163

A. I said it has the characteristics of a trade secret and therefore is intellectual property. That -- such that it would justify a fee for the use of it.
Q. If you turn back to page 10, the third paragraph, could you read that paragraph?
A. Which paragraph now?
Q. The third paragraph, it starts with "my opinion."
A. Yes. Do you want me to read it out loud?
Q. Yes.
A. (As read): My opinion based on the information reviewed is that the Investment and Tax Strategy was adequately maintained as a secret. This is evidenced by the following and discussed in the following sections.
And then I cite those documents -- those four or five bullet points.
Q. Am I right, you did conclude that based on the information you reviewed that the COBRA strategy was adequately maintain the secret, that was one of your conclusions, right?
MS. GAVIOLI: Objection. Form.
A. That's what I said based upon what I reviewed and cited below, yes.
Q. (BY MR. DONAHUE) Turn to page 11, the last

Page 164

bullet.
A. Yeah.
Q. Did you write that bullet?
A. Did I write it?
Q. Yes. The trade secret remains a trade secret even if it's disclosed to the IRS.
A. That was a joint effort by myself, Rick, and Steve in my office. One of the questions I asked is well, common sense tells me that if I disclose something to the IRS, it's maintained in confidence. Just like for years and years if I disclosed my invention to the patent office, it's secret and nobody can get it. And so I -- the premise is, in fact, under The Freedom of Information Act, there's an exception to The Freedom of Information Act saying trade secrets can be kept confidential from government files.
So the mere fact that information is filed with the IRS or with the patent office doesn't mean that it no longer has the necessary confidentiality. It doesn't become automatically in the public domain is what I'm driving at.
Q. Did you -- were you aware of Section 6103 of the Internal Revenue Code at the time you were writing your report?
A. I asked counsel to provide me with the

Page 165

specific section of the code because I assumed that there was one, and they provided that to me. I know that my tax records are kept confidential by the IRS, I assume.
Q. Do you know whether or not the COBRA tax strategy or the features of the COBRA tax strategy have been announced by the Internal Revenue Service?
A. No, I do not.
Q. I'm going to hand you what's been marked as Exhibit 2467. Exhibit 2467 is known as Notice 2044, and it makes reference to tax avoidance using artificially high basis and it indicates it was released in August of 2000.
Have you ever seen this notice before?
A. I don't recall it. Is it part of the documents that I list in Exhibit B? It doesn't have a Bates number.
Q. You know the rule. You can't ask me questions.
A. Well, I'll check just to make -- well, it doesn't have a Bates number, so I assume it wasn't there. I guess the answer is I don't recall.
Q. Okay. Are you aware as to whether or not the Internal Revenue Service can make an announcement regarding the features of a tax strategy without





33536769-e7b1-4f38-a24d-ef6ac1ee2103

Page 166

identifying individuals, are you aware of that?
A. No, I was not or am not.
Q. To what extent if there is an announcement regarding -- a public announcement regarding the features of a tax strategy would that affect your opinion regarding whether or not the secrecy requirement was met?
MS. GAVIOLI: Objection. Form.
A. Let's see, this was released in 2000 -- the end of 2000? This did not exist at the time of 1999 or 2000 with respect to the transactions I was looking at, so I guess this would -- I haven't read this. I don't know what's in it. But that would not have been a factor at the time that I determined what my opinion was based on.
Q. (BY MR. DONAHUE) Well, I didn't necessarily ask a question dealing when it was issued. I just asked a more general question. And generally speaking, to what extent would your opinion be affected if the Internal Revenue Service could announce the features of the tax strategy, would that affect your opinion?
MS. GAVIOLI: Objection. Form.
A. Could or did?
Q. (BY MR. DONAHUE) Could.
A. I guess is the question.

Page 167

Q. Could.
A. That would be one of those factors you would consider, but the question would have to be asked, did they. Anybody can disclose something, but did they disclose it. And if I look at this in 2000, it would not have been a factor at the time that I was making my analysis, which was at the time the transactions occurred.
Q. Well, we'll get to whether it actually -- if you knew it could have, in fact, but my question now is simply -- and it's referring to your reference to 6103, you're saying that the Internal Revenue Service must maintain information regarding the tax strategy a secret. They can't disclose it. And what I'm saying is, if you knew that the Internal Revenue Service could disclose the features of the tax strategy without disclosing the names of the individuals, would that affect your opinion as to whether or not the secrecy requirement would be in effect?
MS. GAVIOLI: Objection. Form.
A. Well, I was not aware of this notice. I don't know what's in it. I just saw it. It would be a factor to be considered, I'll put it that way. But would it be the end all and be all and the deciding factor, I can't say it would be. The fact that it could be doesn't mean

Page 168

it was or under what circumstances it was disclosed or could be disclosed. I don't know what circumstances you're dealing with. I'm not familiar with the way the IRS operates.
Q. (BY MR. DONAHUE) But I was just referring to the secrecy requirement. And for purposes of rendering an opinion, if the Internal Revenue Service announced the features of the strategy, would that affect your opinion as to whether or not the strategy was secret?
MS. GAVIOLI: Objection. Form.
A. If they did in fact announce it?
Q. (BY MR. DONAHUE) Yes.
A. And published it in the --
Q. Yes.
A. -- New York Times or whatever?
Q. Well, in an announcement.
A. Well, it's a public document.
Q. Yeah, a public document.
A. Well, then, you know, that would be a major factor to look at because you've just defined the matter as being in the public domain and that could change things, but it would be one factor you would have to look at.
Q. All right. Let's look at your next requirement, which is security.

