IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

---

IN RE COBRA TAX
SHELTERS LITIGATION

Cause No.
1:05-ML-9727-JDT-WTL

---

Monday, August 20, 2007

Washington, D.C.

Volume I

Deposition of:

David W. LaRue, Ph.D.

Called as a witness by Defendants at the U. S. Department of Justice, 555 4th Street, N.W., Washington, D.C., before Texas S. Eckstone, Professional Reporter/Notary Public, when were present on behalf of the respective parties:

EXHIBIT
tabbies
1

APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:

MEADOWS, OWENS, COLLIER, REED, COUSINS & BLAU, LLB
BY: M. TODD WELTY, ESQUIRE
901 Main Street, Suite 3700
Dallas, TX 75202
(214) 744-3700

ON BEHALF OF THE DEFENDANT:
U.S. DEPARTMENT OF JUSTICE
TAX DIVISION
BY: DENNIS M. DONOHUE, ESQUIRE
Judiciary Center Building
555 4th Street, NW, Suite 7804
Washington, DC 20001
(202) 307-6492



EXHIBIT INDEX

| | | |
|---|---|---|
| MAR 1 | Expert Report of David LaRue, Ph.D., dated June 1, 2007, in the case of JZ Buckingham Investments versus the United States | 5 |
| 2 | Expert Report of Gerald Songy in rebuttal to the Expert Report of David LaRue, Ph.D. in the case of JZ Buckingham Investments versus the United States | 5 |
| 3 | Expert Report of David LaRue, Ph D. dated June 1st, 2007, in connection with the case styled Gary Woods as Tax Matters Partner of Tesoro Drive Partners and SA Tesoro Investment Partners, Texas General Partnerships, Plaintiff versus United States | 5 |
| 4 | Expert Report of Gerald Songy in rebuttal to expert report of David W. LaRue, Ph.D., in connection with the Gary Woods Tesoro Drive case | 5 |
| 5 | Rebuttal Report of David LaRue, Ph.D., dated July 2nd in connection with the case styled Gary Woods Tesoro Drive Partners, SA Tesoro Investment Partners | 5 |
| 5A | Plaintiff's expert report of Stuart A. Smith in connection with the Tesoro Drive case | 5 |
| 6 | Expert Report of David LaRue, Ph.D. filed on June 1st, 2007. in connection with a case styled Murfam Farms, PSM Farms and Murphy Pork Partners versus United States | 5 |
| 7 | Expert Report of Gerald Songy in connection with the Murfam Farms, PSM Farms and Murphy Pork Partners case | 5 |
| 8 | Rebuttal Report of David LaRue, Ph.D., dated July 2nd, in connection with Murfam Farms PSM Farms and Murphy Pork Partners | 5 |



EXHIBIT INDEX, CONT.

| | | |
|---|---|---|
| 9 | Plaintiff's expert report of Stuart A. Smith regarding the case of Murfam Farms, PSM Farms and Murphy Pork Partners versus U.S. | 5 |
| 10 | Supplemental production of Deutsch Bank documents, Bates stamped DB-DOJ-COBRA 00246222 through DB-DOJ-COBRA 0024622-32 | 59 |



Thereupon,

DAVID W. LaRUE, Ph.D.

called as a witness herein, having been first duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION

(DOCUMENT MARKED PLAINTIFF, LaRUE DEPOSITION, EXH. NOS. 1 THROUGH 5 and 5A, 6 THROUGH 9, FOR IDENTIFICATION.)

BY MR. WELTY:

Q. Good morning, Dr. LaRue. I think we've met before, but for the record my name is Todd Welty, and I represent a number of taxpayers in suits filed before the Court of Federal Claims and Federal District Court in San Antonio. And I believe you issued reports in each of those cases. So rather than restate the styles, I'll make sure I get them for the Court Reporter, but can you look at Exhibit 1, 3 and 6, and tell me what those are real quick?

A. You're asking me?

Q. Yes.

A. Exhibit 1 is my report filed on June 1st, 2007, in JZ Buckingham Investments versus the United States.

Q. What is Exhibit 3?
A. Exhibit 3 is the report I that filed on June 1st, 2007, in connection with the case styled Gary Woods as Tax Matters Partner of Tesoro Drive Partners and SA Tesoro Investment Partners, Texas General Partnerships, Plaintiff versus United States.
Q. And Exhibit Number 6?
A. Exhibit Number 6 is the report that I filed on June 1st, 2007, in connection with a case styled Murfam Farms, PSM Farms and Murphy Pork Partners versus United States.
Q. And just so as we get going, it's just easier if we have them for the record now. Can you tell me what Exhibit Number 2 is?
A. Exhibit Number 2 is the expert report of Gerald Songy in connection with the JZ Buckingham case.
Q. And can you tell me what Exhibit Number 4 is?
A. Exhibit 4 is the expert report of Gerald Songy in rebuttal to expert report of David W. LaRue, Ph.D., in connection with the Gary Woods Tesoro Drive case.
Q. What is Exhibit Number 5?



A. Exhibit 5 is my rebuttal report dated July 2nd to -- in connection with the case styled Gary Woods Tesoro Drive Partners, SA Tesoro Investment Partners.
Q. And what is Exhibit Number 6?
A. Exhibit Number 6 is my opening expert report dated June 1st, 2007, in connection with Murfam Farms, PSM Farms And Murphy Park Partners.
MR. WELTY: Can we go off the record for a second?
(WHEREUPON, A CONVERSATION WAS HELD OFF THE RECORD.)
MR. WELTY: Back on the record.
BY MR. WELTY:
Q. Dr. LaRue, can you tell me what Exhibit 5A is?
A. Yes, sir. Exhibit 5A is the plaintiff's expert report of Stuart A. Smith in connection with the Tesoro Drive case.
Q. Exhibit 6?
A. Exhibit 6 is my opening report dated, June 1st in connection with the Murfam, PSM Farms and Murphy Park Partners case.
Q. Exhibit 7?
A. Exhibit 7 is the expert report of



Gerald Songy in connection with the Murfam Farms, PSM Farms and Murphy Pork Partners case.
Q. Exhibit 8?
A. Exhibit 8 is my rebuttal report, dated July 2nd, in connection with Murfam Farms, PSM Farms and Murphy Pork Partners.
Q. Exhibit 9?
A. Exhibit 9 is the plaintiff's expert report of Stuart Smith -- did you say 9?
Q. Yes.
(WHEREUPON, A CONVERSATION WAS HELD OFF THE RECORD.)
BY MR. WELTY:
Q. What is Exhibit 9?
A. Exhibit 9 is the plaintiff's expert report of Stuart A. Smith and Murfam Farms, PSM Farms and Murphy Pork Partners versus U.S.
Q. Have you reviewed all of these reports, either as you drafted them obviously, or those others, Jerry Songy's, Stuart Smith?
A. Yes, sir.
Q. Well, just as a preliminary matter, I know we skipped ahead, I just wanted to identify several of the large stacks of paper in front of us before we got going.



Dr. LaRue, I know you've been deposed before, but just as a matter of form, I want to go through a few questions. You understand that you're under oath here today?
A. I do.
Q. And you also understand that your testimony here today can be used in addition to, or in some circumstances in lieu of, your testimony at trial. Do you understand that?
A. That is my understanding.
Q. And you also understand that you'll have an opportunity to review the questions and your responses at the conclusion of the deposition to make any changes. If there is a miss-transcription or you change the substance of your answer, do you understand that?
A. I do understand.
Q. You also understand that depending on the nature of those changes, we may be able to reconvene the deposition to ask you about those changes, do you understand that?
A. I didn't understand that, but I understand what you're saying, yes.
Q. Consequently we don't want to have to redo this. It's important that your answers be as

complete and accurate as possible. There may be certain circumstances where I may ask you to give an estimate of something, as opposed to just pure speculation. Do you understand the difference between an estimate and speculation?
A. I think you'd have to be more specific.
Q. Well, speculation would be just a wild guess, whereas an estimation is, I think I'm pretty close, can give you an answer within, you know, a few thousand dollars, a few ten thousand dollars, something like that. What I want to avoid later on is when we're talking about losses and figures on the tax returns, having to worry about individual dollars and change, do you understand that?
A. Oh.
Q. We're just going to talk in some round numbers.
A. I understand.
Q. If you don't understand a question, please don't answer it. Please ask me to clarify it, rephrase it. I'll try to do my best so that we're both on the same page when we are talking here today, is that okay?
A. That's fine.



Q. You also understand that Mr. Donohue may object to some of my questions, but that nonetheless, you're obligated to answer unless he instructs you not to, do you understand that?
A. I do.
Q. And we are dealing with lots of documents, lots of paper. We're entitled to your best recollection. I don't expect you to have total recall of all two million pages, or however many are in the database that you had access to, but we are entitled to your best recollection. So, again it's a little bit different from speculation.
I will likely be asking you questions about your reports, and asking you about the basis for your opinions. If you had specifically cited a document in your report, that's easy, it's already there. But if you recall anything else that may also impact your opinions, I may ask you whether you recall anything else. And I would appreciate you giving us your best recollection as to whether there is anything else that impacts your opinion, is that okay?
A. I will do that.
Q. We are also entitled to a complete



explanation of your opinions, so I am going to ask you today to give us complete answers. Hopefully, that won't entail regurgitating everything in your report, but I will ask you to give us complete answers with your opinions, your analysis and your beliefs and the reasons for that, is that okay?
A. I believe that my opinions were fully elaborated upon in my reports, yes.
Q. Given the weight of the report...
And just as a matter of form again, are you under the influence of any medication or anything else that would impact your ability to testify here today?
A. I am not.
Q. Dr. LaRue, would you please turn to Exhibit 1?
And in an effort to speed this up, is it fair to say that there are some similarities between your opinions in Exhibit 1, 3 and 6, which are your initial reports in the Buckingham Investments, Tesoro and Murphy related cases?
A. Yes, sir, there are some similarities.
Q. What I would like to do just to make this faster is, we're going to go through your reports in Buckingham first. We're going to talk



about a number of items, some of which are specific to your reporting in Buckingham, some of which carry over into the Woods, Tesoro cases and the Murphy related cases.
I'm going to try, as we get to the Murphy and the Woods cases later on, not to duplicate those sections that are the same, and just talk about the specific reporting there. Does that make some sense as to economy of time?
A. I understand.
Q. Well, let's go to Exhibit 1, Page 3. I think at paragraph 9 and continuing on to Page 4, you set out your charge and the questions that you were asked to render an opinion on, do you not?
A. My charge is laid out in this report on paragraphs 9, 10 and 11.
Q. Stepping back from those questions, what is your understanding at to the overall purpose of your report?
A. One purpose of my report was to determine whether or not the returns filed by the S-corporation, the partnership and the individuals in this case, individually or collectively, provided any indication or reasonably discernible indication as to the source from which the Tesoro

Page 14

-- or strike that -- the JBJZ losses had been derived.
Q. Would that be the same -- you referenced Tesoro, would that be the same as Tesoro and Murphy related cases as well?
A. That's correct.
Q. So it's the same basic charge for the three cases?
A. That's correct.
Q. Would you turn to your CV in the back of Exhibit 1? I believe it follows Page 102.
Can you tell me what your current employment is?
A. I'm currently employed at the University of Virginia.
Q. What do you do there?
A. I teach in the McIntyre School of Commerce.
Q. What do you teach?
A. I teach a variety of courses at the graduate and at the undergraduate level.
Q. What are they?
A. I've listed the courses that I teach or have taught at the University of Virginia. There's quite a long list of courses that I've

Page 15

taught. At the undergraduate level I've taught basic accounting courses, intermediate accounting courses. I've taught basic tax courses. I've taught finance courses. I've taught international business courses.
At the graduate level, I've taught primarily technical courses that deal with various aspects of international tax law, partnership tax law, S-corporation tax law, corporate tax law. I'm sure I'm missing something. It's a long list. I've been teaching at the University of Virginia for 24 years.
Q. Yes, I'm not trying to see whether you forget that you taught combinations one and two or something like that.
As a part of your teaching, either as a university professor or through some type of continuing education programs, what experience do you have with tax return preparation?
A. My experience with tax return preparation is extensive. It's virtually every course that I teach that deals with some aspect of the tax law, either at the university level or in the hundreds of courses that I have taught for all the public accounting firms, KPMG, Ernst & Young,

Page 16

Deloitte & Touche, Arthur Anderson, Price-Waterhouse, and other firms. A significant component of those courses has to do with compliance issues, and the proper reporting of transactions on the tax return.
Q. Actually filling out the forms?
A. Actually how the transactions are to be reported on the forms, yes.
Q. You taught that for EY?
A. That's correct.
Q. What did you teach? I mean, are you teaching partnership, return preparation, or are you teaching something else?
A. Well, on --
Q. Not just for EY but for anybody. Let's back up. What returns do you teach?
A. Well, as I've indicated in connection with the technical subject matter covered in those courses, invariably we talk about the various compliance requirements associated with reporting the transactions discussed in the class. Whether that has to do with the Form 1040, obviously in the context of teaching a partnership class we talk about the Form 1040 -- strike that, the Form 1065.
With S-corporations, we talk about the

Page 17

various forms that are included with Form 1120S, individual tax forms, special tax forms for reporting the foreign tax credit, certain other international or across border transactions.
Again, just about every course that I teach has some aspect of compliance. We talk about the tax law, and then you talk about how that transaction is to be reported and disclosed. And as you can see, the range of courses that I have taught over the years is very extensive.
Q. So at the graduate level, your Federal Income Taxation of Partnerships and S-corporations, you talk about return preparation?
A. Return preparation is a part of what we talk about in that course, yes.
Q. Do you have course materials for that?
A. Well, of course.
Q. Would you mind providing us a copy of your course materials?
A. In the partnership class we -- obviously we use a textbook.
Q. Sure.
A. And the textbook that we use discusses -- and international, discusses the forms to some extent that are to be used in preparing a

partnership tax return.

My lecture materials vary from one semester to the next. When you look at all of the materials that I've used in connection with teaching, for example, partnerships, that would include not only my materials, but also the materials that are provided me to teach from by KPMG, by Ernst & Young, by Deloitte and Touche, so they're quite extensive.

I don't know that I have copies. I don't save copies of all of the materials that I have used over the years to teach these courses. I'm not even sure I have all the material. I normally update materials and change materials from one semester to the next. Sometimes I have old copies; sometimes I don't.

Q. Well, for example, your Federal Income Taxation of Partnerships and S-corporations, I understand you use a textbook. What textbook do you use?

A. I use a textbook. I've used various textbooks.

Q. Which ones?

A. Gosh, I don't recall specifically the names of the textbooks or the authors. In the



past, I've used a textbook by McKee Nelson & Whitmire, I believe, on partnership taxation. I've used -- CCH has a textbook that deals with partnership taxation that I have used.

There is a book by Mr. Gunn, G-u-n-n, that deals -- I believe it's a Foundation Press book that deals with -- I believe it's partnerships. And there's another one put out by Foundation Press that deals with S-corporations that I've used.

In addition to the books that I've used in class and require my students to read, I obviously have other books that I read from time to time, or use to supplement my understanding and my teaching materials and my lectures.

Q. What would those be?

A. It's a long list. I would suggest that just about any book that's published in the tax area by Warren, Gorham and Lamont, I have read through at some time. Many of the books, particularly the "International Tax Book" published by I think it's -- I can't remember the name of the author, but it deals with international tax. CCH has a book on pension and profit sharing plans that I have used. West, I believe -- west? Is it the



Hornbook series of books.

My office is filled with 50 or 60 books at least, books that I have either read through, or read parts of over the last several years that deal with tax issues.

Q. Do you consider them authoritative sources?

A. Authoritative in what context?

Q. On return preparation.

A. Well, they're textbooks that have been vetted by the editors and by the tax profession presumably before they're published. But they're not authoritative in the sense that the Internal Revenue Code or the regulations or revenue rulings or case law is authoritative.

But the authors of these books tend to be recognized experts in the field, who have done, in my opinion for the most part, a very good and thorough job in terms of presenting materials, presenting subject matter in these books.

Q. Do you have any of your lecture materials for your taxation of partnership and S-corporation classes?

A. I may have.

Q. Would you provide us a copy of those?



A. I'll try to find them.

Q. What about your taxation of corporate mergers and acquisitions, corporate recapitalizations and divisions and consolidated tax returns, same basic sources that you use for background and class information, the treatises, books that you have cited as well as your own lecture notes?

A. That's correct. And in that particular class, I would also add the fact that I've testified before the Ways and Means Committee on tax policy matters dealing with mergers and acquisitions. I wrote a 156-page article on mergers and acquisitions that was published in the tax law review that I use. My doctoral dissertation had to do with corporate mergers and acquisitions.

Q. And you do teach on consolidated tax returns, don't you?

A. I do.

Q. Do you have materials that you use to teach on consolidated tax returns?

A. I have some materials. In that survey course, I tend to use a book written by Steve Thompson. It's a basic primer. Normally in the

Page 22

consolidated return portion of the merger and acquisition class, we don't have a lot of time to go through and deal with consolidated returns comprehensively.
Q. But you've taught consolidated returns to some of the accounting firms; haven't you?
A. I have. I've also taught consolidated returns, a fairly indepth course, to the IRS Chief Counsel's office under the auspices of the NYU Graduate School of Law.
Q. Do you have those course materials?
A. I don't. That's been a number of years. I'm almost certain I don't have those materials. I did use three or four different books in preparing, the Peale Book, the -- I believe it was -- is it Hennessy I believe, a Warren, Gorham and Lamont book.
I remember reading through three or four different treatises on consolidated returns in preparation for my lectures for the NYU courses -- the NYU slash IRS Chief Counsel's office courses that I taught.
As far as the consolidated return classes that I've taught for the public accounting firms, I have never used my own materials. I've

Page 23

always used materials provided to me by the firms.
Q. Do you have any of those materials?
A. It's been a number of years since I've taught for any of the public accounting firms. I'm not sure I still have those materials.
Q. Could you look and see?
A. I will.
Q. And if you locate them, provide them to us?
MR. DONOHUE: Counsel, you can make a request to me for any materials.
MR. WELTY: That he provide them to us?
MR. DONOHUE: You make the request. I'm not sure what relevance consolidated returns would have in this case.
BY MR. WELTY:
Q. You teach a class called Federal Tax Aspects of Business Investment and Personal Decisions. What is that class about?
A. Can you show me what you're referring to? What page are you on?
Q. Two little "i" following Page 102, it's the second page following that, Page 2 of your CV.

Page 24

A. And which course are you referring to?
Q. GCOM 544, Federal Tax Aspects, Business Investment and Personal Decisions.
A. Yes, that was a course that was designed for non-accounting majors, that was designed to acquaint them. It was basically a survey course, that dealt with a wide range of aspects of Federal Income Taxation.
It dealt with certain aspects of individual taxation, property transactions such as like-kind exchanges in voluntary conversions. It dealt with alternative tax aspects and non-tax aspects of alternative choices of conducting business through a partnership, LLC, an S-corporation, a C-corporation, a branch as opposed to a foreign subsidiary.
It dealt with various pension and profit sharing plans and opportunities. It dealt a little bit with the state income taxation. It was generally a survey course designed for non-accounting majors. So it was much less technical than the courses that are designed primarily for accounting majors, most of whom sit for the CPA exam, and go on into public accounting.
Q. I thought you said it was for

Page 25

non-accounting majors.
A. Non-accounting majors.
Q. That will sit for the CPA exam?
A. The course that you're specifically referring to, GCOM 544, is a course that is for non-accounting majors. It's generally taken by finance majors and some management majors who want a background and a general overview background in some basic aspects of taxation, but who are not necessarily planning to sit for the CPA exam.
Q. Oh, who are not planning to sit for the CPA exam?
A. That's correct. And the courses that we offer to -- the rest of the courses -- many of the other courses are taken by primarily accounting concentrators, or accounting majors or accounting graduate students, most or all of whom either sit for the CPA exam or anticipate sitting for the CPA exam.
Q. One of the topics covered in this is choice of entity?
A. It is.
Q. Why is choice of entity a topic?
A. Choice of entity is the topic because many, in particular at the McIntyre school, many of

Page 26

the students are interested in forming their own business. Many of the students take entrepreneurial classes, with the idea of some day forming their own business. When you start a business, you have to make a decision as to whether to conduct that business as a sole proprietorship. Or if you're involved with someone else, there's a limited liability company, an S-corporation or a C-corporation.
Q. Why does that difference matter?
A. That difference matters because there are various tax and non-tax issues that vary sometimes between these choices.
Q. Do you get to choose which one going if into a business?
A. Going into the business, generally you do get to choose unless, of course, you're -- if you have two or more people involved in the enterprise who will be equity holders, then that obviously precludes the use of the sole proprietorship. The S-corporations have certain restrictions that preclude their use. But, yes, generally you have a choice between those alternatives.
Q. I may have already asked you this. Do

Page 27

you have your class materials for that?
A. For which course?
Q. Federal Tax Aspects of Business Investment and Personal Decisions.
A. No.
Q. Is it an old course?
A. It is.
Q. Do you teach lately any Accounting I and II with law?
A. I have taught intermediate accounting I & II. I currently, as you may know, serve as the chairman of the audit committee of a publicly created firm and the firm's financial accounting expert. I've also served as an expert on financial accounting matters.
Q. That's the "weed them out" course, isn't it?
A. It certainly is a decisionmaker for vast numbers of students over the years, yes, it is. It's a difficult course. It's a fun course to teach.
Q. Are you a CPA?
A. I am not.
Q. Have you ever been a paid preparer of tax returns?

