IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

---

IN RE COBRA TAX
SHELTERS LITIGATION

Cause No.
1:05-ML-9727-JDT-WTL

---

Tuesday, August 21, 2007

Washington, D.C.

Volume II

Deposition of:

David W. LaRue, Ph.D.

Called as a witness by Defendants at the U. S. Department of Justice, 555 4th Street, N.W., Washington, D.C., before Texas S. Eckstone, Professional Reporter/Notary Public, when were present on behalf of the respective parties:

EXHIBIT
tabbles
2

APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:

MEADOWS, OWENS, COLLIER, REED,
COUSINS & BLAU, LLB
BY: M. TODD WELTY, ESQUIRE
901 Main Street, Suite 3700
Dallas, TX 75202
(214) 744-3700

ON BEHALF OF THE DEFENDANT:

U.S. DEPARTMENT OF JUSTICE
TAX DIVISION
BY: DENNIS M. DONOHUE, ESQUIRE
Judiciary Center Building
555 4th Street, NW, Suite 7804
Washington, DC 20001
(202) 307-6492



EXHIBIT INDEX

Marked

11 1999 U.S. Income Tax Form 1120S for JBJZ 38
Investors, Inc.

12 1999 U.S. Income Tax Form 1120S for SA Tesoro 41
Drive Investors, Inc.

13 1999 U.S. Income Tax Form 1120S for Tesoro 41
Drive Investors, Inc.

14 2000 U.S. Income Tax Form 1120S for PSM, 41
Inc., c/o Murphy Family Farms

15 2000 U.S. Income Tax Form 1120S for Murfam, 41
Inc., c/o Murphy Family Farms

16 2000 U.S. Income Tax Form 1120S for Murphy 41
Pork, Inc., c/o Murphy Family Farms



Thereupon,

DAVID W. LaRUE, Ph.D.

called as a witness herein, having been previously duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION

BY MR. WELTY:

Q. Dr. LaRue, could you turn to -- well, I guess as a matter of form, you remember you're still under oath today as yesterday, and this is the continuation of that deposition?

A. Yes.

Q. Okay. Would you turn to Exhibit 1, Page 62, Table 2, and could you look at column A. And in column A, could you tell me what that column represents?

A. Yes, the caption for the columns begins with a question, Disclosure on 1999 Returns, question mark. It's broken down into two columns, A and B. The first was the item disclosed on or ascertainable or reasonably ascertainable from disclosures on any of the 1999 returns.

Q. Okay. Well let's start at the cash contributions which is, I believe row -- well, I don't know what row it is -- column A, cash



contributions. Is that row 1?

A. Row 1.

Q. You say the cash contributions were not disclosed; is that correct?

A. They were not disclosed. The fact that they had been -- the cash contributions had been made to the partnership were not disclosed.

Q. What instruction required them to be disclosed?

A. I don't know that any instruction required them to be disclosed.

Q. Let's go to row 2.

A. Again, we're talking about -- let me once again make it clear. When I answer a question like that, I'm referring to the by line instructions on the forms. I'm not referring to what other disclosures might be required in order for a disclosure to be an adequate disclosure.

Q. An adequate disclosure required by what rule or regulation?

A. Well, to the extent that a disclosure is required by the instructions to line 25, Schedule K-1 of Form 1065, to the extent that a disclosure is required by line -- the instructions to line 23 of Schedule K-1 of the 1120S, to the

Page 6

extent that a disclosure is required by Form 8272 or any other form like that.
Q. 8275?
A. I'm sorry, 8275.
Q. Is that true for all of the items in column A, just that caveat?
A. The caveat actually applies to my answers to all of your questions about this table, all of the answers that I gave yesterday. I tried to make sure that I made that distinction. I made a global distinction early on, and I'm making that distinction again.
Q. Column A, row 2 of Table 2, what instruction required disclosure of the total cash cost of the options?
A. Failure to disclose the cash contribution relates to the adequate disclosure issue. There are no instructions that I'm aware that required that disclosure to necessarily be made on the Form 1065. It may be -- well, let me back up a second.
Schedule L of Form 1065 doesn't address the issue of whether or not a new partnership must disclose an opening balance sheet. I'm aware that many people leave the

Page 7

opening balance sheet blank. The instructions don't stay otherwise. Many people include that information on the first 1065 of a partnership. There are no instructions that specifically address that issue, to the best of my knowledge.
Q. We'll get to Schedule L in more detail in a minute. Let's go to column A, row A-3. What instruction required disclosure of the long option premium -- I guess we just went through that. No, we didn't. Yes, we did. I'm sorry, did we go through that one or not? Let's rephrase that question, how about that?
Column A, row 3, what instruction requires the disclosure there?
A. Those amounts were disclosed on the schedule -- those amounts were disclosed in a calculation of the gains and losses from the termination of the options on the Form 1065, as I have indicated in that column.
Q. You have a note that says description ambiguous. What do you mean?
A. The description refers to these as currency contracts. It doesn't provide any additional detail as to what is meant by a currency contract. Does it mean a currency option? Does it

Page 8

mean a forward contract? Does it mean an option swap? Does it mean actually buying currency and then holding it and selling it later?
It also doesn't -- there is no disclosure as to where those long and short options came from, whether they were, you know, purchased with funds from the partnership or contributed to the partnership with borrowed funds and so forth. I pointed out in my report that the use of the descriptive currency options is ambiguous. Some people may consider that to be an adequate disclosure; other people may not.
Q. Okay. I think it actually is currency contracts.
A. I'm sorry, currency contracts.
Q. Were these, in fact, currency contracts?
A. They were a type of currency contract, yes.
Q. And what rule or instruction required descriptions beyond currency contract?
A. The rules are vague in terms of -- the instructions to the form require a description of the property. Beyond that, they don't specify that in the event that you're selling foreign currency

Page 9

options, you must state currency options or provide specifics as to the details of the options sold, the nature of the currency, the cost of the -- the exchange rates and so forth.
The instructions simply state, to my recollection, is that there must be a description of the property sold. So what is considered to be an adequate description, and what is considered to be an inadequate description, insofar as complying with that instruction is, there are no detailed instructions that say what is and what is not an adequate description of that particular type of asset.
Q. Let's to go the next one column A, row 5, sale of options. You say it was disclosed?
A. It was, yes, sir.
Q. Next, row 6, column A, fair market value of the Cisco stock upon contribution, you say it was not disclosed; is that correct?
A. That's correct.
Q. What instruction required it to be disclosed?
A. The instructions for Schedule L, once again, are -- strike that.
The instructions for -- well, the

Page 10

instructions for Schedule L, the instructions for, I believe it's item F -- on item F, row B, column B, I believe it is. I need to look at the form -- require -- unless question 5 is properly answered no, require a disclosure of contributions that were made to the partnership during the year.

Schedule L requires a disclosure of the beginning balance of the partnership's assets. But, as I've already explained, the instructions don't specifically address in the case of a new partnership, what is necessary to disclose in the first year of a new partnership. And people have differing opinions on that.

Q. Is it reasonable to list zero as the beginning balance on Schedule L?

A. Many people do that. I think it's reasonable to do that in most cases.

Q. Was it in this case?

A. I don't recall.

Q. You don't recall if it was reasonable?

A. I would say that I don't recall if -- well, what I don't recall is whether or not these assets were all received on the first day of the partnership's formation. Well, it was formed in November, but when the partnership began -- I would

Page 11

suggest, I believe, that if you form a partnership and on the same day you receive assets and incur liabilities, that you should disclose the beginning balance.

I don't recall that -- I don't recall the facts, whether or not -- you know, when the partnership is considered to have become a partnership for tax purposes. And relative to that, when these assets were received. What Schedule L does not require is -- are the interim adjustments to these accounts that take place during the year.

Q. Let me ask the question again. Is it reasonable to list a zero as a beginning balance on Schedule L on the first year of a partnership return?

A. Under some circumstances, yes.

Q. Under these circumstances here?

A. Again, I don't recall when these assets were received relative to when the partnership was considered to have begun. If they were received on the same day that the partnership is deemed to have started, then my judgment would be that those balances should be disclosed. If they were interim contributions, Schedule L doesn't

Page 12

require the disclosure of interim balances, just beginning and ending balances.

Q. Column A, row 7, you say the tax basis of the Cisco stock upon contribution was not disclosed; is that correct?

A. That's correct.

Q. What instruction required its disclosure?

A. None that I'm aware of. Again, that goes to the adequacy of disclosures.

Q. Column A, rows 8, 9, 10, and 11. You say the purchase was disclosed?

A. Yes, sir.

Q. Column A, rows 12, 13, 14, and 15. You indicate that the sale of the short-term investments was disclosed?

A. That's correct.

Q. Column A, row 16. You say that the purchase of Canadian dollars was not disclosed?

A. That's correct.

Q. What instruction required the purchase of Canadian dollars to be disclosed?

A. No instruction requires the purchase of Canadian dollars to be disclosed. But Schedule L requires -- those dollars, the Canadian currency

Page 13

was still on hand on the last day of the partnership's tax year. Schedule L requires the disclosure of the ending balances of the assets and liabilities, among other things, on the last day of the partnership's tax year.

So the purchase of the Canadian dollars wasn't required to be disclosed. The balance in that account as of the close of the partnership's tax year would have been shown as an asset on the partnership's Schedule L.

Q. Well, if the partnership terminated and its assets distributed, was there a balance on the last day of the year?

A. We're splitting hairs between nano seconds. At what point in time does a partnership terminate? Because one second before it terminates it has all of these assets and liabilities and account balances. One second after it terminates, it has nothing.

I've seen a textbook that was used in connection -- I believe it was an in-house book written by KPMG that actually addressed this issue. It's the only thing I have found that specifically addresses this issue.

That issue was addressed in that book

by saying that in the event that a partnership terminates, on Schedule L, you should show zero balances, but attach an explanatory statement showing what the balances were then the second before the termination of the partnership, so that that information is disclosed.

Q. Do you have this KPMG book?

A. I don't have it with me, no.

Q. Do you have it in your possession still? Not here today, but do you still have a copy of it?

A. I can get you a copy of that. Would you like it?

Q. Yes.

A. I say KPMG book. I'm not sure of the authors, I believe it was a KPMG book, but I certainly can lay my hands on the book.

Q. Is there an instruction to filling out the tax return forms that discusses this?

A. Yes, there is an instruction that says Schedule L is to show your beginning balance and your ending balance. What the instruction doesn't do is to specifically address how you would go about considering your beginning balance for a newly formed partnership, or how you would consider



your ending balance when you have a termination or liquidation of a partnership. So are there instructions that cover this? Yes. Do they deal specifically with this issue one way or the other? No.

Q. But the only source that you found indicates that you should list zero in the ending balance in Schedule L; isn't that correct?

A. That's not what I said.

Q. What did it say?

A. It said list zero on the ending balance for Schedule L, and attach an explanatory statement as a part of the return that shows the ending balances that would have been -- that the partnership had on the moment before it terminated.

Q. Schedule -- excuse me again. Column A, line 17, tax exempt income. That was disclosed on the returns?

A. Yes, sir.

Q. Column A, row 18, claimed increase and basis for E&Y fees incurred, paid, and deducted individually by Zucker and Boyd. You're saying that was not disclosed on the return; is that correct?



