# In the United States Court of Federal Claims

**JZ Buckingham Investments, LLC**
as Tax Matters Partner of
JBJZ Partners,
a South Carolina General Partnership,

Plaintiff

v.

**United States of America,**

Defendant

**Case No. 05-231T**

-----

# Expert Report of David W. LaRue, Ph.D.

McIntire School of Commerce
University of Virginia

June 1, 2007

EXHIBIT 3

# Table of Contents

**I. Background and Qualifications** .......... **1**
**II. Scope and Objectives of Report** .......... **2**
**III. Introductory** .......... **7**
A. Conventions Used in This Report .......... 7
B. Table 2 .......... 7
C. BT Alex. Brown Client Statements .......... 7
**IV. Summary of Key Facts** .......... **8**
A. The Taxpayers .......... 8
1. Jerry Zucker .......... 8
2. James G. Boyd .......... 8
B. Step 1: Formation of The Entities .......... 9
1. The Single-Member LLCs ["The LLCs"] .......... 9
a) JZ Buckingham Investments, LLC ["JZ"] .......... 9
b) JGB Bohicket Investments, LLC ["JGB"] .......... 9
c) SS-4 .......... 9
d) Form 8821 .......... 11
e) Single-Member LLC as "Disregarded Entity" .......... 11
f) Deutsche Bank/BT Alex. Brown Accounts .......... 12
(1) JZ (Zucker) .......... 12
(2) JGB (Boyd) .......... 13
g) Purpose and Effect of Using the LLCs in the Implementation of the COBRA Strategy .......... 14
h) Opinion .......... 16
2. The JBJZ Partners [the "Partnership"] .......... 17
a) Contributions .......... 18
b) Activities .......... 19
c) Liquidation .......... 21
d) Contributions as a Percentage of the Long Option Premium Amounts .......... 22
3. JBJZ Investors, Inc. ["JBJZ"] .......... 23
a) Contributions .......... 25

b) Activities ..... 26

c) Liquidation ..... 28

d) Effect of Use of S Corporation ..... 28

(1) Coplan E-Mails ..... 29

(2) Opinion ..... 30

C. Description of Transaction ..... 35

1. Step 2: November 23, 1999: Purchase (and Sale) of the Long (and Short Options) [Collectively, the "Long Options", the "Short Options," and the "Options"] ..... 35

a) JZ (Zucker) ["JZ Options", "JZ Long Options," and "JZ Short Options"] ..... 35

(1) Euro Options ..... 35

(2) Yen Options ..... 36

b) JGB (Boyd) ["JGB Options", "JGB Long Options," and "JGB Short Options"] ..... 36

c) Table 1: Summary of the Option Transactions ..... 37

2. Step 3: December 7, 1999: Assignment of Long Options and Short Options to the Partnership and the Creation of the "Inflated Basis Amounts" ..... 39

a) JZ (Zucker) ..... 39

b) JGB (Boyd) ..... 39

3. December 22, 1999: Termination of the Options ..... 40

4. Step 4: Acquisition of the "COBRA Loss Assets" ..... 40

a) Overview ..... 40

b) December 22, 1999: Additional Contributions to the Capital of the Partnership [The "Cisco Stock"] ..... 42

(1) JZ (Zucker) ..... 42

(2) JGB (Boyd) ..... 43

c) December 22 & 23, 1999: Partnership's Purchase of Canadian Dollars ["Canadian Currency"] ..... 45

5. Step 5: December 27, 1999: Transfer of Partnership Interests to JBJZ and the Termination and Liquidation of the Partnership ..... 45

a) JZ (Zucker) ..... 45

b) JGB (Boyd) ..... 47

c) The Partnership ..... 48

d) JBJZ .......... 48

6. Step 6: December 29 and 31, 1999: Sale of the Canadian Currency and the Cisco Stock by JBJZ .......... 49

D. Transaction-Related Fees .......... 51

1. Ernst & Young ["E&Y"] .......... 51

2. Jenkens & Gilchrist ["J&G"] .......... 53

3. Brown & Wood ["B&W"] .......... 56

4. Fees as a Percentage of the Long Option Premium .......... 57

E. Table 2: "Derivation of Tax Bases Claimed by JBJZ in the Cisco Stock and the Canadian Currency" .......... 58

**V. Reporting of the Transaction on the 1999 Federal Income Tax Returns .......... 63**

A. The Partnership .......... 63

1. Description .......... 63

2. Opinion .......... 72

B. JBJZ .......... 76

1. Description .......... 76

2. Opinion .......... 88

C. Individual Form 1040s of JBJZ Stockholders (Zucker and Boyd) [The "1999 Form 1040s"] .......... 91

1. Tax Return Preparation .......... 91

2. E&Y Fees .......... 91

3. Legal Fees paid by JBJZ to J&G .......... 92

4. Ordinary Income from the Partnership .......... 92

5. The JBJZ Losses: The Ordinary Loss From the Sale of the Canadian Currency .......... 93

6. The JBJZ Losses: The Capital Losses From the Sale of the Cisco Stock .......... 93

7. Other .......... 94

8. Opinion .......... 97

**VI. Sufficiency of Combined Disclosures .......... 98**

**VII. Communications Relating to Disclosure of the Transactions ... 99**

**VIII. Summary of Conclusions .......... 101**

-----

Appendix A: Curriculum Vita

Appendix B: Depositional and Court Testimony Within Last Four Years

Appendix C: Documents Considered (or Available in Databases)

# I. Background and Qualifications

1. I am an Associate Professor of Commerce at the McIntire School of Commerce at the University of Virginia, where I teach graduate and undergraduate courses on several subjects in the fields of finance, accounting, and taxation. I hold a Bachelor of Business Administration degree (production logistics management), a Master of Science in Accountancy degree (accounting and taxation), and a Ph.D. degree (accounting, taxation, and economics (with honors)).

2. Throughout most of the last twenty-six years, I have also regularly taught continuing education courses covering a wide range of topics for each of several public accounting firms and for others. I have published a number of technical and policy articles in prominent journals, and I have prepared and presented invited testimony before the Ways and Means Committee of the U.S. House of Representatives and the Treasury Department. I have chaired or served on several committees and task forces of the American Taxation Association, the American Accounting Association, and the Federal Tax Division of the American Institute of CPAs. I currently serve as an outside director on the Board of Directors of MicroStrategy, a publicly traded corporation, and as the Chairman and "financial expert" of that firm's Audit Committee.

3. I have been recognized as an expert in accounting by the U.S. Tax Court in five cases involving accounting issues. I was also recognized as an expert in two U.S. District Court cases. Additionally, I have served as an expert in several other cases which were settled prior to trial.

4. A copy of my current Curriculum Vita is attached to this *Report* as Appendix A. It includes all of my publications, including publications within the last 10 years.

5. Appendix B includes a listing of all of the cases in which I have given depositional and trial testimony within the past 4 years.

6. Many of the documents upon which I have relied in preparing this *Report* are referenced in the footnotes that accompany the text.

- Many of the Bates stamped documents that are referenced in this *Report* are included in a PDF File **["Selected Buckingham Documents"]** attached to this *Report*.
- Appendix C includes a description of the documents that were provided to me by the U.S. Department of Justice in connection with this case.

7. I am being compensated for my work on this case at $295/hour.

## II. Scope and Objectives of Report

8. I was retained by the U.S. Department of Justice to examine the documentary evidence pertaining to the interrelated series of transactions[1] **[the "Transaction" or "Transaction-at-issue"]** that took place in November and December of 1999, and that ultimately resulted:

- In the recognition and reporting of:
  - A $29,446,675 ordinary loss **["JBJZ Ordinary Loss"]**,
  - A $2,019,744 short-term capital loss **["JBJZ STCL"]**, and
  - A $18,177,695 long-term capital loss **["JBJZ LTCL"]** by JBJZ, Inc. **["JBJZ"]** on its 1999 Form 1120S;
- In the allocation of these Losses **[collectively, the "JBJZ Losses"]** to and between JBJZ's two individual stockholders (Jerry Zucker and James G. Boyd) **[the "Taxpayers"]**; and,

---

1 See, for example, the Ernst & Young **["E&Y"]** PowerPoint presentation titled "COBRA" ("Currency Options Bring Reward Alternatives") **[the "*E&Y COBRA Presentation*"]**, which describes and illustrates the interrelated sequence of "steps" to be followed in order to "generate" "permanent . . . losses." Bates: 2003EY001565 through 2003EY001583.

See also 12/28/99 e-mail from Robert B. Coplan (E&Y) to Michael Kelley (E&Y) and others in which he describes the COBRA strategy as a "permanent loss generator" and summarizes each of the steps involved. Bates: DOJ 031656 through DOJ 031659.

- In the deduction of these JBJZ Losses by the Taxpayers on their respective 1999 Form 1040s.

9. I was asked to examine the 1999 federal income tax returns (including all accompanying forms, schedules, statements, and attachments) of JBJZ Partners **[the "Partnership"]** (Form 1065), of JBJZ Investors, Inc **["JBJZ"]** (Form 1120S), and of the Taxpayers (Form 1040s) **[the "1999 Returns"]**,[2] and, based on that examination:

- To determine whether or not any of the 1999 Returns identified and/or explained the source [3] of the JBJZ Losses (or, if not, to determine whether or not the information disclosed on or with the 1999 Returns (either individually or collectively) otherwise provided any indication, or any reasonably discernable indication, of the source of the JBJZ Losses);
- To determine whether or not, based solely on the information included on or with the 1999 Returns (either individually or collectively), the IRS could have ascertained, or reasonably ascertained, that the JBJZ Losses were the result of the assignment of a greatly inflated tax basis to certain assets that had been acquired by the Partnership and then distributed to and sold by JBJZ to generate the JBJZ Losses;[4] and

---

2 Unless otherwise stated, references to any of these tax returns are references to the return and all of the forms, schedules, statements and attachments included with the return at the time of its filing.

3 By "source," I mean the series of interrelated transactions that culminated in JBJZ's acquisition of certain assets (Cisco Systems, Inc. stock **[the "Cisco Stock"]** and Canadian Currency) that were sold by JBJZ to produce the JBJZ Losses, the identities and roles of the participants in those transactions, and/or the method and/or rationale applied in calculating JBJZ's tax bases in the Cisco Stock and the Canadian Currency, and, therefore, in determining the amount of the JBJZ Losses.

4 The aggregate tax basis assigned by JBJZ to the Cisco Stock and the Canadian Currency that JBJZ received as a liquidating distribution from the Partnership on December 28, 1999 was $50,952,250. This tax basis was 57.9 times greater than the $864,405 tax basis that the Partnership had in those same assets immediately prior to its termination and liquidation.

JBJZ determined its tax bases in the Cisco Stock and the Canadian Currency by reference to the "carryover" tax bases that JBJZ claimed to have had in the

- To determine whether or not the 1999 Returns (either individually or collectively) disclosed (or otherwise provided any reasonably discernable indication) that $2,150,000 in accounting and legal fees had been incurred and paid (directly and indirectly) by the Taxpayers in 1999[5] in connection with the implementation of a strategy **[the "COBRA**

---

partnership interests of JBJZ Partners **[the "Partnership Interests"]**. JBJZ had received these Partnership Interests from its two stockholders, Mr. Zucker and Mr. Boyd (through, apparently, their respective single-member LLCs), in exchange for all of JBJZ's stock. Simultaneously with this exchange, the Partnership had terminated, and had immediately thereafter distributed all of its assets (cash, Cisco Stock, and Canadian Currency) to JBJZ in complete liquidation. JBJZ determined its tax bases in these assets by allocating to them the aggregate tax basis that it claimed to have had in the Partnership Interests it had received from Mr. Zucker and Mr. Boyd (through their respective LLCs) in exchange for its stock.

The tax basis that JBJZ claimed to have had in the Partnership Interests was the carryover tax basis that the Partnership's partners claimed to have had in their respective Partnership interests as of the date of the exchange, increased by certain Transaction-related legal fees that JBJZ subsequently paid on behalf of its stockholders (below). The partners had previously acquired certain "Long Options" and certain related "Short Options" for total net cash premiums of $2,500,000. Shortly thereafter, the partners had contributed these Long and Short Options to the Partnership as contributions to its capital. The partners thereupon increased there tax bases in their Partnership interests by the full amount of $50,000,000 in premiums "charged" for the Long Options (and without regard to the $47,500,000 in premiums "credited" for the related Short Options). As a result, the aggregate net increase that the partners claimed to have resulted from the purchase and contribution of the Options was $50,000,000. This increase was $47,500,000, or 19 times, greater than the $2,500,000 net cash premiums actually paid by the partners for those Options. See Table 1 at p. 38.

The partners and JBJZ also claimed increases in the tax bases of the Partnership Interests for Transaction-related fees of $750,000 that were incurred and paid by Mr. Zucker and Mr. Boyd, individually, to Ernst & Young **["E&Y Fees"]**. (Mr. Zucker and Mr. Boyd also deducted these fees on their respective 1999 Form 1040s.) See ¶130, *et seq.*

The JBJZ also claimed an increase in its tax basis in these Partnership Interests for Transaction-related fees of $1,400,000 that JBJZ subsequently paid to Jenkens & Gilchrist **["J&G Fee"]**. See ¶136, *et seq.*

5 **The "E&Y Fee."** Transaction-related fees of $750,000 were incurred and paid in 1999 by Mr. Zucker and Mr. Boyd, individually, to Ernst & Young. See ¶130, *et seq.*

Mr. Zucker and Mr. Boyd deducted these amounts twice on their respective 1999 Form 1040s: first, as unidentified components of certain total expense amounts deducted on Schedule A (as miscellaneous itemized deductions), and then as unidentified components of the JBJZ Ordinary Loss, the JBJZ STCL, and the JBJZ LTCL that were allocated to and also deducted by the Zuckers and the Boyds on their respective 1999 Form 1040s. See ¶132.

**The "J&G Fee."** Transaction-related fees totaling $1,400,000 to Jenkens & Gilchrist were incurred by Mr. Zucker and Mr., Boyd, but subsequently paid on their behalf by JBJZ. See ¶136, *et seq.*

**Strategy"]** that was designed *from the outset* to generate permanent tax losses **["COBRA Losses"]**,[6] and that did in fact generate claimed permanent tax losses totaling over $49,644,114.[7]

10. I was also asked, based on my review of the record, to determine whether or not it would be reasonable to conclude that the various elements of the Transaction had been divided between and reported on the various 1999 Returns in a manner that was designed to reduce or eliminate the risk of detection [8] and audit by the IRS.

11. I was also asked, based on my review of the record, to determine whether or not it would be reasonable to conclude that the Transaction-related fees paid to E&Y and J&G were reflected on the 1999 Returns in a manner that

---

**The "B&W Fee."** In addition to these amounts paid in 1999, a Transaction-related fee of $60,000 was paid by JBJZ in 2000 to Brown & Wood **["B&W Fee"]**. In 2000, J&G invoiced JBJZ for an additional $40,000. I have been unable to determine whether or not this additional $40,000 amount was ever paid. See ¶144, *et seq*.

6 See, for example, the *E&Y COBRA Presentation*. Bates: 2003EY001565 through 2003EY001583. Specifically, for example, "What is Cobra? Permanent ordinary/short-term capital loss strategy" (Bates: 2003EY001566) and "Currency Linked Digital Swap Example[:] Objective is to generate $50M loss" (Bates: 2003EY001579).

The *pro forma* illustration that was included in that Presentation shows how, based on certain assumptions, an investment of $4,750,000 ($2,250,000 in fees and $2,500,000 in capital) could generate federal and state income tax savings of over $23 Million (by generating losses of $50 Million ($47.5 Million in excess of the capital investment), and by allowing for a miscellaneous itemized deduction of the fees). Bates: 2003EY001582.

See also quoted passages from the *E&Y Engagement Letters* at ¶130 and the *J&G Engagement Letters* at ¶130.

7 The actual economic gain or loss resulting from the sale of the Cisco Stock and the Canadian Currency (based on the original cost of these assets) was a *gain* of $443,731. However, JBJZ recognized and reported *losses* from these sales totaling $49,644,114. Thus, the total amount of loss effectively claimed by JBJZ from the sale of these assets was $50,087,845.

8 By "detection," I refer to detection of the fact that the JBJZ Losses ultimately resulted from the greatly inflated tax bases that Mr. Zucker and Mr. Boyd claimed to have had in their respective Partnership interests as a result of their contributions of the Long Options and the offsetting Short Options to the capital of the Partnership (through their respective single-member LLCs). *Supra.*, footnote 4.

was designed to reduce or eliminate to the risk of detection [9] and audit by the IRS.

12. The principal facts and circumstances upon which I relied in conducting my analyses and formulating my opinions are presented below and are based, in part, on information set forth in the documents referenced in the footnotes to this *Report*.

13. As of the date of this *Report*, I have received only those documents referenced in the footnotes to the text and those documents listed in Appendix C.

- If and when any additional documentation, deposition testimony, or other information becomes available to me, I will review that information and determine the impact, if any, that it may have on any of the facts, analyses, or opinions set forth in this *Report*.
- Additionally, although I have been provided with the hundreds of thousands of pages of documents and depositions described in Appendix C, the sheer volume of these materials and the limitations of "optical character recognition" and "key word search" technologies have precluded a comprehensive review and evaluation of all of these documents. If I subsequently discover any additional facts that appear to have a bearing on the facts presented in this *Report*, I will review that information and determine the impact, if any, that that information may have on any of the analyses or opinions set forth herein.
- Consequently, I reserve the right to amend or update this *Report*.

14. I have no personal interest or bias with respect to any of the parties involved in this litigation and my compensation is not in any way contingent

9 By "detection," I refer to detection of the fact that very large tax and legal fees ($2,150,000 in 1999 plus an additional $60,000, or possibly $100,000, in 2000) were incurred and paid in connection with the Transaction that generated the JBJZ Losses that were allocated to and between the Taxpayers and then deducted by them on their respective Form 1040s.

upon the nature of my findings, the opinions expressed in this *Report*, or the outcome of this case.

15. No one else provided any significant professional assistance to me in the preparation of this *Report*.

# III. Introductory

## A. Conventions Used in This Report

16. In the text that follows, I have used "Step 1," Step 2," etc., to designate the component steps that made up the Transaction-at-issue. These "Step" designations differ from those used in the E&Y COBRA Presentation.[10]

17. Except where otherwise designated, unqualified dates refer to dates occurring in 1999.

## B. Table 2

18. Table 2 is referenced throughout this *Report*. Table 2: "Derivation of Tax Bases Claimed by JBJZ in the Cisco Stock and the Canadian Currency" is presented at page 62 and discussed at ¶151, *et seq*.

## C. BT Alex. Brown Client Statements

19. In the "BT Alex. Brown Client Statements" **["*Alex Brown Client Statements*" or "Alex Brown"]** referred to below, the frequent use of "A/O" (followed by a date) appears to have been an abbreviation for "as of" the specified date,[11] which was, in all cases referenced in this *Report*, a date prior to the date the amount or transaction was posted.

---

[10] *Supra*., footnote 1.

[11] See, for example. Bates: IRS03288 (where "as of" is spelled out, rather than abbreviated).

# IV. Summary of Key Facts

## A. The Taxpayers

### 1. Jerry Zucker

20. Jerry Zucker owned all of the equity of JZ Buckingham Investments, LLC and, through that limited liability company, a 90% interest in JBJZ Partners.

21. On or about December 27, Mr. Zucker (or his LLC) transferred his Partnership interest to JBJZ Investors, Inc. (an S Corporation) for 90% of its stock.

22. Mr. Zucker's mailing address was 16 Buckingham Drive, Charleston, SC 29407. His Social Security Number was 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. In 1999, he filed a Form 1040 jointly with wife, Anita Zucker. On that return, he listed his occupation as "Consultant."[12]

### 2. James G. Boyd

23. James Boyd owned all of the equity of JGB Bohicket Investments, LLC and, through that limited liability company, a 10% interest in JBJZ Partners.

24. On or about December 27, Mr. Boyd (or his LLC) transferred his Partnership interest in JBJZ Partners to JBJZ Investors, Inc. (an S Corporation) for 10% of its stock.

25. Mr. Boyd's mailing address was 3520 Bohicket Road, Johns Island, SC 29455. His Social Security Number was 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. In 1999, he filed a Form 1040 jointly with wife, Hazel Boyd. On that return, he listed his occupation as "Executive."[13]

[12] Bates: 1288 & 1295.

[13] Bates: 2229 & 2237.

## B. Step 1: Formation of The Entities

### 1. The Single-Member LLCs ["The LLCs"][14]

#### a) ˉZ Buckingham Investments, LLC ["ˋ Z"]

26. JZ Buckingham Investments, LLC **["JZ"]** was a single-member limited liability company formed on or about November 16, 1999 under the laws of the State of Delaware by Mr. Zucker.[15] The mailing address for both JZ and Mr. Zucker was 16 Buckingham Drive, Charleston, SC 29407.[16] JZ was classified as a "disregarded entity" for federal income tax purposes.[17]

#### b) 9GB Bohicket Investments, LLC ["ˋ GB"]

27. JGB Bohicket Investments, LLC **["JGB"]** was a single-member limited liability company formed on or about November 16, 1999 under the laws of the State of Delaware by Mr. Boyd.[18] The mailing address for both JGB and Mr. Boyd was 3520 Bohicket Road, Johns Island, SC 29455.[19] JGB was classified as a "disregarded entity" for federal income tax purposes.[20]

#### c) SS-4

28. Both of these single-member LLCs filed a Form SS-4 ("Application for Employer Identification Number").

- JZ's Form SS-4 was signed by Mr. Zucker and dated November 18, 1999.[21]
- JGB's Form SS-4 was signed by Mr. Boyd and dated November 19, 1999.[22]

---

[14] The *Certificate of Formation* of each of the LLCs was signed by Donna M. Guerin of J&G. Bates: 0618 to 0619 (JZ) and 0612 to 0613 (JGB).

[15] Bates: 0618 & 0619.

[16] Bates: 0622 & 1288.

[17] Bates: 0622.

[18] Bates: 0612 & 0613.

[19] Bates: 0615 & 2229.

[20] Bates: 0615.

[21] Bates: 0622.

29. On Line 13 of Form SS-4, each of the LLCs represented that it did not expect to have any employees during the succeeding 12-month period.

30. The Employer Identification Number **["EIN"]** assigned to the LLCs differed from the Social Security Numbers **["SSN"]** of their respective owners:

- JZ: 57-1088088;[23] Mr. Zucker: 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.[24]
  - The SSN shown for Mr. Zucker ("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") on Form SS-4[25] and on his 1999 JBJZ Schedule K-1[26] was incorrect.
- JGB: 57-1088055;[27] Mr. Boyd: 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.[28]
  - The SSN shown for Mr. Boyd ("474-04-906") on his 1999 JBJZ Schedule K-1[29] was incorrect.

31. It does not appear that either of these disregarded, single-member LLCs was required to file a Form SS-4 or to obtain an EIN.[30]

---

22 Bates: 0615.

23 Bates: 0622.

24 Bates: 1288.

25 Bates: 0622.

26 Bates: 1079.

27 Bates: 0615.

28 Bates: 2229.

29 Bates: 1077.

30 *Instructions for Form SS-4 (Rev. February 1998),* at p. 2 ("Who Must File"). See also *Instructions for Form SS-4 (Rev. December 2001)*, page 4:

> A single-member domestic LLC that accepts the default classification [i.e., to be classified as a disregarded entity] *does not need an EIN* and generally *should not file Form SS-4*. Generally, *the LLC should use the name and EIN of its owner for all federal tax purposes*. [Emphasis supplied.].

### d) Form 8821[31]

32. Both of the LLCs filed a Form 8821 ("Tax Information Authorization") on which they both listed Laura Lightholder, Jenkens & Gilchrist, 225 West Washington, Suite 2600, Chicago, Il 60606 as "Appointee."[32]

- JZ's Form 8821 was signed by Mr. Zucker and dated November 18, 1999.[33]
- JGB's Form 8821 was signed by Mr. Boyd and dated November 19, 1999.[34]

### e) Single-Member LLC as "Disregarded Entity"

33. An LLC that is classified as a "disregarded entity" is disregarded for the purpose of filing a federal income tax return. If the only member of an LLC is an individual, the LLC's income and expenses are reported directly on the Form 1040 of the owner.[35]

34. Except as otherwise provided, an LLC that is classified as a "disregarded entity" is disregarded for all "federal tax purposes."[36]

35. Form 1065 ("U.S. Partnership Return of Income") requires the disclosure of the names, addresses, and tax identification numbers, etc. of each of the partnership's partners.[37] It would appear that where a partner is a

[31] Form 8821 authorizes the "appointee" to inspect and/or receive confidential information in any office of the IRS for the type of tax and the years or periods listed on that form. It does not authorize the appointee to advocate the taxpayer's position, to execute waivers, consents, or closing agreements, or to otherwise represent the taxpayer before the IRS.

[32] Bates: 0621 & 0616.

[33] Bates: 0621.

[34] Bates: 0616.

[35] Treasury Reg. Secs. 301.7701-2(a) and -3(a) (generally effective on and after January 1, 1997).

[36] Treasury Reg. Sec. 301.7701-2(c) and -2(c)(2)(i) (generally effective on and after January 1, 1997): "For federal tax purposes . . . [a] business entity that has a single owner and is not a corporation . . . is disregarded as an entity separate from its owner."

[37] See Schedule K-1 ("Partner's Share of Income, Credits, Deductions, etc.").

disregarded single-member LLC, the single-member owner of that LLC, and not the LLC itself, must be identified and disclosed as the partner.[38]

#### f) Deutsche Bank/BT Alex. Brown Accounts[39]

36. The following accounts were established for the LLCs on or about November 22, 1999.

##### (1) JZ (Zucker)

37. Account Number 222-10153-12 which was funded on 11/23/99 with an initial cash deposit of $3,150,000.[40] This amount was used as follows:

---

38 See also e-mail from Robert Coplan (E&Y) to Amy Keating (E&Y) (dated February 19, 2000) in which Mr. Coplan states, in part:

> Here are my responses to your attached questions, but I look forward to seeing Donna's . . .
>
> 1) I don't have a copy of the proforma return, and will have to look at a 1065 when in the office.
>
> 2) I would have expected that the partners would be listed as the individuals on the returns and would not reference the LLCs. I will be interested to see what Donna says about this.
>
> [Bates DOJ-000196.]

"Donna" is Donna Guerin (J&G) and the "returns" are the partnership Form 1065s.

See also WNK Tax Return Review Notes (Amy Keating) attached to a 2/19/00 e-mail from Amy Keating to Donna Guerin and Robert Coplan, which states, in part:

> 2. I can't find any instruction supporting the treatment on the 1065, form k-1, with respect to the type of entity the partner is classified as. Specifically, do you want to see the individual's name, ss# and individual classification on the top of the k-1. As an alternative, we can put the llc name, ein and then what would you put as the entity classification type on line b? Since a single member llc is a disregarded entity for federal purposes, my logic goes to the first option, but I'd like some clarification.
>
> [Bates: DOJ-000196 through DOJ-000198.]

I have been unable to locate a response from Donna Guerin that explains why the partnership returns were to list the disregarded single-member LLCs, rather than the single-member owners of the LLCs, as the partners. However, one *effect* of identifying the LLC, rather than its single-member owner, as the partner would be to prevent someone reviewing the Partnership's Form 1065 from readily identifying the single-member owner on whose Form 1040 the greatly inflated tax basis amount was ultimately deducted as an unidentified component of the COBRA Losses allocated to that owner.

39 Bates: 00000107.

40 Bates: 2092. This amount was 7.00% of the total combined amount of the $45,000,000 premiums on the Euro Long Options and the Yen Long Options purchased by JZ. See Table 1, Column C, Rows 1 and 2.

- $1,250,000 was used on December 1 to pay the net premiums on the JZ Options (Yen)[41] (which were subsequently contributed by JZ to the Partnership on December 7 (but "A/O 11/24/99")); and
- $1,000,000 was used on December 3 to pay the net premiums on the JZ Options (Euro)[42] (which were subsequently contributed by JZ to the Partnership on December 7 (but "A/O 11/24/99")); and
- $900,000 contributed in cash to the Partnership on December 7 (but "A/O 11/24/99").
- The balance in this account as of December 31, 1999 was $2,479, the total amount of income that was earned in this account (from the temporary investment of the initial cash deposit in a tax-exempt "Cash Reserve Fund") in 1999.[43]

**(2) JGB (Boyd)**

38. Account Number 222-10154-11 which was funded on 11/23/99 with an initial cash deposit of $350,000.[44] This amount was used as follows:

- $250,000 was used on December 1 to pay the net premiums on the JGB Options[45] (which were subsequently contributed by JGB to the Partnership on December 7 (but "A/O 11/24/99"))
- $100,000 contributed in cash to the Partnership on December 7 (but "A/O 11/24/99").
- The balance in this account as of December 31, 1999 was $258, the total amount of income that was earned in this account (from the temporary investment of the initial cash deposit in a tax-exempt "Cash Reserve Fund") in 1999.[46]

---

41 Bates: 2622. Note, however, that the purchase and sale of these Options took place on November 23, 1999. See ¶89, *et seq*.

42 Bates: 2622. Note, however, that the purchase and sale of these Options took place on November 23, 1999. See ¶85, *et seq*.

43 Bates: 2094. As of December 31, 1999, this was also the total remaining balance in the JZ Alex Brown account.

44 Bates: 2616. This amount was 7.00% of the total combined amount of the $5,000,000 premiums on the Euro Long Options purchased by JGB. See Table 1, Column C, Row 3.

45 Bates: 2097. Note, however, that the purchase and sale of these options took place on November 23, 1999. See ¶93, *et seq*.

46 Bates: 2619. As of December 31, 1999, this was also the total remaining balance in the JGB Alex Brown account.

### g) Purpose and Effect of Using the LLCs in the Implementation of the COBRA Strategy

39. As far as I can determine from the documents that I have reviewed, the only activities that the LLCs respectively engaged in were

- The receipt of cash (and, arguably, the Cisco Stock[47]) from their respective owners,
- The purchase and sale of the Long Options and the offsetting Short Options,
- The transfer of the remaining cash, the Long and Short Options (and, arguably, the Cisco Stock) to the Partnership in exchange for a Partnership interest or as a contribution to the Partnership's capital, and, finally,
- The transfer of the Partnership Interests to JBJZ in exchange for JBJZ stock. That stock was issued by the JBJZ directly to the owners of the LLCs, i.e., Mr. Zucker and Mr. Boyd.[48]
- It does not appear from the documents that I have reviewed that the LLCs ever engaged in any business activities or, aside from temporary investments in a tax-exempt "Cash Reserve Fund" that yielded $2,479 (JZ)[49] and $258 (JGB),[50] in any other investment activities or transactions.
- As far as I can determine, neither of the LLCs had any employees or paid any salaries.

---

47 See ¶110, *et seq.*

48 Bates: 1081.

49 Bates: 2094. As of December 31, 1999, this was also the total remaining balance in the JZ Alex Brown account.

50 Bates: 2619. As of December 31, 1999, this was also the total remaining balance in the JGB Alex Brown account.

40. As noted in Part V.,[51] below, the Partnership identified the LLCs, and not Mr. Zucker and Mr. Boyd, as its partners on the "Partner Summary" and on the Schedule K-1s that the Partnership filed with its 1999 Form 1065.

- As previously observed, disregarded single-member LLCs are to be disregarded for federal tax purposes.[52]
- Each of these Schedule K-1s described the LLC-partner as a domestic "LIMITED LIAB CO."
- Neither of these Schedule K-1s or the Form 1065 identified or otherwise described either of the LLC-partners as a single-member LLC or as a "disregarded" entity.
- Neither the names[53] nor the Social Security Numbers of Mr. Zucker or Mr. Boyd appeared anywhere on the Partnership's 1999 Form 1065.

41. The identification of the LLCs as the partners of the Partnership on the 1999 Form 1065 is also inconsistent with the identification of "Jerry Zucker" and "Jim Boyd" (and with the omission of any reference whatsoever to the LLCs) as the transferors of the Partnership Interests to JBJZ on the "Regulation Section 1.351-3(b) Statements" attached to JBJZ's 1999 Form 1120S.[54]

- Neither the names nor the tax identification numbers of the LLCs appeared anywhere on JBJZ's 1999 Form 1120 or on the "Regulation Section 1.351-3(b) Statement" attached to that Return.[55]

---

51 See ¶157, *et seq.*

52 See ¶33, *et seq.*

53 However, as noted *infra.*, footnote 300, Mr. Zucker appears to have signed the Partnership's 1999 Form 1065. His signature was not accompanied by his typed or printed name or by his Social Security Number.

54 See ¶ 190, *et seq.*

55 See ¶175, *et seq.*

- Note that the same "Paid Preparer," Ray A. Knight (of Ernst & Young), signed both the Partnership's 1999 Form 1065 and JBJZ's 1999 Form 1120S.[56]

### h) Opinion

42. In my opinion, it would be reasonable to conclude that the risk of detection[57] and audit by the IRS might have been minimized or significantly reduced through (1) the use of the LLCs to acquire and hold the Partnership Interests, (2) the assignment of entity names to the LLCs that did not include the full names or surnames of their single-member owners, (3) the procurement of EINs for each of the LLCs,[58] and (4) the identification of the LLCs (by name and EIN), and not the Taxpayers (by name or by SSN), as the partners of the Partnership on its 1999 Form 1065.

43. In my opinion, it would be reasonable to conclude that one of the purposes, perhaps the principal purpose, for the creation and use of the LLCs in connection with the implementation of the COBRA Strategy was to minimize or reduce the risk of detection and audit by reducing the possibility that the IRS might trace the ownership of the Partnership *from* the Partnership's 1999 Form 1065 *to* the 1999 Form 1040s of its ultimate partners (Mr. Zucker and Mr. Boyd, on whose 1999 Form 1040s the JBJZ Losses were deducted).[59]

---

56 See ¶157 & ¶175.

57 *Supra.*, footnote 8.

58 *Supra.*, footnote 30

59 Since neither the names nor the SSNs of Mr. Zucker or Mr. Boyd appeared anywhere on the Partnership's 1999 Form 1065, someone examining this Form 1065 would presumably have had to gain access to the LLC-partners' Form SS-4s (or to the information included on them) to be able to identify the ultimate taxpaying entities (i.e., Mr. Zucker and Mr. Boyd), and would presumably have had to take the time and trouble to do so.

As previously observed, however, the SSN shown for Mr. Zucker ("267-84-9<u>38</u>4" rather than "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") on Form SS-4 was incorrect.

### 2. The JBJZ Partners [the "Partnership"]

44. The JBJZ Partners **["the Partnership"]** was a general partnership formed on or about November 16, 1999 under the laws of the State of South Carolina by the LLCs as its general partners.[60]

45. Account Number 222-10155-10 at Alex Brown was established for the Partnership on or about November 22, 1999.[61]

46. The mailing address of the Partnership was Mr. Zucker's home address: 16 Buckingham Drive, Charleston, SC, 29407.[62]

47. The Partnership filed a Form SS-4 ("Application for Employer Identification Number") and was assigned an Employer Identification Number of 57-1088089.[63] This form was signed by Mr. Zucker and dated November 18, 1999.[64]

48. The Partnership's Form SS-4 and its Form 1065 identified a principal activity of "INVESTMENTS."[65]

49. On Line 13 of Form SS-4, the Partnership represented that it did not expect to have any employees during the succeeding 12-month period.

50. The business code on Line C of its Form 1065 was 523900 ("Other Financial Investment Activities (including portfolio management & investment advice"[66]).[67]

51. The Partnership filed a Form 8821[68] ("Tax Information Authorization") on which it listed Laura Lightholder, Jenkens & Gilchrist, 225 West

---

60 Bates: 0624 through 0635.

61 Bates: 00000107. Note, however, that I could not find any record of a *November 1999 Alex Brown Client Statement* being issued to the Partnership. The Partnership's *December 1999 Alex Brown Client Statements* show beginning balances of $0. Bates: 0291 ($US) & 0300 ($CAN).

62 Bates: 0172 & 0637.

63 Bates: 0172 & 0637.

64 Bates: 0637.

65 Bates: 0172 & 0637.

66 *Instructions for Form 1065* (1999), p. 31.

67 Bates: 0172.

Washington, Suite 2600, Chicago, Il 60606 as "Appointee."[69] This form was signed by Mr. Zucker and dated November 18, 1999.[70]

### a) Contributions

52. **JZ (Zucker):** Under the terms of the partnership agreement, JZ was required to make an initial contribution of $900 in cash for a 90% interest in the Partnership.[71] JZ (Zucker)'s actual capital contributions were:[72]

- December 7: Cash of $900,000 from the JZ account (Alex Brown posted this deposit "A/O 11/24/99");[73]
- December 7: JZ contributed the "JZ Options"[74] (net cash cost to JZ of $2,250,000) (Alex Brown posted this transfer "A/O 11/24/99");[75] and
- December 22: 4,500 shares of stock in Cisco Systems, Inc.[76] having an approximate fair market value of $476,775.[77]

---

68 *Supra.*, footnote 31.

