**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **JZ Buckingham Investments, LLC, as Tax Matters Partner of JBJZ Partners, A South Carolina general partnership,** | § | |
| **Plaintiff,** | § | **Case No. 05-231 T** |
| | § | **Chief Judge Edward Damich** |
| **v.** | § | |
| **United States of America,** | § | |
| **Defendant.** | § | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO THE VALIDITY OF TREASURY REGULATION § 1.752-6**

JOEL N. CROUCH
M. TODD WELTY
Meadows, Collier, Reed,
Cousins & Blau, L.L.P.
901 Main Street, Suite 3700
Dallas, TX 75202
(214) 744-3700 Telephone
(214) 747-3732 Facsimile
jcrouch@meadowscollier.com
twelty@meadowscollier.com

ATTORNEYS FOR PLAINTIFF

# TABLE OF CONTENTS


I. QUESTIONS PRESENTED....1

A. Whether the *retroactive date* of the Regulation is valid....1
B. Whether the *rules* of the Regulation are valid....2
C. Whether the Regulation was validly *issued*....2

II. SUMMARY OF THE ARGUMENT....3

III. STATEMENT OF THE CASE....3

A. Introduction....3
B. The facts of the transactions at issue....3
C. The Promulgation of the Regulation....4
D. Federal Court *Invalidates* the Regulation....8

IV. STANDARD OF REVIEW....9

V. ARGUMENT....9

A. The Regulation's effective date violates the prohibition against retroactive regulations under I.R.C. § 7805 and thus is invalid....10

1. Subject to rare exceptions, I.R.C. § 7805 imposes a blanket prohibition on tax regulations with retroactive effect....10
2. The Regulation fails to satisfy the exceptions of I.R.C. § 7805(b), and thus its retroactive effect is not valid....11

B. The Regulation is invalid because it prescribes rules that do not reasonably reflect Congressional intent....22

1. Two-step test under *Chevron* applies....22
2. Step One: Section 309 unambiguously negates the Regulation, and at a minimum, the Regulation is not a manifestation of clear Congressional intent....23
3. Step Two: The Regulation is an unreasonable construction of I.R.C. § 752....24

C. The Regulation is invalid because it was issued in violation of the notice and comment requirements of the Administrative Procedure Act (APA)....27

VI. CONCLUSION....29

**TABLE OF AUTHORITIES**

**Federal Cases**

*Am. Fed'n of Gov't Employees v. Block*, 655 F.2d 1155, 1156 (D.C. Cir. 1981)........................ 28
*Anderson Clayton & Co v. United States.*, 562 F.2d 972, 981 (5th Cir. 1977) ........................... 20
*Beneficial Corp. v. United States*, 814 F.2d 1570, 1574 (Fed. Cir. 1987).................................. 23
*Caterpillar Tractor Co. v. United States*, 589 F.2d 1040, 1043 (Ct.Cl. 1978)............................ 20
*Cemco*, 2007 WL 951944 *4 (N.D. Ill.) ........................................................................... 18
*Chamber of Commerce of the U.S. v. SEC*, 443 F.3d 890, 907-8 (D.C. Cir. 2006)............... 27, 29
*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984) ........................................................................................................................ passim
*Chock Full O'Nuts Corp. v. United States*, 453 F.2d 300, 303 ............................................... 20
*E.I. du Pont de Nemours & Co. v. Comm'r*, 41 F.3d 130, 135-36 (3d Cir. 1994)....................... 24
*Exxon Corp. v. United States*, 40 Fed.Cl. 73, 83 (1998)......................................................... 24
*Gehl Co. v. Comm'r*, 795 F.2d 1324, 1331 (7th Cir. 1986)..................................................... 10
*General Elec. Co. v. Nintendo Co., Ltd.*, 179 F.3d 1350, 1353 (Fed. Cir. 1999) .......................... 9
*Helmer v. Comm'r*, 34 T.C.M. (CCH) 727, 731 (1975) ............................................... 5, 7, 21, 26
*Jade Trading Investors, L.L.C. v. United States*, 2007 WL 951944, *4 (N.D. Ill. Mar. 27, 2007).......................................................................................... 21
*Jade Trading, L.L.C. v. United States*, 2007 WL 4553043, at N. 65 (Fed. Cl. Dec. 21, 2007).... 21
*Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004)................................................................ 28
*Klamath Strategic Inv. Fund LLC v. United States*, 440 F. Supp.2d 608, 619 (E.D. Tex. 2006) .......................................................................... 8, 18, 22, 21, 25, 26
*La Rue v. Comm'r*, 90 T.C. 465, 479 (1988) ..................................................................... 5, 6, 7
*LaRue v. Comm'r*, 71 T.C. 1 (1978) ...................................................................................... 26
*Long v. Comm'r*, 660 F.2d 416, 419 (10th Cir. 1981) ................................................................ 5
*Long v. Comm'r.*, 71 T.C. at 78 (citations omitted) ................................................................... 6
*Mobile Oil Corp. v. Dep't of Energy,* 610 F, 2d 796, 803 (Temp. Emer. Ct. App. 1979); created 1971, abolished 93......................................................................................... 29
*Nalle v. Comm'r*, 997 F.2d 1134, 1138 (5th Cir. 1993)........................................................... 24
*National Muffler Dealers Ass'n v. United States*, 440 U.S. 472, 476-77 (1979)................... 22, 24
*Paulsen v. Daniel*, 413 F.3d 999, 1008 (9th Cir. 2005)........................................................... 27
*Rowan Cos. v. United States*, 452 U.S. 247, 253 (1981) ......................................................... 24
*Salina Partnership, L.P. v. Commissioner*, T.C. Memo 2000-352................................................ 5
*Schuler Industries, Inc. v. United States*, 109 F.3d 753, 755-56 (Fed. Cir. 1997)....................... 24
*Snap-Drape, Inc. v. Comm'r*, 98 F.3d 194, 197 (5th Cir. 1996)................................................. 24
*Somerville v. United States*, 13 Cl.Ct. 287, 290 (1987)............................................................ 20
*Spirit of Sage Council v. Norton*, 294 F. Supp.2d 67, 90 (D.D.C. 2003) .................................... 27
*State of New Jersey v. U.S. EPA*, 626 F.2d 1038, 1049 (D.C. Cir. 1980).................................... 28
*United States Steel Corp. v. EPA*, 595 F.2d 207, 210 (5th Cir. 1979)......................................... 27
*United States v. Carlton*........................................................................................................ 21
*United States v. Garner*, 767 F.2d 104, 120-23 (5th Cir. 1985) .................................................. 27
*United States v. Shimer*, 367 U.S. 374, 382, 383 (1961) ........................................................... 25
*United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 24 (1982) .................................................... 24
*Vinson v. Comm'r*, T.C. Memo 1979-175 ................................................................................ 20

*Woods Psychiatric Institute v. United States*, 20 Ct.Cl. 324, 332 (1990), (internal citations omitted), *aff'd*, 925 F.2d 1454 (Fed. Cir. 1991) .................... 28, 29

**Federal Statutes**

Administrative Procedure Act, 5 U.S.C. § 553 (1966) .................... 27, 28
Community Renewal Tax Relief Act of 2000, Pub. L. 106-554, § 309(a), 114 Stat. 2763, 2763A-638 (2000) .................... 12, 15
Internal Revenue Code of 1986 .................... 12
I.R.C. § 357 .................... 13, 14, 15
I.R.C. § 358 .................... passim
I.R.C. § 358(a)(1), (h)(1), (h)(3) .................... 13
I.R.C. § 358(h) .................... 12, 13, 14, 15
I.R.C. § 358(h)(2)(A) and (B) .................... 8, 17
I.R.C. § 704(c) .................... 14
I.R.C. § 752 .................... passim
I.R.C. § 7805 .................... 9, 10
I.R.C. § 7805(b) .................... 1, 10, 11
I.R.C. § 7805(b)(3) .................... 11
I.R.C. § 7805(b)(6) .................... 11

