IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-231 T
(Chief Judge Damich)

JZ Buckingham Investments, LLC as Tax Matter Partner
of JBJZ Partners, a South Carolina general partnership,

Plaintiff,

v.

United States of America,

Defendant.

---

# EXPERT REPORT OF A. LAWRENCE KOLBE

ON

# ECONOMIC ANALYSES OF THE TRANSACTIONS BY PARTICIPANTS IN JBJZ PARTNERS

Prepared for the
U.S. Department of Justice

*The Brattle Group*
44 Brattle Street
Cambridge, MA 02138-3736
617.864.7900 voice
617.864.1576 fax

June 1, 2007

tabbies
EXHIBIT
A

## Table of Contents


INTRODUCTION AND SUMMARY . . . . 1
- Purpose of Report . . . . 1
- Disclosure Compliance . . . . 2
- Summary of Findings . . . . 2
- Organization of Report . . . . 7

SUMMARY OF THE TRANSACTIONS . . . . 7
- Basic Structure . . . . 7
- Actual Transactions . . . . 13
  - Ownership Structure . . . . 13
  - Steps Taken . . . . 14
- Check of COBRA Presentation as Template . . . . 26

ANALYSES OF RETURNS . . . . 27
- Risk-Return Principles . . . . 27
- Pricing of Offsetting Option Position Components . . . . 29
- Expected Return Analysis of Positions in This Case . . . . 37
  - Single-Option Payoff . . . . 37
  - Identification of the "Investment" . . . . 40
  - Expected Returns . . . . 42
- Check One: Actual Outcomes for Option Pairs #1-#3 . . . . 46
- Check Two: Return Analysis of Similar Positions . . . . 49
- Did a Reasonable Possibility of a Non-Tax Profit Exist? . . . . 55

ANALYSES OF ECONOMIC RATIONALITY OF STATED NON-TAX BUSINESS PURPOSES . . . . 57
- LLC Formation . . . . 58
- Partnership and S Corp Formation . . . . 59

ANALYSES OF DECISION TO CONTRIBUTE OFFSETTING OPTION POSITIONS TO PARTNERSHIP . . . 60

ANALYSES OF WHETHER OFFSETTING OPTION POSITIONS WERE ONE INVESTMENT OR TWO . . . 61

# I. INTRODUCTION AND SUMMARY

My name is A. Lawrence Kolbe. My business address is The Brattle Group, 44 Brattle Street, Cambridge, Massachusetts 02138. I am a Principal of The Brattle Group, Inc. ("Brattle"), an economic, environmental and management consulting firm with offices in Cambridge, San Francisco, Washington, Brussels and London.

My work concentrates on financial and regulatory economics. I hold a B.S. in International Affairs (Economics) from the U.S. Air Force Academy (1968) and a Ph.D. in Economics from the Massachusetts Institute of Technology (1979). I left active duty in the Air Force in 1977. Before co-founding Brattle in 1990, I was a Director of Putnam, Hayes and Bartlett, and before that, a Vice President of Charles River Associates.

I am co-author of three books and author or co-author of a number of articles. The principal topics of these publications involve investment issues such as the cost of capital, risk, and valuation. My latest book is entitled *Capital Investment and Valuation*. It is one of a two-volume set that lists "The Brattle Group" as third author with Professors Richard A. Brealey and Stewart C. Myers. The set adapts their leading textbook, *Principles of Corporate Finance*, now in its eighth edition,[1] for business professionals, rather than graduate students.[2]

Clients for my work have included federal, state and local government agencies, industry organizations, and numerous private firms, in a variety of industries. I have testified on financial and regulatory issues in many forums. These include international arbitrations in The Hague, London and Melbourne, Australia; lawsuits in U.S. courts; U.S. arbitrations; and regulatory proceedings before U.S. and Canadian federal, state and provincial regulatory bodies.

Appendix A provides more detail on my professional qualifications.

## A. Purpose of Report

I have been asked by counsel for the U.S. Department of Justice ("DOJ") to: (a) analyze the risk-return characteristics of the offsetting option transactions at issue independently of any claimed tax benefits, and, viewing the offsetting option transactions objectively, to determine whether a reasonable possibility of profit existed apart from any tax benefit, taking into account all transaction costs; (b) assess the economic rationality of the stated non-tax business purposes for the transactions, (c) examine, both before and after taxes, the economic implications of a decision by the participating taxpayers (the "participants") to contribute offsetting option positions, bought through participant-specific limited liability companies ("LLCs"), to a partnership (JBJZ Partners, or the "Partnership"), along with the subsequent transfer of the LLCs' interests in the Partnership to an S corporation (JBJZ Investors, Inc., or the "S Corp"); and (d) analyze whether, from an economic perspective, the offsetting option positions contributed to the Partnership are one or two investments.

---

1 Prof. Franklin Allen has joined Profs. Brealey and Myers as an author of the eighth edition. The full citation is Brealey, Myers and Allen, *Principles of Corporate Finance*, 8th ed., New York: McGraw-Hill/Irwin (2006).

2 The companion volume, *Financing and Risk Management*, was adapted by another Brattle Principal. Both of these volumes are published by McGraw-Hill.

My examination of the evidence concerning these transactions is from the standpoint of a financial economist. I do not address questions concerning purely legal, accounting or operational issues. My understanding of the facts of this case comes from the record in this case and publicly available information. I am not testifying as to the accuracy of that material, and I have no personal knowledge of these events. In particular, I understand that there is controversy concerning the dates at which certain events did or did not happen. In this report, I sometimes cite record evidence regarding dates, but no statement in this report should be taken to represent a conclusion as to the actual date on which some specific event occurred. In a similar vein, while I cite record evidence regarding the features of the transactions at issue here, I have not studied and have no opinion on who is responsible for the design or implementation of these features. Finally, from time to time my report makes reference to certain aspects of the tax issues that are the subject of this dispute. I am not an attorney, and I have only a lay understanding of the legal issues involved here. I refer to these issues only as context for the economic analyses that are the subject of this report, and nothing I say is intended to express a legal opinion.

I also understand that additional material that might bear on the topics of my report may yet be discovered. This report reflects my analyses and findings to date. However, my work is ongoing, and if necessary, I may update my results as new information becomes available.

### B. Disclosure Compliance

Appendix A includes my publications for the last ten years and lists the trials, depositions and regulatory hearings at which I have testified during the last four years. The materials I considered in preparing my report are listed in Appendix B. Brattle has been compensated for my time in this case at a rate of $440 per hour.

### C. Summary of Findings

My report (1) reviews the structure of the transactions, (2) analyzes whether a reasonable possibility of profit existed absent any tax benefit, (3) assesses the economic rationality of the stated non-tax business purposes for the transaction, (4) examines the economic implications of the decision to contribute offsetting option positions to a partnership and subsequently transfer the partnership interests to an S corporation, and (5) determines whether the offsetting option positions are one investment or two, economically.

**Structure of Transactions:** The basic structure of the transactions that are the subject of my report is described in an Ernst & Young presentation entitled "C.O.B.R.A. (Currency Options Bring Reward Alternatives)" -- "COBRA Presentation."[3] The COBRA Presentation provides a useful framework for summarizing the structure of the relevant transactions. In particular, it identifies the

[3] The statements in this section are summaries of detailed discussions in the body of my report. It is prepared only for the convenience of the reader, and this section cannot and is not intended to replace the subsequent, more detailed discussions. For this reason, this summary does not contain references to documents or data sources. Footnotes that provide the sources of the information on which I rely appear in the body of the report.

five "steps" to be followed in a "30-day strategy". The steps identified in the COBRA Presentation are:

**Step One - Purchase/Sale of Offsetting Option Contracts:** Each individual simultaneously buys (goes long) and sells (goes short) foreign currency options at nearly identical strike prices, creating a position consisting of two offsetting options.

**Step Two - Transfer of Offsetting Options to Partnership:** The individuals transfer the offsetting foreign currency option positions to a "newly formed general partnership." In addition, the individuals contribute cash equal to 2 percent of the "desired loss" (i.e., the stated premium on the long option) to the partnership.

**Step Three - Termination of Options and Acquisition of Assets:** The foreign currency options expire either in or out of the money, resulting in a gain or loss. The COBRA Presentation then states, "[i]f ordinary loss is desired, spot foreign currency will be purchased by the partnership. If capital loss is desired, capital assets will be purchased."

**Step Four - Transfer of Partnership Interests to S Corp:** The individuals transfer their entire interest in the partnership to a newly formed S corporation.

**Step Five - Distribution of Partnership Assets to S Corp and Their Sale:** The partnership liquidates and distributes its assets (i.e., capital assets, such as stocks or bonds, and/or foreign currency) to the S corporation. The S corporation then "sells the stepped-up assets [i.e., the foreign currency or capital assets] to [an] unrelated third party, generating a loss for tax purposes."

In addition to the above five steps, the COBRA Presentation describes fees of approximately 4.5 percent of the ordinary or capital loss (i.e., the cost of the long option), one-third of which go to Ernst & Young itself. It does not identify a "step" in which these fees are to be paid. The COBRA Presentation also refers to legal opinions, but does not list them as part of a "step," either. For convenience, my report identifies such actions as occurring in "Step Six - Payment of Fees and Issuance of Legal Opinions."

The transactions that are the subject of this report did follow these six steps, as did 14 other sets of transactions that I use to check my findings.

**Possibility of Profit Absent Any Tax Benefit:** Most investments, including the securities that underlie the dispute in this case, have uncertain outcomes. Economically rational investors do not premise an investment strategy on the belief that they will do spectacularly well on each such investment.

Deutsche Bank A.G. ("DB") was the participants' counterparty for the offsetting option positions. DB apparently had invested time and effort to help find a basic structure of the option positions that had features Ernst & Young appeared to value, but unlike Ernst & Young (and attorneys also working with Ernst & Young), DB did not get an explicit fee for its services in a given transaction. Accordingly, its fee had to come through the way the options were priced. It turns out that the prices for both the participants' long (sold to them by DB) *and short* (bought from them by DB) options

were well in excess of their basic value as measured by DB itself and as confirmed by calculations in my report. DB still received its fee from the net transaction, since the dollar amount above basic value stated for the long option exceeded the dollar amount above basic value stated for the short option. Nonetheless, DB's overpayment for the short option is unusual because the normal way to make money is to "buy low and sell high," not to "buy high and sell even higher." This unusual pricing pattern turns out to be the only way DB could get a fee while maintaining the structure of the COBRA transaction. In fact, this pattern is inherent in the basic COBRA structure at any non-negative fee level for DB.

There are two effects of the pricing pattern selected. First, it means that the stated value of the long option is materially in excess of its basic value. This problem should have been apparent at the time, since an example in the COBRA Presentation prices the long option as though there were a 50-50 chance of its paying off (a feature retained in all the actual COBRA long options), but the COBRA Presentation also states that the option pair, and hence the long option, had only a 38 percent chance of paying off. Thus, a long option with a payoff worth $100 million should have been worth no more than $38 million, but the COBRA Presentation puts its value at $50 million. This overstates the actual value of the long option premium (i.e., the "desired loss") under the COBRA Presentation's assumptions by $12 million (or a bit more, if the time value of money is factored in). (A similar problem exists for the short option, but the numbers for the short option in the example are not as simple as the long option's coin toss.)

