


**Figure 7**

The total excess of the actual net premiums DB charged over the average of the DB and Kolbe net basic values (i.e., DB's fee) goes from the $630,000 (rounded) value depicted in Figure 7 to $837,000 in Figure 7.[142] As a percentage of the total actual net premium of $2.5 million, the Figure 7 excess over average net basic value is 50 percent, versus the 34 percent in Figure 6. (Please note also that the Figure 7 excess over average basic value is 1.7 percent of the "desired loss," i.e., of the Partnership's total stated long option premium of $50 million; I return to this topic in Part E of this section, below.)

### 2. Identification of the "Investment"

The next question in estimation of expected non-tax returns and rates of return is, expected rate of return *on what amount*?

The COBRA Presentation's calculations take the viewpoint of someone contemplating a return through the combination of (a) a risky bet on an offsetting option position and (b) a safe reduction in income taxes.[143] As a result, the calculations consider the rate of return on the sum of (a) the net

---

[142] See Appendix D, Workpaper D-20 and Table 5.

[143] There is also the two percent cash contribution. Because I have been instructed to limit my expected (continued...)

premium invested in the option position, which is the investment in the risky bet and (b) the fees paid to the tax strategy providers, which is the investment in the claimed tax savings.[144]

However, I have been asked to analyze the *non-tax* risk-return characteristics of the offsetting option positions, taking transaction costs into account. The fees to the law firms and Ernst & Young did not buy additional offsetting option positions. They did not and could not generate any non-tax investment returns. Absent the claimed tax savings, these fees are simply a deadweight loss, i.e., an increase in transaction costs. If the claimed tax savings are put aside, the only way to make money on the offsetting option positions over and above the transaction costs would be to earn a return *on the amount invested in the option positions*. Since the fees amount to 90 percent of the net premium amount (4.5 percent versus 5 percent of the long option premium for the fees and net premium, respectively), the implication is that just to break even on the amount invested in the offsetting option positions, the participants first had to earn 90 percent of the net premium amount,

---

143 (....continued)
profit analysis to offsetting options transactions -- which I am told is the transaction that gives rise to the claimed tax benefit here -- my calculations, like the COBRA Presentation's calculations, ignore the cash contribution. However, even if I had taken this two percent cash investment into account for purposes of determining the overall expected profit, I would have concluded that it was economically irrelevant, for three reasons. First, the other trades, discussed in footnote 59, involved purchases of approximately $1.376 million and subsequent sales of approximately $1.378 million. This activity is economically inconsequential relative to the transactions with the offsetting option positions. (Recall that the offsetting option payoffs are measured in millions of dollars. In millions, the net change in the Partnership value due to these trades was a gain of $0.002 million, after rounding.) Second, this conclusion is consistent (a) with the COBRA Presentation's statement that the two percent cash contribution "is at no risk and is not a cost of transaction," -- COBRA Presentation, 2003EY001581 (longer version) and DOJ 049119 (shorter version), and (b) with a November 15, 1999 Ernst & Young memo to Jerry Zucker that identified the "cash injection to partnership" of two percent as "[n]ot at-risk" -- DOJ 061640.

Third, this conclusion is also supported by an Ernst & Young email entitled "COBRA Matters - URGENT" (dated 12/5/99). This email states,

> As you know, in addition to the transfer of the option spread to the partnership, the clients transferred cash equal to two percent of the loss amount to the partnership. There has been some confusion as to what type of trading is expected to be done with this cash during the life of the partnership. The trading activity is important to the maintainance [sic] of a business purpose for the partnership -- i.e., investment activity. We have not developed precise rules for the investment of the funds, but here are some guidelines. The money should not sit in a money market account. The more trading activity the better, and preferably in an investment that can reasonably be expected to provide a potential for a good return, although "speculative" investments are not encouraged. If one wanted to move in and out of different market indexes, that would be acceptable. Because there are only about three weeks left till [sic] the liquidation of the partnerships, it is essential that if no activity has yet commenced, that it be begun immediately through David Parse at Alex Brown. (DOJ-C-00267-69, also identified as EY02938-40.)

Market indexes offer expected returns that are economically immaterial in the present context, as do common stocks generally.

144 COBRA Presentation 2003EY001582-83 (longer version) and DOJ 049120-21 (shorter version).

merely to recover the fees. Therefore the appropriate denominator for my calculation of the expected rate of return is the net premium paid for the offsetting option position.

An analogy may be useful at this point. Suppose two gamblers each have $95 in their pockets and a choice of two casinos. The casinos are identical in every respect except that one charges $45 to walk in the door. The first gambler chooses that casino, and he pays the $45, goes to the roulette wheel, bets $50 on "red", wins or loses, and walks out. The second gambler chooses the other casino. She walks in without the charge at the door, bets $50 on "red," wins or loses, and walks out with the other $45 still in her pocket either way.

How do the gamblers compare rates of return on the evening's gambling activities? Both gamblers have actually bet $50. In both cases, the gambler's hope for a positive outcome for the casino visit depends on winning enough on the amount actually bet to make back the $50. In the case of the gambler entering the first casino, however, to turn a profit on the evening he must also make back the $45 he paid at the door. The expected rate of return on his gambling activity is much lower, because the $45 is a deadweight loss, not an "investment" in roulette. That gambler's $50 bet starts with a 90 percent loss to make up, due to the wasted $45.

Now suppose that the gambler chooses the first casino because the $45 buys not merely entry, but also a $1,000 tax deduction. (Note that $50 is 5 percent of $1,000 and $45 is 4.5 percent of $1,000.) If the tax deduction is considered, the gambler's whole $95 is an "investment," $50 on a roulette spin with a small negative expected rate of return and $45 on the tax deduction with a high positive expected rate of return.[145] But if the tax deduction is ignored, the gambler entering the first casino "invests" only the $50, and the $45 is simply a wasted outlay with no possibility of a return.

### 3. Expected Returns

Resolution of these issues permits the calculation of expected returns and rates of return. To start, Table 6 provides the probabilities that the offsetting option pairs will pay off for both the deal sheets' basic option values and my basic values, using the RMS reports' assumption that the strike price of the short option equals that of the long option. It also shows the COBRA Presentation's illustrative 38 percent.

---

[145] As noted above, this is the perspective taken in the COBRA Presentation.

**Table 6. Probabilities of Option Payout**

| *Outcome* | *Payout** | Probability | | |
|---|---|---|---|---|
| | | *E&Y COBRA Presentation* | *DB*** | *Kolbe* |
| | [1] | [2] | [3] | [4] |
| **Zucker LLC (JPY/USD)** | | | | |
| Both Options Hit | $ 3,125,000 | 38.0% | 27.9% | 26.2% |
| Neither Option Hits | $ - | 62.0% | 72.1% | 73.8% |
| **Zucker LLC (USD/EUR)** | | | | |
| Both Options Hit | $ 2,500,000 | 38.0% | 26.3% | 26.6% |
| Neither Option Hits | $ - | 62.0% | 73.7% | 73.4% |
| **Boyd LLC (USD/EUR)** | | | | |
| Both Options Hit | $ 625,000 | 38.0% | 26.3% | 26.6% |
| Neither Option Hits | $ - | 62.0% | 73.7% | 73.4% |

Notes: [1]: DB COBRA 04213, 15, 19, 21, 25, 27.
[2]: 2003EY001581, DOJ 049119.
[3]: Appendix D, Workpaper D-4 through Appendix D, Workpaper D-6.
[4]: Appendix D, Workpaper D-7 through Appendix D, Workpaper D-9.
USD: U.S. dollar, EUR: Euro, and JPY: Japanese yen.
*Payouts exclude the net premium for the option.
**The DB probabilities in this column are calculated using DB's premiums
See Appendix D, Workpaper D-4 through Appendix D, Workpaper D-6.
The DB premiums for the Boyd LLC option pair were incorrect.
The DB probability is calculated based on "corrected" DB premiums
that were estimated based on the ratio of the DB premium to the stated
premium from the Zucker LLC USD/EUR option pair.
See Appendix E, Workpaper E-17 for more information.

