Table 14 provides the trade details of the JZ Buckingham EUR/USD offsetting options.

**JBJZ Partners**
Offsetting Options

| | Long Option | Short Option | Net |
|---|---|---|---|
| JZ Buckingham | | | |
| Currency Pair | EUR/USD | EUR/USD | |
| Trade Date | 23-Nov-99 | 23-Nov-99 | |
| Expiration Date | 22-Dec-99 | 22-Dec-99 | |
| Option Type | EUR Put / USD Call | EUR Put / USD Call | |
| Strike Price | 1.0123 | 1.0121 | |
| Stated Premium | ($20,000,000) | $19,000.000 | ($1.000.000) |
| USD Payoff | $40,000,000 | ($37,500,000) | $2,500,000 |
| Counterparty | DEUTSCHE BANK | DEUTSCHE BANK | |

Table 14

I reviewed the 1999 COBRA offsetting options, which are detailed in Appendix VII. In each of these transactions, the long and short options had strike prices that were 2 pips apart. Given this design structure, it is my opinion that the offsetting options were inextricably related components of a single transaction.

***III.D.ii. DEUTSCHE BANK considered the offsetting options traded with the Participants to have created no credit or counterparty risk.***

Because the offsetting options were elements of a single transaction structure, DEUTSCHE BANK could regard them as risk-free from a credit exposure perspective.

In Craig Brubaker's (of DEUTSCHE BANK Alex Brown) email he states that,

> There is no credit involved in this transaction, therefore, credit approval procedures will not be required.[30]

Furthermore, Chuck Binder's previously referenced presentation states,

> FX desk will not accept an order unless both trades are requested at the same time.[31]

And,

> No credit risk on these trades when executed as per the strategy.[32]

And,

> Since options will either each pay a fixed amount or zero, the option purchased will always be worth more than the option sold to DB by the CP. This translates to zero credit risk based on netting under the ISDAs required.[33]

These comments indicate that credit analysis was not necessary because the offsetting options could never be

[30] DB-DOJ-COBRA-00030131.
[31] DB-DOJ-COBRA-00030721.
[32] DB-DOJ-COBRA-00030725.
[33] DB-DOJ-COBRA-00030724.

split. By marrying structurally similar offsetting component options together and establishing a razor-thin strike spread, DEUTSCHE BANK was able to eliminate counterparty credit risk with respect to the Participants. DEUTSCHE BANK would be paid the net premium for the offsetting options and would not owe any money if the options expired out-of-the-money. If the offsetting options expired in-the-money, DEUTSCHE BANK would owe money to the Participants or JBJZ Partners. Under no circumstance would DEUTSCHE BANK be owed money beyond the initial payment of the net option premium.

Hence I conclude DEUTSCHE BANK had no credit risk exposure to the Participants or JBJZ Partners. The Bank would have been able to preserve its risk-free credit position by requiring the component pieces to always remain together. Said another way, each pair of offsetting options would never be split into separate component options.

***III.D.iii. Separation of the offsetting options would have required the Participants, or JBJZ Partners, to post a massive amount of margin collateral.***

It is the industry practice for Master Trading Agreements (and related Credit Support Annexes) to establish margin

requirements for foreign exchange and foreign exchange options, either held as long or short positions. None of the documents I have reviewed stated the margin requirements for the offsetting options. The absence of such an agreement is evidence that DEUTSCHE BANK never intended for the offsetting options to be separated. Indeed, from an internal email by R. Craig Brubaker of DEUTSCHE BANK Alex. Brown, client credit was never an issue.

> We understand that there is no credit involved with this transaction, therefore, credit approval procedures will not be required.[34]

Nonetheless, some basic facts about margin can be understood from industry standards for foreign exchange and options on foreign exchange and a discussion is relevant to my opinions.

Typical master trading agreements establish margin requirements for both long and short positions in currency options, and by extension, offsetting options. These requirements would have applied if DEUTSCHE BANK had ever allowed the offsetting long and short option pairs to be split into stand-alone individual options. Separating these

[34] DB-DOJ-COBRA-00030349

offsetting options from each other would have meant the Participants or JBJZ Partners would have been outright long one option, with no offsetting short option (case #1), or outright short one option, with no offsetting long option (case #2). This would have created a massive margin requirement. The significant margin resulting from splitting the transaction is a convincing reason why the offsetting option pairs would never be separated.

Although there appears to be no documented margin requirements, based on my experience in the financial industry, I can estimate the margin required to split the offsetting options. In case #1, the margin requirement for purchasing a digital currency option is the entire long option premium. For example, in the JBJZ Partners offsetting option pairs, the JZ Buckingham purchased a digital currency option on EUR/USD struck at 1.0123 and sold a digital currency option on EUR/USD struck at 1.0121, for a net premium payable to DEUTSCHE BANK of $1,000,000. If JZ Buckingham wished to purchase the long option by itself (case 1) it would have been required to pay the stated premium in full -- in other words pay $20,000,000 in cash. The other Participants, likewise, would have been required to pay the full premium amounts of $25,000,000 and

$5,000,000, for the long component options of the USD/JPY and the other EUR/USD, respectively.

In case #2, the margin requirement calculation for a stand-alone short digital currency option is more complex. Given no offsetting long option, industry standard margin convention would have required considerable initial margin collateral. This would be necessary to ensure performance by the Participant or the Partnerships on the option sold to the Bank. Any such margin would have to account for the risk of potentially adverse market fluctuations and for the possibility of counterparty non-performance.

