IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-231 T
(Chief Judge Damich)

---

JZ Buckingham Investments LLC as Tax Matters Partner
of JBJZ Partners, a South Carolina general partnership,

Plaintiff,

v.

United States of America,

Defendant.

---

**UNITED STATES' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO THE VALIDITY OF TREASURY REGULATION § 1.752-6**

DENNIS M. DONOHUE
Chief Senior Litigation Counsel
U.S. Department of Justice, Tax Division
Post Office Box 403
Ben Franklin Station
Washington, D.C. 20044
(202) 307-6492

# TABLE OF CONTENTS

**Page(s)**

TABLE OF CONTENTS . . . . . . . . . . ii

TABLE OF AUTHORITIES . . . . . . . . . . iv- vii

APPENDIX.. . . . . . . . . . . viii

BACKGROUND. . . . . . . . . . . 2

STATEMENT . . . . . . . . . . 4

A. The COBRA Transaction. . . . . . . . . . . 4

B. The Transaction At Issue.. . . . . . . . . . 9

ARGUMENT. . . . . . . . . . . 15

THE RETROACTIVE APPLICATION OF TREASURY REGULATION § 1.752-6 IS VALID . . . . . . . . . . 15

A. Introduction . . . . . . . . . . 15

B. Treas. Reg. § 1.752-6 Is A Legislative Regulation And Has The Force And Effect Of Law . . . . . . . . . . 16

C. The Retroactivity Of Treas. Reg. § 1.752-6 Is Valid . . . . . . . . . . 18

D. Congress Was Clearly Aware Of Abusive Partnership Contingent Liability Transactions . . . . . . . . . . 21

E. Plaintiff's Assertion That The Real Purpose Of Treas. Reg. §1.752-6 Was To Buttress The Government's Litigation In Notice 2000-44 Transactions Is Belied By The Mandate In Section 309(c) Of The 2000 Act. . . . . . . . . . . 24

F. COBRA Taxpayers Could Not Rely On *Helmer* And Similar Cases. . . . . . . . . . . 25

G. Plaintiff's Argument That Section 309 Is Limited To Corporate Transactions Is Contrary To The Plain Wording Of The Statute . . . . . . . . . . 27

H. The Regulation's Rules are Comparable to I.R.C § 358 . . . . . . . . . . . . . . . . . . . 29

I. Plaintiff's Argument That The Regulation Fails The *Chevron* Test Is Meritless. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

J. Adoption Of The Regulation Is Constitutional And Does Not Violate Due Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

K. Plaintiff's Contention That The IRS Violated The Notice And Comment Requirements Of The Administrative Procedure Act (the "APA") Lacks Merit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

# TABLE OF AUTHORITIES

## FEDERAL CASES

*ACM Partnership v. Commissioner*,
157 F.3d 231 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*A. Tarricone, Inc. v. United States*,
4 F. Supp. 2d 323 (S.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Anderson, Clayton & Co. v. United States*,
562 F.2d 972 (5th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Cemco Investors, LLC v. United States*,
515 F.3d 749 (7th Cir. Feb. 7, 2008) . . . . . . . . . . . . . . . . . . 3, 19, 20, 21, 24, 26, 36, 37

*Cemco Investors, LLC v. United States*,
2007 WL 951944 (N.D. Ill.2007), *aff'd* 515 F.3d 749 (7th Cir. 2008). . . . . . . . . . . . . . . . . 4

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 30

*Coltec Industrial, Inc. v. United States*,
454 F.3d 1340 (Fed. Cir. 2006), *cert. denied*, 127 S. Ct. 1261 (2007) . . . . . . . . . . . . . 16

*Doe v. Wachovia*,
268 F. Supp. 2d 627 (W.D.N.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Fransen v. United States*,
191 F.3d 599 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Gilman v, Commissioner*,
933 F.2d 143 (2nd Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Helmer v. Commissioner*,
34 T.C.M. (CCH) 727 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*Jade Trading LLC v. United States*,
80 Fed. Cl. 11 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Kandi v. United States*,
2006 WL 83463 (W.D. Wash. 2006), *appeal docketed*, No. 06-35209
(9th Cir. March 14, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Klamath Strategic Investment Fund, LLC v. United States*,
440 F. Supp.2d 608 (E.D. Tex. 2006),
*cross-appeals docketed*, Nos. 07-40861, 07-40915
(5th Cir. Sept. 7, 2007, Sept. 19, 2007) . . . . . . . . . . . . . 3, 4, 18,19, 20, 30, 31, 32, 34, 37

*Klamath Strategic Investment Fund, LLC v. United States*,
472 F. Supp. 2d 885 (E.D. Tex 2007), *cross-appeals docketed*,
Nos. 07-40861, 07-40915 (5th Cir. Sept. 7, 2007, Sept. 19, 2007). . . . . . . . . . . . . . . . . 21

*Kligfield Holdings v. Commissioner*,
128 T.C. 192 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*La Rue v. Commissioner*,
90 T.C. 465 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Long Island Care at Home, Ltd. v. Coke*,
127 S. Ct. 2339 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Long v. Commissioner*,
71 T.C. 1 (1978), *rev'd in part on other grounds*,
660 F.2d 416 (10th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Snap-Drape, Inc. v. Commissioner*,
98 F.3d 194 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Stobie Creek Investments, LLC v. United States*,
2008 WL 852821 (Fed.Cl. March 10, 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
3

*Tate & Lyle, Inc. v. Commissioner*,
87 F.3d 99 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*The Diversifed Group, Incorporated v. Daugerdas*,
139 F. Supp. 2d 445 (2001 S.D.N.Y.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*United States v. Carlton*,
512 U.S. 26 (1944) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Jenkens & Gilchrist*,

03-5693 (N.D. Ill. March 10, 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

## FEDERAL STATUTES

5 U.S.C. § 553(b)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
5 U.S.C. § 553(b) & (c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
5 U.S.C. § 553(d)(1) and (3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36
I.R.C. § 357(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22
I.R.C. § 358 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 29
I.R.C. § 358(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 21, 24, 27, 28, 29
I.R.C. § 358(h)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17
I.R.C. § 362(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11
I.R.C. § 752 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 30
I.R.C. §§ 752(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 18
I.R.C. § 752 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
I.R.C. § 7805(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 30, 31, 34
I.R.C. § 7805(b)(1)), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 31
I.R.C. § 7805(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
I.R.C. § 7805(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
I.R.C. § 7805(b)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
I.R.C. § 7805(b)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
I.R.C. § 7805(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 20, 21, 23, 30, 31
I.R.C. § 7805(b)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

## FEDERAL REGULATIONS

Treas. Reg. § 1.358-7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
Treas. Reg. 1.752-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
Treas. Reg. § 1.752-6..2, 3, 15, 16, 17, 18, 19, 20, 21, 23, 24, 25, 28, 29, 31, 32, 34, 35,36
Treas. Reg. § 1.752-6(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
Treas. Reg. § 1.752-6(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
Treas. Reg. § 1.752-6T . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36
Treas. Reg. § 1.752-6T . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
Treas. Reg. § 1.752-7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 25, 32, 35, 36
Temp. Treas. Reg. § 1.752-6T. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24, 35, 36

## OTHER AUTHORITIES

68 Fed. Reg. 37,414 (2003)........................................................................................ 35
68 Fed. Reg. at 37,416........................................................................................................35
68 Fed. Reg. 37,434 (2003)..................................................................................................35
68 Fed. Reg. 37,434, 37,436-37,437 (2003).......................................................................32
68 Fed. Reg. 37,438.............................................................................................................35
70 Fed. Reg. 30,334, 30,336-30,337 (2005)...................................................................35, 36
I 145 Cong. Rec. 27,547, 27,553- 27,554(1999)................................................................ 22
145 Cong. Rec. at 7,553.................................................................................................. 22, 23
771 of the Internal Revenue Code, Treas. Reg. § 1.752-6.....................................................28
2000-2 C.B. at 255...................................................................................................................2
1996 of the Taxpayer Bill of Rights 2, Pub. L. No. 104-168, 110 Stat. 1452,
1999-2 C.B. at 761...................................................................................................................2
H.R. 2488, 106th Cong. (1999)..............................................................................................22
H.R. Conf. Rep. No. 106-1033 at 1017 (2000), *reprinted in* 2000-3 C.B.
304, 347. Treas. Reg. § 1.................................................................................................17, 29
H.R. Conf. Rep. No. 106-289 at 537 (1999)........................................................... 22
H.R. Rep. No. 106-1036, at 5 (2000)..................................................................... 22
S. Rep. No. 106-120 at 1 (1999)............................................................................. 21
S. Rep. No. 106-201 at 47 (1999)........................................................................... 22
T.D. 9062, 2003-2 C.B. 46, 67 (the "2000 Act")..................................................... 16
T.D. 9062, 2003-2 C.B. at 61.................................................................................. 17
T.D. 9207, 2005-1 C.B. at 1347.............................................................................. 20
Title V of the Ticket to Work and Work Incentives Improvement Act of 1999,
Pub. L. No. 106-170, 113 Stat. 1860 (1999)........................................................... 23
§ 309(c) of the Community Renewal Tax Relief Act of 2000, Pub. L. No.
106-554, 114 Stat. 2763A-638................................................................................16

Staff of the Joint Comm. on Taxation, 106th Cong., *General Explanation of Tax Legislation Enacted in the 106th Congress* 153 n.174 (Comm. Print 2001) (JCS-2-01), *reprinted in* 2000-3 C.B. 565, 651 . . . . . . . . . . . . . . . . . . 22

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-231 T
(Chief Judge Damich)

---

JZ Buckingham Investments LLC as Tax Matters Partner
of JBJZ Partners, a South Carolina general partnership,

Plaintiff,

v.

