# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JZ Buckingham Investments LLC as Tax Matters Partner of JBJZ Partners, a South Carolina general partnership, | § | |
| Plaintiff, | § | Case No. 05-231 T<br>Chief Judge Edward Damich |
| v. | § | |
| United States of America, | § | |
| Defendant. | § | |

## UNITED STATES' ADDITIONAL PROPOSED FINDINGS OF UNCONTROVERTED FACTS IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO THE VALIDITY OF TREASURY REGULATION § 1.752-6

Pursuant to RCFC 56(h)(2), the United States submits the following additional Proposed Findings of Uncontroverted Facts in further support of its opposition to Plaintiff's Motion for Partial Summary Judgment as to the Validity of Treasury Regulation § 1.752-6.

1. COBRA is an acronym for Currency Options Bring Reward Alternatives. See e.g., COBRA Powerpoint, Govt. App. A at pp.126-144, Govt. Ex. 9.

2. The COBRA transaction was designed in the months of September and October of 1999 by the national accounting firm Ernst & Young, LLP ("E&Y"), with the assistance of the Chicago law firm of Jenkens & Gilchrist ("J&G") and Deutsche Bank A.G. ("DB"). See e.g., Govt. App. A at pp.1-278 and 291-345, Govt. Exs. 1-13 and 17-24.

3. J&G and DB were already marketing a similar product known as the Option Partnership Strategy ("OPS") structured with a net premium to DB equal to 1% of the desired tax loss and a potential payoff equal to 2 X the net premium, or 2% of the desired tax loss. See Govt. App. A at pp.243-290, Govt. Exs. 13 and 16.

4. The OPS strategy and its genesis are described in *The Diversified Group, Incorporated v. Daugerdas*, 139 F.Supp.2d 445 (2001 S.D.N.Y.), in which The Diversified Group, alleged that Paul Daugerdas, the newly-appointed head of J&G's recently- formed Chicago office, had stolen its tax shelter product. *See The Diversified Group, Incorporated v. Daugerdas*, 139 F.Supp.2d 445 (2001 S.D.N.Y.),

5. In its suit against J&G, DGI broadly defined its stolen OPS product as follows: "The option partnership strategy is a tax-saving strategy wherein a taxpayer purchases and writes options and transfers these option positions to a partnership so as to create substantial increased basis in the partnership interest. As a result of these trades and transfer, the taxpayer claims that the basis of the taxpayer's partnership interest is increased by the cost of purchased call options, but is not reduced as a result of the partnership's assumption of the taxpayer's obligation with respect to the written call options." *See The Diversified Group, Incorporated v. Daugerdas*, 139 F.Supp.2d at 449.

6. The COBRA and OPS transactions are both predicated upon the use of nearly off-setting digital option contracts. See Govt. App. A at pp.243-290, Govt. Exs. 13 and 16.

7. In the late fall of 1999, J&G and DB implemented 105 OPS transactions. See Govt. App. A at pp.243-290, Govt. Exs. 13 and 16.

8. Concurrently, J&G and DB also implemented 15 COBRA transactions for E&Y. See Govt. App. A at pp.243-290, Govt. Exs. 13 through16.

9. The 15 1999 COBRA transactions generated noneconomic tax losses totaling $834 million. See Govt. App. A at pp.1-144 and 243-286, Govt. Exs. 1 through 9 and 13 through 15.

10. The OPS and COBRA transactions were designed to accomplish the same tax-driven objective and differed only slightly in their terms. The engine driving both transaction was offsetting foreign currency digital options: a purchased (or long) option and a sold (or short) option. See Govt. App. A at pp.1-399, Govt. Exs. 1 through 30.

11. As structured, the offsetting digital options of both OPS and COBRA provided a net payoff at a pre-agreed upon multiple of the net premium. See Govt. App. A at pp.1-399, Govt. Exs. 1 through 30.

12. In the instance of the OPS transactions, the net premium was equal to 1% of the desired loss, with the possibility of a payoff equal to 2 X the net premium. See Govt. App. A at pp.243-278, Govt. Ex. 13.

13. In the case of COBRA, the net premium was equal to 5% of the desired loss, with a possibility of a payoff equal to 2.5 X the net premium. See Govt. App. A at pp.126-144, 271-278, and 470-475,Govt. Exs. 9, 13 and 41.

