# EXHIBIT G1

**From:** Brubaker, R Craig
**Sent:** Monday, October 18, 1999 8:38 AM
**To:** 'emayer@jenkens.com'
**Cc:** Clendening, Todd; Brooks, Daniel
**Subject:** digital swap
**Attach:** CURREN~1.DOC; digital swap confirmation agreement.doc; DB new account form.doc; CURREN~2.XLS

---

Erwin:

I put together over the weekend the format similar to the treasury short-routine for a digital swap transaction. Attached are several items:

<<_>> This is a list of steps required to execute digital swap.

<<_>> Sample copy of confirmation agreement London issues. Please review.

<<_>> Form DB requires, similar to Alex Brown retail new account agreement.

<<_>> Charts on JPY and EUR showing volatility. As Dan probably explained, swap is a different animal than treasury short in terms of sensitivity analysis. You have 3 outcomes, win set amount, lose your investment, win lotto payout. What you may be able to do is show from the standard deviation of monthly currency movements, the probability of a clients target strike price being achieved.

Let's discuss.

Craig

*R. Craig Brubaker*
*Deutsche Banc Alex. Brown*
*Private Client Services*
*214-740-7765 (voice)*
*214-740-7780 (fax)*
*200 Crescent Court, Suite 500*
*Dallas, TX 75201*

PENGAD 800-631-6989
GOVERNMENT EXHIBIT
1



DB-DOJ-COBRA-00030051

**Currency Linked Digital Swap**
**Transaction Steps for Implementation**
**With Deutsche Bank AG London (DBAG) and Deutsche Banc Alex. Brown (DBAB)**

| Step | Description | Client | J & G | DBAB | DBAG |
|---|---|---|---|---|---|
| 1 | J & G requests tentative pricing illustration on sample digital swap (DS). Counterparty A is DBAG, counterparty B is client. Target amount that client seeks to invest is the target basis. Variables in pricing can include—a) which currency, b) maturity dates, c) payout probability, d) lottery payout | | Call Craig Brubaker | | |
| 2 | Deliver sample 2-page indicative term sheet to client. DBAB will also provide historical volatility analysis of currency used in DS. | | | Craig Brubaker will prepare | Dan Brooks will prepare |
| 3 | Conference call with client, including J & G, DBAB and DBAG to explain transaction, current environment for currency, answer questions and cover risk/return ranges of expectation. | Call participation | Call participation | Call participation | Call participation |
| 4 | For client's additional research and understanding, we can mail hard copies of DBAG publication-"Foreign Exchange Weekly" | Make request | Copied if desired | Craig Brubaker will send | |
| 5 | Opening Accounts: | | | | |
| a. | LLC—account agreement, foreign currency agreement, and non corporate resolution | Signs | Prepares | Processes | |
| b. | LP-- account agreement, foreign currency agreement, and partnership authorization and indemnity agreement | Signs | Prepares | Processes | |
| c. | Corp-- account agreement, foreign currency agreement, and corporate resolution | Signs | Prepares | Processes | |
| d. | 1 copy of DBAG account opening agreement | | Prepares | | Processes |
| 6 | Executed Copies of constitutional documents to DBAG: | | | | |
| a. | Limited partnership agreement | | Provides copies | | Reviews |
| b. | LLC articles of organization | | Provides copies | | Reviews |
| c. | Certificate of incorporation/bylaws | | Provides copies | | Reviews |
| d. | Resolution/Incumbency agreements indicating entity has authority to open accounts with DBAB and DBAG, has specific trading authority for "foreign exchange and OTC derivatives entered into with DBAG", and identifies authorized agents of the entity. | | Provides copies | | Reviews |
| 7 | Lawyer letter to DBAG that they have advised client on transaction and believe it to be appropriate, and with substantial authority for tax purposes. | | Prepares | | Reviews |
| 8 | Verification that transaction requires no credit approval & background check | | | | Reviews |

DB-DOJ-COBRA-00030052

| Step | Description | Client | J & G | DBAB | DBAG |
|---|---|---|---|---|---|
| 9 | Provide wire instructions to fund DBAB accounts set up for transaction. Client also provides LOA to move funds from DBAB to DBAG to fund purchase of DS. | Signs LOA, approves and processes wire | Coordinates wire | Receives wire, processes LOA | |
| 10 | Final DS pricing, after funds wired. Call client, get authorization to proceed, provide final quote, and execute DS. | Authorizes DS | | | Quote and execute |
| 11 | Written confirmation agreement will be supplied from DBAG London within 2 days for client signature. Client returns signed copy to DBAG London. | Signs confirm | Reviews & keeps copy | | Prepares confirm |
| 12 | Moving DS positions. J & G will prepare and provide assignment executed by client to DBAG to move DS to target entity. Fax copy to Craig Brubaker, who will process journal to move positions to designated entity. | Signs assignment | Prepares and distributes form | Processes journal | Follows instructions on assignment |
| 13 | Where required, spot foreign currency will be purchased in designated account. When instructed by LOA, FC will be journaled to destination account. LOA will also instruct DBAB to sell designated % of FC. | Signs LOA's | Prepares LOA, delivers to DBAB | Processes LOA's | |
| 14 | Account statements—As DS is a "derivative", there is technically no DBAG account, account number, monthly statement, etc. By opening DBAB accounts and assigning CUSIP to DS, we can carry manually entered descriptions of the DS position, as well as provide an audit trail when journaled as a capital contribution to the partnership. | | | Formats account statements | |
| 15 | Further assistance from DBAB as requested: | | | | |
| a. | Tax reserve fund investment alternative. Provides consistent 11-12% annual returns over 1,3,5,10 year periods at intermediate bond risk profile during statute of limitations period | | | Discuss if desired | |
| b. | Trading activity before yearend to reinforce profit motive/business purpose | | | Discuss if desired | |
| c. | Long-term asset management | | | Discuss if desired | |



DB-DOJ-COBRA-00030053

# Deutsche Bank AG London

July 14, 1999

**Foreign Exchange Linked Swap Transaction**

address

Our Ref: ex26710E

Dear Sirs:

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Swap Transactions entered into between us ("Party A") and you ("Party B") on the Trade Date referred to below (the "Transaction"). The Transaction consists of a number of elements as detailed below in Sections 1, 2(i) and (ii), 3(i) and (ii) and Section 4. Certain definitions and provisions which are applicable to more than one element of the Transaction are detailed in Section 1.

The definitions and provisions contained in the 1991 ISDA Definitions (as amended by the 1997 Supplement) as published by the International Swaps and Derivatives Association, Inc (the "Swap Definitions") and in the 1998 FX and Currency Option Definitions (the "FX Definitions") as published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee (the "1998 Definitions", and together with the Swap Definitions, the "Definitions"), are incorporated into this Confirmation. In the event of any inconsistency between the Swap Definitions and the 1998 Definitions, the 1998 Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

1. This Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition Party A and Party B agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form") with such modifications as Party A and Party B will in good faith agree. Upon execution by Party A and Party B of such an agreement, this Confirmation will supplement, form part of, and be subject to that agreement. All provisions contained or incorporated by reference in that agreement upon its execution will govern this Confirmation. Until the parties execute and deliver that agreement, this Confirmation, together with all other documents referring to the ISDA Form (each a "Confirmation") confirming transactions (each a "Transaction") entered into between the parties (notwithstanding anything to the contrary in a Confirmation) shall supplement, form part of, and be subject to an agreement in the form of the ISDA Form as if the parties had executed an agreement on the Trade Date of the first such Transaction between them in such form with the Schedule thereto (i) specifying only that (a) the governing law is New York law and (b) the Termination Currency is U.S. Dollars; (ii) incorporating the addition to the definition of "Indemnifiable Tax" contained in (page 48 of) the ISDA "Users Guide to the 1992 ISDA Master Agreements"; and (iii) incorporating any other modifications to the ISDA form specified below.

The terms of the Transaction to which this Confirmation relates are as follows:

**1. Section 1 – General Terms**

| | |
|---|---|
| Notional Amount: | USD 80,000,000 |
| Trade Date: | 14th October 1999 |
| Termination Date: | 16th December 1999, subject to modification in accordance with the Following Business Day Convention. |
| Business Days: | New York and Tokyo |
| Calculation Agent: | Party A, whose calculations and determinations shall be binding on the parties hereto in the absence of manifest error |
| Currency Pair: | USD and JPY |

**2. Section 1 – First Swap Transaction**

(i) Initial Exchange Provisions:

| | |
|---|---|
| Party A Initial Exchange Amount: | Zero |
| Party B Initial Exchange Amount: | USD 16,000,000 |
| Initial Exchange Date: | 18th October 1999 subject to adjustment in accordance with the Following Business Day Convention. |

(ii) Final Exchange Provisions:

| | |
|---|---|
| Party A Final Exchange Amount: | USD 80,000,000 |
| Party B Final Exchange Amount: | Zero |
| First Range Level: | JPY 110.82 per USD 1.0000 |
| First Rate Determination Date: | Means the Termination Date |
| Final Exchange Date: | 20th December 1999 subject to adjustment in accordance with the Following Business Day Convention. |

(A) If the Spot Rate is, on the First Rate Determination Date at 10:00 a.m. local time in New York, greater than or equal to the First Range Level (such event being a "First Swap Trigger Event"), then upon the occurrence of such First Swap Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a First Swap Trigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of the First Swap Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the First Swap Trigger Event and provide details of the occurrence of such First Swap Trigger Event. A failure to give such notice shall not, however, prejudice the occurrence of the First Swap Trigger Event.

