# EXHIBIT G7

Received: 05-Nov-99 12:54 PM From: UnknownSender To: 6032579377 Powered by eFax.com Page: 1 of 17
ID: NOV 05'99 14:34 No.004 P.01

Draft

[date]

**CONFIDENTIAL**
**ATTORNEY-CLIENT PRIVILEGED**

Gentlemen:

You have requested us to review the United States federal income tax consequences of a number of transactions in which you have been involved and to provide our opinion regarding certain material United States federal income tax issues. Such transactions are described below under the heading "Facts."

In connection with this opinion, we have examined such matters of law, and such corporate, limited liability, partnership records and such other agreements, certificates, instruments and documents, and we have made such other inquiries of officers, owners and representatives of the entities involved, as we have deemed necessary to render the opinions set forth herein. We have without any investigation or independent confirmation relied upon and assumed the accuracy of the responses to such inquiries and such certificates, corporate, limited liability company and partnership records and other documents with respect to factual matters.

CHICAGO 93333 v1, 10808/00000

GOVERNMENT EXHIBIT 7
PENGAD 800-631-6989

GOVERNMENT EXHIBIT 103

Received: 05-Nov-99 12:54 PM From: UnknownSender To: [illegible] Powered by eFax.com Page: 2 of 17
ID: NOV 05'99 14:35 No.004 P.02

[ ]
[date]
Page 2

<u>FACTS</u>

In particular, our opinion is based upon the following facts:

1. On [Date A], you, through a limited liability company who[illegible] by you("LLC"), entered into certain over-the-counter, non-publicly traded European style foreign currency option positions on the Japanese Yen (the "Options") with Deutsche Bank AG London, an unrelated substantive counter party. Specifically, you bought a digital option on the Japanese Yen/U.S. Dollar exchange rate at a strike price of [Long Strike] Japanese Yen per U.S. Dollar with an expiration date of [Long Expiration], a settlement [illegible] [Long Settlement], and a payoff amount of [Long Payoff] Japanese Yen, and paid a premium of $[Long Premium] (the "Long Option"). Additionally, you sold a digital option on the Japanese Yen/U.S. Dollar Exchange rate at a strike price of [Short Strike] Japanese Yen per U.S. Dollar and received a premium of $[Short Premium] with an expiration date of [Short Expiration], a settlement date of [Short Settlement], and a payoff amount of [Short Payoff] Japanese Yen (the "Short Option").

2. On [Date [illegible]] [illegible] contributed the Options to [Partnership] (the "Partnership") as a contribution to capital.

3. On [Date C], the Partnership's Option positions expired [were exercised].

[illegible] [Date D] you contributed shares of stock in [any long-term investment Corp.] ("LT Corp") to the Partnership as a contribution to capital. You had held such shares in LT Corp as an investment for more than twelve months.

[illegible]

DOJ 008602

Received: 05/Nov/99 12:54 PM From: Unknown Sender To: 6302579877 Powered by eFax.com Page: 3 of 17
ID: NOV 05 '99 14:36 No.004 P.03



5. On [Date E] you contributed your interest in the Partnership to S Corp, Inc. ("S Corp."), a [state] corporation wholly owned by you, as a contribution to its capital. S Corp. was the only other partner of the Partnership, and as a result of your contribution, it became the only owner of the Partnership. Accordingly, the Partnership was dissolved and liquidated, and all of its cash and its investment in LT Corp were distributed to S Corp.

6. On [Date F] S Corp. sold its investment in the stock of LT Corp it received upon the liquidation of the Partnership.

OPINION

Based on the following discussion and analysis and subject to the qualifications, limitations and assumptions set forth herein, we are of the opinion that under current U.S. federal income tax law it is more likely than not that:

A. [illegible] as a single-member limited liability company, should be disregarded as an entity for federal income tax purposes.

B. Investing [illegible], treated for tax purposes as being undertaken by you, should not be a taxable transaction.

C. The Partnership should be classified as a partnership for federal income tax purposes.

D. Your contribution of the Options to the Partnership, should not result in a taxable gain or loss.

Received: 05 Nov 99 12:54 PM From: UnknownSender To: 6032979877 Powered by eFax.com Page: 4 of 17
ID: NOV 05 '99 14:37 No.004 P.04

[ ]
[date]
Page 4

E. The Short Option should not be a liability within the meaning of section 752 of the Internal Revenue Code of 1986, as amended (the "Code").

F. Your basis in your interest in the Partnership after the contribution of the Options should include the cost of the Long Option contributed without adjustment for the Short Option.

G. An adjustment to your adjusted basis in your Partnership interest should be required as a result of the expiration of the Options, due to the recognition of ordinary loss on such expiration under Code section 1234.

H. Your contribution of the shares of LT Corp to the Partnership should not be a taxable transaction and your basis in the Partnership should be increased by an amount equal to your basis in the shares of LT Corp.

I. Your contribution of your interest in the Partnership to S Corp. should not be a taxable transaction.

J. Your basis in your interest in S Corp. should be increased by an amount equal to the adjusted basis of your interest in the Partnership as of the date of contribution

K. The liquidation of the Partnership should not result in gain or loss recognition.

L. The liquidation of the Partnership should result in an allocation of the Partnership's "outside" basis to the properties distributed to it in liquidation. In this case, the properties consisted of cash and an investment in shares of LT Corp.

Draft

[illegible]

DOJ 008604

Received: 05 Nov 99 12:54 PM From: Unknown Sender To: 6002579577 Powered by eFax.com Page: 5 of 17
ID: NOV 05'99 14:38 No.004 P.05

[ ]
[date]
Page 5

L. The disposition by S Corp. of the LT Corp received in liquidation of the Partnership should result in a long-term capital loss.

M. The step transaction and sham transaction doctrines should not apply to the transactions described herein.

N. Treasury Regulation section ("Treas. Reg.") 1.701-2 should not apply to the transactions described herein.

The opinions set forth above are subject to the following qualifications, limitations and exceptions:

No opinion is expressed about the tax treatment of the described transaction for purposes of any state or local income tax, or any tax other than the United States federal income tax.

Any misstatement of a material fact or omission of any fact that may be material or any change in any of the facts referred to may require a modification of all or a part of our opinions.

Our opinions are limited to the matters expressly set forth herein and no opinion may be implied or inferred beyond the matters so stated. The opinions expressed herein are based upon our interpretation of current law. The opinions expressed herein are not binding on the IRS or the courts and there can be no assurance that the IRS and the courts will not take a position contrary to the opinions expressed herein. We do not undertake to advise you of any changes in law which may occur after the date hereof. The Code, the regulations promulgated thereunder, and the administrative position of the IRS are subject to change either prospectively or retroactively. Such changes could render certain or all of the opinions expressed herein inapplicable.

Draft

Received: 05/Nov/99 12:54 PM From: Unknown Sender To: 6032579877 Powered by eFax.com - Page: 6 of 17
ID: NOV 05'99 14:39 No.004 P.06

[ ]
[date]
Page 6

For purposes of all of the above opinions, we are relying on the truth of the representations of you and/or partners or representatives of the Partnership or authorized officers of S Corp.

The opinions expressed herein are furnished by us solely for your benefit and for the benefit of the Partnership and S Corp. and they may not be relied upon or delivered to any person other than you, the Partnership and S Corp. and your successors or assigns without our express, prior written approval.

draft

REPRESENTATIONS

You and/or partners of the Partnership and/or authorized officers of S Corp. have represented the following:

a. You entered into the purchase and sale of the Contributed Options for substantial nontax business reasons, including (i) to produce overall economic profits because of your belief that the Japanese Yen/U.S. dollar exchange rate relationship would change; and (ii) your belief that the most direct way, with the most leverage, to realize gains from expected changes in currency prices was the purchase and sale of the Contributed Options.

b. You contributed the Contributed Options to the Partnership for substantial nontax business reasons, including, but not limited to, diversification of the risks of certain investments, professional management of the portfolio of investments, the desire to

co-invest as partners with the other co-partners and the convenience of the transferors.

c. Neither you, LLC, the Partnership, nor S Corp were [illegible] engage in any transaction to which our opinions herein relate upon the completion [illegible] of such transactions.

d. To the best of your knowledge, you have provided [illegible] the facts and circumstances necessary for us to form [illegible] opinion.

APPLICABLE LAW

Our analysis of the applicable United States federal income tax law with respect to the above-stated facts and in support of each of the [illegible] opinions as set forth on pages 3 through 5 hereof is attached, with each attachment letter [illegible] correspond to each such opinion.

Based [illegible] foregoing and subject to the qualifications, limitations and assumptions set forth herein, we [illegible] opinion that the described tax consequences have substantial authority and that it [illegible] more likely [illegible] that you will prevail if challenged by the IRS.

Very truly yours,

JENKENS & GILCHRIST

Received: 05/Nov/99 12:54 PM From: Unknown Sender To: 6302979377 Powered by eFax.com Page: 8 of 17
ID: NOV 05 '99 14:40 No.004 P.08

A. SINGLE MEMBER LLC DISREGARDED FOR FEDERAL INCOME TAX PURPOSES

*General*

The IRS issued revised regulations promulgated under Code section 7701 on December 17, 1996 (the "Classification Regulations"). T.D. 8697. In general, these regulations provide that, effective January 1, 1997, any domestic business entity which is not a corporation and which has a single owner will be disregarded as an entity separate from its owner unless the entity elects otherwise. Treas. Reg. §301.7701-3(b)(1)(ii).

*LLC*

LLC was formed under a Certificate of Formation filed with the State of Delaware on [Date G]. LLC is a domestic entity which is not a corporation. You own 100% of the membership interest in LLC. Under the rules provided in the Treasury Regulations, LLC should be disregarded as a separate entity. Neither you nor LLC elected nor intend to elect to be classified as a partnership or an association taxable as a corporation. Accordingly, it is more likely than not [illegible] IRS should regard you as the owner of the assets held in the name of LLC.

draft

Received: 05-Nov-99 12:54 PM From: Unknown Sender To: 6302575877 Powered by eFax.com Page: 9 of 17
ID: NOV 05'99 14:41 No.004 P.09

B. INVESTING IN THE OPTIONS IS NOT TAXABLE

You sold the Short Option on [Date A]. Receiving an option premium is more likely than not, not a taxable transaction, as the option writer cannot determine whether the option will be exercised or will lapse. In Rev. Rul. 58-234, 1958-1 C.B. 279, the Service held that no income, gain, profits, or earnings are derived from the receipt of either "put" or "call" option premium unless and until the option expires without being exercised or is terminated upon payment by the optionor of an amount less than the premium.

Also, on [Date A] you bought the Long Option. This is an investment transaction, the taxation of which will more likely than not also be determined upon its exercise or lapse.

Once the Options are exchanged or lapse, their taxation will more likely than not be governed by Code section 1234.

draft

Received: 05/Nov/99 12:54 PM From: UnknownSender To: [illegible] Powered by eFax.com Page: 10 of 17
ID: NOV 05'99 14:42 No.004 P.10

## C. CLASSIFICATION OF THE PARTNERSHIP AS A PARTNERSHIP FOR FEDERAL INCOME TAX PURPOSES

In determining the tax consequences of the transactions involving the Partnership, a threshold issue is its classification for federal tax purposes. Code section 7701(a)(2) defines the term "partnership" to include a syndicate, group, pool, joint venture, or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of the Code, a trust, estate, or corporation. See also Code section 761(a). The term "partner" includes a member in such a syndicate, group, pool joint venture or organization. Code section 7701(a)(2). The classification of an entity as a partnership under state law is not determinative of its classification for federal tax purposes.

Under the Classification Regulations, effective January 1, 1997, any business entity which is not classified as a corporation for federal tax purposes, and which has two or more owners can choose to be classified as either a partnership or an association taxable as a corporation, and if no such election is made, will by default be classified as a partnership. Treas. Reg. sec. 301.7701-2, -3. Entities which are classified as corporations for federal tax purposes include (1) a business entity organized under a Federal or State statute, or under a statute of a federally recognized Indian tribe, if the statute describes or refers to the entity as incorporated or as a corporation, body corporate or body politic; (2) an entity which elects to be classified as an association; (3) a business entity organized under a State statute, if the statute describes or refers to the entity as a joint-stock company or joint-stock association; (4) an insurance company; (5) a State-chartered business entity conducting banking activities; (6) a business entity wholly owned by a state or political subdivision thereof; (7) a business entity that is taxable as a corporation under a provision

Draft

of the Code other than section 7701(a)(3); and (8) certain foreign entities, as more fully provided in the Treasury Regulations. Treas. Reg. sec. 301.7701-2(b).

*The Partnership*

The Partnership, a ____[state]____ general partnership (the "Partnership"), was formed under and governed by an Agreement of General Partnership dated [Date H] (the "Partnership Agreement"). Two entities owned equity interests in the Partnership. Neither the Partnership nor any partner has filed an election to treat the Partnership as an association taxable as a corporation. The Partnership did not constitute a corporation under any [illegible] provision of the Treasury Regulations. Accordingly, the IRS should regard the Partnership as a [illegible] rather than a corporation for tax purposes.

*Potential IRS Arguments*

There are three grounds on which the IRS conceivably could argue that the Partnership should not be treated as a partnership for federal tax purposes. First, the IRS might allege that the Partnership [illegible] a pro[illegible]. To that end, the IRS perhaps would claim that the partners [illegible] the Partnership [illegible] achieve tax [illegible]. Second, the IRS could allege that no true partnership existed. For [illegible] below, you should prevail if the IRS challenges the classification of the Partnership on either of these grounds. Finally, the IRS might argue that the Partnership should be disregarded pursuant to the Subchapter K anti-abuse regulation. That regulation is [illegible] separately in this opinion.

[illegible] generally understood that to qualify as a partnership for tax purposes, the organization must have a profit objective. Hence, a venture formed to pursue a hobby or artistic interest, instead of economic profits, has been held not to constitute a partnership for income tax



Draft

Received: 05/Nov/99 12:54 PM From: UnknownSender To: [illegible] Powered by eFax.com Page: 12 of 17
ID: NOV 05'99 14:43 No.004 P.12

purposes. Ewing v. Commissioner, 20 T.C. 216 (1953), aff'd. 213 F.2d 438 (2d Cir. 1954). However, the Tax Court has treated a tax shelter limited partnership as a partnership for tax purposes despite its determination that the entity lacked a profit motive. Brannen v. Commissioner, 78 T.C. 471, 512 n. 16 (1982), aff'd. 722 F.2d 695 (11th Cir. 1984). See also National Commodity & Barter Association v. United States, [illegible] F.Supp. [illegible] (D. Colo 1993) (membership organization that carried on financial operations and tax [illegible] lacked a profit motive but was classified as a partnership). In addition, the IRS has on at least one occasion indicated that the absence of a joint profit motive does not prevent an arrangement from being a partnership for tax purposes. In PLR 7903064, the IRS classified an arrangement between co-owners of environmental protection equipment as a partnership, even though the arrangement lacked a joint profit motive. In reaching this conclusion, the IRS stated that the classification principles set forth in Treas. Reg. sec. 301.7701-2 "were developed without reference to, and do not definitely cover, unincorporated organizations (other than trusts) that are engaged in [illegible] profit activity." The IRS has also ruled that an unincorporated organization with no profit objective may be classified as a partnership. PLR 9108025 (November 26, 1990).

Assuming [illegible] objective is required of entities classified as partnerships for tax purposes, it has been represented that the Partnership possessed that objective. Moreover, as [illegible] below, objectively the Partnership has a realistic ability to profit through changes in values of [illegible] it holds. In any event, the presence of a tax motive in the formation or use of a [illegible] historically has never prevented a partnership from classification as such for tax purposes. See e.g., Commissioner v. Culbertson, 337 U.S. 733 (1949); Sllfka v. Commissioner, 182 F.2d 345 (2d Cir. 1950).

With respect to whether a partnership actually exists, in the case of ASA Investerings Partnership v. Commissioner, T.C. Memo. 1998-305, the Tax Court held that no partnership existed for federal income tax purposes between Allied Signal Inc. and a foreign commercial bank. In that case, the partnership, which was primarily capitalized with contributions from such foreign partner, invested in high-grade, floating-rate private placement notes ("PPNs"). The PPNs were subsequently sold in an installment sale in which the consideration was cash and LIBOR-indexed installment notes. Due to the structure of the sale, a large portion of the PPNs' tax basis was allocated to the LIBOR notes. Additional financial instruments were purchased by the partnership, and later Allied Signal purchased most of the foreign partner's interest in the partnership. The LIBOR notes were distributed to Allied Signal, which subsequently sold such notes, generating a large capital loss. While a partnership agreement had been entered into by the parties, other agreements regarding the economics of the series of transactions were also in place. The result of such other agreements was that the foreign partner was to get a certain specified return on its contribution to the partnership. The Court held that to form a valid partnership the parties must have intended to join together in the present conduct of an enterprise, and found, as a factual matter, that the purported partners of ASA had divergent business goals. The Court found that, considering all of the facts and circumstances, the foreign partner was, in reality, a creditor to Allied Signal, rather than its partner.

