# EXHIBIT G29

# Discussion Main Topic

**Title:** COBRA Matters - URGENT
**Project:** COBRA
**Category:** Implementation
**Author:** Melinda S. Mark

**Topic:**
**The following message was sent by Bob Coplan to the Quickstrike Team on 12/05/99:**

This email discusses three items of importance to the COBRA transaction -- two relating to completed transactions, and one related to COBRA 2000.

**1) Trading activity in the partnerships.**
As you know, in addition to the transfer of the option spread to the partnership, the clients transferred cash equal to two percent of the loss amount to the partnership. There has been some confusion as to what type of trading is expected to be done with this cash during the life of the partnership. The trading activity is important to the maintainance of a business purpose for the partnership -- i.e., investment activity. We have not developed precise rules for the investment of the funds, but here are some guidelines. The money should not sit in a money market account. The more trading activity the better, and preferably in an investment that can reasonably be expected to provide a potential for a good return, although "speculative" investments are not encouraged. If one wanted to move in and out of different market indexes, that would be acceptable. Because there are only about three weeks left till the liquidation of the partnerships, it is essential that if no activity has yet commenced, that it be begun immediately through David Parse at Alex Brown. Investment in foreign currencies is not necessary at this time -- even in the ordinary loss partnerships. That will be done just prior to the termination of the partnerships after the assets remaining in the trading account have been liquidated.

**2) Closing out profitable currency option positions.**
This has been an unusually favorable time for many of our clients to have embarked upon these types of trades, given the recent extreme volatility in the currency markets. Several of our clients are holding currency options that are in the money already, either due to their own savvy selections or to the guidance provided by David Parse. That is leading some to ask whether it is appropriate for them to grab a profit by having Deutsche Bank buy out their positions. (Remember -- these are European options and cannot be exercised before the term of the option expires in 30 days.) This is not a simple decision. First, keep in mind that a "profit" on these transactions means receiving back more from the option spreads than the sum of the amount invested (e.g., $2.5M on a $50M loss transaction) and the related fees ($2.25M on a $50M loss transaction). Second, because there are still several weeks to go before the options expire and can be exercised, a buyer of an option will insist on a discount to reflect the fact that currency movements could well cause the option to end up out of the money. Therefore, if the discount on the options exceeds the potential profit (e.g., $1.5M on a $50M loss transaction), then cashing out of the options now would mean the client has produced an economic profit on the option, but has prevented himself from making an overall profit on the transaction. If the options continue to move deeper in the money as time elapses on the options, the discount will shrink, and locking in a true profit may become more feasible. Clients with partnerships holding two spreads that are both in the money (there are a couple of these), may find this possible in the near future, but the point is that jumping out too early may lock in a sizeable discount on the option.

In any event, the favorable movement in the currency markets at the time our trades were put on, means that we have clear evidence that the option structure arranged by Richard Shapiro with DB in fact produced a reasonable expectation of making a profit on the options, since many of the options were in the money after such a short period of time.

2003EY000866

GOVERNMENT EXHIBIT 29
PENGAD 800-631-6989

3) <u>COBRA 2000</u>
We are carefully reviewing the possibility of joining with a promoter for 2000 other than Jenkens & Gilchrist with whom to implement COBRA. We have not previously worked with this promoter before, but they have been selling the transaction before in a manner compatible with the economics we have instituted. Advantages of changing to the new promoter would include: 1) a higher fee for E&Y (2%) and a lower overall fee for the transaction (4%) allowing the client to have a greater probability of profiting on the option trade, and 2) a structure that would include a general partner investor that (a) means we can implement the transaction with a single client who need not be paired up, (b) facilitates a supervised trading account, and (c) allows the partnership to remain in existence after the investor/client has been redeemed out. This would mean switching the option trading from Deutsche Bank to other brokers, such as either Lehman Brothers or Sumitomo. However, we would stay with the Brown & Wood opinion. Although National will be trying hard to conclude this decision during the next couple days, it means that any COBRA discussions with potential clients for 2000 should not indicate that our implementation partners are completely set.

Questions on these issues may be directed to any member of the VIPER team.

Edit History

| | | | | | |
|---|---|---|---|---|---|
| Melinda | S. | Mesk | 12/03/99 | 01:04:59 | PM |
| Melinda | S. | Mesk | 12/08/99 | 01:03:28 | PM |

2003EY000867

# EXHIBIT G30

Robert M. Haysle
12/11/1999 08:45 AM

To: Elise Rees/Tax/ErnstYoung/CA @ EY-Canada, Jas S Heyse/Tax/ErnstYoung/CA @ EY-Canada, Philip C. Grad/NCalifornia/TAX/EYLLP/US @ EY-Namerica, Kenneth L. Tracy/NCalifornia/TAX/EYLLP/US @ EY-Namerica, Richard E. Jones/NCalifornia/TAX/EYLLP/US @ EY-Namerica, James A. Cox/NCalifornia/TAX/EYLLP/US @ EY-Namerica
cc: Jason B. Rydberg/NCalifornia/TAX/EYLLP/US @ EY-NAmerica, Francis M. Yung/NCalifornia/TAX/EYLLP/US @ EY-NAmerica, Michael B. Hobson/NCalifornia/TAX/EYLLP/US @ EY-NAmerica
Subject: COBRA - Latest Slides

Thanks for all of your interest in COBRA for 2000. Attached are the latest revised 2000 slides and Excel worksheet for COBRA. Clients must sign an NDA before reviewing it, and it is best for Brian Vaughn or me to walk through the presentation with the client because we know what should be covered.

Robert

cobra2000rev.ppt COBRA 2000.xls

GOVERNMENT EXHIBIT 30

DOJ 009395

**C.O.B.R.A.**
**(Currency Options Bring Reward Alternatives)**

## What is COBRA?

- Foreign currency derivative transaction
- 90-day investment strategy
- Utilizes options to generate a possible return of approximately 39% in 90 days with about a 34% probability of success
- Participation in general partnership with other partners with similar investment interests

## Step One - Option Contracts



## Step Two - Formation




## Step Three - Investment




## Step Four - Transfer to S Corp




DOJ 009396

## Step Five - Distribution

Partnership liquidates and distributes its investments to S Corp

S Corp then sells assets on the market, generating a profit or loss for tax purposes




## COBRA

⇨ Executive Summary

- Taxpayer and other individual(s) (not taxpayer's spouse or wholly owned corporation) sell (write) a short option position on foreign currency and receive premium
  - Premium receipt is contestable event until exercise, assignment, lapse or termination of option
- Long option position on foreign currency is purchased with short option premium + equity
- Option spread may be bullish or bearish
- Different partners use different currencies

## COBRA

⇨ Executive Summary (Continued)

- Taxpayer and other option spread holder(s) contribute options to newly formed general partnership
- Taxpayer and other partner(s) also contribute cash to general partnership
  - In the aggregate, the "other" partners' investment in partnership must be at least 15%
  - Partnership engages in active trading activity with cash contributed

## COBRA

⇨ Executive Summary (Continued)

- After 90 days, options expire either in or out of the money
  - Partnership recognizes economic gain or loss on the spread, which will be ordinary income or loss
- Transfer of 100% GP interest to S Corp causes technical termination of partnership
- In liquidation of partnership interest, S Corp receives equivalent fair value amount of foreign currency or capital assets
  - Distributed assets take on taxpayer's outside basis
- S Corp sells the assets generating ordinary or capital income/loss for tax purposes

## COBRA

⇨ Currency Linked Digital Swap Example

- [illegible]

## COBRA

⇨ Currency Linked Digital Swap Example (Continued)

- If spot EURO/USD trades above .9822, client loses $1,250,000
- If spot EURO/USD trades at or below .9822, client receives [illegible]
- If spot EURO/USD trades at or below .9823, client receives $3,125,000
- approximately 35% chance client will make $1.875 million profit on $1.25 million investment

DOJ 009397








DOJ 009398

# EXHIBIT G31

[date]

**CONFIDENTIAL**
**ATTORNEY-CLIENT PRIVILEGED**

Draft

Gentlemen:

You have requested us to review the United States federal income tax consequences of a number of transactions in which you have been involved and to provide our opinion regarding certain material United States federal income tax issues. Such transactions are described below under the heading "Facts."

In connection with this opinion, we have examined such matters of law, and such corporate, limited liability company, partnership records and such other agreements, certificates, instruments and documents, and we have made such other inquiries of officers, owners and representatives of the entities involved, as we have deemed necessary to render the opinions set forth herein. We have without any investigation or independent confirmation relied upon and assumed the accuracy of the responses to such inquiries and such certificates, corporate, limited liability company and partnership records and other documents with respect to factual matters.



GOVERNMENT EXHIBIT 31

GOVERNMENT EXHIBIT 1032

[ ]
[date]
Page 2

FACTS

In particular, our opinion is based upon the following facts:

1. On [Date A], you, through a limited liability company wholly owned by you("LLC"), entered into certain over-the-counter, non-publicly traded European style foreign currency option positions on the Japanese Yen (the "Options") with Deutsche Bank AG London, an unrelated substantive counter party. Specifically, you bought a digital option on the Japanese Yen/U.S. Dollar exchange rate at a strike price of [Long Strike] Japanese Yen per U S Dollar with an expiration date of [Long Expiration], a settlement date of [Long Settlement], and a payoff amount of [Long Payoff] Japanese Yen, and paid a premium of $[Long Premium] (the "Long Option"). Additionally, you sold a digital option on the Japanese Yen/U.S Dollar Exchange rate at a strike price of [Short Strike] Japanese Yen per U.S. Dollar and received a premium of $[Short Premium], with an expiration date of [Short Expiration], a settlement date of [Short Settlement], and a payoff amount of [Short Payoff] Japanese Yen (the "Short Option").

2. On [Date B], you contributed the Options to [Partnership] (the "Partnership") as a contribution to capital.

3. On [Date C], the Partnership's Option positions expired [were exercised].

4. On [Date D] you contributed shares of stock in [any long-term investment Corp.] ("LT Corp") to the Partnership as a contribution to capital. You had held such shares in LT Corp as an investment for more than twelve months.

[illegible]

[ ]
[date]
Page 3

5. On [Date E] you contributed your interest in the Partnership to S Corp, Inc. ("S Corp."), a ___[state]___ corporation wholly owned by you, as a contribution to its capital. S Corp. was the only other partner of the Partnership, and as a result of your contribution, it became the only owner of the Partnership. Accordingly, the Partnership was dissolved and liquidated, and all of its cash and its investment in LT Corp were distributed to S Corp.

