# COBRA STRIKES BACK: ANATOMY OF A TAX SHELTER

Karen C. Burke†
Grayson M.P. McCouch††

> "Like sellers of treasure maps, promoters of tax shelters promise that for a large fee one can navigate a secret route. What clinches these deals is not the chart itself but [an opinion letter] that appears to warrant that the map is as good as gold. ... Written by tax lawyers using the embossed stationery of their firms, the letters typically cost $50,000, $75,000 or more, and require a signed promise to keep the contents secret, like the treasure map, lest the Internal Revenue Service discover where untaxed fortunes lie. But ... opinion letters may not be worth the paper they are written on."*

## Introduction

Paul M. Daugerdas has gained notoriety for himself and his erstwhile firm, Jenkens & Gilchrist, as the designer of a tax shelter technique that uses contingent liabilities to generate artificial tax losses on a grand scale.[1] For all its surface complexity and sophistication, the basic shelter transaction is surprisingly simple in concept. In essence, it uses offsetting options to inflate the basis of property that is distributed by a partnership and then contributed to and sold by another partnership, resulting in a large tax loss without any corresponding economic loss. In principle, this type of shelter could be replicated indefinitely and generate unlimited tax losses.

---

† Warren Distinguished Professor, University of San Diego School of Law.

†† Professor, University of San Diego School of Law.

We are grateful for superb research assistance provided by Judith Lihosit and for generous research support from the University of San Diego School of Law.

* David Cay Johnston, Costly Questions Arise on Legal Opinions for Tax Shelters, N.Y. Times, Feb. 9, 2003, at 25.

[1] Contingent-liability shelters represent "a majority of all abusive tax-shelter cases in litigation now." Tom Herman, Tax-Shelter Users Get Some Rare Good News, Wall St. J., June 4, 2008, at D1 (quoting an I.R.S. spokesman). A tax shelter might be loosely defined as "a deal done by very smart people that, absent tax consideratons, would be very stupid." Id. (quoting Professor Michael Graetz); see also Joseph Bankman, The New Market in Corporate Tax Shelters, 83 Tax Notes 1775, 1777 (1999) (describing a tax shelter as "a product whose useful life is apt to end soon after it is disovered by the Treasury").

Mr. Daugerdas is by no means unique. The transactions that he approved as shelter counsel on behalf of Jenkens & Gilchrist differ only in trivial details from myriad other transactions peddled by other lawyers and accountants.[2]

Contingent-liability tax shelters, however, are a highly risky business. Mr. Daugerdas and others like him have reaped enormous rewards for themselves and their clients, but some of the tax shelters they designed for credulous and wealthy clients have backfired spectacularly. Congress and the Treasury have taken remedial action to shut down abusive tax shelters, and several courts have invoked the longstanding judicial doctrines to strike down transactions that lack economic substance and have no real business or investment purpose, despite purported compliance with the literal terms of the tax laws. The proliferation of abusive tax shelters could never have gotten off the ground without the active participation of high-priced counsel – some of them at highly reputable firms – who issued reassuring legal opinions concerning the tax consequences of shelter transactions.[3] Upon discovering that the anticipated tax benefits failed to materialize, disgruntled clients have rushed to sue the lawyers, accountants, investment advisers, and banks that created and marketed defective shelters. Mr. Daugerdas is the target of a criminal

---

[2] In November 2003, the Senate held committee hearings on the tax shelter industry, focusing on "generic abusive tax shelters sold to multiple clients." The Role of Professional Firms in the U.S. Tax Shelter Industry, Report of Permanent Subcommittee on Investigations, Senate Committee on Homeland Security and Governmental Affairs, S. Rep. 109-54, at 1 (2005) [hereinafter Tax Shelter Industry]. For insightful discussions of the market for tax shelters, see generally Joseph Bankman, The Tax Shelter Problem, 57 Nat'l Tax J. 925 (2004); Bankman, supra note 1, at 1780-82 (noting that the tax shelter industry relies heavily on maintaining "secrecy in product design and sales" and escaping detection through the "audit lottery").

[3] During the 1990's, several law firms began to compete directly in the shelter market, helping to develop and market "tax products" and charging fees based on the size of the expected tax loss. See Tax Shelter Industry, supra note 2, at 96-100 (discussing role of Brown & Wood). Tax-shelter practice has long been viewed as fundamentally different from legitimate tax planning, although the line may have become blurred. See Peter C. Canellos, A Tax Practitioner's Perspective on Substance, Form and Business Purpose in Structuring Business Transactions and in Tax Shelters, 54 SMU L. Rev. 47, 56 (2001) ("The tax shelter professional is a different breed, by experience, temperament, reputation, and calling.").

investigation, and Jenkens & Gilchrist has been disbanded.[4] And they are only the tip of the iceberg.

This article offers a preliminary assessment of several challenges faced by Congress, the Treasury, and the courts in dealing with contingent-liability tax shelters. The article unfolds in four parts. Part I examines the role of Daugerdas and his firm in creating and marketing contingent-liability shelters, against the broader background of the tax shelter industry. Part II explains the basic structure of the offsetting option transaction and its attempt to manipulate the partnership tax provisions – in essence, the transaction turns on a simple question of whether (and in what amount) contingent liabilities must be taken into account in determining the basis of an investment for tax purposes.[5] Part III analyzes the contrasting rationales of two recent judicial decisions involving defective tax shelters. Part IV argues in favor of applying Treasury regulations retroactively to shut down contingent-liability tax shelters and avoid unnecessary and wasteful litigation.

## I. Contingent-Liability Tax Shelters

*Background.* In late 1998, Jenkens & Gilchrist, a fast-growing Texas firm, brought Mr. Daugerdas on board as a tax partner in charge of the firm's newly-opened Chicago office.[6] Mr.

---

[4] See Lynnley Browning, 3 Lawyers Face Scrutiny in Tax Inquiry, N.Y. Times, Jan. 25, 2006, at C1; Lynnley Browning, Texas Law Firm Will Close and Settle Tax Shelter Case, N.Y. Times, Mar. 30, 2007, at C3.

[5] One hallmark of tax shelters is reliance on "a literal reading of some relevant legal authority" to produce artificial tax losses in a manner "inconsistent with legislative intent or purpose." Bankman, supra note 2, at 925; see also Mark P. Gergen, The Common Knowledge of Tax Abuse, 54 SMU L. Rev. 131 (2001).

[6] Before joining Jenkens & Gilchrist, Mr. Daugerdas was a tax partner at Altheimer & Gray, a Chicago law firm; before that he was the head of futures and options trading in the Chicago office of Arthur Andersen. In the late 1990's, Jenkens & Gilchrist was expanding rapidly. Despite some concerns about Mr. Daugerdas's aggressive tax opinions and his demands for unconventional compensation and indemnification arrangements, the firm viewed him as a promising and "not ... terribly risky" source of additional revenue. Nathan Koppel, Fatal Vision: How a Bid to Boost Profits Led to a Law Firm's Demise, Wall St. J., May 17, 2007, at A1 ("That risk assessment proved

Daugerdas brought with him a lucrative specialty in tax shelters and a close working relationship with several accounting firms (including Ernst & Young and KPMG) and the securities arm of Deutsche Bank.[7] During the next five years, he sold at least 600 generic shelters which generated hundreds of millions of dollars in fees for the firm – he personally netted $93 million – and billions of dollars of artificial tax losses for clients.[8] The financial incentives for crossing the line between shelter promoter and shelter counsel were clearly powerful, and Mr. Daugerdas placed himself and his firm in an ethically equivocal position by rendering favorable tax opinions concerning tax shelters that he helped to design and market.[9] Worse still, the shelters were highly risky. If detected, they would inevitably be challenged by the Internal Revenue Service and might

catastrophically wrong.”). Mr. Daugerdas’s activities leading to the collapse of Jenkens & Gilchrist have received extensive news coverage. Except as otherwise indicated, the factual background summarized in notes 6-26 and accompanying text is drawn from Paul Braverman, Helter Shelter, 25 Am. Law. 65 (Dec. 2003); Brenda Sapino Jeffreys, Bitten by a COBRA?, 19 Tex. Law. _ (Mar. 10, 2003); Nathan Koppel, supra; and Sheryl Stratton, Jenkens Settlement Info Reveals “Wealth” of Shelter Advisers, 105 Tax Notes 273 (2004).

[7] Deutsche Bank allegedly played a major role in creating and marketing COBRA and related tax shelters. See Lynnley Browning, Wider Look at Tax Shelters Offered by Deutsche Bank, N.Y. Times, May 18, 2006, at C4. Deutsche Bank recently settled suits with hundreds of shelter investors for undisclosed amounts but continues to face potential criminal charges. See Lynnley Browning, Bank Settles Shelter Suits By Investors, N.Y. Times, Feb. 8, 2007, at C1.

[8] Mr. Daugerdas created the shelters and issued opinion letters. For each opinion letter, Jenkens & Gilchrist charged the client a fee equal to 3 percent of the expected tax losses. Ernst & Young’s role was to target clients and market the shelters; Ernst & Young charged an additional fee equal to 1.5 percent of the expected tax losses. See Braverman, supra note 6, at 68.

[9] See Bankman, supra note 1, at 1783 (“However profitable it is to write opinions, ... there is more to be made in developing and promoting the shelters.”); see also Braverman, supra note 6, at 66-67. To market shelters, promoters prepare a “selling memorandum” which sets forth technical arguments in support of the shelter. See Canellos, supra note 3, at 57 (“No one really believes the selling memorandum.”). For purposes of penalty protection, shelter investors require an opinion letter from a law firm; although purportedly “independent,” the firm is in fact often identified by the shelter promoter as willing to render a favorable opinion. See id. (“The firms rendering such opinions bridge the gap between real practice and shelter practice, with inevitable adverse reputational consequences, given their role as facilitators of often abusive transactions.”).

well be held invalid in court.[10]

The Service became aware of the scope of shelter promoters' activities in the course of an investigation of accounting firms, and in 2002 began serving summonses on promoters and auditing the tax returns of individual investors. One of those investors, Henry Camferdam, and his business partners had purchased a shelter designed by Mr. Daugerdas and known as COBRA (an acronym for "Currency Options Bring Reward Alternatives").[11] Mr. Camferdam soon emerged as a poster-boy for disgruntled shelter investors.[12] Appearing in 2003 before the Senate Finance Committee at a hearing on abusive tax shelters, he recalled being approached by Ernst & Young with a high-pressure sales pitch about "a tax strategy that could virtually eliminate our capital gains taxes."[13] Although he received assuances that the shelter was "completely legal," he was offered two separate tax opinions from purportedly "independent" counsel as "insurance" against the risk of audit by the Service; in addition, he was required to sign a confidentiality

---

[10] Disgruntled investors eventually brought a class action against Jenkens & Gilchrist, Mr. Daugerdas, and others, claiming that the defendants knew that the tax shelters lacked economic substance and would be held invalid if litigated. See Denney v. Jenkens & Gilchrist, 230 F.R.D. 317, 322 (2005).

[11] In 1999, Mr. Camferdam and his three business partners paid more than $6 million in fees – $1 million to Ernst & Young, $2 million to Jenkens & Gilchrist, $75,000 to Brown & Wood (for a second tax opinion), and $3 million to Deutsche Bank – to avoid $14 million of taxes on $70 million of gain from sale of their business. See Tax Shelters: Who's Buying, Who's Selling, and What's the Government Doing About It?, Hearing Before the Senate Committee on Finance, S. Hrg. 108-371, at 15, 87 (2004) (statement of Henry Camferdam, Jr.) [hereinafter Who's Buying]. Following Ernst & Young's disclosure of their names and the ensuing audit, they eventually ended up owing $14 million in taxes plus an additional $11 million in interest and penalties. See Sheldon D. Pollack & Jay A. Soled, Tax Professionals Behaving Badly, 105 Tax Notes 201, 205 n.31 (2004).

[12] Mr. Camferdam portrayed himself as an innocent investor who "fully intended to pay the taxes [he] owed on the gain from the sale" but was lured by his "trusted legal and tax advisors" into "a tax savings strategy that they represented was completely legal." Who's Buying, supra note 11, at 88. He inquired, with no apparent sense of irony, "[w]hat can be done to protect future taxpayers" from being placed in a similar position. Id. at 89.

