UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Fidelity International Currency Advisor A Fund, L.L.C., by the Tax Matters Partner,
Plaintiff,

vs.

United States of America,
Defendant.

Case No. 05cv40151-FDS

BEFORE: The Honorable F. Dennis Saylor, IV

Status Conference
Rulings on Motions Concerning Expert Testimony

United States District Court
Courtroom No. 2
595 Main Street
Worcester, Massachusetts
July 8, 2008

Marianne Kusa-Ryll, RDR, CRR
Official Court Reporter
United States District Court
595 Main Street, Room 514A
Worcester, MA 01608-2093
508-929-3399
Mechanical Steno - Transcript by Computer

EXHIBIT
A

APPEARANCES:

McKee Nelson, LLP
David J. Curtin, Esquire
Ronald L. Buch, Jr., Esquire
1919 M Street, NW
Suite 800
Washington, DC 20036
for the Plaintiff

Mirick, O'Connell, DeMallie & Lougee, LLP
John O. Mirick, Esquire
100 Front Street
Worcester, MA 01608-1477
for the Plaintiff

United States Department of Justice
Tax Division
Dennis M. Donohue, Chief Senior Litigation Counsel
John A. Lindquist, III, Senior Trial Attorney
Barry E. Reiferson, Trial Attorney
P.O. Box 55
Washington, DC 20044
For the Defendant

# E X H I B I T S

| NO. | | FOR ID |
|---|---|---|
| A | Sealed envelope, with the original of the transcript and exhibits of the two Irish witnesses. | 33 |

P R O C E E D I N G S

THE CLERK: All rise.

Court is now open. You may be seated.

Case No. 05-40151, Fidelity International Currency Advisor A Fund versus the United States.

Counsel, please note your appearance for the record.

MR. CURTIN: Good morning, your Honor. I'm David Curtin, here for the plaintiff. With me is Mr. Ronald Buch.

MR. BUCH: Good morning, your Honor.

THE COURT: Good morning.

MR. CURTIN: And, of course, your Honor, Mr. John Mirick.

MR. MIRICK: Good morning, your Honor.

THE COURT: Good morning.

MR. DONOHUE: Good morning, your Honor. Dennis Donohue appearing on behalf of the defendant, The United States, and with me this morning is John Lindquist.

MR. LINDQUIST: Good morning, your Honor.

MR. DONOHUE: And Barry Reiferson.

THE COURT: Good morning. All right. This is a status conference in this case. The first order of business, from my perspective, is to make my rulings on the various motions concerning expert testimony. I apologize that it has been dangling as long as it has.

And to cut to the chase, essentially I'm going to deny all four motions to exclude with some reservations and exceptions, which I will note; and I'm going to deny the motion seeking additional discovery as to expert Gordon Rausser.

I have concluded that further proceedings are unnecessary, particularly, we don't need a Daubert-type hearing. The matter -- the matters were amply briefed. I've reviewed the pleadings and the underlying reports and exhibits.

There are four motions pending to exclude expert testimony and reports brought under Rule 702 and/or Daubert. Fidelity, the plaintiff, seeks to exclude the testimony of Gordon Rausser, Lawrence Kolbe and David LaRue; and the government seeks in one motion to exclude the testimony of Ethan Yale and Stuart Smith. At this stage, the issue is solely the exercise of the gatekeeper function by the Court under Rule 702. I'm making no rulings on the credibility of the experts or the weight of the evidence. The standard is set forth in Rule 702. I won't repeat it here.

I do want to start by addressing several issues that cut across multiple witnesses, which are the expression of an opinion by an expert as to legal issues, the expression of an opinion of an expert as to motive or state of mind of the taxpayer, and the factual descriptions or recitations set forth in the reports.

The first of those issues is whether an expert witness can testify as to legal conclusions, or more particularly, what the requirements of the Tax Code are. The two leading cases in the First Circuit, as counsel have pointed out, are Nieves-Villanueva vs. Soto-Rivera, 133 F.3d 92 (First Circuit '97) and United States versus -- if I'm pronouncing this correctly -- Mikutowicz, M-I-K-U-T-O-W-I-C-Z, 365 F3d 65 (First Circuit, 2004).

In Nieves-Villanueva, the Court ruled that expert testimony on legal issues was rarely admissible. The Court noted, however, it was often difficult to draw the line between questions of law, questions of fact, and mixed questions. It also noted that what is the law and what is the application or practice of particularly government agencies may be difficult to ascertain; that there may be areas, such as legal malpractice cases where testimony might be admissible where it's normally excluded, and the Court also noted that it could also hypothesize instances in rare highly complex and technical matters where a trial judge utilizing limited and controlled mechanisms, and as a matter of trial management, permit some testimony seemingly at variance with the general rule, and there's a footnote to that sentence that cites to patent cases.

In Mikutowicz, which was a criminal prosecution, a revenue agent testified, as is commonly the practice in tax evasion cases, as to the tax treatment of the income and

deductions and so forth claimed by the taxpayer. The agent testified that a particular item was not deductible. The Court approved that practice, citing a case in the Second Circuit indicating that expert testimony by an IRS agent, which expresses an opinion as to the proper tax consequences of an transaction is admissible evidence. The Court upheld the exclusion of cross-examination as to specific judicial opinions, noting that the revenue agent was not qualified as an expert on tax law, and that the government did not and could not elicit any opinion on the precise meaning of terms used in the Code or discussion of legal sources that could bear on such interpretation.

There's something of a disconnect, I think, in the way these cases are -- are framed, at least as applied in the tax area. The Internal Revenue Code is the law. It's at least conceptually no different than any other law. Whether something is deductible or not, for example, is not simply a tax consequence. It's the application of the law to a specific set of facts. It's a legal conclusion. It's nothing more and nothing less. When an IRS revenue agent says that something is or is not deductible, that agent is making a legal conclusion and applying it to a particular set of facts.

Again, to underscore that, suppose we were talking about the home mortgage interest deduction, the factual matter would be that the taxpayer paid mortgage interest for his

primary residence. The law would be that the Code permits a mortgage interest deduction, and the application of the facts to the law would be that this particular taxpayer was permitted to deduct mortgage interest.

In Mikutowicz, if the agent had testified, for example, and I'll change the facts, that if he had said that the taxpayer was not entitled to a home mortgage interest deduction; in other words, he was wrong on the law, presumably defense counsel should have been permitted to cross-examine him and confront him with the law and say, well, no, that's not true. As a conceptual matter, it seems to me, that a -- an expert expressing similar or making similar testimony here is necessarily permissible with certain, again, limitations and exceptions. The Tax Code, at least as to the matters at issue here, is exceptionally complex and difficult and somewhat absurd to suggest that by virtue of my robe I'm an expert on the Tax Code, and -- and we can leave it to the lawyers to persuade me what the law is. I mean, obviously that's true at some level, and I have no doubt as to the capability of the advocates, who are appearing in front me, but it seems to me that there's also a place for appropriate expert testimony in this regard.

And again, to state the obvious, evidence as to certain aspects of this transaction, how it worked, how it was reported, what the Code requires, how the IRS did react or

might have reacted and so on, what in general terms would be helpful to me to understand the issues in the case.

It is likewise true that the rule is that the admissible -- standards for admissible -- admissibility of expert testimony are the same under Rule 702 in a bench trial and a jury trial; however, it seems to me the Rule 403 analysis is quite different. I think I clearly have more latitude, substantially more latitude, to consider expert testimony than a jury would; and at the end of the day, I'm confident of my ability to filter law from fact, even if we stray over the boundary from time to time through an inadvertence or otherwise.

So, in effect, putting all this together, what I intend to do is to apply what is, in effect, a rule of reason, and it's going to work something like this: First, experts will be permitted to describe, as they would in any other case, the factual basis for their opinions, or to summarize complex transactions, as the case may be, this is how the transaction worked, and this is how it was reported on the returns.

To the extent that an expert is doing so and is interpreting underlying documents, like a contract or a tax return, it should be clear, and I will take it in this light that this is the expert's understanding of the contract, the expert's understanding of the returns. That's the first point.

The second point is experts will be permitted to

describe the basic concepts under the Tax Code as a context in framework for their opinions. I don't see how we can discuss these issues completely divorced from concepts under the Tax Code. However, again, that testimony will reflect only the expert's understanding of how the Code works or what it requires. The ultimate decision as to what the law is is for me to make.

Third, experts are not going to be permitted to argue the law, to advocate legal positions, to delve into the details of the case law. I grant that the boundary between my second point and third point may be fuzzy, but I think as a practical matter it reflects what's going on in, for example, the Mikutowicz case. That is a basic concept, for example, the existence of a home mortgage interest deduction, to put it in simple terms. That's a legal defendant. I would permit an expert, if this were that kind of a case, to stand up and say, "The IRS permits home mortgage interest deductions." I would not permit the expert to talk about a disagreement between the Seventh Circuit and the Ninth Circuit as to what constituted interest. That's for the lawyers; and, again, that boundary may not be precise at times, but I think it's -- we cannot divorce the tax concepts from the expert testimony.

Lastly, and fourth, experts will be permitted to draw certain types of conclusions concerning the applications of the facts to the law. For example, to go back to my home mortgage

interest example, the expert would be permitted to testify that this taxpayer is entitled to this amount of a home mortgage interest deduction; however, one important exception to that is there will be no opining as to the state of mind, or likely state of mind, of a taxpayer, or the intentions of the taxpayer, or his or her advisors, in setting up a transaction. I think the case law is fairly clear that that testimony is not permitted under any circumstances.