Page 169

A. Yeah.
Q. And you'll notice at page 12 of Exhibit 2398 that you refer to the fact that the plaintiff must use reasonable efforts in establishing your security requirement. And I'm referring to the third paragraph. Have I correctly stated what your opinion is?
MS. GAVIOLI: Objection. Form.
A. Well, I say there the standard of reasonable efforts is flexible. Efforts that are reasonable under the circumstances, yeah, that's what I'm saying. It's not a question of absolute secrecy. It's a question of reasonable secrecy.
Q. (BY MR. DONAHUE) You said secrecy. Do yo mean security?
A. Reasonable security, of course.
Q. And what is your basis for your conclusion that the standard of reasonable efforts is flexible?
A. That cites to James Pooley's reference to it. And if you read through the case law, it depends upon the circumstances as to what's reasonable. I could cite you examples, but I won't bore you with that. But reasonable under the circumstances is the test, reasonable security precautions.
Q. So this standard then was based on your understanding of the case law?





33536769-e7b1-4f38-a24d-ef5ac1ee2103

A. Yes.
Q. Okay. In the fifth paragraph in that section of your report on page 12, Exhibit 2398, it states (as read): Court cases have established the importance of adequate security precautions as an element of proof in a trade secret case.
What court cases are you referring to?
A. Oh, there's many, many court cases that say that. And if you look at the statements and you look at the definition of Trade Secrets of the Uniform Act it says that one of the components is that the subject matter was subject to reasonable efforts to maintain security. So it's a fair -- you know, it's a commonly known criteria in this business.
Q. So then this reference to the importance of the adequate security precautions is based on your understanding of the case law?
A. And the statutes.
Q. And the statutes.
A. And the restatements as well as the case law.
Q. And you point out that -- in the next sentence (as read): Based on the information reviewed in this case (the engagement letter, the confidentiality agreement, for example) and nature of the service provider's business...



What did you mean by that statement, the nature of the service provider's business?
A. Well, I'm looking at this -- again, at the totality of circumstances. And being a lawyer it's hard to disassociate the fact that you're a lawyer from everything you do. I feel like I have a heightened degree of confidentiality requirements over a bus driver, for example. And I think that it's my understanding that if I went to my accountant he has some professional obligations to me as well as to other clients.
So that's what I meant by the nature of the service provider's business. I mean, this is not -- I mean, generally speaking, I would assume that your tax advisor would have a heightened degree of confidentiality much like an attorney-client privilege would. Now I'm not an accountant, but I assume they have some professional standards that they have to stick to.
Q. Would you view firms that offer tax shelter strategies as wanting to keep their strategy secret and secure because of their desire to conceal it from the Internal Revenue Service, do you consider that as a possibility?
MS. GAVIOLI: Objection. Form.



Particularly of the use of the term "shelter."
A. Well, I have not considered that, no.
Q. (BY MR. DONAHUE) Even though you haven't considered it, if you knew that a principal reason that the firms that offered tax strategies were to conceal the strategy from the Internal Revenue Service, would that affect your opinion at all as to whether or not the strategy met the security requirement?
MS. GAVIOLI: Objection. Form.
A. I don't frankly understand the question. We spoke earlier about the motivation that people might have. I don't have any idea what E&Y's or other people's motivations might be in keeping things confidential, so I did not factor in motivation in my analysis.
Q. (BY MR. DONAHUE) But if you recall at the beginning, you mentioned that -- you made an assumption that the facts that were presented regarding the COBRA transaction were as stated in a document provided to you by counsel. Do you recall that?
MS. GAVIOLI: Objection. Form.
A. Yeah, that was a letter that we read earlier, yes.
Q. (BY MR. DONAHUE) And alls I'm asking you is -- making another assumption, I know you don't know



whether it's true or not, but I'm saying make another assumption. And the assumption I'm telling you to make is assume that the reason that these confidentiality agreements were being entered into, if not the sole reason, the principal reason was to conceal the transaction from the Internal Revenue Service. And my question is: If you made that assumption, would that affect at all your opinion as to whether the secrecy and security requirements had been met?
MS. GAVIOLI: Objection. Form.
A. I've read a lot of cases in this area, and I don't remember motivation being considered, why people keep it secret. It's just the fact that they've made usable inference to keep it secret. So I did not consider motivation in my analysis. As I said before, my analysis was: Yes, it had the characteristics of a trade secret, therefore the next step was the reasonableness of a fee. So I didn't consider that as a factor.
Q. (BY MR. DONAHUE) I know you didn't. I think what you're saying is even if you did assume it, it wouldn't -- to you it wouldn't make any difference?
A. Well, I --
MS. GAVIOLI: Objection. Form.
A. I'm not aware of any case that considered





33536769-e7b1-4f38-a24d-ef6ac1ee2103

motivation, I'll put it that way. So it would not have been something I would have thought of.

Q. (BY MR. DONAHUE) So if I understand your answer, you're -- you would not because based on your understanding of the law, motivation is not relevant. Is that what you're saying?

MS. GAVIOLI: Objection. Form.

A. I can't tell you whether motivation is relevant or not to what you're involved with here. But I'm not aware of motivation being the factor in trade secret analysis. And, you know, the fact I looked at was the reasonableness of the security precautions and they kept it secret. I did not probe into why they kept it secret, and I would not have thought of asking that question.

Q. (BY MR. DONAHUE) Well, I understand that you didn't probe into it. I just said assume if you knew this what their motivation was to conceal from the Internal Revenue Service. And if you did know that, am I correct that would not play a factor in your ultimate opinion that the secrecy and security requirements had been met?

MS. GAVIOLI: Objection. Form. I believe he's already answered this question.

A. I did not consider that a factor. It wouldn't



have occurred to me to consider that a factor based on the law as I understand it. Would it have been a factor? It's something I might have considered. I don't know how else to answer the questions.