Page 28

A. I served with Arthur Anderson in their national office on an internship, or I think they call it a faculty residency program for a few months in 1980 -- oh, no, about 1980. Other than that, I have not prepared returns for compensation, no.
Q. So you approach it from an academic standpoint?
A. I'm not sure what you mean by an academic standpoint. The tax law and the application of the tax law is inherently -- I mean, it has certainly academic and theoretical and policy oriented ramifications. The courses that I have taught for the public accounting firms from the staff level through the senior level, the manager level and the partner level, as well as the courses that I teach at the University of Virginia are primarily -- especially at the undergraduate level at the University of Virginia, are primarily pragmatic. How do you do things? How do you do things in the real world?
The public accounting firms teaching their in-house training programs are much less interested in theory and policy, and much more interested in the application of the tax law, the

Page 29

application of tax strategies, and the proper reporting of those transactions, and the proper disclosure of those transactions in the tax returns.
So when you talk about tax and my teaching of tax, and the 30 years of experience that I've had in teaching tax, not only at the university level, but for all of these hundreds of courses that I've taught for the public accounting firms, these courses are pragmatic. I wouldn't characterize them as academic.
Q. When you were at the Arthur Anderson internship, whatever --
A. Residency.
Q. -- residency, did you actually prepare tax returns?
A. I think I prepared a couple of tax returns, corporate returns.
Q. Is it safe to say that your experience as a paid preparer of returns is limited to those two?
A. As I've indicated, my experience for the last 30 years as been in academia, and in teaching tax programs for the public accounting firms, as well as graduate and undergraduate

programs at the university.

MR. WELTY: Objection as non-responsive.

BY MR. WELTY:

Q. Is it safe to say that your experience as a paid preparer of tax returns is limited to the two returns you prepared while a resident in Arthur Anderson?

A. I don't recall that I prepared two returns, but I believe I prepared some returns. It's been 27 years. My experience in preparing returns for compensation is limited to that brief experience that I had with Arthur Anderson. Over the years, I have prepared a number of returns pro bono for a variety of organizations and individuals.

Q. Who are they?

A. Those might be assisting organizations on campus in terms of preparing their required forms. I believe that's a Form 990.

Q. Charity organizations?

A. Exempt organizations.

Q. 501-C something?

A. Something.

I have never worked in public



accounting, other than that brief period with Arthur Anderson preparing tax returns. But, once again, I have taught a number of programs that deal specifically with the preparation and review of tax returns, and the proper disclosures on those returns.

Q. Have you ever worked for the Internal Revenue Service?

A. I haven't worked for the Internal Revenue Service, no, but I have taught training programs for the IRS Chief Counsel's office. I have been retained by the NYU Graduate School of Law to teach those programs. And as you know, I have been retained by the Internal Revenue Service in connection with expert witness engagements in the past. I've never been an employee of the Internal Revenue Service, no.

Q. So you've not ever examined tax returns as an auditor for the IRS?

A. As an auditor -- I've never been an auditor for the IRS.

Q. Have you ever studied the return selection process within the IRS?

A. I have.

Q. You have?



A. Of course.

Q. When did you do that?

A. Over the last 30 years. It's something that comes up frequently.

Q. Describe the return selection process within the Internal Revenue Service.

A. Well, I can give you a description that's based on, for example, a summary of, I believe it was about a 40-page report prepared by the Government accounting office in 1999. Based on that report, the return selection process involves a number of different steps, a number of different procedures and a number of different aspects. One aspect is that individual tax returns, and I believe some corporate returns and partnership returns, are assigned a DIF score, D-I-F.

Q. It's an acronym?

A. It's an acronym for discriminate inventory function.

Q. Discriminate inventory function?

A. Discriminate inventory function I believe is what that stands for also. I've seen it also just described as discriminate function.

It's my understanding that that score is calculated when a return -- soon after a return



is filed with the IRS service center, ten service centers now around the country. That DIF score is used to help identify those returns that appear to have the greatest potential for adjustment, in the event that they are audited by the Internal Revenue Service.

Let me take that a little bit further. It's my understanding that once a return has been assigned a DIF score, it is prioritized based on the DIF score. That some of those returns are then reviewed by experienced auditors, who use their experience and judgment during that review process to classify.

I believe they are called classifiers, that use their experience and judgment as experienced auditors, to make an initial assessment as to whether or not, based on their review, physical review, annual review of the information provided on and with those returns, that return should be pulled for further consideration, or accepted as filed.

If to the extent that a decision has been made to consider that return for additional review, it's my understanding that that return or an inventory return is passed onto the district

Page 34

office, where there are multiple levels of review that ultimately culminate in a decision to conduct some sort of audit. And there are various types of audits that vary in scope and detail and quantity -- quality, or to accept the return as filed.

Based on the GAO report, about 59 percent of the returns that are subject to what they call books and records audits are the result of this DIF process. The non-DIF process -- processes account for apparently the other 41 percent of the returns that are selected for audit.

The non-DIF processes involve apparently a variety of different reasons for selecting a return for audit, including referrals, anonymous tips, IRS projects, information provided to the Internal Revenue Service, state, local and Federal agencies, information that comes to the attention of the Internal Revenue Service as a result of summons, and so forth.

Once a return is selected for audit, it's my understanding that the scope and depth of an audit varies substantially, depending on the underlying facts and circumstances.

Q. Is this GAO report the source of your

Page 35

knowledge of the IRS examination function?

A. It is a source of my knowledge. I've been in the tax business for the last 30 years of my life. Over that period of time, in connection with my teaching and in connection with my normal reading and understanding of the tax law, reading the tax literature and so forth, the subject of IRS selection of returns for audit comes up frequently.

Q. When did you review this GAO report?

A. I reviewed this report on Saturday.

Q. Did you review it before preparing your expert opinions here?

A. No.

Q. So is it fair to say in rendering your opinions, which are Exhibits 1, 3 and 6, you relied on your past experience, but not this GAO report?

A. My past experience was confirmed by this GAO report.

Q. What's your past experience with the DIF scoring process?

A. I'm familiar with the DIF scoring process. I know basically what it is. It's a highly secret -- my understanding is it's a secret, very secret process that the Internal Revenue -- formula rather, that the Internal Revenue Service

Page 36

uses with respect to certain information disclosed on the return to assign a score. My understanding is that the DIF score is based on data collected from what are called -- or what were called and may still be called, taxpayer compliance measurement program audits.

Q. TCMP audits.

A. TCMP audits. It's my understanding that the DIF score has been around for a good number of years. I think ever since I've been in tax. How that score is determined, I don't know, other than to say that it's my understanding that it's based primarily or exclusively on the results of the TCMP audits.

Q. So you were not -- the DIF scores were not made available to you for these cases?

A. If they were made available to them, I didn't see them. I have not seen a DIF score for any of the 40 returns that I've reviewed in connection with these cases. Whether or not they were in the database, I don't recall ever seeing a DIF score.

Q. Would the actual DIF score potentially change any of your opinions in your reports?

A. The actual DIF scores, or more

Page 37

accurately the perception as to what those DIF scores might be, if high would, I believe, confirm the opinions that I've expressed in my report. They would support the opinions that I've expressed in my report.

Q. What do you mean "if high," a high DIF score, is that what you're referring to?

A. Yes.

Q. What would they confirm?

A. They would confirm the opinions that I've expressed in my report. They would support -- confirm, that's too strong of a word, but they would support many of the opinions that I've expressed in my report.

Q. How so?

A. Well, if I knew or had a reasonable expectation that the DIF score on my return was going to be sufficiently high to warrant a manual review by an experienced auditor in one of the IRS service centers, then knowing that this return would be reviewed, I would be more concerned about how I disclosed information on that return than if I thought perhaps, that there was a smaller chance or very little chance that my return would be selected for review.

Q. So you're talking about the classifier reviewing the returns at a service center?
A. I believe that's what you've asked me about. The DIF score returns are prioritized, and then manually reviewed by experienced auditors with the Internal Revenue Service, who use their judgment and experience to determine which returns to accept as filed, and which returns to send or to have other people look at to determine whether or not an audit might be warranted.
Q. So it's your opinion that the additional -- the lack of the additional disclosures you discuss in Exhibits 1, 3 and 6 would make it less likely that the returns are audited?
MR. DONOHUE: Objection as to form.
THE WITNESS: Could you repeat that question?
BY MR. WELTY:
Q. So it's your opinion that the lack of additional disclosures that you discuss in Exhibits 1, 3 and 6 would make it less likely that the returns are audited?
A. Yes, I believe I've opined in a number



of situations that it would be reasonable to conclude that a particular aspect of this transaction was reported on the return, in a manner that could be expected to produce the possibility of detection and audit by the Internal Revenue Service.
MR. WELTY: Can we take a break?
MR. DONOHUE: Sure. Five minutes, ten minutes?
(WHEREUPON A RECESS WAS TAKEN.)
BY MR. WELTY:
Q. Dr. LaRue, what is your understanding of the training given to classifiers?
A. My understanding of the training is that they are experienced auditors. By that, I assume that they've had substantial on-the-job training and experience. I assume that they -- I know the Internal Revenue Service conducts training programs, internal training programs. I believe that many people come to the Internal Revenue Service with an accounting background, maybe a graduate degree. I suspect some may be CPAs.
While with the Internal Revenue Service, I imagine it would be reasonable to assume that many people pursue additional education, or



take additional training programs, either in connection with keeping their CPA certificate current, or pursue a Masters degree or possibly a law degree.
So I would assume that certainly at the classifier level, that the people there would include some of the more, or most experienced auditors within the Internal Revenue Service.
Q. There were a lot of assumptions in that answer. Do you have actual knowledge of what their training is?
A. I don't believe there's -- I haven't seen any source that would indicate specifically what the typical profile, or what the range of profiles for people working in that capacity are. It's been my understanding, and that understanding was confirmed by the GAO report, which described those individuals as experienced auditors.
Q. Do you know specifically what they're taught to look for on returns?
A. I imagine there are some specific things that they're asked to look for, that they typically look for, but that may vary. I would assume that that would vary from one examiner to another. Again, the GAO reports confirms my



understanding that these classifiers would rely on their experience and judgment.
Q. Is that a no, you don't know what they're specifically taught to look for on returns?
A. I don't know that I've ever seen a list of things that classifiers are explicitly required to or asked to look for on returns. I've never seen any public disclosure of the specific things that those individuals are directed to look for. I'm not sure that any such document or information exists.
Q. Do you have any experience training, talking to classifiers?
A. Not so much, no.
Q. Not so much, or not at all?
A. I don't know personally any classifier that I know -- I've known some Internal Revenue Service people who worked as auditors for the Internal Revenue Service. Where they are now and what they were doing at the time, I don't recall.
Q. Revenue agents, do you know what revenue agents are taught to look for in returns?
A. I know that they have -- I know that there is an Internal Revenue Service audit manual that provides some guidance in terms of looking for

specific things once a decision to audit a return has been made. But in terms of what kind of internal training programs they're put through, I don't know. I would assume that that would vary substantially from one case to the next.

Q. You don't have any personal experience with them?

A. With?

Q. Training revenue agents or going through the training they have gone through?

A. Very limited. I taught one program for the Internal Revenue Service. I think about 30 or 40 people attended that program. It was a one day long program. I taught it pro bono, and my gosh, that was in 1985 or 1986.

But aside from that, I've never attended or taught a program for Internal Revenue Service agents, or seen the materials that are used in those training programs, although I can imagine what some of those materials might look like.

Q. What do you imagine they look like?

A. I imagine -- I mean, when you teach a course on individual taxation, you look at the various forms, you look at the instructions to the forms. You look at various tax laws that deal with



various aspects of what a person might report on those forms, charitable contributions, business expenses, accounting method issues, and so forth. A lot of the same stuff that we teach at the University of Virginia, and a lot of the materials that, you know, you tend to teach across all of the firms that I've taught for over the years.

Q. Do you know this, or are you speculating?

A. Do I know?

Q. What they're actually taught?

A. I just said I don't know what they're actually taught, but I would assume that they're taught -- that the training programs deal with the tax forms, proper reporting and some of the more important tax laws that taxpayers have to comply with in completing the forms.

Q. Let's go back to Exhibit 1, Page 6, paragraph 12, and, I guess, paragraph 13.

Paragraph 12 states that your analysis is based, in part, on information set forth in the documents referenced in the footnotes to this report. What else is it based on?

A. All right. Let me read that. "The principal facts and circumstances upon which I



relied in conducting my analyses and in formulating my opinions are presented below, and are based, in part, on information set forth in the documents referenced in the footnotes to this report."

When I say "in part," what I've tried to do is provide ready reference to documents that I'm specifically referring to in connection with the comment or fact that I've stated in my report. There are many other documents. I mean, for example, there are numerous copies of the same tax return in the various files, or the same Alex Brown account statements and so forth.

I thought it would be -- I thought it would make, and I believe it did make my report more transparent to you and to your expert to provide wherever feasible, which was in most cases, a specific reference to a specific document that I was referring to. There are other documents out there that are duplicative.

There may be other documents -- there were other documents out there that I read through, and may have considered somehow, some way in formulating my opinions and stating the facts. But I believe that virtually all of the factual statements that I've made in this report are



supported by the references made in the footnotes that accompany those statements in the report.

And again, my objective here is to be as transparent as I can be in terms of my understanding of the facts.

Q. All I'm really trying to find out is if there is something outside of the documents you have listed in your report and the appendices thereto, that you considered in rendering your opinions, either before or after the opinions?

A. Yes, sir. That's a different question than you asked me.

Yes, I have listed in Appendix C -- to the best of my knowledge and ability, I've listed all of the documents that I was provided with and considered, or could have considered in connection with these cases. I believe that -- as I sit here today, I believe that list is complete. There were a lot of documents received over a period of time. I believe I captured all of those, and disclosed them in Exhibit C. I think that's very important to do, and I made a good effort to do that. I think I was successful.

Q. Okay.

Have you received any additional

Page 46

documentations that's not listed in your report, to the best of your knowledge?
A. I've certainly received the expert reports involved in this case and the rebuttal reports.
Q. All of them, or those related to you?
A. I've received the government's expert reports. I've received -- I believe I've received all of your expert reports. I believe I have.
As I've already indicated, I was -- you know, I saw that GAO report that confirmed my understanding of the IRS' return selection process, and that's been since I filed these reports.
Q. So the GAO 1999 report --
A. Was not listed in Schedule C.
Q. -- is not listed. Would you mind updating your opinion or whatever, just for giving us the specific report number, GAO report number so that we can pull that up? I'm sure it's publicly available.
A. I don't recall the number. It's dated February 1999. It's titled IRS Return Selection Process, and it was issued to Congressman Archer as the Chairman of the House, Ways and Means Committee.

Page 47

Q. Okay. That probably will get me there.
What about deposition testimony? Is there deposition testimony that you -- that is relevant to your report, or supports or contradicts your report in any way that has come to light since you prepared your report that dated June 1st, 2007?
A. I'm aware that a number of depositions have been taken, and I believe some of those depositions have been taken since June 1st, 2007, when I filed this report. I don't --
Q. Have you attended any of them?
A. Oh, yes, I'm sorry. I attended Amy Keating's deposition.
Q. What about anybody else?
A. That's the only deposition that I attended.
Q. Have you reviewed any deposition transcripts not listed in your report?
A. I don't recall that I have.
Q. So you haven't reviewed any of the deposition transcripts of any of the other return preparers other than Amy Keating?
A. I've reviewed some of the transcripts that were available to me before June 1st of 2007.

Page 48

Since that time, I don't recall that I've reviewed other transcripts. I know I cited or referred to a transcript of, I believe, a 2003 deposition of Robert Coplan of Ernst & Young. I believe that was a transcript that was available to me in the database that I had, and I may have looked at that before I filed my original report. I certainly reviewed that before I filed my rebuttal report, because I cited it in my rebuttal report.
Q. So the 2003 Coplan depositions are in the database that you had access to?
A. Let me look at Appendix C.
(WITNESS EXAMINING DOCUMENT.)
I believe it was, but I can't be sure. I don't recall specifically where I found that deposition.
Q. Are there any other depositions that you reviewed as well? Are they listed somewhere in your appendix?
A. Yes, Appendix C, the last page of Appendix C, I've listed the depositions that were available to me as of the date that I filed this report, and that were not Bates stamped. There were a number of depositions that were included --

Page 49

that were Bates stamped and included in the Bates numbers that I listed on the first page of Appendix C.
Q. Are those all of the depositions that you had, because Coplan is not listed there?
A. My guess is that his deposition is somewhere in one of the -- I guess it was Bates stamped. Actually...
(WITNESS EXAMINING DOCUMENT.)
I don't have a copy of my rebuttal to Professor Shepherd's report. I believe that's where I quoted from Mr. Coplan's deposition. And I would have cited that deposition by Bates stamp reference if it had been Bates stamped, and my guess is that it was. I don't have a copy of that.
Q. Okay. If -- we're going to be here for a day or two, do you mind just checking on that while we're in this? And this is not a trick question. I'm just trying to figure out what information you had considered in your report, and the Coplan deposition is not listed here. And Amy Keating occurred after your June 1st report, and I'm just trying, for the sake of completeness, to figure out what information you had in rendering your opinions.

Page 50

A. I understand.
Q. And so other than Coplan's deposition and Amy Keating's deposition have you seen any other deposition transcripts, or attended any other depositions?
A. I have not attended any other depositions, no.
Q. Have you seen any other deposition transcripts other than those listed?
A. Other than the ones listed there, I don't recall that I've looked at any other deposition transcripts. So if I recall something, I'll certainly let you know, but I don't believe that I have.
Q. With regard to Mr. Coplan's deposition, since it's not cited in these reports, either in the list of documents reviewed or in the text of the reports, those being Exhibits 1, 3 and 6, did it have any impact on your opinions in this case?
A. If it wasn't cited in my report, then I didn't rely on that deposition in preparing my June 1st report. I did refer to that deposition in preparing my rebuttal report.
Q. To Professor Shepherd?

Page 51

A. To Professor Shepherd, yes. I thought that I had a reference in the rebuttal report to Mr. Smith, but it's hundreds of pages of documents here, and I don't recall. I don't see -- at this point, I don't see a reference to the deposition of Mr. Coplan --
Q. Okay.
A. -- in that report.
Q. What about Amy Keating, the deposition of Amy Keating, what impact, if any, does it have on your opinions here?
A. Well, my opinions were rendered in my June 1st report before I heard her deposition. Her deposition didn't change any of the opinions that I've expressed in this report.
Q. What were the key things that you took from Amy Keating's deposition?
A. My key things were that she was vague in terms of her recollection as to why they did certain things that they did in preparing the returns.
Q. That's all you recall?
A. That's correct.
Q. And the only reason I ask this again, is in your report at paragraph 13 in Exhibit 1, and

Page 52

I think the same language is in Exhibit 3 and 6, you say that you reserve the right to essentially determine what impact, if any, additional information will have on your report. So I'm trying to just figure out if anything that you've learned subsequent to this initial report has changed any of your opinions.
A. It has not changed any of my opinions, no.
Q. Would you look at Exhibit Number 1, Page 7, paragraph 19? And I just want to refer to a convention that appears to have been used with respect to some of the Alex Brown client statements, that being the, quote, A/O, end quote. As you know, it appears to be an abbreviation for as of the specified date. Do you see that?
A. I do.
Q. Just so I'm clear, are you suggesting on noting that convention or the "as of" that the transactions did not occur as of the date noted, or are you suggesting back dating in any way, or are you suggesting anything other than that's just what the statements from Alex Brown say?
A. I'm saying that that's what the statements of Alex Brown say.

Page 53

Q. But you're not suggesting anything improper and nefarious about it?
A. I didn't suggest anything improper and nefarious about that in my report. I don't know why these transactions were recorded on one date, and then stated as of a prior date. In some cases, there is a significant discrepancy. By significant I mean -- well, there is a discrepancy of several days, and possibly weeks between the two dates. Why that was, I couldn't say.
Q. On Page 8 of Exhibit 1, paragraph 22, you note that Mr. Zucker's return lists him as consultant. Again, you've got that in quotes. And the same for Mr. Boyd, executive in quotes in paragraph 25. Are you just simply noting that, or are you suggesting that it's incorrect?
A. I'm not suggesting that that's incorrect. Throughout much of my report, I described what I found on the return.
Q. So you're just regurgitating what's on the face of the return essentially?
A. In paragraphs 22 and 25, those are things -- that is information that I pulled off the face of the return, and I'm describing them in those paragraphs, yes.