A. That's correct. The E&Y fee was nowhere disclosed on the 1065.

Q. What instruction required it to be disclosed?

A. Expenses of a partnership are disclosed separately from income on Schedule K and on Schedules K-1 for each of the partners. So to the extent that the Ernst & Young fee was a business or investment expense of the partnership, it should have been disclosed.

Q. Was it a business expense of the partnership?

A. I think that's a legal opinion that I didn't express an opinion on.

Q. If it's not an expense of the partnership, should it have been disclosed?

A. Not a business or investment -- 162 or 212. Is that your question?

Q. I think the question was if the E&Y expense is not an expense of the partnership, should it have been disclosed?

A. If it was an expense of the partnership, it should have been disclosed.

Q. If it was not an expense of the partnership, should it have been disclosed?



A No.

Q. What instruction -- again, we're in column A, row 18. What instruction required that the basis increase be disclosed on the return?

A. I need a copy of the return -- of a return, a Schedule K. On Schedule K-1, for example, there is a requirement that contributions made by the partners during the year to the partnership be disclosed. I think it's item F, row C, but I'm not positive.

Q. Just for the record, we're not going to mark it as an exhibit, but you're looking at the Form 1065 for JBJZ; is that correct?

A. That's correct. Actually, I'm looking at item J on Schedule K-1 to Form 1065. That item is described as -- I said F a minute ago, I was wrong. It's J. That item is described or captioned analysis of partner's capital account, column A, capital account at the beginning of the year, B, capital contributed during the year.

In this case, my understanding or my recollection is that the fees were attributed to the partnership by the partners. That the cost of the E&Y fees was a contribution made by the partners to the partnership. As such, that would

Page 18

constitute capital contributed during the year, and that amount should have been disclosed in column B of item J on the Schedule K-1's. That amount would also have been disclosed on Schedule M-2 in an aggregate amount on line 2.
Q. Table 2, column A, row 19, you say the claimed tax basis in the partnership interest was disclosed?
A. It was not disclosed on Form 1065. It was disclosed on the JBJZ Form 1120S in the form of the regulation section 1.351-3b statement that was attached to that return.
Q. Was it required to be disclosed on the partnership return?
A. No.
Q. Was it required to be disclosed anywhere else?
A. Yes.
Q. Where?
A. On the JBJZ reg. Section 1.351-3b statement.
Q. Where it was disclosed?
A. Where it was disclosed, yes.
Q. Column A, row 20, claimed retroactive increase in partnership interest basis for J&G fee

Page 19

paid by JBJZ on December 29, 1999. You say that was not disclosed; is that correct?
A. That's correct.
Q. Where was it required to be disclosed?
A. If the characterization of the J&G fee as a business or investment expense is determined to have been required by the law, then as a business or investment expense it should been disclosed on the 1120S, and it was not.
Q. You qualify that answer with an, if the characterization of the J&G fee has a business of -- is a business or investment expense. Explain your answer, your qualification.
A. My understanding -- there was an expenditure of about -- of, I think it's around -- actually I'm not sure in this case. Oh, I am sure in this case. There was an expenditure of 1.4 million dollars to J&G for services rendered as described in the engagement letter, which I refer to later in this report.
On the form 1120S, that amount was capitalized retroactively to the partnership interests received by the S-corporation, and that partnership interest was allocated to the COBRA assets, which in this case, was the Cisco stock and

Page 20

-- actually two lots of Cisco stock in the Canadian currency. The expenditure was made, the tax treatment of that expenditure, must it be capitalized or must it be treated as expense, is an legal issue.
I didn't examine that legal issue. I didn't opine on that legal issue. I did observe that that issue was not addressed. The proper treatment of those fees was not addressed in either the J&G opinion or in the Brown and Wood opinion.
So the question is a legal question. If those fees were not supposed to have been capitalized because they were not section 263 or otherwise capitalized fees, and if they were deducted as an expense by the S-corporation, they should have been separately disclosed, but they weren't.
Q. If it was proper to capitalize them, what is your answer?
A. If it was proper to capitalize them, then those fees, some of those fees, should have been separately disclosed. Other of those fees would not have been disclosed. And we're talking about requirements, not adequate disclosure issues.
Q. Okay. Which portions of the fees

Page 21

should have been disclosed, if it were properly capitalized.
A. Approximately 40.68 percent of that amount should have been disclosed.
Q. Why?
A. Because that is the portion that was allocated to the Cisco stock. The sale of the Cisco stock produced a long-term capital loss and short-term capital loss. Schedule D -- the instructions to Schedule D to the 1120S required that if you use a tax basis other than your cost, you must disclose how that basis was determined.
To do that, you would have had to disclose the fact that that basis had been increased by among other things, the J&G -- an allocated portion of the J&G fees. Inexplicably, a similar issue presents itself with Form 4797, but the instructions to that form do not specifically require a disclosure of how you calculated your basis if you're not using a cost basis.
So there is an inconsistency in the instructions. The instructions for Schedule D, which covered the sale of the Cisco stock, are unambiguous. The instructions to 4797 don't contain a similar explicit requirement.

Q. So is it the portion that was reported on the 4797 that should not have been disclosed? Is that what you're saying? Because I think you said a portion should have been disclosed on Schedule D, but a portion should not have been; is that right?

A. I didn't say should not have been. I said was not required to have been disclosed, on your assumption that those fees were to have been capitalized. And that's not an assumption that I agree with. It's not an assumption that I opined on. I understand that that's one of the legal issues, I believe, in this case, is how those fees should have been characterized.

Q. Which portion was not required to be disclosed if the fees were properly capitalized?

A. Based on the instructions to Form 4797, the 59.32 percent of the fees that were allocated to the foreign currency were not required by the instructions to 4797, to be separately disclosed or discussed or described. Again, we're talking about the line by line instructions, and not the adequate disclosure issue.

Q. You indicate the cash distributed by JBJZ Partners to JBJZ Investors was not disclosed



in column A, row 21 on Table 2; is that correct?

A. Yes.

Q. What instruction required it to be disclosed?

A. On Form 1065, Schedule M-2, line 6, distributions of cash made to the partners are required to be disclosed if the answer to question 5 in Schedule B is answered -- should have been answered yes.

Item J, analysis of partners account on Schedule K-1, on each of the Schedule K-1s, requires under column D that any withdrawals or distributions made during the year must be disclosed.

Also the opening balance of Schedule L for Form 1120S, the beginning balance would have included the amount of cash that the corporation had in its account in its beginning -- as its beginning balance on its balance sheet. None of these lines or forms disclosed the cash.

Q. Do we have the same issue with the opening balance on Schedule L with the S-corporation that we do with the partnership? That being whether you have to list an opening balance in the first year of an S-corporation?



A. I could never find instructions that spoke directly to that issue. The instructions say that Schedule L is to be used to show your opening balance. In this case, because this was a 351 transaction, and because the -- based on the 351 statement, the corporation issued stock at the same moment that it received those assets.

To my mind, that means that it had an opening balance as of the beginning of its existence that included whatever assets were in the partnership at the time of the partnership's termination. In my opinion, that schedule -- the beginning balance of Schedule 1120S, should have shown the information required -- otherwise required by that statement.

Q. What instruction conforms with your opinion?

A. Well, the instruction that conforms with my opinion is that the instructions to Schedule L require the disclosure of your beginning balance. The corporation's beginning balance when it received these assets at the same time that it issued its stock to its shareholder, its beginning balance would have included the Cisco stock, the Canadian currency, and the cash received.



Q. Do the instructions discuss opening balances in the first year of operation of an S-corporation in the context of a 351 exchange?

A. I didn't say that. The instructions require that you disclose the opening balance of the corporation as of the beginning of its tax year.

Q. And that's the sum total of the instructions essentially; isn't it?

A. The instructions don't specifically deal with a situation where you receive assets and issue stock on the same day. Why they don't, I don't -- they don't specifically address that issue. It seems to me that it is self-evident that, you know, your beginning balance sheet -- on your beginning balance sheet when you're issuing stock and receiving assets at the formation of an S-corporation, your beginning balance sheet is whatever you received in that transaction.

Q. Is it reasonable to list zero on the opening balance of Schedule L for an S-corporation in its first year of operation, when there was a 351 exchange contributing assets in return for stock?

A. That's not my interpretation of the

Page 26

instructions or the facts and circumstances.
Q. So that's a no?
A. I don't think it's reasonable, no.
Q. Does that comply with return preparation standards to list a zero in the opening balance of Schedule L?
A. That's hard to say. I've never seen a survey or any empirical data that would suggest that some people do or some people don't.
Q. Do you have experience reviewing hundreds, if not thousands, of tax returns that might have this issue?
A. I don't have experience reviewing hundreds of thousands of returns that address this issue, no.
Q. Hundreds or thousands?
A. Hundreds or thousands.
Q. Again, on Table 2, column A, row 23, you say the aggregate tax basis claimed by JBJZ in Cisco stock in the Canadian currency as of date of sale was disclosed; is that correct?
A. That's correct.
Q. You note that it was disclosed on the 1120S; correct?
A. That's correct.

Page 27

Q. Was it required to be disclosed anywhere else?
A. Well, as I've already indicated, the book value of those assets, in my opinion, should have been disclosed on Schedule L. In my opinion, the closing balance sheet of a partnership or an attached statement listing the assets that existed at the moment that the partnership was terminated, should have been included with the Form 1065. Neither of those -- that information simply wasn't provided.
Q. Are you talking about the Schedule L on the partnership return or on the S-corporation return?
A. Both. On the partnership return, I'm referring to the closing balance sheet. On the S-corporation return, I'm referring to the opening balance sheet.
Q. Well, I think actually with the partnership return, you indicated that the only instruction that you could find was this internal KPMG document that says the ending balance of Schedule L should be zero; correct?
A. I didn't say that. I said that the amounts shown on Schedule L should be -- they

Page 28

recommend -- the authors recommend that those amounts should be zero, with an explanatory statement showing what those ending balances were the moment of termination.
Q. Do you have any basis for knowing whether that's generally accepted return preparation standards or not?
A. The only discussion that I've ever seen that deals with that issue is in the -- again, it may have been a different book, and I'll get a copy of that for you. But in that KPMG book, that's the only place that I've seen this issue discussed.
Q. But it's clear that the IRS instructions don't discuss it?
A. The IRS instructions don't discuss it beyond saying that you're required on Schedule L to show your closing balance.
Q. But you've seen one accounting firm's internal guidance as to how they recommend to handle it; is that correct?
A. Actually, I don't think it was internal guidance. I think it was a book written by KPMG. I don't think it was exclusive to KPMG. But that is the only source that I saw that

Page 29

addresses that issue, that's correct.
Q. Okay. Let's move to column B, Table 2. Can you tell us what this column relates to?
A. Yes. Once again, this relates to the disclosures that were made on the 1999 returns. And the caption for column B was the effect of this item on the partners' tax basis in the partnership interest, or in JBJZ'S tax basis in the Cisco stock, and the Canadian currency disclosed on or reasonably ascertainable from any of the 1999 returns.
Q. Okay. I'm just trying to get a feel for the distinction between column B and column A. Can you me help me with a distinction?
A. Column B goes directly to one of the charges and one of the objectives of my report, and that is whether or not the source of the JBJZ losses was ascertainable or reasonably ascertainable from the information provided on any one of the three sets of returns, or on all of those returns collectively.
And in my opinion, the information necessary to determine that the JBJZ losses, number one, included the legal fees, and number two, included huge amounts of non-economic artificial

losses. That information was not disclosed anywhere on any of the returns, and could not have been devined from an analysis of all the returns sitting side by side together. And this column is responsive to that opinion.