69 Bates: 0638.

70 Bates: 0638.

71 Bates: 0635.

72 See Table 2, Columns C & D, Rows 1 through 4 and 6 & 7.

73 Bates: 0295 & 2097.

74 See ¶85, *et seq.*

75 These assignments ("Transfer[s] In") appear on the Partnership's *December 1999 Alex Brown Client Statement* and are dated 12/07/99 (but "A/O 11/24/99"). Bates: 0296.

76 Bates: 0297 & 00000131. See Table 2, Columns C & D, Rows 6 & 7. Mr. Zucker purchased this Cisco Stock in 1996 for $57,000. These shares had actually been contributed (apparently by Mr. Zucker directly) to the capital of JBJZ, rather than to the capital of the Partnership, in error on December 7, 1999. These shares were subsequently transferred from the JBJZ Alex Brown account to the Partnership's Alex Brown account on December 22, 1999, and then back to JBJZ on December 28, 1999 following the Partnership's termination and liquidation. Bates: 1189. See ¶111.

77 These shares of Cisco Stock were subsequently transferred to JBJZ (on December 28) and then sold by JBJZ on December 31, nine days after they had been transferred to the Partnership, for $476,756. Consequently, this amount appears to approximate the fair market value (and book value) of that stock as of the date of its contribution to the Partnership.

However, I have used the slightly different amount of $476,775 that appears to have been used by Amy Keating of E&Y in making her basis calculations on March 8, 2000 (Bates: 0288) and that is reflected in the tax bases actually reported on Statements 2 and 3 that accompany JBJZ's 1999 Form 1120S (Bates: 1075 & 1075). See also Table 2, Column D, Row 6.

53. **JGB (Boyd):** Under the terms of the partnership agreement, JGB was required to make an initial contribution of $100 in cash for a 10% interest in the Partnership.[78] JGB (Boyd)'s actual capital contributions were:[79]

- December 7: Cash of $100,000 from the JGB account (Alex Brown posted this deposit "A/O 11/24/99");[80]
- December 7: JGB contributed the "JGB Options"[81] (net cash cost to JGB of $250,000) (Alex Brown posted this transfer "A/O 11/24/99");[82] and
- December 22: "500 shares of stock in Cisco Systems, Inc.,[83] having an approximate fair market value of $52,975.[84]

**b) Activities**

54. **Purchase & Sale of Short-Term Investments:** The Partnership purchased and sold the following investments in December 1999 for a total net short-term capital gain of $2,305:[85]

---

78 Bates: 0635.

79 See Table 2, Columns E & F, Rows 1 through 4 and 6 & 7.

80 Bates: 0295 & 2622.

81 See ¶101, *et seq*.

82 These assignments ("Transfer[s] In") appear on the Partnership's *December 1999 Alex Brown Client Statement* and are dated 12/07/99 (but "A/O 11/24/99"). Bates: 0296.

83 Bates: 0297 & 00000131. See Table 2, Columns E & F, Rows 6 & 7. Mr. Boyd purchased this Cisco Stock on August 26, 1999 for $34,905. These shares had actually been contributed (apparently by Mr. Boyd directly) to the capital of JBJZ, rather than to the capital of the Partnership, in error on December 8, 1999. These shares were subsequently transferred from the JBJZ Alex Brown account to the Partnership's Alex Brown account on December 22, 1999, and then back to JBJZ on December 28, 1999 following the Partnership's termination and liquidation. Bates: 1189. See ¶114.

84 These shares of Cisco Stock were subsequently transferred to JBJZ (on December 28) and then sold by JBJZ on December 31, nine days after they had been transferred to the Partnership, for $52,973. Consequently, this amount appears to approximate the fair market value (and book value) of that stock as of the date of its contribution to the Partnership.

However, I have used the slightly different amount of $52,975 that appears to have been used by Amy Keating of E&Y in making her basis calculations on March 8, 2000 (Bates: 0288) and that is reflected in the tax bases actually reported on Statements 2 and 3 that accompany JBJZ's 1999 Form 1120S (Bates: 1074 & 1075).

85 Bates: 0176, 0293 & 0294. See also Table 2, Column H & I, Rows 8-15.

- "9000 Bank of NY Co." purchased on December 10 and sold seven days later on December 17 for a short-term capital gain of $23,957.
- "9000 First Union Corp." purchased on December 10 and sold seven days later on December 17 for a short-term capital loss of $11,042.
- "6000 Bank of America Corp." purchased on December 14 and sold three days later on December 17 for a short-term capital loss of $11,116.
- "16870.519 Gateway Fund" purchased on December 23 and sold four days later on December 27 for a short-term capital gain of $506.[86]
- The Partnership also earned $670 of tax exempt interest income from a short-term investment in the Deutsche Banc Alex. Brown Cash Reserve Fund.[87]

---

86 The purpose of this investment activity was discussed in the following two e-mails from Robert B. Coplan (E&Y National Office) to other E&Y personnel who were apparently involved in the COBRA Transaction (the "Quickstrike Team"):

**December 5, 1999 --**

1) Trading activity in partnerships.

As you know, in addition to the transfer of the option spread to the partnership, the clients transferred cash equal to two percent of the loss amount to the partnership. . . *The trading activity is important to the maintenance of a business purpose for the partnership* – i.e., investment activity. . . . The money should not sit in a money market account. The more trading activity the better . . . . *Because there are only about three weeks left til the liquidation of the partnerships, it is essential that if no activity has yet commenced, that it be begun immediately* through David Parse at Alex Brown. [Emphasis supplied.]

Bates: 2003EY000866 and 2003EY001753 & 2003EY001754.

**December 8, 1999--**

In order to help clarify the type and frequency of trading activity that we consider desirable for the COBRA transaction, here are some guidelines to follow:

By now, the contributed cash (2% of the projected loss amount) as well as the currency options should have been contributed to each of the partnerships. Trades should occur weekly in the partnership, with weekly turnover of positions at or near 100%. The investments can be in low risk no-load mutual funds . . . and/or in individual stocks. *The tax position will be aided if there . . . is at least some type of trading activity*, . . . " [Emphasis supplied.]

Bates: 2003EY000865 & 2003EY001751.

55. **Sale of the Options:** The Options terminated on December 22.[88] The net proceeds from the termination of these positions was $3,125,000.[89] The Partnership recognized and reported total net ordinary income of $625,000[90] ($3,125,000 less $2,500,000[91]) from the Option transactions.[92]

56. **Acquisition of Cisco Stock as Contributions to Capital:**

- On December 22, the Partnership received 4,500 shares of stock in Cisco Systems, Inc. as "a contribution to its capital from JZ Buckingham Investments, LLC."[93]
- On December 22, the Partnership received 500 shares of stock in Cisco Stock as "a contribution to its capital from JGB Bohicket Investments, LLC."[94]

57. **Purchase of Canadian Currency:** On or about December 22 and 23, the Partnership purchased Canadian Dollars **["Canadian Currency"]** for $772,500.[95]

### c) Liquidation

58. On or about December 27, the JZ (Zucker) and JGB (Boyd) contributed their respective Partnership interests to JBJZ in exchange for all of JBJZ's issued and outstanding stock.[96]

- The JBJZ stock was issued directly to Mr. Zucker and Mr. Boyd.

---

87 Bates 0174, 0179, and 2621.
88 Bates: 0295, 0695 through 0703, 0180, and 0297 & 0298.
89 Bates: 0295 ("12/27/99 Funds Received as of 12/24").
90 Bates: 0177 & 0180.
91 $2,500,000 = $2,250,000 + $250,000. See Table 2, Columns C & E, Row 2.
92 See Table 2, Row 5.
93 Bates: 0297 & 00000131. See Table 2, Columns C & D, Rows 6 & 7.
94 Bates: 0297 & 00000131. See Table 2, Columns E & F, Rows 6 & 7.
95 Bates: 0298. These purchases were posted on December 23 and 27, respectively. See Table 2, Column I, Row 16.
96 Bates: 1081.

- The Partnership thereupon terminated, liquidated, and distributed the Canadian Currency, the Cisco Stock, and $3,355,475 in cash to JBJZ.

59. As far as I can determine from the documents that I have reviewed, the only activities that the Partnership engaged in during the less-than-two-month period of its existence are those described above.

- It does not appear from that the Partnership ever engaged in any business activities or, aside from temporary investments described above, in any other investment activities or transactions.
- The termination and liquidation of the Partnership before the end of 1999 was preordained as of the date of its formation and was essential to the generation of the permanent JBJZ Losses claimed by JBJZ and by Mr. Zucker and Mr. Boyd.[97]

### d) Contributions as a Percentage of the Long Option Premium Amounts[98]

60. As discussed below, the "Long Option" premium amounts[99] were included by the partners in the tax bases they respectively claimed to have had in their Partnership interests, and then by JBJZ in the tax bases that JBJZ claimed to have had in the assets it received upon the liquidation of the Partnership (the Cisco Stock and the Canadian Currency), and, therefore, in JBJZ's computation of the JBJZ Losses. The following table shows the contributions described above as a percentage of the Long Option premium amounts:[100]

---

97 See, for example, the *E&Y COBRA Presentation* which describes and illustrates the interrelated sequence of "steps" to be followed in order to "generate" "permanent . . . losses." Bates: 2003EY001565 through 2003EY001583. See *supra*., footnotes 1 and 6. See also *supra*., footnote 4, which summarizes the sequence of events that generated the JBJZ Losses.

98 See Table 1, Column C (page 38).

99 See Table 2, Columns D & F. Row 3.

100 The percentages of contributed cash (2%), the net cash premium paid for the Options (5%), and the E&Y Fees (1.5%) (when added to the legal fees paid by or invoiced to JBJZ (3%), *infra*., footnote 241) match up with the amounts and percentages presented in the *E&Y COBRA Presentation*. Bates: 2003EY001581.

| The amounts shown here are from Table 2, Columns C though G, Rows 1-3, 6, and 18. | JZ (Zucker) | | JGB (Boyd) | | Totals | |
|---|---|---|---|---|---|---|
| | Amount | As a % of the Long Option Premium | Amount | As a % of the Long Option Premium | Amount | As a % of the Long Option Premium |
| Long Option Premium | **$45,000,000** | | **$5,000,000** | | **$50,000,000** | |
| Cash Contributed | $900.000 | 2.0% | $100.000 | 2.0% | $1,000,000 | 2.0% |
| Approximate Value of Cisco Stock Contributed | $476.775 | | $52.975 | | $529.750 | |
| Net Cash Premium Paid for Options Contributed | $2.250.000 | 5.0% | $250.000 | 5.0% | $2.500.000 | 5.0% |
| Payment of the E&Y Fees (by Zucker & Boyd Individually) | $675.000 | 1.5% | $75.000 | 1.5% | $750.000 | 1.5% |
| **Total:** | **$4,301,775** | 9.6% | **$477,975** | 9.6% | **$4,779,750** | 9.6% |

### 3. ¯B¯Z Investors, Inc. ["¯B¯Z"]

61. JBJZ Investors, Inc. **["JBJZ"]** was a corporation formed under the laws of the State of Delaware on or about November 16, 1999.[101]

- Although the JBJZ stock certificates issued to Mr. Zucker and Mr. Boyd are dated November 16, 1999,[102] JBJZ's 1999 Form 1120S included a "Section 351 Statement" that stated that the stock of JBJZ had been issued on December 27, 1999 (in exchange for the Partnership Interests held by Mr. Zucker and Mr. Boyd on that date).[103]
- JBJZ's December 1999 *Alex Brown Client Statement* shows an opening balance as of December 1, 1999 of $0.[104]
- The only other activity prior to December 28 shown on JBJZ's December 1999 *Alex Brown Client Statement* was the receipt of 4,500 of Cisco Systems, Inc. stock on December 7, the receipt of and

101 Bates: 0640 through 0644.

102 Bates: 0679 through 0682.

103 Bates: 1081 & 1082.

104 Bates: 1186 through 1191. I was unable to locate a *November 1999 Alex Brown Client Statement* for JBJZ.

additional 500 shares of Cisco Systems, Inc. stock on December 8, and the "Transfer Out" of all 5,000 of these shares on December 22.[105]

62. The name and mailing address of the incorporator was Donna Guerin, c/o Jenkens & Gilchrist, 225 West Washington, Suite 2600, Chicago, Illinois 60606-3413.[106]

63. JBJZ filed an election to be taxed as an S corporation on Form 2553 ("Election by a Small Business Corporation") dated November 18, 1999[107] and filed on November 29, 1999.[108]

64. At the time of its formation through to the date of its liquidation sometime in 2000,[109] JBJZ had one class of stock outstanding. This stock was issued and owned as follows:[110]

- Mr. Zucker: 90 shares (90%) for $90.00.
- Mr. Boyd: 10 shares (10%) for $10.00.

65. For federal income tax purposes, JBJZ elected a calendar year[111] and the cash method of accounting.[112]

66. JBJZ's Form SS-4 ("Application for Employer Identification Number") identified a principal activity of "INVESTMENTS."[113]

- The business code on Line B of its Form 1120S was 523900 ("Other Financial Investment Activities (including portfolio management & investment advice"[114]).[115]

---

105 Bates: 1186 through 1191. This stock was apparently transferred to JBJZ, rather than to the Partnership, in error. See ¶110 and 113.

106 Bates: 0640 through 0644.

107 Bates: 0650. Donna Guerin of J&G was the designated "officer or legal representative" on Form 2553, Line E.

108 Bates: 0649.

109 Bates: 1252 through 1263.

110 Bates: 0652 through 0656 (1999) and 1252 through 1264.

111 Bates: 1061.

112 Bates: 1067 (1999 Form 1120S, Schedule B, Line 1).

113 Bates: 0646.

- JBJZ's mailing address was Mr. Zucker's home address: 16 Buckingham Drive, Charleston, SC 29407.[116]
- JBJZ's Employer Identification Number was 57-1088087.[117]
- On Line 13 of Form SS-4, JBJZ represented that it did not expect to have any employees during the succeeding 12-month period.

67. JBJZ filed a Form 8821 ("Tax Information Authorization"), dated November 18, 1999, on which it listed Laura Lightholder, Jenkens & Gilchrist, 225 West Washington, Suite 2600, Chicago, Il 60606 as "Appointee."[118]

68. Account Number 222-10156-19 at Alex Brown was established for JBJZ on or about November 22, 1999.[119]

**a) Contributions**

69. **JZ (Zucker):** On December 27, 1999, JZ (Zucker) transferred its/his Partnership interest to JBJZ in exchange for 90 shares (90%) of JBJZ common stock.[120] At the time of the contribution, JZ (Zucker) claimed to have had a tax basis in its/his Partnership interest of $47,616,953.[121]

70. **JGB (Boyd):** On December 27, 1999, JGB (Boyd) transferred its/his Partnership interest to JBJZ in exchange for 10 shares (10%) of JBJZ common stock.[122] At the time of the contribution, JGB (Boyd) claimed to have had a tax basis in its/his Partnership interest of $5,290,773.[123]

71. The exchange of the Partnership interests for the stock of JBJZ resulted in the termination of the Partnership. The Cisco Stock and the Canadian

---

114 *Instructions for Form 1120S* (1999), p. 27.
115 Bates: 1061.
116 Bates: 1061 & 1288.
117 Bates: 1061 & 0646.
118 Bates: 0647.
119 Bates: 00000108, and 00000382 & 00000383.
120 Bates: 1081 & 1082.
121 Bates: 1081 & 1082. See Table 2, Column D, Row 19.
122 Bates: 1081 & 1082.
123 Bates: 1081 & 1082. See Table 2, Column F, Row 19.

Currency (together with cash of $3,355,475) was distributed to JBJZ as a distribution in liquidation of the Partnership.[124]

- The tax basis that JBJZ claimed to have had in the Canadian Currency as of the date of its sale of that Currency was $30,225,082.[125]
- The tax basis that JBJZ claimed to have had in the Cisco Stock that had been contributed to the Partnership by Mr. Zucker was, as of the date of the sale of that Stock by JBJZ, $18,654,451.[126]
- The tax basis that JBJZ claimed to have had in the Cisco Stock that had been contributed to the Partnership by Mr. Boyd was, as of the date of the sale of that Stock by JBJZ, $2,072,717.[127]

**b) Activities**

72. JBJZ sold the Canadian Currency on December 29 for $778,407.[128]

- JBJZ reported an ordinary loss of $29,446,675 **[the "JBJZ Ordinary Loss"]** from this sale on the Form 4797 and on the Schedule K of its 1999 Form 1120S.
- This Loss was allocated to Mr. Zucker and Mr. Boyd in proportion to their stock ownership of JBJZ:
  - Mr. Zucker: $26,520,008.
  - Mr. Boyd: $2,946,668.

73. JBJZ sold the 500 shares of Cisco Stock originally acquired by Mr. Boyd on December 31 for $52,973.[129]

---

124 Bates: 0291 through 0303.
125 Bates: 1075. See Table 2, Column G, Row 26.
126 Bates: 1074. See Table 2, Column G, Row 24.
127 Bates: 1074. See Table 2, Column G, Row 25.
128 Bates: 1075.
129 Bates: 1074.

- JBJZ reported a short-term capital loss of $2,019,744 **[the "JBJZ STCL"]** from this sale on the Schedules D and K of its 1999 Form 1120S.
- The entire amount of the JBJZ STCL was allocated to Mr. Boyd (Schedule K-1 (Boyd), Line 4(d)[130]), and none of that amount was allocated to Mr. Zucker (Schedule K-1 (Zucker), Line 4(d)[131]).

74. JBJZ sold the 4,500 shares of Cisco Stock originally acquired by Mr. Zucker on December 31 for $476,756.[132]

- JBJZ reported a long-term capital loss of $18,177,695 **[the "JBJZ LTCL"]** from this sale on the Schedules D and K of its 1999 Form 1120S.
- The entire amount of the JBJZ LTCL was allocated to Mr. Zucker (Schedule K-1 (Zucker), Line 4(e)(2))[133]), and none of that amount was allocated to Mr. Boyd (Schedule K-1 (Boyd), Line 4(e)(2)[134]).

75. JBJZ invested the cash it received from the Partnership in the Tax Free Deutsche Banc Alex Brown Cash Reserve Fund.

76. On December 31, JBJZ invested the cash proceeds from the sale of the Cisco Stock and the Canadian Currency in the Tax Free Deutsche Banc Alex Brown Cash Reserve Fund.

77. On December 29, JBJZ paid fees to J&G **["J&G Fee"]** of $1,400,000[135] in payment of an invoice dated December 6.[136]

---

130 Bates: 1077.
131 Bates: 1079.
132 Bates: 1074.
133 Bates: 1079.
134 Bates: 1077.
135 Bates: 1189.
136 Bates: 1886. J&G subsequently invoiced JBJZ for an additional $40,000 (Bates: 00000565). I have been unable to determine whether or not this additional $40,000 amount was ever paid.

78. No additional receipts or disbursements were recorded in JBJZ's December 1999 *Alex Brown Client Statements*.

#### c) Liquidation

79. JBJZ liquidated sometime in 2000.[137]

#### d) Effect of Use of S Corporation

80. As far as I can determine from the documents that I have reviewed, the only activities that JBJZ engaged in during the less-than-fourteen-month period of its existence were the sales of the Cisco Stock and the Canadian Currency and the payment of the J&G Fee during the last three days of 1999, the payment of the B&W Fee in 2000,[138] and a limited amount of passive investment activity in 1999 and in 2000 prior to its liquidation.[139]

81. From the documents that I have reviewed in this case, it is not apparent that, tax considerations aside, JBJZ served any function that could not just as readily have been served by the Partnership (e.g., sale of the Cisco Stock and the Canadian Currency, payment of the J&G Fee and the B&W Fee, and the investment of cash proceeds in short-term investments).

- From a tax standpoint, it is my understanding that the transfer of the Partnership Interests to JBJZ was not essential to the ultimate objective of the COBRA Strategy, i.e., the generation of the $49,644,114 of permanent ordinary losses and capital losses that Mr. Zucker and Mr. Boyd deducted on their respective 1999 Form 1040s.[140]
- It is my understanding that this same result could have been achieved by simply liquidating the Partnership and distributing its assets to JZ

---

Scheef & Stone, LLP invoiced J&G $240,000 on 12/28/99 for "12/22/99, GPD For legal services rendered, including, without limitation, consultation regarding design, structure and implementation of transaction" regarding "JBJZ Investors, Inc." (Bates: 00000564).

137 Bates: 1252. See Box F(2) of JBJZ's 2000 Form 1120S (marked "Final return").

138 See ¶144, *et seq.*

139 Bates: 1252 through 1264.

140 *E&Y COBRA Presentation*, *supra*., footnotes 1 & 6.

(Zucker) and JGB (Boyd), in which case the descriptions and calculations of the losses resulting from sales of the Cisco Stock and the Canadian Currency would have had to have been disclosed on the 1999 Form 1040s of the Zuckers and the Boyds.

**(1) Coplan E-Mails**

82. Several statements made by Mr. Coplan (E&Y National Office) in e-mails sent to E&Y personnel involved in the COBRA Transaction lend support to this opinion. For example:

- January 10, 2000 from Mr. Coplan to the Quickstrike Team:

> It is preferable to leave the S corporation in place through the end of the year 2000 *to enhance the substance of the transaction* – i.e., so that the entire structure is not closed down within 2 months. . . . We would recommend that the S corporation continue holding the value that was in the trading account just before the options expired last month – i.e., the final value of the account into which 2% of the long position was transferred. . . .
>
> *As for activity* in *the account, "The more the better."*[141] [Emphasis supplied.]

- March 17, 2000 e-mail from Mr. Coplan to Amy Keating (Subject: Re: COBRA):

> We want them [the S corporations] to maintain some investment activity this year, *so it looks a* little *more like a bona fide entity*. They should all be aware of this and there should actually be some assets in the S corp after the fees are paid."[142] [Emphasis supplied.]

- March 27, 2000 e-mail from Robert B. Coplan (E&Y National Tax) to six E&Y tax professionals ("Subject: RE: WRB Lake, Inc."):

> On a separate note, it had been our strong recommendation that the S corp be kept alive this year for some trading *to add to its 'bona fides.'* Although we

141 Bates: 2003EY000870.

142 Bates: 2003EY010723.

> told John Bean that a client could shut it down if he insisted, we did convey the message that this would *greatly heighten the risks associated with the transaction.*[143] [Emphasis supplied.]

- September 5, 2000 e-mail from Robert B. Coplan (E&Y National Tax) to James A. Cox and Richard J. Shapiro (E&Y) ("Subject: RE: S corp terminations for COBRA transactions", responding to a question from James Cox regarding when to terminate an S corporation used in a COBRA transaction):

> There is no rule. The longer it stays running, *the better it looks* from a business purpose standpoint as to why the thing was formed. *But the main thing was to get it into this year* [2000].[144] [Emphasis supplied.]

**(2) Opinion**

83. In my opinion, it would be reasonable to conclude that one of the principal functions served by JBJZ (and the single-member LLCs) was to further distance:

- The transactions
  - That created the inflated basis amounts, and
  - That were used to capitalize the Transaction-related accounting and legal fees,[145]

---

143 Bates: DOJ031721 & DOJ031722.

144 Bates: 2003EY003912.

145 These transactions included (1) the formation of the single-member LLCs and the acquisition of Employer Identification Numbers for each of them, (2) the purchase of the offsetting Options by the LLCs, (3) the transfer of the offsetting Options by the LLCs to the Partnership, (4) the acquisition of the COBRA Loss Assets (Canadian Currency and Cisco Stock) by the Partnership shortly before its termination and liquidation, (5) the distribution of those COBRA Loss Assets to JBJZ, and the assignment of tax bases to the COBRA Loss Assets that was comprised, in total, of $47,500,000 of artificial, noneconomic built in losses (Table 2, Column I) and $2,150,000 of unidentified built-in deductions for Transaction-related accounting and legal fees.

- From the individual Taxpayers who would ultimately deduct the resulting JBJZ Losses against unrelated gains and income on their respective Form 1040s.

84. In my opinion, it would be reasonable to conclude that another principal function served by JBJZ was to remove the sale of the COBRA Loss Assets (i.e., the Canadian Currency and the Cisco Stock) from the Form 1040s of the individual Taxpayers, and to thereby reduce the possibility of detection and audit by the IRS.

- Had the distributions of these assets been made directly to Mr. Zucker and Mr. Boyd, sold by them, and then reported on their individual Form 1040s, the order of magnitude between the claimed tax basis and the selling price would have been so great (especially, with respect to the Canadian Currency, given a holding period of less than a week), that it is reasonable to assume that the risk of detection and audit would have increased substantially.

- **The Canadian Currency:**
    - The tax basis assigned to the Canadian Currency[146] distributed to and then sold by JBJZ was **38 times greater**[147] than the price this Currency sold for, and **38 times greater**[148] **than its actual cost** when purchased by the Partnership less a week before its sale.
    - The losses from the sale of the Canadian Currency by the Taxpayers would have had to have been reported, in detail, on Form 4797 of the Taxpayers' respective 1999 Form 1040s. Form 4797 would have required disclosure of:
        - "(a) Description of the property,"
        - "(b) Date acquired (mo., day, yr.),"

---

146 The Canadian Currency was purchased for $772,500 on December 22-23 and sold on December 29 for $778,407 for an actual gain of $5,907.

147 37.83 = ($30,225,082 divided by $778,407) - 1.

148 38.13 = ($30,225,082 divided by $772,500) - 1.

  - "(c) Date sold (mo., day, yr.),"
  - "(d) Gross sales price,"
  - "(f) Cost or other basis, plus improvements and expense of sale," and finally
  - "(g) Gain or (loss)"

- **The Cisco Stock:**
  - The tax basis assigned to the Boyd Cisco Stock that was distributed to and then sold by JBJZ was **38 times greater**[149] than the price this Stock sold for, and **58 times greater**[150] than its actual cost to Mr. Boyd when he purchased that Stock about four months prior to its subsequent sale by JBJZ.[151]
  - The tax basis assigned to the Zucker Cisco Stock that was distributed to and then sold by JBJZ was **38 times greater**[152] than the price this Stock sold for, and **326 times greater**[153] than its actual cost to Mr. Zucker when he purchased that Stock in 1996.[154]
  - The losses from the sale of the Cisco Stock by the Taxpayers would have had to have been reported, in detail, on Lines 1 and 8 (columns (a) through (f)) of Parts I and II of Schedule D of the Taxpayers' respective Form 1040s. Lines 1 and 8 required disclosure of:
    - "(a) Description of the property,"
    - "(b) Date acquired (mo., day, yr.),"
    - "(c) Date sold (mo., day, yr.),"

---

149 38.13 = ($2,072,717 divided by $52,973) - 1.

150 58.38 = ($2,072,717 divided by $34,905) - 1.

151 Mr. Boyd purchased the 500 shares of Cisco Stock on August 26, 1999 for $34,905. JBJZ sold that Stock on December 31 for $52,973 for an actual gain of $18,068.

152 38.13 = ($18,654,451 divided by $476,756) - 1.

153 326.27 = ($18,654,451 divided by $57,000) - 1.

154 Mr. Zucker purchased the 4,500 shares of Cisco Stock in 1996 for $57,000. JBJZ sold that Stock on December 31 for $476,756 for an actual gain of $419,756.

- "(d) Sales price,"
- "(e) Cost or other basis," and finally
- "(f) Gain or (loss)"

o Column (e) of Lines 1 and 8 required the disclosure of the "Cost or other basis (see page D-5)." *1999 Instructions for Schedule D (Form 1040)* stated:

> **Column (e)—Cost or other basis.** . . . If you do not use the actual cost, attach an explanation of your basis.[155]

- Since the tax basis that would have been used by Mr. Zucker and Mr. Boyd to calculate their respective losses on the sale of the Cisco Stock would not have been the "actual cost" of that Stock, they would each have been required to attach to their 1999 Form 1040 an explanation of how they had determined their tax basis in that Stock.

• Since the COBRA Loss Assets (the Canadian Currency and the Cisco Stock) were instead distributed to and sold by the newly-formed S Corporation, these required, detailed disclosures were effectively moved from the shareholders' respective Form 1040s to JBJZ's Form 1120.[156]

o The reporting of the JBJZ Ordinary Loss on the Schedule Es included with the Zucker' and the Boyd' 1999 Form 1040s, disclosed the shareholder's allocated amount of the JBJZ Ordinary Loss, together with the name and EIN of JBJZ as the entity from which that loss was allocated. However,

---

155 *1999 Instructions for Schedule D (Form 1040),* at page D-5.

156 As subsequently observed, however, JBJZ did not attach or otherwise include any explanation or description of how the tax bases it claimed to have had in the Boyd Cisco Stock or the Zucker Cisco Stock had been determined.

- Neither of these Form 1040s disclosed a description of the property sold, the sales price, the dates of acquisition and sale, or the tax basis used to compute the amount of the loss, and
- Neither of these Form 1040s disclosed any information or description regarding the source[157] of these losses or the rationale or method used to determine the tax basis claimed by JBJZ in calculating the amounts.

o As subsequently observed, on their 1999 Form 1040s, the Zuckers and the Boyds simply deducted the capital losses allocated to them by JBJZ on a single line (Line 12 and Line 5, respectively) of their Schedule Ds.

- Neither of these Form 1040s identified, by name or by EIN, JBJZ as the source of the capital loss deducted on Line 12 or Line 5.
- Neither of these Form 1040s disclosed a description of the property sold, the sales price, the dates of acquisition or sale, or the tax basis used to compute the amount of the loss.
- Neither of these Form 1040s disclosed any information or description regarding the source[158] of these losses or the rationale or method used to determine the tax basis claimed by JBJZ in calculating the amount.

157 *Supra.*, footnote 3.
158 *Supra.*, footnote 3.

## C. Description of Transaction

### 1. Step 2: November 23, 1999: Purchase (and Sale) of the Long (and Short Options) [Co@ectlve@, the "Long 2 stlons", the "Short 2 stlons," and the "2 stlons"]

#### a) 9Z (Zucker) ["ˉ Z 2 stlons", "ˉ Z Long 2 stlons," and "ˉ Z Short 2 stlons"][159]

##### (1) Euro Options[160]

85. On November 23, 1999, JZ (Zucker) entered into certain over-the-counter, non-publicly traded European-style digital option positions on the Euro **["€"]** with counterparty Deutsche Bank AG New York Branch **["DeutscheBank"]**.[161]

86. **Long Option.** JZ (Zucker) purchased a digital option on the EUR/USD exchange rate at a strike price of $1.0123 per €1.0000. This option had an expiration date of December 22, a settlement date of December 27, a payoff amount of $40,000,000, and a stated premium of $20,000,000.

87. **Short Option.** JZ (Zucker) sold a digital option on the EUR/USD exchange rate at a strike price of $1.0121 per €1.0000. This option had an expiration date of December 22, a settlement date of December 27, a payoff amount of $37,500,000, and a stated premium of $19,000,000.

88. The net cash cost of the JZ Options (Euro) to JZ (Zucker) was $1,000,000.[162]

---

159 See Table 2, Columns C & D, Rows 2 through 4.

160 Bates: 0688 through 0690.

161 DeutscheBank was also the "calculating agent."

162 This amount was wired to DeutscheBanc on December 3, 1999 out of the JZ Alex Brown Account Number 222-10153. Bates: 2097.

### (2) Yen Options[163]

89. On November 23, 1999, JZ (Zucker) entered into certain over-the-counter, non-publicly traded European-style digital option positions on the Japanese Yen **["¥"]** with counter-party DeutscheBank.[164]

90. **Long Option.** JZ (Zucker) purchased a digital option on the USD/JPY exchange rate at a strike price of ¥106.19 per $1.00. This option had an expiration date of December 22, a settlement date of December 27 and a payoff amount of $50,000,000, and a stated premium of $25,000,000.

91. **Short Option.** JZ (Zucker) sold a digital option on the USD/JPY exchange rate at a strike price of ¥106.21 per $1.00. This option had an expiration date of December 22, a settlement date of December 27, a payoff amount of $46,875,000, and a stated premium of $23,750,000.

92. The net cash cost of the JZ Options (Yen) to JZ (Zucker) was $1,250,000.[165]

### b) JGB (Boyd)
### ["˜ GB 2ptions", "˜ GB Lonȷ 2ptions," anG "˜ GB 6hort 2ptions"][166]

93. On November 23, 1999, JGB (Boyd) entered into certain over-the-counter, non-publicly traded European-style digital option positions on the Euro with counterparty DeutscheBank.[167]

94. **Long Option.** JGB (Boyd) purchased a digital option on the EUR/USD exchange rate at a strike price of $1.0123 per €1.0. This option had an expiration date of December 22, a settlement date of December 27, a payoff amount of $10,000,000, and a stated premium of $5,000,000.

---

163 Bates: 691 through 694.

164 DeutscheBank was also the "calculating agent."

165 This amount was wired to DeutscheBanc on December 1, 1999 out of the JZ Alex Brown Account Number 222-10153. Bates: 2097.

166 Bates: 0684 through 0686. See Table 2, Columns E & F, Rows 2 through 4.

167 DeutscheBank was also the "calculating agent."

95. **Short Option.** JGB (Boyd) sold a digital option on the EUR/USD exchange rate at a strike price of $1.0121 per €1.0. This option had an expiration date of December 22, a settlement date of December 27, a payoff amount of $9,375,000, and a stated premium of $4,750,000.

96. The net cash cost of the JGB Options to JGB (Boyd) was $250,000.[168]

### c) Table 1: Summary of the Option Transactions

97. Table 1, below, summarizes the details of each of the option transactions and calculates the "inflated basis amounts" (discussed below).

---

[168] This amount was wired to DeutscheBanc on December 1, 1999 out of the JGB Alex Brown Account Number 222-10154. Bates: 2622.

# Table 1

| Summary of the Option Transactions | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LLC Transferor | Reference | | Currency Pair | Long Positions | | | Offsetting Short Positions | | | Net Premium Paid | "Inflated Basis Amount" | |
| | | | | Strike Price | Premium "Charged" | Payout | Strike Price | Premium "Credited" | Payout | | In Dollars | As a Percentage of Actual Net Cash Cost |
| | | | A | B | C | D | E | F | G | H | I | J |
| JZ (Zucker) | "JZ Options" | 1 | EUR/USD | 1.0123 | $20,000,000 | $40,000,000 | 1.0121 | $19,000,000 | $37,500,000 | $1,000,000 | $19,000,000 | 1900% |
| | | 2 | USD/JPY | 106.1900 | $25,000,000 | $50,000,000 | 106.2100 | $23,750,000 | $46,875,000 | $1,250,000 | $23,750,000 | 1900% |
| JGB (Boyd) | "JGB Options" | 3 | EUR/USD | 1.0123 | $5,000,000 | $10,000,000 | 1.0121 | $4,750,000 | $9,375,000 | $250,000 | $4,750,000 | 1900% |
| Total: | | 4 | | | $ 50,000,000 | | | | | $2,500,000 | $47,500,000 | 1900% |

### 2. Step 3: December 7, 1999:[169] Assignment of Long Options and Short Options to the Partnership and the Creation of the "Inflated Basis Amounts"

#### a) JZ (Zucker)[170]

98. JZ (Zucker) assigned the JZ Long Options and the offsetting JZ Short Options to the Partnership as a contribution to capital.[171]

99. JZ (Zucker) increased its/his tax basis in its/his Partnership interest by the stated premium "paid" ("charged") for the JZ Long Options ($45,000,000), but did not decrease that basis by any of the amount of the premium "received" ("credited") for the JZ Short Options ($42,750,000). Table 1, Columns C and F, Rows 1 and 2.

100. This treatment resulted in a greatly inflated tax basis in the Partnership interest owned by JZ (Zucker), i.e., the $45,000,000 net increase claimed by JZ (Zucker) was $42,750,000 **["inflated basis amount"]** (or 19 times) greater than the $2,250,000 net cash premium actually paid on the JZ Options. Table 1, Columns H through J, Rows 1 and 2.

#### b) JGB (Boyd)[172]

101. JGB (Boyd) assigned the JGB Long Option and the offsetting JGB Short Option to the Partnership as a contribution to capital.[173]

102. JGB (Boyd) increased its/his tax basis in its/his Partnership interest by the stated premium "paid" ("charged") for the JGB Long Option ($5,000,000), but did not decrease that basis by any of the amount of the premium "received" ("credited") for the JGB Short Option ($4,750,000). Table 1, Columns C and F, Row 3.