**Federal Regulations**

Notice of Proposed Rule Making, Assumption of Partner Liabilities, 68 Fed. Reg. 37434, *37437 (June 24, 2003) .................... 17, 19, 27
Preamble to Temp. Reg. § 1.752-6T, 68 Fed. Reg. 37414;
Treas. Reg. § 1.752-6T(b)(2) .................... 18, 19, 28
Treas. Reg. § 1.358-7 .................... 16
Treasury Regulation §1.7527 .................... 17
Treas. Reg. § 1.752-6 (a) .................... 26
Treas. Reg. §§ 1.752-6(a), 1.752-7(a) .................... 19
Treas. Reg. § 1.752-6(h)(2) .................... 17

**Other Authorities**

Notice 200-44 .................... passim
Notice 2000-2 C.B. 255 .................... 6
H.R. 248 .................... 14
H.R. 554 .................... 15
H.R. 5542 .................... 15
Conf. Rep. on H.R. 4577, 106th Cong. (Dec. 15, 2000) .................... 15

## I. QUESTIONS PRESENTED

The question presented is whether purely retrospective Treasury Regulation § 1.752-6T, later finalized (hereinafter, the "Regulation"), is valid. To answer this question, this Court must determine the validity of three aspects of the Regulation: its retroactive date, its substantive rules, and its issuance. If this Court finds that any ***one*** of these is not valid, then the Regulation is invalid.

### A. Whether the *retroactive date* of the Regulation is valid.

Subject to limited exceptions, I.R.C. § 7805(b) places a statutory bar on retroactive regulations. Recognizing this bar, the Treasury claimed the Regulation satisfied the exceptions permitting retroactive effect where Congress expressly authorized it and where the effect is necessary to prevent abuse. Congress, however, authorized rules for corporate transactions involving partnerships that are comparable to I.R.C. § 358. The Regulation, on the other hand, prescribed rules for *pure* partnership transactions that contradict the text and intent of I.R.C. § 358. Further, the Treasury's actions reveal that the Regulation was not issued to prevent abuse, but rather to bolster the IRS' shaky litigation position in Notice 2000-44 transactions, which is an abuse of discretion. Accordingly, is the retroactive date of the Regulation valid under I.R.C. § 7805(b)?

***Short Answer***: **No**. Treasury failed to satisfy the exceptions to the statutory bar against retroactive regulations. Accordingly, the retroactive date of the Regulation is not valid. Because the Regulation has no prospective application, the entire Regulation is invalid.

**B. Whether the *rules* of the Regulation are valid.**

Under U.S. Supreme Court precedent, a Treasury regulation is valid only if it is a reasonable construction of the statute to which it relates. The Regulation relates to I.R.C. § 752, which defines a partnership liability. The Regulation, however, expands the definition of liability to include contingent obligations, which runs contrary to 25 years of well-settled case law interpreting I.R.C. § 752. The Regulation also provides for adjustments that the Treasury has publicly admitted are "inappropriate" in partnership transactions. Accordingly, is the Regulation a valid interpretation of I.R.C. § 752?

***Short Answer***: **No**. The Regulation's reversal of well-settled case law and inappropriate tax results render it an unreasonable interpretation of I.R.C. § 752 and thus invalid.

**C. Whether the Regulation was validly *issued*.**

The Administrative Procedure Act (APA) requires federal agencies to publish notice of proposed rule making and provide the opportunity for persons to participate in the rule-making process. The Treasury gave no notice and provided no opportunity for comment prior to issuing the Regulation, claiming that the existence of Notice 2000-44 transactions established "good cause" to avoid these requirements. But this good-cause exception applies only in emergency-type situations, and the Regulation was issued three years after Notice 2000-44 and only applies to *past* transactions. Accordingly, did the Treasury validly issue the Regulation?

***Short Answer***: **No**. The Treasury violated the APA by failing to comply with the notice and comment requirements without good cause. This procedural defect renders the Regulation invalid.

## II. SUMMARY OF THE ARGUMENT

Plaintiff's argument summaries appear in Section I immediately above.

## III. STATEMENT OF THE CASE

### A. Introduction.

One of the core issues in this case is the proper tax treatment of certain foreign currency digital options that the parties contributed to a partnership during tax year 1999. The Government contends that the obligations under the short option positions constitute "liabilities" for purposes of the Regulation; and therefore, the Regulation applies to reduce the bases of the partners in their partnership interests on the contribution of the short options to the partnership. Plaintiff contends, however, that the Regulation is an invalid exercise of the Treasury's rule making authority. Whether the Regulation is valid is a legal issue that is ripe for summary judgment, and its resolution could greatly simplify the issues to be decided at trial.

### B. The facts of the transactions at issue.

JZ Buckingham Investments, LLC ("JZ") and JGB Bohicket Investments, LLC ("JGB") were each a validly formed and existing Delaware limited liability company during 1999.[1] They were each an owner and general partner of JBJZ Partners, a South Carolina general partnership (the "Partnership"), for the tax year ending December 27, 1999.[2] JBJZ was classified as a partnership for federal income tax purposes for its 1999 tax year.[3]

On November 23, 1999, JZ and JGB entered into over-the-counter, non-publicly traded European-style foreign currency option positions on the Euro and the Yen (collectively, the

---

[1] Pl. Proposed Findings of Uncontroverted Fact ¶¶ 1, 2, 3, and 4.
[2] *Id*. at ¶¶ 5 and 6.
[3] *Id*. at ¶¶ 5, 6, and 7.

"Options") with Deutsche Bank AG New York Branch.[4] Pursuant to these transactions, JZ purchased a long option and short option position on the Euro and Japanese Yen. JGB likewise purchased a long option and short option position on the Euro.[5]

Under the terms of the long options, the parties had the right to receive a fixed sum of money on a future date, provided that the spot price for the underlying currency fell within a certain level relative to the exercise price stated in the option agreement. Conversely, under the terms of the short options, the parties had the obligation to *pay* a fixed sum of money on a future date, provided the spot price for the underlying currency fell within a certain level relative to the exercise price stated in the option agreement.[6]

On November 24, 1999, JZ and JGB contributed the Options to the Partnership.[7] Neither JZ nor JGB reduced the adjusted basis of their respective Partnership interest for the contribution of the sold (short) options.[8]

On December 9, 2004, the IRS issued a notice of final partnership administrative adjustment to the Partnership, wherein it proposed the following:

> It is determined that the obligations under the short positions (written call options) transferred to JBJZ Partners partnership constitute liabilities for purposes of Treasury Regulation § 1.752-6T, the assumption of which by JBJZ Partners partnership shall reduce the purported partners' bases in JBJZ Partners partnership….[9]

**C. The promulgation of the Regulation.**

Prior to June 23, 2003, there was no statutory or regulatory definition of "liability" as the term was used in I.R.C. § 752. There was, however, a line of authority going back more than a

---

[4] *Id*. at ¶ 8.
[5] *Id*.
[6] Pl. Proposed Findings of Uncontroverted Fact ¶¶ 8 and 9.
[7] *Id*. at ¶ 10.
[8] *Id*. at ¶ 11.
[9] *Id*. at ¶ 12.

quarter of a century to *Helmer v. Commissioner*,[10] which held that under I.R.C. § 752, contingent obligations, and more specifically, short option positions, were not "liabilities" within the meaning of that provision.[11]

In *Helmer*, a partnership sold an option to purchase land it owned and distributed the premium to the partners. The taxpayer asserted that the partnership's obligation under the option was a liability for purposes of I.R.C. § 752, which increased his basis in the partnership. The IRS argued, however, that the obligation of the grantor was not a liability within the meaning of I.R.C. § 752. The court agreed with the IRS and found that "[t]he option agreement . . . created no liability on the part of the partnership to repay the funds paid nor to perform any services in the future."[12] The court therefore held that "no liability arose under section 752 and the partners' bases cannot be increased by such amounts."[13]

The Tax Court reached the same conclusion in *Long v. Commissioner.*[14] There, the partnership was a construction company that had been sued for building defects. The suits were pending when the partnership was liquidated, which raised the issue of what the taxpayer's partnership basis was and how he should compute his gain or loss. The court opined that such potential liabilities stemming from the lawsuit "are not 'liabilities' for partnership basis purposes

---

[10] 34 T.C.M. (CCH) 727 (1975).