Second, the actual pricing pattern turns out to produce a fee for DB that averages about 1.5 percent of the "desired loss" across a number of sets of COBRA transactions, and about 1.7 percent in the present set of transactions. This creates an extra, economically material, hurdle to the participants' realization of profits on the offsetting option positions, absent the claimed tax benefits.

My report calculates expected rates of return on the offsetting option positions before and after fees to Ernst & Young and to attorneys. Absent the tax benefits, the 4.5 percent fees to Ernst & Young and attorneys are a pure loss, not an "investment" in something that can make money. Accordingly, the appropriate denominator for calculation of an expected rate of return is the net premium invested in the offsetting option positions, not the sum of that net premium and the fees. (The COBRA Presentation considers the sum as the amount invested, but the COBRA Presentation explicitly considers returns based on investment outcome *and* tax savings, which I have been asked to put aside.) Nonetheless, in addition to the expected rates of return on the actual amounts invested, I report expected rates of return on the sum of the net premium and these fees, for comparison with the calculations in the COBRA Presentation.

Before fees to Ernst & Young and attorneys, the expected rate of return on the offsetting option positions was a *loss* of about 30-35 percent of the amount actually invested. After these fees, the expected rate of return was a loss of approximately 120-125 percent of the amount actually invested. (The 120-125 percent equals the sum of the 30-35 percent expected loss on the investment itself and a 90 percent loss due to the fees.)

I check these conclusions against the expected rates of return on the offsetting option positions in other COBRA transactions, which produce expected values in the same negative range. I also check these conclusions against the actual performance of the offsetting option positions in this case and

those in the other COBRA transactions. These checks confirm that my calculations of expected rates of return have the right magnitudes

Therefore, absent the claimed tax savings, the participants' expected rate of return on each option position was a loss of *more* than the amount they invested to buy the position. This is an extraordinarily bad investment on its own merits (i.e., absent tax considerations). If the claimed tax savings are ignored, the materially negative expected returns on the individual offsetting option positions make them gambles, not investments.

Another consequence of the negative expected rates of return is that it is actually harmful to combine the "investments" by contributing them to the Partnership, since that helps narrow the distribution of possible outcomes. A narrower distribution around a negative expected return increases the chance of realizing a loss. (This is why the casino always wins if someone gambles long enough.) A sign that this holds true for the COBRA transactions is that four of the participants' 43 limited liability corporations in the 15 COBRA transactions in 1999 (including one in this transaction) would have made money after fees had they not contributed their offsetting option positions to partnerships. Yet after contributing the options to partnerships, none of the LLCs made money after fees.

In short, if the claimed tax loss is ignored, these transactions make no economic sense. They cannot be said to provide a "reasonable possibility of a non-tax profit" under any economically sensible definition of the term, "reasonable possibility." Absent tax considerations, these "investments" are not even good gambles, let alone investments with a "reasonable possibility" of non-tax profits.

**Economic Rationality of Stated Non-Tax Business Purposes:** The Plaintiffs state certain non-tax business purposes for the various steps: for the formation of the LLCs, limiting risk exposure to only the amount invested; for formation of the Partnerships, diversification, creating a larger pool of capital, and centralizing decisionmaking; and for formation of the S Corps, "investment purposes." These do not constitute economically rational non-tax business purposes for these transactions.

First, the explanation for the formation of the LLCs is not economically logical. The offsetting option positions in this case are designed so the participant can never owe more than the net premiums used to buy them. This automatically eliminates any exposure to the risk of additional capital demands on the participant, both to the participant *and* to the bank acting as counterparty to the transactions (here DB). (Even with different investments, no rational counterparty would permit a participant's use of the LLC form to provide the participant with a "free lunch" in risk reduction, since the participant's limited risk exposure comes at the counterparty's expense.)

Second, the Partnerships are unnecessary and redundant for the stated non-tax benefits. Exactly the same benefits stated for the Partnerships might equally well be stated for the S Corps, but are not. It would have saved paperwork, if nothing else, to have omitted the Partnerships altogether and to have done everything that was actually done within the Partnerships within the S Corps instead.

Third, the mere existence of a larger pool of capital offers no automatic advantage, and there is no evidence it conveyed any advantage here. Fourth, there was little potential to achieve, or evidence

of, any benefit from centralized decision making. Finally, as noted earlier, the expected outcome on the individual option positions was materially negative, so diversifying these bets was economically harmful to the participants, not helpful.

Thus, the stated non-tax business purposes for the formation of these entities are sometimes illusory, sometimes merely without any factual support, and sometimes flatly illogical. They do not provide economically rational non-tax reasons for undertaking these transactions.

**Decision to Contribute Offsetting Option Positions to Partnership:** "Step Two" of the COBRA Presentation was contribution of the offsetting option positions to a partnership. Without the hope of a tax deduction, these transactions are economically senseless. I understand that the contribution of the offsetting option positions to the Partnership is a necessary step in being able to claim the tax losses. If that is true, it would be economically foolish (to say the very least) to fail to make the contribution, having undertaken the process in the first place. (And as noted above, absent tax considerations, the contribution does economic harm by making a loss for the participants more likely.)

**Whether Offsetting Option Positions were One Investment or Two, Economically:** From an economic perspective, the offsetting option positions in this case are a single investment, not two separate investments. There are two reasons for this, one based on the different characteristics of the two option components together and apart, and the other based on DB's pricing of the components. The latter is the more important, for the COBRA transactions.

Consider how the economics of the offsetting option positions would change if the long and short calls were written separately, with two different, independent banks as counterparties, instead of a single counterparty (here DB). In that case, the bank buying the short option would demand security to insure payment, which would increase the costs to the participant manyfold. It is highly unlikely that a rational investor would be indifferent between keeping these offsetting option positions together and splitting them.

Of course, in the COBRA transactions, there is an even more fundamental problem with trying to split the option position components. The structure of the COBRA transactions meant that the stated value at any positive fee for DB had to be not only more than the long option in a pair was worth (e.g., under the COBRA Presentation's example, a stated premium of $50 million for a long option worth at most $38 million), it also had to be more than the short option was worth. DB's actual implicit fees in the present case would require a bank not simultaneously selling the long option to pay a participant an excess in the range of 80 to 95 percent more than the basic value of the short option, which would be irrational in a stand-alone transaction. In a stand-alone transaction, no one tries to make money by "buying high."

Thus, in the COBRA transactions, the offsetting option pairs are irretrievably tied together by the COBRA structure generally and the way DB's options implemented it specifically, quite apart from

the amount of capital that might be required to separate them. From an economic perspective, the offsetting option positions in this case are unquestionably single investments.[4]

### D. Organization of Report

Section II summarizes the transactions that are the subject of my analyses. Section III reviews the relevant risk-return principles, analyzes the return characteristics of the offsetting option transactions, and determines whether a reasonable probability of profit existed from these transactions apart from any tax benefits. Section IV assesses the economic rationality of the stated non-tax business purposes for the transaction. Section V examines the implications of a decision to contribute the offsetting option positions to the Partnership. Section VI analyzes whether, from an economic perspective, the offsetting option positions are one investment or two.

My report is supported by five appendices. Appendix A contains additional data on my qualifications, and Appendix B lists the materials I considered. Appendix C contains a review of contemporaneous, similar transactions that I use to check my conclusions in Sections II and III. Appendix D contains workpapers that support the findings and calculations in Section III regarding the transactions that are the subject of this case. Lastly, Appendix E analyzes the broader set of transactions discussed in Appendix C to check my Section III conclusions regarding the present case.

## II. SUMMARY OF THE TRANSACTIONS

This section first outlines the basic structure of the transactions, using a simplified format from a presentation created by Ernst & Young. It then uses this simplified structure to review the actual transactions in this case. The understanding gained from this section underlies later sections of my report.

### A. Basic Structure

An Ernst & Young presentation entitled "C.O.B.R.A. (Currency Options Bring Reward Alternatives)"[5] provides a useful framework for summarizing the structure of the relevant

---

4 For the record, this conclusion concerns the essential economic nature of the offsetting option position. It is not a legal opinion (which I am unqualified to form), nor is it a statement about the number of securities (documents) used to construct the offsetting option position.

5 I considered two versions of this presentation: the longer version, 2003EY001565-83, undated, and the shorter version, DOJ 049106-21, dated 11/11/1999. (Note: references to numbers such as "2003EY001565-83" are to Bates numbers throughout my report.) The latter version omits four pages that appear in the former version, and the words vary in places. Also, the tables at the end of the shorter version include taxes owed on the proceeds of the currency trades, if any, which the longer version's do not. When a difference in wording exists, my report cites the longer version and footnotes the difference in the shorter version. Hereafter, I refer to both versions collectively as the "COBRA Presentation." If only one Bates number is cited, the reference is to a chart that appears in the longer version only, not the (continued....)

transactions.[6] In particular, it identifies the five "steps" to be followed in a "30-day strategy".[7] As discussed below, these steps correspond to the transactions in this case that are the subject of my analyses. The steps identified in the COBRA Presentation follow.

**Step One - Purchase/Sale of Offsetting Option Contracts:**[8] In this step, each individual[9] simultaneously buys (goes long) and sells (goes short) foreign currency options at nearly identical strike prices, creating a position consisting of two offsetting options. The COBRA Presentation specifies that "[e]ach individual invests in [a] different type of foreign currency options....".[10]

The COBRA Presentation specifies use of "digital" option contracts.[11] These options are called "digital" because the investor either wins or loses a prespecified amount in full. Thus, the option is either "on" or "off," like a digital (binary) one or zero. If the value of the underlying asset (here, a currency exchange rate, the amount of one currency you can buy with another) is at or beyond a specified "strike" (or "exercise") price at the "maturity" (or "exercise") date, the holder gets the specified cash payout. If not, the holder gets nothing.[12]

---

5 (....continued)
shorter version. Finally, a somewhat different version of "COBRA" existed in 2000, and this report discusses certain aspects of the 2000 COBRA transactions.

6 As discussed further below, there are a number of cases that follow the basic steps in the COBRA Presentation. In some instances, a "COBRA Action Work Plan" (e.g., DOJ 055279-83) also exists that specifies the actions to take in more detail than in the COBRA Presentation. The COBRA Presentation provides the best overall summary for present purposes, however.

7 COBRA Presentation, 2003EY001566 (longer version) and DOJ 049108 (shorter version). The word "investment" appears between "day" and "strategy" in the shorter version. The word "steps" does not appear on these pages, but "step" in this sense is used pervasively in the presentation, as the immediately following discussion demonstrates.