Table 7 presents the calculations of expected returns and rates of return for the first option pair from Table 1, the JPY/USD offsetting option position purchased by the Zucker LLC. For comparability with the COBRA Presentation's calculations, it reports not only the expected rates of return on the actual amount invested, but also the expected rates of return on the combination of the actual investment plus the fees to Ernst & Young, Jenkens & Gilchrist and Brown & Wood.

**Table 7. Expected Returns on Zucker LLC's Option Pair #1 (JPY/USD)**

| | | Probabilities | | |
|---|---|---|---|---|
| | | *E&Y COBRA Presentation* | *DB* | *Kolbe* |
| | **Net Option Position** | | | |
| [1] | *Payout if Options Finish in the Money* | $ 3,125,000 | $ 3,125,000 | $ 3,125,000 |
| [2] | *Probability of Both Options Hitting* | 38.0% | 27.9% | 26.2% |
| [3] | *Expected Payout Before Premium & Fees* | $ 1,187,500 | $ 870,586 | $ 818,574 |
| [4] | *Net Option Premium Paid by LLC* | $ 1,250,000 | $ 1,250,000 | $ 1,250,000 |
| [5] | Net Expected Return on Net Premium Before Fees | $ (62,500) | $ (379,414) | $ (431,426) |
| [6] | Net Expected Return as a % of Net Premium Before Fees | -5.0% | -30.4% | -34.5% |
| [7] | *Outside Advisor Fees* | $ 1,125,000 | $ 1,125,000 | $ 1,125,000 |
| [8] | Net Expected Return on Net Premium After Fees | $ (1,187,500) | $ (1,504,414) | $ (1,556,426) |
| | *Net Expected Return After Fees* | | | |
| [9] | As a % of Net Premium & Fees | -50.0% | -63.3% | -65.5% |
| [10] | As a % of Net Premium | -95.0% | -120.4% | -124.5% |

Notes: [1], [4]: DB COBRA 04219, 04221, Table 2; [2]: Table 6; [3]: [1] x [2]; [5]: [3] - [4]; [6]: [5] / [4]; [7]: 4.5% of the long option premium paid by the LLC (2003EY001567). Long option premium is from DB COBRA 04219. The long option premium paid is: $ 25,000,000
[8]: [5] - [7]; [9]: [8] / ([4] + [7]); [10]: [8] / [4].
Calculation does not adjust for the present value of expected returns due to the uncertain timing of future cash flows. The impact of such an adjustment would be minimal.

Table 7 starts (row [1]) with the payout if both options finish in the money. This amount times the probability that the option pairs will in fact finish in the money (row [2]) is the expected payout before premium and fees (row [3]). Three probabilities are considered, the COBRA Presentation's, DB's, and my own (the three columns). The net expected dollar return before fees is the expected payout (row [3]) less the net premium paid (row [4], which as noted earlier, materially exceeds the basic value of the option position). The percentage expected return before fees (row [6]) is the dollar net expected return (row [5]) divided by the net premium paid (row [4]). As shown in the table, the net premium always embodies an expected loss. The expected loss is clearly material, about 30 or 35 percent of the net premium paid for the offsetting option position when realistic probabilities are used (from the DB deal sheets and my own calculations, respectively).[146]

[146] An expected loss still exists even when using the COBRA Presentation's illustrative 38 percent. However, while the COBRA Presentation's illustrative no-fee expected loss is on the order of the loss expected from betting "red" on roulette (which with U.S. roulette wheels, which have both "0" and "00" in green as well as 18 red and 18 black numbers, is 5.3 percent of each dollar bet), the actual expected (continued...)

Finally, the last part of Table 7 subtracts outside advisor fees (row [7]], calculated as 4.5 percent of the "desired loss," i.e., the long option's premium), which are transaction costs that must be recovered from the return on the option positions if tax savings are to be ignored. After these fees, the expected rate of return is materially negative in all cases, whether calculated on the sum of the actual investment and the fees (line [9]), as in the COBRA Presentation, or on the actual non-tax investment (line [10]). The "bottom line" is that on the actual amount invested in the net option position, the consideration of fees always subtracts the above-mentioned 90 percentage points from the expected rate of return (since the 4.5-percent-of-desired-loss fees are 90 percent of the 5-percent-of-desired-loss net premium). Before taxes, participants therefore have more than a 100 percent expected loss with the realistic payoff probabilities and nearly a 100 percent loss even with the illustrative 38 percent probability from the COBRA Presentation.

In short, absent the claimed tax savings, the participants' expected rate of return on this option position was a loss of *more* than the amount they invested to buy the position. This is an extraordinarily bad investment on its own merits (i.e., absent tax considerations). For example, even lottery tickets have an expected loss of "only" about 50 percent of the money used to buy them.[147]

Workpapers in Appendix D provide the same information for the other three offsetting option positions. Table 8 summarizes the results for all positions, including that in Table 7, and the combined result for the entire set of offsetting option positions. The same overall pattern emerges: after fees, the expected return on each of these offsetting option positions was a loss of *more* than the net premium invested to buy them. Since the expected rate of return of each component is materially negative, the expected rate of return of the entire series of offsetting option positions is materially negative, too.

---

[146] (...continued)
loss is a good deal higher.

[147] A lottery ticket apparently offers expected returns on the order of minus 50 percent. It would be worse, except that (unlike the case with the offsetting option positions here) it is possible to have partial lottery payoffs without winning the whole jackpot. (See http://www.durangobill.com/PowerballOdds.html.)