It is industry standard practice that the investor is required to keep the full short premium received from his option sale on deposit with the custodian. It does not count for margin purposes. The appropriate margin on a short digital currency option is difficult to calculate, especially when the digital currency options are only 30 days from expiration, as was the case for the Participants' transactions. The problem with a single digital is that its value can swing violently up or down with small changes in the spot exchange rate. As the exchange rate moves, the probability that the option will be at- or in-the-money at

expiration can change dramatically. More specifically, as the exchange rate trades around the strike price, and the time value of the option decays, the value of the option can swing so dramatically that any system of assessing and collecting current margin collateral may be insufficient to keep pace with a firm's current exposure. This is due in large part to the fact that digital options feature a large, all-or-nothing lump-sum payoff that is triggered by the option being at- or in-the-money at expiration. With spot trading at or around the strike, as an option converges on expiration, a few pips movement up or down could be the difference between a large payout and no payout at all. For this reason, a bank would be well within rights to simply demand that the full in-the-money payout be kept on deposit.

In fact, the only way that the bank could ensure that its digital currency option client would perform is to demand all of the lump-sum payout as margin collateral. That is to say that the difference between the lump-sum payout of the JZ Buckingham EUR/USD short option of $37,500,000 and the premium of $19,000,000 (equal to $18,500,000) could have been demanded as collateral by DEUTSCHE BANK. Under similar requirements the JZ Buckingham USD/JPY stand-alone

short digital currency options would have had to post margin on their stand-alone short digital currency option of $23,125,000, and the JGB Bohicket EUR/USD short option would have similarly required $4,625,000.

In summary, if JZ Buckingham had entered separate stand-alone long and short EUR/USD options with different brokers, according to the above analysis it would have had to deposit a total of $38,500,000 (the $20,000,000 long premium plus the $18,500,000 difference between the payoff on the short digital and the short digital's premium). This margin requirement would be in excess of 38 times the value of the net premium of $1,000,000 JZ Buckingham paid to DEUTSCHE BANK to enter into the EUR/USD options as offsetting options.

Table 15 compares the margin requirements in a scenario where the long and short options were netted, versus a scenario where they received stand-alone treatment. JBJZ Partners would have been required to post $93,750,000 more in cash had the options received stand-alone margin treatment. It is my opinion that the Participants could not have done these transactions if the long and short options had been separated.

**JBJZ Partners**
Margin Comparison

| | Long Option Premium | Short Option Premium | Premium Requirement (Netting Treatment) | Premium Requirement Stand-Alone Long Option | Premium Requirement Stand-Alone Short Option | Net Premium Requirement (Stand-Alone Treatment) | Additional Premium Due (Stand-Alone vs Net Treatment) |
|---|---|---|---|---|---|---|---|
| JZ EUR/USD | ($20,000,000) | $19,000,000 | ($1,000,000) | ($20,000,000) | ($18,500,000) | ($38,500,000) | ($37,500,000) |
| JZ USD/JPY | ($25,000,000) | $23,750,000 | ($1,250,000) | ($25,000,000) | ($23,125,000) | ($48,125,000) | ($46,875,000) |
| JGB EUR/USD | ($5,000,000) | $4,750,000 | ($250,000) | ($5,000,000) | ($4,625,000) | ($9,625,000) | ($9,375,000) |
| TOTAL | ($50,000,000) | $47,500,000 | ($2,500,000) | ($50,000,000) | ($46,250,000) | ($96,250,000) | ($93,750,000) |

Table 15

Appendix VIII provides an analysis of all margin requirements for the 1999 COBRA offsetting options.

***III.D.iv. DEUTSCHE BANK documentation originally identified the offsetting options as components of a single structured transaction.***

On July 14, 1999 DEUTSCHE BANK AG London created a "prototype confirmation" (DB-DOJ-COBRA-00030054 through 00030057) for a Foreign Exchange Linked Swap Transaction. The participating counterparties were identified only as Party A and Party B. The economic structure of the trade described in the prototype confirmation is identical in practically every respect to that used in the confirmations

pertaining to the Participant's offsetting options. The only differences between the confirmations were:

- The prototype confirmation referred to a certain transaction as a "Foreign Exchange Linked Swap Transaction." That name was changed to "Foreign Exchange Digital Currency Option Transaction" in the current transaction.
- The prototype confirmation referred to certain transactions as a "First Swap Transaction" and "Second Swap Transaction." Those names were changed to "First Digital Currency Option Transaction" and "Second Digital Currency Option Transaction" in the current transactions.
- The prototype confirmation referred to certain events as a "First Swap Trigger Event" and "Second Swap Trigger Event." These names were changed to "First Digital Currency Option Trigger Event" and "Second Digital Currency Option Trigger Event" in the current transaction.

The "Linked Swap Transaction" (singular) was composed of two legs identified as "First Swap Transaction" and "Second Swap Transaction," which incidentally correspond with the

component digital currency options in the Participants' COBRA transactions. In the "First Swap Transaction" Party A was a seller to Party B. In the "Second Swap Transaction" Party A was a buyer from Party B. As explained in III.D.iii, if these transactions stand-alone they would have specific margin requirements that may prohibit participation in larger notional values. However, if they are brought together under one single and unique structured transaction, then the benefits of netting could provide the parties with access to notional values that they would otherwise not be approved. In my opinion one of the principal purposes in designing the Foreign Exchange Linked Swap Transaction was to create a single transaction structure from which DEUTSCHE BANK could take advantage of this netting benefit.

DEUTSCHE BANK essentially married the two offsetting swap transactions under a single transaction structure through two specific text references in the Foreign Exchange Linked Swap Transaction confirmation. In the introductory paragraph of the confirmation DEUTSCHE BANK describes the transaction (structure) as consisting,

> ..of a number of elements as detailed below in Sections 1, 2(i) and (ii), 3(i) and (ii), and Section 4. The details

> of each component swap transaction are listed individually in Section 1.