United States of America,

Defendant.

---

**APPENDIX OF ADDITIONAL LEGISLATIVE AUTHORITIES CITED IN UNITED STATES' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO THE VALIDITY OF TREASURY REGULATION § 1.752-6**

---

| # | Description | Pages |
|---|---|---|
| A1 | § 309(c) of the Community Renewal Tax Relief Act of 2000, Pub. L. No. 106-554, 114 Stat. 2763A-587. T.D. 9062, 2003-2 C.B. 46, 67 (the "2000 Act"). | 001-002 |
| A2 | H.R. 2488, 106th Cong. (1999), pp. 537-538 | 003-005 |
| A3 | H.R. Conf. Rep. No. 106-1033 (2000), *reprinted in* 2000-3 C.B. 304, 347, pp.1017-1020 | 006-010 |
| A4 | H.R. Rep. No. 106-1036 (2000), pp. 5-7 | 011-014 |

| # | Description | Pages |
|---|---|---|
| A5 | S. 1792, the Tax Relief Extension Act of 1999 | 015-017 |
| A6 | S. 1429, 106th Cong. (1999), pp.214-215 | 018-020 |
| A7 | S. Rep. No. 106-201 (1999), pp. 46-48 | 021-024 |
| A8 | Staff of the Joint Comm. on Taxation, 106th Cong., *General Explanation of Tax Legislation Enacted in the 106th Congress* (Comm. Print 2001) (JCS-2-01), *reprinted in* 2000-3 C.B. 565, 651, pp.153-156. | 025-029 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-231 T
(Chief Judge Damich)

---

JZ Buckingham Investments LLC as Tax Matters Partner
of JBJZ Partners, a South Carolina general partnership,

Plaintiff,

v.

United States of America,

Defendant.

---

**UNITED STATES' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO THE VALIDITY OF TREASURY REGULATION § 1.752-6**

Plaintiff moves for partial summary judgment in this case involving offsetting option transactions known as COBRA. Specifically, plaintiff requests the Court to issue an order holding Treas. Reg. § 1.752-6 (the "Regulation") to be invalid. This regulation applies retroactively to the COBRA transaction at issue and requires the taxpayers to reduce their basis in their purported partnership interest (outside basis) by the amount of the premium credited to them on the purported short option liability that their "partnership" assumed. The Regulation was designed to prevent the abusive practice of taxpayers, such as Messrs. Zucker and Boyd here, claiming huge noneconomic losses generated from artificially-inflated bases in partnership interests or assets whose bases are derived from such inflated outside bases. Contrary to

plaintiff's arguments, the Regulation is valid, is manifestly consistent with its authorizing statute and was properly issued.

**BACKGROUND**

Treas. Reg. § 1.752-6 is designed to combat so-called Son of Boss transactions. There are a number of different types of Son-of-BOSS transactions, but what they all have in common is the transfer of assets along with significant liabilities to a partnership, with the goal of artificially inflating the taxpayer's basis in the partnership. *See*, *Kligfield Holdings v. Commissioner*, 128 T.C. 192, 194 (2007). These liabilities may be varied and may not be completely fixed at the time of transfer. The promoters of these tax shelters claim that because these liabilities may be uncertain, they are contingent liabilities and can be ignored in computing a taxpayer's outside basis in the partnership. The result is that the taxpayers will have a basis in the partnership that can be used to generate enormous tax losses, even though the taxpayer has incurred no corresponding economic loss.

On December 27, 1999, the IRS issued Notice 99-59 advising taxpayers that to be deductible for federal income tax purposes, a loss must be bona fide and reflect actual economic consequences. 1999-2 C.B. at 761. On August 11, 2000, the IRS issued Notice 2000-44 informing taxpayers and tax practitioners that noneconomic tax losses generated from artificially-inflated partnership bases are not allowable deductions and warning taxpayers that claiming such fictitious losses may result in penalties. 2000-2 C.B. at 255. Following up on these warnings, on June 24, 2003, the Treasury Department issued Treas. Reg. § 1.752-6, in temporary form, which sets forth a basis reduction rule applicable to partnership assumptions of

certain obligations (whether fixed or contingent) occurring after October 18, 1999, and before June 24, 2003.[1]

To support its position that the Regulation is invalid, plaintiff relies heavily on *Klamath Strategic Inv. Fund, LLC v. United States*, 440 F. Supp. 2d 608 (E.D. Tex. 2006), *cross-appeals docketed*, Nos. 07-40861, 07-40915 (5th Cir. Sept. 7, 2007, Sept. 19, 2007).[2] The transaction at issue in *Klamath* also sought to inflate artificially a partner's basis in his partnership interest. The *Klamath* court held that the retroactive application of Treas. Reg. § 1.752-6 to conduct occurring prior to August 11, 2000 (the date on which the IRS issued Notice 2000-44) was invalid. Incredibly, however, plaintiff fails to inform the Court that the Seventh Circuit recently issued a "withering rejection"[3] of *Klamath* in *Cemco Investors, LLC v. United States*, 515 F.3d 749 (7th Cir. Feb. 7, 2008). In *Cemco*, the Seventh Circuit held, in the strongest possible terms, that *Klamath* was incorrect and that Treas. Reg. § 1.752-6 is valid. Plaintiff's failure to even note in passing the Seventh Circuit's holding in *Cemco*, which was decided a month before plaintiff filed the instant motion, is particularly egregious because plaintiff twice cites the District Court opinion in *Cemco*.[4] Moreover, although citing the lower court decision, plaintiff never even mentions that the District Court also implicitly found Treas. Reg. § 1.752-6 to be

---

[1] A much more detailed set of rules applies to assumptions of such obligations occurring on or after June 24, 2003. *See* Treas. Reg. § 1.752-7.

[2] Plaintiff fails to note that this holding is on appeal.

[3] *See Stobie Creek Investments, LLC v. United States*, 2008 WL 852821 (Fed.Cl. March 10, 2008).

[4] Plaintiff's Memorandum in Support of its Motion for Partial Summary Judgment as to the Validity of Treasury Regulation § 1.752-6 ("P. Brief.") at 18 n.55 and 21 n.64.

valid or alert the Court that the Seventh Circuit, in affirming the District Court's decision, found *Klamath*'s reasoning devoid of logic.[5]

## STATEMENT

### A. The COBRA Transaction.

COBRA is an acronym for Currency Options Bring Reward Alternatives.[6] The COBRA transaction was designed in the months of September and October of 1999 by the national accounting firm Ernst & Young, LLP ("E&Y"), with the assistance of the Chicago law firm of Jenkens & Gilchrist ("J&G") and Deutsche Bank A.G. ("DB"),[7] which were already marketing a similar product known as the Option Partnership Strategy ("OPS").[8] The OPS strategy and its genesis are described in *The Diversifed Group, Incorporated v. Daugerdas*, 139 F.Supp.2d 445 (S.D.N.Y. 2001), in which The Diversified Group, alleged that Paul Daugerdas, the newly-appointed head of J&G's recently- formed Chicago office, had stolen its tax shelter product.[9] The

---

[5] *Cemco Investors, LLC v. United States*, 2007 WL 951944 (N.D. Ill.2007), *aff'd* 515 F.3d 749 (7th Cir. 2008).

[6] United States' Additional Proposed Findings of Uncontroverted Facts in Opposition to Plaintiff's Motion for Partial Summary Judgment as to the Validity of Treasury Regulation § 1.752-6 ("Proposed Findings") ¶ 1.

[7] Proposed Findings ¶ 2.

[8] Proposed Findings ¶ 3.

[9] Proposed Findings ¶ 5. In its suit against J&G, DGI broadly defined its stolen OPS product as follows: "The option partnership strategy is a tax-saving strategy wherein a taxpayer purchases and writes options and transfers these option positions to a partnership so as to create substantial increased basis in the partnership interest. As a result of these trades and transfer, the taxpayer claims that the basis of the taxpayer's partnership interest is increased by the cost of purchased call options, but is not reduced as a result of the partnership's assumption of the taxpayer's obligation with respect to the written call options." *The Diversifed Group, Incorporated v. Daugerdas*, 139 F.Supp.2d at 449. Proposed Findings ¶ 5.

COBRA and OPS transactions are both predicated upon the use of nearly off-setting digital option contracts.[10] In the late fall of 1999, J&G and DB implemented 105 OPS transactions.[11] Concurrently, they also implemented 15 COBRA transactions for E&Y.[12] The 15 COBRA transactions generated noneconomic tax losses totaling $834 million.[13]

The OPS and COBRA transactions were designed to accomplish the same tax-driven objective and differed only slightly in their terms. The engine driving both transactions was offsetting foreign currency digital options: a purchased (or long) option and a sold (or short) option.[14] As structured, the offsetting digital options of both OPS and COBRA provided a net payoff at a pre-agreed upon multiple of the net premium.[15] In the instance of the OPS transactions, the net premium was equal to 1% of the desired loss, with the possibility of a 2:1 payoff.[16] In the case of COBRA, the net premium was equal to 5% of the desired loss, with a possibility of a 2.5:1 net payoff.[17] Notwithstanding these cosmetic changes, these offsetting option transactions were both designed to generate an artificially-inflated basis of a taxpayer's

---

[10] Proposed Findings ¶ 6.