14. Notwithstanding these cosmetic changes, these offsetting option transactions were both designed to generate an artificially-inflated basis of a taxpayer’s partnership interest, which, in turn, could be used to generate massive tax losses, and thereby eliminate a

wealthy taxpayer's unrelated taxable income. See COBRA Powerpoint, Govt. App. A at pp.126-144, Govt. Ex. 9.

15. E&Y began marketing the COBRA transaction in the fall of 1999. See Govt. App. A at pp.1-399, Govt. Exs. 1 through 30.

16. Both E&Y and J&G required so-called "targets" (potential COBRA purchasers) to sign a non-disclosure agreement ("NDAs"). See Govt. App. A at pp.218-242, 341-343, and 456-457, Govt. Exs. 12, 23 and 24, 36.

17. The J&G NDA expressly disclosed J&G's role as a promoter and disclaimed any fiduciary relationship with the target. See Govt. App. A at pp.221-223 at p.223 ¶6.

18. In addition to being required to sign NDAs, targets were not allowed to retain any of the marketing materials. See COBRA Action Workplan, Govt. App. A at pp.291-314, Govt. Exs. 17 through 20.

19. Both of these limitations appear to have been imposed upon potential clients in order to minimize the possibility that the COBRA transactions might be disclosed to the IRS. See Govt. App. A at pp.348-349, Govt. Ex.26.

20. In the marketing of the program, targets were typically shown a template J&G draft legal opinion blessing the transaction for federal income tax purposes. See J&G draft legal opinion dated November 5, 1999, Govt. App. A at pp.400-426, Govt. Ex. 31.

21. To assist in choreographing the intricately sequenced steps of this transaction, the promoters not only developed a COBRA power point, but a "COBRA Client Questionnaire" and a "COBRA Action Workplan." See Govt. App. A at pp.1-22, 236-244, 291-314, Govt. Exs. 1 through 3, 9, and 17 through 20.

22. The COBRA Power Point was used to market the product to potential clients and generally details the overall steps, with particular focus on the planned tax benefits. See Govt. App. A at pp.318-340, Govt. Ex. 9.

23. The COBRA Client Questionnaire was designed to provide J&G the necessary information to implement the transaction, detailing both the amount and the character of the desired tax loss. See Govt. App. A at pp.315-340 and 348-445, Govt. Exs. 21-22, and 34.

24. The COBRA Action Workplan was then to be used by E&Y to monitor the planned choreography. See Govt. App. A at pp.291-314, Govt. Ex. 17-20.

25. The COBRA Power Point provides a good overview of the transaction, which slides can be briefly summarized as follows:

   a. Step One: Purchase/Sale of Offsetting Option Contracts. Each individual simultaneously buys (goes long) and sells (goes short) digital foreign currency options at nearly identical strike prices, creating a position consisting of two offsetting options. See Govt. App. A at pp.126-144 at 130, Govt. Ex. 9.

   b. Step Two: Transfer of Offsetting Options to Partnership. The individuals transfer the offsetting foreign currency option positions to a "newly formed general partnership." In calculating their basis in the partnership, the taxpayers take into account the stated premium of the long option and ignore the offsetting stated premium received for the short option. In addition, the individuals contribute cash equal to two per cent of the "desired loss" (i.e., the stated premium on the long option) to the partnership. See Govt. App. A at pp.126-144 at 131, Govt. Ex.

9.

c. Step Three: Termination of Options and Acquisition of Assets. The digital foreign currency options expire either in or out of the money, resulting in a gain or loss. The COBRA Presentation then states, "[i]f ordinary loss is desired, spot foreign currency will be purchased by the partnership. If capital loss is desired, capital assets will be purchased." See Govt. App. A at pp.126-144 at 132, Govt. Ex. 9.

d. Step Four: Transfer of Partnership Interests to S Corp. The individuals transfer their entire interest in the partnership to a newly formed S corporation, which results in the technical termination of the partnership for federal income tax purposes. See Govt. App. A at pp.126-144 at 133, Govt. Ex. 9.

e. Step Five: Distribution of Partnership Assets to S Corp and Their Sale. The partnership liquidates and distributes its assets to the S corporation. Under I.R.C. § 362(a), the taxpayers' artificially-inflated outside basis in the now-dissolved partnership carries over and becomes the basis of the distributed stock and/or foreign currency distributed to the S corporation. The S corporation then "sells the stepped-up assets [i.e. the foreign currency or securities] to an unrelated third party, generating a loss for tax purposes." See Govt. App. A at pp.126-144 at 134, Govt. Ex. 9.

f. Although not specified on the COBRA Powerpoint, the final step of the transaction was the payment of fees and preparation and issuance to the taxpayers in the following tax year of two separate legal opinions to support COBRA's

claimed tax benefits. See Govt. App. A at pp.427-433 and 446-455, Govt. Ex. 32 and 35.