**3. Section 1 – Second Swap Transaction**

(i) Initial Exchange Provisions:

| | |
|---|---|
| Party A Initial Exchange Amount: | USD 15,666,666.66 |
| Party B Initial Exchange Amount: | Zero |
| Initial Exchange Date: | 18th October 1999 subject to adjustment in accordance with the Following Business Day Convention |

(ii) Final Exchange Provisions:

| | |
|---|---|
| Party A Final Exchange Amount: | Zero |
| Party B Final Exchange Amount: | USD 79,200,000 |
| Second Range Level: | JPY 110.84 per USD 1.00 |
| Second Rate Determination Date: | Means the Termination Date |
| Final Exchange Date: | 20th December 1999 subject to adjustment in accordance with the Following Business Day Convention |

(A) If the Spot Rate is, on the Second Rate Determination Date at 10:00 a.m. local time in New York, greater than or equal to the Second Range Level (such event being a "Second Swap Trigger Event"), then upon the occurrence of such Second Swap Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a Second Swap Trigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of a Second Swap Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the Second Swap Trigger Event and provide details of the occurrence of such Second Swap Trigger Event. A failure to give such notice shall not however prejudice the occurrence of the Second Swap Trigger Event.

**Section 2 - Other Provisions**

(i)For the purposes of this Transaction only, the following provision shall apply:

"Subparagraph (ii) of Section 2 (c) of the ISDA Form shall not apply to the First Swap Transaction and the Second Swap Transaction.

(ii) Account Details:

Account for payments to Party A: Deutsche Bank AG New York Branch
SWIFT DEUT US 33
Account No. 107000210107
ABA 378
CHIPS ID 96804

Account for payments to Party B: To be advised.

(iii) Offices:

(a) The Office of Party A for the Transaction is London; and
(b) The Office of Party B for the Transaction is ?????????????

(iv) Representations:

Each party represents to the other party as of the date that it enters into these Transactions that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for these Transactions):

(i) **Non-Reliance.** It is acting for its own account, and it has made its own independent decision to enter into these Transactions and as to whether these Transactions are appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into these Transactions, it being understood that information and explanations related to the terms and conditions of these Transactions shall not be considered to be investment advice or a recommendation to enter into these Transactions. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of these Transactions.

(ii) **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms and conditions and risks of these Transactions. It is also capable of assuming, and assumes, the risks of these Transactions.

(iii) **Status of Parties.** The other party is not acting as a fiduciary for or adviser to it in respect of these Transactions.

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to Party A or by sending to Party A a letter or telex substantially similar to this letter, which letter or telex sets forth the material terms of the Transaction to which this Confirmation relates and indicates Party B's agreement to those terms.

Yours faithfully,
for and on behalf of
DEUTSCHE BANK AG, LONDON

By: ______________________
Name:
Title:

By: ______________________
Name:
Title:

Confirmed as of the date first above written:

By: ______________________
Name:
Title:

**NEW ACCOUNT OPENING FORM - INSTITUTIONAL CLIENTS -** Deutsche BankGroup

## SECTION A: CLIENT PROFILE

*FOR CSC USE ONLY:*
*Mgmt Group No:* ____________
*Legal Entity No:* ____________
*Sub a/c No:* ____________
*Trax/SIB/Root*

A1 **Client Legal Name:**
([illegible])
**Client's Registered Address:** Is the client domiciled in the USA Yes < > No < >

Sub a/c name/fund title:
Is the underlying account domiciled in the USA Yes < > No < >

Contact person's name (settlements): .................................... Tel no: ....................................

A2 Client Parent Name:

A3 The client relationship is with: DBAG < > MG&Co.Ltd < > DMG Futures Ltd < > Other (specify):

A4 Is this account for an existing relationship within Deutsche Bank Group London? Yes < > No < > If yes, complete A6, B1, B3, & B3 and proceed to Section E & complete. For business introduced by DMGR, complete D10 also. If no please complete the form in full.

A5 The principle business of the client is: (please tick as appropriate)

| | | | | | |
|---|---|---|---|---|---|
| Fund Manager | < > | Bank | < > | Inv. Fund | < > |
| Insurance Co | < > | Financial Institution (non-bank) | < > | Hedge Fund | < > |
| Corporate | < > | Finance Co | < > | Broker/Dealer | < > |
| Other (specify): | < > | | | | |

A6 This application is submitted by which business area?

## SECTION B: BUSINESS PROFILE

B1 The products to be traded: Equities < > Bonds < > Repo < > Commodities <> MM < > FX < > FX Options < > Futures/Options < > Other:
Set a/c up in: Trader MG/FNO/GED/ARB/MOS/GM (circle one) Internet < > Monitor < > FNX <> B'berg <> Tandem SPX <> Other (specify):

B2 Will the client be dealing in derivative products? Yes < > No < >. If yes, ensure that the appropriate documentation is in place

B3 The settlement deadline is: Is this a safekeeping account Yes < > No < >

## SECTION C: MONEY LAUNDERING PREVENTION

C1 Is the client regulated and based within an EC or FATF[2] member country & carrying out financial /credit related activities ? Yes __ No

C2 Are the shares of the client or its ultimate parent company quoted on a Recognised / Designated Exchange? Yes < > Indicate which? No < >

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| LSE | < > | NYSE | < > | Milan | < > | Paris | < > | Tokyo | < > |
| Zurich | < > | Hong Kong | < > | Frankfurt | < > | Unlisted | < > | Other (specify) | < > |

If a client is neither a Financial nor Credit institution resident within an EC or FATF member country, nor quoted on a Recognised or Designated Exchange, nor managed by Relationship Mgmt group, it must provide evidence of its legal existence before trading commences[4].

C3 Is the client acting as an agent? Yes < > No < >. If yes, are the principals: < > disclosed or < > undisclosed?

## SECTION D: KNOW YOUR CUSTOMER

D1 Is the client a wholesale counterparty? Yes < > or No <> If yes, has the Bank of England oral warning been given[3]? Yes <> No <>

D2[4]

| Is the client or its parent a: (please tick below) | No. Of shareholders | Called up share capital /net assets - GBP | Value of cash and investments held - GBP | Value of net assets - GBP |
|---|---|---|---|---|
| Company | 20 or less < ><br>21 or more < > | Less than 500,000 < ><br>More than 500,000 < ><br>More than 5,000,000 < > | N/A | N/A |
| Trust < > | N/A | N/A | Less than 10,000,000 <><br>More than 10,000,000 <> | N/A |
| Partnership < > | N/A | N/A | N/A | Less than 5,000,000 < ><br>More than 5,000,000< > |

D3 Which organisation regulates the client/broker?

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| SFA | <> | PIA | < > | Overseas Regulator (specify which) | < > | FCSB | < > |
| ISMA | < > | Bank of England | < > | Exchange Regulated (specify which) | < > | CBR | < > |
| IMRO | < > | Unregulated | < > | SIB | < > | Other (specify) | < > |

D4 Is the client a trading member of an exchange & dealing in the kind of products which are traded on that exchange? Yes <> No <>

D5 Is the client a central bank? Yes < > No < >

D6 Is the client an EC government agency or local authority? Yes < > No < >

D7 Is the client an approved supranational organisation or controlled by such an organisation?[6] Yes < > No < >

D8 Is the client/broker a member of Nasfor/RTS? Yes < > No < > Not applicable <>

D9[7] For US Legal Entities & Sub Accounts please state if it is:

| | Legal Ent | Sub Acct | | Legal Ent | Sub Acct |
|---|---|---|---|---|---|
| a) SEC Registered Broker-Dealer | < > | < > | h) Bank (not acting as Broker-Dealer) | < > | < > |
| b) Bank acting as a Broker-Dealer | < > | < > | i) Savings and Loan | < > | < > |
| c) Supranational Organisation | < > | < > | j) Insurance Company | < > | < > |
| d) Overseas Branch of a US Firm | < > | < > | k) ERISA Plan | < > | < > |



DB-DOJ-COBRA-00030058

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | e) Offshore Funds (mgd by US fiduciary) | < > | < > | l) Charitable Organisation | < > | < > | |
| | f) SEC Registered Investment Company | < > | < > | m) Trust | < > | < > | |
| | g) US Domiciled Fund | < > | < > | n) Other (specify) | < > | < > | |
| | AND Does the Legal Entity own or control in excess of USD 100 million in *financial assets* (e.g. cash or securities) Yes___ No___ | | | | | | |
| | Is the Legal Entity a Qualified Institutional Buyer? Yes No | | | | | | |

**SECTION E: AUTHORISATION**

| | | | |
|---|---|---|---|
| E1 | Reg. Rep/Trader Name<br>Signature: | Print Name: | Desk: ........................Ext: |
| E2 | Director (Grade 1 for new relationships and Grade 1-5 for existing relationships)<br>Signature: | Print Name:<br>.................................................. Date: ............................ | |
| E3 | Relationship Officer Signature: | Print Name: | Date: ............................ |



DB-DOJ-COBRA-00030059

CSC HELP LINE: 0171 545 5885 FAX No: 0171 545 3847
V21/04/98

**Client Settlement Instructions**

Client's Settlement Agent Name: ______________________ SWIFT BIC: __________

Account Number at Agent: ______________________

Beneficiary Bank Name: ______________________ SWIFT BIC: __________

Beneficiary Bank Account Number: ______________________

Other: ______________________

______________________

[0] **Products for which Credit Approval is required**
If dealing in the following products, approval must be obtained from the Credit department at all times. If in doubt, all non-DVP transactions should be referred for Credit approval.

**Products:** Stock borrowing; Equity and Bond lending; FX settlement; FX forwards; FX options; FRAs; Interest Rate Swaps; Swaptions; Caps; Floors; Money Market lines; Repo/Reverse Repo (Buy sell back and sell buy back); Options on Bonds and other securities; Global Equity Derivatives; Exchange Listed Futures and Options and Commodity limits.