In the case of the Partnership, each of the partners intended to join together in the common purpose of investing in foreign currency option positions and other financial instruments and investments and sharing the losses and profits therefrom. No partner's share was guaranteed

draft

Received: 05-Nov-99 12:54 PM From: UnknownSender To: 6032575677 Powered by Fax.com Page: 14 of 17.
ID: NOV 05'99 14:45 No.004 P.14

or limited. Accordingly, the analysis employed by the Court in ASA should be inapplicable and the partnership should be respected.

draft

D. **YOUR CONTRIBUTION TO THE PARTNERSHIP SHOULD NOT RESULT IN A TAXABLE GAIN OR LOSS**

Code section 721(a) provides the general rule that:

> "No gain or loss shall be recognized to a partnership or to any of its partners in the case of a contribution of property to the partnership in exchange for an interest in the partnership."

There are certain exceptions to the above stated general rule. These [illegible] should have no material effect here. A transfer to a partnership which would be treated [illegible] company under the principles of Code section 351(e)(1) [illegible] the recognition of gain. A transfer of property will be considered to be a transfer to [illegible] company if (1) the transfer results, directly or indirectly, in diversification [illegible] transferor's interests; and (2) the transferee is either (a) a regulated investment company [illegible] real estate investment trust (REIT), or (c) a company more than 80 percent of the value [illegible] whose assets (excluding cash) are held for investment and are readily [illegible] stocks or securities or interests in RICs or REITs. Treas. Reg. [illegible] 1.351-1(c) [illegible] since the [illegible] transferred to the Partnership shortly after their [illegible] should [illegible] material gain. In any event, as noted below, any such gain would simply [illegible] outside basis [illegible] partner's interest in the Partnership and thus the loss on disposition of the [illegible]

Code Section 1256 entitled "Contracts Marked to Market" provides, in section 12[illegible](1) thereof, that the general year-end mark to market rule of section 1256(a) will also ap[illegible] termination by assignment or being assigned. It is possible that Section 1256(c) would apply to a tax-free contribution to a Partnership.

However, the mark to market rule applies only to "Section 1256 contracts," as defined. Section 1256(b) defines such contracts as any regulated futures contracts, foreign currency,

[illegible]

draft

Received: 05-Nov-99 12:54 PM From: Unknown Sender To: 6302572877 Powered by eFax.com Page 15 of 17
ID: NOV 05'99 14:47 No.004 P.16

contracts, nonequity options, and dealer equity options. However, section 1256(g) further defines these terms by providing both the futures contracts and options contracts need to be traded or listed on a board of trade or exchange, thus excluding the options at issue in the instant case.

With respect to foreign currency contracts, section 1256(g)(2)(A) provides [illegible] the foreign currency contract must be a contract --

i. which requires delivery of, or the settlement [illegible] which depends [illegible] value of, foreign currency which is a currency in [illegible] positions are also traded [illegible] through regulated futures contracts,

ii. which is traded in the interbank market, and [illegible]

iii. which is entered into at arm's length at a price determined by reference to the price in the interb[illegible]

While the foreign currency options at issue are [illegible] a currency in which positions are also traded through regulated futures contracts (i.e., Japanese Yen) such digital option contracts are not traded in the interbank market. Additionally, as the legislative history makes clear, "A contract between [illegible] neither [illegible] is a futures commission merchant or other similar [illegible] in the [illegible] market is not a foreign currency contract under the provision." (House [illegible] and Means [illegible] Report on P.L. 97-448). Accordingly, such contracts should not be [illegible] upon contribution to the Partnership.

Additionally, assuming arguendo, that section 1256 were to apply to the transactions at issue [illegible] should be noted that, at the time of contribution, the value of the Contributed Options ap[illegible] tax basis, and accordingly, little or no gain or loss would result.

Other instances in which income or gain might be required to be recognized upon the transfer to a partnership include when debt relief exceeds the basis of property transferred under



DOJ 008616

the principles of Code section 752,[1] or if the contribution were a disguised sale of property to the entity under the principles of Code section 707. In this case, such exceptions are inapplicable and the general rule of nonrecognition of gain should apply to the contribution by you, of the long and short option positions to the Partnership.

draft

[1] As discussed in Section E, below, the Short Option transferred to the Partnership should not constitute a "liability" for purposes of Code section 752; additionally, such contingent liabilities are generally not taken into account for federal income tax purposes in tax-free transactions, such as partnership formations under Code section 721, in accordance with a "step into the shoes" approach. See, e.g., Keyes and Mandarino, "Dealing With Contingent Stock and Contingent Liabilities in Tax-Free Transactions," 52 N.Y.U. 24 (1994).

Draft

## E. TREATMENT UNDER CODE SECTION 752 OF ASSUMING A SHORT OPTION POSITION

For the following reasons, the Short Option should not be treated as a liability of the Partnership for purposes of Code section 752.

*Option Writer Taxation, Generally*

The Internal Revenue Code does not delineate the tax consequences of writing an option, and therefore, resort must be had to cases and rulings. In the case of Virginia Iron Coal & Coke Co. v. Commissioner, 37 BTA 195 (1938), the taxpayer granted a counterparty a four-year option to buy the stock of a subsidiary in exchange for a payment of $300,000 in 1930 and annual payments of $125,000 which were to be applied to the purchase price if the counterparty exercised the option. After paying $300,000 in 1930 and $125,000 in 1931, the counterparty notified the taxpayer in 1933 that it was abandoning the option. The taxpayer, who had not initially reported the receipt of the option premiums, thereupon filed amended returns for 1930 and 1931 and reported the premiums as income for the appropriate year. The Commissioner asserted that the premiums were income in the year the option was abandoned, and the court agreed, adopting an "open transaction" approach:

> "It was impossible to say in 1930 and 1931, when the payments were received, whether they would ultimately represent income to the petitioner or a return of capital. They were to be applied against the purchase price in case of the exercise of the option. Had the option been exercised, they would have represented a return of capital, that is, a recovery of a part of the basis for gain or loss which the property had in the hands of the seller. In that event they would not have been income and their return as income when received would have been improper. . . In the case of termination of the option and abandonment by the Texas Co. of its right to have the payments applied as a part of the purchase price, it would be apparent for the first time that the payments represented clear gain to the petitioner. In that case, since no property would be sold, there would be no reason to reduce the basis of that retained.

Received: 05/Nov/99 03:27 PM From: UnknownSender To: 6302976877 Powered by eFax.com Page: 2 of 22
NOV-05-99 16:23 FROM:E&Y LLP NAT L TAX ID: PAGE 2

Thus it was impossible for either the taxpayer or the Commissioner to determine in 1930 and 1931 whether or not the payments would eventually represent income and how they should be reported. Obviously those years could not be held open for income tax purposes to await the final outcome of such contracts. The taxpayer in this case, after the option to purchase had been surrendered, filed amended returns reporting the payments as income for the years in which received. But returns must be filed in the light of facts known at the time the returns are due. Some other taxpayer might not choose to file amended returns. Then the statute of limitations would foreclose the Commissioner and prevent the collection of taxes lawfully due. If the Commissioner is to make an orderly and uniform collection of taxes in such cases, the tax liability for those earlier years must be determined and closed by collection, without waiting to see whether or not the option is exercised.

Then it is necessary to exclude such payments from [illegible] of the year in which received and to include them for the later year [illegible] the first time, a satisfactory determination of their character for income [illegible] can be made. The other party to the contract in the taxable year for the [illegible] released and abandoned its right under the agreements [illegible] payments applied against the purchase price, and charged off its loss. [illegible] then knew for the first time that it could retain the payments without any [illegible] them against the purchase price. Its property was then free of the option. [illegible] lost nothing, but had retained everything with which it started and had [illegible] $425,000 in addition. The $425,000 was then income.

The taxpayer argues that, since the funds were received in 1930 and 1931 with the right to retain them and to use them without restriction, they should have been [illegible] as income in those years. Although they were received without any obligation to return them, there was one condition attached to their receipt. That is, they [illegible] applied [illegible] purchase price in case the option was exercised. [illegible] the determining factor in this case. Until it was removed [illegible] of the liability of the recipient for income tax upon the payments had [illegible] in abeyance." 37 BTA 197-199.

[illegible] dissent argued that the taxpayer recognized income in the year of receipt because it had [illegible] control of the premiums at that time. The dissent added that the income could be [illegible] the option was abandoned under only one of two theories, both of which the dissent felt were untenable. The first theory is that the counterparty "forfeited" the premiums only in 1933. This theory was untenable because the taxpayer had absolute control of the funds since

1930, so there was nothing to "forfeit." The second theory was that the value of the abandonment was income. However, if that were the case, the only income would be the difference between the value of the optioned property at the time of the abandonment and the price at which the taxpayer was obligated to convey it.

In I. T. 3835, 1947-1 C.B. 53, Internal Revenue Servi[ce] [ru]led th[at] [illegible] [pr]emium received by a writer (issuer or optionor) of a "put" or "call" option [wh]ich is not exercis[ed] [illegible] [constitu]tes a short-term capital gain, under section 117(g)(2) of the In[ternal] [Rev]enue Code of 19[illegible] [illegible] taken into account in computing his gross income, for Fede[ral] [illegible] [t]ax purposes, only for the taxable year in which the failure to exercise the option becomes fin[al] [illegible]

In Rev. Rul. 58-234, 1958-1 C.B. 279 [illegible] [illegible] that section 117(g)(2) of the Internal Revenue Code of 1939 specifically provided that "[illegible] attributable to the failure to exercise privileges or options to buy [illegible] sell property shall be considered as short-term capital gains . . ." whereas in the Internal [illegible] C[illegible] [illegible] there was no corresponding or other provision [illegible] [illegible] or may be considered or treated as capital gain, either short-term or [illegible]. The IR[S] [illegible] the premium received by the writer (issuer or optionor) of a "put" [illegible] [illegible] which is not exercised constitutes ordinary income under section [illegible] of the 1954 Co[de] [illegible] should be included in his gross income only for the taxable year [illegible] which the failure [illegible] exercise the option becomes final. The IRS based its holding on an "[illegible] transaction" approach:

> [illegible] optionor, by the mere granting of an option to sell ("put") or buy ("call"), certain property, may not have parted with any physical or tangible assets; but, just as the optionee thereby acquires a right to sell, or buy, certain property at a fixed price during a specified future period or on or before a specified future date, so does the optionor become obligated to accept, or deliver, such property at that

Received: 05-Nov-99 03:27 PM From: UnknownSender To: 6002575977 Powered by eFax.com Page: 4 of 22
NOV-05-99 16:24 FROM: E&Y LLP NAT L TAX ID: PAGE 4

price, if the option is exercised. Since the optionor assumes such obligation, which may be burdensome and is continuing until the option is terminated, without exercise, or otherwise, there is no closed transaction nor ascertainable income or gain realized by an optionor upon mere receipt of a premium for granting such an option. The open, rather than closed, status of an unexercised and otherwise unterminated option to buy (in effect a "call") was recognized, for Federal income tax purposes, in A.E. Hollingsworth v. Commissioner, 27 B. T. A. 621, acquiescence, C.B. XII-1, 6 (1933). It is manifest, from the nature [illegible] consequences of "put" or "call" option premiums and [illegible] there is no Federal income tax incidence on account of either the receipt or the [illegible] of such option premiums, i.e., from the standpoint of either the optionor or the optionee, unless and until the options have been terminated, by failure to exercise, or otherwise, with resultant gain or loss. The optionor seeking to minimize [illegible] conclude the eventual burden of his option obligation [illegible] pay the optionee, as consideration for cancellation of the option, an amount [illegible] or greater than the premium. Hence, no income, gain, profits, or earnings [illegible] from the receipt of either a "put" or "call" option premium unless and until the option expires without being exercised, or is terminated [illegible] by the [illegible] of an amount less than the premium. Therefore [illegible] that the principle of the decision in North American Oil Consolidated v. Burnet, 286 U.S. 417, Ct. D. 499, C.B. XI-1, 293 (1932), which involved the receipt of [illegible]," is not applicable to receipts of premiums on outstanding options.

In Rev. Rul. 78-182, 1978-1 C.B. 265, dealing with options listed on the Chicago Board Options Exchange, the Service follows Rev. Rul. [illegible]4 in holding, *inter alia*, that as to the writer of a [illegible] "there [illegible] income tax incident on account of either the receipt or the payment of [illegible], from the standpoint of either the optionor or the optionee, unless and until [illegible] have been terminated, by failure to exercise, or otherwise, with resultant gain or loss." Because of a 1976 amendment to section 1234, as noted below, the ruling holds that this gain or loss is now short-term capital gain or loss.

[illegible](a)(1) currently provides the following rule: "Gain or loss attributable to the sale or exchange of, or loss attributable to failure to exercise, an option to buy or sell property shall be considered gain or loss from the sale or exchange of property which has the same



DOJ 008621

Received: 05-Nov-99 03:27 PM From: Unknown Sender To: 6302979877 Powered by &Fax.com Page: 5 of 22
NOV-05-99 10:25 FROM: E&Y LLP NAT L TAX ID: PAGE 5

character as the property to which the option relates has in the hands of the taxpayer (or would have in the hands of the taxpayer if acquired by him)." Rev. Rul 78-192 provides that if a holder sells a put or call option on a capital asset before maturity, any gain or loss recognized at that time is capital gain. In addition, in relevant part, section 1234(b), as amended by the Tax Reform Act of 1976 specifically to address the apparent change in law pointed out by Rev. Rul. 58-234, provides that, in general, in the case of the grantor of an option, "gain or loss [illegible] "closing transaction" with respect to, an option in property shall be treated as a gain or loss from the sale or exchange of a capital asset held not more than 1 year. Section 1234(b)(2)(A) defines a "closing transaction" as "any termination of the taxpayer's obligation under an option in property other than through the exercise or lapse of the option." Section 1234(b)(2)(B) defines "property" as "stock and securities (including stocks and securities dealt with on an "when issued" basis), commodities and commodity futures."

Neither the statute nor the regulations define the term "commodities." Regs. §4.954-2(f)(2), a [illegible] regulation effective until Nov. 6, 1995, previously provided that, for purposes of determining foreign personal holding company, "commodities" included nonfunctional foreign currency. The final regulations, Regs. §1.954-2(f)(2), no longer include nonfunctional foreign currency in the definition of "commodities." However, TD 8618, the preamble to the final regulations, states that "although section 1.954-2(f)(2)(i) no longer explicitly provides that nonfunctional currency is a commodity, nonfunctional currency continues to fall within the general definition of commodity." In addition, section 988(c)(1)(B)(iii) specifically provides that income or loss from an option on nonfunctional currency is taxable as "gain or loss."



DOJ 008622

Accordingly, based upon case law, the rulings, and the statute, the premium from issuing a put or call option should be held in suspense under an open transaction theory until the option expires, lapses, or the writer's potential contractual duty under the option terminates. Additionally, upon the termination of an option on stock, securities or commodities (including foreign currency)—the writer recognizes "gain or loss," not "income," (e.g., cancellation of indebtedness income).

*Code Section 752 and Related Authorities*

Code section 752(a) treats any increase in a partner's share of liabilities of a partnership as a deemed contribution of money by such partner to the partnership, thus increasing basis. Code section 752, however, which governs the "treatment of partnership liabilities," does not define "liabilities." Additionally, no other section of the Code or the regulations defines the term "liability." A standard dictionary defines "liability" as "a debt; an amount which is owed," and a "contingent liability" as "an obligation relating to past transactions which may become a liability in the future [illegible] certain [illegible] occurrence." Merriam-Webster International Dictionary of the English Language, Second Edition. Clearly, under this definition, for there to be a "liability," there must be [illegible] for the liability to be other than "contingent," this amount must be "owed." A potential contractual duty under a short option position flunks both halves of the definition: there is currently nothing owed, so the option contract is not a liability, and there is no debt or amount, so that the option contract is not even a contingent liability. We reach our conclusion stated above by virtue of the case law, the contingent nature of short option positions, and the relationship between partnership liabilities and debt under Temp. Treas. Reg. sec. 1.752-1T (as originally proposed).