6. On [Date F] S Corp sold its investment in the shares of LT Corp it received upon the liquidation of the Partnership.

OPINION

Based on the following discussion and analysis and subject to the qualifications, limitations and assumptions set forth herein, we are of the opinion that under current U S federal income tax law it is more likely than not that:

A. [illegible] as a single-member limited liability company, should be disregarded as an entity for federal income tax purposes.

B. Investing [illegible]tions, treated for tax purposes as being undertaken by you, should not be a taxable transaction.

C. The Partnership should be classified as a partnership for federal income tax purposes.

D. Your contribution of the Options to the Partnership, should not result in a taxable gain or loss.

Draft

CHICAGO 15131 v1, 99999 [illegible]

[ ]
[date]
Page 4

E. The Short Option should not be a liability within the meaning of section 752 of the Internal Revenue Code of 1986, as amended (the "Code").

F. Your basis in your interest in the Partnership after the contribution of the Options should include the cost of the Long Option contributed without adjustment for the Short Option.

G An adjustment to your adjusted basis in your Partnership interest should be required as a result of the expiration of the Options, due to the recognition of ordinary loss on such expiration under Code section 1234.

H. Your contribution of the shares of LT Corp to the Partnership should not be a taxable transaction and your basis in the Partnership should be increased by an amount equal to your basis in the shares of LT Corp

I. Your contribution of your interest in the Partnership to S Corp. should not be a taxable transaction.

J. Your basis in your interest in S Corp. should be increased by an amount equal to the adjusted basis of your interest in the Partnership as of the date of contribution

H The liquidation of the Partnership should not result in gain or loss recognition.

[illegible] The liquidation of the Partnership should result in an allocation of the Partnership's "outside" basis to the properties distributed to it in liquidation. In this case, the properties consisted of cash and an investment in shares of LT Corp

CHICAGO 11118 v 1, 99999-00000



EMERSON01451

L. The disposition by S Corp. of the LT Corp received in liquidation of the Partnership should result in a long-term capital loss.

M. The step transaction and sham transaction doctrines should not apply to the transactions described herein.

N. Treasury Regulation section ("Treas. Reg. sec.") 1.701-2 should not apply to the transactions described herein.

The opinions set forth above are subject to the following qualifications, limitations and exceptions.

No opinion is expressed about the tax treatment of the described transaction for purposes of any state or local income tax, or any tax other than the United States federal income tax.

Any misstatement of a material fact or omission of any fact that may be material or any change in any of the facts referred to may require a modification of all or a part of our opinions.

Our opinion is limited to the matters expressly set forth herein and no opinion may be implied or inferred beyond the matters so stated. The opinions expressed herein are based upon our interpretation of current law. The opinions expressed herein are not binding on the IRS or the courts, and there can be no assurance that the IRS and the courts will not take a position contrary to the opinions expressed herein. We do not undertake to advise you of any changes in law which may occur after the date hereof. The Code, the regulations promulgated thereunder, and the administrative position of the IRS are subject to change either prospectively or retroactively. Such changes could render certain or all of the opinions expressed herein inapplicable.

CHICAGO [illegible]

For purposes of all of the above opinions, we are relying on the truth of the representations of you and/or partners or representatives of the Partnership or authorized officers of S Corp.

The opinions expressed herein are furnished by us solely for your benefit and for the benefit of the Partnership and S Corp. and they may not be relied upon or delivered to any person other than you, the Partnership and S Corp. and your successors or assigns without our express, prior written approval.

REPRESENTATIONS

You and/or partners of the Partnership and/or authorized officers of S Corp. have represented the following:

a. You entered into the purchase and sale of the Contributed Options for substantial nontax business reasons, including (i) to produce overall economic profits because of your belief that the Japanese Yen/U.S. dollar exchange rate relationship would change; and (ii) your belief that the most direct way, with the most leverage, to realize gains from expected changes in currency prices was the purchase and sale of the Contributed Options.

b. You contributed the Contributed Options to the Partnership for substantial nontax business reasons, including, but not limited to, diversification of the risks of certain investments, professional management of the portfolio of investments, the desire to

Draft

[ ]
[date]
Page 7

co-invest as partners with the other co-partners and the convenience of the transferors.

c Neither you, LLC, the Partnership, nor S Corp were obligated to engage in any transaction to which our opinions herein relate upon the completion of any other of such transactions.

d. To the best of your knowledge, you have provided to us all the facts and circumstances necessary for us to form our opinion.

APPLICABLE LAW

Our analysis of the applicable United States federal income tax law with respect to the above-stated facts and in support of each of the lettered opinions as set forth on pages 3 through 5 hereof is attached, with each attachment lettered to correspond to each such opinion.

Based on the foregoing and subject to the qualifications, limitations and assumptions set forth herein, we are of the opinion that the described tax consequences have substantial authority and that it is more likely than not that you will prevail if challenged by the IRS

Very truly yours,

JENKENS & GILCHRIST

draft

CHICAGO 1 [illegible]



EMERSON01454

## E. TREATMENT UNDER CODE SECTION 752 OF ASSUMING A SHORT OPTION POSITION

For the following reasons, the Short Option should not be treated as a liability of the Partnership for purposes of Code section 752.

*Option Writer Taxation, Generally*

The Internal Revenue Code does not delineate the tax consequences of issuing an option, and therefore, resort must be had to cases and rulings. In the case of Virginia Iron Coal & Coke Co. v. Commissioner, 37 BTA 195 (1938), the taxpayer granted a counterparty a four-year option to buy the stock of a subsidiary in exchange for a payment of $300,000 in 1930 and annual payments of $125,000 which were to be applied to the purchase price if the counterparty exercised the option. After paying $300,000 in 1930 and $125,000 in 1931, the counterparty notified the taxpayer in 1933 that it was abandoning the option. The taxpayer, who had not initially reported the receipt of the option premiums, thereupon filed amended returns for 1930 and 1931 and reported the premiums as income for the appropriate year. The Commissioner asserted that the premiums were income in the year the option was abandoned, and the court agreed, adopting an "open transaction" approach:

> "It was impossible to tell in 1930 and 1931, when the payments were received, whether they would ultimately represent income to the petitioner or a return of capital. They were to be applied against the purchase price in case of the exercise of the option. Had the option been exercised, they would have represented a return of capital, that is, a recovery of a part of the basis for gain or loss which the property had in the hands of the seller. In that event they would not have been taxable and their return as income when received would have been improper. . . But in case of termination of the option and abandonment by the Texas Co. of its right to have the payments applied as a part of the purchase price, it would be apparent for the first time that the payments represented clear gain to the petitioner. In that case, since no property would be sold, there would be no reason to reduce the basis of that retained.

CHICAGO DATA • L.99999 CITID

Thus it was impossible for either the taxpayer or the Commissioner to determine in 1930 and 1931 whether or not the payments would eventually represent income and how they should be reported. Obviously those years could not be held open for income tax purposes to await the final outcome of such contracts. The taxpayer in this case, after the option to purchase had been surrendered, filed amended returns reporting the payments as income for the years in which received. But returns must be filed in the light of facts known at the time the returns are due. Some other taxpayer might not choose to file amended returns. Then the statute of limitations would foreclose the Commissioner and prevent the collection of taxes lawfully due. If the Commissioner is to make an orderly and uniform collection of taxes in such cases, the tax liability for those earlier years must be determined and closed by collection, without waiting to see whether or not the option is exercised.

Thus it is necessary to exclude such payments from the income of the year in which received and to include them for the later year when, for the first time, a satisfactory determination of their character for income tax purposes can be made. The other party to the contract in the taxable year for the first time released and abandoned its rights under the agreements to [illegible] payments applied against the purchase price, and charged off its loss. [illegible] then knew for the first time that it could retain the payments without any [illegible] to apply them against the purchase price. Its property was then free of the option. It had lost nothing, but had retained everything with which it started and had acquired $425,000 in addition. The $425,000 was then income.

The taxpayer argues that, since the [illegible] received in 1930 and 1931 with the right to retain them [illegible] and to use them without restriction, they should have been [illegible] as income [illegible] those years. Although they were received without any obligation to return them [illegible] was one condition attached to their receipt. That is, they [illegible] applied [illegible] the purchase price in case the option was exercised. [illegible] condition [illegible] determining factor in this case. Until it was removed in [illegible] question of the liability of the recipient for income tax upon the payments had [illegible] in abeyance." 37 BTA 197-199.

A dissent argued that the taxpayer recognized income in the year of receipt because it had [illegible] control of the premium at that time. The dissent added that the income could be [illegible] the option was abandoned under only one of two theories, both of which the dissent felt were untenable. The first theory is that the counterparty "forfeited" the premiums only in 1933. That theory was untenable because the taxpayer had absolute control of the funds since

1930, so there was nothing to "forfeit." The second theory was that the value of the abandonment was income. However, if that were the case, the only income would be the difference between the value of the optioned property at the time of the abandonment and the price at which the taxpayer was obligated to convey it.