[13] Id. at 15. Mr. Camferdam was initially unaware of "the actual relationships and roles of E&Y, Jenkens & Gilchrist, and Deutsche Bank"; specifically, Ernst & Young told him that the shelter was "an E&Y strategy" and that Jenkens & Gilchrist was "an 'independent' law firm." Id. at 88. Although Jenkens & Gilchrist collected a fee of more than $2 million for an opinion letter, Mr. Camferdam "never talked to anyone" at the firm. Id. at 87.

agreement and was not allowed to discuss the shelter with outside counsel.[14] Mr. Camferdam and his business partners sued Jenkens & Gilchrist, Mr. Daugerdas, and others, claiming that they had been lured into purchasing a defective tax shelter. Despite their efforts to portray themselves as innocent investors, these clients may find it difficult to show that they reasonably relied on legal advice concerning transactions that appeared too good to be true.[15]

In 2004, the government forced Jenkens & Gilchrist to turn over its client lists; in 2005, the firm agreed to pay $81.5 million to settle a class action brought by more than 1,000 tax shelter investors, including Mr. Camferdam.[16] By 2006, Mr. Daugerdas had become "the tax lawyer at the heart of a broadening federal investigation into questionable tax shelters."[17] In 2007, Jenkens & Gilchrist was finally forced to close its doors. As part of a landmark settlement, the firm accepted responsibility for criminal wrongdoing in connection with its tax shelter

---

[14] Id. at 86-88. Ernst & Young was "in a hurry to get the deal done," and Mr. Camferdam viewed it as "like closing a mortgage loan, where it was sign the documents or go to another lender, except that in this case E&Y was the only party we knew of who could eliminate our taxes, in their words, 'legally and conservatively.'" Id. at 87.

[15] Mr. Camferdam admitted that from the outset "it was obvious there was no business purpose for this shelter other than tax reduction. There was no risk possibility." Who's Buying, supra note 11, at 15. In investor suits, it is often difficult to prove malpractice on the part of shelter counsel. See Bankman, supra note 1, at 1782-83. For example, Jenkens & Gilchrist argued that its "more likely than not" opinion was no more aggressive than similar opinions rendered by other law and accounting firms. See Denney v. Jenkens & Gilchrist, 230 F.R.D. 317, 338 (2005).

[16] The bulk of the settlement (more than $70 million) was paid by Jenkens & Gilchrist's insurance; Jenkens & Gilchrist paid $5.25 million; of the remaining $6.25 million, Mr. Daugerdas paid around $4 million and his two tax partners from the Chicago office paid around $1 million each. See Denney v. Jenkens & Gilchrist, 230 F.R.D. 317, 324 (S.D.N.Y. 2005); Paul Braverman, Jenkens and Several Liability: Can Tax Shelter Victims Pierce the Veil of a Law Firm's Corporate Structure?, 27 Am. Law. _ (Feb. 2005). Jenkens & Gilchrist stripped Mr. Daugerdas of his equity stake in the firm, and in December 2005 finally terminated his contractual arrangement with the firm. See Lynnley Browning, 3 Lawyers Face Scrutiny in Tax Inquiry, N.Y. Times, Jan. 25, 2006, at C1.

[17] Lynnley Browning, Inquiry Into Tax Shelters Widens Beyond Audit Firms, N.Y. Times, Feb. 4, 2006, at C3; see also Lynnley Browning, Tax Inquiry Is Moving Past KPMG, N.Y. Times, Sept. 16, 2005, at C1 (describing focus on Jenkens & Gilchrist, Ernst & Young, and Deutsche Bank); Sheldon D. Pollack & Jay A.Soled, Tax Professionals Behaving Badly, 105 Tax Notes 201, 205 n.26 (Oct. 11, 2004) (noting that tax shelter promoters such as Mr. Daugerdas "are denounced as 'rogue' partners by their colleagues after they are publicly exposed, but were hailed as 'rainmakers' before they got caught").

activities and agreed to pay a $76 million penalty.[18]

*Offsetting-Option Shelters.* The COBRA shelter purchased by Mr. Camferdam was part of a family of tax shelters known generically as "Son of BOSS."[19] These transactions typically involved a transfer to a partnership of property encumbered by contingent liabilities, resulting in high-basis, low-value partnership interests. By ignoring the effect of the contingent liabilities on outside basis, the transaction purported to create a large artificial capital loss that could be used to offset unrelated capital gains. These shelters were aggressively marketed to individuals who had accumulated substantial wealth during the technology and stock-market boom of the late 1990's.[20]

The basic concept of an offsetting-option shelter was remarkably simple.[21] A taxpayer would sell an option to acquire securities (or foreign currency) to a bank and simultaneously buy a substantially offsetting option from the bank. The cost of the purchased ("long") option would

---

[18] The combined effect of investor lawsuits and government investigation led to the demise of the Jenkens & Gilchrist. Between 2001 and 2007, the firm lost nearly 400 lawyers. As part of the settlement with the government, Jenkens & Gilchrist admitted that some of its attorneys "developed and marketed fraudulent tax shelters, with fraudulent tax opinions," referring to the Chicago office without naming the individuals involved. Press Release, U.S. Attorney, Southern District of N.Y., Press Release (Mar. 29, 2007) (quoting Jenkens & Gilchrist statement). The government indicated that the decision not to prosecute Jenkens & Gilchrist was based partly on "its inability to continue practicing as a law firm." Id.; see generally Lynnley Browning, Texas Law Firm Will Close and Settle Tax Shelter Case, N.Y. Times, Mar. 30, 2007, at C3.

[19] Variants of COBRA included OPS ("Option Partnership Strategy") and SOS ("Short Option Strategy"). These so-called Son-of-BOSS shelters are variants of an earlier corporate tax shelter known as BOSS ("Bond and Options Sales Strategy").

[20] See Bankman, supra note 2, at 931 ("Many of the new purchasers were individuals, who lacked expertise to judge shelter quality and who had once-in-a-lifetime gains to shelter."). Some shelter investors who sought to avoid tax on their stock options later discovered that they had made a costly mistake when they were assessed with tax on stock that had plummeted in value. See David Cay Johnston, Costly Questions Arise on Legal Opinions for Tax Shelters, N.Y. Times, Feb. 9, 2003, at 25 (noting one executive's lament that he might "lose his entire fortune because all of his Sprint shares are worth millions less than the taxes he avoided on those shares in the shelter").

[21] See Notice 2000-44, 2000-2 C.B. 255 (describing offsetting-option shelter).

be slightly higher than the premium received for the sold ("short") option.[22] The taxpayer would then contribute the long option and the liability incurred under the short option to a partnership in exchange for a partnership interest. Upon a sale of the partnership interest, either before or after the expiration of the short option, the taxpayer would report a capital loss. The tax loss was premised on the theory that the short option was not taken into account as a liability under § 752 due to its contingent nature. Accordingly, the premium paid for the long option would increase the taxpayer's outside basis but the contingent liability under the short option would not be included in the amount realized on sale of the partnership interest.[23]

The offsetting-option transaction was designed to produce a substantial tax loss with no real downside economic risk and minimal cash outlay for the taxpayer. This is the essence of the tax shelter. As long as the purchased and sold options remained bundled together, the taxpayer's potential economic loss and net out-of-pocket cost were limited to the spread between the two positions – a trivial amount, since the premium received for the short option offset most of the cost of the long option. With virtually no economic risk and minimal cash outlay, the transaction could be tailored to create any desired amount of loss (equal to the contingent liability that was ignored). Indeed, the taxpayer might even claim to have a profit motive, due to the (infinitesimal) chance of a large gain if the purchased option was "in the money" at the time of exercise. Of

---

[22] A call option entitles the holder to acquire property (e.g., stock, securities, or currency) at a specified price during a fixed term or at a fixed future date. If the value of the underlying property on the relevant date exceeds the strike price (including the premium paid), the holder exercises the option and realizes a profit; if the value of the underlying property is equal to or less than the strike price, the option is worthless. The grantor ("writer") of a call option is obligated to deliver the underlying property (or any excess value over the strike price) to the holder upon exercise. If the writer of a call option does not actually own the underlying property (a "naked" option), the writer's risk of loss is essentially the same as that of a short seller.

[23] Likewise, outside basis would not be decreased to reflect relief of the contingent liability on expiration of the short option prior to sale of the partnership interest.

course, any realistic possibility of such a large gain would prompt the bank (a necessary accommodation party) to demand additional compensation.[24]

As a practical matter, the artificial tax loss generated by the shelter was limited only by the amount of gain that the taxpayer wished to shelter from tax. While there was no shortage of taxpayers willing to pay hefty fees to promoters based on a percentage of the expected tax loss (as well as $100,000 or more to outside counsel for a tax opinion[25]), there was also fierce competition among designers and promoters for tax shelter business.[26] Shelter counsel maintained that each mutation of the basis-shift transaction could be distinguished from the others if it employed a slightly different financial instrument or legal rationale to achieve an artificial tax loss. Thus, the ability to draw minute, highly technical, formalistic distinctions between functionally equivalent transactions commanded a high premium in the tax shelter industry.

---

[24] In some cases, it is not clear whether the banks involved in tax shelters actually carried out the purported financial transactions. See Lynnley Browning, Deutsche Bank Said to Seek Settlement on Tax Shelters, N.Y. Times, Feb. 24, 2006, at C3 ("With Deutsche Bank, a lack of documents would raise questions about whether the transactions were ever executed at all."); Lynnley Browning, Bank Settles Shelter Suits By Investors, N.Y. Times, Feb. 8, 2007, at C1 (noting allegations that shelters "typically involved fake loans and fake trades to generate artificial losses").

[25] Tax opinions were an important "marketing tool" because they purported to provide insurance against penalties in the event the shelter ultimately proved defective. Tax Shelter Industry, supra note 2, at 45. While the protection of a "more likely than not" opinion was subject to various limitations (e.g., if it relied on factual assumptions that the taxpayer did not reasonably believe were accurate, or if the transaction lacked a significant business purpose), such an opinion was widely perceived as shielding a taxpayer from the 20% substantial-understatement penalty (as well as stiffer civil and criminal penalties). See Bankman, supra note 1, at 1778-79.

[26] For example, in 2000, Mr. Daugerdas was sued by his former business partner, James Haber of Diversified Group Inc., who accused Mr. Daugerdas of selling tax shelters without sharing the profits pursuant to an agreement with Diversified; the suit was eventually settled. See Braverman, supra note 6, at 65 (noting that Mr. Daugerdas described the offsetting-option transaction as "based on a nonproprietary strategy that anyone familiar with the tax code could figure out"). Although promoters sought to limit misappropriation by imposing confidentiality requirements, "leakage" about shelters ensured "some limited competition, with more than one promoter offering identical or at least similar shelters." Bankman, supra note 1, at 1781.

*Response of Courts, Congress, and the Treasury.* The judicial doctrines of economic substance and business purpose pose a formidable obstacle for tax shelter proponents. These doctrines allow courts to disregard or recharacterize a transaction that lacks a business or investment purpose (other than to generate artificial tax losses) and has no real effect on a taxpayer's economic situation.[27] When basis-shift shelters began to proliferate on a large scale in the late 1990's, it was not clear whether these judicial doctrines would prove sufficiently robust to withstand the proclivity of some courts for hyper-literalism in interpreting tax statutes.[28] At the same time, the emergence of antipathy toward taxes and mistrust of the Internal Revenue Service as a powerful political movement contributed to a widespread acceptance of tax avoidance as a legitimate pursuit. Unsurprisingly, shelter counsel and tax litigators made the most of this apparent shift in judicial and public attitudes and redoubled their efforts to discover and exploit perceived gaps and ambiguities in the the tax laws.

In 2000, in response to abusive corporate tax shelters, Congress amended § 358 of the Code to clarify that contingent liabilities, while often difficult to value, are indeed treated as liabilities for purposes of the corporate nonrecognition provisions. Oddly enough, prior law

---

[27] See, e.g., Gregory v. Helvering, 293 U.S. 465 (1935); ACM Partnership v. Comm'r, 157 F.3d 231 (3d Cir. 1998), cert. denied, 526 U.S. 1017 (1999). In applying these doctrines, courts are not always clear about how the relevant transaction should be defined or what kind or level of business purpose is required. See Bankman, supra note 2, at 928 ("The economic substance doctrine is a blunt instrument that works best on the most egregious shelters.").