Again, that's not always a clear boundary; and, for example, the boundary between some subjective intent and what's an objectively reasonable reporting position may not be precisely clear, but I'm going to attempt to fumble our way through with that as the standard.

So, I'll talk about that in the context of specific experts, but again it seems to me that this is a highly complex and technical area in which expert testimony would help me. Experts, I think, properly can be permitted to talk about basic concepts under the Tax Code and their understandings of them and how they apply to the facts in this case provided that they do not opine as to the subjective intent of the taxpayer or taxpayers' advisors.

Let me turn next to the issue of the factual recitations and the experts reports. Fidelity complains about how the government witnesses, particularly Rausser and Kolbe, have recited the evidence. Essentially, they contend that it's

one-sided and argumentive, slanted toward the government and so forth.

Rule 26(a)(2)(B) of the Rules of Civil Procedure and Rules 702 and 703 of the rules of evidence, taken in tandem, require an expert to provide the data or facts upon which he or she relied, and to put that in a report and disclose it to the other side. Naturally, any expert is going to emphasize some facts over others. Normally, the fact finder never sees the report or the factual recitation. An expert might summarize the key pieces of evidence upon which he or she relies, but the -- the factual report itself does not go to the jury.

I'm not going to exclude any of this expert testimony based on how the factual recitations have been set forth. If a factual predicate for a particular conclusion is not supported by the evidence at the end of the day, obviously that will undermine that expert's opinion, but I don't see it as a reason to exclude the testimony, at least not on this record, and obviously it's fair ground for cross-examination to point out to an expert that they considered fact A and ignored fact B and fact C.

It's not clear to me whether the experts are also going to serve in part as summary witnesses, that is, providing summary evidence of voluminous documents, but that's permitted under Rule 11 as well.

All right. With that let me turn to the specific

experts. I'll first take up plaintiff's motion to exclude the expert testimony or reports of David LaRue. Mr. LaRue, or Doctor LaRue, is a professor at UVA Business School, where he teaches taxation, accounting, and finance. He opines generally as to how the transactions were reported on the tax returns of Fidelity and the Egans and whether that reporting was designed to reduce or minimize the actual or perceived risk of detection and audit by the IRS.

Fidelity has objected that LaRue opines on the state of the mind of the taxpayers; that he is not qualified to opine on the risk of detection of audit; and he's a partisan advocate, because he impermissibly summarizes factual evidence, makes misleading observations, and has an undue financial incentive to favor the government.

His opinion, in substance, again, is that it would be reasonable to conclude that the transaction was reported in a manner designed to reduce or minimize the actual or perceived risk of detection or audit.

It seems to me that it is appropriate for him to testify first that the IRS reporting requirements, in general terms, are such and such; second, that the transaction was reported in such and such a way on the returns. He would, I think, be permitted, although I think he has -- does not so testify that the transaction did or did not comply with those reporting requirements; and then the question is does his

opinion impermissibly intrude on the fact finder by testifying as to the subjective intent. There are two key words in the opinion, the words designed and perceived. He says it was -- it would be reasonable to conclude that the transaction was reported in a manner designed to reduce or minimize the actual or perceived risk.

The government says that he is testifying only as to the objective evidence, not as to his subjective intent. I am concerned with the use of the word "designed" in this context. It does appear to be testimony concerning the design of the transaction, meaning how the persons who put it together intended the transaction to work. It seems to me that it is fair game for him to testify as to the likely affect of the way the transaction was reported.

I would draw a distinction here between purpose, which is what the taxpayers intended to do, and the affect, which is the effect of that reporting on the IRS, or the likely effect, which I think can be stated objectively.

And this may be tweaking something that perhaps doesn't need to be tweaked, but I am going to limit his opinion in that respect. I'm going to permit him to testify in general terms as to the effect, or likely effect, of how the transaction was reported, but not to the purpose of how it was reported, and if that requires a modification of the word "designed" or perceived under the circumstances, then he will

be limited in that regard, but I'm not going to exclude the testimony generally, and it will be limited, however, as I've so indicated.

There's a further objection that he's not qualified generally to opine on the subject as to how the returns are selected for audit by the IRS. The government indicates that his testimony is not specific as to a precise program or model used by the IRS, but more in the nature of generalized testimony taking the auditor and/or review process as a whole. I think the issue goes to the weight and credibility of the testimony, not to his lack of expertise. I'm not going to exclude it under Rule 702. On that basis, I don't think he's wholly unqualified to testify in a general manner about the likely effect of the way the returns were framed on the IRS, and I don't read his opinion to read into anything more specific in terms of the mechanics of how the IRS looks at returns for audit.

With regard to the arguments that he impermissibly summarizes the evidence and makes improper observations, again, I'm not going to exclude it under Rule 702. It may or may not go to the weight of credibility of the evidence at the end of the day, and the same analysis applies to his financial incentives that go to his credibility. All expert witnesses, or almost all, are paid witnesses, and the amount that they receive and the proportion of their income that's derived from

being paid by certain litigants is always an issue of credibility and is not a basis for excluding testimony under Rule 702.

So, I'm going to deny the motion as to witness LaRue, again with the caveat that he will only be permitted to testify as to the likely affect on the IRS, not the purpose or intentions of the taxpayer.

Next, plaintiff has moved to exclude the testimony of Gordon Rausser, an economist, who as I understand it is proffered by the government as an options expert. Again, there's an objection that his summary of the evidence argues the government's view. My ruling is the same in that regard.

There is a further objection that he gives opinions as to the business purpose, motive and state of mind of the taxpayer. Without going into every detail again, I think that the general point will be similar, that is, the -- Rausser can testify along the following lines: That the stated purpose of the transactions, as he understood it, was as -- as a hedge or to make a possible profit. Based on his review of the evidence, the transactions did not function effectively as a hedge and could not function effectively as a hedge. I'm paraphrasing here, obviously, and that there was no reasonable possibility of a profit, and it was not likely to generate a profit; and therefore he may conclude that there was no economically rational nontax purpose for the transaction.

I will not permit him to take the next step and to testify that, therefore, the taxpayer must have intended "X," because that goes to the taxpayer's subjective intent and is not objective testimony concerning the nature and structure of the transactions.

There are some subsidiary arguments that he gives opinions on legal issues as to contract interpretation and the sequence of the transaction that he uses specialized legal terms. In terms of his interpretation of the contract, he obviously cannot analyze a transaction without considering the contract and its terms. I will permit him to do so, again with the caveat that he is giving his understanding of the relevant contractual terms. It's not a legal conclusion. He is not opining whether a particular person acted in accordance with the terms of the contract, or giving his understanding as to what the contract permitted and how it worked, and I will permit that testimony.

In terms of the -- his testimony about the sequence of the transactions, again, similarly, he can describe that in general terms and to give his understanding of it and the consequence of it, as long as he doesn't stray into the taxpayers' subjective intent.

And the specialized legal terms that he is said to employ, form over substance, promoter and basis trades, I am not particularly concerned about the use of those terms; and

the witness, if necessary, will need to make clear, for example, with regard to the word "promoter," that if he uses the word that he's using it in a general day-to-day content -- context and not with a specific code-based definition. But I'm not concerned about his use of those terms.

Both Rausser and Kolbe looked at similar transactions to test their conclusions. I, again, with making no comment on the weight or credibility of it, or the underlying evidence, I don't see it as a reason to exclude the report. I'm not convinced that the methodology is such that it's improper or unreliable within the meaning of Rule 702. I'm not going to exclude the report on that basis.

A similar analysis applies to the argument that he made unsupportable inferences concerning the allocation of legal fees and Mr. Mahoney -- and I apologize for pronouncing his name the American way -- Mr. Mahoney's role in generating a desired tax outcome. Again, to the extent those conclusions are not supported by the evidence, or otherwise appear to be infirm, it will go to the weight and credibility of the evidence. I will not exclude it under Rule 702 on that basis.

That also goes at the issue concerning the lack of credibility, or the alleged lack of credibility, whatever business disputes or disparaging comments may have been made about him in the past that's not a basis to exclude the

testimony.

Finally, with regard to the argument that the report was not his own, I have read the cases that comment on this issue. I -- I'm not sure that I agree with their conclusions, but certainly there is no requirement that an expert avoid input from his assistants, or even undue or overwhelming input. The question really is did he sign the report; does he stand behind it; is it his report; is he prepared to testify about it and to defend it; and that's the standard I would dare say that the associates at McKee Nelson, the junior attorneys in the tax division, for example, have had quite a bit of input into the work product that was signed by Mr. Curtin or Mr. Donohue. There's nothing remarkable about that; and obviously, I depend very heavily upon my law clerks, as all -- as almost all judges do. So, I don't see that as a basis to exclude the report within the meaning of Rule 702.

So, again, with the caveat that Rausser will not be permitted to testify as to what the taxpayers' intentions were or must have been, I will permit him to testify as a general matter.

The analysis as to Lawrence Kolbe is similar with regard to the factual issues, as he has laid them out, his interpretation of the contract, his use of similar transactions to test his thesis. There's an issue regarding his discussion of the Dewees case. I'm going to defer any decision on that

until and unless we get to the point where it looks like I'm relying on that case and it's somehow an independent expert's or government expert's, rather, analysis of that case and now makes a difference. I'm not going to keep him off the stand on that basis.