Q. (BY MR. DONAHUE) Well, do you understand as an expert witness I can ask you hypothetical questions. Do you understand that?

A. Hypothetical, yes.

Q. Okay. And do you understand that in a hypothetical question what I can do is ask you to assume facts. Do you understand that?

A. Okay.

Q. And so that's all I'm doing. I'm asking you to assume facts and you're responding I didn't take that into account, and I'm saying assume it. So with that sort of preface, I just would like a clear answer to my question. I think the answer is it wouldn't make any difference, but I'm entitled to a clear answer to my question.

And my question simply is: If you did assume that the reason that these confidentiality agreements were asked for from clients was principally to conceal the transaction from the Internal Revenue Service, would that make any difference, assuming again, would that make any difference to your opinion that the



secrecy and the security requirements had been met?

MS. GAVIOLI: Objection. Form. Asked and answered.

A. I honestly can't tell you if it would or not. I don't know the implications of what you're suggesting that -- I don't want to tell the IRS something and therefore something else happens. So I can't tell you whether that would be relevant or irrelevant based upon what I know sitting here today. So I honestly can't tell you whether that would be a major criteria or not. I wish I could give you the answer.

Q. (BY MR. DONAHUE) Okay.

MS. WIRSKYE: Dennis, before -- were you finished with that topic?

MR. DONOHUE: Yes.

MS. WIRSKYE: Do we want to take a short break? I know we really didn't break for lunch.

MR. DONOHUE: Would you like a break? I said before at any time you would like to take a break, let me know. Would you like to take a break?

THE WITNESS: It all depends on how long you plan to go.

MR. DONOHUE: This can be off the record.

(Recess held, 3:28 p.m. to 3:44 p.m.)

Q. (BY MR. DONAHUE) Mr. Jager, turn again to



Exhibit 2398, page 13. And at the top of that page you state that your opinion is that at the time this Investment and Tax Strategy was implemented it had sufficient value to meet the value-related characteristics of a trade secret.

And could you just briefly state what is the basis of that conclusion?

A. Well, generally speaking, the law says that a trade secret should have actual or potential value. And a business plan or business strategy that has a potential for making a profit and a potential of generating tax savings would have value, and that's basically the basis for my statement there. And then as I say in the next sentence (as read): This is evidenced by the fact that the clients paid to use the Investment and Tax Strategy. They had value in that respect also.

Q. And then in your next sentence you say (as read): Clients paid a percent of their overall loss as fees to Ernst young and Jenkins & Gilchrist and others.

A. Yes.

Q. Does that seem appropriate to you?

MS. GAVIOLI: Objection. Form.

A. Appropriate?

Q. (BY MR. DONAHUE) Yes. For a taxpayer to pay to a firm providing tax strategies a percent of their





33536769-e7b1-4f38-a24d-ef5ac1ee2103

Page 178

overall tax loss, does that seem appropriate to you?
A. That seems appropriate in the sense that's one value -- one way of measuring a reasonableness of a fee, percentage of savings in one respect, percentage of a profit or a percentage of tax savings, that's what that refers to probably. So yes, I guess in a general scheme of things that seems appropriate.
Q. Well, I wasn't asking the question in the context of whether or not it would be helpful for you to determine if there was value. I was looking at it in terms of a broader policy perspective.
And my question was: From a policy prospective, does it appear appropriate to you that a taxpayer would pay to a firm a percent of the taxpayer's tax loss? Does that seem appropriate as a policy matter?
A. Well, it seems appropriate to me as a policy matter because -- well, as I sit here today, I don't think it's illegal to try to minimize your taxes. And if I pay a legal fee in terms of a percentage in what you'll save me, that doesn't seem to be inappropriate. So yes, I guess the answer is yes.
Q. Let me hand you what's been marked as Government Exhibit 2469. Have you seen this document before?

Page 179

A. I don't see it on the list of document that I considered by this Bates number, so I don't recall whether I've seen this document or not.
Q. This is a template of an Ernst & Young engagement letter, and you'll notice in the third paragraph it states as follows (as read): Our fee for providing the professional services referred to above will be -- there's a dollar sign and then there's a bracket. It states (as read): Insert amount equal to 1.5 percent of the desired loss to be generated. If the size of the transaction is not certain at the time this letter is signed, add "based on a total investment in the partnership by you and other individuals in the amount of, dollar sign, blank, million, end of quote.
Do you see that?
A. Yes, I do.
Q. Do you know why Ernst & Young wanted in its template engagement letter, its fee not to be described as a percent of the tax loss but as a fixed amount?
A. No, I do not know why.
Q. Do you -- based now on your knowledge of this transaction, do you believe that Ernst & Young may have felt that it was inappropriate for it to be charging a percent of the tax loss and publicizing that fact to clients?

Page 180

MS. GAVIOLI: Objection. Form.
A. I have no basis for saying whether it was appropriate or inappropriate.
Q. (BY MR. DONAHUE) I previously handed you an indictment of various E&Y individuals, and that document was marked as Exhibit 2439. And I'm going to ask that you turn to page 55.
A. Okay.
Q. And you'll notice that count three of the indictment refers to false statements to the IRS. Do you see that?
A. Yes, I do.
Q. And in paragraph 76 on that page, it makes reference that (as read): On or about June 12th, 2002 in the Southern District of New York and elsewhere Brian Vaughn the defendant in the matter within the jurisdiction -- da, da, da -- unlawfully, willfully, and knowingly made materially false, fictitious, and fraudulent statements and representations.
Do you see that?
A. I see that.
Q. And then if you turn over to page 60, at the bottom of that page there is the following question that is referred to as one of the false and fraudulent statements made by Mr. Vaughn.