Page 54

Q. Page 9 of Exhibit 1, paragraphs 26 and 27, dealing with the single member LLCs, what is a disregarded entity?
A. A disregarded entity, as that term is used here, refers to the single member limited liability companies that were disregarded for -- or to be disregarded for all Federal Income Tax purposes. A disregarded entity could also include, for example a branch, an unincorporated branch of a corporation.
Q. Are LLCs common?
A. I believe that they're common now, yes.
Q. What about single member LLCs?
A. I don't know how common they are, but I suspect that they are fairly common.
Q. Is there anything improper about using a single member LLC?
A. Not that I'm aware of.
Q. You've taught a course on choice of entity, haven't you?
A. I have.
Q. What are the benefits of an LLC?
A. Of a single member LLC, or an LLC generally?

Page 55

Q. LLC generally.
A. The non-tax benefits include at least a possibility of limited liability for the equity holders of the LLC. An LLC, unless it elects otherwise, is generally considered to be a partnership, or taxed as a partnership for Federal Income Tax purposes.
Q. During 1999?
A. Yes.
Q. Okay.
A. In that normally for most people under -- for most businesses under most circumstances, there can be significant benefits to being taxed as a partnership, as opposed to being taxed as an S-corporation or as a C-corporation.
Q. What are some of those benefits?
A. Tax benefits?
Q. Yes.
A. The one benefit would be the single level of taxation on income. Income of a C-corporation is taxed at the corporate level, and then again, at the shareholder level when it's paid out as a dividend. The past year of losses, when an entity experiences losses, subject to a variety of limitations, the losses of a partnership

Page 56

typically flow through, and are potentially deductible by the partners on their individual tax return. That is not the case with a C-corporation generally.
A C-corp -- strike that. A limited liability company treated as a partnership doesn't have many of the same restrictions and limitations that are often relevant to entities that are formed as S-corporations, so those are some of the advantages.
Q. What about non-tax reasons for using an LLC?
A. One non-tax reason would be limited liability for the owners.
Q. Any others?
A. I'm sure there are others. Continuity of life. I believe in some states, limited liability companies may not have a -- some of the events that may result in a dissolution of a partnership, may not result in the dissolution of a limited liability company.
The principal benefit that comes to my mind of conducting a business as a limited liability company as opposed to a general partnership, is that the owners typically have

Page 57

limits, limitations -- limits on their liability insofar as the debts and obligations toward liabilities and so forth of the business enterprise.
Q. What about an S-corporation? What are the benefits of an S-corporation?
A. Well, the benefits of an S-corporation are the single level of tax if the shareholder is opposed to a double tax when compared with a C-corporation. An S-corporation -- the S-corporation rules again, subject to limitations, permit a flow through of the losses sustained or recognized by the S-corporations, a flow through of those losses to the individual shareholders.
Q. Is there a Supreme Court case regarding S-corporations in the last, I don't know, ten years and unusual tax benefits associated with them?
A. I don't recall a specific case.
Q. Dillets?
A. I remember the name of that case.
Q. Do you know what it's about?
A. Not as I sit here today.
Q. What are the benefits of a single member LLC, disregarded as for tax purposes?

Page 58

A. Well, again, I think one potential benefit is the limitation on the liability of the owner of an LLC.
Q. Are there any other benefits that might be relevant to this case that you can think of?
A. The benefit that comes to my mind is limited liability for a limited liability company.
Q. Can you look at your appendix of the documents that you were provided, and tell me whether you were provided copies of the Deutsche Bank subpoena response, Bates numbered DB-DOJ-COBRA 0024622 to DB-DOJ-COBRA 0024622-32?
A. It looks as thought the -- that that number may have been included in the COBRA database. DB ranges are not specified there.
Q. I couldn't tell. It was provided to us on June 18th of this year, so I didn't know --
A. June 18th?
Q. 2007, which is after your report.
A. Oh, then it wouldn't be listed then.
Q. I didn't know if you had access to it before running your report or not.
A. If it's not listed -- if it's listed in that Bates range, presumably it was in the

Page 59

database that was provided to me, but I certainly don't specifically recognize that Bates number from memory.
MR. WELTY: Would you mark this?
(DOCUMENT MARKED PLAINTIFF, LaRUE DEPOSITION, EXH. NO. 10, FOR IDENTIFICATION.)
BY MR. WELTY:
Q. Dr. LaRue, do you recall having -- and this is not a trick question. If it's listed in the Bates range, fine; if it's not, fine. But do you recall these documents that I've handed you that have been marked as Exhibit 10?
A. Actually, let me note with respect to my prior answer that the Bates range number that's on this document begins after my listing leaves off. My listing leaves off with 246221, and this begins, I believe with 246222.
Q. So it doesn't look like you had it at the time you prepared your reports?
A. It's not listed here.
MR. WELTY: Well, can we take about a five-minute break so you can review it, so you have a chance to review it before we continue? Is that okay, Dennis?

Page 60

(WHEREUPON A RECESS WAS TAKEN.)
BY MR. WELTY:
Q. Back on the record.
Dr. LaRue, did you have the opportunity to review Exhibit Number 10?
A. I did.
Q. And is it correct that you did not have the documents which are attached to Exhibit Number 10 in advance of preparing your report?
A. I don't know if that's correct or not. I mean, these documents may have been duplicated in the database.
Q. Do you recall seeing them?
A. I don't recall seeing -- I don't recall these specific emails.
Q. Would you turn to Exhibit 10 and Bates number, the last four digits of the Bates number are actually 6222. Do you see that?
A. I do.
Q. And 6223, 6224, 6225. And then 6231. And I guess 6229.
Are those e-mails discussing the use of single member LLCs?
A. They discuss -- that is one of the things that they discuss.

Page 61

Q. What do the e-mails on the whole suggest about the single member LLCs?
A. They seem to suggest that it would be a matter of administrative convenience to use an LLC, rather than to use an individual to do the -- as a counterparty to the trace.
Q. That's, in fact, what happened in the three cases that we're here for today, isn't it?
A. Yes.
Q. That they were used as a matter of convenience?
A. Well, these e-mails say that a reason would be -- for using the LLC, would be that -- it says here, "I strongly encourage you to avoid having natural persons face the bank as counterparties. They do present the bank with certain due diligence issues that an LLC would not."
Q. What's the date on that?
A. That's on October 18th, 1999.
Q. When were the LLCs set up in the Zucker case?
A. I believe in November of 1999.
Q. What about the Tesoro case?
A. Probably November as well.

Page 62

Q. What about the Murphy case, 2000?
A. I believe they were set up in 2000.
Q. Does anything in Exhibit Number 10 change the opinions you've rendered in Exhibits 1, 3, 6?
A. Are you referring to a specific opinion?
Q. Well, let's go to the summary at the end. Exhibit 1, Page 101, paragraph 217, and turn over to Page 102. I guess it's actually paragraph 219.
Does Exhibit 10 change any of your opinions in paragraph 219?
A. No.
Q. Why?
A. Well, that opinion is actually -- well, let me read it. "In my opinion based on my review of the record, it would be reasonable to conclude that the various elements of the transaction were divided between and reported on the various 1999 returns, in a manner that was designed to reduce or eliminate the risk of detection and audit by the Internal Revenue Service."
Then it goes on to say that, "The

Page 63

transaction related fees paid to E&Y and J&G were reflected on the 1990 returns -- 1999 returns in a manner that was designed to reduce or eliminate the risk of detection and audit by the IRS."
Q. Are you saying that the LLCs were -- the purpose for the LLCs was to accomplish the objectives that you described just now?
A. In the paragraph that you refer to, I'm referring to the partnership, to the LLCs, to the partnership and to the S-corporation. The transaction was divided between the individuals, the LLCs, the partnerships and the S-corporations. All participated in various aspects of the transaction.
Here I opine that it would be reasonable to conclude that the manner in which the transaction was structured, and the manner in which various elements of the transaction were divided among those four groups of entities, was designed to reduce or eliminate the risk of detection and audit by the Internal Revenue Service.
Q. Turn to Exhibit 1, Page 16, paragraph 43. Does anything in Exhibit 10 change your opinion as expressed in paragraph 43 of Exhibit 1?
A. My opinion as stated is that it would

Page 64

be reasonable to conclude that one of the purposes, perhaps the principal purpose for the creation and use of the LLCs in connection with the implementation of the COBRA strategy, was to minimize or reduce the risk of detection and audit, by reducing the possibility that the IRS might trace the ownership of the partnership from the partnership's 1999 Form 1065, to the 1999 Form 1040s of its ultimate partners. This doesn't change that opinion.
Q. What is -- how many documents are in the database, do you think?
A. I don't know that I ever counted them up. I think there are well over a million.
Q. Is there any document that you cite in support of your conclusion in paragraph 43 of Exhibit 1 that discusses using an LLC to minimize the -- or reduce the risk of detection? Is there any document that points to that conclusion?
A. In fact, there is.
Q. What is that document?
A. Footnote 38 on Page 12. See also the e-mail from Robert Coplan to Amy Keating, dated February 19th, where Mr. Coplan states, "Here are my responses to your attached question." I'll

Page 65

abridge this. "I don't have a copy of the pro forma return, and we'll have to look at it at a 1065 when in the office. I would have expected that the partners would be listed as individuals on the returns, and would not reference the LLCs. I will be interested to see what Donna says about this."
I believe that's Donna Gueren at J&G, who was one of the developers and promoters of this transaction.
See also W and K tax return review notes from Amy Keating wherein she states, "I can't find any instructions supporting the treatment on the 1065 Form K-1 with respect to the type of entity the partner is classified as. Specifically, do you want to see the individual's names, Social Security number and individual identification at the top of the K-1?
As an alternative, we can put the LLC name, EIN and then what would you put as the entity classification on -- entity classification type on line B? Since the single member LLC is a disregarded entity for Federal Income Tax purposes, my logic goes to the first option, but I'd like some clarification."

Now I haven't been able to locate any response by Donna Gueren with J&G. But at the end of the day, the limited liability companies -- the disregarded limited liability companies and their EINs were, in fact, listed as the partners of the partnership on the schedule K1s.

And from this, it would be -- from these two e-mails, it would be reasonable to assume that it was Donna Gueren at J&G that may have instructed that that was how the ownership of the partnership was to be disclosed on that return. And she must have had a reason for doing that.

And one reason that comes to my mind is the fact that if you have a single member LLC with it's own EIN listed as the partner on the K-1, it makes it a bit more difficult to go from the partnership tax return to the individual tax return, on which the JBJZ losses were ultimately deducted. So it appears to me that there was a concern here in terms of who to list as the partner on the K-1s.

Q. Is it a concern or a question?

A. It was a question. And it was ultimately resolved in favor of listing the LLCs.

Q. And that is your support for your



conclusion that one of the purposes, perhaps the principal purpose for the creation and use of the LLCs in connection with the implementation of the COBRA strategy was to minimize or reduce the risk of detection and audit by the IRS, by reducing the possibility that the IRS might trace the ownership of the partnership from the partnerships's 1999 Form 1065 to the 1999 Form 1040 of its ultimate partners? That's the sole basis for your conclusion?

A. That is not the sole basis.

Q. What is the other basis?

A. The other basis is the various e-mail -- internal e-mail correspondences between the various individuals at Ernst & Young.

Q. Let's be specific. Which e-mails?

A. I have them all referenced in my report.

Q. Okay. Let's talk about them individually.

A. We can talk about, them but let me answer your question.

These various e-mails have a consistent theme, or a theme, that raises concerns about the possibility that this transaction is



going to be detected by the Internal Revenue Service. That the return -- if a particular course of action is taken, or if a particular disclosure is made, then that might red flag the return. There are a number of e-mails that address that issue.

Q. Are those e-mails listed on Page 99 of Exhibit 1, going over to Page 100, and 101?

A. Some of them are listed there. Some of them are listed in the footnotes.

Q. Okay. Well, let's go over to Page 99, paragraph 216.

A. All right.

Q. The January 21st, 2000, e-mail from William Murphy to Robert Coplan, do you see that?

A. I do.

Q. Doesn't that e-mail say that we want to file these returns without extensions, in other words, timely by April 15th, is that where you're drawing support for your conclusion?

A. Once again, there are a number of e-mails that express concern about the possibility of red flagging a return.

Q. Is that one of them?

A. That is one of them.



Q. Let's go on to Page 100.

A. Let me back up because I don't want you to misinterpret what I've said in that report. Paragraph 216 begins, "The record contains several additional internal E&Y communications that corroborates the opinions I expressed above. These communications indicate, or in some cases seem to indicate, that the parties planned and implemented, or attempted to implement, strategies designed to reduce the possibility that the transaction might be detected and audited by the IRS."

For example, and reading from that January 21st memo, "I know we have expressed a strong preference for our client that they should file their returns by April 15th, quote, with the masses."

Q. How does that reduce the risk of detection?

A. With the masses. I think whoever wrote this e-mail felt that if these returns were included, along with the millions of other returns filed on April 15th, that that would reduce the likelihood of detection and audit vis-a-vis a late filed return.

Q. Is that your opinion?

A. That would be my impression, yes.
Q. And what is that based on?
A. That's based on my common sense and my 30 years of experience in the tax area.
Q. That filing timely reduces the likelihood of audit?
A. Not filing timely I would suggest probably increases the risk of audit.
Q. Filing under an extension but timely increases your risk of audit?
A. It might. And, again, this is one of several e-mails.
Q. Okay. Well let's look at the next one.
A. March 10th from Amy Keating to Robert Coplan. "I'm glad everyone seems to be okay with the returns. I haven't heard anything about the ones that have gone out. As far as signatures go, I think it's best that they're all different, because if one is picked up, they'll surely run an SS number analysis to identify other returns to review."
Q. Okay. Let's go onto the next one, May 8th, 2000.
A. "Our decision to use a coordinated



preparation of transaction tax returns was well received. Our clients like the fact that we're paying close attention to coordinating the reporting of similar transactions, and achieving efficiency in determining proper wording and disclosure issues. This is a major task by the compliance people involved, and for Bob Coplan. Excellent job to all."
Q. How does the May 8th, 2000, e-mail suggest anything other than they're achieving efficiencies in trying to properly disclose items?
A. Again, taken with all of the other analyses and observations that I've made in the report, in my opinion, there were a number of disclosures that were common to all of these returns. That, in my opinion, one could reasonably conclude that the purpose for disclosing the transaction in that particular way was to minimize or reduce the possibility of detection and audit by the Internal Revenue Service.
Q. Is that what you concluded? When you say one could reasonably include, are you saying "that's my conclusion"?
A. I didn't express that opinion in my report. Are you asking me outside of my report



whether that's my conclusion?
Q. Well, I'm trying to -- you say it would be reasonable to conclude.
A. Yes.
Q. Is that your conclusion, or is it just somebody could conclude that?
A. It's not my place to express an opinion on the subjective state of mind of the parties involved. My purpose here was to review the objective evidence, and determine what factors, you know, made it or did not make it reasonable to conclude that an effort was being made to minimize the possibility of detection and audit by the Internal Revenue Service.
So I didn't express that opinion in my report. But I believe that an effort was made, a coordinated effort was made to do a number of things that would minimize the possibility of detection and audit by the Internal Revenue Service.
Q. I'm confused. Is that your conclusion that you conclude that one of the purposes, and perhaps the purposeful purpose for the creation and use of the LLCs and so on, is it your conclusion, or is it some hypothetical person could conclude?



A. My conclusion is that based on an objective analysis of what was done individually and also collectively in terms of looking at the whole record, it would be reasonable for a reasonable person to conclude that a purpose, possibly the principal purpose for the use of the LLCs was to minimize the possibility of detection and audit by the Internal Revenue Service.
Q. All right. Well, maybe we've got a semantics issue here.
Look at Exhibit 10 again.
Is it your opinion that it would be reasonable to conclude that one of the purposes, and perhaps the principal purpose of using LLCs, creation and use of the LLCs, was to make it simpler from an administrative standpoint for Deutsche Bank to conduct the trades?
A. That's a possible explanation as to why an LLC was used.
Q. That isn't the question.
In your opinion, would it be reasonable to conclude that one of the purposes, and perhaps the principal purpose of using the LLCs, was to make it simpler from an administrative standpoint for Deutsche Bank to conduct the trades?

A. It appears from this memo that that was a purpose for using the LLC. It may have been the principal purpose.

Q. Is it reasonable to conclude it was the principal purpose?

A. I'm not so sure. Looking at the record as a whole, all of the e-mail correspondence that goes to or suggests a concern about how the transaction was disclosed, how various aspects of the transaction were disclosed on the various returns, it seems to me that a reasonable -- it would be reasonable to conclude that the LLC, the use of the LLC, and the use of -- or the reference to the LLC on the partnership's K-1, was designed to minimize the possibility of detection and audit by the Internal Revenue Service.

Q. Do you have any specific e-mails, documents discussing the use of LLCs that support your conclusions as just stated?

A. I believe I've laid that out in my report. Again, looking at the totality of the report and all of the e-mail communication, there was a great deal of concern expressed about various reporting issues. And how they might red flag the return, or bring this transaction to the attention



of the Internal Revenue Service.

At the end of the day, in spite of the concerns raised by Amy Keating, who was an experienced tax manager with Ernst & Young preparing these returns, at the end of the day, it was the LLCs that were disclosed as the partners of the partnership, not the individuals. It was the LLCs.

The LLCs on the schedule K-1s were not identified as disregarded entities. They were not identified as single member entities. There is nothing on any of the partnership returns, other than generally illegible signatures, that would connect by name or by Social Security number the partnership or the K-1 directly to the S-corporation where the loss was actually recognized, or the individual tax returns where that loss was deducted. The LLCs broke that link between the partnership returns and the individual 1040s.

MR. WELTY: Objection. Not responsive. Let me ask you again.

BY MR. WELTY:

Q. Do you have any specific e-mail or documents discussing the use of the LLCs to support



your conclusions, other than perhaps those in footnote 38?

MR. DONOHUE: Counsel, I wish you wouldn't make these comments on the record characterizing the witness' response.

MR. WELTY: It's just not responsive.

MR. DONOHUE: It's improper. You're characterizing the witness' response, and it's improper. I thought his response was responsive. We can argue later about whether it's responsive or not. But you're constantly doing that, and it's improper. You can say to the witness if you don't believe he's answered the question you asked.

BY MR. WELTY:

Q. Do you want me to repeat the question?

A. Yes.

Q. Do you have any specific e-mails or documents discussing the use of LLCs to support your conclusions set forth in paragraph 43 of Exhibit 1, other than those in footnote 38?

A. I haven't seen a document or an e-mail that says specifically, we will use LLCs for the purpose of breaking the connection or the direct



link between the partnership returns and the individual Form 1040s of the owners of those single member entities. I think that's responsive.

Q. Go ahead. Are the primary bases for your opinion on the LLCs in footnote 38?

A. That is a basis. Once again, I have to look at my -- the totality of my report, and all of the things that were done -- that I discussed in my report, all of the e-mails. There is a theme in these internal E&Y communications, where there is a concern expressed about red flagging the return.

For example, not closing, not liquidating the S-corporation in the same year, and keeping it alive for another year. There are a number of little things and big things that were discussed in these internal communications that evidence about a concern about disclosures, that might have the effect of red flagging of these returns.

When you look at all of those disclosures and the e-mail that you're referring to in that footnote, and the fact that the effect of using an LLC and using it to disclose who the partners were on the K-1 broke the connection, the direct connection between the K-1 and the

Page 78

partnership return and the individual Form 1040s. So one effect of using the LLC was to break that link.

Whether or not the purpose of using the LLC was exclusively to break that link, or whether or not that was one of the purposes or the principal purpose, I don't know. All I can do is look at the objective evidence and say that it would be reasonable to conclude, based on what I have seen in this record and what I have discussed in my report, that one of the purposes or one of the effects or possibly a principal effect was to break the link between the partnership returns and the individual tax returns.

Q. How is your expertise coming into play in this weighing of the evidence, what aspect of it?

A. 30 years of experience in the tax area, for all of the public accounting firms, for all of the expert witness work that I've done, for all my academic work, for all my publications and testimony. I have 30 years of experience in tax and that's my opinion.

In fact, the link using an LLC -- in fact, the objective, just looking at the Schedule

Page 79

K-1, if you look at the Schedule K-1, you don't see -- or if you look at the Form 1040, you don't see the names of any of the individuals who deducted the losses, the COBRA losses on their Form 1040s. They're nowhere to be found on that return, except in illegible signatures. Most of them are illegible. I think one was legible in the Murphy case. Illegible signatures.

There are no Social Security numbers. There are no references to the S-corporation. There are no references to the individual owners of the LLCs. What you see on that return is a limited liability company that is not identified as a single member limited liability company. It just says limited liability company.

Q. But it has an EIN number; right?

A. Yes, it does.

Q. There is an SS4 filed that says it's a disregarded entity; correct?

A. That's correct.

Q. And that SS4 provides the linkage back to the individual taxpayers, isn't that correct?

A. Presumably it does, yeah.

Q. And isn't it true that the S-corporations file K-1s listing the individual

Page 80

shareholders?