Q. And that opinion relates to the adequate disclosure question, isn't that right?

A. For the most part, it relates to the adequate disclosure question, but not exclusively. Once again, Schedule D required that the basis used to calculate the loss associated with the Cisco stock sales be described in a statement with the return. That description would have basically had to outline the various steps of the COBRA transaction, to explain how the corporation came to the basis that it was using to calculate its gain or loss.

So insofar as the COBRA losses in any of these cases that were capital losses reported on Schedule D, there was a requirement that the manner in which the basis used to generate those losses had been determined must be included in a statement attached to the return, attached to Schedule D in the return.

Q. Okay. Would those requirements that



you were just talking about be the ones that we just went through with column A? If there was a requirement for something that was not met, would it have been listed in Schedule A in the discussion we just had?

A. Schedule -- and what I did not do in this table was clearly to mark what was a required disclosure, and what was not a required disclosure. There is no column that does that. This table focuses on the adequacy of the disclosures as I just mentioned. However, that was the focus of this table.

However, in my discussion, I take the information from this table and explain, for example, that Schedule D requires a full explanation of how you calculated your tax basis in computing the capital losses shown -- capital losses or capital gains, in this case capital losses, shown on Schedule D.

So to that extent, insofar as the losses relating to -- claimed from the sale of the Cisco stock, all of this information should have been disclosed.

Q. Okay. I understand your qualification with regard to Schedule D, so other than Schedule



D, in column B of Table 2, what else was required to be disclosed that wasn't?

A. Once again, this -- I mean these items are -- I mean column B -- I don't know how to answer that. Column B deals with the same exact items that you see under the description tab. So we're talking about the same exact items. And we just went through in column A, where Schedule L, where Schedule M-l or rather M-2, where Schedule D and so forth required disclosures and where those disclosures were not required.

Q. Okay. That's where I'm trying to get. To the extent disclosures or something was required but not furnished, we covered that in column A; is that essentially correct?

A. Required but not furnished. Well, we also covered in column A disclosures that were required and that were furnished.

Q. Okay.

A. As you'll notice in row 3 of column B -- or row 3 of column A and B, there were some items that were disclosed, but they were disclosed in such a way that they did not provide any indication that that phenomenon, or that event or that item would ultimately give rise to the claimed



COBRA losses in this case.

For example, row 3, the total long option premium charged was disclosed in a separate statement on the partnership return. What was not disclosed, however, was the effect of the long option premium and the short option premium, how that created the claimed basis in the partnership asset that ultimately spilled over to the S-corporation and was used by the S-corporation in calculating its COBRA losses.

So even where there were disclosures, column B observes that those disclosures were not sufficient to reveal the fact -- the effect of these items on the calculation of the COBRA losses. Or the fact that the legal fees had been buried in the losses, or the fact that those losses were non-economic, artificial losses.

Q. So just by taking the example you just mentioned, row 3, column B, in column A, you note that the amount was disclosed. In column B, you're saying that disclosure was not sufficient for the purpose that you listed in the heading. But you're not saying there was a further requirement to disclose?

A. What I'm saying here is that even

Page 34

though those amounts were disclosed, there is no way from the information provided on the return, that anyone reviewing that return would have known that those events or those transactions, or those disclosed amounts would ultimately evolve into the COBRA losses.
Q. But you're not saying that additional disclosure was required except maybe on Schedule D?
A. Well, there is no maybe about Schedule D. It was required on Schedule D.
Q. All right. Let's move on to Page 78 of Exhibit 1, paragraph 182.
In this paragraph and elsewhere, you note that under generally accepted accounting principals or GAAP, G-A-A-P, certain things would have been disclosed; is that correct?
A. That's correct.
Q. Does GAAP apply here?
A. GAAP as GAAP -- GAAP includes a number of accounting principals and practices. GAAP as GAAP does not apply in the context -- in the context of requiring that either taxpayers' books and records must be kept under GAAP. It does not also apply in the context that Schedule L must be reported in accordance with GAAP, or that Schedule

Page 35

M-1 must be reported in conformity with GAAP.
Q. So there is no requirement or instructions in either Form 1065 or 1120S or Schedule L or M to report using GAAP?
A. Unless you're using GAAP in keeping your regular books and records.
Q. Were the taxpayers here using GAAP to keep their regular books and records?
A. Two comments: First, I don't know that I've ever seen any books and records, other than the tax returns and the spreadsheets for the tax returns. I don't know that they really kept books and records in the normal sense.
But, secondly, no, they did not use GAAP -- for tax purposes they did not use GAAP. They selected the cash method accounting.
Q. Isn't it normal and customary for closely held businesses to keep their books and records on a tax basis rather than GAAP?
A. Normal and customary, I'm not so sure. I would say it's very common for small businesses to keep their books and records using the cash method, and to use the cash method for reporting -- for calculating and reporting the taxable income.

Page 36

Q. Well, would that apply to the entities that we have here? Would it be very common for entities such as those involved in the cases that you've issued opinions on, which are Exhibits 1, 3, and 6, not to use GAAP?
A. Yes. Just to be clear, Schedule L does not require cash method taxpayers to use GAAP in preparing Schedule L or Schedule M-1.
However, in 30 years of experience in the accounting area, I have never seen anything that would condone, or suggest or imply that recording an asset under the cash method of accounting, or under any method of accounting -- recording an asset that has a value of, let's say, one million dollars, recording that on a balance sheet at a sixty million dollar amount. That's clearly impermissible under GAAP.
And there are no definitive, authoritative standards that apply to cash method taxpayers outside of the tax law. But in all of the textbooks and all of the teaching, and all of the in-house training materials, in everything that I've ever looked at in the last 30 years of my career, I have never seen anything that would permit or suggest it would be proper to record an

Page 37

asset worth one million dollars as having a book value of sixty million dollars. And that's basically what was done by these cash method taxpayers.
Q. Explain that. Are you valuing these assets?
A. Am I valuing these assets? What do you mean?
Q. Well, you said they had a value of a million dollars, and they were booked as a sixty million-dollar value. Where was that?
A. I didn't say they were booked at the sixty million-dollar value. I said they were booked -- they were effectively recorded on the books of the S-corporation at the amount of the claimed basis that the partners had in the contributed partnership interests, increased by the J&G fees. That has nothing to do with value, nothing to do with value.
Now, the value of these assets is evident from the fact that they were sold within a day or two after having been received from the S-corporation, and the amount for which they were sold is reflected on the tax returns.
Q. Where on the tax returns are you

suggesting that this booking occurred? Are you just saying that they claimed a basis in the assets that was a result of the increase in basis under 752, and that that basis is inflated? Is that what you're saying?
A. The reporting on Schedule L and on Schedule M-1 reflects a book accounting treatment showing the sixty -- maybe I should get the specific numbers if I can find those. Do you have your 1120S?
Q. I just might.
A. Actually, I've got these numbers in my report.
Q. Well, why don't we just turn to the 1120S.
A. All right.
Q. Please point out a specific line item where this booking occurred.
MR. DONOHUE: Before we do that, don't you think it should be marked as an exhibit?
MR. WELTY: We can mark it as an exhibit. That's fine.
(DOCUMENT MARKED PLAINTIFF, LaRUE DEPOSITION, EXH. NO. 11, FOR IDENTIFICATION.)
BY MR. WELTY:



Q. Dr. LaRue, would you please point out the specific line and item where this booking occurred on Exhibit 11?
A. Yes. As I've already indicated, the beginning balance on Schedule L was not completed. Had it been completed, it would have shown the cash received from the partnership, the Cisco stock, the two lots of Cisco stock received from the partnership, and the currency, Canadian currency received from the partnership as assets on the balance sheet. And the amount of those assets would also have been reflected in the capital accounts of the corporation. This wasn't -- this sheet was not completed.
The fact that these were treated on Schedule L and on Schedule M-1 based on the highly inflated basis that the partners claimed in their partnership, plus the amount of the J&G fees is reflected in two places.
First of all, it's reflected in the capital stock accounts. Capital stock on line 22, column D, shows one hundred dollars. Additional paid-in capital reflects $52,970,625.
Moving on to book income on Schedule M-1, the amount shown on that line is $49,644,114.



There is no adjustment to convert book income to taxable income on that line. That forty-nine million dollar amount on Schedule M-1, line 1 of schedule M-1, reflects the difference between the selling price of the Canadian currency, and the two lots of bonds, and the highly inflated basis, plus the J&G fees that had been capitalized to that basis. And that's where you got the forty-nine million dollar amount.
So the only way that you could have gotten that amount, was to record the receipt of the Cisco stock and the Canadian currency at the partnership's -- at the partner's basis in the partnership interests increased by the amount of the J&G fees, and then minus the sales price of those three assets.
Also on line 23, the capital account, the amounts contributed by the partners -- the assets in the partnership at the time of its liquidation, included cash, the Cisco stock, two lots of Cisco stock, and the Canadian currency.
In my report, I think I showed the sum of all of those amounts is about 3.2 million dollars. However, that fifty-two million, nine hundred and seven dollar amount reflects recording



on their books those three assets at the claimed basis that the partners had in their partnership interests at the time the partnership interests were contributed to the S-corporation increased by the J&G fees. Those calculations I made and disclosed in the tables, and in the text of my report.
MR. WELTY: Would you mark these as exhibits as well?
(DOCUMENT MARKED PLAINTIFF, LaRUE DEPOSITION, EXH. NOS. 12 through 16, FOR IDENTIFICATION.)
(WHEREUPON A RECESS WAS TAKEN.)
BY MR. WELTY:
Q. Dr. LaRue, did you complete your answer with respect to Exhibit 11 and the implicit booking?
A. There is nothing implicit about how this -- how these assets were booked.
Q. And would you please look at Exhibit 12, which is the Form 1120S for 1999 for SA Tesoro Investors Drive, Inc. Would you look at Schedule M and L, and tell me whether the same issue holds true there that you described in Exhibit 11?
A. (WITNESS EXAMINING DOCUMENT.)

Yes, it does.
Q. Would you look at Exhibit 13, and tell me whether the same holds true there?
A. (WITNESS EXAMINING DOCUMENT.)
Yes.
Q. For the record, can you identify Exhibit 13?
A. Exhibit 13 is the 1999 Form 1120S of Tesoro Drive Investors, Incorporated.
Q. Would you take a look at Exhibit 14, and identify it for the record?
A. This is an unsigned return, Form 1120S for 2000, of PSM, Incorporated, care of Murphy Farms -- Murphy Family Farms.
Q. Does the same issue hold true for Exhibit 14 as described in Exhibit 11?
A. (WITNESS EXAMINING DOCUMENT.)
Yes, the difference being that for the beginning balance of Schedule L, this actually has the word "none" appearing in the columns instead of the columns being blank.
Q. Would you look at Exhibit 15 and identify that for the record?
A. This is an unsigned 2000 Form 1120S of Murfam, Incorporated, care of Murphy Family Farms.