---

169 These assignments ("Transfer[s] In") appear on the Partnership's *December 1999 Alex Brown Client Statement* and are dated 12/07/99 (but "A/O 11/24/99"). Bates: 0296.

170 See Table 2, Columns C & D, Rows 2 through 4.

171 Bates: 0296 and 0698 through 0703.

172 See Table 2, Columns E & F, Rows 2 through 4.

173 Bates: 0296 and 0695 through 0697.

103. This treatment resulted in an greatly inflated tax basis in the Partnership interest owned by JGB (Boyd), i.e., the $5,000,000 net increase claimed by JGB (Boyd) was $4,750,000 **["inflated basis amount"]** (or 19 times) greater than the $250,000 net cash premium actually paid on the JGB Options. Table 1, Columns H through J, Row 3.

### 3. December 22, 1999: Termination of the Options

104. The Options terminated on December 22.[174]

105. The net proceeds from the termination of these positions was $3,125,000.[175] The Partnership recognized and reported total net ordinary income of $625,000[176] ($3,125,000 less $2,500,000[177]) from the Option transactions.[178]

### 4. Step 4: AcTuisition of the "C2 BRA Loss Assets"

#### a) Overview

106. As described in the E&Y COBRA Presentation, at some time after the termination of the option positions, the Partnership Interests were to be contributed to a newly-formed S Corporation in exchange for the stock of that S Corporation.

- The stock of the S Corporation was, or would be, owned by the individual owners of the single-member LLCs in the same proportions as their respective LLCs had owned the Partnership.
- This exchange would result in a technical termination of the Partnership,[179] immediately after which the Partnership would be liquidated and its remaining assets would be transferred to the S Corporation.

---

174 Bates: 0295, 0695 through 0703, 0180, and 0297 & 0298.

175 Bates: 0295 ("12/27/99 Funds Received as of 12/24").

176 Bates: 0177 & 0180.

177 $2,500,000 = $2,250,000 + $250,000. See Table 2, Columns C & E, Row 2.

178 See Table 2, Row 5.

179 Section 708(b)(1)(B).

107. Prior to the assignment of the Partnership Interests to the S Corporation, the Partnership would purchase (or the single-member LLCs would contribute) one or more capital assets and/or foreign currency **[the "COBRA Loss Assets"].** The COBRA Loss Assets would be retained by the Partnership until it terminated, liquidated, and distributed those Assets to the S Corporation.

108. Upon the termination and liquidation of the Partnership, the tax basis that the Partnership had in the COBRA Loss Assets would disappear.

- The S Corporation would instead assign the aggregate tax bases that the transferor-partners claimed to have had in their Partnership Interests (less the amount of the cash distributed by the Partnership to the S Corporation) to those Assets.
- Consequently, the tax basis that the S Corporation claimed to have had in the COBRA Loss Assets would include the greatly inflated tax basis amounts that the transferor-partners respectively claimed to have had in their Partnership Interests.

109. Shortly after the receipt of the COBRA Loss Assets, the S Corporation would then sell those Assets and claim the COBRA Capital Loss(es) and/or the COBRA Ordinary Loss(es) that the S Corporation would allocate to and between its shareholders. These shareholders would then deduct their allocated share of the COBRA Loss(es) on their individual Form 1040s.

**b) December 22, 1999:**
**Additional Contributions to the Capital of the Partnership**
**[The "Cisco Stock"]**

**(1) JZ (Zucker)**

110. On December 22, the Partnership received 4,500 shares of stock in Cisco Systems, Inc. **["Cisco Stock"]** as "a contribution to its capital from JZ Buckingham Investments, LLC."[180]

- However, these shares where actually transferred from *JBJZ's* Alex Brown Account 222-10156-19, not from *JZ's* Alex Brown Account 222-10153-12
- JBJZ had received these shares on December 7, presumably directly from Mr. Zucker.
- There is no indication on either the November 1999 or the December 1999 *Alex Brown Client Statements* that JZ ever received or held any Cisco Stock.[181]
- A December 21 Fax from J&G to Ray Knight at E&Y refers to the "misplacement of the Cisco stock."[182]
  - Attached to this fax is a letter signed by Mr. Zucker conveying the Cisco Stock from JBJZ to the Partnership.[183]
  - One of the four pages referred to on the fax coversheet appears to be missing from the documents I have reviewed. The third page of this fax, however, states that the contribution of the 500 shares of Cisco Stock transferred from Mr. Boyd to JBJZ on December 8 had been made in error. Presumably, the missing fourth page similarly

---

180 Bates: 0297 & 00000131. See Table 2, Columns C & D, Rows 6 & 7.

181 Bates: 2089 through 2093 (November) and 2094 through 2099 (December).

182 Bates: 00000132.

183 Bates: 00000132.

stated that the 4,500 shares of Cisco Stock transferred from Mr. Zucker to JBJZ on December 7 had been made in error.[184]

111. It is my understanding that the Cisco Stock contributed by JZ (Zucker) had been purchased by Mr. Zucker in 1996 for $57,000 and that this basis would have carried over to become the Partnership's tax basis in that Stock.[185]

- Note, however, that in computing the tax bases that JZ (Zucker) claimed to have had in its/his Partnership interest (and that JBJZ subsequently claimed to have had in the Cisco Stock and the Canadian Currency it received from the Partnership upon the Partnership's termination and liquidation), the $476,775 *fair market value* of that stock, not JZ (Zucker)'s $57,000 *tax basis*, was used.[186]

112. The Cisco Stock contributed by JZ (Zucker) on December 22 was ultimately distributed (back) to JBJZ and then sold by JBJZ on December 31 for $476,756. JBJZ recognized and reported a $18,177,695 long-term capital loss on this sale.[187]

### (2) JGB (Boyd)

113. On December 22, the Partnership received 500 shares of stock in Cisco Stock as "a contribution to its capital from JGB Bohicket Investments, LLC."[188]

- However, these shares where actually transferred from *JBJZ's* Alex Brown Account 222-10156-19, not from *JGB's* Alex Brown Account 222-10154-11.

---

184 Bates: 00000132 & 00000134.

185 I.R.C. Section 723. As noted at ¶157,*et seq.*, the Partnership's 1999 Form 1065 (including the accompanying forms, schedules, statements, and attachments) did not disclose any information regarding the Cisco Stock received from JZ (Zucker).

186 See the spreadsheet prepared by Amy Keating of E&Y dated March 8, 2000. Bates: 0288. See also Table 2, Columns C & D, Rows 6 & 7, and the "Proof/Reconciliation" in Rows 24 through 27 (which incorporate the fair market value amount on Column D, Row 6).

187 Bates: 1074.

188 Bates: 0297 & 00000131. See Table 2, Columns E & F, Rows 6 & 7.

- JBJZ had received these shares on December 8, presumably directly from Boyd.
- There is no indication on either the November 1999 or the December 1999 *Alex Brown Client Statements* that JGB ever received or held any Cisco Stock.[189]
- A December 21 Fax from J&G to Ray Knight at E&Y refers to the "misplacement of the Cisco stock."[190]
  - o Attached to this fax is a letter signed by Mr. Zucker conveying the Cisco Stock from JBJZ to the Partnership.[191]
  - o The third page of this fax states that the contribution of the 500 shares of Cisco Stock transferred from Mr. Boyd to JBJZ on December 8 had been made in error, and requests that these shares be transferred from JBJZ to the Partnership "as a contribution to capital from [JGB]."[192]

114. It is my understanding that the Cisco Stock contributed by JGB (Boyd) had been purchased by Mr. Boyd on August 26, 1999 for $34,905, and that this basis would have carried over to become the Partnership's tax basis in that stock.[193]

- o Note, however, that in computing the tax bases that JGB (Boyd) claimed to have had in its/his Partnership interest (and that JBJZ subsequently claimed to have had in the Cisco Stock and the Canadian Currency it received from the Partnership upon the Partnership's

---

189 Bates: 2614 through 2618 (November) and 2619 through 2623 (December).

190 Bates: 00000132.

191 Bates: 00000132.

192 Bates: 00000132 & 00000134.

193 I.R.C. Section 723. As noted at ¶157,*et seq.*, the Partnership's 1999 Form 1065 (including the accompanying forms, schedules, statements, and attachments) did not disclose any information regarding the Cisco Stock received from JGB (Boyd).

termination and liquidation), the $52,975 *fair market value* of that stock, not JGB (Boyd)'s $34,905 *tax basis*, was used.[194]

115. The Cisco Stock contributed by JGB (Boyd) on December 22 was ultimately distributed (back) to JBJZ and then sold by JBJZ on December 31 for $52,973. JBJZ recognized and reported a $2,019,744 short-term capital loss on this sale.[195]

#### c) December 22 & 23, 1999: 3Drtnership's 3urchDse of &DnDdiDn DollDrs ["&DnDdiDn &urrency"]

116. On or about December 22 and 23, the Partnership purchased Canadian Dollars **["Canadian Currency"]** for $772,500.[196]

117. The Canadian Currency was ultimately distributed to JBJZ and then sold by JBJZ on December 29 for $778,407. JBJZ recognized and reported a $29,446,675 ordinary loss on this sale.[197]

### 5. Ptep 5: December 27, 1999: Transfer of Partnership fnterests to JBJZ and the Termination and i iquidation of the Partnership

118. On or about December 27, the JZ (Zucker) and JGB (Boyd) contributed their respective Partnership interests to JBJZ in exchange for all of JBJZ's issued and outstanding stock.[198]

#### a) JZ (Zucker)

119. JZ (Zucker) transferred its/his Partnership interest to JBJZ in exchange for 90 shares (90%) of JBJZ's stock.[199]

---

194 See the spreadsheet prepared by Amy Keating of E&Y dated March 8, 2000. Bates: 0288. See also Table 2, Columns E & F, Rows 6 & 7, and the "Proof/Reconciliation" in Rows 24 through 27 (which incorporate the fair market value amount on Column F, Row 6).

195 Bates: 1074.

196 Bates: 0298. These purchases were posted on December 23 and 27, respectively. See Table 2, Column I, Row 16.

197 Bates: 1075.

198 Bates: 1081.

120. JBJZ claimed a carryover tax basis in this Partnership interest of $48,876,953.[200] This amount included:[201]

- The inflated basis amount of $42,750,000 (Table 1, Column I, Rows 1 and 2),
- Approximately $419,775 of unrealized appreciation in the value of the Cisco Stock[202] that JZ (Zucker) had contributed to the Partnership (erroneously through JBJZ[203]).
- Mr. Zucker's $675,000 share of the E&Y Fee (an amount which was incurred and paid individually by Mr. Zucker[204] and which was also claimed by him as a miscellaneous itemized deduction on his 1999 Form 1040) (¶130).[205]
- Mr. Zucker's $1,260,000 share of the J&G Fee (¶136).

---

199 As previously observed, the stock certificate issued to Mr. Zucker was dated November 16, 1999. Bates: 0679 & 0680.

200 The $48,876,953 tax basis that JBJZ actually claimed to have in this Partnership interest was $1,260,000 more than the $47,616,953 amount shown on the *Regulation Section 1.351-3(b) Statement* that it filed with its *1999 Form 1120S*. Bates: 1081. This difference is the amount of Mr. Zucker's share of the J&G Fee, which was, in fact, retroactively added to (i.e., capitalized to) the tax basis of JZ (Zucker)'s Partnership interest upon the payment of this fee by JBJZ on December 29.

201 See Table 2, Column D.

202 $419,775 = $476,775 (approximate fair market value) less $57,000 (Mr. Zucker's cost basis). This gain was not recognized by Mr. Zucker upon the transfer of the Cisco Stock to the Partnership. Bates: 1288 through 1365. I.R.C. Section 721(a). Instead of increasing his tax basis in the Partnership interest by $57,000 under I.R.C. Section 722, his basis was increased by the stock's $476,775 fair market value. See ¶111.

203 See ¶110.

204 I was unable to locate documentation supporting this payment by Mr. Zucker. However, I concluded that Mr. Zucker must have made this payment individually since (1) he was personally invoiced for this fee, (2) he deducted it on his 1999 Form 1040, (3) this amount does not appear on the Schedule Ks (or on his Schedule K-1s) of either the Partnership or JBJZ, and (4) there is no record of any payment to E&Y (or of any such amount) on the Partnership's *Alex Brown Client Statements* or on JBJZ's *Alex Brown Client Statements*.

205 Bates: 1335.

### b) JGB (Boyd)

121. JGB (Boyd) transferred its/his the Partnership interest to JBJZ in exchange for 10 shares (10%) of JBJZ's stock.[206]

122. JBJZ claimed a carryover tax basis in this Partnership interest of $5,430,773.[207] This amount included:[208]

- The inflated basis amount of $4,750,000 (Table 1, Column I, Row 3),
- Approximately $18,070 of unrealized appreciation in the value of the Cisco Stock[209] that Mr. Boyd had contributed to the Partnership (through, erroneously, JBJZ[210]).
- Mr. Boyd's $75,000 share of the E&Y Fee (an amount which was incurred and paid individually by Boyd[211] and which was also claimed by him as a miscellaneous itemized deduction on his 1999 Form 1040[212]) (¶130).
- Mr. Boyd's $140,000 share of the J&G Fee (¶136).

---

206 As previously observed, the stock certificate issued to Mr. Boyd was dated November 16, 1999. Bates: 0681 & 0682.

207 The $5,430,773 tax basis that JBJZ actually claimed to have in this Partnership interest was $140,000 more than the $5,290,773 amount shown on the Regulation Section 1.351-3(b) Statement that it filed with its 1999 Form 1120S. Bates: 1081. This difference is the amount of Mr. Boyd's share of the J&G Fee, which was, in fact, retroactively added to (i.e., capitalized to) the tax basis of JGB (Boyd)'s Partnership interest upon the payment of this fee by JBJZ on December 1999.

208 See Table 2, Column F.

209 $18,070 = $52,975 (approximate fair market value) less $34,905 (Mr. Boyd's cost basis). This gain was not recognized by Mr. Boyd upon the transfer of his Cisco Stock to the Partnership. Bates: 2203 through 1365. I.R.C. Section 721(a). Instead of increasing his tax basis in the Partnership interest by $34,905 under I.R.C. Section 722, his basis was increased by the stock's $52,973 fair market value. See ¶114.

210 See ¶113.

211 I was unable to locate documentation supporting this payment by Mr. Boyd. However, I concluded that Mr. Boyd must have made this payment individually since (1) he was personally invoiced for this fee, (2) he deducted it on his 1999 Form 1040, (3) this amount does not appear on the Schedule Ks (or on his Schedule K-1s) of either the Partnership or JBJZ, and (4) there is no record of any payment to E&Y (or of any such amount) on the Partnership's *Alex Brown Client Statements* or on JBJZ's *Alex Brown Client Statements*.

212 Bates: 2208 & 2637.

### c) The Partnership

123. On or about December 27, immediately following the contributions of the Partnership Interests to JBJZ, the Partnership terminated and liquidated. The Cisco Stock and the Canadian Currency (together with cash of $3,355,475) was distributed to JBJZ as a distribution in liquidation of the Partnership.[213]

### d) JBJZ

124. On December 28, the Cisco Stock and the Canadian Currency (together with cash of $3,355,475) were received by JBJZ as proceeds from the termination and liquidation of the Partnership.

125. The tax bases that JBJZ assigned to the Cisco Stock and to the Canadian Currency was not a carryover of the Partnership's tax bases in those assets as of the date of its termination, liquidation, and distribution ($91,905[214] and $772,500,[215] respectively).

126. The aggregate tax basis that JBJZ assigned to the Cisco Stock and the Canadian Currency was instead the aggregate carryover tax basis that the partners claimed to have had in their respective Partnership interests (increased by the $1,400,000 J&G Fee reduced by the $3,355,475 cash distributed by the Partnership to JBJZ).

- The aggregate tax basis that JBJZ assigned to the Cisco Stock and the Canadian Currency was $50,952,250,[216] an amount that included:[217]
    - The inflated basis amounts totaling $47,500,000 (Table 1, Column I, Row 4),

---

213 Bates: 0291 through 0303.

214 Table 2, Column C & E, Row 7. As previously noted, the partners incorrectly claimed a Partnership interest tax basis that included an amount equal to the approximate fair market value of the Cisco Stock as of the date of the contribution of that stock to the Partnership ($529,729). Table 2, Column D & F, Row 6. See ¶111 and ¶114.

215 See also Table 2, Column I, Row 16.

216 See Table 2, Column G, Row 23.

217 See Table 2, Column G.

- Approximately $437,845 of unrealized appreciation in the value of the Cisco Stock[218] that Mr. Zucker and Mr. Boyd had contributed to the Partnership (erroneously through JBJZ[219]).
- The $750,000 E&Y Fee (which was incurred and paid individually by Mr. Zucker and Mr. Boyd and which was also claimed by them as miscellaneous itemized deductions on their respective 1999 Form 1040s. (¶130, *et seq.*)).
- The $1,400,000 J&G Fee (¶136, *et seq.*)).

- The difference between the total of these amounts ($50,087,845) and the JBJZ Losses ($49,644,114) is the amount of the actual economic gain (computed using the cost of these assets) realized by JBJZ on the sale of the Cisco Stock and the Canadian Currency ($443,731[220]).

### 6. Step 6: December 29 and 31, 1999: Sale of the Canadian Currency and the Cisco Stock by JBJZ

127. JBJZ sold the Canadian Currency on December 29 for $778,407.[221]

- JBJZ reported an ordinary loss of $29,446,675 **[the "JBJZ Ordinary Loss"]** from this sale on the Form 4797 and on the Schedule K of its 1999 Form 1120S.
- The actual economic gain or loss resulting from the purchase and sale of the Canadian Currency (computed using the Partnership's original cost of this currency) was a gain of $5,907.[222]

---

218 $437,845 = $419,775 (¶111) + $18,070 (¶114).

219 See ¶110 *et seq.*

220 $443,731 gain = $18,068 gain (500 shares of Cisco Stock from Mr. Boyd) + $419,756 gain (4,500 shares of Cisco Stock from Mr. Zucker) + $5,907 gain (Canadian Currency).

221 Bates: 1075.

222 $5,907 = $778,407 (gross sales price) less $772,500 (the Partnership's cost).

- Thus, the amount of the ordinary loss claimed by JBJZ was -4,985 times[223] the amount of the actual economic gain realized on the investment in the Canadian Currency.

128. JBJZ sold the 500 shares of Cisco Stock originally acquired by Mr. Boyd on December 31 for $52,973.[224]

  - JBJZ reported a short-term capital loss of $2,019,774 **[the "JBJZ STCL"]** from this sale on the Schedules D and K of its 1999 Form 1120S.
  - The actual economic gain or loss resulting from the purchase and sale of these 500 shares of Cisco Stock (computed using Mr. Boyd's original cost of these shares) was a gain of $18,068.[225]
  - Thus, the amount of the short-term capital loss claimed by JBJZ was -112 times the amount of the actual economic gain realized on the investment in these 500 shares of Cisco Stock.[226]

129. JBJZ sold the 4,500 shares of Cisco Stock originally acquired by Mr. Zucker on December 31 for $476,756.[227]

  - JBJZ reported a long-term capital loss of $18,177,695 **[the "JBJZ LTCL"]** from this sale on the Schedules D and K of its 1999 Form 1120S.
  - The actual economic gain or loss resulting from the purchase and sale of these 4,500 shares of Cisco Stock (computed using Mr. Zucker's original cost of these shares) was a gain of $419,756.[228]

---

223 -4,985 = -$29,446,675 divided by $5,907.

224 Bates: 1074.

225 $18,068 = $52,973 (gross sales price) less $34,905 (Mr. Boyd's cost).

226 -112 = -$2,019,774 divided by $18,068.

227 Bates: 1074.

228 $419,756 = $476,756 (gross sales price) less $57,000 (Mr. Zucker's cost).

- Thus, the amount of the long-term capital loss claimed by JBJZ was -43 times the amount of the actual economic gain realized on the investment in these 4,500 shares of Cisco Stock.[229]

## D. Transaction-Related Fees

### 1. Ernst & Young ["E&Y"]

130. Sometime in mid-November 1999, Mr. Zucker and Mr. Boyd engaged Ernst & Young **["E&Y"]**

> . . . to provide tax advice . . . concerning the implementation of the COBRA strategy . . . .[230]

131. Sometime subsequent to the date they engaged E&Y, Mr. Zucker and Mr. Boyd individually paid E&Y fees totaling $750,000 **["E&Y Fees"]**:[231]

Mr. Zucker: $675,000.[232]

Mr. Boyd: $ 75,000.[233]

132. From a federal income tax standpoint, the treatment of the E&Y Fees resulted in a duplication of potential tax benefits.

- First, Mr. Zucker and Mr. Boyd deducted these fees on their individual 1999 Form 1040s as miscellaneous itemized deductions.
    - The 1999 Form 1040s of Mr. Zucker and Mr. Boyd respectively disclosed their payments to E&Y, without further elaboration, as "Ernst & Young, LLP"[234] and "Accounting Fees."[235]
- Second, although the E&Y Fees were incurred, paid, and deducted individually by Mr. Zucker and Mr. Boyd, the tax bases in their

---

229 -43 = -$18,177,695 divided by $419,756.

230 Bates: 3192 through 3198 **["E&Y Engagement Letter(s)"]**.

231 See Table 2, Columns D, F, and G, Row 18.

232 *Supra.*, footnote 204.

233 *Supra.*, footnote 211.

234 Bates: 1335.

235 Bates: 2208. See also Bates: 2637.

respective Partnership interests (and, ultimately, the amount of the JBJZ Losses allocated to and deducted by them) were increased by their respective amounts of the E&Y Fees.[236]

133. The Partnership's 1999 Form 1065 (including the accompanying forms, schedules, statements, and attachments) did not disclose any information pertaining to the E&Y Fees -- there was no general or specific description of these fees, there was no disclosure of the identity of the payee, the amounts of these fees were not separately stated or otherwise disclosed, and the fact that these fees were added to the tax bases of the Partnership Interests was not disclosed.[237]

134. The duplicated E&Y Fees that increased the tax bases in the Partnership Interests were ultimately buried in the JBJZ Losses (i.e., as an unidentified component of the $49,644,114 of ordinary and capital losses that JBJZ recognized and reported on its 1999 Form 1120S from the sale of the Canadian Currency and the Cisco Stock, and that it then allocated to and between Mr. Zucker and Mr. Boyd).

135. A December 23, 1999 e-mail from Robert B. Coplan (E&Y National Tax) (to over forty E&Y personnel ("Subject: Deductibility of COBRA Fees") confirms E&Y's policy of capitalizing the fees paid to it by its clients in connection with the COBRA transaction:

> After several discussions internally and with counsel, we have concluded that there is a return filing position that can be taken for *capitalizing the E&Y fees into the basis of the partnership, thereby enabling a capital or ordinary loss to be claimed for this amount.* We recommended previously that the E&Y invoice be sent to the individual partners or the LLCs in order to support the premise that the fees were paid as an expense of setting up the partnership and advising on its activities. Because the fees will be significant, the clients would likely need to have substantial authority to

---

236 See Table 2, Columns C, E, and G, Rows 18 through 27.

237 Bates: 0172 through 0187.

> avoid having to disclose the position as a protection against a section 6662 penalty. We believe substantial authority exists for this positions.
>
> If you have yet to send one out, the E&Y invoice may read, "For professional services rendered to __(individual or LLC)__ during 1999 in connection with the formation and operation of the _____ partnership and the purchase of foreign currency options."[238]

- I have seen no documentation in this case that identifies or otherwise discusses the "substantial authority" referred to above and on the basis of which the E&Y Fees were capitalized to the tax bases in the Partnership Interests.
- Neither the J&G Opinion nor the B&W Opinion identified or in any way addressed this issue.[239]

### 2. ¯enkens & Gilchrist ["¯ &G"]

136. On December 29, JBJZ paid fees to J&G **["J&G Fee"]** of $1,400,000[240] in payment of an invoice dated December 6.[241]

- Under the terms of the engagement letters between J&G and Mr. Zucker and Mr. Boyd (both dated December 1) **[the "J&G Engagement Letters"]**, J&G would provide

---

238 Bates: 2003EY000878.

See also a November 11, 1999 e-mail from Brian Upchurch of E&Y, in which he states: "*The [E&Y] fee may be a flag that we do not want on the return this year. What flexibility do we have and what do you recommend.*" [Emphasis supplied.] Bates: 2003EY010640.

See also the *E&Y COBRA Presentation* which would have treated the E&Y Fees and the J&G Fee as miscellaneous itemized deductions ("*Deduction for fees only available after application of 2% floor.*") Bates: 2003EY001582 & 2003EY001583.

239 Bates: 0419 through 0531 (J&G) and 0532 through 0609 (B&W).

240 Bates: 1189.

241 Bates: 1886 J&G subsequently invoiced JBJZ for an additional $40,000 (Bates: 00000565). I have been unable to determine whether or not this additional $40,000 amount was ever paid.

Scheef & Stone, LLP invoiced J&G $240,000 on 12/28/99 for "12/22/99, GPD For legal services rendered, including, without limitation, consultation regarding design, structure and implementation of transaction" regarding "JBJZ Investors, Inc." (Bates: 00000564).

> . . . legal services . . . for our advice and assistance in the facilitation and execution of European digital foreign currency option investment transactions . . ., the documentation of the transaction, and our research and the rendering of a 'more likely than not' tax opinion letter setting forth our conclusions and rationale.[242]

137. Although the J&G Fee was ultimately paid by JBJZ, this fee was incurred by the Taxpayers, individually, in the following amounts:[243]

- Mr. Zucker: $1,260,000.[244]
- Mr. Boyd: $ 140,000.[245]

138. The Partnership's 1999 Form 1065 (including the accompanying forms, schedules, statements, and attachments) did not disclose any information pertaining to the J&G Fee -- there was no general or specific description or disclosure of the amount, purpose, or payee of this fee.[246]

139. JBJZ's 1999 Form 1120S (including the accompanying forms, schedules, statements, and attachments) did not disclose any information pertaining to the J&G Fee or to its payment by JBJZ -- there was no general or specific description or disclosure of the amount, purpose, or payee, or of the fact that any such amount had been paid to anyone by JBJZ.[247]

140. JBJZ instead capitalized its payment of the J&G Fee to the Cisco Stock and the Canadian Currency. This was apparently done by first increasing (retroactively[248]) the "carryover" tax bases that the partners claimed to have had in their Partnership interests, and by then allocating that

---

242 Bates: 3199 through 3202.

243 See Table 2, Columns D & F, Row 20.

244 Bates: 1881.

245 Bates: 1883.

246 Bates: 0172 through 0187.

247 Bates: 1061 through 1082.

248 The Partnership Interests were received by JBJZ on or about December 27, whereas JBJZ, a cash method taxpayer, paid the J&G Fee on December 29.

increased tax basis between and among the cash, the Cisco Stock and the Canadian Currency.[249]

141. Consequently, the J&G Fee, like the E&Y Fees, was ultimately buried in the JBJZ Losses (i.e., as an unidentified component of the $49,644,114 ordinary and capital losses that JBJZ reported on its 1999 Form 1120S from the sale of the Canadian Currency and the Cisco Stock).

142. A March 13, 2000 e-mail from Robert B. Coplan (E&Y National Tax) to over twenty E&Y tax professionals ("Subject: Further (and close to final) Update on COBRA Returns") confirms E&Y's policy of capitalizing the fees paid to J&G by its clients in connection with the COBRA transaction:

> J&G Fee Capitalized. This is to further advise you that the returns reflect a decision made late last week to capitalize the Jenkens & Gilchrist legal fees into the basis of the partnership interest, which in turn gets included in the basis of the S corporation out of which the payments are ultimately made. We concluded that there was reasonable support for taking this position, in that the key services J&G rendered were the structuring of the partnership, the document preparation and the formation of the entities. The legal opinion was not the main reason for the payment of the fee, since a separate tax opinion was being obtained from Brown & Wood. Therefore, *the J&G fees will produce an additional K-1 loss in the same manner as the E&Y fees.* The final S corp returns and K-1s reflect this position. *The significance of this is that the returns will not force the individuals to show the large payment to J&G as a miscellaneous itemized deduction, which could be a flag on the 1040.*[250] [Emphasis supplied.]

- An earlier e-mail from Mr. Coplan (December 23, 1999, e-mail from Coplan to over forty E&Y personnel ("Subject: Deductibility of COBRA Fees")), had expressed reservations about the propriety of capitalizing the J&G Fees:

---

[249] See excerpt from the March 13, 2000 Coplan e-mail, below, which describes how (and why) the J&G Fees paid in connection with the COBRA Strategy were to be capitalized to the S corporations' tax bases in the assets received in liquidation of the partnerships. See Table 2, Columns C, E, and G, Rows 19 through 27.

[250] Bates: 2003EY011725 & 2003EY011726.

> We believe there is less support for similarly capitalizing the fees for the law firms with respect to their opinion letters. The greatest part of the Jenkens fee is for the opinion letter, which is to be provided to assist the S corporation in preparing K-1s for its shareholders. . . .
>
> As you know, we did not believe there was adequate support for claiming a section 162 deduction at the S corporation level for fees paid by the S corporation for the opinion letters, etc. These fees will be treated as section 212 expenses on the individuals' returns.[251]

- I have seen no documentation in this case that identifies or otherwise discusses the "reasonable support" referred to in the March 13, 2000 e-mail, above, and on the basis of which the J&G Fee was capitalized to the Partnership Interests and then to the Cisco Stock and Canadian Currency.
- Neither the J&G Opinion nor the B&W Opinion identified or in any way addressed this issue.[252]

143. None of the 1999 Form 1040s of the Taxpayers (including the accompanying forms, schedules, statements, and attachments) disclosed any information pertaining to the J&G Fee.

### 3. Brown & Wood ["B&W"]

144. On or about March 3, 2000, Mr. Zucker and Mr. Boyd each retained the law firm of Brown & Wood **["B&W"]** as

> . . . special U.S. Federal income tax counsel to you in connection with certain investment transactions in which you have engaged ('Transactions'). In that capacity, you

[251] Bates: 2003EY000878. See also a December 9, 1999 e-mail sent from Coplan to the "Quickstrike Team": "We are not comfortable treating the [J&G Fee and the B&W Fee] as section 162 expenses, but are exploring the potential for capitalizing them into the basis of the S corp assets, which would increase the size of the loss on the sale of the assets." Bates: 2003EY000868. See also Bates: 2003EY010648 (language repeated in e-mail dated 12/22/99).

See also the *E&Y COBRA Presentation* which would have treated the E&Y Fees and the J&G Fee as miscellaneous itemized deductions ("*Deduction for fees only available after application of 2% floor.*") Bates: 2003EY001582 & 2003EY001583.

[252] Bates: 0419 through 0531 (J&G) and 0532 through 0609 (B&W).

have asked that we provide you with an opinion regarding certain of the U.S. Federal income tax consequences of the Transactions.[253]

145. The opinion letters issued by B&W to Mr. Zucker and to Mr. Boyd were dated March 9, 2000.[254]

146. B&W invoiced JBJZ directly for $60,000 **["B&W Fee"]** on March 28, 2000.[255] This amount was paid by JBJZ.

- The B&W Fee was not separately identified on JBJZ's 2000 Form 1120S.[256] It appears to have been deducted, without elaboration, on Schedule K (and the Schedule K-1s of Mr. Zucker and Mr. Boyd) as "Deductions related to portfolio income (loss)."[257]

### 4. Fees as a Percentage of the Long Option Premium

147. As previously discussed, Long Option premium amounts (totaling $50,000,000)[258] were included by the partners in their respective tax bases of the Partnership interests, and by then by JBJZ in its tax basis in the Cisco Stock and the Canadian Currency (and, ultimately, in JBJZ's computation of the JBJZ Losses).[259]

148. The E&Y Fee was 1.500% of the Long Option premiums.[260]

149. The sum of the J&G Fee, the B&W Fee, and the additional $40,000 amount subsequently invoiced by J&G[261] was 3.000% of the Long Option premiums.[262]

---

253 Bates: 2886 & 2888 **["B&W Engagement Letters"]**.

254 Bates: 0532 (Boyd).

255 Bates: 2895.

256 Bates: 1252 through 1264. Nor was it separately identified or deducted on the Boyds' 2000 Form 1040. Bates: 2279 through 2316. (I could not locate a copy of the Zuckers' 2000 Form 1040 to determine whether or not the B&W Fee was separately identified or deducted on that return.)

257 Bates: 1254, 1259, & 1262.

258 See Table 1, Column C, Row 4.

259 See Table 2, Columns D, F, and G, Row 3.

260 $750,000/$50,000,000 = 1.500%.

261 *Supra*., footnote 241.

150. These percentages match the 4.5% presented in the *E&Y COBRA Presentation*.[263]

### E. TaEle 2: "Derivation of Tax Bases Claimed Ey JBJZ in the Cisco Stock and the Canadian Currency"

151. As noted above, the $50,952,250 aggregate tax basis that JBJZ assigned to and between the Cisco Stock and the Canadian Currency in calculating the JBJZ Losses[264] was the aggregate tax basis that JBJZ claimed that Mr. Zucker and Mr. Boyd had in the Partnership Interests that JBJZ received from them (through their LLCs) in exchange for its stock (reduced by the amount of cash distributed to JBJZ in the liquidation of the Partnership).

152. JBJZ's 1999 Form 1120S included a statement that disclosed:

- o The fact that JBJZ had received the Partnership Interests from Mr. Zucker and Mr. Boyd in a I.R.C. Section 351 exchange for all of its stock, and
- o The tax bases that Mr. Zucker and Mr. Boyd respectively claimed to have had in those Partnership Interests as of the date of their contribution.[265]

153. However, as discussed in more detail in Section V., below, most of the information essential to making a determination of how Mr. Zucker and Mr. Boyd calculated their respective tax bases in their Partnership interests, and, therefore, how JBJZ calculated its tax bases in the Cisco Stock and the Canadian Currency (and, therefore, how JBJZ calculated the amounts of loss that it recognized and reported on their respective sales) was not disclosed on or with any of the 1999 Returns and was not ascertainable or

---

262 ($1,400,000 + $60,000 + $40,000)/$50,000,000 = 3.000%.

263 Bates: 2003EY001581 through 2003EY001583.

264 Bates: 1074 & 1075.

265 Bates: 1081 & 1082.

reasonably ascertainable from the information presented on or with those 1999 Returns, individually or collectively.[266]

154. In "Table 2: Derivation of Tax Bases Claimed by JBJZ in the Cisco Stock and the Canadian Currency," I took the tax bases that JBJZ assigned to:

(1) The 4,500 shares of Cisco Stock originally contributed by Mr. Zucker ($18,654,451),[267]

(2) The 500 shares of the Cisco Stock originally contributed by Mr. Boyd ($2,072,717),[268] and

(3) The Canadian Currency purchased by the Partnership four days before its termination and liquidation ($30,225,082),[269]

And worked backwards to determine how these amounts must have been derived.[270]

155. Essential information that was not disclosed on or ascertainable (or reasonably ascertainable) from the 1999 Returns (and that, therefore, had to first be identified as relevant, and then located or derived from other documents) includes:

- The fact that the tax bases that JBJZ claimed that the partners had in their Partnership interests had been determined, in part, by increasing

---

[266] See Table 2, Columns A & B.

[267] Bates: 1074.

[268] Bates: 1074.

[269] Bates: 1075.

[270] See also the spreadsheet prepared by Amy Keating of E&Y dated March 8, 2000. Bates: 0288. As previously noted, I used the Cisco Stock values that she appears to have used in making her calculations (these amounts differ from the actual selling prices of the Cisco Stock by less than $25).

Ms. Keating calculated a total tax basis allocable to the Cisco Stock and the Canadian Currency of $48,802,250, as compared with the actual amount used on JBJZ's 1999 Form 1120S in computing the JBJZ Losses, $50,952,250. The $2,150,000 difference between these amounts is the amount of the E&Y Fees ($750,000) and the J&G Fee ($1,400,000) (the Coplan e-mail communicating the decision to capitalize the J&G Fee was dated March 13, 2000, five days after the date on this spreadsheet).

See also the description and sequencing of the various "steps" that were outlined in the *E&Y COBRA Presentation*, *supra*., footnote 1.

those bases by the amount of the premium "charged" for the Long Options and without regard to the premiums "credited" for the Short Options (and, therefore, without regard to the actual net cost of the Options);

- The fact that Transaction-related fees to E&Y that had been incurred, paid, and deducted by Mr. Zucker and Mr. Boyd, individually, had also been capitalized as unidentified components of the tax bases of the Partnership Interests (and, ultimately, as unidentified components of the JBJZ Losses).
- The fact that JBJZ had paid a Transaction-related fee to J&G, and that this fee had also been capitalized as an unidentified component of the tax bases of the Partnership Interests (and, ultimately, as an unidentified component of the JBJZ Losses).