11 *Helmer v. Comm'r*, 34 T.C.M. (CCH) 727, 731 (1975); *accord Long v. Comm'r*, 660 F.2d 416, 419 (10th Cir. 1981); *La Rue v. Comm'r*, 90 T.C. 465, 479 (1988).

[12] *Helmer*, 34 T.C.M. (CCH) at 731.

[13] *Id*. The Tax Court revisited *Helmer* in *Salina Partnership, L.P. v. Commissioner*, T.C. Memo 2000-352. Although *Salina* found that an obligation to replace Treasury bills borrowed pursuant to a short sale transaction constituted a § 752 liability, the court distinguished the option in *Helmer* from a short sale. Unlike the latter, the option created no claim for repayment of the premium or demand for further services. It is noteworthy that here, unlike the short sale of Treasury bills in *Salina*, the short options created no obligation to return the premiums to the purchasers.

[14] 71 T.C. 1 (1978), *aff'd and remanded*, 660 F.2d 416 (10th Cir. 1981).

at least until they have become fixed or liquidated," noting that "contingent and indefinite liabilities assumed by the purchaser of an asset are not part of the cost basis of the asset."[15]

The Tax Court completed its trifecta of rulings with *La Rue v. Commissioner*.[16] There, the taxpayers were general partners of a stock brokerage firm that had incurred large back-office liabilities stemming from a variety of errors in consummating securities transactions. They sold the firm's assets at their fair market value subject to the back-office liabilities. In calculating their gain on the sale, the partners sought to increase their bases by including the reserves set aside for the back-office claims as partnership liabilities under I.R.C. § 752. The court found that the reserves were for *potential* liabilities and that the amount of the liabilities was not readily determinable until any missing securities were bought or excess securities sold.[17] It therefore held that the reserves were not a fixed obligation and could not be included in the partners' bases in that year.[18]

Under this line of authority, a partnership's assumption of a short option position has no effect on a partner's basis in the partnership. The transactions at issue herein, as well as Notice 2000-44 transactions at large, were undertaken in reliance on that rule.[19] In fact, the taxpayers relied on the same tax position that the IRS had successfully advocated *against* the taxpayers in these Tax Court cases.

---

[15] *Long*, 71 T.C. at 78 (citations omitted).
[16] 90 T.C. 465 (1988).
[17] *Id*. at 479.
[18] *Id*.
[19] On August 14, 2000, after the transactions at issue herein had been completed, the IRS published Notice 2000-44, 2000-2 C.B. 255, "Tax Avoidance Using Artificially High Basis," which described a generic options transaction involving a partnership. The Notice stated that tax benefits accruing from such transactions "may also be subject to disallowance under other provisions of the Code," including § 752, without, however, identifying any legal basis or authority for challenging such transactions under § 752, and without so much as suggesting that new regulations might be issued under that section.

The similarities between the contingent obligations in these cases and the obligations underlying short foreign currency options are remarkable. Like the option sold in *Helmer*, the short options created no obligation to return the premiums to the purchasers. Like the contingent claims in *Long*, the short options created no obligation unless and until they were exercised. And like the back-office liabilities in *LaRue*, the amount of the potential liability associated with the short options could not be determined unless and until they were exercised.

All of this changed, however, on June 24, 2003, when the Treasury issued Temporary Regulation § 1.752-6T, purportedly under the authority of Section 309(c) and (d)(2) of the Community Renewal Tax Relief Act of 2000 (2000 Tax Act).[20] The Regulation reversed the long-standing rule that *excluded* contingent obligations as I.R.C. § 752 "liabilities" and provided that these obligations were now included in that definition. Moreover, the Regulation purported to apply the new definition of "liability" retroactively to transactions going as far back as October 18, 1999.

On the same day, the Treasury issued a Notice of Proposed Rule Making for a different, prospective rule (Treasury Regulation § 1.7527) addressing the contingent liability issue, which stated for the first time that the IRS would no longer follow *Helmer*.[21]

On May 26, 2005, Temporary Regulation §1.752-6T became permanent as Treasury Regulation §1.7526.[22] It applies to assumptions of liabilities occurring after October 18, 1999, and before June 24, 2003.[23] The Regulation provides:

> If, in a transaction described in section 721(a), a partnership assumes a liability (defined in section 358(h)(3)) of a partner (other than a liability to which section

---

[20] *See* Preamble to Temp. Reg. § 1.752-6T, 68 Fed. Reg. 37414, 37415 (June 24, 2003).
[21] Notice of Proposed Rulemaking, Assumption of Partner Liabilities, 68 Fed. Reg. 37434 (June 24, 2003).
[22] T.D. 9207 (2005).
[23] Treas. Reg. § 1.752-6(d)(1).

> 752(a) and (b) apply), then, after application of section 752(a) and (b), the partner's basis in the partnership is reduced (but not below the adjusted value of such interest) by the amount (determined as of the date of the exchange) of the liability. For purposes of this section, the adjusted value of a partner's interest in a partnership is the fair market value of that interest increased by the partner's share of partnership liabilities under §§1.752-1 through 1.752-5.[24]

The Regulation generally incorporates the exceptions contained in I.R.C. § 358(h)(2)(A) and (B), which exclude liabilities transferred in connection with the sale of a business or substantially all of the assets to which the liability relates. With regard to Notice 2000-44 transactions, however, the Regulation explicitly provides that the latter exception "does not apply to an assumption of a liability (defined in section 358(h)(3)) by a partnership as part of a transaction described in, or a transaction that is substantially similar to the transactions described in, Notice 2000-44."[25]

**D. Invalidation of the Regulation.**

One district court has already ruled that the retroactive effect of the Regulation is invalid. In *Klamath v. Strategic Investment Fund, LLC v. United States*,[26] the district court for the Eastern District of Texas held that the Regulation's application, at least to transactions occurring between October 18, 1999, and August 14, 2000 (the date Notice 2000-44 was issued) was an abuse of discretion and thus not valid.[27] The district court reached this holding based on its findings that (i) the Regulation exceeded the Congressional grant of authority under Section 309(c), (ii) the Regulation retroactively changed existing law regarding the definition of liability under I.R.C. § 752, (iii) Treasury may have promulgated the Regulation for the purpose of buttressing the government's litigation position in Notice 2000-44 cases, and that (iv) taxpayers at large,

---

[24] § 1.752-6(a).
[25] § 1.752-6(b)(1), (2).
[26] 440 F. Supp. 2d 608 (E.D. Tex. 2006).
[27] *Id.* at 625.

including the plaintiffs in that case, were entitled to rely on settled case law and the well-established IRS position under I.R.C. § 752 that helped create it.[28]

## IV. STANDARD OF REVIEW

Summary judgment is proper "when 'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.'"[29] The validity of the Regulation is a purely legal issue and is therefore particularly suited to decision on a motion for summary judgment.

## V. ARGUMENT

The Regulation must overcome three hurdles to survive judicial scrutiny: it must have a valid effective date, its provisions must be reasonable, and the required procedures must have been followed in its issuance. As set forth in detail below, the Regulation falls short on all three hurdles: (1) the effective date violates the prohibition against retroactive regulations under I.R.C. § 7805; (2) the substantive rules of the Regulation are an unreasonable interpretation of I.R.C. § 752 and contrary to Congressional intent; and (3) the Treasury failed to follow the procedures mandated by the Administrative Procedures Act in issuing the Regulation. Each of these failures represents a separate and wholly sufficient basis for this Court to invalidate the Regulation and grant Plaintiff's Motion.

---

[28] *Id*. at 622-26.

[29] *General Elec. Co. v. Nintendo Co., Ltd.*, 179 F.3d 1350, 1353 (Fed. Cir. 1999) (quoting FED. R. CIV. P. 56(c)); *see also* 2002 Rules Committee Note, Rules of the United States Court of Federal Claims (as amended Nov. 15, 2007) (stating that "interpretation of the court's rules will be guided by case law and the Advisory Committee Notes that accompany the Federal Rules of Civil Procedure.").