8 COBRA Presentation, 2003EY001571 (longer version) and DOJ 049109 (shorter version).

9 The COBRA Presentation specifies that multiple partners are needed. 2003EY001567-68 (longer version).

10 COBRA Presentation, 2003EY001571 (longer version) and DOJ 049109 (shorter version).

11 COBRA Presentation, 2003EY001579-80, 82-83 (longer version) and DOJ 0491117-18, 20-21 (shorter version).

12 Some additional terminology: a digital option like the ones here, with a payout of a pre-specified amount, is called a "cash-or-nothing" option; one with a payout equal to the value of the underlying asset at expiration is called an "asset-or-nothing" option. A digital "call" option on an asset pays cash to the owner if the price of the underlying asset is at or above the strike price, and a digital "put" option pays cash to the owner if the price of the underlying asset is at or below the strike price. If it is profitable (unprofitable) to exercise a call option -- i.e., if the spot price of the asset exceeds (is less than) a call's strike price -- the option is said to be "in (out of) the money." Equivalently, puts are in (out of) the money when the asset price is less (greater) than the strike price. The initial seller of an option is said (continued....)

The COBRA Presentation contains numerical illustrations of the options it envisions with a $50 million value for the long option.[13] The strike price difference between the long and short options in the illustrations is two "pips," which is the difference in the digital option positions used in the present case.[14] For the currencies at issue in the present case, a pip has a value on the order of 1/100th of a U.S. cent (i.e., 1/10,000th of a U.S. dollar), which means the strike price differences envisioned in the COBRA Presentation and used in the present case were on the order of 1/5,000th of a U.S. dollar.[15]

**Step Two - Transfer of Offsetting Options to Partnership:**[16] In this step, the individuals transfer the offsetting foreign currency option positions to a "newly formed general partnership."[17] The COBRA Presentation states that the individuals "receive tax basis for long position but do not reduce basis for short position."[18] In addition, the individuals contribute cash equal to 2 percent of the "desired loss" to the partnership.[19]

The Step Two chart does not specify a relationship between the size of the "desired loss" and the size of the net premium used to buy the offsetting option position. However, numerical examples of possible outcomes for the option positions that appear later in the COBRA Presentation show a net premium equal to 5 percent of the "desired loss," i.e., the cost of the long option.[20] This interpretation is confirmed by an Ernst & Young email dated November 5, 1999 that transmits "the spreadsheet file, as shown in the COBRA PowerPoint presentation."[21] The email indicates that the amount of the "desired loss" is to be entered in one cell of the spreadsheet and "the other calculations will be performed automatically." The "Amount of Capital Loss" or "Amount of

---

12 (...continued)
to "write" the option. Finally, note that there is no payment of an "exercise price" at maturity in these digital options, a feature that is common in other types of options.

13 COBRA Presentation, 2003EY001579-80, 82-83 (longer version) and DOJ 0491117-18, 20-21 (shorter version).

14 A "pip" is the smallest unit at which an exchange rate is ordinarily specified.

15 Appendix E, Workpaper E-26.

16 COBRA Presentation, 2003EY001572 (longer version) and DOJ 049110 (shorter version).

17 *Ibid.*

18 COBRA Presentation, 2003EY001572 (longer version).

19 *Ibid.* The shorter version replaces the words "desired loss" with "cost of the long option." DOJ 049110. However, the shorter version does use the phrase "desired loss" in this context in the "Economic Summary" section of the presentation, at DOJ 049119. This chart is equivalent to 2003EY001581 in the longer version.

20 COBRA Presentation, 2003EY001579-83 (longer version) and DOJ 0491117-21 (shorter version).

21 DOJ 035669-72.

Ordinary Loss" equals the premium on the long call in the example, and the "Capital Invested" is equal to 5 percent of that value.[22]

I understand that no electronic copies of this spreadsheet file have been identified in the materials supplied to DOJ. I have been asked by counsel to verify that such a spreadsheet can be constructed and, if so, to replicate the calculations in the COBRA Presentation if possible. It is in fact straightforward to construct such a spreadsheet, and I am providing a Microsoft Excel file that does so along with this report. The details are contained in Appendix C, Workpapers C-3 to C-12, which provide some examples of the kind of output that results when different values are entered for "desired loss," including the $50 million value used in the COBRA Presentation's tables.[23]

**Step Three - Termination of Options and Acquisition of Assets:**[24] In this step, the foreign currency options expire either in or out of the money, resulting in a gain or loss. The COBRA Presentation then states, "[i]f ordinary loss is desired, spot foreign currency will be purchased by the partnership. If capital loss is desired, capital assets will be purchased."[25]

**Step Four - Transfer of Partnership Interests to S Corp:**[26] In this step, the individuals transfer their entire interest in the partnership to a newly formed S corporation, which is said to cause a "technical termination" of the partnership under what I understand to be a provision of tax law.[27]

**Step Five - Distribution of Partnership Assets to S Corp and Their Sale:**[28] After receiving the partnership interests in Step 4, the partnership liquidates and distributes its assets (i.e., capital assets, such as stocks or bonds, and/or foreign currency) to the S corporation.[29] The "[l]iquidation results in a step-up in tax basis of assets distributed by the partnership equal to cost of the long option ([plus

---

[22] *Ibid.* COBRA Presentation, 2003EY001579 (longer version) and DOJ 049117 (shorter version). Another feature of the example is that the net potential payout is $6.25 million if both options are exercised, which equals 12.5 percent of the "desired loss," or 250 percent of the net premium (i.e., 12.5 percent / 5 percent = 250 percent).

[23] DOJ 049120-21 (shorter version). Recall that only the shorter version included taxes owed on the proceeds of the trades, which I include on the replicated spreadsheets in Appendix C. As noted earlier, the longer version's examples omit these taxes, but the Excel file I am providing with this report includes them.

[24] COBRA Presentation, 2003EY001573 (longer version) and DOJ 049111 (shorter version).

[25] *Ibid.*

[26] COBRA Presentation, 2003EY001574 (longer version) and DOJ 049112 (shorter version).

[27] *Ibid.* The shorter version omits mention of the provision, which is "Code section 708(b)(1)(B)."

[28] COBRA Presentation, 2003EY001575 (longer version) and DOJ 049113 (shorter version).

[29] *Ibid.* The shorter version's discussion is much shorter.

or minus] profit or loss on [the offsetting option position])."[30] The S corporation then "sells the stepped-up assets [i.e., the foreign currency or capital assets] to [an] unrelated third party, generating a loss for tax purposes."[31]

**Step Six - Payment of Fees and Issuance of Legal Opinions [not identified as a "step" in COBRA Presentation]:** The COBRA Presentation describes fees of approximately 4.5 percent of the ordinary or capital loss (i.e., the cost of the long option), one third of which go to Ernst & Young itself.[32] It does not identify a "step" in which these fees are to be paid. The COBRA Presentation also refers to legal opinions, but does not list them as part of a "step," either.[33] Accordingly, for convenience, I identify such actions as occurring in "Step Six."

Figure 1, on the next page, depicts these six steps. A later figure uses the same general layout, but with specific details supplied, to depict the transactions in this case. The process starts at the top, with the purchase of the options, moves to the middle with the contribution of the options and the purchase of either foreign currency or capital assets, and finishes at the bottom with the payment of the fees and issuance of the legal opinions. In the figure, "cash" means amounts in U.S. dollars. "Assets" refers to "capital assets" as used in the COBRA Presentation. Entities not controlled by the participants are named in italics. Please note that since the details of the fee payments and legal opinions are not linked to the other steps in the COBRA Presentation, there are no arrows linking that box to the others in Figure 1.

---

30 COBRA Presentation, 2003EY001575 (longer version).

31 COBRA Presentation, 2003EY001575 (longer version) and DOJ 049113 (shorter version). The shorter version does not use the phrase "stepped-up" and adds "profit or" after "generating a".

32 COBRA Presentation, 2003EY001567, 81-82 (longer version) and DOJ 049119-21 (shorter version). See also 2003EY007040.

33 COBRA Presentation, 2003EY001567, 69 (longer version).




**Figure 1**

Please note that in Figure 1, the "individuals" consist of both (a) the individual participants and (b) their LLCs. The COBRA Presentation does not distinguish the LLCs from the individual participants. However, the actual series of transactions involved in following these six steps (which for brevity, I will henceforth refer to as "COBRA transactions") do involve LLCs as well as

individual participants. The LLCs are funded by the participants, and the LLCs are the entities that actually buy the offsetting option positions and contribute them to the General Partnership.

### B. Actual Transactions

The actual transactions in this case involve a series of entities similar to those depicted in Figure 1. This section first describes the ownership structure of these entities and then the steps undertaken. Figure 3 which appears at the end of this discussion, depicts the actual steps in this case using the layout in Figure 1.

#### 1. Ownership Structure

The entities involved in this case were formed on November 16, 1999. Jerry Zucker formed JZ Buckingham Investments, LLC ("Zucker LLC"),[34] and James G. Boyd formed JGB Bohicket Investments, LLC ("Boyd LLC", and collectively the "LLCs").[35] The Zucker LLC had a 90 percent interest and the Boyd LLC a 10 percent interest in the Partnership (i.e., JBJZ Partners)[36] and had the same ownership shares in the S Corp (i.e., JBJZ Investors, Inc.).[37] (As discussed below, the Partnership generates both a claimed capital loss and a claimed ordinary loss.) This ownership structure is depicted in Figure 2.

---

34 DB COBRA 00325-6.

35 DB COBRA 00339-40.

36 DOJ 041479.

37 DOJ 041499.




**Figure 2**

### 2. Steps Taken

This section traces the activities undertaken, organized according to the steps described in the COBRA Presentation.

**Step One - Purchase/Sale of Offsetting Option Contracts:** On November 23, 1999, the participants wired initial funds to the two LLCs, in the amounts of $3,150,000 for the Zucker LLC's account with Deutsche Bank Alex. Brown ("DBAB"),[38] and $350,000 to the Boyd LLC's DBAB account.[39] The offsetting option positions apparently were purchased/sold on November 23, 1999

---

[38] DB COBRA 04775. The LLCs' accounts were opened with BT Alex. Brown, but starting December 1999, they became accounts with DBAB. My report refers only to "DBAB" accounts, ignoring this change of name.

[39] DB COBRA 04799.

in transactions with Deutsche Bank A.G. ("DB"), and are shown in Table 1.[40] These transactions produce offsetting option positions (also called "option pairs," as in Table 1) on (a) the Japanese yen ("JPY") to U.S. dollar ("USD") exchange rate and (b) the USD to euro ("EUR") exchange rate.

In all cases, the strike price differences between the long and short positions are the two pips previewed in the COBRA Presentation. As noted in Part A above, in U.S. dollars, this two-pip spread represents a difference of about 1/5,000th of a U.S. dollar, or 1/50th of a U.S. cent.[41]

**Table 1. Individual Participants' Options Positions**

| | Zucker LLC | | Boyd LLC |
|---|---|---|---|
| *Option Pair #:* | [1] | [2] | [3] |
| **Characteristics of Option Pair** | | | |
| Underlying Currencies | JPY/USD | USD/EUR | USD/EUR |
| Option Type | Call | Put | Put |
| Spot Rate | 104.40 | 1.0265 | 1.0265 |
| Purchase Date | 23-Nov-99 | 23-Nov-99 | 23-Nov-99 |
| Exercise Date | 22-Dec-99 | 22-Dec-99 | 22-Dec-99 |
| **Long Options** | | | |
| Premium | $25,000,000 | $20,000,000 | $5,000,000 |
| Strike Price | 106.19 | 1.0123 | 1.0123 |
| Payout | $50,000,000 | $40,000,000 | $10,000,000 |
| **Short Options** | | | |
| Premium | $23,750,000 | $19,000,000 | $4,750,000 |
| Strike Price | 106.21 | 1.0121 | 1.0121 |
| Payout | $46,875,000 | $37,500,000 | $9,375,000 |
| **Net Option Premiums** | $1,250,000 | $1,000,000 | $250,000 |

Notes: All values from DB COBRA 04211-28.
USD: U.S. dollar, EUR: Euro, and JPY: Japanese yen.