**Table 8. Summary of Expected Returns on All Offsetting Option Pairs**

| | | *Long Option Premium* | Probabilities | | |
|---|---|---|---|---|---|
| | | | *E&Y COBRA Presentation* | *DB* | *Kolbe* |
| [1] | Zucker LLC (JPY/USD Option Position) | $25,000,000 | | | |
| | *Net Expected Return as a % of* | | | | |
| [2] | Net Premium Before Fees | | -5.0% | -30.4% | -34.5% |
| [3] | Net Premium & Fees After Fees | | -50.0% | -63.3% | -65.5% |
| [4] | Net Premium After Fees | | -95.0% | -120.4% | -124.5% |
| [5] | Zucker LLC (USD/EUR Option Position) | $20,000,000 | | | |
| | *Net Expected Return as a % of* | | | | |
| [6] | Net Premium Before Fees | | -5.0% | -34.3% | -33.5% |
| [7] | Net Premium & Fees After Fees | | -50.0% | -65.4% | -65.0% |
| [8] | Net Premium After Fees | | -95.0% | -124.3% | -123.5% |
| [9] | Boyd LLC (USD/EUR Option Position) | $5,000,000 | | | |
| | *Net Expected Return as a % of* | | | | |
| [10] | Net Premium Before Fees | | -5.0% | -34.3% | -33.5% |
| [11] | Net Premium & Fees After Fees | | -50.0% | -65.4% | -65.0% |
| [12] | Net Premium After Fees | | -95.0% | -124.3% | -123.5% |
| [13] | Total Long Option Premiums | $50,000,000 | | | |
| | **Net Expected Return for Entire Transaction as a % of** | | | | |
| [14] | Net Premium Before Fees | | **-5.0%** | **-32.3%** | **-34.0%** |
| [15] | Net Premium & Fees After Fees | | **-50.0%** | **-64.4%** | **-65.3%** |
| [16] | Net Premium After Fees | | **-95.0%** | **-122.3%** | **-124.0%** |

Notes: [1], [5], [9]: DB COBRA 04213, 19, 25; [2] - [4]: Table 7; [6] - [8]: Appendix D, Workpaper D-12.
[10] - [12]: Appendix D, Workpaper D-13; [13] = [1] + [5] + [9];
[14] = ([1] x [2] + [5] x [6] + [9] x [10]) / [13]; [15] = ([1] x [3] + [5] x [7] + [9] x [11]) / [13];
[16] = ([1] x [4] + [5] x [8] + [9] x [12]) / [13]; USD: U.S. dollar, EUR: Euro, and JPY: Japanese yen.

## D. Check One: Actual Outcomes for Option Pairs #1-#3

My above conclusions on expected returns can be checked in two ways. The first is to see how the investments actually turned out. This is a weak test, since it represents the combined results of only the three "bets" placed by the participants in this case, and really only two because option pairs #2 and #3 (the Zucker and Boyd LLCs' euro positions) were really the same bet. However, when combined with a second check described below, it turns out to be quite instructive.

As noted above, the offsetting option positions expired. Despite having had some good luck with the euro (see Table 2, above), the resulting returns were in fact still materially negative overall, as

shown in Table 9. The actual outcome was a 65 percent loss on the amount invested in the offsetting option positions.[148]

**Table 9. Achieved Returns on the Offsetting Option Positions**

| | | *Zucker LLC* | | *Boyd LLC* | | *All Participants* |
|---|---|---|---|---|---|---|
| *Ownership Share of Partnership:* | | *90%* | | *10%* | | *100%* |
| [1] Payout from Options | $ | 2,812,500 | $ | 312,500 | $ | 3,125,000 |
| [2] Net Option Premium | $ | (2,250,000) | $ | (250,000) | $ | (2,500,000) |
| [3] Fees Paid | $ | (2,025,000) | $ | (225,000) | $ | (2,250,000) |
| [4] *Total Costs* | $ | (4,275,000) | $ | (475,000) | $ | (4,750,000) |
| [5] Gain (Loss) on Transaction | **$** | **(1,462,500)** | **$** | **(162,500)** | **$** | **(1,625,000)** |

Notes: Ownership shares from DOJ 041479; [1]: DB COBRA 04894, 04896-7, Total payout is allocated based on ownership shares; [2]: DB COBRA 04213, 15, 19, 21, 25, 27; [3]: DB COBRA 00299, 4910, Plaintiff's Answers to First Set of Interrogatories at #14, Plaintiff's Answers to Second Set of Interrogatories at #32, & Plaintiff's First Supplemental Responses at #15; Table 3; [4] = [2] + [3]; [5] = [1] + [4].

One reason these offsetting option positions did not provide higher returns is there were multiple bets, each with a negative expected rate of return. To win overall, the participants had to win both of these bets, not just one. This is shown in Table 10.

[148] From Table 9: $1.625 million loss / $2.50 million net premium = 65 percent loss.

**Table 10. Combination of Option Position Wins Needed to Win Overall**

| | | | *Direction of Bet* |
|---|---|---|---|
| [1] | Total Net Premium | $2,500,000 | |
| [2] | Total Fees | $2,250,000 | |
| [3] | *Total Costs* | $4,750,000 | |
| | Total Potential Payout by Currency | | |
| [4] | USD/EUR Puts | $3,125,000 | Stronger USD |
| [5] | JPY/USD Call | $3,125,000 | Stronger USD |
| [6] | *Total* | $6,250,000 | |
| [7] | Option Payouts Needed for Positive Profit | All | |

Notes: [1], [4], [5]: DB COBRA 04213, 15, 19, 21, 25, 27; [2]: 4.5% of total long option premium (2003EY001567); [3] = [1] + [2]; [6] = [4] + [5]; [7]: combinations of payouts producing values greater than [3]; Direction of bet: USD/FX puts and FX/USD calls bet that the USD will strengthen relative to the foreign currency; USD/FX calls and FX/USD puts bet that the USD will weaken.
USD: U.S. dollar, EUR: Euro, and JPY: Japanese yen.

The sizes of the bets differed. To obtain a positive payout, the participants needed to win both the bets. However, while the EUR bet did well, the JPY bet did not (again, see Table 2). This outcome for the individual bets produced the 65 percent loss on the amount invested in the offsetting option positions.

Consider what this means, given the earlier tables. The participants in this series of transactions beat the odds and had a return that was about *59 percentage points higher* than the rationally expected rate of return.[149] Normally, an investor would be very happy with such a result. Yet in this series of transactions, the participants *still lost 65 percent* of their net premium investment. The need to win both bets simultaneously, each of them priced with a materially negative expected rate of return, simply was too great a hurdle to produce a positive return overall, despite winning one of the bets. (As discussed further in Section IV, below, this issue also has relevance for the economic merits of the stated non-tax business purposes for these transactions.)

[149] The average of the DB and Kolbe expected returns in Table 9 is a negative 124 percent. The 59 percentage points equals the 65 percent loss (achieved return) minus the 124 percent loss (expected return using the average of the DB and Kolbe basic values). That is, [-65% - (-124%)] = [-65% + 124%] = 59%. The actual return is calculated in footnote 148.

### E. Check Two: Return Analysis of Similar Positions

As noted earlier, the COBRA transactions in this case are only one set of a number of similar transactions undertaken at the same time. This permits a second check on the above expected return calculations, since it provides a much bigger sample. Of course, if all the bets were the same (like the Zucker and Boyd LLCs' two euro bets), the larger sample would be of little or no value for such a purpose, since the outcome for the entire set of bets would simply reflect the good or bad luck for that one position. However, as shown in Appendix E, within the standard offsetting option position format, the directions and details of the foreign currency bets did vary materially among the various transactions.[150]

Table 11 summarizes the Appendix E calculations of the expected returns on all of the offsetting option positions for which sufficient data exist, *excluding* those in the present case, calculated in the same ways used above.[151] These expected return values are comparable in size to those in Table 8 (page 46 above), confirming that these are in fact similar transactions not merely in form, but in their underlying economics as well.

---

[150] See Appendix E, Workpaper E-21. I discuss other implications of this fact below, in part F of this Section of my report.