The plain meaning of this passage indicates that the foreign exchange linked swaps couple together as components in a single transaction structure.

My reading of this language is further supported in Section 2(i) - Other Provisions, which covers payment and settlement netting.

> For the purpose of this Transaction only, the following provisions shall apply: Subparagraph (ii) of Section 2 (c) of the ISDA Form[35] shall not apply to the First Swap Transaction and the Second Swap Transaction.[36]

Subparagraph (ii) of the Section 2(c) of the ISDA Master Agreement (Multicurrency Cross Border)[37] provides that payments could only be netted for a single transaction. Since each swap leg is in form a single transaction this provision would have prevented the swap leg payments from being netted. By electing that single transaction netting

[35] If the parties executed an ISDA Form, then the language in DEUTSCHE BANK's prototypical confirmation would be subject to the relevant ISDA interpretation. Even if they had not executed an ISDA Form, the clear language in the prototypical confirmation specifies that, "Party A and Party B agree to use all reasonable efforts promptly to negotiate, execute, and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency Cross Border) (the "ISDA Form") with such modifications as Party A and Party B will in good faith agree."

[36] DB-DOJ-COBRA-00030056.

[37] The ISDA Master Agreement can be found at www.isda.org.

will not apply, DEUTSCHE BANK is able to combine its two offsetting swap transactions together, creating a separate and unique singular investment structure which takes advantage of this payment netting feature.

DEUTSCHE BANK's Foreign Exchange Linked Swap Transaction links its individual swap component transactions together under one single structure. The structural similarities between its prototype confirmation and the COBRA trade confirmations, in my opinion, demonstrate that DEUTSCHE BANK's architects understood the offsetting options' design should be similar to that of the foreign exchange linked swaps. As such, in DEUTSCHE BANK's eyes the offsetting option components, like the foreign exchange linked swaps, were also interrelated, and indeed comprised a single structured transaction.

***III.D.v. Neither the Participants nor DEUTSCHE BANK sought to separate the offsetting options.***

The offsetting option components were paired together and remained paired together when they were:

- Entered into by the Participants,
- Contributed to JBJZ Partners,

- Closed out in JBJZ Partners.

I am unaware of any effort by the Participants, JBJZ Partners or DEUTSCHE BANK to separate these pairs into their individual digital currency option components. The Participants entered into offsetting long and short options. They contributed the offsetting options to the Partnerships. At no time were the offsetting options split apart. Also supporting this opinion is Chuck Binder's presentation which states:

> Each transaction consists of two trades. One long and the other short on the same underlying.[38]

And,

> FX Desk will not accept an order unless both trades are requested at the same time.[39]

As such, the Participants treated the offsetting options as a single transaction structure.

***III.D.vi. The plain language references of the COBRA trade confirmations indicate DEUTSCHE BANK's intention to regard each offsetting option as a component element in a single transaction structure.***

---

[38] DB-DOJ-COBRA-00030721.
[39] DB-DOJ-COBRA-00030721.

The plain language references in every COBRA trade confirmation issued by DEUTSCHE BANK reflect that the offsetting options were components of a single transaction structure. For example, the JZ Buckingham EUR/USD trade confirmation reads as follows:

> The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Foreign Exchange Digital Option transaction… The transaction consists of a *number* of elements as detailed below in Sections a, 2(i) and (ii), 3(i) and (ii), Section 4. Certain definitions and provisions which are applicable to more that one element of the transaction are detailed in Section 1. The terms of the transaction to which this Confirmation relates are as follows.[40]

DEUTSCHE BANK's intent to package the two offsetting options components into a single transaction structure is evidenced by the specific reference to a singular Foreign Exchange Digital Option transaction, entered into by the two parties. Further reading the confirmation reveals the individual offsetting options are each elements of a transaction detailed within Section 1, and that the terms of the singular "Transaction" (not of each transaction) are contained in the body of the confirmation.

---

[40] DB-DOJ-COBRA-00043552

Furthermore, Section 2 of the Trade Confirmation specifically states that,

> For purposes of this Transaction only, the following provision shall apply: Subparagraph (ii) of Section 2 (c) of the ISDA Form shall not apply to the First Digital Option Transaction and the Second Digital Option Transaction.[41]

This passage specifically refers to the singular structured transaction, and clearly differentiates it from the component offsetting option transactions (First Digital and Second Digital option transactions) that comprise it.

Finally, Section 4 of the Trade Confirmation claims that if the Participants and DEUTSCHE BANK are not parties to an ISDA Interest Rate and Currency Exchange Agreement or an ISDA Master Agreement then the trade confirmation:

> ..evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates.[42]

This implies that if the confirmation references two or more transactions within its text then these transactions are looked upon as comprising component terms of a singular

---

[41] DB-DOJ-COBRA-00043579

[42] DB-DOJ-COBRA-00043552.

transaction structure, the terms of which are contained in the confirmation.

All of the above passages repeatedly refer to a single confirmation, and the singular transaction structure that the confirmation pertains too. This further emphasizes that it was DEUTSCHE BANK's intention to treat these offsetting options as being within a single transaction structure.

In addition to the compelling text within the trade confirmation of each offsetting option transaction, page 22 of Paul Harding's, "Mastering the ISDA Agreement," provides us with a definition of "trade confirmation" that is also useful in identifying each combination of offsetting options as a single transaction structure. He defines a trade confirmation as,

> specifying the economic terms of a transaction (e.g. trade effective and maturity dates, payment calculation terms, timing and mechanics, and Offices through which payments are to be made.)[43]

[43] Reference: Harding, Paul. "Mastering the ISDA Master Agreement." Prentice Hall. 2002, pg. 22

The confirmation is described as specifying the economic terms of a transaction (singular). There is no implication that a single confirmation refers to the economic terms of several different transactions. Rather the plain language meaning is that all of the component elements listed within a single confirmation represent component parts of the economic terms of a single ("specified") transaction structure.