[11] Proposed Findings ¶ 7.

[12] Proposed Findings ¶ 8.

[13] Proposed Findings ¶ 9.

[14] Proposed Findings ¶ 10.

[15] Proposed Findings ¶ 11.

[16] Proposed Findings ¶ 12.

[17] Proposed Findings ¶ 13.

partnership interest, which, in turn, could be used to generate massive tax losses, and thereby eliminate a wealthy taxpayer's unrelated taxable income.[18]

E&Y began marketing the COBRA transaction in the fall of 1999.[19] Both E&Y and J&G required so-called "targets" (potential COBRA purchasers) to sign a non-disclosure agreement ("NDAs").[20] The J&G NDA expressly disclosed J&G's role as a promoter and disclaimed any fiduciary relationship with the target.[21] See, e.g., *Doe v. Wachovia*, 268 F. Supp.2d 627, 634 (W.D.N.C. 2003) (holding that the terms of J&G's NDA vitiated any attorney-client relationship with taxpayers). *See also, United States v. Jenkens & Gilchrist*, 03-5693 (N.D. Ill. March 10, 2005) (same). In addition to being required to sign NDAs, targets were not allowed to retain any of the marketing materials.[22] Both of these limitations appear to have been imposed upon potential clients in order to minimize the possibility that the COBRA transactions might be disclosed to the IRS.[23] In the marketing of the program, targets were typically shown a template J&G draft legal opinion blessing the transaction for federal income tax purposes.[24]

To assist in choreographing the intricately sequenced steps of this transaction, the promoters not only developed a COBRA power point, but a COBRA Client Questionnaire and a

---

[18] Proposed Findings ¶ 14.

[19] Proposed Findings ¶ 15.

[20] Proposed Findings ¶ 16.

[21] Proposed Findings ¶ 17.

[22] Proposed Findings ¶ 18.

[23] Proposed Findings ¶ 19.

[24] Proposed Findings ¶ 20.

COBRA Action Workplan.[25] The COBRA Power Point was used to market the product to potential clients and generally details the overall steps, with particular focus on the planned tax benefits.[26] The COBRA Client Questionnaire was designed to provide J&G the necessary information to implement the transaction, detailing both the amount and the character of the desired tax loss.[27] The COBRA Checklist was then to be used by E&Y to monitor the planned choreography.[28] The COBRA Power Point provides a good overview of the transaction, which slides can be briefly summarized as follows:[29]

Step One: Purchase/Sale of Offsetting Option Contracts. Each individual simultaneously buys (goes long) and sells (goes short) digital foreign currency options at nearly identical strike prices, creating a position consisting of two offsetting options.

Step Two: Transfer of Offsetting Options to Partnership. The individuals transfer the offsetting foreign currency option positions to a "newly formed general partnership." In calculating their basis in the partnership, the taxpayers take into account the stated premium of the long option and ignore the offsetting stated premium received for the short option. In addition, the individuals contribute cash equal to two per cent of the "desired loss" (i.e., the stated premium on the long option) to the partnership.

---

[25] Proposed Findings ¶ 21.

[26] Proposed Findings ¶ 22.

[27] Proposed Findings ¶ 23.

[28] Proposed Findings ¶ 24.

[29] Proposed Findings ¶ 25.

Step Three: Termination of Options and Acquisition of Assets. The digital foreign currency options expire either in or out of the money, resulting in a gain or loss. The COBRA Presentation then states, "[i]f ordinary loss is desired, spot foreign currency will be purchased by the partnership. If capital loss is desired, capital assets will be purchased."

Step Four: Transfer of Partnership Interests to S Corp. The individuals transfer their entire interest in the partnership to a newly formed S corporation, which results in the technical termination of the partnership for federal income tax purposes.

Step Five: Distribution of Partnership Assets to S Corp and Their Sale. The partnership liquidates and distributes its assets to the S corporation. Under I.R.C. § 362(a), the taxpayers' artificially-inflated outside basis in the now-dissolved partnership carries over and becomes the basis of the distributed stock and/or foreign currency distributed to the S corporation. The S corporation then "sells the stepped-up assets [i.e. the foreign currency or securities] to an unrelated third party, generating a loss for tax purposes."

Although not specified on the COBRA Powerpoint, the final step of the transaction was the payment of fees and preparation and issuance to the taxpayers in the following tax year of two separate legal opinions to support COBRA's claimed tax benefits. E&Y charged a fee of 1.5.% of the taxpayers' desired loss and J&Y charged a fee of 3% of the taxpayers' desired loss, net of the fee charged by the firm of Brown & Wood, LLP ("B&W).[30] J&G prepared one of the two legal opinions and because of J&G's status as a co-promoter, E&Y recruited B&W to prepare a second legal opinion.[31] Both of these opinions were boilerplate opinions containing

---

[30] Proposed Findings ¶ 26.

[31] Proposed Findings ¶ 27.

virtually the same formulaic language except for the required change in the taxpayers' names and the names of their respective entities.[32]

**B. The Transaction at Issue.**

The transaction at issue closely adhered to each of these generic steps.[33] On November 16, 1999, Jerry Zucker and his business partner, James Boyd ("taxpayers"), committed to an aggregate $50 million COBRA transaction, to generate a $20 million ordinary tax loss and a $30 million short term capital loss, of which 90% was to be allocated to Zucker.[34] Upon notification of the precise plan, J&G immediately formed the requisite entities for implementing this COBRA transaction. JZ Buckingham LLC and JGB Bohicket LLC were formed by J&G on behalf of Zucker and Boyd. J&G also formed the other requisite entities on their behalf, the partnership JBJZ Partners and JBJZ Investors Inc., a Subchapter S corporation.[35]

Step One: The Zucker LLC purchased a call option on the Japanese yen on or about November 23, 1999, with a premium of $25,000,000 and a strike price of 106.19, and a payout of $50,000,000. At the same time, the Zucker LLC sold a Yen call option with a premium of $23,750,000 with a strike price of 106.21 and a payout of $46,875,000.[36] Therefore, the Zucker LLC only paid $1,250,000, the net of the two premiums, to Deutsche Bank for this option pair

---

[32] Proposed Findings ¶ 28.

[33] Proposed Findings ¶ 29.

[34] Proposed Findings ¶ 30.

[35] Proposed Findings ¶ 31.

[36] Proposed Findings ¶ 32.

which was 5% of the $25,000,000 premium for the long option.[37] The potential payoff on the Yen pair was 2.5 X $1,250,000, or $3,125,000.

The Zucker LLC also purchased a put option on the Euro with a premium of $20,000,000, a strike price of 1.0123, and a payout of $40,000,000.[38] At the same time, the Zucker LLC sold a put option on the Euro for $19,000,000 with a strike price of 1.0121, and a payout of $37,500,000.[39] Therefore, the Zucker LLC paid only $1,000,000, the difference in the premiums, to Deutsche Bank for this option pair, which again was 5% of the long option.[40]

Contemporaneously, the Boyd LLC purchased an identical put option on the Euro, but for $5,000,000, with a strike price of 1.0123 and a payout of $10,000,000.[41] At the same time, the Boyd LLC sold an identical put option on the Euro, but for a premium of $4,750,000, with a strike price of 1.0121 and a payout of $9,375,000.[42] Therefore, the Boyd LLC paid only $250,000, the difference in the premiums, to Deutsche Bank for this option pair, which again was 5% of the long option.[43] The exercise date for all three pairs of these options was in thirty days or December 22, 1999.[44]

---

[37] Proposed Findings ¶ 33.

[38] Proposed Findings ¶ 34.

[39] Proposed Findings ¶ 35.

[40] Proposed Findings ¶ 36.

[41] Proposed Findings ¶ 37.

[42] Proposed Findings ¶ 38.

[43] Proposed Findings ¶ 39.

[44] Proposed Findings ¶ 40.

Step Two: The Zucker LLC transferred its two pairs of options, and $9,000,000 in cash to the Partnership.[45] The Boyd LLC transferred its option pair and $100,000 to the Partnership.[46]

Step Three: The Partnership held the options until their expiration on December 22, 1999.[47] The $25MM of options on the Yen expired out of the money.[48] The $25MM of options on the Euro expired in the money. That is, both Zucker's and Boyd's long option and DB's short option on the Euro were entitled to received the payout amounts, providing Zucker was a net payout of the difference.[49] The payoff on the Euro pair was 2.5 X $1,250,000, or $3,125,000, which Deutsche Bank paid to the Partnership.[50]

On December 7 and 8, 1999, Zucker and Boyd contributed 5,000 shares of Cisco stock to the S Corp.[51] On December 22, 1999, realizing that they had transferred the Cisco stock to the wrong entity, the S Corp transferred the Cisco stock to the Partnership.[52] On December 22,

---

[45] Proposed Findings ¶ 41.

[46] Proposed Findings ¶ 42.

[47] Proposed Findings ¶ 43.

[48] Proposed Findings ¶ 44.

[49] Proposed Findings ¶ 45.

[50] Proposed Findings ¶ 46.

[51] Proposed Findings ¶ 47.

[52] Proposed Findings ¶ 48. To receive a stepped up basis, the stock had to be first in the Partnership, and then distributed to the S Corporation on the termination of the Partnership. See I.R.C. § 362(a).