26. E&Y charged a fee of 1.5.% of the taxpayers' desired loss and J&G charged a fee equal to 3% of the taxpayers' desired loss, net of the fee to be charged by Brown & Wood. See COBRA Engagement Letter, Govt. App. A at pp.279-282 and 446-455, Govt. Exs. 14 and 35.

27. J&G prepared one of the two legal opinions and because of J&G's status as a co-promoter, E&Y recruited the law firm of Brown & Wood, L.L.P. ("B&W") to prepare a second legal opinion. See Govt. App. A at pp.28-125 and 145-214, Govt. Exs. 6-8 and 10.

28. Both of these opinions were boilerplate opinions containing virtually the same formulaic language except for the required change in the taxpayers' names and the names of their respective entities. See Govt. App. A at pp.28-125 and 145-214, 400-426, Govt. Exs. 6-8, 10 and 31.

29. The transaction at issue closely adhered to each of these generic steps. See Govt. App. A at pp.427-570, Govt. Exs. 32-52.

30. On November 16, 1999, Jerry Zucker and his business partner, James Boyd ("taxpayers"), committed to an aggregate $50 million COBRA transaction, to generate a $20 million ordinary tax loss and a $30 million short term capital loss, of which 90% was to be allocated to Zucker. See Govt. App. A at pp.427-433 and 446-455, Govt. Exs. 32 and 35.

31. Upon notification of the precise plan, J&G immediately formed the requisite entities for

implementing this COBRA transaction. JZ Buckingham LLC and JGB Bohicket LLC were formed by J&G on behalf of Zucker and Boyd. J&G also formed the other requisite entities on their behalf, the partnership JBJZ Partners and JBJZ Investors Inc., a Subchapter S corporation. See Govt. App. A at pp.446-455, 458-466, Govt. Exs. 35, 37-39.

32. The Zucker LLC purchased a call option on the Japanese yen on or about November 23, 1999, with a premium of $25,000,000 and a strike price of 106.19, and a payout of $50,000,000. At the same time, the Zucker LLC sold a call option with a premium of $23,750,000 with a strike price of 106.21 and a payout of $46,875,000. See Indicative Terms and Conditions for JZ Buckingham LLC and JGB Bohicket LL, Govt. App. A at pp.477-482, Govt. Ex. 42.

33. The Zucker LLC only paid $1,250,000, the difference of the premiums, to Deutsche Bank for this option pair which was 5% of the $25,000,000 premium for the long option. See Govt. App. A at pp.447 and 467-469, Govt. Exs.35 and 40 (wiring $3,150,000 to Zucker LLC on 11/23/99). See also Indicative Terms and Conditions for JZ Buckingham LLC and JGB Bohicket LL, Govt. App. A at pp.477-482, Govt. Ex. 42.

34. The Zucker LLC also purchased a put option on the Euro with a premium of $20,000,000, a strike price of 1.0123, and a payout of $40,000,000. *Id.*

35. At the same time, the Zucker LLC sold a put option on the Euro for $19,000,000 with a strike price of 1.0121, and a payout of $37,500,000. *Id.*

36. The Zucker LLC paid only $1,000,000, the difference in the premiums, to Deutsche Bank for this option pair, which again was 5% of the long option. *Id.*

37. Contemporaneously, the Boyd LLC purchased a put option on the Euro for $5,000,000 with a strike price of 1.0123 and a payout of $10,000,000. *Id.*

38. At the same time, the Boyd LLC sold a put option on the Euro for a premium of $4,750,000, with a strike price of 1.0121 and a payout of $9,375,000. *Id.*

39. The Boyd LLC paid only $250,000, the difference in the premiums, to Deutsche Bank for this option pair, which again was 5% of the long option. Govt. App. A at pp.527-535, , Govt. Ex. 45.