[2] **Financial Actions Task Force ("FATF")/EC Member Countries**

| | | | | | | |
|---|---|---|---|---|---|---|
| Australia; | Austria*; | Belgium*; | Canada; | Denmark*; | Finland*; | France*; |
| Germany*; | Greece*; | Hong Kong; | Iceland; | Ireland*; | Italy*; | Japan; |
| Luxembourg*; | Netherlands*; | New Zealand; | Norway; | Portugal*; | Singapore; | Spain*; |
| Sweden*; | Switzerland; | Turkey; | U K*; | United States. | | |

*Country is a member of EC and FATF

[3] **Bank of England Wholesale Counterparty Warning**
When transacting with Wholesale Counterparties, you are obliged to notify the counterparty, prior to the transaction, that "Deutsche Bank AG/Morgan Grenfell & Co Ltd is a listed money market institution. We are dealing 'above size' in the wholesale money markets, and therefore we adopt you as a wholesale counterparty. All of our transactions (of whatever size) with you in wholesale money market instruments will be governed by the Bank of England's London Code of Conduct - these transactions will be outside the investor protection regime established by the Financial Services Act 1986. In particular, this means that no compensation fund is available in respect of these transactions. We shall shortly send you a letter setting out this warning."

[4] **Client Size Criteria**
Completion of Section D2 is not necessary for major Banks and Investment Institutions, quoted companies, Local Authorities, Government Agencies and Supranational Organisations and DMGR introduced business.

[5] **Supranational Organisations (examples)**
The African Development Bank; The Asian Development Bank; The Bank for International Settlements; The Caribbean Development Bank; The Council of Europe; Euratom; Eurofima; The European Bank for European Economic Community; The European Investment Bank; The Inter American Development Bank; The World Bank; The International Finance Corporation; The International Monetary Fund; The Nordic Investment Bank; The United Nations.

[6] **Document Types which evidence legal existence of client:**
Latest Report & Accounts; Memorandum & Articles; Cert. of Incorporation; List of Controlling Shareholders; List of Directors; Bank Reference; and (for DMGR introduced business) Evidence to prove relationship between onshore and offshore entities.



DB-DOJ-COBRA-00030060

[7] Stock Exchange Commission (US) Rule 15a6

These questions only need to be answered when trading in securities. If you are trading in commodities, certain types of swaps or FX this section does not need to be completed. If you have any questions please ring your Compliance Officer.

| For Compliance/CSC Use Only | |
|---|---|
| Application reviewed by: | Date: |



DB-DOJ-COBRA-00030061

# EXHIBIT G2

Brian L. Vaughn
10/22/1999 06:05 PM

To: Melinda S. Merk/National/TAX/EYLLP/US@EY-NAmerica
cc: Richard J. Shapiro/NewYork/TAX/EYLLP/US@EY-Namerica, Robert B. Coplan/National/TAX/EYLLP/US@EY-NAmerica, Martin Nissenbaum/NewYork/TAX/EYLLP/US@EY-Namerica, Peter D. Lococo/NewYork/TAX/EYLLP/US@EY-Namerica
Subject: Draft Implementation Steps

Melinda,

Let's take the checklist attached provided by J & G and modify for our use. We need to have National on sales call and insert EY responsibilities where needed. Also, please insert concurring opinion from Locke Liddell & Sapp. This checklist will be a great tool as we move forward. I will thank Paul for his input.

Brian

---------------------- Forwarded by Brian L. Vaughn/Southeast/TAX/EYLLP/US on 10/22/99 05:03 PM ---------------------------

FDaugerdas@jenkens.com on 10/22/99 04:53:45 PM

To: Brian L. Vaughn/Southeast/TAX/EYLLP/US@EY-NAmerica
cc:
Subject: Draft Implementation Steps

See attached draft.

<<15815_1.DOC>>

PENGAD 800-631-6989
GOVERNMENT EXHIBIT
2

DOJ 007914

15815_1.DOC

**Currency Linked Digital Swap**
**Transaction Steps for Implementation**
**With Deutsche Bank AG London (DBAG) and Deutsche Banc Alex. Brown (DBAB)**

| Step | Description | Client | J & G | DBAB | DBAG |
|---|---|---|---|---|---|
| 1 | J & G requests tentative pricing illustration on sample digital swap (DS). Counterparty A is DBAG, counterparty B is client. Target amount that client seeks to invest is the target basis. Variables in pricing can include—a) which currency, b) maturity dates, c) payout probability, d) lottery payout | | Call DBAB broker | | |
| 2 | Deliver sample 2-page indicative term sheet to client. DBAB will also provide historical volatility analysis of currency used in DS. | | | DBAB broker will prepare | Dan Brooks will prepare |
| 3 | Conference call with client, including J & G, DBAB and DBAG to explain transaction, current environment for currency, answer questions and cover risk/return ranges of expectation. | Call participation | Call participation | Call participation | Call participation |
| 4 | For client's additional research and understanding, we can mail hard copies of DBAG publication-"Foreign Exchange Weekly" | Make request | Copied if desired | DBAB broker will send | |
| 5 | Opening Accounts: | | | | |
| 5a. | LLC—account agreement, foreign currency agreement, and non corporate resolution | Signs | Prepares | Processes | |
| 5b. | P'ship-- account agreement, foreign currency agreement, and partnership authorization and indemnity agreement | Signs | Prepares | Processes | |
| 5c. | Corp-- account agreement, foreign currency agreement, and corporate resolution | Signs | Prepares | Processes | |
| 5d. | 1 copy of DBAG account opening agreement | | Prepares | | Processes |
| 6 | Executed Copies of constitutional documents to DBAG: | | | | |
| 6a. | Partnership agreement | | Provides copies | | Reviews |
| 6b. | LLC articles of organization | | Provides copies | | Reviews |
| 6c. | Certificate of incorporation/bylaws | | Provides copies | | Reviews |
| 6d. | Resolution/Incumbency agreements indicating entity has authority to open accounts with DBAB and DBAG, has specific trading authority for "foreign exchange and OTC derivatives entered into with DBAG", and identifies authorized agents of the entity. | | Provides copies | | Reviews |

DOJ 007916

| Step | Description | Client | J & G | DBAB | DBAG |
|---|---|---|---|---|---|
| 7 | Lawyer letter to DBAG that they have advised client on transaction and believe it to be appropriate, and with substantial authority for tax purposes. | | Prepares | | Reviews |
| 8 | Verification that transaction requires no credit approval & background check | | | | Reviews |
| 9 | Provide wire instructions to fund DBAB accounts set up for transaction. Client also provides LOA to move funds from DBAB to DBAG to fund purchase of DS. | Signs LOA, approves and processes wire | Coordinates wire | Receives wire, processes LOA | |
| 10 | Final DS pricing, after funds wired. Call client, get authorization to proceed, provide final quote, and execute DS. | Authorizes DS | | | Quote and execute |
| 11 | Written confirmation agreement will be supplied from DBAG London within 2 days for client signature. Client returns signed copy to DBAG London. | Signs confirm | Reviews & keeps copy | Records position acquisition | Prepares confirm |
| 12 | Moving DS positions. J & G will prepare and provide assignment executed by client to DBAG to move DS to target entity. Fax copy to DBAB Broker, who will process journal to move positions to designated entity. | Signs assignment | Prepares and distributes form | Processes journal | Follows instructions on assignment |
| 13 | Where required, spot foreign currency will be purchased in designated account. When instructed by LOA, FC will be journaled to destination account. LOA will also instruct DBAB to sell designated % of FC. | Signs LOAs | Prepares LOA, delivers to DBAB | Processes LOAs | |
| 14 | Account statements—As DS is a "derivative", there is technically no DBAG account, account number, monthly statement, etc. By opening DBAB accounts and assigning CUSIP to DS, we can carry manually entered descriptions of the DS position, as well as provide an audit trail when journaled as a capital contribution to the partnership. | | | Formats account statements | |
| 15 | Further assistance from DBAB as requested: | | | | |
| 15a. | Tax reserve fund investment alternative. Provides consistent 11-12% annual returns over 1,3,5,10 year periods at intermediate bond risk profile during statute of limitations period | | | Discuss if desired | |
| 15b. | Trading activity before yearend to reinforce profit motive/business purpose | | | Discuss if desired | |
| 15c. | Long-term asset management | | | Discuss if desired | |

DOJ 007917

# EXHIBIT G3

From: Daugerdas, Paul
Sent: 10/22/1999 3:50:33 PM (Central Time)
To: Guerin, Donna M.; Mayer, Erwin; Beery, John; 'miwolves@mediaone.net'
Attachments: 15815_1.DOC
Subject: New Strategy

See the attachment.