Significantly, in the case of George Helmer v. Commissioner, 34 TCM 727 (1975), the Tax Court held that a partnership's receipt of money pursuant to an option agreement did not create a partnership liability under Code section 752. In that case, a partnership owned certain real property on which it granted a corporation a purchase option. In consideration for the option, the corporation paid cash to the partnership. The partnership [illegible] the cash to its partners. The IRS argued that the option agreement did not create a partnership liability under Code section 752 and, thus, the distribution of the option [illegible] caused the partners to recognize gain under Code section 731 (i.e., the distribution of the [illegible] exceeded the partners' tax bases in their partnership interests). The partners argued that the receipt of the option money created a short option partnership liability under [illegible] 752 which increased the adjusted basis of their partnership interests.

The Tax Court held for the [illegible], even though a disparity between partnership inside and outside basis resulted. The Tax Court stated:

> "[illegible] with [illegible] question. Helmer Brothers received payments pursuant [illegible] option [illegible] when there was no forfeiture of any of the option payments [illegible] had [illegible] exercised, nor had any portion of the option been exercised [illegible] option [illegible] respondent, in his brief, conceded that the income from [illegible] was deferrable by the partnership until characterized as ordinary income ([illegible] the default by the optionee) or capital gains (because [illegible] an exercise of [illegible] by the optionee).
>
> * * * * * *
>
> [illegible] received under the option agreement were free of restrictions except that [illegible] of the option such amounts would be applied against the purchase price. [illegible] restriction only affected the character of the gain in the partnership's hands. It is this lack of ability to determine character of income (not any liability to repay or to perform) that causes the deferral of the recognition of the income by the partnership until the option is either exercised or lapsed."

The Service might assert that Helmer should not be followed because it is only a memorandum opinion of the Tax Court. In Nico v. Commissioner, 67 TC 647 (1977) *aff'd in part and rev'd in part on other grounds*, 565 F.D. 1234 (2d Cir. 1977), following a long line of decisions the Tax Court stated that "we consider neither revenue rulings nor Memorandum Opinions of this court to be controlling precedent." See generally [illegible] Waters, "Tax Court Memorandum Decisions–What are They Worth?," [illegible] TNT (LEXIS) [illegible] July 20, 1998). Nevertheless, numerous Tax Court decisions [illegible] memorandum opinions as precedent. In addition, the Helmer decision is consistent with [illegible] Ruling 73-301, 1973-2 CB 215, which holds that an unrestricted progress payment received by [illegible]ership did not create a "liability" for purposes of section 752.[2]

Moreover, the leading treatise on [illegible] mentioning Helmer's status as a memorandum opinion, appears [illegible] it as controlling authority. McKee, Nelson and Whitmire, *Federal Taxation of Partnerships* [illegible] ¶7.01[1] (1998 Supp.#2). Accordingly, Helmer should be followed [illegible] whether a potential contractual duty under an option is a liability for [illegible] section [illegible]

The [illegible] held that commitments which are contingent or speculative are not liabilities for purposes of Code section 752, a principle which the IRS has consistently followed. See Long v. Commissioner, 660 F.2d 416 (10th Cir. 1981), aff'g. 71 T.C. 1 (1979); B[illegible] v. Commissioner, 692 F.2d. 152 (1st Cir. 1982). This line of authority is based on the [illegible] other authorities holding that contingent or speculative commitments cannot give

---

[2] The Service appears to have accepted in other contexts that a contractual duty under an option constitutes a liability. Cf. Rev. Rul. 68-637, 1968-2 CB 158, ampl. Rev. Rul. 98-10, 1998-1 IRB 11; Letter Rulings 7951128 and 8306073.

rise to basis. See Denver & Rio Grande Western Railroad Co. v. United States, 505 F.2d 1266 (Ct. Cl. 1974); Lemery v. Commissioner, 52 T.C. 367 (1969), aff'd. 451 F.2d 173 (9th Cir. 1971).

In Long, the Tenth Circuit addressed whether certain contested claims against a partnership were liabilities under Code section 752. In holding that the claims were not, the court stated,

> "The Tax Court held that because the lawsuit claims against the partnership were indefinite and contingent [illegible], they should not be recognized for basis adjustment purposes [illegible] *the exact amounts of the liabilities were established.* [illegible] the parties settled those suits, the Tax Court treated the settlement [illegible] plus attorneys' fees incurred as partnership liabilities [illegible] adjustment of the estate's basis in the partnership [illegible] extent of its 25% interest. See 1 *W. [illegible] W. Nelson [illegible] Whitmire*, Federal Taxation of [illegible] Partners [illegible].01[2] (1977). We agree with this approach [illegible] [Emphasis added.]"

Brountas involved an oil and gas drilling partnership investment partially paid with nonrecourse obligations that were to be satisfied [illegible] of oil production payments. The First Circuit ([illegible]) characterized the obligation as highly contingent and speculative and seeming "less [illegible] than typically accompanies a recourse loan than like a device for sharing [illegible] the risks that accompany oil explorations." 692 F.2d 158. Hence, the court held, [illegible] that the obligations were not partnership liabilities for purposes of Code section 752.

[illegible] determining whether an commitment is contingent, the analysis generally stops abruptly at the [illegible] the contract if those terms objectively impose a contingency. See Denver & Rio Grande Western Railroad Co. v. United States, *supra*; Lemery v. Commissioner, *supra*; PLR



DOJ 008626

7704269550A ("When the documents, by their terms, create only contingent obligations, Courts ordinarily will not look beyond the documents to determine the intent of the parties.")

In Denver & Rio Grande Western Railroad Co., 505 F.2d at 1269-70, the court refused to allow the railroad taxpayer to include in its cost basis of property advances by a customer (used to build a "spur line") which were repayable only out of proceeds from shipments above a certain annual tonnage for 10 years. The taxpayer argued that the commitment was not contingent because in light of the underlying facts and circumstances it could be predicted with "reasonable certainty" that the advances would be repaid in full. The court rejected the argument, stating it does not matter what the parties' subjective intentions were. Absent a binding obligation to repay all of the advances at the time the subject deductions were taken, the court considered it "impossible" to value the duty assumed.

In Lemery, 52 T.C. at 377-78, the court held that a contractual duty to pay part of the purchase price of a business out of its future profits was too contingent to be included in the purchaser's basis. The petitioners were unsuccessful in arguing that, although the amount was contingent, the obligation itself was fixed.

By its terms, entering into a short put option position--particularly one issued European style, exercisable only at expiration--is both contingent and speculative. There is no certainty as to the amount of the potential contractual duty until settlement. If at expiration, the underlying property has a value greater than the strike price, the option is worthless. In fact, the granting of an out-of the money option presents a more compelling case of a contingent contractual duty than those in the cases discussed above, because the writer's *desired, if not expected, result* is for the value of the option to decline.



DOJ 008627

In an analogous case involving short securities obligations, LaRue v. Commissioner, 90 T.C. 465 (1988), the court held that liabilities attributable to an accrual basis partnership's deductible expenses must meet the "all events" test of Code section 461 (described below) before they would be considered "liabilities" for inclusion in the basis of a partner's partnership interest. In LaRue, LaRue was a general partner of Goodbody and Co. ("Goodbody"), a large stock brokerage firm. Due to the inability of recordkeeping technology at the time to keep up with trading volume, Goodbody incurred large, unanticipated "back office" liabilities. These back office liabilities were created by the following types of transactions:

(1) Fails to Receive–Securities which the broker should have purchased at a stated price were not purchased. Gain or loss would be realized on these transactions measured by the difference between the customer's contract price and what the broker had to pay to obtain the securities. These transactions were the functional equivalent of short sale transactions.

(2) Fails to Deliver–Securities which the broker thought were sold to another broker but for which no "comparison" or proof could be provided. These securities then had to be sold and the gain or loss incurred was measured by the difference between the original sales price and the actual proceeds received.

(3) [illegible] Differences [illegible] represented differences between the securities the broker [illegible] it [illegible] holding for its own or other's accounts and the securities [illegible] the box. These resulted mainly from incorrect deliveries, receipts, or the [illegible] was measured by the value of excess securities or their replacement cost.

(4) Dividend Errors–The broker was responsible to its customers for dividends and interest on securities which it held as nominee for its customers, that is securities held in "street name." If the broker failed to receive a dividend or interest payment when due it was still liable to its customer for such amount.

[illegible] the large losses generated by these back office problems and the withdrawal of capital by subordinated lenders, Goodbody was in violation of the New York Stock Exchange minimum capital requirements. At the same time, another brokerage firm, Merrill Lynch, agreed

Received: 05-Nov-99 00:27 PM From: Unknown Sender To: 6002579877 Powered by eFax.com Page: 12 of 22
NOV-05-99 16:30 FROM: E&Y LLP NAT L TAX ID: PAGE 12

to acquire Goodbody. The acquisition transaction raised the issue as to whether LaRue, and the other Goodbody partners, could include the back office liabilities in the bases of their partnership interests.

The LaRue court held that the Goodbody partners could not include these [illegible]k office liabilities in their bases because the "all events" test had not be[illegible]. [illegible] said:

> "Because an accrual basis partnership uses the 'all-[illegible]' test t[illegible] an expense is deductible, we think that test may be pr[illegible]ly us[illegible] determi[illegible] corresponding liability is includable in basis."

The all-events test is met with respect to any item i[illegible]ve occurred which determine the fact of the liability and the amount of the liability can [illegible]ined with reasonable accuracy. Treas. Reg. sec. 1.461-1(a). The co[illegible]ile Goodbody had a liability to its customers for their back office failures, [illegible] were not determinable with reasonable accuracy until any [illegible] secu[illegible] were [illegible]chased or excess securities were sold at the market price. The La[illegible] holding [illegible] overturned and since the IRS won the case, obvi[illegible] in the decision.

That an [illegible] the grantor with respect to a written option is not a liability under [illegible] is also theoretically consistent with the analogous provisions of Code s[illegible] 1233, which [illegible] short sale as an open transaction. See Treas. Reg. sec. 1.1233-1(a)[illegible] The reason for holding the short sale transaction open until the short sale is covered is [illegible] such time [illegible] borrower's tax basis in the underlying securities is unknown. See McG[illegible] 4th T.M. Transactions in Stock, Securities and Other Financial Instruments at A-19. This demonstrates that the borrowing of securities under a short sale does not create basis. If



DOJ 008629

the short seller did receive a tax basis in the borrowed securities (which is not the case), it would not be necessary to keep the short sale open until it is covered.

The non-basis creating character of a short options position as a performance responsibility and not a monetary obligation was initially espoused in Revenue Ruling 57-29, 1957-1 C.B. 519. In that ruling, the IRS held that a seller of "when-issued securities" does not receive a basis in his contractual duty to deliver securities [illegible] to the buyer [illegible] in the ruling:

> "In computing the cost basis of assets for any purpose, the law does not recognize an obligation of a taxpayer reflected in an executory contract prior to the performance of the contract."

Accordingly, contingent, open transactions, such as created by entering into a short option position, should not give rise to basis under Code section 752.

As the Supreme Court in Deputy v. duPont, 308 U.S. 488 (1940), correctly analyzed in terms of a short sale of stock, although an [illegible] creates an obligation, an obligation is not necessarily [illegible]. In that case, the taxpayer, Pierre duPont, borrowed stock of E.I. duPont de Nemours and Company ("duPont") under an agreement whereby he agreed to return the stock loaned at the end of ten years and in the interim to pay to the lender all dividends declared and paid on the stock loaned. The taxpayer then sold the borrowed shares to certain executives of duPont, for cash which such executives borrowed from duPont. It was thought desirable that these executives have a financial interest in duPont, but there were alleged legal prohibitions on the corporation itself selling the stock to them. When the ten-year term of the loan was about to expire, the taxpayer arranged for a new loan of securities from a different lender, in order to satisfy his obligation to the first lender. The second loan of duPont stock was

Received: 05-Nov-99 03:27 PM From: UnknownSender To: 6032979877 Powered by eFax.com Page: 14 of 22
NOV-05-99 16:21 FROM:E&Y LLP NAT L TAX ID: PAGE 14

similar to the first, in that it had a ten-year term, the obligation was to return the stock loaned in kind, and in the interim pay an amount equivalent to all dividends declared and paid on the borrowed shares, plus an amount equal to the lender's tax liability arising by reason of the agreement. The IRS disallowed the deduction of the amounts paid to the second lender on the grounds that the payment was not an ordinary and necessary business expense of the taxpayer, nor was it deductible interest. The disallowance was reversed on appeal, but upheld by the Supreme Court. On the first point, the Supreme Court held against the taxpayer, finding that, while the expenditures related to offering incentives to duPont's [illegible] may have been ordinary and necessary to duPont's business, they were not ordinary and necessary business expenditures of the taxpayer. On the second point, the Supreme Court [illegible] against the taxpayer, finding that the payments relating to the security loan did not constitute interest because the obligation to return the duPont shares was not an "indebtedness," and the amounts paid did not constitute "interest," which was defined as "compensation for the [illegible] forbearance of money." While the term "indebtedness" [illegible] not "[illegible]" as used by the Supreme Court, the concepts and analysis employed make [illegible] that the [illegible] the term "indebtedness" is substantially similar to, if not equivalent to, [illegible] Code section 752 context.

In Revenue Ruling [illegible], 1973-2 C.B. 216, a partnership received cash progress payments on a construction contract reported under the completed contract method. The partnership distributed the cash to its partners. The issue was whether the partnership's duty [illegible] caused the advance payments to constitute Code section 752 liabilities. If so, the cash distributions to the partners would not have exceeded the basis of the partners' interests.

CHICAGO [illegible]



DOJ 008631

Received: 05-Nov-99 03:27 PM From: UnknownSender To: 6032979877 Powered by eFax.com Page: 15 of 22
NOV-05-99 16:32 FROM:E&Y LLP NAT L TAX ID: PAGE 16

The IRS refused to accord Code section 752 liability treatment to the construction contract, stating:

> "The progress payments ... received by the partnership and reflected as 'deferred income' on the books of the partnership ... represent amounts received on account of services performed on the contract not yet reported as gross income. This amount together with the right of the partnership to an additional payment ... for work performed constitute 'unrealized receivables' within the meaning of Section 751(c) of the Code, and the progress payments are not a 'liability' as referred to in Section 752 which increases the adjusted basis of the partnership interests of the partners. The income [illegible] from performance of the contract will affect the basis of the partnership interests of partners, as provided in Section 705(a), when such income is recognized for Federal income tax purposes.
>
> Accordingly, no increase in the adjusted basis of the partnership interests ... is made as a result of the receipt by the partnership of the advance payments within the meaning of Section 752(a) of the Code."

Therefore, the IRS disallowed a Code section [illegible], despite the resulting disparity between the inside basis of the partnership's assets and the outside basis of the partnership interests. A partnership which enters into a short options position is similar to the partnership that received advance payments in Rev. Rul. 73-301. Both contractual duties are uncertain in [illegible] that the [illegible] cannot precisely calculate the cost of fulfilling such potential duties. [illegible] are reporting their taxable income under specialized methods of accounting which permit [illegible] of taxable income until completion of performance under an executory contract. Accordingly, like the partners in Rev. Rul. 73-301, the Partners here should [illegible] no Code section 752 basis adjustment as a result of the potential contractual duty [illegible] short option position, and the assumption of the short option position by the Partnership should not be treated as the assumption of a liability.

Received: 05/Nov/99 03:27 PM From: Unknown Sender To: 6032279277 Powered by eFax.com Page: 16 of 22
NOV-05-99 19:32 FROM: ESY LLP NAT L TAX 10: PAGE 16

A case involving the issue of whether a short sale of securities constitutes a liability for purposes of Code section 752 was filed with the Tax Court in March 1996 and is currently pending, Fulcrum Financial Partners v. Commissioner, Docket No. 3944-96. In such case, the Petitioner challenged a determination that it had overstated its 1991 capital gains by failing to include a short sale position as a liability for purposes of determining the [illegible] used in computing the gain. The case was set for trial on May 4, 1998, in Atlanta, Georgia. However the parties agreed to submit stipulated facts, rather than have a trial. Such stipulation was filed with the Tax Court on November 27, 1998. On December 18, [illegible] briefing schedule was set by the Tax Court for the parties to submit cross motions for summary judgment and responses to each others' memorandum in support of such motion [illegible] parties will argue the law in the case. While two of the four scheduled briefs have been filed, [illegible] proceedings in the case, including the other filings which were originally due by August 30, 19[illegible], have been stayed. It is unknown at this time when or how the Tax Court will [illegible]

A [illegible] a similar [illegible] [illegible] Partnership L.P. v. Commissioner, Docket No. 25084-96, was filed with the Tax Court on [illegible]ber 21, 1996. The case is currently set for trial in December, 19[illegible]. It is unknown at this time when the trial will be held and how the Tax Court will rule.