In I-T. 3835, 1947-1 C.B. 53, Internal Revenue Service ruled that [illegible] premium received by a writer (issuer or optionor) of a "put" or "call" option which is not exercised constitutes a short-term capital gain, under section 117(g)(2) of the Internal Revenue Code of 1939, to be taken into account in computing his gross income, for Federal [illegible] tax purposes, only for the taxable year in which the failure to exercise the option becomes final [illegible]

In Rev. Rul. 58-234, 1958-1 C.B. 279 the Service [illegible] that that section 117(g)(2) of the Internal Revenue Code of 1939 specifically provided that "gains [illegible] attributable to the failure to exercise privileges or options to buy or sell property shall be considered as short-term capital gains . . ." whereas in the Internal Revenue Code of 1954 there was no corresponding or other provision [illegible] which such [illegible] or may be considered or treated as capital gain, either short-term or long-term. The IRS [illegible] the premium received by the writer (issuer or optionor) of a "put" or "call" option which is not exercised constitutes ordinary income under section 61 of the 1954 Code [illegible] should be included in his gross income only for the taxable year in which the failure to exercise the option becomes final. The IRS based its holding on an "open transaction" approach:

> [illegible] optionor, by the mere granting of an option to sell ("put") or buy ("call"), certain property, may not have parted with any physical or tangible assets; but, just as the optionee thereby acquires a right to sell, or buy, certain property at a fixed price during a specified future period or on or before a specified future date, so does the optionor become obligated to accept, or deliver, such property at that

price, if the option is exercised. Since the optionor assumes such obligation, which may be burdensome and is continuing until the option is terminated, without exercise, or otherwise, there is no closed transaction nor ascertainable income or gain realized by an optionor upon mere receipt of a premium for granting such an option. The open, rather than closed, status of an unexercised and otherwise unterminated option to buy (in effect a "call") was recognized, for Federal income tax purposes, in A.E. Hollingsworth v. Commissioner, 27 B. T. A. 621, acquiescence, C.B. XII-1, 6 (1933). It is manifest, from the nature [illegible] consequences of "put" or "call" option premiums and [illegible] that there is no Federal income tax incidence on account of either the receipt or the payment of such option premiums, i.e., from the standpoint of either the optionor or the optionee, unless and until the options have been terminated, by failure to exercise, or otherwise, with resultant gain or loss. The optionor [illegible] to minimize [illegible] conclude the eventual burden of his option obligation [illegible] pay the optionee, as consideration for cancellation of the option, an amount [illegible] or greater than the premium. Hence, no income, gain, profits, or earnings [illegible] from the receipt of either a "put" or "call" option premium unless and until the option expires without being exercised, or is terminated [illegible] by the optionor of an amount less than the premium. Therefore [illegible] that the principle of the decision in North American Oil Consolidated v. [illegible] U.S. 417, Ct. D 499, C.B. XI-1, 293 (1932), which involved the receipt o[illegible]," is not applicable to receipts of premiums on outstanding options.

In Rev. Rul. 78-182, 1978-1 C.B. 265, [illegible] with options listed on the Chicago Board Options Exchange, the Service follows Rev. [illegible] 54 in holding, *inter alia*, that as to the writer of a p[illegible] "there [illegible] income tax incident on account of either the receipt or the payment of [illegible] premium[illegible], from the standpoint of either the optionor or the optionee, unless and until [illegible] have been terminated, by failure to exercise, or otherwise, with resultant gain or loss." Because of a 1976 amendment to section 1234, as noted below, the ruling adds that this gain or loss is now short-term capital gain or loss.

[illegible] (a)(1) currently provides the following rule: "Gain or loss attributable to the sale or exchange of, or loss attributable to failure to exercise, an option to buy or sell property shall be considered gain or loss from the sale or exchange of property which has the same

character as the property to which the option relates has in the hands of the taxpayer (or would have in the hands of the taxpayer if acquired by him)." Rev. Rul 78-192 provides that if a holder sells a put or call option on a capital asset before maturity, any gain or loss recognized at that time is capital gain. In addition, in relevant part, section 1234(b), as amended by the Tax Reform Act of 1976 specifically to address the apparent change in law pointed out by [illegible] 58-234, provides that, in general, in the case of the grantor of an option, "gain or loss [illegible] "closing transaction" with respect to, an option in property shall be [illegible] a gain or loss from the sale or exchange of a capital asset held not more than 1 year. [illegible](b)(2)(A) defines a "closing transaction" as "any termination of the taxpayer's obligation [illegible] option in property other than through the exercise or lapse of the [illegible] 1234(b)(2)(B) defines "property" as "stock and securities (including stocks and [illegible] dealt with on an "when issued" basis), commodities and commodity futures."

Neither the statute nor the [illegible] the term "commodities" Regs §4 954-2(f)(2), a [illegible] regul[illegible] until Nov. 6, 1995, previously provided that, for purposes of [illegible] foreign p[illegible] company, "commodities" included nonfunctional [illegible] The final regulations, Regs. §1.954-2(f)(2), no longer include nonfunctional foreign curr[illegible] the definition of "commodities." However, TD 8618, the preamble to the final regulations, states that "although section 1.954-2(f)(2)(i) no longer explicitly pro[illegible] that nonfunctional currency is a commodity, nonfunctional currency continues to fall within [illegible] definition of commodity." In addition, section 988(c)(1)(B)(iii) specifically provides that income or loss from an option on nonfunctional currency is taxable as "gain or loss"

Accordingly, based upon case law, the rulings, and the statute, the premium from issuing a put or call option should be held in suspense under an open transaction theory until the option expires, lapses, or the writer's potential contractual duty under the option terminates. Additionally, upon the termination of an option on stock, securities or commodities (including foreign currency)--the writer recognizes "gain or loss," not "[illegible]" ([illegible] cancellation of indebtedness income).

*Code Section 752 and Related Authorities*

Code section 752(a) treats any increase in a partner's [illegible] liabilities of a partnership as a deemed contribution of money by such partner to the partnership, [illegible] increasing basis. Code section 752, however, which governs the "[illegible] partnership liabilities," does not define "liabilities." Additionally, no other section of the Code or the [illegible] defines the term "liability." A standard dictionary defines a "liability" as "a debt; an amount which is owed," and a "contingent liability" as "an amount resulting [illegible] transactions which may become a liability in the future [illegible] certain [illegible] circumstances." Merriam-Webster International Dictionary of the English Language, Second Edition. [illegible]ly, under this definition, for there to be a "liability," there must be [illegible] for the liability to be other than "contingent," this amount must be "owed." A potential contractual duty under a short option position flunks both halves of the definition: there is currently nothing owed, so the option contract is not a liability, and there is no [illegible] amount, so that the option contract is not even a contingent liability. We reach our conclusion [illegible] above by virtue of the case law, the contingent nature of short option positions, and the relationship between partnership liabilities and debt under Temp. Treas. Reg. sec. 1 752-1T (as originally proposed).

Significantly, in the case of George Helmer v. Commissioner, 34 TCM 727 (1975), the Tax Court held that a partnership's receipt of money pursuant to an option agreement did not create a partnership liability under Code section 752. In that case, a partnership owned certain real property on which it granted a corporation a purchase option. In consideration for the option, the corporation paid cash to the partnership. The partnership distributed the cash to its partners. The IRS argued that the option agreement did not create a partnership liability under Code section 752 and, thus, the distribution of the option money caused the partners to recognize gain under Code section 731 (i.e., the distribution of the option money exceeded the partners' tax bases in their partnership interests). The partners argued that the receipt of the option money created a short option partnership liability under Code section 752 which increased the adjusted basis of their partnership interests.

The Tax Court held for the IRS, even though a disparity between partnership inside and outside basis resulted. The Tax Court stated:

> "We are faced with a similar situation. Helmer Brothers received payments pursuant to the option agreement when there was no forfeiture of any of the option payments, the option had not been terminated, nor had any portion of the option been exercised by the optionee. Respondent, in his brief, conceded that the income from the option payments was deferrable by the partnership until characterized as ordinary income (because of the default by the optionee) or capital gains (because of an exercise of the option by the optionee).
>
> * * * * * *
>
> The moneys received under the option agreement were free of restrictions except that upon exercise of the option such amounts would be applied against the purchase price. Thus, the restriction only affected the character of the gain in the partnership's hands. It is this lack of ability to determine character of income (not any liability to repay or to perform) that causes the deferral of the recognition of the income by the partnership until the option is either exercised or lapsed."

The Service might assert that Helmer should not be followed because it is only a memorandum opinion of the Tax Court In Nico v. Commissioner, 67 TC 647 (1977) *aff'd in part and rev'd in part on other grounds*, 565 F.D. 1234 (2d Cir. 1977), following a long line of decisions the Tax Court stated that "we consider neither revenue rulings nor Memorandum Opinions of this court to be controlling precedent." See generally Sommers and Waters, "Tax Court Memorandum Decisions—What are They Worth?," 98 TNT (LEXIS) 138-96 (July 20, 1998). Nevertheless, numerous Tax Court decisions routinely cite memorandum opinions as precedent. In addition, the Helmer decision is consistent with Revenue Ruling 73-301, 1973-2 CB 215, which holds that an unrestricted progress payment received by a partnership did not create a "liability" for purposes of section 752.[2]

Moreover, the leading treatise on partnership taxation, without mentioning Helmer's status as a memorandum opinion, appears to view it as controlling authority. McKee, Nelson and Whitmire, *Federal Taxation of Partnerships and Partners* ¶7.01[1] (1998 Supp #2) Accordingly, Helmer should be followed in determining whether a potential contractual duty under an option is a liability for purposes of section 752.

The courts have consistently held that commitments which are contingent or speculative are not liabilities for purposes of Code section 752, a principle which the IRS has consistently followed. See Long v. Commissioner, 660 F.2d 416 (10th Cir. 1981), affg. 71 T.C. 1 (1979), Brountas v. Commissioner, 692 F 2d. 152 (1st Cir. 1982). This line of authority is based on the [illegible] authorities holding that contingent or speculative commitments cannot give

---

[2] The Service appears to have asserted in other contexts that a contractual duty under an option constitutes a liability. Cf. Rev. Rul. 68-637, 1968-2 CB 158, suppl. Rev. Rul. 98-10, 1998-1 IRB 11; Letter Rulings 7951128 and 8303028.

rise to basis. See Denver & Rio Grande Western Railroad Co. v. United States, 505 F.2d 1266 (Ct. Cl. 1974); Lemery v. Commissioner, 52 T.C. 367 (1969), aff'd, 451 F.2d 173 (9th Cir. 1971).

In Long, the Tenth Circuit addressed whether certain contested claims against a partnership were liabilities under Code section 752. In holding that the claims were not, the court stated,

> "The Tax Court held that because the lawsuit claims against the [illegible] partnership were indefinite and contingent liabilities, they should not be recognized for basis adjustment purposes *until the exact amounts of the liabilities were established.* [illegible] the parties settled those suits, the Tax Court treated the settlement [illegible] plus attorneys' fees incurred as partnership liabilities and [illegible]ted adjustment of the estate's basis in the partnership interest [illegible] extent of its 25% interest. See 1 *W. [illegible] W. Nelson [illegible] Whitmire*, Federal Taxation of Partnerships [illegible] Partners [illegible] 01[2] (1977). We agree with this approach [illegible] [Emphasis added.]"