[28] For example, in a case involving a contingent-liability transaction, one judge mused that the economic substance doctrine might be constitutionally suspect on separation-of-powers grounds. See Coltec Industries, Inc. v. United States, 62 Fed. Cl. 716, 756 (2004), vacated and remanded, 454 F.3d 1340 (Fed. Cir. 2006), cert. denied, 127 S.Ct. 1261 (2007) (Susan Braden, J.) ("[W]here a taxpayer has satisfied all statutory requirements established by Congress, as Coltec did in this case, the use of the 'economic substance' doctrine to trump 'mere compliance with the Code' would violate the separation of powers."). Cf. Marvin A. Chirelstein & Lawrence A. Zelenak, Tax Shelters and the Search for a Silver Bullet, 105 Colum. L. Rev. 1939, 1939-40 (2005) ("It is beyond doubt that such [rule] manipulations are contrary to congressional intent, but that perception has not always been conclusive or even probative in the cases that have arisen.").

provided no statutory or regulatory definition of "liabilities" as used in the corporate nonrecognition provisions of § 358 or the analogous partnership provisions of § 752.[29] In amending § 358, Congress specifically targeted corporate transactions that purported to accelerate or duplicate losses through assumption of contingent liabilities.[30] The amended provision shut down these shelters by requiring a shareholder to reduce its basis in stock of a controlled corporation to reflect contingent obligations that otherwise would not be taken into account under the basis provisions.[31]

In Notice 2000-44, the government signalled its intent to shut down contingent-liability shelters involving partnerships.[32] In amending the corporate tax provisions of § 358, Congress directed the Treasury to promulgate rules providing "appropriate adjustments" under Subchapter

---

[29] Section 358(h)(3) now defines the term "liability" to include "any fixed or contingent obligation to make payment," without regard to whether the obligation constitutes a liability under any other provision of the Code. See Community Renewal Tax Relief Act of 2000, Pub. L. 106-554 (Appendix G), § 309(d)(1), 114 Stat. 2763A-587, 2763A-638 (2001) (effective for assumptions of liability after Oct. 18, 1999); Staff of Joint Comm. on Tax'n, General Explanations of Tax Legislation Enacted in the 106th Congress 153-56 (2001) (JCS-2-01).

[30] The contingent-liability shelter used by Black & Decker Corp. (B&D) was a prototypical transaction targeted by § 358(h). See Black & Decker Corp. v. United States, 436 F.3d 431 (4th Cir. 2006). In essence, B&D transferred $561 million cash to a subsidiary in exchange for preferred stock worth $1 million plus assumption by the subsidiary of B&D's contingent employee and healthcare obligations ($560 million estimated present value). B&D claimed a basis of $561 million in the preferred stock (equal to the cash contribution), ignoring the offsetting contingent obligation, and reported a $560 million loss on sale of the stock to an accommodation party for $1 million. Under § 358(h), B&D would have been required to reduce the basis of the preferred stock to $1 million ($561 million less $560 million contingent obligation), eliminating the built-in $560 million loss on sale of the stock.

[31] Section 358(h)(1), when applicable, requires that a shareholder's basis in stock of a controlled corporation be reduced (but not below fair market value) if the basis of the stock would otherwise exceed its fair market value because an assumed liability does not give rise to a basis reduction under § 358(d), the corporate analog of § 752(b). As in *Black & Decker*, such contingent liabilities represent the estimated present value of future expenses which have not yet generated any tax basis or other tax benefit.

[32] Notice 2000-44 identified two transactions as abusive: the so-called "premium loan" transaction and the offsetting-option transaction. See Notice 2000-44, 2000-2 C.B. 255. Like the corporate tax-shelter identified in Notice 99-59, 1999-2 C.B. 761, these transactions involved aggressive interpretations of the term "liability." Notice 2000-44 warned that participants in these transactions, as well as those involved in promoting or reporting them, might be subject to appropriate penalties. The Notice also warned that willful concealment of gains and losses through improper netting might give rise to criminal liability.

K to prevent "acceleration or duplication of losses" through assumption of liabilities in "transactions involving partnerships," and specifically authorized the new rules to be applied with retroactive effect to October 19, 1999.[33] The Treasury interpreted this directive to authorize rules similar to those of § 358(h) for liabilities assumed by partnerships, and accordingly in 2003 promulgated Temporary Regulations § 1.752-6, which by its terms applies to certain liabilities assumed by partnerships after October 18, 1999.[34] Under the retroactive regulations, the contingent-liability transactions described in Notice 2000-44 no longer produce the desired tax loss because outside basis must be reduced (but not below fair market value) to reflect assumption of the contingent liability. The new regulations require a basis reduction only to the extent that the contingent liability was not previously taken into account for purposes of § 752.

Section 358(h) operates essentially as a buttress to the judicial doctrine of economic substance. In Coltec Industries, Inc. v. United States, the Court of Appeals for the Federal Circuit held that the assumption of contingent asbestos liabilities by a corporate shell subsidiary "had no meaningful economic purpose, save the tax benefits to Coltec."[35] The court focused on the lack

---

[33] See Community Renewal Tax Relief Act of 2000, Pub. L. 106-554 (Appendix G), § 309(c)(1), 114 Stat. 2763A-587, 2763A-638 (2001) (authorizing regulations); id. § 309(d)(2) (authorizing retroactive effect).

[34] See T.D. 9062, 2003-2 C.B. 46 (temporary regulations applicable to partnership's assumption of partner's liabilities occurring after October 18, 1999 and before June 24, 2003); see also REG-106736-00, 2003-2 C.B. 60 (proposed regulations applicable to assumption of liabilities occurring on or after June 24, 2003). The regulations were promulgated in final form in 2005. See T.D. 9207, 2005-1 C.B. 1344. Under the final regulations, the amount of a § 752 liability is equal to the amount of the associated basis increase (or other tax benefit). See Reg. § 1.752-1(a)(4).

[35] Coltec Industries, Inc. v. United States, 454 F.3d 1340, 1347 (Fed. Cir. 2006); see id. at 1351-54 (rejecting as "untenable" the lower court's rejection of the economic substance doctrine on constitutional grounds, and noting that the lower court "failed to follow binding precedent of the Supreme Court and this court"). The court viewed the economic substance doctrine as "merely a judicial tool for effectuating the underlying Congressional purpose that, despite literal compliance with the statute, tax benefits not be afforded based on transactions lacking in economic substance." Id. at 1354.

of any business purpose for the transfer and assumption of liabilities that produced an artificial tax loss. Having properly identified the transaction in question, the court had little difficulty in seeing that any purported business purpose was either mere window-dressing or could have been accomplished without the transfer and assumption of liabilities that purportedly generated tax benefits.[36] The court also held that contingent obligations were liabilities for purposes of § 358 (prior to the enactment of § 358(h)), relying on case law dating back to 1946 concerning the sale of a business.[37] Shortly after the decision in *Coltec*, the government reached a settlement in another high-profile corporate contingent-liability shelter case, in which the taxpayer apparently agreed to pay a portion of the taxes owed without penalties.[38]

In the partnership area as well, contingent-liability shelters have given courts an opportunity to address the tension between literal compliance with the Code and the economic substance doctrine.[39] As one court noted, however, taxpayers may perceive the tension differently, arguing that "the economic substance doctrine cannot ignore 'deliberately adopted rules of law', in particular, [a Tax Court decision holding] that contingent liabilities do not constitute section 752 liabilities for purposes of calculating a partner's basis."[40] While the

---

[36] See id. at 1357-1360.

[37] See id. at 1347 ("It is widely recognized that when one party in an exchange assumes a contingent liability of another party, that contingent liability, like all other liabilities, forms an integral part of the purchase price in the exchange."); Black & Decker Corp. v. United States, 436 F.3d 431, 437-38 (4th Cir. 2006) (concluding that contingent liabilities were liabilities under §§ 357 and 358 prior to enactment of § 358(h)).

[38] See Black & Decker Announces Settlement in Litigation Over Outstanding Income Taxes, 2007 TNT 243-28 (Dec. 18, 2007).

[39] See e.g., Jade Trading, LLC v. United States, 80 Fed. Cl. 11, 13-14 (2007). The court postponed its decision in *Jade Trading* pending release of the appellate decision in *Coltec* concerning the viability of the economic substance doctrine.

[40] Id. at 13.

government may have a strong argument that contingent-liability transactions should fail under existing law based on extant revenue rulings and other authority, there is clearly a risk that a court might not be persuaded by (or might fail to grasp) the specialized definition of a liability for purposes of § 752.[41] Although § 358(h) resolved this issue prospectively in the corporate area by defining liabilities broadly to include both fixed and contingent obligations, the perceived need for a statutory amendment might suggest that contingent liabilities could be ignored under prior law.[42] Moreover, in extending a similar rule to the partnership area through retroactive regulations, the government left itself open to claims of unfairness and overreaching by disappointed taxpayers.

II. The *Cemco* Transaction

*The Transaction*. In December 2000, Mr. Daugerdas designed a tax shelter for himself and a client, Steven Kaplan, using a variation of the basic COBRA transaction.[43] The transaction proceeded as follows. Acting through a grantor trust (Trust),[44] Messrs. Daugerdas and Kaplan purchased a "long" option and simultaneously sold an offsetting "short" option, with Deutsche

---

[41] See infra notes 68-73 & accompanying text.

[42] Cf. Coltec Industries, Inc. v. United States, 454 F.3d 1340, 1348 n.7 (Fed. Cir. 2006) (finding § 358(h) "of little utility" in determining whether contingent liabilities were taken into account under prior law).

[43] Mr. Kaplan contributed all the cash but received only a 37.5% beneficial interest in Trust; Mr. Daugerdas received the remaining 62.5% interest. After the Service audited the taxpayers and assessed penalties, Mr. Kaplan sued Mr. Daugerdas, claiming that Mr. Daugerdas had absconded with investment funds. According to Mr. Kaplan, Mr. Daugerdas portrayed Cemco (an acronym for "Clean Energy Management Company") as "a profit-making partnership" that would invest in third-world energy projects "under the auspices of the United Nations"; appended to a "private placement memorandum" was a copy of the Kyoto Protocol to the U.N. Framework Conventions on Climate Change along with a document entitled "Mandate to the Solar Commission." See Cemco Investors, LLC v. United States (N.D. Ill.), Gov't Exh. No. 19, at 4-5.

[44] A grantor trust is transparent for federal income tax purposes, and each separate item of the trust's gains and losses is reportable directly on the grantor's income tax return. See Notice 2000-44, 2000-2 C.B. 255 (warning against use of grantor trusts to conceal gains and losses in contingent-liability transactions).

Bank (Bank) as the counterparty on both options. The investors' net out-of-pocket outlay for the options was only $6,000, the difference between the $3.6 million premium paid to Bank for the long option and the slightly lower premium received from Bank for the short option.[45] Trust contributed both options and $50,000 additional cash to a general partnership (Partnership),[46] which used the cash to purchase euros. After the options terminated, Partnership liquidated and distributed the euros to Trust, which took the euros with a substituted basis of $3.65 million (equal to Trust's basis in its partnership interest). Trust then contributed the high-basis euros to another partnership (Cemco), which sold the euros for their $50,000 market value and realized a loss of $3.6 million.[47] The entire transaction took place within a four-week period and was undertaken for the purpose of generating an artificial tax loss of $3.6 million for Messrs. Daugerdas and Kaplan.

If Messrs. Daugerdas and Kaplan had directly purchased and sold the offsetting options as individuals, they would have realized a gain of nearly $3.6 million on termination of the sold option and a $3.6 million loss on the termination of the purchased option, resulting in a net loss of only $6,000.[48] For tax purposes, an option is generally treated as an open transaction as long as

---

[45] The spread between the two option premiums was $36,000, which Trust initially paid to Bank; however, Bank refunded $30,000 to Trust upon termination of the options two weeks later.

[46] The only partners of Partnership were Trust and Mr. Daugerdas's wholly-owned shell corporation (a disregarded entity for federal income tax purposes).

[47] When Cemco sold the euros, it reported a net ordinary loss of $3.6 million from disposition of nonfunctional currency. See I.R.C. § 988. Apparently, Mr. Daugerdas believed that he could use his tax shelter to avoid tax on the income he earned from selling the same shelter to others.

[48] See I.R.C. § 1234(a)(1), (a)(2). Under § 1234(b)(1), the grantor's gain or loss from any "closing transaction" is treated as a short-term capital gain or loss; a closing transaction is "any termination of the taxpayer's obligation under an option . . . other than through the exercise or lapse of the option." See I.R.C. § 1234(b)(1), (b)(2).

the option remains outstanding and unexercised.[49] Specifically, an option-writer does not include the premium received on sale of the option in income until the option expires; only then does the option-writer become entitled to keep the premium with no further obligation to deliver the underlying property to the option-holder. Likewise, an option-holder may not claim a loss for the premium paid to purchase an option until the option expires; only then does the option become worthless.

The rule allowing an option-writer to defer inclusion of the option premium in income could also be explained by viewing the option-writer's contingent obligation under the option as an obligation to repay a loan, which would clearly be taken into account as a liability for income tax purposes. Under *Crane* principles, the option-writer could postpone including the premium in income as long as the obligation remained outstanding, and the expiration of an unexercised option could be viewed as analogous to cancellation of indebtedness under § 61.[50] Apart from the character of gain or loss, the overall tax consequences to the option-writer are generally the same, under either an open-transaction or an offsetting-liability analysis.[51] For tax purposes, what

[49] See Rev. Rul. 78-182, 1978-1 C.B. 265. Open transaction treatment can be traced back to Virginia Iron Coal & Coke Co. v. Commissioner, 37 B.T.A. 195, aff'd, 99 F.2d 919 (4th Cir. 1938), cert. denied, 307 U.S. 630 (1939).