There is an argument made by Fidelity that he is not qualified as an expert to talk about the economic consequences of digital options. Within the meaning of Rule 702, I'm going to reject that argument. Again, I'm making no finding as to the weight or credibility of that analysis. I may or may not give it credence at the end of the day, but I will permit the testimony, and a similar analysis applies to his opinion that each pair of the long and short options was a single investment. I'm not going to reject that analysis as unreliable within the meaning of Rule 702. I may or may not give it credence at the end of the day.

Finally, the -- Fidelity argues that Kolbe's and Rausser's testimony is cumulative. The government says that they -- they are analyzing issues from different perspectives. Rausser is an expert on options, and Kolbe is a financial economist specializing in pricing of capital assets. I -- I -- I am not going to permit cumulative testimony, and to what extent it may be cumulative may await further decision, but it appears to me that this testimony is not unduly cumulative, and I'm not going to exclude it on that basis at

least based on my understanding of how the experts intend to testify.

So, the motion as to Kolbe again will be denied.

The government has moved to exclude Ethan Yale and Stuart Smith, both of whom are attorneys. Yale is a professor at Georgetown Law School, and Smith is a lawyer, formerly of the Tax Division of the Solicitor General's Office.

Yale intends to offer the opinion that under any reasonable construction of the phrase "substantially similar," the transactions are not substantially similar. Again, I think there are several concepts intertwined there. There is a legal conclusion as to what "substantially similar" means. There is a factual issue whether or not the facts of this particular transaction are similar or dissimilar with the transaction identified by the IRS or the type of transaction; and third, there is the conclusion, that is, were these transactions or this transaction substantially similar to that in the IRS ruling.

I'm going to permit Yale to testify as to the factual issues upon which he relies, that is, what it is about the transaction that he deemed to be similar or dissimilar. In order to provide context and meaning, I'm going to permit him to discuss the general tax concept of substantial similarity, that is, it is a concept, and here's some, in general terms, how it applies. I'm not going to permit him to go on at length

about what different constructions are substantially similar or what the case history is or might be, what the words might mean based on legal arguments. I think counsel can handle that, but I will permit him again to testify in general terms that this concept exists.

And I will permit the conclusion that -- that is, the application of the facts to the law, that he believes that this transaction was not substantially similar. I will state, as a caveat, that because we do have two lawyers testifying, as opposed to nonlawyers, they probably ought to understand that I will not look favorably on efforts to get in depth to legal concepts that I think counsel are capable are handling. Again, my rule may be fuzzy here, but if a revenue agent can testify about what is and is not deductible, it seems to me a tax professor ought to test -- be able to testify as to what is or is not substantially similar; but again without going into the legal nuances, legal research, legal analysis, and legal argument that is properly left for counsel.

With regard to Mr. Smith, he expects to opine that the opinions of Sidley Austin and Proskauer Rose are objection -- objectively reasonable; that they comply with the professional requirements of the tax profession; that they comply with the specific requirements of Treasury Circular 230, and they are opinions upon which a taxpayer could reasonably rely. He also expects to opine that there is a subtle meaning

of the term "substantially similar" under the Internal Revenue Code, which confirms the reasonableness of the opinion and that the transactions are not substantially similar.

Taking the second point first, I won't permit Smith and Yale to testify cumulatively either, and the same rules will apply to Smith as to Yale, that is, if he's going to talk about substantial similarity, he can do so as a general concept without getting into the legal analysis and legal details; that he can talk about the facts, why they are similar or dissimilar, and he can apply those facts to the law, but that is it.

In terms of the first part of the opinion, whether the legal opinions are objectively reasonable, I will permit that testimony. It seems to me it's similar to a legal malpractice standard. Again, the issue is not that they're accurate or correct. I'm not going to permit him to testify that he's, for example, researched the issue and that they're legally correct, but that they are objectively reasonable under the circumstances.

I -- I will permit him to talk about the professional requirements, such as they are, for the granting of such opinions. In terms of IRS or Treasury Circular 230, the government says that he is relying on the wrong document. I'm not going to exclude it under Rule 702 on that basis. Again, I may or may not reject the argument, but I'm going to leave it

to the -- to the weight and credibility of his analysis.

It seems to me that I will not permit him, however, to testify that these are opinions upon which a taxpayer did or could reasonably rely. I think it's enough for him to state that the opinions are objectively reasonable; and if I agree with that analysis, it's a small inference from which -- for which I don't need expert assistance that it would be reasonable for a taxpayer to rely on those opinions.

So, again, I'm going to deny the government motion as to Yale and Smith with the caveats and exceptions that I have indicated.

Before asking counsel for any follow-up requests for clarification, let me turn to the discovery motion that plaintiff has moved to compel production of certain materials relating to the expert reports and opinions of Gordon Rausser. The first is the materials prepared by Rausser and On Point Analytics concerning the tutorial. The Court entered an order on October 4, 2006, concerning the tutorials that provided in substance the tutorial preparation materials were not discoverable, with an exception, unless they're made part of, or referred to in an expert report.

The government has responded that there are only two documents that are responsive to the request, and that they were not produced based on the tutorial order. I have no reason on the record before me to conclude that that response

given by the government was inaccurate or that the materials are not subject to the protection of the order.

The motion also seeks the production of engagement letters and invoices, which I understand has been mooted by the production of those documents, and it also seeks the notes of the interview of Thomas Yorke, a former Refco employee, who was interviewed by telephone. Apparently, a government attorney and On Point employee were on the call, and the government attorney took notes. The government has represented that the On Point employee did not take notes; that the government employee did, but did not show them to Rausser or On Point, and that those notes were not shared in any way with the expert.

Again, based on the record before me, I have no reason to believe that those representations are not accurate, or that the normal work product protection does not apply, and so I'm denying that motion in its entirety.

All right. And I apologize again, both for the amount of time it took me to render those decisions and for the somewhat, I'm sure, discursive nature of my opinion from the bench. Some of this, I think the details, are going to be worked out on a question-by-question basis at trial. I'm trying to state some basic parameters here. I was quite surprised at how fuzzy the law is and will probably continue to be, but I've framed it as best I can. It seems to be absurd to exclude discussion of the Tax Code entirely at this trial. It

makes no sense to me at all. On the other hand, obviously experts are not substitutes for the lawyers, and I'm just going to try to draw that line as best I can on a question-by-question basis, and I do think that the issue of the taxpayers' subjective intent, to the extent that I need to decide it, is something that at the end of the day I'm capable of deciding on my own.

With that, Mr. Curtain, any questions, clarifications? Obviously, your objections are preserved.

MR. CURTIN: No, your Honor. I think I have no questions. We will take the Court's words and apply them as to the experts. And so we appreciate the outline so we know how to come in on the 22nd and the following days.

THE COURT: All right.

MR. CURTIN: As to the Rausser -- specifically, as to Gordon Rausser's materials, the litigation consulting materials, I -- I hear what the Court says. I will tell the Court we'll probably be back, because of the second round of -- of discovery and expert issues. We'll give it careful consideration based on what you have said.

THE COURT: Okay. And, obviously, I do expect a conference between counsel before any discovery disputes are brought to the Court.

MR. CURTIN: Correct, your Honor.

THE COURT: Okay. Mr. Donohue.

MR. DONOHUE: Your Honor, just a few questions. One is will the Court issue a formal opinion or --

THE COURT: I don't expect to. I mean, under ordinary circumstances I would, but just given the press of time here, I think I'm going to let my oral decisions stand.

MR. DONOHUE: So the oral statement of the Court will represent its decision on all --

THE COURT: Yes.

MR. DONOHUE: -- four motions?

THE COURT: Yes, taken in combination, obviously, with whatever rulings I make in the course of the trial. I mean, this is a Rule 702 ruling, a Daubert-type ruling. I do think that I have some latitude here, because it's a bench trial. I mean I know it's black-letter law that the same standard applies, but if nothing else, from a harmless errors standpoint, I mean, I've read those opinions. I've scanned part of them, to be frank about it, but I've read them enough to get the thrust of what the objections are, and that bell has been rung, so to speak. It seems somewhat absurd to say that -- the same standard applies to a jury, which would never, you know, see some of this opinion at all, as it would to the Court, but the short answer to your question is I'm going to let my oral opinion stand as my decision.

MR. DONOHUE: Your Honor, the second question was, as Mr. Curtin stated, there is in connection with the High Tech

expert witnesses some of the same, if not virtually all of the same issues. So, I assume we should assume that the Court would rule in the same way with respect to a set of motions on the same issues?

THE COURT: Yes. Yes, as a general principle. I mean if you think you need to file a formal motion to preserve your rights, you can do so. I -- if the issues are -- are largely identical, I'll probably deal with that summarily. If there's some wrinkle here that I need to address, I'll take that up separately, okay, but I think you should assume that -- I mean you're going to call the same experts, I assume?

MR. DONOHUE: For the most part, your Honor. The government has one new expert, but for the most part, the same.

THE COURT: Okay, again, the same general principles; for example, if there's a complaint about the factual recitation of the evidence, I'm going to handle it the same way, that is, I'm not going to exclude it under Rule 702, if a witness testifies that he relied on fact A and B, and B turns out not to be true, then that's going to undermine the opinion of the expert.