Page 181

It states (as read): None of that fee was ever based on a tax savings. Answer: No, we never -- our policy as a firm is not to take a percentage of tax savings. So we have an individual perspective -- and I can't speak to what other groups in Ernst & Young, but only the PSE practice -- we take no contingent fees and we -- we don't take a percentage of tax savings.
Do you see that?
A. Yes, I see that.
Q. Okay. Do you have any idea as to why an individual at E&Y involved in the marketing of the COBRA strategy would make a statement to the Internal Revenue Service that their fee was not based on a percent of tax savings?
MS. GAVIOLI: Objection. Form.
A. I have no idea. I can't answer that question.
Q. (BY MR. DONAHUE) Do you view the feature of percent of a tax -- of a firm charging a fee based on a percent of tax savings as a normal ordinary type of feature for providing services in connection with a tax strategy?
MS. GAVIOLI: Objection. Form.
A. Well, I personally have never been involved in tax cases. It's very common in my business of intellectual property law to charge contingent fees and

Page 182

obtain a percentage of the potential damages or actual damages or a percentage of a license fee. So in terms of concept, contingent fees or percentage fees I've seen, but I don't have any experience in the tax area.
Q. (BY MR. DONAHUE) Were you aware -- as I believe you are because you state in your report -- that Jenkins & Gilchrist also charged a fee based on a percent of the tax laws?
A. Where is it? What page? Okay. Yes.
Q. And you're referring to page 13, third sentence at the top?
A. That's correct.
Q. Do you know or do you recall that the fee that was paid to the law firm was 3 percent of the tax loss?
A. The third sentence?
Q. My question is: Do you recall that? That --
A. Well, Jenkins & Gilchrist got a percentage of the tax loss, yes.
Q. Do you recall what percent?
A. It says 3 percent, yes.
Q. Do you know whether the Deutsche Bank received a fee for their services in connection with the transaction?
A. I've never looked into bank fees. I've been advised that there was a bank fee in this case

Page 183

somewhere, but that's about all I can tell you.
Q. And who advised you there was a bank fee?
A. Counsel did.
Q. I'm going to hand you what's been marked as Government Exhibit 2470, this is an E-mail by Brian Vaughn dated 10/22/99. And he makes reference in the second sentence to a discussion in which Dan, referring to Dan Brooks, had reduced his cost to 80 basis points or 8 percent from 1 percent.
Did you -- were you aware that Deutsche Bank was charging, or at least according to this E-mail, charging a fee -- a percentage fee also along with the Deutsche -- along with Ernst & Young and Jenkins & Gilchrist?
A. That's what this says, but I -- I was not aware of it outside of this document. Outside of the general concept that we discussed earlier with counsel that there was some kind of a fee associated with some -- some -- at some point in time, that's all I know about the bank fees.
Q. With respect to the 3 percent charge by Jenkins & Gilchrist, you were also aware, am I right, that Jenkins & Gilchrist was rendering a legal opinion regarding the tax strategy?
A. I recall that, yes.

Page 184

Q. And were you aware that they concluded in their legal opinion that the tax strategy met the requirements of the tax laws?
A. I recall that, yes.
Q. Would you view a law firm that is being paid a percent of the tax loss as being an independent law firm for purposes of rendering a tax opinion?
MS. GAVIOLI: Objection. Form.
A. An independent law firm?
Q. (BY MR. DONAHUE) Would their opinion be independent if the fee that they're receiving for their legal opinion and other services was based on a percent of the tax loss?
A. That doesn't appear to be unprofessional. Is that what you're referring to? It doesn't appear to me to be inappropriate.
Q. Inappropriate. In other words, in your opinion a law firm that charges a fee for rendering a legal opinion and their fee is being based on the percent of the tax laws generated by the very strategy that they are opining meets the requirements of the tax law, you don't think that might impair their independence to render an impartial opinion?
MS. GAVIOLI: Objection. Form. Asked and answered.

Page 185

A. Well, it's clear that I don't have any tax experience in this area, but it's not uncommon to render opinions in my experience on legal issues and even render opinions on the possibility of winning a contingent fee case and then going on and litigating the fee case. So that's the analogy that I thought about when you asked the question.
Q. (BY MR. DONAHUE) So you consider a contingent -- this to be nothing more than a contingent fee?
MS. GAVIOLI: Objection. Form.
A. No, I don't see -- no, I don't think it's -- it's a 3 percent fee of -- I don't know any facts that would lead me to conclude it was inappropriate, I'll put it that way.
Q. (BY MR. DONAHUE) If we could turn back to your report at page 3, that's Exhibit 2398.
A. Yes.
Q. In your second opinion you state -- probably it's best to go to page 4 -- is that compensation in the form of a percentage of the potential benefits, such as cost savings, enabled by intellectual property is a common structure in intellectual property licensing.
And am I right, that's the second conclusion that you -- or opinion that you're rendering?