A. It is true.

Q. Isn't it true that the S-corporations filed an election to be treated as a small business corporation? Isn't that true, listing the owners?

A. Yes, that's true. But you're assuming -- I mean, your comment really makes reference to having all of these forms together in the same place at the same time.

It's my understanding, and I believe that understanding may have been confirmed or was confirmed by Mr. Songy. It's my understanding that when the Internal Revenue Center looks at returns, and tries to decide which returns to accept and which to recommend for additional consideration, it's my understanding that they generally look at one return at a time.

They have the Form 1040. They have the Form 1065. They don't have all of the other forms that, you know, tie in or tie out to the basic form that they're reviewing.

What I'm saying is that looking at the Form 1065 and the K-1s and the statements attached to that form, there is no way, looking at that form and only that form, that you can determine that the

Page 81

partners of the partnership were single member limited liability companies.

There is no way that you can determine, from looking at that form, who the individual owners of the partnership on the K-1s or on the partnership summary were. Their names didn't appear, their Social Security numbers didn't appear anywhere, and there was no mention of the name or the identification number of the S-corporation.

So if you pick up the partnership tax return first, this is the information that you've got. If you need additional information, you're going to have to go some place else to get it.

Q. I believe earlier you testified that Amy Keating expressed a concern about using the LLCs on the partnerships return; is that right?

A. Did I say it that way?

Q. Yes.

A. All right.

Q. Did she express a concern?

A. Well, let's look at the footnote. I have quoted her concern -- I quoted her statement, and I don't recall what page that was on now.

Yes, it's on Page 12, footnote 38.

From her review notes, Amy Keating states the following: "I can't find any instructions supporting the treatment on the 1065 Form K-1 with respect to the type of entity the partner is classified as. Specifically do you want to see the individual's name, Social Security number and individual classification on the top of K-1?

As an alternative, we could put the LLC name EIN, and then what would you put as the entity classification on line B? Since a single member LLC is a disregarded entity for tax purposes, my logic goes to the fist option, but I'd like characterization."

And Bob Coplan in response to this, "I would have expected that the partners would be listed as individuals on the returns, and would not reference the LLCs. I will be interested to see what Donna says about this."

Q. So you're just regurgitating the discussion and saying it's a concern.

Let me ask you this just point blank. Was it correct to use the single member LLCs on the partnership returns, rather than the names of the owners of the single member LLCs?



A. I did not opine on that in my report.

MR. DONOHUE: Objection. Calls for a conclusion of law. You may answer.

BY MR. WELTY:

Q. Well, don't you, throughout your report, reach conclusions as to whether certain information is required on a return or not, and whether it's correctly reported or not?

A. Well, first of all, let me make sure you understand. I did not express -- I was not asked to express any legal opinion in this case, and I did not express any legal opinion in this case.

Q. Based on the guidance you've been able to review, was it correct to list the single member LLCs on the partnership returns instead of the individual owners of the single member LLCs?

MR. DONOHUE: Same objection. You may answer.

THE WITNESS: And I'd like to finish answering my first question. Throughout my report, I point out that there were certain disclosures that did not adequately disclose the source of the COBRA losses that were claimed on the Form 1040s.



In most cases, I didn't express an opinion as to whether or not the disclosures did or did not comply with the instructions for the various forms.

BY MR. WELTY:

Q. We'll get to that in a moment.

A. But I'm answering the question you asked a moment ago.

Q. Fair enough.

A. So I want to make sure I've got the answer.

Q. Fair enough.

A. There were some observations that I made where the unambiguous instructions in -- that go along with the form were not complied with. So there's a difference, and I just want to make sure that you understand the difference. Throughout my report, I did make a couple of observations that something had been misreported.

In many other cases, my opinion related to whether or not the reporting was adequate to disclose the fact that the COBRA losses were, in large measure, artificial and not economic losses. Was it adequate? Not was it required, was it adequate?



Now, back to your question. Was it improper to refer to the LLC as the partner on Schedule K-1? You're asking me for an opinion, a legal opinion, my opinion, which I didn't express in my report, but I'll express it now. In my opinion, the regulations require that a single member LLC be disregarded for all Federal income tax purposes. That's the way that I believe the regulations are stated.

A reasonable interpretation of that would be that when you're reporting the partners of a partnership, you would disregard the limited liability as an entity, and report the individual owner of that entity on Schedule K-1.

I would also point out on that on the Schedule K-1s, not only were the LLCs and not the individual owners of the LLCs listed as the partners on the Schedule K-1 and on the partnership summary, the designation limited liability company doesn't reveal or disclose the fact that these were single member LLCs that were disregarded entities.

So I believe that the correct reporting would have been to list the individual owners of the LLCs, and not the LLCs. Or at a minimum, to disclose that the limited liab co was a

Page 86

single member LLC.
Q. That is, in fact, disclosed on the SS4s; isn't it?
A. The SS4s is on a different form. You asked me about the Schedule K-1 and the proper reporting of the identify of the partners on the Schedule K-1, and that's my answer.
Q. So that was long, but just so I'm clear, you believe it was incorrect to use the single member LLCs on the Form K-1 as opposed to the individual owners?
A. I believe that the individual owners should have been listed as the partners on the K-1s.
Q. You are aware that the Internal Revenue Manual, section 4.31.2.2.6.1 addresses this issue, don't you?
A. Could you -- where are you -- let me see it.
Q. Doesn't the Internal Revenue Manual that section, in Paragraph 3 say, "If a disregarded entity is an investor in a partnership, the examiner should make sure that the Schedule K-1 has the proper EIN of the entity listed on the form. It is not unusual for the EIN of the owner to be

Page 87

listed on the Schedule K-1.
If this is the case, the EIN of the disregarded entity must be secured for proper linkage. If this information is not provided, the campus may contact the examiner and request that the correct EIN be secured."
A. Where are you reading from?
Q. I'm reading from Mr. Songy's expert rebuttal report, which is Exhibit 2, Page 15.
A. (WITNESS EXAMINING DOCUMENT.)
Well, it appears from this quote that this anticipates that -- this seems to anticipate that a disregarded entity would be listed as a partner with it's own EIN on Schedule K-1.
Q. Doesn't it also indicate that that listing of the LLC is the preferred method, and that if the individual is listed rather than the single member of the LLC, that examiners are instructed to go get the EIN number of the LLC for proper linkage?
A. I think what this is saying is that if you list the EIN -- I mean, strike that. If you list the LLC as the owner, you must also list its EIN and not the Social Security number of its individual owner.

Page 88

Q. So is it still your opinion that listing the LLCs is incorrect?
A. This doesn't go further. I mean, this doesn't say whether or not it's appropriate to list the disregarded entity without indicating that it is, in fact, a disregarded entity. It doesn't address that issue.
Q. So you still, in the face of this Internal Revenue Manual provision, maintain that it's incorrect to list an LLC as the partner rather than the individual owner of the LLC?
A. I believe that same concern was raised by Amy Keating, who couldn't find any support for listing the LLC as the partner. And also by Robert Coplan, who believed that the individual probably should have been listed as the owner.
It's not just the fact that the LLC was listed as the owner. It was the fact that it was the LLC listed as the owner, and the fact that it wasn't disclosed on their schedule K-1s that that LLC was a disregarded entity. This doesn't address that issue. If you list the LLC and it's EIN on the K-1, listing the entity classification as an LLC doesn't indicate that this is a disregarded entity.

Page 89

Q. And that's incorrect?
A. I think it might be. I don't know that there are instructions specifically that deal with that.
Q. Well, I thought you said it was incorrect a few minutes ago.
A. I said I think it would be -- I said I think, in my opinion, the individuals, the names of the individuals should have been listed as the partners.
Q. Based on what instructions?
A. Or -- and maybe I didn't make that clear, or if you're going to list the limited liability company, you can't -- you shouldn't label that as an LLC without disclosing the fact that it's a disregarded entity.
Q. Based on what instructions are you --
A. There were no instructions at that time, other than the regulations that state that an LLC that's treated as a disregarded entity is to be disregarded for Federal income tax purposes. And one Federal income tax purpose is to -- is the information disclosed on the tax returns.
Q. So you're not basing that conclusion on anything other than the fact that it's a

Page 90

disregarded entity?
A. And the regulations state disregard that entity for all Federal Income Tax purposes, except as otherwise provided some place.
Q. Well, you know that there are questions about that, about how far that goes, don't you?
A. I imagine there are questions.
Q. And that for some purposes, Federal tax purposes, LLCs are not completely disregarded?
A. That may well be. He's citing a document that was dated 9-22-2006. Back in 1999 and 2000, as far as I know, there were no specific instructions that deal specifically with who to list on the Schedule K-1. In the absence of those specific instructions, where do you look?
The regulations say a disregarded entity is to be disregarded for Federal income tax purposes. My reading of that, absent subsequent clarification, would be that you would list the individuals and not the LLCs as partners. Or if you did list the LLCs, you would clearly indicate that this was a disregarded entity.
And in either event, I did not opine in my report whether or not that was appropriate or

Page 91

inappropriate.
Q. Certainly implied it's inappropriate.
A. Uh-uh. No, I didn't. I said the effect of doing that was to break the connection between the 1040 -- or the 1065 and the 1040. It had that effect.
Q. Well, maybe we'll -- maybe we can speed this up. I think earlier you indicated that you've made some observations about certain disclosures that are just that, observations, and not comment on whether the disclosures were required; right?
A. That's true.
Q. Okay. Well, let's talk about that. Let's start with the JZ Buckingham case, Exhibit 1. What -- and take your time to look through your report, what was required by the Internal Revenue Code that was either incorrect or not included in the returns at issue? And you can just march through your report.
MR. DONOHUE: Objection to the extent the question calls for a conclusion of law. You may answer.
THE WITNESS: Could you restate the question?

Page 92

BY MR. WELTY:
Q. With respect to Exhibit Number 1, what was required by the Internal Revenue Code or the regulations, that was either incorrect or not included in the returns filed?
MR. DONOHUE: Same objection.
THE WITNESS: I don't know to what -- I think what you're really asking is what was required by the instructions to the tax returns to be disclosed?
BY MR. WELTY:
Q. Sure.
A. Okay. There is a difference. Okay, the instructions to the tax returns to be disclosed. But I have to ask another question, for what purpose?
Q. To comply with the instructions. What purposes do you have in mind?
A. Oh, the instructions to the tax forms require certain disclosures in a certain way. There are -- I would specifically refer to line 25 of Schedule K-1 of the Form 1040, line 23 of Schedule K-1 to the 1120S, and to Form 8275, which state that for the purpose of mitigation of certain penalties, to the extent that the tax forms do not

Page 93

otherwise already disclose that adequate information, additional disclosures are required. Required.
So that's why I have to ask, if you look just at the basic instructions to, for example, the Form 1040 and the Form 1065, you have to superimpose upon that the additional requirements for adequate disclosure above and beyond the disclosure that is normally made on those tax forms.
Q. Well, the adequate disclosure actually goes to the question of penalties; right? Is that what you're saying?
A. I did say that, yes.
Q. And that adequate disclosure provision does not apply to tax shelter related items, does it?
A. What do you mean by tax shelter related items?
Q. Transaction of significant purpose of which was to avoid or evade taxes.
A. I believe there are additional disclosures for an entity that is identified as -- and qualifies as a tax shelter.
Q. Well, let's use the -- there are

multiple definitions of that, but I'm talking about the definition related to equitable disclosure under section 6662 of the Internal Revenue Code.
A. It's D2BII.
Q. And that only applies to non-tax shelter related items, doesn't it?
A. I believe that's the case. I'd have to go back and look specifically at the instructions. And I think some of that depends on what you mean by tax shelter.
Q. As defined in section 6662. Want me to get the definition for you real quickly?
A. I'm trying to be responsive to your question. You've asked me to go through a long list that will take quite a bit of time, and you've asked me to identify those statements that I've made in my report that are simply descriptive, those observations where the reporting was not in conformity with the instructions, the basic instructions to the tax return.
And I'm saying that many of the opinions that I've expressed in this report don't really address whether or not the line-by-line instructions to a particular form were or were not complied with. But whether or not the disclosures



that were made were adequate to inform a reader of those tax returns, that the COBRA losses were basically non-economic artificial losses. Was that disclosure adequate?
So my opinion addresses three things. It makes observations about what was disclosed. It makes some observations about disclosures that did not comply with the instructions to that form. It also makes -- it also discusses the adequacy of certain -- or lack of adequacy of certain disclosures insofar as revealing the fact that these losses were artificial non-economic losses. So those are three things.
Q. Okay.
Well, let's focus on the first part. Your observations about what was disclosed. That, you're essentially in just narrative form, discussing what was on the tax returns; is that correct? What was actually on the tax return?
A. That's correct.
Q. And then, the second category is disclosures that were, in fact, on the tax returns that did not comply with the instructions or requirements of the various tax forms; is that right? I'm not trying to trick you here, but I'm



just trying to make sure I've got the categories right.
A. Disclosures or failure to disclose information that was required by the line-by-line instructions to the tax form.
Q. Okay.
And then the third category is the adequacy of disclosures on the returns; is that right?
A. Insofar as the item at issue in this case.
Q. Okay.
Now, let's focus on that third category, the adequate disclosure.
Is that question of the adequacy of the disclosures of the issues involved in this case, that goes to, as you were indicating earlier, the question of penalties; right? As to whether the disclosures, either individually on the returns or collectively, were such that it would disclose the nature and the amount of the item in question, so that somebody in the IRS could discern what was going on, is that right? I'm trying to paraphrase.
A. Incidentally, the first -- in some cases the required disclosure that wasn't made;



okay, if it had been made, it would have alerted -- it would have been indicative of the fact that the losses were artificial non-economics losses.
Q. In other words, there might be some bleed over from the disclosures that were or were not made, actually made on the returns that did or did not comply with the rules that might bleed over into the third category of whether the overall disclosures were adequate?
A. Yes.
Q. No tricks there. I'm just trying to make sure we're on the same page.
And you referenced Section 6662 a while ago.
A. You referenced 6662.
Q. I think you gave me the subsections; right?
A. I did.
Q. Is the standard that you were basing your opinions as to the adequacy of the disclosure that set forth in Section 6662 the adequate disclosure exception or defense to penalties?
A. Well, the standard that I was basing my comments and observations and opinions on was whether or not the information disclosed on the

return was adequate to reveal the fact that, the losses ultimately deducted on the sub chapter S-corporation and on the 1040s were the result of an interrelated series of transactions, that resulted in the creation of an inflated basis, the allocation of that inflated basis amount to what I referred to as the corporate loss asset, the sale of that asset, and the recognition of those artificial non-economic losses on the S-return and on the individual Form 1040.

So whatever special definitions or interpretations there may or may not be with respect to the use of that term "adequate disclosure," I assume that my interpretation of adequate disclosure is subsumed, or that that is subsumed into my interpretation of what adequate disclosure is.

Could I make a determination of the source of these losses, how they came about, where they come from, that they were not economic artificial losses, based on the disclosures on any one of these returns, or on all of them collectively.

Q. Just so I understand, you said subsumed within, are you saying that your use of,



in your opinion as to adequate disclosure, would require greater disclosure than the adequate disclosure in Section 6662?

A. I didn't say that.

Q. Well, would it?

A. I don't know. I haven't done the research on 6662 to see what case law is out there, what regulations are out there, if there are special definitions of adequate disclosure. Was the disclosure adequate to make these determinations as to the source of these losses?

Was it adequate? In my judgment, in my opinion, based on my objective analysis of the returns and the related documentations, was this information discernible or reasonably discernible from the information provided? In my opinion it was not.

Q. So you don't know whether you're using a standard for adequacy of the disclosure that's different than is required under Section 6662?

A. I suspect that it is the same standard, but I haven't -- I'm not expressing a legal opinion, and I haven't thoroughly researched, you know, what special meanings or nuances there may be to that term as used in that code section.



Q. But you are familiar enough with that Section 6662 to know that for the periods here involved, that adequate disclosure was a defense to penalties, accuracy related penalties, except in the case of tax shelter related items?

MR. DONOHUE: Objection. Calls for a conclusion of law.

BY MR. WELTY:

Q. I'm just asking you if you were aware of that?

A. I believe there were other exceptions as well.

Q. But you're aware of that; right? You are aware of the adequate disclosure exception to accuracy related penalties?

A. I am aware that there was an adequate disclosure exception to certain accuracy related penalties under some circumstances, yes.

Q. But you're also aware that that didn't apply to tax shelter related items?

A. I can't say that I was aware or not aware.

Q. If it did not apply to tax shelter related items --

MR. DONOHUE: Objection. Calls



for a conclusion of law. You may answer.

BY MR. WELTY:

Q. If it did not, assume it didn't apply to tax shelter related items, what relevance is your opinion as to the adequacy of the disclosure have to penalties in this case, or any of these three cases?

A. That is a legal question. I can't answer it. My analysis looked to determine whether or not there was adequate disclosure, and I concluded that there wasn't adequate disclosure.

Q. What is Form 8275?

A. I don't remember the title of the form, although I've got it cited here. Form 8275 is used by taxpayers and income tax preparers to disclose items or positions, except those contrary to a regulation that are not otherwise adequately disclosed on a tax return to avoid certain penalties. This form is filed to avoid the portions of the accuracy related penalty due to disregarded rules, and to substantial understatement of income if the return position has a reasonable basis.

Q. Why did you cite that form?

A. I made an observation that that form

Page 102

was not included with the Form 1040s, nor was Form 8275R, nor was Form 8271, nor was a section 351-3A statement. I made the observation that those were not included.
Q. Form 8275R, what is that used for?
A. I'm not familiar with that form. I believe it is used to disclose a position that is contrary to a regulation, Treasury Department regulation.
Q. Are you suggesting that that form was required here?
A. I'm not suggesting that it was required or not. I'm saying that it wasn't there. If it had been there and it had disclosed -- if it had adequately disclosed the source of the COBRA losses, then adequate disclosure would have been with the return or on some statement attached to the return. My observation is that it wasn't there. So that disclosure wasn't on that form.
I'm not suggesting that that was required. I don't know if it was required or not. I'm just saying because it wasn't there, the disclosures that might have gone along with that were not provided to the Internal Revenue Service as part of the Form 1040s.

Page 103

Q. Okay.
I think you made similar observation regarding a tax shelter registration number; is that right?
A. Where? On the --
Q. Well, you observed that there was no tax shelter registration identification number attached to the returns or on the returns. Are you suggesting that one was required?
A. I didn't suggest one way or the other. I made an observation that it wasn't there.
MR. WELTY: Is it 12:30? I'm sorry, it's only 11:30 my time. Why don't we take -- can we take 45 minutes to an hour for lunch? I'm sorry, it's 11:30 to me. I'm starting to feel hungry, so I thought it was lunch time. Do you mind if we take an hour, start back at 1:30? And then maybe we can more speedily go through some of these.
(WHEREUPON A RECESS WAS TAKEN.)
BY MR. WELTY:
Q. Dr. LaRue, would you turn back to Exhibit 1? And given the length of these reports, those being Exhibits 1, 3 and 6, I want to try to quickly, if possible, go through the reports and

Page 104

talk about what each paragraph deals with.
What I mean is, if you recall before the break, we were talking about some of your comments in your reports or observations of what was actually on the returns. Some of your comments related to disclosures or the lack thereof that were not in compliance your understanding of the instructions for filling out the returns.
And then there's a broader category related to the adequacy of the disclosures that may or may not have been required by the instructions. Are those fair categories? I'm trying to just simplify and streamline this process, because we have about 500 pages of reports to go through. So rather than taking three days to do it, I would like to try to go through them quickly, if we can.
Are you comfortable with those --
A. I'm happy with that approach.
Q. -- three categories, I guess of information? And if you're not, you can tell me at any time. I would just to like quickly run through them, and say is this merely an observation, is this a non-compliance. Or is this adequate disclosure, something like that, so we get some kind of kind of a feeling for what you're saying in

Page 105

various parts of the report.
A. I'm happy to do that.
Q. Okay.
Well, let's start with Exhibit 1. Page 1 appears to be just all your background, so that doesn't apply.
Roman Numeral two on Page 2 is the scope and objectives of the report.
Can you look at paragraph 9? Can you tell me whether the questions posed here fit with from your observation of what was recorded on the returns as it related to disclosures or lack thereof that were required, or did this go to adequacy of those disclosures? Can you explain?
A. It went to the latter two, both, what was reported and the propriety of -- well, it goes to what was reported on the return, what was not reported on the return. Whether some of the reporting was in compliance with the instructions, and whether or not the reporting -- the disclosures, individually and collectively, were adequate to indicate, number 1, the source of the artificial non-economic losses, and/or whether or not the substantial fees that were paid in connection with this transaction have been

Page 106

disclosed anywhere on the returns.
Q. So the questions posed don't break up into nice neat categories, because they overlap a little bit?
A. There is overlap, yes.
Q. Let's go on to Page 7, introductory, and go to paragraph 19. Is that merely an observation from the returns, or are you drawing some conclusions as to whether or not that was factually correct or failed to comply with the Internal Revenue Code?
A. That's merely an observation.
Q. Page 8.
A. Excuse me. It's merely an observation. The court may find some significance, but I didn't opine on anything as to the "as of" dates.
Q. Okay. Fine.
Paragraph 20, is it an observation?
A. Observation.
Q. Paragraph 21, is that an observation?
A. It's an observation.
Q. Paragraph 22, observation; is that right?
A. Observation.