Q. Does this Exhibit 15 -- strike that.
Does the same issue hold true for Exhibit 15 as described in Exhibit 11?
A. Yes.
Q. Would you look at Exhibit 16 and identify it for the record?
A. This is an unsigned Form, 1120S for taxable year 2000 of Murphy Pork, Incorporated.
Q. Does the same issue hold true for Exhibit 16 as in Exhibit 11?
A. Yes.
Q. Would you look at Page 83 of Exhibit 1? Under paragraph 188, you note that the Social Security numbers for Mr. Zucker and Boyd were incorrect on the Schedule K-1.
A. I do.
Q. What is your understanding of that?
A. I have no understanding of that. I observed that those numbers are incorrect on the Schedule K-1's and that they were also, I believe, incorrect on the SS4's.
Q. Is it your opinion that that was intentional?
A. I didn't express an opinion one way or the other. It could have been intentional. It



could have been accidental.
Q. You're merely observing that that is, in fact, the case?
A. I'm observing the fact that with respect to both of the two participants in the JBJZ COBRA transaction, the identification numbers on Schedule K-1 and on SS4 were incorrect.
Q. What impact, if any, would that have on the likelihood of the returns being audited?
A. I don't know. I suppose it would have made it more difficult to trace the one form to another.
Q. Would you look at Page 89 of Exhibit 1?
A. Yes.
Q. Never mind. I think we covered that amply.
Would you look at Page 96?
A. I'm there.
Q. At the top you note that a Form 8271 was not attached to the returns.
A. I do.
Q. Was it required?
A. I don't know.
Q. You're simply noting that it was not?



A. That's correct.
Q. In fact, one of the opinions from Brown and Wood opined that effectively that that is not required; didn't it?
A. I don't think the Brown and Wood opinion addressed this particular form. I believe the Brown and Wood opinion spoke to the issue of whether or not, for some purposes under a particular provision of the Internal Revenue Code, this entity would be considered to be a tax shelter requiring registration. I noted that in my report, but I didn't investigate that or opine one way or the other as to whether or not I thought that that statement or conclusion was correct.
Q. Would you turn to Page 99 of Exhibit 1, Roman Numeral 7? You have a heading entitled Communications Relating to Disclosures of the Transactions. Do you see that?
A. I do.
Q. Which of these communications was with the taxpayers?
A. I don't believe any of them were, but let me check.
(WITNESS EXAMINING DOCUMENT.)
I can only answer this question

Page 46

preliminarily. It's my recollection that the cc list, the distribution list on these e-mails, was to Ernst & Young personnel. Some of those Ernst & Young personnel may have been the E&Y partners or managers, or staff people who were involved in the preparation of the individual 1040's of some of the participants in these various transactions.

Without seeing the cc list -- and being able to identify all the parties to whom these e-mails were sent, I can't speak definitively. But I will say that it was my recollection that it was my impression at the time that these were internal with respect to Ernst & Young.

Q. Isn't it true that the only e-mail that you cite in either your initial or rebuttal reports that indicates that there is a communication directly with the clients, is the May 8th, 2000, e-mail on Page 100 of Exhibit 1?

A. I don't recall who Thomas Dougherty is. Are you suggesting that he's not with Ernst & Young?

Q. No. Isn't it true that the only e-mail cited in your initial rebuttal reports, that on its face indicates that it may have been

Page 47

communicated to the taxpayers in this case, is Exhibit -- or is on Page 100 of Exhibit 1, and that is the May 8, 2000, e-mail from Thomas Dougherty to three EY tax people?

A. Oh, I see. I was looking at the name and not the content.

Yes, this e-mail indicates that this message was communicated to some or all of the clients of Ernst & Young in connection with this transaction. It is not true, however, I believe in my COBRA -- in my Carmel rebuttal, I cited deposition testimony that indicated that Ernst & Young had made an additional communication regarding the J&G legal opinion to the individuals involved in the Carmel case.

Q. Okay. We're not here to talk about Carmel. That's different clients, none of ours.

A. I understand.

Q. But with respect to the taxpayers involved in Exhibits 1, 6, and 3, isn't it true that the May 8, 2000, e-mail is the only one that on its face indicates it was communicated to clients?

A. Oh, I can't say that that's the only -- that these are the only e-mails in that

Page 48

database. I will say these are the only ones that I located and included in my report. I can't say that -- I don't recall that I made a concerted effort to try to determine whether or not, and to what extent, there were direct communications between E&Y and their clients insofar as e-mail records or other correspondence, beyond the engagement letters and some of the obvious things.

So these are the only ones that I recall ever having seen. But, again, my analysis and review of the millions of documents in that record was not complete.

Q. Let's move to Exhibit No. 3, which is your expert report in the Tesoro cases. And please turn to Page 87, which is Table 2, and let's focus on column A and B. Are the headings here in Table 2 the same as the headings in, I believe, Table 2 of Exhibit 1?

A. They are. I believe they're either identical or very similar.

Q. Is your usage of those the same as in Table 2 of Exhibit 1?

A. I believe so.

Q. Starting with column A, row 1, you note that the cash contributions were not

Page 49

disclosed. Do you see that?

A. I do.

Q. What instruction required that they be disclosed?

A. My answer is the same as it was in the Buckingham case.

Q. Which is?

A. Well, we talked about disclosing that on Schedule K-1, on the Schedule K-1 to the partnership return, and also to the S-corporation return when the cash was contributed over to the S-corporation.

Q. So your answer is -- I'm not trying to rehash all of this and then go back and compare answers, but your answer here is the same as in Exhibit 1, Table 2; is that right?

A. If it's the same table number. I don't recall if it's the same table number, but the table that we just discussed, yes.

Q. Okay. Well, let's look at Table 2, Exhibit 1. Do you have the page number?

A. Oh, I'm sorry, it's 62.

Q. While we're at it, why don't we just pull out Exhibit No. 6, and I believe it's Table 7 on Page 94, Table 8 on Page 95, and Table 9 on Page

Page 50

96, and do this efficiently. I believe there is another table in Exhibit 3 as well.
A. I don't think there was another table in Exhibit 3. JBJZ had one set of entities, Tesoro had two sets of entities, and Murfam had three sets of entities.
Q. So I think -- let's look at Table 2 and 3 also of Exhibit No. 3, which are the same tables for Tesoro Drive; is that correct?
A. That's correct.
Q. So there is Table 2 in Exhibit 1, Tables 2 and 3 in Exhibit 3, and Tables 7, 8, and 9 in Exhibit 6. Those are the similar tables. I think I've got that correct.
Okay. For column A-1 on Tables 2 and 3 of Exhibit 3, and Tables 7, 8 and 9 for Exhibit 6, is your answer the same as given for Table 2 of Exhibit 1 as to the requirements?
A. It is.
Q. Does the same hold true for A-2, Table 2 and 3 of Exhibit 3, and Table 7, 8, and 9 of Exhibit 6?
A. It does.
Q. Is the same true for table -- or actually column A-3?

Page 51

A. Yes, sir.
Q. For Tables 2 and 3 of Exhibit 3, and 7, 8, and 9 of Exhibit 6?
A. Yes, sir.
Q. Just trying to speed it up, guys, and not re-cover the same ground.
Does the same hold true for column A, row 3, for Table 2 and 3 of Exhibit 3, and Table 7, 8, and 9 of Exhibit 6?
A. Did you say row 3?
Q. Yes.
A. Yes, sir.
Q. Is the same true for column A of Tables 2 and 3 and Tables 7, 8, and 9 of Exhibit 6?
A. Yes.
Q. Is the same true for column A, row 5 of Table 2 and 3 of Exhibit 3 and column A-5 of Table 7, 8, and 9 of Exhibit 6?
A. Yes.
Q. Is the same true for Table 2 and 3 of Exhibit 3 and Tables 7, 8, and 9 of Exhibit 6?
A. What row?
Q. I'm sorry, row 6.
A. No, my answer is not the same, simply because from row 5 on down, the different specific

Page 52

variations in the facts between these cases, those rows as numbered are dealing with different phenomena.
Q. Okay.
A. They're similar phenomena but, for example, in the JBJZ case rows -- I mean, for example, rows 8 through 15 deal with investments made by the partnership, and different investments were made actually in Tesoro. They didn't make those kinds of investments. They made investments in tax-exempt income. That's reflected in row 9 of Table 3 of whatever Exhibit the Tesoro case is.
Q. Can we just break them out? We'll just break them out and go separately now.
A. We can do that, but I would say that my answers are -- for the same phenomenon, my answers are going to be the same for all of these tables. I don't recall that there were significant differences, perhaps one difference is the -- see, I've got Carmel going on in my head too.
Q. Just for the record, you're comparing the -- looking at the individual tables to see if your answers for the same phenomenon would differ, or if there is something unique about the case that would change your answer from --

Page 53

A. I don't think my answers differ. I was looking to see if the underlying facts were significantly different from one case to the other. I've noticed here that I've addressed the treatment -- I believe the Carmel case was the only case where the partnership actually paid the E&Y fee.
Q. Okay.
A. And in the Murphy cases, it wasn't J&G, it was Proskauer & Rose. But the treatment of those fees, I believe, was the same. So I believe, for all of the issues that we discussed in JBJZ Buckingham, my answer is going to be identical with respect to all of these tables. And of course, all of these tables are fully explained in the text of my report.
Q. Okay. And just so you know I'm not laying in wait on you. Was there a difference in the 351 statements in the Murphy cases versus the other cases?
A. Yes, thank you. Yes, there was.
Q. What was that?
A. Well, in the JBJZ Buckingham case, a 351 statement was provided, and let me be more specific, the reg. section 1.351-3b statement was

Page 54

attached to the S-corporation's return.
My recollection is that that is all -- may I look?
Q. Yes.
A. In the Murphy cases, all three of the Murphy entities, there was no such statement filed with the S-corporation's return. However, I did find in the record that a section 351-3b statement had been prepared for PSM, but had not been included with the return that I examined.
Q. Did you examine the filed return?
A. If I had it available to me, I did. I believe I examined the filed return, but I'm not, I can't -- the return that I examined is the return for which I disclosed Bates numbers in that report.
Q. With respect to column B, Tables 2 and 3 in Exhibit 3 and Tables 7, 8, and 9 in Exhibit 6, are your answers the same there as they were in column B, Table 2 of Exhibit 1?
A. They are, except for where the facts are different. And thank you for pointing out that there was a difference in terms of which of the entities filed the reg. Section 1.351-3b statement. Murphy did not. I believe the Tesoro entities did. I know that I recall from our

Page 55

previous discussion today that JBJZ did. I don't believe Carmel did.
Q. Okay. Would you take a look at Exhibits 2, 4, and 7. Just for the record, these are the rebuttal reports of Gary Songy in JZ Buckingham, Tesoro, and the Murphy-related cases respectively.
Dr. LaRue, have you had the opportunity to review the rebuttal reports of Dr. Songy, the Exhibits 2, 4, and 7?
A. I've read them.
Q. And do you dispute that Mr. Songy has vastly more experience in the IRS examination function than you do?
A. Within the Internal Revenue Service? I've never worked for the Internal Revenue Service.
Q. Well, how many examinations have you handled in private practice?
A. Oh...I've reviewed hundreds of thousands of pages of documents and tax returns in connection with the forensic analyses that I've done in connection with expert witness engagements.
Q. Well, I'm actually talking about representing taxpayers in examinations before the

Page 56

IRS?
A. No.
Q. Never represent anybody there?
A. No.
Q. Let's look at the executive summary on Page 4, which I believe is --
MR. DONOHUE: Of Exhibit 2?
BY MR. WELTY:
Q. -- of Exhibit 2, yes. Do you disagree with -- well, let's actually look at Exhibits 4 on Page 4, and Exhibit 7 on Page 4 as well. The executive summary paragraph numbered 1.
Do you disagree with Mr. Songy on any aspect of paragraph one of his executive summary on Page 4 of Exhibits 2, 4, and 7?
A. I'm going to have to take a minute to read it.
Q. Okay.
A. (WITNESS EXAMINING DOCUMENT.)
I don't agree.
Q. Okay. What don't you agree with?
A. Where do I start?
Q. The beginning.
A. All right. The returns as filed should have been and were, in fact, audited by the

Page 57

Internal Revenue Service. He's not referring to -- he's not breaking this down in terms of what return he's talking about.
Is he talking about the partnership return? Is he talking about the 1120S? Is he talking about which of the Form 1040s for which of the taxpayers? So is he referring to all of these returns or just some of them should have been and were, in fact, audited by the Internal Revenue Service.
He later talks throughout his report -- he discusses the significance of discourse. His discussion of discourse does not comport with, in some instances -- in some important instances, with my understanding of the significance of the discourse, or with the GAO report that discusses that issue.
Q. In what way?
A. Well, I mean -- do you want me to point to something specific, or can I just make a general comment?
Q. No, specifics.
A. It's going to take some time. I'm going to have to dig through this report and find where he says what I recall him having said.