156. Table 2 is organized as follows:

- Column A identifies the items of information that were and that were not disclosed on the 1999 Returns.
- Column B (Rows 1 through 23) evaluates whether or not the effect of those items on the tax bases the partners claimed to have had in their respective Partnership interests was disclosed on any of the 1999 Returns or was otherwise ascertainable, or reasonably ascertainable, from the information provided on or with any of those Returns.
- Working backwards from the $50,952,250 aggregate tax basis that JBJZ assigned to the two lots of Cisco Stock and the Canadian Currency (Table 2, Column G, Row 24), Column G identifies the items and the amounts that appear to have been taken into consideration in computing the partners' aggregate tax basis in the Partnership Interests.
    - In Columns C though F (Rows 1 through 20), the totals shown in Column G are broken out between JZ (Zucker) and JGB (Boyd).

  - Columns C and E identify the items and amounts that were *excluded* from the determination of the tax bases.
  - Columns D and F identify the items and amounts that were *included* in the determination of the tax bases.

- Columns H and I respectively show the effect of the item on the Partnership's income or loss, and on its cash flows.

- In Column G, Rows 20 through 23, the total tax basis in the Partnership Interests is first increased by the J&G Fee and then reduced by the amount allocated to the cash distributed by the Partnership to JBJZ in order to determine the residual amount that JBJZ allocated to the two lots of Cisco Stock and the Canadian Currency.

- Rows 24 through 27 allocate this residual tax basis amount between the two lots of Cisco Stock and the Canadian Currency, and compare the amounts so derived with the amounts actually show on JBJZ's 1999 Form 1120S. ***The amounts shown in Column G, Rows 24 through 26 match the amounts reported on the Form 1120S to the dollar.***

# Table 2

## Derivation of Tax Bases Claimed by JBJZ in the Cisco Stock and the Canadian Currency

| Date | Description | | # | Disclosure on 1999 Returns?: Was this Item Disclosed On or Ascertainable (or Reasonably Ascertainable) From Disclosures on any of the 1999 Returns? | Disclosure on 1999 Returns?: Was the Effect of this Item on the Partners' Tax Bases in the Partnership Interests (or on JBJZ's Tax Basis in the Cisco Stock and the Canadian Currency) Disclosed On or Reasonably Ascertainable From Any of the 1999 Returns? | JZ (Zucker) 90.0% – Calculation of Tax Basis in Partnership Interest: Amounts Not Included | JZ (Zucker) 90.0% – Calculation of Tax Basis in Partnership Interest: Amounts Included | JGB (Boyd) 10.0% – Calculation of Tax Basis in Partnership Interest: Amounts Not Included | JGB (Boyd) 10.0% – Calculation of Tax Basis in Partnership Interest: Amounts Included | Totals 100%: Aggregate Tax Basis in Partnership Interests | JZJB Partners: Income & Loss | JZJB Partners: Cash Flows |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | A | B | C | D | E | F | G | H | I |
| 12/07/1999 (A/O 11/24/99) | Cash Contribution | | 1 | No | No | | $900,000 | | $100,000 | $1,000,000 | | $1,000,000 |
| Date acquired by LLC partners: 11/23/1999 Date transferred to the Partnership: 12/07/1999 (A/O 11/24/99) | Options | Total Cash Cost of the Options | 2 | No | No | $2,250,000 | $0 | $250,000 | $0 | $0 | | |
| | Options | Total Long Option Premium "Charged" | 3 | Amounts Disclosed, Descriptions Ambiguous [Partnership Form 1065] | No | | $45,000,000 | | $5,000,000 | $50,000,000 | | |
| | Options | Total Short Option Premium "Credited" | 4 | Amounts Disclosed, Descriptions Ambiguous [Partnership Form 1065] | No | ($42,750,000) | $0 | ($4,750,000) | $0 | $0 | | |
| 12/22/99 | Sale of Options | | 5 | Yes [Partnership Form 1065] | Yes [Partnership Form 1065] | | $562,500 | | $62,500 | $625,000 | $625,000 | $3,125,000 |
| 12/22/99 | Contribution of Cisco Stock | Fair Market Value (approximate) | 6 | No | No | | $476,775 | | $52,975 | $529,750 | | |
| | Contribution of Cisco Stock | Tax Basis | 7 | No | No | $57,000 | | $34,905 | | | | |
| 12/10/99 | Purchase of Short Term Investments by JBJZ Partners | Bank of NY Co. | 8 | Yes [Partnership Form 1065] | Yes [Partnership Form 1065] | | | | | | | ($332,891) |
| 12/10/99 | | First Union Corp. | 9 | | | | | | | | | ($323,891) |
| 12/14/99 | | Bank of America Corp | 10 | | | | | | | | | ($319,053) |
| 12/23/99 | | Gateway Fund | 11 | | | | | | | | | ($400,000) |
| 12/17/99 | Sale of Short-Term Investments by JBJZ Partners | Bank of NY Co. | 12 | Yes [Partnership Form 1065] | Yes [Partnership Form 1065] | | $21,561 | | $2,396 | $23,957 | $23,957 | $350,848 |
| 12/17/99 | | First Union Corp. | 13 | | | | ($9,938) | | ($1,104) | ($11,042) | ($11,042) | $312,849 |
| 12/17/99 | | Bank of America Corp | 14 | | | | ($10,004) | | ($1,112) | ($11,116) | ($11,116) | $307,937 |
| 12/27/99 | | Gateway Fund | 15 | | | | $455 | | $51 | $506 | $506 | $400,506 |
| 12/22-23/99 | Purchase of Canadian Dollars | | 16 | No | No | | $0 | | $0 | $0 | $0 | ($772,500) |
| 12/28/99 | Tax Exempt Income (from "Tax Exempt Money Market") | | 17 | Yes [Partnership Form 1065] | Yes [Partnership Form 1065] | | $603 | | $67 | $670 | $670 | $670 |
| | Claimed Increase in Basis for E&Y Fee Incurred, Paid, and Deducted Individually by Zucker and Boyd | | 18 | No | No | | $675,000 | | $75,000 | $750,000 | $0 | $0 |
| | **Claimed Tax Basis in the Partnership Interests** | | 19 | Yes [JBJZ Form 1120S] | No Disclosure of How This Amount Was Determined. | | **$47,616,953 (90.000%)** | | **$5,290,773 (10.000%)** | **$52,907,725** | | |
| 12/29/99 | Claimed (Retroactive) Increase in Partnership Interest Basis for J&G Fee Paid by JBJZ on December 29, 1999 | | 20 | No | No | | $1,260,000 | | $140,000 | $1,400,000 | $0 | $0 |
| 12/28/99 (A/O 12/27/99) | Cash Distributed by JBJZ Partners to JBJZ Investors | | 21 | No | No | | | | | ($3,354,805) | | ($3,354,805) |
| 12/30/99 (A/O 12/27/99) | Cash Distributed by JBJZ Partners to JBJZ Investors | | 22 | No | No | | | | | ($670) | | ($670) |
| 12/29/99 (Canadian Currency) — 12/31/99 (Cisco Stock) | **Aggregate Tax Basis Claimed by JBJZ in the Cisco Stock and the Canadian Currency As of Date of Sale** | | 23 | Amounts Disclosed [JGJZ Form 1120S] | No Disclosure of How This Amount Was Determined. | | | | | **$50,952,250** | | **Cash flows net out to $0** |

| Allocation of Aggregate Tax Basis Between the Cisco Stock and the Canadian Currency | # | Amount Used to Make Allocation: Fair Market Value | Amount Used to Make Allocation: Cost & Approximate Fair Market Value | Percentage of Total To Be Allocated | Total Tax Basis To Be Allocated | Allocated Tax Basis | Proof/Reconciliation |
|---|---|---|---|---|---|---|---|
| | | A | B | C/D | E/F | G | H/I |
| 4,500 Shares of Cisco Stock (Zucker): | 24 | $476,775 | | 36.61% | $50,952,250 | $18,654,451 | Exactly Matches Amount Reported on JBJZ's 1999 Form 1120S |
| 500 Shares of Cisco Stock (Boyd): | 25 | $52,975 | | 4.07% | $50,952,250 | $2,072,717 | Exactly Matches Amount Reported on JBJZ's 1999 Form 1120S |
| Canadian Currency: | 26 | | $772,500 | 59.32% | $50,952,250 | $30,225,082 | Exactly Matches Amount Reported on JBJZ's 1999 Form 1120S |
| Totals: | 27 | $1,302,250 | | 100.00% | $50,952,250 | $50,952,250 | |

# V. Reporting of the Transaction on the 1999 Federal Income Tax Returns

## A. The Partnership[271]

### 1. Description

157. The Partnership timely filed an "initial" and "final" 1999 short-year Form 1065 ("U.S. Partnership Return of Income")[272] with the IRS Service Center in Atlanta, GA.

- This Return appears to have been signed by Mr. Zucker and was dated March 22, 2000.[273]
- Ray A. Knight signed this Return as Preparer. This signature was dated March 20, 2000, and identified Mr. Knight's employer as Ernst & Young, LLP, 1150 18th Street N.W., Suite 500, Washington, DC.

158. Question 2 of Schedule B ("Are any partners in this partnership also partnerships?") was checked "No."

159. Question 4 of Schedule B ("Is the partnership subject to the consolidated audit procedures . . . ") was checked "No" and "Designation of Tax Matters Partner" (which would have disclosed the name, tax identification number and address of that partner) was left blank.[274]

160. On Form 1065, Schedule B ("Other Information"), Question 5 **["Question 5"]**[275] was answered "Yes" notwithstanding the fact that:

---

271 Bates: 0172 through 0187.

272 Form 1065, Items G(1) and G(2). The short year reported on Form 1065 began on 11/16/99 and ended on 12/27/99. The Partnership elected the cash method of accounting (Form 1065, Item H(1)). Bates: 0172.

273 Bates: 0172. This Return was "RECEIVED" by the IRS on March 30, 2000.

274 Note that Question 4 must be checked "Yes" if any partner was "other than an individual, an estate, or a C corporation." See *1999 Instructions for Form 1065* (p. 18). Although the Partnership's two LLC-partners were disregarded entities that were respectively owned by Mr. Zucker and Mr. Boyd, the LLCs, and not their respective individual owners, were listed as the Partnership's partners on the Schedule K-1s and on the "Partner Summary."

275 Question 5 reads as follows:

- The Partnership's 1999 total receipts[276] (and even its *net* gain from the sale of the Options ($625,000)) far exceeded $250,000, and
- That its total assets at the time of its termination and liquidation far exceeded $600,000.
  - At the time of its termination and liquidation, the Partnership held cash of $3,355,475,[277] Cisco Stock having an approximate value of $529,750[278] (and a carryover tax basis to the Partnership of $91,905[279]), and Canadian Currency having a cost and approximate value of $772,500.[280]
- Since the Partnership's total receipts and total assets (as of the end of its tax year) exceeded the thresholds set forth in Question 5, the Partnership was not exempt from the requirement that the following schedules and items be completed:
  - Schedule L ("Balance Sheet per Books"),
  - Schedule M-1 ("Reconciliation of Income (Loss) per Books With Income (Loss) per Return"), and
  - Schedule M-2 ("Analysis of Partners' Capital Account"),
  - Item F on page 1 of Form 1065 ("Total assets"), and
  - Item J on Schedule K-1 ("Analysis of partner's capital account").

---

> 5. Does the partnership meet ALL THREE requirements?
>    a. The partnership's total receipts for the tax year were *less than $250,000*;
>    b. The partnership's total assets at the end of the tax year were *less than $600,000*; . . . .
>
> If 'Yes,' the partnership is not required to complete Schedules L, M-1, and M-2 . . . or Item J on Schedule K-1. [Emphasis added.]

276 The gross sales price, gross gains (before losses), and net cash receipts from the sale of the Options were $97,500,000, $48,750,000, and $3,125,000, respectively. Bates: 0180.

277 See Table 2, Column I, Rows 21 & 22.

278 See Table 2, Column G, Row 6.

279 See Table 2, Columns C & E, Row 7.

280 See Table 2, Column I, Row 16.

Nevertheless, all of these schedules and items were left blank on the Partnership's 1999 Form 1065.

- Had Schedule L been completed showing the assets and liabilities of the Partnership as of the moment of its termination and liquidation, it would have disclosed:
    - The ending balance of "Cash" ($3,355,475),
    - The existence of the Cisco Stock and the Canadian Currency on Line 6(d) ("Other current assets(attach schedule)") and/or Line 8(d) ("Other investments (attach schedule)"), and a book value for those assets of approximately $1,302,250[281] (far less than the $50,952,250 that JBJZ would claim as its tax basis in those assets when it sold them less than a week later), and
    - The ending balance of the "Partners' capital accounts."

161. On its Schedule K of Form 1065 for 1999, the Partnership reported:[282]

- "Ordinary income . . . from trade or business activities" of $625,000 (Line 1),
- "Net short-term capital gain . . ." of $2,305 (Line 4d), and
- "Tax-exempt interest income" of $607 (Line 19).
- No other items of income, gain, deduction, or loss were reported on Schedule K.

162. The $625,000 of "ordinary income" reported on Schedule K was also reported on Line 10 and Line 18 of Form 4797 ("Sales of Business Property"), and cross-referenced to "STATEMENT 2."[283]

- "STATEMENT 2" listed the gains and losses resulting from each of four "Currency Contract[s]."[284]

---

281 Table 2, Column A/B, Row 27.
282 Bates: 0174.
283 Bates: 0177.

- The term "Currency Contract" is nebulous. It could refer to any of several different types of currency transactions, including options, forward contracts, futures contracts, or currency swaps.[285]
- Statement 2 did not disclose the fact that that the "Currency Contracts" included paired Long Options and offsetting Short Options in each of two foreign currencies.
- There is no indication, in STATEMENT 2 or on any form, schedule, or statements attached to the Partnership's 1999 Form 1065, as to how these "Currency Contracts" were acquired:
  - Whether they were purchased by the Partnership using cash contributed to it by its partners,
  - Whether they were purchased by the Partnership using borrowed funds,
  - Whether they were acquired by the Partnership in exchange for a partnership interest or as a contribution to its capital, or
  - Whether they were acquired by some other means.
- There is nothing on the Partnership's 1999 Form 1065, on any of the Schedule K-1s, or on any other accompanying form, schedule, or statement that provided any indication or any reasonably discernable indication that the Long Options and the offsetting Short Options were contributed to the Partnership by its partners as contributions to capital, or that the contributions of these Options would result in the greatly inflated basis amounts (totaling $47,500,000) that were used to generate the JBJZ Losses (totaling $49,644,114).

---

284 Bates: 0180.

285 For example, the owner of a forward, futures, or swap contract has a obligation to perform. By contrast, the purchase of an option gives the owner a right, but not an obligation.

163. The $750,000 E&Y Fees that were incurred, paid, and deducted by Mr. Zucker and Mr. Boyd, but nevertheless included in the tax bases of the Partnership Interests, were not identified, described, or otherwise disclosed or deducted on Form 1065, in STATEMENT 2 (the supporting schedule to Form 4797 showing the calculation of gains and losses on the "Currency Contract[s]"), on either of the partners' Schedule K-1s, or on any other form, schedule, or statement that accompanied the Partnership's 1999 Form 1065.

164. The partners' respective liabilities for the $1,400,000 J&G Fee (that was subsequently capitalized as an increase to the tax bases of the Partnership Interests and then to the Cisco Stock and the Canadian Currency) were not identified, described, or otherwise disclosed on Form 1065, in STATEMENT 2 (the supporting schedule to Form 4797 showing the calculation of gains and losses on the "Currency Contract[s]"), on either of the partners' Schedule K-1s, or on any other form, schedule, statement, or attachment that accompanied the Partnership's 1999 Form 1065.

165. A "Partner Summary" was attached to Form 1065.[286]

- This summary listed the single-member LLCs as the Partnership's partners and disclosed their respective tax identification numbers and their respective beginning ratios of profit, loss, and ownership. (As previously noted, the names and tax identification numbers of the single-member LLCs differed from the names and tax identification numbers of the individuals who owned them.[287])
- The identities of the individual owners of these LLC-partners was not disclosed, by name or by tax identification number, on this "Partner Summary."

---

286 Bates: 0181.

287 See ¶30.

- The columns titled "Beginning Capital," "Capital Contributions," "Cash Distributions," and "Property Distributions" were left blank.

- The "Partner Summary" did not make any reference to (or provide any description or information relating to) the contributions of the Long Options, the offsetting Short Options, or the Cisco Stock by the LLC-partners to the Partnership's capital during the last month of 1999.

  - More specifically, the "Partner Summary" did not disclose or otherwise allude to the fact that the partners claimed increases in the tax bases of their Partnership interests by the amount of the premiums "charged" for the Long Options (and without regard to either the amount of the premiums "credited" for the offsetting Short Options or the actual net cash costs of the Options).

166. A separate Schedule K-1 was prepared for JZ and JGB.[288]

- Although both of the single-member LLC-partners were expressly designated for treatment as "disregarded entities" on the Form SS-4s that were filed by their respective single-members (¶26, *et seq.*), the Partnership identified the LLCs, and not Mr. Zucker and Mr. Boyd, as its partners on the Schedule K-1s that the Partnership filed with its Form 1065.[289]

  - Each of these Schedule K-1s described the LLC-partner as a domestic "LIMITED LIAB CO."[290]

    - The fact that these LLCs were single-member LLCs was not disclosed on the Partnership's Schedule K-1s or elsewhere on its Form 1065.

---

288 Bates: 0182 through 0187.

289 See *supra.*, footnote 38 (e-mail from Amy Keating to Robert Coplan and Donna Guerin questioning the reference to the LLCs, rather than to their single-member owners, as the partners on the COBRA partnership returns). See also¶33, *et seq.*

290 Response to Question B ("What type of entity is this partner?").

  - The fact that each of these LLCs was classified as a "disregarded entity" was not disclosed on the Partnership's Schedule K-1s or elsewhere on its Form 1065.
  - Neither the names nor the Social Security Numbers of Mr. Zucker[291] or Mr. Boyd appeared anywhere on any of the Schedule K-1s or elsewhere on the Partnership's 1999 Form 1065.

- The space provided for the responses to Item F ("Partner's share of liabilities") and Item G ("Tax shelter registration number")[292] were left blank on each of the Schedule K-1s.

- Since the Partnership's total receipts and total assets (as of the end of its tax year) exceeded the thresholds set forth in Question 5, the Partnership was not exempt from the requirement that Item J(a) through J(e) of Schedule K-1 be completed.
  - o Nevertheless, the spaces provided for the responses to Item J(a) through J(e) ("Analysis of partner's capital account") were left blank on each of the Schedule K-1s.
  - o Consequently, information regarding the partners' respective capital account balances (i.e., (a) the beginning capital account balance, (b) the amount of capital contributed during the year, (c) the amount of adjustments for the partner's share of income, gain, loss, etc., (d) withdrawals and distributions made by and to the partner during the year, and (e) the ending capital account balance) was not disclosed

---

291 However, as noted *infra.*, footnote 300, Mr. Zucker appears to have signed the Partnership's 1999 Form 1065. His signature was not accompanied by his typed or printed name or by his Social Security Number.

292 See Part VI of the Brown & Wood opinion letter (March 9, 2000) in which B&W renders an opinion that ". . . it is more likely than not that the Transactions would not constitute a tax shelter within the meaning of Code Section 6111(c)(1) and, therefore, would not be required to be registered under Code Section 6111(a)." This opinion is based on B&W's opinion that " . . . it is more likely than not that Investor's 'investment base' as defined in Code Section 6111(c)(3) would equal Investor's cost for the Long Option." E.g., Bates: 0609.

on the Schedule K-1s (or anywhere else on the Partnership's 1999 Form 1065).

- The amounts of ordinary income, net short-term capital gain, and tax-exempt interest income that were separately reported on the Partnership's Schedule K were allocated to and between the LLC-partners and separately reported on their respective Schedule K-1s.
- The $750,000 of E&Y Fees that were incurred, paid, and deducted by Mr. Zucker and Mr. Boyd, and that were also capitalized as increases to the tax bases of the Partnership Interests, were not identified, described, or otherwise disclosed on either of the Schedule K-1s.
- The partners' respective liabilities for the $1,400,000 J&G Fee that were subsequently capitalized as an increase to the tax bases of the Partnership Interests and then to the Cisco Stock and the Canadian Currency were not identified, described, or otherwise disclosed on either of the Schedule K-1s.[293]
- Line 25 ("Supplemental information required to be reported separately to each partner") was left blank on each of the Schedule K-1s. Line 25 is used, among other things, to provide adequate disclosure of the relevant facts relating to the tax treatment of any item that may cause an understatement of income tax.[294]

167. The Partnership's 1999 Form 1065 (including all accompanying forms, schedules, statements, and attachments) did not disclose or otherwise provide any reasonably discernable indication of:

---

293 Note, however, that the total Partnership interest tax basis shown on *the Regulation Section 1.351-3(b) Statement* that was filed with JBJZ's 1999 Form 1120S ($47,616,953 + $5,290,773 = $52,907,726) did not include the amount of the J&G Fee. As previously observed, JBJZ was a cash method taxpayer, and this amount was apparently added (retroactively) to JBJZ's "carryover" tax basis in the Partnership Interests (and then to the Cisco Stock and the Canadian Currency) when the J&G Fee was paid by JBJZ on December 29. Table 2, Column G, Row 20.

294 See *1999 Instructions for Form 1065* (p. 27), and *1999 Instructions for Schedule K-1 (Form 1065)* (p. 10).

- The contribution of the Long Options and the offsetting Short Options to the partnership as contributions to its capital,
- The contribution of the Cisco Stock to the partnership as a contribution to its capital,
- The fact that the Partnership had ever held the Cisco Stock (or that it held that stock as of the date of its termination and liquidation on December 27),
- The fact that the Partnership had ever acquired or held the Canadian Currency (or that it held that currency as of the date of its termination and liquidation on December 27),
- The fact that 100% of the Partnership Interests had been transferred by the partners to a corporation (JBJZ) in an exchange for all of the transferee's stock (and that this transfer had resulted in a technical termination of the Partnership for federal income tax purposes[295]),[296]
- The type, identity, tax basis, or fair market value of any of the noncash assets (i.e., the Cisco Stock and the Canadian Currency) distributed upon the termination and liquidation of the Partnership, or
- The identity of the distributee of the those assets (JBJZ) (or the fact that those assets were not distributed to the Partnership's original partners, i.e., the LLCs identified in the "Partner Summary" and on the Schedule K-1s filed with the Partnership's 1999 Form 1065, or to the respective owners, Mr. Zucker and Mr. Boyd, of those original partners).

168. The Partnership's 1999 Form 1065 did not contain any references whatsoever (by name or by tax identification number) to

---

295 Section 708(b)(1)(B).

296 Note, however, that JBJZ's receipt of the Partnership Interests from Mr. Zucker and Mr. Boyd (but without any mention of the LLCs (JZ and JGB) that had been designated as the Partnership's partners on its 1999 form 1065 ("Partner Summary" and the Schedule K-1s) was disclosed on JBJZ's 1999 Form 1120S.

- Mr. Zucker[297] or Mr. Boyd, or to
- JBJZ, the distributee of the Partnership's assets upon its termination and liquidation.

### 2. Opinion

169. In my opinion, the information and disclosures made on and with the Partnership's 1999 Form 1065 (including all accompanying forms, schedules, statements, and attachments), individually and collectively, failed to provide any reasonably discernable indication:

- That the Partnership's partners claimed to have had a greatly inflated tax basis in their Partnership interests.
- That foreign currency options (i.e., the Long Options and the offsetting Short Options) were acquired outside of the Partnership by its partners and then contributed to its capital by those partners.
- That the acquisitions of the Long Options and the offsetting Short Options by the LLCs and the subsequent contributions of these Options to the Partnership was the source of the greatly inflated tax bases claimed:
    - In the Partnership interests respectively held by the single-member LLC-partners (and through these LLCs, their respective individual owners), and, subsequently,
    - In the Cisco Stock and the Canadian Currency distributed by the Partnership to JBJZ, and then sold by JBJZ for claimed losses totaling $49,644,114, and
    - In the JBJZ stock held by JBJZ's individual stockholders.

---

297 Note, however, that the Partnership's 1999 Form 1065 appears to have been signed by Mr. Zucker. See, *infra*., footnote 300. However, his name is not printed or typed with that signature (or anywhere else on the Partnership's 1999 Form 1065) and his signature was not accompanied by his Social Security Number. The addresses of JZ and JGB disclosed on the Schedule K-1s were the same addresses used on the 1999 Form 1040s filed by the Zuckers and the Boyds.

- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if the Partnership's 1999 Form 1065 had disclosed this information.

170. In my opinion, the information and disclosures made on the Partnership's 1999 Form 1065 (including all accompanying forms, schedules, statements, and attachments), individually and collectively, failed to provide any indication that:

- The tax bases claimed by the partners in their respective Partnership interests (and, following the Partnership's termination and liquidation, the tax bases that JBJZ claimed in the Cisco Stock and the Canadian Currency) had been increased by the $750,000 of E&Y Fees that had been incurred, paid, and deducted by Mr. Zucker and Mr. Boyd, individually, or that

- The E&Y Fees were ultimately recognized and reported as an unidentified component of the JBJZ Losses (and as an unidentified component of the amount of those Losses that was allocated to and deducted by Mr. Zucker and Mr. Boyd on their respective 1999 Form 1040s).

- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if the Partnership's 1999 Form 1065 had disclosed this information.

171. In my opinion, the information and disclosures made on the Partnership's 1999 Form 1065 (including all accompanying forms, schedules, statements, and attachments), individually and collectively, failed to provide any indication:

- That the Partnership had received the Cisco Stock as a contribution to its capital by Mr. Zucker and Mr. Boyd (through their respective LLCs),[298]
- That the Partnership had ever held the Cisco Stock or the Canadian Currency,
- That all of the Partnership's partnership interests had been contributed by its original partners to another conduit entity (JBJZ),
- That the Cisco Stock and the Canadian Currency had been distributed by the Partnership to that conduit entity upon its termination and liquidation,
- That the distributee of these assets was JBJZ, or
- That the distributee of these assets was an S corporation owned in the same proportions by the same individuals who had, indirectly through their respective single-member LLCs, been the partners of the Partnership throughout the less-than-two-month period of its existence.
- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if the Partnership's 1999 Form 1065 had disclosed this information.

172. In my opinion, the information and disclosures made on the Partnership's 1999 Form 1065 (including all accompanying forms, schedules, statements, and attachments), individually and collectively, failed to provide any indication that the greatly inflated tax bases (which also included the capitalization of the E&Y Fees and, ultimately, the J&G Fee) that resulted from the creation, capital funding, termination, and liquidation of the Partnership were subsequently used by an undisclosed S corporation (i.e., JBJZ) to report $49,644,114 of ordinary losses and capital losses that were allocated to and deducted by undisclosed

298 See ¶112 & ¶115.

individual taxpayers (i.e., Mr. Zucker and Mr. Boyd) on their individual 1999 Form 1040s.

- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if the Partnership's 1999 Form 1065 had disclosed this information.

173. Neither the name nor tax identification number of JBJZ Investors, Inc. was disclosed anywhere on the Partnership's 1999 Form 1065 (or on any of the accompanying forms, schedules, statements, or attachments).[299]

174. Neither the names nor tax identification numbers of JBJZ, Mr. Zucker, or Mr. Boyd were disclosed anywhere on the Partnership's 1999 Form 1065 (or on any of the accompanying forms, schedules, statements, or attachments).[300]

- As previously stated,[301] in my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS might have been minimized or significantly reduced[302] through (1) the use of the LLCs to acquire and hold the Partnership Interests, (2) the assignment

---

299 However, both JBJZ Partners and JBJZ Investors, Inc. had "JBJZ" in their name and they both had the same address.

300 Note, however, that the Partnership's 1999 Form appears to have been signed by Mr. Zucker.


22 Ordinary income (loss) from trade or business activities. Subtract line 21 from line 8. . . . . . | 22 | 625,000.

Please Sign Here — Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than general partner or limited liability company member) is based on all information of which preparer has any knowledge.

Signature of general partner or limited liability company member — Date 3-22-2000

Paid Preparer's Use Only — Preparer's signature — Date 3/20/00 — Check if self-employed ☐ — Preparer's SSN or PTIN 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

Firm's name (or yours if self-employed) and address: ERNST & YOUNG LLP, 1150 18TH STREET NW, SUITE 500, WASHINGTON, DC — EIN 34-6565596 — ZIP code 20036-0000

For Paperwork Reduction Act Notice, see separate instructions. Form 1065 (1999)

However, his name was not printed or typed with that signature (or anywhere else on the Partnership's 1999 Form 1065) and his signature was not accompanied by his Social Security Number. Bates: 0399.

301 See ¶42, *et seq.*

302 More specifically, the possibility that the IRS might trace the ownership of the Partnership *from* the Partnership's 1999 Form 1065 *to* the 1999 Form 1040s of its ultimate partners (Mr. Zucker and Mr. Boyd, on whose 1999 Form 1040s the JBJZ Loss was deducted) was minimized or reduced.

of entity names to the LLCs that did not include the full names or surnames of their single-member owners, (3) the procurement of EINs for each of the LLCs,[303] and (4) the identification of the LLCs (by name and EIN), and not the Taxpayers (by name or by SSN), as the partners of the Partnership on its 1999 Form 1065.

## B. JBJZ[304]

### 1. Description

175. JBJZ filed its "initial" [305] short-year Form 1120S ("U.S. Income Tax Return for an S Corporation") for the period beginning November 12, 1999 and ending December 31,1999.[306]

- This Return appears to have been signed by Mr. Boyd (as Secretary) and dated March 24, 2000.
- Ray A. Knight signed this Return as Preparer. This signature was dated March 20, 2000, and identified Mr. Knight's employer as Ernst & Young, LLP, TWO COMMERCE SQUARE, STE 4000, Philadelphia, PA.
- Ray A. Knight was also the E&Y Principal who signed the E&Y Engagement Letter (for the COBRA transaction) to Mr. Zucker (and probably to Mr. Boyd),[307] and the Partnership's 1999 Form 1065.

176. JBJZ adopted a calendar tax year and elected the cash method of accounting.[308]

177. JBJZ reported a net loss of $29,446,675 on Line 4 ("Net gain (loss) from Form 4797, Part II, line 18") of the first page of Form 1120S. No other items of income, gain, loss, or deduction were reported on that page.

---

303 *Supra.*, footnote 30.

304 Bates: 1061 through 1082.

305 Bates: 1061. Form 1120S, Item F(1).

306 Bates: 1061. This return was stamped as "RECEIVED" on March 30, 2000. The unextended due date for the 1999 Form 1120S of a calendar-year S corporation was Wednesday, March 15, 2000.

307 Bates: 3192 to 3193 (Zucker) and 3195 to 3196 (Boyd).

308 Bates: 1067.

178. On its Schedule K of Form 1120S, JBJZ reported:[309]

- "Ordinary . . . (loss) from trade or business activities" of $29,446,675 (Line 1),
- "Net short-term capital . . . (loss)" of $2,019,744 (Line 4d), and
- "Net long-term capital . . . (loss)" of $18,177,695 (Line 4e(2)).
- No other items of income, gain, deduction, or loss were reported on Schedule K.

179. The $1,400,000 J&G Fee that JBJZ paid to J&G on December 29 was not identified, described, or otherwise disclosed or deducted on its Form 1120S, on either of the stockholders' Schedule K-1s, or on any other forms, schedules, statements, or attachments filed with that return.

180. On Schedule L of Form 1120S ("Balance Sheet per Books"), JBJZ did not disclose any opening account balances for its assets, liabilities, or shareholders' equity.[310] If the opening account balances as of December 27 (the stock-for-Partnership-Interests exchange shown on the JBJZ's Regulation Section 1.351-3(b) Statement) had been determined under generally accepted accounting principles and disclosed on JBJZ's 1999 Form 1120S, Schedule L would have disclosed:

- "Cash" of $3,355,475 (Line 1(b)).[311]
- "Other current assets(attach schedule)" on Line 6(b)) and/or ("Other investments (attach schedule)" on Line 8(b)) totaling approximately $1,302,250. The required "attach[ed] schedule[s]" would have disclosed the existence and values of the Cisco Stock and the Canadian Currency.[312]

---

309 Bates: 1068.
310 Bates: 1069.
311 Table 2, Column G, Rows 21 & 22.
312 Table 2, Column A/B, Row 27.

- "Other current liabilities (attach schedule)" on Line 18(b) of $1,400,000. The required "attach[ed] schedule" would have disclosed the existence of the liability to J&G for the J&G Fee.
- "Capital stock" of $100 (Line 22(b)).
- "Additional paid-in capital" of approximately $3,257,625 (Line 23(b)).[313]
- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if this information had been disclosed on Schedule L of JBJZ's 1999 Form 1120S.

181. On Schedule L of Form 1120S, JBJZ listed the following closing balances:[314]

- "Cash" of $3,263,611 (Line 1(d)),
- "Capital stock" of $100 (Line 22(d)),
- "Additional paid-in capital" of $52,907,625 (Line 23(d)),
- Negative "Retained earnings" of $49,644,114 (Line 24(d)).
- No other assets, liabilities, etc. were listed on Schedule L.

182. JBJZ's Form 1120S did not identify, describe, or otherwise disclose the source of the $52,907,625 of additional paid-in capital (or any description or calculations that would indicate or explain how that amount was determined).

- Under generally accepted accounting principles:[315]
  - The amount recorded by JGBZ as "Additional paid-in capital" for the Partnership Interests transferred to it in exchange for JBJZ's stock would have been the net amount of cash plus the fair market value

313 $3,257,625 = $3,355,475 + $1,302,250 - $1,400,000 - $100.

314 Bates: 1069.

315 See, for example, *Financial Accounting Standards Board Current Text* at B51.104 and B51.105.

of the Canadian Currency and the Cisco Stock[316] that JGBZ received upon the Partnership's termination and liquidation, net of any liabilities of the transferor-stockholders that were assumed by JBJZ, and net of the $100 recorded as "Capital stock".

- This amount would have been approximately $3,257,625[317] (or approximately 6.16% of the $52,907,625 ending balance actually shown by JGJB on its Schedule L[318]).

o The gains or losses resulting from the sales of the Cisco Stock and the Canadian Currency (and reflected in the ending balance of "Retained earnings" on Schedule L) would have been computed by subtracting the date-of-contribution/liquidation fair market values of those assets from their respective sales prices. Since the Cisco Stock and the Canadian Currency were sold within less than one week of their acquisition by JBJZ, the amount of the gain or loss that would have been recognized under these principles would likely have been *di minimis*.

- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if this information had been disclosed on Schedule L of JBJZ's 1999 Form 1120S.

183. On Schedule M-1 ("Reconciliation of Income (Loss) per Books With Income (Loss) per Return"), "[n]et . . . (loss) per books" was shown as $49,644,114. No adjustments were shown to this amount on Schedule M-1.[319]

- Under generally accepted accounting principles:

316 See Table 2, Columns A & B, Row 27.
317 See ¶180.
318 6.16% = $3,257,625 divided by $52,907,625.
319 Bates: 1069.

- The "[n]et income (loss)" resulting from the sales of the Cisco Stock and the Canadian Currency would have been computed by subtracting the date-of-contribution/liquidation fair market values of those assets from their respective sales prices.
- Since the Cisco Stock and the Canadian Currency were sold within less than one week of their acquisition by JBJZ, the "[n]et . . . (loss) per books" that would have been recognized under these principles would likely have been *di minimis* (Schedule M-1, Line 1), and a negative adjustment of approximately the full $49,644,114 amount of the JBJZ Losses would have been made on Line 6 of Schedule M-1. However, no such amounts or adjustments were identified or made on JBJZ's Schedule M-1.

- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if this information had been disclosed on Schedule M-1 of JBJZ's 1999 Form 1120S.

184. Schedule M-2 ("Analysis of Accumulated Adjustments Account, . . .") reported reductions in JBJZ's "Accumulated adjustments account" for:[320]

- The "[o]rdinary . . . (loss) from trade or business activities" (reported on Line 21 of Page 1 of the 1999 Form 1120S) ($29,446,675), and for
- The net short-term capital loss ($2,019,744) and net long-term capital loss ($18,177,695) (reported on Schedule K and on "STATEMENT 1"[321]).
- Schedule M-2 reported an ending balance of $49,644,114 (Line 8(a)) in JBJZ's "Accumulated adjustments account."[322]

320 Bates: 1069.
321 Bates: 1068 & 1073, respectively.
322 Bates: 1069.

185. JBJZ's Schedule D ("Capital Gains and Losses and Built-In Gains") to its 1999 Form 1120S disclosed the following:[323]

- Part I of Schedule D reported a "Net short-term capital . . . (loss)" of $2,019,744. Schedule D (Line 1) referred to "STATEMENT 2" for the calculations supporting the net amount shown on Lines 1, 4, and 6.