**A. The Regulation's effective date violates the prohibition against retroactive regulations under I.R.C. § 7805 and thus is invalid.**

The Treasury issues most tax regulations with an effective date as of the date of issuance. In determining the validity of these prospective regulations, the courts generally determine whether the regulation is a reasonable interpretation of the statute to which it relates.[30]

But with *retroactive* tax regulations, the courts must first answer a threshold question: whether the tax regulation satisfies one of the limited exceptions to the statutory bar against retroactive regulations found in I.R.C. § 7805(b).

**1. Subject to rare exceptions, I.R.C. § 7805 imposes a blanket prohibition on tax regulations with retroactive effect.**

In 1996, Congress passed the "Taxpayer Bill of Rights 2" (TBOR-2), which contained an extensive list of statutorily-mandated rights and protections that Congress had compiled in the eight years since the first Taxpayer Bill of Rights legislation was enacted. TBOR-2 empowered taxpayers to enforce these rights and created additional protections to ensure that the tax laws were administered in a fair and consistent manner.

A key aspect of TBOR-2 was Congress' amendment to I.R.C. § 7805, which imposed a statutory bar on retroactive regulations. Prior to 1996, I.R.C. § 7805(b) gave the Treasury and IRS the power to prescribe the extent to which any ruling or regulation shall be applied without retroactive effect.[31] The courts interpreted this provision as establishing a presumption that regulations are to be applied retroactively.[32] Congress determined, however, that it was

---

[30] *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984).
[31] *See* I.R.C. § 7805 (b) before amendment by Section 1101(a), PL 104-168 (July 30, 1996).
[32] *Gehl Co. v. Comm'r*, 795 F.2d 1324, 1331 (7th Cir. 1986).

"generally inappropriate for Treasury to issue retroactive regulations."[33] It therefore amended I.R.C. § 7805(b) to reverse the presumption and impose a statutory bar on retroactive regulations. This prohibition is subject to seven limited exceptions enumerated in the statute.

**2. The Regulation fails to satisfy the exceptions of I.R.C. § 7805(b), and thus its retroactive effect is not valid.**

The Treasury acknowledged the statutory bar against retroactive regulations, but claimed that the Regulation satisfied two exceptions under I.R.C. § 7805(b).[34] First, it alleged that the Regulation satisfied I.R.C. § 7805(b)(6), which permits the Treasury to apply a regulation retroactively pursuant to a legislative grant of authority from Congress (the legislative-grant exception). Second, the Treasury claimed that the Regulation satisfied I.R.C. § 7805(b)(3), which permits a retroactive date to prevent abuse (the abuse exception).

A close examination of the 2000 Tax Act and the circumstances surrounding the Regulation's issuance, however, reveals that neither of these exceptions was met. The Regulation's retroactive effect is therefore barred by I.R.C. § 7805(b). Because the Regulation strictly applies retroactively, the entire Regulation is invalid.

**a. The legislative-grant exception is not met because the Regulation far exceeds the scope of the authority granted by Section 309(c) of the 2000 Tax Act.**

The Treasury claimed that the Regulation was being applied retroactively in accordance with the directive from Congress pursuant to Section 309(c) and (d)(2) of the 2000 Tax Act.[35] Section 309(c) provides:

> Application of Comparable Rules to Partnerships and S Corporations
>
> The Secretary of the Treasury or his Delegate – (1) shall prescribe rules which provide appropriate adjustments under subchapter K of chapter 1 of the Internal

---

[33] H.R. Comm. Rep. ¶ 78,051.003, Relief from Retroactive Application of Treasury Department Regulations (Taxpayer Bill of Rights 2, Pub. L. No. 104-168, July 30, 1996).
[34] Preamble to Temp. Reg. § 1.752-6T, 68 Fed. Reg. 37414, 37416 (June 24, 2003).
[35] *Id*. at 37415.

> Revenue Code of 1986 to prevent the acceleration or duplication of losses through the assumption of (or transfer of assets subject to) liabilities described in section 358(h)(3) of such Code (as added by subsection (a)) in transactions involving partnerships, and (2) may prescribe rules which provide appropriate adjustments under subchapter S of Chapter 1 of such Code in transactions described in paragraph (1) involving S corporations rather than partnerships.[36]

Section 309(d)(2) authorizes an effective date for rules promulgated under Section 309(c) of October 18, 1999, "or such later date as may be prescribed in such rules." [37]

The Regulation exceeds this grant of authority in two ways. First, the text and legislative history behind Section 309(c), and more generally I.R.C. § 358(h), confirm that Congress only authorized rules for partnerships that transfer an I.R.C. § 358(h) liability to a *corporation*. The Regulation, however, contains no such rules -- rather, it contains rules that apply to transfers of specially-defined liabilities to a *partnership*. Second, Congress only authorized rules "comparable" to the rules enacted in I.R.C. § 358(h) that provide for "appropriate adjustments." The Regulation ignores this mandate by altering the I.R.C. § 358(h) definition of liability and making adjustments that even the Treasury concedes are inappropriate in the partnership context.

**i. Section 309(c) authorized rules for partnership shareholders in corporate transactions – not rules for pure partnership transactions as prescribed by the Regulation.**

The text of Section 309(c), as well as the legislative history of I.R.C. § 358, makes clear that Congress authorized rules addressing corporate contributions by partnership-shareholders, and not the Regulation's rules that apply to partner contributions to partnerships.

The text of Section 309(c) is unambiguous. It authorizes the Treasury to promulgate rules applying to "liabilities described in [Code] section 358(h)(3)."[38] This refers to liabilities

[36] Community Renewal Tax Relief Act of 2000, Pub. L. 106-554, § 309(c), 114 Stat. 2763, 2763A-638 (2000).
[37] *Id*. § 309(d)(2).
[38] *Id*. § 309(c)(1).

assumed in connection with a transaction "to which section 351, 354, 355, 356, or 361 applies."[39] All of these provisions appear in subchapter C of the Internal Revenue Code and address corporate transactions. This reveals Congress's intent to limit the Treasury's rules to corporate transactions.

Congress further revealed its intent through the use of the phrase "acceleration and duplication." The text of Section 309 limits the Treasury to rules that prevent the "acceleration and duplication" of losses through the assumption of an I.R.C. § 358(h) liability. This type of loss duplication and loss acceleration, however, can only exist in corporate transactions.

The perceived abuse that Congress intended to address by I.R.C. § 358(h) involved the following transactions: a shareholder contributes a contingent liability to a corporation. Because the liability is excluded as an I.R.C. § 357 "liability," the corporation treats it as a non-liability for purposes of I.R.C. § 358, and the shareholder does not reduce its basis by the amount of the liability. These transactions created an opportunity for a double loss: one loss to the shareholder on the sale of its stock, and a second loss to the corporation on the realization of the contingent obligation. They also created an opportunity for loss acceleration: the shareholder could quickly sell its stock and recognize a loss that it couldn't immediately recognize on the contingent liabilities.

This loss duplication does not occur in partnership transactions because partnerships, unlike corporations, are not separately taxable entities. Using the above example, assume a partner contributes a contingent obligation to a partnership, and immediately sells its partnership interest. Like the shareholder, the partner recognizes a loss because its basis was not reduced by the contingent obligation. But there is no corresponding tax benefit that is preserved for the

[39] *See* I.R.C. § 358(a)(1), (h)(1), (h)(3).

partnership. When the partnership later recognizes a loss on the contingent obligation, the loss will flow directly to the new partner who stepped into the shoes of the contributing partner.[40] The new partner will not be able to deduct the loss because it will have insufficient basis to absorb it. This is true because the new partner's basis is equal to its acquisition cost for the interest, which took into account the contingent obligation. Accordingly, there is no possibility for a double-loss deduction.

The potential for abusive loss acceleration likewise does not exist in partnership transactions. Again using our example, the partner's loss on the sale of his partnership interest is not novel. It is the plain-vanilla type of acceleration that is generally available under Subchapter K. In fact, the same type of acceleration occurs in connection with the sale of a partnership interest following the contribution of depreciated assets to a partnership. It therefore falls outside the scope of any contemplated abuse that I.R.C. § 358(h) was designed to curb.