[40] These options' confirmations are dated Nov. 24, 1999, but list a trade date of Nov. 23, 1999 (DOJ 041527-35). Note that the options first appear in the DBAB accounts on the settlement date of Nov. 24, 1999 (DB COBRA 04775, 04800).

[41] Appendix E, Workpaper E-26.

**Step Two - Transfer of Offsetting Options to Partnership:** The options and cash apparently were transferred to the Partnership on November 24, 1999, (on the day of the options' confirmations and settlements with the LLCs),[42] although the transfers were not recorded in the Partnership's account until December 7, 1999.[43] The apparent transfers are as follows:

- Zucker LLC transfers cash of $900,000[44] and two pairs of options (JPY/USD option pair and USD/EUR option pair with $20,000,000 long option premium)[45] from its DBAB account to the Partnership DBAB account.

- Boyd LLC transfers cash of $100,000[46] and one pair of USD/EUR options with a $5,000,000 long option premium[47] from its DBAB account to the Partnership DBAB account.

On December 7, 1999, all cash transfers and option pair transfers are recorded in the two LLCs' and the Partnership's accounts with DBAB.[48]

It is worth noting at this point that the amount of cash in excess of that used to buy the offsetting option positions equals two percent of the premium of their long options, as called for in the COBRA Presentation.[49]

**Step Three - Termination of Options and Acquisition of Assets:** In this step, the COBRA Presentation focuses on the expiration and cashout of the option positions and the type of assets (capital assets versus foreign currency) that remain in the partnership afterwards.

*Option Positions*: The options positions here were held to expiration. On December 22, 1999, the three option pairs held by Partnership expired. Two of the option pairs expired in the money. Specifically, the payouts were:

---

42 DB COBRA 00302-03, 07, 08 (transfer on November 24); DOJ 041527-35 (confirmation dates), and DB COBRA 04775, 04800 (settlement dates).

43 DB COBRA 04894-5.

44 DB COBRA 00308, 04780.

45 DB COBRA 00307, DOJ 041540 - 041545.

46 DB COBRA 00303, 04805.

47 DB COBRA 00302, DOJ 041537 - 041539.

48 DB COBRA 04780, 04805, 04894, 04895. Note that all transfers are as of Nov. 24, 1999.

49 COBRA Presentation, 2003EY001572 (longer version) and DOJ 049110 (shorter version). This calculation is shown later, in Table 4, in connection with the "Step Six" discussion.

Pair # 1: JPY/USD call option pair ($25,000,000 long option premium / $23,750,000 short option premium): Expired out of the money.[50]

Pair # 2: USD/EUR put option pair ($20,000,000 long option premium / $19,000,000 short option premium): $2,500,000.[51]

Pair # 3: USD/EUR put option pair ($5,000,000 long option premium / $4,750,000 short option premium): $625,000.[52]

On December 24, 1999, the Partnership received these payouts.[53] Table 2 summarizes these amounts.

**Table 2. Summary of Actual Option Payouts**

| *Contributor* | *Option Currencies* [1] | *Original Net Premium* [2] | *Payout If Both Options Hit* [3] | *Actual Payout Amount* [4] |
|---|---|---|---|---|
| *Zucker LLC* | | | | |
| Option Pair #1 | JPY/USD | $ (1,250,000) | $ 3,125,000 | $ - |
| Option Pair #2 | USD/EUR | $ (1,000,000) | $ 2,500,000 | $ 2,500,000 |
| *Boyd LLC* | | | | |
| Option Pair #3 | USD/EUR | $ (250,000) | $ 625,000 | $ 625,000 |
| *Total* | | $ (2,500,000) | $ 6,250,000 | $ 3,125,000 |

Notes: [1], [2], [3]: DB COBRA 04213, 15, 19, 21, 25, 27; [4]: DB COBRA 04894, 04896-7. The JPY/USD options are calls and the USD/EUR options are puts. USD: U.S. dollar, EUR: Euro, and JPY: Japanese yen.

*Assets Associated with Tax Loss*: The acquisition of capital assets and/or foreign exchange, the other focus of Step Three of the COBRA Presentation, occurred as follows. On December 7 and 8, 1999,

50 DB COBRA 04896.

51 DB COBRA 04896-7, DB-DOJ-COBRA-00044116.

52 DB COBRA 04896, DB-DOJ-COBRA-00044116.

53 DB COBRA 04894, 04896-7. Note that the payments were received as of Dec. 24, 1999 but had posting dates of Dec. 27, 1999.

the participants contributed 5,000 shares of Cisco stock to the S Corp.[54] Of these, 4,500 shares came from Jerry Zucker and were purchased in February 1996.[55] The remaining 500 shares came from James G. Boyd and were purchased in August 1999.[56] On December 22, 1999, the S Corp transferred the Cisco stock to the Partnership as a contribution to capital from the LLCs.[57] Recall that capital assets, such as the Cisco stock, give rise to capital losses according to the COBRA Presentation.[58,59]

On December 22, 1999, the Partnership purchased US$600,000 worth of Canadian dollars at 0.6800 USD/CAD.[60] On December 23, 1999, the Partnership purchased an additional US$172,500 worth of Canadian dollars at 0.6800 USD/CAD.[61] Recall that foreign exchange amounts, such as the Canadian dollars in the Partnership, give rise to ordinary losses according to the COBRA Presentation.[62]

---

54 DOJ 041733, DB COBRA 04910. Note that Dec. 7 & 8, 1999 are the settlement dates of the transfers. It is not clear when the transfers were authorized.

55 DOJ 041733, DB COBRA 04910, Answer to the Complaint for Readjustment of Partnership Items at ¶30.

56 DOJ 041733, DB COBRA 04910, Answer to the Complaint for Readjustment of Partnership Items at ¶31.

57 DB COBRA 04895-6, 04910; DB-DOJ-COBRA-00044115. Note that this is an alternative way of obtaining capital assets from that discussed in Step Three in the COBRA Presentation, which discussed the purchase of capital assets within the Partnership.

58 COBRA Presentation, 2003EY001573 (longer version) and DOJ 049111 (shorter version).

59 On December 7, 1999, the Partnership purchased shares of three banks for approximately $976,000. (DB COBRA 02871, 02873, 02877, 04892; note that the trade date is Dec. 7, 1999 while the settlement dates are Dec. 10 and 14, 1999) The Partnership sold these shares on December 14, 1999 for approximately $978,000, after fees. (DB COBRA 02879, 02881, 02883, 02885, 04893; note that the trade date is Dec. 14, 1999 while the settlement date is Dec. 17, 1999) On December 22, 1999, the Partnership bought shares of a fund for $400,000. (DB COBRA 02887, 04893; note that the trade date is Dec. 22, 1999 while the settlement date is Dec. 23, 1999) The Partnership sold these shares the next day for $400,506, after fees. (DB COBRA 02889, 04893; note that the trade date is Dec. 23, 1999 while the settlement date is Dec. 27, 1999) The total value of the purchases was approximately $1.376 million and of the sales approximately $1.378 million. See Appendix D, Workpaper D-10, for details.

60 DB COBRA 04897. Note that the purchase date is Dec. 22, 1999 while the settlement date is Dec. 23, 1999.

61 DB COBRA 04897. Note that the purchase date is Dec. 23, 1999 while the settlement date is Dec. 27, 1999.

62 COBRA Presentation, 2003EY001573 (longer version) and DOJ 049111 (shorter version). An Ernst & Young email suggests Canadian dollars were selected for all the partnerships oriented towards ordinary losses because of the currency's "low volatility and ability to be converted within one day." DOJ 045071.

**Step Four - Transfer of Partnership Interests to S Corp:** On December 27, 1999, the Zucker LLC and the Boyd LLC assigned their partnership interests in the Partnership to the S Corp.[63] Under the COBRA Presentation, the transfer of partnership interests causes a "technical termination" of the partnership for tax purposes.[64]

**Step Five - Distribution of Partnership Assets to S Corp and Their Sale:** Also on December 27, 1999, the Partnership was liquidated and its assets were distributed to the S Corp.[65] The S Corp then proceeded to sell the non-cash assets received from the Partnership. On December 28, 1999 the S Corp authorized the sale of all "securities and/or foreign currency positions" from its account.[66] On December 28, 1999, the S Corp sold all 5,000 shares of its Cisco stock at $105.95 per share.[67] The proceeds from the sale were $529,729.34.[68] On December 28, 1999, the S Corp sold all of its Canadian dollars at 0.6852 USD/CAD.[69] The proceeds on the foreign currency sale were $778,407.35.[70]

**Step Six - Payment of Fees and Issuance of Legal Opinions [not identified as a "step" in COBRA Presentation]:** As depicted in Figure 1 above, activities not identified as "steps" in the COBRA Presentation also took place. From an economic perspective, the most important of these involve the payment of the fees mentioned in the COBRA Presentation. Additionally, legal opinions were provided.

---

63 DOJ 041555, 041556.

64 COBRA Presentation, 2003EY001574 (longer version) and DOJ 049112 (shorter version), and DB COBRA 00300.

65 DB COBRA 00300, 04894, 04897, 04901. In addition to assets transferred on December 27, 1999, total dividends of $669.89 and interest of $0.32 were posted as having been transferred to the S Corp on December 30, 1999 and January 26, 2000, respectively. The "as of" date in the transaction record for the interest and dividends is December 27, 1999 in each case (DB COBRA 04894, 04905, 04910, 04919).

66 DOJ 041560, 041561.

67 DB COBRA 02891, 04909. Note that the trade date is Dec. 28, 1999, while the settlement date is Dec. 31, 1999.

68 DB COBRA 02891, 04909.

69 DB COBRA 04910, 04915. Note that the sale date is Dec. 28, 1999, while the settlement date is Dec. 29, 1999.

70 DB COBRA 04910.

The fees to Ernst & Young were paid by the Participants.[71] It is unclear when the fees were paid.[72] The fees are allocated among the participants as follows:

- Jerry Zucker, $675,000 (90% of the total fee).[73]
- James G. Boyd, $75,000 (10% of the total).[74]

At the same time, the fees to Jenkens & Gilchrist were paid by the S Corp. On or around December 29, 1999, the S Corp authorized preparation of a check for $1,400,000 from its DBAB account payable to Jenkens & Gilchrist.[75] The fee represented three percent of the total long option premium of $50,000,000 less the expected Brown & Wood fee of $100,000.[76] The fee is allocated among the participants as follows:

- Jerry Zucker, $1,260,000 (90% of the total fee).[77]
- James G. Boyd, $140,000 (10% of the total).[78]

On December 29, 1999, the check from the S Corp to Jenkens & Gilchrist was posted to the S Corp's account with DBAB.[79]

---

71 Plaintiff's Objections and Responses to United States' First Set of Interrogatories at #14, Plaintiff's First Supplemental Objections and Responses to United States' First Set of Interrogatories at #15, Plaintiff's Objections and Responses to United States' Second Set of Interrogatories at #32.