[151] See Appendix E, Workpaper E-18, for details on the derivation of this table.

**Table 11. Expected Return Statistics on Non-JBJZ Option Pairs with Adequate Data**

| | Expected Return | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | *Before Fees as a % of Net Premium* | | | *After Fees as a % of Net Premium & Fees* | | | *After Fees as a % of Net Premium* | | |
| | E&Y COBRA Present-ation | DB* | Kolbe Calculated | E&Y COBRA Present-ation | DB* | Kolbe Calculated | E&Y COBRA Present-ation | DB* | Kolbe Calculated |
| *Minimum Across All Option Pairs* | -5.0% | -36.7% | -35.9% | -50.0% | -66.7% | -66.3% | -95.0% | -126.7% | -125.9% |
| *Maximum Across All Option Pairs* | -5.0% | -17.4% | -14.4% | -50.0% | -56.5% | -54.9% | -95.0% | -107.4% | -104.4% |
| *Median Across All Option Pairs* | -5.0% | -30.0% | -30.0% | -50.0% | -63.2% | -63.2% | -95.0% | -120.0% | -120.0% |
| *Simple Average Across All Option Pairs (49 with DB data, 53 with Kolbe data)* | -5.0% | -28.9% | -28.2% | -50.0% | -62.6% | -62.2% | -95.0% | -118.9% | -118.2% |
| *Weighted Average Across All Option Pairs (49 with DB data, 53 with Kolbe data)* | -5.0% | -27.1% | -28.7% | -50.0% | -58.9% | -62.5% | -95.0% | -111.8% | -118.7% |
| *Simple Average of 14 Sets of 1999 Individual COBRA Transactions*** | -5.0% | *-29.6%* | *-28.8%* | -50.0% | -62.9% | -62.5% | -95.0% | *-119.6%* | *-118.8%* |

Sources and Notes:
Data exclude options from the JBJZ Partners transaction and transactions with incomplete data.
See calculations and notes in Appendix E, Workpaper E-18.
Expected return after premiums & before fees as a % of net premium is calculated as expected payout on options / total net premium
Expected return after premiums & fees as a % of net premium & fees is calculated as (expected payout on options less fees) / (total net premium + total fees).
Expected return after premiums & fees as a % of net premium is calculated as (expected payout on options less fees) / total net premium
* Uses the "corrected" DB Theoretical Premiums when necessary. Corrections were not available for four options (three from WNK Partners and one from CMC Austin Partners), which are excluded from the DB calculations.
** Value for each set of transactions is the weighted average of the option pairs for that set.

Please note that Table 11 reports three averages for the non-JBJZ COBRA transactions, the simple average of all their option pairs, the weighted average of all their option pairs, and the simple average of the other 14 individual sets of COBRA transactions. The last of these is the simple average over the other 14 COBRA transactions of the weighted average of the offsetting option

positions in that particular set.[152] The simple average of the 14 sets of transactions is the most reliable measure, in my view, since it is consistent with two features of the COBRA transactions:

- The participants in an individual set of transactions end up pooling their options and sharing a weighted-average rate of return even if their LLCs start off with materially different option positions,[153] but
- There is no reason to believe that mere size differences among transaction sets convey additional information about overall rates of return on the COBRA transactions.[154]

However, I also report the other two averages for comparison.

Table 12 summarizes calculations done in Appendix E that show the actual outcomes for these offsetting option positions. Since the purpose of the table is to compare actual outcomes with expected outcomes, it shows the full sample for which data exist, including the offsetting option transactions in this case. Since the offsetting option transactions in this case had a relatively good outcome, their inclusion tends to raise the realized returns shown in the table.

---

[152] The averages for a particular set of transactions are equivalent to the values reported above in rows [14] to [16] in Table 8, page 46 above.

[153] This issue is important in part because differences between the options' stated and basic value that produce DB's fees could differ materially for different offsetting option positions and therefore for different LLCs (see Appendix E, Workpaper E-4), and the sizes of the offsetting option positions could differ materially, too. Yet the LLCs' ultimate returns came on a pooled, weighted-average basis because of the contributions to the partnerships. Therefore, a simple average of the offsetting option positions within a set of transactions could be materially misleading about the actual risks facing the participants in that set.

[154] This issue just recognizes that the expectations or outcomes for a transaction set that happens to be bigger tell us no more about the underlying economics of the COBRA transactions than the expectations or outcomes for a transaction set that happens to be smaller.

**Table 12. Realized Returns on All Option Pairs**

| Returns for All Option Pairs: | Before Fees as a % of Net Premium | After Fees as a % of Net Premium & Fees | After Fees as a % of Net Premium |
|---|---|---|---|
| *Minimum Across All 56 Option Pairs* | -100% | -100% | -190% |
| *Maximum Across All 56 Option Pairs* | 150% | 32% | 60% |
| *Median Across All 56 Option Pairs* | -100% | -100% | -190% |
| *Simple Average Across All 56 Option Pairs* | -35.3% | -66.0% | -125.3% |
| *Weighted Average Across All 56 Option Pairs* | -23.7% | -59.9% | -113.7% |
| *Simple Average of the 15 Sets of 1999 COBRA Transactions** | *-39.4%* | -68.1% | *-129.4%* |
| | | **Total** | **% of Total** |
| **Option Pair Outcomes:** | | | |
| *# of Option Pairs* | | 56 | |
| *# of Option Pairs Sold Early* | | 9 | 16% |
| *# of Option Pairs Expired In the Money (ITM)* | | 9 | 16% |
| *# of Option Pairs Expired Out of the Money (OTM)* | | 38 | 68% |

Sources and Notes:
Premium information is from the DB deal sheets (DB COBRA 04058 - 04389). Payout information is from DB-DOJ-COBRA-00000019, 00000025, 00009771, 00009773, 00010136, 00015768, 00043899 and 00044046-7. See Appendix E, Workpaper E-20.
* Value for each set of transactions is the weighted average of the option pairs for that set.

This table shows that the actual average outcomes were slightly worse than expected. Before fees, the actual outcome average overall (i.e., including the exceptionally good results in this case) was a loss of about *39 percent* of the net premium amounts.[155] This is somewhat worse than the approximately 32-34 percent expected loss before fees in the JBJZ transaction and the approximately 29-30 percent expected loss before fees for the other 1999 COBRA transactions (see Tables 8 and 11, respectively). After fees, the actual average outcome was a loss of approximately *129 percent* of the net premium amounts, somewhat worse than the approximately 119 to 124 percent range of expected losses.[156] Fully 68 percent of the 56 option pairs finished out of the money, losing the entire net premium, and that number might well be somewhat higher had nine of the option pairs not been sold early, prior to expiration.[157]

---

[155] This discussion rounds such percentage values from those in Tables 11 and 12; for clarity, the values discussed are shown in italics in Tables 11 and 12.

[156] Please note again that the after-fees return is exactly 90 percentage points below the no-fees return in each case, since the fees are a guaranteed loss of an amount equal to 90 percent of the net premium on every offsetting option transaction.

[157] What about the fact that nine of the individual offsetting option positions did pay off (which is responsible for positive "maximum" returns in Table 12)? Given that there are 56 offsetting option (continued...)