***III.D.vii. The irregular pricing of the offsetting options supports the single transaction opinion.***

Also arguing for my single transaction opinion are the pricing irregularities of the offsetting options, as was reported in Section III.A. Consider the parts. If the long option were a separate transaction, the pricing would squarely fall under the heading of an unfairly valued derivative. Deutsche Bank's Policies and Procedures manual speaks to this issue:

> For all brokered deals, Trade Support calculates a reasonable Options price using FENICS to verify broker's price is fair (Traders perform this calculation themselves for non-brokered trades). Any Options mispricing discovered by Trade Support is directed to the trader responsible for the options position to investigate the discrepancy.[44]

[44] DB-DOJ-COBRA 00046981.

The long option positions were priced, meaning stated premium, more than 60% over theoretical value - an egregious overpricing that could never be considered fair in any market situation.

There is also no doubt that DEUTSCHE BANK wildly mispriced the short position. If it were a separate transaction, then there would have been no worldly reason why DEUTSCHE BANK would have done the trade. Banks do not voluntarily overpay for options they themselves are dealing.

The only way to understand the gap between the stated premiums and theoretical values for the long and short positions would be to realize the truth of the situation: that the overpricing of the two sides was meant to more or less wash out on a net basis. That said, the options taken as a single transaction were still overpriced.

For all of the reasons detailed in Sections i-vii it is clear that each offsetting digital option the Participants purchased, sold, or contributed to JBJZ Partners represented a component element of a single transaction structure.

### *III.E. An Analysis of the Hedging Transactions Done By DEUTSCHE BANK Supports My Single Transaction Opinion.*

My opinion that the two component options in each Partnership transaction comprise a single transaction is supported by an in-depth analysis of DEUTSCHE BANK's hedging transactions.

First, I must add some background on the nature and practices of option dealing and hedging. In the foreign exchange market large dealing banks, such as DEUTSCHE BANK, make markets in currency options and in exotic currency options. Digital options, which have already been described, are a type of exotic option. In essence the Black-Scholes revolution was contained in a mathematical model for option pricing that allowed option dealers to replicate synthetically long or short positions in options for purchase or sale. As a result, the modern options world consists of counterparties, such as the Participants, who buy and sell options to dealing banks who in turn replicate option exposures using mathematical models. These banks, including DEUTSCHE BANK, run what are known as risk books containing a large variety of plain

and exotic options. A basic tenet of the business of running an option risk book is to keep the book hedged, or "flat," with respect to movements in exchange rates. Options desks hedge their risk by taking positions in spot and forward foreign exchange. Hence an option that is a call or a put on the euro can be hedged with transactions in spot and forward euros. The "recipe" for the hedge comes from the mathematics of the Black-Scholes family of models. The original Black-Scholes model was for put and call options on shares of stock. It has been modified to work for currency options and exotic currency options, as was noted above.

A typical option desk at a dealing bank is organized by currency. There are traders who do the euro against the dollar, the dollar against the yen, and the dollar against the Swiss franc, to take some examples. There are also option dealers who buy and sell options and exotic options on currencies. Finally there are "sales-traders" who bridge between the banks' customers and the traders who make the markets in spot, forward, and options.

In the normal sequence of events, a customer of the dealing bank asks his assigned sales-trader for a bid

price and an ask price for an option. Say, he inquires about a call on the euro (which can also be called a put on the dollar). The sales-trader obtains bids and asks for the option from his trader. Suppose the customer agrees to buy at the price. The sales-trader informs the option dealer at once. In the case of DEUTSCHE BANK we know that this triggers the recording of the option that the bank has sold through a software program called ODET, described earlier in my report.

When an option dealer like DEUTSCHE BANK buys or sells an option, it immediately does an offsetting hedge in the foreign exchange market. I will refer to this as the "initial hedge." In this example, the bank will have sold a call on the euro. To hedge itself against moves in the euro, the bank must buy some number of euros against dollars immediately - the exact amount is provided by the bank's software that incorporates the mathematical machinery of the Black-Scholes family of models. Typically, the option desk will buy the requisite number of euros from the bank's own spot dealing desk. This would be an "internal hedge." What has happened in this case is that the spot desk has sold euros to the options desk. Next, the spot desk itself has to go outside of the bank

to replenish its own euro position. Whatever the exact process, we know in this example that the bank must buy euros and sell dollars, regardless of whether there is an intermediate step of doing the internal trade with the bank's spot desk.

This then is the drill for all option dealing: The bank buys or sells an option, or group of options, and immediately does a one-off transaction in the spot market to create the initial hedge against short-term movements in the relevant exchange rate. Both the option and its hedge are booked in the option risk book.

In the case of offsetting pairs of digital options the ODET function is spread across "legs."

ODET Legs

Leg 0: Common Terms

Leg 1: Long Option

Leg 2: Short Option

Leg 3: Initial Hedging

Leg zero is a recording of the common terms of the entire transaction. Leg one is the long digital option. Leg two

is the short option. Legs one and two contain the stated premium, the theoretical price, the option parameters, such as the strike, the face amount, trade date, expiration date plus several pricing factors, such as interest rates and volatility. Moreover, legs one and two show the recommended hedging amounts from the bank's option model for each option under the captions of buy and sell currency amounts. Leg 3 contains information about the exact hedging transaction that was done. Since there is a long option and a short option the individual component hedging amounts partially offset each other. The leg 3 data shows the actual initial hedging transaction.

It is my understanding that the ODET program, upon receiving a command signifying the option or options that have been dealt, generates the client's confirmations. It also posts the options and any hedges to the option risk book.