1999, the Partnership purchased $600,000 worth of Canadian dollars.[53] On December 23, 1999, the Partnership purchased an additional $172,500 worth of Canadian dollars.[54]

Step Four: On December 27, 1999, the Zucker LLC and the Boyd LLC contributed their interests in the Partnership to the S Corp, causing a technical termination of the Partnership for federal income tax purposes.[55]

Step Five: Also on December 27, 1999, the Partnership is liquidated and its assets are distributed to the S Corp.[56] The S Corp then proceeds to sell the non-cash assets received from the Partnership.[57] On December 28, 1999, the S Corp sold all 5,000 shares of its Cisco stock at $105.95 per share.[58] The proceeds from the sale were $529,729.34.[59] On December 28, 1999, the S Corp sold all of its Canadian dollars.[60] The proceeds on the foreign currency sale were $778,407.35.[61]

Payment of fees: The taxpayers paid a fee of $750,000 to E&Y, which was 1.5% of their desired loss of $50,000,000, and a fee of $1,500,000 to J&G, which was 3% of their desired loss

---

[53] Proposed Findings ¶ 49.

[54] Proposed Findings ¶ 50.

[55] Proposed Findings ¶ 51.

[56] Proposed Findings ¶ 52.

[57] Proposed Findings ¶ 53.

[58] Proposed Findings ¶ 54.

[59] Proposed Findings ¶ 55.

[60] Proposed Findings ¶ 56.

[61] Proposed Findings ¶ 57.

of $50,000,000.[62] B&W charged a separate fee for its legal opinion in the amount of $50,000.[63] As a result of the huge fees and transaction costs, absent the claimed tax benefits at issue, the taxpayers lost substantial amount of money on the COBRA transaction – and despite having some incredibly good luck on the Euro options.[64]

Claimed Tax Losses: Taxpayers claimed a combined outside basis in the Partnership of $52,907,725 at the time that they contributed their respective partnership interests to the S Corporation.[65] This claimed basis consisted almost entirely of the $50,000,000 purported price of the long digital options on the Euro and the Yen.[66] The Partnership did not reduce this basis by the offsetting short options.[67] The basis was increased by contributions of cash and income from the options, as well as capitalization of the fees paid to E&Y.[68] Various smaller transactions also altered the basis to a small extent.[69]

On the termination of the Partnership, taxpayers claim that the basis in the Cisco stock and Canadian currency distributed to the S Corporation took on the same basis as their outside basis in the Partnership.[70] Thus, they claim that their aggregate tax basis of the assets in the S

---

[62] Proposed Findings ¶ 58.

[63] Proposed Findings ¶ 59.

[64] Proposed Findings ¶ 60.

[65] Proposed Findings ¶ 61.

[66] Proposed Findings ¶ 62.

[67] Proposed Findings ¶ 63.

[68] Proposed Findings ¶ 64.

[69] Proposed Findings ¶ 65.

[70] Proposed Findings ¶ 66.

Corp was $50,952,250.[71] This consisted of the $52,907,725 basis in their partnership interests plus $1,400,000 which they paid to J&G, less over $3 million in cash disbursements.[72]

On its Form 1120 S for its 1999 tax year, the S Corporation reported $49,644,114 in ordinary and capital losses from the sale of the Cisco stock and Canadian currency.[73] This consisted of an ordinary loss of $29,446,675 from the sale of the Canadian currency, a short term capital loss of $2,019,106 from the sale of the Cisco stock held for less than a year, and a long term capital loss of $18,177,695 from the sale of Cisco stock held for over a year.[74] On their respective 1999 Form 1040s, Zucker and Boyd, as the stockholders of the S Corporation, reported their pro rata shares of the $29,446,675 in ordinary loss from the sale of the Canadian currency.[75] Boyd, on his 1999 Form 1040, claimed the entire amount of his allocable loss of $2,019,106 from the S Corporation's sale of Cisco stock as a short term capital loss.[76] Zucker, on his 1999 Form 1040, claimed the entire amount of his allocable loss of $18,177,695 from the S Corporation's sale of Cisco stock as a long term capital loss.[77]

## ARGUMENT

[71] Proposed Findings ¶ 67.

[72] Proposed Findings ¶ 68.

[73] Proposed Findings ¶ 69.

[74] Proposed Findings ¶ 70.

[75] Proposed Findings ¶ 71.

[76] Proposed Findings ¶ 72.

[77] Proposed Findings ¶ 73.

## THE RETROACTIVE APPLICATION OF TREASURY REGULATION § 1.752-6 IS VALID

### A. Introduction.

Treas. Reg. § 1.752-6 applies to a partnership's assumption of a liability occurring after October 18, 1999, and before June 24, 2003, if I.R.C. §§ 752(a) and (b) do not apply to that liability. Treas. Reg. § 1.752-6 provides:

> If, in a transaction described in section 721(a), a partnership assumes a liability (defined in section 358(h)(3)) of a partner (other than a liability to which section 752(a) and (b) apply), then, after application of section 752(a) and (b), the partner's basis in the partnership is reduced (but not below the adjusted value of such interest) by the amount . . . of the liability.

This Regulation thus requires a partner, in a transaction described in § 721(a), to reduce his basis in his partnership interest (outside basis) by the amount of any liability, as defined in I.R.C. § 358(h)(3), that the partnership assumes. Section 358(h)(3) defines "liability" to "include any fixed or contingent obligation to make payment, without regard to whether the obligation is otherwise taken into account for purposes of this title." Accordingly, under Treas. Reg. § 1.752-6, a partnership's assumption of a contingent liability results in a partner's outside basis being reduced. This regulation is retroactive, applying to assumptions of liabilities occurring after October 18, 1999, and before June 24, 2003. Treas. Reg. § 1.752-6(d)(1).

Under the Regulation, Jerry Zucker and James Boyd are required to reduce their outside basis in JBJZ Partners by the premiums credited to them on the purported short option liabilities assumed by their alleged partnership. These offsetting premiums in the aggregate amounted to $47.5 million. This reduction in outside basis would in turn result in the aggregate basis of the Cisco stock and Canadian currency of $50.9 million to be reduced by $47.5 million (but not

below the adjusted value of their interests). The Regulation, as it was intended to do, thus eliminates the artificially-inflated basis that lies at the heart of the COBRA tax shelter.[78]

### B. Treas. Reg. § 1.752-6 is a legislative regulation and has the force and effect of law.

Treas. Reg. § 1.752-6 was promulgated pursuant to § 309(c) of the Community Renewal Tax Relief Act of 2000, Pub. L. No. 106-554, 114 Stat. 2763A-638. T.D. 9062, 2003-2 C.B. 46, 67 (the "2000 Act").[79] In the 2000 Act, Congress enacted I.R.C. § 358(h) to address certain situations in which property is transferred to a corporation in exchange for both stock and the corporation's assumption of certain obligations of the transferor. In transactions involving so-called contingent liability tax shelters, transferors took the position that the assumed obligations were not liabilities within the meaning of § 357(c) or that they were described in § 357(c)(3), and, therefore, the obligations did not reduce the basis of the stock received by the transferor in the transferee corporation. *See Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1350-51 (Fed. Cir. 2006), *cert. denied*, 127 S. Ct. 1261 (2007). These assumed obligations, however, meant that the actual market value of the corporation's stock was worth significantly less than the transferor's claimed basis in the corporation's stock.

The transferors, as was the plan all along, then sold the stock and reported enormous, but wholly artificial losses, on the sales. *Id*. Congress responded to these shelters by enacting § 358(h), which provides that, after the application of § 358(d), the basis in stock received in certain exchanges must be reduced by the amount of any liability assumed in the exchange.

---

[78] As the United States will show at trial, however, the taxpayers' COBRA transaction was completely bereft of economic substance, thereby requiring their actual basis in their partnership interests to be zero. *See*, *Gilman v, Comm'r*, 933 F2nd 143, 150-51 (2nd Cir. 1991).

[79] Appendix A1.

T.D. 9062, 2003-2 C.B. at 61. "Liability" was defined to "include any fixed or contingent obligation to make payment. . . ." I.R.C. § 358(h)(3).

When it enacted § 358(h), Congress also "recognized that taxpayers were attempting to use partnerships . . . to carry out the same types of abuses that section 358(h) was designed to deter." T.D. 9062, 2003-2 C.B. at 61. Congress therefore directed the Secretary of the Treasury to "prescribe rules which provide appropriate adjustments under subchapter K of chapter 1 of the Internal Revenue Code of 1986 to prevent the acceleration or duplication of losses through the assumption of (or transfer of assets subject to) liabilities described in section 358(h)(3) of such Code . . . in transactions involving partnerships." 2000 Act, § 309(c)(1).

Treas. Reg. § 1.752-6 was enacted pursuant to this statutory directive and is, therefore, a legislative regulation. Legislative regulations have controlling weight unless they are arbitrary, capricious, or manifestly contrary to the underlying statute. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843-44 (1984); *Fransen v. United States*, 191 F.3d 599, 600 (5th Cir. 1999).