40. The exercise date for all three pairs of these options was in thirty days or December 22, 1999. See Govt. App. A at pp.447 and 467-469, Govt. Exs.35 and 40 (wiring $3,150,000 to Zucker LLC on 11/23/99). See also Indicative Terms and Conditions for JZ Buckingham LLC and JGB Bohicket LL, Govt. App. A at pp.477-482, Govt. Ex. 42.

41. The Zucker LLC transferred its two pairs of options, and $9,000,000 in cash to the Partnership. See Govt. App. A at pp.500-526, Govt. Ex. 44.

42. The Boyd LLC transferred its option pair and $100,000 to the Partnership. See Govt. App. A at pp.500-526, Govt. Ex. 44.

43. The Partnership held the options until their expiration on December 22, 1999. See Govt. App. A at pp.561-562, Govt. Ex. 50.

44. The options on the Yen expired out of the money. See Govt. App. A at pp.561-562, Govt. Ex. 50.

45. The options on the Euro expired in the money. That is, both Zucker's long option and DB's short option on the Euro were entitled to received the payout amounts, providing

Zucker was a net payout of the difference. See Govt. App. A at pp.561-562, Govt. Ex. 50.

46. The Partnership received a payout from Deutsche Bank on the Euro options in the amount of $3,125,000. See Govt. App. A at pp.561-562, Govt. Ex. 50.

47. On December 7 and 8, 1999, Zucker and Boyd contributed 5,000 shares of Cisco stock to the S Corp. See Govt. App. A at pp.552-553, Govt. Ex. 48.

48. On December 22, 1999, realizing that they had transferred the Cisco stock to the wrong entity, the S Corp transferred the Cisco stock to the Partnership. See Govt. App. A at pp.552-553, Govt. Ex. 48.

49. On December 22, 1999, the Partnership purchased $600,000 worth of Canadian dollars.

50. On December 23, 1999, the Partnership purchased an additional $172,500 worth of Canadian dollars.

51. On December 27, 1999, the Zucker LLC and the Boyd LLC contributed their interests in the Partnership to the S Corp, causing a technical termination of the Partnership for federal income tax purposes. See 1999 Form 1065 of JBJZ Partners, Govt. Ex. 53.

52. On December 27, 1999, the Partnership was liquidated and its assets are distributed to the S Corp. See 1999 Form 1065 of JBJZ Partners, Govt. Ex. 53.

53. The S Corp then proceeds to sell the non-cash assets received from the Partnership.

54. On December 28, 1999, the S Corp sold all 5,000 shares of its Cisco stock at $105.95 per share. See Form 1120S of JBJZ Investors, Inc., Govt. Ex. 54.

55. The proceeds from the sale were $529,729.34. See Form 1120S of JBJZ Investors, Inc., Govt. Ex. 54.

56. On December 28, 1999, the S Corp sold all of its Canadian dollars. See Form 1120S of JBJZ Investors, Inc., Govt. Ex. 54.

57. The proceeds on the foreign currency sale were $778,407.35. See Form 1120S of JBJZ Investors, Inc., Govt. Ex. 54.

58. The taxpayers paid a fee of $750,000 to E&Y, which was 1.5% of their desired loss of $50,000,000, and legal fees totaling $1,500,000 equal to 3% of their desired loss of $50,000,000. See E&Y Engagement letters dated November 15, 1999, Govt. App. A at 446-445, Govt. Ex. 35, Revised Legal Fee Allocation Ernst & Young Transactions, Govt. App. A at 279-282, Govt. Ex. 14.

59. J&G was paid a fee of $1,440,000, of which $1,400,000 was paid by JBJZ Investors, Inc. by wire on December 29, 1999, with the balance of $40,000.00 separately invoiced and paid in 2000. B&W separately invoiced and was paid a fee of $60,000. See Revised Legal Fee Allocation Ernst & Young Transactions, Govt. App. A at 279-282, Govt. Ex. 14. See also Govt. App. A at 563-564, Govt. Ex. 51.