GOVERNMENT EXHIBIT 3

PENGAD 800-631-6989

**Currency Linked Digital Swap**
**Transaction Steps for Implementation**
**With Deutsche Bank AG London (DBAG) and Deutsche Banc Alex. Brown (DBAB)**

| Step | Description | Client | J & G | DBAB | DBAG |
|---|---|---|---|---|---|
| 1 | J & G requests tentative pricing illustration on sample digital swap (DS). Counterparty A is DBAG, counterparty B is client. Target amount that client seeks to invest is the target basis. Variables in pricing can include—a) which currency, b) maturity dates, c) payout probability, d) lottery payout | | Call DBAB broker | | |
| 2 | Deliver sample 2-page indicative term sheet to client. DBAB will also provide historical volatility analysis of currency used in DS. | | | DBAB broker will prepare | Dan Brooks will prepare |
| 3 | Conference call with client, including J & G, DBAB and DBAG to explain transaction, current environment for currency, answer questions and cover risk/return ranges of expectation. | Call participation | Call participation | Call participation | Call participation |
| 4 | For client's additional research and understanding, we can mail hard copies of DBAG publication-"Foreign Exchange Weekly" | Make request | Copied if desired | DBAB broker will send | |
| 5 | Opening Accounts: | | | | |
| 5a. | LLC—account agreement, foreign currency agreement, and non corporate resolution | Signs | Prepares | Processes | |
| 5b. | LP-- account agreement, foreign currency agreement, and partnership authorization and indemnity agreement | Signs | Prepares | Processes | |
| 5c. | Corp-- account agreement, foreign currency agreement, and corporate resolution | Signs | Prepares | Processes | |
| 5d. | 1 copy of DBAG account opening agreement | | Prepares | | Processes |
| 6 | Executed Copies of constitutional documents to DBAG: | | | | |
| 6a. | Partnership agreement | | Provides copies | | Reviews |
| 6b. | LLC articles of organization | | Provides copies | | Reviews |
| 6c. | Certificate of incorporation/bylaws | | Provides copies | | Reviews |
| 6d. | Resolution/Incumbency agreements indicating entity has authority to open accounts with DBAB and DBAG, has specific trading authority for "foreign exchange and OTC derivatives entered into with DBAG", and identifies authorized agents of the entity. | | Provides copies | | Reviews |



Confidential J&G Docs
JG-NC064507

JG016108_0001

| Step | Description | Client | J & G | DBAB | DBAG |
|---|---|---|---|---|---|
| 7 | Lawyer letter to DBAG that they have advised client on transaction and believe it to be appropriate, and with substantial authority for tax purposes. | | Prepares | | Reviews |
| 8 | Verification that transaction requires no credit approval & background check | | | | Reviews |
| 9 | Provide wire instructions to fund DBAB accounts set up for transaction. Client also provides LOA to move funds from DBAB to DBAG to fund purchase of DS. | Signs LOA, approves and processes wire | Coordinates wire | Receives wire, processes LOA | |
| 10 | Final DS pricing, after funds wired. Call client, get authorization to proceed, provide final quote, and execute DS. | Authorizes DS | | | Quote and execute |
| 11 | Written confirmation agreement will be supplied from DBAG London within 2 days for client signature. Client returns signed copy to DBAG London. | Signs confirm | Reviews & keeps copy | Records position acquisition | Prepares confirm |
| 12 | Moving DS positions. J & G will prepare and provide assignment executed by client to DBAG to move DS to target entity. Fax copy to DBAB Broker, who will process journal to move positions to designated entity. | Signs assignment | Prepares and distributes form | Processes journal | Follows instructions on assignment |
| 13 | Where required, spot foreign currency will be purchased in designated account. When instructed by LOA, FC will be journaled to destination account. LOA will also instruct DBAB to sell designated % of FC. | Signs LOAs | Prepares LOA, delivers to DBAB | Processes LOAs | |
| 14 | Account statements—As DS is a "derivative", there is technically no DBAG account, account number, monthly statement, etc. By opening DBAB accounts and assigning CUSIP to DS, we can carry manually entered descriptions of the DS position, as well as provide an audit trail when journaled as a capital contribution to the partnership. | | | Formats account statements | |
| 15 | Further assistance from DBAB as requested: | | | | |
| 15a. | Tax reserve fund investment alternative. Provides consistent 11-12% annual returns over 1,3,5,10 year periods at intermediate bond risk profile during statute of limitations period | | | Discuss if desired | |
| 15b. | Trading activity before yearend to reinforce profit motive/business purpose | | | Discuss if desired | |
| 15c. | Long-term asset management | | | Discuss if | |

JG016108_0003
JG-NC064509
Confidential J&G Docs

desired

# EXHIBIT G4

Brian L Vaughn
10/22/99 02 39 PM

To Richard J Shapiro/NewYork/TAX/EYLLP/US@EY-NAmerica, Martin Nissenbaum/NewYork/TAX/EYLLP/US@EY-NAmerica, Robert B Coplan/National/TAX/EYLLP/US@EY-NAmerica, Melinda S Merk/National/TAX/EYLLP/US@EY-NAmerica, Peter D. Lucido/NewYork/TAX/EYLLP/US@EY-NAmerica
cc
Subject COBRA pricing

I just received the fax confirmations of the COBRA pricing Richard and I requested from Dan Brooks at DB. Based upon our discussion, Dan has reduced his cost to 80 basis points or .8% from 1%. He priced USD/Canadian, USD/Eurodollar and USD/Yen. All are priced the same with three different investment choices. Based upon a 100 million desired loss, the client could contribute $1, $5, or $10 million for a 2/1 payoff with a 50% probability of paying off. By reducing his fee, the probability went from approx. 44% to 50%. The $1 and $5 million dollar examples will not work given our fee structure. See the illustration on the excel spreadsheet attached. Thus, the $10 million example produces the best overall results. The client would contribute $10 million plus an additional $4.5 million (fees = 3% or $3 million to J&G, 1 5% to EY or $1.5 million) in order to make $20 million in 30 days (a 38% return) with a 50% probability of paying off. The total % contribution relative to the desired loss will be 14 5%. This is up from the original example of 6% and down from the last model of 18% I believe this will sell The J&G fee would not be paid until the opinion is rendered. Our fee would be paid upon execution. The questions that remain are the defense cap issue and whether PCMG will be the managing GP. If not, J & G will oversee execution They will not be a partner of course. Are we ready to launch? I hope so. I smell fees.

thanks, bv

cobrapricing.xls

GOVERNMENT EXHIBIT 4

PENGAD 800-631-6989

2003EY001767

# EXHIBIT G5

Robert B. Coplan
05/10/2004 06:25 AM

To: GCO-IRS Tax Matters/EY-APPIUS@EY-NAmerica
cc:
Subject: FW:Products

Brian L. Vaughn
10/26/1999 10:21 AM

To: Richard J. Shapiro/NewYork/TAX/EYLLP/US@EY-Namerica, Robert B. Coplan/National/TAX/EYLLP/US@EY-NAmerica, Martin Nissenbaum/NewYork/TAX/EYLLP/US@EY-Namerica, Melinda S. Mark/National/TAX/EYLLP/US@EY-NAmerica, Peter D. Lucido/NewYork/TAX/EYLLP/US@EY-Namerica
cc:
Subject: Products

just wanted to update everyone of our status on the various VIPER product.

SOAP – under control. no additional material needed at this time. continues to sell in certain markets. should reinstate its viability given the recent PICANTE legislation (i.e. it has continued to survive legislation). Could we move to a should opinion? Can we make the product even more appealing through the use of derivatives? Should we roll-out again?

PICANTE – status for existing trusts is uncertain.
Benefactor/Phantom - dead as VIPER products

CDS – need work plan for VIPER toolkit. need to understand how 2000 strategy will be structured. will need to work with Richard Shapiro in redesigning the strategy to ensure technical issues are properly addressed. need powerpoint presentation for QS members. need to understand from PCMG all limitations associated with execution.

COBRA - open issues are engagement letter, technical memo from J & G, documents to be reviewed by Richard S., fee scale for capital gain transactions, what would our settlement options be if audited (i.e. probability of success if audited and percentage of savings we would keep). identification of qualified candidates.

OID - draft slides, engagement letter and nondisclosure to be reviewed by Bob, Richard and Marty. need fast-tax search for qualified candidates. need to discuss transaction with QS members to help them better understand where it is applicable. BV and Melinda to work with QS members to help push sales of this product.

DIABLO - need Richard to review draft opinion of BOSS prepared by PWC. need to make necessary structural changes for 1/1/2000 launch. J & G has agreed to render 3rd party opinion. need Richard to work with David at PCMG regarding execution. BV and Richard to work on product's viability.

BLIPS (to be renamed) - Richard has completed his review of draft KPMG opinion. need to determine if product can be launched for 2000. need to work with Richard on next steps.

As you can see, we have a great inventory of ideas. Let's keep up the R & D to stay ahead of legislation and IRS movements. We should probably appoint individuals to specific tasks associated with R&D, sales, execution and follow-up. Can we meet in the near future to discuss how we proceed in the most efficient manner?

By the way, thanks to all of you for your support with COBRA. I got "down" and pouted when things were going rough. I have a definite change in attitude and want to support the VIPER effort with every fiber of my being. If we proceed with careful planning, we can have a tremendous fiscal year. Please let me help

GOVERNMENT EXHIBIT 5
PENGAD 800-631-6989

DOJ 000441

in any way I can to further the R & D effort. I know I can't approve the technical issues, but I can help move the process along.

Thanks,

brian

DOJ 000442

# EXHIBIT G6

# Jenkens & Gilchrist

A PROFESSIONAL CORPORATION

1445 ROSS AVENUE
SUITE 3200
DALLAS, TEXAS 75202

(214) 855-4500
TELECOPIER (214) 855-4300

www.jenkens.com

AUSTIN, TEXAS
CHICAGO, ILLINOIS
HOUSTON, TEXAS
LOS ANGELES, CALIFORNIA
SAN ANTONIO, TEXAS
WASHINGTON, D.C.

FROM THE DESK OF:
Paul Daugerdas


| | RECIPIENT | COMPANY | FAX NO. | PHONE NO. |
|---|---|---|---|---|
| 1 | Bob Coplan | | (202) 327-6725 | |
| 2. | Richard Shapiro | | (212) 773-3088 | |
| 3. | Ray Knight | | (704) 335-4204 | |

- MESSAGE -

**NOTICE OF CONFIDENTIALITY**

The information contained in and transmitted with this facsimile is

1. SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE;
2. ATTORNEY WORK PRODUCT; OR
3. CONFIDENTIAL.

It is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying, or use of or reliance upon the information contained in and transmitted with this facsimile by or to anyone other than the recipient designated above by the sender is *unauthorized* and *strictly prohibited*. If you have received this facsimile in error, please notify Jenkens & Gilchrist, a professional corporation by telephone at (214) 855-4777 immediately. Any facsimile erroneously transmitted to you should be immediately returned to the sender by U.S. Mail, or if authorization is granted by the sender, destroyed

Time: 6:56 PM   Date: October 27, 1999   Billing #:   Total Pages (+ Cover): 23

[illegible]

2003EY001516

GOVERNMENT EXHIBIT 6

PENGAD 800-631-6989

Jenkens & Gilchrist
A PROFESSIONAL CORPORATION

# MEMORANDUM

**FROM:** Jenkens & Gilchrist

**DATE:** October 1999

**SUBJECT:** Tax Consequences of Contribution of Option Spread to Partnership or Corporation

---

For the following reasons, the short option obligation should not be treated as a liability of the Partnership for purposes of Code section 752.