*Revenue Ruling 95-26*

[illegible] March [illegible] 95, the IRS released Revenue Ruling 95-26, 1995-1 C.B. 798, relating to the [illegible] partnership liabilities. In that ruling the IRS concluded with remarkable brevity that a short sale of securities created a partnership liability under Code section 752. The IRS did not engage in any extensive (or even simplistic) analysis, and stated as its sole rationale that



draft

because the short sale creates an obligation on the part of the seller to return the borrowed securities, and the cash received in the short sale is an asset, the partnership's assets have increased in basis and therefore the short sale creates a liability. Curiously, the IRS cited Deputy v. duPont for the proposition that a short sale creates an obligation to return the securities.

The holding of Deputy v. duPont was cited by the IRS as the only [illegible] authority in Rev. Rul. 95-8, 1995-4 IRB 29, for the proposition that a short sale created an obligation, not an indebtedness. It is interesting to note that Rev. Rul. 95-8 was issued less than ten weeks before the issuance of Rev. Rul. 95-26. In Rev. Rul. 95-8 the IRS held that income attributed to a short sale transaction did not constitute unrelated debt-financed income to a tax-exempt organization.

If, as noted earlier, the standards for determining whether something is a "liability" and a an "indebtedness" are the same, it should follow that if a short sale obligation is not an "indebtedness," it is not a "liability" either.

The IRS extended the questionable rationale [illegible] in Revenue Ruling 95-26 to contributions of short positions to corporate entities in Revenue Ruling 95-45, 1995-1 C.B. 53, issued June 6, 1995. The ruling [illegible] the same faulty analysis as was employed in Revenue Ruling [illegible] for the same reasons previously delineated.

Revenue Rulings [illegible] 95-45 are incorrect for other reasons as well. First, the bootstrap argument that any inclusion of proceeds in basis automatically causes an obligation to be a liability has been criticized by commentators. *See, generally,* Cunningham, "Short-Sale Obligations and Basis in Partnership Interests," Tax Notes, Sept. 23, 1996 at 1663; McKee, *et al,* *supra.* One can easily see the argument's weaknesses:

Received: 05/Nov/99 03:27 PM From: Unknown Sender To: 6032579877 Powered by eFax.com Page: 18 of 22
NOV-05-99 15:34 FROM:E&Y LLP NAT L TAX ID: PAGE 18

- It is inconsistent with Helmer and Rev. Rul. 73-301. In both the case and the ruling, the cash received increased the basis of a partnership's assets, yet that did not cause a "liability" to come into existence for purposes of section 752.

- It is not supported by Rev. Rul. 88-77, 1988-2 C.B. 129, the only authority cited explicitly in Rev. Rul. 95-26 and one of the two authorities cited in Rev. Rul. 95-45. This ruling, revoking a contrary ruling, holds that accrued but unpaid expenses and accounts payable are not liabilities of a cash basis partnership for purposes of section 752. The Service's stated rationale was that an obligation which does *not* give rise to basis is not a liability. The two subsequent rulings characterize Rev. Rul. 88-77 by stating that it stands for the proposition that an obligation which does not give rise to basis is a liability. But, the latter proposition does not at all follow logically from the former's converse. Accordingly, Rev. Rul. 88-77 is no authority for the two later rulings.

- It results in a clearly wrong answer in other contexts. For example, assume that a taxpayer borrows $100x, buys an asset, pays down [illegible] of the liability with other funds, and then contributes the asset to a corporation subject to the liability. Under section 358(d)[3], the taxpayer's basis in the corporation's stock is his original $100x basis, reduced by the liability. Under the Service's argument, the basis would be reduced by the original full amount of the liability, resulting in a zero basis in the corporation's stock.

Cf. Regs. § 1.356-3(b) (right to acquire stock that is treated as security for purposes of sections 354 and 355 has no principal amount).

---

[3] [illegible] the term "liability" could mean different things under different Internal Revenue Code sections, in practice [illegible] have assumed that the terms as used in sections 357, 358 and 752 are synonymous [illegible]. Congress amended section 704(c) to, *inter alia*, require that accounts payable contributed to [illegible] to the contributing partner and not be treated as a liability of the partnership under section 752. The conference report states that this treatment was intended to be "parallel to the [1978] amendment to section 357(c)," which excludes deductible liabilities from the definition of "liability." H.R. Conf. Rep. No. 861, 98th Cong. 2d Sess. 1984-3 (vol 2) C.B. 110-11. In Rev. Rul. 88-77, *supra*, the Service noted that "The legislative history accompanying the amendment to section 704(c) made b the Tax Reform Act of 1984 explicitly rejects the conclusion reached in Revenue Ruling 60-345 in favor of an interpretation of section 752 that is consistent with section 357(c)." And in Rev. Rul. 95-74, 1995-2 C.B. 36, in support of its ruling that contingent environmental liabilities are not "liabilities" for purposes of sections 357 and 358, the Service cited Rev. Rul. 88-77, which addresses [illegible] liabilities under section 752.

Also, since sections 357 and 358 work in tandem, it is generally assumed that the terms "liability" in both sections are synonymous. See Rev. Rul. 95-74, 1995-2 C.B. 36, "Due to the parallel constructions and interrelated function and mechanics of §§357 and 358, liabilities that are not included in the determination under §357(c)(1) also are not included in §358 determination of transferor's basis in the stock received in the §351 exchange." [Citing] Focht v. Commissioner, 68 T.C. 223 (1977), acq. 1980-2 C.B. 1; S. Rep. No. 1263, 95th Cong., 2d Sess. 183-85 (1978), 1978-3 C.B. 481-83.

Second, the legislative history of section 357(c)(3), the only other authority cited in Rev. Rul. 95-45 (and an implicit premise of Rev. Rul. 95-26 as well), does not support the Service's argument that a short sale obligation is a liability. As added by the 1978 tax act, section 357(c)(3)(A)(i) (and thus section 358, since it is construed *in pari materia* with section 357(c)(3)) excludes from the definition of a "liability" one the payment of which would give rise to a deduction. Section 357(c)(3)(B) then provides that this exclusion shall not apply to any liability to the extent that "*the incurrence of the liability* resulted in the creation of, or an increase in, the basis of any property" [emphasis added]. The legislative history of this provision provides as an example a cash-basis taxpayer that purchase tools on credit and, before paying for the tools, transfers them along with the related obligation [illegible] transfer. S. Rep. No. 1263, 95th Cong. 2d Sess. 183-185 (1978), 1978-3 C.B. 481-483. In that example, the incurrence of the liability (not the receipt of the tools) created basis in the tools pending actual payment. By contrast, in the case of a short sale (or, for that matter, the sale of an option), basis is created only because the [illegible] received [illegible] because [illegible] incurred a liability. The mere incurrence of the liability could not create basis in [illegible] because of the longstanding principle that "contingent and indefinite [illegible] by the purchaser of an asset are not part of the cost basis of the asset." As noted above, a short sale obligation is contingent, and a short option position, particularly a European-style out-of-the money option, is less than contingent. It is speculative. [illegible] Moreover, since the short sale obligation and potential contractual duty under the short option [illegible], if instead the short sale had been made (or the option issued) in consideration for property (e.g., machine tools or nonfunctional foreign currency), the basis of the partnership's property would be zero. Thus, the Service's position results in the absurd result that

Received: 05-Nov-99 03:27 PM From: UnknownSender To: 6032579877 Powered by eFax.com Page: 20 of 22
NOV-05-99 16:35 FROM: EY LLP NAT L TAX ID: PAGE 20

whether a short sale obligation (or short option) is a "liability" depends on the consideration received.

In addition to its technical deficiencies, Rev. Rul. 95-26 has questionable pragmatic ramifications. To protect the fisc and perhaps for other policy reasons, the courts and IRS regularly have avoided broad interpretations of partnership liabilities under Code section 752. The uncharacteristically broad interpretation in Rev. Rul. 95-26 has perhaps opened a flood gate for circumventing Code section 731(a) and deferring tax on cash distributions that otherwise would exceed the basis of a partner's interest. Where a partnership holds a short sale or series of short sales open for an indefinite period of time, the ruling generally would require the inflation of the partners' bases in their partnership interests. [illegible] aversion by the IRS to the determination that a liability exists for federal income tax purposes is demonstrated by its determination in Rev. Rul. 95-74, 1995-2 C.B. 36 that contingent environmental liabilities and post-retirement medical liabilities assumed from a parent by a newly created subsidiary of a corporation [illegible] "liabilities" for purposes of Code sections 357(c)(1) and 368. In that ruling, the IRS noted that the contingent liabilities had not yet been taken into account by the parent corporation, and therefore had neither given rise to deductions nor resulted in the creation of, or increase in, basis in any property of the parent. The same reasoning is easily applied to the potential contractual duty which arises due to entering into a short option position, and for the same reasons a short option position should not be found to be a liability.

[illegible], even assuming, *arguendo*, that these rulings are correct as applied to an obligation under a short sale, their rationale should not apply to a potential contractual duty under a short option, for at least three reasons:



DOJ 008637

Received: 05.Nov.99 03:27 PM From: UnknownSender To: 6032979877 Powered by eFax.com Page: 21 of 22
NOV-05-99 15:38 FROM:E&Y LLP NAT L TAX ID: PAGE 21

1. As previously discussed, Helmer stands squarely for the proposition that an option position is not a liability. By contrast, *no case* explicitly holds that a short sale obligation is not a liability, (although LaRue holds that functionally equivalent "back office liabilities" are not Section 752 liabilities under an open transaction theory). The rulings do not cite or make any attempt to distinguish Helmer.

2. The rulings set out a two part test for a "liability" to exist": (1) there must be an "obligation" and (2) incurring the liability must result in an [illegible] in the basis of an asset. The second test alone is clearly not sufficient: [illegible] issuance of stock would give rise to a "liability." Assume, however, that the [illegible] of an option (or a short sale) meets the second part of the test. However, [illegible] contractual duty under a short option position clearly fails the first [illegible] because, unlike the short sale where there [illegible] current obligation to deliver the same replacement securities (even if the [illegible] value of that obligation will change with the price of the item sold short), [illegible] of an option incurs no contractual duty until and unless the option is exercised. Since there is no current obligation, there is no liability.[4]

3. The rulings state that the amount of [illegible] is the amount of cash received for the short sale, *because* that is the amount [illegible] the inside basis of the partnership's assets. As explained below, this [illegible] is suspect. Nevertheless, in the case of a short sale, the same result is also consistent with a different rationale: the amount of liability is the cash received because that is the original amount of the obligation, *i.e.*, the amount that the obligee could demand from the obligor were the "obligation" [illegible] its date of issuance. It is *not* necessarily the [illegible] that the [illegible] might have to pay the obligee to free [illegible] of the obligation.[5] In the case of a short sale, this amount is the original [illegible] purchase replacement securities. By contrast, in the case of an out-of-the-money short option, the amount that the obligee could demand were the option to [illegible] date is zero. Thus, even assuming that both the short sale and the

---

[4] Treating the short option as a liability when—and if—it expires in the money should result in a wash since the obligation would terminate as soon as it comes into existence.

[5] *Accord*, Rev. Rul. 95-45, where the short seller received $1000x in sale proceeds and contributed the [illegible] section 351 transferee when replacement securities would cost $800x. The transferee assumed the transferor's obligation [illegible] securities. The Service ruled that the assumed obligation was a "liability" in the amount of $[illegible], disregarding the OID rules (which are an overlay on the common tax law of debt obligations and in any event apply only after a *de minimis* threshold), the amount of a debt obligation is set when the obligation is issued; it does not change with fluctuations in interest rates or the issuer's credit rating, even though these changes would affect the value of the debt obligation and therefore the amount that an economically rational issuer would pay the holder to discharge the debt. Also, while discharge of indebtedness income is measured by the original issue price and not by the face amount, for numerous other tax purposes the amount of a debt obligation is its face amount, *i.e.*, the amount that the holder would receive at maturity. *See*, *e.g.*, section 144(a)(1)(D), 453A(c)(4), 691(a)(5)(B).



DOJ 008638

Received: 05-Nov-99 03:27 PM From: UnknownSender To: 6032979377 Powered by eFax.com Page: 22 of 22
NOV-06-99 16:37 FROM:E&Y LLP EAT L TAX ID: PAGE 22

short option create "liabilities," the amount of the option liability is, unlike the short sale liability, zero.

*Conclusion*

The relevant authorities consistently oppose treating a short option position as a partnership liability for purposes of Code section 752. The Helmer case, a Tax Court memorandum decision which is directly on point, unequivocally holds that a short option position is not a liability for purposes of code Section 752. The authority for this treatment is substantial, and The Partnership should prevail on this issue if challenged by the IRS.

draft



DOJ 008639

Received: 05/Nov/99 05:09 PM From: UnknownSender To: 6302979977 Powered by eFax.com Page: 1 of 10
NOV-05-99 17:22 FROM:E&Y LLP NAT L TAX ID: PAGE 1

F. YOUR TAX BASIS IN YOUR PARTNERSHIP INTEREST WILL EQUAL THE COST OF THE LONG OPTION POSITION CONTRIBUTED, WITHOUT ADJUSTMENT FOR THE SHORT OPTION

In general, the basis of an interest in a partnership is adjusted for contributions and distributions made by a partner. A partner's tax basis is increased by the amount of money and the adjusted basis of property contributed to the partnership determined as of the date of contribution, and by the amount (if any) of gain recognized to the contributing partner at such time. Code section 722. The basis of a purchased interest is cost. Code section 742; Treas. Reg. sec. 1.742-1. A partner's tax basis is decreased by the amount of money or the adjusted basis of property (other than money) distributed to the partner other than in liquidation of the partnership. Code section 733. If the partnership assumes liabilities of a partner in connection with his contribution of property to the partnership, such decrease in a partner's individual liabilities is deemed to be a distribution of money to the partner by the partnership. Code section 752(b). On the other hand, any increase in a partner's share of liabilities of a partnership or in a partner's individual liabilities by reason of his assumption of partnership liabilities is deemed to be a contribution of money by such partner to the partnership. Code section 752(a). As discussed in Section E, the term liabilities should, more likely than not, not include the short option positions.

The adjusted basis of the Long Option is its cost. Code section 1012. Accordingly, pursuant to Code section 722, your tax basis in your Partnership interest should be your cost basis increased by the cost of the Long Option contributed, and you should prevail on this issue if challenged by the IRS.

Received: 05-Nov-99 04:12PM From: UnknownSender To: 6082979577 Powered by eFax.com Page: 2 of 10
NOV-05-99 17:23 FROM-E&Y LLP NAT L TAX ID. PAGE 2

## G. ORDINARY LOSS AND DECREASE IN BASIS UPON EXPIRATION OF THE OPTIONS

On [Date C] the Long Option and the Short Option expired, respectively. Such Options were held for investment, but did not constitute a capital asset to the Partnership. Code section 1234 provides that options generally have the same character in a taxpay[illegible] as the underlying property would have in that taxpayers hands. I[illegible]se Yen w[illegible] a capital asset to you or to the Partnership.

Code section 988 provides special rules for the c[illegible]ion of gains or losses from certain transactions in foreign currency. In general, any [illegible] nonfunctional currency is treated as a "section 988 transaction" and any res[illegible] or loss [illegible]ch transaction is treated as foreign currency gain or loss (as t[illegible]ion 988(c)(1)(C). Any foreign currency gain or loss is treated [illegible] (as the case may be). Code section 988(a)(1)(A). A nonfuncti[illegible] currenc[illegible] a curr[illegible]y other than the dollar or the currency of the econ[illegible]ch a sig[illegible] of the activities of a trade or business of the taxpayer [illegible]ted. ([illegible]ection 985(b), which defines "functional currency.") Thus, for you or [illegible] such [illegible]rtnership, any currency other than U.S. dollars would constitute [illegible] loss on which would be ordinary in nature, rather than capital.

Code section 12[illegible]A provides for capital treatment of losses from the expiration of options in [illegible] case: when the option is a Code section 1256 contract. As discussed in Section D, the Options are not Code section 1256 contracts. Therefore, any losses from the expiration of the Options are ordinary losses.