Brountas involved an oil and gas drilling partnership investment partially paid with nonrecourse obligations that were to be satisfied [illegible] of oil production payments. The First Circuit (Judge [illegible]) characterized the obligation as highly contingent and speculative and seeming "less like [illegible] payment obligation that typically accompanies a recourse loan than like a device for sharing [illegible] the risks that accompany oil explorations." 692 F.2d 158. Hence, the court held, *[illegible]* that the obligations were not partnership liabilities for purposes of Code section 752.

[illegible] determining whether an commitment is contingent, the analysis generally stops abruptly at the [illegible] of the contract if those terms objectively impose a contingency. See Denver & Rio Grande Western Railroad Co. v. United States, *supra*; Lemery v. Commissioner, *supra*; PLR

7704269550A ("When the documents, by their terms, create only contingent obligations, Courts ordinarily will not look beyond the documents to determine the intent of the parties ")

In Denver & Rio Grande Western Railroad Co., 505 F.2d at 1269-70, the court refused to allow the railroad taxpayer to include in its cost basis of property advances by a customer (used to build a "spur line") which were repayable only out of proceeds from shipments above a certain annual tonnage for 10 years. The taxpayer argued that the commitment was not contingent because in light of the underlying facts and circumstances it could be predicted with reasonable certainty" that the advances would be repaid in full. The court rejected the argument, stating it does not matter what the parties' subjective intentions were. Absent a binding obligation to repay all of the advances at the time the subject deductions were taken, the court considered it "impossible" to value the duty assumed.

In Lemery, 52 T C. at 377-78, the court held that a contractual duty to pay part of the purchase price of a business out of net profits was too contingent to be included in the purchasers' basis. The petitioners were unsuccessful in arguing that, although the amount was contingent, the liability itself was absolute.

By its terms, the writing into a short put option position--particularly one issued European style, exercisable only at expiration--is both contingent and speculative. There is no certainty as to the amount of the potential contractual duty until settlement. If at expiration, the underlying property has a value greater than the strike price, the option is worthless. In fact, the granting of an out-of the money option presents a more compelling case of a contingent contractual duty than those in the cases discussed above, because the writer's *desired, if not expected, result* is for the value of the option to decline.

In an analogous case involving short securities obligations, LaRue v. Commissioner, 90 T.C. 465 (1988), the court held that liabilities attributable to an accrual basis partnership's deductible expenses must meet the "all events" test of Code section 461 (described below) before they would be considered "liabilities" for inclusion in the basis of a partner's partnership interest. In LaRue, LaRue was a general partner of Goodbody and Co. ("Goodbody"), a large stock brokerage firm. Due to the inability of recordkeeping technology at the time to keep up with trading volume, Goodbody incurred large, unanticipated "back office" liabilities. These back office liabilities were created by the following types of transactions:

> (1) Fails to Receive—Securities which the broker should have purchased at a stated price were not purchased. Gain or loss would be realized on these transactions measured by the difference between the customer's contract price and what the broker had to pay to obtain the securities. These transactions were the economic equivalent of short sale transactions.
>
> (2) Fails to Deliver—Securities which the broker thought were sold to another broker but for which no "comparison" or proof could be provided. These securities then had to be sold and the gain or loss incurred was measured by the difference between the original sales price and the actual proceeds received.
>
> (3) Security Differences—These represented differences between the securities the broker's records indicated it should be holding for its own or other's accounts and the securities actually in the box. These resulted mainly from incorrect deliveries, receipts, or thefts. Gain or loss was measured by the value of excess securities or their replacement cost.
>
> (4) Dividend Errors—The broker was responsible to its customers for dividends and interest on securities which it held as nominee for its customers, that is securities held in "street name." If the broker failed to receive a dividend or interest payment when due it was still liable to its customer for such amount.

Due to the large losses generated by these back office problems and the withdrawal of capital by subordinated lenders, Goodbody was in violation of the New York Stock Exchange minimum capital requirements. At the same time, another brokerage firm, Merrill Lynch, agreed

to acquire Goodbody. The acquisition transaction raised the issue as to whether LaRue, and the other Goodbody partners, could include the back office liabilities in the bases of their partnership interests

The LaRue court held that the Goodbody partners could not include these back office liabilities in their bases because the "all events" test had not been met. The court said:

> "Because an accrual basis partnership uses the 'all events' test to determine when an expense is deductible, we think that test may be properly used to determine whether the corresponding liability is includable in basis"

The all-events test is met with respect to any item if all events have occurred which determine the fact of the liability and the amount of the liability can be determined with reasonable accuracy Treas Reg. sec. 1.461-1(a). The court [illegible] while Goodbody had a liability to its customers for their back office failures, the amount of the liabilities were not determinable with reasonable accuracy until any missing securities were purchased or excess securities were sold at the market price. The LaRue holding has not been overturned and since the IRS won the case, obviously [illegible] never [illegible] nonacquiescence in the decision.

That an [illegible] contractual [illegible] of the grantor with respect to a written option is not a liability under Code section [illegible] is also theoretically consistent with the analogous provisions of Code section 1233, which [illegible] short sale as an open transaction. See Treas. Reg. sec 1 1233-1(a)[illegible] The reason for holding the short sale transaction open until the short sale is covered is that until such time the borrower's tax basis in the underlying securities is unknown. See [illegible] 4th T.M. Transactions in Stock, Securities and Other Financial Instruments at A-19. This demonstrates that the borrowing of securities under a short sale does not create basis. If

the short seller did receive a tax basis in the borrowed securities (which is not the case), it would not be necessary to keep the short sale open until it is covered.

The non-basis creating character of a short options position as a performance responsibility and not a monetary obligation was initially espoused in Revenue Ruling 57-29, 1957-1 C.B. 519. In that ruling, the IRS held that a seller of "when-issued securities" does not receive a basis in his contractual duty to deliver securities in kind to the buyer. As stated in the ruling:

> "In computing the cost basis of assets for any purpose, the IRS does not recognize an obligation of a taxpayer reflected in an executory contract prior to the performance of the contract."

Accordingly, contingent, open transactions, such as those created by entering into a short option position, should not give rise to basis under Code section 75[illegible]

As the Supreme Court in Deputy v. duPont, 308 U.S. 488 (1940), correctly analyzed in terms of a short sale of stock, "although an indebtedness is an obligation, an obligation is not necessarily an indebtedness." In that case, the taxpayer, Pierre duPont, borrowed stock of E.I. duPont de Nemours and Company ("duPont") under an agreement whereby he agreed to return the stock [illegible] years and in the interim to pay to the lender all dividends declared and paid on the shares so loaned. The taxpayer then sold the borrowed shares to certain executives of duPont, for cash which such executives borrowed from duPont. It was thought desirable that these executives have a financial interest in duPont, but there were alleged legal prohibitions against the corporation itself selling the stock to them. When the ten-year term of the loan was about to expire, the taxpayer arranged for a new loan of securities from a different lender, in order to satisfy his obligation to the first lender. The second loan of duPont stock was

similar to the first, in that it had a ten-year term, the obligation was to return the stock loaned in kind, and in the interim pay an amount equivalent to all dividends declared and paid on the borrowed shares, plus an amount equal to the lender's tax liability arising by reason of the agreement. The IRS disallowed the deduction of the amounts paid to the second lender on the grounds that the payment was not an ordinary and necessary business expense of the taxpayer, nor was it deductible interest. The disallowance was reversed on appeal, but upheld by the Supreme Court. On the first point, the Supreme Court held against the taxpayer, finding that, while the expenditures related to offering incentives to duPont's management may have been ordinary and necessary to duPont's business, they were not ordinary and necessary business expenditures of the taxpayer. On the second point, the Supreme Court also held against the taxpayer, finding that the payments relating to the security loan did not constitute interest because the obligation to return the duPont shares was not an "indebtedness," and the amounts paid did not constitute "interest," which was defined as "compensation for the use or forbearance of money." While the term "indebtedness" and not "liability" was used by the Supreme Court, the concepts and analysis employed make it clear that the notion of the term "indebtedness" is substantially similar to, if not equivalent to, "liability" in the Code section 752 context.

In Revenue Ruling [illegible], 1973-2 C.B. 216, a partnership received cash progress payments on a construction contract reported under the completed contract method. The partnership distributed the cash to its partners. The issue was whether the partnership's duty under the contract caused the advance payments to constitute Code section 752 liabilities. If so, the cash distributions to the partners would not have exceeded the basis of the partners' interests.

The IRS refused to accord Code section 752 liability treatment to the construction contract, stating:

> "The progress payments ... received by the partnership and reflected as 'deferred income' on the books of the partnership ... represent amounts received on account of services performed on the contract not yet reported as gross income. This amount together with the right of the partnership to an additional payment ... for work performed constitute 'unrealized receivables' within the meaning of Section 751(c) of the Code, and the progress payments are not a 'liability' as referred to in Section 752 which increases the adjusted basis of the partnership interests of the partners. The income resulting from performance of the contract will affect the basis of the partnership interests of the partners, as provided in Section 705(a), when such income is recognized for Federal income tax purposes.
>
> Accordingly, no increase in the adjusted basis of the partnership interests ... is made as a result of the receipt by the partnership of the advance payments within the meaning of Section 752(a) of the Code."

Therefore, the IRS disallowed a Code section 752 basis increase, despite the resulting disparity between the inside basis of the partnership's assets and the outside basis of the partnership interests. A partnership which enters into a short options position is similar to the partnership that received advance payments in Rev. Rul. 73-301. Both contractual duties are uncertain in amount in that the partnerships cannot precisely calculate the cost of fulfilling such potential duties. Both partnerships are reporting their taxable income under specialized methods of accounting which permit deferral of taxable income until completion of performance under an executory contract. Accordingly, like the partners in Rev. Rul. 73-301, the Partners here should receive no Code section 752 basis adjustment as a result of the potential contractual duty assumed by the short option position, and the assumption of the short option position by the Partnership should not be treated as the assumption of a liability.

A case involving the issue of whether a short sale of securities constitutes a liability for purposes of Code section 752 was filed with the Tax Court in March 1996 and is currently pending, Fulcrum Financial Partners v. Commissioner, Docket No. 3944-96. In such case, the Petitioner challenged a determination that it had overstated its 1991 capital gains by failing to include a short sale position as a liability for purposes of determining the basis used in computing the gain. The case was set for trial on May 4, 1998, in Atlanta, Georgia; however the parties agreed to submit stipulated facts, rather than have a trial. Such stipulation was filed with the Tax Court on November 27, 1998. On December 18, 1998, a briefing schedule was set by the Tax Court for the parties to submit cross motions for summary judgment and responses to each others' memorandum in support of such motions in which the parties will argue the law in the case. While two of the four scheduled briefs have been filed, all proceedings in the case, including the other filings which were originally due by August 30, 1999, have been stayed. It is unknown at this time when or how the Tax Court will rule.