[50] See Crane v. Commissioner, 331 U.S. 1 (1947). If a call option is exercised, the option premium is "repaid" by the option-writer's delivery of the underlying property to the option-holder, by analogy to a debtor's repayment of borrowed funds by transferring property other than cash.

[51] For purposes of §§ 357, 358, and 752, there may be no "meaningful difference" between a call option and an obligation to repay a loan. See Monte A. Jackel & Jerred G. Blanchard, Jr., Reflections on Liabilities: Extension of New Law to Partnership Formations, 91 Tax Notes 1579, 1591 (2001); id. at 1590-91 (rejecting notion that a call option is too uncertain to constitute a § 752 liability because of the built-in feature that allows the optionee to forgive the obligation by not exercising the call). Other commentators have also recognized the similarity between an option and a loan. See Noël B. Cunningham & Deborah H. Schenk, Taxation Without Realization: A "Revolutionary" Approach to Ownership, 47 Tax L. Rev. 725, 781 (1992) (noting that option can be viewed as "a loan without stated interest"); Bruce Kayle, Realization Without Taxation? The Not-So-Clear Reflection of Income from an Option to Acquire Property, 48 Tax L. Rev. 233, 251 (1993) (noting "time value of money element" and "presumed equality in value" of grantor's obligation and premium at time of grant).

should matter is whether incurring the obligation generated basis or other tax benefits.[52]

To transmute a real $6,000 economic loss into an artificial $3.6 million tax loss, the taxpayers in *Cemco* interposed Partnership to exploit potential disparities between inside and outside basis. According to Mr. Daugerdas, the tax consequences of the transaction were as follows. Trust's initial outside basis in its Partnership interest, ignoring the contingent obligation under the short option (as well as the spread between the option premiums) was $3.65 million, equal to the cost of the long option and the additional $50,000 contributed to Partnership. According to Mr. Daugerdas, the contingent obligation of nearly $3.6 million under the short option had no effect on outside basis because it was not treated as a liability under § 752.[53] When the options terminated, Partnership realized a gain of nearly $3.6 million (equal to the premium received for the short option) and an offsetting loss of $3.6 million (equal to the premium paid for the worthless long option). Crucially, Mr. Daugerdas argued that the termination of the contingent obligation under the short option had no effect on Trust's outside basis, which remained $3.65 million. On liquidation of Partnership, Trust received the euros with a substituted basis of $3.65 million under § 732. The basis of the euros remained unchanged in Cemco's hands under § 723, and generated a $3.6 million ordinary loss for Messrs. Daugerdas and Kaplan when

[52] See Rev. Rul. 88-77, 1988-2 C.B. 129. Cf. Helmer v. Commissioner, 34 T.C.M. (CCH) 727 (1975) (holding receipt of option payments did not give rise to § 752 liability or increase outside basis because there was no obligation to repay or perform future services). *Helmer* was arguably distinguishable from Rev. Rul. 73-301, involving deferral of income attributable to the taxpayer's accounting method. See Rev. Rul. 73-301, 1973-2 C.B. 215 (treating progress payments as "unrealized receivables" within the meaning of § 751(c)).

[53] Even if the obligation under the short option were treated as a liability, there would be no net change in Trust's initial outside basis, assuming Trust remained obligated to perform under the short option. Under § 752, liabilities assumed and relieved must be netted against each other; in the absence of a net shift of liabilities, Trust would still have an initial outside basis of $3.6 million. See Reg. § 1.752-1(f).

Cemco sold the euros.[54]

Since the basis of the euros in Cemco's hands was derived from Trust's outside basis in its Partnership interest, a key issue is whether Trust was entitled to ignore the contingent obligation under the sold option in calculating outside basis. Even in 2000, the government could reasonably argue that the contingent obligation should have the same effect on outside basis as other liabilities under § 752. Under § 752(b), a reduction of a partner's share of partnership liabilities produces a corresponding reduction in the partner's outside basis; in mechanical terms, relief of liabilities is treated as a deemed distribution of cash. Under this view, the termination of the short option should have given rise to a deemed distribution of nearly $3.6 million, reducing Trust's outside basis by the same amount and leaving Trust with a basis of only $50,000 in the distributed euros (equal to their pre-distribution basis in Partnership's hands).

The rationale for reducing Trust's outside basis by the amount of the terminated contingent liability is reflected in Revenue Ruling 88-77, which treats an obligation as a § 752 liability to the extent it gives rise to basis (i.e., the premium received by Trust on sale of the short option).[55] The ruling thus reflects the conceptual equivalence between a liability's "tax amount"

---

[54] Messrs. Daugerdas and Kaplan could have realized a $3.6 million capital loss if Trust had sold its partnership interest either before or after the options terminated. The liquidation of Partnership, however, allowed Trust to receive the euros with a basis of $3.65 million and realize an ordinary loss on the sale of the euros.

[55] See Rev. Rul. 88-77, 1988-2 C.B. 128. The Service issued the ruling in response to a 1984 Congressional directive to harmonize the treatment of accounts payable of cash-method taxpayers for purposes of §§ 752 and 357. See H.R. Conf. Rep. No. 98-861, at 856-57 (1984) (disapproving Rev. Rul. 60-345, 1960-2 C.B. 211). In relevant part, the ruling defines "partnership liabilities" for purposes of § 752 to include "an obligation only if and to the extent that incurring the liability creates or increases the basis to the partnership of any of the partnership's assets (including cash attributable to borrowings)." Thus, the ruling provided a policy-based definition of liabilities for purposes of § 752, but left the term "obligation" undefined.

and the basis of assets,[56] and maintains symmetry between inside and outside basis.[57] The policy-based definition of § 752 liabilities has been reaffirmed in subsequent rulings and was eventually embodied in final regulations promulgated in 2005.[58] The regulations put to rest the purported "conflict between the plain meaning and the policy-driven definitions" of the term liability that fueled abusive transactions intended to duplicate or accelerate losses by inflating basis.[59]

In *Cemco*, the tax amount of the contingent obligation under the short option was nearly $3.6 million, equal to the premium received from Bank on sale of the option. Failure to reduce Trust's outside basis to reflect relief of the contingent obligation would give rise to double-counting of the basis generated by the obligation. An alternative way to reach the same result would be to view the premiums on the pair of options as a circular flow of funds, in which Trust

---

[56] The ruling departs from the conventional definition of a liability because it focuses on the amount taken into account for tax purposes, which may differ from the principal or face amount. This concept of liabilities may be interpreted broadly to encompass obligations that fall outside the narrow definition of a liability as an obligation to pay a sum certain or perform future services. See William S. McKee et al., Federal Taxation of Partnerships and Partners, ¶ 7.03[2], at 7-16 (4th ed. 2007). Compare Jackel & Blanchard, supra note 51, at 1588 (broad definition of liability) with Bruce Lemons et al., The New Definition of "Liability" and Its Effect on Prepaid Forward Contracts, 100 Tax Notes 1307, 1315 (2003) (narrow definition of liability).

[57] Symmetrical treatment is necessary to preserve equality of inside and outside basis, consistent with the principle that a borrowing transaction does not generate income because of the offsetting repayment obligation.

[58] See T.D. 9207, 2005-1 C.B. 1344; Rev. Rul. 95-26, 1995-1 C.B. 131; Rev. Rul. 95-45, 1995-1 C.B. 53. The definition also appeared in temporary regulations promulgated in 1988 but was later omitted from the final version of those regulations "in response to comments that the definition was redundant and therefore unnecessary." REG-106736-00, 2003-2 C.B. 60, 62. The final regulations expressly adopt a broad definition of liabilities for purposes of § 752. See Reg. § 1.752-1(a)(4) (defining § 752 liability to include any "fixed or contingent obligation" that creates or increases basis). The final regulations clarify that obligations, whether fixed or contingent, are taken into account without regard to whether those obligations constitute liabilities under any other provision of the Code. See id.

[59] William S. McKee et al., supra note 56, ¶ 7.03[3], at 7-19. The preamble acknowledges that "[t]he definition of a liability contained in these proposed regulations does not follow *Helmer*." REG-106736-00, 2003-2 C.B. 60, 62. Under one literalist view, the 2005 regulations may be constitutionally infirm because Treasury lacks the authority to expand the definition of liabilities. See Lemons et al., supra note 56, at 1314 ("The argument against a broad definition of the term 'liability' is simple – it is Congress's responsibility to determine tax policy. It is not within the courts' or the Service's province to disregard the plain meaning of a word to prevent or encourage a benefit to taxpayers.").

paid $3.6 million to Bank for the long option and received nearly the entire purchase price (except for the net out-of-pocket cost of $6,000) from Bank on sale of the offsetting short option. When the short option terminated, the relief of the contingent obligation could be viewed as a purchase-price reduction which should reduce the basis of the long option to $6,000.[60] Under this view, Trust's outside basis should have been limited to $56,000 ($6,000 net out-of-pocket cost plus $50,000 additional cash contribution), and then reduced to $50,000 to reflect a $6,000 loss on termination of the long option. As a matter of policy, it makes no sense to allow a taxpayer to conjure $3.6 million of outside basis from thin air and transfer that basis to other property worth $50,000 in order to realize an artificial loss of $3.6 million.

Mr. Daugerdas had latched onto (or perhaps stumbled into) a form of "pure" tax arbitrage. Pure tax arbitrage occurs when a taxpayer "buys and sells [or borrows and lends] the same asset."[61] In theory, tax losses of any desired magnitude could be "reaped indefinitely" in the absence of "tax law impediments," since there were no real assets on which the pre-tax return would be driven down by market demand.[62] Indeed, pure tax arbitrage is the engine that fueled the rapid growth of contingent-liability shelters and prompted the government to shut them down. Although Congress eventually responded by enacting § 358(h) in 2000, arguably no statutory amendment was needed because the transactions were already vulnerable to attack under existing law on the ground that they lacked economic substance and served no purpose

---

[60] See I.R.C. § 108(e).

[61] Daniel N. Shaviro, The Story of *Knetsch*: Judicial Doctrines Combating Tax Avoidance, in Tax Stories: An In-Depth Look at Ten Leading Federal Income Tax Cases 313, 319 (Paul L. Caron ed., 2003) (quoting C. Eugene Steuerle).

[62] Id.

other than to reduce taxes.[63]

Even if this conclusion were not obvious based on the doctrine of economic substance, the offsetting option scheme concocted by Mr. Daugerdas was clearly vulnerable to challenge under the § 701 partnership anti-abuse regulations; if Partnership was ignored, the $3.6 million artificial loss would evaporate. Yet another line of attack was opened by the retroactive § 752 regulations promulgated in 2003. If the government could show that those regulations applied to Mr. Daugerdas's transaction, there would be no need to litigate the issue of economic substance.

III. Judicial Response

*Cemco*. In *Cemco*, the taxpayers made little or no attempt to defend Mr. Daugerdas's contingent-liability shelter on the merits. Instead, they staked their entire case on a procedural technicality, arguing that the government issued its notice of "final partnership administrative adjustment" (FPAA) to the wrong party. Specifically, they claimed that the government was barred from challenging the artificially-enhanced basis of the euros in Cemco's hands because it failed to challenge Partnership's return in a timely manner. The district court properly rejected this procedural argument, noting that it misapplied the statutory scheme of unified parternship audit and litigation procedures and ignored Cemco's duty to make a correct determination of the basis of the euros contributed by Trust (rather than merely accept whatever fanciful basis Trust might claim).[64] The court then granted summary judgment for the government and disallowed the

---

[63] Except for the interpolation of a partnership, the transaction would not have produced an artificial loss of $3.6 million but rather a real economic loss of $6,000. In effect, Messrs. Daugerdas and Kaplan might just as easily have burned 6,000 one-dollar bills.