MR. DONOHUE: Your Honor, in connection with reserving our rights, would it be appropriate given that it's likely that our motions will be substantially identical simply to incorporate by reference --

THE COURT: Yes, yes, I think that's fair. Again, I'll let you handle it. In terms of what you need to do to preserve the record for Court of -- the Court of Appeals, you're going to have to make your best judgment. I will be generous in terms of, from my own perspective, permitting you to avoid unnecessary work, unnecessary filings. I don't want people staying up around the clock to produce documents that, you know, are simply to preserve rights, if it's not necessary, but you're going to have to make that judgment at the end of the day.

MR. DONOHUE: Thank you, your Honor.

THE COURT: Okay. All right. That's the experts. I issued my order, I guess, a couple of weeks ago now with regard to the Isle of Man.

Is there anything that needs to be done with regard to foreign evidence at this point, or that issue?

Mr. Donohue.

MR. DONOHUE: No, your Honor. First of all, we have some materials that I would like to present to the Court in connection -- before we get to the Isle of Man with the Irish foreign evidence.

THE COURT: Okay.

MR. DONOHUE: Your Honor, as I mentioned at the last status, there was a sealed envelope that was addressed to the Court.

THE COURT: Yes.

MR. DONOHUE: At this point, your Honor, I would like to present that sealed envelope to you, along with the original copy, the originals rather, of the transcript and exhibits of the two Irish witnesses.

THE COURT: All right.

MR. DONOHUE: And, your Honor, for the record, we have supplied a copy of both the transcript and the exhibits to counsel for the Plaintiff, and we have furnished them also with what we believe to be the contents of the sealed envelope that we have not opened.

THE COURT: All right. And exactly what am I to do -- is this made part of the record? Is it part of the record under seal? What do I do with this package you have now handed me?

MR. DONOHUE: Your Honor, one, it is formally part of the record.

THE COURT: All right.

MR. DONOHUE: It's being submitted as being part of the record, and --

THE COURT: That part of the record and docketed, or as an exhibit to this proceeding?

MR. DONOHUE: Your Honor, it's my understanding that this should become actually ultimately an exhibit in the proceedings; and as far as it being docketed, I will leave that

up to the Court as to whether or not this should be actually filed. It's obviously not material, which ordinarily would be filed.

THE COURT: All right. Mr. Curtin, do you have anything to weigh in on this?

MR. CURTIN: I do. If I may, your Honor. I -- in my experience, and in my view, what the Court now has is essentially a deposition, or two depositions, that have been provided by the foreign court. It's certainly not evidence at this point. It's just that the depositions were taken.

Judge Dunne, in Ireland, did not make any rulings on evidence that, as he said on the record, that is for this Court. So, I -- I -- my own view is the Court accepts this, confirms that there has been a response by a note in the record. It is part of the -- the record in the case. I don't know that -- that in its entirety it is filed here.

THE COURT: All right.

MR. CURTIN: But I do think an acknowledgment of receipt, and then we'll see what the Court does with it at trial.

THE COURT: All right. Let's -- I, on the record, hereby acknowledge receipt. Let me -- Mr. Castles, can you hand that up to me. Let me take a look at it. I will not make it part of the docket, unless there is reason to do so, and I'm going to take a moment now to open the sealed envelope.

All right. It's, in substance, transmittal documents. I -- I see no reason why counsel should not have access to copies of these. I don't want to tread on anyone's sensibilities.

Do counsel have an opinion on that as to whether I could simply -- you may already have copies of these, but just to make sure you have them, is there any reason I can't make them available to counsel?

MR. DONOHUE: No, your Honor.

THE COURT: Mr. Curtin.

MR. CURTIN: I agree with that, your Honor.

THE COURT: All right.

MR. CURTIN: I think it's in your hands, and I don't think there's any reason that we could not get those; and indeed, if there is a transmittal from the foreign court indicating that there has been a -- a response provided, frankly, I -- I don't see that there would be any problem with the Court entering that in some way.

THE COURT: All right. What I'm going to do then is I will not enter it in the docket. It is an exhibit to this proceeding, so to speak. I've received it. It will be collectively marked as Exhibit A to today's proceedings; and the contents of the sealed envelope, I will direct Mr. Castles to provide copies to counsel on request.

(Documents were marked Exhibit A for identification.)

MR. CURTIN: Thank you.

MR. DONOHUE: Your Honor, next, is the Isle of Man matter. Deemster Montgomerie has issued an order essentially setting briefing in connection with his right/jurisdiction to withdraw his draft judgment and has set a hearing date for September 23rd. So, that matter is now on a separate track in terms of briefing and oral argument.

THE COURT: All right. Is there anything there that either I ought to do, or that's going to affect our trial in some way? In other words, there may be some consequence here under Manx law, but is it going to affect what we do here?

MR. DONOHUE: Your Honor, I can't envision it will help or affect what we do here in any way.

THE COURT: Okay. All right.

MR. DONOHUE: Your Honor, if you want to hear at this point the current status of the case, I can present that.

THE COURT: Let's just stick to foreign evidence for the time being, and then I'll --

MR. DONOHUE: As far as I can tell, what I have mentioned now represents the sum total of the current foreign evidence. As I mentioned at the last status, we have taken step to -- steps pursuant to our agreement with the Irish witnesses to withdraw all pending treaty requests. So, with the exception of this matter, on the Isle of Man, all other matters regarding foreign evidence have been resolved.

THE COURT: All right. Mr. Curtin, anything further on foreign evidence?

MR. CURTIN: Your Honor, I -- the only addition, I would say, is I do have a copy of the order that Deemster Montgomerie entered, and I know the Court was interested in, well, what -- what will the Deemster have to do now. I fully agree that I don't think there's anything that this Court need to do. I think the issue now there is simply whether Deemster Montgomerie after reading the briefs and hearing argument for a full day on September 23, whether he decides to sign and enter finally the order that your Honor has been advised of. I don't think it has any effect whatsoever on this case. We're done in the Isle of Man.

THE COURT: Okay. All right. Mr. Donohue, let me hear generally a status report.

MR. DONOHUE: Your Honor, the parties were engaged in discovery in connection with the Fidelity High Tech case. Formal discovery has ended, although the parties have agreed that there are some pending matters of discovery that are still outstanding. In terms of fact depositions, the parties have agreed to four depositions that will still be outstanding and will be taken in the month of July, and two expert witness depositions that will also, due to the schedules of the particular experts, be taken in July.

Your Honor, at the last status, it came up that the

United States requested the Court's permission to take two additional depositions. The Court asked us to return to that issue if we found a need. Your Honor, at the deposition of a Mr. Thomas Yorke, which was the deposition taken of him in the Fidelity High Tech case, he asserted his right to his Fifth Amendment privileges; and as a consequence, we were not able to obtain any substantive testimony from the witness. That has given us some concern, particularly since, in our view, the plaintiff was relying on the testimony of Mr. Yorke in the Fidelity International case, and now he is essentially at his second deposition. He is not even willing to attest to the truthfulness of that testimony.

Consequently --

THE COURT: So, he was deposed in the International and responded, that is, did not assert the Fifth, but then was deposed in High Tech and took the Fifth?

MR. DONOHUE: Correct, your Honor.

THE COURT: Okay.

MR. DONOHUE: He was deposed twice, and he testified fully at his Fidelity International deposition. We were concerned about the accuracy of certain statements, but at his Fidelity High Tech deposition, he asserted his Fifth Amendment rights; and consequently, with the exception to his name, I believe, he did not provide any substantive testimony. And more specifically, he would not attest to the truthfulness of

the testimony at the Fidelity International deposition.

So, for that reason, we would like permission to take another Refco deposition, and we have three possibilities, your Honor, as to who we would like to take: Vera Kraker is one possibility; a Cathy Scappatura is another possibility; and then the third possibility is a person actually who is not within the jurisdiction of the United States. He's currently in the United Kingdom. His name is Donora; and one of those three, we think we would like permission to take the deposition of, essentially for purposes of -- of examining the witness with respect to matters that we thought might be obtained at the deposition of Mr. Yorke.

Your Honor, leaving that matter aside, in terms of still outstanding discovery, there is two subpoenas that are still outstanding in the Fidelity High Tech case. One is the subpoena that was issued to EMC, and that subpoena, your Honor, was supposed to be provided documents pursuant to that subpoena, was supposed to be provided on a rolling production starting in early July, but we have not yet received any documents. We've also scheduled a 30(b)(6) deposition of EMC that the parties agreed to defer that deposition pending the completion of the production of documents per the subpoena.

There's still outstanding also a second subpoena, your Honor. That subpoena is -- was issued on the McNeills, if you recall, in your Proskauer opinion that you made reference to

the McNeills. They are -- were involved in one of the, quote/unquote, similar transactions.

THE COURT: Are these the people in North Carolina who filed suit?

MR. DONOHUE: Yes, your Honor.

THE COURT: Okay.

MR. DONOHUE: Also, your Honor, there are pending motions that are now before -- a pending motion now still before the Court. It's the -- essentially what I call the government's motion on the proper invocation of Rule 33(d) of the Federal Rules of Civil Procedure. And then there is a potential of what I call three potential motions.

One, your Honor, we reported to you on a number of occasions that we were trying to essentially work out a resolution of the assertion of privilege by RSM McGladrey. We have come, I believe, now to an impasse, and it looks like very shortly we will be filing a motion on that assertion -- or their assertion of privilege.

And with respect to two other potential motions, your Honor, these would involve a motion against Carruth, or at least a potential motion against Carruth. More specifically, your Honor, we are concerned that with respect to notes that they have provided us that they have not in all cases provided us with the identity of the author of the notes. Just in the past day or so, they did provide us with the cover page of

notebooks, and the cover page we're told in some cases did identify the author, but we are concerned about making sure that we know, since they obviously know, who were the authors of the notes. A number of the notes are going to play a large role at the trial; and from our perspective, it's important to know who were the author of these notes.