33536769-e7b1-4f38-a24d-ef5ac1ee2103

Page 186

A. That's correct.
Q. Do you view these fees that are being paid to Ernst & Young, Jenkins & Gilchrist, and the Deutsche Bank to be in the nature of a royalty?
A. I think they're analogous to a royalty. That's how I analyze this.
Q. And your basis for your analogy is that a royalty can be based on cost savings and that these particular fees are also based on cost savings?
MS. GAVIOLI: Objection. Form.
A. Well, a royalty could be based on a lot of things, not just cost savings, so it's not that specific.
Q. (BY MR. DONAHUE) Well, why don't you tell me what is the basis for your conclusion that the fees here are analogous to a royalty?
A. Well, it's very common to charge a percent royalty, "X" percent for use of your invention, et cetera. And the statement here that the fees to be paid was in terms of a percent makes you immediately think well, it's analogous to a percent royalty for the use of an invention measured in some negotiated estimate of the value of the activity or the asset being employed, if you will.
Q. On page 13 of Exhibit 236 -- 2398 --

Page 187

A. Yes.
Q. -- you show a chart --
A. Yes.
Q. Did you prepare that chart?
A. No. This chart was prepared by counsel and checked out by us at Ocean Tomo so that we understood it.
Q. And did you ask them to prepare this chart?
A. Yes. We wanted to be able to understand how these 4 percent or 3 percent or one and a half percent fees, whatever they were, related to the transaction in general. And that's when we asked them -- they had the information, we did not. So they generated this information.
Q. Well, do you know how the 11.45 percent was arrived at?
A. The 11.45 percent is arrived at by the ratio of the total actual fees paid to the combined anticipated savings. So it's 2 over 18 basically, or one-ninth.
Q. So is this chart indicating that the taxpayers in this particular transaction essentially paid roughly about 11 and a half percent of their tax savings to the firms providing the tax strategy?
A. In this case, the fees paid as a percentage of

Page 188

tax savings was calculated to be 11.45 percent.
Q. On page 14 under the 25 percent rule of thumb --
A. Yes.
Q. -- the first paragraph, last line, you made reference by risks assumed by each party. And what was the risk that was assumed by Ernst & Young, Jenkins & Gilchrist, and the Deutsche Bank?
A. I did not analyze that factor. I'm just restating the criteria generally used under the rule of thumb analysis.
Q. Page 17 and 18 you go through again your analysis of the case law. And could you tell us what you are concluding based on your analysis of the case law?
A. Well, the purpose that I had in stating the case law is to show again that a compensation based upon a percentage of the benefit perceived by the negotiating parties is a reasonable approach to evaluate that asset. The rule of reason was one test of reasonableness, the -- we're dealing with a property that we characterize as having the characteristic of a trade secret, so we looked at the trade secret cases. And I think the most important aspect of this is the statement in the amendments to the Uniform Act that says: In lieu of

Page 189

damages measured by any other methods, the damages caused by misappropriation may be measured by imposing liability for a reasonable royalty, which is our analogy.
We're not dealing here with trade secret misappropriation, per se, but by analogy this is one more evidence that a percent fee or something that's analogous to a royalty is appropriate or reasonable.
Q. So is it fair to say that this is conclusion that cost savings or a percent of cost savings is a widespread licensing technique is based on your, in part, your analysis of the case law?
A. It's based upon my experience in the IP field over 40 years, viewed always in the context of what the law is. I could never unlearn the law, so that's how you have to factor in the conclusions you reach. But as most lawyers do, you start by determining what the law is then apply it to the situation.
Q. You mentioned before that there are certain tax strategies that have been patented. And do you know if the fee that is paid is part of the -- considered part of the patentable elements of the strategy or is that something totally separate?
A. I don't know what you mean. The fees for what?

Page 190

Q. The fees paid as a percent of the strategies of the tax laws, do you know if that's something that would be disclosed as part of the strategy itself?
A. I don't know the answer to that question.
Q. Okay. On page 19 of your report under your conclusion, you -- you point out in the last paragraph, the second sentence that (as read): Assuming the investment tax strategy was believed to provide real or potential benefits, an appropriate way to compensate for use of the tax aspects of the Investment and Tax Strategy would have been to charge a percent of the realized or potential tax benefits in the form of a royalty rate applied to a royalty base.
Do you see that?
A. Yes, I do.
Q. And as you sit here today, you're -- you're not aware as to whether or not this tax strategy is or is not illegal. Am I right?
MS. GAVIOLI: Objection. Form. And to the term "illegal." It's unclear.
A. There's many illegal definitions. Criminally illegal, illegal in the sense that it has other -- it's not enforceable. But yeah, I guess to answer your question specifically, everything I've seen and read and understood is its -- at the time of the 1999 and 2000,

Page 191

or whatever it is, the transactions, it was illegal and the people had opinions that it was. Now --
Q. (BY MR. DONAHUE) You said illegal. Did you mean legal?
A. I meant legal. I'm sorry. Thank you for correcting me.
Q. So --
A. So I understand that it was legal. I have no reason to believe that it was illegal.
Q. So if a court ruled in connection with the very litigation that we're involved in that these deductions are not permitted under the tax laws, they're contrary to the tax laws, do you know, would that affect your opinion?
A. Well, that's an interesting question because I think I've said in the report somewhere where I would consider any new facts that come up if and when they come up. But it's like saying if you charged a fee for a legal opinion and the legal opinion turned out to be wrong, is that fee inappropriate? And I would have to say as a general rule no, it's not appropriate. It's not inappropriate.
I can give you a legal opinion or these people here could render advice or suggest a strategy that everybody in good faith believed it was legal and

Page 192

proper at the time and charged for it. Now, if it was later determined to be inappropriate, does that mean that they should get their fees back? That's an uncommon situation to do that. So they've charged a fee for the services rendered or for the potential investment or tax savings involved in this situation. So would you say it's inappropriate if it was later declared illegal? I would have to look at the whole circumstances.
Q. Well, my question is: If you assumed -- let me strike that question.
Are you aware that if the deductions are disallowed by a court, that later determination relates back to the point in time in which the deductions are taken. Are you aware of that?
MS. GAVIOLI: Objection. Form.
A. Is that a tax law issue? I'm -- I'm not familiar with tax law, so I guess the answer is no, I'm not aware of that.
Q. (BY MR. DONAHUE) I'm going to ask you to assume that.
A. Okay.
Q. Assume that the Court if it disallows the deduction at issues in this litigation, it relates back to the point in time that the deductions were taken.