Page 107

Q. Paragraph 23, is that an observation?
A. Observation.
Q. And when I'm asking these questions, if it bleeds over into some other area that goes to whether it complied with the Internal Revenue code or not, would you let me know that too? I'm not trying to trick you here, I'm just trying to speed up this process.
A. When you say the Internal Revenue Code, I believe you mean the instructions to the forms.
Q. The instructions.
A. Okay.
Q. And likewise, to the adequacy of the disclosure in broader term or context.
Paragraph 24, an observation?
A. Observation.
Q. Paragraph 25, is that merely an observation?
A. Observation.
Q. 26, merely an observation?
A. It's an observation that I make reference to in an opinion.
Q. That's fine. Is 27 merely an observation?

Page 108

A. Same answer.
Q. Paragraph 28?
A. Observation.
Q. 29?
A. Observation.
Q. And when I say observation, you can tell these things from looking essentially at the face of the returns, right, is that fair?
A. No, not necessarily. Well, for example, in 28 when you say "the returns," you're referring not to the returns filed by the partnership or the S-corporation or the individual, but the form SS4, some -- again, I've tried to footnote all of my references.
In paragraph 27, the fact that it was a Delaware corporation wasn't disclosed, I don't believe, on any of the forms. I had to look at some other documents to determine that. Not everything -- these are descriptive paragraphs, but they are not all derived from disclosures on the tax forms themselves.
Q. Okay. Paragraph 30, is that merely an observation, or does it also include something else?
A. It's an observation, and it points out

Page 109

that the Social Security numbers of both Mr. Zucker and Mr. Boyd were misstated on the SS4s, and also on the S-corporations' K-1s.
Q. Paragraph 31, is that an observation?
A. That's an observation.
Q. And just so we're clear on the categories, it does not appear that either of these disregarded single member LLCs was required to file a Form SS4 for obtaining an EIN. You're not saying that it was improper for them to have done so?
A. I did not say that.
Q. Page 11, Paragraph 32.
A. Excuse me. 31. It may have been, I just didn't say one way or the other.
Q. Well, do you believe it was improper to obtain an EIN and file an SS4 for the LLCs?
A. I think the instructions for that return were not clear. The regulations would seem to indicate that a disregarded entity would not generally apply for an EIN, but the instructions to those -- of the SS4 did not address that issue specifically. It did later. The instructions later addressed that issue, but not for the years at issue.
Q. Paragraph 32 on Page 11, is that

Page 110

merely an observation?
A. It's primarily an observation.
Q. What else is it?
A. Well, it points out that Jenkins & Gilchrist was involved in several different aspects of the transaction.
Q. Paragraph 33, is that merely an observation?
A. That's an observation.
Q. Paragraph 34, is that merely an observation?
A. Observation.
Q. Paragraph --
A. Well, observation, and later I point out that as a disregarded entity, whether or not -- we discussed earlier, whether it was appropriate to list a disregarded entity as a partner without designating itself, that entity as being disregarded on the Schedule K-1 to the partnership return.
Q. Paragraph 35, is that merely an observation?
A. It's an observation with the same comment, that the individual owners of the LLCs and the ultimate partners of the partnership were not

Page 111

disclosed anywhere on the Form 1065.
Q. You used the word "must" in paragraph 35. Are you saying that single -- the owner of the single member disregarded LLC must be identified? Is that required?
A. I said that it would appear that where a partner is a disregarded single LLC, the single member owner of the LLC, and not the LLC itself, must be identified and disclosed as a partner.
Q. By listing the LLCs as the partner, was the return, the 1065, incorrect?
A. We've discussed this before. The instructions back then didn't address that issue. The regulations, however, did say that a single member LLC that was treated as a disregarded entity is to be ignored for all Federal income tax purposes.
Q. So it is your position that it was incorrect?
A. It's my interpretation, and, again, this is not supported by specific instructions to the partnership return, but the regulations say that a single member LLC is to be disregarded for all Federal income tax purposes except as otherwise provided.

Page 112

Q. Okay.
I'm just trying to get a simple yes or no answer. Is it your position that listing a single member LLCs as partners rather than individual owners of those single member LLCs was incorrect?
A. It was probably incorrect at that time, or listing the LLCs as the partners, but identifying them as disregarded entities. These returns didn't do -- they listed the LLCs, but they didn't identify them as being disregarded entities.
Q. As filed, were they correct or incorrect?
A. I think they were incorrect. But again, that is my opinion. There is no specific instruction that addresses that issue one way or the other specifically.
Q. Paragraph 36?
A. It's a description.
Q. Paragraph 37, is that merely an observation?
A. It's an observation, but I do make a further observation that there was a limited amount of investment activity in the LLC.
Q. But this paragraph 37 does not say

Page 113

that the instructions for filling out the form were not followed in some way, does it?
A. It does not say that, no.
Q. And it doesn't go to your adequacy of the disclosure question, does it?
A. No.
Q. Paragraph 38, is that merely an observation similar to paragraph 37?
A. Yes, that is correct.
Q. Paragraph 39, is that merely an observation?
A. Yes.
Q. Paragraph 40, is that merely an observation?
A. No.
Q. Does any part of paragraph 40 discuss your opinion as to whether the instructions for filling out the forms were correct or incorrect, are the forms filled out -- let me restate that.
Does any part of paragraph 40 discuss your opinion as to whether the forms were filled out according to instructions?
A. I make an observation there, and I did not express an opinion as to whether or not the K-1s were properly completed insofar as listing the

Page 114

LLCs as the partners.
Q. Paragraph 41, is that merely an observation?
A. That's an observation.
Q. So in paragraph 41, you're not indicating that any instructions or rules for filling out the tax returns was not followed?
A. No, I'm just pointing out what was done, and that there were some inconsistencies in terms of who was identified on the 351 statement and on the K-1.
Q. I'm really trying to focus this in on, you know -- by going through this exercise, I'm trying to focus in on periods where you think some instruction was not followed on filling out the returns, or whether you're talking about some broader adequate disclosure type question.
Paragraph 42, on Page 16.
A. Well, again, those two paragraphs are under the heading opinion, and in those two paragraphs, I am expressing an opinion.
Q. And that opinion is in paragraphs 42 and 43; is that right?
A. That's correct.
Q. With the exception of the EIN, or

Page 115

actually the Social Security numbers being incorrect on the forms as noted in paragraph 30, are you suggesting in paragraph 42 and 43 that in rules or regulations, or more precisely, instructions for filling out the tax returns, were not followed?
A. That's not what either of these two opinions state. These two opinions don't address whether or not it was proper or improper to include the -- or to list and identify the LLCs as partners on the partnership's K-1s without further disclosing that they were single member disregarded entities. These two opinions state that it would be reasonable to conclude that the risk of detection and audit by the IRS might have been minimized or significantly reduced as a result of the items listed in 42.
Q. So just so I understand, the mere fact of using LLCs may have, in listing them as partners on the K-1s -- actually, let me withdraw that. Okay.
As I understand, and I'm just trying to paraphrase this. As I understand, you're saying that the mere fact of using the LLCs reduced the possibility that the IRS might trace the ownership

Page 116

of the partnership from partnerships Form 1065 to the 1040s; is that correct?
A. I'm saying that it would be reasonable to conclude that, yes.
Q. Paragraph 44.
A. Could I just make a general comment?
Q. Yes.
A. Okay. I tried everywhere I expressed an opinion to clearly describe that as an opinion. Where I opined that there was an inconsistency between the reporting on the return and the specific instructions to those returns, I tried to also make it really clear that there was that inconsistency.
So I'm happy to go through all of this, and we're doing that now. I just wanted to make the point that I did try to make that reasonably clear, or completely clear in terms of the way I presented my descriptions and opinions in this report.
Q. Okay.
I think there are a few areas that I wasn't certain about, and so I'm just trying to methodically march through this. And hopefully it will become more clear to me that you did, in fact,

Page 117

do that throughout these reports.
A. Well, let me make another statement. And that is that some of these descriptions I've later referred to in opinions in separate paragraphs, but the connection I believe is fairly clear. So when I say, you know, I've described something, it doesn't necessarily mean that that description had nothing to do with a later opinion that I expressed, in which I made a point of saying why I expressed the opinion that I expressed.
Q. Okay. I understand.
Paragraph 44, is that merely an observation?
A. It's an observation.
Q. Paragraph 45, is that merely an observation?
A. Observation.
Q. Paragraph 46, is that merely an observation?
A. Observation.
Q. Paragraph 47, is that merely an observation?
A. Observation.
Q. Paragraph 48, is that merely an observation?

Page 118

A. Observation.
Q. Paragraph 49, is that merely an observation?
A. Observation.
Q. Paragraph 50, is that merely an observation?
A. Observation.
Q. Paragraph 51 is that merely an observation?
A. Observation.
Q. Paragraph 52, is that merely an observation?
A. The text is an observation. I'm looking at the footnotes. In the footnotes, footnote 76, I observed that Mr. Zucker -- oh, yes. Mr. Zucker apparently had a basis in the Cisco stock of $57,000, but that basis was stepped up to $476,775, basically eliminating all of the built-in gain that had -- that was built up in the value of that stock at the time it was contributed. And that I know of no provision of the tax law that permits you to do that.
Q. So you're pointing out an error essentially in footnote 76 and 77; is that right?
A. I didn't characterize that as an

Page 119

error. I made an observation that this was done. Why it was done, whether it was erroneous or deliberate, I can't speak to that. I didn't speak to that.
Q. I thought you said you know of no Internal Revenue Code provision that allowed that. Is that correct?
A. I did say that. But I thought you were asking me why -- did I express an opinion as to why that was done, I didn't. I did express an opinion that that's not -- or at least suggested that that's inappropriate. Not going to step up in basis without recognizing the gain absent Section 1014.
They did step up the basis in the Cisco stock, both in footnote 76 and 77, and I indicated that that was erroneous. But I didn't express any opinion as to what the intent was, whether it was an accident or deliberate or whatever other explanation there might be.
Q. So in effect, there is a 420 thousand or so dollar error in the basis in the Cisco stock, because they went from the cost basis to the fair market value on the day of contribution, is that true?

Page 120

A. Yes, and I think I also pointed out that that had the ultimate effect of increasing the amount of the loss recognized.
Q. So it's an observation, and you noted in that observation that there was an apparent error, without saying it was deliberate or anything else? I'm just --
A. That's correct.
Q. Okay.
Is the same thing true for paragraph 53? With the exception that the error noted in footnotes 83 and 84 is approximately an $18,000 error, between the cost basis of the stock and the fair market value of their contribution.
A. That's correct. I make the same comment for paragraph 53 that I made for 52.
Q. Paragraph 54, is that merely an observation?
A. The text of 54 is an observation. In footnote 86, I identify -- I excerpted two e-mails from Robert Coplan, that discuss why the trading activity was important.
Q. Or why in his opinion.
A. Why in his opinion the trading activity was important.

Page 121

Q. Are you expressing an opinion as to whether the trading activity was important or not, or are you merely just relating the December 5th and 8th e-mails to the actually trading activity that occurred?
A. In this footnote, I'm -- in this footnote, I'm making an observation that I later rely in part in expressing an opinion.
Q. Are you opining on the business purpose in your report?
A. No.
Q. Paragraph 55, is that merely an observation?
A. Again, that's an observation. I used those numbers in some of my calculations.
Q. But you observed that essentially the options paid off in $3,125,000, and to get the net gain you subtracted the net premium paid of $2,500,000 to arrive at a profit on the options of $625,000; is that correct?
A. That's correct.
Q. Paragraph 56, is that a mere observation?
A. I wouldn't describe that as a mere observation, it is an observation. This is what

Page 122

was done. The ramifications of what was done are discussed later in the report.
Q. Okay.
Paragraph 57, is that an observation?
A. Same answer.
Q. Paragraph 58?
A. Same answer.
Q. Paragraph 59?
A. Observation.
Q. On the second bullet point, the termination and liquidation of the partnership before the end of 1999 was pre-ordained as of the date of its formation, and was essential to the generation of the permanent JBJZ losses claimed by JBJZ, and Mr. Zucker and Mr. Boyd. Do you see that?
A. I do.
Q. Is that your opinion, or are you simply just referring to the COBRA presentation on page -- noted in Footnote 97?
A. Well, that referenced -- there I'm referring to the COBRA presentation, and also whatever was presented in footnotes 1 and 6. I think there was an e-mail from Mr. Coplan to Mr. Murphy that described in some detail the steps,

Page 123

the sequence of steps and the reason for those steps.
Q. What I'm getting at is are you rendering an opinion outside of the EY COBRA presentation set forth in Footnote 97, and likewise in footnotes 1 and 6, and splitting up 4, are you separately opining as, the termination and liquidation of the partnership was essential to the generation of the losses based on your experience as a tax attorney or in the tax profession?
A. The fact that this was pre-ordained is disclosed in the EY presentation and the other documents that I've cited in that footnote. The fact that the use of the term generate and permanent losses were also -- those are the terms that were used in those documents as I quoted them more fully in the earlier footnotes.
So I'm making an observation that in these documents, the liquidation of the partnership was pre-ordained, and that it was essential to the generation of the permanent -- of losses that were permanent losses.
Q. Based on the presentation themselves, or based on your experience with the tax law?
A. I'm observing what I've stating here

Page 124

based on those presentations, which conforms to my understanding of the tax law.
Q. I'm just trying to figure out if this is one of those paragraphs that is part opinion and part something, you know, observation, and that's what I'm trying to figure out. So this one is part opinion, I guess, because it conforms with your understanding of the tax law?
A. Well, it does conform with my understanding of the tax law, and that would be my opinion now. That's not an opinion that I've expressed here.
Q. Okay. I'm just trying to understand.
A. Again, that calls for a legal conclusion and throughout my report, I was instructed -- I was not asked to opine on any legal issues, and I did not opine in this report on any legal issues.
Q. Paragraph 60, is that merely an observation?
A. It's an observation, but again, not all of these observations were derived from the tax returns themselves. Some observations were derived from looking at the tax returns. Some of the observations, such as the payment of the E&Y fees,

Page 125

were derived from other sources, other documents in the record. So I just want to be clear that this is a description that is based not entirely on what was reported on the tax return.
Q. Paragraph 61, is that merely an observation?
A. I believe that's just an observation, uh-huh.
Q. Paragraph 62, is that merely an observation?
A. Observation.
Q. Paragraph 63, is that merely an observation?
A. Observation.
Q. Paragraph 64, is that merely an observation?
A. Observation.
Q. Paragraph 65, is that merely an observation?
A. Observation.
Q. Paragraph 66, is that merely an observation?
A. Observation.
Q. So in paragraph 66, you're not suggesting that the SS forms are in any way

Page 126

incorrect?
A. No, I'm simply describing what was disclosed on those forms.
Q. Paragraph 67, is that merely an observation?
A. Observation.
Q. Paragraph 68, is that merely an observation?
A. Observation.
Q. Paragraph 69, is that merely an observation?
A. Observation.
Q. You're not opining as to whether the basis was correct or not, are you?
A. That's a legal issue, and nowhere in this report did I opine as to whether or not that basis was correct.
Q. Does that comport with your understanding of the basis rules, your 752?
MR. DONOHUE: Objection. Calls for a conclusion of law. You may answer.
THE WITNESS: You're asking me a legal opinion that I haven't thoroughly -- I haven't researched that issue myself. I know that that's one of the issues in this case, I just

Page 127

haven't researched it.
BY MR. WELTY:
Q. Paragraph 71, is that merely an observation?
A. Yes.
Q. Paragraph 72, is that merely an observation?
A. Yes.
Q. Let's go to paragraph 73 and 74.
A. Did you skip 72? Oh, I see.
72 is an observation.
Q. Let's go to paragraph 73 and 74, are these merely observations?
A. Yes, they're observations. Later I point out that that special allocation doesn't appear to be authorized under sub chapter S, but this is an observation.
Q. Is that a legal conclusion?
A. Could we get to the paragraph where I address that issue? This is an observation that I refer back to.
Q. Let's go to Page 83. I'm sorry, footnote 83. When did Mr. Boyd acquire the Cisco stock? In other words, was that a short term capital asset in a sense?

Page 128

A. Well, he acquired it on August 26th, 1999. At the time of the contribution, that would have been -- he would have had a holding period of less than one year.
Q. And at the time that the Cisco stock was ultimately sold, it would have been a holding period of less than one year, which would have made it a short term capital?
A. That's correct.
Q. Page 27, paragraph 74. If you go look at footnote 76 on Page 18, when did Mr. Zucker acquire the Cisco stock?
A. I believe he acquired that sometime in 1996.
Q. And upon the sale of the Cisco stock contributed to JBJZ by Mr. Zucker's LLC, that had been a long term capital asset?
A. Yes.
Q. Paragraph 75, is that merely an observation?
A. Yes.
Q. Paragraph 76, is that merely an observation?
A. Yes.
Q. Paragraph 77, is that merely an

Page 129

observation?
A. It's an observation that I derived not from any of the tax returns, and that I make further comment later in this report.
Q. About the issue partly is the 40,000 additional fee that you weren't able to determine whether it was paid, as well as the inclusion of that fee in the basis, is that what you're referring to, in the further comments you make later on?
A. I don't recall, that additional $40,000 amount was included in any of the basis calculations. I don't recall that. Let me look at table -- whatever table it is. We can determine that. I don't believe that was ever included in any basis.
Q. Okay.
Paragraph 78, is that merely an observation?
A. Yes.
Q. Paragraph 79, is that merely an observation?
A. Yes.
Q. Where did you get that?
A. Bates 1252. Looks like I was -- I do

Page 130

recall looking at JBJZ's 2000 return, which was marked final return.
Q. Do you know whether, in fact, JBJZ continued after 2000?
A. They filed a Form 1120S on which they indicated it was their final return. I assume that that means that they liquidated sometime in 2000.
Q. If they did not, in fact, liquidate in 2000, and the final return was in error, would that change any of your opinions in this report?
A. I don't believe it would.
Q. Paragraph 80, is that merely an observation?
A. It is.
Q. Paragraph 81, is that merely an observation?
A. It's an observation. From the documents that I have reviewed in this case, it is not apparent that tax considerations aside, JBJZ served any function that could not as readily have been served by the partnership. Then I list examples.
And from a tax standpoint, it's my understanding that the transfer of the partnership interest was not essential to the objective of the

Page 131

COBRA strategy. It's my understanding that this result could have been achieved by simply liquidating the partnership and distributing the assets to JBJZ.
Q. So are you stating your legal conclusions as to the tax consequences?
A. It's not apparent that tax considerations aside, JBJZ served any function that could not just as readily have been served by the partnership. That has nothing to do with tax law.
Q. That has nothing to do with tax law?
A. That has to do with what kind of economic activities that they engaged in.
Q. So you're merely saying that the partnership could have sold the currency or the stock and paid the fees.
A. That's correct.
Q. Well, what is your understanding as to the COBRA strategy, and how it could have been structured differently to achieve the same tax results?
A. Well, as I've stated here, my understanding is that the same results could have been achieved by simply liquidating the partnership, distributing its assets to the

Page 132

individual owners of the partnership, and sold by them to generate the COBRA losses.
Q. What is that understanding based on?
A. Well, it would be based in part on the COBRA presentation and the e-mail from Mr. Coplan to Mr. Kelly, that describes the different steps, and how the basis in the Cisco stock in the Canadian currency -- actually not specifically, but in the COBRA assets would take on a basis equal to the partners' claimed interest in the partnership.
Q. You dropped, what is it, the second bullet point in paragraph 81 from the COBRA presentation?
A. I'd have to look at the COBRA presentation again, but it's my recollection that when you walk through the calculations and the description of the transaction, the liquidation of the partnership would result in the partners taking their partnership interest basis, and allocating that to the COBRA loss assets.
Q. Is that based on your understanding of the Internal Revenue Code?
A. That is also based on my understanding of the Internal Revenue Code.
Q. You say that if -- here is what you

Page 133

say. "It's my understanding that this same result could have been achieved by simply liquidating the partnership, and distributing its assets to JBJZ, in which case the descriptions and calculations of the losses resulting from sales of the Cisco stock and the Canadian currency would have had to have been disclosed on the 1990 Form 1040s of the Zuckers and the Boyds." Do you see that?
A. Yes.
Q. What would have had to have been disclosed under 1040s specifically?
A. Well, specifically with respect to the Cisco stock, the sale of that stock would have -- by the individuals would have been reported on their schedule Ds, along with -- because those are capital assets. The sale would have been reported on schedule D.
Schedule D would have required a description of the property, the date of acquisition, the date of sale, a description of how many shares had been sold, the amount realized, the taxpayer's claimed adjusted basis, and the amount of gain or loss recognized by the taxpayer.
And because that basis would not have been a cost basis, the instructions to schedule D

would have required an explanation as to how that basis had been determined.
Q. Was that same information required and actually included on the S-corporation return?
A. The same information was required on the S-corporation return. Some of that information was presented on the S-corporation return, but some of it was not.
Q. Which was not?
A. The explanation as to how the S-corporation's claimed basis in the Cisco stock had been determined. That's one thing that was not disclosed. The other thing that was not disclosed was the basis that was disclosed on the statement that accompanies the schedule D of 1120S referred to that basis as cost. Not as other basis, but as cost.
Q. So the same information that would have been required on the 1040s was also required by the 1120S upon the sale of stock; is that correct?
A. I believe that's correct.
Q. So it was just simply a question of what form; is that correct?
A. I wouldn't characterize that as simply



a question of which form.
Q. Okay. How would you characterize it?
A. Well, it seems to me that it makes a difference whether or not that calculation and that loss and a description of the loss, and a description of how the adjusted basis had been determined, that it made a difference whether or not that was reported on the 1120S, or on the Form 1040s of the taxpayers who actually claimed the deduction for the loss.
Q. And what difference was that? Does that go to your adequate disclosure opinion?
A. Someone reviewing the Form 1040 would not see the detailed information -- by reporting the loss on the sub chapter S-corporation return, the details of the calculation of the loss, and the manner in which the tax basis is used to calculate that loss had been determined was moved from the individual's Form 1040 to a different tax return. Consequently, someone reviewing the 1040 would not have access to that information without also looking at the Form 1120S.
Q. Just so we're clear on this, you're not saying that the sale of the Cisco stock was required to be reported on the 1040s, are you?