Page 58

Q. Okay.
A. Do you want me to go on here?
Q. Let's go ahead and talk about the discourse, and we'll come back to the paragraph one.
A. (WITNESS EXAMINING DOCUMENT.)
Page 3, third paragraph that begins at the outset. It says here tax returns are generally selected for examination based on statistical formulas and scoring models that the IRS has developed as a result of the Taxpayer Compliance Measurement Program Examinations. These scoring models are known as DIF formulas and DIF scores.
Again, without -- not a comprehensive set of comments, but a couple of comments in the GAO report, the periods studied by the GAO indicated that 59 percent of the books and records' audits were the result of examinations of returns based on their DIF scores. The other 41 percent was that they be examined -- the books and records' audits of those returns was based on other auditing -- return-selection techniques.
So the DIF scores were used in a significant number -- in a majority of the cases to identify returns that were eventually audited, but

Page 59

not a hundred percent, not even close to that. Forty-one percent was from other sources, and I believe that study dealt with returns selected from 1992 to 1994.
So the use of the term generally, I think, misrepresents things to some extent. It says here tax returns are generally selected for examination based on -- it's my understanding that once a DIF score has been assigned to a tax return, there are multiple review processes where the experience and judgment of experienced auditors within the Internal Revenue Service manually review, leaf through the returns, looking for something that, based on their experience and background, would seem to indicate that the return should be looked at more closely, or whether or not the return should be accepted as filed.
So my understanding is that just because a return has a high DIF score, that may suggest that it's going to be pulled and reviewed by an experienced auditor within the Internal Revenue Service. It does not, however, mean that that return is necessarily going to be audited.
It's my understanding that there are multiple levels of decision-making processes, both

Page 60

at the service center level and the district office level, where the return is manually reviewed by experienced auditors. Where at any point, the return could be accepted as filed, or at any point, a decision could be made to audit the entire return, based on what's disclosed on the return or only a particular issue on that return.
So the scope and the intensity of the audit, for those returns that are ultimately audited, vary substantially from one situation to another.
Q. Is your understanding based on your review of the GAO report this last Saturday, or is it based on what?
A. It's based on my years of experience in reviewing this issue from time to time, in connection with the classes that I teach for the public accounting firms, and my other reading.
Q. What is the source of that information?
A. Over the last 30 years?
Q. Well, generally. Describe the source of that information?
A. Well, basically every -- most, anyway, of the books that are used at universities to teach

Page 61

tax have a chapter devoted to selection of returns for audit, and how audits are done and compliance issues and so forth. There are a lot of other sources for -- that discuss the auditing process, the return selection process.
Certainly, the in-house training materials that I have used over the years, and the hundreds of courses that I have taught to the public accounting firms deal with various aspects of return selection, compliance, disclosure issues.
Q. Are you contending that your review of these sources provides you with more expertise in this area than Mr. Songy has?
A. What I'm doing here is commenting on statements that he has made in his report that I would disagree with. That's what you asked me to do, and that's what I'm doing.
Q. Are you contending that your review of these sources provides you with more expertise in the return selection criteria than Mr. Songy has?
A. Possibly. I don't know the full extent of exactly what he did when he was with the Internal Revenue Service as those -- as that experience relates to the issues that I addressed in my report.

Page 62

Q. Okay. Let's go on. What else about Mr. Songy's DIF score discussion do you disagree with?
A. Well, it's my understanding that these returns -- I don't know this for a fact, but it's my understanding that these returns were not selected for an audit based on the DIF scores.
Q. Well, where did you obtain this understanding?
A. I think it was mentioned to me by Mr. Donohue at some point. It's my understanding that most of the COBRA returns were the results of lists provided in response to a summons of the promoters of this transaction, and not the result of a DIF score.
Q. Go on.
A. He, throughout his report -- my recollection is, that he doesn't make a clear distinction between an examination of a return and an audit of a return. He doesn't define those terms, and he seems to use them differently in different contexts.
For example, in the second paragraph or the last paragraph on Page 3, given the environmental issues inside the IRS during the

Page 63

years that the 1999 tax returns would have been subject to an audit, it is uncertain whether high DIF scores alone would have generated the examination of the returns in this case.
When he says "examination," is he talking about pulling that return and reviewing the return, or is he talking about examining the return in the form of a complete and thorough books and records' audit that uncovers every -- or turns over every stone looking for something in particular. He uses that term "examination," it seems to me, in an ambiguous way throughout his report, and it makes it very difficult to understand exactly what he's saying, and how his comments interface with the opinions that I've expressed in my report.
I guess if I'm just going to go through this line by line, if I look at footnote 3, it says, as discussed later, much of the information that Dr. LaRue notes is not contained in the reports, is actually discouraged from being included, because the IRS is not set up to process the type of additional disclosures that he suggests.
He hasn't told me -- he doesn't say anywhere, that I recall in this report, what he

Page 64

thinks the additional disclosures I am suggesting are, or how voluminous they might be. As I've already indicated, certainly some of the disclosures, the 351 statements that were not included with some of the returns, are required.
The discussion of how you determined your basis in capital assets sold by the S-corporations on Schedule D, that information is additional information that should have been included with the return that was not included with the return.
He doesn't specifically -- he makes -- this is one of a number of really kind of vague and general comments that really doesn't have much teeth in it. He doesn't sit back and say, well, based on Dr. LaRue's report, he would require this information, this information, this information, this information, this information. And that would result in just volumes and volumes in a tax return that's 150,000 pages long. He doesn't specifically say what he's talking about.
As far as I know, I haven't thought about specific pages, how could this information have been disclosed adequately on the 1065, on the 1120S or on the individual tax returns. I suspect,

Page 65

and I'm not holding myself to this, but I suspect that one sheet of paper that says here's the loss that we're deducting, here's how we came up with that basis, here's how we concluded we were entitled to that loss, a couple of paragraphs on a single page -- on a single piece of paper --
Q. A white paper disclosure?
A. White paper disclosure? What do you mean by white paper disclosure?
Q. Go on.
A. It seems to me that -- he's implying that I'm suggesting that there be volumes and volumes of additional information included with the return. I haven't suggested that at all. And he hasn't pointed to anything that would suggest that I've suggested that. He makes really an unsupported statement here, and I disagree with that.
Q. Let me ask you this. Are 351 statements processed by the IRS?
A. Define processed.
Q. Used in audit selection.
A. I would think that they would be.
Q. Based on what?
A. Well, based on the fact that if

Page 66

they're included with a tax return, and if that tax return is examined at the service center level or at the district office level, someone examining that return is going to flip through -- presumably is going to flip through all of the pages. They're going to look for something, that in their judgment and experience, is going to make it -- is going to help them determine whether or not there are issues apparent, or that may be on that return that need to be examined further.

If the 351 statement is included with the return, and the return is examined along with the 351 statement manually by an experienced audit professional with the Internal Revenue Service, subject to multiple reviews and multiple examinations, somewhere along the line, it would seem to me, that someone might look at that and find something on that schedule that they might think needs to be followed up on.

There has to be a reason the law requires that that schedule be attached to the return. There has to be a reason for that. Presumably the reason is to provide the Internal Revenue Service with information that they feel may be relevant in selecting a return for audit, or in

Page 67

examining a return that has been already selected for audit.

Q. You say, presumably. You know this or are you speculating?

A. I think it's pretty self-evident. If you have experienced revenue agents whose job it is to look through returns, and use their experience and background and judgment to make a determination as to whether or not to accept that return as filed, or to have it reviewed at another level and/or ultimately audited to some greater or lesser extent, it would make sense me -- to my mind, it is self-evident that while some of these returns and some of the information on those returns is not part of the DIF score, they are part of the documents reviewed by these experienced auditors who use their judgment in deciding what items need to be followed up on, and what items don't need to be followed up on. The 351 statement is required to be included with the S-corporation return. With some of these returns, it was. With others, it wasn't.

Q. Just so the record is clear, are you saying that inclusion of the 351 statement makes it more or less likely that the return will be

Page 68

audited?

A. I didn't say either way.

Q. Well, what is your opinion?

A. I would suggest that that might depend on what information is disclosed on the return -- on the statement.

Q. What if the 351 statements were included here?

A. Alright. Ask me your question again, because I don't believe I understood.

Q. Do the 351 statements attached to the returns in the JBJZ case and the Tesoro cases, make it more or less likely that returns will be audited?

A. That depends on the background and the experience of the person reviewing them.

Q. Do you have an opinion?

A. There are things on the 351 return that might cause someone to pull that return and look at it more carefully.

Q. Let me reask the question. Are you saying that including 351 statements on the JBJZ returns and the Tesoro returns in these cases, makes it more or less likely they would be audited?

A. I think, probably, more likely that

Page 69

they would be audited.

Q. Would the absence of the 351 statements, as in the Murphy-related cases, make it more or less likely that those returns would be audited?

A. I don't know.

Q. Well --

A. I don't know what information would have been disclosed, or how it would have been disclosed if a 351 return had been filed.

Q. I think the question was, would the absence of the 351 statements on the Murphy-related 1120S's make it more or less likely that those returns would be audited?

A. Well, given the -- given the high basis that would have been reported on the 351 returns had they been attached, it might have made it less likely.

Q. Okay. I'm trying to ask it simply, and I'll ask it a third time. Would the absence of the 351 statements on the 1120S's in the Murphy cases make it more or less likely that those returns would be audited?

MR. DONOHUE: Objection. Asked and answered. You may answer.