- Part II of Schedule D reported a "Net long-term capital . . . (loss)" of $18,177,695. Schedule D (Line 7) referred to "STATEMENT 2" for the calculations supporting the net amount shown on Lines 7, 10, and 13.

- STATEMENT 2 disclosed the sale of "Cisco Stock" on "12/31/99."[324]

  - The short-term capital loss of $2,019,744 was computed by subtracting a "COST" of $2,072,717 from a "SALES PRICE" of $52,973. The "DATE ACQ" of this Cisco Stock was shown as "8/26/99."

  - The long-term capital loss of $18,177,695 was computed by subtracting a "COST" of $18,654,451 from a "SALES PRICE" of $476,756. The "DATE ACQ" of this Cisco Stock was shown as "2/15/96."

  - The term "COST" that JBJZ used to describe the tax bases that it claimed to have had in the Cisco Stock and that it used to compute these capital losses was misleading and contrary to the instructions for disclosing and computing capital gains and losses on Schedule D.

    - Gains and losses from the sale of capital assets are generally calculated and disclosed on Lines 1 and 7 (columns (a) through (f)) of Parts I and II of Schedule D. Column (e) of Lines 1 and 7 require the disclosure of the "Cost or other basis (see

[323] Bates: 1070.

[324] Bates: 1074.

instructions)." *1999 Instructions for Schedule D (Form 1120S)* states:

> **Column (e)—Cost or other basis.** In determining gain or loss, the basis of property is generally its cost (see section 1012 and related regulations). Special rules for determining basis are provided in sections in subchapters C, K, O, and P of the Code. . . . Attach an explanation if you use a basis other than actual cash cost of the property.[325]

- In my opinion, the use of the word "COST" rather than "Other Basis" (or some other description indicating that the amounts so labeled were not the "actual cash cost" of the Cisco Stock) is misleading and contrary to the IRS's instructions for disclosing sales of capital assets on Schedule D.
- JBJZ did not include any "explanation" or other description of the amounts that it reported on Statement 2 as its "COST" of the Cisco Stock.
- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if this information had been disclosed with JBJZ's 1999 Form 1120S.

186. JBJZ's Form 4797 ("Sales of Business Property") to its 1999 Form 1120S disclosed the following:[326]

- Part II of Form 4797 reported an "[o]rdinary. . . (loss)" of $29,446,675. Form 4797 (Line 10) referred to "STMT 3" for the calculations supporting the net amount shown on Lines 10 and 18.
- STATEMENT 3 disclosed the sale of a "CURRENCY CONTRACT" acquired on "12/23/99" and sold on "12/31/99."[327]

---

325 *1999 Instructions for Schedule D (Form 1120S), at page 3.*

326 Bates: 1071.

327 Bates: 1075.

- The $29,446,675 ordinary loss (shown in Column G) was computed by subtracting the "(F) COST OR OTHER BASIS PLUS IMPROV AND SALE EXPENSE" of $30,225,082 from "(D) GROSS SALES PRICE" of $778,407.

187. A "SHAREHOLDER SUMMARY" was attached to JBJZ's 1999 Form 1120S.[328] This Shareholder Summary listed both of JBJZ's individual stockholders ("Jim Boyd" and "Jerry Zucker") and their respective "Beginning Shares" and "Ownership Percentage[s]." No other information was provided on this Shareholder Summary.

188. A Schedule K-1 for each of JBJZ's two individual stockholders accompanied JBJZ's Form 1120S for 1999. These Schedule K-1s disclosed:[329]

- The stockholder's name, address, erroneous tax identification number, percentage of stock ownership in JBJZ, and the IRS Service Center where JBJZ's tax return was filed (Atlanta, GA).
  - Mr. Zucker's Schedule K-1 misstated his "Shareholder's identifying number." It showed "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,"[330] rather than the correct "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"[331]
  - Mr. Boyd's Schedule K-1 misstated his "Shareholder's identifying number." It showed "474-04-906,"[332] rather than the correct "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"[333]
- The stockholders' proportionate shares of the $29,446,675 ordinary loss.

---

328 Bates: 1076.

329 Bates: 1077 through 1080.

330 Bates: 1079.

331 E.g., Bates: 1288 (the Zuckers' 1999 Form 1040).

332 Bates: 1077.

333 E.g., Bates: 2229 (the Boyds' 1999 Form 1040).

- The entire amount of JBJZ's $2,019,744 short-term capital loss was allocated to Mr. Boyd (Schedule K-1 (Boyd), Line 4(d)[334]), and none of that amount was allocated to Mr. Zucker (Schedule K-1 (Zucker), Line 4(d)[335]).
  - It is my understanding that such special allocations by an S corporation are not permissible.
- The entire amount of JBJZ's $18,177,695 long-term capital loss was allocated to Mr. Zucker (Schedule K-1 (Zucker), Line 4(e)(2))[336]), and none of that amount was allocated to Mr. Boyd (Schedule K-1 (Boyd), Line 4(e)(2)[337]).
  - It is my understanding that such special allocations by an S corporation are not permissible.

189. Also regarding the Zucker and Boyd Schedule K-1s filed with JBJZ's 1999 Form 1120S:

- The $1,400,000 J&G Fee that JBJZ paid to J&G on December 29 was not identified, described, or otherwise disclosed or separately deducted on either of the stockholders' Schedule K-1s.
- Line 23 ("Supplemental information required to be reported separately to each partner") was left blank on each of the Schedule K-1s. Line 23 is used, among other things, to provide adequate disclosure of the relevant facts relating to the tax treatment of any item that may cause an understatement of income tax.[338]

---

334 Bates: 1077.

335 Bates: 1079.

336 Bates: 1079.

337 Bates: 1077.

338 See 1999 *Instructions for Form 1120S* (p. 22-23), and 1999 *Instructions for Schedule K-1 (Form 1120S)* (p. 8).

190. JBJZ's Form 1120S included an attachment titled "TRANSFEREE CORPORATION'S STATEMENT UNDER REGULATION IRC SEC. 1.351-3(b) **["Regulation Section 1.351-3(b) Statement"].**[339]

- On this Statement, JBJZ reported having received, on December 27, 1999, "Partnership interest[s] in JBJZ Partners":
  - From Mr. Zucker (having a "Tax Basis" of $47,616,953), and
  - From Mr. Boyd (having a "Tax Basis" of $5,290,773).[340]
- On this Statement, JBJZ reported having received these partnership interests in exchange for all 100 shares of its common stock issued and outstanding immediately after the exchange (90 shares issued to Mr. Zucker and 10 shares issued to Mr. Boyd).
  - On this Statement, JBJZ represented that the fair market value of these shares was $1/share ("(iii) Fair market value of shares issued in exchange – Each share of common stock issued in the exchange had a fair market value of $1 per share.")
  - As previously noted, the fair market value of the Partnership Interests received by JBJZ from Mr. Zucker and Mr. Boyd in exchange for its stock (and the net fair market value of the Partnership's assets received by JBJZ upon the Partnership's immediate termination and liquidation) would have been approximately $3,257,725.[341]
- On this Statement, JBJZ reported that it "did not assume any liabilities in connection with this exchange."

---

339 Bates: 1081 & 1082.

340 As previously observed and discussed, these amounts do not include the $1,400,000 J&G Fee that was nevertheless included by JBJZ in computing the aggregate tax basis in the Partnership Interests that it retroactively allocated to and between the Cisco Stock and the Canadian Currency that JBJZ received upon the termination and liquidation of the Partnership.

341 See ¶180.

  - JBJZ apparently did, however, assume the $1,400,000 obligation incurred individually by Mr. Zucker and Mr. Boyd to J&G.[342]

- No disclosure was made on this Regulation Section 1.351-3(b) Statement (or on any other form, schedule, statement or attachment accompanying JBJZ's 1999 Form 1120S) of:
  - The tax identification number of the Partnership;
  - The fact that the Partnership had been formed less than two months prior to the date of the exchanges described in this Statement;
  - The fair market value of the Partnership Interests;
  - The percentages of the Partnership's capital and profits interests that were transferred to JBJZ (90% plus 10%);
  - The fact that the transfer of these Partnership Interests to JBJZ resulted in a technical termination of the Partnership or that the Partnership was dissolved and liquidated immediately thereafter;
  - The identity, fair market value, or claimed tax basis of any of the assets (cash, Cisco Stock, and Canadian Currency) held by the Partnership at the time of the exchange and transferred to JBJZ as proceeds from the liquidation of the Partnership.
  - The names or tax identification numbers of the LLC-partners of the Partnership (JZ and JGB), in the names of which the Partnership's Schedule K-1s had been prepared and filed.[343]
  - In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if this information had been disclosed on JBJZ's Regulation Section 1.351-3(b) Statement.

---

342 See ¶136, *et seq.*

343 Bates: 0182 through 0187.

191. JBJZ's Form 1120S (including all accompanying forms, schedules, statements, and attachments):

- Did not make any reference to any aspect of the Transaction (other than the exchange of the JBJZ stock for the Partnership Interests) that created the greatly inflated tax basis assigned by JBJZ to the Cisco Stock and the Canadian Currency (i.e., no reference was made to any of the Long and Short Options that were first acquired by the Partnership's LLC-partners, that were then contributed by those partners to the Partnership, and that ultimately terminated on December 22, prior to the Partnership's termination and liquidation on December 27);
- Did not identify the source from which JBJZ had received the Cisco Stock (i.e., from the Partnership, and before the Partnership, as a contribution to the Partnership's capital from JBJZ (erroneously[344]) or from JZ (Zucker) and JGB (Boyd);
- Did not identify the source from which JBJZ had received the Canadian Currency (i.e., from the Partnership);
- Did not disclose the fact that the Cisco Stock and the Canadian Currency had been received as a distribution (or as a liquidating distribution) from a partnership (or, more specifically, from the Partnership);
- Did not disclose the tax basis that the Partnership had in the Cisco Stock as of the date of the Partnership's termination and liquidation;
- Did not disclose the tax basis that the Partnership had in the Canadian Currency as of the date of the Partnership's termination and liquidation;

344 See ¶110 & ¶113.

- Did not provide any description, explanation, or calculation showing or indicating how Mr. Zucker's and Mr. Boyd's tax bases in the Partnership Interests had been determined.
- Did not provide any description, explanation, or calculation showing how JBJZ determined its tax bases in the Cisco Stock or the Canadian Currency.
- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if this information had been disclosed on JBJZ's 1999 Form 1120S.

192. JBJZ's 1999 Form 1120S (including all accompanying forms, schedules, statements, and attachments) did not contain any references to the tax identification number of the Partnership, or to the name or tax identification number of either of the single-member LLCs (JGB and JZ) that the Partnership had identified as its partners on the Schedule K-1s it filed with its 1999 Form 1065.

### 2. Opinion

193. In my opinion, the information and disclosures made on the JBJZ 1999 Form 1120S (including all accompanying forms, schedules, statements, and attachments), individually and collectively, failed to provide any reasonably discernable indication:

- That the Cisco Stock, prior to its contribution to the Partnership and its distribution by the Partnership to JBJZ on or about December 27, had been owned by JBJZ's stockholders, Mr. Zucker and Mr. Boyd (or that the Cisco Stock had previously been transferred to JBJZ on December 7 (albeit "erroneously") and held by JBJZ from that date through December 22, when that stock was transferred by JBJZ to the Partnership);[345]

[345] See ¶110 & ¶113.

- That the tax bases claimed by JZ (Zucker) and by JGB (Boyd) in their respective Partnership interests (and then by JBJZ in those Partnership Interests, and then by JBJZ in the Cisco Stock and the Canadian Currency that it received upon the termination and liquidation of the Partnership) resulted from:
  - The acquisition of the Options by the LLC-partners, the subsequent contribution of those Options by those partners to the Partnership, and the claimed increase in the tax bases of the Partnership Interests by the amount of the premiums "charged" for the Long Options (and without regard to either the amount of the premiums "credited" for the offsetting Short Options or the actual net cash costs of the Options), and from
  - A "step-up" to fair market value of the tax bases in the Cisco Stock contributed by Mr. Zucker and Mr. Boyd, and from
  - The capitalization of the $750,000 E&Y Fees incurred, paid, and deducted by Mr. Zucker and Mr. Boyd, individually, and from
  - The capitalization of the $1,400,000 J&G Fee that was subsequently paid by JBJZ.
- That in addition to the $750,000 fee paid by Mr. Zucker and Mr. Boyd to E&Y for "tax advice . . . concerning the implementation of the COBRA strategy," legal fees of $1,400,000 had been assumed and paid by JBJZ to J&G in connection with the interrelated series of transactions that ultimately generated the JBJZ Losses recognized and reported by JBJZ on its Schedule K and on the Schedule K-1s of its stockholders (and on the Taxpayers' respective 1999 Form 1040s).
- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if JBJZ's 1999 Form 1120S had disclosed this information.

194. In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if JBJZ's Schedule M-1 had disclosed (1) book income on Line 1 as $0 (or positive) and (2) a negative adjustment (of approximately $49,644,114) to convert that book income to the amount of the JBJZ Losses claimed on JBJZ's 1999 Form 1120S.

195. In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if the "explanation" required by the instructions to Schedule D[346] had been included with JBJZ's 1999 Form 1120S and if that explanation provided a detailed description of how JBJZ computed the tax basis it claimed to have had in the Cisco Stock.

196. In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if the J&G Fee had been separately identified and adequately described on JBJZ's 1999 Form 1120S or if the $1,400,000 assumed and paid by JBJZ to J&G on December 29 had been separately deducted or otherwise disclosed.

197. For reasons stated previously,[347] in my opinion, it would be reasonable to conclude that the principal functions served by JBJZ were:

- To further distance the transactions that created the inflated basis amounts and that were used to capitalize the Transaction-related accounting and legal fees, from the individual Taxpayers (the Zuckers and the Boyds) who would ultimately deduct the resulting JBJZ Losses against unrelated income and gains on their respective Form 1040s, and
- To remove the sale of the Canadian Currency (and therefore the detailed descriptions and calculations of the JBJZ Ordinary Loss) and

---

346 See ¶185.

347 See ¶83, *et seq.*

the sale of the Cisco Stock (and therefore the detailed descriptions, explanations, and calculations of the JBJZ STCL and the JBJZ LTCL) from the Taxpayers' respective 1999 Form 1040s in order to reduce the possibility of detection and audit by the IRS.

## C. Individual Form 1040s of JBJZ Stockholders (Zucker[348] and Boyd[349]) [The "1999 ) orm 1040s"]

### 1. Tax Return Preparation

198. The Zuckers' 1999 Form 1040 was signed by Barry A. Emerson, CPA, LLC as preparer.[350]

199. The Boyds' 1999 Form 1040 was signed by Shelia Pace of Thiem, Jackson & Pace, CPA's [sic], P.A.[351]

### 2. E&Y Fees

200. Mr. Zucker disclosed and deducted the $675,000 he paid to E&Y on Line 22 of Schedule A (other miscellaneous expenses).[352]

- Line 22 referred to "Statement 9," which disclosed a fee paid to "ERNST & YOUNG, LLP" in the amount of $675,000.[353]
- The fact that this fee had been incurred and paid for tax advice, generally, or, more specifically, for "tax advice . . . concerning the implementation of the COBRA strategy," was not disclosed or otherwise alluded to on the Zuckers' 1999 Form 1040.

201. Mr. Boyd disclosed and deducted the $75,000 he paid to E&Y on Line 22 of Schedule A (other miscellaneous expenses).[354]

---

348 Bates: 1288 through 1370.
349 Bates: 2229 through 2274.
350 Bates: 1295.
351 Bates: 2237.
352 Bates: 1296.
353 Bates: 1335.
354 Bates: 2238.

- Line 22 referred to "Stmt 7," and Statement 7 disclosed "ACCOUNTING FEES" totaling $78,015 (together with (apparently unrelated) "LEGAL FEES (TAX PLANNING)" of $1,898).[355]
- The fact that this fee had been incurred and paid for tax advice, generally, or, more specifically, for "tax advice . . . concerning the implementation of the COBRA strategy," was not disclosed or otherwise alluded to on the Boyd's 1999 Form 1040.

202. As noted above, these respective amounts incurred and paid to E&Y by Mr. Zucker and Mr. Boyd were also deducted a second time on their respective 1999 Form 1040s as unidentified components of the JBJZ Ordinary Loss and the JBJZ Capital Losses allocated to and between them by JBJZ.

### 3. Legal Fees paid by JBJZ to J&G

203. None of the $1,400,000 J&G Fee that was paid by JBJZ and allocable to and between its stockholders was identified or otherwise separately disclosed by either Mr. Zucker or Mr. Boyd on their respective Schedule As ("Itemized Deductions") of their individual 1999 Form 1040s.

204. None of the $1,400,000 J&G Fee that was paid by JBJZ and allocable to and between its stockholders was described or separately identified anywhere on their respective 1999 Form 1040s, or on any of the accompanying forms, schedules, statements, or attachments.

205. As noted above, Mr. Zucker and Mr. Boyd deducted their respective shares of the J&G Fee on their respective 1999 Form 1040s as unidentified components of the JBJZ Ordinary Loss and the JBJZ Capital Losses allocated to and between them by JBJZ.

### 4. Ordinary Income from the Partnership

206. On their respective 1999 Form 1040s, Mr. Zucker and Mr. Boyd, as owners of the Partnership's single-member LLC-partners, reported their distributive

---

355 Bates: 2667.

shares of the $625,000 net ordinary gain recognized by the Partnership from the December 22 sales of the "Currency Contracts".

- This amount was disclosed on page 2 of Schedule E as "Nonpassive income from Schedule K-1" from "JBJZ Partners . . .[EIN] 57-1088089."[356]

- The disclosures of these amounts on the 1999 Form 1040s did not identify or describe the fact that these gains had been derived from the sale of the Options (or, as designated on the Partnership's 1999 Form 1065, from the sale of "Currency Contracts") by the Partnership.

#### 5. The JBJZ Losses: The Ordinary Loss From the Sale of the Canadian Currency

207. On their respective 1999 Form 1040s, Mr. Zucker and Mr. Boyd, as the stockholders of JBJZ, reported their *pro rata* shares of the $29,446,675 net ordinary loss recognized by JBJZ from the December 29 sale of the Canadian Currency.

- This amount was disclosed on page 2 of Schedule E as "Nonpassive loss from Schedule K-1" from "JBJZ Investors, Inc. . . .[EIN] 57-1088087."[357]

#### 6. The JBJZ Losses: The Capital Losses From the Sale of the Cisco Stock

208. The entire amount of the $2,019,106 JBJZ STCL was deducted on the Boyd's 1999 Form 1040. As previously noted, the entire amount of this loss had been allocated to Mr. Boyd on his JBJZ Schedule K-1.[358]

- This $2,019,106 short-term capital loss was reported, without any elaboration, on Line 5 of Schedule D ("Net short-term . . . (loss) from . . . S corporations . . . from Schedule(s) K-1."[359]

---

356 Bates: 1305 & 1351 (Zucker) and 2246 & 2256 (Boyd).

357 Bates: 1305 & 1351 (Zucker) and 2246 & 2256 (Boyd).

358 Bates: 1077.

- The Boyd's 1999 Form 1040 did not disclose either the name or the tax identification number of the entity (i.e., JBJZ) that had recognized this loss and allocated it to Mr. Boyd.
- Nor was any other information regarding the JBJZ STCL disclosed on the Boyd's 1999 Form 1040.

209. The entire amount of the $18,177,695 JBJZ LTCL was deducted on the Zucker's 1999 Form 1040. As previously noted, the entire amount of this loss had been allocated to Mr. Zucker on his JBJZ Schedule K-1.[360]

- This $18,177,695 long -term capital loss was reported on Line 12 of Schedule D ("Net long-term . . . (loss) from . . . S corporations . . . from Schedule(s) K-1," and on an attached Statement 21.
- On the attached Statement 21, JBJZ was identified as the source from which this loss had been allocated.[361]
- Nor was any other information regarding this loss disclosed on the Zucker's 1999 Form 1040.

### 7. Other

210. Neither of the 1999 Form 1040s (including all accompanying forms, schedules, statements, and attachments) respectively filed by the Zuckers and the Boyds:

- Disclosed, identified, described, or otherwise referred to (by name or by tax identification number) the single-member LLC that had actually owned the Partnership interest (prior to the Partnership's termination and liquidation) and in the name of which the Partnership's Schedule K-1s had been filed.

---

359 Bates: 2240.
360 Bates: 1079.
361 Bates: 1347.

- Disclosed any description, explanation, calculation, or any other information pertaining to:
    - The determination of the tax basis that Mr. Zucker and Mr. Boyd claimed to have had in the Partnership interests held by their respective LLCs, or
    - The determination of the tax basis that Mr. Zucker and Mr. Boyd claimed to have respectively had in their JBJZ stock.
- Disclosed any description, explanation, calculation, or any other information pertaining to the:
    - Acquisition or cost of the Long Options and the offsetting Short Options by their respective LLCs,
    - The transfer of those Options to the Partnership as a contribution to the Partnership's capital,
    - The transfer of the Cisco Stock to the Partnership as a contribution to the Partnership's capital,
    - The transfer of the Partnership interest to JBJZ in exchange for JBJZ stock,[362] or
    - The termination and liquidation of the Partnership.

211. Neither of the 1999 Form 1040s included:

- A Form 8275 ("Disclosure Statement")[363] or a Form 8275-R ("Regulation Disclosure Statement");[364, 365]

---

[362] Neither Mr. Zucker nor Mr. Mr. Boyd included a Section 351 Statement with their respective Form 1040s. It is my understanding that such a statement is required to be filed with the transferor-stockholder's Form 1040 for the year in which the exchange takes place. See *infra.*, footnotes 366 and 367.

[363] Form 8275 is used by taxpayers and income tax preparers to disclose items or positions, except those contrary to a regulation, that are not otherwise adequately disclosed on a tax return to avoid certain penalties. This form is filed to avoid the portions of the accuracy-related penalty due to disregard of rules or to a substantial understatement of income tax if the return position has a reasonable basis.

- A Form 8271 ("Investor Reporting of Tax Shelter Registration Number") that reported the Partnership or JBJZ as tax shelters;
- A transferor-shareholder "Regulation Section 1.351-3(a) Statement" to disclose the exchange of the Partnership interests for stock of JBJZ.[366,367]

---

364 Form 8275-R is used by taxpayers and income tax preparers to disclose positions taken on a tax return that are contrary to Treasury regulations. This form is filed to avoid the portions of the accuracy-related penalty due to disregard of regulations or to a substantial understatement of income tax for non-tax shelter items if the return position has a reasonable basis.

365 See 3/10/00 e-mail from Robert Coplan (E&Y) to Martin Nissenbaum and Richard Shapiro (both of E&Y) (Subject: RE: COBRA Returns): "Please confirm to me that we are agreed that the opinion letter means no 8275 is needed, since it should indicate more than substantial authority. I can't hink [sic] of any other disclosures. And we have concluded (have we not) that COBRA is not a tax shelter requiring registration?"

366 Regulation Section 1.351-3(a) (prior to removal by T.D. 9264, May 26, 2006) stated, in part:

> (a) Every person who received the stock or securities of a controlled corporation, or other property as part of the consideration, in exchange for property under section 351, shall file with his income tax return for the taxable year in which the exchange is consummated a complete statement of all facts pertinent to such exchange, including—
>
> (1) A description of the property transferred, or of his interest in such property, together with a statement of the cost or other basis thereof, adjusted to the date of transfer.
>
> (2) With respect to stock of the controlled corporation received in the exchange, a statement of—
>
> (i) The kind of stock and preferences, if any;
>
> (ii) The number of shares of each class received; and
>
> (iii) The fair market value per share of each class at the date of the exchange. . . .
>
> (6) With respect to liabilities of the transferors assumed by the controlled corporation, a statement of—
>
> (i) The nature of the liabilities;
>
> (ii) When and under what circumstances created;
>
> (iii) The corporate business reason for assumption by the controlled corporation; . . .

367 See 3/10/00 e-mail from Amy Keating (Compliance Manager, E&Y) to John Nord (E&Y Minneapolis) (regarding one of the other COBRA transactions) in which she

### 8. Opinion

212. In my opinion, the information and disclosures made on the 1999 Form 1040s (including all accompanying forms, schedules, statements, and attachments) respectively filed by Mr. Zucker and Mr. Boyd, individually and collectively, failed to provide any reasonably discernable indication:

- That the JBJZ Losses that were deducted on those returns--
  - Resulted from an interrelated series of steps involving several conduit entities (the Partnership, JBJZ (an S corporation), and the single-member LLCs), or that, according to the parties,
  - These various steps resulted in the creation of greatly inflated tax bases:
    - In the Partnership Interests, and then
    - In the JBJZ stock, and
    - In the Cisco Stock and the Canadian Currency, the sale of which by JBJZ resulted in the JBJZ Losses that were allocated to and between these individuals and that they each deducted on their respective 1999 Form 1040s.
- That in addition to the $750,000 E&Y Fee, Transaction-related fees of $1,400,000 (J&G Fee) (and, in 2000, of $60,000 (B&W Fee)) had been incurred and paid.
- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly had any or all of this information been disclosed on the Taxpayers' 1999 Form 1040s.

---

confirmed Mr. Nord's conclusion that Reg. Section 1.351-3(a) Statements should be attached to the shareholders' Form 1040s.

213. In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if this information had been disclosed on or with the Taxpayers' 1999 Form 1040s.

## VI. Sufficiency of Combined Disclosures

214. Based on the foregoing analyses, in my opinion, even if all of the 1999 Returns had been identified and reviewed together, it would have been unlikely or impossible, based solely on the information disclosed on or with those returns, for the IRS to have been able to determine or reasonably discern:

- That Mr. Zucker and Mr. Boyd had purchased, through their respective single-member LLCs, Long Options and offsetting Short Options in foreign currency;
- That the net cash premiums paid for these Options were only 5% of the amounts by which the LLCs increased their tax bases in their respective Partnership interests;
- That these Options had been contributed to the Partnership as a contribution to capital by the LLC-partners;
- That each LLC had determined its tax basis in its Partnership interest by reference to the premium "charged" for the Long Option and without regard to the premiums "credited" for the offsetting Short Option;
- That shortly before the termination and liquidation of the Partnership, the Cisco Stock had been contributed to the Partnership's capital by JBJZ ("erroneously") or by JZ and JGB;
- That any fees were incurred and/or paid with respect to the Transaction, or, more specifically, that Transaction-related fees totaling $2,210,000 (including the $60,000 B&W Fee that was paid in 2000) were incurred and paid to E&Y, J&G, and B&W.

215. Based on my examination of the 1999 Returns and for the reasons detailed above, it would, in my opinion, be reasonable to conclude:

- That the various elements of the Transaction were divided between and reported on the various 1999 Returns in a manner that was designed to reduce or eliminate the risk of detection[368] and audit by the IRS, and

- That the Transaction-related fees paid to E&Y and J&G were reflected on the 1999 Returns in a manner that was designed to reduce or eliminate the risk of detection[369] and audit by the IRS.

## VII. Communications Relating to Disclosure of the Transactions

216. The record contains several additional internal E&Y communications that corroborate the opinions I expressed above.[370] These communications indicate (or, in some cases, seem to indicate) that the parties planned and implemented (or attempted to implement) strategies designed to reduce the possibility that the Transaction might be detected and audited by the IRS. For example:

- January 21, 2000 e-mail from William P. Murphy (E&Y) to Robert B. Coplan (E&Y National Tax) ("Subject: COBRA S Corp Returns"):

> I know we talked in the last conference call about preparing the S Corp and Pshp returns for the COBRA transaction out of New York. I just wanted to confirm that they will also prepare the K-1 for both entities such that we can file our clients returns by April 15th. I know we have *expressed a strong preference* to our client that they should file their returns by April 15th *with "the masses"*.[371] [Emphasis supplied.]

[368] *Supra*., footnote 5.

[369] *Supra*., footnote 6.

[370] See also the communications excerpted at footnote 86, ¶82, ¶135 and ¶142.

[371] Bates: 2003EY010689.

- March 10, 2000 e-mail from Amy Keating (Compliance Manager, National, E&Y) to Robert B. Coplan (E&Y National Tax):

> I'm glad everyone seems to be okay with the returns - I haven't heard anything about the ones that have gone out. *As far as the signatures go, I think it's best that they're all different b/c if one is picked up, they'll surely run a ss# analysis to identify other returns for review.* Amy.[372] [Emphasis supplied.]

- May 8, 2000 e-mail from Thomas A. Dougherty to three E&Y tax professionals ("Subject: Cobra Transaction Feedback"):

> 3. Our decision to use a coordinated preparation of transaction tax returns was well received. Our clients liked the fact that we were paying close attention to *coordinating the reporting of similar transactions* and achieving efficiency in *determining proper wording and disclosure issues*. This was a major task by the compliance people involved and for Bob Coplan to review all of them. An excellent job by all! Thanks![373] [Emphasis supplied.]

- August 30, 2000 e-mail from Robert B. Coplan (E&Y National Tax) to James E. Ryan (E&Y) ("Subject: RE: [REDACTED] COBRA Materials"):

> DO not use the netting approach on the grantor trust return. *It is too risky at this point, even though the theory is that by doing so, the Service will have a hard time catching the return.*[374] [Emphasis supplied.]

- May 19, 2004 e-mail from Nancy Thibadeau (E&Y Mid-Atlantic Tax Compliance) to Regina K. Wall (E&Y Philadelphia) ("Subject: Fees paid for Mellow"):

---

372 Bates: DOJ 000818 and DOJ 000819. This e-mail was in response to a 3/9/00 e-mail from Mr. Coplan to Ms. Keating, which stated, in part, "So far, I have not heard a peep from anyone on the receiving end of these returns about the returns themselves or having to sign them. Maybe I'll hear the complaints later, but for now, I'm satisfied with our decision." The "decision" that Mr. Coplan referred to appears to have been the decision to have each of the local practice office contact persons sign the COBRA returns, as the preparer, rather than having Amy Keating sign them all. Bates: DOJ 000471 through DOJ 000474.

373 Bates: 2003EY004091.

374 Bates: 2003EY010786.

> Here is yet another question about the COBRA transactions- this is for Mellow and Mellow Partners for 1999.
>
> We have been asked to do an analysis for William Melton and Myer Berlow, for which we need the fees that were paid for the transaction. E&Y fees, attorney fees, etc. *We aren't able to determine that from the returns. Can you help us with finding those amounts?*[375] [Emphasis supplied.]

## VIII. Summary of Conclusions

217. In my opinion, the 1999 federal income tax returns (including all accompanying forms, schedules, statements, and attachments) of the Partnership (Form 1065), JBJZ (Form 1120S), and of the individual stockholders of JBJZ (Form 1040s), individually and collectively, ---

- Failed to identify and/or explain the source[376] of the JBJZ Losses and failed to disclose information that was sufficiently descriptive or complete to provide any reasonably discernable indication of the source of those Losses;
- Failed to specifically identify that the $750,000 E&Y Fees that were paid by Mr. Zucker and Mr. Boyd in 1999 were incurred in connection with the Transaction that generated the permanent JBJZ Losses that these individuals deducted on their respective Form 1040s, or that this amount was ALSO included in the tax bases of the Partnership Interests (and in the Cisco Stock and the Canadian Currency, and, therefore, in the JBJZ Losses allocated to and between the Taxpayers and deducted (again) by them on their respective 1999 Form 1040s); and
- Failed to identify, separately state, or otherwise describe, in general or in specific terms, the $1,400,000 J&G Fee paid by JBJZ in 1999, and failed to disclose information that was sufficiently descriptive or

---

375 Bates: DOJ001046.

376 *Supra.*, footnote 3.

complete to provide any reasonably discernable indication that such fees had been incurred and paid in connection with the generation of the JBJZ Losses or included in the amount of those losses.

218. In my opinion, it would not have been possible, based solely on the information included on or with any or all of the 1999 Returns, for the IRS to determine that:

- The JBJZ Losses were the result of the assignment of a greatly inflated tax basis[377] to the Cisco Stock and the Canadian Currency that JBJZ sold to produce those losses, or that
- Accounting and legal fees totaling $2,210,000 had been incurred and paid in connection with the Transaction that produced the JBJZ Losses.

219. In my opinion, based on my review of the record, it would be reasonable to conclude:

- That the various elements of the Transaction were divided between and reported on the various 1999 Returns in a manner that was designed to reduce or eliminate the risk of detection[378] and audit by the IRS, and
- That the Transaction-related fees paid to E&Y and J&G were reflected on the 1999 Returns in a manner that was designed to reduce or eliminate to the risk of detection[379] and audit by the IRS.

Respectfully submitted,

______________________________

David W. LaRue, Ph.D.
June 1, 2007

377 *Supra.*, footnote 4.

378 *Supra.*, footnote 8.

379 *Supra.*, footnote 9.

# Appendix A

# VITA

## David Wayne LaRue, Ph.D.

**HOME ADDRESS**

1358 Huntersfield Close
Keswick, VA 22947
(434) 979-5496
(434) 825-9081 (cell)

**PERSONAL DATA**

Birth Date: September 3, 1950
Marital Status: Divorced,
Three children

**OFFICE ADDRESS**

McIntire School of Commerce
University of Virginia
Charlottesville, VA 22904
(434) 924-3235
e-mail: dlarue@virginia.edu
UVa website: http://gates.comm.virginia.edu/dwl2c

**FORMAL EDUCATION**

| | | |
|---|---|---|
| Ph.D. (with honors): | Fall, 1983 | University of Houston |
| M.S. Accountancy: | Fall, 1977 | University of Houston |
| B.B.A.: | Fall, 1974 | University of Houston |

**DOCTORAL PROGRAM**

| | |
|---|---|
| Major Field of Study: | Federal Taxation and Financial Accounting |
| Supporting Field of Study: | Economics/Tax Policy |
| Dissertation Title: | Corporate Reorganizations under the Internal Revenue Code of 1954: A Critical Analysis of the Legislative, Administrative, and Judicial Development of Sections 368(a)(1)(D) and (F) and Issues Relating Thereto [532 pp.] |

## ACADEMIC EXPERIENCE

| | |
|---|---|
| Director, Graduate Accounting Program | University of Virginia, 2000 to 2005 |
| Associate Professor | University of Virginia, 1989 to present |
| Assistant Professor | University of Virginia, 1983 to 1989 |
| Lecturer | University of Maryland, 1979 to 1983 |
| Instructor | University of Houston, 1976 to 1978 |

## UNIVERSITY COURSES DEVELOPED AND TAUGHT

### Graduate

| | |
|---|---|
| GCOM 761D | Forensic Analysis, Due Diligence, and Litigation Support |
| GCOM 749 | Federal Tax Research, Procedure, Administration, and Policy |
| GCOM 748 | Federal Income Taxation of Partnerships and S Corporations |
| GCOM 747 | International Taxation and Strategic Tax Planning |
| GCOM 745 | Taxation of Corporate Mergers and Acquisitions, Corporate Recapitalizations and Divisions, and Consolidated Tax Returns |
| GCOM 744 | Accounting, Tax, and Legal Dimensions of International Business and Investment Transactions [conducted throughout Europe (1997, 1998, and 1999) and then Japan/China (2000 and 2001)] |
| GCOM 742 | Tax Jurisprudence |
| GCOM 544 | Federal Tax Aspects of Business, Investment, and Personal Decisions |

Special Topics Courses (Graduate):

Federal Tax Accounting Periods and Methods
Executive Compensation Strategies
Accounting for Derivatives

### Undergraduate

| | |
|---|---|
| COMM 546 | Federal Income Taxation of Corporations, Partnerships, Trusts and Estates |
| COMM 474 | International Finance and Taxation (2000 & 2001) [conducted in Japan/China], (2003) [conducted in Australia and New Zealand] |
| COMM 474A | Special Topics in International Finance and Taxation (2002) [conducted in Brazil] |
| COMM 445/545 | Federal Income Taxation of Individuals and Property Transactions |
| COMM 386 | The Business of Saving Nature (2003) [conducted in Union of So. Africa] |
| COMM 384 | International Business |
| COMM 311/312 | Intermediate Accounting I & II |
| COMM 201/202 | Introductory Accounting I & II |

## AWARDS AND HONORS

Virginia Society of CPAs Outstanding Educator Award (June, 2000)

National Register's Who's Who in Executives and Professionals

KPMG Peat Marwick, "Instructor Excellence Award," 1999.

KPMG Peat Marwick, "Instructor Excellence Award," 1998.

Commendation from U.S. Department of Justice for "dedication, independence, and expert analysis and testimony" as the government's forensic analyst, accounting expert, and tax expert in *U.S. v. Perlman*, 1997.