The history behind the enactment of § 358(h) and Section 309(c) likewise shows that Congress's concern lay purely with abusive corporate transactions, and that its grant of authority was limited to rules involving partnership shareholders in such transactions.

Congress initially made an effort to curb the abusive corporate transactions described above in the Taxpayer Refund and Relief Act of 1999. This bill proposed to amend the anti-abuse rules in I.R.C. § 357 relating to assumption of liabilities.[41] Although this bill stalled, Congress revisited the issue in the Tax Relief Extension Act of 1999, shifting the focus to amending I.R.C. § 358.[42] On October 26, 1999, the earliest forerunner of the present version of

---

[40] *See* I.R.C. § 704(c).
[41] H.R. 2488, 106th Cong. § 1512 (1999).
[42] *See* S. 1792, 106th Cong. § 213 (1999).

I.R.C. § 358(h) was introduced in the Senate in S. 1792.[43] This bill did not result in legislation in 1999, but efforts to deal with the problem continued into 2000.

On April 4, 2000, the addition of I.R.C. § 358(h) was proposed by the Senate Finance Committee in S. 2354.[44] Similarly, on October 25, 2000, the House proposed the addition of I.R.C. § 358(h) in H.R. 5542.[45] There were no hearings in either house on the amendment to I.R.C. § 358 while the bills were under consideration, and it was not until conference that I.R.C. § 358(h) was proposed as Section 309(a) of the 2000 Tax Act.[46] On December 21, 2000, however, Congress amended I.R.C. § 358 by enacting subsection (h) in Section 309(a) of the 2000 Tax Act.[47]

It is evident from these events that Congress focused exclusively on the specific corporate transactions wherein it perceived abuses. Throughout all of Congress' deliberations and various iterations of I.R.C. § 357 and § 358, not once did Congress mention I.R.C. § 752. Nor did it mention I.R.C. §§ 722, 723, 733, or any other provision in Subchapter K potentially applicable to the transfer of contingent obligations to a partnership. Also absent is any mention of Notice 2000-44. In fact, Notice 2000-44 likely played no role in Congress' deliberations, as the IRS released the Notice almost a year *after* the I.R.C. § 358(h) legislation was first introduced. Had Congress been concerned about the use of contingent liabilities in partnership transactions, there would have been at least a whiff of the partnership tax rules in the legislative history.

---

[43] *Id*.
[44] S. 2354, 106th Cong. § 1 (2000).
[45] H.R. 5542, 106th Cong. § 709 (2000).
[46] The Conference Committee Report of December 15, 2000, indicates that neither house had considered Section 358(h). *See* Conf. Rep. on H.R. 4577, 106th Cong. (Dec. 15, 2000).
[47] Community Renewal Tax Relief Act of 2000, Pub. L. 106-554, § 309(a), 114 Stat. 2763, 2763A-638 (2000).

In summary, the text and legislative history behind Section 309(c) and I.R.C. § 358 show Congress's unambiguous intent: to authorize the Treasury to promulgate rules that provide appropriate adjustments for partnerships transferring I.R.C. § 358 liabilities to a corporation. The Treasury acknowledged this intent when it promulgated § 1.358-7 "*Transfers by partners and partnerships to corporations*," which accomplished this objective.[48] The Regulation, on the other hand, moves beyond Congressional intent to provide rules for the transfer of specially-defined liabilities in pure partnership transactions. This is outside the scope of authority in Section 309(c), and thus outside the legislative-grant exception. The Regulation's retroactive effect is therefore barred under I.R.C. § 7805(b).

**ii. The Regulation's rules are not "comparable" to I.R.C. § 358 and its adjustments are not "appropriate" as required by the grant of authority in Section 309(c).**

Even assuming Section 309(c) authorizes pure partnership rules, the Regulation fails for another reason: its rules are not "comparable" to I.R.C. § 358 and the adjustments are not "appropriate" as required by Congress' grant of authority. Thus, the Regulation still does not satisfy the legislative-grant exception.

Congress tasked the Treasury to promulgate rules under Subchapter K "comparable" to those Congress enacted through I.R.C. § 358(h). But the rules of the Regulation are not "comparable" under any reasonable definition of that word. First, the Regulation applies to Notice 2000-44 transactions that flatly do not involve an acceleration or duplication of losses. As previously discussed, no loss duplication occurs in the subchapter K context because any loss claimed by the partnership is not separately recognized, but rather flows through to the contributing partner (or its successor) who cannot fully absorb the loss. Likewise, no acceleration occurs beyond what is otherwise available in plain-vanilla partnership transactions.

---

[48] Treas. Reg. § 1.358-7 (emphasis added).

Perhaps the most egregious deviation from I.R.C. § 358 is the Regulation's inclusion of obligations excluded under I.R.C. § 358(h).[49] Section 358(h) excludes any liability (including a contingent obligation) from its provisions if it is transferred in connection with the sale of a business or transferred with substantially all of the assets to which the liability relates.[50] The Regulation overrides this statutory rule to provide that the latter exception does not apply to transfers occurring in connection with a Notice 2000-44 transaction.[51]

The Regulation also fails to provide "appropriate" adjustments. The Regulation provides for an immediate reduction in the partner's basis upon the contribution of a contingent obligation to the partnership.[52] This type of adjustment, however, is inappropriate in the partnership context, as it limits what should otherwise be an appropriate deduction. Unbelievably, the Treasury conceded this point publicly when it proposed a different set of rules, under Treasury Regulation §1.7527, for the *prospective* treatment of contingent obligations in partnership transactions:

> If, at the time of an assumption of a §1.752-7 liability by a partnership from a partner . . . the partner's outside basis were reduced by the amount of the §1.752-7 liability, then the partner would not have sufficient outside basis to absorb any deduction with respect to the §1.752-7 liability that passed through the partnership. For this reason, these proposed regulations do not reduce the outside basis of the §1.752-7 liability partner upon the assumption of the §1.752-7 liability.[53]

---

[49] Treas. Reg. § 1.752-6(h)(2).
[50] I.R.C. § 358(h)(2)(A), (B).
[51] Treas. Reg. § 1.752-6(h)(2).
[52] This occurs without a corresponding increase in the partner's basis for its share of the partnership's liabilities. I.R.C. § 752 generally requires a partner to reduce its basis upon the assumption by the partnership of the partner's debt, but also permits a partner to increase its basis by its proportionate share of the partnership's liabilities. I.R.C. § 752. The Regulation deviates from this legal regime by providing for a basis reduction for the assumption of a contingent obligation by the partnership without a corresponding adjustment for the partner's proportionate share of that liability. Treas. Reg. § 1.752-6.
[53] Notice of Proposed Rule Making, Assumption of Partner Liabilities, 68 Fed. Reg. 37434, *37437 (June 24, 2003).

The fact that the Treasury felt compelled to issue prospective rules that differed from the Regulation is telling of the appropriateness of the Regulation's rules.

In short, the Regulation's lack comparability to I.R.C. § 358 and inappropriate adjustments place the Regulation outside the scope of authority granted in Section 309(c), and thus outside the legislative-grant exception under I.R.C. § 7805(b)(6).

**b. The abuse exception is not met because the Treasury promulgated the Regulation for the *sole* and *improper* purpose of buttressing the Government's litigation position in Notice 2000-44 transactions.**

The Treasury claimed that the Regulation was necessary to prevent the abusive transactions described in Notice 2000-44. [54] The Treasury's actions, however, reveal its true intent: to cure a flaw in the Government's litigation strategy against Notice 2000-44 transactions. This type of posturing by the Treasury is itself an abuse, and causes the Regulation to fall outside the scope of the abuse-exception under I.R.C. § 7805(b)(3).

**i. The Treasury issued the Regulation solely to bolster the Government's litigation position.**

The Treasury was undoubtedly concerned about the Government's litigating position in Notice 2000-44 transactions (and with good reason). The position rested on the contention that a contingent obligation qualified as an I.R.C. § 752 liability. The problem was for the past 25 years, the IRS had successfully advocated the opposite position *against taxpayers*: that a contingent obligation did *not* constitute an I.R.C. § 752 liability.[55] The Government therefore faced credibility issues and a potential fall out from its flip-flop.