72 *Ibid.*

73 *Ibid.*

74 *Ibid.*

75 DB COBRA 00299. The date is from a fax machine timestamp.

76 JG-NC055927.

77 Plaintiff's Objections and Responses to United States' First Set of Interrogatories at #14, Plaintiff's First Supplemental Objections and Responses to United States' First Set of Interrogatories at #15.

78 *Ibid.*

79 DB COBRA 04910.

Jenkens & Gilchrist in turn wrote legal opinions for the transaction for Jerry Zucker[80] and James G. Boyd.[81] Each participant received one opinion. These opinions were sent on March 10, 2000 to Jerry Zucker[82] and James G. Boyd.[83]

On March 28, 2000, the S Corp wrote an authorization letter for a wire transfer of $60,000 from its account with DBAB to Brown & Wood's account with Citibank.[84] The fees to Brown & Wood were still outstanding as of April 26, 2000.[85] On May 18, 2000, the S Corp sent a letter to DBAB authorizing a wire transfer of $60,000 to Brown & Wood.[86] On or about May 28, 2000, the S Corp transferred $60,000 in fees to Brown & Wood.[87] The fee is allocated among the participants as follows:

- Jerry Zucker, $54,000 (90% of the total fee).[88]
- James G. Boyd, $6,000 (10% of the total).[89]

---

[80] DOJ 030622 - 030737.

[81] DOJ 030505 - 030619.

[82] DOJ 030621.

[83] DOJ 030504.

[84] DB COBRA 00364, 00365.

[85] DOJ 031727.

[86] DB COBRA 00362.

[87] Plaintiff's Objections and Responses to United States' First Set of Interrogatories at #14, Plaintiff's First Supplemental Objections and Responses to United States' First Set of Interrogatories at #15, Plaintiff's Objections and Responses to United States' Second Set of Interrogatories at #32.

[88] Plaintiff's Objections and Responses to United States' First Set of Interrogatories at #14, Plaintiff's First Supplemental Objections and Responses to United States' First Set of Interrogatories at #15.

[89] *Ibid.*

Brown & Wood wrote a legal opinion for the transaction for Jerry Zucker[90] and James G. Boyd.[91] The opinion was sent on March 31, 2000 to Jerry Zucker.[92] No record of Brown & Wood's sending the opinion to James G. Boyd has been found.

Finally, there are two Jenkens & Gilchrist invoices dated February 25, 2000 to the S Corp for $40,000 each.[93] The fee represented the difference between the expected Brown & Wood fee of $100,000 at the time the original Jenkens & Gilchrist invoice was sent and the final Brown & Wood fee of $60,000.[94] On February 27, 2000, the S Corp authorized preparation of a check for $40,000 from its DBAB account payable to Jenkens & Gilchrist.[95] As of July 24, 2000, the fees remained unpaid.[96] The S Corp paid the fees, but the date of payment is not clear.[97]

The participants paid a combined total of $2.25 million in fees to Ernst & Young, Jenkens & Gilchrist, and Brown & Wood. The total fees in the COBRA Presentation were identified as 4.5 percent of the "transaction," i.e., the premium of the long option in the pair, allocated 3 percent to law firms and 1.5 percent to Ernst & Young.[98] The actual fees amount to 4.5 percent of the amount charged by DB for the long options in the offsetting option positions (3 percent for Jenkens & Gilchrist and Brown & Wood combined, and 1.5 percent for Ernst & Young).[99] The quantities

---

[90] Plaintiff's Objections and Responses to United States' Second Set of Interrogatories at #38. The actual opinion is SIDL 0387591-670.

[91] *Ibid.* The actual opinion is DOJ 063998-4075.

[92] Plaintiff's Objections and Responses to United States' Second Set of Interrogatories at #38. The Zucker opinion has a (signed) accompanying letter from E&Y dated March 31, 2000 which states "Enclosed is a copy of the Brown & Wood opinion letter" (DB COBRA 00363).

[93] JG-NC055882, JG-NC055883. JG-NC055882 is labeled "second notice."

[94] JG-NC055927.

[95] DB COBRA 00361.

[96] Patrick O'Daniel of Jenkens & Gilchrist wrote a memo dated July 24, 2000 which states that it is his understanding that there has been no response to the second notice sent to the S Corp at this time (JG-NC055876).

[97] Plaintiff's Objections and Responses to United States' First Set of Interrogatories at #14 (no payment date is specified).

[98] COBRA Presentation, 2003EY001567, 79, 81-83 (longer version) and DOJ049117, 19-21 (shorter version). See also 2003EY007040.

[99] The participants may also have consulted personal counsel concerning the COBRA transactions, in which case the fees paid for such advice are also part of the associated transaction costs. However, I am unable to document such fees.

identified as the "transaction" and the "desired loss"[100] in the COBRA Presentation thus correspond to the dollar value of the long options in the offsetting option positions in this case.[101]

Tables 3 and 4 calculate the fees and the cash contributions, respectively, as percentages of the long option premiums, identified in the tables as the "desired loss." The percentages exactly match those discussed in the COBRA Presentation.

**Table 3. Summary of Fees**

| | | *Zucker LLC* | *Boyd LLC* | *All Participants* |
|---|---|---|---|---|
| | Fees Paid | | | |
| [1] | *Ernst & Young* | $ 675,000 | $ 75,000 | $ 750,000 |
| [2] | *Jenkens & Gilchrist* | $ 1,260,000 | $ 140,000 | $ 1,400,000 |
| [3] | *Jenkens & Gilchrist** | $ 36,000 | $ 4,000 | $ 40,000 |
| [4] | *Brown & Wood* | $ 54,000 | $ 6,000 | $ 60,000 |
| [5] | Total | $ 2,025,000 | $ 225,000 | $ 2,250,000 |
| | Net Option Premium | | | |
| [6] | *USD/EUR Positions* | $ 1,000,000 | $ 250,000 | $ 1,250,000 |
| [7] | *JPY/USD Positions* | $ 1,250,000 | $ - | $ 1,250,000 |
| [8] | Total | $ 2,250,000 | $ 250,000 | $ 2,500,000 |
| | "Desired Loss" | | | |
| [9] | *Amount* | $ 45,000,000 | $ 5,000,000 | $ 50,000,000 |
| [10] | *% of Total for all Participants* | 90.0% | 10.0% | 100.0% |
| [11] | Fees as a % of "Desired Loss" | 4.5% | 4.5% | 4.5% |

Notes: [1]: Interrogatory #14, Plaintiff's Answers to First Set of Interrogatories & Interrogatory #32, Plaintiff's Answers to Second Set of Interrogatories.
[2]: DB COBRA 00299, 04910; Interrogatory #14, Plaintiff's Answers to First Set of Interrogatories & Interrogatory #32, Plaintiff's Answers to Second Set of Interrogatories.
[3]: Interrogatory #14, Plaintiff's Answers to First Set of Interrogatories & Interrogatory #15, Plaintiff's First Supplemental Responses.
[4]: Interrogatory #32, Plaintiff's Answers to Second Set of Interrogatories & Interrogatory #15, Plaintiff's First Supplemental Responses.
[5] = [1] + [2] + [3] + [4].
[6], [7], [9]: DB COBRA 04213, 15, 19, 21, 25, 27.
[8] = [6] + [7].
[10] = [9] / the sum of [9] for all participants.
[11] = [5] / [9] (2003EY001567).
USD: U.S. dollar, EUR: Euro, and JPY: Japanese yen.
*JBJZ Investors, Inc. paid $40,000 to Jenkens & Gilchrist. These fees are allocated among the participants based on the percentages in [10]. See Interrogatory #15, Plaintiff's First Supplemental Responses.

100 COBRA Presentation, 2003EY001567, 72 (longer version).

101 This conclusion is also confirmed by the fact that the participants contributed cash equal to 2 percent of this premium, as called for in the COBRA Presentation, 2003EY001572 (longer version) and the COBRA Presentation, DOJ 049110 (shorter version); see Table 4, below.

**Table 4. Net Cash Contributed to Partnership by Participants**

| | | Zucker LLC | Boyd LLC | Total |
|---|---|---|---|---|
| [1] | Initial Cash Contributed | $ 3,150,000 | $ 350,000 | $ 3,500,000 |
| [2] | Cash Paid for Option Premiums | $ (2,250,000) | $ (250,000) | $ (2,500,000) |
| [3] | *Net Cash Contribution* | $ 900,000 | $ 100,000 | $ 1,000,000 |
| [4] | *"Desired Loss"* | $ 45,000,000 | $ 5,000,000 | $ 50,000,000 |
| [5] | Net Cash as a % of "Desired Loss" | 2.00% | 2.00% | 2.00% |

Notes: [1]: DB COBRA 04775, 04799; [2]: DB COBRA 04780, 04805; [3] = [1] + [2]; [4]: DB COBRA 04213, 19, 25; [5] = [3] / [4].

My subsequent economic analyses are based on the above economic features of the transactions. First, however, it is useful to summarize the features just discussed in a manner similar to the COBRA Presentation summary in Figure 1. An elaboration of the simplified Figure 1 illustration is required to depict all of the steps in these transactions. Figure 3, on the following page, provides this information.

Please note that the JBJZ transaction attaches the partnership tax basis to Cisco stock and Canadian dollars (denoted as "FX," for "foreign exchange," in Figure 3). The figures also use abbreviations to make reference to Ernst & Young ("E&Y"), Jenkens & Gilchrist ("J&G"), Brown & Wood ("B&W") and Morgan Stanley Dean Witter ("Morgan Stanley").[102]

The step numbers in the figure follow those from the COBRA Presentation as illustrated in Figure 1 above, with the elements of each step indicated by lower-case letters (e.g., a "1a" in a circle indicates the first part of Step 1 from the COBRA Presentation). Step 6 in this figure refers to the payment of fees and other actions taken to wind up the transactions. As noted earlier, these activities are not called a "step" in the COBRA Presentation, but the fees are discussed elsewhere in the COBRA Presentation.

[102] The reference is to a Morgan Stanley account. I am unaware of any other involvement of Morgan Stanley in these transactions.

## JBJZ Basic Transaction Steps

**Steps:**

1a. Participants fund LLCs with cash & Cisco stock*

1b. LLCs purchase/sell offsetting options

2. LLCs inject cash & options into Partnership

3a. Cisco stock is injected into S Corp. S Corp transfers Cisco stock to Partnership

3b. Partnership buys FX, and stock in various firms

3c. Receive payout from expired options

3d. Partnership sells stocks other than Cisco

4. LLCs transfer partnership interests to S Corp

5a. Liquidate Partnership & distribute assets to S Corp

5b. S Corp sells stock

**Pay Fees and Get Opinions:**

6a. Each participant pays fees to E& Y

6b. Pay fee to J&G for legal opinion

6c. Pay fee to B&W for legal opinion

6d. Sell assets & transfer cash to Morgan Stanley




Note: Interrogatory #14 says that the participants paid fees to B&W and that JBJZ Investors, Inc. paid supplemental fees to J&G. The timing of each is unclear.