Of course, one reason for these negative expected and actual rates of return was the excess of the DB net premiums over the net basic values of the offsetting option positions. In this regard, it is interesting that the RMS worksheets also report the DB "markups" on the transaction. It is not clear how these markups were calculated.[158] It turns out that the DB markups reported in the RMS worksheets for the COBRA transactions are all on the order of 1 percent of the participants' combined "desired loss."[159] However, in the discussion of Figure 7 (page 40 above), I noted that the excess of the DB net premium over the average of the DB and Kolbe basic values was 1.7 percent of the combined long option stated premium (i.e., of the "desired loss"). The average for this quantity in the COBRA transactions is 1.5 percent.[160] As noted earlier, this excess is the mechanism by which DB gets a fee, so that the total transaction costs associated with the COBRA transactions were on the order of 6 percent on average, not 4.5 percent, part of which were embedded in the prices DB charged.[161]

It turns out that the DB options also provided DB with an implicit fee over net basic value that averaged about 1.5 percent of the "desired loss" in the COBRA transactions that took place in 2000. These transactions differed from the 1999 COBRA transactions in that the fees to Ernst & Young and attorneys and the net premium were a smaller percentage of the stated cost of the long option (i.e., of the "desired loss"), but so too was the potential payoff.[162] As a result, the underlying

---

157 (...continued)
positions and odds of a payoff that are generally in the 25-35 percent range (see Appendix E, Workpaper E-1), it is unsurprising that some pairs did in fact do so. Yet *no* participant's LLC made money after fees (again, see Appendix E, Workpaper E-25). In part this is due to the materially negative expected rates of return on the individual options, since by definition that means the actual outcomes will be negative on average in a large enough sample. But it is also due to the fact that the participants' LLCs combined their options in the partnerships, and good performance on one option is not enough to insure a good outcome overall once the options are combined.

158 The reason is at least in part the impossibility of perfectly replicating the calculations underlying the RMS worksheets. Please recall the issues discussed in footnote 122.

159 See Appendix E, Worksheet E-24.

160 See Appendix E, Workpaper E-33.

161 Even with the smaller "markups" shown in the RMS worksheets, the total fees in the 1999 COBRA transactions would be on the order of 5.5 percent.

162 The 2000 COBRA transactions' parameters can be derived from the transactions in those cases. In particular, relative to the "desired loss," (a) the fees charged by Ernst & Young and attorneys were 2.5 percent instead of 4.5 percent; (b) the net option premium paid was 3 percent rather than 5 percent, and (c) the net potential payout was 6.75 percent (i.e., 225 percent of the net premium) instead of 12.5 percent (i.e., 250 percent of the net premium). See Appendix E, Workpapers E-36 and E-37. The reduction in fees appears as a reduced percentage for the attorneys, since Jenkens & Gilchrist's and Brown & Wood's combined 3 percent in the 1999 COBRA transactions is replaced by a materially smaller percentage percent to a new law firm, on the order of ½ of one percent. But this is offset in part by an increase in Ernst & Young's fee, from 1.5 percent to about 2 percent. (It is possible that part of the money that 2000
(continued...)

economics of the 2000 COBRA transactions are not all that different from those of the 1999 COBRA transactions, with one exception: the average excess of the net premium DB charged over the net basic value of the options was a bigger percentage in the 2000 COBRA transactions than in the 1999 COBRA transactions. The implicit fee created by the proportionately larger excess of the net premium over net basic value turns out to be about 1.5 percent of the "desired loss" on average.[163] Thus, 2000 COBRA transactions produce an implicit fee for DB of about the same average percentage of the "desired loss" as in the 1999 COBRA transactions, despite the smaller net premiums and potential payout in 2000.[164]

The "bottom line" is that the expected returns in the JBJZ offsetting options transactions are in fact materially negative due to the explicit and implicit fees charged by Ernst & Young, Jenkens & Gilchrist, Brown & Wood and DB. The actual JBJZ results are not only materially better than those my calculations show are rationally expected, they are materially better than those actually achieved on average in a sample of similar transactions at the time. The outcome for the other transactions thus supports both my earlier calculations of expected returns in this case and also my conclusion that the participants in this case had an exceptionally favorable outcome, yet still lost 65 percent of the money invested in the option positions.[165]

---

162 (...continued)
COBRA participants paid to Ernst & Young was ultimately intended for attorneys, which would make Ernst & Young's fee exactly 2 percent and the attorneys' fees exactly 0.5 percent. See Appendix E, Workpaper E-37, for details.)

163 See Appendix E, Workpaper E-33.

164 As discussed earlier, the structure of the COBRA transaction parameters left DB with no choice but to overprice the stated values of both the long and the short options if it was to earn a positive fee through the option prices. Moreover, the size of the fee turns out to be uniquely and inversely related to the payoff probabilities on the underlying options. For example, the COBRA parameters would completely constrain DB's pricing flexibility if it wanted to achieve a fee equal to a given percentage of the "desired loss," as Ernst & Young and the attorneys did. Thus, to achieve a fee of 1.50 percent of the "desired loss" with the 1999 COBRA parameters (and with the same strike price for the long and short options), the payoff probability on those options must be exactly 28 percent. Lower probabilities would produce higher implicit fees, and conversely. With the 2000 COBRA parameters, the payoff probability must be exactly 2/9ths, i.e., 22.222 percent. See Appendix E, Workpaper E-38. (To make the calculation in the workpaper easier to follow, these values assume the payoff is received immediately, rather than in one or two months; this assumption reduces these calculated probabilities slightly from those actually required to produce a given fee, since the payoff would be more costly to DB if it had to be paid immediately and a lower payoff probability would be needed to compensate for that fact.) The actual payoff probabilities in the 1999 and 2000 COBRA transactions are slightly higher than these respective values on average (even taking the precise timing into account), which is why the DB fees average slightly less than 1.50 percent of the "desired loss." (See Appendix E, Workpapers E-1 and E-33.) Finally, for completeness, Appendix E, Workpaper E-39, demonstrates that the stated values of the long and short options are overpriced under the COBRA structure even if DB earns no fee at all.

165 See Footnote 148.

### F. Did a Reasonable Possibility of a Non-Tax Profit Exist?

If the claimed tax savings are ignored, the materially negative expected returns on the individual offsetting option positions make them gambles, not investments, and bad gambles at that. Every time the participants placed such a bet, ignoring the claimed tax benefits, their rationally expected return (i.e., the return they would actually get on average over many such bets) was a loss of *more than the money bet.* Tax benefits aside, the participants in the COBRA transactions would have been better off on average if they had given the money away than they were from "investing" in the offsetting option positions.[166] As noted earlier, even lottery tickets offer a much less negative expected rate of return, "only" losing about half the money bet, on average.