With the passage of time and movements in exchange rates (and other parameters), the correct hedge for an option changes. Once an option has been booked any changes to its hedge will be addressed only in context of the larger book. In other words, options are created with their own

hedge, but thereafter the entire book of options is re-hedged as needed (i.e. the hedge is adjusted en bloc). This is referred to as "re-hedging the book." Re-hedging the book, as opposed to the re-hedging separately each of the individual options that make up the book, achieves considerable economies of scale in hedging. This is because the book typically consists of both puts and calls held in either long or short positions, meaning that some portion of the risks cancel each other out across the entire book. The book as a whole will be re-hedged daily or over shorter intervals as needed to address market volatility.

DEUTSCHE BANK's aggregate risk position is managed with another software program called RMS. RMS contains all of the ODET entries plus it allows for direct modification to the positions without going back to ODET.

Now I turn to the particular problem of hedging digital and pairs of digital options that concern the Participants. A single digital option is relatively simple to value but, ironically, difficult to hedge. The hedging difficulty comes from the fact that at expiration the option either pays nothing or pays a lump sum of money.

This all-or-none payoff feature is strictly a function of what the dealing bank, as calculation agent, determines to be the in-the-money or out-of-the-money status of the option at exactly 10 AM in New York on expiration date. The complexity of the hedging comes from the fact that if the spot exchange rate is hovering around the strike close to expiration a small movement in the exchange rate, flipping the option in- or out-of-the money will have a profound effect for the option owner and the dealing bank. By way of analogy, the hedge will have to do a huge amount of work over a small change in exchange rates if it is going to immunize the dealer from the risk of making the lump sum payoff. For this reason digital option hedging is notoriously tricky.

This situation is made more complex when there are two digital options, one long and the other short but with only a razor-thin difference in strike prices. Effectively the offsetting digital options create a three-part payoff matrix. Payoff number one is zero, as both options are out-of-the-money; payoff number two is equal to the net difference between the payoffs of the long and short options. This is equal to $2,500,000 in the case of the JZ Buckingham EUR/USD offsetting options. So far in this

discussion the payoffs one and two create a small digital option.

The complexity comes when we look at the potential third payoff, for what I call the payoff from hitting the sweet spot. This is the case where the long option is in-the-money but the short option is out-of-the money. For the JZ Buckingham EUR/USD offsetting options this would pay a sum of $40 million.[45]

I have discussed in this report that DEUTSCHE BANK would never have allowed this outcome to occur. Yet if it did occur, and this is completely hypothetical, it would mean a huge binary payoff inside the gap between the two strikes.

There is evidence that DEUTSCHE BANK did not hedge the risk of the sweet spot. DEUTSCHE BANK hedged all of the risk of the offsetting options except for the risk the sweet spot would be hit.

[45] Even assuming that DEUTSCHE BANK would have allowed the sweet spot to be realized the sweet spot payoff does not figure largely in the initial price of the options because of the possibility of landing at expiration between the strikes is mathematically remote.

The deposition of Jeanette Michaels (DEUTSCHE BANK middle office) reveals that the DEUTSCHE BANK option traders utilized two separate trading systems: the ODET system (system used to capture the details of each trade) and the RMS system (system used to manage trading risks). She further explains that the trades would be processed into the ODET system and then,

> The traders would just hit a button and it [the trade] would feed into RMS from the ODET system. (page 23)

And

> Trading would make the change in RMS…If there was a change in ODET, I would tell the trader, and he would look at the trade before it was changed and see what the change did to his risk. (page 33)

The case documents show that DEUTSCHE BANK entered the offsetting options via the ODET software at the correct strikes. ODET then generated the confirmations that were sent to the Participants.

However, the story did not end there. Ordinarily, the options desk would have executed its hedging transaction based on the total risk of the options it had just dealt. In the case at hand, DEUTSCHE BANK did something different. There is evidence that DEUTSCHE BANK did the

initial hedge for the JBJZ Partners transactions without consideration of the sweet spot.

According to the trade confirmations, the long components of the EUR/USD options had strikes of 1.0123, and the short components had strikes of 1.0121. Therefore, the sweet spot would have been between these strikes. When these options were entered into ODET, the strike prices were entered correctly. There was no leg 3 for any of the JZ Buckingham transactions, indicating that there was no initial cash hedge.

However, at some point the short component strike was changed from 1.0121, as evidenced in DEUTSCHE BANK's Risk Reports that show the same strike of 1.0123 for both options (DB-DOJ-COBRA 00246053 and 00246055). By changing the strike of the short option DEUTSCHE BANK's trading room removed the theoretical risk of the sweet spot and accordingly no longer maintained an internal hedge for the theoretical risk of hitting the sweet spot. Hedging the sweet spot was not without cost. Moreover the cost of maintaining a hedge for the sweet spot would have grown large and difficult to manage if the spot exchange rate at the end of the transaction's life were in the proximity of

the strikes. Setting the strikes equal precluded the need to run a costly, albeit unnecessary, hedge.[46]

The same is true of the second set of EUR/USD options (DB-DOJ-COBRA 00246061 and 63). Moreover, the USD/JPY options received the same treatment (DB-DOJ-COBRA 00240057 and 57).

In my opinion there is strong evidence showing that in the case of the JBJZ Partners options, DEUTSCHE BANK did not - nor did it ever intend to - hedge the sweet spot.

DEUTSCHE BANK of course had every right to hedge the Partnerships' transactions in any way that it wished. What this analysis shows however is that as far as the DEUTSCHE BANK was concerned the sweet spot was an illusion, meaning something never to be attained. DEUTSCHE BANK's apparent failure to hedge the sweet spot supports my opinion that the offsetting options were a single transaction and provides further evidence of the lack of a reasonable possibility of economic profit for the Partnerships' transactions.