Contrary to plaintiff's assertion,[80] Treas. Reg. § 1.752-6 is fully consistent with the underlying statute -- § 309(c)(1) of the 2000 Act. Indeed, it implements the Congressional intent to put an end to tax shelters designed to inflate the basis in assets through the use of assumed liabilities and then to generate large, but wholly artificial, losses on the sale of the inflated-basis assets. *See* H.R. Conf. Rep. No. 106-1033 at 1017 (2000), *reprinted in* 2000-3 C.B. 304, 347. Treas. Reg. § 1.752-6 prevents tax abuse caused by the creation of artificial losses by requiring

[80] P. Brief at 11-16.

the reduction of a partner's basis by the amount of the liability that his partnership assumed.[81] Moreover, the wording of Treas. Reg. § 1.752-6 closely tracks § 358(h), which requires a reduction in a shareholder's basis in stock by the amount of any liability, fixed or contingent, assumed by the corporation in certain exchanges. Because Treas. Reg. § 1.752-6 is consistent with the underlying statute, it is controlling here.[82] *See Chevron*, 467 U.S. at 844 ("a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency") (footnote omitted).

### C. The retroactivity of Treas. Reg. § 1.752-6 is valid

Plaintiff, relying on *Klamath*, argues that the Regulation fails to satisfy I.R.C. § 7805(b) criteria for retroactive effect of Treasury regulations. Although regulations generally are not retroactive (I.R.C. § 7805(b)(1)), there are exceptions to that rule. Section 7805(b)(6) provides

---

[81] Treas. Reg. § 1.752-6 applies only when I.R.C. § 752 is inapplicable. Thus, a taxpayer to whom the Regulation applies is required to decrease his basis in his partnership interest by the amount of any liability, fixed or contingent, assumed by the partnership – but cannot increase his basis by his proportionate share of the partnership liabilities as is otherwise permitted by I.R.C. § 752(a).

[82] In *Klamath*, the District Court held that Treasury exceeded the Congressional grant of authority in adopting Treas. Reg. § 1.752-6 and that the regulation was, therefore, an interpretive regulation, rather than a legislative regulation. *Id*. at 621-622. The court relied on the lack of reference to § 752 in either the Community Renewal Tax Relief Act or its legislative history and on Treasury's promulgation of Treas. Reg. § 1.358-7 under the authority granted to it by § 309 of the 2000 Act.

The court erred in so holding. In § 309 of the 2000 Act, Congress directed Treasury to prescribe rules to provide "adjustments under subchapter K of chapter 1 of the Code to prevent the acceleration or duplication of losses through the assumption of (or transfer of assets subject to) liabilities described in Section 358(h)(3) . . . in transactions involving partnerships." Because § 752 is in subchapter K, Treas. Reg. § 1.752-6 is a direct fulfillment of the explicit mandate from Congress in the 2000 Act.

that the statutory presumption against retroactive regulations "may be superseded by a legislative grant from Congress authorizing the Secretary to prescribe the effective date with respect to any regulation." Moreover, Section 7805(b)(3) authorizes Treasury to "provide that any regulation may take effect or apply retroactively to prevent abuse."

These two exceptions apply here and validate the retroactivity of Treas. Reg. § 1.752-6. First, Section 7805(b)(6) expressly authorizes the retroactivity because the Community Renewal Relief Tax Act expressly provides that regulations adopted pursuant to § 309(c) "shall apply to assumption of liabilities after October 18, 1999, or such later date as may be prescribed in such rules." 2000 Act, § 309(d)(2). Although the District Court in *Klamath* held that the Commissioner abused his discretion in making Treas. Reg. § 1.752-6 retroactive, the Seventh Circuit held otherwise in Cemco, and in no uncertain terms. As the Seventh Circuit stated, Section 309(c):

> enacts basis reduction rules for many transactions and authorizes the IRS to adopt regulations prescribing similar rules for partnerships and S corporations. Section 309(d)(2) of the 2000 Act adds that these regulations may be retroactive to October 18, 1999. That's the power the Commissioner used when promulgating Treas. Reg. § 1.752-6.

*Cemco*, 515 F.3d at 752.

*Klamath*'s holding that the retroactive Regulation lacked Congressional authority baffled the Seventh Circuit:

> The district court in *Klamath* did not doubt that retroactivity *could* rest on the 2000 Act; Treas. Reg. § 1.752-6 applies to partnerships (and LLCs treated as partnerships) a rule "similar" to the approach that Congress adopted for other business entities. *Klamath* held, however, that when promulgating Treas. Reg. § 1.752-6 the IRS had not availed itself of that power. But if the IRS was not using that authority, why in the world does the regulation reach back to October 18, 1999? Retroactivity requires justification; to make a

> rule retroactive is to invoke one of the justifications; and the choice of date tells us that the justification is the one supplied by the 2000 Act (in conjunction with § 7805(b)(6)). A regulation's legal effect does not depend on reiterating the obvious.

*Cemco*, 515 F.3d at 752.

Even if § 7805(b)(6) did not authorize retroactive application, however, § 7805(b)(3), which authorizes retroactive application to prevent abuse, would so authorize. In adopting Treas. Reg. § 1.752-6, the Treasury made clear that it "has determined that a retroactive effective date is appropriate to prevent abuse." T.D. 9207, 2005-1 C.B. at 1347. Abuse is patent in tax shelters as here that attempt to generate artificially-inflated bases in partnership interests, which inflated bases are designed to generate paper tax losses where no comparable economic losses have occurred. The present case is a perfect illustration of that abuse; the taxpayers in the COBRA transactions here attempted to turn assets with an aggregate basis of $864,405 into assets with an aggregate basis of $50,952,250, or 57.9 times the actual basis of these assets. The taxpayers then arranged the sale of these inflated-basis assets, and claimed $49,643,894 in fictitious losses on their 1999 returns – $29, 446,475 in ordinary losses, $18,177,675 in long term capital losses, and $2,019, 744 in short term capital losses. Under I.R.C. § 7805(b)(3), the Secretary was clearly authorized to prevent such abuse by making Treas. Reg. § 1.752-6 retroactive.

Indeed, as the District Court itself later confirmed in its decision on the merits in *Klamath*, the BLIPS shelter there at issue sought to generate an entirely artificial, noneconomic loss, and, as such, lacked economic substance.[83] And as the Seventh Circuit noted in *Cemco*, "all

[83] *Klamath Strategic Inv. Fund, LLC v. United States*, 472 F.Supp.2d 885, 896-98 (E.D. Tex 2007) *cross-appeals docketed*, Nos. 07-40861, 07-40915 (5th Cir. Sept. 7, 2007, Sept. 19, 2007).

[§ 1.752-6] does is instantiate the pre-existing norm that transactions with no economic substance don't reduce people's taxes." *Cemco*, 515 F.3d at 752.[84] Accordingly, the Treasury's promulgation of retroactive regulations to combat abusive transactions, such as the COBRA shelter involved here, was authorized by § 7805(b)(3), as well as by § 7805(b)(6).

**D. Congress Was Clearly Aware of Abusive Partnership Contingent Liability Transactions**.

Plaintiff also asserts that when it added I.R.C § 358(h) to the Code, Congress focused exclusively on specific corporate transactions, and that Notice 2000-44 likely played no role in Congress' deliberations. P. Brief at 15. But the legislative history shows that Congress knew of the potential for abuse in partnerships' assumptions of liabilities in transactions having nothing to do with corporate transactions. In the summer of 1999, Congress began considering legislation pertaining to the tax treatment of assumptions of liabilities in connection with transfers to controlled corporations. On July 21, 1999, the Senate Committee on Finance favorably reported S. 1429, 106th Cong. (1999), the Taxpayer Refund Act of 1999. S. Rep. No. 106-120 at 1 (1999). S. 1429 included a provision (§ 1318) broadening the scope of I.R.C. § 357(b), the anti-abuse rule related to assumptions of liabilities in connection with transfers to controlled corporations, effective July 15, 1999. *Id*. at 214-15.[85] The Committee explained (*id.*):

> As one example of a transaction that concerns the Committee, a transferor corporation may transfer assets with a fair market value basis . . . in exchange for preferred stock of the transferee corporation, plus the transferee's assumption of a contingent

---

[84] *See generally, ACM P'ship v. Comm'r*, 157 F.3d 231, 252 (3d Cir. 1998). ("Tax losses such as these, which are purely an artifact of tax accounting methods and which do not correspond to any actual economic losses, do not constitute the type of bona fide losses that are deductible under the Internal Revenue Code and regulations.")

[85] Appendix A6.

> liability. . . . The transferor claims a high basis for the stock of the transferee held with respect to this transfer, because the basis of the assets is taken into account, while the taxpayer contends that the assumed liability does not reduce stock basis under current law. However, the value of the transferee stock in the hands of the transferor is nominal, because of the liability that offsets virtually all the value of the assets.

Section 1318 of S. 1429 survived the reconciliation with H.R. 2488, 106th Cong. (1999) (as passed by the House, the Financial Freedom Act of 1999), to become § 1512 of the conference version of H.R. 2488, the Taxpayer Refund and Relief Act of 1999. H.R. Conf. Rep. No. 106-289 at 537 (1999).[86] The Conference Committee added (*id*. at 538):

> It is also expected that the Treasury Department will promptly examine the use of partnerships and apply similar rules (for example, with respect to adjustments to the basis of a partnership interest with respect to certain contingent liabilities) where there is a principal purpose of avoiding Federal income tax through the use of a transaction that includes the assumption of liabilities by a partnership. The conferees note that pursuant to section 7805(b)(3), if necessary to prevent abuse, the Secretary could determine that any regulations applying such rules should be effective on the same date as this provision, i.e., July 15, 1999.[87]

---

[86] Appendix A2.