60. As a result of these fees and transaction costs, without the desired tax losses from the COBRA transaction, the taxpayers lost substantial amount of money on the COBRA transaction. See Govt. App. A at pp.561-562, Govt. Ex. 50 ($3.25MM payoff less $2.5MM net premium = +$675,000 net proceeds from DB); Revised Legal Fee Allocation Ernst & Young Transactions, Govt. App. A at 279-282, Govt. Ex. 14 (less legal fees equal to 3% of $50MM = -$2.5MM); E&Y Engagement letters dated November 15, 1999, Govt. App. A at 446-445, Govt. Ex. 35 (less 1.5% of $50MM = -$750,000).

61. Taxpayers claimed a combined outside basis in the Partnership of $52,907,725 at the time that they contributed their respective partnership interests to the S Corporation. See 1999 Form 1065 of JBJZ Partners, Govt. Ex. 53.

62. This claimed basis consisted almost entirely of the $50,000,000 purported price of the long digital options on the Euro and the Yen. See 1999 Form 1065 of JBJZ Partners, Govt. Ex. 53.

63. The Partnership did not reduce this basis by the offsetting short options. See 1999 Form 1065 of JBJZ Partners, Govt. Ex. 53.

64. The basis was increased by contributions of cash and income from the options, as well as capitalization of the fees paid to E&Y. See 1999 Form 1065 of JBJZ Partners, Govt. Ex. 53.

65. Various smaller transactions also altered the basis to a small extent. See 1999 Form 1065 of JBJZ Partners, Govt. Ex. 53.

66. On the termination of the Partnership, taxpayers claim that the basis in the Cisco stock and Canadian currency distributed to the S Corporation took on the same basis as their outside basis in the Partnership. See Form 1120S of JBJZ Investors, Inc., Govt. Ex. 54.

67. The taxpayers claim that their aggregate tax basis of the assets in the S Corp was $50,952,250. See Form 1120S of JBJZ Investors, Inc., Govt. Ex. 54.

68. This consisted of the $52,907,725 basis in their partnership interests plus $1,400,000 which they paid to J&G, less over $3 million in cash disbursements. See Form 1120S of JBJZ Investors, Inc., Govt. Ex. 54.

69. On its Form 1120 S for its 1999 tax year, the S Corporation reported $49,644,114 in

ordinary and capital losses from the sale of the Cisco stock and Canadian currency. See Form 1120S of JBJZ Investors, Inc., Govt. Ex. 54.

70. This consisted of an ordinary loss of $29,446,675 from the sale of the Canadian currency, a short term capital loss of $2,019,106 from the sale of the Cisco stock held for less than a year, and a long term capital loss of $18,177,695 from the sale of Cisco stock held for over a year. See Form 1120S of JBJZ Investors, Inc., Govt. Ex. 54.

71. On their respective 1999 Form 1040s, Zucker and Boyd, as the stockholders of the S Corporation, reported their pro rata shares of the $29,446,675 in ordinary loss from the sale of the Canadian currency. See 1999 Forms 1040, Govt. Exs. 55 and 57.

72. Boyd, on his 1999 Form 1040, claimed the entire amount of his allocable loss of $2,019,106 from the S-Corporation's sale of Cisco stock as a short term capital loss. See Boyd 1999 Forms 1040, Govt. Exs. 55.

73. Zucker, on his 1999 Form 1040, claimed the entire amount of his allocable loss of $18,177,695 from the S-Corporation's sale of Cisco stock as a long term capital loss. See Boyd 1999 Forms 1040, Govt. Exs. 57.

Respectfully submitted,

/s/ Dennis M. Donohue
DENNIS M. DONOHUE
CHIEF SENIOR LITIGATION COUNSEL
OFFICE OF CIVIL LITIGATION
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-6492
Facsimile: (202) 307-2504

E-mail: dennis.donohue@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on April 21, 2008, I electronically filed the foregoing **UNITED STATES' ADDITIONAL PROPOSED FINDINGS OF UNCONTROVERTED FACTS IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO THE VALIDITY OF TREASURY REGULATION § 1.752-6** with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

Joel N. Crouch
Texas State Bar No. 05144220
Meadows, Collier, Reed
Cousins & Blau, L.L.P.
901 Main Street, Suite 3700
Dallas, Texas 75202

s/ David M. Steiner
David M. Steiner
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 55
Ben Franklin Station
Washington, D.C. 20044
(202) 307-5892