*Option Writer Taxation, Generally*

The Internal Revenue Code does not delineate the tax consequences of issuing an option, therefore, resort must be had to cases and rulings. In the case of Virginia Iron Coal & Coke Co. v. Commissioner, 37 BTA 195 (1938), the taxpayer granted a counterparty a four-year option to buy the stock of a subsidiary in exchange for a payment of $300,000 in 1930 and annual payments of $125,000 which were to be applied to the purchase price if the counterparty exercised the option. After paying $300,000 in 1930 and $125,000 in 1931, the counterparty notified the taxpayer in 1933 that it was abandoning the option. The taxpayer, who had not initially reported the receipt of the option premiums, thereupon filed amended returns for 1930 and 1931 and reported the premiums as income for the appropriate year. The Commissioner asserted that the premiums were income in the year the option was abandoned, and the court agreed, adopting an "open transaction" approach:

> "It was impossible to tell in 1930 and 1931, when the payments were received, whether they would ultimately represent income to the petitioner or a return of capital. They were to be applied against the purchase price in case of the exercise of the option. Had the option been exercised, they would have represented a return of

CHICAGO 1 [illegible]

2003EY001517

capital, that is, a recovery of a part of the basis for gain or loss which the property had in the hands of the seller. In that event they would not have been income and their return as income when received would have been improper. . . But in case of termination of the option and abandonment by the Texas Co. of its right to have the payments applied as a part of the purchase price, it would be apparent for the first time that the payments represented clear gain to the petitioner. In that case, since no property would be sold, there would be no reason to reduce the basis of that retained.

Thus it was impossible for either the taxpayer or the Commissioner to determine in 1930 and 1931 whether or not the payments would eventually represent income and how they should be reported. Obviously those years could not be held open for income tax purposes to await the final outcome of such contracts. The taxpayer in this case, after the option to purchase had been surrendered, filed amended returns reporting the payments as income for the years in which received. But returns must be filed in the light of facts known at the time the returns are due. Some other taxpayer might not choose to file amended returns. Then the statute of limitations would foreclose the Commissioner and prevent the collection of taxes lawfully due. If the Commissioner is to make an orderly and uniform collection of taxes in such cases, the tax liability for those earlier years must be determined and closed by collection, without waiting to see whether or not the option is exercised

Thus it is necessary to exclude such payments from the income of the year in which received and to include them for the later year when, for the first time, a satisfactory determination of their character for income tax purposes can be made. The other party to the contract in the taxable year for the first time released and abandoned its right under the agreements to have the payments applied against the purchase price, and charged off its loss. The recipient then knew for the first time that it could retain the payments without any obligation to apply them against the purchase price. Its property was then free of the option, it had lost nothing, but had retained everything with which it started and had acquired $425,000 in addition. The $425,000 was then income.

The taxpayer argues that, since the funds were received in 1930 and 1931 with the right to retain them forever and to use them without restriction, they should have been accrued as income for those years. Although they were received without any obligation to return them, there was one condition attached to their receipt. That is, they had to be applied against the purchase price in case the option was exercised. That one condition is the determining factor in this case. Until it was removed in 1933, the question of the liability of the recipient for income tax upon the payments had to be held in abeyance." 37 BTA 197-199.

Jenkens & Gilchrist
A PROFESSIONAL CORPORATION

A dissent argued that the taxpayer recognized income in the year of receipt because it had unfettered control of the premium at that time. The dissent added that the income could be included in the year the option was abandoned under only one of two theories, both of which the dissent felt were untenable. The first theory is that the counterparty "forfeited" the premiums only in 1933. That theory was untenable because the taxpayer had absolute control of the funds since 1930, so there was nothing to "forfeit." The second theory was that the value of the abandonment was income. However, if that were the case, the only income would be the difference between the value of the optioned property at the time of the abandonment and the price at which the taxpayer was obligated to convey it.

In I. T. 3835, 1947-1 C.B. 53, Internal Revenue Service ruled that the premium received by a writer (issuer or optionor) of a "put" or "call" option which is not exercised constitutes a short-term capital gain, under section 117(g)(2) of the Internal Revenue Code of 1939, to be taken into account in computing his gross income, for Federal income tax purposes, only for the taxable year in which the failure to exercise the option becomes final.

In Rev. Rul. 58-234,1958-1 C.B. 279 the Service held that section 117(g)(2) of the Internal Revenue Code of 1939 specifically provided that "gains . . . attributable to the failure to exercise privileges or options to buy or sell property shall be considered as short-term capital gains . . " whereas in the Internal Revenue Code of 1954 there was no corresponding or other provision under which such gains shall or may be considered or treated as capital gain, either short-term or long-term. The IRS found that the premium received by the writer (issuer or optionor) of a "put" or "call" option which is not exercised constitutes ordinary income under section 61 of the 1954 Code, which should



2003EY001519

Jenkens & Gilchrist
A PROFESSIONAL CORPORATION

be included in his gross income only for the taxable year in which the failure to exercise the option becomes final. The IRS based its holding on an "open transaction" approach:

> An optionor, by the mere granting of an option to sell ("put") or buy ("call"), certain property, may not have parted with any physical or tangible assets; but, just as the optionee thereby acquires a right to sell, or buy, certain property at a fixed price during a specified future period or on or before a specified future date, so does the optionor become obligated to accept, or deliver, such property at that price, if the option is exercised. Since the optionor assumes such obligation, which may be burdensome and is continuing until the option is terminated, without exercise, or otherwise, there is no closed transaction nor ascertainable income or gain realized by an optionor upon mere receipt of a premium for granting such an option. The open, rather than closed, status of an unexercised and otherwise unterminated option to buy (in effect a "call") was recognized, for Federal income tax purposes, in A.E. Hollingsworth v. Commissioner, 27 B.T.A. 621, acquiescence, C.B. XII-1, 6 (1933). It is manifest, from the nature and consequences of "put" or "call" option premiums and obligations, that there is no Federal income tax incidence on account of either the receipt or the payment of such option premiums, i.e., from the standpoint of either the optionor or the optionee, unless and until the options have been terminated, by failure to exercise, or otherwise, with resultant gain or loss. The optionor seeking to minimize or conclude the eventual burden of his option obligation, might pay the optionee, as consideration for cancellation of the option, an amount equal to or greater than the premium. Hence, no income, gain, profits, or earnings are derived from the receipt of either a "put" or "call" option premium unless and until the option expires without being exercised, or is terminated upon payment by the optionor of an amount less than the premium. Therefore, it is considered that the principle of the decision in North American Oil Consolidated v. Burnet, 286 U.S. 417, Ct. D. 499, C.B. XI-1, 293 (1932), which involved the receipt of "earnings," is not applicable to receipts of premiums on outstanding options.

In Rev. Rul. 78-182, 1978-1 C.B. 265, dealing with options listed on the Chicago Board Options Exchange, the Service follows Rev. Rul. 59-234 in holding, *inter alia*, that as to the writer of a put or call, "there is no Federal income tax incident on account of either the receipt or the payment of such option premium, that is, from the standpoint of either the optionor or the optionee, unless and until the options have been terminated, by failure to exercise, or otherwise, with resultant



2003EY001520

Jenkens & Gilchrist
A PROFESSIONAL CORPORATION

gain or loss." Because of a 1976 amendment to section 1234, as noted below, the ruling adds that this gain or loss is now short-term capital gain or loss.

Section 1234(a)(1) currently provides the following rule: "Gain or loss attributable to the sale or exchange of, or loss attributable to failure to exercise, an option to buy or sell property shall be considered gain or loss from the sale or exchange of property which has the same character as the property to which the option relates has in the hands of the taxpayer (or would have in the hands of the taxpayer if acquired by him)." Rev. Rul 78-192 provides that if a holder sells a put or call option on a capital asset before maturity, any gain or loss recognized at that time is capital gain. In addition, in relevant part, section 1234(b), as amended by the Tax Reform Act of 1976 specifically to address the apparent change in law pointed out by Rev. Rul. 58-234, provides that, in general, in the case of the grantor of an option, "gain or loss" from any "closing transaction" with respect to, an option in property shall be treated as a gain or loss from the sale or exchange of a capital asset held not more than 1 year. Section 1234(b)(2)(A) defines a "closing transaction" as "any termination of the taxpayer's obligation under an option in property other than through the exercise or lapse of the option." Section 1234(b)(2)(B) defines "property" as "stock and securities (including stocks and securities dealt with on an "when issued" basis), commodities and commodity futures."

Neither the statute nor the regulations define the term "commodities." Regs. §4.954-2(f)(2), a temporary regulation effective until Nov. 6, 1995, previously provided that, for purposes of determining foreign personal holding company, "commodities" included nonfunctional foreign currency. The final regulations, Regs. §1.954-2(f)(2), no longer include nonfunctional foreign currency in the definition of "commodities." However, TD 8618, the preamble to the final

Jenkens & Gilchrist
A PROFESSIONAL CORPORATION

regulations, states that "although section 1.954-2(f)(2)(i) no longer explicitly provides that nonfunctional currency is a commodity, nonfunctional currency continues to fall within the general definition of commodity." In addition, section 988(c)(1)(B)(iii) specifically provides that income or loss from an option on nonfunctional currency is taxable as "gain or loss."