CHICAGO [illegible]

DOJ 008641

Received: 05 Nov 99 04:10 PM From: UnknownSender To: 6032379537 Powered by eFax.com Page: 3 of 10
NOV-05-99 17:26 FROM: ESY LLP NAT L TAX ID: PAGE 3

Consistent with the normal rules of partnership accounting, Code section 705(a)(2)(A) provides that your basis in the Partnership will be reduced by your share of those losses.

draft

[illegible]

**E. YOUR CONTRIBUTION OF THE SHARES OF LT CORP SHOULD NOT BE A TAXABLE TRANSACTION, AND SUCH CONTRIBUTION SHOULD INCREASE THE BASIS OF YOUR INTEREST IN THE PARTNERSHIP**

As noted in Section D, above, Code section 721(a) provides the general rule that no gain or loss is recognized upon the contribution of property to a partnership. As previously explained, there are certain exceptions to the above stated general rule, particularly [illegible] respect to transfers to an investment company, when debt relief exceeds the basis of property [illegible] if the contribution were a disguised sale of property. In this [illegible] exceptions are inapplicable and the general rule of nonrecognition of gain more likely than [illegible] apply to the contribution by you of the shares of LT Corp. to the Partnership. While the Partnership [illegible] meet the technical definition of an investment company upon the [illegible] shares [illegible] LT Corp, an exception to the determination of diversification under the investment [illegible] rules is provided "if any transaction involves one or more transfers of nonidentical assets which, taken in the aggregate, constitute an insignificant portion [illegible] total [illegible] assets transferred." Treas. Reg. sec. 1.351-1(c)(5). [illegible] the [illegible] value of the shares of LT Corp. transferred was far less than one percent of [illegible] transferred [illegible] Partnership. Accordingly, there was no diversification of the transferors' [illegible] the contribution should, more likely than not, not result in gain or loss recognition.

[illegible] Your basis in your partnership interest in Partnership was increased by an amount equal to [illegible] basis of [illegible] property you contributed to Partnership (i.e., the shares of LT Corp) as of [illegible] contribution. Code section 722.

[illegible]

DOJ 008643

Received: 05 Nov.99 04:13 PM From: UnknownSender To: [illegible] Powered by GFax.com Page: 5 of 10
NOV-05-99 17:25 FROM:E&Y LLP NAT L TAX ID: PAGE 6

I. THE CONTRIBUTION OF YOUR PARTNERSHIP INTEREST TO S CORP. SHOULD NOT BE A TAXABLE TRANSACTION

You transferred your entire interest in the Partnership to S Corp. as a contribution to capital. In general, no gain or loss is recognized upon a transfer of property to a corporation by one or more persons in exchange for stock in such corporation if, immediately after such exchange, such person or persons are in "control" of the corporation. Code section 351(a); Treas. Reg. sec. 1.351-1(a)(1). For these purposes, "control" is defined as ownership of [illegible] possessing at least 80 percent of the total combined voting [illegible] of all classes of stock entitled to vote and at least 80 percent of the total number of shares [illegible] classes of stock of the corporation. Code section 368(c). Here, S Corp. [illegible]ss of stock and you own 100% percent of all such stock. Although no stock was actually [illegible] S Corp. in exchange for your contribution of the Partnership interest, [illegible] issuance of stock is not required for Code section 351 to apply in an instance [illegible], as [illegible] all shareholders of a corporation contribute property to [illegible] corporation [illegible] same pro[illegible] their interest in the corporation. See Lessinger v. [illegible], 87[illegible]9 (2d Cir. 1989) (Code section 351 applied to a property transfer even [illegible] was [illegible] the actual issuance of shares would have been a "meaningless gesture"); [illegible] Commissioner, 703 F.2d 1402 (9th Cir. 1983). Accordingly, it is more likely than not that your transfer of your interest in the Partnership to S Corp. should [illegible] in the recogni[illegible] of any gain or loss.

Draft

[illegible]

Received: 05-Nov-99 04:18PM From: Unknown Sender To: [illegible] Powered by eFax.com Page: 8 of 10
NOV-05-99 17:26 FROM: E&Y LLP NAT L TAX ID: PAGE 6

J. INCREASE TO BASIS IN S CORP. STOCK DUE TO CONTRIBUTION

Your basis in your S Corp. stock was, more likely than not, increased by an amount equal to the adjusted basis of the interest in the Partnership you contributed to S Corp. as of the date of such contribution. Code section 358(a)(1).

draft

Received: 05/Nov/99 04:18PM From: Unknown Sender To: 6102579577 Powered by eFax.com Page: 7 of 10
NOV-05-99 17:26 FROM:E&Y LLP NAT'L TAX ID: PAGE 7

Draft

## K. THE LIQUIDATION OF THE PARTNERSHIP DID NOT RESULT IN GAIN OR LOSS RECOGNITION TO S CORP.

On [Date E], you contributed your interest in the Partnership to S Corp. and as a result of such contribution, 100% of the interests in the Partnership were held by S Corp. For federal income tax purposes, a partnership is considered terminated if the business, financial operation or venture of the partnership is no longer carried on by its partners in a partnership. Code section 708(b)(1)(A). Additionally, under the ___[state]___ Uniform Partnership Act, a partnership does not exist unless it has two or more partners. [Cite] In the case of the liquidation and dissolution of a ___[state]___ partnership, all of the partnership assets are distributed to its partners, pro rata in accordance with their partnership interests, after the payment of all partnership creditors. [Cite]

Code section 731(a) provides that:

> "In the case of a distribution by a partnership to a partner, gain shall not be recognized to such partner except to the extent that any money distributed exceeds the adjusted basis of such partner's interest in the partnership immediately before the distribution..."

Because the money held by the partnership which was distributed in this liquidation was not in excess of the recipient partner's adjusted basis, such partner should have no recognized gain on the liquidation.

Code section 731(b) provides that "no gain or loss shall be recognized to a partnership on a distribution to a partner of property, including money." Thus, it is more likely than not that the Partnership should not have recognized gain on the distribution of its properties in liquidation.

See Section L, below, for a discussion of the determination of S Corp.'s basis in the property distributed to it from the Partnership in liquidation.

[illegible]

DOJ 008646

Received: 05Nov99 04:13 PM From: UnknownSender To: [illegible] Powered by eFax.com Page: 8 of 10
NOV-05-99 17:27 FROM: [illegible] LLP NAT L TAX 10: PAGE 8

## L. BASIS OF ASSETS RECEIVED IN LIQUIDATION

For purposes of determining your basis in the property received upon the liquidation of the Partnership, the allocation of basis rules of Code section 732 and the regulations thereunder applied.

Under Code section 732(b), the basis of the property distributed [illegible] partnership to a partner in liquidation is equal to the adjusted basis of such partner's interest [illegible], reduced by any money distributed in the same transaction. [illegible] Code section 732[illegible] the basis of distributed properties to which Code section 732(b) is [illegible] allocated in the following steps: (i) first, to any unrealized receivables (as defined in Code section [illegible]) and inventory items (as defined in Code section 751(d)(2)) in [illegible] to the adjusted basis of each such property to the partnership, and (ii) then to any other [illegible] properties as follows: (A) by assigning to each property such property's adjusted basis to the partnership; (B) in the case where there is an increase in basis, by [illegible] those properties with unrealized appreciati[illegible] [illegible] respective amounts of unrealized appreciation, to the extent of such unrealized [illegible], and [illegible] extent not allocated above, in proportion to such properties' [illegible] value.

Thus, your tax basis [illegible] Partnership interest is allocated first to cash received in the liqu[illegible] of the Partnership, and then to the properties distributed from the Partnership, the [illegible] in shares [illegible] LT Corp, in accordance with Code Section 732(c), as described above. The [illegible] is relevant for determination of future gain or loss realized with respect to the later disposition of any such assets.

CHICAGO [illegible]

DOJ 008647

Received: 05-Nov-99 04:18 PM From: Unknown Sender To: 6302579877 Powered by eFax.com Page: 9 of 10
NOV-05-99 17:29 FROM: E&Y LLP NAT L TAX ID: PAGE 9

Due to the fact that more likely than not the short sale liability is not reflected in basis, the net effect of the liquidation is a resultant allocation of your high outside basis in the Partnership to the shares of LT Corp in an amount which is substantially greater than their fair market value. This result is mandated by operation of the Code and the Treasury Regulations thereunder. It is not, for example, a case where basis is inflated by the taxpayer through the use of artificially high nonrecourse debt (see, e.g., Estate of Franklin, 544 F.2d 1045 (9th Cir. 1976); Rev. Rul. 78-29, 1978-1 C.B. 62).

draft



CHICAGO 85538 v 1, 20885.00020

Received: 05/Nov/99 04:18 PM From: UnknownSender To: [illegible] Powered by eFax.com Page: 10 of 10
NOV-05-99 17:20 FROM: [illegible] LLP NAT L TAX ID: PAGE 10

M. CHARACTERIZATION OF LOSS ON SALE OF SHARES OF LT CORP BY S CORP.

S Corp. has sold shares of LT Corp which had originally been purchased by you for investment, contributed to the Partnership, and then distributed by the Partnership to S Corp. in liquidation. Such shares were held for investment, and constituted a capi[illegible]to you, the Partnership, and S Corp. Code section 1221. See also, Ark[illegible] Best Co[illegible] S. 212 (1988).

You have informed us that you held each of the [illegible] Corp for longer than twelve months. When you contributed such stock to the Partnership, [illegible] the shares of LT Corp was determined based upon its basis in your hands [illegible]ction 723. [illegible]rdingly, under the rule set forth in Code section 1223(2), the [illegible] of LT Corp in the hands of the Partnership included the holding period of such stock in your hands, and therefore, the Partnership had a long-term holding period in [illegible] shares of LT Corp. When the Partnership liquidated [illegible] including [illegible] of LT Corp, to S Corp., S Corp.'s basis in such [illegible] rules of Code section 732 (see Section L, above). Because that [illegible]ed by [illegible] various adjustments to the basis of the property in the hands of the partnership, [illegible] forth in Code section 1223(2), described above, resulted in the shares of LT Corp having a long-term holding period in the hands of S Corp.

When S Corp. [illegible]posed of the shares of LT Corp it received from the Partnership, it re[illegible] in an amount less than the tax basis allocated to those shares. Accordingly, it realized a loss upon such disposition. Code section 1001. Because the shares of LT Corp constituted a capital asset which had a long-term holding period, such loss is, more likely than not, a long-term capital loss.

[illegible]

DOJ 008649

Received: 05/Nov/99 04:04 PM From: UnknownSender To: 6032979877 Powered by eFax.com Page: 1 of 20
NOV-05-99 16:56 FROM:EAY LLP NAT L TAX ID: PAGE 1

## N. TREASURY REGULATION SECTION 1.701-2

Treasury Regulation section 1.701-2 (sometimes referred to herein as the "Regulation") was proposed by the Treasury on May 12, 1994, to be effective on or after May 12, 1994, and was revised and re-issued in final form with retention of the original effective date, except for certain aggregate verses entity issues, on December 29, 1994, notwithstanding substantial criticism and adverse commentary by tax practitioners, trade and professional organizations, chairs of the House Ways and Means and Senate Finance Committees, and at least one federal agency. As modified, the regulation was effective for any transaction "involving a partnership" occurring on or after May 12, 1994.

Under the Regulation, if a partnership is formed or availed of in connection with a transaction with a principal purpose of substantially reducing the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K of the Code (the partnership rules), the IRS can disregard the form of the transaction. In such a case, even if the taxpayer complies with the literal language of one or more of the provisions of the Code or regulations thereunder, the IRS can recast the transaction for federal tax purposes as is deemed appropriate. The principal purpose for structuring a transaction involving a partnership will be determined based on all of the facts and circumstances, including a number of illustrative factors articulated in the final Regulation.

There is no clear guidance as to how this Regulation will be applied by the IRS and there can be no assurances that the IRS will not attempt to apply the Regulation to you, the Partnership and/or S Corp.

Draft

CHICAGO [illegible]

Received: 05/Nov/99 04:04 PM From: Unknown Sender To: [illegible] Powered by eFax.com Page: 2 of 20
NOV-05-99 18:57 FROM: E&Y LLP NAT L TAX ID: PAGE 2

*Provisions of the Regulation*

The requirement of Treas. Reg. sec. 1.701-2 of a purpose to achieve a result inconsistent with the purpose of Subchapter K is difficult to analyze. Treas. Reg. sec. 1.701-2(a) purports to define the intent of Subchapter K:

- "Subchapter K is intended to permit taxpayers to conduct joint [illegible] (including investment) activities through a flexible economic arrangement without [illegible] an entity-level tax."

However, implicit in the intent of subchapter K, [illegible] the IRS and [illegible], are the following requirements:

(1) the partnership must be bona fide and each partnership [illegible] or series of related transactions (individually or [illegible]) must be entered into for a substantial business purpose;[15]

(2) the form of each partnership transaction [illegible] respected under substance over form principles; and

(3) generally, the tax consequences under subchapter K to each partner of the partnership operations and of [illegible] between the partner and the partnership must accurately reflect the [illegible] economic agreement and clearly reflect the [illegible]'s [illegible] (collectively, the "proper reflection of income").

The Re[illegible] that [illegible] subchapter K provisions and the regulations thereunder were adopted [illegible] administrative convenience or other policy objectives, with the

---

[15] The definition of "[illegible]" is not provided in Treas. Reg. sec. 1.701-2. Ordinarily, "substantial" [illegible]" or "more than de minimis." See, e.g., Black's Law Dictionary 1428 (6th ed. 1990); Treas. Reg. sec. 25.[illegible](e)(1) ("Any discretionary modification ... that results in other than a de minimis change ... is a substantial modification."); Vulcan [illegible] Industries, Inc. v. Commissioner, 73 T.C. 1059, 1074 (activity was "substantial," not "de minimis"); McNamara v. Commissioner, 54 T.C. 1057, 1064 (1970) ("differential is substantial, not *de minimis*"). [illegible], both meanings are consistent with unofficial statements of Treasury and IRS officials. See [illegible], "Final Partnership Antiabuse Rule: Cudgeling Acceptance," 66 Tax Notes 776, 777-778 (Feb. 6, 1995): "There was no conscious effort to incorporate the standards of section 355; we meant that business purpose has to be real, not an afterthought." (Statement of Monte Jackel, IRS Acting Associate Chief Counsel (Domestic).) "[Treasury] could just say "business purpose," because people would read that to be de minimis, and assert any old purpose. ... A tremendous tax savings requires more than a peppercorn of business purpose." (Statement of John Rooney, Attorney-Advisor, Treasury Office of Tax Legislative Counsel.) In any event, the "substantial" standard clearly represents a lower threshold than the "primary" or "principal" standards.

Received: 05-Nov-99 04:04 PM From: Unknown Sender To: 6032579237 Powered by eFax.com Page: 3 of 20
NOV-05-99 16:58 FROM: E&Y LLP NAT L TAX ID: PAGE 3

recognition that application of those provisions could, in some cases, produce tax results that do not properly reflect income. For this reason, the "proper reflection of income" requirement will be treated as satisfied (for a transaction that also satisfies the other two requirements) to the extent that the application of such provision to the transaction and the ultimate tax results are "clearly contemplated" by the provision.

The IRS can determine that to achieve tax results that are consistent with the intent of subchapter K: (1) the purported partnership may be disregarded in whole or in part, and the partnership's assets and activities considered to be owned or conducted, respectively, by one or more of the partners; (2) one or more of the purported partners should not be treated as a partner; (3) the accounting methods used by the partnership or a partner should be adjusted to clearly reflect the partnership's or partner's income; (4) the partnership's allocations of income, gain, loss, deduction or credit should be reallocated; or (5) the claimed tax treatment should otherwise be adjusted or modified.

Treas. Reg. sec. 1.701-2(c) establishes a facts and circumstances analysis for determining whether a partnership was formed or availed of with a principal purpose of tax avoidance in a manner inconsistent with the intent of Subchapter K, including a comparison of the purported business purpose for a transaction and the claimed tax benefits resulting from the transaction. The Regulation also describes certain illustrative factors which might indicate (without being determinative) that a partnership was used with a principal purpose to reduce substantially the partners' aggregate tax liability in a manner inconsistent with the intent of Subchapter K. These factors include: (1) the present value of the partners' federal tax liability is substantially less than had the partners owned the partnership's assets and conducted the partnership activities directly;

(2) the present value of the partners' federal tax liability is substantially less than would be the case if purportedly separate transactions that are designed to achieve a particular end result are integrated in a single transaction; (3) one or more partners who are necessary to achieve the claimed tax results either have a nominal interest in the partnership, are substantially protected from any risk of loss from the partnership's activities, or have [illegible] or no [illegible] in the partnership's profits other than a preferred return in the [illegible] of a payment [illegible] of capital; (4) substantially all of the partners are related (directly or [illegible]) to one another; [illegible] partnership items are allocated in compliance with the literal [illegible] of Treas. Reg. sections 1.704-1 and 1.704-2, but with results that are inconsistent with the [illegible] of Code section 704(b) and those regulations; (6) the benefits [illegible] ownership of property nominally contributed to the partnership are in substantial part [illegible] or indirectly) by the contributing partner (or a related [illegible]; or (7) [illegible] benefits [illegible] burdens of ownership of partnership property are in substantial part [illegible] or indirectly) to the distributee partner before or [illegible] property [illegible] distributed to the distributee partner (or a related party). The weight to [illegible] these factors [illegible] dependent on the facts and circumstances of the situations.