A case with a similar issue, Salina Partnership L.P. v. Commissioner, Docket No. 25084-96, was filed with the Tax Court on November 21, 1996. The case is currently set for trial in December, 1999. It is unknown at this time when the trial will be held and how the Tax Court will rule.

*Revenue Ruling 95-26*

On March [illegible], 1995, the IRS released Revenue Ruling 95-26, 1995-1 C.B. 798, relating to the [illegible] partnership liabilities. In that ruling the IRS concluded with remarkable brevity that a short sale of securities created a partnership liability under Code section 752. The IRS did not engage in any extensive (or even simplistic) analysis, and stated as its sole rationale that

- It is inconsistent with Helmer and Rev. Rul. 73-301. In both the case and the ruling, the cash received increased the basis of a partnership's assets, yet that did not cause a "liability" to come into existence for purposes of section 752.

- It is not supported by Rev. Rul. 88-77, 1987-2 C.B. 129, the only authority cited explicitly in Rev. Rul. 95-26 and one of the two authorities cited in Rev. Rul 95-45. This ruling, revoking a contrary ruling, holds that accrued but unpaid expenses and accounts payable are not liabilities of a cash basis partnership for purposes of section 752. The Service's stated rationale was that an obligation which does *not* give rise to basis is not a liability. The two subsequent rulings [illegible] characterize Rev. Rul. 88-77 by stating that it stands for the proposition that an obligation which does not give rise to basis is a liability. But, the latter proposition [illegible] does not at all follow logically from the former [illegible] inverse. Accordingly, Rev. Rul 88-77 is no authority for the two later rulings.

- It results in a clearly wrong answer in other contexts. For example, assume that a taxpayer borrows $100x, buys an asset, pays down a portion of the liability with other funds, and then contributes the [illegible] a corporation subject to the liability. Under section 358(d)[3], the taxpayer's [illegible] corporation's stock is his original $100x basis, reduced by the liability. [illegible] the Service's argument, the basis would be reduced by the original full [illegible] the liability, resulting in a zero basis in the corporation's stock.

*Cf.* Regs. § 1.356-3(b) (right to acquire stock that is treated as security for purposes of sections 354 [illegible] 355 has no [illegible] amount [illegible]

---

[3] [illegible] the [illegible] "liability" could mean different things under different Internal Revenue Code sections, in practice [illegible] Congress and the Service have indicated that the terms as used in sections 357, 358 and 752 are synonymous. [illegible] act, Congress amended section 704(c) to, *inter alia*, require that accounts payable contributed to [illegible] to the contributing partner and not be treated as a liability of the partnership under section 752. The conference [illegible] report states that this treatment was intended to be "parallel to the [1978] amendment to section 357(c)," [illegible] excludes deductible liabilities from the definition of "liability." H.R. Conf. Rep. No. [illegible]61, 98th Cong. 2d Sess. 1984-3 (vol 2) C.B. 110-11. In Rev. Rul. 88-77, *supra*, the Service noted that "The legislative history accompanying the amendment to section 704(c) made b the Tax Reform Act of 1984 *explicitly* [illegible] the conclusion reached in Revenue Ruling 60-345 in favor of an interpretation of section 752 that is consistent with section 357(c)." And in Rev. Rul. 95-74, 1995-2 C.B. 36, in support of its ruling that contingent environmental liabilities were not "liabilities" for purposes of sections 357 and 358, the Service cited Rev. Rul. 88-77, which addresses the [illegible] liabilities under section 752.

Also, since sections 357 and 358 work in tandem, it is generally assumed that the terms "liability" in both sections are synonymous. See Rev. Rul. 95-74, 1995-2 C.B. 36, "Due to the parallel constructions and interrelated function and mechanics of §§357 and 358, liabilities that are not included in the determination under §357(c)(1) also are not included in §358 determination of transferor's basis in the stock received in the §351 exchange." [Citing] Focht v. Commissioner, 68 T.C. 223 (1977), acq. 1980-2 C.B. 1; S. Rep. No. 1263, 95th Cong., 2d Sess. 183-85 (1978), 1978-3 C.B. 481-83.

1. As previously discussed, Helmer stands squarely for the proposition that an option position is not a liability. By contrast, *no case* explicitly holds that a short sale obligation is not a liability, (although LaRue holds that functionally equivalent "back office liabilities" are not Section 752 liabilities under an open transaction theory). The rulings do not cite or make any attempt to distinguish Helmer.

2 The rulings set out a two part test for a "liability" to exist": (1) there must be an "obligation" and (2) incurring the liability must result in an [illegible] in the basis of an asset. The second test alone is clearly not sufficient: [illegible] an issuance of stock would give rise to a "liability." Assum[illegible]owever, that [illegible] of an option (or a short sale) meets the second part of the test. However, [illegible] contractual duty under a short option posi[illegible] clearly [illegible] the first part of the test because, unlike the short sale where there [illegible] current obligation to deliver the same replacement securities (even if the [illegible] value of that obligation will change with the price of the item sold short), [illegible] of an option incurs no contractual duty until and unless the option is exe[illegible] Since there is no current obligation, there is no liability.[4]

3 The rulings state that the amount [illegible] is the amount of cash received for the short sale, *because* that is [illegible] amount [illegible] the inside basis of the partnership's assets. As explained below, this [illegible] is suspect. Nevertheless, in the case of a short sale the same result is also consistent with a different rationale: the amount of liability is the cash received because that is the original amount of the obligation, *i.e.*, the amount that the obligee could demand from the obligor were the "obligation" [illegible] its date of issuance. It is *not* [illegible]cessarily the [illegible] that the [illegible] might have to pay the obligee to free [illegible]self of [illegible]on.[5] In the case of a short sale, this amount is the original [illegible] purchasing [illegible] securities. By contrast, in the case of an out-of-[illegible] short op[illegible] amount that the obligee could demand were the option [illegible] that date [illegible]. Thus, even assuming that both the short sale and the

---

[4] Treating the short option as a liability when—and if—it expires in the money should result in a wash [illegible] obligation would [illegible] as soon as it comes into existence.

[5] *Accord*, [illegible]. Rul. 95-45, where the short seller received $1000x in sale proceeds and contributed [illegible] section 351 [illegible] when replacement securities would cost $800x. The transferee assumed the transferor's [illegible] securities. The Service ruled that the assumed obligation was a "liability" in the amount of $[illegible]y, disregarding the OID rules (which are an overlay on the common tax law of debt obligations and in any event apply only after a *de minimis* threshold), the amount of a debt obligation is set when the obligation is issued: it does not change with fluctuations in interest rates or the issuer's credit rating, even though these changes would affect the value of the debt obligation and therefore the amount that an economically rational issuer would pay the holder to discharge the debt. Also, while discharge of indebtedness income is measured by the original issue price and not by the face amount, for numerous other tax purposes the amount of a debt obligation is its face amount, i.e., the amount that the holder would receive at maturity. *See, e.g.*, section 144(a)(1)(D), 453A(c)(4), 691(a)(5)(B)

short option create "liabilities," the amount of the option liability is, unlike the short sale liability, zero.

*Conclusion*

The relevant authorities consistently oppose treating a short option position as a partnership liability for purposes of Code section 752. The Helmer case, a Tax Court memorandum decision which is directly on point, unequivocally holds that a short option position is not a liability for purposes of code Section 752. The authorities for this treatment is substantial, and The Partnership should prevail on this issue if challenged by the IRS.

draft

# EXHIBIT G32

The Drucker Group

Charlotte

PLEASE DELIVER THE FOLLOWING PAGE(S) TO:

NAME: Ray Knight

COMPANY: Exy

FAX NO.: 704-331-1853

FROM: Jerry Zucker

DATE: 11-12-99

I am sending from a Xerox 7020 fax machine. IT IS AUTOMATIC. If you are not receiving the pages, or have any problem during transmission or receiving, please contact ______________ at (843)744-5174

Number of Pages (including cover): 5

CONFIDENTIALITY CAUTION:

This message is intended only for the use of the individual or entity to which it is addressed and contains information that is privileged and confidential. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address at our cost.

P.O. Box 5200, North Charleston, SC 29405 • (843) 744-5174 • Fax (843) 747-4092

TRANSMISSION REPORT

THIS DOCUMENT (REDUCED SAMPLE ABOVE) WAS SENT

** COUNT **
# 5

*** SEND ***

| NO | REMOTE STATION I. D. | START TIME | DURATION | #PAGES | COMMENT |
|---|---|---|---|---|---|
| 1 | 17043311853 | 11-12-99 5:24 | 3'11" | 5 | |
| | | TOTAL | 0:03'11" | 5 | |

XEROX TELECOPIER 7020

GOVERNMENT EXHIBIT 32

PENGAD 800-631-6989

EXHIBIT 2257 Crosby 7-13-07 TB

PENGAD 800-631-6989

The InterTech Group®

Jerry Zucker
Chairman, President and
Chief Executive Officer

MEMO

TO: Ray Knight
E & Y

FROM: Jerry Zucker

DATE: November 12, 1999

Attached is an executed copy of the engagement letter. I have signed the letter and returning, subject to you clarifying what information from me and/or the partnership you are relying upon, and also confirming to me that I will, in fact, receive two legal opinion letters from reputable firm(s).

Additionally, I want you to confirm my understanding of Paragraph 3 [reading of the paragraph suggests that my maximum exposure for a $100 million loss is $8 1/2 million. If the actual cost is different from this amount, I would appreciate you informing me immediately.

Further, the document does not refer specifically to the $100 million loss. I assume this is, in fact, the number to be allocated 98/2, as per our discussion.