[64] See I.R.C. §§ 6221-6234. Section 6222 requires partnerships and partners to treat partnership items of the partnership consistently. However, the Service was not required to treat Cemco and Partnership identically merely because they had overlapping partners.

artificial loss of nearly $3.6 million under the retroactive § 752 regulations; the court also assessed a penalty for gross valuation misstatement.[65]

Because the taxpayers in *Cemco* failed to contest the validity of the retroactive regulations, the court treated them as having conceded the issue.[66] As a practical matter, that concession made it unnecessary to determine whether the contingent obligation under the short option actually constituted a § 752 liability. If the obligation were treated as a § 752 liability, in accordance with Revenue Ruling 88-77, Trust would be required to reduce its outside basis in Partnership by the amount of the liability, thereby preventing Trust and Cemco from obtaining an artificially-enhanced basis in the euros or realizing a $3.6 million loss on the sale of the euros. On the other hand, if the contingent obligation did not constitute a § 752 liability, the retroactive regulations would clearly apply to the offsetting-option transaction and produce the same end result. Accordingly, as a matter of litigation strategy, the government had no incentive to clarify the definition of § 752 liabilities for pre-2003 transactions or to challenge the taxpayers' assertion that the contingent obligation in *Cemco* was technically not a § 752 liability, especially since the prospective regulations unequivocally resolved the issue by restating Revenue Ruling 88-77's policy-based definition of § 752 liabilities for transactions occurring after June 23, 2003.[67]

---

[65] See Cemco Investors LLC v. United States, 2007-1 U.S. Tax Cas. (CCH) ¶ 50,385 (N.D. Ill. 2007).

[66] This appears to have been a calculated tactical risk. Cf. RJT Investments X v. Commissioner, 491 F.3d 732 (8th Cir. 2007) (upholding deficiency and penalties in Son-of-BOSS case based on finding that partnership was a "sham, lacked economic substance and was formed and/or availed of to overstate ... basis").

[67] See Reg. § 1.752-1(a)(4). To remove any possible doubt about the expansive scope of "obligations," the regulations provide a non-exclusive list of illustrations, including "obligations under derivative financial instruments such as options, forward contracts, futures contracts, and swaps." See Reg. § 1.752-1(a)(4)(ii).

The court accepted the taxpayers' view, relying on the Tax Court's 1975 memorandum decision in *Helmer v. Commissioner* for the proposition that "a contingent obligation, such as a short or sold option, is not a liability under section 752."[68] In *Helmer*, a partnership wrote an option in the ordinary course of business and then made cash distributions (from the option premium) to its partners. The partners argued that their outside bases should be increased by their shares of the contingent obligation, but the Tax Court disagreed and held that the distributions were taxable.[69] It is far from clear that *Helmer* was correctly decided or, more importantly, that the decision carried the persuasive power attributed to it by the taxpayers in *Cemco*.[70] Unlike the tax shelter in *Cemco*, the distributions in *Helmer* did not involve the creation of artificial losses through transactions lacking in economic substance. Thus, while the *Cemco* court's statements about *Helmer* are pure dicta, it seems unduly simplistic to suggest that "[u]ntil recently, the law respecting whether an option contract should be treated as a liability under section 752 actually supported" the taxpayers' position.[71] In portraying Notice 2000-44 as an abrupt "revers[al of the

---

[68] 2007-1 U.S. Tax Cas. (CCH) ¶ 50,385, at _ (N.D. Ill. 2007) (citing Helmer v. Commissioner, 34 T.C.M. (CCH) 727 (1975)). The court cited several additional cases which purported to follow *Helmer* but were readily distinguishable because they did not involve creation of basis or other tax benefits. See Jackel & Blanchard, supra note 51, at 1583-92 (distinguishing other pre-2000 cases and rulings and concluding that *Helmer* was the only case that could not be reconciled with the Service's policy-based definition of liabilities).

[69] See Helmer v. Commissioner, 34 T.C.M. (CCH) 727, _ (1975) ("The option agreement ... created no liability on the part of the partnership to repay the funds paid nor to perform any services in the future. Therefore we hold that no liability arose under section 752 and the partners' bases cannot be increased by such amounts.").

[70] In *Helmer*, the Tax Court recognized that it faced "a unique situation" and expressed concern that its holding seemed inconsistent with the passthrough nature of partnerships. See id. at _ n.4.

[71] Cemco Investors LLC v. United States, 2007-1 U.S. Tax Cas. (CCH) ¶ 50,385, at _ (N.D. Ill. 2007) ("For many years, the *Helmer* rule served as the definition of liability under section 752. ... Thus, under *Helmer* and its progeny, it would have been proper for [Partnership] to ignore the short, or sold, option as a liability under section 752.").

government's] position regarding partnership liabilities under section 752,"[72] the *Cemco* court failed to mention the series of revenue rulings going back to 1988 in which the Service took the position that obligations giving rise to basis were § 752 liabilities. In promulgating proposed regulations under § 752 in 2003, the Treasury clearly acknowledged its refusal to follow *Helmer* but expressed no view concerning the technical definition of § 752 liabilities for transactions occurring before June 24, 2003.[73]

On appeal, the Seventh Circuit affirmed the lower court's grant of summary judgment for the government. Writing for a unanimous panel, Judge Easterbrook was plainly skeptical of a transaction that involved "an out-of-pocket cost of $6,000 and no risk beyond that expense, while generating a tax loss of $3.6 million."[74] The offsetting options were part of a single, integrated package which was deliberately structured to eliminate virtually all investment risk. The proceeds that Trust received from selling the short option almost completely offset the $3.6 million premium that it nominally paid for the long option. Similarly, the Trust's potential payment obligation of nearly $7.2 million under the short option almost completely offset the $7.2 million potential payoff from the long option, except in the unlikely event that the euro exchange rate fell within a very narrow collar at the end of the two-week option period.[75] Since both options were

---

[72] Id. at _.

[73] See REG-106736-00, 2003-2 C.B. 60, 62 (noting that the definition of liabilities under the proposed regulations "does not follow *Helmer*"); see also id. at 61 ("There is no statutory or regulatory definition of liabilities for purposes of section 752.").

[74] Cemco Investors LLC v. United States, 515 F.3d 749, 751 (7th Cir. 2008).

[75] Under the long (purchased) option, Bank agreed to pay Trust $7.2 million if the euro was worth less than or equal to $0.8652 at the end of the two-week option period. Under the short (sold) option, Trust agreed to pay Bank $7.128 million if the euro was worth less than or equal to $0.8650 on the same date. Thus, Trust stood to gain $7.2 million only if the euro was worth more than $0.8650 but not more than $0.8652 at the end of the two-week period. If the euro ended up at 0.8650 or less, Trust would receive only $72,000 (the difference between the payoffs

designed to terminate without being exercised, the only real significance of the transaction was to establish a high outside basis that could be assigned to the euros and ultimately used to generate an artificial tax loss of $3.6 million. As Judge Easterbrook drily noted: "The deal as a whole seems to lack economic substance; if it has any substance (a few thousand dollars paid to purchase a slight chance of a big payoff) then the $3.6 million 'gain' on one premium should be paired with the $3.6 million 'loss' on the other; and at all events the deal's nature ([$6,000] paid for a slim chance to receive $7.2 million) is not accurately reflected by treating €56,000 as having a basis of $3.6 million."[76]

In disallowing the purported $3.6 million loss, the Seventh Circuit upheld the validity of the retroactive § 752 regulations. While "[r]etroactivity requires justification," the court found it "obvious" from the terms of the regulations that they were authorized by Congress's explicit 2000 directive to the Treasury to prescribe retroactive rules for partnerships (and S corporations) similar to the basis-reduction rules applicable to corporations under § 358(h).[77] Having concluded that the § 752 regulations "applie[d] to this deal and prevent[ed] Cemco's investors from claiming a loss," Judge Easterbrook gave short shrift to the taxpayers' complaint of unfairness: "Cemco is scarcely in a position to complain – not only because this tax shelter was constructed after the warning in Notice 2000-44, but also because all the regulation does is instantiate the

---

under the two options). At the beginning of the option period, the euro was worth around $0.8875.

[76] Id. at 751.

[77] Id. at 752; see also id. ("Section 309 of the Community Renewal Tax Relief Act of 2000 ... enacts basis-reduction rules for many transactions and authorizes the IRS to adopt regulations prescribing similar rules for partnerships and S corporations. Section 309(d)(2) of the 2000 Act adds that these regulations may be retroactive to October 18, 1999. That's the power the Commissioner used when promulgating Treas. Reg. § 1.752-6.").

pre-existing norm that transactions with no economic substance don't reduce people's taxes."[78]

If Judge Easterbrook is correct in viewing the retroactive § 752 regulations as merely "instantiat[ing]" the doctrine of economic substance, one is tempted to ask why Congress found it necessary to authorize those regulations (or, indeed, to enact § 358(h)). In principle, the retroactive regulations may seem redundant, since courts could reach the same result by applying the doctrine of economic substance (or the closely related doctrines of substance over form, step transaction, and business purpose). As a practical matter, however, by resting its decision squarely on the retroactive regulations, the court avoided the need to remand the case for a full-fledged trial on the fact-dependent issue of economic substance. As Judge Easterbrook clearly perceived, "regulations that specify [the] sorts of transactions that may be looked through" for tax purposes serve an important function of judicial economy: they "avoid the need to litigate, one tax shelter at a time, whether any real economic transaction is inside the box."[79] Even the taxpayers conceded that the retroactive regulations, if they were upheld, would "scupper the entire class of offsetting-option tax shelters."[80]

The retroactive § 752 regulations also allowed Judge Easterbrook to brush aside the taxpayers' reliance on *Helmer* to justify an artificially-enhanced outside basis. "That may or may not be the right way to understand *Helmer*; we need not decide, for it is not controlling in this court – or anywhere else."[81] By applying the retroactive regulations, the court seems to have

[78] Id.

[79] Id. at 751.

[80] Id.

[81] Id.

tacitly accepted the taxpayers' premise that the contingent obligation under the short option was not already taken into account under § 752. If, contrary to the *Helmer* rule, an obligation actually constituted a § 752 liability, there would be no need for a remedial adjustment and the retroactive regulations by their terms would not apply. Although the retroactive regulations did not purport to define the precise scope of § 752 liabilities under pre-2003 law, they effectively undercut *Helmer* as support for contingent-liability tax shelters by requiring that outside basis be reduced in the same manner for obligations that generated basis but escaped classification as § 752 liabilities.[82] For transactions occurring on or after June 24, 2003, the prospective § 752 regulations directly address the issue by defining § 752 liabilities to include both fixed and contingent obligations (consistent with the definition of liabilities in § 358(h)(3)), to the extent they give rise to basis.[83]

The Seventh Circuit's decision in *Cemco* demonstrates the utility of the retroactive § 752 regulations for courts confronted with an impending flood of contingent-liability cases. The controversy over the *Helmer* rule amounted to little more than a distraction because the *Helmer*-based technical arguments advanced by shelter counsel could not survive scrutiny under the economic substance doctrine. Stated differently, shelter counsel invoked the *Helmer* rule to justify rendering penalty-shield opinions, while discounting the contrary position of revenue rulings and Notice 2000-44 as well as the lack of economic substance in the contingent-liability shelters.

---

[82] By analogy to § 358(h)(1) in the corporate context, the retroactive § 752 regulations required outside basis to be reduced only if necessary to prevent a built-in loss (after application of the normal § 752 rules) in the partnership interest of the partner whose liabilities were assumed.

[83] See Reg. § 1.752-1(a)(4); cf. I.R.C. § 358(h)(3).

*Kornman*. Shortly after the Seventh Circuit's decision in *Cemco*, the Fifth Circuit struck down a similar contingent-liability shelter in Kornman & Associates, Inc. v. United States.[84] Mr. Kornman, like Mr. Daugerdas, was a lawyer who peddled tax shelters to others and decided to get a piece of the action himself. Mr. Kornman's shelter involved a short sale, while Mr. Daugerdas's shelter involved offsetting options, but both relied on the same basic tax gimmick. In 1999, acting through a trust and a couple of wholly-owned corporations, Mr. Kornman executed a short sale of Treasury notes with a face value of $100 million.[85] He then contributed the cash proceeds of the short sale (around $102 million) plus $2 million additional cash to a partnership which also assumed the short-sale obligation, and sold the partnership interest for $1.8 million to an employee who used the cash to close the short sale.[86] All of these steps were completed within a four-day period. Although the transaction resulted in a real economic loss of $200,000 ($2 million cash contribution less $1.8 million sale proceeds), the taxpayers reported a "fake" tax loss of over $102 million on the sale of the partnership interest ($104 million outside

[84] Kornman & Associates, Inc. v. United States, _ F.3d _ (2008), aff'g Colm Producer, Inc. v. United States, 460 F. Supp. 2d 713 (N.D. Tex. 2006). The lower court believed that contingent obligations were not treated as § 752 obligations under prior law, but nevertheless disallowed the claimed loss on the ground that the taxpayer's obligation was fixed rather than contingent. See 460 F. Supp. 2d at 715-16.

[85] In a short sale, an investor borrows shares of stock (or other fungible property such as Treasury notes) from a broker and sells them to a third party. The investor is obligated to close the short sale by repaying the borrowed shares in kind (along with a fee or agreed interest) to the broker. If the share price drops, the investor closes the short sale by purchasing identical shares, delivers them to the broker, and pockets the difference between the (higher) sale price and the (lower) purchase price. On the other hand, if the share price rises, the investor's risk of loss is unlimited; there is generally no time limit on the obligation to cover. Thus, a short sale allows the investor to profit from a drop in the share price; it is the mirror image of a stock purchase which allows the investor to profit from a rise in the share price.