Your Honor, there is also on our part the concern dealing with Burke Warren invoices. Now, in the Fidelity International case, this issue of Burke Warren invoices was essentially resolved by the magistrate judge; however, we feel that with respect to Fidelity High Tech, there is a definite additional reason to pursue these invoices, and more specifically, it's the government's position, your Honor, in a nutshell that all costs in connection with these transactions must be taken into account, and one of those types or categories of costs are legal fees that were incurred in connection with the implementation of the transactions, and even prior to the implementation of how the transactions were to be designed. They are part and parcel of the costs that had to being taken into account that focuses in determining, quote/unquote, reasonable possibility of profit. So, your Honor, we have requested those, but it doesn't look like that issue is going to be resolved; and if it can't be resolved, that is another potential motion.

So, your Honor, those -- those are the potential

motions that we can see. And the only other matter, your Honor, if you recall at the last status, you have indicated that you want the parties to prepare essentially to discuss the trial. We have some ideas, your Honor, in terms of, number one, how this case, or I should say, these cases, because technically there are four separate cases, two of them are -- two sets of consolidated cases, how they should be tried. So, once the status is finished, your Honor, we can give you, if the Court so desires, our thoughts on that.

THE COURT: Okay. Let's -- let me hear from Mr. Curtin, as to his response.

MR. CURTIN: Yes, your Honor. Let me start with the comments about a witness by the name of Thomas Yorke, who as your Honor is aware, was deposed in the International case, in FICA A, and answered questions about option trades done by Refco. Refco was the counterparty.

Now, the government did not like Mr. Yorke's testimony, and indeed Mr. Rausser chose to disregard it; and so the government wanted to take another deposition, and this time in High Tech, and basically asked questions about option trading at Refco. Time had passed, and for whatever reasons, although the suggestion here is that Mr. Yorke is taking the Fifth Amendment, because he doesn't want to acknowledge his prior testimony, there's absolutely no evidence of that at all. We do not know what the source of Mr. Yorke's assertion of the

Fifth Amendment is. Now, maybe the government knows somewhere, but we certainly do not. And so the notion that somehow the government went into that deposition and, first of all, expecting to get testimony, is -- is not the case. They were informed ahead of time. Mr. Yorke apparently changed lawyers, or has a new lawyer, not the same lawyer, who represented him in the first deposition.

The -- the government deposed recently a Refco person, a former Refco employee named Mr. Behrmann, who appeared in our offices in New York. We did not represent him. We were there. So, they did have the opportunity to take the testimony of -- of a fellow, who was at Refco, who is no longer there. He appeared and testified. Now, we're told that they want to take depositions of three more Refco people. Now --

THE COURT: I thought they said one of three.

MR. CURTIN: One of three. Well, Vera, I haven't heard of Vera being of interest to them, nor of Cathy Scappatura. Consistent with we learn things at these conferences, these are two names, I think, that are -- have been mentioned in Mr. Behrmann's testimony possibly, but this is the first time the government has expressed an interest in them. Mr. Donora, you remember, was mentioned to you by Mr. Lindquist the last time when we were here, together with one other person from Refco.

THE COURT: My notes say "Anzora," although I don't

know if that's the same person as Scappatura or not.

MR. CURTIN: It could be. I don't think it is, but in any event, we're expanding the list now after discovery, fact discovery, and I think it should be noted, your Honor, the government has -- I mean they've interviewed at least one other person from Refco. They have taken Refco depositions, and I would say that the argument that because Mr. Yorke, for whatever reason, did not testify is hardly a reason or even an excuse to now expand the number of depositions into Refco. This is turning out to be a case of -- of the United States versus Refco. So, I -- I, again, as it would not surprise the Court, I am against expanding this. I think we've had enough Refco depositions. I don't think Mr. Yorke's position in any way changes things. He was examined for a long time in the prior case, and that is usable in this case.

Your Honor, I'll move to the EMC -- the subpoena just to mention that I understand there that documents we were told were going to be produced. I don't think, although Mr. Donohue says that they have scheduled a 30(b)(6) deposition, it is not my recollection that this Court approved such a deposition the last time we were here. So, I think there is an issue there, and that issue is whether the government after all of the discovery here and at the end of the discovery are we going to yet again have another deposition, this time of EMC.

The last time we were before the Court, I think I

mentioned that I have been advised that a lawyer by the name of Permut, Susan Permut, is handling this, but we, of course, do not represent EMC.

The McNeill subpoena, we are not involved in and don't really have anything to comment on there. If your Honor would like to -- we filed a paper yesterday on this 33(d) motion the government filed. If the Court wanted to hear short argument on that, Mr. Buch has handled that and will happily address the Court. Frankly, we do not understand why the government is pursuing this. It doesn't seem like an issue to us at all, but we have filed papers laying out our position.

THE COURT: I haven't had a chance to read that. I don't know why I missed it, but I missed it; and I think, if it's all right, I'd prefer to just rule on the papers, if that -- unless there's something someone wants to add, because I'll be in the dark a little bit, and I think it may be more efficient for me to just read it and decide.

Will that work?

MR. CURTIN: I think it will, your Honor.

THE COURT: Mr. Donohue.

MR. DONOHUE: Yes, your Honor.

THE COURT: All right. And I apologize. I don't know how I missed that, but I did.

MR. CURTIN: I think that's the one pending motion, as to predicted or potential motions. Your Honor, again, we are

working on certainly this notes issue. The Burke Warren issue, it sounds like government counsel has a new theory of waiver. This is the cost theory of waiver, which is one that was not presented to Judge Hillman; and so, I think we have a new attempt here to undo the privilege rules that have been laid out. I will say one thing on this. That is the Burke Warren invoices have been produced in this case. There are portions of some of those invoices that have been redacted, which is very typical, as the Court knows, to protect privilege. And so, we will see and hopefully we can avoid any motions being filed, but we -- we are dealing with what I consider to be a new theory, and this is the cost theory.

Finally, your Honor, the government has added another expert to the case in the High Tech area. This is a Mr. DeRosa, who I think is presented as -- as Mr. Rausser is as an options person, and so the redundancy factor has gone up again; and I think that's something, if we're anticipating possible challenges there, I think we may want the Court to consider the -- the overlap here, and I think your local Rule 16.5 specifically calls our attention to that item of unnecessary and redundant testimony, and it seems to particularly relate to experts. So, we will pay attention to that.

Finally, your Honor, we do have some thoughts on trial in terms of timing and schedule, and -- and how to sequence this. It's the Court's judgment call. Our role would be just

to give you our thoughts on a schedule that would be workable in terms of preparing the case.

THE COURT: Okay. Let's turn to that in a moment. Let me do the following with regard to the outstanding discovery. I don't remember whether I told counsel this or not, but I'm going to be out of the country for three weeks August 4th, 11th, and 18th, and it seems to me that we need to come to closure on, if not every issue, every issue that we can so that counsel can spend time preparing for trial instead of fooling around with these issues.

I am sensitive to the fact that the High Tech case was added later; that it has been something of an afterthought for a long period in the trial; and I'm -- I'm sympathetic to the notion that there are wrinkles in High Tech that may not have been necessarily foreseen, and I'm not particularly concerned about that.

In terms of the possible pending motions are RSM McGladrey, Carruth, and Burke Warren. I'm going to leave that where it is. Obviously, I do expect counsel to confer. Depending on the timing of it, it may wind up with the magistrate judge.

Again, counsel always needs to pick their spots carefully; and as we get closer to trial, I think everyone's attention would be best served by preparing for trial.

In terms of some of these issues, for example, a

30(b)(6) deposition of EMC, I have to say I'm going to be somewhat selfish. For example, a 30(b)(6) deposition, and I obviously don't know what the issue are, but a 30(b)(6) deposition is preferable to calling an EMC witness at the trial, who hasn't been deposed, to fumble his way through some on these issues, so that I have to endure it, as opposed to counsel. So, I'm making no ruling on that. We'll see how it goes, but I mean if those -- if that's my choice, in other words, people subject to subpoena, if the government is just going to wind up subpoenaing them blind, I'd rather do it by deposition beforehand.

In terms of the additional Refco deposition, I think I indicated at one point that I was granting additional depositions the way fast food franchises hand out foil packets of ketchup, that is, grudgingly one by one, and I keep saying that I'm going to stop it and -- and I don't, but here's what I'm going to do. Given the fact that the High Tech case again has been handled in a high -- highly compressed time frame, given the fact that Mr. Yorke, for whatever reason, has asserted the Fifth Amendment, I'm going to permit one more Refco deposition of the identified individuals, but the number of ketchup packets has got to stop at some point, okay. That something less than perfection is going to have to control here.

I'll take the Rule 33(d) motion under advisement.

Mr. Curtin, you didn't address, but with regard to the potential motion of Carruth identifying the author, I'll just say this. I would expect counsel to act sensibly; for example, if you know who the author is, if it can be handled with an interrogatory, an admission, a stipulation, someone calling someone up and saying these are the notebooks of Joe Smith; in other words, I really don't think -- if it's simple, and ultimately they're entitled to the information, I don't want you to fight about it. It may be complex. I don't know what the issues are. I just want everyone to exercise common sense, that's all.