Page 193

A. Okay.
Q. And what that means -- again, I'm asking you to assume this -- is that the point in time the deductions were taken they were improper deductions under the tax laws. Can you make that assumption?
MS. GAVIOLI: Objection. Form.
A. Yes, I can.
Q. (BY MR. DONAHUE) Now, if -- if you assume that at the time the deductions were taken they were improper, would that affect your opinion that the tax strategy had the characteristics of the trade secret?
MS. GAVIOLI: Objection. Form.
A. Improper? You mean ultimately disallowed, for example.
Q. (BY MR. DONAHUE) Disallowed.
A. Well, I would look at all the facts and circumstances, but if the facts showed that at the time the parties entered into the transaction and agreed to pay the fee it was under legal advice considered to be legal and proper and the fees were paid under those circumstances, the fact that it was later declared inappropriate or disallowed, doesn't make that fee inappropriate.
Q. But you're changing what I asked you to assume. You said --





33536769-e7b1-4f38-a24d-ef5ac1ee2103

Page 194

A. No, I assumed -- you -- you -- go ahead and ask the question.
Q. You said: I would look at all the facts and circumstances, but if the facts showed that at the time the transaction was entered into and they agreed to pay the fees, it was under legal advice. So what I'm telling you is at the time assume that the tax strategy was illegal, it did not permit the taking of any deductions, can you make that assumption for me?
MS. GAVIOLI: Objection. Form.
A. Well, that's a different assumption than you gave me earlier.
Q. (BY MR. DONAHUE) Well, we -- if it is, which I don't believe it is, but if it is, can you make that assumption. At the time they entered into this transaction that it was -- it was not a legal tax strategy, can you make that assumption?
MS. GAVIOLI: Objection. Form. The term "legal" is unclear.
A. I can make that assumption, yes, if that's the question.
Q. (BY MR. DONAHUE) Okay. Now, if that is your assumption, would that change your opinion as to whether or not the COBRA strategy was and had the characteristics of a trade secret?

Page 195

A. Well, see, that's why I said it was a different assumption or hypothetical than you gave me earlier because you were saying it related back, which is something you told me is the tax law consequences. And I'm saying if it relates back, then the fact it was declared inappropriate or disallowed after the fact, even if it applied five years earlier to disallow an earlier deduction, the fact that the people in good faith looked into this, had a legal opinion that it was right and they end up being wrong, doesn't mean the fee is wrong. So I guess if it's declared ultimately illegal, it still means that it was knowledge that would have satisfied the requirements that would permit people to charge a fee for using that knowledge. And that's all we're saying here.
Q. But, Mr. Jager, you didn't listen to my question.
A. I thought I did.
Q. No, you didn't. I've asked you to assume that the transaction -- the tax strategy is illegal in the sense that the deductions that are a basis of the strategy are not allowable under the tax laws. Do you understand that?
MS. GAVIOLI: Objection. Form.
A. That's your assumption.

Page 196

Q. (BY MR. DONAHUE) Okay. And you're an expert witness, and I'm just asking you to make that assumption. So if that's your assumption -- and I'm specifically only referring to the part of your opinion that deals with whether or not the COBRA strategy had the characteristic of trade secrets. And if at the time that they entered into this transaction, the strategy was viewed as providing illegal tax deductions in the sense that they were not permitted under the tax laws, would that affect your opinion?
MS. GAVIOLI: Objection. Form. Also asked and answered.
A. Your hypothetical doesn't give me enough hypothetical facts to really change what I've said earlier. So...
Q. (BY MR. DONAHUE) What facts do you need?
A. For example, at the time the transaction was entered into and the fees were paid, in your hypothetical did people know it was illegal? Did they have intent to create an illegal situation? Or the actual facts I was dealing with is that they had an opinion that it was legal and proceeded on that basis, paid a fee on that basis, and after the fact if it's declared unallowable, in my opinion that did not change the appropriateness of the fee. That's what I'm saying.

Page 197

Q. I understand. And you've said that twice. And I've asked you to ignore that assumption, and you said essentially I need to know nevertheless as to whether the individuals involved in the transaction themselves thought the transaction was legal regardless of whether it's legal or not. Am I right?
MS. GAVIOLI: Objection. Form.
Q. (BY MR. DONAHUE) That's what you told me is a fact you would like to know.
A. Well, that would be --
MS. GAVIOLI: Objection. Form.
A. That would be part of the analysis of the totality of circumstances, yes.
Q. (BY MR. DONAHUE) And how does that fact fit into your legal characteristics of a trade secret?
MS. GAVIOLI: Objection. Form.
A. Well, it -- we're not -- we're dealing here with -- your question is related to the fees charged, and the fees charged were charged for services rendered. And the fees -- we're focusing on the fees. I thought we had already done the trade secret aspects of it.
Q. (BY MR. DONAHUE) Then if you made that assumption, you're --
A. Well, ask your question again, please. Maybe I can understand it.