A. The details of the sale of the Cisco stock were to have been reported on the 1120S, because it was the S-corporation that sold that stock.
Q. So it was done correctly as reported on the right entity?
A. I don't think that the reporting of that loss by the S-corporation was correct. But it should have been reported on the 1120, based on how this transaction was structured.
Q. Paragraph 82. You refer to several statements by Bob Coplan in supporting this opinion. Which opinion are you referring to?
A. From the documents I have reviewed in this case, it's not apparent, the tax considerations aside, JBJZ served any function that could not have just as readily have been served by the partnership.
Q. So paragraph 81 is it an opinion?
A. Well, it's an observation slash opinion. I'm observing that JBJZ engaged in a very limited number of activities the last few days of its existence during 1999. And that those functions could probably just have as readily been served by the partnership, tax considerations



aside.
Q. So if you were just to remove the S-corporation from these transactions, you were to disregard the S-corporation, it's your opinion that the tax benefits of the COBRA transaction could be achieved just simply by liquidating the partnership and distributing the assets to the partners; right?
A. And having them sell the assets before the end of the year.
Q. Paragraph 82, you cite a number of EY e-mails. Let's talk about the January 10th, 2000, e-mail from Mr. Coplan to the quick strike team on Page 29, which is, yes, paragraph 82 of Exhibit 1. You say, "It is preferable to leave the S-corporation in place through the end of year 2000 to enhance the substance of the transactions," do you see that?
A. I do.
Q. And that's EY -- essentially EY's opinion on the transaction; right? I mean, that's not your conclusion; right?
A. That's an excerpt from Mr. Coplan's e-mails to the quick strike team. He was a partner with E&Y.
Q. March 17th, 2000, you highlighted, "so

it looks more like bona fide entity." Do you see that?
A. I do.
Q. March 27 of 2000, to add to it's bona fide entity, do you see that?
A. I do.
Q. And continuing on to Page 30, you highlight "Greatly heighten the risk associated with the transaction," do you see that?
A. I do.
Q. And then again on September 5th, 2000, "There it works and that the main thing was to get it into this year" is highlighted, do you see that?
A. Yes, I do.
Q. What does he want to basically do? I mean, what do you take from this? You say that they lend support to your opinion that the S-corporations was not necessary to achieve the tax result of the COBRA strategy, so I'm trying to get your take on what these e-mails are about.
A. Well, wait a minute. When you say the results of the COBRA strategy, I don't think that's exactly the way I put it.
Q. It's not, and I'm not trying to trick you.



A. Well, I want to make sure, you know, I understand and that I answer your question clearly and correctly. I said that it wasn't -- it's my understanding that it wasn't essential to the generation of the 45 million dollar permanent ordinary losses and capital losses that were generated by the COBRA strategy.
The COBRA strategy, I think, again based on my review of the record, another objective of the COBRA strategy was to not create a red flag, and not -- you know, to minimize the possibility -- minimize or reduce the possibility that this transaction -- these transactions would be detected by the Internal Revenue Service and subjected to audits.
So there was one objective to generate the loss. Another objective was, I believe, for the possibility of audit to be reduced. So insofar as the generation of the loss, these indicate to me that there was little or no business purpose for the S-corporation.
I mean, they speak for themselves as far as I can see. "It is preferable to leave the S-corporation in place through the end of the year to enhance the substance of the transaction. As



for activity in the account, more is better. We want to do something so that the investment activity, so that it looks a little more like a bona fide entity.
Strong recommendation that the S-corporations be kept alive for some trading to add to the bona fides. If you liquidate this year, it would greatly heighten the risk associated with the transaction. It looks better from a business purpose standpoint as to why the thing was formed. But the main thing is to get it into this year, 2000."
Those quoted statements, to my mind indicate or confirm the fact that the S-corporation had little business or investment activity. It was very short logged in terms of 2000 -- or 1999 rather, and that there was a concern.
Q. Okay. I was just trying to see how you tie that, the introduction in Paragraph 82, several statements made by Mr. Coplan, the e-mails sent to EY personnel following the COBRA transaction lend support to this opinion, which I thought you said was 81, in paragraph 81.
So how does that lend support to your opinion that the S-corporation was not necessary to



achieving the essential tax benefits with the COBRA strategy?
A. Well, because -- wait a minute, say that again.
Q. How do the statements in paragraph 82 lend support to your opinions in paragraph 81?
A. These statements go to why -- what purpose the S-corporation served. They don't specifically address the fact that the $49 million COBRA loss could have been recognized without the use of an S-corporation.
Q. So that's how it supports your opinions in paragraph 81?
A. It supports one of the statements that I made in paragraph 81.
Q. I think you said that these statements in paragraph 82 go to the -- what did you say, the business purpose of the S-corporation?
A. Well, again, I think the quoted e-mails really speak for themselves. They address the S-corporation, the substance of that part of the transaction to make it look more like a bona fide entity, and so on. I think these e-mails speak for themselves.
Q. What is business purpose as you're

Page 142

using that a while ago?
A. Generally a business purpose would be a purpose of conducting activities with the idea of producing a pretax profit, an economic profit.
Q. I'm sorry -- let's see. Business purpose would be with the purpose of conducting activities with the idea of producing a pretax profit, an economic profit. Is that on an objective or subjective basis?
A. Is what on an objective or subjective basis?
Q. Business purpose?
A. Business purpose -- my gosh. Obviously that's something that involves an analysis of all of the underlying facts and circumstances and an opinion as to whether or not those facts and circumstances arise -- lies to a business purpose for a particular transaction.
Q. I'm not trying to trick you. Is business purpose essentially a term of art in the tax world?
A. What do you mean by a term of art?
Q. Has a lot of meaning built into it other than an ordinary person might think?
A. It's been subject to a lot of

Page 143

interpretations by the Internal Revenue Service, by the courts and by tax commentators.
Q. Does business purpose include anything that is not a non-tax purpose?
A. No.
Q. It doesn't?
A. You're asking me a very vague question. Does business purpose -- I don't understand your question.
Q. You know what non-tax purposes are, don't?
A. Sure.
Q. Well, is saying something has a business purpose the same as saying it has a non-tax purpose?
MR. DONOHUE: Objection. Form.
THE WITNESS: No, I don't think those are the same thing. And I didn't opine as to whether or not the S-corporation had a business purpose or this transaction had a business purpose.
BY MR. WELTY:
Q. You just used "business purpose" in one of your answers, so I'm trying to figure out what someone like you with 30 years of tax

Page 144

experience would understand business purpose to mean.
MR. DONOHUE: Asked and answered. Objection.
THE WITNESS: I think that question is very vague. Business purpose generally implies -- I mean, generally implies an ongoing business activity, with the hope and expectation of earning a profit as a result thereof. Business purpose has been discussed and defined, if that's the right or word, in a lot of court cases, a lot of commentary.
BY MR. WELTY:
Q. Been much debated, hasn't it?
A. It's been much debated, sure.
I would -- I would point out that I've also -- I believe I discovered, after I filed this report, e-mails from Jerry Blanchard and from Terrance Perris, who also had difficulty with the purpose or the business purpose, or supposed or claimed business purpose of the corporation involved in the COBRA strategy. And I have quoted those e-mails, I believe, in one or more of my rebuttal reports.
Q. Okay. You said Jerry Blanchard and

Page 145

who, Terry?
A. Terrance Perris. Terrance Perris was an attorney, and I don't recall who he was with. Jerry Blanchard, on the other hand, was a national office tax partner with Ernst & Young.
Q. He's clearly all over the business purpose?
A. He raised -- in some of his e-mails, he raised a concern about whether or not there was a business purpose for the S-corporation.
Q. Do you know whether any of those concerns were ever communicated to any of EY's clients? And by clients, I'm talking about those involved in these three cases.
A. I don't know one way or the other.
Q. Do you see evidence in all of the documents you've reviewed that it was communicated to any of EY's clients?
A. In a way, yes. The COBRA presentation, and I believe I observed this in my report, the COBRA presentation discusses, I believe -- I'd have to look again at that PowerPoint presentation again, but I believe that presentation discusses the use of the S-corporation, without discussing what purpose

Page 146

other than tax purposes it might serve.
I believe I remember -- you know, I believe in that presentation that the use of an S-corporation was described. And it was described in connection with the, quote permanent loss strategy of the COBRA strategy. And that there was no discussion of -- or suggestion that there was a business purpose for the use of the S-corporation.
Q. Likewise, there was no suggestion that there was not a business purpose for the S-corporation.
A. That's right, I believe the S-corporation was described in connection with the generation of the losses without any discussion or reference to what business purpose or purposes that the S-corporation might or might not serve.
Q. So based on the e-mails that you've cited in paragraph 82, as well as those in your rebuttal reports related to Jerry Blanchard and Terrance Perris, it's clear to you, isn't it, that Ernst & Young was well aware of issues and concerns surrounding the business purpose the S-corporations?
A. Yes, I mean, those concerns were expressed in a lot of the e-mails that I cited in

Page 147

my reports.
Q. In fact, aren't those e-mails directed at trying to enhance the business purpose and the economic substance of the S-corporations?
A. I wouldn't characterize them necessarily that way. I would say that those e-mails are -- you know, suggest an effort to make it appear that the S-corporations had a business purpose or investment purpose.
Q. That's your take away from the language of the e-mails?
A. That would be a reasonable interpretation, yes.
Q. Isn't it also reasonable that -- a reasonable interpretation that Ernst & Young was trying to enhance the substance of the S-corporations to satisfy its purpose for economic substance inquiry?
A. In what way?
Q. By making sure there was trading activity in the account, and to make sure that the S-corporation is kept alive?
A. Well, that looks to be more like enhancing the appearance of substance of business purpose, than actually engaging in activities that

Page 148

really had bona fide business and other purposes.
Q. Are you making a qualitative assessment on what types of activities actually enhance business purpose, as opposed to giving the appearance of business purpose?
A. I'm referring to the plain language, what I think is the plain language of some of these e-mails. The plain language here, "We want the S-corporations to maintain some investment activity this year so that it looks a little more like a bona fide entity."
Q. That's just one of the e-mails though; right?
A. I'll read another one, March 27th on a separate note. "It would be our strong recommendation that the S-corporation be kept alive this year for some trading to add to it's, quote, bona fide, end quote."
Q. Okay. Let's go on to paragraph 83. This is clearly your opinion; right?
A. Yes, sir.
Q. You see where you -- strike that.
You use the term "inflated basis." What does that mean?
A. I define that term in my report.

Page 149

Q. So you're not suggesting it's not a basis provided for in the Internal Revenue code, are you?
A. Well, I defined that term in my report. It's the excess of the long option premium over the actual net premium invested in the long and short options, and without taking into account the premium credited for the short option.
Q. That's a question under section 7:52 of the Internal Revenue code as to the proper determination of basis, isn't it?
MR. DONOHUE: Objection, calls for a conclusion of law. You may answer.
THE WITNESS: Section 7:52 is relevant, and my understanding is that Section 7:52 is relevant in making a determination as to what the appropriate basis in the partnership interest would be.
BY MR. WELTY:
Q. So when you're saying inflated basis, I just want to be clear, you're not suggesting that that wasn't provided in the Internal Revenue code, you're just saying it is what, just as defined?
A. Again, I define that term in my report to be the excess of the premiums charged on the

Page 150

long option without regard to the premiums credited on the short options, minus the amount of the actual net premium paid by the LLCs.

Q. Would you go to paragraph 84 on Page 31? You see the first bullet point under there? "Had the distributions of these assets been made directly to Mr. Zucker and Mr. Boyd, sold by them and then reported on their individual Form 1040, the order of magnitude between the claimed tax basis and the selling price would have been so great, especially with respect to the Canadian currency giving a holding period of less than one week, it's reasonable to assume that the risk of detection and audit would have increased substantially." Do you see that?

A. I sure do.

Q. What would have increased the risk of audit?

A. Well, as I stated there, if they sold those assets themselves, and then reported that on their individual Form 1040s, the order of magnitude between the claimed tax basis, which was very high, and the selling price would have been so great, especially given the fact that the holding period was so short, that it would have been

Page 151

reasonable to assume that the risk of detection and audit would have increased substantially.

Q. Isn't it a fact that the sale of the COBRA loss assets as you define them was reported on the S-corporation return?

A. The sale of the currency and the sale of the Cisco stock was reported on the 1120S.

Q. And isn't it true that on the 1120S, the order of magnitude between the claim tax basis and the selling price would have been so great, especially with respect to the Canadian currency given a holding period of less than a week, then it is reasonable to assume that the risk of detection and audit would have increased substantially?

A. If someone were examining the 1120S, yes, that is something that to my mind would stand out.

Q. Again paragraph 84, the second dark bullet point, I guess the second subparagraph under the Candadian currency, "The losses in the sale of the Canadian currency by the taxpayers would have had to have been reported in detail on Form 4797 for the taxpayers' respective 1999 Forms 1040," do you see that?

A. I do.

Page 152

Q. There was no Form 4747 filed on the 1040s with respect to these assets; is that correct?

A. That's my recollection, yes.

Q. But that Form 4749 was filed on the 1120S return, wasn't it?

A. That's also my recollection, yes.

Q. Go to Page 32. With regard to the bullet point under the Cisco stock, the third sub bullet point starting, "The losses from the sale of the Cisco stock by the taxpayers would have had to have been reported in detail one lines 1, and 8, columns A through F, parts 1 and 2 of Schedule D of the taxpayers respective 1040s," do you see that?

A. I do.

Q. Isn't it true that there was no Schedule D reporting of the Cisco stock on the form 1040s on Schedule D?

A. I believe on their Form 1040s, they showed the net amount of the loss.

Q. But not on Schedule D, right, for any of them?

A. Not on Schedule D.

Q. Okay.

So the full Schedule D, though, was

Page 153

filed on the 1120S, wasn't it?

A. Well, I wouldn't characterize it as full, but the calculation of the loss was filed with the 1120S.

Q. The same information that would have been required on the 1040 was required by the 1120S; isn't that correct?

A. That's correct, and on the 1120S, not all of that information was included.

Q. Isn't it true that on the Zucker's and Boyd's Form 1040s that they displayed the flow through loss from the S-corporation on their returns?

A. Disclosed the amount of the loss?

Q. Yes.

A. Yes.

Q. And that they also referenced the S-corporation name and the EIN number?

A. That I don't recall. I'd have to look.

Q. Why don't you look at the bottom of Page 33?

A. Okay.

Q. Is that correct?

A. What I've said there is correct, but

Page 154

you've mischaracterized what I've said there. The JBJZ ordinary loss was reported on the Schedule Es. The amount was reported on the Schedule Es, and the amount of that loss was reported, along with the name and the employer identification number of JBJZ.
Q. Linking the two returns together?
A. From the Form 1040 -- yes, that's correct.
Now, in the next bullet point on -- hollow bullet point on Page 34, "It was subsequently observed on their 1990 Form 1040s, the Zuckers and Boyds simply deducted the capital losses allocated to them by JBJZ on a single line of their Schedule Ds. Neither of these Form 1040s identified by name or by EIN JBJZ as the source of the capital losses deducted.
Neither of these Form 1040s disclosed a description of the property sold, etc. Neither of these Form 1040s disclosed any information regarding the source, how these losses were calculated and determined or the rationale and method used to determine the tax basis claimed by JBJZ."
So insofar as the capital losses are

Page 155

concerned this states, and it comports with my recollection, that the name of JBJZ and the employer identification number of JBJZ were not disclosed on that schedule.
Q. Did the 1120S's identify the shareholders to whom gains losses were being allocated?
A. Yes.
Q. Let's go to the top of Page 34. You are saying, "Neither of these Form's 1040s disclosed the description of the property sold, the sales price, the dates of acquisition it sells, or the tax basis used to compute the amount of loss. And neither of these forms disclosed any information or description regarding the source of these losses, or the rationale or method used to determine the tax basis claimed by JBJZ in calculating the amounts."
Was that disclosure required on the 1040s?
A. No.
Q. On --
A. It wasn't required on Schedule E.
Q. Okay.
Well, let's go to the next bullet

Page 156

point.
A. And again when I'm --
Q. The square that's under the first hollow bullet point on Page 34, I guess the square bullet points, "Neither of these Form 1040s identify by name or EIN number, JBJZ. Neither of these Form 1040s disclosed a description of the property sold, and the final in neither of these Form 1040s disclosed any information or description regarding the source."
Taking the first one, was that disclosure required?
A. That disclosure was not required, I don't believe by the -- for the line by line instructions that accompanied Schedule D.
Q. What about the second bullet point, was that disclosure required?
A. Same answer, no.
Q. Third bullet point, was that disclosure required?
A. Not by the instructions to Schedule D.
Q. Was it required elsewhere?
A. Well, to the extent that Form 8275 should have been included with the return, Form 8275 states that, "To the extent that items are not

Page 157

otherwise inadequately disclosed, use the space on this return to provide those disclosures."
Q. Was Form 8275 required?
A. I don't know.
Q. Is Form 8275 ever required?
A. For some purposes. My understanding is it's required to avoid certain penalties under some circumstances.
Q. Those penalties that can be avoided by adequate disclosure?
A. I don't remember which penalties. I'm trying to make a clear distinction between adequate disclosure versus the line by line disclosures for the individual returns.
Q. Okay. So I guess on Page 34, is it fair to say that none of the disclosures that you note that are not made on the returns, they're not required; is that right?
A. They weren't required by the line by line instructions on Schedule D.
Q. But if you were trying to avoid penalties by filing a Form 8275, that information might be necessary?
A. Might be necessary, yes.
Q. Page 35, capital C, is paragraph 85 on

Page 35, is that simply an observation?
A. Paragraphs 85 through 96 are merely observations.
Q. Let's go to paragraph 97 on Page 37, is that merely an observation?
A. It is merely an observation. Note, however, that the term inflated basis amount is a term that I've defined in my report later, and that I've made that calculation in column INJ. But, yes, it's descriptive.
Q. Let's go to paragraph 98, merely an observation?
A. Yes.
Q. Is paragraph 99 merely an observation?
A. Yes.
Q. Paragraph 100 merely an observation?
A. Yes.
Q. 101 merely an observation?
A. Yes.
Q. 102, is it merely an observation?
A. Yes, sir.
Q. 103, is it merely an observation?
A. Yes, sir.
Q. 104, is it merely an observation?
A. Yes, sir.



Q. 105 is merely an observation; correct?
A. Correct.
Q. Okay. Paragraph 106, is that merely an observation?
A. 106 through 109 is my description of the transaction based on the E&Y COBRA presentation.
Q. Did the E&Y COBRA presentation discuss section 708 B1 cap B?
A. I don't recall whether or not it actually cited that code section.
Q. You're pretty familiar with partnership tax, aren't you?
A. Somewhat, sure.
Q. What is that provision?
A. Section 708 B-1 B states that a partnership will terminate if more than 50 percent of -- if there is a sale or exchange of more than 50 percent of the capital and profit's interest in the partnership within a 12 consecutive month period.
Q. Paragraph 107, is that an observation based on the EY COBRA presentation?
A. Yes, basically this is my summary of the transaction -- it's an overview of the



transaction based primarily on the E&Y COBRA presentation.
Q. Paragraph 108, you say, "Upon the termination or liquidation of a partnership, the tax basis that a partnership had in the COBRA loss assets would disappear." What do you mean?
A. It goes away.
Q. What happens to it?
A. It just disappears.
Q. What basis arises in its place?
A. Under section 732 B, it would be the basis that the partnership -- the partners had in their partnership interests with certain adjustments.
Q. That would be a carry over basis, is that right?
A. Carry over?
Q. Or is it s substitute basis? I always get the two confused.
A. In this context, it is a little bit confusing. It's the partnership based on the COBRA presentation, the partnership basis that the partners had in the partnership's interests would be attached to the assets distributed by the partnership when it terminated. In this case,



terminated and liquidated.
Q. Are you opining in here how the tax code works, or are you just trying to summarize in your own words what the COBRA presentation is saying?
A. I'm trying to summarize in my own words what the COBRA presentation is saying. And it wasn't just the COBRA presentation. There were other descriptions of this transaction included in the record.
Q. Yeah, but it's not separate opinion by you though, is it?
A. No, it's a description of basically what happened.
Q. And you're not saying that any of the Internal Revenue Code or the regulations thereunder were not followed in paragraph 106, are you? 106 through 109?
A. I'm not saying one way or the other.
Q. I'm sorry, 106 through 109?
A. I'm not saying one way or the other.
Q. On Page 42, paragraph 110, are these merely observations?
A. As far as my report goes, they're merely observations.