BY MR. WELTY:
Q. I'm just looking for more likely or less likely.
A. Less likely, probably.
Q. Why do you say probably?
A. Well, because at the end of the day -- I mean, at the end of the day, we're talking about a group of people that are described as experienced auditors who have different backgrounds, different workload requirements, different levels of experience, different priorities, and different amount of time and experience to review a particular return. Different personalities, different dispositions, and so forth.
So it's always difficult to abstract from that, you know, what any particular individual would consider to be important. What we do know is that they're experienced auditors, and there are some things on the return that to an experienced auditor should or might cause some concerns.
Q. Would Mr. Songy fit the definition of one of those experienced auditors that you describe?
A. Yes, he appears to have extensive experience in terms of auditing tax returns.



Q. Okay.
Well, let's continue with your discussion of the DIF scores and your criticism of, I guess, Mr. Songy's discussion of the DIF scores, I guess is where we were.
A. I don't know where you want me to pick up.
Q. Where you left off.
A. I don't understand his -- what he's trying to say. Given the environmental issues inside the Internal Revenue Service during the years that 1999 tax returns would have been subject to audit, it is uncertain whether high DIF scores alone would have generated the examination of the returns in this case.
I thought that he had suggested that the DIF scores on these returns would have been high, and that, therefore, an audit of the -- or examination or audit of these returns was a foregone conclusion. I know I'm putting words in his mouth, but that's my general recollection as to -- kind of -- one of the messages that I thought he was conveying in this report.
Q. Okay.
A. Then he says it has nothing to do with



the adequacy or inadequacy of the return. Again, I don't see how that results to anything. It is the direct result of the Congressional hearings that resulted in statutory changes. Again, I don't see how that has anything to do with my report or rebutting my report.
On Page 4, I've been asked to review the relevant tax returns to determine whether the transactions reported on those returns would have likely triggered an audit by the Internal Revenue Service.
I would remind Mr. Songy that this transaction was divided between three different returns. I don't know if he's suggesting that if you had all three returns together, or whether you were just examining one return at a time. And it's my understanding that at the service center, initially, you're looking at one return. You're looking at that, and then you decide whether to go further and at some point. You might collect some of the other returns related to that Form 1040 or whatever.
But he's not very specific here. He's talking about tax returns. Again, my analysis looked at the disclosures on individual tax



returns; how the transaction was divided between three sets, between the individual returns, the 1065's and the 1120S's. And I looked at the disclosures on those individual returns.
And I also looked at the disclosures on all of the returns as if they were sitting in front of someone all at the same time, in the same place, someone who didn't have a road map as to what to look for. And it was my conclusion that the transaction was divided between these returns, and not disclosed adequately such that someone could figure out from the information provided on the returns how these artificial, non-economic losses came to be.
So he's making general comments here that I don't think are specific enough to address my issues.
Q. Where do you derive your understanding of what the surveyors or classifiers, whatever you want to call them, at the service center look at?
A. It's my understanding that they look at one return, review one return. And if they decide that they need to explore things further, at some point, they go out and select the other returns. I believe he also makes that statement in

Page 74

his report.
Q. Where do you derive that understanding?
A. In his report someplace.
Q. So you're relying on Mr. Songy for that?
A. No, I say that that is my understanding with all of my years experience.
Q. With classifiers and surveyors?
A. In understanding how returns are selected and processed for examination.
Q. And I think earlier you said that was derived from books, articles or something like that?
A. Books, articles, in-house training materials used by KPMG, Ernst & Young, Arthur Anderson, Price Waterhouse, and Deloitte and Touche in training their in-house staff people, managers, seniors, partners in tax return compliance and in the tax law.
Q. All of those internal things talked about what classifiers do?
A. No. I didn't say that. I'm looking back over 30 years of experience, and hundreds of training programs that I have taught or developed

Page 75

with public accounting firms outside of an academic environment, where you are dealing with people who deal with these issues in the real world day in and out.
Q. Did Mr. Songy deal with these issues in the real world day in and day out in his positions with the IRS?
A. Based on his resume, he dealt with some of these issues on a regular basis during significant periods of his career.
Q. Okay. Go on.
A. (WITNESS EXAMINING DOCUMENT.)
The returns as filed, should have been and were, in fact, audited by the Internal Revenue Service. That's an ex-post observation. Yes, they were audited. That's why we're here. But I don't believe -- it's my understanding, I could be wrong, but I believe those returns were selected for an audit based on lists provided to the Internal Revenue Service as a result of a summons, and not on the basis on the DIF scoring that he discusses in his report.
Q. And that's based on things Mr. Donohue has told you?
A. Things that have been discussed, yes.

Page 76

At some point in time throughout the case, I may have seen a document, I may have seen that summons. I don't recall if it's in the database or not.
These returns should have been examined because the entries on these returns were sufficiently descriptive, and presented numerous flags to examiners. Again, when he says "these returns should have been examined and there were numerous flags," is he talking about all of the returns sitting on the same table in front of someone who has the time and the effort and the motivation to review them altogether? Without the benefit of a road map, without the benefit of having any idea, you know, where these losses came from, and work backwards to try to figure out where those losses came from?
And, as far as numerous flags to examiners, it seems to me -- I understand that he examined the returns. Did he also examine the e-mails from Robert Copeland, from Amy Keating, and others that would indicate that there was a lot of concern on the part of Mr. Copeland and other people with Ernst & Young, experienced people?
Mr. Copeland, I believe, also worked

Page 77

with the Internal Revenue Service for a period of time, or at least the chief counsel's office. Here you're dealing with experienced tax professionals at the partner level and at the manager level. And looking at the internal e-mails, there was a great deal of concern expressed by a great number of people about things that might result in flagging the returns.
And taking that and looking -- and taking my evaluation and my detailed examination and analysis of these returns individually and collectively, there were a number of things that were not properly disclosed.
For example, if on Schedule D, how that basis been computed had been adequately disclosed, as required by the instructions, it would have revealed the mechanics of the COBRA strategy. That information wasn't disclosed. Mr. Songy actually, I believe, observed the fact this should have been disclosed and wasn't, and shrugged it off as something that was insignificant. I don't believe that's insignificant.
I believe if that information had been disclosed, it would have detailed the outline of

the COBRA strategy. An examination would have included a review of related returns as a normal part of an audit. He shifted gears here from identifying returns that need to be audited versus returns that somehow have already been selected for an audit after a multiple review process at the service center level -- at the district office level.

After going through all of that, a decision apparently has been made now that we're going to audit this return. And to do that, we now have to go out and pull in all of the other tax returns, or some of the other tax returns, that feed into that Form 1040. So he's kind of shifting gears here. An examination would have included a review of related returns in the normal part of an audit.

Well, in examination, what do you mean examination? Are you talking about an examination in the form of a review, of DIF score returns of whether to accept or whether to move on and have someone else review that, and ultimately have some level of audit being conducted? He doesn't say that. But I believe later he talks about how once a return has been selected for audit, then there is



an effort to pull in, okay, the related returns, the partnership returns where the K-1 results are reported on a 1040 and so forth.

But that -- my understanding based on his report, my understanding based on my understanding, my understanding based on the GAO report, is that is not part of the initial selection process. That the initial reviewers, in making a decision as to whether or not to accept or to consider some level of audit, doesn't involve going out and pulling in all of the related returns to be examined at the same time, in the same place time, by the same people, with the time and the expertise required to do that.

Q. Okay. What else?

MR. DONOHUE: Objection as to form.

THE WITNESS: Page 4, Number 1 under executive summary, I believe now the third or fourth sentence. "Primarily audit selection criteria are based upon transcribed data from the tax returns and DIF scores."

Well, I'm not sure what he means by that. Transcribed data from the tax returns, are those separately evaluated, or are they simply used



in connection with making the DIF score calculation? Do reviewers have two set of data that are provided automatically with the return, or are we talking about just the DIF score? There's one DIF score. He doesn't make that clear.

BY MR. WELTY:

Q. What is your understanding of the process?

A. My understanding is that the transcribed data from the tax return generally goes into the calculation of a DIF score. Once a return is DIF scored, they are, at the service center, prioritized based on those DIF scores. And then the return itself is reviewed by an experienced auditor. Flipping through the pages, looking at particular items, based on their knowledge and experience, might be indicative of an overstatement of income or overstatement of deductions.

Q. What information is transcribed?

A. I don't know.

Q. Do you have a feel for what information is described?

A. I could speculate. If I could guess.

Q. You can speculate.

A. But I don't know. The calculation or



the manner in which DIF scores are determined, to my understanding, is that that is closely guarded information. If people knew how DIF scores were calculated, I think the concern on the part of the Internal Revenue Service would be that people could gain the system. If they knew where the lines were drawn, they could avoid those lines.

My understanding is -- as a matter of fact, I think there is a court case that talks about even under the Freedom of Information Act, you can't compel the Internal Revenue Service to reveal what information they use, how they process that information, and how they come up with the DIF score.

During this period, the entries on the Schedule K-1's were not transcribed, and would not have been used for return selection process.

Q. Do you agree or disagree?

A. I don't agree. The K-1's are filed along with the 1065's. If someone is looking at a 1065, either because of a DIF score or because that return was selected for consideration or manual review by some non-DIF method, someone is going to look at the form. They're going to flip through the form of which a Schedule K-1 is a part, and an

experienced auditor is going to make judgments based on what they see on the returns, including the Schedule K-1's.

Now it may be true that the Schedule K-1's, and the information thereon, were not part or have not been part of the calculation of a DIF score. I don't know. I don't know that he knows, but that's not issue. It's my understanding that returns are not automatically audited just because of their DIF score, that they are manually reviewed. A high DIF score says, pull this out, take some time with it.

If it's got a really high DIF score, take maybe a little more time with it. But flip through all of those forms, see what you see, and see if you see anything that causes you concern. If you really don't, put it in one stack. If you really do, pass it on to the next guy and let them see what they think.

So to suggest that just because the information on a K-1 isn't transcribed, to suggest that has no bearing on whether or not an ultimate decision to audit that return is going to be made, I don't agree with that. I respectively disagree.

Q. Okay.



A. Through published guidance and specific instructions, the Internal Revenue Service establishes a level of disclosure required for reporting transactions on tax returns. As I pointed out, those instructions were not complied with, insofar as among other things, the reporting of how basis was calculated on Schedule D for computing capital gains and losses.

I've also pointed out that it is true that legally, those fees, under the tax laws -- if the legal fees and the accounting fees should not have been capitalized, but should have instead been deducted as current expenses, that information was not disclosed on any of the returns, individually or collectively, except to the extent they were broken out and disclosed in some way by some of the partners -- some of the individuals, as they double deducted those amounts on their personal returns.

The IRS establishes a level of disclosure required for reporting transactions on the tax returns. Mr. Songy ignores the instructions to Schedules K-1 of the 1120S and the 1065 that state -- and I'll just read it. Line 23, Form 1120 says: "Supplemental information required to be reported separately for each shareholder." And



there is a similar instruction on Line 25 of Schedule K-1.

Q. And what was required to be reported that was not?

A. The instructions to this line make reference to adequate disclosure.

Q. Under 6662?

A. Under 6661, under 6662, there is -- I believe in the partnership instructions to Schedule K-1, there is a list of, I believe, 21 or 22 different, separate disclosures, some of them very specific; some of them more general. But the instructions to that Schedule K-1 line and the instructions to Form 8172, recognize that the line by line instructions or in some cases, for some purposes, don't constitute adequate disclosure of a particular item that may result in an understatement of income.