Commendation from Criminal Investigation Division of the Internal Revenue Service for service as an independent forensic analyst, accounting expert, and tax expert in *U.S. v. Perlman*, 1997.

KPMG Peat Marwick, "Instructor Excellence Award," 1994.

Nominated for University of Virginia Alumni Outstanding Educator Award (Spring, 1991)

Ernst and Young Tax Literature Award, 1990. (Awarded for publication of "A Case for Neutrality In the Design and Implementation of the Merger and Acquisition Statutes: The Post-Acquisition Net Operating Loss Carryback Limitations," 43 *Tax Law Review* (Fall, 1987): pp. 85-240.)

"Dean's Award for Scholastic Excellence -- Ph.D.," 1983

The 1978 Mortar Board "Top Prof" for the College of Business Administration (University of Houston)

Haskins and Sells Fellowship for Doctoral Students, 1977

Peat, Marwick, Mitchell and Co. Tax Research Fellowship, Spring and Fall, 1975. Responsibilities included the research and writing of portions of the American Institute of CPA's *Statement of Tax Policy #3: Elimination of Double Tax on Dividends*, published in 1976, 38 pages.

Beta Gamma Sigma (Honorary Business Fraternity)

Beta Alpha Psi (Honorary Accounting Fraternity)

## RESEARCH AND PUBLICATIONS

### Published Research

"LIFO Recapture on C-to-S Conversions: Filling the Gaps and Ameliorating the Deficiencies of Section 1363(d)," 59 *The Tax Lawyer* (Fall, 2005): pp. 1-106.

"Thomas Asked To Consider Changes For LIFO S Corporations," 2005 *Tax Notes* 168-10 (August 31, 2005). Comments on H.R. 3376, the *Tax Technical Corrections Act of 2005*.

**RESEARCH AND PUBLICATIONS (continued)**

**Published Research (continued)**

"Business Bad Debts: Failure to Prove Worthlessness" (with S. Thompson), *Journal of Accounting* (September, 2005).

"Harnessing Multimedia And Interactive-Assessment Technologies To Promote And Evaluate Cognitive Progression And Critical Thinking In The Classroom" (with Lynda S. Hodgson), *International Journal of Case Method Research and Application*, World Applied Case Research Association, 2005, vol. XVIII, Issue 2: pp. 330 to 340.

"Proposed LIFO Recapture Regulations." 2004 *Tax Notes* 233-14 (December 3, 2004) (Doc 2004-22607).

"Intercompany Investments Between Affiliates Of Multinational Enterprises: Applying the Substance-Over-Form Doctrine to Distinguish 'Equity' From 'Debt'" (with S. Thompson), 2 *Journal of Business and Economics Research* (October, 2004): pp. 55-68.

"Anatomy of a Corporate Tax Shelter: Electron Industries, Inc.," *Case Method Research and Application*, World Applied Case Research Association, 2003, vol. XVI: pp. 457-469.

"Eluding the LIFO Recapture Provisions of Subchapter S After the Eleventh Circuit's Decision in *Coggin Automotive*: Part II" (with J. Dawson), 5 *Business Entities* (September/October, 2003): pp. 22-27, 56.

"Eluding the LIFO Recapture Provisions of Subchapter S After the Eleventh Circuit's Decision in *Coggin Automotive*: Part I" (with J. Dawson), 5 *Business Entities* (July/August, 2003): pp. 40-53.

*The International Chamber of Commerce's Executive Guide to Best Corporate Practices in Combating Corruption and Bribery*, Chapter 4: Accounting Polices, Practices, Controls and Disclosures (with Mritunjay Singh), International Chamber of Commerce, Paris (April, 1999).

"Funding Opportunities for Tax Grant Proposals," in A Guide to Tax Research Databases, American Taxation Association, 1993, pp. 114-124, (with S. Luttman).

"An Empirical Examination of the Influence of Selected Economic and Non-Economic Variables on Decision Making by Tax Professionals," (with W. Duncan and P. Reckers) 2 Advances in Taxation (1989): pp. 91-106.

*Hearings on Tax Policy Aspects of Mergers and Acquisitions Before the Ways and Means Committee of the U.S. House of Representatives*, 101st Congress, 1st Session (February 2, 1989): pp. 569-580.

**RESEARCH AND PUBLICATIONS (continued)**

**Published Research (continued)**

"An Empirical Examination of the Influence of Selected Factors on Professional Tax Preparers' Decision Processes," (with P. Reckers) 7 Advances in Accounting, 1989, pp. 35-48.

"A Case for Neutrality In the Design and Implementation of the Merger and Acquisition Statutes: The Post-Acquisition Net Operating Loss Carryback Limitations," 43 Tax Law Review (Fall, 1987): pp. 85-240. (Funded by grants from the Arthur Young Foundation, the Ralph E. Kent Fund, and the McIntire Associates Program.)

*Hearings on Carryover of Net Operating Losses and Other Tax Attributes of Corporations before the Subcommittee on Select Revenue Measures of the House Committee on Ways and Means*, 99th Congress, 1st Session, (May 22, 1985): pp. 60-110.

"What You Should Know About Protecting Your Tax Exemption," (with A. Lawler), *Association Management* (November, 1981): pp. 71-75.

"New Credit for Child and Dependent Care Expenses: Congress Revamps and Liberalizes a Tax Benefit Provision," (with R. Sapp), *TAXES-The Tax Magazine* (June, 1977): pp. 373-376.

"Investment Tax Credit: Pass-Through Provisions More Attractive as Rate Increases," (with J. Pratt), *Taxation for Accountants* (May, 1975): pp. 304-307.

**Book Reviews**

Tang, Roger Y.W., *"Intrafirm Trade and Global Transfer Pricing Regulation,"* Quorum Books, 1997. 73 Accounting Review 413-414, July, 1998.

Marvin A. Chirelstein, "*Federal Income Taxation, A Guide to Leading Cases and Concepts,*" Seventh Edition, in *Journal of the American Taxation Association*, Spring, 1995, Vol. 17, No. 1, pp. 117-118.

Steuben and Turnier, "*Problems in the Fundamentals of Federal Income Taxation,*" Third Edition, *Journal of the American Taxation Association*, Spring, 1995, Vol. 17, No. 1, pp. 116-117.

**Proceedings**

"'Debt' or 'Equity'? *Laidlaw Transportation, Inc.*" (with S. Thompson), European Applied Business Research Conference, Edinburgh, Scotland (June 14-18, 2004), 12 page case, 23 page teaching note. ("Best Paper Award").

"The Art of Storytelling: Using Technology to Design, Animate, Narrate, and Distribute Engaging Presentations for the Classroom and for Distance Learning," European College Teaching & Learning Conference, Edinburgh, Scotland (June 14-18, 2004), 7 pages.

## RESEARCH AND PUBLICATIONS (continued)

### Proceedings (continued)

"Rethinking Business-School Curriculums: Integrating Tax Concepts and Strategies into Finance and Management Courses," European College Teaching & Learning Conference, Edinburgh, Scotland (June 14-18, 2004), 9 pages.

"Taxation of Distributions from Partnerships and Limited Liability Companies," 46th Annual William and Mary Tax Conference, Williamsburg, VA (December 2, 2000), 98 pages.

"Current Developments in Financial Accounting Standards: Accounting for Derivatives, Hedges, and Corporate Acquisitions," 45th Annual William and Mary Tax Conference, Williamsburg, VA (December 4, 1999), 48 pages.

"A Macroeconomic Analysis of the Western European Welfare State Crisis: Revenue-Side Solutions," University of Madrid (Spain), Conference on European Public Finance, *Perspectivas Fiscales De Los 90*, San Lorenzo de el Escorial, Spain (July 18, 1994), 26 pages.

"Accounting for Stock-Based Compensation and Environmental Remediation Expenditures," 39th Annual William and Mary Tax Conference, Williamsburg, VA (December 4, 1993), 42 pages.

"Accounting for Federal Income Taxes under FASB Statement 109: Analysis, Perspective, and Application," 38th Annual William and Mary Tax Conference, Williamsburg, VA (December 5, 1992) 50 pages. Reported and summarized in 92 *Tax Notes* 244-H (December 8, 1992)

"Post-Acquisition Loss Carrybacks," Tenth Arthur Young Professors' Roundtable, Washington (April 25, 1986, 160 pages).

"The Archer Amendment: Congress Flirts with An Inflation-Neutral Tax System," (with T. Reveley), *1980 Mid-Atlantic American Accounting Association Proceedings*, Martinsburg, W.Va. (April, 1980), pp. 167-183.

### Research In Process

"The Lower of Cost or Market Method of Inventory Valuation: Rethinking an Accounting Anomaly"

**Abstract:**

The "lower-of-cost-or-market" method, as described in and allowed by Reg Sections 1 471-2(c) and -4, distorts the measurement of taxable income by allowing current deductions for unrealized opportunity costs In the opinion of the author, LCM should be repealed on the grounds that it is incongruent with accepted tenets of federal income taxation and that it provides tax benefits that cannot be reconciled with sound tax policy, tax equity, or administrative considerations

## RESEARCH AND PUBLICATIONS (continued)

### Research In Process (continued)

"The Effect of Implicit Tax Assets and Implicit Tax Liabilities on Exchange Values in Corporate Mergers and Acquisitions: An Analytical Framework"

**Abstract:**

In most corporate acquisition structures, the ultimate incidence of most or all of the tax burdens and tax benefits built into the values of the target corporation's assets as of the transaction date, together with most or all of the tax burdens and benefits inherent in the target's tax attributes, shift from the shareholders of the target corporation to the shareholders of the acquiring corporation Some, but not all, of these incidence-shifting acquisition structures also trigger the creation of "phantom built-in gains" (or losses) and "phantom built-in earnings" (or earnings deficits) that can eventually give rise to additional tax burdens (or benefits) to the acquiring corporation and its shareholders. Like any other liability, the acquiring corporation's assumption of the target's built-in tax burdens and, where applicable, the creation of phantom built-in gains and phantom built-in earnings, diminish the value of the target corporation to the acquiring corporation and its shareholders Conversely, like any other asset, the acquirer's acquisition of the built-in tax benefits, and where applicable, the creation of phantom built-in losses and phantom built-in earnings deficits enhance the target corporation's value

This article identifies these "implicit" tax assets and "implicit" tax liabilities It explores the murky interface between economics, corporate finance, financial accounting standards, and the intricacies of the tax law to develop a analytical framework for quantifying their impact on the value of the target corporation's stock (or assets). It suggests how this framework can be integrated with traditional discounted cash flow and "economic value added" analyses and with other valuation techniques to assist the seller and the buyer in establishing more informed ask and bid prices, in identifying and exploiting opportunities for value enhancement through tax arbitrage, and in identifying the optimal acquisition structure. The author also identifies several anomalies and inequities inherent in the current tax regime and suggest alternatives which would enhance economic efficiency and produce a more neutral and credible system for taxing corporate mergers and acquisitions

"Adam Smith Revisited: "Functional Neutrality" in the Design, Implementation, and Interpretation of the Tax Statutes."

**Abstract:**

A voluntary-compliance-based income tax system claims its legitimacy from a consensus as to the broad qualitative policy objectives the system should be simultaneously designed to achieve, from the general acceptance of the individual and collective components of its logical infrastructure, and from the consistency and effectiveness with which that infrastructure manifests itself in identifying similarities in economically (or legally) similar situations, identifying dissimilarities in economically (or legally) dissimilar situations, and then treating these similar vis-à-vis dissimilar situations accordingly. The less generally accepted the broad qualitative policy objectives and/or foundational precepts, the more vulnerable the system is to challenges to its authority Legitimacy may likewise suffer when the logical ordering and consistent application of the system's internal rules breaks down, i.e., where similar situations are treated as though they were entirely unrelated (or where dissimilar situations are subjected to the same treatment)

"Functional neutrality," as that term is used throughout this article, calls for impartiality in the tax recognition and treatment of transactions which are functional equivalents of one another Implicit in this criterion is the necessity of first identifying the legal and economic attributes which distinguish one transactional form another, and then isolating those differences which, for one policy reason or another, ought likewise to distinguish such transactions in the assessment of the income tax. Once a class of transactions has been designated for partial treatment, the relevant inquiry becomes: Are all transactional variations which achieve the "public purpose" supporting the initial departure from neutrality themselves treated impartially inter se? Conversely, are those transactional structures which fail to evidence the achievement of that purpose denied the benefits (or spared the detriments) of discrimination? Consequently, "functional neutrality" has little, if anything, to do with the formulation of policy, and everything to do with the design of rules intended to implement policy once formulated

Functional neutrality should be the standard for evaluating both the adequacy of the statutory implementation of tax policy objectives and the validity of subsequent administrative and judicial interpretations Once the objectives have been unambiguously stated, it is the duty of the legislators and their staffs to identify attributes which either enhance or detract from those objectives. Absent overriding administrative considerations, the statute should be designed so as to affirmatively discriminate between alternative courses of action on the basis of whether they possess or fail to possess such attributes It should be neutral as to the presence or absence of attributes which neither enhance nor detract from the fundamental objective Clearly, perfection is unattainable But it is the frequent failure to embark on its quest which has resulted in so much uncertainty and inconsistency, and which has thus contributed so greatly to the erosion of the tax system's credibility

## PROFESSIONAL ACTIVITIES

### MicroStrategy, Inc.

Member of the Board of Directors (Outside Director) (from February 22, 2006)

Member of the Audit Committee (from February 22, 2006)

Chairman and "Financial Expert" (Regulation S-X Item 401(h)(2)) of Audit Committee (from June 1, 2006)

### Invited Congressional Testimony (oral):

*Hearings on Tax Policy Aspects of Mergers and Acquisitions Before the Ways and Means Committee of the U.S. House of Representatives*, 101st Congress, 1st Session (February 2, 1989): 89 *Tax Notes* 27-4 (February 3, 1989) (Doc 89-928).

*Hearings on Carryover of Net Operating Losses and Other Tax Attributes of Corporations before the Subcommittee on Select Revenue Measures of the House Committee on Ways and Means*, 99th Congress, 1st Session (May 22, 1985): 85 *Tax Notes* 103-3 (May 23, 1985) (Doc 85-4423).

### Testimony Before Internal Revenue Service Office of Chief Counsel (oral):

*Comments on Proposed Regulations Under Section 1363(d).* (Washington, December 8, 2004). Reported in: "S Corporations Rules on Indirectly Owned LIFO Recaptures Not Airtight, Possibly Invalid, Witness to Say" 2004 *BNA Daily Tax Report* No. 234 (December 6, 2004); "S Corporations: Hearing Witness Describes Avenues Around Rules on Indirectly Owned LIFO Recaptures" 2004 *BNA Daily Tax Report* No. 236 (December 9, 2004); "Academic Comments On Proposed LIFO Recapture Regs," 2004 *Tax Notes* 233-14 (December 3, 2004) (Doc 2004-22607); "Professor At Reg Hearing Lectures IRS On LIFO Recapture Rules," 2004 *Tax Notes* 237-3 (December 9, 2004); "Professor Suggests Changes To LIFO Recapture Rules As Recorded In Unofficial Transcript Of IRS Hearing." 2004 *Tax Notes* 241-25 (December 15, 2004);

### Comments Submitted to House Ways and Means Committee

"Thomas Asked To Consider Changes For LIFO S Corporations," 2005 *Tax Notes* 168-10 (August 31, 2005). Comments on H.R. 3376, the *Tax Technical Corrections Act of 2005*.

### External Committee Memberships

Member, Editorial Board, *Journal of the American Taxation Association (Legal Research)* (2006 - 2009)

Chairman, American Taxation Association: Tax Policy: Accounting Period and Methods Committee (2004 - 2006).

Member, American Taxation Association: Tax Policy Oversight Committee (2004 - 2005).

Member, American Taxation Association: Tax Policy: Accounting Period and Methods Committee (2001 - 2004). Report of Committee: "ATA Suggests Changes To Change Of Accounting Method Guidance." 2002 *Tax Notes* 48-24 (March 12, 2002).

## PROFESSIONAL ACTIVITIES (continued)

### External Committee Memberships (continued)

Member, Committee on Taxation of Corporations and Shareholders, AICPA Federal Tax Division (1995-1998).

Member, Tax Faculty Advisory Group, Coopers & Lybrand (1993-1998).

Member, Editorial Advisory Board, *The Journal of Accounting, Taxation and Finance for Business* (1993-1998).

Member, American Taxation Association: Corporate Tax Policy Subcommittee (1991-1992).

Chairman, American Taxation Association: Committee on Relations with the IRS and Treasury Department (1989-1990).

Member, Steering Committee for the 1989 Ernst and Whinney Symposium on Graduate Tax Program Administration.

Member, AICPA's Federal Tax Division Task Force to Re-Evaluate The Institute's Position on the Elimination of Double Taxation of Corporate Source Income (*Statement of Tax Policy #3*) (1981 to 1984).

Member, American Accounting Association Federal Taxation Committee (1982 to 1983). Report of the Committee published as "Indexing the Tax Law to Adjust for Inflation," in *TAXES-The Tax Magazine*, (February, 1984): pp. 125-137.

## TAX INSTITUTE, ETC. PRESENTATIONS

"Harnessing Multimedia And Interactive-Assessment Technologies To Promote And Evaluate Cognitive Progression And Critical Thinking In The Classroom" (with Lynda S. Hodgson), World Applied Case Research Association, July 4, 2005, Brno, The Czech Republic.

"'Debt' or 'Equity'? *Laidlaw Transportation, Inc.*," *European Applied Business Research Conference*, Edinburgh, Scotland (June 14-18, 2004).

"The Art of Storytelling: Using Technology to Design, Animate, Narrate, and Distribute Engaging Presentations for the Classroom and for Distance Learning," *European College Teaching & Learning Conference*, Edinburgh, Scotland (June 14-18, 2004).

"Rethinking Business-School Curriculums: Integrating Tax Concepts and Strategies into Finance and Management Courses," *European College Teaching & Learning Conference*, Edinburgh, Scotland (June 14-18, 2004).

"The Effect of Explicit and Implicit Taxes on Exchange Values in Corporate Mergers and Acquisitions: Part III (Acquisitions of Foreign Corporations)," 36 pages, October, 2003, *Financial Management Association International*, Denver.

"Electron Industries, Inc." *World Applied Case Research Association*, Bordeaux, France, July 2, 2003.

**TAX INSTITUTE, ETC. PRESENTATIONS (continued)**

"The Effect of Explicit and Implicit Taxes on Exchange Values in Corporate Mergers and Acquisitions: Part II (Implicit Tax Assets)," 22 pages, April, 2002, *Eastern Finance Association*, Baltimore, Maryland.

"The Effect of Explicit and Implicit Taxes on Exchange Values in Corporate Mergers and Acquisitions: Part I (Implicit Tax Liabilities)," 24 pages, October, 2001, *Financial Management Association Internationa*l, Toronto, Canada.

"Taxation of Distributions from Partnerships and Limited Liability Companies," *46th Annual William and Mary Tax Conference*, Williamsburg, VA (December 2, 2000).

"Current Developments in Financial Accounting Standards: Accounting for Derivatives, Hedges, and Corporate Acquisitions," *45th Annual William and Mary Tax Conference*, Williamsburg, VA (December 4, 1999).

Thomas Jefferson Chapter of the Virginia Society of CPAs, 2-4 hour seminars on a variety of technical topics, Each year from 1986 through 2005.

"A Macroeconomic Analysis of the Western European Welfare State Crisis: Revenue-Side Solutions," University of Madrid (Spain), *Conference on European Public Finance, Perspectivas Fiscales De Los 90*, San Lorenzo de el Escorial, Spain (July 18, 1994).

"Accounting for Stock-Based Compensation and Environmental Remediation Expenditures," *39th Annual William and Mary Tax Conference*, Williamsburg, VA (December 4, 1993).

"Accounting for Federal Income Taxes under FASB Statement 109: Analysis, Perspective, and Application," *38th Annual William and Mary Tax Conference*, Williamsburg, VA (December 5, 1992). Reported and summarized in 92 Tax Notes 244-H (December 8, 1992)

"An Empirical Examination of the Influence of Selected Factors on Professional Tax Preparers' Decision Processes," *Mid-Atlantic Region American Accounting Association Meeting*, Atlantic City (April 15, 1987). Co-authored with P. Reckers.

"Corporate Business Acquisitions: Tax and Non-Tax Legal Criteria For Evaluating Alternative Acquisition Techniques," presented at both the *Seventeenth Annual University of Hartford Tax Institute* (November 1, 1985), and the *University of Tennessee Federal Tax Conference* (November 8, 1985).

"Current Tax Developments for Individuals," *Sixteenth Annual University of Hartford Tax Institute* (October 11, 1984).

"Selection of a Business Entity After 1982--How Has It Changed?" *Seventh Annual Portland State University Tax Executives Institute* (June 15, 1984).

"Estate Freezing Techniques," *Roanoke Valley Estate Planning Council* (March 5, 1984).

"Current Developments in Taxation," *15th Annual University of Hartford Tax Institute* (September 12, 1983).

## ARTICLE REVIEWER

*Journal of the American Taxation Association* (1989-1996)

*Advances in Taxation* (1990-1996)

*Advances in Accounting* (1985-1986)

*Georgia Journal of Accounting* (1984-1985)

## INTERNAL (UNIVERSITY OF VIRGINIA) COMMITTEE MEMBERSHIPS

Director, Graduate Accounting Program (Tax Consulting), University of Virginia (2000 to 2005)

Chairman, Graduate Admissions Committee (2000-2005)

Chairman, Undergraduate Admissions Committee (1992-2000)

Member, President's International Activities Planning Commission (1998–2000)

Member, Academic Rules Committee (1997 to 1998)

Member, Undergraduate Curriculum Committee (1998–2000)

Member, Admissions Committee (1988-1991)

**CONSULTING: Expert Witness Consulting [See Appendix B]**

**CONSULTING: Professional Development**

***American Institute of CPAs National Tax Training Program***

Advanced Corporate Taxation. Champagne, Il (July 17-20, 2004)

***Citigroup***

Basic Strategic Tax Planning, New York, London (March/April, 2003)

International Tax Planning Strategies, New York (2001-2002)

***New York University Law School Continuing Legal Education/Internal Revenue Service--Office of Chief Counsel Tax Training Program:*** Developed and instructed the following courses:

Federal Tax Accounting, Washington, D.C., Spring, 1992. (Course outline and cases: 112 pages)

Advanced Consolidated Federal Income Tax Returns, Washington, D.C., Fall, 1989. (Course outline and cases: 76 pages)

Basic Consolidated Federal Income Tax Returns, Washington, D.C., Fall, 1989. (Course outline and cases: 93 pages)

Federal Income Taxation of Inventories, Washington, D.C., Summer, 1988 and Fall, 1992. (Course outline and cases: 195 pages)

***Deloitte Touche*:** 2000 to present. Instructed in-house tax training programs covering the following topics:

International Taxation

Corporate Taxation

Advanced Corporate Taxation

Tax Research

***KPMG Peat Marwick*:** 1980 to 1999. (Average instructor evaluation: approx. 4.85/5.0) Instructed in-house tax training programs covering the following topics:

***Tax Management Seminars (partner-level programs)***

International Tax Strategies for Tax Generalists (co-developed and taught program w/Hanna Carvey)

Corporate Mergers and Acquisitions: Advanced Concepts and Strategies

**CONSULTING: Professional Development (continued)**

***KPMG Peat Marwick (continued)*:**

***Tax Strategies Seminar (senior/manager-level programs):***

International Tax Compliance for Tax Generalists (co-developed and taught program w/Hanna Carvey)

Tax Accounting Periods and Methods for Tax Generalists

Tax Accounting Periods and Methods for Financial Services Line of Business

Federal Income Taxation of Partnerships: Basic and Advanced

Federal Income Taxation of S Corporations: Basic and Advanced

Corporate Mergers and Acquisitions (developed and taught program)

***Partner TAP:*** Six-month accelerated program designed to convert audit partners into tax partners (Summer, 1982)

***Level IV:*** Advanced Corporate Taxation (Corporate Reorganizations, Liquidations, and Consolidated Returns (Part II)

***Level III:*** Partnership Taxation and Consolidated Returns (Part I)

***Level I:*** Taxation of Individuals and Property Transactions

***Arthur Andersen and Co.*:** 1980 to 1997. (Average instructor evaluation: 4.87/5.0.) Instructed in-house tax training programs covering the following topics:

***Basic:*** Federal Income Taxation of Individuals and Property Transactions

***Intermediate A*:** Taxation of Qualified and Nonqualified Compensation Arrangements; Subchapter S Corporations; Section 351 Transfers

***Intermediate B:*** Corporate Liquidations, Mergers and Acquisitions

***Tax-Pac IV:*** Taxation of Estates and Trusts; Federal Estate and Gift Taxation

***Tax-Pac VI:*** Uniform Capitalization; Section 481; Taxation of Partners and Partnerships

***Tax-Pac VIII:*** Advanced Corporate Taxation; Foreign Tax Credit; Original Issue Discount

***International Taxation:*** Foreign Tax Credit

***Ernst and Young*:** 1989 to 1995. (Average instructor evaluation: approx. 4.73/5.0) Instructed in-house tax training programs covering the following topics:

Tax Entities

Taxation of Corporate Operations and Consolidated Returns

Seminar on the Taxation of Partners and Partnerships

Seminar on the Taxation of S Corporations and Their Shareholders

Seminar on Advanced Corporate Taxation

**OTHER**

Faculty Advisor: National Association of Black Accountants (2006 - 2007)

Invited Participant, PriceWaterhouseCoopers University for Faculty, New Jersey (June 14-17, 2005).

Judge, 2005 Navigant-McIntire Case Competition, Charlottesville, VA (February 24, 2005)

Faculty Advisor: PWC *xTax* Competition (2004)

Faculty Advisor: Virginia Entrepreneur Organization (University of Virginia) (September 2004 to May 2005)

Invited Participant, Deloitte Tax Faculty Symposium, Herndon, VA (May 6-7, 2004).

Invited Participant, KPMG Tax Faculty Symposium, Washington (May 20-21, 2004).

Invited Participant, PriceWaterhouseCoopers Tax Educators, San Antonio, Texas (August, 2002).

Invited Participant, Ernst & Young Seminar for Tax Educators (Partnership Taxation), Washington, D.C. (March 18-19, 1999).

Invited Participant, Ernst & Young Seminar for Tax Educators (Mergers and Acquisitions), Washington, D.C. (March 13-14, 1997).

Invited Participant, Ernst & Young Seminar for Tax Educators (Tax Practice and Procedure), Washington, D.C. (March 14-15, 1996).

Invited Participant, Ernst & Young Seminar for Tax Educators (Accounting Methods), Washington, D.C. (March 25-26, 1995).

Participant, Fourth International Conference on Principles of Reasoning and Knowledge Representation, Bonn, Germany (May 30-June 3, 1994).

Invited Participant, Ernst and Young Seminar for Tax Educators' (International Taxation), Washington, D.C. (March 20-22, 1991).

Invited Participant, Touche Ross Tax Symposium, ("Critical Tax Issues for the 1990's"), Washington, D.C. (June 12-13, 1989).

Invited Participant, Ernst and Whinney Symposium on Graduate Tax Program Administration, Washington, D.C. (June 8-9, 1989).

Invited Participant, Ernst and Whinney Seminar for Tax Educators, (Personal Financial Planning), Washington, D.C. (March 15-17, 1989).

Invited Participant and discussion leader, Arthur Andersen Tax Professor's Symposium, St. Charles, IL. (October 9-11, 1988).

Invited Participant, Ernst and Whinney Seminar for Tax Educators, (Consolidated Returns), Washington, D.C. (March 16-18, 1988).

Discussant, "Neutrality in the Taxation of Mergers and Acquisitions in the United States," Peat, Marwick, Mitchell & Co. Tax Research Symposium, Washington (May 5-6, 1988).

**OTHER (continued)**

Discussant, "Artificial Intelligence/Expert Systems in Taxation," Peat, Marwick, Mitchell & Co. Tax Research Symposium, Washington (May 14-15, 1987).

Participant, Touche Ross Tax Symposium, Washington (June 11, 1987).

Guest speaker, 1987 Touche Ross Southeastern Leadership Seminar, "Tax Policy and Transition Under the 1986 Act," Seabrook, SC (May 15-17, 1987).

Arthur Andersen and Co., Faculty Resident, National Tax Office, Washington, D.C. (Summer, 1980).

Research assistant, 1977-1979, AICPA Federal Tax Division Task Force on the Taxation of the Formation and Combination of Business Enterprises. (Responsible for the research and writing of Federal Tax Division of the American Institute of CPA's *Statement of Tax Policy #5: Taxation of the Formation and Combination of Business Enterprises*, 1979, 76 pages.)

Research assistant, 1976, AICPA Federal Tax Division Task Force on the Elimination of Double Taxation of Corporate-Source Income. (Responsible for the research and writing of Federal Tax Division of the American Institute of CPA's *Statement of Tax Policy #3: Elimination of Double Tax on Dividends*, published in 1976, 38 pages.)

**PROFESSIONAL ORGANIZATION MEMBERSHIPS [Past and current]**

Academy of Certified Fraud Examiners

Academy of International Business

Aircraft Owners and Pilots Association

American Accounting Association

American Bar Association (non-attorney Associate member)

American Taxation Association

Beta Alpha Psi (Honorary Accounting Fraternity)

- Faculty Advisor, 1997/1998 (University of Virginia)
- Faculty Advisor, 1990/1991 (University of Virginia)
- Faculty Advisor, 1986, 1992 (University of Virginia)
- Faculty Advisor, 1979 to 1981 (University of Maryland)
- Chapter President, 1977/1978 (University of Houston)

Federal Taxation Division of the AICPA (1979-1985, 1995-1998) [Committee Member]

Financial Executive Institute

Financial Management Association International

National Tax Association

**PROFESSIONAL ORGANIZATION MEMBERSHIPS (continued)**

Southern Finance Association

World Applied Case Research Association

**OTHER INTERESTS**

Salt-water reef fish and coral aquarium [350 gal.]
Pre-Revolutionary Russian History and Art
Civil War History
European History
Aviation (Instrument-rated pilot)
Eagle Scout

# Appendix B

## Court and Depositional Testimony Within Last Four Years

*Hans a. Ouaak, et. al. v. Dexia; Janet Baker et. al. v. Dexia; Gary B. Filler et. al. v. Dexia; and Stonington Partners, Inc. et. al. v. Dexia.* Civil action against Dexia Bank of Belgium in connection with certain violations of U.S. securities laws, U.S. SEC regulations, U.S. generally accepted accounting principles, and U.S. generally accepted auditing standards by Lernout & Hauspie Speech Products and several of its senior officers. Deposed (2007), trial pending.

*Procter & Gamble v. U.S., (2006-2007)*: Analysis and evaluation of principles used to account for an "Advance Payment Transaction(s)" involving certain sales of U.S. manufactured inventory to a wholly owned Canadian subsidiary through a wholly-owned foreign sales corporation. Deposed (2006), trial pending.

*Tyson Foods, Inc. and Subsidiaries v. U.S., (2005-2007)*: Analysis and evaluation of the cost accounting and financial principles applied to the dressed poultry ending inventory of certain Tyson subsidiaries. No deposition, testified at trial (2006), recognized by the Court as an expert.

*TransCapital Leasing Associates 1992-VIII, L.P. v. U.S., (2002-2006)*: Economic analyses of certain leasing transactions. Deposed (2006), settled out-of-court prior to trial.

*TransCapital Leasing Associates 1990-II, L.P. v. U.S. (2002-2005)*: Economic analyses of certain leasing transactions. Deposed (2003); testified at trial (2005), recognized by the Court as an expert.

*Retained as an independent expert by Ernst and Young in a malpractice suit that was litigated in a binding arbitration proceeding (Summer, 2002)*: Testified and recognized as a tax and accounting expert. [Details subject to confidentiality agreement.]

*Coggin Automotive Corporation. v. Commissioner (1999)*: Tax, legal, and financial analysis of taxpayer's dollar value LIFO inventories. No deposition, testified at trial, recognized by the Court as an expert.

LaRue, David W.

# Appendix C

## Documents Considered (or Available in Databases)[1]

| Database | Bates Reference Numbers | | PDF File on CD Attached to LaRue Report? |
|---|---|---|---|
| | Beginning | Ending* | |
| Murphy Database | IRSADMIN000001 | IRSADMIN004125 | Murphy Transactions Report |
| | MUCO00001 | MUCO00299 | no |
| | MUDB00002 | MUDB00393 | no |
| | MUEY00003 | MUEY04872 | no |
| | MUFOIA00022 | MUFOIA04424 | no |
| | MUMI00111 | MUMI02153 | no |
| | MUMR00018 | MUMR00431 | no |
| | MUMU12301 | MUMU23271 | no |
| | MUPR00001 | MUPR001793 | no |
| | WC000001 | WC006972 | no |
| | EY-MBCM011998 | EY-MBCM012006 | no |
| | EY-MBCM011020 | EY-MBCM011053 | no |
| | EY-MBCM012016 | EY-MBCM012114 | no |
| | EY-MBCM018980 | EY-MBCM019067 | no |
| Carmel Database | CT00001 | CT00909 | Carmel Transaction Report |
| | HC00001 | HC00893 | |
| | IRS00001 | IRS07251 | |
| | JA00001 | JA00893 | no |
| | JM00001 | JM00885 | no |
| | MICHENER-00001 | MICHENER-00126 | no |
| Buckingham Database | ADMIN000001 | ADMIN006569 | Buckingham Transaction Report |
| | PACE00001 | PACE00978 | no |
| Tesoro Database | INTERROGS00001 | INTERROGS00048 | no |
| | IRS00007 | IRS03482 | no |
| | JGMB00001 | JGMB01301 | no |
| | JGWG0001 | JGWG0356 | no |
| | MCJG00001 | MCJG01294 | no |
| | RETURNS-000001 | RETURNS-000195 | no |
| | WODB000001 | WODB00431 | no |
| | WOEY00001 | WOEY01518 | no |
| | WOJG00001 | WOJG02536 | no |
| | Documents Described on Following Page and Contained in PDF File on CD Accompanying LaRue Report on Tesoro Transactions [Bates Numbers are out of sequence; Documents described in "Bookmarks" to that PDF File] | | |
| COBRA Database | 2003EY000863 | 2003EY020971 | no |
| | C00045 | C00057 | no |
| | CANC00001 | CANC00339-111 | no |
| | DB-COBRA-00000001 | DB-COBRA-00246221 | no |
| | DBCOBRA00001 | DBCOBRA06097 | no |
| | DELAWARE-0001 | DELAWARE-0236 | no |
| | DGI-V-JG-0001 | DGI-V-JG-1618 | no |
| | DOJ-00001 | DOJ-065073 | no |
| | DOJ_V_ROSS-0001 | DOJ_V_ROSS-0487 | no |
| | EY00001 | EY03675 | no |
| | JG-CL0000001 | JG-CL0672960 | no |
| | JG-N0020862086 | JG-N0020862298 | no |
| | JG000001_0001 | JG017040_0011 | no |
| | LL&S00001 | LL&S00043 | no |
| | PSI-EY000001 | PSI-EY027430 | no |
| | S&S0056 | S&S1070 | no |
| | S&S_D00001 | S&S_D01088 | no |
| | SIDL000001 | SIDL477174 | no |

* Many of these Bates sequences have gaps in the numbering.

[1] See also footnotes to text of *Report*.