---

[54] *See* Preamble to Temp. Reg. § 1.752-6T, 68 Fed. Reg. 37414, *37416.

[55] *See Klamath*, 440 F. Supp.2d at 619 ("It is clear . . . that the government has often and consistently relied on the principle that a liability under Section 752 does not include an obligation that is contingent. The government has applied this principle when it works to its benefit (to increase taxes owed)"); *see also Cemco*, 2007 WL 951944 *4 (N.D. Ill.)("the IRS reversed its position regarding partnership liabilities under section 752," when it issued Temporary Regulation §1.752-6T).

The Treasury must have recognized that the Government needed another line of authority or new rule that would support the reversed litigating position. It filled this void by promulgating the Regulation.

This conclusion is evident from a number of sources. First, the Treasury cited Notice 2000-44 at least four times in the Regulation's Preamble, and an additional cite appears in the actual text.[56] This is highly unusual, and suspect, behavior by the Treasury which reeks of gamesmanship.

Second, simultaneous to the issuance of the Regulation, the Treasury issued Proposed Regulation § 1.752-7.[57] This regulation set forth a *different* set of rules, to be applied *prospectively*, to the *same* conduct as described in the Regulation.[58] The obvious inference is that Treasury realized that its long-term solution for the treatment of contingent obligations under Subchapter K was not the most effective rule for the Government's litigation strategy. This inference is bolstered by the Treasury's admission in the Proposed Regulation's Preamble that the result under the Regulation is not appropriate for Subchapter K transactions.[59] Faced with these competing interests, the Treasury made the decision to issue two regulations, with the retroactive Regulation containing the "litigation" rule.

Finally, one day after the Regulation's issuance, the IRS released Chief Counsel Notice 2003-020 – an advice memorandum addressed to IRS attorneys developing Notice 2000-44

---

[56] See Preamble to Temp. Reg. § 1.752-6T, 68 Fed. Reg. 37414; Treas. Reg. § 1.752-6T(b)(2).
[57] Notice of Proposed Rule Making, Assumption of Partner Liabilities, 68 Fed. Reg. 37434 (June 24, 2003)
[58] While the Regulation provides for an immediate basis reduction for transactions occurring before June 24, 2003, on the other hand, § 1.752-7 defers basis reduction until an indeterminate future date. Treas. Reg. §§ 1.752-6(a), 1.752-7(a).
[59] Notice of Proposed Rule Making, 68 Fed. Reg. 37434, *37437.

cases.[60] The notice expressly revealed the IRS' intent to "apply Section 1.752-6T to reduce the outside basis in the partnership of the taxpayer who contributed the options."[61] The coincidence of the IRS developing its litigation strategy around a Treasury rule only one-day old is too remarkable to warrant serious consideration.

These facts lead to the logical conclusion that the Treasury issued the Regulation for the sole and improper purpose of plugging a hole in the IRS' litigation strategy. This type of behavior is an abuse of discretion that falls outside the I.R.C. § 7805(b)(3) exception. It is the same type of abuse of discretion that, as discussed below, the courts have routinely found invalidates a regulation.

#### ii. The Regulation's ill-conceived purpose, coupled with its retroactive change of well-settled case law, establishes an abuse of discretion that compels its invalidation.

The courts are unanimous in their decree that the Treasury and IRS may not bootstrap its litigation position by "chang[ing] settled law at the eleventh hour in order to defend against taxpayer's claim."[62] Such conduct constitutes an abuse of discretion, which is a ground to invalidate the regulation.[63]

The culmination of these factors is present in the Regulation. The preceding section makes clear that the Treasury gave birth to the Regulation to cure a flaw in the Government's

---

[60] CC 2003-020 (June 25, 2003).
[61] *Id*.
[62] *Anderson Clayton & Co v. United States.,*, 562 F.2d 972, 981 (5th Cir. 1977).
[63] *Chock Full O'Nuts Corp. v. United States*, 453 F.2d 300, 303; ("the Commissioner may not take advantage of his power to promulgate retroactive regulations during the course of a litigation for the purpose of providing himself with a defense based on the presumption of validity accorded to such regulations.") *accord, Caterpillar Tractor Co. v. United States*, 589 F.2d 1040, 1043 (Ct.Cl. 1978) (regulation is invalid as to taxpayer if Treasury abused discretion; it may be an abuse of discretion to adopt regulation with purpose of aiding pending litigation); *Vinson v. Comm'r*, T.C. Memo 1979-175 ("[R]espondent may not by a unilateral ruling bootstrap himself into the result he seeks in a litigated case."); *Somerville v. United States*, 13 Cl.Ct. 287, 290 (1987) (revenue ruling issued in response to same controversy entitled to no weight; "the government cannot be allowed to bootstrap its own positions").

litigation strategy against Notice 2000-44 transactions. It is equally clear that the Regulation changed well-settled case law, which provided that a contingent obligation was not a liability within the meaning of I.R.C. § 752. Several federal court decisions have recognized this truism,[64] finding that prior to the Regulation, a contingent obligation was not a liability for purposes of I.R.C. § 752 under *Helmer*[65] and its progeny. In fact, the *Klamath* Court declared that "[t]here is no doubt that the government knew it was changing the law regarding 'liabilities' under Section 752 with this new regulation," noting that the "Regulation itself indicates that it changes settled law."[66] The court proceeded to find that the plaintiffs, as well as taxpayers *generally*, were "entitled to rely on the well-established position of the [IRS] for the past 25 years in the 752 Cases," and held that the retroactive Regulation was invalid.[67] These factors establish that the Treasury abused its discretion in promulgating the Regulation, which should prompt this Court to invalidate.

**iii. Under all circumstances, the Treasury reached too far in setting the effective date of the Regulation at nearly four years prior to its issuance.**

In *United States v. Carlton*,[68] the Supreme Court held that due process requires that the period of any retroactive tax law be "modest." In that case, the Court found that the retroactive period of slightly greater than one year was "modest" especially since the taxpayers had notice of the anticipated change in the law as early as a few months after the original legislation (upon which the taxpayer relied) was passed.

---

[64] *Jade Trading, L.L.C. v. United States*, 2007 WL 4553043, at N. 65 (Fed. Cl. Dec. 21, 2007); *Cemco Investors, L.L.C. v. United States*, 2007 WL 951944, *4 (N.D. Ill. Mar. 27, 2007); *Klamath Strategic Inv. Fund LLC v. United States*, 440 F. Supp.2d 608, 619 (E.D. Tex. 2006).
[65] 34 T.C.M. (CCH) 727 (1975).
[66] 440 F. Supp.2d at 620, quoting, 68 Fed. Reg. 37434, *37436 (June 24, 2003). *Id*., at 625. ("The definition of a liability contained in these proposed regulations does not follow *Helmer v. Commissioner*.")
[67] *Id*. at 625.
[68] *Id*., 512 U.S. 26, 32-33 (1994).

The Regulation retroactively enacted a sweeping change of existing law applicable to a nearly four-year period. This period of time far exceeds the "modest" retroactive period contemplated by *Carlton*. At a minimum, due process requires that the Treasury set the effective date of the Regulation no earlier than the date the IRS issued Notice 2000-44.[69]

**B. The Regulation is invalid because it prescribes rules that do not reasonably reflect Congressional intent.**

**1. Two-step test under *Chevron* applies.**

The U.S. Supreme Court has instructed that in reviewing an agency's construction of the statute it administers, the court must undertake a two-part inquiry to determine first, "whether Congress has spoken to the precise question at issue," and second, "if the statute is silent or ambiguous with respect to the specific issue, . . . whether the agency's answer is based on a permissible construction of the statute."[70] Where "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."[71] Where the statute is silent or ambiguous with respect to the specific issue, however, the courts must determine whether the regulation is reasonable and thus constitutes a permissible construction of the statute.[72]

---

[69] *Klamath*, 440 F. Supp. 2d at 626 (invalidating the Regulation as to transactions predating Notice 2000-44). In the present case, all of the relevant events occurred before the issuance of Notice 2000-44, including the acquisition of the options and their contribution to the partnership. *See* Pl. Proposed Findings of Uncontroverted Facts, ¶ ¶ 1-11.
[70] *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984).
[71] *Id*.
[72] *See Chevron*, 467 U.S. at 842-43; *National Muffler Dealers Ass'n v. United States*, 440 U.S. 472, 476-77 (1979).