* Exact route of contribution of Cisco stock is not clear.

Source documents: DOJ030504, 030621, 041527-32, 55-56, 061630 and 061641; DB COBRA 00298-300, 00302-3, 003077-8, 04775, 04799, 04780, 04805, 04892-3, 04895-7 and 04910.

Figure 3



PL.MJ.APP00027

### C. Check of COBRA Presentation as Template

The COBRA Presentation outlines a general multi-step process, and the previous section concludes that these steps were in fact followed in the present case. As it happens, internal documents identify 15 COBRA transactions undertaken at about the same time, using the same advisors.[103] As a check on the conclusion that the COBRA Presentation provides a valid template for understanding the transactions undertaken here, I reviewed these transactions to see if they, too, contained components that naturally fell within the COBRA Presentation's steps.

Appendix C, Workpaper C-1 contains the details. Some points to note:

- The six basic steps were followed in all 15 transactions.

- A detailed "COBRA ACTION WORK PLAN" checklist that is consistent with the six steps has been identified for three of these transactions.[104]

- A COBRA client questionnaire from Jenkens & Gilchrist has been identified for 25 of the 43 participants in these 15 transactions, including the two participants here.[105]

- An Ernst & Young "COBRA Update" email dated February 28, 2000[106] discusses the Brown & Wood fees, the timing of the "J&G" and "B&W" opinions, and the "Tax Returns" for Ernst & Young clients in the COBRA transactions. The individuals named regarding the Brown & Wood fees include "Zucker/Boyd"[107]

---

[103] 2003EY012551 makes reference to "16 transactions during 1999." However, other documents indicate there were 15 (for example, DOJ 031605-06 and JG-NC055922), and transaction data appear to be available only for 15. There were three other sets of COBRA transactions in 2000, to which my report occasionally refers.

[104] For example, DOJ 054573-77. To date, such a work plan has not been identified for this particular case. This work plan, identified as "Revised 11/05/99", lists 29 "Action Item[s]" for Ernst & Young, to be marked "Completed" as they are accomplished. The items run from "1) Qualify client" to "29) If audited, EY will provide defense through appeals within the IRS". Appendix C, Workpaper C-2, matches items in the work plan to the above COBRA Presentation steps.

[105] JG-CL0148037-38. The questionnaire asks for information such as client name, contact information, social security number, amount of transaction (with sub-categories for "Ordinary Income" and "ST Capital Gain"), bank information, approximate annual household income and approximate net worth excluding residence. Additionally, in three of the transactions for which questionnaires with a "Jenkens & Gilchrist" header have not been identified, questionnaires without such a header, and with a somewhat different format, do exist for eight participants. Bates numbers 00000297-8, 300-1, 303-4, 317-8; DOJ 038585, 057114.

[106] DOJ 031605-06.

[107] DOJ 031605.

Thus, the steps outlined in the COBRA Presentation correspond not merely to the instant transactions, but to a broad set of similar transactions.[108] I view this finding as confirming that (a) I can validly rely on the COBRA Presentation as a template for understanding the nature of these transactions, and (b) the larger set of COBRA transactions are a source of information that can be used to check my analyses of the present transactions.

## III. ANALYSES OF RETURNS

This section first presents the relevant risk-return principles. It then describes the pricing pattern for the offsetting option components that produced fees to DB for these transactions, a factor that must be considered in the analysis of expected returns. Third, it analyzes the expected returns on the transactions in this case. Next, it provides two checks on that analysis by examining the actual outcome here and by analyzing a much broader set of similar transactions. Finally, it presents my conclusions on whether these transactions provided a reasonable opportunity for profit, apart from any tax benefits.

### A. Risk-Return Principles

Most investments, including the securities that underlie the dispute in this case, have uncertain outcomes. Economically rational investors do not premise an investment strategy on the belief that they will do spectacularly well on each such investment. The outcome that rational investors will expect will be the mean of the distribution of these outcomes.[109]

---

[108] See also a November 4, 1999 email from R. Craig Brubaker at DBAB to Eric Gallinek at DB, forwarding an October 27, 1999 email from Mr. Brubaker to several addressees. (DB-DOJ-COBRA-00030347-50.) This email refers specifically to Mr. Brubaker's working with David Parse of DBAB and Dan Brooks at DB. It describes a series of steps that, on their face (but without reference to Ernst & Young or COBRA), correspond to the parts of the COBRA Presentation that lead to the requirement for support from DB or DBAB, and it lays out DB's and DBAB's roles in the transactions.

[109] In fact, that is how "expected value" is defined in statistics. One text describes the basis of the term as follows:

> . . .the idea of expectation of a random variable is closely connected with the origin of statistics in games of chance. Gamblers were interested in how much they could "expect" to win in the long run in a game, and in how much they should wager in certain games if the game was to be "fair." Thus, expected value originally meant the expected long-run winnings (or losings) over repeated play; this term has been retained in mathematical statistics to mean the long-run average value for any random variable over an indefinite number of samplings. This holds whether a large number of samplings will actually be conducted or whether the situation is a one-trial affair and we consider hypothetical repetitions of the situation. Over a long series of trials, we can "expect" to observe the expected value. At any *single* trial, we in general cannot "expect" the expected value; usually the expected value is not even a possible value of the random variable for any single trial. . . .

W. L. Hays, and R. L. Winkler, Statistics, Vol. I , New York: Holt Rinehart & Winston (1970) at (continued....)

That is, the expected rate of return rational investors require to induce them to commit capital depends on the level of risk the investment requires the investor to bear. A risk-free investment (e.g., a U.S. Treasury bill) has a low rate of return. Higher risk investments require higher expected rates of return to attract capital. But investors do not have to bear all risks. Risks that are uncorrelated with other risks become increasingly unimportant as the number of randomly selected securities in a portfolio increases. Such "diversifiable" risks command no risk premium in the rate of return investors expect to receive on average.[110]

Therefore, the standard for an economically rational investment is an expected rate of return on the amount invested that at least equals, and ideally exceeds, the "cost of capital," which is the expected rate of return in capital markets on alternative investments of equivalent risk. The cost of capital for an investment equals a risk-free rate plus a risk premium that depends on one or more factors representing the risk or risks that investors cannot diversify in large portfolios.

What would the rationally expected rate of return be on the JBJZ offsetting option positions? There is a simple answer to that question because both of the components of the offsetting option position have fixed cash payoffs if exercised. With this payoff structure, the expected *dollar* return equals the probability of getting the cash payoff, times the amount of cash if you do get it, less the initial cost of the option:

$$\text{E[\$Return]} = [(\text{Probability of Payoff}) \times (\text{\$Payoff})] - \text{\$Cost of Option} \qquad [1]$$

where E[....] indicates the "expected value" (in the statistical sense) of the quantity in the brackets. The expected *rate* of return is the expected dollar return divided by the cost of the option:

$$\text{E[\%Return]} = \text{E[\$Return]} / \text{\$Cost of Option} \qquad [2]$$

The cost of the option and an appropriate value for the probability of getting the dollar return can be calculated using standard Black-Scholes option pricing technique, given data on the risk-free interest rate, the forward exchange rate, and the volatility of the exchange rate in question. In the

---

109 (...continued)
136-137.

110 Roulette provides an example of diversifiable risk. Betting on roulette is risky for an individual. But roulette by itself is not risky for the casino, because the dozens of spins per wheel per night, over many nights and many roulette wheels, are uncorrelated with one another. The random outcomes of individual spins are inconsequential because of the huge number of spins. This makes the casino's roulette rate of return per dollar bet very predictable. The casino's expected roulette rate of return per dollar bet is positive and the gambler's is negative, which is why gambling is not considered an investment. The casino's risk depends not on the spins of the wheel, but on how many people come to bet and how much they bet when they arrive, which in turn depend on major, non-diversifiable economic factors such as the state of the economy.

present case, these data are available from internal bank records prepared by DB, known as "option deal entry" forms,[111] and which here I call "deal sheets."[112]

### B. Pricing of Offsetting Option Position Components

DB apparently had invested time and effort to help find a basic structure of the option positions that had features Ernst & Young appeared to value,[113] but unlike Ernst & Young and the attorneys, DB did not get an explicit fee for its services in a given transaction. It would be expected that DB would require some sort of fees for its role in the transactions, and the fact that it did not get fees directly would mean they could only come through the pricing of the options. Thus, an investor in these transactions would logically expect that the stated prices of the options would differ from their basic economic value, in order to provide a fee to DB.

There were definite signs that this was in fact true. For example, please refer again to Table 1, on page 15 above, and note in particular how many zeros appear at the end of each of the premiums for the digital options that comprise the offsetting positions in this case. Such round numbers follow the example in the COBRA Presentation, but there is nothing in option pricing theory that calls for

---

[111] These are also known as the "ODETs" or "option deal entry tool". Deposition of Jeanette Michaels, July 25, 2006 ("Michaels Deposition"), p. 19.

[112] The precise values for the risk-free interest rate, the forward rate, and the volatility of an exchange rate vary with time and according to the source from which the data are taken. The values used in the DB deal sheets are generally consistent with those from publicly available sources. To prevent immaterial and unnecessary differences between my calculations and DB's, I use the DB data whenever possible. An example of a deal sheet can be seen at DB COBRA 04211-04216.

[113] See a November 1, 1999 email from Robert B. Coplan to numerous Ernst & Young addresses, subject "COBRA-Revisions to Minimum Investment and Relaxa" [sic], 2003EY001586-87, which begins,

> We have been working closely with Deutsche Bank to reduce the amount that the client must put at risk from the 10% of the loss amount we previously announced. As you know, the present deal requires the client to invest 10% of the desired loss amount with a 50% chance of doubling that amount if he wins his bet, and a 50% chance of losing the entire investment if he loses the bet, with a 38% rate of return (after fees) if he wins.
>
> The new arrangement we are expecting to get final confirmation of from Deutche [sic] Bank tomorrow is as follows. The amount that must be invested has been reduced to 5% of the desired loss, with fees remaining at 4.5%. The probability of winning the bet has been reduced slightly to about 37%. Therefore, on a $50M transaction, the minimum investment is $2.5M, and the fees are $2.25M. If the client wins the bet, they get $6.25M and if they lose the bet they still get nothing. The $6.25M represents a return of $1.5M (6.25 - (2.5+2.25), or a rate of return of 31%. All this with a 37% chance of winning the bet. ....

[Note: a number the periods and decimal points are illegible in this email, even though the spaces where they belong are present; to make the preceding quotation easier to read, I put them in without resort to the use of brackets for each instance.]

option values to be so round. It is effectively impossible that any model of the underlying basic value of these options would produce six option values all ending in so many zeros.[114]

Also, the COBRA Presentation's own example signals a material overpricing of the stated premium for the long option (i.e., of the "desired loss"). While I next spell this out formally as a preface to my later calculations, this conclusion about the COBRA Presentation's example requires no special technical understanding, only the ability to evaluate a coin toss.