Moreover, an internal Ernst & Young document raised questions about the expected performance of the offsetting option positions. A draft Confidential Memorandum from Jerred Blanchard of Ernst & Young dated January 5, 2000 ("Blanchard Memorandum") discusses the numerical example in the COBRA Presentation, taking the stated values of the long ($50 million) and short ($47.5 million) options as the "fair market value" for each option.[167] The Blanchard Memorandum also accepts the 38 percent probability of a $6.25 million net payout.[168] Of course, as explained at some length in part B of this Section, the basic option values are well below the levels DB actually charged, and the actual payoff probabilities are well below 38 percent. Yet despite the unwarranted assumption that the COBRA Presentation's example's input values are correct, the Blanchard Memorandum still expresses concern about the "investment" payoff to the offsetting option transaction:[169]

> The marketing materials[170] indicate that there is a 38% probability that the Euro will trade at $1.0693 or higher on the settlement date, in which case Taxpayer will receive a net amount of $6.25 million .... This implies, of course, that there is also a 62% probability that the Euro will trade at or below $1.0691,[*] in which case Taxpayer loses its entire $4.75 million invested in the transaction. Thus, looking solely at the pre-tax economics of the proposed transaction, and ignoring any potential return on the additional $1 million cash [i.e., the 2 percent additional

---

166 Please recall also Table 12's findings, i.e., that the actual average loss was 129 percent, 29 percent more than the net premiums invested over the full series of offsetting option transactions analyzed in Appendix E.

167 2003EY007041.

168 2003EY007041-42.

169 *Ibid.*

170 The "marketing materials" are not specifically identified as corresponding to the documents I've identified as the "COBRA Presentation," but the numerical example the Blanchard Memorandum discusses has the same values as that in the COBRA Presentation.

> investment called for in the COBRA Presentation[171]] to be invested by Taxpayer in [the Partnership], it would appear that the value of the downside risk ($2.945 million, or 62% of $4.75 million) exceeds the value of the upside opportunity ($2.375 million, or 38% of $6.25 million) by $570,000. [Footnote omitted that shows how reducing the fees would improve the Taxpayer's "bet".]
>
> [*]It is assumed that the likelihood of the Euro trading at exactly $1.0692 is negligible.

As shown by Tables 7, 8 and 11 above (pages 44, 46 and 50, respectively), the actual risk-reward tradeoff is materially worse than that about which the Blanchard Memorandum expressed concern, since the actual probabilities of "winning" the bets are materially worse than Ernst & Young's assumed 38 percent. That is, the expected percentage losses are materially worse than those implied by the COBRA Presentation and discussed in the Blanchard Memorandum.

Moreover, the odds of achieving an extremely good outcome (and thereby avoiding the negative expected rate of return) were reduced by the fact that the parties engaged in multiple offsetting option transactions under the COBRA Presentation's template.[172] Diversification is beneficial when investing, but it is not beneficial when gambling, since the house always wins if you place enough bets. That is, every time a participant placed another bet, it reduced the uncertainty surrounding the ultimate outcome the participant faced. A reduction of uncertainty is good if the expected return is positive (which is why diversification is generally seen as a good *investment* strategy), but bad if the expected return is negative.

For example, in the above roulette analogy, it would not help the gambler who bet on "red" to partner with someone who bet the same amount on "black," since this would simply guarantee a loss for the two gamblers. Nor would it help to divide the amount initially bet among a series of small bets instead of one big one, since this approach just makes a loss more probable.[173] Here, the

---

171 COBRA Presentation, 2003EY001572 (longer version) and DOJ 049110 (shorter version).

172 COBRA Presentation, 2003EY001571 (longer version) and DOJ 049109 (shorter version).

173 That is, if someone bets $50 on red for one spin, s/he needs to win once to make money. If the $50 is divided equally between two or three spins, s/he needs to win twice to come out ahead. With four or five spins, three wins are needed. Since losing is more likely than winning, the more bets needed to come out ahead, the less likely it is to happen. The gambler's best chance to win at roulette when betting a fixed amount is to follow the above strategy, i.e., to make one bet and walk out. Put differently, the true *investor* in roulette is the casino, not the gambler, and the more the gambler "diversifies" his or her bets by splitting them into smaller amounts, the narrower the likely range of outcomes and the more likely the casino is to make money. (I will note for completeness that an individual who made a bet with bad odds -- say the slot machines instead of roulette -- could be helped by partnering with someone who made a less odious bet. But that is not diversification, that is an attempt to remedy a bad decision. Please recall that the contribution of the offsetting option positions to the partnership is pre-planned, as Step Two of the COBRA Presentation. It would make no sense to claim that the intended benefit of that contribution would be to remedy a pre-planned, unusually odious bet for the option pair selected in Step One.
(continued...)

expected outcome on the option positions was materially negative. Therefore, here diversification is a harmful strategy for the participants, not a helpful one.[174]

To see this point more clearly, it may help to note that the corollary of this conclusion is that a gambler's "diversification" does help the casino. In this regard, recall the finding at the start of the previous part of this Section, that the entire set of 1999 COBRA transactions represents a wide variety of bets, which permits inferences to be drawn regarding the underlying economics of the COBRA transactions. Such diversity also represents diversification for DB. DB's expected return on these investments was the reverse of the participants' returns, i.e., materially positive, as is true for the investments that normally underlie recommendations to diversify. Thus this diversification benefits DB for the traditional reason, i.e., it narrows the range of actual returns so that an outcome close to the (positive) expected return is more likely. The problem for the participants is that their negative expected returns make such an outcome harmful, not helpful.

Thus, if the claimed tax loss is ignored, these transactions make no economic sense. They cannot be said to provide a "reasonable possibility of a non-tax profit" under any economically sensible definition of the term, "reasonable possibility." These "investments" are not even good gambles, let alone investments with a "reasonable possibility" of non-tax profits.

## IV. Analyses of Economic Rationality of Stated Non-Tax Business Purposes

My understanding of the stated non-tax business purposes of the transactions in this case is from Plaintiffs' response to Interrogatory No. 11 of the Defendant's First Set of Interrogatories. After a series of initial objections, that response is:

> Individual Participant Jerry Zucker formed JZ Buckingham Investments LLC for the purposes of purchasing and managing investments in stock, securities, foreign currency, and other investments, which had the business purpose of limiting Mr. Zucker's risk exposure to such investments to the amount of capital contributed to the company. Similarly, Individual Participant James Boyd formed JGB Bohicket Investments LLC for the purposes of purchasing and managing investments in stock, securities, foreign currency, and other investments, which had the business purpose of limiting Mr. Boyd's risk exposure to such investments to the amount of capital

---

173 (....continued)
Moreover, taxes aside, it would make no sense for the participants who made less odious bets in Step One to go along with such a plan.)

174 Recall that the participants here lost 65 percent of the net premium amounts invested in the offsetting option transactions despite having won their USD/EUR bets, because they lost the large JPY/USD bet. (See Table 2, page 17, and footnote 148.) Note also that of the 43 LLCs involved in the COBRA transactions, four would have made money after fees and ignoring taxes *if* their offsetting option positions had not been contributed to the partnerships. None of the LLCs made money after fees after the contributions to the partnerships, if the claimed tax deduction is ignored. See Appendix E, Workpaper E-25.

contributed to the company. Because Mr. Zucker and Mr. Boyd were contemplating foreign currency derivative investments that carried a significant risk of loss, it was critical that they have limited liability.