[46] It should be noted that when DEUTSCHE BANK booked the Murphy transactions in 2000 (see footnote 2), they eliminated the sweet spot before the RMS stage. The ODET printouts indicate the Murphy transactions were booked right at inception with a single strike price.

***III.F. The Participants Had No Non-Tax Business Purpose In Contributing Their Offsetting Options To The Partnerships, And Therefore The Partnerships Had No Non-Tax Business Purpose.***

In my opinion, the Participants received no additional non-tax financial benefit by contributing their offsetting options to the JBJZ Partners.

When JZ Buckingham contributed its offsetting options to JBJZ Partners it gave up its economic interest in the EUR/USD and USD/JPY offsetting options. In exchange, it received partial interest in a pool which contained both the same offsetting options, as well as the JGB Bohicket offsetting options. Thus, JZ Buckingham's interest in JBJZ Partners was essentially a share in portfolios containing three separate offsetting pairs of options, each of which had a significantly negative expected return.

Likewise, JGB Bohicket contributed its interest in EUR/USD offsetting options for a share in the JBJZ Partners portfolio containing three separate pairs of offsetting options, each of which, as stated above, had significantly negative expected returns.

Although it seems as though the partnership structure may have offered the benefit of diversification, any of the Participants could have achieved the same economic exposures in their own portfolios on the trade date by having requested a combination of offsetting options on the euro and the Japanese yen. Alternatively, each Participant could have opted to sell off part of its offsetting options and establish new offsetting option positions in the other currency pair. Given these realities the Participants never needed to be invested in the JBJZ Partners to achieve diversification.

Moreover, and more importantly, by exchanging their individual offsetting options for a share in the JBJZ Partners portfolio containing both the EUR/USD and USD/JPY offsetting options, each Participant decreased its probability of achieving a profit on the transactions. This is because after the contribution of the options to JBJZ Partners each Participant's probability of achieving a profit depended on the less likely outcome that all three offsetting option pairs would finish in the money. Before the contributions, the attainment of profitability depended on the individual probability of each pair of offsetting

options finishing in the money. After the contributions, all of the options had to finish in the money for any Participant to achieve a profit.

In addition, it is my opinion that the Participants gained no centralized management benefits from contributing their offsetting options to JBJZ Partners.

Additionally, DEUTSCHE BANK included a "Non-Reliance" clause in all of its trade confirmations stipulating that the investor:

> ..is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party (DEUTSCHE BANK) including any affiliate or subsidiary thereof as investment advice or as a recommendation to enter into this Transaction...[47]

And,

> The other party (DEUTSCHE BANK) is not acting as a fiduciary for or adviser to it (Taxpayer) in respect of this Transaction.[48]

Given this combination of technical market inexperience and the lack of any advisory assistance, it is my opinion that

---

[47] DB COBRA 02443
[48] DB COBRA 02444

benefits related to centralized management could not be a valid business purpose for the Participants to contribute their offsetting options to the JBJZ Partners.

Furthermore, it is my opinion that there were no "leveraging" benefits derived from pooling the assets of the Participants into JBJZ Partners. By leveraging benefits I refer specifically to the ability of the partnership to borrow cash based on the value of its assets. Given the characteristics of the offsetting options (including the short maturity and volatility) I conclude that DEUTSCHE BANK would not have allowed the Participants to borrow money against the collateral of these option pairs, regardless of the size of the positions or whether the offsetting options were held individually by the Participants or collectively in JBJZ Partners.

Moreover, it is obvious that the Participants themselves had no expectation of a non-tax business purpose to JBJZ Partners. The COBRA marketing materials state that after 30-days an S-Corp would be set up to receive 100% of the Partnerships' interest thereby technically terminating JBJZ Partners per Code section 708(b)(1)(B). (2003EY001574 and 1575) That is, the partnership was a temporary phenomenon:

the Participants withdrew after 29 days. This fact was not lost on Jerred Blanchard, national tax expert at E&Y who wrote:

> It appears Taxpayer's investment in Fund will be relatively short-lived (about 30-60 days). The avowed business purpose for the Fund investment is to diversify Taxpayer's foreign currency exposure and expand the pool of capital from which Taxpayer may derive its pre-tax return. Query whether the brevity of Taxpayer's investment in Fund belies this avowed business purpose.[49]

The following internal email from R. Craig Brubaker of DEUTSCHE BANK Alex. Brown provides details of "required"[50] account steps, which are consistent with the actions of the Participants. These steps describe the purchase and subsequent transfer of the offsetting options. After the initial purchase of the offsetting options, there is no change in the investment activities. Rather all of the subsequent actions involve changes in the ownership of the underlying investment.

> The Transaction:
>
> We understand from our client's legal counsel that the format will be virtually identical in all the 100+ cases. We are dealing with wealthy individuals who are entering into a tax-planning

[49] Bates number 2003EY007042.

[50] DB-DOJ-COBRA-00030347

transaction created and advised on by the US law firm, Jenkens & Gilchrist. A component part of their transaction requires our implementation of a financial transaction, namely the digital swap, as a prerequisite step. We understand from Jenkens that they contemplate the transaction steps as follows:

Step 1:

Individual client creates two new entities, both of which will be substantially owned by the client and his/her family members. One entity is a US limited liability company (LLC) and the other a US limited partnership. Client capitalizes the LLC with cash in an amount necessary to fund the purchase of the digital option. This is the only asset in the LLC.