[87] Congress passed the legislation on August 5, 1999, but the President vetoed it on September 23, 1999. H.R. Rep. No. 106-1036, at 5 (2000). What is now § 309 of the 2000 Act originated on October 19, 1999, when the Chairman of the Senate Committee on Finance released his mark of a bill that would be introduced a week later as S. 1792, the Tax Relief Extension Act of 1999. Staff of the Joint Comm. on Taxation, 106th Cong., *General Explanation of Tax Legislation Enacted in the 106th Congress* 153 n.174 (Comm. Print 2001) (JCS-2-01), *reprinted in* 2000-3 C.B. 565, 651. Appendix A8. Instead of altering the general anti-abuse provision of I.R.C. § 357(b), S. 1792 contained a provision (§ 213) aimed at arrangements whereby a taxpayer transfers assets to a corporation in connection with the corporation's assumption of the transferor's contingent liability. 145 Cong. Rec. 27,547, 27,553-27,554 (1999). Appendix A5. The Finance Committee again recognized the potential for abuse: "The transferor claims a basis for the stock equal to the basis of the transferred assets [without reduction for the liability assumption] . . . [but] the value of the stock is reduced by the amount of the liability, creating a potential loss." S. Rep. No. 106-201 at 47 (1999). Appendix A7.

Thus, less than three months before the introduction of S. 1792, the Conference Committee urged Treasury to "promptly examine the use of partnerships and apply similar rules (for example, with respect to adjustments to the basis of a partnership interest with respect to certain contingent liabilities) where there is a principal purpose of avoiding Federal income tax through the use of a transaction that includes the assumption of liabilities by a partnership." *Id.* That Congress decided to draft the subsequent grants of authority in S. 1792 and the 2000 Act as broadly as possible – limiting them neither to partnership assumptions of liabilities nor to transactions described in § 358, but instead referring to "transactions involving partnerships" – is hardly surprising.[88]

In short, in issuing a regulation retroactive to October 18, 1999, to combat tax avoidance resulting from the assumption by partnerships of purportedly contingent liabilities, Treasury did precisely what Congress directed it to do in section 309 of the 2000 Act. It therefore follows that the Regulation's retroactive effective date is valid under I.R.C. § 7805(b)(6).

**E. Plaintiff's Assertion That the Real Purpose of Treas. Reg. §1.752-6 Was to Buttress the Government's Litigation in Notice 2000-44 Transactions Is Belied by the Mandate in Section 309(c) of the 2000 Act.**

---

Section 213(a) of S. 1792, *supra*, would have added a basis reduction rule to I.R.C. § 358 applicable to stock received in contribution/assumption transactions. 145 Cong. Rec. at 27,553. Section 213(b) of the bill directed the IRS to prescribe similar rules for transactions involving partnerships, and § 213(c)(2) of the bill authorized retroactive application of those rules to liability assumptions occurring after October 18, 1999. *Id.* at 27,554. Although several of the bill's provisions were eventually included in Title V of the Ticket to Work and Work Incentives Improvement Act of 1999, Pub. L. No. 106-170, 113 Stat. 1860 (1999), § 213 was not among them. In December 2000, Congress enacted the basis reduction rule of § 358(h), which is substantially similar to § 213 of S. 1792.

[88] Notice 2000-44 was released on August 13, 2000, or over four months before the enactment of the 2000 Act. [Pltf. Appendix B, Ex. B.3. at pp.25-27]

Plaintiff claims the that the real purpose of the Regulation was not to prevent abuse but to bolster the Government's litigation position in cases involving Notice 2000-44 transactions. P. Brief at 18-19. Other than a series of claims of "highly unusual, and suspect behavior" by the Treasury, plaintiff has no direct evidence of this assertion. P. Brief at 19. This allegation is belied by the Congressional mandate in Section 309(c) of the 2000 Act. As discussed above, the Treasury Department promulgated Treas. Reg. § 1.752-6 to comply with Congress' directive to adopt retroactively rules comparable to I.R.C. § 358(h) for partnerships. 2000 Act, § 309(c)(1). Notice 2000-44 was simply the first step of the process. Mindful of the legislative history of Section 309(c), the IRS first issued a warning to taxpayers regarding claiming tax losses arising from artificially-inflated partnership bases. And, as the Seventh Circuit observed in *Cemco*, "[g]etting from a warning to a regulation often takes years...and did so here." 515 F.3d at 751.

Furthermore, since Temp. Treas. Reg. § 1.752-6T, promulgated on June 24, 2003, predated the commencement of this litigation, it clearly was not adopted to further the Government's litigating position here. In any event, a regulation that is adopted in the course of litigation can still be valid. *See Long Island Care at Home, Ltd. v. Coke*, 127 S. Ct. 2339, 2349 (2007) (upholding Department of Labor's most recent interpretation of its regulation even though this interpretation was "written in response to this litigation").

**F. COBRA Taxpayers Could Not Rely on *Helmer* and Similar Cases**.

Plaintiff claims that the retroactive application of Treas. Reg. §1.752-6 contravenes 25 years of precedent, which the taxpayers were entitled to rely upon in engaging in their COBRA transaction. P. Br. at 5-7. What plaintiff means by 25 years of precedent are three non-binding Tax Court cases. This line of cases started with *Helmer v. Comm'r*, 34 T.C.M. (CCH) 727 (1975). These cases stood for the proposition (which has since been superseded by Treas. Reg.

§§ 1.752-6 and 1.752-7) that contingent liabilities are not taken into account for purposes of § 752. Thus, in *Helmer*, 34 T.C.M. at 730-31, the court held that a partnership's obligation to apply amounts received under an option contract towards the purchase price of the underlying property in the event the option was exercised was not a liability for purposes of § 752. In *Long v. Comm'r*, 71 T.C. 1, 7-8 (1978), *rev'd in part on other grounds*, 660 F.2d 416 (10th Cir. 1981), the court held that unliquidated claims against a partnership relating to structural defects in a building the partnership had erected were too contingent to be taken into account under § 752. And in *La Rue v. Comm'r*, 90 T.C. 465, 477-80 (1988), the court held that a partnership could not account for its liability reserves under § 752 because "the reserves were not a fixed obligation of the partnership sufficiently determinable in amount." *Id*. at 479.

But the taxpayers could in no way rely on these Tax Court cases to justify the noneconomic losses claimed by them on the COBRA transactions. For example, the land option contract in *Helmer* which the buyer may or may not ever exercise is not even remotely comparable to the kind of abusive transaction described in Notice 2000-44. This is because an option contract of the kind described in *Helmer* has real economic consequences, *i.e.*, it did not seek to generate phony losses arising from artificially-inflated partnership bases. By stark contrast, the purportedly contingent liabilities in the COBRA offsetting option transactions were designed and implemented for the sole purpose of generating purely fictitious losses. There is simply no comparability in the two types of option transactions.

Moreover, unlike the option in *Helmer*, in COBRA, the taxpayer purports to purchase a long digital option on foreign currency and, simultaneously, purports to sell a short digital option on the same foreign currency with virtually the same strike price and for virtually the same cost. The counterparty never receives the purported price of the short option (the supposed contingent

liability), but only the difference in price between the long and the short options. Therefore, the taxpayer in the COBRA transaction economically has in reality a single position, not a long and a short position. *See Jade Trading LLC v. United States*, 80 Fed. Cl. 11, 50-51 (2007) (finding a similar offsetting options strategy to be a single position for federal tax purposes).

In sum, the contingent liability transaction at issue in these three Tax Court cases are totally unlike the purported contingent obligations at issue in the instant transactions. Thus, taxpayers could rely on this case law in engaging in their COBRA transactions only at their peril. As the Seventh Circuit put it in *Cemco*:

> Cemco says that in treating $50,000 of euros as having a $3.6 million basis, which turned into a loss when the euros were sold for exactly what they had been worth all along, it was just relying on *Helmer* . . . and a few similar decisions. That may or may not be the right way to understand *Helmer*; we need not decide, for it is not controlling in this court–or anywhere else. The Commissioner has a statutory power to disregard transactions that lack economic substance.

*Cemco*, 515 F.3d at 751.[89]

---

[89]It is also noteworthy that E&Y was well aware that the IRS would not respect such transactions well before the preparation of the returns for the taxpayers in question. In an e-mail dated January 6, 2000, from Robert Coplan to the members of E&Y's VIPER and Quickstrike Teams which helped develop and market COBRA, and including Ray Knight, who introduced taxpayers herein to COBRA, Coplan stated:

> After lengthy discussions of the issues involved in the meeting on COBRA, the conclusion reached by Mike Kelly, Ron Friedman and others yesterday was that the firm would not market this strategy in 2000. The primary reasons for this involved the perceived changes in the landscape now being faced by tax-advantaged strategies after the issuance of Notice 99-59 last month and the publication of the PWC BOSS opinion and scathing commentary of BOSS in tax Notes.
>
> We are well aware that many of you had tee'd up COBRA opportunities late last year for execution in 2000. It will be necessary to

### G. Plaintiff's Argument That Section 309 Is Limited to Corporate Transactions Is Contrary to the Plain Wording of the Statute.