Accordingly, based upon case law, the rulings, and the statute, the premium from issuing a put or call option should be held in suspense under an open transaction theory until the option expires, lapses, or the option's obligation under the option terminates. Additionally, upon the termination of an option on stock, securities or commodities (including foreign currency)--the writer recognizes "gain or loss," not "income," (and not cancellation of indebtedness income).

*Code Section 752 and Related Authorities*

Code section 752(a) treats any increase in a partner's share of liabilities of a partnership as a deemed contribution of money by such partner to the partnership, thus increasing basis. Code section 752, however, which governs the "treatment of partnership liabilities," does not define "liabilities." Additionally, no other section of the Code or the regulations defines the term "liability." A standard dictionary defines a "liability" as "a debt; an amount which is owed," and a "contingent liability" as "an amount resulting from past transactions which may become a liability in the future under certain defined circumstances." Merriam-Webster International Dictionary of the English Language, Second Edition. Clearly, under this definition, for there to be a "liability," there must be an "amount," and for the liability to be other than "contingent," this amount must be "owed." An obligation under a short option position flunks both halves of the definition: there is currently nothing owed, so the obligation is not a liability, and there is no defined amount, so that the obligation is not

Jenkens & Gilchrist
A PROFESSIONAL CORPORATION

even a contingent liability. We reach our conclusion noted above by virtue of the case law, the contingent nature of short option obligations, and the relationship between partnership liabilities and debt under Temp. Treas. Reg. sec. 1.752-1T (as originally proposed).

Significantly, in the case of George Helmer v. Commissioner, 34 TCM 727 (1975), the Tax Court held that a partnership's receipt of money pursuant to an option agreement did not create a partnership liability under Code section 752. In that case, a partnership owned certain real property on which it granted a corporation a purchase option. In consideration for the option, the corporation paid cash to the partnership. The partnership distributed the cash to its partners. The IRS argued that the option agreement did not create a partnership liability under Code section 752 and, thus, the distribution of the option money caused the partners to recognize gain under Code section 731 (i.e., the distribution of the option money exceeded the partners' tax bases in their partnership interests). The partners argued that the receipt of the option money created a short option partnership liability under Code section 752 which increased the adjusted basis of their partnership interests.

The Tax Court held for the IRS, even though a disparity between partnership inside and outside basis resulted. The Tax Court stated:

> "We are faced with a unique situation. Helmer Brothers received payments pursuant to the option agreement when there was no forfeiture of any of the option payments, the option had not been terminated, nor had any portion of the option been exercised by the optionee. Respondent, in his brief, conceded that the income from the option payments was deferrable by the partnership until characterized as ordinary income (because of the default by the optionee) or capital gains (because of an exercise of the option by the optionee).
>
> * * * * * *
>
> The moneys received under the option agreement were free of restrictions *except* that upon exercise of the option such amounts would be applied against the purchase price. Thus, the restriction only affected the character of the gain in the partnership's hands. It is this lack of ability to determine character of income (not any liability to repay or to perform) that causes

Jenkens & Gilchrist
A PROFESSIONAL CORPORATION

the deferral of the recognition of the income by the partnership until the option is either exercised or lapsed."

The Service might assert that Helmer should not be followed because it is only a memorandum opinion of the Tax Court. In Nico v. Commissioner, 67 TC 647 (1977) *aff'd in part and rev'd in part on other grounds*, 565 F.D. 1234 (2d Cir. 1977), following a long line of decisions the Tax Court stated that "we consider neither revenue rulings nor Memorandum Opinions of this court to be controlling precedent." See generally Sommers and Waters, "Tax Court Memorandum Decisions--What are They Worth?," 98 TNT (LEXIS) 138-96 (July 20, 1998). Nevertheless, numerous Tax Court decisions routinely cite memorandum opinions as precedent. In addition, the Helmer decision is consistent with Revenue Ruling 73-301, 1973-2 CB 215, which holds that an unrestricted progress payment received by a partnership did not create a "liability" for purposes of section 752.[8]

Moreover, the leading treatise on partnership taxation, without mentioning Helmer's status as a memorandum opinion, appears to view it as controlling authority. McKee, Nelson and Whitmire, *Federal Taxation of Partnerships and Partners* ¶7.01[1] (1998 Supp.#2). Accordingly, Helmer should be followed in determining whether an obligation under an option is a liability for purposes of section 752.

The courts have consistently held that obligations which are contingent or speculative are not liabilities for purposes of Code section 752, a principle which the IRS has consistently followed. See Long v. Commissioner, 660 F.2d 416 (10th Cir. 1981), aff'g. 71 T.C. 1 (1979); Brountas v.

---

8 The Service appears to have asserted in other contexts that an obligation under an option constitutes a liability. Cf. Rev. Rul. 68-627, 1968-2 CB 158, mod. Rev. Rul. 98-10, 1998-1 IRB 11; Letter Rulings 7951128 and [illegible].

[illegible] 8

2003EY001524

Jenkens & Gilchrist
A PROFESSIONAL CORPORATION

Commissioner, 692 F.2d. 152 (1st Cir. 1982). This line of authority is based on the theory that underlies authorities holding that contingent or speculative obligations cannot give rise to basis. See Denver & Rio Grande Western Railroad Co. v. United States, 505 F.2d 1266 (Ct. Cl. 1974); Lemery v. Commissioner, 52 T.C. 367 (1969), affd. 451 F.2d 173 (9th Cir. 1971).

In Long, the Tenth Circuit addressed whether certain contested claims against a partnership were liabilities under Code section 752. In holding that the obligations were not, the court stated,

> "The Tax Court held that because the lawsuit claims against the partnership were indefinite and contingent liabilities, they should not be recognized for basis adjustment purposes *until the exact amounts of the liabilities were established.* After the parties settled those suits, the Tax Court treated the settlement totals plus attorneys' fees incurred as partnership liabilities and permitted adjustment of the estate's basis in the partnership interest to the extent of its 25% interest. See 1 *W. McKee, W. Nelson & R. Whitmire*, Federal Taxation of Partnerships and Partners § 7.01[2] (1977). We agree with this approach and holding. [Emphasis added.]"

Brountas involved an oil and gas drilling partnership investment partially paid with nonrecourse obligations that were to be satisfied only out of oil production payments. The First Circuit (Judge Breyer) characterized the obligation as highly contingent and speculative and seeming "less like the repayment obligation that typically accompanies a recourse loan than like a device for sharing business risks—the risks that accompany oil explorations." 692 F.2d 158. Hence, the court held, *inter alia*, that the obligations were not partnership liabilities for purposes of Code section 752.

In determining whether an obligation is contingent, the analysis generally stops abruptly at the terms of the obligation if those terms objectively impose a contingency. See Denver & Rio Grande Western Railroad Co. v. United States, *supra*; Lemery v. Commissioner, *supra*; PLR 7704269550A

Jenkens & Gilchrist
A PROFESSIONAL CORPORATION

("When the documents, by their terms, create only contingent obligations, Courts ordinarily will not look beyond the documents to determine the intent of the parties.")

In Denver & Rio Grande Western Railroad Co., 505 F.2d at 1269-70, the court refused to allow the railroad taxpayer to include in its cost basis of property advances by a customer (used to build a "spur line") which were repayable only out of proceeds from shipping above a certain annual tonnage for 10 years. The taxpayer argued that the obligation was not contingent because in light of the underlying facts and circumstances it could be predicted with "reasonable certainty" that the advances would be repaid in full. The court rejected the argument, stating it does not matter what the parties' subjective intentions were. Absent a binding obligation to repay all of the advances at the time the subject deductions were taken, the court considered it "impossible" to value the obligation assumed.

In Lemery, 52 T.C. at 377-78, the court held that an obligation to pay part of the purchase price of a business out of "net profit" was too contingent to be included in the purchaser's basis. The petitioners were unsuccessful in arguing that, although the amount was contingent, the liability itself was absolute.

By its terms, the entering into a short put option position--particularly one issued European style, exercisable only at expiration--is both contingent and speculative. There is no certainty as to the amount of the obligation until assignment. If at expiration, the underlying property has a value greater than the strike price, the obligation is worthless. In fact, the granting of an out-of the money option presents a more compelling case of a contingent obligation than those in the cases discussed above, because the writer's *desired, if not expected, result* is for the value of the obligation to decline.



2003EY001526

Jenkens & Gilchrist
A PROFESSIONAL CORPORATION

In an analogous case involving short securities obligations, LaRue v. Commissioner, 90 T.C. 465 (1988), the court held that liabilities attributable to an accrual basis partnership's deductible expenses must meet the "all events" test of Code section 461 (described below) before they would be considered "liabilities" for inclusion in the basis of a partner's partnership interest. In LaRue, LaRue was a general partner of Goodbody and Co. ("Goodbody"), a large stock brokerage firm. Due to the inability of recordkeeping technology at the time to keep up with trading volume, Goodbody incurred large, unanticipated "back office" liabilities. These back office liabilities were created by the following types of transactions:

(1) Fails to Receive–Securities which the broker should have purchased at a stated price were not purchased. Gain or loss would be incurred on these transactions measured by the difference between the customer's contract price and what the broker had to pay to obtain the securities. These transactions were the functional equivalent of short sale transactions.

(2) Fails to Deliver–Securities which the broker thought were sold to another broker but for which no "comparison" for proof could be provided. These securities then had to be sold and the gain or loss incurred was measured by the difference between the original sales price and the actual proceeds received.

(3) Securities Differences–These represented differences between the securities the broker's records stated it should be holding for its own or other's accounts and the securities actually "in the box." These resulted mainly from incorrect deliveries, receipts, or thefts. Gain or loss was measured by the value of excess securities or their replacement cost.

(4) Dividend Errors–The broker was responsible to its customers for dividends and interest on securities which it held as nominee for its customers, that is securities held in "street name." If the broker failed to receive a dividend or interest payment when due it was still liable to its customer for such amount.