[illegible] requirement of [illegible] Reg. sec. 1.701-2 that the partnership be utilized for "a" principal purpose of tax [illegible] as opposed to having tax reduction be "the" principal purpose of [illegible] the partnership suggests an interpretation by the IRS that would proscribe "an important purpose of tax avoidance. However, Webster's Ninth New Collegiate Dictionary (Merriam-Webster Inc., 1975) defines "principal" as "most important," and the Court in Malat v Riddell, 383 U.S. 569 (1966) defined "primarily" as meaning "of first importance" or

Received: 05/Nov/99 04:04 PM From: UnknownSender To: 6302576877 Powered by eFax.com Page: 5 of 20
NOV-05-99 17:00 FROM: E&Y LLP M&T L TAX ID: PAGE 5

"principally." (Emphasis added). Thus, a reasonable regulatory interpretation would require a tax avoidance motivation to rank at least co-equally ("a" versus "the") with some other first order purpose or constitute itself the highest purpose before the Regulation could be invoked. The existence of any non-tax purpose of higher magnitude would presumably render the tax purpose of secondary, and thus non-principal, importance.

The final Regulation initially provided sixteen examples of partnership transactions which discussed the application of the anti-abuse rule. Two of these examples (Examples 5 and 6) concerned the application of the anti-abuse rule to transfers [illegible] in family partnerships. However, on January 3, 1995, only five days after publishing the Regulation in final form after eight months of reconsideration, hearings and comments, the IRS announced in Announcement 95-8, 1995-7 IRB 56, that the Regulation would be amended as of its effective date to provide that it applies solely with respect to income taxes, and that because the Regulation will not apply to transfer taxes, Examples 5 and 6 would be deleted.

The Regulation specifically provides that the IRS can continue to assert and rely upon applicable nonstatutory principles and other statutory and regulatory authorities to challenge transactions, and that the Regulation is not intended to limit the applicability of such principles and authorities.

*Analysis*

***Do the Transactions at Issue Violate the Regulation?***

The Partnership was a bona fide partnership (see discussion in Section C relating to the tax classification of the Partnership). Taxpayers will presumably file returns in a manner consistent with applicable statutes and validly adopted regulations, in fact, they would appear to

Received: 05-Nov-99 04:04 PM From: UnknownSender To: 6002979877 Powered by eFax.com Page: 6 of 20
NOV-05-99 17:01 FROM: E&Y LLP NAT L TAX ID: PAGE 6

have no choice but to do so. For example, the Supreme Court in Commissioner v. Culbertson, 337 U.S. 733 (1949), a case dealing with using partnerships to achieve income splitting to avoid high marginal tax brackets, upheld the tax classification of a family partnership. Congress followed shortly thereafter with the enactment of the predecessor of Code section 704(e), which specifically permits the use of partnership to achieve rate splitting despite [illegible] clearly tax motivated. See, S. Rep. No. 781, 82d Congress, 1st Session 38 (1951) wherein [illegible] stated: "If the ownership is real, it does not matter what motivated [illegible] to him or whether the business benefitted from the entrance of the new partner." In [illegible] equivalent of the current preamble to the regulations subsequently promulgated under the [illegible] of Code section 704(e) expressly disavows the relevance of a [illegible] motive to the classification issue.

The IRS frequently cites Merryman v. Commissioner, [illegible] T.C.M. 191 (CCH) (1988) *aff'd* 873 F.2d 897 (5th Cir. 1989) as a case that supports the IRS when it attempts to disregard a partnership entity (and thus disallow the tax [illegible] allowed through it) when in the view of the IRS the [illegible] lacks [illegible] purpose and profit motive. The facts of the Merryman case make it clear [illegible] decision [illegible] to those facts was correct. In Merryman, a partnership [illegible] a drilling rig from a corporation controlled by the partners of the partnership. Even though the partnership executed a note for purchase of the assets, payments of principal and interest were not timely made and management of the rig was continued by [illegible] corporation. [illegible] essence, the Tax Court held that the rights and burdens of ownership were not [illegible] from the selling corporation to the partnership. The Tax Court opinion and the Court of Appeals opinion made it clear that had the form of the business transaction been followed – as is the case of the transaction at issue – the partnership would have been respected.

Furthermore, in enacting Subchapter K in 1954, Congress stated as its motivation its desire to eliminate confusion and provide certainty with respect to the tax treatment of partnerships and partners. "The presence of a tax avoidance motive, however, is of no consequence if the reality of the transfer of interest and the good faith of the parties are satisfactorily established." Mim. 6767, 1952-1 CB 111. H.R. Rep. No. [illegible] 83d Congress, 2d Session 65 (1954); S. Rep. No. 1622, 83d Congress, 2d Session 89 (1954).

There are numerous areas where Subchapter K [illegible] requires tax results that are inconsistent with substance or economic reality. The general [illegible] Subchapter K creates clear distortions by not mandating equality between "inside" and "outside" [illegible] precisely the situation in the instant case. Also, the character and holding period of partnership assets is determined at the partnership level. Further, recognized partnership income must be allocated among the partners even though it is unclear which partners, if any, will benefit from such income, and even though if the partnership were treated as an aggregate entity no partner would report any income. Additionally, partnership "[illegible]" under Code section 708(b)(1)(B) can have significant beneficial tax [illegible] tax effects on partners whose economic position with respect to the [illegible] and business is not changed. These rules, and numerous similar rules, reflect the fact that Subchapter K was codified primarily to provide certainty, not to achieve the goal of economic harmony. Thus, the resultant step-up in basis is more likely than not consistent with the intent of subchapter K.[17]

[17] It should be noted that, during the comment period on the proposed regulations, the New York State Bar Association made a recommendation to the Treasury that a short sale example that contained facts similar to the transaction at issue be included in the Regulation. The recommendation from the New York State Bar Association was that the example illustrated a transaction that would violate the proposed anti-abuse regulations. However, the Treasury did not adopt the recommendation and did not include the example in the Regulation.





DOJ 008689

Received: 05/Nov/99 04:04 PM From: UnknownSender To: [illegible] Powered by eFax.com Page: 8 of 20
NOV-05-99 17:03 FROM:ESY LLP NAT L TAX ID: PAGE 8

2. *Validity of the Regulation.*

As discussed below, in light of Congress' strong statement that partnerships, if they are real, are to be respected regardless of the motive for their formation and use, and Congress's desire to provide certainty in the area of the taxation of partnerships and partners, the scope of the Regulation and its associated remedies are grossly overbroad. Hence, to the extent the Regulation were applied as broadly as its words permit, it would be invalid. If the Regulation were interpreted to override the clearly expressed intent of Congress as reflected in the provisions of Subchapter K, it would be invalid. See, e.g., Wasserman [illegible] "IRS Attempts To 'Demonize' the Partnership: The Final Section 701 Regulations—Anti-Abuse Regulations or Simply Abusive Regulations?" Portland Tax Forum, 1995; [illegible] "The Proposed Partnership Anti-Abuse Regulation: Treasury Oversteps its Authority," 11 Journal of Partnership Taxation 287 (Winter 1995); McKee, Nelson & Whitmire, "Special Report - Subchapter K Anti-Abuse Rule," Federal Taxation of Partnerships and Partners [illegible] (Warren, Gorham & Lamont, 1994); Dell, "The Proposed Partnership Anti-Abuse Regulation: Let's Get Real (and Practical). Shall We?" 21 Journal of [illegible] Estate [illegible]; Lipton, "IRS Improves Partnership Anti-Abuse Regs., but Major Problems [illegible]" 82 Journal of Taxation 132 (March 1995); Banoff, "Anatomy of an AntiAbuse Rule: What's Really Wrong With Reg. Section 1.701-2" Tax Notes, March 20, 1995, p. 1859; Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. [illegible] (1984); and Commissioner v. South Texas Lumber Co., 333 U.S. 496 (1948). Moreover, regulations issued under Code section 7805 generally have been treated as interpretive, and not legislative. See, United States v. Vogel Fertilizer Co., 455 U.S. 16 (1982); Rowan Cos. v. United States, 452 U.S. 247 (1981); Dresser Industries, Inc. v. Commissioner, 911 F.2d 1128



DOJ 008690

(5th Cir. 1990); Gehl Co. v. Commissioner, 795 F.2d 1327 (7th Cir. 1986); CWT Farms, Inc. v. Commissioner, 755 F.2d 790 (11th Cir. 1985), cert. denied, 477 U.S. 902 (1982).

The thrust of the legal commentary is that the Regulation is unworkable because it does not include a clear and reasonable standard that can be used by taxpayers and the IRS to identify prohibited transactions, nor are the examples of partnership arrangements sufficient to provide a standard or an analytical approach which can be reasonably utilized to identify permissible or impermissible transactions. Inasmuch as the Regulation itself and the Examples it contains provide little or no guidance as to the difference between transactions which are prohibited and those which are not, it may be void for vagueness. The apparent implied standard for application by the IRS of the Regulation consists of "I know it when I see it." (Jacobellis v. Ohio, 378 U.S. 184, 197 (1964)). This type of ambiguous ex post facto standard for application of the Regulation permits and encourages arbitrary and discriminatory enforcement, which is one of the specific evils addressed by courts in invalidating laws for vagueness. See, e.g., Papachristou v. City of Jacksonville, 405 U.S. [illegible] (1972). See also, Village of Hoffman Estates v. Flipside, Hoffman Estates, [illegible] 455 U.S. [illegible], in which the court found that a commercial ordinance may be void for vagueness; and Diebold, Inc. v. Marshall, 585 F.2d 1327 (6th Cir. 1978), where an economic regulation was held void for vagueness.

Additionally, the Regulation should be viewed as a significant regulatory action under Executive Order (EO) 12866. The "Special Analyses" section of the preamble states that "It has been determined that this Treasury decision is not a significant regulatory action as defined in EO 12866." Additionally, in a "Special Analyses and the Secretary's Authority" section of the preamble, the IRS and Treasury acknowledge and discount adverse commentary and criticisms of

Received: 05-Nov-99 04:04 PM From: Unknown Sender To: 6032579877 Powered by eFax.com Page: 10 of 20
NOV-05-99 17:06 FROM: EBY LLP NAT L TAX ID: PAGE 10

this determination and conclude, without analysis, that they "... believe that the regulation complies with all statutory and regulatory requirements related to the issuance of the notice of proposed rulemaking and that it is clearly within the Secretary's authority to issue the final regulation." However, for reasons hereinafter discussed, we believe that the issuance of the Regulation does constitute a significant regulatory action.

Section 3(f) of EO 12866 defines a "significant regulatory action" to include any regulatory action that is likely to result in a rule that "may have an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector of the economy, [or] productivity ..." (emphasis added). The term "significant regulatory action" also includes any regulatory action that is likely to result in a rule that "may: (4) raise novel legal or policy issues" (emphasis added). EO 12866 §3(f)(4). "Regulatory action" includes the issuance of final regulations by Treasury decision.

There may be a significant effect on the economy from the prohibition of allegedly abusive partnership transactions targeted by the Regulation. Any one of these targeted transactions could [illegible] $100 million or more. The impact on Brown Group transactions alone meets this requirement. [illegible] transactions derive their name from the case of Brown Group, Inc. v. Commissioner, 102 T.C. [illegible] (1994), withdrawn and reversed upon reconsideration 104 T.C. No. [illegible] (1995), involving the attempted use of a partnership structure to avoid realization of "[illegible] income." According to IRS officials in their motion for reconsideration, the original decision by the Tax Court in Brown Group, which is a stated target of the Regulation, would reduce tax collections by $4 billion. (See also, "Tax Court's Decision in Brown Group May Have Major Ramifications," 63 Tax Notes 512, May 2, 1994; "Subpart F: U.S. Tax Court's Brown

CHICAGO 18624 v 1, 98958.00200



DOJ 008692

Received: 05.Nov.99 04:04 PM From: Unknown Sender To: 6302579877 Powered by eFax.com Page: 11 of 20
NOV-05-99 17:05 FROM: E&Y LLP NAT L TAX ID: PAGE 11

Group Decision Rejects Aggregate Theory of Partnership Taxation; Threatens Operation of Subpart F," 8 Tax Notes Int'l 1175, May 2, 1994.)

Further, the Regulation could well deter many non-abusive and legitimate economic transactions and thereby have an effect on the U.S. economy that may easily be greater than $100 million annually. If the Regulation affects just ten transactions per year, and each of the transactions has an impact on the economy of $10 million, there would obviously be an annual impact on the economy of $100 million. In such case, the Treasury decision may be a "significant regulatory action" under §3(f)(1) of EO 12866. The likely effect of the Regulation on its intended targets, when combined with the effect on unintended targets, is likely well in excess of the minimum limits required to make EO 12866 apply.

Moreover, EO 12866 can apply even if the impact on the economy as a whole does not reach an annual level of $100 million if the Regulation may "adversely effect in a material way the economy, a sector of the economy, [or] productivity..." For example, the real estate industry, a sector of the economy that is just recently reviving from recession, may be adversely affected by the Regulation, as may the equipment leasing industry, the oil and gas industry, hedge funds, and structured finance transactions.

Moreover, by creating an "abuse of entity" standard that prohibits the use of partnerships "in contravention of the intent of ..." other provisions of the Code, the Regulation raises novel legal and policy issues so as to constitute a "significant regulatory action" under EO 12866 §3(f)(4). The controversy surrounding the issuance of the Regulation is unprecedented. The Regulation describes circumstances under which the IRS may ignore the literal language or

Received: 05/Nov/99 04:04 PM From: UnknownSender To: 8002979877 Powered by eFax.com Page: 12 of 20
NOV-05-99 17:09 FROM: E&Y LLP NAT L TAX ID: PAGE 12

requirements of the Code, and this ability alone obviously "may ... raise novel legal or policy issues."

Thus, the Treasury may have erred in determining that the Regulation is not a "significant regulatory action" under the EO 12866, and if so, at a minimum, a regulatory assessment appears to be required.

Further, the Regulation is further subject to attack because it grants to the Commissioner of Internal Revenue the discretionary power on a case-by-case basis to alter the substantive law and its application to the facts, and thereby usurps Congressional legislative authority and strips the courts of de novo adjudication authority when there is no basis in the law for this grant of power to the Commissioner in the manner asserted by the Regulation.

Subchapter K (sections 701 through 761) of chapter 1 of the Code addresses the federal income taxation of partners and partnerships. Under the Regulation, the Commissioner, who is a delegate of the Secretary of the Treasury, is granted broad discretionary powers that can be exercised on a case-by-case basis with respect to transactions involving partnerships. Specifically, under certain situations which may not be ascertainable, the Commissioner, under paragraph (b) of the Regulation, can recast a transaction "as appropriate to achieve tax results that are consistent with the intent of subchapter K" and "can determine, based on the particular facts and circumstances, that to achieve tax results that are consistent with the intent of subchapter K," the proper manner in which the claimed tax treatment should be "adjusted or modified." Paragraph (d) sets forth various examples of when the Commissioner may exercise his powers to recast a transaction as something other than what it purports to be. However, in none of those examples which conclude that the Commissioner may recast the transaction (Examples 6, 9, 10



CHICAGO 100E v 1 [illegible]

DOJ 008694

Received: 05/Nov/99 06:04 PM From: Unknown Sender To: 6032579077 Powered by eFax.com Page: 13 of 20
NOV-05-99 17:07 FROM:E&Y LLP NAT L TAX ID: PAGE 13

and 13) is there any statement of what the recast transaction shall be or indeed whether the transaction shall be recast at all. Instead, the matter is left to the discretion of the Commissioner. Under paragraph (e) of the Regulation, subject to standards that may not be ascertainable, the Commissioner "can treat a partnership as an aggregate of its partners in whole or in part as appropriate to carry out the purposes of any provision of the Internal Revenue Code or the regulations promulgated thereunder."

The Treasury Department, which is the administrative agency charged by Section 7801 of the Code with the administration and enforcement of the internal revenue laws, has by the issuance of this Regulation asserted an expansion of its powers beyond the powers it had before. Prior to this Regulation, the Secretary's delegate, the Commissioner, with respect to the matters addressed by the Regulation, had the power as a litigant (as does the taxpayer) to argue to a court his own views as to the proper interpretation of the tax laws and their application to the facts of a particular case. Under the Regulation, with respect to the matters addressed therein, the Commissioner [illegible] the discretionary power under certain standards (which may not be ascertainable) to [illegible] and its application to the facts and to do so on a case-by-case basis. The Commissioner's determination thus becomes part of the law itself and is no longer merely the position of a litigant. The power of a court to make a de novo interpretation of the law and a de novo application of it to the facts of a particular case, has been, to the extent the Commissioner's power is exercised, reduced to a review of whether the Commissioner has abused his discretion. This would be starkly apparent in tax-refund cases, where the Commissioner is not even a party to the case, the Justice Department representing the government in such cases. Furthermore, the Regulation sets up no procedures which must be followed or findings which

CHICAGO [illegible]



DOJ 008695

Received: 05 Nov 99 04:04 PM From: UnknownSender To: 6032579877 Powered by eFax.com Page: 14 of 20
NOV-05-99 17:00 FROM: E&Y LLP NAT L TAX ID: PAGE 14

must be made which would form an administrative record which would provide a basis to enable a court adequately to perform a function of judicial review of the exercise of power by an administrative agency.