Jerry
JZ/emp

cc: Jim Boyd

(843) 744-5174 • Fax (843) 747-4092
4838 Jenkins Avenue • P.O. Box 5205 • North Charleston, SC 29405

ERNST & YOUNG LLP

101 Independence Center
Suite 1100
101 North Tryon Street
Charlotte, North Carolina 28246

Phone: 704 372 6300

*PERSONAL AND CONFIDENTIAL*

November 11, 1999

Mr. Jerry Zucker
16 Buckingham Drive
Charleston, South Carolina 29407

Dear Jerry:

This letter will confirm our engagement to provide tax advice to you concerning the implementation of the COBRA strategy we have discussed with you. This strategy will involve the creation of a Partnership by you and third parties. Our work will include assisting in the tax planning aspects of this transaction, working with counsel and other third parties in reviewing the tax aspects of the entities and other consulting services as required. If necessary, we also agree to represent you before the Internal Revenue Service with respect to tax issues associated with this strategy up to and including the appellate level. If you would like us to represent you with regard to other tax issues in the event of an audit, we would charge our normal fees for time and expenses in connection with such representation.

In this engagement, we will be using information provided by you and the Partnership and will be relying upon you and the Partnership for the accuracy and completeness of this information. We will maintain the information provided to us in confidence within our firm and will not disclose to others such confidential information except with your consent or as required by law or permitted under professional standards.

Our fee for providing the professional services referred to above will be $1.5 million on a total investment in the Partnership by you and other individual(s) in the amount of $7.0 million. Investment in partnership equals Cost of long option contract equal to 5% of desired loss, plus cash equal to 2% of the desired loss. We will invoice you for our fee after the foreign currency option contracts and required amount of cash have been contributed to the Partnership. In the event you later decide not to implement the technique described above, our fee will be paid by you and will be limited to our time incurred from the date this letter is signed up to the date we receive written notification of your decision not to proceed, and will be billed at our standard hourly rates. In addition to bills for our hourly fees, an administrative expense charge of 8.5% of our standard fees will be billed at the same time.

All advice and other services we provide pursuant to this arrangement are intended to be solely for your benefit and that of the Partnership and are not for the benefit of anyone else. Accordingly, our advice may not be relied upon by any other person or persons, used in connection with any other transaction, or used for any other purpose without our prior written consent. Furthermore, the content of any oral or written communication made by us in connection with this engagement shall not be communicated to the public or otherwise publicized in any manner without our prior written consent.

Mr. Jerry Zucker

Page 2
November 11, 1999

Ernst & Young LLP will not be liable for any claim for damages arising out of or in connection with any tax services provided to you in an amount greater than the amount of fees actually paid to Ernst & Young LLP with respect to the services directly relating to and forming the basis of such claim.

Any controversy or claim arising out of or relating to tax and tax-related services now or hereafter provided by us to you (including any such matter involving any parent, subsidiary, affiliate, successor in interest, or agent of Ernst & Young LLP) shall be submitted first to voluntary mediation, and if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures set forth in the Attachment to this letter. Judgment on any arbitration award may be entered in any court having proper jurisdiction.

Except as expressly provided herein, this engagement letter does not modify the terms or provisions of any engagement letter for other professional services which were agreed to prior to the date noted below.

Information relating to federal tax advice we provide to you, including communications between us and material we create in the course of providing that advice, may be privileged and protected from disclosure to the Internal Revenue Service. Should the Internal Revenue Service seek disclosure from you or us of written or oral communications relating to such advice, we will discuss with you whether and how you assert, or waive, the privilege.

If any portion of this letter is held to be void, invalid, or otherwise unenforceable, in whole or part, the remaining portions of this letter shall remain in effect.

If these arrangements are acceptable, please sign one copy of this letter and return it to me in the enclosed self-addressed envelope. If you have any questions concerning our engagement, please call me at 704/331-1933. We appreciate the opportunity to work with you.

Very truly yours,

Ray Knight/DF

Ray A. Knight
Principal

Attachment

100 million dollar loss to be allocated @ 98/2 between the parties.

Agreed to by:

Name: JZ
Client

Date: 11/12/98

Subject to clarification of second paragraph on first page JZ

## Dispute Resolution Procedures

The following procedures shall be used to resolve any controversy or claim ("dispute") as provided in our engagement letter of July 23, 1998. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

*Mediation*

A dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by the American Arbitration Association ("AAA") or JAMS/Endispute at the request of a party. Any mediator so designated must be acceptable to all parties.

The mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

The mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings.

Each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties.

*Arbitration*

If a dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. The arbitration will be conducted in accordance with the procedures in this document and the Arbitration Rules for Professional Accounting and Related Services Disputes of the AAA as in effect on the date of the engagement letter ("AAA Rules"). In the event of a conflict, the provisions of this document will control.

The arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the AAA Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures.

The arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or in any other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.

No discovery will be permitted in connection with the arbitration unless it is expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests.

The result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.

# ERNST & YOUNG LLP

*FROM THOUGHT TO FINISH.™*

## Tax Department
## Charlotte Office

101 Independence Center, Suite 1100
101 North Tryon Street, Charlotte, NC 28246

*Telephone: (704) 372-6300* *Fax: (704) 331-1853*

## FAX TRANSMISSION COVER PAGE

**To:** Jerry Zucker **Date:** 11-12-99

**Fax #:** 843-747-4092 **Time:** 4:30 PM

**Location:**

**From:** Roy Knight **Number of Pages: (including cover sheet)** 4

**Telephone No.:**

**Message:**

**CONFIDENTIALITY NOTICE**

The information contained in this facsimile message may be privileged and confidential and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to the above address via the U.S. Postal Service. Thank you. Ernst & Young LLP

# EXHIBIT G33

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NO. 05-231-T

---

JZ BUCKINGHAM INVESTMENTS, LLC, as TAX MATTERS PARTNERS of JBJZ PARTNERS, a SOUTH CAROLINA GENERAL PARTNERSHIP,

Plaintiff,

vs.

UNITED STATES OF AMERICA,

Defendant.

VIDEO DEPOSITION OF

JERRY ZUCKER

Friday, June 8, 2007

9:00 AM to 5:00 PM

North Charleston, South Carolina

Reported by: Jane G. LaPorte

PENGAD 800-631-6989 GOVERNMENT EXHIBIT 33

PENGAD 800-631-6989 GOVERNMENT EXHIBIT 2373

Page 98

So, it didn't even cross my mind as to
that being an issue.
MR. CROUCH: Let him ask his question.
Q. How did you come up with the name of the
LLC that you used, JZ Buckingham?
A. My home address. My home address is, you
know, Buckingham, so just --
Q. Was that your idea to use that name?
A. Yeah, it was.
Q. Did you anticipate that there was going
to be any potential exposure, credit risk, with
respect to JZ Buckingham?
MR. CROUCH: Are you talking about the
LLC?
MR. LINDQUIST: LLC.
MR. CROUCH: Okay.
A. Credit risk always exists in all
transactions.
And, you know, the terms of the
exchange -- what's being guaranteed and what's not
being granted and so forth, had early on not been
done.
Q. Did Mr. Knight discuss with you that the
plan was to have these LLCs engage in the digital
option transactions?

Page 99

A. The, you know, at the LLC level, I can't
-- I can't tell you specifically what that
recollection is.
He went through the overall corporate
structure, the concept of how it worked and, you
know, the thing that stuck in my mind was clearly,
you know, the business purpose for setting up
corporate entities is, you know, creating and
contributing multiple assets, of course, as
diversity, diversifying the portfolio.
And the standard business reasons of
creating the protection in terms of risk exposure of
having any kind of a corporate structure in between
you, as an individual, and any transaction.
So, the basic business fundamentals of
doing those things didn't cross my mind.
The think I really zoned in was this idea
of separateness.
And he had, at the time, was talking
about a real estate transaction and how the
service -- it had already been ruled that the
liability was not considered part of the basis until
it had matured.
And he had described some sort of real
estate transaction.

Page 100

And as I recall, it was something from
the 1970s, but --
Q. Was that a critical feature of the
proposed structure that Mr. Knight was discussing
with you?
A. Not in terms of the earning capacity, but
in terms of retaining profits and/or producing the
structure that he wanted to maximize the tax
benefits, yeah. That would have been an essential
element of the structure.
Q. When you say "retaining the tax
benefits," do you mean to generate the tax loss?
A. Well, let's suppose for a moment -- and
bear with me and -- let's suppose that I hit
perfectly the sweet spot in everything, you know,
regardless of any descriptions of probabilities that
we hit the sweet spot, and we made 90 million
bucks -- just, and I'm being rather arbitrary --
then this was a method to have provided me with a
net $40 million. Okay?
I'm just being arbitrary, just to give
you an idea.
Then I would have only had to pay taxes
on $40 million rather than having to pay taxes on
$90 million.

Page 101

And I know you're presumptive that, boy,
the possibility of hitting that sweet spot is such
that, you know, that's not what happened -- you
actually generated loss.
But, you see, from my perspective, I
looked at it both ways.
I had an opportunity to make a tidy
profit; but at the worst case scenario, that my
money still wasn't wasted because I would still have
a loss to offset revenue.
So, I saw it as a win/win for myself.
Even with the down side, my down side was still a
tax savings.
MR. CROUCH: You answered the question.
Q. What was the business purpose of
contributing the options from the LLC to the
partnership?
A. The business purpose of contributing --
the individual LLCs to the partnership?
Q. Yes.
A. Obviously, you know, any time -- it's
true of all businesses where you have different
partners contributing that you have a pooling; you
have a pooling of assets, you have a pooling of
exhibits, you combine both the knowledge base, as

but --

MR. CROUCH: I think you answered his question.

MR. LINDQUIST: No further questions.

MR. CROUCH: No questions.

MR. LINDQUIST: Thank you for your time.

VIDEOGRAPHER: All right. This concludes the videotape deposition of Jerry Zucker.

The time is approximately 4:55 PM. We are now off the record.

(OFF THE RECORD.)



WITNESS SIGNATURE

I, the undersigned witness, do hereby swear under penalty of perjury that I have read the foregoing transcription and made the following corrections, and signed my signature before a Notary Public as follows:

PAGE LINE CORRECTION

______________________________

WITNESS' SIGNATURE

SIGNED BEFORE ME ______________

ON THIS ________ DAY OF ________, ______ MY

COMMISSION EXPIRES: ______________



REPORTER'S CERTIFICATE

I, Jane G. LaPorte, Court Reporter and Notary Public in and for the States of North Carolina and South Carolina, do hereby certify that the above and foregoing is a true and complete transcription of my stenographic notes, taken and transcribed by me.

Dated this 20th day of June, 2007.