[86] In fact, the *Kornman* transaction involved several additional steps which were apparently intended to disguise the nature of the transaction. According to a lawyer who helped draft the tax opinion, "the groundwork for the tax shelter was conceived and fully blueprinted nearly a year before the transaction occurred," with the understanding that it would produce "a significant tax benefit." _ F.3d at _ [slip op. at 10-11].

basis less $1.8 million amount realized).[87]

The Fifth Circuit clearly understood that Mr. Kornman's shelter was premised on asymmetrical treatment of the short-sale proceeds and the short-sale obligation.[88] The linchpin of the taxpayers' technical argument was that the short-sale obligation was not a § 752 liability and therefore should be ignored in determining the amount realized on sale of the partnership interest. This argument did not impress the court, which responded by directly confronting the issue that the Seventh Circuit had skirted in *Cemco* – the treatment of contingent liabilities as § 752 liabilities under pre-2003 law.

In a decision written by Judge DeMoss, the court began by observing that in 1999 "there was no statutory definition of 'liability' for purposes of section 752 and the IRS had not formally promulgated a definition in its treasury regulations."[89] Noting that it could not resolve the issue "simply by referring to the definition of 'liability' in Black's Law Dictionary" and that neither the statutory language nor the legislative history provided useful guidance, the court turned to the policy-based definition of § 752 liabilities propounded by the Service in revenue rulings beginning with Revenue Ruling 88-77.[90] Although revenue rulings are generally not entitled to the same degree of deference as Treasury regulations, the court gave "significant weight" to the

---

[87] Commenting on "the elephant in the room," the court compared the taxpayers' "premeditated attempt to transform this wash transaction (for economic purposes) into a windfall (for tax purposes)" to "an alchemist's attempt to transmute lead into gold." Id. at _ [slip op. at 31-32].

[88] "If the obligation to replace the borrowed securities was a 'contingent liability' that did not increase the amount realized on the sale, then the proceeds from the short sale should also be treated as a "contingent asset" that has no effect on the outside basis calculation under section 722. The initial short sale that generates the cash proceeds and the subsequent covering transaction are inextricably intertwined." Id. at _ [slip op. at 46].

[89] Id. at _ [slip op. at 16].

[90] See Rev. Rul. 88-77, 1988-2 C.B. 129; Rev. Rul. 95-26, 1995-1 C.B. 131; Rev. Rul. 95-45, 1995-1 C.B. 53.

Service's ruling position based on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."[91] The persuasive power of the rulings was bolstered by a recent Tax Court memorandum decision applying the Service's definition of § 752 liabilities in a similar short-sale transaction.[92] Noting that the taxpayers' position would produce an "absurd result," the court found the Service's definition of § 752 liabilities entirely reasonable as a method of curbing artificial basis enhancements and refused to adopt a definition that would allow taxpayers to pursue a "conspicuous raid on the Treasury through the use of this tax shelter."[93]

The court remained unmoved by the taxpayers' contention that the Service's definition of § 752 liabilities contradicted "years of established law" (including *Helmer*) providing that contingent liabilities should not be taken into account in determining outside basis. Judge DeMoss brushed aside the taxpayer's reliance on *Helmer*, noting that the partnership in that case "did not receive assets giving rise to a partnership obligation."[94] Applying the Service's

---

[91] _ F.3d at _ [slip op. at 29] (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)).

[92] See Salina Partnership LP v. Commissioner, 80 T.C.M. (CCH) 686 (2000). In *Salina*, the court distinguished *Helmer* and found that open-transaction treatment of short sales mandated by § 1233 was not controlling because "sections 1233 and 752 are mutually exclusive." Id. at [*54]. Although the court discussed the Service's policy-based definition of liabilities and the need to maintain equality of inside and outside basis, the decision could be viewed as resting ultimately on a dictionary definition of the liabilities. See William S. McKee et al., supra note 56, ¶ 7.03[2] at 7-19 ("[T]he court hedged between a policy-based approach and the historical definition of 'liability.'"). Since traditional accounts payable of a cash-method taxpayer clearly fall outside § 752, the court's conclusion that § 752 liabilities include all "legally enforceable financial obligations" was clearly overly broad. See id.

[93] _ F.3d at _ [slip op. at 29-31].

[94] Id. at _ [slip op at 48-49]. Other cases cited by the taxpayers were also distinguishable because they did not involve "obligations that created or increased the basis of the partnership assets." Id. at _ [slip op at 50].

definition, he concluded that the short-sale obligation was a § 752 liability with a value equal to the proceeds of the original short sale.[95] Accordingly, the tax amount of the liability was included in the amount realized on sale of the partnership interest under § 752(d), and the taxpayers' artificial $102 million tax loss collapsed like a punctured balloon.

Although it is certainly possible to draw a technical distinction between the short-sale transaction in *Kornman* and the offsetting-option transaction in *Cemco*, the two transactions were functionally similar.[96] As the Fifth Circuit noted, both are variants of the same "Son-of-BOSS" basis-shifting strategy,[97] and the court's rationale for treating a short-sale obligation as a § 752 liability applies with equal force to an obligation under a short option.[98] In both cases, relief of a contingent liability should give rise to an amount realized (or reduce outside basis) to the extent the same liability gave rise to basis when it was originally incurred. In this sense, the Service's policy-based definition of § 752 liabilities may be viewed simply as an application of the

---

[95] The court accepted the Service's view, set forth in Revenue Ruling 95-45, that "in the case of an 'open' short sale, the amount of liability assumed for basis purposes equals the proceeds of the original sale." Id. at _ [slip op at 44-45]. The court also noted that the taxpayers could not claim that they were "unfairly surprised or prejudiced" because "they were on notice as early as 1988, and certainly by 1995, that the IRS considered the obligation to close a short sale to be a liability under section 752." Id. at _ [slip op at 50-51].

[96] In *Kornman*, the court noted that "none of the cases or rulings cited by the [taxpayers] involve a short sale, which we consider a unique transaction." Id. at _ [slip op at 47]. Unlike a short sale, an option expires automatically if it is not exercised by a specified date; in addition, an option-writer's potential profit is limited to the amount of the option premium. Nevertheless, a short seller and the writer of a naked option face essentially the same unlimited downside exposure if the price of the underlying property rises. In *Kornman*, given the low-risk nature of Treasury securities and the compressed time frame of the transaction, the purported tax savings far outweighed any real economic risk.

[97] Id. at _ [slip op at 4].

[98] Cf. Coltec Industries, Inc. v. United States, 454 F.3d 1340, 1347 (Fed. Cir. 2006), cert. denied, 127 S.Ct. 1261 (2007) (treating contingent liabilities as liabilities under analogous provision of § 358 in corporate context).

longstanding symmetry principle of *Crane* and *Tufts*.[99]

If the obligations described in Notice 2000-44 (including contingent obligations under short sales and short options) actually constituted § 752 liabilities, they would already have to be taken into account in determining outside basis and there would be no need to apply the retroactive § 752 regulations.[100] Indeed, regardless of how contingent obligations are classified, the tax shelters in *Cemco*, *Kornman*, and similar cases should be vulnerable to attack under the partnership anti-abuse rule or the economic substance doctrine.[101] As a practical matter, the retroactive regulations provide a convenient short-cut to reach the correct basis result while avoiding case-by-case litigation of particular transactions.[102] At the same time, relying on those

---

[99] See Crane v. Commissioner, 331 U.S. 1 (1947); Commissioner v. Tufts, 461 U.S. 300 (1983). In the analogous context of corporate reorganizations, Congress in 1939 enacted the provisions now set forth in §§ 357, 358, and 362 to reverse Supreme Court's *Hendler* decision which treated an assumption of liabilities as a payment of cash boot. See Stanley S. Surrey, Assumption of Indebtedness in Tax-Free Exchanges, 50 Yale L. J. 1 (1940); Karen C. Burke, The Story of *Hendler*: From Pyrrhic Victory to Modern Section 357, in Business Tax Stories 181 (Steven A. Bank & Kirk J. Stark eds., 2005).

[100] Indeed, one prominent commentator argued that the retroactive § 752 regulations were unnecessary precisely because those obligations were arguably already treated as § 752 liabilities. See Philip F. Postlewaite, Son of Boss Meets Annie Get Your Gun: A Cautionary Tale, 6 Bus. Entities 16, 19 (2004); id. at 26-27 (concluding that the "definition of a 'liability' has remained constant" since 1988); cf. id. at 27 n.28 ("[T]ax advisers may have felt that the *Helmer* decision ... was more substantial authority than the [1988] proposed regulation or the revenue rulings.").

[101] In 1994, several years before Mr. Daugerdas claimed to have invented the COBRA shelter, the New York State Bar Association concluded that, despite the technical distinctions between short sales and options, both transactions were vulnerable to recharacterization under the [proposed] partnership anti-abuse rule of Reg. § 1.701-2. See NYSBA Tax Section, Committee on Partnerships, Report on the Proposed Partnership Anti-Abuse Rule, Appendix, Ex. 13 (July 1, 1994) [94 TNT 130-34] (noting that "the result would be the same" if the partnership used offsetting options "instead of engaging in a [short sale of] government bonds").

[102] Cf. Kornman & Associates, Inc. v. United States, _ F.3d _ [slip op. at 52] (2008) (King, J., concurring) ("The Internal Revenue Service seeks a rule of law from a circuit court to dispose of this case ... without being put to the expense and delay of litigating the fact-bound question whether these transactions should be recharacterized for tax purposes under the no-economic-substance and step-transactions doctrines. The result is a rule of law addressing what is here a pretense, an unsettling undertaking."). Under the final regulations, an obligation under a short sale should give rise to a § 752 liability equal to the amount of cash proceeds from the sale. See Blake D. Rubin & Andrea Macintosh Whiteway, New Partnership Liability Regulations Target Abuse But Sweep More Broadly, 100 J. Tax'n 86, 88-89 (2004).

regulations to curb contingent-liability shelters could ultimately prove to be a risky strategy for the government.[103] Because the retroactive regulations do not purport to clarify the definition of § 752 liabilities under pre-2003 law, taxpayers have repeatedly cited *Helmer* for the broad proposition that contingent obligations could be ignored in determining outside basis under prior law.[104] In cases like *Cemco*, this misleading portrayal of prior law seemed relatively harmless because the court reached the correct result under the retroactive regulations. In other cases, however, the potential mischief is considerably greater. Lulled by the revisionist view of *Helmer* as an accurate reflection of prior law, some courts may be tempted to view the retroactive regulations as a dramatic change and call the validity of those regulations into question.

## IV. The Retroactive § 752 Regulations

The validity of the retroactive § 752 regulations has emerged as a high-stakes issue in litigation over contingent-liability shelters. If the regulations are declared invalid, the government will be forced to litigate each new shelter mutation on a case-by-case basis unless courts conclude that even under pre-2003 law contingent obligations constituted § 752 liabilities because they generated basis.[105] In challenging the regulations, taxpayers have argued that the

---

[103] See Internal Revenue Service, Office of Chief Counsel, CC-2003-020 (June 25, 2003) and CC-2003-030 (Sept. 10, 2003) (discussing application of retroactive § 752 regulations to transactions identified in Notice 2000-44); see also Goldberg Suggests Son of Boss Regs Will Diminish Settlement Prospects, 2003 TNT 219-47 (Nov. 13, 2003) ("[T]he IRS' stakes in litigating the validity of its Temporary Regulation are far different from the stakes faced by individual taxpayers. ... [I]f the IRS loses but one case on the validity of its Temporary Regulation, the consequences from the perspective of tax administration are potentially quite severe.").

[104] Prior to enactment of § 358(h), Treasury officials apparently considered the possibility of expressly repudiating *Helmer* but decided not to do so, presumably because of concerns about a potential whipsaw. See Jade Trading, LLC v. United States, 80 Fed. Cl. 11, 44 n.65 (2007) (referring to internal IRS memorandum which was inadvertently disclosed in other litigation).