MR. CURTIN: We understand, your Honor.

THE COURT: Okay. And I think what I would like to do, jumping ahead a little bit here, is to see you all one more time before the 4th of August and try to have everything as resolved as possible by that time; in other words, clear up whatever is dangling, discovery or otherwise, so that people can focus on the trial.

All right. Let's talk about the trial for a moment, and one of the issues that occurs to me -- well, let me hear counsel's thoughts first, and then I'll tell you whether they answered the issues or not. I think that would make more sense. Mr. Curtin, you're the plaintiff. Tell me what your broad-range thoughts are on the trial.

MR. CURTIN: I will, your Honor. You had asked us to

give some thought to -- to this, and let me work backwards, as we always do. We are going to begin the trial of these cases on the 22nd. I think the Court has asked us to do the best we can being suspicious of lawyers and their predictions as to how long things will take, but our estimate looking at the trial days that we have, that is, the time periods that we have, our best estimate is that it will take -- and these are ranges, but let me give you what I think, in the neighborhood and probably of -- of 20 days. If we can do it in 15, all the better, but I think in not trying to sell it short, in looking very hard at it, I think if we start on the 22nd and use the time period that we have effectively, I think we can beat 20 days, but I think that's -- that's what we've got.

THE COURT: Okay.

MR. CURTIN: Now, we tried to calculate this in terms of hours, total hours, and that can be difficult to do, but we know what hours are available to us in a 20-day period, and lawyers just -- I know you're reluctant to put a clock on us. You can, as you well know.

THE COURT: You're presumed innocent, all of you, in terms of your efficiency. It's a presumption that can be defeated, but I'm going to presume that you are going to try this as efficiently as we can, and sometimes things require some time and attention to get done, and sometimes they don't, but I'm going to leave it to your best judgment pending the

evidence of guilt, let's put it that way.

MR. CURTIN: As I indicated in the past, your Honor, and you probably had this experience, too, I have tried cases in front of judges who actually had the stopwatch out.

THE COURT: Yeah.

MR. CURTIN: And it has burdens and benefits. We understand the Court's view.

THE COURT: It's unpleasant. I prefer not to go that way. I'd rather let you try your case, but again if it looks like we're wildly off schedule, I'm going to have to get it under control. I'm going to leave it at that.

MR. CURTIN: I would hold our feet to the fire and get it done in 15 to 20 days. I think that's where this is. In terms of hours, it's hard to, you know, come down to a hard core calculation, but we've done it, and I think that's where we come out.

THE COURT: Okay. My -- my assumption is we're going to have a 9:00 to 1:00 trial day. I have other work to do in the afternoons. We can squeeze out additional time here and there. I don't mind doing it, but some of this I think is going to be heavy sledding, and I need to digest it, and I think we could -- can -- go full days if we really need to, but I'd rather avoid it just to make sure that I'm not getting overwhelmed by it.

MR. CURTIN: And we understand that and assume and are

preparing for the trial day as it is in our case. That's what it is going to be, 9:00 to 1:00. One thing in my estimate here is that I'm assuming that we are not going to spend a great deal of time with -- in the courtroom with depositions being read or played by video. There may be some of that, but it's going to be selective, and it is not going to be every case, or every witness who is deposed.

So, that's a big time slug, I think, in the case, because of the number of depositions, including videotaped depositions.

Your Honor, I -- just to give you a sense of what I and my colleagues, including Mr. Mirick, thought might work here. Certainly working backwards at trial of the 22nd, we would think trial briefs somewhere -- we've indicated September 17th; a joint pretrial conference on the 9th of September; September 4th, a joint pretrial memo, which would include everything that the rules discuss, including particularly stipulations, objections to exhibits, witness lists, as the rules envision. We are mindful of Labor Day, of course, on September 1. We would, working backwards still, August 29th, and these are just dates we're suggesting, would be a time for counterdesignations and objections to deposition excerpt selection. We note that you return, at least we believe you return from your trip on the 25th. We may have that date wrong, but that's what we are --

THE COURT: Yes.

MR. CURTIN: -- seeing.

Your Honor, we had the 15th of August as a date to exchange exhibits and to provide the other side with deposition designations. I will say that between the 15th and, of course, the pretrial, counsel will have more than one or two or three meetings, I would think, and I'm sure we will. We are not far from each other in Washington. We can confer with Mr. Mirick here; and so through that process, I think we can meet and try to work out all stipulations, exhibit issues, so that we show up at the pretrial conference, whenever the Court sets it, so you know what's objected to and what isn't. So, we should be able to do that, and counsel has been through this many, many times before, so I don't think it's anything that's going to be that difficult. We may not agree, but at least we've been through it and can get it done.

I -- in terms of dispositive motions, as you have defined them before, I -- I would move that to August 1. It gives us -- your order right now has July 15th, which is, I think, under the circumstances with depositions still going on presents a little bit of a quick date there.

THE COURT: Let me ask you that. I mean is someone really going to move for summary judgment at this stage? I mean I don't want --

MR. CURTIN: I don't think so, your Honor.

THE COURT: All right.

MR. CURTIN: There may be an isolated issue, but there isn't -- this case is not going to go away on a motion.

THE COURT: I -- I suspected as much. All right.

MR. CURTIN: And so I -- that -- that is a rough schedule that is only a suggestion. This is purely the -- the observations of collective counsel on the plaintiff's side.

I think, you know, in limine hearing and objections, if we were to sensitize the Court to evidentiary issues so that at the joint pretrial the Court knew, you know, what the -- what the red flag evidentiary issues are as to exhibits, as to types of evidence you've heard, of course, disagreement over other taxpayer evidence, so-called pattern evidence, we should -- we should build that into the joint pretrial and possibly include or file with the joint pretrial something to give the Court advance warning and give the Court an opportunity to identify and -- and be prepared for those issues as we move through the case.

In terms of witnesses, I would say I'll -- we've looked at this. I think from the plaintiff's perspective, again, giving you, I would say in a range, I can't say it would be absolutely ten live witnesses, but it's in that neighborhood from the case-in-chief perspective. So you have ten live fact witness and then three experts, your Honor, from the plaintiff's perspective for the entire matter. This is for the

trial of Fidelity and High Tech.

If the ten is eight, all the better, but best estimate, ten plus three. We do have two rebuttal witnesses, and I -- I just mention them so the Court knows rebuttal witnesses tend to be short and sometimes not used. In terms of numbers of documents, and we have talked to Mr. Mirick, and he is very good about advising us on how the Court likes to see exhibits marked, and we will talk to the Court more about that and how exhibits are used, but our goal would be to obviously stipulate and agree to as much as possible. I'm sure there are matters that -- documents we won't agree to on both sides, but estimating the amount of number of exhibits from the plaintiff's side is difficult, but I'll tell you my guess right now is we will have somewhere in the neighborhood of 200 exhibits, maybe 250. If I hit 300, we have gone too far. I assume we will have joint exhibits, and they, you know, hopefully will be considerable. Let's say 100 joint exhibits. My experience here, if you look back at other cases, you always find that the taxpayers' numbered exhibits is in some instances dwarfed by the government's exhibits, and here I think we're going to see probably more exhibits on the defense side than on the plaintiff's side. But my best estimate now is I -- I would expect we will be in the 200, 250 and then some joint exhibits, whatever those are.

And, your Honor, I'll say the estimate of time here of

roughly 20 days using our schedule, I think, is very consistent with the cases I've mentioned to you before, Sala, Stobie Creek, and Klamath. If you took those trial days, which were in one case 11 days and another five, and another eight and multiply those by two, you get a range, so I don't think we're off. I think we're pretty much on it.

THE COURT: Okay.

MR. CURTIN: So, your Honor, I'll let Mr. Donohue share his ideas with you, but that's the outline as we see it.

THE COURT: All right. Mr. Donohue.

MR. DONOHUE: Thank you, your Honor. Your Honor, before we discuss time at trial, I think the first issue we really have to discuss is how are these two sets of cases going to be tried. And one of the reasons that we wanted to present the Court with tutorials is to give the Court some flavor, if you will, of the transactions, and the flavor that we have come across in preparing these tutorials and in discovery is that both of these transactions are unique and highly complex. That's number one.

And number two, the experts themselves, both sides' sets of experts have found it difficult to keep the transactions straight. And so, what we have --

THE COURT: You're not warming my heart here, Mr. Donohue.

MR. DONOHUE: So what we have here, your Honor, is the

issue as to how to try essentially two -- four cases, two involving essentially two sets of cases involving two separate transactions; however, which took place somewhat contemporaneously, that is, in or about the same tax years. And our suggestion, your Honor, would be that in order for the witnesses, in order for at least government counsel to be able to present this case in any type of coherent fashion, we need to actually try the particular transactions separately, and our suggestion would be to start off with what I would view as the lead transaction, which is the Fidelity International transaction, try that matter, and have the experts separately testify as to that transaction and have some of the key lead fact witnesses separately testify as to that transaction; however, your Honor, as I said, and when we ultimately agree that these cases could be consolidated for trial, we thought there would be efficiencies. And where I think the efficiencies would come would be that there is a number of witnesses, who, in fact, are the less significant witnesses whose testimony really can be handled in whatever is the initial case that is tried, unless, for example, for convenience reasons, it would be important for them to testify, but they -- the less important witnesses, we concede, there is not an issue of confusion where they would testify just once. So, what I am suggesting, your Honor, is essentially two mini trials. A mini trial on the Fidelity High Tech transaction,

with many of the what I'll call quote/unquote side witnesses testifying in that trial, and then a second trial involving the Fidelity High Tech transactions.