33536769-e7b1-4f38-a24d-ef5ac1ee2103

Q. I'm at the conclusion of your report.
A. I beg your pardon?
Q., I'm at the conclusion portion.
A. Okay.
Q. And so right at this point I'm just asking a rather basic question, and I'm going back to your first point or your first conclusion. And do you recall your first conclusion is is that the COBRA strategy had the characteristics of a trade secret. Do you recall that?
A. Had the characteristics of it, yes.
Q. Okay. And so my question simply is: If at the time the transaction was entered into it was an illegal tax strategy in the sense that the deductions that are provided for in the tax strategy are not permitted by the tax laws, would that change your opinion that the COBRA strategy had the characteristics of a trade secret?
MS. GAVIOLI: Objection. Form. Asked and answered.
A. I thought I had answered that question. Is this -- the scenario we're just saying it was illegal from the beginning?
Q. (BY MR. DONAHUE) Yes.
A. And illegal as it was known to other people so that the opinions that they had were wrong opinions or



are you asking in the abstract, the abstract question of whether or not you could charge a fee for using an illegal strategy? Is that what you're asking?
Q. I didn't ask anything about charging a fee. I'm just asking -- that's the reason I asked the question again. You're bringing in a fee. And you're saying whether or not the fee is proper. And alls I'm asking is something totally different from the fee they're charging. I'm just asking if you knew that this strategy was illegal in the sense that the deductions are not permitted under the tax law, if you knew that, would that affect your opinion as to whether or not the COBRA strategy had the characteristics of the trade secret? That's all my question is.
MS. GAVIOLI: Objection. Form. Asked and answered. Please don't admonish the witness.
A. Didn't we talk about this at length a while ago? And I said that I was not aware of any trade secret case that addressed the question of the illegal nature of the underlying property rights, so to speak. And your question is would that change my opinion? Is that your question?
Q. (BY MR. DONAHUE) Well, I would prefer not to -- if you don't understand my question, I can repeat it, but...



A. Would you like to repeat it or read it back? One or the other.
Q. I'll repeat it.
A. Please.
Q. My question is: If you assume the tax strategy was illegal in the sense that the deductions provided by the strategy are not permitted by the tax laws -- can you make -- would you make that assumption
A. Okay.
MS. GAVIOLI: Objection. Form.
Q. (BY MR. DONAHUE) Now, if you make that assumption, would that affect your opinion in any way as to whether or not the COBRA strategy had the characteristics of a trade secret?
MS. GAVIOLI: Objection. Form. Asked and answered.
A. Well, I thought I had answered this, but -- and there are, as I said before, before I could really come to any specific conclusion I would like to have a lot more facts. But I guess you're asking me, can you have a trade secret and potentially illegal business about it?
Q. (BY MR. DONAHUE) Not personally, actually.
A. Actually. That the people knows that --
Q. Well, does that make a difference to you



whether they know it or not? I'm telling you to assume that it's illegal. Does that make a difference in your opinion as to whether the individuals know it or not?
MS. GAVIOLI: Objection. Form.
A. It does in the opinion that I've rendered in this report, yes.
Q. (BY MR. DONAHUE) What characteristic of a trade secret -- you mentioned four. What characteristic would that be relevant to?
MS. GAVIOLI: Objection. Form.
A. What characteristic would what be relevant --
Q. (BY MR. DONAHUE) You mentioned in your report -- you mentioned in your report -- am I right, you mentioned in your report there were four characteristics, in your opinion, of a trade secret.
A. There are four major characteristics.
Q. Major characteristics.
A. There are many others, but those are the four major.
Q. All right. I'm asking you if this is relevant the fact that the individuals involved in the strategy knew as to whether or not the strategy was legal or illegal, what of the four major characteristics, which particular one or ones would that be relevant to?
MS. GAVIOLI: Objection. Form.





33536769-e7b1-4f38-a24d-ef5ac1ee2103

Page 202

A. Which particular -- and your question is would that affect my opinion?
Q. (BY MR. DONAHUE) No. My question is, you've already said -- maybe I'm misunderstanding you. I thought you said it would affect your opinion and you would need to know whether the individuals knew whether this strategy was illegal. You said you would need to know that information, right?
MS. GAVIOLI: Objection. Form. Asked and answered.
Q. (BY MR. DONAHUE) Am I right?
A. Yes.
Q. Okay. So I'm just asking since you felt that's relevant to your opinion as to whether or not the strategy had the characteristics of a trade secret, I would like to know of the major characteristics that you have provided in your report, which one or ones of those would that be relevant to?
MS. GAVIOLI: Objection. Form.
A. Well, that point, for example, would be relevant to the situation of does the information have actual or potential economic value. As I said before, I considered or was told to assume that this had two aspects to it: investment strategy and potential tax savings. And if you tell me that the information

Page 203

ultimately is not deductible, I would have to say did the people know it and was there still some potential for investment income from it or profit from it regardless of whether or not you're going to save taxes? And if that's the case, this information still has the characteristic of a trade secret.
Q. (BY MR. DONAHUE) Can the Government sue to set aside a patent it's issued as invalid, is issued improperly?
A. Well, once a patent issues it can be challenged under examination proceedings by anyone, including the Government, including the patent office. So every patent that issues is now subject to re-examination.
Q. Let me hand you what's been marked as Exhibit 2438. It's a decision in a case called United States vs. The Glaxo Group. Are you familiar with the decision?
A. Let me take a look at it. Okay. I've just read the synopsis.
Q. All right. But are you familiar with the case?
A. No, I'm not.
Q. Turn to page 6 and there's a reference to the fact in the second full paragraph in the left-hand

Page 204

column that the Court doesn't recognize unlimited authority in the Government to attack a patent by basing an antitrust claim on the simple assertion that the patent is invalid, but then goes on to discuss what it will allow the Government to do.
Are you familiar with to what extent the Government can attack a patent as being invalid?
MS. GAVIOLI: Objection. Form.
A. Well, the Walker Process Food Machinery case relates generally to the concept -- that was cited here relates to the concept that a patent that was obtained by fraudulent procurement in the patent office is unenforceable and can be attacked on that basis, as I recall the case. That's been a long time, 1965. But -- so there are -- there are ways in an antitrust case to raise the enforceability or the validity of a patent. That's what this relates to.
Q. (BY MR. DONAHUE) And where a patent was fraudulently obtained, do you know what the effect of that is in terms of the validity of the patent from its very inception?
MS. GAVIOLI: Objection. Form.
A. From its very inception? I think the patent is declared invalid or more accurately the patent would be declared unenforceable. Invalid is a technical term