Page 162

Q. Paragraph 111, is that merely an observation with the caveat that you note the $420,000 error, which I think we discussed it in footnote 76 and 77 on Page 18?
A. That's correct.
Q. Paragraph 112, is that just merely an observation?
A. Yes.
Q. Paragraph 113, is that just merely an observation similar to that contained in paragraph 111 or actually 110?
A. Well, for the purposes of my report, it's merely an observation, but there's, you know, the loss that was calculated by the S-corporation assumes that that asset was distributed -- was owned by the partnership and distributed to the S-corporation as part of termination and liquidation of the partnership. In fact, that does not comport with the flow of the assets as reflected in the Alex Brown case, as I've observed here.
Q. So in your analysis of the COBRA presentation on Page 40 through 41, and based on your 30 years of experience, if the Cisco assets were not contributed to the partnership, instead

Page 163

they stayed in the S-corporation, what would the basis have attached to?
MR. DONOHUE: Objection. Calls for conclusion of law. You may answer.
BY MR. WELTY:
Q. Would it have attached to the Candian currency?
A. Well, first the Canadian currency and Cisco stock would have a carryover basis from the transferors. The basis in the partnership interest wouldn't -- I don't recall that there were any other assets in the partnership for that basis to have attached.
Q. So what assets were inside the partnership when it was liquidating?
A. My recollection is that it was cash, Canadian currency and the Cisco stock.
Q. So assuming that the Cisco stock didn't get distributed to the partnership, it stayed in the S-corporation, as noted, originally was distributed.
What would the basis in the partnership interest have attached to when the partnership was liquidated? Would it have attached to U.S. dollars or just Canadian dollars?

Page 164

MR. DONOHUE: Objection. Calls for a conclusion of law. You may answer.
THE WITNESS: Well, again, you're asking me questions I didn't opine to in my report. But the basis would be first allocated to the cash, to the extent of the cash. And the balance would be allocated -- if there were Canadian currency still in the partnership, the balance would have been allocated, I believe, to the Canadian currency.
I think that's true. I don't believe Canadian currency is considered to be an unrealized receivable under Section 751.
BY MR. WELTY:
Q. The net effect of that would be to increase the ordinary loss and eliminate the capital loss, wouldn't it?
A. Well, you're assuming that the outside basis was properly computed.
Q. Correct.
A. Which I never said anything about.
It seems to me -- I'm sorry. I seemed to have lost my place.
Okay. That's true. Yes. I couldn't remember if the Canadian currency had been

Page 165

misplaced, but it was actually purchased by the partnership.
Q. Let's go to paragraph 114. Is paragraph 114 an observation with the caveat that you note the error in calculation of the basis on the liquidation of the partnership, which I believe is on Page 19, footnotes 83 and 84?
A. Yes.
Q. 115, is that merely an observation?
A. It's an observation.
Q. 116, is that merely an observation?
A. Observation.
Q. 117, is that merely an observation?
A. Observation.
Q. 118, was that merely an observation?
A. Observation.
Q. 119, was that merely an observation?
A. Yes.
Q. 120, you use the term carryover tax basis. What is carryover tax basis?
A. We're talking about a different issue here. Because now what this transaction describes is the transfer of the partnership interests. Yes, a transfer of the partnership interests to the S-corporation in exchange for stock.

Q. You note that the -- explain to me what Footnote 200 is.
A. Well, the basis that JBJZ claimed to have had in the partnership interest is 48.8 million dollars, and that was 1.2 million dollars -- or 1.26 million dollars more than the amount that was shown on the regulation Section 1.351-3D Statement that was filed with the S-corporation's Form 1120S for 1999.
The difference is the amount of Mr. Zucker's share of the J&G fee, which was in fact, retroactively added to -- or capitalized to the tax basis of the JZ Partnership interest upon the payment of this fee by JBJZ on December 29th.
Q. What are you pointing out, that the 351 statement of the S-corporation Form 1120S showed the carryover basis; correct?
A. Showed the transferor's basis in the partnership interests, the transferor's claimed basis in the partnership interest.
Q. That being?
A. 47,616,953.
Q. And who is the transferor?
A. I think we're talking about Mr. Zucker.



Q. So it shows Mr. Zucker's claimed basis on the 1120S, the basis he claimed in the partnership; is that right?
A. Yes.
Q. Which should equal his claimed basis in the partnership; correct?
A. Is that a different question? He showed 47, his claim basis was 47, that's what was shown on the 351 statement. I may have misunderstood your question.
Q. That would have been Mr. Zucker's claimed basis in the partnership interest?
A. That was shown on the 351-3 statement, yes.
Q. Isn't the same true for Mr. Boyd on Page 47, footnote 207 in the 351 statement referenced there?
A. Yes.
Q. So the 351 statement would have shown Mr. Boyd's claimed basis in the partnership; is that correct?
A. That's correct.
Q. Paragraph 120, moving beyond footnote 200, again, you note the error, approximately $420,000 error in the Cisco stock; correct?



A. I do.
Q. Then you also note that Mr. Zucker's 675,000 share of the EY fee was incurred and paid by him individually, and he claimed it on his return as an itemized deduction on his Form 1040; is that correct?
A. That's correct.
Q. Is that a red flag, as you used the term earlier, for audit?
A. Well, the fee wasn't disclosed on the 1120S anywhere.
Q. I'm talking on the 1040.
A. On the 1040, Schedule A, it could have been a red flag, depending upon how it was described and other factors.
Q. Well, how was it described?
A. I think that Mr. Zucker's fee was described as Ernst & Young. I think it just had a caption Ernst & Young. I believe on the other return, it was accounting fees. I may have those backwards.
Q. Isn't it true that you are making the claim that the EY fee was buried in the basis so as not to raise a red flag?
A. It was buried in the basis.



Q. So as not to raise a red flag?
A. Again, I decided the e-mails where Mr. Coplan actually discusses the issue of burying -- of capitalizing the E&Y fees, yes, I think that the fees were capitalized. Or I think it would be reasonable to conclude that the fees were capitalized with the effect of reducing the possibility of detection and audit by the IRS.
Q. Reporting the EY fees on your 1040 runs counter to that, doesn't it?
A. It does.
Q. Is it possible that EY didn't want the transactions audited, but the taxpayers weren't too concerned about it?
A. I don't know what the taxpayers were thinking. I can't imagine that anybody would want to be audited, especially for this type of a substantial loss.
Q. Were you aware that Mr. Zucker and Boyd came forward and disclosed to the IRS that they participated in this transaction?
MR. DONOHUE: Objection. Misstates the facts. You may answer.
THE WITNESS: My understanding is that there was a disclosure by one or both of

them. That the nature and extent of that disclosure, when it was made, the context in which it was made, why it was made, I don't know.

MR. DONOHUE: Could we take a break?

MR. WELTY: Let's go off the record, but don't disappear, Tex.

(WHEREUPON A RECESS WAS TAKEN.)

BY MR. WELTY:

Q. Dr. LaRue, I believe we were on Page 47 of the JZ Buckingham report, Exhibit 1. Paragraph 123, is that an observation?

A. 123?

Q. Yes.

A. It's an observation, but, again, you know, these observations are later used in my report as part of the basis for some of the opinions that I have rendered.

Q. But you're not suggesting that there is anything incorrect about the tax treatment or how that was reported, are you?

A. I'm not suggesting one way or the other.

Q. Paragraph 124, again, is that merely an observation?



A. It is an observation.

Q. Paragraph 125, is that merely an observation, or are you asserting that the tax basis that JBJZ assigned to the Cisco stock and Canadian currency should have been $91,905 and $772,500 respectively?

A. I'm not making a statement either way. I'm making an observation that the partnership's tax basis in those assets were the amounts that you see disclosed in that paragraph.

Again, let me make sure that you understand. When you say mere observation, I'm not sure I would characterize these as mere observations. Again, these are facts and circumstances, some of which -- most of which were really integral to many of the opinions that I have expressed.

But in this particular paragraph, I'm simply making -- now I'm doing it. I am making an observation.

Q. Paragraph 126, is that also an observation?

A. It's an observation that shows my calculations in terms of how that basis was determined. It shows how the -- shows that the



Ernst & Young fee and the J&G fees were capitalized into that basis.

And it also shows the difference between the actual economic gain and the amount of the losses reported by JBJZ on its 1120S. It's certainly not a mere observation. It took me a long time to figure that out from the documents that I had available to me.

Q. 127. Actually, go back up to paragraph 126, footnote 220.

Do you know that there was a gain on the Cisco stock purchased by Mr. Boyd, and a gain on the Cisco stock originally purchased by Mr. Zucker, as well as a gain on the Canadian currency. Do you see that?

A. I do.

Q. So is it safe to say that on a pretax basis, a profit was made on the digital options; is that correct?

A. No, this has nothing to do with the digital options.

Q. I think earlier in your report, you said there was a $625,000 profit, which is a difference of $3,125,000 realized on the options less, the $2,500,000 net premium?



A. I believe there was. My recollection was, and I've got it in the tables, but I believe there was a profit reported by the partnership on this option transaction, yes.

Q. And there was also a pretax profit on the Cisco stock originally purchased by Mr. Zucker; is that correct?

A. Those are my calculations. Those are not the amounts that were reported on the 1120S.

Two comments. First of all, these gains were not reported on the 1120S anywhere. Secondly, the gains that we're referring to here are gains that really, for the most part, economically accrued outside of the S-corporation. But because of the basis issues, the gain was recognized by the S-corporation.

So, you know, was it the S-corporation's gain? Well, the S-corporation sold the asset, and there was a gain as a result, but that gain accrued outside the S-corporation. It was already built into the value of those assets at the time those assets were contributed to the S-corporation.

Q. Let me reask the question. I thought it was pretty simple. Isn't it true that there was

a pretax profit on the Cisco stock originally purchased by Mr. Zucker?
A. Yes.
Q. Isn't it true that there was a pretax profit on the Cisco stock originally purchased by Mr. Boyd?
A. Yes.
Q. Isn't it true that there was a pretax profit on the Canadian currency purchased by the partners?
A. That's correct. But again, none of those profits were reported on their returns.
Q. They weren't reported?
A. No.
Q. Didn't they go into the calculation of the amounts reported on the returns?
A. No.
Q. No?
A. No. I mean, for example --
Q. With the exception of the Cisco stock where you said that they had the basis increase, and I think we established earlier it was a 420 thousand and 18 thousand dollar error.
A. All right. The economic gain on the sale of the Canadian currency was $5,907. None of



this gain was reported anywhere on the S-corporation return, rather a 29,446,675 dollar ordinary loss was reported on that sale.
With respect to the 18 thousand dollar -- 18,068 dollar economic gain on the 500 shares of Cisco stock from Mr. Boyd, none of that gain was reported on the 1120S. That gain was actually reported as a 2,019,744 dollar short term capital loss.
And the same would be true with respect to the 4,500 shares contributed by Mr. Zucker, 419 thousand dollar gain was reported as an 18,177,695 dollar loss on the JBJZ 1120S. Now, these gains weren't reported anywhere, including not on the Schedule M-1 of the 1120S.
Q. So paragraph 127, is that an observation?
A. It's an observation, but I point out that in spite of the fact that a 29 million dollar ordinary loss was reported on the 1120S, the actual economic gain resulting from that transaction was -- from the purchase and sale of the Canadian currency was 5,970 dollar gain. And I also point out that that amount was over -- almost 5,000 times the amount of the actual gain, negative 5,000.



Q. Is paragraph 128 an observation?
A. Same comment as paragraph 127.
Q. Same with 129?
A. That's correct.
Q. Page 51, transaction related fees. You note in paragraph 30, that E&Y was engaged to provide tax advice concerning the implementation of the COBRA strategy?
A. That's correct, paragraph 130.
Q. Do you have any reason to believe that that tax advice was not given?
A. Let me make the following observations. First of all, these fees were charged and paid. My understanding is they were paid. Secondly, I don't recall seeing a tax opinion by Ernst & Young discussing tax consequences.
Thirdly, it's my understanding -- well, I know that Ernst & Young prepared the 1120S and the 1065 for the two entities involved. So in what form that tax advice was given, other than the preparation of the tax returns, I'm not quite sure.
Q. Well, the COBRA presentation.
A. The COBRA presentation, that's correct. My understanding is that the COBRA



presentation was made before the engagement letter was entered into.
Q. Well, they did provide tax advice.
A. Again, I assume that they provided tax advice, but I haven't seen any sort of opinion letter issued by Ernst & Young to either of these individuals.
Q. Paragraph 131, is that merely an observation?
A. Again, "merely" is a word I prefer not to use. But it is an observation. My observation here is that Mr. Zucker and Mr. Boyd individually paid these fees. But as I point out later, nevertheless, the S-corporation capitalized those fees into the basis that it claimed to have had in the COBRA assets, and therefore in the COBRA losses.
Q. Is that in paragraph 132 that you point that out?
A. Paragraph 132, I point out that the E&Y fees were duplicated. They were deducted on the individual returns as itemized deductions, and they were also included in the tax basis that was used to calculate the various JBJZ COBRA losses.
Q. Paragraph 133, is that merely an

observation, or does this go to your adequate disclosure question? Or are you saying that the reporting as it actually occurred was incorrect?
A. I didn't say here in paragraph 133 that that reporting was incorrect. I made the observation that the fact that E&Y fees -- substantial E&Y fees had been incurred and paid wasn't disclosed on the partnership's Form 1065. And I later make the observation that those fees were not disclosed on the 1120S either.
Q. Okay. So you're saying they were disclosed on the 1040, but not the 1065 and the 1120S?
A. They were deducted on the 1120S as part of the COBRA losses deducted on that form, but they were not separately disclosed or described, or there was no reference to them whatsoever.
I am saying also that on the individual 1040s, these fees were disclosed as itemized deductions in a separate schedule that was included with the return.
Q. Should they have been disclosed on the Form 1065?
A. I don't know. They weren't disclosed.
Q. So you're not saying they were



required to be disclosed?
A. I'm not saying that they were required or not required to be disclosed on the partnership's Form 1065. I'm saying that they weren't disclosed. So the fact that these Ernst & Young fees had been paid by or on behalf of the partnership or the S-corporation wasn't evident from either one of those two tax returns.
Q. Look at paragraph 135.
A. And you know you skipped a paragraph?
Q. I do.
A. Okay.
Q. In paragraph 135, you note an e-mail from Bob Coplan regarding a capitalization of E&Y fees on the basis of the partnership; do you see that?
A. I do.
Q. That's on December 23rd, 1999; right?
A. That's correct.
Q. Isn't it true that the COBRA presentation indicated that the individuals should deduct those fees on their Form 1040 as a miscellaneous itemized deduction?
A. Yes, it did. The COBRA presentation did indicate that, yes.



Q. So isn't it the sequence of events that E&Y apparently advised the individuals to deduct those fees on their 1040s that on December 23rd, 1999, or thereabouts, the decision was made to capitalize them instead?
A. I'm not sure I'd characterize it that way. I would say in the COBRA presentation in November, or sometime in November or October, that those fees were described as being miscellaneous itemized deductions at that point in time. Whether or not E&Y subsequently advised their clients to deduct those as itemized deductions, I have no way of knowing.
Q. But at least indications are that they at least told them in the beginning that there was a COBRA presentation; right?
A. That's correct, on the COBRA presentation they were identified as miscellaneous itemized deductions. And there was a footnote, I think, that said something to the effect that this may be subject to limitations of generally applicable miscellaneous itemized deductions.
Q. Have you, in all the documents that you've reviewed, seen any indication that Ernst & Young advised its clients that it had changed its



mind, and that instead of deducting those fees on the 1040s, they should be capitalized as part of the basis?
A. I don't recall seeing any documents that expressly advised the clients to deduct these as itemized deductions from E&Y.
Q. Have you reviewed any of the depositions of any of the taxpayers wherein they state that E&Y told them to deduct them personally, but never told them they were being capitalized?
A. I don't recall seeing that in a deposition. I have not read all of the depositions.
Q. Wouldn't it be a consistent and accurate explanation as to how the E&Y fees got deducted twice? That being EY originally advised the taxpayers to deduct them personally, but then later changed course and decided to capitalize them, but failed to communicate that that fact to the individual taxpayers?
A. Well, I guess the first order of business is to determine who prepared the individual tax returns. I don't recall in this case where the individual tax returns prepared by Ernst & Young. Many of them were. I don't

Page 182

remember. I can look. It appears that the Zucker's and Boyd's returns were not prepared by Ernst & Young.
Q. Well, that's the first order of business. What would be the second?
A. The second order of business would be to determine what communications there were between Ernst & Young. And what information is provided by Ernst & Young to the clients and/or directly to the tax return preparers to see what -- you know, what those communications had to say about the treatment of the E&Y fees. I don't recall that I've seen any such communications. I don't know what information was provided by E&Y to the preparers directly or indirectly in this case.
Another observation that I would make is that not all of the COBRA individual 1040s double deducted the E&Y fees. Some did; some didn't. Some deducted them on Schedule E, some deducted them on Schedule C.
So the treatment of the E&Y fees was not consistent among the seven different sets of entities -- or the 16 individual -- 16 different individual taxpayers whose returns I reviewed in connection with this case. They were not all

Page 183

itemized -- deducted as itemized deductions, and they were not always double deducted.
Q. Okay. We'll address each one. I think I was basically asking the question, doesn't it appear to you, based on what you know that EY originally advised people to deduct their fees personally, but then changed course and decided to capitalize, and failed to advise the taxpayers that they were doing this?
A. I think that overstates what I've -- my earlier answer. In the COBRA presentation made several months before the tax returns were filed, my recollection is that it was on the last page of a multi-page presentation. There was a reference to the fees as being deductible as itemized deductions. I'm not sure that constitutes tax advice.
My understanding is that E&Y left with those PowerPoint presentations. That the clients were not provided with a copy of those PowerPoint presentations. I'm not sure that I would conclude that that is tantamount to advising your clients several months later to deduct the E&Y fees as itemized deductions. And, in fact, again, not all of the individuals did so.