Q. Are you referring to 8275, as opposed to 8272?

A. I'm sorry, I keep saying that. 8275 is the form I am referring to. So the IRS recognizes, and the tax forms recognize and take into account, the possibility that given the wide range of the various kinds of transactions that



people can engage in, that under some circumstances, the line by line instructions and the basic required disclosures according to those lines may not be adequate.

And they instruct the taxpayer, under some circumstances, to provide adequate disclosure, and they provide lines and forms for doing that. I don't believe -- I don't recall, but I don't believe that he addresses that issue anywhere in his report.

Q. Okay.

MR. DONOHUE: Is there a pending question?

BY MR. WELTY:

Q. Is it sufficient to comply with IRS guidelines for disclosure?

A. For what purpose?

Q. For purposes of reporting items on a tax return.

A. That's -- that wasn't my question.

(WHEREUPON A RECESS WAS TAKEN.)

BY MR. WELTY:

Q. Before the break, Dr. LaRue, there was a question pending, and that was, was it sufficient to comply with IRS guidelines for disclosure?

Page 86

A. And my question was, for what purpose?
Q. For purposes of preparing and filing tax returns.
A. IRS guidelines for disclosure include on Schedule K-1, lines 25, 23 – IRS guidelines for disclosure include the information required to be included on Form 8275, and various other forms that require additional disclosures under certain circumstances for various purposes.
And as I've indicated, that information was not provided on the Schedule K-1's. There were no 8275s filed with any of the forms.
Q. Let me reask my question. Is it sufficient to comply with IRS guidelines as to disclosure?
A. I think I've answered that question. I don't know how to answer it any differently.
Q. Yes or no?
A. I can't answer that question yes or no, because you didn't ask the question in such a way that it lends itself to a yes or no answer.
If you're talking about the totality of the instructions provided by the Internal Revenue Service with respect to any and all

Page 87

transactions and disclosures required, that would include 8275, that would include the additional information required on lines 25 and 23 of the K-1's to the – the 1065 and the 1120S.
If you – if you have to fill out those lines and provide that adequate disclosure as that term is described or used in the instructions, then, yes, if you've done that. Then you've provided adequate disclosure, and you've complied with IRS instructions.
Q. If you're not required to file those forms or complete the K-1's, is it sufficient to comply with the IRS guidelines as to disclosure?
A. I don't know how to answer the question any other way than I've answered it. And I would point out again, that these tax returns did not comply with those instructions.
Q. So you won't answer that question?
A. I have answered that question, I believe.
Q. But you won't answer it yes or no?
MR. DONOHUE: Objection. Misstates the witness' answer.
BY MR. WELTY:
Q. Did you answer yes?

Page 88

A. I believe I answered your question as best I can answer your question.
Q. Did you answer yes?
A. I believe I've answered your question as best as I can answer your question.
Q. Did you answer –
A. I did not use the word "yes."
Q. Did you use the word "no"?
A. I did not.
Q. Did the tax returns at issue substantially comply with IRS guidelines?
A. In my opinion, no.
Q. To the extent that those returns did not substantially comply with IRS guidance, in your opinion, would those deficiencies have effected or impacted the return selection process?
A. I believe that the risk of detection and audit, and selection of the returns for consideration to be audited, would have been increased if adequate disclosures had been made on the returns, yes.
Q. If a significant number of taxpayers made the disclosures suggested by your report, would it cripple the IRS's ability to process tax returns?

Page 89

A. I seriously doubt it, but I'd like you to be specific in terms of what disclosures you're suggesting. For example, disclosing the legal fees means putting one additional number on an existing form of the 1165. That's the additional disclosure that would be required to disclose the legal fees. I don't think that would work or create an onerous burden on the Internal Revenue Service in terms of their ability to identify and select and audit returns.
Q. But you criticize the similar disclosure of the E&Y fees using a one-line entry – EY fees in an amount. Didn't you criticize – I'm sorry. Didn't you comment that that was not sufficient disclosure?
A. I believe that discussion had to do with the fact that hundreds of thousands of dollars of E&Y fees had been deducted not once, but twice, in computing the same taxable income by the same taxpayer.
Q. So in the absence of the alleged or apparent double deduction, was the disclosure sufficient?
A. There is nothing alleged or apparent about the double deductions that I've mentioned in

Page 90

my report. Those double deductions were taken.
Q. Absent the double deduction, was the disclosure of the EY fees sufficient?
A. If the E&Y fees -- if a legal determination is made that the E&Y fees should not have been capitalized, then the answer is no. They should have been reported on a separate line and adequately described on whatever the appropriate form would have been. In the Carmel case, that apparently would have been the 1065. In the other cases, that, I believe, would have been the 1120S's.
Q. Okay. Let's go to your rebuttal reports, which are Exhibits 2, 5 and 8. Oh, I'm sorry, just 5 and 8, because you didn't issue a rebuttal report on the J. Z. Buckingham case; did you?
A. No. I have Exhibit 5. I'm still looking for Exhibit 8.
Thank you.
Q. In Exhibits 5 and 8 are your rebuttals to Stuart Smith's initial reports; is that correct?
A. That's correct.
Q. How many tax opinions have you written?

Page 91

A. None.
Q. How many tax opinions have you reviewed through your career?
A. Hundreds.
Q. In what context?
A. In the context of a lot of expert witness work. In the context of reviewing returns that were pro forma -- opinions that were pro forma that went along with some of the transactions that we were discussing. I've reviewed a lot of legal opinions.
Q. Representing clients, you've reviewed tax opinions?
A. Well, in the context of expert witness work, yes.
Q. Oh, but in actually representing clients, have you reviewed tax opinions? Representing say, taxpayers, have you reviewed --
A. Taxpayers who were going to be relying on --
Q. Yes.
A. -- those opinions? Not that I recall.
Q. And have you ever written a tax opinion to a taxpayer?
A. I've already answered that question.

Page 92

The answer is no.
Q. Okay. Turning to your --
A. Let me back up a second. I'm sorry. When you say "tax opinions," I want to make sure that you -- I don't mean to include the opinions that I've expressed in testimony before the Ways and Means Committee or articles that I've written and so forth.
Q. Maybe we should qualify it. What is a tax opinion? Is it a written document?
A. It can be a written document.
Q. Does it have to be?
A. Having an opinion about a tax issue that you convey to someone else, you can do that without writing. I believe you're referring to the written tax opinions.
Q. Looking at Exhibit No. 5. I think one of your general criticisms of Mr. Smith is that he did not review all the internal e-mails that you reviewed; is that correct?
A. I'm trying to see whether I made -- where I made a specific reference to e-mails. I did make a specific reference on Page 2, paragraph 7. It appears that Mr. Smith's review of the documents produced in connection with this case and

Page 93

in connection with the COBRA strategy was extremely limited.
In fact, aside from the items that I've listed at the top of Page 3, Mr. Smith does not make reference to any other document, not that he considered or reviewed or relied upon, in forming his opinions. So I don't -- it doesn't appear that he reviewed -- well, now I don't think he reviewed the tax returns. I don't think he reviewed any of the e-mail correspondence one way or the other. I don't know that he reviewed any depositional testimony.
Again, the comment that I made on the bottom of Page 2 is that his review of the record was extremely limited. In fact, he just looks like -- I believe he just read the opinions themselves, the taxpayers' representation letters, supplemental letters, and the expert witness reports that I've listed on Page 3.
Q. Let's take a step back. What information did the taxpayers in this case have when evaluating whether they could or should rely on the tax opinions in these cases?
A. I haven't explored that issue. I have not explored the issue. I have not opined on that



HG LITIGATION SERVICES
1-888-656-DEPO

issue here or in my report, or any report, as to any aspect of whether or not the taxpayer's reliance on those opinions was warranted.
Having just said that, I do realize that I made a couple of references to Mr. Copeland's testimony and depositional testimony where -- and some other e-mails, where internal E&Y folks indicated that the J&G opinion could not be relied upon, and that they needed to get a different opinion.
Q. Was that communicated to the taxpayers?
A. Which taxpayers?
Q. Well, those taxpayers in these cases that received Jenkens & Gilchrist tax opinions.
A. In the Carmel case, apparently that information was communicated. Whether or not it was communicated to the other taxpayers, I don't -- I don't know. I didn't look for it. I don't recall seeing anything that indicated that it was communicated to the taxpayers. I know that they -- I know that the taxpayers knew they were getting a second opinion. I believe they knew that it was going to cost them a lot less than the J&G opinion.
Q. Let me ask you this. Are you opining



as to whether the taxpayers in the Tersoro cases or the Murphy-related cases acted reasonably and in good faith?
A. No, and I believe I made that point very clear.
Q. Where?
A. I'm sorry, it's paragraph number 5 in this rebuttal report. "I do not examine these authorities or render any legal opinion regarding Mr. Smith's interpretation of them, nor do I opine on the accuracy or completeness of Mr. Smith's legal analyses or on the applicability of the authorities that he sites in this case. Rather, this rebuttal report is generally limited to commenting on Mr. Smith's factual assertions, factual opinions, and factual conclusions in the light of my understanding based on the documents that I reviewed in connection with this case, and the observations, analyses and opinions that I set forth in my opening report.
This rebuttal report presents several specific examples, but I do not mean in any way to suggest these examples are by any means exhaustive, or that I address all of the actual or apparent discrepancies between the factual representations,



and the assumptions that Mr. Smith opines on and the facts and circumstances that I have reviewed in my examination of the documentary record."
Q. Page 8, paragraph 23. Are you saying that some of the representations were not accurate or were misleading?
A. Let me read that. "Beyond the statements and assertions listed above in paragraph 20, Mr. Smith does not identify, discuss or evaluate any of the evidence, or in some cases the lack of documentary evidence, that establishes or suggests that certain of these representations were not accurate, or were misleading or that these representations taken as a whole were not sufficient."
And then I show several examples. For example, Mr. Smith makes no mention of the fact or the implications of the fact that the transactions on which J&G was opining were transactions that had been developed by J&G and E&Y. That the amount of the fee paid to J&G was the percentage of the desired loss, or that the amount of that fee was 1.3 million dollars or three percent of the amount -- fixed amount of the desired loss.
Regarding the business purpose for the



transfer of the options to the partnerships, see also, for example, Jerry Blanchard, where Mr. Blanchard states it appears the taxpayers' investment in the fund will be relatively short lived. The avowed business purpose for the fund is to diversify the taxpayers' foreign currency exposure, and to expand the pool of capital from which the taxpayer may derive its pretax return. query, whether the brevity of the taxpayers investment fund -- in the fund relies an avowed business purpose.
He goes on also -- I mean, just reading in the next paragraph. Mr. Smith does not identify, discuss or evaluate the apparent discrepancies between certain factual representations as stated in the tax opinions, and how these representations were used in formulating and rendering the tax opinions.
For example, according to the B&W tax opinion, the investor represented that the investor believed that the investor had a reasonable opportunity to earn an economic profit. The taxpayer believed that the investor had an opportunity to make an aggregate gross return in excess of the sum of the investor's net

Page 98

investment.
The B&W opinions do not include any objective analysis of that -- of the option transaction, and they don't refer to any objective analysis. Nevertheless, the opinion concludes, based on the representations provided by the investor, it is more likely than not that the transactions will have the requisite business purpose. And there are -- I've noted here, some examples from the record where other people have thought otherwise, that would question whether or not there was that inadequacy of business purpose. These are -- Gerald Blanchard is a partner in the national office of Ernst & Young. He doesn't address any of those issues.
Q. Let me ask you again. Are you saying that some of the representations were not accurate or were misleading?
A. I'm saying that he failed to consider representations that -- I'm sorry, let me start over.
He is -- what I said was that there, and I've cited some of the evidence, that establishes or suggests that certain of these representations were not accurate or were

Page 99

misleading. That's what I've said.
Q. Are you saying -- are you opining that some of the representations were not accurate or were misleading?
A. I am saying what I said in the report.
Q. Is that no or yes?
A. I'm saying what I said in the report.
Beyond the statements and assertions listed in paragraph 20, I'm saying that he does not identify or discuss or evaluate any of the evidence or the lack of documentary evidence that establishes or suggests that certain of these representations were not accurate or were misleading, or that the representations taken as a whole were not sufficiently complete.
My comment is directed to the fact that he ignored and did not address some of the other evidence that would suggest that, you know, that the standards that he laid out for a competent, if that's the right term, tax opinion may not have been satisfied.
Q. Let me try it a third time.
Are you saying that some of the representations were not accurate or were misleading?