# Description of Documents in the Tesoro Database Documents Included (and Bookmarked) in the PDF File on the CD Attached to the LaRue Report on the Tesoro Transactions

#1 9-24-99 J&G Confidentiality Agreement.pdf
10-28-99 email frm vaughn 2 daugherdas.pdf
3-14-00 email from coplan to E&Y managers.pdf
3-8-00 email from guerin to amy keating of E&Y.pdf
3-8-00 email from guerin to coplan.pdf
3-9-00 email from sodano to apillera.pdf
#10 10-26-99 J&G notes.pdf
#11 10-27-99 J&G notes.pdf
#12 10-28-99 J&G notes.pdf
#16 11-3-99 J&G notes.pdf
#18 11-4-99 J&G notes.pdf
#19 11-5-99 daugerdas notes.pdf
#2 9-24-99 J&G notes.pdf
#20 11-5-99 fax frm brian upchurch.pdf
#21 11-8-99 J&G notes.pdf
#22 11-9-99 J&G notes.pdf
#23 11-9-99 BT Alex Brown Partnership Acct Authorization.pdf
#24 11-12-99 email frm coplan 2 daugerdas.pdf
#25 11-19-99 email frm coplan 2 E&Y managers.pdf
#26 12-9-99 email frm coplan 2 E&Y managers.pdf
#27 12-19-99 email frm coplan 2 ruble grady dagerdas.pdf
#28 12-20-99 fax of amended confirmation.pdf
#3 9-27-99 J&G notes.pdf
#33 1-4-00 email frm guerin to coplan.pdf
#34 1-4-00 letter frm ruble to john felkamp.pdf
#35 1-5-00 memo by blanchard re viper cobra tax opinion.pdf
#36 2-11-00 1015 am email from coplan to E&Y managers.pdf
#37 2-11-00 1018 am email from coplan to E&Y managers.pdf
#38 2-19-00 email re cobra return presentation.pdf
#39 2-29-00 email from coplan to guerin re cobra opinion.pdf
#4 10-1-99 email E&Y.pdf
#40 3-3-00 engagement letters from B&W to Michener.pdf
#46 3-21-00 email from sodano to jones.pdf
#47 4-7-00 J&G memo re use of 7609.pdf
#48 4-11-00 thru 5-8-00 email between E&Y and B&W.pdf
#49 7-20-00 letter via fax frm helms of scheef&Stone to odaniel.pdf
#5 10-11-99 email frm brian vaughn to grady dickens.pdf
#50 8-1-00 & 8-10-00 B&W transmittal letters.pdf
#53 11-13-00 email chain re killing COBRA corporations.pdf
#54 1-17-01 email from coplan to ruble of SAB&W.pdf
#59 10-31-01 email from Carl Rhodes of E&Y.pdf
#6 10-14-99 fax frm odaniel to daugerdas.pdf
#60 4-3-02 email from coplan to daugerdas.pdf
#61 Affidavit of Willaim Hart.pdf
#7 10-18-99 J&G notes.pdf
#8 10-21-99 J&G notes.pdf
#9 10-25-99 J&G notes.pdf
SA Tesoro Drive Investors Inc IDR 1 Listed Transactions_12-27-99 letter Parse from BJM.pdf

**LaRue, David W.**
**Appendix C**
**Description of Tesoro Documents**

SA Tesoro Drive Investors Inc IDR 1 Listed Transactions_1-31-02 letter.pdf
SA Tesoro Drive Investors Inc IDR 1 Listed Transactions_Assignment Agreement BMJ SA Tesoro Inves2.pdf
SA Tesoro Drive Investors Inc IDR 1 Listed Transactions_Assignment Agreement BMJ SA Tesoro Invest.pdf
SA Tesoro Drive Investors Inc IDR 1 Listed Transactions_Assignment Agreement GW SA Tesoro Investm.pdf
SA Tesoro Drive Investors Inc IDR 1 Listed Transactions_Assignment Partnership Interest BMJ.pdf
SA Tesoro Drive Investors Inc IDR 1 Listed Transactions_Assignment Partnership Interest GW.pdf
SA Tesoro Drive Investors Inc IDR 1 Listed Transactions_Digital Option 11-18-99 BMJ $25000000.pdf
SA Tesoro Drive Investors Inc IDR 1 Listed Transactions_Digital Option 11-18-99 BMJ $34400000.pdf
SA Tesoro Drive Investors Inc IDR 1 Listed Transactions_Digital Option 11-18-99 GW $6600000.pdf
SA Tesoro Drive Investors Inc IDR 1 Listed Transactions_Digital Option Deutsche Bank 11-10-99.pdf
SA Tesoro Drive Investors Inc IDR 1 Listed Transactions_Dow Jones 11-10-99 Multiple Currency Conv.pdf
SA Tesoro Drive Investors Inc IDR 1 Listed Transactions_Form.pdf
SA Tesoro Drive Investors Inc IDR 1 Listed Transactions_Response Question 10.pdf
SA Tesoro Drive Investors Inc IDR 1 Listed Transactions_Transaction Confirmation ex27741A BMJ $25.pdf
SA Tesoro Drive Investors Inc IDR 1 Listed Transactions_Transaction Confirmation ex27745A GW $660.pdf
SA Tesoro Drive Investors Inc IDR 1 Listed Transactions_Transaction Confirmation ex27746A BMJ $34.pdf
SA Tesoro Drive Investors Inc IDR 2 1120S S Corp_10-31-02 letter conlon to falk.pdf
SA Tesoro Drive Investors Inc IDR 2 1120S S Corp_1120S 12-31-99 not signed.pdf
SA Tesoro Drive Investors Inc IDR 2 1120S S Corp_1999 Activity Sheet.pdf
SA Tesoro Drive Investors Inc IDR 2 1120S S Corp_Incorporation in Delaware.pdf
SA Tesoro Drive Investors Inc IDR 3 Financial Statement 2000 S Corporation 1120S_11-18-02 letter.pdf
SA Tesoro Drive Investors Inc IDR 3 Financial Statement 2000 S Corporation 1120S_1-2-03 letter.pdf
SA Tesoro Drive Investors Inc IDR 3 Financial Statement 2000 S Corporation 1120S_1999 Activity Sh.pdf
SA Tesoro Drive Investors Inc IDR 3 Financial Statement 2000 S Corporation 1120S_2000 S Corporati.pdf
SA Tesoro Drive Investors Inc IDR 3 Financial Statement 2000 S Corporation 1120S_Deutsche Bank De.pdf
SA Tesoro Drive Investors Inc IDR 4 Promotional Materials Loan Docs_No response.pdf
SA Tesoro Drive Investors Inc IDR 5 Repeat Request IDR 3_Repeat Deutsche Bank December 1999.pdf
SA Tesoro Drive Investors Inc IDR 5 Repeat Request IDR 3_Response.pdf
SA Tesoro Drive Investors Inc IDR 5 Repeat Request IDR 3_SA Tesoro Investors 1999 Activity Sheet.pdf
SA Tesoro Drive Investors Inc IDR 6 Sun Microsystems_1999 Activity Sheet.pdf
SA Tesoro Drive Investors Inc IDR 6 Sun Microsystems_Deutsche Bank January 2000.pdf
SA Tesoro Drive Investors Inc IDR 6 Sun Microsystems_Page 3 of 6 for December 1999 Deutsche Bank .pdf
SA Tesoro Drive Investors Inc IDR 6 Sun Microsystems_Repeat Deutsche Bank December 1999.pdf
SA Tesoro Drive Investors Inc IDR 6 Sun Microsystems_Response.pdf
SA Tesoro Drive Investors Inc IDR 7 Smith Barney account opening_3-24-03 letter from goodson to f.pdf
SA Tesoro Drive Investors Inc IDR 7 Smith Barney account opening_Smithi Barney initial doc 1-30-2.pdf
SA Tesoro Drive Investors Inc IDR Repeat IDR Source of Funding_3-24-2003 letter from goodson to f.pdf
SA Tesoro Drive Investors Inc IDR Repeat IDR Source of Funding_Frost Bank for McCombs Enterprises.pdf
SA Tesoro Drive Investors Inc IDR Repeat IDR Source of Funding_Frost Bank statement for Woods 12-.pdf
SA Tesoro Investment Partners IDR 1 Listed Transactions_10-31-2002 letter from conlon to falk.pdf
SA Tesoro Investment Partners IDR 1 Listed Transactions_12-27-99 letter to Parse frm McCombs SA T.pdf

**LaRue, David W.**
**Appendix C**
**Description of Tesoro Documents**

SA Tesoro Investment Partners IDR 1 Listed Transactions_Assignment Agreement BJM SA Tesoro Inves2.pdf
SA Tesoro Investment Partners IDR 1 Listed Transactions_Assignment Agreement BJM SA Tesoro Invest.pdf
SA Tesoro Investment Partners IDR 1 Listed Transactions_Assignment Agreement BJM SATI Partners ex.pdf
SA Tesoro Investment Partners IDR 1 Listed Transactions_Assignment Agreement GW SA Tesoro Investm.pdf
SA Tesoro Investment Partners IDR 1 Listed Transactions_Assignment Agreement GW SATI Partners ex2.pdf
SA Tesoro Investment Partners IDR 1 Listed Transactions_Assignment Partnership interest in SA Te2.pdf
SA Tesoro Investment Partners IDR 1 Listed Transactions_Assignment Partnership interest in SA Tes.pdf
SA Tesoro Investment Partners IDR 1 Listed Transactions_Assignmnt Agrmnt BJM SATI Partners ex2774.pdf
SA Tesoro Investment Partners IDR 1 Listed Transactions_Deutsche Bank digital Option 11-10-99.pdf
SA Tesoro Investment Partners IDR 1 Listed Transactions_Digital Option 11-18-99 BMJ $25000000.pdf
SA Tesoro Investment Partners IDR 1 Listed Transactions_Digital Option 11-18-99 BMJ $34400000.pdf
SA Tesoro Investment Partners IDR 1 Listed Transactions_Digital Option 11-18-99 GW $6600000.pdf
SA Tesoro Investment Partners IDR 1 Listed Transactions_Dow Jones 11-10-99 Multiple Currency Conv.pdf
SA Tesoro Investment Partners IDR 1 Listed Transactions_Response to Question 1.pdf
SA Tesoro Investment Partners IDR 1 Listed Transactions_Response to Question 10.pdf
SA Tesoro Investment Partners IDR 1 Listed Transactions_Transaction Confirmation ex27741A BMJ $25.pdf
SA Tesoro Investment Partners IDR 1 Listed Transactions_Transaction Confirmation ex27745A GW $660.pdf
SA Tesoro Investment Partners IDR 1 Listed Transactions_Transaction Confirmation ex27746A BMJ $34.pdf
SA Tesoro Investment Partners IDR 10 Option Purchase_Response.pdf
SA Tesoro Investment Partners IDR 11 IRS Request for Answer work paper_1999 Activity.pdf
SA Tesoro Investment Partners IDR 11 IRS Request for Answer work paper_Response.pdf
SA Tesoro Investment Partners IDR 12 Sun Microsystem_response.pdf
SA Tesoro Investment Partners IDR 13 follow up on IDR 10_10-29-03 letter goodson to falk.pdf
SA Tesoro Investment Partners IDR 13 follow up on IDR 10_Bloomberg Cross Currency rates 12-20-99.pdf
SA Tesoro Investment Partners IDR 13 follow up on IDR 10_Digital Option values BJM GW 12-16-99 & .pdf
SA Tesoro Investment Partners IDR 13 follow up on IDR 10_Newspaper clippings 11-99 & 12-99.pdf
SA Tesoro Investment Partners IDR 13 follow up on IRD 10_10-29-03 letter goodson to falk.pdf
SA Tesoro Investment Partners IDR 13 follow up on IRD 10_Bloomberg Cross Currency reates 12-20-99.pdf
SA Tesoro Investment Partners IDR 13 follow up on IRD 10_Digital Option values BJM GW 12-16-99 an.pdf
SA Tesoro Investment Partners IDR 13 follow up on IRD 10_foreign currency exchange Sun Microsyste.pdf
SA Tesoro Investment Partners IDR 13 follow up on IRD 10_Newspaper clippings 11-99 & 12-99.pdf
SA Tesoro Investment Partners IDR 13 Supplement to follow up on IDR 10_4-6-04 Pratt Falk.pdf
SA Tesoro Investment Partners IDR 13 Supplement to follow up on IDR 10_Termination Agreement SAT2.pdf
SA Tesoro Investment Partners IDR 13 Supplement to follow up on IDR 10_Termination Agreement SAT3.pdf
SA Tesoro Investment Partners IDR 13 Supplement to follow up on IDR 10_Termination Agreement SATe.pdf

**LaRue, David W.**
**Appendix C**
**Description of Tesoro Documents**

SA Tesoro Investment Partners IDR 13 Supplement to follow up on IDR 10_Termination Agreement Tes2.pdf
SA Tesoro Investment Partners IDR 13 Supplement to follow up on IDR 10_Termination Agreement Teso.pdf
SA Tesoro Investment Partners IDR 14 Memorandums_10-29-03 letter goodson young.pdf
SA Tesoro Investment Partners IDR 2 1065 Partnership Return 1999_10-31-02 letter conlon falk.pdf
SA Tesoro Investment Partners IDR 2 1065 Partnership Return 1999_1065 SA Tesoro not signed.pdf
SA Tesoro Investment Partners IDR 2 1065 Partnership Return 1999_Agreement of General Partnership.pdf
SA Tesoro Investment Partners IDR 2 1065 Partnership Return 1999_SA Tesoro Activity Sheet 1999.pdf
SA Tesoro Investment Partners IDR 3 Details BJM GW_11-18-02 letter conlon to falk.pdf
SA Tesoro Investment Partners IDR 3 Details BJM GW_1-2-03 letter conlon to falk pdf
SA Tesoro Investment Partners IDR 3 Details BJM GW_Response to IDR 3.pdf
SA Tesoro Investment Partners IDR 3 Power of Attorney_No response.pdf
SA Tesoro Investment Partners IDR 4 1040 Woods 1999 and BJM 2000_1-2-03 letter.pdf
SA Tesoro Investment Partners IDR 4 1040 Woods 1999 and BJM 2000_response.pdf
SA Tesoro Investment Partners IDR 5 Financial Documents_1-2-03 letter re IDR 3 through 6.pdf
SA Tesoro Investment Partners IDR 5 Financial Documents_1999 Activity.pdf
SA Tesoro Investment Partners IDR 5 Financial Documents_Deutsche Bank 12-99 SA Tesoro.pdf
SA Tesoro Investment Partners IDR 6 Request for Party info Promoting_1-2-03 letter.pdf
SA Tesoro Investment Partners IDR 6 Request for Party info Promoting_response to question 1.pdf
SA Tesoro Investment Partners IDR 6 Request for Party info Promoting_response to question 6.pdf
SA Tesoro Investment Partners IDR 7 Promotional Materials Loan Doc Value of Option_Response.pdf
SA Tesoro Investment Partners IDR 8 Repeat Request IDR 5_Repeat Deutsche Bank 12-99.pdf
SA Tesoro Investment Partners IDR 8 Repeat Request IDR 5_Response 1999 Activity.pdf
SA Tesoro Investment Partners IDR 8 Repeat Request IDR 5_Response1999 Activity.pdf
SA Tesoro Investment Partners IDR 9 Payments to Parties_bank account statement of GW $165000.pdf
SA Tesoro Investment Partners IDR 9 Payments to Parties_Deutsche Bank SA Tesoro 12-99 payment to .pdf
SA Tesoro Investment Partners IDR 9 Payments to Parties_McCombs Enterprises check to E&Y $525000.pdf
SA Tesoro Investment Partners IDR 9 Payments to Parties_Payment to Brown & Wood $30000.pdf
SA Tesoro Investment Partners IDR 9 Payments to Parties_Response.pdf
SA Tesoro Investment Partners IDR 9 Payments to Parties_Tesoro Drive Investors Inc Payment to Bro.pdf
SATI Partners IDR 13 Supplement to follow up on IDR 10_4-6-04 Pratt Falk.pdf
SATI Partners IDR 13 Supplement to follow up on IDR 10_Termination Agreement SATI Partners ex2774.pdf
SATI Partners IDR 13 Supplement to follow up on IDR 10_Termination Agreement Tesoro Drive Partne2.pdf
SATI Partners IDR 13 Supplement to follow up on IDR 10_Termination Agreement Tesoro Drive Partner.pdf
SATI Partners IDR 6 Request for Party info Promoting_1-2-03 letter.pdf
SATI Partners IDR 6 Request for Party info Promoting_response to question 1.pdf
SATIInc IDR 1 Listed Transactions_Assignmnt Agrmnt BMJ SATI Partners ex27741A.pdf
SATIInc IDR 1 Listed Transactions_Digital Option DB 11-10-99.pdf
SATIPartners IDR 13 Supplement to follow up on IDR 10_Termination Agreement SATesoro Investment P.pdf
SATIPartners IDR 13 Supplement to follow up on IDR 10_Termination Agrmnt SATesoro Investment Part.pdf
Settlement Initiative Docs_11-30-99 E&Y invoice $165000 to GW.pdf
Settlement Initiative Docs_12-1-99 invoice to SATIInc by J&G $1320000.pdf
Settlement Initiative Docs_3-23-04 ltr frm Pratt to Falk re IDR 8 & 9 for GW.pdf
Settlement Initiative Docs_3-9-00 invoice to SATIInc B&W $30000.pdf
Settlement Initiative Docs_3-9-00 invoice to TDIInc by B&W $30000.pdf

**LaRue, David W.**
**Appendix C**
**Description of Tesoro Documents**

Settlement Initiative Docs_6-25-04 ltr to Woods frm Falk re Settlement Initivative.pdf
Settlement Initiative Docs_8-18-04 ltr to Falk frm Goodson E&Y re supporting docs.pdf
Settlement Initiative Docs_8-23-04 FedEx slip to Falk frm McCombsLLC E&Y.pdf
Settlement Initiative Docs_Attachment 1 Schedule E detail $281893 expense.pdf
Settlement Initiative Docs_Attachment 1 statement 12-31-99 WoodsLLC interest dealership.pdf
Settlement Initiative Docs_Attachment 2 to 3-23-04 ltr re IDR 8 & 9.pdf
Settlement Initiative Docs_Check frm GW for $165000 to E&Y.pdf
Settlement Initiative Docs_DBAlexBrown statement for SATIInc Dec 99.pdf
Settlement Initiative Docs_Form K-1 of Form 1065 for SATIPartners 12-31-99.pdf
Settlement Initiative Docs_Form K-1 of Form 1065 for TDPartners EIN 74-2936193 12-31-99.pdf
Settlement Initiative Docs_Form K-1 of Form 1120S for SATIInc Tax year 2000.pdf
Settlement Initiative Docs_Form K-1 of Form 1120S for SATIInc12-31-99.pdf
Settlement Initiative Docs_Form K-1 of Form 1120S for TDIInc tax year 2000.pdf
Settlement Initiative Docs_Form K-1 of Form 1120S for TDIInc12-31-99.pdf
Settlement Initiative Docs_Frost Natl Bank acct of GW showing paid $165000.pdf
Settlement Initiative Docs_SATIInc payment to B&W $30000.pdf
Settlement Initiative Docs_TDIInc payment to B&W $30000 3-30-00.pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_10-31-02 Letter Conlon to Falk.pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_10-31-02 ltr Conlon to Falk.pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_12-27-99 letter to Parse signed BJM.pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_Assignment agreement bmj Tesoro Drive Partne.pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_Assignment agreement GW Tesoro Drive Partner.pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_Assignment Agrmnt BJM Tesoro Drive Partners .pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_Assignment agrmnt GW Tesoro Drive Partners e.pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_Assignment of Partnership Interest Tesoro D2.pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_Assignment of Partnership Interest Tesoro Dr.pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_Assignmnt of Partnership Interest TD Partne2.pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_Assignmnt of Partnership Interest TD Partner.pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_DB Digital Option 11-10-99.pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_Deutsche Bank Digital Option 11-10-99.pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_Digital Option 11-18-99 BMJ $10000000.pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_Digital Option 11-18-99 gw $16000000.pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_Dow Jones Multiple Currency conversion 11-10.pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_Response to question 1 Response to question .pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_Response to question 1Response to question 1.pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_Transaction confirm ex27740A BMJ $10000000.pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_Transaction confirm ex27744A GW $16000000.pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_Transaction confirmation ex27740A BMJ $10000.pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_Transaction confirmation ex27744A gw $160000.pdf
Tesoro Drive Investors Inc IDR 2 1120S Corporation_10-31-02 letter conlon to falk & table of cont.pdf
Tesoro Drive Investors Inc IDR 2 1120S Corporation_1120S S Corporation Tesoro Drive Investors Inc.pdf
Tesoro Drive Investors Inc IDR 2 1120S Corporation_Certificate of Incorporation Tesoro Drive Inve.pdf
Tesoro Drive Investors Inc IDR 2 1120S Corporation_CTDI Inc 99 Activity Sheet.pdf
Tesoro Drive Investors Inc IDR 3 Financial Statement_11-18-02 letter conlon to falk.pdf
Tesoro Drive Investors Inc IDR 3 Financial Statement_1-2-03 letter to falk.pdf
Tesoro Drive Investors Inc IDR 3 Financial Statement_2000 S Corp 1120S TDI signed.pdf

**LaRue, David W.**
**Appendix C**
**Description of Tesoro Documents**

Tesoro Drive Investors Inc IDR 3 Financial Statement_Deutsche Bank December 99 TDI Inc Partners s.pdf
Tesoro Drive Investors Inc IDR 3 Financial Statement_Deutsche Bank December 99 TDI Inc.pdf
Tesoro Drive Investors Inc IDR 3 Financial Statement_Repeat TDI Inc 99 Activity Sheet.pdf
Tesoro Drive Investors Inc IDR 4 Promotional Materials_Response.pdf
Tesoro Drive Investors Inc IDR 5 Repeat Request on IDR 3_Repeat Deutsche Bank 12-1999 TDI Inc.pdf
Tesoro Drive Investors Inc IDR 5 Repeat Request on IDR 3_Response to IDR 2 & 3.pdf
Tesoro Drive Investors Inc IDR 6 Check to E&Y and Smith Barney_12-2-99 Check from GW to E&Y $1650.pdf
Tesoro Drive Investors Inc IDR 6 Check to E&Y and Smith Barney_3-24-03 letter frm goodson E&Y to .pdf
Tesoro Drive Investors Inc IDR 6 Check to E&Y and Smith Barney_Smith Barney initial document 1-30.pdf
Tesoro Drive Partners IDR 1_10-31-2002 letter frm conlon to falk.pdf
Tesoro Drive Partners IDR 1_12-27-99 letter Parse McCombs Tesoro Drive Partners.pdf
Tesoro Drive Partners IDR 1_12-27-99 letter Parse McCombsTDPartners.pdf
Tesoro Drive Partners IDR 1_Assign Agreement GW TDrive Partners ex27744A option.pdf
Tesoro Drive Partners IDR 1_Assign Agreement TDrive Partners Gary Woods.pdf

Tesoro Drive Partners IDR 1_Assign Agrment BMJ Tesoro Drive Partners ex27740A option.pdf
Tesoro Drive Partners IDR 1_Assign of Partnership Interest Tesoro Drive Partners BMJ.pdf
Tesoro Drive Partners IDR 1_Assignment Agreement BMJ Tesoro Drive Partners ex27740A option.pdf
Tesoro Drive Partners IDR 1_Assignment Agreement GW Tesoro Drive Partners ex27744A option.pdf
Tesoro Drive Partners IDR 1_Assignment Agreement Tesoro Drive Partners GW Gary Woods.pdf
Tesoro Drive Partners IDR 1_Assignment of Partnership Interest Tesoro Drive Partners BMJ.pdf
Tesoro Drive Partners IDR 1_DB Tesoro Drive Partners December 99.pdf
Tesoro Drive Partners IDR 1_Deutsche Bank Digital Option 11-10-99.pdf
Tesoro Drive Partners IDR 1_Deutsche Bank Tesoro Drive Partners December 99.pdf
Tesoro Drive Partners IDR 1_Digital Option 11-18-1999 for BMJ $10000000.pdf
Tesoro Drive Partners IDR 1_Digital Option 11-18-1999 for GW $16000000.pdf
Tesoro Drive Partners IDR 1_Dow Jones 11-10-99 Multiple Currency Conversion.pdf
Tesoro Drive Partners IDR 1_IDR Form Listed Transactions.pdf
Tesoro Drive Partners IDR 1_TD Partners 1999 Activity Sheet.pdf
Tesoro Drive Partners IDR 1_Tesoro Drive Partners 1999 Activity Sheet.pdf
Tesoro Drive Partners IDR 1_Transaction Conf ex27740A BMJ $10000000.pdf
Tesoro Drive Partners IDR 1_Transaction Conf ex27744A GW $16000000.pdf
Tesoro Drive Partners IDR 1_Transaction Confirmation ex27740A BMJ $10000000.pdf
Tesoro Drive Partners IDR 1_Transaction Confirmation ex27744A GW $16000000.pdf
Tesoro Drive Partners IDR 1_written response to question 1.pdf
Tesoro Drive Partners IDR 1_written response to question 10 Promoters.pdf
Tesoro Drive Partners IDR 10 Option_Form.pdf
Tesoro Drive Partners IDR 10 Option_Response.pdf
Tesoro Drive Partners IDR 11 Request IRS work paper analysis_Form with analysis.pdf
Tesoro Drive Partners IDR 11 Request IRS work paper analysis_Response.pdf
Tesoro Drive Partners IDR 11 Request IRS work paper analysis_Tesoro Drive Investors Inc 1999 Acti.pdf
Tesoro Drive Partners IDR 12 follow up Option purchase_10-29-2003 letter Goodson Falk.pdf
Tesoro Drive Partners IDR 12 follow up Option purchase_form.pdf
Tesoro Drive Partners IDR 12 Supplement_4-6-2004 letter Pratt to Falk.pdf
Tesoro Drive Partners IDR 12 Supplement_form.pdf
Tesoro Drive Partners IDR 12 Supplement_Termination Agreement SA Tesoro Investment Partners ex 27.pdf
Tesoro Drive Partners IDR 12 Supplement_Termination Agreement SATesoro Investment Partners ex 272.pdf
Tesoro Drive Partners IDR 12 Supplement_Termination Agreement SATesoro Investment Partners ex 277.pdf

Tesoro Drive Partners IDR 12 Supplement_Termination Agreement Tesoro Drive Partners ex 27740A.pdf
Tesoro Drive Partners IDR 12 Supplement_Termination Agreement Tesoro Drive Partners ex 27744A.pdf
Tesoro Drive Partners IDR 12 Supplement_Termination Agrmnt SA Tesoro Investment Partners ex 27741.pdf
Tesoro Drive Partners IDR 12 Supplement_Termination Agrmnt SATesoro Investment Partners ex 27745A.pdf
Tesoro Drive Partners IDR 12 Supplement_Termination Agrmnt SATesoro Investment Partners ex 27746A.pdf
Tesoro Drive Partners IDR 12 Supplement_Termination Agrmnt Tesoro Drive Partners ex 27740A.pdf
Tesoro Drive Partners IDR 12 Supplement_Termination Agrmnt Tesoro Drive Partners ex 27744A.pdf
Tesoro Drive Partners IDR 13 Agreements_10-29-2003 letter frm goodson E&Y to Falk.pdf
Tesoro Drive Partners IDR 13 Agreements_form.pdf
Tesoro Drive Partners IDR 13 Agreements_Jenkens & Gilchrist Opinion.pdf
Tesoro Drive Partners IDR 2 1065 Partnership Tax 1999 - 2000_10-31-2002 letter Conlon to Falk.pdf
Tesoro Drive Partners IDR 2 1065 Partnership Tax 1999 - 2000_1065 Tesoro Drive Partners 12-27-199.pdf
Tesoro Drive Partners IDR 2 1065 Partnership Tax 1999 - 2000_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 Agreement of General Par.pdf
Tesoro Drive Partners IDR 2 1065 Partnership Tax 1999 - 2000_12-12-1999 Agrmnt of General Partner.pdf
Tesoro Drive Partners IDR 2 1065 Partnership Tax 1999 - 2000_1999 Activity Sheet.pdf
Tesoro Drive Partners IDR 2 1065 Partnership Tax 1999 - 2000_form.pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_11-18-2002 Letter from Conlon to Falk.pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_1-2-2003 Letter from Conlon to Falk.pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_8821 Tax Info Authorization GW Lightholder J&G.pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_8821 Tax Info Autthorization Lightholder J&G.pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_8821 Tax Information Authorization GW Lighthold.pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_8821 Tax Information Autthorization Lightholder.pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_Alex Brown 11-1999 for BMJ.pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_Alex Brown 11-1999 for GW.pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_Application for EIN for BMJ.pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_Application for EIN GW.pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_Certificate of Cancellation BMJ.pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_Certificate of Cancellation GW.pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_Certificate of Formation for BMJ.pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_Certificate of Formation for GW.pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_DB 12-1999 for BMJ.pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_Deutsche Banc 12-1999 for BMJ.pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_Deutsche Banc 12-1999 for GW.pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_Form.pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_Parts of two bank statements for wire transfers.pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_Wire transfer Alex Brown All First Bank $242900.pdf
Tesoro Drive Partners IDR 4 1040 Woods 1999 McCombs 2000_1040 amended 1999 Woods not signed.pdf
Tesoro Drive Partners IDR 4 1040 Woods 1999 McCombs 2000_1040 amended 2000 McCombs signed.pdf
Tesoro Drive Partners IDR 4 1040 Woods 1999 McCombs 2000_1-2-2003 Letter frm conlon to Falk.pdf
Tesoro Drive Partners IDR 4 1040 Woods 1999 McCombs 2000_Form.pdf
Tesoro Drive Partners IDR 5 Financial Documents_1-2-2003 letter from conlon to falk.pdf
Tesoro Drive Partners IDR 5 Financial Documents_DB December 1999 for Tesoro Drive Partners 2nd ac.pdf
Tesoro Drive Partners IDR 5 Financial Documents_DB December 1999 for Tesoro Drive Partners.pdf

**LaRue, David W.**
**Appendix C**
**Description of Tesoro Documents**

Tesoro Drive Partners IDR 5 Financial Documents_Deutsche Bank December 1999 for Tesoro Drive Par2.pdf
Tesoro Drive Partners IDR 5 Financial Documents_Deutsche Bank December 1999 for Tesoro Drive Part.pdf
Tesoro Drive Partners IDR 5 Financial Documents_IDR form.pdf
Tesoro Drive Partners IDR 5 Financial Documents_TDIPartners 1999 Activity Sheet.pdf
Tesoro Drive Partners IDR 5 Financial Documents_Tesoro Drive Investment Partners 1999 Activity Sh.pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_1-2-2003 letter.pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_Engagement Letter E&Y to BJM $525000 fee.pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_Engagement Letter E&Y to Woods $165000 fee.pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_Engagement Letter Ernst & Young to McCombs $525.pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_Engagement Letter Ernst & Young to Woods $16500.pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_Engagement Letter J&G McCombs fee $995740.pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_Engagement Letter J&G Woods fee $324260.pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_IDR form.pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_Invoice to Mccombs Enterprises from Ernst Young.pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_Invoice to McCombsLLC frm E&Y $525000.pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_Invoice to SA Tesoro Investors by B&W $30000 Ag.pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_Invoice to SA Tesoro Investors Inc from J&G $13.pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_Invoice to SA Tesoro Investors Inc fromJ&G $132.pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_Invoice to SATIInc frm J&G $1320000.pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_Invoice to TDIInc from B&W $30000.pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_Invoice to Tesoro Drive Investors Inc from B&W .pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_Response to IDR 1 Question 1.pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_Waiver of conflict letter & representation B&W .pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_Waiver of conflict letter & representation B&W2.pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_Waiver of conflict ltr & representation B&W to .pdf
Tesoro Drive Partners IDR 7 Organization Question BJM_IDR 7 Form.pdf
Tesoro Drive Partners IDR 7 Organization Question BJM_Response.pdf
Tesoro Drive Partners IDR 7 Promotional Materials Loan Value of Option_IDR 7 Form no response.pdf
Tesoro Drive Partners IDR 7 Shortened Request Promotional Materials Loan_IDR 7 Form.pdf
Tesoro Drive Partners IDR 8 Repeat Request IDR 5_form.pdf
Tesoro Drive Partners IDR 8 Repeat Request IDR 5_Repeat DB December 1999 Tesoro Drive Partners.pdf
Tesoro Drive Partners IDR 8 Repeat Request IDR 5_Repeat Deutsche Bank December 1999 Tesoro Drive .pdf
Tesoro Drive Partners IDR 8 Repeat Request IDR 5_Repeat TD Partners 1999 Activity Sheet.pdf
Tesoro Drive Partners IDR 8 Repeat Request IDR 5_Written response.pdf
Tesoro Drive Partners IDR 9 Payments_bank acct Woods $165000.pdf
Tesoro Drive Partners IDR 9 Payments_DB SATIInc 12-1999 J&G $1320000.pdf
Tesoro Drive Partners IDR 9 Payments_Deutsche Bank SA Tesoro Investors Inc 12-1999 J&G $1320000.pdf
Tesoro Drive Partners IDR 9 Payments_McCombs Enterprises check to E&Y $525000.pdf
Tesoro Drive Partners IDR 9 Payments_Response to E&Y J&G B&W.pdf
Tesoro Drive Partners IDR 9 Payments_SA Tesoro Brown and Wood $30000.pdf
Tesoro Drive Partners IDR 9 Payments_TDIInc Brown and Wood $30000.pdf
Tesoro Drive Partners IDR 9 Payments_Tesoro Drive Investors Inc Brown and Wood $30000.pdf
0-TES2.pdf

**LaRue, David W.**
**Appendix C**
**Description of Tesoro Documents**

0-Original File Names
10-28-99 email frm vaughn 2 daugherdas.pdf
3-14-00 email from coplan to E&Y managers.pdf
3-8-00 email from guerin to amy keating of E&Y.pdf
3-8-00 email from guerin to coplan.pdf
3-9-00 email from sodano to apillera.pdf
10-29-99 J&G notes.pdf
1040 Billy J & Charline H McCombs_1999 signed.pdf
1040 Billy J & Charline H McCombs_2000 Signed.pdf
1040 Gary and Glenda Woods Amended_1999 Not Signed.pdf
1040 Gary and Glenda Woods_2000 Signed.pdf
1065 SA Tesoro Investment_12-27-99 Signed.pdf
1065 Tesoro Drive Partners_12-31-99 Signed.pdf
1120S S Corp Tesoro Drive_12-31-99 Signed.pdf
1120S SA Tesoro Drive Investors_12-31-99 Signed.pdf
11-2-99 J&G notes.pdf
11-3-99 email frm coplan 2 daugerdas.pdf
12-21-99 email frm daugerdas 2 coplan grady ruble merck.pdf
12-21-99 fax J&G.pdf
12-22-99 email fwd frm o'daniel to daugerdas email.pdf
12-23-99 email frm coplan to E&Y managers.pdf
12-28-99 sheef & Stone invoice to J&G re BAMC.pdf
1-24-01 letter frm ruble to neidus.pdf
1-30-01 email from ruderman to coplan.pdf
2-21-01 emails frm ruble to coplan and sodano.pdf
3-14-00 email from E&Y to sodano.pdf
3-15-01 email from coplan to zmoira of E&Y.pdf
6-4-01 email from welty re disclosure of J&G options.pdf
7-15-01 email from E&Y to J&G.pdf
8-10-00 email chain with other emails 8-7-00 & 6-7-00.pdf
9 3 99 memo frm J&G.pdf
Additional Documents_9-25-02 Power of Atty for SATIPartners signed by GW.pdf
Billy J McCocmbs and Charline H McCombs IDR 3 Power of Attorney_1-2-2003 letter from conlon to fa.pdf
Billy J McCocmbs and Charline H McCombs IDR 3 Power of Attorney_Power of attorney with language.pdf
Billy J McCocmbs and Charline H McCombs IDR 4 Promotional Materials Loan and Option_1-2-2003 lett.pdf
Billy J McCocmbs and Charline H McCombs IDR 4 Promotional Materials Loan and Option_spot option G.pdf
Billy J McCocmbs and Charline H McCombs IDR 4 Promotional Materials Loan and Option_spot option S.pdf
Billy J McCocmbs and Charline H McCombs IDR 5 COBRA Presentation_No response.pdf
Billy J McCocmbs and Charline H McCombs IDR 6 Repeast of 4 Promotional_No response.pdf
Gary Woods & Glenda Woods IDR 8 questions GW 1999 Form 1040_3-23-2004 letter from Pratt to Falk.pdf
Gary V Woods & Glenda M Woods IDR 8 questions woods 1999 Form 1040_9-10-2004 fax behnke to falk.pdf
Gary V Woods & Glenda M Woods IDR 8 questions woods 1999 Form 1040_9-28-2004 fax colmenero to fal.pdf
Gary V Woods & Glenda M Woods IDR 8 questions woods 1999 Form 1040_Schedule D detail.pdf
Gary V Woods and Glenda M Woods IDR 1 Listed Transactions_1-2-2003 letter conlon to falk.pdf
Gary V Woods and Glenda M Woods IDR 1 Listed Transactions_response.pdf
Gary V Woods and Glenda M Woods IDR 2 1040 income taxes_1-2-2003 letter.pdf
Gary V Woods and Glenda M Woods IDR 2 1040 income taxes_response.pdf