**2. <u>Step One</u>: Section 309 unambiguously negates the Regulation, and at a minimum, the Regulation is not a manifestation of clear Congressional intent.**

The only specific authority cited by Treasury for the promulgation of the Regulation is Section 309 of the 2000 Tax Act.[73] Hence, the first inquiry in the deference analysis is whether Section 309 clearly addresses the rules embodied in the Regulation.

Congress' intent was clear: it authorized *comparable* rules that make *appropriate adjustments* to prevent loss *duplication/acceleration* in the transfer of liabilities by a partnership to a *corporation*. It did not authorize rules that (i) apply to pure partnership transactions in which duplicated losses and abusive accelerations are not possible, and that (ii) (A) alter the definition of liability I.R.C. § 358(h), and (B) provide for immediate basis reductions that are inappropriate under traditional Subchapter K principles. This ends our inquiry, as a regulation that contravenes clearly discernable legislative intent, such as the Regulation, is manifestly unreasonable and not valid.[74]

But even if there is a question whether the Regulation is manifestly unreasonable, the Regulation can not conceivably be an expression of *unambiguous* Congressional intent. At a minimum, the fact that Congress granted the alleged authority in the context of corporate tax legislation that effectively makes no reference to partnership tax provisions gives rise to ambiguity for the Regulation. The Regulation must therefore be analyzed to determine whether it is based on a permissible construction of the statute.[75]

---

[73] *See* Preamble to Temp. Reg. §1.752-6T, 68 Fed. Reg. 37414, *37415-16.
[74] *Beneficial Corp. v. United States*, 814 F.2d 1570, 1574 (Fed. Cir. 1987).
[75] *Chevron*, 467 U.S. at 842-43. It should also be noted that while Section 752 addresses the effects of assuming a "liability," the statute does not contain nor refer to any definition of "liability." Therefore, Section 752 is also ambiguous with regard to its definition of "liability."

**3. <u>Step Two</u>: The Regulation is an unreasonable construction of I.R.C. § 752.**

Before applying the second part of the *Chevron* test, this Court must first determine whether the Regulation is a legislative or interpretative regulation. This classification impacts the standard applicable in determining whether a regulation constitutes a permissible construction of the statute. Courts generally afford interpretive regulations less deference than legislative regulation.[76]

A legislative regulation is a regulation that Congress expressly authorizes to clarify or implement a specific statutory provision. The standard applicable to this type of regulation is whether the regulation is "arbitrary, capricious, or manifestly contrary to the statute."[77] An interpretative regulation is simply a regulation other than a legislative regulation.[78] The standard applicable to an interpretative regulation is whether the regulation reflects a "reasonable" interpretation of existing statutory provisions.[79] The specific factors and policy considerations that enter into this reasonableness determination vary depending on specific circumstances.

---

[76] *See, e.g.*, *Schuler Industries, Inc. v. United States*, 109 F.3d 753, 755-56 (Fed. Cir. 1997), *citing National Muffler Dealers Ass'n v. United States*, 440 U.S. 472, 476 (1979) and *Chevron*, 467 U.S. at 844 (more deferential review due to legislative than to interpretive regulations); *Exxon Corp. v. United States*, 40 Fed.Cl. 73, 83 (1998) (less deference due to interpretive regulations); *Qantas Airways Ltd. v. United States*, 30 Fed.Cl. 851,858 (1994), *rev'd on other grounds*, 63 F.3d 385 (Fed. Cir. 1995) (same). *See also E.I. du Pont de Nemours & Co. v. Comm'r*, 41 F.3d 130, 135-36 (3d Cir. 1994); *Nalle v. Comm'r*, 997 F.2d 1134, 1138 (5th Cir. 1993), *citing Rowan Cos. v. United States*, 452 U.S. 247, 253 (1981) and *United States v. Vogel Fertilizer Co*., 455 U.S. 16, 24 (1982).

[77] *Chevron,* 467 U.S. at 844 (1984)

[78] In the tax context, an interpretative regulation is one promulgated under the Treasury's general rulemaking power of Code Section 7805(a).

[79] *Snap-Drape, Inc. v. Comm'r*, 98 F.3d 194, 197 (5th Cir. 1996).

There can be little doubt that the Regulation is not a legislative regulation.[80] The most obvious indicator is that Section 752 of the Code, to which the Regulation relates, contains no express grant of authority to the Treasury. Moreover, as previously discussed, Section 309(c) can not be reasonably interpreted as authorizing the Treasury to promulgate a pure Subchapter K regulation.[81] The Regulation is therefore an interpretative regulation. This determination is consistent with the *Klamath* decision, wherein the Eastern District of Texas expressly held that the Regulation was an interpretive regulation.[82]

The specific factors that are relevant in determining if the Regulation is a reasonable interpretation of the statute depends on the competing policy interests which the statute effects.[83] *Klamath* is instructive in this regard, as the court addressed this very issue. The *Klamath* court identified the following factors as relevant:

1. Whether or to what extent the taxpayer justifiably relied on settled prior law or policy and whether or to what extent the putatively retroactive regulation alters that law;

2. The extent, if any, to which the prior law or policy has been implicitly approved by Congress, as by legislative re-enactment of the pertinent Code provisions;

3. Whether retroactivity would advance or frustrate the interests in equality of treatment among similarly-situated taxpayers; and

4. Whether according retroactive effect would produce an inordinately harsh result.[84]

---

[80] *See supra*, Memorandum Section V.A. 2.a. for a complete explanation of how Regulation 1.752-6 exceeded the scope of the limited authority granted under Section 309(c) of the 2000 Tax Act.

[81] *Id*. at Section V.A.2.a.i. At a minimum, the Regulation's elimination of the I.R.C. §358(h)(2)(B) liability exclusion for Notice 2000-44 transactions is interpretative rather than legislative.

[82] *Klamath Strategic Inv. Fund LLC v. United States*, 440 F.Supp. 2d 608, 621-22 (E.D. Tex. 2006).

[83] *Chevron*, 467 U.S. at 844-45, quoting *United States v. Shimer*, 367 U.S. 374, 382, 383 (1961).

[84] *Klamath*, 440 F.Supp. 2d at 623.

The supra-majority of these factors supports the finding that the Regulation is unreasonable and thus invalid. There can be little doubt that prior to the Regulation, there was 25 years of consistent caselaw that created an unambiguous definition of the term "liability" under I.R.C. § 752.[85] As such, taxpayers could justifiably rely on this settled law (Factor 1). Factor 2 also weighs against the Regulation because Congress had ample opportunity (over 25 years) to legislate a result different from the *Helmer* decision, but never did so. Regarding Factor 4, the Regulation would create an inordinately harsh result by imposing a multi-million dollar liability on taxpayers who relied on valid and existing case law, without knowledge of some future regulation that would retroactively change the legal foundation of their tax positions. The investors in Notice 2000-44 transactions undoubtedly would have structured their transactions differently had they been provided notice of the Government's intentions.

Another relevant factor is the Treasury's promulgation of prospective rules (embodied in § 1.752-7) that, although applying to the *same* conduct as the Regulation, contain *different* rules. While the Regulation provides for an immediate basis reduction,[86] these prospective rules defer basis reduction until an indeterminate future triggering event.[87] In issuing these rules, that Treasury explained that the immediate reduction of a partner's basis was inappropriate for pass-through entities.[88] Thus, by the Treasury's own admission, the rules of the Regulation lead to an inappropriate result and thus are inherently unreasonable.