Formally, first note that the basic value of each of these digital options is the present value of the payout if it finishes in the money, times the probability that it will finish in the money. (For example, the value of a bet that immediately pays $1 if a coin toss comes up heads should be 50 cents.) In equation form,

$$\text{\$Value of Option} = \text{PV[\$Payoff]} \times \text{Probability of Payoff} \qquad [3]$$

where PV[...] indicates the present value of the amount in brackets.[115] In the case of the example in which there is an immediate payment of a dollar if a fair coin comes up "heads", the value of the coin toss is

$$\text{\$Value of Toss} = \$1.00 \times 50\% = \$0.50$$

Now consider the long option value in the COBRA Presentation's example, which offered a payoff of $100 million a month later and a stated 38 percent chance that it would finish in the money. By equation [3], that value should be:[116]

$$\text{\$Value of Long Option} = \text{PV[\$100 million in one month]} \times 38\%$$

$$= \$38 \text{ million.}$$

But the COBRA Presentation states the premium for the long option is $50 million, not $38 million. A $50 million value for a chance at a $100 million payoff would be right only if odds of winning were 50 percent, a requirement that holds true for all of the actual long options used in the COBRA transactions. On its face, the COBRA Presentation's long option is an offer to price a $100 million bet as though the outcome were to be decided by a fair coin toss, but to announce that a weighted

---

[114] For example, using different bid-ask prices or different volatilities in a standard option pricing formula, to create a difference between buy and sell prices, would not automatically produce such round numbers.

[115] For example, for a payment in one month (1/12th of a year), with an annual interest rate of $r$, the present value of the payment will be [$Payment / $(1+r)^{(1/12)}$ ]. (This is the familiar discrete-time version of the present value formula; for completeness, I should note that in option pricing formulas, continuous-time discounting is the norm.)

[116] The calculations in this section of the report ignore the fact that $100 million one month from now is worth a little bit less than $100 million immediately, because there is a month's less time to earn interest on the money.

coin will be used that only lets the other person win 38 percent of the time. This is not a bet that a rational person would accept, absent some offsetting benefit that was distinct from the bet itself. Nor would the person need an advanced degree to see that there was a problem.[117]

As previewed by the COBRA Presentation's example, the Equation [3] relationship in fact does not hold for the DB stated premiums charged to or paid to the participants. In the event, the premiums for both the long *and short* options were much more than their basic values, as determined by this equation. This statement is in fact supported by DB's own internal pricing of these options, which I have independently confirmed. These internal DB prices are identified in the deal sheets as the "(Theo.) Premium Amount" ("DB theoretical premium").

The DB deal sheets contain information on the individual options in an offsetting option position, one element of which is the DB theoretical premium, a measure of the option's basic value.[118] It should be noted that the DB theoretical premium is sometimes far out of line with any economically reasonable value for the option. For example, the DB theoretical premiums sometimes are the same for two otherwise identical options with widely varying payoff amounts. This problem does not

---

117 A similar problem arises for the short option, but the odds are not as easy to assess as the long option's coin toss. By Equation [3], the short option should be worth no more than ("no more than" because at a less favorable strike price, its payoff odds would be somewhat lower than 38 percent)

$Value of Short Option = PV[$93.75 million in one month] × 38%
= $35.625 million, if the delay in payoff receipt is ignored.

Yet the COBRA Presentation values it at $47.5 million, another material overstatement. Thus, an overstatement of the value of both the long and the short option is intrinsic to the structure of the COBRA transactions.

118 The salesperson would put the basic details into ODET, such as buy or sell, put or call, expiry date, strike price, and all the market information (spot, forwards, etc.) Then, he or she would send spreadsheets to a sales assistant with the names of clients and notional and premium amounts. The sales assistant would finish the entries into ODET based upon the spreadsheet. (Michaels Deposition, pp. 19-20, 42.) Additionally, DB-DOJ-COBRA 00046975 states that "[s]ales use ODET (Option Deal Entry Tool) to enter their trade. This flags to the Trader the trade details and allows the Trader to check he is in agreement with the Salesperson before accepting it into his book." The ODET system is also described in a DB document prepared for the "DB New York & DB Frankfurt FX Options Consolidation Planning Workshop," held in London on December 14, 2000. DB-DOJ-COBRA 00047005-15. This document states that "ODET (Option Deal Entry Tool) is an Excel spreadsheet based application that exports completed Vanilla and Exotic deals from the Option Pricer to the Trading risk management systems (FNX/RMS) via the Web Deal database." DB-DOJ-COBRA 00047009. This document also notes that the "Option Pricer is the main Vanilla and Exotic option pricing tool used by the global FX Sales teams at Deutsche Bank." DB-DOJ-COBRA 00047009. DB document production includes a document called the "FX Option Pricer User Guide." DB-DOJ-COBRA 00049120-70. This manual describes a model that calculates theoretical option values. The introduction to the manual notes that the price given by the Option Pricer represents "the 'Theoretical Value' (TV) of that specific option or structure," and that the "TV is calculated according to the Black-Scholes (Merton) Formula". DB-DOJ-COBRA 000049126.

appear to affect the first option entered into a deal sheet for each exchange rate.[119] In the cases in which the DB theoretical premium for one of the offsetting option positions appears to be in error, I replace the deal sheet value with a value based on the ratio between an unaffected option's DB theoretical premium and stated premium, scaled to the affected option's stated premium.[120]

As a separate check of DB's determination of the basic value for these options, I have also determined their pricing with the Black-Scholes option pricing model.[121] The result is two separate calculations of the basic value of the options in all cases.[122] While not identical, my own calculations are consistent with DB's calculations of the basic option value, sometimes somewhat higher, and other times somewhat lower. Please note also that such measures of basic value do not include a fee for the issuing bank, which might come through a bid-ask spread between the prices used to value the two options.[123]

Table 5 compares the stated DB premiums with these two estimates of the basic value of these options. (The options in which the DB theoretical premium needed to be rescaled for the reasons just described are shown in boxes in the table and already reflect the rescaling.)

---

[119] As discussed further below, contemporaneous data exist on a number of other 1999 COBRA transactions. In this expanded data set, there is one exception to this statement, in that it is an option pair other than the first that has the economically reasonable value, for an offsetting option position not part of this case. Also, for four of the 56 option pairs, the DB theoretical premiums do not appear to be reliable and no correction is possible. See Appendix E, Workpaper E-7.

[120] Appendix E, in Workpapers E-10, 11, 16, and 17, explains this correction.

[121] As noted earlier, the Black-Scholes model is a standard (and Nobel-Prize-winning) way to price options. (Prof. Robert Merton shared the Nobel Prize for related work done at the same time but published separately.) The inputs required to use the Black-Scholes model, as also discussed above, are generally supplied in the DB deal sheets. One important input is the volatility of the exchange rate in question, and the deal sheets report a high and a low value for this volatility. The two are not far apart, and I use their average. I follow the same procedure for the "forward points to expiry," the difference between the spot exchange rate and the forward exchange rate for the exercise date. I also use U.S. dollar interest rates to measure the time value of money, since the payoffs to these options are in U.S. dollars. (The deal sheets appear to report non-dollar interest rates in some cases as the "depo rate to expiry," but since the options in question are so short-lived, this issue makes very little difference to the estimate of the theoretical premium.) Appendix D reports the details of my calculations.

[122] The two calculations are not identical, but the differences are small relative to the differences between the two measures of basic value and the DB stated premiums for the option position components. The reasons for the difference are not entirely clear, but might be due to use of inputs that vary somewhat from those in the deal sheets or to a fine-tuning by DB of the basic Black-Scholes formula in the calculation of the final theoretical value of the options. (That is, the DB Option Pricer manual discussed above notes that "[g]iven the fact that [assumptions in the Black-Scholes model] don't hold in real life trading, the existence of transaction costs, volatility smiles, etc. have to be taken into account and the TV has to be adjusted once a tradable price is requested." DB-DOJ-COBRA 000049126.)

[123] That is, the bank would use the price that gave the lower value for the option it purchased and the one that gave the higher value for the one it sold, thereby making a fee by "buying low and selling high."

**Table 5. Comparison Between Stated/Actual Premiums Charged/Paid and Basic Values**

| | | Zucker LLC | | Boyd LLC | All |
|---|---|---|---|---|---|
| | *Currencies:* | *JPY/USD* | *USD/EUR* | *USD/EUR** | *Participants* |
| [1] | Stated Long Premium | $ 25,000,000 | $ 20,000,000 | $ 5,000,000 | $ 50,000,000 |
| [2] | DB Basic Value | $ 13,869,828 | $ 10,461,135 | $ 2,615,284 | $ 26,946,247 |
| [3] | *$ Excess of Stated Over Basic* | $ 11,130,172 | $ 9,538,865 | $ 2,384,716 | $ 23,053,753 |
| [4] | *% Excess of Stated Over Basic* | *80.2%* | 91.2% | 91.2% | 85.6% |
| [5] | Kolbe Basic Value | $ 13,041,197 | $ 10,593,679 | $ 2,648,420 | $ 26,283,296 |
| [6] | *$ Excess of Stated Over Basic* | $ 11,958,803 | $ 9,406,321 | $ 2,351,580 | $ 23,716,704 |
| [7] | *% Excess of Stated Over Basic* | 91.7% | 88.8% | 88.8% | 90.2% |
| [8] | Stated Short Premium | $ 23,750,000 | $ 19,000,000 | $ 4,750,000 | $ 47,500,000 |
| [9] | DB Basic Value | $ 12,913,861 | $ 9,712,466 | $ 2,428,117 | $ 25,054,443 |
| [10] | *$ Excess of Stated Over Basic* | $ 10,836,139 | $ 9,287,534 | $ 2,321,883 | $ 22,445,557 |
| [11] | *% Excess of Stated Over Basic* | 83.9% | *95.6%* | *95.6%* | 89.6% |
| [12] | Kolbe Basic Value | $ 12,140,137 | $ 9,835,977 | $ 2,458,994 | $ 24,435,109 |
| [13] | *$ Excess of Stated Over Basic* | $ 11,609,863 | $ 9,164,023 | $ 2,291,006 | $ 23,064,891 |
| [14] | *% Excess of Stated Over Basic* | *95.6%* | 93.2% | 93.2% | 94.4% |
| [15] | Actual Net Premium Paid | $ 1,250,000 | $ 1,000,000 | $ 250,000 | $ 2,500,000 |
| [16] | Net DB Basic Value | $ 955,967 | $ 748,669 | $ 187,167 | $ 1,891,804 |
| [17] | *$ Excess of Actual Over Basic* | $ 294,033 | $ 251,331 | $ 62,833 | $ 608,196 |
| [18] | *% Excess of Actual Over Basic* | *30.8%* | 33.6% | 33.6% | *32.1%* |
| [19] | Net Kolbe Basic Value | $ 901,060 | $ 757,702 | $ 189,425 | $ 1,848,187 |
| [20] | *$ Excess of Actual Over Basic* | $ 348,940 | $ 242,298 | $ 60,575 | $ 651,813 |
| [21] | *% Excess of Actual Over Basic* | *38.7%* | 32.0% | 32.0% | *35.3%* |

Notes: [1], [2], [8], [9]: DB COBRA 04213, 15, 19, 21, 25, 27; [3] = [1] - [2]; [4] = [1] / [2] - 1;
[5], [12]: Appendix D, Workpaper D-7 through Appendix D, Workpaper D-9; [6] = [1] - [5];
[7] = [1] / [5] - 1; [10] = [8] - [9]; [11] = [8] / [9] - 1; [13] = [8] - [12]; [14] = [8] / [12] - 1;
[15] = [1] - [8]; [16] = [2] - [9]; [17] = [15] - [16]; [18] = [15] / [16] - 1; [19] = [5] - [12];
[20] = [15] - [19]; [21] = [15] / [19] - 1.
USD: U.S. dollar, EUR: Euro, and JPY: Japanese yen.