Relatedly, JZ Buckingham Investments LLC and JGB Bohicket Investments LLC formed JBJZ Partners for the purpose of (i) diversifying their respective investments (without the need of purchasing additional investments), (ii) creating a larger pool of capital from which other investments could be made, and (iii) centralizing investment decision making in the hands of a single manager that could effectively and efficiently manage the overall portfolio of collective assets. Finally, the Individual Participants formed JBJZ Investors, Inc. as a merger of interests for investment purposes and, in fact, subsequent to the Transactions, JBJZ Investors, Inc. continued to invest in stocks and securities.

This section analyzes these purposes in turn.

### A. LLC Formation

The above explanation for the formation of the LLCs is not economically logical. First, individuals do not ordinarily require partnership to hold securities, as anyone with a brokerage account can readily verify. Second, the exposure to large losses for the actual offsetting option positions bought by the Zucker LLC and the Boyd LLC was intrinsically and automatically limited to the net premium amounts paid initially, because the LLCs could *never* owe money to DB unless DB owed the LLC even more money. This is because the long position, in which the LLC gets paid money by DB, always had a bigger payoff than the short position, in which the LLC pays DB money.[175]

Finally, note that the limitation of risk exposure for the LLC comes at the counterparty's expense. Were one of the LLCs actually to have tried to sell a foreign currency derivative for which the LLC's loss exposure was not automatically limited, DB would have been economically negligent, to say the very least, to have permitted such a purchase or sale without the provision of additional, adequate collateral ("margin") from the LLC.[176] DB, or any bank that the LLC might have wanted to use as a counterparty, would be aware of the extent to which the LLC could limit liability on the part of its owner. It would be economically foolish for such a bank to ignore this issue in a transaction with the LLC. The bank's demand for the margin required to remove the bank's

---

175 Also, the options were structured so that any time the obligation to the short position existed, the payoff from the long position would also exist.

176 Note also that an uncovered short position of this sort would appear to run directly contrary to the statement in the Ernst & Young email entitled "COBRA Matters - URGENT" (dated 12/5/99), that "'speculative' investments are not encouraged" with the 2 percent cash contribution; (DOJ-C-00267-69, also identified as EY02938-40). Additionally, a November 4, 1999 email from R. Craig Brubaker at DBAB to Eric Gallinek at DB, forwarding an October 27, 1999 email from Mr. Brubaker to several addressees (DB-DOJ-COBRA-00030347-50), makes specific reference to the fact that since a client acting through an LLC "will have transferred cash sufficient to fund the purchase of the option in advance, we should be comforted that full payment will not be a concern". (DB-DOJ-COBRA-00030348.) This just demonstrates that DB, like any rational bank, will want to make sure it is paid in full in its transactions.

exposure to losses due to the LLC's limited liability would automatically eliminate the stated economic benefit to the LLC owner from use of the LLC form.

In short, the stated non-tax business purposes for forming the LLCs are not economically rational reasons to have done so.

### B. Partnership and S Corp Formation

I would note several points about the non-tax purposes given for the formation of the Partnership and S Corp.

First, *exactly the same benefits stated for the Partnership might equally well be stated for the S Corp, but are not.* As far as the identified economic benefits are concerned, the Partnership is an entirely redundant and unnecessary step. It would have saved paperwork, if nothing else, to have omitted the Partnership altogether and to have done everything that was actually done within the Partnership within the S Corp instead.

Second, the mere existence of a larger pool of capital offers no automatic advantage. A larger capital pool *can* be valuable, if it permits lower transaction costs, but I have found nothing in the record to suggest that any of the counterparties to transactions undertaken with the Partnership offered them a discount on fees because any of the transactions were larger than they would have been with the LLCs alone.

Third, there was little potential to achieve, or evidence of, any benefit from centralized decision making. For one thing, COBRA transactions only had a 30-day horizon.[177] Additionally, by far the biggest investments in the Partnership were the offsetting option positions purchased at the LLC level, before Partnership decision making was relevant at all. The Partnership in this case did not even buy the Cisco stock to which part of the claimed tax basis was attached under the COBRA Presentation's template. It did buy the Canadian dollars to which other tax claims were attached under this template. But centralized decision making was hardly required for that, since the purchase of such assets was one of the COBRA Presentation's planned steps, envisioned from before the Partnership was even formed.[178] In short, there were almost no activities within the Partnership that might have benefitted in any way from "centralized decision making."

---

[177] COBRA Presentation, 2003EY001566 (longer version) and DOJ 049108 (shorter version). Given the 30-day horizon, it might be worth noting that there is no economic relevance for the decision to create or to the terminate the Partnership to the Plaintiff's statement that "subsequent to the Transactions, [the S Corp] continued to invest in stocks and securities." This conclusion is consistent with Ernst & Young emails dated 03/16/2000 and 03/17/2000, which conclude, "[w]e want [the S corps] to maintain some investment activity this year, so it looks a little more like a bona fide entity." DOJ-C-00326, also identified as EY02997.

[178] The only other trading activity consisted of a brief period in which the Partnership invested in various financial institutions, as described in footnote 59. The comments made in footnote 143 apply equally well here. Trades such as these are economically immaterial in the present context.

Finally, as noted above in Section III, part F (starting part way through the discussion, on page 56), diversification narrows the range of investment outcomes around the expected value. This is beneficial when investing, but it is not beneficial when gambling, since gambling has a negative expected payoff. This matters here because the materially negative expected returns on the individual offsetting option positions make them gambles, not investments. Since the expected outcome on the individual option positions was materially negative, diversification of these bets was economically harmful, not helpful.[179]

In short, the stated non-tax business purposes for the formation of these entities are sometimes illusory, sometimes merely without any factual support, and sometimes flatly illogical. They do not provide economically rational non-tax reasons for undertaking these transactions.

## V. Analyses of Decision to Contribute Offsetting Option Positions to Partnership

As discussed in Section II, the COBRA Presentation outlines a series of steps that produce claimed tax savings, and the transactions in this case follow these steps. As discussed in Section III, the offsetting option positions in this case are priced to offer materially negative expected rates of return without fees, and expected rates of return that project losing more than 100 percent of the net premiums invested in the offsetting option positions after fees. As discussed in Section IV, the stated non-tax reasons for engaging in this series of transactions are not economically rational.

Without the hope of a tax deduction, these transactions thus are economically senseless. In fact, with an economically rational expected rate of return involving a loss of more than all of their net premium investment, the participants would have expected to be better off simply giving away the money used to pay the net option premiums, absent the hope of a material tax deduction.

I understand that the contribution of the offsetting option positions to the Partnership is a necessary step in being able to claim the tax losses. If that is true (and if it is not, why would the participants have bothered with the Partnership, since all of their stated goals for them could have been accomplished directly through the S Corp?), the contribution is a "no brainer" if there ever was one.

On the other hand, if the claimed tax benefits are ignored, the contribution actually harms the participants, by diversifying the gambles (and thereby making a negative outcome for the participants more likely) and by incurring costs that could have been avoided by skipping the Partnership and contributing directly to the S Corp.

---

[179] As an illustration of this point, note that as things happened to turn out, the Boyd LLC is one of those that would have made rather than lost money had it simply retained its euro option and not participated in the Partnership. See Appendix E, Workpaper E-25.