In the limited partnership, client will have contributed an asset with a large fair market value and little or no tax basis. There is generally no other asset in the partnership. There are no audited financials for either the LLC or partnership, nor any assets in these entities other than those mentioned. As the client will have transferred cash sufficient to fund the purchase of the option in advance, we should be comforted that full payment will not be a concern, and that issues of suitability have been handled by the Alex Brown account reps.

Step 2:

Client open one Alex Brown retail account for the LLC and one for the partnership. The cash used to fund the digital option is initially contributed into the Alex Brown LLC account. Our purpose is to provide an account documentation for the transaction that would not otherwise exist, by having a CUSIP # assigned to the swap at its inception. Our account statements with then show the existence of the position, described as an option with expiration date, etc. Client will instruct us with a letter of authorization to transfer funds to DB NY to enter into the digital option purchase. Alex. Brown

> will wire funds to DB in NY, Dan Brooks will do the trade, Ross will send the confirmation agreement for client's signature and return to Ross. The options must expire before yearend, 1999, probably having a maturity date of 12/15/99.
>
> Step 3:
>
> Within a few days of opening the digital option trade, an authorized signatory of the LLC will send an assignment letter to DB advising DB that it is their intent to convey legal ownership of the digital option positions from the LLC to the partnership. Settlement proceeds, if the position pays off, would also be paid to the assignee partnership. This is an extremely critical step for their tax transaction to accomplish its purpose. It would be helpful to Jenkens if their assignment letter could have an acknowledgement blank that DB could sign and return to Jenkens formally accepting the assignment. The Alex Brown account statements will reflect the assignment of the digital option positions from the LLC to the partnership.[51]

Given this step-by-step approach to creating a "tax transaction," as well as the inability to satisfy any of the business purposes addressed above, I conclude that the Participants created no meaningful non-tax advantage by contributing the offsetting options to the Partnerships. Therefore, the Partnerships had no non-tax business purpose.

[51] DB-DOJ-COBRA-00030348,9

## IV. CONCLUSION

After examining all 52 COBRA transactions brought to my attention, and more specifically the three offsetting option pairs in JBJZ Partners' case, I conclude that DEUTSCHE BANK's unusual pricing of the offsetting options produces an overstatement of the option premiums on a net and a stated basis when compared with their theoretical values. On a stated basis the long and short stated premiums exceeded their theoretical values by 85.55% for the longs and 89.59%, while on a net basis in excess of 32.15%.

I also conclude that these differences would have been even larger if the prices reflected my opinion that the "sweet spot" in the spread between the offsetting option strikes would never be hit. As stated before, if the offsetting options are valued without the sweet spot, the stated net premium exceeds the net theoretical value of the offsetting options by 49.69%.

Table 16 provides a complete JBJZ Partners premium analysis.

JBJZ Partners
Premium Analysis

| | Deutsche Stated Premium | DeRosa Theoretical Value | % Change Theoretical to Stated Premium | Deutsche Theoretical Premium | % Change Theoretical to Stated Premium |
|---|---|---|---|---|---|
| **Gross Long** | | | | | |
| JZ Buckingham EUR/USD | ($20,000,000) | ($10,660,647) | 187.61% | ($10,461,135) | 191.18% |
| JZ Buckingham USD/JPY | ($25,000,000) | ($13,187,664) | 189.57% | ($13,869,828) | 180.25% |
| JGB Bohicket EUR/USD | ($5,000,000) | ($2,665,161) | 187.61% | ($2,615,284) | 191.18% |
| TOTAL LONG | ($50,000,000) | ($26,513,472) | 188.58% | ($26,946,247) | 185.55% |
| **Gross Short** | | | | | |
| JZ Buckingham EUR/USD | $19,000,000 | $9,898,402 | 191.95% | $9,712,466 | 195.62% |
| JZ Buckingham USD/JPY | $23,750,000 | $12,276,958 | 193.45% | $12,913,861 | 183.91% |
| JGB Bohicket EUR/USD | $4,750,000 | $2,474,600 | 191.95% | $2,428,117 | 195.62% |
| TOTAL SHORT | $47,500,000 | $24,649,960 | 192.70% | $25,054,444 | 189.59% |
| **Net** | | | | | |
| JZ Buckingham EUR/USD | ($1,000,000) | ($762,245) | 131.19% | ($748,669) | 133.57% |
| JZ Buckingham USD/JPY | ($1,250,000) | ($910,706) | 137.26% | ($955,967) | 130.76% |
| JGB Bohicket EUR/USD | ($250,000) | ($190,561) | 131.19% | ($187,167) | 133.57% |
| NET TOTAL | ($2,500,000) | ($1,863,512) | 134.16% | ($1,891,803) | 132.15% |

Table 16

Another reason for my conclusion that the "sweet spot" would never be hit had to do with DEUTSCHE BANK's dual roles of broker and calculation agent. DEUTSCHE BANK, as the calculating agent, could insure that the spot rate for the relevant currency pairs at 10:00am EST on the expiration date would never fall within the 2 pip spread established between the long and short offsetting options. That is, one option would never expire without the other expiring, or be exercised without the other being exercised.

Furthermore, I conclude that any prudent investor will always make an effort to calculate his expected return on a

potential investment. My analysis reveals expected returns of approximately -34% on the Partnerships' offsetting options. When adjusted to include the fees paid to E&Y and Jenkens & Gilchrist these negative expected returns balloon up to approximately -65%. Using the alternative methodology described on p. 61, I find the offsetting options had expected returns of approximately -124%.

Additionally, I conclude that the offsetting options were component pieces of a single transaction structure. Together, they are looked upon as component parts of a singular transaction structure in the trade confirmations, which evidence a complete and binding agreement between the parties as to the terms of the transaction to which they relate. This single transaction structure is supported by marketing literature and DEUTSCHE BANK internal documentation which show the reliance the options have upon each other for credit and margin purposes.