Plaintiff argues that Congress, in enacting § 309(c) of the 2000 Act, only intended Treasury to promulgate rules applicable to partnerships that were shareholders in corporations engaged in transactions subject to I.R.C. § 358(h). P. Brief at 12. Section 309(c), however, contains no such limitation; indeed, it does not even mention corporations, much less give any indication that Congress intended the regulations to cover only the situation in which a partnership was a shareholder of a corporation.[90]

---

> advise these clients ASAP that we have decided not to sell this strategy. We should indicate to these clients that the issuance of Notice 99-59 on December 3, 1999 signals the increased level of scrutiny that will be brought to bear on transactions like BOSS, that generate permanent ordinary losses, and the heightened penalty risk that will be faced by clients (and our firm) after issuance fo the Notice. **Specifically, it is not uncommon for the IRS to follow up the issuance of a Notice with the the [sic] issuance of regulations that adopt the Notice publication date as the effective date of the regulation. Thus, transactions done in 2000 bear a higher risk of being attacked and of being subjected to penalties than ones done before the issuance of the Notice. This explanation of our decision should not raise questions about the 16 transactions that were completed in November 1999.**

[Emphasis added]. As discussed *supra*, however, Congress specifically authorized regulations retroactive to October 18, 1999.

[90]Plaintiff argues that the reference in Section 309(c) to "liabilities described in [Code] section 358(h)(3)" is strictly to liabilities assumed by corporations. P. Brief 12-13. Plaintiff misreads Section 358(h)(3). In Section 309(c), Congress gave Treasury the authority to issue rules to make appropriate adjustments under Subchapter K in partnership transactions involving the assumption of liabilities "described in section 358(h)(3)." That subsection defines a liability to "include any fixed or contingent obligation to make payment, without regard to whether the obligation is otherwise taken into account for purposes of this title." This definition of liability is clear and unambiguous and in no way is limited to corporate transactions.

Rather, §309(c) directs the Secretary to issue retroactive regulations to prevent the creation of improper losses through the assumption of liabilities in transactions *involving* partnerships. Treas. Reg. § 1.752-6 properly implements this Congressional mandate by requiring a basis reduction, directly analogous to the basis reduction required under I.R.C § 358(h), where, in a transaction involving a partnership, liabilities are assumed in an attempt to create wholly artificial tax losses. If Congress had intended the Secretary to issue regulations applying only in the narrow circumstance claimed by plaintiff, it would have so specified in § 309(c) and would not have used the broad language it did to describe the transactions for which the Secretary was directed to issue regulations. Although § 309(c)(1) does not specifically mention § 752, it does instruct Treasury to "prescribe rules which provide appropriate adjustment *under subchapter K*. . . ." (Emphasis supplied.) Since subchapter K includes §§ 701 through 771 of the Internal Revenue Code, Treas. Reg. § 1.752-6 is a proper and direct fulfillment of that mandate.

To further support this argument, plaintiff attempts to parse the text of Section 309(c), noting that the statute seeks only to prevent the "acceleration and duplication" of losses through the assumption of an I.R.C. § 358(h) liability. Concluding that the type of artificial losses resulting from partnership liability-assumption transactions do not quite fit these two categories of abusive losses, plaintiff argues that Congress must have intended the statute to apply only where a partnership is a shareholder of corporation. P. Brief. at 13-14. This argument ignores the fundamental fact that in its mandate, Congress expressly sought to prevent tax abuse resulting from the use of assumed liabilities to create inflated bases in assets that could then be sold to generate fictitious losses. H.R. Conf. Rep. No. 106-1033 at 1017, *reprinted in* 2000-

3 C.B. at 347.[91] Simply because Congress could not anticipate every manner in which unscrupulous tax-shelter promoters would try to manipulate the Internal Revenue Code to secure tax advantages never intended by the Code does not mean that it did not intend the Treasury, acting under its express mandate, to prevent such abuse.

**H. The Regulation's Rules are Comparable to I.R.C § 358.**

Plaintiff argues that the Regulation's rules are not comparable to I.R.C § 358(h) and its adjustments are not appropriate as required by the grant of authority in Section 309(c). P. Brief at 16-18. Plaintiff is wrong. Treas. Reg. § 1.752-6 is consistent with the express language of § 309(c)(1). Section 309(c)(1) requires the issuance of regulations pertaining to the "assumption of (or transfer of assets subject to) liabilities described in section 358(h)(3) of such Code." Consistent with this directive, Treas. Reg. § 1.752-6(a) specifically provides, "[i]f . . . a partnership assumes a liability (defined in section 358(h)(3)) . . . . Moreover, Treas. Reg. § 1.752-6 and I.R.C. § 358(h) are "comparable" because both cause the denial of an artificial tax loss that taxpayers attempt to create by transferring property and an obligation to a business entity, and both accomplish that objective by requiring basis reduction.

**I. Plaintiff's Argument that the Regulation fails the *Chevron* test is Meritless.**

Plaintiff goes through a lengthy explanation of why it believes that the Regulation fails the familiar test set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). P. Brief at 22-27. As previously discussed, according to *Chevron*, legislative regulations adopted according to a specific Congressional grant of authority are valid unless they are "arbitrary, capricious, or manifestly contrary to the statute." 467 U.S. at 844.

---

[91] Appendix A3.

Under this standard, a complainant claiming that a regulation is invalid has an almost insurmountable burden. An interpretive regulation, however, is valid as long as long as it is a reasonable interpretation of the statute, even if the interpretation is not what the court would otherwise consider to be best. It is sometimes argued that this burden, while still great, is not as high as that regarding legislative regulations. *See Id.*

Plaintiff goes through a long analysis which even includes the four-step Fifth Circuit test used by *Klamath*. P. Brief at 21-27. However, as described in section B, *supra*, plaintiff's analysis, just as *Klamath*'s, is based on a faulty premise, *i.e*., that the Regulation is interpretive. In other words, both plaintiff and *Klamath* mistakenly view the Regulation as interpretive of I.R.C. § 752. As we have seen, this is incorrect. The Regulation is not interpretive, it is a legislative regulation specifically authorized by Section 309(c) of the 2000 Act. Therefore, plaintiff's whole analysis is wrong. The issue is not whether the Regulation is a permissible interpretation of I.R.C. § 752 (although it is); the issue is whether, as a legislative regulation authorized by Section 309, it is arbitrary, capricious, or manifestly contrary to the statute. Here again, as the Seventh Circuit held, Section 309 clearly authorizes the Regulation. *Cemco*, 515 F.3d at 752.

Relying on the four-factor test used in *Klamath* to assess the reasonableness of the Regulation, plaintiff argues that the "supra-majority of these factors supports the finding the Regulation is unreasonable and thus invalid." P. Brief at 26. In so holding, however, *Klamath* failed to consider I.R.C. §§ 7805(b)(3) and 7805(b)(6), which validate the retroactivity, and thus the reasonableness, of the Regulation. Instead, the court erroneously relied on case law decided under a prior version of I.R.C. § 7805(b).

Before the enactment in 1996 of the Taxpayer Bill of Rights 2, Pub. L. No. 104-168, 110 Stat. 1452, I.R.C. § 7805(b) gave the Treasury Department wide latitude in prescribing regulations with retroactive effect by providing, "The Secretary may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect."

In order to prevent Treasury from having *carte blanche* authority in determining retroactivity, the Fifth Circuit considered a series of factors in determining whether the Commissioner had abused his discretion in making a regulation retroactive. *See*, *Snap-Drape, Inc. v. Commissioner*, 98 F.3d 194, 202 (5th Cir. 1996); *Anderson, Clayton & Co. v. United States*, 562 F.2d 972, 981 (5th Cir. 1977).

The Taxpayer Bill of Rights 2 included a section entitled "Relief from retroactive application of Treasury Department Regulations." Taxpayer Bill of Rights 2, § 1101. This statute amended § 7805(b) to provide a presumption *against* retroactivity. *See* I.R.C. § 7805(b)(1). The amended statute, however, also contained limited exceptions to this presumption. *See* I.R.C. § 7805(b)(2) (promptly-issued regulations); § 7805(b)(3) (prevention of abuse); §7805(b)(4) (correction of procedural defects) § 7805(b)(5) (regulations relating to internal Treasury Department policies); § 7805(b)(6) (Congressional authorization); § 7805(b)(7) (taxpayer election to apply retroactively).

Because the amended version of § 7805(b) generally restricts the Commissioner's discretion to adopt retroactive regulations, but contains specific exceptions to this general restriction, and because this amended statute applies to Treas. Reg. § 1.752-6, the case law interpreting the pre-1996 statute, on which the District Court relied in *Klamath*, has been statutorily preempted. *See Kandi v. United States*, 2006 WL 83463 at *3 (W.D. Wash. 2006),

*appeal docketed*, No. 06-35209 (9th Cir. March 14, 2006)("Petitioner's reliance on case law interpreting the pre-1996 version of § 7805 is inapposite."). The District Court in *Klamath* erred in failing to consider the current version of § 7805(b) and the specific exceptions to the general prohibition against retroactivity and consequently erred in holding that the Commissioner abused his discretion in making Treas. Reg. § 1.752-6 retroactive.