Due to the large losses generated by these back office problems and the withdrawal of capital by subordinated lenders, Goodbody was in violation of the New York Stock Exchange minimum capital requirements. At the same time, another brokerage firm, Merrill Lynch, agreed to acquire

Jenkens & Gilchrist
A PROFESSIONAL CORPORATION

Goodbody. The acquisition transaction raised the issue as to whether LaRue, and the other Goodbody partners, could include the back office liabilities in the bases of their partnership interests.

The LaRue court held that the Goodbody partners could not include these back office liabilities in their bases because the "all events" test had not been met. The court said:

> "Because an accrual basis partnership uses the 'all-events' test to determine when an expense is deductible, we think that test may be properly used to determine when the corresponding liability is includable in basis."

The all-events test is met with respect to any item if all events have occurred which determine the fact of the liability and the amount of the liability can be determined with reasonable accuracy. Treas. Reg. sec. 1.461-1(a). The court stated that while Goodbody had a liability to its customers for their back office failures, the amount of these liabilities were not determinable with reasonable accuracy until any missing securities were purchased or excess securities were sold at the market price. The LaRue holding has not been overturned and since the IRS won the case, obviously it has never issued a nonacquiescence in the decision.

That an obligation of the grantor with respect to a written option is not a liability under Code section 752 is also theoretically consistent with the analogous provisions of Code section 1233, which treats a short sale as an open transaction. See Treas. Reg. sec. 1.1233-1(a)(1). The reason for holding the short sale transaction open until the short sale is covered is that, until such time, the borrower's tax basis in the underlying securities is unknown. See McCawley, 184-4th T.M. Transactions in Stock, Securities and Other Financial Instruments at A-19. This demonstrates that the borrowing of securities under a short sale does not create basis. If the short seller did receive a



2003EY001528

Jenkens & Gilchrist
A PROFESSIONAL CORPORATION

tax basis in the borrowed securities (which is not the case), it would not be necessary to keep the short sale open until it is covered.

The non-basis creating character of a short options position as a performance obligation and not a monetary obligation was initially espoused in Revenue Ruling 57-29, 1957-1 C.B. 519. In that ruling, the IRS held that a seller of "when-issued securities" does not receive a basis in his contractual obligation to deliver securities in kind to the buyer. As stated in the ruling:

> "In computing the cost basis of assets for any purpose, the IRS does not recognize an obligation of a taxpayer reflected in an executory contract prior to the performance of the contract."

Accordingly, contingent, open transactions, such as those created by entering into a short option position, should not give rise to basis under Code section 752.

As the Supreme Court in Deputy v. duPont, 308 U.S. 488 (1940), correctly analyzed in terms of a short sale of stock, "although an indebtedness is an obligation, an obligation is not necessarily an 'indebtedness'." In that case, the taxpayer, Pierre duPont, borrowed stock of E.I. duPont de Nemours and Company ("duPont") under an agreement whereby he agreed to return the stock loaned in kind within ten years and in the interim to pay to the lender all dividends declared and paid on the shares so loaned. The taxpayer then sold the borrowed shares to certain executives of duPont, for cash which such executives borrowed from duPont. It was thought desirable that these executives have a financial interest in duPont, but there were alleged legal prohibitions on the corporation itself selling the stock to them. When the ten-year term of the loan was about to expire, the taxpayer arranged for a new loan of securities from a different lender, in order to satisfy his obligation to the first lender. The second loan of duPont stock was similar to the first, in that it had a ten-year term,




2003EY001529

Jenkens & Gilchrist
A PROFESSIONAL CORPORATION

the obligation was to return the stock loaned in kind, and in the interim pay an amount equivalent to all dividends declared and paid on the borrowed shares, plus an amount equal to the lender's tax liability arising by reason of the agreement. The IRS disallowed the deduction of the amounts paid to the second lender on the grounds that the payment was not an ordinary and necessary business expense of the taxpayer, nor was it deductible interest. The disallowance was reversed on appeal, but upheld by the Supreme Court. On the first point, the Supreme Court held against the taxpayer, finding that, while the expenditures related to offering incentives to duPont's management may have been ordinary and necessary to duPont's business, they were not ordinary and necessary business expenditures of the taxpayer. On the second point, the Supreme Court also held against the taxpayer, finding that the payments relating to the security loan did not constitute interest, because the obligation to return the duPont shares was not an "indebtedness," and the amounts paid did not constitute "interest," which was defined as "compensation for the use or forbearance of money." While the term "indebtedness," and not "liability," was used by the Supreme Court, the concepts and analysis employed make it clear that the notion of the term "indebtedness" is substantially similar to, if not equivalent to, "liability" in the Code section 752 context.

In Revenue Ruling 73-301, 1973-2 C.B. 216, a partnership received cash progress payments on a construction contract reported under the completed contract method. The partnership distributed the cash to its partners. The issue was whether the partnership's obligation under the contract caused the advance payments to constitute Code section 752 liabilities. If so, the cash distributions to the partners would not have exceeded the basis of the partners' interests. The IRS refused to accord Code section 752 liability treatment to the construction contract, stating:

Jenkens & Gilchrist
A PROFESSIONAL CORPORATION

"The progress payments ... received by the partnership and reflected as 'deferred income' on the books of the partnership ... represent amounts received on account of services performed on the contract not yet reported as gross income. This amount together with the right of the partnership to an additional payment ... for work performed constitute 'unrealized receivables' within the meaning of Section 751(c) of the Code, and the progress payments are not a 'liability' as referred to in Section 752 which increases the adjusted basis of the partnership interests of the partners. The income or loss from performance of the contract will affect the basis of the partnership interest in the partners, as provided in Section 705(a), when such income or loss is recognized for Federal income tax purposes.

Accordingly, no increase in the adjusted basis of the partnership interests ... is made as a result of the receipt by the partnership of the advance payments within the meaning of Section 752(a) of the Code."

Therefore, the IRS disallowed a Code section 752 basis step-up, despite the resulting disparity between the inside basis of the partnership's assets and the outside basis of the partnership interests. A partnership which enters into a short options position is similar to the partnership that received advance payments in Rev. Rul. 73-301. Both contractual obligations are uncertain in amount in that the partnerships cannot precisely calculate the cost of fulfilling their obligations. Both partnerships are reporting their taxable income under specialized methods of accounting which permit deferral of taxable income until completion of performance under an executory contract. Accordingly, like the partners in Rev. Rul. 73-301, the Partners here should receive no Code section 752 basis adjustment as a result of the obligation associated with the short option position, and the assumption of the short option obligation by the Partnership should not be treated as the assumption of a liability.

A petition involving the issue of whether a short sale of securities constitutes a liability for purposes of Code section 752 was filed with the Tax Court in March, 1996, and the case is currently pending. Helmer Financial Partners v. Commissioner, Docket No. 3944-96. In such case, the Petitioner challenged a determination that it had overstated its 1991 capital gains by failing to include



2003EY001531

Jenkens & Gilchrist
A PROFESSIONAL CORPORATION

a short sale position as a liability for purposes of determining the tax basis used in computing the gain. The case was set for trial on May 4, 1998, in Atlanta, Georgia, but the parties agreed to submit stipulated facts, rather than have a trial. Such stipulation was filed with the Tax Court on November 27, 1998. On December 18, 1998, a briefing schedule was set by the Tax Court for the parties to submit cross motions for summary judgment and responses to each others' memorandum in support of such motions, in which the parties will argue the law in the case. Under the schedule set by the Court, the final response will not be due until August 30, 1999. It is unknown at this time when or how the Tax Court will rule.

A petition in a similar case, Salina Partnership L.P. v. Commissioner, Docket No. 25034-96, was filed with the Tax Court on November 21, 1996. The case was originally set for trial in December, 1997, but was continued. It is unknown at this time when the trial will be held and how the Tax Court will rule.

*Revenue Ruling 95-26*

On March 9, 1995, the IRS released Revenue Ruling 95-26, 1995-1 C.B. 798, relating to the treatment of partnership liabilities. In that ruling the IRS concluded with remarkable brevity that a short sale of securities created a partnership liability under Code section 752. The IRS did not engage in any extensive (or even simplistic) analysis, and stated as its sole rationale that because the short sale creates an obligation on the part of the seller to return the borrowed securities, and the cash received in the short sale is an asset, the partnership's assets have increased in basis and therefore the short sale creates a liability. Curiously, the IRS cited Deputy v. duPont for the proposition that a short sale creates an obligation to return the securities.



2003EY001532

Jenkens & Gilchrist
A PROFESSIONAL CORPORATION

The holding of Deputy v. duPont was cited by the IRS as the only relevant authority in Rev. Rul. 95-8, 1995-4 IRB 29, for the proposition that a short sale created an obligation, not an indebtedness. It is interesting to note that Rev. Rul. 95-8 was issued less than ten weeks before the issuance of Rev. Rul. 95-26. In Rev. Rul. 95-8 the IRS held that income attributed to a short sale transaction did not constitute unrelated debt-financed income to a tax-exempt organization.

If, as noted earlier, the standards for determining whether something is a "liability" and a an "indebtedness" are the same, it should follow that if a short sale obligation is not an "indebtedness", it is not a "liability" either.

The IRS extended the same rationale as was used in Revenue Ruling 95-26 to contributions of short positions to corporate entities in Revenue Ruling 95-45, 1995-1 C.B. 53, issued June 6, 1995. This ruling suffers from the same faulty analysis as was employed in Revenue Ruling 95-26, for the same reasons previously delineated.

Revenue Rulings 95-26 and 95-45 are incorrect for other reasons as well. First, the bootstrap argument that an inclusion of proceeds in basis automatically causes an obligation to be a "liability" has been criticized by commentators. *See, generally*, Cunningham, "Short-Sale Obligations and Basis in Partnership Interests," Tax Notes, Sept. 23, 1996 at 1663; McKee, *et al*, *supra*. One can easily see the argument's weaknesses:

- It is inconsistent with Helmer and Rev. Rul. 73-301. In both the case and the ruling, the cash received increased the basis of a partnership's assets, yet that did not cause a "liability" to come into existence for purposes of section 752.