Thus, the Regulation has granted to the Commissioner both a new legislative power and a new judicial power. The new legislative power is the power to alter the [illegible] provisions of subchapter K and other provisions of the Code so as to conform them to the [illegible] perceived intent of subchapter K. The new judicial power is the power to make these alterations [illegible] determinations on a case-by-case basis.

The powers of an administrative agency charged by Congress with the enforcement and administration of a body of law are only those [illegible] or impliedly granted to the administrative agency by Congress. An administrative agency [illegible] by regulation expand its powers unless such expansion of powers by regulation is expressly or impliedly authorized by Congress.

The [illegible], is [illegible] Treasury Department has the authority to issue this Regulation, which [illegible] to the Commissioner these new legislative and judicial powers.

This [illegible] touches upon fundamental issues relating to the nature of our government; specifically, the separation-of-powers doctrine, which distributes legislative, executive, and judicial powers among the three branches of government. Notwithstanding this [illegible] it has been held permissible under certain circumstances for Congress (being the legislative branch) to grant to an administrative agency (being in the executive branch) certain legislative and judicial powers. Without examining the scope of Congress' power to make such grants, the fact is that, with respect to the Regulation, it has not done so in the present case. That



[illegible]

DOJ 008696

Received: 05 Nov 99 04:04 PM From: Unknown Sender To: 6032979877 Powered by eFax.com Page: 15 of 20
NOV-05-99 17:08 FROM:E&Y LLP NAT L TAX ID: PAGE 15

is, Congress has simply not expressly or impliedly authorized the Treasury Department to create for itself the power to alter the substantive law relating to the taxation of partnerships or, most certainly, to do so on a case-by-case basis. Treasury Decision 8588, which promulgated the Regulation, stated that the authority for the Regulation was section 7805 of the Code and also sections 701 through 761 of the Code. Section 7805 is the general provision authorizing the Treasury Department to issue "needful rules and regulations" for the enforcement of the internal revenue laws. Section 7805 has been held to authorize only interpretative regulations. See, e.g., United States v. Vogel Fertilizer Co., supra; Rowan Cos. v. United States, supra; Dresser Industries, Inc. v. Commissioner, supra; Gehl Co. v. Commissioner, supra; CWT Farms, Inc. v. Commissioner, supra. The power to modify on a case-by-case basis is not the power to interpret. With respect to sections 701 through 761 of the Code relating to the taxation of partners and partnerships, there is simply nothing in those sections from which can be inferred the power to issue a regulation granting new legislative or judicial powers to the Commissioner in the manner provided by the present Regulation.

For an interpretative regulation to be valid, it must implement in a reasonable manner a Congressional mandate set forth in the Code. See, e.g., U.S. v. Correll, 389 U.S. 299, 307 (1967); U.S. v. Cartwright, 411 U.S. 546, 550 (1973). An interpretative regulation implements the Congressional mandate in a reasonable manner if it harmonizes the statute's origin and purpose with the statutory language. See, e.g., U.S. v. Vogel Fertilizer Co., supra; National Muffler Dealers Ass'n v. U.S., 440 U.S. 472, 477 (1979).

To be valid under the foregoing test, an interpretative regulation must satisfy the following requirements:

Received: 05/Nov/99 04:04 PM From: UnknownSender To: 6303975877 Powered by eFax.com Page: 16 of 20
NOV-05-99 17:10 FROM:E&Y LLP NAT L TAX ID: PAGE 16

(a) The regulation cannot usurp Congressional authority by adding restrictions that are not contained in the statute. See, e.g., Hughes Int'l Sales Corp. v. Commissioner, 100 T.C. 293, 304 (1993);

(b) The regulation cannot be inconsistent with statutory language. See, e.g., The Ann Jackson Family Foundation v. Commissioner, 15 F.3d 917 (9th Cir. 1994);

(c) In the absence of statutory ambiguity, [illegible] comport with the plain language of the statute it purports to interpret. [illegible] Nalle III v. Commissioner, 997 F.2d 1134 (5th Cir. 1993);

(d) The regulation cannot broaden the [illegible] coverage of the [illegible] beyond its unambiguous terms. See, e.g., [illegible] v. U.S., supra; and

(e) The regulation cannot be used by the Secretary or his delegate to rewrite legislative enactments that give effect to ide[illegible] and fitness or the desirability of symmetry in [illegible] especially [illegible] unclear regulatory interpretation of an otherwise [illegible] ory provision is the means used to accomplish these ends. See, e.g., [illegible] Commissioner, 479 F.2d 1147, 1151 (7th Cir. 1973).

Based upon the foregoing requirements for a valid interpretative regulation, a compelling argument can be made that the Regulation [illegible] cot exceeds Treasury's rulemaking authority. [illegible] Regulation [illegible] not reflect the language or the intent of Code section 701 under which it is [illegible] and [illegible] purports to interpret or Code sections 701 through 761. Code section 701 provides that: "A partnership as such shall not be subject to the income tax imposed by this chapter. Persons carrying on business as partners shall be liable for income tax only in their separate or individual capacities." The Regulation does not interpret this [illegible]

[illegible], there is no other authority under subchapter K for issuance of the Regulation. The Regulation states that a transaction may be abusive if the transaction, although complying with the literal language of the Code, violates the "purposes" of subchapter K or is in

CHICAGO [illegible] N-16

DOJ 008698

circumvention of the intention of other provisions of the Code. Thus, the Regulation cannot be an interpretative regulation; instead of "interpreting" the law, it allows the IRS to <u>ignore</u> subchapter K and other provisions of the Code. The Regulation, in effect, represents a legislative action by the Treasury, creating new tax law and effecting its new anti-abuse policy without [illegible]ngressional approval.

Further, Congress has previously considered and re[illegible]ted broad [illegible] language for the administration of subchapter K. The Hou[illegible] of the Tax Re[illegible] of 1975 would have required, under Code section 704(b), th[illegible]n have a "business purpose" and that "no significant avoidance or evasion [illegible] the subtitle results from such allocation." The Senate Finance Co[illegible] rejected the "significant avoidance or evasion of any tax" concept [illegible] because of its concern as to the uncertainty of application for su[illegible] <u>See</u> S. Rep. No. 938, Part I 49th Cong. 2d Sess. 100 n.11 (June 10, 1976). T[illegible]e Finance [illegible] replaced that standard with the present "substanti[illegible] which was adopted by the Conference Committee and subsequently [illegible] Code sec[illegible](b) by the Tax Reform Act of 1976. (Pub. L. 94-455). Accordingly, [illegible]y rejected the standard of "significant avoidance or evasion of any tax[illegible] the administrati[illegible] provisions which are significant to the operation of subchapter K. Tre[illegible]y cannot now issue a purported interpretative regulation that attempts to implement an e[illegible]der anti-[illegible] rule than Congress has considered and failed to adopt.

[illegible] provisions of the Code which expressly give the Commissioner (as delegate of the Secretary) certain powers to alter substantive law and its application to the facts on a case-by-case basis. For example, Code section 482 authorizes the Commissioner to reallocate income

Received: 05-Nov-99 04:04 PM From: UnknownSender To: 6032579377 Powered by eFax.com Page: 18 of 20
NOV-05-99 17:12 FROM:E&Y LLP NAT L TAX ID: PAGE 18

among related entities. Code section 446(b) states that if a taxpayer's method of accounting does not clearly reflect income, "the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income." Also, for example, Code section 385 authorizes the Secretary to prescribe regulations to determine whether an interest in a corporation is to be treated as stock or as debt, and Code section 1502 authorizes the consolidated return regulations, which in many ways alter the substantive tax law with respect to corporations filing consolidated returns. There is simply nothing, however, authorizing the Secretary to alter or modify the provisions of subchapter K, [illegible] to do so on a case-by-case basis.

Case-by-case basis adjudication authority [illegible] foreign to administrative agencies. The Regulation, however, is simply not in [illegible] with the present regulatory scheme set forth by Congress for enforcement of the internal revenue laws. For example, the Board of Tax Appeals, which adjudicated [illegible], was formerly part of the Bureau of Internal Revenue, which was [illegible] the Treasury Department. Today, the functions of the Bureau of Internal Revenue have [illegible] over by the IRS, which remains part of the Treasury Department. [illegible] functions of the Board of Tax Appeals are today performed by the United States Tax Court, [illegible] legislative court, which is not part of the Treasury Department. The case-by-case adjudication of tax cases is something that Congress addressed. Clearly, Congress could not have envisioned that the Commissioner could be granted such authority by a regulation promulgated without express statutory authority therefor.

The purported grant by the Regulation of these new legislative and judicial powers to the Commissioner is startling. If the Regulation's grant of authority to the Commissioner is valid

under present law, there is virtually no limit on the ability of the Treasury Department to issue regulations granting to the Commissioner the power to alter substantive law with respect to a taxpayer on a case-by-case basis in pursuance of some perceived intent of some statutory provisions. The Regulation, if valid, represents a virtual elimination of restraints on the ability of government officials to expand their own powers over the people by means of their own declarations to that effect. In other words, an interpretation of the Regulation [illegible] valid would create a vast shift in the presumptions to be made [illegible] Congressional silence [illegible] allocations, retentions, and grants of power in a regulatory [illegible] Congressional silence as to whether a particular power has been granted to or instead withheld from the administrative agency would be construed more easily and more often [illegible] granting than the withholding. This is not in accordance with the structure of our government [illegible] own by the Founders. In the U.S. Declaration of Independence, for example, [illegible] was said, as part of the list of the crimes committed by the King of Great Britain, who [illegible] the restraints of representative government [illegible] erected a multitude of new offices and sent hither swarms of officers to harass our people [illegible] out their [illegible]."

Accordingly, [illegible] appears to be a lawless expansion by bureaucrats of their own powers over the people [illegible] derogation of the people's rights to have independent judicial determinations of their controversies with their government regarding the amounts of their [illegible] that their government may take or retain. In similar cases where the Treasury or other [illegible] have usurped Congressional authority in the promulgation of a regulation, the courts have held the regulation invalid. See, e.g., RLC Industries Co. v. Commissioner, 58 F.



DOJ 008701

Received: 05 Nov 99 04:04 PM From: Unknown Sender To: 6002275677 Powered by eFax.com Page: 20 of 20
NOV-05-99 17:13 FROM: E&Y LLP NAT L TAX ID: PAGE 20

3d 413 (9th Cir. 1995); The National Life and Accident Insurance Co. v. U.S., 524 F.2d 559, 560 (6th Cir. 1975).

Even assuming, arguendo, a predominant tax avoidance motive, it is arguable that such a motive is not inconsistent with the purposes of subchapter K inasmuch as that purpose has been demonstrated and determined to be the achievement of certain, [illegible] reflect economic substance, and, to the extent that a taxpayer has followed the literal provisions of the Code, those results which obtain should be given tax effect.

Additionally, the Regulation may be held to be invalid due to 1) vagueness, as it does not articulate a clear and workable standard delineating permissible and proscribed transactions, and thus permits and encourages arbitrary and discriminatory enforcement; 2) failure to comply with Executive Order 12866 and perform the required regulatory assessment; and 3) a lack of authority for issuance of the Regulation and the unauthorized usurpation of legislative and judicial authority.

draft

# EXHIBIT G8

Robert B. Coplan
10/07/1999 04:21 PM

To: Martin Nissenbaum/NewYork/TAX/EYLLP/US, Charles L. Ratner@Ohio-EMichigan/TAX/EYLLP/US@EY-Namerica, Brian L. Vaughn/Southeast/TAX/EYLLP/US@EY-NAmerica, Peter D. Lucido/NewYork/TAX/EYLLP/US@EY-Namerica, Melinda S. Merk@National/TAX/EYLLP/US, Richard J. Shapiro/NewYork/TAX/EYLLP/US@EY-Namerica
cc: Robert J. Garner/NewYork/TAX/EYLLP/US
Subject: Reliance on tax opinion - cases

This is a memo Ron Friedman had prepared by someone in his group on the subject of whether a client can reasonably rely on an opinion from an interested party to protect them from penalties. I see his point about the case law, and think that there is a problem if E&Y brings the idea to the client, collects a big fee and delivers the tax opinion that the client is to rely on. However, it seems far from clear that the cases suggest that an opinion issued by a law firm to a new client of the firm for a reasonable fee cannot be relied on because the firm is issuing a similar opinion to others.

tax opinions negl.doc

GOVERNMENT EXHIBIT
8
PENGAD 800-631-6989

2003EY007852

GOVERNMENT EXHIBIT
2843
PENGAD-Bayonne, N. J.

ERNST & YOUNG LLP ■ Internal Correspondence ■ National Tax

July 16, 2003

## Authorities re: Tax Opinions

- Reasonable reliance on a tax advisor who "had expert knowledge of bank taxes" was held sufficient to avoid the negligence penalty, even though the expert's advice was contrary to a Revenue Ruling on point and the court essentially resolved the substantive issue in conformity with the ruling. *Industrial Valley Bank and Trust Co. v. Comm'r*, 66 TC 272 (1976).

- Fact that the taxpayer/dentist was informed that the IRS was challenging the type of transaction at issue (family trusts) "should have put him on notice to research the law carefully. He failed to proceed with the requisite degree of care." *Pfluger v. Comm'r*, 840 F.2d 1379 (7th Cir. 1988), cert denied, 487 U.S. 1237 (1988).

- Case law establishes that reliance upon professional advice, standing alone, is not an absolute defense to negligence, but rather, is a factor to be considered. For example, the Tax Court upheld the negligence penalty when it found that a person of the taxpayer's experience "should have heard 'warning bells' in view of the tax opinion's reliance on a profit motive from the general partner and lack of meaningful analysis of the profit objective issue." *Coleman v. Comm'r*, 60 TCM 889 (1990). See also *Turner v. Comm'r*, 70 TCM 289 (1995) (taxpayers were liable for the negligence penalty despite their reliance on the advice of a professional because they had prior investment experience and did not make an independent investigation of their investments); *Merino v. Comm'r*, 74 TCM 370 (1997) (negligence penalty upheld against taxpayers despite their independent investigation of the investment because they should have known that the stated value of the investment was not reasonable); *Back v. Comm'r*, 73 TCM 2630 (1997) (taxpayer who relied solely on the advice of his advisor liable for negligence penalties because he failed to prove that the advisor was knowledgeable and independent) and *U.S. v. Boyle*, 469 U.S. 241 (1985).

- Reliance on offering materials may be reasonable if accompanied by seeking the advice of others. *Grabek v. Comm'r*, 57 TCM 1313 (1989), recons. denied, TC Memo 1990-46 (reliance on taxpayer's accountant); *Mosserman v. Comm'r*, 22 F.3d 1001 (1994) (taxpayer did not rely exclusively on information from persons with a "direct or indirect" interest in the investment, but rather also used his own independent attorneys and accountants, with whom he had a long-standing relationship; *Heasley v. Comm'r*, 902 F.2d 380 (1990) ("given the Heasleys' honest misunderstandings of law and fact, ... their reliance on financial advisors,

2003EY007853

and their efforts to monitor their investment, they did not act negligently"); and *Durrett v. Comm'r*, 71 F.3d 515 (1996) (taxpayers not negligent under §6653(a) because they sought advice from both their attorney/accountant and from another knowledgeable expert).

- In contrast, exclusive reliance on the promoter's representations has been held unreasonable. *Sheen v. Comm'r*, 864 F.2d 93 (9th Cir. 1989); *Freytag v. Comm'r*, 904 F.2d 1011 (5th Cir. 1990), aff'd on other grounds 501 U.S. 868 (1991); *Goldman v. Comm'r*, 39 F.3d 402 (1994). See also *Illes v. Comm'r*, 982 F.2d 163 (6th Cir. 1993), aff'g TC Memo 1991-449 (where taxpayer relied on his accountant, Graham, who was also marketing the tax shelter, "'[t]he Tax Court found that a reasonable person who knew that Graham had a personal stake in the CCAC venture would not commit nearly $150,000 before investigating the transaction completely and seeking independent advice. We cannot say this conclusion was clearly erroneous. ... Graham was not a disinterested source.'" The Tax Court stated that "[a]pparently, petitioner did not see any conflict in the fact that Mr. Graham had a financial interest in the transaction." 62 TCM 728, 732. See also *Ryback v. Comm'r*, 91 T.C. 524, 565 (1988) ("[p]etitioners argue that they were not negligent because they placed their reliance in the chartered representatives who were well qualified to analyze the investment. Although the chartered representatives may have been qualified to analyze the investments, they held a financial stake in the shelters. ... In these circumstances, petitioners did not rely on competent, independent parties; they did no more than inquire of the promoters if the investment was sound. Such reliance was not the type of activity which will overcome the addition to tax for negligence of intentional disregard of the rules and regulations.") See also *Depiano v. Comm'r*, 76 TCM 316 (1998) (taxpayer involved in an investment scheme was negligent even though he did not know that his advisor was also acting as the promoter because the taxpayer did not independently investigate the investment itself or his advisor's competency.)