______________________________

JANE G. LaPORTE

# EXHIBIT G34

ERNST & YOUNG LLP

101 N. Tryon Street, Suite 1100
Charlotte, NC 28246
Telephone (704) 372-6300
Fax: (704) 335-4204

**FAX TRANSMISSION**
**CONFIDENTIAL**

DATE: 11-13-99

TO: Jenkins & Gilchrist
Attn: Paul Daugerdas, Esq.
FAX (312) 425-3909

FROM: Ray Knight
Ernst & Young Charlotte
Phone: (704) 331-1933
Fax: 704-335-4204

NUMBER OF PAGES: 7 (Includes cover page)

COMMENTS:

Thomas Durden \ Partnership #1
Gary Snook /
Neal Hunter \ Partnership #2
Richard Mann / (Partners may be added on Mon (11/15))
James Boyd \ Partnership #3
Terry Zucker / Relative amounts may change.
Please contact me at (704) 331-1933.

The information contained in this facsimile message may be privileged and confidential and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to the above address via the U.S. Postal Service. Thank you. Ernst & Young LLP.

Please contact ______________________ if there are errors in receiving this fax.

GOVERNMENT EXHIBIT 34

DEPOSITION EXHIBIT
Witness: R. Hoggins
Number: 140 Rptr: Eckstone
Date: ________ ☐ Deft ☐ Plff

JG-CL0241055

GOVERNMENT EXHIBIT 140

# Jenkens & Gilchrist

an Illinois professional corporation

## COBRA CLIENT INFORMATION QUESTIONNAIRE

***Please complete separate copy for each partner and fax to J&G at 312-425-3909, Attn: Paul Daugerdas, Esq.***

CLIENT NAME: Thomas F. Darden

SPOUSE: JOSEPHINE R. DARDEN

ADDRESS: 702 Oberlin Road.
Suite 150
Raleigh, NC 27605

TFO Oberlin Inv LLC
GSTD Partners
GSTD Investors Inc

PHONE NUMBER: (Home) (919) 782-9523
(Office) (919) 743-2506

FAX NUMBER: (Home)
(Office) (919) 743-2501

E-MAIL ADDRESS: tdarden@cherokee-llc.com

SOCIAL SECURITY NUMBER (CLIENT): 245 76 3361

SOCIAL SECURITY NUMBER (SPOUSE): 245 82 1582 # may change

AMOUNT OF TRANSACTION: $ 4M (long term capital gain)

Ordinary Income $

ST Capital Gain $

ROBERT GILLES
GLORIA SHEPPARD

BANK REFERENCE: WACHOVIA BANK (CAMERON VILLAGE)

BRANCH (CITY, STATE): RALEIGH, NC

APPROX. ANNUAL HOUSEHOLD INCOME: $ 400,000+

APPROX. NET WORTH (EXCLUDING RESIDENCE): $ 20M+

JG-CL0241056

11/13/99 20:48 FAX ⊠003

J&G Client Information Questionnaire.dot Page 1

# Jenkens & Gilchrist

an Illinois professional corporation

## COBRA CLIENT INFORMATION QUESTIONNAIRE

*Please complete seperate copy for each partner and fax to J&G at 312-425-3909, Attn: Paul Daugerdaus, Esq.*

CLIENT NAME: GARRY SNOOK

SPOUSE: SHARON SNOOK

ADDRESS: 220 OWL CREEK ROAD
ASPEN, COLORADO 81611

PHONE NUMBER: (Home) (970) 544 0782
(Office) SAME

FAX NUMBER: (Home) (970) 544-0870
(Office) SAME

E-MAIL ADDRESS: SNOOK@COLORADO.NET

SOCIAL SECURITY NUMBER (CLIENT): 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

SOCIAL SECURITY NUMBER (SPOUSE): 241 74 3193

AMOUNT OF TRANSACTION: $ 21,000,000 LTCG

Ordinary Income $—— 0

ST Capital Gain $—— 0

BANK REFERENCE: BANK of America

BRANCH (CITY, STATE): CHAPEL HILL, NORTH CAROLINA

APPROX. ANNUAL HOUSEHOLD INCOME: $ 1,000,000

APPROX. NET WORTH (EXCLUDING RESIDENCE): $ 50,000,000

GS Owl Creek
Owl LLC
GSTD Partners
GSTD Investment
GSTD Dev

JG-CL0241041

# Jenkens & Gilchrist

an Illinois professional corporation

## COBRA CLIENT INFORMATION QUESTIONNAIRE

*Please complete separate copy for each partner and fax to J&G at 312-425-3909, Attn: Paul Daugerdaus, Esq.*

CLIENT NAME: Fred "Neal" Hunter

SPOUSE: —

ADDRESS: 3515 Courtland Road
Durham, NC
27707

FNH Courtland Inv LLC
FNRH Partners
FNRH Investors Inc.

PHONE NUMBER: (Home) (919) 489-6734
(Office) (919) 313-5300

FAX NUMBER: (Home) —
(Office) (919) 313-5302

E-MAIL ADDRESS: Neal_Hunter@cree.com

SOCIAL SECURITY NUMBER (CLIENT): 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

45%

SOCIAL SECURITY NUMBER (SPOUSE): —

AMOUNT OF TRANSACTION: $ $70 M

Ordinary Income $ $10 M

ST Capital Gain $

BANK REFERENCE: CCB

BRANCH (CITY, STATE): RTP Durham, NC - Highway 54

APPROX. ANNUAL HOUSEHOLD INCOME: $ $1 M +

APPROX. NET WORTH (EXCLUDING RESIDENCE): $ $30 M

11/13/99 20:47 FAX 003

J&G Client Information Questionnaire.dot Page 1

# Jenkens & Gilchrist

an Illinois professional corporation

## COBRA CLIENT INFORMATION QUESTIONNAIRE

*Please complete separate copy for each partner and fax to J&G at 312-425-3909, Attn: Paul Daugerdaus, Esq.*

CLIENT NAME: RICHARD W. MANN

SPOUSE: DONNA D. MANN

ADDRESS: 2105 HIGH MEADOWS ROAD
GREENSBORO, NC
27455

PHONE NUMBER: (Home) (336)644-9977
(Office) (336)333-2050 SID -0240

FAX NUMBER: (Home) —
(Office) (336)-333-2142

E-MAIL ADDRESS: richard_mann@longmiller.com

SOCIAL SECURITY NUMBER (CLIENT): 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

SOCIAL SECURITY NUMBER (SPOUSE): 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

AMOUNT OF TRANSACTION: $ 12,000,000

Ordinary Income $ 12,000,000

ST Capital Gain $ 0

BANK REFERENCE: BANK OF AMERICA (JEANNETTE CRIDER: PERSONAL BANKER)

BRANCH (CITY, STATE): GREENSBORO, NORTH CAROLINA

APPROX. ANNUAL HOUSEHOLD INCOME: $ 4,000,000

APPROX. NET WORTH (EXCLUDING RESIDENCE): $ 10,000,000

RWM High Meadows
DMU LLC
FNRH Partners
FNRH Investors Inc.

(59)

JG-CL0155323

11/13/99 20:47 FAX 005

J&G Client Information Questionnaire.dot Page 1

# Jenkens & Gilchrist

an Illinois professional corporation

## COBRA CLIENT INFORMATION QUESTIONNAIRE

*Please complete separate copy for each partner and fax to J&G at 312-425-3909, Attn: Paul Daugerdaus, Esq.*

CLIENT NAME: James G. Boyd

SPOUSE: Idezel ("Sam") Boyd

ADDRESS: 3520 Bohicket Road
Johns Island, SC 29455

JGB Bohicket Inv. LLC
JBJ2 Funds
JBJ2 Investors Inc

PHONE NUMBER: (Home) (843) 768-9455
(Office) (843) 744-5174

FAX NUMBER: (Home) (843) 768-9430
(Office) (843) 747-4092 843-554-8508 10

E-MAIL ADDRESS: ___

SOCIAL SECURITY NUMBER (CLIENT): 047 40 4906

SOCIAL SECURITY NUMBER (SPOUSE): 249 68 0008

AMOUNT OF TRANSACTION: $ 45 ~~4.7~~ 40% 3,000,000 67.35 $6,357,000 Long Term capital gain

Ordinary Income $ ~~642,000~~ 60% 3205 3,000,000

ST Capital Gain $ ___

BANK REFERENCE: Chase Manhattan

BRANCH (CITY, STATE): New York

APPROX. ANNUAL HOUSEHOLD INCOME: $ 1 Million +

APPROX. NET WORTH (EXCLUDING RESIDENCE): $ 50 Million +

JG-CL0148038

11/11/99 20:47 FAX 007

J&G Client Information Questionnaire.doc Page 1

# Jenkens & Gilchrist

an Illinois professional corporation

## COBRA CLIENT INFORMATION QUESTIONNAIRE

*Please complete separate copy for each partner and fax to J&G at 312-425-3909, Attn: Paul Daugerdaus, Esq.*

CLIENT NAME: Jerry Zucker

SPOUSE: Anita G. Zucker

ADDRESS: 16 Buckingham Drive
Charleston, SC 29401

PHONE NUMBER: (Home) (843) 571-2538
(Office) (843) 744-5174

FAX NUMBER: (Home) (843) 571-4647
(Office) (843) 747-4092 843-556-8508

E-MAIL ADDRESS: ——

SOCIAL SECURITY NUMBER (CLIENT): 267 84 9834

SOCIAL SECURITY NUMBER (SPOUSE): 265 04 4940

AMOUNT OF TRANSACTION: $ $45 million — 65/85 million (long term capital gain) 67.19 18 mill.

Ordinary Income $ 32 million

ST Capital Gain $ 21 million

BANK REFERENCE: Chase Manhattan (David Bradley) (212) 270 5616

BRANCH (CITY, STATE): New York

APPROX. ANNUAL HOUSEHOLD INCOME: $ $10 m +

APPROX. NET WORTH (EXCLUDING RESIDENCE): $ $50 m +

JZ Buckingham Inv. LLC
JBJZ Dimbulas Inc
JBJZ Azurus

90

JG-CL0146037

# EXHIBIT G35

**ERNST & YOUNG LLP**

101 Independence Center
Suite 1100
101 North Tryon Street
Charlotte, North Carolina 28246

Phone 704 372 6300

Jim Boyd

November 15, 1999

Jim,
In view of the fact that I am agreeing to the enclosed on behalf of both of us 90/10 please review all approve or comment, before asking Charlotte to return 1 copy and retain one original in file. Please initial originals.
Tx
JZ

To: Jerry Zucker
(Fax #: 843-747-4092)

From: Ray Knight RK

Attached is a copy of the modified engagement letter. Two legal opinions from reputable law firms will be provided.