[105] Failure by the government to litigate pending cases would provide a windfall for hundreds of shelter investors who refused the opportunity to settle by paying taxes in exchange for reduced penalties and partial deduction of transaction costs. See Notice 2004-46, 2004-21 I.R.B. 964 (announcing settlement initiative); see also

government exceeded its authority under the Congressional directive in § 309 of the Community Renewal Tax Relief Act of 2000 (CRTRA) and that the retroactive regulations unfairly attempt to disallow losses that would have been allowable under pre-2003 law.[106] The regulations were published in temporary form on June 24, 2003, which marks the watershed between the retroactive rules of Regulations § 1.752-6 (applicable to assumptions of liabilities occurring after October 18, 1999 and before June 24, 2003) and the prospective rules of Regulations § 1.752-7 (applicable to assumptions of liabilities occurring on or after June 24, 2003). Significantly, the retroactive regulations do not purport to define § 752 liabilities under prior law; they merely require a reduction in outside basis when a partnership assumes a liability (as defined in § 358(h)(3)) of a partner that was not otherwise taken into account under § 752.[107] The new definition of § 752 liabilities (restating the policy-based definition advanced in Revenue Ruling 88-77) applies only prospectively.[108]

In fact, the retroactive regulations are fully consistent with the plain language, the

---

Lee A. Sheppard, Two Minutes to Midnight: Settle Your Tax Shelter Case, 110 Tax Notes 812 (2006).

[106] See Community Renewal Tax Relief Act of 2000, Pub. L. 106-554 (Appendix G), § 309, 114 Stat. 2763A-587, 2763A-638 (2001). The taxpayers' arguments echo criticisms that initially surfaced in public hearings held on October 14, 2003. Witnesses testifying on behalf of the Coalition Against Regulatory Excesses (CARE) argued that the Congressional directive should apply only to settings in which a partnership is a transferor-shareholder in a § 358(h) assumption. See Witnesses Criticize Temporary Regs at IRS Hearing, According to Unofficial Transcript, 2003 TNT 200-37 (reporting statements by Thomas L. Evans of Kirkland & Ellis, LLP, and Professor Philip F. Postlewaite of Northwestern University School of Law); see also Postlewaite, supra note 100, at 21. Under this restrictive interpretation, no basis reduction would be required when a partnership assumed a partner's contingent liability as described in Notice 2000-44. Of course, the issue concerning the scope of the Congressional directive would be moot if, under prior law, § 752 liabilities (like § 358 liabilities) already included both fixed and contingent obligations.

[107] See Reg. § 1.752-6(a). If the liability was already taken into account for purposes of § 752, the retroactive regulations do not affect adjustments to outside basis, which are instead governed by the normal rules of § 752.

[108] See Reg. § 1.752-1(a)(4).

legislative history, and the purpose of § 309 of the CRTRA. By its terms, § 309 authorizes retroactive regulations "to prevent the acceleration or duplication of losses through the assumption of ... liabilities described in section 358(h)(3) ... in transactions involving partnerships."[109] Notwithstanding this language, taxpayers have argued that the directive is limited to an assumption of liabilities by a corporation of which a partnership is a shareholder. Although § 358, of course, is a corporate provision, the definition of liabilities in § 358(h)(3) to include "any fixed or contingent obligation to make payment" is not confined to corporate transactions; indeed, it serves admirably as a general definition for all business entities. Moreover, nothing in the legislative history suggests that Congress intended to limit the retroactive regulations to transactions between a corporation and a partnership.[110] The obvious purpose of the directive is to harmonize the liability-assumption rules for corporations and partnerships. To conclude that Congress intended the retroactive regulations not to apply to abusive partner-partnership transactions involving contingent liabilities, one would have to make the unwarranted assumption that Congress was either unaware of such transactions or was

---

[109] Section 309 directs the Treasury to prescribe rules which provide "appropriate adjustments under subchapter K ... to prevent the acceleration or duplication of losses through the assumption of (or transfer of assets subject to) liabilities described in section 358(h)(3) ... in transactions involving partnerships." Community Renewal Tax Relief Act of 2000, Pub. L. 106-554 (Appendix G), § 309(c)(1), 114 Stat. 2763A-587, 2763A-638 (2001).

[110] In amending the tax-avoidance provision of § 357(b) in 1999, Congress was clearly aware of analogous problems in the partnership setting. See H.R. Conf. Rep. No. 106-289, at 538 (1999) (directing the Treasury to "promptly examine the use of partnerships and apply similar rules (for example, with respect to adjustments to the basis of a partnership interest with respect to certain contingent liabilities) where there is a principal purpose of avoiding Federal income tax through the use of a transaction that includes the assumption of liabilities by a partnership"). Following a veto of the 1999 legislation, Congress adopted the § 358(h) approach to ensure a basis reduction for contingent liabilities not otherwise taken into account under § 358. See Jackel & Blanchard, supra note 51, at 1594-95; see also Jerred G. Blanchard, Jr. & Kenneth L. Hooker, Fixing Assumption of Liability Rules: The Wrong Way and the Right Way, 85 Tax Notes 933 (1999); Staff of Joint Comm. on Tax'n, General Explanation of Tax Legislation Enacted in the 106th Congress 153 n.174 (2001) (JCS-2-01). The *Coltec* decision eventually resolved any lingering uncertainty about whether, prior to the enactment of § 358(h), contingent liabilities already constituted liabilities for purposes of § 358. Hence, § 358(h)(3) arguably merely codified the prior law that § 358 liabilities – and presumably § 752 liabilities as well – included both fixed and contingent liabilities.

unconcerned about them.

In enacting § 358(h), Congress was well aware of the proliferation of tax shelters involving assumption of liabilities by partnerships analogous to those in the corporate context. Nevertheless, it was not clear that applying the immediate basis-reduction approach of § 358(h) was appropriate for a pass-through system. In the context of the two-level corporate tax, § 358(h) eliminated the built-in loss in the transferor-shareholder's stock basis but did not deprive the transferee corporation of an otherwise allowable deduction upon accrual or payment of the contingent obligation. In contrast, reducing a transferor-partner's outside basis could potentially eliminate even a single deduction; since a partner is not permitted to deduct losses in excess of outside basis, a reduction in outside basis might prevent any partner from deducting a real economic loss upon accrual or payment of the contingent liability.[111]

The drafters of the § 752 regulations recognized the need to modify the § 358(h) approach in the partnership context. To preserve passthrough of a single economic loss, while preventing acceleration of losses, the prospective § 752 regulations generally defer an outside basis reduction as long as possible when a partnership assumes a "non-§752 liability."[112] This approach

---

[111] See Reg. § 1.752-6(c), Example. As the example illustrates, the basis reduction gives rise to a disparity between inside and outside basis; inside basis will be reduced when (and if) the contingent liability is eventually paid, but the partner to whom the deduction is allocated may have insufficient outside basis to absorb the deduction. See I.R.C. § 704(d) (suspending losses in excess of outside basis). Thus, an immediate basis reduction has a harsher effect in the partnership setting than in the corporate setting. In some permutations of the offsetting-option shelter, the transferor-partner separated from the shelter prior to expiration or termination of the paired options and claimed a capital loss on sale of a partnership interest with an artificially-enhanced basis; the immediate basis reduction mechanically eliminated the artificial loss on sale of the interest.

[112] For an excellent discussion of the rationale of the deferred basis adjustment, see Jackel & Blanchard, supra note 51. Under the final regulations, the deferred basis adjustment is triggered upon a sale or liquidation of the transferor-partner's partnership interest or an assumption of a non-§ 752 liability by a partner other than the transferor-partner. See Reg. § 1.752-7(d)-(g). The final regulations recognize that it is these "separation events" (rather than the initial assumption) that give rise to potential abuse; under prior law, there were no mechanical rules to ensure that a liability that escaped classification as a § 752 liability would automatically be taken into account

seeks to preserve, as far as possible, parity between inside and outside basis. In contrast, the retroactive regulations were aimed at abusive transactions identified in Notice 2000-44 and generally required an immediate reduction in outside basis by analogy to the basis-reduction rule of § 358. To mitigate the potential harshness of this approach, however, the retroactive regulations allowed taxpayers to elect the wait-and-see approach for obligations assumed prior to the effective date of the prospective regulations. Thus, taxpayers could elect to reduce outside basis immediately or on a deferred basis; what they could not do was completely ignore the required reduction in outside basis, as Messrs. Daugerdas and Kornman sought to do.

The retroactive regulations generally exempt a bona fide assumption of liabilities from the remedial basis-reduction rules. In enacting § 358(h), Congress provided two statutory safe harbors which apply "[e]xcept as provided by the Secretary."[113] The discretion to override the safe harbors reflected concern that the new rules might be subject to manipulation in unexpected ways. Section 358(h)(2)(A) provides a safe harbor when liabilities are assumed together with a transfer of the associated business. As a result, so-called deductible liabilities that are not treated as liabilities for purposes of § 358 remain subject to the general rule of § 357(c).[114] Such favorable treatment is denied, however, for a "naked" transfer of liabilities separate from the

upon a separation event. Thus, the final regulations distinguish between a § 752 liability for which a basis reduction is required under the normal rules when the liability is assumed from a partner, and a non-§ 752 liability for which a basis reduction is not required until a separation event.

[113] I.R.C. § 358(h)(2).

[114] While the legislative history of § 357(c)'s predecessor provision clearly spells out this requirement, the taxpayers in *Black & Decker* and *Coltec* claimed that the literal requirements of the statute were satisfied when contingent liabilities were stripped from the underlying business and transferred separately to a shell subsidiary. See generally Karen C. Burke, Deconstructing *Black & Decker*'s Contingent Liability Shelter: A Statutory Analysis, 108 Tax Notes 211 (2005) (tracing legislative history).

underlying business that generated the liabilities.[115] Section 358(h)(2)(B) provides a second safe harbor when liabilities are assumed together with substantially all the assets associated with those liabilities. To prevent abuse, the Treasury exercised its authority to limit the second safe harbor both retroactively and prospectively.[116] In promulgating final regulations in 2005, the Treasury reiterated its position that the retroactive regulations apply to "transactions that are abusive in nature and that lack a business purpose."[117]

In challenging the validity of the retroactive regulations, taxpayers have advanced various arguments, some of them hovering on the borderline between the creative and the frivolous. For example, in one case involving an offsetting-option shelter, the taxpayers argued that the retroactive regulations went beyond the Congressional directive to prevent "acceleration or duplication" of losses and reached transactions that create a "single" artificial loss;[118] unfortunately, they neglected to point out that the transaction did in fact result in duplication of

---

[115] This restriction was needed to prevent taxpayers from replicating the abuses involved in *Black & Decker* and *Coltec*. Although *Coltec* applied the economic substance doctrine to eliminate the claimed tax losses, there would have been no need for § 358(h) if courts had interpreted § 357(c)(3) to apply only if an assumption of liabilities was coupled with a transfer of the associated business. See Karen C. Burke, *Black & Decker* in the Fourth Circuit: Tax Shelters and Textualism, 111 Tax Notes 315 (2006).

[116] For example, a transfer of cash generated by a sold option, together with the obligation under the option, might fall within the safe harbor. To prevent this result, the retroactive regulations deny this exception for transactions identified in Notice 2000-44. The Treasury has also determined that removing the exception under § 358(h)(2)(B) is necessary to prevent abuse in transactions involving corporations and shareholders. See T.D. 9397, 2008-22 I.R.B. 385; Reg. § 1.358-5.

[117] T.D. 9207, 2005-1 C.B. 1344, 1346 (preamble); see id. at 1347 (extending the time to elect the wait-and-see approach in lieu of an immediate basis reduction).

[118] In Sala v. United States, 2008-1 U.S. Tax Cas. (CCH) ¶ 50,308 (D. Colo. 2008), the court found the retroactive regulations invalid as applied to an offsetting-option shelter because the transaction resulted in "a single loss that occur[red] at a specific time: liquidation of the inflated-basis assets." [slip op. at *77-*78] The "single loss" notion is developed at length in an article by two practitioners whose views were cited by the court. See James Whitmire & Bruce Lemons, The Partnership Temporary Regulations – Placing a Premium on Validity, Tax Notes 635, 640-42 (2003); see also id. at 642 (portraying regulations that prevent taxpayers from claiming "a tax loss that is unassociated with an economic loss" as a threat to "the checks and balances of our constitutional system").

loss – once at the partnership level when the options expired and again on sale of the inflated-basis property.[119] Similarly, attempts to confine the scope of the Congressional directive to transactions involving liabilities transferred by partnerships to corporations contradict the plain language of the directive and undermine its evident purpose.[120] A more insidious line of argument suggests that contingent-liability shelters would have withstood scrutiny under prior law had the retroactive regulations not abruptly changed the prevailing understanding of § 752 liabilities reflected in *Helmer*.[121] This line of argument misrepresents the state of prior law by ignoring the Service's policy-based definition of § 752 liabilities as well as the partnership anti-abuse rule and the longstanding doctrine of economic substance.[122] Moreover, it distracts attention from the scope of the Congressional directive and portrays the retroactive regulations as

---

[119] Congress directed the Treasury to issue regulations preventing acceleration *or* duplication of loss. The taxpayers' argument is apparently that the transferor-partner's artificial loss on sale of the partnership interest is not "accelerated" if the loss would not otherwise be allowable; and, moreover, that it is not "duplicated" because, in the offsetting-option transaction, the transferee-partnership will recognize gain (and offsetting loss) when the options expire. See Whitmire & Lemons, supra note 118, at 642; cf. Postlewaite, supra note 100, at 26 n.27 ("Without the duplication of loss, the need for the regulation is questionable.").