For almost all the experts, your Honor, it's -- it's from our perspective essential that they keep these transactions separate. If the transactions -- if they begin to testify at the same time with respect to both transactions, the record one is to become very confusing, and it's going to be very difficult for the experts and the fact witnesses, too, to prepare them and for them to keep these transactions straight. Hopefully, the tutorial indicated the -- the intricate aspects of these transactions where it's essential to keep these separate.

So, with that in mind, your Honor, if the Court is amenable to going in that direction, and this would not be a first. This has been done, at least on my part, even where you didn't have separate cases where the -- where the issues were particularly complex. In fact, in one situation I had had there was six mini trials, openings and closings before a jury. We would suggest separate trial briefs on both transactions. These would be pretrial briefs. We would suggest a separate opening, first with respect to Fidelity International, and a separate closing, if the Court so desires a closing. Then, with Fidelity High Tech, a separate opening, and a separate closing. Thereafter, your Honor, we believe the Court may

desire posttrial briefs, because obviously the pretrial briefs will not be able, I think, fully to incorporate all the proposed findings and the conclusions of the evidence that is heard in the course of the trial. So, with that in mind, we would suggest pre -- posttrial briefs, and then again, depending on the Court's wishes, a final closing after the submission of posttrial briefs.

Now, your Honor, in terms of fact witnesses, we concede in the neighborhood of --

THE COURT: Well, let me -- before we get into that. Let me have Mr. Curtin respond. I mean I have no problem with that in the abstract. My -- my two -- particularly with a bench trial, obviously, we have lots of flexibility here. My -- my two concerns immediately come to mind are, number one, the possibility of redundancy, for example, if a witness is being cross-examined, and an attack is made on his credibility, if that witness testifies twice three weeks apart, I don't think counsel would be able to resist the temptations to go over some of the same ground, and obviously there's some impact on the -- I was about to say theatricality of it, but that denigrates it in a way that's not fair. The impact on the Court of how this testimony proceeds, that's concern number one.

Concern number two is the convenience of the witnesses, third parties, you know, if we have someone who's in

Los Angeles or London, I'm reluctant to drag that person here twice, and I would be very protective of the witnesses in that circumstance, but let me hear Mr. Curtin's at least initial response to this idea.

MR. CURTIN: Your Honor, I'm completely against it. I think it's an elaborate procedure that is wholly unnecessary, and it is driven, as I hear it, and this is the first I've heard it, it is driven by a need that the government sees not to confuse the expert witnesses that the government is going to call and the fact witnesses. I'm sorry.

THE COURT: What Mr. Donohue has said, being polite, because he kept talking about how the Court would be easily confused, and he's exercising some more respect, I think, but I think that's really the driver here is the person he's worried about being confused is not the professor of finance, but it's me --

MR. CURTIN: If that's his --

THE COURT: -- and in fairness --

MR. CURTIN: If that's his concern then I think it's ill-founded. This is -- I stood before this Court when we first started and said, you know, it's really a case about one person. It's a case of ones in many ways. The story is a very straightforward simple story that will be told by the experts only after the fact witnesses come on. The fact witnesses are not confused by the story, because it's a story of the Egan

family. It's the story that has to be told of both transactions. It's just the natural flow of the facts. I do not understand why we would take -- and we're the ones with the fact witnesses. I don't think the government has that many fact witnesses that are going to show up live. So, if the government is trying to save the plaintiff's fact witnesses from confusion, I -- I will say we are not concerned about that.

I am concerned about the wear and tear on witnesses having to appear twice in the same trial, because the government feels that there is a strategic advantage to now bifurcate these consolidated cases into at least two different cases. I have no fear of this Court's ability to understand what happened. Complex, yes, but this is not a case that is going to require this kind of elaborate, and I might add, extremely expensive and time-consuming approach.

I think what we have here is a -- a story about investments. They really are investments in options. They involve many of the same people. The differences will be explained; and so, this notion or worry and hand wrangling about record confusion escapes me. It is not a true problem in this case. I think if -- if we were to go the route Mr. Donohue is suggesting, my 20 days does not work. The witnesses will be exhausted. My client will have invested possibly two times the amount of money needed to try this case, which is

really a case about one story.

We all live in this system where a witness gets on the witness stand, gives his or her testimony, and then that's it. Lawyers cannot throw them back on the stand. This case has had a long life of discovery where many of the witnesses have been deposed, not just once, in some instances, not just twice. It is my hope that the Court will let this one story be told, try this case in a straight up, normal fashion, rather than an elaborate fashion, and I think as the plaintiff in the case we should -- we should try the case the way we want to. Certainly, the Court will control that, but here the defendant is attempting to tell us how to put on our case and what witnesses can testify about what aspects of the transaction. Only key witnesses will be asked to testify twice; other witnesses, not. So, I see it as an unnecessary and elaborate and expensive approach to a case that is really a straightforward case about investments.

It hasn't changed at all. I will comment here the government's attempt in this case is -- has been to add other taxpayers, to put in testimony about the McNeills and others, and now their claim is, well, this is so complex, we better bifurcate. I think that is not fair. I don't think it's appropriate, and I don't think it is in the interest of judicial economy.

I will mention that we use -- you heard from Mr.

Donohue about the tutorial; and before we close today, if you would listen and allow Mr. Buch to speak to the tutorial, you asked us to come back with some thoughts as to when we could do that.

THE COURT: All right. I'm going to take Mr. Donohue's suggestion under advisement. I do think it's -- this matter is something more than a simple straightforward case, but I'll take it under advisement, and I'll -- no later than the end of the month, I'll decide how we're going to proceed.

Mr. Donohue, let me hear you on other matters.

MR. DONOHUE: Your Honor, I started to say with respect to actually all other matters dealing with the trial, from our perspective, it depends on how the case is going to be tried. So, for example, assuming the Court agrees with our recommendation, what we would see, for example, would be in the neighborhood of in terms of fact witnesses, anywhere from five to six, which would be separate for each mini trial. The experts, for the most part, would be each separate sets -- I mean witnesses. All the remaining fact witnesses we can see can be presented in the initial trial, which we, if the Court does agree with this recommendation, will be the Fidelity International trial, because from our point of view, it involves far more evidence, and it's really essentially started and remains the lead transaction.

Your Honor, in terms of then the remaining fact

witnesses, Mr. Curtain indicated that he's assuming in his 20-day estimate that none of -- except in rare instances, none of this other testimony is, in fact, going to be heard by the Court in open court, and we have discussed this in the past; and from our perspective, this -- a lot of this evidence is essentially very critical to the government's case; and thus, we are going to make pains to go through all the deposition testimony, and, in fact, only carve out and designate those portions that we think are relevant to the issues, and that will pare it down considerably these depositions. But as it stands, your Honor, there are roughly 45 witnesses, fact witnesses, that have been -- per each set of cases have been deposed. And as I said, we're assuming that if the Court agrees with our suggestion, only about five or six fact witnesses would testify separately. We cannot, your Honor, from that perspective, we cannot see the -- the basis for a 20 day, certainly not based on a 9:00 to 1:00 trial day trial. We don't want to actually state what we think would be the amount of time until we have a better idea, number one, as to what portions of the deposition testimony we think we should be presenting; and number two, your Honor, the Court indicates as to whether or not it's going to actually hear deposition testimony in open court or not. Once we know that, we'll have a better idea as to what are our recommendations are in terms of ultimate times.

THE COURT: And this includes both transcripts and video? Right, yeah, both.

MR. DONOHUE: That is correct. Virtually all the depositions, with the exception, I might add, of the Irish witnesses, virtually all of them have been video depositions.

THE COURT: All right.

MR. DONOHUE: So, the Court, essentially will be hearing and seeing the video, but of course, just the designated portions by the parties.

THE COURT: All right.

MR. DONOHUE: So, your Honor, from our perspective, further discussions on the length of the trial, I think, will depend on the how the Court ultimately resolves the issue of how the case will be tried. And just one other thought on this matter is until roughly a number of months ago, we were proceeding down a path in trying both of these cases at separate times; and from our perspective, we saw and agreed to certain economies. We could see them in presenting these cases together, but again, I come back to it's not, your Honor, really the focus on the Court is -- is the focus on the witnesses, and if the plaintiff feels that its witnesses can keep the record straight we have been informed -- excuse me, your Honor -- informed by our experts that they find it extremely difficult and to keep these transactions straight. So, it would be a major hurdle for them to overcome to be able

to present their testimony as to both transactions in one sitting; and in terms of ensuring that there is not a duplication, your Honor, I think matters in terms of their -- both the counsel being warned that they may not, for example, cross-examine on the same subject matter twice is a simple way to avoid any duplication in terms of -- of concern actually.

THE COURT: That always sounds so easy, all the judge has to do is tell the lawyers not to do it, and then it stops, right?

MR. DONOHUE: Your Honor, that has been my experience. But, your Honor, if we don't stop, we would be doing so at our peril; and obviously we would, I think, have to take that into account in terms of any adverse consequences that the Court may decide, quote/unquote, to dish out. I don't think either of us is willing to be in that type of position.