Page 205

that relates to invalidity versus unenforceability.
Q. (BY MR. DONAHUE) You mentioned previously that you were unavailable at some point in June, was it, in connection with preparation of your report. Do you recall that? You were out of the country.
A. I was in Zurich, Switzerland, yes.
Q. And how long were you there?
A. Five days.
Q. Is there any reason why you could not have prepared your report earlier than when you did?
A. Earlier than when I did? I guess in general no, other than I started considering this in February and I obviously couldn't do it before then. So between February and June we probably could have wrapped this up earlier.
Q. Is there any reason why you could not have submitted your report by June 1st?
A. No. No reason in terms of my schedule, no.
Q. What were your instructions by counsel in terms of when you were to complete your -- your analysis and submit your report?
A. Well, we had a due date. I don't remember when the due date was for the reports, and then I had this commitment to leave the country. So those were kind of the two time frames that we were working with.





33536769-e7b1-4f38-a24d-ef5ac1ee2103

Page 206

Q. Now through our deposition today you have articulated a number of opinions. Would you be of the view that there would be no one out there with your experience who may disagree with you?
MS. GAVIOLI: Objection. Form.
A. I'm not presumptuous enough to say that people can't disagree with me.
Q. (BY MR. DONAHUE) Okay. The reason I asked you that question is because you see you're submitting a rebuttal report, and the Government doesn't have an opportunity with a rebuttal report to provide a rebuttal to your -- your opinions. And I'm just wondering if you're aware as to whether there is someone out there who we can hire to rebut you?
MS. GAVIOLI: Objection. Form.
Q. (BY MR. DONAHUE) You don't have to answer that.
A. I've never been asked that before.
Q. But there are people out there apparently who may disagree with some of your conclusions. I assume you would concede that?
A. I have not discussed that with anybody, but I'm not -- I said before that I'm not presumptuous enough to think that everybody agrees with me in everything I say, ever, including my wife, but that's

Page 207

another story.
MR. DONOHUE: Thank you very much, Mr. Jager. I have no further questions.
THE WITNESS: My pleasure. Am I done? Do I sign this or how do you normally handle the signature.
MR. DONOHUE: Let me state one more thing. What will happen is is that a transcript of the deposition will be prepared, and I'm going to ask that you review and read the transcript. If there are any errors either in -- you see in the questions, but more specifically in the answers that you provided, you can attach an errata sheet and make reference to the page and line of the error and indicate as to what the correction is. And when you're confident that the transcription is a full and complete and accurate account of your testimony, we ask that you sign it and you can then return it to counsel.
THE WITNESS: Understood.
MR. DONOHUE: Okay. Thank you very much.
(Deposition concluded at 4:47 p.m.)

Page 208

CHANGES AND SIGNATURE

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| | | | |

Page 209

I, MELVIN F. JAGER, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

________________________
MELVIN F. JAGER

THE STATE OF __________)
COUNTY OF ____________)

Before me, _______________________, on this day personally appeared MELVIN F. JAGER, known to me (or proved to me under oath or through __________________) (description of identity card or other document)) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this ________ day of __________________, ________.

________________________
NOTARY PUBLIC IN AND FOR
THE STATE OF ________________
COMMISSION EXPIRES: ____________





33536769-e7b1-4f38-a24d-ef5ac1ee2103

Page 210

Page 211

IN THE UNITED STATES DISTRICT COURT

IN RE: COBRA TAX SHELTERS LITIGATION *

CARMEL PARTNERS, et al, * Plaintiffs, * VS. * NO.: 1:06 cv 8001 (S.D. Ind.) UNITED STATES, * Defendant. *

JS BUCKINGHAM INVESTMENTS, LLC, et al, * Plaintiffs, * Vs. * NO: 05-231 (Ct. Fed Claims) UNITED STATES, * Defendant. *

MURFAM FARMS, LLC, * Plaintiff, * Vs. * NO: 06-245T through 06-247T (Ct. Fed Claims.) USA, NO, * DEFENDANT. *

REPORTER'S CERTIFICATION
DEPOSITION OF MELVIN F. JAGER
AUGUST 2ND, 2007

Page 212

I, TAMMY LEA STAGGS, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, MELVIN F. JAGER, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on ____________________ to the witness or to the attorney for the witness for examination, signature and return to me by ____________________;

That the amount of time used by each party at the deposition is as follows:

Ms. Laura L. Gavioli - (0:00)
Ms. Sarah Q. Wirskye - (0:00)
Mr. Dennis M. Donohue - (5:54)
Mr. Joe Pitzinger - (0:00)

Page 213

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

FOR THE PLAINTIFFS:
Laura L. Gavioli, Esq.
Sarah Q. Wirskye, Esq.
FOR THE DEFENDANT, UNITED STATES GOVERNMENT:
Dennis M. Donohue, Esq.
Joe Pitzinger, III, Esq.

That $__________ is the deposition officer's charges to the Defendant, for preparing the original deposition transcript and any copies of exhibits;





33536769-e7b1-4f38-a24d-ef5ac1ee2103

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 13th of August, 2007.

Tammy Lea Staggs, CSR 7496
Expiration Date: 12/31/2007
Firm No. Dallas: 69 Houston: 373
Henjum Goucher Reporting Services
2501 Oak Lawn Avenue
Suite 435
Dallas, Texas 75219
214.521.1188, Fax 214.521.1034
1.888.656.DEPO

AUTHENTICATED
The original certified E-Transcript file was electronically signed using RealLegal technology.





33536769-e7b1-4f38-a24d-ef5ac1ee2103