Page 184

Q. Look over at Page 52 at the bottom of 155. The last sentence on that page says, "Because the fees will be significant, the clients are likely to have substantial authority to avoid having to disclose the position as protection against Section 6662 penalties. We believe that substantial authority exists for this position."
And then you go on to comment, "No documentation in this case that either identifies or otherwise discussed the substantial authority referred to above." Do you see that?
A. I do.
Q. What is substantial authority?
A. It's whatever he says it is. He made the reference to substantial authority. It's his use of the term. Whatever he meant by substantial authority. I haven't seen any documentation in this case that identifies or otherwise describes any authoritative basis upon which the E&Y fees were capitalized. I looked for it. I expected that I might find it.
I didn't see any reference to -- this issue was not addressed in the J&G opinion. It was not addressed in the B&W opinion. I was unable to find -- my recollection is that I was unable to

Page 185

find any discussion of the justification for capitalizing this fee, other than the vague reference in this sentence that you see out of this e-mail.
Q. So this is essentially a tax position at least that EY decided on its own; right?
A. On its own?
Q. Well, it's not in the opinions is what you're saying. You haven't seen any indication that my clients were advising E&Y on the tax consequences of this, have you?
A. No, sir, I haven't.
Q. So was it EY's decision and belief that there was substantial authority, and that they were effectively rendering this advice?
A. Well, again, basically, yes. But again, that e-mail, that quoted passage says, "After several discussions internally and with counsel, we have concluded." I don't know who they mean by counsel. I don't know who else they discussed this issue with.
Q. You're not saying that there is no substantial authority in the position, are you?
A. I'm not saying one way or the other.
Q. Look at footnote 238. "The EY fee may

Page 186

be a flag that we do not want on the return this year. What flexibility do we have, and what do you recommend?" Do you see that?
A. I do.
Q. At least with regard to Mr. Zucker's -- Zucker and Boyd, they reported it and put the flag on the return that year, didn't they?
A. They deducted their shares of the E&Y fee as miscellaneous itemized deductions on their Form 1040 for 1999, and they reported that amount on a separate statement. Whether or not all facts and circumstances considered that would be a flag, I'm not sure I would necessarily characterize it as that.
Q. Well, you seem to be associating the flag with the payment of fees in footnote 238, aren't you?
A. Well, yes. I mean, it says what it says. November 11th from Brian Upchurch in which he states, "The E&Y fee may be a flag that we do not want on the return this year." I don't recall now specifically, but I believe he was referring to the entity return or returns.
Whether or not this would be a flag, you know, whether or not it would really stand out

Page 187

is a function of a variety of things. On the individual tax return, if you had a -- I mean, my gosh, if you had $50 million worth of income, and you've got $675,000 worth of legal fees, that's not quite the same thing certainly as if you had two million dollars worth of income and $675,000 for the fees.
I think there are a lot of variables that go into determining how prominently this E&Y fee would stand out. Remember Mr. -- I get them confused sometimes, but Mr. Zucker I believe described this fee simply as Ernst & Young, whereas Mr. Boyd described this as accounting fees. What they didn't do is describe these as tax advisory fees or tax artificial lost generation fees, or COBRA fees or anything like that. If they had done that, that would change things.
Q. Are those descriptors that you're just calling out there in any way required?
A. I think the requirement is that you adequately disclose what those fees are. Ernst & Young may be considered by some to be adequate. Maybe it is adequate. I didn't opine one way or the other.
Q. Are you saying, though, that they

Page 188

violated the instructions somehow by filing that way?
A. I'm not saying that at all. I'm saying that whether or not the separate deduction and disclosure of those fees on the Form 1040s, whether or not that would really be a flag for those returns is a function of a lot of other facts and circumstances that relate specifically to those returns.
Q. Do you think Brian Upchurch was referring to a narrative discussion of the fees, or the mere fact it was the magnitude of the fees and the payee?
A. I'm not sure. A narrative discussion, I'm not quite sure what --
Q. Well, the descriptors that you were talking about whether it would be a flag or not.
A. Well, I think you have to take both things into consideration at the same time. How an amount is described, where it's described and what the dollar amount involved is. I think that's what he's referring to.
Q. Go to page 137.
A. Paragraph?
Q. I'm sorry, paragraph 137. Are you

Page 189

opining in any way as to whether it was correct or incorrect for JBJZ to pay the fee, as opposed to the taxpayers individually?
A. No.
Q. Are you saying that the way it was deducted by JBJZ was incorrect?
MR. DONOHUE: Objection. Assumes facts.
THE WITNESS: I didn't express a judgment as to whether or not their treatment of the fee was legally proper or not. What I'm discussing here is the fact that the payment of the fee by the S-corporation wasn't disclosed anywhere on the partnership tax returns, on the 1120s and it wasn't disclosed on the 1040s.
So the payment of a large fee in connection with the generation of this loss was, as I pointed out, using the words that I used in my report, was buried in the amount of the JBJZ losses. There was no way to look at any of these tax returns and determine that a substantial fee was paid to J&G in connection with these transactions at issue.
BY MR. WELTY:
Q. Did the reporting of the fees and the

Page 190

lack of disclosure, as you've just described it, on the 1040 or 1120S or 1065 violate any provision of the Internal Revenue Code or regulations or the instructions for preparing the returns?
A. Well, it might have.
Q. How?
A. Well, these fees were capitalized to the basis that was used to calculate the JBJZ losses. If that treatment was not legally proper, then it was improper to include those fees in the calculation of those losses.
Q. What about the disclosure, was any of the disclosure that you mentioned here required by the instructions for filling out the returns?
A. Well, again if the JBJZ -- strike that. If the J&G fees were improperly capitalized to the bases of the Cisco stock and the Canadian currency, and reported as part of the losses on the 1120S, when in fact, they weren't capitalizable expenditures, then the instructions required that those fees and other expenses be reported separately.
Q. Setting aside the question of whether they were capitalized properly, was there any requirement to disclose, as you've noted in

Page 191

paragraphs 138, 139 and 140, the fees?
A. I may not have understand your question. I thought I answered that. If these were not to have been capitalized to the Cisco stock or to the bonds, then they should -- to the extent that they were claimed as a deduction by the S-corporation on the 1120S, those fees should have been listed separately. They weren't.
Q. Well, let's do it this way. Paragraph 138, what rule, regulation or instruction required the disclosure?
A. It's my understanding that the claim was -- well, the partnership return -- the partnership didn't pay the J&G fee. The partnership of the cash method taxpayers, so I'm not sure that the partnership would have been required to disclose the J&G fee.
Q. Paragraph 139, what code, section, rule, regulation, instruction would have required disclosure on the Form 1120S?
A. I'd have to look at the instructions. But clearly, if you -- there are separate lines for different items of expense. And if you're not permitted to capitalize that fee to your basis and an asset, then if you're going to deduct it, you

Page 192

would have to deduct it on some line other than as part of the ordinary loss, or the capital loss or the short term capital loss that you reported on Schedule B or Form 4797.
So that would appear on some other line of the tax return. I'd have to look at the instructions in the form itself to refresh my memory as to what line that would probably have to appear on.
Q. You're not saying -- you're building into your answer the supposition that it should not have been capitalized, aren't you?
A. I'm saying that the effect of not -- strike that. The effect of not reporting the J&G fees separately and the E&Y fee separately, and the effect of capitalizing these fees into the COBRA losses was to minimize or reduce the possibility of detection and audit by the Internal Revenue Service. That's what I'm saying.
Q. So as I understand it, you're not saying that it was improperly capitalized, you're just saying the effect of its capitalization was to reduce the audit profile of the returns?
A. Yes, you're asking for a legal opinion. I didn't render any legal opinions in

Page 193

connection with this report.
Q. On Page 55, paragraph 142, when was the decision made to capitalize the fees?
A. The J&G fees?
Q. Yes.
A. It appears the decision was made sometime around March 13th, 2000, from this e-mail.
Q. Again, are you saying that there's -- paragraph 142, I guess it would be the second to the last bullet on Page 56, you're not saying that there wasn't reasonable support for that position discussed by Mr. Coplan, are you? You're just saying you haven't found any documentation discussing it; right?
A. That's correct.
Q. On Page 56, paragraph 143, you say none of the 1999 Forms 1040 for the taxpayers disclose any information pertaining to the J&G fee.
Again, are you saying that there was disclosure required but not made, or are you just observing that there was no disclosure?
A. I'm not -- I'm observing that there was no disclosure. And later I opine that the failure to disclose the amount of the J&G fee and the E&Y fee could reasonably be expected to reduce

Page 194

or minimize the risk of detection and audit by the Internal Revenue Service.
Q. But, in fact, the E&Y fee was deducted personally, at least in the case of Mr. Zucker and Mr. Boyd, so the converse would be true?
A. First of all, the E&Y fee that was deducted by Boyd and Zucker was a dollar amount that was divided between two returns and made into a smaller dollar amount.
And secondly, that amount was not included -- that amount did not include the J&G fee. If you take the E&Y fee and the J&G fee and throw them on the 1120S, you get a big number on that tax return. If you cut that fee, if you divide that three percent fee going to J&G and 1.5 percent going to E&Y, just take the E&Y fee, split that in two and throw it in with everything else reported on the 1040, you get a very different effect it seems to me, in terms of how much of a flag that would be to someone reviewing a 1040 vis-a-vis reviewing the 1120S.
Q. Is it possible that the reason that the J&G fee was capitalized rather than deducted under Section 162 as an expense is because there wasn't ample authority under section 162 to deduct

Page 195

it?
MR. DONOHUE: Objection. Calls for a legal conclusion. You may answer.
THE WITNESS: There is a section 162 and also a section 212 for investment related expenses. The issue here is whether or not the fee should have been capitalized. Mr. Coplan states that there's substantial support, I believe that that's his term -- reasonable support for capitalizing that fee to the Cisco stock and the Canadian currency.
I simply observe that I haven't seen any support for the conclusion that that fee could be or should be capitalized. There is no support for that. That issue is not addressed in any of the legal opinions that I've reviewed, and I've seen no other documentation offered up in this case that I have reviewed that discusses the support for capitalizing that fee to the basis of the COBRA assets.
BY MR. WELTY:
Q. Paragraph 146, with regard to the Brown and Wood fee, you note that the Brown and Wood fee is deducted on Schedule K as deductions related to portfolio income lost, do you see that?

Page 196

A. I do.
Q. Isn't that consistent with deducting it as a Section 212 expense?
A. It is.
Q. Page 57, paragraphs 147, 148 and 149, are those just merely observations derived from the documents that you cited there? There may be a computation involved.
A. There is a computation involved, and once again, I wouldn't suggest that those are -- that's a description. I wouldn't call it a mere description. I think some may find it significant that the legal fees and the accounting fees were set as fixed fees as a percentage of the long option premium, which was the basis upon which the inflated basis in the COBRA losses were claimed.
Q. Why was it significant?
A. I didn't say it was significant to me in my report. I think it's an observation that some may find significant.
Q. Why?
A. I don't know.
Q. You don't find it significant, but somebody might, and you just happen to include it in your report?

Page 197

A. It may be significant that these fees were based on essentially the amount of the tax losses that these transactions were designed to generate.
Q. Why is that significant in your mind?
A. In my mind?
Q. Yeah.
A. These fees were not based on hourly rates or actual costs. These fees were not based on the expected economics of the transaction, other than the tax losses that this transaction was designed to generate.
The fact that the fees were based on the long option premium that was expected to produce this loss, seems to confirm what the PowerPoint presentation of Ernst & Young, I think makes very clear that these transactions were contemplated, were pre-ordained. That they were interrelated transactions through an interrelated series of steps that was designed to generate substantial tax losses.
But as presented in my report, based on all of the calculations and data that I accumulated and put into tables, and calculations that I made, this is an observation.

Page 198

Q. Page 58, paragraph 151. I was hoping to get through this one today. See if we can speed it back up. Is paragraph 151, merely an observation?

A. It is an observation. The fact that I had to consult several documents to be able to figure out -- hold on. Yes, the fact that I had to consult several documents to figure out how that basis was determined, is a matter that I address in this report as part of an opinion.

Q. You note in Paragraph 152 that there is a 351 statement attached to the Form 1120S. Do you see that?

A. Yes.

Q. Is there anything incorrect or defective about that 351 statement?

A. Well, the 351 statement -- I don't have a copy of that in front of me, but the 351 statement, from my recollection, does not disclose that the J&G fee that was incurred by the transferors was assumed by the S-corporation.

The 351 statement referred to in this paragraph discloses the fair market value of the stock one dollar per share. When in fact, the fair market value of the stock received in exchange for

Page 199

the property given up was substantially greater than the one dollar per share. I don't remember the dollar amount.

Q. Are you opining as to the fair market value of the stock?

A. I'm making an observation that the value given up -- the value of the property given up to the S-corporation in exchange for the stock. The stock was reported as having a fair market value of one dollar per share. I'm saying the stock received back in the exchange had a value greater than one dollar per share.

Q. Wasn't the par value of the stock one dollar?

A. That's not what I said. The statement -- the 351 statement discloses the fair market value of the stock as being one dollar per share, not the par value.

Q. At the time of the contribution, what assets did the S-corporation own?

A. To the best of my knowledge and recollection, they owned cash -- they received cash.

Q. No, before the contribution, what did the S-corporation own?

Page 200

A. As far as I know, they owned nothing.

Q. So you're saying the fair market value of the stock was more than one dollar, and the S-corporation owned nothing at the time of contribution?

A. You have a simultaneous transaction. If you're giving up ten million dollars, and you're getting back stock in the exchange in a simultaneous transaction, the stock that you're getting back has a value of about ten million dollars.

Q. Are you sure about that?

A. In a simultaneous exchange, if I give up cash -- let's simplify things, If I give up cash to a corporation, ten million dollars, and I get back stock, all of the stock of that corporation, no other factors, the stock that I have is worth 10 million dollars.

Q. Are you suggesting that any time there is a 351 contribution, there has to be a valuation performed before and after the contribution?

A. I'm not saying that at all. I'm making an observation that the fair market value disclosed on the 351 statement was not the fair market value of the stock that these individuals

Page 201

received simultaneously with giving up their interest in the partnership.

Q. So you are rendering an opinion as to the fair market value?

A. You're asking me a question, and I'm answering your question. I did not -- in my report, I don't believe that I commented on the propriety of that. I think I made an observation that the value of the stock received back was different than -- it was greater than one dollar per share.

Q. So other than the fair market value being listed as one dollar, and the J&G fee not being noted as assumed on the 351 statement attached to the form 1120S, is there anything else incorrect on that?

A. Incorrect, I don't believe so. But I believe I did make the observation that the tax ID number of the partnership was not disclosed. And I believe I noted that there was an inconsistency between who was listed as a partner on the partnership's Schedule K-1, and who was listed as a transferor of that partnership interest to the S-corporation in exchange for the stock.

Q. Paragraph 153.

Page 202

A. That's an observation and an opinion.
Q. Observation and opinion?
A. Yes.
Q. Are you saying that it was required -- the disclosures you have noted in Paragraph 153 were required to be disclosed, but were not?
A. That's not what this says. It says most of the information essential to making a determination as to how they calculated their basis in the partnership interest, and therefore how JBJZ calculated its basis in the stock and the currency, and therefore the JBJZ losses was not disclosed on or with any of the 1999 returns, and was not ascertainable or reasonably ascertainable from the information presented on or with any of those returns, or all of those returns collectively.
Q. Are you saying that there were disclosures required that were not included?
A. What I've said here is that the disclosures that were made on those returns, individually and collectively, were not sufficiently complete or descriptive to enable the Internal Revenue Service to determine how -- the source of the JBJZ losses.
Q. You can answer simply, and I'll quit

Page 203

asking it. Are you saying that there were disclosures required that were not included?
A. I did not say that in this paragraph.
Q. Or is it embedded in your opinion?
A. As I mentioned earlier, yes. On the Schedule D to Form 1120S, the instructions to the 1120S require that if you're using a basis other than your actual costs, that you include a description of how that basis was determined.
To my mind, a description of how that basis would have been determined would have required a fairly lengthy explanation as to the essential elements of the COBRA transaction. That information was not disclosed on the Schedule D to Form 1120S.
Q. Paragraph 154, are you just describing how you generated the information in Table 2? I mean is that a descriptive paragraph?
A. Yes. Having already stated that this information was not ascertainable from the tax forms, I'm explaining here how I was able to determine what those dollar amounts were.
Q. Okay. Paragraph 155, is that an observation or an opinion?
A. It's more of an observation than an

Page 204

opinion. I observed that to my mind, it wasn't possible to calculate these tax bases from the information that was disclosed on the tax return.
Q. Okay. So when you say essential information, are you saying required information that was not disclosed or ascertainable from -- again, this is getting to the question of something not disclosed that was required to be disclosed.
A. If adequate disclosure of how this loss was determined or the fact that it was sourced back to artificial non-economic losses and embedded legal fees, if that disclosure was somehow somewhere required, it wasn't made.
Q. Where would it have somehow somewhere been required? On what form?
A. Well, it might have been required on Schedule K-1, line 23.
Q. It might have been, or it was required on K-1?
A. I think it was probably required.
Q. Based on what?
A. I've cited that -- the instructions, I believe in my report, and let me finish the -- There are basically three different places where that might have been disclosed. One would have

Page 205

been Form 8275. Another place would have been line 25 of the partnership Schedule K-1. Another place would have been on the S-corporation's K-1s, line 23.
All of those forms and lines state that adequate disclosure must be made to the extent that other disclosures on the tax returns are insufficient.
Q. To avoid certain accuracy related penalties under section 6662, isn't that right?
A. I believe there's a cross reference to 6662 to 6111, and I believe instruction number 21 on the partnership K-1 instructions. I'm trying to remember exactly what that says, but it says something different than just the accuracy related penalties.
In other words, there are spaces provided and lines provided for making adequate disclosure. What I'm saying here is that the information that was essential to determine the source of the JBJZ losses, and the inflated basis that was used as a basis for calculating those losses, was not disclosed on the 1120S, on the 1065 or on the 1040s. That's what I'm saying here.
Q. Were there any other places that this

Page 206

information may have -- or any other instructions or forms that may have required disclosure of this information?

A. Yes, as I've already mentioned, Schedule D. The instructions to Schedule D required adequate disclosure of how you calculated your basis in assets that you claimed a basis other than your actual costs.

Q. Page 59 carrying over onto Page 60 under paragraph 155, the first bullet point that carries over. Really you're referring to the legal question under 752 in that first bullet point, aren't you?

A. I'm saying that there was no way from looking at the returns, the 1120S or the 1065 to know the transactional related fees had been incurred and paid to E&Y, or the transactional related fees had been incurred and paid to J&G.

I'm also making the observation in connection with that first bullet point that Mr. Zucker and Mr. Boyd double deducted the amount of the fees allocated to them.

MR. WELTY: And I'm getting close to finishing. I'm not going to go through Table 2 today, but I want to get through this, is

Page 207

that right, Dennis?

MR. DONOHUE: Okay.

BY MR. WELTY:

Q. Table 2, or actually you refer to it in Page 60, paragraph 166, column B rows 1 through 23, "Evaluates whether or not the effect of those items on the tax bases that the partners claim to have in their respective partnership interests was disclosed on any of the 1999 returns, or was otherwise ascertainable or reasonably ascertainable from the information provided on or in any of those returns." Do you see that?

A. I do.

Q. Okay. This gets back to some of the questions I was asking earlier about what was required to be disclosed versus what would satisfy your adequate disclosure standard that you referenced earlier. What standard are you using in column B?

A. The standard that I'm using in column B is was that information anywhere on any of the tax returns.

Q. It's not whether it was required to be there?

A. Okay. Was the effect of the item on

Page 208

the taxpayer's basis in the partnership interest disclosed or reasonably ascertainable from any of the 1999 forms. That's what that column does.

It doesn't purport to discuss one way or the other what disclosures were or were not required for what purpose. For understatement of penalty amelioration purposes, or for regular tax reporting purposes or for any other purpose, it simply makes the statement.

The information needed to make that adjustment to figure out what this basis was was not disclosed, or was disclosed and where it was disclosed.

MR. WELTY: Okay. I think we can stop there. We'll get to Table 2 tomorrow, and I sincerely hope that tomorrow goes much faster than today. Having worked through one of these methodically, hopefully will speed the others up.

Now, if possible, Dennis and Dr. LaRue, I can't promise that we'll finish tomorrow, but it would certainly speed things up if Dr. LaRue wanted to review Exhibits 3 through 6 between now and when we reconvene.

And we can convene at a little bit later time, if 9:30 isn't too early, to give you an

Page 209

opportunity to just mark those things that say observation, observation, observation. Or you're just reciting facts as opposed to those that might have some embedded opinion, or have some requirement that wasn't followed, or some other error that you noticed in the returns.

I'm just trying to separate the weak from the chaff, and get away from going back through just simply recitations of information reported on the tax returns or other places. I don't know. That's up to you all. I think it would speed things up, but it's your call.

MR. DONOHUE: Why don't we discuss it.

MR. WELTY: There is no intended trap there, it's truly just to try to speed it up.

THE WITNESS: Can I make a comment?

MR. WELTY: Sure.

MR. DONOHUE: Why don't you make a comment off the record. No question is being asked.

(WHEREUPON, SIGNATURE OF THE WITNESS NOT HAVING BEEN WAIVED, THIS DEPOSITION WAS ADJOURNED, TO BE RECONVENED AUGUST 21, 2007 AT 9:30 A.M.)

INSTRUCTIONS TO THE WITNESS

Read your deposition over carefully. It is your right to read your deposition and make any changes in form or substance. You should assign a reason in the appropriate column on the errata sheet for any change made. After making any change in form or substance which has been noted on the following errata sheet along with the reason for any change, sign your name on the errata sheet and date it. Then sign your deposition at the end of your testimony in the space provided. You are signing it subject to the changes you have made in the errata sheet, which will be attached to the deposition before filing. You must sign in the space provided. The witness need not be a notary public. Any competent adult may witness your signature.

Return the original errata sheet and transcript to the deposing attorney (attorney asking questions) promptly! Court rules require filing within 30 days after you receive the deposition.

Thank you.



ERRATA SHEET

PAGE LINE CHANGE REASON THEREFORE

DATE: DEPONENT SIGNATURE

______________ ______________________________



SIGNATURE PAGE
OF
DAVID W. LaRUE, Ph.D

I hereby acknowledge that I have read the foregoing deposition and that the same is a true and correct transcription of the answers given by me to the questions propounded, except for the changes, if any, noted on the attached errata sheet.

SIGNATURE:

______________________________

WITNESSED BY:

______________________________

DATE: ____________________



CERTIFICATE

I, Texas S. Eckstone, a Professional Reporter and Notary Public hereby certify that the foregoing is a true and accurate transcript of the deposition of said witness who was first duly sworn by Texas S. Eckstone on the date and place hereinbefore set forth.

I FURTHER CERTIFY that I am neither attorney nor counsel for, nor related to or employed by, any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed in this action, nor am I financially interested in this case.

Dated this 28th day of August 2007.

______________________
TEXAS S. ECKSTONE