Page 100

A. I did not say that in my report. That's not what I said in my report.
Q. With respect to the evidence that you say Mr. Smith did not consider that may impact whether the representations were accurate or misleading, which of those were communicated to the taxpayers?
A. Certainly the J&G fees were communicated. The magnitude and the basis upon which those fees were calculated, was communicated to the taxpayer.
Q. In what -- in what manner?
A. Well, in the PowerPoint presentation, and also they paid those fees. That was part and parcel of the transaction, was the payment of those fees.
Q. Okay. What else?
A. Ernst & Young, the fees paid to Ernst & Young. The fact that Ernst & Young was the marketer and promoter of that transaction. Perhaps the taxpayers knew that J&G was also involved -- but was also involved in the development of that strategy. I don't know. I don't recall one way or the other.
From the PowerPoint presentation, it's

Page 101

my understanding that that was made by Ernest & Young, and I think it even had Ernst & Young's logo on it. So they knew Ernst & Young was involved. They knew Ernst & Young was receiving a large fee. The fee was 1.5 percent or at least the total fee -- I'm trying to remember if the fee was broken down, but the fee was based on the desired loss and that was presented -- oh, that was presented in the PowerPoint presentation. It was -- also E&Y's fee, as 1.5 percent of the desired loss, was in the engagement letter.
Q. Okay. What else?
A. Taxpayers reviewing the PowerPoint presentation would have known that an S-corporation was used and there was no business purpose stated for that S-corporation.
Q. They would know that from reviewing the PowerPoint presentation?
A. The PowerPoint presentation focused on the tax aspects of the transaction, and did not suggest a business purpose for the S-corporation.
Q. Okay. But EY certainly was aware of the issue surrounding the business purpose for the S-corporation; weren't they?
A. Oh, yes. Jerry Blanchard and Terrance

Paris made those issues crystal clear to somebody with E&Y, I believe Mr. Copeland, because they couldn't see a business purpose. They also couldn't see in the legal opinion that there was any reference to an S-corporation.
Q. Do you know whether EY communicated that to the taxpayers?
A. Communicated?
Q. Their concerns about the business purpose for the S-corporation?
A. I don't know other than -- I don't specifically know other than the possibility -- I'm trying to remember who Terrance Perris, an attorney for Squire, Sanders, Dempsey. I don't know if he was representing one of the taxpayers involved in this case and, you know, his queries and the e-mail that I cited here is a response to a question posed to him on behalf of one of the individuals in these three cases. I don't know.
Q. Assume that Terrance -- what is his last name?
A. Terrance Perris.
Q. Perris had nothing to do with any of the transactions in this case, and did not represent any of the taxpayers in this case, what



other evidence are you aware of that EY shared any of its concerns about the business purpose for the S corporations with the taxpayers here?
A. I don't know that E&Y shared those concerns. However, it's my understanding that the individuals involved in this transaction were provided with representation letters in which a representation -- in which various representations were made regarding various aspects of the transaction. So to the extent that E&Y or J&G or Brown and Wood or some combination of all three --
Q. Proskauer?
A. Oh, yes. I'm sorry, Proskauer, provided representation letters for the taxpayers to sign, those representations presumably were reviewed by the taxpayers. And those issues were presumably considered by the taxpayers before they signed the representations.
Q. Do you know whether EY interfaced with all of the law firms on behalf of the taxpayers?
A. I don't know that I understand your question.
Q. Do you know -- did you know that the taxpayers in these cases didn't speak directly to Jenkens & Gilchrist or Proskauer Rose or even Brown



and Wood for that matter, but instead, Ernst & Young spoke to those law firms on their behalf, but never communicated any concerns with the taxpayers executing the representation letters that E&Y presented to those clients?
MR. DONOHUE: Objection as it assumes facts not in evidence. You may answer.
THE WITNESS: There was direct correspondence between J&G and the taxpayers and Brown and Wood.
BY MR. WELTY:
Q. Regarding representations?
A. There was an engagement letter.
Q. Regarding the representations, there were direct discussions or correspondence?
A. There was an engagement letter between J&G and the individual taxpayers. It was a lengthy, I believe, couple of pages engagement letter. I believe there was also an engagement letter between Brown and Wood and the individual taxpayers.
I am trying to recall whether or not the representation letters were provided directly by the law firms to the individual taxpayers for their review and signature. I don't recall. I



believe they were, but I couldn't say for sure. I don't know if those were routed through Ernst & Young or not.
Q. Do you know whether Ernst & Young shared any concerns with the taxpayers about the representations that they were being asked to sign?
A. I don't know one way or the other.
Q. Was it reasonable for my clients in the JBJZ case to rely on Ernst & Young?
A. I didn't express an opinion on that. I haven't reviewed that issue.
Q. Was it reasonable for my clients in the Tesoro cases to rely on Ernst & Young?
A. Again, I haven't opined on that. I haven't fully reviewed all of the various facts and circumstances that would go into rendering an opinion on that.
I will, however, note that the taxpayers knew they were paying a fee to Ernst & Young, who marketed the transaction. That they were paying a huge fee that had nothing to do with time and effort on the part of the people who would be working on that case. They had to have known that Ernst & Young had a vested interest in the strategy and the success of the strategy.

So they knew they were paying a huge fee that was not based on the number of hours and the level of professionalism -- level of professionals who would be working on the returns or analyzing the issues. They were paying a fixed fee of 1.5 percent, and that 1.5 percent was on the amount of the long option.

So, you know -- I mean, that one fact would seem to indicate that reliance on someone who is trying to sell me the transaction, and charging me a huge fee for that transaction, you know, may not be warranted.

Q. Was it reasonable for my clients in the Murphy-related cases to rely on Ernst & Young?

A. Well, my answer is basically the same. Again, I didn't express an opinion on the reasonableness of their reliance. I did, however, observe in all of my reports that Ernst & Young was the marketer of this transaction, the developer of this transaction. They charged a fee that was based on the desired loss that this transaction was expected to produce, and the transaction fee was substantial.

In the Murphy case, the difference between the Murphy case and the other cases, Ernst



& Young's fee was two percent instead of the 1.5 percent that they had charged the other taxpayers when they were working with J&G on those COBRA transactions in 1999.

Q. I think we talked about this yesterday, but just to make certain I covered it, in your rebuttal reports, which are Exhibit 5, at Page 5, paragraph 14, and Exhibit 8, Page 6 at paragraph 13, you state: "For reasons stated throughout my opening report, it would be reasonable to conclude that the transactions at issue were reported by the various participants in a manner that was designed to avoid detection and audit by the IRS by concealing the source of the resulting losses." Do you see that?

A. I do.

Q. What evidence do you have that if such an effort were made, it was communicated to any of the taxpayers in the JBJZ, Tesoro or Murphy-related cases?

A. Beyond what we've discussed previously, the March 12th, 2000, e-mail from -- that you pointed out in my report --

Q. Could that be the May 8th e-mail?

A. Yes, Dougherty.



Q. On Exhibit 1?

A. Yes, the PowerPoint presentation, and whatever was disclosed on that PowerPoint presentation, and whatever was discussed in connection with that PowerPoint presentation. And, of course, the taxpayers knew or had reason to know how the transaction was reported on the various returns. Beyond that, I haven't seen a lot of -- ask me the question again, I'm sorry.

Q. What evidence do you have that, if such an effort were made, it was communicated to any of the taxpayers in the JBJZ, Tesoro or Murphy-related cases?

A. Well, beyond what is expressed or implied in the PowerPoint presentation, and whatever went on at that presentation, beyond that e-mail that suggests that there was some discussion about reporting disclosure issues with clients, beyond whatever may or may not have been apparent from the face of the returns and the disclosures on those returns themselves, I haven't seen -- I haven't seen -- I don't recall having seen, I should say, correspondence between Ernst & Young and individual taxpayers that discuss disclosure issues.



Q. And that e-mail being again the May 8, 2000, e-mail from Thomas A. Dougherty to three EY tax professionals, which you reference on Page 100 of Exhibit 1?

A. Yes, and I would point out that that's -- the answer to that question was not something that I looked for. If I'd seen it, I would have remembered it, I suspect, but I didn't look for it.

MR. WELTY: That's it. I have no further questions.

MR. DONOHUE: I have no questions.

(WHEREUPON, SIGNATURE OF THE WITNESS NOT HAVING BEEN WAIVED, THIS DEPOSITION WAS CONCLUDED.)

Page 110

INSTRUCTIONS TO THE WITNESS

Read your deposition over carefully. It is your right to read your deposition and make any changes in form or substance. You should assign a reason in the appropriate column on the errata sheet for any change made. After making any change in form or substance which has been noted on the following errata sheet along with the reason for any change, sign your name on the errata sheet and date it. Then sign your deposition at the end of your testimony in the space provided. You are signing it subject to the changes you have made in the errata sheet, which will be attached to the deposition before filing. You must sign in the space provided. The witness need not be a notary public. Any competent adult may witness your signature.

Return the original errata sheet and transcript to the deposing attorney (attorney asking questions) promptly! Court rules require filing within 30 days after you receive the deposition.

Thank you

Page 111

ERRATA SHEET

PAGE LINE CHANGE REASON THEREFORE

DATE: DEPONENT SIGNATURE

__________ ____________________________

Page 112

SIGNATURE PAGE
OF
DAVID W. LaRUE, Ph.D.

I hereby acknowledge that I have read the foregoing deposition and that the same is a true and correct transcription of the answers given by me to the questions propounded, except for the changes, if any, noted on the attached errata sheet.

SIGNATURE:

____________________________________

WITNESSED BY:

____________________________________

DATE: ____________________

Page 113

CERTIFICATE

I, Texas S. Eckstone, a Professional Reporter and Notary Public hereby certify that the foregoing is a true and accurate transcript of the deposition of said witness who was first duly sworn by Texas S. Eckstone on the date and place hereinbefore set forth.

I FURTHER CERTIFY that I am neither attorney nor counsel for, nor related to or employed by, any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed in this action, nor am I financially interested in this case.

Dated this 28th day of August 2007.

________________________
TEXAS S. ECKSTONE
Professional Reporter
Notary Public