Gary V Woods and Glenda M Woods IDR 3 Power of Atty_1-2-2003.pdf
Gary V Woods and Glenda M Woods IDR 3 Power of Atty_power of atty with language.pdf
Gary V Woods and Glenda M Woods IDR 4 Promotional loan option_1-2-2003.pdf
Gary V Woods and Glenda M Woods IDR 4 Promotional loan option_spot option deutschmark12-20-1999.pdf
Gary V Woods and Glenda M Woods IDR 4 Promotional loan option_spot option swiss franc 12-20-1999.pdf
Gary V Woods and Glenda M Woods IDR 5 Cobra Presentations_10-23-00 letter Woods Brown and Wood op.pdf
Gary V Woods and Glenda M Woods IDR 5 Cobra Presentations_2-17-2000 letter Woods frm Daugerdas r2.pdf
Gary V Woods and Glenda M Woods IDR 5 Cobra Presentations_2-17-2000 letter Woods frm Daugerdas re.pdf
Gary V Woods and Glenda M Woods IDR 5 Cobra Presentations_Opinion J&G 1-31-2000 to BJM.pdf
Gary V Woods and Glenda M Woods IDR 5 Cobra Presentations_Opinion J&G 1-31-2000 to Woods.pdf
Gary V Woods and Glenda M Woods IDR 5 Cobra Presentations_Opinion J&G 3-9-2000 to Woods.pdf
Gary V Woods and Glenda M Woods IDR 5 Cobra Presentations_response.pdf
Gary V Woods and Glenda M Woods IDR 6 Repeat request for IDR 4_response.pdf
Gary V Woods and Glenda M Woods IDR 7 E&Y invoices_response.pdf
Gary V Woods and Glenda M Woods IDR 9 participation in other listed transactions_3-23-2004 pratt .pdf
GW and Glenda M Woods IDR 8 questions GW 1999 Form 1040_schedule e detail.pdf
J&G invoice to BAMC Inc in the amt of $25000 - missing.pdf
Jenkens and Gilchrist Summons_11-11-99 Fax Berry J&G Susie for McCombs.pdf
Jenkens and Gilchrist Summons_11-11-99 ltr to GW & BJM frm Daugerdas forward SS-4.pdf
Jenkens and Gilchrist Summons_11-11-99 notes from meeting with E&Y re COBRA.pdf
Jenkens and Gilchrist Summons_11-12-99 Agrmnt General Partnership SATIPartners unsigned.pdf
Jenkens and Gilchrist Summons_11-12-99 Agrmnt General Partnership TDPartners unsigned.pdf
Jenkens and Gilchrist Summons_11-12-99 Certificate for BJM shares stock SATIInc.pdf
Jenkens and Gilchrist Summons_11-12-99 Certificate for GW shares stock SATIInc signed BJM.pdf
Jenkens and Gilchrist Summons_11-12-99 Consent of Sole Director SATIInc signed BJM.pdf
Jenkens and Gilchrist Summons_11-12-99 SS-4 Application EIN SATIInc EIN 74-2936189 BJM.pdf
Jenkens and Gilchrist Summons_11-12-99 SS-4 Application EIN SATIPartner EIN 74-2936192 BJM.pdf
Jenkens and Gilchrist Summons_11-12-99 SS-4 Application EIN TDIInc EIN 74-2936191 BJM.pdf
Jenkens and Gilchrist Summons_11-12-99 SS-4 Application EIN TDPartner EIN 74-2936193 BJM.pdf
Jenkens and Gilchrist Summons_11-12-99 SS-4 Application McCombsLLC EIN 74-2936195 BJM.pdf
Jenkens and Gilchrist Summons_11-12-99 SS-4 Application WoodsLLC EIN 74-2936194 BJM.pdf
Jenkens and Gilchrist Summons_11-16-99 Fax frm Beery to Cummings for BJM & GW Partnership Inv Sum.pdf
Jenkens and Gilchrist Summons_11-16-99 Fax frm Beery to Cummings for BJM & GW.pdf
Jenkens and Gilchrist Summons_11-17-04 Fac frm LightholderL to IRS Austin.pdf
Jenkens and Gilchrist Summons_11-19-99 J&G AlexA agrmnt GW DB.pdf
Jenkens and Gilchrist Summons_11-19-99 ltr J&G AlexanderA agmt McCombs & DB.pdf
Jenkens and Gilchrist Summons_11-19-99 ltr J&G AlexanderA agreement BJM DB.pdf
Jenkens and Gilchrist Summons_11-19-99 ltr J&G AlexanderA agrmnt GW DB.pdf
Jenkens and Gilchrist Summons_11-23-99 fax confrmation Guerin to GW and BJM.pdf
Jenkens and Gilchrist Summons_1-21-1999 Engagement letter daugerdas to woods signed agreed.pdf
Jenkens and Gilchrist Summons_12-1-1999 Engagement ltr Daugerdas to BJM signed agreed.pdf
Jenkens and Gilchrist Summons_1-21-2004 letter from borders to falk.pdf
Jenkens and Gilchrist Summons_12-15-99 ltr to BJM & GW frm Guerin.pdf
Jenkens and Gilchrist Summons_12-15-99 Sun stock sold Tesoro Drive Partners $216000.pdf
Jenkens and Gilchrist Summons_12-20-1999 memo Cummings to Guerin re ownership SA Tesoro.pdf
Jenkens and Gilchrist Summons_12-27-99 letter Guerin Cummings response to 12-20-99.pdf
Jenkens and Gilchrist Summons_12-27-99 ltr Parse BJM SATI transferred SA Tesoro Investors inc.pdf
Jenkens and Gilchrist Summons_12-27-99 ltr Parse BJM Tesoro Drive Partners transf Tesoro Drive In.pdf

**LaRue, David W.**
**Appendix C**
**Description of Tesoro Documents**

Jenkens and Gilchrist Summons_12-28-99 ltr BJM to Parse authorizing sell SATIInc.pdf
Jenkens and Gilchrist Summons_12-28-99 ltr BJM to Parse authorizing sell TDI Inc.pdf
Jenkens and Gilchrist Summons_12-2-99 ltr frm Lightholder to IRS Austin SATIInc.pdf
Jenkens and Gilchrist Summons_12-2-99 ltr frm Lightholder to IRS Austin TDIInc.pdf
Jenkens and Gilchrist Summons_12-2-99 ltr Lightholder to IRS Austin SATIInc.pdf
Jenkens and Gilchrist Summons_12-2-99 ltr lightholder to IRS Austin TDI Inc.pdf
Jenkens and Gilchrist Summons_12-29-99 Sun stock sold SATI Inc $690862.pdf
Jenkens and Gilchrist Summons_12-3-99 Sun stock bought SA Tesoro Invest Partners $633618.pdf
Jenkens and Gilchrist Summons_12-3-99 Sun stock bought Tesoro Drive Partners cancelled.pdf
Jenkens and Gilchrist Summons_12-6-99 Sun stock bought Tesoro Drive Partners $210949.pdf
Jenkens and Gilchrist Summons_Alex Brown Acct Agrmnt McCombsLLC 11-12-99.pdf
Jenkens and Gilchrist Summons_Alex Brown acct agrmnt SATIInc by BJM 11-12-99.pdf
Jenkens and Gilchrist Summons_Alex Brown acct agrmnt SATIPartners signed BJM 11-12-99.pdf
Jenkens and Gilchrist Summons_Alex Brown Acct Agrmnt to WoodsLLC signed 11-12-99.pdf
Jenkens and Gilchrist Summons_Alex Brown corp acct authorization for BJM SATIInc signed.pdf
Jenkens and Gilchrist Summons_Alex Brown Corp Acct Authorization TDIInc.pdf
Jenkens and Gilchrist Summons_Alex Brown CorpAcct Agrmnt TDIInc BJM 11-12-99.pdf
Jenkens and Gilchrist Summons_Alex Brown New Acct GGSA.pdf
Jenkens and Gilchrist Summons_Alex Brown New Acct GWSA Partners.pdf
Jenkens and Gilchrist Summons_Alex Brown New Acct info McCombsLLC.pdf
Jenkens and Gilchrist Summons_Alex Brown New acct info SATIInc.pdf
Jenkens and Gilchrist Summons_Alex Brown New Acct info WoodsLLC.pdf
Jenkens and Gilchrist Summons_Alex Brown New Acct McCombsLLC.pdf
Jenkens and Gilchrist Summons_Alex Brown New Acct SATIPartners.pdf
Jenkens and Gilchrist Summons_Alex Brown new acct TD Partners.pdf
Jenkens and Gilchrist Summons_Alex Brown New Acct TDIInc.pdf
Jenkens and Gilchrist Summons_Alex Brown new acct WoodsLLC.pdf
Jenkens and Gilchrist Summons_Alex Brown non corp resolution authorizging GW signed 11-12-99.pdf
Jenkens and Gilchrist Summons_Alex Brown non Corp resolution McCombsLLC signed 11-12-99.pdf
Jenkens and Gilchrist Summons_Alex Brown partnership acct autho & indemnity for SATIPartners.pdf
Jenkens and Gilchrist Summons_AlexBrown acct agmt TDPartners signed BJM 11-12-99.pdf
Jenkens and Gilchrist Summons_AlexBrown new acct info TDPartners.pdf
Jenkens and Gilchrist Summons_AlexBrown partnership acct author TDPartners BJM & GW.pdf
Jenkens and Gilchrist Summons_Assgmnt Agrmnt 11-19-99 McCombsLLC DB SATIPartners BJM ex27746A.pdf
Jenkens and Gilchrist Summons_Assgmnt Agrmnt 11-19-99 Woods LLC DB SATIPartners ex27745A.pdf
Jenkens and Gilchrist Summons_Assgmnt Agrmnt 11-19-99 Woods LLC DB TDPartners ex27744A.pdf
Jenkens and Gilchrist Summons_Assgnmnt Agrmnt 11-19-99 BMJ SATIPartners unsigned 27741A.pdf
Jenkens and Gilchrist Summons_Assgnmnt Agrmnt 11-19-99 BMJ SATIPartners unsigned 27746A.pdf
Jenkens and Gilchrist Summons_Assgnmnt Agrmnt 11-19-99 BMJ TDPartners unsigned 27740A.pdf
Jenkens and Gilchrist Summons_Assgnmnt Agrmnt 11-19-99 SATIPartners unsigned 27745A.pdf
Jenkens and Gilchrist Summons_Assgnmnt Agrmnt 11-19-99 TDPartners unsigned 27744A.pdf
Jenkens and Gilchrist Summons_Assignmnt Agrmnt 11-19-99 BJM DB SATIPartners McCombsB ex27741A.pdf
Jenkens and Gilchrist Summons_Assignmnt Agrmnt 11-19-99 BJM DB TD Partners McCombsB ex27740A.pdf
Jenkens and Gilchrist Summons_blank Alex Brown Acct Agrmnt to McCombsLLC.pdf
Jenkens and Gilchrist Summons_blank Guaranty Agrmnt frm Alex Brown.pdf
Jenkens and Gilchrist Summons_Blank page Bates MW395.pdf
Jenkens and Gilchrist Summons_COBRA client questionnaire McCombs.pdf
Jenkens and Gilchrist Summons_Cobra Client Questionnaire.pdf
Jenkens and Gilchrist Summons_Confirmation 11-16-99 Fax frm Beery to Cummings.pdf
Jenkens and Gilchrist Summons_DB Dec 1999 SA Tesoro Investment Partners 222-10031.pdf
Jenkens and Gilchrist Summons_DB Dec 1999 Tesoro Drive Investors 222-10033 Canadian.pdf
Jenkens and Gilchrist Summons_DB Dec 1999 Tesoro Drive Partners 222-10032 Canadian.pdf

Jenkens and Gilchrist Summons_DB Digital Opt 27744A WoodsLLC 11-18-99 $16000000.pdf
Jenkens and Gilchrist Summons_DB Digital Opt 27745A $6600000.pdf
Jenkens and Gilchrist Summons_DB Digital Option 27740A McCombsLLC 11-18-99 $10000000.pdf
Jenkens and Gilchrist Summons_DB Digital Option 27746 McCombsLLC 11-18-99 $34400000.pdf
Jenkens and Gilchrist Summons_DB digital Option confirm ex27741A 11-18-99 $25000000.pdf
Jenkens and Gilchrist Summons_DB January 2000 SA Tesoro Investment Partners 222-10031.pdf
Jenkens and Gilchrist Summons_DB January 2000 Tesoro Drive Investors Inc 222-10033.pdf
Jenkens and Gilchrist Summons_DB Nov 1999 BJM Tesoro Drive Investments 222-10029.pdf
Jenkens and Gilchrist Summons_Deutsche Bank Dec 1999 BJMTesoro Investments 222-10029.pdf
Jenkens and Gilchrist Summons_Deutsche Bank Dec 1999 GWTesoro Investments 222-10030.pdf
Jenkens and Gilchrist Summons_Deutsche Bank Dec 1999 SA Tesoro Investors 222-10034.pdf
Jenkens and Gilchrist Summons_Deutsche Bank Dec 1999 Tesoro Drive Investors 222-10033.pdf
Jenkens and Gilchrist Summons_Deutsche Bank Dec 1999 Tesoro Drive Partners 222-10032.pdf
Jenkens and Gilchrist Summons_Deutsche Bank January 2000 SA Tesoro Investors Inc 222-10034.pdf
Jenkens and Gilchrist Summons_Deutsche Bank January 2000 Tesoro Drive Partners 222-10032.pdf
Jenkens and Gilchrist Summons_Deutsche Bank Nov 1999 GW Tesoro Investments LLC 222-10030.pdf
Jenkens and Gilchrist Summons_Fed Ex ship slip to frm J&W.pdf
Jenkens and Gilchrist Summons_financial capital Tesoro Drive Partners and SATI Partners.pdf
Jenkens and Gilchrist Summons_Form 2553 election for SATIInc signed BJM.pdf
Jenkens and Gilchrist Summons_Form 2553 Election for SATIInc signed.pdf
Jenkens and Gilchrist Summons_Form 2553 election for TDIInc signed BJM.pdf
Jenkens and Gilchrist Summons_Guaranty Agrmnt Alex Brown signed BJM 11-12-99.pdf
Jenkens and Gilchrist Summons_Guaranty Agrmnt Alex Brown signed BJM 12-12-99.pdf
Jenkens and Gilchrist Summons_Guaranty Agrmnt AlexBrown signed BJM 11-12-99.pdf
Jenkens and Gilchrist Summons_Guaranty Agrmnt frm Brown to GW 11-12-99.pdf
Jenkens and Gilchrist Summons_Guaranty Agrmnt unsigned frm Alex Brown.pdf
Jenkens and Gilchrist Summons_Instructions by BJM wire funds 2 DBAlexBrown for SATIInc.pdf
Jenkens and Gilchrist Summons_Instructions to BJM wire DBAlexBrown for SATIInc $1041000.pdf
Jenkens and Gilchrist Summons_Internal fax AlexBrownDB frm Yackee to Burnside re new accts.pdf
Jenkens and Gilchrist Summons_Summons to J&G Woods.pdf
Jenkens and Gilchrist Summons_Termination Agmt SATIPartners DB 12-20-99 27741A.pdf
Jenkens and Gilchrist Summons_Termination Agmt SATIPartners DB 12-20-99 27745A.pdf
Jenkens and Gilchrist Summons_Termination Agmt SATIPartners DB 12-20-99 27746A.pdf
Jenkens and Gilchrist Summons_Termination Agmt TDPartners DB 12-20-99 27740A.pdf
Jenkens and Gilchrist Summons_Termination Agmt TDPartners DB 12-20-99 27744A.pdf
Jenkens and Gilchrist Summons_undated ltr frm Parse wire transfer BJMLLC to DB.pdf
Jenkens and Gilchrist Summons_undated ltr frm Parse wire transfer GWLLC to DB.pdf
Jenkens and Gilchrist Summons_Unsigned 11-12-99 Consent of Sole Director SATIInc.pdf
Jenkens and Gilchrist Summons_Unsigned 11-12-99 consent of Sole Director TDIInc.pdf
Jenkens and Gilchrist Summons_Unsigned 11-12-99 Statement of Incorporation SATIInc.pdf
Jenkens and Gilchrist Summons_Unsigned 11-12-99 Statement of Incorporation TDIInc.pdf
Jenkens and Gilchrist Summons_Unsigned 11-19-99 Asgn Agrmnt WoodsLLC DB SATIPartners 27745.pdf
Jenkens and Gilchrist Summons_Unsigned 11-19-99 Assgn Agrmnt McCombsLLC DB SATI 27741.pdf
Jenkens and Gilchrist Summons_Unsigned 11-19-99 ltr to Parse BJM assigned SATIPartners.pdf
Jenkens and Gilchrist Summons_Unsigned 11-19-99 ltr to Parse BJM transfer to SATIPartners.pdf
Jenkens and Gilchrist Summons_Unsigned 11-19-99 ltr to Parse frm McCombsLLC TDPartners transfer.pdf
Jenkens and Gilchrist Summons_Unsigned 11-19-99 ltr to Parse frm McCombsLLC TDPartners.pdf
Jenkens and Gilchrist Summons_Unsigned 11-19-99 ltr to Parse WoodsLLC assigned to SATIPartners.pdf
Jenkens and Gilchrist Summons_Unsigned 11-19-99 ltr to Parse WoodsLLC transfer to SATIPartners.pdf
Jenkens and Gilchrist Summons_Unsigned 11-19-99 ltr to Parse WoodsLLC transfer to TDPartners.pdf
Jenkens and Gilchrist Summons_Unsigned 11-19-99 to Parse transfer WoodsLLC to TDPartners.pdf

Jenkens and Gilchrist Summons_Unsigned 12-1-99 Engagement ltr frm Daugerdas to BJM legal advice.pdf
Jenkens and Gilchrist Summons_Unsigned Agrmnt 11-19-99 McCombsLLC DB TDPartners 27740A.pdf
Jenkens and Gilchrist Summons_Unsigned Alex Brown Acct Agrmnt form to TDIInc.pdf
Jenkens and Gilchrist Summons_Unsigned Alex Brown acct agrmnt GGSA.pdf
Jenkens and Gilchrist Summons_Unsigned Alex Brown Acct Agrmnt GWSA Partners.pdf
Jenkens and Gilchrist Summons_Unsigned Alex Brown Acct Agrmnt TDPartners.pdf
Jenkens and Gilchrist Summons_Unsigned Alex Brown Acct Agrmnt to WoodsLLC.pdf
Jenkens and Gilchrist Summons_Unsigned Alex Brown corp acct autho BJM TDIInc.pdf
Jenkens and Gilchrist Summons_Unsigned Alex Brown corp act for GW of GGSA.pdf
Jenkens and Gilchrist Summons_Unsigned Alex Brown Guaranty Agrmnt.pdf
Jenkens and Gilchrist Summons_Unsigned Alex Brown non Corp resolution BJM.pdf
Jenkens and Gilchrist Summons_unsigned Asgnment Agrmnt McCombsLLC DB TDPartners 27740.pdf
Jenkens and Gilchrist Summons_Unsigned Ass Agrmnt 11-19-99 GWLLC DB SATIP 27745A.pdf
Jenkens and Gilchrist Summons_Unsigned Ass Agrmnt 11-19-99 WoodsLLC DB TDPartners.pdf
Jenkens and Gilchrist Summons_Unsigned Assgn Agrmnt 11-19-99 WoodsLLC DB TDPartn 27744A.pdf
Jenkens and Gilchrist Summons_Unsigned Assgn Agrmnt McCombsLLC DB SATIPartners 27746A.pdf
Jenkens and Gilchrist Summons_Unsigned Assgnmnt Agrmnt 11-19-99 27746A.pdf
Jenkens and Gilchrist Summons_Unsigned Assgnmnt Agrmnt 11-19-99 McCombsLLC DB SATIPartners.pdf
Jenkens and Gilchrist Summons_Unsigned BJM digital Option 27740A 11-18-99 $10000000.pdf
Jenkens and Gilchrist Summons_Unsigned BJM Digital Option 27741 $25000000.pdf
Jenkens and Gilchrist Summons_Unsigned BJM Digital Option 27746A 11-18-99 $34400000.pdf
Jenkens and Gilchrist Summons_Unsigned by GW Digital Option 27744A $16000000.pdf
Jenkens and Gilchrist Summons_Unsigned Certificate BJM shares stock of SATIInc.pdf
Jenkens and Gilchrist Summons_Unsigned Certificate McCombs stock SA Tesoro Investors Inc.pdf
Jenkens and Gilchrist Summons_Unsigned Certificate stock TDIInc BJM 11-12-99.pdf
Jenkens and Gilchrist Summons_Unsigned Certificate stock TDIInc GW 11-12-99.pdf
Jenkens and Gilchrist Summons_Unsigned Certificate Woods shares stock SATIInc.pdf
Jenkens and Gilchrist Summons_Unsigned Certificate Woods stock SA Tesoro Investors Inc.pdf
Jenkens and Gilchrist Summons_Unsigned Consent of Sole Director SA Tesoro Investors Inc.pdf
Jenkens and Gilchrist Summons_Unsigned Digital Option 27745 11-18-99.pdf
Jenkens and Gilchrist Summons_Unsigned Engagement ltr frm Daugerdas to GW $324260.pdf
Jenkens and Gilchrist Summons_Unsigned Form 2553 election TDIInc.pdf
Jenkens and Gilchrist Summons_Unsigned Form 2553 GGSA.pdf
Jenkens and Gilchrist Summons_Unsigned Form 8821 McCombsLLC.pdf
Jenkens and Gilchrist Summons_Unsigned Form 8821 re GGSA for LightholderL.pdf
Jenkens and Gilchrist Summons_Unsigned Form 8821 re GWSA LightholderL.pdf
Jenkens and Gilchrist Summons_Unsigned Form 8821 re WoodsLLC for LightholderL.pdf
Jenkens and Gilchrist Summons_Unsigned form 8821 Tax TDPartners LightholderL.pdf
Jenkens and Gilchrist Summons_Unsigned Form 8821 TDIInc LightholderL.pdf
Jenkens and Gilchrist Summons_Unsigned Guaranty Agrmnt Alex Brown.pdf
Jenkens and Gilchrist Summons_Unsigned Guaranty Agrmnt frm Alex Brown.pdf
Jenkens and Gilchrist Summons_Unsigned Guaranty Agrmnt.pdf
Jenkens and Gilchrist Summons_Unsigned ltr 11-15-99 to Roak frm Guerin confirm consult with inves.pdf
Jenkens and Gilchrist Summons_Unsigned non corp resolution GW to act in behalf.pdf
Jenkens and Gilchrist Summons_Unsigned partnership acct autho & indemnity for GWSA.pdf
Jenkens and Gilchrist Summons_Unsigned partnership acct authorization & indemnity TDPartners.pdf
Jenkens and Gilchrist Summons_Unsigned SS-4 App EIN McCombsLLC.pdf
Jenkens and Gilchrist Summons_Unsigned SS-4 App EIN TDPartners.pdf
Jenkens and Gilchrist Summons_Unsigned SS-4 Application for EIN for WoodsLLC.pdf
Jenkens and Gilchrist Summons_Unsigned SS-4 EIN GGSA Investors.pdf
Jenkens and Gilchrist Summons_Unsigned SS-4 EIN GWSA Partners.pdf
Jenkens and Gilchrist Summons_Unsigned SS-4 EIN TDIInc.pdf
Jenkens and Gilchrist Summons_Unsigned Term Agrmnt Tesoro Drive Partners 12-20-99 ex27740A.pdf

**LaRue, David W.**
**Appendix C**
**Description of Tesoro Documents**

Jenkens and Gilchrist Summons_Unsigned Terminat Agrmnt SATI Partners DB 12-20-99 ex27741A.pdf
Jenkens and Gilchrist Summons_Unsigned Terminat Agrmnt TD Partners & DB 12-20-99 ex27744A.pdf
Jenkens and Gilchrist Summons_Unsigned Termination Agreement SA Tesoro Investment Partners Deuts2.pdf
Jenkens and Gilchrist Summons_Unsigned Termination Agreement SA Tesoro Investment Partners Deutsc.pdf
Jenkens and Gilchrist Summons_Unsigned undated Assgn of Partnership SATIInc from BJM LLC.pdf
Jenkens and Gilchrist Summons_Unsigned undated Assgn of Partnership SATIInc from WoodsLLC.pdf
Jenkens and Gilchrist Summons_Unsigned undated Assgn of Partnership TDPartn frm McCombsLLC.pdf
Jenkens and Gilchrist Summons_Unsigned undated Assgn of Partnership TDPartn frm WoodsLLC.pdf
Jenkens and Gilchrist Summons_Unsigned undated ltr to Parse frm McCombs LLC.pdf
Jenkens and Gilchrist Summons_Unsigned undated ltr to Parse frm McCombsLLC.pdf
JMJ JL J&G DOCS_ #1 9-24-99 J&G Confidentiality Agreement.pdf
JMJ JL J&G DOCS_ 10-28-99 email frm vaughn 2 daugherdas.pdf
JMJ JL J&G DOCS_ 3-14-00 email from coplan to E&Y managers.pdf
JMJ JL J&G DOCS_ 3-8-00 email from guerin to amy keating of E&Y.pdf
JMJ JL J&G DOCS_ 3-8-00 email from guerin to coplan.pdf
JMJ JL J&G DOCS_ 3-9-00 email from sodano to apillera.pdf
JMJ JL J&G DOCS_#10 10-26-99 J&G notes.pdf
JMJ JL J&G DOCS_#11 10-27-99 J&G notes.pdf
JMJ JL J&G DOCS_#12 10-28-99 J&G notes.pdf
JMJ JL J&G DOCS_#16 11-3-99 J&G notes.pdf
JMJ JL J&G DOCS_#18 11-4-99 J&G notes.pdf
JMJ JL J&G DOCS_#19 11-5-99 daugerdas notes.pdf
JMJ JL J&G DOCS_#2 9-24-99 J&G notes.pdf
JMJ JL J&G DOCS_#20 11-5-99 fax frm brian upchurch.pdf
JMJ JL J&G DOCS_#21 11-8-99 J&G notes.pdf
JMJ JL J&G DOCS_#22 11-9-99 J&G notes.pdf
JMJ JL J&G DOCS_#23 11-9-99 BT Alex Brown Partnership Acct Authorization.pdf
JMJ JL J&G DOCS_#24 11-12-99 email frm coplan 2 daugerdas.pdf
JMJ JL J&G DOCS_#25 11-19-99 email frm coplan 2 E&Y managers.pdf
JMJ JL J&G DOCS_#26 12-9-99 email frm coplan 2 E&Y managers.pdf
JMJ JL J&G DOCS_#27 12-19-99 email frm coplan 2 ruble grady dagerdas.pdf
JMJ JL J&G DOCS_#28 12-20-99 fax of amended confirmation.pdf
JMJ JL J&G DOCS_#3 9-27-99 J&G notes.pdf
JMJ JL J&G DOCS_#33 1-4-00 email frm guerin to coplan.pdf
JMJ JL J&G DOCS_#34 1-4-00 letter frm ruble to john felkamp.pdf
JMJ JL J&G DOCS_#35 1-5-00 memo by blanchard re viper cobra tax opinion.pdf
JMJ JL J&G DOCS_#36 2-11-00 1015 am email from coplan to E&Y managers.pdf
JMJ JL J&G DOCS_#37 2-11-00 1018 am email from coplan to E&Y managers.pdf
JMJ JL J&G DOCS_#38 2-19-00 email re cobra return presentation.pdf
JMJ JL J&G DOCS_#39 2-29-00 email from coplan to guerin re cobra opinion.pdf
JMJ JL J&G DOCS_#4 10-1-99 email E&Y.pdf
JMJ JL J&G DOCS_#40 3-3-00 engagement letters from B&W to Michener.pdf
JMJ JL J&G DOCS_#46 3-21-00 email from sodano to jones.pdf
JMJ JL J&G DOCS_#47 4-7-00 J&G memo re use of 7609.pdf
JMJ JL J&G DOCS_#48 4-11-00 thru 5-8-00 email between E&Y and B&W.pdf
JMJ JL J&G DOCS_#49 7-20-00 letter via fax frm helms of scheef&Stone to odaniel.pdf
JMJ JL J&G DOCS_#5 10-11-99 email frm brian vaughn to grady dickens.pdf
JMJ JL J&G DOCS_#50 8-1-00 & 8-10-00 B&W transmittal letters.pdf
JMJ JL J&G DOCS_#53 11-13-00 email chain re killing COBRA corporations.pdf
JMJ JL J&G DOCS_#54 1-17-01 email from coplan to ruble of SAB&W.pdf
JMJ JL J&G DOCS_#59 10-31-01 email from Carl Rhodes of E&Y.pdf
JMJ JL J&G DOCS_#6 10-14-99 fax frm odaniel to daugerdas.pdf
JMJ JL J&G DOCS_#60 4-3-02 email from coplan to daugerdas.pdf

**LaRue, David W.**
**Appendix C**
**Description of Tesoro Documents**

JMJ JL J&G DOCS_#61 Affidavit of Willaim Hart.pdf
JMJ JL J&G DOCS_#7 10-18-99 J&G notes.pdf
JMJ JL J&G DOCS_#8 10-21-99 J&G notes.pdf
JMJ JL J&G DOCS_#9 10-25-99 J&G notes.pdf
JMJ JL J&G DOCS_10-11-99 email frm brian vaughn to grady dickens.pdf
JMJ JL J&G DOCS_10-14-99 fax frm odaniel to daugerdas.pdf
JMJ JL J&G DOCS_10-18-99 J&G notes.pdf
JMJ JL J&G DOCS_10-1-99 email E&Y.pdf
JMJ JL J&G DOCS_10-21-99 J&G notes.pdf
JMJ JL J&G DOCS_10-25-99 J&G notes.pdf
JMJ JL J&G DOCS_10-28-99 email frm vaughn 2 daugerdas.pdf
JMJ JL J&G DOCS_10-29-99 J&G notes.pdf
JMJ JL J&G DOCS_10-31-01 email from Carl Rhodes of E&Y.pdf
JMJ JL J&G DOCS_11-12-99 email frm coplan 2 daugerdas.pdf
JMJ JL J&G DOCS_11-13-00 email chain re killing COBRA corporations.pdf
JMJ JL J&G DOCS_11-2-99 J&G notes.pdf
JMJ JL J&G DOCS_11-3-99 email frm coplan 2 daugerdas.pdf
JMJ JL J&G DOCS_11-3-99 J&G notes.pdf
JMJ JL J&G DOCS_11-4-99 J&G notes.pdf
JMJ JL J&G DOCS_11-5-99 fax frm brian upchurch.pdf
JMJ JL J&G DOCS_1-17-01 email from coplan to ruble of SAB&W.pdf
JMJ JL J&G DOCS_11-8-99 J&G notes.pdf
JMJ JL J&G DOCS_11-9-99 BT Alex Brown Partnership Acct Authorization.pdf
JMJ JL J&G DOCS_12-19-99 email frm coplan 2 ruble grady daugerdas.pdf
JMJ JL J&G DOCS_12-20-99 fax of amended confirmation.pdf
JMJ JL J&G DOCS_12-21-99 email frm daugerdas 2 coplan grady ruble merck.pdf
JMJ JL J&G DOCS_12-21-99 fax J&G.pdf
JMJ JL J&G DOCS_12-22-99 email fwd frm o'daniel to daugerdas email.pdf
JMJ JL J&G DOCS_12-23-99 email frm coplan to E&Y managers.pdf
JMJ JL J&G DOCS_12-28-99 sheef & Stone invoice to J&G re BAMC.pdf
JMJ JL J&G DOCS_1-24-01 letter frm ruble to neidus.pdf
JMJ JL J&G DOCS_1-30-01 email from ruderman to coplan.pdf
JMJ JL J&G DOCS_1-4-00 email frm guerin to coplan.pdf
JMJ JL J&G DOCS_1-4-00 letter frm ruble to john felkamp.pdf
JMJ JL J&G DOCS_1-5-00 memo by blanchard re viper COBRA tax opinion.pdf
JMJ JL J&G DOCS_2-21-01 emails frm ruble to coplan and sodano.pdf
JMJ JL J&G DOCS_2-29-00 email from coplan to guerin re cobra opinion.pdf
JMJ JL J&G DOCS_3-14-00 email from E&Y to sodano.pdf
JMJ JL J&G DOCS_3-15-01 email from coplan to zmoira of E&Y.pdf
JMJ JL J&G DOCS_3-21-00 email from Sodano to Jones.pdf
JMJ JL J&G DOCS_3-3-00 engagement letters from B&W to Michener.pdf
JMJ JL J&G DOCS_4-11-00 thru 5-8-00 email between E&Y and B&W.pdf
JMJ JL J&G DOCS_4-3-02 email from coplan to daugerdas.pdf
JMJ JL J&G DOCS_4-7-00 J&G memo re use of 7609.pdf
JMJ JL J&G DOCS_6-4-01 email from welty re disclosure of J&G options.pdf
JMJ JL J&G DOCS_7-15-01 email from E&Y to J&G.pdf
JMJ JL J&G DOCS_7-20-00 letter via fax frm helms of Scheef&Stone to Odaniel.pdf
JMJ JL J&G DOCS_8-10-00 email chain with other emails 8-7-00 & 6-7-00.pdf
JMJ JL J&G DOCS_9 3 99 memo frm J&G.pdf
JMJ JL J&G DOCS_9-24-99 J&G Confidentiality Agreement.pdf
JMJ JL J&G DOCS_9-24-99 J&G notes.pdf
JMJ JL J&G DOCS_9-27-99 J&G notes.pdf
JMJ JL J&G DOCS_Affidavit of William Hart.pdf

JMJ JL J&G DOCS_March 11 2005 ltr frm jlindquist.pdf

**LaRue, David W.**
**Appendix C**
**Description of Tesoro Documents**

March 11 2005 ltr frm jlindquist.pdf
Penalty IDRs BJM_11-11-99 Jones of E&Y engagement ltr BJM.pdf
Penalty IDRs BJM_12-13-04 ltr to Jodeh frm Couch.pdf
Penalty IDRs BJM_3-3-00 signed off representation to B&W by HJM and GW.pdf
Penalty IDRs BJM_Item 6 is blank.pdf
Penalty IDRs BJM_McCombs tax refund Examination Years 1986-1990.pdf
Penalty IDRs BJM_Notes frm meeting & partnership investments to AlexBrown wiring.pdf
Penalty IDRs BJM_Options - 11-18-99 fax to Cummings from Parse of DBAlexBrown.pdf
Penalty IDRs BJM_Options - Brooks reports valuation 12-16-99 & 12-17-99 both LLCs.pdf
Penalty IDRs BJM_Options - DB Digital Option 11-18-99 McCombsLLC $10000000.pdf
Penalty IDRs BJM_Options - DB Digital Option 11-18-99 McCombsLLC $25000000.pdf
Penalty IDRs BJM_Options - DB Digital Option 11-18-99 McCombsLLC $34400000.pdf
Penalty IDRs BJM_Options - DB Digital Option 11-18-99 WoodsLLC $16000000.pdf
Penalty IDRs BJM_Options - DB Digital Option 11-18-99 WoodsLLC $6600000.pdf
Penalty IDRs BJM_Options - Partnership investments BJM and GW.pdf
Penalty IDRs BJM_Options - Various currency reports 11-19-99 to 12-20-99.pdf
Penalty IDRs BJM_Red McCombs biographical data.pdf
Penalty IDRs BJM_Various Currency calculators.pdf
Penalty IDRs GW_Penalty IDR Exam 1999 and 2002 Form 1040.pdf

# Depositions

Michael Dell
Paula B. Kennedy
Jeannette T. K. Martin
Richard Kramer
Robert Johnson
Robert C. Schlemmer
Thomas Tahl
Susan Henry
Janet Lee Robinson
Christopher T. Chilcoat
Jeanette Michaels
Dawn Forbes
Joseph Nicosia
Kenneth Hooker
Joyce Bauchner
Kenneth Hughes
Shari R. Fessler-Tepper
Susan M. Parson
Michael Szalkowski
Alexander Eckman
Gary Duboff
Andrew Kyriacou
Stuart G. Goodson

# Other

Buckingham: Complaint For Readjustment Of Partnership Items Under 26 U.S.C. Section 6226

Buckingham: Objections And Responses To United States' First Set Of Interrogatories

Buckingham: Plaintiff's First Set Of Requests For Admissions

Buckingham: United States' Corrected Response To Plaintiff's First Set Of Requests For Production

Buckingham: Unites States' First Set Of Interrogatories

Buckingham: Plaintiff's First Supplemental Objections And Responses To United States' First Set Of Interrogatories

Buckingham: Plaintiff's RCFC 26(a)(1) Initial Disclosures

Buckingham: Plaintiff's Second Request For Production

Buckingham: Plaintiff's Supplemental Responses To United States' First Requests For Production Of Documents

Cobra (Carmel): Petitioners' Combined Responses To United States' Second And Third Sets Of Interrogatories

Letter From Mr. Crouch To Mr. Donohue (April 4, 2006)

Plaintiff's First Set Of Interrogatories

Tesoro: Billy J. McCombs' Objections And Responses To United States' Subpoena Duces Tecum

Tesoro: Objections And Responses To United States' First Request For Production Of Documents

Tesoro: Objections And Responses To United States' First Set Of Interrogatories