---

[85] *See Helmer v. Comm'r.*, 34 T.C.M. (CCH) 727 (1975); *Long v. Comm'r.*, 660 F.2d 416 (10th Cir. 1981); *LaRue v. Comm'r*, 71 T.C. 1 (1978); *see also Klamath*, 440 F.Supp. 2d at 620. ("There is no doubt that the government knew it was changing the law regarding "liabilities" under Section 752 with this new regulation. The Regulation itself indicates that it changes settled law . . .")
[86] Treas. Reg. § 1.752-6 (a).
[87] Treas. Reg. § 1.752-6 (a).
[88] Notice of Proposed Rule Making, 68 Fed. Red. 37434, *37437.

Based on this factor analysis, this Court should find that the Regulation is not a reasonable interpretation of I.R.C. § 752, which renders the Regulation invalid under *Chevron*.

**C. The Regulation is invalid because it was issued in violation of the notice and comment requirements of the Administrative Procedure Act (APA).**

The APA requires federal agencies to publish a general notice of proposed rule making in the Federal Register at least 30 days prior to the proposed rule's effective date.[89] The APA also mandates that federal agencies give interested persons an opportunity to participate in the rulemaking process through submission of written data, views, or arguments.[90] Subject to limited exemptions, rules that are not promulgated in accordance with the notice and comment requirements are invalid.[91]

The Treasury gave no notice and provided no opportunity for comment prior to issuing Temporary Regulation § 1.752-6T on June 24, 2003. Nor did it provide an opportunity for comment before finalizing the regulation without change on May 26, 2005. Although the Preamble to the Regulation solicited comments and requests to speak at a public hearing,[92] this

---

[89] Administrative Procedure Act, 5 U.S.C. § 553 (1966).

[90] 5 U.S.C. § 553(c).

[91] 5 U.S.C. § 706(2)(D) ("The reviewing court shall – (2) hold unlawful and set aside agency action, findings, and conclusions found to be – (D) without observance of procedure required by law."); *Paulsen v. Daniel*, 413 F.3d 999, 1008 (9th Cir. 2005) ("Ordinarily, when a regulation is not promulgated in compliance with the APA, the regulation is invalid."). *See also, e.g.*, *Chamber of Commerce of U.S. v. SEC*, 443 F.3d 890, 908-09 (D.C. Cir. 2006) (holding agency violated APA §553(c), vacating several parts of rule and withholding issuance of mandate for 90 days to allow reopening of record for comment); *Spirit of Sage Council v. Norton*, 294 F. Supp.2d 67, 90 (D.D.C. 2003) (holding rule was adopted in violation of APA §553(b), vacating rule and remanding for notice and comment procedures), *app. dismissed, judgment vacated in part as moot*, 411 F.3d 225 (D.C. Cir. 2005); *United States v. Garner*, 767 F.2d 104, 120-23 (5th Cir. 1985) (finding agency failed to comply with APA §553(c) and remanding for rulemaking proceedings); *United States Steel Corp. v. EPA*, 595 F.2d 207, 210 (5th Cir. 1979) (finding EPA failed to comply with APA §553, invalidating EPA's designations and remanding for re-promulgation after proper notice and comment).

[92] Preamble to Temp. Reg. § 1.752-6T, 68 Fed. Reg. 37434 (June 24, 2003).

pertained only to Proposed Regulation § 1.752-7, which applied prospectively and contained substantively different rules.[93]

The Treasury attempted to justify this procedural failure based on a "good cause" exception.[94] This exception applies when "the agency for good cause finds . . . that notice and public procedure . . . are impracticable, unnecessary, or contrary to the public interest."[95] The "good cause" identified by the Treasury was the alleged necessity to prevent abusive transactions of the type described in Notice 2000-44.[96]

The courts have narrowly construed the good-cause exception "so that the exception does not become an all-purpose escape clause."[97] They have limited the exception to excuse notice and comment only in emergency situations,[98] where delay may result in serious harm,[99] or when the announcement of a proposed rule could precipitate conduct by the affected parties that would harm the public welfare.[100] The courts have consistently held that good cause is not present where the Treasury acts swiftly simply to reduce uncertainty and promote better decision

[93] Some practitioners unilaterally raised the issue of the Regulation at the hearing for the Proposed Regulation. Any suggestion that these unsolicited comments satisfy the APA requirements should be summarily rejected, as: (1) persons affected by, and solely interested in commenting on, the retroactive regulation are unlikely to have been heard; and (2) even full-fledged post hoc notice and comment proceedings may not cure a failure to comply with the APA requirements, as it is doubtful that persons would bother to submit their views or that the Secretary would seriously consider their suggestions after the fact. *See, e.g., State of New Jersey v. U.S. EPA*, 626 F.2d 1038, 1049 (D.C. Cir. 1980) (post hoc comments did not cure failure to follow APA §553 procedures). This latter concern is manifest in this case, as the Treasury ignored the unsolicited comments in finalizing the Regulation.
[94] Preamble to Temp. Reg. § 1.752-6T, Fed. Reg. 37414, *37416.
[95] 5 U.S.C. §553(b)(B).
[96] Preamble to Temp. Reg. § 1.752-6T, Fed. Reg. 37414, *37416.
[97] *Woods Psychiatric Institute v. United States*, 20 Ct.Cl. 324, 332 (1990), (internal citations omitted), *aff'd*, 925 F.2d 1454 (Fed. Cir. 1991).
[98] *Am. Fed'n of Gov't Employees v. Block*, 655 F.2d 1155, 1156 (D.C. Cir. 1981).
[99] *See Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004).
[100] *See Mobile Oil Corp. v. Dep't of Energy*, 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983) created 1971, abolished 93.

making,[101] emphasizing that such an interpretation would "swallow the [notice and comment] rule."[102]

The Treasury's statement about Notice 2000-44 transactions does not meet the standard for "good cause" for at least two reasons. The first, and most obvious reason, is the Regulation only applies retroactively. The Treasury would be hard-pressed to argue that it needed to act swiftly to promulgate a rule that only applies to transactions that have already occurred. The second reason is that the Treasury acted in a dilatory manner in issuing the Regulation. The Treasury sat idly for nearly three years after the 2000 Tax Act and Notice 2000-44 before it issued the Regulation. It would be fallacious under these circumstances for the Treasury to argue that the need for the Regulation was so urgent so as to warrant an abrogation of the normal APA procedures.

Because the Treasury, without good cause, issued the Regulation in violation of APA Section 553(b), (c) and (d), the Regulation is invalid.

## VI. CONCLUSION

The Regulation is invalid on three separate grounds. First, the Regulation's retroactive date fails to comply with the Code's requirements for retroactive regulations under I.R.C. § 7805. Second, the Regulation is invalid under the two-prong *Chevron* test as it fails to carry out Congressional intent in a reasonable manner. Third, the Regulation is invalid because the Treasury failed to follow the APA's notice and comment requirements without good cause. A finding on any one of these grounds is sufficient to invalidate the Regulation, and thus should compel this Court to grant Plaintiff's Motion.

---

[101] *Chamber of Commerce of the U.S. v. SEC*, 443 F.3d 890, 907-8 (D.C. Cir. 2006).
[102] *Mobile Oil Corp. v. Dep't of Energy,* 610 F, 2d 796, 803 (Temp. Emer. Ct. App. 1979); created 1971, abolished 93. *Woods,* 20 Ct.Cl. at 333.

Respectfully submitted,

By: s/Joel N. Crouch

Joel N. Crouch
State Bar No. 05144220
M. Todd Welty
State Bar No. 00788642

MEADOWS, COLLIER, REED,
COUSINS & BLAU, L.L.P.
901 Main Street, Suite 3700
Dallas, TX 75202
(214) 744-3700 Telephone
(214) 747-3732 Facsimile

jcrouch@meadowscollier.com
twelty@meadowscollier.com

ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

I hereby certify that on March 7, 2008, a copy of the foregoing Plaintiff's Memorandum in Support of Its Motion for Partial Summary Judgment as to the Validity of Treasury Regulation § 1.752-6 was served upon counsel listed below via electronic means.

Dennis M. Donohue, Esq.
Trial Attorney
United States Department of Justice
Tax Division
P.O. Box 26
Ben Franklin Station
Washington DC 20044
(202) 616-3366

s/Joel N. Crouch
Joel N. Crouch