*The DB premiums for the Boyd LLC option pair were incorrect. The "corrected" DB premiums were estimated based on the ratio of the DB premium to the stated premium from the Zucker LLC USD/EUR option pair. See Appendix E, Workpaper E-17 for more information.

The overpayment for the individual options *starts at* 80.2 percent (for the largest of the options, on Japanese yen) and runs to 95.6 percent, depending on the particular measure of theoretical premium considered. (For convenience, the numbers discussed in this paragraph are italicized in the table.) Of course, the net overpayment relative to theoretical value is lower, because DB overstates the value of the short option (the one it buys from the LLC) at the same time as it overstates the value of the long option (i.e., the one it sells to the LLC). The net overpayment relative to theoretical value runs from 30.8 percent to 38.7 percent. The overall excess of the net premium paid over the

net basic value of the position is 32.1 percent of the DB estimates of basic option position value and 35.3 percent of my estimates.

Table 5 is fairly detailed, so it is useful to break it into steps. Figures 4, 5, and 6 take DB's perspective for payment amounts (but define "long" and "short" in the same way used elsewhere) and depict:

**Figure 4, for each of the long options and in total:**

- The stated amount DB charged the participants
- The DB basic value
- The Kolbe basic value
- The excess of the stated amount DB charged the participants over the average of the DB and Kolbe basic values.

**Figure 5, for each of the short options and in total:**

- The stated amount DB paid to the participants
- The DB basic value
- The Kolbe basic value
- The excess of the stated amount DB paid to the participants over the average of the DB and Kolbe basic values.

**Figure 6, for each of the actual offsetting option positions and in total:**

- The actual net amount DB charged the participants
- The DB basic net value
- The Kolbe basic net value
- The excess of the actual net amount DB charged the participants over the average of the DB and Kolbe basic net values.

Note that Figure 5 shows negative amounts because DB is paying rather than receiving money.




**Figure 4**




**Figure 5**




**Figure 6**

Two points are worth special note here. First, look at Figure 4: the excess of the stated amount over the average basic value is over *$23 million*, out of a total "desired loss" of $50 million. By this measure, fully *47 percent* of the "desired loss" represents a simple overstatement of the long options' actual basic values. Or measured from average basic value, the participants got 88 percent more "desired loss" than their long options were actually worth, based on the basic values in Table 5. Of course, as noted earlier, the fact that something of the sort was contemplated was implicit in the unfair coin toss in the COBRA Presentation's own long option pricing example.

Second, the excess of the net premium over the average basic value in Figure 6 is 34 percent of the average basic value of the offsetting option positions. This is less than for the long and short option components because the DB stated value is proportionately higher for the options it buys than for those it sells.[124] (Compare the percentage excesses on the long and short options in Table 5.) Nonetheless, it is a positive amount in DB's favor because the long components of the option position are larger.

[124] However, as discussed in the expected returns section below, the way DB manages the offsetting option positions means DB overpays for the short half of the position by less than it first appears. An alternative version of Figure 6, which depicts the results under the way DB manages the positions, appears below.

Since the *actual* probability of receiving a cash payout from an offsetting option position depends on the factors that govern its basic value, not on the premiums DB charged, this 34 percent average difference represents an additional, and economically material, cost to the participants in these transactions. The excesses of the net premiums actually paid over the basic values of the option positions thus is in fact a fee to DB, which needs to be considered in assessing the expected rates of return on these positions.

### C. Expected Return Analysis of Positions in This Case

Equations [1] and [2] above show that to analyze the expected returns in this case, the probabilities of obtaining a cash payout must be multiplied times the amount of the cash payout. The data needed to calculate the probabilities are available from the deal sheets, as described above. (Additionally, the COBRA Presentation uses a uniform probability of 38 percent for the payoff of the two components of an offsetting option position, which I consider below for comparison.[125]) However, two issues should be addressed before calculating expected returns: (a) the possibility of a single option's paying off, and (b) determination of what constitutes the "investment" on which a return could be earned, absent tax considerations. This section reports the expected return calculations after discussions of these two issues.

#### 1. Single-Option Payoff

In addition to both or neither option's paying off, the COBRA Presentation mentions the theoretical possibility that only one of the two options will pay off.[126] If this were to happen, it would provide an extremely high payoff for the participant at DB's expense. However, the COBRA Presentation neglects this possibility entirely in its calculations of possible payoffs.[127] I have concluded that neglecting this possibility is appropriate in these circumstances, for several reasons.

First, the strike price difference between the offsetting options, at only two pips, implies that almost any bid-ask exchange rate difference used by DB to value the options at the exercise date would eliminate the single-option payoff. In this regard, the option confirmations merely state that the spot rate is the rate "at 10:00 a.m. local time in New York," without stating whether that spot rate is a bid or ask rate or what bank's or other source's exchange rate quotation is to be used. Moreover, it provides that "... a particular spot rate shall be disregarded if the Calculation Agent [DB], acting in good faith considers that it would not be commercially reasonable to take account of it."[128] There is no long history of established trading between the LLCs and DB that could have worked out, over the years, the details of just which exchange rate to use as the spot rate at an option's expiration. Nor does the record reveal any other agreements between DB and the LLCs that would specify the exchange rate value used to determine whether the options are in the money in sufficient detail to

---

[125] COBRA Presentation, 2003EY001580-81 (longer version) and DOJ 049118-9 (shorter version).

[126] COBRA Presentation, 2003EY001580 (longer version) and DOJ 049118 (shorter version).

[127] COBRA Presentation, 2003EY001582-83 (longer version) and DOJ 049120-1 (shorter version).

[128] DOJ 041527-35.

require DB to select a particular, pre-specified exchange rate as the spot rate at option expiration. This is significant because there are multiple banks quoting multiple (bid-ask) exchange rates. In fact, a DB email explains that DB routinely polls five banks for their exchange rate ranges at 10:00 a.m., and DB chooses that day's rate based on that information (a process that the email characterizes as an "industry standard" practice).[129] The email contains an example, and the exchange rate ranges from all five banks in this example exceed two pips, with a total range of six pips.[130] All of this implies that DB has discretion over which exchange rate to use.

Second, DB of course would be aware of the potentially very high costs to itself of a single-option payoff in these circumstances. In fact, in a closely related context, a DB document makes this point explicitly: "Strike[ price]s on both options are about the same. Any spread must fall within DB's ability to set a bid/ask spread. Both options must either pay off or not."[131] Given this confirmation of DB's awareness and the acknowledgment that use of bid-ask spreads could in fact achieve such an end, it seems clear that DB would be able to use the very narrow strike price difference to avoid a single-option payoff, and that it would have very material economic incentives to do so.[132]

Third, additional evidence that a single-option payoff would not actually occur comes from DB's "Risk Management System" ("RMS"), which the above-referenced DB planning workshop document describes as "the main risk management system for all Vanilla, Exotic and structured FX options."[133] The document also states that "RMS is a central system for the global FX Options business and obtains direct feeds of new trades from ODET [i.e., the DB deal sheets], GEOS, and FNX."[134] The record in this proceeding includes printouts from the RMS system consisting of "RMSRPT" worksheets for all of the options used in the 1999 known COBRA transactions. The RMSRPT sheets can be linked back to the ODET sheets (i.e., the DB deal sheets). For example, the Zucker LLC ODETs report a field entitled "RMS." The entry on both the long and short ODET sheets for the Zucker LLC is 27920.[135] In one set of RMS sheets, the field "TRADEID" contains entries for 27920A and 27920B, which describe trades that have characteristics that are generally

---

[129] DB-DOJ-COBRA 00052674-75.

[130] *Ibid.*

[131] DB-DOJ-COBRA-00030723.

[132] For the record, no option pair in any of the transactions discussed in Appendix C did in fact finish with a single-option payout.

[133] DB-DOJ-COBRA 00047005-15. Quotation on DB-DOJ-COBRA 00047009. Again, the document was produced for the "DB New York & DB Frankfurt FX Options Consolidation Planning Workshop," held in London on December 14, 2000.

[134] DB-DOJ-COBRA 00047009.

[135] DB COBRA 04219, 21.

consistent with the Zucker LLC long and short JPY/USD options, respectively.[136] Also, the corresponding confirmation letter for the offsetting option position contains the reference number, "ex27920A".[137]

In the present context, the important point is that while the DB deal sheets in the 1999 COBRA transactions show a two-pip spread between the long and the short options, the short option in the RMS reports always has a strike price equal to that of the long option, which eliminates the two-pip spread. (See Appendix E, Workpaper E-23, for details.) If there is no two-pip spread, a single option payout is impossible. This matters because the RMS could only perform its function as "the main risk management system"[138] for DB if it accurately reflected the risks to which DB was *actually* exposed. The fact that the RMS reports did not include the possibility of a strike price difference for the two parts of the option position thus implies that DB assessed its own risks under the assumption that a single-option payout was impossible. Given the factors already discussed regarding the selection of a spot price at expiration, it was within DB's control to assure that this assumption would always prove valid, and DB had strong economic incentives to do so.[139]

Thus in these circumstances, the expected single-option payoff probability is zero and would be seen as effectively zero by an economically rational investor.[140] This means that the short options are more valuable and the net position is less valuable than indicated in Table 5 (page 33 above). Appendix D provides a revised version of Table 5 in which the short options' strike prices are equal to those of the long options'.[141] There is a relatively small percentage difference in the short options' basic values, but this translates into a much bigger percentage difference in the basic values for the net premium. Figure 7 shows how Figure 6 (page 36 above) changes when the strike prices for both the long and short options are the same.

---

[136] DB-DOJ-COBRA-00241631, 633.

[137] DOJ 041533.

[138] DB-DOJ-COBRA 00047009.

[139] The COBRA transactions in 2000 provide one additional piece of evidence in this regard. In those transactions, not only did the RMS worksheets report only one strike price for both the long and short positions of the offsetting option positions, so too did the DB deal sheets in the places where the option pricing input parameters were entered. See, for example, DB-DOJ-COBRA 00240685, 89. Other ODETs for 2000 COBRA cases are contained in DB-DOJ-COBRA 00240679-799. For completeness, I would add that a strike price reflecting the two-pip spread does appear in comments made in the "confirmation details" field in the short options' deal sheets in 2000.

[140] That said, even if all of the above reasons to disregard the possibility were put aside and I were to include this probability in my calculations, my basic conclusions would not change.

[141] Appendix D, Workpaper D-20.