## VI. Analyses of Whether Offsetting Option Positions were One Investment or Two

From an economic perspective, the offsetting option positions in this case are a single investment, not two separate investments. There are two reasons for this, one based on the different characteristics of the two option components together and apart, and the other based on DB's pricing of the components under the COBRA structure. The latter is the more important, for the COBRA transactions.

**Characteristics of the Options Together or Apart:** The offsetting option transactions in this case have the basic structure set out in the COBRA Presentation. The COBRA Presentation provided an example with:[180]

- A long option with a stated premium of $50 million with a $100 million payoff and a short option with a stated premium of $47.5 million with a $93.75 million payoff, which implies:

- A net premium payment of $2.5 million, and a $6.25 million net payoff if both options are exercised.[181]

The participant in the COBRA Presentation's example only needs to make the net premium payment of $2.5 million, because whenever DB was owed $93.75 million for the short option, DB would also owe the participant $100 million for the long option.

However, if the two components of the offsetting option position were written separately, with two different banks as counterparties, the bank buying the short option would not know that the participant would be receiving $100 million from another bank whenever the participant owed this bank $93.75 million. An economically rational bank would worry whether the participant could make good on the $93.75 million payment in the event that the short option finished in the money. The bank would therefore demand that the participant supply margin sufficient to remove the bank's risk of non-payment.[182]

These are short-term options, and the only way for the bank that bought the short option to be completely safe would be for it to have the entire $93.75 million available. This could consist of a withholding of the bank's promised $47.5 million payment for the short option plus a demand that the participant supply ($93.75 million - $47.5 million) = $46.25 million in margin to the bank. I am not a trader, and I cannot say exactly how much margin a bank would require in these circumstances, but I can say that it would be financially imprudent not to require a material margin

---

[180] COBRA Presentation, 2003EY001579-80, 82-83 (longer version) and DOJ 0491117-18, 20-21 (shorter version).

[181] For reasons discussed earlier, the theoretical possibility of the exercise of only one option should be ignored, as it is in the COBRA Presentation's numerical example.

[182] For example, recall from Table 12 that 16 percent of the COBRA transaction option pairs did expire in the money, and that another 16 percent were bought out by DB before expiration.

deposit in such circumstances (particularly if the counterparty were an LLC without additional assets that might be recovered in a subsequent lawsuit).

Suppose the bank required margin sufficient to cover the full potential amount owed. In that case, to separate the components of the offsetting option position, the participant would have to supply the $50 million to buy the long option from one bank and supply $46.25 million in margin to the second bank, the one buying the short option from the participant. This would require [($50 + $46.25) =] $96.25 million in capital to get the same ultimate payoff as achieved with $2.5 million in the COBRA Presentation's example, a ratio of 38.5 to 1.[183] Also, the investor in such a transaction would face potentially material transaction costs[184] associated with coming up with the required capital (and for a 30-day investment), unless the investor happened to keep such amounts of money in a highly liquid form.

Whether the margin requirement were the entire amount or something less, however, the fact that this is a digital option affects the risks the option-purchasing bank would face, and hence the margin it would require. With an ordinary option, the value at expiration depends on just how far above the strike price the spot rate turns out to be. Therefore, options only slightly in the money do not pay off very much relative to options deep in the money, and a buyer's risk exposure (and margin demands) are affected accordingly. Here, the digital option is either in the money or not, which implies the bank should demand more margin for options close to the money and less margin for options deep in the money than it would for a standard option.

Another possible concern is a difference of opinion between the two independent counterparties as to whether its own option had paid off. If (1) the bank from whom the participant bought the option believed its exercise price had not been reached, but (2) the bank to whom the participant sold the option believed its exercise price had been reached, the first bank would send no money to pay off the long option even as the second announced that the participant was required to pay off the short option (possibly by forfeiting the payment for the sold option and the margin).[185] The participant would be out the sum of the long call premium and the payoff on the short call.

---

[183] The participant might well be paid some interest on its account with the bank buying the short option, but the ultimate payoff on the combined option position would be the same, $6.25 million or nothing.

[184] The importance of transaction costs in economic affairs was recognized, for example, in the award of the 1991 Nobel Prize in economics to Prof. Ronald Coase. (See http://nobelprize.org/economics/laureates/1991/press.html.)

[185] Recall the DB email (DB-DOJ-COBRA 00052674-75) in which it described its "industry standard" exercise price determination as based on price quotations from five banks, each of which had a bid-ask spread that exceeded two pips, with a total range of six pips. This suggests that this outcome -- i.e., one in which (1) a long call (put) with one counterparty is said not to be in the money while (2) a short call (put) with another counterparty and with a two-pip higher (lower) strike price is said to be in the money -- is not impossible.

Given the above problems, it is highly unlikely that a rational investor would be indifferent between keeping the options together and splitting them.[186]

**Impact of the COBRA Structure and DB's Receipt of Fees through Pricing:** Of course, in the COBRA transactions, there is an even more fundamental problem with trying to split the option position components. As noted earlier (see Appendix E, Workpaper E-39), the stated values of *both* the long and short options are overpriced under the COBRA structure even if DB earns no fee at all, and DB did price the options in a way that provided itself with a fee. The result is that DB not only charged too much for the long option, it paid too much for the short option. Consider what this implies for an attempt to split the components of the option between two different banks.

First, the fact that tens of millions of dollars in long option value are involved both in the COBRA Presentation and in the actual transactions in this case means any participant contemplating splitting the options should know how to calculate basic option values or should have access to an independent advisor who does. Someone contemplating such an investment might well want to compare quotes from different banks. Tax considerations aside, a rational participant would not pay to a bank an excess in the range of 80-90 percent more than the basic value of the long option.[187]

Even more telling, a bank not simultaneously selling the long option would not pay to a participant an excess in the range of 80 to 95 percent more than the basic value of the short option.[188] In a stand-alone transaction, no one tries to make money by "buying high."

Thus, in the COBRA transactions, the offsetting option pairs are irretrievably tied together by their intrinsic structure and by the way DB actually priced them, quite apart from the amount of capital that might be required to separate them.[189] From an economic perspective, the offsetting option positions in this case are unquestionably single investments.[190]

This completes the body of my report. The appendices follow.

---

186 The consideration of alternatives that produce indifference in the decision maker is a fundamental tool of economics that has long been taught even in introductory courses. (See, for example, Paul A. Samuelson, *Economics*, 9th edition, New York: McGraw-Hill Book Company (1973) at pp. 441-42, or Robert S.Pindyck and Daniel L. Rubinfeld, *Microeconomics*, 6th ed., Upper Saddle River, NJ: Pearson Prentice Hall (2005), pp. 67-71.)

187 Please see Table 5 (page 33 above).

188 The overpayment range on the short options in Table 5 would be slightly higher. However, as discussed in connection with Figure 7 (page 40 above), DB's overpayment is smaller when the short option is valued at the long option's strike price, as DB does in its RMS worksheets.

189 In this context, please note also that the "Binary Option Strategy" document stated that "FX desk will not accept an order unless both trades are requested at the same time." DB-DOJ-COBRA-00030721.

190 For the record, this conclusion concerns the essential economic nature of the offsetting option position. It is not a legal opinion (which I am unqualified to form), nor is it a statement about the number of securities (documents) used to construct the offsetting option position.

A. Lawrence Kolbe

5/31/2007

Date