Finally, I conclude that there is no meaningful non-tax business purpose to contributing the options beyond the Participant level, and that therefore JBJZ Partners had no meaningful non-tax business purpose. There is no evidence of the Participants receiving any material advantage in

terms of diversity, leverage, or management support, through JBJZ Partners, than was otherwise available through the Participants' LLC's.

David F. DeRosa, Ph.D.

## V. APPENDICIES

| | |
|---|---|
| Appendix I: | Dr. DeRosa's Resume |
| Appendix II: | Discovery Documents |
| Appendix III: | COBRA Stated Premiums vs. Theoretical Values |
| Appendix IV: | COBRA Net Stated Premiums vs. Theoretical Values |
| Appendix V: | COBRA Key Ratios Analysis |
| Appendix VI: | COBRA Expected Return Analysis |
| Appendix VII: | COBRA Transaction Detail Analysis |
| Appendix VIII: | COBRA Margin Requirement Analysis |

APPENDIX I: David F. DeRosa's Resume
*(3 pages to follow)*

**DeRosa Research and Trading, Inc.**
495 White Oak Shade Road
New Canaan, CT 06840
Tele (203) 801-4340 Fax (203) 801-4342
derosa@derosa-research.com

# David DeRosa

## Education

**The University of Chicago, Graduate School of Business** Chicago, Illinois
Doctor of Philosophy (Ph.D.), December 1978. Finance and Economics.
- Dissertation: Rates of Return on Common Stocks and Inflation

**The University of Chicago** Chicago, Illinois
Bachelor of Arts (AB), August 1972.
- Major Field: Economics

## Experience

1997 - Present **DeRosa Research and Trading, Inc.** New Canaan, Connecticut
*President and Owner*
- Consultant for international financial markets and derivative instruments matters.
- Expert witness in foreign exchange, international finance, emerging markets, derivatives, and risk management.
- Commodity Trading Advisor (effective May 1998).

Spring 1996 - Present **Yale School of Management** New Haven, Connecticut
*Adjunct Professor of Finance*
- Instructor for advanced graduate courses in international finance, financial policy in emerging markets, foreign exchange, derivatives, and asset management.

Summer 2006 - Present **Columbia University** New York, New York
*Adjunct Associate Professor Industrial Engineering and Operations Research*
- Instructor in graduate program in Financial Engineering

1998 - 2004 **Midwest Independent Transmission System Operator** Carmel, Indiana
*Director, Chairman of the Markets Committee, Member of the Finance and Audit Committee*
- Member of a seven-director board for MISO, which oversees wholesale transmission electricity in the Midwest and portions of Canada.

1999 - Present **Rubicon Fund Management** Cayman Islands
*Director*
- Member of board of directors of Cayman Islands-registered macro-hedge fund.

2002 - Present **BlueCrest Capital International** Cayman Islands
*Director*
- Member of board of directors of Cayman Islands-registered investment company.

2003 - Present **The Children's Investment Fund** Cayman Islands
*Director*
- Member of board of directors of Cayman Islands-registered European equity, event-driven hedge fund.

2005 - Present **GSA Capital International** Cayman Islands
*Director*
- Member of board of directors of Cayman Island-registered statistical arbitrage hedge fund.

2005 - 2006 **CCC Carbon Fund** Cayman Islands
*Director*
- Member of board of directors of Cayman Island-registered hedge fund.

1998 - 2004 **Bloomberg News** New Canaan, Connecticut
*Financial Columnist*
- Regular columnist for Bloomberg News, Bloomberg Radio, and Bloomberg Magazines on international finance, foreign exchange, and global politics.

1996-1997 **Quadrangle Investments, LLC** Greenwich Connecticut
*Co-Founder and Managing Partner*
- Global trader of foreign exchange, options, and exotic options on foreign exchange.
- Founder of macro-fundamental hedge fund with $32 million in assets.

1993 - 1996 **Swiss Bank Corporation** New York, New York
*Director, Foreign Exchange Trading*
- Global proprietary trader of foreign exchange, options, and exotic options on foreign exchange.
- Head of SBC technical education for North America.
- Instructor, intensive training courses for traders.
- Spoke to financial press (wire services, newspapers, and television) re: foreign exchange issues.

Spring 1995 - Fall 1996 **The University of Chicago, Graduate School of Business** Chicago, Illinois
*Lecturer in Finance*
- Concurrent with Swiss Bank.

1992 – 1993 **BEA Associates** New York, New York
*Vice President and Derivatives Portfolio Manager*
- Portfolio Manager in $7 billion hedging and arbitrage group.

1988 - 1992 **Alliance Capital Management L.P.** New York, New York
*Vice President – Derivatives and Synthetics*
- Handled portfolio management, product design, trading, and marketing for start-up derivatives group.

1985 - 1988 **DeRosa & Company** Los Angeles, California
*President and Owner*
- Established NASD broker-dealer firm which performed soft-dollar funded quantitative research for investment managers. Company sold in 1988.

1984 - 1985 **International Financial Advisers** Kuwait City, Kuwait
*Acting General Manager*
- Advised and ran operations of IFA, a registered investment banking firm in Kuwait owned by members of the royal family and their close business associates.

1981 - 1983 **Consulting Center For Finance and Investment** Riyadh, Saudi Arabia
*Senior Vice President*

1980 - 1981 **Wilshire Associates** Santa Monica, California
*Senior Associate*

1979 - 1980 **The University of Southern California** Los Angeles, California
*Assistant Professor of Finance and Business Economics*

1979 **Ministry of Finance and National Economy** Riyadh, Saudi Arabia
*Economic Advisor*

1975 - 1978 **Loyola University of Chicago** Chicago, Illinois
*Instructor in Finance*