Moreover, plaintiff's argument that because the prospective rules of Treas. Reg. § 1.752-7 differ from the retrospective rules of Treas. Reg. § 1.752-6, the Regulation must be unreasonable, is similarly incorrect. P. Brief at 26. The Department of Treasury drafted Treas. Reg. § 1.752-6 to mirror § 358(h) as closely as possible for partnership assumptions of liabilities after October 18, 1999, as required by Congress. Indeed the Treasury did so even though it did not believe that this was the best approach for the assumption of liabilities by partnerships, given their passthrough nature *See* 68 Fed. Reg. 37,434, 37,436-37,437 (2003). That is, the Treasury drafted the Regulation, which operates retroactively, to mirror Section 358(h) to accommodate explicit Congressional direction. The fact that it chose a different approach with Treas. Reg. § 1.752-7 to prevent prospective abusive partnership transactions is irrelevant to the validity of the Regulation.

**J. Adoption of the Regulation is Constitutional and does not violate Due Process.**

Relying on *United States v. Carlton*, 512 U.S. 26 (1944), plaintiff also argues that the Regulation violates due process in that the period of retroactivity is too long. P. Brief. at 21. Plaintiff is incorrect. The Supreme Court "repeatedly has upheld retroactive tax legislation against a due process challenge." *Carlton*, 512 U.S. at 30. Furthermore, at least two lower courts have expressly upheld retroactive regulations against due process challenges. See *Tate &*

*Lyle, Inc. v. Commissioner*, 87 F.3d 99, 107 (3d Cir. 1996) (holding that a six-year retroactive application of a regulation did not violate due process); *A. Tarricone, Inc. v. United States*, 4 F.Supp.2d 323, 327 (S.D.N.Y. 1998) (ruling that a retroactive regulation did not violate taxpayer's due process rights notwithstanding his "settled expectations that he would not be liable for the excise tax").

Plaintiff asserts that "[a]t a minimum, due process requires that the Treasury set the effective date of the Regulation no earlier than the date the IRS issued Notice 2000-44." P. Brief at 22. Due Process requires no such thing. The period of retroactivity of less than four years, from October 18, 1999 to June 23, 2003, the date preceding the date that Treasury issued the Temporary Regulation, was necessary to stem the vast amount of abuse by taxpayers who used transactions with partnerships to create artificial tax losses. Moreover, it was Congress that expressly authorized Treasury to issue retroactive regulations with an effective date of October 18, 1999, in Section 309 of the 2000 Act. There can hardly be a due process violation when Treasury, at the direction of Congress, issues retroactive regulations to combat tax abuse involving the assumption of liabilities by partnerships, and chooses as the effective date for such regulations the specific date that Congress indicated would be appropriate. The only conceivable argument to the contrary is that the statute itself is unconstitutional. But plaintiff has never suggested that Congress violated the Constitution in adopting Section 309 of the 2000 Act.

Plaintiff further relies on *Klamath*, which held that the Regulation was invalid insofar as it was retroactive to any date prior to August 11, 2000, the date on which the IRS issued Notice 2000-44. *Klamath* came to this conclusion, however, by reliance on the four-step test it claimed was applicable to interpretive regulations under Fifth Circuit law. By means of the four-step test, *Klamath* concluded that the Regulation was invalid if applied retroactively beyond August

11, 2000, but took no position as to whether the Regulation could be applied retroactively to activity occurring subsequent to August 11, 2000. *Klamath*, 440 F.Supp.2d at 622-25. As we have seen, however, the court in *Klamath* based its holding on faulty reasoning: (1) that the Regulation is interpretive in nature and (2) that this four-factor test has applicability to Treas. Reg. § 1.752-6. Critically, the Regulation is not interpretive but legislative – adopted under the authorization of Section 309 of the 2000 Act, which specifically authorizes regulations retroactive to October 18, 1999. Equally fundamental, the four-factor test has been supplanted by statutory exceptions in § 7805(b), and therefore has no applicability to the issue of the retrospective nature of the Regulation.

### K. Plaintiff's Contention that the IRS violated the Notice and Comment Requirements of the Administrative Procedure Act (the "APA") Lacks Merit.

In general, the APA requires agencies to publish notices of proposed rulemaking in the Federal Register and to provide interested persons the opportunity to comment on the proposed rules before the agency adopts them as final regulations. 5 U.S.C. § 553(b) & (c). These requirements, however, do not apply to interpretive rules, *id.* § 553(b)(A), or if "the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." *Id.* § 553(b).

Treasury published Temp. Treas. Reg. § 1.752-6T in the Federal Register on June 24, 2003. 68 Fed. Reg. 37,414 (2003). In this publication, Treasury stated that it had good cause for dispensing with the APA's notice requirements:

> These temporary regulations are necessary to prevent abusive transactions of the type described in Notice 2000-44. Accordingly, good cause is found for dispensing with notice and public procedure pursuant to 5 U.S.C. 553(b)(B) and for dispensing with a delayed effective date pursuant to 5 U.S.C. 553(d)(1) and (3).

68 Fed. Reg. at 37,416.

On the same day that Treasury issued Temp. Treas. Reg. § 1.752-6T (June 24, 2003), it also published in the Federal Register a "Notice of Proposed Rulemaking; Notice of Proposed Rulemaking by Cross-reference to Temporary Regulations and Notice of Public Hearing," with respect to proposed rules on the assumption of partner liabilities. 68 Fed. Reg. 37,434 (2003). While this notice was principally addressed to the proposed rules of Treas. Reg. § 1.752-7, it also stated –

> In the Rules and Regulations section of this issue of the Federal Register, the IRS is issuing temporary regulations (§ 1.752-6T) that apply to liabilities assumed by a partnership after October 18, 1999, and before June 24, 2003. The text of those temporary regulations published in the Rules and Regulation section of this issue of the Federal Register serves as the text of § 1.752-6 of these regulations.

68 Fed. Reg. 37,438.

It then advised taxpayers and tax practitioners that "[i]n lieu of applying § 1.752-6T of the temporary Income Tax Regulations, partnerships may elect to be subject to"the proposed rules of Treas. Reg. § 1.752-7. The notice then solicited comments on these proposed rules and provided instructions on how to submit them by mail, hand delivery, or the internet. Comments were received, and a public hearing was held on October 14, 2003, at which commentators spoke. 70 Fed. Reg. 30,334, 30,336-30,337 (2005). On May 26, 2005, Temp. Treas. Reg. § 1.752-6T was withdrawn and Treas. Reg. § 1.752-6 was adopted. *Id.* at 30,344.

Plaintiff argues that the notice, comment and hearing dealt only with Treas. Reg. § 1.752-7. As shown, however, this is not the case, and plaintiff even admits that commentators commented on the Regulation. P. Brief at 28 n.93. The Government's issuance of Treas. Reg. §1. 752-6 (the permanent version of the Regulation) thus complied with the APA.

As for the temporary version of the Regulation, plaintiff argues that Treasury was dilatory in adopting Temp. Treas. Reg. § 1.752-6T so long after the 2000 Tax Act. P. Brief at 28-29. Plaintiff's argument is obviously premised on the assumption that Congress had not directed Treasury to issue retroactive regulations. As *Cemco* held, however, that is exactly what Congress directed, and even observed that the process of issuing regulations can take years. *Cemco*, 515 F.3d at 751.

In addition, plaintiff argues that Treasury could not have had good cause to dispense with notice and comment for temporary retroactive regulation, since it deals only with transactions which had already occurred. P. Brief at 29. But the Temporary Regulation is not aimed at preventing the transactions, but on preventing or correcting their misuse for tax purposes. The Temporary Regulation prevented abuse by deterring taxpayers who had engaged in Son of Boss transactions from using these transactions to avoid taxes on yet unfiled returns, and to require amended returns for those who had already reported such noneconomic losses. Even if, however, Treasury had violated the APA in issuing the Temporary Regulation, Treasury has withdrawn the Temporary Regulation and the Regulation is in effect in permanent form. Plaintiff's motion asks only that the Court invalidate the Regulation, not the now withdrawn Temporary Regulation.[92]

[92]Ironically, relying at *Klamath*, 440 F.Supp.2d at 622, plaintiff argues that the Regulation is interpretive, not legislative. P. Brief at 25. If plaintiff were correct, then the

In sum, the whole analysis used by plaintiff and by *Klamath* is wrong. The Regulation is legislative, not interpretive, is valid and, as the Seventh Circuit has found, was properly issued.

notice, comment, and waiting periods required by the APA would not apply. An interpretative regulation does not expand the law, it merely interprets what the law has always been. Consequently, waiting periods can have no place with such a regulation. As *Cemco* held, however, the Regulation is legislative as Treasury promulgated it pursuant to a direct mandate in Section 309 of the 2000 Act. *Cemco*, 515 F.3d at 751.

## CONCLUSION

For the reasons described above, Treas. Reg. 1.752-1 is valid. The United States respectfully requests that the Court deny plaintiff's motion for partial summary judgment.

Respectfully submitted,

/s/ Dennis M. Donohue
DENNIS M. DONOHUE
CHIEF SENIOR LITIGATION COUNSEL
OFFICE OF CIVIL LITIGATION
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-6492
Facsimile: (202) 307-2504
E-mail: dennis.donohue@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on April 21st, 2008, I electronically filed the foregoing **UNITED STATES' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO THE VALIDITY OF TREASURY REGULATION § 1.752-6** with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

Joel N. Crouch
Texas State Bar No. 05144220
Meadows, Collier, Reed
Cousins & Blau, L.L.P.
901 Main Street, Suite 3700
Dallas, Texas 75202

s/ David M. Steiner
David M. Steiner
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 55
Ben Franklin Station
Washington, D.C. 20044
(202) 307-5892