- It is not supported by Rev. Rul. 88-77, 1987-2 C.B. 129, the only authority cited explicitly in Rev. Rul. 95-26 and one of the two authorities cited in Rev. Rul. 95-45. This ruling, revoking a contrary ruling, holds that accrued but unpaid expenses and accounts payable are not liabilities of a cash basis partnership for purposes of section



2003EY001533

> 752. The Service's stated rationale was that an obligation which does *not* give rise to basis is not a liability. The two subsequent rulings mischaracterize Rev. Rul. 88-77 by stating that it stands for the proposition that an obligation which does not give rise to basis is a liability. But, the latter proposition simply does not at all follow logically from the former, its inverse. Accordingly, Rev. Rul. 88-77 is no authority for the two later rulings.

- It results in a clearly wrong answer in other contexts. For example, assume that a taxpayer borrows \$100x , buys an asset, pays down a portion of the liability with other funds, and then contributes the asset to a corporation subject to the liability. Under section 358(d)[3], the taxpayer's basis in the corporation's stock is his original \$100x basis, reduced by the liability. Using the Service's argument, the basis would be reduced by the original full amount of the liability, resulting in a zero basis in the corporation's stock.

*Cf.* Regs. § 1.356-3(b) (right to acquire stock that is treated as security for purposes of sections 354 and 355 has no principal amount).

Second, the legislative history of section 357(c)(3), the only other authority cited in Rev. Rul. 95-45 (and an implicit premise of Rev. Rul. 95-26 as well), does not support the Service's argument that a short sale obligation is a liability. As added by the 1978 tax act, section 357(c)(3)(A)(i) (and

---

[3] While in theory the term "liability" could mean different things under different Internal Revenue Code sections, in practice both Congress and the Service have indicated that the terms as used in sections 357, 358 and 752 are synonymous. In the 1984 tax act, Congress amended section 704(c) to, *inter alia*, require that accounts payable contributed to a partnership be allocated to the contributing partner and not be treated as a liability of the partnership under section 752. The conference committee report states that this treatment was intended to be "parallel to the [1978] amendment to section 357(c)," which also excludes deductible liabilities from the definition of "liability." H.R. Conf Rep. No 861, 98th Cong. 2d Sess, 1984-3 (vol 2) C.B. 110-11. In Rev. Rul. 88-77, *supra*, the Service noted that: "The legislative history accompanying the amendment to section 704(c) made b the Tax Reform Act of 1984 explicitly rejected the conclusion reached in Revenue Ruling 60-345 in favor of an interpretation of section 752 that is consistent with section 357(c)." And in Rev. Rul. 95-74, 1995-2 C.B. 36, in support of its ruling that contingent environmental liabilities were not "liabilities" for purposes of sections 357 and 358, the Service cited Rev. Rul. 88-77, which addresses the treatment of liabilities under section 752.

Also, since sections 357 and 358 work in tandem, it is generally assumed that the terms "liability" in both sections are synonymous. See Rev. Rul. 95-74, 1995-2 C.B. 36, "Due to the parallel constructions and interrelated function and mechanics of §§357 and 358, liabilities that are not included in the determination under §357(c)(1) also are not included in §358 determination of transferor's basis in the stock received in the §351 exchange." (Citing) Focht v. Commissioner, 68 T.C. 223 (1977), acq. 1980-2 C.B. 1; S. Rep. No. 1263, 95th Cong., 2d Sess 183-85 (1978), 1978-3 C.B. 481-83.

then section 358, since it is construed *in pari materia* with section 357(c)(3)) excludes from the definition of a "liability" one the payment of which would give rise to a deduction. Section 357(c)(3)(B) then provides that this exclusion shall not apply to any liability to the extent that "*the incurrence of the liability* resulted in the creation of, or an increase in, the basis of any property" [emphasis added]. The legislative history of this provision provides as an example a cash-basis taxpayer that purchase tools on credit and, before paying for the tools, transfers them along with the related obligation in a section 351 transfer. S. Rep. No. 1263, 95th Cong. 2d Sess. 183-185 (1978), 1978-3 C.B. 481-483. In the example, the incurrence of the liability (not the receipt of the tools) created basis in the tools pending actual payment. By contrast, in the case of a short sale (or, for that matter, the sale of an option), basis is created only because the seller received cash, not because he incurred a liability. The mere incurrence of the liability could not create basis in either case because of the longstanding principle that "contingent and indefinite liabilities assumed by the purchaser of an asset are not part of the cost basis of the asset." As noted above, a short sale obligation is contingent, and a short option obligation, particularly a European-style out-of-the money option, is less than contingent. It is speculative.

Moreover, since the short sale and option obligations are contingent, if instead the short sale had been made (or the option issued) in consideration for property (e.g., machine tools or nonfunctional foreign currency), the basis of the partnership's property would be zero. Thus, the Service's position results in the absurd result that whether a short sale (or option) obligation is a "liability" depends on the consideration received.

Jenkens & Gilchrist
A PROFESSIONAL CORPORATION

In addition to its technical deficiencies, Rev. Rul. 95-26 has questionable pragmatic ramifications. To protect the fisc and perhaps for other policy reasons, the courts and IRS regularly have avoided broad interpretations of partnership liabilities under Code section 752. The uncharacteristically broad interpretation in Rev. Rul. 95-26 has perhaps opened a flood gate for circumventing Code section 731(a) and deferring tax on cash distributions that otherwise would exceed the basis of a partner's interest. Where a partnership holds a short sale or series of short sales open for an indefinite period of time, the ruling generally would require the inflation of the partners' bases in their partnership interests. The typical aversion by the IRS to the determination that a liability exists for federal income tax purposes is demonstrated by its determination in Rev. Rul 95-74, 1995-2 C.B. 36, that contingent environmental liabilities and post-retirement medical liabilities assumed from its parent by a newly created subsidiary of a corporation are not "liabilities" for purposes of Code sections 357(c)(1) and 368. In that ruling, the IRS noted that such contingent liabilities had not yet been taken into account by the parent corporation, and therefore had neither given rise to deductions nor resulted in the creation of, or increase in, basis in any property of the parent. The same reasoning is easily applied to the obligation which arises due to entering into a short option position, and for the same reasons a short option position should not be found to be a liability.

However, even assuming, *arguendo*, that these rulings are correct as applied to an obligation under a short sale, their rationale should not apply to an obligation under a short option, for at least three reasons:

1. As previously discussed, Helmer stands squarely for the proposition that an option obligation is not a liability. By contrast, *no case* explicitly holds that a short sale obligation is not a liability, (although LaRue holds that functionally equivalent "back



2003EY001536

office liabilities" are not Section 752 liabilities under an open transaction theory). The rulings do not cite or make any attempt to distinguish Helmer.

2. The rulings set out a two part test for a "liability" to exist": (1) there must be an "obligation" and (2) incurring the liability must result in an increase in the basis of an asset. The second test alone is clearly not sufficient: if it were, an issuance of stock would give rise to a "liability." Assume however, that the sale of an option (or a short sale) meets the second part of the test. However, an option obligation clearly fails the first part of the test because, unlike the short sale where there is a fixed current obligation to deliver the same replacement securities (even if the dollar value of that obligation will change with the price of the item sold short), the grantor of an option incurs no obligation until and unless the option is exercised. Since there is no current obligation, there is no liability.[3]

3. The rulings state that the amount of the liability is the amount of cash received for the short sale, *because* that is the amount included in the inside basis of the partnership's assets. As explained below, this rationale is suspect. Nevertheless, in the case of a short sale, the same result is also consistent with a different rationale- the amount of liability is the cash received because that is the original amount of the obligation, *i.e.*, the amount that the obligee could demand from the obligor were the "obligation" to mature on its date of issuance. It is *not* necessarily the amount that the obligor might have to pay the obligee to free himself of the obligation[4]. In the case of a short sale, this amount is the original cost of purchasing replacement securities. By contrast, in the case of an out of-the-money short option, the amount that the obligee could demand were the option to expire on that date is zero. Thus, even assuming that both the short sale and the short option create "liabilities," the amount of the option liability is, unlike the short sale liability, zero.

---

[3] Treating the short option as a liability when—and if—it expires in the money should result in a wash since the obligation would terminate as soon as it comes into existence.

[4] *Accord*, Rev. Rul. 95-45, where the short seller received $1000x in sale proceeds and contributed them in a section 351 transfer when replacement securities would cost $800x. The transferee assumed the transferor's obligations to deliver identical securities. The Service ruled that the assumed obligation was a "liability" in the amount of $1000x. Similarly, disregarding the OID rules (which are an overlay on the common tax law of debt obligations and in any event apply only after a *de minimis* threshold), the amount of a debt obligation is set when the obligation is issued: it does not change with fluctuations in interest rates or the issuer's credit rating, even though these changes would affect the value of the debt obligation and therefore the amount that an economically rational issuer would pay the holder to discharge the debt. Also, while discharge of indebtedness income is measured by the original issue price and not by the face amount, for numerous other tax purposes the amount of a debt obligation is its face amount, i.e., the amount that the holder would receive at maturity. *See, e.g.*, section 144(a)(1)(D), 453A(c)(4), 691(a)(5)(B).



2003EY001537

Jenkens & Gilchrist
A PROFESSIONAL CORPORATION

***Conclusion***

The relevant authorities consistently oppose treating a short option position as a partnership liability for purposes of Code section 752. The Helmer case, a Tax Court memorandum decision which is directly on point, unequivocally holds that a short option position is not a liability for purposes of code Section 752. The authority for this treatment is substantial, and the Partnership should prevail on this issue if challenged by the IRS.