- These cases emphasize that reliance on an advisor's tax opinion may not be reasonable if the advisor has a direct or indirect interest in the investment. If the opinion originates from an interested party, a taxpayer, particularly one with sophisticated knowledge of business transactions, would be well-advised to seek additional input from another, independent tax advisor.

2003EY007854

# EXHIBIT G9

Melinda S Merk
11/11/1999 11 45 AM

To: Robert L Carson/NewEngland/TAX/EYLLP/US@EY-Namerica, Andrew Kyrazcus/NewEngland/TAX/EYLLP/US@EY-Namerica, Glenn H Hascher/Connecticut/TAX/EYLLP/US@EY-Namerica, David Gerson/NewYork/TAX/EYLLP/US@EY-Namerica, Charles R Cargo/NewYork/TAX/EYLLP/US@EY-Namerica, Michael F Beamer/Washington/TAX/EYLLP/US@EY-Namerica, Charles W Paul/Washington/TAX/EYLLP/US@EY-NAmerica, James A Hutcheson/Philadelphia/TAX/EYLLP/US@EY-NAmerica, Charles R Koval/Southeast/TAX/EYLLP/US@EY-Namerica, Michael K Stallworth/Southeast/TAX/EYLLP/US@EY-NAmerica, Ray Knight/Carolinas/TAX/EYLLP/US@EY-NAmerica, Richard W Jones/GulfCoast/TAX/EYLLP/US@EY-Namerica, Robert Johnson/GulfCoast/TAX/EYLLP/US@EY-Namerica, Richard J Joyner/Southwest/TAX/EYLLP/US@EY-NAmerica, Victoria R Mazaloni/Southwest/TAX/EYLLP/US@EY-NAmerica, David G Johnson/NOhioEMichigan/TAX/EYLLP/US@EY-NAmerica, William P Murphy/NOhioEMichigan/TAX/EYLLP/US@EY-NAmerica, Mark A Troccoli/Pittsburgh/TAX/EYLLP/US@EY-Namerica, Carl A Rhodes/SOhioKentuckyIndiana/TAX/EYLLP/US@EY-NAmerica, Robert C Schlemmer/SOhioKentuckyIndiana/TAX/EYLLP/US@EY-Namerica, Brian W Upchurch/SOhioKentuckyIndiana/TAX/EYLLP/US@EY-Namerica, Richard F Kane/MissouriKansas/TAX/EYLLP/US@EY-Namerica, Michael Reed/MissouriKansas/TAX/EYLLP/US@EY-NAmerica, Sylvia J. Pozarnsky/Chicago/TAX/EYLLP/US@EY-Namerica, Jeff Brodsky/Chicago/TAX/EYLLP/US@EY-NAmerica, Gary M Duboff/Chicago/TAX/EYLLP/US@EY-Namerica, Allan M Harbour/Chicago/TAX/EYLLP/US@EY-NAmerica, Michael S Friedlander/SCalifornia/TAX/EYLLP/US@EY-NAmerica, James A Cordi/NCalifornia/TAX/EYLLP/US@EY-Namerica, Robert M Hayrie/NCalifornia/TAX/EYLLP/US@EY-NAmerica, Robert B Coplan/National/TAX/EYLLP/US@EY-NAmerica, Martin Nissenbaum/NewYork/TAX/EYLLP/US@EY-Namerica, Melinda S Merk/National/TAX/EYLLP/US@EY-NAmerica, Peter D. Lucido/NewYork/TAX/EYLLP/US@EY-Namerica, Richard J Shapiro/NewYork/TAX/EYLLP/US@EY-Namerica, Robert J Garner/NewYork/TAX/EYLLP/US@EY-Namerica
cc: Paula B Kennedy/Minneapolis/TAX/EYLLP/US@EY-NAmerica
Subject: Revised COBRA Spreadsheet and Slides

The attached spreadsheet and slide numbers 14-15 for COBRA have been revised to account for the Federal and state tax on the net proceeds from the option contracts in the event that the client wins the economic bet. This slightly reduces the Net After-Tax Return for a $50 million ordinary loss in the Win/Win scenario from 526.50% to 512 37% (reduction for $50 million capital loss is from 316 05% to 301 84%)

cobranew111199.ppt COBRA new111199.xls

GOVERNMENT EXHIBIT 9

PENGAD 800-631-6989

2003EY003750

# C.O.B.R.A.
# (Currency Options Bring Reward Alternatives)

2003EY003751

# What is COBRA?

- Foreign currency derivative transaction
- 30-day investment strategy
- Utilizes options to generate a possible 31% return in 30 days with a 38% probability of success
- Participation in general partnership with other partners with similar investment interests



2003EY003752

# Step One - Option Contracts

Each individual sells (writes) short option and receives premium, and buys long option, on foreign currency at different strike prices. Each individual invests in different type of foreign currency options (e.g., CAD, JAP, or EURO).






2003EY003753

# Step Two - Formation

Individuals transfer foreign currency option contracts to a newly formed general partnership.

In addition, individuals contribute cash equal to 2% of the cost of the long option to the partnership.

The individuals receive a 100% general partnership interest in exchange for their contributions to the partnership.




ERNST & YOUNG LLP 4

2003EY003754

# Step Three - Investment

After 30 days, the options will expire either in or out of the money. Partnership recognizes economic gain or loss on the spread.

If ordinary loss is desired, spot foreign currency will be purchased by the partnership. If capital loss is desired, capital assets will be purchased.




ERNST & YOUNG LLP 5

2003EY003755

# Step Four - Transfer to S Corp

Individuals transfer 100% GP interest to a newly formed S corporation, which will cause a technical termination.




ERNST & YOUNG LLP 6

2003EY003756

# Step Five - Distribution

Partnership liquidates and distributes its investments to S Corp.

S Corp then sells assets to an unrelated third party, generating a profit or loss for tax purposes.




ERNST & YOUNG LLP 7

2003EY003757

# COBRA

## ⇨Executive Summary

- **Taxpayer and other non-related individual(s) sell (write) a short option position on foreign currency and receives premium**
  - Premium receipt is nontaxable event until exercise, assignment, lapse or termination of option
- **Long option position on foreign currency is purchased with short option premium +/- equity**
- **Option spread may be bullish or bearish**

ERNST & YOUNG LLP 8

2003EY003758

# COBRA

## ⇨Executive Summary (Continued)

- **Taxpayer and other non-related individual(s) contribute options to newly formed general partnership**
- **Taxpayer and other non-related individual(s) contribute cash to general partnership**
  - Non-related individual's investment in partnership must be at least 10%
- **After 30 days, options expire either in or out of the money**
  - Partnership recognizes economic gain or loss on the spread

# COBRA

## ⇨Executive Summary (Continued)

- Transfer of 100% GP interest to S Corp causes technical termination of partnership
- In liquidation of partnership interest, S Corp receives equivalent fair value amount of foreign currency or capital assets
- Distributed assets take on taxpayer's outside basis
- S Corp sells the assets generating ordinary or capital income/loss for tax purposes



2003EY003760

# COBRA

## ⇨ Currency Linked Digital Swap Example

- Objective is to generate $50M loss
- Counterparties = Deutsche Bank and Client
- Trade Date = 11/2/99
- Maturity Date = 12/2/99
- Notional Amount of SWAP #1 (short option) = 93,750,000 USD
  - ✓ Deutsche Bank pays $47,500,000
  - ✓ Client pays $0
  - ✓ If spot Eurodollar/USD is trading at or above 1.0693 - Deutsche Bank pays $0, Client pays $93,750,000
- Notional Amount of SWAP #2 (long option) = 100,000,000 USD
  - ✓ Deutsche Bank pays USD $0
  - ✓ Client pays USD $50,000,000
  - ✓ If spot Eurodollar/USD is trading at or above 1.0691 - Deutsche Bank pays $100,000,000, Client pays $0



2003EY003761

# COBRA

⇨ **Currency Linked Digital Swap Example (Continued)**

- ◆ If spot Eurodollar/USD trades at or below 1.0691, client loses $2,500,000
- ◆ If spot Eurodollar/USD trades at 1.0692, client receives $100,000,000
- ◆ If spot Eurodollar/USD trades at or above 1.0693, client receives $6,250,000
- ◆ 38% chance client will make $3.75 million profit on $2.5 million investment

# COBRA

## ⇨Economic Summary

- Fees are 4.5% of $50 million or $2.25 million
- Clients' upfront investment in option contracts is $2.5 million
- Clients' additional upfront investment in partnership is 2% of desired loss or $1 million cash
- Total cost including fees is $4.75 million (cash investment is at no risk and is not a cost of transaction)
- 38% probability of $6.25 million payoff
- Return is 32% if payoff occurs
- Duration of contract will be 30 days
- See Illustration of 4 different outcome scenarios on next two slides



2003EY003763

| Amount of Ordinary Loss | $50,000,000 | | | |
|---|---|---|---|---|
| ***Economics Only:*** | Win Bet/Win Tax | Lose Bet/Win Tax | Win Bet/Lose Tax | Lose Bet/Lose Tax |
| Fees | $2,250,000 | $2,250,000 | $2,250,000 | $2,250,000 |
| Capital Invested | $2,500,000 | $2,500,000 | $2,500,000 | $2,500,000 |
| Total Capital & Fees | $4,750,000 | $4,750,000 | $4,750,000 | $4,750,000 |
| Proceeds of Currency Trades | $6,250,000 | $0 | $6,250,000 | $0 |
| Net-Economic Profit/Loss | $1,500,000 | ($4,750,000) | $1,500,000 | ($4,750,000) |
| % Return After Fees | 31.58% | -100.00% | 31.58% | -100.00% |
| ***On After-Tax Basis:*** | | | | |
| Federal Income Tax Savings | $20,000,000 | $20,000,000 | $0 | $0 |
| State Income Tax Savings | $2,500,000 | $2,500,000 | $0 | $0 |
| Trading Loss Deduction | $0 | $1,125,000 | $0 | $1,125,000 |
| Deduction for Fees | $1,012,500 | $1,012,500 | $1,012,500 | $1,012,500 |
| Fed & State Tax on Proceeds | ($675,000) | | ($675,000) | |
| Total Tax Savings | $22,837,500 | $24,637,500 | $337,500 | $2,137,500 |
| Net After-Tax Profit/Loss | $24,337,500 | $19,887,500 | $1,837,500 | ($2,612,500) |
| Net After-Tax % Return | 512.37% | 418.68% | 38.68% | -55.00% |
| Fed OI tax rate = 40% | | | | |
| State OI tax rate = 5% | | | | |

** Deduction for fees only available after application of 2% floor

ERNST & YOUNG LLP 14

2003EY003764

| Amount of Capital Loss | $50,000,000 | | | |
|---|---|---|---|---|
| ***Economics Only:*** | Win Bet/Win Tax | Lose Bet/Win Tax | Win Bet/Lose Tax | Lose Bet/Lose Tax |
| Fees | $2,250,000 | $2,250,000 | $2,250,000 | $2,250,000 |
| Capital Invested | $2,500,000 | $2,500,000 | $2,500,000 | $2,500,000 |
| Total Capital & Fees | $4,750,000 | $4,750,000 | $4,750,000 | $4,750,000 |
| Proceeds of Currency Trades | $6,250,000 | $0 | $6,250,000 | $0 |
| Net Economic Profit/Loss | $1,500,000 | ($4,750,000) | $1,500,000 | ($4,750,000) |
| % Return After Fees | 31.58% | -100.00% | 31.58% | -100.00% |
| ***On After-Tax Basis:*** | | | | |
| Federal Income Tax Savings | $10,000,000 | $10,000,000 | $0 | $0 |
| State Income Tax Savings | $2,500,000 | $2,500,000 | $0 | $0 |
| Trading Loss Deduction | $0 | $1,125,000 | $0 | $1,125,000 |
| Deduction for Fees | $1,012,500 | $1,012,500 | $1,012,500 | $1,012,500 |
| Fed & State Tax on Proceeds | ($675,000) | | ($675,000) | |
| Total Tax Savings | $12,837,500 | $14,637,500 | $337,500 | $2,137,500 |
| Net After-Tax Profit/Loss | $14,337,500 | $9,887,500 | $1,837,500 | ($2,612,500) |
| Net After-Tax % Return | 301.84% | 208.16% | 38.68% | -55.00% |
| Fed CG tax rate = 20% | | | | |
| State CG tax rate = 5% | | | | |

** Deduction for fees only available after application of 2% floor

ERNST & YOUNG LLP 15

2003EY003765

## Ordinary Loss

**Amount of Ordinary Loss** $50,000,000

| *Economics Only:* | Win Bet/Win Tax | Lose Bet/Win Tax | Win Bet/Lose Tax | Lose Bet/Lose Tax |
|---|---|---|---|---|
| Fees | $2,250,000 | $2,250,000 | $2,250,000 | $2,250,000 |
| Capital Invested | $2,500,000 | $2,500,000 | $2,500,000 | $2,500,000 |
| Total Capital & Fees | $4,750,000 | $4,750,000 | $4,750,000 | $4,750,000 |
| Proceeds of Currency Trades | $6,250,000 | $0 | $6,250,000 | $0 |
| Net Economic Profit/Loss | $1,500,000 | ($4,750,000) | $1,500,000 | ($4,750,000) |
| % Return After Fees | 31.58% | -100.00% | 31.58% | -100.00% |
| *On After-Tax Basis:* | | | | |
| Federal Income Tax Savings | $20,000,000 | $20,000,000 | $0 | $0 |
| State Income Tax Savings | $2,500,000 | $2,500,000 | $0 | $0 |
| Trading Loss Deduction | $0 | $1,125,000 | $0 | $1,125,000 |
| Deduction for Fees | $1,012,500 | $1,012,500 | $1,012,500 | $1,012,500 |
| Fed & State Tax on Proceeds | ($675,000) | | ($675,000) | |
| Total Tax Savings | $22,837,500 | $24,637,500 | $337,500 | $2,137,500 |
| Net After-Tax Profit/Loss | $24,337,500 | $19,887,500 | $1,837,500 | ($2,612,500) |
| Net After-Tax % Return | 512.37% | 418.63% | 38.68% | -55.00% |

Fed OI tax rate = 40%
State OI tax rate = 5%



2003EY003766

## Capital Loss

**Amount of Capital Loss** $50,000,000

| *Economics Only:* | Win Bet/Win Tax | Lose Bet/Win Tax | Win Bet/Lose Tax | Lose Bet/Lose Tax |
|---|---|---|---|---|
| Fees | $2,250,000 | $2,250,000 | $2,250,000 | $2,250,000 |
| Capital Invested | $2,500,000 | $2,500,000 | $2,500,000 | $2,500,000 |
| Total Capital & Fees | $4,750,000 | $4,750,000 | $4,750,000 | $4,750,000 |
| Proceeds of Currency Trades | $6,250,000 | $0 | $6,250,000 | $0 |
| Net Economic Profit/Loss | $1,500,000 | ($4,750,000) | $1,500,000 | ($4,750,000) |
| % Return After Fees | 31.58% | -100.00% | 31.58% | -100.00% |
| *On After-Tax Basis:* | | | | |
| Federal Income Tax Savings | $10,000,000 | $10,000,000 | $0 | $0 |
| State Income Tax Savings | $2,500,000 | $2,500,000 | $0 | $0 |
| Trading Loss Deduction | $0 | $1,125,000 | $0 | $1,125,000 |
| Deduction for Fees | $1,012,500 | $1,012,500 | $1,012,500 | $1,012,500 |
| Fed & State Tax on Proceeds | ($675,000) | | ($675,000) | |
| Total Tax Savings | $12,837,500 | $14,637,500 | $337,500 | $2,137,500 |
| Net After-Tax Profit/Loss | $14,337,500 | $9,887,500 | $1,837,500 | ($2,612,500) |
| Net After-Tax % Return | 301.84% | 208.16% | 38.68% | -55.00% |

Fed CG tax rate = 20%
State CG tax rate = 5%



2003EY003767