The equity contribution and fee structure are as follows:

| | | |
|---|---|---|
| Cost of long option | 5% | At-risk |
| Cash injection to partnership | 2% | Not at-risk |
| E&Y fee | 1½% | |
| Law firms and bank (billed separately from E&Y) | 3% | |

The amount of the loss is $50 million (60% ordinary loss and 40% long term capital loss). The allocation of partnership interests is 90/10 (i.e., 10% is allocated to Jim).

GOVERNMENT EXHIBIT 35

GOVERNMENT EXHIBIT 1104

Ernst & Young LLP is a member of Ernst & Young International, Ltd.





Produced by Plaintiff to United States on 8/31/2005

ERNST & YOUNG LLP

101 Independence Center
Suite 1100
101 North Tryon Street
Charlotte, North Carolina 28246
Phone: 704 372 6300

*Tax Advisor/Client Communication*
*Privileged And Confidential*

November 15, 1999

Mr. Jerry Zucker
16 Buckingham Drive
Charleston, South Carolina 29407

Dear Jerry:

This letter will confirm our engagement to provide tax advice to you concerning the implementation of the COBRA strategy we have discussed with you. This strategy will involve the creation of a Partnership by you and third parties. Our work will include assisting in the tax planning aspects of this transaction, working with counsel and other third parties in reviewing the tax aspects of the entities and other consulting services as required. If necessary, we also agree to represent you before the Internal Revenue Service with respect to tax issues associated with this strategy up to and including the appellate level. If you would like us to represent you with regard to other tax issues in the event of an audit, we would charge our normal fees for time and expenses in connection with such representation.

In this engagement, we will be using information provided by you and the Partnership and will be relying upon you and the Partnership for the accuracy and completeness of this information. We will maintain the information provided to us in confidence within our firm and will not disclose to others such confidential information except with your consent or as required by law or permitted under professional standards.

Our fee for providing the professional services referred to above will be $675,000 on a total investment in the Partnership by you and other individual(s) in the amount of $3.5 million. Investment in partnership equals Cost of long option contract equal to 5% of desired loss, plus cash equal to 2% of the desired loss. We will invoice you for our fee after the foreign currency option contracts and required amount of cash have been contributed to the Partnership. In the event you later decide not to implement the technique described above, our fee will be paid by you and will be limited to our time incurred from the date this letter is signed up to the date we receive written notification of your decision not to proceed, and will be billed at our standard hourly rates. In addition to bills for our hourly fees, an administrative expense charge of 8.5% of our standard fees will be billed at the same time.

All advice and other services we provide pursuant to this arrangement are intended to be solely for your benefit and that of the Partnership and are not for the benefit of anyone else. Accordingly, our advice may not be relied upon by any other person or persons, used in connection with any other transaction, or used for any other purpose without our prior written consent. Furthermore, the content of any oral or written communication made by us in connection with this engagement shall not be communicated to the public or otherwise publicized in any manner without our prior written consent.





Produced by Plaintiff to United States on 8/31/2005

Mr. Jerry Zucker

Ernst & Young LLP will not be liable for any claim for damages arising out of or in connection with any tax services provided to you in an amount greater than the amount of fees actually paid to Ernst & Young LLP with respect to the services directly relating to and forming the basis of such claim.

Any controversy or claim arising out of or relating to tax and tax-related services now or hereafter provided by us to you (including any such matter involving any parent, subsidiary, affiliate, successor in interest, or agent of Ernst & Young LLP) shall be submitted first to voluntary mediation, and if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures set forth in the Attachment to this letter. Judgment on any arbitration award may be entered in any court having proper jurisdiction.

Except as expressly provided herein, this engagement letter does not modify the terms or provisions of any engagement letter for other professional services which were agreed to prior to the date noted below.

Information relating to federal tax advice we provide to you, including communications between us and material we create in the course of providing that advice, may be privileged and protected from disclosure to the Internal Revenue Service. Should the Internal Revenue Service seek disclosure from you or us of written or oral communications relating to such advice, we will discuss with you whether and how you assert, or waive, the privilege.

If any portion of this letter is held to be void, invalid, or otherwise unenforceable, in whole or part, the remaining portions of this letter shall remain in effect.

* * * * * * * * * * *

If these arrangements are acceptable, please sign one copy of this letter and return it to me in the enclosed self-addressed envelope. If you have any questions concerning our engagement, please call Ray Knight at 704-331-1933. We appreciate the opportunity to work with you.

Very truly yours,

Ernst + Young LLP

Agreed to by:

Name: ______________________

Date: ______________________



Produced by Plaintiff to United States on 8/31/2005

Attachment I

# Dispute Resolution Procedures

The following procedures shall be used to resolve any controversy or claim ("dispute") as provided in our engagement letter of November 15, 1999. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

Mediation

A dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by the American Arbitration Association ("AAA") or JAMS/Endispute at the request of a party. Any mediator so designated must be acceptable to all parties.

The mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

The mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings.

Each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties.

Arbitration

If a dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. The arbitration will be conducted in accordance with the procedures in this document and the Arbitration Rules for Professional Accounting and Related Services Disputes of the AAA as in effect on the date of the engagement letter ("AAA Rules"). In the event of a conflict, the provisions of this document will control.

The arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the AAA Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures.



Produced by Plaintiff to United States on 8/31/2005

The arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or in any other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.

No discovery will be permitted in connection with the arbitration unless it is expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests.

The result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.

**ERNST & YOUNG LLP**

101 Independence Center
Suite 1100
101 North Tryon Street
Charlotte, North Carolina 28246
Phone 704 372 6300

*Tax Advisor/Client Communication*
*Privileged And Confidential*

November 15, 1999

Mr. James G. Boyd
3520 Bohicket Road
Johns Island, South Carolina 29455

Dear Jim:

This letter will confirm our engagement to provide tax advice to you concerning the implementation of the COBRA strategy we have discussed with you. This strategy will involve the creation of a Partnership by you and third parties. Our work will include assisting in the tax planning aspects of this transaction, working with counsel and other third parties in reviewing the tax aspects of the entities and other consulting services as required. If necessary, we also agree to represent you before the Internal Revenue Service with respect to tax issues associated with this strategy up to and including the appellate level. If you would like us to represent you with regard to other tax issues in the event of an audit, we would charge our normal fees for time and expenses in connection with such representation.

In this engagement, we will be using information provided by you and the Partnership and will be relying upon you and the Partnership for the accuracy and completeness of this information. We will maintain the information provided to us in confidence within our firm and will not disclose to others such confidential information except with your consent or as required by law or permitted under professional standards.

Our fee for providing the professional services referred to above will be $75,000 on a total investment in the Partnership by you and other individual(s) in the amount of $3.5 million. Investment in partnership equals Cost of long option contract equal to 5% of desired loss, plus cash equal to 2% of the desired loss. We will invoice you for our fee after the foreign currency option contracts and required amount of cash have been contributed to the Partnership. In the event you later decide not to implement the technique described above, our fee will be paid by you and will be limited to our time incurred from the date this letter is signed up to the date we receive written notification of your decision not to proceed, and will be billed at our standard hourly rates. In addition to bills for our hourly fees, an administrative expense charge of 8.5% of our standard fees will be billed at the same time.

All advice and other services we provide pursuant to this arrangement are intended to be solely for your benefit and that of the Partnership and are not for the benefit of anyone else. Accordingly, our advice may not be relied upon by any other person or persons, used in connection with any other transaction, or used for any other purpose without our prior written consent. Furthermore, the content of any oral or written communication made by us in connection with this engagement shall not be communicated to the public or otherwise publicized in any manner without our prior written consent.





Produced by Plaintiff to United States on 8/31/2005

Ernst & Young LLP will not be liable for any claim for damages arising out of or in connection with any tax services provided to you in an amount greater than the amount of fees actually paid to Ernst & Young LLP with respect to the services directly relating to and forming the basis of such claim.

Any controversy or claim arising out of or relating to tax and tax-related services now or hereafter provided by us to you (including any such matter involving any parent, subsidiary, affiliate, successor in interest, or agent of Ernst & Young LLP) shall be submitted first to voluntary mediation, and if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures set forth in the Attachment to this letter. Judgment on any arbitration award may be entered in any court having proper jurisdiction.

Except as expressly provided herein, this engagement letter does not modify the terms or provisions of any engagement letter for other professional services which were agreed to prior to the date noted below.

Information relating to federal tax advice we provide to you, including communications between us and material we create in the course of providing that advice, may be privileged and protected from disclosure to the Internal Revenue Service. Should the Internal Revenue Service seek disclosure from you or us of written or oral communications relating to such advice, we will discuss with you whether and how you assert, or waive, the privilege.

If any portion of this letter is held to be void, invalid, or otherwise unenforceable, in whole or part, the remaining portions of this letter shall remain in effect.

* * * * * * * * * *

If these arrangements are acceptable, please sign one copy of this letter and return it to me in the enclosed self-addressed envelope. If you have any questions concerning our engagement, please call Ray Knight at 704-331-1933. We appreciate the opportunity to work with you.

Very truly yours,

Ernst + Young LLP

Agreed to by:

Name: ______________________

Date: ______________________



Produced by Plaintiff to United States on 8/31/2005

Attachment I

# Dispute Resolution Procedures

The following procedures shall be used to resolve any controversy or claim ("dispute") as provided in our engagement letter of November 15, 1999. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

## Mediation

A dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by the American Arbitration Association ("AAA") or JAMS/Endispute at the request of a party. Any mediator so designated must be acceptable to all parties.

The mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

The mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings.

Each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties.

## Arbitration

If a dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. The arbitration will be conducted in accordance with the procedures in this document and the Arbitration Rules for Professional Accounting and Related Services Disputes of the AAA as in effect on the date of the engagement letter ("AAA Rules"). In the event of a conflict, the provisions of this document will control.

The arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the AAA Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures.



Produced by Plaintiff to United States on 8/31/2005

The arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or in any other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.

No discovery will be permitted in connection with the arbitration unless it is expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests.

The result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.



Produced by Plaintiff to United States on 8/31/2005