[120] This argument, however, appears to have resonated with a few lower courts. See Klamath Strategic Investment Fund, LLC v. United States, 440 F. Supp. 2d 608, 622 (E.D. Tex. 2006) (interpreting directive as contemplating "rules applicable to partnerships that were shareholders in corporations that engaged in transactions subject to Section 358(h)"); Sala v. United States, 2008-1 U.S. Tax Cas. (CCH) ¶ 50,308, at _ (D. Colo. 2008) [slip op. at *79] (holding that Congress "only authorized the Treasury to issue regulations involving transactions between a corporation and a partnership").

[121] One court apparently believed that the retroactive regulations adopted a definition of § 752 liabilities that "change[d] settled law." Klamath Strategic Investment Fund, LLC v. United States, 440 F. Supp. 2d 608, 620 (E.D. Tex. 2006). Although the preamble to the regulations correctly observes that "[t]here [was] no statutory or regulatory definition of liabilities for purposes of section 752" under pre-2003 law, T.D. 9062, 2003-2 C.B. 46, it requires a considerable leap of logic to conclude, as the *Klamath* court did, that *Helmer* and its progeny furnished "the only definition available to taxpayers" under pre-2003 law. 440 F. Supp. 2d at 625; see also Sala v. United States, 2008-1 U.S. Tax Cas. (CCH) ¶ 50,308, at _ (D. Colo. 2008) [slip op. at *83-*84] ("Treasury Regulation § 1.752-6 not only alters settled prior law ... it directly contradicts the underlying statutes – 26 U.S.C. §§ 358 and 752 – the abuse of which it supposedly prevents.").

[122] See Klamath Strategic Investment Fund, LLC v. United States, 440 F. Supp. 2d 608, 620 (E.D. Tex. 2006) (asserting that the government "knew it was changing the law regarding 'liabilities' under Section 752 with this new regulation" and sought "to bar, retroactively, the transactions engaged in by [taxpayers]").

an unprincipled attempt by the government to bolster its litigating position.[123]

Ironically, perhaps the strongest argument against the retroactive regulations is that they were redundant because the abusive transactions in question were already covered either by § 752 or by the partnership anti-abuse rule.[124] Although a robust application of § 752 arguably should have made it unnecessary to rely on the retroactive regulations, the courts have experienced considerable difficulty in arriving at a sensible and consistent definition of § 752 liabilities. As a practical matter, the retroactive regulations provide a useful and effective backstop. Moreover, although the anti-abuse rule probably should have been sufficient to prevent transactions described in Notice 2000-44 from occurring the first place, it clearly was not. Perhaps shelter counsel, who seem prone to wishful thinking on so many matters, convinced themselves that the anti-abuse rule itself would be declared invalid.[125]

To the extent that courts are reluctant to apply the retroactive § 752 regulations or the partnership anti-abuse rule, the government may be forced to litigate tax shelters one case at a time, demonstrating that each mutation of the same basic transaction lacks economic substance.[126] Even if the government ultimately prevails on the issue of economic substance, an

---

[123] See id. at 625 (inferring that the regulations were promulgated "to buttress the government litigation position").

[124] See Postlewaite, supra note 100, at 19 (arguing that the retroactive regulations were unnecessary in light of "[t]he shields of Section 752 and/or the anti-abuse regulation" which "should have been the preferred solutions of choice").

[125] See William S. McKee et al., supra note 56, ¶ 1.05[1][c], at 1-21 (suggesting that failure to litigate the anti-abuse rule in *Jade Trading* "invokes a strong presumption that the Service does not believe in the validity of its own regulation" and that, absent judicial enforcement, "taxpayers will eventually recognize the rule for the scarecrow that it is").

[126] In *Klamath*, for example, the government ultimately prevailed on the issue of economic substance. As a result of the court's earlier partial summary judgment invalidating the retroactive regulations, however, the government was foreclosed from relitigating the § 752 issue in eight other shelter cases involving nearly 100

equally important issue is whether investors in defective tax shelters can rely on opinions issued by shelter counsel to shield them from penalties. At least one district court found that although a transaction lacked economic substance, taxpayers nevertheless avoided all accuracy-related penalties because they relied in "good faith" on opinions of shelter counsel and had "reasonable cause" for their reporting position.[127] Other courts have been less eager to treat penalty-shield opinions as a grant of unqualified immunity for transactions that plainly lacked economic substance.[128] Faced with a rising tide of tax shelter litigation involving exotic financial instruments and elaborate fictional transactions, courts have struggled to understand the nature of the transactions and the applicable legal principles. Allowing investors to hide behind self-serving opinions of shelter counsel to avoid penalties will only encourage the proliferation of

---

partnerships with the same tax matters partner.

[127] In *Klamath*, the court eventually agreed that a "premium loan" transaction described in Notice 2000-44 lacked economic substance based on internal bank records documenting a secret understanding between the shelter promoter and the lending banks that (1) funds purportedly available for currency trading would never actually be used for that purpose and (2) the banks were prepared to apply pressure to ensure that the investment would be terminated promptly. Nevertheless, the court found that the investors (two lawyers who sought to shelter fees from successful tobacco litigation) had a "reasonable cause" defense to penalties. See Klamath Strategic Investment Fund, LLC v. United States, 472 F. Supp. 2d 885 (E.D. Tex. 2007); see also Lee A. Sheppard, What Does IRS BLIPS Victory Mean?," Tax Notes 617, 621 (Feb. 12, 2007) (noting that the shelter investors were permitted to rely on "template opinions ... that assumed facts and assumed economic substance – what are politely called factual disconnect opinions"). The court concluded, somewhat incongruously, that the investors were not aware of the tax benefits until they left the partnership, even though they obtained several opinions confirming the potential tax benefits.

[128] One court found that a transaction's lack of economic substance trumped reliance on *Helmer* as "substantial authority" for purposes of assessing accuracy-related and negligence penalties at the partnership level. Jade Trading, LLC v. United States, 80 Fed. Cl. 11, 58 (2007) ("At bottom, the fictional nature of the transaction and its lack of economic reality outweigh *Helmer* in the substantial authority assessment."). In *Jade Trading*, shelter counsel charged three taxpayers $100,000 each for substantially identical opinions in connection with an offsetting-option transaction. Based on the taxpayers' representations that they expected potential profits from the transaction in excess of costs and expenses, shelter counsel opined that it was "more likely than not" that neither the economic substance doctrine nor the partnership anti-abuse rule applied to the transaction. Practitioners have been quick to object to the application of penalties to taxpayers who "technically complied with the code" and "merely guessed wrong as to whether the transaction was valid under the economic substance doctrine, an amorphous and vague common-law standard." Thomas A. Cullinan & Julie P. Bowling, This One Left Us Jaded," 118 Tax Notes 422 (2008).

abusive tax shelters and undermine the sound administration of the tax laws. Conversely, the surest way to curb abuse is to deny penalty-shield protection for transactions that demonstrably lack economic substance or violate the partnership anti-abuse rule.

Conclusion

The rise of contingent-liability shelters has reaffirmed the importance of economic substance as a pervasive judicial doctrine and an essential backstop to the increasingly tangled web of tax statutes and regulations. All too often, shelter counsel have issued favorable tax opinions concerning transactions that clearly lacked economic substance, relying on strained logic and tendentious interpretation of governing law. In doing so, they have lost a healthy sense of skepticism and abandoned professional scruples, putting their own professional reputations and those of their firms at risk in order to extract large fees from gullible clients. Designers of tax shelters excel in drawing fine lines and formalistic distinctions, and they have brought enormous energy and ingenuity to bear in inventing new variations of the same old basis-shift transaction. Ultimately, however, the exercise is essentially sterile and destructive. The experience of Paul Daugerdas and Jenkens & Gilchrist serves as a reminder that "the ability to perceive alternatives in great number" may be a "dangerous intelligence unless it is combined with a power to forecast the likely reaction of the Service and the courts to each of the alternatives in view."[129] Shelter counsel who, through overconfidence or simple carelessness, fail to appreciate the limits of legitimate tax planning do a disservice not only to their clients but also to the rest of the tax bar and the public at large.

[129] Marvin A. Chirelstein, Learned Hand's Contribution to the Law of Tax Avoidance, 77 Yale L.J. 440, 440 (1968).

Ironically, the excesses of tax shelter designers have helped to reinvigorate the economic substance doctrine, as courts search for ways to cut through contrived transactions and artificial tax losses.[130] Congress and the Treasury also have a role to play. Detailed provisions like § 358(h) and the retroactive § 752 regulations can block off specific abuses by plugging gaps in the existing statute and regulations, but they inevitably lag behind the capacity of shelter designers to discover new gaps and invent fresh variations. Moreover, targeted technical remedies may prove counterproductive. With each new amendment, the basic rules concerning transfers of encumbered property to and from partnerships (and corporations) become more tangled, complex, and unwieldy, and provide new grist for the tax shelter mills.

The decisions in *Cemco* and *Kornman* demonstrate that courts need not stand by helplessly when confronted with abusive shelters.[131] If further reinforcement is necessary to protect investors and deter peddlers of defective shelters, perhaps Congress should consider a more flexible, broad-gauged approach. The partnership anti-abuse rule has been on the books since 1994 but has not yet been tested in litigation.[132] Any lingering doubt about the validity of the anti-abuse rule could easily be removed by codifying it, presumably with retroactive effect to

---

[130] See David P. Hariton, When and How Should the Economic Substance Doctrine Be Applied?, 60 Tax L. Rev. 29, 56 (2006) (defending economic substance doctrine as an antidote to "tax shelter promoters who ignore the obvious intent of the law" and courts that "encourage tax-shelter promoters by applying the literal words of a statute without regard to their underlying intent.").

[131] See Bankman, supra note 2, at 932 ("At the present ... the market for individual shelters is in disarray, and this condition seems likely to hold for at least the near future."); Canellos, supra note 3, at 65 ("[T]ax shelters fail regularly in court. ... Once a judge sees the transaction as a shelter, ... the result is predictable – taxpayer loses.").

[132] The anti-abuse rule explicitly requires a weighing of business purpose against the purported tax benefits. See Reg. § 1.701-2(a)(1); Karen C. Burke, Tax Avoidance as A Legitimate Business Purpose, 118 Tax Notes 1393 (2008). Cf. Countryside Limited Partnership v. Commissioner, T.C. Memo 2008-3 (2008) (purporting to apply the anti-abuse rule but failing to consider whether the partnership's business purpose was substantial relative to the purported tax benefits).

the effective date of the existing regulations.[133] In the meantime, the surge of lawsuits by disappointed investors who paid large fees for defective shelters is likely to continue unabated. Mr. Daugerdas and Jenkens & Gilchrist may be the most spectacular casualties of the tax shelter wars to date, but they are unlikely to be the last.[134]

[133] In constructing and selling offsetting-option and short-sale shelters, promoters blithely ignored the New York State Bar Association's conclusion that these transactions violated the anti-abuse rule. See note 101 supra; see also Reg. § 1.701-2(d), Example 8 (illustrating abusive duplication of basis in the absence of a § 754 election). The anti-abuse rule, though much criticized, sets forth a concept of abuse that avoids the twin perils of open-ended judicial doctrines and "arbitrary, mechanical rules." Alan Gunn, The Use and Misuse of Antiabuse Rules: Lessons from the Partnership Antiabuse Regulations, 54 S.M.U. L. Rev. 159, 176 (2001); see id. at 174 ("[T]he regulations perform a useful service by setting forth the notion of abuse as something distinct in principle from substance-over-form and business purpose.").

[134] Several promoters and shelter counsel (including Mr. Daugerdas and Jenkens & Gilchrist) have been the targets of criminal investigations involving allegations of fraudulent concealment and other activities, but those allegations do not depend on the technical merits of the Son-of-BOSS shelters. Unfortunately, the *Klamath* decision invalidating the retroactive § 752 regulations has generated widespread confusion concerning the stakes – both civil and criminal – in the contingent-liability shelter cases. Cf. Kristin E. Hickman, Of Lenity, *Chevron*, and KPMG, 26 Va. Tax Rev. 905, 928-29 (200) ("[I]f one accepts the *Klamath* court's holding that the government abused its discretion" in issuing the retroactive regulations, and "if taxpayers manage to prevail on economic substance and other issues, then liability – whether criminal or civil – rests on how a court evaluates the meaning of liabilities under section 752.").