So, your Honor, in terms of the -- the last final matter is counsel gave his suggested dates for the presentation of, for example, the pretrial. The various pretrial matters is the trial briefs, the pretrial conference, the joint pretrial memo, counterdesignations, exchange of exhibits and designation; and your Honor, while we haven't thought specifically about those dates, just hearing them for the first time, they don't seem unreasonable to us, so -- but it's something, I think, that we would like to give further thought

to once the Court rules on how the -- how the case is going to be initially tried.

THE COURT: All right. Let me do this. What I'm going to do is I'm going to set a tentative schedule for these events so that it's in the calendar, and it's going to be the default, unless we tweak it, but just so you can plan accordingly, and I -- I don't see any reason at this point not to adopt Mr. Curtin's proposed timetable. I'm a little nervous about the suggestion that dispositive motions should be filed on August 1st.

Tell me, Mr. Donohue, tell me you're not filing a dispositive motion. Are you?

MR. DONOHUE: No, your Honor.

THE COURT: All right. Then what I'll do is I'll order that on August 15th, the parties provide deposition designations and exchange -- exchange exhibit lists; that counterdesignations of depositions shall be made by August 29; that by September 4th, the parties provide objections to designations, witness lists, and prepare any evidentiary stipulations.

Marty, does September 9th work for a pretrial conference?

THE CLERK: I don't know --

(Mr. Castles conferred with Court.)

THE COURT: All right. The pretrial conference will

be on September the 9th at three o'clock, and I think we need to be prepared to go late. I've got a trial in the morning and a sentencing, and trial briefs will be due on September the 17th.

Some other comments more or less at random. For what it's worth, I'm going to distribute my standing or my standard, rather, instructions to counsel concerning trial procedures. These are obviously designed for jury trials and for matters of considerably less complexity, but just so that you have it, and you know at least that's my starting point.

MR. CURTIN: I think we have them, your Honor.

THE COURT: Okay. It gets revised from time to time. But in terms of stipulations, I do expect the parties again to exercise common sense. I will be extraordinarily unhappy if we have to have a parade of witnesses to authenticate documents, to qualify things as business records and so on. Obviously, you don't have to agree, but I do expect that you'll fight only that that's worth fighting about.

In terms of motions in limine, obviously, they have less significance given that it's not a jury trial, but I would like some general heads up. We do have at least one substantial motion, I think, and that's this pattern evidence issue; and, in fact, let me ask you, should that be keyed up on a different timetable, because it's little more substantive?

Should we -- Mr. Curtin.

MR. CURTIN: Your Honor, I -- may I give that some thought. I -- I think that we are going to be deposing yet another expert, Mr. DeRosa. We're not sure right now how that would go in terms of his use of pattern evidence. Right now, I think if we include that in the in limine group that we are prepared to discuss and outline for the Court at the pretrial, I think that will work. We may ask you before we get there to give it a particular treatment. But right now, I think we -- we leave it with the others.

THE COURT: All right. Exhibit lists and witness list. There's a tendency, of course, in order to protect yourselves to list everything. And so these things often are quite cumbersome. What I would expect from both of you is a -- a two part witness list and a two part exhibit list, that is, this is what you expect the exhibits to be, and what you expect the witnesses to be; and to avoid unfair surprise, you can have this as an addendum, or something, all the other possible exhibits that you may use.

But I -- I do expect you to focus on what really needs to be done to try the case, what witnesses you really need, what documents you really need. You know, I teach trial advocacy, and one of the things I tell my students is every word you utter detracts from the impact of every other word you utter. Every document you introduce detracts from every other document you introduce. Don't drown your important points in a

sea of trivial ones. I'm going to let you try your case again, within reasonable limits, but pick your spots and focus on what you think is important.

I have issued a standing order, as you may know, strongly encouraging the use of less experienced counsel. If any witness counsel wants to turn over the reigns for any witness to a junior person, I will welcome that. It's up to you. I will be forgiving, so to speak, of minor fumblings, although obviously counsel, any counsel, that appears in court will need to be appropriately prepared.

I will consider, as I indicated, how we're going to try this case. One possibility that occurs to me is a middle ground in which we hear of the fact witnesses all together, and then we separate the experts, but I'm going to turn this over in my mind and think about it, and we can talk about that further within the next few weeks.

I do expect that the case will be tried in large part in this courtroom, which is electronic. I have no objection to doing parts of it in Boston, except I will have other work to do that needs to be done in Worcester, and we can talk about whether some of this can be done elsewhere. It may or may not convenience you or inconvenience you to move it. We can talk about that, but I won't be close-minded about it. And it may be that it suits my convenience, and I will give you notice to do it in one city or the other, but for the most part, it will

be done here.

And as I indicated, I do expect counsel to be prompt. I do want to try this case 9:00 to 1:00. It may make sense to squeeze in occasional time here and there depending on how we're doing, what I think my attentiveness level will be, and so forth.

I do like three-ring notebooks with exhibits. I suspect I'm going to have quite a vast mountain of them if we do that, but consider how you think that evidence will best be handled by me. We could have key document exhibit notebooks and then other in more general notebooks. There's lots of different ways we can handle this. I'll leave it up to you.

All right. Those are my general thoughts. I suspect we're going to be somewhere north of 20 days when it's all said and done, but I do have other work to do, and I have to get this case over, even if it is four cases tried at once involving what at least appears to my simple mind as an incredibly complex series of transactions that is going to take some time for me to get my arms around.

All right. Why don't we schedule a further conference at the end of July at which point we will finalize what the trial is going to look like and hopefully wrap up whatever dangling discovery issues there are.

All right. I have a trial presently scheduled for the week of July 28th. There's an assented to motion to continue

it, which I haven't ruled on yet, but what I'm going to do is I'm going to set this conference on the assumption that I am going to continue that trial; and then if I don't for some reason, we'll backfill and figure it out. I'm seeing the lawyers within the next day or two, I think. Monday.

So why don't we -- what about Tuesday morning, the 29th, will that work?

MR. CURTIN: Your Honor, there is one problem there. The government counsel's expert witness, Mr. DeRosa.

THE COURT: Yes.

MR. CURTIN: Professor DeRosa is being deposed that day. So, that's not a good day.

THE COURT: Okay.

MR. CURTIN: We also have a deposition, I think, on the 31st of Mr. Buesinger. You have heard his name before from Alpha. So two days there are depositions.

THE COURT: What about --

MR. CURTIN: Now, all lawyers are indispensable, I know that, but DeRosa is particularly important; and Mr. Buesinger's important, too, but I would like to be at this next conference.

THE COURT: All right. How about Monday morning, the 28th?

MR. CURTIN: That's good.

THE COURT: Mr. Donohue.

MR. DONOHUE: Your Honor, that's fine.

THE COURT: All right. Monday morning the 28th at ten o'clock.

I don't think I quite said that all lawyers were indispensable.

MR. CURTIN: No, just me.

THE COURT: Well, I -- I was perhaps attempting to suggest that Mr. Buch and others might handle some things in your absence.

All right. Mr. Buch apparently wants to be heard. Is there something else on the trial that we ought to talk about between now and then? Again, I'm going to let this percolate a little bit, and then I will make our final decision at that point.

MR. CURTIN: I have nothing else, your Honor.

THE COURT: Mr. Donohue.

MR. DONOHUE: No, your Honor.

THE COURT: All right. Mr. Buch, do you wish to be heard?

MR. BUCH: When we last met, your Honor, you indicated that we would have an opportunity to present a responding tutorial and offered the weeks of July 28th, or in the alternative, the week of August 25th; and we have taken a hard look at that, and given the schedule of the things to be completed between now and the end of July, including now I

believe five more depositions in that time frame, I don't know that we're going to be able to have something prepared for the Court by the week of July 28th.

THE COURT: Okay.

MR. BUCH: So our preference would be to try to schedule it for the week of August 25th.

THE COURT: Okay. All right. How much time do you think you need, an hour and a half or so? Is that --

MR. BUCH: I think at the outside, your Honor.

THE COURT: All right. Let's schedule it then.

All right. I'm going to be in Australia, and perhaps this isn't the perfect thing to have the day I come back when I may be a little jet lagged.

What about the 26th, 10:30. Does that work, Tuesday, the 26th?

MR. BUCH: That works for us, your Honor.

THE COURT: Mr. Donohue.

MR. DONOHUE: Your Honor, that's fine.

THE COURT: Okay.

MR. DONOHUE: Your Honor, if you recall, you ordered us to provide a copy of our tutorials, I believe, the day before.

THE COURT: Yes.

MR. DONOHUE: I'm wondering if reciprocity could be --

THE COURT: Yes.

MR. BUCH: I would be happy to do so, your Honor.

THE COURT: All right. And it's subject to my earlier order as well, that is the order I issued in 2006, concerning these two tutorials.

MR. BUCH: Thank you, your Honor.

THE COURT: All right. Anything further?

MR. CURTIN: Thank you, your Honor, no.

MR. DONOHUE: No, your Honor.

THE COURT: All right. We'll take a short recess, and then I'll take up the grand jury.

(At 12:08 p.m., Court was adjourned.)

C E R T I F I C A T E

I, Marianne Kusa-Ryll, RDR, CRR, do hereby certify that the foregoing excerpt of the transcript, consisting of 72 pages, is a true and accurate transcription of my stenographic notes in Case No. 05-40151 Fidelity International Currency Advisor A Fund, L.L.C., versus United States of America, before F. Dennis Saylor, IV, on July 8, 2008, to the best of my skill, knowledge, and ability.

/s/ Marianne Kusa-Ryll

Marianne Kusa-Ryll, RDR, CRR

Official Court Reporter